Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT
SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS
RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND
(D)  CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION
INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and

"Final Order"):  (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Management System (as defined below); (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms (as defined below) in the ordinary course of business; (iv) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees (as defined below); and (v) continue to perform Intercompany Transactions (as defined below) consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; (c) authorizing the Debtors to freeze withdrawal requests from the MC FBO Account (as defined below) for a period of sixty (60) days after the Freeze Date (as defined below); and (d) granting related relief. In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105, 345, 363, 364, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

5.     On July 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.[2]

6.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## The Cash Management System

### I.     Overview.

7.     The Debtors are a leading cryptocurrency agency broker.  In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system (the "Cash Management System") comparable to the systems used by similarly situated companies to manage the cash and digital assets on their platform in a cost-effective and efficient manner. The Debtors' Cash Management System is critical to the Debtors' business, as it streamlines the Debtors' ability to collect, transfer, and disburse cash and cryptocurrency generated from their operations and to facilitate cash and digital asset monitoring, forecasting, and reporting.

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

8.    As of the Petition Date, the Cash Management System is comprised of fourteen active bank accounts (collectively, the "Bank Accounts").  As illustrated on the Cash Management System diagram attached as **Exhibit 1** to both **Exhibit A** and **Exhibit B** hereto, the Debtors maintain eight bank accounts at Metropolitan Commercial Bank ("MC Bank"), two accounts at Silvergate Bank ("Silvergate"), two accounts at BMO Harris Bank ("BMO Harris"), and two accounts at Signature Bank (together, the "Cash Management Banks"). The Bank Accounts are identified on **Exhibit 2** annexed to both **Exhibit A** and **Exhibit B** hereto. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

9.    As part of the Debtors' Cash Management System, the Debtors maintain a cryptocurrency management system that allows the Debtors to facilitate the trading of various cryptocurrency and to store digital currencies on the Debtors' platform.

10.    As described more fully herein, the Cash Management System is an essential component of the Debtors' businesses. Any interruption of the Cash Management System would severely disrupt the Debtors' operations and result in harm to the Debtors' estates and their stakeholders. Accordingly, the Debtors seek authority to continue using their Cash Management System in the ordinary course of business on a postpetition basis in a manner consistent with past practice, and to pay any prepetition fees related to the Cash Management System.

**II.    The Bank Accounts and Flow of Funds.**

11.    The Cash Management System consists of two separate systems that interact regularly in the ordinary course of business. The first system consists of the accounts held at MC Bank, Silvergate and Signature Bank, which facilitate the Debtors' cryptocurrency transactions.

The second system consists of the accounts held at MC Bank and BMO Harris, which the Debtors use for, among other things, payment of administrative costs and day-to-day operations.

### A.    Master Operating Accounts.

12.    The Debtors maintain two master operating accounts (the "Master Operating Accounts").  Debtor Voyager Digital Holdings, Inc. maintains a centralized master operating account at MC Bank (the "MC Bank Master Operating Account") that directly or indirectly wires or transfers substantially all of the Debtors' cash to all other Debtor Bank Accounts.  Specifically, the MC Bank Master Operating Account funds the Debtors' disbursements, automated-clearing-house ("ACH") transfers, and wires for the Debtors' operating, capital, and general administrative expenses, and other cryptocurrency exchange related operating, capital, and general administrative expenses.

13.    Debtor Voyager Digital, LLC maintains a Master Operating Account at Silvergate Bank (the "Silvergate Master Operating Account") that is used to facilitate a customer's purchase and sale of crypto through the Debtors' mobile application (the "Voyager App").  When a customer purchases crypto, money is transferred from the applicable MC FBO Account for wires or for ACH transfers (as described below) to the Silvergate Master Operating Account. The Silvergate Master Operating Account then transfers the cash to Silvergate's Exchange Network ("SEN") account (the "SEN Account").  The SEN Account is used to settle the purchase and sale of cryptocurrency assets with market-makers related to the execution of a customer's order.  Conversely, when a customer sells crypto, the Silvergate Master Operating Account then hosts the transfer of funds and sweeps it into the applicable MC FBO Account.



14.    When customers buy, sell, or trade cryptocurrency on the Voyager App, the Debtors earn a profit from the "spread," or the difference between the bid and the ask on each trade. The Debtors earn the "spread" in crypto and then commingle such crypto with other crypto positions that the Debtors hold.  However, from time-to-time the "spread" revenue is converted to cash and swept into the Silvergate Master Operating Account.

**B.    Other Accounts**

15.    Debtor Voyager Digital Holdings, Inc. maintains an operating account at MC Bank which funds the Debtors' payroll and all other employee compensation and benefits as well as rent for the Debtors' offices spaces (the "<u>MC Bank Administrative Operating Account</u>"). The MC Bank Administrative Operating Account is funded by the MC Bank Master Operating Account.  The Debtors' treasury team maintains a target balance in excess of $2 million in the MC Bank Administrative Operating Account and cash is swept from the MC Bank Master Operating Account into the MC Bank Administrative Operating Account in advance of biweekly payroll to top-up the target balance.

16.     Debtor Voyager Digital, LLC maintains an operating account at MC Bank to fund the Debtors' ordinary course of business dealings, which includes, without limitation, payments related to the Debtors' vendors, obligations under its marketing contracts, and other accounts payable (the "MC Bank A/P Operating Account").  The MC Bank A/P Operating Account is funded by the MC Bank Master Operating Account.  Cash is swept from the MC Bank Master Operating Account into the MC Bank A/P Operating Account when the Debtors' accounts payable team informs the Debtors' treasury team of upcoming ACH payments to vendors and other upcoming accounts payable.

17.     Debtor Voyager Digital, LLC also maintains two accounts at Signature Bank (the "Signature Bank Accounts").  The Signature Bank Accounts are infrequently used and currently hold a zero balance.

18.     Debtor Voyager Digital, Ltd maintains two accounts at BMO Harris Bank to fund compensation for the board of directors and proceeds from new capital raises (the "BMO Bank Accounts").  The BMO Bank Accounts are funded by paid-in capital and are infrequently used.

19.     Debtor Voyage Digital, LLC maintains a dormant account at MC Bank that was previously opened for a stand-by letter of credit (the "SBLC Bank Account"). The SBLC Bank Account is in the process of being closed.

20.     ***Voyager Debit Card.*** As described in further detail in the Customer Programs Motion,[3] the Debtors have historically maintained a branded USD Coin-backed prepaid MasterCard debit card (the "Voyager Debit Card") that allows customers with USDC (a stablecoin pegged to the value of the United States dollar) to directly spend cryptocurrency loaded or

---

[3]     *See Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor Certain Debits under the Voyager Debit Card to Customers in the Debtors' Sole Discretion and (II) Granting Related Relief* (the "Customer Programs Motion") filed contemporaneously herewith.

deposited onto the Voyager Debit Card, without paying any conversion fees typically associated with cryptocurrency trade.  The Voyager Debit Card is backed by MC Bank, which is FDIC-insured.  In connection with the Voyager Debit Card, the Debtors maintain a settlement account (the "Voyager Debit Card Account") whereby customer debit purchases are settled through the account. The Voyager Debit Card Account is funded through either the MC Bank Master Operating Account or the MC FBO Account (ACH) (as described below), depending on debit card activity.  MC Bank also requires the Debtors to maintain a reserve account (the "Voyager Debit Card Reserve Account") with a $500,000 balance.[4]

21.    As of the Petition Date, the Debtors have approximately $104 million of cash on hand.  The Bank Accounts and Cash Management System are described further in the following table:

| Bank Accounts | Account Description |
| --- | --- |
| **MC FBO Accounts**<br><br>Voyager Digital Holdings, Inc.<br>(-3997)<br>(-0254) | The MC FBO Bank Account pools customer cash for the benefit of each customer to fund customer's accounts in order to buy and sell cryptocurrency through the Voyager App. |
| **MC Bank Master Operating Account**<br><br>Voyager Digital, LLC<br>(-3989) | The MC Bank Master Operating Account is the Debtors' primary operating account, into which substantially all of the Debtors' cash is directly or indirectly wired or transferred.  The MC Bank Master Operating Account funds the Debtors' operating, capital, and general administrative expenses, and other Bank Accounts to satisfy disbursement obligations. |
| **Silvergate Master Operating Account**<br><br>Voyager Digital, LLC<br>(-0017) | The Silvergate Master Operating Account is used to facilitate a customer's purchase and sale of crypto through the Voyager App and hosts the transfer of funds to and from the MC FBO Accounts whereby customer trades are settled with market-makers through the SEN Account, with cash then swept into the Silvergate Master Operating Account for transfer to the applicable MC FBO Account. |

---

[4]    For the avoidance of doubt, the Debtors do not expect to maintain the Voyager Debit Card except on a case-by-case basis where certain circumstances unique to customers warrant the relief, such as where a customer's montage is paid out of, or paychecks are deposited into, their Voyager Debit Card account.

| Bank Accounts | Account Description |
|---|---|
| **SEN Account**<br><br>Voyager Digital, LLC<br>(-2484) | The SEN Account is used to settle the purchase and sale of cryptocurrency assets with market-makers. The SEN Account then transfers cash made from customer trades into the Silvergate Master Operating Account. |
| **MC Bank Administrative Operating Account**<br><br>Voyager Digital Holdings, Inc.<br>(-0238) | The MC Bank Administrative Operating Account is funded by the MC Bank Master Operating Account. The MC Bank Administrative Operating Account is maintained at MC Bank and funds payroll-related disbursements all other employee compensation and benefits costs and expenses, as well rent for the Debtors' office spaces. |
| **MC Bank A/P Operating Account**<br><br>Voyager Digital, LLC<br>(-0246) | The MC Bank A/P Operating account is funded by the MC Bank Master Operating Account and is used to remit payments to vendors, obligations on the Debtors' marketing contracts, and other accounts payable. |
| **Signature Bank Accounts**<br><br>Voyager Digital, LLC<br>(-5047)<br>(-1609) | The Signature Bank Accounts are infrequently used Bank Accounts that were opened to provide a source of alternate fiat payment, as needed as part of the Debtors' cryptocurrency management. |
| **BMO Bank Accounts**<br><br>Voyager Digital, LTD<br>(-2028)<br>(-2296) | The BMO Bank Accounts are funded by the value of equity sold above par value (paid-in capital) and are infrequently used. Such accounts are primarily used to pay director compensation and hold proceeds from new capital raises. |
| **SBLC Bank Account**<br><br>Voyager Digital, LLC<br>(-0688) | The SBLC Bank Account is held at MC Bank and currently holds a zero balance. Such account is in the process of being closed. |
| **Voyager Debit Card Account**<br><br>Voyager Digital, LLC<br>(-8835) | The Debtors maintain a Voyager Debit Card for interested customers, which are prefunded and facilitate customers' ability to engage in cryptocurrency trading services through the Voyager platform. The Voyager Debit Card Account is funded by either the MC Bank Master Operating Account or the MC FBO Account (ACH) and is used to settle customer debit card purchases on the Voyager Debit Card. |
| **Voyager Debit Card Reserve Account**<br><br>Voyager Digital, LLC<br>(-8762) | In connection with the Debtors' prepaid Voyager Debit Card, the Debtors maintain a $500,000 reserve account held at MC Bank. |

## C.    The Voyager App and the MC FBO Bank Accounts.

22.    As set forth in the First Day Declaration, the Debtors operate as a cryptocurrency "agency broker," matching its customers with counterparties who facilitate the customer's desired trade. Through the Debtors' platform, customers are able to trade various cryptocurrency and store digital currencies on the Debtors' platform through one of the Debtors' third-party crypto

custodians, such as Coinbase Trust Company, LLC, Copper.co, and Anchorage Digital, or a self-custody custodian, such as Fireblocks, Inc.

23.    ***Cash Deposits.*** The Debtors maintain a unique platform whereby customers can fund their account on the Voyager App using either cash or cryptocurrency assets. To fund a Voyager App account with cash, a customer must link their personal bank account to the Voyager App, which is verified through a third-party platform to ensure the customer's personal bank account holds sufficient cash. Once the customer's personal bank account is verified, a customer may transfer funds from their Voyager App account via ACH to a "for the benefit of" account[5] held at, and maintained by, MC Bank (the "<u>MC FBO Account (ACH)</u>"). The MC FBO Account (ACH) holds the majority of cash transferred by the Debtors' customers. Each customer holds FDIC insurance on cash deposits in the MC FBO Account (ACH), up to a maximum of $250,000 per customer and provided by MC Bank. The Debtors also maintain a second smaller "for the benefit of" account at MC Bank to allow customers to transfer funds from their Voyager App account via wire transfer rather than ACH (the "<u>MC FBO Account (Wire)</u>" and, together with the MC FBO Account (ACH), the "<u>MC FBO Accounts</u>"). The Debtors also process wire transfers to their customers from the MC FBO Account (Wire). MC Bank provides cash management and payment concentration services through such custodial "for the benefit of" accounts whereby the movement of a customer's cash into the MC FBO Accounts are in such customer's name and payments through the MC FBO Accounts are charged against the bank accounts of the Debtors' customers via ACH or wire transfer. Cash from the MC FBO Accounts is then swept into the Master Operating Accounts or the Payment Data System Account (as defined below) when customers execute trades on the Voyager App.

---

[5]    The Debtors use the "for the benefit of" account to manage funds on behalf of their customers.

24.     ***Buying Crypto.*** The MC FBO Accounts are the bedrock of the Debtors' platform as they host important functions for the funding of customer accounts on the Voyager App, as well as for the buying and selling of cryptocurrency from customer's accounts on the Voyager App. When a customer executes an order to buy cryptocurrency assets on the Voyager App, the Debtors' order management system ("OMS") instructs the applicable MC FBO Account to move cash from the account to a third-party exchange or market-maker[6] and deliver the cryptocurrency through the Voyager App.  Voyager holds the cryptocurrency through one of its approved crypto custodians. Voyager utilizes third-party custodians such as Coinbase Trust Company, LLC, Copper.co, and Anchorage Digital, or self-custody solutions such as Fireblocks, among others.

25.     ***Selling Crypto.*** Conversely, when a customer executes an order to sell cryptocurrency on the Voyager App, the Debtors' OMS instructs the Debtors' treasury management system to transfer the cryptocurrency held with the Debtors' third-party custodian or self-custody solution to the third-party exchange or market-maker. The third-party exchange or market-maker then receives and deposits cash in the applicable MC FBO Account via the Silvergate Master Operating Account, which is then transferred to the customer's personal bank account via ACH or wire transfer, as applicable.

26.     ***Withdrawals.*** Customers may also request to withdraw the cash attributable to their cryptocurrency trades from the Voyager App.  The customer's transfer request is conveyed through the Voyager App to the OMS, which in turn instructs the requested amount of cash to be withdrawn from the applicable MC FBO Account and subsequently transferred through third-party payment

---

[6]    To seek the best possible price, Voyager's platform connects the user to multiple exchanges and liquidity providers, aggregating prices across market with the ability to execute order flow in seconds.

processor Usio, Inc. ("Usio") via ACH or wire transfer to the customer's personal bank account.[7] Such transfer typically takes approximately 24 hours from the time the withdrawal is initiated. For this reason, the Debtors prefund the withdrawal from their MC Bank Master Operating Account into an account held by Usio (the "Payment Data System Account") to ensure proper funds are available for the customer's withdrawal request at any given time.[8] The Debtors do not prefund withdrawals on a one-to-one basis, instead they prefund a targeted amount and replenish the prefunded amount as needed. When the money is deposited into a customer's personal bank account from the applicable MC FBO Account, MC Bank then reconciles the amount that the Debtors prefunded and remits such amount back to the MC Bank Master Operating Account. Such remittances may take up to 24 hours before the Debtors receive such amounts.



---

[7]    For the avoidance of doubt, the Debtors maintain default limits on withdrawals and deposits.

[8]    From time to time, the MC FBO Accounts will be overfunded. In those instances, the Debtors will move the excess funds back to the MC Bank Master Operating Account or the Silvergate Master Operating Account.

27.     *Reconciliation.* On average, approximately $100 to $200 million is held in the MC FBO Accounts for the benefit of customers, which may fluctuate outside of such range depending on the amount of fiat funds that customers seek to transfer into the MC FBO Accounts to purchase cryptocurrency.   As of July 1, 2022, the MC FBO Accounts held approximately $355 million. At approximately 8 p.m. Eastern Standard Time each day, the Debtors generate a report that provides a "snapshot" of the customer balances in each MC FBO Account (including the ACH and wire transfer activity from the day) and the balances owed to each customer based on their respective trades that day.  The Debtors send the report to MC Bank each day.  To ensure the MC FBO Accounts align with the balances from the customers' daily activity, the Debtors reconcile, or true up, the MC FBO Accounts each morning by depositing or removing funds from the MC Bank Master Operating Account.

**D.     Cryptocurrency Transactions.**

28.     Through the Voyager App, a customer may also fund their Voyager account by initiating a transfer of cryptocurrency assets from a customer's external wallet to their Voyager account.  When a customer makes a crypto deposit, it first enters Voyager's self-custody wallet system called Bedrock ("Bedrock").[9]  The Debtors contract with ChainAnalysis, a third-party vendor that conducts blockchain review of cryptocurrency assets held within the Voyager platform, to verify each customer's external cryptocurrency wallet.  If a customer's deposit of cryptocurrency assets passes ChainAnalysis verification, then such digital assets are automatically swept from Bedrock for transfer to the applicable third-party custodian or self-custody solution, which the Debtors control.  As soon as the cryptocurrency hits Bedrock, the customer no longer has control over the cryptocurrency.

---

[9]     All cryptocurrency traded via the Voyager App is held at Debtor Voyager Digital, LLC.

29.     The Debtors do not maintain individual cryptocurrency wallets for each customer. Instead, cryptocurrency assets are commingled on an asset-by-asset basis when swept from Bedrock to the applicable third-party custodian. The Debtors utilize several custodial accounts depending on the specific type of cryptocurrency asset (*e.g.*, bitcoin, ethereum).  To ensure a customer is credited for the proper amount of cryptocurrency they transferred into Bedrock, Bedrock attributes a unique wallet address for such cryptocurrency prior to it being swept and aggregated into one of the Debtors' custodial accounts.

30.     The Debtors maintain separate cryptocurrency Bedrock wallets (the "Hot Wallets") for outbound transactions when a customer wishes to withdraw cryptocurrency from the Voyager App.  Consistent with when a customer withdraws cash from the Voyager App, the Debtors prefund each outbound Hot Wallet to ensure that there are enough digital assets to process withdrawals of cryptocurrency as they are requested.  The cryptocurrency is then transferred from the Hot Wallets to the customer's individual wallet.



E.     **ACH Chargebacks.**

31.     ACH transactions, while critical to the Debtors' flow of funds, also leave the Debtors susceptible to fraudulent chargebacks by customers of the MC FBO Account (the "ACH Chargeback").   This occurs when customers utilize the Voyager platform to purchase

cryptocurrency with payment for such cryptocurrency held by the MC FBO Account via ACH transfer; yet once the Debtors purchase the cryptocurrency, the customer asserts that such purchase was unauthorized and demands that MC Bank unilaterally reverse the ACH transfer.  This practice is fraud, and harms the Debtors and their legitimate customers.  The Debtors are in the process of assessing how many illegitimate transactions account holders have engaged in, particularly given the volatility of the cryptocurrency business in recent months.

32.    On July 1, 2022 (the "Freeze Date"), the Debtors halted their trading services and froze all withdrawals from the Voyager platform.  If MC Bank were to continue honoring ACH Chargeback requests following the Freeze Date, the stability of the Debtors' platform could be compromised as customers may fraudulently claim that valid ACH transfers were unauthorized and seek to withdraw such amounts from the MC FBO Account. Therefore, to protect against fraudulent reversals and ensure the stability of the platform during these chapter 11 cases, the Debtors request authority to prohibit MC Bank from honoring any withdrawals or ACH Chargeback requests from the MC FBO Account for a period of sixty (60) days after the Freeze Date while the Debtors work with MC Bank to confirm whether such requests are legitimate or fraudulent, and honor such legitimate requests accordingly.

### III.    Bank Fees.

33.    In the ordinary course, the Debtors incur periodic service charges, payment processing fees, and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur approximately $4,000 in Bank Fees each month under the Cash Management System in the aggregate.  The Debtors estimate that approximately $2,000 in prepetition Bank Fees remain outstanding as of the Petition Date.  To ensure continued access to their Bank Accounts without disruption, the Debtors' seek authority to

pay any such due and owing Bank Fees, including prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historic practice.

### IV.    Compliance with U.S. Trustee Guidelines and the Bankruptcy Code.

34.    MC Bank and Signature Bank are designated as authorized depositories in the Southern District of New York by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").  MC Bank and Signature Bank are each party to a uniform depository agreement with the U.S. Trustee, and therefore, the Debtors believe that the Bank Accounts at these institutions will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.  To the extent that the other Cash Management Banks are not authorized depositories, the Debtors maintain that they are well capitalized and financially stable financial institutions that are insured by the Federal Deposit Insurance Corporation (the "FDIC"), and therefore maintenance of the Bank Accounts will not jeopardize any party in interest. Moreover, the amounts held with BMO Harris are approximately $2.4 million in the aggregate and are fully insured up to the FDIC limit. Additionally, amounts held in Silvergate Bank are approximately $2.8 million in the aggregate and are fully insured up to the FDIC limit.

35.    In addition, the Debtors hold cryptocurrency assets through third party custodians including Coinbase Trust Company, LLC in the ordinary course of business.  Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all).  Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized depository would be value destructive to the debtors and their stakeholders.

36.     Requiring the Debtors to transfer the cash funds held in non-authorized depositories to authorized depositories or for the Debtors to post a bond for their third-party crypto custodial accounts would similarly place a needless administrative and financial burden on the Debtors, imposing unnecessary and avoidable costs on the Debtors' estates to the detriment of their efforts to maximize value for stakeholders.  In the event that any of the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during the chapter 11 cases, the Debtors request that the Court either (a) provide the Debtors with 45 days without prejudice to seeking an additional extension from the entry of the Interim Order, to bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or (b) to seek appropriate relief from the Court.

## V.     Intercompany Transactions.

### A.     Overview.

37.     The Debtors maintain business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (the "Intercompany Balances").  In the ordinary course of business, the Debtors make Intercompany Transactions to either (a) reimburse certain Debtors or non-Debtor affiliates for various expenditures associated with their business or (b) fund certain Debtors' or non-Debtor affiliates' accounts in anticipation of such expenditures as needed.  As discussed above, the MC Bank Master Operating Account is the Debtors' primary operating account where substantially all of the Debtors' cash is directly or indirectly wired or transferred throughout the Cash Management System.

38.     In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, at any given time there may be Intercompany Balances owing by one Debtor

to another Debtor.  Certain Intercompany Balances are settled in cash while others are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

39.     The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.[10]

### B.      Importance of the Intercompany Transactions.

40.     The Debtors' ability to engage in Intercompany Transactions is essential to the smooth and uninterrupted operation of the Debtors' business.  The Intercompany Transactions are crucial for the Debtors to process payroll, pay vendors for goods and services, and to otherwise operate their business.  The Debtors would be unduly burdened both financially and logistically if they were required to halt or otherwise modify the Intercompany Transactions at this time.  As a practical matter, deconsolidation likely would require extensive renegotiation with and outreach to vendors and other third parties, most of whom are accustomed to interfacing only with the Debtors.  These third parties also are accustomed to using the existing Cash Management System, which funnels payments on account of all Debtors through the various Bank Accounts and the MC Bank Master Operating Account.  Hasty changes to this established system likely would disrupt the Debtors' ability to timely and properly process receivables and payables and allocate them to the appropriate legal entity.

---

[10]    Moreover, this Motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

41.     Moreover, the Intercompany Transactions are comparable to those of other companies with similarly complex corporate structures and operate in a fashion typical of other cryptocurrency exchange companies.  Importantly, all Intercompany Transactions can be, and will be, tracked on a postpetition basis, and fully subject to monthly reviews by the Debtors.  Any discrepancies can, and will be, addressed consistent with past practice.

## VI.     Corporate Cards.

42.     As part of the Cash Management System, the Debtors have provided approximately five employees with corporate credit cards (the "Corporate Cards") issued by Brex to cover legitimate business expenses, including certain travel expenses, incurred in the ordinary course of business in connection with their employment as well as certain vendor payments.  Historically, the Debtors accrued and paid approximately $300,000 per month on account of the Corporate Cards, which hold a $2 million aggregate credit limit.  As of the Petition Date, the Corporate Cards hold a balance of approximately $76,000.  The costs incurred through use of the Corporate Cards are billed directly to the Debtors and do not pass through the applicable employee's personal financial account.  The Corporate Card payments are paid on a monthly basis.

43.     The Corporate Cards are an integral part of the Debtors' cash management and account functions.  The ability of the Debtors to use the Corporate Cards on a go-forward basis is essential to the continued operation of the Debtors' business and the corporate administration thereof in order for the relevant employees and vendors to have assurance that they will be able to purchase certain business expenses without having to seek reimbursement from their own account or otherwise seek proper remittance.  Accordingly, the Debtors' inability to maintain the Corporate Cards would result in unnecessary hardship on the continued operation of the Debtors' business.  Out an abundance of caution, the Debtors seek authorization to continue honoring obligations in relation to the Corporate Cards on a postpetition basis in the ordinary course of business.

VII.    **Business Forms and Books and Records.**

44.    As part of their Cash Management System, the Debtors use various preprinted business forms (the "Business Forms") in the ordinary course. To minimize expenses to their estates and to avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks, invoices, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required by the U.S. Trustee Guidelines. The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

## Basis for Relief

I.    **Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates.**

45.    The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. *See* U.S. Trustee

Guidelines. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Considering, however, the complex Cash Management System that the Debtors have in place for the transfer and distribution of funds, which ties into the Debtors existing corporate accounting and cash forecasting reporting, enforcement of this provision of the U.S. Trustee Guidelines during these chapter 11 cases would disrupt the Debtors' ability to efficiently administer these chapter 11 cases.

46.     Continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing." 11 U.S.C. § 363(c)(1). *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (stating same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y. 1983), aff'd, 753 F.2d 230 (2d Cir. 1985); *see also Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

47.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). Additionally, courts have noted that an integrated cash management system "allows efficient utilization of cash resources and

recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Id.* at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

48.    Here, the Debtors respectfully request that the Court allow them to continue operating each of the Bank Accounts identified on Exhibit 2 annexed to **Exhibit A** and **Exhibit B** attached.  The Bank Accounts will be maintained in the ordinary course as they were before the Petition Date and are necessary to conduct the Debtors' routine prepetition transactions.  As noted in the cases above, maintaining the Cash Management System and Bank Accounts allows efficient utilization of the Debtors' cash resources and will enable the Debtors' businesses to continue operating.

## II.    Maintaining the Existing Cash Management System Will Not Harm Parties-in-Interest.

49.    The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  The Debtors respectfully submit that parties-in-interest will not be harmed by the Debtors' maintenance of their existing Cash Management System, including maintenance of the Bank Accounts and continuance of the Intercompany Transactions, because the Debtors have developed and implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' accounting department.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

### III.    Authorizing the Debtors to Continue Using Debit, Wire, and ACH Transfers Is Warranted.

50.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.  The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  The Debtors conduct a large number of transactions on a daily basis through ACH transfers and other similar methods. If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors' day-to-day activities may be unnecessarily disrupted, and the estates will incur additional costs.  Therefore, the Debtors submit that authorizing the continuation of using debit, wire, and ACH transfers is warranted.

### IV.    Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course is Warranted.

51.    The Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts, without interruption and in the ordinary course.  In this regard, the Debtors request that, with the exception of the item described in paragraph 52 below, the Banks be authorized to (a) receive, process, honor, and pay any and all checks, ACH transfers, and other instructions and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; (b) accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with

any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date; and (c) continue to charge the Debtors the Bank Fees and charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

52.     Notwithstanding anything to the contrary herein, including without limitation, paragraph 51, the Debtors further request that MC Bank be temporarily prohibited from honoring any withdrawals or ACH Chargeback requests from the MC FBO Account for a period of sixty (60) days after the Freeze Date so that the Debtors and MC Bank can confirm whether such request was fraudulent.  If the Debtors determine that the request was not fraudulent, MC Bank shall be authorized to permit the withdrawal.  This relief is reasonable and appropriate under the circumstances because the MC FBO Account is the heart of the Debtors' platform. Absent this relief, customers may seek to fraudulently reverse transfers after the Debtors have purchased cryptocurrency at their request, leaving the Debtors without the requisite consideration for that purchase and reducing the value of the Debtors' estates. Under these circumstances, in an effort to prevent fraud and ensure the equal treatment of similarly situated creditors, MC Bank should be temporarily prohibited from authorizing withdrawals or ACH Chargeback from the MC FBO Account until the Debtors and MC Bank are able to confirm whether such requests are valid.

53.     The Debtors also request that, except for those transactions noted in paragraph 52 above, to the extent a Bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of an innocent mistake made despite implementation of customary item handling procedures, such Bank will not be deemed to be liable to the Debtors or to the estates on account of such prepetition check or other item honored

postpetition. This is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise. The Debtors also request that the Court authorize the Debtors to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition.

54.    Courts in this district have regularly waived certain U.S. Trustee Guidelines and allowed the continued use of cash management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. *See, e.g., In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (authorizing debtors to continue to operate their cash management system on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020) (same).[11]

## V.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

55.    To avoid disruption of the Cash Management System and the incurrence of unnecessary expense, the Debtors request that they be authorized to continue to use their existing Business Forms (including, without limitation, letterhead, checks, and other Business Forms) substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. The Debtors submit that parties-in-interest will not be prejudiced if they are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date. Such parties will undoubtedly be aware of the Debtors'

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

status as debtors in possession and, thus, changing Business Forms is unnecessary and would be unduly burdensome. The Debtors further submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession." With respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

56.    In other chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label. *See, e.g., In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (authorizing use of existing business forms on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020) (same).

**VI.    The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Superpriority Administrative Expense Status to Postpetition Intercompany Balances Among the Debtors.**

57.    The Debtors' funds move through the Cash Management System as described above. At any given time, there may be Intercompany Balances owing among Debtor entities. Intercompany Transactions are made between and among Debtors in the ordinary course as part of the Cash Management System.[12] The Debtors track all fund transfers in their accounting system

---

[12]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like it, the Debtors submit that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors seek express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

and can ascertain, trace, and account for all Intercompany Transactions previously described. The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.

58.    If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the Debtors' and the estates' detriment. In addition, a number of critical services, including centralized management services and cash management services, currently provided to Debtor entities on an intercompany basis would be interrupted. Since these transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order.

59.    To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request, pursuant to section 503(b)(1) of the Bankruptcy Code, that all postpetition transfers and payments from a Debtor to another Debtor on account of an Intercompany Transaction be accorded superpriority administrative expense status. This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

60.    Similar relief has been granted in other similarly situated chapter 11 cases in this district. *See, e.g., In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (allowing intercompany transactions to continue on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647

(JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD)

(Bankr. S.D.N.Y. July 27, 2020) (same).

## VII.    Cause Exists for Waiving the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis.

61.    To the extent the Cash Management System does not strictly comply with

section 345 of the Bankruptcy Code, the Debtors further seek a waiver of the deposit and

investment requirements set forth therein.

62.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a

chapter 11 case and authorizes deposit or investment of money of estates, such as cash, as

"will yield the maximum reasonable net return on such money, taking into account the safety of

such deposit or investment."  For deposits that are not "insured or guaranteed by the United States

or by a department, agency or instrumentality of the United States or backed by the full faith and

credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must

require from the entity with which the money is deposited or invested a bond in favor of the

United States secured by the undertaking of a corporate security, "unless the court for cause orders

otherwise."  Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among

other things, close prepetition bank accounts and open new "debtor in possession" operating,

payroll, and tax accounts at one or more approved depositories.

63.    Courts may waive compliance with the Bankruptcy Code section 345 and the

U.S. Trustee Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered

a number of factors such as:

   (1)  the sophistication of the debtor's business;

   (2)  the size of the debtor's business operations;

   (3)  the amount of the investments involved;

(4)      the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(5)      the complexity of the case;

(6)      the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(7)      the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8)      the benefit to the debtor;

(9)      the harm, if any, to the debtor;

(10)     the harm, if any, to the estate; and

(11)     the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

64.     Because the Bank Accounts are vital to the Cash Management System, requiring the Debtors to transfer funds to other banks would be unduly burdensome to the Debtors' operations and potentially cause severe tax consequences to the detriment of the Debtors' estates. In addition, the Bank Accounts are maintained at well-capitalized, highly-rated FDIC-insured banks. The Debtors believe that the Bank Accounts provide protections that are comparable to those contemplated by section 345 of the Bankruptcy Code. Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.

65.     Additionally, the Debtors hold cryptocurrency assets through third-party custodians such as Coinbase Trust Company LLC in the ordinary course of business. Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all). Further, requiring the Debtors to liquidate their digital assets and

transfer the resulting cash to an authorized depository would be value destructive to the Debtors and their stakeholders.

66.     To allay the concerns addressed by section 345(b) of the Bankruptcy Code, the Debtors will engage with the U.S. Trustee in good faith discussion to determine potential modifications to the Debtors' Cash Management System.

67.     Courts in this district have granted relief similar to that requested herein in other complex chapter 11 cases. *See, e.g., In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (waiving U.S. Trustee Guidelines regarding approved depositories on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020) (same).

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

68.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

69.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

70.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **Motion Practice**

71.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

**Notice**

72.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the United States Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors conduct their business operations; (h) the Cash Management Banks; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

73.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and

Final Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

Dated:  July 6, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com
              cmarcus@kirkland.com
              christine.okike@kirkland.com
              allyson.smith@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## <u>Exhibit A</u>

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

———————————————————————

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT**
**SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS**
**RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D)**
**CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION**
**INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"):  (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system (the "Cash Management System");  (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; (c) authorizing the Debtors to freeze withdrawal requests from the MC FBO Account for a period of sixty (60) days after the Freeze Date; and (d) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2022, at __:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2022, and shall be served on: (a) the Debtors, Voyager Digital Holdings, LLC, 33 Irving Place, Suite 3060, New York, New York 10003, Attn: David Brosgol; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith; (c) the Office of The United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006,

New York, New York 10014, Attn. Richard Morrissey and Mark Bruh; and (d) counsel to any statutory committee appointed in these chapter 11 cases.

3.      The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue operating the Cash Management System, substantially as illustrated on **Exhibit 1** attached hereto; (b) honor their prepetition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

4.      The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on **Exhibit 2** attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits; (d) pay all prepetition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

5.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

6.      The Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

7.      Notwithstanding anything provided in this Interim Order to the contrary, including without limitation, paragraphs 6 and 11 of this Interim Order, the Debtors are authorized to temporarily prohibit MC Bank from honoring any withdrawal or ACH Chargeback requests from the MC FBO Account for sixty (60) days after the Freeze Date, during which time the Debtors and MC Bank will work together in good faith to determine whether such request was fraudulent; *provided, that*, for any request that is subsequently determined by the Debtors and MC Bank to be legitimate, MC Bank shall be authorized to honor such withdrawal request.

8.      All Banks provided with notice of this Interim Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

9.      The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

10.     In the course of providing cash management services to the Debtors, the Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the

appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

11.     Each Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and other debits credited to Debtor's account after the Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

12.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository and shall timely indicate the opening of such account on the Debtors' monthly operating report

and shall provide advance notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

13.     Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of the Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

14.     Those agreements existing between the Debtors and the Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

15.     The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

16.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the

prepetition or postpetition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices; and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any postpetition Intercompany Transactions involving the transfer of cash for the preceding month (to be available on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

17.     All postpetition transfers and payments from the Debtors to another Debtor under any postpetition Intercompany Transactions authorized hereunder are hereby accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

18.     Notwithstanding the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

19.     Those certain existing deposit and service agreements between the Debtors and the Banks shall continue to govern the postpetition cash management relationship between the Debtor and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

20.     The Debtors and the Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

21.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Bank Fees.

22.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

23.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

24.     Nothing in this Interim Order shall modify or impair the ability of any party in interest to contest how the Debtors account, including, without limitation, the validity or amount set forth in such accounting for any Intercompany Transaction or Intercompany Balance. The rights of all parties in interest with the respect thereto are fully preserved.

25.     The Debtors shall have forty-five (45) days, without prejudice to seeking an additional extension, from the entry of this Interim Order to either come into compliance with section 345(b) of the Bankruptcy Code or to seek appropriate relief from the Court.

26.     As soon as practicable after entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on the Banks.

27.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

28.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

29.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

30.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

31.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Cash Management System Schematic**

## Bank Flows



## **Exhibit 2**

**Bank Accounts**

| No. | Entity | Bank Name | Last Four Digits of Account No. | Account Type |
|---|---|---|---|---|
| 1 | Voyager Digital Holding | Metropolitan Commercial Bank | 0238 | Operating Account |
| 2 | Voyager Digital LLC | Metropolitan Commercial Bank | 0246 | Operating Account |
| 3 | Voyager Digital LLC | Metropolitan Commercial Bank | 0254 | FBO Account |
| 4 | Voyager Digital LLC | Metropolitan Commercial Bank | 0688 | Dormant Account |
| 5 | Voyager Digital LLC | Metropolitan Commercial Bank | 3989 | Operating Account |
| 6 | Voyager Digital LLC | Metropolitan Commercial Bank | 3997 | FBO Account |
| 7 | Voyager Digital LLC | Signature Bank | 5047 | Dormant Account |
| 8 | Voyager Digital Ltd | BMO Harris Bank | 2028 | Operating Account |
| 9 | Voyager Digital Ltd | BMO Harris Bank | 2296 | Operating Account |
| 10 | Voyager Digital LLC | Silvergate Bank | 0017 | Operating Account |
| 11 | Voyager Digital LLC | Silvergate Bank | 2484 | Exchange Network Account |
| 12 | Voyager Digital Holdings Inc. | Signature Bank | 1609 | Dormant Account |
| 13 | Voyager Digital LLC | Metropolitan Commercial Bank | 8835 | Debit Card Account |
| 14 | Voyager Digital LLC | Metropolitan Commercial Bank | 8762 | Reserve Account |

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————
                                                                     )
In re:                                                               )        Chapter 11
                                                                     )
VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1]         )        Case No. 22-10943 (___)
                                                                     )
                                  Debtors.                    )        (Joint Administration Requested)
                                                                     )
———————————————————————

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"): (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system (the "Cash Management System"); (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; (c) authorizing the Debtors to freeze withdrawal requests from the MC FBO Account for a period of sixty (60) days after the Freeze Date; and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C.

———————————

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

§§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors; estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted on a final basis as set forth herein.

2.     The Debtors are authorized, in their sole discretion, to:  (a) continue operating the Cash Management System, substantially as illustrated on **Exhibit 1** attached hereto; (b) honor their prepetition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

3.     The Debtors are further authorized, in their sole discretion, to:  (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on **Exhibit 2** attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other

debits; (d) pay all prepetition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

4.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

5.      The Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

6.      Notwithstanding anything provided in this Final Order to the contrary, including without limitation, paragraphs 5 and 10 of this Final Order, the Debtors are authorized to temporarily prohibit MC Bank from honoring any withdrawal or ACH Chargeback requests from the MC FBO Account for sixty (60) days after the Freeze Date, during which time the Debtors and MC Bank will work together in good faith to determine whether such request was fraudulent;

*provided, that*, for any request that is subsequently determined by the Debtors and MC Bank to be legitimate, MC Bank shall be authorized to honor such withdrawal request.

7.     All Banks provided with notice of this Final Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

8.     The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

9.     In the course of providing cash management services to the Debtors, the Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

10.     Each Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid

for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and other debits credited to Debtor's account after the Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

11.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide advance notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

12.     Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date and should be honored pursuant to this or any other order of the Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

13.     Those agreements existing between the Debtors and the Banks shall continue to govern the postpetition cash management relationship between the Debtors and Banks, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect

to any such agreement with any Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

14.    The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

15.    Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the prepetition or postpetition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices; and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any postpetition Intercompany Transactions involving the transfer of cash for the preceding month (to be available on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

16.    All postpetition transfers and payments from the Debtors to another Debtor under any postpetition Intercompany Transactions authorized hereunder are hereby accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

17.     Notwithstanding the Debtors use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

18.     Those certain existing deposit and service agreements between the Debtors and the Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

19.     The Debtors and the Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

20.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Bank Fees.

21.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or

lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors'
rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors
that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion
are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection
or seek avoidance of all such liens.  Any payment made pursuant to this Final Order is not intended
and should not be construed as an admission as the validity of any particular claim or a waiver of
the Debtors' rights to subsequently dispute such claim.

22.    The banks and financial institutions on which checks were drawn or electronic
payment requests made in payment of the prepetition obligations approved herein are authorized
and directed to receive, process, honor, and pay all such checks and electronic payment requests
when presented for payment, and all such banks and financial institutions are authorized to rely on
the Debtors' designation of any particular check or electronic payment request as approved by this
Final Order.

23.    Nothing in this Final Order shall modify or impair the ability of any party in interest
to contest how the Debtors account, including, without limitation, the validity or amount set forth
in such accounting for any Intercompany Transaction or Intercompany Balance.  The rights of all
parties in interest with the respect thereto are fully preserved.

24.    Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee
Guidelines requiring that the Bank Accounts be U.S. Trustee authorized depositories is waived
with respect to the Bank Accounts existing as of the Petition Date.

25.    As soon as practicable after entry of this Final Order, the Debtors shall serve a copy
of this Final Order on the Banks.

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

29.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

## <u>Exhibit 1</u>

**Cash Management System Schematic**

## Bank Flows



**Exhibit 2**

**Bank Accounts**

| No. | Entity | Bank Name | Last Four Digits of Account No. | Account Type |
|---|---|---|---|---|
| 1 | Voyager Digital Holding | Metropolitan Commercial Bank | 0238 | Operating Account |
| 2 | Voyager Digital LLC | Metropolitan Commercial Bank | 0246 | Operating Account |
| 3 | Voyager Digital LLC | Metropolitan Commercial Bank | 0254 | FBO Account |
| 4 | Voyager Digital LLC | Metropolitan Commercial Bank | 0688 | Dormant Account |
| 5 | Voyager Digital LLC | Metropolitan Commercial Bank | 3989 | Operating Account |
| 6 | Voyager Digital LLC | Metropolitan Commercial Bank | 3997 | FBO Account |
| 7 | Voyager Digital LLC | Signature Bank | 5047 | Dormant Account |
| 8 | Voyager Digital Ltd | BMO Harris Bank | 2028 | Operating Account |
| 9 | Voyager Digital Ltd | BMO Harris Bank | 2296 | Operating Account |
| 10 | Voyager Digital LLC | Silvergate Bank | 0017 | Operating Account |
| 11 | Voyager Digital LLC | Silvergate Bank | 2484 | Exchange Network Account |
| 12 | Voyager Digital Holdings Inc. | Signature Bank | 1609 | Dormant Account |
| 13 | Voyager Digital LLC | Metropolitan Commercial Bank | 8835 | Debit Card Account |
| 14 | Voyager Digital LLC | Metropolitan Commercial Bank | 8762 | Reserve Account |