Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF STEPHEN EHRLICH,**
**CHIEF EXECUTIVE OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Stephen Ehrlich, Chief Executive Officer of Voyager Digital Holdings, Inc., hereby

declare under penalty of perjury:

**<u>Introduction</u>**

1.     The Debtors are facing a short-term "run on the bank" due to the downturn in the

cryptocurrency industry generally and the default of a significant loan made to a third party.  But

the Debtors have a viable business and a plan for the future.  As discussed in this Declaration, we

worked tirelessly with our advisors over the last three weeks to develop a strategy that will position

the Debtors for long-term success.  Ultimately, the Debtors filed for chapter 11 relief to protect

their customers and preserve the value of their business.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

2.      Voyager operates a cryptocurrency brokerage that allows customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform.  Using the Company's mobile application, Voyager's customers can earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets.  Voyager's mission since inception has been to provide any investor with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer.  Voyager's mobile application has been downloaded millions of times and currently has over 3.5 million active users.   In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

3.      Recent events in the world economy have roiled traditional markets and the cryptocurrency markets alike.  The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in 2022.  Total wealth in the United States declined by $5 trillion between January 2022 and May 2022.



The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022.  All major coins and cryptocurrency-focused

companies have experienced significant declines; as of June 2022, the cryptocurrency market has lost $2 trillion in aggregate market value. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Part IV of this Declaration), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.



4.        In addition to providing brokerage services, Voyager provides custodial services to customers who store cryptocurrency on Voyager's platform. Voyager provides loans, typically in the form of a specific type of cryptocurrency, to counterparties in the cryptocurrency sector to facilitate liquidity or trade settlement. Interest earned from the Company's loans is passed along to customers, who earn a "yield" on their stored cryptocurrency. Due to the severe market down turn in early 2022, the Company proactively engaged in a number of internal initiatives to hedge risk, reduce its outstanding loan balances, and mitigate the effects of a significant market decline on customers. Ultimately, the Company was able to trim exposure on a majority of its loans and generally avoid exposure to counterparty risk in most instances.

5.      In June 2022, it appeared that the Company's loan to Three Arrows Capital ("3AC"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment.  The Company's loan to 3AC was one of its largest outstanding loans.[2]  On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna.  The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act as a broker for cryptocurrency assets.  Accordingly, the Company's management team immediately began to explore potential strategic solutions.  On or about June 16, 2022, the Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis").  The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022.  The Company engaged in numerous discussions with a number of third parties and potential sources of new liquidity.  The Company also negotiated and secured an unsecured loan from Alameda Ventures Ltd., a major participant in the cryptocurrency space, and began discussions with a host of third parties about a long-term solution.  Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to yield the most value-maximizing path forward available to the Company.

6.      To that end, and consistent with Voyager's mission to serve its customers, this is not a "free-fall" filing without direction.  On the contrary, Voyager has a path forward and a plan to swiftly bring these chapter 11 cases to an appropriate conclusion.  Voyager's proposed chapter 11 plan of reorganization (attached hereto as **Exhibit C**, the "Plan") contemplates a standalone restructuring that the Company can effectuate without a sale or a strategic partner.  The Company

---

[2]   Voyager disclosed the size of the 3AC Loan in the Company's publically filed financial reports.  The Company disclosed the balance of its seven largest cryptocurrency loans in its March 31, 2022 quarterly financial statements.  The Company also provided the geographic location of the counterparty for each of the seven loans it disclosed in the those financial statements.

will continue a robust marketing process—one that was already underway prepetition—to test the value proposition of the Company's business. This process is designed to position Voyager for success in a turbulent market environment, allowing the Company to support go-forward operations and preserve the value of its customers' assets.

7.      The Company's primary focus has been, and always will be, its customers. The Company's chapter 11 cases allow the Company to continue to meet its objectives by marketing the Company to third-party investors or effectuating a comprehensive restructuring transaction that will preserve the value of the business and operations. Voyager will move as swiftly as possible through these cases to maximize the value of its business and allow customers to fully use the Company's platform.

**Background**

8.      I am the Co-Founder and Chief Executive Officer of Voyager Digital, LLC ("Voyager Digital," together with debtor subsidiaries and affiliates, the "Company" or "Voyager"), and have held that position since Voyager Digital's founding in 2018. I am also the Chief Executive Officer of Voyager Digital Holdings, Inc. Prior to co-founding Voyager Digital, I co-founded and served as Chief Executive Officer of Voyager Digital Canada Ltd. and served on Voyager Digital Canada Ltd.'s board of directors. I served as Vice-President, Brokerage of E*Trade Financial Corporation from 1999 to 2006 and Chief Executive Officer of ETrade Professional Trading from 2002 to 2006 before I founded Lightspeed Financial, LLC in 2006.

9.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with other members of Voyager's management team and advisors, my review of relevant documents and information concerning Voyager's operations, financial affairs, and restructuring initiatives, or my opinions based upon

my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

10. On July 5, 2022 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Court. To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

11. To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections as follows:

- **Part I** provides a general overview of the cryptocurrency market;

- **Part II** provides an overview of the Company's history and operations;

- **Part III** describes the Company's prepetition corporate and capital structure; and

- **Part IV** provides an overview of circumstances leading to these chapter 11 cases.

## I.    Overview of Cryptocurrency

12. The cryptocurrency industry is in its nascent stages, and many of the technologies, terminologies, and platforms discussed in this Declaration may be unfamiliar. This section provides an overview of some of the key components of the cryptocurrency ecosystem that are discussed throughout this Declaration.

### A.    Cryptocurrency and the Blockchain

13.    A cryptocurrency is a digital currency designed to serve as a medium of exchange or store of value.  Cryptocurrency is used to execute transactions on a "blockchain," a digital technology that vets and verifies transactions through a rigorous mathematical process.  Each blockchain utilizes a specific cryptocurrency or a limited number of cryptocurrencies to execute transactions (the Ethereum blockchain uses Ether as its cryptocurrency).  The blockchain is often called a digital "ledger" because it records every single transaction ever made by "native" cryptocurrency.

14.    Cryptocurrencies are decentralized (they are not issued or created by a government or central institution).  Transactions are completely anonymous, but each transaction is recorded by the blockchain and viewable by any individual.  Instead of needing to consult a third party (like a bank or title company) to verify that a transaction took place, an individual could consult the blockchain for free.  One example of the potential utility of cryptocurrency and blockchain technology is buying a house.  If a house was "on the blockchain," a homeowner could provide a potential homebuyer with the blockchain "ID" associated with the house and the homebuyer could see the transaction history of the house and the status of all deeds or titles associated with it without having to consult a third party.  Such a process would provide the homebuyer up-to-date information quickly, securely, and inexpensively and all without the need for a third-party service provider.

### B.    Cryptocurrency Overview

15.     There are thousands of cryptocurrencies and blockchain protocols.  Certain cryptocurrencies and blockchain protocols offer specific advantages or use cases.  Of the cryptocurrencies in existence, two have emerged as leaders in the industry:

*Bitcoin*.  Bitcoin or "BTC" was the most successful early cryptocurrency.  The core focus of Bitcoin and the Bitcoin blockchain was developing a decentralized payment network.  Bitcoin is often viewed as the "father" of modern cryptocurrency and is used as a proxy for the cryptocurrency industry in the same way that the S&P 500 is often used as a proxy for the financial markets.  The market capitalization of Bitcoin as of the date hereof is approximately $371 billion.



*Ethereum*.  Ether is the native token of the Ethereum blockchain, though Ether is generally referred to as "Ethereum" as well.  Ether or "ETH" is similar to Bitcoin in that it can be used to make payments or used as a store of value or collateral.  The Ethereum blockchain also enables the use of "smart contracts," or simple programs that can be used on a blockchain to facilitate non-payment related transactions.  Storing the title information for a house, in the example above, would likely be done through a smart contract.  The market capitalization of Ether as of the date hereof is approximately $15 billion.



Other popular cryptocurrencies include Binance Coin, Cardano, and Solana.  All are able to provide the same general utility of Bitcoin or Ethereum, but each uses different blockchain technologies and provides certain unique benefits to participants.

16.    Stablecoins are a separate but important type of cryptocurrency.  A stablecoin is a type of cryptocurrency that is tied (or "pegged") to another currency, commodity, or financial instrument.  Stablecoins are designed to reduce volatility and help facilitate transactions on a blockchain.  USD Coin (or "USDC") is one of the largest stablecoins by market capitalization, and is pegged 1:1 with the U.S. Dollar.  USDC is collateralized by a pool of cash and short-dated U.S. Treasury securities to ensure that it maintains its price stability—for every USDC in circulation, $1 is held as collateral.  Each USDC is redeemable for $1.

17.    All cryptocurrency is stored (or "lives") on the blockchain but can only be accessed by a private "key" held by the cryptocurrency's owner.  Cryptocurrency keys are held in cryptocurrency "wallets" that allow the owner to easily, and securely, manage the keys to their cryptocurrency assets.

## II.    Voyager's History and Operations

### A.    The Company's Corporate History

18.    I helped found Voyager in 2018 along with Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors.  Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail investors.

19.    Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading brokerage with 3.5 million users and over $5.9 billion of cryptocurrency assets held.  Voyager is a public company and has traded on the Toronto Stock Exchange since 2021 under the ticker "VOYG."

### B.    The Company's Operations

20.    Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards on stored cryptocurrency assets, and (iii) lending programs.   All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### a.   Brokerage Services

21.    Traditional brokerage services have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other.   Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused brokerage provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.



22.    Voyager operates as a cryptocurrency "agency broker," matching its customers with counterparties who can facilitate the customer's desired trade.   The Company's platform is simple and easy to use, but beneath the retail investor-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution

across numerous digital currencies.  The Company's platform is unique, as it surveys more than a

dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that

evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution

to deliver each customer a high quality execution.  Ultimately, Voyager's customers know that

they have access to a best-in-class trading platform no matter how big or small their trade.

### b.  Custodial Services



23.     Digital currencies deposited by customers are

stored on Voyager's platform rather than individualized digital

"wallets."  In exchange, Voyager customers earn interest on

deposits.  Interest is primarily paid in three ways: (i)  PIK Interest; (ii) through VGX and the

Voyager Loyalty Program; and (iii) through "staking" programs.  To complement its custodial

services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

24.     *PIK Interest*.  Customers who deposit certain cryptocurrencies with Voyager earn

payable-in-kind interest ("PIK Interest") on their assets.  Customers can earn up to 12 percent

interest on certain digital currencies, provided that such users maintain a minimum monthly

balance and keep their assets on the Company's platform.

25.     *Voyager Loyalty Program and VGX Token*.  Voyager token ("VGX") is a digital

currency issued and administered by the Company.  VGX is primarily issued in connection with

the company's loyalty and rewards program (the "Voyager Loyalty Program").  Ownership of

VGX entitles users to benefits on their accounts operating through a tiered reward system.  VGX

is traded on the Coinbase Exchange under the ticker "VGX."

26.     The Voyager Loyalty Program is similar to retail or restaurant loyalty programs,

where loyal users are rewarded for continued use of the platform.  Active users on the Voyager

platform can earn a variety of rewards and incentives, including higher referral bonuses, lower

transaction fees, prioritized customer support, higher PIK Interest rates, and access to special events and investment opportunities.

27.   ***Debit Card***.   The Voyager debit card (the "Voyager Debit Card") is a cobranded debit card that can be used anywhere MasterCard is accepted.   This card is structured as a prepaid debt card issued through Metropolitan Commercial Bank[3] (an FDIC-insured bank) and allows investors to spend cryptocurrency directly without having to pay fees associated with currency conversion.   Voyager Debit Card holders also earn rewards associated with each purchase, including up to 3 percent "crypto back" in the form of VGX.

28.   ***Staking***.   Voyager allows its customers to "stake" cryptocurrencies.   Staking refers to the process of committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each protocol.   Staked cryptocurrency is typically not immediately "callable"— generally, the owner will need to wait for a fixed period before being able to recall the cryptocurrency to their wallet.   Voyager facilitates staking projects for its customers through the Company's simple mobile app, opening up new sources of passive income to cryptocurrency investors and maximizing the utility of the customer's assets.

### c.   Lending Program

29.   To provide customers with PIK Interest, Voyager lends cryptocurrency deposited on its platform to third parties.   Such third parties pay Voyager a pre-negotiated interest rate that is payable in either cash or payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin).   Voyager's lending program is an integral part of its business and necessary to provide customers with a meaningful return on their assets.   Loans made by the Company that are outstanding as of the Petition Date are as follows:

---

[3]   Metropolitan Commercial Bank is also an authorized depository in the Southern District of New York.

| Loan Counterparty | Borrowing Rates | Amount Outstanding (in thousands) |
|---|---|---|
| Alameda Research Ltd. | 1% - 11.5% | $376,784 |
| Three Arrows Capital | 3% - 10% | $654,195 |
| Genesis Global Capital, LLC | 4% - 13.5% | $17,556 |
| Wintermute Trading Ltd | 1% - 14% | $27,342 |
| Galaxy Digital LLC | 1% - 30% | $34,427 |
| Tai Mo Shan Limited | 10% | $13,770 |
| Other | 4% - 8% | $751 |
| Total Loan Obligations | | $1,124,825 |

### C.    Using Voyager's Platform

30.    Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App").  Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement, and can link their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's cryptocurrency on the platform.

31.    The Company does not maintain a separate cryptocurrency wallet for each customer.  Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and swept from the Company's commingled wallet to a third-party custodial account that protects and secures keys to the Company's cryptocurrency deposits.  The Company utilizes several custodial accounts depending on the specific type of cryptocurrency asset (*e.g.*, Bitcoin, Ether).

### III.    Voyager's Prepetition Corporate and Capital Structure.

### A.    Voyager's Corporate Structure.

32.    As set forth on the corporate structure chart attached as **Exhibit B**, Debtor entity Voyager Digital Ltd. currently owns, directly or indirectly, each of the other Debtor entities.

**B.      Voyager's Capital Structure.**

**a.  Loan Facility.**

33.      On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility") with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USDC (the "Cash Loans") and 15,000 Bitcoin (the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility is approximately $500 million.[4]

34.      The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans, or BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date.  Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

35.      As of the Petition Date, 75 million USDC are outstanding under the Loan Facility. The aggregate value of the USDC outstanding is $75 million.[5]

**b.  Equity Interests in Voyager.**

36.      As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49% of which is held by Alameda and its affiliates with the remainder widely held by investors.

---

[4]      Assuming a Bitcoin price of $20,000.
[5]      As a stablecoin, USDC is pegged to $1 per coin.

IV.      **Circumstances Leading to These Chapter 11 Cases.**

A.      **Turbulent Market Conditions**

37.      The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike.  Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value.  The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

38.      Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether.  Voyager, however, continued to provide brokerage services through the entirety of the 2020 "COVID Crash."  Customers were able to use the platform to trade despite extreme volatility in the markets, and yield rewards were paid out to qualifying customers as well.  The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency broker—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

39.      After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth.  Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic.  Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed.  Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent.  The S&P 500 rose by nearly 100 percent over the same period.

40.      In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove equity markets sideways through the end of 2021.  In the

cryptocurrency space, strong selloffs in "risk-on" assets like technology and early-stage equities led to selloffs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses from all-time highs.

41.    Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal. But discussions around a possible recession in 2022 began to materialize as inflation rose, along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

42.    2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. Western countries imposed a series of financial, trade, and travel sanctions against Russia in an effort to weaken Russia's ability to pursue the war, which led to a rampant increase in commodity prices. The S&P 500 shed 20% of its value to date in 2022, while the tech-heavy NASDAQ declined by nearly 30% over the same period. Rising inflation and commodity prices contributed to investor pessimism and further selloffs. In June 2022, market analysts officially labeled 2022 as a bear market.



**B.    "Extreme Fear" and the "Cryptocalypse"**

43.    The widespread selloff in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in the first half of 2022; Bitcoin slumped 37.3% in June 2022 alone and is down 60% year-to-date. Companies in the cryptocurrency industry



also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June, the aggregate value of the cryptocurrency market slumped below $1 trillion for the first time since January 2021.

44.    Distressed situations faced by two industry participants—Terra and Three Arrows Capital—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and Three Arrows Capital, and the resulting fallout, created the "cryptopocalyse."

**a.   The Terra Luna Collapse**

45.    Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its platform), Terra issued Luna, a

cryptocurrency that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 and had a market capitalization of approximately $14 billion.

46.    Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1.[6] UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1, and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of the two tokens. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5% yield (payable in UST).

47.    On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Though traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

---

[6]    Stablecoins are typically backed by the U.S. dollar. Instead, Terra utilized its arbitrage mechanism with Luna and a reserve of Bitcoin to maintain UST's "peg."

48.    Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral." Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion



The collapse of Terra (Luna)

Daily closing price in USD, last three months (22 February - 22 May 2022)
Source: CoinMarketCap    BBC

of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The price of Luna fell from $82.55 to $0.000001 in one week.

49.    The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further selloffs in the cryptocurrency sector.

**b. Three Arrows Capital**

50.    The collapse of Luna had a significant effect on the cryptocurrency industry. Many cryptocurrency-focused hedge funds and other cryptocurrency companies owned Luna and incurred losses on their position after they sold. Some participants were unable to sell their Luna under staking agreements or other lock-up agreements—such participants were forced to incur up to a 99% loss on their investment if they were prohibited from selling their Luna.

51.    In early June 2022, it was reported that 3AC may have incurred significant losses due to Luna's collapse. On June 15, one of 3AC's founders stated that the fund incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore

potential liquidity solutions.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

52.    The Company's management team is familiar with market volatility, having navigated the Company through the COVID Crash and through their collective experience in the finance industry.  As Voyager is a brokerage services provider that is not directly dependent on the price of Bitcoin or any other cryptocurrency for revenue, Voyager has limited exposure to an industry-wide selloff.

53.    But to provide customers with a yield on the assets they store with Voyager, Voyager loans out a portion of its cryptocurrency reserves to third parties.  Voyager customers expressly acknowledge that Voyager may loan the customer's deposited assets (which are pooled with all other retail investors' deposited assets) to third parties when they agree to the Voyager customer agreement, a requirement to deposit assets on Voyager's platform.  Loans are typically made in the form of cryptocurrency to, among other things, facilitate the counterparty's transactions or provide the counterparty with additional liquidity of a specific type of token.

54.    The Company has entered into a number of third party loans.  Between March 2021 and March 2022, the Company entered into 125 third party loans with 9 different counterparties, lending out cryptocurrency with an aggregate market value of $5.15 billion.

55.    In March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan").  Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC.  The 3AC Loan was callable at any time by the Company.  3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

56.    After the Luna crash in 2022, the Company began to assess 3AC's downside exposure and the likelihood of repayment under the 3AC Loan.  The Company made an initial

request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan.[7]

### C.       The Alameda Loan and the Prepetition Marketing Process

57.       Once it became clear that 3AC had significant exposure to the Luna crash, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized.

58.       The Alameda Loan Facility provided the Company with $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. The Company could draw on the facility in either U.S. dollars or Bitcoin, providing the Company with capital to fund its business and cryptocurrency to facilitate trade execution if necessary. The Alameda Loan Facility also communicated to the market at large that Voyager had significant cash on hand and support from one of the industry's key players.

59.       The Alameda Loan Facility, however, was only a partial solution to the Company's liquidity issues. General market pessimism due to significant declines in cryptocurrency prices, coupled with concerns about the 3AC Loan, contributed to an influx of customer withdrawals. The Company's management team understood that the Company would likely need to pursue a strategic transaction and/or seek additional sources of liquidity. Accordingly, the Company engaged Kirkland as legal counsel, Moelis as investment banker, Teneo Strategy LLC ("Teneo")

---

[7]       As described above, the Company had several other master loan agreements in place with other counterparties in the cryptocurrency space. However, the Company proactively engaged in significant efforts to secure repayment of its other outstanding loans. As of the Petition Date, the 3AC Loan is the Company's only significant outstanding loan.

as a strategic advisor, and Consello MB LLC ("Consello") as a strategic advisor in June 2022 to advise on potential transactions.

60.    In late June 2022, the Company, with the assistance of Moelis, commenced a comprehensive, dual-track marketing process to solicit investor appetite in either (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise.[8] I understand that Moelis reached out to 60 potential financial and strategic partners across the globe, including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have cryptocurrency-related investments and/or historical experience investing in the cryptocurrency industry. Ultimately, I understand that 22 parties entered into confidentiality agreements with the Debtors. I understand that Moelis provided these parties with a copy of Voyager's investor presentation and access to a virtual data room with comprehensive information regarding Voyager's business operations and financial position. I understand that the virtual data room was robust and was supplemented throughout the marketing process and ultimately contained thousands of pages. I, and other members of the Voyager management team, attended virtual diligence sessions with Moelis and several interested parties.

61.    I understand that the marketing process yielded one proposal for an out-of-court financing. The Company determined that the proposal was not actionable, however, as the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable. I understand that no other counterparty was willing to participate in an

---

[8]    Additional information regarding the Company's prepetition marketing efforts is contained in the *Declaration of Jared Dermont Regarding the Debtors' Marketing Process and in Support of the Debtors' Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith.

out-of-court transaction on the timeline required.   However, I understand that several parties indicated interest in participating in a potential in-court transaction.   Accordingly, Voyager and its advisors continued to discuss potential transactions and provide diligence to third parties on potential in-court and out-of-court restructuring transactions.

### D.    Gates.

62.    On June 13, 2022, Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced that it was raising the "gates" on account activity, pausing all account withdrawals and transfers due to what it referred to as "extreme market conditions." Celsius' announcement triggered a further pulldown in the cryptocurrency markets; Bitcoin slid over 30% in the ensuing days as investors on other platforms began to liquidate their positions. Voyager saw a significant uptick in customer withdrawals—some of which Voyager does not believe are legitimate[9]—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

63.    On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.   Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager, as well as stabilize the Company's business while it engaged in discussions with potential third-party sponsors.   Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[10]

---

[9]    While the gates are in place, customers may fraudulently attempt to disclaim prepetition purchases by seeking to revoke ACH transactions.  This practice (if permitted by ACH and the banks) would shift the risk of crypto price movements during the intervening period from the customers seeking to evade transactions they initiated to Voyager's other customers, and is unfair and improper.  For that reason and others, Voyager is asking as part of its Cash Management Motion for authority to prohibit MC Bank from honoring chargeback requests from the MC FBO Account for a sixty day period while the Debtors work with MC Bank to confirm whether such requests are legitimate or fraudulent.

[10]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their account.

64.    Voyager hoped that lower withdrawal limits would allow the Company to stabilize its business.  However, as the cryptocurrency markets continued to trend down, the Company realized that further steps were required to preserve customer investments, avoid irreparable damage to the Debtors' business, and ensure that its trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, the Company froze all withdrawals and trading activity on its platform.

65.    Though the Company continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Company petitioned for chapter 11 relief.  Accordingly, the Company began to analyze a potential in-court timeline and finalize its contingency preparations process.  The Company engaged BRG as restructuring advisor to assist the Company with its contingency planning efforts.

**E.    Governance Initiatives.**

66.    Voyager Digital LLC ("OpCo") formally formed a special committee (the "Special Committee") on July 5, 2022, comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee is vested with the authority to, among other things:

- investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deems necessary or appropriate, and the facts and circumstances surrounding such transactions;

- interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate;

- request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by OpCo that the Special Committee deems necessary and appropriate to review;

- perform any other activities consistent with the matters described herein or as the Special Committee or OpCo's board of directors otherwise deems necessary or appropriate; and

- conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of OpCo, including any claims arising from the 3AC Loan (the "Investigation"). The Investigation remains ongoing as of the Petition Date.

The Special Committee is also authorized to prosecute or settle any and all claims and causes of action arising from the historical transactions that are investigated by the Special Committee.

67.     In addition to the appointment of two independent directors and the establishment of the Special Committee at Voyager Digital, LLC, the Debtors also appointed one independent director, Matthew Ray, to the board of directors at Voyager Digital Ltd. and one independent director, Scott Vogel, to the board of directors at Voyager Digital Holdings, Inc.

**F.     The Company's Chapter 11 Plan, these Chapter 11 Cases, and Next Steps.**

68.     The Company filed the Plan concurrently with this Declaration. The Plan provides for a standalone restructuring transaction that can be effectuated without a sale or a strategic partner. Under the Plan, account holders will receive a combination of (i) coins, (ii) new common shares in reorganized Voyager, (iii) existing VGX tokens, (iv) and any recovery on account of the 3AC Loan.[11] Account holders can also elect to increase or decrease their *pro rata* recovery of equity in reorganized Voyager in exchange for an equal increase or decrease in the amount of coins such account holder is entitled to. Ultimately, the standalone restructuring will provide account holders with a meaningful recovery on account of their claims and vest ownership of the go-forward business of the Company in its customers.

69.     The Plan effectively functions as a "stalking horse" proposal. The Company will continue discussions with strategic third-party investors to solicit interest in sponsoring the Plan or otherwise providing financing to Voyager in exchange for partial or full ownership of the reorganized Company. Ultimately, pursuing the standalone restructuring and a marketing process

---

[11]   The Company is pursuing all available avenues to recover the 3AC Loan in 3AC's liquidation proceedings in the British Virgin Islands.

in tandem will allow the Company to consummate the most value-maximizing transaction available.

70.     These chapter 11 cases provide the Company with the best opportunity to stabilize its business, consummate a comprehensive restructuring transaction that maximizes value for all stakeholders, and emerge from chapter 11 positioned for success in the cryptocurrency industry. The proposed transactions under the Plan will also allow the Company to consummate a restructuring transaction that will meet all applicable regulatory and operating requirements in each of the states in which it does business. The Company plans to engage with all constituencies, including the official committee of unsecured creditors (which will likely be composed of largely account holders), in a productive dialogue with the hope of building consensus around the Company's chapter 11 plan of reorganization and, ultimately, a transaction that will maximize the value of the Company's business.

## I.   Evidentiary Support for First Day Motions.[12]

71.     Contemporaneously herewith, Voyager filed a number of First Day Motions and is seeking orders granting various forms of relief intended to stabilize Voyager's business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run Voyager's business, ensure the continuation of Voyager's cash management systems, and allow for other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give Voyager an opportunity to work towards successful chapter 11 cases that will benefit Voyager's stakeholders.

---

[12]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

72.     The First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, Voyager has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to Voyager and its estates.  Other relief will be deferred for consideration at a later hearing.

73.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable Voyager to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully implementing a chapter 11 strategy.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

## II.     Information Required by Local Bankruptcy Rule 1007-2.

74.     Local Bankruptcy Rule 1007-2 requires certain information related to Voyager, which I have provided in the exhibits attached hereto as **Exhibit D** through **Exhibit O**. Specifically, these exhibits contain the following information with respect to Voyager (on a consolidated basis, unless otherwise noted):[13]

- **Exhibit D**. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these

---

[13]   The information contained in **Exhibit D** through **Exhibit O** attached to this Declaration does not constitute an admission of liability by, nor is it binding on, Voyager.  Voyager reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee.

- **Exhibit E**. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the debtors' 50 largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- **Exhibit F**. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- **Exhibit G**. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the debtors' assets and liabilities.

- **Exhibit H**. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides a summary of the publicly held securities of the debtors.

- **Exhibit I**. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- **Exhibit J**. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the debtors operate their business.

- **Exhibit K**. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets forth the location of the debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the debtors outside the territorial limits of the United States.

- **<u>Exhibit L</u>**. Pursuant to Local Bankruptcy Rule 1007-2(a)(11), provides a list of the nature and present status of each action or proceeding, pending or threatened, against the debtors or their property where a judgment or seizure of their property may be imminent.

- **<u>Exhibit M</u>**. Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise the debtors' existing senior management, their tenure with the debtors, and a brief summary of their relevant responsibilities and experience.

- **<u>Exhibit N</u>**. Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), provides the estimated amount of payroll to the debtors' employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the debtors, for the 30-day period following the Petition Date.

- **<u>Exhibit O</u>**. Pursuant to Local Bankruptcy Rule 1007-2(b)(3), provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 6, 2022

/s/ *Stephen Ehrlich*

Name:  Stephen Ehrlich
Title:    Co-Founder and Chief Executive Officer
Voyager Digital Ltd.

## **Exhibit A**

**Evidentiary Support for First Day Pleadings[1]**

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

A.   **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.      The Debtors have filed several purely administrative or procedural First Day Pleadings, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of the Order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

2.      I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Joint Administration Motion.

B.   **Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Motion</u>").**

3.      The Debtors seek entry of an order approving and implementing the notice, case management, and administrative procedures.

4.      Given the size and complexity of these chapter 11 cases, the Debtors believe that implementing the Case Management Procedures will facilitate the fair and efficient administration of these chapter 11 cases and promote judicial economy.   Specifically, the proposed Case Management Procedures will benefit the Debtors, the Court, and all parties in interest by, among other things:

    a.   assuring prompt and appropriate notice of matters affecting parties' interests;

    b.   allowing for electronic notice pursuant to the Court's Electronic Filing System;

    c.   providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;

    d.   reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these chapter 11 cases;

    e.   reducing the administrative burdens on the Court and the clerk of the Court; and

    f.   providing for Omnibus Hearings for the Court to consider motions, pleadings, applications, objections, and responses thereto.

5.      I believe that the relief requested in the Case Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**C.      Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports; (II) Waiving Requirements to File List of Equity Holders; and (III) Granting Related Relief (the "Schedules and Statements Extension Motion").**

6.      Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and

liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in rule 2015.3 of the Federal Rules of Bankruptcy Procedure, or to file a motion with the Court seeking a modification of such reporting requirements for cause, to the later of: (i) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code and (ii) 44 days from the Petition Date, each without prejudice to the Debtors' ability to request additional extensions; (c) waiving the requirements to file the list of equity security holders, as set forth in Bankruptcy Rule 1007(a)(3), of Debtor Voyager Digital Ltd.; and (d) granting related relief.

7.      Given the size and complexity of the Debtors' business and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

8.      I believe that extending the deadline to file the initial 2015.3 Reports will provide the Debtors with the necessary time to examine the books and records of their non-debtor subsidiaries that are subject to Bankruptcy Rule 2015.3. The additional time will also enable the Debtors to work with their financial advisors and the United States Trustee for the Southern District of New York to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

9.      I believe that preparing and submitting a list with the last known addresses for each equity security holder and sending notices to all such parties will be expensive and time consuming and will serve little or no beneficial purpose.

10.      I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Extension Motion should be approved.

**D.      Debtors' Application Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "Claims Agent Application").**

11.      The Debtors seek entry of an order (a) appointing Stretto as the claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.  Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of entities to be noticed in these chapter 11 cases.

12.      Given the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of Stretto as Claims and Noticing Agent is both required by Local Rule 5075-1(b) and is otherwise in the best interest of the Debtors' estates and their creditors, because the distribution of notices and the processing of claims will be expedited, and the Clerk's Office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

13.      I believe that the relief requested in the Claims Agent Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the

5

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

    **E.**    **Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of Notifying Creditors of Commencement, and (V) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

14.    The Debtors have filed a purely administrative or procedural First Day Pleading requesting that the Bankruptcy Court enter an order (a) authorizing the Debtors to (i) prepare a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' fifty largest unsecured creditors, and (iii) redact certain personal identifiable information for the Debtors' employees; (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases; and (c) granting related relief.

15.    Permitting the Debtors to maintain the Creditor Matrix in electronic format only, in lieu of each Debtor filing a creditor matrix, is warranted under the circumstances of these cases. Because the Debtors have many thousands of creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

16.    The Debtors submit that the proposed maintenance of the Creditor Matrix by the Debtors' proposed Claims and Noticing Agent, Stretto, Inc. is consistent with applicable Local Rules. Pursuant to Local Rule 5075-1, a debtor filing a petition with more than 250 creditors and

equity interest holders, in the aggregate, as is the case here, is required to retain an approved claims and noticing agent pursuant to an order of the Court.

17.     Compiling separate top twenty creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' fifty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.  Filing a single consolidated list of the fifty largest unsecured creditors in these chapter 11 cases is appropriate for these reasons.

18.     The Creditor Matrix and Schedules and Statements may contain the home addresses of individuals—including the Debtors' employees and former employees; such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. The Debtors therefore, propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted to the proposed order to (a) the Court, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (if any), and (b) any party-in-interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.

19.     The Debtors believe that using Stretto to undertake all mailings directed by the Court or the U.S. Trustee, or as required by section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002 (a) and (f) to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Additionally, Stretto will assist the Debtors in preparing creditor lists and mailing initial notices, and therefore there are efficiencies in authorizing Stretto to mail the notice of commencement of these chapter 11 cases.  Accordingly, the Debtors respectfully submit that Stretto should undertake such mailings.

20.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**Operational Motions**

F.      **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief (the "Cash Management Motion").**

21.     The Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System (as defined below); (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms (as defined below) in the ordinary course of business; (iv) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees (as defined below); and (v) continue to perform Intercompany Transactions (as defined below) consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; (c) authorizing the Debtors to freeze withdrawal requests from the MC FBO Account (as defined below) for a period of sixty (60) days after the Freeze Date (as defined below); and (d) granting related relief.

22.     In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system.  The Cash Management System is comprised of fourteen active bank accounts.  The Debtors maintain eight bank accounts at Metropolitan Commercial Bank, two accounts at Silvergate Bank, two accounts at BMO Harris Bank, and two accounts at Signature Bank.

23.    The Cash Management System consists of two separate systems that interact regularly in the ordinary course of business. The first system consists of the accounts held at MC Bank, Silvergate and Signature Bank, which facilitate the Debtors' cryptocurrency transactions. The second system consists of the accounts held at MC Bank and BMO Harris, which the Debtors use for, among other things, payment of administrative costs and day-to-day operations.

24.    The Debtors maintain two master operating accounts.  Debtor Voyager Digital Holdings, Inc. maintains a centralized master operating account at MC Bank that directly or indirectly wires or transfers substantially all of the Debtors' cash to all other Debtor Bank Accounts.  Debtor Voyager Digital, LLC maintains a Master Operating Account at Silvergate Bank that is used to facilitate a customer's purchase and sale of crypto through the Debtors' mobile application.

25.    Debtor Voyager Digital Holdings, Inc. maintains an operating account at MC Bank which funds the Debtors' payroll and all other employee compensation and benefits as well as rent for the Debtors' offices spaces.  The MC Bank Administrative Operating Account is funded by the MC Bank Master Operating Account.  The Debtors' treasury team maintains a target balance in excess of $2 million in the MC Bank Administrative Operating Account and cash is swept from the MC Bank Master Operating Account into the MC Bank Administrative Operating Account in advance of biweekly payroll to top-up the target balance.  Debtor Voyager Digital, LLC also maintains two accounts at Signature Bank.  The Signature Bank Accounts are infrequently used and currently hold a zero balance.

26.    Debtor Voyager Digital, Ltd maintains two accounts at BMO Harris Bank to fund compensation for the board of directors and proceeds from new capital raises.  The BMO Bank Accounts are funded by paid-in capital and are infrequently used.  Debtor Voyage Digital, LLC

maintains a dormant account at MC Bank that was previously opened for a stand-by letter of credit. The SBLC Bank Account is in the process of being closed.

27.     The Debtors have historically maintained a branded USD Coin-backed prepaid MasterCard debit card.  The Voyager Debit Card is backed by MC Bank, which is FDIC-insured. In connection with the Voyager Debit Card, the Debtors maintain a settlement account whereby customer debit purchases are settled through the account. The Voyager Debit Card Account is funded through either the MC Bank Master Operating Account or the MC FBO Account (ACH), depending on debit card activity.  MC Bank also requires the Debtors to maintain a reserve account with a $500,000 balance.

28.     As of the Petition Date, the Debtors have approximately $104 million of cash on hand.

29.     A customer may transfer funds from their Voyager App account via ACH to a "for the benefit of" account[1] held at, and maintained by, MC Bank.  The MC FBO Account (ACH) holds the majority of cash transferred by the Debtors' customers.  Each customer holds FDIC insurance on cash deposits in the MC FBO Account (ACH), up to a maximum of $250,000 per customer and provided by MC Bank.  The Debtors also maintain a second smaller "for the benefit of" account at MC Bank to allow customers to transfer funds from their Voyager App account via wire transfer rather than ACH.  The Debtors also process wire transfers to their customers from the MC FBO Account (Wire).

30.     When a customer executes an order to buy cryptocurrency assets on the Voyager App, the Debtors' order management system instructs the applicable MC FBO Account to move

---

[1]     The Debtors use the "for the benefit of" account to manage funds on behalf of their customers.

cash from the account to a third-party exchange or market-maker[2] and deliver the cryptocurrency through the Voyager App.  Voyager holds the cryptocurrency through one of its approved crypto custodians.  Voyager utilizes third-party custodians such as Coinbase Trust Company, LLC, Copper.co, and Anchorage Digital, or self-custody solutions such as Fireblocks, among others.

31.     When a customer executes an order to sell cryptocurrency on the Voyager App, the Debtors' OMS instructs the Debtors' treasury management system to transfer the cryptocurrency held with the Debtors' third-party custodian or self-custody solution to the third-party exchange or market-maker. The third-party exchange or market-maker then receives and deposits cash in the applicable MC FBO Account via the Silvergate Master Operating Account, which is then transferred to the customer's personal bank account via ACH or wire transfer, as applicable.

32.     Customers may also request to withdraw the cash attributable to their cryptocurrency trades from the Voyager App.  The customer's transfer request is conveyed through the Voyager App to the OMS, which in turn instructs the requested amount of cash to be withdrawn from the applicable MC FBO Account and subsequently transferred through third-party payment processor Usio, Inc. via ACH or wire transfer to the customer's personal bank account.[3]  Such transfer typically takes approximately 24 hours from the time the withdrawal is initiated.  For this reason, the Debtors prefund the withdrawal from their MC Bank Master Operating Account into an account held by Usio to ensure proper funds are available for the customer's withdrawal request at any given time.[4]  The Debtors do not prefund withdrawals on a one-to-one basis, instead they

---

[2]   To seek the best possible price, Voyager's platform connects the user to multiple exchanges and liquidity providers, aggregating prices across market with the ability to execute order flow in seconds.

[3]   For the avoidance of doubt, the Debtors maintain default limits on withdrawals and deposits.

[4]   From time to time, the MC FBO Accounts will be overfunded.  In those instances, the Debtors will move the excess funds back to the MC Bank Master Operating Account or the Silvergate Master Operating Account.

prefund a targeted amount and replenish the prefunded amount as needed.  When the money is deposited into a customer's personal bank account from the applicable MC FBO Account, MC Bank then reconciles the amount that the Debtors prefunded and remits such amount back to the MC Bank Master Operating Account.  Such remittances may take up to 24 hours before the Debtors receive such amounts.

33.    On average, approximately $100 to $200 million is held in the MC FBO Accounts for the benefit of customers, which may fluctuate outside of such range depending on the amount of fiat funds that customers seek to transfer into the MC FBO Accounts to purchase cryptocurrency.  As of July 1, 2022, the MC FBO Accounts held approximately $355 million. At approximately 8 p.m. Eastern Standard Time each day, the Debtors generate a report that provides a "snapshot" of the customer balances in each MC FBO Account (including the ACH and wire transfer activity from the day) and the balances owed to each customer based on their respective trades that day.  The Debtors send the report to MC Bank each day.  To ensure the MC FBO Accounts align with the balances from the customers' daily activity, the Debtors reconcile, or true up, the MC FBO Accounts each morning by depositing or removing funds from the MC Bank Master Operating Account.

34.    When a customer makes a crypto deposit, it first enters Voyager's self-custody wallet system called Bedrock.[5]  If a customer's deposit of cryptocurrency assets passes ChainAnalysis verification, then such digital assets are automatically swept from Bedrock for transfer to the applicable third-party custodian or self-custody solution, which the Debtors control. As soon as the cryptocurrency hits Bedrock, the customer no longer has control over the cryptocurrency.

---

[5]    All cryptocurrency traded via the Voyager App is held at Debtor Voyager Digital, LLC.

35.    The Debtors do not maintain individual cryptocurrency wallets for each customer. Instead, cryptocurrency assets are commingled on an asset-by-asset basis when swept from Bedrock to the applicable third-party custodian. The Debtors utilize several custodial accounts depending on the specific type of cryptocurrency asset (*e.g.*, bitcoin, ethereum).  To ensure a customer is credited for the proper amount of cryptocurrency they transferred into Bedrock, Bedrock attributes a unique wallet address for such cryptocurrency prior to it being swept and aggregated into one of the Debtors' custodial accounts.

36.    The Debtors maintain separate cryptocurrency Bedrock wallets for outbound transactions when a customer wishes to withdraw cryptocurrency from the Voyager App. Consistent with when a customer withdraws cash from the Voyager App, the Debtors prefund each outbound Hot Wallet to ensure that there are enough digital assets to process withdrawals of cryptocurrency as they are requested.  The cryptocurrency is then transferred from the Hot Wallets to the customer's individual wallet.

37.    In the ordinary course, the Debtors incur periodic service charges, payment processing fees, and other fees in connection with maintaining the Cash Management System. The Debtors incur approximately $4,000 in Bank Fees each month under the Cash Management System in the aggregate.  The Debtors estimate that approximately $2,000 in prepetition Bank Fees remain outstanding as of the Petition Date.

38.    MC Bank and Signature Bank are designated as authorized depositories in the Southern District of New York by the Office of the United States Trustee for the Southern District of New York, pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees*.  MC Bank and Signature Bank are each party to a uniform depository agreement with the U.S. Trustee, and therefore, the Debtors believe that the Bank Accounts at

these institutions will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.

39.    To the extent that the other Cash Management Banks are not authorized depositories, the Debtors maintain that they are well capitalized and financially stable financial institutions that are insured by the Federal Deposit Insurance Corporation, and therefore maintenance of the Bank Accounts will not jeopardize any party in interest. Moreover, the amounts held with BMO Harris are approximately $2.4 million in the aggregate and are fully insured up to the FDIC limit. Additionally, amounts held in Silvergate Bank are approximately $2.8 million in the aggregate and are fully insured up to the FDIC limit.

40.    In addition, the Debtors hold cryptocurrency assets through third party custodians including Coinbase Trust Company, LLC in the ordinary course of business

41.    In the event that any of the the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during the chapter 11 cases, the Debtors request that the Court either (a) provide the Debtors with 45 days without prejudice to seeking an additional extension from the entry of the Interim Order, to bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or (b) to seek appropriate relief from the Court.

42.    The Debtors maintain business relationships with each other resulting in intercompany receivables and payables in the ordinary course of business.  The MC Bank Master Operating Account is the Debtors' primary operating account where substantially all of the Debtors' cash is directly or indirectly wired or transferred throughout the Cash Management System.

43.     In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, at any given time there may be Intercompany Balances owing by one Debtor to another Debtor.  Certain Intercompany Balances are settled in cash while others are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

44.     The Intercompany Transactions are crucial for the Debtors to process payroll, pay vendors for goods and services, and to otherwise operate their business.  As a practical matter, deconsolidation likely would require extensive renegotiation with and outreach to vendors and other third parties, most of whom are accustomed to interfacing only with the Debtors.  These third parties also are accustomed to using the existing Cash Management System, which funnels payments on account of all Debtors through the various Bank Accounts and the MC Bank Master Operating Account.

45.     Intercompany Transactions can be, and will be, tracked on a postpetition basis, and fully subject to monthly reviews by the Debtors.

46.     As part of the Cash Management System, the Debtors have provided approximately five employees with corporate credit cards issued by Brex to cover legitimate business expenses, including certain travel expenses, incurred in the ordinary course of business in connection with their employment as well as certain vendor payments.  Historically, the Debtors accrued and paid approximately $300,000 per month on account of the Corporate Cards, which hold a $2 million aggregate credit limit.   As of the Petition Date, the Corporate Cards hold a balance of approximately $76,000.  The costs incurred through use of the Corporate Cards are billed directly

to the Debtors and do not pass through the applicable employee's personal financial account. The Corporate Card payments are paid on a monthly basis.

47.     As part of their Cash Management System, the Debtors use various preprinted business forms in the ordinary course. To minimize expenses to their estates and to avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks, invoices, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required by the U.S. Trustee Guidelines. The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

48.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**G.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

49.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses

and (b) continue employee compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

50.      As of the Petition Date, the Debtors employ approximately 351 individuals across the United States, Denmark, Canada, France, and Latin America on a part- or full-time basis.  In the United States, the Debtors employ approximately 284 Employees, of which approximately 245 are salaried, exempt, and approximately 39 are nonexempt and paid on an hourly basis.  None of the Employees are represented by a union or collective bargaining unit.  From time to time, the Debtors retain approximately 83 engineering consultants.  In addition, in Latin America, the Debtors retain approximately ten consultants.

51.      As of the Petition Date, the Debtors estimate that the total amount outstanding on account of the Employee Compensation and Benefits is approximately $2,382,652, $1,810,117 of which will become due and owing within the first 21 days of these chapter 11 cases.  The Debtors do not believe any Employee is owed prepetition amounts in excess of the $15,150 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

52.      Without the continued, uninterrupted services of the Debtors' workforce, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.  The Debtors seek to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases in the Debtors' sole discretion.

53.    By this Motion, the Debtors seek authority to (a) pay and honor certain prepetition claims relating to, among other things, Wage Obligations, Withholding and Deductions Obligations, Reimbursable Expenses, Health and Welfare Coverage and Benefits, Workers' Compensation Programs, the 401(k) Retirement Savings Plan, Paid Leave, Non-Insider Severance Benefits, and certain other benefits that the Debtors have historically provided in the ordinary course and (b) pay all costs incident to the Employee Compensation and Benefits including any prepetition amounts related thereto.

54.    Additionally, the Debtors seek to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases in the Debtors' sole discretion.

55.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  Additionally, the Debtors should be authorized to pay certain withholding obligations amounts that governments, Employees, and judicial authorities have designated for deduction from Employees' wages and that federal, state, and local government require the Debtors to remit.

56.    I believe the relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(a).

The Debtors believe that without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, which would deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.

57.    I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

**H.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor Certain Debts Under the Voyager Debit Card to Customers in the Debtors' Sole Discretion and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

58.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to honor certain debits under the Voyager Debit Card to customers on a case-by-case basis and in the Debtors' sole discretion, and (b) granting related relief.

59.    On July 1, 2022, the Debtors made the difficult but necessary decision to temporarily suspend trading, deposits, and withdrawals on the platform to provide time to continue exploring strategic alternatives and preserve the value of the Debtors' platform.  Prior to this suspension, the Debtors maintained several programs to promote their platform, garner customer business, strengthen customer loyalty, and ensure that the Debtors remain competitive in the marketplace.  These customer programs included, among others, a cryptocurrency-backed prepaid debit card offered in partnership with MasterCard that allows customers to directly spend cryptocurrency loaded or deposited onto the Voyager Debit Card and provides a percentage of cryptocurrency rewards on qualifying transactions.  As of July 1, 2022, the Debtors froze certain rewards provided in connection with the Voyager Debit Card.  Although the Debtors do not seek

authority to continue and honor the Voyager Debit Card in full, the Debtors seek to honor certain transactions under the Voyager Debit Card, in their sole discretion, on a case-by-case basis.

60.    The Debtors believe that their ability to honor certain obligations under the Voyager Debit Card is critical to retain their reputation for reliability and ensure customer satisfaction. Continuing to honor certain transactions ensures that the Debtors maintain the goodwill of their current customers, which will further enhance the Debtors' revenue and profitability. Further, certain of the Debtors' customers rely on the Voyager Debit Card for essential purchases, including mortgage payments and paycheck deposits. Failure to honor these debits on a case-by-case basis would harm the Debtors' goodwill and jeopardize certain customers' livelihoods.

61.    Failure of the Debtors to meet certain obligations under the Voyager Debit Card, would damage the Debtors' standing with their current and potential future customers at this critical time. The success and viability of the Debtors' businesses, and ultimately the Debtors' ability to maximize the value of their assets, is dependent upon their customers' continued patronage and loyalty.

62.    Although the Debtors do not intend to unfreeze the Voyager Debit Card in its entirety, or pay any rewards related thereto, while the platform is still in "sleep mode," the Debtors seek authority to honor certain debits on a one-off basis in their sole discretion. Such relief is necessary because failing to honor specific transactions within the debit account for certain customers could have disastrous repercussions for those customers, particularly those who use the Voyager Debit Card to make essential purchases.

63.    I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on

behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**I.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain Their Surety Bond Program and (II) Granting Related Relief (the "Insurance Motion").**

64.    The Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) pay their obligations under prepetition insurance policies, (ii) continue to pay certain brokerage fees, (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course, and (iv) maintain their Surety Bond Program on an uninterrupted basis; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

65.    The Debtors are the beneficiaries of various insurance policies administered by certain third-party insurance carriers. Continuation of the Insurance Policies and entry into new insurance policies, as applicable, are essential to the preservation of the value of the Debtors' properties and assets. Moreover, in many instances, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirement of the United States Trustee for the Southern District of New York that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

66.    Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, and to renew, supplement, or enter into new Insurance Policies in the ordinary course of business on a postpetition basis consistent with past practice.

67.     The Debtors utilize the services of certain Insurance Brokers, whose services are necessary to the Debtors' ability to obtain Insurance Policies on advantageous terms and at competitive rates.  The Insurance Brokers' services will also facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, administer insurance-related claims on a postpetition basis, and ensure adequate protection of the Debtors' property.  Accordingly, the Debtors request authority to pay and/or reimburse any amounts owed on account of Insurance Brokerage Fees or any other prepetition obligations in full, in cash, in the ordinary course of business and to continue paying Insurance Brokerage Fees on a postpetition basis in the ordinary course of business and consistent with past practices.

68.     Moreover, in the ordinary course of business, certain statutes, rules, contracts, and regulations require that the Debtors provide surety bonds to certain third parties, often to governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.  The Debtors obtain their Surety Bonds through their surety broker, which assists the Debtors in, among other things, obtaining the Surety Bonds.  The Debtors request authority to continue paying the Premium Payments and Surety Brokerage Fees in the ordinary course of business on a postpetition basis, including any prepetition obligations related thereto, to ensure uninterrupted coverage under the Surety Bond Program.

69.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

J.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payments of Certain Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes and Fees Motion</u>").**

70.     Pursuant to the Taxes and Fees Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors, in their sole discretion, to remit and pay (or use applicable credits to offset) Taxes and Fees and (b) granting related relief.  In addition, the Debtors request a final hearing be scheduled by the Court within approximately 21 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

71.     In the ordinary course of business, the Debtors bill, collect, incur, remit and/or pay sales and use taxes, franchise taxes, and/or various other governmental taxes, fees, and assessments, as applicable, to various federal, state, and local governmental units, including taxing authorities.  The Debtors have remitted and paid Taxes and Fees through checks and electronic transfers processed through their banks and other financial institutions or tax service providers.

72.     Failure by the Debtors to pay the Taxes and Fees when due could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, the Debtors seek authority to pay, in their reasonable discretion, the Taxes and Fees in the ordinary course as they become due.

73.     I believe that the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**K.     Debtors' Motion for Entry of an Order (I) Authorizing Voyager Digital Ltd. to Act as Foreign Representative and (II) Granting Related Relief (the "<u>Foreign Representative Motion</u>").**

74.     Pursuant to the Foreign Representative Motion, the Debtors seek entry of an order authorizing Voyager to act as foreign representative[6] on behalf of the Debtors' estates in legal proceedings in the Canadian Court.

75.     I understand that Voyager, as the proposed Foreign Representative, will seek ancillary relief in Canada on behalf of Voyager, and, to the extent necessary or appropriate, the other Debtors, in the Ontario Superior Court of Justice.  The purpose of the ancillary proceeding is to request that the Canadian Court recognize the chapter 11 case of Voyager and to the extent necessary or appropriate, the other Debtors, as "foreign main proceedings" under the applicable provisions of the CCAA to, among other things, protect Voyager's assets and operations in Canada and obtain a Canadian order staying self-help remedies by stakeholders, lenders, or other parties following the commencement of the chapter 11 cases.

76.     Absent an order of this Court, the Debtors may find it difficult to satisfy the requirements set out in the CCAA for an application for recognition of these chapter 11 cases. Accordingly, in order for Voyager to be recognized as the Foreign Representative in the Canadian Proceeding, and thereby apply to have its chapter 11 case and, if necessary or appropriate, those

---

[6]     A "foreign representative" is defined in section 45(1) of the CCAA to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company to:  (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding."

chapter 11 cases of the other Debtors, recognized by the Canadian Court, this Court must enter an order authorizing Voyager to act as the Foreign Representative in the Canadian Proceeding. This relief will allow coordination of the chapter 11 cases and the Canadian Proceeding and provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates. Specifically, the Canadian Proceeding will allow the Debtors to seek orders of the Canadian Court, ensuring that the relief granted in this Court is enforceable in Canada and that creditors in the United States and Canada are subject to similar stays as a result of the commencement of these chapter 11 cases.

77.     I believe that the relief requested in the Foreign Representative Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Representative Motion should be approved.

**L.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "NOL Motion").**

78.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to the Debtors' common stock, including the variable voting shares, or any beneficial ownership therein, and directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*.

79.     I understand that the Debtors expect to generate various Tax Attributes that are of significant value to the Debtors and their estates because the Debtors may be able to utilize the

Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases. Additionally, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years. I believe that any termination or limitation of the Tax Attributes, including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.

80.     If no restrictions on trading or worthlessness deductions are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes. I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process. I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the NOL motion.

81.     I believe that the relief requested in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

**M.      Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code and (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief (the "<u>Automatic Stay Motion</u>").**

82.     The Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code and (b) approving the form and manner of notice related thereto.

83.    The Debtors' business operations and customer base are international in scope.  The Debtors have customers in, and regularly contract with, counterparties that are based outside of the United States.  Further, many of the equity holders of Debtor Voyager Digital Ltd., a Canadian public company listed on the Toronto Stock Exchange, are non-U.S. persons.

84.    The Debtors' customers and contract counterparties located in various foreign jurisdictions may be unfamiliar with the chapter 11 process, including the scope of a debtor in possession's authority to operate its business and the importance of the automatic stay.  The Debtors may owe certain of these customers and contract counterparties prepetition obligations. These creditors—and others—may attempt to take actions violating the automatic stay to the detriment of the Debtors, their estates, and other creditors.

85.    Furthermore, upon the commencement of these chapter 11 cases, non-U.S. counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside the United States may attempt to deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, leases, or other similar grants required for the Debtors' ongoing business operations, violating section 525 of the Bankruptcy Code.

86.    The Debtors seek the relief requested herein out of an abundance of caution and to assist them in better informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with this Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help guard the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.  For these reasons,

the relief requested in the Automatic Stay Motion is in the best interest of the Debtors, their creditors, and all other parties in interest.

87.     I believe that the relief requested in the Automatic Stay Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Automatic Stay Motion should be approved.

**<u>Exhibit B</u>**

**Corporate Organizational Structure**

# Voyager Corporate Structure



## **Exhibit C**

### **Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## JOINT PLAN OF REORGANIZATION OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

---

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## **TABLE OF CONTENTS**

**Page**

Introduction ...................................................................................................................1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and**
**Other References**...................................................................................................1

    A.    Defined Terms ........................................................................................1
    B.    Rules of Interpretation ..........................................................................13
    C.    Computation of Time.............................................................................13
    D.    Governing Law .....................................................................................14
    E.    Reference to Monetary Figures..............................................................14
    F.    Reference to the Debtors or the Reorganized Debtors ...........................14
    G.    Nonconsolidated Plan ...........................................................................14

**Article II. Administrative and Priority Claims** .........................................................14

    A.    Administrative Claims ..........................................................................14
    B.    Professional Fee Claims........................................................................15
    C.    Priority Tax Claims...............................................................................16

**Article III. Classification, Treatment, and Voting of Claims and Interests** ............16

    A.    Classification of Claims and Interests ...................................................16
    B.    Summary of Classification....................................................................17
    C.    Treatment of Classes of Claims and Interests........................................18
    D.    Special Provision Governing Unimpaired Claims..................................20
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..21
    F.    Subordinated Claims.............................................................................21
    G.    Intercompany Interests..........................................................................21
    H.    Controversy Concerning Impairment .....................................................21
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code .....................................................................................................21

**Article IV. Provisions for Implementation of the Plan**...............................................22

    A.    General Settlement of Claims and Interests............................................22
    B.    Restructuring Transactions ...................................................................22
    C.    The Stand-Alone Restructuring .............................................................22
    D.    Corporate Existence..............................................................................24
    E.    New Organizational Documents............................................................24
    F.    Directors and Officers of the Reorganized Debtors...............................25
    G.    Transfer of Control of Money Transmitter Licenses and Other Related Approvals 25
    H.    Corporate Action..................................................................................25
    I.    Vesting of Assets in the Reorganized Debtors .......................................26
    J.    Cancellation of Notes, Instruments, Certificates, and Other Documents .............26
    K.    Effectuating Documents; Further Transactions ......................................27
    L.    Section 1145 Exemption .......................................................................27
    M.    Section 1146(a) Exemption ..................................................................28
    N.    Preservation of Rights of Action ...........................................................28
    O.    Closing the Chapter 11 Cases ...............................................................29

P.    Employee Arrangements........................................................................29

**Article V. Treatment of Executory Contracts and Unexpired Leases .....................................29**

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .........29
B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases........................................................................................................30
C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases...........30
D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.......31
E.    Indemnification Provisions.......................................................................32
F.    Insurance Policies and Surety Bonds........................................................32
G.    Reservation of Rights..............................................................................33
H.    Nonoccurrence of Effective Date .............................................................33
I.     Contracts and Leases Entered into After the Petition Date .................................33

**Article VI. Provisions Governing Distributions ........................................................................33**

A.    Timing and Calculation of Amounts to Be Distributed ......................................33
B.    Rights and Powers of Distribution Agent .................................................34
C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..........34
D.    Compliance Matters.................................................................................36
E.    Foreign Currency Exchange Rate ...........................................................36
F.    Claims Paid or Payable by Third Parties .................................................36
G.    Setoffs and Recoupment .........................................................................37
H.    Allocation between Principal and Accrued Interest .................................37

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests......................................................................................................................38**

A.    Disputed Claims Process .........................................................................38
B.    Objections to Claims................................................................................39
C.    Estimation of Claims ...............................................................................39
D.    No Distributions Pending Allowance ......................................................39
E.    Distributions After Allowance.................................................................39
F.    No Interest................................................................................................40
G.    Adjustment to Claims and Interests without Objection .........................40
H.    Time to File Objections to Claims...........................................................40
I.     Disallowance of Claims ..........................................................................40
J.     Amendments to Proofs of Claim .............................................................41

**Article VIII. Effect of Confirmation of the Plan ......................................................................41**

A.    Discharge of Claims and Termination of Interests .................................41
B.    Releases by the Debtors ..........................................................................41
C.    Releases by Holders of Claims and Interests.........................................42
D.    Exculpation .............................................................................................43
E.    Injunction ................................................................................................43
F.    Release of Liens.......................................................................................44
G.    OSC and SEC...........................................................................................44
H.    Protection against Discriminatory Treatment ........................................44
I.     Document Retention ................................................................................44
J.     Reimbursement or Contribution .............................................................45
K.    Term of Injunctions or Stays ..................................................................45

ii

**Article IX. Conditions Precedent to the Effective Date** ............................................................**45**

    A.     Conditions Precedent to the Effective Date ............................................45
    B.     Waiver of Conditions Precedent ............................................................46
    C.     Effect of Non-Occurrence of Conditions to Consummation ................46

**Article X. Modification, Revocation, or Withdrawal of the Plan** ............................................**46**

    A.     Modification of Plan ..............................................................................46
    B.     Effect of Confirmation on Modifications ...............................................46
    C.     Revocation or Withdrawal of Plan .........................................................46

**Article XI. Retention of Jurisdiction** ........................................................................................**47**

**Article XII. Miscellaneous Provisions** ......................................................................................**49**

    A.     Immediate Binding Effect ......................................................................49
    B.     Additional Documents ...........................................................................49
    C.     Payment of Statutory Fees .....................................................................49
    D.     Dissolution of Statutory Committees .....................................................49
    E.     Reservation of Rights ............................................................................49
    F.     Successors and Assigns .........................................................................50
    G.     Service of Documents ............................................................................50
    H.     Entire Agreement; Controlling Document ..............................................50
    I.     Plan Supplement ....................................................................................50
    J.     Non-Severability ...................................................................................51
    K.     Votes Solicited in Good Faith ...............................................................51
    L.     Waiver or Estoppel ...............................................................................51

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this joint plan of reorganization (the "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.    Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*3AC*" means Three Arrows Capital, Ltd.

2.    "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

3.    "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

4.    "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Loan.

5.    "*3AC Recovery Allocation*" means the 3AC Recovery, if any, to be distributed to Holders of Allowed Account Holder Claims.

6.    "*Account*" means any active account at OpCo held by an Account Holder, which contains Coin as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who maintains an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against OpCo that is held by an Account Holder on account of such Holder's Account.

9.      "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

10.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

11.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

12.     "*Alameda*" means Alameda Ventures Ltd., along with its affiliates and subsidiaries.

13.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

14.     "*Alameda Loan Facility"* means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

15.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

16.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy

2

Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest. "Allow" and "Allowing" shall have correlative meanings.

17.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their Estates or other parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

18.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

19.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

20.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

22.     "*Bar Date Order*" means [●].

23.     "*Board*" means the board of directors of Voyager.

24.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

25.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

26.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes

of Action" include: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Action.

27.    "*Certificate*" means any instrument evidencing a Claim or an Interest.

28.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

29.    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

30.    "*Claims Allocation Pool*" means [●].

31.    "*Claims Equity Allocation*" means New Common Stock in an amount equal to 100% of all New Common Stock, subject to dilution by the Management Incentive Plan, to be distributed to Holders of Account Holder Claims.

32.    "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

33.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims),180 days after the Effective Date  and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

34.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

35.    "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

36.    "*Coin*" or "*Coins*" means the specific Cryptocurrency(ies) deposited by, or purchased for, an Account Holder and held by, or on behalf of, OpCo as of the Petition Date.

37.    "*Coin Allocation*" means all Coins to be distributed to Holders of Account Holder Claims.

38.    "*Coin Election*" means the election by an eligible Holder of an Allowed Account Holder Claim to increase its share of the Coin Allocation by exchanging New Common Stock for additional Coin from a Holder of an Allowed Account Holder Claim that makes the Equity Election. The Coin Election shall not exceed [•]% of each Holder's Pro Rata share of the Coin Allocation. To the extent that the total

Coin Election is greater than the total Equity Election, each Holder's Coin Election shall be reduced Pro Rata.

39.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

40.    "*Confirmation Date*" means the date on which Confirmation occurs.

41.    "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

42.    "*Confirmation Order*" means the Bankruptcy Court's order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

43.    "*Consummation*" means the occurrence of the Effective Date.

44.    "*Cryptocurrency*" means any digital token based on a publicly accessible blockchain.

45.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

46.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Reorganized Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy") and all agreements, documents, or instruments relating thereto.

47.    "*Debtor Release*" means the releases set forth in Article VIII.B of the Plan.

48.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

49.    "*Definitive Documents*" means (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders), including the First Day Filings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the New Organizational Documents; (h) any key employee incentive plan or key employee retention plan; (i) all documentation with respect to any post-emergence management incentive plan; (j) any other disclosure documents related to the issuance of the New Common Stock; (k) any new material employment, consulting, or similar agreements; and (l) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

50.    "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

51.    "*Disclosure Statement Order*" means [●].

52.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

53.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Reorganized Debtors for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

54.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities designated by the Reorganized Debtors to make or to facilitate distributions that are to be made pursuant to the Plan.

55.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

56.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

57.    "*DTC*" means the Depository Trust Company.

58.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

59.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

60.    "*Equity Election*" means the election by an eligible Holder of an Allowed Account Holder Claim to increase its share of the Claims Equity Allocation by exchanging Coin for additional New Common Stock from a Holder of an Allowed Account Holder Claim that makes the Coin Election. The Equity Election shall not exceed [•]% of each Holder's Pro Rata share of the Claims Equity Allocation. To the extent that the total Equity Election is greater than the total Coin Election, each Holder's Equity Election shall be reduced Pro Rata.

61.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2017), and the regulations promulgated thereunder.

62.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

63.    ["*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; and (c) each Related Party of each Entity in clauses (a) through (b).][1]

64.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

65.    "*Existing Equity Interests*" means any Interest in Voyager existing immediately prior to the occurrence of the Effective Date.

66.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

67.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

68.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

69.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

70.    "*First Day Filings*" means the "first-day" filings that the Debtors made upon or shortly following the commencement of the Chapter 11 Cases.

71.    "*General Unsecured Claim*" means any Claim against a Debtor that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; (h) an Alameda Loan Facility Claim; (i) an Intercompany Claim; or (j) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against one or more of the Debtors are General Unsecured Claims.

72.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

---

[1]    This definition and any related provision in this Plan remain subject to an ongoing investigation.

73.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

74.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Indemnification Provisions*" means the provisions in place before or as of the Effective Date, whether in a Debtor's bylaws, certificates of incorporation, limited liability company agreement, partnership agreement, management agreement, other formation or organizational document, board resolution, indemnification agreement, contract, or otherwise providing the basis for any obligation of a Debtor as of the Effective Date to indemnify, defend, reimburse, or limit the liability of, or to advance fees and expenses to, any of the Debtors' current and former directors, equity holders, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals, and each such Entity's respective affiliates, as applicable.

76.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

77.    "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

78.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

79.    "*Interim Compensation Order*" means [●].

80.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

81.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

82.    "*Litigation Agent*" has the meaning ascribed to it in Article IV.I herein.

83.    "*Management Incentive Plan*" means the post-emergence management incentive plan to be implemented with respect to Reorganized Voyager by the New Board, as applicable, on or as soon as reasonably practicable after the Effective Date, which shall be set forth in the Plan Supplement.

84.    "*Money Transmitter Licenses*" means any license or similar authorization of a Governmental Unit that an Entity is required to obtain to operate as a broker of Cryptocurrency.

85.    "*New Board*" means the initial board of directors of Reorganized Voyager immediately following the occurrence of the Effective Date, to be appointed in accordance with the Plan and the New Organizational Documents.

86.     "*New Common Stock*" means the common stock of Reorganized Voyager to be issued on the Effective Date.

87.     "*New Organizational Documents*" means the organizational and governance documents for the Reorganized Debtors and any subsidiaries thereof, including, as applicable, the certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, or certificates of conversion, limited liability company agreements, operating agreements, or limited partnership agreements, stockholder or shareholder agreements, bylaws, the identity of proposed members of the board of Reorganized Voyager, indemnification agreements, and Registration Rights Agreements (or equivalent governing documents of any of the foregoing).

88.     "*OpCo*" means Voyager Digital, LLC.

89.     "*OSC*" means the Ontario Securities Commission.

90.     "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

91.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

92.     "*Petition Date*" means July 5, 2022.

93.     "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the New Organizational Documents; (b) to the extent known, the identity and members of the New Board; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Retained Causes of Action; (e) the Restructuring Transactions Memorandum; and (f) any additional documents necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.

95.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

96.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan, unless otherwise indicated.

9

97.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

98.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

99.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

100.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

101.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

102.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

103.    "*Registration Rights Agreement*" means any agreement providing registration rights to any parties with respect to the New Common Stock.

104.    "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

105.    ["*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) Alameda; (d) the Releasing Parties; and (e) each Related Party of each Entity in clauses (a) through (d); *provided* that any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party shall not be a "Released Party."][2]

106.    ["*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) Alameda, (d) all Holders of Claims that vote to accept the Plan; (e) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the

---

[2]    This definition and any related provision in this Plan remain subject to an ongoing investigation.

releases provided by the Plan; (f) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (g) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (h) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (i) each Related Party of each Entity in clauses (a) through (h).][3]

107.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Voyager and any intermediary holding company formed in the Restructuring Transactions through which Reorganized Voyager holds any other Reorganized Debtor.

108.    "*Reorganized Voyager*" means the Entity that will be the issuer of the New Common Stock, which Entity shall be either (a) a Debtor (including, for the avoidance of doubt, potentially Voyager), or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, or (b) a newly formed corporation, limited liability company, partnership, or other entity that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors, in each case, in accordance with the Restructuring Transactions Memorandum, on or after the Effective Date.

109.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

110.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

111.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement at the Debtors' option of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Reorganized Debtors, as applicable, in accordance with the Plan.

112.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement.

113.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Rejected Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

114.    "*SEC*" means the United States Securities and Exchange Commission.

---

[3]    This definition and any related provision in this Plan remain subject to an ongoing investigation.

11

115.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

116.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

117.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

118.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

119.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

120.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

121.    "*Stand-Alone Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.C of this Plan, which shall occur on the Effective Date.

122.    "*Third-Party Release*" means the releases set forth in Article VIII.C of the Plan.

123.    "*Transfer of Control*" means the transfer of control of the Money Transmitter Licenses held by Voyager or any of its subsidiaries as a result of the issuance of the New Common Stock to Holders of Account Holder Claims.

124.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, within six months of outreach, has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

125.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

126.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

127.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

128.    "*Voting Deadline*" means the date that is twenty-eight (28) days after Solicitation Launch (as defined in the Disclosure Statement).

129.    "*Voyager*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

130.    "*Voyager Tokens*" means that certain cryptocurrency token issued by Voyager.

131.    "*Voyager Token Allocation*" means the Voyager Tokens held by the Debtors as of the Petition Date to be distributed to Holders of Allowed Account Holder Claims.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

**ARTICLE II.**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date for Administrative Claims.

14

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Reorganized Debtors and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.      Professional Fee Claims**

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five days (45) after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.  The Reorganized Debtors shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.      Professional Fee Escrow Account

No later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account

in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      Professional Fee Escrow Amount

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

A.      **Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting,

16

Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is summarized in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[4]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[4]     The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

**C.      Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.

1.    <u>Class 1 —Secured Tax Claims</u>

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 — Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 — Account Holder Claims</u>

(a)    *Classification*:  Class 3 consists of all Account Holder Claims.

(b)    *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Account Holder Claim, its Pro Rata share of:

(i)      the Coin Allocation;

(ii)     the Claims Equity Allocation;

(iii)    the Voyager Token Allocation; and

(iv)     the 3AC Recovery Allocation;

*provided* that subclauses (i) and (ii) shall be subject to such Holder's Coin Election or Equity Election, as applicable.

(c)     *Voting:*  Class 3 is Impaired under the Plan.  Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 — Alameda Loan Facility Claims

(a)     *Classification*:  Class 4 consists of all Alameda Loan Facility Claims.

(b)     *Treatment*:  Alameda Loan Facility Claims shall be cancelled, released, discharged and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Alameda Loan Facility Claims will not receive any distribution on account of such Alameda Loan Facility Claims.

(c)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

5.     Class 5 — General Unsecured Claims

(a)     *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, its Pro Rata share of the Claims Allocation Pool.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.     Class 6 — Section 510(b) Claims

(a)     *Classification*:  Class 6 consists of all Section 510(b) Claims.

(b)     *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)     *Treatment*:  Allowed Section 510(b) Claims, if any, shall be cancelled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)     *Voting*:  Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

19

7.      <u>Class 7 — Intercompany Claims</u>

    (a)      *Classification*:  Class 7 consists of all Intercompany Claims.

    (b)      *Treatment*:  On the Effective Date, all Intercompany Claims shall be, at the option of Reorganized Voyager, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Restructuring Transactions Memorandum.

    (c)      *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.      <u>Class 8 — Intercompany Interests</u>

    (a)      *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)      *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of Reorganized Voyager, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Restructuring Transactions Memorandum.

    (c)      *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9.      <u>Class 9 — Existing Equity Interests</u>

    (a)      *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)      *Treatment*:  On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Equity Interests will not receive any distribution on account of such Existing Equity Interests.

    (c)      *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**H.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims and Interests**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors or Reorganized Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan and Restructuring Transactions Memorandum, including:   (1) the execution and delivery of any New Organizational Documents, including any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation, in each case, containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of any New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (4) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (5)  all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Voyager, which purchase may be structured as a taxable transaction for United States federal income tax purpose; and (6) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**C.      The Stand-Alone Restructuring**

The Debtors shall effectuate the Stand-Alone Restructuring, which shall be governed by the following provisions.

1.      Sources of Consideration for Plan of Reorganization Distributions

The Reorganized Debtors shall fund distributions under the Plan with:  (a) Cash, (b) Coins (c) the Voyager Tokens, (d) the 3AC Recovery, and (e) the New Common Stock.  The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

2.      Sale and Distribution of Coins.

On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtors shall distribute Coins to the Holders of applicable Claims in exchange for such Holders' respective Claims against the Debtors as set forth in Article III.C hereof and consistent with the Restructuring Transactions Memorandum.  The Debtors or the Reorganized Debtors shall be authorized to sell [●]% of the Coins for purposes of effectuating the Stand-Alone Restructuring.

3.      Issuance and Distribution of the New Common Stock

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Voyager shall issue the New Common Stock, the Existing Equity Interests in Voyager shall be cancelled, and the New Common Stock (along with the other consideration described in this Plan) shall be transferred to the Holders of applicable Claims in exchange for such Holders' respective Claims against the Debtors as set forth in Article III.C hereof and consistent with the Restructuring Transactions Memorandum.  The issuance of the New Common Stock by Reorganized Voyager and the transfer of the New Common Stock to the Holders of applicable Claims is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims.

All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of New Common Stock by any Holder of any Claim shall be deemed such Holder's agreement to the New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

[It is intended that the New Common Stock will be publicly traded and Reorganized Voyager will seek to obtain a listing for the New Common Stock on a recognized U.S. or Canadian stock exchange as promptly as reasonably practicable on or after the date on which such New Common Stock is issued. However, Reorganized Voyager shall have no liability if it does not or is unable to do so.  In the event the New Common Stock is listed on a recognized U.S. stock exchange, recipients accepting distributions of New Common Stock shall be deemed to have agreed to cooperate with Reorganized Voyager's reasonable requests to assist in its efforts to list the New Common Stock on a recognized U.S. stock exchange.]

4.    Distribution of the Voyager Tokens

On, or as soon as reasonably practicable after, the Effective Date, the Voyager Tokens shall be transferred to the Holders of applicable Claims in exchange for such Holders' respective Claims against the Debtors as set forth in Article III.C hereof and consistent with the Restructuring Transactions Memorandum. Such transfer of the Voyager Tokens is authorized without the need for any further corporate action and without the need for any further action by Holders of any Claims.

All of the Voyager Tokens transferred pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution of the Voyager Tokens under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution and by the terms and conditions of the instruments evidencing or relating to such distribution, which terms and conditions shall bind each Entity receiving such distribution.

5.    3AC Recovery Allocation

The Plan provides that Allowed Holders of Account Holder Claims shall receive their Pro Rata share of the 3AC Recovery Allocation. The Debtors shall distribute the 3AC Recovery Allocation to Allowed Holders of Account Holder Claims as soon as reasonably practicable after receiving any 3AC Recovery in the 3AC Liquidation Proceeding.

**D.    Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law). After the cancellation of the Existing Equity Interests in Voyager, the former equityholders of Voyager shall not, on account of their former ownership of Existing Equity Interests in Voyager, own or be deemed to own any interest, directly or indirectly, in Voyager, any Reorganized Debtor, or any of their assets.

**E.    New Organizational Documents**

To the extent advisable or required under the Plan or applicable non-bankruptcy law, on or prior to the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, the Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation or formation in accordance with the applicable corporate or formational laws of the respective state, province, or country of incorporation. The New Organizational Documents of Reorganized Voyager shall, among other things: (1) authorize the issuance of the New Common Stock; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend, amend and

restate, supplement, or modify the New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, or certificates of conversion, limited liability company agreements, operating agreements, or limited partnership agreements, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation or formation and the New Organizational Documents.

F.     **Directors and Officers of the Reorganized Debtors**

1.     <u>The New Board</u>

As of the Effective Date, the terms of the current members of the board of directors of Voyager shall expire, and, without further order of the Bankruptcy Court, the New Board shall be appointed. For the avoidance of doubt, the existing board of directors of Voyager will approve the appointment of the New Board.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the commencement of the Confirmation Hearing.  The directors of each of the subsidiary Debtors shall consist of either existing directors of such Debtor or such persons as designated in the Plan Supplement or prior to the commencement of the Confirmation Hearing, and remain in such capacities as directors of the applicable Reorganized Debtor until replaced or removed on or after the Effective Date in accordance with the New Organizational Documents of the applicable Reorganized Debtor; *provided* that, in the event a director of a subsidiary Debtor also holds a management position and is replaced or removed from such management position prior to the Effective Date, then any such director may be replaced or removed from his or her subsidiary director role prior to the Effective Date.

From and after the Effective Date, each director (or director equivalent) of the Reorganized Debtors shall serve pursuant to the terms of the respective Reorganized Debtor's charters and bylaws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

G.     **Transfer of Control of Money Transmitter Licenses and Other Related Approvals**

The Plan and the Confirmation Order shall provide the Debtors or the Reorganized Debtors, as applicable, with the requisite authority to proceed with any Transfer of Control required under the Money Transfer Licenses and any other requirements for similarly situated state and/or federal regulatory approvals.

H.     **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) selection of the directors, managers, members, and officers for the Reorganized Debtors, including the appointment of the New Board or any directors of a subsidiary Debtor; (2) the issuances, transfer, and distribution of the New Common Stock and Voyager Tokens; (3) the formation of any entities pursuant to and the implementation of the Restructuring Transactions and performance of all actions and transactions contemplated hereby and thereby; (4) adoption and filing of the New Organizational Documents; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and

Unexpired Leases; and (6) all other acts or actions contemplated by the Plan or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Coins, New Common Stock, Voyager Tokens, 3AC Recovery, if applicable, and the New Organizational Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

I.   **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property in each Debtor's Estate, all Causes of Action of the Debtors (unless otherwise released or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Notwithstanding the above, the 3AC Recovery shall not revest with the Reorganized Debtors. The 3AC Recovery will be assigned on the Effective Date to an assignee of the Debtors (the "Litigation Agent") as determined by the Debtors, in their sole discretion, to be pursued by the Litigation Agent in the name and right of the Debtors or Reorganized Debtors, as applicable. Pursuit of any 3AC Recovery in accordance with the 3AC Liquidation Proceeding is solely for the benefit of Holders of Allowed Account Holder Claims. Any 3AC Recovery in the 3AC Liquidation Proceeding shall be segregated from general corporate funds of the Reorganized Debtors and held for the benefit of Holders of Allowed Account Holder Claims. Notwithstanding the foregoing, to the extent the Reorganized Debtors or Litigation Agent incur costs and expenses in connection with the pursuit of the 3AC Recovery, such costs and expenses shall be reimbursed first before any other distribution of the proceeds of the 3AC Proceeding. After payment of such costs and expenses, as well as any tax amounts associated with 3AC Recovery Allocation (if applicable), the net remaining proceeds shall be distributed by the Litigation Agent, Pro Rata, in proportion to the distributable value under this Plan allocated to each Holder of an Allowed Account Holder Claim capped at the Allowed amount of the Claim as of the Petition Date.

J.   **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically

provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto, and the duties and obligations of the Debtors or the Reorganized Debtors, as applicable, any non-Debtor Affiliates shall be deemed satisfied in full, cancelled, released, discharged, and of no force or effect.

**K.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the directors, managers, partners, officers, authorized persons, and members thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Common Stock, the New Organizational Documents, and any other Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**L.      Section 1145 Exemption**

The shares of New Common Stock being issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) only to the extent that such exemption under section 1145 of the Bankruptcy Code is not available (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Securities issued in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable by any holder thereof that, at the time of transfer, (1) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, (3) has not acquired such securities from an "affiliate" within one year of such transfer and (4) is not an entity that is an "underwriter."

To the extent any shares of New Common Stock are issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, they will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan are exempt from

registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## M.      Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Entity) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## N.      Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion

28

doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**O.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Debtors, or the Reorganized Debtors shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of [Voyager Digital, LLC], or any other Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of [Voyager Digital, LLC], or any other Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

**P.      Employee Arrangements**

After the Effective Date, the Debtors shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that such payments shall not adversely affect any distributions provided for under this Plan.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed, assumed and assigned, or rejected by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume, assume and assign, or reject Filed on or before the Confirmation Date that is pending on the Effective Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments, all pursuant to sections 365(a) and 1123 of the

Bankruptcy Code and effective on the occurrence of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**B.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Leases, if any, shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Reorganized Debtors, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.E of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.**  All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date, with the amount and timing of payment of any such Cure dictated by the Debtors' ordinary course of business.  The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases no later than the Effective Date.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date.  **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.**  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding:  (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.D, in the amount and at the time dictated by the Debtors' ordinary course of business, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been**

fully paid pursuant to this Article V.D, in the amount and at the time dictated by the Debtors' ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute.  Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.

E.      **Indemnification Provisions**

On and as of the Effective Date, the Indemnification Provisions will be assumed by the Debtors, and shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date.  The Reorganized Debtors' governance documents shall provide for indemnification, defense, reimbursement, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Debtors' current and former directors, managers, officers, members, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors to the fullest extent permitted by law and at least to the same extent as provided under the Indemnification Provisions against any Cause of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted; *provided* that the Reorganized Debtors shall not indemnify any Person for any Cause of Action arising out of or related to any act or omission that is a criminal act or constitutes actual fraud, gross negligence, bad faith, or willful misconduct.  None of the Reorganized Debtors will amend or restate their respective governance documents before, on, or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such rights to indemnification, defense, reimbursement, limitation of liability, or advancement of fees and expenses.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Indemnification Provisions.

F.      **Insurance Policies and Surety Bonds**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code.

The Debtors or the Reorganized Debtors, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Reorganized Debtors may deem necessary.

32

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Reorganized Debtor(s) unaltered.

## G.   Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## H.   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## I.   Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.   Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest,

dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.      Rights and Powers of Distribution Agent**

      1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Reorganized Debtors.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      1.      Distributions Generally

Except as otherwise provided in the Plan (including in the next paragraph), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

Distributions of New Common Stock shall be made through the facilities of DTC in accordance with DTC's customary practices.  For the avoidance of doubt, DTC shall be considered a single Holder for purposes of distributions.

      2.      Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

      3.      Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims.  The Distribution Agent shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution

Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.       Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all of the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; *provided* that, if the Reorganized Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Distribution Agent may make a partial distribution on account of that portion of such Claim that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

5.       De Minimis Distributions; Minimum Distributions

No fractional shares of New Common Stock, Coin, Voyager Token or 3AC Recovery shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts and such fractional amounts shall be deemed to be zero.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment thereto.  The total number of authorized shares of New Common Stock to be distributed to Holders of Account Holder Claims may (at the Debtors' discretion) be adjusted as necessary to account for the foregoing rounding; *provided* that DTC will be considered a single holder for purposes of distributions.

The Distribution Agent shall not make any distributions to any Holder of an Allowed Claim pursuant to Art. III.C.1-9 of this Plan on account of such Allowed Claim of Coin, New Common Stock, Cash, Voyager Token or 3AC Recovery if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $[●], and each Holder of an Allowed Claim to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Allowed Claim against the Reorganized Debtors or their property.

6.       Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable (other than a distribution to or through DTC) or (b) the Holder of an Allowed Claim does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the Effective Date. After such date, all unclaimed

property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

7.     Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise provided in applicable agreements.

**D.     Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Reorganized Debtors and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Reorganized Debtors, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.     Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, other than any Account Holder Claim, asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**F.     Claims Paid or Payable by Third Parties**

1.     Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor (or other Distribution Agent), as applicable. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor (or other Distribution Agent), as applicable, on account of such Claim, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution

36

shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

2.     Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such satisfaction, such Claim may be expunged on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.     Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, Reorganized Debtor, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or Reorganized Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claims, rights, or Causes of Action the Debtors or Reorganized Debtors may possess against such Holder.

**H.     Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim, if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED,
## CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

### A.    Disputed Claims Process

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  If a Holder of a Claim in Class disputes the amount of their Claim as listed in the Schedules, the Holder should notify of the Debtors of such dispute.  If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date.  If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties).  After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary:  (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including with respect to the 3AC Recovery), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or fund's assets and then contributed such interests (in accordance with the Restructuring Transactions Memorandum) to such account or fund.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Reorganized Debtors would be required to comply with the relevant rules.

B.    **Objections to Claims**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors, shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, any objections to Claims; and (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article IV.N of the Plan.

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

C.    **Estimation of Claims**

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim is estimated.

D.    **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

E.    **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed

Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law.

### F.     No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### G.     Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### H.     Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

### I.     Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.       Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.       Discharge of Claims and Termination of Interests**

As provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B.       Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the**

41

Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.     **Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the

42

Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

D.    **Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    **Injunction**

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Article VIII.B of this Plan; (c) have been released pursuant to Article VIII.C of this Plan, (d) are subject to exculpation pursuant to Article VIII.D of this Plan, or (e) are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any Claims, Interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any discharged, released, settled, compromised, or exculpated Claims, Interests, Causes of Action, or liabilities.

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E.**

**F.      Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order  on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Reorganized Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**G.      OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**H.      Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**I.      Document Retention**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

**J.        Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**K.        Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.        Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order and in full force and effect.

2.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

3.    The Debtors shall have sold [●]% of the Coins for purposes of effectuating the Plan.

4.    Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and shall not have been modified in a manner inconsistent therewith;

5.    The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

6.    The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.        Waiver of Conditions Precedent**

The Debtors may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.        Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur, then the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.        Modification of Plan**

Subject to the limitations and terms contained in the Plan, the Debtors reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.        Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.        Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases,  and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.    hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.    hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.    enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.    enforce all orders previously entered by the Bankruptcy Court; and

18.    hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

### E.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

### F.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

### G.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Reorganized Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention:  David Brosgol<br>General Counsel,<br>E-mail address:  dbrosgol@investvoyager.com |
|---|---|
| | with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |

### H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

### I.    Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

## L.    Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  July 6, 2022                         VOYAGER DIGITAL HOLDINGS, INC.
                                             on behalf of itself and all other Debtors


                                             _/s/ Stephen Ehrlich_
                                             Stephen Ehrlich
                                             Co-Founder and Chief Executive Officer
                                             Voyager Digital Holdings, Inc.

## **Exhibit D**

## **Committees Organized Prepetition**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge there were, prior to the Petition Date, no committees formed to participate in the Debtors' ongoing restructuring efforts.

## Exhibit E

### Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Alameda Research Ltd. Tortola Pier Park, Building 1, Second Floor Wickhams Cay I, Road Town, Tortola, British Virgin Islands Alameda Research Ventures Ltd. 2000 Center Street, 4th Floor, Berkeley, CA 94704 | Alameda Research Ltd. | Unsecured Loan Party | | | | $75,000,000.00 |
| 2 | On file | On file | Customer | | | | $9,771,026.39 |
| 3 | On file | On file | Customer | | | | $7,875,569.88 |
| 4 | On file | On file | Customer | | | | $5,133,077.33 |

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5 | On file | On file | Customer | | | | $3,327,083.25 |
| 6 | On file | On file | Customer | | | | $3,316,285.83 |
| 7 | On file | On file | Customer | | | | $3,084,416.32 |
| 8 | On file | On file | Customer | | | | $2,930,770.56 |
| 9 | On file | On file | Customer | | | | $2,899,546.46 |
| 10 | On file | On file | Customer | | | | $2,699,537.41 |

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 11 | On file | On file | Customer | | | | $2,584,297.56 |
| 12 | On file | On file | Customer | | | | $2,472,855.31 |
| 13 | On file | On file | Customer | | | | $2,466,916.67 |
| 14 | On file | On file | Customer | | | | $2,405,985.41 |
| 15 | On file | On file | Customer | | | | $2,163,490.52 |
| 16 | On file | On file | Customer | | | | $2,048,781.58 |

3

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | On file | On file | Customer | | | | $1,999,936.23 |
| 18 | On file | On file | Customer | | | | $1,936,370.03 |
| 19 | On file | On file | Customer | | | | $1,855,378.84 |
| 20 | On file | On file | Customer | | | | $1,785,763.23 |
| 21 | On file | On file | Customer | | | | $1,781,958.34 |
| 22 | On file | On file | Customer | | | | $1,689,566.42 |

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 23 | On file | On file | Customer | | | | $1,661,058.19 |
| 24 | On file | On file | Customer | | | | $1,577,946.44 |
| 25 | On file | On file | Customer | | | | $1,509,038.80 |
| 26 | On file | On file | Customer | | | | $1,442,283.33 |
| 27 | On file | On file | Customer | | | | $1,391,369.85 |
| 28 | On file | On file | Customer | | | | $1,329,222.92 |

5

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 29 | On file | On file | Customer | | | | $1,310,281.37 |
| 30 | On file | On file | Customer | | | | $1,307,524.62 |
| 31 | On file | On file | Customer | | | | $1,260,535.52 |
| 32 | On file | On file | Customer | | | | $1,225,553.05 |
| 33 | On file | On file | Customer | | | | $1,223,832.81 |
| 34 | On file | On file | Customer | | | | $1,174,538.85 |

6

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | On file | On file | Customer | | | | $1,165,604.89 |
| 36 | On file | On file | Customer | | | | $1,125,470.69 |
| 37 | On file | On file | Customer | | | | $1,116,305.23 |
| 38 | On file | On file | Customer | | | | $1,107,941.23 |
| 39 | On file | On file | Customer | | | | $1,061,546.38 |
| 40 | On file | On file | Customer | | | | $1,024,800.55 |

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 41 | On file | On file | Customer | | | | $1,009,999.15 |
| 42 | On file | On file | Customer | | | | $1,004,308.85 |
| 43 | On file | On file | Customer | | | | $997,520.99 |
| 44 | On file | On file | Customer | | | | $991,340.08 |
| 45 | On file | On file | Customer | | | | $988,921.41 |
| 46 | On file | On file | Customer | | | | $981,899.00 |

| | Name of creditor and complete mailing address, including zip code and last 6 digits of customer user ID | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 47 | Google, LLC.<br>Google LLC<br>1600 Amphitheatre Pkwy<br>Mountain View, CA 94043 | collections@google.com | Vendor | | | | $959,775.94 |
| 48 | On file | On file | Customer | | | | $958,713.73 |
| 49 | On file | On file | Customer | | | | $955,579.05 |
| 50 | On file | On file | Customer | | | | $955,417.27 |

## **<u>Exhibit F</u>**

**Consolidated List of the Holders of the Debtors' Largest Secured Claims**

Pursuant to local Rule 1007-2(a)(5), to the best of the Debtors' knowledge there were, prior to the Petition Date, no secured claims against the Debtors.

## Exhibit G

**Summary of the Debtors' Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of April 30, 2022) | $5,087,725,000 |
| Total Liabilities (Book Value as of April 30, 2022) | $4,901,129,000 |

## **Exhibit H**

### **Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date.

| Equity Security | Number of Outstanding Shares |
|---|---|
| Common Stock Outstanding | 196,110,199 |

## Exhibit I

### Summary of the Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

As further discussed in the First Day Declaration and the Cash Management Motion, the Debtors contract with third-party crypto custodians and self-custody custodians to allow their customers to trade various cryptocurrency and store digital currencies.  Through these arrangements, the Debtors' ownership interest is not affected.  Any additional information that the Debtors may have with respect to the aforementioned will be provided during these chapter 11 cases.

**Exhibit J**

**Summary of the Debtors' Property From Which the Debtors Operates Its Business**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates their business as of the Petition Date.

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Debtor | Street Address | City | State | Zip Code |
| Voyager Digital Ltd. | 333 Bay Street, Suite 2400 | Toronto | ON, Canada | M5H 2R2 |
| Voyager Digital Ltd. | 33 Irving Place, 3rd Floor | New York | NY | 10003 |
| Voyager Digital Ltd. | 150 4th Avenue N | Nashville | TN | 37219 |
| Voyager Digital Ltd. | 78 Southwest 7th Street, 8th Floor | Miami | FL | 33130 |
| Voyager Digital Holdings, Inc. | 33 Irving Place, 3rd Floor | New York | NY | 10003 |
| Voyager Digital Holdings, Inc. | 150 4th Avenue N | Nashville | TN | 37219 |
| Voyager Digital Holdings, Inc. | 78 Southwest 7th Street, 8th Floor | Miami | FL | 33130 |
| Voyager Digital, LLC | 2500 Plaza 5, 25th Floor | Jersey City | NJ | 07311 |
| Voyager Digital, LLC | 150 4th Avenue N | Nashville | TN | 37219 |
| Voyager Digital, LLC | 78 Southwest 7th Street, 8th Floor | Miami | FL | 33130 |

## Exhibit K

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of April 30, 2022, the Debtors' had assets of approximately $5,087,725,000, as provided in Schedule 4, substantially all of which are held digitally and securely by cloud computing service providers.

### Books and Records

The Debtors' books and records are stored digitally and securely by cloud computing service providers.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States; however, in the ordinary course of business, on any given day, the Debtors may own title to goods and merchandise that is in transit to the United States from locations outside the territorial limits.  Such goods only remain outside the United States for the duration of shipping and transport.  Because of the constant movement of this property, providing a comprehensive list of such goods and merchandise would be impractical.

**Exhibit L**

**Summary of Legal Actions against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Company or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| Voyager Digital Ltd. and Voyager Digital, LLC | Mark Cassidy, on behalf of himself and all others similarly situated | New Jersey Consumer Fraud Act; Florida Deceptive and Unfair Trade Practices Act; and Unjust Enrichment | Pending |
| Voyager Digital, LLC *et al.* | Jordan Berk | California Customer Records Act; California Consumer Privacy Act; and Negligence | Pending |
| Voyager Digital, LLC | U.S. Bank Nat'l Ass'n | Federal Trademark Infringement; Federal Unfair Competition; Common Law Trade Name Infringement; Common Law Unfair Competition; Unjust Enrichment; and Minnesota Deceptive Trade Practices Act | Pending |
| Voyager Digital, LLC *et al.* | State of Indiana Office of the Secretary of State Securities Division | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | Commonwealth of Kentucky Department of Financial Institutions | State Regulatory Action | Pending[1] |

---

[1]   Debtors have ceased offering the Voyager Earn Program in Commonwealth of Kentucky.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| Voyager Digital, LLC *et al.* | State of New Jersey Bureau of Securities | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | State of Oklahoma Department of Securities | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | State of Alabama Securities Commission | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | Texas State Securities Board | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | State of Vermont Department of Financial Regulation | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | State of Washington Department of Financial Institutions Securities Division | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | Securities Commissioner of South Carolina | State Regulatory Action | Pending |
| Voyager Digital, LLC *et al.* | State Of California Business, Consumer Services and Housing Agency Department of Financial Protection and Innovation | State Regulatory Action | Pending |

## Exhibit M

### The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Stephen Ehrlich*, Chief Executive Officer & Director | Stephen Ehrlich is Chief Executive Officer and co-founder of Voyager Digital Ltd. Under his leadership, Voyager has scaled from a start-up to a $3 billion company. Previously, he was Chief Executive Officer at E*TRADE Professional Trading LLC where he led eight mergers and acquisitions over seven years, including the management buyout of the Lightspeed division in July 2006, making him Chief Executive Officer of Lightspeed Financial, LLC. Stephen is founder of the Hockey in Norwalk Foundation, a non-profit that created opportunities in hockey for 300 young players, and was awarded a grant by the New York Rangers in connection therewith. He graduated from Franklin & Marshall College with a Bachelor of Science in Accounting. | 2018–Present |
| *Philip Eytan*, Chairman & Director | Philip Eytan began his career at Morgan Stanley in 2000 as an analyst in Telecom M&A. From 2002 to 2007, he helped manage a large distressed debt book at Cerberus Capital Management. After leaving Cerberus, Philip started his own hedge fund. He has been an avid tech investor since 2007. He was a founding investor in Livestream (sold to IAC in 2017); a founding investor in Socure (a cyber fraud prevention company); and an early investor in Uber. In 2014, Philip co-founded Pager, a digital health startup at which he is currently the Chief Strategy Officer and a director. He holds a bachelor's degree and master's degree in finance and management from HEC Geneva (University of Geneva). | 2018–Present |
| *Gerard Hanshe*, Chief Operations Officer | As Voyager's Chief Operating Officer, Gerard Hanshe is responsible for overseeing the trading operations, customer service, product development, design, quality assurance, and data analysis teams. Gerard joined the Company as product manager shortly after its founding and led the team's efforts in building the system and processes to support its product launch in early 2019. Later that year he was promoted to COO and has since been charged with leading the team as it expands its reach geographically through strategic partnerships and acquisitions and with additional product feature releases. Prior to joining Voyager, Gerard had experience as a practicing attorney, a product manager, a data and business analyst for a large public legal services firm, a professional trader, and the registered principal of a direct access equities broker. He earned his Juris Doctorate from St. John's University School of Law and his BBA in Finance and MBA in IT Management from Hofstra University. With his diverse experience and education, Gerard brings a multi-faceted approach to managing the Company's operations, analyzing issues, and handling challenges with a measured and practical approach to operations management. | 2018–Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Evan Psaropoulos*, Chief Commercial Officer | As the Chief Commercial Officer, Evan Psaropoulos leads our revenue diversification and cost efficiency efforts for Voyager.  Evan joined the Company in September 2020, bringing more than twenty years of experience across a diverse background including finance, strategy, investment banking, and accounting.   Evan began his career in public accounting at PricewaterhouseCoopers LLP where he was a Manager in the audit practice. He then transitioned to investment banking, performing M&A and corporate finance advisory at Credit Suisse in the Technology, Media, & Telecom Group, where he was a Vice President.  Evan has also held several senior finance leadership roles across both public and private companies.  He earned his B.S.B.A. in Accountancy from John Carroll University and M.B.A. from Cornell University at the Johnson Graduate School of Management.  He is also a CPA. | 2020–Present |
| *Janice Barrilleaux*, Chief Administrative Officer | As Voyager's Chief Administrative Officer, Janice Barrilleaux is responsible for firm-wide program and project management, establishing and maintaining vendor and exchange relationships, and is directly involved in strategic development initiatives.  Janice joined shortly after Voyager's founding and spearheads organization-wide initiatives that impact the firm and its valued community.  Previously, she served as President & Chief Operating Officer of Lightspeed Financial, LLC for seven years and, subsequently, Vice President at State Street Bank and Trust, managing their insurance division. In addition, Janice held the position of Chief Operating Officer of Nations First Capital, where she was responsible for operational planning and the leadership of day-to-day operations of the firm.  She was one of the original associates of E*TRADE Financial, joining the brokerage in 1996.  During her time with E*TRADE, Janice garnered a wide breadth of experience in acquisitions and corporate level project management.  She holds a Master's degree in Communications as well as Bachelor's degrees in both Journalism and Communications from California State University Sacramento.  Her certifications and licenses include Series 24, 7, and 63 and PMP. | 2018–Present |
| *Lewis Bateman*, Chief International Officer | As the Chief International Officer, Lewis Bateman heads Voyager's strategic partnerships.   During his career, Lewis has strategically structured and implemented business groups and acted as a regulatory lead.  He holds over two decades of direct financial services experience with senior executive positions at traditional capital market firms and digital asset management companies.  Before establishing two asset management firms as CEO, he was VP of ETF Operations & Business Development at First Asset (CI Financial) and Managing Director, Business Development & Executive Vice President Institutional Sales at Horizons ETFs Management Inc.  He held senior roles with the Toronto Stock Exchange (TMX), where he was responsible for introducing new global participants to the Canadian marketplace, as well as providing coverage to large domestic and international accounts and Structured Products Providers.  He also has experience as a sales equity trader for Merrill Lynch (Midland Walwyn) in Edmonton, Calgary, Toronto and New York. Lewis holds a degree from the University of Toronto - Bachelor of Arts (B.A.) in economics and political science. | 2020–Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Dan Costantino*, Chief Information Security Officer | As the Chief Information Security Officer, Dan Costantino leads all technical and administrative cybersecurity programs for Voyager. Dan joined Voyager in 2021, bringing more than fifteen years of industry experience to the business with a mission focused on the protection of assets and enablement of safe customer trading. During his career, Dan developed and led a number of industry-recognized and award-winning cybersecurity programs and teams. A highly-decorated United States Marine, Dan served in both combat and humanitarian operations and was responsible for the scalability, resilience, and security of mission-critical infrastructure. Dan transitioned from the military into consulting, where he partnered with some of the largest organizations in the United States to advise on the development of highly secure environments and sustainable technology and cybersecurity programs. In his most recent role as the Chief Information Security Officer and Associate CIO of Penn Medicine, he led the IT Infrastructure and Information Security departments, supporting one of the United States' largest and most recognized academic medical centers, including the complete development and staffing of a 24/7 security operations center (SOC) and a highly mature governance, risk, and compliance program. Dan received an Executive Master of Business Administration from the Jack Welch Management Institute and a Bachelor of Science from the American Military University. He holds the Certified Information Systems Security Professional (CISSP), Certified Information Security Manager (CISM), and Certified Ethical Hacker (C\|EH) designations. | 2021–Present |
| *David Brosgol*, General Counsel | As the General Counsel, David Brosgol is responsible for the legal and compliance functions of Voyager. He is a financial services professional with over 25 years of experience and has been deeply involved in digital assets since 2017, when he was among the founders of Digital Asset Custody Company (DACC). DACC was a pioneer in the digital asset space that sought to become industry standard for institutional custody of digital assets. DACC was acquired by Bakkt (a subsidiary of the Intercontinental Exchange) in April 2019. In his role as General Counsel and Chief Compliance Officer at DACC, David was responsible for the management of the regulatory build, recruitment, and development of the management and operations team and preparation and advancement of service offerings and corresponding customer documentation. Since the sale, he has been an adviser and project manager to several companies in digital asset financial services, notably Anchor Labs and BlockTower Capital. Earlier in his career, David held senior legal positions at asset managers and broker dealers, most recently as General Counsel of Maverick Capital and, prior to that, General Counsel and Managing Director of Solus Alternative Asset Management. David graduated Phi Beta Kappa and with Honors in Economics from Trinity College in Connecticut. He also holds an MA in Philosophy from University of Essex in Colchester, England, and a JD from the University of Virginia School of Law. David is admitted to the New York State Bar. | 2021–Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Pam Kramer*, Chief Marketing Officer | As Chief Marketing Officer, Pam Kramer oversees the brand, advertising, marketing, social media, customer insights and more.  She is a Silicon Valley marketing and product veteran, with a career focused on working with leading innovators that go from nowhere to mainstream.  Pam spent nine years at E*TRADE, rising to become E*TRADE's Chief Product Officer and then Chief Marketing Officer.  After E*TRADE, Pam became CMO and General Manager of MarketTools/Zoomerang (now part of SurveyMonkey). She then moved on to become LendingClub's first CMO, creating their brand identity and building out their marketing operations.  She then co-led a start up from 2012-2014 with an innovative video app called Lightt that predated Vine, Instagram video, and Snapchat.  Most recently, Pam focused on growing the leading premium podcast network, Cadence13, to over 1.5 billion downloads/year.  She has an M.A. in East Asian Studies from Cornell University and a B.A. in English Literature and Political Science from the University at Buffalo.  She currently serves on the boards of several non-profits, including the Bay Area Ridge Trail and is an advisor to Just Human Productions. | 2021–Present |
| *Rakesh Gidwani*, Chief Technology Officer | As Chief Technology Officer, Rakesh leads the evolution of Voyager's platform and systems as the Company continues its plans for international expansion and growing to 10+ million customers. Previously, Rakesh served as Senior Vice President of Engineering at Two Sigma Investments, a technology and data-driven financial services company applying artificial intelligence, machine learning, and distributed computing to investing. He led the engineering strategy, planning, and technical program management for Two Sigma Investment Management.    Rakesh has experience building and scaling high-caliber teams in hyper-growth environments.  Over his career, he successfully led engineering teams to deliver eCommerce solutions, high-performance trading systems, financial compliance and risk management systems, and customer-facing websites. | 2021–Present |
| *Marshall Jensen*, Head of Corporate Development | As Voyager's Head of Corporate Development, Marshall is focused on acquisition opportunities and leading strategic initiatives as Voyager expands its product offering and geographic reach.  Marshall has held senior roles in technology investment banking, principal investment, and within the crypto industry.  He has substantive knowledge of the digital asset and crypto ecosystem, notably having served as Executive Vice President, Finance of crypto custodian Digital Asset Custody Company (DACC) which was acquired by BAKKT in 2019.    Previously, he successfully served in leadership roles at Dianomic Systems, Fort Mason Capital, UBS, and Adams Harkness (now Canaccord Genuity).  In addition to his diversified finance and technology experience, Marshall was a transactional attorney with Shearman & Sterling. | 2021–Present |
| *Ashwin Prithipaul*, Chief Financial Officer | Ash has over 20 years of finance, accounting and treasury experience.  Prior to joining Voyager, he was the CFO of DriveDigital, a digital asset focused subsidiary of DriveWealth (a global fintech infrastructure company).  Previously, he was the CFO of Galaxy Digital, a financial services and investment management firm in the digital asset space.  Before joining Galaxy Digital, he was the Director of Financial Reporting at Assured Guaranty. Ash started his career in public accounting and was a senior manager at PwC. Ash holds a BSc in Economics from the London School of Economics and is a Fellow Chartered Accountant (FCA). | 2022–Present |

## **Exhibit N**

**The Debtors' Payroll for the 30-Day Period**
**Following the Filing of the Debtors' Chapter 11 Petitions**


Pursuant to Local Rules 1007-2(b)(1)–(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained the Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $3,100,000 |
| Payments to officers, directors, and stockholders | $500,000 |
| Payments to financial and business consultants[1] | -- |

---

[1]    Pursuant to the retention applications filed, or to be filed, by these professionals, and the applicable Bankruptcy Rules and Local Rules, the Debtors will not make any payment to financial and business consultants in the 30-day period following the filing of the chapter 11 petitions.

**Exhibit O**

**The Debtors' Estimated Cash Receipts and Disbursements for the
Thirty 30-Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $25,000,000 |
| Cash Disbursements | $21,000,000 |
| Net Cash Gain | $4,000,000 |
| Unpaid Obligations (excluding professional fees) | $8,000,000 |
| Unpaid Receivables (excluding professional fees) | $0[1] |

---

[1] Receivables accrued in connection with the Debtors' lending and staking programs are denominated in cryptocurrency, not cash.