Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10943-mew

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   VOYAGER DIGITAL HOLDINGS, INC.,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY 10004

15

16                   July 8, 2022

17                   11:00 AM

18

19

20

21  B E F O R E :

22  HON MICHAEL WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  KB

1    HEARING re Hearing on First Day Motions

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for Voyager Digital Holdings, Inc.

 5         214 Richardson Street

 6         Brooklyn, NY 11222

 7

 8    BY:  CHRISTINE OKIKE

 9         ALLYSON SMITH

10         JOSHUA SUSSBERG

11         CHRISTOPHER MARCUS

12

13    LAW OFFICES OF RACHEL BLUMENFELD, PLLC

14         Attorneys for The Levitt Group

15         26 Court Street

16         Brooklyn, NY 11242

17

18    BY:  RACHEL BLUMENFELD

19

20    STRETTO

21         Attorneys for Stretto

22         7 Times Square, 16 Floor

23         New York, NY 10036

24

25    BY:  ERIC KURTZMAN
```

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street

4         New York, NY 10014

5

6    BY:  RICHARD MORRISSEY

7

8    ALSO PRESENT TELEPHONICALLY:

9    MARK BRUH

10   ANDREW GLANTZ

11   ANDREW VELEZ-RIVERA

12   ANNIE WELLS

13   TAYLOR HARRISON

14   PATRICK HOLOHAN

15   SOMA BISWAS

16   PAUL HAGE

17   GABRIEL BRUNSWICK

18   LETICIA SANCHEZ

19   JEFF STAPLETON

20   BRIAN GLUECKSTEIN

21   STACY DASARO

22   TALIA HELFRICK

23   ANDREW DIETDERICH

24   DELIA WU

25   CHRIS UPDIKE

| 1  | ANDREW BUTLER          |
| 2  | RICK ARCHER            |
| 3  | ALEXANDER POTCOVARU    |
| 4  | NEGISA BALLUKU         |
| 5  | MICHAEL SLADE          |
| 6  | MICHAEL BERTHIAUME     |
| 7  | RAHMAN CONNELLY        |
| 8  | ROBERT JORDAN          |
| 9  | DENISE KALOUDIS        |
| 10 | BRADFORD SANDLER       |
| 11 | ANDREW SCURRIA         |
| 12 | JOSEPH MOLDOVAN        |
| 13 | JODI KLEIN             |
| 14 | HAMID POORSAFAR        |
| 15 | THOMAS DWAN            |
| 16 | DIETRICH KNAUTH        |
| 17 | RYAN MARTIN            |
| 18 | DENNIS O'DONNELL       |
| 19 | CORDEARO DADSON        |
| 20 | RICKLY ANGIOLINI       |
| 21 | HEIDI KLING, PRO SE    |
| 22 | MITCHELL SUSSMAN       |
| 23 | GEORGE SINGER          |
| 24 | SHERYL BETANCE         |
| 25 | ANDREW CARTY           |

Page 6

1    ELLE CHOI

2    ARI GUREWITZ

3    SARAH HAUTZINGER

4    JEFFREY KAPLAN

5    BRYAN KOTLIAR

6    MIKE LEGGE

7    CATHY TA

8    ALBERT TOGUT

9    NACIF TAOUSSE

10   NANCY BELLO

11   PHILIP BREDEL

12   KELLY DIBLASI

13   DAVID EGGERMANN

14   GABRIEL EISENBERGER

15   ERIC FRIEL

16   HAROLD KAPLAN

17   MICHAL MAHZAMEN

18   NOAH MORRIS

19   ROBERT MOSKALEWICZ

20   TRACY PECHER

21   BRIAN ROSEN

22   CAROLINE SALLS

23   GREGG STEINMAN

24   BRIAN STOUT

25   JOSEPH SZYDLO

1   GRAYSON WILLIAMS

2   TESS WINSTON

3   KENNETH AULET

4   MADELYN NICOLINI

5   ALLISON GILBERT

6   DARREN KLEIN

7   STEPHEN EHRLICH

8   BENJAMIN BELLER

9   JEREMY HILL

10   JARED DERMONT

11   THOMAS DAVIS

12   ADAM GOLDBERG

13   SUSAN GOLDEN

14   RYAN HAMILTON

15   JARED KASNER

16   JACQUELYN KASULIS

17   CHRISTOPHER MARCUS

18   MARK SILVERSCHOTZ

19   EMMA FLEMING

20   VINCENT INDELICATO

21   TIMOTHY REILLY

22   ROBERT SCHECHTER

23   CALVIN AAS

24   SHELBY NACE

25   JASON DIBATTISTA

1  MATTHEW GOLD

2  KELLY KNIGHT

3  LUIS LANDAS

4  SUJEET INDAP

5  AKIKO MATSUDA

6  LOREN HARMAN

7  VLADIMIR JELISAVCIC

8  LINDA RIFFKIN

9  DOV KLEINER

10  ILUSION RODRIGUEZ

11  CHARLIE SHREM

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, everybody.  Are the

3    parties ready on the Voyager matter?

4            MR. SUSSBERG:  Yes, Your Honor.

5            THE COURT:  All right.  I don't need to take

6    everybody's appearances up front.  We can do that as people

7    speak, but when people speak, please identify yourselves and

8    who you represent.  Are you going to proceed and handle

9    this, Mr. Sussberg?

10           MR. SUSSBERG:  I am, Your Honor, and it's good to

11   be in front of you again.  It's been a while.  I hope

12   everything is well with you.  And thank you to you and your

13   chambers for accommodating us on an expedited timeline when

14   we all know that you have a lot happening.  We appreciate

15   it.

16           THE COURT:  Very good.

17           MR. SUSSBERG:  Your Honor, I do appreciate the

18   opportunity to walk through a presentation and a bit of

19   background on crypto because I think for many of us, this is

20   unchartered territory and there will be many potential legal

21   issues of first impression.

22           And then we'll get into the agenda, which I think

23   is straightforward and not controversial.  We have reviewed

24   Your Honor's orders and prior transcripts in an effort to be

25   compliant with all of your past concerns and preferences and

1    I'm hopeful that we were able to do so.

2              Does Your Honor have a copy of the presentation?

3              THE COURT:  I do.  And before you even do that,

4    just to indicate questions that I have that you can either

5    work into your presentation or answer afterwards.

6              MR. SUSSBERG:  Sure.

7              THE COURT:  The papers say that you put a

8    suspension in place on July 1 on customer withdrawals, for

9    example.

10             MR. SUSSBERG:  Yes.

11             THE COURT:  Are you proposing to lift that and to

12   permit withdrawals at this point?

13             MR. SUSSBERG:  We are not proposing to lift the

14   gates that we put down until the plan is confirmed, which is

15   part of the reason -- and I'll cover this during the course

16   of the presentation -- we believe it's incredibly important

17   to move with all deliberate speed.

18             THE COURT:  I understand.  And when you say the

19   gates, at one point, you referred to a maximum as a gate of

20   $10,000; at another point, it sounded like you'd stopped all

21   withdrawals.  Are you permitted any in the meantime?

22             MR. SUSSBERG:  There are no withdrawals at

23   current, Your Honor.  It originally was a $25,000 withdrawal

24   limit that we lowered to $10,000, as you saw in the papers,

25   in an effort to help stabilize things.  There was not the

Page 11

1   stabilization that was necessary or comforting from the

2   company's perspective, so the gates were lowered, and

3   withdrawals were stopped.

4           And I think as we'll present during the course of

5   the day, we have a pretty clear direction to be able to

6   deliver everything that's in the system back to the

7   customers.

8           THE COURT:  Okay.  Just to make sure that you know

9   what my questions are so you can address them.  I know that

10  insolvency lawyers around the world have theorized about

11  what exactly is going to happen with cryptocurrency and a

12  lot of the concerns revolve around the concepts of just what

13  is their property at all and, if there is, just what the

14  property consists of because cryptocurrency has no tangible

15  form.

16          And unlike stocks or even other kinds of currency,

17  it's not really a claim on anybody else or backed by anybody

18  else in particular.  It's in some ways just an abstract

19  construct.

20          It seems to me that plainly there is something

21  that people regard as an item of value that can be bought

22  and sold and is treated as an item of value, though there

23  can be difficulty figuring out both what it is and how

24  ownership is determined.  How ownership is determined can be

25  very important applying various provisions of the Bankruptcy

Page 12

1    Code.

2          Of more immediate concern to me is not so much the

3    hypothetical issue of exactly how you nail down what the

4    property is, but you've described your business in some

5    places as a (indiscernible) arrangement under which

6    customers store cryptocurrency with you in exchange for

7    interest payments, but under which the actual cryptocurrency

8    are the company's to keep.

9          And I need, especially if any of the business is

10   going to be reopened or the withdrawals are going to be

11   made, I need to understand the basis for the description of

12   this as a custodial arrangement because it's very important,

13   obviously, for the bankruptcy case to understand whether on

14   the one hand, you are a sort of bailee holding property that

15   belongs to customers or whether instead your customers are

16   unsecured creditors of yours, much the way bank depositors

17   are unsecured creditors of banks.

18         And in the securities field, there are statutes,

19   there are regulations, there are even insolvency-based

20   statutes that describe how the segregation of customer

21   property works and customers' rights to it.  I don't know if

22   there's anything like that in the cryptocurrency area.

23   Perhaps your customer agreement or your other agreements

24   establish trusts or make clear that there's a trust

25   arrangement, or even if they don't call it a trust, maybe

1    (indiscernible) arrangements that you think I should treat

2    as trusts, but I don't have any details of those as to how

3    they work.

4             So if in the course of your presentation, you

5    could describe just how you regard these, what you think the

6    relationship is and what the legal basis for it is, that

7    would be very helpful to me.

8             MR. SUSSBERG:  Absolutely, Your Honor.  I'm happy

9    to go through that.  And I'm personally getting background

10   noise.  I'm not sure if others are.

11            THE COURT:  I hope that's not from my phone, but I

12   didn't hear background noise.

13            MR. SUSSBERG:  Okay.

14            MAN:  There is no background noise.

15            MR. SUSSBERG:  It just subsided, okay.  Well,

16   thank you.

17            Your Honor, let us address that during the course

18   of the presentations.  Those are all important questions

19   and, you know, frankly, lends itself to the comment I made

20   about questions of first impression in this field and this

21   sector.

22            I also just wanted to thank at the outset, Mr.

23   Morrissey and the U.S. Trustee' Office for working with us

24   over the last several days on what was an expedited timeline

25   and help and make sure that this is as smooth as possible.

1          Interestingly enough, Your Honor, I am personally

2    new to the cryptocurrency space.  I've heard about it for

3    many years from family and friends, many of whom were very

4    interested.  I couldn't necessarily wrap my head around it.

5    And over the last several weeks, the team at Voyager spent a

6    tremendous amount of time getting us up to speed and really

7    digging into the specifics here.

8          And I actually wanted to share an anecdote with

9    the Court about a pretty fascinating story that helped put

10   things in perspective for me.  Back on May 22nd of 2010,

11   there was a Florida computer programmer named Laszlo Hanyecz

12   and he wanted to buy pizza and Mr. Hanyecz had 10,000

13   Bitcoins and he was looking to convert his Bitcoins into two

14   pizzas from Papa Johns.

15         At the time, his 10,000 Bitcoins were worth $40.

16   Again, this is 12 years ago.  Now because Bitcoin was not

17   yet a thing in the commercial world, Mr. Hanyecz reached out

18   online to something called "Bitcoin Talk Community" and

19   openly offered to trade his Bitcoins to anyone who would buy

20   him two pizzas.  So when he went on to the internet, a 19-

21   year old man named Jeremy Sturdivant accepted his offer.

22   And literally an hour later, Mr. Hanyecz had his doorbell

23   ring and there were two pizzas from Papa Johns.

24         And this was the first official use of Bitcoin for

25   a commercial transaction, and I went and verified and

Page 15

1    documented this.  It's online for everyone to read.  And,

2    frankly, one can only hope that Mr. Hanyecz enjoyed those

3    pizzas because based on the value of Bitcoin when I checked

4    this morning -- and again, this is a volatile, volatile

5    cryptocurrency and it's up something like 4 to 5 percent

6    just today -- that those two pizzas would have cost

7    approximately $215,208 as we sit here today.

8            Turning to the presentation, Your Honor, and I

9    want everyone to understand that we posted a copy of the

10   presentation on the website of Stretto, our proposed

11   noticing and claims agent.

12           On Slide 2, I wanted to quickly make a few key

13   introductions for folks you'll hear from during the course

14   of the case.  Mr. Steve Ehrlich, who is our first day

15   declarant and is on a live line, and I'm sure he's probably

16   the best placed person to answer questions the Court may

17   have today.  Mr. Ehrlich is the cofounder of the company and

18   previously served as the CEO of E*TRADE.

19           I also wanted to point out and introduce Mr. David

20   Brosgol.  He is the general counsel of the company and a

21   professional with 25 years' experience in financial

22   services, including several advisory roles in digital asset

23   financial services and previously served as the general

24   counsel of Solus Asset Management.

25           Kirkland & Ellis is proposed counsel to the

Page 16

1    Debtors here, Your Honor, and joining me today will be my

2    partners and colleagues, Mr. Christopher Marcus, Christine

3    Okike, and Allyson Smith.

4         Moelis & Company is the company's proposed

5    financial advisor and investment bank.  The team is led by

6    Jared Durmont, who submitted a declaration, as well as Barak

7    Klein, Brian Tichenor, Michael DiYanni, and Michael

8    Mestayer.

9         Additional professionals that you'll hear

10   throughout the course of the case include Fasken, who's our

11   Canadian counsel, and we'll talk about that with respect to

12   the foreign representative motion.  Paul Hastings as

13   regulatory counsel regulatory counsel.  BRG, led by Mark

14   Renzi and Bob Duffy, who are serving as financial advisor.

15   Teneo is the company's communication advisor.  Consello is

16   serving as a strategic advisor to the company.  And then, of

17   course, Stretto as the proposed noticing and claims agent.

18        Now part of the question Your Honor, at least one

19   of the questions Your Honor asked at the outset was about

20   the currencies and what the company has.  And I want to make

21   a clear statement at the outset of this case, and I hope

22   customers can hear and appreciate this, and Mr. Marcus is

23   going to cover this in more detail in the presentation when

24   we talk about the plan because I think it helps address Your

25   Honor's questions.

1            But if you look on Slide 3 and before getting into

2    a bit of Crypto 101, I want to just note and be very clear.

3    We have $100 million of cash and owned crypto assets that

4    belong to the company on hand.  There's $350 million of cash

5    held in for-benefit-of-customer accounts at Metropolitan

6    Commercial Bank.  We're going to talk about that account in

7    the context of the cash management motion and Miss Okike has

8    been leading the charge on this front.

9            But I want to be very clear, and I want Your Honor

10   to appreciate and all customers who are listening to hear

11   this.  That money belongs to those customers and will go to

12   those customers so long as the company has the opportunity

13   to reconcile the amounts and who's entitled to what and does

14   a fraud prevention review, which we will talk about briefly.

15           In addition, Your Honor, we have $1.3 billion of

16   crypto assets on the platform.  And to Your Honor's question

17   and comment, the customer agreements say that this is

18   comingled crypto and it's effectively property of the

19   estate; it's not held in trust for the benefit of customers.

20   And again, we have claims against three EROS Capital of more

21   than $650 million.

22           Now to the point Your Honor raised about whose

23   property it is and whose property it isn't, I think over the

24   last several weeks, we've actually come to a collective

25   view, based on everything that we know, based on everything

Page 18

1    we've read, and based on our discussions with the company

2    that our focus has always been and will be on our customers.

3    And so while there are many interesting, as I mentioned at

4    the outset, legal issues that are complicated and of first

5    impression, in our view, those only become relevant in a

6    liquidation.

7            And when Your Honor talks about brokerage services

8    that had previously commenced bankruptcy proceeding, whether

9    in a SIPC context or otherwise, all of those were

10   liquidations where commodities were liquidated and returned

11   to customers.  In our view in a liquidation, we are going to

12   be fighting all of the various legal issues that people can

13   raise and, at the end of the day, the only people that will

14   benefit are lawyers on both sides arguing the issues.  We do

15   not want to see that happen.

16           We want to move quickly for the benefit of our

17   customers to deliver them the value that exists in this

18   estate today regardless of the legal issues, and that's why

19   we filed the Chapter 11 plan.

20           THE COURT:  Let me interrupt for one second.  Who

21   are your creditors other than the parent company that made

22   the loan and your customers?

23           MR. SUSSBERG:  Other than a small amount of true

24   general unsecured trade creditors because of day-to-day

25   business, whether utilities or otherwise, this is

Page 19

1    predominantly customer driven and it's both retain and

2    institutional.  And I know Mr. Morrissey will ultimately

3    compose a committee of the case.  You know, I think a

4    creditors' committee is probably the wrong verbiage.  I view

5    it as a customer committee.

6              THE COURT:  So is it fair to say that we're not

7    likely to have a situation here where there are a lot of

8    unsecured creditor claims that would be drastically affected

9    by whether customers are treated as owners or as creditors;

10   that, in effect, there aren't very many and the customers

11   kind of overwhelm the rest of the creditor group or however

12   you...

13             MR. SUSSBERG:  Yes, Your Honor, that's absolutely

14   correct.

15             THE COURT:  Okay.

16             MR. SUSSBERG:  Now moving forward to Slide 4, let

17   me give a little context here.  I know Your Honor has

18   obviously read our pleadings and familiarized yourself with

19   crypto.  And, to the extent, you know, any of this is

20   unnecessary, feel free to stop me and I can move on, but I

21   wanted to just generally take a step back and talk about

22   crypto and the marketplace.

23             You know, crypto, obviously, it's any form of

24   currency that exists digitally or virtually and uses

25   cryptography to secure transactions.  Cryptography is a

Page 20

1    technique that uses secure communications to allow only the

2    sender and the recipient of a message to view its contents.

3    And so, it's effectively a peer-to-peer electronic cash

4    system that's digital and decentralized, and it can be used

5    to buy and sell anything like pizza.

6         The potential to store value -- and this goes to

7    the custodial question Your Honor asked and I'll cover this

8    in due course -- that has caught the eye of many investors.

9    And most people have invested in crypto like they would in

10   other assets like stocks and precious metals.

11        And interestingly enough in technology, it's

12   pretty unbelievable, but transactions are stored in an

13   electronic checkbook ledger recorded in blocks that are then

14   linked together on a chain.  And as you saw in the papers,

15   this is referred to as the blockchain.  And these transfers

16   are completed through a computer network that is not reliant

17   on any central authority, like the government or a bank, to

18   uphold and maintain.  And since Mr. Hanyecz bought those

19   pizzas with Bitcoin back in 2010, this virtual world and the

20   technology and crypto exchanges have exploded.

21        And as Your Honor read and as Slide 4 talks about

22   and Mr. Ehrlich's declaration, Voyager operates a

23   cryptocurrency brokerage trading exchange that allows

24   customers to buy, sell, trade, and store their crypto on a

25   pretty easy-to-use and accessible platform through a

Page 21

1    developed mobile application and customers end up earning

2    rewards on the crypto assets that they store on the

3    company's platform, and they can trade over a hundred unique

4    digital assets.

5            And so as you see on the slide, the process

6    through which the money comes from customers and crypto

7    comes from customers and flows through, including the Met

8    Bank FBO bank account to Voyager that serves as the broker,

9    manages all of these trades on an efficient basis through

10   various exchanges, as well as the custodial business.  And

11   there are really three business lines encompassed in this

12   slide.  We'll talk about that --

13           THE COURT:  Let me interrupt.

14           MR. SUSSBERG:  Yes, sir.

15           THE COURT:  In this brokerage capacity, do you

16   register with any regulatory authority in any of the

17   jurisdictions where you operate; are there any regulatory

18   authorities; are there restrictions on who can be customers,

19   for example, who are authorized to trade or who are eligible

20   to trade?

21           MR. SUSSBERG:  Great question, Your Honor.  It is

22   not regulated by an authority, although we have money

23   transmission licenses that we are going to talk about during

24   the course of today in various states to allow these

25   services to be conducted.  And then the customer agreement

1    and the entire customer process provides for verification of

2    an individual as they get themselves onto the platform

3    through the network application.  And I'll cover all of

4    this, Your Honor, so that it's clear and some of the relief

5    we're seeking is tailored to it.

6            THE COURT:  And do the customers have to satisfy

7    kind of a sophistication or financial worth requirements,

8    like options trading requirements, customers would have to

9    do or anything like that?

10           MR. SUSSBERG:  There's customer questionnaires,

11   but it would not be of the same level as would be the type

12   to get through an options trading application.

13           THE COURT:  Okay.

14           MR. SUSSBERG:  Moving to Slide 5, Your Honor,

15   quickly, the three business lines.  Trading where the

16   company effectively serves as a middleman connecting buyers

17   and sellers to facilitate a transaction with an eye towards

18   the retail investor who Your Honor is focused on and really

19   gets provided a quality experience and even playing field as

20   other market participants.

21           The Voyager platform is actually unique in that it

22   surveys more than a dozen exchanges and liquidity provides

23   and executes trades through a proprietary algorithm that

24   evaluates the price, the certainty of execution, reliability

25   of trading venue, and the speed.

Page 23

1          The custodial services, the second line of

2    business that Your Honor was asking about, is where digital

3    currencies are deposited and stored on Voyager's platform,

4    not in individual wallets, so not an individual identifiable

5    trust account per Your Honor's comment.

6          And in return for putting their crypto on the

7    company's system and storing it as part of the custody

8    arrangement.  Customers earn interest on deposits through

9    four main ways: there's pick interest that can be up to 12

10   percent on certain currencies; there's a loyalty program

11   that issues a Voyager-specific token that's publicly traded

12   on the Coin Base Exchange and Mr. Marcus will talk about

13   this in the context of the plan; there's a debit card that

14   allows investors to spend cryptocurrency directly without

15   having to pay fees associated with currency conversion, and

16   that's accepted wherever Mastercard is accepted; and there's

17   staking.

18          Now staking is a concept that is specific to

19   cryptocurrency and it's a process through which a party

20   commits crypto assets to a specific project in exchange for

21   set rewards.  And the way I think about it, it's the

22   equivalent of putting money in a high-yield savings account

23   where it's locked up for a period of time but has the

24   possibility of earning huge rewards.

25          And then finally, Your Honor, and I think it'll be

Page 24

1   important as we get into this because it's one of the

2   reasons why the company finds itself in Chapter 11, there's

3   the lending business.  Now typically in the form of specific

4   types of cryptocurrency to counterparties in the sector that

5   facilitate liquidity or trade settlement and interest from

6   the lending practice is passed along to customers who earn

7   yield on their stored crypto on the company's platform.

8   Lending's a critical way to provide electing customers with

9   a meaningful return on their assets.

10          And Voyager, as I'll get to, is a significant

11  institutional lender to crypto trading firms that are known

12  as market makers, who use algorithms to buy and sell assets

13  continually and repeatedly, and they make money by

14  collecting a small difference between the bid and offer

15  price.

16          And, frankly, the way to think about it, Your

17  Honor, and the way that Mr. Ehrlich helped me think about

18  it, the more crypto that Voyager has on the platform, the

19  more crypto that has been put onto the system, the more

20  opportunities you have to lend the crypto out and earn value

21  for your customers.

22          THE COURT:  All right, let me interrupt you for a

23  second.

24          MR. SUSSBERG:  Yes, sir.

25          THE COURT:  Lending program sounds like the

1    cryptocurrency analogy or analog to a securities lending

2    program, so I think I get that.

3            You mentioned that in this arrangement, your

4    customer agreements say that there's no trust, that there's

5    comingled currency holdings, and I understand that the

6    lender in these arrangements is actually Voyager; is that

7    right?

8            MR. SUSSBERG:  Yes.  It's typically, and I can

9    show you on the capital structure and chart, there's three

10   Debtor entities.  The lender is the operating company, which

11   is the lowest entity in the capital structure chart, and the

12   Voyager entity is the lender.

13           THE COURT:  When there is a loan, is that

14   allocated to any particular customer or it's just from the

15   pool itself; there's no particular record of whose

16   cryptocurrency has loaned or which customers get the

17   benefit, et cetera?  How does that work?

18           MR. SUSSBERG:  My understanding, Your Honor, is

19   that it's not directly identified as to which coins and

20   whose customer coins they were that were lent out, so it's

21   the company on the company's platform that's lending the

22   money and the coins.

23           THE COURT:  And the staking arrangements that you

24   described, is that something that a customer decides on?

25           MR. SUSSBERG:  That's part of the customer

1   agreement.

2           THE COURT:  So if cryptocurrency is going to be

3   staked for a project, is that done similar to the lender

4   program?

5           MR. SUSSBERG:  Yes.  I think of them very similar,

6   Your Honor, the way in which the customer arrangement is

7   defined and explained.

8           THE COURT:  So is that something that Voyager and

9   its affiliates actually do or that the customers dictate?

10           MR. SUSSBERG:  It's something that Voyager does

11   pursuant to the customer agreement, yes.

12           THE COURT:  Okay.

13           MR. SUSSBERG:  Your Honor, on Slide 6, and I'll

14   cover this very quickly, just wanted to show you the growth

15   from 2018 when the company was founded until recently, and

16   at the height, the company has $5.8 billion of assets on its

17   platform.

18           And as we've noted throughout, it maintains 3.5

19   million users on the application, and this was through a

20   series of acquisitions, as we note on the slide, including

21   Ethos, which was a leading cryptocurrency services provider

22   that bridges multiple blockchain protocols and financial

23   institutions and systems, and then the acquisition of

24   Circle, a retail digital asset business that accompanied and

25   came with 40,000 new customers.

Page 27

1           Now, Your Honor, on Slide 7, and I think this goes

2    to some of your questions.  On the left side, this just

3    demonstrates the simplicity of our capital structure.  The

4    company has a $500 million total facility with Alameda

5    Ventures.  Alameda also owns equity in the company and, as

6    you'll see on the right side, Alameda has an outstanding

7    loan with the company.  This is not a dollar loan that was

8    entered into this past June, but a crypto loan that's

9    payable in kind.

10           And as you see, the loan included 200 million of

11   USDC, which is USD coin, and I'll talk about that in a few

12   minutes, as well as 15,200 Bitcoins.  Under the terms of

13   that agreement, which was put in just a few weeks ago and

14   was negotiated in an effort to try to stabilize things in

15   the complete uncertain market environment that we're living,

16   we were able to draw, pursuant to the conditions in the loan

17   agreement, 75 million of USDC, which we did, in fact, draw.

18           So as we sit here today, there's $75 million

19   outstanding under that facility and that facility sits at

20   the U.S. holding company which sits above the operating

21   entity that serves as the lender on the third-party loans

22   that we note on the right side of the page.

23           On the right side of the page are the various

24   outstanding loans, the most significant of which and

25   probably the major reason why we're here today -- and we

1   will talk about it in more detail -- is the loan to Three

2   Arrows Capital.  That's approximately $650 million, Your

3   Honor, and it's subject to movement because of volatility in

4   Bitcoin, and that loan was a loan made by the company to

5   Three Arrow of 15,250 Bitcoins and $350 million of USD coin.

6          Now, USD coin -- and I think it's important to

7   talk about this -- is a hundred percent backed by cash and

8   short dated U.S. Treasuries, so it's always redeemable one-

9   to-one for U.S. dollars, but this is going to come into play

10  when we talk about some of the precipitous events that led

11  the company to where it is today, and I'll cover that in

12  detail.

13          Just briefly, Your Honor, and I know you're aware

14  of all this because of all the activity that's happened over

15  the last several weeks, but on Slide 9 as a combination of

16  inflation, the war in Ukraine, rising rates, we've seen a

17  historic drop in the S&P 500.  And as noted on the left, the

18  S&P 500 has posted its worst first half this year since 1970

19  and inflation is at pretty historic highs.

20          As you see on Slide 10, the cryptocurrency markets

21  have closely tracked the S&P and maybe even been depressed

22  even further, and the volatility and the ups and downs have

23  been drastic to the point where 2 trillion in value has been

24  lost in the marketplace in the last six months and it's

25  rattled the markets entirely.

1          As you see on Slide 11, just to give Your Honor a

2      flavor, two of the cryptocurrency leaders in some of the

3      original coins, Bitcoin and Ethereum, have been decimated in

4      loss throughout the course of 2022.  And it's interesting

5      and we talked about it in Mr. Ehrlich's declaration, COVID

6      and the onset of COVID caused a real crash in the

7      marketplace generally and in crypto as well, but it's seen

8      historic rises during the course of 2021 as everyone

9      benefited from the influx of liquidity and the spending that

10     occurred post the initial phases of the pandemic.

11          2022 has effectively been a freefall across the

12     marketplace and crypto is no different and there are

13     thousands of cryptocurrencies and blockchain protocols.  The

14     right side names many of them and identifies the loss of

15     value over the course of time.

16          The next page on Slide 12 -- and I think this is

17     pretty important because it really indicates and provides

18     some background as to why the company is here -- there's a

19     concept of Stablecoins, and I talked about this in the

20     context of the USD coin or USDC.  These are pegged to a

21     reserve asset to maintain price stability.  And because

22     they're less volatile, Stablecoins are better suited for

23     day-to-day commerce or routine transactions, and they can

24     facilitate trade execution for any purpose where minimum

25     volatility is useful.

1          So I think of this, conceptually and practically,

2     you know, if Walgreens down the street was to accept

3     cryptocurrency, you would use a Stablecoin to facilitate the

4     purchase of whatever you needed as Walgreens, as opposed to

5     Bitcoin where the volatility is so significant.  And if you

6     were Walgreens, you wouldn't necessarily want to accept the

7     Bitcoin even if at that moment in time it was dollar for

8     dollar because 10 minutes later, that value could dissipate

9     or it could rise and the consumer, at that point, would be

10    out the value proposition for the investment.

11         Now the issue here is while the USDC reserves are

12    in custody and management of leading U.S. financial

13    institutions -- and actually each month, Grant Thornton

14    provides third-party assurances as to the size and

15    composition of the USDC reserves -- other parties have tried

16    to emulate the concept without a fiat, without a currency

17    behind it, without something tangible.

18         And that's really kind of what the crypto system

19    was all about: being deregulated.  And effectively if

20    someone was able to create a system where you're truly

21    backed not by U.S. dollars, not by a commodity, but by a

22    stabilized Bitcoin or stabilized crypto, you really have

23    created what effectively is nirvana in the crypto world.

24         So enter the company that we talk about here,

25    Terra.  Terra is a blockchain protocol that was created by

Page 31

1      Terra Labs, and Terra Labs created two coins to be used on

2      the Terra blockchain: the first was Terra USD, which is

3      known as UST, and LUNA.  UST was a Stablecoin; LUNA was not.

4      And the yield on staking your UST was actually enormous

5      because those who owned and staked UST ultimately were

6      earning 19.5 percent on their staked UST.  So 75 percent of

7      all UST in circulation was staked, but it was the riskiest

8      version of a Stablecoin because it wasn't backed by a fiat

9      or a dollar.

10             And what UST was was an algorithmic Stablecoin or

11     a Stablecoin that, again, is backed by another coin.  And

12     for UST, the other coin was LUNA, Terra's blockchain other

13     coin.  In addition, UST had the backing of what was $3

14     billion from the LUNA Foundation Guard, and that was created

15     to defend a drop in pricing of UST if there was an

16     occurrence that necessitated trading in and out.

17             At one point before the crash, LUNA had a market

18     cap of $18 billion.  UST maintained its peg to LUNA via an

19     arbitrage mechanism that relied on traders to re-peg and de-

20     peg the currencies to make sure it was effectively one to

21     one.  And the concept was one UST was always exchangeable

22     for $1 of LUNA and vice versa.  So when UST was exchanged

23     for LUNA, the UST was converted into LUNA; when LUNA was

24     exchanged for UST, the LUNA was converted into UST.  And the

25     theory behind this, it was meant to have the UST always

Page 32

1    trade at a dollar and LUNA traded freely, mostly on

2    sentiment, regarding the Terra ecosystem.  And before its

3    collapse, LUNA traded around $80.

4           Fast forward to May 7th of 2022: over $2 billion

5    of UST was un-staked and then sold.  And recall of all of

6    the UST in circulation, 75 percent of it was staked.  This

7    un-staking, as people have diligence and investigated, was

8    done in a limited number of large trades, suggesting that

9    the UST LUNA collapse may have been malicious, all of which

10   is being investigated.

11          But the point is the massive selling pressure

12   caused UST to slide below a dollar to 91 cents, and this is

13   when the arbitrage traders are supposed to step in and re-

14   peg LUNA to the dollar to get everything equal.  But what

15   they realized was that the system was only set up to allow

16   100 million of UST to be converted into the LUNA each day,

17   and that amount was insufficient to facilitate enough

18   arbitrage trading to effectively re-peg UST quickly to a

19   dollar.

20          And when that happened and the UST failed to re-

21   peg itself to the dollar amount, investors panicked and sold

22   more UST and that forced the price even lower, and what this

23   effectively does is creates a vicious circle and a death

24   spiral.  As UST dropped in price and the arbitragers

25   continued to try to re-attempt to re-peg this, but they were

1    unsuccessful, creating an oversupply of LUNA which then

2    dropped in price as well.  And when people tried to convert

3    their LUNA into UST, created even more UST, which caused

4    UST's price to drop even further.

5           And at the end of the vicious cycle, both

6    currencies were trading below a penny and the LUNA

7    Foundation Guard that had 3 billion of assets backing this

8    play burned all of those dollars trying to get everything

9    back to one to one.  And all of that, Your Honor, occurred

10   in one week's time.

11          Unfortunately for the company -- and we talk about

12   this on Slide 13 -- Three Arrows, a Singaporean-based hedge

13   fund that focused on the cryptocurrency sector, had staked

14   LUNA that it couldn't claw back in time to sell and ended up

15   watching and rode its investment all the way down to a

16   penny.  We don't know, at this moment in time, how much

17   crypto Three Arrows had staked with respect to LUNA, all of

18   which is under investigation.

19          And as we note on this slide, Three Arrows

20   Corporation was recently ordered by a Court in the British

21   Virgin Islands to commence liquidation proceedings.  They've

22   had liquidators appointed and, in fact, recently filed for

23   recognition under Chapter 15 in the Southern District of New

24   York and Judge Glenn has scheduled a hearing later this

25   morning to begin that process.

Page 34

1          The problem vis-à-vis Voyager is that, as I

2    mentioned earlier, we had a loan to Three Arrows Capital and

3    Three Arrows Capital was a darling of crypto, as it has been

4    described to me, and many, many people wanted to do business

5    with Three Arrows.  The loan that Voyager made to Three

6    Arrows was 15,250 Bitcoins and 350 million of USDC.  And as

7    we sit here today -- again there's volatility and it's

8    payable in kind, so you get your coin back and benefit from

9    the swings in the market if it's up and if the market's

10   down, that's a problem -- but we believe this is

11   approximately $650 million.

12          And I can submit to Your Honor that we are active

13   in the BVI.  We will be active in the Chapter 15, and we are

14   going to work aggressively with other large creditors who

15   we've been in touch with to convert as much of our claim

16   into dollars as we possibly can all for the benefit of our

17   customers.

18          Quickly, Your Honor, on Slide 15, I just wanted to

19   note this all has transpired incredibly quickly, and the

20   company has moved as quickly as it possibly can in an effort

21   to try to do right by customers.  But we do note all of the

22   events over the course of the last several weeks, ultimately

23   leading to the Chapter 11 filing, as well as the company

24   lowering the gates as we talked about at the outset and

25   calling a default on the Three Arrow loan.

1          One of the other things we've done, Your Honor,

2     and it's reflected on Slide 16, and I just want to address

3     it briefly, we've taken some proactive steps on the

4     government's front, which we thought was very important from

5     the company's perspective.  And there are a lot of questions

6     that a lot of people have that need to be investigated and

7     understood and we are doing just that.

8          We've added four independent directors at three

9     different entities, and the three Debtor entities -- and we

10     appreciate Your Honor entered the joint administrative

11     motion and order -- the three Debtor entities are Voyager

12     Digital, Ltd.  That's the parent Canadian company and that's

13     the entity for which we will seek recognition in Canada.  To

14     that board, we added Matthew Ray.

15          Voyager Digital Holdings, Inc., again, that was

16     the loan counterparty with Alameda for the June loan.  Mr.

17     Scott Vogel was added to the board.

18          And at the operating company, which Your Honor

19     identified and noted was the lending counterparty to the

20     various third parties that were participants in the loan

21     arrangements, including Three Arrows, we've added Mr. Tim

22     Pool and Miss Jill Frizzle.

23          And at the operating company, that entity at the

24     bottom, we created a special committee that has been tasked

25     with investigating all of the company's institutional loans

Page 36

1    and the process through which those loans were made, most

2    all of which were done on an unsecured basis, as well as the

3    company's historical financial reporting and any other

4    issues that become necessary to review as we gear towards

5    the plan process and moving things forward.

6         I will pause there, Your Honor, to see if you have

7    questions.  But otherwise, I'm going to turn it over to Mr.

8    Marcus to walk through the last several slides and really

9    specifically talk about our process and the plan and why we

10   filed it.

11        THE COURT:  I have just a couple of other

12   questions.  You also mentioned in your papers that there are

13   -- that you have custody arrangements with other firms to

14   hold cryptocurrency.  How exactly does that work?  And does

15   that apply to all of the cryptocurrency that Voyager has,

16   and is there a different account for what it holds for

17   customers; how does the whole thing work?

18        MR. SUSSBERG:  You know, I think it's best, Your

19   Honor, we can answer that.  I'd like to walk through that in

20   the context of the first day motions where we walk through

21   how those arrangements work in the relief that we're

22   seeking, if that is okay with Your Honor.

23        THE COURT:  Well, humor me and let's try to do it

24   right now.  Because there are customer -- there are

25   accounts, FBO accounts for cash, there's description of

Page 37

1    custody arrangements for crypto, so how do the different

2    arrangements (indiscernible)?

3              MR. SUSSBERG:  Yeah, let me try to do it then in a

4    simplistic way.

5              The FBO account is for the benefit of customers,

6    and I would think of that as held in trust.  It's

7    backstopped effectively by Metropolitan Bank, and that's

8    $350 million of cash that either customers have put in or

9    customers have made a request to draw out, and we are going

10   to give that $350 million back to customers subject to a

11   review to make sure that the system is not inappropriately

12   manipulated.  And there are several ways in which we have

13   been exposed to friendly fraud that we will walk through and

14   make sure Your Honor understands.

15             But what the company is suggesting here and what

16   the company intends to do -- and I will be on record saying

17   that we intend to do this -- there have been a lot of

18   articles talking about whether that $350 million is property

19   of the estate.  I am here to tell Your Honor that $350

20   million is property of the customers, subject to a review

21   and reconciliation and avoidance of fraud, and all of that

22   will be addressed in cash management.

23             THE COURT:  I don't mean to challenge that in any

24   way.  I'm just trying to understand.  I haven't read any

25   articles about whether this particular arrangement is

Page 38

1   property of the estate.  I'm trying not to read articles

2   about Voyager.

3           But how is the arrangement structured and what is

4   it that leads some people to suggest maybe it's property of

5   the estate and leads you to conclude that it's a trust

6   arrangement, just tell me how it works.

7           MR. SUSSBERG:  It's simply because it's in a for-

8   benefit-of-customer account at Metropolitan Bank.

9   Metropolitan Bank is backstopped, and FDIC insured; that's

10  in the event that Metropolitan Bank was to have an

11  insolvency issue.  So people have been speculating that we

12  haven't been honoring withdrawals from that account because

13  we're going to argue that that money is somehow ours, and we

14  are unequivocally saying that that's customer money.

15          Our case is focused on our customers, and we want

16  to deliver our customers the value of this enterprise for

17  their benefit, whether it's cash, crypto, claims, or

18  otherwise.  And I think that based on the agreements in

19  place and the way in which it's described in the customer

20  arrangements and the account arrangements, that we've given

21  clarity that that's the case.  I don't think there's an

22  argument to the contrary, and I am standing here not

23  suggesting that we make an argument to the contrary.

24          THE COURT:  All right.  Those accounts, whose name

25  are they are they in?  You say they're for the benefit; is

1    it Voyager FBO customers, something like that?

2              MR. SUSSBERG:  Yeah.  I don't have the exact

3    phraseology in front of me, but my understanding is it's

4    similar to the way Your Honor describes.

5              THE COURT:  So customers send cash.  Who has the

6    authority to instruct the bank to make movements of cash; is

7    it just Voyager?

8              MR. SUSSBERG:  It is Voyager.  But as we'll get

9    into the context of cash management, this is incredibly

10   complicated because individual customers will go to pick

11   their bank and initiate a transfer to Metropolitan Bank and

12   Metropolitan Bank will then indicate to Voyager that the

13   cash is there.

14             The problem is that in between, as soon as someone

15   initiates the application and starts the process, in order

16   to be competitive in this environment, you need to affect

17   the transaction.  So the customer signs the agreement, they

18   initiate a transfer from their bank, and the company

19   transacts and goes out and buys crypto.

20             I don't want to be too specific and, you know,

21   prescribe to folks how to go about doing something

22   nefarious, but there are instances where people actually do

23   bad things and effectuate trades and then go take their

24   money back.

25             THE COURT:  I understand that.  I understand that.

Page 40

1   The trade has gone bad before the money's been taking and

2   they try to disavow it.  I understand that.

3            But I'm trying -- is there something in your

4   agreements with the customers that is different as to the

5   cash that says, for example, that the cash is held in trust?

6            MR. SUSSBERG:  Yes, very different.  The customer

7   agreements are specific that the crypto is held on the

8   Voyager platform and the customers agree that Voyager will

9   hold that crypto and use that crypto to help benefit the

10  customers by producing yield, whether through the various

11  customer programs or through the lending program that

12  creates higher yields.  That's all property within the

13  company.

14           And we wanted to take the mystery out of what was

15  happening there by filing the plan and letting everyone know

16  that they will get the benefit of the crypto that's on the

17  system because we're effectively proposing that they become

18  owners of the business.

19           THE COURT:  What do the customer agreements say

20  about the FBO accounts, if anything?

21           MR. SUSSBERG:  The customer agreements aren't

22  specific to the FBO accounts.  Those are separate standalone

23  agreements is my understanding.

24           THE COURT:  Okay.  So is there any communication,

25  are customers told anything when they transfer money as to

1    whose money that is when it reaches those accounts?  Is

2    there anything in the agreement with the bank that says

3    whose money that is?

4             MR. SUSSBERG:  Well, the FBO accounts agreement

5    say that this money is yours and it's held for your benefit

6    at Metropolitan Bank and Voyager directs Metropolitan Bank

7    on a daily basis whether to release that money based on the

8    ledger that the company keeps, again, on a daily basis.

9             And I think the reason, Your Honor, that we paused

10   it is because we're concerned about the issue that Your

11   Honor circled around and understands and we want to make

12   sure that when that money goes out, it actually benefits the

13   right recipients and the intended recipients and not bad

14   actors.

15            THE COURT:  Understand.  I ask these questions not

16   because I dispute your characterization or because I want to

17   keep anybody from their money.  I just need to understand

18   for sure whether these are, in effect, trust arrangements so

19   that that money is customer money subject to whatever

20   accrued rights you have, as opposed to whether it's just an

21   unsecured claim against you.

22            MR. SUSSBERG:  Yeah, no, the customers, just to be

23   crystal clear.  Those customer agreements on the FBO basis

24   are with Metropolitan Bank, so they have an account, and

25   they have an agreement with Metropolitan Bank, and as a

1   result, it's not part of the system where we keep the crypto

2   on the Voyager platform.  And so, that relationship exists

3   and that's why it's held for their benefit and Metropolitan

4   Bank serves as an in between with the company and the

5   customers.

6           THE COURT:  Is there one account, is there a

7   separate account for each customer, do the customer

8   establish these accounts; how does it work?

9           MR. SUSSBERG:  I believe it's one account

10  established through the customer agreement.  It's omnibus

11  accounts, and they use that at Metropolitan Bank and

12  everything floods into that account at Metropolitan Bank.

13          THE COURT:  And just to be sure I got an answer to

14  this question, is there anything in your agreement with

15  Metropolitan Bank that says, in effect, these are customer

16  assets against which you may have claims or that says these

17  are your assets against which customers may have claims; how

18  is it described?

19          MR. SUSSBERG:  No, they're customers of the bank,

20  so it wouldn't be a provision in there.  And there's not a

21  provision, we'll confirm for Your Honor, that says that the

22  company has entitlement to those funds.

23          THE COURT:  I see.  So the company gives

24  directions, but it is not treated as the company's money.

25          MR. SUSSBERG:  Correct.  It's between the bank and

 1    the customer.

 2              THE COURT:  All right.  And your parent company is

 3    your largest creditor here.  Do they agree with that

 4    arrangement and agree that that's the nature of the

 5    arrangement?

 6              MR. SUSSBERG:  Yes.  I have not heard from anyone

 7    otherwise.

 8              THE COURT:  Okay, very good.

 9              MR. SUSSBERG:  I'm going to turn it over to Mr.

10    Marcus, Your Honor, but obviously I'm here to the extent you

11    have any other questions.  Thank you.

12              THE COURT:   Thank you, that was very helpful.  If

13    you think that you're new to cryptocurrency, you are a

14    seasoned veteran compared to me.

15              MR. SUSSBERG:  Well, I appreciate the opportunity

16    to indulge you.  We're learning every single day, so I

17    really do appreciate the time.

18              MR. MARCUS:  Good afternoon, Your Honor.  This is

19    Christopher Marcus from Kirkland & Ellis on behalf of the

20    Debtors.  Can you hear me okay?

21              THE COURT:  I can, thank you.

22              MR. MARCUS:  Great.  I'm going to pick up on Slide

23    18 where Mr. Sussberg left off.  And obviously, Your Honor,

24    if you have any questions along the way, I'd be happy to

25    answer them as best I can.

1          Slide 18 really talks about or really depicts what

2     is our dual track process.  I'm going to talk first about

3     the standalone plan that we filed.  But as is detailed in

4     Mr. Durmont's declaration that he filed with our first day

5     pleadings, before we filed, we commenced a marketing

6     process, and that process continues.  We do have some

7     interested parties and we'll continue down that path as

8     well.

9          On Slide 19, Your Honor, I want to address the

10    standalone plan.  And, you know, it still needs some work,

11    and I will talk about why we filed the plan at this time in

12    just a second but let me just address the recoveries under

13    the plan.  And obviously to the back and forth that you just

14    had with Mr. Sussberg, this doesn't include whatever cash is

15    in the customer accounts for the benefit of the customer;

16    those are outside of distributions to be made from property

17    of the estate.

18          So Mr. Sussberg ticked through some of the

19    significant assets that are property of the estate.  And so,

20    for our account holders, the distributions would include,

21    one, a to-be-determined percentage of the specific

22    cryptocurrency that's held by each account holder.  In other

23    words, if an account holder had 10 Bitcoins, then that

24    account holder's coin recovery would be the percentage of

25    Bitcoins.  We're not dollarizing the claims; we're not

Page 45

1    crystalline the claims in dollars.  Those coin recoveries

2    will be paid in kind under the plan.

3          Account holders will also receive their pro rata

4    share of the new common equity in the reorganized company,

5    subject to a management incentive plan, which we would

6    expect would be there as most companies have.

7          They would also receive their pro rata share of

8    the existing Voyager tokens.  Mr. Sussberg mentioned these

9    Voyager tokens are effectively the currency of the Voyager

10   platform.  They're like reward points.  They're issued in

11   connection with the company's rewards program.  They entitle

12   holders to benefits like higher interest rates and lower

13   transaction fees.

14         And then, of course, a pro rata share of any

15   recovery on account of the Three AC loan, which again, Mr.

16   Sussberg mentioned, we're very focused on doing whatever we

17   can to make sure we get the most we can out of the Three AC

18   liquidation process.

19         The plan also provides a mechanism -- we wanted to

20   give some flexibility to our account holders, those who

21   wanted to increase their recovery of coins and decrease

22   their recovery in reorganized equity and vice versa.  The

23   specific details of the mechanism need to be fleshed out a

24   bit, but we did want to provide that flexibility as well, so

25   folks have that opportunity to invest more in what we hope

1     is an upside.

2          The plan does take into account the structural

3     priorities of the different legal entities, and we are still

4     doing work -- to Your Honor's earlier question, we are still

5     doing work on where exactly the general unsecured claim sit.

6     But we don't think, as Mr. Sussberg said, we don't think

7     there are material, general, unsecured claims.  And by far

8     the largest creditors at Opco will be our accountholders.

9          And then structurally junior to the accountholders

10    is Alameda Ventures, their loan facility  They say that the

11    mid-level -- I'm sorry, the mid-level holding company in the

12    structure chart.  And this client contemplates that they

13    will receive no recovery on account of that claim.  And then

14    absolute priority equity holders at the ultimate parent

15    would not get a recovery unless and until our creditors are

16    paid in full.

17          So, Your Honor, back to my point before about why

18    we filed the plan now despite the fact that there remains

19    work to be done to really finalize it.

20          So, you know, as is typical before you file a

21    Chapter 11 case due to disclosure and similar issues, we

22    haven't been able to say much in the days leading up to the

23    filing.  And as Your Honor can imagine, when the gates came

24    down on the trading platform, customers had lots of

25    questions.  They were upset, they were angry, which is very

Page 47

1    understandable.  And unfortunately, because we were silent,

2    the anger in some customers rose to the level of personal

3    threats against management and their families, which is

4    obviously very concerning for us.

5              But the filing gives us the opportunity to start

6    answering at least some of the questions and start

7    communicating with the customers and hopefully reducing some

8    of the anger and some of the uncertainty that's out there.

9    And as we get further in this process, we can continue to

10   dissipate both.  And that's really the main reason why we

11   filed the plan at this time, Your Honor, so customers can

12   see that we are focused on a path forward.  It is not

13   correct to think that there is no hope.  It is not correct

14   to think that they have lost everything.  We are doing

15   everything we can to preserve and maximize value.  We are

16   running out every ground ball.  We are doing everything we

17   can to move the process forward and get as much of a return

18   for customers as possible.  And we will engage with the

19   Creditor's Committee expeditiously and keep pressing the

20   plan forward, even if no third party sponsors or purchasers

21   arise.  And that's why we filed the plan.  That's what we

22   want the customers to know.  This company really does

23   understand how important its customers are.

24             Your Honor, on Slide 20, which is the sort of ice

25   cream cone, this is an overview of what I mentioned before

Page 48

1    set forth in detail in Mr. Dermont's declaration discussing

2    Moelis' efforts with respect to the third party sponsor sale

3    path, which as they develop, you know, will be compared and

4    contrasted with the standalone plan to ensure we are

5    maximizing value.

6           We did receive one proposal for an out-of-court

7    transaction, but that proposal was not viable.  And

8    discussions do continue with parties that have signed NDAs

9    and have expressed interests in an out-of-court solution,

10   and we will certainly stay on top of that and be sharing

11   information with the Creditor's Committee as soon as they

12   are appointed.

13          On Slide 21, Your Honor, I wanted to mention a

14   couple of issues, to highlight a couple issues that are

15   today issues or near-term issues.  The first is the money

16   transmitter licenses.  In several states we are licensed as

17   a money transmitter and already we've had some states seek

18   to attempt to terminate those licenses.  We believe based on

19   the filing, and again, we believe based on -- we believe is

20   a violation of Section 525 and 362 of the Code.  That will

21   be discussed later with the automatic stay motion.  And Mr.

22   Sussberg went into some detail, Ms. Okike is going to go

23   into detail in connection with the Cash Management Motion.

24   But unauthorized ACH transfers are problematic, both for the

25   company and for the customers.

Page 49

1          THE COURT:  What are the money transmitter

2    licenses and what's the grounds on which the states have

3    sought to terminate them?

4          MR. MARCUS:  So in order to move money from

5    customers and back and forth, in certain states we have to

6    be licensed as a money transmitter.  And in other states

7    where we can't be licensed as a money transmitter, we use

8    institutions like MCB to function for us.

9          I do not know the answer to why the states have

10   terminated those licenses, Your Honor.  I haven't been as

11   close to the actual termination notices.  So I'm not sure of

12   the answer to that question.

13         THE COURT:  Are they on grounds other than the

14   filing of bankruptcy or the failure to pay a debt owed to

15   the states?

16         MR. MARCUS:  Not that I'm aware of.  My

17   understanding is they were based upon the company's filing.

18   But I will leave the certainty of that to the automatic stay

19   motion.

20         THE COURT:  Okay.

21         MR. MARCUS:  Your Honor, the last issue I wanted

22   to highlight for Your Honor that is a near-term issue, not a

23   today issue, is the sale of Coinify, which is an online

24   trading platform and payment processing server that's owned

25   through a series of Danish entities that are not Debtors.

Page 50

 1    They are on the right side of the chart, but they roll up to

 2    the parent company, Voyager Digital Limited Canada.  And we

 3    are working through a process to sell Coinify and we expect

 4    to file a motion seeking Your Honor's approval to sell that

 5    asset in the near-term.  I just wanted to highlight that for

 6    you.

 7              And then as I said, we look forward to the

 8    transparency that's required in the Chapter 11 process, Your

 9    Honor.  To repeat the earlier message, we intend to use all

10    of the tools and work together with the Creditor's Committee

11    to get our customers as much value as possible as quickly as

12    possible through whatever the value-maximizing path is.

13              That's all I have in the overview of the

14    restructuring process, Your Honor.  Unless you have any

15    questions, which I'm happy to answer, I would turn it over

16    to my partner, Ms. Okike.

17              THE COURT:  I think I've asked my questions.

18              MS. OKIKE:  Okay.  Thank you, Your Honor.

19    Christine Okike of Kirkland and Ellis on behalf of the

20    Debtors.

21              THE COURT:  Good morning.

22              MS. OKIKE:  Your Honor, can you hear me okay?

23              THE COURT:  I can, yes.

24              MS. OKIKE:  Great.  Your Honor, before we move

25    into the relief we are seeking today, I would like to submit

1    into evidence the first day declaration of Mr. Stephen

2    Ehrlich.  Mr. Ehrlich is the co-founder and chief executive

3    officer of Voyager Digital LLC and also the chief executive

4    officer of Voyager Digital Holdings Inc.  His declaration

5    was filed at Docket Number 15.  And his declaration has been

6    submitted to the Court in support of all of the first-day

7    relief and other matters required under Local Rule 1007-2.

8              Mr. Ehrlich is available on the line today if any

9    party wishes to cross-examine him.  I would move to have his

10   declaration submitted at this time, Your Honor.

11             THE COURT:  All right.  Are there any objections

12   to the admission of Mr. Ehrlich's declaration into evidence?

13             All right, I hear no objections.  Is there anyone

14   on the line who wishes to cross-examine Mr. Ehrlich as to

15   anything said in his declaration?

16             All right, very good.  The declaration is

17   admitted.

18             MS. OKIKE:  Thank you, Your Honor.  Your Honor,

19   before we move into the relief requested today, I just

20   wanted to note at the outset that we are only seeking relief

21   that is really necessary to avoid immediate and irreparable

22   harm to the Debtors during the first 21 days of these cases.

23   We have reviewed your rulings in previous cases, and late

24   last night we filed a number of revised proposed orders to

25   make sure that the relief we are seeking today is properly

Page 52

1    tailored within the confines of Rule 6003.

2         And, Your Honor, as we will hear more about, the

3    relief we are seeking is critical to these Debtors and the

4    success of these cases.  By way of example, since filing for

5    Chapter 11, one of our key banks purported to terminate our

6    accounts after we informed them of the bankruptcy filing, in

7    violation of the automatic stay.

8         Your Honor, with that, I would like to move into

9    the first item on the agenda, which is the Debtor's cash

10   management motion at Docket Number 10.  And a revised

11   proposed order can also be found at Docket Number 46.

12        Your Honor, by way of background, the Debtors

13   utilize a cash and cryptocurrency management system in the

14   ordinary course of business, which is comparable to the

15   systems used by similar cryptocurrency platforms to collect,

16   disburse, an otherwise manage the Debtor's cash and digital

17   assets.

18        The cash management system facilitates cash and

19   cryptocurrency monitoring, forecasting, and reporting,

20   enabling the Debtors to maintain necessary oversight over

21   their cash and cryptocurrency accounts.  And the cash

22   management system consists of really two separate systems

23   that interact together in the ordinary course of business.

24        The first system consists of accounts which are

25   held at MC Bank, Silvergate, and Signature Bank, which

Page 53

 1    facilitate the Debtor's cryptocurrency transactions.  And

 2    the second system consists of accounts that the Debtors hold

 3    at MC Bank and BMO Harris, which the Debtors use for payment

 4    of administrative costs and day-to-day operations.

 5          The Debtors maintain a total of 14 bank accounts.

 6    They have eight bank accounts at MCB, or Metropolitan

 7    Commercial Bank, two accounts at Silvergate Bank --which I

 8    will get to, this is the bank that purportedly terminated

 9    our accounts -- two accounts at BMO Harris Bank, and two

10    accounts at Signature Bank.  And we've provided a list of

11    the Debtor's 14 bank accounts in Exhibit D to the motion.

12          Your Honor, the Debtors maintain two master

13    operating accounts.  Debtor, Voyager Digital Holdings Inc.,

14    has a centralized master operating account at MC Bank that

15    directly or indirectly wires or transfers substantially all

16    of the Debtor's cash to the other Debtor bank accounts.

17          The MC Bank master operating account funds the

18    Debtor's disbursements, ACH transfers, and wires for the

19    Debtor's operating, capital, and general administrative

20    expenses and other cryptocurrency exchange-related expenses.

21          We also maintain Debtor Voyager Digital LLC, the

22    Opco, also maintains a master operating account at

23    Silvergate Bank.  And that is used to facilitate a

24    customer's purchase and sale of crypto through the Debtor's

25    mobile application, or what we refer to as the Voyager App.

1            So when a customer purchases crypto, money is

2     transferred from the applicable bank at MC Bank -- and I'll

3     go in -- there's two accounts.  One is for wires and one is

4     for ACH transvers.  So when a customer purchases crypto, the

5     money is transferred from the applicable bank account at MCB

6     to the Silvergate master operating account.  The Silvergate

7     master operating account then transfers the cash to

8     Silvergate's exchange network account, or what we call the

9     SEN account.  And that account is used to settle the

10    purchase and sale of cryptocurrency assets with market

11    makers which are related to the execution of a customer's

12    order.

13           On the other hand, when a customer sells crypto,

14    the Silvergate master operating account hosts the transfer

15    of funds and the sweeps the funds into the applicable MCFBO

16    account, which I will talk about in more detail.

17           As Mr. Sussberg mentioned, when a customer buys,

18    sells, or trades cryptocurrency on the Voyager app, the

19    Debtors earn a profit from the spread, or the difference

20    between the bid and the ask on the trade.  And the Debtors

21    typically earn the spread in crypto and then they comingle

22    that crypto with other crypto positions that the Debtors

23    hold.  However, from time to time, less frequently, the

24    spread revenue is converted into cash, and at that point

25    it's swept into the Silvergate master operating account.

Page 55

1          Your Honor, there's two other key accounts outside

2     of the master operating accounts that I would like to

3     mention.  Debtor, Voyager Digital Holdings Inc., maintains

4     an operating account at MC Bank which funds the Debtor's

5     payroll and all other employee compensation and benefits as

6     well as rent for the Debtor's office spaces.  And that bank

7     account is funded by the MC Bank master operating account,

8     which I just mentioned.

9          The Debtors maintain a target balance in that

10    account in excess of two million dollars, and cash is swept

11    from the MC Bank master operating account into the MC Bank

12    administrative operating account in advance of their

13    biweekly payroll.

14         Your Honor, I want to briefly describe the Voyager

15    app and the MCFBO accounts which are intertwined with the

16    Debtor's cash management system.

17         So, Your Honor, through the Debtor's platform,

18    customers can fund their account on the Voyager app using

19    either cash or cryptocurrency assets.  And I'll walk through

20    how they do that in both scenarios.

21         So to fund the app with cash, a customer links

22    their personal bank account to the Voyager app.  That is

23    then verified through a third-party platform to ensure that

24    the customer actually has sufficient cash for the

25    transaction in its personal bank account.  MC Bank provides

Page 56

1     the cash management and payment concentration services to

2     the Debtor through custodial for the benefit of customer

3     accounts whereby the movement of a customer's cash from

4     their personal account into the MCFBO accounts are in the

5     customer's name and payments made from the MCFBO accounts

6     are charged against the bank accounts of the Debtor's

7     customers either via ACH transfer or wire transfer.

8              Once the customer's personal bank account is

9     verified, a customer may transfer funds from their Voyager

10    app account via ACH to the for the benefit of customer

11    account held at MC Bank.

12             The MCFBO account holds the majority of cash

13    that's transferred by the Debtor's customers.  And, Your

14    Honor, I just want to touch on the customer agreement since

15    it came up a little bit earlier.

16             So the customer agreement makes clear that the

17    customers are customers of MC Bank with respect to their

18    cash deposits.  And the Debtor's agreement with MC Bank

19    provides that the bank is the holder of the MCBO accounts,

20    which constitute -- in which customers' funds will be held.

21             Your Honor, in addition to the ACH account, the

22    Debtors also maintain a smaller for the benefit of customers

23    account at MC Bank which allows customers to transfer funds

24    via wire transfer rather than ACH.  So there is basically

25    two ways for customers to fund their trades on the app,

Page 57

1    either through ACH or wire transfer to the applicable MCFBO

2    account.   So one for wire transfers, one for ACH transfers.

3              Cash in those MCFBO accounts when a customer

4    transacts to -- when a customer transacts is swept into the

5    master operating account when customers execute trades on

6    the Voyager app.   So these accounts are really at the core

7    of the Debtor's platform.   You know, they host really

8    important functions for the functioning of the whole

9    platform and the funding of the customer accounts on the

10   Voyager app as well as for buying and selling cryptocurrency

11   from those accounts.   Your Honor, so that kind of deals with

12   the cash.

13             In terms of when a customer wants to execute an

14   order to buy cryptocurrency assets on the app, that goes

15   through the Debtor's order management system, or OMS.   And

16   the Debtor instructs the applicable MCFBO account to move

17   cash from the account to a third-party exchange or market

18   maker and deliver the cryptocurrency through the Voyager pp

19   to the Debtors.

20             Voyager then holds the crypto-custody through one

21   of its approved crypto custodians.   So we utilize third-

22   party custodians, which include companies such as Coinbase

23   Trust Company, Copper.co, and Anchorage Digital.   And we

24   also have a self-custody solution called Fireblocks.

25   Typically, which I'll get into, crypto remains in Fireblocks

Page 58

1    not for a significant period of time before it's swept to

2    one of our third-party custodians.

3            Your Honor, in terms of when a customer wants to

4    sell cryptocurrency, they execute that order through the

5    app.  Then our order management system instructs our

6    treasury management system to transfer the cryptocurrency

7    held with our third-party custodian for our self-custody

8    solution, Fireblocks, to the third-party exchange or market

9    maker.

10           The third party exchange or market maker then

11   receives and deposits the cash in the applicable MCFBO

12   account via the Silvergate master operating account, which I

13   mentioned.  And then that money is transferred to the

14   customer's personal count from the MCFBO account either via

15   ACH or wire transfer as applicable.

16           Customers may also request to withdraw the cash

17   applicable to their cryptocurrency trades from the Voyager

18   app.  The customer's transfer request is conveyed through

19   the Voyager app to the Debtor's order management system,

20   which in turn instructs the requested amount of cash to be

21   withdrawn from the applicable MCFBO account and subsequently

22   transferred through a third-party processor called UZIO

23   either via ACH or wire transfer to the customer's personal

24   bank account.

25           The Debtors are required to pre-fund the

Page 59

1   withdrawal from their master operating account at MC Bank

2   into an account held by UZIO to ensure that proper funds are

3   available as customers transact on the platform and try to

4   withdraw payments.  So the Debtors don't fund withdrawals on

5   a one-to-one basis.  Instead, we pre-fund a targeted amount

6   and then we replenish it as needed.

7          When the money is deposited into a customer's

8   personal bank account from the applicable MCFBO account, MC

9   Bank then reconciles the amount that the Debtors prefunded

10  and remits that amount back to the master operating account.

11         Your Honor, I just want to briefly touch on the

12  customer agreement and your questions with respect to

13  cryptocurrency and what it provides.

14         So the customer agreement provides that -- and

15  every customer has to sign up for the customer agreement or

16  agree to the customer agreement when they set up their

17  account in the app.  That agreement provides that the

18  customer authorizes and instructs Voyager to hold the

19  customer's cryptocurrency on its behalf.  And the customer

20  understands that Voyager may hold the customer's

21  cryptocurrency, together with the cryptocurrency of other

22  Voyager customers in omnibus accounts or wallets.  In

23  addition, the customer understands and authorizes Voyager to

24  delegate some or all custody functions to one or more

25  affiliates or third parties at Voyager's discretion.

Page 60

1           The customer agreement goes on to provide that the

2    customer grants Voyager the right, without further notice to

3    the customer, to hold cryptocurrency held in the customer's

4    account in Voyager's name or in another name, and to pledge,

5    repledge, hypothecate, rehypothecate, sell, lend, stake,

6    arrange for staking, or otherwise transfer or use any amount

7    of such cryptocurrency separately or together with other

8    property with all attendant rights of ownership and for any

9    period of time and without retaining a like amount of

10   cryptocurrency and to use or invest such cryptocurrency at

11   the customer's sole risk.

12           Your Honor, so as Mr. Sussberg stated, we believe

13   that the cryptocurrency are assets of the estate.  And I

14   know that was a question that you asked earlier.  Not sure

15   it's an issue for today, but that's the position that we

16   believe based off of the various agreements and how they

17   interact with each other.

18           THE COURT:  All right.

19           MS. OKIKE:  Your Honor --

20           THE COURT:  Go ahead.

21           MS. OKIKE:  Sorry.

22           THE COURT:  I thought you were finished.  Go

23   ahead.

24           MS. OKIKE:  Oh, no, no.  So with respect to the

25   MCFBO accounts, on average there is approximately $100

Page 61

1    million to $200 million that's held in the accounts for the

2    benefit of customers.  But that fluctuates depending on the

3    amount of transactions that customers are engaging and how

4    much they are seeking to withdraw from the platform.

5              As Mr. Sussberg said, there's currently

6    approximately $350 million of cash that is held in those

7    accounts.  And basically what happens is at eight p.m. each

8    day the Debtors generate a report that provides a snapshot

9    of customer balances in each MCFBO account and the balances

10   that are owed to each customer based on their respective

11   trades for that day.  The Debtors send that report to MC

12   Bank each day because MC Bank controls those accounts.  And

13   to ensure that the account is aligned with the balances from

14   the customer's daily activity, the Debtors reconcile or

15   true-up with MCB each morning when the plan was active by

16   depositing or removing funds from that master operating

17   account.  But the Debtors do not control those accounts.

18   Any transactions that happen with respect to the FBO

19   accounts are at MC Bank's discretion.

20             Your Honor, I was going to go into how customers

21   can also transact by funding cryptocurrency, but happy to

22   answer questions if you had something you wanted me to

23   address.

24             THE COURT:  Well, my fundamental question is most

25   of these arrangements that you've described are descriptions

Page 62

1    of how things worked say two months ago when active trading

2    was going on, active deposits and withdrawals were going on,

3    et cetera.  I understand that all of that is in suspense

4    right now.  Are you seeking authority today to restart any

5    of that?

6              MS. OKIKE:  No, Your Honor.  We are not seeking to

7    restart the platform.  As Mr. Sussberg said, we anticipate

8    reopening the plan when we have a transaction completed,

9    whether that's through a plan or a sale to a third party.

10   That being said, everything is kind of in sleep mode right

11   now.  So there's no trades going on.  But we still are

12   maintaining the system to the best of our ability so that

13   when we do confirm a plan, we can reopen the system and

14   customers can continue to transact through the platform.

15             THE COURT:  Well, I think any order that -- given

16   the broad description of your cash management process, any

17   order that I enter has to say very clearly that it is not

18   interpreted as restarting the platform, reopening the

19   platform, allowing withdrawals of cryptocurrency, for

20   example.

21             MS. OKIKE:  Understood, Your Honor.

22             THE COURT:  Okay.  Then the motion describes

23   various intercompany arrangements.  I don't really know what

24   all of the non-Debtor affiliates do or how the funding of

25   them works.  I am always concerned with funding of non-

Page 63

1    Debtors that money leaks out of the universe that I control

2    and I don't know what it's leaking out to.  Do these

3    affiliates have customers similar to the customers that you

4    have at the operating entity?  And what happens if -- what

5    obligations exactly would be funded by continued

6    intercompany transfers?

7            MS. OKIKE:  Yes, Your Honor.  So just to make

8    clear, we are only seeking to continue intercompany

9    transactions between Debtors.  Do no funding of non-Debtor

10   entities, which hopefully alleviates some of the concern.

11           As I mentioned, the Debtor --

12           THE COURT:  That alleviates all of my concerns.  I

13   did not understand that.  Okay.

14           MS. OKIKE:  Okay, yeah.  We are not seeking to

15   make any transfers from Debtors to non-Debtors.  And in

16   addition, we are seeking to provide superpriority

17   administrative expense to the extent that there's

18   transactions happening between Debtors, but we have agreed

19   in the order to provide notice of those transactions I

20   believe on a monthly basis to the U.S. Trustee and to any

21   committee appointed in this case.

22           THE COURT:  Okay.  All right.  And your proposed

23   motion asks for permission to limit the chargeback rights

24   for 60 days.

25           MS. OKIKE:  Yes, Your Honor.

Page 64

1            THE COURT:  Now, I'm not clear whether you are

2    asking me to authorize you to exercise a right that you have

3    under your bank agreements or if you're asking me to enjoin

4    the bank for 60 days.  What's the nature of that?

5            MS. OKIKE:  Understood, Your Honor.  Understood.

6    So, Your Honor, as I described, the MC Bank FBO ACH account

7    is really central to the platform, as it holds the majority

8    of the cash that's transferred by the Debtor's customers.

9    And so while these transactions are critical to the plan,

10   they also are susceptible to fraudulent chargebacks by

11   customers of the MCBFBO account.  I've learned a lot about

12   these types of chargebacks in the last couple of weeks.

13   Suffice it to say that when a customer utilizes the Voyager

14   platform to purchase cryptocurrency with the payment of that

15   coming out of the MCFBO account via ACH transfer, there are

16   mechanisms, which is essentially fraud -- it's actually a

17   felony for people to do this -- but where they are able to

18   kind of reverse those transactions, sometimes leaving the

19   company without the cryptocurrency which they have

20   withdrawn, and sometimes without the cash as well.

21            Unfortunately, there really is no mechanism to

22   stop that process given how ACH transfers work.  We have

23   been working very closely with MC Bank, and the language in

24   the order is actually consensual language which has been

25   agreed to by MC Bank, which is designed to really provide us

Page 65

1    with the most protection we think we can get in order to

2    challenge illegitimate chargebacks.  And so we are no longer

3    seeking to freeze the MCBFBO account, because it's actually

4    just not possible.  But we have provided in the order a

5    process for Voyager essentially to step into the shoes of MC

6    Bank for purposes of disputing what we believe are

7    fraudulent transactions and we've incorporated language in

8    the proposed order to that effect.

9           This is a consensual agreement, as I said, between

10   MC Bank and Voyager.  I think we would appreciate it being

11   included in the order because we think that will be helpful

12   in terms of providing that order to the banks of customers

13   who are initiating some of these ACH chargebacks.

14           THE COURT:  Okay.  And so if I authorize the cash

15   management motion, does that have anything to do with the

16   extent to which customers can withdraw cash from those

17   accounts in the case of customers against whom you don't

18   have potential chargeback issues?

19           MS. OKIKE:  Your Honor, right now the issue is

20   that we are going through a process of reconciling.  And the

21   problem is that people are initiating chargebacks for

22   periods, you know, that are a long time ago.  Right?  So

23   it's going to take some time for us to kind of go through

24   and make sure that the proper -- the legitimate customers

25   are actually receiving funds.  That being said, neither we

Page 66

1    nor MC Bank really has authority to stop one of these

2    transactions.  Our recourse is really to proceed against the

3    customer's personal bank or the customer themselves in cases

4    of fraud.

5              THE COURT:  So the 60-day provision, what exactly

6    what would happen if you've got a customer who you think is

7    trying to disavow a trade that shouldn't be disavowed?

8              MS. OKIKE:  Your Honor, so we actually filed a

9    revised proposed order.  I'm not sure whether you had a

10   chance to review it.  It's at Docket 46.

11             THE COURT:  I did not.

12             MS. OKIKE:  Yes.  So we are no longer seeking to

13   freeze the account because it's -- as I mentioned, it's just

14   not possible.  But what we are seeking is for MC Bank to

15   delegate to Voyager all of their rights -- because, again,

16   MC Bank is the one who has the relationship with the

17   customer -- to designate the rights and authority to

18   investigate, dispute, and prosecute unauthorized or

19   illegitimate ACH chargebacks under those accounts to Voyager

20   to the Opco and also to designate to Voyager that they have

21   the right to recover against these processing banks,

22   including rights of indemnification.

23             And so what we've built into the order and what MC

24   Bank has agreed is basically a delegation of authority that

25   puts us in the best position to try to kind of go after some

Page 67

1      of these fraudulent transactions.  And that's the relief

2      that we are seeking today.

3              THE COURT:  So essentially you would have whatever

4      right the MC Bank would have against the customers and the

5      customers' other banks to recover.

6              MS. OKIKE:  Exactly.

7              THE COURT:  Okay.  All right.  And I think you've

8      also sought authority to pay some corporate credit cards.

9              MS. OKIKE:  Yes.

10             THE COURT:  Do those come due?  What's the

11     irreparable harm if they have to wait until a final hearing?

12             MS. OKIKE:  Your Honor, so the corporate credit

13     cards -- and we only have a couple.  We have five of them.

14     They are issued by Brex.  And they are really designed to

15     cover, you know, legitimate business expenses, travel

16     expenses.  Given that the Debtors are operating in many

17     states, employees obviously need to travel to transact

18     business and interact with regulators and governmental

19     authorities in those states.

20             As of the petition date, there is a balance of

21     about $76,000 on the corporate cards.  We believe that the

22     Debtors would suffer a loss in excess of not paying the

23     amounts due because these are legitimate business expenses.

24     They are needed to keep the business in operation.  Any

25     delay in payment of the expenses we think would harm the

1    Debtor's reputation at a critical time if they have to tell

2    people that they can't make them.  And likewise would be

3    difficult to fulfill travel obligations which are essential

4    to ongoing business operations.  Further, if Brex decided to

5    cut off the cards and the balance isn't paid, we would have

6    to open up new cards, which could cause delay of payments to

7    vendors and also result in added expenses of having to get a

8    new line of credit for certain business expenses.

9            And then finally, I think probably most

10   importantly, if we aren't able to use the cards, employees

11   are going to have to come out of pocket to pay for what

12   could be large expenses that they are not otherwise

13   accustomed to charging to their personal accounts, which is

14   not only burdensome, but we believe could harm employee

15   morale.  And if we were to have employee attrition at this

16   critical moment would cause further harm to the Debtors, and

17   we would have to recruit and train new personnel.

18           And so for all those reasons, we believe that --

19   and given the limited amount that the Debtor should be

20   authorized to pay the pre-petition amount and continue using

21   the corporate cards in the ordinary course of business.

22           THE COURT:  All right.  My primary question was

23   who has to pay them if the Debtors don't pay them.  Does it

24   just mean that the card company had to wait until the 21st

25   day, or would the employees have to come out of -- the

1    employees would have to come out of pocket for this?

2          MS. OKIKE:  Not for the existing cards, Your

3    Honor.  But for go-forward expenses potentially.  But I

4    think potentially if they shut down the card, I think the

5    expenses that we would incur in getting new cards would

6    potentially override the amounts that we're seeking to have

7    approved for payment.

8          THE COURT:  Why would they shut them down?  Have

9    they threatened to shut them down?

10         MS. OKIKE:  Not to my knowledge, Your Honor.  But

11   we have had a bank which has shut down our accounts,

12   Silvergate.  So I don't think it's out of the question that

13   this could happen as well with respect to Brex.  And if it

14   was to happen, we would have a delay in terms of making

15   vendor payments and operational payments which are important

16   to the business.

17         THE COURT:  All right.  Well, under the rules, I

18   am not supposed to authorize things except to the extent

19   actually necessary to avoid immediate and irreparable harm.

20   Kind of telling me that there could be immediate or

21   irreparable harm if somebody does something that they

22   haven't threatened to do doesn't really meet that standard.

23   So it's a relatively small amount, but that's the same

24   reason why I can't believe that the entity would really make

25   such a bit stink about it just by having to wait the 21 days

Page 70

1    until a committee can look at it as opposed to doing it on

2    day one.

3              MS. OKIKE:  Okay.  Understood, Your Honor.  I

4    mean, happy to revise the order to provide that, you know,

5    we're not able to make that prepetition payment with the

6    understanding that if the bank shuts off our card, we may

7    want to come before Your Honor before that period expires.

8              THE COURT:  Right.  And it's not that the motion

9    is being denied, it's just procedurally you've got to wait

10   the 21 days.  I understand entirely that it's a relatively

11   small amount in the grand scheme of things.  It's tempting

12   for many reason to just say forget it on that basis.  But

13   unfortunately, the rule doesn't say you can pay because

14   something is relatively small in the grand scheme of things.

15   It says you can pay if necessary to avoid immediate

16   irreparable harm.  And I really think I should abide by the

17   rule.

18             MS. OKIKE:  Understood, Your Honor.  Your Honor,

19   one more thing I just want to mention in terms of the relief

20   we are seeking is with respect to Section 345(b).  And so I

21   just wanted to highlight that MC Bank and Signature Bank are

22   designated as authorized depositories in the Southern

23   District of New York.  They are each party to a depository

24   agreement with the U.S. Trustee.  And therefore, we believe

25   these bank accounts at institutions that will be

Page 71

1    collateralized in a manner consistent with the requirements

2    of Section 345.

3            To the extent that the other banks are not

4    authorized depositories, we maintain they are well-

5    capitalized and financially stable financial institutions

6    that are ensured by the FDIC, and therefore maintenance of

7    the bank accounts will not jeopardize any party-in-interest.

8            In terms of the two banks who are not authorized

9    signatories, it's BMO Harris and Silvergate.  BMO Harris, we

10   have approximately $2.4 million in the aggregate at that

11   bank account, and we are fully insured up to the FDIC limit.

12   Silvergate, we have or had $2.8 million in the aggregate and

13   we are fully insured up to the FDIC limit.

14           Silvergate purported to terminate our bank

15   accounts after we apprised them of the filing of the

16   bankruptcy and said they were sending us a cashier's check.

17   We dispute their ability to terminate our bank accounts.

18   And so by this order, we are seeking to continue those bank

19   accounts.

20           I will maybe pause there, Your Honor, to see

21   whether you have any questions about the other additional

22   relief that we're seeking.

23           THE COURT:  Does the United States Trustee want to

24   be heard on the 345(b) issue?

25           MR. MORRISSEY:  Your Honor, good afternoon.

Page 72

1    Richard Morrissey for the U.S. Trustee.  I would like to

2    weigh in on that issue.  But first I should state, Your

3    Honor, that the people at Kirkland have been extremely

4    cooperative for several days now, right through the weekend.

5    And we have resolved a lot of issues regarding not only the

6    cash management motion, but others as well.  And because

7    they spent so much time with me and my colleague, they are

8    saving everyone present today a lot of time at this hearing.

9    And I just wanted the Court to know that.

10           Regarding the cash management motion and the 345

11   issue in particular, we have gone through this with the

12   people at Kirkland.  Ms. Okike is correct about the

13   authorized depositories.  She did say that BMO Harris is

14   fully insured up to the FDIC limit.  However, there's $2.4

15   million in the account.  So the FCIC limit is $250,000.  So

16   it's a lot less than that.

17           Having said that, Your Honor, as we often do or

18   almost always do in such cases, we give the Debtor some time

19   to come into compliance with 345(b), specifically 45 days.

20   The Debtor has agreed to insert a provision into the order

21   to that effect so that hopefully they'll be able to come

22   into compliance.

23           Your Honor, I have other comments to make with

24   respect to this motion, but Your Honor asked me specifically

25   about 345(b), so I just wanted to know whether it was Your

Page 73

1   Honor's preference to allow Ms. Okike to continue with her

2   presentation.

3               THE COURT:  Ms. Okike, are you finished or do you

4   have more to present?

5               MS. OKIKE:  Your Honor, just two things I would

6   like to mention.  And one of these I may be prefacing what

7   Mr. -- the U.S. Trustee may raise.  But in addition to the

8   cash, obviously we do hold cryptocurrency assets through

9   third-party custodians -- I mentioned three of them,

10  Coinbase, Copper.co, and Anchorage Digital -- in the

11  ordinary course of business.  And I think requests to

12  collateralize the cryptocurrency would just be prohibitively

13  expensive, if possible at all.  The alternative -- I don't

14  know whether it's going to be suggested, but to liquidate

15  our assets, our digital assets and transfer the resulting

16  cash into an authorized depository would obviously be

17  extremely value-destructive to the Debtors and their

18  stakeholders and jeopardize our ability to reorganize.

19              So, Your Honor, with that, I would just mention we

20  have made one revision to the order from the version which

21  was filed late last night at the request of the U.S.

22  Trustee, which is that we agree, the Debtors agree to notify

23  the U.S. Trustee and the Committee within five business days

24  as opposed to ten business days, which was provided in the

25  order, of the opening of any new bank accounts.  And we have

Page 74

```
 1    no issue with making that change.

 2              THE COURT:  Okay.  All right. Mr. Morrissey, you

 3    had other issues you wished to raise?

 4              MR. MORRISSEY:  Yes, Your Honor.  I guess I'll

 5    start with the one that Ms. Okike raised at the end, which

 6    is the fact that the Debtor is holding the crypto assets

 7    through custodian.  There is, as far as I am aware, Your

 8    Honor, no precedent for this.  So we are in uncharted

 9    territory, as Mr. Sussman said earlier -- Sussberg said

10    earlier.  And we are going to be continuing to have a

11    dialogue with the Debtors and the representatives regarding

12    the cash management issue because it's not only what they

13    hold, it's also what they spend.  To the extent that the

14    Debtor makes disbursements in cash, that's what we're used

15    to.  To the extent that the Debtors make disbursements in

16    cryptocurrency, that is decidedly not what we're used to.

17              We obviously expect that payments are going to be

18    made for quarterly fees, for example, in cash and not

19    crypto.  But we also are going to need to see the cash

20    equivalent.  Any time we see a certain amount of bitcoin,

21    for example, we are going to need to see in any document

22    really what the cash equivalent is to that amount of bitcoin

23    on the relevant date.  So this is going to be a little

24    tricky going forward, but I am sure we can come to an

25    understanding as we do.
```

1           Regarding intercompany arrangements which Your

2   Honor raised, I would note that the Debtor in the wage

3   motion, which we'll get to later, indicated that post-

4   petitions of non-Debtor employees in the ordinary course is

5   contemplated.  This would be I assume for the final of the -

6   - final wage order.  But still there are going to be certain

7   intercompany arrangements or payments in the ordinary

8   course.  The only one I am aware of are the wages.  I don't

9   know if there are others in the ordinary course that the

10  Debtors in tend to make going forward.  But again, that was

11  in a different motion.  Specifically, Your Honor, it's at

12  Paragraph 16 of the wage motion at Page 7 of 41.  That would

13  be Document Number 8.

14          Now, as far as the five days to notify the U.S.

15  Trustee and the Committee of the opening of a bank account,

16  my hope, Your Honor, is that there will be dialogue actually

17  before that happens.  But we have no problem with this

18  provision in the order regarding the notice.

19          There were a few other issues, Your Honor, that we

20  discussed.  I don't think I have to go into every single one

21  of them.  But we did want to know, Your Honor, how much --

22  and some of this was addressed in the presentation today and

23  in the papers -- how much cryptocurrency do the Debtors hold

24  and what kind of crypto as well.  How much belongs to the

25  Debtors themselves and how much is held for the clients.

1   And other things, Your Honor, involved, you know, as I said

2   before, the extension of time and also, you know, we wanted

3   to make it clear that all the disbursements of the Debtor

4   were going to be made in U.S. Dollars.

5         So we got agreement from the Debtors on virtually

6   everything that we asked for, and we do appreciate their

7   cooperation.  And based on that fact, Your Honor, the U.S.

8   Trustee has no objection to the entry of the Interim Cash

9   Management order.  Thank you.

10        THE COURT:  Okay.  So your various issues you've

11  raised, you've resolved them to your satisfaction for

12  purposes of today?

13        MR. MORRISSEY:  Yes, Your Honor.

14        THE COURT:  Okay.  All right.  What is the issue

15  on the employees in the intercompany?  I'm not quite sure I

16  understood you.

17        MR. MORRISSEY:  Yes, Your Honor.  Again, this was

18  in the wage motion.  Earlier Ms. Okike said that there

19  really were no intercompany transactions to be contemplated.

20  And I think the Court was okay with that.  I just wanted to

21  point out that there was one going forward that I was aware

22  of that was going to be made, and that was the payment of

23  unpaid wages for a non-Debtor.  Specifically I didn't name

24  the non-Debtor.  It's called Voyager Digital Brokerage

25  Limited.  And there are approximately 11 employees involved

1    there.  So I just wanted to point that out, Your Honor.

2            THE COURT:  Okay.  And Ms. Okike, what is the

3    story as to those employees, former employees?  Ms. Okike,

4    are you still there?

5            MS. SMITH:  Hi, Your Honor.  It's Allyson Smith

6    from Kirkland & Ellis on behalf of the Debtors.  Can you

7    hear me all right?

8            THE COURT:  Yes, I can.

9            MS. SMITH:  Sure.  I can jump in here.  I was

10   going to be presenting the wages motion down the line.

11           There are 11 employees at the entity.  Mr.

12   Morrisey raised Voyager Digital Brokerage Limited.  It's

13   about 100,000 Canadian Dollars per month.  There are no

14   prepetition amounts outstanding.  We're not asking for any

15   prepetition amounts or anything like that.  It's just on a

16   go-forward basis that we seeking pursuant to the final

17   order.  So no relief with respect to today.

18           To the extent that Your Honor has concerns about

19   those payments, we are happy to work with the Court and with

20   Mr. Morrissey's team to attempt to resolve in advance of the

21   final hearing.

22           THE COURT:  Okay.

23           MS. OKIKIE:  Apologies, Your Honor.  I had muted

24   myself and realized I was talking and no one was hearing me.

25           So, Your Honor, with that, we would request entry

Page 78

 1   of the Interim Cash Management Order.

 2            THE COURT:  All right.  If you make the

 3   clarifications that we discussed, I would appreciate it.

 4   But otherwise, I will approve the order.

 5            MS. OKIKIE:  Will do.  Thank you, Your Honor.

 6            Your Honor, the next item on the agenda is at

 7   Docket Number 13.  Pursuant to this motion, the Debtors are

 8   seeking authorization to prepare and maintain a consolidated

 9   creditor list in lieu of preparing separate mailing matrixes

10   for each Debtor and to file a consolidated list of their top

11   50 unsecured creditors in lieu of filing separate top 20

12   lists for each Debtor entity.

13            Given the affiliated nature of the Debtors, the

14   Debtors believe that filing a consolidate list would be

15   appropriate and would provide the U.S. Trustee with a more

16   efficient means of review for purposes of appointing a

17   committee.

18            In addition, the motion seeks to redact certain

19   personally-identifiable information for individuals included

20   in the creditor matrix and in other filings in these Chapter

21   11 cases.

22            Specifically with respect to individuals, the

23   motion seeks to redact the name and addresses of these

24   individuals pursuant to Section 107(c) because disclosure

25   would create undue risk of identity theft or other injury to

1        the individual or their property.

2                The Debtors believe this relief is also

3        appropriate in light of a privacy agreement that the Debtors

4        have with their customers, the vast majority of which are on

5        the creditor matrix, and to ensure that the Debtors comply

6        with the United Kingdom General Data Protection Regulation

7        and the European General Data Protection Regulation.

8                Your Honor, all of the individuals listed on the

9        creditor matrix are customers of the Debtors.  And if an

10       employee is included, he or she is on the list on account of

11       claims held by such induvial as a customer of the Debtors,

12       not as an employee.

13               Your Honor, there's a real risk of identity theft

14       and harm to our employees if their names and addresses are

15       disclosed.  There's been a lot of chatter on Twitter and

16       other social media platforms with respect to people who are

17       management team and others at the company.  And so there is

18       a real risk here of disclosure of the names and addresses of

19       these individuals.

20               Your Honor, we also believe the requested relief

21       is appropriate given that the disclosure of our customers

22       would really provide a roadmap for our competitors to seek

23       to lure them away from our platform, which would cause

24       damage to the Debtors in their efforts to reorganize.

25               Although we are proposing to redact that

Page 80

1    information, the names of these creditors have been provided

2    to the United States Trustee and this Court.  And in the

3    interest of transparency, the Debtors propose to provide an

4    unredacted version of any relevant filings to any party in

5    interest upon a request that is reasonably related to these

6    Chapter 11 cases.

7           Your Honor, I would also note that because most of

8    our customers or all of our customers are transacting

9    through the platform, we actually don't have addresses for

10   our customers.  There is a way for them to identify

11   themselves through emails and other things, but we don't

12   have physical addresses.  So we are not in a position to

13   even provide those for our customers.

14          Unless there are any questions, we would

15   respectfully request that the Court grant the motion.

16          THE COURT:  Are there any objections to the

17   motion?

18          MR. MORRISSEY:  Your Honor, Richard Morrissey for

19   the U.S. Trustee.  Your Honor, as the Court is aware, we've

20   had several cases where employees' addresses are redacted.

21   The solution has been sometimes to have the business

22   addresses of the employees used instead of the home

23   addresses.  And sometimes we have the home addresses

24   redacted.  These are home addresses of former employees.

25   Here, we have a whole new category as far as I am aware.

Page 81

 1    And that is creditors.  The motion here contains within it a

 2    107 motion.  And the U.S. Trustee believes that if the

 3    Debtor wishes to seal, the Debtor should make a 107 motion

 4    and make its case to show evidence of what Ms. Okike has

 5    just been saying.

 6            But if I can -- again, Your Honor -- and I think

 7    we should begin, Your Honor, with the general rule here.

 8    The Code at Section 521 imposes a duty on all Debtors to

 9    file schedules and statement.  And Rule 1007(b) requires

10    that those schedules and statements be prepared as

11    prescribed by the appropriate official forms.

12            When we get to the official forms, the first one,

13    which is form 206 relating to schedules, requires the

14    complete disclosure of creditors' names and mailing

15    addresses.  Official Form 207 is for the statement of

16    financial affairs, which again requires the disclosure of

17    names and addresses.

18            So what the Debtor is asking for here is not only

19    relief under 107, but also a relief from the general

20    requirement of disclosure of names and addresses.  And what

21    we're saying here today, Your Honor, is that if the Debtor

22    wants to make that case, the Debtor has to make that case,

23    and it shouldn't be -- the relief shouldn't be granted on

24    the first day of the case, but rather that the Debtor should

25    make a motion under 107 and seek authorization from the

1    Court to have a hearing.  And we'll see if somebody objects

2    to the relief sought.  But I don't think it would be fitting

3    and proper, Your Honor, for this relief to be summarily

4    granted on the first day.

5              THE COURT:  All right.  Does anybody else wish to

6    be heard?  All right --

7              MS. OKIKIE:  Your Honor, I --

8              THE COURT:  Go ahead.

9              MS. OKIKIE:  Sorry.  No, no.

10             THE COURT:  Go ahead.

11             MS. OKIKIE:  Sorry to interrupt, Your Honor.

12             THE COURT:  Did you have something you wished to

13   add?

14             MS. OKIKIE:  No, Your Honor.  Well, yes.  I just

15   wanted to add that I think we've provided the -- I think

16   we've provided what's necessary for purposes of the relief

17   that we're seeking, which is to redact the names.  And, as I

18   said, we don't have the addresses for 99 percent of people

19   who are on the creditor list.  So it's not even information

20   in our possession that we can provide.  But in particular

21   with respect to employees, there is a real risk here.  And

22   there's -- as I said, there's a lot that's been going on on

23   social media, people publishing people's addresses.  And we

24   believe there's a real risk here in that the benefit of

25   disclosing the information to the public does not outweigh

Page 83

1      the harm that would be potentially done to these

2      individuals.

3              THE COURT:  Okay.  Mr. Morrissey, I have ruled on

4      this issue before.  My memory isn't good enough to remember

5      the case in which I outlined my views on it in great detail.

6      You may remember.  But I am going to adhere to that ruling

7      and I am going to grant the motion.

8              The order should say that if anybody needs or

9      believes they are entitled to access to addresses, that they

10     remain free to make an application to the Court for access

11     to that information.  And I think that's sufficient.

12             MS. OKIKIE:  Thank you, Your Honor.  And we have

13     that provision in our order.

14             THE COURT:  Okay.  Are there any other comments on

15     the creditor list motion?

16             MR. MORRISSEY:  Your Honor, Richard Morrissey

17     again for the U.S. Trustee.  We understand the ruling.  I

18     know in a case where I appeared before Your Honor, it was

19     GTT.  But I don't believe that Your Honor made a long

20     explanation as to the ruling in that case.  But I understand

21     Your Honor's ruling.  What we would like to be able to do,

22     Your Honor, though, is caucus with Debtor's counsel

23     regarding the form of the proposed order just to make sure

24     that not only it reflects today's ruling, but also that we

25     have a clear understanding as to what's involved.  Thank

Page 84

1    you, Your Honor.

2            THE COURT:  All right.  Yeah, I don't remember --

3    the case in which I ruled on this was a few years ago the

4    first time that I gave a lengthy ruling on it.  And I just

5    am drawing a complete blank as to which case it was, but one

6    of your colleagues may remember.

7            It may have been Mr. Velez-Rivera who was the U.S.

8    Trustee in that particular instance.  He may recall.  Okay?

9            MR. MORRISSEY:  Thank you, Your Honor.

10           THE COURT:  All right.

11           MS. OKIKE:  Your Honor, the next item on the

12   agenda at Docket No. 5 is the Debtors' application to retain

13   Stretto as claims and noticing agent in these Chapter 11

14   cases.

15           THE COURT:  All right, before --

16           MS. OKIKE:  There are --

17           THE COURT:  Before we do that, it being 12:56, I'm

18   just going to take a five minute break so --

19           MS. OKIKE:  Yes.

20           THE COURT:  -- put myself on mute here and we'll

21   be back in five minutes.

22           (Recess)

23           THE COURT:  All right.  I am back if you're ready

24   to proceed.

25           MS. OKIKE:  Yes, Your Honor, thank you.  The next

Page 85

1    item on the agenda at Docket No. 5 is the Debtors'

2    application to retain Stretto, Inc. as claims and noticing

3    agent in these Chapter 11 cases.  Your Honor, there are over

4    100,000 creditors and other parties in interest in these

5    Chapter 11 cases and the Debtors believe that retaining

6    Stretto will help ensure the efficient and cost effective

7    administration of the cases.  Moreover, Local Rule 5075-1(b)

8    requires that the Debtors retain a claims and noticing agent

9    in these cases.

10           As Your Honor is aware, Stretto is one of the

11   leading Chapter 11 claims agents and has substantial

12   experience in these types of matters including in the

13   Southern District of New York.  As far as process is

14   concerned, the Debtors have satisfied this Court's protocol

15   for the employment of claims and noticing agents in that the

16   Debtors have solicited and reviewed engagement proposals

17   from three Court-approved claims and noticing agents and

18   have determined that Stretto's rates are competitive and

19   reasonable and that Stretto is well qualified for the role.

20           In addition, in advance of this hearing, we filed

21   a revised proposed order at Docket No. 42 to clarify that

22   the limitation of liability and arbitrage provisions in the

23   engagement letter are deemed to be of no force and effect

24   and the Court will retain jurisdiction over all matters

25   related to Stretto's engagement, notwithstanding anything to

Page 86

1    the contrary in the engagement agreement.

2          Your Honor, we also filed a supplemental

3    declaration of Mr. Eric Kurtzman, chief executive officer of

4    Stretto at Docket No. 44 which stipulates that the Debtors'

5    claim registers shall be excluded from Stretto's arrangement

6    with Xclaim and Stretto shall not receive any compensation

7    with respect to such arrangement with -- related to the

8    Debtors' claims registers.

9          THE COURT:  Okay.  Let me interrupt one more time.

10   My battery on my phone is dying.  I have to call in on a

11   different phone.  This'll only take 30 seconds, but I need

12   to dial out of this connection.  I'll be right back.

13         MS. OKIKE:  Understood.

14         (Recess)

15         THE COURT:  All right, my apologies for the two

16   interruptions, but I'm back.  Can everybody hear me?

17         MS. OKIKE:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MS. OKIKE:  So unless Your Honor has any

20   questions, we would respectfully request that the Court

21   approve the application.

22         THE COURT:  All right.  I see in your proposed

23   revised order that you've dealt with the limitation of

24   liability and arbitration (sound drops) that I usually raise

25   questions about.  I still have some questions about the

Page 87

1    Xclaim arrangements and I don't know if somebody

2    representing Stretto is on the phone, but you could tell me

3    what exactly they are and how they work and I just want to

4    be sure in this particular case, are you proposing to retain

5    the ability to sell this information to anybody, whether

6    it's on an exclusive basis or not?

7            MS. OKIKE:  Yes, Your Honor --

8            MR. KURTZMAN:  Your Honor --

9            MS. OKIKE:  Happy to turn it over to Stretto.

10           MR. KURTZMAN:  I'm sorry --

11           MS. OKIKE:  Yes.  Go ahead.

12           MR. KURTZMAN:  Sorry.  Thank you, Your Honor.

13   This is Eric Kurtzman.  I'm the CEO of Stretto.  I'm happy

14   to dive into this as deeply as you want to, but at the very

15   superficial level in this particular matter, Stretto will

16   not have any engagement with Xclaim and so I'm hopeful that

17   that will resolve all of the issues.  We have the ability

18   to, in a binary way, turn on or off Xclaim in our matters

19   and it will simply be off here.  And Stretto will have no

20   activity where data's being sold to any other parties.

21   That's not really what was happening here, but to alleviate

22   any concern, that's not the case.  There's no data sale

23   going on.

24           THE COURT:  All right.  I think you're aware of

25   the fact that we've only -- at least the judges have only

Page 88

1    recently become aware of these kinds of arrangements with

2    Xclaim.  Have they been disclosed in your prior retentions?

3              MR. KURTZMAN:  You know, I can't speak to that.

4    I'm not sure.  I have Chris Updike, our general counsel,

5    also Sheryl Betance on the line.  They may have a better

6    answer, but there's a long history to the claims trading

7    that we believe that Xclaim is helping to resolve.  I want

8    to avoid spending everyone's time kind of going through that

9    today, but I'm happy to if the Court thinks that would be of

10   value.

11             Xclaim didn't exist until a couple of years ago

12   and their activity from my experience has been up to date

13   fairly small.  Small doesn't mean it's immaterial, but they

14   haven't been kind of widely recognized as a player in the

15   Courts until fairly recently.  So I'm not sure that there's

16   been a lot of disclosure anywhere about what they're doing,

17   which is unfortunate in my view, because I think what

18   they're doing is actually a very great piece in the

19   evolution of the claims trading aspect of the bankruptcy

20   industry that's been necessary for many, many years.

21             THE COURT:  All right.  Well, so if you'll include

22   in the order that -- not just the reference to Xclaim but

23   that there won't be any agreements or charges for access to

24   or copies of the claims docket then that will alleviate any

25   concerns here.  I think I'm not making any rulings if that's

Page 89

1    the issue in this case, but the concern of the Court was

2    that the claims agents stand in the shoes of the clerk's

3    office in this process and the question is, why are they

4    receiving compensation for making Court data available to

5    other people or why are they making arrangements to give

6    other people particular kind of preferred access to Court

7    data.

8          If it doesn't apply in this case, I won't rule on

9    it in this case, but it's going to be an issue that you

10   should be prepared to address in other cases if you wish to

11   proceed with that arrangement.

12         MR. KURTZMAN:  Thank you, Your Honor.  Those are

13   great questions.  I'm glad that you're asking them and

14   they're not at issue in this matter, so I guess I won't get

15   to answer, but we are prepared to answer them when they do

16   come up.  But thank you for the forewarning.  That's --

17   unless the Court has any other question, that's all I have.

18         THE COURT:  All right.  Well, if you modified to

19   have that explicit statement, then I'll approve the

20   retention.

21         MR. MORRISSEY:  Your Honor, may I be heard?

22   Richard Morrissey for the U.S. Trustee.

23         THE COURT:  Sure.

24         MR. MORRISSEY:  Your Honor, as counsel has stated,

25   Ms. Okike has stated, Stretto put in a supplemental

Page 90

1    declaration.  It's at ECF Docket No. 44 and part of that

2    declaration has been part of the colloquy just now about the

3    fact that they're not going to be using or dealing with

4    Xclaim in this particular case.  But the other part of the

5    declaration, Your Honor, describes the agreement with

6    Xclaim.  And I have to begin with two disclaimers.  One is,

7    as a technical matter, Your Honor, this is a retention under

8    156(c) and the U.S. Trustee generally doesn't get involved

9    in that.  That's a matter for the Court and the clerk's

10   office, but still, we obviously are monitoring all the

11   pleadings.

12         The second thing, Your Honor, is that I don't have

13   a copy of the agreement with Xclaim so I can't speak to this

14   with knowledge, but from what I do understand, Your Honor,

15   it is not clear that the description of Stretto's agreement

16   with Xclaim as set forth in the supplemental declaration is

17   complete.  My understanding, Your Honor, is that there are

18   other aspects of the agreement that are not included in the

19   declaration and I would request that there be a further

20   supplemental declaration which sets forth the entire

21   agreement.

22         I don't know, Your Honor, if perhaps the Court may

23   have a copy of this agreement.  I don't know who has it, to

24   tell you the truth.  But I'm a little concerned that what we

25   have is -- I'm not saying there are false statements or

1    anything like that, but I don't think we're getting the

2    entire picture of the agreement between Xclaim and Stretto,

3    and I think that's a concern, not just for this case but in

4    general.

5                THE COURT:  All right.  Does Stretto have any

6    objections to filing a complete copy of the agreement?

7                MR. KURTZMAN:  Your Honor, I do, candidly, because

8    it's not relevant to this case anymore.  I'm happy to

9    provide it directly to the United States Trustee.  I'm not

10   sure why it would be relevant here as we've excluded it, but

11   Your Honor, if you'd like to see it for any reason, I'm

12   happy to provide it and file it with the Court.

13               Other -- if the Court doesn't need to see it, then

14   I'd be happy to have a side conversation with the United

15   States Trustee to alleviate any concerns they have, which

16   candidly, I'm not sure what they would be, but I'm sure the

17   United States Trustee has something in mind that I can't

18   think of, but I'm not sure why that would be done publicly

19   in the Court instead of on the side.

20               THE COURT:  I think it would be constructive for

21   this and future cases if you went ahead and filed (sound

22   drops).

23               MR. KURTZMAN:  Okay.  Happy to do so.

24               THE COURT:  Anything else, Mr. Morrissey?

25               MR. MORRISSEY:  No, Your Honor.  Thank you.

1          THE COURT:  Okay.  All right, very good.  Ms.

2     Okike --

3          MR. MORRISSEY:  Your Honor -- I'm sorry, Your

4     Honor.  There was one issue.  I think it was in Paragraph 19

5     and I'm not looking at it right now, unfortunately.  I'm

6     just trying to remember it.  I just want to make sure that

7     that provision states simply that Stretto is not going to be

8     dealing with Xclaim and not conditioning that on an order of

9     the Court or a request by the United States Trustee.  I just

10    want to make sure the final version of the order doesn't

11    contain those conditional words.

12         THE COURT:  Why don't you run your final order by

13    the United States Trustee to make sure they have no

14    objection with the language.  Okay?

15         MR. MORRISSEY:  Thank you, Your Honor.

16         THE COURT:  Okay.  Ms. Okike, I think we're back

17    to you, then.  What's next on the agenda?

18         MS. OKIKE:  Sorry about that, Your Honor.  I

19    pressed mute by mistake.  Your Honor, the next item on the

20    agenda at Docket No. 4 is the Debtors' motion to authorize

21    Voyager Digital LTD to act as foreign representative on

22    behalf of the Debtors' estates in legal proceedings in the

23    Ontario Superior Court of Justice in Canada, pursuant to the

24    company's Creditors Arrangement Act.

25              Your Honor, Voyager Digital LTD, the ultimate

1    parent entity of the two other Debtors, is a Canadian public

2    company listed on the Toronto Stock Exchange.  As of the

3    petition date, it has over 196 million shares of common

4    stock outstanding which is widely held.  Shortly after

5    filing, the Toronto Stock Exchange suspended trading of

6    Voyager stock.

7              Your Honor, Voyager Digital LTD intends to

8    commence and ancillary proceeding in Canada to request that

9    the Canadian court recognize the Chapter 11 case of Voyager

10   Digital LTD as a foreign main proceeding under the

11   applicable provisions of the CCAA.  Recognition of its

12   Chapter 11 case is necessary to protect Voyager's assets and

13   operations in Canada and obtain a Canadian order staying

14   self-help remedies by stakeholders.

15             Absent an order of this Court authorizing Voyager

16   Digital LTD to act as the foreign representative of the

17   Debtors' estates in the Canadian proceeding, the Debtors may

18   find it difficult to satisfy the requirements under the

19   CCAA.  At this time, Your Honor, we anticipate seeking

20   recognition only of the Chapter 11 case commenced by Voyager

21   Digital LTD but out of an abundance of caution, we are

22   seeking authority for that entity to act as the foreign

23   representative on behalf of all of the Debtors.

24             Your Honor, we filed a revised proposed order at

25   Docket No. 37 which clarified that the Debtors, not the

Page 94

1    Court, are authorized to request the aid and assistance of

2    the Canadian court and also to remove the references to Rule

3    6003 and 6004 which are not applicable to the relief we're

4    seeking.  Unless Your Honor has any questions, the Debtors

5    respectfully request entry of the proposed order.

6              THE COURT:  Any objections to this motion?  All

7    right.  My -- I don't have an objection.  The concern I have

8    is that -- and I think you've tried to address it, is that

9    wording suggested that I had made some determination as to

10   whether this is or is not a foreign main proceeding as to

11   any of the particular Debtors.  Those issues have not been

12   presented to me and I note that in the case of the parent

13   entity, its listed main place of business is in Toronto in

14   Canada, not in the United States.  So I don't want the order

15   to suggest that I have made any ruling or requested any

16   particular ruling in that regard.  So if you could just

17   modify it a little further to just make it clear that the

18   Court hasn't made any ruling on that issue, that would be

19   fine, that I --

20             MS. OKIKE:  Understood, Your Honor.  Will do.

21             THE COURT:  Okay.

22             MS. OKIKE:  Your Honor, the next item on the

23   agenda, Docket No. 6, is a motion seeking entry of an order

24   restating and enforcing the worldwide automatic stay,

25   antidiscrimination provisions, and ipso facto provisions of

1    the Bankruptcy Code.  Given the Debtors' global presence and

2    customer base that are likely unfamiliar with the Chapter 11

3    process and the Bankruptcy Code, we are seeking an order

4    enforcing the automatic stay to make it crystal clear what

5    the automatic stay is and what actions it prohibits.

6    Despite the automatic effect of the stay, parties in

7    interest aren't familiar with the Bankruptcy Code -- and

8    we've already had one party do so -- may nevertheless

9    attempt to proceed against the Debtors or their property.

10              In addition, upon the commencement of these

11    Chapter 11 cases counterparties to contracts with the

12    Debtors could attempt to terminate such contracts pursuant

13    to ipso facto provisions in contravention of Sections 362

14    and 365 of the Bankruptcy Code and governmental units may

15    seek to terminate certain licenses that are required for the

16    Debtors' business operations, in violation of Section 525 of

17    the Bankruptcy Code.

18              Your Honor, the Debtors cannot operate the

19    platform when they choose to reopen, or lift the gates, as

20    we say, without their money transmitter licenses.  The

21    Debtors are currently licensed in 17 states and they have

22    pending applications in 18 states, and these are kind of the

23    jurisdictions where most of the material business takes

24    place.

25              Under federal law, business are required to

Page 96

1    register for a money transmitter license when their activity

2    falls within the state's definition of a money transmitter

3    and that's, you know, generally a business that provides

4    money transfer services or payment instructions like the

5    Debtors.

6            And Your Honor, since the filing, we have had at

7    least one state and potentially another state purporting or

8    seeking to terminate our licenses, you know, on the heels of

9    the bankruptcy filing.  Your Honor, I don't have, you know,

10   in front of me the correspondence or the conversations that

11   took place between that state and our management team, but

12   our perspective is, you know, this particular state sought

13   to terminate the license immediately following the

14   bankruptcy and it appears to be a violation of Section 525,

15   subject to, obviously, getting additional facts.

16           And so this order is extremely important, you

17   know, to put those states and others on notice as to the

18   rights that the Debtors have under the Bankruptcy Code.

19   We're only seeking to affirm the rights that are provided

20   under the code in Sections 362, 365, and 525, and we believe

21   that an order from the Court will help the Debtors guard

22   against improper actions and provide clarity for parties in

23   interest.

24           Your Honor, we intend to provide the order, the

25   proposed order, to states who have sought to terminate our

Page 97

1    licenses and other parties and we may be back in front of

2    you requesting additional relief if the protections that the

3    Debtors are entitled to under the code and confirmed in your

4    order are not respected.

5           Your Honor, we filed the revised proposed order at

6    Docket No. 38 to incorporate requests that Your Honor has

7    made in other cases including adding the full text of

8    Sections 362, 365, and 525 to the order to make clear that

9    there are exceptions to the relief we are requesting and

10   clarify that the order confirms but does not enlarge the

11   provisions and the protections of the Bankruptcy Code.

12          With that, Your Honor, we would respectfully

13   request that you approve the motion.

14          THE COURT:  Are there any comments or objections

15   on this motion?

16          MS. BLUMENFELD:  Your Honor, it's Rachel

17   Blumenfeld.  Good afternoon.  I was retained at about

18   midnight last night to represent Matthew Levitt and the

19   Levitt Group and as Your Honor -- first of all, I probably

20   understand less about this than Your Honor does, everyone

21   else getting up to speed, and I've had a very short period

22   of time.  My client wasn't even informed officially ofthe

23   filings.  He found out about it on social media.

24          I would ask Your Honor with this motion and

25   possibly some of the other motions to consider it on an

Page 98

1    interim basis, only because of the presentation as earlier

2    stated as well.  We don't know what's considered property of

3    the estate or not property of the estate.  Of course, I

4    would not want my client violating the stay or doing

5    anything of that sort, but if Your Honor would consider that

6    I think there's just a lot of information that we need to

7    know here as far as, you know, what's an asset and what's a

8    -- not asset of the case and I would never want a client to

9    violate the stay.

10           Just to also mention, you know, earlier talking

11   about the plan and their filing it quickly, I can say my

12   client has a million dollars invested and people -- he's

13   probably one of the top 50 people who have invested in this,

14   and people are angry because from the perception of the plan

15   that is out there right now, they're not really offering

16   anything much and the clients have been blocked from

17   accessing their own cash.

18           So if Your Honor would consider that, that's all I

19   have to say.  Thank you.

20           THE COURT:  Well, I don't understand -- I don't

21   understand there to be anything about this motion that seeks

22   a ruling as to the scope of the automatic stay.  It's just a

23   motion for a means of informing people as to what the

24   automatic stay says.  Am I missing something in that regard?

25           MS. BLUMENFELD:  Your Honor, it's Rachel

1    Blumenfeld.  Is that the scope of what it's asking?  And

2    again, I do like to come to court hearings very prepared,

3    but again, just getting retained on this about midnight, 1

4    a.m., it was not enough time for me to familiarize myself

5    and get through everything.  If that's the scope, then we

6    would have no problem with that, Your Honor.

7          THE COURT:  And in that regard, I'm accustomed to

8    seeing these motions with their having been made for the

9    purpose of informing the foreign creditors or people who may

10    not be in the United States about the requirements of the

11    automatic stay.  I'm not sure I've ever had anybody explain

12    that they want the motion for the purpose of informing a

13    state government.  Not sure they really need and order from

14    me that tells them what the automatic (sound drops) says,

15    but you can certainly -- if all I'm doing is saying this is

16    what the automatic stay is and not particularly ruling on

17    whether anything specific is or is not governed by it, I

18    don't have any objection to it as long as you've conformed

19    it to my other practices.

20          Probably really, I'd be surprised if you need it

21    for dealing with the state governments.  It would be very

22    peculiar, because it's not a provision that applies

23    optionally.  It's just an automatic provision.

24          MS. OKIKE:  Your Honor, we totally agree, but we

25    have been surprised in terms of some of the actions that

1    states have been taking with respect to the licenses that

2    the Debtors have and so we believe that providing this order

3    -- you know, I presume that the states do know, but I think

4    providing this order lays out exactly what the provisions

5    provide.

6              Again, we're not seeking to expand anything under

7    the Bankruptcy Code.  We're simply laying out the sections.

8    Puts people on notice as to what they can and can't do and,

9    you know, if somebody were to violate them, we were to be in

10   front of you again, I think it would be important that we

11   had provided them with the order which highlights the

12   sections at issue.  And if people want to seek relief from

13   the stay, they should be. Coming in front of Your Honor and

14   seeking that relief.

15             And so we believe, although this is typically, as

16   you said, an order that's provided to foreign creditors, we

17   actually think given the nature of the Debtors' customer

18   base, many of who -- sorry, creditor base, many of who are

19   customers and not familiar with the Bankruptcy Code, as well

20   as, you know, some regulatory authorities that maybe don't

21   deal with Bankruptcy Code -- the bankruptcy as much.  We

22   think it'd be helpful to have this order that we can provide

23   to them.

24             THE COURT:  All right.  Well, as we discussed

25   earlier, I don't have any particular idea of the grounds on

1    which any of these authorities have purported to terminate

2    your licenses or threatened to terminate your licenses, so

3    not really ruling on any of those, just in the context of

4    this particular motion, just confirming that the automatic

5    stay says what it says.

6            MS. OKIKE:  Thank you, Your Honor.  That's only --

7    the only relief we're looking for.

8            THE COURT:  Okay.  Very good.  And --

9            MS. OKIKE:  Your Honor, with that -- sorry.

10           THE COURT:  Which of my primary orders did you use

11   as the model for your revision here?

12           MS. OKIKE:  I believe we looked at the orders you

13   entered yesterday, I want to say, in the SAS case.

14           THE COURT:  Okay.

15           MR. MORRISSEY:  Your Honor, Richard Morrissey for

16   the U.S. Trustee.  The provision that Ms. Okike described

17   before, to the effect that nothing in the order is going to

18   enlarge the automatic stay, was a result of our request and

19   I'm -- I can't remember right now, Your Honor, which order

20   that came from but it was entered in another case.  I don't

21   know if it was one -- if it was a case before Your Honor.

22   Thank you.

23           MS. OKIKE:  Your Honor, just one correction.  I --

24   from my team, I think we relied on the Aegean case for

25   purposes of changes that we made.

1            THE COURT:  Very good.

2            MR. MORRISSEY:  And Your Honor, Richard Morrissey

3    again.  It was the Aegean case where you issued the ruling

4    regarding the redactions from the earlier order.

5            THE COURT:  Okay.  I really didn't remember, but

6    okay.

7            MS. OKIKE:  Your Honor, with that, I'd like to

8    pass the podium to Ms. Allyson Smith to take you through the

9    rest of the motions.

10           THE COURT:  Okay.

11           MS. OKIKE:  Thank you.

12           MS. SMITH:  Thank you.  Good afternoon again, Your

13   Honor.  Can you hear me okay?

14           THE COURT:  I can, thank you.

15           MS. SMITH:  Great.  Again for the record, Allyson

16   Smith of Kirkland and Ellis, proposed counsel to the

17   Debtors.  Just as Ms. Okike said, we will be -- I will be

18   taking us through the remainder of the agenda for today.

19   Turning next to the case management motion, if that's all

20   right.

21           THE COURT:  That's fine.

22           MS. SMITH:  The case management procedures motion

23   was originally filed at Docket No. 12.  We did file a

24   revised order and redline last night at Docket No. 46.  The

25   changes were to more fully align the proposed procedures

Page 103

1    with those approved by this Court in the McClatchy cases

2    which we understand to be this Court's preference.  As

3    you're aware, these procedures are intended to benefit the

4    Court and parties involved by streamlining case

5    administration and management, particularly in a case of

6    this complexity and size, but we of course will defer to

7    Your Honor if you would prefer to proceed without these

8    procedures.  But unless Your Honor has any questions, we

9    would respectfully ask that the Court enter the revised

10   order found at Docket No. 46.

11           THE COURT:  All right.  Are there any objections?

12   To be honest, I had so much reading to do with the SAS case

13   yesterday and the orders there and this case, that I didn't

14   look at the case management because I knew you would -- that

15   I would be asking that you conform it to one of my prior

16   models.  I will look at it and if we have any questions,

17   we'll let you know, but as long as it's along the lines of

18   what we've done before, I don't have any issues with that.

19           MS. SMITH:  And yes, Your Honor, we did model

20   after the McClatchy cases.

21           THE COURT:  Very good.

22           MS. SMITH:  Okay, then next moving to the

23   schedules extension motion.  This motion was filed at Docket

24   No. 9 and by this motion the Debtors are seeking to extend

25   the deadline by which they must file their statements and

Page 104

1    schedules, such extension by 30 days for a total of 44 days

2    from the petition date.  We are also seeking to extend the

3    deadline by which the Debtors must file their Rule 2015

4    report.

5            We understand that Your Honor sometimes prefers

6    that these extensions be the same, so while our order

7    currently asks for the later of 44 days from the petition

8    date or 30 days after the 341 meeting, we're happy to just

9    extend by 30 days for a total of 44 days, same as the SOFA

10   extension, if that is acceptable.

11           THE COURT:  All right.  Yes, that's my usual

12   requirement.  The rule contemplates that those reports be

13   filed before the 341 meeting, so it always seems funny to me

14   to get a request to sort of automatically extend it until

15   after the 341 meeting.  It seems to defeat what the rule was

16   trying to do.  So if you just make it the fixed time period,

17   that's just fine.

18           MS. SMITH:  Of course.  We'll revise and submit to

19   chambers with just the 30 day extension.

20           MR. MORRISSEY:  Your Honor, if I may be heard on

21   this motion?  Richard Morrissey again.

22           THE COURT:  Yes.

23           MR. MORRISSEY:  Your Honor, regarding the 30-day

24   extension, the U.S. Trustee has no particular objection to

25   that.  We understand that this is a very atypical case in

Page 105

1    many respects.  However, the Debtor filed a plan on the

2    first day, as Mr. Marcus described earlier and this is

3    usually an indicator of Debtors in a hurry.  And I was just

4    wondering whether the extension might delay the plan

5    process.  Also, one of the alternatives, the alternatives to

6    the stand-alone plan, again as described by Mr. Marcus, is a

7    sale process.

8              And the U.S. Trustee is concerned if a Debtor is

9    marketing itself, if it needs to wait in this case 44 days

10   to file schedules, the question is, does -- would potential

11   buyers know what it is that they're buying.  But again, it's

12   just a question as to whether the extension squares with the

13   Debtors' intentions regarding a plan or a sale.

14             MS. SMITH:  Sure.  If I could address that

15   briefly, Your Honor?

16             THE COURT:  yeah.

17             MS. SMITH:  And Mr. Marcus and Mr. Sussberg said

18   at the outset, we are really exploring all options here, and

19   while we did file a plan because we want to indicate not

20   just to our customers but our vendors and other

21   counterparties that we are working to emerge on the other

22   side here, this is not a liquidation or winddown in any

23   respect, but at this point in time, you know, we're not

24   seeking to schedule any disclosure statement hearing or any

25   additional milestones with respect to the plan process and

Page 106

1   we understand that that plan will likely evolve as Creditors

2   Committee and other parties in interest come into

3   negotiations.

4        But as you're also aware, this was a very

5   accelerated filing and we have not had the requisite time to

6   begin the workstreams on preparing schedules and statements.

7   It's a very complex company.  So we would request the 30-day

8   extension, and should the path and timeline forward change,

9   we're happy to revisit and reassess as necessary.

10       THE COURT:  All right.  I have no problem with the

11   scheduling issue, that circumstances of the filing here

12   obviously didn't allow for lengthy advance planning.  In

13   addition, with all large businesses and particularly

14   business of this kind, kind of nailing down exactly what all

15   of your assets and liabilities were and all the information

16   required by Rule 2015.3 is all a difficult task, so I don't

17   have any problem with that and I don't -- if there's

18   something about the plan process or anything that requires

19   information to be provided for swiftly, I'm sure we can

20   address it then.

21       I'm sure if any buyers are interested or

22   tentatively interested that they certainly know what

23   information they're interested in and they know how to wait

24   for it if they need to wait for it.

25       MS. SMITH:  We completely agree, Your Honor.  So

Page 107

1     unless Your Honor has any additional questions or concerns,

2     we would respectfully ask that the order -- I'm sorry, we

3     will submit a revised order requesting the 30-day extension

4     for the 2015 report.

5               THE COURT:  Very good.

6               MS. SMITH:  Thank you, Your Honor.  Turning next

7     on the agenda, then, to the insurance motion.  It was

8     originally filed at Docket No. 3.  In the ordinary course of

9     business, the Debtors maintain six insurance policies as

10    well as approximately 42 surety bonds.  As you likely saw in

11    our papers, there are no amounts currently outstanding on

12    account of these programs and we are seeking this relief out

13    of an abundance of caution to ensure that the Debtors are

14    able to continue operations.

15              And as you've heard multiple times by now, the

16    Debtors are money transmitters, meaning that they engage in

17    the transmission and exchange of currency.  State and

18    federal law require that money transmitters, including the

19    Debtors, be licensed to operate in each state that they wire

20    money to or wire money from and as part of each state's

21    licensing protocols, the Debtors are required to obtain an

22    maintain a surety bond.

23              And while the Debtors' platform is currently in

24    "sleep mode" and not operating, the Debtors do need to

25    maintain compliance and good standing so that operation can

Page 108

1    resume as soon as the suspension on the platform is lifted.

2    And doing so requires the ability to continue the insurance

3    and surety programs, including renewing and/or extending as

4    necessary.

5            There is one piece I wanted to flag for Your Honor

6    for the sake of full transparency, particularly in light of

7    the inter-company transaction discussion earlier.  The

8    Debtors do maintain and pay for two surety bonds on behalf

9    of a non-Debtor entity.  The non-Debtor entity is Glacier

10   Digital NY, LLC.  And it's -- the bonds are required to

11   permit operations in the state of New York.

12           No amounts are due currently, but we did want to

13   make sure Your Honor was aware of that.  And similarly to

14   the wages issue, if there are concerns about this, we can

15   certainly make that specific relief subject to final order

16   and work to resolve in the interim.

17           THE COURT:  Okay.  My only comment on this one was

18   that the motions that doesn't identify any prepetition

19   amounts that need to be paid but the proposed order

20   authorizes payment.  I think if I don't have anything that's

21   specifically been identified, I shouldn't be authorizing it.

22   That can certainly wait for the final hearing.

23           MS. SMITH:  Sure, Your Honor.  This was filed as a

24   protective measure, just given the importance of staying in

25   compliance with the various licenses.  So if you would like,

Page 109

1    we can certainly base this on a final order only and or do

2    final relief only and if something comes up in the interim

3    that does require emergency payment, we'll come back to the

4    Court for that relief.

5            THE COURT:  Yeah, if you discover something that

6    you didn't -- weren't aware of, something surprises you, you

7    need an emergency hearing, we'll make ourselves available

8    extremely quickly.  But I don't think I should just give you

9    that kind of blanket authority without any identification of

10   a particular payment that you think is coming due.

11           MS. SMITH:  Understood, Your Honor, and we

12   appreciate the flexibility should something to come up in

13   the interim.  We're happy to return to this at the final

14   hearing.

15           THE COURT:  Right.

16           MS. SMITH:  Okay, then.  The next item up, Your

17   Honor, is the taxes motion.  This was originally filed at

18   Docket No. 30 and we did file a revised order last night at

19   Docket No. 41.  As you probably saw, the only revisions were

20   to make clear that the small amount we are seeking to pay,

21   $3,000, that not making this payment will result in

22   immediate and irreparable harm.  The $3,000 is wholly

23   comprised of business and licensing fees related to the same

24   money transmitter licenses just discussed.

25           As noted, maintaining compliance and good standing

Page 110

 1   with these licenses and regulations is crucial to the

 2   Debtors' ability to operate and even though the platform is

 3   not currently operating today, our hope of course is to turn

 4   it back on as soon as possible and as -- that will require

 5   that we have these licenses still in good standing and in

 6   place.

 7            So happy to address any questions Your Honor has,

 8   but otherwise we would ask that the revised interim order be

 9   entered.

10            THE COURT:  All right.  I don't have any

11   questions.  Are there any comments or objections to this

12   one?  Okay.  Just submit your order.  We'll enter it.

13            MS. SMITH:  Thank you, Your Honor.  Moving next to

14   the wages motion.  This was filed at Docket No. 8 with a

15   revised order filed last night at Docket No. 43.  As with

16   any company, the heart of a company is its people.  Without

17   its employees, a company could not operate.  By this motion,

18   Voyager is merely seeking to continue and maintain their

19   existing wages and benefit programs to ensure no

20   interruption to their employees' payments.

21            I did want to be fully transparent again, Your

22   Honor.  It has come to our attention since filing that there

23   is one additional invoice outstanding for prepetition

24   amounts to independent contractors.  This does not affect

25   any of the interim relief we are seeking today, but it will

1    increase the final relief for independent contracts by

2    approximately $600,000; however, the independent contractors

3    here comprise over 50 percent of the engineering support for

4    the Voyager platform, and in the last two years, the

5    pandemic has made it increasingly difficult for the Debtors

6    to hire engineers within the United States.

7              Accordingly, the company made the conscious

8    decision to partner with certain engineering consulting

9    firms, primarily Thoughtworks, to expand their engineering

10   workforce and the Debtors contract with Thoughtworks and the

11   engineers are employees of Thoughtworks, but all invoices

12   are comprised only of wages directly to these independent

13   contractors.  There is no additional administrative or

14   processing fee or anything of the like.

15             And as I noted, more than 50 percent of the

16   engineers that support the Debtors' platform are hired

17   through Thoughtworks and without these engineers, the

18   Debtors would lose a significant amount of institutional

19   knowledge and skills that are required to keep the platform

20   and the app up and running and even thought trading has been

21   frozen, customers are still able to open the app, view their

22   balances and historical transactions, view market data,

23   among other functions that require the engineering of those

24   consultants employed through Thoughtworks.

25             The concern with -- if the Debtors do not pay for

Page 112

1    these services, Thoughtworks may reassign the engineers

2    currently working with the Debtors to other projects and

3    once these engineers are reassigned, it is very difficult if

4    not impossible to get them assigned back to the Debtors.

5    Again, because they comprise over 50 percent of the

6    technological support for the company's platform, there is a

7    real concern that not paying this amount will cause

8    irreparable harm to the Debtors.

9             And then as we already touched on -- I'm sorry.

10   Go ahead, Your Honor.

11            THE COURT:  Let me make sure I heard you

12   correctly.  You are or are not seeking relief as to them on

13   an interim basis?

14            MS. SMITH:  We are.  We are seeking approximately

15   $530,000 on an interim basis but then we will need an

16   additional approximately $600,000 on a final basis, in

17   addition to what is already requested in the motion and

18   order.

19            THE COURT:  All right.  Understood.  Are there any

20   -- is that it, or are there other things you need (sound

21   drops).

22            MS. SMITH:  The only other thing I was going to

23   touch on was just, again, those certain employees that the

24   Debtors pay on behalf of a non-Debtor entity, but it's not

25   an issue for today.  Again, we're not seeking any interim

Page 113

1    relief with respect to that, so happy to punt that to the

2    final order and we'll try to resolve in the meantime.

3              THE COURT:  Are there any objections to this

4    motion?

5              MR. MORRISSEY:  Your Honor, Richard Morrissey for

6    the U.S. Trustee.  First, with respect to the independent

7    contractors, I reached out to ask if these independent

8    contractors, whether the ones that Ms. Smith was just

9    describing or any others had any alternative means of

10   payment.  So for example, their actual employer in this

11   case, but also maybe a staffing agency with respect to other

12   independent contractors, and the answer came back that the

13   answer was no.  The Debtors were the only source of payment.

14   As a result, the U.S. Trustee has no objection on that

15   score.

16             Your Honor, there is an issue about insiders here

17   getting expense reimbursement.  Expense reimbursement is not

18   technically entitled to priority under the Bankruptcy Code,

19   under 507(a)(4), because it's not really wages.  However, if

20   these expenses are de minimis, we generally don't object to

21   their payments, especially for low-level employees.  But

22   what we don't really know here is whether insiders are being

23   paid on the first day on account of reimbursement of

24   expenses.

25             As a general proposition, Your Honor, we believe

Page 114

1   that the Committee should get to look at that to see if they

2   think it's reasonable and that it should wait until the

3   final hearing.  Other than that, Your Honor, the U.S.

4   Trustee has no issues with respect to this motion.  Thank

5   you.

6           MS. SMITH:  And I'm happy to address the

7   reimbursable expenses point, Your Honor.  There are a couple

8   insiders, I believe four in total, contemplated to be paid

9   in the interim period on account of reimbursable expenses;

10  however, while I fully appreciate Mr. Morrissey's concern,

11  these are reimbursable expenses.  So these are expenses that

12  are on these employees' personal credit cards and personal

13  accounts and in our view, it's separate from wages.

14          You know, employees should not be penalized or

15  have their credit score potentially affected because they

16  were not able to obtain this interim relief.  It is solely

17  reimbursing for ordinary course business expenses.  It just

18  happens that payment comes due on the interim period.

19          THE COURT:  In the case of insiders, how much are

20  we talking about and who are we talking about?

21          MS. SMITH:  The total is about $14,000 for the

22  four insiders.  I don't have the exact name and title in

23  front of me, but we're happy to follow up with that.

24          THE COURT:  Do you know how many insiders we're

25  talking about?

Page 115

1              MS. SMITH:  Four.

2              THE COURT:  Four?

3              MS. SMITH:  Yes.

4              THE COURT:  Mr. Morrissey, this is notwithstanding

5    my comments before about strictly applying Rule 6003.  This

6    sounds to me like an instance where we'll spend more money

7    than we have at stake if we investigate it further.

8              MR. MORRISSEY:  No, I understand, Your Honor, and

9    it's just -- it's a brief colloquy right now, but again, the

10   only request wasn't that they not be reimbursed but just

11   that they wait until the final.  That's all I have, Your

12   Honor.  Thank you.

13             MS. SMITH:  Again, we would request on the interim

14   period.  If the employees are not reimbursed, then they will

15   still have to make those payments to their own credit card

16   companies or risk penalties for late payments or nonpayment.

17   So in our view, we think interim relief is appropriate here.

18             THE COURT:  All right.  This is a fairly standard

19   form of relief and I'll go ahead and grant it.

20             MS. SMITH:  Thank you, Your Honor.  That's all we

21   had on wages, so if you are all right, we can go ahead to

22   the last motion on today's agenda.

23             THE COURT:  On the 401(k), the $15,000, is that

24   employees' contributions or the Debtors' contributions or

25   both?

Page 116

1          MS. SMITH:  I believe it is a mix of both.

2          THE COURT:  All right.  Very good.

3          MS. SMITH:  Thank you, Your Honor.  And then last

4    but not least for today, we have the NOL motion.  It was

5    originally filed at Docket No. 7 with a revised order filed

6    last night at Docket No. 40.  We are not seeking any

7    substantive relief through this motion.  Rather it is a

8    purely procedural motion filed as a precautionary measure to

9    ensure that there are notice procedures in place for trading

10   the Debtors' equity and declarations of worthlessness and

11   their stock.

12          You probably saw in our filing that we don't

13   currently have any tax attributes available but we do expect

14   to generate attributes this year.  While we don't currently

15   know the exact amount of attributes to be generated, it

16   could be material and a valuable asset as the Debtors

17   proceed through this process.  And while we have a plan on

18   file, as Mr. Marcus noted in his opening, we are continuing

19   to explore all alternatives to ensure that we find the best

20   solution to maximize value and the Debtors need to ensure to

21   protect the potential valuable assets in the interim.

22          I think it's also worth noting that to our

23   knowledge, only one party is affected by the relief sought,

24   and that is the same lender under the Debtors' prepetition

25   credit facility, but they have been well apprised of the

Page 117

1    situation to date.  And Your Honor, we did make one change

2    to the interim order last evening. As you will see, we

3    reduced the Debtors' objection period from 20 days to 14

4    days.  We understand that Your Honor does prefer a shorter

5    objection period, so we made this change to align

6    accordingly; however, the unique characteristics of the

7    Debtors' tax structure relative to a more typical Chapter 11

8    Debtor does cause us hesitation to go anywhere below 14

9    days.

10           So unless Your Honor has any questions, we would

11   ask that this order be entered.

12           THE COURT:  I thought you just said that given the

13   tax attributes at issue, there was really only one party who

14   would be affected?

15           MS. SMITH:  That's correct, but the Debtors

16   require flexibility --

17           THE COURT:  So why --

18           MS. SMITH:  I'm sorry.  Go ahead.

19           THE COURT:  If that's the case, why -- if that's

20   the case, why do you need 14 days to look at any proposed

21   trade by any stockholder?

22           MS. SMITH:  Well, unlike a lot of Chapter 11

23   Debtors, Voyager's tax profile is subject to substantial

24   fluidity and so we would require this flexibility to

25   evaluate the impact of transfers of common stock and

Page 118

1    declarations of worthlessness that such impact will have on

2    the Debtors' ownership structure.  And also, you know, we're

3    not fully sure which path and which ultimate transaction

4    will take place in these Chapter 11 cases and this is more

5    to ensure that we have the 14 days to complete our analysis,

6    engage with the other party, and hopefully do away with the

7    need to object at all and come to an informed decision.

8           You know, our concern is that by having too short

9    a time period, we won't be able to fully complete the

10   analysis and have to object as a precautionary measure;

11   where having a few additional days would permit us that

12   additional time to hopefully engage and reach a resolution

13   without the need for any formal objection.

14          THE COURT:  What is happening to your stock price

15   at the moment?

16          MS. SMITH:  I have not checked today, but if I had

17   to guess, it's probably decreasing.  We -- in the process of

18   being delisted, I believe, actually.

19          THE COURT:  My concern on these motions is that --

20   is the time periods, because in fairness to everybody, I

21   understand that the Debtor may have assets it wants to

22   protect and wants to be able to take action in a timely

23   enough basis to protect them.  But the time periods that are

24   suggested usually are too heavily skewed in favor of the

25   Debtors' interests and not heavily enough favored in the

Page 119

1   interests of the people who want to sell, because a longer

2   time period just imposes extra market risk.

3           And so I can't remember what time periods I've

4   allowed in the past, but I'm pretty sure I've in many cases

5   only allowed seven days.  And if your stockholders are as

6   spread out as you think here, I'm not really sure why you

7   need 14 days instead of seven days.  It sounds like most of

8   what you would get is relatively small group of transactions

9   that you would kind of know right away whether they're an

10  issue or not.

11          MR. SUSSBERG:  Your Honor, it's Josh Sussberg.

12  Seven days is fine and we'll modify the order appropriately.

13          THE COURT:  Okay.  Thank you very much.

14          MS. BLUMENFELD:  Your Honor, it's Rachel

15  Blumenfeld.  My client is on the line and he is very

16  familiar and knows everything about this because again, he

17  has a lot invested, and he just informed me that the stock

18  is halted.  So I just wanted to inform the Court because it

19  didn't seem like the Debtors' counsel knew that.  So that's

20  why my client's informing me.

21          MR. SUSSBERG:  We did know that and it's a

22  question of taking worthlessness deductions as well that can

23  impact the assets, so understood.

24          MS. BLUMENFELD:  Okay, thank you.

25          THE COURT:  All right.  Does that take us through

1    the entirety of the agenda, then?

2         MR. SUSSBERG:  It does, Your Honor, and I would

3    like to say on behalf of everyone at Voyager, Kirkland, the

4    advisor team, we appreciate the nearly three hours on a

5    Friday in July and appreciate Your Honor working through all

6    the pleadings with us and getting this off to the right

7    start and as I said at the beginning, we're going to work

8    incredibly hard with our customers to facilitate exactly

9    what we've charted out here.  So thank you.

10        THE COURT:  Very good.  Thank you.  You're -- you

11   and your team did a good job making very good presentations,

12   very clear presentations.  One thing I am certain of is that

13   as this case proceeds, I will have further questions about

14   exactly how the (sound drops) work and may even be repeating

15   some questions so be patient with me, but I think I have a

16   much better understanding now than I did before.

17        MR. SUSSBERG:  We will, of course, be patient,

18   Your Honor, and we appreciate it and we look forward to

19   seeing you soon.

20        THE COURT:  All right, very good.  Are any of

21   these motions the kind that you need to have the orders

22   entered on a higher priority, that we should keep our eye

23   out for and make sure that we get entered today?

24        MR. SUSSBERG:  No, Your Honor.  We'll get them

25   over to you in due course and, you know, understand we're

Page 121

1   heading into the weekend anyway, but whenever you can enter

2   them, you know, soon as you can, that'd be fine.

3          THE COURT:  And I'm sure Lorraine will be

4   reminding me, if it didn't just occur to me, you need a date

5   for your final hearing, don't you?

6          MR. SUSSBERG:  We do and Your Honor, the only

7   motion and order that, you know, I think would be helpful

8   for us today -- and we'll get his uploaded quickly -- is

9   cash management because of all the issues we covered and our

10  need to probably send that to a bunch of banks, so we'll

11  make sure that's the top priority and we'll get that to you.

12         THE COURT:  Very good.  I think we can give you

13  the 29th as a date for your final hearings at 11 o'clock.

14         MR. SUSSBERG:  Okay.

15         THE COURT:  Actually, you know what?  I just said

16  that -- let me tentatively give you the 29th.  I may have

17  Lorraine call you back.  My wife may have other plans for us

18  that day that I just recalled.  So let me --

19         MR. SUSSBERG:  That's fine.  The week after is

20  okay, too, so --

21         THE COURT:  The week after?

22         CLERK:  Your Honor, if you want me to give you a

23  date now for the following week, I could give you August 4th

24  at 11 or August 2nd at 11.

25         THE COURT:  Let's do August 4th, just to be sure.

Page 122

1    I'd like to make sure I'm not forgetting something else on

2    my calendar.  All right, I think that works, August 4th.

3              MR. SUSSBERG:  Perfect.  Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you all very much.

5              MR. SUSSBERG:  Thank you.

6              THE COURT:  If there's nothing else, we are

7    adjourned.

8              (Whereupon these proceedings were concluded at

9    1:55 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 123

1                              I N D E X

2

3                              RULINGS

4                                          Page        Line

5    Interim Cash Management Order, granted    78          4

6

7    Creditor Matrix/Privacy Motion, granted   83          7

8

9    Retention of Stretto, granted             89          19

10

11   Foreign Representative Motion, granted     94          7

12

13   Enforce Automatic Stay, granted          101          8

14

15   Case Management, granted                 103          18

16

17   Schedules Extension, granted             107          5

18

19   Insurance Motion, denied                 108          21

20

21   Taxes Motion, granted                    110          12

22

23   Wages Motion, granted                    115          19

24

25   NOL Motion, granted                      119          13

Page 124

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 9, 2022

[& - 7th]                                                                 Page 1

| & |
|---|
| **&**  3:3 15:25 16:4 43:19 77:6 |

**1**

**1**  10:8 31:22 99:3
**1.3**  17:15
**10**  28:20 30:8 44:23 52:10
**10,000**  10:20,24 14:12,15
**100**  17:3 32:16 60:25
**100,000**  77:13 85:4
**10004**  1:14
**10014**  4:4
**10036**  3:23
**1007**  81:9
**1007-2**  51:7
**101**  17:2 123:13
**103**  123:15
**107**  78:24 81:2,3 81:19,25 123:17
**108**  123:19
**11**  18:19 24:2 29:1 34:23 46:21 50:8 52:5 76:25 77:11 78:21 80:6 84:13 85:3,5,11 93:9,12 93:20 95:2,11 117:7,22 118:4 121:13,24,24
**110**  123:21
**11222**  3:6
**11242**  3:16
**115**  123:23
**11501**  124:23
**119**  123:25
**11:00**  1:17
**12**  14:16 23:9 29:16 102:23 123:21

**12151**  124:7
**12:56**  84:17
**13**  33:12 78:7 123:25
**14**  53:5,11 117:3,8 117:20 118:5 119:7
**14,000**  114:21
**15**  33:23 34:13,18 51:5
**15,000**  115:23
**15,200**  27:12
**15,250**  28:5 34:6
**156**  90:8
**16**  3:22 35:2 75:12
**17**  95:21
**18**  31:18 43:23 44:1 95:22 123:15
**19**  14:20 44:9 92:4 123:9,23
**19.5**  31:6
**196**  93:3
**1970**  28:18
**1:55**  122:9

**2**

**2**  15:12 28:23 32:4
**2.4**  71:10 72:14
**2.8**  71:12
**20**  47:24 78:11 117:3
**200**  27:10 61:1
**201**  4:3
**2010**  14:10 20:19
**2015**  104:3 107:4
**2015.3**  106:16
**2018**  26:15
**2021**  29:8
**2022**  1:16 29:4,11 32:4 124:25
**206**  81:13
**207**  81:15
**21**  48:13 51:22 69:25 70:10

123:19
**214**  3:5
**215,208**  15:7
**21st**  68:24
**22-10943**  1:3
**22nd**  14:10
**25**  15:21
**25,000**  10:23
**250,000**  72:15
**26**  3:15
**29th**  121:13,16
**2nd**  121:24

**3**

**3**  17:1 31:13 33:7 107:8
**3,000**  109:21,22
**3.5**  26:18
**30**  86:11 104:1,8,9 104:19,23 106:7 107:3 109:18
**300**  124:22
**330**  124:21
**341**  104:8,13,15
**345**  70:20 71:2,24 72:10,19,25
**350**  17:4 28:5 34:6 37:8,10,18,19 61:6
**362**  48:20 95:13 96:20 97:8
**365**  95:14 96:20 97:8
**37**  93:25
**38**  97:6

**4**

**4**  15:5 19:16 20:21 92:20 113:19 123:5
**40**  14:15 116:6
**40,000**  26:25
**401**  115:23
**41**  75:12 109:19

**42**  85:21 107:10
**43**  110:15
**44**  86:4 90:1 104:1 104:7,9 105:9
**45**  72:19
**46**  52:11 66:10 102:24 103:10
**4th**  121:23,25 122:2

**5**

**5**  15:5 22:14 84:12 85:1 123:17
**5.8**  26:16
**50**  78:11 98:13 111:3,15 112:5
**500**  27:4 28:17,18
**507**  113:19
**5075-1**  85:7
**521**  81:8
**525**  48:20 95:16 96:14,20 97:8
**530,000**  112:15

**6**

**6**  26:13 94:23
**60**  63:24 64:4 66:5
**600,000**  111:2 112:16
**6003**  52:1 94:3 115:5
**6004**  94:3
**650**  17:21 28:2 34:11

**7**

**7**  3:22 27:1 75:12 116:5 123:7,11
**75**  27:17,18 31:6 32:6
**76,000**  67:21
**78**  123:5
**7th**  32:4

**8**

**8**  1:16 75:13
  110:14 123:13
**80**  32:3
**83**  123:7
**89**  123:9

**9**

**9**  28:15 103:24
  124:25
**91**  32:12
**94**  123:11
**99**  82:18

**a**

**a.m.**  99:4
**aas**  7:23
**abide**  70:16
**ability**  62:12
  71:17 73:18 87:5
  87:17 108:2 110:2
**able**  10:1 11:5
  27:16 30:20 46:22
  64:17 68:10 70:5
  72:21 83:21
  107:14 111:21
  114:16 118:9,22
**absent**  93:15
**absolute**  46:14
**absolutely**  13:8
  19:13
**abstract**  11:18
**abundance**  93:21
  107:13
**ac**  45:15,17
**accelerated**  106:5
**accept**  30:2,6
**acceptable**  104:10
**accepted**  14:21
  23:16,16
**access**  83:9,10
  88:23 89:6
**accessible**  20:25

**accessing**  98:17
**accommodating**
  9:13
**accompanied**
  26:24
**account**  17:6 21:8
  23:5,22 36:16
  37:5 38:8,12,20
  41:24 42:6,7,9,12
  44:20,22,23,24
  45:3,15,20 46:2
  46:13 53:14,17,22
  54:5,6,7,8,9,9,14
  54:16,25 55:4,7,7
  55:10,11,12,18,22
  55:25 56:4,8,10
  56:11,12,21,23
  57:2,5,16,17
  58:12,12,14,21,24
  59:1,2,8,8,10,17
  60:4 61:9,13,17
  64:6,11,15 65:3
  66:13 71:11 72:15
  75:15 79:10
  107:12 113:23
  114:9
**accountholders**
  46:8,9
**accounts**  17:5
  36:25,25 38:24
  40:20,22 41:1,4
  42:8,11 44:15
  52:6,21,24 53:2,5
  53:6,7,9,9,10,11
  53:13,16 54:3
  55:1,2,15 56:3,4,5
  56:6,19 57:3,6,9
  57:11 59:22 60:25
  61:1,7,12,17,19
  65:17 66:19 68:13
  69:11 70:25 71:7
  71:15,17,19 73:25
  114:13

**accrued**  41:20
**accurate**  124:4
**accustomed**  68:13
  99:7
**ach**  48:24 53:18
  54:4 56:7,10,21
  56:24 57:1,2
  58:15,23 64:6,15
  64:22 65:13 66:19
**acquisition**  26:23
**acquisitions**  26:20
**act**  92:21,24 93:16
  93:22
**action**  118:22
**actions**  95:5 96:22
  99:25
**active**  34:12,13
  61:15 62:1,2
**activity**  28:14
  61:14 87:20 88:12
  96:1
**actors**  41:14
**actual**  12:7 49:11
  113:10
**adam**  7:12
**add**  82:13,15
**added**  35:8,14,17
  35:21 68:7
**adding**  97:7
**addition**  17:15
  31:13 56:21 59:23
  63:16 73:7 78:18
  85:20 95:10
  106:13 112:17
**additional**  16:9
  71:21 96:15 97:2
  105:25 107:1
  110:23 111:13
  112:16 118:11,12
**address**  11:9
  13:17 16:24 35:2
  44:9,12 61:23
  89:10 94:8 105:14

106:20 110:7
  114:6
**addressed**  37:22
  75:22
**addresses**  78:23
  79:14,18 80:9,12
  80:20,22,23,23,24
  81:15,17,20 82:18
  82:23 83:9
**adhere**  83:6
**adjourned**  122:7
**administration**
  85:7 103:5
**administrative**
  35:10 53:4,19
  55:12 63:17
  111:13
**admission**  51:12
**admitted**  51:17
**advance**  55:12
  77:20 85:20
  106:12
**advisor**  16:5,14
  16:15,16 120:4
**advisory**  15:22
**aegean**  101:24
  102:3
**affairs**  81:16
**affect**  39:16
  110:24
**affiliated**  78:13
**affiliates**  26:9
  59:25 62:24 63:3
**affirm**  96:19
**afternoon**  43:18
  71:25 97:17
  102:12
**agency**  113:11
**agenda**  9:22 52:9
  78:6 84:12 85:1
  92:17,20 94:23
  102:18 107:7
  115:22 120:1

**agent** 15:11 16:17
84:13 85:3,8
**agents** 85:11,15
85:17 89:2
**aggregate** 71:10
71:12
**aggressively**
34:14
**ago** 14:16 27:13
62:1 65:22 84:3
88:11
**agree** 40:8 43:3,4
59:16 73:22,22
99:24 106:25
**agreed** 63:18
64:25 66:24 72:20
**agreement** 12:23
21:25 26:1,11
27:13,17 39:17
41:2,4,25 42:10
42:14 56:14,16,18
59:12,14,15,16,17
60:1 65:9 70:24
76:5 79:3 86:1
90:5,13,15,18,21
90:23 91:2,6
**agreements** 12:23
17:17 25:4 38:18
40:4,7,19,21,23
41:23 60:16 64:3
88:23
**ahead** 60:20,23
82:8,10 87:11
91:21 112:10
115:19,21 117:18
**aid** 94:1
**akiko** 8:5
**alameda** 27:4,5,6
35:16 46:10
**albert** 6:8
**alexander** 5:3
**algorithm** 22:23

**algorithmic** 31:10
**algorithms** 24:12
**align** 102:25
117:5
**aligned** 61:13
**alleviate** 87:21
88:24 91:15
**alleviates** 63:10
63:12
**allison** 7:5
**allocated** 25:14
**allow** 20:1 21:24
32:15 73:1 106:12
**allowed** 119:4,5
**allowing** 62:19
**allows** 20:23
23:14 56:23
**allyson** 3:9 16:3
77:5 102:8,15
**alternative** 73:13
113:9
**alternatives** 105:5
105:5 116:19
**amount** 14:6
18:23 32:17,21
58:20 59:5,9,10
60:6,9 61:3 68:19
68:20 69:23 70:11
74:20,22 109:20
111:18 112:7
116:15
**amounts** 17:13
67:23 69:6 77:14
77:15 107:11
108:12,19 110:24
**analog** 25:1
**analogy** 25:1
**analysis** 118:5,10
**anchorage** 57:23
73:10
**ancillary** 93:8
**andrew** 4:10,11
4:23 5:1,11,25

**anecdote** 14:8
**anger** 47:2,8
**angiolini** 5:20
**angry** 46:25 98:14
**annie** 4:12
**answer** 10:5 15:16
36:19 42:13 43:25
49:9,12 50:15
61:22 88:6 89:15
89:15 113:12,13
**answering** 47:6
**anticipate** 62:7
93:19
**antidiscrimination**
94:25
**anybody** 11:17,17
41:17 82:5 83:8
87:5 99:11
**anymore** 91:8
**anyway** 121:1
**apologies** 77:23
86:15
**app** 53:25 54:18
55:15,18,21,22
56:10,25 57:6,10
57:14 58:5,18,19
59:17 111:20,21
**appearances** 9:6
**appeared** 83:18
**appears** 96:14
**applicable** 54:2,5
54:15 57:1,16
58:11,15,17,21
59:8 93:11 94:3
**application** 21:1
22:3,12 26:19
39:15 53:25 83:10
84:12 85:2 86:21
**applications**
95:22
**applies** 99:22
**apply** 36:15 89:8

**applying** 11:25
115:5
**appointed** 33:22
48:12 63:21
**appointing** 78:16
**appreciate** 9:14
9:17 16:22 17:10
35:10 43:15,17
65:10 76:6 78:3
109:12 114:10
120:4,5,18
**apprised** 71:15
116:25
**appropriate**
78:15 79:3,21
81:11 115:17
**appropriately**
119:12
**approval** 50:4
**approve** 78:4
86:21 89:19 97:13
**approved** 57:21
69:7 85:17 103:1
**approximately**
15:7 28:2 34:11
60:25 61:6 71:10
76:25 107:10
111:2 112:14,16
**arbitrage** 31:19
32:13,18 85:22
**arbitragers** 32:24
**arbitration** 86:24
**archer** 5:2
**area** 12:22
**argue** 38:13
**arguing** 18:14
**argument** 38:22
38:23
**ari** 6:2
**arrange** 60:6
**arrangement** 12:5
12:12,25 23:8
25:3 26:6 37:25

38:3,6 43:4,5 86:5
86:7 89:11 92:24
**arrangements**
13:1 25:6,23
35:21 36:13,21
37:1,2 38:20,20
41:18 61:25 62:23
75:1,7 87:1 88:1
89:5
**arrow** 28:5 34:25
**arrows** 28:2 33:12
33:17,19 34:2,3,5
34:6 35:21
**articles** 37:18,25
38:1
**asked** 16:19 20:7
50:17 60:14 72:24
76:6
**asking** 23:2 64:2,3
77:14 81:18 89:13
99:1 103:15
**asks** 63:23 104:7
**aspect** 88:19
**aspects** 90:18
**asset** 15:22,24
26:24 29:21 50:5
98:7,8 116:16
**assets** 17:3,16
20:10 21:2,4
23:20 24:9,12
26:16 33:7 42:16
42:17 44:19 52:17
54:10 55:19 57:14
60:13 73:8,15,15
74:6 93:12 106:15
116:21 118:21
119:23
**assigned** 112:4
**assistance** 94:1
**associated** 23:15
**assume** 75:5
**assurances** 30:14

**attempt** 32:25
48:18 77:20 95:9
95:12
**attendant** 60:8
**attention** 110:22
**attorneys** 3:4,14
3:21 4:2
**attributes** 116:13
116:14,15 117:13
**attrition** 68:15
**atypical** 104:25
**august** 121:23,24
121:25 122:2
**aulet** 7:3
**authorities** 21:18
67:19 100:20
101:1
**authority** 20:17
21:16,22 39:6
62:4 66:1,17,24
67:8 93:22 109:9
**authorization**
78:8 81:25
**authorize** 64:2
65:14 69:18 92:20
**authorized** 21:19
68:20 70:22 71:4
71:8 72:13 73:16
94:1
**authorizes** 59:18
59:23 108:20
**authorizing** 93:15
108:21
**automatic** 48:21
49:18 52:7 94:24
95:4,5,6 98:22,24
99:11,14,16,23
101:4,18 123:13
**automatically**
104:14
**available** 51:8
59:3 89:4 109:7
116:13

**average** 60:25
**avoid** 51:21 69:19
70:15 88:8
**avoidance** 37:21
**aware** 28:13
49:16 74:7 75:8
76:21 80:19,25
85:10 87:24 88:1
103:3 106:4
108:13 109:6

**b**

**b** 1:21 70:20
71:24 72:19,25
81:9 85:7
**back** 11:6 14:10
19:21 20:19 33:9
33:14 34:8 37:10
39:24 44:13 46:17
49:5 59:10 84:21
84:23 86:12,16
92:16 97:1 109:3
110:4 112:4
113:12 121:17
**backed** 11:17 28:7
30:21 31:8,11
**background** 9:19
13:9,12,14 29:18
52:12
**backing** 31:13
33:7
**backstopped** 37:7
38:9
**bad** 39:23 40:1
41:13
**bailee** 12:14
**balance** 55:9
67:20 68:5
**balances** 61:9,9
61:13 111:22
**ball** 47:16
**balluku** 5:4
**bank** 12:16 16:5
17:6 20:17 21:8,8

37:7 38:8,9,10
39:6,11,11,12,18
41:2,6,6,24,25
42:4,11,12,15,19
42:25 52:25,25
53:3,5,6,7,7,8,9
53:10,11,14,16,17
53:23 54:2,2,5
55:4,6,7,11,11,22
55:25,25 56:6,8
56:11,17,18,19,23
58:24 59:1,8,9
61:12,12 64:3,4,6
64:23,25 65:6,10
66:1,3,14,16,24
67:4 69:11 70:6
70:21,21,25 71:7
71:11,14,17,18
73:25 75:15
**bank's** 61:19
**bankruptcy** 1:1
1:12,23 11:25
12:13 18:8 49:14
52:6 71:16 88:19
95:1,3,7,14,17
96:9,14,18 97:11
100:7,19,21,21
113:18
**banks** 12:17 52:5
65:12 66:21 67:5
71:3,8 121:10
**barak** 16:6
**base** 23:12 95:2
100:18,18 109:1
**based** 12:19 15:3
17:25,25 18:1
33:12 38:18 41:7
48:18,19 49:17
60:16 61:10 76:7
**basically** 56:24
61:7 66:24
**basis** 12:11 13:6
21:9 36:2 41:7,8

41:23 59:5 63:20
70:12 77:16 87:6
98:1 112:13,15,16
118:23
**battery** 86:10
**beginning** 120:7
**behalf** 43:19
50:19 59:19 77:6
92:22 93:23 108:8
112:24 120:3
**believe** 10:16
34:10 42:9 48:18
48:19,19 60:12,16
63:20 65:6 67:21
68:14,18 69:24
70:24 78:14 79:2
79:20 82:24 83:19
85:5 88:7 96:20
100:2,15 101:12
113:25 114:8
116:1 118:18
**believes** 81:2 83:9
**beller** 7:8
**bello** 6:10
**belong** 17:4
**belongs** 12:15
17:11 75:24
**benefit** 17:5,19
18:14,16 25:17
34:8,16 37:5 38:8
38:17,25 40:9,16
41:5 42:3 44:15
56:2,10,22 61:2
82:24 103:3
110:19
**benefited** 29:9
**benefits** 41:12
45:12 55:5
**benjamin** 7:8
**berthiaume** 5:6
**best** 15:16 36:18
43:25 62:12 66:25
116:19

**betance** 5:24 88:5
**better** 29:22 88:5
120:16
**bid** 24:14 54:20
**billion** 17:15
26:16 31:14,18
32:4 33:7
**binary** 87:18
**biswas** 4:15
**bit** 9:18 17:2
45:24 56:15 69:25
**bitcoin** 14:16,18
14:24 15:3 20:19
28:4 29:3 30:5,7
30:22 74:20,22
**bitcoins** 14:13,13
14:15,19 27:12
28:5 34:6 44:23
44:25
**biweekly** 55:13
**blank** 84:5
**blanket** 109:9
**blockchain** 20:15
26:22 29:13 30:25
31:2,12
**blocked** 98:16
**blocks** 20:13
**blumenthal** 3:13
3:18 97:16,17
98:25 99:1 119:14
119:15,24
**bmo** 53:3,9 71:9,9
72:13
**board** 35:14,17
**bob** 16:14
**bond** 107:22
**bonds** 107:10
108:8,10
**bottom** 35:24
**bought** 11:21
20:18
**bowling** 1:13

**bradford** 5:10
**break** 84:18
**bredel** 6:11
**brex** 67:14 68:4
69:13
**brg** 16:13
**brian** 4:20 6:21
6:24 16:7
**bridges** 26:22
**brief** 115:9
**briefly** 17:14
28:13 35:3 55:14
59:11 105:15
**british** 33:20
**broad** 62:16
**broker** 21:8
**brokerage** 18:7
20:23 21:15 76:24
77:12
**brooklyn** 3:6,16
**brosgol** 15:20
**bruh** 4:9
**brunswick** 4:17
**bryan** 6:5
**built** 66:23
**bunch** 121:10
**burdensome**
68:14
**burned** 33:8
**business** 12:4,9
18:25 21:10,11
22:15 23:2 24:3
26:24 34:4 40:18
52:14,23 67:15,18
67:23,24 68:4,8
68:21 69:16 73:11
73:23,24 80:21
94:13 95:16,23,25
96:3 106:14 107:9
109:23 114:17
**businesses** 106:13
**butler** 5:1

**buy** 14:12,19 20:5
20:24 24:12 57:14
**buyers** 22:16
105:11 106:21
**buying** 57:10
105:11
**buys** 39:19 54:17
**bvi** 34:13

**c**

**c** 3:1 9:1 78:24
90:8 124:1,1
**calendar** 122:2
**call** 12:25 54:8
86:10 121:17
**called** 14:18 57:24
58:22 76:24
**calling** 34:25
**calvin** 7:23
**canada** 35:13 50:2
92:23 93:8,13
94:14
**canadian** 16:11
35:12 77:13 93:1
93:9,13,17 94:2
**candidly** 91:7,16
**cap** 31:18
**capacity** 21:15
**capital** 17:20 25:9
25:11 27:3 28:2
34:2,3 53:19
**capitalized** 71:5
**card** 23:13 68:24
69:4 70:6 115:15
**cards** 67:8,13,21
68:5,6,10,21 69:2
69:5 114:12
**caroline** 6:22
**carty** 5:25
**case** 1:3 12:13
15:14 16:10,21
19:3 38:15,21
46:21 63:21 65:17
81:4,22,22,24

83:5,18,20 84:3,5
87:4,22 89:1,8,9
90:4 91:3,8 93:9
93:12,20 94:12
98:8 101:13,20,21
101:24 102:3,19
102:22 103:4,5,12
103:13,14 104:25
105:9 113:11
114:19 117:19,20
120:13 123:15
**cases** 51:22,23
52:4 66:3 72:18
78:21 80:6,20
84:14 85:3,5,7,9
89:10 91:21 95:11
97:7 103:1,20
118:4 119:4
**cash** 17:3,4,7 20:3
28:7 36:25 37:8
37:22 38:17 39:5
39:6,9,13 40:5,5
44:14 48:23 52:9
52:13,16,18,18,21
52:21 53:16 54:7
54:24 55:10,16,19
55:21,24 56:1,3
56:12,18 57:3,12
57:17 58:11,16,20
61:6 62:16 64:8
64:20 65:14,16
72:6,10 73:8,16
74:12,14,18,19,22
76:8 78:1 98:17
121:9 123:5
**cashier's** 71:16
**category** 80:25
**cathy** 6:7
**caucus** 83:22
**caught** 20:8
**cause** 68:6,16
79:23 112:7 117:8

**caused** 29:6 32:12
33:3
**caution** 93:21
107:13
**ccaa** 93:11,19
**central** 20:17 64:7
**centralized** 53:14
**cents** 32:12
**ceo** 15:18 87:13
**certain** 23:10 49:5
68:8 74:20 75:6
78:18 95:15 111:8
112:23 120:12
**certainly** 48:10
99:15 106:22
108:15,22 109:1
**certainty** 22:24
49:18
**certified** 124:3
**cetera** 25:17 62:3
**chain** 20:14
**challenge** 37:23
65:2
**chambers** 9:13
104:19
**chance** 66:10
**change** 74:1 106:8
117:1,5
**changes** 101:25
102:25
**chapter** 18:19
24:2 33:23 34:13
34:23 46:21 50:8
52:5 78:20 80:6
84:13 85:3,5,11
93:9,12,20 95:2
95:11 117:7,22
118:4
**characteristics**
117:6
**characterization**
41:16

**charge** 17:8
**chargeback** 63:23
65:18
**chargebacks**
64:10,12 65:2,13
65:21 66:19
**charged** 56:6
**charges** 88:23
**charging** 68:13
**charlie** 8:11
**chart** 25:9,11
46:12 50:1
**charted** 120:9
**chatter** 79:15
**check** 71:16
**checkbook** 20:13
**checked** 15:3
118:16
**chief** 51:2,3 86:3
**choi** 6:1
**choose** 95:19
**chris** 4:25 88:4
**christine** 3:8 16:2
50:19
**christopher** 3:11
7:17 16:2 43:19
**circle** 26:24 32:23
**circled** 41:11
**circulation** 31:7
32:6
**circumstances**
106:11
**claim** 11:17 34:15
41:21 46:5,13
86:5
**claims** 15:11
16:17 17:20 19:8
38:17 42:16,17
44:25 45:1 46:7
79:11 84:13 85:2
85:8,11,15,17
86:8 88:6,19,24
89:2

**clarifications** 78:3
**clarified** 93:25
**clarify** 85:21
97:10
**clarity** 38:21
96:22
**claw** 33:14
**clear** 11:5 12:24
16:21 17:2,9 22:4
41:23 56:16 63:8
64:1 76:3 83:25
90:15 94:17 95:4
97:8 109:20
120:12
**clearly** 62:17
**clerk** 121:22
**clerk's** 89:2 90:9
**client** 46:12 97:22
98:4,8,12 119:15
**client's** 119:20
**clients** 75:25
98:16
**close** 49:11
**closely** 28:21
64:23
**code** 12:1 48:20
81:8 95:1,3,7,14
95:17 96:18,20
97:3,11 100:7,19
100:21 113:18
**cofounder** 15:17
**coin** 23:12 27:11
28:5,6 29:20
31:11,12,13 34:8
44:24 45:1
**coinbase** 57:22
73:10
**coinify** 49:23 50:3
**coins** 25:19,20,22
29:3 31:1 45:21
**collapse** 32:3,9
**collateralize**
73:12

**collateralized**
71:1
**colleague** 72:7
**colleagues** 16:2
84:6
**collect** 52:15
**collecting** 24:14
**collective** 17:24
**colloquy** 90:2
115:9
**combination**
28:15
**come** 17:24 28:9
67:10 68:11,25
69:1 70:7 72:19
72:21 74:24 89:16
99:2 106:2 109:3
109:12 110:22
118:7
**comes** 21:6,7
109:2 114:18
**comforting** 11:1
**coming** 64:15
100:13 109:10
**comingle** 54:21
**comingled** 17:18
25:5
**commence** 33:21
93:8
**commenced** 18:8
44:5 93:20
**commencement**
95:10
**comment** 13:19
17:17 23:5 108:17
**comments** 72:23
83:14 97:14
110:11 115:5
**commerce** 29:23
**commercial** 14:17
14:25 17:6 53:7
**commits** 23:20

**committee** 19:3,4
19:5 35:24 47:19
48:11 50:10 63:21
70:1 73:23 75:15
78:17 106:2 114:1
**commodities**
18:10
**commodity** 30:21
**common** 45:4
93:3 117:25
**communicating**
47:7
**communication**
16:15 40:24
**communications**
20:1
**community** 14:18
**companies** 45:6
57:22 115:16
**company** 15:17
15:20 16:4,16,20
17:4,12 18:1,21
22:16 24:2 25:10
25:21 26:15,16
27:4,5,7,20 28:4
28:11 29:18 30:24
33:11 34:20,23
35:12,18,23 37:15
37:16 39:18 40:13
41:8 42:4,22,23
43:2 45:4 46:11
47:22 48:25 50:2
57:23 64:19 68:24
79:17 93:2 106:7
108:7 110:16,16
110:17 111:7
**company's** 11:2
12:8 16:4,15 21:3
23:7 24:7 25:21
35:5,25 36:3
42:24 45:11 49:17
92:24 112:6

**comparable** 52:14
**compared** 43:14
48:3
**compensation**
55:5 86:6 89:4
**competitive** 39:16
85:18
**competitors** 79:22
**complete** 27:15
81:14 84:5 90:17
91:6 118:5,9
**completed** 20:16
62:8
**completely**
106:25
**complex** 106:7
**complexity** 103:6
**compliance** 72:19
72:22 107:25
108:25 109:25
**compliant** 9:25
**complicated** 18:4
39:10
**comply** 79:5
**compose** 19:3
**composition**
30:15
**comprise** 111:3
112:5
**comprised** 109:23
111:12
**computer** 14:11
20:16
**concentration**
56:1
**concept** 23:18
29:19 30:16 31:21
**concepts** 11:12
**conceptually** 30:1
**concern** 12:2
63:10 87:22 89:1
91:3 94:7 111:25
112:7 114:10

118:8,19
**concerned** 41:10
62:25 85:14 90:24
105:8
**concerning** 47:4
**concerns** 9:25
11:12 63:12 77:18
88:25 91:15 107:1
108:14
**conclude** 38:5
**concluded** 122:8
**conditional** 92:11
**conditioning** 92:8
**conditions** 27:16
**conducted** 21:25
**cone** 47:25
**confines** 52:1
**confirm** 42:21
62:13
**confirmed** 10:14
97:3
**confirming** 101:4
**confirms** 97:10
**conform** 103:15
**conformed** 99:18
**connecting** 22:16
**connection** 45:11
48:23 86:12
**connelly** 5:7
**conscious** 111:7
**consello** 16:15
**consensual** 64:24
65:9
**consider** 97:25
98:5,18
**considered** 98:2
**consistent** 71:1
**consists** 11:14
52:22,24 53:2
**consolidate** 78:14
**consolidated** 78:8
78:10

constitute 56:20
construct 11:19
constructive
91:20
consultants
111:24
consulting 111:8
consumer 30:9
contain 92:11
contains 81:1
contemplated
75:5 76:19 114:8
contemplates
46:12 104:12
contents 20:2
context 17:7 18:9
19:17 23:13 29:20
36:20 39:9 101:3
continually 24:13
continue 44:7
47:9 48:8 62:14
63:8 68:20 71:18
73:1 107:14 108:2
110:18
continued 32:25
63:5
continues 44:6
continuing 74:10
116:18
contract 111:10
contractors
110:24 111:2,13
113:7,8,12
contracts 95:11
95:12 111:1
contrary 38:22,23
86:1
contrasted 48:4
contravention
95:13
contributions
115:24,24

control 61:17 63:1
controls 61:12
controversial
9:23
conversation
91:14
conversations
96:10
conversion 23:15
convert 14:13
33:2 34:15
converted 31:23
31:24 32:16 54:24
conveyed 58:18
cooperation 76:7
cooperative 72:4
copies 88:24
copper.co 57:23
73:10
copy 10:2 15:9
90:13,23 91:6
cordearo 5:19
core 57:6
corporate 67:8,12
67:21 68:21
corporation 33:20
correct 19:14
42:25 47:13,13
72:12 117:15
correction 101:23
correctly 112:12
correspondence
96:10
cost 15:6 85:6
costs 53:4
counsel 15:20,24
15:25 16:11,13,13
83:22 88:4 89:24
102:16 119:19
count 58:14
counterparties
24:4 95:11 105:21

counterparty
35:16,19
country 124:21
couple 36:11
48:14,14 64:12
67:13 88:11 114:7
course 10:15 11:4
13:4,17 15:13
16:10,17 20:8
21:24 29:4,8,15
34:22 45:14 52:14
52:23 68:21 73:11
75:4,8,9 98:3
103:6 104:18
107:8 110:3
114:17 120:17,25
court 1:1,12 3:15
9:2,5,16 10:3,7,11
10:18 11:8 13:11
14:9 15:16 18:20
19:6,15 21:13,15
22:6,13 24:22,25
25:13,23 26:2,8
26:12 33:20 36:11
36:23 37:23 38:24
39:5,25 40:19,24
41:15 42:6,13,23
43:2,8,12,21 48:6
48:9 49:1,13,20
50:17,21,23 51:6
51:11 60:18,20,22
61:24 62:15,22
63:12,22 64:1
65:14 66:5,11
67:3,7,10 68:22
69:8,17 70:8
71:23 72:9 73:3
74:2 76:10,14,20
77:2,8,19,22 78:2
80:2,15,16,19
82:1,5,8,10,12
83:3,10,14 84:2
84:10,15,17,20,23

85:17,24 86:9,15
86:18,20,22 87:24
88:9,21 89:1,4,6
89:17,18,23 90:9
90:22 91:5,12,13
91:19,20,24 92:1
92:9,12,16,23
93:9,15 94:1,2,6
94:18,21 96:21
97:14 98:20 99:2
99:7 100:24 101:8
101:10,14 102:1,5
102:10,14,21
103:1,4,9,11,21
104:11,22 105:16
106:10 107:5
108:17 109:4,5,15
110:10 112:11,19
113:3 114:19,24
115:2,4,18,23
116:2 117:12,17
117:19 118:14,19
119:13,18,25
120:10,20 121:3
121:12,15,21,25
122:4,6
court's 85:14
103:2
courts 88:15
cover 10:15 16:23
20:7 22:3 26:14
28:11 67:15
covered 121:9
covid 29:5,6
crash 29:6 31:17
cream 47:25
create 30:20
78:25
created 30:23,25
31:1,14 33:3
35:24
creates 32:23
40:12

**creating** 33:1
**credit** 67:8,12
  68:8 114:12,15
  115:15 116:25
**creditor** 19:8,11
  43:3 78:9,20 79:5
  79:9 82:19 83:15
  100:18 123:7
**creditor's** 47:19
  48:11 50:10
**creditors** 12:16,17
  18:21,24 19:4,9
  34:14 46:8,15
  78:11 80:1 81:1
  81:4 85:4 92:24
  99:9 100:16 106:1
**critical** 24:8 52:3
  64:9 68:1,16
**cross** 51:9,14
**crucial** 110:1
**crypto** 9:19 17:2,3
  17:16,18 19:19,22
  19:23 20:9,20,24
  21:2,6 23:6,20
  24:7,11,18,19,20
  27:8 29:7,12
  30:18,22,23 33:17
  34:3 37:1 38:17
  39:19 40:7,9,9,16
  42:1 53:24 54:1,4
  54:13,21,22,22
  57:20,21,25 74:6
  74:19 75:24
**cryptocurrencies**
  29:13
**cryptocurrency**
  11:11,14 12:6,7
  12:22 14:2 15:5
  20:23 23:14,19
  24:4 25:1,16 26:2
  26:21 28:20 29:2
  30:3 33:13 36:14
  36:15 43:13 44:22

  52:13,15,19,21
  53:1,20 54:10,18
  55:19 57:10,14,18
  58:4,6,17 59:13
  59:19,21,21 60:3
  60:7,10,10,13
  61:21 62:19 64:14
  64:19 73:8,12
  74:16 75:23
**cryptography**
  19:25,25
**crystal** 41:23 95:4
**crystalline** 45:1
**currencies** 16:20
  23:3,10 31:20
  33:6
**currency** 11:16
  19:24 23:15 25:5
  30:16 45:9 107:17
**current** 10:23
**currently** 61:5
  95:21 104:7
  107:11,23 108:12
  110:3 112:2
  116:13,14
**custodial** 12:12
  20:7 21:10 23:1
  56:2
**custodian** 58:7
  74:7
**custodians** 57:21
  57:22 58:2 73:9
**custody** 23:7
  30:12 36:13 37:1
  57:20,24 58:7
  59:24
**customer** 10:8
  12:20,23 17:5,17
  19:1,5 21:25 22:1
  22:10 25:4,14,20
  25:24,25 26:6,11
  36:24 38:8,14,19
  39:17 40:6,11,19

  40:21 41:19,23
  42:7,7,10,15 43:1
  44:15,15 54:1,4
  54:13,17 55:21,24
  56:2,9,10,14,16
  57:3,4,9,13 58:3
  59:12,14,15,15,16
  59:18,19,23 60:1
  60:2,3 61:9,10
  64:13 66:3,6,17
  79:11 95:2 100:17
**customer's** 53:24
  54:11 56:3,5,8
  58:14,18,23 59:7
  59:19,20 60:3,11
  61:14 66:3
**customers** 11:7
  12:6,15,15,21
  16:22 17:10,11,12
  17:19 18:2,11,17
  18:22 19:9,10
  20:24 21:1,6,7,18
  22:6,8 23:8 24:6,8
  24:21 25:16 26:9
  26:25 34:17,21
  36:17 37:5,8,9,10
  37:20 38:15,16
  39:1,5,10 40:4,8
  40:10,25 41:22
  42:5,17,19 46:24
  47:2,7,11,18,22
  47:23 48:25 49:5
  50:11 55:18 56:7
  56:13,17,17,20,22
  56:23,25 57:5
  58:16 59:3,22
  61:2,3,20 62:14
  63:3,3 64:8,11
  65:12,16,17,24
  67:4,5 79:4,9,21
  80:8,8,10,13
  100:19 105:20
  111:21 120:8

**cut** 68:5
**cycle** 33:5

**d**

**d** 9:1 53:11 123:1
**dadson** 5:19
**daily** 41:7,8 61:14
**damage** 79:24
**danish** 49:25
**darling** 34:3
**darren** 7:6
**dasaro** 4:21
**data** 79:6,7 87:22
  89:4,7 111:22
**data's** 87:20
**date** 67:20 74:23
  88:12 93:3 104:2
  104:8 117:1 121:4
  121:13,23 124:25
**dated** 28:8
**david** 6:13 15:19
**davis** 7:11
**day** 2:1 11:5
  15:14 18:13,24,24
  29:23,23 32:16
  36:20 43:16 44:4
  51:1,6 53:4,4 61:8
  61:11,12 66:5
  68:25 70:2 81:24
  82:4 104:19,23
  105:2 106:7 107:3
  113:23 121:18
**days** 13:24 46:22
  51:22 63:24 64:4
  69:25 70:10 72:4
  72:19 73:23,24
  75:14 104:1,1,7,8
  104:9,9 105:9
  117:3,4,9,20
  118:5,11 119:5,7
  119:7,12
**de** 31:19 113:20
**deadline** 103:25
  104:3

deal  100:21
dealing  90:3 92:8
  99:21
deals  57:11
dealt  86:23
death  32:23
debit  23:13
debt  49:14
debtor  1:9 25:10
  35:9,11 53:13,16
  53:21 55:3 56:2
  57:16 62:24 63:9
  63:11 68:19 72:18
  72:20 74:6,14
  75:2,4 76:3,23,24
  78:10,12 81:3,3
  81:18,21,22,24
  105:1,8 108:9,9
  112:24 117:8
  118:21
debtor's  52:9,16
  53:1,11,16,18,19
  53:24 55:4,6,16
  55:17 56:6,13,18
  57:7,15 58:19
  64:8 68:1 83:22
debtors  16:1
  43:20 49:25 50:20
  51:22 52:3,12,20
  53:2,3,5,12 54:19
  54:20,22 55:9
  56:22 57:19 58:25
  59:4,9 61:8,11,14
  61:17 63:1,9,15
  63:15,18 67:16,22
  68:16,23 73:17,22
  74:11,15 75:10,23
  75:25 76:5 77:6
  78:7,13,14 79:2,3
  79:5,9,11,24 80:3
  81:8 84:12 85:1,5
  85:8,14,16 86:4,8
  92:20,22 93:1,17

93:17,23,25 94:4
94:11 95:1,9,12
95:16,18,21 96:5
96:18,21 97:3
100:2,17 102:17
103:24 104:3
105:3,13 107:9,13
107:16,19,21,23
107:24 108:8
110:2 111:5,10,16
111:18,25 112:2,4
112:8,24 113:13
115:24 116:10,16
116:20,24 117:3,7
117:15,23 118:2
118:25 119:19
decentralized
  20:4
decided  68:4
decidedly  74:16
decides  25:24
decimated  29:3
decision  111:8
  118:7
declarant  15:15
declaration  16:6
  20:22 29:5 44:4
  48:1 51:1,4,5,10
  51:12,15,16 86:3
  90:1,2,5,16,19,20
declarations
  116:10 118:1
decrease  45:21
decreasing  118:17
deductions
  119:22
deemed  85:23
deeply  87:14
default  34:25
defeat  104:15
defend  31:15
defer  103:6

defined  26:7
definition  96:2
delay  67:25 68:6
  69:14 105:4
delegate  59:24
  66:15
delegation  66:24
delia  4:24
deliberate  10:17
delisted  118:18
deliver  11:6 18:17
  38:16 57:18
demonstrates
  27:3
denied  70:9
  123:19
denise  5:9
dennis  5:18
department  4:1
depending  61:2
depicts  44:1
deposited  23:3
  59:7
depositing  61:16
depositories
  70:22 71:4 72:13
depositors  12:16
depository  70:23
  73:16
deposits  23:8
  56:18 58:11 62:2
depressed  28:21
deregulated  30:19
dermont  7:10
dermont's  48:1
describe  12:20
  13:5 55:14
described  12:4
  25:24 34:4 38:19
  42:18 61:25 64:6
  101:16 105:2,6
describes  39:4
  62:22 90:5

describing  113:9
description  12:11
  36:25 62:16 90:15
descriptions
  61:25
designate  66:17
  66:20
designated  70:22
designed  64:25
  67:14
despite  46:18 95:6
destructive  73:17
detail  16:23 28:1
  28:12 48:1,22,23
  54:16 83:5
detailed  44:3
details  13:2 45:23
determination
  94:9
determined  11:24
  11:24 44:21 85:18
develop  48:3
developed  21:1
dial  86:12
dialogue  74:11
  75:16
dibattista  7:25
diblasi  6:12
dictate  26:9
dietderich  4:23
dietrich  5:16
difference  24:14
  54:19
different  29:12
  35:9 36:16 37:1
  40:4,6 46:3 75:11
  86:11
difficult  68:3
  93:18 106:16
  111:5 112:3
difficulty  11:23
digging  14:7

**digital** 1:7 3:4
  15:22 20:4 21:4
  23:2 26:24 35:12
  35:15 50:2 51:3,4
  52:16 53:13,21
  55:3 57:23 73:10
  73:15 76:24 77:12
  92:21,25 93:7,10
  93:16,21 108:10
**digitally** 19:24
**diligence** 32:7
**direction** 11:5
**directions** 42:24
**directly** 23:14
  25:19 53:15 91:9
  111:12
**directors** 35:8
**directs** 41:6
**disavow** 40:2 66:7
**disavowed** 66:7
**disburse** 52:16
**disbursements**
  53:18 74:14,15
  76:3
**disclaimers** 90:6
**disclosed** 79:15
  88:2
**disclosing** 82:25
**disclosure** 46:21
  78:24 79:18,21
  81:14,16,20 88:16
  105:24
**discover** 109:5
**discretion** 59:25
  61:19
**discussed** 48:21
  75:20 78:3 100:24
  109:24
**discussing** 48:1
**discussion** 108:7
**discussions** 18:1
  48:8

**dispute** 41:16
  66:18 71:17
**disputing** 65:6
**dissipate** 30:8
  47:10
**distributions**
  44:16,20
**district** 1:2 33:23
  70:23 85:13
**dive** 87:14
**diyanni** 16:7
**docket** 51:5 52:10
  52:11 66:10 78:7
  84:12 85:1,21
  86:4 88:24 90:1
  92:20 93:25 94:23
  97:6 102:23,24
  103:10,23 107:8
  109:18,19 110:14
  110:15 116:5,6
**document** 74:21
  75:13
**documented** 15:1
**doing** 35:7 39:21
  45:16 46:4,5
  47:14,16 70:1
  88:16,18 98:4
  99:15 108:2
**dollar** 27:7 30:7,8
  31:9 32:1,12,14
  32:19,21
**dollarizing** 44:25
**dollars** 28:9 30:21
  33:8 34:16 45:1
  55:10 76:4 77:13
  98:12
**doorbell** 14:22
**dov** 8:9
**downs** 28:22
**dozen** 22:22
**drastic** 28:23
**drastically** 19:8

**draw** 27:16,17
  37:9
**drawing** 84:5
**driven** 19:1
**drop** 28:17 31:15
  33:4
**dropped** 32:24
  33:2
**drops** 86:24 91:22
  99:14 112:21
  120:14
**dual** 44:2
**due** 20:8 46:21
  67:10,23 108:12
  109:10 114:18
  120:25
**duffy** 16:14
**durmont** 16:6
**durmont's** 44:4
**duty** 81:8
**dwan** 5:15
**dying** 86:10

**e**

**e** 1:21,21 3:1,1 9:1
  9:1 15:18 123:1
  124:1
**earlier** 34:2 46:4
  50:9 56:15 60:14
  74:9,10 76:18
  98:1,10 100:25
  102:4 105:2 108:7
**earn** 23:8 24:6,20
  54:19,21
**earning** 21:1
  23:24 31:6
**easy** 20:25
**ecf** 90:1
**ecosystem** 32:2
**ecro** 1:25
**effect** 19:10 41:18
  42:15 65:8 72:21
  85:23 95:6 101:17

**effective** 85:6
**effectively** 17:18
  20:3 22:16 29:11
  30:19,23 31:20
  32:18,23 37:7
  40:17 45:9
**effectuate** 39:23
**efficient** 21:9
  78:16 85:6
**effort** 9:24 10:25
  27:14 34:20
**efforts** 48:2 79:24
**eggermann** 6:13
**ehrlich** 7:7 15:14
  15:17 24:17 51:2
  51:2,8,14
**ehrlich's** 20:22
  29:5 51:12
**eight** 53:6 61:7
**eisenberger** 6:14
**either** 10:4 37:8
  55:19 56:7 57:1
  58:14,23
**electing** 24:8
**electronic** 20:3,13
**eligible** 21:19
**elle** 6:1
**ellis** 3:3 15:25
  43:19 50:19 77:6
  102:16
**emails** 80:11
**emerge** 105:21
**emergency** 109:3
  109:7
**emma** 7:19
**employed** 111:24
**employee** 55:5
  68:14,15 79:10,12
**employees** 67:17
  68:10,25 69:1
  75:4 76:15,25
  77:3,3,11 79:14
  80:20,22,24 82:21

110:17,20 111:11
112:23 113:21
114:12,14 115:14
115:24
**employer** 113:10
**employment**
85:15
**emulate** 30:16
**enabling** 52:20
**encompassed**
21:11
**ended** 33:14
**enforce** 123:13
**enforcing** 94:24
95:4
**engage** 47:18
107:16 118:6,12
**engagement** 85:16
85:23,25 86:1
87:16
**engaging** 61:3
**engineering** 111:3
111:8,9,23
**engineers** 111:6
111:11,16,17
112:1,3
**enjoin** 64:3
**enjoyed** 15:2
**enlarge** 97:10
101:18
**enormous** 31:4
**ensure** 48:4 55:23
59:2 61:13 79:5
85:6 107:13
110:19 116:9,19
116:20 118:5
**ensured** 71:6
**enter** 30:24 62:17
103:9 110:12
121:1
**entered** 27:8
35:10 101:13,20
110:9 117:11

120:22,23
**enterprise** 38:16
**entire** 22:1 90:20
91:2
**entirely** 28:25
70:10
**entirety** 120:1
**entities** 25:10 35:9
35:9,11 46:3
49:25 63:10
**entitle** 45:11
**entitled** 17:13
83:9 97:3 113:18
**entitlement** 42:22
**entity** 25:11,12
27:21 35:13,23
63:4 69:24 77:11
78:12 93:1,22
94:13 108:9,9
112:24
**entry** 76:8 77:25
94:5,23
**environment**
27:15 39:16
**equal** 32:14
**equity** 27:5 45:4
45:22 46:14
116:10
**equivalent** 23:22
74:20,22
**eric** 3:25 6:15
86:3 87:13
**eros** 17:20
**especially** 12:9
113:21
**essential** 68:3
**essentially** 64:16
65:5 67:3
**establish** 12:24
42:8
**established** 42:10
**estate** 17:19 18:18
37:19 38:1,5

44:17,19 60:13
98:3,3
**estates** 92:22
93:17
**et** 25:17 62:3
**ethereum** 29:3
**ethos** 26:21
**european** 79:7
**evaluate** 117:25
**evaluates** 22:24
**evening** 117:2
**event** 38:10
**events** 28:10
34:22
**everybody** 9:2
86:16 118:20
**everybody's** 9:6
**everyone's** 88:8
**evidence** 51:1,12
81:4
**evolution** 88:19
**evolve** 106:1
**exact** 39:2 114:22
116:15
**exactly** 11:11 12:3
36:14 46:5 63:5
66:5 67:6 87:3
100:4 106:14
120:8,14
**examine** 51:9,14
**example** 10:9
21:19 40:5 52:4
62:20 74:18,21
113:10
**exceptions** 97:9
**excess** 55:10
67:22
**exchange** 12:6
20:23 23:12,20
53:20 54:8 57:17
58:8,10 93:2,5
107:17

**exchangeable**
31:21
**exchanged** 31:22
31:24
**exchanges** 20:20
21:10 22:22
**excluded** 86:5
91:10
**exclusive** 87:6
**execute** 57:5,13
58:4
**executes** 22:23
**execution** 22:24
29:24 54:11
**executive** 51:2,3
86:3
**exercise** 64:2
**exhibit** 53:11
**exist** 88:11
**existing** 45:8 69:2
110:19
**exists** 18:17 19:24
42:2
**expand** 100:6
111:9
**expect** 45:6 50:3
74:17 116:13
**expedited** 9:13
13:24
**expeditiously**
47:19
**expense** 63:17
113:17,17
**expenses** 53:20,20
67:15,16,23,25
68:7,8,12 69:3,5
113:20,24 114:7,9
114:11,11,17
**expensive** 73:13
**experience** 15:21
22:19 85:12 88:12
**expires** 70:7

explain 99:11
explained 26:7
explanation 83:20
explicit 89:19
exploded 20:20
explore 116:19
exploring 105:18
exposed 37:13
expressed 48:9
extend 103:24
  104:2,9,14
extending 108:3
extension 76:2
  103:23 104:1,10
  104:19,24 105:4
  105:12 106:8
  107:3 123:17
extensions 104:6
extent 19:19
  43:10 63:17 65:16
  69:18 71:3 74:13
  74:15 77:18
extra 119:2
extremely 72:3
  73:17 96:16 109:8
eye 20:8 22:17
  120:22

**f**

f 1:21 124:1
facilitate 22:17
  24:5 29:24 30:3
  32:17 53:1,23
  120:8
facilitates 52:18
facility 27:4,19,19
  46:10 116:25
fact 27:17 33:22
  46:18 74:6 76:7
  87:25 90:3
facto 94:25 95:13
facts 96:15
failed 32:20

failure 49:14
fair 19:6
fairly 88:13,15
  115:18
fairness 118:20
falls 96:2
false 90:25
familiar 95:7
  100:19 119:16
familiarize 99:4
familiarized
  19:18
families 47:3
family 14:3
far 46:7 74:7
  75:14 80:25 85:13
  98:7
fascinating 14:9
fasken 16:10
fast 32:4
favor 118:24
favored 118:25
fbo 21:8 36:25
  37:5 39:1 40:20
  40:22 41:4,23
  61:18 64:6
fcic 72:15
fdic 38:9 71:6,11
  71:13 72:14
federal 95:25
  107:18
fee 111:14
feel 19:20
fees 23:15 45:13
  74:18 109:23
felony 64:17
fiat 30:16 31:8
field 12:18 13:20
  22:19
fighting 18:12
figuring 11:23
file 46:20 50:4
  78:10 81:9 91:12

102:23 103:25
  104:3 105:10,19
  109:18 116:18
filed 18:19 33:22
  36:10 44:3,4,5,11
  46:18 47:11,21
  51:5,24 66:8
  73:21 85:20 86:2
  91:21 93:24 97:5
  102:23 103:23
  104:13 105:1
  107:8 108:23
  109:17 110:14,15
  116:5,5,8
filing 34:23 40:15
  46:23 47:5 48:19
  49:14,17 52:4,6
  71:15 78:11,14
  91:6 93:5 96:6,9
  98:11 106:5,11
  110:22 116:12
filings 78:20 80:4
  97:23
final 67:11 75:5,6
  77:16,21 92:10,12
  108:15,22 109:1,2
  109:13 111:1
  112:16 113:2
  114:3 115:11
  121:5,13
finalize 46:19
finally 23:25 68:9
financial 15:21,23
  16:5,14 22:7
  26:22 30:12 36:3
  71:5 81:16
financially 71:5
find 93:18 116:19
finds 24:2
fine 94:19 102:21
  104:17 119:12
  121:2,19

finished 60:22
  73:3
fireblocks 57:24
  57:25 58:8
firms 24:11 36:13
  111:9
first 2:1 9:21
  13:20 14:24 15:14
  18:4 28:18 31:2
  36:20 44:2,4
  48:15 51:1,6,22
  52:9,24 72:2
  81:12,24 82:4
  84:4 97:19 105:2
  113:6,23
fitting 82:2
five 67:13 73:23
  75:14 84:18,21
fixed 104:16
flag 108:5
flavor 29:2
fleming 7:19
fleshed 45:23
flexibility 45:20
  45:24 109:12
  117:16,24
floods 42:12
floor 3:22
florida 14:11
flows 21:7
fluctuates 61:2
fluidity 117:24
focus 18:2
focused 22:18
  33:13 38:15 45:16
  47:12
folks 15:13 39:21
  45:25
follow 114:23
following 96:13
  121:23
force 85:23

forced  32:22
forecasting  52:19
foregoing  124:3
foreign  16:12
  92:21 93:10,16,22
  94:10 99:9 100:16
  123:11
forewarning
  89:16
forget  70:12
forgetting  122:1
form  11:15 19:23
  24:3 81:13,15
  83:23 115:19
formal  118:13
former  77:3 80:24
forms  81:11,12
forth  44:13 48:1
  49:5 90:16,20
forward  19:16
  32:4 36:5 47:12
  47:17,20 50:7
  69:3 74:24 75:10
  76:21 77:16 106:8
  120:18
found  52:11 97:23
  103:10
foundation  31:14
  33:7
founded  26:15
founder  51:2
four  23:9 35:8
  114:8,22 115:1,2
frankly  13:19
  15:2 24:16
fraud  17:14 37:13
  37:21 64:16 66:4
fraudulent  64:10
  65:7 67:1
free  19:20 83:10
freefall  29:11
freely  32:1

freeze  65:3 66:13
frequently  54:23
friday  120:5
friel  6:15
friendly  37:13
friends  14:3
frizzle  35:22
front  9:6,11 17:8
  35:4 39:3 96:10
  97:1 100:10,13
  114:23
frozen  111:21
fulfill  68:3
full  46:16 97:7
  108:6
fully  71:11,13
  72:14 102:25
  110:21 114:10
  118:3,9
function  49:8
functioning  57:8
functions  57:8
  59:24 111:23
fund  33:13 55:18
  55:21 56:25 58:25
  59:4,5
fundamental
  61:24
funded  55:7 63:5
funding  57:9
  61:21 62:24,25
  63:9
funds  42:22 53:17
  54:15,15 55:4
  56:9,20,23 59:2
  61:16 65:25
funny  104:13
further  28:22
  33:4 47:9 60:2
  68:4,16 90:19
  94:17 115:7
  120:13

future  91:21

**g**

g  9:1
gabriel  4:17 6:14
gate  10:19
gates  10:14,19
  11:2 34:24 46:23
  95:19
gear  36:4
general  15:20,23
  18:24 46:5,7
  53:19 79:6,7 81:7
  81:19 88:4 91:4
  113:25
generally  19:21
  29:7 90:8 96:3
  113:20
generate  61:8
  116:14
generated  116:15
george  5:23
getting  13:9 14:6
  17:1 69:5 91:1
  96:15 97:21 99:3
  113:17 120:6
gilbert  7:5
give  19:17 29:1
  37:10 45:20 72:18
  89:5 109:8 121:12
  121:16,22,23
given  38:20 62:15
  64:22 67:16 68:19
  78:13 79:21 95:1
  100:17 108:24
  117:12
gives  42:23 47:5
glacier  108:9
glad  89:13
glantz  4:10
glenn  33:24
global  95:1
glueckstein  4:20

go  13:9 17:11
  39:10,21,23 48:22
  54:3 60:20,22
  61:20 65:23 66:25
  69:3 75:20 77:16
  82:8,10 87:11
  112:10 115:19,21
  117:8,18
goes  20:6 27:1
  39:19 41:12 57:14
  60:1
going  9:8 11:11
  12:10,10 16:23
  17:6 18:11 21:23
  26:2 28:9 34:14
  36:7 37:9 38:13
  43:9,22 44:2
  48:22 61:20 62:2
  62:2,11 65:20,23
  68:11 73:14 74:10
  74:17,19,21,23,24
  75:6,10 76:4,21
  76:22 77:10 82:22
  83:6,7 84:18
  87:23 88:8 89:9
  90:3 92:7 101:17
  112:22 120:7
gold  8:1
goldberg  7:12
golden  7:13
good  9:2,10,16
  43:8,18 50:21
  51:16 71:25 83:4
  92:1 97:17 101:8
  102:1,12 103:21
  107:5,25 109:25
  110:5 116:2
  120:10,11,11,20
  121:12
governed  99:17
government  20:17
  99:13

**government's**
35:4
**governmental**
67:18 95:14
**governments**
99:21
**grand** 70:11,14
**grant** 30:13 80:15
83:7 115:19
**granted** 81:23
82:4 123:5,7,9,11
123:13,15,17,21
123:23,25
**grants** 60:2
**grayson** 7:1
**great** 21:21 43:22
50:24 83:5 88:18
89:13 102:15
**green** 1:13
**gregg** 6:23
**ground** 47:16
**grounds** 49:2,13
100:25
**group** 3:14 19:11
97:19 119:8
**growth** 26:14
**gtt** 83:19
**guard** 31:14 33:7
96:21
**guess** 74:4 89:14
118:17
**gurewitz** 6:2

**h**

**hage** 4:16
**half** 28:18
**halted** 119:18
**hamid** 5:14
**hamilton** 7:14
**hand** 12:14 17:4
54:13
**handle** 9:8
**hanyecz** 14:11,12
14:17,22 15:2

20:18
**happen** 11:11
18:15 61:18 66:6
69:13,14
**happened** 28:14
32:20
**happening** 9:14
40:15 63:18 87:21
118:14
**happens** 61:7 63:4
75:17 114:18
**happy** 13:8 43:24
50:15 61:21 70:4
77:19 87:9,13
88:9 91:8,12,14
91:23 104:8 106:9
109:13 110:7
113:1 114:6,23
**hard** 120:8
**harm** 51:22 67:11
67:25 68:14,16
69:19,21 70:16
79:14 83:1 109:22
112:8
**harman** 8:6
**harold** 6:16
**harris** 53:3,9 71:9
71:9 72:13
**harrison** 4:13
**hastings** 16:12
**hautzinger** 6:3
**head** 14:4
**heading** 121:1
**hear** 13:12 15:13
16:9,22 17:10
43:20 50:22 51:13
52:2 77:7 86:16
102:13
**heard** 14:2 43:6
71:24 82:6 89:21
104:20 107:15
112:11

**hearing** 2:1,1
33:24 67:11 72:8
77:21,24 82:1
85:20 105:24
108:22 109:7,14
114:3 121:5
**hearings** 99:2
121:13
**heart** 110:16
**heavily** 118:24,25
**hedge** 33:12
**heels** 96:8
**heidi** 5:21
**height** 26:16
**held** 17:5,19 37:6
40:5,7 41:5 42:3
44:22 52:25 56:11
56:20 58:7 59:2
60:3 61:1,6 75:25
79:11 93:4
**helfrick** 4:22
**help** 10:25 13:25
40:9 85:6 93:14
96:21
**helped** 14:9 24:17
**helpful** 13:7 43:12
65:11 100:22
121:7
**helping** 88:7
**helps** 16:24
**hesitation** 117:8
**hi** 77:5
**high** 23:22
**higher** 40:12
45:12 120:22
**highlight** 48:14
49:22 50:5 70:21
**highlights** 100:11
**highs** 28:19
**hill** 7:9
**hire** 111:6
**hired** 111:16

**historic** 28:17,19
29:8
**historical** 36:3
111:22
**history** 88:6
**hold** 36:14 40:9
53:2 54:23 59:18
59:20 60:3 73:8
74:13 75:23
**holder** 44:22,23
56:19
**holder's** 44:24
**holders** 44:20
45:3,12,20 46:14
**holding** 12:14
27:20 46:11 74:6
**holdings** 1:7 3:4
25:5 35:15 51:4
53:13 55:3
**holds** 36:16 56:12
57:20 64:7
**holohan** 4:14
**home** 80:22,23,24
**hon** 1:22
**honest** 103:12
**honor** 9:4,10,17
10:2,23 13:8,17
14:1 15:8 16:1,18
16:19 17:9,15,22
18:7 19:13,17
20:7,21 21:21
22:4,14,18 23:2
23:25 24:17 25:18
26:6,13 27:1 28:3
28:13 29:1 33:9
34:12,18 35:1,10
35:18 36:6,19,22
37:14,19 39:4
41:9,11 42:21
43:10,18,23 44:9
46:17,23 47:11,24
48:13 49:10,21,22
50:9,14,18,22,24

51:10,18,18 52:2
52:8,12 53:12
55:1,14,17 56:14
56:21 57:11 58:3
59:11 60:12,19
61:20 62:6,21
63:7,25 64:5,6
65:19 66:8 67:12
69:3,10 70:3,7,18
70:18 71:20,25
72:3,17,23,24
73:5,19 74:4,8
75:2,11,16,19,21
76:1,7,13,17 77:1
77:5,18,23,25
78:5,6 79:8,13,20
80:7,18,19 81:6,7
81:21 82:3,7,11
82:14 83:12,16,18
83:19,22 84:1,9
84:11,25 85:3,10
86:2,17,19 87:7,8
87:12 89:12,21,24
90:5,7,12,14,17
90:22 91:7,11,25
92:3,4,15,18,19
92:25 93:7,19,24
94:4,20,22 95:18
96:6,9,24 97:5,6
97:12,16,19,20,24
98:5,18,25 99:6
99:24 100:13
101:6,9,15,19,21
101:23 102:2,7,13
103:7,8,19 104:5
104:20,23 105:15
106:25 107:1,6
108:5,13,23
109:11,17 110:7
110:13,22 112:10
113:5,16,25 114:3
114:7 115:8,12,20
116:3 117:1,4,10

119:11,14 120:2,5
120:18,24 121:6
121:22 122:3
**honor's** 9:24
  16:25 17:16 23:5
  46:4 50:4 73:1
  83:21
**honoring** 38:12
**hope** 9:11 13:11
  15:2 16:21 45:25
  47:13 75:16 110:3
**hopeful** 10:1
  87:16
**hopefully** 47:7
  63:10 72:21 118:6
  118:12
**host** 57:7
**hosts** 54:14
**hour** 14:22
**hours** 120:4
**huge** 23:24
**humor** 36:23
**hundred** 21:3
  28:7
**hurry** 105:3
**hyde** 2:25 124:3,8
**hypothecate** 60:5
**hypothetical** 12:3

                **i**

**ice** 47:24
**idea** 100:25
**identifiable** 23:4
  78:19
**identification**
  109:9
**identified** 25:19
  35:19 108:21
**identifies** 29:14
**identify** 9:7 80:10
  108:18
**identity** 78:25
  79:13

**illegitimate** 65:2
  66:19
**ilusion** 8:10
**imagine** 46:23
**immaterial** 88:13
**immediate** 12:2
  51:21 69:19,20
  70:15 109:22
**immediately**
  96:13
**impact** 117:25
  118:1 119:23
**importance**
  108:24
**important** 10:16
  11:25 12:12 13:18
  24:1 28:6 29:17
  35:4 47:23 57:8
  69:15 96:16
  100:10
**importantly**
  68:10
**imposes** 81:8
  119:2
**impossible** 112:4
**impression** 9:21
  13:20 18:5
**improper** 96:22
**inappropriately**
  37:11
**incentive** 45:5
**include** 16:10
  44:14,20 57:22
  88:21
**included** 27:10
  65:11 78:19 79:10
  90:18
**including** 15:22
  21:7 26:20 35:21
  66:22 85:12 97:7
  107:18 108:3
**incorporate** 97:6

**incorporated** 65:7
**increase** 45:21
  111:1
**increasingly**
  111:5
**incredibly** 10:16
  34:19 39:9 120:8
**incur** 69:5
**indap** 8:4
**indelicato** 7:20
**indemnification**
  66:22
**independent** 35:8
  110:24 111:1,2,12
  113:6,7,12
**indicate** 10:4
  39:12 105:19
**indicated** 75:3
**indicates** 29:17
**indicator** 105:3
**indirectly** 53:15
**indiscernible** 12:5
  13:1 37:2
**individual** 22:2
  23:4,4 39:10 79:1
**individuals** 78:19
  78:22,24 79:8,19
  83:2
**indulge** 43:16
**industry** 88:20
**induvial** 79:11
**inflation** 28:16,19
**influx** 29:9
**inform** 119:18
**information** 48:11
  78:19 80:1 82:19
  82:25 83:11 87:5
  98:6 106:15,19,23
**informed** 52:6
  97:22 118:7
  119:17
**informing** 98:23
  99:9,12 119:20

**initial** 29:10
**initiate** 39:11,18
**initiates** 39:15
**initiating** 65:13
  65:21
**injury** 78:25
**insert** 72:20
**insiders** 113:16,22
  114:8,19,22,24
**insolvency** 11:10
  12:19 38:11
**instance** 84:8
  115:6
**instances** 39:22
**institutional** 19:2
  24:11 35:25
  111:18
**institutions** 26:23
  30:13 49:8 70:25
  71:5
**instruct** 39:6
**instructions** 96:4
**instructs** 57:16
  58:5,20 59:18
**insufficient** 32:17
**insurance** 107:7,9
  108:2 123:19
**insured** 38:9
  71:11,13 72:14
**intend** 37:17 50:9
  96:24
**intended** 41:13
  103:3
**intends** 37:16
  93:7
**intentions** 105:13
**inter** 108:7
**interact** 52:23
  60:17 67:18
**intercompany**
  62:23 63:6,8 75:1
  75:7 76:15,19

**interest** 12:7 23:8
  23:9 24:5 45:12
  71:7 80:3,5 85:4
  95:7 96:23 106:2
**interested** 14:4
  44:7 106:21,22,23
**interesting** 18:3
  29:4
**interestingly** 14:1
  20:11
**interests** 48:9
  118:25 119:1
**interim** 76:8 78:1
  98:1 108:16 109:2
  109:13 110:8,25
  112:13,15,25
  114:9,16,18
  115:13,17 116:21
  117:2 123:5
**internet** 14:20
**interpreted** 62:18
**interrupt** 18:20
  21:13 24:22 82:11
  86:9
**interruption**
  110:20
**interruptions**
  86:16
**intertwined** 55:15
**introduce** 15:19
**introductions**
  15:13
**invest** 45:25 60:10
**invested** 20:9
  98:12,13 119:17
**investigate** 66:18
  115:7
**investigated** 32:7
  32:10 35:6
**investigating**
  35:25
**investigation**
  33:18

**investment** 16:5
  30:10 33:15
**investor** 22:18
**investors** 20:8
  23:14 32:21
**invoice** 110:23
**invoices** 111:11
**involved** 76:1,25
  83:25 90:8 103:4
**ipso** 94:25 95:13
**irreparable** 51:21
  67:11 69:19,21
  70:16 109:22
  112:8
**islands** 33:21
**issue** 12:3 30:11
  38:11 41:10 49:21
  49:22,23 60:15
  65:19 71:24 72:2
  72:11 74:1,12
  76:14 83:4 89:1,9
  89:14 92:4 94:18
  100:12 106:11
  108:14 112:25
  113:16 117:13
  119:10
**issued** 45:10
  67:14 102:3
**issues** 9:21 18:4
  18:12,14,18 23:11
  36:4 46:21 48:14
  48:14,15,15 65:18
  72:5 74:3 75:19
  76:10 87:17 94:11
  103:18 114:4
  121:9
**it'd** 100:22
**it'll** 23:25
**item** 11:21,22
  52:9 78:6 84:11
  85:1 92:19 94:22
  109:16

**j**

**jacquelyn** 7:16
**jared** 7:10,15 16:6
**jason** 7:25
**jeff** 4:19
**jeffrey** 6:4
**jelisavcic** 8:7
**jeopardize** 71:7
  73:18
**jeremy** 7:9 14:21
**jill** 35:22
**job** 120:11
**jodi** 5:13
**johns** 14:14,23
**joining** 16:1
**joint** 35:10
**jordan** 5:8
**joseph** 5:12 6:25
**josh** 119:11
**joshua** 3:10
**judge** 1:23 33:24
**judges** 87:25
**july** 1:16 10:8
  120:5 124:25
**jump** 77:9
**june** 27:8 35:16
**junior** 46:9
**jurisdiction** 85:24
**jurisdictions**
  21:17 95:23
**justice** 4:1 92:23

**k**

**k** 115:23
**kaloudis** 5:9
**kaplan** 6:4,16
**kasner** 7:15
**kasulis** 7:16
**kb** 1:25
**keep** 12:8 41:17
  42:1 47:19 67:24
  111:19 120:22
**keeps** 41:8

[kelly - little]                                                                    Page 18

**kelly**  6:12 8:2
**kenneth**  7:3
**key**  15:12 52:5
  55:1
**kind**  19:11 22:7
  27:9 30:18 34:8
  45:2 57:11 62:10
  64:18 65:23 66:25
  69:20 75:24 88:8
  88:14 89:6 95:22
  106:14,14 109:9
  119:9 120:21
**kinds**  11:16 88:1
**kingdom**  79:6
**kirkland**  3:3
  15:25 43:19 50:19
  72:3,12 77:6
  102:16 120:3
**klein**  5:13 7:6
  16:7
**kleiner**  8:9
**kling**  5:21
**knauth**  5:16
**knew**  103:14
  119:19
**knight**  8:2
**know**  9:14 11:8,9
  12:21 13:19 17:25
  19:2,3,17,19,23
  28:13 30:2 33:16
  36:18 39:20 40:15
  44:10 46:20 47:22
  48:3 49:9 57:7
  60:14 62:23 63:2
  65:22 67:15 70:4
  72:9,25 73:14
  75:9,21 76:1,2
  83:18 87:1 88:3
  90:22,23 96:3,8,9
  96:12,17 98:2,7,7
  98:10 100:3,3,9
  100:20 101:21
  103:17 105:11,23

106:22,23 113:22
114:14,24 116:15
118:2,8 119:9,21
120:25 121:2,7,15
**knowledge**  69:10
  90:14 111:19
  116:23
**known**  24:11 31:3
**knows**  119:16
**kotliar**  6:5
**kurtzman**  3:25
  86:3 87:8,10,12
  87:13 88:3 89:12
  91:7,23

**l**

**labs**  31:1,1
**landas**  8:3
**language**  64:23,24
  65:7 92:14
**large**  32:8 34:14
  68:12 106:13
**largest**  43:3 46:8
**laszlo**  14:11
**late**  51:23 73:21
  115:16
**law**  3:13 95:25
  107:18
**lawyers**  11:10
  18:14
**laying**  100:7
**lays**  100:4
**leaders**  29:2
**leading**  17:8
  26:21 30:12 34:23
  46:22 85:11
**leads**  38:4,5
**leaking**  63:2
**leaks**  63:1
**learned**  64:11
**learning**  43:16
**leave**  49:18
**leaving**  64:18

**led**  16:5,13 28:10
**ledanski**  2:25
  124:3,8
**ledger**  20:13 41:8
**left**  27:2 28:17
  43:23
**legal**  9:20 13:6
  18:4,12,18 46:3
  92:22 124:20
**legge**  6:6
**legitimate**  65:24
  67:15,23
**lend**  24:20 60:5
**lender**  24:11 25:6
  25:10,12 26:3
  27:21 116:24
**lending**  24:3,6,25
  25:1,21 35:19
  40:11
**lending's**  24:8
**lends**  13:19
**lengthy**  84:4
  106:12
**lent**  25:20
**leticia**  4:18
**letter**  85:23
**letting**  40:15
**level**  22:11 46:11
  46:11 47:2 87:15
  113:21
**levitt**  3:14 97:18
  97:19
**liabilities**  106:15
**liability**  85:22
  86:24
**license**  96:1,13
**licensed**  48:16
  49:6,7 95:21
  107:19
**licenses**  21:23
  48:16,18 49:2,10
  95:15,20 96:8
  97:1 100:1 101:2

101:2 108:25
109:24 110:1,5
**licensing**  107:21
  109:23
**lieu**  78:9,11
**lift**  10:11,13 95:19
**lifted**  108:1
**light**  79:3 108:6
**likewise**  68:2
**limit**  10:24 63:23
  71:11,13 72:14,15
**limitation**  85:22
  86:23
**limited**  32:8 50:2
  68:19 76:25 77:12
**linda**  8:8
**line**  15:15 23:1
  51:8,14 68:8
  77:10 88:5 119:15
  123:4
**lines**  21:11 22:15
  103:17
**linked**  20:14
**links**  55:21
**liquidate**  73:14
**liquidated**  18:10
**liquidation**  18:6
  18:11 33:21 45:18
  105:22
**liquidations**  18:10
**liquidators**  33:22
**liquidity**  22:22
  24:5 29:9
**list**  53:10 78:9,10
  78:14 79:10 82:19
  83:15
**listed**  79:8 93:2
  94:13
**listening**  17:10
**lists**  78:12
**literally**  14:22
**little**  19:17 56:15
  74:23 90:24 94:17

live 15:15
living 27:15
llc 51:3 53:21
  108:10
llp 3:3
loan 18:22 25:13
  27:7,7,8,10,16
  28:1,4,4 34:2,5,25
  35:16,16,20 45:15
  46:10
loaned 25:16
loans 27:21,24
  35:25 36:1
local 51:7 85:7
locked 23:23
long 17:12 65:22
  83:19 88:6 99:18
  103:17
longer 65:2 66:12
  119:1
look 17:1 50:7
  70:1 103:14,16
  114:1 117:20
  120:18
looked 101:12
looking 14:13
  92:5 101:7
loren 8:6
lorraine 121:3,17
lose 111:18
loss 29:4,14 67:22
lost 28:24 47:14
lot 9:14 11:12
  19:7 35:5,6 37:17
  64:11 72:5,8,16
  79:15 82:22 88:16
  98:6 117:22
  119:17
lots 46:24
low 113:21
lower 32:22 45:12
lowered 10:24
  11:2

lowering 34:24
lowest 25:11
loyalty 23:10
luis 8:3
luna 31:3,3,12,14
  31:17,18,22,23,23
  31:23,24 32:1,3,9
  32:14,16 33:1,3,6
  33:14,17
lure 79:23

**m**

madelyn 7:4
mahzamen 6:17
mailing 78:9
  81:14
main 23:9 47:10
  93:10 94:10,13
maintain 20:18
  29:21 52:20 53:5
  53:12,21 55:9
  56:22 71:4 78:8
  107:9,22,25 108:8
  110:18
maintained 31:18
maintaining
  62:12 109:25
maintains 26:18
  53:22 55:3
maintenance 71:6
major 27:25
majority 56:12
  64:7 79:4
maker 57:18 58:9
  58:10
makers 24:12
  54:11
making 69:14
  74:1 88:25 89:4,5
  109:21 120:11
malicious 32:9
man 13:14 14:21
manage 52:16

management
  15:24 17:7 30:12
  37:22 39:9 45:5
  47:3 48:23 52:10
  52:13,18,22 55:16
  56:1 57:15 58:5,6
  58:19 62:16 65:15
  72:6,10 74:12
  76:9 78:1 79:17
  96:11 102:19,22
  103:5,14 121:9
  123:5,15
manages 21:9
manipulated
  37:12
manner 71:1
marcus 3:11 7:17
  16:2,22 23:12
  36:8 43:10,18,19
  43:22 49:4,16,21
  105:2,6,17 116:18
mark 4:9 7:18
  16:13
market 22:20
  24:12 27:15 31:17
  34:9 54:10 57:17
  58:8,10 111:22
  119:2
market's 34:9
marketing 44:5
  105:9
marketplace
  19:22 28:24 29:7
  29:12
markets 28:20,25
martin 5:17
massive 32:11
master 53:12,14
  53:17,22 54:6,7
  54:14,25 55:2,7
  55:11 57:5 58:12
  59:1,10 61:16

mastercard 23:16
material 46:7
  95:23 116:16
matrix 78:20 79:5
  79:9 123:7
matrixes 78:9
matsuda 8:5
matter 1:5 9:3
  87:15 89:14 90:7
  90:9
matters 51:7
  85:12,24 87:18
matthew 8:1
  35:14 97:18
maximize 47:15
  116:20
maximizing 48:5
  50:12
maximum 10:19
mc 52:25 53:3,14
  53:17 54:2 55:4,7
  55:11,11,25 56:11
  56:17,18,23 59:1
  59:8 61:11,12,19
  64:6,23,25 65:5
  65:10 66:1,14,16
  66:23 67:4 70:21
mcb 49:8 53:6
  54:5 61:15
mcbfbo 64:11
  65:3
mcbo 56:19
mcclatchy 103:1
  103:20
mcfbo 54:15
  55:15 56:4,5,12
  57:1,3,16 58:11
  58:14,21 59:8
  60:25 61:9 64:15
mean 37:23 68:24
  70:4 88:13
meaning 107:16

**meaningful** 24:9
**means** 78:16
  98:23 113:9
**meant** 31:25
**measure** 108:24
  116:8 118:10
**mechanism** 31:19
  45:19,23 64:21
**mechanisms**
  64:16
**media** 79:16
  82:23 97:23
**meet** 69:22
**meeting** 104:8,13
  104:15
**memory** 83:4
**mention** 48:13
  55:3 70:19 73:6
  73:19 98:10
**mentioned** 18:3
  25:3 34:2 36:12
  45:8,16 47:25
  54:17 55:8 58:13
  63:11 66:13 73:9
**merely** 110:18
**message** 20:2 50:9
**mestayer** 16:8
**met** 21:7
**metals** 20:10
**metropolitan** 17:5
  37:7 38:8,9,10
  39:11,12 41:6,6
  41:24,25 42:3,11
  42:12,15 53:6
**mew** 1:3
**michael** 1:22 5:5,6
  16:7,7
**michal** 6:17
**mid** 46:11,11
**middleman** 22:16
**midnight** 97:18
  99:3

**mike** 6:6
**milestones** 105:25
**million** 17:3,4,21
  26:19 27:4,10,17
  27:18 28:2,5
  32:16 34:6,11
  37:8,10,18,20
  55:10 61:1,1,6
  71:10,12 72:15
  93:3 98:12
**mind** 91:17
**mineola** 124:23
**minimis** 113:20
**minimum** 29:24
**minute** 84:18
**minutes** 27:12
  30:8 84:21
**missing** 98:24
**mistake** 92:19
**mitchell** 5:22
**mix** 116:1
**mobile** 21:1 53:25
**mode** 62:10
  107:24
**model** 101:11
  103:19
**models** 103:16
**modified** 89:18
**modify** 94:17
  119:12
**moelis** 16:4 48:2
**moldovan** 5:12
**moment** 30:7
  33:16 68:16
  118:15
**money** 17:11 21:6
  21:22 23:22 24:13
  25:22 38:13,14
  39:24 40:25 41:1
  41:3,5,7,12,17,19
  41:19 42:24 48:15
  48:17 49:1,4,6,7
  54:1,5 58:13 59:7

63:1 95:20 96:1,2
  96:4 107:16,18,20
  107:20 109:24
  115:6
**money's** 40:1
**monitoring** 52:19
  90:10
**month** 30:13
  77:13
**monthly** 63:20
**months** 28:24
  62:1
**morale** 68:15
**morning** 9:2 15:4
  33:25 50:21 61:15
**morris** 6:18
**morrisey** 77:12
**morrissey** 4:6
  13:23 19:2 71:25
  72:1 74:2,4 76:13
  76:17 80:18,18
  83:3,16,16 84:9
  89:21,22,24 91:24
  91:25 92:3,15
  101:15,15 102:2,2
  104:20,21,23
  113:5,5 115:4,8
**morrissey's** 77:20
  114:10
**moskalewicz** 6:19
**motion** 16:12 17:7
  35:11 48:21,23
  49:19 50:4 52:10
  53:11 62:22 63:23
  65:15 70:8 72:6
  72:10,24 75:3,11
  75:12 76:18 77:10
  78:7,18,23 80:15
  80:17 81:1,2,3,25
  83:7,15 92:20
  94:6,23 97:13,15
  97:24 98:21,23
  99:12 101:4

102:19,22 103:23
  103:23,24 104:21
  107:7 109:17
  110:14,17 112:17
  113:4 114:4
  115:22 116:4,7,8
  121:7 123:7,11,19
  123:21,23,25
**motions** 2:1 36:20
  97:25 99:8 102:9
  108:18 118:19
  120:21
**move** 10:17 18:16
  19:20 47:17 49:4
  50:24 51:9,19
  52:8 57:16
**moved** 34:20
**movement** 28:3
  56:3
**movements** 39:6
**moving** 19:16
  22:14 36:5 103:22
  110:13
**multiple** 26:22
  107:15
**mute** 84:20 92:19
**muted** 77:23
**mystery** 40:14

## n

**n** 3:1 9:1 123:1
  124:1
**nace** 7:24
**nacif** 6:9
**nail** 12:3
**nailing** 106:14
**name** 38:24 56:5
  60:4,4 76:23
  78:23 114:22
**named** 14:11,21
**names** 29:14
  79:14,18 80:1
  81:14,17,20 82:17

nancy 6:10
nature 43:4 64:4
  78:13 100:17
ndas 48:8
near 48:15 49:22
  50:5
nearly 120:4
necessarily 14:4
  30:6
necessary 11:1
  36:4 51:21 52:20
  69:19 70:15 82:16
  88:20 93:12 106:9
  108:4
necessitated
  31:16
need 9:5 12:9,11
  35:6 39:16 41:17
  45:23 67:17 74:19
  74:21 86:11 91:13
  98:6 99:13,20
  106:24 107:24
  108:19 109:7
  112:15,20 116:20
  117:20 118:7,13
  119:7 120:21
  121:4,10
needed 30:4 59:6
  67:24
needs 44:10 83:8
  105:9
nefarious 39:22
negisa 5:4
negotiated 27:14
negotiations
  106:3
neither 65:25
network 20:16
  22:3 54:8
never 98:8
nevertheless 95:8
new 1:2,14 3:23
  4:4 14:2 26:25

33:23 43:13 45:4
  68:6,8,17 69:5
  70:23 73:25 80:25
  85:13 108:11
nicolini 7:4
night 51:24 73:21
  97:18 102:24
  109:18 110:15
  116:6
nirvana 30:23
noah 6:18
noise 13:10,12,14
nol 116:4 123:25
non 62:24,25 63:9
  63:15 75:4 76:23
  76:24 108:9,9
  112:24
nonpayment
  115:16
note 17:2 26:20
  27:22 33:19 34:19
  34:21 51:20 75:2
  80:7 94:12
noted 26:18 28:17
  35:19 109:25
  111:15 116:18
notice 60:2 63:19
  75:18 96:17 100:8
  116:9
notices 49:11
noticing 15:11
  16:17 84:13 85:2
  85:8,15,17
notify 73:22 75:14
noting 116:22
notwithstanding
  85:25 115:4
number 32:8 51:5
  51:24 52:10,11
  75:13 78:7
ny 1:14 3:6,16,23
  4:4 108:10 124:23

**o**

o 1:21 9:1 124:1
o'clock 121:13
o'donnell 5:18
object 113:20
  118:7,10
objection 76:8
  92:14 94:7 99:18
  104:24 113:14
  117:3,5 118:13
objections 51:11
  51:13 80:16 91:6
  94:6 97:14 103:11
  110:11 113:3
objects 82:1
obligations 63:5
  68:3
obtain 93:13
  107:21 114:16
obviously 12:13
  19:18,23 43:10,23
  44:13 47:4 67:17
  73:8,16 74:17
  90:10 96:15
  106:12
occur 121:4
occurred 29:10
  33:9
occurrence 31:16
offer 14:21 24:14
offered 14:19
offering 98:15
office 13:23 55:6
  89:3 90:10
officer 51:3,4 86:3
offices 3:13
official 14:24
  81:11,12,15
officially 97:22
ofthe 97:22
oh 60:24
okay 11:8 13:13
  13:15 19:15 22:13

26:12 36:22 40:24
  43:8,20 49:20
  50:18,22 62:22
  63:13,14,22 65:14
  67:7 70:3 74:2
  76:10,14,20 77:2
  77:22 83:3,14
  84:8 86:9,18
  91:23 92:1,14,16
  94:21 101:8,14
  102:5,6,10,13
  103:22 108:17
  109:16 110:12
  119:13,24 121:14
  121:20 122:4
okike 3:8 16:3
  17:7 48:22 50:16
  50:18,19,22,24
  51:18 60:19,21,24
  62:6,21 63:7,14
  63:25 64:5 65:19
  66:8,12 67:6,9,12
  69:2,10 70:3,18
  72:12 73:1,3,5
  74:5 76:18 77:2,3
  81:4 84:11,16,19
  84:25 86:13,17,19
  87:7,9,11 89:25
  92:2,16,18 94:20
  94:22 99:24 101:6
  101:9,12,16,23
  102:7,11,17
okikie 77:23 78:5
  82:7,9,11,14
  83:12
old 14:21 124:21
omnibus 42:10
  59:22
oms 57:15
once 56:8 112:3
ones 113:8
ongoing 68:4

online  14:18 15:1
49:23
onset  29:6
ontario  92:23
opco  46:8 53:22
66:20
open  68:6 111:21
opening  73:25
75:15 116:18
openly  14:19
operate  21:17
95:18 107:19
110:2,17
operates  20:22
operating  25:10
27:20 35:18,23
53:13,14,17,19,22
54:6,7,14,25 55:2
55:4,7,11,12 57:5
58:12 59:1,10
61:16 63:4 67:16
107:24 110:3
operation  67:24
107:25
operational  69:15
operations  53:4
68:4 93:13 95:16
107:14 108:11
opportunities
24:20
opportunity  9:18
17:12 43:15 45:25
47:5
opposed  30:4
41:20 70:1 73:24
optionally  99:23
options  22:8,12
105:18
order  35:11 39:15
49:4 52:11 54:12
57:14,15 58:4,5
58:19 62:15,17
63:19 64:24 65:1

65:4,8,11,12 66:9
66:23 70:4 71:18
72:20 73:20,25
75:6,18 76:9
77:17 78:1,4 83:8
83:13,23 85:21
86:23 88:22 92:8
92:10,12 93:13,15
93:24 94:5,14,23
95:3 96:16,21,24
96:25 97:4,5,8,10
99:13 100:2,4,11
100:16,22 101:17
101:19 102:4,24
103:10 104:6
107:2,3 108:15,19
109:1,18 110:8,12
110:15 112:18
113:2 116:5 117:2
117:11 119:12
121:7 123:5
ordered  33:20
orders  9:24 51:24
101:10,12 103:13
120:21
ordinary  52:14,23
68:21 73:11 75:4
75:7,9 107:8
114:17
original  29:3
originally  10:23
102:23 107:8
109:17 116:5
outlined  83:5
outset  13:22 16:19
16:21 18:4 34:24
51:20 105:18
outside  44:16 55:1
outstanding  27:6
27:19,24 77:14
93:4 107:11
110:23

outweigh  82:25
override  69:6
oversight  52:20
oversupply  33:1
overview  47:25
50:13
overwhelm  19:11
owed  49:14 61:10
owned  17:3 31:5
49:24
owners  19:9 40:18
ownership  11:24
11:24 60:8 118:2
owns  27:5

**p**

p  3:1,1 9:1
p.m.  61:7
page  27:22,23
29:16 75:12 123:4
paid  45:2 46:16
68:5 108:19
113:23 114:8
pandemic  29:10
111:5
panicked  32:21
papa  14:14,23
papers  10:7,24
20:14 36:12 75:23
107:11
paragraph  75:12
92:4
parent  18:21
35:12 43:2 46:14
50:2 93:1 94:12
part  10:15 16:18
23:7 25:25 42:1
90:1,2,4 107:20
participants
22:20 35:20
particular  11:18
25:14,15 37:25
72:11 82:20 84:8
87:4,15 89:6 90:4

94:11,16 96:12
100:25 101:4
104:24 109:10
particularly
99:16 103:5
106:13 108:6
parties  9:3 30:15
35:20 44:7 48:8
59:25 85:4 87:20
95:6 96:22 97:1
103:4 106:2
partner  50:16
111:8
partners  16:2
party  23:19 27:21
30:14 47:20 48:2
51:9 55:23 57:17
57:22 58:2,7,8,10
58:22 62:9 70:23
71:7 73:9 80:4
95:8 116:23
117:13 118:6
pass  102:8
passed  24:6
path  44:7 47:12
48:3 50:12 106:8
118:3
patient  120:15,17
patrick  4:14
paul  4:16 16:12
pause  36:6 71:20
paused  41:9
pay  23:15 49:14
67:8 68:11,20,23
68:23 70:13,15
108:8 109:20
111:25 112:24
payable  27:9 34:8
paying  67:22
112:7
payment  49:24
53:3 56:1 64:14
67:25 69:7 70:5

76:22 96:4 108:20
109:3,10,21
113:10,13 114:18
**payments** 12:7
56:5 59:4 68:6
69:15,15 74:17
75:7 77:19 110:20
113:21 115:15,16
**payroll** 55:5,13
**pecher** 6:20
**peculiar** 99:22
**peer** 20:3,3
**peg** 31:18,19,20
32:14,18,21,25
**pegged** 29:20
**penalized** 114:14
**penalties** 115:16
**pending** 95:22
**penny** 33:6,16
**people** 9:6,7 11:21
18:12,13 20:9
32:7 33:2 34:4
35:6 38:4,11
39:22 64:17 65:21
68:2 72:3,12
79:16 82:18,23
89:5,6 98:12,13
98:14,23 99:9
100:8,12 110:16
119:1
**people's** 82:23
**percent** 15:5
23:10 28:7 31:6,6
32:6 82:18 111:3
111:15 112:5
**percentage** 44:21
44:24
**perception** 98:14
**perfect** 122:3
**period** 23:23 58:1
60:9 70:7 97:21
104:16 114:9,18
115:14 117:3,5

118:9 119:2
**periods** 65:22
118:20,23 119:3
**permission** 63:23
**permit** 10:12
108:11 118:11
**permitted** 10:21
**person** 15:16
**personal** 47:2
55:22,25 56:4,8
58:14,23 59:8
66:3 68:13 114:12
114:12
**personally** 13:9
14:1 78:19
**personnel** 68:17
**perspective** 11:2
14:10 35:5 96:12
**petition** 67:20
68:20 93:3 104:2
104:7
**petitions** 75:4
**phases** 29:10
**philip** 6:11
**phone** 13:11
86:10,11 87:2
**phraseology** 39:3
**physical** 80:12
**pick** 23:9 39:10
43:22
**picture** 91:2
**piece** 88:18 108:5
**pizza** 14:12 20:5
**pizzas** 14:14,20
14:23 15:3,6
20:19
**place** 10:8 38:19
94:13 95:24 96:11
110:6 116:9 118:4
**placed** 15:16
**places** 12:5
**plainly** 11:20

**plan** 10:14 16:24
18:19 23:13 36:5
36:9 40:15 44:3
44:10,11,13 45:2
45:5,19 46:2,18
47:11,20,21 48:4
61:15 62:8,9,13
64:9 98:11,14
105:1,4,6,13,19
105:25 106:1,18
116:17
**planning** 106:12
**plans** 121:17
**platform** 17:16
20:25 21:3 22:2
22:21 23:3 24:7
24:18 25:21 26:17
40:8 42:2 45:10
46:24 49:24 55:17
55:23 57:7,9 59:3
61:4 62:7,14,18
62:19 64:7,14
79:23 80:9 95:19
107:23 108:1
110:2 111:4,16,19
112:6
**platforms** 52:15
79:16
**play** 28:9 33:8
**player** 88:14
**playing** 22:19
**pleadings** 19:18
44:5 90:11 120:6
**please** 9:7
**pledge** 60:4
**pllc** 3:13
**pm** 122:9
**pocket** 68:11 69:1
**podium** 102:8
**point** 10:12,19,20
15:19 17:22 28:23
30:9 31:17 32:11
46:17 54:24 76:21

77:1 105:23 114:7
**points** 45:10
**policies** 107:9
**pool** 25:15 35:22
**poorsafar** 5:14
**position** 60:15
66:25 80:12
**positions** 54:22
**possession** 82:20
**possibility** 23:24
**possible** 13:25
47:18 50:11,12
65:4 66:14 73:13
110:4
**possibly** 34:16,20
97:25
**post** 29:10 75:3
**posted** 15:9 28:18
**potcovaru** 5:3
**potential** 9:20
20:6 65:18 105:10
116:21
**potentially** 69:3,4
69:6 83:1 96:7
114:15
**pp** 57:18
**practically** 30:1
**practice** 24:6
**practices** 99:19
**pre** 58:25 59:5
68:20
**precautionary**
116:8 118:10
**precedent** 74:8
**precious** 20:10
**precipitous** 28:10
**predominantly**
19:1
**prefacing** 73:6
**prefer** 103:7
117:4
**preference** 73:1
103:2

**preferences** 9:25
**preferred** 89:6
**prefers** 104:5
**prefunded** 59:9
**prepare** 78:8
**prepared** 81:10
  89:10,15 99:2
**preparing** 78:9
  106:6
**prepetition** 70:5
  77:14,15 108:18
  110:23 116:24
**prescribe** 39:21
**prescribed** 81:11
**presence** 95:1
**present** 4:8 11:4
  72:8 73:4
**presentation** 9:18
  10:2,5,16 13:4
  15:8,10 16:23
  73:2 75:22 98:1
**presentations**
  13:18 120:11,12
**presented** 94:12
**presenting** 77:10
**preserve** 47:15
**pressed** 92:19
**pressing** 47:19
**pressure** 32:11
**presume** 100:3
**pretty** 11:5 14:9
  20:12,25 28:19
  29:17 119:4
**prevention** 17:14
**previous** 51:23
**previously** 15:18
  15:23 18:8
**price** 22:24 24:15
  29:21 32:22,24
  33:2,4 118:14
**pricing** 31:15
**primarily** 111:9

**primary** 68:22
  101:10
**prior** 9:24 88:2
  103:15
**priorities** 46:3
**priority** 46:14
  113:18 120:22
  121:11
**privacy** 79:3
  123:7
**pro** 5:21 45:3,7,14
**proactive** 35:3
**probably** 15:15
  19:4 27:25 68:9
  97:19 98:13 99:20
  109:19 116:12
  118:17 121:10
**problem** 34:1,10
  39:14 65:21 75:17
  99:6 106:10,17
**problematic**
  48:24
**procedural** 116:8
**procedurally** 70:9
**procedures**
  102:22,25 103:3,8
  116:9
**proceed** 9:8 66:2
  84:24 89:11 95:9
  103:7 116:17
**proceeding** 18:8
  93:8,10,17 94:10
**proceedings**
  33:21 92:22 122:8
  124:4
**proceeds** 120:13
**process** 21:5 22:1
  23:19 33:25 36:1
  36:5,9 39:15 44:2
  44:6,6 45:18 47:9
  47:17 50:3,8,14
  62:16 64:22 65:5
  65:20 85:13 89:3

95:3 105:5,7,25
  106:18 116:17
  118:17
**processing** 49:24
  66:21 111:14
**processor** 58:22
**producing** 40:10
**professional**
  15:21
**professionals** 16:9
**profile** 117:23
**profit** 54:19
**program** 23:10
  24:25 25:2 26:4
  40:11 45:11
**programmer**
  14:11
**programs** 40:11
  107:12 108:3
  110:19
**prohibitively**
  73:12
**prohibits** 95:5
**project** 23:20 26:3
**projects** 112:2
**proper** 59:2 65:24
  82:3
**properly** 51:25
**property** 11:13,14
  12:4,14,21 17:18
  17:23,23 37:18,20
  38:1,4 40:12
  44:16,19 60:8
  79:1 95:9 98:2,3
**proposal** 48:6,7
**proposals** 85:16
**propose** 80:3
**proposed** 15:10
  15:25 16:4,17
  51:24 52:11 63:22
  65:8 66:9 83:23
  85:21 86:22 93:24
  94:5 96:25 97:5

102:16,25 108:19
  117:20
**proposing** 10:11
  10:13 40:17 79:25
  87:4
**proposition** 30:10
  113:25
**proprietary** 22:23
**prosecute** 66:18
**protect** 93:12
  116:21 118:22,23
**protection** 65:1
  79:6,7
**protections** 97:2
  97:11
**protective** 108:24
**protocol** 30:25
  85:14
**protocols** 26:22
  29:13 107:21
**provide** 24:8
  45:24 60:1 63:16
  63:19 64:25 70:4
  78:15 79:22 80:3
  80:13 82:20 91:9
  91:12 96:22,24
  100:5,22
**provided** 22:19
  53:10 65:4 73:24
  80:1 82:15,16
  96:19 100:11,16
  106:19
**provider** 26:21
**provides** 22:1,22
  29:17 30:14 45:19
  55:25 56:19 59:13
  59:14,17 61:8
  96:3
**providing** 65:12
  100:2,4
**provision** 42:20
  42:21 66:5 72:20
  75:18 83:13 92:7

99:22,23 101:16
**provisions** 11:25
85:22 93:11 94:25
94:25 95:13 97:11
100:4
**public** 82:25 93:1
**publicly** 23:11
91:18
**publishing** 82:23
**punt** 113:1
**purchase** 30:4
53:24 54:10 64:14
**purchasers** 47:20
**purchases** 54:1,4
**purely** 116:8
**purported** 52:5
71:14 101:1
**purportedly** 53:8
**purporting** 96:7
**purpose** 29:24
99:9,12
**purposes** 65:6
76:12 78:16 82:16
101:25
**pursuant** 26:11
27:16 77:16 78:7
78:24 92:23 95:12
**put** 10:7,14 14:9
24:19 27:13 37:8
84:20 89:25 96:17
**puts** 66:25 100:8
**putting** 23:6,22

**q**

**qualified** 85:19
**quality** 22:19
**quarterly** 74:18
**question** 16:18
17:16 20:7 21:21
42:14 46:4 49:12
60:14 61:24 68:22
69:12 89:3,17
105:10,12 119:22

**questionnaires**
22:10
**questions** 10:4
11:9 13:18,20
15:16 16:19,25
27:2 35:5 36:7,12
41:15 43:11,24
46:25 47:6 50:15
50:17 59:12 61:22
71:21 80:14 86:20
86:25,25 89:13
94:4 103:8,16
107:1 110:7,11
117:10 120:13,15
**quickly** 15:12
18:16 22:15 26:14
32:18 34:18,19,20
50:11 98:11 109:8
121:8
**quite** 76:15

**r**

**r** 1:21 3:1 9:1
124:1
**rachel** 3:13,18
97:16 98:25
119:14
**rahman** 5:7
**raise** 18:13 73:7
74:3 86:24
**raised** 17:22 74:5
75:2 76:11 77:12
**rata** 45:3,7,14
**rates** 28:16 45:12
85:18
**rattled** 28:25
**ray** 35:14
**reach** 118:12
**reached** 14:17
113:7
**reaches** 41:1
**read** 15:1 18:1
19:18 20:21 37:24
38:1

**reading** 103:12
**ready** 9:3 84:23
**real** 29:6 79:13,18
82:21,24 112:7
**realized** 32:15
77:24
**really** 11:17 14:6
21:11 22:18 29:17
30:18,22 36:8
43:17 44:1,1
46:19 47:10,22
51:21 52:22 57:6
57:7 62:23 64:7
64:21,25 66:1,2
67:14 69:22,24
70:16 74:22 76:19
79:22 87:21 98:15
99:13,20 101:3
102:5 105:18
113:19,22 117:13
119:6
**reason** 10:15
27:25 41:9 47:10
69:24 70:12 91:11
**reasonable** 85:19
114:2
**reasonably** 80:5
**reasons** 24:2
68:18
**reassess** 106:9
**reassign** 112:1
**reassigned** 112:3
**recall** 32:5 84:8
**recalled** 121:18
**receive** 45:3,7
46:13 48:6 86:6
**receives** 58:11
**receiving** 65:25
89:4
**recess** 84:22 86:14
**recipient** 20:2
**recipients** 41:13
41:13

**recognition** 33:23
35:13 93:11,20
**recognize** 93:9
**recognized** 88:14
**reconcile** 17:13
61:14
**reconciles** 59:9
**reconciliation**
37:21
**reconciling** 65:20
**record** 25:15
37:16 102:15
124:4
**recorded** 20:13
**recourse** 66:2
**recover** 66:21
67:5
**recoveries** 44:12
45:1
**recovery** 44:24
45:15,21,22 46:13
46:15
**recruit** 68:17
**redact** 78:18,23
79:25 82:17
**redacted** 80:20,24
**redactions** 102:4
**redeemable** 28:8
**redline** 102:24
**reduced** 117:3
**reducing** 47:7
**refer** 53:25
**reference** 88:22
**references** 94:2
**referred** 10:19
20:15
**reflected** 35:2
**reflects** 83:24
**regard** 11:21 13:5
94:16 98:24 99:7
**regarding** 32:2
72:5,10 74:11
75:1,18 83:23

102:4 104:23
105:13
**regardless**  18:18
**register**  21:16
96:1
**registers**  86:5,8
**regulated**  21:22
**regulation**  79:6,7
**regulations**  12:19
110:1
**regulators**  67:18
**regulatory**  16:13
16:13 21:16,17
100:20
**rehypothecate**
60:5
**reilly**  7:21
**reimbursable**
114:7,9,11
**reimbursed**
115:10,14
**reimbursement**
113:17,17,23
**reimbursing**
114:17
**related**  53:20
54:11 80:5 85:25
86:7 109:23
**relating**  81:13
**relationship**  13:6
42:2 66:16
**relative**  117:7
**relatively**  69:23
70:10,14 119:8
**release**  41:7
**relevant**  18:5
74:23 80:4 91:8
91:10
**reliability**  22:24
**reliant**  20:16
**relied**  31:19
101:24

**relief**  22:4 36:21
50:25 51:7,19,20
51:25 52:3 67:1
70:19 71:22 77:17
79:2,20 81:19,19
81:23 82:2,3,16
94:3 97:2,9
100:12,14 101:7
107:12 108:15
109:2,4 110:25
111:1 112:12
113:1 114:16
115:17,19 116:7
116:23
**remain**  83:10
**remainder**  102:18
**remains**  46:18
57:25
**remedies**  93:14
**remember**  83:4,6
84:2,6 92:6
101:19 102:5
119:3
**reminding**  121:4
**remits**  59:10
**remove**  94:2
**removing**  61:16
**renewing**  108:3
**rent**  55:6
**renzi**  16:14
**reopen**  62:13
95:19
**reopened**  12:10
**reopening**  62:8,18
**reorganize**  73:18
79:24
**reorganized**  45:4
45:22
**repeat**  50:9
**repeatedly**  24:13
**repeating**  120:14
**repledge**  60:5

**replenish**  59:6
**report**  61:8,11
104:4 107:4
**reporting**  36:3
52:19
**reports**  104:12
**represent**  9:8
97:18
**representative**
16:12 92:21 93:16
93:23 123:11
**representatives**
74:11
**representing**  87:2
**reputation**  68:1
**request**  37:9
58:16,18 73:21
77:25 80:5,15
86:20 90:19 92:9
93:8 94:1,5 97:13
101:18 104:14
106:7 115:10,13
**requested**  51:19
58:20 79:20 94:15
112:17
**requesting**  97:2,9
107:3
**requests**  73:11
97:6
**require**  107:18
109:3 110:4
111:23 117:16,24
**required**  50:8
51:7 58:25 95:15
95:25 106:16
107:21 108:10
111:19
**requirement**
81:20 104:12
**requirements**
22:7,8 71:1 93:18
99:10

**requires**  81:9,13
81:16 85:8 106:18
108:2
**requisite**  106:5
**reserve**  29:21
**reserves**  30:11,15
**resolution**  118:12
**resolve**  77:20
87:17 88:7 108:16
113:2
**resolved**  72:5
76:11
**respect**  16:11
33:17 48:2 56:17
59:12 60:24 61:18
69:13 70:20 72:24
77:17 78:22 79:16
82:21 86:7 100:1
105:23,25 113:1,6
113:11 114:4
**respected**  97:4
**respectfully**  80:15
86:20 94:5 97:12
103:9 107:2
**respective**  61:10
**respects**  105:1
**rest**  19:11 102:9
**restart**  62:4,7
**restarting**  62:18
**restating**  94:24
**restrictions**  21:18
**restructuring**
50:14
**result**  42:1 68:7
101:18 109:21
113:14
**resulting**  73:15
**resume**  108:1
**retail**  22:18 26:24
**retain**  19:1 84:12
85:2,8,24 87:4
**retained**  97:17
99:3

retaining 60:9
  85:5
retention 89:20
  90:7 123:9
retentions 88:2
return 23:6 24:9
  47:17 109:13
returned 18:10
revenue 54:24
reverse 64:18
review 17:14 36:4
  37:11,20 66:10
  78:16
reviewed 9:23
  51:23 85:16
revise 70:4 104:18
revised 51:24
  52:10 66:9 85:21
  86:23 93:24 97:5
  102:24 103:9
  107:3 109:18
  110:8,15 116:5
revision 73:20
  101:11
revisions 109:19
revisit 106:9
revolve 11:12
reward 45:10
rewards 21:2
  23:21,24 45:11
richard 4:6 72:1
  80:18 83:16 89:22
  101:15 102:2
  104:21 113:5
richardson 3:5
rick 5:2
rickly 5:20
riffkin 8:8
right 9:5 24:22
  25:7 27:6,22,23
  29:14 34:21 36:24
  38:24 41:13 43:2
  50:1 51:11,13,16

60:2,18 62:4,10
  63:22 64:2 65:19
  65:22 66:21 67:4
  67:7 68:22 69:17
  70:8 72:4 74:2
  76:14 77:7 78:2
  82:5,6 84:2,10,15
  84:23 86:12,15,22
  87:24 88:21 89:18
  91:5 92:1,5 94:7
  98:15 100:24
  101:19 102:20
  103:11 104:11
  106:10 109:15
  110:10 112:19
  115:9,18,21 116:2
  119:9,25 120:6,20
  122:2
rights 12:21 41:20
  60:8 63:23 66:15
  66:17,22 96:18,19
ring 14:23
rise 30:9
rises 29:8
rising 28:16
risk 60:11 78:25
  79:13,18 82:21,24
  115:16 119:2
riskiest 31:7
rivera 4:11 84:7
road 124:21
roadmap 79:22
robert 5:8 6:19
  7:22
rode 33:15
rodriguez 8:10
role 85:19
roles 15:22
roll 50:1
rose 47:2
rosen 6:21
routine 29:23

rule 51:7 52:1
  70:13,17 81:7,9
  85:7 89:8 94:2
  104:3,12,15
  106:16 115:5
ruled 83:3 84:3
rules 69:17
ruling 83:6,17,20
  83:21,24 84:4
  94:15,16,18 98:22
  99:16 101:3 102:3
rulings 51:23
  88:25 123:3
run 92:12
running 47:16
  111:20
ryan 5:17 7:14

           s

s 3:1 9:1
s&p 28:17,18,21
sake 108:6
sale 48:2 49:23
  53:24 54:10 62:9
  87:22 105:7,13
salls 6:22
sanchez 4:18
sandler 5:10
sarah 6:3
sas 101:13 103:12
satisfaction 76:11
satisfied 85:14
satisfy 22:6 93:18
saving 72:8
savings 23:22
saw 10:24 20:14
  107:10 109:19
  116:12
saying 37:16
  38:14 81:5,21
  90:25 99:15
says 40:5 41:2
  42:15,16,21 70:15
  98:24 99:14 101:5

101:5
scenarios 55:20
schechter 7:22
schedule 105:24
scheduled 33:24
schedules 81:9,10
  81:13 103:23
  104:1 105:10
  106:6 123:17
scheduling 106:11
scheme 70:11,14
scope 98:22 99:1
  99:5
score 113:15
  114:15
scott 35:17
scurria 5:11
se 5:21
seal 81:3
seasoned 43:14
second 18:20 23:1
  24:23 44:12 53:2
  90:12
seconds 86:11
section 48:20
  70:20 71:2 78:24
  81:8 95:16 96:14
sections 95:13
  96:20 97:8 100:7
  100:12
sector 13:21 24:4
  33:13
secure 19:25 20:1
securities 12:18
  25:1
see 18:15 21:5
  27:6,10 28:20
  29:1 36:6 42:23
  47:12 71:20 74:19
  74:20,21 82:1
  86:22 91:11,13
  114:1 117:2

[seeing - soon]                                                                                      Page 28

seeing  99:8
  120:19
seek  35:13 48:17
  79:22 81:25 95:15
  100:12
seeking  22:5
  36:22 50:4,25
  51:20,25 52:3
  61:4 62:4,6 63:8
  63:14,16 65:3
  66:12,14 67:2
  69:6 70:20 71:18
  71:22 77:16 78:8
  82:17 93:19,22
  94:4,23 95:3 96:8
  96:19 100:6,14
  103:24 104:2
  105:24 107:12
  109:20 110:18,25
  112:12,14,25
  116:6
seeks  78:18,23
  98:21
seen  28:16 29:7
segregation  12:20
self  57:24 58:7
  93:14
sell  20:5,24 24:12
  33:14 50:3,4 58:4
  60:5 87:5 119:1
sellers  22:17
selling  32:11
  57:10
sells  54:13,18
sen  54:9
send  39:5 61:11
  121:10
sender  20:2
sending  71:16
sentiment  32:2
separate  40:22
  42:7 52:22 78:9
  78:11 114:13

separately  60:7
series  26:20 49:25
served  15:18,23
server  49:24
serves  21:8 22:16
  27:21 42:4
services  15:22,23
  18:7 21:25 23:1
  26:21 56:1 96:4
  112:1
serving  16:14,16
set  23:21 32:15
  48:1 59:16 90:16
sets  90:20
settle  54:9
settlement  24:5
seven  119:5,7,12
share  14:8 45:4,7
  45:14
shares  93:3
sharing  48:10
shelby  7:24
sheryl  5:24 88:5
shoes  65:5 89:2
short  28:8 97:21
  118:8
shorter  117:4
shortly  93:4
show  25:9 26:14
  81:4
shrem  8:11
shut  69:4,8,9,11
shuts  70:6
side  27:2,6,22,23
  29:14 50:1 91:14
  91:19 105:22
sides  18:14
sign  59:15
signatories  71:9
signature  52:25
  53:10 70:21 124:7
signed  48:8

significant  24:10
  27:24 30:5 44:19
  58:1 111:18
signs  39:17
silent  47:1
silvergate  52:25
  53:7,23 54:6,6,14
  54:25 58:12 69:12
  71:9,12,14
silvergate's  54:8
silverschotz  7:18
similar  26:3,5
  39:4 46:21 52:15
  63:3
similarly  108:13
simplicity  27:3
simplistic  37:4
simply  38:7 87:19
  92:7 100:7
singaporean
  33:12
singer  5:23
single  43:16 75:20
sipc  18:9
sir  21:14 24:24
sit  15:7 27:18 34:7
  46:5
sits  27:19,20
situation  19:7
  117:1
six  28:24 107:9
size  30:14 103:6
skewed  118:24
skills  111:19
slade  5:5
sleep  62:10
  107:24
slide  15:12 17:1
  19:16 20:21 21:5
  21:12 22:14 26:13
  26:20 27:1 28:15
  28:20 29:1,16
  32:12 33:12,19

34:18 35:2 43:22
  44:1,9 47:24
  48:13
slides  36:8
small  18:23 24:14
  69:23 70:11,14
  88:13,13 109:20
  119:8
smaller  56:22
smith  3:9 16:3
  77:5,5,9 102:8,12
  102:15,16,22
  103:19,22 104:18
  105:14,17 106:25
  107:6 108:23
  109:11,16 110:13
  112:14,22 113:8
  114:6,21 115:1,3
  115:13,20 116:1,3
  117:15,18,22
  118:16
smooth  13:25
snapshot  61:8
social  79:16 82:23
  97:23
sofa  104:9
sold  11:22 32:5,21
  87:20
sole  60:11
solely  114:16
solicited  85:16
solus  15:24
solution  48:9
  57:24 58:8 80:21
  116:20
solutions  124:20
soma  4:15
somebody  69:21
  82:1 87:1 100:9
sonya  2:25 124:3
  124:8
soon  39:14 48:11
  108:1 110:4

120:19 121:2
**sophistication**
  22:7
**sorry**  46:11 60:21
  82:9,11 87:10,12
  92:3,18 100:18
  101:9 107:2 112:9
  117:18
**sort**  12:14 47:24
  98:5 104:14
**sought**  49:3 67:8
  82:2 96:12,25
  116:23
**sound**  86:24 91:21
  99:14 112:20
  120:14
**sounded**  10:20
**sounds**  24:25
  115:6 119:7
**source**  113:13
**southern**  1:2
  33:23 70:22 85:13
**space**  14:2
**spaces**  55:6
**speak**  9:7,7 88:3
  90:13
**special**  35:24
**specific**  23:11,18
  23:20 24:3 39:20
  40:7,22 44:21
  45:23 99:17
  108:15
**specifically**  36:9
  72:19,24 75:11
  76:23 78:22
  108:21
**specifics**  14:7
**speculating**  38:11
**speed**  10:17 14:6
  22:25 97:21
**spend**  23:14 74:13
  115:6

**spending**  29:9
  88:8
**spent**  14:5 72:7
**spiral**  32:24
**sponsor**  48:2
**sponsors**  47:20
**spread**  54:19,21
  54:24 119:6
**square**  3:22
**squares**  105:12
**stability**  29:21
**stabilization**  11:1
**stabilize**  10:25
  27:14
**stabilized**  30:22
  30:22
**stable**  71:5
**stablecoin**  30:3
  31:3,8,10,11
**stablecoins**  29:19
  29:22
**stacy**  4:21
**staffing**  113:11
**stake**  60:5 115:7
**staked**  26:3 31:5,6
  31:7 32:5,6 33:13
  33:17
**stakeholders**
  73:18 93:14
**staking**  23:17,18
  25:23 31:4 32:7
  60:6
**stand**  89:2 105:6
**standalone**  40:22
  44:3,10 48:4
**standard**  69:22
  115:18
**standing**  38:22
  107:25 109:25
  110:5
**stapleton**  4:19
**start**  47:5,6 74:5
  120:7

**starts**  39:15
**state**  72:2 96:7,7
  96:11,12 99:13,21
  107:17,19 108:11
**state's**  96:2
  107:20
**stated**  60:12 89:24
  89:25 98:2
**statement**  16:21
  81:9,15 89:19
  105:24
**statements**  81:10
  90:25 103:25
  106:6
**states**  1:1,12 4:1
  21:24 48:16,17
  49:2,5,6,9,15
  67:17,19 71:23
  80:2 91:9,15,17
  92:7,9,13 94:14
  95:21,22 96:17,25
  99:10 100:1,3
  111:6
**statutes**  12:18,20
**stay**  48:10,21
  49:18 52:7 94:24
  95:4,5,6 98:4,9,22
  98:24 99:11,16
  100:13 101:5,18
  123:13
**staying**  93:13
  108:24
**steinman**  6:23
**step**  19:21 32:13
  65:5
**stephen**  7:7 51:1
**steps**  35:3
**steve**  15:14
**stink**  69:25
**stipulates**  86:4
**stock**  93:2,4,5,6
  116:11 117:25
  118:14 119:17

**stockholder**
  117:21
**stockholders**
  119:5
**stocks**  11:16
  20:10
**stop**  19:20 64:22
  66:1
**stopped**  10:20
  11:3
**store**  12:6 20:6,24
  21:2
**stored**  20:12 23:3
  24:7
**storing**  23:7
**story**  14:9 77:3
**stout**  6:24
**straightforward**
  9:23
**strategic**  16:16
**streamlining**
  103:4
**street**  3:5,15 4:3
  30:2
**stretto**  3:20,21
  15:10 16:17 84:13
  85:2,6,10,19 86:4
  86:6 87:2,9,13,15
  87:19 89:25 91:2
  91:5 92:7 123:9
**stretto's**  85:18,25
  86:5 90:15
**strictly**  115:5
**structural**  46:2
**structurally**  46:9
**structure**  25:9,11
  27:3 46:12 117:7
  118:2
**structured**  38:3
**sturdivant**  14:21
**subject**  28:3 37:10
  37:20 41:19 45:5
  96:15 108:15

117:23
**submit**  34:12
50:25 104:18
107:3 110:12
**submitted**  16:6
51:6,10
**subsequently**
58:21
**subsided**  13:15
**substantial**  85:11
117:23
**substantially**
53:15
**substantive**  116:7
**success**  52:4
**suffer**  67:22
**suffice**  64:13
**sufficient**  55:24
83:11
**suggest**  38:4
94:15
**suggested**  73:14
94:9 118:24
**suggesting**  32:8
37:15 38:23
**suite**  124:22
**suited**  29:22
**sujeet**  8:4
**summarily**  82:3
**superficial**  87:15
**superior**  92:23
**superpriority**
63:16
**supplemental**
86:2 89:25 90:16
90:20
**support**  51:6
111:3,16 112:6
**supposed**  32:13
69:18
**sure**  10:6 11:8
13:10,25 15:15
31:20 37:11,14

41:12,18 42:13
45:17 49:11 51:25
60:14 65:24 66:9
74:24 76:15 77:9
83:23 87:4 88:4
88:15 89:23 91:10
91:16,16,18 92:6
92:10,13 99:11,13
105:14 106:19,21
108:13,23 112:11
118:3 119:4,6
120:23 121:3,11
121:25 122:1
**surety**  107:10,22
108:3,8
**surprised**  99:20
99:25
**surprises**  109:6
**surveys**  22:22
**susan**  7:13
**susceptible**  64:10
**suspended**  93:5
**suspense**  62:3
**suspension**  10:8
108:1
**sussberg**  3:10 9:4
9:9,10,17 10:6,10
10:13,22 13:8,13
13:15 18:23 19:13
19:16 21:14,21
22:10,14 24:24
25:8,18,25 26:5
26:10,13 36:18
37:3 38:7 39:2,8
40:6,21 41:4,22
42:9,19,25 43:6,9
43:15,23 44:14,18
45:8,16 46:6
48:22 54:17 60:12
61:5 62:7 74:9
105:17 119:11,11
119:21 120:2,17
120:24 121:6,14

121:19 122:3,5
**sussman**  5:22
74:9
**sweeps**  54:15
**swept**  54:25 55:10
57:4 58:1
**swiftly**  106:19
**swings**  34:9
**system**  11:6 20:4
23:7 24:19 30:18
30:20 32:15 37:11
40:17 42:1 52:13
52:18,22,24 53:2
55:16 57:15 58:5
58:6,19 62:12,13
**systems**  26:23
52:15,22
**szydlo**  6:25

**t**

**t**  124:1,1
**ta**  6:7
**tailored**  22:5 52:1
**take**  9:5 19:21
39:23 40:14 46:2
65:23 84:18 86:11
102:8 118:4,22
119:25
**taken**  35:3
**takes**  95:23
**talia**  4:22
**talk**  14:18 16:11
16:24 17:6,14
19:21 21:12,23
23:12 27:11 28:1
28:7,10 30:24
33:11 36:9 44:2
44:11 54:16
**talked**  29:5,19
34:24
**talking**  37:18
77:24 98:10
114:20,20,25

**talks**  18:7 20:21
44:1
**tangible**  11:14
30:17
**taousse**  6:9
**target**  55:9
**targeted**  59:5
**task**  106:16
**tasked**  35:24
**tax**  116:13 117:7
117:13,23
**taxes**  109:17
123:21
**taylor**  4:13
**team**  14:5 16:5
77:20 79:17 96:11
101:24 120:4,11
**technical**  90:7
**technically**
113:18
**technique**  20:1
**technological**
112:6
**technology**  20:11
20:20
**telephonically**  4:8
**tell**  37:19 38:6
68:1 87:2 90:24
**telling**  69:20
**tells**  99:14
**tempting**  70:11
**ten**  73:24
**tend**  75:10
**teneo**  16:15
**tentatively**  106:22
121:16
**term**  48:15 49:22
50:5
**terminate**  48:18
49:3 52:5 71:14
71:17 95:12,15
96:8,13,25 101:1
101:2

**terminated** 49:10
53:8
**termination** 49:11
**terms** 27:12 57:13
58:3 65:12 69:14
70:19 71:8 99:25
**terra** 30:25,25
31:1,1,2,2 32:2
**terra's** 31:12
**territory** 9:20
74:9
**tess** 7:2
**text** 97:7
**thank** 9:12 13:16
13:22 43:11,12,21
50:18 51:18 76:9
78:5 83:12,25
84:9,25 87:12
89:12,16 91:25
92:15 98:19 101:6
101:22 102:11,12
102:14 107:6
110:13 114:4
115:12,20 116:3
119:13,24 120:9
120:10 122:3,4,5
**that'd** 121:2
**theft** 78:25 79:13
**theorized** 11:10
**theory** 31:25
**thing** 14:17 36:17
70:19 90:12
112:22 120:12
**things** 10:25
14:10 27:14 35:1
36:5 39:23 62:1
69:18 70:11,14
73:5 76:1 80:11
112:20
**think** 9:19,22 11:4
13:1,5 16:24
17:23 19:3 23:21
23:25 24:16,17

25:2 26:5 27:1
28:6 29:16 30:1
36:18 37:6 38:18
38:21 41:9 43:13
46:6,6 47:13,14
50:17 62:15 65:1
65:10,11 66:6
67:7,25 68:9 69:4
69:4,12 70:16
73:11 75:20 76:20
81:6 82:2,15,15
83:11 87:24 88:17
88:25 91:1,3,18
91:20 92:4,16
94:8 98:6 100:3
100:10,17,22
101:24 108:20
109:8,10 114:2
115:17 116:22
119:6 120:15
121:7,12 122:2
**thinks** 88:9
**third** 27:21 30:14
35:20 47:20 48:2
55:23 57:17,21
58:2,7,8,10,22
59:25 62:9 73:9
**this'll** 86:11
**thomas** 5:15 7:11
**thornton** 30:13
**thought** 35:4
60:22 111:20
117:12
**thoughtworks**
111:9,10,11,17,24
112:1
**thousands** 29:13
**threatened** 69:9
69:22 101:2
**threats** 47:3
**three** 17:20 21:11
22:15 25:9 28:1,5
33:12,17,19 34:2

34:3,5,5,25 35:8,9
35:11,21 45:15,17
73:9 85:17 120:4
**tichenor** 16:7
**ticked** 44:18
**tim** 35:21
**time** 14:6,15
23:23 29:15 30:7
33:10,14,16 43:17
44:11 47:11 51:10
54:23,23 58:1
60:9 65:22,23
68:1 72:7,8,18
74:20 76:2 84:4
86:9 88:8 93:19
97:22 99:4 104:16
105:23 106:5
118:9,12,20,23
119:2,3
**timeline** 9:13
13:24 106:8
**timely** 118:22
**times** 3:22 107:15
**timothy** 7:21
**title** 114:22
**today** 15:6,7,17
16:1 18:18 21:24
27:18,25 28:11
34:7 48:15 49:23
50:25 51:8,19,25
60:15 62:4 67:2
72:8 75:22 76:12
77:17 81:21 88:9
102:18 110:3,25
112:25 116:4
118:16 120:23
121:8
**today's** 83:24
115:22
**togut** 6:8
**token** 23:11
**tokens** 45:8,9

**told** 40:25
**tools** 50:10
**top** 48:10 78:10
78:11 98:13
121:11
**toronto** 93:2,5
94:13
**total** 27:4 53:5
104:1,9 114:8,21
**totally** 99:24
**touch** 34:15 56:14
59:11 112:23
**touched** 112:9
**track** 44:2
**tracked** 28:21
**tracy** 6:20
**trade** 14:19 15:18
18:24 20:24 21:3
21:19,20 24:5
29:24 32:1 40:1
54:20 66:7 117:21
**traded** 23:11 32:1
32:3
**traders** 31:19
32:13
**trades** 21:9 22:23
32:8 39:23 54:18
56:25 57:5 58:17
61:11 62:11
**trading** 20:23
22:8,12,15,25
24:11 31:16 32:18
33:6 46:24 49:24
62:1 88:6,19 93:5
111:20 116:9
**train** 68:17
**transact** 59:3
61:21 62:14 67:17
**transacting** 80:8
**transaction** 14:25
22:17 39:17 45:13
48:7 55:25 62:8
108:7 118:3

transactions
19:25 20:12 29:23
53:1 61:3,18 63:9
63:18,19 64:9,18
65:7 66:2 67:1
76:19 111:22
119:8
transacts 39:19
57:4,4
transcribed 2:25
transcript 124:4
transcripts 9:24
transfer 39:11,18
40:25 54:14 56:7
56:7,9,23,24 57:1
58:6,15,18,23
60:6 64:15 73:15
96:4
transferred 54:2
54:5 56:13 58:13
58:22 64:8
transfers 20:15
48:24 53:15,18
54:7 57:2,2 63:6
63:15 64:22
117:25
transmission
21:23 107:17
transmitter 48:16
48:17 49:1,6,7
95:20 96:1,2
109:24
transmitters
107:16,18
transparency
50:8 80:3 108:6
transparent
110:21
transpired 34:19
transvers 54:4
travel 67:15,17
68:3

treasuries 28:8
treasury 58:6
treat 13:1
treated 11:22 19:9
42:24
tremendous 14:6
tricky 74:24
tried 30:15 33:2
94:8
trillion 28:23
true 18:23 61:15
124:4
truly 30:20
trust 12:24,25
17:19 23:5 25:4
37:6 38:5 40:5
41:18 57:23
trustee 4:2 13:23
63:20 70:24 71:23
72:1 73:7,22,23
75:15 76:8 78:15
80:2,19 81:2
83:17 84:8 89:22
90:8 91:9,15,17
92:9,13 101:16
104:24 105:8
113:6,14 114:4
trusts 12:24 13:2
truth 90:24
try 27:14 32:25
34:21 36:23 37:3
40:2 59:3 66:25
113:2
trying 33:8 37:24
38:1 40:3 66:7
92:6 104:16
turn 36:7 43:9
50:15 58:20 87:9
87:18 110:3
turning 15:8
102:19 107:6
twitter 79:15

two 14:13,20,23
15:6 29:2 31:1
52:22 53:7,9,9,12
54:3 55:1,10
56:25 62:1 71:8
73:5 86:15 90:6
93:1 108:8 111:4
type 22:11
types 24:4 64:12
85:12
typical 46:20
117:7
typically 24:3
25:8 54:21 57:25
100:15

**u**

u.s. 1:23 4:2 13:23
27:20 28:8,9
30:12,21 63:20
70:24 72:1 73:7
73:21,23 75:14
76:4,7 78:15
80:19 81:2 83:17
84:7 89:22 90:8
101:16 104:24
105:8 113:6,14
114:3
ukraine 28:16
ultimate 46:14
92:25 118:3
ultimately 19:2
31:5 34:22
un 32:5,7
unauthorized
48:24 66:18
unbelievable
20:12
uncertain 27:15
uncertainty 47:8
uncharted 74:8
unchartered 9:20
understand 10:18
12:11,13 15:9

25:5 37:24 39:25
39:25 40:2 41:15
41:17 47:23 62:3
63:13 70:10 83:17
83:20 90:14 97:20
98:20,21 103:2
104:5,25 106:1
115:8 117:4
118:21 120:25
understandable
47:1
understanding
25:18 39:3 40:23
49:17 70:6 74:25
83:25 90:17
120:16
understands
37:14 41:11 59:20
59:23
understood 35:7
62:21 64:5,5 70:3
70:18 76:16 86:13
94:20 109:11
112:19 119:23
undue 78:25
unequivocally
38:14
unfamiliar 95:2
unfortunate
88:17
unfortunately
33:11 47:1 64:21
70:13 92:5
unique 21:3 22:21
117:6
united 1:1,12 4:1
71:23 79:6 80:2
91:9,14,17 92:9
92:13 94:14 99:10
111:6
units 95:14
universe 63:1

unnecessary
19:20
unpaid 76:23
unredacted 80:4
unsecured 12:16
12:17 18:24 19:8
36:2 41:21 46:5,7
78:11
unsuccessful 33:1
updike 4:25 88:4
uphold 20:18
uploaded 121:8
ups 28:22
upset 46:25
upside 46:1
usd 27:11 28:5,6
29:20 31:2
usdc 27:11,17
29:20 30:11,15
34:6
use 14:24 20:25
24:12 30:3 40:9
42:11 49:7 50:9
53:3 60:6,10
68:10 101:10
useful 29:25
users 26:19
uses 19:24 20:1
ust 31:3,3,4,5,6,7
31:10,12,13,15,18
31:21,22,23,24,24
31:25 32:5,6,9,12
32:16,18,20,22,24
33:3,3
ust's 33:4
usual 104:11
usually 86:24
105:3 118:24
utilities 18:25
utilize 52:13
57:21
utilizes 64:13

uzio 58:22 59:2

**v**

valuable 116:16
116:21
value 11:21,22
15:3 18:17 20:6
24:20 28:23 29:15
30:8,10 38:16
47:15 48:5 50:11
50:12 73:17 88:10
116:20
varick 4:3
various 11:25
18:12 21:10,24
27:23 35:20 40:10
60:16 62:23 76:10
108:25
vast 79:4
velez 4:11 84:7
vendor 69:15
vendors 68:7
105:20
ventures 27:5
46:10
venue 22:25
verbiage 19:4
verification 22:1
verified 14:25
55:23 56:9
veritext 124:20
versa 31:22 45:22
version 31:8
73:20 80:4 92:10
veteran 43:14
viable 48:7
vice 31:22 45:22
vicious 32:23 33:5
view 17:25 18:5
18:11 19:4 20:2
88:17 111:21,22
114:13 115:17
views 83:5

vincent 7:20
violate 98:9 100:9
violating 98:4
violation 48:20
52:7 95:16 96:14
virgin 33:21
virtual 20:19
virtually 19:24
76:5
vis 34:1,1
vladimir 8:7
vogel 35:17
volatile 15:4,4
29:22
volatility 28:3,22
29:25 30:5 34:7
voyager 1:7 3:4
9:3 14:5 20:22
21:8 22:21 23:11
24:10,18 25:6,12
26:8,10 34:1,5
35:11,15 36:15
38:2 39:1,7,8,12
40:8,8 41:6 42:2
45:8,9,9 50:2 51:3
51:4 53:13,21,25
54:18 55:3,14,18
55:22 56:9 57:6
57:10,18,20 58:17
58:19 59:18,20,22
59:23 60:2 64:13
65:5,10 66:15,19
66:20 76:24 77:12
92:21,25 93:6,7,9
93:15,20 110:18
111:4 120:3
voyager's 23:3
59:25 60:4 93:12
117:23

**w**

wage 75:2,6,12
76:18

wages 75:8 76:23
77:10 108:14
110:14,19 111:12
113:19 114:13
115:21 123:23
wait 67:11 68:24
69:25 70:9 105:9
106:23,24 108:22
114:2 115:11
walgreens 30:2,4
30:6
walk 9:18 36:8,19
36:20 37:13 55:19
wallets 23:4 59:22
want 15:9 16:20
17:2,9,9 18:15,16
30:6 35:2 38:15
39:20 41:11,16
44:9 45:24 47:22
55:14 56:14 59:11
70:7,19 71:23
75:21 87:3,14
88:7 92:6,10
94:14 98:4,8
99:12 100:12
101:13 105:19
108:12 110:21
119:1 121:22
wanted 13:22
14:8,12 15:12,19
19:21 26:14 34:4
34:18 40:14 45:19
45:21 48:13 49:21
50:5 51:20 61:22
70:21 72:9,25
76:2,20 77:1
82:15 108:5
119:18
wants 57:13 58:3
81:22 118:21,22
war 28:16
watching 33:15

way   12:16 23:21
  24:8,16,17 26:6
  33:15 37:4,24
  38:19 39:4 43:24
  52:4,12 80:10
  87:18
ways   11:18 23:9
  37:12 56:25
we've   17:24 18:1
  26:18 28:16 34:15
  35:1,3,8,21 38:20
  48:17 53:10 65:7
  66:23 80:19 82:15
  82:16 87:25 91:10
  95:8 103:18 120:9
website   15:10
week   121:19,21
  121:23
week's   33:10
weekend   72:4
  121:1
weeks   14:5 17:24
  27:13 28:15 34:22
  64:12
weigh   72:2
wells   4:12
went   14:20,25
  48:22 91:21
wholly   109:22
widely   88:14 93:4
wife   121:17
wiles   1:22
williams   7:1
winddown   105:22
winston   7:2
wire   56:7,24 57:1
  57:2 58:15,23
  107:19,20
wires   53:15,18
  54:3
wish   82:5 89:10
wished   74:3 82:12

wishes   51:9,14
  81:3
withdraw   58:16
  59:4 61:4 65:16
withdrawal   10:23
  59:1
withdrawals   10:8
  10:12,21,22 11:3
  12:10 38:12 59:4
  62:2,19
withdrawn   58:21
  64:20
wondering   105:4
wording   94:9
words   44:23
  92:11
work   10:5 13:3
  25:17 34:14 36:14
  36:17,21 42:8
  44:10 46:4,5,19
  50:10 64:22 77:19
  87:3 108:16 120:7
  120:14
worked   62:1
workforce   111:10
working   13:23
  50:3 64:23 105:21
  112:2 120:5
works   12:21 38:6
  62:25 122:2
workstreams
  106:6
world   11:10 14:17
  20:19 30:23
worldwide   94:24
worst   28:18
worth   14:15 22:7
  116:22
worthlessness
  116:10 118:1
  119:22
wrap   14:4

wrong   19:4
wu   4:24

**x**

x   1:4,10 123:1
xclaim   86:6 87:1
  87:16,18 88:2,7
  88:11,22 90:4,6
  90:13,16 91:2
  92:8

**y**

yeah   37:3 39:2
  41:22 63:14 84:2
  105:16 109:5
year   14:21 28:18
  116:14
years   14:3,16
  15:21 84:3 88:11
  88:20 111:4
yesterday   101:13
  103:13
yield   23:22 24:7
  31:4 40:10
yields   40:12
york   1:2,14 3:23
  4:4 33:24 70:23
  85:13 108:11

**à**

à   34:1