

NYT
The New York Times
620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

Jul-13, 2022

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

July 13, 2022, NYT & Natl, pg B5

Sworn to me this 13th day
of July, 2022

Ellen Herb

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] Debtors. | Chapter 11<br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |

**NOTICE OF (I) DISCLOSURE PROCEDURES APPLICABLE TO CERTAIN HOLDERS OF COMMON STOCK, (II) DISCLOSURE PROCEDURES FOR TRANSFERS OF AND DECLARATIONS OF WORTHLESSNESS WITH RESPECT TO COMMON STOCK, AND (III) FINAL HEARING ON THE APPLICATION THEREOF**

**TO: ALL ENTITIES (AS DEFINED BY SECTION 101(15) OF THE BANKRUPTCY CODE) THAT MAY HOLD BENEFICIAL OWNERSHIP OF THE EXISTING CLASSES OF COMMON STOCK (THE "COMMON STOCK")[2] OF VOYAGER DIGITAL LTD:**

**PLEASE TAKE NOTICE** that on July 5, 2022 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed petitions with the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Subject to certain exceptions, section 362 of the Bankruptcy Code operates as a stay of any act to obtain possession of property of or from the Debtors' estates or to exercise control over property of or from the Debtors' estates.

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 7] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on July 8, 2022, the Court entered the *Interim Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 58] (the "Interim Order") approving procedures for certain transfers of and declarations of worthlessness with respect to Common Stock set forth in **Exhibit 1** attached to the Interim Order (the "Procedures").[3]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, a Substantial Shareholder may not consummate any purchase, sale, or other transfer of Common Stock or Beneficial Ownership of Common Stock in violation of the Procedures, and any such transaction in violation of the Procedures shall be null and void *ab initio*.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, the Procedures shall apply to the holding and transfers of Common Stock or any Beneficial Ownership therein by a Substantial Shareholder or someone who may become a Substantial Shareholder.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Interim Order, a 50-Percent Shareholder may not claim a worthless stock deduction with respect to Common Stock, or Beneficial Ownership of Common Stock, in violation of the Procedures, and any such deduction in violation of the Procedures shall be null and void *ab initio*, and the 50-Percent Shareholder shall be required to file an amended tax return revoking such proposed deduction.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, upon the request of any entity, the proposed notice, claims, and solicitation agent for the Debtors, Stretto, will provide a copy of the Interim Order and a form of each of the declarations required to be filed by the Procedures in a reasonable period of time. Such declarations are also available via PACER on the Court's website at https://ecf.nysb.uscourts.gov/ for a fee or free of charge by accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager.

**PLEASE TAKE FURTHER NOTICE** that the final hearing (the "Final Hearing") on the Motion shall be held on August 4, 2022, at 11:00 a.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on July 28, 2022, and shall be served on: (a) the Debtors, Voyager Digital Holdings, Inc., 33 Irving Place, Suite 3060, New York, New York 10003, Attn: David Brosgol; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith; (c) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Richard Morrissey and Mark Bruh; and (d) counsel to any statutory committee appointed in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, failure to follow the procedures set forth in the Interim Order shall constitute a violation of, among other things, the automatic stay provisions of section 362 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that nothing in the Interim Order shall preclude any person desirous of acquiring any Common Stock from requesting relief from the Interim Order from this Court, subject to the Debtors' and the other Notice Parties' rights to oppose such relief.

**PLEASE TAKE FURTHER NOTICE** that other than to the extent that the Interim Order expressly conditions or restricts trading in, or claiming a worthless stock deduction with respect to, Common Stock, nothing in the Interim Order or in the Motion shall, or shall be deemed to, prejudice, impair, or otherwise alter or affect the rights of any holders of Common Stock, including in connection with the treatment of any such stock under any chapter 11 plan or any applicable bankruptcy court order.

**PLEASE TAKE FURTHER NOTICE** that any prohibited purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock, beneficial ownership thereof, or option with respect thereto in violation of the Interim Order is prohibited and shall be null and void *ab initio* and may be subject to additional sanctions as this court may determine.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Interim Order are in addition to the requirements of applicable law and do not excuse compliance therewith.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] For the avoidance of doubt, the Common Stock includes the variable voting shares.

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Interim Order or the Motion, as applicable.

**TECHNOLOGY | ENERGY**

# Apple Breaks With Ex-Chief Of Design Unit

By TRIPP MICKLE

SAN FRANCISCO — When Jony Ive, Apple's influential design leader, exited the company in 2019, Tim Cook, its chief executive, reassured customers that Mr. Ive, the man who gave the world candy-colored computers, would work exclusively with the company for many years.

Not anymore.

Mr. Ive and Apple have agreed to stop working together, according to two people with knowledge of their contractual agreement, ending a three-decade run during which the designer helped define every rounded corner of an iPhone and guided development of its only new product category in recent years, the Apple Watch.

When Mr. Ive left Apple in 2019 to start his own design firm, LoveFrom, the iPhone maker signed a multiyear contract with him valued at more than $100 million. That made Apple his firm's primary client, people with knowledge of the agreement said.

The deal restricted Mr. Ive from taking on work that Apple found competitive and ensured that the designer would inform the development of future products, such as an augmented-reality headset that it is expected to ship next year, the people said.

In recent weeks, with the contract coming up for renewal, the parties agreed not to extend it. Some Apple executives had questioned how much the company was paying Mr. Ive and had grown frustrated after several of its designers left to join Mr. Ive's firm. And Mr. Ive wanted the freedom to take on clients without Apple's

*A consulting deal is cut short three years after departure.*

clearance, these people said.

Through a spokeswoman, Mr. Ive, 55, declined to comment. Apple also declined to comment.

Before leaving Apple in June 2019, Mr. Ive had grown disillusioned as Mr. Cook made the increasingly enormous company focused more on operations than on big design leaps, according to more than a dozen people who worked closely with Mr. Ive. The designer shifted to a part-time role as Mr. Cook focused on selling more software and services.

In July 2019, Mr. Cook called news coverage of Mr. Ive's frustrations at Apple "absurd" and said it "distorts relationships, decisions and events."

Mr. Cook's strategy has been validated by investors who have added $1.5 trillion to Apple's market valuation in just over two years, even as some analysts have chided it for the lull in its introduction of revolutionary devices.

Jeff Williams, Apple's chief operating officer, will continue to oversee the company's design teams, with industrial design being led by Evans Hankey and software design being led by Alan Dye. Apple's product marketing team, led by Greg Joswiak, the senior vice president of marketing, has assumed a central role in product choices.

Mr. Ive's firm, LoveFrom, will continue to work with clients including Airbnb and Ferrari, and Mr. Ive will continue his personal work with Sustainable Markets Initiative, the nonprofit run by Prince Charles that focuses on climate change.

Born and raised outside London, Mr. Ive joined Apple in 1992 and rose to lead its design team. The company was on the brink of bankruptcy in 1997 when Steve Jobs tasked Mr. Ive's team with designing the iMac. The bulbous, translucent computer became, at the time, the fastest-selling desktop in history. It restored Apple's business and turned Mr. Ive into Mr. Jobs's closest collaborator.

"He's not just a designer," Mr. Jobs told his biographer, Walter Isaacson. "He has more operational power than anyone at Apple, except me."

After Mr. Jobs's death from cancer in 2011, Mr. Ive spearheaded the development of the Apple Watch. The product failed to fulfill initial sales expectations, but it created a wearables business that last year generated $38 billion in revenue.

In 2015, Mr. Ive approached Mr. Cook about leaving Apple, according to four people familiar with the conversation. The designer was exhausted from building the consensus required to produce the Apple Watch, these people said. Mr. Cook agreed to let Mr. Ive work part time.

Four years later, Mr. Ive and Mr. Cook announced the designer would leave Apple to create LoveFrom. In a statement at the time, Mr. Cook said, "I'm happy that our relationship continues to evolve, and I look forward to working with Jony long into the future."

# Oil Prices Fall on Bleak Economic Outlook in China

By CLIFFORD KRAUSS

Crude oil prices plunged more than 7 percent on Tuesday as the American and world benchmarks fell below $100 a barrel.

The Chinese economic outlook, dimmed by lockdowns to contain Covid-19 outbreaks, appeared to be the major cause of the decline, along with increasing signs of a global economic slowdown. China is the world's leading oil importer, and the second-largest consumer after the United States.

In addition, while demand may be weakening, supplies have withstood the strains spurred by Western sanctions against Russia, which has found new markets for its oil and petroleum products in China, India and South America.

"We're past the point where the market was tightest, and I think from here we're going to see oil inventories rising and prices moderate," said Michael Lynch, president of Strategic Energy and Economic Research, an analytics firm. "China is a big part of it. They have been carrying oil demand for 10 years."

**$95.84**

The price per barrel on Tuesday of West Texas Intermediate, the U.S. benchmark, a drop of 7.9 percent.

The price of West Texas Intermediate, the U.S. benchmark, dropped 7.9 percent to $95.84 a barrel, while Brent crude, the international standard, declined 7.1 percent to $99.49. Brent briefly fell below $100 last week before rebounding. Oil prices surpassed $120 a barrel last winter after Russia invaded Ukraine.

CHINA DAILY/VIA REUTERS

A tanker arriving at Qingdao, China, with crude oil. China is the world's leading oil importer, but Covid-related lockdowns have slowed its economy.

Gasoline prices are also falling, though it takes a week or more for motorists to benefit from drops in the oil price. This is because petroleum travels through several stages of processing and marketing before it is sold at retail outlets.

The national average for regular gasoline dropped to $4.66 a gallon on Tuesday, nearly 2 cents below Monday's price, according to the AAA motor club. Prices have fallen 14 cents over the last week and 35 cents over the last month, but are roughly $1.50 higher than a year ago.

# Manchin Stands in the Way of Incentives for Electric Vehicles

FROM FIRST BUSINESS PAGE

dangerously heating the planet. Pollution from transportation is the leading source of greenhouse gas emissions in the U.S.

Mr. Manchin has already succeeded in shrinking the proposed tax credits by about a third, deleting a $4,500 incentive for consumers who purchase union-made American cars, a measure opposed by Toyota Motor, which operates a nonunion plant in Mr. Manchin's home state.

In a statement, Toyota said that while it supported tax credits for consumers to speed the transition to electric cars, awarding a premium for union-made vehicles would be wrongheaded.

"What does this say to the American autoworker who has decided not to join a union?" the company said. "It says that their work is worth $4,500 less because they made that choice. What does this say to the American consumer?"

That money was designed in part to win support from American automakers and union voters in industrial areas of the Midwest and Northeast who helped elect Mr. Biden but who are wary of a transition to electric vehicles, which require fewer workers to assemble.

Now Democrats are considering a means test to limit tax credits to consumers below a certain income level as a way of appeasing Mr. Manchin, according to people close to the talks. And he has suggested stripping out the tax credits altogether.

"There's a waiting list for E.V.s right now with a fuel price at $4, but they still want us to throw $5,000 or $7,000 or a $12,000 credit to buy an electric vehicle," Mr. Manchin said at a Senate hearing this year.

"It makes no sense to me whatsoever," Mr. Manchin said, adding, "It's absolutely ludicrous."

West Virginia drivers purchase fewer electric vehicles than almost any other state. As of 2020, there were only 600 EVs registered in the state, representing less than 1 percent of all vehicle registrations. Only motorists in Wyoming and South Dakota drive fewer electric vehicles, according to federal data.

"Combine that with the oil and gas focus and I am not sure that there is a public groundswell of support for E.V.s in that state that might compel Manchin to embrace E.V. subsidies for new vehicle purchase," said Barry Rabe, a professor of public policy at the University of Michigan.

The typical buyer of an electric vehicle earns more than $100,000 annually, is college educated and owns at least one other vehicle, according to a 2021 survey commissioned by the Fuels Institute, an energy research organization.

"These are people who aren't West Virginians, aren't people that he represents and he's raised real questions about why, in his mind, taxpayers should be subsidizing their ability to buy very pricey, new-to-market E.V.s," said Josh Freed, the senior vice president for climate and energy at Third Way, a moderate think tank.

Mr. Freed described tax credits to purchase electric vehicles as critical to spur the market and encourage carmakers to produce a high volume of automobiles, which would bring down the price per unit. A 2021 study by Cox Automotive found that 51 percent of shoppers said electric vehicles were too expensive to seriously consider.

ISSEI KATO/REUTERS

PETE MAROVICH FOR THE NEW YORK TIMES

A Toyota worker in Motomachi, Japan. Like Senator Joe Manchin III, left, Toyota opposed an incentive for union-made cars. But it supported the E.V. incentive he opposes.

Mr. Biden wants 50 percent of new vehicles sold by 2030 to be all-electric — up from just 5 percent today. To meet that goal, he wants to pair tax credits with tough new auto fuel economy regulations now being developed by the Environmental Protection Agency.

But the same litigants who won a Supreme Court decision in June that limited the E.P.A.'s authority to regulate greenhouse gas pollution from smokestacks are expected to challenge the rules under development on tailpipe emissions. That makes the tax credits even more important, said Drew Kodjak, executive director of the International Council on Clean Transportation, a research organization.

In an evenly divided Senate, Democrats need Mr. Manchin's swing vote in order to push through a budget bill without any Republican support. That has given him unusual sway over the substance of the legislation. Mr. Manchin also has personal financial ties to the coal industry, which have made him a multimillionaire.

Senator Chuck Schumer of New York, the Democratic majority leader, is making a last-ditch effort to pass a scaled-down domestic policy bill before August. Mr. Schumer has tested positive for Covid but spoke with Mr. Manchin on Monday via a video call, an aide said.

Mr. Manchin has not yet signed off on a top-line figure for the overall bill, but supporters are expecting far less than the $555 billion in climate and clean energy provisions that the House approved when it passed its version of the bill in November. Several people familiar with the negotiations said lawmakers were discussing a $300 billion ceiling for climate and energy measures.

*Fossil fuel merchants warn of a 'rushed E.V. transition.'*

On Monday Mr. Manchin dismissed the notion that lawmakers were anywhere close to a deal.

"There's a lot of talk and considerations going on and back and forth," he said, adding that any climate legislation needed to address inflation and should increase the supply of fossil fuels.

Mr. Manchin said he was most concerned about the price at the pump. "How do we bring down the price of gasoline?" he said. "From the energy thing, but you can't do it unless you produce more. If there's people that don't want to produce more fossil, then you got a problem. That's just reality. You got to do it."

Mr. Manchin's efforts to whittle down the electric vehicle tax incentives began last fall, as Senate Democrats sought to reach a deal on a much broader $2 trillion climate change and social policy bill.

In addition to eliminating the union-made tax credit, Mr. Manchin has suggested deleting the core $7,500 credit for purchase of any kind of electric vehicle, according to several people involved in the negotiations. That would leave only a $500 tax credit for electric vehicles with a battery made in America.

That would also put Mr. Manchin at odds with Toyota and the United States' Big Three automakers. While Toyota opposes the tax credits for union-made electric vehicles, last month the company joined with General Motors, Ford and Stellantis in a letter to congressional leaders asking them to expand number of electric vehicle sales that would be eligible to receive the tax credits. The current proposal would limit the tax credits to the first 200,000 vehicles sold by each individual automaker.

"Eliminating the cap will incentivize consumer adoption of future electrified options and provide much-needed certainty to our customers and domestic work force," the auto executives wrote.

One possible bargaining chip in the negotiations between Senate Democrats and Mr. Manchin could be the construction of a new hydrogen research and development hub in West Virginia. The bipartisan infrastructure law includes $8 billion to create four such regional "hydrogen hubs."

Hydrogen can be converted into electricity to power a vehicle, emitting only water vapor. But much of the hydrogen produced today is extracted from natural gas, a process that generates methane and carbon dioxide, both greenhouse gases.

Mr. Manchin and other leaders from West Virginia want the Biden administration to choose their state as a site for one of the hubs, where hydrogen would be produced using natural gas.

"We have not put the money or put the research to hydrogen the way we have on E.V.s," Mr. Manchin said this year.

One person familiar with Mr. Manchin's thinking, who asked to speak anonymously because the negotiations were not public, said Mr. Manchin could support some electric vehicle tax credits in exchange for an understanding with the Biden administration that West Virginia would be selected as a hydrogen hub.

Sam Runyon, a spokeswoman for Mr. Manchin, dismissed that suggestion. "There is absolutely no truth to this," she said.

A hydrogen industry coalition backed by oil companies including Chevron and BP is pushing for federal support for hydrogen infrastructure. Toyota has also staked its future on the development of hydrogen fuel cell vehicles — a costlier alternative that has fallen behind electric battery-powered cars.

John Kilwein, chairman of the political science department at West Virginia University, said Mr. Manchin's opposition to electric vehicle tax credits, and his effort to make the entire package smaller, plays well at home.

"West Virginia is getting redder, dislikes D.C., dislikes national Dems and dislikes the federal government," Mr. Kilwein said in an email. "Manchin gets to argue that he's the common sense West Virginian who keeps them under control."

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Chapter 11 |
| | ) | Case No. 22-10943 (MEW) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF (I) DISCLOSURE PROCEDURES APPLICABLE TO CERTAIN HOLDERS OF COMMON STOCK, (II) DISCLOSURE PROCEDURES FOR TRANSFERS OF AND DECLARATIONS OF WORTHLESSNESS WITH RESPECT TO COMMON STOCK, AND (III) FINAL HEARING ON THE APPLICATION THEREOF**

**TO: ALL ENTITIES (AS DEFINED BY SECTION 101(15) OF THE BANKRUPTCY CODE) THAT MAY HOLD BENEFICIAL OWNERSHIP OF THE EXISTING CLASSES OF COMMON STOCK (THE "COMMON STOCK")[2] OF VOYAGER DIGITAL LTD:**

**PLEASE TAKE NOTICE** that on July 5, 2022 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed petitions with the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Subject to certain exceptions, section 362 of the Bankruptcy Code operates as a stay of any act to obtain possession of property of or from the Debtors' estates or to exercise control over property of or from the Debtors' estates.

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 7] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on July 8, 2022, the Court entered the *Interim Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 58] (the "Interim Order") approving procedures for certain transfers of and declarations of worthlessness with respect to Common Stock set forth in **Exhibit 1** attached to the Interim Order (the "Procedures").[3]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, a Substantial Shareholder may not consummate any purchase, sale, or other transfer of Common Stock or Beneficial Ownership of Common Stock in violation of the Procedures, and any such transaction in violation of the Procedures shall be null and void *ab initio*.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, the Procedures shall apply to the holding and transfers of Common Stock or any Beneficial Ownership therein by a Substantial Shareholder or someone who may become a Substantial Shareholder.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Interim Order, a 50-Percent Shareholder may not claim a worthless stock deduction with respect to Common Stock, or Beneficial Ownership of Common Stock, in violation of the Procedures, and any such deduction in violation of the Procedures shall be null and void *ab initio*, and the 50-Percent Shareholder shall be required to file an amended tax return revoking such proposed deduction.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, upon the request of any entity, the proposed notice, claims, and solicitation agent for the Debtors, Stretto, will provide a copy of the Interim Order and a form of each of the declarations required to be filed by the Procedures in a reasonable period of time. Such declarations are also available via PACER on the Court's website at https://ecf.nysb.uscourts.gov/ for a fee or free of charge by accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager.

**PLEASE TAKE FURTHER NOTICE** that the final hearing (the "Final Hearing") on the Motion shall be held on August 4, 2022, at 11:00 a.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on July 28, 2022, and shall be served on: (a) the Debtors, Voyager Digital Holdings, Inc., 33 Irving Place, Suite 3060, New York, New York 10003, Attn: David Brosgol; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith; (c) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Richard Morrissey and Mark Bruh; and (d) counsel to any statutory committee appointed in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, failure to follow the procedures set forth in the Interim Order shall constitute a violation of, among other things, the automatic stay provisions of section 362 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that nothing in the Interim Order shall preclude any person desirous of acquiring any Common Stock from requesting relief from the Interim Order from this Court, subject to the Debtors' and the other Notice Parties' rights to oppose such relief.

**PLEASE TAKE FURTHER NOTICE** that other than to the extent that the Interim Order expressly conditions or restricts trading in, or claiming a worthless stock deduction with respect to, Common Stock, nothing in the Interim Order or in the Motion shall, or shall be deemed to, prejudice, impair, or otherwise alter or affect the rights of any holders of Common Stock, including in connection with the treatment of any such stock under any chapter 11 plan or any applicable bankruptcy court order.

**PLEASE TAKE FURTHER NOTICE** that any prohibited purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock, beneficial ownership thereof, or option with respect thereto in violation of the Interim Order is prohibited and shall be null and void *ab initio* and may be subject to additional sanctions as this court may determine.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Interim Order are in addition to the requirements of applicable law and do not excuse compliance therewith.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] For the avoidance of doubt, the Common Stock includes the variable voting shares.

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Interim Order or the Motion, as applicable.

Information to identify the case:
**Debtor: SAS AB, *et al.*** (see below for list of all Debtors) EIN: N/A
United States Bankruptcy Court for the Southern District of New York
Date case filed for chapter 11: July 5, 2022
Lead Case Number: 22-10925 (MEW)
Official Form 309F1 (For Corporations or Partnerships)
**Notice of Chapter 11 Bankruptcy Case 10/20**

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors and debtors, including information about the meeting of creditors and deadlines. Read both pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice. Do not file this notice with any proof of claim or other filing in the case.**

**1. Debtors' full name(s) (List of Jointly Administered Debtors): Name of Debtors, EIN Number, Case Numbers, Address:** **SAS AB,** N/A, 22-10925 (MEW), Frösundaviks Allé 1, SE-169 70 Solna, Sweden; **SAS Danmark A/S,** N/A, 22-10926 (MEW), Frösundaviks Allé 1, SE-169 70 Solna, Sweden; **SAS Norge AS,** N/A, 22-10927 (MEW), Frösundaviks Allé 1, SE-169 70 Solna, Sweden; **SAS Sverige AB,** N/A, 22-10928 (MEW), Frösundaviks Allé 1, SE-169 70 Solna, Sweden; **Scandinavian Airlines System Denmark-Norway-Sweden,** N/A, 22-10929 (MEW), Frösundaviks Allé 1, SE-169 70 Solna, Sweden; **Scandinavian Airlines of North America Inc.,** 11-1782393, 22-10930 (MEW), 301 State Route 17, Rutherford, New Jersey 07070; **Gorm Asset Management Limited,** N/A, 22-10931 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Dark Blue Limited,** N/A, 22-10932 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Deep Blue Limited,** N/A, 22-10933 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Sky Blue Limited,** N/A, 22-10934 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Warm Red Limited,** N/A, 22-10935 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Light Blue Limited,** N/A, 22-10936 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Ocean Blue Limited,** N/A, 22-10937 (MEW), 2nd Floor, Block 5 Irish Life Centre, Abbey Street Lower, Dublin 1, Ireland D01 P767; **Gorm Engine Management Limited,** N/A, 22-10938 (MEW), 4a Swords Business Campus, Balheary Road, Balheary Demesne, Swords, Dublin, Ireland

**2. All other names used in the last 8 years:** Loadax Carrier Aktiebolag; Danair A/S; Danairlines A/S; DDL A/S; Det Danske Luftfartselskab A/S; SAS A/S; SAS Accounting Services Denmark A/S; SAS Ground Equipment Denmark A/S; SAS Ground Services Denmark A/S; SAS Human Resources Services Denmark A/S; SAS Scandinavian Airlines Danmark A/S; Scandinavian Airlines System A/S; SAS Revenue Information A/S; SAS Scandinavian Airlines Sverige; The Consortium; SAS Scandinavia; and Konsortiet

**3. Address: SEE ABOVE LIST**

**4. Debtors' attorney** Name and address: **WEIL, GOTSHAL & MANGES LLP,** Gary T. Holtzer, Kelly DiBlasi, David Griffiths, Lauren Tauro, 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007, Email: Gary.Holtzer@weil.com, Kelly.DiBlasi@weil.com, David.Griffiths@weil.com, Lauren.Tauro@weil.com

**Debtors' Claims and Noticing Agent** (for Court Documents and Case Information Inquiries): SAS AB Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232, US/Canada Toll-Free Number: (844) 242-7491, International Toll Number: +1 (347) 338-6450, **Email inquiries:** SASInfo@ra.kroll.com, **Case website:** https://cases.ra.kroll.com/SAS

**5. Bankruptcy clerk's office:** United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, NY 10004-1408, Hours: Monday to Friday – 8:30 a.m. to 5:00 p.m. (ET), Telephone: (212) 668-2870. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at https://pacer.uscourts.gov

**6. Meeting of creditors:** August 18, 2022 at 1:00 p.m. (ET). **Location:** 341 meeting will be virtual with information to be provided by the U.S. Trustee. The Debtors' representative must attend the meeting to be questioned under oath. Creditors may attend, but are not required to do so. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.

**7. Proof of claim deadline: Deadline for filing proof of claim:** No date set. To be provided by notice when determined by the Court.

A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed*, *contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at https://pacer.uscourts.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

**8. Exception to discharge deadline:** The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below

**Deadline for filing the complaint:_____**

**9. Creditors with a non-U.S. address:** If you are a creditor receiving notice mailed to a non-U.S. address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.

**10. Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.

**11. Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES

OFFICE SPACE (100)

Offices–Nassau/Suffolk 130

PRIME LOCATION - SYOSSET
OFFICE: 500 to 1,000 sqft.;
Brokers Welcome
Call 516-364-9320 Mon.-Fri. 9am-3pm