Harley J. Goldstein
Matthew E. McClintock (*pro hac vice pending*)
Steven Yachik
**GOLDSTEIN & MCCLINTOCK LLLP**
111 W Washington Street, Suite 1221
Chicago, Illinois 60602
Telephone:  (312) 337-7700
E-mail:  harleyg@restructuringshop.com
         mattm@restructuringshop.com
         steveny@restructuringshop.com

    -and-

Douglas T. Tabachnik
**LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C.**
Woodhull House, Suite C
63 West Main Street
Freehold, New Jersey 07728
Telephone:  (732) 780-2760
Facsimile:  (732) 780-2761
E-mail:  dtabachnik@dttlaw.com

*Co-Counsel to Emerald Ocean Isle LLC, Amano Global Holdings, Inc., Shingo Lavine, and Adam Lavine*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| In re: | ) | Chapter 11 |
|---|---|---|
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**LIMITED OBJECTION TO DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES AND RELATED DATES AND DEADLINES; (II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DEBTORS' SALE, DISLCOSURE STATEMENT, AND PLAN CONFIRMATION, AND (III) GRANTING RELATED RELIEF**

---

[1]     The debtors in these chapter 11 cases (collectively, the "*Debtors*"), along with the last four digits of each debtor's federal tax identification number are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

1

Emerald Ocean Isle LLC ("*Emerald*"), Amano Global Holdings, Inc. ("*Amano*"), Shingo Lavine ("*Shingo*"), and Adam Lavine ("*Adam*"; and together with Emerald, Amano, and Shingo, the "*Objecting Parties*"), by and through their counsel, Goldstein & McClintock LLLP and the Law Offices of Douglas T. Tabachnik, P.C., hereby submit their limited objection to *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* (the "*Bid Procedures Motion*") [Docket No. 126],[2] and in support thereof state as follows:

## INTRODUCTION

Amano, Shingo, and Adam are equity holders in Voyager Digital, Ltd., and Shingo is a former board member and the Debtors' former Chief Innovation Officer. Emerald, an entity that Adam and Shingo control, is a potential bidder or transaction partner that, for the reasons discussed below, could hold the keys to providing creditors in these cases (and even potentially equity holders) with a materially enhanced recovery.

Subject to the concerns raised below, the Objecting Parties do not generally object to the establishment of bidding procedures, or even to an expedited bidding process (though they believe a bit more time – on the order of a week to 10 days – would be beneficial).

Rather, the Objecting Parties file this Limited Objection due to serious concerns over their own treatment in the process thus far, as well as specific aspects of the Bidding Procedures that (a) prevent evaluation and consideration of creative alternative restructurings of the type the

---

[2] Undefined capitalized terms used herein shall have the meanings ascribed to them in the Bidding Procedures attached as Exhibit 1 to the proposed order to the Bid Procedures Motion.

Objecting Parties are uniquely situated to propose, structure, and execute, and (b) limit expedited judicial review of the Debtors' discretion under the Bidding Procedures.

This last point is informed by the fact that as discussed below, Emerald's experience in trying to gain access to diligence and be deemed an "Accepted Bidder" has – at least thus far – not been good. Precious time has been wasted, and the Objecting Parties are becoming more and more concerned about the combination of (a) Bidding Procedures that limit consideration of alternative plan structures and (b) the Debtors apparent unwillingness to facilitate access for a group (Emerald and Shingo and Adam) that is most obviously and uniquely situated to propose such an alternative. Without ascribing a motive, the result of the foregoing would be to limit the competition to (a) cash bids (likely to be less than ideal) and (b) the internal restructuring proposed by the Debtors' existing management (with no economic detail) in the Plan.

If that is the case, it would be a disaster for creditors and interest holders, as it would preclude consideration of the very type of creative restructuring that can actually move the needle on recoveries. Given the timeline the Debtors are proposing, it is critical that over the next approximately 30 days all options are explored so the Debtors, Committee, and Court can evaluate a full set of alternatives.

## BACKGROUND

### I. The Objecting Parties and their involvement with the Debtors

Shingo started his first company, Ethos.io, at age 19 in his dorm as a student at Brown University. Adam, Shingo's father, is a lifelong entrepreneur who has built several successful companies and is an expert on building industry-leading platforms on limited budgets and turning around distressed organizations. Adam has also built numerous organizations and platforms over his career, including Ethos, with his son Shingo.

3

The primary retail application of Ethos was the Ethos Universal Wallet. Importantly, this was a robust *self-custody* platform that put the power of crypto directly into customer's hands, allowing them to safely store, swap, purchase, send, and receive hundreds of different digital assets.

The Ethos Universal Wallet was powered by Ethos Bedrock, a powerful high-performance blockchain abstraction architecture. Ethos Bedrock enables developers to build a variety of blockchain applications through a unique API set that unifies different blockchain protocols into a single interface. The vision for Ethos Bedrock was to create a foundational architecture for crypto services and make blockchain protocols as easy as internet protocols.

In 2018, after Shingo and Adam had grown Ethos to over 100,000 users, they sold certain of the Ethos assets to the Debtors. Amano, Shingo, and Adam became major shareholders in Voyager Digital, Ltd., and Shingo was appointed to the Debtors' board and assumed the role of Chief Innovation Officer. Today, Ethos Bedrock has been used to drive billions of dollars in transactions and still powers Voyager's crypto systems.

The combination of Ethos and Voyager – and the work Adam and Shingo put in along with the rest of the team to combine them in the form of a sleek easy-to-use app – was hugely successful. Growth exploded in 2020 and Voyager quickly went from a few hundred accounts to a few thousand. Then it became hundreds of thousands. Then millions.

By early 2021, however, Shingo disagreed with the company's direction and certain decisions that were being made. Due to these disagreements and associated concerns, Shingo resigned from the Board and left the company in February 2021.

In 2022, the company shuttered the Ethos Universal Wallet, moving the remaining self-custody customers onto the centralized trading platform. Rather than the cryptocurrency being held

4

safely in the hands of customers through self-custody, all assets were then in commingled accounts (and as we now know, lent out in the form of risky, uncollateralized loans).

## II. The cause of the Voyager bankruptcy cases

The *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "*Ehrlich Declaration*") [Docket No. 15], squarely blames the Debtors' bankruptcy filings on the downturn in the cryptocurrency market and world economy. *See* First Day Declaration, ¶¶ 3, 37-56. Although Mr. Ehrlich is correct that the crypto market is suffering a (foreseeable) downturn – this explanation ignores the much more direct cause of the bankruptcy cases.

Specifically, the bankruptcy filings are a direct result of the Debtors' management team's decisions to: (a) commingle customer deposit accounts (including eliminating a self-custody wallet as an option) resulting in account holders being relegated to unsecured creditors; (b) fuel growth by promising increasingly high interest rates or "rewards" to depositors (up to 12%);[3] and (c) use customer funds to make risky uncollateralized loans to cover costs (including the increasing costs of the rewards program). That is an extremely risky business model – bordering on unsustainable. In fact, Voyager's rewards program does not appear to have ever been profitable despite the existential risk it was posing to the company. The downturn in the crypto market was just the "straw that broke the camel's back" – not the cause.

"Between March 2021 and March 2022, the Company entered into 125 third party loans with 9 different counterparties, lending out cryptocurrency with an aggregative market value of $5.15 billion." Ehrlich Declaration, ¶ 54. There are material questions about how these loans were vetted. For example, the Three Arrows Capital ("*3AC*") loan of 15,250 Bitcoins (valued at

---

[3]     Up to 12% interest on certain digital currencies, provided that such users maintain a minimum monthly balance and keep their assets on Voyager's platform. *See* Ehrlich Declaration, ¶ 23.

5

approximately $694 million USD at the time) and $350 million USDC to 3AC was issued in March 2022 (just a few months before the bankruptcy filings) and was entirely drawn down. Ehrlich Declaration, ¶ 55.

The harm that all of this has caused to depositors is obviously massive, and directly impacted many depositors not prepared for such an event, as reflected in the dozens of letters filed on the Court's case docket. *See, e.g.,* Docket Nos. 63, 69, 75, 76, 140, 142, 146, etc.

### III. The Debtors' Plan – and the problem of trust

It is important to remember that one of the main benefits of cryptocurrency is undisputable ownership, with blockchain technology making transactions open, secure, and immutable. This remains true if cryptocurrencies are controlled by a user via a self-custody solution but was turned on its head by the commingled approach taken by the Debtors. Whatever the fine print may have stated, the Voyager app UI showed that customers "owned" the crypto as in "You Own 2 Bitcoin" when viewing "their" assets. Many customers appear shocked to learn that not only did they not own that Bitcoin, but that they are in fact now "unsecured creditors."

Even as late as June 14 – as 3AC was collapsing – Voyager released a press statement stating their lending program is "low risk", strongly implying a lack of material contagion.

> *"Voyager differentiates itself through a straightforward, **low-risk approach to lending and asset management** by working with a select group of reputable counterparties, **which are all vetted through extensive due diligence by its Risk Committee**. The company **does not participate in DeFi lending activities, algorithmic stablecoin staking and lending, or derivative assets, such as stETH**. One of Voyager's important objectives is to make crypto as simple and safe as possible for consumer use. With that mission in mind, safeguarding customer assets is a top priority."*

*See* June 14, 2022 press release (https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management) attached as **Exhibit A**.

6

Putting aside the legal ramifications of all of this, trust in the platform has – rightly – been eviscerated. If the Debtors were to simply open up the platform with current senior management and essentially the same business model – as their "stalking horse" Plan seems to contemplate – it is hard to not see how almost all customers would seek to liquidate the remnants of their portfolios.

**IV.   The alternative solution being explored by Emerald**

The alternative restructuring solution being explored by Emerald might be one of the only ways to truly create value for creditors – and potentially re-pay them in full.

Specifically, Emerald has been exploring submitting an alternative restructuring plan that, while similar to the Debtors' plan in structure, would immediately re-build trust by changing management, re-implementing a robust self-custody solution, and focusing the business around trading: eliminating the lending and debit card platforms, paring back costs, and restructuring around a mission of building a best in class self-custody and integrated trading solution. Specifically, such an alternative plan structure would likely involve:

1) Replace management with a management team led by Shingo and Adam – *i.e.*, a crypto-centric and trusted management team that (a) was not supportive of the lending business and (b) built the very proprietary self-custody solution that existing management did away with (not to mention the Ethos Bedrock technology that is powering much of Voyager's crypto platform today).

2) Institute a new culture based on innovation, transparency, and profitability. There is every reason to believe that key employees would be eager to back a crypto-centric and customer-focused restructuring plan.

3) Prioritize implementing a technical solution to ensure customer assets are safe and self-secured via Ethos SmartKey technology. In other words, re-build trust through a technological solution that ensures it.

4) Cease all lending activity.

5) Reboot the trading platform.

6) Integrate "Live Trading" to enable instant trades from self-custody.

7) Implement a sharded key vault to assist customers with key recovery and open up subscription business opportunities.

8) Provide major additional upside to unsecured creditors and incentivize customer retention through a "recovery token" in addition to VGX tokens.

Even with the vastly enhanced trust that would be engendered by such a plan, Emerald assumes that a large number of customers would likely leave the platform (though far less than under the Debtors' Plan and likely any other). Even with assumed customer attrition, Emerald believes that enough would stay – as a direct result of a changed management, technology, shared community mission, and business plan – that a scaled down Voyager could be break-even to EBITDA cash-flow positive very quickly and provide an improved return on capital to stakeholders (*i.e.*, creditors).

Such a plan might also only require a portion of the company's current capital, so a solution could involve maximizing immediate recoveries while also giving creditors the upside of equity in this new entity along with VGX and recovery tokens that could, for example, be bought back as the reorganized entity generates free cash (increasing their value).

To flesh out all of this – and propose a plan, financial projections, and an exact recovery structure – Emerald and its principals and professionals need access to the data room and Emerald needs to be able to participate under the Bidding Procedures as an "Approved Bidder."

V. **Emerald struggles to get access to information from the Debtors**

Counsel to Emerald reached out to the Debtors' counsel on July 19, 2022 to express Emerald's interest in being involved in the process and to set up a call to understand the Debtors' anticipated process and to obtain data room access. After multiple follow-up, a fairly terse call ultimately took place on July 21, 2022. Emerald's counsel left the call understanding that Emerald

8

and its investment banker should coordinate with Moelis (the Debtors' investment banker) to obtain data room access.[4]

Although not mentioned on the call – Debtors' counsel would not discuss a contemplated timeline – later that same day the Debtors filed the Bid Procedures Motion proposing the *exact timeline* that Emerald's counsel had been trying to get a rough sense of on the call.

On July 24, 2022, Emerald submitted its "Bid Documents" (as contemplated by Section A of the Bidding Procedures) in order to be deemed a "Acceptable Bidder." *See* Exhibit 1 to the proposed order to the Bid Procedures Motion [Docket No. 126]. Per their own Bidding Procedures, the Debtors have 4 business days to confirm that a Potential Bidder that sends in Bid Documents has been deemed an "Acceptable Bidder." *Id*. As of the filing of this Limited Objection (the fourth business day after the Bid Documents were submitted), the Debtors have not yet deemed Emerald an "Acceptable Bidder" (an easy decision that could have avoided at least a portion of this Limited Objection).

Moreover, also on July 24, 2022, Emerald's investment banker followed-up by email with the Debtor's investment banker (Moelis) about data room access (as he understood was contemplated after the July 21, 2022 call). Notwithstanding another follow-up, Emerald has not received a response or access.

In a case without time pressure, this would be less important. But here the Debtors are pressing an extremely aggressive timeframe – and should be doing everything possible to get interested parties immersed in diligence. Yet the opposite seems to be happening at least with respect to a group that might propose an alternative to management's proposed reorganization Plan.

---

[4] Emerald returned its non-disclosure agreement – materially unmodified from the form received by the Debtors – on July 21, 2022.

9

**VI. The Bidding Procedures appear not to contemplate alternative restructuring options**

The Bidding Procedures appear to be set up to only consider cash bids – not alternative restructuring proposals that may not involve an "asset sale." Effectively this would result in a situation where at the end of the process, the Debtors, Committee, and Court are left to choose between the best of any cash bids (which may not be great given the situation), and the Debtors' "stalking horse" Plan. Intentional or not, that would preclude alternative restructuring proposals by groups like Emerald, which for obvious reasons (some touched on above) could provide vastly better outcomes for creditors.

Equally concerning – given the foregoing and the Debtors' delay in providing data room access and naming Emerald an "Acceptable Bidder" – the Bidding Procedures propose to grant the Debtors' current management sole discretion to designate Acceptable Bidders without recourse to the bidder.

Emerald has provided comments to the Debtors (including via the redlined Bidding Procedures attached hereto as **Exhibit B**). Without getting into settlement discussions, the parties have to date been unable to resolve the issues raised. Accordingly, Emerald has no choice but to file this Limited Objection.

## OBJECTION

**VII. Bid Procedures must be designed to maximize value and must not favor existing management or any other party**

In any bankruptcy sale, the "overarching objective" is to "maximize value to the estate." *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009); *see also In re GSC, Inc.*, 453 B.R. 132, 169 (Bankr. S.D.N.Y. 2011) ("The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate."). A debtor maximizes value for the estate and its creditors by selecting a bid with the highest and best purchase price.

10

*GSC, Inc.*, 453 B.R. at 169-70 citing, *In re Fin. News Network, Inc.*, 126 B.R. 152, 157 (Bankr. S.D.N.Y. 1991), aff'd 980 F.2d 165 (2d Cir. 1992).

In turn, bid procedures must be reasonably calculated to attract all bidders and maximize value. *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) (rejecting bid procedures that fail to maximize value and undermine principles of fair play). They cannot discourage competitive bidding. *See In re Diocese of Buffalo*, 637 B.R. 701, 705 (Bankr. W.D.N.Y. 2022) (sustaining committee objection and denying debtor's bid procedures because the bid procedures discouraged competitive bidding and were not designed to maximize value). Further, bid procedures cannot be structured to provide an advantage to the Debtors (or some other party) at the expense of another. *See, e.g., In re Blixseth*, No. 09-60452-7, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) (denying trustee's proposed procedures for selling property that limited number of entities that could bid on the property and favored a bid by creditor that held a secured interest in the property).

**VIII. Given the tight timeframe, and the broad discretion the Debtors are proposing, Potential and Approved Bidders should have the right to seek emergency review of decisions they deem inappropriate**

As drafted, the Bid Procedures grant the Debtors with sole discretion to make numerous decisions about potential bids, including deciding whether a Potential Bidder is "acceptable" as a gating issue. This provision (and others like it) would be cause for serious concern in any case. *See, In re Diocese of Buffalo*, 637 B.R. 704 (rejecting proposed bid procedures that gave debtor sole discretion to deem a bid unacceptable for any reason). But it is especially concerning where, as discussed above, a logical potential bidder / plan sponsor that knows the company, has the technological wherewithal to re-build trust, and actually built much of the technology

11

underpinning the Debtors' operations, has to this point been denied access to diligence and not deemed an "Acceptable Bidder."

In order to sufficiently protect the interests of all the Debtors' stakeholders and ensure maximum recovery, the Bid Procedures need to grant both Potential Bidders and Acceptable Bidders the ability to seek emergency Court intervention in the event they believe the Debtors have exercised their discretion improperly. *See In re Diocese of Buffalo*, 637 B.R. 704 (holding that with respect to determining whether a bidder is a qualified bidder, "the Court will not assign 'sole discretion' to the debtor without opportunity for judicial oversight.").

The Court should require the language Emerald added in Sections A and N of the redlined Bid Procedures to be included prior to approving the Bidding Procedures. *See* Exhibit B, pp. 2, 12.

## IX. The Bidding Procedures need to be flexible enough to contemplate and allow for alternative Plan proposals in addition to cash bids

As described above, an alternative plan scenario like what Emerald would propose would likely not be a cash bid (though it is possible it could involve a new capital component, and certainly would require a cash deposit sufficient to cover any Initial Overbid amount). Rather, such a plan would be similar to the Debtors' own Plan, but with new management, a new business plan, and a new technological solution for ensuring that customer assets are protected. This is wholly consistent with what the Debtors have professed that their objective is: putting the Plan out there as a "stalking horse" proposal to solicit other proposals to maximize value.

Unfortunately, as also noted, the Bidding Procedures as proposed do not appear to allow for such bids to be considered as part of the Auction. The requirements for submitted bids are heavily geared towards cash bids which would almost certainly cap creditor recoveries (quite possibly at a level that many will view as unsatisfactory). Again, this may result in a situation where the only alternatives at the end of this compressed process are the worst ones – low cash

bids for some or all assets and the Debtors' restructuring plan (which as noted, would suffer from serious trust issues).

The relatively minimal changes reflected in Sections D, G, and J of the redlined Bid Procedures (*see* Exhibit B, pp. 4-9, 11) would cure this, by at least allowing consideration of alternative structures alongside cash bids. The Court should require that these changes be included as a condition of approving the Bidding Procedures.

### X. The Debtors should be required to provide details on their Plan

Right now, the Debtors' Plan provides no economic detail. Creditors have no idea what the Debtors believe a restructured entity would look like in a stand-alone reorganization, and thus what the equity or recovery tokens offered under the Plan (also not described with particularity), might be worth. Just as would be the case with Emerald if it submits an alternative plan proposal, or with a cash buyer, the Debtors should be required to provide the same level of detail by no later than the Bid Deadline. Again, the Debtors are the ones driving this expedited process, and at the end of it the Debtors, Committee, and the Court should be allowed to compare a full panoply of options with sufficient economic detail to do so in a meaningful way.

Dated: July 28, 2022

**GOLDSTEIN & MCCLINTOCK LLLP**

*/s/ Harley J. Goldstein*

Harley J. Goldstein
Matthew E. McClintock (*pro hac vice pending*)
Steven Yachik
111 W Washington Street, Suite 1221
Chicago, Illinois 60602
Telephone: (312) 337-7700
Facsimile: (312) 277-2305
E-mail: harleyg@restructuringshop.com
            mattm@restructuringshop.com
            steveny@restructuringshop.com

*--and--*

13

**LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C.**

*/s/ Douglas T. Tabachnik*

Woodhull House, Suite C
63 West Main Street
Freehold, New Jersey 07728
Telephone: (732) 780-2760
Facsimile: (732) 780-2761
E-mail: dtabachnik@dttlaw.com

*Co-Counsel to Emerald Ocean Isle LLC, Amano Global Holdings, Inc., Shingo Lavine, and Adam Lavine*