**J. Singer Law Group, PLLC**
*Counsel for Matthew Levitt*
Jeb Singer, Esq.
One Liberty Plaza, 23rd Floor
New York, New York 10038
(917) 806-5832
jsinger@singerlawgroup.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTH DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11<br>Case No. 22-10943-mew |
| **VOYAGER DIGITAL HOLDINGS, INC. et. al.**[1] | |
| **Debtors** | |

-----------------------------------------------------------------X

**LIMITED OBJECTION OF MATTHEW LEVITT TO THE DEBTORS' MOTION TO HONOR WITHDRAWALS AND CROSS MOTION TO HONOR LEVITT'S WITHDRAWAL REQUEST AND GRANT RELATED RELIEF**

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE

      Matthew Levitt ("Levitt"), through his undersigned counsel, hereby submits this limited objection to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals for the MC FBO Accounts, (B) Liquidate Cryptocurrency From Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief and Cross Moves, pursuant to Sections 105(a) and 1122 of Title 11 of the United States Bankruptcy Code, 17 CFR Part 240, Rules 5070-1 of the Local Rules for the Southern District of New York Bankruptcy Court for (A) a determination that Levitt is a cash

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

1

customer whose withdrawal request must be honored, and (B) granting such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012. Levitt confirms his consent to the Court entering a final order in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

Levitt, a customer creditor in this case, files this limited objection based on the unique facts of his customer status which warrant treating him as a cash customer and only granting the Debtor's present motion if and to the extent that Levitt is treated as a cash customer and his pre-petition withdrawals are honored. In an abundance of caution, he also cross-moves for (A) a determination that Levitt is a cash customer whose withdrawal request must be honored, (B) deem his partially filled cryptocurrency order to be cancelled, and / or (C) granting such other and further relief as the Court deems just and proper.

Levitt has been a loyal customer of Voyager Digital Holdings, Inc.'s ("Voyager" or "Debtor") since February 2021. He also purchased and holds over 100,000 shares of common equity in the Company (which are not affected by this filing). Over the majority of the past several months, Levitt's customer account at Voyager consisted almost entirely of Bitcoin which was, during most time periods, was worth close to a million dollars. At all times relevant, these holdings

represented almost the entirety of Levitt's net worth. As of the date hereof, the Debtor continues to hold nearly all of Levitt's net worth despite Levitt's pre-petition order to withdrawal all cash funds via wire transfer. Voyager unjustifiably did not honor Levitt's withdrawal order despite confirming that wire withdrawals were permitted (without any monetary dollar limitations).

As is well-documented in international news, over the past several months' time, prior to the commencement of the Debtor's bankruptcy case, the value of Bitcoin (as well as many other cryptocurrencies) plummeted by fifty percent or more. During that time period, Levitt justifiably became extremely concerned about Voyager's liquidity and the security of his assets. He closely followed Voyager's public statements and wished to redeem his holdings and "cash out."

Unfortunately, and without any sort of justification or explanation, Voyager did not honor this withdrawal request. This was despite the fact that Voyager had not issued any sort of moratorium on bank wire withdrawals (withdrawal restrictions were limited to withdrawal through Voyager's application – not bank wire withdrawals). Levitt spent the better part of a day attempting to obtain his funds via wire request – his life savings. Only when he was absolutely unable to redeem his funds via wire withdrawal, through no fault of his own, did Levitt re-purchase Bitcoin under extreme duress only to assure that his funds were not lost. Due to Voyager's complete failure (as it acknowledges in the Motion) at honoring Levitt's orders, this re-purchase was Levitt's only option for redeeming any of his life savings.

The Debtor now seeks to honor cash withdrawals in this case while inexcusably dishonoring Levitt's pre-petition withdrawal request. This should not and cannot be permitted over Levitt's limited objection and this Court should only grant the Debtor's request if it simultaneously directs the Debtor to honor Levitt's cash withdrawal request and wire cash in the amount of that request. In an abundance of caution, in addition to filing a limited objection, Levitt

3

hereby cross moves to be treated as a cash customer and for an order requiring the Debtor to permit him to withdraw his life savings which he was wrongfully prevented from doing pre-petition.

The amount of the withdrawal request which Levitt seeks to have honored is $676,551.66. This is the amount of USD funds which was in his account on the date of his withdrawal request (about 12 days prior to the Debtor's Chapter 11 filing). In other words, provided that Levitt is treated as a cash customer, he does not wish to take advantage of the recent increase in the value of the Bitcoin (about $100,000 or 15%) which he only brought under duress.

## FACTUAL BACKGROUND

From November 2021 through June 2022, Levitt sent eight separate wires into Metropolitan Commercial Bank ("MC Bank"), the Debtor's bank, to fund his Voyager account with no deposit limits. (See Affidavit of Matthew Levitt, dated July 28, 2022 ("Levitt Aff.") ¶ 3, Ex. A. On November 6, 2021, in advanced of these transactions, a representative of Voyager informed Levitt that Voyager charged a $50 fee per wire transaction. Levitt Aff. ¶ 2. In that same conversation on November 6, 2021, the Voyager representative stated that wire transfers carried a *minimum* of $10,000. Levitt Aff. ¶ 2. These wires had no limits and were all received at MC Bank and then made immediately available in Levitt's Voyager account usually within 1-3 hours, or if sent after 5 pm Eastern, funds were available by mid-morning the next day. Levitt. Aff. ¶4, Ex. A. In other words, between the time that the wire was sent and processed well less than half a day had passed. This plainly indicates that Voyager had direct access to the MC Bank account.

On June 14, 2022, Voyager issued a public statement to its customers that "your assets" are safe on the Voyager platform. See Levitt Aff. ¶ 5, Ex. B. On June 17, 2022, Voyager announced that they were working on signing a term sheet whereby Alameda Research would provide liquidity Voyager to protect customer assets. See Levitt Aff. ¶ 6, Ex. C. In the public

4

statement announcing this transaction, Voyager conspicuously omitted any mention of the fact that Alameda owed Voyager $376.8 million. See Declaration of Stephen Ehrlich, Chief Executive Office of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ("Ehrlich Declaration") (ECF Doc. 15) at ¶ 29. This material omission was clearly meant to induce customers to leave assets in Voyager as Voyager was clearly concerned about "a run on the bank." Levitt Aff. ¶ 8.

What the June 17th public statement also conspicuously omitted to mention was the fact that a day before (on June 16, 2022) Voyager had engaged the internationally recognized corporate restructuring and bankruptcy law firm, Kirkland & Ellis, LLP ("K&E") and Moelis & Company LLC ("Moelis") an internationally known restructuring financial advisor. See Ehrlich Declaration ¶ 59. In other words, Voyager was misleading its customers as a fiduciary because their problems had begun well before they made these engagements.

On June 22, 2022, Voyager issued a press release stating that the term sheet was signed with Alameda but added that they may issue a notice of default to 3AC on June 24 if no loan payment was received. Levitt Aff. ¶ 11, Ex. D. The very next day (June 23rd) a news article appeared in a crypto industry publication (amongst other places) stating that Voyager had reduced daily withdrawal limits from $25,000 to $10,000 for cash-in-kind transfers via ACH or transfers of cryptocurrency to exterior wallets from the Voyager platform. Levitt Aff. ¶ 12, Ex. E. Importantly, Voyager's reduction never could have applied to wire transfers as Voyager lacked jurisdiction to force their bank to limit wire amounts.

Upon reading the June 22nd press release and the June 23rd news article, Levitt became extremely concerned that his life savings may be at risk and determined that he needed to withdraw his funds from Voyager without delay. Levitt initially felt trapped because of the announcement

5

reducing the withdrawal limitation to $10,000. Levitt Aff. ¶ 13. He reviewed Voyager's User Agreement, attached at Ex. F to the Levitt Aff. and attached to the Debtor's Motion, to determine whether the daily withdrawal limitations only applied to ACH withdrawals and other ETFs and not to wire withdrawals. Levitt Aff. ¶ 14. Specifically, Sections 24 and 25 of the User Agreement make no reference to wire restrictions. Those sections read, at pertinent parts:

**24, Electronic Fund Transfers**

(A)    Overview. Customer understands that the Account provides for certain electronic fund transfer ("EFT") capabilities. This Section applies solely with respect to EFTs. Customer understands and agrees that Customer's use of any EFT function is subject to the disclosures set forth in Section 24 – Electronic Fund Transfers, and Customer acknowledges that they have received and reviewed such disclosures.

(D) Transfer Types and Limits. EFTs are subject to the following limits: USD Deposits: Daily limit: $5,000. USD Withdrawals: Daily limit: $25,000.

(H) Voyager Liability. In no event will Voyager be liable to Customer for any equitable, consequential (including lost profits, indirect, extraordinary, incidental, punitive, or special damages). For instance, Voyager will not be liable to Customer if:

(1)    Customer does not have enough funds in the Account to complete the EFT;

(2)    Voyager has placed a hold or other limit on Customer's Account in connection with any legal, regulatory, or administrative process, or in connection with Voyager's anti-money laundering and compliance obligations;

(3)    Voyager experienced a technical malfunction that the Customer was aware of at the time of the transaction;

(4)    Voyager suspects that the requested EFT is unauthorized; circumstances beyond Voyager's control prevent the completion of the EFT or otherwise cause an EFT to be completed incorrectly or inaccurately.

**25.** Customer authorizes Voyager, at its discretion and without further prior notice, to utilize an electronic check process or Automated Clearing House ("ACH") facility to draft funds in the amount of any checks payable to Voyager, its agents or assigns. Money deposited via ACH is normally not available for five (5) to ten (10) business days. Customer understands that for ACH

6

22-10943-mew    Doc 161    Filed 07/28/22    Entered 07/28/22 15:51:49    Main Document
Pg 7 of 16

transfers to be established, the name on the Account must match Customer's bank account. To send and receive funds via ACH, Customer's bank must be a member of the ACH system. For ACH transactions, Customer hereby grants Voyager limited power of attorney to effectuate such transactions. Customer understand that if Customer decides to rescind an ACH transfer, or if an ACH transaction is returned to Customer's bank for any reason, Customer hereby directs and grants Voyager power of attorney to redeem any and all Cryptocurrency purchases and deposits necessary to fulfill and make such rescission regardless of whether Customer incurs a loss. The remediation described in the preceding sentence may result in a delay of returned funds or liquidation of Customer assets. Voyager may also choose to sever the client relationship and return prior deposits if warranted to protect Voyager from risk or potential fraud. An ACH bank reversal may occur when (1) there are insufficient funds in Customer's bank account, (2) there is a duplicate transaction, (3) transaction is denied, (4) the type of account is incorrect, or 5) any of the return reasons as noted in ACH Return Codes R01 – R33. Customer acknowledges that in the event of an ACH bank reversal, Customer might incur a fee.

Levitt almost instantly recognized that sections 24 and 25 of the User Agreement did not, in fact, apply to wire transfers. Levitt Aff. ¶ 15. Therefore, he correctly reasoned that the aforementioned reduced $10,000 withdrawal limit would not apply to any wire request. Levitt Aff. ¶ 15. This understanding is evident from the text of the Sections. Section 25 states that it applies to ACH withdrawals only. The EFTs described in Section 24 cannot apply to wire transfers. Section 24(E) states, "Fees. Voyager will not charge Customer any fees in connection with the initiation and completion of any EFT, however, third party fees, including foreign taxes, as applicable, may apply." Contrarily, as aforementioned, on November 6, 2021, a representative of Voyager informed had informed Levitt that Voyager charged a $50 fee per wire transaction. In that same conversation on November 6, 2021, the Voyager representative stated that wire transfers carried a *minimum* of $10,000. Levitt Aff. ¶ 16. This is directly contrarily to the $5,000 daily maximum in Section 24(D). Therefore, definitionally, this Section could not apply to wire transfers. These instructions regarding wire transactions were emailed to Levitt multiple times

7

whenever he inquired about the subject. There were never any mention of wire limits. As mentioned, Voyager lacked all jurisdiction to cause MCB to limit wire amounts.

Levitt sold his Bitcoin holdings to convert the same into U.S. dollars (USD) so as to have the USD available for an instant wire withdrawal transaction order. Levitt Aff. ¶ 17, Ex. G. This sale order was processed instantly meaning Levitt now had the USD equivalent available instantaneously at MCB. Levitt thus endeavored to withdrawal all his funds via wire withdrawal. As is reflected in Levitt's conversations with Voyager customer support, Voyager had no customer service phone line.

On June 23, 2022, Levitt had the following crucial conversation with an automated and then a live customer service representative (Vanessa) in which Voyager confirmed that there were no wire limits (as there were with EFTs). Levitt Aff. ¶ 18, Ex. H. The Voyager representative then took an order for the wire withdrawal for Levitt's full life's savings:

BOT: I'm Val, your Voyager virtual assistant. I'm created by the Voyager team and hope I can help you out!
BOT: Let's get started! Ask me your question by typing below.
USER: Send wire
BOT: We are happy to provide you info about wire transfers!
BOT: What type of wire are you looking to do?
USER: Selected: Withdraw from my Voyager account
BOT: Ok, want you to know, there's $10K minimum and a $50.00 fee for the wire BOT: If you would like to initiate a wire, I can get the process started with our support team!
BOT: What is your full name?
USER: Matthew Levitt
BOT: What is the email address associated with your Voyager account?
USER: Matthewjlevitt@gmail.com
BOT: Your Voyager rep will respond here in a bit. Feel free to leave and come back at your convenience to check on your inquiry.
AGENT (Vanessa Merlyn): Hello Matthew. Thank you for contacting Voyager.
AGENT (Vanessa Merlyn): I understand your concern regards to wire withdrawal.
AGENT (Vanessa Merlyn): There is a $50 charge from our bank that is passed through to you and a $10K minimum on incoming wires and a $25K

8

minimum on outgoing wires.
AGENT (Vanessa Merlyn): If you are interested in submitting a wire withdrawal please provide your bank details below.
Account Name:
ABA/Routing No:
Account No:
Bank Address:
AGENT (Vanessa Merlyn): Also, please confirm the amount that you wish to withdraw.
USER: The Levitt Group
USER: 026009593 Routing
USER: [] account number
**USER: Entire account. Will move my crypto to cash. Approximately $700 000. Please advise if any restrictions before I give exact amount to send**
**AGENT (Vanessa Merlyn): There is no limits for wire outgoing.**
AGENT (Vanessa Merlyn): Please share the bank address and withdrawal amount?
USER: Bank of America, 880 East Colorado Blvd, Pasadena, CA 91106
AGENT (Vanessa Merlyn): I will forward this request to our team and will get back to you shortly with an update.
AGENT (Vanessa Merlyn): Thank you for messaging with us. We have created a new ticket and your ticket ID is 643707. Our team will get back to you as soon as possible via email.
BOT: Chat survey was submitted
Satisfaction rating: None/5
BOT: Hey, it's Val again, hope you enjoyed your conversation with your Voyager rep! Is there anything else I can help you with?
**USER: $676551.66**

Voyager's online customer service portal was the only manner in which Levitt knew how to initiate or request a wire transaction, and what the parameters of such a transaction would be.

On June 23, the conversation between Levitt and Vanessa, the live agent, continued via email.

Levitt Aff. Ex. I. This conversation, which included Levitt restating the wire order, was as follows:

Merlyn (Support) <support@investvoyager.com>
23 June 2022 at 14:21
Reply-To: Support <support@investvoyager.com>
To: Matthew Levitt < >

Hi Matthew,

Thanks for choosing Voyager, it was great to message with you.

9

      Unfortunately, our team was unable to resolve the inquiry in your message so your Voyager representative opened a support ticket (643707) for you. We will continue to look into this issue and get back to you as soon as possible with next steps.

      Talk soon,
      Voyager Support Team

Matthew Levitt <    >    23 June 2022 at 14:43
To: Support <support@investvoyager.com>

      Please wire out
      $676551.66 to the bank account I listed in the chat:
      The Levitt Group
      026009593 Routing
      Account number
      Bank of America, 880 East Colorado Blvd, Pasadena, CA 91106
      Thank you, Matthew Levitt

Matthew Levitt <    >    23 June 2022 at 16:08
To: Support <support@investvoyager.com>

Hello. I am not satisfied with the lack of a clear response about my outgoing wire request earlier today.

I need to know that my funds will be sent in full tomorrow/immediately as requested. We are talking about my life's savings here.

I understand Voyager may be experiencing liquidity issues, however the company was bailed out by Alameda Research recently and Steve Ehrlich said this money was there to protect the clients' assets.

Please confirm that my funds will be wired to my bank asap.

According to the attached screenshot from your customer service desk today, there is no restriction on the dollar amount of outgoing wires so please process my request immediately and let me know when that has been done.

Thank you,
Matthew Levitt

In sum and substance, Levitt was pleading with Voyager to send him his life's savings. Levitt Aff.

¶ 21. At no point was Levitt advised by Voyager live operators that his wire transaction could not be processed. At no point was he advised that they otherwise needed to be reviewed for

10

compliance or fraud prevention. There was no mention of any time delay of any kind or any prohibition on sending out Levitt's wire. Levitt Aff. ¶ 22.

Levitt waited until 5 pm EST the next day (June 24th) and the wire was never sent. At that time Levitt reasonably assumed that the company was not going to send his funds out in the form of a USD withdrawal via wire transaction due to lack of customer support response or action as well as the conflicting official statement from Voyager on June 22, 2022 when they stated that liquidity issues had been solved. Levitt Aff. ¶ 23. Levitt had to take desperate measures at this point, and the only solution he could come to, under immense stress and fear in order to recover any of his life savings and based on the lack of information and guidance from Voyager, he bought back Bitcoin. Levitt Aff. ¶ 24, Ex. J. That Bitcoin order was only partially filled, but the fulfillment of the order demonstrates that USD funds were available all day to send Levitt's wire and Voyager simply failed to process the same. Levitt instantly began withdrawing $10,000 worth of Bitcoin per day. Levitt Aff. ¶ 25, Ex. L. Once again this was only necessary because of Voyager's inexcusable failure to process the wire withdrawal which Levitt had requested. Levitt had no other way to recover his life savings. Levitt Aff. ¶ 25, Ex. J.

On June 28, Voyager's online application asked Levitt to provide a copy of his identification and to provide a photograph. Levitt Aff. Ex. K. He had only been asked to provide his identification twice before. Once when he opened his account and again in reference to USD transfers. Levitt reasonably assumed, based on this important request, that Voyager was finally prepared to honor his USD withdrawal request and wire transaction order. He emailed Voyager support on the same email chain and asked for them to confirm that they will indeed send out a wire in full if redeemed his Bitcoin for cash. Voyager never replied and provided precisely zero fiduciary guidance. Levitt kept his holdings in Bitcoin because this was the only way that he could

11

recover any of the funds in his account as Voyager had refused to process wire requests. Levitt Aff. ¶ 26.

On June 30, an entire week after Levitt's wire withdrawal request, a live Customer support agent finally replied to the same wire transaction order email chain, "request 643707", contradicting the information Levitt was provided on June 23 by Voyager's customer support. Levitt Ex. K. In that June 30 exchange, a customer service representative named Tony stated that withdrawals were now only allowed now through the Voyager app (via ACH) and limited to $10,000 per day. This was the very first instance in which Levitt was indirectly told that Voyager would not honor wire transactions and this policy was never made public. Levitt Aff. ¶ 27.

On July 1, 2022, less than 24 hours after Tony's email reply, Voyager froze the platform for trading, deposits and withdrawals. To be certain, this was the first time that Voyager had frozen withdrawals. On July 5, 2022, Voyager filed a bankruptcy petition under Chapter 11. Voyager's present Motion now requests court authority to honor customer withdrawals.

**ARUGMENT**

Section 5 (C) of the User Agreement states, "How an insolvency court would categorize and treat Customer Cryptocurrency is a highly fact-dependent inquiry that necessarily depends upon the circumstances of each individual case." By this Limited Objection and Cross Motion, Levitt hereby asserts its entitlement to a review of the specific facts of circumstances of his wire request and, after doing so, to have his withdrawal request honored.

I. **The Debtor Violated the Best Interest Test When They Failed to Remit the Wire.**

The Securities Exchange Commission's Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934 establishes a "best interest" standard of conduct for broker-dealers and associated persons. 17 CFR Part 240. While cryptocurrency is unregulated, Voyager

12

was acting as a cryptocurrency broker and fiduciary. Nonetheless, Voyager repeatedly did not act in Levitt's best interests as their customer.

First, Voyager's June 23rd $10,000 withdrawal limit would not apply to any wire request. This understanding is evident from the text of the Sections of the User Agreement. Section 25 states that it applies to ACH withdrawals only. The EFTs described in Section 24 cannot apply to wire transfers. Section 24(E) states, "Fees. Voyager will not charge Customer any fees in connection with the initiation and completion of any EFT, however, third party fees, including foreign taxes, as applicable, may apply." Contrarily in the November 6, 2021 correspondence with Levitt, the Voyager representative informed Levitt that Voyager charged a $50 fee per wire transaction and that wire transfers carried a *minimum* of $10,000. This is directly contrarily to the $5,000 daily maximum in Section 24(D). Therefore, definitionally, this Section 24 could not apply to wire transfers. As mentioned, Voyager lacked all jurisdiction to cause MCB to limit wire amounts.

Despite the June 23rd withdrawal limits, Voyager could have instantly wired Levitt's money which he ordered at 5:43 pm EST on June 23, 2022.[2] Furthermore, the fact that Levitt was able to buy Bitcoin on June 24, after 5 pm EST, proves that Levitt's USD funds were available all day for Voyager to initiate and send his wire request. This additional fact concretizes the fact that Voyager had direct access to the MCB FBO account, and that Voyager could have easily sent Levitt's funds to him in a reasonable time frame that we are all used to, by 5 pm EST the next day, which was a business day.

---

[2] The MCB website currently states: "Our Wire Transfer services allow you to send wires from your MCB accounts for timely credit to your clients. You can securely and conveniently send wires from our Business Online Banking platform at any time of day."

13

The events of June 28 and June 30, 2022, which were both on the same email chain that began on June 23, 2022, proves that Voyager did indeed receive Levitt's wire order, which they completely ignored, and that according to Tony, their live representative they had neglected to offer him any guidance in regards to his life savings in their capacity as a fiduciary for an entire week.

All of this points to the fact that Levitt's USD withdrawal request and wire transaction order should have been sent and should be honored.  Simply put, Voyager's bad faith failure to execute Levitt's withdrawal or to offer any explanation as to why it could not be executed was a per se breach of Voyager's fiduciary obligation to act in Levitt's best interest.

**II. The Debtor Should Classify Levitt as a Cash Customer and Honor His Withdrawal Request.**

Levitt's claim should be classified as a cash claim and his wire withdrawal should be processed.  Section 1122 of the Bankruptcy Code governs the classification of creditors in a bankruptcy case.  That Section provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122, In re Enron Corp., No. 01-16034 (AJG) (Jointly Administered), at *118 (Bankr. S.D.N.Y. July 15, 2004).  While the Debtor's Motion is not being made pursuant to a bankruptcy plan, the debtor is asking the court to distribute property to customers and therefore cannot violate this provision of the Bankruptcy Code.

Under section 1122(a), the relevant inquiry is whether all claims of a class have substantially similar rights to a portion of each Debtor's estate.  A plan proponent is afforded some flexibility in classifying claims under section 1122(a), but only if there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar. See

14

Aetna Cas. Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); In re Drexel Burnham Lambert Group, Inc.,138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

Here, there is no reasonable or rationale basis for permitting the Debtor to process withdrawals for some of its customers while not processing Levitt's withdrawal which it wrongly, unjustifiably, and irrationally refused to process. Levitt's rights should be treated identically to the rights of all other cash customers. Levitt only was coerced to buy Bitcoin back as a last result to extract any of his life savings. His objective, which Voyager torpedoed was always to wire out his funds in the form of a USD wire. For the Court to permit such disparate treatment would be entirely inequitable and perpetuate Debtor's pre-petition failure to act in its fiduciary capacity and wholly botching its obligation to process Levitt's wire withdrawal request.

For that reason, this Court should classify Levitt as a cash customer and, in conjunction with permitting cash customers to withdrawal funds, Levitt's June 23rd withdrawal should be honored.

### III. The Court Should Cancel Levitt's Partially Filled Bitcoin Order.

The Debtor's Motion also requests the right to cancel partially filled order. As aforementioned, Levitt's desperate June 24 Bitcoin Order was only partially filled. To the extent that the Court is inclined to cancel partially filled orders, there is an equitable basis to cancel Levitt's partially filled Bitcoin order and revert him to all cash.

### MOTION PRACTICE

This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, Levitt submits that this Motion satisfies Local Rule 9013-1(a).

### NO PRIOR REQUEST

15

No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE for the reasons stated herein and in the accompanying Levitt Aff. and exhibits attached thereto, this Court should (i) deny the Debtor's Customer Withdrawal Motion unless Levitt is treated as a cash customer, (ii) grant Levitt's Cross Motion to be treated as a cash customer, and (iii) grant such other and further relief as the Court deems just and proper.

Date:  New York, NY
       July 28, 2022

**J. Singer Law Group, PLLC**
*Counsel for Matthew Levitt*

**By: /s/ Jeb Singer**
       Jeb Singer, Esq.
       One Liberty Plaza, 23rd Floor
       New York, New York 10006
       (917) 806-5832
       jsinger@singerlawgroup.com

16