Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM THE MC FBO ACCOUNTS, (B) LIQUIDATE CRYPTOCURRENCY FROM CUSTOMER ACCOUNTS WITH A NEGATIVE BALANCE, (C) SWEEP CASH HELD IN THIRD-PARTY EXCHANGES, (D) CONDUCT ORDINARY COURSE RECONCILIATION OF CUSTOMER ACCOUNTS, AND (E) CONTINUE STAKING CRYPTOCURRENCY, AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on July 5, 2022 (the "Petition Date"), the above-captioned

debtors and debtors in possession (collectively, the "Debtors"), each filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York

(the "Court").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**PLEASE TAKE FURTHER NOTICE** that on July 14, 2022 the Debtors filed *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on July 29, 2022, the Debtors filed the *Supplement to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* (the "Supplement").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion and the Supplement will be held on August 4, 2022 at 11:00 a.m. (prevailing Eastern Time) (the "Hearing"). In accordance with General Order M-543 dated May 20, 2020, the Hearing will be conducted telephonically. Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion and the Supplement shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's

electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **July 28, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the Debtors at https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in the subject matter of the Motion and Supplement.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion and the Supplement as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  July 29, 2022          /s/ Joshua A. Sussberg
New York, New York          **KIRKLAND & ELLIS LLP**
                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                            Joshua A. Sussberg, P.C.
                            Christopher Marcus, P.C.
                            Christine A. Okike, P.C.
                            Allyson B. Smith (admitted *pro hac vice*)
                            601 Lexington Avenue
                            New York, New York 10022
                            Telephone:      (212) 446-4800
                            Facsimile:      (212) 446-4900
                            Email:          jsussberg@kirkland.com
                                            cmarcus@kirkland.com
                                            christine.okike@kirkland.com
                                            allyson.smith@kirkland.com

                            *Proposed Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS
FROM THE MC FBO ACCOUNTS, (B) LIQUIDATE CRYPTOCURRENCY
FROM CUSTOMER ACCOUNTS WITH A NEGATIVE BALANCE, (C)
SWEEP CASH HELD IN THIRD-PARTY EXCHANGES, (D) CONDUCT ORDINARY
COURSE RECONCILIATION OF CUSTOMER ACCOUNTS, AND (E) CONTINUE
STAKING CRYPTOCURRENCY, AND (II) GRANTING RELATED RELIEF**

On July 14, 2022, the above-captioned debtors and debtors in possession (collectively, the

"Debtors") filed *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor*

*Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer*

*Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct*

*Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency;*

*and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion").[2]  As a supplement to the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion*

FBO Motion (this "Supplement"), the Debtors respectfully state as follows:

**Supplement to the Relief Requested by the FBO Motion**

1.     Pursuant to the FBO Motion, the Debtors are seeking, among other things, authority to honor withdrawals from two "for the benefit of" accounts (the "MC FBO Accounts") held at Metropolitan Commercial Bank ("MC Bank"). This Supplement provides additional information regarding the prepetition procedures and processes for processing customer withdrawal requests and reconciling amounts in the MC FBO Accounts and requests authorization for the Debtors to continue to perform under the MC Bank Agreements (as defined below) on a postpetition basis.

2.     In the ordinary course of business, when a customer wants to buy cryptocurrency on the Debtors' platform using cash, the customer transfers cash from their personal bank account to the applicable MC FBO Account.  Then, to execute the customer's purchase order, the cash is sent from the applicable MC FBO Account through the Debtors' platform to a market-maker to execute the purchase. Conversely, when a customer executes an order to sell cryptocurrency on the Debtors' platform, the resulting cash attributable to the trade is transferred by the Debtors to the applicable MC FBO Account. The customer can then withdraw the cash from the applicable MC FBO Account and MC Bank transfers such cash to the customer's personal bank account via ACH or wire.  Prior to the Petition Date, the Debtors would prefund withdrawals from their MC Bank Master Operating Account to ensure proper funds were available for customers' withdrawal requests at any given time.

---

*Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 10] (the "Cash Management Motion").

3.      The majority of the Debtors' customers fund transactions on the Debtors' platform by transferring cash to the applicable MC FBO Account via Automated Clearing House ("ACH" and such transfer, an "ACH Transfer").  Customers sometimes seek to reverse their ACH Transfers, in which case, under the rules of the National Automated Clearing House Association, the customer's bank removes the funds from the applicable MC FBO Account and credits their customer's personal bank account for the original debited amount (each an "ACH Chargeback"). Under the terms of the FBO Account Payment Services Agreement dated June 3, 2019 between Voyager Digital Holdings, Inc. and MC Bank (the "FBO Agreement") and the ACH Origination Agreement dated May 9, 2018 between MC Bank and Voyager Digital, LLC (the "ACH Agreement" and, together with the FBO Agreement, the "MC Bank Agreements" attached hereto as **Exhibit A** and **Exhibit B**, respectively), the Debtors are responsible for ensuring that funds sufficient to satisfy ACH Chargebacks are available in the applicable MC FBO Account. Specifically, section 9 of the ACH Origination Agreement provides that the Debtors "shall at all times maintain a balance of available funds . . . sufficient to cover its payment obligations under this [ACH Origination Agreement]. In the event there are not sufficient available funds in the Account to cover Company's obligations under this [ACH Origination Agreement], Company agrees that the Bank may debit any account maintained by Company with the Bank or any affiliate of the Bank."[3] In addition, a designated "reserve account" exists for chargebacks of ACH debits. *See* Schedule C to the FBO Agreement.  Such designated "reserve account" is a $24 million earmarked portion of the Debtors' MC Bank Master Operating Account.

---

[3]    Section 3.6 of the FBO Agreement requires the Debtors' entry into the ACH Origination Agreement to govern the provision of ACH services by MC Bank.

4.     To ensure that there are sufficient funds in the applicable MC FBO Account related

to a customer's daily activity on the platform, the Debtors generate a report at 8 p.m. Eastern

Standard Time each day that provides a "snapshot" of the customer balances in the MC FBO

Accounts (including the ACH and wire transfer activity from the day) and the balances owed to

each customer based on their activity that day.  The Debtors send the report to MC Bank each day

and the parties reconcile, or true up, the MC FBO Accounts the following morning either by the

Debtors depositing funds from the MC Bank Master Operating Account into the applicable MC

FBO Account if there is a deficiency in customer cash in the MC FBO Accounts, or by MC Bank

transferring cash from the applicable MC FBO Account to the MC Bank Master Operating

Account in the event there is excess cash in the MC FBO Accounts.  Importantly, the Debtors do

not commingle their cash with customer cash in the MC FBO Accounts.

5.     Pursuant to the relief sought in the FBO Motion to honor customer withdrawals, it

is essential that the Debtors continue to address ACH Chargebacks on a go-forward basis through

the ordinary course reconciliation process between the applicable MC FBO Account and the

Debtors' MC Bank Master Operating Account.  Failure by the Debtors to properly reconcile ACH

Chargebacks since the Petition Date has and will continue to result in the applicable MC FBO

Account carrying a cash balance less than the total outstanding customer cash balances as of the

Petition Date.  Any deficiency in the applicable MC FBO Account could impact the Debtors'

obligations under the MC Bank Agreements and would disrupt the ordinary course operations of

the Debtors' platform.  In addition, if some customers are allowed to withdraw their cash while

others are not, it would result in disparate treatment of similarly situated customers and cause

customers to lose confidence in the Debtors' platform to the detriment of the Debtors' restructuring

efforts. Therefore, as part of the relief requested in the FBO Motion, the Debtors are seeking

authority to continue to perform under the MC Bank Agreements in the ordinary course of business.

6.      As of July 28, 2022, the Debtors owe $2,778,191.58 to the applicable MC FBO Account resulting from ACH Chargebacks initiated by customers.  The Debtors believe some or all of the ACH Chargebacks were caused by customers improperly reversing authorized ACH Transfers for purchase of cryptocurrency. The Debtors have aggressively sought to combat the deficit caused by unauthorized ACH Chargebacks by contacting customers and their personal banks whom the Debtors believe may have engaged in unauthorized ACH Chargebacks to remedy such activity pursuant to the authority granted to the Debtors under the *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 53]. Moreover, if the Debtors are authorized to liquidate cryptocurrency from customer accounts with a negative cash balance consistent with their prepetition practices, authorization of which they are seeking through the FBO Motion, they anticipate generating approximately $3.2 million in cash, which will eliminate the current deficit in the applicable MC FBO Account. The Debtors filed this Supplement to inform the Court and parties in interest about the necessary steps involved in honoring customer withdrawals of their cash, including reconciling any deficiency in the MC FBO Accounts in the ordinary course of business.  Accordingly, the relief sought in the FBO Motion, as supplemented herein, is necessary to reinstate customers' right to withdraw cash that they legitimately own.

## Basis for Relief

I.    **The Debtors Should Be Authorized to Honor Their Obligations Under the MC Bank Agreements to Reconcile Amounts in the MC FBO Accounts to the Extent of Any Deficiency.**

A.    **Continuing to Perform Under the MC Bank Agreements Is a Sound Exercise of Business Judgment and Is Necessary Under the Circumstances.**

7.    Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c). The Debtors believe that honoring their postpetition obligations under the MC Bank Agreements is ordinary course, including honoring ACH Chargebacks to the extent of any deficiency in the MC FBO Accounts, and thus the Debtors believe they are authorized to do so pursuant to section 363(c) of the Bankruptcy Code. If, however, the Court were to determine that the Debtors' continued performance under the MC Bank Agreements is not ordinary course, the Debtors further believe the requested relief in the FBO Motion, as supplemented herein, is warranted under section 363(b) of the Bankruptcy Code.

8.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Under section 363(b) of the Bankruptcy Code, courts require a debtor to demonstrate that a "good business reason" justifies the proposed use of property. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (same); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification).

9.      The Debtors' continued performance under the MC Bank Agreements, including honoring their obligations to address ACH Chargebacks and any resulting deficiency in the applicable MC FBO Account, is an exercise of the Debtors' sound business judgment.  The Debtors' contractual relationship with MC Bank has been ongoing since 2018 and is central to the effective and efficient operation of the Debtors' platform.  Since that time, the Debtors have been responsible for ensuring there are adequate funds in the applicable MC FBO Account for ACH Chargebacks.  Likewise, since the Petition Date, MC Bank has continued to perform its obligations under the MC Bank Agreements. The Debtors therefore also must continue to uphold their end of the bargain under the MC Bank Agreements on a postpetition basis to maintain their critical business relationship with MC Bank at this pivotal juncture in the chapter 11 cases. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (holding that if a debtor elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract).  MC Bank plays a key role in the Debtors' business operations and the Debtors hope that MC Bank will play a key role in their reorganization.

10.     Allowing the Debtors to ensure adequate amounts are held in the applicable MC FBO Account to cover ACH Chargebacks pursuant to their obligations under the MC Bank Agreements will result in the fair treatment of and rightful payment to customers.  Absent the Debtors' ability to honor such contractual obligations, customers risk not being paid in full for the cash they deposited into the applicable MC FBO Account, which would damage the Debtors' relationship with their customers and the ultimate value of the platform.

11.     The Debtors are not seeking to pay any amounts to MC Bank by way of honoring their obligations to process ACH Chargebacks; all amounts in the MC FBO Account to address ACH Chargebacks go directly to the Debtors' customers.   Under the MC Bank Agreements, MC Bank, among other things, facilitates the ability of the Debtors' customers to transact with the Debtors on their platform, by providing banking and payment services including ACH and wire transfers. This has always been the system and should continue to remain so to avoid harm to the Debtors' customers and the Debtors' estates.

12.     Approval of the requested relief is justified under section 363(b) of the Bankruptcy Code to avoid what would otherwise be a severe and detrimental interruption to the Debtors' business operations if they breach the MC Bank Agreements. The substantial benefit conferred on the Debtors' estates by honoring their obligations under the MC Bank Agreements so as not to disrupt the ordinary course operations of the Debtors' platform, while also ensuring no customers are treated differently than other similarity situated customers, warrants the authority to continue processing ACH Chargebacks and any obligations relating thereto.   Accordingly, the Debtors respectfully submit that continuing to address ACH Chargebacks pursuant to their obligations under the MC Bank Agreements, including reconciling any deficiency in the applicable MC FBO Account, is a sound exercise of the Debtors' business judgment and should be approved.

**Notice**

13.     The Debtors will provide notice of this Supplement to the following parties and/or their respective counsel, as applicable:  (a) the United States Trustee for the Southern District of New York; (b) the Committee; (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors conduct their business operations; (h) MC Bank; and (i) any party that has requested notice

pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully reiterate their requests for relief as stated in the

FBO Motion and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: July 29, 2022 | /s/ Joshua A. Sussberg |
| New York, New York | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
cmarcus@kirkland.com
christine.okike@kirkland.com
allyson.smith@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**FBO Account Payment Services Agreement**

# FBO ACCOUNT PAYMENT SERVICES AGREEMENT

~~DRAFT~~/CONFIDENTIAL

3rd
of June
2019
nr

**THIS FBO ACCOUNT PAYMENT SERVICES SUPPLEMENT AGREEMENT** (this "*Agreement*" or "Supplement") dated this ~~28th day of March, 2019~~ ("*Effective Date*") is by and between Voyager Digital Holdings Inc., which changed its name from CryptoTrading Holdings Inc ("*Client*"), and **Metropolitan Commercial Bank**, a New York commercial bank ("*Bank*"). Client and Bank are collectively referred to as the "*Parties*" and are each individually referred to as a "*Party*."

## RECITALS

**Whereas,** Bank wishes to market and promote certain payment services to the public, as a means of gaining new Bank customers, increasing Bank deposits and increasing Bank fee revenues; and

**Whereas,** Client is in the business of offering crypto currency exchange and software services and wishes to promote such services to the public which entails access to the payment system and a depository institution to hold USD denominated funds

**Whereas,** Bank desires to contract with Client to support a program whereby Bank provides cash management and payment concentration services through a custodial "for the benefit of" or "FBO" account established by and at the Bank. Such payments will be charged against the bank accounts of Client's customers via ACH files sent by Client to Bank for processing and will be effective on the date advised by Client to Bank.;

**Now, therefore,** in consideration of the mutual covenants and conditions hereinafter set forth, the Parties hereto, intending to be legally bound, agree as follows:

## DEFINITIONS

**SECTION 1.1    Definitions**

Except as otherwise specifically indicated herein, all definitions in any of the Bank's standard account opening agreements to be signed between the parties (each a "Party") shall apply to this Supplement.

## ARTICLE II – GENERAL DESCRIPTION OF PROGRAM

**SECTION 2.1    Purpose**

Bank hereby appoints Client as Bank's representative to market, offer and sell crypto currency exchange services, and other related products as agreed in writing by the Parties from time to time, that meet Bank requirements solely in accordance with the terms of this Agreement.

## ARTICLE III - DUTIES OF CLIENT

**SECTION 3.1    Management**

Client agrees as follows:

(a)   that the scope of this Agreement shall be limited to the Bank's formally accepted and approved Program(s), as amended from time to time. Any Program documents specified in a Program Outline provided by Client shall be approved in writing by Bank and incorporated herein pursuant to the terms and conditions of this Agreement and include the additional documents and correspondence submitted and registered comprising the Program(s). Additional services may be added to the Program(s) by Bank approved documents submitted by Client and accepted in writing by Bank.  Client may directly provide or receive any additional services outside the scope of this Agreement from any third party if: (i) its receipt of such service does not conflict, interfere with, and/or limit Bank's ability, reputation, risk, or right to provide the services provided for in this Agreement; (ii) it specifically meets and conforms to all Rules and Regulations; and (iii) it meets all requirements within the terms and conditions of this Agreement. Client shall be responsible for all costs and services from any third-party entity contracted by or providing service to Client for the Program(s) pursuant to this Agreement.  A Program Outline is only

P. 1 of 25    nr

finalized by signatures of both Parties.

(b) Client has reviewed and agrees to abide by Bank's underwriting guidelines for Consumers and Program Affiliates attached hereto as Schedule A. Client agrees to abide by these underwriting guidelines at all times and acknowledges that in the event a Program Affiliate requires Bank's approval, as described in Schedule A, information regarding such Program Affiliate shall be disclosed in advance and written approval will be sought from Bank for such Program Affiliate prior to engaging in any services with Program Affiliate. Client agrees that all documents required pursuant to Schedule A shall be maintained by Client in accordance with all confidentiality and review provisions herein.

(c) Any Customer Service Center providing services by a Program Affiliate to Cardholders must be certified and approved by Bank pursuant to Schedule A.

(d) Any Program Affiliate retained by Client in connection with any of the Programs shall be in accordance with the Guidelines set forth in Schedule A.

**SECTION 3.2    Access to Program Documents and Information**

Bank shall have access to all information and documents it reasonably requests with regard to any activity contemplated by this Supplement.

**SECTION 3.3    Processing Services**

If Processing Services are required for the Program, Client, at its sole expense, shall provide for Processing Services. Any processor retained by Client to provide Processing Services must be approved in advance by the Bank and must have executed a Processing Services Agreement. A list of pre-approved processors may be obtained from Bank, upon Client's request.

**SECTION 3.4    Account Obligations**

(a)    Client shall cooperate with Bank to open such FBO Accounts pursuant to Bank policies and procedures as are necessary for Bank to provide the services outlined in this Supplement (the "Program Accounts"). The Program Accounts will be reconciled by Bank as set forth to this Agreement and shall include the following:

(i)**FBO Accountholder Pooled Funds Account**, which will hold all funds that the Customers remit to Bank for payment to the Recipients;

(b)    Funding and settlement flows, guidelines and requirements for each FBO Account established hereunder shall be set forth in Schedule B.

(c)    Client shall, on a daily basis, provide to Bank written or electronic reports in a manner acceptable to Bank showing the total of funds and/or credits received from all Customers, the, list of all transactions posted to Recipients for prior day, and any other reports or information as requested by Bank.

(d)    Compensation for the services provided by Bank and by Client, as well as Client's Reserve Account requirements, as set forth in the attached Term Sheet dated February 20, 2019 between the parties as amended and incorporated herein and modified by the parties as Schedule C.

**SECTION 3.5    Error Resolution**

Client agrees to resolve, in accordance with the applicable Rules and Applicable Law, all alleged errors or unauthorized Transactions with respect to any Transactions performed or attempted to be performed in accordance with or under this Supplement. In particular, Client agrees, upon written notification by Bank regarding any Customer complaint or

P. 2 of 26

allegation, to obtain any and all documentation or data required to resolve the matter and reasonably investigate the allegations, advise Bank of the results of the investigation in writing and provide an audit trail of information pertinent to the matter, all within any timeframes required by the Rules and Applicable Law, but in no event later than ten (10) Business Days after Bank, any Customer or any Cardholder has provided Client with written notice of the complaint or allegations.

**SECTION 3.6**

Client acknowledges that it has requested the ACH origination and treasury management services of Bank, which requires a separate and independent agreement with Bank. Bank agrees to perform services as Originating Depository Financial Institution ("ODFI"). Such ODFI services require a separate and independent agreement with Bank and such services shall be performed based upon the separate terms, conditions and service pricing for such services, as set forth in the Schedule C Term Sheet attached hereto between the Parties and modified therein.

Bank will act as Receiving Depository Financial Institution ("RDFI") for receipt of all Customer or Cardholder Funds, as provided herein. Bank's duties and obligations related to ACH services of Program and for Client are limited solely to ACH rules and regulations which are defined within the operating rules of NACHA.

Client agrees to perform, and to direct all Licensees (collectively, "Program Affiliates") to perform all services relative to Bank RDFI functions in accordance with all Legal Requirements.

Client shall be solely responsible for any losses on all Customer Funds in Transit, and Client's contracts with Program Affiliates shall reflect appropriate controls and indemnification regarding such activity. Notwithstanding anything to the contrary in this Supplement, Bank shall not be responsible under any circumstance for misdirected Customer Funds. Examples of Bank-approved entities for the purpose of Transmitting Customer Funds under this Supplement are approved correspondent banks, the Federal Reserve, or approved Licensees in electronic files, and for which under the Program shall be treated and accounted for as Customer Funds. For clarity, at no time shall Client or any Licensee ever collect, hold, or remit any Customer Program funds.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF CLIENT

**SECTION 4.1        Representations and Warranties**

Client represents and warrants to Bank as follows:

(a)    Client has the full right, power and authority to execute and deliver this Supplement and to perform all its obligations under this Supplement and other agreements which must be executed to affect the services contemplated herein.

(b)    No consent or approval of any third party is required for the valid execution, delivery and performance of this Supplement by Client.

(c)    Except as otherwise disclosed, neither Client nor any principal of Client has been subject to the following:

(i)    Criminal conviction (except minor traffic offenses and other petty offenses);

(ii)    Any unpaid Federal or state tax lien;

(iii)    Administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities regulatory authority, Federal Trade Commission, federal or state bank regulator, or any other state or federal regulatory agency; or

(iv)    Restraining order, decree, injunction, or judgment in any proceeding or lawsuit, alleging fraud or deceptive practice on the part of Client or any principal thereof.

For purposes of this subparagraph, the word "principal" shall include any person directly or indirectly owning ten percent (10%) or more of Client, any officer or director of the Client or any person actively participating in the control of Client's business. The Bank hereby reserves the right to order credit reports on such principals as part of its due diligence process.

(d)    There is not pending or threatened against Client, any litigation or proceeding, judicial, tax or administrative, the outcome of which might materially adversely affect the continuing operations of Client. Attached to this Supplement as Schedule D is a list and brief description of all such pending lawsuits in which Client is a party.

(e)    Client has delivered to Bank complete and correct copies of its balance sheets and related statements of income and cash flow. Client's financial statements, subject to any limitation stated therein, which have been or which

hereafter will be furnished to Bank will fairly represent the financial condition of the Client.

(f)   Client agrees that, at Bank's sole discretion, Bank, its authorized representatives, or agents and any government entity with regulatory or supervisory authority over Bank (collectively the "Auditing Party"), shall have the right to inspect, audit, and examine all of Client's facilities, records and personnel relating to the Program at any time during normal business hours upon reasonable notice.   The Auditing Party shall have the right to make abstracts from Client's books, accounts, data, reports, papers, and computer records directly pertaining to the subject matter of this Supplement, and Client shall make all such facilities, records, personnel, books, accounts, data, reports, papers, and computer records available to the Auditing Party for the purpose of conducting such inspections and audits.

(g)   Client in compliance with all applicable federal, state and local laws, regulations, rules and administrative orders which are applicable to Client, the Program and the Cards.

(h)   Client has obtained and is in compliance with all licenses, permits, memberships, consents and authorizations required to perform all its obligations under this Supplement and other agreements which must be executed to affect the services contemplated herein.

(i)   Client is validly existing and in good standing under the laws of the state of its formation and is authorized to conduct business as defined with this Supplement in each state in which the nature of the Client's activities hereunder makes such authorization necessary.

## ARTICLE V - COVENANTS OF CLIENT

**SECTION 5.1    Covenants**

Client covenants and agrees with Bank as follows:

(a)   Client is performing and will at all times continue to perform its obligations under this Supplement and to ensure any Program Affiliates will, and are and shall at all times be, in compliance with all Legal Requirements that relate to Client's business, the Client's Programs, this Supplement, or the matters and transactions contemplated herein.

(b)   Client will provide on an ongoing basis, at least once each calendar year, updated balance sheets and related statements of income and cash flow, as well as year-end or fiscal year financial statements and tax returns prepared by an outside accountant.

(c)   Client will provide a list of all material written consumer complaints received by Client, relating to the Card or its use, will be reported to Bank no later than weekly.   Such report shall include the name and address of the complaining Customer, a brief summary of the Customer's complaint, and when resolved a brief summary of how the complaint was resolved.

(d)   Any litigation or court proceedings filed against Client, relating to the Card or its use, or the outcome of which might materially adversely affect the continuing operations of Client, will be immediately reported to Bank.   Such report shall include a copy of the court papers or proceedings, together with a summary of the Client's position with respect to the matter, the name and address of Client's counsel handling the matter, and the likelihood of settlement of such matter.

(e)   Client has received an electronic copy of the applicable System Rules, as applicable, which may be amended by System from time to time.

(f)   Client will obtain or will at all times maintain appropriate licenses required with respect to any Marks, copyrights and patents used by Client effecting any and all aspects of Client's performance of this Supplement.

(g)   Client will implement the BSA/AML/OFAC policies and procedures approved by Bank to approve Customers, to report Transactions to the Bank as required by the Bank, and to monitor Transactions for suspicious activity and to notify Bank of the same.   Client shall provide to Bank a summary report of findings from Client's fraud monitoring upon request.

(h)   Client shall implement policies and procedures approved by Bank with respect to (i) employee training and (ii) customer service levels to be provided to Customers and potential Customers, including but not limited to the handling or escalation of consumer complaints.

(i)   Client shall be responsible for the handling/escheatment of any Customer Funds that constitute unclaimed, abandoned or similar property under Legal Requirements based upon the Customer records maintained by Client, including returning unspent funds to owners to the extent required under applicable Systems Rules. Client shall provide such applicable reports and notices that may be reasonably requested by Bank from time to time.

P. 4 of 26

## ARTICLE VI - DUTIES OF BANK

### SECTION 6.1    Assessment, Development and Approval of Programs

Bank shall work closely with Client to develop Programs that meet Bank's strategic objectives and customer goals. Any Programs proposed by Client shall be reviewed and assessed by the Bank, and shall be approved or declined in Bank's sole discretion.

### SECTION 6.2    Holder of FBO Account

Bank shall be the holder of the FBO Account through which funds sent by Customers will be held.

### SECTION 6.3    Settlement

Bank shall provide for Settlement for all transactions made under the Program. To facilitate Settlement, Bank has established or will establish one or more Settlement Accounts owned by Bank. Client agrees all Customer Funds shall be held in an FBO Deposit Account owned and controlled solely by Bank.

### SECTION 6.4    Program Monitoring

(a)  At all times, Bank shall be responsible for monitoring Client's performance of services hereunder and the results of the Program developed and implemented jointly with Client. Bank shall review reports and financials from the Programs, and shall meet regularly with Client, on at least a semi-annual basis, to discuss the results of the Program (including any problems, losses or complaints, and any changes or modifications that may be necessary to ensure the viability of the Programs).

(b)  Client acknowledges it is subject to examination under the Bank Service Company Act and is subject to an assessment by Bank or its designee of Client's ability to perform its contractual obligations pursuant to this Supplement and acknowledges the statutory authority of all relevant regulatory entities to regulate, examine, and take an enforcement action against Client with respect to the activities performed by Client hereunder.

## ARTICLE VII – COMPLIANCE WITH LAW; DISASTER RECOVERY

### SECTION 7.1    Legal Compliance

Each Party will comply with all federal statutes, rules, laws and regulations, all rules, orders and decrees under Applicable Law, Governmental Requirements and Rules that relate to the Bank's performance of its duties and obligations pursuant to this Supplement. Without limiting the foregoing, the Parties acknowledge and agree that (i) Bank, in addition to its own anti-money laundering compliance obligations, will also delegate anti-money laundering compliance and OFAC compliance obligations under applicable law, including, without limitation, the Bank Secrecy Act, to Client, (ii) Client shall develop, implement and maintain an anti-money laundering and OFAC compliance program compliant with applicable law and approved by Bank, which addresses such obligations, and (iii) The Parties acknowledge that Programs established under this Supplement may be deemed a "prepaid program" under rules promulgated by FinCEN at 31 C.F.R. Part 1010 and 31 C.F.R. Part 1022 and regulations or official interpretations of FinCEN thereunder (the "Prepaid Access Rule"). The Parties agree that Bank exercises primary oversight and control over the Programs, and that because the Programs are therefore bank-controlled, neither Client nor any other Program Affiliate or person is required to register as "provider of prepaid access" pursuant to the Prepaid Access Rule.

### SECTION 7.2    Disaster Recovery

Each Party shall have a viable and tested contingency plan ("Disaster Recovery Plan") in effect and hereby warrants that any third party performing any of its duties hereunder that has access to Customer data has represented to such Party that it has a viable and tested contingency plan in effect. Each Party's Disaster Recovery Plan shall provide for short–term recovery of data for processing, reasonable security, confidentiality of customer data and reasonable period for full recovery in relation

to the volume and importance of the application to such Party's operations and duties under this Supplement. Client shall deliver a copy of such Disaster Recovery Plan to Bank upon Bank's request, which plan shall be subject to review and approval by Bank. Each Party shall test its Disaster Recovery Plan by conducting at least one test annually, and Client agrees to provide Bank a copy of its written test report within a reasonable time after completion of each test. Upon Bank's request, Bank shall have the right in its reasonable discretion to participate by conference call in Client's annual testing of its Disaster Recovery Plan if reasonably deemed necessary or appropriate by Bank. On an annual basis, Client shall provide Bank an executive summary of Client's Disaster Recovery Plan and a new copy of the Disaster Recovery Plan, each dated as of the year that it is provided to Bank, and shall provide Bank a new executive summary of its Disaster Recovery Plan and a new copy of the Disaster Recovery Plan promptly after any time during the Term of this Supplement that Client amends such plan.

## ARTICLE VIII – COMPENSATION AND EXPENSES

**SECTION 8.1    Expenses of Bank**
Bank shall be solely responsible for the following expenses:
(a)  Membership fees related to Bank's own membership in any System utilized by a Program.
(b)  Bank shall pay its own costs and overhead generated from its review, assessment and development of Programs, and from its supervision and oversight of Client and the Program results.

**SECTION 8.2    Expenses of Client**
Client shall be solely responsible for the following:
(a)  Advertising and other expenses associated with the Program.
(b)  All fees, fines and penalties assessed by any Regulatory Authority or System (other than Bank) due to Client's or Licensees actions, inactions, or omissions.
(c)  All expenses associated with and losses resulting from over limit processing, Customer or Cardholder fraud, value load fraud and under floor limit processing shall be paid on a daily basis from the Reimbursement Account or Operating Account.
(d)  A fee not to exceed ███████ annually to Bank to offset the expenses for conducting such inspections and audits as described in Section 4.1(f).
(e)  Any fees charged by a System, if any, in relation to Client's registration, as applicable, as a marketing agent or service provider of Bank in connection with the Program.
(f)  All fees charged by a System for any purpose related to the Program.
(g)  All expenses associated with establishing and maintaining any accounts with, or receiving services from, any financial institution providing Settlement and all expenses in providing Bank with account balances.
(h)  All expenses associated with completing a due diligence review for any third-party vendor or contractor relationship contemplated in this Supplement.
(i)  All expenses associated with Client's retention, oversight and supervision of a processor providing Processing Services.

**SECTION 8.3    INTENTIONALLY DELETED**

**SECTION 8.4    Right of Set-Off**
If at any time Bank determines that Client has breached any of the terms, conditions, obligations, covenants, representations or warranties under this Supplement, and Client is indebted to Bank, Bank may, without prior notice, exercise a right of set-off against the Reserve Accounts and the Program Revenue Account and exercise all other rights and remedies provided in this Supplement or the Uniform Commercial Code or the New York Uniform Commercial Code as applicable. Client hereby agrees that Bank shall have the right to enforce its rights as provided herein. Client agrees that any and all costs incurred by Bank in enforcing this Supplement, including reasonable attorneys' fees, shall constitute additional indebtedness owed by Client to Bank pursuant to this Supplement. Client represents and warrants none of the funds in any Client account held by Bank, including the Program Revenue Account or the Reserve Account, and any other Client funds are "trust funds" or funds belonging to other parties. Client agrees to execute such documentation including, but not limited to, security

P. 6 of 25
m

agreements, UCC-1 Financing Statements, assignments and notices of assignment, as may be reasonably requested in writing by Bank to effectuate and perfect its security interests granted pursuant to this Section 8.4.

## ARTICLE IX - LIMITATION OF LIABILITY

**SECTION 9.1    No Special Damages**

Neither Party shall be liable to the other, whether in contract, tort, equity or otherwise, for any indirect, incidental, consequential, special, punitive or exemplary damages arising from or relating to this Supplement.  Notwithstanding the foregoing, the limitations set forth in this Section shall not apply to or in any way limit a claim that (i) is subject to the third-party indemnity obligations under this Supplement, (ii) arises out of a breach of confidentiality or a breach of information security, (iii) with respect to Bank, arises out of gross negligence, willful misconduct or fraud, or (iv) with respect to Client, arises out of gross negligence, willful misconduct or fraud.

**SECTION 9.2    Disclaimers of Warranties**

Bank specifically disclaims all warranties of any kind, express, implied, statutory or otherwise, arising out of or related to this Supplement, including without limitation, any warranty of marketability, fitness for a particular purpose or non-infringement, each of which is hereby excluded by agreement of the Parties.

**SECTION 9.3    Liabilities of Client for System, Regulatory and other Claims**

Client shall be liable to Bank for any and all liabilities and every loss, cost, expense, claim, demand, and cause of action (including, without limitation, the cost of investigating the claim, the cost of litigation and reasonable attorneys' fees, whether or not legal proceedings are instituted and whether paid or incurred, as the case may be) by or on behalf of any Customer, Regulatory Authority, System, or other third party as a result of any of Client's Programs or the Client's failure to fully comply with the Legal Requirements.

## ARTICLE X – TERM OF PROGRAMS AND AGREEMENT

**SECTION 10.1    Term**

The term of this Supplement shall commence on the Effective Date and continue for three (3) years (the "Initial Term") unless terminated earlier as provided below.  After the Initial Term, this Supplement shall automatically extend for additional periods of three (3) years each (a "Renewal Term") unless either Party terminates this Supplement for any reason by providing written notice to the other at least 180 days prior to the commencement of the next Renewal Term. The Initial Term and any Renewal Term(s) are collectively referred to herein as the "Term".

**SECTION 10.2    Termination of Supplement**

(a)  Either Bank or Client shall have the right to terminate this Supplement upon occurrence of one or more of the following events:

(i)  Failure by the other Party to observe or perform, in any material respect, that Party's obligations to the other Party hereunder, so long as the failure is not due to the actions or failure to act of the terminating Party, but only if the failure continues for a period of (A) thirty (30) days after the non-performing Party receives written notice from the other Party specifying the failure in the case of a failure not involving the payment of money, or (B) ten (10) days after the non-performing Party receives written notice from the other Party specifying the failure in the case of a failure to pay any amount then due hereunder; provided, however, that Bank, in its sole discretion, may terminate this Supplement without such a cure period if a substantially similar material failure has previously occurred;

(ii)  In the event any financial statement, representation, warranty, statement or certificate furnished to it by the other Party in connection with or arising out of this Supplement is untrue, misleading or omits material information, as of the date made or delivered and is adverse towards the terminating Party.

(iii)  A Party (A) voluntarily or involuntary (and such involuntary petition or proceeding is not dismissed within sixty (60) days) commences (or is the subject of, as the case may be) any proceeding or filing any petition seeking relief under Title 11 of the United States Code or any other Federal, state or foreign bankruptcy, insolvency, liquidation or similar law, (B)

applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator or similar official for such Party or for a substantial part of its property or assets, (C) makes a general assignment for the benefit of creditors, (D) commences the winding up or liquidation of its business or affairs, or (E) takes corporate action for the purpose of effecting any of the foregoing.

(iv)  Upon any change to or enactment of or change in interpretation or enforcement of any law or regulation which would have a material adverse effect upon such Party's ability to perform its obligations or such Party's costs/revenues with respect to the Program.

(v)  Violation by either Party of any material federal or applicable state law relating to the performance of this Supplement.

(vi)  Upon direction from any Regulatory Authority or System to cease or materially limit performance of the rights or obligations under this Supplement or the inability to obtain any required regulatory approvals.

(b)  Notwithstanding the foregoing, Bank shall be entitled at any time, upon at least two hundred seventy (270) days prior written notice to Client, to terminate Bank's issuance of any new Card or to terminate Bank's participation in any new Program.  Such termination will not affect or impact any other Cards or Programs implemented hereunder.  In the event the Bank exercises its right to terminate any Cards or Programs under this subsection 10.2(b), the Bank will assist the Client to ensure a smooth transition for Client with any affected Customers as set forth in Section 10.3 below.

**SECTION 10.3    Termination, Effect of Termination and Transition Assistance**

(a)  In the event: (i) any Cards or any Programs are terminated by Bank without cause pursuant to Section 10.2(b); or (ii) this Supplement is terminated by Client due to a material default by Bank; then, upon Client's request, Bank will take commercially reasonable steps to permit the relevant BINs or Programs to be transferred to another issuing financial institution.

(b)  In the event that: (i) Bank elects to terminate any Card or any Program; or (ii) this Supplement is terminated for any reason the Parties will cooperate to provide a smooth and orderly wind-down of the Program or Programs involved.

(c)  Termination or expiration of this Supplement shall not preclude either Party from pursuing other remedies available to it, including injunctive relief, nor shall such termination or expiration relieve Client's obligation to pay all fees or charges that have accrued or are otherwise owed by Client under this Supplement, including Minimum Transaction Fees, for the remainder of the then-current term, which shall be due and payable upon the early termination of this Supplement for any reason other than an uncured material breach by Bank or a termination by Bank under Subsection 10.2(a)(i), (ii), (iii), (iv) or (v).  Should Bank terminate this Agreement other than for cause or if termination is due to Bank's breach, then the Minimum Transaction Fees shall be waived for the remainder of the then-current term.

(d)  Liquidated Damages.  The Parties agree that the pricing under this Supplement was determined by mutual agreement based upon certain assumed volumes of processing activity and the length of the Term of this Supplement. The Parties further agree that it would be difficult or impossible to ascertain Bank's actual damages for an early termination of this Supplement by Client for its convenience or by Bank due to Client's breach.  Accordingly the Parties agree that, in the event of an early termination of this Supplement by Client for its convenience or by Bank due to Client's breach, the Bank is entitled to the following due to the termination of the Supplement prior to the end of its then-current term: the aggregate of (i) all fees earned but not paid prior to the date of termination, (ii) any direct costs incurred as a result of the termination, deconversion and/or change-over; and (iii) $120,000.  Each Party acknowledges and agrees, after taking into account the terms of this Supplement and all relevant circumstances at the date hereof, that the liquidated damages payable under this Section represent a reasonable and genuine pre-estimate of the damages which would be suffered by Bank in the event of early termination of this Supplement and do not constitute a penalty.

(e)  In no event will any Parties make any public statement or customer communication regarding the termination or wind-down of this Supplement, or any Cards or Programs without the express prior written approval of both Bank and Client, which approval shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, Client agrees that Bank may communicate the termination or expiration of this Supplement with any Party that Client has contracted with to provide any Processing Services, marketing, or other service with regard to this Program.

P. 8 of 26
m

## ARTICLE XI – CONFIDENTIALITY

**SECTION 11.1      Confidential Information**

The term "Confidential Information" shall mean this Supplement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever which (a) a Party ("Discloser") discloses, in writing, orally or visually, to the other Party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Supplement, and which (b) relates to (i) the Discloser, (ii) in the case of Client, Bank and its customers and or associates, or (iii) consumers who have made confidential or proprietary information available to Client and/or Bank. The definition of Confidential Information shall include Customer Information as described below.

**SECTION 11.2      Compliance with the Gramm-Leach-Bliley Act**

The purpose of this Section is to ensure that this Supplement and the activities conducted hereunder conform to the applicable provisions of the Gramm-Leach-Bliley Act (the "Act").  Client acknowledges and agrees that "Non-Public Personal Information" and "Personally Identifiable Financial Information" (as defined in Sections 573.3(n) and (o) respectively of the Office of Thrift Supervision Regulations on Privacy of Consumer Information published at 12 CFR Chapter V) about Bank's customers shall be considered as confidential and proprietary information of Bank, and shall not be disclosed to or shared with any third party without prior written consent of Bank.  Client agrees to implement and maintain appropriate measures designed to meet the objectives of the guidelines establishing standards for safeguarding Non-Public Personal Information and Personally Identifiable Financial Information as adopted from time to time by the Office of Thrift Supervision.  Except as provided in, and subject to the limitations stated herein, Client will not compile, use, sell or otherwise distribute any lists of Bank's customers nor use the names, account numbers or any other Non-Public Personal Information and Personally Identifiable Financial Information about Customers to compile, use, sell or distribute lists or data for use by Client, its subsidiaries or affiliates, or by any third parties.  Client will instruct its employees, agents and contractors (including the processor) as to the confidentiality of the Non-Public Personal Information and Personally Identifiable Financial Information and will not disclose any such Non-Public Personal Information or Personally Identifiable Financial Information to any third party or entity.  Client also agrees that any dissemination of the aforementioned confidential Non-Public Information or Personally Identifiable Financial Information within its own business entity, and to agents, and contractors, shall be restricted to "a need to know basis" for the purpose of performance hereunder.  Client shall protect any Non-Public Personal Information and Personally Identifiable Financial Information from disclosure with no less than the same degree of care afforded by Client to its own Confidential Information.  The foregoing restrictions on disclosure of Non-Public Personal Information and Personally Identifiable Financial Information shall apply for so long as is required under applicable statutes and regulations. All Client obligations and undertakings relating to Non-Public Personal Information and Personally Identifiable Financial Information shall survive the termination of this Supplement for whatever reason.  Non-Public Personal Information and Personally Identifiable Financial Information may be collectively referred to herein as "Customer Information".

Client agrees and represents to Bank that it (or its processor) will implement a security program including measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information (the "Security Guidelines").  Bank has the right to make reasonable requests to inspect, during normal business hours and upon 30 days advance written notice, Client's Program, associated audit reports, summaries of test results or equivalent measures taken by Client or the processor to ensure that its security measures meet the objectives of the Security Guidelines in accordance with the Rules and this Supplement.

In carrying out the above-described obligations to secure and protect the respective Confidential Information, Client agrees that it will protect Confidential Information and will require any of its service providers or subcontractors to protect and safeguard the Confidential Information to the same degree required of Client.

Client agrees that in the event there is a breach of security resulting in unauthorized disclosure of the Confidential Information, Client will promptly notify Bank of such breach, the nature of such breach, and the corrective action taken to respond to the breach.

P. 9 of 26

**SECTION 11.3    Disclosure to Employees and Agents.**

Each of the Parties, as Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates, agents, representatives, contractors and subcontractors that Confidential Information will not be disclosed or made available to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third-parties specifically permitted under this Supplement, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; (c) independent contractors, agents, and consultants hired or engaged by Recipient, provided that all such persons are subject to a confidentiality agreement which shall be no less restrictive than the provisions of this Section; and (d) as required by law or as otherwise permitted by this Supplement, either during the term of this Supplement or after the termination of this Supplement. Prior to any disclosure of Confidential Information as required by law or regulation, the Recipient shall (i) notify the Discloser of any, actual or threatened legal compulsion of disclosure, and any actual legal obligation of disclosure immediately upon becoming so obligated, and (ii) cooperate with the Discloser's reasonable, lawful efforts to resist, limit or delay disclosure. Nothing in this Section shall require any notice or other action by Bank in connection with requests or demands for Confidential Information from bank examiners or for compliance purposes.

**SECTION 11.4    Non-Solicitation of Employees**

The Parties agree that they shall neither seek to employ nor employ any employee of the other Party nor otherwise interfere with the contractual relationship of any employee, agent or contractor of the other Party for a period commencing on the Effective Date of this Supplement and ending on the later to occur of: (i) three (3) years following the Effective Date of this Supplement; or (ii) two (2) years following the date of actual termination (for any reason) of this Supplement. The foregoing restrictions shall not apply to any person solicited solely by means of a general solicitation.

**SECTION 11.5    Return of Materials**

Upon the termination or expiration of this Supplement, or at any time upon the request of a Party, the other Party shall return (or destroy if so directed by the other Party) all Confidential Information, including Customer Information, in the possession of such Party or in the possession of any representative, contractor or third party otherwise required by this Supplement or Applicable Law. If destroyed, such destruction of Confidential Information shall be designated by a certificate executed by an officer of the Party which was responsible for such destruction.

**SECTION 11.6    Exceptions**

With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section shall not apply to any information which a Party rightfully has in its possession when disclosed to it by the other Party, information which a Party independently develops, information which is or becomes known to the public other than by breach of this Section or information rightfully received by a Party from a third party without the obligation of confidentiality.

**SECTION 11.7    Media Releases**

All media releases, public announcements and public disclosures by either Party, or their representatives, employees or agents, relating to this Supplement or the name or logo of Bank or Client, any Bank or Program Affiliate or supplier, including, without limitation, promotional or marketing material, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing Party, shall be coordinated with and approved by the other Party in writing prior to the release thereof.

## ARTICLE XII - GENERAL PROVISIONS

**SECTION 12.1    Indemnification**

(a)    Client covenants and agrees to indemnify and hold harmless and defend Bank, its parent, subsidiaries or affiliates, and their respective officers, directors, employees and permitted assigns, as such, against any losses, costs or expenses, including but not limited to attorneys' fees, arising from any third party legal action, claim, demand or proceedings brought against any of them as a result of: (i) any misrepresentation, breach of representation or warranty or failure to fulfill a covenant of this Supplement on the part of Client; (ii) any act or omission of Client or its  contractors, providers or

P. 10 of 26

representatives which violates any Legal Requirement; (iii) any claim or action against the Bank related to any state or local law, rule regulation, or ordinance; (iv) any claim or action by any state regulatory agency, subdivision, or attorney general relating to any of Client's Programs; or (v) any claim relating to obligations owed to or by Client or any third party retained by it. Provided, however, that this provision shall not apply if such claim arises out of (i) an act of fraud, embezzlement or criminal activity by Bank, (ii) willful misconduct or bad faith by Bank, or (iii) the failure of Bank to comply with, or to perform its obligations under, this Supplement.

(b)   Bank covenants and agrees to indemnify and hold harmless Client and its parent, subsidiaries or affiliates, and their respective officers, directors, employees, and permitted assigns, as such, against any losses, costs or expenses arising from any legal action, claim, demand, or proceedings brought against any of them as a result of: (i) any misrepresentation, breach of representation or warranty or failure to fulfill a covenant of this Supplement on the part of Bank; (ii) any act or omission of Bank or its contractors, providers or representatives which violates any federal statutes, rules, laws or regulations, any rules, orders or decrees of the Office of Thrift Supervision, or Rules; or (iii) any claim relating to obligations owed to or by Bank or any third party retained by it (except to the extent that Client has agreed to fulfill such obligation under this Supplement).   Provided, however, that this provision shall not apply if such claim arises out of (i) an act of fraud, embezzlement or criminal activity by Client or its contractors, providers or representatives, (ii) negligence, willful misconduct or bad faith by Client or its contractors, providers or representatives, or (iii) the failure of Client or its contractors, providers or representatives to comply with, or to perform its obligations under, this Supplement.

(c)   If any claim or demand is asserted against any Party or Parties (individually or collectively, the "Indemnified Party") by any person who is not a party to this Supplement in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections (a) or (b) above, written notice of such claim or demand shall promptly be given to any Party or Parties (individually or collectively, the "Indemnifying Party") from whom indemnification may be sought. The Indemnifying Party shall have the right, by notifying the Indemnified Party within ten (10) days of its receipt of the notice of the claim or demand, to assume the entire control (subject to the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice) of the defense, including, at the Indemnifying Party's expense, employment of counsel subject to the approval of Indemnified Party, which approval shall not be unreasonably withheld. Indemnifying Party shall not compromise or settle the matter without the consent of Indemnified Party, which consent shall not be unreasonably withheld. If the Indemnifying Party gives notice to any Indemnified Party that the Indemnifying Party will assume control of the defense of the matter the Indemnifying Party will be deemed to have waived all defenses to the claims for indemnification by the Indemnified Party with respect to that matter. Any damage to the assets or business of the Indemnified Party caused by a failure of the Indemnifying Party to defend, compromise or settle a claim or demand in a reasonable and expeditious manner, after the Indemnifying Party has given notice that it will assume control of the defense, shall be included in the damages for which the Indemnifying Party shall be obligated to indemnify the Indemnified Party.

## SECTION 12.2    Disclosure

(a)   Each Party shall promptly notify the other of any action, suit, proceeding, facts and circumstances, and the threat of reasonable prospect of same, which might give rise to any indemnification hereunder or which might materially and adversely affect either Party's ability to perform this Supplement.

(b)   Each Party represents and warrants to the other that it has no knowledge of any pending or threatened suit, action, arbitration or other proceedings of a legal, administrative or regulatory nature, or any governmental investigation, against it or any of its affiliates or any officer, director, or employee which has not been previously disclosed in writing and which would materially and adversely affect its financial condition, or its ability to perform this Supplement.

## SECTION 12.3    Use of Marks

(a)   Bank hereby grants to Client during the Term, a non-exclusive, royalty-free, non-assignable license, in the United States, to use Bank's Marks (and the copyrights that exist in such Marks, if any) as the Bank authorizes in connection with the Program in accordance with the Graphic Specifications, including on the Cards, on Customer Agreements, and in other communications to Customers and prospective Customers. Bank's Marks shall be used only in the forms and format expressly approved by Bank, which approval shall not be unreasonably withheld, condition or delayed. Except as provided herein, it is expressly agreed that neither Client nor any Customer is acquiring any right, title or interest (other than the

P. 11 of 26

foregoing license rights) in Bank's Marks, which shall remain the property and/or rights of Bank. Client agrees that it shall not challenge the title or any rights of Bank in and to Bank's Marks.

(b) Client hereby grants to Bank during the Term, and any wind-down or Transition Period, a non-exclusive, non-assignable license, in the United States, to use Client's Marks (and the copyrights that exist in such Marks, if any) as Client authorizes in connection with the Program, including on the Cards, on Customer Agreements, and in other communications to Customers and prospective Customers. Client's Marks shall be used only in the forms and format expressly approved by Client, which approval shall not be unreasonably withheld, condition or delayed. Except as provided herein, it is expressly agreed that neither Bank nor any Customer is acquiring any right, title or interest (other than the foregoing license rights) in Client's Marks, which shall remain the property and/or rights of Client. Bank agrees that it shall not challenge the title or any rights of Client in and to Client's Marks.

### SECTION 12.4    Insurance and Bond / Letter of Credit

(a) Client shall maintain, throughout the term of this Supplement, appropriate comprehensive general liability (which shall include contractual liability), errors and omissions, bodily injury, property damage, and employee theft and dishonesty insurance policies, the limit of which shall be no less than a combined single limit of $1,000,000 per occurrence and naming the Bank as additional insured.

### SECTION 12.5    Third Party Services

Client shall obtain Bank's prior written approval, which Bank may grant or deny in its sole discretion, before retaining any third party to perform any services to be provided by Client pursuant to this Supplement, and will assist Bank in obtaining such due diligence materials from, or agreements with, any proposed third-party service provider that Bank may deem reasonably necessary or that may otherwise be required by Applicable Law. Bank's approval of any proposed third-party service provider shall not in any way relieve Client of its duties and obligations under this Supplement, nor shall such approval constitute a representation or warranty by Bank that the services to be performed or products to be furnished by such Program Affiliate will be performed as agreed or represented.

### SECTION 12.6    Relationship of Parties

Bank and Client agree they are independent contractors to each other in performing their respective obligations hereunder. Nothing in this Supplement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, Bank and Client to be treated as partners, joint ventures, or otherwise as joint associates for profit.

### SECTION 12.7    Regulatory Examinations and Financial Information

Client agrees to submit to any examination which may be required by any Regulatory Authority or System with audit and examination authority over Bank, to the fullest extent of such Regulatory Authority or System. Client shall also provide to Bank any information, which may be required by any Regulatory Authority or System in connection with their audit or review of Bank or the Program and shall reasonably cooperate with such Regulatory Authority or System in connection with any audit or review of Bank. Client shall furnish Bank, at Client's expense, with audited financial statements prepared by a certified public accountant. Client shall also provide such other information as Bank, Regulatory Authorities, or the System may from time to time reasonably request with respect to the financial condition of Client and such other information as Bank may from time to time reasonably request with respect to third parties contracted with Client.

### SECTION 12.8    Governing Law

This Supplement shall be governed by the internal laws, and not by the laws regarding conflicts of laws, of the State of New York. Each Party hereby submits to the jurisdiction of the courts of such state, and (subject to the Bank's reservation of preemption rights above) waives any objection to venue with respect to actions brought in such courts and further waives the right to trial by jury.

### SECTION 12.9    Severability

In the event that any part of this Supplement is deemed by a court, Regulatory Authority, System, or other public or

P. 12 of 26

private tribunal of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Supplement. The remainder of this Supplement shall remain in full force and effect and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent.

**SECTION 12.10    Survival**

All representations, warranties, and covenants contained herein shall survive any termination or expiration of this Supplement. In addition to the representations, warranties, and covenants contained here, the Parties agree that the following sections will survive termination: Article IX (Limitation of Liability); Article XI (Confidentiality); Article XII (General Provisions).

**SECTION 12.11    Successors and Third Parties**

Except as limited by Section 12.10, this Supplement and the rights and obligations hereunder shall bind and inure to the benefit of the Parties and their successors and permitted assigns.

**SECTION 12.12    Assignments**

The rights and obligations of Client under this Supplement are personal and may not be assigned either voluntarily or by operation of law, without prior written consent from Bank.

**SECTION 12.13    Notices**

All notices, requests and approvals required by this Supplement shall be in writing addressed/directed to the other Party at the address by registered mail, return receipt requested, or at such other address of which the notifying Party hereafter receives notice in conformity with this section. All such notices, requests, and approvals shall be deemed given upon actual receipt thereof. All such notices, requests and approvals shall be addressed to the attention of:

|  |  |
|---|---|
| Bank to: | Metropolitan Commercial Bank |
|  | 99 Park Ave., New York, NY 10016 |
|  | Attention: Nick Rosenberg, EVP |
|  | Facsimile Number: 212-659-0610 |
|  |  |
| With Copy to: | Michael Guarino, EVP/Legal |
|  |  |
| Client to: | Stephen Ehrlich |
|  | **Voyager Digital, LLC** |
|  | **54 Thompson Street 3rd Floor** |
|  | **New York, NY 10012** |
|  | **917-885-9024** |

**SECTION 12.14    Waivers**

Neither Party shall be deemed to have waived any of its rights, power, or remedies hereunder except in writing signed by an authorized agent or representative of the Party to be charged. Either Party may, by an instrument in writing, waive compliance by the other Party with any term or provision of this Supplement on the part of the other Party to be performed or complied with. The waiver by either Party of a breach of any term or provision of this Supplement shall not be construed as a waiver of any subsequent breach.

**SECTION 12.15    Entire Agreement; Amendments**

This Supplement constitutes the entire Agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. This

Supplement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought.

**SECTION 12.16    Counterparts**

This Supplement may be executed and delivered by the Parties in counterpart, each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

**SECTION 12.17    Disputes**

(a)    Duty to Notify.  In the event of any dispute, controversy, or claim arising out of or relating to this Supplement or the construction, interpretation, performance, breach, termination, enforceability or validity thereof (hereinafter, a "Dispute"), the Party raising such Dispute shall notify the other promptly and no later than sixty (60) days from the date of its discovery of the Dispute.  In the case of a Dispute relating to account or transaction statements or similar matter, the failure of a Party to notify the other Party of such Dispute within sixty (60) days from the date of its receipt shall result in such matter being deemed undisputed and accepted by the Party attempting to raise such Dispute.

(b)    Cooperation to Resolve Disputes.  The Parties shall cooperate and attempt in good faith to resolve any Dispute promptly by negotiating between persons who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration and performance of the provisions or obligations of this Supplement that are the subject of the Dispute.

(c)    Arbitration.  Any Dispute which cannot otherwise be resolved as provided in paragraph (b) above shall be resolved by arbitration conducted in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereof.  The arbitration tribunal shall consist of a single arbitrator mutually agreed upon by the Parties, or in the absence of such agreement within 30 days from the first referral of the Dispute to the American Arbitration Association, designated by the American Arbitration Association.  The place of arbitration shall be New York City, New York, unless the Parties shall have agreed to another location within 15 days from the first referral of the Dispute to the American Arbitration Association.  The arbitral award shall be final and binding.  The Parties waive any right to appeal the arbitral award, to the extent a right to appeal may be lawfully waived.  Each Party retains the right to seek judicial assistance: (i) to compel arbitration, (ii) to obtain interim measures of protection prior to or pending arbitration, (iii) to seek injunctive relief in the courts of any jurisdiction as may be necessary and appropriate to protect the unauthorized disclosure of its proprietary or confidential information, and (iv) to enforce any decision of the arbitrator, including the final award.  In no event shall either Party be entitled to punitive, exemplary or similar damages.

(d)    Confidentiality of Proceedings.  The arbitration proceedings contemplated by this Section shall be as confidential and private as permitted by law.  To that end, the Parties shall not disclose the existence, content or results of any proceedings conducted in accordance with this Section, and materials submitted in connection with such proceedings shall not be admissible in any other proceeding, provided, however, that this confidentiality provision shall not prevent a petition to vacate or enforce an arbitral award, and shall not bar disclosures required by any laws or regulations.

**SECTION 12.18    Headings**

The table of contents, various captions and section headings in this Supplement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Supplement.  References in this Supplement to any Section are to such Section of this Supplement.

**SECTION 12.19    Drafting Presumption**

Client and Bank agree that they participated in the drafting of this Supplement and, in the event that any dispute arises in the interpretation or construction of this Supplement, no presumption shall arise that either one Party or the other drafted this Supplement.

**IN WITNESS WHEREOF**, this Supplement is executed by the Parties' authorized officers or representatives and shall be effective as of the date first above written.

P. 14 of 26

**CLIENT:** Voyager Digital Holdings, Inc.                    **BANK**

By: _Steve Ehrlich_                                          By: _Nick_ ✓

Name: _Stephen Ehrlich_                                      Name: _NICK ROSENBERG_

3724C7F0863B428...                                           Title: _EVP_

Title:        CEO                                            Name: _Michael A Guarino_

                                                             Title: _EVP_

P. 15 of 26

## Schedule A

Underwriting Guidelines for Program Affiliates

**Underwriting Guidelines for Program Affiliates**

The following guidelines are established to define due diligence requirements for Client's Program Affiliates (i.e., retailers, sales and marketing agents, third party service providers, etc.) who purchase, participate in or provide services for the Prepaid Stored Value Program and other Programs defined in Schedule A and elsewhere in this Agreement. Circumstances may arise which would permit variances to these procedures, based on industry trends or association requirements; however variances will be in writing, authorized by a Bank officer, and approved by Bank's compliance department prior to implementing a change.  Bank will require verified documentation prior to review and acceptance of any program related to the affiliate. Background checks including, without limitation, Lexis Nexis, D&B, entity status searches, etc. will be performed by Bank at Client's expense unless alternative process is independently reviewed and approved by the Risk Committee.

1.  Table 1: Description of Program Affiliates and Required Due Diligence Levels defines the role(s) that each potential affiliate plays in the Prepaid Stored Value Card Program and the corresponding level of information/due diligence required to be held on file and provided to Bank. Upon request.

| Table 1: Description of Program Partners and Required Due Diligence Levels | | | |
|---|---|---|---|
| **Affiliate Type** | **Examples** | **Defined** | **Due Diligence to be shared with Bank** |
| Indirect Marketers, Distributors | • Direct mailers <br> • Print ads <br> • Email lists <br> • Call center transfers <br> • Affiliate Systems | • Marketer runs ad campaign using Client's creative materials <br> • Transfer of Customer to Client <br> • Client provides scripts, etc. <br> • Client controls/monitors ads, etc. <br> • Marketer **does not** touch Customer data at any time. | • Level A <br> • Creative, Marketing Materials |
| Employer | • Small to mid-sized businesses <br> • Payroll companies <br> • Temporary staffing agencies | • Contracts to deploy cards to employees <br> • Allows Client to market cards directly to employees <br> • Provides Client's card product to employers who use payroll services <br> • **Does not** touch Customer data other than employee information (i.e., does not handle PAN data) | • Level B <br> • Marketing and employee enrollment forms <br> • Systems, Rules and Regulations |
| Co-Branders | • Large employers <br> • Corporate incentive partners <br> • Cards sold in co-brander's stores <br> • Product tie-ins | • Client seeking brand identity with card product <br> • May or may not participate in distribution of product <br> • **Does not** touch Customer data (exception: retail sales through POS) | • Level B or C (latter if handles card product or Customer data) <br> • Marketing, creative, employee forms <br> • PCI, if applicable |
| Direct Marketers | • Card distributors (Blackhawk, InComm) <br> • Contract marketing or distribution agents <br> • Retail distributors <br> • Web portals hosting Client application/API interface | • Distributes cards to/from retail stores <br> • Directly markets Client's product <br> • Solicits Customers and collects Customer information <br> • **May or may not** touch Customer data, including PAN | • Level C <br> • Marketing, creative materials <br> • PCI, if applicable <br> • Copy of state MSB license and FinCEN MSB registration per location, if applicable |
| Load Systems | • GreenDot <br> • Western Union <br> • PayXone <br> • PaySpot | • Facilitates loading of cards at public/retail locations <br> • Stores, transmits or processes Customer data | • Level C <br> • Funds flow documents <br> • Guaranty of funds or copy of contract <br> • PCI |


P. 1b of 26

| Table 1: Description of Program Partners and Required Due Diligence Levels | | | |
|---|---|---|---|
| **Affiliate Type** | **Examples** | **Defined** | **Due Diligence to be shared with Bank** |
| | | | • State MSB licenses and FinCEN registration, if applicable |
| Digital Currency Exchanges/Custodians | • Coinbase<br>• Paxos<br>• Genesis Global Trading | • Facilitates exchange of digital currency to fiat currency<br>• Hold digital currency on behalf of customers<br>• Stores, transmits or processes Customer data<br>• May maintain E-Wallet | • Level C<br>• Funds flow documents<br>• Guaranty of funds or copy of contract<br>• PCI if applicable<br>• State MSB licenses and FinCEN registration, as applicable |
| Service Providers | • Call centers<br>• Systems Hosts<br>• Mobile payments | • Stores, transmits or processes Customer data<br>• Interacts directly with Customers | • Level C<br>• PCI<br>• Other documentation as appropriate<br>• Prior Bank approval required for third party call centers and mobile payment companies. Bank will require due diligence documents obtained for third party call centers and mobile payments |
| Check Cashing<br><br>Pay-day Lending | • Ace Check Cashing | • Individual locations or Client locations | • Level C<br>• Copy of State MSB license and FinCEN MSB registration per location, if applicable<br>• Funds flow documents<br>• Copy of contract |
| Processors | • Metavante<br>• i2c<br>• TSYS | • Processes Customer data for Transaction Settlement and authorization. | • Level C<br>• PCI<br>• Prior Bank approval<br>• Copy of State MSB license and FinCEN MSB registration per location, if applicable |

2. <u>Table 2: General Due Diligence Requirements</u> define the necessary requirements included with every application for a client/employer, agent or third-party service provider prior to acceptance by Bank. The level of information/due diligence that must be completed is dependent upon the role that the client/employer, agent or third party plays in the management, marketing, distribution, loading, Customer service or processing of the Program (see above Table 1 for the various indicated roles). Due diligence levels are defined in Table 2 below:

P. 120026

MM

| Table 2: General Due Diligence Requirements for Program Affiliates | |
|---|---|
| Level A | 1. Application listing:<br>   a. Legal name, address and state of incorporation/licensing of business<br>   b. Federal tax ID<br>   c. Name, SSN, DOB and contact information of principal owners (10%+)<br>   d. Signature(s) of principals attesting to accuracy of information<br>   e. List of any current or pending law suits in which business is named<br>2. Proof of business (copy of business license, document of corporate registration with state, etc.)<br>3. Any other information required by Systems, card associations or regulators. |
| Level B | Due diligence collected at Level A, plus:<br>1. Client financial information (most current audited financials or Federal tax returns)<br>2. Dunn & Bradstreet report on Client or business credit report on Client<br>3. Public filings, if applicable |
| Level C | Due diligence collected at Levels A and B, plus:<br>1. Principals' financial information (most current Federal tax returns)<br>2. Signed permission to conduct background investigations for all principals<br>3. Civil and criminal background check on principals<br>4. Credit check on principals |

3. <u>Restricted Affiliates</u>: Program Affiliates that fall into any of the following categories or business type are considered an exception and must be approved by the Bank designate. Affiliate request must be submitted to Bank for any additional Bank requirements prior to using services.

    i. "How to" type businesses
    ii. Adoption agencies
    iii. Body Building Products (HGH, Beta Alanine etc.)
    iv. Buying Club/ Shopping Services
    v. Check cashing
    vi. Collection agency
    vii. Online Cosmetics
    viii. Counseling services
    ix. Credit restoration, protection, reporting, or identity theft programs
    x. Dating services
    xi. E-Wallet Providers
    xii. Grants – "Free Money" Assistance
    xiii. Gold Buyers
    xiv. Finance companies
    xv. Furniture Stores (Including Mattress Stores)
    xvi. Internet Insurance Sales
    xvii. Investor services/clubs
    xviii. Management Consulting
    xix. Massage parlors (Does not include Licensed Massage Therapists)
    xx. Medical billing
    xxi. Memberships/Subscriptions/Negative Billing Merchants – Inbound Telemarketing Services
    xxii. Mortgage brokers
    xxiii. Multi-level marketers
    xxiv. Marketers and Distributors of Nutriceuticals and Other Direct Response Products (Acai, Colon Cleanse, Res-V/Anti-Aging, Related Diet Products, Phenylmine, Glucosulin, Teeth Whitening, Male Enhancement, Sexual Enhancement, Green Tea etc.)
    xxv. Outbound phone solicitation/telemarketing
    xxvi. Pornographic solicitation or material including telephone, pictures, books, movies, t-shirts, internet adult sites, etc.
    xxvii. Prepaid legal services
    xxviii. Protection services
    xxix. Real Estate Agents/Brokers

P. 18 of 26
NR

DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA854122

|       |        |                                                            |
|-------|--------|------------------------------------------------------------|
| xxx.   | Search Engine Optimization                                |
| xxxi.  | Seminar brokers                                           |
| xxxii. | Teeth Whitening/Laser Hair Removal Locations             |
| xxxiii.| Telecom                                                   |
| xxxiv. | Telephone sales, solicitation, talk lines, pre-paid phone cards |
| xxxv.  | Third-party processors, aggregators or fulfillment houses |
| xxxvi. | Time shares                                               |
| xxxvii.| Travel agents                                            |
| xxxviii.| Vitamin sales                                           |
| xxxix. | VOIP / Web Phone Services                                |
| xl.    | Web Hosting                                              |

4. <u>Restricted Affiliates</u>: Program Affiliates engaged in the following businesses require approval through the Bank executive committee.

a. Airlines
b. Cruise Lines
c. Airline Carriers
d. Pharmacies (Online Only)
e. Cigar Stores and Stands (Online Only – Includes E-Cigarettes)
f. Betting, Lottery, Off Track Betting, and Gambling
g. Escort Services
h. Medicinal Marijuana Dispensaries
i. Online Alcohol Sales
j. Penny Auctions
k. Drug or sex paraphernalia related
l. Massage parlors
m. Pornographic solicitation or material including telephone, pictures, books, movies, t-shirts, internet adult sites, etc.

## 5. Additional State Requirements

**(1) Authorized Subdelegates** *(for programs involving money transmission activity with Authorized Delegates or Subdelegates in Minnesota)*

The designation of any subdelegates by Program Manager for money transmission purposes under the Program shall be subject to all applicable requirements under Applicable Law, including, but not limited to, the following state statutory requirements:

(i)For all subdelegates to be conducting money transmission activities in Minnesota, neither the Bank nor the Program Manager may authorize a subdelegate to conduct such activity without the written consent of the Minnesota Commissioner of the Department of Commerce; and

(ii) Bank hereby acknowledges that it is subject to the supervision and regulation of the commissioner and that as part of that supervision and regulation, the commissioner may require Bank to cancel an authorized delegate contract as a result of a violation of authorized delegate conduct requirements as outlined in Minnesota Statutes Section 53B.21.

P. 19 of 26

**Schedule B**

**Funding and Settlement Flow Diagrams, Guidelines and Requirements**

P 20 of 26

Schedule C

**Bank Services Term Sheet**

| | |
|---|---|
| To | Stephen Ehrlich, Crypt°Trading Holding Inc. ("Company") |
| From: | Kyle Hingher |
| Re: | Metropolitan Commercial Bank ("Bank") FBO Account Term Sheet |
| Effective Date: | 02/20/2019 |
| Issue Date: | 02/20/2019 |

**CryptoTrading Holding Inc. FBO Account Term Sheet**

The undersigned parties hereby agree to the following terms and conditions regarding fees, revenues and expenses, as applicable, in connection with the Bank serving as depository bank for a US Dollar Bank Account for Company's Digital Currency Program with Company as Program Manager, and any other services agreed upon between the parties in writing — the "Bank Services:

- Bank Costs and Expenses. Company shall pay "Bank" the following costs and expenses t "Bank Costs and Expenses")

| Fee | Price | Notes |
|---|---|---|
| Initial Program Setup Fee and Core Deposit Account Integration Fee | ███████ | This fee shall cover all of MCB's internal and external costs associated with due diligence of establishing bank account. Payable upon signing this term sheet and non-refundable. |
| Legal Expense Pass-through | ████ | This may be incurred when and, in the event, that Company requests the terms and conditions be modified or other changes or requests which require legal documents or opinions to be drafted or discussed in support of your Program with/by outside counsel. Bank will advise company where such legal work will be required and will provide an itemized invoice for each program or document, as applicable. |



DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA854122

| Minimum monthly transaction fees | ████████ | In the event only the Transaction Fees payable in any month are less than (SEE Price), Company shall pay to Bank on a monthly basis the amount equal to (SEE Price) less than the total Transaction Fees payable in that month. |
| --- | --- | --- |

| Fee | Price | Notes |
| --- | --- | --- |
| Wire transaction fee | ████████ | Cost per wire transfer. Includes transaction monitoring fee which is associated with all banks' obligation under regulatory requirement to monitor, identify, and report to FinCen transactions that travel through the bank that present as unusual and/or suspicious activity. |
| ACH transaction fee | ████████ | Cost per ACH transaction. Debits and Credits. Includes transaction monitoring fee which is associated with all banks' obligation under regulatory requirement to monitor, identify, and report to FinCen transactions that travel through the bank that present as unusual and/or suspicious activity. |
| Reserve Account/s | ████████ | This is a non-interest bearing account, established and controlled by Bank as an account for chargeback of ACH debits. Account will be reviewed and/or adjusted any time the daily ACH debit limit is adjusted. |



DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA854122

| | | |
|---|---|---|
| Annual Audit Fee | ███████ | This fee will be used to cover pass through actual third-party audit expenses for annual audit of Company. |
| Early Termination Provisions | TBD | The Parties agree that the pricing under the Term Sheet was determined by mutual agreement based upon certain assumed volumes of processing activity and the length of the Term of the Agreement. The Parties further agree that it would be difficult or impossible to ascertain Bank's actual damages for an early termination of this Agreement by Program Manager for its convenience or by Bank due to Program Manager's breach. Accordingly the Parties agree that, in the event of an early termination of the Agreement by Program Manager for its convenience or by Bank due to Program Manager's breach, the Bank is entitled to the following due to the termination of the Issuer Agreement prior to **the end of its then-current term: the aggregate of (i)** all Bank fees earned but not paid prior to the date of termination, (ii) any direct costs incurred as a result of the termination, de-conversion and/or change-over; and (iii) ██████ Each Party acknowledges and agrees, after taking into account the terms of this Issuer Agreement and all relevant circumstances at the date hereof, that the liquidated damages payable under this Section represent a reasonable and genuine pre-estimate of the damages which would be suffered by Bank in the event of early termination of this Issuer Agreement and do not constitute a penalty. |

P 23 or 26

DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA85412E

No foreign wire transfers are allowed unless authorized by Bank in writing in advance.

Term of Agreement — The term of this Agreement which shall incorporate the terms of this Term Sheet will be for a minimum of five (5) years from contract execution, with auto-renewal after completion of the 60th month, for a successive five (5) year period, unless either party provides notice of non-renewal 180 days in advance of the term date.

• Licensing — Company shall maintain all applicable licensing, registrations and authorizations required under applicable law and/or regulation in order to conduct its business activities for the term of its Banking Services with Bank.

• Insurance — Company maintains adequate coverage of the amounts and types appropriate for the type of business it conducts.

• Final Approval — Final approval of the terms and conditions for the Banking Services, including but not limited to those set forth herein, is subject to a satisfactory Bank Risk Assessment and execution of any agreements required by Bank for the type of Banking Services provided.

• Confidential — This Term Sheet and all pricing, etc. within are considered Bank Confidential Information per the Non-Disclosure Agreement, is for use by the Company in connection with the Banking Services to be provided only and is not to be shared with any third party.

• Term Sheet — This Term Sheet offer expires 30 days after the Issue Date, unless executed by the Company by that time frame and counter-signed by the Bank.

Company: CryptoTrading Holding Inc.

By: *Stephen Ehrlich*

Name:    **Stephen Ehrlich**

Title:    **Chief Executive Officer**

Date: 02/20/19


Bank:  Metropolitan Commercial Bank

By:

Name: Kyle Hingher

Title: VP, Director of New Products

Date: 02/20/19

Client ___   Bank ___

DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA854122

**Schedule D**

**Pending Material Litigation**

Client ___  Bank

DocuSign Envelope ID: FFC238E6-1AB1-44B9-BAA1-0E78BA55412F

**Schedule E**

**Customer Agreement**

See Voyager Digital's user agreement located on their website: https://www.investvoyager.com/useragreement

Client ___  Bank ___

**<u>Exhibit B</u>**

**ACH Origination Agreement**



## **ACH Origination Agreement**

This Agreement (the "ACH Origination Agreement"), dated as of **5/4** 20 **18** is between *CryptoTrading Trading Technologies LLC* ("Company") and Metropolitan Commercial Bank (hereinafter referred to as the "Bank").

## Recitals

A. Company wishes to initiate ACH Entries (as defined below) pursuant to the terms of this ACH Origination Agreement and the rules of the National Automated Clearing House Association (NACHA) and local, State and Federal regulations (the "Rules"), and the Bank is willing to act as an Originating Depository Financial Institution with respect to such Entries.

B. Unless otherwise defined herein, capitalized terms shall have the meanings provided in the Rules. The term "Entries" shall have the meaning provided in the Rules and shall also mean the data received from Company hereunder from which Bank Prepares Entries.

## Agreement

1. **Transmittal of Entries By Company.** Company shall transmit Entries to the Bank in compliance with the formatting and other requirements set forth in Schedule A attached hereto. The total dollar amount of Entries transmitted by Company to the Bank on any day shall not exceed $ _100,000_ (the "ACH Origination Daily Limit").

2. **Security Procedure.** Company and the Bank shall comply with the security procedure requirements described in Schedule B attached hereto with respect to Entries transmitted by Company to the Bank.

3. **Processing, Transmittal and Settlement by the Bank (the "Services").**

   (a) Except as provided in sections 4 and 5, the Bank shall (i) process Entries received from the Company to conform with the file specifications set forth in the Rules and in Schedule A, (ii) transmit such Entries as an Origination Depository Financial Institution to the Federal Reserve Bank, either directly or via a third-party Automated Clearing House processor, and (iii) settle for such Entries as provided in the Rules.

   (b) Bank shall transmit such Entries to the Automated Clearing House (the " ACH") by the deadline of the ACH set forth in Schedule C, provided (i) such Entries are received by the Bank's related cut-off time set forth in Schedule C on a Business Day (as defined below), (ii) the Effective Entry Date is at least two (2) days after such business day, and (iii) the ACH is open for business on such business day. For purposes of this ACH Origination Agreement a "Business Day" is a day on which the Bank is open to the public for carrying on substantially all of its business, and Entries shall be deemed received by the Bank, in the case of transmittal by electronic transmission, when the transmission (and compliance with any related security procedure provided for herein) is completed as provided in Schedule A.

   (c) If any of the requirements of clause (i), (ii), or (iii) of Section 3(b) is not met, the Bank shall use reasonable efforts to transmit such Entries to the ACH by the next deposit deadline of the ACH following that specified in Schedule C which is a business day and a day on which the ACH is open for business.

4. **On-Us Entries.** Except as provided in Section 5, in the case of an Entry received for debit to an account maintained with Bank (an "On-Us Entry"), Bank shall debit the Receiver's account in the amount of such Entry, provided the requirements set forth in clauses (i) and (ii) of section 3(b) are met. If either of those requirements is not met, the Bank shall use reasonable efforts to debit the Receiver's account in the amount of such Entry on the next Business Day following such Effective Entry Date.

5. **Rejection of Entries.** The Bank may reject any Entry, with or without cause, at its sole discretion. Without limiting the foregoing, the Bank may reject any Entry which does not comply with the requirements of Section 1 or 2, or which contains an Effective Entry Date more than 5 days after the business day such Entry is received by the Bank. The Bank shall have the right to reject an On-Us Entry for any reason for which an Entry may be returned under the Rules. The Bank shall have the right to reject the Entry if Company has failed to comply with its account balance obligations under Section 9. The Bank shall have no liability to Company by reason of the rejection of any such Entry.

6.  **Cancellation or Amendment By Company.** Company shall have no right to the cancellation or amendment of any Entry after its receipt by the Bank. However, the Bank shall use reasonable efforts to act on a request by Company for cancellation of an Entry in pending origination status prior to transmitting it to the ACH or, in the case of an On-Us Entry, prior to debating a Receiver's account, provided such request complies with the security procedure set forth in Schedule B for cancellation of Data, but shall have no liability if such cancellation is not affected.

7.  **Notice of Returned Entries.** The Bank shall notify Company by a representative posting to Company's account, of the receipt of a returned Entry from the ACH no later than one Business Day after the Business Day of such receipt. Except for an Entry retransmitted by Company in accordance with the requirements of Section 1, the Bank shall have no obligation to retransmit a returned Entry to the ACH if the Bank complied with the terms of this ACH Origination Agreement with respect to the original Entry.

8.  **Payment.** Company shall pay the Bank the amount of each Entry transmitted by the Bank pursuant to this ACH Origination Agreement at such time on the date of transmittal by the Bank of such Entry as the Bank, in its discretion, may determine, and the amount of each On-Us Entry at such time on the Effective Entry of such Entry as the Bank, in its discretion, may determine.

9.  **The Account.** The Bank may, without prior notice or demand, obtain payment of any amount due and payable to it under this ACH Origination Agreement by debiting the account(s) of Company identified in Schedule D attached hereto (the "Account"), and shall credit the Account for any amount received by the Bank by reason of the return of an Entry transmitted by the Bank for which the bank has previously received payment from Company. Such credit shall be made no later than the first Business Day following the day of such receipt by the Bank. Company shall at all times maintain a balance of available funds in the Account sufficient to cover its payment obligations under this Agreement. In the event there are not sufficient available funds in the Account to cover Company's obligations under this ACH Origination Agreement, Company agrees that the Bank may debit any account maintained by Company with the Bank or any affiliate of the Bank or that the Bank may set off against any amount it owes to Company, in order to obtain payment of Company's obligations under this ACH Origination Agreement. Company acknowledges that to the extent that funds available it its accounts with the Bank are not sufficient to cover its obligations hereunder, it shall immediately provide available funds to Bank to cover such shortfall and is liable until paid in full.

10. **Account Reconciliation.** Entries transmitted by the Bank or debited to a receiver's account maintained with the bank will be reflected on the Company's periodic statement issued by the Bank with respect to the account pursuant to the agreement between the Bank and the Company. Company agrees to notify the Bank in writing promptly of any discrepancy between Company's records and the information shown on any such periodic statement. If company fails to notify the Bank of any such discrepancy within thirty (30) days of receipt of a periodic statement containing such information, Company agrees that the Bank shall not be liable for any losses resulting from Company's failure to give such notice or any loss of interest with respect to an Entry shown on such periodic statement.

11. **Liability; limitations; indemnity.**

    (a) The Bank shall be responsible for performing the Services expressly provided for in this ACH Organization Agreement, and shall be liable only for its gross negligence in performing those services. The Bank shall not be responsible for Company's acts or omissions ( including without limitation the amount, accuracy, timeless, of transmittal or due authorization of any entry received from company) or those of any other person, including without limitation any Federal Reserve Bank, third party processor or transmission or communications facility, any receiver or receiving Depository Financial Institution ( including without limitation the return of an Entry by such Receiver or Receiving Depository Financial Institution ), and no such person shall be deemed the Bank's agents. Company agrees to indemnify and hold harmless the Bank against any loss, liability or expense( including attorney's fees and expenses) resulting from or arising out of any claim of any person that the Bank is responsible for any act or omission of company or any other person described in this section 11(a).

    (b) In no event shall the Bank be liable for any consequential, special, punitive or indirect loss or damage which company may incur or suffer in connection with this ACH Origination Agreement, including without limitation loss or damage from subsequent wrongful dishonor resulting from the Bank's acts or omissions pursuant to this ACH Origination Agreement.

    (c) Without limiting the generality of the foregoing provisions, the Bank shall be excused from failing to act or delay is caused by legal constraint, interruption of transmission or communication facilities, equipment failure, war, emergency conditions, civil unrest or other circumstances beyond the Bank's control. In addition, the Bank shall be excused from failing to transmit or delay in transmitting an Entry if such transmittal would result in Bank's having exceed any limitation upon its intra-day net funds position established pursuant to present or future Federal Reserve guidelines or in the Bank's otherwise violating any provision of any future risk control program of the Federal Reserve or any rule or regulation of any other U.S or state governmental regulatory authority.

(d) Subject to the foregoing limitations, the Bank's liability for loss of interest resulting from its error or delay shall be calculated by using a rate equal to the average Federal Funds rate at the Federal Reserve Bank of New York for the period involved. At the Bank's option, payment for such interest may be made by crediting Account.

12. **Compliance with security procedure.**

(a) If an Entry (or request for cancellation or amendment of an Entry) received by the Bank purports to have been transmitted or authorized by Company, it will be deemed effective as Company's Entry (or request) and Company shall be obligated to pay the Bank the amount of such Entry as provided   herein even though the Entry (or request) was not authorized by Company, provided the Bank acted in compliance with the security procedure referred to in Schedule B with respect to such Entry.

(b) If an Entry (or request for cancellation or amendment of an Entry) received by the Bank was transmitted or authorized by Company, Company shall be obligated to pay the amount of the Entry as provided herein, whether or not the Bank complied with the security procedure referred to in Schedule B with respect to that Entry and whether or not that Entry was erroneous in any respect or that error would have been detected if Bank had complied with such procedure.

13. **Inconsistency of Name and Account Number.** Company acknowledges and agrees that, if an Entry describes the Receiver inconsistently by name and account number, payment of the Entry transmitted by the to the Receiving Depository Financial Institution might be made by the Receiving Depository Financial institution (or by the Bank in the case of an On-Us Entry) on the basis of the account number even if it identifies a person different from the named Receiver, and that Company's obligation to pay the amount of the entry to the Bank is not excused in such circumstances.

14. **Notifications of Change.** The Bank shall notify Company of all notification of change received by the Bank relating to Entries transmitted by Company by mail no later than five Business Days after receipt thereof.

15. **Payment For Services.** Company shall pay the Bank the charges for the Services provided for herein set forth in Schedule E attached hereto. Such charges do not include, and Company shall be responsible for payment of, any sales, use, excise, value added, utility or other similar taxes relating to the Services provided for herein, and any fees or charges provided for in the agreement between the Bank and Company with respect to the Account (the "Account agreement").

16. **Amendments.** From time to time the Bank may amend any of the terms and conditions contained in this ACH Origination Agreement, including without limitation, any cut-off time, any Business Day, and any part of Schedule A through E attached hereto. Such amendments shall become effective upon receipt of notice by Company or such later date as may be stated in the Bank's notice to Company.

17. **Notices, Instruction, Etc.**

(a) Except as otherwise expressly provided herein, the Bank shall not be required to act upon any notice or instruction received from Company or any other person, or to provide any notice or advice to Company or any other person with respect to any matter.

(b) The Bank shall be entitled to rely on any written notice or other written communication believed by it in good faith to be genuine and to have been signed by an authorized representative as set forth in Schedule B attached hereto.

(c) Except as otherwise expressly provided herein, any written notice or other written communication required or permitted to be given under this Agreement shall be delivered, or sent by United States registered or certified mail, postage prepaid, or by express carrier, and , if to the Bank, addressed to:

**Metropolitan Commercial Bank**
**99 Park Avenue, 4th floor**
**New York, NY 10016**
**Attn: Operations Department**

And, if to Company, addressed to their address of record associated with the account(s) specified in the attached schedules:

Except as otherwise expressly provided herein, any such notice shall be deemed given when received.

18. **Data Retention.** Company shall retain data on file adequate to permit remaking of Entries for thirty (30) days following the date of their transmittal by the Bank as provided herein, and shall provide such Data to the Bank upon its request.

19. **Termination.** Company may terminate this ACH Origination Agreement at any time. Such termination shall be effective on the second

Business Day following the day of the Bank's receipt of written notice of such termination or such latter date is specified in that notice. The Bank reserves the right to terminate this ACH origination Agreement immediately upon providing written notice of such termination to the Company. Any termination of this ACH Origination Agreement shall not affect any of Company's obligations arising prior to such termination.

20. **Entire Agreement.** This ACH Origination Agreement (including the Schedules attached here to) is the complete and exclusive statement of the agreement between the Bank and Company with respect to the subject matter hereof and supersedes any prior agreement(s) between the Banks and Company with respect to such subject matter. In the event performance of the services provided herein in accordance with the terms of this ACH Origination Agreement would result in a violation of any present or future statute, regulation or government policy to which the bank is subject , and which governs or affects the transactions contemplated by this ACH Origination Agreement, then this ACH Origination Agreement shall be deemed to the extent necessary to comply with such statute, regulation or policy, and the Bank shall incur no liability to Company as a result of such violation or amendment.

21. **Non-**Assignment. Company may not assign this ACH Origination Agreement or any of the rights or duties hereunder to any entity without the Bank's prior written consent.

22. **Binding Agreement; Benefit.** This ACH Origination Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. This ACH Origination Agreement is not for the benefit of any other entity, and no other entity shall have any rights against the bank or company here under.

23. **Headings.** Headings are used for reference purposes only and shall not be deemed a part of this ACH Origination Agreement.

24. **Governing law.** This ACH origination Agreement shall be constructed in accordance with and governed by the laws of the State of New York.

**IN WITNESS WHERE OF** the parties hereto have caused this agreement to be executed by their duly authorized officers.

Crypto Trading Technologies LLC
Entity

METROPOLITAN COMMERCIAL BANK

Authorized Signer:

Signature:

Name: Steve Ehrlich

Name: Denney Teets

Title: CEO

Title: FVP

Date: 5/9/18

Date: 5/9/18

Authorized Signer:

Name:

Title:

Date:

## ACH Origination Agreement Schedule A - Delivery of Entries

Company: *CryptoTrading Technologies, LLC*

Estimated Commencement Date: *5/21/18*

I.    **Method of Entry Data Delivery to the Bank:**
☐ Electronic transmission via payroll processor.
☒ Business Online Banking submission.

II.    **Company Shall Deliver Entry Data to the Following:**
The Bank.

III.    **Number of Files Transmitted Daily:** *3*
☐ Daily        ☐ Weekly ☐ Bi-weekly        ☐ Semi-Monthly        ☒ Monthly

## ACH Origination Agreement Schedule B – Security Procedure

I.    **Delivery of Entries**
Transactions will be delivered to the Bank as specified in Schedule A. Upon receipt of transactions the Bank will verify the validity of the transactions by:
☒ Business Online Banking submission – No additional verification will be performed due to security configuration of the ACH manager system.

II.    **Cancellation of Data**
As specified in Section 6 of the ACH Origination Agreement, Company shall have no right to cancel or amend transactions
The Bank may attempt to cancel transaction(s) provided:
- Transactions have not been transmitted to the ACH or debited to the Receivers account; and
- Written request is received from the Company, in accordance with Resolution(s) on the file with the Bank.

III    **Use of Security Token**
All users of the Bank's ACH Origination and/or Funds Transfer services are required to us a Security Token to be provided by Bank in order to conduct such transactions, subject to the requirements of the attached Schedule 1 Addendum.

IV    **Modification of Security Procedure and Authorized Representatives**
The above security procedure may be modified by the Bank as required.

## ACH Origination Agreement Schedule C – Cut-off Times

I.    **Receipt of Entries Deadline**
Company will provide entries to the Bank by 3:00 pm Eastern Time two (2) business days prior to the effective date in order to be considered eligible for processing. .

II.    **Metropolitan Commercial Bank Processing Deadline.**
- In the case of Non On-Us Entries, the Bank will transmit eligible to the ACH for processing by 5:00 pm two (2) business days prior to the effective date.
- In the case of On-Us Entries, the Bank will make eligible entries available to Receiver's account on the effective date.
- The Bank will transmit, or post in the case of On-Us Entries, non-eligible entries at the next available deadline.

III.    **ACH Processing Deadlines**
- ACH will process all entries received at the next available processing window.

## ACH Origination Agreement Schedule D – Account

I.    **Company Account**
Account number ▮▮▮▮▮▮▮▮▮▮ the "Account") has been specified for the posting of ☐ debit ☒ credit originated on behalf of the Company.
Account will be funded with available funds for the total on:
☒ Effective entry date of the transactions.

II.    **Rejected Entries**
Rejected entries will be posted to the above mentioned Account.

## ACH Origination Agreement Schedule E – Payment of Services

I.    **Method of Payment**
☒ Debit Company's Metropolitan Commercial Bank Account as specified In Schedule D.
☐ Credit Company's Metropolitan Commercial Bank Account as Specified in Schedule D.

**SCHEDULE 1 – ADDENDUM TO METROPOLITAN COMMERCIAL BANK, TERMS &CONDITIONS FOR THE TRANSFER OF FUNDS AND ACH ORIGINATION AGREEMENT, RESPECTIVELY (TOKEN AGREEMENT)**

This Addendum supplements the Metropolitan Commercial Bank ("Bank") *Terms & Conditions For the Transfer of Funds* and its *ACH Origination Agreement* between the parties (together, the Agreements"). By signing below, the undersigned hereby acknowledges that the following additional terms and conditions are incorporated into the Agreements as additional security procedures and are subject to its terms:

1. *Security Items*
(A) The "Security Items" will be specific to each individual Authorized User (as defined below) and may include, but not limited to, such items as, the individual's log-in information such as the user's personal identification code ("User ID"), password, digital certificate, and Security Token (which token will provide such individual a new access number periodically). Services provided by or in conjunction with Vendors may require separate Security Items for use of such services.

(B) The Bank will deliver to the Company's Authorized System Administrator(s) (as defined below) the Security Items which each Authorized User shall use to access the service. The Company's Authorized System Administrator(s) is responsible to deliver to each Authorized User the Security Items the Bank provides and which are required for that Authorized User to access the service. The Bank may rely on the Company's Authorized System Administrator(s) to correctly maintain and administer the access rights of all authorized users and to correctly distribute Security Items. Each Authorized user will sign a Token add user form. The Authorized system administrator will return all Add Users Token forms to the ebanking department at the Bank.

(C) The Company further agrees to comply with such security measures as may be established from time to time by the Bank or by the applicable Vendor, to maintain the confidentiality of all Security Items, which the Vendor adopts or which are assigned to the Company by the Vendor or by the Bank and to take such other measures as may be appropriate to prevent unauthorized access to the service.

(D) The Company shall notify the Bank immediately, by telephone and in writing, if it believes or suspects that any of its Security Items have become known to an unauthorized person or that an unauthorized person has gained access to the Service.

2. THE COMPANY UNDERSTANDS, ACKNOWLEDGES AND AGREES TO THE FOLLOWING:

(A) THAT BY USING THE SECURITY PROCEDURES OR SECURITY ITEMS, ANY PERSON WILL BE ABLE TO CONDUCT TRANSACTIONS ON BEHALF OF COMPANY, USING THE SERVICE AT THE COMPANY'S RISK AND LIABILTY;

(B) THAT COMPANY'S FAILURE TO PROTECT THE SECURITY ITEMS AND USE ITS SECURITY PROCEDURES MAY ALLOW AN UNAUTHORIZED PARTY TO (1) USE THE SERVICES; INCLUDING, BUT NOT LIMITED TO INITIATING TRANSFERS, CHECKS AND OTHER WITHDRAWLS ALL IN THE COMPANY'S NAME AND AT COMPANY'S RISK AND LIABILITY AS THE COMPANY, (2) ADD, CHANGE, OR SEND DATA USED WITH THE SERVICE (3) SEND INFORMATION AND COMMUNICATIONS TO OR RECEIVE INFORMATION AND COMMUNICATIONS FROM THE BANK, AND (4) ACCESS COMPANY'S COMMUNICATIONS AND FINANCIAL DATA;

(C) THAT THE COMPANY IS RESPONSIBLE FOR THE ACTS OF EACH AUTHORIZED USER AND OF EACH PERSON, WHETHER OR NOT AUTHORIZED, WHO USES ANY SECURITY PROCEDURE OR SECURITY ITEM AND AGREES TO INDEMNIFY AND HOLD HARMLESS THE BANK FOR ANY LOSSES, CLAIMS OR EXPENSES THAT RESULT FROM SUCH ACTS, INCLUDING BUT NOT LIMITED TO ATTORNEYS' FEES ;

(D) THAT THE COMPANY ASSUMES THE RISK OF LOSS FOR ALL SUCH ACTS AND FOR ALL FRAUDULENT OR UNAUTHORIZED ACTS AND/OR USE OF ALL SECURITY PROCEDURES OR SECURITY ITEMS AND ACKNOWLEDGES THAT THE SECURITY PROCEDURES ADOPTED HEREIN AND IN THE AGREEMENTS ARE REASONABLE AND APPROPRIATE.

3. Upon termination the Company will immediately return to the Bank all security codes, devices and materials and security instructions the Bank or any Vendor provided to the Company or, at the Bank's option, destroy any such security codes, devices and materials and security instructions and certify in writing to the Bank that the Company has done so. Neither the Bank nor Vendor or service provider shall be liable to the Company for any loss or damage the Company may suffer or incur as a result of termination.

Any inconsistency between the Original Term Sheet and this Amendment shall be controlled by this Addendum. All other terms and conditions of the Agreements remain in full force and effect. *By signing below Company hereby acknowledges receipt of the Security Token(s).*

Acknowledged & Agreed: Company: *Crypto Trading Technologies* LLC By: _____ Name/Title: Steve Ehrlich, CEO   Date: 5/9/18