JASON B. BINFORD
Texas Bar No. 24045499
ABIGAIL R. RYAN
Texas Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
jason.binford@oag.texas.gov
abigail.ryan@oag.texas.gov
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1],<br><br>Debtors. | Chapter: 11<br><br>Case No. 22-10943 (MEW)<br><br>(Jointly Administered) |

**LIMITED OBJECTION OF THE TEXAS STATE SECURITIES BOARD TO DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES AND RELATED DATES AND DEADLINES, (II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DEBTORS' SALE, DISCLOSURE STATEMENT, AND PLAN CONFIRMATION, AND (III) GRANTING RELATED RELIEF**

The Texas State Securities Board ("SSB"), by and through the Office of the Texas Attorney General, hereby files this Limited Objection (the "Objection") to the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with respect to the Debtors' Sale, Disclosure Statement, and Plan*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

1

*Confirmation, and (III) Granting Related Relief* [D.E. 126] (the "Scheduling Motion" or "Motion"). In support of the Objection, the SSB respectfully states as follows:

## OVERVIEW

The issues presented in this bankruptcy are novel, and as recognized in one consumer letter, "a number of landmark decisions" will be made in this case.[2] In reviewing the customer letters, one thing is certain: there has been a great lack of information given to Voyagers' customers---people who were basically kept in the dark regarding Voyagers' financial issues prior to the bankruptcy filing.

Now, Voyager seeks to continue keeping the public in the dark, by seeking the approval of bidding procedures to sell the entirety of the companies and the approval of important deadlines that will drive this bankruptcy process before the Debtors' Schedules or Statements of Financial Affairs[3] are filed.

To date, the filings in this bankruptcy provide little to no information as to the current and actual value of the Debtors or what assets, liabilities, executory contracts, or causes of action are contemplated by the proposed sale. In fact, no one, with the exception of the Debtors and the potential bidders, who are signatories to pre-petition confidentiality agreements, know what the assets and liabilities of the Debtors are and what assets will be included in any sale.

Due to this lack of information, the Debtors' expedited timeline may result in many objections to a sale once their Schedules and Statements are filed. Further, many states have open investigations[4] regarding the Debtors' business, and Debtors' proposed schedule is too short to provide the opportunity for the states to complete these investigations before a sale of the Debtors' assets could be considered.

As such, due to the novelty of this case, the lack of information regarding assets and liabilities,

---

[2] EX. A, Letter at Dkt. No. 140.
[3] Hereinafter ("Schedules and Statements").
[4] EX. B, public state actions filed against Voyager by the states of Alabama, California, Indiana, Kentucky, New Jersey, Oklahoma, South Carolina, Texas, Vermont, Washington, and Washington D.C.

2

and the ongoing regulatory investigations, the Debtors' Motion should be denied, and the Debtors should be required to file their Schedules and Statements and hold a 341 Meeting before any deadlines are set in this case.

## FACTUAL BACKGROUND

1. The Debtors operate a complex, global cryptocurrency business.[5] The Debtors' corporate structure includes seventeen (17) non-debtor affiliates that operate in various parts of the world. The company acts in the capacity of a broker, a bank, and a lending institution.[6] The Debtors admittedly have 3.5 million active users and hold $5.9 billion of cryptocurrency assets. Customers sign up for an account on the Debtors' digital platform, deposit their assets or link their bank accounts, and enter into a customer agreement whereby the Debtors are permitted to utilize customer assets to enter into third-party loans.[7]

2. Before June 2022, and thereafter, Voyager had many indications of the upcoming serious financial issues---but, up to four days before suspending customers' accounts, continued to indicate that the company was in good standing.

3. Specifically, between March 29, 2022, and April 13, 2022, Voyager received cease and desist orders regarding the "Voyager Earn Program" from the state securities boards of Indiana, Kentucky, New Jersey, Oklahoma, and South Carolina, and show cause orders from the state securities boards of Alabama, Texas, Vermont, and Washington.[8] The State of Kentucky forbade Voyager from using its "Voyager Earn Program" in its State.[9] On June 9, 2022, that Voyager issued a press report in the United States disclosing this information.[10]

---

[5] Capitalized terms not defined herein shave the meanings ascribed to such terms in the Scheduling Motion.
[6] Dkt. No. 15, pp. 9-12. ("First Day Declaration").
[7] See id. at pp 13-20.
[8] Voyager MD&A SEDAR filing at p. 26 located at:
https://www.sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=03384797&docId=5206315
[9] EX C, June 9, 2022, Press Release.
[10] Id.

3

4. In June of 2022[11], Voyager knew that its loan to 3AC was "in jeopardy of partial or full nonpayment."[12] Further, "[t]he Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act as a broker for cryptocurrency assets."[13]

5. Despite this knowledge, on June 14, 2022, Voyager sent an email to its customers[14] and issues a press report in the United States in which its CEO stated:

> 'Voyager holds a strong position in the crypto industry. Not only were we among the first to go public and provide full balance sheet transparency, our leadership also has deep financial expertise across the sector and has led companies through multiple market cycles,' said Steve Ehrlich, Chief Executive Officer and co-founder of Voyager. 'The company is well capitalized and in a good position to weather this market cycle and protect customer assets. It is Voyager's goal to continue to build secure products and services, as well as build trust and leadership in the cryptocurrency industry.'[15]

6. Despite the positive message, two days later, on June 16, 2022, Voyager hired Kirkland and Ellis and Moelis to assess strategic solutions.[16] As anticipated, on June 17, 2022, 3AC announced heavy losses.[17] On or about June 20, 2022, Moelis started a marketing campaign, and reached out to over sixty (60) Potential Counterparties.[18]

7. On June 22, 2022, Voyager issued a press release in the United States reporting that it obtained an unsecured loan from Alameda Ventures, Ltd. and that Alameda held approximately 11.56% of the outstanding common and variable voting shares.[19] But, the very next day, Alameda files an Early Warning Report in Canada[20] and issues a press release in Canada only, reporting that it

---

[11] *See* Dkt. No. 15. No specific day is cited in the First-Day Declaration---just June of 2022. Further, on June 17, 2022, 3AC announced losses.
[12] Dkt. No. 15, para. 5.
[13] *Id*.
[14] EX. D, Letter at Dkt. No. 124, page 3.
[15] EX. E, Voyager June 14, 2022, press release.
[16] Dkt. No. 15 at para. 5.
[17] *Id*.
[18] Dkt. No. 16, para. 10-11.
[19] EX. F, June 22, 2022, Voyager press release.
[20] EX. G, June 23, 2022, Alameda Early Warning Report, Form 62-103F1, required under the British Columbia Securities Commission rules. *See* https://www.bcsc.bc.ca/securities-law/law-and-policy/instruments-and-policies/6-takeover-bids-special-transactions/current/62-103/62103f1-required-disclosure-under-the-early-warning-requirements-f

4

had surrendered 4,500,000 common and variable voting shares of Voyager Digital Ltd. worth $2.4 million US dollars for no consideration at all, and that Alameda and its affiliate now hold 9.49% of the issued and outstanding shares of Voyager.[21] This Alameda press release specifically states: "*NOT FOR DISSEMINATION IN THE U.S. OR FOR DISTRIBUTION TO U.S. NEWSWIRE SERVICES.*"[22]

8. On June 27, 2022, Voyager issued another press release in the United States informing the public that Voyager issued a notice of default on 3AC and that it intends to take action against 3AC.[23] Further, the press release touts the Alameda loan and assures customers of the integrity of Voyagers' financial condition as follows:

> The platform continues to operate and fulfill customer orders and withdrawals. As of June 24, 2022, Voyager had approximately US$137 million cash and owned crypto assets on hand. The Company also has access to the previously announced US$200 million cash and USDC revolver and a 15,000 BTC revolver from Alameda Ventures Ltd. The Company has accessed US$75 million of the line of credit made available by Alameda and may continue to make use of the Alameda facilities to facilitate customer orders and withdrawals, as needed. The default of 3AC does not cause a default in the agreement with Alameda. 'We are working diligently and expeditiously to strengthen our balance sheet and pursuing options so we can continue to meet customer liquidity demands,' said Stephen Ehrlich, Chief Executive Officer of Voyager. As part of this process, the Company has engaged Moelis & Company as financial advisors.[24]

9. However, on July 1, 2022, just four days after this press release, Voyager suspended their customer accounts to give Voyager some breathing room to "explore strategic alternatives,"[25] and stating that Voyager would "provide additional information at the appropriate time."[26]

10. Four days later, on July 5, 2022, Voyager filed bankruptcy---issuing another press release about the bankruptcy.[27] Also, on July 5, 2022, Moelis' marketing campaign of the Debtors' business had over twenty (20) Potential Counterparties that entered into confidentiality agreements

---

[21] EX. H, June 23, 2022, Alameda Canada Press Release.
[22] *Id.*
[23] EX. I, June 27, 2022, United States Press Release.
[24] *Id.*
[25] EX. J, July 1, 2022, United States Press Release.
[26] *Id.*
[27] EX K, July 5, 2022, United States Press Release.

with the Debtors.[28] By signing the confidentiality agreement, the Potential Counterparties obtained access to a virtual data room containing:

> . . .thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.[29]

11.     Despite the thousands of pages of information in the virtual data room, to date, no schedules or statements of financial affairs have been filed, and the other filings in the bankruptcy provide little to no information regarding the Debtors' financial affairs---leaving the public with no financial information about the Debtors.

12.     The Debtors' Scheduling Motion seeks approval of certain procedures for the expedited sale of substantially all the Debtors' assets (including causes of action) that will be held before a § 341 Meeting[30] has occurred, and only eight (8) days after the Debtors are currently[31] required to file their Schedules and Statements.

13.     While the SSB appreciates the Debtors' desire to consummate a sale quickly to ensure the continued viability of the Debtors' business, as it currently stands,[32] the unnecessarily abbreviated timeframe set forth in the Scheduling Motion, if approved, will result in the sale of all the assets of the Debtors in just two months into this case---a case that sets forth new and novel issues in bankruptcy.

14.     Further, the proposed timeline deprives the creditors and parties in interest an adequate opportunity to review the Debtors' Schedules and Statements Affairs or to question the Debtors at the § 341 Meeting. Finally, the deadlines do not allow sufficient time for creditors and parties in interest

---

[28] Dkt. No. 16 at para. 11.
[29] Id.
[30] Hereinafter (the "341 Meeting").
[31] See Dkt. No. 9 (Motion to extend) and Dkt. No. 59 (Order). The Debtors obtained an extension of time to file their schedules and statement and financial affairs but retain the rights to seek further extensions for filing.
[32] EX. L, Collection of Consumer Letters at Dkt. Nos. 77, 92, 100, 109, 140, 146, 150, 155, and 172. Based upon many consumer letters, it is foreseeable that, as soon as the Debtors restart their business, consumers intend to withdraw their funds and not continue their relationship with the Debtors.

to determine that, *inter alia*, the Debtors or Potential Counterparties meet regulatory requirements required to do business or whether the sale is the best value-maximizing path for the Debtors' customers and all parties in interest.

## PROCEDURAL BACKGROUND

15.     The Debtors commenced these cases on July 5, 2022, (the "Petition Date") and continues to operate its businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"). [33]

16.     On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Official Creditors' Committee (the "Committee"). [34]

17.     The current deadline to file the Debtors' Schedules and Statements is August 18, 2022,[35] and the § 341 Meeting is scheduled to occur on August 30, 2022.[36]

18.     The Debtors filed the Scheduling Motion on July 21, 2022, and set an objection deadline of July 28, 2022, seven (7) days following the filing.[37]

## OBJECTION

**A.      The Debtors' Proposed Timeline Circumvents the Transparency of the Bankruptcy Proceeding.**

19.     One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors.[38] To further this purpose, procedural bidding orders must seek to "facilitate an open and fair public sale designed to maximize value for the estate[,]"[39] and

---

[33] Dkt. No. 1.
[34] Dkt. No. 102.
[35] Dkt. No. 59 at para. 2.
[36] Dkt. No. 71.
[37] Dkt. No. 126. By agreement, Debtors' counsel extended the SSB's objection deadline until August 1, 2022, at 4 PM EST.
[38] *Matter of Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate).
[39] *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value).

7

should "strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets."[40]

20. The Debtors submit that they have sound business justification for requesting the aggressive timeline set out in the Scheduling Motion. The Court, however, should not merely defer to the Debtors' "sound" business judgment; indeed, the Court need not consider the Debtors' business judgment in matters of process under the Bankruptcy Code, but should instead assess the fairness and reasonableness of the proposed schedule.[41]

21. In the current case, the proposed timeline requested by the Debtors is not fair and reasonable to creditors or parties in interest. The Debtors' proposed process results in the Schedules and Statements being filed just days before the Bid Deadline, and the § 341 Meeting will be held *after* the Auction has taken place. Creditors and parties in interest will have insufficient time to determine what property is owned by the Debtors, much less to determine what is being sold and whether the sale price resulting at Auction is reasonable.

22. While the Debtors heavily rely on the pre-petition marketing process conducted by their investment banker, very little information regarding the pre-petition marketing process or the Debtors' financials has been filed in this case, and the states do not know what information, if any, regarding their investigations has been provided to potential bidders.

23. The SSB appreciates the need for an expedited sale process that minimizes expenses, but the proposed break-neck pace sought by the Debtors is simply too aggressive and would eviscerate any meaningful opportunity for parties in interest to review the Schedules and Statements and participate in a § 341 Meeting prior to the Assets of the Debtors being sold.

---

[40] *In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008) *citing* (*In re Food Barn Stores, Inc.*, 107 F.3d 558, 562 (8th Cir. 1997)).
[41] *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr. at 132-33 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for all the parties.").

8

24. Accordingly, for the sale process to achieve the desired goal of maximizing value, no dates for the sales process should be set until the Debtors' Schedules and Statements have been filed, all interested parties have a full and fair opportunity to thoroughly examine the assets and liabilities of the Debtors and can question the Debtors and seek further information regarding the sale process and potential purchasers.

B.  **Potential Purchasers Must Comply with State Laws and Regulations.**

25. Any bidder that ultimately becomes the final purchaser of the Debtors' Assets will be obligated to comply with all applicable state laws and regulations, just as if the property had been purchased outside of bankruptcy.[42]

26. To avoid any ambiguity or confusion on this point with respect to potential purchasers, the SSB respectfully requests that the following language be included in any final order approving the bidding procedures:

*Requested Language:*

**No Effect on Governmental Regulatory Authority:**
For the avoidance of doubt, nothing in the Sale Order or the APA shall authorize or require the transfer of any Assets to a Purchaser unless and until the Purchaser is registered as appropriate with the Texas State Securities Board and otherwise complies with all nonbankruptcy law.

Nothing in this Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit"); (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

---

[42] *See In re Oldco M. Corp.*, 438 B.R. 775, 785 (Bankr. S.D.N.Y. 2010) (noting that, even when a bankruptcy sale is "free and clear," the purchaser must comply with applicable legal obligations "starting with the day it got the property"); *see also In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Tex. 1994) (stating that "[n]o subsection of § 363 applies to authorize the trustee to sell free and clear of [governmental regulatory] interests.").

9

Further, nothing in this Order or related documents authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order or related documents shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order or related documents shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

## **RESERVATION OF RIGHTS**

27.     The SSB reserves the right to supplement this Objection or to raise additional or further objections to the Scheduling Motion at or prior to the Hearing, or any other relevant hearing.

## **PRAYER**

WHEREFORE premise considered, the Texas State Securities Board requests that no dates for the bidding procedures or the sales process be set until the Debtors' Schedules and Statements have been filed and all interested parties have a full and fair opportunity to review them and question the Debtors as to the information contained therein at a § 341 Meeting; that the requested language herein be included in any order approving bidding procedures; and for any other relief that the Court finds the Texas State Securities Board entitled.

*[Remainder of Page Intentionally Left Blank]*

| | |
|---|---|
| Dated: August 1, 2022, | Respectfully submitted, |

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Abigail Ryan*
JASON B. BINFORD
Texas State Bar No. 24045499
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ABIGAIL R. RYAN
Texas State Bar No. 24035956
ROMA DESAI
N.Y.S.D. Bar No. RD8227
Texas Bar No. 24095553
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2173
Facsimile: (512) 936-1409
jason.binford@oag.texas.gov
layla.milligan@oag.texas.gov
abigail.ryan@oag.texas.gov
roma.desai@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on August 1, 2022.

                                       */s/ Abigail Ryan*
                                       ABIGAIL RYAN
                                       Assistant Attorney General