Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF**
**STEPHEN EHRLICH IN SUPPORT OF THE**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS**
**FROM THE MC FBO ACCOUNTS, (B) LIQUIDATE CRYPTOCURRENCY**
**FROM CUSTOMER ACCOUNTS WITH A NEGATIVE BALANCE, (C) SWEEP**
**CASH HELD IN THIRD-PARTY EXCHANGES, (D) CONDUCT ORDINARY**
**COURSE RECONCILIATION OF CUSTOMER ACCOUNTS, AND (E) CONTINUE**
**STAKING CRYPTOCURRENCY, AND (II) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Stephen Ehrlich, Chief Executive Officer of Voyager Digital Holdings, Inc., hereby declare under penalty of perjury:

1.  I submit this declaration (the "Declaration") on behalf of the *Debtors' Motion for for Entry of an Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*(c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency, and (II) Granting Related Relief* [Docket No. 73] (the "Motion"), and the *Supplement to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency, and (II) Granting Related Relief* [Docket No. 173] (the "Supplement").[2]

2. Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the facts described herein, (b) information gleaned from my review of relevant documents, or (c) information I received from the Debtors' advisors. If I were called upon to testify, I could and would competently testify to the facts set forth herein. I am authorized to submit this Declaration on behalf of the above captioned debtors and debtors in possession (collectively, the "Debtors").

## Background

3. On July 1, 2022 (the "Freeze Date"), the Debtors made the difficult decision to halt their trading services and freeze all withdrawals from the Debtors' platform to preserve customer investments, avoid irreparable damage to the Debtors' business, and ensure equal treatment of all customers. Before the Freeze Date, the Debtors operated their cryptocurrency platform in the ordinary course of business which, among other things, included staking cryptocurrency and honoring withdrawals of cash from the MC FBO Accounts. Allowing customers to withdraw customer cash from the MC FBO Accounts on a go-forward basis is critical to alleviate customer

---

[2] All capitalized terms used herein have the meaning given to them in the Motion.

2

concerns over their ability to rightfully access their cash held in the MC FBO Accounts and to bolster confidence in the Debtors' platform. I also believe staking cryptocurrency on behalf of customers is beneficial to the Debtors' business because it is a low-risk way for the Debtors to generate income while supporting blockchain operations necessary for the Debtors and other companies in the cryptocurrency industry to operate. Staking offers cryptocurrency holders a way of putting their digital assets "to work" by earning passive income without needing to sell their cryptocurrency. The Debtors, with the assistance of their advisors, determined that seeking relief to, among other things, honor withdrawals of customer cash from the MC FBO Accounts and continue staking cryptocurrency was appropriate and prudent under the circumstances.

4.  Furthermore, the Debtors have been in close coordination with MC Bank, who filed a statement in support of the Motion and the Supplement (*see* [Docket No. 177]), and the official committee of unsecured creditors in the chapter 11 cases (the "Committee"), who I understand supports the requested relief. It is my understanding that the proposed order submitted by the Debtors incorporates comments from the Committee that afford it various protections, including the Debtors providing the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight over staking activities in the absence of agreement between the Committee and the Debtors.

5.  For the reasons more fully set forth herein, I believe that the relief requested in the Motion and the Supplement is a sound exercise of the Debtors' business judgment and would be in the best interests of the Debtors, their estates, and other parties in interest.

**I.      Allowing Customers to Withdraw Cash in the MC FBO Accounts Will Benefit the Debtors' Restructuring Efforts**

    **A.      Cash in the MC FBO Accounts Is Held for the Benefit of Customers and Is Not Commingled With the Debtors' Cash.**

6.      For a customer to fund an account on the Debtors' platform with cash, the customer must link a personal bank account to the Debtors' mobile application. Once the customer's personal bank account is verified, a customer may transfer funds from their account on the Debtors' platform via ACH or wire to the applicable MC FBO Account. Each of the MC FBO Accounts are held at, and in the name of, MC Bank not the Debtors.

7.      When a customer executes an order to buy cryptocurrency on the Debtors' platform, MC Bank transfers customer cash from the applicable MC FBO Account to the Debtors for purchase of the cryptocurrency. Conversely, when a customer executes an order to sell cryptocurrency on the Debtors' platform, the resulting cash attributable to the trade is transferred by the Debtors to the applicable MC FBO Account. The customer can then withdraw the cash from the applicable MC FBO Account and MC Bank transfers their cash to the customer's personal bank account via ACH or wire. At approximately 8 p.m. Eastern Standard Time each day, the Debtors generate a report that provides a "snapshot" of the customer balances in each MC FBO Account (including the ACH and wire transfer activity from the day) and the balances owed to each customer based on their respective trades that day. The Debtors send the report to MC Bank daily. To ensure the MC FBO Accounts align with the balances from the customers' daily activity, the Debtors and MC Bank reconcile, or "true up," the MC FBO Accounts each morning by transferring funds from the MC FBO Accounts into the MC Bank Master Operating Account or transferring funds from the MC Bank Master Operating Account into the MC FBO Accounts as applicable.

8. Importantly, the Debtors have not borrowed funds from the MC FBO Accounts. Additionally, all cash movement from the MC FBO Accounts is approved by MC Bank following the daily reconciliation process. The Debtors do not and have not commingled their cash with the customer cash held in the MC FBO Accounts during the reconciliation process or otherwise. The cash held in the MC FBO Accounts for the benefit of customers is segregated from the Debtors' cash.

9. Therefore, I believe that the cash in the MC FBO Accounts is customer cash and that customers should be allowed to withdraw their cash from the MC FBO Accounts.[3] Allowing customers to withdraw their cash will not only alleviate the hardship many customers have experienced, but also may facilitate the Debtors' restructuring efforts by renewing customer trust in the platform. The Debtors have worked closely with MC Bank to confirm the customer cash holdings in the MC FBO Accounts to ensure that, if the Motion is granted, withdrawal requests can proceed expeditiously.

## II. Continuing to Stake Cryptocurrency Maximizes Value for the Benefit of All Stakeholders

### A. Staking Cryptocurrency Supports Blockchain Operations and Generates Revenue.

10. The "blockchain" is a digital technology that vets and verifies transactions through a rigorous mathematical process. A blockchain is completely decentralized — anyone using the blockchain for a transaction can see each transaction on the blockchain. Using a blockchain to verify transactions allows transactions to be done quickly, inexpensively, and anonymously, all

---

[3] For the avoidance of doubt, the Debtors will continue to exercise their rights granted to them under the *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 53] (the "Cash Management Order") regarding withdrawals resulting from fraudulent ACH chargebacks.

without the need for a third party. Blockchains use cryptocurrencies to verify transactions on the blockchain. In other words, cryptocurrencies do the "work" of the blockchain by acting as a medium of exchange on the blockchain and, ultimately, are used to verify transactions on the blockchain. Accordingly, it is critical for a blockchain project to have enough cryptocurrency on hand to facilitate transactions and keep the blockchain "running." Too many transactions, and not enough cryptocurrency on hand to process transactions, disrupts the ability of the blockchain to function.

11. One of the ways that a blockchain service provider can ensure that it has enough cryptocurrency on hand to execute transactions is by setting up a staking protocol. The blockchain service provider will ask for other institutions to "stake" it with cryptocurrency, or transfer cryptocurrency to the platform to process transactions. Some staking protocols require that a staking party leave the cryptocurrency on the recipient's blockchain for a fixed period of time, while others allow the cryptocurrency to be taken off at any time (or after a certain notice period). In exchange, the project typically provides the staking party with additional cryptocurrency over the staking period.

12. Staking generates passive income on cryptocurrency assets by offering a way to earn interest on coins that are staked through staking protocols. In many ways it is akin to depositing money in an interest-bearing savings account (*i.e.*, an investor locks up their assets, and in exchange, earns interest). I believe that staking crypto is advantageous when investors are generally not planning to trade in the near term because it allows investors to put their assets to work and earn gains, as opposed to just sitting in digital wallets without capitalizing on potential earnings. Additionally, the Debtors do not have a lock-up period for the majority of the coins they have historically staked, which allows the Debtors to withdraw from the relevant staking program

6

at any time if it is beneficial to do so. Staking provides a means to generate income on the cryptocurrency assets the Debtors hold while trading on the platform is frozen.

13.     The customer agreement that each customer enters into with Voyager Digital, LLC upon a customer's decision to use the Debtors' platform explicitly allows the Debtors to stake cryptocurrency for their customers. Before doing so, the Debtors' treasury team begins by conducting reviews to identify cryptocurrency assets eligible for staking. For coins that are stakable, the Debtors' treasury team works with the blockchain development team to research each protocol's staking function to ensure that it is both safe and reliable. If cleared for staking, the Debtors' treasury team creates an operational plan for staking a given asset, including how and where to custody it and how to execute the staking commands. The Debtors maintain daily projections of accrued staking revenue based on current cryptocurrency assets staked. At the end of each month, staking revenues are reconciled to the relevant third-party sources or are received in digital wallets.

14.     From July 1, 2021 to June 30, 2022, the Debtors staked up to sixteen coins at any given time and earned an average yield of approximately 7%, generating approximately $51 million in staking rewards. If the Motion is approved, and subject to review by the Committee or (if there is disagreement) order of the Court, the Debtors anticipate staking approximately nineteen coins on a go-forward basis for a potential average yield of approximately 7%. Seven of the proposed staking coins do not have a lock-up period. For the remaining twelve coins that are subject to a lock-up period, each period is less than thirty (30) days. Accordingly, I believe that staking cryptocurrency will provide a passive, low-risk way to generate income for the benefit of the Debtors' estates while the platform is frozen during these chapter 11 cases. Additionally, I believe that staking cryptocurrency on behalf of customers on a go forward basis will ultimately

help the Debtors and customers by, among other things, instilling confidence that the Debtors are taking the necessary steps to restart their platform and support blockchain operations while the platform is still in "freeze" mode. The Debtors have also agreed to provide the Committee with notice and an opportunity to object prior to staking or unstaking any cryptocurrency, along with other oversight rights in connection therewith.

### B. Staking Cryptocurrency Is Not the Equivalent of Lending Cryptocurrency.

15. As described above, staking cryptocurrencies is simply a process that involves committing cryptocurrency assets to support a blockchain network and confirm transactions while allowing participants to earn rewards on their holdings. Importantly, staking does not involve lending any cryptocurrency to third parties, and staking cryptocurrency does not bring the attendant risks associated with lending cryptocurrency. The Debtors commenced these chapter 11 cases largely due to the nonpayment of a large cryptocurrency loan made to Three Arrows Capital.[4] The loan to Three Arrows Capital was a cryptocurrency loan and was in no way associated with the Debtors' staking efforts. Staking programs are significantly less risky than lending programs because staking is not used for financial liquidity by the blockchain.

16. I believe that staking will benefit the Debtors' estates and their customers because it is a low-risk practice that offers the potential for the Debtors and their customers to earn interest on their cryptocurrency holdings. Accordingly, I believe that approval of the Motion permitting the Debtors to continue staking cryptocurrency on behalf of customers is crucial to maximizing value for the Debtors' estates for the benefit of customers and all other stakeholders.

*[Remainder of page intentionally left blank]*

---

[4] A detailed description of the events leading to these chapter 11 cases is discussed in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration").

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: August 2, 2022  
New York, New York

/s/ *Stephen Ehrlich*  
Name: Stephen Ehrlich  
Title: Co-Founder and Chief Executive Officer  
Voyager Digital Ltd.