UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECISION AS TO MOTION TO PERMIT WITHDRAWALS BY CUSTOMERS OF FUNDS HELD IN FBO ACCOUNTS AT METROPOLITAN COMMERCIAL BANK**

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors-in-possession in these cases (the "Debtors") have filed a motion seeking, among other things, to permit customers to withdraw funds from two "for the benefit of" (or "FBO") accounts held at Metropolitan Commercial Bank ("MC Bank"). The Debtors argued, among other things, that the funds that are actually on deposit in the FBO accounts belong directly to Voyager's customers and are not property of the Debtors' bankruptcy estates. The Official Committee of Unsecured Creditors (the "Committee"), and MC Bank, have filed papers in support of this request for relief, and no party in interest has opposed the relief. During a hearing on the motion held on August 4, 2022 (the "Hearing"), the Committee and MC Bank concurred with the Debtors' contentions that the funds in the relevant bank accounts belong to customers and are not property of the estates.

The Customer Agreement that governs the Debtors' relationships with customers, as updated through January 7, 2022, was submitted as an attachment to the Debtors' motion. [ECF No. 73.] The Customer Agreement has different provisions regarding the manner in which cash and cryptocurrency will be held. With respect to cash, paragraph 5(A) of the Customer Agreement states that customers may deposit cash that will be held in an omnibus account at MC Bank. More particularly, it states:

1

> Cash deposited into the Customer's Account is maintained in an omnibus account at Metropolitan Commercial Bank (the "Bank"), which is a member of the Federal Deposit Insurance Corporation ("FDIC"). Voyager maintains an agreement with the Bank whereby the Bank provides all services associated with the movement of and holding of USD in connection with the provision of each account. Therefore, each Customer is a customer of the Bank. All U.S. regulatory obligations associated with the movement of, and holding of, USD in connection with each Account are the responsibility of the Bank. For purposes of clarity, any services pertaining to the movement of, and holding of, USD are not provided by Voyager or its Affiliates. Cash in the Account is insured up to $250,000 per depositor by the FDIC in the event the Bank fails if specific insurance deposit requirements are met.

*See* Customer Agreement, ¶ 5(A).

Different arrangements were set forth with respect to cryptocurrencies. Paragraph 5(C) of the Customer Agreement states that "Customer authorizes and instructs Voyager to hold Customer's Cryptocurrency . . . on its behalf. Customer understands that Voyager may hold Customer's Cryptocurrency together with the Cryptocurrency of other Voyager customers in omnibus accounts or wallets." *Id*. ¶ 5(C). The same paragraph then warns that the treatment of such cryptocurrency holdings in the event of an insolvency proceeding was uncertain:

> In the event that Customer, Voyager or a Custodian become subject to an insolvency proceeding it is unclear how Customer Cryptocurrency would be treated and what rights Customer would have to such Cryptocurrency. How an insolvency court would characterize and treat Customer Cryptocurrency is a highly fact-depending inquiry that necessarily depends upon the circumstances of each individual case. In addition, within the U.S. there is notably little case law addressing insolvency proceedings involving Cryptocurrency. As such, the law governing the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding remains largely unsettled. Voyager does not make any representation as to the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding whether in the U.S. or in any other jurisdiction. Customer explicitly understands and acknowledges that the treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict, including but not limited to Customer being treated as an unsecured creditor and/or the total loss of all Customer Cryptocurrency.

*Id.* ¶ 5(C). Paragraph 5(D) then specified that cryptocurrency would be held in Voyager's own

name, and granted certain rights to Voyager with respect to the use, lending, "staking" and rehypothecation of such cryptocurrency, "with all attendant rights of ownership:"

> Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk.

*Id.* ¶ 5(D). The Debtors have contended that, pursuant to these terms, customers have only the rights of general unsecured creditors with respect to their cryptocurrency holdings. That particular contention has not been challenged at this stage of these cases and is not before the Court in connection with the present motion.

At the request of the Court the Debtors also filed copies of the agreements that govern the FBO accounts at MC Bank. [ECF No. 145.] One such agreement is the "FBO Account Payment Services Agreement," executed in 2019. The recitals to that agreement state that Voyager wishes to promote services to the public that entail "access to the payment system and a depository institution to hold USD denominated funds" and that the Bank desires to "support a program" under which "Bank provides cash management and payment concentration services through a custodial 'for the benefit of' or 'FBO' account established by and at the Bank." *See* FBO Agreement, p. 1. For that purpose, the Bank appointed Voyager as the Bank's representative to "market, offer and sell crypto currency exchange services." *Id.* ¶ 2.1. Voyager agreed to open FBO pooled accounts that would hold "all funds that the Customers remit to Bank . . ." *Id.* ¶ 3.4(a). The parties also agreed that "[f]or clarity, at no time shall [Voyager] or any Licensee ever collect, hold, or remit any Customer Program funds." *Id.* ¶ 3.6.

The FBO Agreement further stated that the Bank would be the "holder" of the FBO

accounts through which funds sent by customers would be held. *Id*. ¶ 6.2. As a practical matter, Voyager gave instructions to the Bank with respect to movements of funds, and the FBO accounts were reconciled each business day. Voyager took responsibility for all expenses and losses resulting from fraud or certain processing errors. *Id*. ¶ 8.2. The Bank reserved rights of setoff against certain other accounts held in Voyager's name in the event of a breach of Voyager's obligations. *Id*. ¶ 8.4.

Voyager and MC Bank also executed an "ACH Origination Agreement" in 2018. It does not appear that this agreement has any terms that pertain to the ownership of the funds contained in the FBO accounts.

The Court also asked the Debtors to file copies of sample bank statements. [ECF No. 189.] The bank statements for the main FBO Account were issued in the name of "Metropolitan Commercial Bank FBO Voyager Customers." The statement for the other FBO account, used to handle wire transfers rather than ACH transfers, was issued in the name of "FBO Voyager Wires." Other accounts that Voyager held with MC Bank were stated to be in the names of various Voyager entities themselves.

During the course of the Hearing the Court asked the Bank to confirm whether it agreed that Voyager's customers were customers of the Bank for purposes of the cash held in the FBO accounts. The Bank's counsel did not wish to adopt that characterization, since the Bank did not have direct dealings and relationships with Voyager's customers. However, the Bank acknowledged that "FBO" accounts generally hold funds that are administered by one entity but that belong to someone else. The Bank also agreed that customers whose funds are held in such accounts have the benefit of FDIC insurance in the event of a failure by the bank. The Bank also confirmed that pursuant to the terms of the FBO Agreement Voyager itself is not permitted to

hold or to take ownership of customer funds.

The FBO agreement included a number of terms that were capitalized but that were not defined, and it referred to the need for authorization by MC Bank of various "Programs" that apparently were not separately described or authorized. However, the Bank and Voyager assured the Court that all relevant agreements and documents had been provided.

The Debtors have argued that the Debtors have no legal or equitable rights to the funds in the FBO accounts. They have further contended that even if the Debtors had legal title to the funds in the FBO accounts that would be insufficient to permit those funds to be treated as property of the Debtors' estates, since the Debtors have no equitable or beneficial interests in such funds. The Debtors have cited numerous authorities in support of those propositions. [ECF No. 73]. It appears to the Court, based on the agreements cited above, that the Debtors do not have either legal title or equitable interests to the funds in the FBO accounts. No party in interest has argued to the contrary. The Debtors had administrative rights to direct cash movements, but that is all. The funds held in the FBO accounts therefore are not "property of the estate." *See* 11 U.S.C. § 541.

Based on the foregoing, and for the reasons stated at the Hearing, the Court has determined that customers should be permitted to withdraw funds actually held for them in the two FBO accounts at MC Bank, and that such funds are not property of the Debtors' bankruptcy estates. A separate Order that has granted this and other relief has been entered by the Court.

One final word of caution: I am aware that the treatment of cash and cryptocurrency in this and similar cases is a subject of avid interest among investors and insolvency attorneys, and that similar issues may arise in other cases. These chapter 11 cases are somewhat unusual, in that the overwhelming percentage of claims are held by customers, with very few other creditors.

As a result, there really were no parties before the Court who had any strong financial interests in disputing the relief sought with respect to the FBO accounts, or in presenting any competing arguments or facts as to how the funds in the FBO accounts should be treated. Other courts who may be presented with similar issues therefore should understand, not only that my decision in this case is based on the particular agreements that have been presented to the Court, but also that my decision has been rendered without the kind of vigorous opposition by competing creditors that may be present in other cases. This decision is not intended to be a ruling as to the rights that customers might have in cryptocurrency cases generally, or as a ruling on any issues that competing creditors might raise in other cases.

Dated: New York, New York
August 5, 2022

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge