Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10943-mew

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   VOYAGER DIGITAL HOLDINGS, INC.,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  August 4, 2022

17                  11:02 AM

18

19

20

21  B E F O R E :

22  HON MICHAEL E. WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  UNKNOWN

Page 2

1    HEARING re Final hearing RE: motion authorizing the Debtors

2    to pay their obligations under prepetition insurance

3    policies, continue to pay certain brokerage fees, renew,

4    supplement, modify, or purchase insurance coverage, and

5    maintain their surety bond program and granting related

6    relief

7

8    HEARING re Application to employ Kirkland & Ellis LLP and

9    Kirkland & Ellis International LLP as attorneys for the

10   debtors and debtors in possession effective as of July 5,

11   2022

12

13   HEARING re Application to employ Moelis & Company LLC as

14   investment banker, capital markets advisor, and financial

15   advisor effective as of the petition date

16

17   HEARING re Application authorizing employment and retention

18   Quinn Emanuel Urquhart & Sullivan LLP as special counsel to

19   Voyager Digital Holdings, Inc. effective July 13, 2022

20

21   HEARING re Application authorizing the employment and

22   retention of Stretto, Inc. as administrative advisor to the

23   Debtors effective as of the petition date

24

25

Page 3

1   HEARING re Final hearing RE: motion authorizing the payment

2   of certain taxes and fees and granting related relief

3   Final hearing RE: motion authorizing the Debtors to pay

4   prepetition employee wages, salaries, other compensation,

5   and reimbursable expenses and continue employee benefits

6   programs and granting related relief

7

8   HEARING re Final hearing RE: motion approving notification

9   and hearing procedures for certain transfers of and

10  declarations of worthlessness with respect to common stock

11  and granting related relief

12

13  HEARING re Final hearing RE: motion authorizing the Debtors

14  to continue to operate their cash management system, honor

15  certain prepetition obligations related thereto, maintain

16  existing business forms, and continue to perform

17  intercompany transactions, granting superpriority

18  administrative expense status to post-petition intercompany

19  balances, and granting related relief

20

21  HEARING re Final hearing RE: motion establishing certain

22  notice, case management, and administrative procedures and

23  granting related relief

24

25

Page 4

1    HEARING re Motion establishing procedures for interim

2    compensation and reimbursement of expenses for retained

3    professionals and granting related relief

4

5    HEARING re Motion authorizing retention and compensation of

6    professionals utilized in the ordinary course of business

7

8    HEARING re Motion authorizing the Debtors to honor

9    withdrawals from the MC FBO accounts, liquidate

10   Cryptocurrency from customer accounts with a negative

11   balance, sweep cash held in third-party exchanges, conduct

12   ordinary course reconciliation of customer accounts and

13   continue stalking cryptocurrency, and granting related

14   relief Limited objection filed

15

16   HEARING re Motion approving the bidding procedures and

17   related dates and deadlines, scheduling hearings and

18   objection deadlines with respect to the Debtors sale,

19   disclosure statement and plan confirmation, and granting

20   related relief Limited objections filed

21

22   HEARING re Motion setting bar dates for submitting proofs of

23   claim, approving procedures for submitting proofs of claim

24   and approving notice thereof

25   ***ORDER SIGNED AND ENTERED ON 8/3/2022 AS DOCUMENT 218

1    REGARDING ABOVE MOTION***

2    ***NO APPEARANCE NECESSARY***

3

4    HEARING re Motion approving the share purchase agreement by

5    and among Voyager European Holdings ApS and Ascension ApS

6    and related documents, authorizing the private sale of

7    equity interests in coinify ApS, and granting related relief

8    ***ADJOURNED TO A DATE TO BE DETERMINED***

9

10   HEARING re Application to employ Berkeley Research Group,

11   LLC as financial advisor effective as of July 5, 2022

12   Adjourned Reset for 08/16/2022 at 11:00 am

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1   A P P E A R A N C E S :

2

3   KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         601 Lexington Avenue

6         New York, NY 10022

7

8   BY:  JOSHUA SUSSBERG (TELEPHONICALLY)

9        CHRISTOPHER MARCUS (TELEPHONICALLY)

10       CHRISTINE OKIKE (TELEPHONICALLY)

11       ALLYSON SMITH (TELEPHONICALLY)

12       NICHOLAS ADZIMA (TELEPHONICALLY)

13

14  SULLIVAN & CROMWELL LLP

15        Attorneys for Alameda Ventures

16        125 Broad Street

17        New York, NY, 10004

18

19  BY:  ANDREW DIETDERICH (TELEPHONICALLY)

20

21

22

23

24

25

Page 7

1   MCDERMOTT WILL & EMERY LLP

2        Attorneys for the Official Committee of Unsecured

3        Creditors

4        340 Madison Avenue

5        New York, NY 10173

6

7   BY:   DARREN AZMAN (TELEPHONICALLY)

8

9   MCDERMOTT WILL & EMERY LLP

10        Attorneys for the Official Committee of Unsecured

11        Creditors

12        2501 N. Harwood Street

13        Dallas, TX, 75201

14

15   BY:   CHARLES GIBBS (TELEPHONICALLY)

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Attorneys for the U.S. Trustee

19        201 Varick Street, Suite 1006

20        New York, NY 10014

21

22   BY:   RICHARD MORRISSEY (TELEPHONICALLY)

23

24

25

Page 8

1    LISA DAGNOLI (TELEPHONICALLY)

2         Pro Se Creditor

3         256 Millbrook Drive

4         East Longmeadow, MA, 01028

5

6    CORDEARO DADSON (TELEPHONICALLY)

7         Pro Se Creditor

8         15521 SW 1006 Avenue

9         Miami, FL 33157

10

11   SINGER LAW GROUP

12        Attorneys for Matthew Levitt

13        222 Broadway, 19th Floor

14        New York, NY, 10038

15

16   BY:  JEB SINGER (TELEPHONICALLY)

17

18   WACHTELL, LIPTON, ROSEN & KATZ

19        Attorneys for Metropolitan Commercial Bank

20        51 West 52nd Street

21        New York, NY, 10019

22

23   BY:  AMY WOLF (TELEPHONICALLY)

24        ROSEMARY SPAZIANI (TELEPHONICALLY)

25

1    AIRD & BERLIS

2          Attorneys for the Canadian BDL Entity

3          181 Bay Street

4          Toronto, m5m 3

5

6    BY:  STEVEN GRAFF (TELEPHONICALLY)

7

8    CHRISTOPHER ROUSE (TELEPHONICALLY)

9          Pro Se Creditor

10         7425 Democracy Blvd.

11         Bethesda, MD 20817

12

13   ALSO PRESENT TELEPHONICALLY:

14   GINGER LITTLE

15   TRACY HENDERSHOTT

16   PATRICK HOLOHAN

17   LETICIA SANCHEZ

18   ALYONA FOERTSCH

19   JEFF STAPLETON

20   ROBERT BURNS

21   ANDREW BUTLER

22   LYSBETH GEORGE

23   BENJAMIN NICKERSON

24   BRIAN GLUECKSTEIN

25   GIORGIO BOVENZI

1   MEGAN MALONEY

2   VINCE SULLIVAN

3   JEONGHOON HA

4   NEGISA BALLUKU

5   BRAD AXELROD

6   RICHARD BAUDOUIN

7   NATHANIEL DUPREE

8   CHRISTOPHER STABLE

9   DAN LAWRENCE

10  SOMA BISWAS

11  JOE COLVIN

12  CHRISTOPHER GASTELU

13  BRYANT OBERG

14  LISA DAGNOLI

15  JASON DIBATTISTA

16  ANDREW GLANTZ

17  ROBERT JORDAN

18  MIKE LEGGE

19  CAROLINE SALLS

20  RICKY ANGIOLINI

21  JOY HU

22  JUEWETT BOSTICK

23  JOSEPH BRANDT

24  PHILIP BRENDEL

25  ELLE CHOI

1    ROBERT HONEYWELL

2    GAVIN MCKELVEY

3    ANDREW SCHIFF

4    CHRIS UPDIKE

5    SHAIK BABA

6    PAUL HAGE

7    JEREMY HILL

8    JOSEPH BARSALONA

9    ERIC FRIEL

10   ANTHONY GREENE

11   VLADIMIR JELISAVCIC

12   JEFFREY KALPLAN

13   DAVID KOZLOWSKI

14   ERIC KURTZMAN

15   MATTHEW MASARO

16   MATT MICHELI

17   CRAIG RASILE

18   BRIAN ROSEN

19   MICHAEL SAVETSKY

20   KATHERINE SCHERLING

21   DOUGLAS TABACHNIK

22   JEREMIAH VANDERMARK

23   JARED DERMONT

24   STEPHEN EHRLICH

25   SUSAN GOLDEN

1    RICHARD HOWELL

2    SUSHEEL KIRPALANI

3    MATTHEW MCCLINTOCK

4    MATT MURPHY

5    MICHAEL SLADE

6    THOMAS BRAZIEL

7    BENJAMIN BELLER

8    JOHN DODD

9    GRACE LAMPERT

10   CARRIE LORANGER

11   MARTIN ALLOCATI

12   CHESTER BA

13   JASON BINFORD

14   ROMA DESAI

15   MICHAEL DUNN

16   DAVID HOLLERITH

17   LAYLA MILLIGAN

18   JASON ROSELL

19   ABIGAIL RYAN

20   JEAN PAUL

21   TIMOTHY REILLY

22   ZACHARY RUSSELL

23   DENISE KALOUDIS

24   IGNACIO GUERRERO

25   AISLINN KEELY

Page 13

1    STEVEN GRAFF

2    YUN FANG

3    GERARDO PEDRAZA

4    ZACHARY TOWLE

5    HUGH BELLAMY

6    MARK BRUH

7    ELIZABETH WAGENBACH

8    ANDREW VELEZ-RIVERA

9    RICHARD MORRISSEY

10   ERICA CLARK

11   YATES FRENCH

12   MARK FRANKEL

13   MICHAEL CORDASCO

14   JOSEPH EVANS

15   CHARLES GIBBS

16   DANIEL SIMON

17   GRAYSON

18   GREGG STEINMAN

19   CHARLIE SHREM

20

21

22

23

24

25

1            P R O C E E D I N G S

2            CLERK:  Before we begin, there are two

3    announcements.  Please be advised that you are strictly

4    prohibited from recording, reproducing or rebroadcasting any

5    part of this hearing in whole or in part in any fashion.  A

6    violation of this Court's order could be deemed a contempt

7    of Court.

8            Please note that with respect to each motion, the

9    presentation should not be interrupted.  At the conclusion

10   of each motion's presentation, the Court will entertain any

11   additional comments or objections.  Thank you.

12           THE COURT:  Good morning, everybody.  Are the

13   parties ready to proceed in the Voyager matter?

14           MR. SUSSBERG:  Yes, Your Honor.  It's Joshua

15   Sussberg from Kirkland and Ellis on behalf of Voyager.  Hope

16   you're doing well.

17           THE COURT:  Thank you.

18           MR. SUSSBERG:  Thank you.  I know the Court has

19   lots of questions, and we are going to endeavor to answer

20   all of them today.  But before we do, I wanted to note that

21   while it's only been 26 days since our first day hearing,

22   I'm not sure I've ever seen the volume of activity that has

23   occurred in a case over the last several weeks.

24           And I thought it would make sense to provide Your

25   Honor and the community with a brief update on the overall

Page 15

1    state of play before diving into the two contested matters,

2    and then moving through the rest of the agenda, if that's

3    okay with the Court?

4           THE COURT:  That's fine.

5           MR. SUSSBERG:  Thank you, Your Honor.  We posted a

6    presentation to the noticing agent's website, Stretto, that

7    I'm going to walk through.  And I believe we provided a copy

8    to Your Honor.  Quickly, on Slide 2, Your Honor, I wanted to

9    note that, as is obvious, that the Committee was formed.

10   And that was formed on July 19th.

11          And that Committee has been working incredibly

12   hard with us to get up to speed as quickly as possible.  Now

13   this is not your typical UCC, although the acronym is still

14   applicable.  This is purely a customer committee.  All seven

15   members are customers with crypto and coin holdings on the

16   Voyager platform.

17          The Committee's represented by McDermott Will &

18   Emery led by Mr. Azman and FTI Consulting led by Mr. Simms.

19   I think we've taken a very different approach than is

20   typical with a Committee, because this case is all about the

21   customers.  And this customer Committee is riding shotgun

22   with us, and we intend to be shoulder to shoulder

23   throughout.

24          It's been incredibly collaborative.  We appreciate

25   the efforts of the Committee members and its professionals.

Page 16

1    And I am pleased to report that we resolved all potential

2    objections from the Committee today, and even have a

3    statement filed by the Committee in support of important

4    relief that we'll get to shortly.

5            I also wanted to mention, Your Honor, and I'm sure

6    Mr. Azman will comment on this, we've been negotiating a

7    potential support for the process agreement with the

8    Committee.  And we've discussed and are exploring ways in

9    which we can get holdings and distributions back to holders

10   as quickly as possible, maybe even before a planned process.

11           Now in 5.3, Your Honor, I want to talk about this,

12   because there's a lot of misinformation in the media

13   regarding the rebound in crypto and who gets the value

14   associated with that rebound.  And as you can see, over the

15   course of just four weeks, the price of Bitcoin is up 14

16   percent, and the price of Ethereum is up 42 percent.

17           And if you remember the story I told back on the

18   first day about the two pizzas that Mr. Hanyecz bought in

19   2010, back for 10,000 Bitcoins and $40, those pizzas today

20   would be about $220 million.  But I want to be clear about

21   something, and I think this is super important, and but

22   customer should hear this.

23           The plan we filed and the transactions we are

24   negotiating seek to put all the value associated with the

25   rise in crypto over the last few weeks right back in our

Page 17

1    customers' pockets.  The company is not seeking to dollarize

2    claims on a petition date and benefit in any way from this

3    rebound.

4            And if we could avoid a liquidation and litigation

5    of all the interesting, but in our view, and as I said on

6    the first day, irrelevant legal issues of first impression,

7    that is exactly what we're going to be able to do.  The

8    rampant speculation that the advisors to this company are

9    trying to drag these cases out to earn fees is completely

10   false.

11           Now on Slide 4, Your Honor, and we're going to

12   cover this, and Mr. Marcus will walk the Court through as

13   part of the bidding procedure's presentation, we are seeking

14   approval of bidding procedures to formalize our process.  It

15   is a process led by Moelis, and it's working as we had

16   designed it.

17           We have multiple indications of interest, and

18   expect several more, all geared up and tied to an auction

19   we're seeking to set for August 29th.  We have some parties

20   publicly saying we're going too slow.  We have other parties

21   publicly saying we're going too fast.

22           And in my experience that means we're doing

23   something right.  Importantly, the company has $97 million

24   of cash, $27 million of USDC and $19 million of crypto today

25   as we sit here.  The faster we move, the more of that value

Page 18

1    goes to the customers, not lawyers.

2              THE COURT:  Would you remind me, what are the

3    Creditor claims that you know of apart from the customer

4    claims?

5              MR. SUSSBERG:  It's a very small universe, Your

6    Honor, of vendors that are mixed in.  I don't think it is

7    more than a couple million dollars, but I can get you the

8    exact figure.

9              THE COURT:  Okay, go ahead.

10             MR. SUSSBERG:  Slide 5, Your Honor, and this was

11   on the docket.  And I just wanted to mention this because

12   this was a new one for me.  A company called KaJ Labs

13   reached out to the company and asked the company to say on

14   social media that we Voyager were in discussions with them.

15             And if we did that, KaJ would send us a letter of

16   intent.  We of course advised the company against this and

17   encouraged KaJ to sign an NDA.  They did not.  KaJ then

18   announced via press release on July 21 that it rescinded its

19   LOI because of disagreements with the company.

20             But it's impossible to rescind something that was

21   never provided.  And it's impossible to disagree with

22   someone that you've never spoken to.  It's unclear what KaJ

23   was up to, but we've publicly reserved our rights and will

24   pursue any and all claims or causes of action to the extent

25   it becomes necessary.

Page 19

1              On Slide 6, Your Honor, this was another new one

2      for me.  This was our response to FTX and Alameda.  And we

3      spoke a bit about the relationship with FTX and Alameda at

4      the first day hearing.  But just so Your Honor has context

5      and everyone understands, FTX is a cryptocurrency exchange

6      that averages $10 billion of daily trading value and has

7      over one million users.

8              Alameda is a quantitative trading firm.  Both were

9      founded by Sam Bankman-Fried, who is a 30-year-old MIT grad.

10     Alameda and FTX are represented by Mr. Dietderich, who I

11     know the Court is familiar with, and who I expect --

12     respect, admire and consider a friend.

13             And as I mentioned to the Court previously,

14     Alameda and FTX wear multiple hats here.  They are a

15     borrower and owe the company $377 million.  They are a

16     lender.  We've borrowed and owe $75 million to Alameda,

17     which we borrowed in June to help stabilize the platform.

18             And Alameda and FTX is also the largest equity

19     holder, holding approximately 10 percent.  Now one day after

20     we filed our proposed bidding procedures, Alameda and FTX

21     put out a press release with a proposal to short circuit the

22     process that we were seeking to approve and seek expedited

23     approval of a deal to provide customers with liquidity and

24     transfer those customers to FTX's platform.

25             I do not intend to get into a food fight here

Page 20

1    today.  And the back and forth with FTX and Mr. Dietderich

2    over the last couple of weeks is water under the bridge to a

3    certain extent.  What is relevant, however, is that

4    everyone, including other bidders who are actively

5    participating and some who are hesitant to participate,

6    everyone needs to understand and hear that FTX does not have

7    a leg up.  And that is why we responded the way we did.

8            Our job, our sole focus, Your Honor, is to

9    maximize value for our customers, and that's exactly what

10   we're planning to do.  And we don't intend to let anyone try

11   to infiltrate that process.  And the proof has been in the

12   pudding.

13           Of the proposals we've received to date, FTX's is

14   actually the lowest, but we hope that improves through

15   engagement over the coming days and weeks.  And we are going

16   to work with FTX and continue to work with FTX.  And I

17   understand that they intend to participate in the process we

18   seek to have approved by Your Honor today.  And Mr. Marcus

19   will report on the resolution we reached on their objection.

20           And we absolutely welcome that.  And at the end of

21   the day, if FTX's proposal turns out to be the highest and

22   best, they will win.  But the games and the publicity

23   campaign should stop.  I watched Mr. Bankman-Fried's

24   interview on CNBC earlier this week on Tuesday.

25           And the major focus of that discussion was his bid

Page 21

1    for Voyager and the status of that bid.  And Mr. Bankman-

2    Fried said, and I quote, "You know, a lot of the bids that

3    we're hearing people thinking about were giving you 10, 20,

4    30 cents on the dollar back to customers."  And I just want

5    to be clear, and everyone should hear it, that is untrue.

6            No bid we have received is anywhere close to that.

7    Parties in our process have expressly made concerns aware to

8    us that FTX has a leg up and is working behind the scenes to

9    force its way with the Customer Committee or the company.

10   And some parties have even indicated they may be unwilling

11   to bid because of this.

12           Again, I want to assure all parties, the Court and

13   our customers that we will not stand for that and we will

14   run a process that is open, transparent and designed to

15   maximize value.

16           Your Honor, moving to Slide 8, and this is

17   important.  And I'm sure the Court has read each and every

18   one of these letters as well.  But I have read all 31

19   letters that have been filed to date on the docket.  And the

20   stories told are heartbreaking and unnerving.

21           And I understand that many people are confused,

22   concerned and feel lost.  I also know that McDermott, FTI

23   and the Committee intend to convene a meeting for all

24   customers in the near-term to clear up as many of the

25   questions and articulated concerns as they can, and we

Page 22

1    welcome that, because that's exactly what this Customer

2    Committee is formed for.

3            I simply wanted to take a brief opportunity, Your

4    Honor, to address the key themes that I gleamed from the

5    letters, and hopefully clear up a few of the key questions

6    and confusion.  Many customers indicated that all their

7    money will be lost.  That is not true, as we discussed

8    today.

9            I'll come back to the FDIC in a minute, because

10   that bears a separate discussion.  Customers have indicated

11   that they will not receive the cash held on Voyager's

12   platform.  That likewise is not true.  And Ms. Okike will

13   present our motion to distribute the close to $300 million

14   held in the benefit only account at Metropolitan Bank.

15           Many of the letters indicated that no party is

16   interested in acquiring Voyager's business.  Again, that is

17   untrue.  We have multiple indications of interest, and we

18   are very pleased with the robust amount of interest that has

19   been maintained throughout the pre-petition and post-

20   petition process.

21           Flipping to Slide 9.  There have been questions

22   and concerns regarding Voyager's stealing customer money and

23   profiting from the restructuring at the expense of

24   customers.  And this goes to the point I made, Your Honor,

25   about dollarizing claims and having the company benefit from

Page 23

1    the 14 and 17 percent rise in various coins.

2              That is exactly not what we're intending to do and

3    will not do.  There was also a story that broke yesterday

4    about Mr. Ehrlich's sale of company shares 18 months ago

5    back in February and March 2021.  And while that story seems

6    strategically placed in time, just want to make sure the

7    Court and all of our customers understand the facts.

8              When Voyager was first publicly listed in October

9    2020, Voyager traded at seven cents per share.  It reached

10   its high of $26 per share in March of '21.  Mr. Ehrlich

11   originally held 8.9 million shares.  He personally purchased

12   6 million shares and was given 2.9 million options to

13   purchase shares as part of his employment arrangement.

14             Mr. Ehrlich did in fact sell 1.9 million shares in

15   February and March of 2021.  Those sales were on the heels

16   of a $100 million primary offering at a time when the

17   publicly listed stock traded between $13 and $24.  This was

18   also at a time interestingly when Bitcoin climbed by 455

19   percent and Ether jumped by 688 percent.

20             Standing here today, Mr. Ehrlich owns 4 million

21   shares and 2.9 million in options.  Had he sold all of those

22   shares back in 2021 at the height of the market, he would've

23   mad $200 million.  But all of his remaining close to $7

24   million in shares and options are proposed to be canceled

25   without compensation under the proposed plan.

1          And just like many of our customers, Mr. Ehrlich

2    and many employees at Voyager and their family members hold

3    cryptocurrency on the Voyager exchange.  Mr. Ehrlich, his

4    family members and all the other employees are Voyager are

5    going to be treated just like everybody else.

6          THE COURT:  All right.

7          MR. SUSSBERG:  Your Honor, to other quick points

8    on this slide.  There have been a lot of comments around

9    SIPC and whether or not this case was eligible for SIPC.

10   Interestingly, Voyager is not a member of SIPC, but that's

11   not through Voyager's doing.  In fact, membership in SIPC

12   requires approval from FINRA.  And FINRA has declined to

13   approve digital asset brokers like Voyager.

14         In fact, Voyager applied three different times.

15   We've got a real conflict in the government here because SEC

16   Chairman Gensler repeatedly says crypto is a security, yet

17   FINRA has denied membership over and over again.  And so,

18   something this going to have to change on that front.

19         But I want to rest our customers assured that it

20   doesn't need to change in this case, because those issues

21   and those legal questions are not necessarily going to be

22   answered if we can figure out how to quickly get our assets

23   back into our customers' hands.

24         And finally, Your Honor, there are questions

25   around this process taking years to resolve itself.  It's

Page 25

1    simply not the case.  Our case timeline, the sale and the

2    plan has this company emerging from bankruptcy in the first

3    quarter of next year.  And we are committed to doing

4    everything we can to keeping to that schedule.

5            On Slide 10, Your Honor, and I think this is

6    important, I want to make sure the Court and all the

7    customers understand this.  Voyager's relationship and

8    interaction with the Federal Deposit Insurance Corporation

9    did not begin on July 28t last week, when the FDIC issued

10   its press release and letter to Voyager.

11           On the contrary, Voyager has been in close contact

12   with the FDIC since early March of 2021, more than 16 months

13   ago.  Now as Your Honor is aware, deposit insurance is one

14   of the significant benefits of having an account at an FDIC

15   insured bank.  This means your deposits at a federally

16   insured bank are protected up to $250,000 in the event of a

17   bank failure or theft.

18           So as an example, if you have one million in a

19   bank account at a federally insured bank, and that bank

20   fails subsequent to your deposit, you would get back at

21   least $250,000.  Now again, Ms. Okike will cover this in

22   detail today, but Metropolitan Bank represented by Mr. Mason

23   at Wachtel, is a place where customers deposit cash that can

24   be transferred to the Voyager platform.

25           And Metropolitan Bank is FDIC insured.  Customer

Page 26

1   cash at Metropolitan Bank is protected in the event of a

2   Metropolitan Bank failure, not a Voyager failure.

3   Regardless, we believe this is really a bit of a red

4   herring, as again, we're seeking today to return the close

5   to $300 million in the Metropolitan Bank account to our

6   customers.

7          And I want to be clear, Voyager does not believe

8   that it knowingly made misrepresentations about the

9   existence of or the extent of deposit insurance.

10  Nonetheless, as we explained in our confidential response to

11  the FDIC, Voyager has reviewed all of its media statements

12  and remediated those statements to the extent they could've

13  been misconstrued.

14         Now finally, Your Honor, before I cede the podium,

15  I wanted to mention on Slide 11 the Three Arrows liquidation

16  proceedings, which are pending in front of Judge Glenn.

17  Voyager was one of five members identified and selected for

18  the Creditors Committee.

19         And based on media reports, I can't confirm

20  without getting into the specifics, that Voyager is not the

21  biggest Creditor of 3(a)(c).  But Voyager is focused, as our

22  the other Committee members, on pursuing and collecting as

23  much as we possibly can on account of the Voyager $650

24  million claim and the billions of other claims that exist

25  for other parties in interest.

Page 27

1            And finally, just to drive home the point that has

2     been articulated in many of the letters, on Slide 12, we've

3     put forth our proposed case timeline.  And it reiterates

4     what we've talked about from a sale and a plan perspective.

5     And while aggressive, we believe it's doable and necessary

6     because of the assets that we're dealing with and the

7     customers that rightfully deserved to get their assets back.

8            And everything is geared towards a September 7th

9     sale hearing and an October 31st confirmation hearing.  We

10    are working diligently and around the clock on

11    documentation, including the disclosure statement, so that

12    we can be in a position to achieve these milestones and move

13    this case forward.

14            With that, Your Honor, I am happy to answer any

15    other questions, or we are prepared to hear from the

16    Committee or otherwise move right into the agenda.

17            MR. DIETDERICH:  Your Honor, Andy Dietderich for

18    Alameda Research.  At your convenience, Your Honor, I would

19    like to be heard.

20            THE COURT:  Yes --

21            MR. DIETDERICH:  And Your Honor --

22            THE COURT:  -- in a moment.  I just want to make a

23    few comments because I have a feeling that in this

24    particular case, we have a lot of people listening in, who

25    are not attorneys, who do not usually participate in

Page 28

1    bankruptcy proceedings.

2          The Debtor's Counsel has just proposed his summary

3    of what the Debtor is proposing in some cases before me

4    today.  And we'll make rulings on a lot of that today.  I am

5    keenly aware that this particular bankruptcy has adversely

6    affected a lot of customers.

7          We have rules and statutes that we need to abide

8    by in bankruptcy.  To the extent that it can be shown to me

9    that particular property doesn't belong to the Debtor, as

10   that term is used in the Bankruptcy Code and instead belongs

11   to somebody else, I have no intention of getting in the way

12   of somebody's access to such property.  But that's something

13   that requires careful consideration that we will discuss

14   today.

15         One thing that all the customers should know.  Any

16   sale process that happens in this case will only happen on

17   terms that I approve and under my supervision, and on terms

18   that will be subject to debate, if there's disagreement in

19   connection with any hearing.

20         So while the Debtors may administer the sale

21   process in the first instance, as much as they might have

22   done outside of bankruptcy, they will do so subject to

23   restrictions that I will impose and any final decision that

24   is made will only be approved if I believe that it is the

25   best deal that is available and is an appropriate deal for

Page 29

1    approval under the Bankruptcy Code.

2            So if anybody is concerned that somebody might

3    interfere with the process, tilt the process, steer the

4    process, upset the process, those are all things that I

5    would consider and that I have the power to stop and that I

6    would not tolerate.  Mr. Dietderich, did you have something

7    you wanted to say?

8            MR. DIETDERICH:  I did, Your Honor, if it pleases

9    the Court, I would like to respond just briefly.  I probably

10   have a few minutes of remarks, but I think it will help set

11   the tone in response to I think some of the statements that

12   have been made about Alameda.

13           So Your Honor, we were a bit surprised by the

14   presentation.  We weren't provided that in advance.  Our

15   client is being portrayed unfavorably for proposing a rescue

16   deal that helps customers.  We don't think that's

17   appropriate.  Alameda and the Debtors simply have different

18   ideas on how to help customers.

19           My clients had asked me to address the Court

20   briefly in response, just so the Court understands our

21   position in the case.  Alameda, Your Honor, was and is first

22   a shareholder.  It owns about 10 percent of the public

23   stock.  There are many other shareholders, including retail

24   investors.

25           Shareholders also were harmed by Alameda's

1  failure.  Once Creditors are paid in full, if they can be,

2  public equity owns the next dollars.  Voyager solicited

3  Alameda for rescue capital when it learned of the impaired

4  loan to Three Arrows Capital.

5        That loan was $650 million lent on an unsecured

6  basis.  Alameda entered into a rescue loan facility in

7  response to management's request.  It was intended to stop a

8  run on the bank.  The use of proceeds was specific to fund

9  customer redemption.

10        It was to be repaid when the balance sheet

11  stabilized and crypto prices recovered.  $75 million of

12  Alameda's money was funded under that loan.  Virtually all

13  of it went directly to customers.  The loan facility helped

14  to stall the run on the bank, and created more time for

15  other customers to withdraw their money before the gates

16  closed.

17        Ultimately the rescue facility was unsuccessful to

18  prevent Chapter 11.  Now when Voyager filed, Your Honor,

19  Alameda tried again to help.  We proposed to move customer

20  assets out away from the estate immediately using a good

21  bank/bad bank structure.

22        Customers would have immediate liquidity in crypto

23  or cash, own all the appreciation in the crypto we could

24  extract, and also keep their claims against the liquidating

25  estate.  We sincerely believed and continue to believe this

Page 31

1   is the right approach for customers.

2          That was rejected violently.  We spent two weeks.

3   We have not even received a counter proposal.  Why?  The

4   answer is in the bidding procedures.  Now we were prepared

5   to contest the bidding procedures today, Your Honor, but

6   changes have been responsive to our comments and we have no

7   objection with you clarifying things when we get to that in

8   the hearing today.

9          But the answer is in the bidding procedures

10  Paragraph M.  It says, "The Debtors prefer any sale to be

11  implemented in a plan."  That's the difference of opinion.

12  In other words, the Debtors prefer to walk stakeholders in

13  until a plan can tie up all loose ends in the case.

14         And we appreciate the Debtors have a quick plan

15  schedule.  If we have to wait for a plan, a quick plan's

16  better than a slow one.  But that will be November at the

17  earliest, even on an optimistic schedule.

18         And so, that's the difference of opinion.  The

19  difference of opinion is that we believe there is a way to

20  do this quicker for customers, the Debtors would like to

21  wait for a plan.  And we have some concerns.

22         We can get into those in more detail when we get

23  to the bidding procedures, but I just wanted to address

24  immediately this idea that you know, Alameda has anything --

25  Alameda and the Debtor have a difference of opinion in how

1    to protect customers, Your Honor.

2           That difference of opinion is related to the pace

3    of the case.  But it continues to be our perspective, and we

4    will continue to advocate as part of the bidding procedures

5    or otherwise to a quicker solution to customers and what the

6    Debtor's currently proposing.

7           THE COURT:  All right.  Let me make --

8           MR. SUSSBERG:  Your Honor --

9           THE COURT:  Let me make something clear.  I

10   allowed the Debtor to make this presentation because I know

11   there are so many rumors that are circulating and so many

12   concerns that are circulating.  I have no intention of

13   turning my Court hearings into a sort of cable news show

14   with people slinging accusations at each other and making

15   extremely characterized descriptions of what their prior

16   proposals or discussions were.

17          I don't know why all this is happening and why

18   it's happening in the press.  Certainly the parties who are

19   on the phone know that's not how it's usually done in the

20   bankruptcy context and it ought to stop.  Okay?

21          MR. AZMAN:  Your Honor, it's Darren Azman for the

22   Committee, if I could make a few brief statements?

23          THE COURT:  Yes.

24          MR. AZMAN:  Good morning, Your Honor.  Again, it's

25   Darren Azman from McDermott, Will & Emery.  We are the

1    proposed Counsel to the Committee.  Also on the line today

2    are a few McDermott colleagues, including my partner Chuck

3    Gibbs.

4            MR. GIBBS:  Good morning, Your Honor.  This is

5    Chuck Gibbs.  It's a pleasure to be in your court today,

6    even though it's just virtual.

7            MR. AZMAN:  All right, Your Honor, over the last

8    two weeks, we've had a lot of catching up to do and we

9    appreciate all the cooperation that we've received from the

10   Debtors and their professionals so far.  We hope that

11   continues.

12           As Your Honor has quickly learned, there is no

13   shortage of novel issues at the intersection of crypto and

14   bankruptcy law.  Unfortunately, we have a lot of experience

15   in this space.  In particular, we were Committee Counsel in

16   a very similar case that was filed two years ago called Cred

17   Inc.

18           Cred was a yield-earning crypto platform, similar

19   to Voyager.  So I think we will have a lot to offer, not

20   only to our Committee and the Creditor body, but hopefully

21   also for Your Honor on the difficult issues that all of us

22   will be facing together.

23           As an initial matter, I want everyone, customers

24   in particular, to know that the Committee has established

25   its own information website.  As Mr. Sussberg noted, we'll

Page 34

1    also be holding regular Town Halls to answer questions, and

2    to do our best to help customers understand the bankruptcy

3    process generally and specifically what is happening in this

4    case.

5             We are aiming to hold the first Town Hall next

6    week.  Once that date is set, we will be filing a notice on

7    the docket with the time and date, along with logged

8    information for the Town Hall broadcast.  In the meantime,

9    we are asking customers to submit questions that they would

10   like for us to answer during the Town Hall.

11            That can be done by sending an email.  I can't say

12   we picked the most user-friendly email address, so let me

13   read it maybe a couple of times so folks have it.  The email

14   address is VoyagerCommitteeInfo@epiq -- e-p-i-q --

15   global.com.

16            Again, it's VoyagerCommitteeInfo@epiqglobal.com.

17   We will include that email address on the notice that we

18   file hopefully next week regarding the Town Hall details.

19   We will try to address as many questions as possible at the

20   first Town Hall, and we will continue to host Town Halls as

21   long as needed to make sure that customers feel that their

22   voices are heard and that they understand what is happening

23   in this case.  And for those unable to attend any of the

24   Town Halls, each one will be recorded and available on

25   YouTube.

Page 35

1          Your Honor, I also want to preview what we expect

2     to see from the Debtors in this bankruptcy case.  We've

3     already made this clear to them, and I think they are

4     largely aligned with us as reflected in many of the changes

5     that were made to the proposed orders on the agenda today.

6          First, to the extent the Debtors are holding

7     customer property that is not property of the estate, we

8     want that property returned to customers immediately.  That

9     of course, is the subject of one of the motions on today's

10    agenda and we are hopeful that Your Honor enters that order.

11         Second, we want the Debtor's remaining property,

12    including crypto, distributed to Creditors and customers as

13    soon as possible.  Whether that happens under a plan, a

14    transaction or some other mechanism is to be determined.

15    But there is a significant amount of crypto in this estate

16    and there's no reason why customers who are suffering deeply

17    should wait years for distribution as is often the case in

18    Chapter 11.

19         Third, the Debtor's Special Committee has retained

20    Quinn Emanuel to conduct an internal investigation.  Our

21    working assumption, Your Honor, is that at the conclusion of

22    that investigation, there will be a report that either

23    supports the Debtor's proposed releases of insiders or it

24    does not.

25         We fully expect that the Special Committee and its

Page 36

1   Counsel will act impartially, but the Creditor's Committee

2   needs to ensure that the process is fair, comprehensive and

3   transparent.  And for that reason, the UCC will be

4   conducting its own investigation alongside the Special

5   Committee consistent with the UCC's statutory obligations.

6           The Debtors in the Special Committee have agreed

7   to cooperate in that investigation, including by producing

8   documents to us and allowing us to participate in the

9   Special Committee's informal interviews that will happen

10  with insiders and others.

11          And to the extent that the Debtors ultimately

12  support releases of claims that we believe have merit and

13  value, we will be prepared to explain to this Court and to

14  Creditors why the releases are improper and should not be

15  approved.  But we will let that process play out and we will

16  see what happens.

17          Fourth, we expect a fast timeline in these cases.

18  You'll see that we worked with the Debtors to shave off

19  about three weeks from the original plan timeline that was

20  proposed.  I don't think we can cut it down any more than

21  that.  And we are hoping to stick to that timeline.

22          The goal here is to confirm the plan quickly, so

23  that a liquidation trust controlled by Creditors can begin

24  pursuing causes of action to make up whatever deficiency

25  remains after distributing the crypto and cash that is

Page 37

1    currently on hand.

2            And Your Honor, based on our preliminary analysis,

3    and more importantly our experience in the crypto industry

4    that dates back all the way to 2013, by the way, we do

5    expect there to be significant litigation claims here.  At

6    bottom, Your Honor, customers here deserve answers about

7    what happened and who should be held responsible, and they

8    will get those answers.  That's all I have, Your Honor,

9    unless you have questions.

10           THE COURT:  No, thank you very much.  Are we ready

11   to proceed with the motions that are scheduled for today

12   now?

13           MR. SUSSBERG:  Yes, Your Honor.  We'd like to

14   proceed.  I think we're going to start with the bid

15   procedures.  Thank you.

16           MS. DAGNOLI:  Sir?  Sir?

17           THE COURT:  Yes?

18           MS. DAGNOLI:  I am one of the customers.  At what

19   point do I get an opportunity to speak or ask questions?  Or

20   I'm not really sure.  I'm -- sorry, I'm new to this.

21           THE COURT:  Okay.  If you have comments on

22   particular motions, then after the lawyers have presented

23   their arguments, if you have something you want me to

24   consider, I'll ask for comments.

25           MS. DAGNOLI:  Okay.

1          THE COURT:  Do you have comments about the

2     particular motions that are scheduled today?

3          MS. DAGNOLI:  Well, I'm not quite sure what the

4     motions are, so I guess I should speak after I hear the

5     motions.

6          THE COURT:  All right.  What is the -- what is it

7     that you wanted me to consider today?

8          MS. DAGNOLI:  Well, sir, I just, you know, I just

9     want to thank you for hearing me.  And I just want to

10    represent some of these customers that you know, I'm -- I

11    think I'm one of the largest investors or Creditors that are

12    now on this case.

13          And I just hope to speak on behalf of all of us.

14    But I did trust Voyager and their word and their promises.

15    I have over $1 million of 24 years I worked in a family

16    business.  I worked hours that I was away from my children.

17    I missed out on big, little, you name it.  It was a family

18    business.

19          I don't speak with my brother anymore because of

20    it.  I mean, I worked very hard for the money I got for the

21    sale in the end of 2020 on that business.  It's on me, I

22    know crypto goes up and down.  I understand there was risk.

23    But I did not fact in -- factor in that this company that

24    was saying, you know, as of Steven Ehrlich said in December

25    2021, I mean, six months ago or seven months ago, we expect

Page 39

1     record earnings.

2          I mean, this is a company that's talking about how

3     great they're doing.  They have Mark Cuban, Rob Gronkowski.

4     They have the Dallas Mavericks Arena, you know, with the

5     Voyager all over it.  I mean, they're spending big money on

6     their marketing, on their people, on their locations.

7          Where was the heads up on this?  So I just want to

8     say that I had over $1 million invested on that platform.  I

9     had $350,000 that was for my kids' college on their USD coin

10    that they touted was FDIC insured and I read up on it.  And

11    they had the Metropolitan Bank.

12         And I mean, if you look at their partners on their

13    website, there's all banks on there.  I mean, it's

14    misleading.  And I trusted them.  I mean, I -- they made so

15    many fraudulent claims to lure in their customers and now

16    Creditors.

17         I mean, we funded them.  And the lies and the

18    fraud continued until the beginning of July, when they

19    locked us all out of our own money.  I mean, how -- it's

20    crypto, yeah, but it's a bank.  They're holding our money.

21    It's a bank.

22         I mean, that's how I looked at it.  I'm not, you

23    know, a advanced investor, but I looked at it, that this is

24    something long-term.  The crypto will go up and down, but

25    I'll wait long-term, you know?  I'll hold out for this

Page 40

1   because I'll wait out the lows and I'll wait five, 10 years

2   if I had to and just sit on it.

3         That's my thinking.  I didn't expect them to just

4   say, well, guess what?  We're just folding.  So I did not

5   feel like I got a notice.  I didn't get a heads up.  I just

6   you know, did not expect this.  So I really feel like they

7   made themselves look like a healthy, viable, long-term

8   company.

9         Their leadership was, you know, supposed to be

10  experienced professionals.  They were not fiscally

11  responsible.  They -- I feel like they defrauded their

12  investors.  They defrauded their customers.  Where was the -

13  - in the first six months of 2022, when they knew things

14  were going south, why are they borrowing more money?

15        Why weren't they cutting jobs?  Why weren't they

16  cutting costs?  Did they cut costs?  I don't know.  But you

17  know, is Steven Ehrlich still getting paid and is he getting

18  bonuses?  And what payment structure is in place for all of

19  these people right now?  And if they restructure, is all our

20  money going in -- like who's starting that new company?

21  Who's funding it?

22        So I do feel like we're playing -- we're paying

23  the ultimate price for them being fiscally irresponsible.

24  And they had our trust.  They had our money and they did not

25  run this company properly.  You look at Coinbase, you look

Page 41

1    at FTX --

2            MAN 1:  Ma'am, I'm a customer, too.  Can we please

3    proceed with the case?  Thank you.

4            THE COURT:  All right.

5            MS. DAGNOLI:  Well, I'd like to be able to speak.

6            THE COURT:  Stop, stop, stop right now.  I will

7    not -- let me make it 100 percent clear -- I will not

8    tolerate interruptions and cross-talk.  Is that clear to

9    everybody?

10           MS. DAGNOLI:  Yes sir.

11           THE COURT:  That's not in a court hearing.

12   Everything proceeds in order.  Ms. Dagnoli, is that how you

13   pronounce your name?

14           MS. DAGNOLI:  Yes, sir.

15           THE COURT:  I understand your concerns and I

16   understand these are issues that a lot of customers have

17   raised in letters that they have filed.  And unfortunately,

18   we are in a bankruptcy case.  In a bankruptcy case, what

19   happens is, all of the assets that under the terms of the

20   law and the Bankruptcy Code belong to the Debtor.

21           Are made available for equal distribution among

22   Creditors in accordance with their legal rights.  I know it

23   may seem strange to you, and it seems a lot of people don't

24   understand this, but a lot of people have raised concerns

25   about whether they were defrauded, or whether they were lied

Page 42

1    to, whether something was stolen, a lot of concerns of that

2    kind.

3            Those are Creditor claims.  It doesn't mean

4    necessarily that you have any bigger or lesser rights than

5    other Creditors or other customers who may not have been

6    defrauded.  The issue -- some of the issues before me today

7    are whether some of the cash that's on deposit in the bank

8    really belongs directly to the customers and not to the

9    company, and therefore, shouldn't be part of the bankruptcy

10   proceeding.

11           It shouldn't be treated as an asset of the estate.

12   I have some questions to ask the parties about that because

13   I need to make sure that the rights of all Creditors are

14   protected, but that's one of the issues.  But the fact that

15   you may feel wronged, while I am very sympathetic, and while

16   I am determined as is everybody to make sure that this case

17   moves as quickly as possible, so that you're not in limbo

18   forever, it doesn't mean that I can solve your problem

19   today.

20           It doesn't mean that I can simply say that you get

21   your cryptocurrency back, for example, where there are

22   issues about whether under the structure of these

23   relationships, that belongs to the Debtor.  It doesn't mean

24   that I can do that today.  In fact, I can't do that today.

25           If there were a valid, legal argument that had

Page 43

1    been presented to me that showed that particular

2    cryptocurrency belonged to a customer and it didn't even

3    belong to the Debtor within the applicable rules, that would

4    be one thing.  I don't have any such motion in front of me

5    today.

6         The Debtor's position and so far at least has been

7    that there's a difference between the cryptocurrency

8    holdings and the cash holdings.  And that as a bankruptcy

9    matter, the cryptocurrencies are assets of the estate, and

10   the Creditor's individual rights are rights of Creditors.

11        Most people don't understand this, but as a

12   general matter, even when you have money on deposited on

13   bank, which you have as a Creditor claim against the bank,

14   there are rules in the bank context that change that, that

15   give you insurance, may give you prior rights.

16        But the underlying relationship is really a

17   Creditor relationship.  And unfortunately, a lot of those

18   rules that apply to banks or securities brokers don't, at

19   least may not apply to Voyager.  So I am very sympathetic to

20   you and everybody else who feels that they were wronged

21   here.

22        But being wronged, being owed cryptocurrency

23   because you're a customer and being owed something because

24   you are wrong or being owed your cryptocurrency because you

25   were wronged is really a Creditor claim.  And the best way

Page 44

1    to deal with that is to try to make sure that we move

2    through this bankruptcy case as quickly as possible.

3          But it doesn't necessarily mean at all that I can

4    simply say, well, everything should be given back to the

5    customers.  That's not something that Bankruptcy Code just

6    allows me to do, unless there's some specific motion that

7    shows that that result is consistent with the requirements

8    of the law in the Bankruptcy Code.  I hope that's an --

9    that's probably not a very comforting explanation, but I

10   hope that explains to you why people aren't immediately

11   reacting to allegations of fraud, okay?

12          THE COURT:  I hope that's an -- it's probably not

13   a very comforting explanation but I hope that explains to

14   you why people aren't immediately reacting to allegations of

15   fraud, okay?

16          MS. DAGNOLI:  Okay, thank you so much.  I really

17   appreciate you hearing me and for explaining that.

18          THE COURT:  Okay.  All right, Mr. Sussberg, how do

19   you wish to proceed?

20          MR. SUSSBERG:  Your Honor, we -- go ahead, go

21   ahead, Chris.

22          MR. MARCUS:  This is Christopher Marcus from

23   Kirkland & Ellis on behalf of the Debtors.  I was going to

24   take over from here and begin first with Item 14 on the

25   agenda, which is the bidding procedures motion, if that's

Page 45

1    okay, Your Honor.

2          THE COURT:  Can we take that last?  Let's get the

3    easier things out of the way, and then take the FBO motion,

4    and then take the bidding procedures, if that's all right

5    with you.

6          MR. MARCUS:  Of course, Your Honor, whatever your

7    preference.

8          THE COURT:  All right.

9          MS. OKIKE:  Good morning, Your Honor.  Christine

10   Okike of Kirkland & Ellis on behalf of the Debtors.

11         THE COURT:  Good morning, Ms. Okike.

12         MS. OKIKE:  Your Honor, if we could start -- we're

13   going to skip around a little bit on -- on the agenda, if

14   that works.  If we can start with Item Number 4, which is

15   the Debtors' cash management motion?

16         THE COURT:  Okay.

17         MS. OKIKE:  So, Your Honor, we filed the revised

18   proposed order at Docket Number 227.  Subsequent to the

19   entry of the interim cash management order, we have had

20   discussions with the Committee, the U.S. Trustee and the

21   SEC, and the revised proposed order incorporates their

22   comments.

23         Your Honor, you probably saw that we've agreed to

24   seek a second interim order at this time while the U.S.

25   Trustee continues to evaluate the Debtors' cash management

1    system.  If Your Honor is amenable, we'd like to schedule a

2    final hearing at the end of September.  We were thinking

3    September 27th, if that works for Your Honor.

4              THE COURT:  Lorraine, does that date work?

5              CLERK:  I will check, Your Honor.

6              MS. OKIKE:  So, Your Honor, while we wait to hear

7    back on the date, at the request of the Committee, we have

8    added --

9              CLERK:  I'm sorry.  Yes --

10             MS. OKIKE:  Oh.  Apologies...

11             CLERK:  Yes, the September 27 works.  I'm sorry.

12             THE COURT:  Okay.

13             MS. OKIKE:  Okay, thank you.  Your Honor, at the

14   request of the Committee, we have added a provision that the

15   Debtors will not engage in any intercompany transactions

16   that involve payments from a debtor to a non-debtor without

17   prior consent of the Committee.  And for clarification, we

18   are not seeking, through this motion, to make any payments

19   from debtors to non-debtors.

20             We have also agreed to provide the Committee with

21   a rolling 13-week cash-flow budget.  The U.S. Trustee has

22   agreed to an extension of the date for the Debtors to come

23   into compliance with Section 345(b) to September 13th.  I

24   would note that only one of the Debtors' banks, BMO, Bank of

25   Montreal, is not an authorized depository.  And we have

Page 47

1    transferred cash in excess of the Canadian equivalent of the

2    SBIC limit out of those accounts to one of our authorized

3    depositories.  So, we believe that all -- all of the

4    Debtors' cash is adequately protected.  And we need to

5    maintain that bank account at BMO, Bank of Montreal, because

6    some of our vendors only accept payment in Canadian dollars.

7            At the request of the SEC, we have included

8    language that nothing in the motion or order shall

9    constitute a finding as to whether the cash management

10   system complies with federal or state securities laws, and

11   the right of the SEC to challenge such transactions is

12   expressly reserved.  And we've also provided, at the request

13   of the SEC, that nothing in the motion or the order

14   constitutes a finding under the federal securities laws as

15   to whether crypto tokens or transactions involving crypto

16   tokens are securities, and the right of the SEC to challenge

17   such transactions is expressly reserved.

18           We've also indicated on the bank account schedule

19   that the Debtors' -- the Silvergate bank accounts have been

20   closed and that the Debtors' BMO accounts, just for purposes

21   of clarification, are with BMO, Bank of Montreal.

22           Your Honor, with that, and there being no

23   objections to the motion, we would propose -- respectfully

24   request entry of the second interim order.

25           THE COURT:  Are there any objections to the cash

Page 48

1    management motion?

2           MR. MORRISSEY:  Your Honor, Richard Morrissey for

3    the U.S. Trustee.  The U.S. Trustee has no objection.  But

4    I'd like to begin actually with a -- a point about the

5    September 27th hearing.  Does the Court have a preferred

6    time for that hearing?

7           CLERK:  11 a.m.

8           MR. MORRISSEY:  Thank you.  Your Honor, the U.S.

9    Trustee has no objection.  As Ms. Okike just said, we're

10   continuing to work with the Debtors so that, hopefully,

11   we'll have all our ducks in a row by -- by or before the

12   September 27th hearing.  Thank you.

13          THE COURT:  Okay.  Anyone else?  All right, Ms.

14   Okike, I have one question.  I'm not sure when the last

15   version of this particular order was filed, so I guess I'm

16   not 100 percent sure I've seen the most recent one.  So,

17   I'll ask you to submit it --

18          MS. OKIKE:  Yes, Your Honor, we filed a revised

19   order at Docket Number 227.

20          THE COURT:  What time was it filed?

21          MS. OKIKE:  I believe that was late last night.

22          THE COURT:  All right, I may or may not have seen

23   it, I just don't recall.  But I wanted to ask you, because

24   later today we'll be considering the motion on the

25   withdrawals from the FBO account -- and Paragraph 6 of the

Page 49

1    proposed -- proposed order for that motion refers to

2    Paragraph 8 of the cash management order.

3         MS. OKIKE:  Yes.

4         THE COURT:  It seems to imply that I have already

5    given the bank that authority in the cash management to

6    honor cash withdrawals from customers from the FBO accounts.

7    Is that correct --

8         MS. OKIKE:  No, Your Honor.  No.  So, you may

9    recall at the first day hearing, we sought approval to step

10   into MC Bank's shoes with respect to disputing ACH

11   chargebacks.  So, because Voyager doesn't have a direct

12   relationship with customers in terms of transferring cash,

13   MC Bank and Voyager agree that we would step into their

14   shoes for purposes of challenging fraudulent ACH

15   chargebacks.  And so we just wanted to make sure that the

16   rights that were granted to us through the first interim

17   order still remain in effect, notwithstanding the release of

18   cash from the FBO account, assuming that that motion is

19   granted.

20        THE COURT:  Okay.  All right.  I don't think I

21   have any issues with the cash management order then but I

22   just need to look at it to make sure.

23        MS. OKIKE:  Understood, Your Honor.

24        THE COURT:  Okay.

25        MS. OKIKE:  Your Honor, with that, I'll turn the

Page 50

1    podium over to my colleague, Ms. Smith, who'll walk through

2    some additional motions that are up for hearing today.

3            THE COURT:  Very good.  Ms. Smith?  You may be

4    muted.

5            MS. OKIKE:  Your Honor, I believe Ms. Smith -- I

6    believe she got kicked off.  So, we have a couple people

7    presenting, so why don't we move -- I'll move to Ms. Clark

8    next.

9            THE COURT:  Okay.

10           MS. CLARK:  Good morning, Your Honor.  Erica Clark

11   from Kirkland & Ellis, proposed counsel for the Debtors.

12   Can you hear me okay?

13           THE COURT:  I can, yes.

14           MS. CLARK:  Thank you.  I'm going to take us

15   through the next few items on the agenda starting with

16   Agenda Item Number 1, the insurance motion, which was

17   initially filed at Docket Number 3.

18           Today, the Debtors' request authority on a final

19   basis to pay obligations that may arise under the insurance

20   policies and charity bonds in the ordinary course.  As Your

21   Honor may recall, we did not submit an interim insurance

22   order for court approval under your guidance, as there were

23   not prepetition amounts due and owing at the time of filing.

24           Since filing the motion, no objections have been

25   filed, however, we have received and incorporated informal

Page 51

1    comments from the SEC and the Committee which were reflected

2    in the -- the proposed order that was filed on August 2nd at

3    Docket Number 203.

4           Unless Your Honor has any questions with respect

5    to the proposed order, we would respectfully request that

6    the Court grant the relief requested in the -- in the

7    insurance motion and enter the order as proposed at Docket

8    Number 203.

9           THE COURT:  All right, I haven't seen any

10   objections on file.  Is there anybody on the phone who has

11   an objection to the insurance order?  All right, I hear no

12   objections.  The proposed order that I reviewed looked fine

13   to me and we'll approve it.

14          MS. CLARK:  Thank you, Your Honor.  The next item

15   on the agenda is Agenda Item Number 3, the wages motion,

16   which was initially filed at Docket Number 8.  Here, the

17   Debtors are seeking entry of a final order authorizing the

18   Debtors to pay employee wages and continue their

19   compensation and benefits programs.  Your Honor entered the

20   interim wages order on July 8th at Docket Number 57.  Since

21   that time, no objections to the wages motion have been

22   filed.  However, we did incorporate the SEC's informal

23   comment to the revised proposed wages order that was filed

24   on August 2nd at Docket Number 206.

25          Unless Your Honor has any questions with respect

Page 52

1    to the final revised proposed order, we would request that

2    the Court enter the order as proposed at Docket Number 206.

3              THE COURT:  Does anybody object to the motion as

4    to the employee applications and the proposed order?

5              MR. MORRISSEY:  Your Honor, Richard Morrissey

6    again for the U.S. Trustee.  The U.S. Trustee has no

7    objection but we do have something in the way of an update

8    with respect to one of the aspects of the wages motion.

9              There were -- there was a reference to non-insider

10   severance benefits that may or may not be payable at the

11   beginning of the case.  Also, non-insider ad hoc bonuses.

12   These were relatively de minimis bonuses but at the time of

13   the filing, I don't think the Debtor was aware of whether

14   there were any such bonuses to be paid.

15             I understand that, number one, Your Honor, as of

16   today, there are no non-insider severance payments to be

17   made, so that's not an issue.  However, regarding ad hoc

18   bonuses, there were a few contemplated.  I believe there

19   were five individuals, all non-insiders, and the bonuses

20   were sign-on bonuses.  And my understanding, Your Honor, is

21   that these employees signed on prepetition and -- in other

22   words, they became employees prepetition -- and they were to

23   earn the sign-on bonuses not immediately but after a certain

24   specified period of time.  That period of time carried into

25   the post-petition period.

Page 53

1          So, they did earn those sign-on bonuses and they

2    were -- you know, again, they range from 5,000 to 20,000, I

3    believe, at the top.  So, the -- so, that's sort of an

4    update.  The U.S. Trustee has no objection to that but I

5    just wanted the Court to be aware of that minor development.

6    The U.S. Trustee has no objection to the proposed order.

7    Thank you.

8          THE COURT:  All right, anybody else?

9          MS. DAGNOLI:  This is Lisa Dagnoli.  I just -- I

10   would object to paying, you know, wages and benefits to a

11   company that's filing -- for this company, that's filing

12   bankruptcy.  I guess I don't agree with that but I'm not

13   really sure how to go about it.

14         THE COURT:  All right.  Well, just to be clear,

15   Ms. Dagnoli, the motion is not about paying wages and

16   benefits earned after the bankruptcy date.  That happens

17   automatically under the Bankruptcy Code in the ordinary

18   course of business.  The motion is about paying wages and

19   obligations that have accrued prior to the date of the

20   bankruptcy.

21         MS. DAGNOLI:  Okay, thank you, sir.

22         THE COURT:  Do you -- do you have an objection or

23   not have an objection?

24         MS. DAGNOLI:  Well, personally, I would have an

25   objection because I feel that that's probably going to come

Page 54

1    out of, you know, the bucket of -- you know, the pie of

2    what's going to be distributed.

3              THE COURT:  Do the Debtors or the Committee have a

4    response?

5              MS. CLARK:  Your Honor, this is Erica Clark again

6    in representation of the Debtors.  As we kind of disclosed

7    on the first day, the Debtors currently have about 351

8    individuals across the United States, Denmark, Canada,

9    France and Latin America that they employ and are in need of

10   their services in order to ensure that the operations are

11   continued post-petition as well as making sure that the

12   platform continues to be up and running.

13             These employees are reliant on -- on their

14   compensation and their benefits programs and would suffer

15   great hardship if those amounts are not paid.  And so we --

16   we would seek authority from the Court in order to make sure

17   that the employees are reassured that they are -- they're

18   important in this case and that we would like to continue to

19   pay them.  We would like to pay them for their prepetition

20   amounts and we would also like to continue to pay them for

21   post-petition amounts.

22             MR. AZMAN:  Your Honor, it's Darren Azman for the

23   Committee.  We view the sale process that's occurring as an

24   integral part of this bankruptcy case and the overall

25   recovery that customers, including the party objecting, will

Page 55

1    ultimately receive in this case.  Nonpayment of prepetition

2    wages is likely to have an incredibly negative impact on

3    whether employees are willing to stick around.  And

4    employees leaving at this critical time would be incredibly

5    detrimental to the overall sale process.

6              And so for (indiscernible) we would -- we support

7    the Debtors' motion and think it's critical that the motion

8    be approved and that prepetition wages be paid.

9              THE COURT:  Did you understand that response, Mr.

10   -- Ms. Dagnoli?  Essentially, the argument is that the best

11   way for you and other creditors and customers to get

12   recoveries that are as high and as quick as possible is to

13   be able to either sell or reorganize this business as an

14   actual operating business as quickly and on the best terms

15   possible.  And, in that regard, that it would be essentially

16   cutting off your nose to spite the face -- to spite your

17   face to say that you can't pay the employees because that

18   would basically dismantle the business you're trying to

19   sell.  Does that make sense to you?

20             MS. DAGNOLI:  Yes, sir, thank you for explaining

21   that.

22             THE COURT:  Okay.  Anyone else wish to be heard?

23             MR. DOTSON:  Your Honor, Cordero Dotson, one of

24   the customers on the Voyager platform.  May I please have a

25   moment just to give my input?

1            THE COURT:  Yes.

2            MR. DOTSON:  Thank you, sir.  I apologize for not

3    speaking up in the first hearing.  I attended but I wanted

4    to seek more professional knowledge from a law firm such as

5    the Chelsea and whatnot.  And I just wanted to position

6    myself as an owner and a depositor of my cryptocurrency.

7            I'm witnessing ten years of my life being frozen

8    on a platform that I trusted.  They are not a bank, though,

9    they allowed me to use them in such a way.  They are a

10   brokerage.  And for me to hear through the recklessness of

11   risk assessment and management that over a half a billion

12   dollars was owned out to a single entity and

13   uncollateralized, and the penalty of that is that I am no

14   longer the rightful owner of my cryptocurrency is quite

15   hurtful.

16           And I understand that the importance of this case

17   is not only for what is going on currently but will affect

18   generations to come when it comes to digital assets and the

19   management of who's the rightful owner.  There's a sentiment

20   in the space that if you do not have the rightful ownership

21   of your private keys, that is not your crypto, though you

22   may have trusted a third-party entity such as Voyager to be

23   the secured -- to secure your assets and to hold your --

24   your digital assets until your claim of ownership.

25           And I don't understand how me, that had no prior

Page 57

1    knowledge -- I'm 32-years old -- I had no prior knowledge

2    that I would be considered to be a creditor or unsecured

3    creditor in this motion.  I've always identified myself as

4    an owner and a rightful depositor of the cryptocurrency that

5    was provided on their platform, and I've been a supporter of

6    this business entity before it was even called Voyager --

7    when it previously called Ethos.

8            So, I feel that I have more ownership than the

9    ones that were selected to be in the board of directors or

10   the CEO himself, since I was present before all proceeding

11   members that Kirkland represents.  And I just want to get

12   more of a handle on why I'm being labeled a creditor or

13   unsecured creditor instead of an owner of my cryptocurrency,

14   sir.

15           THE COURT:  Well, all right.  Right now what we

16   have before us is the motion for approval of the payment of

17   the employees.  Did you have an objection to that?

18           MR. DOTSON:  No, sir, I don't.  I totally agree

19   with the Debtors on any charges that were accruing before

20   the halt of transactions on their platform should be paid

21   out to those employees, though I do not agree with them not

22   laying off their staff and only prioritizing those that can

23   maintain the operations, the day-to-day of the maintenance

24   of the platform.

25           THE COURT:  All right.  As to the nature of your

Page 58

1    claim as a creditor, I explained that as best as I could to

2    Ms. Dagnoli.  As I understand the position that the Debtors

3    explained to me on the first date, under the customer

4    agreement, cryptocurrency is held in the Debtors' name, and

5    the Debtors had the right to lend it, or to stake it, or to

6    re-hypothecate it and to do other things.

7             Ordinarily what that means is that the property

8    ownership actually resides with the Debtors.  And your claim

9    to a particular currency, cryptocurrency, is a creditor

10   claim.  I -- I can't -- I'm sorry but I can't turn this

11   hearing into a tutorial.  I have to address the particular

12   motions that are in front of me.  But that's, as I

13   understand it, the basis for the Debtors' position that the

14   cryptocurrency is an asset of the estate.  And if you've

15   been in touch with counsel, perhaps they can explain that to

16   you a little more clearly, okay?

17            MR. DOTSON:  Thank you, Your Honor.  Yeah, I just

18   need some clarity on that, that's all.  It's -- it's totally

19   confusing for me to witness well over seven figures being

20   frozen on the platform that -- that I trusted.  And there

21   was no preceding or like, information that I saw that was

22   presentable to customers that would -- would state these

23   claims that by me depositing my funds here, that I no longer

24   had the ownership of it and that it could be used in

25   situations as an uncollateralized loan.

Page 59

1           So, that's why I just felt -- where I actually

2    feel a bit lost.  And I don't really see much is being

3    spoken on the customers' behalf on the rightful ownership of

4    these digital assets.  You know, the customers are very

5    flexible.  We'll even do time locks, decrease the

6    withdrawals.  But we just really want Voyager to acknowledge

7    the ownership of the cryptocurrency belongs to the customers

8    that provided the liquidity for this -- for Voyager to -- to

9    be what it is today.

10           THE COURT:  All right.  As to the employee motion,

11   is there anybody else who wishes to be heard?  All right,

12   I'm going to grant the motion.  It is relatively ordinary

13   relief in a bankruptcy case.  I do understand the concerns

14   of customers who have opposed it.  To some extent, some of

15   the attitude seems to be that customers don't want employees

16   to get anything because they were part of the problem.

17   That's not a constructive way to approach the maximization

18   of the value of the assets of this estate.  And I agree with

19   the Debtors and the Committee in their business judgment

20   that this is an appropriate thing to do.

21           Hopefully, what will happen here will make

22   customers, if not happy, at least get them the best result

23   that we can get under the circumstances.  But we're not

24   going to accomplish that by kind of throwing things aside

25   and destroying the business that we're actually trying to --

Page 60

1    to rescue, okay?

2           MS. CLARK:  Thank you, Your Honor.  The last item

3    that I will be --

4           THE COURT:  If there's any other customer that has

5    a general question about the cryptocurrency and who it

6    belongs to, I encourage you to just -- you have a creditors

7    committee.  They can speak with you more directly.  I'm

8    really supposed to be ruling on specific requests for

9    relief, not kind of answering general questions.  Okay?

10          MS. CLARK:  Thank you, Your Honor.  And I'm sorry

11   I cut you off earlier.  The last item that I will be

12   presenting is Agenda Item Number 6, the taxes motion, which

13   was originally filed at Docket Number 30.  The Debtors are

14   seeking a final order authorizing the Debtors to pay any

15   outstanding prepetition taxes and fees owed in the ordinary

16   course of business.

17          Similarly to the weighted motion, Your Honor

18   entered an interim taxes order on July 8th at Docket Number

19   56.  Since that time, no objections to the taxes motion have

20   been filed.  But the revised proposed order filed at Docket

21   Number 197 includes similar informal comments from the

22   Committee and the SEC.

23          Unless Your Honor has any questions, we would

24   respectfully request that the Court enter the order as

25   proposed at Docket Number 197.

Page 61

1          THE COURT:  All right, I didn't see any

2    objections.  Are there any objections?  All right, I'll

3    approve that order.  Thank you.

4          MS. CLARK:  Thank you, Your Honor.  That's all for

5    me.  I'll now hand it over to my colleague, Allyson Smith.

6    I think she's been reconnected.

7          MS. SMITH:  Yes, thank you, Erica.  And apologies

8    again, Your Honor, for before.  I did accidentally get

9    disconnected.  For the record, Allyson Smith, Kirkland &

10   Ellis, proposed counsel to the Debtors.  If it's all right

11   with Your Honor, I will just continue taking us through the

12   agenda, moving next to Item Number 7.

13         THE COURT:  All right.

14         MS. SMITH:  The interim compensation motion, which

15   seeks to establish procedures for interim compensation and

16   reimbursement of expenses for retained professionals was

17   originally filed at Docket Number 95.  We did file a revised

18   proposed order on Tuesday evening at Docket Number 194.

19   There were no formal objections received, though we did

20   incorporate informal comments received from the Committee

21   and the SEC.

22         Additionally, we understand that Your Honor has a

23   preference to address the release of holdbacks in connection

24   with interim fee applications rather than now in advance.

25   So, while not currently reflected in the order, we will add

Page 62

1    language before submitting to chambers that make clear

2    interim approvals are without prejudice to objections or to

3    changes at the final hearing.

4          We will also propose to add language to make clear

5    that when interim applications are filed, parties must

6    include a consolidated set of time records rather than refer

7    to docket numbers of prior monthly statements to hopefully

8    make things easier and more efficient for Your Honor.

9          Unless Your Honor has any questions, we'd ask that

10   the order with the changes I just mentioned above

11   incorporated be approved.

12          THE COURT:  All right, does anybody have any

13   objections to this motion?  All right, I'll approve it.  The

14   language about attaching the full-time records should also

15   make clear that the -- the interim compensation applications

16   that are submitted to me should complete -- should not just

17   incorporate other documents by reference.

18          I know it's efficient for the lawyers to

19   incorporate their prior monthly submissions, but if they do

20   that, it essentially means that every time this comes up I

21   have to read four documents for each party instead of one,

22   which gets confusing (indiscernible).  The interim

23   compensation applications should stand on their own.

24          MS. SMITH:  Understood, Your Honor.  And we will

25   make sure that the order we submit to chambers reflects

Page 63

1    that.

2            THE COURT:  Very good.

3            MS. SMITH:  The next item on the agenda is the

4    ordinary course professionals motion, originally filed at

5    Docket Number 96.  This motion seeks an order authorizing

6    the appointment or retention of certain legal services

7    utilized in the ordinary course of the Debtors' business.

8    No formal objections were received, though we did

9    incorporate comments from the Committee and SEC.

10   Specifically, we added the Committee has a notice party and

11   as a party whose consent is required to mutually agree to

12   increase the monthly cap or case cap.  And we added the same

13   SEC language that you will see throughout various orders.

14           Additionally, we thank Mr. Morrissey and his team

15   for working so collaboratively with us.  We did clarify a

16   number of pieces of information with him and the U.S.

17   Trustee's Office, and I will state some of those on the

18   record here for parties.

19           First, only legal service professionals are

20   proposed to be OCPs.  Second -- and I'll address

21   specifically what services the firms provide in a moment --

22   we discussed at length with Mr. Morrissey to assure that

23   there's no overlap or duplication of services between

24   Kirkland and the proposed OCPs.  The OCPs provide distinct

25   services, including defending against a specific class

Page 64

1    action litigation, copyright litigation, counsel regarding

2    registration licenses and the New York Department of

3    Financial Services, U.S. Securities counsel, local counsel

4    from various litigation matters, intellectual property

5    advice, employment loss services, U.S. and European banking

6    and regulatory advice, marketing legal advice and BVI

7    counsel in connection with the Three Arrows liquidation

8    proceedings, in which, as stated earlier, Voyager is on the

9    Creditors Committee.

10          On that last point, you'll see in the redline we

11   filed at Docket Number 202 that we added a new BVI counsel,

12   Campbells.  Campbells will be replacing, not supplementing,

13   the initial BVI counsel, Conyers.  So, at any point in time,

14   there is only one BVI counsel; not both.  And that swap just

15   recently occurred this past week.

16          Unless Your Honor has any questions, we would

17   respectfully ask that the OCP order be entered.

18          THE COURT:  Are there any objections?  All right,

19   I have one comment.  In the -- I know you've negotiated as

20   to who gets to consent to change in the caps that apply for

21   the interim compensation, but actually I think that's a

22   determination that should be made by me.  So, if you want to

23   change the caps, you'll need my approval.  You can ask for

24   it --

25          MS. SMITH:  Absolutely.

1          THE COURT:  -- okay?  That'll require a few

2     changes throughout your order.

3          MS. SMITH:  Absolutely.  We will make those before

4     submitting to chambers.

5          THE COURT:  Okay.

6          MS. SMITH:  Thank you, Your Honor.  Next up is

7     Stretto's 327 retention application.  It was originally

8     filed at Docket Number 97.  In support of this application

9     is the declaration of Cheryl (indiscernible).  Unless Your

10    Honor has any questions, I would like to move that

11    declaration into evidence.

12         THE COURT:  Are there any objections to the

13    receipt of the declaration in evidence?  All right, it's

14    admitted.  Thank you.

15         MS. SMITH:  Thank you.  Stretto was previously

16    retained as claims and noticing agent under Section 156(c).

17    That approval was entered at Docket Number 67.  Today, we

18    seek to retain Stretto for the administrative services that

19    they will be providing to the Debtors outside the scope of

20    156(c).  A revised proposed order was filed in advance of

21    today's hearing at Docket Number 195, and it reflects the

22    comments received from the U.S. Trustee.  Otherwise, no

23    formal objections were filed.

24         Unless Your Honor has any questions, we would ask

25    that Stretto's 327 retention be approved.

Page 66

1              THE COURT:  Does anyone have any objections?

2              MR. MORRISSEY:  Your Honor, Richard Morrissey for

3    the U.S. Trustee.  The U.S. Trustee has no objections.  As

4    Ms. Smith has just said, there were a couple of changes

5    made.  Namely, that the -- that Stretto's retainer will be

6    applied to the first allowed fees, which I would expect

7    would be interim fees in this case.

8              Also, Your Honor, going back to the first hearing

9    I wanted to assure the Court that there is no Xclaim issue

10   here.  There will be no dealings with Xclaim in this case in

11   the 327 context, just as there was none -- or there is to be

12   none in the Section 156(c) context.  But, overall, Your

13   Honor, the U.S. Trustee has no objection to the retention.

14   Thank you.

15             THE COURT:  All right.  In the prior order on the

16   retention to perform the noticing services, didn't it

17   address various -- various arbitration provisions and

18   limitations (indiscernible), and don't they need to be

19   addressed in this context as well?

20             MS. SMITH:  Yes, Your Honor, we can -- we can add

21   those same provisions to this order.

22             THE COURT:  Okay.  And then consistent with what

23   Mr. Morrissey just said, is there any reason why we

24   shouldn't say in this order what we said in the prior order?

25   I wouldn't want this to be used as a backdoor way of doing

1    any of the Xclaim business that we were discussing.

2           MS. SMITH:  Of course.  We actually included

3    language already.  It's Paragraph 13, I believe, and it's

4    the same language that was in their 156(c) order.

5           THE COURT:  Okay, I didn't see that in what I had

6    reviewed.  Perhaps I overlooked it.  But okay, thanks.

7           MS. SMITH:  Of course.  It's okay to move to the

8    next item?

9           THE COURT:  Yes.

10          MS. SMITH:  Thank you.  The next item is the

11   application to retain and employ Kirkland & Ellis as

12   attorneys in these Chapter 11 cases and related matters.  It

13   was originally filed at Docket Number 116.  In support of

14   our application there are two declarations from Mr. Josh

15   Sussberg and one from Mr. Steve Ulrich.  Unless Your Honor

16   has questions, I would ask to submit these three

17   declarations into evidence.

18          THE COURT:  Are there any objections to the

19   receipt of the declarations in evidence?  All right, they

20   are admitted.

21   (Declarations to retain Kirkland & Ellis Admitted into

22   Evidence)

23          MS. SMITH:  Thank you, Your Honor.  No formal

24   objections were filed to Kirkland's retention.  We did

25   receive a handful of informal comments from Mr. Morrissey's

Page 68

1    offices, which are addressed in Mr. Sussberg's supplemental

2    application at Docket Number 201.  Specifically, the

3    supplemental declaration clarifies the meaning of overtime

4    expenses, affirms that Kirkland will not charge the Debtors

5    for standard office supplies, and confirms that Kirkland's

6    hourly rates have not changed since the petition date.

7            There were no other changes to the order since

8    filing, but I did want to highlight that we took guidance

9    from our colleagues on the Aegean and Hollander matters and

10   included a paragraph in the order.  It's Paragraph 8 that

11   states certain provisions of the engagement letter are

12   stricken.  We understand that's your preference and so we

13   did make sure to include that from the outset.

14           THE COURT:  All right, are there any objection so

15   the Kirkland (indiscernible) retention?  All right, I saw

16   that you addressed those provisions of the engagement letter

17   and the proposed order looks fine to me.  I'll approve it.

18           MS. SMITH:  Thank you, Your Honor.  The next item

19   on the agenda is the retention of Moelis & Company as

20   investment banker and capital markets advisor to the

21   Debtors.  We are still finalizing a few open items with Mr.

22   Morrissey's team.  And though we are confident we will reach

23   a resolution, we're not quite there yet.  The order is

24   otherwise fully consensual and incorporates comments and

25   revisions from the Committee.  We've also incorporated

Page 69

1    comments by the SEC which will be reflected in the revised

2    order.

3            If okay with Your Honor, we would ask that we

4    continue to work with the U.S. Trustee's Office and, upon

5    resolution of the outstanding items, submit a proposed order

6    to chambers.  Of course, to the extent Your Honor has any

7    questions or concerns, we're happy to address them at the

8    next omnibus hearing on August 16th or at whichever time

9    Your Honor (indiscernible)...

10           THE COURT:  Yeah.  I do have some questions.  I

11   don't know if they're the same things you're discussing with

12   the United States Trustee.  The proposed letter says that

13   there will be a restructuring fee of $11 million, payable in

14   connection with each restructuring in the event that more

15   than one restructuring occurs.  That seems concerning to me,

16   particularly since restructuring as a term is defined

17   (indiscernible) include a restructuring of any material

18   portion of the liabilities of the company.  That suggests to

19   me if that -- for some example, parts of the business were

20   sold to one entity and parts to another entity, I would be

21   paying $22 million in fees instead of $11 million in fees.

22           And (indiscernible) while I understand the overall

23   restructuring fee, I have trouble understanding the reasons

24   why there would be an $11 million fee for every little

25   subdivision of a restructuring.  Can you explain that to me?

Page 70

1            MS. SMITH:  It's just one, Your Honor.  They would

2    not be subject -- or they would not be entitled to multiple

3    restructuring fees.

4            MR. AZMAN:  Your Honor, it's Darren Azman from the

5    Committee.  This was the same concern that we had.  The

6    proposed order that the Debtors have uploaded -- and it may

7    have only been filed last night so it's possible Your Honor

8    hadn't had a chance to look at it yet -- does address

9    exactly that issue.  And we are comfortable that -- and

10   you've just heard the Debtors' statement on the record that

11   there is only one potential fee.  There cannot be a

12   restructuring fee and a sale fee, there cannot be multiple

13   sale fees, there cannot be multiple restructuring fees.

14   It's going to be one fee.

15           THE COURT:  Okay.  And as to the capital

16   transaction fee, are you even proposing to do a capital

17   transaction at the moment?

18           MS. SMITH:  As part of the bidding process, we are

19   really open to -- to all bids and all transactions.  So, I

20   think it's a -- I think it's a little too early to know for

21   sure that that's not on the table.  We are very early in the

22   cases, as Your Honor is aware, and as you -- as you can see

23   from the bidding procedures and process that we've set forth

24   that Mr. Marcus will address, we really are exploring every

25   single option to provide the best -- the best value to the

Page 71

1    estates and stakeholders.

2            THE COURT:  Well, it'd be one thing if you were

3    out looking for equity financing or trying to raise debt

4    capital on your own.  If somebody comes to you with a

5    proposal and their preferred structure is that they buy

6    (indiscernible) equity, you're not proposing to pay a

7    capital transaction fee, are you?  That's just a sale.

8            MS. SMITH:  That's right, Your Honor.

9            THE COURT:  Well, in that case, you know, I think

10   the only thing you're proposing right now is that you'll

11   solicit offers from third parties; not that you're trying to

12   look for equity financing or debt financing to reorganize on

13   your own.  So, unless and until you get to that point, why

14   should I approve capital transaction fees at the moment?

15           My concern with financing fees, in general, and

16   investment bankers' retentions -- I've represented bankers

17   for years -- those are usually the ones that generate the

18   biggest surprises in the cases because they're approved but

19   they're often approved at a time when you don't even know

20   what financing, if any, is being sought or what roles people

21   will play in the financing.  Why shouldn't we wait until

22   you're actually trying to do something before we approve any

23   particular role or any particular fee in connection with the

24   capital transaction?

25           MS. SMITH:  We will, of course, defer and take

Page 72

1    your guidance, Your Honor.  But I think, you know, again, we

2    are exploring all alternatives.  And as part of a -- as part

3    of a restructuring transaction it's very possible that a

4    component of that transaction is a rights offering, in which

5    case, (indiscernible) would be potentially triggered or

6    would be triggered.  And so, again, I think, from our

7    perspective, it is too early to rule anything out.  But,

8    again, we will -- we will take Your Honor's guidance.

9          And we're not -- and just to kind of circle back

10    to where I originally started -- we're not seeking approval

11    of this right now.  There are still open issues with the

12    Trustee, so we can certainly discuss with Moelis --

13          THE COURT:  Okay.

14          MS. SMITH:  -- and come back to Your Honor with a

15    proposed order.

16          THE COURT:  All right.  Does anyone else wish to

17    be heard in regard to that question that I raised?

18          MR. AZMAN:  Your Honor, it's Darren Azman for the

19    Committee.  Understood on your concerns with the capital

20    transaction fee.  The only other -- the only other note I

21    want to point out is that we -- we added a crediting

22    component with respect to the capital transaction fees.

23    And, again, I don't know if Your Honor had a chance to -- to

24    see that yet.  I won't detail what it is here because it's

25    somewhat complicated, but essentially a portion of the

Page 73

1    capital transaction fees, if one accrues, will be credited

2    against any restructuring fee or sale transaction fee.  It's

3    not one-to-one but it scales up from, I think, 25 percent

4    all the way up to potentially 50 percent, depending on how

5    big the capital transaction is.

6            THE COURT:  All right.  Why don't you discuss with

7    Moelis and with the Committee whether they think that a

8    capital transaction really needs to be addressed at this

9    point?  And if they think so, we can address that part at

10   the August 16th hearing, okay?

11           MS. SMITH:  Of course, Your Honor.  Will do.  The

12   last item that you'll be hearing --

13           MR. MORRISSEY:  Excuse me.  Excuse me, Allyson.

14   Richard Morrissey for the U.S. Trustee.  For one thing, the

15   Court hasn't ruled, but the point I wanted to make to Your

16   Honor is there were actually three hats that Moelis was

17   originally going to wear.  In addition to being the

18   investment banker and dealing with capital transactions,

19   they were also going to be the financial advisor.  They've

20   taken that component out of the retention papers and out of

21   the retention order.  So, I think that should simplify

22   things.

23           As far as the discussions that obviously we all

24   will have with the Committee, Moelis and the Debtors on

25   this, is that when we get to the fee application stage, we

Page 74

1    always look back to the retention order to see what was

2    contemplated there.  And if there's a different kind of a

3    fee that appears in the fee application, we may have a

4    problem with that if we don't see it authorized in advanced

5    in the retention order.

6              But, again, retention orders can be modified

7    during the course of a case.  But we will be discussing that

8    issue with the parties.  Thank you.

9              THE COURT:  All right.  Well, to be clear, my

10   intention was to approve the retention of Moelis subject to

11   seeing the final language as to the sale and restructuring

12   transaction fees and whatever other issues are being

13   finalized with the U.S. Trustee, and to defer the retention

14   as to capital transactions until August 16th with the idea

15   that if the parties think that should be added, we can add

16   it at that time.

17             MS. SMITH:  Thank you, Your Honor.  Let us confirm

18   with the Moelis team.  I just don't want to speak without

19   consulting with them.  But I think that -- that may be

20   workable.  But let us confirm with them and we will

21   certainly coordinate with chambers.

22             THE COURT:  All right.

23             MS. SMITH:  Then the last item that you will hear

24   from me on this afternoon is the retention application of

25   Quinn Emanuel as special counsel to Debtor, Voyager Digital,

Page 75

1   LLC, in connection with the special committee's

2   investigation at that entity.  The application was filed at

3   Docket Number 125 and is supported by the declarations of

4   Susheel Kirpalani and Steve Ulrich.  Unless any questions, I

5   would like to move those two declarations into evidence.

6           THE COURT:  Are there any objections to the

7   admission of those declarations into evidence?  All right,

8   they are admitted.

9   (Kirpalani and Ulrich Declarations Admitted into Evidence)

10          MS. SMITH:  Thank you, Your Honor. No formal

11  objections were filed.  The U.S. Trustee raised one informal

12  objection which was reserved with language in the revised

13  order.  Unless Your Honor has any additional questions, we

14  would ask that the Quinn Emanuel retention also be approved.

15          THE COURT:  Okay, are there any objections?

16          MR. MORRISSEY:  Your Honor, Richard Morrissey for

17  the U.S. Trustee.  I just wanted the Court to be aware that

18  Quinn Emanuel, which has a connection to Alan Meda, has

19  added a provision to the proposed retention order that

20  whatever it is doing in this case, it will not be dealing

21  with any claim or cause of action that Alan Meda may have

22  against the Debtors or vice versa.

23          So, with that, Your Honor, the U.S. Trustee has no

24  objection.  Thank you.

25          THE COURT:  I did see that provision, thanks.  All

1    right, anything else that anybody wishes to say in regard to

2    the retention of Quinn Emanuel?  Very good, I'll approved

3    that.   I saw the order, it looked fine.

4              MS. SMITH:  Thank you, Your Honor.  That is all

5    from me this afternoon.  So, unless Your Honor has any

6    additional questions, I will hand the podium over to my

7    colleague, Mr. Nick Adzima.

8              THE COURT:  All right, Mr. Nick Adzima.

9              MR. ADZIMA:  Thank you, Ms. Smith.  Good

10   afternoon, Your Honor.  For the record, Nicholas Adzima of

11   Kirkland & Ellis, counsel to the Debtors.  The next item

12   before the Court is Agenda Item Number 2, the final NOL

13   order.  The Debtors filed the NOL motion at Docket Number 7

14   on the first day of these cases.  The Court entered the

15   interim order at Docket Number 58.  The Debtors filed a

16   revised proposed final order at Docket Number 205.  Excuse

17   me -- at 207.  This reflects a few non-substantive

18   modifications compared against the interim order and

19   includes language from both the SEC and the Committee.

20   Otherwise no formal objections were filed.

21              Unless Your Honor has any questions, the Debtors

22   respectfully request that the Court enter the revised final

23   order.

24              THE COURT:  All right, are there -- excuse me --

25   are there any objections to this particular motion and

1    order?  All right, it looked fine to me so submit your order

2    in final form and we'll enter it.

3              MR. ADZIMA:  Thank you, Your Honor.  Next, is the

4    final case management order, which is Item Number 5 on

5    today's agenda.  The Debtors filed the case management

6    motion at Docket Number 12.  The Court entered the interim

7    order at Docket Number 60.  The Debtors filed a revised

8    proposed order at Docket Number 205.

9              The revised -- revised proposed final order

10   conforms to this Court's order in McClatchy and includes the

11   SEC's requested language.  Otherwise, no formal objections

12   have been filed.  Unless Your Honor has any questions, the

13   Debtors respectfully request that the Court enter the

14   revised final order.

15             THE COURT:  All right.  Are there any objections?

16   Very good.  It looked fine to me.  We'll enter it.

17             MR. ADZIMA:  Thank you, Your Honor.  That is it

18   from me.  Unless Your Honor has any questions, I will cede

19   the podium to Ms. Okike.

20             THE COURT:  All right.

21             MS. OKIKE:  Thank you, Your Honor.  Good

22   afternoon.  Christine Okike of Kirkland & Ellis on behalf of

23   the Debtors.  Your Honor, the next item, Number 13 on the

24   agenda is the Debtors' motion seeking authority for the

25   debtors to honor withdrawals of customer cash from the MCFBO

Page 78

1    accounts, liquidate cryptocurrency from customer accounts

2    with a negative balance, sweep cash held in third-party

3    exchanges, conduct ordinary course reconciliation of

4    customer accounts and continue staking cryptocurrency, which

5    was filed at Docket Number 73.

6             A supplement to the motion was filed at Docket

7    Number 173.  We also submitted a declaration by Steve

8    Ulrich, chief executive officer of the Debtors, in support

9    of the motion at Docket Number 192.

10            Importantly, Your Honor, MCB and the Committee are

11   supportive of the relief we are requesting today.  And MCB

12   and the Committee each filed a statement in support of the

13   motion at Dockets Number 177 and 193, respectively.  The

14   revised proposed order filed at Docket Number 225

15   incorporates comments from MCB, the Committee, the U.S.

16   Trustee and the SEC.

17            Your Honor, the Debtors submit that the cash held

18   in the MCFBL accounts is not property of the Debtors'

19   estates.  That the cash belongs to the Debtors' customers,

20   and that customers should be permitted to withdraw their

21   cash in the ordinary course.

22            Your Honor, when you look at the FBO agreement

23   between Voyager and MCB, which we filed at Docket Number

24   173, and the customer agreement between Voyager and its

25   customers, which we filed at Docket Number 73, as well as

Page 79

1    the historical practice of cash coming in and going out of

2    the MCFBO accounts, we believe it is clear that the Debtors

3    do not hold any legal or equitable interest in the case in

4    the MCFBO accounts and that such cash is held in trust for

5    customers.

6            Your Honor, under the terms of the FBO agreement,

7    MCB agrees to establish a custodial for the benefit or FBO

8    account at MCB.  Section 3.4(a)(1) of the FBO agreement

9    provides that the FBO account holds all customer funds that

10   customers remit to MCB for payment to recipients.  Section

11   3.6 of the FBO agreement provides that at no time shall

12   Voyager ever collect, hold or remit any customer funds.

13           Section 6.2 of the FBO agreement provides that MCB

14   is the holder of the FBO account through which the funds

15   sent by customers will be held.  And Section 6.3 of the FBO

16   agreement provides that Voyager agrees that all customer

17   funds will be held in the FBO account, owned and controlled

18   solely by the bank.

19           Your Honor, the customer agreement aligns with the

20   FBO agreement in terms of the treatment of customer cash.

21   Section 5 of the customer agreement provides, in relevant

22   part, that customer understands and acknowledges that

23   customer may arrange to deposit United States dollars into

24   the account.  Cash deposited into the customer's account is

25   maintained in an omnibus account at Metropolitan Commercial

1    Bank, which is a member of the Federal Deposit Insurance

2    Corporation.  Voyager --

3              THE COURT:  All right.  Ms. Okike, I have to

4    interrupt you just one second.  My battery is dying on the

5    phone that I'm using.  I have to hang it up and I'll dial in

6    with a different telephone if you can just all indulge me.

7    I apologize for the interruption.

8              MS. OKIKE:  No problem, Your Honor.

9              THE COURT:  All right, I'll be right back.

10             I'm back, everybody.  I apologize for that

11   interruption.

12             MS. OKIKE:  Thank you, Your Honor.  Your Honor,

13   Section 5(a) of the customer agreement provides in relevant

14   part that customer understands and acknowledges that

15   customer may arrange to deposit United States dollars into

16   the account.  Cash deposited into the customer's account is

17   maintained in an omnibus account at Metropolitan Commercial

18   Bank, which is a member of the Federal Deposit Insurance

19   Corporation.

20             Voyager maintains an agreement with the bank

21   whereby the bank provides all services associated with the

22   movement of and holding of USBC -- sorry, of USB in

23   connection with the provision of each account.  Therefore,

24   each customer is a customer of the bank.

25             Your Honor, the expectation and intent of all

Page 81

1    relevant parties -- the Debtors, MCB, and the customers, was

2    that cash in the MCFBO accounts was held in trust for the

3    benefit of customers.  Your Honor, I think it might be

4    helpful to walk through how cash historically flowed into

5    and out of the MCFBO accounts.

6           Your Honor, if a customer wishes to transact on

7    the Debtors' platform with cash they have to transfer funds

8    via either ACH, Automated Clearing House, or wire transfer

9    to the relevant for the benefit account held at MCB.  And

10   there's one account for ACH transfers and one account for

11   wire transfers.

12          When a customer executes an order to buy

13   cryptocurrency assets on the Voyager app, the Debtors' order

14   management system notifies the applicable MCFBO account of

15   the transaction and MCB moves the requisite customer cash to

16   fund the transaction from the applicable MCFBO account to

17   the Debtors' Silvergate master operating account.  The cash

18   is then transferred from the Debtors' Silvergate master

19   operating account to a third party exchange or market maker,

20   and the third party exchange or market maker delivers the

21   cryptocurrency to the Debtors through the Voyager app.

22   Voyager then holds the cryptocurrency through one of its

23   approved custodians.

24          Conversely, when a customer executes an order to

25   sell cryptocurrency on the Voyager app, the Debtors' order

Page 82

1    management system instructs the Debtors' treasury management

2    system to transfer the cryptocurrency held with the Debtors'

3    third party custodian or self-custody solution to the third

4    party exchange or market maker.  The third party exchange or

5    market maker then sells the cryptocurrency and deposits the

6    resulting cash in the Debtors' Silvergate master operating

7    account.  That cash is then transferred from the Silvergate

8    master operating account to the MCFBO account.

9              Customers may also request to withdraw the cash

10   attributable to their cryptocurrency trades from the MCFBO

11   account.  The customer's transfer request is conveyed

12   through the Voyager app to the -- to the Debtors' order

13   management system, which, in turn, instructs the requested

14   amount of cash to be withdrawn from the applicable MCFBO

15   account and subsequently transferred through a third-party

16   payment processor, UZIO, via ACH or wire transfer to the

17   customer's personal bank account.

18             Historically, the Debtors prefunded withdrawals

19   from their MC Bank master operating account into an account

20   held by UZIO to ensure that there were sufficient funds

21   available for customer withdrawal requests at any given

22   time.  And the Debtors did not prefund withdrawals on a one-

23   to-one basis.  Instead, they prefund a targeted amount based

24   on historical transaction trends and replenish that amount

25   as needed.

1          When the money is deposited into a customer's

2     personal bank account from UZIO, MC Bank then reconciles the

3     amount the Debtors prefunded and remits such amount back to

4     the Debtors' MC Bank master operating account from the MCFBO

5     account.

6          Your Honor, before the gates went up and the

7     platform went into freeze mode, there was a daily

8     reconciliation process that took place to ensure that the

9     cash in the MCFBO accounts accurately reflected customer

10    cash balances.

11         At approximately 8 p.m. Eastern Standard Time each

12    day, the Debtors and MCB would generate a report that

13    provided a snapshot of the customer balances in each MCFBO

14    account, including the ACH and wire transfer activity from

15    the day, and the balances owed to each customer based on

16    their respective trades that day.  To ensure the cash in the

17    MCFBO accounts aligned with the balances from the customers'

18    daily activity, the Debtors and MCB would reconcile or true

19    up the MCFBO accounts each morning.  If customers were owed

20    cash based on transactions on the Debtors' platform, the

21    Debtors would deposit funds from Voyager's MCB master

22    operating account into the MCFBO accounts.  And if the

23    Debtors were owed cash from customers based on transactions

24    on the platform, MCB would transfer customer cash from the

25    MCFBO accounts to Voyager's MCB master operating account.

Page 84

1          Importantly, at no point was there any comingling

2      of Voyager cash held in its MCB master operating account and

3      customer cash held in the MCFBO accounts.  Your Honor, the

4      Debtors believe any cash in the MCFBO accounts, whether it

5      constitutes cash sent by a customer to the MCFBO accounts to

6      fund future transactions on the Debtors' platform or cash

7      sent by the Debtors to the MCFBO accounts upon a sale of

8      cryptocurrency on behalf of a customer does not constitute

9      property of the estate.

10          Our view is that once the cash hit the MCFBO

11     accounts, it was held by MCB in trust for the benefit of

12     customers.  Because the cash was held in trust by MCB for

13     customers, we do not believe that it is property of the

14     estate.  Your Honor, the Debtors and MCB have not engaged in

15     the daily reconciliation process since the bankruptcy

16     filing.  Importantly, though, the Debtors are not owed any

17     amounts from the MCFBO accounts on account of customer

18     transactions that took place prior to the gates going up.

19     So, there is no concern, from our perspective, that there

20     are Debtor funds in the MCFBO accounts.  Rather, as of

21     August 3, 2022, there is a deficit in customer cash in the

22     MCFBO accounts of approximately 2.85 million, which is due

23     to the ACH, or Automated Clearing House, chargeback issue we

24     noted at the first day hearing.

25          Your Honor may recall that an ACH chargeback

Page 85

1    occurs when a customer seeks to reverse an ACH transfer to

2    the MCFBO account.  In which case, under the rules of the

3    National Automated Clearing House Association, the

4    customer's bank removes the funds from the applicable MCFBO

5    account and credits their customer's personal bank account

6    for the original debited amount.

7                Immediately after the petition date, there was a

8    spike in ACH chargebacks, many of which the Debtors believe

9    may be unlawful attempts to revers authorized transfers that

10   customers made to purchase cryptocurrency on the Debtor's

11   platform.  The Debtors have aggressively moved to prevent

12   such improper ACH chargebacks by communicating with the ACH

13   banks and the customers involved pursuant to the authority

14   granted to the Debtors under the interim cash management

15   order.  And we're happy to report that the rate of ACH

16   chargebacks has subsequently declined.

17               Under the terms of the FBO agreement and the ACH

18   origination agreement between MCB and the Debtors, the

19   Debtors are responsible for ensuring that funds sufficient

20   to satisfy ACH chargebacks are available in the MCFBO

21   account.  Under Section 8.2(c) of the FBO agreement, we are

22   -- the Debtors are solely responsible for all expenses

23   associated with, and losses resulting from, over-limit

24   processing and customer or cardholder fraud.

25               In addition, Section 9 of the ACH origination

Page 86

1    agreement provides that the Debtors shall at all times

2    maintain a balance of available funds sufficient to cover

3    its payment obligations under this ACH origination

4    agreement.  In the event there are not sufficient funds

5    available in the account to cover company's obligations

6    under this agreement, company agrees -- which, in this case,

7    is the Debtors -- agrees that the bank may debit any account

8    maintained by the company with the bank or any affiliate of

9    the bank.

10            In addition, a designated reserve account exists

11   for chargeback -- chargebacks of ACH debits, and that's

12   Schedule C to the FBO agreement.  This is a designated

13   reserve account -- this designated reserve account is a 24-

14   million earmarked portion of the Debtors' MCB master

15   operating account.  Your Honor, the Debtors are seeking

16   authority to continue to perform under the MCB agreements in

17   the ordinary course of business, including continuing to

18   address ACH chargebacks through the ordinary course

19   reconciliation process that took place prepetition.

20            The Debtors believe that honoring their post-

21   petition obligations under the MCB agreements is ordinary

22   course and that they are authorized to do so under Section

23   363(1) of the Bankruptcy Code.  However, if the Debtors'

24   continued performance under the MCB agreements is not

25   ordinary course, the Debtors believe the requested relief is

Page 87

1    justified under Section 363(b) of the Bankruptcy Code.

2    Under Section 363(b), courts require a debtor to demonstrate

3    that a good business reason justifies the proposed use of

4    property.

5            The Debtors believe that there is a good business

6    reason to continue to perform under the MCB agreements,

7    including honoring their obligations to address ACH

8    chargebacks and any resulting deficiency in the applicable

9    MCFB account.  Failure by the Debtors to properly reconcile

10   ACH chargebacks will result in a default under the MCB

11   agreements and put those agreements, which are central to

12   the Debtors' ability to operate the Voyager platform, at

13   risk.

14           Your Honor, since the petition date, MCB has

15   continued to perform its obligations under the MCB

16   agreements, and the Debtors are seeking to do the same

17   through this motion.  Your Honor, the Debtors further

18   believe that the ability of customers to be able to withdraw

19   the full amount of their cash in the MCFBO account, as of

20   the petition date, is necessary to maintain customer

21   confidence in the Debtors' platform and, in turn, the

22   ultimate value of the Debtors' business.

23           Accordingly, we are seeking to continue to perform

24   under the MCB agreements in the ordinary course, including

25   satisfying any ACH chargebacks from the MCFBO account.  Your

Page 88

1    Honor, the relief the Debtors are requesting is

2    overwhelmingly supported by the Debtors' customer base.  The

3    Debtors have over 1 million customers with active accounts

4    and received a single objection to the FBO motion.  And,

5    Your Honor, Mr. Levitt is not objecting to the relief we are

6    seeking. Mr. Levitt objects to the FBO motion only to the

7    extent he is not treated as a cash customer entitled to

8    withdraw his cash from the MCFBO accounts.

9            Your Honor, if the motion is granted, all

10   customers who have cash in the MCFBO accounts, as of the

11   petition date, will be treated equally and will be allowed

12   to withdraw the full amount of their cash.  Your Honor, the

13   facts are that on June 22nd, the Debtors determined to stop

14   accepting outbound wire requests and redirected customers to

15   their standard ACH withdrawal process, following the

16   Debtors' decision to reduce their daily withdrawal limit to

17   $10,000.  And this decision was reported by multiple news

18   sources.

19           That decision was also permitted by the customer

20   agreement, which provides that Voyager may refuse to allow a

21   USB -- USB withdrawal from a customer's account when it

22   deems it appropriate or necessarily in its sole discretion.

23   The customer agreement goes on to provide where the customer

24   makes a deposit into the account and effectuates one or more

25   transactions thereafter, subsequent withdrawal requests may

Page 89

 1   be subject to delays, holds or limits, as determined by

 2   Voyager in its sole discretion.

 3            A day later on June 23rd, Mr. Levitt sold his

 4   bitcoin holdings of approximately 32.67 BTC and executed a

 5   wire withdraw request for the applicable U.S. dollar amount

 6   -- that was the amount of $676,000 -- sorry, $676,541.66.

 7   On June 24th, Mr. Levitt canceled his outgoing wire request

 8   and placed three separate orders to buy back the bitcoin he

 9   sold.  Two of the three orders were for 250,000 each, and

10   the third BTC order was for $176,551.66.

11            One of the BTC orders for 250,000 was only

12   partially filled in the amount of 249,879.48.  The remaining

13   120.52 -- sorry -- $120.52 is processed in the Debtors'

14   system as a held order.  The remainder of the BTC orders

15   were completed prior to the petition date.  For the

16   partially unfilled order, the FBO motion, if approved, will

17   allow the Debtors to reconcile the order and either fulfill

18   or, in the case of Mr. Levitt's request, cancel it, in which

19   case such cash will be sent to the applicable MCFBO account

20   for withdrawal.

21            Your Honor, the Debtors made many difficult

22   decision in the days leading up to the petition date and

23   there are, unfortunately, many customers who are in the same

24   position as Mr. Levitt.  But this case is no different than

25   any other case where creditors are stuck in whatever

Page 90

1   position they were in when the Debtors decided to stop

2   making payments and to file for Chapter 11 protection.

3           Mr. Levitt may have a prepetition claim against

4   the Debtors for breach of contract or on some other theory,

5   but the Debtors cannot and are not seeking to liquidate

6   cryptocurrency so that Mr. Levitt can be considered a

7   customer with cash in the MCFBO account.  Taking that action

8   would result in the preferential treatment of Mr. Levitt to

9   the detriment of other similarly situated creditors.

10          Your Honor, because Mr. Levitt does not oppose the

11  relief we are seeking today and Mr. Levitt's cross-motion

12  has been separately noticed for August 16th, the Debtors

13  respectfully request that his objection to the FBO motion be

14  overruled.

15          Your Honor, I'm happy to proceed with the rest of

16  the relief we're seeking in the motion or I can pause here

17  if Your Honor has questions or if there are other parties

18  who'd like to be heard with respect to the withdrawal of

19  customer funds.

20          THE COURT:  I would like to take the different

21  components to this motion one by one.  And I'd like to

22  separate the discussion of Mr. Levitt's motion from the

23  general discussion of permitting withdrawals from the FBO

24  account.  And so, first, to discuss the motion to permit

25  withdrawals from the FBO accounts, okay?

1          MS. OKIKE:  Yes, Your Honor.

2          THE COURT:  Let me ask you some questions based on

3    your presentation.  At various points you said that -- in

4    describing the flows of funds, that -- that MC Bank makes

5    transfers to various accounts of the Debtor?

6          MS. OKIKE:  Yes.

7          THE COURT:  If I understand -- if I understand

8    this arrangement correctly, all of the movements into and

9    out of the MC Bank account happen at the instruction of the

10   Debtors.  It isn't that the Debtors send a request and MC

11   Bank then does something.  The agreement basically allocates

12   to the Debtors, which are described as the agent of the

13   bank, the authority to do those things.  So, is that right

14   or is that wrong?

15         MS. OKIKE:  Your Honor, the Debtor and MCB work

16   closely together.  But in terms of actually effectuating

17   actions at the MCB accounts, that is completely at MCB's

18   discretion.

19         THE COURT:  All right. As a practical matter, from

20   day to day, it was the Debtor who gave the instructions and

21   actually moved the funds, wasn't it?

22         MS. OKIKE:  Yes, Your Honor.  The Debtors and MCB

23   would -- every day would reconcile the movement of cash

24   between the master operating account and the FBO accounts

25   based on customer trades that occurred the prior day.

Page 92

1           THE COURT:  It isn't as though I go to Citibank

2      and I say, please make a transfer, and somebody at Citibank

3      has to do something.  The Debtors were doing all this.

4      Making the transfers and then reconciling on a daily basis

5      with, I guess, some checking and oversight by MC Bank but

6      it's not --

7           MS. OKIKE:  Your Honor, we were -- we --

8      apologies, Your Honor.  But the Debtors were not initiating

9      any movement of funds out of the MCFBO accounts.  The

10     Debtors had to work with MCB to figure out, you know, that

11     there was accurate balances of customer cash in the MCBFBO

12     accounts, but we were not actually moving the cash.

13           THE COURT:  So, let's walk through that then.

14     When -- when a customer wanted to buy cryptocurrency and

15     that called for money to be moved out of the FBO account, I

16     presume the Debtor would check to see if the customer had

17     money.  And then the Debtor would issue some kind of a

18     transfer request or authorization.  And then -- what exactly

19     happened then?  Who had to act on that in order for the

20     transfer to happen?

21           MS. OKIKE:  MCB would need to act on that.

22           THE COURT:  And who at MCB and in what way?

23           MS. OKIKE:  Your Honor, I know that counsel for

24     MCB is on the line, but MCB has obviously a whole team of

25     professionals that administer their bank accounts.  And so

Page 93

1    there's a team that works very closely with the Voyager

2    treasury management team to reconcile transactions that are

3    occurring.  So, there would be this daily reconciliation

4    process, there would be agreement on --

5              THE COURT:  I'm not asking about the next day

6    reconciliation process; I'm asking about as each trade is

7    placed, what was the role at MCB and did its employees

8    receive requests and act on them, or was all this done

9    basically by Voyager subject to a reconciliation the next

10   day?  Because the banks --

11             MS. OKIKE:  Understood, Your Honor.  The -- the

12   transfers were done by MCB.

13             THE COURT:  Okay.  Can the bank confirm exactly

14   how that worked?  Is the bank's counsel on the phone?

15             MS. WOLF:  I'm sorry, Your Honor.  I'm actually

16   conferring... This is Amy Wolf from Wachtell Lipton Rosen &

17   Katz on behalf of MCB, and I was just conferring with other

18   counsel in my conference room to make sure that we answer

19   your question accurately.

20             As I understand it -- one thing I understand for

21   certain is that all of the instructions had to come from

22   Voyager.  We had no contact -- the bank had no contact and

23   no knowledge really of the individual customers.  So, as I

24   understand it, the customer would go to the app and -- and

25   seek a withdrawal, and an instruction would go to the bank.

Page 94

1    Now, given that the bank controlled the account, now I'm

2    just -- sort of a matter of common sense, it has to be the

3    case that somebody at the bank pushed the button to cause a

4    transfer since the bank held the funds.

5          But I think that's sort of the extent of the

6    bank's function in regard -- you know, the bank was not

7    interacting with the customer and really had no -- as I

8    said, had no knowledge of the specific customer, but got an

9    instruction that then caused it to move funds.  I'm just

10   going to look -- I apologize, Your Honor.  I have some

11   banking lawyers with me and I want to make sure that they

12   think what I'm seeing is -- the best we can do.  Okay, thank

13   you.

14         THE COURT:  All right.  So, you say the control of

15   the account was with Voyager.  That Voyager issued

16   instructions and if somebody at the bank had to push a

17   button, they followed those instructions and it was all

18   subject to a daily reconciliation.  The bank was not

19   receiving requests directly from customers, was not acting

20   at the instructions of customers; it was just doing what

21   Voyager told it to do in this account, correct?

22         MS. WOLF:  Yes, Your Honor.

23         THE COURT:  All right.  And were any subaccounts

24   set up for individual customers, or was there just the two

25   separate pooled accounts, one for wire transfers and one for

Page 95

1   ACH transfers?

2          MS. WOLF:  There were -- there were not separate

3   customer accounts.  There were just -- there were just the

4   (indiscernible).  These are funds held for the benefit of

5   Voyager customers generally.

6          THE COURT:  And when a customer wanted to remove

7   money from the account, was there any way for the customer

8   to contact the bank directly to do that, or did it have to

9   go through Voyager?

10         MS. WOLF:  My understanding is all the

11  instructions came through Voyager.  There was no individual

12  relationship between the customer and the bank.

13         THE COURT:  For the bank I have some questions.

14  The bank agreements reference a Program, with a capital P,

15  and far more generally to formally accept the Programs of

16  the bank as being governed by this agreement.  Is there some

17  document I haven't seen that describes the Program that is

18  involved here?  Where is that?

19         MS. WOLF:  I don't think there is anything that

20  you haven't seen.  We -- we made sure when Kirkland

21  requested to make -- this request had been made from Your

22  Honor.  We believe you have everything that we -- that we

23  could find and everything that we have that governs this

24  relationship.  So, the reference, I don't, frankly, entirely

25  understand what the reference to Program is either but I

Page 96

 1    don't think -- I don't think it's something different from

 2    what -- you know, that there's something else going on other

 3    than what we've now been talking about in terms of the

 4    functioning of the bank for Voyager.

 5              THE COURT:  Okay.  And the Voyager customer

 6    agreement says that each customer is a customer of the bank.

 7    Does the bank agree with that?

 8              MS. WOLF:  That's not our statement and I -- I

 9    think we probably don't agree with it.  Because, again, we

10    have no individual relationship with the customers.  We

11    don't know who the customers are.  We are holding their

12    funds but that's -- that's the extent of it.  And does that

13    make the person a customer of the bank?  Again, there's no

14    account agreement between the customer and the bank, and

15    really no knowledge in our part of particular customers.

16              THE COURT:  All right.  And do you agree with the

17    statement that each separate customer is FDIC-insured in the

18    event of a failure of MCB?

19              MS. WOLF:  That -- that -- it is my understanding

20    that that is a correct statement of the law, that there is -

21    - and here I'm definitely looking at my colleagues -- but

22    there's a pass-through concept that allows each customer

23    Voyager to take advantage of the $250,000 level of insurance

24    in the event of a bank failure.  Even though there is just

25    this one account and one might think it would just have

Page 97

1    $250,000 of insurance, the law does permit the insurance to

2    pass through such that each customer would be protected up

3    to $250,000.

4         THE COURT:  Okay.  The FBO agreement in Paragraph

5    3.6 says that the client, meaning Voyager, would not collect

6    or hold any customer program funds.  I didn't see a

7    definition of customer program funds.  Is there one

8    somewhere?  Did I just miss it?

9         MS. WOLF:  I don't believe so.  I'm not aware of

10   there being.  Again, I'm not aware of -- I really don't know

11   what this word Program was intended to mean in this

12   agreement.  It's just not clear.  And I'm not aware that

13   there is -- again, that there is anything else going on in

14   the relationship.

15        THE COURT:  I appreciate your candor in that

16   regard, but that's -- I hope you understand why I asked the

17   questions because there are all these capitalized terms that

18   usually have definitions somewhere and I didn't find

19   definitions anywhere.

20        MS. WOLF:  Yes.

21        THE COURT:  Paragraph -- Paragraph 6.2 of the FBO

22   agreement says that the bank will be the "holder" of the

23   account.  Just to make sure I understand the full

24   significance of that, from a banking point of view, what

25   does it mean to say that the bank is the holder?

Page 98

1              MS. WOLF:  We serve as a depository.  The function

2     is to -- to hold their funds and, you know -- I think that's

3     -- I don't think there's anything more to it than that.

4              THE COURT:  Are there any specific rules and

5     regulations in the banking industry that govern the FBO

6     accounts?

7              MS. WOLF:  Limited.  There are -- there are some.

8     I believe that the pass-through concept that we discussed a

9     moment ago is sort of the central way in which there are

10    rules and regs that govern FBO accounts.  I'm asking exactly

11    Your Honor's question of my colleagues and there isn't

12    something that says, banks can establish accounts that are

13    for the benefit of, and these are the terms that apply to

14    that.  There's not -- there's much less there than I was

15    hoping.  And, as I said, the one -- the one place is on this

16    FDIC insurance issue.

17             THE COURT:  Okay.  And, in general, in the banking

18    industry, what is it understood to mean if someone --

19    something is designated as an FBO account?

20             MS. SPAZIANI:  Hi, this is Rosemary Spaziani from

21    Wachtell as well.  So, in the industry the expectation, when

22    you have a for benefit of account, is essentially the bank

23    is responsible for the customer funds, and a third party, in

24    this case Voyager, is responsible for the recordkeeping.

25    So, they are the direct interface with the customers.  They

Page 99

1    have the obligation to comply with certain recordkeeping

2    requirements and to be able to provide the bank, within a

3    very short period, information on the customers in the event

4    that there's ever going -- in the even there's ever a bank

5    failure.  And that's how the FDIC thinks about the FBO

6    accounts.

7                THE COURT:  Okay.  The agreements that were

8    provided have various provisions that entitle the bank to

9    indemnities or setoffs as to obligations owed by Voyager and

10   that further provide that the bank can file a UCC-1

11   financing statement to evidence its secured interest.  Did

12   the bank file such UCC-1 file -- financing statement?

13               MS. WOLF:  Not to my knowledge, Your Honor.  I'm

14   not sure why one would, because the bank does have

15   possession of the accounts, which is how one would protect.

16               THE COURT:  Right.  Okay.  The agreement provided

17   for it, that's why I asked.

18               MS. WOLF:  Yes.

19               THE COURT:  Has the bank had -- has the bank

20   asserted any offset rights or indemnity rights as to the

21   funds held in the FBO accounts themselves?

22               MS. WOLF:  No.  I mean, first of all, the bank is

23   not owed anything.  The bank isn't a creditor.  Hopefully,

24   never will be.  So, there's nothing to -- there's no reason

25   for a setoff.  And the funds in the account we also do not

Page 100

1    believe to be Voyager's funds.  We would -- we would look to

2    the reserve account, which is provided for in the FBO

3    agreement and is clearly Voyager funds, in the -- in the

4    event that we ended up with a claim.  But we do not have a

5    claim and hope not to have a claim because we're just

6    administering someone else's funds and Voyager would like to

7    do its side of -- what they've always done, which is to

8    ensure that the customer's funds are there.

9            The reason that there's a potential --

10           THE COURT:  (indiscernible)

11           MS. WOLF:  I'm sorry, Your Honor.  Go ahead.

12           THE COURT:  No, you go ahead and finish.  I want

13   to make sure you're finished.

14           MS. WOLF:  I just -- the initial -- the initial

15   hit to the account caused by these chargebacks that happily

16   have pretty much fallen away, I believe, because of the way

17   the ACH system works, they caused a hit to the funds in the

18   FBO account.  And it has always been the practice -- because

19   there always are, as I understand it, chargebacks in the

20   normal course -- that in this daily reconciliation, Voyager

21   would make sure that the customer -- the amount of customer

22   funds that were supposed to be in the account remained in

23   the account.  And if they had -- you know, if they had to

24   make a transfer into the account in order to ensure that,

25   they did.

Page 101

1          THE COURT:  All right.  On the chargebacks, the

2    (indiscernible) provide that if there's a deficit in the FBO

3    account, that Voyager needs to make that up.  And part of

4    the motion -- a different part of the motion is a request

5    that that particular provision be enforced.  Is that

6    correct?

7          MS. WOLF:  Yes, Your Honor.

8          THE COURT:  That part of it seems to me to involve

9    potentially a claim by you against Voyager.  Is that -- I

10   suppose if every customer withdrew every penny of cash, that

11   might leave you short.  But am I right?  Is that essentially

12   just the bank asking Voyager to make up that particular

13   deficit for the benefit of the bank?

14          MS. WOLF:  I don't believe so because it is the

15   account that has the deficit.  As Your Honor knows, for

16   there ever to be an issue as to what would happen if there

17   were inadequate funds to cover all customer withdrawals, you

18   know, then -- then that -- you know, then that creates the

19   possibility -- and we don't know the answer, to be perfectly

20   candid, what happens in that circumstance.  But at the

21   moment, the bank has no claim.  The bank is not out any

22   money, and it is the account that requires replenishment.

23   It is not a bank -- I do not believe that it is a claim of

24   the bank.

25          It is a claim of the account that, at the moment,

1    may be short some customer funds as a result of the -- the

2    chargebacks.  And it was always anticipated that that could

3    happen and it always did happen that the account would be

4    made whole.  And then Voyager would do things like sell

5    cryptocurrency if it was -- you know, if it was actually

6    having to -- having to deal with chargebacks.  But it was

7    always the process that this account is -- we are simply

8    holding it and it has to have enough in it so that it can be

9    the customers.

10           I do not believe that the bank has a claim.

11   Certainly not at this time.  So, I do not think that the

12   relief that is being asked for is for Voyager to be

13   effectively making a payment to the bank.

14           THE COURT:  I appreciate that.  Thank you very

15   much, that's very helpful.  Ms. Okike, just to make sure I

16   understand.  In this motion, you're seeking to allow

17   customers to withdraw funds from the FBO accounts --

18   withdraw cash?  You're seeking certain permission to do

19   certain kinds of things, staking, dealing with open

20   transactions, things like that; you're not actually asking

21   to go back and start up a whole platform of buying and

22   trading?

23           MS. OKIKE:  No, Your Honor.  No, Your Honor.

24   We're simply seeking to allow customers to withdraw cash

25   from the MCFBO accounts. And there's -- sorry, I should just

Page 103

1    mention, Your Honor, there is a way to allow that to happen

2    through the app without opening the other functions.

3           THE COURT:  Okay.  The Debtors' position, as I

4    understand it, is that cryptocurrency is owned by the

5    Debtors and customers only with general unsecured claims

6    against the Debtors.  I presume that some cryptocurrency

7    sales occurred during the 90 days that preceded the

8    commencement of the Debtors' cases.  If the Debtors made

9    cash payments that are currently sitting in the FBO accounts

10   in satisfaction of those particular obligations, wouldn't

11   those potentially be preferences?

12          MS. OKIKE:  Yes.  Your Honor, obviously, we do

13   believe cryptocurrency on the platform is property of the

14   estate.  And to the extent that we sold crypto on behalf of

15   customers in the 90 days prior to the petition date, one

16   could potentially argue that those transfers of cash to the

17   FBO accounts are preferences.  However, you know, we believe

18   there are pretty viable defenses to any preference claims,

19   including that such transfers were made in the ordinary

20   course of building and according to ordinary business terms.

21          I think there's arguments on both sides but,

22   importantly, I don't think that issue needs to be decided

23   today.  And we've actually included a provision in the order

24   that, you know, the Debtors' rights under Chapter 5 are not

25   being impacted in any way by the relief we are seeking

Page 104

1    today.  And that was at the request of the Committee, which

2    makes -- makes clear that to the extent -- at some point in

3    this case, the Debtors were to determine that it made sense

4    to pursue potential preference actions.  We have...  Sorry,

5    I'm hearing an echo.  We have maintained that right.

6         THE COURT:  Okay.  I didn't see anything in the

7    motion or in the order that would bar a preference claim.

8    Obviously, if funds are sitting there currently in the FBO

9    accounts and are released to customers, then that would be

10   an additional obstacle to the enforcement of a preference

11   claim, if one were to be pursued.  I just wanted to know

12   from a business perspective for both the Debtor and the

13   Committee if they have considered that issue and still

14   believe this makes sense.

15        MR. AZMAN:  Your Honor, it's Darren Azman from the

16   Committee.  I don't want to interrupt Ms. Okike's

17   presentation, but agreed, it's an issue identified not only

18   by the professionals, but actually by committee members.

19   And we haven't necessarily analyzed the issue, but we did

20   want to preserve it and make sure that we weren't losing any

21   potential rights that either the Debtor or the Committee

22   would want to preserve for the future.

23        THE COURT:  But risk that if such a claim is

24   pursued, it would be harder to enforce than it otherwise

25   would have, and that doesn't change the assessment of

Page 105

1    whether these funds would be released or not.

2         MR. AZMAN:  No, not from the Committee's

3    perspective.

4         THE COURT:  Okay.  Thank you.  The only other

5    question I have for both the bank and the Debtor is if the

6    intent here was to establish a trust to deal with the trust,

7    why don't the bank account and the customer agreements say

8    that more clearly?  Why don't they simply say that customer

9    funds are held in trust and do not belong to Voyager?

10        MS. OKIKE:  Your Honor, this is Christine Okike on

11   behalf of the Debtors.  Your Honor, I agree.  I think the

12   agreements could be more clearly -- could have been drafted

13   more clearly.  That being said, you know, I do believe for

14   the benefit is akin to establishing a trust relationship,

15   right?  You're holding funds for the benefit of another.

16   And so, although I agree with you that the agreements, you

17   know, could be clearer in terms of stating that a trust

18   relationship was established, we believe that when you

19   evaluate the agreements together, you know, that

20   relationship does exist notwithstanding that it wasn't

21   explicitly stated in the documents.

22        And, Your Honor, I would like to clarify just one

23   point which relates to something Ms. Wolf said earlier,

24   which -- when, you know she said that she doesn't believe

25   the customers are customers of the bank.  I would just like

Page 106

1    to point out, you know, Section Five of the customer

2    agreement, which MCB signed off of, explicitly provides that

3    each customer is a customer of the bank.  That is what their

4    agreement says, that is what MCB signed off on, and that is

5    our view.  And I wanted to make it explicitly clear that we

6    do not agree that the customers are not customers of the

7    bank.

8            THE COURT:  Okay.  All right.

9            MS. WOLF:  Your Honor, I mean, I think we'll leave

10   that for another day.  Hopefully, no day -- a day that will

11   not need to come, you know, that disagreement.  But in

12   response to Your Honor's question about why doesn't it say

13   that -- again, I would turn it over in a moment to my

14   colleague, who knows quite a bit more about these agreements

15   than I do.  But I would say that I think when people use the

16   language as held in trust, I think that just -- I mean, you

17   know, I think that, you know -- I frankly think they're

18   using the language loosely.  I don't believe that this --

19   that we're a trustee and that we have -- I mean, that would

20   have entailed -- that would make us a fiduciary.  It would

21   impose various obligations that it's not clear to me were

22   intended to be -- are taken on in this circumstance.  We

23   have whatever duties we have by virtue of holding people's

24   funds.  And I don't know if, you know, it would have been

25   better drafting to call it a trust situation if it really

Page 107

```
 1    was not intended to be.

 2              And with that, Ms. Spaziani, do you have anything

 3    to add on the nature of the FBO account?

 4              ROSEMARY SPAZIANI:  The FBO usage is really --

 5    this is a very common type of account and established from

 6    an FDIC perspective.  So, referring to it as a for-benefit-

 7    of account by definition under the FDIC rules, it is treated

 8    a very specific way.  So, the fact that there wasn't any

 9    additional language associated with it wouldn't undermine

10    its treatment from a banking perspective.

11              THE COURT:  And when you say it's treated in a

12    very specific way, can you explain that better?

13              ROSEMARY SPAZIANI:  That's the -- oh, sorry, Your

14    Honor.  Go ahead.

15              THE COURT:  No, go ahead.  Just explain that.

16              MS. SPAZIANI:  So, an FBO accounting intent is

17    essentially that if it's a third party, there's an account

18    that's being opened.  The third party is the one who is in

19    direct relationship with the bank and the account is for the

20    benefit of its customers.  And for the benefit of the

21    customers, as we noted, is the third party is responsible

22    for the recordkeeping.  But in establishing this account and

23    ensuring that there are no other -- so, that the owner of

24    the third party, so here Voyager, you know, specifically

25    there's no comingled funds.  These are all customer funds.
```

Page 108

1    They have the recordkeeping.  It's established in a way such

2    that there's able to be the pass-through insurance so that

3    all of the underlying customers are able to have the full

4    insurance up to the FDIC limits.  Instead of the account

5    itself being subject to the 250, each of the underlying

6    customers is able to have the insurance up to those limits.

7              And again, they're indirect.  It's an indirect

8    relationship.  The bank does not have the information on all

9    of the underlying customers.  So, there is a reliance on

10   Voyager for that information.

11             THE COURT:  Okay.  And again, putting aside Mr.

12   Levitt's issue, which I'm going to deal with separately, is

13   there anybody else who wishes to be heard on the motion to

14   the extent it seeks to allow customers to make withdrawals

15   from the FBO account?

16             MR. AZMAN:  Your Honor, it's Darren Azman for the

17   Committee.  I'll be brief.

18             Your Honor, the Committee strongly supports the

19   requested relief.  We want to see cash and crypto returned

20   or distributed to customers as soon as possible.  Of course,

21   that needs to happen in a way that is consistent with the

22   Bankruptcy Code.  And we conducted an extensive analysis

23   over the last two weeks and worked with the Debtors to

24   understand in detail how the FBO accounts operated, both by

25   design, including how the agreements were set up, and in

Page 109

1    practice.

2          And the Committee agrees with the Debtors'

3    conclusion that the cash in the FBO accounts is not property

4    of the estate.  We view the relief in the motion as low-

5    hanging fruit in the sense that we can get $270 million back

6    to customers less than a month into this case.  That is

7    rare.

8          So again, we support the Debtors on this motion

9    and would urge you to allow the Debtors to return that cash

10   to customers.

11         In terms of the clarity of the agreement, I

12   believe that the FDIC actually has the definition for

13   custodial accounts and FBO accounts, and it specifically

14   says that a deposit account was established for the benefit

15   of a single owner or a comingled account for the benefit of

16   multiple owners.  And importantly, it says that the

17   individual or entity with the account does not have an

18   ownership interest in the account.  And that would be

19   Voyager here.

20         And so, as Wachtell -- counsel from Wachtell just

21   told you, Your Honor, this is not a -- FBO accounts are not

22   unique to the crypto industry.  They've been around for a

23   very long time and they operate in a number of different

24   capacities.  But it's a well-known structure that is used

25   for one entity to hold cash on behalf of another in a trust

Page 110

1    relationship.  And we believe that that is not only the

2    intention here by the parties, but that is actually what was

3    done in practice.  And so, for those reasons, we'd ask that

4    Your Honor enter the order.

5           Your Honor, I don't know if you're also asking for

6    comments on the staking portion of the motion.  I have just

7    two brief comments on that.  But if you're just looking for

8    comments on the FBO portion, then I can hold.

9           THE COURT:  Just the FBO portion.  We'll get to

10   the staking issue in a moment.

11          MR. AZMAN:  Okay.  Thank you.

12          THE COURT:  All right.  Anybody else wish to be

13   heard on the FBO portion?

14          MR. ROUSE:  Christopher Rouse, customer here.  I

15   want to second that statement by the Committee.  I have cash

16   being held in the FBO, and I'd like it back.  I have a

17   letter from MCB.  When I filed my complaint, they reiterated

18   that I do hold this cash in that account in their letter to

19   me.  And clearly, Voyager had some part in relaying that

20   information to MCB, that my cash that was reflected in my

21   Voyager account was in fact being held in the FBO account.

22          That's all.  Thank you.

23          THE COURT:  All right.  Anybody else?

24          MS. LITTLE:  (Indiscernible) --

25          MR. SINGER:  Jeb Singer for Matthew Levitt.  I

1    assume you're not asking for my presentation just yet.

2              THE COURT:  Not yet, Mr. Levitt, no.

3              MR. SINGER:  Mr. Singer.  Sorry.

4              THE COURT:  Okay.  All right.  I hear no further

5    comments.  Ordinarily --

6              MS. LITTLE:  Can you hear me?

7              THE COURT:  Oh, I'm sorry.  Go ahead.

8              MS. LITTLE:  This is Ginger Little.  I do have a

9    question as a consumer.  I do have cash and digital in the

10   accounts.  When we were made to put the money in, we had to

11   change it from USD to USDC.  Is that the same?  Is that what

12   we're talking about?

13             MS. OKIKE:  Your Honor, this is Christine Okike on

14   behalf of the Debtors.  I am happy to address that.

15             USDC is a type of cryptocurrency, a type of coin.

16   And so that is not being discussed or adjudicated on in the

17   context of the release of cash that's being requested by the

18   Debtors.

19             MS. LITTLE:  Then why were we forced to do that in

20   order to get any interest?

21             MS. OKIKE:  I'm not sure what question you're

22   asking.  But in terms of -- USDC is a type of

23   cryptocurrency.  Pursuant to this motion, we are only

24   seeking to authorize the debtors to allow customers to

25   withdraw cash from the FBO account.  So there's nothing

Page 112

1    before the Court today with respect to the USDC --

2              MS. LITTLE:  But the only reason we were allowed

3    to put -- that we got interest which would entice you to put

4    your money in there was that we had to change it from USD to

5    USDC.  And we were never told that wasn't the same as cash.

6    We told them it had to be -- we were told that it had to be

7    listed that way in order to get interest for the monies that

8    we put in there as an investment.  But you're saying that if

9    it says USDC, which we were forced to do, we're basically

10   SOL?

11             MS. OKIKE:  No, that's not what we're saying.  So,

12   the cryptocurrency that the Debtors are holding, you know,

13   we're not seeking today obviously to make distributions of

14   cryptocurrency.  But as we've talked about, we are engaged

15   in an active marketing and sale process, and our intention

16   is to, you know, have coin obviously redistributed back to

17   customers as soon as possible.  But we have to kind of run

18   that process in order to make sure that we're maximizing

19   value for all customers.

20             THE COURT:  All right.

21             MS. LITTLE:  Well, it just doesn't make sense

22   because we were forced to do it.  That's the only --

23             THE COURT:  Well, the motion before me doesn't

24   deal with that particular situation or that --

25             MS. LITTLE:  Okay.  I guess what I'm trying to say

Page 113

1    is we were not told it was a crypto.  We were told it had to

2    go from USD to USDC.  And the way it was explained to me,

3    that it was U.S. dollars, that they just had to put it in

4    that form in order to pay us interest.

5              THE COURT:  All right.  But the --

6              MS. LITTLE:  Okay.  No, I understand

7    (indiscernible).

8              THE COURT:  If what you actually have in your plan

9    -- if what you actually have in your account is not cash in

10   the FBO account at MCB but instead is something else, a

11   cryptocurrency, then it doesn't matter whether that is

12   because you wanted it that way, you were asked to do it that

13   way, you were told to do it that way, you were lied to, they

14   made you do it that way.  It means you have a different kind

15   of a claim.  It means that you are claiming rights as to

16   something that's different from the cash in the FBO account.

17   And the only motion before me right now is for a ruling as

18   to whether the cash that is actually in the FBO account is

19   property that belongs directly to the customers, that was

20   not property of the estate.  Okay?

21             MS. LITTLE:  Okay.  Thank you, sir.

22             THE COURT:  All right.

23             MR. GRAFF:  Your Honor, it might be appropriate

24   for me to make one comment at this point.  My name is Steven

25   Graff.  I am a lawyer at the Law Firm of Aird & Berlis in

Page 114

1    Toronto.  Our firm, along with a class action firm named

2    Siskins, represents or is seeking to gain representation on

3    behalf of the shareholders of the Canadian entity, Voyager

4    Digital LTD.

5            At this point, we have not been able to, because

6    of the position that we're in to engage U.S. counsel,

7    currently we have no U.S. counsel on the phone on behalf of

8    that stakeholder group.  And in no way am I opposing the

9    relief that is being sought last by the company that has

10   been put before you.  But we would ask, of course, that you

11   give consideration to all of the submissions that have been

12   made, which undoubtedly you will, and that you review all of

13   the documentation which both the Wachtell firm as well as

14   Kirkland has put before you concerning this issue of

15   ownership when rendering your decision, because it will be

16   something that will in a consequential manner have

17   potentially a large impact upon the shareholders at the

18   parent company level between the parent company level.

19           Thank you, Your Honor.  And I'm happy to answer

20   any questions you have.  I know I have no practice standing

21   before this Court, so I make my comment to you with

22   knowledge of that fact.

23           THE COURT:  All right.  Anybody else?  All right.

24           Here's my ruling.  Ordinarily on an issue where

25   both the bank and the debtor agreed as to whose funds these

1    are with no formal objection, I wouldn't have spent quite so

2    much time looking at it.

3            My unease in this particular case is that I am in

4    effect being asked to issue a declaratory judgment and I

5    don't really have anybody on the opposite side.  If anybody

6    is going to be adversely affected by this, I suppose it

7    would be other general unsecured creditors who might, if

8    this were property of the estate, wind up getting a smaller

9    recovery.

10            If there were more creditor claims, then I might

11    have felt more comfortable that those people either were

12    heard or they might even agree with it.  But that's the

13    reason why I asked so many questions, is that everybody is

14    going to look at this, everybody is going to look at the

15    ruling.  And I feel like I'm ruling on a litigation where

16    the other side, or whoever might be on the other side, isn't

17    really there.

18            With that being said, it appears to me from all of

19    the presentations that have been made, the uncontroverted

20    presentations, and the statements in the bank agreement and

21    in the Customer Agreement, more particularly Paragraph 5 of

22    the Customer Agreement, which states explicitly that each

23    customer would be regarded as a customer of the bank insofar

24    as the cash is concerned, the FBO agreement, Paragraph 3.6,

25    which says that at no time shall client every collect, hold,

1    or remit any customer program funds, and Paragraph 6.2,

2    which says that the bank shall be the holder of the FBO

3    account, plus the uncontroverted submissions that have been

4    made to me as to what it means to have an FBO account in

5    general, I find that on the basis of all that, that there is

6    a sufficient basis for the Debtors' position that these are

7    not Debtors' funds, not the estate's funds, and that

8    customers should be permitted to make withdrawals.  I assume

9    that's going to be subject to whatever reconciliations and

10   whatever dispute mechanisms ordinarily would apply in the

11   event that there are disputes as to how much money a

12   customer has in the account.  But as to the account

13   withdrawals being permitted, that seems appropriate.

14          I would just caution if anybody wants to use this

15   as a ruling in another case, just take to heart my notation

16   that nobody was really here to argue the other side.  So, I

17   tried to think of what arguments might be applicable.

18   Perhaps there are other arguments.  It didn't occur to me.

19   But that's kind of an unusual situation here.

20          MR. GRAFF:  Your Honor, it's Steven Graff again.

21   And I don't mean to interrupt you.  Just to clarify one

22   point because I know I mentioned that we act for a number of

23   the shareholders of the parent company, VDL, the Canadian

24   entity, the public entity.  But you should be aware that we

25   have been requesting both Canadian counsel on behalf of the

1    Debtors as well as from the information officer appointed

2    under the (indiscernible) in Canada, as well as from

3    Kirkland, information about the intercorporate indebtedness

4    as between the parent Canadian company and the U.S.

5    operating companies that operated the trading platform.  And

6    that information as to the quantum of that intercorporate

7    indebtedness, which of course is incredibly important for

8    the Canadian shareholder base, that information has not yet

9    been provided to us.

10           So, we do not know whether the intercorporate

11   indebtedness in favor of the Canadian parent is $5 million

12   or $250 million.  And obviously, the ruling could have a

13   large impact potentially, this ruling that is, on the

14   ultimate recovery and distribution to the Canadian entity

15   absent any substantive -- that substantive consolidation

16   order.

17           So, again, I just wanted you to appreciate the

18   position from which we come.  And I know you're in a

19   difficult position.

20           THE COURT:  Yeah.  All right.  I've made my

21   ruling.  I am not going to hold it up based on speculation

22   that there might be another larger unsecured creditor and

23   that such creditor might have arguments to make, that I

24   haven't -- haven't made with me today.  So, I have made my

25   ruling just subject to that caution.  Okay?

Page 118

1               MR. GRAFF:  Thank you, Your Honor.

2               THE COURT:  Now, as to Mr. Levitt's motion, Mr.

3       Levitt, if I understand correctly, your argument is that you

4       think you should have cash and that you should have been

5       given cash, but what you actually hold right now is Bitcoin

6       or a different cryptocurrency.  Is that correct?

7               MR. LEVITT:  So, I'm going to let Jeb Singer talk

8       for me, sir.  But the whole basis of the reason that I've

9       gone to great lengths to provide you factual evidence of my

10      situation is I invested funds, and then as my right, sold

11      Bitcoin and requested a wire withdrawal.  And that was

12      received by the bank prior to their 8:00 p.m. sweep and they

13      did not send me my funds.  They did not provide me any

14      fiduciary information.  They did not provide me any

15      information whatsoever.

16              The only reason I am in the situation I'm in is

17      because this company blatantly acted with absolutely no

18      regard for someone who was asking for a wire immediately of

19      their life savings.  And if you were me, sir, and you've

20      been lied to multiple times through all of their press

21      releases, I may -- may I ask you, what would you have done

22      if the only way you knew you could redeem any funds was to

23      buy back Bitcoin and withdraw in kind?  The only way to

24      recover any of your life savings, what would you have done,

25      sir, stayed in cash and hope that the same company would

Page 119

1    treat you right?  I didn't know that the FBO account ruling

2    you were going to make to separate funds was absolutely

3    clear.  If I had, I would never have bought it back.

4              I've shown through all of my evidence that I

5    repeatedly asked this company to provide me clarity.  I

6    repeatedly asked for them to send a wire.  And there was

7    nothing in their user agreement that states anything about

8    wire transactions.  They were not a bank.  When they said

9    they limited funds from $25,000 to $10,000 on the 23rd of

10   June, that could not have referenced wires.

11             It's not in their agreement.  If you really want

12   to uphold the law, that this agreement -- which is

13   absolutely farcical to me.  But if you do, which is your

14   right, then my rights is that there is no reference to

15   wires.  I made a wire request to a fiduciary.  And if this

16   is not approved, then it means that any fiduciary, public

17   company, people holding customer funds, may at their own

18   leisure hold ransom people's money.

19             So, my question to you, sir, is what would you

20   have done based on my information, and is it not right that

21   I should be treated the same?  If you're going to honor a

22   withdrawal of a cash customer from this date, why is it that

23   I cannot have my withdrawal honored as I requested, a bank

24   wire directly one week before, when these same people knew,

25   they were going to freeze the platform.  They've hired

Page 120

1       Kirkland and Ellis; they knew what they were going to do.

2       They ignored my bank wire order.  And that is not equitable,

3       sir.

4                  If you're going to make an equitable ruling, which

5       is the law, then you must allow the fact that what I did was

6       under pure duress, and you must allow me to be treated as a

7       cash customer.  Thank you.  Please treat me fairly.

8                  THE COURT:  All right.  Does your counsel have

9       anything?

10                 MR. SINGER:  Your Honor, Jeb Singer for Mr.

11      Levitt.  Thank you for letting me be heard.  Pleasure to be

12      in your courtroom.

13                 Paragraph 5C of the User Agreement states plainly

14      that in an insolvency proceeding, you have to look at the

15      facts of each individual customer.  Okay?

16                 Mr. Levitt has very unique facts here.  Okay?  And

17      there's a couple of key words here.  He's a cash customer

18      requesting that his wire withdrawal be honored and that he

19      be treated the same, that they be held accountable --

20                 THE COURT:  Let me interrupt you, Counsel.  Mr.

21      Levitt's rights in bankruptcy are determined through the

22      Bankruptcy Code, not by his contract.

23                 So, what is there to support your contention that

24      Mr. Levitt actually owns cash that is currently held by the

25      Debtor?  Aren't you instead asking me to sort of undo a

Page 121

1    transaction that happened before on the grounds that Mr.

2    Levitt believes he was defrauded into doing it?

3    (Indiscernible) --

4             MR. SINGER:  He absolutely was -- first of all, I

5    think there's no -- go ahead, Your Honor.

6             THE COURT:  From a bankruptcy perspective, why

7    isn't that just a regular creditor claim?  I don't mean to

8    demean it and I don't mean to say that it's right or wrong.

9    But as I tried to say before, the people on the phone who

10   aren't lawyers probably don't understand.  It is not my job

11   or my power today to just say that you can have claims, you

12   can have property just because I think it's fair.  What's

13   deemed to be fair in the Bankruptcy Code is that property is

14   divided up equally among creditors.  And if you think that

15   you have something other than an ownership interest, a

16   creditor claim, if you think a contract was breached, if you

17   think you were defrauded, if you think something was stolen

18   from you, those are creditor claims.  They're not claims

19   that I can separate out from other creditor claims in the

20   bankruptcy context.

21            And the point of the FBO motion was that cash, the

22   actual cash that is there, according to the agreement with

23   the bank and the customers, doesn't belong to the Debtors.

24            So, you may think that you should have been in the

25   position of being a cash holder on behalf of Mr. Levitt.

Page 122

1    You may feel very angry.  And I don't know the underlying

2    facts.  But maybe you're right to be angry.  You may be well

3    be.  But all I can do in this context is at this stage of

4    the case is make rulings as to whether the property that is

5    actually held belongs to you or to the Debtor.  And to the

6    extent you want relief because of wrongdoing, that's a claim

7    to be resolved in the bankruptcy case along with other

8    claims.  And let me ask why --

9              MR. LEVITT:  Judge, may I speak?  May I speak,

10   please?  And I'm sorry to interrupt you, sir.  But my point

11   is you're basing the Bankruptcy Code and the law based upon

12   their user agreements.  That's what you're ruling with.  And

13   in their exact user agreement, it states, as my counsel has

14   said, that every -- that Voyager themselves in the agreement

15   state everyone must be treated individually based on the

16   facts and that the information regarding how a bankruptcy

17   proceeding will actually adjudicate is extremely hazy and

18   that there's no precedent to it.  So that states that you do

19   have the ability as a judge to look at this and treat people

20   equitably based on their situation.

21             The other thing is that Ms. Okike --

22             THE COURT:  Hang on, Mr. Levitt.  Let me make

23   clear.  I am relying on the terms of the agreements insofar

24   as they determine whose property the cash currently held is,

25   who owns that property.  As to how creditor claims are

Page 123

1    treated in bankruptcy, the contracts do not govern that.

2    The Bankruptcy Code governs that.  Okay?

3              MR. LEVITT:  Okay, so here's my next point then.

4    Okay?  Ms. Okike at Kirkland and Ellis when she tried to

5    describe me as the same as everybody else -- because I also

6    provided evidence that I had a partially filled order.  And

7    then she stated that that would be -- that that could be

8    canceled, which is part of this same motion to cancel

9    partially filled orders.

10             Now, let me explain why there were three orders.

11   There were three orders because this firm only allowed you

12   to make orders at $250,000 apiece.  Okay?  That's why I had

13   to make three orders.  And they were all done in the same

14   minute, and Voyager wasn't an exchange, they were a broker.

15   So, when they set those orders out, they all went out in the

16   same 10 seconds.  And they should all be ordered like seen

17   as one order.  So, if you won't allow that, then you -- then

18   please allow for my partially-filled order of $676,000 to be

19   canceled so I can be treated equitably to all of the other

20   accounts that thy wish to partially fill -- that they wish

21   to cancel.  Okay?

22             I have a solid argument both ways here, sir.

23   Like, you know, I'm -- like, you're asking me -- you're

24   saying to me, I should just be a creditor.  Okay?  But the

25   Debtors' attorneys just said they would cancel one of the

Page 124

1    orders.  It's essentially one order.  And that's something

2    you could --- please, can you comment on?

3              MS. OKIKE:  Your Honor, this is Christine Okike of

4    Kirkland and Ellis on behalf of the Debtors.  I think I

5    tried to make this clear in my presentation, but there's

6    only $120.52 that was not processed.  And that is being held

7    in the Debtors' system as a held order.  So, yes, in

8    connection with this motion, we would be seeking to

9    reconcile that amount.

10             But the remaining amount, the $249,879.48, is not

11   cash that we are holding.  It's currently Bitcoin.

12             MR. SINGER:  Your Honor, Jeb Singer for Mr.

13   Levitt.  I don't think that's what she said, and I don't

14   think that's what the motion asked for.  The motion asked to

15   cancel partially-filled orders.  There's no question that

16   his --

17             THE COURT:  No, no.  I'm going to interrupt you.

18             MR. SINGER:  Yes, Your Honor.

19             THE COURT:  What I understood is the motion seeks

20   permission to cancel the parts of orders that are still

21   unfilled, not to cancel prior orders to the extent they were

22   already filled, but to cancel the parts that currently

23   remain unfilled.  That's my understanding.  Am I wrong about

24   that, Ms. Okike?

25             MS. OKIKE:  Yes, Your Honor, that's correct.

Page 125

1            MR. LEVITT:  The words are cancel partially filled

2      orders.  Mine was a partially filled order.  That means you

3      cancel the order.  It's pretty black and white English.

4      Partially filled order canceled.  Okay?  Clear in the

5      motion.

6            THE COURT:  No.  Okay.  The motion seeks to cancel

7      the portions of orders that remain unfilled.  That's what

8      the motion seeks to do.  Okay?

9            MR. LEVITT:  That's not the way I read it, and

10     that's not the way it's written.  It says cancel partially

11     filled orders.  And I state that this is one order all made

12     within the same 10 seconds, only because the company limited

13     orders to $250,000.  And I've shown evidence that it was all

14     submitted in that same minute.

15           THE COURT:  Ms. Okike, are you seeking to cancel

16     and reverse any orders to the extent they were already

17     partially filled or just to cancel the unfilled portions of

18     them?

19           MS. OKIKE:  Just to cancel the unfilled portions,

20     Your Honor.

21           MR. SINGER:  Your Honor, that's not what the --

22     Jeb Singer for the -- for Mr. Levitt.  That's not what the

23     motion says.  It says reconciling and fulfilling filed

24     orders to buy or sell, partially filled orders.  Reconciling

25     partially filled orders.

Page 126

1          MS. OKIKE:  No.  It says --

2          MR. SINGER:  All -- and otherwise canceling all

3    open orders that were not filled or partially filled prior

4    to the freeze date.  That's exactly -- he definitely falls

5    within that category.

6          And by the way, Your Honor, I just want to be

7    clear, that's only an alternative basis for granting the

8    relief that we request in our limited objection and our

9    cross-motion.  Okay?

10          The real point here, I think when you look at the,

11    you know, the equitable argument under the best interest

12    provisions of the FTC and under Section 105 of the

13    Bankruptcy Code, they come down to the fact that his claim

14    arose by their improper, inexcusable, inequitable, unfair

15    refusal to honor a COI request, an uncontroverted -- wire

16    request, rather, Your Honor, on June 23rd.  Okay?  The

17    Debtors have stated that all wire requests were frozen prior

18    to that time.  They put in zero evidence.  They say, oh,

19    it's in some press release or somebody reported it.  They

20    did not put any sort of evidence into the record.  And at

21    the very least, we should be -- an evidentiary hearing as to

22    whether they had a right not to fulfill a wire request.

23          Your Citibank example, Your Honor, is right on

24    point.  Okay?  Citibank cannot go and just refuse to fulfill

25    a wire request.  If I request my money by wire, they have to

Page 127

1    honor it just as the Debtor had to.  It's uncontroverted

2    here that the Debtor told Mr. Levitt through the chat that I

3    put in as an exhibit to Mr. Levitt's affidavit that they

4    would honor his wire request.  They didn't do it.  Okay?  At

5    that point, his claim arose.

6           The fact that he went out there and mitigated

7    damages I think is smart.  Okay?  Because he needed to get

8    his money out and get his money as fast as possible because

9    of the concerns about liquidity.  But his claim in

10   bankruptcy arose at the moment he put in a wire request.

11   Okay?  For him to be treated differently than any other cash

12   customer is actually --

13           THE COURT:  All right, stop.

14           MR. SINGER:  He actually did more --

15           THE COURT:  Just stop.  Stop.  Stop, stop.  I've

16   heard enough.

17           And let me just say again, I understand, I

18   completely sympathize.  I understand why tempers are hot.

19   But you cannot turn the Debtors' motion into what you want

20   it to be rather than what it is or at least what the Debtor

21   says is what they're looking for right now.  Okay?  And if

22   you misunderstood or if the Debtor was inartful in

23   describing what they were looking for, nobody is being

24   treated differently than they are proposing to treat you.

25   They are not proposing to undo the portions of any

Page 128

1    transactions that previously were filled.  They're seeking

2    to cancel orders that presently remain unfilled to the

3    extent they presently remain unfilled.  So, if it was 99

4    percent billed before the bankruptcy, they're only seeking

5    to cancel the one percent.  And everybody will be treated

6    the same in that regard.

7            I understand your anger and I understand your

8    feeling that you were wronged.  But adding words like

9    wronged, totally, and making it more extreme doesn't change

10   the fact -- does not change the fact -- that what you have

11   described is a creditor claim.  And it doesn't -- you don't

12   have priority just because you feel you were more wronged

13   than somebody else.

14           You -- for whatever reason, what you actually have

15   is a claim for Bitcoin.  And if you don't actually have cash

16   in the FBO account, then you don't actually have ownership

17   of something that is outside of the estate.  You have a

18   claim.  And I can't just because you are more upset than

19   others -- you may not be more upset than others.  But I

20   can't just because you are upset or because you feel wronged

21   or, quite frankly, even on the theory that you were strongly

22   wronged, I can't treat you as owning something that is

23   different from what you actually own.  I am not allowed to

24   do that.  You reference --

25           MR. LEVITT:  Sir, you -- are you allowed to do

1    this?  On Docket 73 Section 13.3, reconciling and fulfilling

2    partially filled orders to buy or sell cryptocurrency and

3    otherwise canceling all open orders that were not filled or

4    partially filled prior to the freeze date, otherwise

5    canceling all open orders that were partially filled.  So

6    that is clear English that applies to my case.

7              THE COURT:  Just stop.  Just stop.  Okay?  They

8    are not bound by your interpretation of the language they

9    used in their motion.  I've tried to be patient.  I've tried

10   to explain that.  But the fact that you think that language

11   means something doesn't mean that that's what they are

12   seeking or that what I have -- or what I have a power to

13   order or what the motion is really about.  They've said very

14   clearly, and they are the movant, that that's not what they

15   are seeking to do.  I can't force them to do it.  You can't

16   force them to do it.  They're not seeking to do it.  I don't

17   know how to be any clearer about that.  Okay?

18             MR. SINGER:  Your Honor, I think that's clearly

19   what they wrote, they want to do.  Now, they're changing

20   their tune.

21             THE COURT:  Well, it doesn't matter.  It's not

22   what they're seeking today to do, and it's not what I

23   therefore would give them permission to do.

24             I have to tell you; I don't think that was ever

25   what they were seeking permission to do.  Maybe that's what

Page 130

1       you interpreted, but I didn't interpret it that way.

2              MR. SINGER:  Your Honor, I think denying Mr.

3       Levitt his cash claim based on their refusal, without any

4       justification -- and I'm very -- you know, I'm sorry if I

5       get emotional.  I am very passionate about my argument.  I

6       am very passionate about helping my client.  Okay?  But

7       allowing them to get away with not fulfilling a wire order

8       is a very dangerous precedent.  It's basically just

9       withholding without any policy that applies to everybody

10      that says no wire orders are allowed.  It's allowing them to

11      withhold my customer's -- my client's assets.

12             And for you to say, no, he owns cryptocurrency

13      now, not cash because he bought cryptocurrency afterwards,

14      that's sort of ignoring how intelligent he was to try to

15      mitigate damages.

16             I do think you have the power to undo that

17      transaction.  I am asking you to undo that transaction based

18      on your equitable powers under Section 105.  And I think not

19      doing so would -- and allowing somebody to not honor a wire

20      request is really a dangerous precedent, and I once again

21      ask that you treat him as a cash customer.

22             THE COURT:  Let me make two points.  Number one, I

23      don't have that power as an equitable matter.  If you look

24      at the caselaw under Section 105, it's very clear.  I don't

25      have the power under 105 to change what the Bankruptcy Code

Page 131

1    says.  I have the power only to implement the terms of the

2    Bankruptcy Code.

3            Also, to the extent that you even think you're

4    entitled to this relief, it is disputed by the Debtor.

5    Right?  I haven't had a factual hearing.  I haven't had a

6    proper complaint.  I haven't had discovery.  I haven't had

7    all the things that I would have to have in order to rule on

8    whatever the factual issues are that would underly such a

9    dispute.

10           So even if what you were describing was something

11   that there was a legal basis for, I couldn't give it to you

12   today.

13           MR. SINGER:  Hence why I put in my cross-motion,

14   Your Honor.

15           THE COURT:  Okay.  And we'll consider that --

16           MR. SINGER:  And I would like an evidentiary --

17           THE COURT:  All right.  But we won't have an

18   evidentiary hearing at that first hearing.  What we'll have

19   is --

20           MR. SINGER:  No, I understand that.

21           THE COURT:  Right.  But please, you have to

22   understand I'm not trying to be unsympathetic.  I am not

23   trying to change rules.  I am not trying to endorse what you

24   think was wrongful behavior.  You have to understand the

25   rules in bankruptcy about the claims process and equal

Page 132

1    sharing among creditors are intended for the benefit of the

2    creditors.  You keep talking about this as if it's just you

3    and the company.  But what happens to the claims against

4    this company or the assets of this company has to

5    potentially affect everybody.  And I have to make sure that

6    if the property belongs to the company, that it winds up and

7    its value winds up being distributed ratably and equally

8    among all creditors, not that it be given to anybody in

9    particular because they feel like they were particularly

10   wronged unless there is something in the Bankruptcy Code

11   that gives them a priority.

12          Now, it may be the fact that there is cash that is

13   not property of the estate and therefore is not subject to

14   those rules.  But your anger at the company -- and when you

15   think that by not granting your claim I am somehow siding

16   with the company as opposed to the interest of all creditors

17   and the requirements of the Bankruptcy Code that all

18   creditor claims be stopped and be dealt with ratably, that's

19   what I am doing.  You have to understand that.  Okay?  If

20   you don't understand that, please talk to a bankruptcy

21   lawyer and maybe you'll get an understanding.  All right?

22          All right.  So, to the extent that there was a

23   cross-motion presently and before me to treat Mr. Levitt as

24   a cash creditor, I will deny that without prejudice.  I

25   understand that there's further proceedings that may come up

Page 133

1    at the next hearing.  All right?

2              MS. OKIKE:  Thank you, Your Honor.  May I proceed

3    with the rest of the relief we are requesting today?

4              THE COURT:  Yes, please.

5              MS. OKIKE:  Your Honor, the Debtors are also

6    seeking authority through the motion to continue certain

7    ordinary course pre-petition business practices, including

8    liquidating cryptocurrency assets attributable to customer

9    accounts that hold a negative U.S. dollar balance and

10   sweeping such cash which is held on third-party exchanges

11   into the Debtors' operating accounts.

12             Your Honor, a customer can have a negative account

13   balance when the customer executes a transaction on the

14   Debtors' platform.  The Debtors purchase the cryptocurrency

15   on behalf of the customer.  The customer then seeks to

16   reverse the ACH transfer of cash that was made into the

17   MCFBO account to fund the transaction, leaving the Debtors

18   with the cryptocurrency and a shortfall in the MCFBO account

19   which the Debtors are responsible for under the MCB

20   agreements.

21             Each day that an account with a negative balance

22   is not liquidated, it subjects the Debtors to the risk of

23   price depreciation in the cryptocurrency.  Given the current

24   market volatility, having the authority but not the

25   obligation to liquidate customer accounts with a negative

Page 134

1   balance will serve to preserve estate assets for the benefit

2   of the debtor's customers.

3            Your Honor, if the Debtors are authorized to

4   liquidate cryptocurrency from customer accounts with a

5   negative cash balance, they anticipate generating

6   approximately $3.2 million in cash.

7            c

8            Your Honor, I would pause there to see whether

9   there's any questions with respect to this part of the

10  motion.

11           THE COURT:  Do you need my authority to do these

12  two things?

13           MS. OKIKE:  Your Honor, I believe this is ordinary

14  course.  But out of an abundance of caution, we wanted to

15  apprise parties as to what we intend to do.

16           THE COURT:  And just to be clear, you are not

17  asking me to authorize you to do something that you would

18  otherwise have a legal right to do, you're just asking me to

19  essentially say that to the extent it's not in the ordinary

20  course of business, it's okay.  But you still have to have

21  the legal right to do these things, right?

22           MS. OKIKE:  Yes, Your Honor.

23           THE COURT:  Are there any objections?  All right.

24  I will grant those two portions of the relief.

25           MS. OKIKE:  Thank you, Your Honor.  The Debtors

Page 135

```
 1    are also seeking authority to continue to engage in various

 2    ordinary course reconciliation practices related to customer

 3    accounts, including reconciling cryptocurrency deposits and

 4    withdrawals that currently hold an incomplete status,

 5    reconciling withdrawals that were submitted prior to the

 6    freeze date, reconciling and fulfilling partially-filled

 7    orders to buy or sell cryptocurrency, and otherwise

 8    canceling all open orders that were not filled or partially

 9    filled prior to the freeze date.  And just to put -- just to

10    be very clear here, we are only seeking to cancel orders --

11             MALE 1:  Thank you.  We're all (indiscernible).

12    Thank you.

13             THE COURT:  Go ahead, Ms. Okike.

14             MS. OKIKE:  Sorry about that.  I'm not sure what

15    that was.

16             We are just seeking to cancel orders that were not

17    completely filled prior to the freeze date.  So just the

18    amount that was not -- the amount of cash that is not

19    attributable or that we were not able to complete an order

20    prior to the petition date.  We're not seeking to kind of

21    cancel orders where we're holding Bitcoin but there's a part

22    of cash that was not able to purchase coin prior to the

23    petition date.

24             We are also seeking to -- we are also seeking to

25    close accounts that no longer have a balance and to disable
```

Page 136

1   user access to the Debtors' platform, to receive customer-

2   withdrawn or deposited cryptocurrency that was sent to

3   incorrect blockchains, and to close unfunded accounts that

4   the Debtors deem fraudulent.

5         Your Honor, these reconciliatory practices which

6   the Debtors engage in in the ordinary course of business are

7   primarily accounting-related in nature and are commonplace

8   in technology-focused platforms similar to the Debtors'.

9         Your Honor, it's important for the Debtors to

10  correctly reconcile customer balances to ensure that they

11  accurately reflect all trading and transfer activity that

12  took place prior to the petition date so that the Debtors'

13  books and records accurately reflect pre-petition claims and

14  that when there is a distribution to customers as part of a

15  plan, it's based off of correct balances.

16        THE COURT:  Let me ask you because it's not clear

17  to me.  Are you proposing to (indiscernible) in the purchase

18  or sale (indiscernible).

19        MAN 2:  (Indiscernible) just let me --

20        MS. OKIKE:  Your Honor, I'm having trouble hearing

21  you.  I think somebody is not on mute.

22        MAN 3:  (Indiscernible).  Can you hear me?  Hello?

23  Hello?

24        MAN 4:  Yes.

25        MAN 3:  Okay.  (Indiscernible) --

1              MAN 4:  I can hear you.  In fact, I could hear

2       Christine.

3              MAN 3:  Hey.  They approved -- they just approved

4       the USB retrieval.

5              THE COURT:  Whoever is talking on the phone,

6       please mute yourself.  You're interfering with the hearing.

7              MAN 3:  (Indiscernible).  He has just approved

8       that 10 minutes ago.

9              MAN 4:  Going to be a big rush today.  Is it

10      turned on today, or at some point or --

11             THE COURT:  Lorraine, can you turn off whoever

12      that is?

13             MAN 4:  Technically, is it turned on today, or

14      does that come later?

15             MAN 3:  No, I don't know when that's going to

16      happen.

17             CLERK:  Your Honor, it's not showing on the

18      dashboard.  I can't see.  It's nobody in the live lines.

19      So, I'm not sure where it's coming from.

20             UNIDENTIFIED SPEAKER:  It looks like it's G.

21      Pedraza.

22             CLERK:  Right.  But he's not on a live line, so we

23      shouldn't hear him at all.  All right.  I'm going to see if

24      I can hang him up.

25             THE COURT:  I just did.  I just did.  All right.

Page 138

1    Please, Ms. Okike, go ahead.

2            MS. OKIKE:   I believe Your Honor was about to ask

3    me a question.

4            THE COURT:   Yeah.   Are you proposing to fulfill

5    any currently unfilled purchase or sale orders?

6            MS. OKIKE:   Which -- so, Your Honor, it probably

7    makes sense for me to explain kind of when deposits and

8    withdrawals hold an incomplete status.   So, this is

9    basically a deposit or a withdrawal that kind of got stuck

10   before the platform was shut down.   With respect to crypto

11   deposits, we have to determine whether we actually received

12   the deposit from a customer's wallet address.   If we did

13   received it, we would set the status to clear and we would

14   sweep the funds into our Bedrock account.   But if we did not

15   receive it, we would cancel the deposit.   And so, we would

16   reflect that in the customer's account that we never

17   received it.

18           With respect to crypto withdrawals, we have to

19   determine whether the assets were sent to the blockchain.

20   So, if they were sent, then the Debtors set the status and

21   complete the accounting where necessary.   But this has no

22   kind of impact on the customer portfolio value.   And if it

23   hasn't been sent, then we would basically cancel the

24   withdrawal and credit the customer's asset balance on the

25   platform.

Page 139

1           THE COURT:  So, in essence what you're doing is

2     just finishing your recordkeeping as to what happened before

3     the bankruptcy and what didn't happen, what didn't get

4     finished basically.

5           MS. OKIKE:  Correct, Your Honor.

6           THE COURT:  And you're not proposing today to buy

7     or sell something based on an order that was given to you

8     many, many weeks ago.  Right?

9           MS. OKIKE:  No, Your Honor.

10          THE COURT:  Okay.  All right.  Does anyone have

11    any objection to this portion of the motion?

12          I take it what you also want to do here is to

13    replenish the FBO account to the extent that the ACH

14    transfers have left a deficit.  Is that right?

15          MS. OKIKE:  Yes, Your Honor.  So, when we look at

16    customer cash and what is supposed to be in the FBO account,

17    there is a deficit.  I think it's approximately $2.8 million

18    right now.

19          That being said, there will be a process for

20    opening the app so that customers can withdraw cash.  I

21    don't know that we anticipate that all customers will

22    withdraw cash.  But in the event that that does happen, we

23    are seeking through this motion to replenish that in the

24    ordinary course pursuant to our agreements with MCB.

25          THE COURT:  While retaining your rights against

Page 140

1    customers, right?

2             MS. OKIKE:  Yes, Your Honor.

3             THE COURT:  And how big an issue is this as a

4    practical matter?  Are there time limits within which ACH

5    transfers must be questioned or challenged?

6             MS. OKIKE:  Yes, Your Honor.  There's -- it's

7    about a 60- to 90-day period from when a customer receives

8    their personal bank statement that they can challenge a

9    transaction.  But as we kind of noted, we've been

10   aggressively trying to prevent this practice.  We've

11   contacted the 30 largest banks that most customers transact

12   with, and it's obviously -- it's a felony to engage in a

13   fraudulent ACH transfer.  And so, we have contacted

14   customers that we believe have done so as well as banks and

15   are going through the process of kind of evaluating those

16   claims and determining our rights to pursue.

17            THE COURT:  Okay.  And at the moment what's the

18   size of the deficit?

19            MS. OKIKE:  I believe it's $2.8 million.

20            THE COURT:  Let me ask the Committee counsel.  You

21   are in favor of this portion of the motion?

22            MR. AZMAN:  We are, Your Honor.  And the other

23   point we would note is that the agreements between MCB --

24   sorry, it's Darren Azman again just for the record.  The

25   agreements between MCB and the Debtors actually allow MCB to

Page 141

1     take that deficit out of an operating account.  It's the

2     reserve account from the Debtors.  And so, from our

3     standpoint, it's happening one way or another.  I know that

4     MCB's counsel said earlier they don't think they had claims.

5     That's fine.  But the agreements certainly appear to allow

6     them to fill that hole whether we like it or not.  And so,

7     for that reason alone, we support it.  But also, for the

8     reasons that Ms. Okike has said.

9            THE COURT:  Very good.  Unless anybody else wants

10    to be heard, I will approve that motion.

11           MR. GRAFF:  Your Honor, again, Steven Graff on

12    behalf of stakeholders of the Canadian VDL entity.  I just

13    raise, Your Honor, the concern that you too had expressed

14    earlier as to whether or not the payment by VDL to the FBO

15    account at the bank could constitute a preference on the

16    basis that the UCC filing was not affected, and that

17    otherwise the bank would merely be an unsecured creditor or

18    the Voyager entity.  So, again, I raise the same concern you

19    had raised early.  As long as that right I guess to recover

20    those funds on the basis of potentially being a preference

21    are reserved, then I can understand the payment.  Otherwise,

22    it strikes me as potentially preferential to all the other

23    unsecured creditors.  Thank you, Your Honor.

24           THE COURT:  Does the Committee have a response?

25           MS. OKIKE:  Your Honor, our view is if there is a

Page 142

1    deficit, which at this point we don't know.  Right?  Because

2    we don't know how much customers are going to withdraw.  But

3    our view is that is a post-petition claim that is going to

4    arise when a deficit occurs, which has not happened to date

5    because customers are not allowed to withdraw.  And under

6    the terms of our agreements with MCB, we have the obligation

7    to satisfy that deficit.  We don't view it as a pre-petition

8    claim.  We view it as continuing to perform under the

9    agreement in the ordinary course.  And obviously these

10   agreements are kind of central to the platform.  And so,

11   it's essential that we perform so that we can keep them in

12   place.

13          THE COURT:  Well, I am not convinced by that.  You

14   have a pre-petition contract, so that makes it a pre-

15   petition claim.  But there may be offset rights.  And to the

16   extent there are offset rights, those may be secured claims.

17   What's your position on that?

18          MR. AZMAN:  Your Honor, it's Darren Azman for the

19   Committee.  One, I agree with Ms. Okike that these are post-

20   petition claims.  The chargebacks occurred post-petition as

21   far as we understand.  And although it's based on a -- just

22   like if you had a purchase agreement that's pre-petition, if

23   the actual purchase occurs post-petition, it's post-

24   petition.  Or if the delivery or products occurs post-

25   petition, it's post-petition.

Page 143

1          Here, I believe the chargebacks occurred post-

2    petition, which gives rise to the obligation of Voyager to

3    fill that hole.  And then MCB has the setoff rights under

4    contract to take the money out of the reserve account to do

5    it themselves.  And I believe they would also have the

6    ability to do that under the doctrine of recoupment such

7    that even if it was a pre-petition claim being sought to set

8    off against a post-petition claim, obviously recoupment does

9    not have that same limitation.

10          MS. OKIKE:  Yes, Your Honor.  Just to confirm,

11   these are all post-petition ACH withdrawals.

12          THE COURT:  The ACH withdrawal may have been post-

13   petition, but that isn't enough to make it a post-petition

14   claim where essentially what you're enforcing is a pre-

15   petition indemnity or a pre-petition contractual

16   reimbursement obligation any more than a post-petition

17   lawsuit is a post-petition claim under a pre-petition

18   indemnity contract.  But to the extent there are offset or

19   recoupment rights here, that would make the difference to

20   me.  Or to the extent that the dollar amount is small enough

21   that it doesn't make much of a difference, then it

22   (indiscernible) make a difference to me.  But I'm not going

23   to approve it just on the idea that it's a post-petition

24   claim, because I think that's wrong.

25          MS. OKIKE:  Your Honor, I mean, MC Bank's counsel

Page 144

1    should chime in.  But they do have a right to setoff under

2    the terms of the agreement.  We're obviously responsible

3    then, we're holding a reserve in connection with not

4    satisfying our obligations, which includes ACH transfers.

5    And if they have a valid setoff claim, they would be the

6    holder of secured claim, and thus allowing us to satisfy the

7    ACH chargebacks in the ordinary course would not harm the

8    rights of unsecured creditors or shareholders.

9            MS. WOLF:  Your Honor, Amy Wolf from Wachtell

10   Lipton.  Ms. Okike is certainly correct.  There's $24

11   million reserve account against which selloff rights could

12   be -- could be.  But clearly, we have -- are perfected, we

13   hold the account.  We clearly could set off against it if we

14   had a claim.  I continue to believe that actually we don't

15   have a claim right now, that the bank is not -- this is not

16   a transfer to the bank.  This is a transfer into an account

17   that is holding customer funds and replenishing those

18   customer funds.  I don't believe the bank is -- if there's a

19   preference -- I think the concern Your Honor raised earlier

20   about a preference is customers who are receiving a payment

21   on account of the past 90 days of transactions or whatever

22   is, you know, is there potentially a preference claim

23   against the customers.  And wouldn't it be easier if the

24   money stayed in the bank than being sent out to the

25   customers who would have to be individually chased.  I

Page 145

1      thought that was Your Honor's question.  But I don't think

2      there's a question about the bank being preferred, because I

3      don't think the bank is asserting a claim.

4              But we do -- at the end of the day if we had to,

5      if we ended up being compelled somehow to go negative in the

6      account, then yes, we certainly have the ability to setoff

7      against the reserve account.  That's why it's there.  And

8      Voyager has been very careful about recognizing that right.

9      I just don't think we ever get there in the analysis is my

10     only point.

11             MR. GRAFF:  And, Your Honor, it's Steven Graff

12     from Aird & Berlis again.  I respect the comment made, but I

13     don't believe that I've seen -- certainly I have not had the

14     benefit of again retaining U.S. counsel to address these

15     issues.  And this is a matter that I don't know is before

16     Your Honor insofar as whether there is security in the name

17     of MC Bank that is held as against this particular reserve

18     account.  Certainly, that reserve account is not held in

19     trust for the benefit of MC Bank.

20             THE COURT:  I think the argument is that under the

21     Bankruptcy Code, a common law offset right is treated as a

22     security claim without regard to UCC perfection or anything

23     like that.  And that the contracts here make very clear that

24     there is rights to reimbursement in this account for any

25     deficiency from the reserve account.  Have I stated that

Page 146

1    correctly, Ms. Wolf and Ms. Okike?

2            MS. OKIKE:  Yes, Your Honor.

3            MS. WOLF:  I'm sorry, Your Honor.  I'm having

4    trouble hearing you.  Apologize.

5            THE COURT:  All right.  I will grant this part of

6    the motion for the reasons --

7            MS. WOLF:  Thank you, Your Honor.

8            MS. OKIKE:  Thank you, Your Honor.

9            Your Honor, the last part of the motion, the

10   Debtors are seeking authority to continue staking in the

11   ordinary course of business subject to the Committee's right

12   to notice and an opportunity to object to the Debtors'

13   proposed staking or unstaking of any cryptocurrency.

14           Your Honor, staking involves locking up a portion

15   of your cryptocurrency as a way of contributing to a

16   blockchain network.  Staking benefits networks that use a

17   proof of stake model because the stake coins can be used to

18   verify transactions and forge new blocks in the blockchain.

19           In proof of stake, only holders of the native

20   tokens who stake their own coin in the network become a

21   valid --

22           CLERK:  I'm sorry, Your Honor.  Your Honor, I'm

23   sorry.  We have to interrupt because I was trying to see if

24   we could continue until the end of this motion.  However,

25   the tape is going to run out at 2:25.  So we need to stop

1    now.

2              THE COURT:  And what do we do?  Can we

3    (indiscernible)?

4              CLERK:  Yeah.  You could take a -- I guess to give

5    the ECRO an opportunity to change the tape and to resume.  I

6    was trying to wait until the end of this motion, but

7    apparently, it's not -- it's going to run out sooner.

8              THE COURT:  All right.  Let's take a five-minute

9    break.  Does that work?

10             CLERK:  I think she needs more time than that,

11   Your Honor.

12             THE COURT:  How much time?

13             CLERK:  I don't know, but I would say at least 15

14   minutes.

15             THE COURT:  Is the ECRO on the phone?

16             CLERK:  Unless you want to stop here and then stop

17   again to give her a break.

18             CLERK:  Judge, this is Jenna.  I am in

19   communication with the ECRO.  She said five minutes will be

20   fine.

21             THE COURT:  All right.  We'll take a five-minute

22   break.  Sorry for the interruption.

23             (Recess)

24             THE COURT:  All right.  Are we ready to resume

25   then?

Page 148

1          MS. OKIKE:  Yes, Your Honor.

2          THE COURT:  All these proceedings are recorded by

3     tape, and we've been on for long enough that apparently

4     we're nearing the end of the tape, so that's why we had to

5     break.

6          So please proceed as to the portion of your motion

7     that (sound glitch) staking operations.

8          MS. OKIKE:  Yes.  Thank you, Your Honor.  So, Your

9     Honor, in a proof of stake model, only the holders of the

10    native token who stake their claim in the network become a

11    validator to make the process more reliable.

12         And staking is important to the crypto ecosystem

13    because it is critical for a blockchain project to have

14    enough cryptocurrency on hand to facilitate transactions and

15    keep the blockchain running.

16         One of the ways that a blockchain service provider

17    can ensure that it has enough cryptocurrency on hand to

18    execute transactions is by setting up a staking protocol.

19    The blockchain service provider will ask for other

20    institutions to stake it with cryptocurrency or transfer

21    cryptocurrency to the platform to process transactions.

22    While some staking protocols require that the staker leave

23    the cryptocurrency on the blockchain for a fixed period of

24    time, others allow the cryptocurrency to be taken off at any

25    time or after a certain notice period.

Page 149

1              Importantly, Your Honor, staking cryptocurrency is

2    not the same as lending cryptocurrency.  And to be clear,

3    the Debtors are not seeking and do not intend to lend any

4    cryptocurrency pursuant to this motion.  Staked coins are

5    not used for liquidity purpose by the network.  Rather,

6    staking simply helps the blockchain work.  And in exchange

7    for staking, stakers can earn rewards typically in the form

8    of additional coins or tokens.

9              And in that way, staking is similar to depositing

10   money in a bank in that an investor locks up their assets

11   for a period of time and, in exchange, earns interest.  And

12   in turn, staking provides a means for the Debtors to

13   generate passive income on their cryptocurrency assets while

14   trading on the Debtors' platform is frozen.

15             Historically, the Debtors stake cryptocurrency on

16   their platform in the ordinary course of business and,

17   importantly, the customer agreement between Voyager and each

18   customer explicitly allows the Debtors to stake

19   cryptocurrency; that's Section 5(d) of the customer

20   agreement.

21             Your Honor, as described in the Ehrlich

22   declaration, from July 1, 2021 to June 30, 2022, the Debtors

23   staked up to 16 coins at any given time and earned an

24   average yield of approximately 7 percent, generating

25   approximately 51 million in staking rewards.  This gives you

Page 150

1    a sense of the significant value that can be generated

2    through staking.

3            The Debtors have eight coins that are currently

4    staked: four of those coins have no lockup period, one coin

5    has a three-day lockup period, one coin has a 28-day lockup

6    period, and one coin has a 30-day lockup period, and one

7    coin's lockup period is unknown because it is based on a

8    future event.

9            Your Honor, the Debtors' anticipate staking

10   approximately 19 coins on a go forward basis for a potential

11   average yield of approximately 7 percent.  Seven of the

12   proposed staking coins do not have a lockup period and can

13   be withdrawn at any time.

14           For the remaining 12 coins, the lockup period -- I

15   think someone's not on mute.

16           Your Honor, for the remaining 12 coins, the lockup

17   period is less than 30 days, and lockup periods are a number

18   of days from when the unlock command is performed.

19           Your Honor, the Debtors view staking as a low risk

20   means to continue to generate income for the benefit of

21   their estates and to offset some of the administrative costs

22   while the platform is frozen.

23           As reflected in the revised proposed order, the

24   Debtors have agreed to provide the committee with seven

25   business days' written notice prior to staking or unstaking

Page 151

1   any cryptocurrency, including information regarding the

2   staking protocol, the smart contract address, anticipated

3   yield, the cryptocurrency to be staked, staking mechanics,

4   the lockup period, transaction fees, the actions required to

5   unstake, and the involvement of any third party and their

6   respective fees.

7           If the committee objects to the proposed staking

8   or unstaking within seven business days of receiving the

9   staking notice, the Debtors will not stake or unstake until

10  such objection is adjudicated by Your Honor.

11          Your Honor, we filed the revised -- maybe I'll

12  pause there before I go to the order and see whether Your

13  Honor has any questions about the staking portion of the

14  motion.

15          THE COURT:  What are the risks of continuing the

16  staking?  What can happen that might put the holdings at

17  risk?

18          MS. OKIKE:  Yeah, it's a good question, Your

19  Honor.  So I think there's a couple different potential

20  risks.  One is that obviously cryptocurrency is a volatile

21  investment and so, you know, price swings are common.  And

22  as I noted, some staking protocols require you to lock up

23  your funds for a period of time, in which case, you're not

24  able to unstake during that period.  I think this is

25  mitigated to a large extent given the staking -- the lockup

Page 152

1      periods with respect to the coins that we are anticipating

2      to stake, as well as kind of working closely with the

3      committee to determine whether it makes sense in the best

4      interest of the estate to stake certain coins on a go

5      forward basis.

6              I think the other -- Your Honor, there's something

7      that's known as slashing, and slashing is basically you can

8      get penalized on proof of stake networks to the extent that

9      you're engaging in kind of fraudulent actions; obviously,

10     the Debtors would not be doing that.  But to the extent that

11     a network accuses you of kind of trying to defraud the

12     network, there are penalties associated with that, including

13     a reduction in rewards or actual seizure of the tokens in

14     extreme circumstances.

15             THE COURT:  If I understand staking, and it's

16     quite possible I don't, the staked cryptocurrency is used as

17     a way of validating other transactions.  Can there also be

18     slashing if it turns out that some of those other

19     transactions were fraudulent without any participation by

20     you in the fraud?

21             MS. OKIKE:  No, Your Honor.  So my understanding

22     is slashing primarily happens, you know, due to two reasons:

23     one is if you have significant downtime.  So obviously the

24     purpose of staking is for you to validate transactions on

25     the network and so, if you're not validating transactions,

Page 153

1    you can be penalized for that.  So that's basically the

2    downtime is the inactivity of a validator to sign

3    transactions.

4         The other kind of occurrence for slashing is when

5    you kind of double sign transactions, so that's when you try

6    to validate two transaction blocks at the same time, which

7    can obviously cause confusion in the network.

8         I can just say that my understanding from the

9    Debtors is that, you know, we've never been subject to

10   slashing with respect to our staking and, obviously, we

11   would continue to stake as we have done historically subject

12   to committee review and approval.

13        THE COURT:  All right.  Let me hear from the

14   committee on this one.

15        MR. AZMAN:  Your Honor, it's Darren Azman.  We

16   initially had a lot of heartache about this motion when we

17   reviewed it after we were appointed.  I'm going to turn

18   things over to my colleague, Joe Evans, who's going to talk

19   about why we had that heartache and also answer your

20   question about what the risks are in staking.

21        But what you'll hear is ultimately, we did not

22   have sufficient time between when we were appointed and

23   today to get comfortable with both what the Debtors

24   currently have staked, right, because they could either

25   leave it staked or unstake it and, more importantly, with

Page 154

1   what the Debtors may want to stake in the future.

2          And so, ultimately, we're signed off on the

3   proposed order because it does give the committee consent

4   rights effectively over any decisions regarding staking,

5   including what's currently staked.

6          But let me turn it over to my colleague, Joe

7   Evans, to help the Court understand a little bit better what

8   the risks are here.

9          MR. EVANS:  Your Honor, this is Joe Evans from

10  McDermott on behalf of the committee.

11         One of the risks that we identified, along with

12  those that counsel identified, are that these staking

13  protocols, you must stake in the native token for that

14  protocol.  So what that means is that you're taking Bitcoin

15  and sometimes Ether and cryptocurrencies, commonly are blue-

16  chip cryptocurrencies, and turning them into more

17  speculative cryptocurrencies and then staking those.

18         So while there is a risk of slashing, there is a

19  risk of the protocol failing, there is also a risk that your

20  tokens, your tokens that you have staked, are going to be

21  reduced in value as compared to the price of Bitcoin or

22  Ether or other tokens that customers had on the platform.

23  So that's one primary risk that we saw.

24         The other is the Debtors' definition of staking,

25  which was set forth in their Securities filings is a little

Page 155

1    different than the industry perceives it to be.  It is not

2    just taking tokens and putting them directly pledged to a

3    decentralized finance protocol to validate transactions and

4    things of that nature.  They've also described their staking

5    programs as, "delegating crypto assets to staking platform

6    providers."

7              And so, what that means is that there is a

8    middleman in between the company and the actual stake.  So

9    we are reviewing all of these, both contracts with the

10   middlemen, the particular tokens at issue, and the viability

11   of the thinking protocol itself.

12             In our experience that we've been doing for many

13   years, not all staking programs are the same, not all the

14   risks are the same, and while they do have these slashing

15   risks, these native risks, there's also a risk that the

16   staking program doesn't work and that's happened in subject

17   litigation across the country in various different aspects.

18             And so, because we didn't have sufficient amount

19   of time to review each staked position and as to whether

20   there should be (sound glitch) unwinding of those positions

21   and staking going forward, we negotiated this provision in

22   this order so that the committee would have the properly

23   evaluated staking position and middlemen at issue, in

24   particular, and whether we want exposure to those particular

25   tokens or not, rather than more blue-chip cryptocurrencies

1    like Bitcoin.  And so, (sound glitch) those are the risks

2    that we've (sound glitch).

3              THE COURT:  Well, does not make more sense,

4    instead of just giving you a kind of carte blanche yes or no

5    authority, to wait until we have more specificity as to

6    exactly how this staking operation will work?

7              MR. AZMAN:  I'll handle that, Joe.  So I think the

8    concern -- we thought about that, but we didn't want the

9    Debtor to have to come back to the Court because we do see

10   the merit.  I mean, you just heard from Ms. Okike how much

11   money the Debtors have made off of staking, and we want the

12   Debtors to be able to put, you know, their assets to work

13   while they're sitting in the estate.  And the concern was if

14   we, you know, require the Debtors to come to the Court every

15   time they wanted to engage in some type of new staking, that

16   would like money.

17             And, you know, Mr. Evans can maybe, or Ms. Okike

18   can speak more to the timing elements here.  For example,

19   you know, you might have only a short period of time to

20   stake.  I don't know if that's true or not.  But in general,

21   we wanted to get the order entered, give the Debtors the

22   flexibility to do that under our guidance and oversight.

23             MS. OKIKE:  Your Honor, this is Christine Okike on

24   behalf of the Debtors.  Your Honor, we'll obviously work

25   very, very closely with the committee to provide additional

Page 157

1    information on both our prepetition staked coins, as well

2    as, you know, post-petition anticipated staked coins.

3           And, you know, under the proposed order, which I

4    know we haven't gotten to, but we're not allowed to do this,

5    right, unless the committee signs off.  But I agree with Mr.

6    Azman, like, that we want the authority now because this

7    does generate a significant amount of revenue for the

8    company over time.  As I mentioned, within the last year, it

9    generated $51 million, and we view this as a very low risk

10   way for the Debtors to generate, you know, passive income

11   while the platform is frozen, and we think this is the most

12   low risk way for us to do that.

13          And in the absence of having, you know, some means

14   to kind of generate income, we are continuing obviously to

15   incur administrative costs and so, that was the reason for

16   seeking the relief.  We do believe it's low risk, but we're

17   willing to work closely with the committee to get them on

18   board.  And if, you know, the committee objects to what we

19   propose to do, we'll be back in front of Your Honor seeking

20   approval.

21          THE COURT:  And are you proposing any limits as to

22   how much of your holdings you can stake or anything like

23   that?

24          MS. OKIKE:  Your Honor, we're not at the time.

25   But I can say historically, I can check on what we have

1   historically done in terms of the percentage that's current

2   staked.  I don't have the chart in front of me, but we are

3   not proposing to of stake all the coins.  It's a typical

4   percentage that we do in the normal ordinary course of

5   business.

6           THE COURT:  All right.  Any other parties want to

7   be heard as to this part of the motion?

8           MS. DAGNOLI:  Sir, it's Lisa Dagnoli.  I just am

9   curious if they benefit -- if we all benefit from the

10  staking, how does this help the customer in this situation

11  and who gets the money that's earned from the staking?

12          MS. OKIKE:  So the staking rewards are paid in the

13  native currency and those coins would become property of the

14  estate, which we would distribute, you know, to customers in

15  connection with confirmation of a plan.

16          MS. DAGNOLI:  So is this in the plan at this time?

17          MS. OKIKE:  The plan on file provides, you know,

18  that a percentage of coin is going back to customers.

19  Staking is not addressed in the plan, but it provides a way

20  for us to accumulate additional coins, which would be

21  available for distribution to customers under the plan.

22  That being said, as we're kind of going to get to, we have

23  an active sale process ongoing.  And so, the plan is not

24  definitive in terms of the direction that the Debtors are

25  moving, but this would be another source of recovery for

Page 159

1  customers in the case.

2           THE COURT:  If I can explain.

3           MS. DAGNOLI:  Okay.

4           THE COURT:  When we talk about a plan, Bankruptcy

5  Code calls for the filing of a proposed plan.  It gets voted

6  on by creditors.  If it's approved by the Court, it becomes

7  the terms under which there is a reorganization.

8           And usually, there are requirements as to how the

9  company's assets are distributed, and value is distributed.

10  Some kind of claims that priority under the Bankruptcy Code

11  for the costs of administering the estate, for example.  But

12  in general, the idea is that the more value there is, the

13  better chance of recovery for the creditors.

14           So while I don't think that they're proposing to

15  allocate returns from staking to particular customers or

16  directly to customers; they'll go into the general pool of

17  assets.  As a general matter, the bigger that pool is, the

18  better the chance is that customers and other creditors will

19  get higher recoveries.

20           MS. DAGNOLI:  Okay.  Thank you, sir, for

21  explaining that.

22           THE COURT:  Does that make sense?

23           MS. LITTLE:  This is Ginger Little.  I'm sorry to

24  bother you all again.

25           What you just said, okay -- and I don't interpret

Page 160

1    the law, I don't know the law, so it's difficult for me, as

2    well as it is I'm sure for everybody else because this has

3    been devastating for my family alone.

4            You're saying that if it's approved, then the

5    company's going to make more money, the more assets will be

6    there, but we still can't touch our money; is that correct?

7            THE COURT:  When you say touch your money, this

8    part of the motion has nothing to do with whether you can

9    withdraw cash, right.

10           MS. LITTLE:  Right.

11           THE COURT:  But if you're talking about

12   cryptocurrency holdings, this doesn't affect that.

13           MS. LITTLE:  It doesn't?  So in other words, let's

14   just say I have one Ethereum, okay, and it's automatically

15   staked.  So if they continue to keep it and continue to

16   build money on it, it's going to put that asset into the

17   company; it's not basically going to help the individual

18   holder that started at the beginning.  Am I correct on that?

19           THE COURT:  Ms. Okike, do you want to respond?

20           MS. OKIKE:  Yes, Your Honor.  So we're proposing

21   to stake various cryptocurrency and in connection with that,

22   there may be rewards, which is additional coin, that will

23   come into the estate.  So if we staked one Ethereum and

24   Ethereum is the one we're waiting for in terms of the

25   protocols merging and we get, you know, two Ethereum back,

Page 161

1       we're now holding three Ethereum, right?

2               So the company is taking the position that all of

3       the cryptocurrency -- Ethereum, Bitcoin, et cetera -- is

4       property of the estate, which we will distribute to

5       customers in connection with a plan of reorganization which

6       you and other customers will have the opportunity to vote on

7       and approve.

8               So through what we're proposing, it will increase

9       the overall pool of assets that are available for

10      distribution to creditors in the case.

11              THE COURT:  Okay.

12              MS. LITTLE:  So basically, it's building the

13      company back; it's not really doing anything for the

14      creditors.

15              THE COURT:  Think of it as building the estate

16      back.  In bankruptcy, everything of the company owns is part

17      of an estate and the bigger that estate is -- all the

18      creditors are basically claimants against the estate.  The

19      bigger the estate is, the better the recoveries for the

20      claimants (sound drops).

21              MS. LITTLE:  Okay, thank you.

22              THE COURT:  Okay.  All right, anybody else want to

23      be heard about the staking portion of the motion?  All

24      right.

25              I don't pretend that I have a complete

Page 162

1    understanding of what is involved here, but there are no

2    objections.  And with the committee oversight, I'll approve

3    it.

4              MS. OKIKE:  Thank you, Your Honor.  Your Honor,

5    with that, I think the last motion is the bid procedures

6    motion.  I'll turn it over to my partner, Mr. Marcus.

7              THE COURT:  Okay.

8              MR. MARCUS:  For the record, Your Honor,

9    Christopher Marcus from Kirkland & Ellis on behalf of the

10   company.  Can you hear me okay, Your Honor?

11             THE COURT:  Yes, I can.

12             MR. MARCUS:  Your Honor, Item 14 on the agenda is

13   the bid procedures motion; that's at Docket 126.

14             The Debtors filed a revised proposed order, which

15   includes redlines of the order, the bidding procedures, form

16   of notice, and that's at Docket 210, and I'll be referring

17   to that, Your Honor.

18             Before we begin, I would ask that the two

19   declarations of Mr. Jared Dermont from Moelis; those are

20   filed at Dockets 161 and 216 be admitted into evidence.  Mr.

21   Dermont is on the line and is available for cross-

22   examination should any party wish to do so.

23             THE COURT:  All right.  Are there any objections

24   to the admission of the declarations into evidence?  Does

25   anyone wish to cross-examine the witness as to the

Page 163

1    declarations?  All right, the declarations are admitted.

2            (Declarations of Jared Dermont Entered Into

3    Evidence)

4            MR. MARCUS:  Thank you, Your Honor.  As Your Honor

5    is aware, we are pursuing multiple alternatives on a

6    parallel path.  We filed a standalone plan on the first day

7    of the case, and that was both to generate momentum and to

8    provide an alternative against which to weigh bids that are

9    developed in the Moelis process.

10           These bid procedures are an important part of that

11   process to help develop the alternatives.  As we've

12   mentioned numerous times, Mr. Sussberg at the outset of this

13   hearing again, and as noted in our motion, our goal here is

14   to maximize value regardless of what form the transaction

15   takes, and orderly bid procedures are an important tool in

16   the value maximization effort.

17           So I would submit that these procedures, as

18   revised at Docket 210, subject to a couple of additions that

19   I want to put on the record today, are necessary and

20   appropriate to govern our auction sale process and help

21   maximize value.

22           Your Honor, what I would propose to do is walk

23   through the revised order and bid procedures, point out a

24   couple of important changes that were made, and obviously

25   any questions that Your Honor may have, explain the

Page 164

```
1     resolutions with two of the three objecting parties, and
2     then address the one remaining objection that was filed by
3     the Texas State Securities Board.
4               THE COURT:  Okay.
5               MR. MARCUS:  Does Your Honor have the redline
6     order and bid procedures handy?
7               THE COURT:  I do not and I'm not sure I know what
8     the actual current one is, but why don't you just tell me
9     what the changes are.
10              MR. MARCUS:  Okay.  It is at Docket 210; that is
11    the most recent.  And I don't know we submitted a hearing
12    binder, but if we did, it would be this.  We only filed one
13    blackline.  It's a blackline of the current version against
14    what was filed, together with the motion.
15              I'm happy to walk through and just guide Your
16    Honor through the changes to the order and the bid
17    procedures, unless you want me to wait a moment and try to
18    dig it out of the binder; whatever you'd prefer, Your Honor.
19              THE COURT:  Just go ahead and proceed.
20              MR. MARCUS:  Okay.  So, Your Honor, I would first
21    turn in the order to -- we are at Page 5, which lists a
22    number of dates that we're asking the Court to set as part
23    of this process.
24              Your Honor, I'm aware of the concerns that you
25    raised in Hollander regarding establishing confirmation
```

1   dates as part of the sale process, as part of the sale

2   procedures.  We've attempted to address those concerns by

3   prefacing the first two dates related to the disclosure

4   statement with the notion that the Debtors would have to

5   have filed the disclosure statement on or before August

6   12th, and we prefaced the last four dates relating to

7   confirmation with the notion that these dates are subject to

8   being modified by ultimately the disclosure statement order.

9           But, I mean, let me just be up front, Your Honor.

10  If you're still uncomfortable with confirmation related

11  dates being established pursuant to this order versus a

12  disclosure statement order -- and again, confirmation dates,

13  not sale and auction dates -- an alternative would be to

14  just move these dates out of the order and list them as

15  indicative dates in the bid procedures.

16          These are absolutely dates that we will do our

17  best to achieve and it's important that participants in the

18  process understand the timing, but I want to make sure that

19  Your Honor is comfortable with the dates in the order.

20          THE COURT:  Does anybody else wish to be heard on

21  this?

22          MR. MARCUS:  Your Honor, I'm sorry, I don't mean

23  to interrupt.  I have about six or seven modifications to

24  the order and then a couple of things --

25          THE COURT:  I think on the timing issue, does

1    anybody have any --

2            MR. MARCUS:  Oh, okay.  I'm sorry.

3            MR. AZMAN:  Your Honor, it's Darren Azman for the

4    committee.  We have no objection, and, in fact, we support

5    the timeline.

6            MS. RYAN:  Your Honor, this is Abigail Ryan with

7    the Office of the Texas Attorney General represent the State

8    Securities Board.  I got cut off from the hearing.  I got

9    dropped from CourtCall.  And so, as to timing, was the

10   question if we support the timing set out in the motion?

11           THE COURT:  I know you do not think -- the

12   question is whether we should set target dates today for

13   plan confirmation.  I don't mind setting dates that require

14   you to file a particular disclosure statement by a

15   particular time, but shouldn't we set the other dates if and

16   when we have a disclosure statement on file?

17           MR. MARCUS:  We can do that, Your Honor.  We can

18   do that and move the other dates to the order.  Again, it's

19   important really for participants in the process and,

20   frankly, you know, our agreement with the creditors'

21   committee and folks who are interested in the outcome of the

22   case, to understand the timeline that we're seeking to keep

23   ourselves to.

24           I didn't want to get crosswise with confirmation

25   related dates in the procedures order.

Page 167

1          THE COURT:  I don't have a problem.

2          CLERK:  Judge, I'm sorry.  There is some problem

3   with the website in Court Solutions.  It appears that people

4   are getting cut off.  The person in the upper left corner is

5   getting cut off.  And when they get cut off, they sign back

6   on and then the next person that moves to that spot gets cut

7   off.  I'm not sure if it's a glitch in the system or

8   somebody's tampering with it, but I sent a message to the

9   clerk's office.

10          THE COURT:  Is anybody experiencing a problem

11   where they're being cut off and signing back on?

12          MR. AZMAN:  Your Honor, it's Darren Azman.  It's

13   happened to me seven times during the hearing.

14          MS. RYAN:  Yes, Your Honor.  This is Abigail Ryan

15   with the State of Texas.  My colleagues and I have all been

16   cut off at different times during the hearing as well.

17          MR. TABACHNIK:  Your Honor,  Douglas Tabachnik

18   here.  I just now signed back on.  It happened to me just a

19   moment ago.  I think it has to do with the length of the

20   hearing and the Court Solution somehow cuts you off at some

21   point and I'm not sure why they do that.

22          THE COURT:  Lorraine, if we all sign off and call

23   back in, will that work for Court Solutions?

24          CLERK:  I don't know.  I haven't heard from Court

25   Solutions, but I suppose we can try that.

Page 168

1           MR. TABACHNIK:  I'm thinking I just signed back

2      on, so I'm probably good for another five hours.

3           CLERK:  But it's been doing it.  I've watched the

4      dashboard move left as each person gets dropped.  And it's

5      the person right to the right of you that gets dropped, so

6      Jena will be the next person to get dropped probably.

7           THE COURT:  It's a four-hour time limit on Court

8      Solutions, right?

9           CLERK:  Well, that was for the tape, I believe,

10     but the tape, we already changed that.  I have a message out

11     to Mike, but I haven't heard from him yet.

12          THE COURT:  I think Court Solutions has a time

13     where they start to drop you.

14          MR. DIETDERICH:  This is Andy Dietderich.  I think

15     that's correct, Your Honor.  I was just dropped, and I just

16     dialed back in.

17          THE COURT:  Why doesn't everybody who hasn't

18     already dialed back in just take a moment to do that, and

19     we'll wait five minutes to resume this hearing with another

20     apology for the delay, okay?

21          MR. MARCUS:  Very good, Your Honor.

22        (Recess)

23          CLERK:  Judge, the recording is started again.

24          THE COURT:  All right.  I hope everybody has

25     signed back in.

Page 169

1           On this particular issue, let's just have the date

2    for the disclosure statement and then say that at the

3    disclosure statement hearing, the Court will set the

4    remaining dates.  And you can go ahead and tell people in

5    your bidding procedures what you intend to propose and try

6    to live by with the cooperation of the committee and

7    endorsement of the committee and just say that the Court

8    won't officially rule on those dates until the disclosure

9    statement hearing.  Will that serve your purpose?

10          MR. MARCUS:  That would be fine, Judge.  We can do

11   that.

12          THE COURT:  Okay.

13          MR. MARCUS:  Okay.  Your Honor, the second change

14   to the bid procedures order that I wanted to point out is on

15   Page 6 of the order, Paragraph 14, there's a proviso at the

16   end.  This provision had originally allowed the Debtors to

17   modify the bid procedures in their discretion.  The proviso

18   now makes modifications of the bid procedures subject to the

19   consent of the committee, and if we don't get the

20   committee's consent, we would have to come back to Court.

21          There was a change that I discussed with the

22   committee this morning that I just wanted to add and make

23   sure that it's clear, sort of a corollary to the date issue

24   that we discussed earlier.  So I would like it to say, any

25   modifications to the bid procedures, including the deadlines

Page 170

1    in this order and that's because, for example, Paragraph 3

2    sets the final deadline to submit bids at August 26th.

3            But if we wanted to move those, if we wanted to

4    move that back a day or two just to accommodate -- you know,

5    if we thought it was in the best interest of the process, we

6    would be moving it in a way that was inconsistent with your

7    order and, obviously, Your Honor's order governs.  So we

8    just wanted it to be clear that those deadlines can be moved

9    with committee consent as well.

10           THE COURT:  Okay.

11           MR. MARCUS:  Thank you, Your Honor.  And that

12   change will appear in the revised order when we submit it,

13   taking into account Your Honor's first comment as well.

14           Your Honor, the third important change that we

15   wanted to point out, also on Page 6, Paragraph 15, deals

16   with how the Debtors can incur bid protections.  Again, this

17   was originally set up to be in the Debtors' discretion.  But

18   what we've agreed with the committee is up until seven days

19   prior to the auction, the Debtors will consult with the

20   committee about offering a breakup fee and expense

21   reimbursement to potential bidders.  But we will also

22   provide notice to all interested parties, and all interested

23   parties will have three business days to object to the

24   incurrence of those bid protections.  If nobody objects, the

25   Debtors are authorized to incur those bid protections, and

Page 171

1   if someone objects, we'll be back in front of Your Honor to

2   discuss the bid protections that we want to offer.

3            THE COURT:  I'm going to change your procedure in

4   that regard.  I don't delegate that authority.  I think it's

5   something I'm supposed to rule on, to tell you the truth.

6            MR. MARCUS:  Okay.

7            THE COURT:  So if you want to designate a stalking

8   horse and/or want to grant bid protections, I'll let you use

9   the (sound glitch) three-day period.  You can make an

10  application to that effect on three days' notice.  And just

11  like anything else, if there are no objections, I may go

12  ahead and enter it or I may have questions.

13           MR. MARCUS:  Very good, Judge.  We will make that

14  change when we submit the order.

15           Your Honor, on Page 9 of the revised bid

16  procedures order, there's a paragraph that we added to

17  accommodate the SEC; they didn't file an objection, just

18  some comments.  And that paragraph is the same as was added

19  to the others, that there's no finding in this order under

20  the Federal Securities laws as to whether crypto tokens or

21  transactions or securities.

22           Your Honor, Paragraph 27 originally preserved the

23  creditors' committee's rights to object to the winning

24  bidder, the sale, the disclosure statement, the plan.

25  Obviously, nothing in this order is intended to impair

Page 172

1    anybody's rights, and so, we had originally been fine giving

2    that to the creditors' committee.

3            We did resolve the objection that was filed by

4    Alameda in exchange for two changes, to additional changes

5    to the bid procedures and the bid procedures order.  This is

6    the first of those two changes, Judge, where we're going to

7    change this from a reservation of rights just for the

8    committee to a reservation of rights for all parties in

9    interest.

10            Your Honor, on the last two sort of important

11   changes that we made are actually in the bid procedures

12   themselves, Page 6 of the blackline bid procedures.

13            First, you'll notice a number of times on Page 6

14   where we have made sure it was clear that bids received can

15   be in all different forms; they don't have to be an asset

16   sale.  It can be in the form of a plan to be sponsored as

17   well.  This was actually some language that was suggested in

18   the Emerald objection, which we thought was helpful in

19   clarifying, so we included it.

20            And then the second change that helps resolve the

21   Alameda objection is with respect to the bid deposit in the

22   middle of the page.  The bid deposit is -- we're going to

23   make it -- sorry.  We're going to change how we calculate

24   the amount of the bid deposit to be the greater of $5

25   million or 10 percent of the non-coin-related value in cash.

Page 173

1    And, again, we'll make that change before we submit it to

2    the Court.

3            Those were the major changes.  There were a number

4    of grammatical clerical changes throughout.  We added

5    committee consent rights throughout.  Obviously, if Your

6    Honor has any other questions about any other changes, I'm

7    happy to address those.  Otherwise, I would walk through the

8    resolution with Emerald and Alameda and then get to the one

9    remaining objection, which is the Texas SSB.

10           THE COURT:  Okay.  I have a couple of comments.

11   As a general matter, the order should make clear that any

12   bidder that feels that the procedures are unduly restrictive

13   or improper or any party in interest who feels that who

14   believes relief from them is warranted can apply to me for

15   such relief and not -- there were some complaints about

16   whether everything is too much in your discretion.  Anybody

17   who thinks that the procedures as they are set up or the

18   process as set up as just not working or is being applied

19   improperly, they can always ask me for relief.  All right?

20           MR. MARCUS:  Okay.

21           THE COURT:  And similarly, anybody who has a

22   complaint about the conduct of any auction can ask for a

23   ruling from me.

24           The proposed notice as that was going to be

25   published, I guess?  It just talks about -- suggests that

Page 174

1    there's going to be a 363 sale.  It doesn't really seem to

2    quite alert people that the timing might be different if

3    there's a plan.  You need to make sure that people are aware

4    of that.

5            MR. MARCUS:  Will do, Judge.  It actually starts

6    to talk about the sale confirmation schedule.  But, you're

7    right, it just refers to the sale date, so we'll make that

8    clear.

9            THE COURT:  And then on the timing, you're asking

10   for a bid deadline of August 26th, auction date of the 29th,

11   and a sale hearing on the 7th.  That seems pretty

12   compressed.  I know you've made some efforts in the past,

13   but (indiscernible) in August when people aren't necessarily

14   as available as they otherwise would be.  So why that

15   particular schedule and tell me why you're comfortable with

16   moving things that quickly.

17           MR. MARCUS:  Yeah.  I think it's a balancing, Your

18   Honor, actually.  Much of this schedule was a little bit

19   less compressed, but we've been working cooperatively with

20   the committee and actually the creditors want the process to

21   move even faster.

22           I think it's really just a function of making sure

23   Moelis believes that the timing of the process is sufficient

24   to develop the most value-maximizing alternatives possible.

25   And if we're going to go down the sale path at the end of

1     that process, we'll be able to move quickly to a 363

2     hearing, subject, of course, to Your Honor's views on

3     whether at that time we're moving too quickly.  And if it's

4     through a plan, then we would have some additional time to

5     get the requisite plan documents on file.

6              Mr. Dermont filed a supplemental affidavit, and we

7     know from that that Moelis is comfortable with the timing,

8     that we've had a lot of interest in the process, and the

9     counterparties or the potential bidders who are involved in

10    the process seem to be ready, willing, and able to move on

11    that expedited timeline.

12             We've noted again and again that it's important to

13    move quickly through this case, not just with these initial

14    distributions, but to show customers we're doing everything

15    we can to get them recovery as quickly as possible.

16             And so, you know, based on all those factors, Your

17    Honor, we are comfortable with the timeline.  It's

18    aggressive, there's no doubt about it, but we're ready to

19    lean in and try to do everything we can to hit these dates.

20             MR. AZMAN:  Your Honor, it's Darren Azman for the

21    committee.  Would you like to hear our view on the timeline?

22             THE COURT:  Yes, please.

23             MR. AZMAN:  Look, ordinarily as committee counsel,

24    we'd be pounding the table and asking for more time, right?

25    That's what we do in 95 percent of the cases, we want more

Page 176

1    time for the sale process because we think more time

2    maximizes value, but we've got two issues here.

3           One is the sale or transaction whatever occurs,

4    whether it's a plan or a sale, is ultimately going to drive

5    the timing for distributions in one way or another.  And so,

6    the longer this sale process takes, the longer customers and

7    creditors are waiting to receive a distribution of what a

8    lot of them believe is theirs.  It may not be the case, but

9    that's what they believe.

10          The second issue is the longer the sale process

11   takes, the longer this case takes and the more expensive

12   this case is and the less there will be at the end of this

13   case to distribute to creditors.

14          So we've gotten very comfortable, we've had a lot

15   of conversations with the Debtors' investment banker,

16   Moelis.  We've, you know, communicated with out own

17   financial advisor, FTI, and we've also had direct

18   conversations with several of the bidders.  And we are

19   comfortable both with the process that has transpired to

20   date and with the idea that there is a limited pool of

21   interested buyers for this asset.

22          There are several bidders that have submitted

23   bids, and I expect it to be a robust auction.  But the

24   reality is that this is a complicated asset, just

25   cryptocurrency in general, and we don't believe that more

1    time is necessarily going to yield more value; in fact, it

2    could yield less value.  You already heard from one bidder

3    today, Mr. Dietderich, who's representing FTX, that they

4    want less time.

5          And so, we think the Debtors struck the

6    appropriate balance in reaching this timeline and we support

7    it.

8          MS. RYAN:  Your Honor, if I may.  This is Abigail

9    Ryan on behalf of the State Securities Board.

10          The timeline actually is the issue raised in our

11    objection.  And if you would like to hear my argument on it

12    now, I'm happy to do so.  If you're preferring me to wait

13    until Debtors counsel is finished, I'm fine with that too,

14    Your Honor.

15          THE COURT:  We'll hear your position now.  But,

16    you know, I just read your position.  You don't need to

17    repeat what you already said.  (Indiscernible) it seems to

18    me that what you're saying is that we should wait until all

19    regulatory issues and lots of other things are figured out.

20    Doesn't that delay, basically destroy the value of what

21    we're trying to sell?

22          MS. RYAN:  Well, I wouldn't say we need to wait

23    until all regulatory issues are figured out.  I think

24    regulatory issues are a thing that are going to have to be

25    dealt with throughout the bankruptcy.  And if it's sold,

Page 178

1    we'll have to properly take care of that in any sale order.

2         The real issue is the lack of information that

3    anyone other than the UCC, the Debtor, or the bidders who

4    signed confidentiality agreements have.  There are no

5    schedules or statement of affairs filed.  That's extended

6    until August 18th with the Debtors mail, they'll ask for an

7    extra extension.

8         And we aren't going to have a 341 meeting until

9    after the auction, but the day before the sale hearing, and

10   the 341 meeting of creditors is supposed to give creditors

11   and parties in interest an opportunity to question a

12   representative of the Debtor.  And here, that's not really a

13   meaningful opportunity.

14        The timeline really hurts other creditors and

15   parties in interest in that we have no idea what assets the

16   Debtor claims to have, what debts they claim to have, what

17   other creditors other than the customer creditors are out

18   there.  And I believe that information should be obtained

19   before a sale is approved because once a sale of assets is

20   approved, those assets are out of the jurisdiction of the

21   Court because they're not part of the bankruptcy anymore.

22        THE COURT:  Let me ask you, what is the current

23   deadline for the filing of schedules?

24        MS. RYAN:  August 18th, Your Honor.

25        THE COURT:  So they'll be on file long before we

Page 179

1    have a sale hearing.

2              MS. RYAN:  They'll be on file 13 days before the

3    objection deadline, Your Honor, and the objection deadline

4    for the sale, it's a one-day deadline looking at the

5    timeline that was put up this morning.  The auction is held

6    on the 29th, August 30th is the 341 meeting, August 31st is

7    the sale objection deadline, and then a week later,

8    September 7th, is the sale hearing.

9              I say that no meaningful objection could be

10   written in that short of a time period, Your Honor.  It's

11   basically one day and it's the one day that the 341 meeting

12   would be held.

13             And so, with the lack of information and the

14   constrained timeline, I don't think that this balances a,

15   you know, fair and open process with maximizing the value of

16   the Debtors' estate.  We have to do both in this process.

17             And I'm not saying put this off for months and

18   months, absolutely not.  But let's give creditors a little

19   more time in here to review schedules and statement of

20   affairs, so long as there's not another extension of those

21   requested, and have a meaningful opportunity to appear at a

22   341 meeting and have a meaningful opportunity to write a

23   decent objection to any sale motion that might come up.

24             This is a difficult topic, cryptocurrency, and the

25   exchange, and I'm sure any sale motion and deal that's

Page 180

1    presented to the Court will be equally as complex and folks

2    are going need more than one day to understand it and figure

3    out if they want to object to it.

4           THE COURT:  Well, to the extent that you think

5    that the 341 meeting should be held first.  I mean, the

6    committee that's representing creditors thinks the opposite.

7    They don't think creditors will need that more time; if

8    anything, they want to rush.

9           MS. RYAN:  They do, Your Honor, and we disagree

10   with them on that point.  Right now as I understand it, and

11   I could be wrong, the committee is made up of some

12   consumers.  We don't know what other creditors are out there

13   that might want to have things slow down.  I think the first

14   Town Hall meeting for the UCC is going to be next week, I

15   believe Mr. Azman said earlier.

16          And so really getting a feel for what all the

17   creditors want, I don't know that's been done yet.

18          MR. AZMAN:  Your Honor, it's Darren Azman for the

19   committee.  I appreciate the comments by Ms. Ryan, who we've

20   had the opportunity to work with in a number of other cases

21   and we've, you know, worked with them successfully in those

22   other cases.

23          I think what I'm failing to understand here is

24   what is it in the schedules or that happens at a 341 meeting

25   that could possibly inform whether a creditor or another

Page 181

1    parties in interest is going to object to the sale, right?

2    The goal of the sale process is trying to get as much money

3    or crypto, whatever the form of consider is going to be, for

4    the assets of this company in whatever form the buyers want

5    to propose a transaction structure, and I'm not sure I'm

6    following.

7            You know, we're not talking about confirming a

8    plan here; we're talking about the Debtor accepting whatever

9    they believe to be, with our consultation of course, is the

10   highest and best bid for the assets that the Debtor has.

11   And I'm not sure I understand what it is that, you know,

12   could be found in schedules that would alter somebody's

13   opinion of whether that's the best bid or not.

14           MS. RYAN:  If I may respond, Your Honor.  Again,

15   this is Abigail Ryan for the State Securities Board in

16   Texas.

17           It would actually give us a lot of information

18   because right now, other than the Debtor and the bidders who

19   signed confidentiality agreements and the UCC, nobody knows

20   what assets are being sold.  We have no idea what the Debtor

21   owns, purports to own, what liabilities are out there, what

22   other creditors are out there.  We have zero information.

23           All the information we have on the bidding process

24   or potential sale is what we have heard from Debtors counsel

25   and now UCC's counsel.  I think to be able to value an asset

Page 182

1    properly and to know how to properly object to the sale, if

2    an objection is needed, creditors need information about

3    what is being sold, and we don't have that.

4          And when we do finally get the sale motion,

5    there's a one-day turnaround to object to it.  I

6    respectfully say that is not enough time for a meaningful,

7    open, and fair process to take place in this bankruptcy,

8    Your Honor.

9          THE COURT:  Okay.  The schedules will be on file

10   long before we have a sale hearing, so I'm not convinced by

11   that, and I'm not convinced they're really going to make

12   that much of a difference in evaluating sale options.

13         As to the objections, if you're proposing a sale

14   hearing of September 6th, I don't usually like to make

15   objection deadlines on a holiday weekend, but we can allow

16   objections up until September 5th.

17         MR. MARCUS:  I'm just looking for the objection

18   deadline paragraph in the procedures.  Give me one second,

19   Your Honor.

20         MR. GRAFF:  Your Honor, it's Steven Graff on

21   behalf of the shareholders of the Canadian parent.  I might

22   just add that I would support the submissions of Ms. Ryan

23   and I expressed the concern, Your Honor, that you too had

24   voiced, being that August is a month in which many of the

25   participants in this industry and many others are on holiday

Page 183

1    and it seems like an abridged timeframe.

2         I respect the concern over costs occurring.  I

3    respect that counsel for the committee and counsel for the

4    company believe that they can lean in and get this done and

5    that there is probably a small pool of participant buyers.

6    But just certainly from my 32 years of experience of sale

7    processes, though none have been specifically in the crypto

8    space, this seems like an incredibly abbreviated timeframe.

9         That's all.  Thank you, Your Honor.

10        MR. MARCUS:  Your Honor, this is Chris Marcus.

11   Let me respond to all that with a couple of things.

12        First of all, there is a sale objection deadline.

13   Yes, that's on August 31st, but objections related to the

14   conduct, manner, results of the auction have some additional

15   time already under the revised sale order deadline.

16        As Your Honor yourself noted, as Mr. Azman said as

17   well, I can't imagine what's in the schedules, the

18   statements, and at the 341 meeting that's going to be in any

19   way correlated to the sale, and I don't think they are.

20   There are numerous cases in this district that have approved

21   bid procedures and established dates prior to the Debtor

22   filings its schedules and SOFAs, including Garrett Motion,

23   Barney's, Hollander, Nine West, Runway Holdings.  So I don't

24   think those two things are correlated in a way that requires

25   one to follow the other.

Page 184

1           I would also say, you know, the SSB's argument and

2    several times said, for example, we don't know what other

3    creditors out there might object to, we don't know who's

4    going to object to the bid procedures.

5           Well, the largest creditor in the case, probably

6    the largest creditor in the case, which is Alameda, believes

7    we should be moving fast.  Perhaps we should be, if we

8    receive a bid that is an offer that we can't refuse, we

9    should be abandoning the bid procedures altogether.  And the

10   creditors' committee and the member of the creditors'

11   committee are all consumers in this case, obviously want the

12   case moving faster.

13          So this was a motion that was put out on broad

14   notice and those hypothetical other creditors are not

15   present.  And the relief that the objection seeks -- and I'm

16   looking at Paragraph 23 of the SSB's objection, which says,

17   "The breakneck pace sought by the Debtors is simply too

18   aggressive and would eviscerate any meaningful opportunity

19   for parties in interest in to review the schedules."

20          Well, again, you know, I don't see the

21   correlation.  But what they're asking for is none of the

22   dates should be set until the schedules are filed and the

23   341 meeting occurs.  And I'm not sure why we would take our

24   foot off the gas and not at least continue with the process.

25   Everybody's rights with respect to the ultimate relief, the

Page 185

1    ultimate transaction, are preserved.  If a creditor believes

2    that they haven't had ample opportunity, they can object to

3    the ultimate transaction.  By the way, it may not be a sale.

4    It may be a plan, in which case, folks will have an

5    additional two months, so we just don't know yet.

6            And what the SSB is asking for is to shut down our

7    current sale process and wait until we see the schedules and

8    statements because somebody might have an objection later

9    on.  I agree that there's got to be some sort of balancing

10   here.  I mentioned that before in connection with the

11   discussion of why we thought that this was an appropriate

12   time.  That is not a balancing; that's just a shutdown

13   without regard to whether -- without regard, one, to what

14   the creditors who have spoken up have already said and, two,

15   without regard to the potential loss of value, which is what

16   is set forth in Mr. Dermont's affidavit.

17           MR. DIETDERICH:  Your Honor, Andy Dietderich for

18   Alameda, if I can be heard just very briefly.

19           THE COURT:  Okay.

20           MR. DIETDERICH:  I'd like to just confirm, because

21   it's been mentioned before by others, our support for the

22   timetable.  We support that with a bidder hat on and we

23   support that with a creditor hat on and we are, indeed, the

24   largest creditor in the case and so, we fully support the

25   timetable.

Page 186

1              And I think Mr. Marcus put his finger on an

2      important distinction, which is, you know, a sale here in

3      similar situations has been done very, very quickly.  It may

4      be that a plan, if it's ends up in a plan, will have more

5      process built into it because it's a plan.  But I think

6      Alameda thinks it's important, you know, that at least the

7      sale alternative be able to be done as quickly as possible.

8              We also, Your Honor, have one other reason not to

9      wait too long, which is the price of crypto is highly

10     volatile and these issues, these kind of issues about claim

11     versus property right, who gets what, have one level of

12     significance, you know, if crypto was more or less stable.

13     If crypto goes up substantially, the case becomes, you know,

14     very complicated very quickly, so we think speed is

15     important for that reason as well.

16             MS. RYAN:  Your Honor, this is --

17             WOMAN:  I'm sorry, go ahead.

18             MS. RYAN:  Thank you.  This is Mrs. Ryan with the

19     Texas Attorney General's Office on behalf of the State

20     Securities Board.

21             I'm not suggesting that the -- I didn't object

22     first to the actual procedures set out in the bidding

23     procedures.  It's merely the abbreviated timeline that gives

24     me heartburn.

25             I do believe the schedules and statement of

Page 187

1   financial affairs are important because it will set out what

2   assets the Debtor has and the value.  And the only people

3   that know that right now are the potential bidders, the UCC,

4   and Debtors' counsel.  Nobody else in this case even knows

5   what's for sale.  And then to know whether the sale is

6   proper, we need to know how the assets are being valued and

7   so, this is why the schedules and statement of affairs are

8   important.

9            Secondarily, from a regulatory standpoint, we need

10  to know what regulations or certifications or things the

11  Debtor believes they have.  We don't know what they believe

12  they have.  We know what we believe they don't have.

13           Finally, the one timeline that really is giving me

14  heartburn here is the sale objection deadline.  And I would

15  not anticipate, you know, my client objecting to the conduct

16  at the auction or anything like that, but there may be a

17  term in the sales order or the processes that they would

18  object to and a one-day turnaround to do that is just too

19  short.

20           And so, we don't always get what we want, and I

21  know I'm not going to get what I asked for in our pleadings

22  and that's okay.  But I do ask for an extension of the sale

23  objections deadline, Your Honor, to give people enough time

24  to review and digest exactly what's being sold, since we

25  don't know, and the processes that'll be taken to sell it.

Page 188

1          THE COURT:  Does anyone else wish to be heard?

2          MR. GRAFF:  Your Honor, it's Steven Graff, just

3     three quick reply comments.

4          Number one, I appreciate the comment and crypto

5     value that I believe counsel for Alameda made with respect

6     to the value of crypto, but that cuts both ways, so I don't

7     consider that to be a relevant factor.

8          Number two, I question whether Alameda can

9     objectively stand before you today or sit before you today,

10    as the case may be, and objectively make comments from its

11    position as a bidder on what the timeline ought to be.

12          And, number three, though Mr. Marcus identified

13    the fact that he has engaged in expedited sale processes

14    comparably abridged to the one proposed here, I challenge

15    him to identify any case where he has done so during the

16    month of August.

17          That is it.  Thank you, Your Honor.

18          MS. LITTLE:  Your Honor, this is Ginger Little

19    again.  I look at it as, you know, I'm one of the small fish

20    in the pond, so to speak, in this situation, but it's not a

21    small fish to me.

22          I understand how auctions go, but usually, you

23    have a right to know what's going to be auctioned and what

24    they're looking at for that actual value.  And as for

25    crypto, I heard a statement -- I don't know who said it, but

Page 189

1    they said that, you know, crypto is down right now and

2    crypto could go up and crypto can go down.  But I remember

3    crypto back when it first started, and I remember it sold

4    for a nickel.  And now -- and I've seen it go from that to

5    85,000 -- not 85, excuse me -- I think it was, like, 68 or

6    something like that.

7           So crypto is -- you know, it does fluctuate from

8    one to another.  And I know that in an auction like this,

9    you can -- they can buy, just say, a Bitcoin for pennies on

10   the dollar and that very same crypto knowing that it's going

11   to flip, and it will flip, and it will go back up and it

12   will go up substantially more than it was when it fell this

13   time because we're not always going to be in a recession.

14          So what they're doing -- and this is my eyes; I

15   don't know if other people are looking at this way or not.

16   But if I'm selling something or they're going to sell

17   something of mine that is worth, they say, 10,000 now when I

18   know the value -- and the only reason you put money is to

19   make money in, not to lose money -- and you see it go up

20   that high later on.  And the person with the money, the

21   whales as they call them, that have the money to buy it at

22   the little part to push the little guy out and then bring it

23   back up and then they make all the fortune is the way it's

24   always been and it's almost like it's staggered to be that

25   way in this situation, and I do have concerns about that.

Page 190

1          And I'm sorry for taking this much time.

2          THE COURT:  Okay.  Anybody else?  All right.  I'm

3     not concerned about the filing dates in relation to the

4     schedules.  The schedules will be on file long before any

5     sale hearing.  To the extent creditors who are watching the

6     sale process ought to have an understanding of how good or

7     bad the bids are, they will certainly have the schedules

8     long before the bids are in and announced long before a

9     specific sale is proposed.  That, to me, is not a reason to

10    wait at all.

11         And I am very concerned that the idea of waiting

12    to make people more comfortable or to give people more time

13    to ask questions runs counter to what needs to be our main

14    goal here, which is to maximize value.

15         This is an unusual business.  It's not, I hope,

16    going to be a situation where the only thing that's being

17    sold is the Bitcoin assets that are held.  Maybe it can be

18    sold as an ongoing business, as an ongoing brokerage, maybe

19    there's something that can be salvaged.  The longer it sits

20    idle, the less likely, it seems to me, that that could

21    possibly happen, and all that is very good reason to me to

22    proceed as quickly as the circumstances reasonably allow.

23         It is a very compressed schedule, but there has

24    apparently been quite a bit of marketing before the

25    bankruptcy and also underway before we get to today, so it's

Page 191

1    not like everything is starting today and nothing has

2    happened before today.

3              And it's also the case that if circumstances turn

4    out to be such that we get closer to the date and that

5    schedule is too compressed, well, it's not like it's written

6    in stone and can't be changed.  If it needs to be adjusted

7    at that time and there's very good reasons to adjust at that

8    time, it can be adjusted.

9              It is a very short objection deadline, and I will

10   extend that and potentially inconvenience people if there

11   are objections.  But if we have a September -- instead of

12   the 7th, can we make it the 8th, and then have the 6th as

13   the objection deadline; would that work for you, counsel?

14   That way, we won't have a holiday as an objection deadline.

15             MR. MARCUS:  That's certainly okay with me.  We

16   can move that hearing date back by a day if that's Your

17   Honor's preference.

18             THE COURT:  All right.  And I think otherwise I

19   will overrule the objections.

20             I do have one other question.  I didn't see any

21   procedures for identifying possible cure payments to

22   contract counterparties to the extent that you are talking

23   about selling any contracts or assuming and assignment

24   contracts.  That possibility is mentioned in your motion,

25   but usually, that's accompanied by procedures where you

Page 192

1     propose what the cure payments are and people can object if

2     they think they pose something different, et cetera.  I

3     didn't see any of that.

4              MR. MARCUS:  Your Honor, I don't know that we have

5     contracts and leases that are going to be assumed and

6     assigned.  But we can come up with procedures to make sure

7     that, to the extent that there are assumptions and

8     assignments of contracts and/or leases, that the

9     counterparties will receive appropriate notice and an

10    opportunity to be heard with respect to both adequate

11    assurance, as well as cure amounts.

12             THE COURT:  All right.  I'm not telling you you

13    have to make provision for it.  I'm just saying that if

14    that's going to be an issue, it would be normal to make some

15    provision for some for it if you want to consider (sound

16    drops).

17             Anybody else have anything else they want to be

18    heard on with respect to the bidding procedures?  All right.

19             WOMAN 1:  Your Honor --

20             THE COURT:  So if you modify the order

21    accordingly.  Yes?

22             WOMAN 1:  I'm just curious since the creditor,

23    like, do we get to actually see the bids or is that

24    something that's published in Stretto and the case summary?

25             THE COURT:  The bids will be confidential.  You'll

Page 193

1     get to see the (sound drops) outcome of the hearing, at

2     which time the Debtors will announce why they picked a

3     particular bidder, as well as such information as is

4     appropriate as to what the alternatives were.

5             WOMAN 1:  Okay.  Thank you, sir.

6             THE COURT:  Anything else?

7             MR. DADSON:  Your Honor, Cordearo Dadson, one of

8     the consumers from Voyager.  Will there ever be any ruling

9     concerning USDC because I was taught that it goes back to

10    the U.S. dollar though and this matter is considered

11    cryptocurrency.  Will there be any future in the future of

12    the next hearing anything that goes to that regards of how

13    do we go about those that were primarily USDC exposed on the

14    platform?

15            THE COURT:  Yeah.  I'm not sure I fully heard the

16    question.  Will there be a ruling on what exactly now?

17            MR. DADSON:  On the matter of USDC.  From what I

18    understand, a lot of the customers that were using the

19    platform were exposed in that manner.  And I understand in

20    these proceedings it's a cryptocurrency, but it was taught

21    that it was pegged to the U.S. dollar, so I just wanted to

22    know will there be any clarity for those going forward.

23            THE COURT:  I don't know how to answer that

24    question.  You know, as the judge, I basically rule on

25    motions when they are made.

Page 194

1              Ms. Okike, do you have any comments in response to

2      that question?

3              MS. OKIKE:  Yes, Your Honor.  Christine Okike of

4      Kirkland & Ellis on behalf of the Debtors.

5              Your Honor, USDC is a type of cryptocurrency which

6      the Debtors are currently holding.  And, you know, as we've

7      talked about, the Debtors' view is that the cryptocurrency

8      is property of the estate.  Our job is to maximize that

9      value, which we're seeking to do, among other things,

10     through staking.  And when we have, you know, a transaction

11     that we're moving forward with, there'll be further

12     information provided to customers in terms of what they can

13     expect to receive on account of claims in the case,

14     including, you know, claims for USDC.

15             THE COURT:  All right.  Is there any other

16     business for today?  Okay.  If not, then we are adjourned.

17     I'll look forward to seeing your revised orders.

18             MR. MARCUS:  Thank you, Your Honor.

19             (Whereupon these proceedings were concluded at

20     3:38 PM)

21

22

23

24

25

Page 195

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 8, 2022

[& - 27th]                                                                      Page 1

| & | | | |
|---|---|---|---|

**&**   2:8,9,13,18
6:3,14 7:1,9
8:18 9:1 15:17
32:25 44:23
45:10 50:11
61:9 67:11,21
68:19 76:11
77:22 93:16
113:25 145:12
162:9 194:4

| **0** |
|---|

**01028**   8:4
**08/16/2022**   5:12

| **1** |
|---|

**1**   38:15 39:8
41:2 50:16 79:8
86:23 88:3
99:10,12 135:11
149:22 192:19
192:22 193:5
**1.9**   23:14
**10**   19:6,19 21:3
25:5 29:22 40:1
123:16 125:12
137:8 172:25
**10,000**   16:19
88:17 119:9
189:17
**100**   23:16 41:7
48:16
**10004**   1:14 6:17
**10014**   7:20
**10019**   8:21
**10022**   6:6
**10038**   8:14
**1006**   7:19 8:8
**10173**   7:5

**105**   126:12
130:18,24,25
**11**   26:15 30:18
35:18 48:7
67:12 69:13,21
69:24 90:2
**11501**   195:23
**116**   67:13
**11:00**   5:12
**11:02**   1:17
**12**   27:2 77:6
150:14,16
**120.52**   89:13,13
124:6
**12151**   195:7
**125**   6:16 75:3
**126**   162:13
**12th**   165:6
**13**   2:19 23:17
46:21 67:3
77:23 179:2
**13.3**   129:1
**13th**   46:23
**14**   16:15 23:1
44:24 162:12
169:15
**15**   147:13
170:15
**15521**   8:8
**156**   65:16,20
66:12 67:4
**16**   25:12 149:23
**161**   162:20
**16th**   69:8 73:10
74:14 90:12
**17**   23:1
**173**   78:7,24
**176,551.66.**
89:10

**177**   78:13
**18**   23:4
**181**   9:3
**18th**   178:6,24
**19**   17:24 150:10
**192**   78:9
**193**   78:13
**194**   61:18
**195**   65:21
**197**   60:21,25
**19th**   8:13 15:10

| **2** |
|---|

**2**   15:8 76:12
136:19
**2.8**   139:17
140:19
**2.85**   84:22
**2.9**   23:12,21
**20**   21:3
**20,000**   53:2
**200**   23:23
**201**   7:19 68:2
**2010**   16:19
**2013**   37:4
**202**   64:11
**2020**   23:9 38:21
**2021**   23:5,15,22
25:12 38:25
149:22
**2022**   1:16 2:11
2:19 5:11 40:13
84:21 149:22
195:25
**203**   51:3,8
**205**   76:16 77:8
**206**   51:24 52:2
**207**   76:17
**20817**   9:11

**21**   18:18 23:10
**210**   162:16
163:18 164:10
**216**   162:20
**218**   4:25
**22**   69:21
**22-10943**   1:3
**220**   16:20
**222**   8:13
**225**   78:14
**227**   45:18 48:19
**22nd**   88:13
**23**   184:16
**23rd**   89:3 119:3
126:16
**24**   23:17 38:15
86:13 144:10
**249,879.48**
124:10
**249,879.48.**
89:12
**24th**   89:7
**25**   73:3
**25,000**   119:9
**250**   108:5
117:12
**250,000**   25:16
25:21 89:9,11
96:23 97:1,3
123:12 125:13
**2501**   7:12
**256**   8:3
**26**   14:21 23:10
**26th**   170:2
174:10
**27**   17:24 46:11
171:22
**270**   109:5
**27th**   46:3 48:5
48:12

**28**   150:5
**28t**   25:9
**29th**   17:19
   174:10 179:6
**2:25**   146:25
**2nd**   51:2,24

**3**

**3**   9:4 26:21
   50:17 51:15
   84:21 136:22,25
   137:3,7,15
   170:1
**3.2**   134:6
**3.4**   79:8
**3.6**   79:11 97:5
   115:24
**30**   19:9 21:4
   60:13 140:11
   149:22 150:6,17
**300**   22:13 26:5
   195:22
**30th**   179:6
**31**   21:18
**31st**   27:9 179:6
   183:13
**32**   57:1 183:6
**32.67**   89:4
**327**   65:7,25
   66:11
**330**   195:21
**33157**   8:9
**340**   7:4
**341**   178:8,10
   179:6,11,22
   180:5,24 183:18
   184:23
**345**   46:23
**350,000**   39:9

**351**   54:7
**363**   86:23 87:1,2
   174:1 175:1
**377**   19:15
**3:38**   194:20

**4**

**4**   1:16 17:11
   23:20 45:14
   136:24 137:1,9
   137:13
**40**   16:19
**42**   16:16
**455**   23:18

**5**

**5**   2:10 5:11
   18:10 77:4
   79:21 80:13
   103:24 115:21
   117:11 149:19
   164:21 172:24
**5,000**   53:2
**5.3**   16:11
**50**   73:4
**51**   8:20 149:25
   157:9
**52nd**   8:20
**56**   60:19
**57**   51:20
**58**   76:15
**5c**   120:13
**5th**   182:16

**6**

**6**   19:1 23:12
   48:25 60:12
   169:15 170:15
   172:12,13
**6.2**   79:13 97:21
   116:1

**6.3**   79:15
**60**   77:7 140:7
**601**   6:5
**650**   26:23 30:5
**67**   65:17
**676,000**   89:6
   123:18
**676,541.66.**   89:6
**68**   189:5
**688**   23:19
**6th**   182:14
   191:12

**7**

**7**   23:23 61:12
   76:13 149:24
   150:11
**73**   78:5,25 129:1
**7425**   9:10
**75**   19:16 30:11
**75201**   7:13
**7th**   27:8 174:11
   179:8 191:12

**8**

**8**   21:16 49:2
   51:16 68:10
   83:11 195:25
**8.2**   85:21
**8.9**   23:11
**8/3/2022**   4:25
**85**   189:5
**85,000**   189:5
**8:00**   118:12
**8th**   51:20 60:18
   191:12

**9**

**9**   22:21 85:25
   171:15
**90**   103:7,15
   140:7 144:21

**95**   61:17 175:25
**96**   63:5
**97**   17:23 65:8
**99**   128:3

**a**

**a.m.**   48:7
**abandoning**
   184:9
**abbreviated**
   183:8 186:23
**abide**   28:7
**abigail**   12:19
   166:6 167:14
   177:8 181:15
**ability**   87:12,18
   122:19 143:6
   145:6
**able**   17:7 41:5
   55:13 87:18
   99:2 108:2,3,6
   114:5 135:19,22
   151:24 156:12
   175:1,10 181:25
   186:7
**abridged**   183:1
   188:14
**absence**   157:13
**absent**   117:15
**absolutely**   20:20
   64:25 65:3
   118:17 119:2,13
   121:4 165:16
   179:18
**abundance**
   134:14
**accept**   47:6
   95:15
**accepting**   88:14
   181:8

| | | | |
|---|---|---|---|
| access 28:12 | 111:25 113:9,10 | accruing 57:19 | 152:9 |
| 136:1 | 113:16,18 116:3 | accumulate | active 88:3 |
| accidentally | 116:4,12,12 | 158:20 | 112:15 158:23 |
| 61:8 | 119:1 128:16 | accurate 92:11 | actively 20:4 |
| accommodate | 133:12,17,18,21 | 195:4 | activity 14:22 |
| 170:4 171:17 | 138:14,16 | accurately 83:9 | 83:14,18 136:11 |
| accompanied | 139:13,16 141:1 | 93:19 136:11,13 | actual 55:14 |
| 191:25 | 141:2,15 143:4 | accusations | 121:22 142:23 |
| accomplish | 144:11,13,16,21 | 32:14 | 152:13 155:8 |
| 59:24 | 145:6,7,18,18 | accuses 152:11 | 164:8 186:22 |
| account 22:14 | 145:24,25 | ach 49:10,14 | 188:24 |
| 25:14,19 26:5 | 170:13 194:13 | 81:8,10 82:16 | ad 52:11,17 |
| 26:23 47:5,18 | accountable | 83:14 84:23,25 | add 61:25 62:4 |
| 48:25 49:18 | 120:19 | 85:1,8,12,12,15 | 66:20 74:15 |
| 79:8,9,14,17,24 | accounting | 85:17,20,25 | 107:3 169:22 |
| 79:24,25 80:16 | 107:16 136:7 | 86:3,11,18 87:7 | 182:22 |
| 80:16,17,23 | 138:21 | 87:10,25 88:15 | added 46:8,14 |
| 81:9,10,10,14 | accounts 4:9,10 | 95:1 100:17 | 63:10,12 64:11 |
| 81:16,17,19 | 4:12 47:2,19,20 | 133:16 139:13 | 72:21 74:15 |
| 82:7,8,8,11,15 | 49:6 78:1,1,4,18 | 140:4,13 143:11 | 75:19 171:16,18 |
| 82:17,19,19 | 79:2,4 81:2,5 | 143:12 144:4,7 | 173:4 |
| 83:2,4,5,14,22 | 83:9,17,19,22 | achieve 27:12 | adding 128:8 |
| 83:25 84:2,17 | 83:25 84:3,4,5,7 | 165:17 | addition 73:17 |
| 85:2,5,5,21 86:5 | 84:11,17,20,22 | acknowledge | 85:25 86:10 |
| 86:7,10,13,13 | 88:3,8,10 90:25 | 59:6 | additional 14:11 |
| 86:15 87:9,19 | 91:5,17,24 92:9 | acknowledges | 50:2 75:13 76:6 |
| 87:25 88:21,24 | 92:12,25 94:25 | 79:22 80:14 | 104:10 107:9 |
| 89:19 90:7,24 | 95:3 98:6,10,12 | acquiring 22:16 | 149:8 156:25 |
| 91:9,24 92:15 | 99:6,15,21 | acronym 15:13 | 158:20 160:22 |
| 94:1,15,21 95:7 | 102:17,25 103:9 | act 36:1 92:19 | 172:4 175:4 |
| 96:14,25 97:23 | 103:17 104:9 | 92:21 93:8 | 183:14 185:5 |
| 98:19,22 99:25 | 108:24 109:3,13 | 116:22 | additionally |
| 100:2,15,18,22 | 109:13,21 | acted 118:17 | 61:22 63:14 |
| 100:23,24 101:3 | 111:10 123:20 | acting 94:19 | additions |
| 101:15,22,25 | 133:9,11,25 | action 18:24 | 163:18 |
| 102:3,7 105:7 | 134:4 135:3,25 | 36:24 64:1 | address 22:4 |
| 107:3,5,7,17,19 | 136:3 | 75:21 90:7 | 29:19 31:23 |
| 107:22 108:4,15 | accrued 53:19 | 114:1 | 34:12,14,17,19 |
| 109:14,15,17,18 | accrues 73:1 | actions 91:17 | 58:11 61:23 |
| 110:18,21,21 | | 104:4 151:4 | 63:20 66:17 |

69:7 70:8,24
73:9 86:18 87:7
111:14 138:12
145:14 151:2
164:2 165:2
173:7
**addressed** 66:19
68:1,16 73:8
158:19
**adequate** 192:10
**adequately** 47:4
**adjourned** 5:8
5:12 194:16
**adjudicate**
122:17
**adjudicated**
111:16 151:10
**adjust** 191:7
**adjusted** 191:6
191:8
**administer**
28:20 92:25
**administering**
100:6 159:11
**administrative**
2:22 3:18,22
65:18 150:21
157:15
**admire** 19:12
**admission** 75:7
162:24
**admitted** 65:14
67:20,21 75:8,9
162:20 163:1
**advance** 29:14
61:24 65:20
**advanced** 39:23
74:4
**advantage** 96:23

**adversely** 28:5
115:6
**advice** 64:5,6,6
**advised** 14:3
18:16
**advisor** 2:14,15
2:22 5:11 68:20
73:19 176:17
**advisors** 17:8
**advocate** 32:4
**adzima** 6:12
76:7,8,9,10 77:3
77:17
**aegean** 68:9
**affairs** 178:5
179:20 187:1,7
**affect** 56:17
132:5 160:12
**affidavit** 127:3
175:6 185:16
**affiliate** 86:8
**affirms** 68:4
**afternoon** 74:24
76:5,10 77:22
**agenda** 15:2
27:16 35:5,10
44:25 45:13
50:15,16 51:15
51:15 60:12
61:12 63:3
68:19 76:12
77:5,24 162:12
**agent** 65:16
91:12
**agent's** 15:6
**aggressive** 27:5
175:18 184:18
**aggressively**
85:11 140:10

**ago** 23:4 25:13
33:16 38:25,25
98:9 137:8
139:8 167:19
**agree** 49:13
53:12 57:18,21
59:18 63:11
96:7,9,16
105:11,16 106:6
115:12 142:19
157:5 185:9
**agreed** 36:6
45:23 46:20,22
104:17 114:25
150:24 170:18
**agreement** 5:4
16:7 58:4 78:22
78:24 79:6,8,11
79:13,16,19,20
79:21 80:13,20
85:17,18,21
86:1,4,6,12
88:20,23 91:11
93:4 95:16 96:6
96:14 97:4,12
97:22 99:16
100:3 106:2,4
109:11 115:20
115:21,22,24
119:7,11,12
120:13 121:22
122:13,14 142:9
142:22 144:2
149:17,20
166:20
**agreements**
86:16,21,24
87:6,11,11,16
87:24 95:14
99:7 105:7,12

105:16,19
106:14 108:25
122:12,23
133:20 139:24
140:23,25 141:5
142:6,10 178:4
181:19
**agrees** 79:7,16
86:6,7 109:2
**ahead** 18:9
44:20,21 100:11
100:12 107:14
107:15 111:7
121:5 135:13
138:1 164:19
169:4 171:12
186:17
**aiming** 34:5
**aird** 9:1 113:25
145:12
**aislinn** 12:25
**akin** 105:14
**alameda** 6:15
19:2,3,8,10,14
19:16,18,20
27:18 29:12,17
29:21 30:3,6,19
31:24,25 172:4
172:21 173:8
184:6 185:18
186:6 188:5,8
**alameda's** 29:25
30:12
**alan** 75:18,21
**alert** 174:2
**aligned** 35:4
83:17
**aligns** 79:19
**allegations**
44:11,14

allocate  159:15
allocates  91:11
allocati  12:11
allow  88:20
  89:17 102:16,24
  103:1 108:14
  109:9 111:24
  120:5,6 123:17
  123:18 140:25
  141:5 148:24
  182:15 190:22
allowed  32:10
  56:9 66:6 88:11
  112:2 123:11
  128:23,25
  130:10 142:5
  157:4 169:16
allowing  36:8
  130:7,10,19
  144:6
allows  44:6
  96:22 149:18
allyson  6:11
  61:5,9 73:13
alongside  36:4
alter  181:12
alternative
  126:7 163:8
  165:13 186:7
alternatives
  72:2 163:5,11
  174:24 193:4
altogether  184:9
alyona  9:18
amenable  46:1
america  54:9
amount  22:18
  35:15 82:14,23
  82:24 83:3,3
  85:6 87:19

88:12 89:5,6,12
  100:21 124:9,10
  135:18,18
  143:20 155:18
  157:7 172:24
amounts  50:23
  54:15,20,21
  84:17 192:11
ample  185:2
amy  8:23 93:16
  144:9
analysis  37:2
  108:22 145:9
analyzed  104:19
andrew  6:19
  9:21 10:16 11:3
  13:8
andy  27:17
  168:14 185:17
anger  128:7
  132:14
angiolini  10:20
angry  122:1,2
announce  193:2
announced
  18:18 190:8
announcements
  14:3
answer  14:19
  27:14 31:4,9
  34:1,10 93:18
  101:19 114:19
  153:19 193:23
answered  24:22
answering  60:9
answers  37:6,8
anthony  11:10
anticipate  134:5
  139:21 150:9
  187:15

anticipated
  102:2 151:2
  157:2
anticipating
  152:1
anybody  29:2
  51:10 52:3 53:8
  59:11 62:12
  76:1 108:13
  110:12,23
  114:23 115:5,5
  116:14 132:8
  141:9 161:22
  165:20 166:1
  167:10 173:16
  173:21 190:2
  192:17
anybody's  172:1
anymore  38:19
  178:21
apart  18:3
apiece  123:12
apologies  46:10
  61:7 92:8
apologize  56:2
  80:7,10 94:10
  146:4
apology  168:20
app  81:13,21,25
  82:12 93:24
  103:2 139:20
apparently
  147:7 148:3
  190:24
appear  141:5
  170:12 179:21
appearance  5:2
appears  74:3
  115:18 167:3

applicable  15:14
  43:3 81:14,16
  82:14 85:4 87:8
  89:5,19 116:17
application  2:8
  2:13,17,21 5:10
  65:7,8 67:11,14
  68:2 73:25 74:3
  74:24 75:2
  171:10
applications
  52:4 61:24 62:5
  62:15,23
applied  24:14
  66:6 173:18
applies  129:6
  130:9
apply  43:18,19
  64:20 98:13
  116:10 173:14
appointed  117:1
  153:17,22
appointment
  63:6
appreciate
  15:24 31:14
  33:9 44:17
  97:15 102:14
  117:17 180:19
  188:4
appreciation
  30:23
apprise  134:15
approach  15:19
  31:1 59:17
appropriate
  28:25 29:17
  59:20 88:22
  113:23 116:13
  163:20 177:6

185:11 192:9
193:4
**approval** 17:14
19:23 24:12
29:1 49:9 50:22
57:16 64:23
65:17 72:10
153:12 157:20
**approvals** 62:2
**approve** 19:22
24:13 28:17
51:13 61:3
62:13 68:17
71:14,22 74:10
141:10 143:23
161:7 162:2
**approved** 20:18
28:24 36:15
55:8 62:11
65:25 71:18,19
75:14 76:2
81:23 89:16
119:16 137:3,3
137:7 159:6
160:4 178:19,20
183:20
**approving** 3:8
4:16,23,24 5:4
**approximately**
19:19 83:11
84:22 89:4
134:6 139:17
149:24,25
150:10,11
**aps** 5:5,5,7
**arbitration**
66:17
**arena** 39:4
**aren't** 44:14

**argue** 103:16
116:16
**argument** 42:25
55:10 118:3
123:22 126:11
130:5 145:20
177:11 184:1
**arguments**
37:23 103:21
116:17,18
117:23
**arose** 126:14
127:5,10
**arrange** 79:23
80:15
**arrangement**
23:13 91:8
**arrows** 26:15
30:4 64:7
**articulated**
21:25 27:2
**ascension** 5:5
**aside** 59:24
108:11
**asked** 18:13
29:19 97:16
99:17 102:12
113:12 115:4,13
119:5,6 124:14
124:14 187:21
**asking** 34:9 93:5
93:6 98:10
101:12 102:20
110:5 111:1,22
118:18 120:25
123:23 130:17
134:17,18
164:22 174:9
175:24 184:21
185:6

**aspects** 52:8
155:17
**asserted** 99:20
**asserting** 145:3
**assessment**
56:11 104:25
**asset** 24:13
42:11 58:14
138:24 160:16
172:15 176:21
176:24 181:25
**assets** 24:22
27:6,7 30:20
41:19 43:9
56:18,23,24
59:4,18 81:13
130:11 132:4
133:8 134:1
138:19 149:10
149:13 155:5
156:12 159:9,17
160:5 161:9
178:15,19,20
181:4,10,20
187:2,6 190:17
**assigned** 192:6
**assignment**
191:23
**assignments**
192:8
**associated** 16:14
16:24 80:21
85:23 107:9
152:12
**association** 85:3
**assume** 111:1
116:8
**assumed** 192:5
**assuming** 49:18
191:23

**assumption**
35:21
**assumptions**
192:7
**assurance**
192:11
**assure** 21:12
63:22 66:9
**assured** 24:19
**attaching** 62:14
**attempted** 165:2
**attempts** 85:9
**attend** 34:23
**attended** 56:3
**attitude** 59:15
**attorney** 166:7
186:19
**attorneys** 2:9
6:4,15 7:2,10,18
8:12,19 9:2
27:25 67:12
123:25
**attributable**
82:10 133:8
135:19
**auction** 17:18
163:20 165:13
170:19 173:22
174:10 176:23
178:9 179:5
183:14 187:16
189:8
**auctioned**
188:23
**auctions** 188:22
**august** 1:16
17:19 51:2,24
69:8 73:10
74:14 84:21
90:12 165:5

170:2 174:10,13
178:6,24 179:6
179:6 182:24
183:13 188:16
195:25
**authority**   49:5
50:18 54:16
77:24 85:13
86:16 91:13
133:6,24 134:11
135:1 146:10
156:5 157:6
171:4
**authorization**
92:18
**authorize**
111:24 134:17
**authorized**
46:25 47:2 74:4
85:9 86:22
134:3 170:25
**authorizing**   2:1
2:17,21 3:1,3,13
4:5,8 5:6 51:17
60:14 63:5
**automated**   81:8
84:23 85:3
**automatically**
53:17 160:14
**available**   28:25
34:24 41:21
82:21 85:20
86:2,5 158:21
161:9 162:21
174:14
**avenue**   6:5 7:4
8:8
**average**   149:24
150:11

**averages**   19:6
**avoid**   17:4
**aware**   21:7
25:13 28:5
52:13 53:5
70:22 75:17
97:9,10,12
116:24 163:5
164:24 174:3
**axelrod**   10:5
**azman**   7:7 15:18
16:6 32:21,21
32:24,25 33:7
54:22,22 70:4,4
72:18,18 104:15
104:15 105:2
108:16,16
110:11 140:22
140:24 142:18
142:18 153:15
153:15 156:7
157:6 166:3,3
167:12,12
175:20,20,23
180:15,18,18
183:16

**b**

**b**   1:21 46:23
87:1,2
**ba**   12:12
**baba**   11:5
**back**   16:9,17,19
16:25 20:1 21:4
22:9 23:5,22
24:23 25:20
27:7 37:4 42:21
44:4 46:7 66:8
72:9,14 74:1
80:9,10 83:3

89:8 102:21
109:5 110:16
112:16 118:23
119:3 156:9
157:19 158:18
160:25 161:13
161:16 167:5,11
167:18,23 168:1
168:16,18,25
169:20 170:4
171:1 189:3,11
189:23 191:16
193:9
**backdoor**   66:25
**bad**   30:21 190:7
**balance**   4:11
30:10 78:2 86:2
133:9,13,21
134:1,5 135:25
138:24 177:6
**balances**   3:19
83:10,13,15,17
92:11 136:10,15
179:14
**balancing**
174:17 185:9,12
**balluku**   10:4
**bank**   8:19 22:14
25:15,16,17,19
25:19,19,22,25
26:1,2,5 30:8,14
30:21,21 39:11
39:20,21 42:7
43:13,13,14
46:24 47:5,5,18
47:19,21 49:5
49:13 56:8
79:18 80:1,18
80:20,21,24
82:17,19 83:2,2

83:4 85:4,5 86:7
86:8,9 91:4,9,11
91:13 92:5,25
93:13,22,25
94:1,3,4,6,16,18
95:8,12,13,14
95:16 96:4,6,7
96:13,14,24
97:22,25 98:22
99:2,4,8,10,12
99:14,19,19,22
99:23 101:12,13
101:21,21,23,24
102:10,13 105:5
105:7,25 106:3
106:7 107:19
108:8 114:25
115:20,23 116:2
118:12 119:8,23
120:2 121:23
140:8 141:15,17
144:15,16,18,24
145:2,3,17,19
149:10
**bank's**   143:25
**banker**   2:14
68:20 73:18
176:15
**bankers**   71:16
**bankers'**   71:16
**banking**   64:5
94:11 97:24
98:5,17 107:10
**bankman**   19:9
20:23 21:1
**bankruptcy**   1:1
1:12,23 25:2
28:1,5,8,10,22
29:1 32:20
33:14 34:2 35:2

41:18,18,20
42:9 43:8 44:2,5
44:8 53:12,16
53:17,20 54:24
59:13 84:15
86:23 87:1
108:22 120:21
120:22 121:6,13
121:20 122:7,11
122:16 123:1,2
126:13 127:10
128:4 130:25
131:2,25 132:10
132:17,20 139:3
145:21 159:4,10
161:16 177:25
178:21 182:7
190:25
**banks** 39:13
43:18 46:24
85:13 93:10
98:12 140:11,14
**bank's** 49:10
93:14 94:6
**bar** 4:22 104:7
**barney's** 183:23
**barsalona** 11:8
**base** 88:2 117:8
**based** 26:19
37:2 82:23
83:15,20,23
91:2,25 117:21
119:20 122:11
122:15,20 130:3
130:17 136:15
139:7 142:21
150:7 175:16
**basically** 55:18
91:11 93:9
112:9 130:8

138:9,23 139:4
152:7 153:1
160:17 161:12
161:18 177:20
179:11 193:24
**basing** 122:11
**basis** 30:6 50:19
58:13 82:23
92:4 116:5,6
118:8 126:7
131:11 141:16
141:20 150:10
152:5
**battery** 80:4
**baudouin** 10:6
**bay** 9:3
**bdl** 9:2
**bears** 22:10
**bedrock** 138:14
**beginning** 39:18
52:11 160:18
**behalf** 14:15
38:13 44:23
45:10 59:3
77:22 84:8
93:17 103:14
105:11 109:25
111:14 114:3,7
116:25 121:25
124:4 133:15
141:12 154:10
156:24 162:9
177:9 182:21
186:19 194:4
**behavior** 131:24
**believe** 15:7
26:3,7 27:5
28:24 30:25
31:19 36:12
47:3 48:21 50:5

50:6 52:18 53:3
67:3 79:2 84:4
84:13 85:8
86:20,25 87:5
87:18 95:22
97:9 98:8 100:1
100:16 101:14
101:23 102:10
103:13,17
104:14 105:13
105:18,24
106:18 109:12
110:1 134:13
138:2 140:14,19
143:1,5 144:14
144:18 145:13
157:16 168:9
176:8,9,25
178:18 180:15
181:9 183:4
186:25 187:11
187:12 188:5
**believed** 30:25
**believes** 121:2
173:14 174:23
184:6 185:1
187:11
**bellamy** 13:5
**beller** 12:7
**belong** 28:9
41:20 43:3
105:9 121:23
**belonged** 43:2
**belongs** 28:10
42:8,23 59:7
60:6 78:19
113:19 122:5
132:6
**benefit** 17:2
22:14,25 79:7

81:3,9 84:11
95:4 98:13,22
101:13 105:14
105:15 107:6,20
107:20 109:14
109:15 132:1
134:1 145:14,19
150:20 158:9,9
**benefits** 3:5
25:14 51:19
52:10 53:10,16
54:14 146:16
**benjamin** 9:23
12:7
**berkeley** 5:10
**berlis** 9:1
113:25 145:12
**best** 20:22 28:25
34:2 43:25
55:10,14 58:1
59:22 70:25,25
94:12 126:11
152:3 165:17
170:5 181:10,13
**bethesda** 9:11
**better** 31:16
106:25 107:12
154:7 159:13,18
161:19
**bid** 20:25 21:1,6
21:11 37:14
162:5,13 163:10
163:15,23 164:6
164:16 165:15
169:14,17,18,25
170:16,24,25
171:2,8,15
172:5,5,11,12
172:21,22,24
174:10 181:10

181:13 183:21
184:4,8,9
**bidder** 171:24
173:12 177:2
185:22 188:11
193:3
**bidders** 20:4
170:21 175:9
176:18,22 178:3
181:18 187:3
**bidding** 4:16
17:13,14 19:20
31:4,5,9,23 32:4
44:25 45:4
70:18,23 162:15
169:5 181:23
186:22 192:18
**bids** 21:2 70:19
163:8 170:2
172:14 176:23
190:7,8 192:23
192:25
**big** 38:17 39:5
73:5 137:9
140:3
**bigger** 42:4
159:17 161:17
161:19
**biggest** 26:21
71:18
**billed** 128:4
**billion** 19:6
56:11
**billions** 26:24
**binder** 164:12
164:18
**binford** 12:13
**biswas** 10:10
**bit** 19:3 26:3
29:13 45:13

59:2 106:14
154:7 174:18
190:24
**bitcoin** 16:15
23:18 89:4,8
118:5,11,23
124:11 128:15
135:21 154:14
154:21 156:1
161:3 189:9
190:17
**bitcoins** 16:19
**black** 125:3
**blackline** 164:13
164:13 172:12
**blanche** 156:4
**blatantly** 118:17
**blockchain**
138:19 146:16
146:18 148:13
148:15,16,19,23
149:6
**blockchains**
136:3
**blocks** 146:18
153:6
**blue** 154:15
155:25
**blvd** 9:10
**bmo** 46:24 47:5
47:20,21
**board** 57:9
157:18 164:3
166:8 177:9
181:15 186:20
**body** 33:20
**bond** 2:5
**bonds** 50:20
**bonuses** 40:18
52:11,12,14,18

52:19,20,23
53:1
**books** 136:13
**borrowed** 19:16
19:17
**borrower** 19:15
**borrowing**
40:14
**bostick** 10:22
**bother** 159:24
**bottom** 37:6
**bought** 16:18
119:3 130:13
**bound** 129:8
**bovenzi** 9:25
**bowling** 1:13
**brad** 10:5
**brandt** 10:23
**braziel** 12:6
**breach** 90:4
**breached**
121:16
**break** 147:9,17
147:22 148:5
**breakneck**
184:17
**breakup** 170:20
**brendel** 10:24
**brian** 9:24 11:18
**bridge** 20:2
**brief** 14:25 22:3
32:22 108:17
110:7
**briefly** 29:9,20
185:18
**bring** 189:22
**broad** 6:16
184:13
**broadcast** 34:8

**broadway** 8:13
**broke** 23:3
**broker** 123:14
**brokerage** 2:3
56:10 190:18
**brokers** 24:13
43:18
**brother** 38:19
**bruh** 13:6
**bryant** 10:13
**btc** 89:4,10,11
89:14
**bucket** 54:1
**budget** 46:21
**build** 160:16
**building** 103:20
161:12,15
**built** 186:5
**burns** 9:20
**business** 3:16
4:6 22:16 38:16
38:18,21 53:18
55:13,14,18
57:6 59:19,25
60:16 63:7 67:1
69:19 86:17
87:3,5,22
103:20 104:12
133:7 134:20
136:6 146:11
149:16 150:25
151:8 158:5
170:23 190:15
190:18 194:16
**butler** 9:21
**button** 94:3,17
**buy** 71:5 81:12
89:8 92:14
118:23 125:24
129:2 135:7

139:6 189:9,21
**buyers** 176:21
181:4 183:5
**buying** 102:21
**bvi** 64:6,11,13
64:14

**c**

**c** 6:1 14:1 26:21
65:16,20 66:12
67:4 85:21
86:12 134:7
195:1,1
**cable** 32:13
**calculate** 172:23
**call** 106:25
167:22 189:21
**called** 18:12
33:16 57:6,7
92:15
**calls** 159:5
**campaign** 20:23
**campbells** 64:12
64:12
**canada** 54:8
117:2
**canadian** 9:2
47:1,6 114:3
116:23,25 117:4
117:8,11,14
141:12 182:21
**cancel** 89:18
123:8,21,25
124:15,20,21,22
125:1,3,6,10,15
125:17,19 128:2
128:5 135:10,16
135:21 138:15
138:23

**canceled** 23:24
89:7 123:8,19
125:4
**canceling** 126:2
129:3,5 135:8
**candid** 101:20
**candor** 97:15
**can't** 55:17
58:10,10
**cap** 63:12,12
**capacities**
109:24
**capital** 2:14
30:3,4 68:20
70:15,16 71:4,7
71:14,24 72:19
72:22 73:1,5,8
73:18 74:14
95:14
**capitalized**
97:17
**caps** 64:20,23
**cardholder**
85:24
**care** 178:1
**careful** 28:13
145:8
**caroline** 10:19
**carrie** 12:10
**carried** 52:24
**carte** 156:4
**case** 1:3 3:22
14:23 15:20
24:9,20 25:1,1
27:3,13,24
28:16 29:21
31:13 32:3
33:16 34:4,23
35:2,17 38:12
41:3,18,18

42:16 44:2
52:11 54:18,24
55:1 56:16
59:13 63:12
66:7,10 71:9
72:5 74:7 75:20
77:4,5 79:3 85:2
86:6 89:18,19
89:24,25 94:3
98:24 104:3
109:6 115:3
116:15 122:4,7
129:6 151:23
159:1 161:10
163:7 166:22
175:13 176:8,11
176:12,13 184:5
184:6,11,12
185:4,24 186:13
187:4 188:10,15
191:3 192:24
194:13
**caselaw** 130:24
**cases** 17:9 28:3
36:17 67:12
70:22 71:18
76:14 103:8
175:25 180:20
180:22 183:20
**cash** 3:14 4:11
17:24 22:11
25:23 26:1
30:23 36:25
42:7 43:8 45:15
45:19,25 46:21
47:1,4,9,25 49:2
49:5,6,12,18,21
77:25 78:2,17
78:19,21 79:1,4
79:20,24 80:16

81:2,4,7,15,17
82:6,7,9,14 83:9
83:10,16,20,23
83:24 84:2,3,4,5
84:6,10,12,21
85:14 87:19
88:7,8,10,12
89:19 90:7
91:23 92:11,12
101:10 102:18
102:24 103:9,16
108:19 109:3,9
109:25 110:15
110:18,20 111:9
111:17,25 112:5
113:9,16,18
115:24 118:4,5
118:25 119:22
120:7,17,24
121:21,22,25
122:24 124:11
127:11 128:15
130:3,13,21
132:12,24
133:10,16 134:5
134:6 135:18,22
139:16,20,22
160:9 172:25
**catching** 33:8
**category** 126:5
**cause** 75:21 94:3
153:7
**caused** 94:9
100:15,17
**causes** 18:24
36:24
**caution** 116:14
117:25 134:14
**cede** 26:14
77:18

central 87:11
98:9 142:10
cents 21:4 23:9
ceo 57:10
certain 2:3 3:2,9
3:15,21 20:3
52:23 63:6
68:11 93:21
99:1 102:18,19
133:6 148:25
152:4
certainly 32:18
72:12 74:21
102:11 141:5
144:10 145:6,13
145:18 183:6
190:7 191:15
certifications
187:10
certified 195:3
cetera 161:3
192:2
chairman 24:16
challenge 47:11
47:16 140:8
188:14
challenged
140:5
challenging
49:14
chambers 62:1
62:25 65:4 69:6
74:21
chance 70:8
72:23 159:13,18
change 24:18,20
43:14 64:20,23
104:25 111:11
112:4 128:9,10
130:25 131:23

147:5 169:13,21
170:12,14 171:3
171:14 172:7,20
172:23 173:1
changed 68:6
168:10 191:6
changes 31:6
35:4 62:3,10
65:2 66:4 68:7
163:24 164:9,16
172:4,4,6,11
173:3,4,6
changing 129:19
chapter 30:18
35:18 67:12
90:2 103:24
characterized
32:15
charge 68:4
chargeback
84:23,25 86:11
chargebacks
49:11,15 85:8
85:12,16,20
86:11,18 87:8
87:10,25 100:15
100:19 101:1
102:2,6 142:20
143:1 144:7
charges 57:19
charity 50:20
charles 7:15
13:15
charlie 13:19
chart 158:2
chased 144:25
chat 127:2
check 46:5
92:16 157:25

checking 92:5
chelsea 56:5
cheryl 65:9
chester 12:12
chief 78:8
children 38:16
chime 144:1
chip 154:16
155:25
choi 10:25
chris 11:4 44:21
183:10
christine 6:10
45:9 77:22
105:10 111:13
124:3 137:2
156:23 194:3
christopher 6:9
9:8 10:8,12
44:22 110:14
162:9
chuck 33:2,5
circle 72:9
circuit 19:21
circulating
32:11,12
circumstance
101:20 106:22
circumstances
59:23 152:14
190:22 191:3
citibank 92:1,2
126:23,24
claim 4:23,23
26:24 43:13,25
56:24 58:1,8,10
75:21 90:3
100:4,5,5 101:9
101:21,23,25
102:10 104:7,11

104:23 113:15
121:7,16 122:6
126:13 127:5,9
128:11,15,18
130:3 132:15
142:3,8,15
143:7,8,14,17
143:24 144:5,6
144:14,15,22
145:3,22 148:10
178:16 186:10
claimants
161:18,20
claiming 113:15
claims 17:2 18:3
18:4,24 22:25
26:24 30:24
36:12 37:5
39:15 42:3
58:23 65:16
103:5,18 115:10
121:11,18,18,19
122:8,25 131:25
132:3,18 136:13
140:16 141:4
142:16,20
159:10 178:16
194:13,14
clarification
46:17 47:21
clarifies 68:3
clarify 63:15
105:22 116:21
clarifying 31:7
172:19
clarity 58:18
109:11 119:5
193:22
clark 13:10 50:7
50:10,10,14

51:14 54:5,5
60:2,10 61:4
**class** 63:25
114:1
**clear** 16:20 21:5
21:24 22:5 26:7
32:9 35:3 41:7,8
53:14 62:1,4,15
74:9 79:2 97:12
104:2 106:5,21
119:3 122:23
124:5 125:4
126:7 129:6
130:24 134:16
135:10 136:16
138:13 145:23
149:2 169:23
170:8 172:14
173:11 174:8
**clearer** 105:17
129:17
**clearing** 81:8
84:23 85:3
**clearly** 58:16
100:3 105:8,12
105:13 110:19
129:14,18
144:12,13
**clerical** 173:4
**clerk** 14:2 46:5
46:9,11 48:7
137:17,22
146:22 147:4,10
147:13,16,18
167:2,24 168:3
168:9,23
**clerk's** 167:9
**client** 29:15 97:5
115:25 130:6
187:15

**client's** 130:11
**clients** 29:19
**climbed** 23:18
**clock** 27:10
**close** 21:6 22:13
23:23 25:11
26:4 135:25
136:3
**closed** 30:16
47:20
**closely** 91:16
93:1 152:2
156:25 157:17
**closer** 191:4
**cnbc** 20:24
**code** 28:10 29:1
41:20 44:5,8
53:17 86:23
87:1 108:22
120:22 121:13
122:11 123:2
126:13 130:25
131:2 132:10,17
145:21 159:5,10
**coi** 126:15
**coin** 15:15 39:9
111:15 112:16
135:22 146:20
150:4,5,6
158:18 160:22
172:25
**coin's** 150:7
**coinbase** 40:25
**coinify** 5:7
**coins** 23:1
146:17 149:4,8
149:23 150:3,4
150:10,12,14,16
152:1,4 157:1,2
158:3,13,20

**collaborative**
15:24
**collaboratively**
63:15
**colleague** 50:1
61:5 76:7
106:14 153:18
154:6
**colleagues** 33:2
68:9 96:21
98:11 167:15
**collect** 79:12
97:5 115:25
**collecting** 26:22
**college** 39:9
**colvin** 10:11
**come** 22:9 46:22
53:25 56:18
72:14 93:21
106:11 117:18
126:13 132:25
137:14 156:9,14
160:23 169:20
179:23 192:6
**comes** 56:18
62:20 71:4
**comfortable**
70:9 115:11
153:23 165:19
174:15 175:7,17
176:14,19
190:12
**comforting** 44:9
44:13
**coming** 20:15
79:1 137:19
**comingled**
107:25 109:15
**comingling** 84:1

**command**
150:18
**commencement**
103:8
**comment** 16:6
51:23 64:19
113:24 114:21
124:2 145:12
170:13 188:4
**comments** 14:11
24:8 27:23 31:6
37:21,24 38:1
45:22 51:1
60:21 61:20
63:9 65:22
67:25 68:24
69:1 78:15
110:6,7,8 111:5
171:18 173:10
180:19 188:3,10
194:1
**commercial**
8:19 79:25
80:17
**committed** 25:3
**committee** 7:2
7:10 15:9,11,14
15:20,21,25
16:2,3,8 21:9,23
22:2 26:18,22
27:16 32:22
33:1,15,20,24
35:19,25 36:1,5
36:6 45:20 46:7
46:14,17,20
51:1 54:3,23
59:19 60:7,22
61:20 63:9,10
64:9 68:25 70:5
72:19 73:7,24

76:19 78:10,12
78:15 104:1,13
104:16,18,21
108:17,18 109:2
110:15 140:20
141:24 142:19
150:24 151:7
152:3 153:12,14
154:3,10 155:22
156:25 157:5,17
157:18 162:2
166:4,21 169:6
169:7,19,22
170:9,18,20
172:2,8 173:5
174:20 175:21
175:23 180:6,11
180:19 183:3
184:10,11
**committee's**
15:17 36:9
105:2 146:11
169:20 171:23
**committee's**
75:1
**common**  3:10
94:2 107:5
145:21 151:21
**commonly**
154:15
**commonplace**
136:7
**communicated**
176:16
**communicating**
85:12
**communication**
147:19
**community**
14:25

**companies**
117:5
**company**  2:13
17:1,8,23 18:12
18:13,13,16,19
19:15 21:9
22:25 23:4 25:2
38:23 39:2 40:8
40:20,25 42:9
53:11,11 68:19
69:18 86:6,8
114:9,18,18
116:23 117:4
118:17,25 119:5
119:17 125:12
132:3,4,4,6,14
132:16 155:8
157:8 160:17
161:2,13,16
162:10 181:4
183:4
**company's**
159:9 160:5
**company's**  86:5
**comparably**
188:14
**compared**  76:18
154:21
**compelled**  145:5
**compensation**
3:4 4:2,5 23:25
51:19 54:14
61:14,15 62:15
62:23 64:21
**complaint**
110:17 131:6
173:22
**complaints**
173:15

**complete**  62:16
135:19 138:21
161:25
**completed**  89:15
**completely**  17:9
91:17 127:18
135:17
**complex**  180:1
**compliance**
46:23
**complicated**
72:25 176:24
186:14
**complies**  47:10
**comply**  99:1
**component**  72:4
72:22 73:20
**components**
90:21
**comprehensive**
36:2
**compressed**
174:12,19
190:23 191:5
**concept**  96:22
98:8
**concern**  70:5
71:15 84:19
141:13,18
144:19 156:8,13
182:23 183:2
**concerned**  21:22
29:2 115:24
190:3,11
**concerning**
69:15 114:14
193:9
**concerns**  21:7
21:25 22:22
31:21 32:12

41:15,24 42:1
59:13 69:7
72:19 127:9
164:24 165:2
189:25
**concluded**
194:19
**conclusion**  14:9
35:21 109:3
**conduct**  4:11
35:20 78:3
173:22 183:14
187:15
**conducted**
108:22
**conducting**  36:4
**conference**
93:18
**conferring**
93:16,17
**confidence**
87:21
**confident**  68:22
**confidential**
26:10 192:25
**confidentiality**
178:4 181:19
**confirm**  26:19
36:22 74:17,20
93:13 143:10
185:20
**confirmation**
4:19 27:9
158:15 164:25
165:7,10,12
166:13,24 174:6
**confirming**
181:7
**confirms**  68:5

conflict 24:15
conforms 77:10
confused 21:21
confusing 58:19
62:22
confusion 22:6
153:7
connection
28:19 61:23
64:7 69:14
71:23 75:1,18
80:23 124:8
144:3 158:15
160:21 161:5
185:10
consensual
68:24
consent 46:17
63:11 64:20
154:3 169:19,20
170:9 173:5
consequential
114:16
consider 19:12
29:5 37:24 38:7
131:15 181:3
188:7 192:15
consideration
28:13 114:11
considered 57:2
90:6 104:13
193:10
considering
48:24
consistent 36:5
44:7 66:22
108:21
consolidated
62:6

consolidation
117:15
constitute 47:9
84:8 141:15
constitutes
47:14 84:5
constrained
179:14
constructive
59:17
consult 170:19
consultation
181:9
consulting 15:18
74:19
consumer 111:9
consumers
180:12 184:11
193:8
contact 25:11
93:22,22 95:8
contacted
140:11,13
contemplated
52:18 74:2
contempt 14:6
contention
120:23
contest 31:5
contested 15:1
context 19:4
32:20 43:14
66:11,12,19
111:17 121:20
122:3
continue 2:3 3:5
3:14,16 4:13
20:16 30:25
32:4 34:20
51:18 54:18,20

61:11 69:4 78:4
86:16 87:6,23
133:6 135:1
144:14 146:10
146:24 150:20
153:11 160:15
160:15 184:24
continued 39:18
54:11 86:24
87:15
continues 32:3
33:11 45:25
54:12
continuing
48:10 86:17
142:8 151:15
157:14
contract 90:4
120:22 121:16
142:14 143:4,18
151:2 191:22
contracts 123:1
145:23 155:9
191:23,24 192:5
192:8
contractual
143:15
contrary 25:11
contributing
146:15
control 94:14
controlled 36:23
79:17 94:1
convene 21:23
convenience
27:18
conversations
176:15,18
conversely
81:24

conveyed 82:11
convinced
142:13 182:10
182:11
conyers 64:13
cooperate 36:7
cooperation
33:9 169:6
cooperatively
174:19
coordinate
74:21
copy 15:7
copyright 64:1
cordasco 13:13
cordearo 8:6
193:7
cordero 55:23
corner 167:4
corollary
169:23
corporation
25:8 80:2,19
correct 49:7
94:21 96:20
101:6 118:6
124:25 136:15
139:5 144:10
160:6,18 168:15
correctly 91:8
118:3 136:10
146:1
correlated
183:19,24
correlation
184:21
costs 40:16,16
150:21 157:15
159:11 183:2

[could've - cred]                                                                                    Page 15

**could've**  26:12
**counsel**  2:18
  28:2 33:1,15
  36:1 50:11
  58:15 61:10
  64:1,3,3,7,11,13
  64:14 74:25
  76:11 92:23
  93:14,18 109:20
  114:6,7 116:25
  120:8,20 122:13
  140:20 141:4
  143:25 145:14
  154:12 175:23
  177:13 181:24
  181:25 183:3,3
  187:4 188:5
  191:13
**counter**  31:3
  190:13
**counterparties**
  175:9 191:22
  192:9
**country**  155:17
  195:21
**couple**  18:7 20:2
  34:13 50:6 66:4
  120:17 151:19
  163:18,24
  165:24 173:10
  183:11
**course**  4:6,12
  16:15 18:16
  35:9 45:6 50:20
  53:18 60:16
  63:4,7 67:2,7
  69:6 71:25
  73:11 74:7 78:3
  78:21 86:17,18
  86:22,25 87:24

100:20 103:20
108:20 114:10
117:7 133:7
134:14,20 135:2
136:6 139:24
142:9 144:7
146:11 149:16
158:4 175:2
181:9
**court**  1:1,12
  14:7,10,12,17
  14:18 15:3,4
  17:12 18:2,9
  19:11,13 21:12
  21:17 23:7 24:6
  25:6 27:20,22
  29:9,19,20 32:7
  32:9,13,23 33:5
  36:13 37:10,17
  37:21 38:1,6
  41:4,6,11,11,15
  44:12,18 45:2,8
  45:11,16 46:4
  46:12 47:25
  48:5,13,20,22
  49:4,20,24 50:3
  50:9,13,22 51:6
  51:9 52:2,3 53:5
  53:8,14,22 54:3
  54:16 55:9,22
  56:1 57:15,25
  59:10 60:4,24
  61:1,13 62:12
  63:2 64:18 65:1
  65:5,12 66:1,9
  66:15,22 67:5,9
  67:18 68:14
  69:10 70:15
  71:2,9 72:13,16
  73:6,15 74:9,22

75:6,15,17,25
76:8,12,14,22
76:24 77:6,13
77:15,20 80:3,9
90:20 91:2,7,19
92:1,13,22 93:5
93:13 94:14,23
95:6,13 96:5,16
97:4,15,21 98:4
98:17 99:7,16
99:19 100:10,12
101:1,8 102:14
103:3 104:6,23
105:4 106:8
107:11,15
108:11 110:9,12
110:23 111:2,4
111:7 112:1,20
112:23 113:5,8
113:22 114:21
114:23 117:20
118:2 120:8,20
121:6 122:22
124:17,19 125:6
125:15 127:13
127:15 129:7,21
130:22 131:15
131:17,21 133:4
134:11,16,23
135:13 136:16
137:5,11,25
138:4 139:1,6
139:10,25 140:3
140:17,20 141:9
141:24 142:13
143:12 145:20
146:5 147:2,8
147:12,15,21,24
148:2 151:15
152:15 153:13

154:7 156:3,9
156:14 157:21
158:6 159:2,4,6
159:22 160:7,11
160:19 161:11
161:15,22 162:7
162:11,23 164:4
164:7,19,22
165:20,25
166:11 167:1,3
167:10,20,22,23
167:24 168:7,7
168:12,12,17,24
169:3,7,12,20
170:10 171:3,7
173:2,10,21
174:9 175:22
177:15 178:21
178:22,25 180:1
180:4 182:9
185:19 188:1
190:2 191:18
192:12,20,25
193:6,15,23
194:15
**court's**  14:6
**courtcall**  166:9
**courtroom**
  120:12
**courts**  87:2
**court's**  77:10
**cover**  17:12
  25:21 86:2,5
  101:17
**coverage**  2:4
**craig**  11:17
**created**  30:14
**creates**  101:18
**cred**  33:16,18

**credit** 138:24
**credited** 73:1
**crediting** 72:21
**creditor** 8:2,7
9:9 18:3 26:21
33:20 42:3
43:13,17,25
57:2,3,12,13
58:1,9 99:23
115:10 117:22
117:23 121:7,16
121:18,19
122:25 123:24
128:11 132:18
132:24 141:17
180:25 184:5,6
185:1,23,24
192:22
**creditor's** 36:1
43:10
**creditors** 7:3,11
26:18 30:1
35:12 36:14,23
38:11 39:16
41:22 42:5,13
43:10 55:11
60:6 64:9 89:25
90:9 115:7
121:14 132:1,2
132:8,16 141:23
144:8 159:6,13
159:18 161:10
161:14,18
166:20 171:23
172:2 174:20
176:7,13 178:10
178:10,14,17,17
179:18 180:6,7
180:12,17
181:22 182:2

184:3,10,10,14
185:14 190:5
**credits** 85:5
**critical** 55:4,7
148:13
**cromwell** 6:14
**cross** 41:8 90:11
126:9 131:13
132:23 162:21
162:25
**crosswise**
166:24
**crypto** 15:15
16:13,25 17:24
24:16 30:11,22
30:23 33:13,18
35:12,15 36:25
37:3 38:22
39:20,24 47:15
47:15 56:21
103:14 108:19
109:22 113:1
138:10,18
148:12 155:5
171:20 181:3
183:7 186:9,12
186:13 188:4,6
188:25 189:1,2
189:2,3,7,10
**cryptocurrenci...**
43:9 154:15,16
154:17 155:25
**cryptocurrency**
4:10,13 19:5
24:3 42:21 43:2
43:7,22,24 56:6
56:14 57:4,13
58:4,9,14 59:7
60:5 78:1,4
81:13,21,22,25

82:2,5,10 84:8
85:10 90:6
92:14 102:5
103:4,6,13
111:15,23
112:12,14
113:11 118:6
129:2 130:12,13
133:8,14,18,23
134:4 135:3,7
136:2 146:13,15
148:14,17,20,21
148:23,24 149:1
149:2,4,13,15
149:19 151:1,3
151:20 152:16
160:12,21 161:3
176:25 179:24
193:11,20 194:5
194:7
**cuban** 39:3
**cure** 191:21
192:1,11
**curious** 158:9
192:22
**currency** 58:9
158:13
**current** 133:23
158:1 164:8,13
178:22 185:7
**currently** 32:6
37:1 54:7 56:17
61:25 103:9
104:8 114:7
120:24 122:24
124:11,22 135:4
138:5 150:3
153:24 154:5
194:6

**custodial** 79:7
109:13
**custodian** 82:3
**custodians**
81:23
**custody** 82:3
**customer** 4:10
4:12 15:14,21
16:22 18:3 21:9
22:1,22 25:25
30:9,19 35:7
41:2 43:2,23
58:3 60:4 77:25
78:1,4,24 79:9
79:12,16,19,20
79:21,22,23
80:13,14,15,24
80:24 81:6,12
81:15,24 82:21
83:9,13,15,24
84:3,5,8,17,21
85:1,24 87:20
88:2,7,19,23,23
90:7,19 91:25
92:11,14,16
93:24 94:7,8
95:3,6,7,12 96:5
96:6,6,13,14,17
96:22 97:2,6,7
98:23 100:21,21
101:10,17 102:1
105:7,8 106:1,3
106:3 107:25
110:14 115:21
115:22,23,23
116:1,12 119:17
119:22 120:7,15
120:17 127:12
130:21 133:8,12
133:13,15,15,25

134:4 135:2
136:1,10 138:22
139:16 140:7
144:17,18
149:17,18,19
158:10 178:17

**customer's**
130:11 138:12
138:16,24

**customers**  15:15
15:21 17:1 18:1
19:23,24 20:9
21:4,13,24 22:6
22:10,24 23:7
24:1,19,23 25:7
25:23 26:6 27:7
28:6,15 29:16
29:18 30:13,15
30:22 31:1,20
32:1,5 33:23
34:2,9,21 35:8
35:12,16 37:6
37:18 38:10
39:15 40:12
41:16 42:5,8
44:5 49:6,12
54:25 55:11,24
58:22 59:4,7,14
59:15,22 78:19
78:20,25 79:5
79:10,15 81:1,3
82:9 83:19,23
84:12,13 85:10
85:13 87:18
88:3,10,14
89:23 93:23
94:19,20,24
95:5 96:10,11
96:15 98:25
99:3 102:9,17

102:24 103:5,15
104:9 105:25,25
106:6,6 107:20
107:21 108:3,6
108:9,14,20
109:6,10 111:24
112:17,19
113:19 116:8
121:23 134:2
136:14 139:20
139:21 140:1,11
140:14 142:2,5
144:20,23,25
154:22 158:14
158:18,21 159:1
159:15,16,18
161:5,6 175:14
176:6 193:18
194:12

**customers'**  59:3
83:17

**customer's**
79:24 80:16
82:11,17 83:1
85:4,5 88:21
100:8

**cut**  36:20 40:16
60:11 166:8
167:4,5,5,6,11
167:16

**cuts**  167:20
188:6

**cutting**  40:15,16
55:16

**d**

**d**  14:1 149:19
**dadson**  8:6
193:7,7,17

**dagnoli**  8:1
10:14 37:16,18
37:25 38:3,8
41:5,10,12,14
44:16 53:9,9,15
53:21,24 55:10
55:20 58:2
158:8,8,16
159:3,20

**daily**  19:6 83:7
83:18 84:15
88:16 92:4 93:3
94:18 100:20

**dallas**  7:13 39:4

**damages**  127:7
130:15

**dan**  10:9

**dangerous**
130:8,20

**daniel**  13:16

**darren**  7:7
32:21,25 54:22
70:4 72:18
104:15 108:16
140:24 142:18
153:15 166:3
167:12 175:20
180:18

**dashboard**
137:18 168:4

**date**  2:15,23 5:8
17:2 20:13
21:19 34:6,7
46:4,7,22 53:16
53:19 58:3 68:6
85:7 87:14,20
88:11 89:15,22
103:15 119:22
126:4 129:4
135:6,9,17,20

135:23 136:12
142:4 169:1,23
174:7,10 176:20
191:4,16 195:25

**dates**  4:17,22
37:4 164:22
165:1,3,6,7,11
165:12,13,14,15
165:16,19
166:12,13,15,18
166:25 169:4,8
175:19 183:21
184:22 190:3

**david**  11:13
12:16

**day**  14:21 16:18
17:6 19:4,19
20:21 49:9 54:7
57:23,23 76:14
83:12,15,16
84:24 89:3
91:20,20,23,25
93:5,10 106:10
106:10,10
133:21 140:7
145:4 150:5,5,6
163:6 170:4
171:9 178:9
179:4,11,11
180:2 182:5
187:18 191:16

**days**  14:21
20:15 89:22
103:7,15 144:21
150:17,18,25
151:8 170:18,23
171:10 179:2

**de**  52:12

**deadline**  170:2
174:10 178:23

179:3,3,4,7
182:18 183:12
183:15 187:14
187:23 191:9,13
191:14
**deadlines**  4:17
4:18 169:25
170:8 182:15
**deal**  19:23 28:25
28:25 29:16
44:1 102:6
105:6 108:12
112:24 179:25
**dealing**  27:6
73:18 75:20
102:19
**dealings**  66:10
**deals**  170:15
**dealt**  132:18
177:25
**debate**  28:18
**debit**  86:7
**debited**  85:6
**debits**  86:11
**debt**  71:3,12
**debtor**  1:9 6:4
28:3,9 31:25
32:10 41:20
42:23 43:3
46:16,16 52:13
74:25 84:20
87:2 91:5,15,20
92:16,17 104:12
104:21 105:5
114:25 120:25
122:5 127:1,2
127:20,22 131:4
156:9 178:3,12
178:16 181:8,10
181:18,20

183:21 187:2,11
**debtor's**  28:2
32:6 35:11,19
35:23 43:6
134:2
**debtors**  2:1,10
2:10,23 3:3,13
4:8,18 28:20
29:17 31:10,12
31:14,20 33:10
35:2,6 36:6,11
36:18 44:23
45:10 46:15,19
46:19,22 48:10
50:11 51:17,18
54:3,6,7 57:19
58:2,5,8 59:19
60:13,14 61:10
65:19 68:4,21
70:6 73:24
75:22 76:11,13
76:15,21 77:5,7
77:13,23,25
78:8,17 79:2
81:1,21 82:18
82:22 83:3,12
83:18,21,23
84:4,7,14,16
85:8,11,14,18
85:19,22 86:1,7
86:15,20,25
87:5,9,16,17
88:1,3,13 89:17
89:21 90:1,4,5
90:12 91:10,10
91:12,22 92:3,8
92:10 103:5,6,8
104:3 105:11
108:23 109:2,8
109:9 111:14,18

111:24 112:12
116:6,7 117:1
121:23 123:25
124:4,7 126:17
127:19 133:5,11
133:14,14,17,19
133:22 134:3,25
136:1,4,6,8,9,12
138:20 140:25
141:2 146:10,12
149:3,12,14,15
149:18,22 150:3
150:9,19,24
151:9 152:10
153:9,23 154:1
154:24 156:11
156:12,14,21,24
157:10 158:24
162:14 165:4
169:16 170:16
170:17,19,25
176:15 177:5,13
178:6 179:16
181:24 184:17
187:4 193:2
194:4,6,7
**debtors'**  45:15
45:25 46:24
47:4,19,20
50:18 55:7 58:4
58:13 63:7
70:10 77:24
78:18,19 81:7
81:13,17,18,25
82:1,2,6,12 83:4
83:20 84:6
86:14,23 87:12
87:21,22 88:2
88:16 89:13
103:3,8,24

**debtor's**  85:10
**debts**  178:16
**december**  38:24
**decent**  179:23
**decentralized**
155:3
**decided**  90:1
103:22
**decision**  28:23
88:16,17,19
89:22 114:15
**decisions**  154:4
**declaration**  65:9
65:11,13 68:3
78:7 149:22
**declarations**
3:10 67:14,17
67:19,21 75:3,5
75:7,9 162:19
162:24 163:1,1
163:2
**declaratory**
115:4
**declined**  24:12
85:16
**decrease**  59:5
**deem**  136:4
**deemed**  14:6
121:13
**deems**  88:22
**deeply**  35:16
**default**  87:10
**defending**  63:25
**defenses**  103:18
**defer**  71:25
74:13
**deficiency**  36:24
87:8 145:25
**deficit**  84:21
101:2,13,15

139:14,17
140:18 141:1
142:1,4,7
**defined**  69:16
**definitely**  96:21
126:4
**definition**  97:7
107:7 109:12
154:24
**definitions**
97:18,19
**definitive**
158:24
**defraud**  152:11
**defrauded**  40:11
40:12 41:25
42:6 121:2,17
**delay**  168:20
177:20
**delays**  89:1
**delegate**  171:4
**delegating**  155:5
**delivers**  81:20
**delivery**  142:24
**demean**  121:8
**democracy**  9:10
**demonstrate**
87:2
**denied**  24:17
**denise**  12:23
**denmark**  54:8
**deny**  132:24
**denying**  130:2
**department**
7:17 64:2
**depending**  73:4
**deposit**  25:8,13
25:20,23 26:9
42:7 79:23 80:1
80:15,18 83:21

88:24 109:14
138:9,12,15
172:21,22,24
**deposited**  43:12
79:24 80:16
83:1 136:2
**depositing**  58:23
149:9
**depositor**  56:6
57:4
**depositories**
47:3
**depository**
46:25 98:1
**deposits**  25:15
82:5 135:3
138:7,11
**depreciation**
133:23
**dermont**  11:23
162:19,21 163:2
175:6
**dermont's**
185:16
**desai**  12:14
**describe**  123:5
**described**  91:12
128:11 149:21
155:4
**describes**  95:17
**describing**  91:4
127:23 131:10
**descriptions**
32:15
**deserve**  37:6
**deserved**  27:7
**design**  108:25
**designate**  171:7
**designated**
86:10,12,13

98:19
**designed**  17:16
21:14
**destroy**  177:20
**destroying**
59:25
**detail**  25:22
31:22 72:24
108:24
**details**  34:18
**determination**
64:22
**determine**  104:3
122:24 138:11
138:19 152:3
**determined**  5:8
35:14 42:16
88:13 89:1
120:21
**determining**
140:16
**detriment**  90:9
**detrimental**
55:5
**devastating**
160:3
**develop**  163:11
174:24
**developed**  163:9
**development**
53:5
**dial**  80:5
**dialed**  168:16,18
**dibattista**  10:15
**didn't**  61:1
66:16 67:5 97:6
97:18 104:6
**dietderich**  6:19
19:10 20:1
27:17,17,21

29:6,8 168:14
168:14 177:3
185:17,17,20
**difference**  31:11
31:18,19,25
32:2 43:7
143:19,21,22
182:12
**different**  15:19
24:14 29:17
74:2 80:6 89:24
90:20 96:1
101:4 109:23
113:14,16 118:6
128:23 151:19
155:1,17 167:16
172:15 174:2
192:2
**differently**
127:11,24
**difficult**  33:21
89:21 117:19
160:1 179:24
**dig**  164:18
**digest**  187:24
**digital**  1:7 2:19
24:13 56:18,24
59:4 74:25
111:9 114:4
**diligently**  27:10
**direct**  49:11
98:25 107:19
176:17
**direction**  158:24
**directly**  30:13
42:8 60:7 94:19
95:8 113:19
119:24 155:2
159:16

directors  57:9
disable  135:25
disagree  18:21
  180:9
disagreement
  28:18 106:11
disagreements
  18:19
disclosed  54:6
disclosure  4:19
  27:11 165:3,5,8
  165:12 166:14
  166:16 169:2,3
  169:8 171:24
disconnected
  61:9
discovery  131:6
discretion  88:22
  89:2 91:18
  169:17 170:17
  173:16
discuss  28:13
  72:12 73:6
  90:24 171:2
discussed  16:8
  22:7 63:22 98:8
  111:16 169:21
  169:24
discussing  67:1
  69:11 74:7
discussion  20:25
  22:10 90:22,23
  185:11
discussions
  18:14 32:16
  45:20 73:23
dismantle  55:18
dispute  116:10
  131:9

disputed  131:4
disputes  116:11
disputing  49:10
distinct  63:24
distinction
  186:2
distribute  22:13
  158:14 161:4
  176:13
distributed
  35:12 54:2
  108:20 132:7
  159:9,9
distributing
  36:25
distribution
  35:17 41:21
  117:14 136:14
  158:21 161:10
  176:7
distributions
  16:9 112:13
  175:14 176:5
district  1:2
  183:20
divided  121:14
diving  15:1
doable  27:5
docket  18:11
  21:19 34:7
  45:18 48:19
  50:17 51:3,7,16
  51:20,24 52:2
  60:13,18,20,25
  61:17,18 62:7
  63:5 64:11 65:8
  65:17,21 67:13
  68:2 75:3 76:13
  76:15,16 77:6,7
  77:8 78:5,6,9,14

78:23,25 129:1
  162:13,16
  163:18 164:10
dockets  78:13
  162:20
doctrine  143:6
document  4:25
  95:17
documentation
  27:11 114:13
documents  5:6
  36:8 62:17,21
  105:21 175:5
dodd  12:8
doesn't  28:9
  42:23 49:11
doing  14:16
  17:22 24:11
  25:3 39:3 66:25
  75:20 92:3
  94:20 121:2
  130:19 132:19
  139:1 152:10
  155:12 161:13
  168:3 175:14
  189:14
dollar  21:4 89:5
  133:9 143:20
  189:10 193:10
  193:21
dollarize  17:1
dollarizing
  22:25
dollars  18:7
  30:2 47:6 56:12
  79:23 80:15
  113:3
don't  48:23
  49:20 50:7
  52:13 53:12

56:25 57:18
  59:2,15 66:18
  69:11 71:19
  72:23 73:6 74:4
  74:18 95:19,24
  96:1,1,9,11 97:9
  97:10 98:3
  101:14,19
  103:22
dotson  55:23,23
  56:2 57:18
  58:17
double  153:5
doubt  175:18
douglas  11:21
  167:17
downtime
  152:23 153:2
drafted  105:12
drafting  106:25
drag  17:9
drive  8:3 27:1
  176:4
drop  168:13
dropped  166:9
  168:4,5,6,15
drops  161:20
  192:16 193:1
ducks  48:11
due  50:23 84:22
  152:22
dunn  12:15
duplication
  63:23
dupree  10:7
duress  120:6
duties  106:23
dying  80:4

| e | effectuating | emotional 130:5 | engaging 152:9 |
|---|---|---|---|

**e** 1:21,21,22 6:1
6:1 14:1,1 34:14
195:1
**earlier** 20:24
60:11 64:8
105:23 141:4,14
144:19 169:24
180:15
**earliest** 31:17
**early** 25:12
70:20,21 72:7
141:19
**earmarked**
86:14
**earn** 17:9 52:23
53:1 149:7
**earned** 53:16
149:23 158:11
**earning** 33:18
**earnings** 39:1
**earns** 149:11
**easier** 45:3 62:8
144:23
**east** 8:4
**eastern** 83:11
**echo** 104:5
**ecosystem**
148:12
**ecro** 1:25 147:5
147:15,19
**effect** 49:17
115:4 171:10
**effective** 2:10,15
2:19,23 5:11
**effectively**
102:13 154:4
**effectuates**
88:24

**effectuating**
91:16
**efficient** 62:8,18
**effort** 163:16
**efforts** 15:25
174:12
**ehrlich** 11:24
23:10,14,20
24:1,3 38:24
40:17 149:21
**ehrlich's** 23:4
**eight** 150:3
**either** 35:22
55:13 81:8
89:17 95:25
104:21 115:11
153:24
**elements** 156:18
**eligible** 24:9
**elizabeth** 13:7
**elle** 10:25
**ellis** 2:8,9 6:3
14:15 44:23
45:10 50:11
61:10 67:11,21
76:11 77:22
120:1 123:4
124:4 162:9
194:4
**else's** 100:6
**email** 34:11,12
34:13,17
**emanuel** 2:18
35:20 74:25
75:14,18 76:2
**emerald** 172:18
173:8
**emerging** 25:2
**emery** 7:1,9
15:18 32:25

**emotional** 130:5
**employ** 2:8,13
5:10 54:9 67:11
**employee** 3:4,5
51:18 52:4
59:10
**employees** 24:2
24:4 52:21,22
54:13,17 55:3,4
55:17 57:17,21
59:15 93:7
**employment**
2:17,21 23:13
64:5
**encourage** 60:6
**encouraged**
18:17
**endeavor** 14:19
**ended** 100:4
145:5
**endorse** 131:23
**endorsement**
169:7
**ends** 31:13
186:4
**enforce** 104:24
**enforced** 101:5
**enforcement**
104:10
**enforcing**
143:14
**engage** 46:15
114:6 135:1
136:6 140:12
156:15
**engaged** 84:14
112:14 188:13
**engagement**
20:15 68:11,16

**engaging** 152:9
**english** 125:3
129:6
**ensure** 36:2
54:10 82:20
83:8,16 100:8
100:24 136:10
148:17
**ensuring** 85:19
107:23
**entailed** 106:20
**enter** 51:7 52:2
60:24 76:22
77:2,13,16
110:4 171:12
**entered** 4:25
30:6 51:19
60:18 64:17
65:17 76:14
77:6 156:21
163:2
**enters** 35:10
**entertain** 14:10
**entice** 112:3
**entirely** 95:24
**entitle** 99:8
**entitled** 70:2
88:7 131:4
**entity** 9:2 56:12
56:22 57:6
69:20,20 75:2
109:17,25 114:3
116:24,24
117:14 141:12
141:18
**entry** 45:19
47:24 51:17
**epiq** 34:14
**epiqglobal.com.**
34:16

equal   41:21
  131:25
equally   88:11
  121:14 132:7
  180:1
equitable   79:3
  120:2,4 126:11
  130:18,23
equitably
  122:20 123:19
equity   5:7 19:18
  30:2 71:3,6,12
equivalent   47:1
eric   11:9,14
erica   13:10
  50:10 54:5 61:7
essence   139:1
essential   142:11
essentially
  55:10,15 62:20
  72:25 98:22
  101:11 107:17
  124:1 134:19
  143:14
establish   61:15
  79:7 98:12
  105:6
established
  33:24 105:18
  107:5 108:1
  109:14 165:11
  183:21
establishing
  3:21 4:1 105:14
  107:22 164:25
estate   30:20,25
  35:7,15 42:11
  43:9 58:14
  59:18 84:9,14
  103:14 109:4

113:20 115:8
  128:17 132:13
  134:1 152:4
  156:13 158:14
  159:11 160:23
  161:4,15,17,17
  161:18,19
  179:16 194:8
estate's   116:7
estates   71:1
  78:19 150:21
et   161:3 192:2
ether   23:19
  154:15,22
ethereum   16:16
  160:14,23,24,25
  161:1,3
ethos   57:7
european   5:5
  64:5
evaluate   45:25
  105:19
evaluated
  155:23
evaluating
  140:15 182:12
evans   13:14
  153:18 154:7,9
  154:9 156:17
evening   61:18
event   25:16 26:1
  69:14 86:4
  96:18,24 99:3
  100:4 116:11
  139:22 150:8
everybody
  14:12 24:5 41:9
  42:16 43:20
  80:10 115:13,14
  123:5 128:5

130:9 132:5
  160:2 168:17,24
everybody's
  184:25
evidence   65:11
  65:13 67:17,19
  67:22 75:5,7,9
  99:11 118:9
  119:4 123:6
  125:13 126:18
  126:20 162:20
  162:24 163:3
evidentiary
  126:21 131:16
  131:18
eviscerate
  184:18
exact   18:8
  122:13
exactly   17:7
  20:9 22:1 23:2
  70:9 92:18
  93:13 98:10
  126:4 156:6
  187:24 193:16
examination
  162:22
examine   162:25
example   25:18
  42:21 69:19
  126:23 156:18
  159:11 170:1
  184:2
excess   47:1
exchange   19:5
  24:3 81:19,20
  82:4,4 123:14
  149:6,11 172:4
  179:25

exchanges   4:11
  78:3 133:10
excuse   73:13,13
  76:16,24 189:5
execute   148:18
executed   89:4
executes   81:12
  81:24 133:13
executive   78:8
exhibit   127:3
exist   26:24
  105:20
existence   26:9
existing   3:16
exists   86:10
expect   17:18
  19:11 35:1,25
  36:17 37:5
  38:25 40:3,6
  66:6 176:23
  194:13
expectation
  80:25 98:21
expeditated
  188:13
expedited   19:22
  175:11
expense   3:18
  22:23 170:20
expenses   3:5 4:2
  61:16 68:4
  85:22
expensive
  176:11
experience
  17:22 33:14
  37:3 155:12
  183:6
experienced
  40:10

experiencing
    167:10
explain   36:13
    58:15 69:25
    107:12,15
    123:10 129:10
    138:7 159:2
    163:25
explained   26:10
    58:1,3 113:2
explaining
    44:17 55:20
    159:21
explains   44:10
    44:13
explanation
    44:9,13
explicitly
    105:21 106:2,5
    115:22 149:18
exploring   16:8
    70:24 72:2
exposed   193:13
    193:19
exposure   155:24
expressed
    141:13 182:23
expressly   21:7
    47:12,17
extend   191:10
extended   178:5
extension   46:22
    178:7 179:20
    187:22
extensive   108:22
extent   18:24
    20:3 26:9,12
    28:8 35:6 36:11
    59:14 69:6 88:7
    94:5 96:12

103:14 104:2
108:14 122:6
124:21 125:16
128:3 131:3
132:22 134:19
139:13 142:16
143:18,20
151:25 152:8,10
180:4 190:5
191:22 192:7
extra   178:7
extract   30:24
extreme   128:9
    152:14
extremely   32:15
    122:17
eyes   189:14

                f

f   1:21 195:1
face   55:16,17
facilitate   148:14
facility   30:6,13
    30:17
facing   33:22
fact   23:14 24:11
    24:14 38:23
    42:14,24 107:8
    110:21 114:22
    120:5 126:13
    127:6 128:10,10
    129:10 132:12
    137:1 166:4
    177:1 188:13
factor   38:23
    188:7
factors   175:16
facts   23:7 88:13
    120:15,16 122:2
    122:16

factual   118:9
    131:5,8
failing   154:19
    180:23
fails   25:20
failure   25:17
    26:2,2 30:1 87:9
    96:18,24 99:5
fair   36:2 121:12
    121:13 179:15
    182:7
fairly   120:7
fallen   100:16
falls   126:4
false   17:10
familiar   19:11
family   24:2,4
    38:15,17 160:3
fang   13:2
far   33:10 43:6
    73:23 95:15
    142:21
farcical   119:13
fashion   14:5
fast   17:21 36:17
    127:8 184:7
faster   17:25
    174:21 184:12
favor   117:11
    140:21
fbo   4:9 45:3
    48:25 49:6,18
    78:22 79:6,7,8,9
    79:11,13,14,15
    79:17,20 85:17
    85:21 86:12
    88:4,6 89:16
    90:13,23,25
    91:24 92:15
    97:4,21 98:5,10

98:19 99:5,21
100:2,18 101:2
102:17 103:9,17
104:8 107:3,4
107:16 108:15
108:24 109:3,13
109:21 110:8,9
110:13,16,21
111:25 113:10
113:16,18
115:24 116:2,4
119:1 121:21
128:16 139:13
139:16 141:14
fdic   22:9 25:9,12
    25:14,25 26:11
    39:10 96:17
    98:16 99:5
    107:6,7 108:4
    109:12
february   23:5
    23:15
federal   25:8
    47:10,14 80:1
    80:18 171:20
federally   25:15
    25:19
fee   61:24 69:13
    69:23,24 70:11
    70:12,12,14,16
    71:7,23 72:20
    73:2,2,25 74:3,3
    170:20
feel   21:22 34:21
    40:5,6,11,22
    42:15 53:25
    57:8 59:2
    115:15 122:1
    128:12,20 132:9
    180:16

**feeling** 27:23
128:8
**feels** 43:20
173:12,13
**fees** 2:3 3:2 17:9
60:15 66:6,7
69:21,21 70:3
70:13,13 71:14
71:15 72:22
73:1 74:12
151:4,6
**fell** 189:12
**felony** 140:12
**felt** 59:1 115:11
**fiduciary** 106:20
118:14 119:15
119:16
**fight** 19:25
**figure** 18:8
24:22 92:10
180:2
**figured** 177:19
177:23
**figures** 58:19
**file** 34:18 51:10
61:17 90:2
99:10,12,12
158:17 166:14
166:16 171:17
175:5 178:25
179:2 182:9
190:4
**filed** 4:14,20
16:3,23 19:20
21:19 30:18
33:16 41:17
45:17 48:15,18
48:20 50:17,25
51:2,16,22,23
60:13,20,20

61:17 62:5 63:4
64:11 65:8,20
65:23 67:13,24
70:7 75:2,11
76:13,15,20
77:5,7,12 78:5,6
78:12,14,23,25
110:17 125:23
151:11 162:14
162:20 163:6
164:2,12,14
165:5 172:3
175:6 178:5
184:22
**filing** 34:6 50:23
50:24 52:13
53:11,11 68:8
84:16 141:16
159:5 178:23
190:3
**filings** 154:25
183:22
**fill** 123:20 141:6
143:3
**filled** 89:12
123:6,9,18
124:15,22 125:1
125:2,4,11,17
125:24,25 126:3
126:3 128:1
129:2,3,4,5
135:6,8,9,17
**final** 2:1 3:1,3,8
3:13,21 28:23
46:2 50:18
51:17 52:1
60:14 62:3
74:11 76:12,16
76:22 77:2,4,9
77:14 170:2

**finalized** 74:13
**finalizing** 68:21
**finally** 24:24
26:14 27:1
182:4 187:13
**finance** 155:3
**financial** 2:14
5:11 64:3 73:19
176:17 187:1
**financing** 71:3
71:12,12,15,20
71:21 99:11,12
**find** 95:23 97:18
116:5
**finding** 47:9,14
171:19
**fine** 15:4 51:12
68:17 76:3 77:1
77:16 141:5
147:20 169:10
172:1 177:13
**finger** 186:1
**finish** 100:12
**finished** 100:13
139:4 177:13
**finishing** 139:2
**finra** 24:12,12
24:17
**firm** 19:8 56:4
113:25 114:1,1
114:13 123:11
**firms** 63:21
**first** 14:21 16:18
17:6,6 19:4 23:8
25:2 28:21
29:21 34:5,20
35:6 40:13
44:24 49:9,16
54:7 56:3 58:3
63:19 66:6,8

76:14 84:24
90:24 99:22
121:4 131:18
163:6 164:20
165:3 170:13
172:6,13 180:5
180:13 183:12
186:22 189:3
**fiscally** 40:10,23
**fish** 188:19,21
**five** 26:17 40:1
52:19 106:1
147:8,19,21
168:2,19
**fixed** 148:23
**fl** 8:9
**flexibility**
156:22
**flexible** 59:5
**flip** 189:11,11
**flipping** 22:21
**floor** 8:13
**flow** 46:21
**flowed** 81:4
**flows** 91:4
**fluctuate** 189:7
**focus** 20:8,25
**focused** 26:21
136:8
**foertsch** 9:18
**folding** 40:4
**folks** 34:13
166:21 180:1
185:4
**follow** 183:25
**followed** 94:17
**following** 88:15
181:6
**food** 19:25

foot 184:24
force 21:9
  129:15,16
forced 111:19
  112:9,22
foregoing 195:3
forever 42:18
forge 146:18
form 77:2 113:4
  149:7 162:15
  163:14 172:16
  181:3,4
formal 61:19
  63:8 65:23
  67:23 75:10
  76:20 77:11
  115:1
formalize 17:14
formally 95:15
formed 15:9,10
  22:2
forms 3:16
  172:15
forth 20:1 27:3
  70:23 154:25
  185:16
fortune 189:23
forward 27:13
  150:10 152:5
  155:21 193:22
  194:11,17
found 181:12
founded 19:9
four 16:15 62:21
  150:4 165:6
  168:7
fourth 36:17
france 54:9
frankel 13:12

frankly 95:24
  106:17 128:21
  166:20
fraud 39:18
  44:11,15 85:24
  152:20
fraudulent
  39:15 49:14
  136:4 140:13
  152:9,19
freeze 83:7
  119:25 126:4
  129:4 135:6,9
  135:17
french 13:11
fried 19:9 21:2
fried's 20:23
friel 11:9
friend 19:12
friendly 34:12
front 24:18
  26:16 43:4
  58:12 157:19
  158:2 165:9
  171:1
frozen 56:7
  58:20 126:17
  149:14 150:22
  157:11
fruit 109:5
ftc 126:12
fti 15:18 21:22
  176:17
ftx 19:2,3,5,10
  19:14,18,20
  20:1,6,16,16
  21:8 41:1 177:3
ftx's 19:24 20:13
  20:21

fulfill 89:17
  126:22,24 138:4
fulfilling 125:23
  129:1 130:7
  135:6
full 30:1 62:14
  87:19 88:12
  97:23 108:3
fully 35:25
  68:24 185:24
  193:15
function 94:6
  98:1 174:22
functioning 96:4
functions 103:2
fund 30:8 81:16
  84:6 133:17
funded 30:12
  39:17
funding 40:21
funds 58:23
  79:9,12,14,17
  81:7 82:20
  83:21 84:20
  85:4,19 86:2,4
  90:19 91:4,21
  92:9 94:4,9 95:4
  96:12 97:6,7
  98:2,23 99:21
  99:25 100:1,3,6
  100:8,17,22
  101:17 102:1,17
  104:8 105:1,9
  105:15 106:24
  107:25,25
  114:25 116:1,7
  116:7 118:10,13
  118:22 119:2,9
  119:17 138:14
  141:20 144:17

144:18 151:23
further 87:17
  99:10 111:4
  132:25 194:11
future 84:6
  104:22 150:8
  154:1 193:11,11

## g

g 14:1 137:20
gain 114:2
games 20:22
garrett 183:22
gas 184:24
gastelu 10:12
gates 30:15 83:6
  84:18
gavin 11:2
geared 17:18
  27:8
general 43:12
  60:5,9 71:15
  90:23 98:17
  103:5 115:7
  116:5 156:20
  159:12,16,17
  166:7 173:11
  176:25
general's 186:19
generally 34:3
  95:5,15
generate 71:17
  83:12 149:13
  150:20 157:7,10
  157:14 163:7
generated 150:1
  157:9
generating
  134:5 149:24

**generations**
  56:18
**gensler**   24:16
**george**   9:22
**gerardo**   13:3
**getting**   26:20
  28:11 40:17,17
  115:8 167:4,5
  180:16
**gibbs**   7:15 13:15
  33:3,4,5
**ginger**   9:14
  111:8 159:23
  188:18
**giorgio**   9:25
**give**   43:15,15
  55:25 114:11
  129:23 131:11
  147:4,17 154:3
  156:21 178:10
  179:18 181:17
  182:18 187:23
  190:12
**given**   23:12 44:4
  49:5 82:21 94:1
  118:5 132:8
  133:23 139:7
  149:23 151:25
**gives**   132:11
  143:2 149:25
  186:23
**giving**   21:3
  156:4 172:1
  187:13
**glantz**   10:16
**gleamed**   22:4
**glenn**   26:16
**glitch**   148:7
  155:20 156:1,2
  167:7 171:9

**global.com.**
  34:15
**glueckstein**   9:24
**go**   18:9 39:24
  44:20,20 53:13
  92:1 93:24,25
  95:9 100:11,12
  102:21 107:14
  107:15 111:7
  113:2 121:5
  126:24 135:13
  138:1 145:5
  150:10 151:12
  152:4 159:16
  164:19 169:4
  171:11 174:25
  186:17 188:22
  189:2,2,4,11,12
  189:19 193:13
**goal**   36:22
  163:13 181:2
  190:14
**goes**   18:1 22:24
  38:22 88:23
  186:13 193:9,12
**going**   14:19 15:7
  17:7,11,20,21
  20:15 24:5,18
  24:21 37:14
  40:14,20 44:23
  45:13 50:14
  53:25 54:2
  56:17 59:12,24
  66:8 70:14
  73:17,19 79:1
  84:18 94:10
  96:2 97:13 99:4
  108:12 115:6,14
  115:14 116:9
  117:21 118:7

  119:2,21,25
  120:1,4 124:17
  137:9,15,23
  140:15 142:2,3
  143:22 146:25
  147:7 153:17,18
  154:20 155:21
  158:18,22 160:5
  160:16,17 171:3
  172:6,22,23
  173:24 174:1,25
  176:4 177:1,24
  178:8 180:2,14
  181:1,3 182:11
  183:18 184:4
  187:21 188:23
  189:10,13,16
  190:16 192:5,14
  193:22
**golden**   11:25
**good**   14:12
  30:20 32:24
  33:4 45:9,11
  50:3,10 63:2
  76:2,9 77:16,21
  87:3,5 141:9
  151:18 168:2,21
  171:13 190:6,21
  191:7
**gotten**   157:4
  176:14
**govern**   98:5,10
  123:1 163:20
**governed**   95:16
**government**
  24:15
**governs**   95:23
  123:2 170:7
**grace**   12:9

**grad**   19:9
**graff**   9:6 13:1
  113:23,25
  116:20,20 118:1
  141:11,11
  145:11,11
  182:20,20 188:2
  188:2
**grammatical**
  173:4
**grant**   51:6 59:12
  134:24 146:5
  171:8
**granted**   49:16
  49:19 85:14
  88:9
**granting**   2:5 3:2
  3:6,11,17,19,23
  4:3,13,19 5:7
  126:7 132:15
**grayson**   13:17
**great**   39:3 54:15
  118:9
**greater**   172:24
**green**   1:13
**greene**   11:10
**gregg**   13:18
**gronkowski**
  39:3
**grounds**   121:1
**group**   5:10 8:11
  114:8
**guerrero**   12:24
**guess**   38:4 40:4
  48:15 53:12
  92:5 112:25
  141:19 147:4
  173:25
**guidance**   50:22
  68:8 72:1,8

156:22
**guide** 164:15
**guy** 189:22

**h**

**ha** 10:3
**hadn't** 70:8
**hage** 11:6
**half** 56:11
**hall** 34:5,8,10,18
34:20 180:14
**halls** 34:1,20,24
**halt** 57:20
**hand** 37:1 61:5
76:6 148:14,17
**handful** 67:25
**handle** 57:12
156:7
**hands** 24:23
**handy** 164:6
**hang** 80:5
122:22 137:24
**hanging** 109:5
**hanyecz** 16:18
**happen** 28:16
36:9 59:21 91:9
92:20 101:16
102:3,3 103:1
108:21 137:16
139:3,22 151:16
190:21
**happened** 37:7
92:19 121:1
139:2 142:4
155:16 167:13
167:18 191:2
**happening** 
32:17,18 34:3
34:22 141:3

**happens** 28:16
35:13 36:16
41:19 53:16
101:20 132:3
152:22 180:24
**happily** 100:15
**happy** 27:14
59:22 69:7
85:15 90:15
111:14 114:19
164:15 173:7
177:12
**hard** 15:12
38:20
**harder** 104:24
**hardship** 54:15
**harm** 144:7
**harmed** 29:25
**harwood** 7:12
**hasn't** 73:15
**hat** 185:22,23
**hats** 19:14 73:16
**haven't** 51:9
95:17,20
**hazy** 122:17
**heads** 39:7 40:5
**healthy** 40:7
**hear** 16:22 20:6
21:5 27:15 38:4
46:6 50:12
51:11 56:10
74:23 111:4,6
136:22 137:1,1
137:23 153:13
153:21 162:10
175:21 177:11
177:15
**heard** 27:19
34:22 55:22
59:11 70:10

72:17 90:18
108:13 110:13
115:12 120:11
127:16 141:10
156:10 158:7
161:23 165:20
167:24 168:11
177:2 181:24
185:18 188:1,25
192:10,18
193:15
**hearing** 2:1,1,8
2:13,17,21 3:1,1
3:3,8,8,9,13,13
3:21,21 4:1,5,8
4:16,22 5:4,10
14:5,21 19:4
21:3 27:9,9
28:19 31:8 38:9
41:11 44:17
46:2 48:5,6,12
49:9 50:2 56:3
58:11 62:3
65:21 66:8 69:8
73:10,12 84:24
104:5 126:21
131:5,18,18
133:1 136:20
137:6 146:4
163:13 164:11
166:8 167:13,16
167:20 168:19
169:3,9 174:11
175:2 178:9
179:1,8 182:10
182:14 190:5
191:16 193:1,12
**hearings** 4:17
32:13

**heart** 116:15
**heartache** 
153:16,19
**heartbreaking** 
21:20
**heartburn** 
186:24 187:14
**heels** 23:15
**height** 23:22
**held** 4:11 22:11
22:14 23:11
37:7 58:4 78:2
78:17 79:4,15
79:17 81:2,9
82:2,20 84:2,3
84:11,12 89:14
94:4 95:4 99:21
105:9 106:16
110:16,21
120:19,24 122:5
122:24 124:6,7
133:10 145:17
145:18 179:5,12
180:5 190:17
**hello** 136:22,23
**help** 19:17 29:10
29:18 30:19
34:2 154:7
158:10 160:17
163:11,20
**helped** 30:13
**helpful** 81:4
102:15 172:18
**helping** 130:6
**helps** 29:16
149:6 172:20
**hendershott** 
9:15
**herring** 26:4

hesitant  20:5
hey  137:3
hi  98:20
high  23:10
  55:12 189:20
higher  159:19
highest  20:21
  181:10
highlight  68:8
highly  186:9
hill  11:7
hired  119:25
historical  79:1
  82:24
historically  81:4
  82:18 149:15
  153:11 157:25
  158:1
hit  84:10 100:15
  100:17 175:19
hoc  52:11,17
hold  24:2 34:5
  39:25 56:23
  79:3,12 97:6
  98:2 109:25
  110:8,18 115:25
  117:21 118:5
  119:18 133:9
  135:4 138:8
  144:13
holdbacks  61:23
holder  19:19
  79:14 97:22,25
  116:2 121:25
  144:6 160:18
holders  16:9
  146:19 148:9
holding  19:19
  34:1 35:6 39:20
  80:22 96:11

102:8 105:15
106:23 112:12
119:17 124:11
135:21 144:3,17
161:1 194:6
holdings  1:7
  2:19 5:5 15:15
  16:9 43:8,8 89:4
  151:16 157:22
  160:12 183:23
holds  79:9 81:22
  89:1
hole  141:6 143:3
holiday  182:15
  182:25 191:14
hollander  68:9
  164:25 183:23
hollerith  12:16
holohan  9:16
home  27:1
hon  1:22
honeywell  11:1
honor  3:14 4:8
  14:14,25 15:5,8
  15:8 16:5,11
  17:11 18:6,10
  19:1,4 20:8,18
  21:16 22:4,24
  24:7,24 25:5,13
  26:14 27:14,17
  27:18,21 29:8
  29:13,21 30:18
  31:5 32:1,8,21
  32:24 33:4,7,12
  33:21 35:1,10
  35:21 37:2,6,8
  37:13 44:20
  45:1,6,9,12,17
  45:23 46:1,3,5,6
  46:13 47:22

48:2,8,18 49:6,8
49:23,25 50:5
50:10,21 51:4
51:14,19,25
52:5,15,20 54:5
54:22 55:23
58:17 60:2,10
60:17,23 61:4,8
61:11,22 62:8,9
62:24 64:16
65:6,10,24 66:2
66:8,13,20
67:15,23 68:18
69:3,6,9 70:1,4
70:7,22 71:8
72:1,14,18,23
73:11,16 74:17
75:10,13,16,23
76:4,5,10,21
77:3,12,17,18
77:21,23,25
78:10,17,22
79:6,19 80:8,12
80:12,25 81:3,6
83:6 84:3,14,25
86:15 87:14,17
88:1,5,9,12
89:21 90:10,15
90:17 91:1,15
91:22 92:7,8,23
93:11,15 94:10
94:22 95:22
99:13 100:11
101:7,15 102:23
102:23 103:1,12
104:15 105:10
105:11,22 106:9
107:14 108:16
108:18 109:21
110:4,5 111:13

113:23 114:19
116:20 118:1
119:21 120:10
121:5 124:3,12
124:18,25
125:20,21 126:6
126:15,16,23
127:1,4 129:18
130:2,19 131:14
133:2,5,12
134:3,8,13,22
134:25 136:5,9
136:20 137:17
138:2,6 139:5,9
139:15 140:2,6
140:22 141:11
141:13,23,25
142:18 143:10
143:25 144:9,19
145:11,16 146:2
146:3,7,8,9,14
146:22,22
147:11 148:1,8
148:9 149:1,21
150:9,16,19
151:10,11,13,19
152:6,21 153:15
154:9 156:23,24
157:19,24
160:20 162:4,4
162:8,10,12,17
163:4,4,22,25
164:5,16,18,20
164:24 165:9,19
165:22 166:3,6
166:17 167:12
167:14,17
168:15,21
169:13 170:11
170:14 171:1,15

171:22 172:10
173:6 174:18
175:17,20 177:8
177:14 178:24
179:3,10 180:9
180:18 181:14
182:8,19,20,23
183:9,10,16
185:17 186:8,16
187:23 188:2,17
188:18 192:4,19
193:7 194:3,5
194:18
**honor's** 106:12
145:1 170:7,13
175:2 191:17
**honored** 119:23
120:18
**honoring** 86:20
87:7
**honor's** 72:8
98:11
**hope** 14:15
20:14 33:10
38:13 44:8,10
44:12,13 97:16
100:5 118:25
168:24 190:15
**hopeful** 35:10
**hopefully** 22:5
33:20 34:18
48:10 59:21
62:7 99:23
106:10
**hoping** 36:21
98:15
**horse** 171:8
**host** 34:20
**hot** 127:18

**hour** 168:7
**hourly** 68:6
**hours** 38:16
168:2
**house** 81:8
84:23 85:3
**howell** 12:1
**hu** 10:21
**hugh** 13:5
**hurtful** 56:15
**hurts** 178:14
**hyde** 5:25 195:3
195:8
**hypothecate**
58:6
**hypothetical**
184:14

**i**

**idea** 31:24 74:14
143:23 159:12
176:20 178:15
181:20 190:11
**ideas** 29:18
**identified** 26:17
57:3 104:17
154:11,12
188:12
**identify** 188:15
**identifying**
191:21
**idle** 190:20
**ignacio** 12:24
**ignored** 120:2
**ignoring** 130:14
**imagine** 183:17
**immediate**
30:22
**immediately**
30:20 31:24

35:8 44:10,14
52:23 85:7
118:18
**impact** 55:2
114:17 117:13
138:22
**impacted**
103:25
**impair** 171:25
**impaired** 30:3
**impartially** 36:1
**implement**
131:1
**implemented**
31:11
**imply** 49:4
**importance**
56:16
**important** 16:3
16:21 21:17
25:6 54:18
117:7 136:9
148:12 163:10
163:15,24
165:17 166:19
170:14 172:10
175:12 186:2,6
186:15 187:1,8
**importantly**
17:23 37:3
78:10 84:1,16
103:22 109:16
149:1,17 153:25
**impose** 28:23
106:21
**impossible**
18:20,21
**impression** 17:6
**improper** 36:14
85:12 126:14

173:13
**improperly**
173:19
**improves** 20:14
**inactivity** 153:2
**inadequate**
101:17
**inartful** 127:22
**include** 34:17
62:6 68:13
69:17
**included** 47:7
67:2 68:10
103:23 172:19
**includes** 60:21
76:19 77:10
144:4 162:15
**including** 20:4
27:11 29:23
33:2 35:12 36:7
54:25 63:25
83:14 86:17
87:7,24 103:19
108:25 133:7
135:3 151:1
152:12 154:5
169:25 183:22
194:14
**income** 149:13
150:20 157:10
157:14
**incomplete**
135:4 138:8
**inconsistent**
170:6
**inconvenience**
191:10
**incorporate**
51:22 61:20
62:17,19 63:9

incorporated
  50:25 62:11
  68:25
incorporates
  45:21 68:24
  78:15
incorrect  136:3
increase  63:12
  161:8
incredibly  15:11
  15:24 55:2,4
  117:7 183:8
incur  157:15
  170:16,25
incurrence
  170:24
indebtedness
  117:3,7,11
indemnities
  99:9
indemnity  99:20
  143:15,18
indicated  21:10
  22:6,10,15
  47:18
indications
  17:17 22:17
indicative
  165:15
indirect  108:7,7
indiscernible
  55:6 62:22 65:9
  66:18 68:15
  69:9,17,22 71:6
  72:5 95:4
  100:10 101:2
  110:24 113:7
  117:2 121:3
  135:11 136:17
  136:18,19,22,25

137:7 143:22
  147:3 174:13
  177:17
individual  43:10
  93:23 94:24
  95:11 96:10
  109:17 120:15
  160:17
individually
  122:15 144:25
individuals
  52:19 54:8
indulge  80:6
industry  37:3
  98:5,18,21
  109:22 155:1
  182:25
inequitable
  126:14
inexcusable
  126:14
infiltrate  20:11
inform  180:25
informal  36:9
  50:25 51:22
  60:21 61:20
  67:25 75:11
information
  33:25 34:8
  58:21 63:16
  99:3 108:8,10
  110:20 117:1,3
  117:6,8 118:14
  118:15 119:20
  122:16 151:1
  157:1 178:2,18
  179:13 181:17
  181:22,23 182:2
  193:3 194:12

initial  33:23
  64:13 100:14,14
  175:13
initially  50:17
  51:16 153:16
initiating  92:8
input  55:25
insider  52:9,11
  52:16
insiders  35:23
  36:10 52:19
insofar  115:23
  122:23 145:16
insolvency
  120:14
instance  28:21
institutions
  148:20
instruction  91:9
  93:25 94:9
instructions
  91:20 93:21
  94:16,17,20
  95:11
instructs  82:1
  82:13
insurance  2:2,4
  25:8,13 26:9
  43:15 50:16,19
  50:21 51:7,11
  80:1,18 96:23
  97:1,1 98:16
  108:2,4,6
insured  25:15
  25:16,19,25
  39:10 96:17
integral  54:24
intellectual  64:4
intelligent
  130:14

intend  15:22
  19:25 20:10,17
  21:23 134:15
  149:3 169:5
intended  30:7
  97:11 106:22
  107:1 132:1
  171:25
intending  23:2
intent  18:16
  80:25 105:6
  107:16
intention  28:11
  32:12 74:10
  110:2 112:15
interacting  94:7
interaction  25:8
intercompany
  3:17,18 46:15
intercorporate
  117:3,6,10
interest  17:17
  22:17,18 26:25
  79:3 99:11
  109:18 111:20
  112:3,7 113:4
  121:15 126:11
  132:16 149:11
  152:4 170:5
  172:9 173:13
  175:8 178:11,15
  181:1 184:19
interested  22:16
  166:21 170:22
  170:22 176:21
interesting  17:5
interestingly
  23:18 24:10
interests  5:7

interface 98:25
interfere 29:3
interfering
  137:6
interim 4:1
  45:19,24 47:24
  49:16 50:21
  51:20 60:18
  61:14,15,24
  62:2,5,15,22
  64:21 66:7
  76:15,18 77:6
  85:14
internal 35:20
international
  2:9
interpret 130:1
  159:25
interpretation
  129:8
interpreted
  130:1
interrupt 80:4
  104:16 116:21
  120:20 122:10
  124:17 146:23
  165:23
interrupted
  14:9
interruption
  80:7,11 147:22
interruptions
  41:8
intersection
  33:13
interview 20:24
interviews 36:9
invested 39:8
  118:10

investigation
  35:20,22 36:4,7
  75:2
investment 2:14
  68:20 71:16
  73:18 112:8
  151:21 176:15
investor 39:23
  149:10
investors 29:24
  38:11 40:12
involve 46:16
  101:8
involved 85:13
  95:18 162:1
  175:9
involvement
  151:5
involves 146:14
involving 47:15
irrelevant 17:6
irresponsible
  40:23
isn't 91:10 92:1
  98:11 99:23
issue 42:6 52:17
  66:9 70:9 74:8
  84:23 92:17
  98:16 101:16
  103:22 104:13
  104:17,19
  108:12 110:10
  114:14,24 115:4
  140:3 155:10,23
  165:25 169:1,23
  176:10 177:10
  178:2 192:14
issued 25:9
  94:15

issues 17:6
  24:20 33:13,21
  41:16 42:6,14
  42:22 49:21
  72:11 74:12
  131:8 145:15
  176:2 177:19,23
  177:24 186:10
  186:10
item 44:24
  45:14 50:16
  51:14,15 60:2
  60:11,12 61:12
  63:3 67:8,10
  68:18 73:12
  74:23 76:11,12
  77:4,23 162:12
items 50:15
  68:21 69:5
it'd 71:2
it's 44:12 54:22
  55:7 58:18,18
  61:10 62:18
  65:13 67:3,3,7
  68:10 70:1,4,7
  70:14,20,20
  72:3,18,24 73:2
  92:6 96:1 97:12
i'd 48:4 90:21
i'll 48:17 49:25
  50:7 61:2,5
  62:13 63:20
  68:17 76:2 80:5
  80:9
i'm 46:9,11
  48:14,15 50:14
  53:12 56:7 57:1
  57:12 58:10
  59:12 60:7,10
  80:5,10 90:15

93:5,6,15,15
94:1,9,12 96:21
97:9,10,12
98:10 99:13
100:11 104:5
i've 48:16 57:3,5
  71:16

**j**

jared 11:23
  162:19 163:2
jason 10:15
  12:13,18
jean 12:20
jeb 8:16 110:25
  118:7 120:10
  124:12 125:22
jeff 9:19
jeffrey 11:12
jelisavcic 11:11
jena 168:6
jenna 147:18
jeonghoon 10:3
jeremiah 11:22
jeremy 11:7
job 20:8 121:10
  194:8
jobs 40:15
joe 10:11 153:18
  154:6,9 156:7
john 12:8
jordan 10:17
joseph 10:23
  11:8 13:14
josh 67:14
joshua 6:8 14:14
joy 10:21
judge 1:23
  26:16 122:9,19
  147:18 167:2

168:23 169:10
171:13 172:6
174:5 193:24
**judgment** 59:19
115:4
**juewett** 10:22
**july** 2:10,19
5:11 15:10
18:18 25:9
39:18 51:20
60:18 149:22
**jumped** 23:19
**june** 19:17
88:13 89:3,7
119:10 126:16
149:22
**jurisdiction**
178:20
**justice** 7:17
**justification**
130:4
**justified** 87:1
**justifies** 87:3

**k**

**kaj** 18:12,15,17
18:17,22
**kaloudis** 12:23
**kalplan** 11:12
**katherine** 11:20
**katz** 8:18 93:17
**keely** 12:25
**keenly** 28:5
**keep** 30:24
132:2 142:11
148:15 160:15
166:22
**keeping** 25:4
**key** 22:4,5
120:17

**keys** 56:21
**kicked** 50:6
**kids** 39:9
**kind** 42:2 54:6
59:24 60:9 72:9
74:2 92:17
112:17 113:14
116:19 118:23
135:20 138:7,9
138:22 140:9,15
142:10 152:2,9
152:11 153:4,5
156:4 157:14
158:22 159:10
186:10
**kinds** 102:19
**kirkland** 2:8,9
6:3 14:15 44:23
45:10 50:11
57:11 61:9
63:24 67:11,21
68:4,15 76:11
77:22 95:20
114:14 117:3
120:1 123:4
124:4 162:9
194:4
**kirkland's**
67:24 68:5
**kirpalani** 12:2
75:4,9
**knew** 40:13
118:22 119:24
120:1
**know** 14:18 18:3
19:11 21:2,22
28:15 31:24
32:10,17,19
33:24 38:8,10
38:22,24 39:4

39:23,25 40:6,9
40:16,17 41:22
53:2,10 54:1,1
59:4 62:18
64:19 69:11
70:20 71:9,19
72:1,23 92:10
92:23 94:6 96:2
96:11 97:10
98:2 100:23
101:18,18,19
102:5 103:17,24
104:11 105:13
105:17,19,24
106:1,11,17,17
106:24,24
107:24 110:5
112:12,16
114:20 116:22
117:10,18 119:1
122:1 123:23
126:11 129:17
130:4 137:15
139:21 141:3
142:1,2 144:22
145:15 147:13
151:21 152:22
153:9 156:12,14
156:17,19,20
157:2,3,4,10,13
157:18 158:14
158:17 160:1,25
164:7,11 166:11
166:20 167:24
170:4 174:12
175:7,16 176:16
177:16 179:15
180:12,17,21
181:7,11 182:1
184:1,2,3,20

185:5 186:2,6
186:12,13 187:3
187:5,6,10,11
187:12,15,21,25
188:19,23,25
189:1,7,8,15,18
192:4 193:22,23
193:24 194:6,10
194:14
**knowing** 189:10
**knowingly** 26:8
**knowledge** 56:4
57:1,1 93:23
94:8 96:15
99:13 114:22
**known** 109:24
152:7
**knows** 101:15
106:14 181:19
187:4
**kozlowski** 11:13
**kurtzman** 11:14

**l**

**labeled** 57:12
**labs** 18:12
**lack** 178:2
179:13
**lampert** 12:9
**language** 47:8
62:1,4,14 63:13
67:3,4 74:11
75:12 76:19
77:11 106:16,18
107:9 129:8,10
172:17
**large** 114:17
117:13 151:25
**largely** 35:4

larger 117:22
largest 19:18
  38:11 140:11
  184:5,6 185:24
late 48:21
latin 54:9
law 8:11 33:14
  41:20 44:8 56:4
  96:20 97:1
  113:25 119:12
  120:5 122:11
  145:21 160:1,1
lawrence 10:9
laws 47:10,14
  171:20
lawsuit 143:17
lawyer 113:25
  132:21
lawyers 18:1
  37:22 62:18
  94:11 121:10
laying 57:22
layla 12:17
leadership 40:9
leading 89:22
lean 175:19
  183:4
learned 30:3
  33:12
leases 192:5,8
leave 101:11
  106:9 148:22
  153:25
leaving 55:4
  133:17
led 15:18,18
  17:15
ledanski 5:25
  195:3,8

left 139:14
  167:4 168:4
leg 20:7 21:8
legal 17:6 24:21
  41:22 42:25
  63:6,19 64:6
  79:3 131:11
  134:18,21
  195:20
legge 10:18
leisure 119:18
lend 58:5 149:3
lender 19:16
lending 149:2
length 63:22
  167:19
lengths 118:9
lent 30:5
lesser 42:4
leticia 9:17
letter 18:15
  25:10 68:11,16
  69:12 110:17,18
letters 21:18,19
  22:5,15 27:2
  41:17
letting 120:11
let's 45:2 92:13
level 96:23
  114:18,18
  186:11
levitt 8:12 88:5
  88:6 89:3,7,24
  90:3,6,8,10
  110:25 111:2
  118:3,7 120:11
  120:16,24 121:2
  121:25 122:9,22
  123:3 124:13
  125:1,9,22

127:2 128:25
  130:3 132:23
levitt's 108:12
  118:2 120:21
  127:3
levitt's 89:18
  90:11,22
lexington 6:5
liabilities 69:18
  181:21
licenses 64:2
lied 41:25
  113:13 118:20
lies 39:17
life 56:7 118:19
  118:24
likewise 22:12
limbo 42:17
limit 47:2 85:23
  88:16 168:7
limitation 143:9
limitations
  66:18
limited 4:14,20
  98:7 119:9
  125:12 126:8
  176:20
limits 89:1
  108:4,6 140:4
  157:21
line 33:1 92:24
  137:22 162:21
lines 137:18
lipton 8:18
  93:16 144:10
liquidate 4:9
  78:1 90:5
  133:25 134:4
liquidated
  133:22

liquidating
  30:24 133:8
liquidation 17:4
  26:15 36:23
  64:7
liquidity 19:23
  30:22 59:8
  127:9 149:5
lisa 8:1 10:14
  53:9 158:8
list 165:14
listed 23:8,17
  112:7
listening 27:24
lists 164:21
litigation 17:4
  37:5 64:1,1,4
  115:15 155:17
little 9:14 38:17
  45:13 58:16
  69:24 70:20
  110:24 111:6,8
  111:8,19 112:2
  112:21,25 113:6
  113:21 154:7,25
  159:23,23
  160:10,13
  161:12,21
  174:18 179:18
  188:18,18
  189:22,22
live 137:18,22
  169:6
llc 2:13 5:11
  75:1
llp 2:8,9,18 6:3
  6:14 7:1,9
loan 30:4,5,6,12
  30:13 58:25

local 64:3
locations 39:6
lock 151:22
locked 39:19
locking 146:14
locks 59:5
  149:10
lockup 150:4,5,5
  150:6,7,12,14
  150:16,17 151:4
  151:25
logged 34:7
loi 18:19
long 34:21 39:24
  39:25 40:7
  109:23 141:19
  148:3 178:25
  179:20 182:10
  186:9 190:4,8,8
longer 56:14
  58:23 135:25
  176:6,6,10,11
  190:19
longmeadow 8:4
look 39:12 40:7
  40:25,25 49:22
  70:8 71:12 74:1
  78:22 94:10
  100:1 115:14,14
  120:14 122:19
  126:10 130:23
  139:15 175:23
  188:19 194:17
looked 39:22,23
  51:12 76:3 77:1
  77:16
looking 71:3
  96:21 110:7
  115:2 127:21,23
  179:4 182:17

184:16 188:24
  189:15
looks 68:17
  137:20
loose 31:13
loosely 106:18
loranger 12:10
lorraine 46:4
  137:11 167:22
lose 189:19
losing 104:20
loss 64:5 185:15
losses 85:23
lost 21:22 22:7
  59:2
lot 16:12 21:2
  24:8 27:24 28:4
  28:6 33:8,14,19
  41:16,23,24
  42:1 43:17
  153:16 175:8
  176:8,14 181:17
  193:18
lots 14:19
  177:19
low 109:4
  150:19 157:9,12
  157:16
lowest 20:14
lows 40:1
lure 39:15
lysbeth 9:22

**m**

m 31:10
m5m 9:4
ma 8:4
ma'am 41:2
mad 23:23

madison 7:4
mail 178:6
main 190:13
maintain 2:5
  3:15 47:5 57:23
  86:2 87:20
maintained
  22:19 79:25
  80:17 86:8
  104:5
maintains 80:20
maintenance
  57:23
major 20:25
  173:3
maker 81:19,20
  82:4,5
making 32:14
  54:11 90:2 92:4
  102:13 128:9
  174:22
male 135:11
maloney 10:1
man 41:2
  136:19,22,24,25
  137:1,3,7,9,13
  137:15
management
  3:14,22 45:15
  45:19,25 47:9
  48:1 49:2,5,21
  56:11,19 77:4,5
  81:14 82:1,1,13
  85:14 93:2
management's
  30:7
manner 114:16
  183:14 193:19
march 23:5,10
  23:15 25:12

marcus 6:9
  17:12 20:18
  44:22,22 45:6
  70:24 162:6,8,9
  162:12 163:4
  164:5,10,20
  165:22 166:2,17
  168:21 169:10
  169:13 170:11
  171:6,13 173:20
  174:5,17 182:17
  183:10,10 186:1
  188:12 191:15
  192:4 194:18
mark 13:6,12
  39:3
market 23:22
  81:19,20 82:4,5
  133:24
marketing 39:6
  64:6 112:15
  190:24
markets 2:14
  68:20
martin 12:11
masaro 11:15
mason 25:22
master 81:17,18
  82:6,8,19 83:4
  83:21,25 84:2
  86:14 91:24
material 69:17
matt 11:16 12:4
matter 1:5
  14:13 33:23
  43:9,12 91:19
  94:2 113:11
  129:21 130:23
  140:4 145:15
  159:17 173:11

193:10,17
**matters** 15:1
64:4 67:12 68:9
**matthew** 8:12
11:15 12:3
110:25
**mavericks** 39:4
**maximization**
59:17 163:16
**maximize** 20:9
21:15 163:14,21
190:14 194:8
**maximizes**
176:2
**maximizing**
112:18 174:24
179:15
**mc** 4:9 49:10,13
82:19 83:2,4
91:4,9,10 92:5
143:25 145:17
145:19
**mcb** 78:10,11,15
78:23 79:7,8,10
79:13 81:1,9,15
83:12,18,21,24
83:25 84:2,11
84:12,14 85:18
86:14,16,21,24
87:6,10,14,15
87:24 91:15,17
91:22 92:10,21
92:22,24,24
93:7,12,17
96:18 106:2,4
110:17,20
113:10 133:19
139:24 140:23
140:25,25 142:6
143:3

**mcb's** 141:4
**mcbfbo** 92:11
**mcb's** 91:17
**mcclatchy** 77:10
**mcclintock** 12:3
**mcdermott** 7:1
7:9 15:17 21:22
32:25 33:2
154:10
**mcfb** 87:9
**mcfbl** 78:18
**mcfbo** 77:25
79:2,4 81:2,5,14
81:16 82:8,10
82:14 83:4,9,13
83:17,19,22,25
84:3,4,5,7,10,17
84:20,22 85:2,4
85:20 87:19,25
88:8,10 89:19
90:7 92:9
102:25 133:17
133:18
**mckelvey** 11:2
**md** 9:11
**mean** 38:20,25
39:2,5,12,13,14
39:17,19,22
42:3,18,20,23
44:3 97:11,25
98:18 99:22
106:9,16,19
116:21 121:7,8
129:11 143:25
156:10 165:9,22
180:5
**meaning** 68:3
97:5
**meaningful**
178:13 179:9,21

179:22 182:6
184:18
**means** 17:22
25:15 58:7
62:20 113:14,15
116:4 119:16
125:2 129:11
149:12 150:20
154:14 155:7
157:13
**mechanics**
151:3
**mechanism**
35:14
**mechanisms**
116:10
**meda** 75:18,21
**media** 16:12
18:14 26:11,19
**meeting** 21:23
178:8,10 179:6
179:11,22 180:5
180:14,24
183:18 184:23
**megan** 10:1
**member** 24:10
80:1,18 184:10
**members** 15:15
15:25 24:2,4
26:17,22 57:11
104:18
**membership**
24:11,17
**mention** 16:5
18:11 26:15
103:1
**mentioned**
19:13 62:10
116:22 157:8
163:12 185:10

185:21 191:24
**merely** 141:17
186:23
**merging** 160:25
**merit** 36:12
156:10
**message** 167:8
168:10
**metropolitan**
8:19 22:14
25:22,25 26:1,2
26:5 39:11
79:25 80:17
**mew** 1:3
**miami** 8:9
**michael** 1:22
11:19 12:5,15
13:13
**micheli** 11:16
**middle** 172:22
**middleman**
155:8
**middlemen**
155:10,23
**mike** 10:18
168:11
**milestones**
27:12
**millbrook** 8:3
**milligan** 12:17
**million** 16:20
17:23,24,24
18:7 19:7,15,16
22:13 23:11,12
23:12,14,16,20
23:21,23,24
25:18 26:5,24
30:5,11 38:15
39:8 69:13,21
69:21,24 84:22

86:14 88:3
109:5 117:11,12
134:6 139:17
140:19 144:11
149:25 157:9
172:25
**mind**   166:13
**mine**   125:2
189:17
**mineola**   195:23
**minimis**   52:12
**minor**   53:5
**minute**   22:9
123:14 125:14
147:8,21
**minutes**   29:10
137:8 147:14,19
168:19
**misconstrued**
26:13
**misinformation**
16:12
**misleading**
39:14
**misrepresentat...**
26:8
**missed**   38:17
**misunderstood**
127:22
**mit**   19:9
**mitigate**   130:15
**mitigated**   127:6
151:25
**mixed**   18:6
**mode**   83:7
**model**   146:17
148:9
**modifications**
76:18 165:23
169:18,25

**modified**   74:6
165:8
**modify**   2:4
169:17 192:20
**moelis**   2:13
17:15 68:19
72:12 73:7,16
73:24 74:10,18
162:19 163:9
174:23 175:7
176:16
**moment**   27:22
55:25 63:21
70:17 71:14
98:9 101:21,25
106:13 110:10
127:10 140:17
164:17 167:19
168:18
**momentum**
163:7
**money**   22:7,22
30:12,15 38:20
39:5,19,20
40:14,20,24
43:12 83:1
92:15,17 95:7
101:22 111:10
112:4 116:11
119:18 126:25
127:8,8 143:4
144:24 149:10
156:11,16
158:11 160:5,6
160:7,16 181:2
189:18,19,19,20
189:21
**monies**   112:7
**month**   109:6
182:24 188:16

**monthly**   62:7,19
63:12
**months**   23:4
25:12 38:25,25
40:13 179:17,18
185:5
**montreal**   46:25
47:5,21
**morning**   14:12
32:24 33:4 45:9
45:11 50:10
83:19 169:22
179:5
**morrissey**   7:22
13:9 48:2,2,8
52:5,5 63:14,22
66:2,2,23 73:13
73:14 75:16,16
**morrissey's**
67:25 68:22
**motion**   2:1 3:1,3
3:8,13,21 4:1,5
4:8,16,22 5:1,4
14:8 22:13 43:4
44:6,25 45:3,15
46:18 47:8,13
47:23 48:1,24
49:1,18 50:16
50:24 51:7,15
51:21 52:3,8
53:15,18 55:7,7
57:3,16 59:10
59:12 60:12,17
60:19 61:14
62:13 63:4,5
76:13,25 77:6
77:24 78:6,9,13
87:17 88:4,6,9
89:16 90:11,13
90:16,21,22,24

101:4,4 102:16
104:7 108:13
109:4,8 110:6
111:23 112:23
113:17 118:2
121:21 123:8
124:8,14,14,19
125:5,6,8,23
126:9 127:19
129:9,13 131:13
132:23 133:6
134:10 139:11
139:23 140:21
141:10 146:6,9
146:24 147:6
148:6 149:4
151:14 153:16
158:7 160:8
161:23 162:5,6
162:13 163:13
164:14 166:10
179:23,25 182:4
183:22 184:13
191:24
**motion's**   14:10
**motions**   35:9
37:11,22 38:2,4
38:5 50:2 58:12
193:25
**movant**   129:14
**move**   17:25
27:12,16 30:19
44:1 50:7,7
65:10 67:7 75:5
94:9 165:14
166:18 168:4
170:3,4 174:21
175:1,10,13
191:16

**moved** 85:11
91:21 92:15
170:8
**movement**
80:22 91:23
92:9
**movements** 91:8
**moves** 42:17
81:15 167:6
**moving** 15:2
21:16 61:12
92:12 158:25
170:6 174:16
175:3 184:7,12
194:11
**multiple** 17:17
19:14 22:17
70:2,12,13
88:17 109:16
118:20 163:5
**murphy** 12:4
**mute** 136:21
137:6 150:15
**muted** 50:4
**mutually** 63:11

**n**

**n** 6:1 7:12 14:1
195:1
**name** 38:17
41:13 58:4
113:24 145:16
**named** 114:1
**nathaniel** 10:7
**national** 85:3
**native** 146:19
148:10 154:13
155:15 158:13
**nature** 57:25
107:3 136:7

155:4
**nda** 18:17
**near** 21:24
**nearing** 148:4
**necessarily**
24:21 42:4 44:3
88:22 104:19
174:13 177:1
**necessary** 5:2
18:25 27:5
87:20 138:21
163:19
**need** 24:20 28:7
42:13 47:4
49:22 54:9
58:18 64:23
66:18 92:21
106:11 134:11
146:25 174:3
177:16,22 180:2
180:7 182:2
187:6,9
**needed** 34:21
82:25 127:7
182:2
**needs** 20:6 36:2
73:8 101:3
103:22 108:21
147:10 190:13
191:6
**negative** 4:10
55:2 78:2 133:9
133:12,21,25
134:5 145:5
**negisa** 10:4
**negotiated**
64:19 155:21
**negotiating** 16:6
16:24

**network** 146:16
146:20 148:10
149:5 152:11,12
152:25 153:7
**networks**
146:16 152:8
**never** 18:21,22
99:24 112:5
119:3 138:16
153:9
**new** 1:2,14 6:6
6:17 7:5,20 8:14
8:21 18:12 19:1
37:20 40:20
64:2,11 146:18
156:15
**news** 32:13
88:17
**nicholas** 6:12
76:10
**nick** 76:7,8
**nickel** 189:4
**nickerson** 9:23
**night** 48:21 70:7
**nine** 183:23
**nol** 76:12,13
**non** 46:16,19
52:9,11,16,19
76:17 172:25
**nonpayment**
55:1
**normal** 100:20
158:4 192:14
**nose** 55:16
**notation** 116:15
**note** 14:8,20
15:9 46:24
72:20 140:23
**noted** 33:25
84:24 107:21

140:9 151:22
163:13 175:12
183:16
**notice** 3:22 4:24
34:6,17 40:5
63:10 146:12
148:25 150:25
151:9 162:16
170:22 171:10
172:13 173:24
184:14 192:9
**noticed** 90:12
**noticing** 15:6
65:16 66:16
**notification** 3:8
**notifies** 81:14
**notion** 165:4,7
**notwithstanding**
49:17 105:20
**novel** 33:13
**november** 31:16
**number** 45:14
45:18 48:19
50:16,17 51:3,8
51:15,16,20,24
52:2,15 60:12
60:13,18,21,25
61:12,17,18
63:5,16 64:11
65:8,17,21
67:13 68:2 75:3
76:12,13,15,16
77:4,6,7,8,23
78:5,7,9,13,14
78:23,25 109:23
116:22 130:22
150:17 164:22
172:13 173:3
180:20 188:4,8
188:12

numbers   62:7
numerous
  163:12 183:20
ny   1:14 6:6,17
  7:5,20 8:14,21
  195:23

**o**

o   1:21 14:1
  195:1
oberg   10:13
object   52:3
  53:10 146:12
  170:23 171:23
  180:3 181:1
  182:1,5 184:3,4
  185:2 186:21
  187:18 192:1
objecting   54:25
  88:5 164:1
  187:15
objection   4:14
  4:18 20:19 31:7
  48:3,9 51:11
  52:7 53:4,6,22
  53:23,25 57:17
  66:13 68:14
  75:12,24 88:4
  90:13 115:1
  126:8 139:11
  151:10 164:2
  166:4 171:17
  172:3,18,21
  173:9 177:11
  179:3,3,7,9,23
  182:2,15,17
  183:12 184:15
  184:16 185:8
  187:14 191:9,13
  191:14

objections   4:20
  14:11 16:2
  47:23,25 50:24
  51:10,12,21
  60:19 61:2,2,19
  62:2,13 63:8
  64:18 65:12,23
  66:1,3 67:18,24
  75:6,11,15
  76:20,25 77:11
  77:15 134:23
  162:2,23 171:11
  182:13,16
  183:13 187:23
  191:11,19
objectively
  188:9,10
objects   88:6
  151:7 157:18
  170:24 171:1
obligation   99:1
  133:25 142:6
  143:2,16
obligations   2:2
  3:15 36:5 50:19
  53:19 86:3,5,21
  87:7,15 99:9
  103:10 106:21
  144:4
obstacle   104:10
obtained   178:18
obvious   15:9
obviously   73:23
  92:24 103:12
  104:8 112:13,16
  117:12 140:12
  142:9 143:8
  144:2 151:20
  152:9,23 153:7
  153:10 156:24

157:14 163:24
  170:7 171:25
  173:5 184:11
occur   116:18
occurred   14:23
  64:15 91:25
  103:7 142:20
  143:1
occurrence
  153:4
occurring   54:23
  93:3 183:2
occurs   69:15
  85:1 142:4,23
  142:24 176:3
  184:23
ocp   64:17
ocps   63:20,24,24
october   23:8
  27:9
offer   33:19
  171:2 184:8
offering   23:16
  72:4 170:20
offers   71:11
office   63:17 68:5
  69:4 166:7
  167:9 186:19
officer   78:8
  117:1
offices   68:1
official   7:2,10
officially   169:8
offset   99:20
  142:15,16
  143:18 145:21
  150:21
oh   46:10 107:13
  111:7 126:18
  166:2

okay   15:3 18:9
  32:20 37:21,25
  44:11,15,16,18
  45:1,16 46:12
  46:13 48:13
  49:20,24 50:9
  50:12 53:21
  55:22 58:16
  60:1,9 65:1,5
  66:22 67:5,6,7
  69:3 70:15
  72:13 73:10
  75:15 90:25
  93:13 94:12
  96:5 97:4 98:17
  99:7,16 103:3
  104:6 105:4
  106:8 108:11
  110:11 111:4
  112:25 113:6,20
  113:21 117:25
  120:15,16 123:2
  123:3,4,12,21
  123:24 125:4,6
  125:8 126:9,16
  126:24 127:4,7
  127:11,21 129:7
  129:17 130:6
  131:15 132:19
  134:20 136:25
  139:10 140:17
  159:3,20,25
  160:14 161:11
  161:21,22 162:7
  162:10 164:4,10
  164:20 166:2
  168:20 169:12
  169:13 170:10
  171:6 173:10,20
  182:9 185:19

187:22 190:2
191:15 193:5
194:16
**okike** 6:10 22:12
25:21 45:9,10
45:11,12,17
46:6,10,13 48:9
48:14,18,21
49:3,8,23,25
50:5 77:19,21
77:22 80:3,8,12
91:1,6,15,22
92:7,21,23
93:11 102:15,23
103:12 105:10
105:10 111:13
111:13,21
112:11 122:21
123:4 124:3,3
124:24,25
125:15,19 126:1
133:2,5 134:13
134:22,25
135:13,14
136:20 138:1,2
138:6 139:5,9
139:15 140:2,6
140:19 141:8,25
142:19 143:10
143:25 144:10
146:1,2,8 148:1
148:8 151:18
152:21 156:10
156:17,23,23
157:24 158:12
158:17 160:19
160:20 162:4
194:1,3,3
**okike's** 104:16

**old** 19:9 57:1
195:21
**omnibus** 69:8
79:25 80:17
**once** 30:1 34:6
84:10 130:20
178:19
**ones** 57:9 71:17
**ongoing** 158:23
190:18,18
**open** 21:14
68:21 70:19
72:11 102:19
126:3 129:3,5
135:8 179:15
182:7
**opened** 107:18
**opening** 103:2
139:20
**operate** 3:14
87:12 109:23
**operated** 108:24
117:5
**operating** 55:14
81:17,19 82:6,8
82:19 83:4,22
83:25 84:2
86:15 91:24
117:5 133:11
141:1
**operation** 156:6
**operations**
54:10 57:23
148:7
**opinion** 31:11
31:18,19,25
32:2 181:13
**opportunity**
22:3 37:19
146:12 147:5

161:6 178:11,13
179:21,22
180:20 184:18
185:2 192:10
**oppose** 90:10
**opposed** 59:14
132:16
**opposing** 114:8
**opposite** 115:5
180:6
**optimistic** 31:17
**option** 70:25
**options** 23:12,21
23:24 182:12
**order** 4:25 14:6
35:10 41:12
45:18,19,21,24
47:8,13,24
48:15,19 49:1,2
49:17,21 50:22
51:2,5,7,11,12
51:17,20,23
52:1,2,4 53:6
54:10,16 60:14
60:18,20,24
61:3,18,25
62:10,25 63:5
64:17 65:2,20
66:15,21,24,24
67:4 68:7,10,17
68:23 69:2,5
70:6 72:15
73:21 74:1,5
75:13,19 76:3
76:13,15,16,18
76:23 77:1,1,4,7
77:8,9,10,14
78:14 81:12,13
81:24,25 82:12
85:15 89:10,14

89:16,17 92:19
100:24 103:23
104:7 110:4
111:20 112:7,18
113:4 117:16
120:2 123:6,17
123:18 124:1,7
125:2,3,4,11
129:13 130:7
131:7 135:19
139:7 150:23
151:12 154:3
155:22 156:21
157:3 162:14,15
163:23 164:6,16
164:21 165:8,11
165:12,14,19,24
166:18,25
169:14,15 170:1
170:7,7,12
171:14,16,19,25
172:5 173:11
178:1 183:15
187:17 192:20
**ordered** 123:16
**orderly** 163:15
**orders** 35:5
63:13 74:6 89:8
89:9,11,14
123:9,10,11,12
123:13,15 124:1
124:15,20,21
125:2,7,11,13
125:16,24,24,25
126:3 128:2
129:2,3,5
130:10 135:7,8
135:10,16,21
138:5 194:17

**ordinarily** 58:7
  111:5 114:24
  116:10 175:23
**ordinary** 4:6,12
  50:20 53:17
  59:12 60:15
  63:4,7 78:3,21
  86:17,18,21,25
  87:24 103:19,20
  133:7 134:13,19
  135:2 136:6
  139:24 142:9
  144:7 146:11
  149:16 158:4
**original** 36:19
  85:6
**originally** 23:11
  60:13 61:17
  63:4 65:7 67:13
  72:10 73:17
  169:16 170:17
  171:22 172:1
**origination**
  85:18,25 86:3
**ought** 32:20
  188:11 190:6
**outbound** 88:14
**outcome** 166:21
  193:1
**outgoing** 89:7
**outset** 68:13
  163:12
**outside** 28:22
  65:19 128:17
**outstanding**
  60:15 69:5
**overall** 14:25
  54:24 55:5
  66:12 69:22
  161:9

**overlap** 63:23
**overlooked** 67:6
**overrule** 191:19
**overruled** 90:14
**oversight** 92:5
  156:22 162:2
**overtime** 68:3
**overwhelmingly**
  88:2
**owe** 19:15,16
**owed** 43:22,23
  43:24 60:15
  83:15,19,23
  84:16 99:9,23
**owing** 50:23
**owned** 56:12
  79:17 103:4
**owner** 56:6,14
  56:19 57:4,13
  107:23 109:15
**owners** 109:16
**ownership**
  56:20,24 57:8
  58:8,24 59:3,7
  109:18 114:15
  121:15 128:16
**owning** 128:22
**owns** 23:20
  29:22 30:2
  120:24 122:25
  130:12 161:16
  181:21

### p

**p** 6:1,1 14:1
  34:14 95:14
**p.m.** 83:11
  118:12
**pace** 32:2
  184:17

**page** 164:21
  169:15 170:15
  171:15 172:12
  172:13,22
**paid** 30:1 40:17
  52:14 54:15
  55:8 57:20
  158:12
**papers** 73:20
**paragraph**
  31:10 48:25
  49:2 67:3 68:10
  68:10 97:4,21
  97:21 115:21,24
  116:1 120:13
  169:15 170:1,15
  171:16,18,22
  182:18 184:16
**parallel** 163:6
**parent** 114:18
  114:18 116:23
  117:4,11 182:21
**part** 14:5,5
  17:13 23:13
  32:4 42:9 54:24
  59:16 70:18
  72:2,2 73:9
  79:22 80:14
  96:15 101:3,4,8
  110:19 123:8
  134:9 135:21
  136:14 146:5,9
  158:7 160:8
  161:16 163:10
  164:22 165:1,1
  178:21 189:22
**partially** 89:12
  89:16 123:6,9
  123:18,20
  124:15 125:1,2

125:4,10,17,24
  125:25 126:3
  129:2,4,5 135:6
  135:8
**participant**
  183:5
**participants**
  165:17 166:19
  182:25
**participate** 20:5
  20:17 27:25
  36:8
**participating**
  20:5
**participation**
  152:19
**particular** 27:24
  28:5,9 33:15,24
  37:22 38:2 43:1
  48:15 58:9,11
  71:23,23 76:25
  96:15 101:5,12
  103:10 112:24
  115:3 132:9
  145:17 155:10
  155:24,24
  159:15 166:14
  166:15 169:1
  174:15 193:3
**particularly**
  69:16 115:21
  132:9
**parties** 14:13
  17:19,20 21:7
  21:10,12 26:25
  32:18 42:12
  62:5 63:18
  71:11 74:8,15
  81:1 90:17
  110:2 134:15

158:6 164:1
170:22,23 172:8
178:11,15 181:1
184:19
**partner**  33:2
162:6
**partners**  39:12
**parts**  69:19,20
124:20,22
**party**  4:11 22:15
54:25 56:22
62:21 63:10,11
78:2 81:19,20
82:3,4,4,15
98:23 107:17,18
107:21,24
133:10 151:5
162:22 173:13
**pass**  96:22 97:2
98:8 108:2
**passionate**
130:5,6
**passive**  149:13
157:10
**path**  163:6
174:25
**patient**  129:9
**patrick**  9:16
**paul**  11:6 12:20
**pause**  90:16
134:8 151:12
**pay**  2:2,3 3:3
50:19 51:18
54:19,19,20
55:17 60:14
71:6 113:4
**payable**  52:10
69:13
**paying**  40:22
53:10,15,18

69:21
**payment**  3:1
40:18 47:6
57:16 79:10
82:16 86:3
102:13 141:14
141:21 144:20
**payments**  46:16
46:18 52:16
90:2 103:9
191:21 192:1
**pedraza**  13:3
137:21
**pegged**  193:21
**penalized**  152:8
153:1
**penalties**  152:12
**penalty**  56:13
**pending**  26:16
**pennies**  189:9
**penny**  101:10
**people**  21:3,21
27:24 32:14
39:6 40:19
41:23,24 43:11
44:10,14 50:6
71:20 106:15
115:11 119:17
119:24 121:9
122:19 167:3
169:4 174:2,3
174:13 187:2,23
189:15 190:12
190:12 191:10
192:1
**people's**  106:23
119:18
**perceives**  155:1
**percent**  16:16
16:16 19:19

23:1,19,19
29:22 41:7
48:16 73:3,4
128:4,5 149:24
150:11 172:25
175:25
**percentage**
158:1,4,18
**perfected**
144:12
**perfection**
145:22
**perfectly**  101:19
**perform**  3:16
66:16 86:16
87:6,15,23
142:8,11
**performance**
86:24
**performed**
150:18
**period**  52:24,24
52:25 99:3
140:7 148:23,25
149:11 150:4,5
150:6,6,7,12,14
150:17 151:4,23
151:24 156:19
171:9 179:10
**periods**  150:17
152:1
**permission**
102:18 124:20
129:23,25
**permit**  90:24
97:1
**permitted**  78:20
88:19 116:8,13
**permitting**
90:23

**person**  96:13
167:4,6 168:4,5
168:6 189:20
**personal**  82:17
83:2 85:5 140:8
**personally**
23:11 53:24
**perspective**  27:4
32:3 72:7 84:19
104:12 105:3
107:6,10 121:6
**petition**  2:15,23
3:18 17:2 22:19
22:20 52:25
54:11,21 68:6
85:7 86:21
87:14,20 88:11
89:15,22 103:15
133:7 135:20,23
136:12,13 142:3
142:7,14,15,20
142:20,22,23,24
142:25,25 143:2
143:7,8,11,13
143:13,15,15,16
143:17,17,23
157:2
**philip**  10:24
**phone**  32:19
51:10 80:5
93:14 114:7
121:9 137:5
147:15
**picked**  34:12
193:2
**pie**  54:1
**pieces**  63:16
**pizzas**  16:18,19
**place**  25:23
40:18 83:8

84:18 86:19
98:15 136:12
142:12 182:7
**placed** 23:6 89:8
93:7
**plainly** 120:13
**plan** 4:19 16:23
23:25 25:2 27:4
31:11,13,14,15
31:21 35:13
36:19,22 113:8
136:15 158:15
158:16,17,19,21
158:23 159:4,5
161:5 163:6
166:13 171:24
172:16 174:3
175:4,5 176:4
181:8 185:4
186:4,4,5
**plan's** 31:15
**planned** 16:10
**planning** 20:10
**platform** 15:16
19:17,24 22:12
25:24 33:18
39:8 54:12
55:24 56:8 57:5
57:20,24 58:20
81:7 83:7,20,24
84:6 85:11
87:12,21 102:21
103:13 117:5
119:25 133:14
136:1 138:10,25
142:10 148:21
149:14,16
150:22 154:22
155:5 157:11
193:14,19

**platforms** 136:8
**play** 15:1 36:15
71:21
**playing** 40:22
**pleadings**
187:21
**please** 14:3,8
41:2 55:24 92:2
120:7 122:10
123:18 124:2
131:21 132:20
133:4 137:6
138:1 148:6
175:22
**pleased** 16:1
22:18
**pleases** 29:8
**pleasure** 33:5
120:11
**pledged** 155:2
**plus** 116:3
**pm** 194:20
**pockets** 17:1
**podium** 26:14
50:1 76:6 77:19
**point** 22:24 27:1
37:19 48:4
64:10,13 71:13
72:21 73:9,15
84:1 97:24
104:2 105:23
106:1 113:24
114:5 116:22
121:21 122:10
123:3 126:10,24
127:5 137:10
140:23 142:1
145:10 163:23
167:21 169:14
170:15 180:10

**points** 24:7 91:3
130:22
**policies** 2:3
50:20
**policy** 130:9
**pond** 188:20
**pool** 159:16,17
161:9 176:20
183:5
**pooled** 94:25
**portfolio** 138:22
**portion** 69:18
72:25 86:14
110:6,8,9,13
139:11 140:21
146:14 148:6
151:13 161:23
**portions** 125:7
125:17,19
127:25 134:24
**portrayed** 29:15
**pose** 192:2
**position** 27:12
29:21 43:6 56:5
58:2,13 89:24
90:1 103:3
114:6 116:6
117:18,19
121:25 142:17
155:19,23 161:2
177:15,16
188:11
**positions** 155:20
**possession** 2:10
99:15
**possibility**
101:19 191:24
**possible** 15:12
16:10 34:19
35:13 42:17

44:2 55:12,15
70:7 72:3
108:20 112:17
127:8 152:16
174:24 175:15
186:7 191:21
**possibly** 26:23
180:25 190:21
**post** 3:18 22:19
52:25 54:11,21
86:20 142:3,19
142:20,23,23,24
142:25 143:1,8
143:11,12,13,16
143:17,23 157:2
**posted** 15:5
**potential** 16:1,7
70:11 100:9
104:4,21 150:10
151:19 170:21
175:9 181:24
185:15 187:3
**potentially** 72:5
73:4 101:9
103:11,16
114:17 117:13
132:5 141:20,22
144:22 191:10
**pounding**
175:24
**power** 29:5
121:11 129:12
130:16,23,25
131:1
**powers** 130:18
**practical** 91:19
140:4
**practice** 79:1
100:18 109:1
110:3 114:20

140:10
practices 133:7
  135:2 136:5
pre 22:19 133:7
  136:13 142:7,14
  142:14,22 143:7
  143:14,15,17
preceded 103:7
precedent
  122:18 130:8,20
preceding 58:21
prefaced 165:6
prefacing 165:3
prefer 31:10,12
  164:18
preference 45:7
  61:23 68:12
  103:18 104:4,7
  104:10 141:15
  141:20 144:19
  144:20,22
  191:17
preferences
  103:11,17
preferential
  90:8 141:22
preferred 48:5
  71:5 145:2
preferring
  177:12
prefund 82:22
  82:23
prefunded
  82:18 83:3
prejudice 62:2
  132:24
preliminary
  37:2
prepared 27:15
  31:4 36:13

prepetition 2:2
  3:4,15 50:23
  52:21,22 54:19
  55:1,8 60:15
  86:19 90:3
  157:1
present 9:13
  22:13 57:10
  184:15
presentable
  58:22
presentation
  14:9,10 15:6
  17:13 29:14
  32:10 91:3
  104:17 111:1
  124:5
presentations
  115:19,20
presented 37:22
  43:1 180:1
presenting 50:7
  60:12
presently 128:2
  128:3 132:23
preserve 104:20
  104:22 134:1
preserved
  171:22 185:1
press 18:18
  19:21 25:10
  32:18 118:20
  126:19
presume 92:16
  103:6
pretend 161:25
pretty 100:16
  103:18 125:3
  174:11

prevent 30:18
  85:11 140:10
preview 35:1
previously
  19:13 57:7
  65:15 128:1
price 16:15,16
  40:23 133:23
  151:21 154:21
  186:9
prices 30:11
primarily 136:7
  152:22 193:13
primary 23:16
  154:23
prior 32:15
  43:15 46:17
  53:19 56:25
  57:1 62:7,19
  66:15,24 84:18
  89:15 91:25
  103:15 118:12
  124:21 126:3,17
  129:4 135:5,9
  135:17,20,22
  136:12 150:25
  170:19 183:21
prioritizing
  57:22
priority 128:12
  132:11 159:10
private 5:6
  56:21
pro 8:2,7 9:9
probably 29:9
  44:9,12 45:23
  53:25 96:9
  121:10 138:6
  168:2,6 183:5
  184:5

problem 42:18
  59:16 74:4 80:8
  167:1,2,10
procedure 171:3
procedure's
  17:13
procedures 3:9
  3:22 4:1,16,23
  17:14 19:20
  31:4,5,9,23 32:4
  37:15 44:25
  45:4 61:15
  70:23 162:5,13
  162:15 163:10
  163:15,17,23
  164:6,17 165:2
  165:15 166:25
  169:5,14,17,18
  169:25 171:16
  172:5,5,11,12
  173:12,17
  182:18 183:21
  184:4,9 186:22
  186:23 191:21
  191:25 192:6,18
proceed 14:13
  37:11,14 41:3
  44:19 90:15
  133:2 148:6
  164:19 190:22
proceeding
  42:10 57:10
  120:14 122:17
proceedings
  26:16 28:1 64:8
  132:25 148:2
  193:20 194:19
  195:4
proceeds 30:8
  41:12

**process** 16:7,10
17:14,15 19:22
20:11,17 21:7
21:14 22:20
24:25 28:16,21
29:3,3,4,4 34:3
36:2,15 54:23
55:5 70:18,23
83:8 84:15
86:19 88:15
93:4,6 102:7
112:15,18
131:25 139:19
140:15 148:11
148:21 158:23
163:9,11,20
164:23 165:1,18
166:19 170:5
173:18 174:20
174:23 175:1,8
175:10 176:1,6
176:10,19
179:15,16 181:2
181:23 182:7
184:24 185:7
186:5 190:6
**processed** 89:13
124:6
**processes** 183:7
187:17,25
188:13
**processing**
85:24
**processor** 82:16
**producing** 36:7
**products** 142:24
**professional**
56:4
**professionals**
4:3,6 15:25

33:10 40:10
61:16 63:4,19
92:25 104:18
**profiting** 22:23
**program** 2:5
95:14,17,25
97:6,7,11 116:1
155:16
**programs** 3:6
51:19 54:14
95:15 155:5,13
**prohibited** 14:4
**project** 148:13
**promises** 38:14
**pronounce**
41:13
**proof** 20:11
146:17,19 148:9
152:8
**proofs** 4:22,23
**proper** 131:6
187:6
**properly** 40:25
87:9 155:22
178:1 182:1,1
**property** 28:9
28:12 35:7,7,8
35:11 58:7 64:4
78:18 84:9,13
87:4 103:13
109:3 113:19,20
115:8 121:12,13
122:4,24,25
132:6,13 158:13
161:4 186:11
194:8
**proposal** 19:21
20:21 31:3 71:5
**proposals** 20:13
32:16

**propose** 47:23
62:4 157:19
163:22 169:5
181:5 192:1
**proposed** 19:20
23:24,25 27:3
28:2 30:19 33:1
35:5,23 36:20
45:18,21 49:1,1
50:11 51:2,5,7
51:12,23 52:1,2
52:4 53:6 60:20
60:25 61:10,18
63:20,24 65:20
68:17 69:5,12
70:6 72:15
75:19 76:16
77:8,9 78:14
87:3 146:13
150:12,23 151:7
154:3 157:3
159:5 162:14
173:24 188:14
190:9
**proposing** 28:3
29:15 32:6
70:16 71:6,10
127:24,25
136:17 138:4
139:6 157:21
158:3 159:14
160:20 161:8
182:13
**protect** 32:1
99:15
**protected** 25:16
26:1 42:14 47:4
97:2
**protection** 90:2

**protections**
170:16,24,25
171:2,8
**protocol** 148:18
151:2 154:14,19
155:3,11
**protocols**
148:22 151:22
154:13 160:25
**provide** 14:24
19:23 46:20
63:21,24 70:25
88:23 99:2,10
101:2 118:9,13
118:14 119:5
150:24 156:25
163:8 170:22
**provided** 15:7
18:21 29:14
47:12 57:5 59:8
83:13 99:8,16
100:2 117:9
123:6 194:12
**provider** 148:16
148:19
**providers** 155:6
**provides** 79:9
79:11,13,16,21
80:13,21 86:1
88:20 106:2
149:12 158:17
158:19
**providing** 65:19
**provision** 46:14
75:19,25 80:23
101:5 103:23
155:21 169:16
192:13,15
**provisions**
66:17,21 68:11

68:16 99:8
126:12
**proviso** 169:15
169:17
**public** 29:22
30:2 116:24
119:16
**publicity** 20:22
**publicly** 17:20
17:21 18:23
23:8,17
**published**
173:25 192:24
**pudding** 20:12
**purchase** 2:4
5:4 23:13 85:10
133:14 135:22
136:17 138:5
142:22,23
**purchased**
23:11
**pure** 120:6
**purely** 15:14
**purports** 181:21
**purpose** 149:5
152:24 169:9
**purposes** 47:20
49:14
**pursuant** 85:13
111:23 139:24
149:4 165:11
**pursue** 18:24
104:4 140:16
**pursued** 104:11
104:24
**pursuing** 26:22
36:24 163:5
**push** 94:16
189:22

**pushed** 94:3
**put** 16:24 19:21
27:3 87:11
111:10 112:3,3
112:8 113:3
114:10,14
126:18,20 127:3
127:10 131:13
135:9 151:16
156:12 160:16
163:19 179:5,17
184:13 186:1
189:18
**putting** 108:11
155:2

## q

**quantitative**
19:8
**quantum** 117:6
**quarter** 25:3
**question** 48:14
60:5 72:17
93:19 98:11
105:5 106:12
111:9,21 119:19
124:15 138:3
145:1,2 151:18
153:20 166:10
166:12 178:11
188:8 191:20
193:16,24 194:2
**questioned**
140:5
**questions** 14:19
21:25 22:5,21
24:21,24 27:15
34:1,9,19 37:9
37:19 42:12
51:4,25 60:9,23

62:9 64:16
65:10,24 67:16
69:7,10 75:4,13
76:6,21 77:12
77:18 90:17
91:2 95:13
97:17 114:20
115:13 134:9
151:13 163:25
171:12 173:6
190:13
**quick** 24:7
31:14,15 55:12
188:3
**quicker** 31:20
32:5
**quickly** 15:8,12
16:10 24:22
33:12 36:22
42:17 44:2
55:14 174:16
175:1,3,13,15
186:3,7,14
190:22
**quinn** 2:18
35:20 74:25
75:14,18 76:2
**quite** 38:3 56:14
68:23 106:14
115:1 128:21
152:16 174:2
190:24
**quote** 21:2

## r

**r** 1:21 6:1 14:1
195:1
**raise** 71:3
141:13,18

**raised** 41:17,24
72:17 75:11
141:19 144:19
164:25 177:10
**rampant** 17:8
**range** 53:2
**ransom** 119:18
**rare** 109:7
**rasile** 11:17
**ratably** 132:7,18
**rate** 85:15
**rates** 68:6
**reach** 68:22
**reached** 18:13
20:19 23:9
**reaching** 177:6
**reacting** 44:11
44:14
**read** 21:17,18
34:13 39:10
62:21 125:9
177:16
**ready** 14:13
37:10 147:24
175:10,18
**real** 24:15
126:10 178:2
**reality** 176:24
**really** 26:3
37:20 40:6 42:8
43:16,25 44:16
53:13 59:2,6
60:8 70:19,24
73:8 93:23 94:7
96:15 97:10
106:25 107:4
115:5,17 116:16
119:11 129:13
130:20 161:13
166:19 174:1,22

178:12,14
180:16 182:11
187:13
**reason** 35:16
36:3 66:23 87:3
87:6 99:24
100:9 112:2
115:13 118:8,16
128:14 141:7
157:15 186:8,15
189:18 190:9,21
**reasonably**
190:22
**reasons** 69:23
110:3 141:8
146:6 152:22
191:7
**reassured** 54:17
**rebound** 16:13
16:14 17:3
**rebroadcasting**
14:4
**recall** 48:23
49:9 50:21
84:25
**receipt** 65:13
67:19
**receive** 22:11
55:1 67:25 93:8
136:1 138:15
176:7 184:8
192:9 194:13
**received** 20:13
21:6 31:3 33:9
50:25 61:19,20
63:8 65:22 88:4
118:12 138:11
138:13,17
172:14

**receives** 140:7
**receiving** 94:19
144:20 151:8
**recess** 147:23
168:22
**recession** 189:13
**recipients** 79:10
**recklessness**
56:10
**recognizing**
145:8
**reconcile** 83:18
87:9 89:17
91:23 93:2
124:9 136:10
**reconciles** 83:2
**reconciliation**
4:12 78:3 83:8
84:15 86:19
93:3,6,9 94:18
100:20 135:2
**reconciliations**
116:9
**reconciliatory**
136:5
**reconciling** 92:4
125:23,24 129:1
135:3,5,6
**reconnected**
61:6
**record** 39:1 61:9
63:18 70:10
76:10 126:20
140:24 162:8
163:19 195:4
**recorded** 34:24
148:2
**recording** 14:4
168:23

**recordkeeping**
98:24 99:1
107:22 108:1
139:2
**records** 62:6,14
136:13
**recoupment**
143:6,8,19
**recover** 118:24
141:19
**recovered** 30:11
**recoveries** 55:12
159:19 161:19
**recovery** 54:25
115:9 117:14
158:25 159:13
175:15
**red** 26:3
**redeem** 118:22
**redemption**
30:9
**redirected** 88:14
**redistributed**
112:16
**redline** 64:10
164:5
**redlines** 162:15
**reduce** 88:16
**reduced** 154:21
**reduction**
152:13
**refer** 62:6
**reference** 52:9
62:17 95:14,24
95:25 119:14
128:24
**referenced**
119:10
**referring** 107:6
162:16

**refers** 49:1
174:7
**reflect** 136:11
136:13 138:16
**reflected** 35:4
51:1 61:25 69:1
83:9 110:20
150:23
**reflects** 62:25
65:21 76:17
**refusal** 126:15
130:3
**refuse** 88:20
126:24 184:8
**regard** 55:15
72:17 76:1 94:6
97:16 118:18
128:6 145:22
171:4 185:13,13
185:15
**regarded** 115:23
**regarding** 5:1
16:13 22:22
34:18 52:17
64:1 122:16
151:1 154:4
164:25
**regardless** 26:3
163:14
**regards** 193:12
**registration**
64:2
**regs** 98:10
**regular** 34:1
121:7
**regulations** 98:5
187:10
**regulatory** 64:6
177:19,23,24
187:9

reilly  12:21
reimbursable
  3:5
reimbursement
  4:2 61:16
  143:16 145:24
  170:21
reiterated
  110:17
reiterates  27:3
rejected  31:2
related  2:5 3:2,6
  3:11,15,19,23
  4:3,13,17,20 5:6
  5:7 32:2 67:12
  135:2 136:7
  165:3,10 166:25
  172:25 183:13
relates  105:23
relating  165:6
relation  190:3
relationship
  19:3 25:7 43:16
  43:17 49:12
  95:12,24 96:10
  97:14 105:14,18
  105:20 107:19
  108:8 110:1
relationships
  42:23
relatively  52:12
  59:12
relaying  110:19
release  18:18
  19:21 25:10
  49:17 61:23
  111:17 126:19
released  104:9
  105:1

releases  35:23
  36:12,14 118:21
relevant  20:3
  79:21 80:13
  81:1,9 188:7
reliable  148:11
reliance  108:9
reliant  54:13
relief  2:6 3:2,6
  3:11,19,23 4:3
  4:14,20 5:7 16:4
  51:6 59:13 60:9
  78:11 86:25
  88:1,5 90:11,16
  102:12 103:25
  108:19 109:4
  114:9 122:6
  126:8 131:4
  133:3 134:24
  157:16 173:14
  173:15,19
  184:15,25
relying  122:23
remain  49:17
  124:23 125:7
  128:2,3
remainder
  89:14
remained
  100:22
remaining  23:23
  35:11 89:12
  124:10 150:14
  150:16 164:2
  169:4 173:9
remains  36:25
remarks  29:10
remediated
  26:12

remember
  16:17 189:2,3
remind  18:2
remit  79:10,12
  116:1
remits  83:3
remove  95:6
removes  85:4
rendering
  114:15
renew  2:3
reorganization
  159:7 161:5
reorganize
  55:13 71:12
repaid  30:10
repeat  177:17
repeatedly
  24:16 119:5,6
replacing  64:12
replenish  82:24
  139:13,23
replenishing
  144:17
replenishment
  101:22
reply  188:3
report  16:1
  20:19 35:22
  83:12 85:15
reported  88:17
  126:19
reports  26:19
represent  38:10
  166:7
representation
  54:6 114:2
representative
  178:12

represented
  15:17 19:10
  25:22 71:16
representing
  177:3 180:6
represents
  57:11 114:2
reproducing
  14:4
request  30:7
  46:7,14 47:7,12
  47:24 50:18
  51:5 52:1 60:24
  76:22 77:13
  82:9,11 89:5,7
  89:18 90:13
  91:10 92:18
  95:21 101:4
  104:1 119:15
  126:8,15,16,22
  126:25,25 127:4
  127:10 130:20
requested  51:6
  77:11 82:13
  86:25 95:21
  108:19 111:17
  118:11 119:23
  179:21
requesting
  78:11 88:1
  116:25 120:18
  133:3
requests  60:8
  82:21 88:14,25
  93:8 94:19
  126:17
require  65:1
  87:2 148:22
  151:22 156:14
  166:13

| | | | |
|---|---|---|---|
| **required** 63:11 151:4 | 52:8 72:22 90:18 112:1 | 69:15,16,17,23 69:25 70:3,12 | **review** 114:12 153:12 155:19 |
| **requirements** 44:7 99:2 132:17 159:8 | 134:9 138:10,18 145:12 152:1 153:10 172:21 | 70:13 72:3 73:2 74:11 | 179:19 184:19 187:24 |
| **requires** 24:12 28:13 101:22 183:24 | 183:2,3 184:25 188:5 192:10,18 | **result** 44:7 59:22 87:10 90:8 102:1 | **reviewed** 26:11 51:12 67:6 153:17 |
| **requisite** 81:15 175:5 | **respectfully** 47:23 51:5 60:24 64:17 | **resulting** 82:6 85:23 87:8 | **reviewing** 155:9 **revised** 45:17,21 48:18 51:23 |
| **rescind** 18:20 | 76:22 77:13 | **results** 183:14 | 52:1 60:20 |
| **rescinded** 18:18 | 90:13 182:6 | **resume** 147:5,24 168:19 | 61:17 65:20 |
| **rescue** 29:15 30:3,6,17 60:1 | **respective** 83:16 151:6 | **retail** 29:23 | 69:1 75:12 76:16,22 77:7,9 |
| **research** 5:10 27:18 | **respectively** 78:13 | **retain** 65:18 67:11,21 | 77:9,14 78:14 150:23 151:11 |
| **reservation** 172:7,8 | **respond** 29:9 160:19 181:14 | **retained** 4:2 35:19 61:16 65:16 | 162:14 163:18 163:23 170:12 |
| **reserve** 86:10,13 86:13 100:2 | 183:11 | **retainer** 66:5 | 171:15 183:15 194:17 |
| 141:2 143:4 144:3,11 145:7 | **responded** 20:7 **response** 19:2 | **retaining** 139:25 145:14 | **revisions** 68:25 **rewards** 149:7 |
| 145:17,18,25 | 26:10 29:11,20 30:7 54:4 55:9 | **retention** 2:17 2:22 4:5 63:6 | 149:25 152:13 158:12 160:22 |
| **reserved** 18:23 47:12,17 75:12 | 106:12 141:24 194:1 | 65:7,25 66:13 66:16 67:24 | **richard** 7:22 10:6 12:1 13:9 |
| 141:21 | **responsible** 37:7 40:11 85:19,22 | 68:15,19 73:20 73:21 74:1,5,6 | 48:2 52:5 66:2 73:14 75:16 |
| **reset** 5:12 | 98:23,24 107:21 | 74:10,13,24 | **ricky** 10:20 |
| **resides** 58:8 | 133:19 144:2 | 75:14,19 76:2 | **riding** 15:21 |
| **resolution** 20:19 68:23 69:5 | **responsive** 31:6 **rest** 15:2 24:19 | **retentions** 71:16 **retrieval** 137:4 | **right** 16:25 17:23 24:6 |
| 173:8 | 90:15 133:3 | **return** 26:4 109:9 | 27:16 31:1 32:7 33:7 38:6 40:19 |
| **resolutions** 164:1 | **restrictions** 28:23 | **returned** 35:8 108:19 | 41:4,6 44:18 45:4,8 47:11,16 |
| **resolve** 24:25 172:3,20 | **restrictive** 173:12 | **returns** 159:15 **revenue** 157:7 | 48:13,22 49:20 51:9,11 53:8,14 |
| **resolved** 16:1 122:7 | **restructure** 40:19 | **revers** 85:9 **reverse** 85:1 | 57:15,15,25 58:5 59:10,11 |
| **respect** 3:10 4:18 14:8 19:12 49:10 51:4,25 | **restructuring** 22:23 69:13,14 | 125:16 133:16 | |

61:1,2,10,13
62:12,13 64:18
65:13 66:15
67:19 68:14,15
71:8,10 72:11
72:16 73:6 74:9
74:22 75:7 76:1
76:8,24 77:1,15
77:20 80:3,9,9
91:13,19 94:14
94:23 96:16
99:16 101:1,11
104:5 105:15
106:8 110:12,23
111:4 112:20
113:5,17,22
114:23,23
117:20 118:5,10
119:1,14,20
120:8 121:8
122:2 126:22,23
127:13,21 131:5
131:17,21
132:21,22 133:1
134:18,21,21,23
137:22,23,25
139:8,10,14,18
140:1 141:19
142:1 144:1,15
145:8,21 146:5
146:11 147:8,21
147:24 153:13
153:24 157:5
158:6 160:9,10
161:1,22,24
162:23 163:1
168:5,5,8,24
173:19 174:7
175:24 180:10
181:1,18 186:11

187:3 188:23
189:1 190:2
191:18 192:12
192:18 194:15
**rightful** 56:14
56:19,20 57:4
59:3
**rightfully** 27:7
**rights** 18:23
41:22 42:4,13
43:10,10,15
49:16 72:4
99:20,20 103:24
104:21 113:15
119:14 120:21
139:25 140:16
142:15,16 143:3
143:19 144:8,11
145:24 154:4
171:23 172:1,7
172:8 173:5
184:25
**rise** 16:25 23:1
143:2
**risk** 38:22 56:11
87:13 104:23
133:22 150:19
151:17 154:18
154:19,19,23
155:15 157:9,12
157:16
**risks** 151:15,20
153:20 154:8,11
155:14,15,15
156:1
**rivera** 13:8
**road** 195:21
**rob** 39:3
**robert** 9:20
10:17 11:1

**robust** 22:18
176:23
**role** 71:23 93:7
**roles** 71:20
**rolling** 46:21
**roma** 12:14
**room** 93:18
**rosell** 12:18
**rosemary** 8:24
98:20 107:4,13
**rosen** 8:18 11:18
93:16
**rouse** 9:8 110:14
110:14
**row** 48:11
**rule** 72:7 131:7
169:8 171:5
193:24
**ruled** 73:15
**rules** 28:7 43:3
43:14,18 85:2
98:4,10 107:7
131:23,25
132:14
**ruling** 60:8
113:17 114:24
115:15,15
116:15 117:12
117:13,21,25
119:1 120:4
122:12 173:23
193:8,16
**rulings** 28:4
122:4
**rumors** 32:11
**run** 21:14 30:8
30:14 40:25
112:17 146:25
147:7

**running** 54:12
148:15
**runs** 190:13
**runway** 183:23
**rush** 137:9
180:8
**russell** 12:22
**ryan** 12:19
166:6,6 167:14
167:14 177:8,9
177:22 178:24
179:2 180:9,19
181:14,15
182:22 186:16
186:18,18

**s**

**s** 6:1 14:1
**salaries** 3:4
**sale** 4:18 5:6
23:4 25:1 27:4,9
28:16,20 31:10
38:21 54:23
55:5 70:12,13
71:7 73:2 74:11
84:7 112:15
136:18 138:5
158:23 163:20
165:1,1,13
171:24 172:16
174:1,6,7,11,25
176:1,3,4,6,10
178:1,9,19,19
179:1,4,7,8,23
179:25 181:1,2
181:24 182:1,4
182:10,12,13
183:6,12,15,19
185:3,7 186:2,7
187:5,5,14,22

188:13 190:5,6
190:9
**sales**  23:15
103:7 187:17
**salls**  10:19
**salvaged**  190:19
**sam**  19:9
**sanchez**  9:17
**satisfaction**
103:10
**satisfy**  85:20
142:7 144:6
**satisfying**  87:25
144:4
**savetsky**  11:19
**savings**  118:19
118:24
**saw**  45:23 58:21
68:15 76:3
154:23
**saying**  17:20,21
38:24 112:8,11
123:24 160:4
177:18 179:17
192:13
**says**  24:16 31:10
69:12 96:6 97:5
97:22 98:12
106:4 109:14,16
112:9 115:25
116:2 125:10,23
125:23 126:1
127:21 130:10
131:1 184:16
**sbic**  47:2
**scales**  73:3
**scenes**  21:8
**schedule**  25:4
31:15,17 46:1
47:18 86:12

174:6,15,18
190:23 191:5
**scheduled**  37:11
38:2
**schedules**  178:5
178:23 179:19
180:24 181:12
182:9 183:17,22
184:19,22 185:7
186:25 187:7
190:4,4,7
**scheduling**  4:17
**scherling**  11:20
**schiff**  11:3
**scope**  65:19
**se**  8:2,7 9:9
**sec**  24:15 45:21
47:7,11,13,16
51:1 60:22
61:21 63:9,13
69:1 76:19
78:16 171:17
**second**  35:11
45:24 47:24
63:20 80:4
110:15 169:13
172:20 176:10
182:18
**secondarily**
187:9
**seconds**  123:16
125:12
**section**  46:23
65:16 66:12
79:8,10,13,15
79:21 80:13
85:21,25 86:22
87:1,2 106:1
126:12 129:1
130:18,24

149:19
**secure**  56:23
**secured**  56:23
99:11 142:16
144:6
**securities**  43:18
47:10,14,16
64:3 154:25
164:3 166:8
171:20,21 177:9
181:15 186:20
**security**  24:16
145:16,22
**sec's**  51:22
77:11
**see**  16:14 35:2
36:16,18 59:2
61:1 63:13
64:10 67:5
70:22 72:24
74:1,4 75:25
92:16 97:6
104:6 108:19
134:8 137:18,23
146:23 151:12
156:9 184:20
185:7 189:19
191:20 192:3,23
193:1
**seeing**  74:11
94:12 194:17
**seek**  16:24 19:22
20:18 45:24
54:16 56:4
65:18 93:25
**seeking**  17:1,13
17:19 19:22
26:4 46:18
51:17 60:14
72:10 77:24

86:15 87:16,23
88:6 90:5,11,16
102:16,18,24
103:25 111:24
112:13 114:2
124:8 125:15
128:1,4 129:12
129:15,16,22,25
133:6 135:1,10
135:16,20,24,24
139:23 146:10
149:3 157:16,19
166:22 194:9
**seeks**  61:15 63:5
85:1 108:14
124:19 125:6,8
133:15 184:15
**seen**  14:22 48:16
48:22 51:9
95:17,20 123:16
145:13 189:4
**seizure**  152:13
**selected**  26:17
57:9
**self**  82:3
**sell**  23:14 55:13
55:19 81:25
102:4 125:24
129:2 135:7
139:7 177:21
187:25 189:16
**selling**  189:16
191:23
**selloff**  144:11
**sells**  82:5
**send**  18:15
91:10 118:13
119:6
**sending**  34:11

sense 14:24
  55:19 94:2
  104:3,14 109:5
  112:21 138:7
  150:1 152:3
  156:3 159:22
sent 79:15 84:5
  84:7 89:19
  136:2 138:19,20
  138:23 144:24
  167:8
sentiment 56:19
separate 22:10
  89:8 90:22
  94:25 95:2
  96:17 119:2
  121:19
separately 90:12
  108:12
september 27:8
  46:2,3,11,23
  48:5,12 179:8
  182:14,16
  191:11
serve 98:1 134:1
  169:9
service 63:19
  148:16,19
services 54:10
  63:6,21,23,25
  64:3,5 65:18
  66:16 80:21
set 17:19 29:10
  34:6 62:6 70:23
  94:24 108:25
  123:15 138:13
  138:20 143:7
  144:13 154:25
  164:22 166:10
  166:12,15 169:3

170:17 173:17
  173:18 184:22
  185:16 186:22
  187:1
setoff 99:25
  143:3 144:1,5
  145:6
setoffs 99:9
sets 170:2
setting 4:22
  148:18 166:13
seven 15:14 23:9
  38:25 58:19
  150:11,24 151:8
  165:23 167:13
  170:18
severance 52:10
  52:16
shaik 11:5
share 5:4 23:9
  23:10
shareholder
  29:22 117:8
shareholders
  29:23,25 114:3
  114:17 116:23
  144:8 182:21
shares 23:4,11
  23:12,13,14,21
  23:22,24
sharing 132:1
shave 36:18
sheet 30:10
she's 61:6
shoes 49:10,14
short 19:21 99:3
  101:11 102:1
  156:19 179:10
  187:19 191:9

shortage 33:13
shortfall 133:18
shortly 16:4
shotgun 15:21
shoulder 15:22
  15:22
shouldn't 66:24
  71:21
show 32:13
  175:14
showed 43:1
showing 137:17
shown 28:8
  119:4 125:13
shows 44:7
shrem 13:19
shut 138:10
  185:6
shutdown
  185:12
side 100:7 115:5
  115:16,16
  116:16
sides 103:21
siding 132:15
sign 18:17 52:20
  52:23 53:1
  153:2,5 167:5
  167:22
signature 195:7
signed 4:25
  52:21 106:2,4
  154:2 167:18
  168:1,25 178:4
  181:19
significance
  97:24 186:12
significant
  25:14 35:15
  37:5 150:1

152:23 157:7
signing 167:11
signs 157:5
silvergate 47:19
  81:17,18 82:6,7
similar 33:16,18
  60:21 136:8
  149:9 186:3
similarly 60:17
  90:9 173:21
simms 15:18
simon 13:16
simplify 73:21
simply 22:3 25:1
  29:17 42:20
  44:4 102:7,24
  105:8 149:6
  184:17
sincerely 30:25
singer 8:11,16
  110:25,25 111:3
  111:3 118:7
  120:10,10 121:4
  124:12,12,18
  125:21,22 126:2
  127:14 129:18
  130:2 131:13,16
  131:20
single 56:12
  70:25 88:4
  109:15
sipc 24:9,9,10
  24:11
sir 37:16,16
  38:8 41:10,14
  53:21 55:20
  56:2 57:14,18
  113:21 118:8,19
  118:25 119:19
  120:3 122:10

123:22 128:25
158:8 159:20
193:5
**siskins** 114:2
**sit** 17:25 40:2
188:9
**sits** 190:19
**sitting** 103:9
104:8 156:13
**situated** 90:9
**situation** 106:25
112:24 116:19
118:10,16
122:20 158:10
188:20 189:25
190:16
**situations** 58:25
186:3
**six** 38:25 40:13
165:23
**size** 140:18
**skip** 45:13
**slade** 12:5
**slashing** 152:7,7
152:18,22 153:4
153:10 154:18
155:14
**slide** 15:8 17:11
18:10 19:1
21:16 22:21
24:8 25:5 26:15
27:2
**slinging** 32:14
**slow** 17:20
31:16 180:13
**small** 18:5
143:20 183:5
188:19,21
**smaller** 115:8

**smart** 127:7
151:2
**smith** 6:11 50:1
50:3,5 61:5,7,9
61:14 62:24
63:3 64:25 65:3
65:6,15 66:4,20
67:2,7,10,23
68:18 70:1,18
71:8,25 72:14
73:11 74:17,23
75:10 76:4,9
**snapshot** 83:13
**social** 18:14
**sofas** 183:22
**sol** 112:10
**sold** 23:21 69:20
89:3,9 103:14
118:10 177:25
181:20 182:3
187:24 189:3
190:17,18
**sole** 20:8 88:22
89:2
**solely** 79:18
85:22
**solicit** 71:11
**solicited** 30:2
**solid** 123:22
**solution** 32:5
82:3 167:20
**solutions** 167:3
167:23,25 168:8
168:12 195:20
**solve** 42:18
**soma** 10:10
**somebody** 28:11
29:2 71:4 92:2
94:3,16 126:19
128:13 130:19

136:21 185:8
**somebody's**
28:12 167:8
181:12
**someone's**
150:15
**somewhat** 72:25
**sonya** 5:25
195:3,8
**soon** 35:13
108:20 112:17
**sooner** 147:7
**sorry** 37:20 46:9
46:11 58:10
60:10 80:22
89:6,13 93:15
100:11 102:25
104:4 107:13
111:3,7 122:10
130:4 135:14
140:24 146:3,22
146:23 147:22
159:23 165:22
166:2 167:2
172:23 186:17
190:1
**sort** 32:13 53:3
94:2,5 98:9
120:25 126:20
130:14 169:23
172:10 185:9
**sought** 49:9
71:20 114:9
143:7 184:17
**sound** 148:7
155:20 156:1,2
161:20 171:9
192:15 193:1
**source** 158:25

**sources** 88:18
**south** 40:14
**southern** 1:2
**space** 33:15
56:20 183:8
**spaziani** 8:24
98:20,20 107:2
107:4,13,16
**speak** 37:19
38:4,13,19 41:5
60:7 74:18
122:9,9 156:18
188:20
**speaker** 137:20
**speaking** 56:3
**special** 2:18
35:19,25 36:4,6
36:9 74:25 75:1
**specific** 30:8
44:6 60:8 63:25
94:8 98:4 107:8
107:12 190:9
**specifically** 34:3
63:10,21 68:2
107:24 109:13
183:7
**specificity** 156:5
**specifics** 26:20
**specified** 52:24
**speculation** 17:8
117:21
**speculative**
154:17
**speed** 15:12
186:14
**spending** 39:5
**spent** 31:2 115:1
**spike** 85:8
**spite** 55:16,16

spoke  19:3
spoken  18:22
  59:3 185:14
sponsored
  172:16
spot  167:6
ssb  173:9 185:6
ssb's  184:1,16
stabilize  19:17
stabilized  30:11
stable  10:8
  186:12
staff  57:22
stage  73:25
  122:3
staggered
  189:24
stake  58:5
  146:17,17,19,20
  148:9,10,20
  149:15,18 151:9
  152:2,4,8
  153:11 154:1,13
  155:8 156:20
  157:22 158:3
  160:21
staked  149:4,23
  150:4 151:3
  152:16 153:24
  153:25 154:5,20
  155:19 157:1,2
  158:2 160:15,23
stakeholder
  114:8
stakeholders
  31:12 71:1
  141:12
staker  148:22
stakers  149:7

staking  78:4
  102:19 110:6,10
  146:10,13,14,16
  148:7,12,18,22
  149:1,6,7,9,12
  149:25 150:2,9
  150:12,19,25
  151:2,3,7,9,13
  151:16,22,25
  152:15,24
  153:10,20 154:4
  154:12,17,24
  155:4,5,13,16
  155:21,23 156:6
  156:11,15
  158:10,11,12,19
  159:15 161:23
  194:10
stalking  4:13
  171:7
stall  30:14
stand  21:13
  62:23 188:9
standalone
  163:6
standard  68:5
  83:11 88:15
standing  23:20
  114:20
standpoint
  141:3 187:9
stapleton  9:19
start  37:14
  45:12,14 102:21
  168:13
started  72:10
  160:18 168:23
  189:3
starting  40:20
  50:15 191:1

starts  174:5
state  15:1 47:10
  58:22 63:17
  122:15 125:11
  164:3 166:7
  167:15 177:9
  181:15 186:19
stated  64:8
  105:21 123:7
  126:17 145:25
statement  4:19
  16:3 27:11
  70:10 78:12
  96:8,17,20
  99:11,12 110:15
  140:8 165:4,5,8
  165:12 166:14
  166:16 169:2,3
  169:9 171:24
  178:5 179:19
  186:25 187:7
  188:25
statements
  26:11,12 29:11
  32:22 62:7
  115:20 183:18
  185:8
states  1:1,12
  7:17 54:8 68:11
  69:12 79:23
  80:15 115:22
  119:7 120:13
  122:13,18
stating  105:17
status  3:18 21:1
  135:4 138:8,13
  138:20
statutes  28:7
statutory  36:5

stayed  118:25
  144:24
stealing  22:22
steer  29:3
steinman  13:18
step  49:9,13
stephen  11:24
steve  67:15 75:4
  78:7
steven  9:6 13:1
  38:24 40:17
  113:24 116:20
  141:11 145:11
  182:20 188:2
stick  36:21 55:3
stock  3:10 23:17
  29:23
stolen  42:1
  121:17
stone  191:6
stop  20:23 29:5
  30:7 32:20 41:6
  41:6,6 88:13
  90:1 127:13,15
  127:15,15,15
  129:7,7 146:25
  147:16,16
stopped  132:18
stories  21:20
story  16:17 23:3
  23:5
strange  41:23
strategically
  23:6
street  6:16 7:12
  7:19 8:20 9:3
stretto  2:22 15:6
  65:15,18 192:24
stretto's  65:7,25
  66:5

**stricken** 68:12
**strictly** 14:3
**strikes** 141:22
**strongly** 108:18
  128:21
**struck** 177:5
**structure** 30:21
  40:18 42:22
  71:5 109:24
  181:5
**stuck** 89:25
  138:9
**subaccounts**
  94:23
**subdivision**
  69:25
**subject** 28:18,22
  35:9 70:2 74:10
  89:1 93:9 94:18
  108:5 116:9
  117:25 132:13
  146:11 153:9,11
  155:16 163:18
  165:7 169:18
  175:2
**subjects** 133:22
**submissions**
  62:19 114:11
  116:3 182:22
**submit** 34:9
  48:17 50:21
  62:25 67:16
  69:5 77:1 78:17
  163:17 170:2,12
  171:14 173:1
**submitted** 62:16
  78:7 125:14
  135:5 164:11
  176:22

**submitting** 4:22
  4:23 62:1 65:4
**subsequent**
  25:20 45:18
  88:25
**subsequently**
  82:15 85:16
**substantially**
  186:13 189:12
**substantive**
  76:17 117:15,15
**successfully**
  180:21
**suffer** 54:14
**suffering** 35:16
**sufficient** 82:20
  85:19 86:2,4
  116:6 153:22
  155:18 174:23
**suggested**
  172:17
**suggesting**
  186:21
**suggests** 69:18
  173:25
**suite** 7:19
  195:22
**sullivan** 2:18
  6:14 10:2
**summary** 28:2
  192:24
**super** 16:21
**superpriority**
  3:17
**supervision**
  28:17
**supplement** 2:4
  78:6
**supplemental**
  68:1,3 175:6

**supplementing**
  64:12
**supplies** 68:5
**support** 16:3,7
  36:12 55:6 65:8
  67:13 78:8,12
  109:8 120:23
  141:7 166:4,10
  177:6 182:22
  185:21,22,23,24
**supported** 75:3
  88:2
**supporter** 57:5
**supportive**
  78:11
**supports** 35:23
  108:18
**suppose** 101:10
  115:6 167:25
**supposed** 40:9
  60:8 100:22
  139:16 171:5
  178:10
**sure** 14:22 16:5
  21:17 23:6 25:6
  34:21 37:20
  38:3 42:13,16
  44:1 48:14,16
  49:15,22 53:13
  54:11,16 62:25
  68:13 70:21
  93:18 94:11
  95:20 97:23
  99:14 100:13,21
  102:15 104:20
  111:21 112:18
  132:5 135:14
  137:19 160:2
  164:7 165:18
  167:7,21 169:23

  172:14 174:3,22
  179:25 181:5,11
  184:23 192:6
  193:15
**surety** 2:5
**surprised** 29:13
**surprises** 71:18
**susan** 11:25
**susheel** 12:2
  75:4
**sussberg** 6:8
  14:14,15,18
  15:5 18:5,10
  24:7 32:8 33:25
  37:13 44:18,20
  67:15 163:12
**sussberg's** 68:1
**sw** 8:8
**swap** 64:14
**sweep** 4:11 78:2
  118:12 138:14
**sweeping**
  133:10
**swings** 151:21
**sympathetic**
  42:15 43:19
**sympathize**
  127:18
**system** 3:14
  46:1 47:10
  81:14 82:1,2,13
  89:14 100:17
  124:7 167:7

**t**

**t** 195:1,1
**tabachnik** 11:21
  167:17,17 168:1
**table** 70:21
  175:24

**take** 22:3 44:24
45:2,3,4 50:14
71:25 72:8
90:20 96:23
116:15 139:12
141:1 143:4
147:4,8,21
168:18 178:1
182:7 184:23
**taken** 15:19
73:20 106:22
148:24 187:25
**takes** 163:15
176:6,11,11
**talk** 16:11 41:8
118:7 132:20
153:18 159:4
174:6
**talked** 27:4
112:14 194:7
**talking** 39:2
96:3 111:12
132:2 137:5
160:11 181:7,8
191:22
**talks** 173:25
**tampering**
167:8
**tape** 146:25
147:5 148:3,4
168:9,10
**target** 166:12
**targeted** 82:23
**taught** 193:9,20
**taxes** 3:2 60:12
60:15,18,19
**team** 63:14
68:22 74:18
92:24 93:1,2

**technically**
137:13
**technology**
136:8
**telephone** 80:6
**telephonically**
6:8,9,10,11,12
6:19 7:7,15,22
8:1,6,16,23,24
9:6,8,13
**tell** 129:24 164:8
169:4 171:5
174:15
**telling** 192:12
**tempers** 127:18
**ten** 56:7
**term** 21:24
28:10 39:24,25
40:7 69:16
187:17
**terms** 28:17,17
41:19 49:12
55:14 79:6,20
85:17 91:16
96:3 97:17
98:13 103:20
105:17 109:11
111:22 122:23
131:1 142:6
144:2 158:1,24
159:7 160:24
194:12
**texas** 164:3
166:7 167:15
173:9 181:16
186:19
**thank** 14:11,17
14:18 15:5
37:10,15 38:9
41:3 44:16

46:13 48:8,12
50:14 51:14
53:7,21 55:20
56:2 58:17 60:2
60:10 61:3,4,7
63:14 65:6,14
65:15 66:14
67:10,23 68:18
74:8,17 75:10
75:24 76:4,9
77:3,17,21
80:12 94:12
102:14 105:4
110:11,22
113:21 114:19
118:1 120:7,11
133:2 134:25
135:11,12
141:23 146:7,8
148:8 159:20
161:21 162:4
163:4 170:11
183:9 186:18
188:17 193:5
194:18
**thanks** 67:6
75:25
**that'll** 65:1
**that's** 44:12,25
45:4 52:17 53:3
53:11,11,25
54:23 58:12,18
59:1,17 61:4
64:21 68:12
70:21 71:7,8
86:11 94:5 96:8
96:12,12 97:16
98:2 99:5,17
102:15

**theft** 25:17
**theirs** 176:8
**themes** 22:4
**theory** 90:4
128:21
**thereof** 4:24
**thereto** 3:15
**there's** 56:19
60:4 63:23 74:2
81:10 93:1 96:2
96:13,22 98:3
98:14,14 99:4,4
99:24,24 100:9
101:2 102:25
103:21
**they're** 54:17
69:11 71:18,19
**they've** 73:19
100:7
**thing** 28:15 43:4
59:20 71:2,10
73:14 93:20
122:21 177:24
190:16
**things** 29:4 31:7
40:13 45:3 58:6
59:24 62:8
69:11 73:22
91:13 102:4,19
102:20 131:7
134:12,21
153:18 155:4
165:24 174:16
177:19 180:13
183:11,24
187:10 194:9
**think** 15:19
16:21 18:6 25:5
29:10,11,16
33:19 35:3

36:20 37:14
38:11 49:20
52:13 55:7 61:6
64:21 70:20,20
71:9 72:1,6 73:3
73:7,9,21 74:15
74:19 81:3 94:5
94:12 95:19
96:1,1,9,25 98:2
98:3 102:11
103:21,22
105:11 106:9,15
106:16,17,17
116:17 118:4
121:5,12,14,16
121:17,17,24
124:4,13,14
126:10 127:7
129:10,18,24
130:2,16,18
131:3,24 132:15
136:21 139:17
141:4 143:24
144:19 145:1,3
145:9,20 147:10
150:15 151:19
151:24 152:6
156:7 157:11
159:14 161:15
162:5 165:25
166:11 167:19
168:12,14 171:4
174:17,22 176:1
177:5,23 179:14
180:4,7,13,23
181:25 183:19
183:24 186:1,5
186:14 189:5
191:18 192:2

**thinking**   21:3
40:3 46:2
155:11 168:1
**thinks**   99:5
173:17 180:6
186:6
**third**   4:11 35:19
56:22 71:11
78:2 81:19,20
82:3,3,4,15
89:10 98:23
107:17,18,21,24
133:10 151:5
170:14
**thomas**   12:6
**thought**   14:24
145:1 156:8
170:5 172:18
185:11
**three**   24:14
26:15 30:4
36:19 64:7
67:16 73:16
89:8,9 123:10
123:11,13 150:5
161:1 164:1
170:23 171:9,10
188:3,12
**throwing**   59:24
**thy**   123:20
**tie**   31:13
**tied**   17:18
**tilt**   29:3
**time**   23:6,16,18
30:14 34:7
45:24 48:6,20
50:23 51:21
52:12,24,24
55:4 59:5 60:19
62:6,14,20

64:13 69:8
71:19 74:16
79:11 82:22
83:11 102:11
109:23 115:2,25
126:18 140:4
147:10,12
148:24,25
149:11,23
150:13 151:23
153:6,22 155:19
156:15,19 157:8
157:24 158:16
166:15 168:7,12
175:3,4,24
176:1,1 177:1,4
179:10,19 180:7
182:6 183:15
185:12 187:23
189:13 190:1,12
191:7,8 193:2
**timeframe**
183:1,8
**timeline**   25:1
27:3 36:17,19
36:21 166:5,22
175:11,17,21
177:6,10 178:14
179:5,14 186:23
187:13 188:11
**times**   24:14
34:13 86:1
118:20 163:12
167:13,16
172:13 184:2
**timetable**
185:22,25
**timing**   156:18
165:18,25 166:9
166:10 174:2,9

174:23 175:7
176:5
**timothy**   12:21
**today**   14:20
16:2,19 17:24
20:1,18 22:8
23:20 25:22
26:4 28:4,4,14
31:5,8 33:1,5
35:5 37:11 38:2
38:7 42:6,19,24
42:24 43:5
48:24 50:2,18
52:16 59:9
65:17 78:11
90:11 103:23
104:1 112:1,13
117:24 121:11
129:22 131:12
133:3 137:9,10
137:13 139:6
153:23 163:19
166:12 177:3
188:9,9 190:25
191:1,2 194:16
**today's**   35:9
**today's**   65:21
77:5
**token**   148:10
154:13
**tokens**   47:15,16
146:20 149:8
152:13 154:20
154:20,22 155:2
155:10,25
171:20
**told**   16:17 21:20
94:21 109:21
112:5,6,6 113:1
113:1,13 127:2

tolerate 29:6
41:8
tone 29:11
tool 163:15
top 53:3
topic 179:24
toronto 9:4
114:1
totally 57:18
58:18 128:9
touch 58:15
160:6,7
touted 39:10
towle 13:4
town 34:1,5,8,10
34:18,20,20,24
180:14
tracy 9:15
trade 93:6
traded 23:9,17
trades 82:10
83:16 91:25
trading 19:6,8
102:22 117:5
136:11 149:14
transact 81:6
140:11
transaction
35:14 70:16,17
71:7,14,24 72:3
72:4,20,22 73:1
73:2,5,8 74:12
81:15,16 82:24
121:1 130:17,17
133:13,17 140:9
151:4 153:6
163:14 176:3
181:5 185:1,3
194:10

transactions
3:17 16:23
46:15 47:11,15
47:17 57:20
70:19 73:18
74:14 83:20,23
84:6,18 88:25
93:2 102:20
119:8 128:1
144:21 146:18
148:14,18,21
152:17,19,24,25
153:3,5 155:3
171:21
transcribed
5:25
transcript 195:4
transfer 19:24
81:7,8 82:2,11
82:16 83:14,24
85:1 92:2,18,20
94:4 100:24
133:16 136:11
140:13 144:16
144:16 148:20
transferred
25:24 47:1
81:18 82:7,15
transferring
49:12
transfers 3:9
81:10,11 85:9
91:5 92:4 93:12
94:25 95:1
103:16,19
139:14 140:5
144:4
transparent
21:14 36:3

transpired
176:19
treasury 82:1
93:2
treat 119:1
120:7 122:19
127:24 128:22
130:21 132:23
treated 24:5
42:11 88:7,11
107:7,11 119:21
120:6,19 122:15
123:1,19 127:11
127:24 128:5
145:21
treatment 79:20
90:8 107:10
trends 82:24
tried 30:19
116:17 121:9
123:4 124:5
129:9,9
triggered 72:5,6
trouble 69:23
136:20 146:4
true 22:7,12
83:18 156:20
195:4
trust 36:23
38:14 40:24
79:4 81:2 84:11
84:12 105:6,6,9
105:14,17
106:16,25
109:25 145:19
trusted 39:14
56:8,22 58:20
trustee 7:18
45:20,25 46:21
48:3,3,9 52:6,6

53:4,6 65:22
66:3,3,13 69:12
72:12 73:14
74:13 75:11,17
75:23 78:16
106:19
trustee's 63:17
69:4
truth 171:5
try 20:10 34:19
44:1 130:14
153:5 164:17
167:25 169:5
175:19
trying 17:9
55:18 59:25
71:3,11,22
112:25 131:22
131:23,23
140:10 146:23
147:6 152:11
177:21 181:2
tuesday 20:24
61:18
tune 129:20
turn 49:25
58:10 82:13
87:21 106:13
127:19 137:11
149:12 153:17
154:6 162:6
164:21 191:3
turnaround
182:5 187:18
turned 137:10
137:13
turning 32:13
154:16
turns 20:21
152:18

tutorial  58:11
two  14:2 15:1
    16:18 31:2 33:8
    33:16 67:14
    75:5 89:9 94:24
    108:23 110:7
    130:22 134:12
    134:24 152:22
    153:6 160:25
    162:18 164:1
    165:3 170:4
    172:4,6,10
    176:2 183:24
    185:5,14 188:8
tx  7:13
type  107:5
    111:15,15,22
    156:15 194:5
typical  15:13,20
    158:3
typically  149:7

**u**

u.s.  1:23 7:18
    45:20,24 46:21
    48:3,3,8 52:6,6
    53:4,6 63:16
    64:3,5 65:22
    66:3,3,13 69:4
    73:14 74:13
    75:11,17,23
    78:15 89:5
    113:3 114:6,7
    117:4 133:9
    145:14 193:10
    193:21
ucc  15:13 36:3
    99:10,12 141:16
    145:22 178:3
    180:14 181:19

187:3
ucc's  36:5
    181:25
ulrich  67:15
    75:4,9 78:8
ultimate  40:23
    87:22 117:14
    184:25 185:1,3
ultimately  30:17
    36:11 55:1
    153:21 154:2
    165:8 176:4
unable  34:23
unclear  18:22
uncollateralized
    56:13 58:25
uncomfortable
    165:10
uncontroverted
    115:19 116:3
    126:15 127:1
underly  131:8
underlying
    43:16 108:3,5,9
    122:1
undermine
    107:9
understand  20:6
    20:17 21:21
    23:7 25:7 34:2
    34:22 38:22
    41:15,16,24
    43:11 52:15
    55:9 56:16,25
    58:2,13 59:13
    61:22 68:12
    69:22 91:7,7
    93:20,20,24
    95:25 97:16,23
    100:19 102:16

103:4 108:24
    113:6 118:3
    121:10 127:17
    127:18 128:7,7
    131:20,22,24
    132:19,20,25
    141:21 142:21
    152:15 154:7
    165:18 166:22
    180:2,10,23
    181:11 188:22
    193:18,19
understanding
    52:20 69:23
    95:10 96:19
    124:23 132:21
    152:21 153:8
    162:1 190:6
understands
    19:5 29:20
    79:22 80:14
understood
    49:23 62:24
    72:19 93:11
    98:18 124:19
underway
    190:25
undo  120:25
    127:25 130:16
    130:17
undoubtedly
    114:12
unduly  173:12
unease  115:3
unfair  126:14
unfavorably
    29:15
unfilled  89:16
    124:21,23 125:7
    125:17,19 128:2

128:3 138:5
unfortunately
    33:14 41:17
    43:17 89:23
unfunded  136:3
unidentified
    137:20
unique  109:22
    120:16
united  1:1,12
    7:17 54:8 69:12
    79:23 80:15
universe  18:5
unknown  1:25
    150:7
unlawful  85:9
unlock  150:18
unnerving  21:20
unsecured  7:2
    7:10 30:5 57:2
    57:13 103:5
    115:7 117:22
    141:17,23 144:8
unstake  151:5,9
    151:24 153:25
unstaking
    146:13 150:25
    151:8
unsuccessful
    30:17
unsympathetic
    131:22
untrue  21:5
    22:17
unusual  116:19
    190:15
unwilling  21:10
unwinding
    155:20

| | | | |
|---|---|---|---|
| update 14:25 | **v** | ventures 6:15 | 24:13,14 25:10 |
| 52:7 53:4 | | verify 146:18 | 25:11,24 26:2,7 |
| updike 11:4 | valid 42:25 | veritext 195:20 | 26:11,17,20,21 |
| uphold 119:12 | 144:5 146:21 | versa 75:22 | 26:23 30:2,18 |
| uploaded 70:6 | validate 152:24 | version 48:15 | 33:19 38:14 |
| upper 167:4 | 153:6 155:3 | 164:13 | 39:5 43:19 |
| upset 29:4 | validating | versus 165:11 | 49:11,13 55:24 |
| 128:18,19,20 | 152:17,25 | 186:11 | 56:22 57:6 59:6 |
| urge 109:9 | validator | viability 155:10 | 59:8 64:8 74:25 |
| urquhart 2:18 | 148:11 153:2 | viable 40:7 | 78:23,24 79:12 |
| usage 107:4 | value 16:13,24 | 103:18 | 79:16 80:2,20 |
| usb 80:22 88:21 | 17:25 19:6 20:9 | vice 75:22 | 81:13,21,22,25 |
| 88:21 137:4 | 21:15 36:13 | view 17:5 54:23 | 82:12 84:2 |
| usbc 80:22 | 59:18 70:25 | 84:10 97:24 | 87:12 88:20 |
| usd 39:9 111:11 | 87:22 112:19 | 106:5 109:4 | 89:2 93:1,9,22 |
| 112:4 113:2 | 132:7 138:22 | 141:25 142:3,7 | 94:15,15,21 |
| usdc 17:24 | 150:1 154:21 | 142:8 150:19 | 95:5,9,11 96:4,5 |
| 111:11,15,22 | 159:9,12 163:14 | 157:9 175:21 | 96:23 97:5 |
| 112:1,5,9 113:2 | 163:16,21 | 194:7 | 98:24 99:9 |
| 193:9,13,17 | 172:25 174:24 | views 175:2 | 100:3,6,20 |
| 194:5,14 | 176:2 177:1,2 | vince 10:2 | 101:3,9,12 |
| use 30:8 56:9 | 177:20 179:15 | violation 14:6 | 102:4,12 105:9 |
| 87:3 106:15 | 181:25 185:15 | violently 31:2 | 107:24 108:10 |
| 116:14 146:16 | 187:2 188:5,6 | virtual 33:6 | 109:19 110:19 |
| 171:8 | 188:24 189:18 | virtually 30:12 | 110:21 114:3 |
| user 34:12 119:7 | 190:14 194:9 | virtue 106:23 | 122:14 123:14 |
| 120:13 122:12 | valued 187:6 | vladimir 11:11 | 141:18 143:2 |
| 122:13 136:1 | vandermark | voiced 182:24 | 145:8 149:17 |
| users 19:7 | 11:22 | voices 34:22 | 193:8 |
| usually 27:25 | varick 7:19 | volatile 151:20 | voyager's 22:11 |
| 32:19 71:17 | various 23:1 | 186:10 | 22:16,22 24:11 |
| 97:18 159:8 | 63:13 64:4 | volatility 133:24 | 25:7 |
| 182:14 188:22 | 66:17,17 91:3,5 | volume 14:22 | voyagercomm... |
| 191:25 | 99:8 106:21 | vote 161:6 | 34:14,16 |
| utilized 4:6 63:7 | 135:1 155:17 | voted 159:5 | voyager's 83:21 |
| uzio 82:16,20 | 160:21 | voyager 1:7 | 83:25 100:1 |
| 83:2 | vdl 116:23 | 2:19 5:5 14:13 | |
| | 141:12,14 | 14:15 15:16 | **w** |
| | velez 13:8 | 18:14 21:1 23:8 | wachtel 25:23 |
| | vendors 18:6 | 23:9 24:2,3,4,10 | |
| | 47:6 | | |

| | | | |
|---|---|---|---|
| **wachtell** 8:18 | 147:16 154:1 | 59:17 66:25 | 64:15 119:24 |
| 93:16 98:21 | 155:24 156:8,11 | 73:4 92:22 95:7 | 179:7 180:14 |
| 109:20,20 | 157:6 158:6 | 98:9 100:16 | **weekend** 182:15 |
| 114:13 144:9 | 160:19 161:22 | 103:1,25 107:8 | **weeks** 14:23 |
| **wagenbach** 13:7 | 163:19 164:17 | 107:12 108:1,21 | 16:15,25 20:2 |
| **wages** 3:4 51:15 | 165:18 166:24 | 112:7 113:2,12 | 20:15 31:2 33:8 |
| 51:18,20,21,23 | 171:2,7,8 | 113:13,13,14 | 36:19 108:23 |
| 52:8 53:10,15 | 174:20 175:25 | 114:8 118:22,23 | 139:8 |
| 53:18 55:2,8 | 177:4 180:3,8 | 125:9,10 126:6 | **weigh** 163:8 |
| **wait** 31:15,21 | 180:13,17 181:4 | 130:1 141:3 | **weighted** 60:17 |
| 35:17 39:25 | 184:11 187:20 | 146:15 149:9 | **welcome** 20:20 |
| 40:1,1 46:6 | 192:15,17 | 152:17 157:10 | 22:1 |
| 71:21 147:6 | **wanted** 14:20 | 157:12 158:19 | **went** 30:13 83:6 |
| 156:5 164:17 | 15:8 16:5 18:11 | 170:6 176:5 | 83:7 123:15 |
| 168:19 177:12 | 22:3 26:15 29:7 | 183:19,24 185:3 | 127:6 |
| 177:18,22 185:7 | 31:23 38:7 | 189:15,23,25 | **west** 8:20 |
| 186:9 190:10 | 48:23 49:15 | 191:14 | 183:23 |
| **waiting** 160:24 | 53:5 56:3,5 66:9 | **ways** 16:8 | **we'd** 46:1 62:9 |
| 176:7 190:11 | 73:15 75:17 | 123:22 148:16 | **we'll** 48:11,24 |
| **walk** 15:7 17:12 | 92:14 95:6 | 188:6 | 51:13 59:5 77:2 |
| 31:12 50:1 81:4 | 104:11 106:5 | **we've** 15:19 | 77:16 |
| 92:13 163:22 | 113:12 117:17 | 16:6,8 18:23 | **we're** 45:12 |
| 164:15 173:7 | 134:14 156:15 | 19:16 20:13 | 48:9 59:23,25 |
| **wallet** 138:12 | 156:21 169:14 | 24:15 27:2,4 | 68:23 69:7 72:9 |
| **want** 16:11,20 | 169:22 170:3,3 | 33:8,9 35:2 | 72:10 85:15 |
| 21:4,12 23:6 | 170:8,15 193:21 | 112:14 140:9,10 | 90:16 100:5 |
| 24:19 25:6 26:7 | **wants** 116:14 | 148:3 153:9 | 102:24 |
| 27:22 33:23 | 141:9 | 155:12 156:2 | **we've** 45:23 |
| 35:1,8,11 37:23 | **warranted** | 163:11 165:2 | 47:12,18 68:25 |
| 38:9,9 39:7 | 173:14 | 170:18 174:19 | 70:23 96:3 |
| 57:11 59:6,15 | **wasn't** 91:21 | 175:8,12 176:2 | 103:23 |
| 64:22 66:25 | **watched** 20:23 | 176:14,14,16,17 | **whales** 189:21 |
| 68:8 72:21 | 168:3 | 180:19,21 194:6 | **whatnot** 56:5 |
| 74:18 94:11 | **watching** 190:5 | **wear** 19:14 | **whatsoever** |
| 100:12 104:16 | **water** 20:2 | 73:17 | 118:15 |
| 104:20,22 | **way** 17:2 20:7 | **website** 15:6 | **what's** 54:2 |
| 108:19 110:15 | 21:9 28:11 | 33:25 39:13 | **whichever** 69:8 |
| 119:11 122:6 | 31:19 37:4,4 | 167:3 | **white** 125:3 |
| 126:6 127:19 | 43:25 45:3 52:7 | **week** 20:24 25:9 | **who'd** 90:18 |
| 129:19 139:12 | 55:11 56:9 | 34:6,18 46:21 | |

who'll   50:1
who's   56:19
wiles   1:22
willing   55:3
  157:17 175:10
win   20:22
wind   115:8
winds   132:6,7
winning   171:23
wire   81:8,11
  82:16 83:14
  88:14 89:5,7
  94:25 118:11,18
  119:6,8,15,24
  120:2,18 126:15
  126:17,22,25,25
  127:4,10 130:7
  130:10,19
wires   119:10,15
wish   44:19
  55:22 72:16
  110:12 123:20
  123:20 162:22
  162:25 165:20
  188:1
wishes   59:11
  76:1 81:6
  108:13
withdraw   30:15
  78:20 82:9
  87:18 88:8,12
  89:5 102:17,18
  102:24 111:25
  118:23 139:20
  139:22 142:2,5
  160:9
withdrawal
  82:21 88:15,16
  88:21,25 89:20
  90:18 93:25

118:11 119:22
119:23 120:18
138:9,24 143:12
withdrawals   4:9
  48:25 49:6 59:6
  77:25 82:18,22
  90:23,25 101:17
  108:14 116:8,13
  135:4,5 138:8
  138:18 143:11
withdrawn
  82:14 136:2
  150:13
withdrew
  101:10
withhold   130:11
withholding
  130:9
witness   58:19
  162:25
witnessing   56:7
wolf   8:23 93:15
  93:16 94:22
  95:2,10,19 96:8
  96:19 97:9,20
  98:1,7 99:13,18
  99:22 100:11,14
  101:7,14 105:23
  106:9 144:9,9
  146:1,3,7
woman   186:17
  192:19,22 193:5
won't   72:24
word   38:14
  97:11
words   31:12
  52:22 120:17
  125:1 128:8
  160:13

work   20:16,16
  46:4 48:10 69:4
  91:15 92:10
  147:9 149:6
  155:16 156:6,12
  156:24 157:17
  167:23 180:20
  191:13
workable   74:20
worked   36:18
  38:15,16,20
  93:14 108:23
  180:21
working   15:11
  17:15 21:8
  27:10 35:21
  63:15 152:2
  173:18 174:19
works   45:14
  46:3,11 93:1
  100:17
worth   189:17
worthlessness
  3:10
would've   23:22
wouldn't   66:25
  103:10
write   179:22
written   125:10
  150:25 179:10
  191:5
wrong   43:24
  91:14 121:8
  124:23 143:24
  180:11
wrongdoing
  122:6
wronged   42:15
  43:20,22,25
  128:8,9,12,20

128:22 132:10
wrongful
  131:24
wrote   129:19

x

x   1:4,10
xclaim   66:9,10
  67:1

y

yates   13:11
yeah   39:20
  58:17 69:10
  117:20 138:4
  147:4 151:18
  174:17 193:15
year   19:9 25:3
  157:8
years   24:25
  33:16 35:17
  38:15 40:1 56:7
  57:1 71:17
  155:13 183:6
yesterday   23:3
yield   33:18
  149:24 150:11
  151:3 177:1,2
york   1:2,14 6:6
  6:17 7:5,20 8:14
  8:21 64:2
youtube   34:25
you'll   64:10,23
  71:10 73:12
you're   55:18
  69:11 71:6,10
  71:11,22 100:13
  102:16,18,20
you've   58:14
  64:19 70:10

| | |
|---|---|
| **yun** | 13:2 |

| | |
|---|---|
| **z** | |

| | |
|---|---|
| **zachary** | 12:22 |
| 13:4 | |
| **zero** | 126:18 |
| 181:22 | |