Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF**
**ZACHARY P. GEORGESON IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'**
**KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Zachary P. Georgeson, hereby declare under penalty of perjury:

1.    I am a Senior Consulting Director at Willis Towers Watson US LLC ("Willis Towers Watson"). In July 2022, Voyager Digital Holdings, Inc. (one of the debtors and, together with the other debtors in possession in these chapter 11 cases, collectively, the "Debtors") engaged Willis Towers Watson to provide certain compensation consulting services.

2.    I work as a compensation consultant for companies inside and outside of bankruptcy and am familiar with the pre- and postpetition structure of the Debtors' compensation

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

programs, including the Debtors' key employee retention plan (the "KERP") as set forth in the
*Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan
and (II) Granting Related Relief* [Docket No. 212] (the "Motion").[2]  My team and I assisted the
Debtors in developing the proposed KERP and advised them on, among other things, sizing,
participation considerations, and structure of the KERP.

3.      I submit this declaration (this "Declaration") in support of the Motion.  Except as
otherwise indicated, I have personal knowledge of all facts in this Declaration, based on my review
of the Debtors' business and compensation practices, my research into compensation practices for
other similarly sized companies, my research into the designs of retention plans approved in
comparable chapter 11 proceedings and my significant experience in developing such programs,
and information supplied to me by members of the Debtors' management team and the Debtors'
other advisors.  For the reasons described below, it is my opinion that the KERP is reasonable,
consistent with market practice in other similarly sized companies, and generally consistent with
my consulting experience with similarly situated companies that have sought relief under chapter
11.  If called upon to testify, I could and would testify competently to the facts and opinions set
forth in this Declaration.

### Background and Qualifications

4.      I received my Bachelor's degree in Finance from Indiana University Bloomington
in 2002.  I have been employed by Willis Towers Watson since 2008, after working at Deloitte
Consulting LLP and Capital H Group.

5.      Willis Towers Watson is an international professional services firm that offers a
wide variety of services to public and private clients, including expert analysis of executive and

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

management compensation.    Services offered by Willis Towers Watson include actuarial, compensation, performance management, employee benefits design communication and administration, organizational communication, reinsurance and risk management amongst other practice areas.

6.      My responsibilities at Willis Towers Watson have primarily involved providing consulting services to mid- and large-sized companies, specifically with regard to executive compensation.  I routinely work with public and private companies in various industries regarding compensation philosophy, pay competitiveness, incentive plan design, and other compensation-related analyses.  I have worked with numerous *Fortune 1000* companies and have participated in the development and design of over 100 management and employee incentive plans for companies in and outside of the bankruptcy context.

7.      I am highly experienced in executive compensation with 20 years of experience in the field.  During this time, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of pre- and postpetition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including Aearo Technologies, Aegean Marine, American Airlines, American Tire Distributors, Appvion, Armstrong Flooring, Aspect Software, Avianca S.A., Bonanza Creek, Breitburn Energy, Caesars Entertainment Operating Company, California Pizza Kitchen, Chaparral Energy, Chesapeake Energy, Cumulus Media, Dex Media, Dura Automotive, Energy Future Holdings, EXCO Resources, Fieldwood Energy, Frontier Communications, Full Beauty Brands, Fairway Market, GenOn Energy, Gymboree, Hornbeck Offshore, iHeartMedia, Intelsat, JCPenney, Jones Energy,

McDermott, MolyCorp, Oasis Petroleum, OneWeb, Parker Drilling, Pier One, RadioShack, Republic Airways, Sabine Oil & Gas, Samson Resources, Sheridan Production, Southeastern Grocers, Speedcast Holdings, Takata, Talen Energy Supply, Tops Grocers, Westmoreland, and Windstream Holdings.  I am also currently active in several restructuring matters that are not yet in the public domain.

### Willis Towers Watson's Involvement with the Debtors

8.      Once Willis Towers Watson was engaged by the Debtors, I familiarized myself with the Debtors' operations, business, and restructuring efforts.  At the outset of our engagement, the Debtors, the Debtors other advisors, and Willis Towers Watson discussed the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs.  Willis Towers Watson reviewed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

9.      We performed significant due diligence in helping the Debtors develop the KERP, and my team and I collaborated closely with the Debtors' management and other advisors in reviewing and advising on it.  My team and I were provided information concerning the Debtors' historical compensation structure, the Debtors' recent financial and operational performance, and the Debtors' ongoing restructuring efforts.  We also discussed the rationale for the proposed KERP with the Debtors, the Debtors' advisors, and Debtor Voyager Digital, LLC's special committee of independent directors.  My primary goal in the course of these interactions was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant

market data as well as my significant experience in designing comparable programs for similarly-situated companies, including companies in chapter 11.

## **KERP Overview**

10.    The KERP grants fixed cash amounts in two (2) installments to select non-insiders[3] who I understand are essential to the Debtors' ongoing operations and pose significant retention risks during the pendency of the Debtors' chapter 11 process.  The aggregate maximum award under the KERP is approximately $1.9 million that may be allocated to certain key non-insider employees.

11.    The key terms of the KERP are as follows:

- *Participants*:  Limited to 38 non-insider key employees who will remain with the go-forward business, or approximately 11 percent of the Debtors' current workforce.  Each Participant is a critical employee that performs, among other things, accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions for the Debtors.

- *KERP Awards*:  KERP awards represent fixed cash amounts payable in two installments based on continued employment of the Participant through the applicable payment dates (except as provided below).  KERP awards are equal to 25% of the Participant's annual salary.

- *Payment Dates*:  50% of each Participant's KERP award will be paid immediately subject to a clawback through emergence from chapter 11, with the remaining 50% paid at the earlier of the date that is (i) twelve months after the effective date of the KERP or (ii) 90 days following emergence from chapter 11.

- *Termination of Employment*:  If a Participant voluntarily terminates employment or is terminated for cause prior to the end of the clawback or retention period, the Participant will be required to repay on an after-tax

---

[3]    Based on my experience and discussions with the Debtors' advisors, I understand that an "insider" for purposes of the KERP refers to the definition under section 101(31) the Bankruptcy Code and that no Participant in the proposed KERP is an employee who:  (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance.  My understanding is that, as a result, none of the Participants is an "insider" under the Bankruptcy Code.

basis, any amounts subject to clawback and forfeit any unpaid KERP award. If a Participant's employment is terminated due to death, disability, or by the Debtors without cause prior to the end of the clawback or retention period, the clawback will be waived and unpaid retention amounts will vest and be paid.

## Analysis of the KERP

12.     In assessing the reasonableness of the KERP, I worked with my team to analyze the retention plans authorized and approved in the chapter 11 cases of the following 31 similarly-sized companies (the "Comparison Group") that filed petitions from 2017 through 2020 and had approximate prepetition annual revenues of $175 million to $750 million or prepetition assets of $1 billion to $10 billion: Aceto Corporation; AcuSport Corporation; Appvion, Inc.; Armstrong Energy, Inc.; Avianca Holdings S.A.; BICOM NY, LLC; Bristow Group Inc.; Brookstone Inc. (2018); California Resources Corporation; Celadon Group, Inc.; Ciber, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Fairway Group Holdings Corp.; FirstEnergy Solutions Corp.; GNC Holdings, Inc.; Gordmans Stores, Inc.; Hexion Holdings LLC; Ignite Restaurant Group; Legacy Reserves Inc.; Marsh Supermarkets; Michigan Sporting Goods Distributors; Nine West Holdings, Inc.; PHI, Inc.; RadioShack (General Wireless); Real Mex Restaurants, Inc.; Rex Energy; Stage Stores, Inc.; The McClatchy Company; Tops Holding II Corporation; and True Religion Apparel, Inc.

13.     In conducting this analysis, I also relied upon my significant consulting experience in the research and design of key employee retention plans generally at dozens of other companies.

14.     The structure of the KERP comports with my general experience and the findings of my review of retention plans approved in similarly-sized companies. Based on my experience, I also believe that when a reorganizing debtor lacks material prepetition non-equity incentive programs for critical employees (as is the case here for), a cash-based KERP will help align a debtor's compensation program with the prevailing market while in chapter 11. Based on my

experience, similarly-sized companies operating in the financial services, technology, or general industry would not offer only base salaries as the sole form of compensation, and it's my opinion the Participants would very likely receive incentive opportunities should they leave the Debtors for other jobs.  I would note the following observations:

- Limiting retention awards to a small group of critical, key employees is common, and the Debtors' number of Participants is at the 58th percentile of the Comparison Group;

- The use of fixed cash retention payouts, expressed as a percentage of salary, is common in key employee retention plans;

- The retention awards expressed as a percentage of salary (*i.e.*, 25% of salary) are generally consistent with awards in comparable key employee retention plans;

- The installment payout feature is consistent with market practice as 42% of key employee retention plans reviewed by Willis Towers Watson provided awards through installments;

- Companies providing for installment payments frequently provide for consistent installment payments (*e.g.*, two installments representing 50% of the total retention award); and

- Accelerated vesting and payment of retention awards is common in the event of an involuntary termination.

15.    My team and I also reviewed the annualized total costs of the KERP, which are consistent with other key employee retention plans analyzed by Willis Towers Watson.

| Annualized KERP Cost vs. Comparison Group | | | | | |
|---|---|---|---|---|---|
| Plan Metrics | Voyager | Percentile Rank | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group |
| Number of Participants | **38** | 58% | 23 | 32 | 50 |
| | | | | | |
| Total Cost ($mm) | **$1,892** | 62% | $651 | $1,499 | $2,600 |
| Cost per Participant | **$49,791** | 60% | $24,806 | $45,870 | $60,772 |

16.    In evaluating the reasonableness of the KERP, my team and I also analyzed the retention compensation award opportunities (expressed as a dollar value) relative to competitive normal course incentive opportunities using market data from proprietary Willis Towers Watson surveys of general industry employee compensation practices.  I took the following steps to review the proposed award opportunities:

a.    program participants were segmented into 13 different base salary tiers, with an average retention award opportunity calculated by tier;

b.    for each tier, competitive market 25th, 50th, and 75th percentile incentive compensation opportunities (dollar values) were developed based on similarly paid (on the basis of salary) employees in the proprietary survey;

c.    the Debtors' average annualized KERP award opportunities by tier were compared to market 25th, 50th, and 75th percentile incentive opportunities from the Willis Towers Watson survey; and

d.    The relationship between the Debtors' proposed KERP award opportunities and the competitive market benchmarks noted above was determined.

17.    Based on this analysis, I observed that the Debtors' KERP opportunities generally were positioned at or below the 25th percentile of the market, on average and for the majority of participants.  Given this relationship, I believe the KERP opportunities are reasonable and appropriate in light of competitive market practice.  Based on the market data my team and I reviewed, and my significant experience with postpetition non-insider retention programs in other matters, the structure of the KERP is also generally consistent from a key design perspective (such

as the frequency of payments, participation levels, and use of cash) of similar non-insider award plans approved on a post petition basis.

## <u>Conclusion</u>

18.     Based on my education, experience, and the work I have done in these chapter 11 and in similar chapter cases, I believe that the design, structure, cost, and award opportunities available under the KERP are reasonable given the facts and circumstances of these chapter 11 cases.


*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 9, 2022                    By:    _/s/ Zachary P. Georgeson_____
New York, New York                        Name:  Zachary P. Georgeson
                                          Title:   Senior Consulting Director
                                                   Willis Towers Watson US LLC