Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine a. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | Case No. 22-10943 (MEW) |
|     Debtors. | (Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | |
|     Plaintiffs, | |
| v. | Adv. Pro. No. 22-_____ |
| FRANCINE DE SOUSA, et al, | |
|     Defendants. | |

**DEBTORS' ADVERSARY COMPLAINT TO EXTEND AUTOMATIC STAY OR, IN**
**THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION OF**
**PENDING LITIGATION AGAINST THE DEBTORS' DIRECTORS AND OFFICERS**

The Debtors[1] in the above-captioned Chapter 11 case ("Plaintiffs," and together with their debtor-affiliates, directors, and officers, the "Debtors"), through their undersigned proposed counsel, hereby file this adversary complaint for an extension of the automatic stay pursuant to Section 362(a) or Section 105(a) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.    Voyager Digital Ltd., one of the Debtors, and certain of the Debtors' current and former directors and officers have been named as defendants in a putative class-action lawsuit, filed in Canada, arising from the Debtor's cryptocurrency ("crypto") trading, lending, and selling activities (the "Canadian Class Action").  A copy of the Notice of Action is attached as Exhibit A hereto.

2.    The Canadian Class Action is brought against Voyager Digital Ltd. as well as certain of the Debtors' current and former directors and officers: Stephen Ehrlich (Debtors' CEO and co-founder), Philip Eytan (Debtors' non-executive Chairman and a director), Evan Psaropoulos (Debtors' Chief Commercial Officer), Lewis Bateman (Debtors' former Chief International Officer), Krisztian Toth (Debtor's director), Jennifer Ackart (Debtor's director), Glenn Stevens (Debtors' director), and Brian Brooks (Debtors' director) (collectively, the "D&Os").

3.    The Canadian Class Action alleges claims against the Debtor's D&Os for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

4.    The Canadian Class Action is dependent on, and inextricably intertwined with, the Debtors' alleged conduct. To prove many of the claims in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, which allegedly requires a vicarious finding of underlying wrongdoing by the Debtor, Voyager Digital Ltd. The Canadian Class Action may also require a determination as to whether the Debtors' crypto-based financial products are securities at all—an unsettled legal issue in Canada and the United States.

5.    The Canadian Class Action is currently stayed against Debtor Voyager Digital Ltd. pursuant to the automatic stay provided by Section 362.  This Court should extend the automatic stay pursuant to Section 362, or issue an injunction pursuant to Section 105 to enjoin the continuation of the Canadian Class Action as against the D&Os for the following reasons:

a.    ***First***, the Debtors will be exposed to a significant risk of collateral estoppel, *stare decisis*, and evidentiary prejudice if the Canadian Class Action is permitted to proceed. The Debtors' D&Os' alleged conduct is the foundation for the Canadian Class Action's claims, and any judicial decision on the claims against the D&Os could be used against all the Debtors (not just Voyager Digital Ltd.)

b.    ***Second***, some D&Os named in the Canadian Class Action are critical to the restructuring efforts of the Debtors, and particularly given the fast pace and anticipated short timetable of these chapter 11 cases, the Debtors need their D&Os focused on the restructuring, not defending a class action lawsuit in Canada.

c.    ***Third***, the Debtors will face likely indemnification claims if the Canadian Class Action is allowed to continue. The Articles of Voyager Digital Ltd. require indemnification of its directors for liabilities incurred in the course of their business as directors, and if the Canadian Class Action results in such liability, Voyager

Digital Ltd. could be required to pay for such indemnification. As such, the Debtors could be directly affected should the Canadian Class Action proceed against the D&Os.

d.    ***Fourth***, the Debtors' estates own property which may be depleted if the Canadian Class Action proceeds. Voyager Digital Ltd., the other Debtors, and the D&Os share insurance coverage for the Canadian Class Action. If prosecution of the Canadian Class Action continues, the Debtors and the D&Os will incur defense costs that could draw down these insurance policies, depleting an asset that the Debtors contend is the estates' property.

6.    For these reasons, the Debtors request that the Court extend the automatic state pursuant to Section 362 or issue an injunction pursuant to Section 105 to stay or enjoin the prosecution of the Canadian Class Action against the D&Os and Voyager Digital, Ltd. until the effective date of a restructuring plan in these Chapter 11 cases.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

8.    This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

9.    Venue in this district is proper pursuant to 28 U.S.C. § 1409.

10.    Pursuant to Federal Bankruptcy Rule of Procedure 7008, the Debtors consent to the entry of a final order or judgment by the Bankruptcy Court.

## PARTIES

11.    The Debtors are plaintiffs in this adversary proceeding.

12.     Francine De Sousa is the named plaintiff in the Canadian Class Action.  This Complaint is being served on the attorneys that filed the Canadian Class Action on her behalf.

## RELIEF REQUESTED

13.     By this Complaint, the Debtors seek a declaratory judgment pursuant to Sections 105 and 362 of the Bankruptcy Code to extend the automatic stay under Sections 362(a)(1) and 362(a)(3) to the Action, or in the alternative, stay and enjoin the Canadian Class Action pursuant to Section 105 of the Bankruptcy Code during the pendency of the Debtors' Chapter 11 cases.

## FACTUAL BACKGROUND

14.     On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Court").  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

15.     On July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee") appointed an eight-member official committee of unsecured creditors (the "Creditors Committee"). (ECF No. 102).

16.     The Debtors and certain of their non-Debtor affiliates (collectively, "Voyager," or "the Company") are a crypto-based financial platform that provides brokerage services that allows customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Voyager's customers can earn rewards on their cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mobile application has been downloaded millions of times and currently had over 3.5 million active users at its peak. A detailed description of Voyager's business operations, capital and debt structure, and the facts and circumstances leading to these Chapter 11 cases is set forth in the *Declaration of Stephen Ehrlich,*

*Chief Executive Officer of Voyager Digital Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Ehrlich Declaration"), (ECF No. 15) (July 6, 2022).

17.     Debtor Voyager Digital Ltd. and certain of the Debtors' current and former directors and officers have been named as a defendant in a putative class-action proceeding filed in Toronto, Canada, captioned *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice Ct. July 6, 2022). Plaintiff Francine De Sousa, as proposed class representative, asserts claims against the D&Os and Voyager Digital Ltd. for allegedly violating Canadian securities laws.  Ex. A, Notice of Action ¶¶ 27–44.

18.     The Notice of Action asserts that Voyager Digital Ltd. is vicariously liable for the acts or omissions of the D&Os. *Id.* ¶¶ 45–48.  For example, the Notice of Action alleges that in written and oral statements, Voyager Digital Ltd. falsely represented its exposure to the Terra/Luna collapse, the exposure of its lendees to the Terra/Luna collapse, and the extent of Voyager Digital Ltd.'s liquidity issues, all of which are alleged to be "misrepresentations" under Ontario securities law. *Id.* ¶¶ 10–14.

19.     Parallel with these Chapter 11 cases, Debtor Voyager Ltd. commenced recognition proceedings under Part IV of the *Companies' Creditors Arrangement Act* (Canada) pending in the Ontario Superior Court of Justice (Commercial List). Those proceedings bear the caption *In the Matter of Voyager Digital Ltd.*, Court File No. CV-22-00683820-00CL.

20.     On July 12, 2022, the Canadian Court recognized the Chapter 11 case of Debtor, Voyager Digital, Ltd., as a foreign proceeding, subject to a further determination as to whether such Chapter 11 case is a foreign main proceeding.

21.     On August 9, 2022, the Canadian court made a determination that the "centre of main interest" of Debtor, Voyager Digital, Ltd. is in the United States and that the Chapter 11

cases of Voyager Digital, Ltd. would be recognized as a "foreign main proceeding" under Canadian law. *In the Matter of Voyager Digital Ltd.*, 2022 ONSC 4553 ¶¶ 3, 15–16 (quoting Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 47(2)). *See* Exhibit B. Pursuant to the Amended and Restated Initial Recognition Order of the Canadian Court dated July 12, 2022, and the amended and restated August 5, 2022 Order, and the Supplemental Order of the Canadian Court dated July 12, 2022, all suits in Canada against Voyager Digital Ltd. are stayed, absent a further order of that court. *Id.* ¶ 55; *see* Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 48(1) (requiring the stay after ordering recognition of a foreign main proceeding).

22.    Despite the Canadian Court's orders, and that the filing of a notice of action does not, by itself, require any response or other active proceedings in the Canadian court,[2] counsel for the plaintiff has made it clear that the plaintiff intends to pursue the action quickly. Indeed, counsel for the Canadian Class Action plaintiff has already filed a motion in the Canadian insolvency case that would, if granted and among other relief, require Voyager Digital Ltd. to provide certain discovery, create an equity committee to which the Canadian Class Action plaintiff would be appointed, and appoint the Canadian lawyers for the Canadian Class Action plaintiff as representative counsel on behalf of equity holders. *See* Exhibit C.

### *The D&O Insurance Coverage*

23.    The Debtors and their directors and officers share a common primary Executive and Corporate Securities Liability Insurance Policy and a common excess insurance policy. The Policy provides coverage for claims made against directors and executives of both Voyager Digital

---

[2]    Under Ontario Rule of Civil Procedure 14.03, a plaintiff may commence a case with a "notice of action" "that contains a short statement of the nature of the claim," which must then be followed by a full "statement of claim" "within thirty days after the notice of action is issued." Rules of Civil Procedure, R.R.O. 1990, Reg. 194, at Rule 14.03. The statement of claim and notice of action are then served together. *Id.* Service must take place "within six months after the notice of action is issued." *Id.* Rule 14.08.

Ltd. and its subsidiaries, including, but not limited to, non-indemnified losses of officers and

directors under Insuring Agreement (A); losses of the Company or those of its directors and

officers that the Company indemnifies, under Insuring Agreement (B); and the Company's losses

from securities claims, under Insuring Agreement (C).

24.     The Company and its officers and directors are entitled to use the proceeds of that

policy for "damages, judgments, settlements, pre-judgment and post-judgment interest or other

amounts … that any Insured is obligated to pay and Defense Expenses," subject to a few non-

relevant limitations.  If made, such payments could deplete proceeds available to the estates.

*Voyager Digital Ltd.'s Indemnification Obligations*

25.     The Articles of Voyager Digital Ltd. obligate it to indemnify its "director[s], former

director[s], [and] alternate director[s]," and their "heirs and legal personal representatives" for any

"judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of," any "legal

proceeding or investigative action … in which a director, former director or alternate director…,

by reason of the eligible party being or having been a director or alternate director … is or may be

joined as a party; or is or may be liable for in respect of a judgment, penalty or fine in, or expenses,

related [thereto]." Ex. D, Articles of Voyager Digital Ltd. art. 21.1–21.2.

## THE CONTINUATION OF THE ACTIONS AGAINST THE D&Os WILL BE DETRIMENTAL TO THE DEBTORS' ESTATES

26.     If the Canadian Class Action continues, and is not stayed or enjoined, the Debtors'

estate and reorganization will be harmed.

27.     **First**, the Debtors will be exposed to a significant risk of collateral estoppel, *stare

decisis*, and/or evidentiary prejudice if the Canadian Class Action against the D&Os is allowed to

continue.  The Canadian Class Action raises many legal issues that will be central to the Chapter

11 proceedings.  The Debtors' alleged conduct is the foundation for the allegations against the

D&Os in the Canadian Class Action. Thus, any judicial decision—whether on the merits or on procedural issues—could be used later against the Debtors.

28.     *Second*, if the Canadian Class Action continues, an asset of the Debtors' estate—namely the insurance policy and proceeds that Debtors share with the D&Os—will be depleted. Because the insurance proceeds are paid on a first-billed, first-paid basis, allowing the Canadian Class Action to continue against the D&Os will reduce the proceeds available to the Debtors, and, once exhausted, increase the Debtors' indemnification obligations.

29.     *Third*, the Canadian Class Action will create indemnification obligations for the Debtors. In addition to the Debtors' contractual indemnification obligations to the D&Os, the Articles of Voyager Digital Ltd. obligate it to indemnify its "director[s], former director[s], [and] alternate director[s]," and their "heirs and legal personal representatives" for any "judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of," any "legal proceeding or investigative action … in which a director, former director or alternate director…, by reason of the eligible party being or having been a director or alternate director … is or may be joined as a party; or is or may be liable for in respect of a judgment, penalty or fine in, or expenses, related [thereto]." Exhibit D, Articles of Voyager Digital Ltd. art. 21.1–21.2. The Canadian Class Action raises claims against the Debtors' directors and officers, who will then have direct claims against the Debtors' estate for their defense costs and any settlement or judgment.

30.     *Fourth*, certain of the D&Os are critical to any successful restructuring, and they will be distracted from their bankruptcy-related obligations to deal with the Canadian Class Action. The D&Os have the overriding responsibility to shepherd the Debtors through their restructuring, and they will necessarily be distracted from this responsibility if they are obligated to devote time to responding to discovery demands and litigating claims against them.  These chapter 11 cases

are proceeding at a rapid pace, and the Debtors need their officers and directors focused on the restructuring, not on defending a class action lawsuit in Canada.

## FIRST CLAIM FOR RELIEF

### (Section 362 Declaratory Judgment)

31.     The Debtors repeat and re-allege the allegations contained in paragraphs 1-30 of this Complaint as if fully set forth herein.

32.     The Debtors seek an order staying the continuation of the Canadian Class Action until the effective date of a restructuring plan in these Chapter 11 cases, pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.

33.     Extension of the stay is warranted because continuation of the Canadian Class Action against the D&Os would expose the Debtors to a risk of collateral estoppel, *stare decisis*, and evidentiary prejudice.

34.     Extension of the stay is further warranted because continuation of the Canadian Class Action against the D&Os would expose the Debtors to burdensome discovery obligations. Discovery from the Debtors would consume significant time and resources, distract their management, eviscerate the benefits of the automatic stay, and frustrate their ability to restructure successfully.

35.     Extension of the stay is additionally warranted because continuation of the Canadian Class Action against the D&Os could deplete the Debtors' insurance coverage.

36.      Extension of the stay is likewise warranted because continuation of the Canadian Class Action against the D&Os would expose the Debtors to indemnification claims by the D&Os, further jeopardizing property of the Debtors' estate.

37.     If the Canadian Class Action is allowed to continue, the Debtors' prospects for confirming their restructuring plan will be impaired, thwarting the Congressional purpose of

providing the Debtors with a breathing spell from litigation pressures in their efforts to confirm a plan of reorganization. Accordingly, the automatic stay should extend to the Canadian Class Action that name D&Os as defendants or respondents.

38.    Based on the foregoing, the Debtors seek a declaratory judgment extending the stay under sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code to the continuation of the Canadian Class Action against the D&Os.

## SECOND CLAIM FOR RELIEF

### (Section 105 Injunctive Relief)

39.    The Debtors repeat and re-allege the allegations contained in paragraphs 1–38 of this Complaint as if fully set forth herein.

40.    The Debtors seek an injunction enjoining the continued prosecution of the Canadian Class Action against the D&Os under section 105(a) of the Bankruptcy Code until the effective date of a restructuring plan or further order of this Court.

41.    Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

42.    Relief under section 105 of the Bankruptcy Code is particularly appropriate in a Chapter 11 case when necessary to protect a debtor's ability to effectively confirm a restructuring plan and to preserve the property of the debtor's estates.

43.    For the reasons stated herein, this Court should apply section 105 of the Bankruptcy Code to enjoin the continuation of the Canadian Class Action against the Debtors because the continuation of that case against the Debtors will harm the Debtors' efforts to successfully restructure and will interfere with the property of the Debtors' Chapter 11 estate.

44.     The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to the parties in the Canadian Class Action. The plaintiffs in the Canadian Class Action will suffer little if any harm if the Canadian Class Action is enjoined until the effective date of the Debtors' restructuring plan.

45.     If the Canadian Class Action against the Debtors is not enjoined, the Debtors will likely suffer harm and their restructuring efforts will be threatened, including:

a.     The risk of collateral estoppel, *stare decisis*, issue preclusion, or other findings that could impair the Debtors' ability to defend themselves in subsequent litigation;

b.     The risk that a finding of liability against the D&Os will harm the Debtors' estate because a finding of liability against the D&Os will result in indemnification claims against the Debtors;

c.     The risk that continuation of the Canadian Class Action against the D&Os will result in depletion of insurance policies and proceeds through payment of the D&Os' defense costs and any settlement or judgment against them; and

d.     The fact that the D&Os will be distracted by the Canadian Class Action during a time period they should be completely focused on shepherding the Debtors through these Chapter 11 cases.

## **PRAYER FOR RELIEF**

WHEREFORE, the Debtors as Plaintiffs demand judgment against the Defendants and respectfully request relief as follows:

i.     The entry of a declaratory judgment that the continuation of the Canadian Class Action against the D&Os is stayed under Bankruptcy Code Sections 362(a)(1) and/or 362(a)(3) until the effective date of a restructuring plan or further order of this Court; and/or

ii.    In the alternative, the entry of an Order granting an injunction pursuant to

Bankruptcy Code Section 105(a) enjoining and prohibiting the continuation of the

Canadian Class Action against the D&Os until the effective date of a restructuring

plan or further order of this Court; and/or

iii.    Such other relief as this Court deems just and proper under the circumstances.

Dated:  August 10, 2022
New York, New York                      */s/ Joshua A. Sussberg*
                                        **KIRKLAND & ELLIS LLP**
                                        **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                        Joshua A. Sussberg, P.C.
                                        Christopher Marcus, P.C.
                                        Christine A. Okike, P.C.
                                        Allyson B. Smith (admitted *pro hac vice*)
                                        601 Lexington Avenue
                                        New York, New York 10022
                                        Telephone:     (212) 446-4800
                                        Facsimile:     (212) 446-4900
                                        Email:         jsussberg@kirkland.com
                                                       cmarcus@kirkland.com
                                                       christine.okike@kirkland.com
                                                       allyson.smith@kirkland.com

                                        Michael B. Slade (admitted *pro hac vice*)
                                        **KIRKLAND & ELLIS LLP**
                                        **KIRKLAND & ELLIS**
                                            **INTERNATIONAL LLP**
                                        300 North LaSalle
                                        Chicago, IL 60654
                                        Telephone:     (312) 862-2000
                                        Facsimile:     (312) 862-2200
                                        *Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I HEREBY CERTIFY that on this 10th day of August, 2022, I caused a true and correct

copy of the foregoing to be served by e-mail upon the following:

Michael Robb
Anthony O'Brien
Garrett Hunter
Siskinds LLP
100 Lombard St., Suite 302
Toronto ON M5C 1M3
CANADA

Steven Graff
Miranda Spence
Tamie Dolny
Aird & Berlis
181 Bay Street, Suite 1800
Toronto  ON M5J 2T9
CANADA

/s/ Michael Slade
Michael Slade

**Exhibit A**

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP



Court File No.

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

B E T W E E N :

FRANCINE DE SOUSA

Plaintiff

- and -

VOYAGER DIGITAL LTD., STEPHEN EHRLICH, PHILIP EYTAN, EVAN
PSAROPOULOS, LEWIS BATEMAN, KRISZTIÁN TÓTH, JENNIFER ACKART, GLENN
STEVENS AND BRIAN BROOKS

Defendants

Proceeding under the *Class Proceedings Act, 1992*

### NOTICE OF ACTION

TO THE DEFENDANTS

    A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff.
The claim made against you is set out in the statement of claim served with this notice of action.

    IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for
you must prepare a statement of defence in Form 18A prescribed by the *Rules of Civil Procedure*,
serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the
plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after
this notice of action is served on you, if you are served in Ontario.

    If you are served in another province or territory of Canada or in the United States of
America, the period for serving and filing your statement of defence is forty days.  If you are served
outside Canada and the United States of America, the period is sixty days.

    Instead of serving and filing a statement of defence, you may serve and file a notice of
intent to defend in Form 18B prescribed by the *Rules of Civil Procedure*.  This will entitle you to
ten more days within which to serve and file your statement of defence.

    IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN
AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.  IF
YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES,
LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID
OFFICE.

    IF YOU PAY THE PLAINTIFF'S CLAIM, and $5,000.00 for costs, within the time for
serving and filing your statement of defence, you may move to have this proceeding dismissed by

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP

the court. If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

Date:   July 6, 2022                    Issued by _____
                                                      Local registrar

                                        Address of   393 University Avenue
                                        court office:  10th Floor
                                                       Toronto, ON  M5G 1E6

TO:         Voyager Digital Ltd.
            Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Stephen Erlich
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Philip Eytan
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Evan Psaropoulos
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Lewis Bateman
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Krizstian Toth
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Jennifer Ackart
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Glenn Stevens
            c/o  Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Brian Brooks
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada

## CLAIM

### CURRENCY AND DEFINITIONS

1.      Unless otherwise stated, all dollar amounts stated herein are in Canadian dollars.

2.      In this Notice of Action, in addition to the terms that are defined elsewhere herein, the
following definitions apply:

(a)      "**3AC**" means Three Arrows Capital, a cryptocurrency hedge fund to whom
**Voyager Digital** made material loans during the **Class Period**;

(b)      "*CJA*" means the *Courts of Justice Act*, RSO 1990, c C-43, as amended;

(c)      "**Class**" and "**Class Members**" all persons and entities, wherever they may reside
or be domiciled, who acquired **Voyager Digital** securities on the secondary market
during the **Class Period**, other than **Excluded Persons**;

(d)      "**Class Period**" means the period from and including October 28, 2021 to and
including July 5, 2022;

(e)      "*CPA*" means the *Class Proceedings Act, 1992*, SO 1992, c 6, as amended;

(f)      "**Impugned Core Documents**" means:

　　a.  the Annual Information Form for the year ended June 30, 2021;

　　b.  the Management's Discussion and Analysis for the year and
quarter ended June 30, 2021 (filed October 28, 2021);

　　c.  financial statements for the year and quarter ended June 30, 2021
(filed October 28, 2021);

　　d.  the Management's Discussion and Analysis for the quarter
ended September 30, 2021 (filed November 15, 2021);

　　e.  financial statements for the quarter ended September 30, 2021
(filed November 15, 2021);

　　f.  the Management's Discussion and Analysis for the quarter
ended December 31, 2021 (filed February 14, 2022);

　　g.  the financial statements for the quarter ended December 31,
2021 (filed February 14, 2022);

　　h.  the Management's Discussion and Analysis for the quarter
ended March 31, 2022 (filed May 16, 2022);

3

i.   the financial statements for the quarter ended March 31, 2022 (filed May 16, 2022);

(g)   "**Impugned Non-Core Documents**" means:

a.   the news release dated June 14, 2022 entitled "Voyager Digital Provides Update on Asset and Risk Management";

b.   the news release dated June 17, 2022 entitled "Voyager Digital Signs Term Sheet for US$200 Million and 15,000 BTC Revolving Line of Credit with Alameda Research"; and

c.   the news released dated June 22, 2022 entitled "Voyager Digital Provides Market Update";

(h)   "**Impugned Oral Representations**" means the statements made on the May 16, 2022 earnings call with investors;

(i)   "**Defendants**" means **Voyager Digital**, Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens and Brian Brooks;

(j)   "**Excluded Persons**" means the **Defendants**, and **Voyager Digital**'s past and present subsidiaries, affiliates, officers, directors, senior employees, partners, legal representatives, heirs, predecessors, successors and assigns, and any member of the individual **Defendants**' families;

(k)   "***OSA***" means the *Securities Act*, RSO 1990, c S.5, as amended;

(l)   "**Other Canadian Securities Legislation**" means , collectively, the *Securities Act*, RSA 2000, c S-4, as amended; the *Securities Act*, RSBC 1996, c 418, as amended; *The Securities Act*, CCSM c S50, as amended; the *Securities Act*, SNB 2004, c S-5.5, as amended; the *Securities Act*, RSNL 1990, c S-13, as amended; the *Securities Act*, SNWT 2008, c 10, as amended; the *Securities Act*, RSNS 1989, c 418, as amended; the *Securities Act*, S Nu 2008, c 12, as amended; the *Securities Act*, RSPEI 1988, c S-3.1, as amended; the *Securities Act*, RSQ c V-1.1, as amended; *The Securities Act, 1988*, SS 1988-89, c S-42.2, as amended; and the *Securities Act*, SY 2007, c 16, as amended;

(m)   "**Plaintiff**" means Francine De Sousa;

(n)   "**TSX**" means the Toronto Stock Exchange; and

(o)   "**Voyager Digital**" means the Defendant Voyager Digital Ltd.

4

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP

## RELIEF SOUGHT

3.      The Plaintiff claims on her own behalf and on behalf of the other Class Members:

(a)     an order granting leave to pursue this action under Part XXIII.1 of the *OSA* and the
        Other Canadian Securities Legislation (if necessary);

(b)     an order certifying this action as a class proceeding pursuant to the *CPA* and
        appointing the Plaintiff as the representative plaintiff for the Class;

(c)     a declaration that the Impugned Core Documents, the Impugned Non-Core
        Documents and the Impugned Oral Representations contained one or
        misrepresentations at common law and within the meaning of the *OSA* and the
        Other Canadian Securities Legislation (if necessary);

(d)     a declaration that the Defendants or one of them made the misrepresentations;

(e)     a declaration that Voyager Digital is vicariously liable for the acts and/or omissions
        of the individual Defendants and, as may be application, of its other officers,
        directors or employees;

(f)     general damages in an amount to be determined by this Honourable Court;

(g)     an order directing a reference or giving such other directions as may be necessary
        to determine issues not determined at the trial of the common issues;

(h)     pre-judgment and post-judgment interest pursuant to the *CJA*;

(i)     costs of this action on a substantial indemnity basis or in an amount that provides
        full indemnity;

(j)     pursuant to section 26(9) of the *CPA*, the costs of notice and of administering the
        plan of distribution of the recovery in this action plus applicable taxes; and

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

(k)     such further and other relief as this Honourable Court may deem just.

**NATURE OF THE ACTION**

4.      Voyager Digital is a publicly traded company incorporated in British Columbia. Its shares
        trade on the TSX and over the counter in the United States of America.

5.      Through its wholly owned subsidiaries, Voyager Digital's primary operations consist of (i)
        brokerage services for retail and institutional clients; (ii) custodial services through which
        customers earn interest and other rewards on stored cryptocurrency assets; and (iii) a
        lending program whereby the cryptocurrency assets Voyager Digital holds for its largely
        retail customer base are lent to third parties in return for interest on those cryptocurrency
        assets.

6.      Voyager Digital's loan portfolio consists of large loans made to a limited number of
        undisclosed counterparties.

7.      In the Impugned Core Documents, the Defendants represented that these loans posed little
        credit risk because of Voyager Digital's stringent ongoing due diligence processes into its
        debtors and the high-quality financial institutions that it lent money and other assets to. At
        all material times, those statements were misrepresentations. Voyager Digital's due
        diligence processes were woefully inadequate and the counterparties to its loans were not
        high quality institutions.

8.      In March 2022, Voyager Digital entered into a loan agreement with 3AC. Pursuant to that
        agreement, Voyager Digital made an unsecured loan to 3AC consisting of 15,250 Bitcoins
        and 350 million USDC. As of July 5, 2022, the value of the loan to 3AC was $654,195,000.
        Since the time of the loan to 3AC, the value of bitcoin has decreased significantly.
        Consequently, the value of the loan as of March 2022 was substantially higher. The

Defendants did not disclose that it had made a loan of this magnitude to 3AC until June 22, 2022.

9.    In early May 2022, the crypto platform Terra and the related crypto assets Terra and Luna collapsed. Unbeknownst to the Plaintiff and Class, 3AC had significant exposure to the Terra platform and Terra and Luna. Moreover, as Defendant Stephen Ehrlich explained after the end of the Class Period, "[t]he Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act as a broker for cryptocurrency assets." Despite knowledge of the acute dangers to Voyager Digital's ability to continue as a going concern posed by the 3AC loans, the Defendants failed to disclose both Voyager's loan to 3AC and the quantum of that loan in the Impugned Core Document dated May 16, 2022 and in the Impugned Non-Core Documents prior to June 22, 2022.

10.    Instead of disclosing these material facts to the Plaintiff and Class as they were required to, the Defendants represented in the Impugned Core Document dated May 16, 2022, in the Impugned Non-Core Documents prior to June 22, 2022 and in the Impugned Oral Representations that:

(a)    Voyager Digital had no exposure to the Terra/Luna collapse;

(b)    Voyager Digital had verified that the unidentified counterparties to its loans had not been exposed to any contagion from the Terra/Luna collapse;

(c)    Voyager Digital was "really comfortable we did not have to call anything in [call for repayment of the loans due to a credit risk] and we have zero issues with any of our borrowers";

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

(d)    Voyager Digital had a "low-risk approach to lending and asset management by working with a select group of reputable counterparties, which are all vetted through extensive due diligence by its Risk Committee"; and

(e)    Voyager Digital had no credit risk because "The company is well capitalized and in a good position to weather this market cycle and protect customer assets".

11.    These statements were all misrepresentations within the meaning of the *OSA* and Other Canadian Securities Legislation, if necessary. Voyager Digital had made massive loans to 3AC, which 3AC was unable to pay or had an impaired ability to repay due to 3AC's exposure to the Terra/Luna collapse.

12.    On June 22, 2022, Voyager Digital issued a news release that corrected the above-described misrepresentations. Voyager Digital disclosed its loan to 3AC and that it might have to issue a notice of default to 3AC for failure to repay that loan. As a result of this materially negative news, the trading price of Voyager Digital's shares collapsed.

13.    Despite the correction of some of the misrepresentations on June 22, 2022, Voyager Digital continued to mislead investors. At the same time it disclosed its loan to 3AC, Voyager Digital announced that it had secured a loan from Alameda "to be used to safeguard customer assets in light of current market volatility and only if such use is needed." In so doing, Voyager Digital represented to the market that despite the 3AC loan it was financially secure.

14.    These statements contained misrepresentations by omission. They failed to disclose that Voyager Digital required an immediate cash infusion or else it would be required to enter insolvency proceedings. As the Defendant Stephen Ehrlich later stated in insolvency

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

materials filed in the United States, the Alameda loan was only "a partial solution to the Company's liquidity issues… The Company's management team understood that the Company would likely need to pursue a strategic transaction and/or seek additional sources of liquidity." Indeed, Defendant Ehrlich states that outside advisors were retained by June 16, 2022 to search for such alternative financing options.

15.    These misrepresentations were corrected July 6, 2022 when Voyager Digital disclosed that it had filed for Chapter 11 bankruptcy protection in the US. Trading in Voyager Digital shares was halted by the Investment Industry Regulatory Organization of Canada after the news and before the start of trading on July 6, 2022.

**THE PARTIES**

*The Plaintiff and Class*

16.    The Plaintiff is an individual residing in Milton, Ontario.  The Plaintiff acquired 13,000 shares during the Class Period.

17.    The Class consist of all persons and entities, wherever they may reside or be domiciled, who acquired Voyager Digital securities on the secondary market during the Class Period, other than Excluded Persons.

*The Defendants*

18.    Voyager Digital is a publicly traded company incorporated in British Columbia. Its shares trade on the TSX and over the counter in the United States of America. Voyager Digital's principal place of business is Toronto. Voyager Digital's principal securities regulator is the Ontario Securities Commission.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

19.    Stephen Ehrlich was the Chief Executive Officer of Voyager Digital during the Class Period. He is also the co-founder of Voyager Digital.

20.    Philip Eytan was the non-executive Chairman of Voyager Digital and a director of Voyager Digital during the Class Period.

21.    Evan Psaropoulos was the Chief Commercial Officer and Chief Financial Officer of Voyager Digital during the Class Period.

22.    Lewis Bateman was the Chief International Officer of Voyager Digital during the Class Period responsible for Voyager Digital's strategic partnerships.

23.    Krisztian Toth was a director of Voyager Digital during the Class Period.

24.    Jennifer Ackart was a director of Voyager Digital during the Class Period.

25.    Glenn Stevens was a director of Voyager Digital during the Class Period.

26.    Brian Brooks was a director of Voyager Digital during the Class Period.

**RIGHTS OF ACTION**

*Statutory Secondary Market Liability*

27.    On behalf of the Class Members, the Plaintiff pleads the right of action found in section 138.3(1) of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation) against the Defendants for misrepresentations in the Impugned Core documents, Impugned Non-Core Documents and Impugned Oral Representations subject to leave being granted under section 138.8(1) of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

28.    The Impugned Core Documents and Impugned Non-Core Documents are documents within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

29.    The Impugned Oral Representations are public oral statements within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

30.    At all material times, Voyager Digital was a "responsible issuer" within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

31.    The individual Defendants were officers and directors of Voyager Digital during the Class Period. The individual Defendants authorized, permitted or acquiesced in the release of the Impugned Core Documents and the Impugned Non-Core Documents and in the making of the Impugned Oral Representations.

32.    The Impugned Non-Core Documents, Impugned Core Documents and Impugned Oral Representations contained misrepresentations as described herein. Any one of such misrepresentations is a misrepresentation for the purposes of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

33.    The Defendants knew at the time the Impugned Non-Core Documents were released and at the time the Impugned Oral Representations were made, that it contained a misrepresentation; or alternatively, at or before the time that those Documents were released or the misrepresentations were made the Defendants deliberately avoided acquiring knowledge that they contained a misrepresentation; or alternatively, the Defendants were, through action or failure to act, guilty of gross misconduct in connection

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

with the release of the Impugned Non-Core Documents or the making of the Impugned Oral Representations.

34. The Plaintiff and the other Class Members who purchased securities of Voyager in the secondary market during the Class Period are entitled to damages assessed in accordance with section 138.5 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

### *Negligent Misrepresentation*

35. On behalf of the Class Members, the Plaintiff pleads negligent misrepresentation against the Defendants for the misrepresentations described herein.

36. The Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations were prepared, released and/or made for the purpose of providing material information and inducing Class Members to purchase Voyager Digital shares.

37. The Defendants undertook to do so with reasonable care for the aforementioned purpose. The Defendants intended and were aware that the Class Members would rely reasonably and to their detriment upon the Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations.

38. The Defendants further knew and intended that the information contained in the Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations would be incorporated into the price of Voyager Digital's publicly traded shares such that the trading price of those shares would at all times reflect the information contained in therein.

39. The Defendants had a duty of care at common law to exercise due care and diligence to ensure that the Impugned Core Documents, Impugned Non-Core Documents and

Impugned Oral Representations fairly and accurately disclosed all material information about the 3AC loan, Voyager Digital's financial stability and its loan due diligence procedures.

40.    The Defendants breached that duty as described herein.

41.    Throughout the Class Period, the Defendants had exclusive access to information about Voyager Digital's business and operations, including the 3AC loan, Voyager Digital's financial stability and its loan due diligence procedures. As such, they were the primary source of such information for Class Members.

42.    The Class Members directly or indirectly relied upon the misrepresentations in making a decision to purchase Voyager Digital's shares, and suffered damage when the misrepresentations were publicly corrected.

43.    Alternatively, the Class Members relied upon the misrepresentations by the act of purchasing Voyager Digital's shares in an efficient market that promptly incorporated into the price of those shares all publicly available material information regarding the shares of Voyager Digital.

44.    As a result, the misrepresentations caused the price of Voyager Digital's shares to trade at artificially inflated prices during the Class Period, thus directly resulting in damage to the Plaintiff and the other Class Members when the misrepresentations were publicly corrected.

**VICARIOUS LIABILITY**

45.    Voyager Digital is vicariously liable for the acts and omissions of the individual Defendants.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

46.    The acts or omissions particularized and alleged herein to have been done by Voyager Digital were authorized, ordered and done by the individual Defendants and other agents, employees and representatives of Voyager Digital, while engaged in the management, direction, control and transaction of the business and affairs of Voyager Digital.

47.    By virtue of the relationship between the individual Defendants and Voyager Digital, such acts and omissions are, therefore, not only the acts and omissions of the individual Defendants, but are also the acts and omissions of Voyager Digital.

48.    At all material times, the individual Defendants were directors and officers of Voyager Digital. As their acts and omissions are independently tortious, they are personally liable for same to the Plaintiff and the other Class Members.

**REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO**

49.    The Plaintiff pleads that this action has a real and substantial connection with Ontario because, among other things:

(a)    Voyager Digital is a reporting issuer in Ontario;

(b)    Voyager Digital trades on the TSX, which is based in Toronto, Ontario;

(c)    the misrepresentations alleged herein were disseminated to Class Members resident in Ontario;

(d)    a substantial proportion of the Class Members reside in Ontario; and

(e)    damage was sustained by Class Members in Ontario.

**SERVICE OUTSIDE OF ONTARIO**

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

50.    The Plaintiff may serve the Statement of Claim outside of Ontario without leave in accordance with rule 17.02 of the *Rules of Civil Procedure*, because this claim is:

(a)    a claim in respect of personal property in Ontario (rule 17.02(a));

(b)    a claim in respect of a tort committed in Ontario (rule 17.02(g)); and

(c)    a claim against a person or entity carrying on business in Ontario (rule 17.02(p)).

**RELEVANT LEGISLATION AND PLACE OF TRIAL**

51.    The Plaintiff pleads and relies on the *CJA*, the *CPA*, the *OSA*, the Other Canadian Securities Legislation, securities regulatory instruments and the TSX Company Manual.

52.    The Plaintiff proposes that this action be tried in the City of Toronto, in the Province of Ontario, as a proceeding under the *CPA*.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP

July 6, 2022

**SISKINDS LLP**
275 Dundas Street, Unit 1
London, ON  N6B 3L1

Michael G. Robb (LSO#: 45787G)
Tel: 519-660-7872
Fax: 519-660-7873
Email: michael.robb@siskinds.com

Garett M. Hunter (LSO#: 71800D)
Tel: 519-660-7802
Fax: 519-660-7803
Email: garett.hunter@siskinds.com

**SISKINDS LLP**
100 Lombard Street, Suite 302
Toronto, ON  M5C 1M3

Anthony O'Brien (LSO#: 56129U)
Tel: 416-594-4394
Fax: 416-594-4395
Email: anthony.obrien@siskinds.com

Lawyers for the Plaintiff

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP

DE SOUSA v. VOYAGER DIGITAL LTD. *et al.*                     Court File No:

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

Proceeding under the *Class Proceedings Act, 1992*

---

### NOTICE OF ACTION

---

**Siskinds LLP**
Barristers & Solicitors
275 Dundas Street, Unit 1
London, ON  N6B 3L1

Michael G. Robb (LSO#: 45787G)
Tel: 519-660-7872
Fax: 519-660-7873

Garett M. Hunter (LSO#: 71800D)
Tel: 519-660-7802
Fax: 519-660-7803

100 Lombard Street, Suite 302
Toronto, ON  M5C 1M3

Anthony O'Brien (LSO#: 56129U)
Tel: 416-594-4394
Fax: 416-594-4395

Lawyers for the Plaintiff

**<u>Exhibit B</u>**

CITATION: In The Matter of Voyager Digital Ltd., 2022 ONSC 4553
COURT FILE NO.: CV-22-00683820-00CL
DATE: 20220804

## SUPERIOR COURT OF JUSTICE – ONTARIO
## (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE
COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**    Kimmel J.

**COUNSEL:**    *Stuart Brotman*, *Daniel Richer, and Aubrey Kauffman,* for the Applicant Voyager Digital Ltd.

*Miranda Spence, Steve Graff, Anthony O'Brien and Garret Hunter*, for Francine De Sousa (proposed class action plaintiff)

*Linc Rogers and Caitlyn McIntyre* for Alvarez Marsal, the Proposed Information Officer

**HEARD:**    July 19, 2022

## ENDORSEMENT
## (INITIAL RECOGNITION AND SUPPLEMENTAL ORDER)

[1]    Following a hearing on July 12, 2022, an endorsement was released on July 13, 2022 that established the issues for determination at this July 19, 2022 hearing. For ease of reference the court's brief July 13, 2022 endorsement was as follows[1]:

> [1] Voyager Digital Ltd. ("VDL") is incorporated and has its registered office at a law firm in British Columbia. Its shares are listed for sale on the Toronto Stock Exchange ("TSX"). Its subsidiaries in the United States operate a cryptocurrency brokerage, and custodial

---

[1] Defined terms from the July 13, 2022 endorsement shall have the same meaning in this endorsement.

and lending services. VDL maintains that the centre of its main interests ("COMI") is in the United States ("US").

[2] VDL (together with other US affiliates) commenced a case for relief under Chapter 11 of title 11 of the United States Code (The "Chapter 11 Case") in the United States Bankruptcy court for the Southern District of New York (the "US Bankruptcy Court") on July 5, 2022. On the First Day Hearing on July 8, 2022, the U.S. Bankruptcy Court granted certain Orders (the "U.S. Orders") and appointed VDL as the foreign representative of VDL. VDL seeks recognition of the U.S. Orders and various other relief set out in a proposed Initial Recognition Order and proposed Supplemental Order.

[3] VDL sought, as part of the Initial Recognition Order, a declaration that the proceeding before the US Bankruptcy Court (the "Foreign Proceeding") is a "foreign main proceeding" within the meaning of s. 45(1) of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA").

[4] The requested relief for an Initial Recognition Order and Supplemental Order proceeded on an unopposed basis, save and except with respect to the request for the court to declare that the Foreign Proceeding is a "foreign main proceeding" for purposes of Part IV of the CCAA**.** Counsel appearing for certain possible investors and counsel for a proposed representative plaintiff in a recently commenced proposed class action in Ontario (the "opposing counsel") each advised the court that they required some additional time to formulate their position and file evidence and/or submissions in respect of the court's determination of whether the Foreign Proceeding is a "foreign main proceeding" or a "foreign non-main proceeding" for purposes of Part IV of the CCAA (the "question").

[5] At the request of the opposing counsel, the court's determination of this question was adjourned to a hearing scheduled for 2:00 p.m. on Tuesday July 19, 2022 in Toronto, *via* video conference. The following timetable was ordered with respect to the material for this hearing:

a.   Any proponent of the position that the Foreign Proceeding is a "foreign non-main proceeding" shall deliver their material by Thursday July 14, 2022;

b.   The applicant and any parties supporting the applicant's position that the Foreign Proceeding is a "foreign main proceeding" shall deliver their material by Saturday July 16, 2022;

c.   Reply material, if any to be delivered by Sunday July 17, 2022;

> d. All materials to be filed with the court and uploaded onto
> CaseLines by 12:00 p.m. on Monday July 18, 2022.
>
> [6] The amended Initial Recognition Order and Supplemental Order
> (that allow for the future determination of this question *nunc pro tunc*)
> are granted and shall issue, with my reasons to follow.

[2]     This endorsement contains the court's reasons for granting the Initial Recognition Order and Supplemental Order, and for the court's determination of the "question" after taking into account the written and oral submissions presented in connection with the July 19, 2022 hearing.

[3]     In answer to the "question", I find that the Foreign Proceeding is a "foreign main proceeding" for purposes of Part IV of the CCAA.

**The Participating Stakeholders**

[4]     VDL is not an operating company. VDL is not seeking interim financing at this time and, consequently is not seeking any charge or security related to interim financing on its properties, assets, or undertakings. The material filed on this application discloses that it has no secured creditors that will be affected by the priority Administration Charge that is granted under the paragraph 18 of the Supplemental Order (in favour of counsel to the Foreign Representative, the Information Officer and counsel to the Information Officer). VDL did not identify any stakeholders who it was required to serve with this application, pursuant to the CCAA or otherwise.

[5]     However, just prior to the commencement of this application a proposed class proceeding was commenced in the Ontario Superior Court of Justice seeking, among other things, relief under the *Securities Act* R.S.O. 1990 c. S-5 and the *Class Proceedings Act*, 1992, S.O. 1992, c 6, as amended, in which VDL, its Ontario-based director, and its Ontario-based former employee are named as defendants (the "De Sousa Action").

[6]     The proceedings involving VDL in the U.S. Bankruptcy Court were a matter of public knowledge. Counsel for the plaintiff in the De Sousa Action requested to be served or notified in connection with the Chapter 11 Case. Such counsel were served with this application. The application also came to the attention of counsel hoping to be retained by certain other investors in VDL.

[7]     These opposing counsel appeared on July 12, 2022. They also appeared on July 19, 2022 after being given the opportunity to make further written and oral submissions on the "question" in accordance with the court's July 13, 2022 endorsement.

[8]     No one else asked to be notified of insolvency proceedings in Canada, appeared or took any position in connection with the relief sought by this application aside from the participants identified in this endorsement. Opposing counsel speculate that there may be other creditors of VDL whose claims are not significant enough to warrant them retaining counsel and/or appearing.

## Legal Analytical Framework for Recognition Orders

[9]     Comity mandates that Canadian courts should recognize and enforce the judicial acts of other jurisdictions, provided that those other jurisdictions have assumed jurisdiction on a basis consistent with principles of order, predictability, and fairness. Canadian courts have emphasized the importance of comity and cooperation in cross-border insolvency proceedings to avoid multiple proceedings, inconsistent judgments, and general uncertainty. See *Hollander Sleep Products, LLC (Re)*, 2019 ONSC 3238, at paras. 41,42 ("*Hollander*").

[10]    Part IV of the CCAA establishes the applicable process for the administration of cross-border insolvencies, with a view to promoting cooperation and coordination with foreign courts. Sections 46 and 47 of the CCAA provide as follows:

**Application for recognition of a foreign proceeding**

**46 (1)** A foreign representative may apply to the court for recognition of the foreign proceeding in respect of which he or she is a foreign representative.

**Documents that must accompany application**

(2) Subject to subsection (3), the application must be accompanied by

(a) a certified copy of the instrument, however designated, that commenced the foreign proceeding or a certificate from the foreign court affirming the existence of the foreign proceeding;

(b) a certified copy of the instrument, however designated, authorizing the foreign representative to act in that capacity or a certificate from the foreign court affirming the foreign representative's authority to act in that capacity; and

(c) a statement identifying all foreign proceedings in respect of the debtor company that are known to the foreign representative.

**Order recognizing foreign proceeding**

47 **(1)** If the court is satisfied that the application for the recognition of a foreign proceeding relates to a foreign proceeding and that the applicant is a foreign representative in respect of that foreign proceeding, the court shall make an order recognizing the foreign proceeding.

**Nature of foreign proceeding to be specified**

(2) The court shall specify in the order whether the foreign proceeding is a foreign main proceeding or a foreign non-main proceeding.

[11]    The determination of whether a foreign proceeding is a foreign main proceeding or a foreign non-main proceeding is a factual question. These, and related, terms are defined in s. 45 of the CCAA as follows:

**45 (1)** The following definitions apply in this Part.

**foreign court**  means a judicial or other authority competent to control or supervise a foreign proceeding.  (*tribunal étranger*)

**foreign main proceeding**  means a foreign proceeding in a jurisdiction where the debtor company has the centre of its main interests.  (*principale*)

**foreign non-main proceeding**  means a foreign proceeding, other than a foreign main proceeding.  (*secondaire*)

**foreign proceeding**  means a judicial or an administrative proceeding, including an interim proceeding, in a jurisdiction outside Canada dealing with creditors' collective interests generally under any law relating to bankruptcy or insolvency in which a debtor company's business and financial affairs are subject to control or supervision by a foreign court for the purpose of reorganization.  (*instance étrangère*)

**foreign representative**  means a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to

    **(a)** monitor the debtor company's business and financial affairs for the purpose of reorganization; or

    **(b)** act as a representative in respect of the foreign proceeding.  (*représentant étranger*)

**Centre of debtor company's main interests**

    **(2)** For the purposes of this Part, in the absence of proof to the contrary, a debtor company's registered office is deemed to be the centre of its main interests.

[12]    One of the other important considerations that has been emphasized by Canadian courts in dealing with insolvency proceedings is the need for consistency and fair treatment of all creditors across multiple jurisdictions under a single proceeding model. See *Hollander* at para. 42 and *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, at para. 22.

[13]    This is viewed to be consistent with the preferred "modified universalism" approach that is propounded in much of the Canadian jurisprudence dealing with cross-border insolvencies, described as follows:

> The notion of modified universalism is court recognition of main proceedings in one jurisdiction and non-main proceedings in other jurisdictions, representing some compromise of state sovereignty under domestic proceedings to advance international comity and co-operation.

See *MtGox Co. Ltd (Re)*, 2014 ONSC 5811, at para.11 ("*MtGox*").

**Analysis**

<u>Recognition of the Foreign Proceeding Under s. 46 and 47 of the CCAA</u>

[14]    There is no question that VDL has been named the Foreign Representative in a Foreign Proceeding. The requirements for recognizing the Ch. 11 proceedings involving VDL before the U.S. Bankruptcy Court as a foreign proceeding under ss. 46 and 47 of the CCAA are clearly satisfied and not disputed. Nor was the granting of the stay under the Initial Recognition Order

opposed, although such an order would be mandatory if the Foreign Proceeding is found to be a foreign-main proceeding, but only discretionary if it is found to be a foreign non-main proceeding.

<u>Where is the COMI of VDL Under s. 45 of the CCAA</u>

[15]    The "question" to be decided by the court in this case is whether the Foreign Proceeding is a foreign main proceeding or foreign non-main proceeding under s. 45 of the CCAA. This is dependent on where VDL's centre of main interests (COMI) is, as defined under s. 45 of the CCAA.

[16]    The applicant maintains that the Foreign Proceeding is a foreign main proceeding because the centre of VDL's COMI is in the US.  The applicant argues that there is ample proof in this case to rebut the presumption under s. 45(2) of the CCAA that its COMI is the local of its registered office in British Columbia.

[17]    The opposing counsel argue that VDL's COMI is in Canada, but do not appear to be insisting that it is in British Columbia, only that it is not in the US.

[18]     The parties agree on the test to be applied to determine whether the location in which the proceeding has been filed is VDL's COMI. This involves initial consideration of the following three primary factors:

> a. the location in which the Foreign Proceeding has been filed is readily ascertainable by creditors;
>
> b. the location in which the Foreign Proceeding has been filed is one in which the debtor's principal assets or operations are found; and
>
> c. the location in which the Foreign Proceeding has been filed is where the management of the debtor takes place.

See *Zochem Inc. (Re)*, 2016 ONSC 958, at para 22 ("*Zochem*").

[19]    The applicant focuses on the location of the underlying operations of the VDL enterprise cryptocurrency business, all of which are in the US. The applicant also focuses on the fact that all the officers and senior management, and all but one of the directors, of VDL are residents and located in the US.

[20]    Opposing counsel instead focus on the business of VDL as the "parent" company, raising funds on the TSX, which activity they argue is operationally situated in Canada.  On the theory of opposing counsel, the operating businesses in the U.S. that are funded by the fruits of VDL's business in Canada, are secondary businesses to VDL's main business.

[21]    All participating parties also agree that, when these primary factors do not point to a single jurisdiction as the COMI of the debtor, other factors may need to be considered. When determining the COMI of a Canadian entity operating as part of a larger corporate group, courts have considered, among other factors:

    a.   the location where corporate decisions are made;

    b.   the location of employee administrations, including human resource functions;

    c.   the location of the company's marketing and communication functions;

    d.   whether the enterprise is managed on a consolidated basis;

    e.   the extent of integration of an enterprise's international operations;

    f.   the centre of an enterprise's corporate, banking, strategic and management functions;

    g.   the existence of shared management within entities and in an organization;

    h.   the location where cash management and accounting functions are overseen;

    i.   the location where pricing decisions and new business development initiatives are created; and

    j.   the location of an enterprise's treasury management functions, including management of accounts receivable and accounts payable.

See *Hollander*, at para 33; *CHC Group Ltd (Re)*, 2016 BCSC 2623 at para 11, citing *Angiotech Pharmaceuticals Inc. (Re)*, 2011 BCSC 115 at para. 7 ; *Massachusetts Elephant & Castle Group, Inc (Re)*, 2011 ONSC 4201 at paras 26-31 ("*Elephant & Castle*").

[22]    While the decision making and management at the corporate group level is a relevant consideration, the analysis of VDL's COMI must still be undertaken at the entity level. See *MtGox*, at para. 11; *Hollander*, at para. 30; *Elephant & Castle*, at para. 20.

[23]    In all cases, however, the court must not lose sight of what it is attempting to determine: "… the review is designed to determine that the location of the proceeding, in fact, corresponds to where the debtor's true seat or principal place of business actually is, consistent with the expectations of those who dealt with the enterprise prior to commencement of the proceedings." See *Lightsquared LP, Re*, 2012 ONSC 2994, at para. 26 ("*Lightsquared*"); see also *Zochem* at paras. 23-25.

*The Primary Factors*

[24]    The location of the U.S. Bankruptcy Court where the Foreign Proceeding was filed is readily ascertainable to stakeholders. VDL is clearly managed in the US. However, the location of its principal assets and operations could arguably be a question of perspective and how its creditors and other stakeholder perceive the nature of VDL's business as a holding company.

[25]    Opposing counsel primarily argue that investors and other stakeholders in the shares and securities issued by VDL have an expectation of VDL's business being conducted in and from Canada, and particularly emphasize the description of VDL's core business by its CEO as: "VDL

serves only as a publicly-traded holding company whose sole function is to raise capital from public markets by listing on the TSX." While this may be a relevant consideration, I consider it to be only the start of the analysis.

[26]    In a case involving a public company, a logical place to look for the objectively ascertainable expectations of shareholders and other stakeholders as to the location of a company's principal assets and operations is its publicly filed documents, such as the short form shelf prospectus dated August 17, 2021 (the "Prospectus") used for VDL's public offering.

[27]    The opposing counsel point to statements in the Prospectus indicating that VDL's "… securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "U.S. Securities Act"), or the securities laws of any state of the United States… and may not be offered, sold or delivered, directly or indirectly, in the United States except pursuant to an exemption from registration under the U.S. Securities Act and applicable U.S. state securities laws."

[28]    However, these prescriptive statements about the registration and sale of VDL's securities do not paint the full picture. The Prospectus referred to and relied upon by opposing counsel not only clearly states that VDL's "principal place of business is in the United States", but it also includes the following statements:

At page 22 of the Prospectus:

> The Company is a corporation formed under the laws of British Columbia, Canada; however its principal place of business is in the United States. Most of the Company's directors and officers, the Company's auditors, and the majority of the Company's assets, are located in the United States.

The narrative on this page goes on to indicate that service of claims against the non-resident directors, officers, employees etc. of VDL could be difficult, as could be the pursuit and/or enforcement of claims against them in the U.S.

At page 8 of the Prospectus:

> The Company [earlier defined as VDL] is a technology company involved in the business of developing and commercializing a digital platform focused on enabling users to buy and sell digital assets (cryptocurrencies) in one account across multiple centralized or decentralized marketplaces that unite and match buyers and sellers of cryptocurrencies. Voyager is a licensed digital asset Money Services Business that provides investors with a turnkey solution to trade digital assets. References in this prospectus, including the documents incorporated by reference herein, to the Company being licensed or registered refer to its status as a Money Services Business in the United States under FinCEN, a bureau of the United States Department of the Treasury. The Company has implement [sic] procedures in order to prevent residents in the provinces and territories of Canada from become [sic] clients or customers of its crypto-asset trading and investing business, these measures include KYC procedures and geofencing the availability of the Voyager app.

> To the best of the Company's knowledge, the Company does not have any clients or customers who are ordinarily resident in, or have immigrated to, Canada.

[29]    There is no question that VDL's decision making takes place in the US.  Even before the one Canadian employee and officer of VDL left in June 2022, that was the situation.  VDL does not have, and never had, any physical premises in Canada. Operationally, the entirety of the cryptocurrency business is run out of the US. Although the COMI of VDL must be analyzed at the entity level, the existence of a corporate group operating through foreign subsidiaries cannot be ignored. See *Hollander*, at para. 34.

[30]    The Prospectus contextualizes VDL's business and is an objective source from which to ascertain the reasonable expectations of VDL's stakeholders.  It clearly indicates the locale of VDL's principal assets and operations and management to be the U.S.

[31]    Opposing counsel argue that there would be corporate records at VDL's head office in Vancouver and that VDL is subject to the Canadian securities' regulatory regime as a reporting issuer with shares listed on the TSX. These are disclosed in the Prospectus and do not, in my view, displace the US. as the more readily ascertainable principal place of VDL's business, operations, and management.

*The Secondary Factors*

[32]    If there was any doubt about the US as the more readily ascertainable principal place of VDL's business, an analysis of the applicable secondary factors either supports or is neutral to that same conclusion.  There is little that points to Canada as the principal place of the self-described cryptocurrency business of VDL.

[33]    Opposing counsel points out that two of VDL's subsidiaries, one in Canada and one in the US, have been granted Money Services Business ("MSB") registrations with Canada's Financial Transaction and Reports Analysis Centre of Canada ("FINTRAC"), suggesting that this may be paving the way for operations in Canada. However, there is no suggestion of any activity undertaken in Canada that is reliant upon the MSB registrations, just speculation by opposing counsel that these registrations may lead to future prospective activity in Canada. This is not a current indicia of the primary seat of VDL's business being located in Canada.

[34]    Opposing counsel further speculate that there could be creditors of this securities business who did not appear on the application but for whom the court should not presume an expectation that the principal place of business of VDL is in the US. However, this speculation runs against the disclosure contained in the Prospectus about the locale of VDL's business, operations and management and does not displace that disclosure in the absence of any concrete evidence to the contrary.

[35]    Having regard to the facts and evidence before the court at this time, I find that the proceedings before the U.S. Bankruptcy Court correspond with where "the debtor's true seat or principal place of business actually is, consistent with the expectations of those who dealt with the enterprise prior to commencement of the proceedings."  See *Lightsquared* , at para. 26; see also *Zochem* at paras. 23-25. The legitimate expectations of third parties dealing with VDL and its subsidiaries would consider the US to be the principal seat of VDL's business.

[36]    This case is similar to *Probe Resources Ltd (Re)*, 2011 BCSC 552, at paras. 2-3 and 24-25 and 28, in which the British Columbia Supreme Court found a publicly listed Canadian parent holding company of an oil and natural gas business operating through US subsidiaries (with nominal assets located in Canada and all of its operations, other than administration and organization matters, located in the US) to have its COMI in the US.

[37]    I find in all of the circumstances of this case that the COMI of VDL is in the US and that the Foreign Proceeding in the U.S. Bankruptcy Court should be recognized on that basis, as a foreign main proceeding. Accordingly, I find that the presumption in s. 45(2) of the CCAA has been rebutted in respect of VDL.

*Policy Considerations*

[38]    The test for determining the COMI of a debtor is not a balancing of prejudices. However, s. 61(2) of the CCAA applies and provides as follows: "Nothing in [Part IV of the CCAA] prevents the court from refusing to do something that would be contrary to public policy."

[39]    Opposing counsel make two foundational policy assertions, that: (i) if the Foreign Proceeding is recognized as a "foreign main proceeding", Canadian securities regulators and police would be prohibited from carrying out their investigative functions, and (ii) if the Foreign Proceeding is recognized as a "foreign main proceeding", Ms. De Sousa (the proposed representative plaintiff in the proposed class action) and the equity holders she wishes to represent (and possibly other Canadian stakeholders) will be excluded from participating in the restructuring proceedings of VDL.

[40]    In *MtGox*  (at para. 25), relied upon by opposing counsel, the trustee wanted ongoing litigation to be enjoined in Canada, to give priority to the protections afforded in the Japan bankruptcy proceeding. There was no prohibition against ongoing investigations by regulators or police.  There is nothing to indicate whether there was, in fact, any  Canadian police, regulatory or criminal authority involvement after the stay was granted in *MtGox*, and if not why  The suggestion by opposing counsel that this was the result of the court's recognition of the foreign proceeding in Japan as a foreign main proceeding is not supported.

[41]    Furthermore, the Supplemental Order issued by this court on July 12, 2022 in this case expressly exempts from the stay the exceptions to the automatic stay contained in Bankruptcy Code section 362(b), which exceptions include:

    a.  (1) the commencement or continuation of a criminal action or proceeding against the debtor; and

    b.  (25) under subsection (a), of -- (A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

[42]    Thus, there is no basis for the suggestion in this case that there is a public policy concern that the finding that the Foreign Proceeding before the U.S. Bankruptcy Court is a foreign main proceeding will preclude any Canadian regulatory or police investigations of VDL.

[43]    There is similarly no factual basis for the contention of opposing counsel that a finding that the Foreign Proceeding in this case is a foreign main proceeding will preclude Canadian equity holders or other stakeholders of VDL from participating, or lead to their inequitable treatment, in the restructuring proceedings of VDL.

[44]    During oral argument, further speculative concerns about the terms of a future proposed plan and the possibility of effective substantive consolidation were also raised.

[45]    Much emphasis was placed on the speculative concern that the U.S. Bankruptcy Court would not agree to the appointment of representative counsel for class action shareholders or other uniquely situated Canadian stakeholders, whereas there is precedent for so doing in CCAA proceedings, when warranted.  First, I note that it is not guaranteed that representative counsel would be appointed even if the Foreign Proceeding was declared to be a foreign non-main proceeding and there was to be a parallel CCAA proceeding in Canada.

[46]    But, a more direct rebuke to the suggestion that there would be no role opportunity for representative counsel to represent uniquely situated Canadian stakeholders in the Foreign Proceeding is found in the example of a precedent (brought to the court's attention by the applicant) for recognizing and carving out a role for representative counsel on behalf of Canadian stakeholders in a different type of U.S. bankruptcy proceeding: See *Re LTL Management LLC*, (SCJ Court File No. CV-21-00673856-00CL).

[47]    The Information Officer that has been appointed by the court in this case supports the position of VDL and is appropriately situated, by virtue of the powers, authority, duties, and responsibilities that it has been given pursuant to the Supplemental Order, to keep the court of apprised of any concerns that are specific to Canadian stakeholders that may arise in the context of future recognition orders sought from this court.

[48]    The concerns raised by opposing counsel, at some level, seem to presume that the Information Officer will fail to recognize and bring concerns to the court's attention in the future, or that the "reporting" role of the Information Officer is too limited and would need to be expanded to include monitoring and making recommendations to the court.

[49]    Counsel for the Information Officer did not necessarily accept the suggested limitations on the role of the Information Officer. The role of the Information Officer was described by its counsel to include identifying points of prejudice or potential asymmetry with respect to the treatment of Canadian stakeholders for the court's consideration.  It was suggested that this must be done contextually when there is a plan or some other proposal under consideration that affects those stakeholders.  The court can and should be able to rely upon the Information Officer to carry out this role.  It is presumptuous for opposing counsel to suggest or assume that the Information Office will not carry out this role and its duties to the best of its abilities.

[50]    But, more importantly and appropriately, counsel for the Information Officer noted that the speculative concerns raised do not affect the factual determination of the COMI of VDL, which is in the US, and the court's determination that the Foreign Proceeding is a foreign main proceeding as the CCAA mandates in such circumstances. The noted concerns are more

appropriately addressed if and when they, or other concerns, actually arise in the context of future requests for recognition orders in this proceeding.

[51]    If there are valid public policy concerns that are raised in connection with future requests for recognition orders, they may be considered by the court under s. 61(2) of the CCAA at that time. To speculate about those concerns and attempt to pre-emptively address them now at the stage of the Initial Recognition Order and Supplemental Order in the context of the determination of the "question" of whether the Foreign Proceeding is a foreign main or foreign non-main proceeding would be premature.

[52]    I do not find there to be any existing identified public policy concerns that lead me to exercise the court's jurisdiction under s. 61(2) of the CCAA to refuse to make the finding that the US is the COMI of VDL and/or to refuse to make the declaration that the Foreign Proceeding is a foreign main proceeding under part IV of the CCAA.

[53]    The court's findings and orders made at this time do not preclude the future examination of legitimate public policy concerns that may arise in connection with future requests for recognition orders in connection with the Foreign Proceeding.

[54]    Nor do they preclude any party from applying to vary or amend the Initial Recognition Order pursuant to paragraph 9 thereof, including for a request to expand the duties and powers of the Information Officer.

**Final Determination of the Question**

[55]    The only immediate and mandated effect of a determination that the Foreign Proceeding as a foreign main proceeding is that the stay is mandatory (whereas it would have been a discretionary order if I had determined it was a foreign non-main proceeding). In either event, the stay has already been ordered.  To that extent, I find myself in the same place as Newbould J. was when he said in *Zochem* (at para. 26):

> In this case it is perhaps an academic exercise to decide if the foreign proceeding is a main or non-main proceeding because it is appropriate for a stay to be ordered in either event. However, I am satisfied that for our purposes the applicants have established that the foreign proceeding is a foreign main proceeding. The court's declaration that the Foreign Proceeding is a foreign main proceeding is made *nunc pro tunc* to the date of the Initial Recognition Order and Supplemental Order, July 12, 2022.

**Kimmel J.**

**Date:** August 4, 2022

**Exhibit C**

Court File No. CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

**NOTICE OF MOTION**
**(returnable August 11, 2022)**

Francine De Sousa ("**De Sousa**"), on behalf of the proposed class action plaintiffs under Court File No. 22-00683699-00CP (namely, *Francine De Sousa v. Voyager Digital Ltd. et al.)* (the "**Proposed Class Action Plaintiff**"), will make a motion to a Judge of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") (i) at a scheduling hearing, on a date and at a time available to the Court and counsel, for the Interim Relief Order, via Zoom coordinates to be provided by the Court; and (ii) on August 11, 2022 at 10:00 AM, or as soon after that time as the motion can be heard, via Zoom coordinates to be provided by the Court, for the Additional Relief Order; and

**PROPOSED METHOD OF HEARING:** The motion is to be heard:

☐     in writing under subrule 37.12.1 (1);

☐     in writing as an opposed motion under subrule 37.12.1 (4);

☐     in person;

☐     By telephone conference;

☒     By video conference.

**THE MOTION IS FOR**:

1.      An order (the "**Interim Relief Order**"), substantially in the form included in the Motion Record, for certain interim relief, namely:

    (a)      that  Voyager Digital Ltd. (the "**Canadian Debtor**") must provide the following information to counsel for De Sousa (the "**Information Provisions**"):

        (i)      Copies of any insurance policies, from whatever source, that may be responsive to the claims of the putative class members in the De Sousa Class Action; and

        (ii)     Details of the intercorporate funding arrangement between the Canadian Debtor and its relevant subsidiaries, including any debts owed to the Canadian Debtor and the dates and amounts of transfers from the Canadian Debtor to its subsidiaries since May 1, 2022;

2.      An order (the "**Additional Relief Order**"), substantially in the form included in the Motion Record, for certain additional relief, namely:

    (a)      Amending the supplemental order granted by the Honourable Madam Justice Kimmel on July 12, 2022 (the "**Supplemental Order**" and the "**Supplemental Order Amendments**", respectively) to:

        (i)      Remove paragraph 10;

        (ii)     Amend paragraph 12 to include additional duties of Alvarez & Marsal Canada Inc. ("**A&M**") in its capacity as information officer ("**Information Officer**") to:

            (1)      file a report with this Honourable Court on the state of Voyager Digital Ltd.'s (the "**Canadian Debtor**") business and financial affairs — containing the Information Officer's opinion as to the reasonableness of a decision, if any, to include in a compromise  or arrangement a provision that sections 38 and 95 to

101 of the Bankruptcy and Insolvency Act, or any similar sections of the U.S. Bankruptcy Code, do not apply in respect of the compromise or arrangement and containing the prescribed information, if any — at least seven days before any meeting to vote on the compromise or arrangement is held;

(2)    attend ongoing Canadian court proceedings that relate to the Canadian Debtor under Court File No. CV-22-00683820-00CL (the "**CCAA Proceeding**"), hearings in ongoing proceedings in the Southern District of New York under *Voyager Digital Holdings, Inc., et al.,* per Court File No. 22-10943 (MEW) (the "**US Proceeding**"), and meetings of the company's creditors, if the Information Officer considers that his or her attendance is necessary for the fulfilment of his or her duties or functions; and

(3)    advise this Honourable Court on the reasonableness and fairness of any compromise or arrangement that is proposed by the debtors in the US Proceeding;

(iii)    Add an additional paragraph which tolls all prescription, time or limitation periods applicable to any Misrepresentation Rights (as defined herein) as of the time of the initial recognition order dated July 12, 2022 (the "**Initial Recognition Order**") until the stay is lifted;

(iv)    Add an additional paragraph which tolls the mandatory dismissal for delay provision under section 29.1 of the *Class Proceedings Act, 1992* as of the time of the Initial Recognition Order dated July 12, 2022 until the stay is lifted;

(b)    Appointing Siskinds LLP/Aird & Berlis LLP as representative counsel (in such capacity, "**Representative Counsel**") for all securities claimants and current shareholders of the Canadian Debtor (collectively, the "**VDL Shareholders**") impacted in the CCAA Proceeding and the US Proceeding, to be funded by a

charge on the estate of the Canadian Debtor or such other financial arrangement that this Honourable Court finds acceptable;

(c)     Allowing for the creation of an equity committee in the CCAA Proceeding from which Representative Counsel shall take instruction, which will include the appointment of De Sousa as one of its members to represent the interests of the VDL Shareholders (the "**Equity Committee**"); and

(d)     such further and other relief as this Court may find just.

**THE GROUNDS FOR THE MOTION ARE:**

*BACKGROUND*

(e)     The Canadian Debtor is a corporation incorporated under the *Business Corporations Act*, S.B.C. 2002, c. 57 ("**BCBCA**") with a registered head office in Vancouver, British Columbia;

(f)     The Canadian Debtor is a publicly listed company that traded on the Toronto Stock Exchange. through certain US subsidiary entities, Voyager Digital, LLC and Voyager Digital Holdings, Inc. (collectively, the "**American Debtors**" and with the Canadian Debtor, "**Voyager**") the Canadian Debtor operated a non-custodial cryptocurrency exchange (the "**Voyager Platform**"). The Canadian Debtor generated revenue by, among other things, loaning its clients' crypto assets to third parties. The Canadian Debtor's lending activities were extremely risky. Among other things, the loans were concentrated in only a few counterparties, the loans were unsecured and the Canadian Debtor's counterparties engaged in high-risk trading strategies. ;

(g)     The Canadian Debtor is potentially implicated in inappropriate conduct that violates Canadian securities legislation in multiple provincial jurisdictions, which exposes both the Canadian Debtor and the Canadian Debtor's directors and officers to claims for damages;

(h)     On or about June 27, 2022, Voyager issued a press release stating that:

5

     (i)       Voyager Digital, LLC had issued a notice of default to Three Arrows Capital ("**3AC**") for failure to make required payments on a loan of 15,250 BTC and $350 million USDC (roughly equivalent to $650 million CDN per exchange conversion rates as of June 2022) (the "**3AC Loan**" and the "**3AC Loan Default**").

     (ii)     Total crypto-assets loaned by Voyager to counterparties across various jurisdictions, including the British Virgin Islands, Singapore, United States, Canada, the United Kingdom and various other locations (including the 3AC Loan) totalled $1,124,825,000 CDN as of June 30, 2022; and

     (iii)    As of June 24, 2022, Voyager only had approximately $137 million USD on hand;

(i)     In summary, approximately three-quarters of Voyager's original known assets were reported as being depleted publicly by early July of 2022;

(j)     On or about July 1, 2022, Voyager temporarily suspended trades, deposits, withdrawals and loyalty rewards to customers;

(k)     On July 6, 2022, public trading in the Canadian Debtor's shares was suspended by the Investment Industry Regulatory Organization of Canada ("**IIROC**"). The Canadian Debtor subsequently announced that it would seek to have its shares delisted from the Toronto Stock Exchange.  The IIROC suspension remains in place.

(l)     3AC's Founders publicly stated that they suffered significant financial losses due to the collapse of the Luna/Terra cryptocurrencies and hired financial advisors to explore liquidity solutions.

(m)    3AC subsequently entered into liquidation proceedings pursuant to orders of the High Court of the Territory of the British Virgin Islands under Claim No. BVIHC (COM) 2022/0119 (the "**3AC Liquidation**") upon application by a creditor, DRB

Panama Inc. ("**DRB**"), as well as initiating sister proceedings in America. The joint liquidators in the 3AC Liquidation have also sought urgent interim relief and recognition of the 3AC Liquidation in Singapore due to significant and pressing quasi-criminal concerns, including allegations by liquidators that, *inter alia*:

(i)     The two founders of 3AC, Su Zhu and Kyle Davies (the "**3AC Founders**") used company funds inappropriately to pay for:

    (1)     a $50 million USD mega-yacht;

    (2)     a $35 million USD Good Class Bungalow (or mansion); and

    (3)     a $21 million USD Good Class Bungalow (or mansion);

(ii)    A separate corporate entity, Tai Ping Shan Ltd. ("**TPS**"), owned by the 3AC Founders' partner, Kelly Chen, was recently transferred $31 million USD in crypto-assets by a known cryptocurrency address linked to 3AC;

(iii)   3AC did not appropriately move or hold crypto-assets;

(n)     The 3AC Founders have since been reported as missing by public media outlets;

(o)     While the precise circumstances under which the 3AC Loan occurred, including what, if any, diligence Voyager did into 3AC's financial status, and the relationship between Voyager and 3AC remain unclear, some details have emerged. For instance, Voyager correspondence to 3AC filed as an exhibit to a sworn declaration in 3AC's liquidation proceedings indicates that Voyager refinanced the 3AC loan on May 12th and May 13th, 2022 *after* the collapse of Terra/Luna;

(p)     Furthermore, media outlets reported that in early July 2022, three American state securities regulators (Alabama, Texas and New Jersey) were investigating Voyager's freezes of customer withdrawals, with prior actions by regulators and a public probe against Voyager dating to March of 2022 due to allegations of Voyager inappropriately selling unregistered securities to residents in each state;

(q)     As a result of its conduct and the 3AC Loan, on July 5, 2022, the Canadian Debtor commenced a Chapter 11 case in the United States by filing a voluntary petition for relief under the U.S. Bankruptcy Code in the U.S. Bankruptcy Court (as amended from time to time, the "**VDL Petition**" and the "**Chapter 11 Case**"), along with filings by the American Debtors ;

(r)     Only recognition of the US Proceeding as relating to the Canadian Debtor is being sought in Canada;

(s)     On or about July 12, 2022, the Canadian Debtor obtained the Initial Recognition Order and a supplemental order regarding the Chapter 11 Case. Certain other relief sought during the July 12, 2022 hearing date was adjourned upon request by counsel to Ms. De Sousa;

(t)     On or about July 19, 2022, this Honourable Court heard a motion brought by Ms. De Sousa to determine whether: (i) the centre of main interest of the Canadian Debtor is the United States of America or Canada; and (ii) whether the Chapter 11 Case should be recognized as a "foreign main proceeding" under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**");

(u)     The decision on relief sought on July 19, 2022, remains under reserve by this Honourable Court;

(v)     Ms. De Sousa now brings this motion to initiate a transparent court process in the public interest that seeks both interim and additional relief in the nature of protection of the vulnerable VDL Shareholders;

*INTERIM RELIEF*

(w)     The Information Provisions are required to protect the rights of thousands of the VDL Shareholders, who may have been financially victimized by the Canadian Debtor and its associates;

(x)     The Information Provisions are further appropriate and necessary for VDL Shareholders to understand the financial status of the Canadian Debtor, which

remains unclear despite the public nature of its restructuring through the ongoing Chapter 11 Case;

(y)     As it stands, the Canadian Debtor and the American Debtors have failed to appropriately publicly disclose certain information relevant to their restructuring within the Chapter 11 Case which will impact VDL Shareholders;

(z)     Without the Information Provisions, VDL Shareholders will be unable to analyze whether the proposed compromise within the Chapter 11 Case is a reasonable arrangement, as VDL Shareholders are currently missing fulsome information on: (i) intercompany loans held by the Canadian Debtor which reveal whether monies raised as paid-in capital to the Canadian Debtor flowed to other subsidiaries by way of equity or debt; and (ii) any other pertinent debts held by the Canadian Debtor;

*ADDITIONAL RELIEF*

*i.*     *Supplemental Amendments Relief*

(a)     The Supplemental Amendments, which largely function to enhance the powers of the Information Officer, will facilitate a neutral party's involvement in both the CCAA Proceeding and the US Proceeding to ensure that:

(i)     VDL Shareholders' rights are not disregarded by American courts with no consideration of Canadian legal principles; and

(ii)    This Honourable Court is advised and aware of any compromises occurring in the US Proceeding which will impair the rights of VDL Shareholders of the Canadian Debtor, without appropriate consultation or consideration of the significance of consultation between judiciary systems in cross-border insolvencies;

(b)     Furthermore, the Supplemental Amendments will appropriately toll any limitation periods applicable to any of the rights of a purchaser of a security of the Canadian Debtor to (i) commence an action for damages against the Canadian Debtor or its

current or former directors or officers; and (ii) exercise a right of rescission in connection with the purchase of a security of the Canadian Debtor, pursuant to and in accordance with the requirements of (a) Parts XXIII or XXIII.1 of the *Securities Act,* or any corresponding or similar provisions under the securities legislation of any other Canadian province or territory; and/or (b) any contractual rights granted by the Canadian Debtor to a purchaser of its securities that are the same or substantially the same as any such statutory rights for damages or rescission, including, without limitation, in any offering memorandum pursuant to which securities of the Canadian Debtor were offered for sale (collectively, the "**Misrepresentation Rights**");

(c)    Pursuant to section 138.14(2) of the *Securities Act*, a notice of motion for leave to assert the right of action under Part XXIII.1 must be filed before the limitation period under the *Act* stops running. Ms. De Sousa is prohibited from filing the notice of motion for leave while a stay is in place. Accordingly, this tolling of the Misrepresentation Rights is required to prevent the expiration of the limitation period for the right of action provided by Part XXIII.1.

(d)    The Supplemental Amendments will also toll the mandatory dismissal for delay provision under section 29.1 of the *Class Proceedings Act*, *1992.* On a motion, a class action must be dismissed one year after it is commenced unless one of the following conditions are met: (i) the representative plaintiff has filed a final and complete motion record for certification; (ii) the parties have agreed in writing to a timetable for service of the motion record for certification or for the completion of one or more steps required to advance the proceeding, and have filed the timetable with the court; and (iii) the court has established a timetable for service of the representative plaintiff's motion record for certification or for completion of one or more other steps required to advance the proceeding. Absent the tolling requested by Ms. De Sousa, the De Sousa Class Action could be dismissed because of her inability to meet the requirements of section 29.1 while the stay is in place;

ii.    *Representative Counsel and Equity Committee Relief*

(e)    De Sousa also seeks court appointment of Representative Counsel for VDL Shareholders, which counsel will report to both VDL Shareholders and this Honourable Court for the purposes of representing their interests and maximizing their recoveries in both the CCAA Proceeding and the US proceeding;

(f)    The VDL Shareholders are the largest and most important stakeholder group in the CCAA Proceedings;

(g)    The court appointment of Representative Counsel is necessary to ensure a proper mandate of advocacy and investigations on behalf of VDL Shareholders. Representative Counsel will provide VDL Shareholders with effective and cost-efficient representation with the ultimate objective of protecting their vulnerable interests in complex cross-border restructuring proceedings;

(h)    As the ongoing CCAA Proceeding and US Proceeding reveals potential misconduct by Voyager which may require the need for advocacy in front of both regulators and criminal authorities, VDL Stakeholders will otherwise lack a voice without the appointment of Representative Counsel to act on their behalf in:

    (i)    Managing communications with VDL Shareholders, regulators and criminal authorities;

    (ii)    Acting as a VDL Shareholder liaison to the Information Officer to provide strategy and tactical advice to the Equity Committee;

    (iii)    Working with and cooperating with any US counsel appointed or hired to represent the same interests in the Chapter 11 Case;

    (iv)    Advocating for VDL Shareholder rights and interests in the CCAA Proceeding and any pertinent negotiations or discussions; and

    (v)    Identifying any potential divergences in the interests of any subgroups of the VDL Shareholders.

(i)     Additional courses of action that will likely need to be reviewed by Representative Counsel include, *inter alia*: (i) the protection of VDL Shareholders' privacy; (ii) ensuring that the US Proceeding does not substantially consolidate the restructuring of the Canadian Debtor; (iii) reviewing whether any releases from liability contemplated in the CCAA Proceeding or the US Proceeding inappropriately impact the rights of VDL Shareholders; and (iv) potentially opting out of any releases on behalf of VDL Shareholders.

(j)     There is significant precedent for the establishment of Representative Counsel in cases involving large numbers of victims in quasi-criminal insolvencies, and all final relief sought here mirrors these well-established Canadian procedural steps, such that the appointment of Representative Counsel also contemplates the establishment of an Equity Committee in accordance with a democratic process;

(k)     The market cap of Voyager in 2021, the prior year before the Chapter 11 Case, is publicly noted as $2.10 billion USD, with a decrease of -97.64% to $0.04 billion USD by 2022, which indicates the need for significant VDL Shareholder protection;

(l)     Both the creation of the Equity Committee, including Ms. De Sousa, and the appointment of Representative Counsel represent a fair and robust procedure for ensuring that VDL Shareholders are directly communicated with and provided with direct legal advice, which the majority of VDL Shareholders would be likely unable to access otherwise;

(m)     The balance of convenience favours the appointment of Representative Counsel and the creation of the Equity Committee, as it will be of substantial assistance to VDL Shareholders;

(n)     Both the appointment of Representative Counsel and the creation of the Equity Committee is in the best interests of the public, and ensures confidence in the Canadian judicial system to protect the vulnerable;

12

(o)     Since the work to be done by Representative Counsel will benefit VDL Shareholders, it is appropriate that a charge be established to secure payment of counsel's fees on the estate of the Canadian Debtor; and

(p)     Fund are available in the Canadian Debtor to be used for such purpose of protecting the stakeholders of the Canadian Debtor.

*GENERALLY*

(q)     The circumstances that exist make the Order sought appropriate;

(r)     Sections 96 and 97 of the *Courts of Justice Act,* R.S.O. 1990, c. C-43, as amended;

(s)     The *Rules of Civil Procedure* (Ontario), RRO 1990, reg. 194, including, without limitation, Rules 1.04, 2.03, 3.02, 16 and 37 thereof; and

(t)     S. 11 and s. 11.52 of the *CCAA*; and

(u)     Such further and other grounds as counsel may advise and this Court may permit.

3.     **THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)     The Affidavit of Ms. De Sousa, to be sworn and the exhibits attached thereto;

(b)     The Affidavit of ▮, to be sworn and the exhibits attached thereto;

(c)     Joint Factum of Siskinds LLP/Aird & Berlis LLP; and

(d)     Such further and other material as counsel may submit and this Court may permit.

13

Date: August 2, 2022

**SISKINDS LLP**
100 Lombard Street, Suite 302
Toronto, ON M5C 1M3

Michael Robb (LSO #: 45787G)
Email: michael.robb@siskinds.com

**Anthony O'Brien (LSO#: 56129U)**
Email: anthony.obrien@siskinds.com

**Garett M. Hunter (LSO#: 83486A)**
Email: garett.hunter@siskinds.com

*Counsel to the Proposed Class Action Plaintiff*

**AIRD & BERLIS LLP**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

**Miranda Spence (LSO#: 66410Q)**
Email: mspence@airdberlis.com

**Tamie Dolny (LSO#: 77958U)**
Email: tdolny@airdberlis.com

*Insolvency Counsel Assisting Siskinds LLP, Counsel
to the Proposed Class Action Plaintiff*

**TO:    SERVICE LIST**

IN THE MATTER OF THE *COMPANIES CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36 AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

CV-22-00683820-00CL

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>**Proceedings commenced at Toronto** |
| | **NOTICE OF MOTION** |
| | **SISKINDS LLP**<br>100 Lombard St., Suite 302<br>Toronto, ON M5C 1M3<br><br>**Michael Robb (LSO#: 45787G)**<br>Email: michael.robb@siskinds.com<br>**Anthony O'Brien (LSO #: 56129U)**<br>Email: anthony.obrien@siskinds.com<br>**Garrett Hunter (LSO #: 71800D)**<br>Email: garett.hunter@siskinds.com<br><br>**AIRD & BERLIS LLP**<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9<br><br>**Miranda Spence (LSO #: 66410Q)**<br>Email: mspence@airdberlis.com<br>**Tamie Dolny (LSO#: 77958U)**<br>Email: tdolny@airdberlis.com<br><br>*Siskinds LLP as Counsel to the Proposed Class Action Plaintiff and Aird & Berlis LLP as Insolvency Counsel Assisting Siskinds LLP* |

48036998.3
48036998.4

**<u>Exhibit D</u>**

Amended and Restated Articles
Approved by Special Resolutions dated
December 14, 2021 and effective upon filing
of Notice of Alteration on December 15, 2021.

# ARTICLES

## OF

# VOYAGER DIGITAL LTD.

Incorporation Number: BC0392838

(the "**Company**")

# INDEX

**PART 1 - INTERPRETATION** ............................................................................. **8**

   1.1    Definitions ........................................................................................................ 8

   1.2    *Business Corporations Act* and *Interpretations Act* Definitions Applicable ................ 9

**PART 2 - SHARES AND SHARE CERTIFICATES** ....................................... **10**

   2.1    Authorized Share Structure ............................................................................ 10

   2.2    Form of Share Certificate .............................................................................. 10

   2.3    Shareholder Entitled to Certificate or Acknowledgement ........................... 10

   2.4    Delivery by Mail ........................................................................................... 10

   2.5    Replacement of Worn Out or Defaced Certificate or Acknowledgment ..................... 10

   2.6    Replacement of Lost, Stolen or Destroyed Certificate or Acknowledgment .............. 11

   2.7    Splitting Share Certificates ........................................................................... 11

   2.8    Certificate Fee ................................................................................................ 11

   2.9    Recognition of Trusts .................................................................................... 11

**PART 3 - ISSUE OF SHARES** ......................................................................... **11**

   3.1    Directors Authorized ..................................................................................... 11

   3.2    Commissions and Discounts .......................................................................... 12

   3.3    Brokerage ...................................................................................................... 12

   3.4    Conditions of Issue ........................................................................................ 12

   3.5    Share Purchase Warrants and Rights ............................................................ 12

**PART 4 - SHARE REGISTERS** ...................................................................... **12**

   4.1    Central Securities Register ............................................................................. 12

   4.2    Closing Register ............................................................................................. 13

**PART 5 - SHARE TRANSFERS** ..................................................................... **13**

   5.1    Registering Transfers ..................................................................................... 13

   5.2    Form of Instrument of Transfer ..................................................................... 13

   5.3    Transferor Remains Shareholder ................................................................... 13

   5.4    Signing of Instrument of Transfer ................................................................. 13

   5.5    Enquiry as to Title Not Required ................................................................... 14

   5.6    Transfer Fee ................................................................................................... 14

**PART 6 - TRANSMISSION OF SHARES** ...................................................... **14**

   6.1    Legal Personal Representative Recognized on Death .................................... 14

   6.2    Rights of Legal Personal Representative ....................................................... 14

-2-

**PART 7 - PURCHASE OF SHARES** ............................................................... **14**

7.1    Company Authorized to Purchase Shares ........................................ 14

7.2    Purchase When Insolvent ................................................................ 15

7.3    Sale and Voting of Purchased Shares ............................................. 15

**PART 8 - BORROWING POWERS** ............................................................... **15**

8.1    Company Authorized to Borrow ...................................................... 15

**PART 9 - ALTERATIONS** ............................................................................ **15**

9.1    Alteration of Authorized Share Structure ....................................... 15

9.2    Special Rights and Restrictions ...................................................... 16

9.3    Change of Name .............................................................................. 16

9.4    Other Alterations ............................................................................. 16

**PART 10 - MEETINGS OF SHAREHOLDERS** ......................................... **17**

10.1    Annual General Meetings .............................................................. 17

10.2    Consent Resolution Instead of Annual General Meeting .............. 17

10.3    Calling of Meetings of Shareholders ............................................ 17

10.4    Meetings by Telephone or Other Electronic Means ...................... 17

10.5    Notice for Meetings of Shareholders ............................................ 17

10.6    Record Date for Notice .................................................................. 17

10.7    Record Date for Voting .................................................................. 18

10.8    Failure to Give Notice and Waiver of Notice ............................... 18

10.9    Notice of Special Business at Meetings of Shareholders .............. 18

10.10    Notice of Special Business .......................................................... 19

**PART 11 - PROCEEDINGS AT MEETINGS OF SHAREHOLDERS** ............................... **20**

11.1    Special Business ............................................................................ 20

11.2    Special Majority ............................................................................ 20

11.3    Quorum .......................................................................................... 20

11.4    One Shareholder May Constitute Quorum .................................... 20

11.5    Other Persons May Attend ............................................................ 21

11.6    Requirement of Quorum ................................................................ 21

11.7    Lack of Quorum ............................................................................ 21

11.8    Lack of Quorum at Succeeding Meeting ....................................... 21

11.9    Chair ............................................................................................... 21

11.10    Selection of Alternate Chair ....................................................... 22

11.11    Adjournments .............................................................................. 22

11.12    Notice of Adjourned Meeting ...................................................................... 22

11.13    Decisions by Show of Hands or Poll ........................................................... 22

11.14    Declaration of Results ................................................................................. 22

11.15    Motion Need Not be Seconded .................................................................... 22

11.16    Casting Vote ................................................................................................ 23

11.17    Manner of Taking Poll ................................................................................ 23

11.18    Demand for Poll on Adjournment ............................................................... 23

11.19    Chair Must Resolve Dispute ....................................................................... 23

11.20    Casting of Votes.......................................................................................... 23

11.21    Demand for Poll.......................................................................................... 23

11.22    Demand for Poll not to Prevent Continuance of Meeting ............................ 23

11.23    Retention of Ballots and Proxies ................................................................ 24

**PART 12 - VOTES OF SHAREHOLDERS ............................................................ 24**

12.1    Number of Votes by Shareholder or by Shares ............................................ 24

12.2    Votes of Persons in Representative Capacity ............................................... 24

12.3    Votes by Joint Holders ................................................................................ 24

12.4    Legal Personal Representatives as Joint Shareholders ................................. 24

12.5    Representative of a Corporate Shareholder .................................................. 25

12.6    Proxy Provisions do not Apply to all Companies......................................... 25

12.7    Appointment of Proxy Holders .................................................................... 25

12.8    Alternate Proxy Holders .............................................................................. 25

12.9    Proxy Holder Need not be Shareholders....................................................... 26

12.10    Deposit of Proxy ......................................................................................... 26

12.11    Validity of Proxy Vote ................................................................................ 26

12.12    Form of Proxy ............................................................................................. 26

12.13    Revocation of Proxy .................................................................................... 27

12.14    Revocation of Proxy Must be Signed .......................................................... 27

12.15    Production of Evidence of Authority to Vote .............................................. 27

**PART 13 -DIRECTORS ........................................................................................... 27**

13.1    First Directors; Number of Directors ........................................................... 27

13.2    Change in Number of Directors ................................................................... 27

13.3    Directors' Acts Valid Despite Vacancy ....................................................... 28

13.4    Qualification of Directors ............................................................................ 28

13.5    Remuneration of Directors........................................................................... 28

13.6    Reimbursement of Expenses of Directors ................................................................ 28

13.7    Special Remuneration for Directors ......................................................................... 28

13.8    Gratuity, Pension or Allowance on Retirement of Director ..................................... 28

**PART 14 - ELECTION AND REMOVAL OF DIRECTORS ................................................ 29**

14.1    Election at Annual General Meeting ........................................................................ 29

14.2    Consent to be a Director .......................................................................................... 29

14.3    Failure to Elect or Appoint Directors ...................................................................... 29

14.4    Places of Retiring Directors Not Filled ................................................................... 29

14.5    Directors May Fill Casual Vacancies ...................................................................... 30

14.6    Remaining Directors Power to Act .......................................................................... 30

14.7    Shareholders May Fill Vacancies ............................................................................ 30

14.8    Additional Directors ................................................................................................ 30

14.9    Ceasing to be a Director........................................................................................... 30

14.10   Removal of Director by Shareholders ...................................................................... 31

14.11   Removal of Director by Directors ............................................................................ 31

14.12   Nomination of Directors .......................................................................................... 31

**PART 15 - ALTERNATE DIRECTORS......................................................................... 34**

15.1    Appointment of Alternate Director........................................................................... 34

15.2    Notice of Meetings................................................................................................... 34

15.3    Alternate for More Than One Director Attending Meetings ..................................... 34

15.4    Consent Resolutions ................................................................................................ 34

15.5    Alternate Director Not an Agent............................................................................... 34

15.6    Revocation of Appointment of Alternate Director ................................................... 35

15.7    Ceasing to be an Alternate Director.......................................................................... 35

15.8    Remuneration and Expenses of Alternate Director ................................................... 35

**PART 16 - POWERS AND DUTIES OF DIRECTORS .................................................. 35**

16.1    Powers of Management ............................................................................................ 35

16.2    Appointment of Attorney of Company ..................................................................... 35

**PART 17 - DISCLOSURE OF INTEREST OF DIRECTORS ........................................ 36**

17.1    Obligation to Account for Profits ............................................................................. 36

17.2    Restrictions on Voting by Reason of Interest ........................................................... 36

17.3    Interested Director Counted in Quorum ................................................................... 36

17.4    Disclosure of Conflict of Interest or Property .......................................................... 36

17.5    Director Holding Other Office in the Company ........................................................ 36

17.6   No Disqualification .................................................... 36

17.7   Professional Services by Director or Officer ...................... 36

17.8   Director or Officer in Other Corporations ......................... 37

**PART 18 - PROCEEDINGS OF DIRECTORS.................................. 37**

18.1   Meetings of Directors ................................................ 37

18.2   Voting at Meetings ................................................... 37

18.3   Chair of Meetings .................................................... 37

18.4   Meetings by Telephone or Other Communications Medium ........ 37

18.5   Calling of Meetings .................................................. 38

18.6   Notice of Meetings ................................................... 38

18.7   When Notice Not Required ........................................... 38

18.8   Meeting Valid Despite Failure to Give Notice ..................... 38

18.9   Waiver of Notice of Meetings ....................................... 38

18.10  Quorum ............................................................... 39

18.11  Validity of Acts Where Appointment Defective .................... 39

18.12  Consent Resolutions in Writing ..................................... 39

**PART 19 - EXECUTIVE AND OTHER COMMITTEES ....................... 39**

19.1   Appointment and Powers of Executive Committee .................. 39

19.2   Appointment and Powers of Other Committees ..................... 39

19.3   Obligations of Committees ........................................... 40

19.4   Powers of Board ...................................................... 40

19.5   Committee Meetings .................................................. 40

**PART 20 - OFFICERS ...................................................... 41**

20.1   Directors May Appoint Officers ..................................... 41

20.2   Functions, Duties and Powers of Officers .......................... 41

20.3   Qualifications ........................................................ 41

20.4   Remuneration and Terms of Appointment .......................... 41

**PART 21 - INDEMNIFICATION ............................................ 41**

21.1   Definitions ........................................................... 41

21.2   Mandatory Indemnification of Directors and Former Directors.... 42

21.3   Indemnification of Other Persons ................................... 42

21.4   Non-Compliance with Business Corporations Act ................... 42

21.5   Company May Purchase Insurance ................................... 42

**PART 22 - DIVIDENDS** ................................................................................................ **43**

22.1   Payment of Dividends Subject to Special Rights ................................................ 43

22.2   Declaration of Dividends ................................................................................... 43

22.3   No Notice Required ............................................................................................ 43

22.4   Record Date ....................................................................................................... 43

22.5   Manner of Paying Dividend ............................................................................... 43

22.6   Settlement of Difficulties ................................................................................... 43

22.7   When Dividend Payable ..................................................................................... 44

22.8   Dividends to be Paid in Accordance with Number of Shares .............................. 44

22.9   Receipt by Joint Shareholders ........................................................................... 44

22.10  Dividend Bears No Interest ................................................................................ 44

22.11  Fractional Dividends .......................................................................................... 44

22.12  Payment of Dividends ........................................................................................ 44

22.13  Capitalization of Surplus ................................................................................... 44

**PART 23 - DOCUMENTS, RECORDS AND REPORTS** ............................................. **44**

23.1   Recording of Financial Affairs .......................................................................... 44

23.2   Inspection of Accounting Records ...................................................................... 45

**PART 24 - NOTICES** .................................................................................................... **45**

24.1   Method of Giving Notice ................................................................................... 45

24.2   Deemed Receipt of Mailing ............................................................................... 45

24.3   Certificate of Sending ........................................................................................ 46

24.4   Notice to Joint Shareholders .............................................................................. 46

24.5   Notice to Trustees .............................................................................................. 46

**PART 25 - SEAL AND EXECUTION** .......................................................................... **46**

25.1   Seal and Execution of Documents ..................................................................... 46

25.2   Sealing Copies ................................................................................................... 47

25.3   Mechanical Reproduction of Seal ...................................................................... 47

**PART 26 - PROHIBITIONS** ........................................................................................ **47**

26.1   Definitions ......................................................................................................... 47

26.2   Application ......................................................................................................... 48

26.3   Consent Required for Transfer of Shares or Designated Securities ..................... 48

**PART 27 - SPECIAL RIGHTS AND RESTRICTIONS ATTACHED TO THE COMMON
SHARES** ....................................................................................................................... **48**

27.1   Voting Rights ..................................................................................................... 48

27.2   Conversion and Constraints on Ownership ........................................................ 48

27.3    Dividends ........................................................................................................ 49

27.4    Rights to Subscribe; Pre-Emptive Rights ................................................... 49

27.5    Subdivision or Consolidation....................................................................... 49

27.6    Conversion of Common Shares Upon an Offer........................................... 49

27.7    Exclusionary offer conversion right ............................................................ 50

27.8    exlusionary offer conversion right deposit and reconversion ..................... 51

27.9    converted shares share certificate ............................................................... 51

**PART 28 VARIABLE VOTING SHARES** ............................................................... **52**

28.1    Voting Rights................................................................................................ 52

28.2    Conversion of Variable Voting Shares ........................................................ 53

28.3    Constraints on Ownership............................................................................ 53

28.4    Dividends ..................................................................................................... 53

28.5    Liquidation, Dissolution or Winding-Up .................................................... 53

28.6    Rights to Subscribe; Pre-Emptive Rights ................................................... 53

28.7    Subdivision or Consolidation....................................................................... 54

28.8    Conversion of Variable Voting Shares Upon an Offer................................ 54

28.9    exlusionary offer conversion right .............................................................. 55

28.10   exlusionary offer conversion right deposit and reconversion ..................... 55

28.11   converted shares share certificate ............................................................... 56

28.12   Non-CERTIFICATED and DRS ................................................................. 56

**PART 29 - BOARD AUTHORITY** ............................................................................ **56**

**PART 30 - BOARD POWERS, DECLARATIONS AND DEEMING PROVISIONS** ........ **57**

## PART 1 - INTERPRETATION

### 1.1    DEFINITIONS

In these Articles, unless the context otherwise requires:

1.     "Aggregate Votes" means the aggregate of the votes attached to all Voting Shares of the Company that may ordinarily be cast to elect directors of the Company;

2.     "board of directors", "directors" and "board" mean the directors or sole director of the Company for the time being;

3.     "business day" means any day other than a Saturday or a Sunday when Canadian chartered banks are open for regular business in the City of Vancouver, Canada or Toronto, Ontario;

4.     "Business Corporations Act" or "BCBCA" means the *Business Corporations Act* (British Columbia) from time to time in force and all amendments thereto and includes all regulations and amendments thereto made pursuant to that Act;

5.     "Change of Control Transaction" means an amalgamation, arrangement, recapitalization, business combination or similar transaction of the Company, other than an amalgamation, arrangement, recapitalization, business combination or similar transaction that would result in (i) the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the continuing entity or its direct or indirect parent) more than fifty percent (50%) of the total voting power of the voting securities of the Company, the continuing entity or its direct or indirect parent, and more than fifty percent (50%) of the total number of outstanding shares of the Company, the continuing entity or its direct or indirect parent, in each case as outstanding immediately after such transaction, and (ii) the shareholders of the Company immediately prior to the transaction owning voting securities of the Company, the continuing entity or its direct or indirect parent immediately following the transaction in substantially the same proportions (vis-a-vis each other) as such shareholders owned the voting securities of the Company immediately prior to the transaction (provided that in neither event shall the exercise of any exchangeable shares of a subsidiary of the Company that are exchangeable into shares of the Company be taken into account in such determination);

6.     "Common Shares" means the common shares in the capital of the Company;

7.     "Equity Shares" means the Common Shares and the Variable Voting Shares;

8.     "legal Personal representative" means the Personal or other legal representative of the shareholder;

9.     "Non-U.S. Resident" means any Person or entity that is not a U.S. Resident;

10.    "Non-Voting Share" means the non-voting shares of the share capital of the Company;

11.  "Notice of Articles" means the notice of articles for the Company contained in the Company's incorporation application, as amended from time to time;

12.  "Person" means any individual, partnership, corporation, company, association, trust, joint venture or limited or unlimited liability company, and for greater certainty, shall include any U.S. Resident or Non-U.S. Resident;

13.  "registered address" of a shareholder means the shareholder's address as recorded in the central securities register;

14.  "seal" means the seal of the Company, if any;

15.  "Transfer Agent" means the transfer agent and the registrar of the Common Voting Shares and Variable Voting Shares of the Company (and if there is no such transfer agent, "Transfer Agent" means the Company);

16.  "U.S. Resident" means a resident of the United States, determined as set forth in Rule 405 under the U.S. Securities Act. Without limiting the foregoing but for greater clarity in these Articles, a security holder is a U.S. Resident if such person's address appears on the records of the Company (i.e., a registered holder) as in the United States; provided that (i) the Company is required to "look through" the record ownership of brokers, dealers, banks or nominees located in (A) the United States, (B) Canada, and (C) the Company's primary trading market (if different from Canada) who hold securities for the accounts of their customers, to determine the residency of those customers, and the Company is also required to take into account information regarding U.S. ownership derived from beneficial ownership reports that are provided to the Company or filed publicly, as well as information that otherwise is provided to the Company;

17.  "U.S. Securities Act" means the United States Securities Act of 1933, as amended;

18.  "Variable Voting Share" means the variable voting shares of the share capital of the Company; and

19.  "Voting Share" means the Variable Voting Shares and the Common Shares of the share capital of the Company.

## 1.2 *BUSINESS CORPORATIONS ACT* AND *INTERPRETATIONS ACT* DEFINITIONS APPLICABLE

The definitions in the Business Corporations Act and the definitions and rules of construction in *the Interpretation Act* (British Columbia), with the necessary changes, so far as applicable, and unless the context requires otherwise, apply to these Articles as if they were an enactment. If there is a conflict between a definition in the Business Corporations Act and a definition or rule in the *Interpretation Act* (British Columbia) relating to a term used in these Articles, the definition in the Business Corporations Act will prevail in relation to the use of the term in these Articles. If there is a conflict between these Articles and the Business Corporations Act, the Business Corporations Act will prevail.

## PART 2- SHARES AND SHARE CERTIFICATES

### 2.1    AUTHORIZED SHARE STRUCTURE

The authorized share structure of the Company consists of shares of the class or classes and series, if any, described in the Notice of Articles of the Company as the same may be amended from time to time.

### 2.2    FORM OF SHARE CERTIFICATE

Each share certificate issued by the Company must comply with, and be signed as required by, the Business Corporations Act.

### 2.3    SHAREHOLDER ENTITLED TO CERTIFICATE OR ACKNOWLEDGEMENT

A share issued by the Company may be represented by a share certificate or may be an uncertificated (electronic or book based) share. Each shareholder is entitled, without charge, to either (a) one physical share certificate representing the shares of each class or series of shares registered in the shareholder's name, or (b) a non-transferable written acknowledgment of the shareholder's right to obtain such a share certificate (such as a direct registration statement), provided that in respect of a share held jointly by several Persons, the Company is not bound to issue more than one share certificate and delivery of a share certificate for a share to one of several joint shareholders or to one of the shareholders' duly authorized agents will be sufficient delivery to all. Shares may be issued in book or electronic form. The directors of the Company may, by resolution, provide that (a) the shares of any or all of the classes and series of the Company's shares may be uncertificated shares, or (b) any specified shares may be uncertificated shares.

### 2.4    DELIVERY BY MAIL

Any share certificate or non-transferable written acknowledgment of a shareholder's right to obtain a share certificate may be sent to the shareholder by mail at the shareholder's registered address and neither the Company nor any director, officer or agent of the Company is liable for any loss to the shareholder because the share certificate or acknowledgment is lost in the mail or stolen.

### 2.5    REPLACEMENT OF WORN OUT OR DEFACED CERTIFICATE OR ACKNOWLEDGMENT

If the directors are satisfied that a share certificate or a non-transferable written acknowledgment of the shareholder's right to obtain a share certificate is worn out or defaced, they must, on production to them of the share certificate or acknowledgment, as the case may be, and on such other terms, if any, as they think fit:

1.      order the share certificate or acknowledgment, as the case may be, to be cancelled; and

2.      issue a replacement share certificate or acknowledgment, as the case may be.

**2.6    REPLACEMENT OF LOST, STOLEN OR DESTROYED CERTIFICATE OR ACKNOWLEDGMENT**

If a share certificate or a non-transferable written acknowledgment of a shareholder's right to obtain a share certificate is lost, stolen or destroyed, a replacement share certificate or acknowledgment, as the case may be, must be issued to the Person entitled to that share certificate or acknowledgment, as the case may be, if the directors receive:

1.    proof satisfactory to them that the share certificate or acknowledgment is lost, stolen or destroyed; and

2.    any indemnity the directors consider adequate.

**2.7    SPLITTING SHARE CERTIFICATES**

If a shareholder surrenders a share certificate to the Company with a written request that the Company issue in the shareholder's name two or more share certificates, each representing a specified number of shares and in the aggregate representing the same number of shares as the share certificate so surrendered, the Company must cancel the surrendered share certificate and issue replacement share certificates in accordance with that request.

**2.8    CERTIFICATE FEE**

There must be paid to the Company, in relation to the issue of any share certificate under Articles 2.5, 2.6 or 2.7, the amount determined by the directors, if any, which must not exceed the amount prescribed under the Business Corporations Act.

**2.9    RECOGNITION OF TRUSTS**

Except as required by law or statute or these Articles, no Person will be recognized by the Company as holding any share upon any trust, and the Company is not bound by or compelled in any way to recognize (even when having notice thereof) any equitable, contingent, future or partial interest in any share or fraction of a share or (except as by law or statute or these Articles provided or as ordered by a court of competent jurisdiction) any other rights in respect of any share except an absolute right to the entirety thereof in the shareholder.

## PART 3 - ISSUE OF SHARES

**3.1    DIRECTORS AUTHORIZED**

Subject to the Business Corporations Act and the rights of the holders of issued shares of the Company, the Company may issue, allot, sell or otherwise dispose of the unissued shares, and issued shares held by the Company, at the times, to the Persons, including directors, in the manner, on the terms and conditions and for the issue prices (including any premium at which shares with par value may be issued) that the directors may determine. The issue price for a share with par value must be equal to or greater than the par value of the share, if any.

120675999v2

## 3.2    COMMISSIONS AND DISCOUNTS

The Company may at any time, pay a reasonable commission or allow a reasonable discount to any Person in consideration of that Person purchasing or agreeing to purchase shares of the Company from the Company or any other Person or procuring or agreeing to procure purchasers for shares of the Company.

## 3.3    BROKERAGE

The Company may pay such brokerage fee or other consideration as may be lawful for or in connection with the sale or placement of its securities.

## 3.4    CONDITIONS OF ISSUE

Except as provided for by the Business Corporations Act, no share may be issued until it is fully paid. A share is fully paid when:

1.      consideration is provided to the Company for the issue of the share by one or more of the following:

      a)      past services performed for the Company;

      b)      property;

      c)      money; and

2.      the value of the consideration received by the Company equals or exceeds the issue price set for the share under Article 3.1.

## 3.5    SHARE PURCHASE WARRANTS AND RIGHTS

Subject to the Business Corporations Act, the Company may issue share purchase warrants, options and rights upon such terms and conditions as the directors determine, which share purchase warrants, options and rights may be issued alone or in conjunction with debentures, debenture stock, bonds, shares or any other securities issued or created by the Company from time to time.

## PART 4 - SHARE REGISTERS

## 4.1    CENTRAL SECURITIES REGISTER

As required by and subject to the Business Corporations Act, the Company must maintain in British Columbia a central securities register. The directors may, subject to the Business Corporations Act, appoint an agent to maintain the central securities register. The directors may also appoint one or more agents, including the agent which keeps the central securities register, as transfer agent for its shares or any class or series of its shares, as the case may be, and the same or another agent as registrar for its shares or such class or series of its shares, as the case may be. The directors may terminate such appointment of any agent at any time and may appoint another agent in its place.

So long as they are publicly listed and subject to the Business Corporations Act, the Common Shares and Variable Voting Shares may, in the Company's discretion, be subject to a single securities register (with appropriate notations to indicate the applicable class, where applicable).

## 4.2    CLOSING REGISTER

The Company must not at any time close its central securities register.

## PART 5 - SHARE TRANSFERS

## 5.1    REGISTERING TRANSFERS

A transfer of a share of the Company must not be registered unless:

1.    a duly signed instrument of transfer in respect of the share has been received by the Company;

2.    if a share certificate has been issued by the Company in respect of the share to be transferred, that share certificate has been surrendered to the Company; and

3.    if a non-transferable written acknowledgment of the shareholder's right to obtain a share certificate has been issued by the Company in respect of the share to be transferred, that acknowledgment has been surrendered to the Company.

## 5.2    FORM OF INSTRUMENT OF TRANSFER

The instrument of transfer in respect of any share of the Company must be either in the form, if any, on the back of the Company's share certificates or in any other form as may be acceptable to the Company or its transfer agent.

## 5.3    TRANSFEROR REMAINS SHAREHOLDER

Except to the extent that the Business Corporations Act otherwise provides, the transferor of shares is deemed to remain the holder of the shares until the name of the transferee is entered in a securities register of the Company in respect of the transfer.

## 5.4    SIGNING OF INSTRUMENT OF TRANSFER

If a shareholder, or his or her duly authorized attorney, signs an instrument of transfer in respect of shares registered in the name of the shareholder, the signed instrument of transfer constitutes a complete and sufficient authority to the Company and its directors, officers and agents to register the number of shares specified in the instrument of transfer or specified in any other manner, or, if no number is specified, all the shares represented by the share certificates or set out in the written acknowledgments deposited with the instrument of transfer:

1.    in the name of the Person named as transferee in that instrument of transfer; or

2.      if no Person is named as transferee in that instrument of transfer, in the name of the Person on whose behalf the instrument is deposited for the purpose of having the transfer registered.

## 5.5    ENQUIRY AS TO TITLE NOT REQUIRED

Neither the Company nor any director, officer or agent of the Company is bound to inquire into the title of the Person named in the instrument of transfer as transferee or, if no Person is named as transferee in the instrument of transfer, of the Person on whose behalf the instrument is deposited for the purpose of having the transfer registered or is liable for any claim related to registering the transfer by the shareholder or by any intermediate owner or holder of the shares, of any interest in the shares, of any share certificate representing such shares or of any written acknowledgment of a right to obtain a share certificate for such shares.

## 5.6    TRANSFER FEE

There must be paid to the Company, in relation to the registration of any transfer, the amount, if any, determined by the directors.

## PART 6 - TRANSMISSION OF SHARES

## 6.1    LEGAL PERSONAL REPRESENTATIVE RECOGNIZED ON DEATH

In case of the death of a shareholder, the legal personal representative, or if the shareholder was a joint holder, the surviving joint holder, will be the only Person recognized by the Company as having any title to the shareholder's interest in the shares. Before recognizing a Person as a legal personal representative, the directors may require proof of appointment by a court of competent jurisdiction, a grant of letters probate, letters of administration or such other evidence or documents as the directors consider appropriate.

## 6.2    RIGHTS OF LEGAL PERSONAL REPRESENTATIVE

The legal personal representative has the same rights, privileges and obligations that attach to the shares held by the shareholder, including the right to transfer the shares in accordance with these Articles, provided the documents required by the Business Corporations Act and the directors have been deposited with the Company.

## PART 7 - PURCHASE OF SHARES

## 7.1    COMPANY AUTHORIZED TO PURCHASE SHARES

Subject to Article 7.2, the special rights and restrictions attached to the shares of any class or series and the Business Corporations Act, the Company may, if authorized by the directors, purchase or otherwise acquire any of its shares at the price and upon the terms specified in an authorizing resolution.

**7.2    PURCHASE WHEN INSOLVENT**

The Company must not make a payment or provide any other consideration to purchase or otherwise acquire any of its shares if there are reasonable grounds for believing that:

1.    the Company is insolvent; or

2.    making the payment or providing the consideration would render the Company insolvent.

**7.3    SALE AND VOTING OF PURCHASED SHARES**

If the Company retains a share redeemed, purchased or otherwise acquired by it, the Company may sell, gift or otherwise dispose of the share, but, while such share is held by the Company, it:

1.    is not entitled to vote the share at a meeting of its shareholders;

2.    must not pay a dividend in respect of the share; and

3.    must not make any other distribution in respect of the share.

## PART 8 - BORROWING POWERS

**8.1    COMPANY AUTHORIZED TO BORROW**

The Company, if authorized by the directors, may:

1.    borrow money in the manner and amount, on the security, from the sources and on the terms and conditions that they consider appropriate;

2.    issue bonds, debentures and other debt obligations either outright or as security for any liability or obligation of the Company or any other Person and at such discounts or premiums and on such other terms as they consider appropriate;

3.    guarantee the repayment of money by any other Person or the performance of any obligation of any other Person; and

4.    mortgage, charge, whether by way of specific or floating charge, grant a security interest in, or give other security on, the whole or any part of the present and future assets and undertaking of the Company.

## PART 9 - ALTERATIONS

**9.1    ALTERATION OF AUTHORIZED SHARE STRUCTURE**

Subject to Article 9.2, the Business Corporations Act, and any regulatory or stock exchange requirements applicable to the Company, the Company may by directors' resolution or ordinary resolution:

1.      create one or more classes or series of shares or, if none of the shares of a class or series of shares are allotted or issued, eliminate that class or series of shares;

2.      increase, reduce or eliminate the maximum number of shares that the Company is authorized to issue out of any class or series of shares or establish a maximum number of shares that the Company is authorized to issue out of any class or series of shares for which no maximum is established;

3.      subdivide or consolidate all or any of its unissued, or fully paid and issued, shares;

4.      if the Company is authorized to issue shares of a class of shares with par value:

    a)      decrease the par value of those shares; or

    b)      if none of the shares of that class of shares are allotted or issued, increase the par value of those shares;

5.      change all or any of its unissued, or fully paid issued, shares with par value into shares without par value or any of its unissued shares without par value into shares with par value;

6.      alter the identifying name of any of its shares; or

7.      otherwise alter its shares or authorized share structure when required or permitted to do so by the Business Corporations Act.

## 9.2    SPECIAL RIGHTS AND RESTRICTIONS

Subject to the Business Corporations Act and any regulatory or stock exchange requirements applicable to the Company, the Company may by directors' resolution or ordinary resolution:

1.      create special rights or restrictions for, and attach those special rights or restrictions to, the shares of any class or series of shares, whether or not any or all of those shares have been issued; or

2.      vary or delete any special rights or restrictions attached to the shares of any class or series of shares, whether or not any or all of those shares have been issued.

## 9.3    CHANGE OF NAME

The Company may by directors' resolution authorize an alteration of its Notice of Articles in order to change its name subject to any other regulatory or stock exchange requirements applicable to the Company.

## 9.4    OTHER ALTERATIONS

If the Business Corporations Act does not specify the type of resolution and these Articles do not specify another type of resolution, the Company may by directors' resolution alter these Articles subject to any other regulatory or stock exchange requirements applicable to the Company.

120675999v2

## PART 10 - MEETINGS OF SHAREHOLDERS

### 10.1    ANNUAL GENERAL MEETINGS

Unless an annual general meeting is deferred or waived in accordance with the Business Corporations Act, the Company must hold its first annual general meeting within 18 months after the date on which it was incorporated or otherwise recognized, and after that must hold an annual general meeting at least once in each calendar year and not more than 15 months after the last annual reference date at such time and place as may be determined by the directors.

### 10.2    CONSENT RESOLUTION INSTEAD OF ANNUAL GENERAL MEETING

If all the shareholders who are entitled to vote at an annual general meeting consent by a unanimous resolution under the Business Corporations Act to all of the business that is required to be transacted at that annual general meeting, the annual general meeting is deemed to have been held on the date of the unanimous resolution. The shareholders must, in any unanimous resolution passed under this Article 10.2, select as the Company's annual reference date a date that would be appropriate for the holding of the applicable annual general meeting.

### 10.3    CALLING OF MEETINGS OF SHAREHOLDERS

The directors may, whenever they think fit, call a meeting of shareholders.

### 10.4    MEETINGS BY TELEPHONE OR OTHER ELECTRONIC MEANS

A meeting of the Company's shareholders may be held entirely or in part by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the meeting, if approved by directors' resolution prior to the meeting and subject to the Business Corporations Act. Any Person participating in a meeting by such means is deemed to be present at the meeting.

### 10.5    NOTICE FOR MEETINGS OF SHAREHOLDERS

The Company must send notice of the date, time and location (except in the case of a fully electronic meeting) of any meeting of shareholders, in the manner provided in these Articles, or in such other manner, if any, as may be prescribed by ordinary resolution (whether previous notice of the resolution has been given or not), to each shareholder entitled to attend the meeting, to each director and to the auditor of the Company, unless these Articles otherwise provide, at least the following number of days before the meeting:

1.    if and for so long as the Company is a public company, 21 days;

2.    otherwise, 10 days.

### 10.6    RECORD DATE FOR NOTICE

The directors may set a date as the record date for the purpose of determining shareholders entitled to notice of any meeting of shareholders. The record date must not precede the date on which the meeting is to be held by more than two months or, in the case of a general meeting requisitioned

by shareholders under the Business Corporations Act, by more than four months. The record date must not precede the date on which the meeting is held by fewer than:

1.      if and for so long as the Company is a public company, 21 days;

2.      otherwise, 10 days.

If no record date is set, the record date is 5 p.m. on the day immediately preceding the first date on which the notice is sent or, if no notice is sent, the beginning of the meeting.

If the general meeting is an electronic meeting, the notice must also contain instructions for attending and participating in the meeting by telephone or other communications medium, including, if applicable, instructions for voting.

**10.7    RECORD DATE FOR VOTING**

The directors may set a date as the record date for the purpose of determining shareholders entitled to vote at any meeting of shareholders. The record date must not precede the date on which the meeting is to be held by more than two months or, in the case of a general meeting requisitioned by shareholders under the Business Corporations Act, by more than four months. If no record date is set, the record date is 5 p.m. on the day immediately preceding the first date on which the notice is sent or, if no notice is sent, the beginning of the meeting.

**10.8    FAILURE TO GIVE NOTICE AND WAIVER OF NOTICE**

The accidental omission to send notice of any meeting to, or the non-receipt of any notice by, any of the Persons entitled to notice does not invalidate any proceedings at that meeting. Any Person entitled to notice of a meeting of shareholders may, in writing or otherwise, waive or reduce the period of notice of such meeting.

**10.9    NOTICE OF SPECIAL BUSINESS AT MEETINGS OF SHAREHOLDERS**

If a meeting of shareholders is to consider special business within the meaning of Article 11.1, the notice of meeting must:

1.      state the general nature of the special business; and

2.      if the special business includes considering, approving, ratifying, adopting or authorizing any document or the signing of or giving of effect to any document, have attached to it a copy of the document or state that a copy of the document will be available for inspection by shareholders:

    a)      at the Company's records office, or at such other reasonably accessible location in British Columbia as is specified in the notice; and

    b)      during statutory business hours on any one or more specified days before the day set for the holding of the meeting.

### 10.10  NOTICE OF SPECIAL BUSINESS

1.  In addition to any other requirements under applicable laws, for a shareholder to put forward a motion at a meeting of shareholders for any other business not being put forward for consideration by management (the "**Motioning Shareholder**"), the Motioning Shareholder must have given prior notice thereof that is both timely (in accordance with paragraph 2 below) and in proper written form (in accordance with paragraph 3 below) to the Secretary of the Company at the principal executive offices of the Company.

2.  To be timely, a Motioning Shareholder's notice to the Secretary of the Company must be made:

    a)  in the case of an annual meeting of shareholders, not less than 30 nor more than 65 days prior to the date of the annual meeting of shareholders; provided, however, that in the event that the annual meeting of shareholders is to be held on a date that is less than 50 days after the date (the "**Notice Date**") on which the first public announcement of the date of the annual meeting was made, notice by the Motioning Shareholder may be made not later than the close of business on the tenth day following the Notice Date; and

    b)  in the case of a special meeting (which is not also an annual meeting) of shareholders, not later than the close of business on the fifteenth day following the day on which the first public announcement of the date of the special meeting of shareholders was made.

The time periods for the giving of a Motioning Shareholder's notice set forth above shall in all cases be determined based on the original date of the applicable annual meeting or special meeting of shareholders, and in no event shall any adjournment or postponement of a meeting of shareholders or the announcement thereof commence a new time period for the giving of such notice.

3.  To be in proper written form, a Motioning Shareholder's notice to the Secretary of the Company must set forth particulars of:

    a)  the specific matter and motion intended to be put forward by the Motioning Shareholder and such information relating to the motion that would be required to be disclosed in a dissident's proxy circular in connection with solicitations of proxies for holding a shareholders' meeting pursuant to the Act and Applicable Securities Laws (as defined below); and

    b)  the Motioning Shareholder, including full particulars regarding any proxy, contract, agreement, arrangement or understanding pursuant to which such Motioning Shareholder has a right to vote or direct the voting of any Common Shares of the Company and any other information relating to such Motioning Shareholder that would be required to be made in a dissident's proxy circular in connection with solicitations of proxies for election of directors pursuant to the Act and Applicable Securities Laws (as defined below).

4.      The provisions of sections 14.12(5), (6), (7) and (8) apply equally in this Article 10.10.

## PART 11 - PROCEEDINGS AT MEETINGS OF SHAREHOLDERS

### 11.1    SPECIAL BUSINESS

At a meeting of shareholders, the following business is special business:

1.      at a meeting of shareholders that is not an annual general meeting, all business is special business except business relating to the conduct of or voting at the meeting;

2.      at an annual general meeting, all business is special business except for the following:

   a)      business relating to the conduct of or voting at the meeting;

   b)      consideration of any financial statements of the Company presented to the meeting;

   c)      consideration of any reports of the directors or auditor;

   d)      the setting or changing of the number of directors;

   e)      the election or appointment of directors;

   f)      the appointment of an auditor;

   g)      the setting of the remuneration of an auditor;

   h)      business arising out of a report of the directors not requiring the passing of a special resolution or an exceptional resolution;

   i)      any other business which, under these Articles or the Business Corporations Act, may be transacted at a meeting of shareholders without prior notice of the business being given to the shareholders.

### 11.2    SPECIAL MAJORITY

The majority of votes required for the Company to pass a special resolution at a meeting of shareholders is two-thirds (⅔) of the votes cast on the resolution.

### 11.3    QUORUM

Subject to the special rights and restrictions attached to the shares of any class or series of shares, the quorum for the transaction of business at a meeting of shareholders is one Person who is, or who represents by proxy, one or more shareholders who, in the aggregate, hold at least 5% of the issued shares entitled to be voted at the meeting.

### 11.4    ONE SHAREHOLDER MAY CONSTITUTE QUORUM

If there is only one shareholder entitled to vote at a meeting of shareholders:

1.      the quorum is one Person who is, or who represents by proxy, that shareholder; and

2.      that shareholder, present in Person or by proxy, may constitute the meeting.

## 11.5   OTHER PERSONS MAY ATTEND

The directors, the chief executive officer (if any), the president (if any), the chief financial officer (if any), the secretary (if any), the assistant secretary (if any), any lawyer for the Company, the auditor of the Company and any other Persons invited by the directors are entitled to attend any meeting of shareholders, but if any of those Persons does attend a meeting of shareholders, that Person is not to be counted in the quorum and is not entitled to vote at the meeting unless that Person is a shareholder or proxy holder entitled to vote at the meeting.

## 11.6   REQUIREMENT OF QUORUM

No business, other than the election of a chair of the meeting and the adjournment of the meeting, may be transacted at any meeting of shareholders unless a quorum of shareholders entitled to vote is present at the commencement of the meeting, but such quorum need not be present throughout the meeting.

## 11.7   LACK OF QUORUM

If, within one-half hour from the time set for the holding of a meeting of shareholders, a quorum is not present:

1.      in the case of a general meeting requisitioned by shareholders, the meeting is dissolved; and

2.      in the case of any other meeting of shareholders, the meeting stands adjourned to the same day in the next week at the same time and place.

## 11.8   LACK OF QUORUM AT SUCCEEDING MEETING

If, at the meeting to which the meeting referred to in Article 11.7(2) was adjourned, a quorum is not present within one-half hour from the time set for the holding of the meeting, the Person or Persons present and being, or representing by proxy, one or more shareholders entitled to attend and vote at the meeting constitute a quorum.

## 11.9   CHAIR

The following individual is entitled to preside as chair at a meeting of shareholders:

1.      the chair of the board, if any; or

2.      the chief executive officer, if any; or

3.      the president, if any.

## 11.10   SELECTION OF ALTERNATE CHAIR

If, at any meeting of shareholders, there is no chair of the board, chief executive officer or president present within 15 minutes after the time set for holding the meeting, or if the chair of the board, chief executive officer and the president are unwilling to act as chair of the meeting, or if the chair of the board, chief executive officer and the president have advised the secretary, if any, or any director present at the meeting, that they will not be present at the meeting, the directors present must choose one of their number or the Company's solicitor to be chair of the meeting failing which the shareholders entitled to vote at the meeting who are present in Person or by proxy may choose any Person present at the meeting to chair the meeting.

## 11.11   ADJOURNMENTS

The chair of a meeting of shareholders may, and if so directed by the meeting must, adjourn the meeting from time to time and from place to place, but no business may be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

## 11.12   NOTICE OF ADJOURNED MEETING

It is not necessary to give any notice of an adjourned meeting or of the business to be transacted at an adjourned meeting of shareholders except that, when a meeting is adjourned for 30 days or more, notice of the adjourned meeting must be given as in the case of the original meeting.

## 11.13   DECISIONS BY SHOW OF HANDS OR POLL

Subject to the Business Corporations Act, every motion put to a vote at a meeting of shareholders will be decided on a show of hands unless a poll, before or on the declaration of the result of the vote by show of hands, is directed by the chair or demanded by at least one shareholder entitled to vote who is present in Person or by proxy.

## 11.14   DECLARATION OF RESULTS

The chair of a meeting of shareholders must declare to the meeting the decision on every question in accordance with the result of the show of hands or the poll, as the case may be, and that decision must be entered in the minutes of the meeting. A declaration of the chair that a resolution is carried by the necessary majority or is defeated is, unless a poll is directed by the chair or demanded under Article 11.13, conclusive evidence without proof of the number or proportion of the votes recorded in favour of or against the resolution.

## 11.15   MOTION NEED NOT BE SECONDED

No motion proposed at a meeting of shareholders need be seconded unless the chair of the meeting rules otherwise, and the chair of any meeting of shareholders is entitled to propose or second a motion.

**11.16  CASTING VOTE**

In case of an equality of votes, the chair of a meeting of shareholders does not, either on a show of hands or on a poll, have a second or casting vote in addition to the vote or votes to which the chair may be entitled as a shareholder.

**11.17  MANNER OF TAKING POLL**

Subject to Article 11.18, if a poll is duly demanded at a meeting of shareholders:

1.     the poll must be taken:

   a)     at the meeting, or within seven days after the date of the meeting, as the chair of the meeting directs; and

   b)     in the manner, at the time and at the place that the chair of the meeting directs;

2.     the result of the poll is deemed to be the decision of the meeting at which the poll is demanded; and

3.     the demand for the poll may be withdrawn by the Person who demanded it.

**11.18  DEMAND FOR POLL ON ADJOURNMENT**

A poll demanded at a meeting of shareholders on a question of adjournment must be taken immediately at the meeting.

**11.19  CHAIR MUST RESOLVE DISPUTE**

In the case of any dispute as to the admission or rejection of a vote given on a poll, the chair of the meeting must determine the dispute, and his or her determination made in good faith is final and conclusive.

**11.20  CASTING OF VOTES**

On a poll, a shareholder entitled to more than one vote need not cast all the votes in the same way.

**11.21  DEMAND FOR POLL**

No poll may be demanded in respect of the vote by which a chair of a meeting of shareholders is elected.

**11.22  DEMAND FOR POLL NOT TO PREVENT CONTINUANCE OF MEETING**

The demand for a poll at a meeting of shareholders does not, unless the chair of the meeting so rules, prevent the continuation of a meeting for the transaction of any business other than the question on which a poll has been demanded.

**11.23  RETENTION OF BALLOTS AND PROXIES**

The Company must, for at least three months after a meeting of shareholders, keep each ballot cast on a poll and each proxy voted at the meeting, and, during that period, make them available for inspection during normal business hours by any shareholder or proxyholder entitled to vote at the meeting. At the end of such three month period, the Company may destroy such ballots and proxies.

<b>PART 12 - VOTES OF SHAREHOLDERS</b>

**12.1  NUMBER OF VOTES BY SHAREHOLDER OR BY SHARES**

Subject to any special rights or restrictions attached to any shares and to the restrictions imposed on joint shareholders under Article 12.3:

1.      on a vote by show of hands, every Person present who is a shareholder or proxy holder and entitled to vote on the matter has one vote; and

2.      on a poll, every shareholder entitled to vote on the matter has one vote in respect of each share entitled to be voted on the matter and held by that shareholder and may exercise that vote either in Person or by proxy.

**12.2  VOTES OF PERSONS IN REPRESENTATIVE CAPACITY**

A Person who is not a shareholder may vote at a meeting of shareholders, whether on a show of hands or on a poll, and may appoint a proxy holder to act at the meeting, if, before doing so, the Person satisfies the chair of the meeting, or the directors, that the Person is a legal personal representative or a trustee in bankruptcy for a shareholder who is entitled to vote at the meeting.

**12.3  VOTES BY JOINT HOLDERS**

If there are joint shareholders registered in respect of any share:

1.      any one of the joint shareholders may vote at any meeting, either personally or by proxy, in respect of the share as if that joint shareholder were solely entitled to it; or

2.      if more than one of the joint shareholders is present at any meeting, personally or by proxy, and more than one of them votes in respect of that share, then only the vote of the joint shareholder present whose name stands first on the central securities register in respect of the share will be counted.

**12.4  LEGAL PERSONAL REPRESENTATIVES AS JOINT SHAREHOLDERS**

Two or more legal personal representatives of a shareholder in whose sole name any share is registered are, for the purposes of Article 12.3, deemed to be joint shareholders.

## 12.5    REPRESENTATIVE OF A CORPORATE SHAREHOLDER

If a corporation, that is not a subsidiary of the Company, is a shareholder, that corporation may appoint a Person to act as its representative at any meeting of shareholders of the Company, and:

1.       for that purpose, the instrument appointing a representative must:

   a)       be received at the registered office of the Company or at any other place specified, in the notice calling the meeting, for the receipt of proxies, at least the number of business days specified in the notice for the receipt of proxies, or if no number of days is specified, two business days before the day set for the holding of the meeting; or

   b)       be provided, at the meeting, to the chair of the meeting or to a Person designated by the chair of the meeting;

2.       if a representative is appointed under this Article 12.5:

   a)       the representative is entitled to exercise in respect of and at that meeting the same rights on behalf of the corporation that the representative represents as that corporation could exercise if it were a shareholder who is an individual, including, without limitation, the right to appoint a proxy holder; and

   b)       the representative, if present at the meeting, is to be counted for the purpose of forming a quorum and is deemed to be a shareholder present in Person at the meeting.

Evidence of the appointment of any such representative may be sent to the Company by written instrument, fax or any other method of transmitting legibly recorded messages.

## 12.6    PROXY PROVISIONS DO NOT APPLY TO ALL COMPANIES

Articles 12.7 to 12.15 do not apply to the Company if and for so long as it is a public company or a pre-existing reporting company which has the Statutory Reporting Company Provisions (as defined in section 1(1) of the Business Corporations Act) as part of its Articles or to which the Statutory Reporting Company Provisions apply.

## 12.7    APPOINTMENT OF PROXY HOLDERS

Every shareholder of the Company, including a corporation that is a shareholder but not a subsidiary of the Company, entitled to vote at a meeting of shareholders of the Company may, by proxy, appoint one or more (but not more than five) proxy holders to attend and act at the meeting in the manner, to the extent and with the powers conferred by the proxy.

## 12.8    ALTERNATE PROXY HOLDERS

A shareholder may appoint one or more alternate proxy holders to act in the place of an absent proxy holder.

**12.9    PROXY HOLDER NEED NOT BE SHAREHOLDERS**

A Person appointed as a proxy holder need not be a shareholder.

**12.10    DEPOSIT OF PROXY**

A proxy for a meeting of shareholders must be received:

1.    at the registered office of the Company or at any other place specified, in the notice calling the meeting, for the receipt of proxies, at least the period of time specified in the notice, or if no period of time is specified, at least 48 hours before the day set for the holding of the meeting; or

2.    at the meeting by the chair of the meeting or by the Person designated by the chair of the meeting, subject to acceptance at the sole discretion of the chair of the meeting.

A proxy may be sent to the Company by written instrument, fax or any other method of transmitting legibly recorded messages.

**12.11    VALIDITY OF PROXY VOTE**

A vote given in accordance with the terms of a proxy is valid notwithstanding the death or incapacity of the shareholder giving the proxy and despite the revocation of the proxy or the revocation of the authority under which the proxy is given, unless notice in writing of that death, incapacity or revocation is received:

1.    at the registered office of the Company, at any time up to and including the last business day before the day set for the holding of the meeting at which the proxy is to be used; or

2.    by the chair of the meeting, before the vote is taken.

**12.12    FORM OF PROXY**

A proxy, whether for a specified meeting or otherwise, must be either in the following form or in any other form approved by the directors or the chair of the meeting:

[*name of company*]
(the "Company")

The undersigned, being a shareholder of the Company, hereby appoints [name] or, failing that Person, [name], as proxy holder for the undersigned to attend, act and vote for and on behalf of the undersigned at the meeting of shareholders of the Company to be held on [month, day, year] and at any adjournment of that meeting.

Number of shares in respect of which this proxy is given (if no number is specified, then this proxy if given in respect of all shares registered in the name of the shareholder):

_____

Signed [*month, day, year*]

-27-

_____

[*Signature of shareholder*]

_____

[*Name of shareholder—printed*]

## 12.13   REVOCATION OF PROXY

Subject to Article 12.14, every proxy may be revoked by an instrument in writing that is:

1.      received at the registered office of the Company at any time up to and including the last business day before the day set for the holding of the meeting at which the proxy is to be used; or

2.      provided, at the meeting, to the chair of the meeting.

## 12.14   REVOCATION OF PROXY MUST BE SIGNED

An instrument referred to in Article 12.13 must be signed as follows:

1.      if the shareholder for whom the proxy holder is appointed is an individual, the instrument must be signed by the shareholder or his or her legal personal representative or trustee in bankruptcy;

2.      if the shareholder for whom the proxy holder is appointed is a corporation, the instrument must be signed by the corporation or by a representative appointed for the corporation under Article 12.5.

## 12.15   PRODUCTION OF EVIDENCE OF AUTHORITY TO VOTE

The chair of any meeting of shareholders may, but need not, inquire into the authority of any Person to vote at the meeting and may, but need not, demand from that Person production of evidence as to the existence of the authority to vote.

## PART 13 -DIRECTORS

## 13.1   FIRST DIRECTORS; NUMBER OF DIRECTORS

The first directors are the Persons designated as directors of the Company in the Notice of Articles that applies to the Company when it is recognized under the Business Corporations Act. There is no requirement for the directors or shareholders to fix or set the number of directors from time to time. If the Company is a public company, the Company shall have at least three directors. If the Company is not a public company, the Company shall have at least one director.

## 13.2   CHANGE IN NUMBER OF DIRECTORS

If the number of directors is at any time fixed or set hereunder:

-28-

1.      the shareholders may elect or appoint the directors needed to fill any vacancies in the board of directors up to that number; or

2.      if the shareholders do not elect or appoint the directors needed to fill any vacancies in the board of directors up to that number contemporaneously with the setting of that number, then the directors may appoint, or the shareholders may elect or appoint, directors to fill those vacancies.

## 13.3    DIRECTORS' ACTS VALID DESPITE VACANCY

An act or proceeding of the directors is not invalid merely because fewer than the number of directors set or otherwise required under these Articles is in office.

## 13.4    QUALIFICATION OF DIRECTORS

A director is not required to hold a share in the capital of the Company as qualification for his or her office but must be qualified as required by the Business Corporations Act to become, act or continue to act as a director.

## 13.5    REMUNERATION OF DIRECTORS

The directors are entitled to the remuneration for acting as directors, if any, as the directors may from time to time determine. If the directors so decide, the remuneration of the directors may be determined by the shareholders. Any remuneration received by a director may be in addition to any salary or other remuneration paid to such Person in his capacity as an officer or employee of the Company.

## 13.6    REIMBURSEMENT OF EXPENSES OF DIRECTORS

The Company must reimburse each director for the reasonable expenses that he or she may incur in and about the business of the Company.

## 13.7    SPECIAL REMUNERATION FOR DIRECTORS

If any director performs any professional or other services for the Company that in the opinion of the directors are outside the ordinary duties of a director, or if any director is otherwise specially occupied in or about the Company's business, he or she may be paid remuneration fixed by the directors, or, at the option of that director, fixed by ordinary resolution, and such remuneration may be either in addition to, or in substitution for, any other remuneration that he or she may be entitled to receive.

## 13.8    GRATUITY, PENSION OR ALLOWANCE ON RETIREMENT OF DIRECTOR

Unless otherwise determined by ordinary resolution, the directors on behalf of the Company may pay a gratuity or pension or allowance on retirement to any director who has held any salaried office or place of profit with the Company or to his or her spouse or dependents and may make contributions to any fund and pay premiums for the purchase or provision of any such gratuity, pension or allowance.

## PART 14 - ELECTION AND REMOVAL OF DIRECTORS

### 14.1    ELECTION AT ANNUAL GENERAL MEETING

At every annual general meeting and in every unanimous resolution contemplated by Article 10.2:

1.    the shareholders entitled to vote at the annual general meeting for the election of directors must elect, or in the unanimous resolution appoint, a board of directors consisting of the number of directors for the time being set under these Articles; and

2.    all the directors cease to hold office at the close of the next annual general meeting at which the election or appointment of directors under paragraph (1) occurs, but are eligible for re-election or re-appointment.

### 14.2    CONSENT TO BE A DIRECTOR

No election, appointment or designation of an individual as a director is valid unless:

1.    that individual consents to be a director in the manner provided for in the Business Corporations Act;

2.    that individual is elected or appointed at a meeting at which the individual is present and the individual does not refuse, at the meeting, to be a director; or

3.    with respect to first directors, the designation is otherwise valid under the Business Corporations Act.

### 14.3    FAILURE TO ELECT OR APPOINT DIRECTORS

If (i) the Company fails to hold an annual general meeting, and all the shareholders who are entitled to vote at an annual general meeting fail to pass the unanimous resolution contemplated by Article 10.2, on or before the date by which the annual general meeting is required to be held under the Business Corporations Act; or (ii) the shareholders fail, at the annual general meeting or in the unanimous resolution contemplated by Article 10.2, to elect or appoint any directors, then each director then in office continues to hold office until the earlier of:

1.    the date on which his or her successor is elected or appointed; and

2.    the date on which he or she otherwise ceases to hold office under the Business Corporations Act or these Articles.

### 14.4    PLACES OF RETIRING DIRECTORS NOT FILLED

If, at any meeting of shareholders at which there should be an election of directors, the places of any of the retiring directors are not filled by that election, those retiring directors who are not re-elected and who are asked by the newly elected directors to continue in office will, if willing to do so, continue in office to complete the number of directors for the time being set pursuant to these Articles until further new directors are elected at a meeting of shareholders convened for that purpose. If any such election or continuance of directors does not result in the election or

continuance of the number of directors for the time being set pursuant to these Articles, the number of directors of the Company is deemed to be set at the number of directors actually elected or continued in office.

## 14.5    DIRECTORS MAY FILL CASUAL VACANCIES

Any casual vacancy occurring in the board of directors may be filled by the directors.

## 14.6    REMAINING DIRECTORS POWER TO ACT

The directors may act notwithstanding any vacancy in the board of directors, but if the Company has fewer directors in office than the number set pursuant to these Articles as the quorum of directors, the directors may only act for the purpose of appointing directors up to that number or of summoning a meeting of shareholders for the purpose of filling any vacancies on the board of directors or, subject to the Business Corporations Act, for any other purpose.

## 14.7    SHAREHOLDERS MAY FILL VACANCIES

If the Company has no directors or fewer directors in office than the number set pursuant to these Articles as the quorum of directors, the shareholders may elect or appoint directors to fill any vacancies on the board of directors.

## 14.8    ADDITIONAL DIRECTORS

Notwithstanding Articles 13.1 and 13.2, between annual general meetings or unanimous resolutions contemplated by Article 10.2, the directors may appoint one or more additional directors, but the number of additional directors appointed under this Article 14.8 must not at any time exceed:

1.      one-third of the number of first directors, if, at the time of the appointments, one or more of the first directors have not yet completed their first term of office; or

2.      in any other case, one-third of the number of the current directors who were elected or appointed as directors other than under this Article 14.8.

Any director so appointed ceases to hold office at the close of the next annual general meeting at which the election or appointment of directors under Article 14.1(1) occurs, but is eligible for re-election or re-appointment.

## 14.9    CEASING TO BE A DIRECTOR

A director ceases to be a director when:

1.      the term of office of the director expires;

2.      the director dies;

3.      the director resigns as a director by notice in writing provided to the Company or a lawyer for the Company; or

4.       the director is removed from office pursuant to Articles 14.10 or 14.11.

## 14.10   REMOVAL OF DIRECTOR BY SHAREHOLDERS

The Company may remove any director before the expiration of his or her term of office by special resolution. In that event, the shareholders may elect, or appoint by ordinary resolution, a director to fill the resulting vacancy. If the shareholders do not elect or appoint a director to fill the resulting vacancy contemporaneously with the removal, then the directors may appoint or the shareholders may elect, or appoint by ordinary resolution, a director to fill that vacancy.

## 14.11   REMOVAL OF DIRECTOR BY DIRECTORS

The directors may remove any director before the expiration of his or her term of office if:

1.       such director is convicted of an indictable offence;

2.       such director ceases to be qualified to act as a director of a company and does not promptly resign; or

3.       if there are at least three directors on the board, then if all other directors pass a resolution to remove such director;

and the remaining directors may in any such event appoint a director to fill the resulting vacancy.

## 14.12   NOMINATION OF DIRECTORS

1.       Only Persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Company. Nominations of Persons for election to the board of directors may be made at any annual meeting of shareholders, or at any special meeting of shareholders if one of the purposes for which the special meeting was called was the election of directors:

a)       by or at the direction of the board, including pursuant to a notice of meeting; or

b)       by any Person (a "**Nominating Shareholder**"), (A) who, at the close of business on the date of the giving by the Nominating Shareholder of the notice provided for below in this Article 14.12 and at the close of business on the record date for notice of such meeting, is entered in the securities register of the Company as a holder of one or more Common Shares carrying the right to vote at such meeting or who beneficially owns Common Shares that are entitled to be voted at such meeting; and (B) who complies with the notice procedures set forth below in this Article 14.12.

2.       In addition to any other requirements under applicable laws, for a nomination to be made by a Nominating Shareholder, the Nominating Shareholder must have given prior notice thereof that is both timely (in accordance with paragraph 3 below) and in proper written form (in accordance with paragraph 4 below) to the Secretary of the Company at the principal executive offices of the Company.

3.     To be timely, a Nominating Shareholder's notice to the Secretary of the Company must be made:

    a)    in the case of an annual meeting of shareholders, not less than 30 nor more than 65 days prior to the date of the annual meeting of shareholders; provided, however, that in the event that the annual meeting of shareholders is to be held on a date that is less than 50 days after the date (the "**Notice Date**") on which the first public announcement of the date of the annual meeting was made, notice by the Nominating Shareholder may be made not later than the close of business on the tenth day following the Notice Date; and

    b)    in the case of a special meeting (which is not also an annual meeting) of shareholders called for the purpose of electing directors (whether or not called for other purposes), not later than the close of business on the fifteenth day following the day on which the first public announcement of the date of the special meeting of shareholders was made.

The time periods for the giving of a Nominating Shareholder's notice set forth above shall in all cases be determined based on the original date of the applicable annual meeting or special meeting of shareholders, and in no event shall any adjournment or postponement of a meeting of shareholders or the announcement thereof commence a new time period for the giving of such notice.

4.     To be in proper written form, a Nominating Shareholder's notice to the Secretary of the Company must set forth:

    a)    as to each Person whom the Nominating Shareholder proposes to nominate for election as a director: (A) the name, age, business address and residential address of the Person; (B) the present principal occupation, business or employment of the Person within the preceding five years, as well as the name and principal business of any company in which such employment is carried on; (C) the citizenship of such Person; (D) the class or series and number of Common Shares in the capital of the Company which are controlled or which are owned beneficially or of record by the Person as of the record date for the meeting of shareholders (if such date shall then have been made publicly available and shall have occurred) and as of the date of such notice; and (E) any other information relating to the Person that would be required to be disclosed in a dissident's proxy circular in connection with solicitations of proxies for election of directors pursuant to the Act and Applicable Securities Laws (as defined below); and

    b)    as to the Nominating Shareholder giving the notice, full particulars regarding any proxy, contract, agreement, arrangement or understanding pursuant to which such Nominating Shareholder has a right to vote or direct the voting of any Common Shares of the Company and any other information relating to such Nominating Shareholder that would be required to be made in a dissident's proxy circular in connection with solicitations of proxies for election of directors pursuant to the Act and Applicable Securities Laws (as defined below).

The Company may require any proposed nominee to furnish such other information as may reasonably be required by the Company to determine the eligibility of such proposed nominee to serve as an independent director of the Company or that could be material to a reasonable shareholder's understanding of the independence, or lack thereof, of such proposed nominee.

5.    No Person shall be eligible for election as a director of the Company unless nominated in accordance with the provisions of this Article 14.12; provided, however, that nothing in this Article 14.12 shall be deemed to preclude discussion by a shareholder (as distinct from the nomination of directors) at a meeting of shareholders of any matter that is properly before such meeting pursuant to the provisions of the Act or the discretion of the Chairman. The Chairman of the meeting shall have the power and duty to determine whether a nomination was made in accordance with the procedures set forth in the foregoing provisions and, if any proposed nomination is not in compliance with such foregoing provisions, to declare that such defective nomination shall be disregarded.

6.    For purposes of this Article 14.12 and Article 10.10:

    a)    "**Applicable Securities Laws**" means the applicable securities legislation of each province and territory of Canada in which the Company is a reporting issuer, as amended from time to time, the rules, regulations and forms made or promulgated under any such statute and the published national instruments, multilateral instruments, policies, bulletins and notices of the securities commission and similar regulatory authority of each province and territory of Canada; and

    b)    "**public announcement**" shall mean disclosure in a press release reported by a national news service in Canada, or in a document publicly filed by the Company under its profile on the System of Electronic Document Analysis and Retrieval at www.sedar.com.

7.    Notwithstanding any other provision of this Article 14.12, notice given to the Secretary of the Company pursuant to this Article 14.12 may only be given by personal delivery, facsimile transmission or by email (at such email address as may be stipulated from time to time by the Secretary of the Company for purposes of this notice), and shall be deemed to have been given and made only at the time it is served by personal delivery at the address of the principal executive offices of the Company, email (at the address as aforesaid) or sent by facsimile transmission (provided that receipt of confirmation of such transmission has been received); provided that if such delivery or electronic communication is made on a day which is a not a business day or later than 5:00 p.m. (Vancouver time) on a day which is a business day, then such delivery or electronic communication shall be deemed to have been made on the next following day that is a business day.

8.    Notwithstanding the foregoing, the Board may, in its sole discretion, waive any requirement in this Article 14.12.

## PART 15 - ALTERNATE DIRECTORS

### 15.1    APPOINTMENT OF ALTERNATE DIRECTOR

Any director (an "**appointor**") may by notice in writing received by the Company appoint any Person (an "**appointee**") who is qualified to act as a director to be his or her alternate to act in his or her place at meetings of the directors or committees of the directors at which the appointor is not present unless (in the case of an appointee who is not a director) the directors have reasonably disapproved the appointment of such Person as an alternate director and have given notice to that effect to his or her appointor within a reasonable time after the notice of appointment is received by the Company.

### 15.2    NOTICE OF MEETINGS

Every alternate director so appointed is entitled to notice of meetings of the directors and of committees of the directors of which his or her appointor is a member and to attend and vote as a director at any such meetings at which his or her appointor is not present.

### 15.3    ALTERNATE FOR MORE THAN ONE DIRECTOR ATTENDING MEETINGS

A Person may be appointed as an alternate director by more than one director, and an alternate director:

1.    will be counted in determining the quorum for a meeting of directors once for each of his or her appointors and, in the case of an appointee who is also a director, once more in that capacity;

2.    has a separate vote at a meeting of directors for each of his or her appointors and, in the case of an appointee who is also a director, an additional vote in that capacity;

3.    will be counted in determining the quorum for a meeting of a committee of directors once for each of his or her appointors who is a member of that committee and, in the case of an appointee who is also a member of that committee as a director, once more in that capacity;

4.    has a separate vote at a meeting of a committee of directors for each of his or her appointors who is a member of that committee and, in the case of an appointee who is also a member of that committee as a director, an additional vote in that capacity.

### 15.4    CONSENT RESOLUTIONS

Every alternate director, if authorized by the notice appointing him or her, may sign in place of his or her appointor any resolutions to be consented to in writing.

### 15.5    ALTERNATE DIRECTOR NOT AN AGENT

Every alternate director is deemed not to be the agent of his or her appointor.

## 15.6    REVOCATION OF APPOINTMENT OF ALTERNATE DIRECTOR

An appointor may at any time, by notice in writing received by the Company, revoke the appointment of an alternate director appointed by him or her.

## 15.7    CEASING TO BE AN ALTERNATE DIRECTOR

The appointment of an alternate director ceases when:

1.    his or her appointor ceases to be a director and is not promptly re-elected or re-appointed;

2.    the alternate director dies;

3.    the alternate director resigns as an alternate director by notice in writing provided to the Company or a lawyer for the Company;

4.    the alternate director ceases to be qualified to act as a director; or

5.    his or her appointor revokes the appointment of the alternate director.

## 15.8    REMUNERATION AND EXPENSES OF ALTERNATE DIRECTOR

The Company may reimburse an alternate director for the reasonable expenses that would be properly reimbursed if he or she were a director, and the alternate director is entitled to receive from the Company such proportion, if any, of the remuneration otherwise payable to the appointor as the appointor may from time to time direct.

## PART 16 - POWERS AND DUTIES OF DIRECTORS

## 16.1    POWERS OF MANAGEMENT

The directors must, subject to the Business Corporations Act and these Articles, manage or supervise the management of the business and affairs of the Company and have the authority to exercise all such powers of the Company as are not, by the Business Corporations Act or by these Articles, required to be exercised by the shareholders of the Company.

## 16.2    APPOINTMENT OF ATTORNEY OF COMPANY

The directors may from time to time, by power of attorney or other instrument, under seal if so required by law, appoint any Person to be the attorney of the Company for such purposes, and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Articles and excepting the power to fill vacancies in the board of directors, to remove a director, to change the membership of or fill vacancies in, any committee of the directors, to appoint or remove officers appointed by the directors and to declare dividends) and for such period, and with such remuneration and subject to such conditions as the directors may think fit. Any such power of attorney may contain such provisions for the protection or convenience of Persons dealing with such attorney as the directors think fit. Any such attorney may be authorized by the directors to sub-delegate all or any of the powers, authorities and discretions for the time being vested in him or her.

## PART 17 - DISCLOSURE OF INTEREST OF DIRECTORS

### 17.1   OBLIGATION TO ACCOUNT FOR PROFITS

A director or senior officer who holds a disclosable interest (as that term is used in the Business Corporations Act) in a contract or transaction into which the Company has entered or proposes to enter is liable to account to the Company for any profit that accrues to the director or senior officer under or as a result of the contract or transaction only if and to the extent provided in the Business Corporations Act.

### 17.2   RESTRICTIONS ON VOTING BY REASON OF INTEREST

A director who holds a disclosable interest in a contract or transaction into which the Company has entered or proposes to enter is not entitled to vote on any directors' resolution to approve that contract or transaction, unless all the directors have a disclosable interest in that contract or transaction, in which case any or all of those directors may vote on such resolution.

### 17.3   INTERESTED DIRECTOR COUNTED IN QUORUM

A director who holds a disclosable interest in a contract or transaction into which the Company has entered or proposes to enter and who is present at the meeting of directors at which the contract or transaction is considered for approval may be counted in the quorum at the meeting whether or not the director votes on any or all of the resolutions considered at the meeting.

### 17.4   DISCLOSURE OF CONFLICT OF INTEREST OR PROPERTY

A director or senior officer who holds any office or possesses any property, right or interest that could result, directly or indirectly, in the creation of a duty or interest that materially conflicts with that individuals duty or interest as a director or senior officer, must disclose the nature and extent of the conflict as required by the Business Corporations Act.

### 17.5   DIRECTOR HOLDING OTHER OFFICE IN THE COMPANY

A director may hold any office or place of profit with the Company, other than the office of auditor of the Company, in addition to his or her office of director for the period and on the terms (as to remuneration or otherwise) that the directors may determine.

### 17.6   NO DISQUALIFICATION

No director or intended director is disqualified by his or her office from contracting with the Company either with regard to the holding of any office or place of profit the director holds with the Company or as vendor, purchaser or otherwise, and no contract or transaction entered into by or on behalf of the Company in which a director is in any way interested is liable to be voided for that reason.

### 17.7   PROFESSIONAL SERVICES BY DIRECTOR OR OFFICER

Subject to the Business Corporations Act, a director or officer, or any Person in which a director or officer has an interest, may act in a professional capacity for the Company, except as auditor of

the Company, and the director or officer or such Person is entitled to remuneration for professional services as if that director or officer were not a director or officer.

## 17.8   DIRECTOR OR OFFICER IN OTHER CORPORATIONS

A director or officer may be or become a director, officer or employee of, or otherwise interested in, any Person in which the Company may be interested as a shareholder or otherwise, and, subject to the Business Corporations Act, the director or officer is not accountable to the Company for any remuneration or other benefits received by him or her as director, officer or employee of, or from his or her interest in, such other Person.

## PART 18 - PROCEEDINGS OF DIRECTORS

## 18.1   MEETINGS OF DIRECTORS

The directors may meet together for the conduct of business, adjourn and otherwise regulate their meetings as they think fit, and meetings of the directors held at regular intervals may be held at the place, at the time and on the notice, if any, as the directors may from time to time determine.

## 18.2   VOTING AT MEETINGS

Questions arising at any meeting of directors are to be decided by a majority of votes and, in the case of an equality of votes, the chair of the meeting does not have a second or casting vote.

## 18.3   CHAIR OF MEETINGS

The following individual is entitled to preside as chair at a meeting of directors:

1.    the chair of the board, if any;

2.    in the absence of the chair of the board, the president, if any, if the president is a director; or

3.    any other director chosen by the directors or, if the directors wish, the Company's solicitor, if:

   a)    neither the chair of the board nor the president, if a director, is present at the meeting within 15 minutes after the time set for holding the meeting;

   b)    neither the chair of the board nor the president, if a director, is willing to chair the meeting; or

   c)    the chair of the board and the president, if a director, have advised the secretary, if any, or any other director, that they will not be present at the meeting.

## 18.4   MEETINGS BY TELEPHONE OR OTHER COMMUNICATIONS MEDIUM

A director may participate in a meeting of the directors or of any committee of the directors in Person or by telephone if all directors participating in the meeting, whether in Person or by

telephone or other communications medium, are able to communicate with each other. A director may participate in a meeting of the directors or of any committee of the directors by a communications medium other than telephone if all directors participating in the meeting, whether in Person or by telephone or other communications medium, are able to communicate with each other and if all directors who wish to participate in the meeting agree to such participation. A director who participates in a meeting in a manner contemplated by this Article 18.4 is deemed for all purposes of the Business Corporations Act and these Articles to be present at the meeting and to have agreed to participate in that manner.

## 18.5   CALLING OF MEETINGS

A director may, and the secretary or an assistant secretary of the Company, if any, on the request of a director must, call a meeting of the directors at any time.

## 18.6   NOTICE OF MEETINGS

Other than for meetings held at regular intervals as determined by the directors pursuant to Article 18.1, reasonable notice of each meeting of the directors, specifying the place, day and time of that meeting must be given to each of the directors and the alternate directors by any method set out in Article 24.1 or orally or by telephone.

## 18.7   WHEN NOTICE NOT REQUIRED

It is not necessary to give notice of a meeting of the directors to a director or an alternate director if:

1.     the meeting is to be held immediately following a meeting of shareholders at which that director was elected or appointed, or is the meeting of the directors at which that director is appointed; or

2.     the director or alternate director, as the case may be, has waived notice of the meeting.

## 18.8   MEETING VALID DESPITE FAILURE TO GIVE NOTICE

The accidental omission to give notice of any meeting of directors to, or the non-receipt of any notice by, any director or alternate director, does not invalidate any proceedings at that meeting.

## 18.9   WAIVER OF NOTICE OF MEETINGS

Any director or alternate director may send to the Company a document signed by him or her waiving notice of any past, present or future meeting or meetings of the directors and may at any time withdraw that waiver with respect to meetings held after that withdrawal. After sending a waiver with respect to all future meetings and until that waiver is withdrawn, no notice of any meeting of the directors need be given to that director and, unless the director otherwise requires by notice in writing to the Company, to his or her alternate director, and all meetings of the directors so held are deemed not to be improperly called or constituted by reason of notice not having been given to such director or alternate director.

## 18.10  QUORUM

The quorum necessary for the transaction of the business of the directors may be set by the directors and, if not so set, is deemed to be set at two directors or, if the number of directors is set at one, is deemed to be set at one director, and that director may constitute a meeting.

## 18.11  VALIDITY OF ACTS WHERE APPOINTMENT DEFECTIVE

Subject to the Business Corporations Act, an act of a director or officer is not invalid merely because of an irregularity in the election or appointment or a defect in the qualification of that director or officer.

## 18.12  CONSENT RESOLUTIONS IN WRITING

A resolution of the directors or of any committee of the directors consented to in writing by all of the directors entitled to vote on it, whether by signed document, fax, email or any other method of transmitting legibly recorded messages, is as valid and effective as if it had been passed at a meeting of the directors or of the committee of the directors duly called and held. Such resolution may be in two or more counterparts which together are deemed to constitute one resolution in writing. A resolution passed in that manner is effective on the date stated in the resolution or on the latest date stated on any counterpart. A resolution of the directors or of any committee of the directors passed in accordance with this Article 18.12 is deemed to be a proceeding at a meeting of directors or of the committee of the directors and to be as valid and effective as if it had been passed at a meeting of the directors or of the committee of the directors that satisfies all the requirements of the Business Corporations Act and all the requirements of these Articles relating to meetings of the directors or of a committee of the directors.

## PART 19 - EXECUTIVE AND OTHER COMMITTEES

## 19.1  APPOINTMENT AND POWERS OF EXECUTIVE COMMITTEE

The directors may, by resolution, appoint an executive committee consisting of the director or directors that they consider appropriate, and this committee has, during the intervals between meetings of the board of directors, all of the directors' powers, except:

1.      the power to fill vacancies in the board of directors;

2.      the power to remove a director;

3.      the power to change the membership of, or fill vacancies in, any committee of the directors; and

4.      such other powers, if any, as may be set out in the resolution or any subsequent directors' resolution.

## 19.2  APPOINTMENT AND POWERS OF OTHER COMMITTEES

The directors may, by resolution:

1.      appoint one or more committees (other than the executive committee) consisting of the director or directors that they consider appropriate;

2.      delegate to a committee appointed under paragraph (1) any of the directors' powers, except:

    a)      the power to fill vacancies in the board of directors;

    b)      the power to remove a director;

    c)      the power to change the membership of, or fill vacancies in, any committee of the directors; and

    d)      the power to appoint or remove officers appointed by the directors; and

3.      make any delegation referred to in paragraph (2) subject to the conditions set out in the resolution or any subsequent directors' resolution.

## 19.3    OBLIGATIONS OF COMMITTEES

Any committee appointed under Articles 19.1 or 19.2, in the exercise of the powers delegated to it, must:

1.      conform to any rules that may from time to time be imposed on it by the directors; and

2.      report every act or thing done in exercise of those powers at such times as the directors may require.

## 19.4    POWERS OF BOARD

The directors may, at any time, with respect to a committee appointed under Articles 19.1 or 19.2:

1.      revoke or alter the authority given to the committee, or override a decision made by the committee, except as to acts done before such revocation, alteration or overriding;

2.      terminate the appointment of, or change the membership of, the committee; and

3.      fill vacancies in the committee.

## 19.5    COMMITTEE MEETINGS

Subject to Article 19.3(1) and unless the directors otherwise provide in the resolution appointing the committee or in any subsequent resolution, with respect to a committee appointed under Articles 19.1 or 19.2:

1.      the committee may meet and adjourn as it thinks proper;

2.      the committee may elect a chair of its meetings but, if no chair of a meeting is elected, or if at a meeting the chair of the meeting is not present within 15 minutes after the time set

for holding the meeting, the directors present who are members of the committee may choose one of their number to chair the meeting;

3.    a majority of the members of the committee constitutes a quorum of the committee; and

4.    questions arising at any meeting of the committee are determined by a majority of votes of the members present, and in case of an equality of votes, the chair of the meeting does not have a second or casting vote.

## PART 20 - OFFICERS

### 20.1    DIRECTORS MAY APPOINT OFFICERS

The directors may, from time to time, appoint such officers, if any, as the directors determine and the directors may, at any time, terminate any such appointment.

### 20.2    FUNCTIONS, DUTIES AND POWERS OF OFFICERS

The directors may, for each officer:

1.    determine the functions and duties of the officer;

2.    entrust to and confer on the officer any of the powers exercisable by the directors on such terms and conditions and with such restrictions as the directors think fit; and

3.    revoke, withdraw, alter or vary all or any of the functions, duties and powers of the officer.

### 20.3    QUALIFICATIONS

No officer may be appointed unless that officer is qualified in accordance with the Business Corporations Act. One Person may hold more than one position as an officer of the Company. Any Person appointed as the chair of the board or as the managing director must be a director. Any other officer need not be a director.

### 20.4    REMUNERATION AND TERMS OF APPOINTMENT

All appointments of officers are to be made on the terms and conditions and at the remuneration (whether by way of salary, fee, commission, participation in profits or otherwise) that the directors think fit and are subject to termination at the pleasure of the directors, and an officer may in addition to such remuneration be entitled to receive, after he or she ceases to hold such office or leaves the employment of the Company, a pension or gratuity.

## PART 21 - INDEMNIFICATION

### 21.1    DEFINITIONS

In this Article 21:

1.    "eligible penalty" means a judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of, an eligible proceeding;

2.    "eligible proceeding" means a legal proceeding or investigative action, whether current, threatened, pending or completed, in which a director, former director or alternate director of the Company (an "**eligible party**") or any of the heirs and legal Personal representatives of the eligible party, by reason of the eligible party being or having been a director or alternate director of the Company:

   a)    is or may be joined as a party; or

   b)    is or may be liable for or in respect of a judgment, penalty or fine in, or expenses related to, the proceeding;

3.    "expenses" has the meaning set out in the Business Corporations Act.

## 21.2    MANDATORY INDEMNIFICATION OF DIRECTORS AND FORMER DIRECTORS

Subject to the Business Corporations Act, the Company must indemnify a director, former director or alternate director of the Company and his or her heirs and legal personal representatives against all eligible penalties to which such Person is or may be liable, and the Company must, after the final disposition of an eligible proceeding, pay the expenses actually and reasonably incurred by such Person in respect of that proceeding. Each director and alternate director is deemed to have contracted with the Company on the terms of the indemnity contained in this Article 21.2.

## 21.3    INDEMNIFICATION OF OTHER PERSONS

Subject to any restrictions in the Business Corporations Act, the Company may indemnify any Person.

## 21.4    NON-COMPLIANCE WITH BUSINESS CORPORATIONS ACT

The failure of a director, alternate director or officer of the Company to comply with the Business Corporations Act or these Articles does not invalidate any indemnity to which he or she is entitled under this Part.

## 21.5    COMPANY MAY PURCHASE INSURANCE

The Company may purchase and maintain insurance for the benefit of any Person (or his or her heirs or legal personal representatives) who:

1.    is or was a director, alternate director, officer, employee or agent of the Company;

2.    is or was a director, alternate director, officer, employee or agent of a corporation at a time when the corporation is or was an affiliate of the Company;

3.    at the request of the Company, is or was a director, alternate director, officer, employee or agent of a corporation or of a partnership, trust, joint venture or other unincorporated entity;

4.      at the request of the Company, holds or held a position equivalent to that of a director, alternate director or officer of a partnership, trust, joint venture or other unincorporated entity,

against any liability incurred by him or her as such director, alternate director, officer, employee or agent or Person who holds or held such equivalent position.

## PART 22 - DIVIDENDS

## 22.1    PAYMENT OF DIVIDENDS SUBJECT TO SPECIAL RIGHTS

The provisions of this Article 22 are subject to the rights, if any, of shareholders holding shares with special rights as to dividends.

## 22.2    DECLARATION OF DIVIDENDS

Subject to the Business Corporations Act, the directors may from time to time declare and authorize payment of such dividends as they may deem advisable.

## 22.3    NO NOTICE REQUIRED

The directors need not give notice to any shareholder of any declaration under Article 22.2.

## 22.4    RECORD DATE

The directors may set a date as the record date for the purpose of determining shareholders entitled to receive payment of a dividend. The record date must not precede the date on which the dividend is to be paid by more than two months. If no record date is set, the record date is 5 p.m. on the date on which the directors pass the resolution declaring the dividend.

## 22.5    MANNER OF PAYING DIVIDEND

A resolution declaring a dividend may direct payment of the dividend wholly or partly by the distribution of cash or of specific assets or of fully paid shares or of bonds, debentures or other securities of the Company, or in any one or more of those ways.

## 22.6    SETTLEMENT OF DIFFICULTIES

If any difficulty arises in regard to a distribution under Article 22.5, the directors may settle the difficulty as they deem advisable, and, in particular, may:

1.      set the value for distribution of specific assets;

2.      determine that cash payments in substitution for all or any part of the specific assets to which any shareholders are entitled may be made to any shareholders on the basis of the value so fixed in order to adjust the rights of all parties; and

3.      vest any such specific assets in trustees for the Persons entitled to the dividend.

**22.7    WHEN DIVIDEND PAYABLE**

Any dividend may be made payable on such date as is fixed by the directors.

**22.8    DIVIDENDS TO BE PAID IN ACCORDANCE WITH NUMBER OF SHARES**

All dividends on shares of any class or series of shares must be declared and paid according to the number of such shares held.

**22.9    RECEIPT BY JOINT SHAREHOLDERS**

If several Persons are joint shareholders of any share, any one of them may give an effective receipt for any dividend, bonus or other money payable in respect of the share.

**22.10    DIVIDEND BEARS NO INTEREST**

No dividend bears interest against the Company.

**22.11    FRACTIONAL DIVIDENDS**

If a dividend to which a shareholder is entitled includes a fraction of the smallest monetary unit of the currency of the dividend, that fraction may be disregarded in making payment of the dividend and that payment represents full payment of the dividend.

**22.12    PAYMENT OF DIVIDENDS**

Any dividend or other distribution payable in cash in respect of shares may be paid by cheque, made payable to the order of the Person to whom it is sent, and mailed to the address of the shareholder, or in the case of joint shareholders, to the address of the joint shareholder who is first named on the central securities register, or to the Person and to the address the shareholder or joint shareholders may direct in writing. The mailing of such cheque will, to the extent of the sum represented by the cheque (plus the amount of the tax required by law to be deducted), discharge all liability for the dividend unless such cheque is not paid on presentation or the amount of tax so deducted is not paid to the appropriate taxing authority.

**22.13    CAPITALIZATION OF SURPLUS**

Notwithstanding anything contained in these Articles, the directors may from time to time capitalize any surplus of the Company and may from time to time issue, as fully paid, shares or any bonds, debentures or other securities of the Company as a dividend representing the surplus or any part of the surplus.

**PART 23 - DOCUMENTS, RECORDS AND REPORTS**

**23.1    RECORDING OF FINANCIAL AFFAIRS**

The directors must cause adequate accounting records to be kept to record properly the financial affairs and condition of the Company and to comply with the Business Corporations Act.

**23.2    INSPECTION OF ACCOUNTING RECORDS**

Unless the directors determine otherwise, or unless otherwise determined by ordinary resolution, no shareholder of the Company is entitled to inspect or obtain a copy of any accounting records of the Company.

**PART 24 - NOTICES**

**24.1    METHOD OF GIVING NOTICE**

Unless the Business Corporations Act or these Articles provides otherwise, a notice, statement, report or other record required or permitted by the Business Corporations Act or these Articles to be sent by or to a Person may be sent by any one of the following methods:

1.    mail addressed to the Person at the applicable address for that Person as follows:

    a)    for a record mailed to a shareholder, the shareholder's registered address;

    b)    for a record mailed to a director or officer, the prescribed address for mailing shown for the director or officer in the records kept by the Company or the mailing address provided by the recipient for the sending of that record or records of that class;

    c)    in any other case, the mailing address of the intended recipient;

2.    delivery at the applicable address for that Person as follows, addressed to the Person:

    a)    for a record delivered to a shareholder, the shareholder's registered address;

    b)    for a record delivered to a director or officer, the prescribed address for delivery shown for the director or officer in the records kept by the Company or the delivery address provided by the recipient for the sending of that record or records of that class;

    c)    in any other case, the delivery address of the intended recipient;

3.    sending the record by fax to the fax number provided by the intended recipient for the sending of that record or records of that class;

4.    sending the record by email to the email address provided by the intended recipient for the sending of that record or records of that class; or

5.    physical delivery to the intended recipient.

**24.2    DEEMED RECEIPT OF MAILING**

A record that is mailed to a Person by ordinary mail to the applicable address for that Person referred to in Article 24.1 is deemed to be received by the Person to whom it was mailed on the day, Saturdays, Sundays and holidays excepted, following the date of mailing.

## 24.3    CERTIFICATE OF SENDING

A certificate or other document signed by the secretary, if any, or other officer of the Company or of any other corporation acting in that behalf for the Company stating that a notice, statement, report or other record was addressed as required by Article 24.1, prepaid and mailed or otherwise sent as permitted by Article 24.1 is conclusive evidence of that fact.

## 24.4    NOTICE TO JOINT SHAREHOLDERS

A notice, statement, report or other record may be provided by the Company to the joint shareholders of a share by providing the notice to the joint shareholder first named in the central securities register in respect of the share.

## 24.5    NOTICE TO TRUSTEES

A notice, statement, report or other record may be provided by the Company to the Persons entitled to a share in consequence of the death, bankruptcy or incapacity of a shareholder by:

1.    mailing the record, addressed to them:

    a)    by name, by the title of the legal personal representative of the deceased or incapacitated shareholder, by the title of trustee of the bankrupt shareholder or by any similar description; and

    b)    at the address, if any, supplied to the Company for that purpose by the Persons claiming to be so entitled; or

2.    if an address referred to in paragraph (1)(b)) has not been supplied to the Company, by giving the notice in a manner in which it might have been given if the death, bankruptcy or incapacity had not occurred.

## PART 25 - SEAL AND EXECUTION

## 25.1    SEAL AND EXECUTION OF DOCUMENTS

Except as provided in Articles 25.2 and 25.3, the Company's seal, if any, must not be impressed on any record except when that impression is attested by the signatures of any of the following, or in the absence of a seal and if no authorized signatories are provided for by resolution, then documents may be executed on behalf of the Company by the following Persons:

1.    any two directors;

2.    any officer, together with any director;

3.    if the Company only has one director, that director; or

4.    any one or more directors or officers or other Persons as may be determined from time to time by the directors in respect of the specific record to be signed.

## 25.2    SEALING COPIES

For the purpose of certifying under seal a certificate of incumbency of the directors or officers of the Company or a true copy of any resolution or other document, despite Article 25.1, the impression of the seal may be attested by the signature of any director or officer.

## 25.3    MECHANICAL REPRODUCTION OF SEAL

The directors may authorize the seal to be impressed by third parties on share certificates or bonds, debentures or other securities of the Company as they may determine appropriate from time to time. To enable the seal to be impressed on any share certificates or bonds, debentures or other securities of the Company, whether in definitive or interim form, on which facsimiles of any of the signatures of the directors or officers of the Company are, in accordance with the Business Corporations Act or these Articles, printed or otherwise mechanically reproduced, there may be delivered to the Person employed to engrave, lithograph or print such definitive or interim share certificates or bonds, debentures or other securities one or more unmounted dies reproducing the seal and the chair of the board or any senior officer together with the secretary, treasurer, secretary-treasurer, an assistant secretary, an assistant treasurer or an assistant secretary-treasurer may in writing authorize such Person to cause the seal to be impressed on such definitive or interim share certificates or bonds, debentures or other securities by the use of such dies. Share certificates or bonds, debentures or other securities to which the seal has been so impressed are for all purposes deemed to be under and to bear the seal impressed on them.

## PART 26 - PROHIBITIONS

## 26.1    DEFINITIONS

In this Article 26:

1.    "designated security" means:

   a)    a voting security of the Company;

   b)    a security of the Company that is not a debt security and that carries a residual right to participate in the earnings of the Company or, on the liquidation or winding up of the Company, in its assets; or

   c)    a security of the Company convertible, directly or indirectly, into a security described in paragraph (a) or (b);

2.    "security" has the meaning assigned in the *Securities Act* (British Columbia);

3.    "voting security" means a security of the Company that:

   a)    is not a debt security, and

   b)    carries a voting right either under all circumstances or under some circumstances that have occurred and are continuing.

## 26.2    APPLICATION

Article 26.3 does not apply to the Company if and for so long as it is a public company or a pre-existing reporting company which has the Statutory Reporting Company Provisions as part of its Articles or to which the Statutory Reporting Company Provisions apply.

## 26.3    CONSENT REQUIRED FOR TRANSFER OF SHARES OR DESIGNATED SECURITIES

No share or designated security may be sold, transferred or otherwise disposed of without the consent of the directors and the directors are not required to give any reason for refusing to consent to any such sale, transfer or other disposition.

## PART 27 - SPECIAL RIGHTS AND RESTRICTIONS ATTACHED TO THE COMMON SHARES

The Common Shares shall have to them special rights and restrictions as set forth below:

## 27.1    VOTING RIGHTS

Holders of Common Shares shall be entitled to notice of and to attend and participate in any general meeting of the Company. Holders of Common Shares shall be entitled to vote at any general meeting (including electronic meetings) of the Company, and at each such meeting, shall be entitled to one (1) vote in respect of each Common Share held, except that holders shall not have an entitlement to vote at a class meeting or series meeting of which only holders of another particular class or series of shares of the Company shall have the right to vote.

Except as otherwise provided in these Articles (including without limitation the restrictions on voting rights for the election or removal of directors in the case of the Variable Voting Shares) or except as provided in the Business Corporations Act, Common Shares and Variable Voting Shares are equal in all respects and shall vote together as if they were shares of a single class. In connection with any Change of Control Transaction requiring approval of the holders of all Voting Shares under the Business Corporations Act, all Voting Shares shall be treated equally and identically, on a per share basis.

Notwithstanding the provisions of the above, the holders of Common Shares shall be entitled to vote as a separate class, in addition to any other vote of shareholders that may be required, in respect of any alteration, repeal or amendment of these Articles which would: (i) adversely affect the rights or special rights of the holders of Common Shares; or (ii) affect the holders of any Voting Shares on a per share basis; or (iii) except as already set forth herein, create any class or series of shares ranking equal to or senior to the Common Shares; and in each case such alteration, repeal or amendment shall not be effective unless a resolution in respect thereof is approved by a majority of the votes cast by holders of outstanding Common Shares.

## 27.2    CONVERSION AND CONSTRAINTS ON OWNERSHIP

Except as permitted by Section 28.8, the Common Voting Shares may only be held by Non-U.S. Residents.

Each issued and outstanding Common Share shall be automatically converted into one Variable Voting Share without any further act on the part of the Company or of the holder, if such Common Share is or becomes held by a U.S. Resident.

## 27.3    DIVIDENDS

Holders of Common Shares shall be entitled to receive, as and when declared by the board of directors, dividends in cash, shares or property of the Company. No dividend will be declared or paid on the any other class of Voting Shares unless the Company simultaneously declares or pays, as applicable, equivalent dividends (on a per share basis) on the Common Shares. The Common Shares shall rank equally with the other Voting Shares as to dividends on a share-for-share basis, without preference or distinction. In the event of the payment of a dividend in the form of shares, holders of Common Shares shall receive Common Shares, unless otherwise determined by the board of directors, provided an equal number of shares is declared as a dividend or distribution on a then outstanding per-Equity Share basis, without preference or distinction, in each case.

## 27.4    RIGHTS TO SUBSCRIBE; PRE-EMPTIVE RIGHTS

The holders of Common Shares are not entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of shares, or bonds, debentures or other securities of the Company now or in the future.

## 27.5    SUBDIVISION OR CONSOLIDATION

No subdivision or consolidation of the Common Shares shall occur unless, simultaneously, the other classes of Voting Shares are subdivided or consolidated or otherwise adjusted so as to maintain and preserve the relative rights of the holders of the shares of each of the said classes.

## 27.6    CONVERSION OF COMMON SHARES UPON AN OFFER.

For the purposes of this Section 27.6:

1.    "Affiliate" has the meaning assigned by the *Securities Act* (Ontario) as, from time to time, amended, re-enacted or replaced;

2.    "Associate" has the meaning assigned by the *Securities Act* (Ontario) as, from time to time, amended, re-enacted or replaced;

3.    "Conversion Period" means the period of time commencing on the eighth day after the Offer Date and terminating on the Expiry Date;

4.    "Converted Shares" means Subject Voting Shares resulting from the conversion of Common Shares into the Subject Voting Shares pursuant to subparagraph (ii) below;

5.    "Exclusionary Offer" means an offer to purchase Subject Voting Shares that:

    a)        is a General Offer; and

-50-

b)      is not made concurrently with an offer to purchase Common Shares that is identical to the offer to purchase the Subject Voting Shares in terms of price per share and percentage of outstanding shares to be taken up exclusive of shares owned immediately prior to the offer by the Offeror, and in all other material respects, and that has no condition attached other than the right not to take up and pay for shares tendered if no shares are purchased pursuant to the offer for Subject Voting Shares;

and for the purposes of this definition, if an offer to purchase Subject Voting Shares is a General Offer but not an Exclusionary Offer, the varying of any term of such offer shall be deemed to constitute the making of a new offer unless a variation identical in all material respects concurrently is made to the corresponding offer to purchase Common Shares;

6.      "Expiry Date" means the last date on which holders of the Subject Voting Shares may accept an Exclusionary Offer;

7.      "General Offer" means an offer to purchase Subject Voting Shares that must, by reason of applicable securities legislation or the requirements of any stock exchange on which the Subject Voting Shares are listed, be made to all or substantially all holders of Subject Voting Shares who are in a province of Canada to which any such legislation or requirement applies (assuming that the offeree was resident in Ontario);

8.      "Offer Date" means the date on which an Exclusionary Offer is made;

9.      "Offeror" means a Person that makes an offer to purchase the Subject Voting Shares (the "bidder"), and includes any Associate or Affiliate of the bidder or any Person that is disclosed in the offering document to be acting jointly or in concert with the bidder,

10.     "Person" has the meaning assigned by the Securities Act (Ontario) as, from time to time, amended, re-enacted or replaced and includes a company or other body corporate wherever or however incorporated; and

11.     "Subject Voting Shares" means any one or more classes of Voting Shares that are subject to an Exclusionary Offer, other than Common Shares; and

## 27.7   EXCLUSIONARY OFFER CONVERSION RIGHT

If an Exclusionary Offer is made, each outstanding Common Share shall, at the option of each holder of Common Shares during the Conversion Period, be convertible on a one-for-one basis into the class of Voting Shares that are subject to such Exclusionary Offer (and if more than one class of Voting Shares are subject to such Exclusionary Offer, or different Exclusionary Offers are made for separate classes of Subject Voting Shares, on a one-for-one basis into any class of Voting Shares that are subject to any such Exclusionary Offer, at the holder's election, or failing such election, into any class of Voting Shares that are subject to any such Exclusionary Offer at the board of directors' discretion). The conversion right may be exercised by notice in writing given to the Transfer Agent prior to the Expiry Date accompanied by the share certificate or certificates (s) representing the Common Shares which the holder desires to convert, together with any letter of transmittal or other documentation, including any medallion signature guarantee, as may be required by the Transfer Agent or pursuant to the Exclusionary Offer, in either case in duly

executed or completed form, and such notice shall be executed by such holder, or by his attorney duly authorized in writing, and shall specify the number of Common Shares which the holder desires to have converted and the class of Voting Shares which are desired to be converted into. The Company shall pay any governmental stamp, transfer or similar tax (but for greater certainty, no income or capital gains tax) imposed on or in respect of such conversion. If less than all of the Common Shares represented by any share certificate are to be converted, the holder shall be entitled to receive a new share certificate representing in the aggregate the number of Common Shares represented by the original share certificate, which are not to be converted. Upon any conversion of any shares of any class into shares of another class, the Company shall adjust the capital accounts maintained for the respective classes of shares as provided in the Business Corporations Act. The conversion right may only be exercised in respect of Common Shares for the purpose of depositing the resulting Subject Voting Shares pursuant to such offer and for no other reason;

## 27.8    EXLUSIONARY OFFER CONVERSION RIGHT DEPOSIT AND RECONVERSION

1.      An election by a holder of Common Shares to exercise the conversion right provided for in Section **Error! Reference source not found.** above shall be deemed to also constitute irrevocable elections by such holder (a) to deposit the Converted Shares pursuant to the Exclusionary Offer (subject to such holder's right to subsequently withdraw the shares from the offer), and

2.      To exercise the right to convert back into Common Shares all Converted Shares (on a one-for-one basis) in respect of which such holder exercises his, her or its right of withdrawal from the Exclusionary Offer or which are not otherwise ultimately taken up under the Exclusionary Offer. Any conversion of Converted Shares back into Common Shares in respect of which the holder exercises his , her or its right of withdrawal from the Exclusionary Offer shall become effective at the time such right of withdrawal is exercised. If the right of withdrawal is not exercised, any conversion of Converted Shares back into Common Shares pursuant to a deemed election shall become effective:

   a)      for Converted Shares not taken up in accordance with the terms of an Exclusionary Offer which is nonetheless completed, on the day that the Offeror has taken up and paid for all shares to be acquired by the Offeror under the Exclusionary Offer; and

   b)      in respect of an Exclusionary Offer which is abandoned or withdrawn, at the time at which the Exclusionary Offer is abandoned or withdrawn;

## 27.9    CONVERTED SHARES SHARE CERTIFICATE

1.      No share certificates representing Converted Shares shall be delivered to the holders of such shares before such shares are deposited pursuant to the Exclusionary Offer. The Transfer Agent, on behalf of the holders of the Converted Shares, shall deposit pursuant to the Exclusionary Offer the certificates representing all Common Shares for which the certificates, notices and other documents have been duly delivered to the Transfer Agent pursuant to Section **Error! Reference source not found.** above and shall advise the Offeror of the extent that such certificates so deposited represent Subject Voting Shares of the Company. Upon completion of the Exclusionary Offer, the Transfer Agent shall deliver

to the holders of the shares purchased pursuant to the Exclusionary Offer all consideration paid by the Offeror pursuant to the Exclusionary Offer. If Converted Shares are converted back into Common Shares pursuant to Section **Error! Reference source not found.** above, the Transfer Agent shall deliver to the holders entitled thereto share certificates representing the Common Shares resulting from the conversion. Provided however that if no Common Shares of a shareholder were acquired by the Offeror pursuant to the Exclusionary Offer, the Transfer Agent shall return the original share certificate (if not duly endorsed for transfer to a named transferee) evidencing such Common Shares tendered pursuant to Section **Error! Reference source not found.** above in satisfaction of its obligations under this subparagraph (iv). The Company shall make all arrangements with the Transfer Agent necessary or desirable to give effect to this Section **Error! Reference source not found.**;

2.    references to share certificates shall include, as applicable, the equivalent in any non-certificated inventory system (such as, for example, a Direct Registration System or electronic position), with appropriate changes.

## PART 28 VARIABLE VOTING SHARES

The Variable Voting Shares shall have to them the special rights and restrictions as set forth below:

### 28.1    VOTING RIGHTS

Holders of Variable Voting Shares shall be entitled to notice of and to attend and participate in any general meeting of the Company. Holders of Variable Voting Shares shall be entitled to vote at any general meeting (including electronic meetings) of the Company, and at each such meeting, shall be entitled to one (1) vote in respect of each Variable Voting Share held, except that (i) holders shall not have an entitlement to vote at a class meeting or series meeting of which only holders of another particular class or series of shares of the Company shall have the right to vote and (ii) if the number of votes that may be exercised, in connection with the election or removal of directors, in respect of all issued and outstanding Variable Voting Shares exceeds 49.9% of the total number of votes that may be exercised, in connection with the election or removal of directors, in respect of all issued and outstanding Voting Shares, the vote attached to each Variable Voting Share will decrease automatically and pro rata and without further act or formality to equal the maximum permitted vote per Variable Voting Share. The Variable Voting Shares as a class cannot carry more than 49.9% of the Aggregate Votes, in connection with the election or removal of directors, attached to all issued and outstanding Voting Shares of the Corporation.

Except as otherwise provided in these Articles (including without limitation the restrictions on voting rights for the election or removal of directors in the case of the Variable Voting Shares) or except as provided in the Business Corporations Act, Common Shares and Variable Voting Shares are equal in all respects and shall vote together as if they were shares of a single class. In connection with any Change of Control Transaction requiring approval of the holders of all Voting Shares under the Business Corporations Act, all Voting Shares shall be treated equally and identically, on a per share basis, unless different treatment of the shares of each such class is approved by a majority of the votes cast by the holders of outstanding Variable Voting Shares or their

proxyholders in respect of a resolution approving such Change of Control Transaction, voting separately as a class at a meeting of the holders of that class called and held for such purpose.

Notwithstanding the provisions of the above, the holders of Variable Voting Shares shall be entitled to vote as a separate class, in addition to any other vote of shareholders that may be required, in respect of any alteration, repeal or amendment of these Articles which would: (i) adversely affect the rights or special rights of the holders of Variable Voting Shares; or (ii) affect the holders of any class of Voting Shares differently, on a per share basis; or (iii) except as already set forth herein, create any class or series of shares ranking equal to or senior to the Variable Voting Shares; and in each case such alteration, repeal or amendment shall not be effective unless a resolution in respect thereof is approved by a majority of the votes cast by holders of outstanding Variable Voting Shares.

## 28.2    CONVERSION OF VARIABLE VOTING SHARES

Each issued and outstanding Variable Voting Share shall be automatically converted into one Common Share without any further act on the part of the Company or of the holder, if such Variable Voting Share is or becomes held by a Non-U.S. Resident.

## 28.3    CONSTRAINTS ON OWNERSHIP.

Excepted as permitted by Section 27.6, the Variable Voting Shares may only be held by U.S. Residents.

## 28.4    DIVIDENDS

Holders of Variable Voting Shares shall be entitled to receive, as and when declared by the board of directors, dividends in cash, shares or property of the Company. No dividend will be declared or paid on any other class of Voting Shares unless the Company simultaneously declares or pays, as applicable, equivalent dividends (on a per share basis) on the Variable Voting Shares. The Variable Voting Shares shall rank equally with the other Voting Shares as to dividends on a share-for-share basis, without preference or distinction. In the event of the payment of a dividend in the form of shares, holders of Variable Voting Shares shall receive Variable Voting Shares, unless otherwise determined by the board of directors, provided an equal number of shares is declared as a dividend or distribution on a then outstanding per-Equity Share basis, without preference or distinction, in each case.

## 28.5    LIQUIDATION, DISSOLUTION OR WINDING-UP

In the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or in the event of any other distribution of assets of the Company among its shareholders for the purpose of winding up its affairs, the holders of Variable Voting Shares shall, subject to the prior rights of the holders of any shares of the Company ranking in priority to the Variable Voting Shares, be entitled to participate ratably in the remaining property of the Company along with all holders of the other classes of Voting Shares (on a per share basis).

**28.6    RIGHTS TO SUBSCRIBE; PRE-EMPTIVE RIGHTS**

The holders of Variable Voting Shares are not entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of shares, or bonds, debentures or other securities of the Company now or in the future.

**28.7    SUBDIVISION OR CONSOLIDATION**

No subdivision or consolidation of the Variable Voting Shares shall occur unless, simultaneously, the other classes of Voting Shares are subdivided or consolidated or otherwise adjusted so as to maintain and preserve the relative rights of the holders of the shares of each of the said classes. Subject to Sections 28.2 and 28.8, the Variable Voting Shares cannot be converted into any other class of shares.

**28.8    CONVERSION OF VARIABLE VOTING SHARES UPON AN OFFER**

For the purposes of this Section 28.8:

1.      "Affiliate" has the meaning assigned by the *Securities Act* (Ontario) as, from time to time, amended, re-enacted or replaced;

2.      "Associate" has the meaning assigned by the *Securities Act* (Ontario) as, from time to time, amended, re-enacted or replaced;

3.      "Conversion Period" means the period of time commencing on the eighth day after the Offer Date and terminating on the Expiry Date;

4.      "Converted Shares" means the Subject Voting Shares resulting from the conversion of Variable Voting Shares into the Subject Voting Shares pursuant to subparagraph (ii);

5.      "Exclusionary Offer" means an offer to purchase Subject Voting Shares that:

   a)      is a General Offer; and

   b)      is not made concurrently with an offer to purchase Variable Voting Shares that is identical to the offer to purchase the Subject Voting Shares in terms of price per share and percentage of outstanding shares to be taken up exclusive of shares owned immediately prior to the offer by the Offeror, and in all other material respects, and that has no condition attached other than the right not to take up and pay for shares tendered if no shares are purchased pursuant to the offer for Subject Voting Shares;

   and for the purposes of this definition, if an offer to purchase Subject Voting Shares is a General Offer but not an Exclusionary Offer, the varying of any term of such offer shall be deemed to constitute the making of a new offer unless a variation identical in all material respects concurrently is made to the corresponding offer to purchase Variable Voting Shares;

6.      "Expiry Date" means the last date on which holders of the Subject Voting Shares may accept an Exclusionary Offer;

120675999v2

7.    "General Offer" means an offer to purchase Subject Voting Shares that must, by reason of applicable securities legislation or the requirements of any stock exchange on which the Subject Voting Shares are listed, be made to all or substantially all holders of Subject Voting Shares who are in a province of Canada to which any such legislation or requirement applies (assuming that the offeree was resident in Ontario);

8.    "Offer Date" means the date on which an Exclusionary Offer is made;

9.    "Offeror" means a Person that makes an offer to purchase the Subject Voting Shares (the "bidder"), and includes any Associate or Affiliate of the bidder or any Person that is disclosed in the offering document to be acting jointly or in concert with the bidder;

10.    "Person" has the meaning assigned by the Securities Act (Ontario) as, from time to time, amended, re-enacted or replaced and includes a company or other body corporate wherever or however incorporated; and

11.    "Subject Voting Shares" means any one or more classes of Voting Shares that are subject to an Exclusionary Offer, other than Variable Voting Shares.

## 28.9    EXLUSIONARY OFFER CONVERSION RIGHT

If an Exclusionary Offer is made, each outstanding Variable Voting Share shall, at the option of each holder of Variable Voting Shares during the Conversion Period, be convertible on a one-for-one basis into the class of Voting Shares that are subject to such Exclusionary Offer (and if more than one class of Voting Shares are subject to such Exclusionary Offer, or different Exclusionary Offers are made for separate classes of Subject Voting Shares, on a one-for-one basis into any class of Voting Shares that are subject to any such Exclusionary Offer, at the holder's election, or failing such election, into any class of Voting Shares that are subject to any such Exclusionary Offer at the board of directors' discretion). The conversion right may be exercised by notice in writing given to the Transfer Agent prior to the Expiry Date accompanied by the share certificate(s) representing the Variable Voting Shares which the holder desires to convert, together with any letter of transmittal or other documentation, including any medallion signature guarantee, as may be required by the Transfer Agent or pursuant to the Exclusionary Offer, in either case, in duly executed or completed form, and such notice shall be executed by such holder, or by his attorney duly authorized in writing, and shall specify the number of Variable Voting Shares which the holder desires to have converted and the class of Voting Shares which are desired to be converted into. The Company shall pay any governmental stamp, transfer or similar tax (but for greater certainty, no income or capital gains tax) imposed on or in respect of such conversion. If less than all of the Variable Voting Shares represented by any share certificate are to be converted, the holder shall be entitled to receive a new share certificate representing in the aggregate the number of Variable Voting Shares represented by the original share certificate, which are not to be converted. Upon any conversion of any shares of any class into shares of another class, the Company shall adjust the capital accounts maintained for the respective classes of shares as provided in the Business Corporations Act. The conversion right may only be exercised in respect of Variable Voting Shares for the purpose of depositing the resulting Subject Voting Shares pursuant to such offer and for no other reason;

**28.10   EXLUSIONARY OFFER CONVERSION RIGHT DEPOSIT AND RECONVERSION**

An election by a holder of Variable Voting Shares to exercise the conversion right provided for in Section **Error! Reference source not found.** above shall be deemed to also constitute irrevocable elections by such holder (a) to deposit the Converted Shares pursuant to the Exclusionary Offer (subject to such holder's right to subsequently withdraw the shares from the offer), and (b) to exercise the right to convert back into Variable Voting Shares all Converted Shares (on a one-for-one basis) in respect of which such holder exercises his, her or its right of withdrawal from the Exclusionary Offer or which are not otherwise ultimately taken up under the Exclusionary Offer. Any conversion of Converted Shares back into Variable Voting Shares in respect of which the holder exercises his, her or its right of withdrawal from the Exclusionary Offer shall become effective at the time such right of withdrawal is exercised. If the right of withdrawal is not exercised, any conversion of Converted Shares back into Variable Voting Shares pursuant to a deemed election shall become effective:

a)    for Converted Shares not taken up in accordance with the terms of an Exclusionary Offer which is nonetheless completed, on the day that the Offeror has taken up and paid for all shares to be acquired by the Offeror under the Exclusionary Offer; and

b)    in respect of an Exclusionary Offer which is abandoned or withdrawn, at the time at which the Exclusionary Offer is abandoned or withdrawn;

**28.11   CONVERTED SHARES SHARE CERTIFICATE**

No share certificates representing Converted Shares shall be delivered to the holders of such shares before such shares are deposited pursuant to the Exclusionary Offer. The Transfer Agent, on behalf of the holders of the Converted Shares, shall deposit pursuant to the Exclusionary Offer the share certificates representing all Variable Voting Shares for which the certificates, notices and other documents have been duly delivered to the Transfer Agent pursuant to Section **Error! Reference source not found.** above and shall advise the Offeror of the extent that such certificates so deposited represent Subject Voting Shares of the Company. Upon completion of the Exclusionary Offer, the Transfer Agent shall deliver to the holders of the shares purchased pursuant to the Exclusionary Offer all consideration paid by the Offeror pursuant to the Exclusionary Offer. If Converted Shares are converted back into Variable Voting Shares pursuant to Section **Error! Reference source not found.** above, the Transfer Agent shall deliver to the holders entitled thereto share certificates representing the Variable Voting Shares resulting from the conversion. Provided however that if no Variable Voting Shares of a shareholder were acquired by the Offeror pursuant to the Exclusionary Offer, the Transfer Agent shall return the original share certificate (if not duly endorsed for transfer to a named transferee) evidencing such Variable Voting Shares tendered pursuant to Section **Error! Reference source not found.** above in satisfaction of its obligations under this Section **Error! Reference source not found..** The Company shall make all arrangements with the Transfer Agent necessary or desirable to give effect to this Section **Error! Reference source not found.**;

## 28.12  NON-CERTIFICATED AND DRS

References to share certificates shall include, as applicable, the equivalent in any non- certificated inventory system (such as, for example, a Direct Registration System or an electronic position), with appropriate changes.

## PART 29 - BOARD AUTHORITY

The Board of Directors may at any time and from time to time by notice to the transfer agent of the Company suspend or unsuspend, in each case by way of a resolution of the Board any or all of items in the defined term "applicable measurement period" .

## PART 30 - BOARD POWERS, DECLARATIONS AND DEEMING PROVISIONS

1.      Where a Common Share is held, beneficially owned or controlled, directly or indirectly, or jointly by (i) one or more U.S. Residents and (ii) one or more Non-U.S. Residents, such Common Share shall be deemed to be held, beneficially owned or controlled by a U.S. Resident.

2.      Subject to the Business Corporations Act, the board of directors may, in its sole discretion, in order to administer the special rights and restrictions on the Common Shares set out in these Articles:

a)      require any Person in whose name Common Shares are registered or any beneficial holder or controller, whether direct or indirect, of the Common Shares to furnish a statutory declaration declaring whether:

(i)     the shareholder holds, is the beneficial owner of and/or has control over the Common Shares of the Company (and if the Person is not also the beneficial owner and in control of the Common Shares, the Person must make reasonable inquiries of the beneficial owner(s) or Persons in control of such Common Shares to confirm that the statements made in the statutory declaration as they pertain to the beneficial owner and controller are true); and

(ii)    the Common Shares are held, beneficially owned or controlled, by a U.S. Resident or a Non- U.S. Resident;

and declaring any further facts or provide any other documents that the directors consider relevant;

b)      require any Person seeking to have a transfer of a Common Share registered in such Person's name or to have a Common Share issued to him or her or it to furnish a declaration similar to the declaration a shareholder may be required to furnish under paragraph a) above; and

c)      determine the circumstances in which any declarations are required, their form and the times when they are to be furnished.

-58-

3.   Where a Person fails to furnish a declaration pursuant to this Section in accordance with the requested timeline, the directors may, in their sole discretion, deem such shareholder to be a U.S. Resident.

4.   Where a Person is required to furnish a declaration pursuant to this Section the directors may refuse to register a transfer of a Common Share in such Person's name or to issue a Common Share to such Person until that Person has furnished the declaration.

5.   In the administration of the provisions of these Articles, the board of directors shall have, in addition to the powers set forth herein, all of the powers necessary or desirable, in their opinion, to carry out the intent and purpose of these Articles.

6.   In administering the provisions of these Articles, including for the purpose of determining the shareholder's or transferee's status as a U.S. Resident or Non-U.S. Resident, the board of directors may rely on:

   a)   a statement made in a declaration referred to in this Section; and

   b)   any information received from Broadridge Investor Communications Corporation, or any affiliate, successor or assign thereof or any company performing similar services;

   c)   any information received from Depositary Trust Company, CDS Clearing and Depositary Services Inc., or any affiliate, successor or assign thereof; and/or

   d)   the knowledge of any director, officer, employee or agent (including any transfer agent) of the Company.

7.   Where the directors are required to determine the number of any Equity Securities held by or on behalf of Persons who are U.S. Residents or Non-U.S. Resident, as applicable, the directors may rely upon (i) the share register of the Company or (ii) any other register held, or any declaration collected by, the transfer agent of the Company or any depositary, such as Depositary Trust Company, CDS Clearing and Depositary Services Inc. (or any affiliate, successor or assign thereof), or by Broadridge Investor Communications Corporation (or any affiliate, successor or assign thereof), in each case, as of any date.

8.   Wherever in these Articles it is necessary to determine the opinion of the board of directors, such opinion shall be expressed and conclusively evidenced by a resolution of the board of directors duly adopted, including a resolution in writing executed pursuant these Articles and the Business Corporations Act.

Krisztian Toth

120675999v2

-59-

DATED at Vancouver, British Columbia, this 15th day of December 2021