**AFFIDAVIT OF PUBLICATION**

**IN THE MATTER OF:** *{ Kirkland & Ellis. }*

**STATE OF NEW YORK**

        **ss:**

**COUNTY OF NEW YORK**

I, Jonathan Florez, being duly sworn, hereby certify that (a) I am the Account Planner, US Advertising of FT Publications, Inc. Publisher of the FINANCIAL TIMES, a daily newspaper published and of general circulation Worldwide including the City and County of New York, and (b) that the Notice of which the annexed is a copy was published in THE FINANCIAL TIMES ON THE:

11th Day of August 2022.

Jonathan Florez, ACCOUNT PLANNER, **ADVERTISING:**

**Signature:** *Jonathan Florez*

**Date: 08/02/2022**

**Pressure on Pru** New business profits at insurer's Hong Kong business suffer sharp decline amid zero-Covid policy ● PAGE 6

# Companies & Markets

## SoftBank to gain $34bn by selling down Alibaba shares

● Historic shift in ties to China group
● Investors expect further handovers

**LEO LEWIS** — TOKYO
**RYAN MCMORROW** — BEIJING

SoftBank expects to post a gain of more than $34bn by turning over a chunk of its holdings in the Chinese ecommerce group Alibaba, marking a historic shift in the Japanese group's relationship with its best-known investment.

The investor had made a series of complex derivative deals that allowed it to raise cash while retaining the option to buy back the shares later. But the company said yesterday that that right would now be fully relinquished with many deals settled early with shares.

The move is a step back from the 22-year-old bet on which Masayoshi Son built his name as a top technology investor. The decision, which investors said

> SoftBank said the decision was being taken to play 'defence against the severe market environment'

suggested further selldowns, means SoftBank's stake in Alibaba will fall from 23.7 per cent at the end of June to 14.6 per cent in September.

The reduced stake will take SoftBank below the threshold for retaining its board seat at Alibaba and prevent the Japanese group from continuing to recognise its share of Alibaba's income in its financial statements. It will also void a voting agreement with Alibaba vice-chair Joe Tsai that required SoftBank to vote its shares at the direction of Jack Ma, Tsai and other top executives.

The selldown follows a 70 per cent drop in Alibaba's share price that began in the autumn of 2020 when the authorities in Beijing halted the blockbuster initial public offering of its Ant Group fintech arm.

SoftBank's announcement came two days after Son announced the company's worst quarterly loss of $23bn and heralded a period of "dramatic" cost-cutting. SoftBank added that it was exploring the sale of other key assets, including Fortress Investment Group.

The loss posted for the April to June period followed a record loss in the previous quarter, and prompted Son to make an eye-catching statement of regret at his previous triumphalism when tech markets were booming.

The lion's share of SoftBank's red ink was unrealised losses on the stocks, both listed and unlisted, in Vision Funds 1 and 2, its flagship technology portfolios.

The funds were hit hard by the global technology rout, though Son himself presented a chart showing that listed Vision Fund stocks had underperformed the Nasdaq.

The maximum number of shares set to be handed over represents about two-thirds of all the Alibaba shares SoftBank has sold into prepaid forward contracts that remained outstanding in mid-July.

This year the Japanese group sold about one-third of its Alibaba stake through these forward deals to raise more than $21bn in cash as Son worked to strengthen SoftBank's balance sheet.

SoftBank said that the decision to relinquish the shares now was taken to play "defence against the severe market environment" and would resolve concerns about future cash outflows while cutting costs.

In deals struck with banks such as Goldman Sachs and UBS this year, SoftBank has cashed in its Alibaba stake at prices slightly higher than the level where Ma's group began trading in New York in 2014.

SoftBank said that its counterparties hedged those transactions when the deals were struck so the current move would not create additional selling pressure on Alibaba's stock.

---



**Fair wind** Vestas says Biden's subsidies package will accelerate renewables in US for next decade

The US tax credit regime is expected to give more visibility to turbine makers such as Vestas — David Swanson/Reuters

**RICHARD MILNE**
NORDIC AND BALTIC CORRESPONDENT

A new subsidies package for renewable energy about to be passed in the US is "extraordinarily important" and should help improve the outlook for the under-pressure wind industry, the head of one of the world's largest turbine manufacturers says.

Henrik Andersen, chief executive of Danish wind turbine manufacturer Vestas, said that concern over whether the US could end its production tax credits (PTC) had led to "stop and go" conditions for the renewable industry in the past year, but a new climate bill should halt those worries.

"It's extraordinarily important," he said. "I think that will give some clarity and will accelerate renewables in the US for the next decade. It's important for offshore wind, onshore, solar [and] power-to-x hydrogen."

The US Senate passed Joe Biden's flagship economic package, which includes support for renewable energy technologies, last Sunday.

The bill still needs to pass the House of Representatives and be signed by the president before it becomes law.

Vestas and the rest of the wind industry have had a tough year despite rising interest in renewables following Russia's invasion of Ukraine and worries among many western countries about how they will replace Russian energy.

Vestas reported second-quarter results on Tuesday below analysts' expectations with an underlying operating loss of €182mn, versus the average forecast of a €143mn deficit.

But unlike German-Spanish rival Siemens Gamesa, which cut its full-year profit guidance again last week, Vestas held on to its forecast for an underlying profit margin of zero to minus 5 per cent. Its margin was minus 5.5 per cent in the second quarter. Shares in Vestas closed 8.8 per cent higher at DKr198 yesterday.

Andersen said it was "not an easy quarter at all" as Vestas and the renewables sector faced a "challenged world" with sharp increases in raw material costs and component prices.

He added that Vestas had been able to raise prices to the highest level in a decade, so by working through its €19bn order backlog it would move closer to profitability. He stressed that the second half of the year would compare "positively" with the first.

"There should be an improvement," he added, pointing to "six to eight" quarters of improved pricing.

Martin Wilkie, analyst at Citi, said the US's new PTC regime would give "unprecedented visibility" for turbine manufacturers in the US as it would be available on new projects until at least 2032, leading to significant upgrades for Vestas's forecast revenues from 2024 onwards.

---

## Musk offloads $7bn of Tesla stock ahead of Twitter case

**RICHARD WATERS** — SAN FRANCISCO

Elon Musk has taken advantage of a recent rebound in Tesla's stock price to sell $6.9bn worth of shares in the electric-car maker since the end of last week, according to a series of regulatory filings late on Tuesday.

The sales are the first since the Tesla and SpaceX chief executive sold $8.5bn of stock in April, shortly after he agreed a $44bn deal to buy Twitter, and added to his cash reserves as he faces the social media company's demands to go through with the purchase.

Concerns that Musk would be forced to liquidate a significant part of his Tesla stake in a falling market have hung over the electric-car maker's stock price in the weeks following the offer for Twitter, and were only eased after he said he was scrapping the bid in early July.

Twitter has sued Musk to force him to go through with the deal and a Delaware court is due to hear the case in early October. Musk has claimed he can abandon the deal because Twitter misstated how much of its traffic comes from bots, while the company insisted its regulatory disclosures were complete.

The sales disclosed on Tuesday averaged at a price of $869, well above the low of $620 Tesla's shares hit in May.

Responding to a tweet asking if he was "done selling", Musk said "yes", and added: "In the (hopefully unlikely) event that Twitter forces this deal to close *and* some equity partners don't come through, it is important to avoid an emergency sale of Tesla stock."

Under the terms of his Twitter offer, Musk is responsible for financing up to $33.5bn of the purchase, with the rest coming from debt, though he has announced commitments from other investors of more than $7bn.

The Twitter deal provides for a $1bn break-up fee. But it also requires "specific performance", meaning Musk must complete the deal unless he can prove he was misled or a "material adverse event" has occurred at Twitter. He could also walk away if the debt needed to close the deal is no longer available.

That has raised the stakes ahead of the October court hearing, leaving Musk at risk of being ordered to go ahead with the deal on its original terms or forced to try to reach an out-of-court settlement with Twitter.

*Additional reporting by Sujeet Indap in New York*

**See Lex**

---

## Prolonged dry spell casts cloud over Norway's energy fortunes

### INSIDE BUSINESS
### EUROPE

**Richard Milne**



Norway is in many ways a lucky country. Its abundant oil and gas resources are much in demand since Russia's full-scale invasion of Ukraine. Numerous rivers and reservoirs up and down the vast country mean that more than 90 per cent of its electricity needs are covered by its own hydropower.

But in a sign of just how deeply an energy crisis is shaking Europe, Norway is suddenly facing its own electricity problems that are affecting everything from politics and international relations to business.

An unusually dry winter and spring have left many reservoirs in southern Norway at historically low levels for this time of the year, leading to the government in Oslo pledging to curb electricity exports until they are replenished.

That could be a significant problem for countries from Germany and the Netherlands to the UK that have imported large amounts of electricity over the years from Norway through cables, even before Russia sparked panic about what could happen this winter.

The most striking demonstration of the problems is the gaping price discrepancy between northern and central Norway — with close to half of the country's hydropower production — and southern Norway, with all the export cables. Electricity in the three southern areas of Norway will cost between €263/MWh and €327/MWh today, but in the north and centre of the country they will be just over €1/MWh, according to the day-ahead prices from the Nord Pool power market.

The pattern has lasted long enough that some businesses are voting with their feet: Kryptovault, a Norwegian bitcoin miner, is moving its activities from the south to above the Arctic Circle to slash its power bill.

The main reason for the 160-fold difference in prices is a lack of transmission capacity between north and south. It is a similar situation in neighbouring Sweden but it leads to absurd situations.

Norway's national broadcaster NRK earlier this summer ran stories only hours apart with power companies in the north of the country complaining that prices were so low they could not afford to invest in new capacity, and industrial companies in the south complaining prices were so high they could not afford to keep manufacturing.

The issue has leapt to the top of the political agenda in Oslo, where the government has warned that it cannot rule out electricity rationing this winter, even if it currently believes that any such restriction is unlikely.

The centre-left government faces a difficult balancing act: it has gone out of its way to present itself in Brussels as a reliable energy supplier, keen to sell as much oil and gas as it can; but it has become almost impossible to justify selling electricity abroad at sky-high prices when many Norwegians are hav-

> The issue has leapt to the top of the political agenda in Oslo as the government warns it cannot rule out electricity rationing

ing to pay the same. Sylvi Listhaug, leader of the rightwing populist Progress party, has called for Norway to build gas power stations and said "it would be a scandal" if "energy nation Norway" would need electricity rationing.

Other politicians have called for expensive plans to electrify Norway's offshore oil platforms — which run on gas turbines — to be dropped.

The government has responded carefully. Some of the most generous support to consumers in Europe will be increased, meaning the state will pick up 90 per cent of electricity bills over a certain price level.

Harder though is devising a scheme that could help businesses without merely encouraging an increase in consumption.

Left unsaid is how a big green transition in Norway's industry is likely to fare if there are already problems with supply. Norway is far ahead of the rest of the world in areas such as electric cars — eight in every 10 new vehicle sales produce zero emissions.

But it also has ambitious plans for green batteries, shipping and hydrogen that rely on plentiful — and cheap — hydropower.

Squaring all of that with continuing exports to Europe is a tricky feat. The government has given itself a week to come up with a mechanism that would allow it to stop exports when reservoir levels are below their seasonal average, something that is the case in most of southern Norway.

These are still mostly the problems of a lucky country but the warning signs flashing in Norway highlight just how tough this winter could be across Europe.

*richard.milne@ft.com*

---

**Legal Notices**

Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted pro hac vice), KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP, 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, *Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL HOLDINGS, INC., et al.,[1] Debtors. — Chapter 11 — Case No. 22-10943 (MEW) (Jointly Administered)

**NOTICE OF BAR DATES FOR SUBMITTING PROOFS OF CLAIM AND CLAIMS UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE AGAINST THE DEBTORS**

PLEASE TAKE NOTICE THAT the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has entered an order (Docket No. 218) (the "Bar Date Order") establishing **5:00 p.m. Eastern Time on October 3, 2022** (the "General Claims Bar Date"), as the last date for each person or entity (including individuals, partnerships, corporations, joint ventures and trusts) to submit a Proof of Claim against any of the Debtors listed below (collectively, the "Debtors"). A copy of the Bar Date Order, and any exhibits thereto are available (i) at the Debtors' expense upon request to Stretto, Inc. (the noticing and claims agent retained in these chapter 11 cases), by calling 855-473-8665 for callers in the United States or by calling 949-271-6507 for callers outside the United States, (ii) for no charge by visiting the Debtors' restructuring website at http://cases.stretto.com/Voyager, or (iii) for a fee via PACER by visiting http://ecf.nysb.uscourts.gov.

The Bar Date Order requires that all entities (collectively, the "Claimants") holding or wishing to assert a claim that arose or is deemed to have arisen prior to July 5, 2022 (the "Petition Date"), against the Debtors ("Claims") to submit a Proof of Claim so as to be actually received by Stretto, Inc. (the "Notice and Claims Agent") on or before the applicable bar date (collectively, the "Bar Dates") as set forth below. None of the bar dates described herein apply to any governmental unit. Pursuant to section 502(b)(9) of the Bankruptcy Code, all governmental units shall have at least 180 days from the commencement of these chapter 11 cases to submit Claims against the Debtors.

**Debtor Name, Last Four Digits of Tax Identification Number, Case Number:** Voyager Digital Holdings, Inc., 7687, 22-10943; Voyager Digital Ltd., 7224, 22-10944; Voyager Digital, LLC, 8013, 22-10945

**General Claims Bar Date** (Applicable to 503(b)(9) Claims). All Claimants holding or wishing to assert a Claim must submit a Proof of Claim with respect to such Claim so as to be **actually received** by the Notice and Claims Agent **by October 3, 2022, at 5:00 p.m. prevailing Eastern Time** (the "General Claims Bar Date"), including parties asserting Claims pursuant to section 503(b)(9) of the Bankruptcy Code.

**Supplemental Bar Date.** In the event the Debtors amend or supplement their schedules of assets and liabilities (collectively, the "Schedules"), the Debtors shall give notice of any such amendment to the holders of any Claim affected thereby, and such holders shall be afforded at least 35 days from the date on which such notice is given to submit a Proof of Claim with respect to such amended Claim (any such date, a "Supplemental Bar Date") or be forever barred from doing so.

**Rejection Bar Date.** If you have a Claim arising from the rejection of an executory contract or unexpired lease, you must submit a Proof of Claim based on such rejection on or before the later of (a) the General Claims Bar Date and (b) any date the Bankruptcy Court may fix in the applicable order authorizing such rejection and, if no such date is provided, 30 days from the date of entry of such order (the "Rejection Bar Date"). The Debtors will provide notice of the Rejection Bar Date to the contract or lease counterparty whose contract or lease is being rejected at the time the Debtors reject any executory contract or unexpired lease.

**When and Where To Submit.** Each Proof of Claim, including supporting documentation, must be submitted so that the Notice and Claims Agent (a) electronically using the interface available on the Notice and Claims Agent's website at https://cases.stretto.com/Voyager, or (ii) first-class U.S. Mail, overnight mail, or other hand-delivery system, which Proof of Claim must include an *original* signature, at the following address: Voyager Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED AND WILL NOT BE DEEMED TIMELY SUBMITTED.**

**Contents of Proofs of Claim.** Each Proof of Claim must: (i) be written in English; (ii) set forth (A) for any Claim based on cryptocurrency(ies) held in an account on the Debtors' platform, the number of units of each cryptocurrency held in such account;[2] and (B) in the case of any other Claim, the amount of such Claim denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form provided by the Notice or Official Form 410; (iv) be executed by the claimant or by an authorized agent or legal representative of the claimant and (v) unless otherwise required by applicable law, include supporting documentation unless voluminous, in which case a summary must be attached or an explanation provided as to why documentation is not available.

**Section 503(b)(9) Claims.** Vendors and suppliers of goods may be entitled to request an administrative priority Claim under section 503(b)(9) of the Bankruptcy Code for the value of goods delivered, and the Debtor received, goods within the twenty-day period prior to the Petition Date. The Bankruptcy Court has deemed the submission of a Proof of Claim as satisfying the procedural requirements for asserting such a Claim under section 503(b)(9) of the Bankruptcy Code. In addition to the other requirements listed above, any Proof of Claim asserting a 503(b)(9) Claim must (i) include the value of the goods delivered to and received by the Debtors in the 20 days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the 503(b)(9) Claim is being asserted; (iii) attach documentation of any reclamation demand made pursuant to section 546(c) of the Bankruptcy Code (if applicable); and (iv) set forth whether any portion of the 503(b)(9) Claim was satisfied by payments made by the Debtors.

**Consequences of Failing to Timely Submit Your Proof of Claim.** Any holder of a Claim that is not exempted from the requirements of the Bar Date Order, as set forth in paragraph 9 of the Bar Date Order, and that fails to timely file a Proof of Claim in the appropriate form, shall not be treated as a creditor with respect to such Claim for the purposes of voting on any plan of reorganization filed in these cases and participating in any distribution in the Debtors' cases on account of such Claim.

**Reservation of Rights.** Nothing contained in this notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any submitted Claim or any Claim listed or reflected in the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases as to the nature, amount, liability, or classification thereof; (b) subsequently designate any scheduled Claim as disputed, contingent, or unliquidated; and (c) otherwise amend the Schedules.

**Additional Information.** If you have any questions regarding the Claims process and/or if you wish to obtain a copy of the Bar Date Order (which contains a more detailed description of the requirements for submitting Proofs of Claim), a Proof of Claim form or related documents, you may do so by visiting the Debtors' restructuring website at http://cases.stretto.com/Voyager or contacting the Notice and Claims Agent by calling 855-473-8665 for callers in the United States or by calling 949-271-6507 for callers outside the United States and/or writing to the following address: Voyager Claims Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602. Please note that the Notice and Claims Agent cannot advise you how to submit, or whether you should submit, a Proof of Claim.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] For the avoidance of doubt, all Claims for cryptocurrency held by any holder must clearly state (i) each type of cryptocurrency held and (ii) the number of units of each cryptocurrency held.

---

**Notice to Advertisers**

Calls to the Financial Times Advertising Department may be monitored.

Acceptance of any advertisement for publication will be subject to the then current terms and conditions of insertion of advertisements in FT publications.

A copy of the terms and conditions of insertion of advertisements in FT publications can be obtained from +44 (0)20 7873 3000, or viewed at www.FT.com/advertising