THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.

THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON SEPTEMBER 15, 2022, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT RELATING TO THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

Page

IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT ......................................1

I.        INTRODUCTION ...........................................................................................................8

II.       PRELIMINARY STATEMENT ....................................................................................8

III.      THE POTENTIAL RESTRUCTURING TRANSACTIONS ......................................9

         A.       The Stand-Alone Plan. ......................................................................................10
         B.       The Third-Party Transaction. ..........................................................................10

IV.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
              STAND-ALONE PLAN ...............................................................................................12

         A.       What is chapter 11? ..........................................................................................12
         B.       Why are the Debtors sending me this Disclosure Statement? ..........................12
         C.       Am I entitled to vote on the Stand-Alone Plan? ..............................................12
         D.       What will I receive from the Debtors if the Stand-Alone Plan is consummated? ......13
         E.       What will I receive from the Debtors if I hold an Allowed Administrative Claim? ......15
         F.       Are any regulatory approvals required to consummate the Stand-Alone Plan? ......16
         G.       What happens to my recovery if the Stand-Alone Plan is not confirmed or does not go
               effective? ..........................................................................................................18
         H.       If the Stand-Alone Plan provides that I get a distribution, do I get it upon Confirmation or
               when the Stand-Alone Plan goes effective, and what is meant by "Confirmation,"
               "Effective Date," and "Consummation"? ........................................................18
         I.        What are the sources of Consideration and other consideration required to fund the Stand-
               Alone Plan? ......................................................................................................18
         J.        Is there potential litigation related to the Stand-Alone Plan? ..........................18
         K.       Are there risks to owning the New Common Stock upon emergence from Chapter 11? ......19
         L.       Will there be releases and exculpation granted to parties in interest as part of the Stand-
               Alone Plan? ......................................................................................................19
         M.      What is the deadline to vote on the Stand-Alone Plan? ....................................22
         N.       How do I vote for or against the Stand-Alone Plan? ........................................22
         O.       Why is the Bankruptcy Court holding a Confirmation Hearing? ....................22
         P.       When is the Confirmation Hearing set to occur? ..............................................22
         Q.       What is the purpose of the Confirmation Hearing? ..........................................23
         R.       What is the effect of the Stand-Alone Plan on the Debtors' ongoing business? ......23
         S.       Will any party have significant influence over the corporate governance and operations of
               the Reorganized Debtors? ................................................................................23
         T.       What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ..........23
         U.       Who do I contact if I have additional questions with respect to this Disclosure Statement
               or the Stand-Alone Plan? ..................................................................................23

V.        THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ....................24

         A.       The Debtors' Corporate Structure and History. ..............................................24
         B.       The Debtors' Assets and Operations. ..............................................................24
         C.       The Debtors' Capital Structure. ......................................................................26

VI.      EVENTS LEADING TO THESE CHAPTER 11 CASES ..........................................27

         A.       Market and Industry-Specific Challenges. ......................................................27
         B.       Retention of Restructuring Advisors and Initial Third-Party Outreach. ..........29
         C.       Governance Initiatives. ....................................................................................29
         D.       Voyager's Decision to Commence these Chapter 11 Cases. ............................30

VII.     EVENTS OF THE CHAPTER 11 CASES ..................................................................30

| | | |
|---|---|---|
| A. | First and Second Day Relief and Other Case Matters. | 30 |
| B. | Appointment of Unsecured Creditors' Committee. | 32 |
| C. | Schedules and Statements. | 32 |
| D. | Bar Date Motion. | 32 |
| E. | The FBO Motion. | 32 |
| F. | The 3AC Liquidation Proceeding. | 33 |
| G. | Litigation Matters. | 33 |
| H. | The Coinify Sale Motion. | 34 |
| I. | The Post-Petition Sale Process. | 35 |
| J. | The Key Employee Retention Plan. | 36 |
| K. | Canadian Recognition Proceeding. | 36 |

**VIII.  PROJECTED FINANCIAL INFORMATION** ......37

**IX.  RISK FACTORS** ......37

| | | |
|---|---|---|
| A. | Risks Related to the Restructuring. | 37 |
| B. | Risks Related to Recoveries under the Stand-Alone Plan. | 43 |
| C. | Risks Related to the Debtors' Businesses. | 44 |
| D. | Miscellaneous Risk Factors and Disclaimers. | 52 |

**X.  SOLICITATION AND VOTING PROCEDURES** ......53

| | | |
|---|---|---|
| A. | Classes Entitled to Vote on the Stand-Alone Plan. | 53 |
| B. | Votes Required for Acceptance by a Class. | 53 |
| C. | Certain Factors to Be Considered Prior to Voting. | 54 |
| D. | Classes Not Entitled To Vote on the Stand-Alone Plan. | 54 |
| E. | Solicitation Procedures. | 54 |
| F. | Voting Procedures. | 55 |
| G. | Voting Tabulation. | 56 |
| H. | Ballots Not Counted. | 57 |

**XI.  CONFIRMATION OF THE STAND-ALONE PLAN** ......57

| | | |
|---|---|---|
| A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 57 |
| B. | Best Interests of Creditors—Liquidation Analysis. | 58 |
| C. | Feasibility. | 58 |
| D. | Acceptance by Impaired Classes. | 58 |
| E. | Confirmation without Acceptance by All Impaired Classes. | 59 |

**XII.  IMPORTANT U.S. SECURITIES LAWS DISCLOSURES** ......60

| | | |
|---|---|---|
| A. | Issuance of Securities under the Stand-Alone Plan. | 60 |
| B. | Subsequent Transfers of Securities Issued under the Stand-Alone Plan. | 60 |

**XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE STAND-ALONE PLAN** ......61

| | | |
|---|---|---|
| A. | Introduction. | 61 |
| B. | Certain U.S. Federal Income Tax Consequences of the Stand-Alone Plan to the Debtors. | 63 |
| C. | Certain U.S. Federal Income Tax Consequences of the Stand-Alone Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 63 |

**XIV.  RECOMMENDATION OF THE DEBTORS** ......66

**EXHIBITS**

EXHIBIT A    Stand-Alone Plan

EXHIBIT B    Liquidation Analysis[2]

EXHIBIT C    Financial Projections[3]

EXHIBIT D    Valuation Analysis[4]

---

[2]    The Debtors shall file **Exhibit B** in advance of the deadline to object to this Disclosure Statement.

[3]    The Debtors shall file **Exhibit C** in advance of the deadline to object to this Disclosure Statement.

[4]    The Debtors shall file **Exhibit D** in advance of the deadline to object to this Disclosure Statement.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED AUGUST 12, 2022

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE FIRST AMENDED
JOINT PLAN OF REORGANIZATION OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE STAND-ALONE
PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE STAND-ALONE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 5 | General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1. Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on [October 24, 2022]).<br><br>2. Ballots may be returned by the following methods:<br><br>a) For Holders of Account Holder Claims: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.<br><br>   b) For Holders of General Unsecured Claims: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (ii) via first class mail, overnight courier, or hand delivery to the address set forth below:<br><br><div align="center">Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602</div><br>If you have any questions on the procedures for voting on the Stand-Alone Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE FIRST AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE STAND-ALONE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII.J HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE STAND-ALONE PLAN AND THE DISCLOSURE STATEMENT, THE STAND-ALONE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE STAND-ALONE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE STAND-ALONE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE STAND-ALONE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE STAND-ALONE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE STAND-ALONE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE STAND-ALONE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY

UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE STAND-ALONE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE STAND-ALONE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE STAND-ALONE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE STAND-ALONE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE STAND-ALONE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE STAND-ALONE PLAN) WILL BE BOUND BY THE TERMS OF THE STAND-ALONE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE STAND-ALONE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE STAND-ALONE PLAN. THERE IS NO ASSURANCE THAT THE STAND-ALONE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE STAND-ALONE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE STAND-ALONE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VII.J, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE STAND-ALONE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE STAND-ALONE PLAN.

SUMMARIES OF THE STAND-ALONE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE STAND-ALONE PLAN.   THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE STAND-ALONE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE STAND-ALONE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE STAND-ALONE PLAN, THE RELEVANT PROVISIONS OF THE STAND-ALONE PLAN WILL GOVERN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE STAND-ALONE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY.  THE STAND-ALONE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE STAND-ALONE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE LEGAL TEST FOR DETERMINING WHETHER ANY GIVEN CRYPTOCURRENCY ASSET OR TRANSACTION INVOLVING CRYPTOCURRENCY IS A SECURITY IS A HIGHLY COMPLEX, FACT-DRIVEN ANALYSIS THAT EVOLVES OVER TIME, AND THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B).  THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER APPLICABLE STATE SECURITIES LAW (COLLECTIVELY, THE "BLUE SKY LAWS").  THE SOLICITATION OF VOTES ON THE STAND-ALONE PLAN IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE (THE "SOLICITATION").  THE DEBTORS INTEND TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT TO EXEMPT THE OFFER, ISSUANCE, AND DISTRIBUTION OF SECURITIES OF THE REORGANIZED DEBTORS IN CONNECTION WITH THE SOLICITATION AND THE STAND-ALONE PLAN FROM REGISTRATION UNDER THE SECURITIES ACT AND THE BLUE SKY LAWS.  NEITHER THE SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- **THE DEBTORS' BUSINESS STRATEGY;**

- **THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;**

- **POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;**

- **INTRODUCTION OF NEW COMPETITORS IN THE CRYPTOCURRENCY INDUSTRY;**

- **THE DEBTORS' REGULATORY LICENSES;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;**

- **THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;**

- **THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;**

- **THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;**

- **THE DEBTORS' LEVELS OF INDEBTEDNESS;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**

- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**

- **THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO GENERATE SUFFICIENT CASH FROM OPERATIONS TO FUND THEIR CURRENT AND FUTURE OPERATIONS;**

- **THE DEBTORS' ABILITY TO PROPOSE AND IMPLEMENT A BUSINESS PLAN;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE STAND-ALONE PLAN;**

- **VOLATILITY OF THE DEBTORS' FINANCIAL RESULTS AS A RESULT OF THE CHAPTER 11 CASES;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **THE DEBTORS' ABILITY TO CONTINUE AS A GOING CONCERN;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **CHANGES IN LABOR RELATIONS;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

I.    **INTRODUCTION**

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] (as supplemented or amended from time to time, the "<u>Stand-Alone Plan</u>"). A copy of the Stand-Alone Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference. The Stand-Alone Plan constitutes a separate chapter 11 plan for each of the Debtors.[5]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE STAND-ALONE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE STAND-ALONE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE STAND-ALONE PLAN.**

II.    **PRELIMINARY STATEMENT**

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by the downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. But the Debtors have a viable business and a plan for the future. As set forth in this Disclosure Statement, the Debtors have worked tirelessly with their advisors to develop a strategy that will position the Debtors for long-term success. Ultimately, the Debtors filed for chapter 11 relief to protect their customers and preserve the value of their business.

Voyager operates a cryptocurrency trading platform that allows customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers can earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "<u>Petition Date</u>"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy have roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies have experienced significant declines; as of June 2022, the cryptocurrency market had lost $2 trillion in aggregate market value. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("<u>Luna</u>") (as discussed in Article VI.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

In June 2022, it became apparent that the Company's loan to Three Arrows Capital ("<u>3AC</u>" and such loan the "<u>3AC Loan</u>"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that

---

[5]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Stand-Alone Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Stand-Alone Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Stand-Alone Plan, are qualified in their entirety by reference to the Stand-Alone Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Stand-Alone Plan, the Stand-Alone Plan shall govern.**

nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. On or about June 16, 2022, the Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. With the advice and assistance of Moelis, the Company engaged in numerous discussions with a number of third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd., a major participant in the cryptocurrency space, and began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On July 6, 2022, the Debtors filed the Stand-Alone Plan. The Stand-Alone Plan contemplates a comprehensive restructuring of the Debtors business, pursuant to which Holders of Account Holder Claims will receive their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan and discussed in greater detail herein. As set forth in greater detail in the liquidation analysis (attached hereto as **Exhibit B**, the "Liquidation Analysis") as well as Article IV.D herein, Account Holders will receive a significantly higher recovery in either a Stand-Alone Restructuring or a Third-Party Transaction (each as defined herein) than such Account Holders would receive in a hypothetical liquidation.

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee"), as discussed in greater detail in Article VII.B herein. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor. The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Stand-Alone Plan, and Debtors' proposed case timeline.

The value of certain Coins has increased substantially since the Petition Date. Although the cryptocurrency market remains subject to significant volatility, continued gains in value of Coins on the Voyager platform may result in higher recoveries than as of the Petition Date to Account Holders under the Stand-Alone Plan.

The Debtors are intent on maximizing the value of their business for customers. The Debtors, with the assistance of Moelis and their other advisors have continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a strategic transaction with a third-party investor (the "Marketing Process"). On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures"). The Bidding Procedures provide a roadmap for a potential sale of, or investment into, the Debtors' business and set forth the procedures for obtaining bids from interested third parties. As of the date hereof, the Debtors have received several bids and expect to receive additional bids over the coming weeks. The Debtors will continue to engage with interested parties to identify the transaction that maximizes value for the Debtors' stakeholders, including customers. In the event it is determined that a Third-Party Transaction would provide more value to stakeholders than a Stand-Alone Restructuring, the Debtors will pursue the Third-Party Transaction, and will provide Holders of Claims and Interests with additional information and revised documents, as applicable.

## III.    THE POTENTIAL RESTRUCTURING TRANSACTIONS

The Debtors seek to effectuate a comprehensive reorganization through either (a) a restructuring pursuant to the Stand-Alone Plan (a "Stand-Alone Restructuring") or (b) a sale of the Company (a "Third-Party Transaction") through either (i) an alternative chapter 11 plan of reorganization pursuant to which a controlling stake of the equity in Reorganized Voyager may be distributed to a third party purchaser (an "Alternative Plan") or (ii) an orderly sale of all or substantially all of the Debtors' assets through an asset sale pursuant to section 363 of the Bankruptcy Code (a "363 Sale").

**A Third-Party Transaction will only be effectuated if, ultimately, the Third-Party Transaction provides Account Holders with greater value than the Stand-Alone Restructuring.** In the event the Debtors pursue a Third-Party Transaction, the Debtors will file a revised chapter 11 plan that sets forth the distribution of the proceeds from such Third-Party Transaction.

A.      **The Stand-Alone Plan.**

The Stand-Alone Plan can be effectuated without a sale or a strategic partner.  Under the Stand-Alone Plan, account holders will receive a combination of (a) any available Cash on hand on the Effective Date, (b) Coins, (c) Voyager Tokens, (d) 3AC Recovery, and (e) New Common Stock.  Account holders can also elect to increase or decrease their pro rata recovery of equity in reorganized Voyager in exchange for an equal increase or decrease in the amount of Coins such account holder is entitled to.  Ultimately, the Stand-Alone Plan will provide account holders with a meaningful recovery on account of their claims and vest ownership of the go-forward business of the Company in its customers.

The Bidding Procedures provide that the Debtors will seek confirmation of a Stand-Alone Plan or Alternative Plan, as applicable, in accordance with the following timeline:

| Action | Description | Deadline |
|---|---|---|
| Deadline to file Disclosure Statement | The deadline for the Debtors to file the Disclosure Statement. | August 12, 2022 |
| Disclosure Statement Objection Deadline | The deadline by which objections to the Disclosure Statement must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Disclosure Statement Objection Deadline"). | September 9, 2022, at 4:00 p.m. prevailing Eastern Time. |
| Disclosure Statement Hearing | The date for the hearing for the Bankruptcy Court's approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Hearing"). | September 15, 2022, at 11:00 a.m., prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |
| Solicitation Deadline | The deadline for distributing Solicitation Packages, including ballots, to holders of claims entitled to vote to accept or reject the Stand-Alone Plan or Alternative Plan, as applicable (the "Solicitation Deadline"). | September 26, 2022, or 10 days after entry of the Order approving the Disclosure Statement. |
| Plan Objection and Plan Voting Deadlines | The deadline by which (a) objections to the Stand-Alone Plan or Alternative Plan, as applicable, must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Plan Objection Deadline"), and (b) all ballots must be properly executed, completed, and delivered so that they are actually received by the Debtors' notice, claims, and solicitation agent (the "Plan Voting Deadline"). | October 24, 2022, at 4:00 p.m., prevailing Eastern Time. |
| Confirmation Hearing | The hearing before the Court to consider approval of the successful Bid or Bids and Confirmation of the Stand-Alone Plan or Alternative Plan, as applicable (the "Confirmation Hearing"). | November 1, 2022, at [●]:00 [a/p].m., prevailing Eastern Time. |

B.      **The Third-Party Transaction.**

As an alternative to the Stand-Alone Plan, the Debtors may effectuate a Third-Party Transaction in the form of either (a) an Alternative Plan or (b) a 363 Sale if the Debtors determine, in their business judgment, that doing so would be more value maximizing for stakeholders.  As described in greater detail in Article VI.B herein, the Debtors engaged in significant prepetition efforts to ascertain interest in the sale of all or substantially all of the Debtors' assets or equity to a third-party investor.  The Debtors continued such marketing efforts during these Chapter 11 Cases.

Because the Debtors' process remains ongoing, the form and structure of any potential Third-Party Transaction is currently unknown.

The following table sets forth the timeline, pursuant to the Bidding Procedures, by which formal bids (each, a "Bid") to effectuate a Third-Party Transaction, shall be submitted, evaluated, and approved:

| Action | Description | Deadline |
|---|---|---|
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline"). | August 26, 2022 at 12:00 p.m. prevailing Eastern Time. |
| Auction | The date and time of the auction, if one is needed, which will be held at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022. | August 29, 2022 at 10:00 a.m., prevailing Eastern Time, if needed. |
| Sale Objection Deadline | The deadline by which objections to the entry of an order by the Court approving the Third-Party Transaction must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline"). | September 6, 2022, at 4:00 p.m., prevailing Eastern Time. |
| Sale Hearing | The hearing before the Court to consider approval of the successful Bid or Bids, pursuant to which the Debtors and the Winning Bidder or Bidders will consummate the Third-Party Transaction. | September 8, 2022 at 11:00 a.m., prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |

     1.    *An Alternative Plan.*

A Bid submitted by a third party may take the form of an Alternative Plan. If the Debtors determine that an Alternative Plan represents the most value maximizing path forward for stakeholders, the Debtors will pursue such Alternative Plan. An Alternative Plan may result in a third party obtaining a controlling stake in the equity of Reorganized Voyager. In the event that the Debtors pursue an Alternative Plan, the Debtors will provide all Holders of Claims and Interests with additional information and revised documents, as applicable, and use commercially reasonable best efforts to confirm and effectuate such Alternative Plan in accordance with the timeline set forth in Article III.A above.

     2.    *A 363 Sale.*

If the Debtors determine that a 363 Sale provides greater value to the Debtors' creditors than the Stand-Alone Plan and/or an Alternative Plan, the Debtors will seek to effectuate such 363 Sale. A 363 Sale may result in a third party obtaining control of all or substantially all of the Debtors' assets. In the event the Debtors consummate a 363 Sale that entails the sale of all or substantially all of the Debtors' assets, the Debtors will seek confirmation of a chapter 11 plan that distributes proceeds of the 363 Sale to customers and other stakeholders. In the event that the Debtors pursue a 363 Sale, the Debtors will provide all Holders of Claims and Interests with additional information and revised documents, as applicable.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND STAND-ALONE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Stand-Alone Plan.  Before soliciting acceptances of the Stand-Alone Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Stand-Alone Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Stand-Alone Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Stand-Alone Plan?

Your ability to vote on, and your distribution under, the Stand-Alone Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Stand-Alone Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.        What will I receive from the Debtors if the Stand-Alone Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Stand-Alone Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Stand-Alone Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Stand-Alone Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit B**.

**In a hypothetical liquidation, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive in either a Stand-Alone Restructuring or a Third-Party Transaction.**  In the event of a liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses would likely result in Account Holders and General Unsecured Creditors receiving significantly reduced recoveries.  Additionally, the Liquidating Trustee would potentially sell all of the Debtors' cryptocurrency assets and distribute the proceeds in U.S. Dollars.  Such proceeds would likely be distributed based on the amount of cryptocurrency held in each Holder's account on the Petition Date, preventing Holders of Account Holder Claims from capturing any of the appreciation in cryptocurrency prices that occurred after the Petition Date.  Finally, in a hypothetical liquidation the Company will forgo any value owing to synergies inherent to the Company continuing as a going concern.  Assets such as the Company's intellectual property may be substantially undervalued in a liquidation and, accordingly, would lead to further reduced recoveries to Holders of Account Holder Claims and General Unsecured Claims.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE**

DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[6]

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $[●] | 100% | [●]% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $[●] | 100% | N/A |
| 3 | Account Holder Claims | Each Holder of an Allowed Account Holder Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Account Holder Claim, its Pro Rata share of: (i) the Coin Allocation; (ii) the Claims Equity Allocation; (iii) the Voyager Token Allocation; and (iv) the 3AC Recovery Allocation; *provided* that subclauses (i) and (ii) shall be subject to such Holder's Coin Election or Equity Election, as applicable. | $[●] | [●]% | [●]% |
| 4 | Alameda Loan Facility Claims | Alameda Loan Facility Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and will be of no further force or effect, and Holders of Alameda Loan Facility Claims will not receive any distribution on account of such Alameda Loan Facility Claims. | $75,000 | [●]% | 0% |
| 5 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, its Pro Rata share of Claims Allocation Pool. | $[●] | [●]% | [●]% |

[6] The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 6 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be cancelled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | $[●] | 0% | 0% |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of Reorganized Voyager, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Restructuring Transactions Memorandum. | N/A | N/A | N/A |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of Reorganized Voyager, either (a) Reinstated in accordance with Article III.G of the Stand-Alone Plan or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Restructuring Transactions Memorandum. | N/A | 100% / 0% | 0% |
| 9 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Equity Interests will not receive any distribution on account of such Existing Equity Interests. | N/A | 0% | 0% |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Stand-Alone Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Stand-Alone Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.      Are any regulatory approvals required to consummate the Stand-Alone Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[7] and has license applications pending[8] in eighteen (18) states.[9] The regulatory approvals required to consummate the Stand-Alone Plan, Third-Party Transaction, and/or Alternative Plan vary. The potential scenarios for state money transmission approval requirements are: (i) a Third-Party Transaction occurs in which the acquirer is a fully licensed entity and regulatory approvals are not required, (ii) a Third-Party Transaction occurs in which the acquirer is not a fully licensed entity and certain regulatory approvals are required, and (iii) no Third-Party Transaction occurs and Voyager effectuates a Stand-Alone Plan.

The state banking departments have been engaged with the Debtors throughout the bankruptcy process and will continue to actively participate in the Stand-Alone Plan process with the goal of ensuring that any Plan provides for compliance by Voyager (and, in the case of a Third-Party Transaction, by the acquirer) with state money transmission laws as of the closing of any Third-Party Transaction or the Effective Date. The state banking departments will have broad discretion as to the approvals required in connection with a Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. The below sets forth the Company's view of the most likely approval scenarios in connection with various Plan types.

---

[7]     The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[8]     On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[9]     Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

1.    *Regulatory Approvals in Connection with a Third-Party Transaction.*

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

If a Third-Party Transaction is pursued, the structure of such transaction and the licensed status of the relevant acquirer will dictate the scope of regulatory approvals that are needed. Specifically, if the relevant acquirer itself is fully licensed pursuant to state money transmission laws, Voyager may decide to surrender Voyager's Money Transmission Licenses, in which case notice to and approval by all state banking departments where the Debtors are licensed would be required pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[10]  If a Third-Party Transaction is pursued and the acquirer is not fully licensed pursuant to Money Transmission Laws, regulatory approvals will likely be required by those state banking departments in states where the acquirer is not licensed if licensure would be required for the activity the acquirer will engage in with the purchased assets of the Debtors. As set forth above, if the Third-Party Transaction is structured as an asset sale, the Money Transmission Licenses may not be acquired by the acquirer. In such a scenario, the acquirer will likely be required by the state banking departments to be fully licensed in order for the state banking departments to support the transaction.[11]  If the Third-Party Transaction is structured as an acquisition of Voyager Digital LLC itself (Voyager's licensed entity) as opposed to an asset purchase, two sets of regulatory approvals will triggered:  (i) change of control approvals[12] will be required before the Third-Party Transaction may close in those states in which Voyager maintains Money Transmission Licenses (assuming the unlicensed acquirer will both desire to and will be required to maintain in effect those Money Transmission Licenses) and (ii) the state banking departments will likely require Voyager to obtain Money Transmission Licenses in all states in which such licensure is required and be in material compliance with the terms of all such licenses as a condition to supporting the transaction.

As discussed in Article III.B of this Disclosure Statement, the Debtors are actively engaged with potential third-party investors on the terms of a Third-Party Transaction. In the event that the Debtors pursue a Third-Party Transaction, the Debtors will provide all Holders of Claims and Interests with additional information and revised documents, as applicable.

2.    *Regulatory Approvals in Connection with a Stand-Alone Plan.*

In the event that the Debtors pursue a Stand-Alone Plan, the state banking departments will likely require Voyager to obtain Money Transmission Licenses in all states in which such licensure is required and be in material compliance with the terms of all such licenses as a condition to supporting the transaction. Because the Stand-Alone Plan involves Account Holders obtaining equity interests in the Reorganized Debtors, change of control approvals by the state banking departments (as described above) will likely be required.

---

[10]    The state approval process for the surrender of a license typically takes several months.

[11]    After application materials have been finalized and submitted to the relevant state banking departments, approval times vary significantly by state and the applicant, ranging from less than one month in certain states to a year or more in others.

[12]    By way of background, all state money transmission statutes or regulations include provisions that address a change in ownership of a licensee to ensure that the acquirer has the character, fitness, and financial acuity to own a licensed money transmitter and that the deal structure does not pose an undue safety and soundness risk to the licensee. While states vary with respect to how they define "control" or "ultimate owner" (or its equivalent) under their statutes, typically, a change in at least 10% of the direct or indirect ownership of a licensee constitutes a "change of control" of a licensee in a number of states. States vary with respect to the requirements in connection with a change of control of a licensee, but all states typically require some form of change of control application filing, provision of information regarding the acquirer and its control persons, and an approval from the state banking department of such change prior to closing. In a typical scenario, it typically takes between six (6) and nine (9) months in order to file all required change of control applications and receive the required approvals from all jurisdictions.

G.    **What happens to my recovery if the Stand-Alone Plan is not confirmed or does not go effective?**

In the event that the Stand-Alone Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Stand-Alone Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Art. X.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

H.    **If the Stand-Alone Plan provides that I get a distribution, do I get it upon Confirmation or when the Stand-Alone Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Stand-Alone Plan refers to approval of the Stand-Alone Plan by the Bankruptcy Court.  Confirmation of the Stand-Alone Plan does not guarantee that you will receive the distribution indicated under the Stand-Alone Plan.  After Confirmation of the Stand-Alone Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Stand-Alone Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Stand-Alone Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Stand-Alone Plan.  *See* Article IX of the Stand-Alone Plan for a description of the conditions precedent to consummation of the Stand-Alone Plan.

I.    **What are the sources of Consideration and other consideration required to fund the Stand-Alone Plan?**

1.    *Stand-Alone Plan.*

The Reorganized Debtors shall fund distributions under the Stand-Alone Plan with:  (a) Cash, (b) Coins (c) Voyager Tokens, (d) 3AC Recovery, and (e) New Common Stock.  The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Stand-Alone Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Stand-Alone Plan.

From and after the Effective Date, the Reorganized Debtors, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

2.    *Third-Party Transaction.*

In the event that the Debtors effectuate a Third-Party Transaction through a 363 Sale, the Debtors will file a chapter 11 plan that provides, among other things, for the distribution of proceeds from the 363 Sale.  Distributions in such chapter 11 plan will be funded by any available cash on hand and proceeds from the 363 Sale.  In the event the Debtors effectuate a Third-Party Transaction that is achieved through an Alternative Plan, the Debtors will provide all Holders of Claims and Interests with additional information and revised documents, as applicable.

J.    **Is there potential litigation related to the Stand-Alone Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Stand-Alone Plan as well, which objections potentially could give rise to litigation.  See Article IX.C.11 of this Disclosure Statement titled "The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases, As Well As Ongoing Regulatory Investigations" for further discussion on this issue.

**K.      Are there risks to owning the New Common Stock upon emergence from Chapter 11?**

Yes.  *See* Article VII.J of this Disclosure Statement, entitled "Risk Factors."  The Debtors may seek to list the New Common Stock on the New York Stock Exchange, the Nasdaq Stock Market (the "Nasdaq"), the Toronto Stock Exchange, or another comparable national securities exchange on or as soon as reasonably practicable after the Effective Date.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Stand-Alone Plan?**

Yes, Article VIII of the Stand-Alone Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee ("Special Committee").  The Special Committee is comprised of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation").  On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee with the mandate to conduct the Investigation.  As of the date hereof, the Investigation remains ongoing.  To the extent the Investigation concludes there are viable Claims and/or Causes of Action against certain parties, such parties will be expressly carved out of the Released Parties and the Exculpated Parties, and such Claims and/or Causes of Action will be retained by the Reorganized Debtors.

**THE RELEASES AND EXCULPATIONS IN THE STAND-ALONE PLAN ARE EXPRESSLY SUBJECT TO THE OUTCOME OF THE INVESTIGATION, AND THE COMMITTEE'S RIGHTS TO OBJECT TO SUCH PROVISIONS OR SEEK TO LIMIT THE SCOPE OF SUCH PROVISIONS.**

"Released Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; and (c) each Related Party of each Entity in clauses (a) and (b); *provided* that Alameda and any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party shall not be "Released Parties."

"Releasing Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) all Holders of Claims that vote to accept the Stand-Alone Plan; (d) all Holders of Claims that are deemed to accept the Stand-Alone Plan and who do not affirmatively opt out of the releases provided by the Stand-Alone Plan; (e) all Holders of Claims or Interests that are deemed to reject the Stand-Alone Plan and who do not affirmatively opt out of the releases provided by the Stand-Alone Plan; (f) all Holders of Claims who abstain from voting on the Stand-Alone Plan and who do not affirmatively opt out of the releases provided by the Stand-Alone Plan; (g) all Holders of Claims who vote to reject the Stand-Alone Plan and who do not affirmatively opt out of the releases provided by the Stand-Alone Plan; and (h) each Related Party of each Entity in clauses (a) through (g); *provided* that Alameda shall not be a "Releasing Party."

"Exculpated Parties" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; and (c) each Related Party of each Entity in clauses (a) through (b); *provided* that Alameda shall not be an "Exculpated Party."

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE STAND-ALONE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE STAND-ALONE PLAN; (II) VOTE TO REJECT THE STAND-ALONE PLAN OR ARE DEEMED TO REJECT THE STAND-ALONE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE STAND-ALONE PLAN; OR (III) ABSTAIN FROM VOTING ON THE STAND-ALONE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE STAND-ALONE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY**

**RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE REORGANIZED DEBTORS.**

　　1.　　*Releases by the Debtors.*

Notwithstanding anything contained in the Stand-Alone Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Stand-Alone Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Stand-Alone Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Stand-Alone Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Stand-Alone Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

　　2.　　*Release by Holders of Claims or Interests.*

Except as expressly set forth in the Stand-Alone Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Stand-Alone Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors'

out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Stand-Alone Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

3.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Stand-Alone Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Stand-Alone Plan, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Stand-Alone Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Stand-Alone Plan, the administration and implementation of the Stand-Alone Plan, including the issuance of Securities pursuant to the Stand-Alone Plan, or the distribution of property under the Stand-Alone Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Stand-Alone Plan or the reliance by any Exculpated Party on the Stand-Alone Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Stand-Alone Plan.

The Exculpated Parties have, and upon Consummation of the Stand-Alone Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Stand-Alone Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Stand-Alone Plan or such distributions made pursuant to the Stand-Alone Plan.

4.    *Injunction.*

Except as otherwise provided in the Stand-Alone Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Stand-Alone Plan; (b) have been released pursuant to Article VIII.B of the Stand-Alone Plan; (c) have been released pursuant to Article VIII.C of the Stand-Alone Plan; (d) are subject to exculpation pursuant to Article VIII.D of the Stand-Alone Plan; or (e) are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Stand-Alone Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any Claims, Interests, Causes of Action, or liabilities

that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any discharged, released, settled, compromised, or exculpated Claims, Interests, Causes of Action, or liabilities.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Stand-Alone Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Stand-Alone Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Stand-Alone Plan.

**M.      What is the deadline to vote on the Stand-Alone Plan?**

The Voting Deadline is [October 24, 2022], at 4:00 p.m. (prevailing Eastern Time).

**N.      How do I vote for or against the Stand-Alone Plan?**

Detailed instructions regarding how to vote on the Stand-Alone Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Stand-Alone Plan. To be counted as votes to accept or reject the Stand-Alone Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**O.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Stand-Alone Plan and recognizes that any party in interest may object to Confirmation of the Stand-Alone Plan.

**P.      When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for [Wednesday, November 1, 2022], at [●] [a/p].m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Stand-Alone Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Stand-Alone Plan must be filed and served on the Debtors, and certain other parties, by [October 24, 2022,] at [4:00] [p].m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Stand-Alone Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**Q.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**R.      What is the effect of the Stand-Alone Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Stand-Alone Plan will be consummated on the Effective Date, which is the first business day after which all conditions precedent to Consummation have been satisfied or waived.  *See* Article IX of the Stand-Alone Plan.  On or after the Effective Date, and unless otherwise provided in the Stand-Alone Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Stand-Alone Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Stand-Alone Plan will be deemed authorized and approved.

**S.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

**1.      *Stand-Alone Plan.***

If the Debtors effectuate a Stand-Alone Plan, Holders of Claims who receive, as of the Effective Date, distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval from the Holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**2.      *Third-Party Transaction.***

In the event of a Third-Party Transaction, the purchaser (the "Winning Bidder") may obtain control over the Debtors' assets or the equity in Reorganized Voyager.  The Winning Bidder may have interests that differ from those of Holders of Claims and may act in a manner adverse to the interests of Holders of Claims.

**T.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VI herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**U.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Stand-Alone Plan?**

If you have any questions regarding this Disclosure Statement or the Stand-Alone Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
Email:  voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Stand-Alone Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

## V.      THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.      The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held. Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[13] A simplified version of the Debtors' current corporate structure is as follows:



### B.      The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the Company's

---

[13]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.

services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1.    *The Trading Platform.*

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2.    *Custodial Services.*

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3.    *Staking.*

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4.    *Voyager's Lending Program.[14]*

Prior to the Petition Date, to provide their platform with PIK Rewards, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in either cash or payment-in-kind (i.e., a Bitcoin loan accrues interest payable in Bitcoin). During these

---

[14]    The Lending Program is described in further detail in the First Day Declaration.

chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Alameda.

### 5.    *Using Voyager's Platform.*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App").  Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer.  Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital LLC.  When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock").  All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform.  If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account.  If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### C.    **The Debtors' Capital Structure.**

### 1.    *The Debtors' Debt Obligations.*

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[15]  However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions.  The aggregate value of the USDC outstanding is $75 million.[16]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans, or BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date.  Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

### 2.    *The Equity Interests in the Debtors.*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

---

[15]    Assuming a Bitcoin price of $20,000.

[16]    As a stablecoin, USDC is pegged to $1 per coin.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

#### 1.    *2020 and 2021 Market Conditions.*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses from all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

#### 2.    *Cryptocurrency Industry-Wide Sell-off.*

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. Distressed situations faced by two industry participants—Terra and 3AC—exacerbated this

"cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

**(a)    The Terra Luna Collapse.**

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its platform), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per share and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per share. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-share price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

**(b)    Three Arrows Capital Loan and Liquidation.**

As described above, Voyager loaned out a portion of its cryptocurrency assets to third parties. The Voyager customer agreement expressly provides that Voyager may loan the customer's deposited assets (which are pooled with all other retail customers' deposited assets) to third parties when they agree to the Voyager customer agreement, a requirement to depositing assets with Voyager. Loans are typically made in the form of cryptocurrency to, among other things, facilitate the counterparty's transactions or provide the counterparty with additional liquidity of a specific type of token.

Accordingly, in March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan"). Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC. The 3AC Loan was callable at any time by the Company. 3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

The collapse of Luna had a significant effect on the cryptocurrency industry. Many cryptocurrency-focused hedge funds and other cryptocurrency companies owned Luna and incurred losses on their position after they sold. Some participants were unable to sell their Luna shares under staking agreements or other lock-up agreements. Those participants took a 99 percent loss on their investment if they were prohibited from selling their Luna shares before it eventually bottomed out.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions. The

Company made a request for a repayment by 3AC of 25 million USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

### B.      Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry (a "Sale") and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (a "Financing," and together with a Sale, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below. Among the deal structures considered for the Financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry. By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors. Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a Stand-Alone Restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court Financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required. Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis. Potential Counterparties were similarly reticent to participate in an out-of-court Financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Third-Party Transaction. However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential Stand-Alone Restructuring.

### C.      Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors: (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

D.     **Voyager's Decision to Commence these Chapter 11 Cases.**

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager, as well as stabilize the Company's business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[17]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business.  However, as the cryptocurrency markets continued to trend down, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief to ensure that the Debtors could preserve value.

## VII.    EVENTS OF THE CHAPTER 11 CASES

A.     **First and Second Day Relief and Other Case Matters.**

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting the First Day Motions and applications on interim and final bases:

(i)     *The Joint Administration Order* authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)    *The Foreign Representative Order* authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)   *The Credit Matrix Order* authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv)    *The Automatic Stay Order* restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)     *The Schedules and Statements Order* authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements of Financial Affairs must be filed by 30 days [Docket No. 59];

(vi)    *Order Retaining Stretto as Noticing Agent* authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

---

17    Approximately 97% of customers on Voyager's platform have less than $10,000 in their account.

(vii)   ***The Wages Order*** authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)  ***The Taxes Order*** authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)    ***The Interim Cash Management Orders*** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[18]

(x)     ***The NOL Order*** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock [Docket No. 238];

(xi)    ***The Insurance Order*** authorizing the Debtors to honor existing obligations in respect thereof [Docket No. 239]; and

(xii)   ***The Case Management Order*** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following the Second Day Hearing a, the Bankruptcy Court entered orders granting the following relief:

(i)     ***The Interim Compensation Order*** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)    ***The Ordinary Course Professionals Order*** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)   ***Applications to Retain Professionals*** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

    i.    Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];

    ii.   Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. [●]];

    iii.  Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. [●]];

    iv.   Stretto, Inc. as administrative advisor [Docket No. 241]; and

    v.    Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242].

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11.  The postpetition compensation of all of the Debtors' professionals retained pursuant to

---

[18]   On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84].  On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court. Certain other retention applications and second day motions were approved by the Bankruptcy Court on [●], 2022, and [●], 2022. *See* Docket Nos. [●] and [●].

### B.    Appointment of Unsecured Creditors' Committee.

On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 102].[19]  The seven-member Committee is currently composed of the following members:  Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman.  The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.

### C.    Schedules and Statements.

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional 30 days for a total of 44 days after the Petition Date.  Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022.  This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On [●], 2022, the Debtors filed their Schedules and Statements [Dockets No. [●]].  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

### D.    Bar Date Motion.

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion").  On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time.  The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

### E.    The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion").  The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Account") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and

---

[19]    Such notice was subsequently amended by the *Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173], which provided additional information on the prepetition procedures and processes for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH Chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief and the FBO Order affords the Committee with various protections, including the Debtors' providing the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the FBO Accounts. To date, the Debtors have begun processing the return of approximately $117.5 million of customer funds from the FBO Accounts.

### F.    The 3AC Liquidation Proceeding.

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[20] On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[21]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one the five creditors appointed to the committee.[22] Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims under the Stand-Alone Plan.

### G.    Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

---

[20]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[21]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[22]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[23]  The Canadian Class Action alleges claims against the Debtors' directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. The Canadian Class Action is dependent on, and inextricably intertwined with, the Debtors' alleged conduct.  To prove many of the claims in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, which allegedly requires a vicarious finding of underlying wrongdoing by the Debtor, Voyager Digital Ltd.  The Canadian Class Action may also require a determination as to whether the Debtors' crypto-based financial products are securities at all—an unsettled legal issue in Canada and the United States.  On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[24]  On, August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiffs' motion seeking for appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[25]

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint press release regarding their demand that Voyager cease and desist from making false or misleading representations of deposit insurance status.  While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that there were no misrepresentations with respect to the Debtors' deposit insurance status.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, general contracts, billing disputes, taxes and surcharges, consumer protection, marketing, trademark and patent infringement, employment, regulatory, tort, claims of competitors and disputes with other companies.  Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### H.    The Coinify Sale Motion.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe").  Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd.  Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business.  On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify.  In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations.  On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement").  The Coinify Purchase Agreement contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge.  On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify.  Accordingly, the Debtors adjourned the Coinify Motion while they continue to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business.

---

[23]    *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[24]    *Voyager Digital Holdings, Inc. v. De Sousa, et a.l*, Adv. Pro. No 22-01133 (MEW).

[25]    *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

I.        **The Post-Petition Sale Process.**

On July 13, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bid Procedures Motion"). The Bid Procedures Motion was was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures establish an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complement and continue the Prepetition Marketing Process described in greater detail in Article 0 herein.

The timeline set forth in the Bidding Procedures is calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provide the Debtors with a clear and fair process to ascertain interest in the Debtors' business and facilitate a sale of the Debtors' business if a value-maximizing bid is received.

**The Sale Schedule**

Pursuant to the Bidding Procedures, the potential Third-Party Transaction will proceed on the following timeline:

| Action | Description | Deadline |
|---|---|---|
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline"). | August 26, 2022 at 12:00 p.m. prevailing Eastern Time. |
| Auction | The date and time of the auction, if one is needed, which will be held at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022. | August 29, 2022 at 10:00 a.m., prevailing Eastern Time, if needed. |
| Sale Objection Deadline | The deadline by which objections to the entry of an order by the Court approving the Third-Party Transaction must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline"). | September 6, 2022, at 4:00 p.m., prevailing Eastern Time. |
| Sale Hearing | The hearing before the Court to consider approval of the successful Bid or Bids, pursuant to which the Debtors and the Winning Bidder or Bidders will consummate the Third-Party Transaction. | September 8, 2022 at 11:00 a.m., prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |

**The Confirmation Schedule**

Pursuant to the Bidding Procedures, the Debtors intend to solicit votes to accept or reject the Stand-Alone Plan on the following confirmation timeline, which is consistent with the Bankruptcy Code:

| Action | Description | Deadline |
|---|---|---|
| Deadline to file Disclosure Statement | The deadline for the Debtors to file the Disclosure Statement. | August 12, 2022 |
| Disclosure Statement Objection Deadline | The deadline by which objections to the Disclosure Statement must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Disclosure Statement Objection Deadline"). | September 9, 2022, at 4:00 p.m. prevailing Eastern Time. |
| Disclosure Statement Hearing | The date for the hearing for the Bankruptcy Court's approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Hearing"). | September 15, 2022, at 11:00 a.m., prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |
| Solicitation Deadline | The deadline for distributing Solicitation Packages, including ballots, to holders of claims entitled to vote to accept or reject the Stand-Alone Plan (the "Solicitation Deadline"). | September 26, 2022, or 10 days after entry of the Order approving the Disclosure Statement. |
| Plan Objection and Plan Voting Deadlines | The deadline by which (a) objections to the Stand-Alone Plan must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Plan Objection Deadline"), and (b) all ballots must be properly executed, completed, and delivered so that they are actually received by the Debtors' notice, claims, and solicitation agent (the "Plan Voting Deadline"). | October 24, 2022, at 4:00 p.m., prevailing Eastern Time. |
| Confirmation Hearing | The hearing before the Court to consider approval of the successful Bid or Bids and Confirmation of the Stand-Alone Plan (the "Confirmation Hearing"). | November 1, 2022, at [●]:00 [a/p].m., prevailing Eastern Time. |

### J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

The KERP Motion will be heard at a hearing before the Bankruptcy Court on August 24, 2022.

### K.    Canadian Recognition Proceeding.

On August 11, 2022, the Debtors sought and were granted a Recognition Order by Mr. Justice Cavanagh of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to which the Chapter 11

Cases were recognized in Canada under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings").  Among other things, the Recognition Order and the Supplemental Order: (i) recognized the Chapter 11 Cases as a foreign main proceeding; (ii) recognized Voyager Digital Ltd.as the Foreign Representative of the Debtors in Canada; (iii) recognized certain first-day orders granted by the Bankruptcy Court; (iv) granted a stay of proceedings in Canada in respect of the Debtors, their property and business, and their directors and officers; (v) prohibited the commencement of any proceedings against the Debtors in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings.

## VIII.    PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit C** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning [●] and continuing through [●].  The Financial Projections are based on an assumed Effective Date of [●].  To the extent that the Effective Date occurs before or after [●], recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE STAND-ALONE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE STAND-ALONE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE STAND-ALONE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE STAND-ALONE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Stand-Alone Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Stand-Alone Plan and its implementation.

### 1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against in the Debtors.*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against in the Debtors than the terms of the Stand-Alone Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Stand-Alone Plan, or the Chapter 11 Cases, or the threat of rejection of the Stand-Alone Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

## 2.    *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Stand-Alone Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Stand-Alone Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)    **Parties in Interest May Object to the Stand-Alone Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Stand-Alone Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b)    **The Conditions Precedent to the Effective Date of the Stand-Alone Plan May Not Occur.**

As more fully set forth in Article IX of the Stand-Alone Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

### (c)    **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Stand-Alone Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Stand-Alone Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Holders of Allowed Claims as those proposed in the Stand-Alone Plan.

### (d)    **The Debtors May Not Be Able to Secure Confirmation of the Stand-Alone Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Stand-Alone Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Stand-Alone Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Stand-Alone Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Stand-Alone Plan, reserve the right to modify the terms and conditions of the Stand-Alone Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Stand-Alone Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Stand-Alone Plan or no distribution whatsoever under the Stand-Alone Plan.

### (e)    Nonconsensual Confirmation.

In the event that any Impaired Class of Claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Stand-Alone Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Stand-Alone Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Stand-Alone Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### (f)    Continued Risk After Consummation.

Even if the Stand-Alone Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Stand-Alone Plan will achieve the Debtors' stated goals.

### (g)    Filing of a Competing Plan.

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Stand-Alone Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Stand-Alone Plan upon filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Stand-Alone Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### (h)    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a

chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### (i)        The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Stand-Alone Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Stand-Alone Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### (j)        Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

### (k)        Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Stand-Alone Plan.

The distributions available to Holders of Allowed Claims under the Stand-Alone Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Stand-Alone Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Stand-Alone Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Stand-Alone Plan.

### (l)        Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Stand-Alone Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Stand-Alone Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Stand-Alone Plan.

### 3.        *Even if the Restructuring Transactions Are Successful, the Debtors Will Continue to Face Risks.*

The Restructuring Transactions are generally designed to improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, changes in cryptocurrency prices, changes in the cryptocurrency regulatory environment, and changes in the Debtors' customer base.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

4.      *Risks Related to the New Common Stock.*

The following are some of the risks that apply to Holders of Claims against the Debtors who become Holders of the New Common Stock if such New Common Stock is distributed pursuant to the Stand-Alone Plan.  There are additional risk factors attendant to ownership of the New Common Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Stand-Alone Plan.

(a)      **The Estimated Value of the New Common Stock in Connection with the Stand-Alone Plan May Differ from the Actual Value of the New Common Stock.**

The estimated value of the New Common Stock for purposes of estimating recovery percentages under the Stand-Alone Plan represents a valuation of the Reorganized Debtors and assumes that, among other things, such Reorganized Debtors continue as an operating business.  Such valuation does not purport to constitute an appraisal of the Reorganized Debtors or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors or their assets, which may be materially different than the estimated value of the New Common Stock.  Accordingly, the estimated value of the New Common Stock does not necessarily reflect the actual market value of the New Common Stock that might be realized after Confirmation and Consummation of the Stand-Alone Plan, which may be materially lower than the estimated valuation of the New Common Stock as set forth in this Disclosure Statement.  Accordingly, such estimated value is not necessarily indicative of the prices at which the New Common Stock may trade after giving effect to the transactions set forth in the Stand-Alone Plan.

(b)      **An Active Trading Market May Not Develop for the New Common Stock.**

The New Common Stock will be a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Stock.  If no active trading market in the New Common Stock develops, the market price and liquidity of the New Common Stock may be adversely affected.  If a trading market does not develop or is not maintained, holders of New Common Stock may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all.  Even if a trading market were to materialize, such market could have limited liquidity and the New Common Stock could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Stand-Alone Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, prevailing interest rates, conditions in financial markets, or prospects and investor expectations thereof.  As a result, there may be limited liquidity in any trading market that does develop for the New Common Stock.  Finally, the New Organizational Documents may also contain restrictions on the transferability of the New Common Stock (such as rights of first refusal/offer, tag-along rights, and/or drag-along rights, among others), which may adversely affect the liquidity in the trading market for the New Common Stock.

(c)      **The Trading Prices for the New Common Stock May Be Depressed Following the Effective Date.**

Following the Effective Date, recipients of New Common Stock under the Stand-Alone Plan may seek to dispose of such securities to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the lack of established trading markets for these securities.  Furthermore, the possibility that recipients of New Common Stock may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New Common Stock.

(d)      **A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.**

Consummation of the Stand-Alone Plan may result in a small number of holders owning a significant percentage of the outstanding New Common Stock in the Reorganized Debtors.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.  A party in control of the Reorganized Debtors may have interests that differ from those of the other Holders of shares of New Common Stock and may act in a manner adverse to the interests of other Holders of shares of New Common Stock.  Such concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized

Debtors and consequently impact the value of the shares of New Common Stock. In addition, a party in control of the Reorganized Debtors may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A party in control of the Reorganized Debtors may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business and, as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by parties in control of the Reorganized Debtors may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

    (e)   **The New Common Stock Are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank junior to all debt claims against the Reorganized Debtors. As a result, holders of New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

    (f)   **Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

To the extent that the New Common Stock is issued under the Stand-Alone Plan pursuant to section 1145(a) of the Bankruptcy Code, such New Common Stock may be resold by the holders thereof without registration under the Securities Act, unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock pursuant to the Stand-Alone Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act or another applicable exemption.

The New Common Stock will not be registered under the Securities Act or any state securities law, and the Reorganized Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the New Common Stock.

    (g)   **The Consideration Under the Stand-Alone Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Stand-Alone Plan.

    (h)   **The Terms of the New Common Stock Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Common Stock have not been finalized and are subject to ongoing negotiations. The results of such negotiations may alter the terms of the New Common Stock in a material manner. As a result, the final terms of the New Common Stock may be less favorable to Holders of Claims than as described herein and in the Stand-Alone Plan.

    5.   *Governmental Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Stand-Alone Plan.

B.       **Risks Related to Recoveries under the Stand-Alone Plan.**

1.       *The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.*

The financial projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.

There is no guarantee that the financial projections will be realized, and actual financial results may differ significantly from the financial projections. To the extent that the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Common Stock. Furthermore, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Debtors to seek additional working capital. The Reorganized Debtors may be unable to obtain such working capital when it is required, or may only be able to obtain such capital on unreasonable or cost-prohibitive terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors and also have a negative effect on the value of the New Common Stock. In addition, if any such required capital is obtained in the form of equity, the New Common Stock to be issued to Holders of Allowed Claims could be diluted.

2.       *Estimated Valuations of the Debtors, the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values.*

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the financial projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

3.       *Holders of Claims That Acquire the New Common Stock May Assert Significant Control over the Reorganized Debtors.*

On the Effective Date, the Reorganized Debtors shall issue the New Common Stock to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Stand-Alone Plan. As a result, following the Consummation of a Stand-Alone Restructuring, certain Holders of Allowed Claims may exercise substantial influence over the Reorganized Debtors and their affairs.

4.       *The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XIII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Stand-Alone Plan," to determine how the tax implications of the Stand-Alone Plan and the Chapter 11 Cases may adversely affect the Debtors.

C.    **Risks Related to the Debtors' Businesses.**[26]

1.    ***The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service Their Indebtedness.***

The Reorganized Debtors' ability to generate cash to fund their operations and make scheduled payments on or refinance their debt obligations following emergence depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to fund their operations and pay the principal, premium, if any, and interest on their indebtedness or to refinance it on acceptable terms or at all.

2.    ***The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.***

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan and continue as a going concern will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Stand-Alone Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with vendors, service providers, customers, employees, independent contractors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with service providers, customers, employees, independent contractors, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.    ***Financial Results May Be Volatile and May Not Reflect Historical Trends.***

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as the platform freeze, asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ

---

[26]    For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Reorganized Debtors after the Effective Date.

materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

**4.    *Cryptocurrency is Volatile, and Instability Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition.***

The Debtors' operating results are dependent on cryptocurrency assets and the broader cryptocurrency economy. Due to the highly volatile nature of the cryptocurrency economy and the prices of cryptocurrency assets, the Debtors' operating results have, and will continue to, fluctuate significantly from quarter to quarter in accordance with market sentiments and movements in the broader cryptocurrency economy. In addition, the Debtors' operating results may be impacted by a variety of factors, many of which are unpredictable and in certain instances are outside of the Debtors' control, including:

- decline in the cryptocurrency market or general economic conditions;

- regulatory uncertainty and risk of the internet and cryptocurrency economy, including changes in laws and regulations or the interpretation or application or enforcement thereof and the obtaining of regulatory approvals;

- recategorization of a particular cryptocurrency asset's or product offering's status as a "security" or "commodity" in any relevant jurisdiction, which may result in greater regulatory scrutiny, investigations, fines, and other penalties;

- risks related to managing the Debtors' growth;

- dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;

- the failure of the cryptocurrency industry to grow and develop at the rate the Debtors expect;

- loss of a critical banking or insurance relationship, which could adversely impact the Debtors' business, operating results, and financial condition;

- any significant disruption in the Debtors' products and services, in their information technology systems, or in any of the blockchain networks the Debtor support;

- counterparty risk and credit risk;

- lending risks;

- technology and infrastructure risks, including their ability to meet surges in demand or the introduction of a temporary or permanent blockchain fork;

- cybersecurity risks;

- competition in the Debtors' industry and markets;

- the Debtors' reliance on third-party service providers;

- system failure, outages, or interruptions, including with respect to the Debtors' cryptocurrency platform and third-party cryptocurrency networks;

- lack of control over decentralized or third-party blockchains and networks that may experience downtime, cyber-attacks, critical failures, errors, bugs, corrupted files, data losses, or other similar software failures, outages, breaches, and losses;

- breaches of security or privacy;

- inaccessibility of the Debtors' platform due to their or third-party actions;

- exchange rate fluctuations; and

- risks related to the Debtors' ability to adapt to rapid technological change.

**5.     *The Future Development and Growth of Cryptocurrency Is Subject to a Variety of Factors that Are Difficult to Predict and Evaluate.  If Cryptocurrency Does Not Grow As the Debtors Expect, the Debtors' Business, Operating Results, and Financial Condition Could Be Adversely Affected.***

Cryptocurrency assets built on blockchain technology were only introduced in 2008 and remain in the early stages of development.  Many other cryptocurrency networks, ranging from cloud computing to tokenized securities networks, have only recently been established.  In addition, different cryptocurrency assets are designed for different purposes.  The further growth and development of any cryptocurrency assets and their underlying networks and other cryptographic and algorithmic protocols governing the creation, transfer, and usage of cryptocurrency assets represent a new and evolving paradigm that is subject to a variety of factors that are difficult to evaluate, including:

- many cryptocurrency networks have limited operating histories, have not been validated in production, and are still in the process of developing and making significant decisions that will affect the design, supply, issuance, functionality, and governance of their respective cryptocurrency assets and underlying blockchain networks, any of which could adversely affect their respective cryptocurrency assets;

- many cryptocurrency networks are in the process of implementing software upgrades and other changes to their protocols, which could introduce bugs or security risks or adversely affect the respective cryptocurrency networks;

- security issues, ineffective source codes, bugs, and software errors have been identified with many cryptocurrency assets and their underlying blockchain networks, some of which have been exploited by malicious actors.  There are also inherent security weaknesses in some cryptocurrency assets, such as when creators of certain cryptocurrency networks use procedures that could allow hackers to counterfeit tokens.  Any weaknesses identified with a cryptocurrency asset could adversely affect its price, security, liquidity, and adoption.  If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the compute or staking power on a cryptocurrency network, as has happened in the past, it may be able to manipulate transactions, which could cause financial losses to holders, damage the network's reputation and security, and adversely affect its value;

- the development of new technologies for mining, such as improved application-specific integrated circuits (commonly referred to as ASICs), or changes in industry patterns, such as the consolidation of mining power in a small number of large mining farms, could reduce the security of blockchain networks, lead to increased liquid supply of cryptocurrency assets, and reduce a cryptocurrency's price and attractiveness;

- if rewards and transaction fees for miners or validators on any particular cryptocurrency network are not sufficiently high to attract and retain miners, a cryptocurrency network's security and speed may be adversely affected, increasing the likelihood of a malicious attack and/or the miners or validators could collude to raise transaction fees, which could adversely affect the usage of digital currency networks;

- many cryptocurrency assets have concentrated ownership or an "admin key," allowing a small group of holders to have significant unilateral control and influence over key decisions related to their cryptocurrency networks, such as governance decisions and protocol changes, as well as the market price of such cryptocurrency assets;

- the governance of many decentralized blockchain networks is by voluntary consensus and open competition, and many developers are not directly compensated for their contributions.  As a result, there may be a lack of consensus or clarity on the governance of any particular cryptocurrency network, a lack of incentives for developers to maintain or develop the network, and other unforeseen issues, any of which could result in

unexpected or undesirable errors, bugs, or changes, or stymie such network's utility and ability to respond to challenges and grow; and

- many cryptocurrency networks are in the early stages of developing partnerships and collaborations, any of which may not succeed and adversely affect other participants in the cryptocurrency ecosystem.

### 6.    *Loss of Customers and/or Inability to Attract New Customers.*

The Debtors operate in a highly competitive industry and compete with, among others, other cryptocurrency trading platforms, large traditional retail investment platforms, and alternative asset brokerage services.  The Debtors have experienced the adverse effects of increasing competition in recent years, and the Chapter 11 Cases may put the Debtors at a competitive disadvantage.  If the Debtors or Reorganized Debtors are unable to maintain a competitive position, they could experience increased negative pressure on demand for their services and a loss of customers or inability to attract new customers, which in turn would have a material adverse effect on their businesses, financial condition, and results of operations.

### 7.    *Cyberattacks and Security Breaches of the Debtors' Platform, or those Impacting the Debtors' Customers or Third Parties, Could Adversely Impact Their Brand and Reputation.*

The Debtors' business involves the collection, storage, processing, and transmission of confidential information, customer, employee, service provider, and other personal data as well as information required to access customer assets.  The Debtors have built their reputation on the premise that their platform offers customers a secure way to purchase, store, and transact in cryptocurrency assets.  As a result, any actual or perceived security breach of the Debtors or their third-party partners may:

- harm reputation and brand;

- result in systems or services being unavailable and interrupting operations;

- result in improper disclosure of data and violations of applicable privacy and data protection laws, which could in turn result in the theft of client identities;

- result in significant regulatory scrutiny, investigations, fines, penalties, and other legal, regulatory, and financial exposure;

- cause incurrence of significant remediation costs;

- lead to theft or irretrievable loss of fiat currencies or cryptocurrency assets; and

- reduce customer confidence in, or decreased use of, products and services.

Furthermore, any actual or perceived breach or cybersecurity attack directed at other financial institutions or cryptocurrency companies, whether or not the Debtors are directly impacted, could lead to a general loss of customer confidence in the cryptocurrency economy or in the use of technology to conduct financial transactions, which could negatively impact the Debtors, including the market perception of the effectiveness of the Debtors' security measures and technology infrastructure.  An increasing number of organizations, including large merchants, businesses, technology companies, and financial institutions, as well as government institutions, have disclosed breaches of their information security systems, some of which have involved sophisticated and highly targeted attacks, including on their websites, mobile applications, and infrastructure.

**8.      *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Operating Results, and Financial Condition.*[27]**

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy requires the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IX.C.9), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business is difficult to predict.

**9.      *The Debtors May Not Retain the Necessary Money Transmission Approvals Upon Effectuation of a Restructuring Transaction.***

States may not approve pending, or revoke existing, Money Transmission Licenses as a result of the effectuation of either the Stand-Alone Plan or Third-Party Transaction. The state banking departments will have broad discretion as to the approvals required in connection with the Stand-Alone Plan or a Third-Party Transaction; thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately granted, and the expected timeframes of the state banking departments' determinations.

**10.      *The Debtors Compete Against a Growing Number of Decentralized and Noncustodial Platforms and Their Business May Be Adversely Affected if the Debtors Fail to Compete Effectively Against Them.***

The Debtors also compete against an increasing number of decentralized and noncustodial platforms. On these platforms, users can interact directly with a market-making smart contract or on-chain trading mechanism to exchange one type of cryptocurrency asset for another without any centralized intermediary. These platforms are typically not as easy to use as the Debtors' platform, and some lack the speed and liquidity of centralized platforms, but various innovative models and incentives have been designed to bridge the gap. In addition, such platforms have low startup and entry costs as market entrants often remain unregulated and have minimal operating and regulatory

---

[27]     Certain regulatory bodies have already commenced actions, which are described in IX.C.9.

costs. A significant number of decentralized platforms have recently been developed and released, and many such platforms have experienced significant growth and adoption.

> **11.      *The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations.***

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Stand-Alone Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC issued a second subpoena with additional requests for information and documents. Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, Voyager received a cease and desist order from the Federal Deposit Insurance Corporation and Board of Governors of the Federal Reserve Board regarding their demand that Voyager cease and desist from making false or misleading representations of deposit insurance status. Voyager took immediate steps to ensure no misrepresentations of the deposit insurance status and clarify, if needed, that any deposit insurance is in accordance with the FBO Accounts held at MC Bank.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. Voyager is working to provide the CFTC with information that its responsive to its requests.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[28] on March 29, 2022, which required a response within 28 days. Alabama extended the response deadline to September 30, 2022. On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Alabama with the remaining responsive materials.

---

[28]    Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

Indiana issued a cease and desist order[29] on March 29, 2022. Indiana submitted a motion extending the time by which Voyager must respond to the order and request a hearing. Voyager submitted a second motion extending that deadline until August 15, 2022. Indiana confirmed receipt of Voyager's motion and agreed to the August 15 deadline. Voyager is currently expecting a file-stamped copy of its motion. Voyager has requested a further extension of the deadline until October 31, 2022, but has yet to hear back from the state regulator.

Kentucky issued an emergency cease and desist order[30] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[31] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. However, all response deadlines have been extended until October 31, 2022.

Oklahoma issued a cease and desist order[32] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently on August 1, 2022, Oklahoma extended the deadline by which to respond to the order and request a hearing until August 31, 2022.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[33] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until August 31, 2022.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. Most recently, on August 3, 2022, Vermont extended the response deadline to August 31, 2022. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials.

---

[29]    Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[30]    Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[31]    New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[32]    Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[33]    South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

Washington issued a statement of charges and notice of opportunity for a hearing[34] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022.

Texas issued a notice of hearing[35] on April 12, 2022. On April 21, 2022, Texas issued an order setting the hearing date for September 7, 2022 at 9:00 a.m. via Zoom. Prior to this hearing, by August 26, 2022, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.

California issued a desist and refrain order[36] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Georgia issued a subpoena on July 19, 2022, for certain information on Voyager's customers and business operations.

Washington, D.C. issued a summary cease and desist order[37] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022.

### 12.    *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

---

[34] Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[35] The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[36] California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[37] Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

13. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their chapter 11 petitions or before Confirmation of the Stand-Alone Plan (a) would be subject to compromise and/or treatment under the Stand-Alone Plan and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a Plan could be asserted against the reorganized entity and may have an adverse effect on the Debtors' financial condition and results of operations.

D. **Miscellaneous Risk Factors and Disclaimers.**

1. **The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. **No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Stand-Alone Plan or whether to object to Confirmation.

3. **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Stand-Alone Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4. **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Stand-Alone Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5. **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6. **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information

set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Stand-Alone Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

<p style="text-align:center">**7.**     *No Representations Outside This Disclosure Statement Are Authorized.*</p>

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE STAND-ALONE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE STAND-ALONE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.  VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

**X.     SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Stand-Alone Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Stand-Alone Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

<div style="border:1px solid black; text-align:center">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

**A.     Classes Entitled to Vote on the Stand-Alone Plan.**

The following Classes are entitled to vote to accept or reject the Stand-Alone Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|---|---|---|
| 3 | Account Holder Claims | Impaired |
| 5 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

**B.     Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a plan of reorganization by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a

<p style="text-align:center">53</p>

class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**C.     Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Stand-Alone Plan should consider prior to voting to accept or reject the Stand-Alone Plan.  These factors may impact recoveries under the Stand-Alone Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Stand-Alone Plan and the Disclosure Statement;

- although the Debtors believe that the Stand-Alone Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Stand-Alone Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Stand-Alone Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article X of this Disclosure Statement.

**D.     Classes Not Entitled To Vote on the Stand-Alone Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Stand-Alone Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Deemed to Accept |
| 2 | Other Priority Claims | Deemed to Accept |
| 4 | Alameda Loan Facility Claims | Deemed to Reject |
| 6 | Section 510(b) Claims | Deemed to Reject |
| 7 | Intercompany Claims | Presumed to Accept |
| 8 | Intercompany Interests | Presumed to Accept |
| 9 | Existing Equity Interests | Deemed to Reject |

**E.     Solicitation Procedures.**

**1.     *Claims, Noticing, and Solicitation Agent.***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Stand-Alone Plan.

### 2.    *Solicitation Package.*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Stand-Alone Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3.    *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors are causing the Claims, Noticing, and Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on [September 26, 2022] (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).  Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

### F.    Voting Procedures

[September 15, 2022,] (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Stand-Alone Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Stand-Alone Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on [October 24, 2022,] at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Stand-Alone Plan, such Claim Holder is

automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Stand-Alone Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Stand-Alone Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE STAND-ALONE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE STAND-ALONE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE STAND-ALONE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE STAND-ALONE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE STAND-ALONE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE STAND-ALONE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.    **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Stand-Alone Plan or if the Debtors waive a material condition to Confirmation of the Stand-Alone Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Stand-Alone Plan cast with respect to that Claim will be counted for purposes of determining whether the Stand-Alone Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report").  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Stand-Alone Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Stand-Alone Plan or is marked both to accept and reject the Stand-Alone Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Stand-Alone Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE NUMBER AT (855) 473-8665.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE STAND-ALONE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Stand-Alone Plan is accepted by all impaired Classes of Claims and Interests or, if the Stand-Alone Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Stand-Alone Plan and a determination that the Stand-Alone Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Stand-Alone Plan is feasible; and (iii) the Stand-Alone Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4 Alameda Loan Facility Claims, Holders of Class 5 General Unsecured Claims, Holders of Class 6 Section 510(b) Claims, Holders of Class 7 Intercompany Claims, Holders of Class 8 Intercompany Interests, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Stand-Alone Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Stand-Alone Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Stand-Alone Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Stand-Alone Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Stand-Alone Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Stand-Alone Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Stand-Alone Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Stand-Alone Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Stand-Alone Plan, or each non-accepting Holder will receive or retain under the Stand-Alone Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Stand-Alone Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Stand-Alone Plan, determined without including any acceptance of the Stand-Alone Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Stand-Alone Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### B.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Stand-Alone Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As set forth in greater detail in Article IV.E of this Disclosure Statement, Holders of Account Holder Claims and General Unsecured Claims would likely receive significantly reduced recoveries in a hypothetical liquidation due to, among other things, (i) the expenses and costs of a Liquidating Trustee, (ii) the payment of Claims in U.S. Dollars instead of cryptocurrency, which would not account for the appreciation of cryptocurrency during these chapter 11 cases, and (iii) the loss of assets and synergies (such as intellectual property) that negatively impacts the value of distributable assets in a liquidation. Accordingly, the Debtors believe that the Stand-Alone Plan is in the best interests of creditors.

### C.    Feasibility.

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Stand-Alone Plan provides for the distribution of the Debtors' assets. The Debtors believe that sufficient funds will exist to make all payments required by the Stand-Alone Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the

legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Stand-Alone Plan, including Classes of Claims or Interests deemed to reject the Stand-Alone Plan, the Debtors will request Confirmation of the Stand-Alone Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Stand-Alone Plan in accordance with Article X of the Stand-Alone Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Stand-Alone Plan as to such Debtor.

The Debtors believe that the Stand-Alone Plan and the treatment of all Classes of Claims and Interests under the Stand-Alone Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Stand-Alone Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Stand-Alone Plan.

#### 1.    *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.    *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Stand-Alone Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Stand-Alone Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Stand-Alone Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Stand-Alone Plan.

(a)    **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)    **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    IMPORTANT U.S. SECURITIES LAWS DISCLOSURES

The Debtors believe the New Common Stock to be issued pursuant to the Stand-Alone Plan to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

### A.    Issuance of Securities under the Stand-Alone Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.  In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  In reliance upon this exemption, the Debtors believe that the offer and sale of the New Common Stock to be issued pursuant to the Stand-Alone Plan will be exempt from registration under the Securities Act and state securities laws with respect to any such holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### B.    Subsequent Transfers of Securities Issued under the Stand-Alone Plan.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who, except with respect to ordinary trading transactions of an entity that is not an issuer:

- purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under the plan of reorganization for the holders of such securities;

- offers to buy securities offered or sold under the plan of reorganization from the holders of such securities if the offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Stand-Alone Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be "underwriters" may, however, be permitted to sell such securities without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules generally permit the public sale of securities received by "underwriters" subject to certain holding periods if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any securities issued pursuant to the Stand-Alone Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving securities under the Stand-Alone Plan would be an "underwriter" with respect to such securities.

**PERSONS WHO RECEIVE SECURITIES UNDER THE STAND-ALONE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER U.S. FEDERAL, FOREIGN, OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF U.S. FEDERAL, FOREIGN, AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE STAND-ALONE PLAN.**

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE STAND-ALONE PLAN**

**A.    Introduction.**

The following discussion is a preliminary overview of certain U.S. federal income tax consequences of the consummation of the Stand-Alone Plan to the Debtors, the Reorganized Debtors, and to Holders entitled to vote to accept or reject the Stand-Alone Plan. The Debtors expect to supplement the below short-form overview with a more fulsome discussion of the U.S. federal income tax consequences of the consummation of the Stand-Alone Plan at a later point in time. *Any such supplement may deviate in material ways from the content in this preliminary overview as the Debtors (together with their advisors and other relevant stakeholders) continue to study the numerous tax issues applicable to the Stand-Alone Plan—all Holders of Claims and Interests are urged to consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Stand-Alone Plan.* This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Stand-Alone Plan, to transactions that might occur as a result of the ongoing marketing process, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and generally do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Stand-Alone Plan. No portion of this preliminary overview or any future supplement is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Reorganized Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE STAND-ALONE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This preliminary overview does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Stand-Alone Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Stand-Alone Plan to the Debtors, Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This preliminary overview does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Stand-Alone Plan, or (b) that are deemed to reject the Stand-Alone Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Stand-Alone Plan.

**ACCORDINGLY, THE FOLLOWING PRELIMINARY OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS**

B.    **Certain U.S. Federal Income Tax Consequences of the Stand-Alone Plan to the Debtors.**

The tax consequences of the implementation of the Stand-Alone Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "<u>Taxable Transaction</u>") or as a recapitalization of the Debtors (a "<u>Recapitalization Transaction</u>"). It has not yet been determined how the Restructuring Transactions will be structured under Applicable Tax Law.[38] If the transactions undertaken pursuant to the Stand-Alone Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.

Thus, the U.S. federal income tax consequences of a Taxable Transaction to the Debtors will in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this and other U.S. federal income tax issues relevant to a Taxable Transaction, and, to the extent possible, the Debtors will elaborate on them in a supplement to this discussion.

C.    **Certain U.S. Federal Income Tax Consequences of the Stand-Alone Plan to U.S. Holders[39] of Allowed Claims Entitled to Vote.**

1.    *Taxable Transaction.*

The U.S. federal income tax consequences of a Taxable Transaction to U.S. Holders of Allowed Claims entitled to vote may depend, in part, on the way that such a Taxable Transaction is structured. The Debtors are actively analyzing different transaction structures, and any supplement hereto will describe in greater detail the expected U.S.

---

[38] The Debtors will discuss certain U.S. federal income tax consequences of a Recapitalization Transaction, both as to the Debtors and Reorganized Debtors, on the one hand, and to certain Holders, on the other hand, in a supplement hereto if it appears reasonably likely that such a transaction may be effectuated.

[39]    The Debtors will discuss certain U.S. federal income tax consequences of the consummation of the Stand-Alone Plan to Non-U.S. Holders in a supplement hereto to the extent the Debtors determine such a supplement is necessary or appropriate based on the Debtors' understanding of the residence of Holders.

federal income tax consequences of the consummation of the Stand-Alone Plan to U.S. Holders of Allowed Claims entitled to vote.

Importantly, though the Debtors (together with their advisors and other relevant stakeholders) continue to study the issue (including with respect to whether some portion of the consideration to be distributed under the Stand-Alone Plan could be received in a tax-deferred manner), the Debtors currently expect that there is a material risk that any version of a Taxable Transaction will result in a taxable event for U.S. Holders of Account Holder Claims and General Unsecured Claims with respect to the consideration that they receive under the Stand-Alone Plan in exchange for their Claims, even if such Taxable Transaction involves the migration of customers to an acquiring cryptocurrency platform and an attempt to preserve the customer's cryptocurrency position, rather than fully "dollarizing" such claims. Although the tax treatment of customer deposits to customers is itself subject to uncertainty, the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the Tax Code because it does not involve an exchange of property "differing materially either in kind or in extent." There is an argument that the same position could be taken with respect to the return by the Debtors of cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency is itself not an exchange of property "differing materially either in kind or in extent." However, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. The Debtors continue to study whether there is a position that would permit Holders to take the position that, in a situation involving the migration of customers to a different entity in connection with a Taxable Transaction, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction. The Debtors also continue to study whether this argument, when combined with a general "bifurcation" approach that separates the recovery Holders receive into cryptocurrency and non-cryptocurrency components, may permit Holders to take the position that, in the context of a Taxable Transaction, Holders retain their cryptocurrency positions in a tax-free manner, even if the receipt of other consideration constitutes a taxable exchange. The Debtors emphasize that these positions are unclear and may ultimately not be sustained.

Very generally, to the extent a transaction is taxable to a Holder, each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration received under the Stand-Alone Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with a taxable transaction. The Debtors generally expect such loss would arise *when such transaction is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under section 166 when a debt has become entirely worthless. As set forth in the Stand-Alone Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Stand-Alone Plan.

2.     *Recapitalization Transaction.*

The tax consequences of a Recapitalization Transaction to a U.S. Holder are similarly unclear.  It is likely that the receipt by customers of any consideration other than a continuing stake in a customer's underlying cryptocurrency (including, for the avoidance of doubt, the receipt of Debtor stock, Debtor-issued cryptocurrency (except with respect to persons that receive such Debtor-issued cryptocurrency in respect of their currently-held Debtor-issued cryptocurrency), and cash) will be taxable and subject to the same rules discussed above. The Debtors continue to study whether there is a reasonable position that the receipt of the cryptocurrency underlying a customer claim, or a continuing deposit position with respect to such cryptocurrency, could be "bifurcated" from the taxable elements of the transaction and subject to tax-free treatment.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE STAND-ALONE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE STAND-ALONE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

\* \* \* \* \*

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Stand-Alone Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Stand-Alone Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Stand-Alone Plan support Confirmation and vote to accept the Stand-Alone Plan.

|  | Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors |
|---|---|
| By: | */s/ Stephen Ehrlich* |
| Name: | Stephen Ehrlich |
| Title: | Co-Founder and Chief Executive Officer Voyager Digital Ltd. |

Prepared By:

Dated: August 12, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Stand-Alone Plan**

**Exhibit B**

**Liquidation Analysis**

**<u>Exhibit C</u>**

**Financial Projections**

**Exhibit D**

**Valuation Analysis**