**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING**
**THE SHARE PURCHASE AGREEMENT BY AND AMONG**
**VOYAGER EUROPEAN HOLDINGS APS AND ASCENSION APS**
**AND RELATED DOCUMENTS, (II) AUTHORIZING THE PRIVATE SALE OF**
**EQUITY INTERESTS IN COINIFY APS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the Debtors for entry of an order (this "Order"),

(i) approving that certain Share Purchase Agreement, by and among Voyager European Holdings

ApS (the "Seller") and Ascension ApS (the "Buyer") and related documents, attached hereto as

**Exhibit 1** and incorporated herein by reference (the "Share Purchase Agreement");[2]

(ii) authorizing and approving the private sale of Coinify to Buyer (the "Sale"); and (iii) granting

related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and

this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, entered February 1, 2012; and this Court having the power to enter a final

order consistent with Article III of the United States Constitution; and this Court having found that

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and
Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving
Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Share Purchase
Agreement.

and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:[3]

1.      The Motion is granted to the extent set forth herein.

2.      The Share Purchase Agreement and the Sale are hereby approved as being in the best interest of the Debtors' estates.  The Debtors are hereby authorized and empowered to cause the Seller to enter into, consummate, implement and perform its obligations under the Share Purchase Agreement, and to execute, deliver, and perform such other agreements, instruments, and documents and take any other actions that may be reasonably necessary or desirable to implement and effectuate the terms of the Share Purchase Agreement, this Order, and the Sale, including, without limitation, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring Coinify to Buyer, as may be necessary or appropriate to the performance of Seller's obligations as contemplated by the Share Purchase Agreement, without any further corporate action or orders of the Court.

---

[3]    All findings of fact and conclusions of law set forth above or announced by the Court at the hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

3.      Upon the Closing Date, the Debtors shall be, and hereby are, authorized and empowered to cause the Seller to sell and assign Coinify to Buyer.

4.      Subject to the terms of the Share Purchase Agreement, the Share Purchase Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the parties thereto without further action or order of the Court; *provided*, *however*, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Share Purchase Agreement and any related agreements.

5.      The failure specifically to include any particular provisions of the Share Purchase Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, Seller, and Buyer that the Share Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties to the Share Purchase Agreement in accordance with this Order.

6.      This Order and the Share Purchase Agreement shall be binding upon all parties in interest in these cases, including, without limitation, the Debtors and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates, and all creditors of the Debtors (whether known or unknown).

7.      The Debtors shall cause the Seller to cooperate with Buyer and Buyer will cooperate with Seller, in a commercially reasonable manner, in each case to ensure that the transaction contemplated by the Share Purchase Agreement is consummated, and the Debtors shall cause the Seller to make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Share Purchase Agreement.

8.      This Order shall inure to the benefit of Buyer, the Seller, the Debtors, and their respective successors and assigns, including but not limited to any chapter 11 or chapter 7 trustee that may be appointed in the Debtors' cases, and shall be binding upon any trustee, party, entity, or fiduciary that may be appointed in connection with these cases or any other or further cases involving the Debtors, whether under chapter 7 or chapter 11 of the Bankruptcy Code.

9.      The Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order and to decide any disputes concerning this Order.

10.     Notwithstanding Bankruptcy Rules 6004 and 7062, this Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a) and shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

11.     The provisions of this Order are non-severable and mutually dependent.

12.     To the extent any provisions of this Order conflict with the terms and conditions of the Share Purchase Agreement, this Order shall govern and control.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

Dated:  New York, New York
        August 16, 2022

                                              /s/ **Michael E. Wiles**
                                              THE HONORABLE MICHAEL E. WILES
                                              UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1**

**Share Purchase Agreement**

**BRUUN & HJEJLE**

Execution copy

---

# Share Purchase Agreement

---

**CONCERNING** ## Coinify ApS

---

13 July 2022

B R U U N & H J E J L E

## Contents

1. Definitions and interpretation .................................................................................... 3
2. Sale and purchase of Shares ..................................................................................... 6
3. Purchase Price ............................................................................................................. 6
4. Conclusion of the Agreement .................................................................................... 7
5. Operations until Closing ............................................................................................ 8
6. Conditions precedent ................................................................................................. 8
7. Pre-Closing deliveries ................................................................................................ 9
8. Closing ......................................................................................................................... 9
9. Actions after Closing .................................................................................................10
10. Seller's Warranties ....................................................................................................11
11. Buyer's Warranties ....................................................................................................12
12. Seller's liability ...........................................................................................................13
13. Buyer's liability ..........................................................................................................14
14. Joint tax .......................................................................................................................15
15. Confidentiality and publication ...............................................................................15
16. Other provisions ........................................................................................................16
17. Governing law and disputes ....................................................................................17

## Schedules

Schedule 4.1(a)        Seller's signing documents
Schedule 4.1(b)        Company's approval of this Agreement
Schedule 4.2(a)        Buyer's signing documentation
Schedule 8.2(d)        Share pledge agreement concerning the Shares
Schedule 9.4.1         Form of loan note
Schedule 14.1          Joint tax
Schedule 15.5          Press release

DocuSign Envelope ID: 48F-08A877-0153-4BF8-AB92-F2F3F5EF76A9C

**BRUUN & HJEJLE**

This Agreement was concluded on 13 July 2022 by and among

Voyager European Holdings ApS
CVR no. 42 54 05 52
Højbro Plads 10, 4.
1200 Copenhagen C
(the "**Seller**")

and

Ascension ApS
CVR no. 25 34 85 59
Poppel Alle 28
Hareskov
3500 Værløse
Denmark
(the "**Buyer**")

(each a "**Party**" and jointly the "**Parties**")

1.      **Definitions and interpretation**

1.1     In this Agreement, the following words and expressions have the meanings
        stated below, unless the context requires otherwise.

| | |
|---|---|
| **"Agreement"** | This share purchase agreement with Schedules. |
| **"Affiliate"** | With respect to any Person, any other Person directly or indirectly, Controlling, or Controlled by, or under common Control with such Person. |
| **"Bankruptcy Code"** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended. |
| **"Bankruptcy Court"** | The United States Bankruptcy Court for the Southern District of New York. |
| **"Bankruptcy Rules"** | The Federal Rules of Bankruptcy Procedure. |
| **"Breach"** | Any failure to fulfil the obligations under the Agreement. |
| **"Business Day"** | A day (weekends and holidays excluded) on which the commercial banks in Denmark, Toronto (Canada) and New York City (United States) are generally open for business (except for |

DocuSign Envelope ID: 48F08A877-0155-4BF8-AB92-FFE3F5E7E5A8C

BRUUN & HJEJLE

|  | banking business being conducted exclusively through the Internet). |
|---|---|
| **"Buyer"** | As set forth in the introduction to this Agreement. |
| **"Cash Purchase Price"** | Has the meaning defined in clause 3.1. |
| **"Chapter 11 Cases"** | The procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. |
| **"Closing Date"** | The date of Closing. |
| **"Closing"** | The Parties' mutual fulfilment of the obligations described in clause 4. |
| **"Company"** | Means Coinify ApS, CVR no. 35847995, c/o Matrikel 1 office no. 401, Højbro Plads 10, 4., 1200 Copenhagen K, Denmark. |
| **"Confidential Information"** | Has the meaning defined in clause 15.1. |
| **"Control"** | The, direct or indirect, (i) possession of more than fifty (50) % of the ownership interest or voting rights in a legal entity, (ii) the right to appoint or remove the majority of the members of the board of directors (disregarding such members who are elected or appointed by the employees of such legal entity or by organizations of employees) or the similar management level of a legal entity, and/or (iii) the power to otherwise control the financial and/or operating policies of a legal entity, and "**Controlling**" and "**Controlled**" shall be constructed accordingly. |
| **"Corporate Documents"** | The articles of association, memorandum of association and the rules of procedure for the board of directors and the executive board. |
| **"Debtors"** | Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC. |
| **"Earn Out"** | Has the meaning defined in clause 3.3. |
| **"Exit Proceeds"** | Means the proceeds (in cash or shares) actually received by the Buyer in an Exit less any transaction costs. |

DocuSign Envelope ID: 8F08A877-0157-4BF8-AB92-F7F3F5EE35A90

**B R U U N & H J E J L E**

| | |
|---|---|
| **"Exit"** | Means an event whereby a material part of the value of the Company is realized in consideration for cash or shares irrespective of whether such event is carried out as (i) a trade sale by the Buyer of more than 50% of the Company's shares, (ii) a sale of the Company's activities, including a sale of all or a material part of the Company's assets or all or a material part of the Company's intellectual property rights, (iii) an initial public offering (IPO) of the Company's shares, or (iv) a merger whereby the Company is the discontinuing entity. |
| **"Law"** | Any law, rule, regulation, statute, directive, international regulation, treaty or any other legally binding requirements in any country or jurisdiction, and the regulations and orders promulgated thereunder. |
| **"Loss"** | Any loss, damage, claim, liability, cost or expense (including reasonable legal fees) calculated in accordance with and recoverable under the Laws of Denmark and this Agreement. |
| **"Parties"** | The Seller and the Buyer and a "Party" shall mean either of them. |
| **"Person"** | Any natural or legal person. |
| **"Purchase Price"** | Has the meaning defined in clause 3.1. |
| **"Schedule"** | A schedule (including all attachments, if any) to this Agreement. |
| **"Seller's Bank Account"** | A USD account to be designated by the Seller no later than 3 Business Days prior to the Closing Date. |
| **"Shares"** | Means nominal DKK 450,153 shares in the Company equal to 100 % of the Company's nominal share capital. |
| **"Signing Date"** | The date on which the Parties sign the Agreement. |
| **"Tax"** | Any and all direct and indirect tax liabilities, both current and deferred, including income tax, corporation tax, capital gains tax, VAT and sales tax, withholding taxes, including but not limited to A tax (A-skat) and labour market contributions, dividend tax, interest tax and royalty tax, registration fees, stamp duties, customs duties, social security contributions and costs, |

DocuSign Envelope ID: 8F08A877-0153-4EF8-AB92-F7E5F5E7E98C

**BRUUN & HJEJLE**

|  |  |
|---|---|
|  | property taxes and similar taxes, including interest, fees, additional tax and tax penalties and payments under the Danish joint taxation regime. |
| **"Third Party Rights"** | Any type of legal charge, property right, right to utilize, right of first refusal, purchase option, retention of title, option, title and any other current or potential third party right. |
| **"USD"** | U.S. Dollar, the official currency of United States of America. |
| **"Warranties"** | The representations and warranties made by the Seller or the Buyer, respectively, as set out in clauses 10 and 11, each of them a "**Warranty**". |

1.2     This Agreement is the result of the Parties' negotiations, and it cannot be interpreted against a Party as a consequence of such Party having drafted or made amendments to one or more of the provisions of this Agreement.

1.3     Expressions, such as "including" and similar expressions, mean "including, but not limited to".

1.4     Words in the singular include the plural and vice versa.

1.5     The headings of this Agreement are for guidance only and have no legal effect on the understanding or interpretation of the provisions of this Agreement.

1.6     If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

**2.     Sale and purchase of Shares**

2.1     In accordance with the terms and conditions of this Agreement, the Seller shall sell to the Buyer and the Buyer shall purchase from the Seller the Shares free and clear from any Third Party Rights.

2.2     The Parties agree that with effect from the Closing Date, the Buyer will acquire all rights attaching to the Shares, including title, voting rights and the rights to receive dividends.

**3.     Purchase Price**

3.1     The purchase price (the "**Purchase Price**") for the Shares is USD 2,000,000 (the "**Cash Purchase Price**") to be paid as set forth in clause 3.2 plus the Earn Out referred to in clause 3.3.

3.2     The Cash Purchase Price shall be paid in three equal installments as follows:

**6**

DocuSign Envelope ID: 48F080A877-0157-4BF8-AB92-F7E5F5F75A9C

BRUUN & HJEJLE

    (a)    At Closing, the Buyer shall pay to the Seller USD 666,666.67 by way of wire transfer of such funds to the Seller's Bank Account.

    (b)    On the date that is one (1) month after the Closing Date, the Buyer shall pay to the Seller USD 666,666.67 by way of wire transfer of such funds to the Seller's Bank Account (or such other bank account designated by the Seller in writing).

    (c)    On the date that is two (2) months after the Closing Date, the Buyer shall pay to the Seller USD 666,666.66 (less the amount of any interim loan funding actually paid to the Company as provided for in clause 9.4.1) by way of wire transfer of such funds to the Seller's Bank Account (or such other bank account designated by the Seller in writing).

3.3    In addition to the Cash Purchase Price, the Seller shall be eligible to receive an earn out (the "**Earn Out**") in accordance with the principles set forth below:

3.3.1    In the event that the Buyer signs an agreement or otherwise commits to complete an Exit on or before the third anniversary of the Closing Date and such transaction is actually consummated, the Buyer shall pay to the Seller an Earn Out amount to be calculated as 12.5% of the Buyer's Exit Proceeds.

3.3.2    In the event that the Exit Proceeds consist of shares or a combination of shares and cash, the Buyer shall pay to the Seller a cash amount equal to the Seller's portion of the purchase price attributed to such shares in the transaction.

3.3.3    The Earn Out amount shall be capped at USD 15,000,000.

3.3.4    The Earn Out payment must be paid by the Buyer to the Seller by way of wire transfer of such funds to the Seller's Bank Account (or such other bank account designated by the Seller in writing) no later than 10 Business Days after the later of (i) completion of the Exit (ii) such date when the relevant amount is received by the Buyer.

3.4    The Purchase Price shall be deemed final and, hence, not be subject to later adjustments, except pursuant to clauses 9.4.1 and 12.8.

**4.**    **Conclusion of the Agreement**

4.1    On the Signing Date, the Seller has provided documentation:

    (a)    That this Agreement has been duly signed by the Seller in accordance with the Seller's registered rules regulating the power to bind the Seller by way of a transcript from the Danish Business Authority, enclosed as Schedule 4.1(a).

    (b)    That the Company's board of directors has approved the transfer of Shares pursuant to this Agreement, enclosed as Schedule 4.1(b).

DocuSign Envelope ID: 8F08A877-0153-4FF8-AB92-FE5F5E5E5A9C

4.2    On the Signing Date, the Buyer has provided documentation

    (a)  That this Agreement has been duly signed by the Buyer in accordance with the Buyer's registered rules regulating the power to bind the Buyer by way of a transcript from the Danish Business Authority, enclosed as <u>Schedule 4.2(a)</u>.

**5.**    **Operations until Closing**

5.1    The Seller shall procure that, in the interim period from the Signing Date until Closing, the Company (i) carries on its business in the ordinary course and in accordance with existing practice (taking the state of the Company's business into consideration) so as to maintain its business as a going concern, including by giving the Company's senior management team the widest degree of autonomy legally permissible to operate the Company in such interim period and (ii) does not terminate any employment contract with the Company's senior management team or make any new material hires of employees without the prior written consent of the Buyer.

**6.**    **Conditions precedent**

6.1    The Parties' obligation to proceed to Closing is subject to the following conditions:

    (a)  The Seller obtaining approval from the Bankruptcy Court overseeing the Chapter 11 Cases  to consummate the transactions contemplated by this Agreement.

    (b)  The Bankruptcy Court finding that cause exists to waive the 14-day stay period under Bankruptcy Rule 6004(h) or such 14-day period shall have expired.

    (c)  The Company not having filed any petition for winding-up, dissolution, liquidation, bankruptcy or receivership or for the appointment of a trustee, an administrator or a supervisor and no petition having been presented and no meeting having been convened for such purpose.

6.2    The Seller shall use all reasonable endeavors to fulfil, or ensure the fulfilment of, the conditions precedent listed in this clause 6, and shall notify the Buyer immediately upon the satisfaction of such.

6.3    The Agreement may only be terminated prior to Closing

    (a)  By either Party, if the conditions precedent stated in clauses 6.1 (a)  or 6.1(b) are not satisfied or waived on or before 30 September 2022;

    (b)  By the Buyer, if the Seller has committed a material Breach of its obligations under clauses 6.1(c) or 6.2; or

    (c)  by the Parties' written agreement.

DocuSign Envelope ID: 8F08A877-0153-4FF8-AB92-FE5E5EE5E90

BRUUN & HJEJLE

6.4    Notwithstanding termination of the Agreement under clause 6.3, the Parties'
obligations under clauses 15 and 17 will survive for an indefinite term.

**7.      Pre-Closing deliveries**

7.1    The Seller must no later than three (3) Business Days prior to the date agreed
for Closing, as set out in clause 8.1, deliver a draft Closing memorandum to the
Buyer.

**8.      Closing**

8.1    Closing will take place electronically on the date falling five (5) Business Days
after the conditions precedent set out in clause 6 has been duly satisfied or
waived by the Parties, as applicable.

8.2    At Closing, the Seller must take the following actions and deliver the following
documents:

(a)    Deliver transcripts of the Company's electronic register of shareholders
documenting that the Buyer is registered as owner of the Shares free
from any Third Party Rights.

(b)    Deliver letters of resignation signed by Stephen Jay Ehrlich and Lewis
Bateman. Each letter of resignation must state that the resigning board
members will resign effective as of Closing and that they do not have
any claims against the Company as of the Closing Date.

(c)    Deliver a statement from the Seller and Voyager Digital Ltd., Reg. no.
BC0392838, 33 Irving Place, Suite 3060 3rd floor, New York, NY 10003,
USA ("**Voyager**"), confirming (i) that as of the Closing Date the Seller
and Voyager have no claims (actual or pending) against the Company
and (ii) that Seller and Voyager have not entered into any agreements or
incurred any liabilities for or on behalf of the Company outside the or-
dinary course of business of the Company.

(d)    Deliver a copy of the share pledge agreement attached hereto as <u>Sched-
ule 8.2(d)</u> concerning the Shares duly executed by the Seller.

8.3    At Closing, the Buyer must take the following actions and deliver the following
documents:

(a)    Transfer USD 666,666.67 to the Seller's Bank Account in accordance with
clause 3.2(a).

(b)    Deliver a copy of the share pledge agreement attached hereto as Sched-
ule 8.2(d) concerning the Shares duly executed by the Buyer.

8.4    Closing shall be deemed to have occurred, once the actions set out in clauses
8.2 - 8.3 have occurred.

9

DocuSign Envelope ID: 8F-08A877-0154-4BF8-AB92-FE5E5EE7E9AC

BRUUN & HJEJLE

8.5     The actions taken under clauses 8.2 - 8.3 will be considered to have been taken simultaneously, and none of the actions taken by one Party will be considered to have been taken until the actions to be taken by the other Party have been taken.

8.6     If a Party fails to fulfil its obligations at Closing under clauses 8.2 - 8.3, such failure will be considered as a breach of the Agreement to the effect that the other Parties will become entitled to;

(a)     terminate the Agreement with immediate effect; and

(b)     receive indemnification against its Loss from the Party in Breach.

**9.     Actions after Closing**

9.1     Filings

9.1.1     The Buyer must hold a general meeting of the Company promptly after Closing for the purpose of electing new members of the board of directors in replacement of the members resigning in accordance with clause 8.2(b). The Buyer must register the changes with the Danish Business Authority as soon as practicably possible after the Closing Date.

9.1.2     The Buyer must as soon as possible after Closing register the change of ownership of the Company with the Danish public register of shareholders in accordance with applicable Law.

9.2     Further assurance

9.2.1     Subject to the limitations under applicable Law, each of the Parties shall sign and deliver any such documents and take any such actions as may reasonably be required by the other Party in order to carry out the provisions of this Agreement and to consummate the transactions contemplated hereby.

9.3     Access to books and records

9.3.1     Following Closing, the Buyer will give the Seller and the Seller's advisers reasonable access to (i) all of the Company's information and documentation relevant for the Seller and the Seller's affiliates to close out Q2, Q3 and Q4 2022 financials as well as prepare, complete audit of and file their audited annual report 2022 and (ii) during working hours, the Company's management and employees, who shall at no cost to the Seller render all such assistance to the Seller and its advisers which is reasonably necessary for the Seller and the Seller's affiliates to close out Q2, Q3 and Q4 2022 financials as well as prepare, complete audit of and file their annual report 2022, provided in each case that any such information and assistance shall be delivered in a way that is as little a burden to the Company and its management and employees as reasonably possible.

9.4     Interim loan funding

DocuSign Envelope ID: 8F08A877-0153-4EF8-AB92-F7E2F5EF5A90

BRUUN & HJEJLE

9.4.1    In the interim period between the Signing Date and the earlier of Closing and 1 October 2022, the Seller shall ensure that the Company's board of directors accepts any bona fide proposal from the Company's CEO to raise loan financing for essential working capital needs on terms as set out in the form of loan note attached as <u>Schedule 9.4.1</u> from the Buyer, the Buyer's Affiliates or from third party financing providers designated by the Buyer.

9.4.2    Any such loan financing provided by the Buyer to the Company pursuant to clause 9.4.1 shall reduce the Cash Purchase Price USD for USD and be set off in the third instalment as set out in clause 3.2(c).

9.4.3    If additional funding is provided to the Company pursuant to clause 9.4.1 and the transaction contemplated by this Agreement is not consummated for any reason, the Seller shall condition any subsequent sale of the Company or its assets on such financing being repaid in full to the respective lender by the acquiror or the Company in connection with such subsequent transaction.

9.4.4    The Parties specifically agree that any proposal(s) for loan financing cumulatively totaling more than (i) USD 300,000 before 1 September 2022 or (ii) more than USD 500,000 before 1 October 2022 shall be presumed to not be "bona fide" proposals for the purpose of clause 9.4.1, as that would exceed what is anticipated to be required for essential working capital needs of the Company during the interim period between the Signing Date and Closing. In addition, without the prior agreement of the Buyer and the Seller in writing, no loan financing will be funded after 1 October 2022.

9.4.5    For the avoidance of doubt, the Seller has the discretion to refuse to ensure that the Company's board of directors accepts any non-bona fide proposals to raise loan financing.

**10.    Seller's Warranties**

10.1    The ultimate owners of the Buyer (i) are the Company's founders, (ii) had up until 1 August 2021 a substantial ownership interest in the Company, and (iii) form part of the Company's senior management team (CEO and board member, respectively) as at the Signing Date and the Closing Date. The Buyer accordingly has detailed knowledge of and insight into the Company's business and the Seller's warranties are therefore limited to the fundamental warranties listed in clause 10.2.

10.2    The Seller warrants to the Buyer that each of the following warranties is true and accurate in all respects (subject to the terms and conditions set out in this Agreement, including the condition precedent set out in clause 6):

(a)    The Seller is a Danish limited liability company incorporated in accordance with Danish legislation and registered with the Danish Business Authority.

DocuSign Envelope ID: 48F08A877-0153-4FF8-AB92-FE5F5E5F5A9C

(b)   The Seller has the required organisation and is entitled (i) to operate its business; (ii) to own its assets; (iii) to sue and be sued; (iv) to conclude this Agreement; and (v) to fulfil its obligations under this Agreement.

(c)   The Seller is not required to have this Agreement and the fulfilment of the obligations of this Agreement approved by any shareholder, creditor or other Person or to file or register this Agreement with any public authority unless otherwise provided by this Agreement.

(d)   This Agreement is binding on the Seller, and its terms may be enforced against the Seller.

(e)   The conclusion of this Agreement and the fulfilment of the obligations of this Agreement do not conflict with (i) the Seller's Corporate Documents; (ii) any judgment, court order or other decision made by a court, arbitration tribunal or public authority being binding on the Seller; or (iii) any legislation to which the Seller is subject.

(f)   The Seller has not been met with any claim or lawsuit, and is not a party to any dispute before a court, arbitration tribunal or public authority, which may prevent or delay Closing, except for the approval set forth in clause 6.1(a).

(g)   The Shares represent the entire issued and outstanding share capital of the Company. The Seller has full and unrestricted title to the Shares, which are all fully paid up and free and clear of all Third Party Rights.

(h)   The Company has not issued or resolved to issue any financial instruments that entitle or may in the future entitle any person to receive, subscribe for, convert to or otherwise acquire any share capital or any other security giving rise to a right over, or an interest in, the share capital of the Company.

10.3   The Seller's warranties set out in clause 10.1 are given with effect as per the Signing Date and the Closing Date.

10.4   The Seller's warranties set out in clause 10.1 are the Seller's complete and only warranties in connection with this Agreement. The Buyer is not entitled to rely on any assumptions, warranties, agreements or declarations not explicitly stated in this Agreement.

**11.   Buyer's Warranties**

11.1   The Buyer warrants to the Seller that each of the following warranties is true and accurate in all respects:

(a)   The Buyer is a Danish limited liability company incorporated in accordance with Danish legislation and registered with the Danish Business Authority.

DocuSign Envelope ID: 9F08A877-0153-4FF8-AB92-FFE5E5E5E9BC

(b)    The Buyer has the required organisation and is entitled (i) to operate its business; (ii) to own its assets; (iii) to sue and be sued; (iv) to conclude this Agreement; and (v) to fulfil its obligations under this Agreement.

(c)    The Buyer is not required to have this Agreement and the fulfilment of the obligations of this Agreement approved by any shareholder, creditor or other Person or to file or register this Agreement with any public authority unless otherwise provided by this Agreement.

(d)    This Agreement is binding on the Buyer, and its terms may be enforced against the Buyer.

(e)    The conclusion of this Agreement and the fulfilment of the obligations of this Agreement do not conflict with (i) the Buyer's Corporate Documents; (ii) any judgment, court order or other decision made by a court, arbitration tribunal or public authority being binding on the Buyer; or (iii) any legislation to which the Buyer is subject.

(f)    The Buyer has not been met with any claim or lawsuit, and is not a party to any dispute before a court, arbitration tribunal or public authority, which may prevent or delay Closing.

11.2    The Buyer's Warranties set out in clause 11.1 are given with effect as per the Signing Date and the Closing Date.

**12.    Seller's liability**

12.1    In the event of any Breach by the Seller of the Agreement, the Seller must indemnify and hold the Buyer harmless against and from any Loss in accordance with the general principles of Danish Law, subject to the limitations stated in this clause 12.

12.2    Notwithstanding anything herein to the contrary, the Seller shall not be liable for any indirect or consequential Loss (in Danish: "*indirekte tab og følgeskader*").

12.3    The Buyer's Loss shall be calculated on a DKK-for-DKK basis without regard to any methods of calculation used for the determination of the Purchase Price.

12.4    When calculating a Loss, the Buyer must take into account any amount and any benefit that the Buyer or the Company has received or is entitled to receive from a third party as a result of the Breach or the Loss, and any such amount and benefit must be set off against the Buyer's claim, including (i) any net Tax benefit that the Buyer or the Company has received or is entitled to receive as a result of such Breach or Loss, and (ii) any insurance payment or benefit that the Buyer or the Company has received or is entitled to receive in respect of such Loss.

12.5    No loss will be considered a Loss under the Agreement to the extent that:

DocuSign Envelope ID: 8F08A877-0157-4BF8-AB92-F2F0F5FF7EA9C

BRUUN & HJEJLE

(a)   it is caused or increased as a result of voluntary acts or omissions of the Buyer or the Company after Closing (other than any acts or omissions carried out pursuant to (i) the requirements of any mandatory Law, or (ii) legally binding obligation created on or before Closing); or

(b)   it would not have arisen but for changes in Laws, regulations or practices of any governmental authority not finally enacted and published on the Closing Date.

12.6    The Buyer is required to mitigate any Loss in accordance with the general rules of Danish Law. In furtherance of the foregoing, the Buyer undertakes and agrees to use commercially reasonable efforts to recover from a third party any Loss for which an indemnity payment hereunder may be due. If the Buyer receives payment from a third party in respect of a Loss against which the Seller has already indemnified the Buyer, the Buyer shall promptly reimburse the Seller up to the amount paid by the Seller in indemnification hereunder.

12.7    The Seller shall have no obligation to indemnify the Buyer for any Loss in respect of a Breach of the Seller's Warranties if the Buyer fails to give notice of the claim to the Seller no later than 11:59 pm CET on the date which is 12 months following the Closing Date.

12.8    Any amount of indemnification paid by the Seller to the Buyer under the Agreement shall be regarded as a reduction of the Purchase Price.

12.9    In no event can the liability of the Seller under the Agreement exceed the Purchase Price (including for the avoidance of doubt any Earn Out payable pursuant to clause 3.3).

12.10   After Closing, the rights described in this clause 12 are the Buyer's exclusive remedy for a Breach by the Seller. The Buyer is not entitled to terminate (in Danish: "*hæve*") the Agreement or demand a proportionate reduction of the Purchase Price (in Danish: "*forholdsmæssigt afslag*").

12.11   The Buyer shall give notice to the Seller (in accordance with clause 16.1) promptly and in any event within 40 Business Days after the Buyer obtains actual knowledge of the events or circumstances giving rise to a claim. Failure of the Buyer to give notice to the Seller shall not relieve the Seller from liability unless – and to the extent only - that the Seller is actually prejudiced by such failure. The Buyer's notice must include (i) a reasonably detailed description of the claim, (ii) its actual and legal basis, and (iii) a calculation of the Loss or the estimated Loss together with reasonable supporting documentation, to the extent reasonably available.

**13.     Buyer's liability**

13.1    In the event of a Breach by the Buyer, the Buyer undertakes to indemnify the Seller's Loss in accordance with the general principles of Danish Law.

DocuSign Envelope ID: 48F08A877-0153-4EF8-AB92-FZE9F5F5F5A8C

**14.    Joint tax**

14.1    The Company has participated in a mandatory tax consolidation scheme with the Seller. Provisions regarding the termination of the mandatory tax consolidation scheme of the Company are set out in <u>Schedule 14.1</u>.

**15.    Confidentiality and publication**

15.1    The Parties are obligated to treat as confidential all information obtained as result of the entering into or performing of this Agreement which relates to (i) the provisions of this Agreement; (ii) the negotiations relating to this Agreement; (iii) the subject-matter of this Agreement; and (iv) the other Party (the "**Confidential Information**"), and shall abstain from using and from disclosing any such Confidential Information to any third party.

15.2    Notwithstanding clause 15.1, each Party is entitled to disclose Confidential Information if and to the extent (i) required by Law or for the purpose of any judicial proceedings between the Parties; (ii) required by any securities exchange, regulatory or governmental body, including Tax authorities, to which that Party is subject or submits, wherever situated, whether or not the requirement for information has the force of Law; (iii) such disclosure is made to a Party's owners, affiliates, directors and officers in need of the Confidential Information for the preparation, execution or consummation of this Agreement; (iv) such disclosure is made to a Party's professional advisers, auditors, bankers or prospective financing sources, or its direct or indirect investors, together with their directors, officers, advisers or agents who are, in each case, subject to a duty of confidentiality to the disclosing Party and who are made aware of the confidential nature of the information disclosed; (v) such disclosure is made in the Chapter 11 Cases for purposes of obtaining Bankruptcy Court approval of this Agreement; (vi) if and to the extent the Confidential Information has come into the public domain through no fault of that Party; or (vi) the Party to whom the Confidential Information relates gives prior written consent to the disclosure.

15.3    A Party disclosing Confidential Information in accordance with clause 15.2(iii) shall cause any permitted recipient receiving Confidential Information not to disclose to any Person or use or exploit for any purpose whatsoever any such Confidential Information, which such Party itself is prohibited from disclosing.

15.4    The Parties shall not, in any manner, directly or indirectly, make any oral or written statement that disparages or places the Company, the other Party, any subsidiary or affiliates thereof, or any of their employees, directors, shareholders or advisors, in a false or negative light, provided, however, that the Parties shall not be required to make any untruthful statement or to violate any law. The Parties shall refrain from making any statements regarding the historical ownership of the Company by either Party, but instead – upon request for a comment – provide a generic comment without reference to the other Party such as "we have no comments". Each Party shall prior to making a comment

DocuSign Envelope ID: 4F080A877-0153-4EF8-AB92-FF5F5F5F5A9C

**BRUUN & HJEJLE**

inform the other Party of such request for a comment and consult with the other Party on the content of the comment.

15.5    Immediately after the Closing Date, the Parties will issue the press release which has been jointly agreed between the Parties, attached as <u>Schedule 15.5</u>.

**16.    Other provisions**

16.1    <u>Notices</u>

16.1.1    Any notices between the Parties concerning matters arising out of this Agreement must be in writing and be sent by (i) registered letter/letter sent by courier with return receipt or (ii) e-mail to the following addresses/email addresses:

If to the Seller:
Voyager Digital Ltd.
Reg. no. BC0392838
33 Irving Place, Suite 3060 3rd Floor, New York
NY 10003, USA
Att: Stephen Ehrlich (e-mail: sehrlich@investvoyager.com) and David Brosgol (e-mail: dbrosgol@investvoyager.com)

with a copy to:

Fasken Martineau DuMoulin LLP
Bay Adelaide Centre
333 Bay Street, Suite 2400
P.O. Box 20, Toronto, ON, M5H 2T6, Canada
Att: Krisztián Tóth (e-mail: ktoth@fasken.com)

If to the Buyer:

Ascension ApS
c/o Hans Henrik Hoffmeyer
Poppel Alle 28, Hareskov
3500 Værløse
Denmark
Att: Hans Henrik Hoffmeyer (e-mail: hhh@ascension-invest.com) and Mark Højgaard (e-mail: mhn@ascension-invest.com)

with a copy to:

Bruun & Hjejle Advokatpartnerselskab
Nørregade 21
1165 Copenhagen K
Denmark
Att: Christian Eichen (e-mail: <u>cei@bruunhjejle.dk</u>)

DocuSign Envelope ID: 8F08A877-0153-4FF8-AB92-F7E2F5F7E49C

BRUUN & HJEJLE

or to such other Person, address or email address which either Party may in writing in accordance with this clause 16.1 notify to the other Party.

16.1.2    Notices shall be deemed to have been made on the date of the receipt thereof by the recipient as indicated on the return receipt, or in case of email transmission, the date of the email.

16.1.3    Any notice given under this Agreement outside working hours of the place to which it is addressed is deemed to have been given at the beginning of the next Business Day. Notice letters and emails sent to Persons designated to receive only a copy of the notice in clause 16.1.1 do not serve as notice in accordance with this clause 16.1.3. Notices must be made in English language.

16.2    <u>Assignment</u>

16.2.1    Neither Party is entitled to assign, in full or in part, the rights and obligations set out in this Agreement without the prior written consent of the other Party.

16.3    <u>Amendments and severability</u>

16.3.1    If the Parties agree to amend this Agreement, such agreement must be made in writing and signed by both Parties.

16.3.2    If any provision of this Agreement shall be held to be illegal, void, invalid or unenforceable, the legality, validity and enforceability of the rest of this Agreement shall not be affected.

16.4    <u>Costs</u>

16.4.1    Unless otherwise explicitly stated in this Agreement, each Party will pay its own costs relating to negotiating, drafting and conclusion of this Agreement and the fulfilment of the obligations of this Agreement (including all fees for its own legal, financial or other advisers).

**17.    Governing law and disputes**

17.1    This Agreement, including disputes regarding its existence or validity and disputes concerning this arbitration clause and the arbitration procedure, is governed by Danish Law (irrespective of any conflict-of-laws rules which might refer the dispute to the Laws of another jurisdiction).

17.2    Any dispute relating to or arising out of this Agreement, including any dispute concerning its existence, validity or termination, that cannot be settled amicably between the Parties within 30 Business Days after one Party's receipt of notice from the other Party including a detailed description of the dispute accompanied by all available documentation pertaining thereto, will be decided with final effect by the Danish Institute of Arbitration (Danish Arbitration). The Danish Institute of Arbitration will apply the rules of procedure in force when the application for arbitration is submitted.

DocuSign Envelope ID: 8F98A877-0153-4BF8-9B92-FEF5E5E7E680

BRUUN & HJEJLE

17.3    The number of arbitrators shall be three. Each Party will appoint one arbitrator, who shall be appointed within 30 Business Days as of submitting an application for arbitration or of receiving notice of arbitration. The third arbitrator (who shall act as chairman of the arbitral tribunal) shall be nominated by agreement of the two Party-nominated arbitrators within 15 Business Days of the nomination of the second arbitrator. If a Party fails to appoint an arbitrator, or the two Party-nominated arbitrators fail to jointly agree on and appoint the third arbitrator acting as chairman, within the deadlines set out above in this clause 17.3, the Danish Institute of Arbitration will appoint an arbitrator for that Party and/or the third arbitrator acting as chairman of the arbitration tribunal.

17.4    The arbitration proceedings will take place in Copenhagen, and the language of the proceedings will be English.

17.5    Information relating to the arbitration proceedings, including information on any decision or arbitration award, shall be considered as Confidential Information, and may not be disclosed by a Party unless in accordance with clauses 15.1-15.3, which shall apply correspondingly.

## 18.    Fiduciary Obligations

18.1    Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations, and further provided that any invocation of the preceding sentence which results in a material alteration or diminishment of any such parties' actions from the undertakings otherwise committed to herein, shall result in a corresponding, equitable modification to or release of Buyer from Buyer's undertakings herein, accordingly.

This Agreement has been executed electronically.

*[signatures on the next page]*

18

BRUUN & HJEJLE

[*Signature page for the share purchase agreement concerning Coinify ApS*]

On behalf of Voyager European Holdings ApS:

Name: Evangelos Psaropoulos
Title: CEO

On behalf of Ascension ApS:

_____        _____
Mark Højgaard                                                  Hans Henrik Hoffmeyer
Executive officer                                               Executive officer

19

BRUUN & HJEJLE

[*Signature page for the share purchase agreement concerning Coinify ApS*]

On behalf of Voyager European Holdings ApS:

_____

Name: Evangelos Psaropoulos
Title: CEO

On behalf of Ascension ApS:

DocuSigned by:

__65CDFCA5269F404_____

Mark Højgaard
Executive officer

DocuSigned by:

__D914E44E190D4EF_____

Hans Henrik Hoffmeyer
Executive officer

# ERHVERVSSTYRELSEN

Dato: 13.07.2022

# Voyager European Holdings ApS

| | |
|---|---|
| **CVR-nummer** | 42540552 |
| **Adresse** | C/O Coinify ApS Højbro Plads 10, 4. |
| **Postnummer og by** | 1200 København K |
| **Startdato** | 12.07.2021 |
| **Virksomhedsform** | Anpartsselskab |
| **Reklamebeskyttelse** | Nej |
| **Status** | Normal |

## Udvidede virksomhedsoplysninger

| | |
|---|---|
| **Kommune** | København |
| **Branchekode** | 642020 Ikke-finansielle holdingselskaber |
| **Formål** | Selskabets formål er at erhverve, eje og afhænde unoterede og noterede kapitalandele samt anden virksomhed, der står i forbindelse hermed. |
| **Regnskabsår** | 01.07 - 30.06 |
| **Seneste vedtægtsdato** | 16.12.2021 |
| **Registreret kapital** | 40.001,00 DKK |
| **Første regnskabsperiode** | 12.07.2021 - 30.06.2022 |

## Tegningsregel, personkreds og revisor

| | |
|---|---|
| **Tegningsregel** | Selskabet tegnes af direktøren. |
| **Direktion** | ( Direktør )<br>Evangelos Psaropoulos<br>303 E 83rd St<br>Apt 7B<br>New York<br>NY 10028<br>USA |
| **Stiftere** | Voyager Digital Ltd.<br>33 Irving Place<br>Suite 3060 3rd Floor<br>New York |

Erhvervsstyrelsen, Langelinie Allé 17, 2100 København Ø

Oplysningerne i dette dokument stammer fra Centrale Virksomhedsregister (CVR). Data må ikke bruges på en måde, så det kan fremstå som om, at Erhvervsstyrelsen godkender, støtter, anbefaler eller markedsfører brugeren, brugerens produkter eller tjenester. Erhvervsstyrelsen har intet ansvar for hverken indhold, oprindelse, fejl og mangler eller nogen form for skade, der måtte følge af brug af data.

DocuSign Envelope ID: 8F08A877-0157-4BF8-AB92-FE53EEE7E68C

# ERHVERVSSTYRELSEN

Dato: 13.07.2022

|  | NY 10003 |
|---|---|
|  | USA |
| **Revisor** | DELOITTE STATSAUTORISERET REVISIONSPARTNERSELSKAB |
|  | Weidekampsgade 6 |
|  | 2300 København S |

## Ejerforhold

| **Legale ejere** | Voyager Digital Ltd. |
|---|---|
|  | 33 Irving Place |
|  | Suite 3060 3rd Floor |
|  | New York |
|  | NY 10003 |
|  | USA |
|  | Ejerandel: 100% (12.07.2021 - ) |
|  | Stemmerettigheder: 100% (12.07.2021 - ) |
|  | Ændringsdato: 12.07.2021 |

| **Reelle ejere** | Virksomheden har ikke reelle ejere, og ledelsen er indsat som reelle ejere. |
|---|---|

Oplysningerne i dette dokument stammer fra Centrale Virksomhedsregister (CVR). Data må ikke bruges på en måde, så det kan fremstå som om, at Erhvervsstyrelsen godkender, støtter, anbefaler eller markedsfører brugeren, brugerens produkter eller tjenester. Erhvervsstyrelsen har intet ansvar for hverken indhold, oprindelse, fejl og mangler eller nogen form for skade, der måtte følge af brug af data.

DocuSign Envelope ID: 8F08A877-0153-4BF8-AB92-FFE5F5F7E98C

**Schedule 4.1(b) – Company's approval of this Agreement**

**Minutes of Board Meeting**

On 13 July 2022, a meeting was held by the board of directors of Coinify ApS (CVR no. 35 84 79 95) (the "**Company**").

The meeting of the board of directors was held by written procedure.

**In attendance:**

- Stephen Jay Ehrlich (chairman of the board of directors)
- Hans Henrik Hoffmeyer (member of the board of directors)

**Agenda:**

1. Formalities
2. Documents
3. Considerations
4. Resolutions

**Re item 1 – Formalities**
It was:

(a) approved that the meeting was held by a written procedure and in English in accordance with Sections 125(1) and 126(2) of the Danish Companies Act;

(b) noted that none of the members of the board of directors were prevented by the conflict of interest rules, cf. Section 131 of the Danish Companies Act, from participating in the considerations and resolutions with respect to any matter of the agenda, other than (i) in his/her capacity as a shareholder or stakeholder in the Company and/or (ii) as a director or executive officer in the Company or other companies within the same group of companies as the Company; and

(c) noted that the board of directors formed a quorum and was lawfully authorised to transact the business with respect to all matters on the agenda.

**Re item 2 – Documents**
A draft share purchase agreement between the Company's shareholder and Ascension ApS, CVR no. 25 34 85 59 (the "**SPA**") was made available prior to the meeting.

**Re item 3 – Considerations**
Reference was made to the SPA and contemplated sale of 100% of the share capital in the Company which is scheduled to be executed on or around 11 July 2022.

The board of directors noted that section 3.4 of the Company's articles of association requires the board of directors' prior consent to transfers of shares in the Company.

**Re item 4 – Resolutions**

The board of directors approved the transfer of shares contemplated by the SPA unanimously and by all votes.

There being no further business, the meeting was adjourned.

**On the board of directors of Coinify ApS:**

_____                    _____
Stephen Jay Ehrlich                          Hans Henrik Hoffmeyer
Chairman of the board of directors           Member of the board of directors

**Re item 4 – Resolutions**

The board of directors approved the transfer of shares contemplated by the SPA unanimously and by all votes.

There being no further business, the meeting was adjourned.

**On the board of directors of Coinify ApS:**

_____          _____
Stephen Jay Ehrlich                                Hans Henrik Hoffmeyer
Chairman of the board of directors                 Member of the board of directors

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FF53FEE7E480

# ERHVERVSSTYRELSEN

Dato: 13.07.2022

# ASCENSION ApS

| | |
|---|---|
| **CVR-nummer** | 25348559 |
| **Adresse** | C/O Hans Henrik Hoffmeyer Poppel Alle 28 Hareskov |
| **Postnummer og by** | 3500 Værløse |
| **Startdato** | 04.12.2013 |
| **Virksomhedsform** | Anpartsselskab |
| **Reklamebeskyttelse** | Ja |
| **Status** | Normal |

## Udvidede virksomhedsoplysninger

| | |
|---|---|
| **Telefon** | 50505007 |
| **Mail** | hhhoffme@gmail.com |
| **Kommune** | Furesø |
| **Branchekode** | 642010 Finansielle holdingselskaber |
| **Formål** | Selskabets formål er at besidde ejerandele i datter- eller associerede selskaber. |
| **Regnskabsår** | 01.01 - 31.12 |
| **Seneste vedtægtsdato** | 18.05.2018 |
| **Registreret kapital** | 80.000,00 DKK |
| **Første regnskabsperiode** | 04.12.2013 - 31.12.2014 |

## Tegningsregel, personkreds og revisor

| | |
|---|---|
| **Tegningsregel** | Selskabet tegnes af direktionen. |
| **Direktion** | ( Direktør )<br>Mark Højgaard<br>Malerbakken 1<br>Øverød<br>2840 Holte<br>Danmark |
| | ( Direktør )<br>Hans Henrik Hoffmeyer |

Erhvervsstyrelsen, Langelinie Allé 17, 2100 København Ø

Oplysningerne i dette dokument stammer fra Centrale Virksomhedsregister (CVR). Data må ikke bruges på en måde, så det kan fremstå som om, at Erhvervsstyrelsen godkender, støtter, anbefaler eller markedsfører brugeren, brugerens produkter eller tjenester. Erhvervsstyrelsen har intet ansvar for hverken indhold, oprindelse, fejl og mangler eller nogen form for skade, der måtte følge af brug af data.

Side 1

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53E5E75A90

# ERHVERVSSTYRELSEN

Dato: 13.07.2022

|  | Poppel Alle 28 |
|  | Hareskov |
|  | 3500 Værløse |
|  | Danmark |

| **Stiftere** | HOFFMEYER HOLDING ApS |
|  | C/O Hans Henrik Hoffmeyer |
|  | Poppel Alle 28 |
|  | Hareskov |
|  | 3500 Værløse |
|  | |
|  | ALETH HØJGAARD ApS |
|  | C/O Mark Højgaard |
|  | Malerbakken 1 |
|  | Øverød |
|  | 2840 Holte |

## Ejerforhold

| **Legale ejere** | HOFFMEYER HOLDING ApS |
|  | C/O Hans Henrik Hoffmeyer |
|  | Poppel Alle 28 |
|  | Hareskov |
|  | 3500 Værløse |
|  | Ejerandel: 50-66,66% (04.12.2013 - ) |
|  | Stemmerettigheder: 50-66,66% (04.12.2013 - ) |
|  | Ændringsdato: 04.12.2013 |
|  | |
|  | ALETH HØJGAARD ApS |
|  | C/O Mark Højgaard |
|  | Malerbakken 1 |
|  | Øverød |
|  | 2840 Holte |
|  | Ejerandel: 50-66,66% (04.12.2013 - ) |
|  | Stemmerettigheder: 50-66,66% (04.12.2013 - ) |
|  | Ændringsdato: 04.12.2013 |

| **Reelle ejere** | Mark Højgaard |
|  | Malerbakken 1 |
|  | Øverød |
|  | 2840 Holte |
|  | Danmark |
|  | Ejerandel: 50,00% (04.12.2013 - ) |

Erhvervsstyrelsen, Langelinie Allé 17, 2100 København Ø

Oplysningerne i dette dokument stammer fra Centrale Virksomhedsregister (CVR). Data må ikke bruges på en måde, så det kan fremstå som om, at Erhvervsstyrelsen godkender, støtter, anbefaler eller markedsfører brugeren, brugerens produkter eller tjenester. Erhvervsstyrelsen har intet ansvar for hverken indhold, oprindelse, fejl og mangler eller nogen form for skade, der måtte følge af brug af data.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53EE5755A9C

# ERHVERVSSTYRELSEN

Dato: 13.07.2022

Stemmerettigheder: 50,00% (04.12.2013 - )
Særlige ejerforhold: Har indirekte besiddelser (04.12.2013 - )
Ændringsdato: 04.12.2013


Hans Henrik Hoffmeyer
Poppel Alle 28
Hareskov
3500 Værløse
Danmark
Ejerandel: 50,00% (04.12.2013 - )
Stemmerettigheder: 50,00% (04.12.2013 - )
Særlige ejerforhold: Har indirekte besiddelser (04.12.2013 - )
Ændringsdato: 04.12.2013

Oplysningerne i dette dokument stammer fra Centrale Virksomhedsregister (CVR). Data må ikke bruges på en måde, så det kan fremstå som om, at Erhvervsstyrelsen godkender, støtter, anbefaler eller markedsfører brugeren, brugerens produkter eller tjenester. Erhvervsstyrelsen har intet ansvar for hverken indhold, oprindelse, fejl og mangler eller nogen form for skade, der måtte følge af brug af data.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FEE3FEE7EA8C

B&H draft 8 July 2022

ACCURA

# SHARE PLEDGE AGREEMENT

between

Ascension ApS

as pledgor

and

Voyager European Holdings ApS

as pledgee

concerning the shares in Coinify ApS

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53E5E75A80

ACCURA

## CONTENTS

|  |  | Page |
|---|---|---|
| 1 | DEFINITIONS AND CONSTRUCTION | 3 |
| 2 | PLEDGE | 4 |
| 3 | PERFECTION | 5 |
| 4 | VOTING RIGHTS AND DIVIDENDS | 5 |
| 5 | REPRESENTATIONS AND WARRANTIES | 6 |
| 6 | UNDERTAKINGS | 7 |
| 7 | EFFECTIVENESS OF SECURITY | 7 |
| 8 | CONTINUING SECURITY AND REINSTATEMENT | 8 |
| 9 | ENFORCEMENT | 9 |
| 10 | POWER OF ATTORNEY | 10 |
| 11 | REMEDIES AND WAIVERS | 10 |
| 12 | ASSIGNMENT OR TRANSFER | 11 |
| 13 | NOTICES | 11 |
| 14 | COSTS AND EXPENSES | 11 |
| 15 | MISCELLANEOUS | 11 |
| 16 | GOVERNING LAW AND DISPUTES | 11 |
| SCHEDULE 1 – FORM OF LETTER OF NOTIFICATION | | 12 |
| SCHEDULE 2 – FORM OF ACKNOWLEDGEMENT | | 14 |
| SIGNATURES | | 16 |

DocuSign Envelope ID: 9F08A877-0154-4BF8-AB92-FE53E5E75A80

ACCURA

This

## SHARE PLEDGE AGREEMENT

is dated [ ] 2022 and made between:

(1)     **Ascension ApS**, company registration no. (CVR) 25 34 85 59, Poppel Alle 28, Hareskov, 3500 Værløse, Denmark, as pledgor (the "**Pledgor**"); and

(2)     **Voyager European Holdings ApS**, company registration no. (CVR) 42 54 05 52, Højbro Plads 10, 4., 1200 Copenhagen C, Denmark, as pledgee (the "**Pledgee**")

        (individually a "**Party**" and collectively the "**Parties**")

**BACKGROUND**

(A)     The Pledgee as seller and the Pledgor as buyer have entered into a share purchase agreement dated on or about the date hereof (the "**Share Purchase Agreement**") relating to the acquisition of the Shares (as defined below) in Coinify ApS, company registration no. (CVR) 35 84 79 95, c/o Matrikel 1 office no. 401, Højbro Plads 10, 4., 1200 Copenhagen K, Denmark (the "**Company**").

(B)     It is, *inter alia*, a closing deliverable under the Share Purchase Agreement that the Pledgor provides security in respect of the Secured Obligations (as defined below).

**IT IS AGREED** as follows:

## 1       DEFINITIONS AND CONSTRUCTION

1.1     Definitions

        In this Agreement (as defined below), capitalised words and expressions have the meanings stated in the Share Purchase Agreement unless otherwise stated below or required by the context. In addition to the terms defined above and in the Share Purchase Agreement, the following terms have the following meanings in this Agreement.

        "**Agreement**" means this share pledge agreement, including its schedules, as amended, novated, supplemented, extended, varied or restated from time to time.

3

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53FE57EA80

ACCURA

"**Event of Default**" means any failure of the Pledgor to pay on the due dates any of the Secured Obligations at the place at and in the currency in which it is expressed to be payable.

"**Pledge**" means the pledge created under Clause 2 (*Pledge*).

"**Secured Obligations**" means all the liabilities and all other present and future liabilities and obligations at any time due, owing or incurred by the Pledgor in relation to payment of the Cash Purchase Price to the Pledgee.

"**Shares**" means nominal DKK 450,153 shares in the Company equal to 100 % of the Company's nominal share capital.

1.2     Construction

Unless a contrary indication appears, a reference in this Agreement to:

(a)     "assets" includes present and future properties, revenues and rights of every description;

(b)     the Pledgor, the Pledgee or any other person will be construed so as to include its successors in title, permitted assigns and permitted transferees;

(c)     this Agreement or any other agreement or instrument is a reference to this Agreement or other agreement or instrument as amended, novated, supplemented, extended, varied or restated;

(d)     a security is a reference to any mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect;

(e)     a provision of law is a reference to that provision as amended or reenacted; and

(f)     a time of day is a reference to Danish time.


2     **PLEDGE**

As a continuing security for the immediate payment, discharge and performance in full of the Secured Obligations when due in accordance with the Share Purchase Agreement, the Pledgor hereby pledges (in Danish: *håndpantsætter*) with first priority to the Pledgee all of its rights, title and interests in and to the Shares (the "**Pledge**").

**ACCURA**

3       **PERFECTION**

3.1     The Pledgor shall promptly upon execution of this Agreement, deliver a letter of notification in the form set out in Schedule 1 (*Form of letter of notification*) for the purpose of notifying the Company of the creation of the Pledge.

3.2     The Pledgor shall ensure that the Company, promptly (on a same day basis) upon the Company receiving the letter of notification, delivers:

        (a)     an acknowledgement in the form set out in Schedule 2 (*Form of acknowledgement*) confirming receipt of the letter of notification and that the Pledge has been recorded in the Company's register of shareholders in accordance with the terms of this Agreement; and

        (b)     a true, complete and up-to-date copy of the Company's register of shareholders, evidencing the proper recording of the Pledge together with the name, address and company registration number of the Pledgee.[1]

3.3     The Pledgee may request from the Pledgor proof of delivery of any documents pursuant to this Clause 3.

4       **VOTING RIGHTS AND DIVIDENDS**

4.1     Prior to the occurrence of an Event of Default and notwithstanding Clause 2 (*Pledge*) above, the Pledgor will be entitled to exercise the voting rights attached to the Shares provided that it shall not exercise its voting rights in a manner which:

        (a)     adversely affects the validity or enforceability of the Pledge created by this Agreement;

        (b)     adversely affects the rights attached to or conferred by the Shares; or

        (c)     constitutes a breach of or is otherwise inconsistent with any of the terms of this Agreement or the Share Purchase Agreement.

4.2     Prior to the occurrence of an Event of Default and notwithstanding Clause 2 (*Pledge*) above, the Pledgor will be entitled to collect and receive any dividends declared on or in respect of the Shares.

4.3     Upon the occurrence of an Event of Default which has not been remedied within 5 Business Days after notice of such Event of Default has occurred, the Pledgee may, at its sole discretion

---

[1] **Agreed pledge annotation in the share register of the Company:**

*Kapitalandelene er pantsat med førsteprioritet til fordel for Voyager European Holdings ApS, CVR-nr. 42 54 05 52, Højbro Plads 10, 4., 1200 Copenhagen C, Danmark, i henhold til en pantsætningsaftale (share pledge agreement) dateret [●] 2022, jf. pantsætningsmeddelelse af samme dato. /*
*The shares have been pledged with first priority pursuant to a share pledge agreement dated [●] 2022 in favour of Voyager European Holdings ApS, company registration no. (CVR) 42 54 05 52, Højbro Plads 10, 4., 1200 Copenhagen C, Denmark, according to a notice of the same date.*

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-F7E3F5E7E5A8C

ACCURA

(without any further consent or authority from the Pledgor or the Company) subject to written notice to the Company and the Pledgor, exercise all voting rights and any other rights conferred by the Shares.

4.4    Immediately upon the Company's receipt of a notice under Clause 4.3 above, the Pledgor shall ensure that the Company registers the Pledgee as holder of 100 per cent. of the voting rights attached to the Shares in the Danish Business Authority's (in Danish: *Erhvervsstyrelsens*) public register of shareholders (in Danish: *Ejerregisteret*) in accordance with Section 58 of the Danish Companies Act (in Danish: *selskabsloven*).

4.5    Upon the occurrence of an Event of Default which has not been remedied within 5 Business Days after notice of such Event of Default has occurred, the Pledgee may demand at its sole discretion and subject to written notice to the Company and the Pledgor (without any further consent or authority from the Pledgor or the Company) that all payments of dividends and other distributions are made to such accounts as the Pledgee may specify.

## 5    REPRESENTATIONS AND WARRANTIES

5.1    The Pledgor represents and warrants to the Pledgee as at the date of this Agreement:

(a)    that this Agreement has been duly approved by and signed with final and binding effect on the Pledgor, and that all necessary actions by or on behalf of the Pledgor for the conclusion and performance of this Agreement have been duly taken;

(b)    that the conclusion and performance of this Agreement and the transactions contemplated by this Agreement do not:

(i)    conflict with applicable law or any administrative or judicial order or judgment of any governmental agency or court;

(ii)    conflict with the articles of association or any other constitutional documents of the Pledgor; or

(iii)    conflict with or result in a breach of any material agreement or document to which the Pledgor is a party or which is binding on the Pledgor or any of its assets;

(c)    that the Pledgor has the power to conclude, perform and deliver and has taken all necessary actions to authorise its conclusion, performance and delivery of this Agreement and the creation of the Pledge contemplated by this Agreement; and

(d)    that no action, legal proceedings or any other procedure or step (including any application for such procedure or step) in relation to:

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FZF3F5E7EA80

ACCURA

    (i)    any suspension of payments, extension of payments, reorganisation, winding-up, dissolution, composition with creditors, administration or restructuring, bankruptcy or other insolvency procedure; or

    (ii)    any expropriation or compulsory sale, attachment, sequestration or enforcement of any security,

has been taken by it or against it or any of its assets, nor is the Pledgor aware that any such actions or proceedings have been threatened against it.

## 6    UNDERTAKINGS

6.1    The Pledgor undertakes towards the Pledgee (at all times during the existence of this Agreement):

    (a)    not to sell or otherwise dispose of any or all of the Shares, except as set out in this Agreement;

    (b)    warrant and defend the rights and interests of the Pledgee conferred by this Agreement over the Shares against the claims and demands of all persons whomsoever;

    (c)    to ensure (i) that the Company does not, without the prior consent of the Pledgee, merge, demerge or dispose of all or a material part of its assets or (ii) that the articles of association of the Company are not amended in a manner that may adversely affect the rights of the Pledgee without the prior consent of the Pledgee;

    (d)    promptly upon becoming aware thereof, inform the Pledgee of anything which will, or could reasonably be expected to, adversely affect the Pledge and/or the rights of the Pledgee under this Agreement;

    (e)    ensure that the Pledge continues to be recorded at all times in the share register of the Company; and

    (f)    promptly upon request of the Pledgee, to execute and deliver to the Pledgee such other documents and take such further actions to perfect, preserve and protect the Pledge and enable the Pledgee to exercise and enforce the rights vested in it under this Agreement.

## 7    EFFECTIVENESS OF SECURITY

7.1    The Pledgee's rights under this Agreement will be in addition to and independent of any other security granted in favour of the Pledgee, whether by the Pledgor or any other party. The Pledgee's rights, powers and remedies granted under this Agreement are cumulative and in addition to any other right arising by operation of law.

DocuSign Envelope ID: 9F08A877-01F7-4BF8-AB92-FF53F5E5E5A8C

ACCURA

7.2     The Pledgee is entitled to freely choose and decide which security interest and in what order such security interests are to be applied towards the satisfaction of the Secured Obligations. Any omission to invoke any security or rights granted to the Pledgee under this Agreement or the Share Purchase Agreement will not in any way impede the Pledgee from invoking such rights at a later time.

## 8    CONTINUING SECURITY AND REINSTATEMENT

8.1     This Agreement takes effect as at the date hereof and will remain in full force and effect until the Secured Obligations have been irrevocably discharged in full. Consequently, this Agreement will serve as a continuing security for the due payment and satisfaction in full of the Secured Obligations.

8.2     This Agreement and the Pledge will not be discharged or affected by:

(a)     the unenforceability, illegality or invalidity of the any person's obligations under the Share Purchase Agreement or any security or guarantee granted in that connection;

(b)     any incapacity or lack of power, authority or legal personality or any dissolution or change in the status of the Pledgor, the Company or any other person;

(c)     any extension, time, waiver or consent granted to or any composition with the Pledgor, the Company or any other person being liable for the Secured Obligations;

(d)     any failure or delay in enforcing the Secured Obligations or any security or guarantee granted in connection with such enforcement;

(e)     any release of, or amendment, supplement or replacement of, the Share Purchase Agreement or any of the security granted in connection therewith;

(f)     any amendment, novation, supplement, extension (whether of maturity or otherwise), variation or restatement (in each case, however fundamental and of whatsoever nature) or replacement of the Share Purchase Agreement or any other document, security or guarantee granted in that connection;

(g)     any taking, variation, renewal or release of any security or guarantee;

(h)     the insolvency of the Pledgor, the Company or any other person being liable for the Secured Obligations or part thereof under the terms of any composition or arrangement with the Pledgee or any other creditor; and

(i)     any other action or omission by the Pledgor, the Company, the Pledgee or any other person which may constitute a discharge or reduction of the Pledge or the Pledgor's obligations under this Agreement.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FF53F5E7E5A9

**ACCURA**

8.3    If any payment received in respect of the Secured Obligations is avoided or reduced as a result of bankruptcy or any similar event, the Secured Obligations will be restored in full as if the payment, discharge, avoidance or reduction had not occurred. Moreover, this Agreement and the Pledge created by this Agreement will remain in full force and effect regardless of any discharge or termination of this Agreement or the Pledge.

**9    ENFORCEMENT**

9.1    If an Event of Default has occurred which has not been remedied within 5 Business Days after notice of such Event of Default has occurred, the Pledgee may in its own name, declare the Pledge to be immediately enforceable and subsequently take any appropriate steps to enforce the security created by the Pledge subject to Section 538(a)(2) of the Danish Administration of Justice Act (in Danish: *retsplejeloven*).

9.2    Once the Pledge has become enforceable under Clause 9.1 above, the Pledgee may in its own name, take any appropriate steps to enforce the security created by the Pledge and may at its absolute discretion:

(a)    sell, assign or transfer all or part of the Shares by way of private sale or public auction or contract at such price and on such terms as the Pledgee may acting reasonably decide reflects the market fair value of the Shares;

(b)    take over any or all of the Shares after valuation (in Danish: *overtage efter vurdering*) prepared by an independent accountant appointed by FSR – Danske Revisorer;

(c)    effect such endorsements, documents or certificates for evidencing the sale, transfer or other disposal of title and request such registrations in the shareholders' register of the Company as may be required to vest full title in, and ownership of, the Shares to any buyer or transferee;

(d)    exercise any or all rights relating to the Shares on behalf of and in the name of the Pledgor, including, without limitation, the voting, financial and administrative rights;

(e)    collect and receive any and all dividends and income on the Shares, including, without limitation, any liquidation and/or redemption proceeds;

(f)    demand, to the extent permitted by applicable law, that an extraordinary general meeting be convened in the Company with such agenda as the Pledgee deems appropriate (including a proposal to elect a new board of directors) and, if such general meeting is not convened, to convene a general meeting with such notice as decided by the Pledgee, including any notice shorter than that required by the Danish Companies Act (in Danish: *selskabsloven*), if possible, or request that the Danish Business Authority (in Danish: *Erhvervsstyrelsen*) convene a general meeting;

9

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE3F5E5E75A80



(g)     enforce the Pledge in accordance with any other applicable law, including the Danish Administration of Justice Act (in Danish: *retsplejeloven*);

(h)     (without limiting the generality of this Clause 9.2 or Clause 10 (*Power of attorney*) below) demand that the Pledgor executes and delivers to the Pledgee (i) an unconditional transfer certificate in favour of the Pledgee or a transferee nominated by the Pledgee concerning any or all of the Shares; (ii) an irrevocable power of attorney to sell all or part of the Shares to a transferee nominated by the Pledgee; and/or (iii) such other documents that the Pledgee may require to give effect to a transfer in accordance with the above provisions of all or part of the Shares in a form and substance acceptable to the Pledgee; and

(i)     take all other actions and do all other things (including signing and executing all documents and instruments) as the Pledgee deems to be incidental or conducive to any of the matters or powers in this clause or otherwise incidental or conducive to the preservation, improvement or realisation of the Shares.

9.3     Subject to applicable mandatory law, the Pledgee will not be liable for any loss occurring in connection with any enforcement proceedings unless such losses are caused by the Pledgee's gross negligence or wilful misconduct.

## 10     POWER OF ATTORNEY

10.1    The Pledgor hereby irrevocably appoints the Pledgee as its agent with full power and authority upon the occurrence of an Event of Default to act for the Pledgor and in its name and on its behalf to:

(a)     do such things and take such action as set out in Clause 9 (*Enforcement*); and

(b)     execute and register all such documents which may be necessary in connection with any of the actions set out in Clause 9 (*Enforcement*) and/or to do all such acts and things as the Pledgor is required to do and fails to do under this Agreement.

## 11     REMEDIES AND WAIVERS

11.1    Unless otherwise expressly stated in writing by the Pledgee, no failure to exercise nor any delay in exercising any right or remedy under this Agreement will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies provided for in this Agreement are cumulative and not exclusive of any rights or remedies provided by applicable law.

DocuSign Envelope ID: 9F08A877-0153-4BF8-AB92-FE53F5E7EA80

ACCURA

**12      ASSIGNMENT OR TRANSFER**

12.1    Subject to the terms of the Share Purchase Agreement, the Pledgee may assign or transfer any of its rights or obligations under this Agreement at any time.

12.2    The Pledgor is not entitled to assign or transfer any of its rights or obligations under this Agreement.

**13      NOTICES**

13.1    Unless otherwise stated in this Agreement, any communication to be made under or in connection with this Agreement must be made in accordance with the Share Purchase Agreement.

**14      COSTS AND EXPENSES**

14.1    Each Party will pay its own costs relating to the negotiations, drafting and conclusion of the Agreement and the fulfilment of the obligations of the Agreement (including all fees for its own legal, financial or other advisors).

14.2    Notwithstanding the above and subject to the terms of the Share Purchase Agreement, the Pledgor shall pay all reasonable costs incurred by the Pledgee in connection with the enforcement of this Agreement.

**15      MISCELLANEOUS**

15.1    Neither this Agreement nor any provision hereof may be waived, amended or modified except according to a written agreement concluded between the Pledgee and the Pledgor and subject to any consent required in accordance with the Share Purchase Agreement.

15.2    If one or more of the provisions of this Agreement are declared invalid or unenforceable as a result of applicable mandatory law or decisions made by public authorities, the Parties agree that the other provisions of this Agreement will be severed and remain effective.

**16      GOVERNING LAW AND DISPUTES**

16.1    This Agreement is subject to Clause 16 (*Governing law and disputes*) of the Share Purchase Agreement which shall apply mutatis mutandis.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

(*signatures follow*)

11

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FZE3F5E7EA80



**SCHEDULE 1 – FORM OF LETTER OF NOTIFICATION**

Coinify ApS
Company registration no. (CVR) 35 84 79 95
c/o Matrikel 1 office no. 401
Højbro Plads 10, 4.
1200 Copenhagen K
Denmark

[●] 2022

**LETTER OF NOTIFICATION – PLEDGE OF SHARES**

We, Ascension ApS (the "**Pledgor**"), hereby notify you, Coinify ApS (the "**Company**"), of the following:

1. By a share pledge agreement dated on or about the date hereof (the "**Share Pledge Agreement**") concluded between us as pledgor and Voyager European Holdings ApS (company registration no. (CVR) 42 54 05 52 and registered address at Højbro Plads 10, 4., 1200 Copenhagen C, Denmark) as pledgee (the "**Pledgee**"), we have granted a first ranking pledge on our entire shareholding in the Company (including any future shares and any other present and future securities issued by the Company to us, including warrants, options, bonus shares, subscription rights and convertibles and all rights over or in respect of such shares or other securities in the Company, including all voting rights and rights to receive dividends, liquidation or redemption proceeds) (the "**Shares**"), currently representing a nominal amount of DKK 450,153 in favour of the Pledgee.

2. Notwithstanding paragraph 1 above, we are still entitled to exercise the voting rights on the Shares and receive any dividends declared on or in respect of the Shares until the Pledgee gives notice to the contrary to the Company.

3. Immediately on receipt of such notice from the Pledgee, the Company must register the Pledgee as holder of 100 per cent of the voting rights attached to the Shares in the Danish Business Authority's public register of shareholders (in Danish: *Ejerregisteret*) in accordance with Section 58 of the Danish Companies Act (in Danish: *selskabsloven*).

With reference to paragraphs 1-3 above, we kindly request that the Company (i) record the pledge in the Company's register of shareholders together with the name, address and company registration number of the Pledgee in accordance with Sections 53 and 65 of the Danish Companies Act (in Danish: *selskablsoven*) and (ii) sign and forward the enclosed acknowledgement to the Pledgee together with a true, complete and up-to-date copy of the Company's register of shareholders.

(*signatures follow*)

12

DocuSign Envelope ID: 9F08A877-01F7-4BF8-AB92-FE53F5E75A80

ACCURA

*(Signature page - Notice of share pledge re. the shares in Coinify ApS)*

For and on behalf of **Ascension ApS**:


Signature: _____    Signature: _____
Name:                                      Name:
Capacity:                                  Capacity:

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FZE3F5E7E6A9C



**SCHEDULE 2 – FORM OF ACKNOWLEDGEMENT**

Voyager European Holdings ApS
Company registration no. (CVR) 42 54 05 52
Højbro Plads 10, 4.
1200 Copenhagen C
Denmark
(the "**Pledgee**")

[●] 2022

**ACKNOWLEDGEMENT OF RECEIPT OF NOTIFICATION OF PLEDGE OF SHARES**

We refer to the notice of pledge of shares dated the date hereof regarding the pledge of the Shares created under the Share Pledge Agreement (the "**Notice**").

Capitalised terms used and not otherwise defined herein shall, unless the context otherwise requires, have the meaning given to them in the Notice.

We hereby acknowledge receipt of the Notice and confirm that:

1.  the Pledgor is registered in the Company's register of shareholders as the owner of the entire share capital of the Company, equal to shares in the nominal value of DKK 450,153;

2.  the Company has not been notified of any other security interest over the Shares other than the pledge created pursuant to the Share Pledge Agreement, nor has such security interest been registered in the Company's register of shareholders;

3.  we have recorded the pledge in the Company's register of shareholders in accordance with Sections 53 and 65 of the Danish Companies Act (in Danish: *selskabsloven*);

4.  the voting rights on the Shares can be exercised by the Pledgor, until the Company is notified to the contrary by the Pledgee; and

5.  dividends and any other payment related to the Shares can be paid to the Pledgor, until the Company is notified to the contrary by the Pledgee.

We enclose a true, complete and up-to-date copy of the Company's register of shareholders.

(*signatures follow*)

14

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE3FEE7EA80

ACCURA

*(Signature page - Acknowledgement of share pledge re. the shares in Coinify ApS)*

For and on behalf of **Coinify ApS**:

Signature: _____          Signature: _____
Name:                                       Name:
Capacity:                                   Capacity:

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53F5E75A80

ACCURA

*(Signature page - Share pledge agreement re. the shares in Coinify ApS)*

**SIGNATURES**

The **Pledgor**

For and on behalf of **Ascension ApS:**


Signature: _____          Signature: _____
Name: Mark Højgaard                          Name: Hans Henrik Hoffmeyer
Capacity: Executive officer                  Capacity: Executive officer



The **Pledgee**

For and on behalf of **Voyager European Holdings ApS**:


Signature: _____          Signature: _____
Name:                                        Name:
Capacity:                                    Capacity:

16

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FE53F5E5E5A8C

**B&H DRAFT 10 JULY 2022**

**B R U U N & H J E J L E**

This loan note (the "**Loan Note**") was entered into on [date] among

Coinify ApS
CVR no. 35847995
c/o Matrikel 1, office no. 401
Højbro Plads 10, 4
1200 København K
Denmark
(the "**Borrower**")

and

[name]
[company registration number]
[address]
(the "**Lender**")

(each a "**Party**" and collectively the "**Parties**")

**1.      The loan**

1.1      Subject to the terms and conditions of this Loan Note, the Lender has agreed
to make available to the Borrower a loan in the total amount of USD [●] (the
"**Loan**").

1.2      Disbursement of the Loan shall occur no later than 5 days after this Loan Note
is signed by the Borrower and the Lender.

**2.      Interest**

2.1      This Loan Note shall be subject to fixed interest of 4% p.a. Interest will accrue
from the date when the Loan is paid out and compound yearly by adding the
accrued and unpaid interest to the principal amount under this Loan Note and
accruing interest on the increased principal amount thereafter. All accrued but
unpaid interest shall be payable in full as required by clause 3.

**3.      Repayment**

3.1      The Loan and any accrued and unpaid interest shall be due and payable on the
date that is 30 days after the Borrower's receipt of written demand from the
Lender, however, not earlier than 30 September 2022.

3.2      The Borrower may repay the Loan at any time.

**4.      Assignment**

4.1      Either party may grant, assign or transfer any of its rights and obligations un-
der this Loan Note to a third party only with the prior consent of the other
party.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FEE3FEE7E5A80

**B R U U N & H J E J L E**

5.    **Governing law and disputes**

5.1    This Loan Note is governed by and will be interpreted in accordance with Danish law, disregarding the Danish choice of law rules to the extent that such rules would otherwise lead to the application of any other law than Danish law.

*****

*(Signatures on the next page)*

2

**BRUUN & HJEJLE**

*(Signature page – Loan note)*

For and on behalf of Coinify ApS as Borrower:

_____         _____
Name:                                    Name:
Title:                                   Title:

For and on behalf of [name] as Lender:

_____         _____
Name:                                    Name:
Title:                                   Title:

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FZF3EE5E75A80



## Schedule 14.1 – Joint taxation

**1    Background and purpose**

1.1    The Company and its two wholly owned subsidiaries Coinify Technologies ApS, CVR no. 41060921, and Coinify Financial Services ApS, CVR no. 41060891 (the "Exiting Companies"), are members of the Seller's mandatory Danish joint taxation group ("Seller's Joint Taxation Group") in accordance with the rules on joint taxation in section 31 of the Danish Corporate Income Tax Act (*selskabsskatteloven*). The Seller is acting as administration company for the Seller's Joint Taxation Group.

1.2    Upon discontinuation of the group relation with the Seller, the Exiting Companies will leave the Seller's Joint Taxation Group. The Buyer is aware that for Danish tax purposes, the income and losses of the Exiting Companies for any income period ending on or before the Closing Date will be included in the calculation of the consolidated income of the Seller's Joint Taxation Group.

1.3    In order to ensure a clearly defined process for the discontinuation of the joint taxation and to minimise and, to the extent possible, neutralise any negative effects for the Parties of the joint taxation, the Parties agree as set out in this Schedule.

**2    Discontinuation of joint taxation**

2.1    The Parties agree that for purposes of the Danish joint taxation, the Seller shall be deemed to cease control of the Exiting Companies (thereby ending the joint taxation) as of the Closing Date. If the Danish tax authorities consider the control to have been ceased on a date different from the Closing Date, the Parties agree that the provisions of this Schedule shall apply with the necessary modifications.

2.2    The Seller must with reasonable assistance of the Exiting Companies (to the extent required) procure that the discontinuation of the joint taxation is registered online with the Danish tax authorities no later than thirty (30) days after the Closing Date, including notification of (i) the date of the Exiting Companies' withdrawal from the Seller's Joint Taxation Group, (ii) the period in which the Exiting Companies' income is to be included in the Seller's joint taxation income, and (iii) the reason for the Exiting Companies' withdrawal from the Seller's Joint Taxation Group. The Buyer will procure that the Exiting Companies' entry into the Buyer's joint taxation group is duly registered with the Danish tax authorities.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FF53E5E7E6A8

ACCURA

3        **Preparation and submission of tax returns**

3.1      The Seller must with reasonable assistance of the Exiting Companies (to the extent required) procure the preparation and due and timely submission of all tax returns of the Exiting Companies covering income periods ending before or on the Closing Date.

3.2      For the interim income period beginning on 1 July 2022 and ending at the Closing Date (the "Interim Income Period"), the Seller must procure that draft income statements for the Exiting Companies are sent to the Buyer no later than 60 days following the Closing Date. The income statements must be prepared in accordance with applicable Danish tax Law and the tax principles and practice consistently applied by the Exiting Companies in previous income years.

3.3      The Buyer's comments, if any, on the income statements for the Interim Income Period must be submitted to the Seller no later than 20 Business Days after the Buyer's receipt of the draft income statements. If the Buyer fails to submit any comments within the stated deadline, the drafts shall be deemed accepted by the Buyer. If the Buyer within the stated deadline submits objections to the draft income statements for the Interim Income Period, the Seller and the Buyer shall in good faith seek to settle any difference of opinion. If that the Seller and the Buyer cannot agree on the contents of income statements and the tax returns for the Interim Income Period, the Seller shall nevertheless be authorised to file the tax returns for the Interim Income Period in the form selected by the Seller, and the disagreement between the Seller and the Buyer must instead be solved in accordance with the dispute resolution provisions of the Agreement.

3.4      The Buyer and the Exiting Companies shall make available to the Seller all relevant bookkeeping, accounting material and other documents regarding the Exiting Companies which the Seller reasonably requests to prepare the income statements and the tax returns of the Exiting Companies for income periods ending on or before Closing.

3.5      The Seller shall pay all costs to its own advisers relating to the preparation and submission of the Exiting Companies' tax returns and income statements relating to clause 3.1 and all costs to its/their own advisers in respect of the Interim Income Period, provided however that a reservation for such costs has not been made in the Purchase Price. The Buyer shall pay all costs to its own advisers.

3.6      For a period of 7 years from the Closing Date, the Exiting Companies shall maintain all relevant information and documentation which the Parties may reasonably require for the purpose of Danish corporate income tax matters pertaining to the Exiting Companies or the Seller's Joint Taxation Group.

4        **Settlement of taxes and joint taxation contributions**

4.1      The Seller shall in accordance with section 31 of the Danish Corporate Income Tax Act:

ACCURA

4.1.1  compensate the Exiting Companies for the tax value of losses in the Exiting Companies, to the extent such losses are used by companies in the Seller's Joint Taxation Group (other than the Exiting Companies);

4.1.2  repay amounts to the extent the Exiting Companies have paid excess tax amounts to the Seller; and

4.1.3  pay any further amounts under section 31 of the Danish Corporate Income Tax Act.

4.2  The Buyer shall ensure that the Exiting Companies in accordance with section 31 of the Danish Corporate Income Tax Act:

4.2.1  pay an amount to the Seller corresponding to the final tax on the Exiting Companies' income in the relevant income year(s), including the Interim Income Period (after deduction of relevant prepayments of tax from the Exiting Companies to the Seller);

4.2.2  compensate the Seller for the tax value of losses in the Seller and/or other companies which are jointly taxed with the Seller (except for the Exiting Companies), to the extent that such losses are used by the Exiting Companies; and

4.2.3  pay any further amounts under section 31 of the Danish Corporate Tax Act.

4.3  The Parties agree to procure the settlement of any taxes and joint taxation contributions between the Exiting Companies and the Seller's Joint Taxation Group – which are payable according to clauses 4.1 and 4.2 or otherwise under section 31 of the Danish Corporate Income Tax Act and section 8X(2) in the Danish Tax Assessment Act (*ligningsloven*) – in respect of income periods ending on or before the Closing Date no later than 1 November in the year in which the income tax for the relevant income period falls due, provided, however, that payments (i) in accordance with the clause 4.1.2 shall be made not later than 10 days after the Seller has received repayment from the Danish tax authorities of the excess tax in question, and (ii) that are a consequence of an increase or a decrease of taxable income shall be made not later than 14 days after the final decision on such increase or decrease.

4.4  If the Exiting Companies after the Closing Date receives a credit, refund or repayment of tax or joint taxation contribution in respect of a pre-Closing Date income period, the Buyer shall pay a corresponding amount to the Seller as an adjustment of the Purchase Price.

**5      Communications with the Danish tax authorities**

5.1  The Seller shall conduct all communications and negotiations with the Danish tax authorities and other competent tax authorities regarding all pre-closing income periods. The Seller shall keep the Buyer informed of all such communications and negotiations on an ongoing basis.

DocuSign Envelope ID: 9F08A877-0157-4BF8-AB92-FZF3F5E7E5A8C

ACCURA

5.2    The Seller will otherwise be entitled at its own risk and expense to handle the correspondence with the Danish tax authorities regarding pre-Closing periods, unless the Buyer acknowledges in writing that the topics for the correspondence, tax inquiry or tax increase is not covered by the Seller's Warranties, and to bring a tax case before an administrative authority or a court until all avenues of appeal have been exhausted. The Buyer must ensure that the Exiting Companies collaborates with the Seller and its advisors, and that negotiations with the Danish tax authorities are not closed until the Seller has accepted in writing. The Seller must keep the Buyer informed of the progress of any tax case on a regular basis.

5.3    If the Seller decides to appeal against a tax case, and if the appeal will not act as a stay of execution for the Exiting Companies, the Seller will be obligated to pay an amount equal to the subsequent adjustment plus any further additional taxes and fines imposed and interest accrued to the Buyer no later than on the date on which the Exiting Companies' payment of the amount to the Danish tax authorities falls due. If the Seller's appeal is subsequently allowed, in full or in part, the Buyer must repay an amount equal to the Taxes repaid to the Exiting Companies, including any accrued interest etc., no later than 7 days after receiving the repayment from the Danish tax authorities.

5.4    If the Seller's appeal is dismissed, in full or in part, the Seller must indemnify the Buyer against any further additional taxes and fines imposed and interest accrued during the appeal. The Seller must pay the full amount to the Buyer no later than on the date on which the Exiting Companies' payment of the amount to the Danish tax authorities falls due.