Hearing Date: August 24, 2022 at 10:00 a.m. (prevailing Eastern Time)

**MCDERMOTT WILL & EMERY LLP**
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MCDERMOTT WILL & EMERY LLP**
Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

*Proposed Counsel to the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 212** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLAN AND
(II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors ("Committee") of Voyager Digital

Holdings, Inc. and its affiliated debtors and debtors-in-possession (the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby objects (the "Objection")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

to the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "Motion"),[2] and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. At a time when thousands of creditors struggle to pay basic personal expenses due to the Debtors' flawed business model, the Debtors now seek to pay bonuses to their already well-compensated employees. And despite customer heartaches, many of which are set forth in dozens of letters filed on the docket, the Debtors have taken no measures to reduce headcount. This stands in stark contrast to how some of the most prominent cryptocurrency companies have reacted since the start of the "crypto winter," including Coinbase (18% staff reduction), BitPanda (27% staff reduction), Blockfi (20% staff reduction), and Blockchain.com (20% staff reduction). To be clear, the foregoing companies are *still* operating in the ordinary course of business, while the Debtors' platform has been essentially frozen with no or minimal operations for the last seven weeks.

2. The Debtors have not provided any evidence to justify the retention awards beyond conclusory statements that these employees are needed. Importantly, the Debtors provide no evidence that the 38 Participants are at risk of resigning. And that is because no such evidence exists—since the Petition Date, only 12 of the Debtors' approximately 350 employees have voluntarily resigned. This lack of attrition is attributable to the current employment market in the cryptocurrency space as a result of the aforementioned industry-wide layoffs.

3. For these reasons, it is difficult to understand how the KERP "is necessary and appropriate to avoid costly disruptions to the Debtors' business and allow the Debtors to resume operations post-emergency," as the Debtors allege. The primary responsibilities of

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

2

these employees since the platform was frozen seven weeks ago has been limited to "routine maintenance and updates on the Debtors' platform." Presumably, these routine duties could be performed by the Debtors' current employee base even assuming there is some level of attrition. In attempting to justify the KERP, the Debtors point to the unique skillset and institutional knowledge of the Participants, which the Debtors assert are "exceptionally hard to replace" in the "hottest job market in recent history." Both of these statements are simply wrong. First, given the downturn of the cryptocurrency industry as a whole, the job market is relatively barren. Second, given the recent reductions and layoffs across the industry, a bevy of recently-terminated professionals could fill their roles. The facts and circumstances do not support a KERP in these Chapter 11 Cases.

## BACKGROUND

### I. The Chapter 11 Cases

4. On July 5, 2022 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in these cases.

5. On July 19, 2022, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee pursuant to Bankruptcy Code section 1102(a) [Docket No. 102]. Each member of the Committee is a customer of the Debtors. No trustee or examiner has been appointed in the Chapter 11 Cases.

### II. "Crypto Winter" Layoffs

6. Beginning in late May 2022 (referred to in the industry as the beginning of "crypto winter"), cryptocurrency companies have implemented mass reductions in workforce amidst volatility in the market. For example:

3

    (a)    In June 2022, Coinbase Global Inc. reduced its workforce by 18% (approximately 1,100 employees);[3]

    (b)    In June 2022, BlockFi reduced its workforce by 20% (approximately 170 employees);[4]

    (c)    In June 2022, Bitpanda reduced its workforce by 27% (approximately 270 employees);[5] and

    (d)    In July 2022, facing a $270 million default by Three Arrows Capital ("3AC"), Blockchain.com reduced its workforce by 25% (approximately 150 employees).[6]

### III. The Debtors' Business and Workforce

7. According to the First Day Declaration, the Debtors' operations consist of brokerage services, custodial services for stored cryptocurrency assets, and lending programs. All of these services are accessible through a mobile application.

8. On July 1, 2022, following a series of events in the cryptocurrency markets, culminating in the default of a $650 million loan issued by the Debtors to 3AC, the Debtors paused operations by freezing all customer withdrawals and trading activity on its platform. Although customers can log into the Debtors' mobile application, there are no functions accessible.[7]

---

[3] Mengqi Sun, *Crypto Layoffs Hit Risk and Compliance Staff at Big Exchanges*, WSJ, July 19, 2022, https://www.wsj.com/articles/crypto-layoffs-hit-risk-and-compliance-staff-at-big-exchanges-11658223000.

[4] Vicky Ge Huang, *Seven Crypto Companies That Laid Off Employees This Summer*, WSJ, July 21, 2022, https://www.wsj.com/articles/seven-crypto-companies-that-laid-off-employeesthis-summer-11658436437.

[5] Shashank Bhardwaj, *bitpanda becomes next in line to announce layoffs amidst bear market blues*, Forbes India, https://www.forbesindia.com/article/crypto-made-easy/bitpanda-becomes-next-in-line-to-announce-layoffs-amidst-bear-market-blues/77689/1#:~:text=Bitpanda%20is%20in%20the%20process,time%20and%20full%2Dtime%20employees.

[6] Ryan Browne, *Crypto startup Blockchain.com lays off 25% of staff as 3AC fallout spreads*, CNBC, July 21, 2022, https://www.cnbc.com/2022/07/21/crypto-firm-blockchaincom-lays-off-25percent-of-staff-as-3ac-fallout-spreads.html.

[7] Except for customer withdrawals permitted in accordance with the *Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief* [Docket No. 247].

4

9. The Debtors' workforce comprises 350 employees. Docket No. 285, ¶ 10. The Debtors also employ 83 engineering consultants (sourced through third parties). Docket No.8, ¶¶ 7-8. The Debtors assert that despite the platform being frozen, the 83 engineering consultants are necessary because "customers are still able to open the app, view their balances and historical transactions, view market data, among other functions . . . " Hr'g Tr. 111:15-24 (July 8, 2022).

10. Since the Petition Date, 12 of the 350 employees have voluntarily resigned. Docket No. 285, ¶ 12. The Debtors have not terminated any of their workforce.

**IV.    The Key Employee Retention Plan**

11. On August 2, 2022, the Debtors filed the Motion, which seeks approval of the KERP. The cost of the KERP will not exceed approximately $1.9 million. The Participants consist of 38 employees who perform various duties, including accounting, cash and digital asset management, IT infrastructure, legal, and human resources.

12. Pursuant to the KERP, the Debtors seek authority to award the Participants with two equal cash payments equal to 25% of each Participant's annual salary, payable immediately and at the earlier of the date that is (i) twelve months after the effective date of the KERP or (ii) 90 days following the emergence from chapter 11.

**OBJECTION**

13. Section 503(c)(3) prohibits "transfers or obligations that are outside the ordinary course of business and *not justified by the facts and circumstances* of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3) (emphasis added). Thus, the Debtors must demonstrate that the KERP is warranted by the facts and circumstances of the case. To meet this burden, the Debtors must show that there is a "sound business judgment" for the bonuses in question. *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr.

5

S.D.N.Y. 2007). Courts in the Second Circuit consider the following non-exhaustive list of factors when determining whether the "sound business judgment" test is met:

(a) Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

(b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

(c) Is the scope of the plan fair and reasonable: does it apply to all employees, or if not, does it discriminate unfairly?

(d) Is the plan or proposal consistent with industry standards?

(e) What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Id.* at 576-77.

14. Although the Debtors go to great lengths to establish that the KERP is an exercise of their sound business judgment, the Debtors fail to establish that the facts and circumstances of these Chapter 11 Cases justify the KERP, as required by Bankruptcy Code section 503(c)(3). The Debtors assert that implementation of the KERP is necessary because: (i) the Participants have valuable institutional knowledge of the Debtors' operations that would be difficult and expensive to replace; (ii) the Participants are essential to the administration of the Chapter 11 Cases; (iii) the Participants may be motivated to look for alternative employment given the uncertainty of the chapter 11 process; and (iv) the Participants are underpaid. These purported justifications miss the mark for at least four reasons.

15. ***First***, the risk of the Participants resigning is low. The cryptocurrency space is experiencing a tumultuous time, which has resulted in some of the largest cryptocurrency

6

exchanges freezing operations, many of which have commenced insolvency proceedings in the US and abroad. Some examples include: (i) Celsius Network (paused withdrawals on June 13, 2022 and filed for chapter 11 relief on July 13, 2022);[8] (ii) CoinFlex.US (paused withdrawals on June 23, 2022);[9] (iii) Babel Finance (paused withdrawals on June 17, 2022);[10] (iv) Vauld (paused withdrawals on July 4, 2022);[11] and (v) Hodlnaut (paused withdrawals on August 8, 2022).[12] Comparable cryptocurrency companies to the Debtors are contracting rather than hiring. In fact, they are reducing their workforces considerably. The Debtors' concern over employee motivation to leave the company is unwarranted as evidenced by the fact that only 12 of their 350 employees have voluntarily resigned since the Petition Date.

16. **_Second_**, there is no evidence to demonstrate that the KERP is likely to have an impact on reaching a chapter 11 plan in these cases. Any purported risk of attrition has been mitigated, and most likely eliminated, by the expedited timeline in these Chapter 11 Cases. The Debtors' proposed chapter 11 plan contemplates a standalone restructuring with confirmation expected at the beginning of November. There is no basis to expect that the Participants would seek alternative employment in the next two months (particularly given the state of the cryptocurrency market). Alternative chapter 11 plan or sale structures similarly do not justify the KERP. For example, a 363 sale (which would occur in the next month or so) followed by a liquidating plan would obviate any need to retain employees. Accordingly, regardless of which path the Debtors pursue, the expedited timeline eliminates

---

[8] *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.).

[9] Mark Lamb, *Coinflex Update on Withdrawals*, June 23, 2022, https://coinflex.com/blog/coinflex-update-on-withdrawals/.

[10] Babel Finance, *Notice*, June 17, 2022, https://babel.finance/article-views.html?id=50.

[11] Darshan Bathija, *Corporate Statement*, July 4, 2022, https://www.vauld.com/blog/corporate-statement/.

[12] Hodlnaut, *Important Message to All Hodlnaut Users*, August 8, 2022, https://www.hodlnaut.com/press/hodlnaut-message-to-our-users.

7

the need to offer employees a bonus simply to remain with the company for a very short period of time.

17. **Third**, routine maintenance and institutional knowledge is not a basis for a retention bonus. The Debtors are paying all of their employees and have taken no action to reduce their workforce. Presumably, the reason for this is because the Debtors believe each employee has institutional knowledge and is necessary to conduct routine maintenance. There is no evidence that justifies bonuses to one employee as opposed to another. The Debtors can not have it both ways. If the KERP Participants are so critical to the Debtors that they should be entitled to bonuses, then the Debtors should be terminating employees who are not critical. If all of the Debtors' employees are so critical that none can be terminated, then no employee should be entitled to a bonus simply for remaining employed.

18. **Fourth**, the Debtors' platform is not in operation. It is unclear why the Debtors have made no reductions in force when the core of their business has been paused for seven weeks and will remain paused through confirmation of these Chapter 11 Cases. The fact that the Debtors now seek to pay bonuses to 38 employees in addition to their salaries to run routine maintenance while creditors continue to suffer is not justifiable under the facts and circumstances. If the Debtors' "primary focus has been, and always will be, its customers," then the Debtors should be preserving assets, not incurring unnecessary costs. First Day Declaration, ¶ 7.

19. For the foregoing reasons, the facts and circumstances do not support making payments to the Participants outside the ordinary course of business, and thus, the Motion should be denied.

## RESERVATION OF RIGHTS

20. The Committee is in the process of taking discovery of the Debtors in connection with the Motion and thus reserves its rights to further object, supplement and

8

amend this Objection, and all pleadings in support or filed in response thereto at any time, including at the hearing on the Motion.

WHEREFORE, the Debtors respectfully request that the Court (i) sustain the Objection, (ii) deny the relief requested in the Motion, and (iii) grant such other relief as may be deemed just and proper.

| | |
|---|---|
| Dated: New York, New York<br>August 19, 2022 | **MCDERMOTT WILL & EMERY LLP**<br><br>*/s/ Darren Azman*<br>Darren Azman<br>Joseph B. Evans<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Telephone: (212) 547-5400<br>Facsimile: (212) 547-5444<br>E-mail: dazman@mwe.com<br>E-mail: jbevans@mwe.com<br><br>and<br><br>Charles R. Gibbs (admitted *pro hac vice*)<br>Grayson Williams (admitted *pro hac vice*)<br>2501 North Harwood Street, Suite 1900<br>Dallas, TX 75201<br>Telephone: (214) 295-8000<br>Facsimile: (972) 232-3098<br>E-mail: crgibbs@mwe.com<br>E-mail: gwilliams@mwe.com<br><br>and<br><br>Gregg Steinman (admitted *pro hac vice*)<br>333 SE 2nd Avenue, Suite 4500<br>Miami, FL 33131-2184<br>Telephone: (305) 329-4473<br>Facsimile: (305) 503-8805<br>E-mail: gsteinman@mwe.com<br><br>*Proposed Counsel to the Official Committee of Unsecured Creditors* |