Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>PIERCE ROBERTSON *et al.*,<br><br>    Defendants. | |

**THE DEBTORS' ADVERSARY COMPLAINT TO EXTEND AUTOMATIC STAY OR,
IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION
OF CERTAIN PENDING LITIGATION**

The Debtors in the above-captioned chapter 11 cases ("Plaintiffs" or the "Debtors"),

through their undersigned counsel, hereby file this adversary complaint seeking an extension of an

the automatic stay pursuant to section 362(a) of the Bankruptcy Code or an injunction preventing

further prosecution of a lawsuit pursuant to section 105(a) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.      In 2021, a certain plaintiff filed a putative class action lawsuit against two of the Debtors, alleging improprieties in Voyager's cryptocurrency business ("*Cassidy*"). *See* Ex. A (Am. Class Action Compl. & Demand for Jury Trial, *Cassidy v. Voyager Digital Ltd.*, 1:21-cv-2441-CMA (S.D. Fla. Apr. 28, 2022)). That case was litigated for approximately six months. *See* Ex. B (*Cassidy* docket). When the Debtors initiated these chapter 11 cases, they filed a suggestion of bankruptcy in *Cassidy*, and the district court entered an administrative stay the next day. Ex. C (Suggestion of Bankruptcy and Notice of Operation of the Automatic Stay, *Cassidy v. Voyager Digital Ltd.*, No. 1:21-cv-24441-CMA (S.D. Fla. July 7, 2022) (ECF No. 69)); Ex. D. (Order, *Cassidy v. Voyager Digital Ltd.*, No. 1:21-cv-24441-CMA (S.D. Fla. July 7, 2022) (ECF No. 70)).

2.      When the attorneys pursuing *Cassidy* saw their case stayed pursuant to 11 U.S.C. § 362, they did not honor that statute and pursue relief from the stay from this Court. Instead they restyled the *Cassidy* case as a lawsuit against the Debtors' chief executive officer and co-founder, Stephen Ehrlich. Ex. E (Class Action Compl. and Demand for Jury Trial, *Robertson v. Cuban*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (ECF No. 1) ("*Robertson* Complaint")). In an effort to gain media attention, plaintiffs also added as a defendant the Dallas Mavericks basketball team and its owner, Mark Cuban. *Id.* But is obvious that the *Robertson* Complaint simply attempts to circumvent the automatic stay while still charging the Debtors with grievous wrongs. It literally incorporates the bulk of the plaintiffs' prior complaint against the Debtors and asks a court to hold the Debtors' CEO and Mr. Cuban responsible for the Debtors' alleged misconduct.

3.      The *Robertson* suit is dependent on, and inextricably intertwined with, the Debtors' alleged conduct. Its claims are based on alleged actions taken for the benefit of the Debtors' business by Mr. Ehrlich and others. *Robertson* likely also requires a threshold determination as to whether cryptocurrencies are securities at all, as alleged in the *Robertson* Complaint—an unsettled

legal issue. If it were this easy to circumvent the automatic stay—merely by removing debtors as defendants in litigation and adding their CEO in a their place—the stay would be rendered a nullity.

4.    This Court should extend the automatic stay pursuant to section 362 to cover *Robertson*, or issue an injunction pursuant to section 105 to enjoin the continuation of *Robertson*, for the following reasons:

i.    ***First***, the Debtors will be exposed to a risk of collateral estoppel, *stare decisis*, and evidentiary prejudice if *Robertson* is permitted to proceed. Mr. Ehrlich's alleged conduct is the foundation for *Robertson*'s claims, and any judicial decision on the claims raised in *Robertson* would inevitably affect claims against the Debtors.

ii.    ***Second***, Mr. Ehrlich is critical to the Debtors' restructuring efforts, and *Robertson* would create challenges in conducting those efforts in an efficient and coordinated manner because Mr. Ehrlich's attention will be divided between shepherding the Debtors' restructuring and defending against *Robertson*.

iii.    ***Third***, the Debtors will face indemnification claims if *Robertson* is permitted to continue. The Debtors' governing organizational documents require indemnification of their directors and officers for liabilities incurred in the course of their business. As such, the Debtors could be directly affected should *Robertson* proceed against Mr. Ehrlich.

iv.    ***Fourth***, the Debtors' estate owns property which may be depleted if *Robertson* proceeds. Mr. Ehrlich, the Debtors and other of their directors and officers (D&Os) share insurance coverage. If prosecution of *Robertson* continues, Mr. Ehrlich will incur defense costs and that could draw down these insurance policies, depleting an asset that the Debtors contend is the estate's property.

5.      Accordingly, the Debtors request that the Court extend the automatic stay pursuant to section 362 or issue an injunction pursuant to section 105 to stay or enjoin the prosecution of *Robertson* until the effective date of a plan in these chapter 11 cases.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

7.      This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1409.

9.      Pursuant to Federal Bankruptcy Rule of Procedure 7008, the Debtors consent to the entry of a final order or judgment by the Bankruptcy Court.

## PARTIES

10.      The Debtors are plaintiffs in this adversary proceeding.

11.      Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall Peters, and Edwin Garrison are the named plaintiffs in *Robertson*. This Complaint is being served on the attorneys that filed *Robertson* on their behalf.

## FACTUAL BACKGROUND

12.      On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Court"). These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

13.      On July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee") appointed an eight-member official committee of unsecured creditors (the "Creditors Committee"). (ECF No. 102.)

14.     The Debtors and certain non-Debtor affiliates (collectively, "Voyager," or "the Company") operate a cryptocurrency trading platform that allows customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Voyager's mobile application has been downloaded millions of times and had over 3.5 million active users in early 2022. A detailed description of Voyager's business operations, capital and debt structure, and the facts and circumstances leading to these chapter 11 cases is set forth in the *Declaration of Stephen Ehrlich, Chief Executive Officer of Voyager Digital Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Ehrlich Declaration") (ECF No. 15) (July 6, 2022).

15.     Stephen Ehrlich, CEO of the Debtors, was named as a defendant in a putative class-action captioned *Pierce Robertson et al. v. Mark Cuban et al.*, No. 1:22-cv-22538-RKA, S.D. Fla. *See* Ex. E (*Robertson* Compl.). Plaintiffs assert claims for allegedly (1) aiding and abetting fraud, (2) aiding and abetting breach of fiduciary duty, (3) civil conspiracy, (4) violating the New Jersey Consumer Fraud Act, (5) violating New Jersey Statute Section 49:3–60, (6) unjust enrichment, (7) violating Florida's Deceptive and Unfair Trade Practices Act, (8) violating Florida Statute Section 517.07, (9) violating Louisiana's Unfair Trade Practices and Consumer Protection Law, (10) violating Louisiana Statute Section 51:705 et seq., (11) violating Alabama's Deceptive Trade Practices Act, (12) violating Alabama Code 1975, Chapter 6, (13) violating Virginia's Consumer Protection Act, (14) violating Virginia Code Section 13.1–501, (15) violating California's Unfair Competition Law, (16) violating California's Corporations Code, (17) violating Pennsylvania's Unfair Trade Practices and Consumer Protection Law, (18) violating the Pennsylvania Securities Act of 1972, (19) violating the Tennessee Consumer Protection Act, (20) violating the Tennessee Securities Act of 1980, (21) violating the Oklahoma Consumer Protection Act, and (22) violating the Oklahoma Uniform Securities Act. *Robertson* Compl. ¶¶ 144–414

16.     The *Robertson* Complaint asserts that Stephen Ehrlich, among other things, aided and abetted the Debtors in "tak[ing] advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner" by using false pretenses and making false representations. *Id.* ¶ 20. The bulk of the lawsuit is directed at the Debtors' conduct and, for all practical purposes, the claims are directed at the Debtors. In other words, the alleged "fraud" the Defendants supposedly aided and abetted was that of the Debtors.

17.     In fact, an overlapping lawsuit against the Debtors was filed on December 24, 2021, in the Southern District of Florida, with an amended complaint filed on April 28, 2022. *See* Ex. A (*Cassidy* Am. Compl.). *Cassidy* was litigated for approximately six months before, following the Debtors' chapter 11 filings, it was automatically stayed pursuant to 11 U.S.C. § 362. Exs. B (*Cassidy* docket), C (suggestion of bankruptcy), & D (order staying *Cassidy*). The *Robertson* Complaint explicitly connects itself to *Cassidy*, and contains several allegations copied directly from the original and amended complaints filed in *Cassidy. Compare, e.g.*, *Cassidy* Am. Compl. ¶ 7 *with Robertson* Compl. ¶ 6 (identically alleging that "Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations," then identically quoting the same statement), *Cassidy* Am. Compl. ¶¶ 34–35 & 37 *with Robertson* Compl. ¶¶ 19–20 & 22 (describing Voyager's platform and services), *and Cassidy* Am. Compl. ¶¶ 40–41 *with Robertson* Compl. ¶¶ 103–107 (discussing and quoting Mr. Ehrlich's statements from an October 28, 2021 press conference, with additional quotes added for the *Robertson* Complaint). For all practical purposes, the complaint in *Cassidy*, asserting claims against the Debtors, was repackaged as *Robertson*, asserting claims on the same theories against the Debtors' CEO, a basketball team, and its owner, a prominent public figure who has spoken favorably of Voyager.

18.    If *Robertson* were to proceed, it would have an immediate impact on assets of the Debtors' bankruptcy estates. The Debtors and their directors and officers share insurance coverage, which covers claims made against directors and executives of both Voyager Digital Ltd. and its subsidiaries, which include the other two Debtors. The Debtors believe that the filing of *Robertson* triggers coverage and that Mr. Ehrlich would be entitled to use (and should use) policy proceeds to defend himself in *Robertson* if the matter proceeded.

19.    In addition, the Debtors have indemnity obligations to Mr. Ehrlich. The Articles of Voyager Digital Holdings, Inc. obligate it to indemnify "any director or officer of the corporation … who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative … against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonable incurred by him or her in connection with such actions, suit, or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation." Ex. F, Second Amended Articles of Voyager Digital Holdings, Inc. § 10.01. The LLC agreement of Voyager Digital, LLC similarly require it to "indemnify, defend and hold the [Voyager Digital Holdings, Inc.] (and its Representatives) harmless from and against any expense, loss, damage or liability incurred or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of such Person on behalf of the Company, and amounts paid in settlement of any of the foregoing, provided that the same were not the result of fraud, willful misconduct or gross negligence on the part of the Person against whom a claim is asserted." Ex. G, Amended and Restated Limited Liability Company Agreement of Voyager Digital, LLC. § 4.7; *see also id.* § 4.6 (providing related definition).

20.    If *Robertson* continues, and is not stayed or enjoined, the Debtors' estate will be harmed for, among others, the following reasons:

21.    ***First***, the Debtors will be exposed to a risk of collateral estoppel, *stare decisis*, and/or evidentiary prejudice if *Robertson* is permitted to continue. *Robertson* raises many legal issues that are central to the chapter 11 proceedings. The Debtors' alleged conduct is the foundation for the allegations against Mr. Ehrlich in *Robertson*. Thus, any judicial decisions—whether on the merits or on procedural issues—will inevitably be used later against the Debtors.

22.    ***Second***, if *Robertson* continues, an asset of the Debtors' estate—namely the insurance policy and proceeds that the Debtors share with Mr. Ehrlich and other directors and officers ("D&Os")—could be depleted. Because the insurance proceeds are paid on a first-billed, first-paid basis, allowing *Robertson* to continue against Mr. Ehrlich will reduce the proceeds available to the Debtors and the other D&Os.

23.    ***Third***, *Robertson* will create indemnification obligations for the Debtors. The Articles of Voyager Digital Holdings, Inc., and Voyager Digital, LLC, obligate both Debtors to indemnify Mr. Ehrlich for the claims averred in *Robertson*. Permitting prosecution of those claims now would create a direct claim against the Debtors' estate for his defense costs and any settlement or judgment (if any).

24.    ***Fourth***, Mr. Ehrlich is important to the successful restructuring of the Debtors, and he should not be distracted from his obligations to the Debtors chapter 11 estates in order to address a putative class action lawsuit in Florida that was originally directed against the Debtors. Mr. Ehrlich has an overriding responsibility to shepherd the Debtors through their restructuring, and he will necessarily be distracted from this responsibility if he is obligated to devote time to respond to discovery demands and litigate claims against him.

## FIRST CLAIM FOR RELIEF

### (Section 362 Declaratory Judgment)

25.     The Debtors repeat and re-allege the allegations contained in paragraphs 1–24 of this Complaint as if fully set forth herein.

26.     The Debtors seek an order staying the continuation of *Robertson* until the effective date of a plan of reorganization in these chapter 11 cases, pursuant to section 362(a)(1) and 362(a)(3) of the Bankruptcy Code.

27.     The stay and, if necessary, its extension until the effective date of a restricting plan, is warranted because continuation of *Robertson* would expose the Debtors to potential risks of collateral estoppel, *stare decisis*, and evidentiary prejudice should the matter proceed against the defendants to that action (which include the Debtors' CEO).

28.     The stay and its extension are further warranted because continuation of *Robertson* would expose both Mr. Ehrlich and the Debtors to burdensome discovery obligations. The Plaintiffs and all of the defendants in the *Robertson* case will need discovery from the Debtors to prosecute or defend against the pled allegations. Such discovery would consume significant time and resources, distract management, and frustrate Debtors' ability to restructure successfully.

29.     The stay and its extension are also warranted because continuation of *Robertson* could deplete the Debtors' insurance coverage, which is an asset of these chapter 11 estates.

30.     The stay and its extension are likewise warranted because continuation of *Robertson* against Mr. Ehrlich would expose the Debtors to indemnification claims.

31.     If *Robertson* is allowed to continue, the Debtors' restructuring prospects will be impaired, thwarting the Congressional purpose of providing the Debtors with a breathing spell from litigation in their efforts to confirm a plan of reorganization. Accordingly, the automatic stay should extend to *Robertson*.

## <u>SECOND CLAIM FOR RELIEF</u>

### (Section 105 Injunctive Relief)

32.    The Debtors repeat and re-allege the allegations contained in paragraphs 1–31 of this Complaint as if fully set forth herein.

33.    The Debtors seek an injunction enjoining the continued prosecution of *Robertson* under section 105(a) of the Bankruptcy Code until the effective date of a restructuring plan or further order of this Court.

34.    Section 105(a) of the Bankruptcy code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

35.    Relief under section 105 of the Bankruptcy Code is particularly appropriate in a chapter 11 case when necessary to protect a debtor's ability to effectively confirm a restructuring plan and to preserve the property of the debtor's estates.

36.    For the reasons stated herein, the Court should apply section 105 of the Bankruptcy Code to enjoin the continuation of *Robertson* because the continuation of the case will frustrate and jeopardize the Debtors' efforts to successfully restructure and will interfere with the property of Debtors' chapter 11 estate.

37.    The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to the parties in *Robertson*. The plaintiffs in *Robertson* will suffer little if any harm if *Robertson* is enjoined until the effective date of the Debtors' restructuring plan.

38.    If *Robertson* is not enjoined, the Debtors will likely suffer harm and their restructuring efforts will be threated, including:

i.    The risk of collateral estoppel, *stare decisis*, issue preclusion, or adverse evidentiary findings that could potentially impair the Debtors' ability to defend themselves in subsequent litigation;

ii.    The risk of indemnification claims against the Debtors;

iii.    The risk that continuation of *Robertson* will result in depletion of insurance policies through payment of Mr. Ehrlich's defense costs;

iv.    The risk that Mr. Ehrlich will be forced to spend his time defending against the allegations in *Robertson*, diminishing his ability to shepherd the Debtors' estate through confirmation.

39.    The injunctive relief sought by the Debtors is necessary and proper in order to allow the Debtors an unobstructed opportunity to restructure in these chapter 11 cases.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors as Plaintiffs demand judgment against Defendants and respectfully request relief as follows:

i.    The entry of a declaratory judgment that the continuation of *Robertson* is stayed under Bankruptcy Code sections 362(a)(1) and/or 362(a)(3) until the effective date of a plan of reorganization or further order of this Court; and/or

ii.    In the alternative, the entry of an order granting an injunction pursuant to Bankruptcy Code section 105(a) enjoining and prohibiting the continuation of *Robertson* until the effective date of a plan of reorganization or further order of this Court; and/or

iii.    Such other relief as this Court deems just and proper under the circumstances.

Dated: August 22, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          jsussberg@kirkland.com
                   cmarcus@kirkland.com
                   christine.okike@kirkland.com
                   allyson.smith@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
       **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          mslade@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 22nd day of August, 2022, I caused a true and correct

copy of the foregoing to be served by e-mail upon the following:

      Adam M. Moskowitz (adam@moskowitz-law.com)
      Joseph M. Kaye (joseph@moskowitz-law.com)
      Barbara C. Lewis (barbara@moskowitz-law.com)
      THE MOSKOWITZ LAW FIRM, PLLC
      2 Alhambra Plaza, Suite 601
      Coral Gables, FL 33134

                          */s/ Michael Slade*
                          Michael Slade

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and all others similarly situated,

|  |  |
|---|---|
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY DEMAND** |
| VOYAGER DIGITAL LTD, and VOYAGER DIGITAL LLC | |
| Defendants. | |

_____/

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Mark Cassidy files this class action complaint on behalf of himself, and all others similarly situated, against VOYAGER DIGITAL LTD. ("Voyager") and VOYAGER DIGITAL LLC ("VDL") (Voyager and VDL shall at times together be referred to as "the Voyager Defendants").

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

## INTRODUCTION

1.      The Crypto Currency market is expected to reach US over $ 32 Trillion by 2027, exhibiting a compound annual growth rate (CAGR) of 58.4% during 2022–2027.[1] Accordingly, there is fierce competition within the crypto currency market to obtain as many customers and capital as quickly as possible. One of the largest, and most well attended crypto investor conferences, is the Bitcoin 2022 Miami that was held just weeks ago here in Miami. Voyager was not only a Main Sponsor for the Event, but also sent a large contingent to speak and participate, including Voyager's CEO, Steven Ehrlich and Chief Marketing Officer, Pam Kramer.

2.      Voyager has been very successful in quickly growing into the crypto currency market. As Voyager's CEO Steve Ehrlich proudly announced on Voyager's investor earnings call on February 15, 2022: "As volume and funded accounts grew, so did our assets om platform, increasing from $4.4 billion in the September quarter to $5.9 billion at the end of the December quarter with approximately $1 billion in net new deposits, making up the majority of the $1.4 billion increase."[2]

3.      Mr. Ehrlich's unorthodox cryptocurrency growth strategy was simple: (1) making his company, Voyager, open to the public and for sale on the Toronto and OTC public stock exchanges, so that his company (unlike almost all other cryptocurrency competitors) would appear to the public to be "regulated," and so those that might be hesitant to buy cryptocurrency directly, could be sucked into the market by simply buying Voyager stock,[3] and (2) deceptively designing and marketing Voyager's Platform, which is operated by VDL, a company that has the same CEO, CFO, COO and General Counsel, in order to "put a lot of energy into pushing people down the funnel and incentivize them,"[4] to attract the most investors.

---

[1] https://www.imarcgroup.com/cryptocurrency-market (last accessed April 28, 2022).
[2] Transcript of Voyager Digital FY2Q 2022 Earnings Call dated February 15, 2022, attached as **Exhibit A**.
[3] "Voyager is extremely excited by the new symbol as it reflects our global brand", said Stephen Ehrlich, CEO of Voyager. "The Stock symbol change makes it clear to all of our customers and investors that they can purchase Voyager stock through U.S. Brokers and is the next step in our growth."
https://www.businesswire.com/news/home/20190325005091/en/Voyager-Changes-OTC-Pink-Symbol-to-VYGVF (last accessed April 28, 2022) (last accessed April 28, 2022)
[4] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit B.**

4.       Voyager's CEO Steve Ehrlich proudly touts that "[w]e're already self-regulating ourselves when it comes to bringing products to retail investors." [5] "Ehrlich adds that there is a limited number of cryptocurrency companies abiding by this extra set of rules as a publicly traded company."[6]

5.       The original Complaint filed in this action, specifically detailed with Expert Reports, how Voyager's practices were deceptive, illegal and were the sale of unregistered securities.

6.       ***After this Complaint*** was filed, the following important actions took place:

(a)  the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)  seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based);

(c)  On March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year;[7]

(d)  On February 14, 2022, crypto trader Block-Fi entered into a $50 million dollar settlement with the state regulators and $50 million dollar settlement with the

---

[5]      https://www.msn.com/en-us/money/news/sec-regulations-and-the-cryptocurrency-market-voyager-digital-grayscale-bitcoin-executives-weigh-in/ar-AANZDZc (last accessed April 28, 2022)

[6] *Id.*

[7]  https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (last accessed April 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (last accessed April 28, 2022)

SEC and agreed to stop selling its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators;

(e) In September 2021, the New Jersey Bureau issued a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful unregistered securities had raised at least $14 billion nationwide;[8] and,

(f) the largest cypto exchange, COINBASE, dropped all plans to offer the same lending rewards program after the SEC threatened to sue them.[9]

7.      Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations: "… that's a conversation between myself, out internal GC, our advisors. And we have a very, very deep team, and we're evaluating all that at this point in time."[10]

## **FACTUAL BACKGROUND**

8.      Voyager describes itself as "a fast-growing, publicly traded cryptocurrency platform in the United States founded in 2018 to bring choice, transparency, and cost efficiency to the marketplace."[11] Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[12] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE.

9.      Voyager stock is also available Over-the-Counter (OTC) through many US brokerages and can be purchased in the state of Florida and throughout the United States via the symbol VYGVF. Voyager has quickly become one of the most utilized avenues for nascent

---

[8]      https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (last accessed April 28, 2022)

[9]      https://www.coindesk.com/policy/2022/01/26/sec-scrutinizing-crypto-firms-over-interest-paying-services-report/ (last accessed April 28, 2022)

[10] Ex. A.

[11] https://www.investvoyager.com/investorrelations/overview/ (last accessed April 28, 2022)

[12] *See* https://www.investvoyager.com/blog/why-voyager-is-a-public-company/ (last accessed April 28, 2022)

investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

10.     Voyager's founder and CEO, Stephen Ehrlich, who is also the CEO of nearly every other Voyager wholly-owned subsidiary, including VDL, explains that Voyager "made the decision to go public early in our company history. This was an unconventional choice for a crypto-company in 2019 but proved beneficial for our customers and our platform."[13] Ehrlich goes on to explain:

> Here are three reasons why Voyager and our customers benefit from a public structure.
>
> **1) Transparency**
>
> We believe that our users deserve transparency when it comes to their finances.
>
> As a public company, we are held to the highest standards. We are legally required to disclose both quarterly and annual reports as well as conduct public filings for mergers, acquisitions, insider trading, securities transactions by company insiders, and ownership changes. We also have an obligation to act in the best interest of our shareholders and drive value to their investments. Furthermore, our shareholders have a voice in our future, and a vested interest in our success.
>
> **2) Bridging the gap between traditional finance and crypto**
>
> A public structure enables us to create opportunities for investors who want exposure to the crypto markets by investing in companies like Voyager through stock offerings.
>
> Equities traders have the opportunity to invest in the crypto industry by buying shares of Voyager, even if they do not directly invest in crypto. We believe that this type of exposure will help more people become comfortable with the crypto market and ultimately increase widespread adoption.
>
> **3) Opportunity for growth**
>
> We decided to go public early in our growth trajectory, which gave Voyager an alternate avenue for company growth while also empowering everyday equities traders the opportunity to back an emerging crypto company.

---

[13] *Id.*

By going public, we keep our doors open to all who see the potential for growth at
Voyager and the crypto economy.

11.     What Ehrlich does not disclose in his blog, however, is that he intentionally
structured Voyager to siphon as much profit off American consumers as possible while
simultaneously preventing them from ever being able to effectively vindicate their rights when
Voyager wrongs them, as Plaintiff is attempting to do here on behalf of himself and all others
similarly situated. As Voyager explains in its Annual Information Form for Fiscal Year 2021:[14]

> [Voyager] is a corporation formed under the laws of British Columbia, Canada;
> however its principal place of business is in the United States. Most of [Voyager's]
> directors and officers, [Voyager's] auditors, and the majority of [Voyager's] assets,
> are located in the United States.
>
> It may be difficult for customers in the United States to effect service of process
> within the United States upon those directors who are not residents of the United
> States or to enforce against them judgments of the United States courts based upon
> civil liability under the United States federal securities laws or the securities laws
> of any state within the United States. There is doubt as to the enforceability in
> Canada against [Voyager] or against any of its non-United States directors, in
> original actions or in actions for enforcement of judgments of United States courts
> of liabilities based solely upon the United States federal securities laws or securities
> laws of any state within the United States.

12.     Voyager's disdain for being held accountable for its actions by the legal system and
its penchant for gamesmanship continue throughout this litigation. Initially, Plaintiff's counsel
were contacted approximately one year ago by numerous aggrieved consumers who had serious
concerns about Voyager's business practices. Essentially, these consumers and experts concluded
that Voyager was conducting an inherently rigged game, fueled by specific misrepresentations and
lies.

13.     Counsel spent the following months focusing on two main projects:

    a.  investigating and researching, along with some of the top cryptocurrency experts
        in the United States and Europe, to not only prepare allegations regarding
        Voyager's unlawful actions, but to generate preliminary expert reports with
        supporting evidence as to these allegations and a set plan for managing discovery
        of the disputed issues to confirm the allegations, and

---

[14] *See* Ex. I

     b.   researching and concluding that there was no enforceable arbitration clause and/or class action waiver executed by Plaintiff Mark Cassidy that precluded him from filing this action before this Court.[15]

14.    When Plaintiff first filed his 29-page complaint, along with over two hundred pages of exhibits, including two comprehensive preliminary Expert Reports, however, Voyager's then Chief Communications Officer, Michael Legg (since this Complaint was filed and his deposition was specifically noticed, Voyager "immediately" took him off of the Voyager Website and he was given a different position), within barely an hour after receiving a copy of the pleading, wrote on behalf of Voyager to the press that "This action is absolutely spurious and without any merit whatsoever. We look forward to dealing with this matter through the appropriate legal channels." Legg Tr. 38:19–39:20.

15.    As a result of some initial, nefarious conduct by Voyager, Plaintiff was required to file a Motion for Order to Show Cause and noticed Voyager Digital LLC for deposition on three topics. *See* ECF No. 25. Voyager Digital LLC refused to produce any deponent and instead filed a Motion to Stay, [ECF No. 29], along with Defendants' Motion to Compel Arbitration and to Dismiss this case [ECF No. 28]. Defendants included in their Motion to Compel Arbitration, for the first time, arguments that, as a factual matter were beyond the four corners of Plaintiff's complaint, such as that the Court does not have personal jurisdiction over Defendant Voyager Digital LTD.

16.    While Defendants had exclusive access to all materials relevant to the Court's determination of whether Plaintiff and either Defendant entered into an enforceable arbitration agreement, they selectively produced some cherry-picked information in their Motion and asked this Court to refuse to allow Plaintiff to take even limited discovery necessary to uncover all of the relevant facts to test Defendants' assertions. For instance, Defendants claimed that Plaintiff is specifically bound by a January 2021 User Agreement with VDL to arbitrate all claims, but then confusingly attaches four additional revised versions and claim that "notice was sent to customers" regarding one of the revisions, two days after the revision was implemented, though asserts that

---

[15] At this early pleading stage of the litigation, the Court initially will only need to find that Plaintiff has standing to assert his claims and is not bound by an arbitration clause, and not whether all, or even any, other class members may be bound by such revised agreements.

they are all materially the same [ECF No. 28, 10–11; ECF No. 28-1 ¶¶ 14–21]. Defendants stipulate that Voyager is not a party or signatory to VDL's User Agreement but maintain that Voyager should still be entitled to enforce its arbitration provision against Plaintiff, assuming any such agreement with VDL was formed [ECF No. 28 at 16–21]. Defendants also claimed that Voyager is "a foreign holding company with no operations or employees," and that VDL "operates" the Voyager Platform. *Id*. 8; [ECF No. 28-1 ¶ 5].

17.     This Court, through careful analysis, saw through the Defendants' ruse, calling their arguments "nonsense," and afforded Plaintiff the opportunity to take limited discovery before filing this amended complaint. [ECF No. 36]. In conducting its analysis, the Court noted, among other things, that the evidence Plaintiff attached to his original complaint showed that In Voyager Ltd.'s March 2021 earnings call, one of its representatives stated, "We're at 49 states today. We offer our services in 49 states. It's only New York that we're not —we don't offer this service." *Id*. (citing Compl., Ex. G, March 3, 2021 Earnings Call [ECF No. 1-8] 17; *see id*. 2 ("[W]elcome to Voyager Digital Limited earnings call." (alteration added)). The Court noted that "[i]t is possible that the representative meant to reference Voyager Digital, LLC, when he used 'we,' but this ambiguity only accentuates the need for jurisdictional discovery." *Id*.

18.     Discovery, however, only further reinforced that Voyager does, in fact, conduct business throughout the United States, including Florida. In response to the question, "[w]as Voyager doing business in 49 states except for the State of New York when you were there?" Voyager's former Chief Communications Officer, Michael Legg, testified "Here is my answer to this. We do business in New York. We don't have customers in New York. **We do business in every state**. We do business internationally, okay." Legg Tr. 26:5–21 (emphasis added).

19.     Why did Defendants fight so vociferously against submitting to even limited discovery? Because they did not want to afford Plaintiff the opportunity to reveal the illusory nature of the VDL User Agreement, or that their claims that Voyager is merely a holding company with no operations or employees were false.

20.     The corporate representative for VDL confirmed in deposition testimony that VDL's regular practice is that it not only unilaterally "makes continuous revisions" to the User Agreement, but it also undertakes a conscious effort to ensure that its customers are not notified of the changes—VDL does not even have *a phone number* to contact customer support—so that

customers can actually decide whether they agree to them before VDL attempts to bind them, as was the case with Plaintiff:

> Q. I'm asking you do you know why, when Voyager makes continuous revisions to the User Agreement -- and you're aware of that, right? Every couple –
>
> A. Yeah.
>
> Q. -- months or years there's changes to this agreement?
>
> . . .
>
> THE WITNESS: Yes.
>
> Q. Okay. Why -- for those subsequent changes that are made why doesn't Voyager just follow the same easy process of having this "click this button," and if you click it, then you could go back, type in the user ID, and you can see, simply, if they clicked it and read it or even received it. Why don't you do that?
>
> A. I don't know.
>
> Q. Have you ever asked anybody?
>
> A. No.
>
> Q. Do you know of any reason, sitting here today as the director of operations that's in charge of the Voyager Platform User Agreement, why Voyager can't do this same process for subsequent amendments?
>
> . . .
>
> THE WITNESS: No.

LLC Tr. (**Exhibit C**) 48:11–49:9

> THE WITNESS: In reviewing the -- the terms he agreed to it's discussed that as the -- that they may change and that they're where they're available and that he can go look at them and make sure that he's still in agreement with them.
>
> Q. But how would he know that those changes have been made?
>
> . . .
>
> THE WITNESS: That would be his responsibility.

LLC Tr. 53:20–54:6

> Q. Okay. And just so I'm perfectly clear, regardless of whether Voyager lets Mr. Cassidy know that there's been an amendment, it's Mr. Cassidy's responsibility on his own to go find out and monitor the site to make sure there's no changes made?
>
> . . .

THE WITNESS: Yes. The user, after they've agreed to it, is -- that is part of what they are agreeing to.

LLC Tr. 56:16–24

Q. Okay. So Pam [Kramer, Voyager's Chief Marketing Officer] writes "Also, based on the specific updates, do you think this warrants an email to customers? This summary is very helpful in that regard. So what we just looked at in the email, the form email, that was sent out that you testified about dated April 16th [sic], that didn't provide a summary to any of the customers. It just said your user agreement has been updated, correct?

A. Yes.

Q. Do you know why the internal summary that Voyager was aware of isn't provided to the customers of Voyager?

. . .

THE WITNESS: No.

Q. Okay. As the corporate rep today with the person with the most knowledge about the unifor- -- the User Agreements, including any revisions thereto, have you ever spoke to anybody about providing your customers with a summary of the changes?

A. No.

. . .

Q. I mean, wouldn't you think that would be helpful if somebody wanted to know?

A. I suppose it could be helpful for some people.

LLC Tr. 75:4–76:16

Q. [Plaintiff] says under oath he reviewed your declaration in support of the motion and he said "I did not receive the April 18th email notifying of the April 16th update to the Customer Agreement," that you had testified went out to this mass mailing of 1.2 million.

My question is very simple. Do you have any shred of evidence, anything, to indicate that he is wrong and that he did receive that email, not that the mass marketing email went out, but that he, in fact, received it?

. . .

THE WITNESS: I -- I personally do not, no.

. . .

Q. Okay. Number 9, he says "I did not receive any email, notifications, or any other form of actual notice of any other versions of the Customer Agreement referenced in Shannon Casey's declaration."

You have no evidence, standing here today, that he did, in fact, receive any of those other notices, correct?

A. What other notices?

Q. Any other notices.

A. I'm just not sure what you're referring to.

Q. Mr. Cassidy says: I didn't receive any emails, any notifications, or any other form of actual notice of any other versions of the Customer Agreement referred to in Shannon Casey's declaration.

You talked about six different modifications that were done over time. Mr. Cassidy under oath is saying I never received any of those.

Do you, sitting here today, have any evidence to show that Mr. Cassidy received any of these other updates or emails?

A. No. We only sent the update on the April 18th email.

LLC Tr. 94:7–96:25

Q. Okay. Paragraph 10 says after he – Users apparently can't contact Defendants by phone regarding the questions of their account. Is that correct? Is there a number that I can call and say, hey, I'm having a problem logging in to my account, can you help me, Voyager LLC?

A. That's correct, there's -- we do not have phone support.

LLC Tr. 99:4–11

21.     Discovery further revealed deficiencies in the January 2021 version of the User Agreement. Janice Barrilueax, Voyager's Chief Administrative Officer, in reviewing the January 2021 version of the User Agreement, advised that "I just think that we need to be aware that things [sic] grossly outdated" and that customers "need to be put in their little corner." VOYAGER_001890. Later, David Brosgol, Voyager's General Counsel, agreed with Janice and stated that, rather than simply revise the January 2021 User Agreement in effect when Plaintiff created his Voyager account, "it seems that it might be best to do a significant overhaul." VOYAGER_001894.

22.     Further, discovery revealed that, prior to July 26, 2021, not only did VDL *never* submit any version of its arbitration provision to the AAA for review, but when it finally did, the AAA determined that the requirements that "the arbitration will occur in New Jersey and will be conducted confidentially by a single, neutral arbitrator" constituted "a material or substantial

deviation from the Consumer Rules and/or Protocol" and requested that VDL waive those requirements for all future consumer arbitrations under the User Agreement.[16]

23.     Under these circumstances, especially where VDL fully retains the unfettered right to unilaterally modify the User Agreement at will without providing advance notice to its customers, applicable law holds that no agreement has been formed. Thus, not only was Plaintiff not bound by any amendments to the VDL User Agreement, he did not enter into any agreement to arbitrate (or delegate issues of arbitrability) with VDL.

24.     Discovery also revealed that Defendants' sworn statement that Voyager Digital LTD has "no operations or employees" and "does not . . . market the Voyager Platform," [ECF No. 28-1 ¶ 5], was a false statement. For instance, Voyager explained during its Q2 2022 earnings call that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform. This level of growth makes Voyager one of the fastest-growing cryptocurrency platforms in the industry and one of the largest in the United States. Based on data obtained from one of our investment banking partners, Voyager was third on the list of fastest-growing public companies listed on any U.S. exchange including the OTC markets, based on revenue growth in calendar 2021 with $416 million of revenue, up from just $6.6 million for the calendar year 2020."[17]

25.     Moreover, Voyager markets and offers for sale unregistered securities in the form of cryptocurrency interest-earning accounts. Since Voyager first introduced these unregistered securities to consumers in Florida and throughout the United States in November 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA"). As Voyager LTD's former Chief Communications Officer, Michael Legg, explained in his deposition taken in this case, "[t]here's always been a program in place to earn yield. How the terminology has been around it has evolved." Legg 43:24–44:1.

---

[16] *See* VOYAGER_001951–52.

[17] Ex. A. Moreover, Legg confirmed in his testimony that (1) every press release was cleared by Stephen Ehrlich as CEO of Voyager Digital Ltd.; and (2) every statement made during the earnings calls was "100 percent accurate at that time." Legg Tr. excerpts (**Exhibit D**), 15:2–12; 17:14–18:2

26.    As explained below, the reasoning for that change in terminology has been to avoid the reality—that the EPAs are, in fact, securities that must be registered with the SEC and state analogs.

27.    Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the Florida Office of Financial Regulation (the "OFR").

28.    Not only that, but Voyager has spent tens of millions of dollars from capital raises to fund marketing efforts throughout the United States, including in the state of Florida, to market, offer and sell EPAs through various internet and social media campaigns across state lines to consumers, including Plaintiff. The results have been for Voyager to earn, in turn, tens of millions of dollars in revenue from the EPA investments.

29.    Plaintiff's original complaint, including the extensive preliminary expert report of Rich Sanders of CipherBlade, went into great detail regarding the inherent risks and issues with the fact that Voyager was offering for sale the EPAs without the necessary registration with federal and state regulatory entities or the oversight that follows that registered status.[18]

30.    After Plaintiff filed the original complaint, in February 2022, the SEC charged Voyager's competitor, BlockFi, with failing to register the offers and sales of its retail crypto lending product—a nearly identical offering to Voyager's EPA, called the BlockFi Interest Account.[19] BlockFi settled those claims with the SEC and paid $100 million in fines and agreed to cease its unregistered offers and sales of the BlockFi Interest Accounts, to bring its business within the provisions of the Investment Company Act, and to register under the Securities Act of 1933 the offer and sale of a new lending product.[20]

31.    Shortly after the BlockFi settlement was announced, Stephen Ehrlich, CEO and co-founder of Voyager, explained during the Q2 2022 earnings call for Voyager Digital Ltd, that:[21]

> Lastly, we want to address the recent news about the SEC order in the matter of BlockFi lending LLC. We recognize that this is a significant development in the industry and will provide a potential regulatory path for market participants. We

---

[18] Attached as **Exhibit E** is a supplemental report from Mr. Sanders, which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp.").

[19] https://www.sec.gov/news/press-release/2022-26 (last accessed April 28, 2022).

[20] *Id.*

[21] Ex. A.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

also understand that some may view Voyager's rewards program to be similar to
BlockFi interest accounts. While we understand the temptation to bucket them
together, we think there are important differences between Voyager's program and
BlockFi's that we think have legal significance.

That said, we are in ongoing discussions with regulators about the rewards program,
and it is, of course, possible that regulators may have a different view. Under the
circumstances, we think it's important to confirm that Voyager has received
requests and subpoenas from the SEC and certain states in connection with the
rewards program as part of nonpublic fact-finding inquiries. Of course, we believe
that Voyager accounts that earn rewards comply with existing U.S. law and look
forward to demonstrating that as necessary. We think it is normal and appropriate
for financial service firms, especially in the crypto industry with these evolving
regulatory frameworks to receive inquiries from regulators and law enforcement.
When Voyager received such requests, our policy is to cooperate fully, but we limit
public discussion as these matters are always evolving and as a public company,
Voyager is subject to important rules regarding disclosures about its business.

32.     Two weeks after Voyager made these statements to its investors, on March 30,
2022, Voyager issued a press release revealing that it was served with orders from various state
securities divisions, including New Jersey and Alabama, ordering Voyager to cease and desist its
offer and sale of the EPAs as they constitute unregistered securities.[22] As Voyager admits, "The
Voyager Earn Program is the only Voyager product subject to the Orders. No other products and
services offered by the Company are noted in the Orders."[23]

33.     As Stephen Ehrlich, CEO and co-founder of Voyager, also explained, "I want to
emphasize to our shareholders and customers that only one of our products is noted in the Orders.
Voyager has always recognized that the US regulatory framework must evolve, and in some cases
completely transform, to address the needs of the rapidly expanding crypto sector. Historically,
Voyager has advocated for thoughtful regulation, which is a natural progression for this asset class.
We believe tailored regulation will spur increased confidence and adoption of crypto assets.
Nonetheless, Voyager continues to pursue its strategy to innovate and grow the business and
position the Company as a leader in the crypto asset market."[24] As explained more fully, below,

---

[22] A copy of the New Jersey Cease and Desist Order is attached as **Exhibit F**.
[23]     https://www.investvoyager.com/pressreleases/voyager-provides-update-on-state-orders     (last
accessed April 28, 2022)
[24] *Id.*

Voyager's offering and selling the EPAs, which are unregistered securities, violates federal and state securities laws.

34.     VDL, on the other hand, operates the multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform"), owned by Voyager, that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. Specifically targeted to young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing are uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, these statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

35.     The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

36.     VDL offers what it misleadingly claims to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses in the 1980s.

37.     In reality and unbeknownst to unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), VDL ***never*** discloses that they intentionally set the pricing on the Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

38.     Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the

"Proprietary Fills Algorithm," numerous experts explain that VDL places their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

39.     The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how this marketing is targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

40.     Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and Voyager. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.

> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[25]

41.     Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in

---

[25] https://www.mavs.com/mavsvoyager/ (last accessed April 28, 2022)

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [26]

42.     VDL's representations and marketing materials regarding the "100% Commission-Free" Voyager Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, VDL's conduct violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, ("NJCFA") and the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq.*, Florida Statutes ("FDUTPA").

43.     Plaintiff thus seeks damages and restitution on behalf of himself and the Class members, as well as declaratory and injunctive relief to put an end to VDL's unfair and deceptive marketing and sales practices.

## PARTIES

44.     Plaintiff is a citizen of the State of Florida residing in Broward County, Florida. He is a natural person over the age of 21 and is otherwise *sui juris*.

45.     Defendant Voyager is an entity existing and incorporated pursuant to the laws of British Columbia, Canada, is regulated by the Securities and Exchange Commission, and maintains a principal place of business in 33 Irving Place, 3rd Floor, New York, New York 10003. Defendant Voyager, for purposes of this action, is therefore a citizen of New York.

46.     Defendant VDL is an entity existing and incorporated pursuant to the laws of Delaware, with its principal place of business in Jersey City, New Jersey. Defendant VDL is therefore a citizen of Delaware and New Jersey.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to

---

[26] *Id.*

28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Voyager Defendants. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff, a Florida citizen, brings his individual claims against Delaware, New Jersey, or New York citizens, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

48.    This Court has jurisdiction over Voyager because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of its EPAs in Florida, to Plaintiff and all those similarly situated, which constitutes committing a tortious act within the state of Florida.

49.    For example, Voyager sells its stock OTC throughout the United States, including specifically in the state of Florida to Florida residents. As another example. in November 2020, Voyager hired Natalie Jaeger as the Head of Digital Marketing, and promptly began "a more aggressive marketing strategy which included digital advertising, increased social marketing, and increased influencer marketing using crypto centric influencers and professional athletes."[27] Part of this aggressive marketing strategy, in addition to increased direct targeted marketing to consumers, has been to introduce an "interest rate hike campaign" known as "March Interest Mania," where Voyager increased the rates of interest it would pay to customers to whom it had offered and sold EPAs.[28]

50.    As a result of this increased marketing, Voyager enjoyed explosive growth throughout the ongoing COVID-19 pandemic. In January 2021, Voyager closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million.[29] In February 2021, Voyager closed on a private placement offering of 7,633,588

---

[27] *Id.*
[28] *See* "Voyager Digital Announces March Interest Mania Rate Increases" dated March 10, 2021, attached as **Exhibit G**.
[29] *See* Voyager Digital LTD' Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (**Exhibit H**), 8.

shares of common stock for gross proceeds of approximately $100.0 million.[30] Unsurprisingly, Voyager allocated 50% of this increased budget towards marketing EPAs so it could "get that market share that we're grabbing from everybody else right now and keeping accelerating the land grab." [31]

51.     In addition to marketing and offering the EPAs for sale to U.S. consumers, including those in Florida, Voyager Digital LTD received revenue from lending and staking activities as a result of receiving investments in the EPAs from consumers like Plaintiff and similarly situated Florida residents. For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[32] As Voyager's CFO, Evan Psaropoulos, explained in Voyager's latest earnings call, Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[33]

52.     This purposeful availment renders the exercise of jurisdiction by this Court over Voyager permissible under traditional notions of fair play and substantial justice.

53.     Further, and alternatively, jurisdiction over Voyager is proper in that Voyager and VDL (1) have common stock ownership; (2) have common business departments; (3) file consolidated financial statements and tax returns; (4) do not keep separate their daily operations; and (5) share at least the following Executive Officers in common, who have the following overlapping duties and responsibilities across Voyager and its subsidiaries, including VDL:

| Name, province or state and country of residence | Tenure with the Company | Principal occupation |
|---|---|---|
| **Stephen Ehrlich** Connecticut, USA | CEO & Director | Chief Executive Officer of Voyager and its US subsidiaries. |
| **Evan Psaropoulos** New York, USA | Chief Financial Officer | Chief Financial Officer of Voyager and certain subsidiaries. Mr. Psaropoulos leads the finance, accounting and treasury functions for Voyager. |
| **Gerard Hanshe** New York, USA | Chief Operating Officer | Chief Operating Officer of Voyager and its US subsidiaries. Mr. Hanshe is responsible |

[30] *Id.*
[31] *See* Ex B.
[32] *see* Annual Information Form dated October 27, 2021, attached as **Exhibit I**.
[33] Ex. A.

| | | |
|---|---|---|
| | | for overseeing the customer experience, the business process and strategy, and treasury and trading operations teams, and works closely on coordinating their work with the product, engineering, data analysis, finance and marketing teams. |
| **Lewis Bateman** Ontario, Canada | Chief International Officer | Chief International Officer of Voyager and its US subsidiaries. Mr. Bateman is the executive leader for Voyager's Canadian, European and Cayman based subsidiaries, and heads all the Voyager strategic corporate acquisitions and international expansion. |
| **Daniel Constantino** Pennsylvania, USA | Chief Information Security Officer | Chief Information Security Officer of Voyager and its US subsidiaries. Mr. Costantino leads all technical and administrative cybersecurity programs for Voyager. |
| **David Brosgol** New York, USA | General Counsel | General Counsel and Secretary of Voyager and General Counsel of its US subsidiaries. Mr. Brosgol is responsible for the legal and compliance functions of Voyager. |
| **Pam Kramer** California, USA | Chief Marketing Officer | Chief Marketing Officer of Voyager and its US subsidiaries. Ms. Kramer oversees the brand, advertising, marketing, social media, customer insights and more. |
| **Rakesh Gidwani** New Jersey, USA | Chief Technology Officer | Chief Technology Officer at Voyager and its US subsidiaries. Rakesh leads the evolution of the Platform and systems as Voyager continues its plans for international expansion. |

54.     For example, discovery has demonstrated that for the calendar year 2021 alone, Voyager received nearly $29 million in trading revenue from VDL—which is separate from Voyager's interest revenue from the EPAs. Further, Voyager allocated funds from its approximately $200 million in capital raises to finance VDL's marketing of the Voyager Platform, Moreover, discovery has uncovered evidence that Voyager finances VDL's operations, provides compensation to VDL's employees in the form of, among other things, various stock options and

other monetary compensation and incentives, and treats VDL's property as its own, such has when both utilize the investvoyager website for marketing and selling their various products and communicating with Voyager's investors. For these alternative reasons, too, then, jurisdiction over Voyager is proper.

55.     This Court has jurisdiction over VDL because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of the Voyager Platform in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over VDL permissible under traditional notions of fair play and substantial justice. Notably, Defendants have not contested and have instead admitted that this Court has personal jurisdiction over VDL throughout this litigation.

56.     Venue is proper in this District under 28 U.S.C. § 1391 because the Voyager Defendants each maintain substantial operations in this District; thousands of Class Members either reside or did business with the Voyager Defendants in this District; the Voyager Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because the Voyager Defendants entered into transactions and received substantial profits from Class Members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

57.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A. Voyager's Offer and Sale of EPAs Extensively in the State of Florida and Throughout the United States

58.     On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.

59.     According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion."[34]

60.     For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[35] Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[36] To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan. [37]

61.     Voyager maintains that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws. [38] Voyager's conclusion is apparently drawn from its position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based.[39]

62.     At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations." [40]

63.     As Plaintiff's expert, Rich Sanders, explains in his supplemental report Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as

---

[34] *see* Ex. I.
[35] *see* Ex. I.
[36] *see* Ex. A.
[37] *see* Ex. I.
[38] *see* Ex. I.
[39] *see* Ex. I.
[40] *see* Ex. I.

Celsius and BlockFi.[41] The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.[42]

64.    Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings.[43] To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so." [44]

65.    In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain: [45]

> There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

> Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms

---

[41] Sanders Supp. ¶ 4
[42] *Id.*
[43] Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (last accessed April 28, 2022).
[44] Sanders Supp. ¶ 6
[45] Sanders Supp. ¶¶ 9–10.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[46] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

66.     Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiff and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

67.     The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets.

---

[46]     https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (last accessed April 28, 2022)

Second, EPAs were offered and sold to a broad segment of the general public. Third, Voyager promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs.

68.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth herein, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[47] Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. Further, as Rich Sanders demonstrates in his Preliminary Report, once an investor purchases a EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise.[48] "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear."[49] Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from

---

[47] https://www.sec.gov/litigation/investreport/34-81207.pdf (last accessed April 28, 2022)
[48] Sanders Supp. ¶ 11.
[49] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

### B. The Deceptive Voyager Platform

69.     The Deceptive Voyager Platform offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[50] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[51]

70.     VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[52] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[53] Some of the services offered by VDL include:

> (a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;
>
> (b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;
>
> (c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;
>
> (d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

---

[50] *See* Ex. H.
[51] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit J**.
[52] *See* Ex. H.
[53] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

(e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

(f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[54]

71.     Further, during the months of January, February, and March 2021, 65,000, 70,000, and 95,000 new funded accounts were onboarded onto the Voyager Platform with net deposits of $170M, $400M, and $650M, respectively:[55]

|                        | March 2021 | February 2021 | January 2021 |
|------------------------|------------|---------------|--------------|
| Net Deposits           | $650M      | $400M         | $170M        |
| New Funded Accounts    | 95,000     | 70,000        | 65,000       |
| New Verified Users     | 395,000    | 190,000       | 250,000      |
| Principal Value traded | $2.5B      | $1.6B         | $840M        |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[56]

72.     Moreover, during the month of April 2021 alone, new users were onboarded "at a record rate with over 130,000 new funded accounts added to the platform."[57]

**C.  VDL's Uniform "100% Commission-Free" Misrepresentations**

73.     Included prominently throughout VDL's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

---

[54] *Id.*
[55] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit K**.
[56] *Id.*
[57] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit L**.

74.    These representations enable VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

75.    These "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While VDL does not openly display the commissions it charges on each cryptocurrency trade, it utilizes various methods to secrete the exorbitant commissions it retains from every trade.

76.    For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is a main source of revenue:[58]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

77.    Similarly, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[59]

> With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

> At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager

---

[58] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit M.**
[59] *See* Ex. B.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

78.     Although the Voyager Platform will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Platform's systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

79.     To effectuate these unfair and deceptive business practices, VDL claims to use proprietary systems, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[60]

80.     In describing the Smart Order Router, VDL maintains that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[61] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[62]

81.     To obscure this overarching scheme, VDL utilizes vague and opaque representations that VDL will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer

---

[60]     *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at
https://www.investvoyager.com/blog/passion-for-product-trading/ (last accessed April 28, 2022)
[61] *Id.*
[62] *Id.*

submits the market order).[63] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[64]

82.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

83.     In support of these allegations, Plaintiff attaches the preliminary expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[65] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[66]

84.     Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[67] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A

---

[63] *Id.*
[64] *Id.*
[65] *See* **Exhibit N**
[66] *See* **Exhibit O**
[67] Sanders report at ¶ 18

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

combination of automated analysis and manual investigation is utilized to continually add attribution.[68]

85.     Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. VDL currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

86.     For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as VDL, according to Sanders, should have more address attribution. VDL's lack of attribution may at least partially have to do with how VDL processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[69] Further, attribution for VDL wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum) to be lacking immediately stands out. Sanders therefore performed manual attribution for VDL addresses."[70]

87.     Mr. Sanders found through his analysis that VDL lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not

---

[68] *Id*. at ¶ 20
[69] *Id.* at ¶ 22
[70] *Id*. at ¶ 23

rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[71]

88.     According to Mr. Sanders, VDL fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, ***it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router***, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. ***The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers***.[72] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps described on their own FAQ. ***Voyager, in essence, is expecting the same degree of trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist</u>.*** Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[73]

89.     Mr. Sanders further explains that VDL's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

---

[71] *Id*. at ¶ 27

[72] https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/ (last accessed April 28, 2022)

[73] *Id*. at ¶ 29 (emphasis in original and added)

> The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[74]

90.    Mr. Sanders also obtained comparison data from VDL's competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[75]

91.    This lack of attribution indicates, in Mr. Sanders' view, that VDL demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

> While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[76]

92.    This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

> While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while

---

[74] *Id*. at ¶ 30
[75] *Id*. at ¶ 34
[76] *Id*. at ¶ 35 (emphasis added)

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[77] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[78]

93.     Not only does VDL fail to deliver on their advertising promise of "Better Pricing On Trades," ***they charge their users the highest premium on trades across all competitors***. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[79] "Consequently, VDL's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[80]

94.     Upon further testing, Mr. Sanders also found it probable that VDL is not basing their market quotes off exchanges:

> Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[81] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume,

---

[77]   https://www.investvoyager.com/blog/where-is-voyager-available/ (last accessed April 28, 2022)

[78] *Id*. at ¶ 43

[79] *Id*. at ¶ 47

[80] *Id*. at ¶ 48

[81] https://invao.org/how-stable-are-stablecoins/

which is also likely to have fake order books, such as HitBTC[82] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[83] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[84] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[85]

95.     This probability is further bolstered by the questionability of VDL's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading[86] and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[87]

---

[82]     https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or (last accessed April 28, 2022)

[83] *Id*. at ¶ 50

[84] *Id*. at ¶ 51

[85] *Id*. at ¶ 53

[86] Notably, when asked at deposition about Voyager's wholly-owned subsidiary, HTC Trading, Inc., even when shown Sanders' analysis and chart from Chainalysis indicating that VDL is routing trades through HTC Trading, Voyager's corporate representative claimed that HTC Trading holds no accounts and conducts no operations. *See* LTD Tr. excerpts (**Exhibit P**), 37:7–38:15, 44:3–45:19.

[87] *Id*. at ¶ 55

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

96.     Mr. Sanders lastly concludes, in line with what Plaintiff alleges:

Voyager has fraudulently conducted business by making false claims, utilizing
misleading marketing, and obscuring the truth behind what Voyager does with
customer's funds, and what fees users are charged. "Voyager's aggressive
expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting
inexperienced cryptocurrency users/investors that would not have the experience to
know better. New cryptocurrency users rely on active industry participants
(companies such as Voyager, and "educators/influencers") to provide them with
good-faith insight and not mislead them. Voyager's representations, namely those
about commission-free and best price trading, would undoubtedly be understood to
mean what they say they mean whether by a cryptocurrency novice or a deeply
experienced expert."[88]

97.     Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the
potential scope of damages resulting from VDL's overcharges. This analysis, "relying on
Voyager's own reported figures," reflected that VDL's conduct has likely resulted or will result in
over **1.08 billion dollars** in damages to its users.[89]

98.     Dr. Castell agrees with Mr. Sanders in that VDL does not actually execute trades at
the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the
Voyager App does not materially provide the user functionality as represented by Voyager Digital
as regards achieving the 'best market price' for the user/trader."[90]

99.     The Voyager app was likely deliberately designed to not provide the actual
functionality aspects represented to users. Dr. Castell states:

Furthermore, in my preliminary opinion the failure of the Voyager App to provide
the represented functionality is likely to be centered principally within elements of
the coding or programmed behavior of the "Smart Order Router," and/or the
"Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting
alone, amongst themselves, or in conjunction with the Voyager Digital corporate
software and systems with which these modules connect and inter-operate.[91]

In my preliminary view it is clear that the available technical evidence shows that
the Voyager App does not materially provide the user functionality as represented
by Voyager Digital as regards achieving the "best market price" or "fair market
price" for the user/trader.[92]

---

[88] *Id*. at ¶ 67
[89] Castell report at ¶ 43
[90] *Id*. at ¶ 45
[91] *Id*. at ¶ 46
[92] *Id*. at ¶ 40

100.     This obscurity leading to charging customers extra hidden fees is most likely known to VDL at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[93]

101.     According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e. the overcharge was never less than 0.5% of the value of the trade."[94]

102.     According to Dr. Castell, it is a fact that there is a definite material defect in the design of the Voyager Platform software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[95]

103.     That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

> However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional,

---

[93] *Id*. at ¶ 41
[94] *Id*. at ¶ 26
[95] *Id*. at ¶ 29(b)

in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[96]

104.     VDL has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[97]

### PLAINTIFF-SPECIFIC ALLEGATIONS

105.     Plaintiff purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings.

106.     In exchange for receiving Plaintiff's crypto assets for use in its clandestine lending activities, Plaintiff was paid the following interest payments, as revealed from Voyager's business records:

| TRANSACTION NUMBER | SYMBOL | TYPE | DATE | QUANTITY | NET | PRICE |
|---|---|---|---|---|---|---|
| 01FC0C0YT1ZX NAYYZG61TC28 WG | BTC | INTEREST | 2021-08-01 08:06:59.6 48 +0000 | 7.42E-05 | 3.098 3844 09 | 41745.95 |
| 01F9GM2K4E5C NCTPK6Q4P4B52 5 | BTC | INTEREST | 2021-07-01 08:48:27.2 78 +0000 | 8.03E-05 | 2.690 6442 66 | 33524.1 |

[96] *Id.* at ¶ 29(c)
[97] *Id.* at ¶ 50

38

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| 01F73D8TSKKF06QAW20XT56NJ5 | BTC | INTEREST | 2021-06-01 09:08:00.436 +0000 | 7.98E-05 | 2.948955325 | 36940.44 |
| 01F4MFHB79ZVMTGBKJKHJ64FK9 | USDC | INTEREST | 2021-05-01 17:27:36.426 +0000 | 1.6041 | 1.6041 | 1 |
| 01F4KQDDQXSM1XF5ZBYEV688W4 | BTC | INTEREST | 2021-05-01 10:26:02.110 +0000 | 6.07E-05 | 3.515016492 | 57946.2 |

107. Moreover, after being exposed to VDL's uniform misrepresentations that the Voyager Platform is "100% Commission-Free," Plaintiff registered for an account on the Voyager Platform on March 17, 2021. Further, in reliance on VDL's foregoing misrepresentations and omissions, Plaintiff executed the following trades on the Voyager Platform:

| Date | Order | Cryptocurrency | Amount (USD) | Order ID |
|---|---|---|---|---|
| March 18, 2021 | Market Buy | +0.008588 BTC | $500.00 | ZSSEDN |
| March 18, 2021 | Market Buy | +0.11627 ETH | $300.00 | YJTZRN |
| March 18, 2021 | Market Buy | +0.000838 BTC | $50.00 | R9QFBS |
| March 18, 2021 | Market Sell | -0.16627 ETH | $301.06 | Q6G4VX |
| March 18, 2021 | Market Buy | +0.005028 BTC | $301.06 | E13RAS |
| March 18, 2021 | Market Sell | -0.004455 BTC | $263.32 | HK8RCB |
| March 18, 2021 | Market Buy | +0.14357 ETH | $263.31 | 3VHERZ |
| March 31, 2021 | Market Sell | -0.14358 ETH | $263.88 | 5M8EVR |
| March 31, 2021 | Market Buy | +263.88 USDC | $263.88 | GGXZYW |
| April 3, 2021 | Market Sell | -100.00 USDC | $100.00 | 3VFR9Z |
| April 6, 2021 | Market Buy | +100.00 USDC | $100.00 | E07N9M |
| April 18, 2021 | Market Sell | -100.00 USDC | $100.00 | 5A1XVM |
| April 18, 2021 | Market Buy | +0.001788 BTC | $99.99 | EB7CF5 |
| April 25, 2021 | Market Buy | +0.003061 BTC | $150.00 | J57N9H |
| May 1, 2021 | Market Sell | -163.88 USDC | $163.88 | 32VX48 |
| May 1, 2021 | Market Buy | +0.05729 ETH | $163.87 | 3K6TA6 |
| May 4, 2021 | Market Buy | +55.3 ADA | $74.99 | BWY5H0 |

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| May 4, 2021 | Market Sell | -1.60 USDC | $1.60 | G9HV8H |
| May 11, 2021 | Market Buy | +0.00248 ETH | $10.00 | DX65EW |
| May 11, 2021 | Limit Buy | +0.00250 ETH | $10.11 | 5J3F4Q |
| May 20, 2021 | Market Sell | -55.3 ADA | $95.30 | FJGHVA |
| July 31, 2021 | Market Buy | +0.00229645 BTC | $96.79 | 2HVC4R |
| August 17, 2021 | Market Sell | -0.06227 ETH | $197.01 | M7JWCA |
| August 17, 2021 | Market Sell | -0.017862 BTC | $821.30 | 2N96YH |

108.     To illustrate the deceptive nature of the Platform and how VDL secretly charges exorbitant commissions on each trade for Plaintiff and all putative class members despite their misrepresentations that the Platform is "100% Commission-Free," Plaintiff includes the following screenshots of his May 11, 2021 Market Buy trade at Order ID Dx65EW.

109.     At 11:17am EST, the cryptocurrency Ethereum (ETH) was displayed on the Platform with a "Fair Market Price" of $3,997.83 a coin.



40

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

110.    On the "trade" page for Ethereum in the Platform at 11:17am EST, the "Bid Price" displayed at $3,969.44, and the "Ask Price" displayed at $4,025.44.



111.    At 11:17am EST, Plaintiff submitted a Market Buy order for $10.00 USD worth of Ethereum. On execution of the trade, however, the "Estimated Price" for Ethereum suddenly reflected at $4,027.36 a coin, higher than the maximum quoted "Ask Price" on the immediately preceding page. Plaintiff's order filled at $4,025.28 per coin, at the top end of the bid/ask spread.



112.    At no point during Plaintiff's relationship with VDL did VDL ever disclose, contrary to its representations that the Platform operates "100% Commission-Free," that the "Smart Order Routing," "Voyager Pricing Engine," and "Proprietary Fills algorithm" systems are intentionally designed to provide VDL with secret commissions built into the pricing of every trade.

## CLASS ACTION ALLEGATIONS

113.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.   **Class Definitions**

114.     Plaintiff seeks to represent the following Nationwide Classes and Florida Subclasses (collectively, "the Classes"):

> **(1) Nationwide Voyager Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a EPA.

> **(2) Florida Voyager Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a EPA.

> **(3) Nationwide VDL Class:** All persons in the United States who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

> **(4) Florida VDL Subclass:** All persons in the state of Florida who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

Excluded from the Classes are the Voyager Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class or Florida Subclass, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

### B.   **Numerosity**

115.     The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the state of Florida to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout the state of Florida have executed trades on the Voyager Platform within the applicable limitations period. Membership in

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiff, but is easily identifiable through the Voyager Defendants' corporate records.

### C. <u>Commonality/Predominance</u>

116.   This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

As to Voyager:

(a) whether the EPAs were unregistered securities under federal and Florida law;

(b) whether Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida law; and

(c) the type and measure of damages suffered by Plaintiff and the Class.

As to VDL:

(a) whether VDL's description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether VDL's representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether VDL's practices violate the NJCFA;

(d) whether VDL's practices violate the FDUTPA;

(e) whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

(f) whether Plaintiff and Class members are entitled to injunctive relief;

(g) whether Plaintiff and Class members are entitled to declaratory relief; and

(h) whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of VDL's conduct.

### D. <u>Typicality</u>

117.   Plaintiff's claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiff

and all class members were offered and/or sold EPAs by Voyager, or that Plaintiff and all members were exposed to VDL's identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to either Voyager or VDL that are unique to Plaintiff.

### E. **Adequacy of Representation**

118.　Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F. **Requirements of Fed. R. Civ. P. 23(b)(3)**

119.　The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct (1) by Voyager in marketing, offering, and/or selling the EPAs, which are unregistered securities, or (2) by VDL in making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform.

120.　Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

121.　As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G. **Superiority**

122.　A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

### H. Requirements of Fed. R. Civ. P. 23(b)(2)

123.    Voyager has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

124.    VDL has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% Commission-free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### I. Requirements of Fed. R. Civ. P. 23(c)(4)

125.    As it is clear that the predominant issue regarding Voyager's liability is whether the EPAs it has offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify either or both of the Classes against Voyager for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

45

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

126.     As it is clear that the predominant issue regarding VDL's liability is whether it has violated the NJCFA or the FDUTPA in making identical and uniform misrepresentations and omissions regarding their trading platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, utilizing Rule 23(c)(4) to certify either or both of the Classes against VDL for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J.   Nature of Notice to the Proposed Classes.

127.     The names and addresses of all Class Members are contained in the business records maintained by the Voyager Defendants and are readily available to the Voyager Defendants. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

### COUNT ONE

### Offer and Sale of Unregistered Securities

### in Violation of Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a)

### (on behalf of Plaintiff and Members of the Nationwide Class against Voyager)

128.     Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

129.     Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Voyager.

130.     Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), states:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

131.    The Voyager Earn Program Account ("EPA") is a security within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) because it is a "note" and an "investment contract."

132.    The EPAs were not registered with the SEC.

133.    Voyager sold and offered to sell the unregistered EPAs to Plaintiff and Nationwide Class members, in violation of 15 U.S.C. §§ 77e(a).

134.    Plaintiff and members of the Nationwide Class suffered damages as a result of their purchase of the unregistered EPAs securities through Defendants' website and/or application.

135.    As a result of Voyager's unregistered sale of the EPAs securities, Voyager is liable to Plaintiff and the members of the Nationwide Class. 15 U.S.C. § 77l(a).

WHEREFORE, Plaintiff, on behalf of himself and the Nationwide Class members, demands judgment for rescission and/or compensatory damages, in addition to prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT TWO

**Offer and Sale of Unregistered Securities**

**in Violation of Florida Statute Section 517.07,**

**The Florida Securities and Investor Protection Act**

**(on behalf of Plaintiff and Members of the Florida Sub-Class <u>against Voyager</u>)**

136.    Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

137.    Plaintiff brings this claim individually and on behalf of the members of the Florida Sub-Class against Voyager.

138.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

139.    The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

140.     The EPAs sold and offered for sale to Plaintiffs and members of the Florida Sub-Class were not:

     a.     exempt from registration under Fla. Stat. § 517.051;

     b.     a federal covered security;

     c.     registered with the Office of Financial Regulations (OFR); or

     d.     sold in a transaction exempt under Fla. Stat. § 517.061.

141.     Through its actions described above, Voyager sold and offered to sell the unregistered EPAs to Plaintiff and the members of the Class.

142.     As a result of Voyager's sale and offer to sell the EPAs, Voyager violated Fla. Stat. § 517.07.

WHEREFORE, Plaintiff, on behalf of himself and the Florida Sub-Class members, demands judgment for rescission and/or damages pursuant to Fla. Stat. § 517.211, together with prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT THREE

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (Against VDL on behalf of Plaintiff and Members of the Nationwide Class)

143.     Plaintiff re-alleges and incorporates paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 above as if fully set forth herein and further alleges as follows.

144.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

145.    VDL has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

146.    VDL's statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because VDL in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

147.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

148.    Plaintiff and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

149.    Plaintiff and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

150.    Plaintiff and the Class have a private right of action against VDL and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

151.    Plaintiff and the Class have suffered, and will continue to suffer, irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FOUR
### For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.*
### (Against VDL on behalf of Plaintiff and Members of the Florida Subclass)

152.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 as if fully set forth herein.

153.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

154.     Plaintiff and Class members are consumers as defined by section 501.203, Fla. Stat. VDL is engaged in trade or commerce within the meaning of the FDUTPA.

155.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

156.     VDL's unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

157.     VDL has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

158.     Plaintiff and consumers in the Class have been aggrieved by VDL's unfair and deceptive practices and acts of false advertising by paying VDL undisclosed commissions on cryptocurrency trades on the Voyager Platform, having parted with money under false pretenses.

159.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of VDL, as more fully described herein.

160.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

161.     VDL still utilizes many of the deceptive acts and practices described above and is still secretly retaining money from every cryptocurrency trade made on the Voyager Platform. Plaintiff and the other members of the Class have suffered and will continue to suffer irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff and the Class to obtain both declaratory or injunctive relief to put an end to VDL's unfair and deceptive scheme.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment on behalf of himself and the Classes:

    a.  Certifying the Classes as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Voyager Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Voyager Defendants from continuing those unlawful practices as set forth herein, and directing the Voyager Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and costs; and

    h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

Dated: April 28, 2022

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: */s/ Stuart Z. Grossman*
Stuart Z. Grossman
Florida Bar No. 156113
szg@grossmanroth.com
Rachel W. Furst
Florida Bar No. 45155
rwf@grossmanroth.com
Ryan J. Yaffa
Florida Bar No. 1026131
rjy@grossmanroth.com
**GROSSMAN ROTH YAFFA COHEN, P.A.**
2525 Ponce de Leon Blvd Ste 1150
Coral Gables, FL 33134
Office: 305-442-8666

*Co-Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on April 28, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

# EXHIBIT B

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

Current on Bloomberg Law as of 2022-08-11 10:16:10

**U.S. District Court**
**Southern District of Florida (Miami)**
**CIVIL DOCKET FOR CASE #: 1:21-cv-24441-CMA**

# Cassidy v. Voyager Digital Ltd et al

| | |
|---|---|
| **Date Filed:** | Dec 24, 2021 |
| **Status:** | Closed |
| **Nature of suit:** | 370 Other Fraud |
| **Assigned to:** | Chief Judge Cecilia M. Altonaga |
| **Cause:** | 28:1332 Diversity-Fraud |
| **Date terminated:** | 2022-07-08 |
| **Jurisdiction:** | Diversity |
| **Jury demand:** | Plaintiff |
| **Referred to:** | Ch. Magistrate Judge Edwin G. Torres |

# Parties and Attorneys

| **Plaintiff** | **MARK CASSIDY** on behalf of himself and all others similarly situated | |
|---|---|---|
| **Representation** | **Barbara Cabrera Lewis** *The Moskowitz Law Firm* 2 Alhambra Plaza #601 Miami, FL 33134 (305) 740-1423 Fax: (786) 298-5737 barbara@moskowitz-law.com LEAD ATTORNEY ATTORNEY TO BE NOTICED | **Joseph M. Kaye** *The Moskowitz Law Firm, PLLC* 2 Alhambra Plaza, Suite 601 Miami, FL 33134 (305) 740-1423 joseph@moskowitz-law.com LEAD ATTORNEY ATTORNEY TO BE NOTICED |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| | | |
|---|---|---|
| **Rachel Wagner Furst** | | **Stuart Z. Grossman** |
| *Grossman Roth Yaffa Cohen, P.A.* | | *Grossman, Roth, Yaffa, Cohen, PA* |
| 2525 Ponce de Leon Boulevard | | 2525 Ponce de Leon Boulevard |
| Suite 1150 | | Suite 1150 |
| Coral Gables, FL 33134 | | Coral Gables, FL 33134 |
| (305) 442-8666 | | (305) 442-8666 |
| rwf@grossmanroth.com | | Fax: 285-1668 |
| ATTORNEY TO BE NOTICED | | szg@grossmanroth.com |
| | | ATTORNEY TO BE NOTICED |

**Adam M. Moskowitz**
*The Moskowitz Law Firm, PLLC*
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134-6036
(305) 740-1423
adam@moskowitz-law.com
ATTORNEY TO BE NOTICED

---

| | |
|---|---|
| **Defendant** | **VOYAGER DIGITAL LTD** |
| **Representation** | |

| | |
|---|---|
| **Gavin Cunningham Gaukroger** | **Jeremy H. Ershow** |
| *Berger Singerman LLP* | *Jenner & Block LLP* |
| 350 East Las Olas Blvd. | 1155 Avenue of the Americas |
| Suite 1000 | New York, NY 10036 |
| Fort Lauderdale, FL 33301 | (212) 891-1600 |
| (954) 525-9900 | jershow@jenner.com |
| Fax: (954) 523-2872 | LEAD ATTORNEY |
| ggaukroger@bergersingerman.com | PRO HAC VICE |
| LEAD ATTORNEY | ATTORNEY TO BE NOTICED |
| ATTORNEY TO BE NOTICED | |

| | |
|---|---|
| **Kayvan B. Sadeghi** | **Sara E. Cervantes** |
| *Jenner & Block LLP* | *Jenner & Block LLP* |
| 1155 Avenue of the Americas | 1155 Avenue of the Americas |
| New York, NY 10036 | New York, NY 10036 |
| (212) 891-1600 | (212) 891-1600 |
| ksadeghi@jenner.com | scervantes@jenner.com |
| LEAD ATTORNEY | LEAD ATTORNEY |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

|  |  |
|---|---|
| PRO HAC VICE | PRO HAC VICE |
| ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |

**Defendant**          **VOYAGER DIGITAL LLC**

**Representation**

| | |
|---|---|
| **Gavin Cunningham Gaukroger** | **Jeremy H. Ershow** |
| (See above for address) | (See above for address) |
| LEAD ATTORNEY | LEAD ATTORNEY |
| ATTORNEY TO BE NOTICED | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED |
| | |
| **Kayvan B. Sadeghi** | **Sara E. Cervantes** |
| (See above for address) | (See above for address) |
| LEAD ATTORNEY | LEAD ATTORNEY |
| PRO HAC VICE | PRO HAC VICE |
| ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |

# Docket Entries

Numbers shown are court assigned numbers.

| Entry # | Filing Date | Description |
|---|---|---|
| 1 | Dec 24, 2021 | COMPLAINT against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-15273612, filed by MARK CASSIDY. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Summon(s), # 13 Summon(s))(Moskowitz, Adam) (Entered: 12/24/2021) |
| 2 | Dec 24, 2021 | Clerks Notice of Judge Assignment to Chief Judge Cecilia M. Altonaga. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Edwin G. Torres is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (kpe) (Entered: 12/27/2021) |
| 3 | Dec 27, 2021 | Summons Issued as to VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (kpe) (Entered: 12/27/2021) |
| 4 | Jan 3, 2022 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by MARK CASSIDY. VOYAGER DIGITAL LLC served on 12/28/2021, response/answer due 1/18/2022. (Moskowitz, Adam) (Entered: 01/03/2022) |
| 5 | Jan 4, 2022 | Order Requiring Joint Scheduling Report and Certificates of Interested Parties by 1/28/2022. Signed by Chief Judge Cecilia M. Altonaga on 1/4/2022. See attached document |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| | | for full details. (ps1) (Entered: 01/04/2022) |
| 6 | Jan 4, 2022 | ORDER that Defendant Voyager Digital LLC shall not file a response until all Defendants have been served. Once all Defendants have been served, Defendants shall submit a single combined response or separate answers within the time allowed for the last-served Defendant to respond. Although Voyager Digital LLC is not required to file a response to the Complaint until all Defendants have been served, Defendant's counsel shall file a notice of appearance no later than January 18, 2022, or a Clerk's default may be entered against it. Signed by Chief Judge Cecilia M. Altonaga on 1/4/2022. See attached document for full details. (ps1) (Entered: 01/04/2022) |
| 7 | Jan 11, 2022 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by MARK CASSIDY. VOYAGER DIGITAL LTD served on 12/29/2021, response/answer due 1/19/2022. (Moskowitz, Adam) (Entered: 01/11/2022) |
| 8 | Jan 18, 2022 | NOTICE of Attorney Appearance by Gavin Cunningham Gaukroger on behalf of VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. Attorney Gavin Cunningham Gaukroger added to party VOYAGER DIGITAL LLC(pty:dft), Attorney Gavin Cunningham Gaukroger added to party VOYAGER DIGITAL LTD(pty:dft). (Gaukroger, Gavin) (Entered: 01/18/2022) |
| 9 | Jan 18, 2022 | Joint MOTION and Stipulation for Defendants' Date to Response to The Complaint by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 01/18/2022) |
| 10 | Jan 19, 2022 | ORDER granting 9 Motion and Stipulation for Defendants Date to Respond to the Complaint. Defendants shall file their combined response or separate answers to Plaintiff's Complaint by February 25, 2022. The deadline for compliance with the Order entered on January 4, 2022 [ECF No. 5 ] shall not be extended. Signed by Chief Judge Cecilia M. Altonaga on 1/19/2022. See attached document for full details. (ps1) (Entered: 01/19/2022) |
| | Jan 19, 2022 | Set/Reset Response/Answer Due Deadline: VOYAGER DIGITAL LLC and VOYAGER DIGITAL LTD's combined response/answer due 2/25/2022. (ps1) (Entered: 01/19/2022) |
| 11 | Jan 19, 2022 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kayvan B. Sadeghi. Filing Fee $ 200.00 Receipt # AFLSDC-15327349 by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. Responses due by 2/2/2022 (Attachments: # 1 Certification Certification, # 2 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 01/19/2022) |
| 12 | Jan 19, 2022 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jeremy H. Ershow. Filing Fee $ 200.00 Receipt # AFLSDC-15327469 by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. Responses due by 2/2/2022 (Attachments: # 1 Certification Certification, # 2 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 01/19/2022) |
| 13 | Jan 19, 2022 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Sara E. Cervantes. Filing Fee $ 200.00 Receipt # AFLSDC-15327504 by VOYAGER DIGITAL LLC, VOYAGER |

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| | | DIGITAL LTD. Responses due by 2/2/2022 (Attachments: # 1 Certification Certification, # 2 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 01/19/2022) |
| 14 | Jan 19, 2022 | ORDER granting 13 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Sara E. Cervantes. Signed by Chief Judge Cecilia M. Altonaga on 1/19/2022. See attached document for full details. (wc) (Entered: 01/19/2022) |
| 15 | Jan 19, 2022 | ORDER granting 12 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Jeremy H. Ershow. Signed by Chief Judge Cecilia M. Altonaga on 1/19/2022. See attached document for full details. (wc) (Entered: 01/19/2022) |
| 16 | Jan 19, 2022 | ORDER granting 11 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Kayvan B. Sadeghi. Signed by Chief Judge Cecilia M. Altonaga on 1/19/2022. See attached document for full details. (wc) (Entered: 01/19/2022) |
| 17 | Jan 26, 2022 | NOTICE of Attorney Appearance by Barbara Cabrera Lewis on behalf of MARK CASSIDY. Attorney Barbara Cabrera Lewis added to party MARK CASSIDY(pty:pla). (Lewis, Barbara) (Entered: 01/26/2022) |
| 18 | Jan 28, 2022 | Certificate of Other Affiliates/Corporate Disclosure Statement - NONE disclosed by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD (Gaukroger, Gavin) (Entered: 01/28/2022) |
| 19 | Jan 28, 2022 | Joint SCHEDULING REPORT - Rule 16.1 by MARK CASSIDY (Moskowitz, Adam) (Entered: 01/28/2022) |
| 20 | Jan 31, 2022 | ORDER Setting Trial and Pretrial Schedule, Requiring Mediation, and Referring Certain Matters to Magistrate Judge: Trial set for two-week period beginning 1/30/2023 in Miami Division before Chief Judge Cecilia M. Altonaga. Calendar Call set for 1/24/2023 09:00 AM in Miami Division before Chief Judge Cecilia M. Altonaga. Motions to amend pleadings or join parties due by 3/14/2022. Discovery, including Expert Discovery, due by 10/3/2022. Mediation Deadline 10/11/2022. Class Certification Discovery due by 5/9/2022. Motion for Class Certification due by 05/20/2022. In Limine Motions due by 11/15/2022. Pretrial Motions due by 10/18/2022. Pretrial Stipulation due by 11/15/2022. REFERRING CASE to Ch. Magistrate Judge Edwin G. Torres for Discovery Matters. Signed by Chief Judge Cecilia M. Altonaga on 1/31/2022. See attached document for full details. (ps1) (Entered: 01/31/2022) |
| 21 | Jan 31, 2022 | ORDER that by 2/2/2022 Plaintiff shall comply with the January 4, 2022 Order [ECF No. 5 ] by February 2, 2022, failing which the case will be dismissed without prejudice and without further notice. Furthermore, in his written submission, Plaintiff shall explain why he failed to comply with the January 4, 2022 Order, necessitating this second Order. Signed by Chief Judge Cecilia M. Altonaga on 1/31/2022. See attached document for full details. (ps1) (Entered: 01/31/2022) |
| 22 | Jan 31, 2022 | Certificate of Other Affiliates/Corporate Disclosure Statement - NONE disclosed by MARK CASSIDY (Moskowitz, Adam) (Entered: 01/31/2022) |
| 23 | Jan 31, 2022 | RESPONSE TO ORDER TO SHOW CAUSE re 21 Order to Show Cause, by MARK CASSIDY. (Moskowitz, Adam) (Entered: 01/31/2022) |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| 24 | Feb 1, 2022 | ORDER SETTING DISCOVERY PROCEDURES. Signed by Ch. Magistrate Judge Edwin G. Torres on 2/1/2022. See attached document for full details. (mdc) (Entered: 02/01/2022) |
| 25 | Feb 10, 2022 | MOTION for Order to Show Cause PLAINTIFFS MOTION FOR ORDER TO SHOW CAUSE by MARK CASSIDY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Moskowitz, Adam) (Entered: 02/10/2022) |
| 26 | Feb 10, 2022 | PAPERLESS ORDER denying 25 Motion for Order to Show Cause. The motion appears to primarily seek relief in the form of better discovery responses and complete initial disclosures related to the specific topics identified. Accordingly it primarily relates to discovery issues that the Court's Standing Discovery Order requires must first be addressed through the Court's discovery calendar. The motion is thus procedurally defective and is Denied as such, without prejudice to this matter being properly raised at a later date. Signed by Ch. Magistrate Judge Edwin G. Torres on 2/10/2022. (EGT) (Entered: 02/10/2022) |
| 27 | Feb 11, 2022 | PAPERLESS NOTICE of Hearing: A Discovery Hearing is set for 3/10/2022 at 2:30 PM before Chief Magistrate Judge Edwin G. Torres. This hearing will take place in person at the United States Courthouse, James Lawrence King Building, Tenth Floor - Courtroom 5, 99 N.E. Fourth Street, Miami, Florida. All persons attending the hearing will be subject to the Court's latest COVID Order and guidelines. (elk) (Entered: 02/11/2022) |
| 28 | Feb 17, 2022 | Defendant's MOTION to Compel Arbitration ( Responses due by 3/3/2022), MOTION to Dismiss with Prejudice 1 Complaint, and Supporting Memorandum of Law by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Attachments: # 1 Exhibit Exhibit A)(Gaukroger, Gavin) (Entered: 02/17/2022) |
| 29 | Feb 17, 2022 | Defendant's EXPEDITED MOTION to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the Complaint re 28 Defendant's MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 1 Complaint, and Supporting Memorandum of Law by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 02/17/2022) |
| 30 | Feb 18, 2022 | ORDER requiring expedited briefing, re: 29 Defendant's EXPEDITED MOTION to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the Complaint. Responses due by 2/23/2022, Replies due by 2/24/2022. Signed by Chief Judge Cecilia M. Altonaga on 2/18/2022. See attached document for full details. (ps1) (Entered: 02/18/2022) |
| 31 | Feb 22, 2022 | Joint NOTICE of Mediator Selection and Hearing. JOINT NOTICE OF SELECTION OF MEDIATOR Selected/Added Harry R. Schafer, Esq. as Mediator. Mediation Hearing set for September 15, 2022, at 10:00a.m. EST. (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 02/22/2022) |
| 32 | Feb 23, 2022 | ORDER Scheduling Mediation before Harry R. Schafer, Esq. Mediation Hearing set for 9/15/2022 10:00 AM. The parties are reminded that a report of their mediation must be filed within seven (7) days thereafter. Signed by Chief Judge Cecilia M. Altonaga on 2/23/2022. See attached document for full details. (wc) (Entered: 02/23/2022) |
| 33 | Feb 23, 2022 | RESPONSE in Opposition re 29 Defendant's EXPEDITED MOTION to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| | | Complaint re 28 Defendant's MOTION to Compel Arbitration MOTION to Dismiss wi PLAINTIFFS RESPONSE IN OPPOSITION TO DEFENDANTS EXPEDITED MOTION TO STAY DISCOVERY filed by MARK CASSIDY. Replies due by 3/2/2022. (Attachments: # 1 Exhibit A)(Moskowitz, Adam) (Entered: 02/23/2022) |
| 34 | Feb 24, 2022 | Defendant's REPLY to Response to Motion re 29 Defendant's EXPEDITED MOTION to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the Complaint re 28 Defendant's MOTION to Compel Arbitration MOTION to Dismiss wi filed by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Gaukroger, Gavin) (Entered: 02/24/2022) |
| 35 | Mar 1, 2022 | EXPEDITED MOTION EXTENSION OF TIME PLAINTIFFS EXPEDITED MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANTS MOTION TO COMPEL ARBITRATION re 29 Defendant's EXPEDITED MOTION to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the Complaint re 28 Defendant's MOTION to Compel Arbitration MOTION to Dismiss wi, 28 Defendant's MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 1 Complaint, and Supporting Memorandum of Law, 33 Response in Opposition to Motion, by MARK CASSIDY. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Moskowitz, Adam) (Entered: 03/01/2022) |
| 36 | Mar 3, 2022 | ORDER denying 35 Expedited Motion for Extension of Time; denying 28 Motion to Compel Arbitration; denying 29 Expedited Motion to Stay Discovery Pending Resolution of Defendants' Motion to Compel Arbitration and to Dismiss the Complaint. The deadlines set forth in the Court's Scheduling Order [ECF No. 20 ] are SET ASIDE. Signed by Chief Judge Cecilia M. Altonaga on 3/3/2022. See attached document for full details. (ps1) (Entered: 03/03/2022) |
| 37 | Mar 4, 2022 | PAPERLESS Order Cancelling Discovery Hearing upon notification of the parties that the hearing is now moot. Discovery Hearing previously set for 3/10 [D.E. 27] is now CANCELLED. Signed by Ch. Magistrate Judge Edwin G. Torres on 3/4/2022. (EGT) (Entered: 03/04/2022) |
| 38 | Mar 21, 2022 | PAPERLESS NOTICE of Hearing: A Discovery Hearing is set for 4/7/2022 at 2:30 PM before Chief Magistrate Judge Edwin G. Torres. This hearing will take place in person in the United States Courthouse, James Lawrence King Building, 99 N.E. Fourth Street, Tenth Floor, Courtroom Five, Miami, Florida. All persons attending the hearing will be subject to the Court's latest COVID Order and guidelines. (elk) (Entered: 03/21/2022) |
| 39 | Mar 22, 2022 | Joint MOTION for Extension of Time of Deadlines in Court's March 3, 2022 Order to Complete Discovery JOINT MOTION FOR BRIEF EXTENSION OF DEADLINES IN THE COURTS MARCH 3, 2022 ORDER [ECF NO. 36] TO COMPLETE DISCOVERY re 36 Order on Expedited Motion,, Order on Motion to Compel,, Order on Motion to Dismiss,,, by MARK CASSIDY. Responses due by 4/5/2022 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Moskowitz, Adam) (Entered: 03/22/2022) |
| 40 | Mar 22, 2022 | ORDER granting 39 Joint Motion for Brief Extension of Deadlines in the Court's March 3, 2022 Order to Complete Discovery. Signed by Chief Judge Cecilia M. Altonaga on 3/22/2022. See attached document for full details. (ps1) (Entered: 03/22/2022) |
| 41 | Mar 25, 2022 | Joint MOTION for Protective Order STIPULATED PROTECTIVE ORDER by MARK CASSIDY. (Moskowitz, Adam) (Entered: 03/25/2022) |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| 42 | Mar 28, 2022 | ORDER granting 41 Motion for Protective Order. Signed by Chief Judge Cecilia M. Altonaga on 3/28/2022. See attached document for full details. (ps1) (Entered: 03/28/2022) |
| 43 | Apr 6, 2022 | NOTICE of Compliance by MARK CASSIDY re 38 Notice re Hearing, 24 Order (Moskowitz, Adam) (Entered: 04/06/2022) |
| 44 | Apr 7, 2022 | PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: Discovery Hearing held on 4/7/2022. Attorney Appearance(s): Adam M. Moskowitz, Gavin Cunningham Gaukroger, (Digital 14:40:54) Total time in court: 45 minutes. (mdc) (Entered: 04/07/2022) |
| 45 | Apr 27, 2022 | TRANSCRIPT of Discovery Hearing held on 4/7/2022 before Ch. Magistrate Judge Edwin G. Torres, 1-44 pages, Court Reporter: Bonnie Joy Lewis, 954-985-8875. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/18/2022. Redacted Transcript Deadline set to 5/31/2022. Release of Transcript Restriction set for 7/26/2022. (apz) (Entered: 04/27/2022) |
| 46 | Apr 28, 2022 | AMENDED COMPLAINT AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL against VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD, filed by MARK CASSIDY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Moskowitz, Adam) (Entered: 04/28/2022) |
| 47 | May 4, 2022 | MOTION to Certify Class PLAINTIFFS MOTION TO CERTIFY A LIABILITY ISSUE ONLY CLASS AGAINST DEFENDANT VOYAGER DIGITAL LTD., PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 23(a), 23(b)(3), and 23(c)(4) by MARK CASSIDY. Responses due by 5/18/2022 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Moskowitz, Adam) (Entered: 05/04/2022) |
| 48 | May 4, 2022 | EXPEDITED MOTION for Extension of Time and for Authorization to File a Consolidated Brief in Response to Both Renewed and Newly Asserted Claims in the Amended Complaint re 46 Amended Complaint/Amended Notice of Removal, by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Gaukroger, Gavin) (Entered: 05/04/2022) |
| 49 | May 5, 2022 | RESPONSE in Opposition re 48 EXPEDITED MOTION for Extension of Time and for Authorization to File a Consolidated Brief in Response to Both Renewed and Newly Asserted Claims in the Amended Complaint re 46 Amended Complaint/Amended Notice of Removal, filed by MARK CASSIDY. Replies due by 5/12/2022. (Moskowitz, Adam) (Entered: 05/05/2022) |
| 50 | May 5, 2022 | ORDER granting 48 Expedited Motion for Extension of Time and for Authorization to File a Consolidated Brief in Response to both Renewed and Newly Asserted Claims in the Amended Complaint. Defendants shall file a consolidated response to the Amended Complaint of no more than 30 pages; the deadline to file that response is May 16, 2022. The response and reply memoranda are due within the times permitted by the Local Rules. Plaintiff's responsive memorandum shall not exceed 30 pages. Signed by Chief Judge Cecilia M. Altonaga on 5/5/2022. See attached document for full details. (ps1) (Entered: 05/05/2022) |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
| 51 | May 6, 2022 | MOTION to Enforce Protective Order re 42 Order on Motion for Protective/ Confidentiality Order , MOTION for Sanctions for Violation of Protective Order by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Attachments: # 1 Exhibit "A" Meet and Confer Email, # 2 Exhibit "B" May 4, 2022 Correspondence)(Gaukroger, Gavin) (Entered: 05/06/2022) |
| 52 | May 6, 2022 | ORDER denying 51 Motion to Enforce Protective Order and Impose Sanctions for Violation of Protective Order. Signed by Chief Judge Cecilia M. Altonaga on 5/6/2022. See attached document for full details. (ps1) (Entered: 05/06/2022) |
| 53 | May 10, 2022 | ORDER denying without prejudice 47 Motion to Certify Class. Signed by Chief Judge Cecilia M. Altonaga on 5/10/2022. See attached document for full details. (ps1) (Entered: 05/10/2022) |
| 54 | May 16, 2022 | MOTION to Compel Arbitration ( Responses due by 5/31/2022), MOTION to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. (Attachments: # 1 Exhibit "A" Declaration of Kayvan B. Sadeghi, # 2 Exhibit "1" Declaration of Shannon Casey, # 3 Exhibit "2" Excerpts from the Deposition of Voyager Digital Ltd 30(b)(6), # 4 Exhibit "3" Excerpts from the Deposition of Michael Legg, # 5 Exhibit "4" Voyager Digital LLC Responses to Plaintiff's Interrogatories, # 6 Exhibit "5" Voyager Digital Ltd Responses to Plaintiff's Interrogatories)(Gaukroger, Gavin) (Entered: 05/16/2022) |
| 55 | May 20, 2022 | Plaintiff's EXPEDITED MOTION CLARIFY BRIEFING SCHEDULE ON MOTION TO DISMISS PENDING APPOINTMENT OF LEAD PLAINTIFF/COUNSEL AND FILING CONSOLIDATED AMENDED COMPLAINT re 54 MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law by MARK CASSIDY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Moskowitz, Adam) (Entered: 05/ 20/2022) |
| 56 | May 21, 2022 | PAPERLESS ORDER taking under advisement 55 Expedited Motion for Clarification. Defendants have until Monday, May 23, 2022 at 3:00 p.m. to file their opposition. Signed by Chief Judge Cecilia M. Altonaga (CMA) (Entered: 05/21/2022) |
| | May 21, 2022 | Set Deadlines per order DE#56 as to 55 Plaintiff's EXPEDITED MOTION CLARIFY BRIEFING SCHEDULE ON MOTION TO DISMISS PENDING APPOINTMENT OF LEAD PLAINTIFF/COUNSEL AND FILING CONSOLIDATED AMENDED COMPLAINT re 54 MOTION to Compel Arbitration MOTION to Dismiss. Responses due by 5/23/ 2022 by 3:00pm. (drz) (Entered: 05/23/2022) |
| 57 | May 23, 2022 | RESPONSE to Motion re 55 Plaintiff's EXPEDITED MOTION CLARIFY BRIEFING SCHEDULE ON MOTION TO DISMISS PENDING APPOINTMENT OF LEAD PLAINTIFF/COUNSEL AND FILING CONSOLIDATED AMENDED COMPLAINT re 54 MOTION to Compel Arbitration MOTION to Dismiss filed by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. Replies due by 5/31/2022. (Gaukroger, Gavin) (Entered: 05/ 23/2022) |
| 58 | May 23, 2022 | REPLY to 55 Plaintiff's EXPEDITED MOTION CLARIFY BRIEFING SCHEDULE ON MOTION TO DISMISS PENDING APPOINTMENT OF LEAD PLAINTIFF/COUNSEL AND FILING CONSOLIDATED AMENDED COMPLAINT re 54 MOTION to Compel Arbitration MOTION to Dismiss, 57 Response to Motion, PLAINTIFFS BRIEF REPLY TO MOTION TO CLARIFY by MARK CASSIDY. (Moskowitz, Adam) (Entered: 05/23/ |

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
|  |  | 2022) |
| 59 | May 24, 2022 | ORDER granting 55 Expedited Motion to Clarify Briefing Schedule on Motion to Dismiss Pending Appointment of Lead Plaintiff/Counsel and Filing Consolidated Amended Complaint. Plaintiff shall file his response to Defendant, Voyager Digital LLC's Motion to Compel Arbitration and to Dismiss the Amended Complaint 9ECF No. 54 ) by 5/30/2022. Signed by Chief Judge Cecilia M. Altonaga on 5/24/2022. See attached document for full details. (ps1) (Entered: 05/24/2022) |
| 60 | May 30, 2022 | RESPONSE in Opposition re 54 MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law PLAINTIFFS RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION filed by MARK CASSIDY. Replies due by 6/6/2022. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Moskowitz, Adam) (Entered: 05/30/2022) |
| 61 | May 31, 2022 | PAPERLESS NOTICE of Hearing on Motion 54 MOTION to Compel Arbitration to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law : Oral Argument set for 6/14/2022 09:00 AM in Miami Division before Chief Judge Cecilia M. Altonaga. One hour has been set aside for this hearing. (ps1) (Entered: 05/31/2022) |
| 62 | Jun 1, 2022 | Defendant's EXPEDITED MOTION for Leave to File a 15-Page Reply to Plaintiff's Response to the Motion to Compel Arbitration re 60 Response in Opposition to Motion, by VOYAGER DIGITAL LLC. (Attachments: # 1 Text of Proposed Order Proposed Order)(Gaukroger, Gavin) (Entered: 06/01/2022) |
| 63 | Jun 2, 2022 | ORDER granting 62 Expedited Motion for Leave to File a 15-Page Reply to Plaintiff's Response to the Motion to Compel Arbitration. Defendant Voyager Digital LLC may file a reply brief of up to fifteen (15) pages on or before June 6, 2022. Signed by Chief Judge Cecilia M. Altonaga on 6/2/2022. See attached document for full details. (ps1) (Entered: 06/02/2022) |
| 64 | Jun 6, 2022 | Defendant's REPLY to Response to Motion re 54 MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law filed by VOYAGER DIGITAL LLC. (Gaukroger, Gavin) (Entered: 06/06/2022) |
| 65 | Jun 8, 2022 | MOTION for Leave to Appear via Zoom at hearing scheduled for June 14, 2022, at 9:00am [ECF No. 61]. PLAINTIFFS MOTION FOR CERTAIN COUNSEL TO APPEAR AT JUNE 14, 2022 HEARING VIA ZOOM. Attorney/Representative: GROSSMAN ROTH YAFFA COHEN, P.A. and THE MOSKOWITZ LAW FIRM, PLLC by MARK CASSIDY. Responses due by 6/22/2022 (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 06/08/2022) |
| 66 | Jun 8, 2022 | ORDER granting 65 Motion for Certain Counsel to Appear at June 14, 2022 Hearing via Zoom. Signed by Chief Judge Cecilia M. Altonaga on 6/8/2022. See attached document for full details. (ps1) (Entered: 06/08/2022) |
| 67 | Jun 14, 2022 | PAPERLESS Minute Entry for proceedings held before Chief Judge Cecilia M. Altonaga: Motion Hearing held on 6/14/2022 re 54 MOTION to Compel Arbitration MOTION to Dismiss with Prejudice 46 Amended Complaint/Amended Notice of Removal, and Supporting Memorandum of Law filed by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD. Total time in court: 00 hour(s) : 55 minutes. Attorney |

Cassidy v. Voyager Digital Ltd et al, Docket No. 1:21-cv-24441 (S.D. Fla. Dec 24, 2021), Court Docket

| Entry # | Filing Date | Description |
|---------|-------------|-------------|
|  |  | Appearance(s): Joseph M. Kaye, Adam M. Moskowitz, Rachel Wagner Furst, Gavin Cunningham Gaukroger, Kayvan B. Sadeghi, Sara E. Cervantes, Court Reporter: Stephanie McCarn, 305-523-5518 / Stephanie_McCarn@flsd.uscourts.gov. (ggn) (Entered: 06/14/2022) |
| 68 | Jul 1, 2022 | NOTICE by MARK CASSIDY re 60 Response in Opposition to Motion, PLAINTIFFS NOTICE OF FILING SUPPORTING RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION (Moskowitz, Adam) (Entered: 07/01/2022) |
| 69 | Jul 7, 2022 | SUGGESTION OF BANKRUPTCY as to Defendants, Voyager Digital Ltd. and Voyager Digital LLC, and affiliate, Voyager Digital Holdings, Inc. by VOYAGER DIGITAL LLC, VOYAGER DIGITAL LTD (Attachments: # 1 Exhibit A - Bankruptcy Petitions)(Gaukroger, Gavin) (Entered: 07/07/2022) |
| 70 | Jul 8, 2022 | ORDER that the case is STAYED and ADMINISTRATIVELY CLOSED. All pending motions are DENIED as moot. Signed by Chief Judge Cecilia M. Altonaga on 7/8/2022. See attached document for full details. (wc) (Entered: 07/08/2022) |

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

VOYAGER DIGITAL LTD. and
VOYAGER DIGITAL LLC,

      Defendants.

_____/

## SUGGESTION OF BANKRUPTCY AND NOTICE OF OPERATION OF THE AUTOMATIC STAY

PLEASE TAKE NOTICE that on July 5, 2022 (the "Petition Date"), Defendants Voyager

Digital Ltd. and Voyager Digital LLC, and affiliate Voyager Digital Holdings, Inc. (collectively,

the "Debtors"), each filed voluntary petitions for relief under Chapter 11 of Title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), which Chapter 11 cases

are being jointly administered under case number 22-10943 (MEW) before the Honorable

Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court"). True and correct copies of the Debtors' petitions are annexed hereto

as Exhibit A. The Debtors' bankruptcy cases have not been dismissed or stayed.

PLEASE TAKE FURTHER NOTICE that pursuant to Section 362 of the Bankruptcy

Code, the commencement of the Chapter 11 cases operates as a stay (the "Automatic Stay"),

applicable to all of the Debtors, including, without limitation, Defendants Voyager Digital Ltd.

and Voyager Digital LLC, of among other things: "the commencement or continuation, including

the issuance or employment of process, of a judicial, administrative or other action or proceeding

against the debtor that was or could have been commenced before the commencement of the case

under this title, or to recover a claim against the debtor that arose before the commencement of

the case under this title." 11 U.S.C. § 362(a). Accordingly, this action is stayed by operation of

law.

PLEASE TAKE FURTHER NOTICE that actions taken in violation of the Automatic

Stay are void and may subject the person or entity taking such action to the imposition of

sanctions by the Bankruptcy Court.

The filing of this Suggestion of Bankruptcy and Notice of Operation of the Automatic

Stay is not and shall not be construed as a waiver by the Debtors, their estates or any statutory

committee appointed in the Debtors' bankruptcy cases of any rights, claims, actions, defenses

(including, without limitation, any jurisdictional defenses), setoffs or recoupments, under

agreements, in law, in equity, or otherwise, all of which rights, claims, actions, defenses, setoffs,

and recoupments are expressly reserved.

Dated July 7, 2022                               Respectfully submitted,

                                                 By: /s/ *Gavin C. Gaukroger*
                                                 Gavin C. Gaukroger
                                                 Florida Bar No. 76489
                                                 ggaukroger@bergersingerman.com
                                                 **BERGER SINGERMAN LLP**
                                                 201 East Las Olas Boulevard, Suite 1500
                                                 Fort Lauderdale, Florida 33301
                                                 Telephone: (954) 525-9900

                                                 Kayvan B. Sadeghi (*admitted pro hac vice*)
                                                 ksadeghi@jenner.com
                                                 Jeremy Ershow (*admitted pro hac vice*)
                                                 jershow@jenner.com
                                                 Sara E. Cervantes (*admitted pro hac vice*)
                                                 scervantes@jenner.com
                                                 **JENNER & BLOCK LLP**
                                                 1155 Avenue of the Americas
                                                 New York, NY 10036-2711
                                                 Telephone: (212) 891-1600

                                                 *Counsel for Defendants*

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-24441-CIV-ALTONAGA/Torres

**MARK CASSIDY**,

     Plaintiff,

v.

**VOYAGER DIGITAL LTD.**, *et al.*,

     Defendants.

_____/

## ORDER

     **THIS CAUSE** came before the Court on the Defendants, Voyager Digital Ltd. and Voyager Digital LLC's Suggestion of Bankruptcy and Notice of Operation of the Automatic Stay [ECF No. 69], filed on July 7, 2022. According to the Suggestion, Defendants each filed a Voluntary Petition seeking relief under Chapter 11 the United States Code in the United States Bankruptcy Court in the United States Bankruptcy Court for the Southern District of New York. (*See* Suggestion 1). The cases are being administered jointly under Case No. 22-10943 (MEW) as of July 5, 2022. (*See id.*).

     The filing of a petition for bankruptcy "operates as a stay . . . of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code]." 11 U.S.C. § 362(a)(1) (alterations added); *accord Ellison v. Nw. Eng'g Co.*, 707 F.2d 1310, 1311 (11th Cir. 1983).

     Accordingly, it is

     **ORDERED AND ADJUDGED** that the case is **STAYED** and **ADMINISTRATIVELY CLOSED**. All pending motions are **DENIED** as moot. The case shall be restored to the active

docket upon Court order following motion of a party.

**DONE AND ORDERED** in Miami, Florida this 8th day of July, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.:

Pierce Robertson, Rachel Gold, Sanford Gold,
Rahil Sayed, Christopher Ehrentraut, Todd
Manganiello, Dan Newsom, William Ayer,
Anthony Dorn, Dameco Gates, Marshall Peters,
and Edwin Garrison, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, and Stephen Ehrlich,

        Defendants.

**CLASS ACTION COMPLAINT**

 **JURY DEMAND**

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*"I gotta add, I am a [Voyager] customer and I've been a customer for several months now. I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages."*

    —Mark Cuban

*"In stocks and crypto, you will see companies that were **sustained by cheap, easy money** — but didn't have valid business prospects — will disappear. Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked."*

    —Mark Cuban

*"**Mark is a tremendous advisor to me and we have a great relationship**. He is a big believer in crypto. Sometimes the value someone brings is **not what the public sees** but where they give you guidance and **help behind the scenes**."*

    —Stephen Ehrlich

Plaintiffs Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall, and Edwin Garrison file this class action complaint on behalf of themselves, and all others similarly situated, against Mark Cuban ("Cuban"), Dallas Basketball Limited, d/b/a Dallas Mavericks (the "Mavericks"), and Stephen Ehrlich ("Ehrlich").

## INTRODUCTION

1.      On December 24, 2021, counsel for Plaintiffs and the class members brought a class action complaint styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the Deceptive Voyager Platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud, similar to other Ponzi schemes. It was specifically alleged in detail in that complaint how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through the Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform.

2.      Cuban and Ehrlich, as will be explained, went to great lengths to use their experience as investors to dupe millions of Americans into investing—in many cases, their life savings—into the Deceptive Voyager Platform and purchasing Voyager Earn Program Accounts ("EPAs"),[1] which are unregistered securities. As a result, over 3.5 million Americans have now all but lost over ***5 billion dollars*** in cryptocurrency assets. This action seeks to hold Ehrlich, Cuban, and his Dallas Mavericks responsible for paying them back.



---

[1] https://currency.com/crypto-brokerage-scores-dallas-mavericks-sponsorship (accessed August 10, 2022).

3.      As alleged in paragraphs 1–8 of the *Cassidy* Complaint:

Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week. The Voyager Defendants operate a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. The Voyager Defendants specifically target young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing, promises of interest payments on cryptocurrency holdings (if a minimum balance is met), and uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, the Voyager Defendants' statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

The Voyager Defendants offer what they misleadingly claim to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses in the 1980s.

In reality and unbeknownst to the Voyager Defendants' unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), the Voyager Defendants **never** disclose that they intentionally set the pricing on their Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm," numerous experts explain that the Voyager Defendants place their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how the Voyager Defendants are targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and the Voyager Defendants. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."
>
> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.
>
> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for

fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[2]

Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[3]

4. The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Deceptive Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

5. After the *Cassidy* Complaint was filed, the following important actions took place:

---

[2] https://www.mavs.com/mavsvoyager/
[3] *Id.*

5

(a) the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based);

(c) On March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered— and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year;[4]

(d) On February 14, 2022, crypto trader Block-Fi entered into a $50 million dollar settlement with the state regulators and $50 million dollar settlement with the SEC and agreed to stop selling its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators;

(e) In September 2021, the New Jersey Bureau issued a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful unregistered securities had raised at least $14 billion nationwide;[5] and,

(f) the largest cypto exchange, COINBASE, dropped all plans to offer the same lending rewards program after the SEC threated to sue them.[6]

6.     Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations: "… that's a conversation between myself, out internal GC, our advisors. And we have a very, very deep team, and we're evaluating all that at this point in time."[7]

---

[4]     https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed August 10, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed August 10, 2022)

[5]     https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed August 10, 2022)

[6]     https://www.coindesk.com/policy/2022/01/26/sec-scrutinizing-crypto-firms-over-interest-paying-services-report/ (accessed August 10, 2022)

[7] Transcript of Voyager Digital FY2Q 2022 Earnings Call dated February 15, 2022, **Exhibit A**.

7.     As the *Cassidy* action proceeded through discovery and motion practice on issues relating to arbitration and personal jurisdiction over the Voyager entities, and just before class counsel was able to serve third party discovery on Cuban (who, discovery in the *Cassidy* action showed, personally asked Ehrlich whether he should be worried about the *Cassidy* action), the news broke that Voyager's irresponsible lending activities drove them to lose hundreds of millions of dollars of customer cryptocurrency assets, and Voyager quickly filed Chapter 11 bankruptcy.[8] As a result, the *Cassidy* action is currently stayed by virtue of the automatic stay.

8.     Before filing for Chapter 11 bankruptcy, just like Scott Rothstein did in his infamous Ponzi scheme, it was a necessary element, to continue to persuade, influence and convince the common investor, as cash was getting scarce, to continue to put their earned money (sometimes life savings) into specifically the Deceptive Voyager Platform. To do this, Stephen Ehrlich, CEO and founder of Voyager, made a plethora of false and misleading public statements that were broadcast around the country through the internet, and enlisted the help of Mark Cuban to do the same, who also invested his own money into the Deceptive Voyager Platform for this purpose.



https://www.mavs.com/photos/voyager-press-conference/ (accessed August 10, 2022).

9.     Importantly, although Cuban disclosed the partnership between Voyager and the Dallas Mavericks, he has never disclosed the nature, scope, and amount of compensation he has

---

[8]     https://www.cnbc.com/2022/07/06/crypto-firm-voyager-digital-files-for-chapter-11-bankruptcy-protection.html (accessed August 10, 2022).

7

personally received in exchange for the promotion of the Deceptive Voyager Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[9]

10.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

11.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [12]

12.     Cuban's enthusiasm over the Voyager/Mavericks partnership was shared by Steve Erhlich, CEO and co-founder of Voyager, who said the company "could not be more excited" about partnering with the Mavs. [13] "This partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto," he added. [14]

13.     Ehrlich made it clear that Cuban was integral to his plan to push the Deceptive Voyager Platform on retail investors around the country: "What we think that we'll be able to

---

[9] https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed August 10, 2022).

[10] https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed August 10, 2022).

[11] https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed August 10, 2022).

[12] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed August 10, 2022).

[13] https://decrypt.co/84639/crypto-broker-voyager-digital-partner-mark-cubans-dallas-mavericks (accessed August 10, 2022).

[14] https://decrypt.co/84639/crypto-broker-voyager-digital-partner-mark-cubans-dallas-mavericks (accessed August 10, 2022).

deliver—and it starts here, it starts in Dallas—is teaching people about decentralized finance, cryptocurrencies and nonrefundable tokens," Voyager Digital CEO and Co-founder Steve Ehrlich said. "We really want to bring that to the community. We'll start that now. And some say, 'Why the Mavs?' ***Because of Mark*** and the leadership he brings to the NBA when it comes to cryptocurrencies."[15]

14. Mark Cuban, in turn, went on record calling the Deceptive Voyager Platform "as close to risk free as you're gonna get in the crypto universe." [16]

15. Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[17]

> I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

16. Cuban went so far in his promotion of Voyager that he had even staged a press conference with Voyager CEO Steve Ehrlich, where newly signed New York Knick Jalen Brunson, then a Maverick, asked, "If this is my first time getting into crypto, what are some key things I need to know?"



---

[15] https://www.forbes.com/sites/doylerader/2021/10/28/dallas-mavericks-announce-five-year-partnership-with-cryptocurrency-brokerage-voyager-digital/?sh=64aacae92e99
[16] https://www.proactiveinvestors.com/companies/amp/news/987495
[17] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed August 10, 2022)

17.    "Yeah, you're spending your money, so always be careful," Cuban responded at the time. "But the other thing, look, there's investments, things like Shiba Inu and Dogecoin, those aren't investments. But Voyager … this is a good way to learn and it's something you can do on your smart phone. You can start getting into this and saving your money and that's just a unique opportunity."[18] Ironically, Cuban concluded that "[i]n stocks and crypto, you will see companies that were sustained by cheap, easy money — but didn't have valid business prospects — will disappear," Cuban said. "Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked.'" [19]

18.    As the Texas regulators explain in their recent filing in the Voyager Chapter 11 bankruptcy, misrepresentations regarding Voyager were made on a regular basis:[20]

> Voyager claims it is a "fully compliant and licensed crypto broker" and touts its status as a public company, its listing on the Toronto Stock Exchange, and the "trust and transparency" resulting from its being a public company in Canada. These statements are materially misleading or otherwise likely to deceive the public because:
> • Respondents are not licensed as money service businesses in Texas to conduct currency exchange or money transmission activities defined by Chapter 151 of the Texas Finance Code;
> • Respondents are not registered with the Commodity Futures Trading Commission or the National Futures Association;
> • Respondents are not licensed, registered, or qualified, nor are their securities notice filed, with the United States Securities and Exchange Commission;
> • Respondents are not registered with the Texas State Securities Board to offer or sell securities in Texas, as required by Section 4004.051 of the Securities Act, and the Voyager Interest Accounts are not registered or permitted for sale in Texas, as required by Section 4003.001 of the Securities Act;
> • The Voyager Interest Accounts are not protected by the Securities Investor Protection Corporation, otherwise known as the SIPC, a federally mandated, non-profit, member funded United States corporation created under the Securities Investor Protection Act of 1970 that mandates membership of most US-registered broker-dealers;
> • The Voyager Interest Accounts are not insured by the Federal Deposit Insurance

---

[18]    https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/ ; https://www.thestreet.com/investing/cryptocurrency/mark-cuban-caught-in-bankruptcy-of-crypto-lender-voyager

[19]    https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/ ; https://www.thestreet.com/investing/cryptocurrency/mark-cuban-caught-in-bankruptcy-of-crypto-lender-voyager

[20]    https://www.ssb.texas.gov/sites/default/files/2022-04/20220412_FINAL_Voyager_NOH_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.pdf (accessed August 10, 2022).

Corporation, otherwise known as the FDIC, an agency that provides deposit insurance to depositors in the United States, or the National Credit Union Administration, otherwise known as the NCUA, an agency that regulates and insures credit unions;

• Although Voyager's stock is listed on the Toronto Stock Exchange, the Voyager Interest Accounts are not registered, qualified, or permitted in Canada and Voyager represents Canadian investors cannot invest in the Voyager Interest Accounts;

• The Canadian laws that apply to Voyager's securities listed on the Toronto Stock Exchange do not provide the same regulation or protection as domestic laws that apply to Voyager Interest Accounts Voyager sells exclusively to United States residents; and

• Voyager is not disclosing material risks relevant to these statements, material information including the amount of principal used to fund subsequent transactions, the identity, nature, and creditworthiness of borrowers, the type, nature, and counterparts for transactions involving digital asset exchanges, digital assets, staking, arranging for staking, or proprietary trading, the risks associated with digital asset exchanges, individual digital assets, staking protocols, or proprietarily traded assets, and the profits and/or losses derived from transactions.

19. Voyager Digital LTD ("Voyager") and Voyager Digital LLC ("VDL") operate a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. These companies promise young, inexperienced investors interest payments on cryptocurrency holdings (if a minimum balance is met) and represent that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades.

20. The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

21. Put differently, the Deceptive Voyager Platform was a massive Ponzi scheme, and it relied on Cuban's and the Dallas Maverick's vocal support and Cuban's monetary investment in order to continue to sustain itself until its implosion and Voyager's subsequent bankruptcy.

22. In reality and unbeknownst to unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), VDL **never**

discloses that they intentionally set the pricing on the Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

23.     Ehrlich also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform are as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured. Ehrlich even misrepresented the extent of the FDIC insurance on USD holdings, misleading customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed. This is similar to the official stance of the Voyager entities, which was representing that "Your USD is held by our banking partner, Metropolitan Commercial Bank, which is FDIC insured, so the cash you hold with Voyager is protected," Voyager's website said, claiming deposits are "FDIC insured on USD $250,000."[21] Voyager had also tweeted (@investvoyager, on November 12, 2020): Have you heard? USD held with Voyager is FDIC insured up to $250K. Our customers' security is our top priority. Start growing your crypto portfolio today. [22] Similar misrepresentations were present on the Voyager website:



24.     But those claims "are false and misleading," officials from the FDIC and the Federal Reserve said in a letter to Voyager Thursday. Voyager's claims "likely misled and were

---

[21] https://www.cbsnews.com/news/voyager-fdic-insurance-federal-reserve/ (accessed August 10, 2022).
[22] *Id*.

relied upon by customers who placed their funds with Voyager and do not have immediate access to their funds," the letter said. The officials demanded that the company scrub those claims from its website and social media, and give written confirmation by Monday that they've done so. [23]

25.     The FDIC is a government agency tasked with guarding the public's bank accounts — such as checking, savings and CDs — against unforeseen losses. Having a FDIC insured account means that anyone who has up $250,000 deposited into a bank would have their money reimbursed if the bank unexpectedly fails. However, speculative investments such as stocks and cryptocurrencies typically aren't FDIC insured. [24]

26.     Ehrlich, Cuban, and the Dallas Mavericks pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform.

27.     As will be explained with extensive expert support, these statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

28.     Voyager also markets and offers for sale unregistered securities in the form of cryptocurrency interest-earning accounts. Since Voyager first introduced these unregistered securities to consumers in the United States in November 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA").

29.     Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the financial regulators of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana.

30.     Defendants, who are seen and acknowledged by the general public as "experts" in cryptocurrency, have publicly supported and endorsed Voyager and have encouraged and even incentivized consumers into investing in Voyager.

31.     Defendants, individually and through Voyager, engaged in and/or participated in an illegal offering and sale of unregistered securities and, in connection with the offering, engaged in fraudulent conduct and made material misstatements designed to deceive investors. By doing so, Defendants aided and abetted Voyager's securities laws violations.

---

[23] *Id*.
[24] *Id*.

32.     Defendants have also misrepresented the reality behind Voyager's Deceptive Platform and how it operates. Defendants' representations regarding the "100% Commission-Free" Voyager Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, Defendants' conduct violates multiple consumer and securities statutes, including those in Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana.

33.     Plaintiffs thus seek damages and restitution on behalf of themselves and the Class members.

## PARTIES

34.     Plaintiff Pierce Robertson is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Robertson purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Robertson did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Robertson has sustained damages for which Cuban and Ehrlich are liable.

35.     Plaintiff Rachel Gold is a citizen and resident of the State of Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ms. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Plaintiff Ms. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ms. Gold has sustained damages for which Cuban and Ehrlich are liable.

36.     Plaintiff Sanford Gold is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Mr. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Mr. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in

reliance on those misrepresentations and omissions. As a result, Plaintiff Mr. Gold has sustained damages for which Cuban and Ehrlich are liable.

37.     Plaintiff Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person and is otherwise *sui juris*. Plaintiff Sayed purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Sayed did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Sayed has sustained damages for which Cuban and Ehrlich are liable.

38.     Plaintiff Christopher Ehrentraut is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ehrentraut purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ehrentraut did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ehrentraut has sustained damages for which Cuban and Ehrlich are liable.

39.     Plaintiff Todd Manganiello is a citizen and resident of the State of Louisiana. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Manganiello purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Manganiello did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Manganiello has sustained damages for which Cuban and Ehrlich are liable.

40.     Plaintiff Dan Newsom is a citizen and resident of the State of Alabama. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Newsom purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Newsom did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the

Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Newsom has sustained damages for which Cuban and Ehrlich are liable.

41.    Plaintiff William Ayer is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ayer purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ayer did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ayer has sustained damages for which Cuban and Ehrlich are liable.

42.    Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Dorn purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Dorn did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Dorn has sustained damages for which Cuban and Ehrlich are liable.

43.    Plaintiff Dameco Gates is a citizen and resident of the State of California residing. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gates purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gates did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gates has sustained damages for which Cuban and Ehrlich are liable.

44.    Plaintiff Marshall Peters is a citizen and resident of the State of Pennsylvania. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Peters purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Peters did so after being exposed

to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Peters has sustained damages for which Cuban and Ehrlich are liable.

45.    Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Cuban and Ehrlich are liable.

46.    Defendant Stephen Ehrlich is a citizen of the State of Connecticut. He is the Chief Executive Officer at Voyager Digital LTD.

47.    Defendant Mark Cuban is a citizen of the State of Texas. Cuban is the well-known businessman, investor, television and media personality, and the team owner of the American professional basketball team, the Dallas Mavericks.

48.    Defendant Dallas Basketball Limited, d/b/a Dallas Mavericks is a Texas limited partnership doing business in the United States.

**JURISDICTION AND VENUE**

49.    This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

50.    This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or has otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in

Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

51. Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

52. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A. Background on Voyager and VDL

53. Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

54. Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[25] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE. Voyager stock is also available Over-the-Counter (OTC) through many US brokerages and can be purchased in the state of Florida and throughout the United States via the symbol VYGVF. Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

### B. Voyager's offer and sale of EPAs, which are unregistered securities.

55. On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.

---

[25] *See* https://www.investvoyager.com/blog/why-voyager-is-a-public-company/ (accessed August 10, 2022)

56.     According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion."[26]

57.     For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[27] Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[28] To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan.[29]

58.     Voyager has maintained that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws.[30] Voyager's conclusion is apparently drawn from its position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based.[31] At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations."[32]

59.     As Plaintiffs' expert, Rich Sanders, explains in his report, Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as Celsius and

---

[26] *see* Annual Information Form dated October 27, 2021, attached as **Exhibit B**.
[27] *see* Ex. B.
[28] *see* Ex. A.
[29] *see* Ex. B.
[30] *see* Ex. B.
[31] *see* Ex. B.
[32] *see* Ex. B.

BlockFi.[33] The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.[34]

60.     Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings.[35] To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so." [36]

61.     In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain: [37]

> There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

> Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms

---

[33] Attached as **Exhibit C** is a supplemental report from Mr. Sanders that was proffered in the *Cassidy* Action, which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp."), ¶ 4
[34] *Id*.
[35] Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (accessed August 10, 2022).
[36] Sanders Supp. ¶ 6
[37] Sanders Supp. ¶¶ 9–10.

like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[38] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

62.     Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiffs and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

63.     The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets. Second, EPAs were offered and sold to a broad segment of the general public. Third, Voyager

---

[38]     https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (accessed August 10, 2022)

promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs.

64.      Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth herein, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[39] Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. Further, as Rich Sanders demonstrates in his report, once an investor purchases an EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise.[40] "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear."[41] Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

65.      As explained more fully in this Complaint, Ehrlich's and Cuban's misrepresentations and omissions made and broadcast around the country through the internet

---

[39] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed August 10, 2022)
[40] Sanders Supp. ¶ 11.
[41] *Id*.

render them liable to Plaintiffs and class members for soliciting their purchases of the unregistered EPAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

### C. The Deceptive Voyager Platform and Related Ponzi Scheme

66.     The Deceptive Voyager Platform offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[42] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[43]

67.     VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[44] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[45] Some of the services offered by VDL include:

(a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

(b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

(c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

---

[42] Voyager Digital LTD' Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (**Exhibit D**).
[43] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit E.**
[44] *See* Ex. D.
[45] *Id.*

(d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

(e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

(f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[46]

68.     Further, during the months of January, February, and March 2021, 65,000, 70,000, and 95,000 new funded accounts were onboarded onto the Voyager Platform with net deposits of $170M, $400M, and $650M, respectively:[47]

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[48] Moreover, during the month of April 2021 alone, new users were onboarded "at a record rate with over 130,000 new funded accounts added to the platform."[49]

69.     Included prominently throughout VDL's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

70.     These representations enabled VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

---

[46] *Id*.
[47] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit F**.
[48] *Id*.
[49] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit G**.

71.     These "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While VDL does not openly display the commissions it charges on each cryptocurrency trade, it utilizes various methods to secrete the exorbitant commissions it retains from every trade.

72.     For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is a main source of revenue:[50]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

73.     Although the Voyager Platform will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Platform's systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

74.     To effectuate these unfair and deceptive business practices, VDL claims to use proprietary systems, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[51]

---

[50] See Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit H.**
[51] See "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed August 10, 2022)

75.     In describing the Smart Order Router, VDL maintains that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[52] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[53]

76.     To obscure this overarching scheme, VDL utilizes vague and opaque representations that VDL will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer submits the market order).[54] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[55]

77.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

78.     In support of these allegations, Plaintiffs attach from the *Cassidy* Action the expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[56] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom

---

[52] *Id*.
[53] *Id*.
[54] *Id*.
[55] *Id*.
[56] *See* **Exhibit I** ("Sanders Report")

company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[57]

79.     Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[58] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A combination of automated analysis and manual investigation is utilized to continually add attribution.[59]

80.     Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. VDL currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

81.     For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as VDL, according to Sanders, should have more address attribution. VDL's lack of attribution may at least partially have to do with how VDL processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[60] Further, attribution for VDL wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum)

---

[57] *See* **Exhibit J** ("Castell Report")
[58] Sanders report at ¶ 18
[59] *Id*. at ¶ 20
[60] *Id.* at ¶ 22

to be lacking immediately stands out. Sanders therefore performed manual attribution for VDL addresses."[61]

82.     Mr. Sanders found through his analysis that VDL lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[62]

83.     According to Mr. Sanders, VDL fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, *it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router*, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. *The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers*.[63] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps

---

[61] *Id*. at ¶ 23

[62] *Id*. at ¶ 27

[63]         https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/ (accessed August 10, 2022)

described on their own FAQ. ***Voyager, in essence, is expecting the same degree of trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist</u>.*** Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[64]

84.     Mr. Sanders further explains that VDL's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

> The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[65]

85.     Mr. Sanders also obtained comparison data from VDL's competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[66]

86.     This lack of attribution indicates, in Mr. Sanders' view, that VDL demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

> While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with

---

[64] *Id*. at ¶ 29 (emphasis in original and added)
[65] *Id*. at ¶ 30
[66] *Id*. at ¶ 34

false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[67]

87.    This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

> While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[68] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[69]

88.    Not only does VDL fail to deliver on their advertising promise of "Better Pricing On Trades," **they charge their users the highest premium on trades across all competitors**. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[70] "Consequently, VDL's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[71]

89.    Upon further testing, Mr. Sanders also found it probable that VDL is not basing their market quotes off exchanges:

---

[67] *Id.* at ¶ 35 (emphasis added)
[68] https://www.investvoyager.com/blog/where-is-voyager-available/ (accessed August 10, 2022)
[69] *Id.* at ¶ 43
[70] *Id.* at ¶ 47
[71] *Id.* at ¶ 48

Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[72] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume, which is also likely to have fake order books, such as HitBTC[73] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[74] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[75] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[76]

90.     This probability is further bolstered by the questionability of VDL's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[77]

---

[72] https://invao.org/how-stable-are-stablecoins/ (accessed August 10, 2022)
[73]         https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or (accessed August 10, 2022)
[74] *Id*. at ¶ 50
[75] *Id*. at ¶ 51
[76] *Id*. at ¶ 53
[77] *Id*. at ¶ 55

91.     Mr. Sanders lastly concludes, in line with what Plaintiffs allege:

Voyager has fraudulently conducted business by making false claims, utilizing misleading marketing, and obscuring the truth behind what Voyager does with customer's funds, and what fees users are charged. "Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert."[78]

92.     As to the widespread use of individuals like Ehrlich and promoters like Cuban and the Dallas Mavericks to continue to push the Deceptive Voyager Platform and related Ponzi Scheme and their importance in keeping the scheme afloat, Mr. Sanders provides his report dated August 10, 2022, a copy of which is attached as **Exhibit K** ("Sanders Report 2"). In his report, Mr. Sanders details how Ehrlich and Cuban knowingly and intentionally misrepresented the Deceptive Voyager Platform and related Ponzi Scheme to the unsuspecting public:

Voyager's APY was called into question early, including in a 2021 podcast with Decrypt[79] (which, despite being recorded by someone that openly admitted to being a Voyager customer, aged like milk) titled "9% APY Too Good to be True" in which [Ehrlich] is questioned why Voyager can do this, but banks can't: "It's sustainable for us, yeah." [Ehrlich] never evidenced how this yield was sustainable: because it wasn't, and because he lied. "We're sending coins to really secure, billion dollar companies" can not be an accurate risk representation with what (still little) we now know Voyager customer assets were utilized for. [Ehrlich] also lied about having "hack insurance" in this podcast, or at least Voyager has not evidenced any such "hack insurance" protecting against a hack of Voyager itself, nor would hack insurance be at the top of the list of concerns whereas solvency would be; a solvency audit would be a higher priority than hack insurance for an organization like Voyager if legitimately and competently managed. In just one approximately 23 minute podcast, Ehrlich lies about a variety of critical issues that, in and of itself, is sufficient to outline the issues of Voyager's misrepresentations; suffice to say, outlining all examples of Voyager's representations would make this report potentially hundreds of pages in length. The Decrypt podcast with Ehrlich, however provides what I assess to be an extremely accurate indicator of the problems with Voyager's representations in a 23 minute segment.

---

[78] *Id*. at ¶ 67
[79]     https://soundcloud.com/user-792539118-188863837/oct-4-is-9-apy-too-good-to-be-true     (accessed August 10, 2022).

Ehrlich lying about the sustainability of their 'Earn' program is one of dozens, if not hundreds, of examples of Voyager deliberately lying and misleading the public, and fostered the culture and conditions for the "educators" and "influencers" to do the same.

Understanding the issues with promoting Voyager via professional sports teams requires understanding the audience. The average NASCAR viewer, or generally, the average professional sports viewer, is likely to be a lower to middle class individual with below average to average technical expertise. Certainly, an individual that has never been engaged with cryptocurrency and is exposed to digital assets for the first time via something like NASCAR is not only a new investor, but a naive one. By definition, this is a vulnerable demographic: for investment in general, and especially for investment in digital assets[80]. Representing to this demographic that investment in digital assets *at all* is low risk was and is wrong. Representing to this demographic that it is appropriate to keep one's "rainy day fund", let alone their life's savings, in digital assets, was and is wrong. Representing to brand new cryptocurrency investors an array of things regarding Voyager, such as that the APY was "sustainable" and low risk, was egregiously predatory and, in my opinion, more maliciously cunning than the activity of "direct scammers" such as those behind Bitconnect.

Put simply, Mark Cuban is no more qualified to provide digital asset investment advice than most laypeople. Experience in other investments makes not for an honest cryptocurrency "influencer", and, in fact, only increases the likelihood that they're being paid for their social media following. Mark Cuban may know some things about finance and business, but he is in no way, shape, or form deeply experienced with blockchain technology. While Mark Cuban has an array of companies under his portfolio (including generally successful startups such as OpenSea, Zapper, and Polygon[81]), investment in a company does not mean expertise in the industry, and as has been the case with digital assets especially since the 2017 market, if you "throw enough darts", eventually something will stick – especially if you're getting undisclosed/non-public deals with more beneficial investment terms than offered publicly. Mark Cuban is not far removed from other "influencers" that focus on price discussion and have experience largely limited to trading the altcoin/NFT flavor of the week to try to catch a profit.

In the simplest terms possible, "influencers" like Mark Cuban were utilized purely for their reach. Ironically, the area Mark Cuban would have more knowledge business knowledge should have made plain that Voyager's APY was not

---

[80] Investment in digital assets is widely accepted to be higher risk than "traditional" investments for a plethora of reasons, including but not limited to less regulatory protection and irreversible nature of transactions.

[81] https://markcubancompanies.com/blockchain/ (accessed August 10, 2022).

sustainable. Despite this, Mark Cuban opted to promote Voyager aggressively, including via the Dallas Mavericks[82].

*"In stocks and crypto, you will see companies that were sustained by cheap, easy money — but didn't have valid business prospects — will disappear," Cuban said. "Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked." - Mark Cuban[83]*

Voyager didn't simply lack "valid business prospects" – it was doomed from the onset. "Educators" and "influencers" continue to push Voyager's false narrative that the reasons for their collapse were somehow outside of their control, citing "market conditions" and other external factors. It's also worth pointing out that despite Mark Cuban's purported sharp acumen, he didn't see risks with Voyager during the earlier crypto bear market, such as when interviewed in May of 2022[84]. Put simply, Mark Cuban knew better both when he was promoting Voyager early, and all the way through the endgame of Voyager collapsing shortly after his May 2022 interview.

. . .



Mark Cuban suggested that it would be safe to save only four month of expenses in the form of USDC and to live off of 7% "on DeFi". The average salary of a full time employee in the US in 2021 was approximately $5,854 per month[85]. This would be a savings of $23,416. To state the obvious, a 7% yield on that figure will not pay one's bills. There would be no point in putting assets you'd need for expenses into a yield program (especially if it was subject to lock), and it would be insanely risky to put money one will need to pay the bills into something (that Mark Cuban knew was) risky. Regardless of whether Mark Cuban was alluding to

---

[82]         https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/

[83] *Id.*

[84]         https://www.cnbc.com/2022/05/12/mark-cuban-crypto-is-going-through-a-similar-lull-to-early-web.html

[85] https://www.ziprecruiter.com/Salaries/Average-Salary-per-Month (accessed August 10, 2022).

Voyager and not DeFi here, this Tweet is an example of what led many Voyager customers into false confidence.

Sanders Report 2, ¶¶ 30–37.

93. Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the potential scope of damages resulting from VDL's overcharges. This analysis, "relying on Voyager's own reported figures," reflected that VDL's conduct has likely resulted or will result in over **1.08 billion dollars** in damages to its users.[86]

94. Dr. Castell agrees with Mr. Sanders in that VDL does not actually execute trades at the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' for the user/trader."[87]

95. The Voyager app was likely deliberately designed to not provide the actual functionality aspects represented to users. Dr. Castell states:

> Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be centered principally within elements of the coding or programmed behavior of the "Smart Order Router," and/or the "Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.[88]

> In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the "best market price" or "fair market price" for the user/trader.[89]

96. This obscurity leading to charging customers extra hidden fees is most likely known to VDL at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[90]

---

[86] Castell report at ¶ 43
[87] *Id*. at ¶ 45
[88] *Id*. at ¶ 46
[89] *Id*. at ¶ 40
[90] *Id*. at ¶ 41

97.     According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e., the overcharge was never less than 0.5% of the value of the trade."[91]

98.     According to Dr. Castell, it is a fact that there is a definite material defect in the design of the Voyager Platform software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[92]

99.     That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

> However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional, in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[93]

---

[91] *Id*. at ¶ 26
[92] *Id*. at ¶ 29(b)
[93] *Id*. at ¶ 29(c)

100.    VDL has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

> Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[94]

### D. Defendants lure consumers into Voyager

101.    Cuban is also no stranger to the cryptocurrency market. Earlier this year, in a podcast he did with Jon Stewart, he stated that 80% of the investments he makes outside of those on Shark Tank "are in or around cryptocurrencies"[95] because "[t]hat is really where I look to invest."[96]

102.    On October 28, 2021, at a Mavericks press conference, Defendants announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[97]



---

[94] *Id*. at ¶ 50
[95]  https://www.cnbc.com/2022/01/14/mark-cuban-says-80percent-of-his-non-shark-tank-investments-are-in-crypto.html (accessed August 10, 2022).
[96] *Id*.
[97] https://www.mavs.com/mavsvoyager/ (accessed August 10, 2022).

103.    Defendant Cuban proudly described how he would personally help significantly increase the scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."
>
> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.
>
> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[98]

104.    Defendant Ehrlich agreed with Cuban and added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.
>
> About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [99]

105.    Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[100]

---

[98] https://www.mavs.com/mavsvoyager/ (accessed August 10, 2022)
[99] *Id.*
[100] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed August 10, 2022)

I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

. . .

And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

106.    Throughout the press conference, Cuban continuously represented that Voyager was an easy to use platform that offered the best pricing in the market:

And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

107.    Ehrlich, in turn, continuously touted the Voyager rewards program, posing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Deceptive Voyager Platform: [101]

You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.

. . .

It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.

. . .

Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of

---

[101] *Id.*

39

building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens, and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

108.    Cuban also shamelessly pushed investors to invest heavily into USDC and other assets on the Deceptive Voyager Platform, claiming that investing in the Deceptive Voyager Platform was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account at a bank for young children:[102]

One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

. . .

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.

. . .

So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach— you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.

. . .

It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a

---

[102] *Id.*

smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

109. Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as opposed to lending them out to institutional investors like 3AC), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [103]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.
>
> . . .
>
> Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.
>
> . . .
>
> I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

110. Finally, Cuban went to great lengths to cast investing in the Deceptive Voyager Platform as a "fun" opportunity with a low cost of entry: [104]

> Access, first and foremost. The simplicity of access, The fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then

---

[103] *Id.*
[104] *Id.*

experimentation, right? Be curious. . . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key. . . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . . It's a low cost entry to fun.

111.    As an incentive, Defendants Cuban and the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[105]

112.    Although it is unclear without discovery to what extent Cuban was invested in the Deceptive Voyager Platform, how much he profited from his involvement in soliciting purchases of EPAs from investors around the country, or whether he was able to get his investment into the Deceptive Voyager Platform out before Voyager filed Chapter 11 bankruptcy, it would not be the first time he led investors to ruin while he was able to enrich himself at their expense.

113.    Cuban previously endorsed the cryptocurrency Titan by Iron Finance, a coin he publicly endorsed that was trading at $65 promising over 200% APY which then crashed to $0.000000024 within a few days of his endorsement.[106] Cuban reported via Twitter (@mcuban) that "I got hit like everyone else. Crazy part is I got out, thought they were increasing their TVL enough. Than [sic] Bam." Cuban never publicly disclosed whether he lost money in that transaction.[107] What was clear, though, is that Cuban's public endorsement of Titan caused the price to double in a matter of days: "Many crypto investors follow the lead of crypto-friendly billionaires' comments—and that could have contributed to the surge. At the start of June 13, the day of Cubans' blog post, Titan was trading at $29. Three days later, it hit its peak." [108] Thus, Cuban's public statements clearly carry tremendous weight with the public.

114.    As intended by Cuban, Ehrlich, and the Dallas Mavericks, their promotion worked. Hundreds of investors, including Class Member Anand Bhatt, who resides in Wyoming, joined Voyager. Anand recalls that "the only reason I signed up is because of Mark Cuban offering the free Bitcoin/Dallas Mavericks deal."

---

[105]    https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed August 10, 2022).

[106]    https://www.publish0x.com/at-scottcbusiness/celebrity-crypto-endorsements-gone-wrong-xznzyqd (accessed August 10, 2022).

[107]  https://fortune.com/2021/06/17/crypto-titan-token-crash-mark-cuban/ (accessed August 10, 2022).

[108]  *Id.*

115.   As Plaintiff Pierce Robinson explained:

So, I first heard about Voyager from Mark Cuban. The dogecoin hype was at its
peak and I was thinking about investing in crypto. This was back in the summer of
2021. I saw Mark promoting dogecoin and then Voyager and thought "he's a sound
investor," so I downloaded the app and began to play around with a very small
amount of money in June 2021. Later in the year, I remember the news was on
Voyager and all over the TV and internet that there was a partnership with Mark
and the Mavericks, so I trusted that it was legitimate started putting more and more
money into the app. I invested even more because of the interest opportunities on
Voyager that Mark loudly promoted the second half of last year.

116.   Another Class Member, Katie Damore, states:

I opened my Voyager account . . . after hearing Mark Cuban's partnership and
support with Voyager I felt overly confident in the platform and I made 3 more
deposits . . . I am an inexperienced investor and crypto person and I got caught up
in the hype.

117.   Others have similarly pointed to Defendants for their decision to join Voyager:

"[I] saw many statements from Mark Cuban stating that Voyager was "100% Risk
Free, and it's as close to risk free as you are going to get in the crypto universe . . .
[Mark Cuban's] trust in Voyager [] made me purchase the coin from Voyager . . ."

      Class Member, Nikhila Beesetti

"I was aware that Mark Cuban and others . . . had become investors . . . so I felt
comfortable to move the bulk of my holdings to Voyager . . . These gave me
comfort."

      Plaintiff, Marshall Peters

118.   A further reason for the necessity of taking in as many customers as possible to use

their funds to perpetuate the Deceptive Voyager Platform and related Ponzi scheme, Founder and

President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the

earnings call for Voyager's Second Quarter for Fiscal Year 2021:[109]

With the growth of assets under management, we remind investors of our 2 main
revenue sources, spread revenue and interest revenue. Estimated spread revenue is
derived by the trading velocity of our assets while interest revenue was driven by
the gross interest earned on the overall assets under management. Historically, the
company has earned between 10 to 12% annualized revenue on assets under
management.

At this point, I would also like to remind investors of certain drivers of our business.
As in agency brokerage business, market volatility can often act as our friend.

---

[109] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit
L.**

Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

119.    Defendants also relied on social media to promote Voyager. On May 3, 2021, Ehrlich made a number of misrepresentations to induce people to invest in Voyager, including that he and Voyager are "really trying to create wealth for retail investors," and, citing his 25 years of experience in finance, he is "looking out for best interests of consumers." https://www.youtube.com/watch?v=nKevUsTGN3I (accessed August 10, 2022).

120.    On October 13, 2021, when asked in an interview by Dan Weiskopf, "is it true the customers own the crypto, specifically Bitcoin and Ethereum on your platform, where that's not necessarily the case on other platforms," Ehrlich unequivocally stated that customers "absolutely" own all of their crypto on the platform and can remove it at any time:[110]

> Yes, **_they absolutely own it_**. **_They can take it off the platform any time they want_** and bring it into their own personal wallets. You know, a lot of customers want us to hold it for them and everyone who brings crypto into us has a specified wallet address for them. But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – **_yes, you can take it any time you want_**. Now we have limits on withdrawals and that's for customer safety and protection but **_you can take anything off whenever you want, you know, no questions asked._**

He also stated that this ownership of the cryptocurrency assets is "a differentiator" from other wallet apps.

121.    Ehrlich also made a number of misleading representations at an October 23, 2019 interview broadcast on the internet,[111] including:

> We aren't an exchange. We are a broker. We are a regulated agency broker so our job is to do nothing but find the best price and execution for the consumers. So we don't have a horse in the race. We don't have proprietary trading, we don't need to get people to put orders off the bid and the ask, we are trying to find the best execution for the consumer on every single trade. We are a traditional online service provider, but in the crypto space.

---

[110]

https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8K8FMOgVdpqOA (accessed August 10, 2022).

[111] https://www.youtube.com/watch?v=NwVA1wiDr5E (accessed August 10, 2022)

44

122.    Ehrlich even personally took to Reddit to host an "AMA" (Ask-Me-Anything) session on the r/Invest_Voyager subreddit, in order to communicate directly with Voyager customers and potential Voyager customers in order to induce them to invest or to continue investing in the Deceptive Voyager Platform:[112]





---

[112]

123.    During that AMA, Ehrlich played up Cuban's involvement as his advisor:



124.    He also played up Voyager's "transparency":



125.     He even advocated for customers to *ditch their bank accounts* in favor of investing in Voyager:



126.     Ehrlich also falsely represented that he and Voyager sought to "ensure the safety and security of all customer assets at all points in time," that customers could earn rewards with "no lockup on your token," and that Voyager "eat[s the] risk on our end to ensure you get a consistent monthly return on your end":

*How does voyager plan to increase staking revenues to maintain their yield payment.*

Our main strategy is to add more staking coins, where we can bring value to our consumers. Over the past 40 days, we've added 20 new coins–10 of which are staking tokens. As you may know, we work with at least 8 custodians and we're looking to add more. We have multiple execution providers and exchanges and multiple node providers delivering new coins with competitive rewards as fast as we can. The key to this is ensuring everything meets our security standards so that we can ensure the safety and security of all customer assets at all points in time

Apart from that, some of our non-staking rewards are based on market demand. We'll always aim to offer competitive rates on as many tokens as we can. Some key benefits outside of the rewards number alone is the ability to earn with no lockup on your token, and the reward rate staying consistent on a monthly basis. The market demand can shift on a daily basis, but we eat that risk on our end to ensure you get a consistent monthly return on your end.

127.    When specifically asked whether he anticipated any "major fines like BlockFi," Ehrlich sought to reassure his customers:

*Does voyager anticipate any major fines like BlockFi?*

*I believe our rewards program is different from BlockFi's program and complies with current law. I've been in the financial services industry, working with regulators for 28 years now. Since the start of Voyager, we've been in communication with regulators to ensure we operate not only within the rules but we are also planning for any potential necessary changes.*

128.    Although Ehrlich claims that one of the major benefits of Voyager is its transparency, his own dealings in connection with Voyager have been extremely opaque. According to a report from CNBC, Ehrlich made millions of dollars selling Voyager shares in February and March 2021 when shares were near their peak, financial records show, in an apparent insider trading move.[113] What is evident, based on corporate insider disclosures and Voyager filings, is that Ehrlich made over $30 million disposing of Voyager equity as the crypto lender's shares neared an all-time high.[114] Ehrlich and his Delaware LLCs sold nearly 1.9 million shares from February 9, 2021, to March 31, 2021, in 11 separate sales which totaled $31 million, according to data from the Canadian Securities Administration. [115] The three largest of Ehrlich's transactions – totaling 1.4 million shares worth nearly $19 million – were connected to a $50,000,000 secondary offering by Stifel Nicolaus in February 2021.[116] Voyager shares would peak at $29.86 ___a week after Ehrlich's final sale___ on April 5, 2021. [117] Three weeks later, VOYG shares had lost 41% of their value. By November 2021 — as the crypto market overall was peaking —Voyager was down 69% from its peak. [118]

---

[113] https://www.cnbc.com/2022/08/03/voyager-ceo-made-millions-in-stock-sales-in-2021.html (accessed August 10, 2022).
[114] *Id*.
[115] *Id*.
[116] *Id*.
[117] *Id*.
[118] *Id*.

## CLASS ACTION ALLEGATIONS

129.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A. Class Definitions

130.    Plaintiffs seek to represent the following Nationwide Classes and State Subclasses (collectively, "the Classes"):

(1) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in an EPA.

(2) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in an EPA.

(3) **New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased or enrolled in an EPA.

(4) **Virginia Subclass:** All persons in the state of Virginia who, within the applicable limitations period, purchased or enrolled in an EPA.

(5) **Alabama Subclass:** All persons in the state of Alabama who, within the applicable limitations period, purchased or enrolled in an EPA.

(6) **Louisiana Subclass:** All persons in the state of Louisiana who, within the applicable limitations period, purchased or enrolled in an EPA.

(7) **California Subclass:** All persons in the state of California who, within the applicable limitations period, purchased or enrolled in an EPA.

(8) **Oklahoma Subclass:** All persons in the state of Oklahoma who, within the applicable limitations period, purchased or enrolled in an EPA.

      **(9)** **Pennsylvania Subclass:** All persons in the state of Pennsylvania who, within the applicable limitations period, purchased or enrolled in an EPA.

      **(10)** **Tennessee Subclass:** All persons in the state of Tennessee who, within the applicable limitations period, purchased or enrolled in an EPA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana Subclasses, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

      **B.**   **Numerosity**

      131.   The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana, to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Deceptive Voyager Platform and related Ponzi scheme.

      **C.**   **Commonality/Predominance**

      132.   This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

      (a) whether the EPAs were unregistered securities under federal, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana law;

(b) whether Defendants' participation and/or actions in Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana securities law.

(c) the type and measure of damages suffered by Plaintiffs and the Classes.

(a) whether Defendants' description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether Defendants' practices violate the UDAP statutes of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana;

(d) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(e) whether Plaintiffs and Class members are entitled to injunctive relief;

(f) whether Plaintiffs and Class members are entitled to declaratory relief; and

(g) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## D. **Typicality**

133.     Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

## E. **Adequacy of Representation**

134.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation,

and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firm, which has the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F. Requirements of Fed. R. Civ. P. 23(b)(3)**

135. The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPAs, which are unregistered securities, (2) in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme.

136. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

137. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G. Superiority**

138. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.  Requirements of Fed. R. Civ. P. 23(b)(2)**

139.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

140.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.  Requirements of Fed. R. Civ. P. 23(c)(4)**

141.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPAs Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the "EPA" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

142.    As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme, utilizing Rule 23(c)(4) to certify the "Platform" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

J. **Nature of Notice to the Proposed Classes.**

143.     The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

| THE NATIONWIDE AND NEW JERSEY CLAIMS |
|---|

### COUNT ONE

**Aiding and Abetting Fraud**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

144.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

145.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

146.     Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

147.     Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

148.     Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

149.     Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

150.     Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)

151.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

152.     As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

153.     Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

154.     Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

155.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THREE

### Civil Conspiracy

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

156.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

157.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

158.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

159.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

160.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

161.    Plaintiffs allege that Defendants had actual knowledge, which can be inferred from the totality of the circumstances of the events plead in this complaint. Plaintiffs lack access to the very discovery materials which would illuminate the Defendants' state of mind. But participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a

fraud. Intent to commit fraud is to be divined from surrounding circumstances, and in this case, Plaintiffs plead that Defendants participated in the fraud by participating in the creation of Voyager's marketing strategy which contained clear misstatements and omit material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

162.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT FOUR

### For Violations of the New Jersey Consumer Fraud Act,

### §§ 56:8-1 *et seq.*

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)

163.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

164.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

165.    Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

166.    Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

167.    Defendant's acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiff and Class members, into investing in the Comp any's falsely touted business and are immoral, unethical, oppressive, unscrupulous,

or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

    a. knowingly and intentionally concealing the Defendant's specific roles and interests in Voyager;

    b. knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs;

    c. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

    d. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that funds or assets held in the Voyager Platform are FDIC insured.

168. The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

169. Plaintiffs and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

170. Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

171. Plaintiffs and the Class have a private right of action against Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

172. Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FIVE

**Violations of New Jersey Statute Section 49:3-60,**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

173.  Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

174.  N.J.S.A. 49:3-60 provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under N.J.S.A. 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

175.  N.J.S.A. 49:3-52 also makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security," to either directly or indirectly:

   a.  employ any device, scheme, or artifice to defraud;

   b.  make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

   c.  engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

176.  The Voyager Earn Program Account is a security pursuant to N.J.S.A. 49:3-49(m).

177.  The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

178.  The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

179.  In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

180.  Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

181.  As a result of these actions, Defendants violated N.J.S.A. 49:3-60.

## COUNT SIX

### Unjust Enrichment
**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

182.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–143 as if fully set forth herein.

183.    Plaintiffs and Class members conferred upon the Defendants non-gratuitous payments of undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants appreciated, accepted and/or retained, in whole or in part, the non-gratuitous benefits conferred by Plaintiffs and Class members.

184.    Defendants profited from their unlawful collection and retention of undisclosed commissions at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for the Defendants to be permitted to retain the benefit. Under common law principles of unjust enrichment, the Defendants should not be permitted to retain the benefits of this unjust enrichment, as they were obtained through deceptive representations and omissions, as more fully described above.

185.    Because the Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and Class members is unjust and inequitable, Plaintiffs and Class members suffered damages as a result of the Defendants' unjust enrichment, and are entitled to, and hereby seek disgorgement and restitution of the Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## COUNT SEVEN

### Declaratory Judgment

**(Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

184.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–143 as if fully set forth herein.

185.    This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

186.    The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 et seq. (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To

maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

187.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

188.    Plaintiffs and members of the Class purchased EPAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive Voyager Platform as further described hereinabove.

189.    If the true facts had been known, including but not limited to that the EPAs are unregistered securities, the Deceptive Voyager Platform does not work as represented, Voyager operated as a Ponzi scheme, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Class would not have purchased EPAs in the first place.

190.    Thus, there is a justiciable controversy over whether the EPAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiffs and the Class.

191.    Plaintiffs and the Class seek an order declaring that the EPAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive Voyager Platform did not work as represented, Voyager operated as a Ponzi scheme, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation.

## THE FLORIDA CLAIMS

### COUNT EIGHT

### Aiding and Abetting Fraud

### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

192.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

193.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if

they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

194.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

195.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

196.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

197.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

198.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.


## COUNT NINE

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

199.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

200.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

201.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and

encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

202. Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

203. Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TEN

### Civil Conspiracy

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

204. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

205. Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

206. Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

207.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

208.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

209.     Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT ELEVEN

### For Violations of the Florida Deceptive and Unfair Trade Practices Act,
### § 501.201, Florida Statutes, *et seq.*

### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

210.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

211.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

212.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

213.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

214.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

215.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

216. Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform and in the amount of their lost investments.

217. The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

218. Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

219. Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT TWELVE

### Violations of the Florida Statute Section 517.07,
### The Florida Securities and Investor Protection Act
### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

220. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

221. Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

222. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

223. The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

224.     The EPAs sold and offered for sale to Plaintiffs and Class members were not:

    a.  exempt from registration under Fla. Stat. § 517.051;

    b.  a federal covered security;

    c.  registered with the Office of Financial Regulations (OFR); or

    d.  sold in a transaction exempt under Fla. Stat. § 517.061.

225.     Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

226.     Defendants are directors, officers, partners and/or agents of Voyager pursuant to Fla. Stat. § 517.211.

227.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq.

---

**THE LOUISIANA CLAIMS**

---

**COUNT THIRTEEN**

**For Violations of the Unfair Trade Practices and Consumer Protection Law,**

**R.S. 51:1401, et seq.,**

**(Individually by Plaintiff Manganiello against Defendants)**

228.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

229.     This cause of action is brought pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA").

230.     Plaintiff is a consumer as defined by section 1402(1). Defendants are engaged in trade or commerce as defined by section 1402(10).

231.     Section 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

232.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

233.     Defendants have violated the LUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

234.     Plaintiff has been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

235.     The harm suffered by Plaintiff was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

236.     Pursuant to section 1409, Plaintiff brings this action and makes claims for actual damages, attorneys' fees and costs.

## COUNT FOURTEEN

### Violations of the Louisiana Section 51:705 et seq,
### (Plaintiff Manganiello Individually and on behalf of the Louisiana Class)

237.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

238.     RS 51:705 provides that it is unlawful for any person to offer for sale or sell a security within the State of Louisiana unless the security or transaction is exempt under RS 51:708 or 709, is a federally covered security, or is registered.

239.     The Voyager Earn Program Account is a security pursuant to RS 51:702 (15)(a).

240.     The EPAs sold and offered for sale to Plaintiffs and Class members were not exempt from registration under RS 51:708 or 709, federal covered securities, or registered.

241.     Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

242.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated RS 51:705 et seq.

<div style="border:1px solid black; text-align:center;">

**THE ALABAMA CLAIMS**

</div>

## COUNT FIFTEEN

### Civil Conspiracy

**(Plaintiff Newsom Individually and on behalf of the Alabama Class)**

243.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

244.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

245.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

246.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

247.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

248.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT SIXTEEN

### For Violations of the Alabama Deceptive Trade Practices Act,

### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

249.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

250.     This cause of action is brought pursuant to the Alabama Trade Practices Act, section 8-19-1 *et seq*. ("Alabama DTPA"). The stated purpose of the Alabama DTPA is to "protect the interest of both the consuming public and the legitimate businessperson." § 8-19-2.

251.     Plaintiffs and Class members are consumers as defined by section 8-19-3(2). Defendants are engaged in trade or commerce within the meaning of the Alabama DTPA.

252.     Section 8-19-5(27) declares unlawful "[e]ngaging in any [] unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

253.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

254.     Defendants have violated the Alabama DTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

255.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform.

256.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

257.     Pursuant to Section 8-19-10, Plaintiffs and consumers in the Class bring this cause of action for actual damages, attorneys' fees and costs.

258.     Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 8-19-10entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT SEVENTEEN

### Violations of the Code of Alabama 1975, Chapter 6

### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

259.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

260.    Section 8-6-17 provides that it is unlawful for any person to sell or offer to sell a security within the State of Alabama unless the security is registered pursuant to Ch. 6, exempt from registration under § 8-6-10, or the transaction is exempt under § 8-6-11.

261.    Section 8-6-17 also provides prohibited acts regarding the offer, sale or purchase of securities, including, for example:

    a.    Employing any device, scheme, or artifice to defraud;

    b.    Making untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

    c.    Engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

262.    The Voyager Earn Program Account is a security pursuant to § 8-6-2(10).

263.    The EPAs sold and offered for sale to Plaintiffs and Class members were not:

    a.    registered;

    b.    exempt from registration under § 8-6-10; or

    c.    part of a transaction exempt under § 8-6-11.

264.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

265.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Chapter 6.

| THE VIRGINIA CLAIMS |
|---|

## COUNT EIGHTEEN

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

266.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

267.     As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

268.     Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

269.     Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

270.     Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT NINETEEN

### Civil Conspiracy

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

271.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

272.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge

Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

273.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

274.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

275.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

276.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

**COUNT TWENTY**

**For Violations of the Virginia Consumer Protective Act,**

**§ 59.1-196 et seq, Code of Virginia**

**(Plaintiff Ayer Individually and on behalf of the Virginia Class)**

277.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

278.    This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

279.    Plaintiffs and Class members are consumers as defined by § 59.1-198. Defendants are "supplier(s)" and engage in "consumer transaction(s)" as defined by the Act.

280.    Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

281.    Defendants have violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

282.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments.

283.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendants, as more fully described herein.

284.    Pursuant to section 59.1-204, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT TWENTY-ONE

### Violations of Section 13.1-501 et seq, Code of Virginia

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

285.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

286.    Section 13.1-507 provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

287.    Section 13.1-502 makes it unlawful "for any person in the offer or sale of any securities, directly or indirectly,"

  a.    "employ any device, scheme or artifice to defraud";

  b.    "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or

  c.    "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

288.    The Voyager Earn Program Account is a security pursuant to Section 13.1-501.

289.    The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered, are not exempt from registration, and are not federal securities.

290. In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

291. Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

292. As a result of these actions, Defendants violated Sections 13.1-501 et seq.

| THE CALIFORNIA CLAIMS |
|---|

## COUNT TWENTY-TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

293. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

294. As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

295. Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

296. Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

297. Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-THREE

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(Plaintiffs Dorn and Gates Individually and on behalf of the California Class)**

298.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

299.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

300.     Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

301.     The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

302.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT TWENTY-FOUR

### Violations of the CSL

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

303.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

304.    California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

305.    Voyager, with Defendants' material assistance, offered and sold the EPAs **Securities** in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

306.    Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Voyager's non-compliance with the CSL establishes their intent to deceive investors regarding the EPAs.

307.    California Corp. Code § 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

308.    Defendants breached Section 25210(b) by encouraging Voyager to offer and sell the EPAs **Securities** despite the fact that such securities were not qualified under the CSL.

309.    California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

310.    California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section

76

25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

311.    Voyager, with Defendants' material assistance, offered and sold the EPAs Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

312.    Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25504.1.

313.    Plaintiffs hereby conditionally tender their Voyager Securities in accordance with Cal. Corp. Code § 25503.

---

**THE PENNSYLVANIA CLAIMS**

**COUNT TWENTY-FIVE**

**Aiding and Abetting Fraud**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

314.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

315.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

316.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

317.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich

misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

318.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

319.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

320.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-SIX

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

321.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

322.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

323.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

324.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the

Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

325.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-SEVEN
### Civil Conspiracy
### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

326.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

327.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

328.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

329.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

330.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

331.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-EIGHT

**For Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**

**73 Pa. Stat. §§ 201-1 et seq**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

332.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

333.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4).

334.     Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of Pennsylvania, as described more fully hereinabove.

335.     Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' representations regarding Voyager's FDIC insured status were also false.

336.     Defendant's acts and omissions constitute unfair trade practices because they are fraudulent or deceptive and create a likelihood of misunderstanding. *See* 73 Pa. Stat. § 201-2(4)(xxi).

337.     Plaintiffs and the Class are "person(s)" as that term is defined in 73 Pa. Stat. § 201-2(2).

338.     Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of Defendants' unconscionable practices described above. Plaintiffs and the Class have a private right of action against Defendants and they are entitled to recover, in addition to their actual damages, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. 73 Pa. Stat. § 201-9.2(a).

339.     Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT TWENTY-NINE

### Violations of the Pennsylvania Securities Act of 1972,

### 70 Penn. Stat. §§ 1-102 *et seq*

### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

340.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

341.     70 Penn. Stat. § 1-201 provides that it is unlawful for any person to sell or offer to sell a security within the State of Pennsylvania unless the security is exempt under the act, is a federally covered security, or is registered pursuant to the act.

342.     70 Penn. Stat. § 1-401 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly: (a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

343.     70 Penn. Stat. § 1-503 extends liability to any person who "materially aids" in a violation of the Pennsylvania Securities Act and makes them jointly and severally liable with any other person liable under the Act.

344.     The Voyager EPA is a security pursuant to 70 Penn. Stat. § 1-102(t).

345.     The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not federally securities.

346.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

347.     As a result of these actions, Defendants violated 70 Penn. Stat. § 1-201 and § 1-401 and are liable to Plaintiffs pursuant to 70 Penn. Stat. § 1-501.

| THE TENNESSEE CLAIMS |
|---|

## COUNT THIRTY

### Aiding and Abetting Fraud

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

348.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

349.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

350.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

351.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

352.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

353.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press

conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

354. Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

<div align="center">

**COUNT THIRTY-ONE**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

</div>

355. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

356. As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

357. Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

358. Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

359. Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-TWO

### Civil Conspiracy

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

360.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

361.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

362.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

363.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

364.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

365.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-THREE

### For Violations of the Tennessee Consumer Protection Act,

### Tenn. Code § 47-18-101 et seq

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

366. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

367. This cause of action is brought pursuant to the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code § 47-18-101 et seq.

368. The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within th[e] state." Tenn. Code § 47-18-102(2).

369. Plaintiffs and Class members are consumers as defined by Tenn. Code § 47-18-103(2). Defendants are engaged in trade or commerce as defined by Tenn. Code § 47-18-103(19).

370. The TCPA declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104(a). This includes actions which cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and cause "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code § 47-18-104(2)-(3).

371. Defendants' unfair and deceptive practices as described herein are objectively likely to cause—and have caused— confusion and misunderstanding to consumers acting reasonably in the circumstances.

372. Defendants have violated the TCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

373. Plaintiffs allege that the unfair and deceptive acts and practices described herein are distinct from the marketing or sale of a security, which is expressly excluded by Tenn. Code § 47-18-109(h).

374. Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

375.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

376.    Pursuant to Tenn. Code § 47-18-109, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTY-FOUR

### Violations of Tennessee Securities Act of 1980,

### Tenn. Code § 48-1-122

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

377.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

378.    Tenn. Code § 48-1-104(a) makes it unlawful to sell a security in Tennessee unless the security is registered, exempted, or the security is a covered security as defined in the act.

379.    Tenn. Code § 48-1-121 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

380.    The Voyager EPA is a security pursuant to Tenn. Code § 4-1-102(20)(A).

381.    The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered.

382.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

383.    As a result of these actions, Defendants violated Tenn. Code § 48-1-104(a) and § 48-1-121 and are liable to Plaintiffs pursuant to Tenn. Code § 48-1-122.

## THE OKLAHOMA CLAIMS

### COUNT THIRTY-FIVE

#### Aiding and Abetting Fraud

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

384.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

385.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

386.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

387.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

388.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

389.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

390.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-SIX

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)

391.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

392.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

393.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

394.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

395.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-SEVEN

### Civil Conspiracy

### (Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)

396.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

397.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

398.     Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

399.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

400.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

401.     Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-EIGHT

**For Violations of the Oklahoma Consumer Protection Act, *Stat. Tit. 15, Section 751 et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

402. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

403. This cause of action is brought pursuant to the Oklahoma Consumer Protection Act, *Okla. Stat. tit. 15, § 751 et seq*.

404. The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See* § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in Section 752." § 753(20).

405. Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2).

406. Defendants have violated the Oklahoma Consumer Protection Act by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

407. Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

408. The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

409. Pursuant to section 761.1 of the Act, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTY-NINE

**Violations of the Oklahoma Uniform Securities Act of 1980,**

**Okla. Stat. Tit. 71, §§ 1-101 *et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

410.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

411.     71 Okla. Stat. § 1-102(32) makes it unlawful "for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly":

   a.   "employ a device, scheme, or artifice to defraud";

   b.   "make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading"; or

   c.   "engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

412.     The Voyager EPA is a security pursuant to 71 Okla. Stat. § 1-102(32).

413.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest with Voyager, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

414.     As a result of these actions, Defendants violated 71 Okla. Stat. § 1-102(32) and are liable to Plaintiffs pursuant to 71 Okla. Stat. § 1-509.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.  Certifying the Classes as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and costs; and

    h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

    Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: August 10, 2022                  Respectfully submitted,

                                      By: */s/ Adam Moskowitz*
                                      Adam M. Moskowitz
                                      Florida Bar No. 984280
                                      adam@moskowitz-law.com
                                      Joseph M. Kaye
                                      Florida Bar No. 117520
                                      joseph@moskowitz-law.com
                                      Barbara C. Lewis
                                      barbara@moskowitz-law.com
                                      Florida Bar No. 118114
                                      **THE MOSKOWITZ LAW FIRM, PLLC**
                                      2 Alhambra Plaza, Suite 601
                                      Coral Gables, FL 33134
                                      Telephone: (305) 740-1423

                                      *Counsel for Plaintiffs and the Class*

# EXHIBIT F

**SECOND AMENDED AND RESTATED BYLAWS**

**OF**

**VOYAGER DIGITAL HOLDINGS, INC.**

**(F/K/A CYRPTOTRADING TECHNOLOGIES, INC.)**

**a Delaware corporation**

**Adopted as of May 28, 2021**

# TABLE OF CONTENTS

Page

ARTICLE I OFFICES ................................................................................................ 1

Section 1.01    Registered Office ......................................................................... 1

Section 1.02    Other Offices ............................................................................... 1

ARTICLE II MEETINGS OF STOCKHOLDERS ................................................... 1

Section 2.01    Annual Meeting ........................................................................... 1

Section 2.02    Special Meeting ........................................................................... 1

Section 2.03    Place of Meeting .......................................................................... 1

Section 2.04    Notice of Meeting ........................................................................ 1

Section 2.05    Voting List ................................................................................... 1

Section 2.06    Quorum ........................................................................................ 2

Section 2.07    Voting .......................................................................................... 2

Section 2.08    Proxies ......................................................................................... 2

Section 2.09    Consent of Stockholders .............................................................. 2

Section 2.10    Voting of Stock of Certain Holders ............................................ 3

Section 2.11    Treasury Stock ............................................................................. 3

Section 2.12    Fixing Record Date ...................................................................... 3

ARTICLE III BOARD OF DIRECTORS .................................................................. 3

Section 3.01    Powers ......................................................................................... 3

Section 3.02    Number, Election and Term ........................................................ 3

Section 3.03    Vacancies, Additional Directors, and Removal from Office........ 4

Section 3.04    Resignation .................................................................................. 4

Section 3.05    Regular Meetings ........................................................................ 4

Section 3.06    Special Meetings ......................................................................... 4

Section 3.07    Quorum ........................................................................................ 4

Section 3.08    Communications .......................................................................... 4

Section 3.09    Action Without Meeting.............................................................. 4

Section 3.10    Compensation .............................................................................. 5

ARTICLE IV COMMITTEES.................................................................................... 5

Section 4.01    Designation, Powers and Name.................................................... 5

Section 4.02    Minutes ........................................................................................ 5

ARTICLE V NOTICE ............................................................................................... 5

Section 5.01    Methods of Giving Notice ........................................................... 5

Section 5.02    Consent to Electronic Notice .................................................................. 6

Section 5.03    Waiver .................................................................................................... 6

ARTICLE VI OFFICERS .............................................................................................. 6

Section 6.01    Officers ................................................................................................... 6

Section 6.02    Initial Offices; Election and Term of Office .......................................... 6

Section 6.03    Removal and Resignation ....................................................................... 6

Section 6.04    Vacancies ............................................................................................... 7

Section 6.05    Salaries ................................................................................................... 7

Section 6.06    Duties and Authority of Officers ........................................................... 7

ARTICLE VII CONTRACTS, CHECKS AND DEPOSITS ......................................... 8

Section 7.01    Contracts ................................................................................................ 8

Section 7.02    Checks .................................................................................................... 9

Section 7.03    Deposits .................................................................................................. 9

ARTICLE VIII CERTIFICATES OF STOCK ............................................................... 9

Section 8.01    Issuance .................................................................................................. 9

Section 8.02    Lost Certificates ..................................................................................... 9

Section 8.03    Transfers ............................................................................................... 10

Section 8.04    Registered Stockholders ....................................................................... 10

ARTICLE IX DIVIDENDS ......................................................................................... 10

Section 9.01    Declaration ........................................................................................... 10

Section 9.02    Reserve .................................................................................................. 10

ARTICLE X INDEMNIFICATION ............................................................................. 10

Section 10.01    Third Party Actions ............................................................................. 10

Section 10.02    Actions By or In the Right of the Corporation ................................... 10

Section 10.03    Mandatory Indemnification ................................................................ 11

Section 10.04    Determination of Conduct .................................................................. 11

Section 10.05    Payment of Expenses in Advance ....................................................... 11

Section 10.06    Indemnity Not Exclusive .................................................................... 11

Section 10.07    Continuation of Indemnity .................................................................. 12

ARTICLE XI MISCELLANEOUS .............................................................................. 12

Section 11.01    Seal ...................................................................................................... 12

Section 11.02    Books ................................................................................................... 12

Section 11.03    Section Headings ................................................................................. 12

Section 11.04    Amendments ........................................................................................ 12

## SECOND AMENDED AND RESTATED BYLAWS
### OF
## VOYAGER DIGITAL HOLDINGS, INC.
### (a Delaware corporation)

## ARTICLE I
## OFFICES

Section 1.01     <u>Registered Office</u>.  The registered office of the corporation in the State of Delaware shall be in the City of Wilmington, County of New Castle, and the name of its registered agent shall be Corporation Service Company.

Section 1.02     <u>Other Offices</u>.  The corporation may also have offices at such other places both within and without the State of Delaware as the corporation's board of directors (the "<u>Board of Directors</u>") may from time to time determine or the business of the corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 2.01     <u>Annual Meeting</u>.  The annual meeting of stockholders for the election of directors, and for the transaction of any other proper business, shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting.

Section 2.02     <u>Special Meeting</u>.  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the corporation's certificate of incorporation (as may be amended from time to time, the "<u>Certificate of Incorporation</u>"), may be called at any time by the Chief Executive Officer or by the Board of Directors or by written order of a majority of the directors and shall be called by the Chief Executive Officer or the General Counsel and Secretary at the request in writing of stockholders owning not less than ten percent (10%) of the capital stock of the corporation issued and outstanding and entitled to vote.  Such request shall state the purposes of the proposed meeting.

Section 2.03     <u>Place of Meeting</u>.  All meetings of stockholders shall be held at such place, if any, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors and stated in the notice of such meeting. The Board of Directors may, in its sole discretion and subject to such guidelines and procedures as the Board of Directors may from time to time adopt, determine that the meeting shall not be held at any specific place, but may instead be held solely by means of remote communication.

Section 2.04     <u>Notice of Meeting</u>.  Written or other proper notice of any meeting of stockholders, stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meetings, and, in the case of a special meeting, the purpose or purposes thereof, shall be given to each stockholder entitled to vote thereat, not less than ten (10) nor more than sixty (60) days before the meeting.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.05     <u>Voting List</u>.  The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list

shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours, at the principal place of business of the corporation. If the meeting is to be held at a specific place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 2.06    Quorum.  At any meeting of the stockholders, the holders of a majority of the shares issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business, except as otherwise provided by statute, by the Certificate of Incorporation or by these bylaws. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.07    Voting.  When a quorum is present at any meeting of the stockholders, the vote of the holders of a majority of the shares entitled to vote on the subject matter and present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which, by express provision of applicable statutes, of the Certificate of Incorporation or of these bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question. Except as otherwise provided in the Certificate of Incorporation, each stockholder entitled to vote at any meeting of the stockholders shall be entitled to one vote for each share of capital stock held by the stockholder.

Section 2.08    Proxies.  Each stockholder entitled to vote at a meeting of the stockholders may authorize, by an instrument in writing subscribed by such stockholder, bearing a date not more than three (3) years prior to voting, unless such instrument provides for a longer period, and filed with the General Counsel and Secretary of the corporation before, or at the time of the meeting, another person or persons to act for him by proxy.

Section 2.09    Consent of Stockholders.  Unless otherwise provided in the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. For the purposes of this Section 2.09 to the extent permitted by law, an electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated as of the date on which such writing or other electronic transmission is transmitted.

Section 2.10    <u>Voting of Stock of Certain Holders</u>.  Shares of the corporation's capital stock standing in the name of another business entity, domestic or foreign, may be voted by such officer, agent, or proxy as the bylaws or applicable governance document of such business entity may prescribe, or in the absence of such provision, as the board of directors or applicable managers of such business entity may determine.  Shares standing in the name of a deceased person may be voted by the executor or administrator of such deceased person, either in person or by proxy.  Shares standing in the name of a guardian, conservator, or trustee may be voted by such fiduciary, either in person or by proxy, but no such fiduciary shall be entitled to vote shares held in such fiduciary capacity without a transfer of such shares into the name of such fiduciary.  Shares standing in the name of a receiver may be voted by such receiver, either in person or by proxy.  A stockholder whose shares are pledged shall be entitled to vote such shares, unless in the transfer by the pledgor on the books of the corporation, such stockholder has expressly empowered the pledgee to vote thereon, in which case only the pledgee, or its proxy, may represent the stock and vote thereon.

Section 2.11    <u>Treasury Stock</u>.  The corporation shall not vote, directly or indirectly, shares of its own capital stock owned by it; and such shares shall not be counted in determining the total number of outstanding shares of the corporation's capital stock.

Section 2.12    <u>Fixing Record Date</u>.  The Board of Directors may fix in advance a date, which shall not be more than sixty (60) days nor less than ten (10) days preceding the date of any meeting of stockholders, nor more than sixty (60) days preceding the date for payment of any dividend or distribution, or the date for the allotment of rights, or the date when any change, or conversion or exchange of capital stock shall go into effect, or a date in connection with obtaining a consent, as a record date for the determination of the stockholders entitled to notice of, and to vote at, any such meeting and any adjournment thereof, or entitled to receive payment of any such dividend or distribution, or to receive any such allotment of rights, or to exercise the rights in respect of any such change, conversion or exchange of capital stock, or to give such consent, and in such case such stockholders and only such stockholders as shall be stockholders of record on the date so fixed, shall be entitled to such notice of, and to vote at, any such meeting and any adjournment thereof, or to receive payment of such dividend or distribution, or to receive such allotment of rights, or to exercise such rights, or to give such consent, as the case may be, notwithstanding any transfer of any stock on the books of the corporation after any such record date fixed as aforesaid.

### ARTICLE III
### BOARD OF DIRECTORS

Section 3.01    <u>Powers</u>.  The business and affairs of the corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

Section 3.02    <u>Number, Election and Term</u>.  The number of directors that shall constitute the whole Board of Directors shall be not less than one (1).  Subject to the Certificate of Incorporation, such number of directors shall from time to time be fixed and determined by the directors and shall be set forth in the notice of any meeting of stockholders held for the purpose of electing directors.  The directors shall be elected at the annual meeting of stockholders, except as provided in <u>Section 3.03</u>, and each director elected shall hold office until his or her successor has been elected and qualified or, if earlier, his or her death, resignation, retirement, disqualification or removal.  The vote of any stockholder on an election of directors may be taken in any manner and no such vote shall be required to be taken by written ballot or by electronic transmission unless otherwise required by law.  Directors need not be residents of the State of Delaware, citizens of the United States of America or stockholders of the corporation.

Section 3.03    <u>Vacancies, Additional Directors, and Removal from Office</u>.    Unless otherwise provided in the Certificate of Incorporation, and subject to the rights of the holders of any class or series of capital stock of the corporation pursuant to any stockholders agreement of the corporation, (i) if any vacancy occurs in the Board of Directors caused by death, resignation, retirement, disqualification, or removal from office of any director, or otherwise, or if any new directorship is created by an increase in the authorized number of directors, a majority of the directors then in office, though less than a quorum, or a sole remaining director, may choose a successor or fill the newly created directorship; and a director so chosen shall hold office until the next election and until his or her successor shall be duly elected and shall qualify, unless sooner displaced, and (ii) any director may be removed either for or without cause at any special meeting of stockholders duly called and held for such purpose.

Section 3.04    <u>Resignation</u>.    Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation. A resignation from the Board of Directors shall be deemed to take effect immediately upon receipt by the corporation of such notice or at a later time, or upon the occurrence of a later event or events, as the director may specify in the notice.

Section 3.05    <u>Regular Meetings</u>.    A regular meeting of the Board of Directors shall be held each year, without other notice than this <u>Section 3.05</u>, at the place of, and immediately following, the annual meeting of stockholders; and other regular meetings of the Board of Directors may be held at such places (within or without the State of Delaware), if any, and at such times as the Board of Directors may provide, by resolution, without other notice than such resolution.

Section 3.06    <u>Special Meetings</u>.    A special meeting of the Board of Directors may be called by the Chief Executive Officer of the corporation.  Further, the General Counsel and Secretary shall call a special meeting of the Board of Directors on the written request of any director.  Notice of special meetings of the Board of Directors shall be given to each director at least forty-eight (48) hours prior to the time of such meeting and shall be given in writing or by electronic transmission.  Each such notice shall state the time and place (within or without the State of Delaware), if any, of the meeting but need not state the purposes thereof, except that notice shall be given of any proposed amendment to the bylaws if it is to be adopted at any special meeting or with respect to any other matter where notice is required by statute or by these bylaws.

Section 3.07    <u>Quorum</u>.    The greater of the majority of the directors in office or one-third (1/3) of the total number of directors shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by the Delaware General Corporation Law (the "<u>DGCL</u>"), by the Certificate of Incorporation or by these bylaws.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.08    <u>Communications</u>.    Members of the Board of Directors, or of any committee thereof, may participate in a meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this <u>Section 3.08</u> shall constitute presence in person at such meeting.

Section 3.09    <u>Action Without Meeting</u>.    Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof may be taken without a meeting, if all the members of the Board of Directors or of such committee, as the case may be, consent thereto in writing or by electronic transmission,

and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or such committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10    <u>Compensation</u>.    Unless otherwise restricted by the Certificate of Incorporation or these bylaws, the Board of Directors shall have the authority to fix the compensation of directors. In addition, the directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors. Nothing herein shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings or serving on such committees.

## ARTICLE IV
## COMMITTEES

Section 4.01    <u>Designation, Powers and Name</u>.    The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, including, if they shall so determine, an Executive Committee, each such committee to consist of one or more of the directors of the corporation. Unless prohibited by Section 141(c) of the DGCL, the committee shall have and may exercise such of the powers of the Board of Directors in the management of the business and affairs of the corporation as may be provided in such resolution. The committee may authorize the seal of the corporation (if any) to be affixed to all papers that may require it. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of any member of such committee or committees, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she, or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Such committee or committees shall have such name or names and such limitations of authority as may be determined from time to time by resolution adopted by the Board of Directors.

Section 4.02    <u>Minutes</u>. Each committee of the Board of Directors shall keep regular minutes of its proceedings and actions and report on its proceedings and actions to the Board of Directors when                                                                                                          required.
**NOTICE**

Section 5.01    <u>Methods of Giving Notice</u>. Whenever, under the provisions of applicable statutes, the Certificate of Incorporation or these bylaws, notice is required to be given to any director, member of any committee or stockholder, it shall not be necessary that personal notice be given, and such notice may be given in writing, by mail, addressed to such director, member, or stockholder at his, her or its address as it appears on the records of the corporation or at his, her or its residence or usual place of business, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited with the United States Postal Service. Notice also may be given in any other proper form, as authorized by the DGCL. Notice that is given by facsimile shall be deemed delivered when sent to a number at which any director, member or stockholder has consented to receive such notice. Notice that is given in person or by telephone shall be deemed given when the same shall be delivered. Without limiting the manner by which notice otherwise may be given effectively to any director, member or stockholder, any notice given under any provision of these bylaws shall be effective if given by a form of electronic transmission consented to by such person. Notice given by electronic mail shall be deemed delivered when directed to an electronic mail address at which such person has consented to receive notice and notice given by a posting on an electronic network together with separate notice to such person of such specific posting shall be deemed delivered upon the later of (a) such posting and (b) the giving of such

separate notice. Notice given by any other form of electronic transmission shall be deemed given when directed to any director, member or stockholder in the manner consented to by such director, member or stockholder.

Section 5.02    Consent to Electronic Notice. Subject to the limitations set forth in Section 232(e) of the DGCL, each stockholder, by acceptance of his or her certificate for shares of capital stock of the corporation, consents to the delivery of any notice to stockholders given by the corporation under the Delaware General Corporation Law or the Certificate of Incorporation or these bylaws by (i) facsimile telecommunication to the facsimile number for the stockholder, if any, in the corporation's records, (ii) electronic mail to the electronic mail address for the stockholder, if any, in the corporation's records, (iii) posting on an electronic network together with separate notice to the stockholder of such specific posting, or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to the stockholder. The foregoing consent may be revoked by a stockholder by written notice to the corporation and may be deemed revoked in the circumstances specified in Delaware General Corporation Law § 232.

Section 5.03    Waiver. Whenever any notice is required to be given under the provisions of an applicable statute, the Certificate of Incorporation, or these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, or a waiver by electronic transmission by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VI
## OFFICERS

Section 6.01    Officers. The officers of the corporation (the "Officers") may include the following: a Chief Executive Officer, one or more Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, a Treasurer, a Chief Information Security Officer, a Chief Technology Officer, General Counsel and a Secretary, each having the respective powers and duties set forth in Section 6.06. The Board of Directors may appoint such other officers and agents as the Board of Directors shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined by the Board of Directors. Any two or more offices may be held by the same person. None of the officers need be a director, and none of the officers need be a stockholder of the corporation.

Section 6.02    Initial Offices; Election and Term of Office. The Officers of the corporation shall be elected annually by the Board of Directors at its first regular meeting held after the annual meeting of stockholders or as soon thereafter as conveniently possible. Each Officer shall hold office until his or her successor shall have been elected and shall have qualified or until his or her death or the effective date of his or her resignation or removal. The following shall be the offices of the corporation (the "Initial Offices"): Chief Executive Officer, Chief Operating Officer and Vice President, Chief Financial Officer, Vice President and Treasurer, Chief Information Security Officer and Chief Technology Officer and General Counsel and Secretary.

Section 6.03    Removal and Resignation. Any officer elected by the Board of Directors may be removed with or without cause, for any or no reason, at any time by the Board of Directors. Any officer may resign at any time by giving written notice to the corporation. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

-6-

Section 6.04    Vacancies.  Any vacancy occurring in any office of the corporation by death, resignation, removal, or otherwise, may be filled by the Board of Directors for the unexpired portion of the term.

Section 6.05    Salaries.  The compensation of all officers and agents of the corporation shall be fixed by the Board of Directors or pursuant to its direction; and no officer shall be prevented from receiving such salary by reason of his or her also being a director.

Section 6.06    Duties and Authority of Officers.

(a)    Chief Executive Officer.  The Chief Executive Officer shall be the chief executive officer of the corporation and, subject to the control of the Board of Directors, shall in general supervise and control the business and affairs of the corporation.  The Chief Executive Officer shall have the power to appoint and remove subordinate Officers, agents, and employees, except those elected or appointed by the Board of Directors.  The Chief Executive Officer shall keep the Board of Directors fully informed and shall consult with the Board of Directors concerning the business of the corporation.  The Chief Executive Officer may enter into and execute in the name of the corporation contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by these bylaws or by the Board of Directors exclusively to some other officer or agent of the corporation, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Board of Directors.  The Chief Executive Officer may sign, with the General Counsel and Secretary or a Vice President, certificates for shares of the corporation.  The Chief Executive Officer shall vote, or give a proxy to any other officer of the corporation to vote, all shares of stock or other equity interests of any other corporation or entity standing in the name of the corporation.  In general, the Chief Executive Officer shall perform all other duties normally incident to the office of Chief Executive Officer and such other duties as may be prescribed by the Board of Directors from time to time.

(b)    Vice Presidents.  In the absence of the Chief Executive Officer, or in the event of the Chief Executive Officer's inability or refusal to act, any Vice President designated by the Board of Directors shall perform the duties and exercise the powers of the Chief Executive Officer.  Any Vice President may enter into and execute in the name of the corporation contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by these bylaws or by the Board of Directors exclusively to some other officer or agent of the corporation, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Board of Directors.  Any Vice President may sign, with the Chief Executive Officer and General Counsel and Secretary, certificates for shares of the corporation.  The Vice Presidents shall perform such other duties as from time to time may be assigned to them by the Chief Executive Officer or the Board of Directors.  Unless otherwise determined by the Board of Directors, each of the corporation's Chief Operating Officer, Chief Financial Officer and Treasurer, and General Counsel and Secretary shall be a Vice President of the corporation.

(c)    Chief Operating Officer.  The Chief Operating Officer shall have general charge and supervision over, and responsibility for, the business and affairs of the corporation's operations.  The Chief Operating Officer may enter into and execute in the name of the corporation contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by these bylaws or by the Board of Directors exclusively to some other officer or agent of the corporation, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or

-7-

specifically, by the Board of Directors.  The Chief Operating Officer shall also perform such duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Board of Directors.

(d)    Chief Financial Officer and Treasurer.  The Chief Financial Officer and Treasurer shall have general supervision over the financial affairs of the corporation.  He or she shall (a) have charge and custody of and be responsible for all funds, assets and securities of the corporation; (b) receive and give receipts for moneys due and payable to the corporation from any source whatsoever and deposit all such moneys in the name of the corporation in such banks, trust companies, or other depositories as shall be selected in accordance with the provisions of Section 7.03 of these bylaws; (c) prepare, or cause to be prepared, at such times as may be required by the Board of Directors or the Chief Executive Officer, a statement of financial condition of the corporation in such detail as may be required; and (d) in general, perform all the duties incident to the office of Chief Financial Officer and/or Treasurer and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Board of Directors.  The Chief Financial Officer and Treasurer may enter into and execute in the name of the corporation contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by these bylaws or by the Board of Directors exclusively to some other officer or agent of the corporation, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Board of Directors.  The Chief Financial Officer and Treasurer shall also perform such duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Board of Directors.

(e)    General Counsel and Secretary.  The General Counsel and Secretary shall have general supervision over the legal and compliance affairs of the corporation.  The General Counsel and Secretary may enter into and execute in the name of the corporation contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by these bylaws or by the Board of Directors exclusively to some other officer or agent of the corporation, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Board of Directors.  The General Counsel and Secretary may sign, with the Chief Executive Officer or a Vice President, certificates for shares of the corporation.  The General Counsel and Secretary shall (a) keep the minutes of the meetings of the Board of Directors; (b) see that all notices are duly given in accordance with the provisions of the bylaws and as required by law; (c) be custodian of the corporate records and of the seal of the corporation (if any), and see that the seal of the corporation or a facsimile thereof (if any), is affixed to all certificates for shares prior to the issue thereof and to all documents, the execution of which on behalf of the corporation under its seal is duly authorized in accordance with the provisions of these bylaws; (d) keep or cause to be kept a register of the post office address and electronic mail address (if provided) of each stockholder which shall be furnished by such stockholder; (e) have general charge of the stock transfer books of the corporation and; (f) in general, perform all duties normally incident to the office of General Counsel and Secretary and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Board of Directors, including, but not limited to, advising the corporation on various legal issues that may arise in connection with the corporation's operations and recommending outside counsel for the corporation as required from time to time.

**ARTICLE VII**
**CONTRACTS, CHECKS AND DEPOSITS**

Section 7.01    Contracts.  The Board of Directors may authorize any officer, officers, agent, or agents, to enter into or execute or affix the seal of the corporation or a facsimile thereof (if any)

to, any contract and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

      Section 7.02    <u>Checks</u>.  All checks, demands, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the corporation, shall be signed by such officer or officers or such agent or agents of the corporation, and in such manner, as shall be determined by the Board of Directors.

      Section 7.03    <u>Deposits</u>.  All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

<h3 style="text-align:center">ARTICLE VIII<br>CERTIFICATES OF STOCK</h3>

      Section 8.01    <u>Issuance</u>.  Each stockholder of this corporation shall be entitled to a certificate or certificates showing the number of shares of capital stock registered in his or her name on the books of the corporation.  The certificates shall be in such form as may be determined by the Board of Directors, shall be issued in numerical order and shall be entered in the books of the corporation as they are issued.  They shall include the holder's name and number of shares and shall be signed by the Chief Executive Officer, or a Vice President, and by the General Counsel and Secretary.  The same person shall be permitted to sign a single stock certificate in more than one capacity.  If any certificate is countersigned (a) by a transfer agent other than the corporation or any employee of the corporation, or (b) by a registrar other than the corporation or any employee of the corporation, any other signature on the certificate may be a facsimile.  If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the designations, preferences, and relative participating, optional, or other special rights of each class of stock or series thereof and the qualifications, limitations, or restrictions of such preferences and rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class of stock; provided that, except as otherwise provided by statute, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish to each stockholder who so requests the designations, preferences and relative, participating, optional, or other special rights of each class of stock or series thereof and the qualifications, limitations, or restrictions of such preferences and rights.  All certificates surrendered to the corporation for transfer shall be canceled and no new certificate shall be issued until the former certificate for a like number of shares shall have been surrendered and canceled, except that in the case of a lost, stolen, destroyed, or mutilated certificate a new one may be issued therefor upon such terms and with such indemnity, if any, to the corporation as the Board of Directors may prescribe.  Certificates shall not be issued representing fractional shares of stock.

      Section 8.02    <u>Lost Certificates</u>.  The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require (a) the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require, (b) such owner to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate or certificates alleged to have been lost, stolen, or destroyed, or (c) both requirements set forth in (a) and (b) of this <u>Section 8.02</u>.

Section 8.03    <u>Transfers</u>.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.  Transfers of shares shall be made only on the books of the corporation by the registered holder thereof, or by his or her attorney thereunto authorized by power of attorney and filed with the General Counsel and Secretary or the transfer agent of the corporation.

Section 8.04    <u>Registered Stockholders</u>.  The corporation shall be entitled to treat the holder of record of any share or shares of the corporation's capital stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

## ARTICLE IX
## DIVIDENDS

Section 9.01    <u>Declaration</u>.  Subject to the provisions of the Certificate of Incorporation, if any, dividends with respect to the shares of the corporation's capital stock may be declared by the Board of Directors at any regular or special meeting, pursuant to applicable law.  Dividends may be paid in cash, in property, or in shares of capital stock, subject to the provisions of the Certificate of Incorporation.

Section 9.02    <u>Reserve</u>.  Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors shall think conducive to the interest of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE X
## INDEMNIFICATION

Section 10.01    <u>Third Party Actions</u>.  The corporation shall indemnify any director or officer of the corporation, and may indemnify any other person, who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit, or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, or conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

Section 10.02    <u>Actions By or In the Right of the Corporation</u>.  The corporation shall indemnify any director or officer, and may indemnify any other person, who was or is a party or is

-10-

threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Delaware Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the Delaware Court of Chancery or such other court shall deem proper.

Section 10.03    Mandatory Indemnification.  To the extent that a present or former director or officer of the corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 10.01 and 10.02, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

Section 10.04    Determination of Conduct.  Any indemnification under Section 10.01 or 10.02 of this Article X (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee, or agent is proper in the circumstances because he or she has met the applicable standard of conduct set forth in Section 10.01 or 10.02 of this Article X.  Such determination shall be made (a) by a majority vote of directors who were not parties to such action, suit or proceeding, even though less than a quorum, or (b) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (c) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion or (d) by the stockholders.

Section 10.05    Payment of Expenses in Advance.  Expenses (including attorneys' fees) incurred in defending a civil or criminal action, suit, or proceeding may be paid by the corporation in advance of the final disposition of such action, suit, or proceeding upon receipt of an undertaking by or on behalf of the director, officer, employee, or agent to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation as authorized in this Article X.  Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

Section 10.06    Indemnity Not Exclusive.  The indemnification and advancement of expenses provided or granted hereunder shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate of Incorporation, any other bylaw, agreement, vote of stockholders or disinterested directors, or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office. Definitions. For purposes of this Article X:

(a)    "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other

enterprise, shall stand in the same position under this Article X with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued;

(b)      "other enterprises" shall include employee benefit plans;

(c)      "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan;

(d)      "serving at the request of the corporation" shall include any service as a director, officer, employee, or agent of the corporation that imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants or beneficiaries; and

(e)      a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Article X.

Section 10.07    Continuation of Indemnity.    The indemnification and advancement of expenses provided or granted hereunder shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of such a person.

## ARTICLE XI
## MISCELLANEOUS

Section 11.01    Seal.    The corporate seal, if one is authorized by the Board of Directors, shall have inscribed thereon the name of the corporation, and the words "Corporate Seal, Delaware."  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

Section 11.02    Books.    The books of the corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at the offices of the corporation, or at such other place or places as may be designated from time to time by the Board of Directors.

Section 11.03    Section Headings.    The headings contained in these bylaws are for reference purposes only and shall not be construed to be part of and shall not affect in any way the meaning or interpretation of these bylaws.

Section 11.04    Amendments.    These bylaws may be altered, amended, or repealed or new bylaws may be adopted by a majority of the number of directors then constituting the Board of Directors at any regular meeting of the Board of Directors without prior notice, or at any special meeting of the Board of Directors if notice of such alteration, amendment, or repeal be contained in the notice of such special meeting.  Notwithstanding the foregoing, the fact that such power has been so conferred upon the Board of Directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal these bylaws.

* * End * *

# EXHIBIT G

DocuSign Envelope ID: BD9803C1-6226-401F-AA22-71C520B785B7

**WRITTEN CONSENT**
**OF**
**THE SOLE MEMBER**
**OF**
**VOYAGER DIGITAL, LLC**

Dated as of May 6, 2022

In accordance with Section 18-404(d) of the Delaware Limited Liability Company Act, as amended (the "DLLCA") and Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, Voyager Digital Holdings, Inc., being the Sole Member (the "Member") of Voyager Digital, LLC (the "Company"), a Delaware limited liability company, hereby takes the following actions and adopts the following resolutions by written consent without a meeting, effective for all purposes as of the date first written above and directs that this written consent (this "Written Consent") be filed with the minutes of proceedings of the Company:

**WHEREAS**, pursuant to Section 2.4 of the Amended and Restated Limited Liability Company Agreement dated as of May 28, 2021, (the "Operating Agreement") for the Company states that the principal office of the Company shall be at such place as the Member designates from time to time; and

**WHEREAS**, the Company intends to move its headquarters to 701 S Miami Ave, 8th Floor, Miami, FL 33131, on or prior to May 6, 2022; and

**WHEREAS**, the Member desires to designate 701 S Miami Ave Miami, 8th Floor, Miami, FL 33131 as the location of the Company's principal office, effective on and after May 6, 2022; and

**WHEREAS**, pursuant to Section 8.2 of the Operating Agreement, the Operating Agreement may be amended at any time by the written consent of the Member and the Company desires to make clean-up amendments to the Operating Agreement.

**NOW, THEREFORE**, be it:

**RESOLVED**, that the Company shall move its headquarters to 701 S Miami Ave, 8th Floor, Miami, FL 33131, which location shall become the Company's designated principal office, effective as of May 6, 2022; and be it further

**RESOLVED**, that the Operating Agreement be amended and restated substantially in the form attached hereto as Exhibit A; and be it further

**RESOLVED**, that each officer of the Company (or such officer's designee) ("Authorized Officer") is hereby authorized and approved to take any and all actions, and to perform all such acts and things as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, appropriate or advisable in order to approve, execute, and deliver for and in the name of and on behalf of the Company, the change in location of the Company's designated principal office, and the Company be and is hereby authorized to perform its obligations thereunder; and be it further

**RESOLVED**, that each Authorized Officer be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to take any and all actions, and to perform all such acts and things as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, appropriate or advisable in order to carry out the purpose or intent of, or consummate the transactions

111826799.2

DocuSign Envelope ID: BD9803C1-6226-401F-AAC2-71ED20B785B7

contemplated by, the foregoing resolutions, the authorization therefor to be conclusively evidenced by the taking of such action; and be it further

**RESOLVED**, that all actions heretofore taken by the Company or by any officer or director thereof in connection with or relating to the subject matter of the foregoing resolutions that are within the authority conferred by the foregoing resolutions are hereby authorized, adopted, approved, ratified and confirmed in all respects as the acts and deeds of the Company, having the same force and effect as if performed pursuant to the direct authorization of the Member; and be it further

**RESOLVED**, that an authorized employee of the Company is hereby directed to file a signed copy of this Written Consent in the minute book of the Company; and be it further

**RESOLVED**, that this Written Consent may be delivered via facsimile or as an attachment to an electronic mail message in "pdf" or similar format, which such facsimile or other electronic copy shall be deemed an original.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

111826799.2

DocuSign Envelope ID: BD9803C1-6226-401F-AA22-71ED20B765B7

**IN WITNESS WHEREOF**, the undersigned has duly executed this Written Consent as of the date first above written.

**SOLE MEMBER**
VOYAGER DIGITAL HOLDINGS, INC.

By: _____
Stephen Ehrlich, Chief Executive Officer

*[Signature Page to Written Consent of the Sole Member of Voyager Digital, LLC]*

111826799.2

DocuSign Envelope ID: 8D9803C1-6226-401F-AAC2-71ED20B765B7

## Schedule A

**[Amended and Restated Limited Liability Company Agreement of Voyager Digital, LLC (May 6, 2022)]**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**VOYAGER DIGITAL, LLC**

**(F/K/A CYRPTOTRADING TECHNOLOGIES LLC)**

**Dated as of May 6, 2022**

DocuSign Envelope ID: BD9803C1-6226-401F-AA22-71E520B765B7

# **TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

ARTICLE II ORGANIZATION OF THE COMPANY ..................................................... 2

     2.1     Formation and Name of Company ....................................................... 2
     2.2     Purpose ................................................................................................. 2
     2.3     Registered Office; Registered Agent .................................................. 2
     2.4     Principal Office; Other Offices .......................................................... 2
     2.5     Term .................................................................................................... 3
     2.6     Liability to Third Parties ..................................................................... 3
     2.7     Effective Date; Amendment and Restatement ..................................... 3

ARTICLE III THE MEMBER; CAPITAL CONTRIBUTIONS ..................................... 3

     3.1     The Member; Capital Contributions .................................................... 3
     3.2     Additional Members ........................................................................... 3
     3.3     Loans by Member ............................................................................... 3

ARTICLE IV MANAGEMENT ....................................................................................... 3

     4.1     Management of the Company ............................................................... 3
     4.2     Officers ................................................................................................ 4
     4.3     Initial Offices; Election of Officers .................................................... 4
     4.4     Removal of Officers; Resignation; Vacancies .................................... 4
     4.5     Duties and Authority of Officers ........................................................ 4
     4.6     Exculpation ......................................................................................... 6
     4.7     Indemnification ................................................................................... 6
     4.8     Conflicts of Interest ............................................................................ 6
     4.9     Continuing Rights ............................................................................... 7

ARTICLE V PROFITS AND LOSSES; DISTRIBUTIONS ........................................... 7

     5.1     Profits and Losses ............................................................................... 7
     5.2     Distributions ....................................................................................... 7

ARTICLE VI TRANSFERS OF INTEREST ................................................................... 7

     6.1     Transfer ............................................................................................... 7
     6.2     Effect of Disposition .......................................................................... 7

ARTICLE VII DISSOLUTION/LIQUIDATION ............................................................. 7

     7.1     Dissolution .......................................................................................... 7
     7.2     Winding Up and Liquidation ............................................................... 8
     7.3     Liquidating Trustee ............................................................................. 8

DocuSign Envelope ID: BD9803C1-6226-401F-AAC2-71ED20B765B7

ARTICLE VIII MISCELLANEOUS ............................................................................................ 8

8.1     Binding Effect..................................................................................................... 8
8.2     Amendments ....................................................................................................... 8
8.3     Waiver................................................................................................................. 8
8.4     Governing Law.................................................................................................... 8
8.5     Captions; Interpretation; Pronouns and Number ............................................... 9
8.6     Entire Agreement ............................................................................................... 9
8.7     Severability......................................................................................................... 9
8.8     Notice.................................................................................................................. 9
8.9     Remedies............................................................................................................. 9
8.10    Membership Interests Certificates...................................................................... 9
8.11    Electronic Signatures.......................................................................................... 9

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**VOYAGER DIGITAL, LLC**

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** is made and entered into as of the 4th day of May, 2022 (the "Effective Date") by VOYAGER DIGITAL HOLDINGS, INC., as the sole member of VOYAGER DIGITAL, LLC (f/k/a CYRPTOTRADING TECHNOLOGIES LLC) (the "Company"). Defined terms used in this Agreement are set forth in Article I below.

**RECITALS**

**WHEREAS**, on January 22, 2018 (the "Formation Date"), the Company was formed as a Delaware limited liability company under the name "CRYPTOTRADING TECHNOLOGIES LLC" pursuant to the provisions of the Act to conduct such lawful business which limited liability companies may conduct under the Act and such name was subsequently changed on January 30, 2019, to "VOYAGER DIGITAL, LLC."

**WHEREAS**, on May 28, 2021, the Member entered into that certain Amended and Restated Limited Liability Company Agreement of the Company (the "Existing Agreement") to set forth certain terms and conditions of the ownership, management and operation of the Company;

**WHEREAS**, on May 4, 2022, the Company changed its headquarters;

**WHEREAS**, pursuant to Section 8.2 of the Existing Agreement, the Existing Agreement may be amended at any time by the written consent of the Member; and

**WHEREAS**, the Member now desires to amend and restate the Existing Agreement in the form of this Agreement to reflect its new headquarters as set forth below.

**ARTICLE I**
**DEFINITIONS**

For purposes of this Agreement, unless the context otherwise requires:

"Act" means the Limited Liability Company Act of the State of Delaware, 6 Del. C. § 18-101, *et seq.*, and any successor statute, as amended from time to time.

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as it may be amended and/or restated from time to time.

"Capital Contribution" means the amount of money and the value of any property other than money, as determined by the Member, contributed to the Company by the Member.

"Certificate of Formation" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the initial paragraph of this Agreement.

1

"Effective Date" has the meaning set forth in the initial paragraph of this Agreement.

"Existing Agreement" has the meaning set forth in the recitals to this Agreement.

"Formation Date" has the meaning set forth in the recitals to this Agreement.

"Liquidating Trustee" has the meaning set forth in Section 7.3.

"Member" means the Person initially executing this Agreement as the sole member or any Person hereafter admitted to the Company as the successor "Member" as provided in and in accordance with this Agreement, but does not include any Person who has ceased to be a member of the Company.

"Membership Interest" shall mean the interest of the Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision or action of or by the Member granted by this Agreement or the Act.

"Officers" has the meaning set forth in Section 4.2.

"Person" means a natural person, partnership, joint venture, association, corporation, limited liability company, estate, trust, or any other legal entity.

"Secretary of State" means the Office of the Secretary of State of the State of Delaware.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, gift, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, give or otherwise dispose of.

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.1    Formation and Name of Company.  The Company was formed under the name "Cryptotechnologies Trading LLC" on the Formation Date as a Delaware  limited liability company pursuant to the provisions of the Act, by the filing for record of a certificate of formation with respect thereto (the "Certificate of Formation") with the Secretary of State.  The rights and liabilities of the Member shall be as provided in the Act, except as herein otherwise expressly provided.  The name of the Company is "Voyager Digital, LLC".  All Company business shall be conducted under that name or such other names that comply with applicable law as the Member may select from time to time.

2.2    Purpose.  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act.

2.3    Registered Office; Registered Agent.  The registered office of the Company in the State of Delaware shall be located at Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, and the Company's registered agent at such address for service of process is Corporation Service Company. The registered office in other states in which the Company does business shall be established by the Member.

2.4    Principal Office; Other Offices.  The principal office of the Company shall be at such place as the Member may designate from time to time, which need not be in the State of Delaware. The Company may change the principal office or have such other offices as the Member may designate from time to time.

2

DocuSign Envelope ID: BD9803C1-6226-401F-AAC2-71E5D20B7587

2.5    <u>Term</u>. The term of the Company commenced on the Formation Date. The existence of the Company shall be perpetual unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act.

2.6    <u>Liability to Third Parties</u>. The Member shall not be liable for the debts, obligations or liabilities of the Company, except to the extent required under the Act with respect to amounts distributed to the Member at a time when the Company was insolvent or rendered insolvent by virtue of the distribution.

2.7    <u>Effective Date; Amendment and Restatement</u>. This Agreement shall become effective as of the Effective Date. Effective as of the Effective Date: (i) this Agreement amends, restates and supersedes in its entirety the Existing Agreement; (ii) the Existing Agreement is hereby terminated in all respects; and (iii) the Member hereby consents to, approves and adopts this Agreement as the limited liability agreement of the Company in all respects.

## ARTICLE III
## THE MEMBER; CAPITAL CONTRIBUTIONS

3.1    <u>The Member; Capital Contributions</u>. The Member is the sole member of the Company as of the Effective Date and owns one hundred percent (100%) limited liability company interest in the Company. The Member shall be a member of the Company until it ceases to be a member in accordance with the Act or this Agreement. The Capital Contribution attributable to the Member is as set forth in the books and records of the Company. The Member shall not be obligated to make any additional Capital Contributions to the Company. Except as otherwise expressly provided herein, the Member shall not be entitled to the return of any part of its Capital Contribution or to be paid interest in respect of its Capital Contribution.

3.2    <u>Additional Members</u>. The Member may not admit additional members to the Company unless and until this Agreement is amended and restated or another limited liability company agreement which supersedes this Agreement is entered into between the Member and such new member(s).

3.3    <u>Loans by Member</u>. The Member may lend or advance money to the Company. If the Member shall make any loan to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan or advance by the Member shall bear interest at a rate agreed upon by the Company and the Member. The Member shall not be obligated to make any loan or advance to the Company.

## ARTICLE IV
## MANAGEMENT

4.1    <u>Management of the Company</u>. The powers of the Company shall be exercised exclusively by or under the exclusive authority of, and the business and affairs of the Company shall be managed under the exclusive direction and control of, the Member. The Member shall always retain the authority to make management decisions notwithstanding any delegation of duties by the Member to any Officer, employee or agent. The Member shall have the authority to act for and bind the Company and any person dealing with the Company shall be entitled to rely upon the Member's authority to act without further inquiry. In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company

DocuSign Envelope ID: BD98D3C1-6226-401F-AA22-71E020876587

shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware.

4.2    Officers.

(a)    The Member may designate employees of the Company or such other individuals as officers of the Company (the "Officers") as it shall deem necessary or desirable to carry on the business of the Company, such designation form being in the discretion of the Manager. The Officers are not "managers" (within the meaning of the Act) of the Company, but the Member may delegate to such Officers such power and the authority as the Member deems advisable.

(b)    Each of the Officers, acting individually, shall have the right, power and authority, as may be delegated or authorized by the Member from time to time (i) to supervise, control and the transact the day-to-day business and affairs of the Company, (ii) to act for or on behalf of the Company, (iii) to bind the Company, and (iv) to execute in the name of the Company and on behalf of the Company any contracts, deeds, bonds, mortgages, contracts, checks, notes, drafts, or other instruments that the Member has authorized to be executed, except in cases where the signing and execution thereof has been expressly delegated by the Member to some other officer or agent of the Company. The Member shall always retain the authority to make management decisions notwithstanding any delegation of duties by the Member to an officer, employee or agent.

(c)    The Officers may include a Chief Executive Officer, one or more Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, a Treasurer, a Chief Information Security Officer, a Chief Technology Officer, General Counsel and a Secretary, each having the respective powers and duties set forth in Section 4.5. Such other Officers as may be deemed necessary may be appointed by the Member and shall have such titles, powers and duties as may reasonably be prescribed by the Member. Any Officer may hold two or more offices of the Company.

4.3    Initial Offices; Election of Officers. The following shall be the offices of the Company as of the Effective Date (the "Initial Offices"): Chief Executive Officer, Chief Operating Officer and Vice President, Chief Financial Officer and Treasurer, Chief Information Security Officer and Chief Technology Officer and General Counsel and Secretary. The Initial Offices shall be held by such individuals as designated by the Member from time to time and each Officer shall hold office until his or her successor is designated by the Member or until his or her earlier death, resignation or removal, as provided herein.

4.4    Removal of Officers; Resignation; Vacancies. Any Officer may be removed as an Officer by the Member, with or without cause; provided, however, that any such removal shall not effect such Officer's rights under his or her employment agreement with the Member or the Company, if any. Any Officer may resign in writing at any time, which resignation may be noted on the books and records of the company. Any Officer may be removed by the Member with or without cause at any time, subject to the terms of their respective employment agreements with the Member or the Company, if any. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Member.

4.5    Duties and Authority of Officers.

(a)    Chief Executive Officer. The Chief Executive Officer shall be the chief executive officer of the Company and, subject to the control of the Member, shall in general supervise and

control the business and affairs of the Company. The Chief Executive Officer shall have the power to appoint and remove subordinate Officers, agents, and employees, except those elected or appointed by the Member. The Chief Executive Officer shall keep the Member fully informed and shall consult with the Member concerning the business of the Company. The Chief Executive Officer may enter into and execute in the name of the Company contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by this Agreement or by the Member exclusively to some other officer or agent of the Company, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Member. The Chief Executive Officer may sign, with the General Counsel and Secretary or a Vice President, certificates representing the ownership of Membership Interests in the Company. The Chief Executive Officer shall vote, or give a proxy to any other officer of the Company to vote, all shares of stock or other equity interests of any other corporation or entity standing in the name of the Company. In general, the Chief Executive Officer shall perform all other duties normally incident to the office of Chief Executive Officer and such other duties as may be prescribed by the Member from time to time.

(b)    Vice Presidents. In the absence of the Chief Executive Officer, or in the event of the Chief Executive Officer's inability or refusal to act, any Vice President designated by the Member shall perform the duties and exercise the powers of the Chief Executive Officer. Any Vice President may enter into and execute in the name of the Company contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by this Agreement or by the Member exclusively to some other officer or agent of the Company, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Member. Any Vice President may sign, with the Chief Executive Officer and General Counsel and Secretary, certificates representing the ownership of Membership Interests in the Company. The Vice Presidents shall perform such other duties as from time to time may be assigned to them by the Chief Executive Officer or the Member. Unless otherwise determined by the Member, each of the Company's Chief Operating Officer, the Chief Financial Officer and Treasurer and General Counsel and Secretary shall be a Vice President of the Company.

(c)    Chief Operating Officer. The Chief Operating Officer shall have general charge and supervision over, and responsibility for, the business and affairs of the Company's operations. The Chief Operating Officer may enter into and execute in the name of the Company contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by this Agreement or by the Member exclusively to some other officer or agent of the Company, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Member. The Chief Operating Officer shall also perform such duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Member.

(d)    Chief Financial Officer and Treasurer. The Chief Financial Officer and Treasurer shall have general supervision over the financial affairs of the Company. He or she shall (a) have charge and custody of and be responsible for all funds, assets and securities of the Company; (b) receive and give receipts for moneys due and payable to the Company from any source whatsoever and deposit all such moneys in the name of the Company in such banks, trust companies, or other depositories as shall be selected by the Member; (c) prepare, or cause to be prepared, at such times as may be required by the Member or the Chief Executive Officer, a statement of financial condition of the Company in such detail as may be required; and (d) in general, perform all the duties incident to the office of Chief Financial Officer and/or Treasurer and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Member. The Chief Financial Officer and Treasurer may enter into and execute

5

DocuSign Envelope ID: BD9893C1-6226-4D1E-AA22-71E520B765B7

in the name of the Company contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by this Agreement or by the Member exclusively to some other officer or agent of the Company, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Member. The Chief Financial Officer and Treasurer shall also perform such duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Member.

(e)    General Counsel and Secretary. The General Counsel and Secretary shall have general supervision over the legal and compliance affairs of the Company. The General Counsel and Secretary may enter into and execute in the name of the Company contracts, deeds, bonds, mortgages, checks, notes, drafts, or other instruments (i) in the regular course of business, except in cases where the signing and execution thereof has been expressly delegated by this Agreement or by the Member exclusively to some other officer or agent of the Company, or shall be required by law to be otherwise executed and (ii) not in the regular course of business which are authorized, either generally or specifically, by the Member. The General Counsel and Secretary may sign, with the Chief Executive Officer or a Vice President, certificates representing the ownership of Membership Interests in the Company. The General Counsel and Secretary shall (a) keep the minutes of the meetings of the Member; (b) see that all notices are duly given in accordance with the provisions of this Agreement and as required by law; and (c) in general, perform all duties normally incident to the office of General Counsel and Secretary and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Member, including, but not limited to, advising the Company on various legal issues that may arise in connection with the Company's operations and recommending outside counsel for the Company as required from time to time.

4.6    Exculpation. The Member and its members, managers, directors, Officers, employees and agents (collectively, the "Representatives") shall not be liable to the Company for (a) the performance of, or the omission to perform, any act or duty on behalf of the Company if, in good faith, such Person determined that such conduct was in the best interests of the Company, (b) the termination of the Company and this Agreement pursuant to the terms hereof, and (c) the performance of, or the omission to perform, any act on behalf of the Company in good faith reliance on advice of legal counsel, accountants or other professional advisors to the Company, unless such act or failure to act resulted from their respective willful misfeasance or gross negligence. The Member and the officers may consult with counsel and accountants in respect of Company affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants.

4.7    Indemnification. The Company, its receiver or its trustee shall indemnify, defend and hold the Member (and its Representatives) harmless from and against any expense, loss, damage or liability incurred or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of such Person on behalf of the Company, and amounts paid in settlement of any of the foregoing, provided that the same were not the result of fraud, willful misconduct or gross negligence on the part of the Person against whom a claim is asserted. The Company shall advance reasonable attorneys' fees and other costs and expenses incurred by the Member and the officers in connection with the defense of any pending or threatened action or proceeding which arises out of conduct that is the subject of the indemnification provided hereunder, subject to the agreement of the Member or officer, as the case may be, to reimburse the Company for such advance to the extent that it shall finally be determined by a court of competent jurisdiction that the Member or officer was not entitled to indemnification under this Section 4.7. The indemnification provided for herein shall not be deemed exclusive of any other rights to indemnification.

4.8    Conflicts of Interest. Subject to the other express provisions of this Agreement, the Member, at any time and from time to time, may engage in and possess interests in other business

6

DocuSign Envelope ID: BD9803C1-6226-401F-AAC2-71ED20B765B7

ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company the right to participate therein. The Company may transact business with the Member or a party related to the Member.

4.9    Continuing Rights.  Any repeal or modification of Section 4.6 or Section 4.7 shall not adversely affect any right or protection of the Member existing at or prior to the time of such repeal or modification. The rights provided in Section 4.6 and Section 4.7 shall inure to the benefit of the heirs, executors and administrators of the Member. For purposes of Section 4.6 and Section 4.7, references to the Member shall include a former Member.

## ARTICLE V
## PROFITS AND LOSSES; DISTRIBUTIONS

5.1    Profits and Losses.  All profits and losses of the Company shall be allocated to the Member.

5.2    Distributions.  Subject to any restrictions under applicable law, any assets of the Company may be distributed from time to time to the Member upon determination of the Member.

## ARTICLE VI
## TRANSFERS OF INTEREST

6.1    Transfer.

(a)    The Member may Transfer its interest in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision or action of or by the Member granted by this Agreement or the Act, either voluntarily or involuntarily by operation of law.  Upon the assignment by the Member of its entire Membership Interest, the transferee shall be admitted to the Company as the sole member without further action (and all references in this Agreement to the "Member" shall thereafter refer to the transferee). The Member and the transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such assignment and to confirm the agreement of the transferee to be bound by the provisions of this Agreement as the Member hereunder (including this Article VI).  A Transfer (other than as a pledge, security interest or other lien) of part of the Member's Membership Interest that results in the Company having more than one member shall not be effective unless and until another limited liability company agreement is entered into between or among all of the Persons who would be members, including the existing Member.

6.2    Effect of Disposition.  Following any permitted Transfer of the Member's entire Membership Interest (other than a Transfer as a pledge or security interest), the Member shall cease to be a member of the Company and shall have no further rights as a member of the Company (except for rights to indemnification under Section 4.7, which rights shall be deemed to survive any permitted Transfer).

## ARTICLE VII
## DISSOLUTION/LIQUIDATION

7.1    Dissolution.  The Company shall be dissolved and its affairs wound up on the first to occur of the following:

(a)    The written consent of the Member;

DocuSign Envelope ID: BD98023C1-6226-401F-AA22-71E920B765B7

(b)      Ninety (90) days after the date upon which the Company has no members, unless within that ninety (90) day period a member has been admitted to the Company pursuant to the Act; or

(c)      Entry of a decree of judicial dissolution.

7.2      <u>Winding Up and Liquidation</u>.

(a)      Upon a dissolution of the Company requiring the winding-up of its affairs, the Member shall wind up the Company's affairs.  The assets of the Company shall be sold within a reasonable period of time to the extent necessary to pay or provide for the payment of all debts and liabilities of the Company, and may be sold to the extent deemed practicable and prudent by the Member.

(b)      The net assets of the Company remaining after satisfaction of all such debts and liabilities and the creation of any reserves under <u>Section 7.2(c)</u> shall be distributed to the Member.

(c)      The Member may withhold from distribution under this <u>Article VII</u> such reserves that are required by applicable law and such other reserves for subsequent computation adjustments and for contingencies, including contingent liabilities relating to pending or anticipated litigation or to Internal Revenue Service examinations.  Any amount withheld as a reserve shall reduce the amount payable under this <u>Article VII</u>.  The unused portion of any reserve shall be distributed (with any interest earned thereon) pursuant to this <u>Article VII</u> after the Member shall have determined that the need therefor shall have ceased.

7.3      <u>Liquidating Trustee</u>.  If there is no Member at the time of the winding up of the affairs of the Company under this <u>Article VII</u>, all references to "Member" herein shall be deemed to be references to a liquidating trustee (the "<u>Liquidating Trustee</u>") selected by the personal representative, successor or assignee of the Member.  The Liquidating Trustee shall be subject to the benefits of <u>Sections 4.2(b)</u> and <u>4.7</u> as if the Liquidating Trustee was the Member.

## ARTICLE VIII
## MISCELLANEOUS

8.1      <u>Binding Effect</u>.  Except as otherwise specifically provided herein, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and permitted assigns.

8.2      <u>Amendments</u>.  This Agreement may be modified or amended at any time and from time to time with the written consent of the Member.

8.3      <u>Waiver</u>.  No failure by any Member to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

8.4      <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FORMATION, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE, CONSTRUCTION OR INTERPRETATION OF THIS AGREEMENT TO THE LAWS OF ANOTHER STATE.

DocuSign Envelope ID: BD98903C1-6226-401F-AAC2-71E520B765B7

      8.5    <u>Captions; Interpretation; Pronouns and Number</u>.  Captions or section headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

      (a)    Use of the terms "herein," "hereunder," "hereof," and like terms shall be deemed to refer to this entire Agreement and not merely to the particular provision in which the term is contained, unless the context clearly indicates otherwise. Use of the word "including" or a like term shall be construed to mean "including, but not limited to." Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

      (d)    Any reference to a provision of the Code or the Act shall be construed to be a reference to any successor provision thereof.

      8.6    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Member with respect to the Membership Interest and the subject matter hereof, and supersedes all prior and contemporaneous agreements (including the Existing Agreement), representations, and understandings of the Member with respect thereto.

      8.7    <u>Severability</u>.  If one or more provisions of this Agreement are held by a proper court to be unenforceable under applicable law, portions of such provisions, or such provisions in their entirety, to the extent necessary and permitted by law, shall be severed herefrom, and the balance of this Agreement shall be enforceable in accordance with its terms.

      8.8    <u>Notice</u>.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile or e-mail of a portable document format (PDF) file) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to the Member at its address specified in the Company's books and records.

      8.9    <u>Remedies</u>.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

      8.10    <u>Membership Interests Certificates</u>.  The Company is hereby authorized, but is not required, to issue certificates representing the ownership of Membership Interests in the Company in accordance with the Act.

      8.11    <u>Electronic Signatures</u>.  The electronic signature (including PDF) of the Member may be used at all times and for all purposes in place of an original signature.

*[Signature page follows]*

9

DocuSign Envelope ID: BD9803C1-6226-401F-AAC2-71ED20B765B7

IN WITNESS WHEREOF, the undersigned has executed, adopted and consented to this Agreement as of the Effective Date.


**SOLE MEMBER:**

**VOYAGER DIGITAL HOLDINGS, INC.**


By: _Steve Ehrlich_____
3724C7F08638426
Name: Stephen Ehrlich
Title: Chief Executive Officer


*[Signature Page to Amended and Restated Limited Liability Company Agreement of Voyager Digital, LLC]*