Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

## REPLY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully represent as follows in further support of the *Debtors' Motion for Entry of an Order*

*(I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief*

[Docket No. 212] (the "KERP Motion")[2] and *Debtors' Motion for Entry of an Order Authorizing*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not defined herein shall have the meanings set forth in the KERP Motion.  In support of the KERP Motion, the Debtors filed the *Declaration of Zachary P. Georgeson in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 258] (the "Georgeson Declaration") and the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 285] (the "Ehrlich Declaration").  Contemporaneously herewith, the Debtors also filed the *Supplemental Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "Supplemental Ehrlich Declaration," and with the Georgeson Declaration and the Ehrlich Declaration, the "Declarations").

*the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 284] (the "Motion to Seal"), and in response to the objection filed by the U.S. Trustee for Region 2[3] (the "U.S. Trustee," and such objection, the "U.S. Trustee Objection") and the objection filed by the Official Committee of Unsecured Creditors[4] (the "Committee," and such objection, the "Committee Objection" and, together with the U.S. Trustee Objection, the "Objections").

## Summary

1.      Following extensive discussions, the Debtors and the Committee resolved the Committee's objection.  The U.S. Trustee's objection is the lone remaining objection.

2.      As it relates to the Committee, the Debtors have agreed to the following revised terms:

- **KERP Awards**: KERP awards represent fixed cash amounts payable in two installments based on continued employment of the Participant through the applicable payment dates (except as provided below).   KERP awards are equal to 22.5% (previously 25%) of the Participant's annual salary.

- **Payment Dates**: 55.6% of each Participant's KERP award (or 12.5% of annual salary) will be paid immediately subject to a clawback through emergence from chapter 11, with the remaining 44.4% (or 10% of annual salary) paid at the earlier of (i) twelve months after the effective date of the KERP or (ii) 90 days following emergence.

- **Additional Cost-Cutting Measures**: The Debtors agree to work with the Committee to implement operational cost-cutting measures on or before September 22, 2022, resulting in projected annualized savings of approximately $4.6 million.

---

[3]   *See Objection of the United States Trustee to (1) Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan, and (2) to Motion of Debtors for Entry of an Order Approving Debtors' Key Employee Retention Plan* [Docket No. 314].

[4]   *See Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 316].

3.      The U.S. Trustee Objection should be overruled.  Despite the U.S. Trustee's assertion that the KERP "may well include insiders" pursuant to section 101(31) of the Bankruptcy Code, no Participant is an "insider."  The U.S. Trustee has neither identified a specific Participant as an "insider" nor demonstrated that any Participant qualifies as one.  The U.S. Trustee also claims the Debtors have not established that the KERP is justified by the facts and circumstances of these cases as required by section 503(c)(3) of the Bankruptcy Code.  But the U.S. Trustee is incorrect. The KERP is critical to maximizing the value of the Debtors' estates in either a sale transaction or a stand-alone restructuring and is necessary to maximizing distributions to creditors.  The Debtors have more than satisfied their burden of proof, and the KERP Motion should be granted.

## Response to the Committee's Objection

4.      Notwithstanding the resolution reached with the Committee, it is important and necessary for the Debtors to respond to certain statements made in the Committee Objection, many of which were incorrect.

5.      The KERP was developed with the goals of (i) retaining employees critical to ensuring continued maintenance of customer accounts and the platform more generally, even while in "sleep mode," and (ii) ensuring that a value-maximizing transaction—whether pursuant to a standalone restructuring or sale—is effectuated.  The KERP Participants are responsible for, among other things, performing essential accounting, cash and digital asset management, IT infrastructure, legal, and other critical functions for the Debtors.  *These functions are critical to the Debtors' business and must be performed in any scenario.*

6.      The Debtors' employees have legitimate reasons to be concerned about their long-term employment status given the ongoing sale process and uncertainty of future operations.  And key employees are necessary regardless of whether there is a sale or a stand-alone reorganization. To confirm a stand-alone plan, the Debtors will obviously need these employees to operate the

3

Debtors' go-forward business. If the Debtors sell all or substantially all of their assets, such a sale will likely be conditioned on key employees staying on to run the business or to transition operations and customer accounts. Ultimately, retaining the Debtors' key employees is critical to successfully consummate any transaction that delivers value to customers.

7.     The only scenario in which the KERP Participants are not necessary is in a liquidation, and that scenario is in no stakeholder's best interest: customers would wait a long time for a much smaller recovery, as professionals litigate wholly unnecessary legal issues of first impression and erode the value of the Debtors' estate. Any dispute regarding the necessity of the Debtors' key employees fails to recognize reality and suggests a lack of interest in maximizing value, a desire to punish the Debtors' employees, or a lack of understanding the Debtors' business.

8.     At the same time, the Debtors recognize their liquidity constraints and have and will take measures to reduce operating expenses. Supplemental Ehrlich Decl. ¶ 13. The Debtors would not seek to implement a retention program unless they believed it was critical to preserving ongoing capabilities and consummating a transaction. The Debtors firmly believe that denial of the KERP would have a massively destructive effect on these estates and all stakeholders in these chapter 11 cases.

9.     Further, the law is clear that approval of a KERP hinges on the sound exercise of a debtor's business judgment. It is inappropriate for another party to seek to supplant the Debtors' business judgment with its own, and statements pointing to so-called "comparable" companies—none of which are currently in chapter 11 and none of which are remotely close to as leanly operated as the Debtors—are misleading and misguided. The Debtors worked closely with their advisors (including Willis Towers Watson US LLC ("WTW"), an independent compensation consultant) and Voyager Digital, LLC's special committee of independent directors to prepare a

4

KERP to address the threat of attrition brought on by the Debtors' chapter 11 filings. And these concerns are not speculative. Of the Debtors' 259 U.S.-based employees,[5] 12—or approximately 5%—of the Debtors' employees resigned after the Petition Date but before the filing of the KERP Motion, including one proposed KERP Participant. Seven additional employees have resigned since the filing of the KERP Motion, including four more proposed KERP Participants. Denial of the KERP would undoubtedly exacerbate the situation, destroying value and costing the Debtors (and ultimately customers) multiples of the maximum cost of the KERP.

10.    The Debtors need the relief requested in the KERP Motion now more than ever. Careless alternative suggestions of reductions in force as a "cure-all" remedy and a public call for firing en masse surely kills value. Any argument that denying the KERP maximizes value for creditors is unsupportable and, frankly, stands in direct opposition to the Committee's support of the modified KERP. The Debtors must retain key employees to ensure a value-maximizing emergence and the KERP, even at is maximum spend (which will occur only if all Participants stay), is a worthwhile investment toward that end. There is no evidence to the contrary, and the KERP is clearly a sound exercise of the Debtors' business judgment.

---

[5]    Due to the extremely accelerated filing of these chapter 11 cases, the aggregate number of employees stated in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 8] (the "Wages Motion") was unintentionally inflated as a result of inadvertent double counting and communication error. As of the Petition Date, the Debtors and their non-Debtor affiliates employed approximately 328 employees (as opposed to the 351 stated in the Wages Motion), 259 of which were employed by the Debtors.

## The U.S. Trustee's Objection

**I.      The U.S. Trustee Objection.**

11.      The U.S. Trustee opposes the KERP Motion on two principal grounds, each of which the Debtors respectfully submit are without merit.

12.      ***First***, the U.S. Trustee objects that the list of Participants "may well include insiders" pursuant to the definition in section 101(31) of the Bankruptcy Code.  But the U.S. Trustee does not identify ***any*** such people (and the U.S. Trustee has not told the Debtors who it is referring to), rendering its objection waived in addition to being meritless.

13.      ***Second***, the U.S. Trustee objects that the Debtors have not established that the KERP is justified by the facts and circumstances of these cases as required by section 503(c)(3) of the Bankruptcy Code.  But the Debtors have submitted ample evidence to satisfy their burden of proof, and the U.S. Trustee has offered nothing to the contrary.

## Argument

**I.      The Participants are Non-Insiders and Therefore Not Subject to Section 503(c)(1) of the Bankruptcy Code.**

14.      The U.S. Trustee argues that some unidentified Participants may be "insiders" due to their job titles and responsibilities, and, as such, approval of the KERP is subject to section 503(c)(1) of the Bankruptcy Code.  The U.S. Trustee is incorrect.  As set forth in the KERP Motion and the supporting declarations, no Participant: (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance.

15.      Although the Bankruptcy Code does not define the term "officer," courts have looked to Black's Law Dictionary as a source of authority.  *See In re Borders Grp., Inc.,* 453 B.R.

459, 468 (Bankr. S.D.N.Y. 2011).  Black's Law Dictionary defines an officer of a corporation as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer."  Black's Law Dictionary (11th ed. 2019).  An employee's title alone (for example, "Vice President") does not make that employee an insider.  *See In re LSC Commc'ns, Inc.*, 631 B.R. 818, 824 (S.D.N.Y. 2021) (emphasizing that "it is not simply the title of 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds") (quoting *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011)).  This law reflects the reality of modern-day corporate America: "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive."  *In re Glob. Aviation Holdings, Inc.,* 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (quoting *In re Borders Grp.*, 453 B.R. 469).

16.     Courts evaluate whether particular employees are insiders "on a case-by-case basis from the totality of the circumstances, including whether the individual has at least a controlling interest in the debtor or exercises sufficient authority over the debtor so as to qualifiably dictate corporate policy and disposition of corporate assets."  *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2012) (internal quotations omitted).  The Debtors have submitted such evidence describing why each of the proposed Participants does not have the duties or responsibilities of an insider.  Ehrlich Decl. ¶¶ 13-14, Supplemental Ehrlich Decl. ¶¶ 11.  The U.S. Trustee offers none in response.

17.     The U.S. Trustee asserts that employees holding a title containing "officer" are presumptively insiders.  But none of the Participants have broad responsibilities over the Debtors' entire business.  Rather, any Participant with an officer title manages only single aspects of specific departments of the Debtors' business and is removed from general managerial control over the

Debtors by at least one direct supervisor.  The U.S. Trustee thus cannot, and has not, identified any Participant whose job duties rise to the role of "insider."

18.      Moreover, the Debtors have demonstrated that each of the Participants' roles are limited in scope; each of the Participants does not make "company-wide or strategic decisions," and does not "exercise[] sufficient authority over the debtor as to unqualifiably dictate corporate policy." *See In re Glob. Aviation Holdings*, 478 B.R. at 148 and 150.  None of the Participants were appointed by the Board, sits on the Board, or directly reports to the Board.  Ehrlich Decl. ¶ 14, Supplemental Ehrlich Decl. ¶ 11.  The Participants do not dictate overall corporate policy, nor do they exercise control over the Debtors' significant business or strategic decisions.  *See* Ehrlich Decl. ¶¶ 13–14, Supplemental Ehrlich Decl. ¶¶ 11.

19.      The U.S. Trustee further asserts that the Debtors failed to provide specific information regarding the job descriptions of the Participants.  That statement is simply incorrect. The Ehrlich Declaration lists the title of each Participant and details the job description of each Participant.[6]  As is set forth in the KERP Motion, the Ehrlich Declaration, and the Supplemental Ehrlich Declaration, the Participants perform functions such as accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other functions for the Debtors. Ehrlich Decl. ¶ 10; Supplemental Ehrlich Decl. ¶ 8, KERP Motion ¶ 10.  As noted in the U.S. Trustee Objection, the Debtors provided an unredacted list of the Participants' job titles, supervisors, corresponding salary, and proposed KERP award to the U.S. Trustee and the Committee.  No requests for additional information were made by the U.S. Trustee.  The Debtors submit that these descriptions are sufficiently detailed to establish that each Participants is not an insider and the relief requested does not implicate section 503(c)(1) of the Bankruptcy Code.

---

[6]    The Supplemental Ehrlich Declaration similarly lists the title and job description detail of the additional Participant but was not filed at the time the U.S. Trustee filed his objection.

## II.      The KERP Is Justified by the Facts and Circumstances of these Chapter 11 Cases.

20.      The U.S. Trustee argues that the KERP is not justified by the facts and circumstances of these chapter 11 cases as required by section 503(c)(3) of the Bankruptcy Code.

21.      The KERP is justified in light of, among other things, the nature of the Debtors' business, the need to retain these key employees in any scenario, and the attrition the Debtors continue to experience.   The Debtors, in consultation with their advisors, including WTW, designed the KERP to motivate the Participants to remain with the Debtors.   Georgeson Decl. ¶ 8. And the opportunities provided by the KERP are fair.   WTW analyzed the retention plans authorized and approved in the chapter 11 cases of 31 similarly-sized companies that filed petitions from 2017 through 2020.   The Debtors' KERP opportunities generally are positioned at or below the 25th percentile of the market, for the majority of participants.   Georgeson Decl. ¶ 17.

22.      Courts in this district and elsewhere recognize that satisfying section 503(c)(3) of the Bankruptcy Code requires a showing that the proposed plan is within the Debtors' business judgment.   *See In re Velo Holdings Inc.*, 472 B.R. 209, 212 (Bankr. S.D.N.Y. 2012) (noting "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *see also In re Borders*, 453 B.R. at 473–74 (evaluating debtors' KERP under the framework of the business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2007) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment" test in accordance with section 503(c)(3) of the Bankruptcy Code).   The Debtors have provided ample evidence that it is.

23.      ***First***, the risk of Participants resigning is real.   Since the Petition Date, 19 of the Debtors' employees, including approximately 13% of the Debtors' key employees, resigned.

Considering the level of attrition, the Debtors' remaining employees have become even more critical.

24.    Contrary to the Committee's statement that "only" 12 of the Debtors' employees have resigned—the number has further increased to 19 since—the harm caused by losing key employees is tangible and costly.  The employees have left positions that need to be filled—these employees played key roles in the Debtors' operations, and were not in roles which the Debtors can reduce their workforce (which, as described in more detail below and in the Supplemental Ehrlich Declaration, the Debtors intend to do).  The cost and time required to search for, hire, and train new employees is substantial when compared to the cost of the KERP.

25.    *Second*, implementation of the KERP would only benefit these chapter 11 cases. The Debtors and their advisors are running an extensive sale process and actively marketing the Debtors' assets to potential purchasers.  The Debtors' failure to retain Participants would clearly destroy value to the detriment of the sale process.  Many potential purchasers of the Debtors' assets or equity interests will and do want reassurance that the Debtors have retained the employees with the specialized knowledge needed to resume operations at the appropriate time.  Again, no potential purchaser objected to the KERP Motion.  And if the Debtors pursue the standalone plan, the Debtors clearly need the knowledge and skills of these highly specialized Participants to prepare and eventually resume operations upon emergence.

26.    Further, the statement that "any purported risk of attrition has been mitigated, and most likely eliminated, by the expedited timeline," (Committee Obj. ¶ 16) is patently false.  It is unclear to the Debtors on what basis the Committee based this assumption, and the assumption that "there is no basis to expect that the Participants would seek alternative employment in the next months" (*id*.) ignores reality.   Key employees have already resigned and sought new

employment—two employees submitted their resignations the day before, and the same day, the
Committee filed its objection.  The Debtors' employees are well-qualified and knowledgeable in
their respective roles, and there is no serious question that they have other opportunities in many
different industries if they decide leave the Debtors' business.

27.    **Third**, while the Debtors' platform is temporarily frozen during the pendency of
these chapter 11 cases, the Debtors (in the event of a standalone plan transaction) or a purchaser
(in the event of a sale transaction) will need to smoothly restart that platform immediately upon
emergence.  Without the ongoing maintenance and continued preparation for the eventual
"unfreezing," the Debtors' will be unable to resume or sell operations.  A disruption to the Debtors'
workforce could negatively impact these efforts, leading to a lower recovery and lower distribution
to the Debtors' creditors, including customers.  Even a sale transaction that involves only the
movement of customer accounts will require these key employees.

36.    In assessing the soundness of the Debtors' business judgment, courts in the Second
Circuit consider the following non-exhaustive list of factors:

(a)    Is there a reasonable relationship between the plan proposed and the results
to be obtained, *i.e.*, will the key employee stay for as long as it takes for the
debtor to reorganize or market its assets?

(b)    Is the cost of the plan reasonable in the context of the debtor's assets,
liabilities, and earning potential?

(c)    Is the scope of the plan fair and reasonable: does it apply to all employees,
or if not, does it discriminate unfairly?

(d)    Is the plan or proposal consistent with industry standards?

(e)    What were the due diligence efforts of the debtor in investigating the need
for a plan, analyzing which key employees need to be incentivized, what is
available, and what is generally applicable in a particular industry?

(f)    Did the debtor receive independent counsel in performing due diligence and
in creating and authorizing the incentive compensation?

*Id*. at 576–77.  All of these standards are satisfied.

11

28.     *First*, there is a reasonable relationship between the KERP and the results to be obtained, namely retention of the Participants through the Debtors' restructuring process.  The loss of critical employees could put the entire restructuring effort at risk.  As a result, the Debtors' management team, with the assistance of their advisors, carefully developed a plan and a process by which the Participants were selected.  Given their job insecurity and uncertainty, these Participants currently have little other incentive to remain with the Debtors, and, as mentioned above, the Debtors have lost talent since filing for chapter 11 already.

29.     While the U.S. Trustee expresses concern that participants could receive the initial payout and leave, the proposed initial KERP payments are ***subject to a clawback through emergence*** from chapter 11, with the remaining 44.4% paid at the earlier of the date that is (i) twelve months after the effective date of the KERP or (ii) 90 days following emergence from chapter 11.  As such, the Participants are highly incentivized to stay through duration of the chapter 11 cases and beyond.

30.     *Second*, as set forth in the Ehrlich Declaration, the total cost of the KERP is only a fraction of the Debtors' total revenue and liabilities, while the costs, both financial and operational, of losing KERP Participants would be far greater.  Additionally, pursuant to the resolution reached with the Committee, the Debtors will further reduce costs by implementing measures, on or before September 22, 2022, that will result in annualized savings of at least $4.6 million.  *See* Supplemental Ehrlich Decl. ¶ 13.

31.     *Third*, the scope of the KERP is fair and reasonable under the circumstances and does not unfairly discriminate.  As discussed above, selection of the KERP Participants was an in-depth process.  The result of that process is a narrowly tailored program that applies to 34 (down from originally 38 due to resignations) of the Debtors' non-insider employees (out of a population

of approximately 328 employees), at modest cost considering the devastating economic effect should the Debtors lose the ability to operate without key talent.  Further, the KERP's maximum cost of $1.6 million (given the Participants that have already left) is reasonable in absolute terms when compared to the aggregate costs of key employee plans approved in other chapter 11 cases, and the retention awards expressed as a percentage of salary (*i.e.*, 22.5% of salary) are consistent with awards in comparable key employee retention plans.  *See* Georgeson Declaration ¶ 17, 14.

32.     *Fourth*, the KERP is consistent with industry standards.  The Debtors' management team, none of whom will receive payment under the KERP, in consultation with the Debtors' advisors, developed the KERP after a rigorous analysis.

33.     *Fifth*, as discussed in detail above, and in the KERP Motion, the Ehrlich Declaration, and the Georgeson Declaration, the Debtors, in consultation with their advisors, undertook an extensive process to determine the list of proposed Participants and the amount to be paid to each Participant.  Accordingly, the KERP was created after significant due diligence.

34.     The business judgment rule allows the Debtors to consider their business needs and market conditions and make the best decision for stakeholders.  The Debtors believe that the KERP will maximize and preserve value, and the KERP is justified by the facts and circumstances of this case.

III.    **The Debtors Have Satisfied Sections 107(b) and 107(c) of the Bankruptcy Code and the Motion to Seal Should be Granted.**

35.     The U.S. Trustee argues that "the Debtors have not met their burden under . . . section 107(b)(1) [of the Bankruptcy Code]" and that "the Debtors rely entirely on speculative fears in support of the Motion to Seal."  U.S. Trustee Obj., pg. 11.

36.     This is not the case.  The Debtors have provided cogent reasons why the Confidential Information (as defined below) falls within the scope of "confidential information"

that may be protected pursuant to Bankruptcy Code section 107(b)(1).  Therefore, the Debtors

have overcome the presumption of public disclosure.

37.     Section 107(b)(1) of the Bankruptcy Code provides that "the bankruptcy court shall

. . . protect an entity with respect to . . . confidential . . . commercial information."  11 U.S.C. §

107(b)(1).  Section 107(b) does not require the Debtors to engage in a balancing test or show "good

cause" to merit sealing.  *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion

Pictures Corp.)*, 21 F.3d 24, 28 (2d Cir. 1994).  If the material sought to be protected constitutes

"confidential . . . commercial information," "the Court is required to protect a requesting interested

party and has no discretion to deny the application."  *Id*. at 27.

38.     Courts are required to provide protections "generally where open inspection may

be used as a vehicle for improper purposes."  *Orion Pictures*, 21 F.3d at 27.  Indeed, the "authority

goes not just to the protection of confidential documents, but to other confidentiality restrictions

that are warranted in the interests of justice."  *See In re Glob. Crossing Ltd.*, 295 B.R. 720, 724

(Bankr. S.D.N.Y. 2003).  Confidential commercial information "has been defined as information

which would cause 'an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  *In re Faucett*, 438 B.R. 564, 567–68 (Bankr. W.D. Tex.

2010) (quoting *Orion Pictures Corp.*, 21 F.3d at 27).  Commercial information need not rise to the

level of a trade secret to be protected under section 107(b) of the Bankruptcy Code.  *Id.* at 28.

Additionally, Courts have also held that the resulting sealing order should be broad (*i.e.*, "any order

which justice requires").  *See, e.g.*, *In re Glob. Crossing, Ltd.*, 295 B.R. at 724 (citing Bankruptcy

Rule 9018).

39.     The Ehrlich Declaration and the Supplemental Ehrlich Declaration contain

commercially and personally sensitive information with respect to the Debtors' reporting structure

and the Debtors' employees, including their job titles, their supervisors' names, their salaries, and their proposed KERP awards (the "Confidential Information"). The Debtors operate in a highly competitive market and the disclosure of the Confidential Information would make it easier for the Debtors' competitors to attract the very employees necessary to the Debtors' operations and restructuring efforts.

40.    In addition, publication of the Confidential Information would enable the Debtors' employees to learn or intuit certain confidential information with respect to their colleagues, which is not only inappropriate, but also is likely to negatively affect employee morale to the detriment of the Debtors and their estates. Accordingly, publication of the Confidential Information would negatively impact the Debtors' business, put the Debtors at a competitive disadvantage, erode employee morale, and undermine the Debtors' efforts to reorganize. The Debtors' competitors should not be allowed to use confidential employee and retention information to obtain an unfair business advantage to the detriment of the Debtors' estates and creditors.

41.    Finally, the Confidential Information, if publicly disclosed, could expose the Participants to undue risks of identity theft or other harm. *See, e.g.*, *Brennan v. Stevenson*, 2015 U.S. Dist. LEXIS 158848, *2, 2015 WL 7454109 (explaining "doxing" as "searching on the Internet for, and publishing, private identifying information about an individual, typically with malicious intent."). Even if portions of the Confidential Information were to be redacted, parties might be able piece together certain bits of the available information in furtherance of fraud, identity theft, or other crimes. By requesting to file the Confidential Information under seal, the Debtors are seeking to protect the Participants, and their families, to the maximum extent possible.

42.    The invective of the Committee's Objection, combined by certain social media posts made by the Committee, provides still another reason to seal information about the Debtors'

employees. The KERP Participants are not senior management whose identities and compensation would be generally disclosed publicly, and they do not deserve to be at risk of being targeted merely because they have decided to continue working hard in an effort to maximize value for all stakeholders. The Debtors believe sealing the information, regardless of the success of the KERP Motion, is important to protect their employees under these circumstances.

43.    The Debtors have sufficiently described the nature, general role, and scope of the Participants' roles in the KERP Motion, the Ehrlich Declaration, and the Supplemental Ehrlich Declaration. The only parties that asked for more detail were provided it. The public has been provided with adequate information to evaluate the relief sought in the KERP Motion, and the Debtors have only withheld the information that would have the potential to harm the Debtors' estates and stakeholders. Moreover, limiting the disclosure to the Court, the U.S. Trustee, and the Committee has enabled more-than sufficient scrutiny of the KERP Motion while minimizing the potential adverse impact of disclosure. As a result, the Debtors respectfully submit that the factual and legal predicates for filing the Ehrlich Declaration and the Supplemental Ehrlich Declaration under seal have been satisfied.

## Conclusion

44.    Implementation of the KERP is necessary and appropriate to avoid costly losses of key employees and maximize value, regardless of the outcome of these chapter 11 cases. All parties will benefit if the Participants, none of whom are insiders, are incentivized to remain in the Debtors' employ. The Debtors respectfully submit that the Proposed Order should be entered.

*[Remainder of page intentionally left blank.]*

WHEREFORE for the foregoing reasons and upon the KERP Motion and the Declarations filed in support therewith, the Debtors respectfully request that the Court overrule the objections and approve the KERP Motion.

Dated:  August 22, 2022
New York, New York

*/s/ Joshua A. Sussberg*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com
              cmarcus@kirkland.com
              christine.okike@kirkland.com
              allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*