Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            mslade@kirkland.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, |  |
| Plaintiffs, |  |
| v. | Adv. Pro. No. 22-[●] |
| ADAM LAVINE AND SHINGO LAVINE, |  |
| Defendants, |  |

**THE DEBTORS' ADVERSARY COMPLAINT
FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF TO
ENFORCE THE AUTOMATIC STAY, DECLARATORY RELIEF, AND DAMAGES
AND SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

The Debtors in the above-captioned chapter 11 cases ("Plaintiffs" or the "Debtors"), through their undersigned counsel, allege for their Complaint against Defendants as follows:

**Preliminary Statement**

1. This is an adversary proceeding brought pursuant to 28 U.S.C. § 2201, sections 105, 106(a), 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 7001(7), (9) and 7065, for declaratory judgment, a temporary restraining order, preliminary injunctive relief, and damages and sanctions for willful violation of the automatic stay.

2. At issue in this proceeding are threats and actions carried out by two disgruntled former employees of the Debtors: Adam Lavine and his son Shingo Lavine ("Defendants").

3. Both Defendants are active participants in these bankruptcy proceedings, they both participated in the recent 363 auction of Debtors' assets, and they both have actual knowledge of the scope and meaning of the automatic stay. Nonetheless, as set forth more fully below, both Defendants have done everything within their power to cause and threaten harm to the Debtors' estate in clear violation of the automatic stay.

4. On Monday, September 26, 2022, at 2:45 PM EST, Adam Lavine sent the following email to Voyager CEO Steve Ehrlich and other Voyager employees:

> Voyager Team,
>
> Ethos is launching a new service on Friday October 1st. To do this we need to edit our DNS records. Typically DNS records need 48 hours to propagate, meaning we need to terminate Voyager usage of the Ethos.io DNS servers Wednesday, Sep 28th. This may affect some services on Voyager which are pointing to Amazon servers via the Ethos DNS.
>
> We have been highly cooperative with the auction process, and gave notice about this DNS issue years ago. This is a basic technical infrastructure issue that should have been resolved years ago, and we can't imagine there is a technical dependency still in place. In any event, we can no longer allow Voyager's unauthorized access to Ethos DNS at this time. We can't wait any longer, as without this change we can't even do basic services such as CRM and hosted email through ethos.io.
>
> Very truly yours,
>
> Adam Lavine
>
> Adam Lavine | COO | ETHOS.io
> www.ethos.io | @ethos_io

5.      This threat came out of nowhere. Since the Petition Date, the Debtors had been working in good faith to transition the last remaining technical relationships between the Ethos.io Domain Name held by the Lavines and the Debtors' internal platforms—a complex workstream that is approximately 30 days away from completion. The Lavines never indicated a need for the Debtors to complete their work by a particular date, let alone on 48 hours' notice. And the Lavines' statement that terminating the Debtors' access "may affect some services on Voyager which are pointing to Amazon servers via the Ethos DNS" was a massive understatement. While the issue is complex, as described in the *Declaration of Rakesh Gidwani* (attached as Exhibit B to the Debtors' Motion for a Temporary Restraining Order), terminating the Debtors' access to DNS servers that they have used for years is serious: it could eliminate the Debtors' ability to access cloud services hosting the Debtors' Bedrock platform and Google data, imposing significant costs on the Debtors and the estate, and threatening timely consummation of the sale transaction just announced.

6.      The Lavines well understand the damage they are threatening. Continuing a crusade against the Debtors' management team he had began before the Petition Date, Adam

3

Levine's son, Shingo, publicly announced his plan as one that would render "potentially critical systems" used by the Debtors non-functional.

7. This conduct violates the automatic stay. The Debtors have accordingly brought this adversary to request that the Court enforce the automatic stay against Defendants and for injunctive relief, and grant all appropriate relief needed to preserve the value of the estate and give effect to the public policies underlying the Bankruptcy Code.

## Jurisdiction and Venue

8. ThE United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9. This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

10. Venue in this district is proper pursuant to 28 U.S.C. § 1409.

11. Pursuant to Federal Bankruptcy Rule of Procedure 7008, the Debtors consent to the entry of a final order or judgment by the Bankruptcy Court.

## Parties

12. The Debtors are plaintiffs in this adversary proceeding.

13. Adam Lavine and Shingo Lavine are both former Debtor employees and current Debtor shareholders. This Complaint is being served on the Lavines, through their counsel, on September 27, 2022.

4

**Factual Background**

14. On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Court"). These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

15. The Debtors and certain non-Debtor affiliates (collectively, "Voyager," or "the Company") operate a cryptocurrency trading platform that allows customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Voyager's mobile application has been downloaded millions of times and had over 3.5 million active users in early 2022. A detailed description of Voyager's business operations, capital and debt structure, and the facts and circumstances leading to these chapter 11 cases is set forth in the *Declaration of Stephen Ehrlich, Chief Executive Officer of Voyager Digital Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Ehrlich Declaration") (ECF No. 15) (July 6, 2022).

16. On September 26, 2022, at approximately 2:45 p.m. EST, Voyager employees and counsel received an email message from Adam Levin ("9/26 Email") threatening to terminate Voyager's access to the Ethos.io "DNS servers" within thirty-six hours.

17. The 9/26 email reads, as follows:

> Voyager Team,
>
> Ethos is launching a new service on Friday October 1st. To do this we need to edit our DNS records. Typically DNS records need 48 hours to propagate, meaning we need to terminate Voyager usage of the Ethos.io DNS servers Wednesday, Sep 28th. This may affect some services on Voyager which are pointing to Amazon servers via the Ethos DNS.
>
> We have been highly cooperative with the auction process, and gave notice about this DNS issue years ago. This is a basic technical infrastructure issue that should have been resolved years ago, and we can't imagine there is a technical dependency still in place. In any event, we can no longer allow Voyager's unauthorized access to Ethos DNS at this time. We can't wait any longer, as without this change we can't even do basic services such as CRM and hosted email through ethos.io.
>
> Very truly yours,
>
> Adam Lavine
>
> Adam Lavine | COO | ETHOS.io
> www.ethos.io | @ethos_io

18.     For years, Voyager's operations have utilized access to the Ethos.io "DNS Servers." However, since the Petition Date, Voyager has been working to migrate off the Ethos.io "DNS Servers." The target completion date for that migration is the end of October, 2022. Prior to the 9/26 Email, the Lavines never indicated a need for the Debtors to complete their work by any particular date. Voyager had no notice that it needed to migrate its operations by a specific time, let alone within 36 hours of receiving the 9/26 Email.

19.     The Domain Name System (DNS) is a standard internet protocol that allows users, smartphones and computing devices to access computer servers using a human readable "domain name" and optionally a subdomain. For example, if a user types the domain name investvoyager.com into a web browser, the web browser will use the DNS service to locate a numerical internet address for one of Voyager's web servers. Oftentimes, a "subdomain" may be added to the domain name so that different computer servers within a domain name hierarchy can be easily accessed (for example, email.investvoyager.com might have been used to identify a different computer server providing email services). The domain owner has the ability to create,

modify and delete domain records that link computer servers with the domain name, and optionally create subdomains and assign different computer servers on the internet to each subdomain.

20. When Voyager acquired the "Bedrock" business from Ethos.io PTE Ltd. in October 2019, the domain name ethos.io was not included in the acquired assets. However, assets critical to the business that were acquired by Voyager and included in the Bedrock business were linked to the ethos.io domain name, including computer servers and subdomains linked to api.ethos.io, mainnet.ethos.io, ceres.ethos.io and rc2.ethos.io (the "Voyager Subdomains"). The computer servers referenced by the Voyager Subdomains were part of the assets acquired from Ethos.io PTE Ltd., and those computer servers perform critical functions as part of the existing Voyager platform, such as enabling transfers of cryptocurrency into and out of customer accounts, multifactor authentication, storage of computer programming source code for the Bedrock system, storing and updating blockchains used by the Voyager platform to perform cryptocurrency services for its customers, and testing and rollout of platform updates and revisions. Without access to the Voyager Subdomains, access to the above-mentioned computer services would cease.

21. The domain name ethos.io is registered in the name of Ethos.io PTE Ltd., and believed to be controlled by Lavine and his associates. The 9/26 Email threatened to modify or delete the DNS records for ethos.io in a manner that would either remove the Voyager Subdomains entirely or reroute the Voyager Subdomains to computer servers controlled by the Lavines. In either case, without the Voyager Subdomains, the Debtors' access to the critical computer servers linked to such Voyager Subdomains would abruptly end (and at a minimum temporarily), requiring the Debtors to resort to restoring their systems from "backups" that they maintain, at a substantial cost, burden and distraction to the Debtors.

7

22. In conjunction with the 9/26 Email and specific subsequent Tweets, Lavine suggested that he would use his control of the ethos.io domain name to impair or eliminate Voyager's access to certain Google cloud services, which are critical to Voyager's business and ability to reorganize under chapter 11 protection.

23. The Lavines are aware that termination of the Debtors' access to DNS servers could cause substantial damage to the Debtors. On September 26, 2022, in response to a Tweet from @digantgoyal inquiring how terminating the Debtors access to DNS servers would impact the Debtors, Shingo Lavine Tweeted, "Any systems hosted on Ethos.io will no longer function once we cut off access. I do not know the full extent of it, however, it seems there are potentially critical systems that still run on Ethos owned DNS." Later on that evening, in response to a Tweet from @ricky_ricks7 asking what it would mean to terminate the Debtors access to the DNS servers, Shingo Lavine responded that "Voyager would stop working."

24. When Voyager acquired the Bedrock business from Ethos.io PTD Ltd., the computer and blockchain assets it acquired, and which formed the backbone of the Bedrock business, were stored on and operated from Google cloud computer servers that were tied to the ethos.io domain name. Authentication records are currently included in the DNS for ethos.io that are necessary to enable Voyager's continued access to the Google cloud services that provide cryptocurrency transfers into and out of customer accounts, multifactor customer account authentication, computer program source code, engineering systems, blockchain nodes for all cryptocurrencies supported by Voyager, and databases containing the primary transaction records required to enable Voyager to provide an audit trail needed for regulatory compliance. Importantly, the Google computer servers that provide those services for Voyager also include digital wallets that temporarily hold inbound cryptocurrency transfers. There is approximately $5-

8

6 million dollars' worth of cryptocurrency in the temporary wallets on those Google servers, which were frozen only July 1, 2022—prior to the filing of the Debtors' bankruptcy petitions.

25. Assuming Lavine makes good on his threat in the 9/26 Email, Lavine will be able to remove access to, or potentially destroy, numerous valuable assets of the estate and cryptocurrencies held by the estate in temporary wallets for customers. Even if Voyager can recover its Google cloud servers with all data intact, it would require the investment of extensive time and effort to fully recover access to such servers and enable operations sufficient to transfer cryptocurrencies out of customer accounts as contemplated in the pending sale of customer account assets to FTX, and may impair the timely completion of that transaction.

26. More concerning about the threat is the timing. As stated before, Voyager has been working diligently to migrate its operations from Ethos.io to a domain name owned and controlled by the Debtors called Cryptotradinginc.com. Due to the complex and burdensome nature of the process, Voyager anticipates the entire process to be completed by the end of October, if not sooner.

27. In the interim, the 9/22 Email suggests a need to remove the Debtors' access to Ethos.io because Lavine intends to start a new business, and without eliminating the Debtors' access, he incorrectly believes he "can't even do basic services such as CRM and hosted email through ethos.io." The Debtors, however see no reason why Lavine cannot conduct "basic services such as CRM and hosted email through ethos.io" without interfering with the Debtors' Subdomains.

**Basis for Relief**

28. This Court should enjoin Defendants from taking action to interfere with Debtors' access to estate property, including but not limited to terminating Voyager's usage of the Ethos.io

DNS servers, because Debtors satisfy all of the elements for injunctive relief "as modified to fit the bankruptcy context." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007). The Court should likewise award Debtors actual damages (including costs and attorney's fees), as well as punitive damages and sanctions. 11 USC § 362.

29. In the bankruptcy context, courts consider the following factors when determining whether to grant injunctive relief: (1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction. *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007). In evaluating these factors, the courts take a flexible approach and no one factor is determinative. *Id*.

30. All of these elements for injunctive relief are met in this case. First, there is a high likelihood of successful reorganization, as Debtors have filed a Joint Plan of Reorganization and have announced a proposed sale of assets. Second, the Lavines' proposed conduct would cause irreparable harm to the estate and, as explained below, there is a bankruptcy law presumes irreparable harm when the automatic stay is violated. Third, while the Debtors will suffer grievous harm if the domain access is terminated, the Lavines would suffer no harm whatsoever by maintaining the status quo until the Debtors can migrate their systems to another domain name. Finally, public interest militates in favor of preventing violations of the automatic stay and supporting the Debtors' chances of a successful reorganization.

### A. Likelihood of Successful Reorganization

31. On July 6, 2022, the Debtors filed their Joint Plan of Reorganization. (Dkt. 17.) An Amended Joint Plan of Reorganization was subsequently filed on August 12, 2022. Dkt. 287.

Just yesterday, Voyager announced the completion of a successful two-week auction. There is every indication that the reorganization will be successful.

32. Conversely, the Lavines' threatened conduct poses a substantial risk to a successful reorganization. Gidwani Decl. ¶ 4. By acting to limit access to the Voyager Subdomains, the Lavines would effectively cut off access to the Debtors' computer services. *Id*. at ¶6. The Debtors would be forced to restore their systems from backups they maintain at a substantial cost, which could require weeks or months to fully recover access to their servers and enable operations sufficient to transfer cryptocurrencies out of customer accounts as contemplated in the announced proposed sale of customer-account assets to FTX US. *Id*. at ¶¶ 7–9. Continuing the status quo and enjoining the Lavines' threatened conduct improves the likelihood of a successful reorganization.

**B.    Imminent Irreparable Harm to the Estate**

33. Irreparable harm to the estate is presumed when there is a violation of the automatic stay. *See, e.g.*, *In re Prudential Lines, Inc.*, 107 B.R. at 835 ("Where an act would violate the automatic stay, irreparable harm is established by the violation since Congress, by legislatively staying such acts, has determined that they cause irreparable injury to the estate.") The automatic stay prohibits "any act to obtain possession of property of the estate or of property from the estate or to *exercise control* over property of the estate." 11 U.S.C. § 362(a)(3) (emphasis added). "In the context of 11 U.S.C. § 362(a)(3), control is interpreted broadly to include any actions taken post-petition against estate property that disrupt the status quo and inhibit the debtor's ability to effectively proceed through the bankruptcy process." *In re Colonial Penniman, LLC*, 575 B.R. 664, 689–90 (Bankr. E.D. Va. 2017). "The language in the Code is purposefully broad to encompass a wide array of actions that seek to exercise control over property of the estate

and the Court must look to the purpose of the Bankruptcy Code to interpret its meaning." *In re Saint Vincents Catholic Med. Ctrs.*, 429 B.R. 139, 146 (Bankr. S.D.N.Y. 2010) *citing In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983). The restrictions laid out in Section 362(a)(3) extend to any act which restricts access to estate property.

34. But even if it were not presumed, irreparable harm is readily apparent. Mr. Lavine threatened last night, "with one press of a button," to destroy Voyager's access to estate property in which case "Voyager would stop working." If Mr. Lavine makes good on his threat, the Debtors would have to attempt to restore their systems from backups they maintain, which would result in substantial costs that would deplete the value of the estate. See Ex. A, Gadwani Decl., ¶¶ 7, 9. Moreover, even if the Debtors are able to completely recover their systems, it would take weeks or even months to to so to enable operations sufficient to transfer customer-account assets to FTX US. *Id.* at ¶ 9. Thus, there is no doubt that, if acted upon, the threats in Mr. Lavine's September 26 email would cause irreparable harm.

  **C.** **Balance of Harms**

35. In stark contrast, the Lavines suffer no harm from enforcing the automatic stay. If they desire to do so, the Lavines can certainly start a new business and without eliminating the Debtors' access to the Voyager Subdomains, and the Debtors stand ready and willing to help them do so. *See* Gadwani Decl., ¶ 11. In the interim, continuing the status quo (continuing access to the Voyager Subdomains and not making any changes to the authentication that impairs Voyager's ability to access the Google cloud services) does not impose any cost or burden on Ethos.io's potential business in any manner. *Id.* Voyager pays all costs for the Google cloud servers, and DNS records that would enable Ethos.io to establish its own servers can be easily added to the DNS without changing any of the Voyager DNS records.

### D. Public Interest

36. "Evaluation of the public interest factor of the analysis "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests." *In re Calpine Corp.*, 365 B.R. at 413. This factor weighs strongly in favor the Debtors.

37. First, courts have recognized that "enforcing the provisions of the Bankruptcy Code better serves the public interest." *In re Raney*, 2002 WL 32114560, at *1 (Bankr. E.D. Ark. Dec. 6, 2002); *see also In re Diamond Indus. Corp.*, 265 B.R. 707, 716 (Bankr. D.V.I. 2001) ("[T]he public interest unquestionably favors enjoining a course of conduct that knowingly violates a cornerstone of federal bankruptcy law—i.e., the automatic stay.")

38. In addition, there is a clear public benefit, as that is evaluated in the context of bankruptcy courts, in permitting the Debtors to proceed with their proposed sale and Plan. If successful, the sale and Plan will result in maximized distributions to all creditors of the Debtors' estate.

39. In contrast, the Debtors cannot conceive of any possible public interest in permitting disgruntled former employees to interfere with the reorganization of a debtor, egregiously violate the automatic stay, and take actions that will immediately result in the destruction of estate value.

### First Claim for Relief

### (Declaratory Judgment)

40. The Debtors repeat and re-allege the allegations contained in paragraphs 1–39 of this Complaint as if fully set forth herein.

41. The Debtors seek an order declaring that any Defendant conduct in violation of Bankruptcy Code sections 362(a), including but not limited to (i) any attempts to enforce or compel

13

the Debtors from use of the Ethos.Io domain or DNS servers, or (ii) any other acts which interfere with the Debtors' operation and use of estate assets, are null and *void ab initio*.

42. The Debtors also seek damages, costs, and attorneys' fees resulting from Defendants' threats to violate the automatic stay.

## Second Claim for Relief

### (Injunctive Relief)

43. The Debtors repeat and re-allege the allegations contained in paragraphs 1–41 of this Complaint as if fully set forth herein.

44. The Debtors seek a temporary restraining order and/or preliminary injunction enjoining any Defendant acts in violation of Bankruptcy Code sections 362(a), including but not limited to (i) any attempts to enforce or compel the Debtors from use of the Ethos.Io domain or DNS servers, or (ii) any other acts which interfere with the Debtors' operation and use of estate assets.

45. The injunctive relief sought by the Debtors is (i) necessary and proper in order to allow the Debtors an unobstructed opportunity to restructure in these chapter 11 cases, (ii) consistent with and available pursuant to Sections 362(a) and 105(a) of the Bankruptcy Code, and warranted in this case because Debtors satisfy all of the elements for injunctive relief "as modified to fit the bankruptcy context." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007).

## Third Claim for Relief

### (Damages and Sanctions)

46. The Debtors repeat and re-allege the allegations contained in paragraphs 1–45 of this Complaint as if fully set forth herein.

14

47.   As set forth in the preceding allegations, the Defendants' violations of the automatic stay and the ensuing harm to the Debtors and estate assets has been knowing, willful and intentional.

48.   Pursuant to 11 USC § 362(k), the Debtors are entitled to all of their actual damages (in an amount to be proven in an evidentiary proceeding before this court), as well as any punitive damages and sanctions as are proven to be appropriate.

### Prayer for Relief

WHEREFORE, the Debtors as Plaintiffs demand judgment against Defendants and respectfully request relief as follows:

i.   The entry of a declaratory judgment that any Defendant acts in violation of Bankruptcy Code sections 362(a), including but not limited to (i) any attempts to remove the Debtors' links to Ethos.Io DNS servers, or (ii) any other acts which interfere with the Debtors' operation and use of estate assets, are null and *void ab initio*.

ii.  The entry of an order granting a temporary restraining order and/or preliminary injunction pursuant to Bankruptcy Code sections 362(a) and/or 105(a) enjoining and prohibiting any Defendant acts in violation of Bankruptcy Code sections 362(a), including but not limited to:

   a.   deleting or modifying any DNS record for the Ethos.io domain name;

   b.   changing the owner, technical or administrative contacts for the Ethos.io domain name;

   c.   terminating or requesting the deletion or termination of any Google cloud services that are currently linked to the Ethos.io domain name;

15

          d.      any action to obtain control over DNS records or Google cloud services that are currently under the control of Voyager employees;

          e.      terminating or restricting Debtors' use or access to Ethos.io DNS servers; or

          f.      any other acts which interfere with the Debtors' operation and use of estate assets.

iii.    Actual damages (including costs and attorney's fees) in an amount to be proven at trial, as well as any punitive damages and sanctions as are proven to be appropriate, due to Defendants' violation of the automatic stay.

iv.    Such other relief as this Court deems just and proper under the circumstances.

| | |
|---|---|
| Dated: September 27, 2022<br>New York, New York | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>Christopher Marcus, P.C.<br>Christine A. Okike, P.C.<br>Allyson B. Smith (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br>Email:          jsussberg@kirkland.com<br>                     cmarcus@kirkland.com<br>                     christine.okike@kirkland.com<br>                     allyson.smith@kirkland.com<br><br>- and -<br><br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Michael B. Slade (admitted *pro hac vice*)<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200<br>Email:          mslade@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |

## **CERTIFICATE OF SERVICE**

   I HEREBY CERTIFY that on this 27th day of September, 2022, I caused a true and correct copy of the foregoing to be served by e-mail upon the following:

Douglas T. Tabachnik
Law Offices of Douglas T. Tabachnik, P.C.
Woodhull House
Suite C
63 West Main Street
Freehold, NJ 07728

Matt McClintock
Goldstein & McClintock LLP
111 W Washington St STE 1221
Chicago, IL 60602

                    */s/ Michael Slade*
                    Michael Slade