**Hearing Date:  October 19, 2022, at 2:00 p.m. (prevailing Eastern Time)**
**Objection Deadline:  October 12, 2022, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

### NOTICE OF HEARING ON DEBTORS' MOTION
### FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO
### THE ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* (the "Motion,") will be held on **October 19, 2022, at 2:00 p.m., prevailing Eastern Time** (the "Hearing").  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically.  Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **October 12, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "Debtors") at https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  September 28, 2022          /s/ Joshua Sussberg
New York, New York                  **KIRKLAND & ELLIS LLP**
                                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                    Joshua A. Sussberg, P.C.
                                    Christopher Marcus, P.C.
                                    Christine A. Okike, P.C.
                                    Allyson B. Smith (admitted *pro hac vice*)
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:    (212) 446-4800
                                    Facsimile:    (212) 446-4900
                                    Email:        jsussberg@kirkland.com
                                                  cmarcus@kirkland.com
                                                  christine.okike@kirkland.com
                                                  allyson.smith@kirkland.com

                                    *Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO
## THE ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):[2]

### Preliminary Statement

1.      The Debtors and their advisors worked tirelessly to identify the value-maximizing

transaction for their customers and other creditors on an expedited timeline over the last several

months.  These efforts were successful.  Following a two-week competitive auction process, the

Debtors selected the bid submitted by FTX US as the winning bid.  The Debtors value FTX US's

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used by not defined herein shall have the meaning given to them in the Asset Purchase Agreement or the Bidding Procedures (each as defined below), as applicable.

bid at approximately $1.422 billion, comprised of (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates. Most importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

2.     Before the Petition Date, and as discussed in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), the Debtors commenced a marketing process for an investment in, or a sale of the Debtors' business to, a third-party purchaser. Discussions with interested parties, however, revealed that an in-court process would be necessary to yield the most value-maximizing transaction available to the Debtors. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.

3.     The Debtors and their advisors left no stone unturned. Over the last several months, Moelis & Company LLC ("Moelis"), the Debtors' investment banker, reached out to 90 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. Fifty-four parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations and financial position. The virtual data room was robust, supplemented throughout the marketing process, and contained thousands of diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

4.     On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan served as a floor for the marketing process. Shortly thereafter, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and the bidding procedures established therein, the "Bidding Procedures"),[3] which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

5.     The Debtors' marketing process proved fruitful and yielded bids from numerous strategic investors. Accordingly, on September 13, 2022, the Debtors commenced an auction (the "Auction") to determine the winning bid. The two-week Auction consisted of hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment, and in consultation with the Committee, selected the bid from West Realm Shires Inc. ("FTX US" or the "Purchaser") as the Successful Bid.[4] On September 27, 2022, Voyager Digital, LLC, as seller (the "Seller") and FTX US, as Purchaser, executed that certain asset purchase agreement (including all exhibits and schedules

---

[3]    The Court approved the Bidding Procedures Motion on August 5, 2022. See *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").

[4]    *See* Notice of Successful Bidder [Docket No. 457].

related thereto, the "Asset Purchase Agreement") memorializing the terms of the Successful Bid and proposed sale transaction (the "Sale"). The Asset Purchase Agreement provides that the Sale will be consummated through a chapter 11 plan.

6.    As set forth in the Asset Purchase Agreement, the Sale contemplates approximately $1.422 billion of aggregate deal consideration comprised primarily of: (a) the value of all Voyager cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration estimated as providing approximately at least $111 million of incremental value for the Debtors' estates that includes (i) a cash payment of $51,000,000, (ii) an earn out of up to $20 million, (iii) the value associated with a $50 account credit for customers who pass Purchaser's KYC process, (iv) a cash payment equal to the Acquired Cash, and (v) the transfer to the Debtors of all right, title, and interest in the Loan Claims (collectively, the "Purchase Price").

7.    Notably, the Purchase Price provides substantially more value to the Debtors' estates than the original offer made by FTX US on July 22, 2022. The Debtors and their advisors conducted a rigorous, multi-month marketing process that featured competitive negotiations with all interested parties, including FTX US. Due to this comprehensive marketing process and robust Auction, the Sale provides all creditors with significantly more value through the Sale than they would have received had the Debtors accepted FTX US's original offer.

8.    The Sale is the result of months of outreach, negotiations, and discussions with strategic investors, cryptocurrency industry participants, and financial institutions and a very active and competitive Auction. The Sale maximizes the value of the Debtors' assets, provides customers with the best possible recovery, and is in the best interest of all stakeholders. By this Motion, the Debtors seek an Order authorizing the Seller's entry into the Asset Purchase Agreement and

authorizing Seller to perform its obligations under the Asset Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of an amended chapter 11 plan to be filed in the near term.

## **Relief Requested**

9.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) authorizing entry into the Asset Purchase Agreement and (ii) granting related relief.

10.      In support of the Debtors' request for entry of the Order, the Debtors submit the Tichenor Declaration, filed substantially contemporaneously herewith.[5]

## **Jurisdiction and Venue**

11.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.      The bases for the relief requested herein are sections 105(a), 363, 365, 1107, and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 2002 of the

---

[5]      *See Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* (the "Tichenor Declaration"), filed substantially contemporaneously herewith.

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9006-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Sale*

*Guidelines for the Conduct of Asset Sales Established and Adopted by the United States*

*Bankruptcy Court for the Southern District of New York Pursuant to General Order M-383*

(the "Sale Guidelines").

## Background

14.     On July 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and

circumstances of these chapter 11 cases is set forth in the First Day Declaration, incorporated by

reference herein.

15.     The Debtors are operating their business and managing their property as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases

have been consolidated for procedural purposes only and are jointly administered pursuant to

Bankruptcy Rule 1015(b) [Docket No. 18].  On July 19, 2022, the United States Trustee for the

Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured

creditors [Docket No. 102] (the "Committee").

## The Proposed Sale

**I.      The Marketing Process and the Standalone Plan.**

16.     In late June 2022, the Debtors, with the assistance of Moelis, commenced a

marketing process for a sale of the Debtors' business to, or an investment in the Debtors' business

from, a third-party investor.  Discussions with interested parties ultimately revealed that, though

there was significant interest in consummating a transaction with the Debtors, an in-court process

would be necessary to effectuate any transaction.  Accordingly, the Debtors commenced these

chapter 11 cases and continued their marketing efforts.

17.     Pursuant to the Debtors' marketing process, Moelis engaged with 90 interested parties, provided access to the virtual data room, facilitated telephone conferences with the Debtors' management team, and held multiple virtual diligence sessions with interested parties.

18.     In parallel to the Debtors' marketing process, the Debtors filed the Standalone Plan. The Standalone Plan contemplated a comprehensive restructuring transaction that would provide creditors with a meaningful recovery without the need for a transaction partner.  The Standalone Plan provided parties active in the Debtors' marketing process with a "floor" that any bid would need to clear to be considered by the Debtors.

## II.    The Bidding Procedures and the Auction.

19.     The Debtors established formal Bidding Procedures to guide their marketing process pursuant to the Bidding Procedures Order.  The Bidding Procedures established, among other things:

- the deadlines and requirements for submitting bids and the terms and conditions that must be satisfied;
- the criteria by which the winning bidder or bidders will be selected by the Debtors; and
- August 26, 2022 as the deadline by which all bids must be actually received (which deadline was later extended to September 6, 2022).

20.     The Debtors received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures.  The Auction spanned two weeks and featured multiple rounds of bids.  The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the

Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

21.    Ultimately, the Debtors, in consultation with the Committee, determined that the FTX US bid was the highest and best bid and would provide meaningful value to the Debtors' estates and stakeholders.

22.    It was well known that the Debtors' assets were for sale and all interested parties were encouraged to submit bids. The Debtors believe that an expeditious timeline is necessary to reduce the administrative costs of these chapter 11 cases, maximize stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate. Nonetheless, as described in the Tichenor Declaration, the marketing process was thorough, public, fair, and produced the most value-maximizing transaction upon culmination of the two-week Auction. As evidenced by the competitive Auction process, the Debtors' ability to maximize value was not compromised by the timeline. Importantly, the Asset Purchase Agreement includes a "Fiduciary Out" on the terms set forth in the Asset Purchase Agreement. This express preservation of the Debtors' fiduciary duties ensures that the transaction the Debtors consummate is the highest, best, and, ultimately, value-maximizing for their estates and creditors.

23.    In light of the foregoing, the Debtors believe that entry into the Asset Purchase Agreement is in the best interests of the Debtors' estates.

**<u>Summary of the Key Terms of the Asset Purchase Agreement</u>**

24.    As described herein, the Debtors executed the Asset Purchase Agreement following a robust and extensive marketing process and multiple rounds of bidding at the Auction over the

course of two weeks. The following chart summarizes the principal terms of the Asset Purchase

Agreement.[6]

| Agreement Provision | Summary Description |
|---|---|
| **Parties** | Seller:  Voyager Digital, LLC <br> Purchaser:  West Realm Shires, Inc. |
| **Purchase Price** | • The Purchase Price to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $51,000,000, (iii) a cash payment equal to the Acquired Cash, (iv) the transfer to Seller of all right, title and interest in the Loan Claims, and (v) (A) the Fair Market Value of all Cryptocurrency of Seller (in each case, other than any Collateral or any proceeds under the Collateral) and (B) the Fair Market Value of the outstanding balance of any Acquired Cryptocurrency Loan, in each case of clause (A) and (B), determined in accordance with Schedule 2.1(a) of the Asset Purchase Agreement. <br><br> • Subject to the occurrence of the Closing and the terms and conditions set forth in Section 2.6 of the Asset Purchase Agreement, Purchaser will pay to Seller the Supplemental Payment, equal to (x) the value of the daily average assets (in terms that are denominated in the digital commodity (or "digital asset") based on the decentralized open source protocol of the peer-to-peer Bitcoin computer network ("BTC") based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts during the six (6) month period following the Initial Distribution Date, divided by (y) the value of the assets (in BTC-denominated terms based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts on the day after the Initial Distribution Date, multiplied by (z) $10,000,000; provided that in no event shall the Supplemental Payment exceed $20,000,000. Purchaser shall make the Supplemental Payment to Seller within ten (10) Business Days following the end of the Payment Period and contemporaneously therewith shall provide to Seller Purchaser's calculation of the Supplemental Payment with reasonable supporting detail. <br><br> • At or promptly following the Closing (but in no event later than 30 days after the Closing Date), Purchaser shall credit to each Transferred Creditor's FTX Account an amount equal to $50.00, which Trading Credit shall be subject to only the following account withdrawal limitations: each Transferred Creditor must execute one trade from such FTX Account, which trade shall not be subject to any transaction fee, no minimum balance shall be required to be maintained, and the Trading Credit may be |

---

[6] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Asset Purchase Agreement, the Asset Purchase Agreement shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the Asset Purchase Agreement.

| Agreement Provision | Summary Description |
|---|---|
| | withdrawn from the Transferred Creditor's FTX Account following a period of one month following the establishment of such credit.<br><br>***See*** **Asset Purchase Agreement, §§ 2.1, 2.6, and 6.5(d).** |
| **Acquired Assets** | • all Cryptocurrency attributable to Voyager Customer accounts on the Voyager Platform;<br><br>• all Assigned Contracts;<br><br>• all Collateral attributable to or backing each Acquired Cryptocurrency Loan;<br><br>• all Avoidance Actions or other affirmative causes of action or claims against Seller's customers, borrowers under the Acquired Cryptocurrency Loans and counterparties to Assigned Contracts whether arising before or after the Closing Date, in each case, other than the Retained Avoidance Actions, and all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller);<br><br>• all Cash and Cash Equivalents, other than cash held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve;<br><br>• all of Seller's rights in Trademarks, including the trademarks, trademark applications, domain names and social media accounts listed in <u>Schedule 1.1(f)</u> of the Asset Purchase Agreement and any and all goodwill associated with any of the foregoing, together with all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and otherwise recover and retain damages and other remedies for any past, present or future infringement, dilution, and other violations of any of the foregoing, and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "<u>Acquired IP Rights</u>"); and<br><br>• all Documents to the extent related to the other Acquired Assets, except for the Excluded Documents.<br><br>***See*** **Asset Purchase Agreement, § 1.1.** |
| **Excluded Assets** | • all Cash and Cash Equivalents held for the benefit of Voyager Customers, any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than |

10

| Agreement Provision | Summary Description |
|---|---|
| | Cryptocurrency attributable to Voyager Customer accounts on the Voyager Platform, Collateral or any proceeds under the Collateral; |
| | • all Excluded Contracts; |
| | • the Excluded Documents; |
| | • all current and prior insurance policies of Seller, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; |
| | • all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests; |
| | • (i) all Retained Avoidance Actions, (ii) other than the Specified Transferred Claims, all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Excluded Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case, arising out of or relating to events or circumstances occurring on or prior to the Closing Date, and (iii) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities; |
| | • Seller's claims or other rights under the Asset Purchase Agreement, including the Purchase Price thereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date thereof; |
| | • (x) all Tax attributes of Seller or its Affiliates, and (y) all Tax refunds that are (1) refunds of income Taxes of Seller or its Affiliates, (2) refunds of Taxes with respect to the Excluded Assets, or (3) refunds of Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period; |
| | • the 3AC Loan and any Actions related thereto; |
| | • the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries; |
| | • all Governmental Authorizations, including Money Transmitter Licenses; |
| | • any accounts receivable, negotiable instruments and chattel paper of Seller, for the avoidance of doubt, other than with respect to the Acquired Cryptocurrency Loans; |
| | • any amounts or Liabilities owing to Seller from its Affiliates; |
| | • any leased real property of Seller; |
| | • any tangible assets (including Equipment) of Seller; |

| Agreement Provision | Summary Description |
|---|---|
| | • all employment agreements or arrangements with employees of Seller or its Affiliates and all personnel records (including all human resources and other records) of Seller or its Affiliates relating to employees of Seller or any of its Affiliates; |
| | • other than the Acquired IP Rights and the Intellectual Property in or to other Acquired Assets, all of Seller's rights in Seller Intellectual Property, and all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other violations of, such Intellectual Property; |
| | • any goodwill, payment intangibles and general intangible assets and rights of Seller other than those associated with or related to the Acquired Assets; and |
| | • the properties, rights, interests and assets set forth on Schedule 1.2(t) of the Asset Purchase Agreement. |
| | *See* **Asset Purchase Agreement, § 1.2.** |
| **Assumed Liabilities** | • all Liabilities and obligations of Seller under the Assigned Contracts that become due from and after the Closing; |
| | • all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts; |
| | • all Liabilities arising out of the ownership of the Acquired Assets, in each case, by Purchaser from and after the Closing Date; |
| | • all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under the Asset Purchase Agreement and all Transfer Taxes that Purchaser bears under Section 9.1 of the Asset Purchase Agreement; |
| | • all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date, provided that Assumed Liabilities will not include any Taxes other than in Section 1.3(e) and Section 1.3(d) of the Asset Purchase Agreement (and, for the avoidance of doubt, any income Taxes of Seller or any other Person or any Taxes with respect to the Acquired Assets for a Pre-Closing Tax Period are not Assumed Liabilities); and |
| | • certain other Liabilities as described in the Asset Purchase Agreement. |
| | *See* **Asset Purchase Agreement, § 1.3.** |
| **Excluded Liabilities** | Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities. |
| | *See* **Asset Purchase Agreement, § 1.4.** |

| Agreement Provision | Summary Description |
|---|---|
| **Employee Matters** | Notwithstanding anything herein to the contrary, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any and all of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination or notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("<u>WARN Act</u>"). <br><br> *See* **Asset Purchase Agreement, § 6.3.** |
| **Conditions Precedent to Obligations of Purchaser** | • No court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; <br><br> • (i) the Bankruptcy Court shall have entered the Approval Order, and the Approval Order shall have become a Final Order, and (ii) the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall have become a Final Order, and the Plan shall have become effective in accordance with its terms, in each case, without amendment, modification or supplementation, other than immaterial clarifications, solely with respect to the Asset Purchase Agreement and the Transactions, without Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed); <br><br> • The representations and warranties of Seller set forth in <u>Article III</u> of the Asset Purchase Agreement (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> of the Asset Purchase Agreement or in <u>Section 3.8</u> of the Asset Purchase Agreement)) and (ii) the Fundamental Representations shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; <br><br> • Seller shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Seller under the Asset Purchase Agreement on or prior to Closing; and <br><br> • Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u> of the Asset Purchase Agreement. <br><br> *See* **Asset Purchase Agreement, §§ 7.1 and 7.2.** |
| **Conditions Precedent to Obligations of Seller** | • No court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; <br><br> • (i) the Bankruptcy Court shall have entered the Approval Order, and the |

| Agreement Provision | Summary Description |
|---|---|
| | Approval Order shall have become a Final Order, and (ii) the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall have become a Final Order, and the Plan shall have become effective in accordance with its terms, in each case, without amendment, modification or supplementation, other than immaterial clarifications, solely with respect to the Asset Purchase Agreement and the Transactions, without Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed);<br><br>• The representations and warranties made by Purchaser in <u>Article IV</u> of the Asset Purchase Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;<br><br>• Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under the Asset Purchase Agreement on or prior to the Closing Date; and<br><br>• Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u> of the Asset Purchase Agreement.<br><br>*See* **Asset Purchase Agreement, §§ 7.1 and 7.3.** |
| **Means of Implementation** | • The Sale shall be implemented and effectuated through a chapter 11 plan.<br><br>*See* **Asset Purchase Agreement, §§ 5.3, 5.5, and 5.8; and Schedule 11.1.** |
| **Milestones** | The Asset Purchase Agreement may be terminated at any time prior to the Closing by written notice from the Purchaser to the Seller if, among other things:<br><br>• Seller does not publicly announce Purchaser as the Winning Bidder and execute the Asset Purchase Agreement (with Seller's obligations subject to Bankruptcy Court approval where indicated) on or prior to 11:59 PM Eastern time on September 27, 2022;<br><br>• the Approval Order is not entered by October 19, 2022, or does not become a Final Order by November 2, 2022; and<br><br>• the Confirmation Order is not entered by December 15, 2022, or has not become a Final Order by December 31, 2022.<br><br>Within ten (10) Business Days after the Asset Purchase Agreement is signed, Seller shall file with the Bankruptcy Court an amended Disclosure Statement, which, solely with respect to matters relating to the Asset Purchase Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser.<br><br>*See* **Asset Purchase Agreement, §§ 5.3 and 8.1.** |

| Agreement Provision | Summary Description |
|---|---|
| **No-Shop** | From and following the entry of the Approval Order, Seller shall not, and shall not permit its Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing. <br><br> *See* **Asset Purchase Agreement, § 5.2.** |
| **Fiduciary Out** | Notwithstanding any other provision of this Agreement to the contrary, but subject to Section 5.2 of the Asset Purchase Agreement, Purchaser acknowledges that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction in accordance with the Bidding Procedures Order, in each case, prior to the entry of the Approval Order. <br><br> *See* **Asset Purchase Agreement, § 5.3.** |

## III.    Rebalancing of the Debtors' Cryptocurrency.

25.    The Debtors hold a significant amount of cryptocurrency across a diverse portfolio of coins.  To effectuate the Sale, the Debtors may need to "rebalance" their cryptocurrency portfolio (*i.e.*, execute trades of various types of cryptocurrency to ensure that the proper types of coins are available for distribution to each customer) on the Debtors' platform.  Accordingly, the Debtors seek authority to execute any rebalancing to effectuate the Sale; *provided* that any such rebalancing transactions shall require the consent of both FTX US and the Committee.

## Basis for Relief

## I.    The Debtors' Entry into the Asset Purchase Agreement Should Be Approved as an Exercise of Sound Business Judgment.

26.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of

property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale

is based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d

141 (2d Cir. 1992) (approval of section 363(b) sale is appropriate if good business reasons exist

for such sale); *see also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re MF

Global Ltd.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); *In re Borders Grp., Inc.*, 453 B.R. 477,

482 (Bankr. S.D.N.Y. 2011).

27.    Courts generally will accord significant deference to a debtor's business judgment

to use or sell assets outside the ordinary course of business. *See In re Global Crossing, Ltd.*, 295

B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate

for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their

advisors, so long as they have satisfied the requirements articulated in the caselaw."); *see In re

Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor articulates

a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct.") (citation

omitted); *see also In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836–37 (Bankr. E.D. Va. 1997)

("[G]reat deference is given to a business in determining its own best interests.").

28.    When determining whether to approve a proposed sale under section 363 of the

Bankruptcy Code, courts apply a business judgment test. *See*, *e.g.*, *In re MF Global Ltd.*, 535 B.R.

at 605; *Global Crossing Ltd.*, 295 B.R. at 744. For instance, in *In re Lionel Corp.*, the Court of

Appeals for the Second Circuit analyzed several (non-exclusive) factors in conducting a

section 363(b) analysis, including whether:  (a) a sound business purpose existed that justified the

sale; (b) adequate and reasonable notice was provided to interested parties; (c) the sale value

obtained was fair and reasonable; and (d) the debtor acted in good faith.  722 F.2d at 1071–72.

A.    **A Sound Business Purpose Exists for Entry into the Asset Purchase Agreement.**

29.    The Debtors have concluded that entry into the Asset Purchase Agreement, which outlines and governs the terms of the Sale, is in the best interest of their chapter 11 estates and is supported by a number of sound business reasons.

- *First*, the Debtors believe that the Sale will maximize the value of the Debtors' assets because the Purchase Price offers more value than the Acquired Assets would have on a stand-alone basis or through any other bids received by the Debtors.

- *Second*, the Debtors believe that, as a result of the marketing efforts that have been undertaken, the highest and best offer has been obtained and will provide maximum value to the Debtors under the current circumstances.

- *Third*, the Sale was subject to a public and competitive process, enhancing the Debtors' ability to receive the highest or otherwise best value for their assets. Consequently, the Sale has been subject to a "market check" that, in the Debtors' reasonable business judgment, was the best means for establishing whether a fair and reasonable price is being paid. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326 at *4 (Bankr. D. Del. 2001) (although a "section 363(b) sale transaction does not require an auction procedure," "[t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

- *Fourth*, entry into the Asset Purchase Agreement allows the Debtors to lock in the terms of the Sale now, subject to confirmation of the Debtors' chapter 11 plan, which is particularly important given the volatility of cryptocurrency markets.

30.    The Debtors submit that the Sale constitutes the highest or otherwise best offer for the Acquired Assets and will provide the Debtors the best path forward to maximizing value for their estates and, ultimately, providing a recovery to customers on an efficient timeline.  As such, the Debtors believe that entry into the Asset Purchase Agreement is a valid and sound exercise of the Debtors' business judgment.

**B.**    **Adequate and Reasonable Notice of the Sale Has Been Provided.**

31.    The Bidding Procedures contained the form of notice of the Sale that the Debtors served on all parties.  Further, the Debtors' marketing process and the notice provided through this Motion constitute adequate and reasonable notice of the Sale.  The Debtors undertook a very public and lengthy Auction that spanned multiple weeks and received late interest from parties. The Debtors' creditors and parties-in-interest were apprised of the marketing process throughout these chapter 11 cases.  Therefore, adequate and reasonable notice of the Sale has been provided.

**C.**    **The Purchase Price Contemplated in the Asset Purchase Agreement Reflects a Fair Value Transaction.**

32.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also Trans World Airlines*, 2001 WL 1820326 at *4.  As discussed herein, the Debtors, and their advisors conducted a thorough and extensive marketing process. Among other things, the Debtors have engaged in significant discussions with 90 interested parties, provided potential bidders with virtual data room access, including thousands of pages of business and financial diligence, hosted meetings with the Debtors' management team, held numerous conference calls and meetings with interested parties, considered alternative transaction structures, and otherwise taken all appropriate efforts to increase transaction value.  The Debtors respectfully submit that this process maximized the number of bidders that participated in a competitive auction process, and, accordingly, provided the Debtors and their stakeholders with the best possible transaction.

**Reservation of Rights**

33.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Motion Practice**

34.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

**Notice**

35.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the U.S. Trustee; (b) the Committee; (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys

19

general in the states where the Debtors conduct their business operations; (h) all parties who have expressed a written interest in the Acquired Assets; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

36.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: September 28, 2022
New York, New York

/s/ Joshua Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com
              cmarcus@kirkland.com
              christine.okike@kirkland.com
              allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) AUTHORIZING ENTRY INTO THE**
**ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (i) authorizing entry into the Asset Purchase Agreement and (ii) granting related relief; and this Court having entered the Bidding Procedures Order on August 5, 2022 approving, among other things, the proposed form of notice of the Hearing (as defined herein); and the Debtors having determined, after an extensive marketing process, that West Realm Shires, Inc. ("FTX US" or the "Purchaser") has submitted the highest or otherwise best bid for the Acquired Assets; and the Debtors having selected FTX US as the Winning Bidder pursuant to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and this Court

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

## I.    Notice of the Motion.

1.    Notice of the Hearing, the Motion, and the Debtors' entry into the Asset Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing is, or shall be, required.  The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

2.    A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

## II.    Highest or Otherwise Best Offer.

3.    The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.  The transactions contemplated by the Asset Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets,

and the Debtors' determination that the terms of the Asset Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

4.    Approval of the Motion and entry into the Asset Purchase Agreement is in the best interests of the Debtors' chapter 11 estates, their creditors, and other parties in interest.

**THE COURT HEREBY ORDERS THAT:**

**I.    General Provisions.**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.

3.    The Motion is granted as set forth herein.

4.    Voyager Digital, LLC, as seller under the Asset Purchase Agreement, is authorized to enter into the Asset Purchase Agreement and perform its obligations under the Asset Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan.

5.    The Asset Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2

4

(the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Asset Purchase Agreement.

6.      The Debtors are authorized, but not directed, to enter into non-material amendments to the Asset Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Asset Purchase Agreement, and without further order of the Court.

7.      The Debtors are authorized to rebalance their cryptocurrency portfolio; *provided* that such rebalancing transactions are subject to the consent of the Committee and FTX US pursuant to the consent rights held by FTX US under the Asset Purchase Agreement.

8.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

9.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

10.      Nothing in this Order shall be deemed a waiver or limitation of the Committee's rights to object to any chapter 11 plan or disclosure statement filed or to be filed by the Debtors, other than with respect to provisions of such plan or disclosure statement effectuating the Sale, and any such rights are expressly preserved.

11.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

12.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

13.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

14.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

15.      The failure to specifically include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Asset Purchase Agreement be authorized and approved in its entirety; *provided* that this Order shall govern if there is any inconsistency between the Asset

Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.

16.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Asset Purchase Agreement.

17.     To the extent that this Order is inconsistent with the Motion, the terms of this Order shall govern.

Dated: _____, 2022
New York, New York

    THE HONORABLE MICHAEL E WILES
    UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

**Asset Purchase Agreement**

**Execution Version**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF SEPTEMBER 27, 2022**

**BY AND BETWEEN**

**WEST REALM SHIRES INC.**

**AS PURCHASER**

**AND**

**VOYAGER DIGITAL, LLC**

**AS SELLER.**

---

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED
  LIABILITIES .................................................................................................................5

  1.1    Purchase and Sale of the Acquired Assets.....................................................5
  1.2    Excluded Assets..............................................................................................6
  1.3    Assumption of Certain Liabilities..................................................................9
  1.4    Excluded Liabilities .......................................................................................9
  1.5    Assumption/Rejection of Certain Contracts ................................................10

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ...............................................12

  2.1    Consideration; Payment; Initial Distribution ..............................................12
  2.2    Deposit .........................................................................................................13
  2.3    Closing .........................................................................................................13
  2.4    Closing Deliveries by Seller ........................................................................14
  2.5    Closing Deliveries by Purchaser ..................................................................14
  2.6    Supplemental Payment.................................................................................15
  2.7    Withholding ..................................................................................................15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .........................15

  3.1    Organization and Qualification.....................................................................15
  3.2    Authorization of Agreement .........................................................................16
  3.3    Conflicts; Consents ......................................................................................16
  3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts......................17
  3.5    Financial Statements.....................................................................................17
  3.6    Title to Acquired Assets...............................................................................18
  3.7    Title to Properties.........................................................................................18
  3.8    Contracts ......................................................................................................18
  3.9    Compliance with Laws .................................................................................20
  3.10   Environmental Matters..................................................................................20
  3.11   Intellectual Property; Cybersecurity and Personal Information....................21
  3.12   Tax Matters ..................................................................................................22
  3.13   Affiliate Transactions...................................................................................23
  3.14   Brokers .........................................................................................................23
  3.15   No Litigation ................................................................................................23
  3.16   No Other Representations or Warranties ......................................................23
  3.17   No Outside Reliance .....................................................................................24

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................24

  4.1    Organization and Qualification.....................................................................24
  4.2    Authorization of Agreement .........................................................................24
  4.3    Conflicts; Consents ......................................................................................25
  4.4    Financing.......................................................................................................25

KE 88491672.37

4.5     Absence of Restraints; Compliance with Laws; Permits ......................................25
4.6     Brokers ....................................................................................................................26
4.7     No Litigation ...........................................................................................................26
4.8     Certain Arrangements .............................................................................................26
4.9     No Foreign Person ..................................................................................................26
4.10   Other Representations or Warranties .....................................................................26
4.11   No Outside Reliance ...............................................................................................27

**ARTICLE V BANKRUPTCY COURT MATTERS** ..........................................................................**27**

5.1     Selection of Successful Bid and Winning Bidder and Sale Approval ...................27
5.2     No-Shop ..................................................................................................................28
5.3     Bankruptcy Actions ................................................................................................28
5.4     Cure Costs ...............................................................................................................30
5.5     Confirmation Order .................................................................................................30
5.6     Approval .................................................................................................................31
5.7     Filings .....................................................................................................................31
5.8     Support for the Plan ................................................................................................31
5.9     Grantback License ..................................................................................................32

**ARTICLE VI COVENANTS AND AGREEMENTS** ........................................................................**32**

6.1     Conduct of Business of Seller ................................................................................32
6.2     Access to Information .............................................................................................34
6.3     Employee Matters ...................................................................................................36
6.4     Regulatory Approvals .............................................................................................36
6.5     Customer Transition ...............................................................................................37
6.6     Transfer of Acquired Cryptocurrency Loans .........................................................39
6.7     Reasonable Efforts; Cooperation ...........................................................................39
6.8     Further Assurances .................................................................................................39
6.9     Insurance Matters ...................................................................................................39
6.10   Receipt of Misdirected Assets; Liabilities .............................................................40
6.11   Wind-Down ............................................................................................................40
6.12   Confidentiality .......................................................................................................40
6.13   3AC Matters ...........................................................................................................41
6.14   Voyager IP Assets ..................................................................................................41
6.15   Customer Accounts ................................................................................................41

**ARTICLE VII CONDITIONS TO CLOSING** ...............................................................................**42**

7.1     Conditions Precedent to the Obligations of Purchaser and Seller .........................42
7.2     Conditions Precedent to the Obligations of Purchaser ..........................................42
7.3     Conditions Precedent to the Obligations of Seller .................................................43
7.4     Waiver of Conditions .............................................................................................43

**ARTICLE VIII TERMINATION** ...............................................................................................**43**

8.1     Termination of Agreement .....................................................................................43
8.2     Effect of Termination .............................................................................................45

3

8.3    Reverse Termination Fee ...................................................................................45
8.4    Further Effect of Termination .............................................................................46

**ARTICLE IX TAXES** ...................................................................................................................**47**

9.1    Transfer Taxes ....................................................................................................47
9.2    Cooperation .........................................................................................................47
9.3    Preparation of Tax Returns and Payment of Taxes ...........................................47

**ARTICLE X MISCELLANEOUS** .................................................................................................**48**

10.1    Non-Survival of Representations and Warranties and Certain Covenants;
Certain Waivers ..................................................................................................48
10.2    Expenses .............................................................................................................49
10.3    Notices ................................................................................................................49
10.4    Binding Effect; Assignment................................................................................51
10.5    Amendment and Waiver .....................................................................................51
10.6    Third-Party Beneficiaries ...................................................................................52
10.7    Non-Recourse .....................................................................................................52
10.8    Severability .........................................................................................................52
10.9    Construction ........................................................................................................52
10.10   Schedules ............................................................................................................52
10.11   Complete Agreement ..........................................................................................53
10.12   Specific Performance .........................................................................................53
10.13   Jurisdiction and Exclusive Venue ......................................................................54
10.14   Governing Law; Waiver of Jury Trial ................................................................54
10.15   No Right of Set-Off ............................................................................................55
10.16   Counterparts and PDF ........................................................................................55
10.17   Publicity ..............................................................................................................55
10.18   Bulk Sales Laws..................................................................................................56
10.19   Fiduciary Obligations..........................................................................................56
10.20   No Solicitation ....................................................................................................56

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**....................................**56**

11.1    Certain Definitions..............................................................................................56
11.2    Index of Defined Terms ......................................................................................66
11.3    Rules of Interpretation ........................................................................................67

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B    FORM OF TRADEMARK ASSIGNMENT AGREEMENT

4

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of September 27, 2022, is made by and between West Realm Shires Inc., a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Plan and subject to entry of the Confirmation Order and the consummation of the Plan.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means the following properties, rights, interests and other assets of Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, but excluding in all cases the Excluded Assets:

(a)    all Cryptocurrency attributable to Voyager Customer accounts on the Voyager Platform;

(b)      the Contracts listed on Schedule 1.1(b) (the "Assigned Contracts"), including all Contracts evidencing the Cryptocurrency Loans that remain outstanding as of the Closing (for the avoidance of doubt, not including the 3AC Loan) (the "Acquired Cryptocurrency Loans");

(c)      with respect to each Acquired Cryptocurrency Loan, the security interest in and to any collateral, including any Cryptocurrency, attributable to or backing such Acquired Cryptocurrency Loan (such collateral for all Acquired Cryptocurrency Loans, collectively, the "Collateral"), all rights in the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(d)      (i) all Avoidance Actions or other affirmative causes of action or claims against Seller's customers, borrowers under the Acquired Cryptocurrency Loans and counterparties to Assigned Contracts whether arising before or after the Closing Date, in each case, other than the Retained Avoidance Actions (the "Specified Transferred Claims"), and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller);

(e)      all Cash and Cash Equivalents, other than cash held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve (collectively, "Acquired Cash");

(f)      all of Seller's rights in Trademarks, including the trademarks, trademark applications, domain names and social media accounts listed in Schedule 1.1(f) and any and all goodwill associated with any of the foregoing, together with all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and otherwise recover and retain damages and other remedies for any past, present or future infringement, dilution, and other violations of any of the foregoing, and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "Acquired IP Rights"); and

(g)      all Documents to the extent related to the other Acquired Assets, including all Documents that display any Acquired IP Rights or are otherwise used for marketing, advertising or external publication or communications, in each case, other than the Excluded Documents; provided that Seller and its Affiliates shall be permitted to have reasonable access to and retain copies of all such Documents.

1.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under all properties, rights, interests and other assets of Seller other than the Acquired Assets, which, for the avoidance of doubt, shall include the following

6

(collectively, the "Excluded Assets"); provided that, at any time up to five (5) Business Days prior to the Closing, Purchaser may notify Seller in writing that it wishes to purchase any of the properties, rights, interests and other assets of Seller set forth in clauses (p), and (s), and upon such notice, any such properties, rights, interests and other assets shall be deemed Acquired Assets for all purposes under this Agreement for no additional consideration or adjustment to the Purchase Price; provided that any such Excluded Assets that are deemed Acquired Assets shall not be deemed Acquired Assets for purposes of Article III or Section 6.1:

(a)      all Cash and Cash Equivalents held for the benefit of Voyager Customers, any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than Cryptocurrency attributable to Voyager Customer accounts on the Voyager Platform, Collateral or any proceeds under the Collateral;

(b)      all Contracts of Seller, other than the Assigned Contracts (the "Excluded Contracts");

(c)      all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller), (ii) that are Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)      all Documents prepared or received by Seller or any of its Affiliates in connection with this Agreement or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Section 1.2(c), the "Excluded Documents");

(e)      all current and prior insurance policies of Seller, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)    all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)    (i) all Retained Avoidance Actions, (ii) other than the Specified Transferred Claims, all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Excluded Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case, arising out of or relating to events or circumstances occurring on or prior to the Closing Date, and (iii) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)    Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)    (x) all Tax attributes of Seller or its Affiliates, and (y) all Tax refunds that are (1) refunds of income Taxes of Seller or its Affiliates, (2) refunds of Taxes with respect to the Excluded Assets, or (3) refunds of Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period;

(j)    the 3AC Loan and any Actions related thereto;

(k)    the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(l)    all Governmental Authorizations, including Money Transmitter Licenses;

(m)    any accounts receivable, negotiable instruments and chattel paper of Seller, for the avoidance of doubt, other than with respect to the Acquired Cryptocurrency Loans;

(n)    any amounts or Liabilities owing to Seller from its Affiliates;

(o)    any leased real property of Seller;

(p)    any tangible assets (including Equipment) of Seller;

(q)    all employment agreements or arrangements with employees of Seller or its Affiliates and all personnel records (including all human resources and other records) of Seller or its Affiliates relating to employees of Seller or any of its Affiliates;

(r)    other than the Acquired IP Rights and the Intellectual Property in or to other Acquired Assets, all of Seller's rights in Seller Intellectual Property, and all rights to collect

8

royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other violations of, such Intellectual Property;

(s)     any goodwill, payment intangibles and general intangible assets and rights of Seller other than those associated with or related to the Acquired Assets; and

(t)     the properties, rights, interests and assets set forth on Schedule 1.2(t).

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, effective as of the Closing, in addition to the payment of the Cash Payment, the Acquired Cash Payment and the Cryptocurrency Consideration in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of Seller under the Assigned Contracts that become due from and after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)     all Liabilities arising out of the ownership of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(d)     all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes that Purchaser bears under Section 9.1;

(e)     all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date, provided that Assumed Liabilities will not include any Taxes other than in this Section 1.3(e) and Section 1.3(d) (and, for the avoidance of doubt, any income Taxes of Seller or any other Person or any Taxes with respect to the Acquired Assets for a Pre-Closing Tax Period are not Assumed Liabilities); and

(f)     all Liabilities for which Purchaser has agreed to be responsible in accordance with this Agreement.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed

9

Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

      1.5    Assumption/Rejection of Certain Contracts.

      (a)    Assumption and Assignment of Executory Contracts. Seller shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts as of the Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing (or as of such later date as may be required by the provisions of the Bankruptcy Code), Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing (or as of such later date as may be required by the provisions of the Bankruptcy Code), Seller shall, pursuant to the Plan, the Confirmation Order (or any other Order of the Bankruptcy Court applicable to assuming and assigning any Assigned Contract in accordance herewith) and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

      (b)    Excluding or Adding Assigned Contracts Prior to Closing. Promptly, but in any event within ten (10) days following the date hereof, Seller shall deliver to Purchaser a true and complete list of all Material Contracts, together with Seller's good faith best estimate of the amount of Cure Costs with respect to each such Contract, and within five (5) Business Days of Purchaser's request, Seller shall make available a true and complete copy of any such Contract to Purchaser. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the anticipated Closing (the "Designation Deadline"), and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract, to the extent assignable under applicable Law, shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to

Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. For the avoidance of doubt, (x) if Purchaser has not informed Seller of their intent to assume any additional Assigned Contracts in accordance with the foregoing, then all such Contracts (whether or not known or disclosed by Seller to Purchaser) shall be deemed to be Excluded Contracts and may be rejected by Seller as of the Closing and (y) no prepetition Cure Cost shall be due or payable with respect to any Contract until the assumption thereof in accordance herewith (except in the case of any such Contract whose purported assignment or transfer requires a Necessary Consent, in which case, any associated Cure Costs shall be payable by Purchaser on or following the Closing at such time as such Contract is assigned or transferred) and (z) no Contract set forth on Schedule 1.2(t) shall be subject to the terms set forth in this Section 1.5(b).

(c)      Non-Assignment.

(i)      Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)      Notwithstanding anything to the contrary in this Agreement, to the extent that the purported assignment or transfer of any Acquired Asset (i) would be prohibited by applicable Law, (ii) would be reasonably likely to subject Purchaser, Seller or their respective Affiliates to civil or criminal liability to a Governmental Body or (iii) would constitute a breach, default or violation of a Law or Order, in each case, without the receipt of a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) (each such Consent or Governmental Authorization, a "Necessary Consent"), and such Necessary Consent has not been obtained prior to the Closing, such asset shall be deemed not to be an Acquired Asset at the Closing and shall not be transferred to, or received by, Purchaser, unless and until the Necessary Consent is obtained. In such event, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Necessary Consent is obtained and six (6) months following the Closing (or the closing of the Bankruptcy Case, if shorter), Seller and Purchaser shall (A) use reasonable best efforts to secure such Necessary Consent as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, sublicensing, or passing through via a swap arrangement to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law or Order) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Necessary Consent has not been obtained and (2) Purchaser shall

11

assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Necessary Consent requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Plan, the Confirmation Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment; Initial Distribution.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $51,000,000 (the "Cash Payment"), (iii) a cash payment equal to the Acquired Cash (the "Acquired Cash Payment"), (iv) the transfer to Seller of all right, title and interest in the Loan Claims, and (v) (A) the Fair Market Value of all Cryptocurrency of Seller (in each case, other than any Collateral or any proceeds under the Collateral) and (B) the Fair Market Value of the outstanding balance of any Acquired Cryptocurrency Loan, in each case of clause (A) and (B), determined in accordance with Schedule 2.1(a) (the "Cryptocurrency Consideration"). For purposes of this Section 2.1, the "Fair Market Value" of any Cryptocurrency shall be such price for the Cryptocurrency as calculated by Purchaser reasonably and in good faith based on market practice and available pricing information and any mutually agreed pricing principles set forth on Schedule 2.1(a); provided that, if Seller, reasonably and in good faith, fails to agree on the Fair Market Value of any specific Cryptocurrency as so determined, then such Cryptocurrency shall be deemed to be an Excluded Asset for all purposes under this Agreement.

(b)    Purchaser shall not, and shall cause its Affiliates or any other Person acting on behalf of Purchaser or its Affiliates not to, take any action with the intent to affect the Fair Market Value of any Cryptocurrency, taking into account the parameters set forth in Schedule 2.1(a), or the Daily Average Price (as defined in Schedule 2.1(a)).

(c)    Seller shall use its reasonable best efforts to calculate the Pro Rata Share of any initial distributions due to any Transferred Creditors (taking into account each of the Cash Payment, the Acquired Cash Payment and the Cryptocurrency Consideration) under the Plan (the aggregate amount of such distribution, the "Initial Distribution") within one (1) Business Day prior to the Closing Date.

(d)    With respect to any Transferred Creditors, at or as promptly as possible following the Closing (but in no event later than five (5) Business Days following the Closing Date) (the actual date of such distribution, the "Initial Distribution Date"), Purchaser shall deliver, or cause to be delivered, to such Transferred Creditors, on behalf of Seller, their Pro Rata Share of the Initial Distribution directly to their respective FTX Accounts. Any Voyager Creditor that would be a Transferred Creditor at the Closing (if otherwise satisfying the requirements hereunder) and who is listed in the Customer Migration Protocol as having a claim against Seller with respect to one or more Supported Cryptocurrencies shall receive the Initial Distribution in kind in such Supported Cryptocurrencies; provided that such Supported Cryptocurrencies shall be valued for

12

purposes of the Initial Distribution in US Dollars as of the Reference Period in the same manner as used to determine the Cryptocurrency Consideration paid to Seller. The Initial Distribution to Transferred Creditors shall otherwise be made in US Dollars.

(e)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller: (i) the Cash Payment, plus (ii) the Acquired Cash Payment, plus (iii) the Cryptocurrency Consideration, less (iv) the aggregate amount of the Initial Distributions to be paid to Transferred Creditors pursuant to Section 2.1(d), less (v) the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller at least two (2) Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $5,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate escrow account. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by Seller pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then Seller shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the Closing, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Seller.

2.3    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other Transactions (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the Effective Date of the Plan (as defined therein), subject to the full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to satisfaction or waiver of those conditions), or at such other

place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    control of any possessory Collateral held by Seller and executed versions of any assignments, deeds and other documents of assignment, conveyance or transfer required under applicable Law to evidence the transfer to Purchaser of the Acquired Cryptocurrency Loans and Seller's rights with respect to the Acquired Cryptocurrency Loans, the Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(c)    to the extent not previously provided or made available to Purchaser prior to the Closing, access to or copies of all material Documents that are Acquired Assets, including all customer information and applicable account positions or holdings with respect to the Voyager Accounts specified in the Customer Migration Protocol, in each case, that are in Seller's possession, in such digital format as reasonably requested by Purchaser prior to the Closing;

(d)    an Internal Revenue Service Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes, as applicable;

(e)    a short-form trademark assignment agreement substantially in the form of Exhibit B (the "Trademark Assignment Agreement"), duly executed by Seller;

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(g)    a written instruction, duly executed by Seller, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit.

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    the Closing Date Payment;

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    the Loan Claims, on a quitclaim basis without recourse;

(d)    the Trademark Assignment Agreement, duly executed by Purchaser; and

KE 88491672.37

(e)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6      Supplemental Payment. Subject to the occurrence of the Closing and the terms and conditions set forth in this Section 2.6, Purchaser will pay to Seller an amount in US Dollars (the "Supplemental Payment"), equal to (x) the value of the daily average assets (in terms that are denominated in the digital commodity (or "digital asset") based on the decentralized open source protocol of the peer-to-peer Bitcoin computer network (the "BTC") based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts during the six (6) month period following the Initial Distribution Date (the "Payment Period"), divided by (y) the value of the assets (in BTC-denominated terms based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts on the day after the Initial Distribution Date, multiplied by (z) $10,000,000; provided that in no event shall the Supplemental Payment exceed $20,000,000. Purchaser shall make the Supplemental Payment to Seller within ten (10) Business Days following the end of the Payment Period and contemporaneously therewith shall provide to Seller Purchaser's calculation of the Supplemental Payment with reasonable supporting detail.

2.7      Withholding. Purchaser shall be entitled to deduct and withhold from the Purchase Price all taxes that Purchaser is required to deduct and withhold under any applicable tax Law. All such withheld amounts shall be treated as delivered to Seller (or the applicable recipient in accordance herewith) for all purposes hereunder. If Purchaser is required to deduct and withhold from the Purchase Price under any applicable tax Law, Purchaser shall (a) use commercially reasonable efforts to give Seller notice at least five (5) Business Days before deduction and withholding and (b) reasonably cooperate with Seller to use commercially reasonable efforts to mitigate deduction and withholding.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business to the extent publicly available on the CSA's System for Electronic Document Analysis and Retrieval (the "Filed CSA Documents"), (ii) disclosed in any forms, statements or other documents filed by the Debtors with the Bankruptcy Court in the Bankruptcy Case, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1      Organization and Qualification.

(a)      Except as set forth on Schedule 3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and

KE 88491672.37

has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement, and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the consummation by it of the Transactions; and

(c)    this Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller, except, in the case of <u>clauses (ii)</u>

16

through (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts.

(a)    Schedule 3.4(a) sets forth a list of all Cryptocurrency of Seller as of September 26, 2022, the means through which Seller as of such date controls such Cryptocurrency (e.g., "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to Voyager Customer accounts on the Voyager Platform. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.4(a) (other than Collateral and Cryptocurrency that is subject to staking), free and clear of all Encumbrances (other than Permitted Encumbrances); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.4(b) sets forth a list of all Cryptocurrency Loans as of the date of this Agreement, including (i) the counterparty thereto, (ii) the amount and type of all Cryptocurrency loaned under each Cryptocurrency Loan, (iii) the amount and type of any collateral held by Seller with respect to each Cryptocurrency Loan, including the means through which Seller controls such collateral, and (iv) the interest rate and maturity of each Cryptocurrency Loan.

(c)    Schedule 3.4(c) sets forth a list of all Voyager Customers (excluding (i) Voyager Customers with addresses in the European Union or European Economic Area and (ii) Voyager Customers that did not possess Cryptocurrency or other investment assets or products in their Voyager Account as of immediately prior to the Petition Date (such Voyager Customers contemplated by this clause (ii), the "No Balance Voyager Customers")) and the account position (including type and amount of Cryptocurrency) that such customer held as of immediately prior to the Petition Date.

3.5    Financial Statements. Attached to Schedule 3.5 are the unaudited statements of financial position as of June 30, 2022 and the audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case of Parent (collectively, the "Financial Statements"). Except as set forth on Schedule 3.5, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2022 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The

17

Financial Statements present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.6     Title to Acquired Assets. Seller has good and valid title to all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

3.7     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     Contracts.

(a)     Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that:

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

18

(iv)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(v)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for Intellectual Property limiting Seller's use of such Intellectual Property to specified fields of use or specified territories;

(vi)     evidences or relates to a Cryptocurrency Loan, including security or collateral agreements;

(vii)     is a custody agreement or agreement with any Person performing validation services with respect to any Cryptocurrency;

(viii)     each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(ix)     any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or platform.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, or been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has received no written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

19

3.9    Compliance with Laws.

(a)    Except as set forth on Schedule 3.9, Seller is not in violation of any Laws or Orders applicable to the Acquired Assets, except for violations the existence of which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, nor any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), Her Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor are any of the foregoing designated as a Specially Designated National or Blocked Person by OFAC and (ii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January

20

1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property; Cybersecurity and Personal Information.

(a)    Schedule 3.11(a) sets forth a true, correct and complete list of all Seller Registered IP, indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

21

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller and its Affiliates have complied in the past three (3) years in all material respects with all applicable Privacy and Data Security Requirements, and the consummation of the Transactions will not cause Seller or its Affiliates to breach, in any material respect, any Privacy and Data Security Requirements.

(h)     Seller and its Affiliates have established and implemented a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)     To the Knowledge of Seller, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there have been no Security Incidents involving Personal Information in Seller's or its Affiliates' custody, possession or control or for which Seller or its Affiliates are otherwise responsible. Except as set forth on Schedule 3.11(i), Seller and its Affiliates have not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy and Data Security Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy and Data Security Requirements by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy and Data Security Requirements; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)     Seller is not and has not been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(b)     Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course) which would have effect after the Closing Date.

(c)     Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulations Section 1.6011-4(b)(2).

KE 88491672.37

(d)      Seller has not received any claim in writing from a Governmental Body or social security administration in a jurisdiction where Seller or any of its Affiliates (to the extent related to the Acquired Assets) does not file Tax Returns that such Seller or its Affiliate is or may be subject to taxation by that jurisdiction.

(e)      Seller has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of Law with respect to Seller's assets. Seller has not executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Body and has not been subject to any ruling guidance specific to Seller with respect to the Acquired Assets that would, in any manner, bind, obligate or restrict Purchaser or any of its Affiliates.

(f)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13     <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.13</u> or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14     <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller for which Purchaser shall be liable.

3.15     <u>No Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth on <u>Schedule 3.15</u>, there are no Actions pending or, to the Knowledge of Seller, threatened in writing against Seller.

3.16     <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Seller Representations</u>") (it <u>being</u> <u>understood</u> that Purchaser has relied only on such express representations and warranties), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, or will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any

23

information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "Information Presentation") or in that certain datasite administered by Datasite (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.17    No Outside Reliance. Notwithstanding anything contained in this Article III or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date:

4.1    Organization and Qualification. Purchaser is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2    Authorization of Agreement.

(a)     Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions.

(b)     The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance by such Purchaser of this Agreement and the consummation by it of the Transactions.

(c)     This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

(b)     Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment, Acquired Cash Payment and the Cryptocurrency Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Absence of Restraints; Compliance with Laws; Permits.

25

(a)     To the Knowledge of Purchaser, as of the date of this agreement, no facts or circumstances exist that would reasonably be expected to impair or materially delay the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(b)     Purchaser is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

(c)     Purchaser holds and is in compliance with all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership or use of the Acquired Assets, except those the absence of which to have would not, individually or in the aggregate, reasonably be expected to be material to Purchaser's business.

4.6     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions for which Seller or any of its Affiliates shall be liable.

4.7     <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser, in each case, that would, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

4.8     <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any Affiliate of Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement, other than as disclosed to Seller on or prior to the date hereof, or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9     <u>No Foreign Person</u>. As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.10    <u>Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article IV</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Purchaser Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Seller has relied only on such express representations and warranties), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to

26

Seller or any of its Affiliates or Advisors on behalf of Purchaser or any of its Affiliates or Advisors. Without limiting the foregoing, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller or any of its Affiliates or Advisors, or Seller's or any of its Affiliates' or Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to Seller or any of its Affiliates or Advisors in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11   No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and that Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1   Selection of Successful Bid and Winning Bidder and Sale Approval.

(a)   Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid at the Auction pursuant to the Bidding Procedures Order and Seller has selected

27

the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    Promptly, and in any event within two (2) Business Days following entry into this Agreement, Seller shall publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder and file a motion with the Bankruptcy Court seeking entry of an Order in form and substance reasonably acceptable to Purchaser, approving the execution, delivery and performance of this Agreement by Seller, other than the performance of those obligations to be performed at or after the Closing (the "Approval Order"). Seller shall use reasonable best efforts to seek and obtain entry of the Approval Order.

5.2    No-Shop.

(a)    From and following the entry of the Approval Order, Seller shall not, and shall not permit its Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto.

5.3    Bankruptcy Actions.

(a)    Within ten (10) Business Days after the date hereof, Seller shall file with the Bankruptcy Court an amended Disclosure Statement, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. The Plan Solicitation Order and Confirmation Order, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance

28

reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall use its reasonable best efforts to obtain entry by the Bankruptcy Court of the Confirmation Order.

(c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (ii) commence solicitation of the Plan, and (iii) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion, and in any case prior to the Outside Date.

(d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Plan Solicitation Order, the Confirmation Order and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and the Plan, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan, solely with respect to matters relating to this Agreement and the Transactions, and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan, solely with respect to matters relating to this Agreement and the Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan, solely with respect to matters relating to this Agreement and the Transactions.

(f)    Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that, subject to Section 5.2, Seller and the other Debtors have taken reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and conducting an Auction.

(g)        Notwithstanding any other provision of this Agreement to the contrary, but subject to Section 5.2, Purchaser acknowledges that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction in accordance with the Bidding Procedures Order, in each case, prior to the entry of the Approval Order.

(h)        Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

(i)        Nothing in this Section 5.3 shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations, but subject to the provisions of the Bidding Procedures Order.

5.4        Cure Costs. Subject to entry of the Confirmation Order and consummation of the Plan, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5        Confirmation Order. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142  of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Confirmation Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

KE 88491672.37

5.6    Approval. Seller's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Approval Order and Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.7    Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material to the Transactions or Cryptocurrency of Seller or Voyager Accounts (such approval not to be unreasonably withheld, conditioned or delayed; provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8    Support for the Plan.

(a)    During the term of this Agreement, Purchaser agrees to, and to cause its Affiliates to, support the Plan and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Plan;

(b)    During the term of this Agreement, Purchaser shall not, and shall cause its Affiliates not to, directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with, delay, or impede, the acceptance, consummation or implementation of the Plan;

(ii)    propose, file, support, or vote for any Alternative Transaction;

(iii)    seek to pursue any claims against any of the Debtors' directors and officers in excess of the Debtors' D&O liability insurance policies;

(iv)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(v)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind that is inconsistent with this Agreement and the Plan against any Seller Party Parties;

(vi)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims (as defined in Bankruptcy Code section 101(5)) against or interests in the Debtors and their Affiliates, in a manner inconsistent with this Agreement or the Plan; or

31

(vii)    object to, delay, impede, or take any other action to interfere with the Debtors' and their Affiliates' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under Bankruptcy Code section 362, other than as permitted by this Agreement.

(c)    Purchaser shall, and shall cause its Affiliates to:

(i)    vote each of its Claims or interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan;

(ii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in Section 5.8(c)(i) above; and

(iii)    file on the docket of the Bankruptcy Case a letter in support of the Plan, which shall be included in the materials accompanying the Disclosure Statement.

(d)    Nothing in this Section 5.8 shall prevent Purchaser or its Affiliates from taking any action or asserting any right (including as an objection to the Plan or any related relief requested by the Debtors) in their capacity as a holder of equity interests or section 510(b) claims; provided that Purchaser confirms that it shall not, and shall cause its Affiliates not to, in any capacity, seek to pursue any claims against any of the Debtors' directors and officers or object to the compromise of any such claims in any manner provided in connection with the Plan.

5.9    Grantback License. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Seller a limited, non-exclusive, worldwide, royalty-free, fully paid-up, non-transferable license solely to permit the committee of unsecured creditors in the Bankruptcy Case, and any litigation trust created in connection with the Bankruptcy Case, to use and display the "Voyager" trademark, including as incorporated into their respective social media handles, solely during the remainder of the Bankruptcy Case, as reasonably necessary to perform their respective obligations and communicate with any Voyager Creditor, in each case, in connection with the resolution of the Bankruptcy Case. Any goodwill derived from the foregoing licensees' use or display of the "Voyager" trademark pursuant to the foregoing license shall inure to the benefit of Purchaser. Seller shall, and shall cause and require the applicable committee of unsecured creditors and litigation trust to, use their reasonable best efforts to avoid any customer confusion as between themselves and Purchaser, and will not hold themselves out as continuing to operate the business of Seller or to offer or operate any of its products or services, including the Voyager Platform.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Seller.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii)

KE 88491672.37

as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall use its commercially reasonable efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person other than as permitted pursuant to Section 6.1(b)(iii);

(ii)    sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets for consideration, individually or in the aggregate, in excess of $1,000,000, except (A) Ordinary Course dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Seller and (B) sales and transfers in the Ordinary Course (other than Cryptocurrency);

(iii)    make any acquisition of, or investment in, another business (whether by asset, stock or other equity, or merger);

33

(iv)    perform or offer to perform any staking that is not in effect as of the date hereof; provided that within two (2) Business Days of the date hereof, Seller shall place an unstaking order with respect to all Cryptocurrency that is staked as of the date hereof;

(v)    enter into referral agreements with a third party with respect to the Voyager Customers and any Documents with respect to the Voyager Customers or account information with respect thereto;

(vi)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions;

(vii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms);

(viii)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets; or

(ix)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 (any action or inaction described in this clause of this Section 6.1(c), a "COVID-19 Response").

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller, in order for Purchaser and its authorized Advisors to access such

34

information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser or its Advisors if such access or disclosure (A) would cause significant competitive harm to Seller if the Transactions are not consummated, (B) would waive any legal privilege or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound (and which is not entered into in contemplation hereof) (provided that, at Purchaser's reasonable request, the Parties shall in good faith use reasonable best efforts to implement appropriate and mutually agreeable measures to permit the disclosure of such information in a manner to remove the basis for the non-disclosure to the greatest extent reasonably possible, including by arrangement of appropriate clean room procedures, redaction of text from documents or entry into a customary joint defense agreement with respect to any information to be so provided). Notwithstanding anything to the contrary contained herein, no COVID-19 Response by Seller shall be deemed to violate or breach this Section 6.2 in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the Transactions, and will be governed by the confidentiality provisions in Section 6.12. Purchaser will, and will cause its Advisors to, abide by such confidentiality provisions with respect to such access and any information furnished to Purchaser or any of its Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Seller Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)    Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to the Transaction without the prior written consent of Seller or Moelis.

6.3    <u>Employee Matters</u>. Notwithstanding anything herein to the contrary, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any and all of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination or notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("<u>WARN Act</u>").

6.4    <u>Regulatory Approvals</u>.

(a)    Subject to <u>Section 6.7</u>, Seller will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, and (ii)(A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group, and cooperate and take all requisite action to obtain any requisite approvals or authorizations, if any, in each case, under any applicable Laws for the consummation of the Transactions as soon as practicable, but in any event on or prior to the Outside Date, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings made by Seller pursuant to <u>Section 6.4(a)</u>, and (iii)(A) provide promptly an appropriate response to any request for additional information and documentary material that may be requested by a Governmental Body in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> or any applicable Antitrust Law and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances and to avoid or eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the Transactions.

(c)    The Parties commit to instruct their respective counsel to cooperate with each other to resolve any objections raised by any Governmental Body pursuant to any applicable Antitrust Law. For greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body pursuant to any applicable Antitrust Law and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the transactions contemplated hereby and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the commencement or proposed or threatened commencement of any investigation, litigation or

administrative or judicial action or proceeding under applicable Antitrust Laws, including any proceeding initiated by a private party, and (B) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body pursuant to any applicable Antitrust Law with respect to this Agreement and the transactions contemplated hereby. Neither Seller nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect to any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Seller will have the right to review and approve the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.4</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)    Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, knowingly engage in any action or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an Order prohibiting or materially delaying the consummation of the transactions contemplated by this Agreement or (ii) materially delay the consummation of the transactions contemplated by this Agreement; <u>provided</u> that this <u>Section 6.4(d)</u> shall not restrict Purchaser or any member of the Purchaser Group or their respective Affiliates from taking or omitting to take any action (x) to comply with applicable Law, (y) to cooperate with the requests or inquiries of any applicable Governmental Body or (z) in the Bankruptcy Cases that is not otherwise inconsistent with the terms of this Agreement.

6.5    <u>Customer Transition</u>.

(a)    From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including any service providers), and use commercially reasonable efforts, in each case, to: (i) develop orderly and transparent procedures with respect to the migration of Voyager Customers and other Voyager Creditors who elect to migrate to the Purchaser platform, including the posting of prominent links on the home page for the mobile application and website of Seller's platform to direct Voyager Customers and other Voyager Creditors to the Purchaser migration process; (ii) effect the orderly migration of any Voyager Customers and other Voyager Creditors who elect to open an FTX Account, and to minimize any disruption to the business of Seller and Purchaser or any adverse effect that might result from the actions contemplated hereby; (iii) minimize the tax consequences to the Voyager Customers resulting from the Transactions and (iv) take, or cause to be taken, all appropriate action, to do or cause to be done all things reasonably necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions and to make effective the arrangements contemplated by this <u>Section 6.5</u>.

37

(b)        As soon as reasonably practicable (and in any event within ten (10) days) following the date of entry into this Agreement, Seller shall send a written notice informing each Voyager Creditor of the Transactions and the availability of the referral option contemplated by this Section 6.5.

(c)        Without limiting the foregoing, (i) Seller shall use commercially reasonable efforts to promote the transition of all Voyager Creditors to the Purchaser platform and to support the opening of FTX Accounts by such Voyager Creditors, including using commercially reasonable efforts to share and obtain relevant information relating to Voyager Creditors to help facilitate Purchaser's "KYC" and on-boarding process and information relating to Voyager Creditors' account positions or holdings in their Voyager Accounts as of the Petition Date (taking into account any subsequent revisions prior to the Closing Date), and (ii) the Parties shall cooperate to transition any Voyager Creditors to the Purchaser platform, including by (A) facilitating the execution of new customer agreements between Voyager Creditors and Purchaser (or its relevant Affiliates), (B) facilitating the Initial Distribution to Transferred Creditors' FTX Accounts, and (C) promoting that customers execute a new customer agreement with Purchaser or its relevant Affiliates and, if applicable, any other reasonable documentation. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require Purchaser to (x) in connection with the opening of any FTX Account, waive Purchaser's customary "KYC" or customer-screening procedures applicable to Purchaser's new customers generally administered in the ordinary course of business or (y) provide or match any Cryptocurrency or product offered by Seller that Purchaser does not provide or offer in the ordinary course of business.

(d)        At or promptly following the Closing (but in no event later than 30 days after the Closing Date), Purchaser shall credit to each Transferred Creditor's FTX Account an amount equal to $50.00 (the "Trading Credit"), which Trading Credit shall be subject to only the following account withdrawal limitations:  each Transferred Creditor must execute one trade from such FTX Account, which trade shall not be subject to any transaction fee, no minimum balance shall be required to be maintained, and the Trading Credit may be withdrawn from the Transferred Creditor's FTX Account following a period of one month following the establishment of such credit.

(e)        Notwithstanding anything to the contrary herein, Seller shall remain in material compliance with all privacy policies, notices or representations of Seller that are in effect as of the date of this Agreement and shall cooperate with Purchaser to ensure that the transfer of all Personal Information contained in the Acquired Assets to Purchaser in connection with the Transactions will be consistent with such privacy policies, notices or representations. Notwithstanding anything to the contrary herein, Seller shall not be required to take any action contrary to such privacy policies or notices.

(f)        From and following the date of this Agreement, Seller shall not, and shall cause its Affiliates not to, provide any confidential customer information that constitutes an Acquired Asset to any third party crypto exchange or platform or refer any Voyager Customers to any third party crypto exchange or platform, except to Purchaser's platform pursuant to the arrangements contemplated by this Section 6.5.

(g)    Purchaser shall permit Seller and its Affiliates to continue to operate the Voyager Platform in connection with distributions under the Plan, other effectuation of the Transactions and the transactions contemplated by the Plan, and otherwise as reasonably necessarily in connection with the winddown of Seller and its Affiliates.

6.6    <u>Transfer of Acquired Cryptocurrency Loans</u>. From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including counterparties to Acquired Cryptocurrency Loans), and use reasonable best efforts to transfer all rights and interests of Seller in the Acquired Cryptocurrency Loans, all Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral, to Purchaser, in all cases, effective only as of the Closing.

6.7    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. Without limiting the foregoing, Seller shall use its reasonable best efforts to transfer to Purchaser control and operation of the Acquired IP Rights, including by transferring or modifying account information and details, as reasonably requested by Purchaser, with respect to any social media accounts and domain names included therein. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this <u>Section 6.7</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Approval Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.8    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.9    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third-party insurers or with Seller

39

or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.10    Receipt of Misdirected Assets; Liabilities.

(a)    From and after the Closing, if Seller or any of its Affiliates receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of their Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred.

(b)    From and after the Closing, if Seller or any of its Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to Seller, and Seller shall accept such Liability.

6.11    Wind-Down. Following the later of the completion of the referral of customers pursuant to Section 6.5 and the Closing, Seller shall promptly discontinue any material business operations related to the Voyager Platform and wind down such operations.

6.12    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2. Purchaser shall, and shall cause its Affiliates and its and their respective Advisors to, keep confidential any Confidential Information concerning Seller or its Affiliates furnished in connection with the Transactions. Seller shall, and shall cause their respective Affiliates and respective Advisors to, keep confidential any Confidential Information concerning Purchaser furnished in connection with the Transactions.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause its Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.12 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a

40

Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.12 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.12 by Seller or Purchaser are inadequate to protect Purchaser or Seller and their respective Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to any Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.12, each other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.12 will survive the Closing and terminate two (2) years after the Closing Date.

6.13    3AC Matters. Nothing in this Agreement shall be construed to prevent Seller and its Affiliates from contributing, assigning, or otherwise transferring the 3AC Loan to any third-party purchaser, trust or other entity, subject to approval of such contribution, assignment or other transfer by the Bankruptcy Court and the retention by Purchaser and its Affiliates of any potential objection or other rights with respect thereto.

6.14    Voyager IP Assets. To the extent Voyager IP, LLC holds any right, title or interest in or to any asset set forth in Schedule 1.1(f), Seller shall promptly following the date hereof and in any case prior to the Closing, cause Voyager IP, LLC to assign to Seller all of Voyager IP, LLC's right, title and interest in or to such assets, including any and all goodwill associated with any of the foregoing, together with all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and otherwise recover and retain damages and other remedies for any past, present or future infringement, dilution, and other violations of any of the foregoing, and any and all corresponding rights that, now or hereafter, may be secured throughout the world.  For the avoidance of doubt, the assets described in the foregoing sentence shall constitute Acquired IP Rights and Acquired Assets for all purposes under this Agreement.

6.15    Customer Accounts.  Seller shall deliver a list of all No Balance Voyager Customers (excluding No Balance Voyager Customers with addresses in the European Union or European Economic Area) and the account position (including type and amount of Cryptocurrency) that such customer held as of immediately prior to the Petition Date within five (5) Business Days following the date hereof.

# ARTICLE VII

# CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to this Agreement to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    (i) the Bankruptcy Court shall have entered the Approval Order, and the Approval Order shall have become a Final Order, and (ii) the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall have become a Final Order, and the Plan shall have become effective in accordance with its terms, in each case, without amendment, modification or supplementation, other than immaterial clarifications, solely with respect to this Agreement and the Transactions, without Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed).

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.8</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1(a)</u> (*Organization and Qualification*), <u>Section 3.2</u> (*Authorization of Agreement*) and <u>Section 3.14</u> (*Brokers*) (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date;

(b)    Seller shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing; and

KE 88491672.37

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4    Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement.

## ARTICLE VIII

## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before January 31, 2023 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

43

(d)      by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied; provided that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)      by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)      by written notice from Seller to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing within two (2) Business Days after the date required by Section 2.3;

(g)      by written notice from Seller to Purchaser, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)      by written notice from Purchaser to Seller, if (A) Seller or Seller's Affiliates seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets;

(i)      by written notice from Purchaser to Seller, if:

(i)      Seller does not publicly announce Purchaser as the Winning Bidder and execute this Agreement (with Seller's obligations subject to Bankruptcy Court approval where indicated) on or prior to 11:59 PM Eastern time on September 27, 2022;

44

(ii)     the Approval Order is not entered by October 19, 2022, or does not become a Final Order by November 2, 2022;

(iii)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in breach of Section 5.7;

(iv)     the Confirmation Order is not entered by December 15, 2022, or has not become a Final Order by December 31, 2022; or

(v)     Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Backup Bidder (as defined in the Bidding Procedures Order), or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser or the Backup Bidder; or

(vi)     Seller or its Affiliates or Advisors have committed a breach of Section 5.2.

8.2     Effect of Termination. In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), this Section 8.2, Section 8.3, and Article X shall survive any such termination; provided further that no termination will relieve either Party from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of the non-breaching Party) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder). For purposes of this Agreement, "willful breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

8.3     Reverse Termination Fee. In the event that:

(a)     the conditions set forth in Sections 7.1(b) and 7.2 have been satisfied or waived, Purchaser fails to consummate the Closing prior to the Outside Date, and this Agreement is validly terminated in accordance with its terms;

(b)     this Agreement is terminated pursuant to Section 8.1(b) by Purchaser (unless the issuance of such Order was caused by Seller's failure to perform any of its obligations under this Agreement, in which case the Reverse Termination Fee shall not be payable pursuant to this Section 8.3(b)), or Seller; or

(c)     Seller is unable to obtain the Approval Order or the Confirmation Order due primarily to actions by or events or circumstances caused by or relating to Purchaser or any of its

45

Affiliates (including in connection with any Governmental Body) and this Agreement is validly terminated in accordance with its terms,

then, in any such case, subject to Section 8.4, Purchaser shall pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an aggregate amount equal to $10,000,000 (the "Reverse Termination Fee").

8.4    Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that, prior to the Closing, any disbursement of the Deposit to Seller pursuant to Section 2.2(b) and payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the transactions contemplated by this Agreement to be consummated, except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the transactions contemplated herein) pursuant to Section 10.12. In the event of valid termination of this Agreement pursuant to Section 8.1, in the event that Seller has elected not to require, or is not entitled to require, specific performance of Purchaser's obligations to consummate the transactions contemplated herein pursuant to Section 10.12 and is entitled to receive the Deposit pursuant to Section 2.2(b) or payment of the Reverse Termination Fee pursuant to Section 8.3, then upon release of the Deposit to Seller in accordance with Section 2.2(b) or payment of the Reverse Termination Fee pursuant to Section 8.3, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby and (ii) none of Seller or any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any member of the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise. For the avoidance of doubt, prior to the Closing, the maximum aggregate liability of Purchaser and the Purchaser Group for losses in connection with this Agreement shall be limited to the Deposit and the Reverse Termination Fee, and under no circumstances will either Seller or any of the Seller Parties be entitled to, nor will either Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages) in connection with the termination of this Agreement in excess of the amount of the Deposit and the Reverse Termination Fee; provided, however, that the foregoing shall not be interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the transactions contemplated herein) pursuant to Section 10.12 in the event this Agreement has not been terminated.

KE 88491672.37

## ARTICLE IX

## TAXES

9.1     <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser. Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes, and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party (<u>provided</u>, for the avoidance of doubt, nothing in this <u>Section 9.1</u> shall require the parties to take any actions to cause Section 1146 of the Bankruptcy Code to apply).

9.2     <u>Cooperation</u>. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to (x) determine a consistent tax treatment to each of them of the Transactions, and (y) minimize the tax consequences to the Voyager Customers resulting from the Transactions, <u>provided</u> that neither agreeing on consistent tax treatment nor minimizing such tax consequences shall be a closing condition and Seller shall have no liability under this Agreement if the parties are unable to so agree or so-minimize.

9.3     <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)     Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period). Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this <u>Section 9.3</u> is otherwise reflected as an adjustment to Purchase Price, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this <u>Section 9.3(a)</u>. Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "<u>Seller Income Tax Return</u>"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) any of Purchaser and its Affiliates regarding any tax issue which would reasonably be expected to impact a Seller Income Tax Return (any such action, a "<u>Seller-Related Action</u>"), then Purchaser shall reasonably promptly inform Seller of such Seller-Related Action and (x) allow Seller to fully participate, at Seller's cost, in such Seller-Related Action to the extent relevant to a Seller Income Tax Return, (y) provide Seller with copies of all material documents and correspondence relevant to such Seller-Related Action, and (z) not settle, compromise, or otherwise resolve any such Seller-Related Action without Seller's prior written consent (not to be unreasonably withheld, conditioned, or

47

delayed) to the extent such resolution would reasonably be expected to have a material, adverse, and disproportionate impact (as compared to Purchaser and its Affiliates) on Seller and its Affiliates.

(b)      Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a). With respect to any Straddle Period, Purchaser shall provide Seller with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchaser shall consider in good faith and not unreasonably fail to reflect any changes reasonably requested by Seller with respect to such Tax Returns. Purchaser shall be responsible for paying any Taxes allocable to the portion of a Straddle Period after the Closing Date reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b). Seller shall be responsible for paying any Taxes allocable to the portion of a Straddle Period ending on the Closing Date, except to the extent any Seller Tax is otherwise reflected as an adjustment to Purchase Price.

(c)      For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in clause (i), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

## ARTICLE X

## MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with

48

respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (b) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party. For the avoidance of doubt, the Parties agree that the delivery of any notices, demands or other communications hereunder shall not be deemed to be a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.

Notices to Purchaser:

West Realm Shires Inc.
2000 Center Street, 4th Floor
Berkeley, CA 94704
Attention:    Ramnik Arora
            Can Sun
            Rahul Sharma
Email:    ramnik@alameda-research.com
            can@ftx.com
            rahul@ftx.us

with a copy to (which shall not constitute notice):

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention:    Andrew G. Dietderich
              Brian D. Glueckstein
              Mitchell S. Eitel
Email:        dietdericha@sullcrom.com
              gluecksteinb@sullcrom.com
              eitelm@sullcrom.com

and

McDermott Will & Emery LLP (counsel for the committee of unsecured creditors
in the Bankruptcy Case)
One Vanderbilt Avenue
New York, NY 10017-3852
Attention:    Darren Azman
Email         Dazman@mwe.com

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention:    Stephen Ehrlich
              David Brosgol
Email:        sehrlich@investvoyager.com
              dbrosgol@investvoyager.com

KE 88491672.37

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Joshua A. Sussberg, P.C.
               Christine A. Okike, P.C.
               Christopher Marcus
               Jonathan L. Davis, P.C.
               Steve Toth
               Eduardo M. Leal
               Allyson B. Smith
Email:         joshua.sussberg@kirkland.com
               christine.okike@kirkland.com
               cmarcus@kirkland.com
               jonathan.davis@kirkland.com
               steve.toth@kirkland.com
               eduardo.leal@kirkland.com
               allyson.smith@kirkland.com

and

McDermott Will & Emery LLP (counsel for the committee of unsecured creditors in the Bankruptcy Case)
One Vanderbilt Avenue
New York, NY 10017-3852
Attention:     Darren Azman
Email          Dazman@mwe.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Approval Order, Confirmation Order and consummation of the Plan, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, except that Purchaser may, at its discretion, assign or delegate any and all of its rights or obligations under this Agreement, in whole or in part, to one or more of its Affiliates, if such assignment or delegation would not reasonably be expected to prevent or materially delay the Closing or impose any greater cost upon Seller or its Affiliates pursuant to the terms of this Agreement (provided that, no such assignment or delegation, shall relieve Purchaser of any Liability or obligation hereunder), and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or Exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No

waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third-Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in this Agreement to which the relevance of such item is reasonably apparent on its face. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or Exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be

52

disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, and the Schedules and Exhibits hereto, is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    <u>Complete Agreement</u>. This Agreement, together with any other agreements expressly referred to herein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12    <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other

time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Party to remedy any breach of any representation or warranty of such Party made herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    <u>Governing Law; Waiver of Jury Trial</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regard to conflict of laws principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES

KE 88491672.37

AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf of the Purchaser Group and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Seller and Purchaser shall agree to an initial joint press release with respect to this Agreement and the Transactions. Thereafter, neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations, other than <u>Section 5.2(a)</u>.

10.20   <u>No Solicitation</u>. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

**ARTICLE XI**

**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

11.1   <u>Certain Definitions</u>.

(a)   "<u>3AC</u>" means Three Arrows Capital, Ltd.

(b)   "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(c)   "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(d)   "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

56

(e)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f)     "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the Acquired Assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise) to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a Chapter 11 plan) the consummation of which would prevent the consummation of the Transactions in accordance with the terms hereof.

(g)     "Antitrust Law" means any law that is designed or intended to prohibit, restrict or regulate actions, including transactions, acquisitions and mergers, having the purpose or effect of creating or strengthening a dominant position, monopolization, lessening of competition or restraint of trade, including the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the Clayton Antitrust Act of 1914, the Sherman Act of 1890, the Federal Trade Commission Act of 1914 and any other federal, state, or foreign law.

(h)     "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(i)     "Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim.

(j)     "Bidding Procedures Order" means the Bankruptcy Court's *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(k)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(l)     "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, certificates of deposits, time deposits, bankers' acceptances, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(m)     "Code" means the United States Internal Revenue Code of 1986.

(n)     "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of any Party; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a

result of disclosure by any Party in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party from a third party not known by such receiving Party after reasonable inquiry to be bound by a duty of confidentiality to such other Party with respect to such information.

(o)    "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Seller, and solely to the extent related to this Agreement and the Transactions, Purchaser, (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan, as may have been amended, supplemented or otherwise modified with the consent of Seller and, solely to the extent related to this Agreement and the Transactions, Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), and (ii) authorizing Seller to undertake the Transactions, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

(p)    "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(q)    "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(r)    "Cryptocurrency" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

(s)    "Cryptocurrency Loans" means loans made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector, other than the 3AC Loan.

(t)    "Customer Migration Protocol" means a protocol prepared by Purchaser for the migration of Transferred Creditors to Purchaser's platform that is consistent with this Agreement and otherwise mutually acceptable to Seller and Purchaser, such protocol to be agreed on or prior to the approval of the Disclosure Statement by the Bankruptcy Court.

(u)    "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(v)    "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form, including, for the avoidance of doubt, all customer information, including "know

58

your customer" information and applicable account positions or holdings, with respect to the Voyager Accounts.

(w)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(x)    "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(y)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(z)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(aa)    "Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(bb)    "Final Order" shall mean an Order which has not been stayed (or with respect to which any stay has been lifted) and (i) as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari has expired and no appeal, motion, stay or petition is pending, or (ii) in the event that such an appeal or petition thereof has been sought, either (A) such Order shall have been affirmed by the highest court to which such Order was appealed or certiorari shall have been denied, and the time to take any further appeal or petition of certiorari shall have expired or (B) such appeal, motion, stay or petition shall not have been granted and shall no longer be pending and the time for seeking such appeal, motion, stay or petition shall have expired.

(cc)    "FTX Account" means a customer account opened by a Voyager Creditor with Purchaser.

(dd)    "GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

(ee)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(ff)    "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(gg)    "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(hh)    "<u>IFRS</u>" means the International Financial Reporting Standards.

(ii)    "<u>Intellectual Property</u>" means all of the following: (i) patents, patent applications and patent disclosures, including all divisions, revisions, continuations, continuations-in-part, substitutes, re-examinations, extensions and reissues; (ii) trademarks, service marks, applications, brand names, certification marks, collective marks, d/b/a's, social media accounts and identifiers, IP addresses, logos, symbols, assumed names, fictitious names, source of origin, trade dress, corporate names and Internet domain names, in each case, whether or not registered, together with all goodwill associated with any of the foregoing (collectively, "<u>Trademarks</u>"); (iii) copyrights; (iv) registrations, renewals and applications for any of the foregoing; (v) trade secrets and confidential or proprietary know-how, processes, ideas, schematics, business methods, formulae, drawings, prototypes, models, designs, data, databases, algorithm and supplier lists; (vi) published and unpublished works of authorship, whether copyrightable or not (including data, databases, Software, Internet websites, content and other compilations of information); (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property rights, proprietary rights or industrial rights, in each case, arising in any jurisdiction of the world.

(jj)    "<u>Knowledge of Purchaser</u>" means the actual knowledge without independent verification (and in no event encompasses constructive, imputed or similar concepts of knowledge) of the executive officers of Purchaser, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(kk)    "<u>Knowledge of Seller</u>" means the actual knowledge without independent verification (and in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Ashwin Prithipaul, Gerard Hanashe, Rakesh Gidwani, Dan Constantino, and Mark Egert, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(ll)    "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(mm)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(nn)    "<u>Loan Claims</u>" means all claims of Alameda Ventures Ltd. or any successor thereto arising under or related to the loan agreement, dated June 21, 2022, by and among Voyager

KE 88491672.37

Digital Holdings, Inc., as the borrower, Voyager Digital Ltd., as the guarantor, and Alameda Ventures Ltd., as the lender, whether against Seller or any other person or entity.

(oo)    "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates or changes in prices of any Cryptocurrency, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or the interpretation thereof; (vii) Effects in, arising from or relating to (A) the taking of any action expressly required by this Agreement or at the request of Purchaser or their Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, or (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) Effects in, arising from or relating to any matter disclosed in the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; (ix) Effects that arise from any seasonal fluctuations in the business; (x) Effects that arise from any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items; (xi) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; or (xii) the Effect of (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Plan or the Disclosure Statement, (3) the Bidding Procedures Order, the Approval Order or the Confirmation Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith;

61

provided, however, that with respect to clauses (i), (ii), (iii), (iv), (v) or (vi), such Effects will not be excluded to the extent the same disproportionately affects the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses in the industry in which Seller operates.

(pp)    "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(qq)    "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission Laws.

(rr)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order and the Approval Order).

(ss)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case and past practice in light of the current pandemic, epidemic or disease outbreak.

(tt)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmen's, mechanics', artisans', shippers', warehousemen's or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis in the Ordinary Course, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets in any material respect, (vii) any Encumbrances set forth on Schedule 11.1(tt), (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or released on or prior to the Closing by operation of any other Order of the Bankruptcy Court, and (ix) any Encumbrances in connection with staking activities in effect as of the date hereof.

(uu)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

62

(vv)    "Personal Information" means any information that (i) identifies or can reasonably be used to identify an individual or (ii) that constitutes "personal information," "personal data," "nonpublic personal information," or any other equivalent term as defined under or otherwise protected by Privacy and Data Security Laws.

(ww)    "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement and the Transactions, approved by Purchaser in its reasonable discretion and that is consistent with this Agreement and Schedule 11.1(ww).

(xx)    "Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory Contracts and unexpired leases under the Plan.

(yy)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(zz)    "Plan Supplement" has the meaning set forth in the Plan.

(aaa)    "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(bbb)    "Privacy and Data Security Laws" means any and all applicable Laws, rules, or regulations together with any binding guidance, decisions, determinations, orders, or associated judgments of any Governmental Body regarding privacy, cybersecurity or the Processing or protection of personal information or personal data, including, as applicable: the Gramm-Leach-Bliley Act and its implementing regulations; the GDPR and any national laws implementing the GDPR; and all applicable Laws or regulations requiring notification in connection with a Security Incident.

(ccc)    "Privacy and Data Security Requirements" means all (i) Privacy and Data Security Laws, (ii) legally binding industry standards and practices such as the Payment Card Industry Data Security Standard, (iii) contractual obligations imposed on Seller or its Affiliates and (iv) any policies, notices or representations published or adopted by Seller or its Affiliates, whether internal or publicly available, in each case, to the extent related to privacy, cybersecurity or the Processing or protection of any Personal Information.

(ddd)    "Pro Rata Share" means, with respect to any Transferred Creditor, such Transferred Creditor's pro rata share of any distributions to Transferred Creditors in accordance with the Plan and as determined by Seller.

(eee)   "Processing" means any operation or set of operations performed, whether by manual or automated means, on Personal Information or on sets of Personal Information, such as the collection, use, storage, disclosure, analysis, deletion or modification of Personal Information.

(fff)   "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(ggg)   "Retained Avoidance Action" means any Avoidance Action against (i) 3AC or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other Avoidance Action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, and (iv) any claims for actual fraudulent transfers.

(hhh)   "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(iii)   "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(jjj)   "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by, or licensed exclusively to, Seller.

(kkk)   "Seller Parties" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(lll)   "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(mmm)   "Seller Registered IP" means all Seller Intellectual Property that is issued by, registered with, renewed by, or the subject of a pending application before any Governmental Body or Internet domain name registrar.

(nnn)   "Software" means any and all computer programs, applications, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, and application programming interfaces, in each case, whether in source code, object code or other form or format, including

64

libraries, subroutines and other components thereof, together with input and output formats, and all user manuals, instructions and other documentation relating to any of the foregoing.

(ooo)    "<u>Straddle Period</u>" means any taxable period that includes but does not end on the Closing Date.

(ppp)    "<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(qqq)    "<u>Supported Cryptocurrencies</u>" means any Cryptocurrency that is supported by Purchaser's platform in the ordinary course of Purchaser's operations during the Reference Period, including Bitcoin and USD Coin.

(rrr)    "<u>USD Wind-Down Reserve</u>" means the amount estimated by the Debtors in good faith, and in consultation with Purchaser, to be appropriate to establish a reserve to ensure full funding of the winding up of the affairs of the Debtors and the closing of the Bankruptcy Case.

(sss)    "<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ttt)    "<u>Tax Return</u>" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(uuu)    "<u>Transferred Creditors</u>" means Voyager Creditors who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened FTX Accounts as of the Closing Date and the successors and assigns of such Voyager Creditors.

(vvv)    "<u>Transactions</u>" means the transactions contemplated by this Agreement.

(www)    "<u>Voyager Account</u>" means any active account at Seller that (i) contains Cryptocurrency or other investment assets or products or (ii) is held by any Person who has completed Seller's customary "KYC" processes.

(xxx)    "<u>Voyager Creditor</u>" means any Voyager Customer or other general creditor of the Debtors with an allowed claim under the Plan.

KE 88491672.37

(yyy)  "Voyager Customer" means any Person who maintained a Voyager Account with Seller as of the Petition Date.

(zzz)  "Voyager Platform" means Seller's proprietary mobile and web platform.

11.2   Index of Defined Terms.

Acquired Assets ........................................... 5
Acquired Cash.............................................. 6
Acquired Cash Payment............................ 12
Acquired Cryptocurrency Loans................ 6
Acquired IP Rights..................................... 6
Agreement.................................................... 5
Anti-Money Laundering Laws................. 20
Approval Order ........................................ 28
Assigned Contracts .................................... 6
Assignment and Assumption Agreement.. 14
Assumed Liabilities .................................... 9
Bankruptcy Case ........................................ 5
Bankruptcy Code ........................................ 5
Bankruptcy Court....................................... 5
BTC............................................................ 15
Cash Payment........................................... 12
Chosen Courts .......................................... 54
Closing ...................................................... 13
Closing Date.............................................. 14
Closing Date Payment............................. 13
Collateral..................................................... 6
COVID-19 Response ............................... 34
Cryptocurrency Consideration ................. 12
CSA............................................................ 15
Cure Costs................................................... 9
Dataroom................................................... 24
Debtors ........................................................ 5
Deposit ...................................................... 13
Designation Deadline............................... 10
Enforceability Exceptions........................ 16
Environmental Permits............................. 21
Escrow Agent ........................................... 13
Excluded Assets .......................................... 7
Excluded Contracts ..................................... 7
Excluded Documents ................................... 7
Excluded Liabilities ................................. 10
Express Purchaser Representations.......... 26

Express Seller Representations ................ 23
Fair Market Value .................................... 12
FCPA.......................................................... 20
Filed CSA Documents .............................. 15
Financial Statements ................................ 17
Fundamental Representations .................. 42
Holdings ...................................................... 5
Indebtedness.............................................. 33
Information Presentation........................... 24
Initial Distribution.................................... 12
Initial Distribution Date .......................... 12
Leased Real Property ................................ 18
Material Contract ...................................... 18
Necessary Consent ................................... 11
No Balance Voyager Customers.............. 17
OFAC.......................................................... 20
Outside Date............................................... 43
Parent .......................................................... 5
Parties.......................................................... 5
Party ............................................................ 5
Payment Period ........................................ 15
Petition Date............................................... 5
Purchase Price........................................... 12
Purchaser ..................................................... 5
Reverse Termination Fee ......................... 46
Sanctions .................................................. 20
Seller ........................................................... 5
Seller Income Tax Return ........................ 47
Seller-Related Action............................... 47
Specified Transferred Claims .................... 6
Supplemental Payment............................. 15
Trademark Assignment Agreement ......... 14
Trademarks ............................................... 60
Trading Credit........................................... 38
Transfer Taxes .......................................... 47
WARN Act................................................. 36

66

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under IFRS consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and Exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall." The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (a) included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at Seller's offices.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature pages follow.]*

68

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**WEST REALM SHIRES INC.**

By: _____
         *Sam Bankman-Fried*
         672DA88132804B9...
Name: Sam Bankman-Fried
Title: CEO

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____

Name: Stephen Ehrlich
Title: Chief Executive Officer

<u>**EXHIBIT A**</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Agreement</u>") is made and entered into as of [●] 2022, by and between West Realm Shires Inc., a Delaware corporation (the "<u>Purchaser</u>"), and Voyager Digital, LLC, a Delaware limited liability company ("<u>Seller</u>").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of September 27, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), providing for, among other things, the sale and assignment by Seller to Purchaser of the Acquired Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, Seller desire to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.4(a) and 2.5(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Seller and Purchaser, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

<u>Definitions</u>.    Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

<u>Transfer of Acquired Assets</u>.    Subject to the terms and conditions of the Purchase Agreement, the Confirmation Order and the Plan, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

<u>Assignment and Assumption</u>.    Subject to the terms and conditions of the Purchase Agreement, the Confirmation Order and the Plan, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Seller's right, title and interest in and to, as of the Closing, the Assigned Contracts free and clear of all Encumbrances (other than Permitted Encumbrances).    Subject to the terms and conditions of the Purchase Agreement, the Confirmation Order and the Plan, Purchaser does hereby assume the Assumed Liabilities.

KE 88491672.37

<u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Seller shall not sell, transfer, assign, convey or deliver to Purchaser, and Purchaser shall not purchase, acquire or accept, or take assignment of, any of the Excluded Assets.

<u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume or otherwise be liable in respect of any of the Excluded Liabilities.

<u>Terms of the Purchase Agreement</u>.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

<u>Governing Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

<u>Successors and Assigns</u>.  This Agreement shall be binding upon Purchaser and Seller, and shall inure to the benefit of and be so binding on the parties hereto and their respective successors and permitted assigns under the Purchase Agreement.

<u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[The remainder of this page is intentionally left blank.]*

A-2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**<u>SELLER</u>:**

**VOYAGER DIGITAL, LLC**

_____
Name:
Title:

**PURCHASER:**

**WEST REALM SHIRES INC.**

By: _____
Name:
Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

## <u>EXHIBIT B</u>

### FORM OF TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT (this "<u>Assignment</u>"), effective as of [●], 2022 is made by Voyager Digital, LLC, a Delaware limited liability company ("<u>Assignor</u>"), to West Realm Shires Inc., a Delaware corporation ("<u>Assignee</u>"). Capitalized terms not otherwise defined herein shall have the meaning given to them in the Purchase Agreement (as defined below).

**WHEREAS**, Assignor and Assignee have executed an Asset Purchase Agreement, effective as of September 27, 2022, pursuant to which Assignor assigned all of its right, title and interest in and to certain intellectual property assets to Assignee (the "<u>Purchase Agreement</u>");

**WHEREAS**, the assets assigned pursuant to the Purchase Agreement include all of Seller's rights in Trademarks (collectively, the "<u>Assigned Trademarks</u>"), including, but not limited to, those listed in <u>Exhibit A</u> attached hereto; and

**WHEREAS**, pursuant to the Purchase Agreement, Assignor has agreed to execute this Assignment in order to effectuate, evidence and record its assignment of the Assigned Trademarks to Assignee in the United States Patent and Trademark Office and corresponding offices in other applicable jurisdictions.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby conveys, assigns, transfers and delivers to Assignee and its successors and assigns, all of Assignor's right, title and interest in and to the Assigned Trademarks, including all goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, all rights in and to any of the foregoing provided by international treaties or conventions, all rights, interests, and claims of such Assignor or any of its Affiliates, and all rights to sue or otherwise recover and retain damages and other remedies for any past, present, or future infringement, dilution or other violations of the foregoing.

Assignor hereby authorizes and requests the Commissioner of Trademarks of the United States, and any official of any other jurisdiction or organization whose duty it is to record the registration or transfer of Trademarks, to record this Assignment.

This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall this Assignment be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

*[Signature Page Follows]*

B-1

KE 88491672.37

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed by its duly authorized representative.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

Accepted and Agreed:

**WEST REALM SHIRES INC.**


By: _____
Name:
Title: