Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF BRIAN TICHENOR
IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING ENTRY INTO THE ASSET PURCHASE
AGREEMENT, AND (II) GRANTING RELATED RELIEF**

I, Brian Tichenor, hereby declare under penalty of perjury:

1. I am a Managing Director in the Financial Institutions Group at Moelis & Company LLC ("Moelis").  Moelis is an investment banking firm that has its principal office at 399 Park Avenue, 5th Floor, New York, New York 10022.  Among the businesses and products that fall within the purview of the FIG Group are cryptocurrency, banks, asset managers, securities exchanges, and insurance companies.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

2. The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") engaged Moelis as investment banker. I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 472] (the "<u>Motion</u>,").[2]

3. A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Steve Ehrlich, Co-Founder and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "<u>First Day Declaration</u>"), and is incorporated by reference herein.

4. Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the marketing and sale process and the Auction, (b) information learned from my review of relevant documents, or (c) information I received from the Debtors or the Debtors' other advisors. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Moelis as a professional retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

### **Qualifications**

5. Moelis is an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority. Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the First Day Declaration (as defined herein), as applicable.

22-10943-mew    Doc 476    Filed 09/29/22    Entered 09/29/22 13:11:39    Main Document
Pg 3 of 10

& Company Group LP.  Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees based in offices in North America, South America, Europe, the Middle East, and Asia.  Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

6. Moelis provides a broad range of financial advisory and investment banking services to its clients, including (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising.  Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.  Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including:  In re Knotel, Inc., No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); In re CBL & Assocs. Props., Inc., No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); In re Energy Alloys Holdings, LLC, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); In re Jason Indus., Inc., No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); In re The Hertz Corp., No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); In re Extraction Oil & Gas, Inc., No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); In re The McClatchy Co., No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); In re Internap Technology Solutions Inc., No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); In re Rentpath Holdings, Inc., No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); In re Sanchez Energy Corp., No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); In re Monitronics Int'l, Inc., No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); In re Aegerion Pharmaceuticals, Inc., No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); In re Joerns WoundCo Holdings, Inc., No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); In re FTD Cos., No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); In re Hexion Holdings LLC, No. 19-10684

(KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 31, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys "R" US, Inc., No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc., No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re UCI International, LLC, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); In re AOG Ent., Inc., No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); In re SFX Entertainment, Inc., No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); In re American Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); In re ITR Concession Co., No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re MPM Silicones, LLC, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

7.  I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a broad range of transactions. Prior to joining Moelis, I was in the corporate and investment banking group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group. I hold Bachelor of Science degrees in finance and computer science from Boston College and have a Master's of Business Administration degree from Georgetown University.

8. I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding Corporation pursuant to a section 363 asset sale. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.

### Overview

9. Moelis was engaged by the Debtors in June 2022 to advise the Debtors in their efforts to navigate challenges impacting the cryptocurrency industry and evaluate strategic alternatives in connection therewith. I have been involved as a senior member of the Moelis team throughout our engagement.

### The Process

10. Beginning on or about June 20, 2022, Moelis initiated a dual-track process to solicit interest in, among other possible deal structures: (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise to allow the Debtors to weather volatility in public equity markets, declines in cryptocurrency prices, and dislocations in the cryptocurrency industry.

11. While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not actionable, and no other potential counterparty was willing to participate in an out-of-court transaction on the timeline required.

12. In light of the foregoing, the Debtors determined that filing for chapter 11 would improve their chances of effectuating a transaction to help stabilize the Debtors' business and preserve the value of the Debtors' enterprise in the best interests of the Debtors and their estates as well as the Debtors' creditors, customers, employees, and all other parties in interest.

13. Since the filing of these chapter 11 cases, the Debtors, in consultation with the Unsecured Creditors' Committee, worked to identify the transaction that is in the best interest of all creditors under the circumstances. On July 21, 2022, the Debtors filed the *Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and procedures established therein, the "Bidding Procedures"),[3]

---

[3] The Court granted the Bidding Procedures Motion on September 5, 2022. *See Order (I) Approving the Bidding*
(Continued)

6

which complemented the Debtors' *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Bidding Procedures provided the Debtors with the opportunity to continue to pursue a potential third-party transaction that may enhance value for stakeholders under the circumstances. The Bidding Procedures allowed the Debtors to receive and evaluate bids, hold an Auction, and prepare and negotiate a sale transaction to be consummated either outside of or through a chapter 11 plan.

14. Since the Petition Date, the Debtors communicated to all parties in interest that an expeditious timeline is necessary to reduce administrative costs, increase stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate.

15. Over the past several months, Moelis, on behalf of the Debtors, reached out to approximately 90 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. Ultimately, 54 parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations. The virtual data room was robust, supplemented throughout the marketing process, and ultimately contained over 1,000 diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

16. The Debtors' marketing process yielded preliminary bids from several strategic investors with various structures and terms. Moelis, along with the Debtors' other advisors, helped the Debtors carefully consider each of the bids received. The marketing process involved the

---

*Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248].

Debtors working closely with each interested party, answering numerous requests for additional information, holding several conferences with the Debtors' management team, and diligently scrutinizing the viability of each bid that was received.

### The Auction

17.     The Debtors received multiple bids in advance of the bid deadline and on September 13, 2022, the Debtors commenced an auction (the "Auction") in accordance with the Bidding Procedures to determine the Successful Bid. The Auction lasted two weeks, included multiple rounds of bidding, and featured extensive arm's-length negotiations with each participating bidder. Moelis, along with the Debtors and their other advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased in the bid, (b) the total expected deal consideration, (c) the likelihood of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including treatment of customer claims, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment.

18.     The Debtors thoroughly engaged with and encouraged all participating bidders in the Auction to submit the highest and best bid that each party was willing to make. After receiving each participating bidder's final bid, the Debtors selected the bid from West Realm Shires Inc. ("FTX US" or the "Purchaser") and closed the Auction. On September 27, 2022, the Debtors and FTX US executed that certain asset purchase agreement (the "Asset Purchase Agreement") memorializing the terms of the FTX US bid. The Asset Purchase Agreement is attached as Exhibit B to the Motion.

19.     Pursuant to the Asset Purchase Agreement, FTX US will acquire substantially all of the Debtors' assets, including substantially all of the cryptocurrency held by the Debtors and the Debtors' customer accounts. The transactions contemplated by the Asset Purchase Agreement

will be effectuated through a chapter 11 plan. Ultimately, I believe that the FTX US bid provides the most value available under the circumstances for the Debtors' assets and ultimately to their stakeholders—including the Debtors' customers. The Asset Purchase Agreement provides $1.422 billion of aggregate deal consideration, composed of (i) the fair market value of all Voyager cryptocurrency at a to-be-determined date in the future in a manner consistent with the Asset Purchase Agreement, which at current market prices as of September 26, 2022 is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated by the Debtors as providing approximately $111 million of incremental value. I understand the Asset Purchase Agreement has a "No-Shop" provision which, upon entry of the Order, prohibits the Seller from soliciting alternative offers from third parties. However, I also understand that the Asset Purchase Agreement includes a "Fiduciary Out" on the terms set forth in the Asset Purchase Agreement, that allows the Debtors to consider offers that may be superior to the Asset Purchase Agreement. The Debtors' claims against Three Arrows Capital will remain with the bankruptcy estate and any recovery thereon will be distributed to creditors.

20.     Based upon my involvement in the marketing process, including discussions and negotiations in which I both observed and participated, I believe that the Asset Purchase Agreement and the proposed Sale are the product of good-faith, arm's-length negotiations between sophisticated and well-represented parties, and, in light of the marketing process described above, the transactions contemplated by the Asset Purchase Agreement provide the most value for the Debtors' assets available under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 29, 2022

/s/ Brian Tichenor
Name: Brian Tichenor
Title: Managing Director
Moelis & Company LLC
*Investment Banker and Financial Advisor to the Debtors and Debtors in Possession*