Hearing Date: October 19, 2022
Hearing Time: 2:00 p.m. (Eastern Time)

Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld
Debra I. Grassgreen (admitted *pro hac vice*)
Jason H. Rosell
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Email:    rpachulski@pszjlaw.com
          akornfeld@pszjlaw.com
          dgrassgreen@pszjlaw.com
          jrosell@pszjlaw.com

Counsel to Creditor Pierce Robertson

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re                                                          :    Chapter 11
                                                               :
VOYAGER DIGITAL HOLDINGS, INC., *et al.*,                      :    Case No. 22-10943 (MEW)
                                                               :
                                                               :    (Jointly Administered)
              Debtors.[1]                                      :
---------------------------------------------------------------x

**OBJECTION OF PIERCE ROBERTSON TO DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO
THE ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

Pierce Robertson ("Robertson"), a creditor in the above-captioned chapter 11 cases (the "Chapter 11 Cases") and the lead plaintiff in the putative class-action litigation filed in the United States District Court for the Southern District of Florida (the "Florida District Court"), captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Class Action"), by and through his undersigned counsel, respectfully submits this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

DOCS_SF:108046.2 75003/001

objection (the "Objection") to the *Motion for Entry of an Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 472] (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors").[3] In support of this Objection, Robertson respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Motion has three fatal flaws. First, the Debtors seek authority to sell the Debtors' causes of action against non-debtors, for which (a) the Special Committee (defined below) is still investigating, (b) no consideration is being paid, (c) the approximate value of such causes of action has not been disclosed, (d) the identity of the non-debtors has not been disclosed (which may include Stephen Ehrlich's friends and Mark Cuban), and (e) the Plan (defined below) purports to retain for the benefit of creditors.

2. Second, through the Motion, the Debtors seek to "rebalance" their cryptocurrency portfolio, which action the Debtors, FTX US, and the Committee propose to execute without transparency to the impacted creditors, this Court, or other parties in interest, and which may have negative tax consequences to creditors that are "dollarized" under the Plan.

3. Third, the Debtors seek authority to sell cryptocurrency that will be "dollarized" under the recently filed Plan and, as disclosed in the Disclosure Statement (defined below), there is a material risk that cryptocurrency that is "dollarized" under the Plan (the "Dollarized Cryptocurrency") will create a negative taxable event for Voyager's customers that deposited such

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.
[3] The Motion was filed by the Debtors, but only debtor Voyager Digital, LLC is a party to the Asset Purchase Agreement.

2

cryptocurrency.[4] Since FTX US is purchasing the Dollarized Cryptocurrency at purported fair market value and the Plan proposes to distribute such proceeds *pro rata* to holders of Dollarized Cryptocurrency, it is not a proper exercise of the Debtors' business judgment to sell this cryptocurrency rather than return the identical cryptocurrency to Voyager's customers, thereby minimizing the potential tax consequences.

4. Robertson does not object to the other terms of the proposed Sale. However, these identified flaws must be addressed for the Court to conclude that the proposed Sale is a reasonable exercise of the Debtors' business judgement.

## RELEVANT BACKGROUND

**A.    The Appointment of the Special Committee to Investigate Causes of Action**

5. On July 5, 2022 (the "Petition Date"), the board of directors of debtor Voyager Digital, LLC ("Voyager Digital" or "Seller") formally established a special committee (the "Special Committee"), comprising independent directors Timothy Pohl and Jill Frizzley, and vested it with authority to, among other things, investigate any potential estate claims and causes of action.

**B.    Identity of Creditors / Released Parties are Undisclosed**

6. On July 6, 2022, the Debtors filed the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petition and First Day Motions* [Docket No. 15] (the "First Day Declaration").

7. Pursuant to the First Day Declaration, as of the Petition Date, the Debtors had over 3.5 million active users (*i.e.*, creditors). First Day Declaration at ¶ 2.

---

[4] To the extent there is a negative tax consequence to holders of claims related to Dollarized Cryptocurrency, the Plan may not be confirmable because it fails the best interest of creditors test in that recoveries under a chapter 7 liquidation, where the cryptocurrency is returned rather than dollarized, would be greater on a net tax basis.

8.  On July 8, 2022, the Court entered its *Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (V) Granting Related Relief* [Docket No. 54] (the "Creditor Matrix Order").

9.  Pursuant to paragraph 6 of the Creditor Matrix Order (emphasis added):

> **The Debtors are authorized to redact** on the Creditor Matrix, Schedules and Statements, or other document filed with the Court (a) the home addresses of individuals and (b) **the names, addresses, and other Personal Data of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or European Economic Area member state**. The Debtors shall provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other filings redacted pursuant to this Order to (x) the Court, the U.S. Trustee, and counsel to any official committee appointed in these chapter 11 cases, and (y) to any party in interest upon a request to the Debtors (email is sufficient) or to the Court that is reasonably related to these chapter 11 cases; provided that any receiving party shall not transfer or otherwise provide such unredacted document to any person or entity not party to the request. The Debtors shall inform the U.S. Trustee promptly after denying any request for an unredacted document pursuant to this Order.[5]

10. On August 22, 2022, the Debtors filed the *Schedules of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945* (the "VDL Schedules"). "Schedule F Attachment – Customer Claims" to the VDL Schedules provides a link to the schedule of creditors who have non-priority unsecured claims ("Schedule F").[6] Schedule F contains more than 20,000 pages and

---

[5] On October 8, 2022, counsel to Robertson requested via electronic mail that the Debtors provide unredacted versions of the Creditor Matrix, Schedules, and Statements. On October 10, 2022, the Debtors informed counsel to Robertson that the Debtors will be denying the request and informing the United States Trustee of their decision.

[6] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175308182280000000077.pdf

approximately 1 million entries (assuming 50 entries per page x 20,000 pages), none of which appear to contain the unredacted name of a customer.

C.    **The Robertson Action**

11.    On August 10, 2022, Robertson and his co-plaintiffs filed a putative class-action lawsuit in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (defined above as the "Robertson Class Action"). The current defendants in the Robertson Class Action are Stephen Ehrlich, Mark Cuban, and the Dallas Basketball Limited d/b/a Dallas Mavericks (the "Dallas Mavericks"). The Robertson Class Action asserts various causes of action against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, including causes of action for aiding and abetting breach of fiduciary duty and violations under federal and state securities law and violations of state consumer-protection laws.

12.    On August 15, 2022, in a letter to counsel to the plaintiffs in the Robertson Class Action (the "Committee Letter"), the Committee asserts that certain causes of action in the Robertson Class Action are property of the Debtors' estates and that such claims "must be preserved for the benefit of all general unsecured creditors." A true and correct copy of the Committee Letter is attached hereto as Exhibit A.[7]

D.    **The Sale Motion and Asset Purchase Agreement**

13.    On September 28, 2022, the Debtors filed the Motion seeking authority to enter into the Asset Purchase Agreement with FTX US for the sale of substantially all of the assets (primarily cryptocurrency) of debtor Voyager Digital, LLC.

---

[7] Robertson includes the Committee Letter as an exhibit to this Objection to highlight that there are potentially valuable estate claims against non-debtors and that the Asset Purchase Agreement proposes to transfer such claims to FTX US for no consideration.

5

14. As set forth in the Motion, the Debtors assert that the Asset Purchase Agreement, contemplates approximately "$1.422 billion of aggregate deal consideration comprised primarily of: (a) the value of all Voyager cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration estimated as providing approximately at least $111 million of incremental value for the Debtors' estates that includes (i) a cash payment of $51,000,000, (ii) an earn out of up to $20 million, (iii) the value associated with a $50 account credit for customers who pass Purchaser's KYC process, (iv) a cash payment equal to the Acquired Cash, and (v) the transfer to the Debtors of all right, title, and interest in the Loan Claims." Motion at ¶ 6.

15. Pursuant to the Asset Purchase Agreement, "Acquired Assets" includes (a) **all cryptocurrency** attributable to Voyager Customer accounts on the Voyager Platform and (b) all causes of action against, among others, Seller's customers. Specifically, Section 1.1(d) of the Asset Purchase Agreement provides for the sale of (emphasis added):

> (i) **all Avoidance Actions or other affirmative causes of action or claims against Seller's customers**, borrowers under the Acquired Cryptocurrency Loans and counterparties to Assigned Contracts whether arising before or after the Closing Date, in each case, **other than the Retained Avoidance Actions** (the "Specified Transferred Claims"), and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller);

16. Section 11.1(ggg) of the Asset Purchase Agreement defines "Retained Avoidance Actions" as "any Avoidance Action against (i) 3AC or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other Avoidance Action that Purchaser agrees in writing

6

prior to the Closing may be retained by the Debtors, and (iv) any claims for actual fraudulent transfers."

17. Accordingly, pursuant to the Motion and the Asset Purchase Agreement, ***the Debtors seek authority to sell (1) all of the Seller's affirmative claims against "customers" and "contract counterparties" and (2) all avoidance actions against non-insiders – which includes any avoidance actions that may exist with respect to Stephen Ehrlich's friends (including Mark Cuban).***

**E.    The Plan and Disclosure Statement**

18. On October 5, 2022, the Debtors filed the (a) *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496] (the "Plan") and (b) *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "Disclosure Statement").

**i.    The Investigation of Causes of Action Remains Ongoing**

19. As set forth in the Disclosure Statement, the Special Committee was established to conduct an Investigation (as defined in the Disclosure Statement), which remains ongoing as of October 5, 2022. Disclosure Statement at p. 17. In addition, the Debtors disclose in the Disclosure Statement that ***"[t]o the extent the Investigation concludes there are viable Claims and/or Causes of Action against certain parties, such parties will be expressly carved out of the Released Parties and the Exculpated Parties, and such Claims and/or Causes of Action will be retained by the Wind-Down Entity.*** " *Id*. (emphasis added).

20. Article I(A)(28) of the Plan defines "Causes of Action" as (emphasis added):

> any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt,

7

account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. **For the avoidance of doubt, "Causes of Action" includes:** (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) **any claim based on or relating to**, or in any manner arising from, in whole or in part, tort, breach of contract, **breach of fiduciary duty**, violation of local, state, federal, or foreign law, **or breach of any duty imposed by law or in equity, including securities laws**, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) **any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code**; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

### ii.     The Dollarization of Non-Supported Cryptocurrency

21.     Pursuant to Article II(C)(3)(c) of the Plan, each holder of an Allowed Account Holder Claim (as defined in the Plan) will receive, in pertinent part, either (a) its pro rata share of cryptocurrency or (b) if the cryptocurrency is not supported by FTX US, its pro rata share of cash. In other words, if the cryptocurrency deposited by a Voyager customer is not supported by FTX US (*e.g.*, XRP, HBAR, BAND, TRAC, GALA), then such cryptocurrency will be sold to FTX US for cash and the customer's cryptocurrency claim will become "dollarized" (referred to above as Dollarized Cryptocurrency).[8]  The Disclosure Statement describes this process more fully in Article II as follows (emphasis added):

> . . . the Debtors will effectuate the transition of Account Holders to the FTX US platform pursuant to the Customer Migration Protocol, which will be included in the Plan Supplement and will be filed with the Court in advance of the Voting Deadline. As a general matter, the Customer Migration Protocol will provide, among other things, that Purchaser will make initial

---

[8]  The Disclosure Statement fails to disclose which cryptocurrency is supported or not supported by FTX US and may become dollarized. The list of cryptocurrency subject to dollarization in this paragraph is illustrative and based on the chart of estimated recoveries of hypothetical holders of Account Holder Claims on page 8 of the Disclosure Statement.

distributions to Transferred Creditors under the Plan into such Transferred Creditors' FTX Accounts (i) in Cryptocurrency if such Transferred Creditor has become a Transferred Creditor prior to the Closing Date and Purchaser supports the Cryptocurrency maintained by such Transferred Creditor in such Transferred Creditor's Account, or (ii) in Cash, for the Cash portions of such initial distributions and if (x) Purchaser does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (y) a Transferred Creditor did not maintain Cryptocurrency in its Account, or (z) a Transferred Creditor becomes a Transferred Creditor after the Closing Date but before the final cut-off date contemplated in the Customer Migration Protocol.

It is anticipated that all Voyager customers will be transitioning to FTX US. **In the event that a customer is not successfully transitioned to FTX US, such customer** will not be eligible for the $50 Account Credit (as discussed below), and **will not receive the Transferred Cryptocurrency Value in kind. Instead, such Holder will receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code**. . . .

### iii. The Negative Tax Consequences of Dollarized Cryptocurrency

22. To the extent an Allowed Account Holder Claim is "dollarized" pursuant to the Customer Migration Protocol, there is a material risk of a negative tax consequence. Specifically, Article XI(C)(1)(a) of the Disclosure Statement informs creditors that (emphasis in original):

> There is a material risk that U.S. Holders of Account Holder Claims and General Unsecured Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Clams (or separate taxable events for both events). This is the case even though the Taxable Transaction contemplates the migration of customers to an acquiring cryptocurrency platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.
>
> …
>
> **The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concept of a non-taxable in-kind distribution referred to above rests in large part on the**

9

**theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).**

## OBJECTION

### A. The Sale of the Causes of Action Conflict with the Plan

23. There is an inherent conflict between the Asset Purchase Agreement and the Plan with respect to the retention of causes of action. On one hand, the Asset Purchase Agreement contemplates the sale of "all Avoidance Actions or other affirmative causes of action or claims against Seller's customers . . . other than the Retained Avoidance Actions" – which necessarily includes all claims against non-insiders, such as Stephen Ehrlich's friends (*i.e.*, Mark Cuban). Asset Purchase Agreement at § 1.1(d). On the other hand, the Plan contemplates the retention of various "Causes of Action" which is defined in the Plan as including, among other claims, any claims arising under chapter 5 of the Bankruptcy Code (*i.e.*, Avoidance Actions) and any claim based on or relating to breach of fiduciary duty and breach of any duty under securities laws. Plan at Art. I(A)(28). In other words, the Asset Purchase Agreement purports to sell various claims and causes of action to FTX US that the Plan purports to retain for the benefit of creditors.

24. Confusing matters further is the mandate of the Special Committee. As discussed above, the Special Committee was established to investigate causes of action, ***which remains ongoing as of October 5, 2022***. Disclosure Statement at p. 17. The Debtors state in the Disclosure

10

Statement that "*[t]o the extent the Investigation concludes there are viable Claims* and/or Causes of Action against certain parties, such parties will be expressly carved out of the Released Parties and the Exculpated Parties, and s*uch Claims and/or Causes of Action will be retained* by the Wind-Down Entity." *Id*. (emphasis added). Accordingly, it's unclear how or why the Special Committee is investigating claims that it has already agreed to sell to FTX US.

B.      The Sale Transfers Causes of Action to FTX US for No Consideration

25.     To the extent the Asset Purchase Agreement seeks to transfer causes of action (defined as "Specified Transferred Claims" in the Asset Purchase Agreement), that portion of the Sale must be denied for lack of consideration. There is nothing in the record to support a finding that the Debtors are receiving reasonably equivalent value for the Specified Transferred Claims.

26.     As an initial matter, Robertson disputes the Debtors' assertion that the aggregate deal consideration is $1.422 billion. The deal consideration primarily consists of the fair market value of Voyager's cryptocurrency ($1.3 billion). To be clear, FTX US is not paying $1.3 billion to the Debtors. Rather, Voyager's cryptocurrency (other than Dollarized Cryptocurrency) is simply being transferred from Voyager customer's accounts to new FTX US accounts established for the benefit of the same customers (*i.e.*, creditors). In fact, the Debtors anticipate that "all Voyager customers will be transitioning to FTX US." Disclosure Statement at p. 8.

27.     The true deal consideration is the approximate $51 million cash payment – which is a *de minimis* amount when viewed in terms of customer acquisition costs.[9] Assuming Voyager's 3.5 million customers transfer to FTX US, the customer acquisition cost is approximately $14.50

---

[9] Last year, FTX US purportedly spent $135 million for the naming rights of the Miami Heat's NBA arena. https://decrypt.co/70004/ftx-ceo-sbf-19-year-miami-heat-stadium-deal-funds

11

– a bargain compared to the approximate $147 customer acquisition cost of Robinhood (a company that FTX US has invested in).[10]

28. From the record, it is evident that the cash purchase price is on account of the customer accounts – not the Specified Transferred Claims. Assuming, however, that the entire $51 million cash purchase price was specific consideration for the Specified Transferred Claims, there is nothing in the record to suggest that this is fair market value or reasonably equivalent value for the Specified Transferred Claims, as they were not marketed (let alone known) by the Debtors or Moelis. The Special Committee's (and the Committee's) investigation of the Specified Transferred Claims *remains ongoing*. As a result, neither the Debtors, the Special Committee, the Committee, nor their various professionals can assign a potential value on the Specified Transferred Claims – and no such value is disclosed in the Disclosure Statement.

C. **The Causes of Action May Include Valuable Claims Against Mark Cuban**

29. As a result of the Creditor Matrix Order, the VDL Schedules do not disclose the identities of the Debtors' customers. This means parties in interest are unable to readily determine what causes of action against which parties are being sold/buried under the terms of the Asset Purchase Agreement. Specifically, it is unclear whether Voyager's customers include Stephen Ehrlich's friends and personal advisors, such as Mark Cuban, who is the subject of the Robertson Class Action and represents a potential source of meaningful recovery for Voyager's customers.

30. Although the unsealing of the identity of Voyager's customers would allow Voyager's active creditor base to assist in efforts to untangle Stephen Ehrlich's network of friends and personal advisors and identify specific customers whose claims should not be sold / buried, Robertson submits that there is no business justification for the Debtors to sell any causes of action.

---

[10] https://www.coindesk.com/business/2022/05/12/ftx-ceo-sam-bankman-fried-buys-56m-position-in-robinhood/

DOCS_SF:108046.2 75003/001

D. **The Sale of Dollarized Cryptocurrency Should be Prohibited**

31. As set forth above, the Asset Purchase Agreement and Plan contemplate the "dollarization" of cryptocurrency that is not supported on the FTX US platform. In other words, under the Asset Purchase Agreement and Plan, the Dollarized Cryptocurrency will be sold to FTX US at fair market value for USD and the cash proceeds will be distributed *pro rata* to certain of Voyager's customers who deposited the Dollarized Cryptocurrency.

32. The Debtors acknowledge that the "dollarization" of this cryptocurrency will trigger a taxable event at the expense of holders of Dollarized Cryptocurrency. Disclosure Statement at Art. XI(C)(1)(a). As a result of the taxable event associated with the Dollarized Cryptocurrency, it is not in the best interest of certain of the Debtors' creditors to sell the Dollarized Cryptocurrency to FTX US when such Dollarized Cryptocurrency can be distributed directly to holders of Allowed Account Holder Claims with Dollarized Cryptocurrency. As such, the sale of the Dollarized Cryptocurrency should be denied.

E. **The Debtors' Request to Rebalance Their Cryptocurrency Portfolio Should be Denied or, in the Alternative, a Specific and Transparent Protocol Should Developed and be Subject to Court Approval and Supervision**

33. The Motion requests authority to "rebalance" their cryptocurrency portfolio and "execute any rebalancing to effectuate the Sale; *provided* that any such rebalancing transactions shall require the consent of both FTX US and the Committee." Motion at ¶ 25. It is unclear what this entails or why it is necessary. For example, do the Debtors propose to exchange cryptocurrency that is earmarked to be "dollarized" under the Plan? Will this negatively impact holders of Dollarized Cryptocurrency in the event the Plan is not confirmed (*e.g.*, because the Plan fails to meet the best interest of creditors test due to negative tax consequences)?

34. Robertson respectfully submits that the Debtors should be required propose a specific and transparent portfolio rebalancing protocol that gives parties in interest a subsequent opportunity to object. Otherwise, the request should be denied.

## CONCLUSION

35. For the reasons discussed above, the Motion should be denied unless the flaws identified herein are adequately addressed.

Dated: October 10, 2022              PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Jason H. Rosell*
Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld
Debra I. Grassgreen (admitted *pro hac vice*)
Jason H. Rosell
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (212) 561-7700
Email:  rpachulski@pszjlaw.com
           akornfeld@pszjlaw.com
           dgrassgreen@pszjlaw.com
           jrosell@pszjlaw.com

*Counsel to Creditor Pierce Robertson*

# EXHIBIT A

**Committee Letter**



mwe.com

Darren Azman
Attorney at Law
dazman@mwe.com
+1 212 547 5615

August 15, 2022

**VIA EMAIL AND FEDEX**

**THE MOSKOWITZ LAW FIRM, PLLC**
c/o Adam M. Moskowitz
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
adam@moskowitz-law.com

**RE:** *In re Voyager Digital Holdings, Inc., et al.* **(Bankr. S.D.N.Y. 22-10943 (MEW))**

Dear Mr. Moskowitz,

This firm is counsel to the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of Voyager Digital Holdings, Inc., Voyager Digital Ltd. ("Voyager Limited"), and Voyager Digital, LLC ("Voyager LLC" and, collectively, the "Debtors"). As you know, on July 6, 2022, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On July 19, 2022, the Office of the United States Trustee appointed the Committee, which is comprised of seven of the Debtors' customers. The Committee and its members owe fiduciary duties to the Debtors' general unsecured creditors, which includes a duty to maximize their recoveries. Accordingly, the Committee has a responsibility to ensure that property of the Debtors' estates is preserved for the benefit of unsecured creditors.

We write to you in response to the putative class action (the "Class Action") that your clients commenced against Mark Cuban, Dallas Basketball Limited, d/b/a Dallas Mavericks (the "Mavericks"), and Stephen Ehrlich (collectively, the "Defendants") on August 10, 2022 by filing the *Class Action Complaint and Demand for Jury Trial* (the "Complaint"), *Robertson, et al. v. Cuban, et al.* (S.D. Fla. 22-22538-RKA). The Complaint includes causes of action that are property of the Debtors' estates. Accordingly, by commencing the Class Action, your clients violated the automatic stay imposed under Bankruptcy Code section 362 in the Chapter 11 Cases. For the reasons set forth below, we hereby request that you voluntarily dismiss the Class Action by no later than August 19, 2022.

**A.    The Automatic Stay**

The commencement of a bankruptcy case results in the imposition of an automatic stay that acts as an injunction against all parties from taking certain actions, including "any act to obtain possession of

---

One Vanderbilt Avenue  New York NY 10017-3852  Tel +1 212 547 5400  Fax +1 212 547 5444

*US practice conducted through McDermott Will & Emery LLP.*

August 15, 2022
Page 2

property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). When the automatic stay is willfully violated, section 362(k)(1) provides that "the individual injured by such violation . . . shall recover actual damages, including attorneys' fees . . . ." 11 U.S.C. § 362(k)(1). A "willful" violation of the automatic stay means only that the violator (i) take a deliberate action (*e.g.*, filing the Class Action) and (ii) with knowledge of the automatic stay. *In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1105 (2d Cir. 1990).

B.     **Property of the Estate**

The commencement of a bankruptcy case forms an estate that, pursuant to Bankruptcy Code section 541, includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This includes all "rights of action" assertable by the debtor based on state or federal law. If a company is in bankruptcy, those claims belong to the estate, and "creditors lack standing to assert" those claims. *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).

"[A]mong the claims that only a debtor—and not a debtor's creditors—may pursue is a 'general claim,' understood to be a claim 'with no particularized injury arising from it,' and which could be 'brought by any creditor of [a] debtor . . . ." *Soundview Elite*, 565 B.R. 534, 544 (Bankr. S.D.N.Y. 2017) (quoting *St. Paul Fire & Marine Ins. Co.*, 884 F.2d 688, 701 (2d Cir. 1989)). A common "general claim" is a "derivative claim," which has been defined as "[a] claim based on rights 'derivative' of, or 'derived' from, the debtor . . . ." *Id.* (quoting *Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 89 (2d Cir. 2014)). Conversely, a claim is not property of the estate, but rather a creditor claim, when the claim particularly injures a creditor. *See In re Tronox*, 855 F.3d 84, 100 (2d Cir. 2017).

To determine whether a claim is derivative or direct, courts look to state law. *In re SemCrude L.P.*, 796 F.3d 310, 316 (3d Cir. 2015)—more specifically, the law of the state law in which the entity was formed. *In re CD Liquidation Co., LLC*, 462 B.R. 124, 131 (Bankr. D. Del. 2011). In the bankruptcy context, when determining whether a claim is (A) derivative (*i.e.*, general) or (B) particular, courts are tasked with "inquir[ing] into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Madoff*, 740 F.3d at 89. Where a cause of action is based on facts "generally available to any creditor," and recovery would "serve to increase the pool of assets available to all creditors," then the cause of action is "general," and therefore, property of the estate. *Emoral, Inc.*, 740 F.3d at 881; *SemCrude*, 796 F.3d at 317-19, 321-22. On the other hand, if the claim "arises from the wrongdoer's breach of a separate legal obligation owed to the victim . . . that results in an injury particularized to the victim," then the claim is non-derivative. *Sec In'r Prot. Corp v. Bernard L. Madoff Inv. Sec. LLC*, Case No. 08-01789 (SMB), 2017 WL 921963, at *4 (Bankr. S.D.N.Y. Mar. 7, 2017). Ultimately, if the claim "is a general one . . . , the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul*, 884 F.2d at 701.



August 15, 2022
Page 3

C. **Delaware Law Applies**

Voyager Limited and Voyager LLC are Delaware entities, and thus Delaware law applies. Delaware courts "look to the nature of the wrong and to whom the relief should go" when determining whether a claim is derivative. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). The test under Delaware law "turns solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing [party], individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the [suing party], individually)?" *Tooley*, 845 A.2d at 1033. Moreover, "[t]he [suing party's] claimed direct injury must be independent of any alleged injury to the corporation. The [suing party] must demonstrate that the duty breached was owed to the [suing party] and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039.

The classification of causes of action in the Complaint is not binding. *In re MultiPlan Corp. Stockholders Litig.*, 268 A.3d 784, 801 (Del. Ch. 2022). Instead, the court must "'look to all the facts of the complaint and determine for itself' whether a claim is direct or derivative." *Id.* "[A] claim is not 'direct' simply because it is pleaded that way, and . . . does not talismanically create a direct action." *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004); *see Dieterich v. Harrer*, 857 A.2d 1017 at 1027, 2004 WL 1739664, at *9 (Del. Ch. Aug.3, 2004) ("a claim is not 'direct' simply because it is pleaded that way . . . . Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.").

D. **The Class Action Improperly Seeks to Circumvent the Automatic Stay**

The Class Action is merely a recitation of the first class action (the "Prepetition Class Action") filed by your clients against Voyager Limited and Voyager LLC on December 24, 2021. The only difference is that Voyager Limited and Voyager LLC were replaced as defendants with Cuban, Ehrlich, and the Mavericks. The Complaint begins by directly quoting the first eight paragraphs of the Prepetition Complaint, and all but three paragraphs from the factual allegations in the Prepetition Complaint are included in the Complaint.[1] The fact that the Debtors are not named as defendants does not now move the Class Action outside the bounds of the automatic stay. *See In re Continental Airlines*, 177 B.R. 475, 479 (D. Del. 1993) (class actions against non-debtors cannot be used to circumvent the stay when the debtor is the real party defendant).

E. **Under Delaware Law, the Class Action Claims are Derivative and Thus Violate the Automatic Stay**

The causes of action asserted in the Complaint allege only indirect harm to the plaintiffs—harm that derives from an asserted direct injury to the Debtors relating to negligent management, aiding and abetting breach of fiduciary duties, fraudulent transfers, and similar claims, each of which can only be

---

[1] Paragraphs 20, 21, and 24, which pertain to marketing by the Debtors.



August 15, 2022
Page 4

brought by the Debtors. In considering the nature of such claims, two things are clear. *First*, the Debtors suffered the alleged harm from the acts of the Defendants, and any harm to your clients was secondary. *Second*, the secondary harm is not particular as to your clients. Rather, all of the Debtors' creditors suffered the same general harm.

The gravamen of the Class Action is that the Defendants conspired together and with the Debtors to induce customers to invest in the Debtors and use the Debtors' platform. As part of this conspiracy, the plaintiffs allege that the Defendants received substantial commissions. If these allegations are true, and the Defendants were conducting fraudulent schemes to use the Debtors to induce consumers to use the Debtors' platform for the Defendants' own enrichment, the Debtors are the victims, and any injury resulting from the Defendants' actions is common to all creditors. *See In re Barkany*, 542 B.R. 662, 692 (Bankr. E.D.N.Y. 2015) (finding that the injury to defrauded investors was no different than the injury to other defrauded investors); *see also Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (claims for failure to provide competent and active management are "clearly derivative").

Moreover, any improper commissions or payments that the Defendants received from the Debtors are subject to avoidance as fraudulent transfers. Courts have uniformly held that these types of claims are derivative in nature. *See, e.g.*, *In re Tronox Inc.*, 549 B.R. 21, 42 (S.D.N.Y. 2016) (applying Delaware law and holding that "[t]he classic case" of a derivative action is fraudulent conveyance or undercapitalization); *MultiPlan*, 268 A.3d at 801 (finding that overpayment claims, or claims causing an exchange of assets or equity at a loss to the corporation are "normally viewed as exclusively derivative under the *Tooley* analysis") (internal quotations omitted); *In re JMO Wind Down, Inc.*, Case No. 16-10682 (BLS), 2018 WL 1792185, at *8 (Bankr. D. Del. April 13, 2018) ("As such, the Court finds that fraudulent transfer claims constitute derivative claims because the alleged injury is to the general creditor body and the recovery returns to the estate."); *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* Case No. N18C-08-086 EMD CCLD, 2021 WL 710816, at *11 (Del. Super. Ct. Feb. 23, 2021) ("Because that recovery would serve to increase the pool of assets available to all creditors, fraudulent transfer claims are derivative as a matter of federal bankruptcy law.") (internal quotations omitted).

The Class Action also includes claims for aiding and abetting breaches of fiduciary duties. These claims are unequivocally property of the estate. "Aiding and abetting has been recognized as a 'dependent' claim," and "the derivative nature of an aiding and abetting claim will exist only with the success of the breach of fiduciary duty claim." *In re Draw Another Circle.*, 602 B.R. 878, 904 (Bankr. D. Del. 2019). "Any breach of fiduciary duty harms the corporation [and] . . . [a]s such, those claims belong to the [estate] to pursue." *In re JMO Wind Down, Inc.*, 2018 WL 1792185, at *8; *see also LaSala v. Bordier et Cie*, 519 F.3d 121, 130 (3d Cir. 2008) ("[W]here alleged breach of fiduciary duty harmed the corporation, alleged aiding-and-abetting claim is derivative in nature") (citing *In re First Interstate Bancorp Cons. S'holder Litig.*, 729 A.2d 851, 864 (Del. Ch. 1998)).



August 15, 2022
Page 5

      For the foregoing reasons, the claims asserted in the Class Action are property of the Debtors' estates. These claims must be preserved for the benefit of all general unsecured creditors. If necessary, the Committee is prepared to seek relief from the Bankruptcy Court to enforce the automatic stay and seek damages for the willful stay violation. Moreover, if for any reason the Bankruptcy Court finds that some of the asserted causes of action are *not* property of the Debtors' estates, the Committee intends to seek, in the alternative, enjoinment of the Class Action given the impact that the Class Action will have on the Chapter 11 Cases and the ability to recover funds from the same Defendants for the benefit of all general unsecured creditors. Courts have held that when a creditor's claims are so closely related to a debtor's claims, third party actions should be enjoined because the estate claims have the potential to reduce such creditor's injury and, until then, it is impossible to measure the creditor's damages. *See In re Giga Watt Inc.*, Case No. 18-03197-FPC7, 2021 WL 4436941, at *10 (Bankr. E.D. Wa. Sep. 26, 2021) (enjoining direct claims when they threaten the orderly procedure of bankruptcy where all creditors are treated equally); *see Madoff*, 429 B.R. 423, 435-37 (Bankr. S.D.N.Y. 2010) (quoting *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); *see also Fisher v. Apostolou*, 155 F.3d 876, 881-83 (7th Cir. 1998).

      Again, the Committee requests that you voluntarily dismiss the Class Action by no later than August 19, 2022. If you are unwilling to do so, the Committee will have no choice but to seek judicial intervention from the Bankruptcy Court.

                                         Best,

                                         Darren Azman

cc:  Charles R. Gibbs (crgibbs@mwe.com)
     Joseph B. Evans (jbevans@mwe.com)
     Gregg Steinman (gsteinman@mwe.com)
     Joseph M. Kaye (joseph@moskowitz-law.com)
     Barbara C. Lewis (barbara@moskowitz-law.com)
     Josh Sussberg (jsussberg@kirkland.com)
     Christine Okike (christine.okike@kirkland.com)

