Hearing Date: October 19, 2022 at 2:00 p.m. (ET)
Objection Deadline: October 12, 2022 at 4:00 p.m. (ET)

David M. Posner
Kelly E. Moynihan
**KILPATRICK TOWNSEND &
STOCKTON LLP**
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile:  (212) 775-8800
Email: dposner@kilpatricktownsend.com
        kmoynihan@kilpatricktownsend.com

*Counsel to the Ad Hoc Group of Equity Holders
of Voyager Digital Ltd.*

Paul M. Rosenblatt, Esq.
**KILPATRICK TOWNSEND &
STOCKTON LLP**
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile:  (404) 815-6555
Email: prosenblatt@kilpatricktownsend.com

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **VOYAGER DIGITAL HOLDINGS, LLC,** *et al.*, | : | **Case No. 22-10943 (MEW)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| _____ | : | |

**OBJECTION OF THE AD HOC GROUP OF EQUITY HOLDERS TO DEBTORS'
MOTION FOR ENTRY OF AN ORDER APPROVING (I) THE ADEQUACY
OF THE DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE
PROCEDURES, (III) FORMS OF BALLOTS AND NOTICES IN CONNECTION
THEREWITH, AND (IV) CERTAIN DATES WITH RESPECT THERETO**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

The Ad Hoc Group of Equity Holders (the "<u>AHG</u>") of Voyager Digital Ltd. ("<u>TopCo</u>"), a debtor and debtor-in-possession in the above-captioned chapter 11 cases (collectively with each other debtor in the above-captioned cases, the "<u>Debtors</u>" or the "<u>Company</u>," as applicable), by and through its undersigned counsel, hereby submits this objection (the "<u>Objection</u>") to the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [ECF No. 289] (the "<u>Disclosure Statement Motion</u>" or the "<u>Motion</u>") and the *Declaration of Matthew Dundon in Support of the Objection of the Ad Hoc Group of Equity Interest Holders to the Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "<u>Dundon Declaration</u>") in support of the Objection filed contemporaneously herewith.  In support of this Objection, the AHG respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      TopCo Interests are "in the money," based upon publicly available information disclosed in these Chapter 11 Cases.  Yet, the Debtor's Disclosure Statement[2] provides no mention of the potential value that could and should be available for Holders of TopCo Interests.  Worse yet, the Plan is structured to allow for the elimination of any such value.  The Plan is designed, based upon the Debtors' own admissions, for the benefit of Account Holders resulting

---

[2] Capitalized Terms used but not defined herein shall have the meanings ascribed to them in the Debtors' *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 496] (the "<u>Plan</u>").

in prejudice to the detriment of TopCo Interests.  As shown below, the Plan strips TopCo of its assets, and the Disclosure Statement fails to explain this sham.

2.       The Plan does not provide for substantive consolidation of TopCo with the other Debtors.  And the Disclosure Statement reveals that the sole material obligation of TopCo is being negated, leaving TopCo with no significant obligations.  That sole material obligation is TopCo's guaranty of the Alameda Loan, which loan obligation is being cancelled through the Plan thereby eliminating TopCo's guaranty obligation and leaving TopCo without any material liabilities.

3.       On the other hand, TopCo has significant and valuable assets.  TopCo holds over $230 million of intercompany claims against OpCo.  TopCo owns equity interests in its non-debtor subsidiaries.  TopCo holds significant direct and derivative claims against its directors and officers.  TopCo's assets are easily worth hundreds of millions of dollars.  Yet the Disclosure Statement either fails to explain why this value is not being made available to the TopCo Interest Holders or discloses Plan provisions that will impermissibly result in the elimination of such value to the detriment of the TopCo Interest Holders.

4.       The over $230 million in intercompany claims that TopCo holds against OpCo are equal in priority to the claims of Account Holders.  Both the intercompany claims and the claims of Account Holders are general unsecured claims.  The treatment for Account Holders' claims is discussed in detail in the Disclosure Statement.  The treatment for TopCo's intercompany claims is not, other than to say such claims will receive 0%.  The Debtors propose a multitude of possible outcomes for TopCo's intercompany claims, all in accordance with a "Restructuring Transactions Memorandum" that is not included in the Disclosure Statement.  TopCo Interest Holders have no role in negotiating the Restructuring Transactions Memorandum.  Shockingly,

2

the Restructuring Transactions Memorandum could simply provide that TopCo's $230 million of intercompany claims are worthless, without any justification or explanation for such treatment.

5.      TopCo owns equity interests in its non-debtor subsidiaries.  The Disclosure Statement fails to disclose how that value will be provided to TopCo.  For example, the Disclosure Statement discusses the sale of a TopCo non-debtor subsidiary, Coinify.  Disclosure Statement § VII.I [ECF No. 498 at p. 45 of 186].  OpCo owns no interest in Coinify.  *Id*; see also Dundon Declaration ¶ 28.  There is no mention in the Disclosure Statement as to how the proceeds of the Coinify sale will inure to the benefit of TopCo.  Nor does the Disclosure Statement discuss the value of any other non-debtor subsidiary or how that value may inure to the benefit of TopCo.

6.      TopCo holds significant direct and derivative claims against its directors and officers.  As further evidence of the validity of these claims, on the Petition Date, TopCo voted to appoint independent directors and establish a Special Committee to investigate certain of the Debtors' transactions.  As of August 31, 2022, the Debtors had incurred over $1.6 million in professional fees just in the investigation of these claims.  The Disclosure Statement fails to reveal any findings from this Special Committee investigation, other than to provide that if there are claims, such claims will be retained by the Wind-Down Entity and carved out of the proposed releases.  Not surprisingly, the proposed Wind-Down Entity fails to include a mechanism to represent the TopCo Interest Holders.  To make matters worse, the Wind-Down Entity will operate as if the Debtors' Estates are substantively consolidated even though they are not being consolidated, elevating creditor claims of the non-consolidated Debtor entities ahead of TopCo Interests.

3

7.      Additionally, the Debtor's proposal to carve out from the Plan's releases any claims identified by the Special Committee is a red herring.  The one claim that has already been carved out of the proposed release, a claim related to the 3AC Loan, has many conditions that could result in such claim having no value.  For example, the 3AC Loan claim can only be asserted against the Debtors' Chief Executive Officer (the "CEO") and only to the extent of the Debtors' available insurance coverage.  The Disclosure Statement fails to provide the amount of coverage provided by the insurance policies or explain if any coverage will be remaining after litigation costs are first deducted from the coverage.  No claim can be collected from the CEO personally, even if the value of the claim exceeds the amount of available insurance coverage, and this despite the fact that the CEO has assets including $40 million realized from the sale of TopCo equity.[3]  Thus, the Debtors' proposal to carve out from the proposed releases any additional claims identified from the Special Committee investigation leaves little hope that such claims will result in value for the TopCo Interests.

8.      TopCo Interests are further harmed by the breadth and depth of the proposed releases.  The Disclosure Statement fails to value any of the releases and reveals that no consideration was provided by the released parties in exchange for the extensive releases.  The only activity that was set forth in the Disclosure Statement to justify the proposed releases was the administration of the Chapter 11 Cases, which activities the released parties are already being compensated for in salaries and professional fees.

9.      The Plan now includes an "opt in" provision for the releases.  No explanation is provided in the Disclosure Statement as to how the "opt in" works or what it means.  For example, if the class representative for the Class Action does not opt in to the releases, does that

_____

[3] The Debtors' CEO may have significant personal assets that could be recovered.  The Debtors' CEO and entities under his control sold stock in 2021 for reported proceeds of $39.2 million.  Dundon Declaration ¶ 8.

4

mean the releases will have no impact on the class representative proceeding with the Class Action against the non-Debtor defendants following termination of the stay?

10.    In addition to the lack of adequate information which warrants denial of the Disclosure Statement Motion in and of itself, the proposed Plan is patently unconfirmable, which also warrants denial of the Disclosure Statement Motion.  The Plan is patently unconfirmable for three reasons.  First, the Plan's treatment of TopCo Interests amounts to unfair discrimination and is not fair and equitable.  The Plan effectively proposes to cancel TopCo Interests by stripping TopCo of its assets.  Although the Plan provides that TopCo Interest Holders retain their interests, such treatment is in name only.  The practical effect of the Plan is that TopCo Interests will be impermissibly wiped out.  It is no surprise that the Plan provides that TopCo Interest Holders are "deemed to reject."

11.    Second, section 502(b) of the Bankruptcy Code requires that claims be valued as of the petition date, known as "dollarization" as applied to cryptocurrency.  Here, the Debtors are not proposing to value claims of Account Holders as of the Petition Date.  Rather, the Debtors have not yet disclosed as of what date such claims will be valued, a clear violation of section 502(b) of the Bankruptcy Code.

12.    Third, the release and exculpation provisions in the proposed Plan are simply impermissible.  The Disclosure Statement fails to set forth information to satisfy the standard set forth by the Second Circuit for non-debtor releases in a plan.  And the exculpation portion far exceeds that permitted by Section 1125 of the Bankruptcy Code.

13.    For these reasons, and the other reasons set forth herein and in the Dundon Declaration, the Disclosure Statement Motion should be denied.

5

# BACKGROUND

## A.     General Background

14.     On July 5, 2022, (the "Petition Date"), the Debtors each filed a voluntary petition for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

15.     On or about September 19, 2022, the AHG, which comprises holders of equity interests in Debtor Voyager Digital Ltd. ("TopCo," "TopCo Interests," and "TopCo Interest Holders"), formally retained counsel and a financial advisor in connection with the Chapter 11 Cases.   See *Second Amended Verified Statement of the Ad Hoc Group of Equity Holders Pursuant to Bankruptcy Rule 2019* [ECF No. 511].

## B.     The Class Action and Intercompany Claims

### i.     The Class Action

16.     On July 6, 2022, a Notice of Action (the "Notice of Action") regarding a class action suit was filed with the Ontario Superior Court of Justice (Court File Number CV-22-00683699-00CP) (the "Class Action"). TopCo and certain of its directors and officers, including the Debtors' CEO, are defendants in the Class Action (collectively the "Class Action Defendants").  The Notice of Action is attached to the Dundon Declaration as **Exhibit 1**.

17.     The Class Action arises from a series of alleged misrepresentations by TopCo and the individual defendants regarding, among other things, (i) its credit risk levels; (ii) the nature of certain loans and other transactions, especially with regard to a March 2022 loan (the "3AC Loan") that TopCo provided to Three Arrows Capital ("3AC"), a cryptocurrency hedge fund; and (iii) the ramifications for the 3AC Loan arising from the May 2022 collapse of cryptocurrency platform Terra and its related cryptocurrency assets Terra and Luna (the "Terra

6

Collapse").

18.     According to the Notice of Action, in certain documents and public statements dated May 16, 2022, TopCo and the director and officer defendants, misrepresented, among other things, that TopCo had no exposure to the Terra Collapse and that it had no credit risk due to strong capitalization. *See id.* at 8-10.

19.     On June 22, 2022, TopCo corrected its statements regarding exposure to the Terra Collapse and other misrepresentations. *See id.* TopCo disclosed the previously undisclosed 3AC Loan, noting that it may have to issue a notice of default to 3AC for nonpayment. *See id.* Following these disclosures, TopCo's share price dropped significantly. *See id.*

20.     Along with its disclosure of the 3AC Loan, TopCo also disclosed that it had secured a loan from Alameda Ventures Ltd. as a backstop against the fallout of the Terra Collapse. *See id.* The Notice of Action alleges that this statement was also a misrepresentation, as TopCo required "an immediate cash infusion or else it would be required to enter insolvency proceedings." *See id.*

21.     The Notice of Action provides that this alleged misrepresentation was corrected on "July 6, 2022 when Voyager Digital disclosed that it had filed for Chapter 11 bankruptcy protection in the US." *See id.* at 9.

## ii.     The Intercompany Claims

22.     TopCo holds over $230 million in intercompany claims against its subsidiaries, as detailed in its Schedule of Assets.  [Case No. 22-10944, ECF 8, page 34].

23.     According to the *Second Report of the Information Officer* dated September 30, 2022 (the "Second IO Report") that was filed in the associated Canadian proceeding pending in the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act and is

7

attached to the Dundon Declaration as **Exhibit 4**, approximately $229 million of the Intercompany Claims comprise intercompany receivables owing to TopCo from other Debtors and non-Debtor affiliates. *See* Second IO Report § 6.4.

24.    Additionally, in the fiscal year ended June 30, 2022, in connection with an acquisition, TopCo advanced approximately $46 million in equity to Debtor Voyager Digital Holdings, Inc. ("OpCo") and approximately $16 million to non-Debtor affiliate Voyager European Holdings ApS. *Id.* § 6.5.

**C.    The Debtors' Proposed Plan of Reorganization**

25.    On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 17].

26.    On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 287] (the "First Amended Plan").

27.    In conjunction with the filing of the First Amended Plan, the Debtors filed the proposed *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 288].

28.    Also on August 12, 2022, the Debtors filed the Disclosure Statement Motion.

29.    On October 5, 2022, the Debtors filed the Plan.

30.    In conjunction with the filing of the Plan, the Debtors also filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

*Bankruptcy Code* [ECF No. 498] (the "Disclosure Statement").

31.     The Plan contemplates the sale of the Company (the "Sale") pursuant to an Asset Purchase Agreement between the Debtors and West Realm Shires Inc. ("FTX US" or "Purchaser").  *See* Disclosure Statement § II [ECF No. 498 at p. 14 of 186].

32.     Following the Sale, the remaining assets of the Debtors will be transferred to a Wind Down Trust that will distribute such assets pursuant to the Wind Down Trust Agreement to be filed with the Plan Supplement.

33.     The Debtors propose to provide TopCo Interest Holders their Pro Rata share of the Wind-Down Trust Units, provided that any distributions shall only be made following payment in full of all Account Holder Claims and General Unsecured Claims.  Plan § III.C.9(b) [ECF No. 496 at p. 30 of 139].  The Debtors further propose to provide Holders of Allowed General Unsecured Claims and Allowed Account Holder Claims with (i) their Pro Rata share of Transferred Cryptocurrency Value in Cryptocurrency or Cash; (ii) the right to become a Transferred Creditor; (iii) their Pro Rata share of Distributable Cash; and (iv) their Pro Rata share of Wind-Down Trust Units.  Plan §§ III.C.3(b), III.C.5(b) [ECF No. 496 at pp. 27, 28 of 139].

**OBJECTION**

34.     The Court should not approve the Motion because the Disclosure Statement (i) does not contain adequate information as required by section 1125 of the Bankruptcy Code; and (ii) describes a Plan that is patently unconfirmable.  Accordingly, the Disclosure Statement cannot be approved at this time and, therefore, the Motion should be denied.

I.    **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION**

A.    **Applicable Law**

35.    It is well-settled that a debtor may only solicit votes to accept or reject a chapter 11 plan after the Court has approved the debtor's written disclosure statement for that plan as containing "adequate information."   11 U.S.C. § 1125(b).   The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); *see also In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006).

36.    The primary purpose of a disclosure statement is to give creditors adequate information necessary to make an informed decision about whether to accept or reject the proposed plan of reorganization.  *See In re Momentum Mfg. Corp.*, 25 F.3d at 1136 ("Of prime importance in the reorganization process is the principle of disclosure."); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("Disclosure is the 'pivotal' concept in Chapter 11 reorganization." (citing 5 *Collier on Bankruptcy*, ¶ 1125.03 (15th ed. 1992)).

37.    Courts have held that the "purpose of a disclosure statement is to inform equity holders and claimants, *as fully as possible*, about the probable financial results of acceptance or rejection of a particular plan."  *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 689 (Bankr. D. Colo. 1995) (emphasis added) (quoting *In re The Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981)); *see also In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (stating that "substantial financial information with respect to the

10

ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

38.    In determining whether a disclosure statement satisfies section 1125 of the Bankruptcy Code, courts consider whether it provides creditors with the necessary information regarding the following:

- the events which led to the filing of a bankruptcy petition;
- the relationship of the debtor with its affiliates;
- a description of the available assets and their value;
- the anticipated future of the company;
- the source of information stated in the disclosure statement;
- the present condition of the debtor while in chapter 11;
- claims asserted against the debtor;
- the estimated return to creditors under a chapter 7 liquidation;
- the chapter 11 plan or a summary thereof;
- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
- information relevant to the risks posed to creditors under the plan;
- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;
- litigation likely to arise in a nonbankruptcy context; and
- tax attributes of the debtor.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

39.    For the reasons discussed below, the Disclosure Statement fails to include adequate information regarding critical matters that a hypothetical investor would need to understand in order to make an informed decision regarding its acceptance or rejection of the Plan.

**B.    Inadequate Disclosures Regarding Intercompany Claims and Other Assets**

40.    The Disclosure Statement is woefully inadequate with respect to the Intercompany Claims, the values of the same, the bases of the same, and the treatment of the

11

same.  According to the Debtors, the Intercompany Claims *may* be Reinstated or "converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum."  Disclosure Statement § III.D [ECF No. 498 at p. 21 of 186].   Further details regarding the Restructuring Transactions Memorandum and the contents thereof are scant in the Disclosure Statement.  Worse yet, the Restructuring Transactions Memorandum, which may set forth the treatment of the Intercompany Claims, will only be revealed upon the filing of the Plan Supplement, a document that the Debtors propose to file only seven days prior to the Voting Deadline. *See* Plan § I.A.85 [ECF No. 496 at p. 16 of 139].

41.    The Debtor's Liquidation Analysis, attached as Exhibit B to the Disclosure Statement, notes that, for purposes of the Liquidation Analysis, Intercompany Claims are assumed to be subordinated, and estimates a 0% recovery for Intercompany Claims.  Yet, the Disclosure Statement itself lacks any information as to the purported basis for the assumption that the Intercompany Claims will be subordinated or how or when the Debtors intend to attempt to subordinate the Intercompany Claims.  Despite the Debtors proposing that TopCo receive zero for its Intercompany Claims, the Debtors propose that TopCo itself is "deemed to accept" the Plan.  No rational entity would vote for a plan that proposes to strip it of over $230 million in value with no explanation.

42.    The Dundon Declaration provides a thorough analysis of the ramifications of the Debtors' Plan and its shortcomings, especially with respect to disclosures regarding the Intercompany Claims.  According to the Dundon Declaration, which is based on publicly available information, the Debtors fail to disclose in the Disclosure Statement several important facts that, taken together, show a high likelihood of a recovery for the TopCo Interests. *See*

Dundon Declaration ¶ 5.  Namely, the Debtors fail to discuss that TopCo's Intercompany Claims rank *pari passu* and are entitled to equal treatment with account holders' claims at subsidiaries obligated to account holders.  *See id.* at ¶ 5(c).

43.    The Disclosure Statement also fails to address certain other potential sources of value which may inure to the benefit of TopCo Interest Holders.  For example, the Disclosure Statement lacks any reference to TopCo's holding of direct or indirect equity ownership at non-Debtor subsidiaries, which one may presume to be solvent and therefore potentially confer value upon such equity, and it omits any reference to TopCo's holding direct or indirect equity ownership at Debtor subsidiaries, which could come into the money if Bitcoin and Ether were to significantly appreciate or the 3AC Loan were to provide a significant recovery.  *Id.* at ¶ 5(e).

44.    Finally, the Debtors fail to provide any meaningful information regarding TopCo Interest Holders having claims against TopCo officers and directors and derivative interests in claims of TopCo against such officers and directors, which (a) cannot be released absent significant consideration which would be for the benefit of holders of TopCo Interests, (b) the AHG has been advised may be covered, at least in part, by TopCo director and officer insurance, and (c) could be valuable even in the absence or exhaustion of such coverage on account of the significant personal wealth of at least some directors and officers.  *Id.* at ¶ 5(f).

45.    Given that there is no disclosure of information as to the Intercompany Claims and other sources of value on which a party in interest may rely for purposes of making an informed decision when voting on the Plan, the Disclosure Statement Motion should be denied until the Debtors provide a more appropriate disclosure regarding such issues.

C.    **Inadequate Disclosures Regarding Proposed Releases**

13

46.     Notwithstanding the pending investigations surrounding the Intercompany Claims, the Debtors intend to release the Debtors' directors and officers, as well as a litany of other third parties, from nearly all claims by way of the Plan. Unsurprisingly, the Disclosure Statement fails to include *any* substantive discussion regarding the consideration that the Released Parties are providing in exchange for their broad sweeping releases. Rather, the Disclosure Statement merely references the Released Parties "substantial and valuable contributions to the Debtors' chapter 11 process." Disclosure Statement § III.M [ECF No. 498 at p. 24 of 186]. By way of example, the Debtors point to the Released Parties' work "to market and sell the Debtors' assets and negotiate and implement the Plan." *Id.* The Debtors presume that this cursory statement will be adequate for Plan voting purposes and have decided that they will wait until the Confirmation Hearing to provide substantive evidence of such efforts by the Released Parties. *See id.*

47.     Courts have held that contributions are a core component of the determination of whether to approve releases of non-debtor parties. *See, e.g.*, *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005). As such, the AHG requests that the Disclosure Statement include a detailed analysis as to why the Released Parties should be entitled to the generous releases that are currently proposed in the Plan and whether the Debtors' independent directors conducted any investigation as to the propriety of the releases in connection with the Plan.

48.     The Debtors do explain that there will be no releases for the Debtors' CEO, but only with respect to causes of action against him relating to the "approval of the 3AC Loan." *Id.* § IV.A.5 [ECF No. 498 at p. 30 of 186]. However, any recovery by the Wind-Down Entity on account of such claims shall be limited to the Debtor's available D&O Liability Insurance

14

Policies and only *after* payment from such policies of all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims. *Id.* The Plan would still release the CEO from recovery against any of his personal assets which as noted above are substantial. The circumstances surrounding the Debtors' CEO and his actions with respect to the 3AC Loan are the subject of an investigation spearheaded by a Special Committee appointed by the Debtors. *See id.* § III.M [ECF No. 498 at p. 24 of 186].

49.     Quinn Emmanuel Urquhart & Sullivan, LLP ("<u>Quinn Emmanuel</u>"), following Court approval, acts as counsel to the Special Committee. *Id.* Though references are made to an investigation report in Quinn Emmanuel's monthly fee statements [ECF Nos. 358, 474], as of the filing of this Objection, the AHG has not seen any report relating to the investigation of the 3AC Loan and the Debtors' CEO. Any final report concerning the 3AC Loan investigation could have important ramifications for Plan voting purposes, and in the absence of such report, the Disclosure Statement Motion should be denied.

50.     Given the lack of investigation regarding the releases, especially in the context of the Class Action pending against TopCo and its directors and officers, the releases as currently proposed in the Disclosure Statement, including any releases in favor of the Debtors' directors and officers, are premature and inappropriate

### D.     Inadequate Disclosures Regarding the Release Opt In Provisions

51.     The Plan now includes an "opt in" provision for the releases.

102. ["*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) the Purchaser; (g) all Holders of Claims that vote to accept the Plan **and affirmatively opt into** the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan **and affirmatively opt into** the releases provided by the Plan; and (h) all Holders of Claims or Interests that

15

> abstain from voting (or are otherwise not entitled to vote) on the Plan **and affirmatively opt into** the releases provided by the Plan.]

[ECF No. 496 at p. 18 of 139] (emphasis added).

52.     The Disclosure Statement is devoid of any explanation as to how the release "opt in" provisions will work, or what impact the releases will have upon either direct or derivative claims against non-Debtor defendants where the claimant did not opt in.  For example, if the class representative for the Class Action does not opt into the releases, does that mean the releases will have no impact on the class representative proceeding with the Class Action against the non-Debtor defendants following termination of the stay, or will the releases nevertheless still bar some or all of the claims asserted in the Class Action?  TopCo Interest Holders should not be put into a "gotcha" situation if they choose to not opt into the releases, yet the releases are nevertheless used to block claims of the TopCo Interest Holders against non-Debtor defendants.  As of the preparation of this Objection, the Debtors had not filed proposed ballots and opt in forms for the Plan.  The Debtors should fully explain in the Disclosure Statement what impact if any the opt in provisions will have on claims that are being released under the Plan.

### E.     Inadequate Disclosures Regarding Substantive Consolidation

53.     While the Plan provides at Article I.G that the Debtors are not seeking substantive consolidation, the Disclosure Statement does not contain any information relating to the Debtors' intentions regarding the same.  The Plan provides only that the Debtors are using a joint plan that "presents together Classes of Claims against and Interests in the Debtors" and that they are not seeking substantive consolidation.  Plan § I.G [ECF No. 496 at p. 22 of 139].  Information must be added to Section I of the Disclosure Statement clearly explaining that (i) the separate corporate existences of the Debtors shall be retained; (ii) the filing of a single Plan does not

16

mean that there is intended to be substantive consolidation or merger of the Debtors; and (iii) each Debtor is proposing its own Plan with respect to the treatment of Claims and Interests applicable to each particular Debtor.

54.    Although the Disclosure Statement states that the Plan does not substantively consolidate the Debtors, the Disclosure Statement fails to explain the justification for the Plan having a single "Wind-Down Entity."    The Wind-Down Entity proposes to control the liquidation of the remaining assets and to distribute them under what appears to be a waterfall provision premised upon substantive consolidation. TopCo Interest Holders could be denied recovery until holders of claims from *other* Debtors are paid in full, which is substantive consolidation in practice.[4]    The Debtors have not established any basis on which to have a substantively consolidated Wind-Down Entity.    *See In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011) (burden is on the debtor to establish a basis for substantive consolidation).

55.    The details of the Wind-Down Entity are not included in the Disclosure Statement.    Rather, the Debtors propose to address the Wind-Down Entity in the Restructuring Transactions Memorandum, but the Restructuring Transactions Memorandum will not be made available until the filing of the Plan Supplement, a document that the Debtors propose to file only seven days prior to the Voting Deadline.    See Plan § I.A.85 [ECF No. 496 at pp. 12 and 16 of 139].    The Disclosure Statement provides no information as to how the terms of the Restructuring Transactions Memorandum will be determined or by whom.    See Dundon Declaration ¶ 18.    It does not state which stakeholders, if any, will be entitled to review or

---

[4] With no significant liabilities, for the TopCo "waterfall" to provide no recovery to TopCo Interest Holders, as the Disclosure Statement Estimates, a write-down of TopCo's assets of over 99% would have to occur.    Dundon Declaration ¶ 21.

approve the proposed Restructuring Transactions Memorandum, nor does it state whether this Court will be required to approve the same. *Id*.

56.     Not only have the Debtors not met their burden to prove the appropriateness of consolidation for the Wind-Down Entity, they cannot do so.  The Second Circuit uses a disjunctive, two-prong inquiry to determine whether substantive consolidation is appropriate. *In re Republic Airways Holdings Inc.*, 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017), *aff'd*, 582 B.R. 278 (S.D.N.Y. 2018).  The first prong is whether the creditors dealt with the debtors as a "single economic unit" and "did not rely on their separate identity in extending credit." *Id.* (quoting *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988)).  The second prong is whether "the affairs of the debtors are so entangled consolidation will benefit all creditors." *Id.*  "[S]atisfaction of either prong can justify substantive consolidation." *Id.*    Additionally, courts have considered whether substantive consolidation "will yield an equitable treatment of creditors without any undue prejudice to any particular group." *In re Food Fair, Inc.*, 10 B.R. 123, 127 (Bankr. S.D.N.Y. 1981).  In this case, the Debtors cannot satisfy either of the *Augie/Restivo* prongs, and they cannot be consolidated without undue prejudice to the AHG.

57.     The Debtors fail to satisfy the first prong because, among other things, creditors must rely on their separate identities when extending credit: namely, one of the Debtors is Canadian and is thereby subject to an entirely different set of regulations.  The Debtors cannot be, and in fact were not, dealt with as a single economic unit, because transactions on either side of the U.S.-Canada border will have different requirements due to varying laws and regulations that pertain to the Debtors' respective countries.

18

58.    The Debtors fail to satisfy the second prong because they have already proven that their affairs are not so entangled that consolidation is necessary.  At least, the Debtors' affairs were detangled enough to allow for separate insolvency proceedings in the United States and Canada, as well as the preparation of separate statements of financial affairs and schedules of assets and liabilities for each Debtor, delineating the separate assets and liabilities of each.  *See Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 552 (S.D.N.Y. 2008) ("[C]ourts will consider . . . whether the entities share costs or obligations; fail to observe corporate formalities; *or, in the case of a subsidiary and parent, fail to act independently*." (emphasis added)); *see also* [Case No. 22-10943, ECF Nos. 321, 429, 430; Case No. 22-10944, ECF Nos. 7, 8, 9; Case No. 22-10945, ECF Nos. 9, 10, 11].  By proving their ability to act independently, the Debtors have precluded any argument in favor of consolidation.

59.    Finally, the Debtors cannot propose a substantively consolidated Wind-Down Entity because consolidation would unduly prejudice the TopCo Interest Holders.  By consolidating the Debtors and collapsing their intercompany claims, transactions, and other separate features of each entity, the Debtors may create a structure in which distributions which would have been reserved for and distributed to the TopCo Interest Holders would instead be distributed among all of the Debtors' creditors, resulting in a dilution of any recovery for the TopCo Interest Holders.

60.    Without more information in the Disclosure Statement regarding the Debtors' intentions regarding substantive consolidation, in the formal or the informal sense, the Disclosure Statement should not be approved.  Additionally, the Court should decline to approve any form

19

of substantive consolidation in this case as the Debtors have not and cannot establish a basis for

consolidation, and any consolidation would unduly prejudice the TopCo Interest Holders.

## II.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IT DESCRIBES IS PATENTLY UNCONFIRMABLE

61.    Courts routinely hold that, if a plan is not confirmable as a matter of law, the

related disclosure statement should not be approved.  *See, e.g.*, *In re Am. Cap. Equip., LLC*, 688

F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that 'if it appears there is a defect that

makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue

at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and

rejections and a contested confirmation hearing.'" (citation omitted)); *In re Quigley Co., Inc.*,

377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable

on its face" then solicitation of votes on the plan would be futile); *In re CRIIMI MAE, Inc.*, 251

B.R. 796, 799 (Bankr. D. Md. 2000) ("It is now well accepted that a court may disapprove of a

disclosure statement, even if it provides adequate information about a proposed plan, if the plan

could not possibly be confirmed." (citations omitted)); *In re Beyond.com Corp.*, 289 B.R. 138,

140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where plan could not be

confirmed).

62.    A plan is considered "patently unconfirmable" if (i) confirmation defects cannot

be overcome by creditor voting results and (ii) those defects concern matters upon which all

material facts are not in dispute or have been fully developed at the disclosure statement hearing.

*In re Am. Cap. Equip.*, 688 F.3d at 154-55 (citing *In re Monroe Well Serv.*, *Inc.*, 80 B.R. 324,

333 (Bankr. E.D. Pa. 1987)).  In such circumstances, the related disclosure statement may not be

approved.  To do otherwise would be to impose upon a debtor's estate the costs and expenses

20

associated with an unnecessary solicitation and allow the debtor to waste further the time and resources of its creditors and this Court. *See In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

63.    The Debtors' Plan is patently unconfirmable on three principal grounds: (i) the Plan proposes to effectively cancel certain equity interests which may otherwise be entitled to distributions; (ii) the Plan violates Bankruptcy Code section 502(b); and (iii) the Plan proposes impermissible releases.

### A.    The Plan Contemplates Premature Cancellation of Certain Equity Interests Which May Be Entitled to Distributions

64.    A court may not confirm a plan of reorganization unless, among other things, one of two scenarios occurs: (i)(a) each class of claims or interest must be unimpaired under the plan or must accept the plan, *see* 11 U.S.C. § 1129(a)(8), and (b) each holder of an impaired claim or interest must accept the plan or receive the distribution to which the holder would be entitled under a chapter 7 liquidation, *see* 11 U.S.C. § 1129(a)(7); or (ii) if the plan satisfies all requirements under section 1129 except section 1129(a)(8), the plan may be confirmed if it does not discriminate unfairly and is fair and equitable to each impaired, non-accepting class of claims or interests. *See* 11 U.S.C. § 1129(b)(1).

65.    The Debtors' Plan does not satisfy either scenario and is therefore unconfirmable on its face.

66.    First, the TopCo Interests are classified in Class 9 Existing Equity Interests ("Class 9 Interests") and are impaired and are deemed to reject the Plan. *See* Plan § III.B [ECF No. 496 at pp. 25-26 of 139]. Although the Class 9 Interests are not technically being cancelled,

21

holders of such Class 9 Interests will almost certainly not receive any distribution under the Plan. Further, it is not clear that under the current Plan the holders of Class 9 Interests stand to receive the amounts they would receive under a chapter 7 liquidation. There are still certain claims subject to litigation, including but not limited to the Intercompany Claims, which, when liquidated, may provide a recovery not only to unsecured creditors, but also to TopCo Interest Holders. Additionally, the Plan contemplates the cancellation by OpCo of the Alameda Loan Facility Claims. *See* Disclosure Statement § III.D [ECF No. 498 at p. 20 of 186]. Such cancellation would extinguish OpCo's obligations under the Alameda Loan Facility, which are currently guaranteed by TopCo. *See id.* § V.C.1 [ECF No. 498 at p. 35 of 186]; s*ee also* Dundon Declaration ¶ 5. Upon extinguishment of such obligations, TopCo's guarantee will be void, and in the absence of such guarantee, TopCo lacks any material liabilities. *See* Dundon Declaration ¶¶ 5, 13, 14, 25. Indeed, under such circumstances, the Dundon Declaration confirms that the TopCo Interest Holders may very well be entitled to a significant distribution under the Plan. *See generally id.*

67.    Furthermore, by demonstrating that TopCo Interest Holders could be entitled to any recovery, let alone one as significant as is likely to be available in this case, the information in the Dundon Declaration exposes that the Plan in its current form is unable to guarantee that TopCo Interest Holders will receive the recovery to which they would be entitled under chapter 7 of the Bankruptcy Code. The current Plan seeks to subordinate TopCo Interest Holders to an extent that would remove any hope of a recovery, but the Dundon Declaration and the public information on which it is based provide that in the event of liquidation, funds would be available for distribution to TopCo Interest Holders. Accordingly, the Plan cannot satisfy the first scenario under which a plan may be confirmed.

22

68.    Second, the Plan is not "fair and equitable" with respect to the Class 9 Interests.

69.    Bankruptcy Code section 1129(b)(2)(C) provides that, to be considered fair and equitable "with respect to a class of interests," a plan must provide

> that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or . . . the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).

70.    Under the current Plan, holders of Class 9 Interests (i.e., the TopCo Interests) will almost certainly not receive the value of their respective interests because of the Plan's treatment of assets that would be available for holders of Class 9 Interests.  Additionally, there is no class of interests junior to the Class 9 Interests.  Accordingly, the Plan, by its own terms, is not fair and equitable with respect to the Class 9 Interests.  Thus, the Plan cannot satisfy the second scenario under which a plan may be confirmed.

71.    Because the Plan, by its own terms, cannot satisfy either confirmation scenario, the Plan is patently unconfirmable.  Therefore, the Court should deny the Disclosure Statement Motion.

### B.    The Plan Violates Bankruptcy Code Section 502(b)

72.    A court may only confirm a plan if such plan "complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).

73.    Pursuant to Bankruptcy Code section 502(b), claims against the bankruptcy estate "are generally valued 'as of the date of the filing of the petition.'"  *In re Lehman Bros. Holdings Inc.*, 602 B.R. 564, 582 (Bankr. S.D.N.Y. 2019) (citation omitted).  Moreover, the value of such

claims must be established "in lawful currency of the United States." 11 U.S.C. § 502(b); *see also In re Enron Corp.*, 354 B.R. 652, 657 (S.D.N.Y. 2006); *In re Glob. Power Equip. Grp., Inc.*, 400 B.R. 17, 20 (D. Del. 2009).

74.     The Debtors have openly announced their intention to flout this express provision of the Bankruptcy Code.  The Plan states explicitly: "[A]s of the Effective Date, any Claim, asserted in government issued currency . . . other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published . . . on the Effective Date."  Plan § VI.E [ECF No. 496 at p. 48 of 139].  As for Holders of Account Holder Claims, such Holders will receive, among other things, their "Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol."  *Id.* § III.C.3(c)(i) [ECF No. 496 at p. 27 of 139].

75.     Both above provisions violate section 502(b) of the Bankruptcy Code. The first provision purports to value Claims not asserted in U.S. dollars according to the applicable exchange rate on the Effective Date of the Plan rather than on the Petition Date as required by section 502(b) of the Bankruptcy Code.  *See id.* § VI.E [ECF No. 496 at p. 48 of 139]; *see also* 11 U.S.C. § 502(b).

76.     The second provision allows for distribution of certain cryptocurrency assets to Holders of Account Holder Claims without any explanation of how such assets are to be valued. Are the assets subject to "dollarization," fixing such assets at their value on the Petition Date, some other date, or is the value of such assets left to the fluctuations of the market.  *See In re RCS Cap. Dev., LLC*, No. BAP AZ-12-1381-JuTaAh, 2013 WL 3618550, at *13 (B.A.P. 9th Cir. July 16, 2013) (stating section 502(b) "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars" (quoting *In re Glob.*

24

*Power Equip. Grp.*, No. 06-11045 (BLS), 1911, 2191, 2213, 2008 WL 435197 (Bankr. D. Del.

Feb. 14, 2008), *aff'd*, 400 B.R. 17)); *see also* Plan § III.C.3(b)(i), (iii) [ECF No. 496 at p. 27 of

139].

77.     The AHG submits that the omission of a valuation method for the relevant

cryptocurrency assets is an intentional one, considering how the Debtors have repeatedly

reassured the Court and other parties in interest that these Chapter 11 Cases are being run for the

benefit of the Debtors' customers.

78.     In their August 4, 2022 Second Day Hearing Presentation (the "Second Day

Hearing Presentation"), the Debtors insist that "[t]hese chapter 11 cases are for customers." *See*

Second Day Hearing Presentation at 8.  In the Disclosure Statement, the Debtors explain that

they "worked tirelessly to identify the most value-maximizing transactions for their customers

and other creditors."  Disclosure Statement § II [ECF No. 498 at p. 14 of 186].  The Debtors'

strategy for maximizing value for customers appears to include ensuring that the value of any

cryptocurrency assets distributed to customers is not fixed in accordance with section 502(b),

with the possible detriment to other classes of stakeholders.

79.     Because the Debtors seek through the Plan to circumvent the express language of

section 502(b), the Debtors' Plan does not comply with the applicable provisions of the

Bankruptcy Code and is therefore unconfirmable.  *See* 11 U.S.C. § 1129(a)(1).

**C.     The Releases Contained in the Plan are Impermissible**

80.     Article VIII of the Plan provides for broad releases of various non-Debtor parties

(each, a "Released Party" and, collectively, the "Released Parties")[5] in these Chapter 11 Cases.

---

[5] "Released Parties" is defined in the Plan as, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) Alameda and each of its Related

Paragraph VIII.B of the Plan provides that the Debtors and their Estates will release (the "Debtor Releases") the Released Parties from "any and all Claims asserted or that could have been asserted . . . *including any derivative Claims*" (emphasis added), while paragraph VIII.C provides that an extensive list of third parties (the "Releasing Parties")[6] will release (the "Third Party Releases" and, together with the Debtor Releases, the "Releases") the Released Parties from the same. *See* Plan §§ VIII.B, VIII.C [ECF No. 496 at pp. 54-55 of 139].

81.    For the reasons set forth below, the Releases render the Plan patently unconfirmable. Accordingly, unless the Releases are excised from the Plan, the Disclosure Statement cannot be approved.

### i.    The Debtor Releases are Impermissible

82.    The United States Court of Appeals for the Second Circuit has stated that courts should not approve non-debtor releases "absent the finding that truly unusual circumstances render the release terms important to success of the plan." *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143. In making this determination, courts should consider, *inter alia*, whether (i) "the estate received substantial consideration," *id.* at 142 (citing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992)); (ii) "the enjoined claims were 'channeled' to a settlement fund rather than extinguished," *id.* at 142 (citing *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d

---

Parties; (f) each of the Released Professionals; and (g) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F of the Plan). *See* Plan § I.A.99 [ECF No. 496 at p. 18 of 139].

[6] "Releasing Parties" is defined in the Plan as, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) the Purchaser; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan. *See* Plan § I.A.102 [ECF No. 496 at p. 18 of 139].

89, 93-94 (2d Cir. 1988); *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 701 (4th Cir. 1989)); (iii) "the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution,'" *id.* citation omitted; (iv) "the plan otherwise provided for the full payment of the enjoined claims," *id.*; or (v) "the affected creditors consent [to the releases]." *Id.* (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)) (romanettes (i)-(v), collectively, the "*Metromedia* Considerations").

83.     The Debtor Releases contained in the Plan do not satisfy any of the *Metromedia* Considerations. As an initial matter, the Debtors do not purport to pay all (or any) of the claims to be enjoined, and this is not a case involving the channeling of claims to a settlement fund, so the Debtor Releases cannot satisfy these two *Metromedia* Considerations.

84.     Furthermore, the Debtors provide no evidence of any substantial consideration provided by the Released Parties.  That is because there is no such consideration.  Certainly, the Debtors' officers and directors have not merited such releases simply by steering the Company through bankruptcy.   Indeed, "[t]here are plenty of officers and directors of non-bankrupt companies who have to steer their companies through difficult situations," and such officers and directors do not receive any such releases.  *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019).  Within or without of bankruptcy, disposal of potential litigation claims is not a reward for simply doing one's job.  *See Aegean Marine*, 599 B.R. at 728-29 ("I am sure that [the officers and directors of non-bankrupt companies] would also like to dispose of potential litigation claims against them as a reward for the work that they have done. But that is not recognized as a ground on which to terminate litigation claims outside of bankruptcy.  There is no reason why it should constitute an excuse to terminate litigation claims just because a company is emerging from bankruptcy. . . . [T]he directors did what they were

paid to do, and that does not mean they are entitled to releases of third-party claims, particularly when those releases really are not necessary or important to the accomplishment of the restructuring transactions."). Moreover, it is dubious that a suit against the Debtors' officers and directors would "indirectly impact" or otherwise hinder the Debtors' reorganization in any way, particularly given that the Plan is a liquidating plan with the Debtors' officers and directors having no role in the winddown following any Plan effective date.

85.      Put simply, there are no facts present here to warrant the proposed Debtor Releases in favor of the Released Parties and the Disclosure Statement fails to articulate any justifications in support of the same. Accordingly, unless substantially revised, the Debtor Releases render the Plan unconfirmable as a matter of law.

### ii.      The Third Party Releases are Impermissible and Nonconsensual

86.      Paragraph VIII.C of the Plan provides Third Party Releases of the Debtors, their directors and officers, and other third parties.[7]  Such Third Party Releases fail to satisfy the

---

[7] The Third Party Releases encompass almost any imaginable scenario. *See* Plan § VIII.C [ECF No. 496 at pp. 54-55 of 139] ("[E]ffective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in this Article VIII.C shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order. ").

*Metromedia* Considerations, are overly broad, and with respect to certain parties, are nonconsensual.

87.    As discussed above, the Debtors have provided no evidence of substantial consideration in return for releases, there is no plan to channel claims into a settlement fund, and the Debtors are not seeking to pay the claims that will be enjoined. Moreover, it is not at all certain that the affected creditors have or will consent to the Third Party Releases. Thus, the Third Party releases fail to satisfy the *Metromedia* Considerations.

88.    The Third Party Releases are also impermissibly broad. Given the unduly expansive scope of these releases, the AHG asserts that the intent of the Third Party Releases is to improperly insulate the Debtors and their directors and officers from nearly all prepetition causes of action, which are the subject of ongoing discovery and investigation, and a pending Class Action. Given the pending discovery into these potentially case-defining matters, it is improper and premature to solicit a plan that will extinguish potentially valuable claims while providing TopCo Interest Holders with no recovery.

89.    Given the breadth of the Third Party Releases that the Debtors seek to impose in the Plan, the Disclosure Statement should contain information explaining why such Third Party Releases are the result of rare and unique circumstances under the facts of this case and as such, are likely to be approved by the Court. *See In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique . . . . But where those circumstances haven't been shown, third-party releases can't be found to be 'appropriate.'" (citations omitted)).

29

90. The Debtors have not provided any evidence that the parties being granted Third Party Releases have done anything more than "things that were positive to the process." *Aegean Marine*, 599 B.R. at 727. As previously noted, we will have to wait until the confirmation hearing to see such evidence. In the meantime, the Debtors have provided no basis for their impermissible, overly broad, and nonconsensual Third Party Releases. Moreover, the AHG submits that there is no such basis, and in the absence of the same, the Plan is unconfirmable.

**D. The Exculpation Provision in the Plan Exceeds the Scope of Section 1125(e) of the Bankruptcy Code**

91. Paragraph VIII.D of the Plan provides that the Released Parties will be exculpated from liability for, in relevant part:

> any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence . . .

Plan § VIII.D [ECF No. 496 at p. 55 of 139].

92. In contrast to this Plan provision, section 1125(e) of the Bankruptcy Code provides as follows:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good

faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).

93.    The Plan's exculpation provision exceeds the parameters of section 1125(e) of the Bankruptcy Code as it has been interpreted in this District.  The provision provides exculpation for liability in connection with a wide variety of transactions and events (including but not limited to "*any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases . . .*") not provided for in section 1125(e).  *See* Plan § VIII.D [ECF No. 496 at p. 55 of 139] (relevant portion quoted in paragraph 91 above) (emphasis added).

94.    Moreover, by its own terms, the exculpation provision would impermissibly "bar the enforcement of contracts that were entered into in the course of the case and that were approved by the Court."  *Aegean Marine*, 599 B.R. at 721.  Rather, "an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court." *Id.*

95.    For these reasons, the Plan is patently unconfirmable unless the exculpation provision is revised consistent with the parameters of section 1125(e) of the Bankruptcy Code. Accordingly, the Court should deny the Motion unless the exculpation provision is appropriately modified.

31

## RESERVATION OF RIGHTS

96.    The objections set forth herein are limited to the AHG's objections to the Disclosure Statement and are not intended, nor should they be construed, to represent all of the objections the AHG may have to any chapter 11 plan or plans the Debtors have filed or may file. The AHG reserves all of its rights with respect thereto.

## CONCLUSION

**WHEREFORE**, the AHG respectfully requests that the Court enter an order: (i) denying the Motion or, in the alternative, requiring the Debtors to further amend the Disclosure Statement, and provide sufficient time for creditors to review the newly revised disclosure statement prior to the hearing to approve the same, so as to address the issues and concerns raised in this Objection; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: October 12, 2022          _/s/ David M. Posner_____
**KILPATRICK TOWNSEND & STOCKTON LLP**
David M. Posner, Esq.
Kelly Moynihan, Esq.
The Grace Building
1114 Avenue of the Americas
New York, New York 10036-7703
Telephone:  (212) 775-8700
Facsimile:  (212) 775-8800
Email:  dposner@kilpatricktownsend.com
           kmoynihan@kilpatricktownsend.com

-and-

Paul M. Rosenblatt, Esq.
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile:  (404) 815-6555
Email: prosenblatt@kilpatricktownsend.com

*Counsel to the Ad Hoc Group of Equity Holders of Voyager Digital Ltd.*