Hearing Date: October 19, 2022 at 2:00 p.m. (ET)
Objection Deadline: October 12, 2022 at 4:00 p.m. (ET)

David M. Posner                          Paul M. Rosenblatt, Esq.
Kelly E. Moynihan                        **KILPATRICK TOWNSEND &**
**KILPATRICK TOWNSEND &**                **STOCKTON LLP**
**STOCKTON LLP**                         1100 Peachtree Street NE, Suite 2800
The Grace Building                       Atlanta, GA 30309
1114 Avenue of the Americas              Telephone: (404) 815-6500
New York, NY 10036                       Facsimile: (404) 815-6555
Telephone: (212) 775-8700                Email: prosenblatt@kilpatricktownsend.com
Facsimile: (212) 775-8800
Email: dposner@kilpatricktownsend.com
        kmoynihan@kilpatricktownsend.com

*Counsel to Ad Hoc Group of Equity Interest Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                          :
In re:                                                    :        Chapter 11
                                                          :
VOYAGER DIGITAL HOLDINGS, INC., et al.,[1]                :        Case No. 22-10943 (MEW)
                                                          :
                                                          :        (Jointly Administered)
                              Debtors.                    :
                                                          :
------------------------------------------------------------------:


**DECLARATION OF MATTHEW DUNDON IN SUPPORT OF THE OBJECTION OF THE AD HOC GROUP OF EQUITY INTERESTS HOLDERS TO THE DEBTORS' MOTIONS FOR ENTRIES OF ORDERS APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, SOLICITATION AND NOTICE PROCEDURES, FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND CERTAIN DATES WITH RESPECT THERETO**

        I, Matthew Dundon, hereby declare that the following is true to the best of my

knowledge, information and belief[2]:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] This Declaration relies solely upon the Debtors' own public disclosures and assertions to this Court. The AHG and I reserve the right to modify or withdraw any portion of this Declaration if evidence is established that contradicts the Debtors' disclosures to date and, accordingly, contradicts the views expressed below.

I submit this declaration (this "<u>Declaration</u>") in support of the objection filed herewith (the "<u>Objection</u>") of the Ad Hoc Group of Equity Interest Holders (the "<u>AHG</u>") to the approval of the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (ECF No. 289) (the "<u>Disclosure Statement Approval Motion</u>") and the AHG's limited objection to the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* (ECF No. 472) (the "<u>APA Approval Motion</u>").

## I.    Qualifications of Declarant

1.    I am a principal of Dundon Advisers LLC, a financial and investment advisory firm founded in February 2016 based in White Plains, New York ("<u>Dundon</u>"). I graduated from the University of California at Berkeley and the University of Chicago Law School in December 1993 and June 1998, respectively. I was admitted to practice law in Massachusetts and New York in December 1998 and February 1999, respectively. Other than a brief interlude in the technology business, I practiced corporate and transactional law in New York City from August 1998 to August 2003. I commenced my career in finance in August 2003 when I became a distressed debt and equity analyst with the institutional securities brokerage firm then known as Miller Tabak Roberts Securities, LLC and now known as StoneX Credit ("<u>MTR</u>"). In June 2006, I was promoted to be the head of securities research for MTR. In the course of my work for MTR, I received the Series 7 and 23 registrations (general securities representative), Series 24 registration (general securities principal), and Series 86 and Series 87 registrations (securities analyst); each of these registrations is presently inactive. In May 2010, I joined Pine River Capital Management, LP as a portfolio manager with responsibility for high yield and distressed credit and opportunistic

equity investments. In December 2014, having been part of Pine River's growth in assets under management from under $2 billion to over $10 billion, I joined Advent Capital Management, LLC in a capacity similar to my Pine River role. I was involved in hundreds of complex Chapter 11 proceedings in these roles dating back to the 1990s, and analyzed many of those, and hundreds more, capital structures from the standpoint of investment of risk and reward, most certainly including intercompany complexities such as are the general subject of this Declaration.

2.      I founded Dundon in February 2016. Since its foundation, Dundon has grown to over 30 associated professionals, and has acted as financial adviser to (a) 78 Chapter 11 official and *ad hoc* creditor and investor groups and committees, and (b) debtors, asset buyers and discreet creditors in more than 100 other Chapter 11 proceedings and out-of-court restructurings. I participate or participated to at least some extent in almost every one of those engagements and was or am the hands-on engagement leader of many of those engagements.

3.      Dundon's and my experience includes the two sizeable Chapter 11 cases involving blockchain/cryptocurrency operators besides these Chapter 11 Cases: *In re Cred, Inc., et al.*, (Del. 20-12836-JTD) and *In re Celsius Network LLC* (SDNY 22-10964-MG). In the *Cred* cases, Dundon advised the Official Committee of Unsecured Creditors, and presently advises the Liquidating Trust. In the *Celsius* cases, Dundon advises the holder of a claim more than $20 million. I personally lead each of these engagements.

4.      On August 29, 2022, Dundon commenced services as financial adviser to the AHG. I understand the AHG to consist of numerous holders of common stock of Voyager Digital Ltd. ("TopCo") and the lead plaintiff in a lawsuit filed in Canada on behalf of a class of TopCo common

stockholders.[3] I lead Dundon's services to the AHG.

## II.    Summary

5.        The Debtors' own public documents, statements, and schedules make it clear that equity interests in TopCo ("TopCo Interests") are likely "in the money" and should receive a recovery under the Debtors' Plan.   These bases include:

      (a)        the invalidity of the Alameda loan obligation, which TopCo is purported to have guaranteed.   The Debtors' *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 496) (the "Plan") cancels the loan;

      (b)        TopCo having, according to the Debtors' schedules and the *Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 497) (the "Disclosure Statement"), *no* material liabilities, including, but not limited to, arising from any guarantee of or assumption of responsibility to any other Debtor's obligations to its account holders or other general unsecured creditors;

      (c)        TopCo holding (by the Debtors' admission) at least $230 million in intercompany claims due from its subsidiaries, which rank at least *pari passu* with account holders and other general unsecured creditors' claims at subsidiaries obligated to such creditors (the "Disclosed TopCo Claims");

      (d)        TopCo holding direct or indirect equity ownership of *non-Debtor* subsidiaries,

---

[3] For more information regarding the Canadian class action suit, which is pending in the Ontario Superior Court of Justice (Court File Number CV-22-00683699-00CP), see the Notice of Action regarding the same, which is attached hereto as **Exhibit 1**.

whose presumed solvency confers value upon such equity;

(e)      TopCo holding direct or indirect equity ownership at Debtor subsidiaries, which could come into the money if Bitcoin and Ether were to significantly appreciate and/or the 3AC loan were to provide a significant recovery; and

(f)      holders of TopCo Interests ("TopCo Interest Holders") having direct claims against TopCo officers and directors, and derivative interest in claims of TopCo against such officers and directors, which

     (i)      cannot be released under the Plan or any subsequent Chapter 11 plan absent significant consideration which would be for the benefit of TopCo Interest Holders,

     (ii)      I am advised may be covered, at least in part, by significant TopCo director and officer liability insurance, and

     (iii)      could be valuable even in the absence or exhaustion of such coverage on account of the significant personal wealth of at least some directors and officers – recourse to which the Plan appears to bar and release.

6.      The Disclosure Statement provides no disclosure of any of the above-described bases to believe TopCo Interests have significant value.

7.      Taking into account the Disclosed TopCo Claims, I believe the Plan and the proposed asset purchase Agreement between Voyager Digital, LLC ("OpCo") and West Realm Shires, Inc. ("FTX") (the "APA") should provide for (a) TopCo to have all the rights, including elections, if any, under the APA, of any other OpCo general unsecured creditors and (b) an effective means for TopCo Interest Holders to control TopCo's exercise of those rights and receive substantially all the benefit of such exercise.

8.      The Disclosure Statement provides no disclosure of why the Plan, in my view impermissibly:

    a. can or should place Disclosed TopCo Claims and other intercompany claims at risk of disallowance or subordination by means of a Restructuring Transactions Memorandum regarding which there is no disclosure of what its terms might be, or how its terms might be arrived at, or how it could or should be subject to approval by stakeholders or this Court;

    b. appears to consolidate residual value in a single "Wind-Down Entity" and subordinate *all* Debtors' equity interests, including TopCo Interests, until *all* claims are paid in full, notwithstanding the absence of substantive consolidation;

    c. provides for director and officer releases without apparent consideration, limits recovery on non-released claims against certain directors and officers to available director and officer insurance proceeds, and protects the Debtors' Chief Executive Officer from any personal liability, notwithstanding his over $40 million in proceeds of share sales[4] and other indicia of wealth; and

---

[4] According to the (Canadian) System for Electronic Disclosure by Insiders ("SEDI"), accessed electronically at SEDI.ca on October 8, 2022, Chief Executive Officer Stephen Ehrlich and entities under his control sold stock in 2021 for reported proceeds of $39.2 million, as set forth below.

| Trade | Shares Sold | Average Price | Proceeds |
|---|---|---|---|
| 2/9/2021 | 124,031 | $17.11 | $2,122,170.41 |
| 2/9/2021 | 126,609 | $17.11 | $2,166,279.99 |
| 2/9/2021 | 1,149,360 | $17.11 | $19,665,549.60 |
| 3/19/2021 | 50,000 | $30.19 | $1,509,500.00 |
| 3/22/2021 | 8,800 | $31.00 | $272,817.60 |
| 3/22/2021 | 15,000 | $32.25 | $483,750.00 |
| 3/26/2021 | 96,900 | $30.41 | $2,946,729.00 |
| 3/29/2021 | 135,000 | $31.43 | $4,243,050.00 |
| 3/30/2021 | 89,000 | $30.80 | $2,741,200.00 |
| 3/31/2021 | 100,000 | $31.00 | $3,100,000.00 |
| **Total Proceeds** | | | **$39,251,046.60** |

A copy of the SEDI page containing this information is attached hereto as **Exhibit 2**.

d. does not clearly vest in the TopCo Interest Holders the right to appoint any trustees,
plan administrators or similar fiduciaries in respect of any liquidating or wind-down
entity that might be responsible for the enforcement of TopCo's rights and
fulfillment of TopCo's obligations under a confirmed and effective Chapter 11 Plan
and/or CCAA Plan of Arrangement.

9.      I believe that the denial of the Motion would not prejudice the Official Committee
of Unsecured Creditors appointed in these Chapter 11 Cases, or any other party in interest, from
seeking to refute the Debtors' public information upon which this Declaration relies and establish
the existence of an intercompany regime more favorable to account holders or other general
unsecured creditors, nor would such denial necessarily impose any significant delay in account
holders receiving recoveries.  For example, and without limiting the generality of the foregoing
statement, I believe that the AHG would be content with modifications to the Plan and APA, and
corresponding disclosures in a modification to the Disclosure Statement.    Acceptable
modifications would provide that recoveries on account of Disclosed TopCo Claims be placed in
escrow which would not be disbursed until any reasonable challenge to the validity or ranking of
the Disclosed TopCo Claims was resolved and would then be disbursed in accordance with such
resolution(s).  Such a modification would permit the disbursement of the initial allocation of
recoveries to account holders (treating the Disclosed TopCo Claims as if allowed) while the
resolution of such disputes was pending.

## III.    Materials Primarily Relied Upon in this Declaration

10.     I have primarily relied upon (a) the Debtors' filings in these Chapter 11 Cases, most
notably the Chapter 11 petitions[5], *Declaration of Steven Ehrlich, Chief Executive Officer of the*

---

[5] Case No. 22-10943 ECF Nos. 1, 14; Case No. 22-10944 ECF Nos. 1, 3, 4; Case No. 22-10945 Case Nos. 1, 3, 4.

*Debtors, in Support of Chapter 11 Petitions and First Day Motions* (ECF No. 15) (the "Ehrlich Declaration"), the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities[6], the Disclosure Statement, the Plan, the APA, and the APA Approval Motion; (b) the *First Report of the Information Officer* dated August 8, 2022 (the "First Information Officer Report"), a true and correct copy of which is attached hereto as **Exhibit 3** and the *Second Report of the Information Officer* dated September 30, 2022, a true and correct copy of which is attached hereto as **Exhibit 4**[7] (the "Second Information Officer Report"), each of which was filed in filings made by or for certain of the Debtors in their "recognition" proceedings pending in the Ontario (Canada) Superior Court of Justice under the Companies' Creditors Arrangement Act (the "CCAA Proceedings"); (c) the Debtors' "First Day Presentation" and "Second Day Presentation" hearing presentations as available for download at https://cases.stretto.com/Voyager; and (d) (U.S.) Securities and Exchange Commission and (Canadian) System for Electronic Document Analysis and Retrieval ("SEDAR") shareholdings data compiled by and retrieved from the Bloomberg Professional Service and SEDI filings compiled by and retrieved from the SEDI official website.

## IV.    Discussion

11.    The Debtors provide in the Second Day Presentation that "[t]hese chapter 11 cases are for customers" seeking to "provide[] the greatest possible recovery to customers." *See* Second Day Presentation, p. 8.  The Debtors stated at the inception of these Chapter 11 Cases, and the Disclosure Statement and proposed Plan confirm, that these cases are being run primarily for the benefit of the customers.  These Chapter 11 Cases must, instead, be run for the benefit of all holders

---

[6] Case No. 22-10943 ECF Nos. 311, 312, 321, 429, 430; Case No. 22-10944 ECF Nos. 6, 7, 8, 9; Case No. 22-10945 Case Nos. 7 - 11.

[7] Information related to and filings in connection with the CCAA Proceedings can be accessed here: https://www.alvarezandmarsal.com/VoyagerDigital#intro.

of the Debtors' various claims and interests.

12.     The Plan expressly disclaims substantive consolidation of the Debtors consistent with the priority scheme under the Bankruptcy Code. Plan § I.G. Accordingly, all analysis of proper recoveries under the Plan must be performed on a Debtor-by-Debtor basis. Intercompany claims and interests cannot be disregarded if that would tend to distort Debtor-by-Debtor recoveries. The Disclosure Statement does not explain how it can be justified for the Plan to have a single "Wind-Down Entity" that controls the assets not sold under the APA and distributes them under what appears to be a waterfall provision under which TopCo Interest Holders might be denied recovery until holders of claims on *other* Debtors were paid in full, which is substantive consolidation in practice. The Plan appears to be patently unconfirmable without corrected provisions in this regard.

13.     The *Schedule of Assets and Liabilities of Voyager Digital Ltd.* (Case No. 22-10944 ECF Nos. 6, 8, 9) (the "TopCo Schedules") and the *Statement of Financial Affairs of Voyager Digital Ltd.* (Case 22-10944 ECF No. 7) represent themselves to be, and I understand they are required by law and rule to be, the Debtors' best current estimate of TopCo's financial condition, including assets and liabilities and certain other material matters, having made due inquiry into the same.

14.     Notable disclosures within the TopCo Schedules include:

| Disclosed item | Amount | Source |
|---|---|---|
| Total property | $233.1 million | ECF No. 8, page 25 |
| Total liabilities | $1.6 million | *Id.* |
| Cash on hand | $2.5 million | ECF No. 8, p. 26 |
| Coinify IP interests | $2.0 million | ECF No. 8, p. 32 |
| Intercompany receivable – revolver | $1.5 million | ECF No. 8, p. 33 |
| Intercompany receivables – presented under "Other property" | $229.9 million | ECF No. 8, p. 34 |
| Secured debt | Nil | ECF No. 8, p. 37 |
| Priority unsecured claims | Nil | ECF No. 8, p. 39 |
| Non-priority unsecured claims | $1.6 million | ECF No. 8, p. 40 |
| Amount of non-priority unsecured claims owed to subsidiaries | Nil | ECF No. 9, p. 41 |
| Amount of non-priority unsecured claims owed to subsidiaries' account holders or depositors | Nil | *Id.* |
| Executory contracts with subsidiaries' account holders or depositors | Nil | ECF No. 8, p. 43 |
| Co-Debtors also responsible certain TopCo debts | Voyager Digital Holdings, Inc. Voyager Digital LLC | ECF No. 8, pp. 45,46 |
| Total payments made by TopCo in 90 days pre-petition | $0.1 million | ECF No. 7, p. 37 |

15.    The OpCo Schedules of Assets and Liabilities (Case No. 22-10945 ECF No. 9)

reflect, in pertinent part:

| Disclosed item | Amount | Source |
|---|---|---|
| Total property | $1.52 billion | ECF No. 9, p. 25 |
| Total liabilities | $465.2 million | *Id.* |
| Cash on hand | $97.1 million | ECF No. 9, p. 26 |
| Intercompany receivable from Voyager Digital Holdings | $26.3 million | ECF No. 9, p. 33 |
| Intercompany receivables – presented under "Other property" | $229.9 million | ECF No. 9, p. 34 |
| Secured debt | Nil | ECF No. 9, p. 39 |
| Priority unsecured claims | Nil | ECF No. 9, p. 41 |
| Non-priority unsecured claims | $465.3 million | ECF No. 9, p. 40 |
| Amount of non-priority unsecured claims owed to subsidiaries | Nil | ECF No. 9, p. 41 |
| **Amount of non-priority unsecured claims owed to TopCo** | **$217.4 million** | ECF No. 9, p. 41 |

16.    The Information Officer filed the Second Information Officer Report on September

30, 2022.  *See* Exhibit 4.  The Information Officer understands that the amount owing to TopCo,

as of the Petition Date, is $217.5 million, $80.4 million of which is documented by certain loan

agreements and $137.1 million of which the Information Officer asserts is characterized as debt

on the books and records of TopCo.  *See* Second Information Officer Report ¶ 6.2.  In addition,

the Information Officer understands that the amount owing to TopCo from Voyager Digital

Holdings, Inc. includes (i) a $6.3 million intercompany unsecured debt facility for which a loan

agreement is in place, and (ii) $2.1 million on account of unsecured intercompany receivables

relating to allocation of expenses and management fees, recharges of bills paid on behalf of one another and cash movements between the two entities. *Id.* at ¶ 6.3. The Information Officer further understands that approximately $46 million was advanced to OpCo from TopCo in the form of equity and $16 million was advanced to Voyager European Holdings ApS by TopCo in the form of equity for acquisition of Coinify in 2022. *Id.* at ¶ 6.5.

17.     The Disclosure Statement does not explain the Plan's proposal to make the status of the intercompany claims (including but not limited to the $233.1 million owed to TopCo) subject of the unspecified and unaccountable Restructuring Transactions Memorandum. Plan § III.C. The Disclosure Statement provides no legal basis for the Plan's provision for a Restructuring Transactions Memorandum that will determine the treatment, including subordination or cancellation, of intercompany claims, including the Disclosed TopCo Claims. The Disclosure Statement does not include any information regarding how the terms of the Restructuring Transactions Memorandum will be determined or by whom nor which stakeholders, if any, will be entitled to review or approve of the Restructuring Transactions Memorandum. It does not provide any evidence contradicting the Debtors' many other disclosures demonstrating that the Disclosed TopCo Claims validly exist. It does not state whether this Court will be required to approve the proposed Restructuring Transactions Memorandum, or what standards of fact or law ought to govern the Court's consideration of such approval if required.

18.     The Disclosure Statement does not maintain that intercompany claims against certain Debtors should be subordinated to third party claims, including account holder claims, against such Debtor. Nevertheless, the Disclosure Statement estimates that all intercompany claims will receive a 0% recovery. Disclosure Statement § III.D (ECF No. 498 at p. 21 of 186).

19.     The Debtor's Chief Executive Officer asserts that TopCo was a guarantor of the

Alameda loan, the balance of which was approximately $75 million at the Petition Date. *See* Ehrlich Declaration ¶ 32. The Plan provides that holders of claims relating to the Alameda loan "will not receive any distribution." Plan § III.D.4. This Plan provision, together with the omission of liability for the Alameda loan from the TopCo Schedules, implies that TopCo has no liability to Alameda.

20.     Other than with respect to the Alameda loan, at no place do the Ehrlich Declaration, the TopCo Schedules, or the Disclosure Statement assert that TopCo is a guarantor or otherwise responsible for the liabilities of any of its subsidiaries. For the TopCo "waterfall" to provide no recovery to TopCo Interest Holders, as the Disclosure Statement estimates (ECF No. 498 at page 21 of 186), a write-down of TopCo's assets of over 99% would have to occur. For the Plan to rely upon a certainty of such write-down occurring, detailed explanation is due.

21.     The First Information Officer Report and Second Information Officer Report do not disclose any obligation of TopCo to any of its Debtor or non-debtor subsidiaries or to any creditor of any other entities (such as account holders). *See* First Information Officer Report and Second Information Officer Report. The First Information Officer Report describes TopCo as "a holding company whose primary functions are (i) to raise capital and fund the operations of the Voyager Group through various intercorporate funding arrangements, and (ii) act as an unsecured guarantor of the Alameda Loan Facility." *Id.* at ¶ 4.9. The Information Officer makes clear that the Debtors' understanding of TopCo was as a recipient of, and intercompany transferor of, investment proceeds. The Information Officer confirms that none of TopCo's cash on hand is supposed to be used by or for the benefit of any other of the Debtors, although it might be transferred for convenience's sake to Voyager Digital Holdings, Inc. *See* First Report of the Information Officer. at ¶ 4.17.

22.     The Disclosure Statement does not explain or justify the Debtors' proposal that TopCo, as a holder of Disclosed TopCo Claims and intercompany interests, ought to be "Presumed to Accept" the Plan.  If acting in its own interest, one would presume that TopCo through its independent directors would insist that the Disclosed TopCo Claims be distributed to holders of claims against and interests in TopCo to pursue directly.

23.     I am advised there is no binding authority that permits the value of a bankruptcy claim arising from obligation to return or repay cryptocurrency to float with the post-petition market value of that cryptocurrency.  Rather, I am advised that the requirements of section 502(b) of the Bankruptcy Code are that the value of the claim be reduced to a specific dollar amount as of the Petition Date which is colloquially called "dollarization."  I am advised, and it is further my experience in my involvement in crypto industry bankruptcies, that this is one of the most hotly contested and speculated-about issues for crypto industry bankruptcies.

24.     The Second Day Presentation states that the Debtors are "not looking or seeking to capture upside in the markets by freezing claims as of the Petition Date," *i.e.*, the Debtors do not intend to dollarize the claims of the customers.  *See* Second Day Presentation, p. 9.  It appears to me that an important design element of the Plan would have the effect of permitting floating claim valuation to a significant effect.  The Disclosure Statement does not include any information regarding TopCo's consenting to this approach.  Importantly, I note it is far from certain that customer creditors will benefit from the floating-not-fixed presumption the Debtors have made.  While it is true that non-cryptocurrency-denominated claimants, including intercompany claimants, would benefit from a fixed claim approach in a rising cryptocurrency price environment, it would be cryptocurrency-based claimants who would relatively suffer in a *falling* price environment.  As I prepare this Declaration, Bitcoin is trading at $19,095 – roughly in line with its

price on the Petition Date and down over 20% from its local high after the Petition Date.

25.    Past and present directors and officers may have violated their duties to TopCo and/or TopCo Interest Holders.  As noted, one member of the AHG is the proposed representative plaintiff[8] in a Canadian securities law class action suit, presently stayed, advancing claims directly for the class against TopCo and certain directors and officers for violations of securities disclosure obligations. Claims arising from those violations may be property of TopCo Interest Holders.  If it is concluded that there is a basis for claims alleging that the directors and officers violated their duties to TopCo, those claims may benefit the TopCo Interest Holders to the extent they are property of TopCo. In both cases, those claims may be valuable considering the personal wealth of certain TopCo officers and directors[9] and the value of any director and officer insurance.[10] Notwithstanding the opt-in nature of the releases, the Plan limits recourse *only* to available director and officer insurance and *expressly* excludes the Chief Executive Officer's personal assets,

---

[8] A proposed representative plaintiff in a Canadian securities class action is akin to a lead plaintiff in a U.S. class action.

[9] For example, according to SEDI, accessed electronically at SEDI.ca on October 8, 2022, Chief Executive Officer Stephen Ehrlich and entities under his control sold stock in 2021 for reported proceeds of $39.2 million.

| Trade | Shares Sold | Average Price | Proceeds |
|---|---|---|---|
| 2/9/2021 | 124,031 | $17.11 | $2,122,170.41 |
| 2/9/2021 | 126,609 | $17.11 | $2,166,279.99 |
| 2/9/2021 | 1,149,360 | $17.11 | $19,665,549.60 |
| 3/19/2021 | 50,000 | $30.19 | $1,509,500.00 |
| 3/22/2021 | 8,800 | $31.00 | $272,817.60 |
| 3/22/2021 | 15,000 | $32.25 | $483,750.00 |
| 3/26/2021 | 96,900 | $30.41 | $2,946,729.00 |
| 3/29/2021 | 135,000 | $31.43 | $4,243,050.00 |
| 3/30/2021 | 89,000 | $30.80 | $2,741,200.00 |
| 3/31/2021 | 100,000 | $31.00 | $3,100,000.00 |
| **Total Proceeds** | | | **$39,251,046.60** |

[10] I am advised by counsel to the AHG that the existence of D&O insurance has been disclosed to such counsel by counsel to the Debtors.

including those derived from almost $40 million of stock sales, from any recourse. Plan § IV.F. The Plan also appears to place control of the causes of action, and their proceeds, in the custody of a single Wind-Down Entity which would disburse the proceeds to creditors without regard to which entity those creditors had claims against, before permitting any disbursement to TopCo Interests. *Id*. At no point does the Disclosure Statement seek to explain or justify these limitations and channelings. The Plan is unclear as to how TopCo itself may opt-out of such releases if it determines that granting such releases is not in *its* interest or those of *its* creditors and interest holders.

26.     I did not participate in the non-public elements of the Debtors' sale and auction process, nor did any other advisor to the AHG who might have informed me. In my view, the APA appropriately provides generically for all holders of general unsecured claims upon OpCo to have elections and participations; however, when read together with the Plan, the APA does not sufficiently provide for Disclosed TopCo Claims on OpCo of over $217 million, in that there does not appear to be a proposed creation of potential account(s) for TopCo at FTX, which is an essential feature of the consummation of the APA. The Disclosure Statement provides no disclosure regarding this complication.

27.     On August 17, 2022, the Debtors announced on a SEDAR release that they had sold Coinify for $2 million.[11] Coinify ApS is a wholly owned subsidiary of non-debtor Voyager European Holdings ApS, which is a wholly owned subsidiary of TopCo. Disclosure Statement § VII.I (ECF No. 498 at p. 45 of 186). The Disclosure Statement does not value the direct and indirect subsidiaries of the Debtors which are non-Debtors (with no intermediate Debtor ownership). Intercompany claims of TopCo, if any, upon such subsidiaries are presumably worth

---

[11] *See* "Voyager Announces Coinify Sale" attached hereto as **Exhibit 5**, accessed through SEDAR.

par because such non-debtor entities are presumed to be solvent given the apparent lack of any disclosure of liabilities or claims at those entities. Additionally, their equity interests may be worth something as well. The Disclosure Statement provides no discussion or justification for the Plan's deprivation of TopCo Interest Holders' rights to any value as a result of the Coinify sale or any asset sales with respect to other non-debtor subsidiaries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 12, 2022                    /s/ Matthew J. Dundon
                                           Matthew J. Dundon

## **EXHIBIT 1**

Notice of Class Action

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP



Court File No.

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

B E T W E E N :

FRANCINE DE SOUSA

Plaintiff

- and -

VOYAGER DIGITAL LTD., STEPHEN EHRLICH, PHILIP EYTAN, EVAN PSAROPOULOS, LEWIS BATEMAN, KRISZTIÁN TÓTH, JENNIFER ACKART, GLENN STEVENS AND BRIAN BROOKS

Defendants

Proceeding under the *Class Proceedings Act, 1992*

### NOTICE OF ACTION

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the statement of claim served with this notice of action.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the *Rules of Civil Procedure*, serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this notice of action is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the *Rules of Civil Procedure*. This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

IF YOU PAY THE PLAINTIFF'S CLAIM, and $5,000.00 for costs, within the time for serving and filing your statement of defence, you may move to have this proceeding dismissed by

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

the court.  If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

Date:   July 6, 2022                          Issued by  _____
                                                                          Local registrar

                                             Address of    393 University Avenue
                                             court office:  10th Floor
                                                            Toronto, ON  M5G 1E6

TO:         Voyager Digital Ltd.
            Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Stephen Erlich
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Philip Eytan
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Evan Psaropoulos
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Lewis Bateman
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Krisztian Toth
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Jennifer Ackart
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Glenn Stevens
            c/o  Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada
AND TO:     Brian Brooks
            c/o Suite 2900 – 595 Burrard Street,
            Vancouver, BC, V7X 1J5, Canada

## CLAIM

## CURRENCY AND DEFINITIONS

1.      Unless otherwise stated, all dollar amounts stated herein are in Canadian dollars.

2.      In this Notice of Action, in addition to the terms that are defined elsewhere herein, the following definitions apply:

(a)      "**3AC**" means Three Arrows Capital, a cryptocurrency hedge fund to whom **Voyager Digital** made material loans during the **Class Period**;

(b)      "*CJA*" means the *Courts of Justice Act*, RSO 1990, c C-43, as amended;

(c)      "**Class**" and "**Class Members**" all persons and entities, wherever they may reside or be domiciled, who acquired **Voyager Digital** securities on the secondary market during the **Class Period**, other than **Excluded Persons**;

(d)      "**Class Period**" means the period from and including October 28, 2021 to and including July 5, 2022;

(e)      "*CPA*" means the *Class Proceedings Act, 1992*, SO 1992, c 6, as amended;

(f)      "**Impugned Core Documents**" means:

      a.      the Annual Information Form for the year ended June 30, 2021;

      b.      the Management's Discussion and Analysis for the year and quarter ended June 30, 2021 (filed October 28, 2021);

      c.      financial statements for the year and quarter ended June 30, 2021 (filed October 28, 2021);

      d.      the Management's Discussion and Analysis for the quarter ended September 30, 2021 (filed November 15, 2021);

      e.      financial statements for the quarter ended September 30, 2021 (filed November 15, 2021);

      f.      the Management's Discussion and Analysis for the quarter ended December 31, 2021 (filed February 14, 2022);

      g.      the financial statements for the quarter ended December 31, 2021 (filed February 14, 2022);

      h.      the Management's Discussion and Analysis for the quarter ended March 31, 2022 (filed May 16, 2022);

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

i.    the financial statements for the quarter ended March 31, 2022 (filed May 16, 2022);

(g)    "**Impugned Non-Core Documents**" means:

a.    the news release dated June 14, 2022 entitled "Voyager Digital Provides Update on Asset and Risk Management";

b.    the news release dated June 17, 2022 entitled "Voyager Digital Signs Term Sheet for US$200 Million and 15,000 BTC Revolving Line of Credit with Alameda Research"; and

c.    the news released dated June 22, 2022 entitled "Voyager Digital Provides Market Update";

(h)    "**Impugned Oral Representations**" means the statements made on the May 16, 2022 earnings call with investors;

(i)    "**Defendants**" means **Voyager Digital**, Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens and Brian Brooks;

(j)    "**Excluded Persons**" means the **Defendants**, and **Voyager Digital**'s past and present subsidiaries, affiliates, officers, directors, senior employees, partners, legal representatives, heirs, predecessors, successors and assigns, and any member of the individual **Defendants**' families;

(k)    "*OSA*" means the *Securities Act*, RSO 1990, c S.5, as amended;

(l)    "**Other Canadian Securities Legislation**" means , collectively, the *Securities Act*, RSA 2000, c S-4, as amended; the *Securities Act*, RSBC 1996, c 418, as amended; *The Securities Act*, CCSM c S50, as amended; the *Securities Act*, SNB 2004, c S-5.5, as amended; the *Securities Act*, RSNL 1990, c S-13, as amended; the *Securities Act*, SNWT 2008, c 10, as amended; the *Securities Act*, RSNS 1989, c 418, as amended; the *Securities Act*, S Nu 2008, c 12, as amended; the *Securities Act*, RSPEI 1988, c S-3.1, as amended; the *Securities Act*, RSQ c V-1.1, as amended; *The Securities Act, 1988*, SS 1988-89, c S-42.2, as amended; and the *Securities Act*, SY 2007, c 16, as amended;

(m)    "**Plaintiff**" means Francine De Sousa;

(n)    "**TSX**" means the Toronto Stock Exchange; and

(o)    "**Voyager Digital**" means the Defendant Voyager Digital Ltd.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

## RELIEF SOUGHT

3.      The Plaintiff claims on her own behalf and on behalf of the other Class Members:

    (a)      an order granting leave to pursue this action under Part XXIII.1 of the *OSA* and the Other Canadian Securities Legislation (if necessary);

    (b)      an order certifying this action as a class proceeding pursuant to the *CPA* and appointing the Plaintiff as the representative plaintiff for the Class;

    (c)      a declaration that the Impugned Core Documents, the Impugned Non-Core Documents and the Impugned Oral Representations contained one or misrepresentations at common law and within the meaning of the *OSA* and the Other Canadian Securities Legislation (if necessary);

    (d)      a declaration that the Defendants or one of them made the misrepresentations;

    (e)      a declaration that Voyager Digital is vicariously liable for the acts and/or omissions of the individual Defendants and, as may be application, of its other officers, directors or employees;

    (f)      general damages in an amount to be determined by this Honourable Court;

    (g)      an order directing a reference or giving such other directions as may be necessary to determine issues not determined at the trial of the common issues;

    (h)      pre-judgment and post-judgment interest pursuant to the *CJA*;

    (i)      costs of this action on a substantial indemnity basis or in an amount that provides full indemnity;

    (j)      pursuant to section 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes; and

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

(k)     such further and other relief as this Honourable Court may deem just.

**NATURE OF THE ACTION**

4.     Voyager Digital is a publicly traded company incorporated in British Columbia. Its shares
trade on the TSX and over the counter in the United States of America.

5.     Through its wholly owned subsidiaries, Voyager Digital's primary operations consist of (i)
brokerage services for retail and institutional clients; (ii) custodial services through which
customers earn interest and other rewards on stored cryptocurrency assets; and (iii) a
lending program whereby the cryptocurrency assets Voyager Digital holds for its largely
retail customer base are lent to third parties in return for interest on those cryptocurrency
assets.

6.     Voyager Digital's loan portfolio consists of large loans made to a limited number of
undisclosed counterparties.

7.     In the Impugned Core Documents, the Defendants represented that these loans posed little
credit risk because of Voyager Digital's stringent ongoing due diligence processes into its
debtors and the high-quality financial institutions that it lent money and other assets to. At
all material times, those statements were misrepresentations. Voyager Digital's due
diligence processes were woefully inadequate and the counterparties to its loans were not
high quality institutions.

8.     In March 2022, Voyager Digital entered into a loan agreement with 3AC. Pursuant to that
agreement, Voyager Digital made an unsecured loan to 3AC consisting of 15,250 Bitcoins
and 350 million USDC. As of July 5, 2022, the value of the loan to 3AC was $654,195,000.
Since the time of the loan to 3AC, the value of bitcoin has decreased significantly.
Consequently, the value of the loan as of March 2022 was substantially higher. The

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

Defendants did not disclose that it had made a loan of this magnitude to 3AC until June 22, 2022.

9.    In early May 2022, the crypto platform Terra and the related crypto assets Terra and Luna collapsed. Unbeknownst to the Plaintiff and Class, 3AC had significant exposure to the Terra platform and Terra and Luna. Moreover, as Defendant Stephen Ehrlich explained after the end of the Class Period, "[t]he Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act as a broker for cryptocurrency assets." Despite knowledge of the acute dangers to Voyager Digital's ability to continue as a going concern posed by the 3AC loans, the Defendants failed to disclose both Voyager's loan to 3AC and the quantum of that loan in the Impugned Core Document dated May 16, 2022 and in the Impugned Non-Core Documents prior to June 22, 2022.

10.    Instead of disclosing these material facts to the Plaintiff and Class as they were required to, the Defendants represented in the Impugned Core Document dated May 16, 2022, in the Impugned Non-Core Documents prior to June 22, 2022 and in the Impugned Oral Representations that:

(a)    Voyager Digital had no exposure to the Terra/Luna collapse;

(b)    Voyager Digital had verified that the unidentified counterparties to its loans had not been exposed to any contagion from the Terra/Luna collapse;

(c)    Voyager Digital was "really comfortable we did not have to call anything in [call for repayment of the loans due to a credit risk] and we have zero issues with any of our borrowers";

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

(d)     Voyager Digital had a "low-risk approach to lending and asset management by working with a select group of reputable counterparties, which are all vetted through extensive due diligence by its Risk Committee"; and

(e)     Voyager Digital had no credit risk because "The company is well capitalized and in a good position to weather this market cycle and protect customer assets".

11.    These statements were all misrepresentations within the meaning of the *OSA* and Other Canadian Securities Legislation, if necessary. Voyager Digital had made massive loans to 3AC, which 3AC was unable to pay or had an impaired ability to repay due to 3AC's exposure to the Terra/Luna collapse.

12.    On June 22, 2022, Voyager Digital issued a news release that corrected the above-described misrepresentations. Voyager Digital disclosed its loan to 3AC and that it might have to issue a notice of default to 3AC for failure to repay that loan. As a result of this materially negative news, the trading price of Voyager Digital's shares collapsed.

13.    Despite the correction of some of the misrepresentations on June 22, 2022, Voyager Digital continued to mislead investors. At the same time it disclosed its loan to 3AC, Voyager Digital announced that it had secured a loan from Alameda "to be used to safeguard customer assets in light of current market volatility and only if such use is needed." In so doing, Voyager Digital represented to the market that despite the 3AC loan it was financially secure.

14.    These statements contained misrepresentations by omission. They failed to disclose that Voyager Digital required an immediate cash infusion or else it would be required to enter insolvency proceedings. As the Defendant Stephen Ehrlich later stated in insolvency

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-22-00683699-00CP

materials filed in the United States, the Alameda loan was only "a partial solution to the Company's liquidity issues… The Company's management team understood that the Company would likely need to pursue a strategic transaction and/or seek additional sources of liquidity." Indeed, Defendant Ehrlich states that outside advisors were retained by June 16, 2022 to search for such alternative financing options.

15.   These misrepresentations were corrected July 6, 2022 when Voyager Digital disclosed that it had filed for Chapter 11 bankruptcy protection in the US. Trading in Voyager Digital shares was halted by the Investment Industry Regulatory Organization of Canada after the news and before the start of trading on July 6, 2022.

## THE PARTIES

### *The Plaintiff and Class*

16.   The Plaintiff is an individual residing in Milton, Ontario.  The Plaintiff acquired 13,000 shares during the Class Period.

17.   The Class consist of all persons and entities, wherever they may reside or be domiciled, who acquired Voyager Digital securities on the secondary market during the Class Period, other than Excluded Persons.

### *The Defendants*

18.   Voyager Digital is a publicly traded company incorporated in British Columbia. Its shares trade on the TSX and over the counter in the United States of America. Voyager Digital's principal place of business is Toronto. Voyager Digital's principal securities regulator is the Ontario Securities Commission.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

19.    Stephen Ehrlich was the Chief Executive Officer of Voyager Digital during the Class Period. He is also the co-founder of Voyager Digital.

20.    Philip Eytan was the non-executive Chairman of Voyager Digital and a director of Voyager Digital during the Class Period.

21.    Evan Psaropoulos was the Chief Commercial Officer and Chief Financial Officer of Voyager Digital during the Class Period.

22.    Lewis Bateman was the Chief International Officer of Voyager Digital during the Class Period responsible for Voyager Digital's strategic partnerships.

23.    Krisztian Toth was a director of Voyager Digital during the Class Period.

24.    Jennifer Ackart was a director of Voyager Digital during the Class Period.

25.    Glenn Stevens was a director of Voyager Digital during the Class Period.

26.    Brian Brooks was a director of Voyager Digital during the Class Period.

**RIGHTS OF ACTION**

***Statutory Secondary Market Liability***

27.    On behalf of the Class Members, the Plaintiff pleads the right of action found in section 138.3(1) of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation) against the Defendants for misrepresentations in the Impugned Core documents, Impugned Non-Core Documents and Impugned Oral Representations subject to leave being granted under section 138.8(1) of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

28.    The Impugned Core Documents and Impugned Non-Core Documents are documents within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

29.    The Impugned Oral Representations are public oral statements within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

30.    At all material times, Voyager Digital was a "responsible issuer" within the meaning of Part XXIII.1 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

31.    The individual Defendants were officers and directors of Voyager Digital during the Class Period. The individual Defendants authorized, permitted or acquiesced in the release of the Impugned Core Documents and the Impugned Non-Core Documents and in the making of the Impugned Oral Representations.

32.    The Impugned Non-Core Documents, Impugned Core Documents and Impugned Oral Representations contained misrepresentations as described herein. Any one of such misrepresentations is a misrepresentation for the purposes of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

33.    The Defendants knew at the time the Impugned Non-Core Documents were released and at the time the Impugned Oral Representations were made, that it contained a misrepresentation; or alternatively, at or before the time that those Documents were released or the misrepresentations were made the Defendants deliberately avoided acquiring knowledge that they contained a misrepresentation; or alternatively, the Defendants were, through action or failure to act, guilty of gross misconduct in connection

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

with the release of the Impugned Non-Core Documents or the making of the Impugned Oral Representations.

34.    The Plaintiff and the other Class Members who purchased securities of Voyager in the secondary market during the Class Period are entitled to damages assessed in accordance with section 138.5 of the *OSA* (and, if necessary, the equivalent sections of the Other Canadian Securities Legislation).

***Negligent Misrepresentation***

35.    On behalf of the Class Members, the Plaintiff pleads negligent misrepresentation against the Defendants for the misrepresentations described herein.

36.    The Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations were prepared, released and/or made for the purpose of providing material information and inducing Class Members to purchase Voyager Digital shares.

37.    The Defendants undertook to do so with reasonable care for the aforementioned purpose. The Defendants intended and were aware that the Class Members would rely reasonably and to their detriment upon the Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations.

38.    The Defendants further knew and intended that the information contained in the Impugned Core Documents, Impugned Non-Core Documents and Impugned Oral Representations would be incorporated into the price of Voyager Digital's publicly traded shares such that the trading price of those shares would at all times reflect the information contained in therein.

39.    The Defendants had a duty of care at common law to exercise due care and diligence to ensure that the Impugned Core Documents, Impugned Non-Core Documents and

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

Impugned Oral Representations fairly and accurately disclosed all material information about the 3AC loan, Voyager Digital's financial stability and its loan due diligence procedures.

40.    The Defendants breached that duty as described herein.

41.    Throughout the Class Period, the Defendants had exclusive access to information about Voyager Digital's business and operations, including the 3AC loan, Voyager Digital's financial stability and its loan due diligence procedures. As such, they were the primary source of such information for Class Members.

42.    The Class Members directly or indirectly relied upon the misrepresentations in making a decision to purchase Voyager Digital's shares, and suffered damage when the misrepresentations were publicly corrected.

43.    Alternatively, the Class Members relied upon the misrepresentations by the act of purchasing Voyager Digital's shares in an efficient market that promptly incorporated into the price of those shares all publicly available material information regarding the shares of Voyager Digital.

44.    As a result, the misrepresentations caused the price of Voyager Digital's shares to trade at artificially inflated prices during the Class Period, thus directly resulting in damage to the Plaintiff and the other Class Members when the misrepresentations were publicly corrected.

**VICARIOUS LIABILITY**

45.    Voyager Digital is vicariously liable for the acts and omissions of the individual Defendants.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice
Court File No./N° du dossier du greffe : CV-22-00683699-00CP

46.     The acts or omissions particularized and alleged herein to have been done by Voyager Digital were authorized, ordered and done by the individual Defendants and other agents, employees and representatives of Voyager Digital, while engaged in the management, direction, control and transaction of the business and affairs of Voyager Digital.

47.     By virtue of the relationship between the individual Defendants and Voyager Digital, such acts and omissions are, therefore, not only the acts and omissions of the individual Defendants, but are also the acts and omissions of Voyager Digital.

48.     At all material times, the individual Defendants were directors and officers of Voyager Digital. As their acts and omissions are independently tortious, they are personally liable for same to the Plaintiff and the other Class Members.

**REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO**

49.     The Plaintiff pleads that this action has a real and substantial connection with Ontario because, among other things:

(a)     Voyager Digital is a reporting issuer in Ontario;

(b)     Voyager Digital trades on the TSX, which is based in Toronto, Ontario;

(c)     the misrepresentations alleged herein were disseminated to Class Members resident in Ontario;

(d)     a substantial proportion of the Class Members reside in Ontario; and

(e)     damage was sustained by Class Members in Ontario.

**SERVICE OUTSIDE OF ONTARIO**

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

50.     The Plaintiff may serve the Statement of Claim outside of Ontario without leave in accordance with rule 17.02 of the *Rules of Civil Procedure*, because this claim is:

   (a)     a claim in respect of personal property in Ontario (rule 17.02(a));

   (b)     a claim in respect of a tort committed in Ontario (rule 17.02(g)); and

   (c)     a claim against a person or entity carrying on business in Ontario (rule 17.02(p)).

**RELEVANT LEGISLATION AND PLACE OF TRIAL**

51.     The Plaintiff pleads and relies on the *CJA*, the *CPA*, the *OSA*, the Other Canadian Securities Legislation, securities regulatory instruments and the TSX Company Manual.

52.     The Plaintiff proposes that this action be tried in the City of Toronto, in the Province of Ontario, as a proceeding under the *CPA*.

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

July 6, 2022

**SISKINDS LLP**

275 Dundas Street, Unit 1
London, ON  N6B 3L1

Michael G. Robb (LSO#: 45787G)
Tel: 519-660-7872
Fax: 519-660-7873
Email: michael.robb@siskinds.com

Garett M. Hunter (LSO#: 71800D)
Tel: 519-660-7802
Fax: 519-660-7803
Email: garett.hunter@siskinds.com

**SISKINDS LLP**

100 Lombard Street, Suite 302
Toronto, ON  M5C 1M3

Anthony O'Brien (LSO#: 56129U)
Tel: 416-594-4394
Fax: 416-594-4395
Email: anthony.obrien@siskinds.com

Lawyers for the Plaintiff

Court File No./N° du dossier du greffe : CV-22-00683699-00CP

DE SOUSA v. VOYAGER DIGITAL LTD. *et al.*

Electronically issued / Délivré par voie électronique : 06-Jul-2022
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No:

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

Proceeding under the *Class Proceedings Act, 1992*

**NOTICE OF ACTION**

**Siskinds LLP**
Barristers & Solicitors
275 Dundas Street, Unit 1
London, ON  N6B 3L1

Michael G. Robb (LSO#: 45787G)
Tel: 519-660-7872
Fax: 519-660-7873

Garett M. Hunter (LSO#: 71800D)
Tel: 519-660-7802
Fax: 519-660-7803

100 Lombard Street, Suite 302
Toronto, ON  M5C 1M3

Anthony O'Brien (LSO#: 56129U)
Tel: 416-594-4394
Fax: 416-594-4395

Lawyers for the Plaintiff

## **<u>EXHIBIT 2</u>**

October 8, 2022 SEDI Report Regarding
Equity Transactions of the Debtors' Insiders

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3717553 | 2021-03-30 | 2021-03-31 | | 10 - Acquisition or disposition in the public market | -89,000 | 30.8100 | 93,842 | | | |

**Insider name:** Brosgol, David
**Insider's Relationship to Issuer:** 5 - Senior Officer of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Options (Common Shares)

| 3693449 | 2021-02-22 | 2021-03-04 | Direct Ownership | 00 - Opening Balance-Initial SEDI Report | | | 300,000 | | Common Shares | 300,000 |

**Insider name:** Constantino, Daniel
**Insider's Relationship to Issuer:** 5 - Senior Officer of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Options (Common Shares)

| 3716593 | 2021-02-01 | 2021-03-22 | Direct Ownership | 00 - Opening Balance-Initial SEDI Report | | | 300,000 | | Common Shares | 300,000 |

**Insider name:** Ehrlich, Stephen
**Insider's Relationship to Issuer:** 4 - Director of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Common Shares

| 3679473 | 2021-02-09 | 2021-02-12 | Direct Ownership | 10 - Acquisition or disposition in the public market | -124,031 | 17.1100 | 3,000 | | | |
| 3679462 | 2021-02-09 | 2021-02-12 | Indirect Ownership : Honos Financial | 10 - Acquisition or disposition in the public market | -126,609 | 17.1100 | 0 | | | |
| 3679467 | 2021-02-09 | 2021-02-12 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -1,149,360 | 17.1100 | 4,434,969 | | | |
| 3712706 | 2021-03-19 | 2021-03-25 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -50,000 | 30.1900 | 4,384,969 | | | |
| 3714369 | 2021-03-22 | 2021-03-26 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -8,000 | 31.0020 | 4,376,169 | | | |
| 3714362 | 2021-03-22 | 2021-03-26 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -15,000 | 32.2500 | 4,361,169 | | | |
| 3717929 | 2021-03-26 | 2021-03-31 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -96,900 | 30.4100 | 4,264,269 | | | |
| 3720046 | 2021-03-29 | 2021-04-02 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -135,000 | 31.4300 | 4,129,269 | | | |
| 3720047 | 2021-03-30 | 2021-04-02 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -89,000 | 30.8000 | 4,040,269 | | | |
| 3720048 | 2021-03-31 | 2021-04-02 | Indirect Ownership : SJE Consulting, LLC | 10 - Acquisition or disposition in the public market | -100,000 | 31.0000 | 3,940,269 | | | |

**Insider name:** Elliott, Guy
**Insider's Relationship to Issuer:** 4 - Director of Issuer
**Ceased to be Insider:** 2021-05-20
**Security designation:** Common Shares

| A | 3711193 | 2021-03-18 | 2021-03-23 | Direct Ownership | 51 - Exercise of options | +50,000 | 0.9000 | 1,432,500 | | | |
| O | 3711193 | 2021-03-21 | 2021-03-23 | Direct Ownership | 51 - Exercise of options | +50,000 | 0.9000 | | | | |

**Security designation:** Options (Common Shares)

| 3715205 | 2021-03-18 | 2021-03-23 | Direct Ownership | 51 - Exercise of options | -50,000 | | 0 | 0.9000 | Common Shares | -50,000 | 0 |

**Insider name:** Eytan, Philip
**Insider's Relationship to Issuer:** 4 - Director of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Common Shares

| 3649236 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +400 | 12.7400 | 634,427 | | | |
| 3649251 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +1,100 | 12.7300 | 635,527 | | | |
| 3649252 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +100 | 12.6977 | 635,627 | | | |
| 3649254 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +400 | 12.7056 | 636,027 | | | |
| 3649255 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +100 | 12.6922 | 636,127 | | | |
| 3649259 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +100 | 12.7001 | 636,227 | | | |
| 3649266 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +400 | 12.6899 | 636,627 | | | |
| 3649269 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +300 | 12.6843 | 636,927 | | | |
| 3649271 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +700 | 12.6978 | 637,627 | | | |
| 3649276 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +100 | 12.7371 | 637,727 | | | |
| 3649278 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +800 | 12.6800 | 638,527 | | | |
| 3649279 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +500 | 12.7200 | 639,027 | | | |
| 3649286 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +1,200 | 12.7292 | 640,227 | | | |
| 3649289 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +250 | 12.7450 | 640,477 | | | |
| 3649293 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | +5,050 | 12.7500 | 645,527 | | | |
| 3649297 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -200 | 12.8305 | 645,327 | | | |
| 3649301 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -400 | 12.8400 | 644,927 | | | |
| 3649305 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -2,200 | 12.8400 | 642,727 | | | |
| 3649306 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -100 | 12.8144 | 642,627 | | | |
| 3649311 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -2,400 | 12.8223 | 640,227 | | | |
| 3649312 | 2021-12-10 | 2021-12-15 | Direct Ownership | 10 - Acquisition or disposition in the public market | -6,200 | 12.8405 | 634,027 | | | |

**Security designation:** Options (Common Shares)

| 3185681 | 2021-06-09 | Direct Ownership | 50 - Grant of options | +250,000 | 7.0000 | 1,300,000 | 7.0000 | 2022-02-15 | Common Shares | +250,000 | 1,300,000 |

**Insider name:** Hanshe, Gerard
**Insider's Relationship to Issuer:** 5 - Senior Officer of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Common Shares

| 3700004 | 2021-03-15 | 2021-03-18 | Direct Ownership | 10 - Acquisition or disposition in the public market | -80,000 | 22.6100 | 78,875 | 78,875 | | |
| 3719656 | 2021-03-29 | 2021-04-02 | Direct Ownership | 10 - Acquisition or disposition in the public market | -20,000 | 31.1060 | 58,875 | | | |
| 3719658 | 2021-03-30 | 2021-04-02 | Direct Ownership | 10 - Acquisition or disposition in the public market | -20,000 | 30.4600 | 38,875 | | | |
| 3719659 | 2021-03-31 | 2021-04-02 | Direct Ownership | 10 - Acquisition or disposition in the public market | -18,875 | 31.5300 | 20,000 | | | |
| 3343999 | 2021-04-21 | 2021-04-28 | Direct Ownership | 51 - Exercise of options | +142,000 | 0.3000USD | 162,000 | | | |

**Security designation:** Options (Common Shares)

| 3343997 | 2021-04-21 | 2021-04-28 | Direct Ownership | 51 - Exercise of options | -142,000 | 0.3000USD | 385,000 | 0.3000USD | Common Shares | -142,000 | 225,000 |

**Insider name:** Lillien, Robert Jarrett
**Insider's Relationship to Issuer:** 4 - Director of Issuer
**Ceased to be Insider:** Not applicable
**Security designation:** Common Shares

| 3703366 | 2021-03-09 | 2021-03-11 | Direct Ownership | 51 - Exercise of options | +50,000 | 0.9000 | 50,000 | | | |
| 3703358 | 2021-03-09 | 2021-03-11 | Direct Ownership | 10 - Acquisition or disposition in the public market | +180,545 | 0.4000 | 230,545 | | | |
| 3703362 | 2021-03-11 | 2021-03-11 | Direct Ownership | 51 - Exercise of options | -230,545 | 20.0600 | 0 | | | |

**Security designation:** Options (Common Shares)

| 3703360 | 2021-03-09 | 2021-03-11 | Direct Ownership | 51 - Exercise of options | -180,545 | 0.4000 | 119,455 | | Common Shares | -180,545 | 69,455 |
| 3703353 | 2021-03-09 | 2021-03-11 | Direct Ownership | 51 - Exercise of options | -50,000 | 0.9000 | 69,455 | | Common Shares | -50,000 | 69,455 |

**Insider name:** Psaropoulos, Evan
**Insider's Relationship to Issuer:** 5 - Senior Officer of Issuer

## **EXHIBIT 3**

First Information Officer Report
Dated August 8, 2022

Court File No.  CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**FIRST REPORT**
**OF THE INFORMATION OFFICER**

**ALVAREZ & MARSAL CANADA INC.**

**AUGUST 8, 2022**

# TABLE OF CONTENTS

1.0  **INTRODUCTION**.................................................................................**- 1 -**

2.0  **TERMS OF REFERENCE AND DISCLAIMER** ....................................**- 4 -**

3.0  **PURPOSE OF THIS REPORT** ..............................................................**- 5 -**

4.0  **BACKGROUND** .....................................................................................**- 6 -**

5.0  **RECOGNIZED FIRST DAY ORDERS OF THE U.S. COURT** ............**- 15 -**

6.0  **SUBSEQUENT ORDERS OF THE U.S. COURT** ..................................**- 21 -**

7.0  **DIRECTOR & OFFICER STAY** ...........................................................**- 27 -**

8.0  **MOTION BY PROPOSED PLAINTIFF**................................................**- 28 -**

9.0  **INITIAL ACTIVITIES OF THE INFORMATION OFFICER** ............**- 31 -**

10.0  **RECOMMENDATIONS**.........................................................................**- 32 -**

**APPENDICES**

Appendix "A" – Adjourned Relief Endorsement

Appendix "B" – Initial Recognition Order granted on July 12, 2022 (as amended and restated)

Appendix "C" – Supplemental Order granted on July 12, 2022 (without schedules)

Appendix "D" – Corporate Organization Chart

Appendix "E" – FBO Accounts Decision

Appendix "F" – Chart Summarizing U.S. Court Orders

Appendix "G" – July 24 Letter

Appendix "H" – July 29 Letter

Appendix "I" – August 8 Hearing Endorsement

Appendix "J" – Digital Tearsheets of Publication in *The Globe and Mail (National Edition)*

- - 1 - -

## 1.0    INTRODUCTION

<u>Voyager Chapter 11 Proceedings</u>

1.1    On July 5, 2022 (the "**Petition Date**"), Voyager Digital Holdings, Inc. ("**Voyager Holdings**"), Voyager Digital Ltd. ("**VDL**") and Voyager Digital, LLC ("**OpCo**") (each a "**Debtor**" and collectively, the "**Debtors**", and together with their direct and indirect non-Debtor affiliates, the "**Voyager Group**"), commenced voluntary reorganization proceedings[1] (the "**Chapter 11 Proceedings**") pursuant to Chapter 11 of the U.S. Code (the "**U.S. Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Court**").

1.2    On July 8, 2022 (the "**First Day Hearing**"), the U.S. Court granted various interim and final orders in the Chapter 11 Proceedings (the "**First Day Orders**"), including an order (the "**Foreign Representative Order**") authorizing VDL to act as foreign representative of the Debtors (in such capacity, the "**Foreign Representative**") in a proceeding to be commenced in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**" and these proceedings the "**CCAA Recognition Proceedings**", and together with the Chapter 11 Proceedings, the "**Restructuring Proceedings**"). The Foreign Representative Order also authorizes VDL to:

(a)    seek recognition of the Chapter 11 Proceedings in a proceeding in Canada;

---

[1] On July 6, 2022, the U.S. Court granted an order directing, for procedural purposes only, joint administration of the Chapter 11 Proceedings as Voyager Digital Holdings, Inc. *et al*. (the "**Joint Administration Order**"). This order does not provide for consolidation for substantive purposes.

- - 2 - -

    (b)      request that the Canadian Court lend assistance to the U.S. Court in protecting the property of the estates; and

    (c)      seek any other appropriate relief from the Canadian Court that VDL deems just and proper in furtherance of the protection of the Debtors' estates.

<u>CCAA Recognition Proceedings</u>

1.3    On July 11, 2022, the Foreign Representative brought an application before the Canadian Court for certain relief pursuant to Part IV of the CCAA.

1.4    On July 12, 2022, VDL obtained two orders of Canadian Court:

    (a)      an initial recognition order (the "**Initial Recognition Order**"), among other things,

        (i)      declaring that VDL is the foreign representative in respect of the Chapter 11 Proceedings;

        (ii)      recognizing the Chapter 11 Proceedings of VDL as a foreign proceeding under Part IV of the CCAA;

        (iii)     granting a stay of proceedings in respect of VDL and their property and business; and

        (iv)     prohibiting VDL from selling or otherwise disposing of any property in Canada outside of the ordinary course of business, without leave of the Canadian Court; and

    (b)      a supplemental order (the "**Supplemental Order**"), among other things,

        (i)      recognizing certain of the First Day Orders;

- - 3 - -

(ii)     appointing Alvarez & Marsal Canada Inc. ("**A&M**") as information officer in respect of the CCAA Recognition Proceedings (in such capacity, the "**Information Officer**"); and

(iii)    granting a super-priority charge up to a maximum of CDN$500,000 (the "**Administration Charge**") over VDL's property in Canada in favour of counsel to VDL, the Information Officer and counsel to the Information Officer, Blake, Cassels & Graydon LLP, as security for their professional fees and disbursements in respect of these CCAA Recognition Proceedings.

1.5    Also on July 12, 2022, in response to opposition from counsel appearing for certain possible investors and counsel for a proposed representative plaintiff (the "**Proposed Plaintiff**"), in a recently commenced proposed class action in Ontario, the Canadian Court adjourned the determination of whether (i) the Chapter 11 Proceedings of VDL is a "foreign main proceeding" or a "foreign non-main proceeding", and (ii) whether VDL's centre of main interest ("**COMI**") is the United States (the "**Adjourned Relief**").

1.6    On July 19, 2022, the Canadian Court conducted a hearing (the "**July 19th Hearing**") with respect to the Adjourned Relief.

1.7    On August 4, 2022, the Canadian Court issued an endorsement declaring that the Foreign Proceeding is a "foreign main proceeding" and that VDL's COMI is the United States (the "**Adjourned Relief Endorsement**"), a copy of which is attached as **Appendix "A"**. On August 5, 2022, the Canadian Court issued an amended and restated Initial Recognition Order setting out that the COMI of VDL is the United States and that the Chapter 11 Proceeding of VDL is a foreign main proceeding.

- - 4 - -

1.8     Copies of the Initial Recognition Order (as amended and restated) and Supplemental Order (without schedules) are attached as **Appendix "B"** and **Appendix "C"** respectively.

1.9     Further information regarding these CCAA Recognition Proceedings can be found on the Information Officer's website at https://alvarezandmarsal.com/Voyager Digital (the "**Case Website**"). Copies of documents filed in the Chapter 11 Proceedings can be found on the case website maintained by Stretto, Inc. ("**Stretto**") at: https://cases.stretto.com/Voyager (the "**Chapter 11 Website**"), which can also be accessed via the Case Website.

**2.0     TERMS OF REFERENCE AND DISCLAIMER**

2.1     In preparing this Report of the Information Officer (the "**First Report**"), the Information Officer has relied solely on information and documents provided by the Foreign Representative and their Canadian legal counsel (collectively, the "**Information**"). Except as otherwise described in this First Report, the Information Officer has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Information Officer has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CASs**") pursuant to the *Chartered Professional Accountants Canada Handbook* (the "**Handbook**"), and accordingly, the Information Officer expresses no opinion or other form of assurance contemplated under CASs in respect of the Information.

2.2     This First Report should be read in conjunction with the Declaration of Stephen Ehrlich dated July 6, 2022 (the "**First Ehrlich Declaration**") in the Chapter 11 Proceedings and the Affidavit of Stephen Ehrlich sworn July 10, 2022 (the "**First Ehrlich Affidavit**") and

the Affidavit of Stephen Ehrlich sworn August 6, 2022 (the "**Second Ehrlich Affidavit**")

in the CCAA Recognition Proceedings.

2.3    Unless otherwise stated, all monetary amounts contained herein are expressed in USD.

## 3.0    PURPOSE OF THIS REPORT

3.1    The purpose of this First Report is to provide the Canadian Court with certain background

information concerning the Debtors and the Restructuring Proceedings, including:

(a)    the Debtors' business, operations, organizational structure and capital structure;

(b)    the Chapter 11 Proceedings and the events leading up to them;

(c)    the Orders of the U.S. Court which the Foreign Representative has obtained

recognition of in Canada;

(d)    the Orders of the U.S. Court which the Foreign Representative is seeking

recognition of in Canada;

(e)    the stay of proceedings in place in Canada in respect of directors and officers;

(f)    the motion brought by the Proposed Plaintiff for certain relief; and

(g)    the initial activities of the Information Officer.

## 4.0    BACKGROUND

Cryptocurrency Overview[2]

4.1    Cryptocurrency is any form of currency that only exists digitally, that usually has no central

issuing or regulating authority but instead uses a decentralized system to record

transactions and manage the issuance of new units. Cryptocurrency relies on cryptography

to prevent counterfeiting and fraudulent transactions.

4.2    Cryptocurrency is used to execute transactions on a blockchain, a digital database

containing information (such as records of financial transactions) that can be

simultaneously used and shared within a large decentralized, publicly accessible network.

4.3    Each blockchain utilizes a specific cryptocurrency or a limited number of cryptocurrencies

to execute transactions. The blockchain is often called a digital "ledger" because it records

every single transaction ever made by "native" cryptocurrency.

Voyager Group Overview[3]

4.4    Prior to the Petition Date, the Voyager Group's primary operations consisted of U.S. based

cryptocurrency trading platform services, custodial services through which customers earn

interest and other rewards on stored cryptocurrency assets, and lending programs. The

Voyager Group's head office functions are performed in New York, NY. A copy of the

---

[2] The following represents a summary of cryptocurrency generally. For a more detailed review, please refer to the First Ehrlich Affidavit.

[3] The following represents a summary of the Voyager Group's business. For a more detailed review, please refer to First Ehrlich Affidavit.

corporate organization chart illustrating the ownership structure of the Voyager Group is attached as **Appendix "D"**.

4.5     As of the Petition Date the Voyager Group entities, other than VDL[4], employed approximately 351 individuals across the United States, Denmark, Canada, France, and Latin America on a part- or full-time basis.

4.6     As of March 31, 2022, the Voyager Group's consolidated assets included approximately $3.4 billion in cryptocurrency held and approximately $2.0 billion in cryptocurrency loaned. The Voyager Group's consolidated liabilities included approximately $5.5 billion in cryptocurrency assets payable to customers.

4.7     The Debtors do not have any secured lenders; however, on June 22, 2022, Voyager Holdings entered into an agreement for an unsecured revolving credit facility with Alameda Ventures Ltd. ("**Alameda**") as lender (the "**Alameda Loan Facility**"), to provide a revolving credit facility of $200 million cash and USD Coin ("**USDC**") and 15,000 Bitcoin. As of the Petition Date, 75 million USDC are outstanding under the Alameda Loan Facility. The aggregate value of the USDC outstanding is $75 million. The Alameda Loan Facility is guaranteed by VDL.

<u>VDL</u>

4.8     VDL is an incorporated entity under British Columbia's *Business Corporations Act*, S.B.C 2002, c.57 as amended and is the ultimate parent entity of the Voyager Group. As of the

---

[4] VDL does not have any employees. The Information Officer understands that VDL had one Canadian employee situated in Ontario, whose employment was terminated on a without cause basis on June 9, 2022. VDL has since paid or otherwise satisfied all obligations owing to the employee under his employment agreement, and the employee has executed a full and final release in favour of VDL.

Petition Date, the common shares of VDL traded on the Toronto Stock Exchange ("**TSX**")
under the trading symbol of "VOYG". On July 7, 2022, VDL announced it would
voluntarily delist its common shares from the TSX.

4.9     The registered head office of VDL is the Vancouver law office of the VDL's counsel,
Fasken Martineau DuMoulin LLP. VDL does not, however, have any operating business
in Canada. VDL serves as a holding company whose primary functions are (i) to raise
capital and fund the operations of the Voyager Group through various intercorporate
funding arrangements, and (ii) act as an unsecured guarantor of the Alameda Loan Facility
(both as further described below). The Information Officer understands neither VDL nor
any Voyager Group entity owns or leases any office space in Canada.

<u>OpCo</u>

4.10    OpCo is a Delaware incorporated entity and is the primary operating entity of the Voyager
Group. The Voyager Group's primary operations are carried out through OpCo. All of
OpCo's services are accessible through a mobile application that users can download on
their smartphones and other smart devices. All cryptocurrency traded via the Voyager
Group's mobile application is done through and held in the U.S. incorporated OpCo. As a
result of electronic "geo-fencing", the Voyager Group does not believe any individuals
regularly resident in Canada use the mobile application. As of the Petition Date, OpCo's
platform included approximately 1.1 million active users.

<u>Voyager Holdings</u>

4.11    Voyager Holdings a Delaware incorporated entity and is the direct parent company of
OpCo. As discussed in greater detail above, Voyager Holdings is the borrower under the

Alameda Loan Facility and, as discussed in greater detail below, holds certain bank accounts of the Debtors that form part of the Voyager Group's cash management system.

### VDL's Non-Consolidated Capital Structure

4.12    As of the Petition Date, VDL had approximately 196,000,000 shares of common stock outstanding. As of July 26, 2022, Alameda and its affiliate, Alameda Research Ventures LLC own 7,723,995 and 10,457,265 VDL shares, respectively, representing approximately 9.3% of outstanding common stock. The Information Officer understands the remaining VDL shares are widely held by investors.

4.13    Through private placements, paid-in capital raised (i.e. the cash that shareholders have given VDL in exchange for shares) by VDL exceeds $280 million. VDL advanced certain of these funds to various affiliated entities through a combination of unsecured debt and equity investments. As of the Petition Date, the Information Officer understands the amount owing to VDL from OpCo in respect of unsecured intercompany debt facilities totaled approximately $71.5 million. VDL's other assets include the VDL Cash (defined below), investments in other Debtor and non-Debtor affiliates and receivables from other Debtor and non-Debtor affiliates. As of the date of this Report, the Information Officer is still in the process of reviewing the aggregate intercompany position of VDL and will report back to Court with additional information as appropriate.

### Cash Management System

4.14    In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system (the "**Cash Management System**"). The Cash Management System is comprised of twelve active bank accounts. The Debtors maintain eight bank accounts at

Metropolitan Commercial Bank, two accounts at BMO Bank of Montreal (the "**BMO Accounts**"), and two accounts at Signature Bank.

4.15    The BMO Accounts are registered in the name of VDL and are located in British Columbia. VDL has historically maintained the BMO Accounts to fund direct expenses of VDL, including but not limited to, compensation for the board of directors, professional fees and public listing expenses and other direct costs of VDL. In addition, the BMO Accounts have historically been used to receive proceeds from new capital raises and fund debt and equity advances to affiliates and to fund day-to-day expenses of VDL. The BMO Accounts are funded by paid-in capital.

4.16    The Information Officer understands that, as of the Petition Date, the BMO Accounts held approximately $2.5 million in the aggregate (the "**VDL Cash**"). Following the Petition Date, the Information Officer understands that the U.S. Trustee specifically requested that no more than $100,000 be left in the BMO Accounts (being the amount insured by the Canadian Deposit and Insurance Corporation), Accordingly, $2.4 million was transferred from the BMO Accounts to Voyager Holdings' Signature Bank account[5]The Information Officer understands that, while these funds are currently held in a Voyager Holdings account, management is in the process of opening a specific Signature Bank VDL account, and the funds will be transferred once opened.

4.17    Based on information provided directly by the Voyager Group management, the Information Officer understands the VDL Cash is expected to be used for direct, third-

---

[5] Management has confirmed that, as of the date of this Report Voyager Holdings still holds $2.4 million of VDL Cash

party expenses of VDL, such ongoing operating costs and professional fees and not to fund

the costs and expenses properly payable by any other Debtor or non-Debtor affiliates.

4.18    Other than the BMO Accounts, VDL does not maintain any other active bank account and

none of the other ten bank accounts maintained by the Debtors have affiliation to Canada.

<u>Intercompany Transactions</u>

4.19    In connection with the daily operation of the Cash Management System, as funds are swept

and disbursed throughout the Cash Management System and as business is transacted

between the Debtors, at any given time there may be intercompany balances owing by one

Debtor to another Debtor. Shared services expenses have historically been charged to VDL,

however the Voyager Group does not generally settle amounts owing between Debtor and

non-Debtor affiliates in cash, unless a specific Voyager Group entity requires cash funding.

The majority of intercompany transactions are reflected as journal entry receivables and

payables, as applicable, in the respective Debtors' accounting systems.

4.20    As discussed above, as of the Petition Date, the Information Officer understands the

amount owing to VDL from OpCo in respect of intercompany debt facilities totaled

approximately $71.5 million.

<u>Events Leading to the Chapter 11 Proceeding</u>

4.21    The Chapter 11 Proceedings were primarily driven by downward trending cryptocurrency

market conditions caused by various distressed situations.

4.22    As OpCo is a cryptocurrency trading service provider that is not directly dependent on the

price of Bitcoin or any other cryptocurrency for revenue, the Voyager Group has limited

exposure to an industry-wide selloff. However, to provide customers with a yield on the

- - 12 - -

assets they store with OpCo, the Voyager Group lends out a portion of its cryptocurrency reserves to third parties. Loans are typically made in the form of cryptocurrency to, among other things, facilitate the counterparty's transactions or provide the counterparty with additional liquidity of a specific type of token.

4.23    Between March 2021 and March 2022, the Voyager Group entered into 125 third party loans with 9 different counterparties, lending out cryptocurrency with an aggregate market value of approximately $5.2 billion. As of the Petition Date, loans outstanding totaled approximately $1.1 billion.

4.24    On March 4, 2022, OpCo and HTC Trading, Inc. (the "**Voyager Lenders**") entered into a master loan agreement with Three Arrows Capital (the "**Three Arrows Loan**"). Pursuant to the Three Arrows Loan, the Voyager Lenders agreed to lend 15,250 Bitcoins and 350 million USDC to Three Arrows Capital. The Three Arrows Loan was callable at any time by the Voyager Lenders. Three Arrows Capital fully drew down on the 15,250 Bitcoins and 350 million USDC.

4.25    In early June 2022, it was reported that Three Arrows Capital may have incurred significant losses due to Luna's collapse[6]. On June 27, 2022, the Voyager Lenders issued a notice of default to Three Arrows Capital for failure to make the required payments under the Three Arrows Loan. Three Arrows Capital has subsequently been subjected to liquidation

---

[6] In May of 2022, the price of Luna, a cryptocurrency that was used to execute transactions on the blockchain of Terra, an open-source blockchain protocol created by Terraform Labs collapsed. The Luna collapse, as detailed further in the First Ehrlich Affidavit, erased over $18 billion of value and contributed to further selloffs in the cryptocurrency sector. Widespread concern arose as industry participants began learning of exposure to Luna.

proceedings by Order of the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands.

4.26    In addition, on June 13, 2022, Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced that it was pausing all account withdrawals and transfers due to what it referred to as "extreme market conditions." Celsius' announcement triggered a further pulldown in the cryptocurrency markets and OpCo saw a significant uptick in customer withdrawals (some of which OpCo does not believe are legitimate) which put additional strain on OpCo's liquidity and business. This, coupled with the uncertain collectability of the Three Arrows Loan, raised concerns as to OpCo's ability to fulfil customer withdrawals.

Proposed Restructuring

4.27    In late June 2022, the Voyager Group, with the assistance of its investment banker, Moelis & Company LLC ("Moelis"), commenced a comprehensive marketing process to solicit investor appetite in either (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry or (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Voyager Group's business enterprise (collectively, the "**Marketing Process**").

4.28    In addition, simultaneously with their Marketing Process efforts, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a standalone chapter 11 plan of reorganization.

4.29    As part of the materials submitted in support of the motions brought at the First Day Hearing in the Chapter 11 Proceedings, the Debtors filed a proposed Plan & Disclosure

- - 14 - -

Statement ("**Proposed Reorganization Plan**"). The Proposed Reorganization Plan provides for a standalone plan that can be effectuated without a sale or strategic partner. Under the Proposed Reorganization Plan, account holders would receive, among other things, a combination of (a) coins (b) new common shares in a reorganized Voyager Group and (c) any recovery in respect of the Three Arrows Loan. The Proposed Reorganization Plan is not final and is subject to ongoing engagement with all constituencies, including the official committee of unsecured creditors (the "**UCC**").

4.30    As described further in this Report, on August 5, 2022 the U.S. Court entered an Order (i) Approving the Bidding Procedures and Related Dates and Deadlines, and (ii) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation (the "**Bidding Procedures Order**").

4.31    As of the date of filing of this Report, the Proposed Reorganization Plan remains subject to further negotiation and amendment, and the Marketing Process is still in progress. No motion has been brought before the U.S. Court to approve the Proposed Reorganization Plan and no relief is being sought before the Canadian Court in respect of the Proposed Reorganization Plan at this time. The Information Officer will prepare a report on these matters if and when it is considered appropriate and relevant to the CCAA Recognition Proceedings, in response to any application brought forward by the Foreign Representative.

- - 15 - -

## 5.0    RECOGNIZED FIRST DAY ORDERS OF THE U.S. COURT

5.1    On July 12, 2022, the Canadian Court granted the Supplemental Order which, among other things, recognized the following First Day Orders of the U.S. Court[7]:

(a)    the Foreign Representative Order;

(b)    the Joint Administration Order;

(c)    an Order (i) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (ii) Approving the Form and Manner of Notice (the "**Automatic Stay Order**");

(d)    an Interim Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock (the "**NOL Order**");

(e)    an Interim Order Authorizing the Debtors to (i) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (ii) Continue Employee Benefits Programs (the "**Wages Order**");

(f)    an Order (i) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (ii) Waiving Requirements to File List of Equity Holders (the "**Schedules and Statements Extension Order**");

---

[7] Additional information regarding each of the First Day Orders can be found in the First Ehrlich Declaration.

- - 16 - -

(g)     an Interim Order Authorizing the Debtors to (i) Continue to Operate Their Cash Management System, (ii) Honor Certain Prepetition Obligations Related Thereto, (iii) Maintain Existing Business Forms, and (iv) Perform Intercompany Transactions (the "**Cash Management Order**");

(h)     an Interim Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "**Case Management Order**");

(i)     an Order (i) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (ii) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (iii) Authorizing the Debtors to Redact Certain Personally Identifiable Information, and (iv) Approving the Form and Manner of Notifying Creditors of Commencement (the "**Creditor Matrix Order**"); and

(j)     an Interim Order Authorizing the Payment of Certain Taxes and Fees (the "**Taxes Order**").

5.2     Copies of all such orders and other documents related to the Chapter 11 Proceedings are available on the Chapter 11 Website, a link to which is included on the Case Website. The above orders and their relevance to the Canadian stakeholders are discussed below, with the exception of the Foreign Representative Order which is described at paragraph 1.2 above.

<u>Joint Administration Order</u>

5.3     The Joint Administration Order directs the joint administration of the Debtors' individual chapter 11 cases for procedural purposes only. The Joint Administration Order does not provide for consolidation of the chapter 11 cases for substantive purposes.

- - 17 - -

Automatic Stay Order

5.4    The Automatic Stay Order, among other things, restates and enforces the broad automatic

stay in place in accordance with the U.S. Bankruptcy Code. The automatic stay provides

for a comprehensive stay of proceedings preventing substantially all remedial action

against the Debtors without leave of the U.S. Court.

5.5    Moreover, pursuant to the terms of the Automatic Stay Order, all foreign or domestic

governmental units and other regulatory authorities and those acting on their behalf are

also stayed, restrained, prohibited and enjoined from (a) denying, revoking, suspending or

refusing to renew any license, permit, charter, franchise or other similar grant to the

Debtors or the Debtors' affiliates, (b) placing conditions upon such grant to the Debtors or

the Debtors' affiliates, (c) discriminating against the Debtors or the Debtors' affiliates, or

(d) interfering in any way with any and all property of the Debtors' estates wherever

located, on account of commencement of the Chapter 11 Proceedings, the Debtors'

insolvency, the fact that the Debtors have not paid a debt dischargeable in the Chapter 11

Proceedings.

5.6    For greater certainty the following, among others, are not subject to the stay:

(a)    commencement or continuation of a criminal action or proceeding against the

Debtors; and

(b)    the commencement or continuation of an investigation or action by a securities self-

regulatory organization to enforce such organization's regulatory power, the

enforcement of an order or decision (other than for monetary sanctions) obtained

in an action by such securities self-regulatory organization to enforce such

organization's regulatory power, or any act taken by such securities self-regulatory

organization to delist, delete or refuse to permit quotation of any stock that does not meet applicable regulatory requirements.

### NOL Order

5.7     The NOL Order, among other things, approves on an interim basis notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to the Debtors' common stock, including any beneficial ownership therein, and directing that any purchase, sale, other transfer of or declaration of worthlessness with respect to common stock in violation of the procedures shall be null and void. Such transfers or declarations of worthlessness could limit the Debtors' ability to utilize potential tax attributes which may ultimately benefit the Debtors' estate and stakeholders, absent the NOL Order.

### Wages Order

5.8     The Wages Order, among other things, authorizes but does not direct the Debtors on an interim basis to pay prepetition wages, salaries, other compensation and reimbursable expenses and continue employee benefit programs in the ordinary course ("**Employee Compensation and Benefits**").

5.9     As of the Petition Date, the Voyager Group (other than VDL) employed approximately 351 individuals across the United States, Denmark, Canada, France, and Latin America on a part- or full-time basis. In the United States, the Debtors employed approximately 284 employees, of which approximately 245 are salaried, exempt, and approximately 39 are nonexempt and paid on an hourly basis. None of the employees are represented by a union or collective bargaining unit.

5.10    As of the Petition Date, the Debtors estimated the total amount outstanding on account of the Employee Compensation and Benefits was approximately $2.4 million. The Debtors

do not believe any employee is owed prepetition amounts in excess of the $15,150 priority cap set forth in the U.S. Bankruptcy Code.

5.11    As of the Petition Date:

(a)    the Debtors did not employ any individuals in Canada; and

(b)    non-Debtor affiliates employed 11 individuals in Canada (five full-time and six part-time).

Schedules and Statements Extension Order

5.12    The Schedules and Statements Extension Order, among other things, extends the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date (without prejudice to the Debtors' ability to seek further extensions).

5.13    This Order also extends the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in rule 2015.3 of the Federal Rules of Bankruptcy Procedure to August 4, 2022, without prejudice to the Debtors' ability to request additional extensions.

5.14    These extensions were deemed necessary in order to examine the books and records of the non-Debtor subsidiaries and to determine the nature and scope of the reports required under the U.S. Bankruptcy Code.

5.15    This Order also waives the requirement to file a list of equity security holders of VDL.

- - 20 - -

Cash Management Order

5.16    The Cash Management Order, among other things, authorizes the Debtors on an interim

basis to continue their Cash Management System and continue to perform Intercompany

Transactions (as described above). Post-Petition Date transfers and payments from one

Debtor to another Debtor under any Intercompany Transactions authorized under the Cash

Management Order are accorded superpriority administrative expense status.

Case Management Order

5.17    The Case Management Order, among other things, establishes on an interim basis certain

notice, case management, and administrative procedures, which are set forth in Exhibit 1

of the Case Management Order (the "**Case Management Procedures**").

5.18    Pursuant to the Case Management Order, the Debtors are authorized to schedule, in

cooperation with the U.S. Court, periodic omnibus hearings (the "**Omnibus Hearings**") to

consider all notices, motions, applications, and other requests for relief, briefs, memoranda,

affidavits, declarations, replies, and other documents filed in support. The next four

Omnibus Hearings are scheduled as follows:

(a)    August 16, 2022 at 11:00 a.m.;

(b)    September 13, 2022 at 11:00 a.m.;

(c)    October 18, 2022 at 11:00 a.m.; and

(d)    November 15, 2022 at 11:00 a.m.

Creditor Matrix Order

5.19    The Creditor Matrix Order, among other things, reduces certain administrative burdens

under the U.S. Bankruptcy Code and permits the Debtors to redact certain personally

identifiable information (such as employee and former employee home addresses) to protect from identity theft and/or other potential malicious outcomes.

5.20    The Creditor Matrix Order also authorizes the Debtors to prepare a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor.

Taxes Order

5.21    The Taxes Order, among other things, authorizes on an interim basis the payment of certain taxes and fees, in an amount not to exceed $3,000, provided that the Debtors determine that in the absence of making such payment, the Debtors would suffer a loss of value in excess of such payment amount.

Stretto Appointment Order

5.22    At the same time as the foregoing First Day Orders were made, the U.S. Court also made an Order Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent (the "**Stretto Appointment Order**") which was not brought forward for recognition under the Supplemental Order. The Stretto Appointment Order approves the appointment of Stretto, Inc. as claims and noticing agent to, among other things (i) distribute required notices to parties in interest, (ii) receive, maintain, docket and otherwise administer proofs of claim filed in the Chapter 11 Proceedings, and (iii) provide other administrative services. The Foreign Representative is now seeking recognition of the Stretto Appointment Order in the CCAA Recognition Proceedings.

## 6.0    SUBSEQUENT ORDERS OF THE U.S. COURT

6.1    On August 3, 2022, the U.S. Court made an Order (i) Setting Bar Dates for Submitting Proofs of Claim, (ii) Approving Procedures for Submitting Proofs of Claim, and (iii)

Approving Notice Thereof (the "**Bar Date Order**") for which recognition is sought in the CCAA Recognition Proceedings.

6.2    On August 4, 2022, the U.S. Court conducted a second day hearing (the "**Second Day Hearing**") in respect of a wide variety of requested relief. Canadian counsel to VDL, the Information Officer and counsel to the Proposed Plaintiff were all given the opportunity to attend the Second Day Hearing telephonically.

6.3    At the Second Day Hearing, the U.S. Court made final orders in respect of the following interim First Day Orders which were recognized in the CCAA Recognition Proceedings:

(a)    the NOL Order;

(b)    the Wages Order;

(c)    the Taxes Order; and

(d)    Case Management Order.

6.4    As described in greater detail in the Second Ehrlich Affidavit, the Foreign Representative is seeking recognition of the final NOL Order, Wages Order, and Taxes Order. At this time, the Foreign Representative is not seeking recognition of the final Case Management Order. The final NOL Order, Wages Order and Taxes Order are in substantially the same form as the interim versions of such orders granted at the First Day Hearing.

6.5    On August 4, 2022, the U.S. Court also made a further interim order in respect of the Cash Management Order (the "**Second Interim Cash Management Order**"). The Foreign Representative seeks recognition of the Second Interim Cash Management Order, which provides;

(a)     additional assurance that the Debtors will not engage in any intercompany transactions that involve payments from a Debtor entity to a non-Debtor entity without prior written consent of the UCC;

(b)     that the Debtors shall provide the UCC with rolling 13-week cash flow budgets as soon as reasonably practicable after the entry of the Second Interim Cash Management Order and every subsequent month thereafter[8]; and

(c)     an acknowledgement that nothing in the Second Interim Cash Management Order constitutes a finding as to whether the cash management system complies with federal or state securities laws.

6.6     The Information Officer understands that the final Cash Management Order will be considered at a hearing before the U.S. Court on September 27, 2022.

6.7     At the Second Day Hearing, the U.S. Court also made, among others, the following Orders for which recognition is sought in the CCAA Recognition Proceedings:

(a)     an Order (I) Authorizing the Debtors to (A) Pay Their Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain Their Surety Bond Program, and (II) Granting Related Relief (the "**Insurance Order**");

---

[8] The Information Officer has also requested that the Debtors provide copies of the above referenced cash flow forecasts to the Information Officer.

(b)    an Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business (the "**OCP Order**"); and

(c)    the Bidding Procedures Order.

6.8    Copies of all such orders and other documents related to the Chapter 11 Proceedings are available on the Chapter 11 Website. These orders and their relevance to the Canadian stakeholders are discussed below.

6.9    The U.S. Court also granted certain orders at the Second Day Hearing for which Canadian recognition is not sought, including the Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief (the "**FBO Accounts Order**").

6.10    The FBO Accounts Order authorizes the Debtors to, among other things, honour customer withdrawals from accounts at MC Bank (the "**MC FBO Accounts**"). The Information Officer understands that the Debtors take the position that the cash in the MC FBO Accounts is customer cash and not cash belonging to the Debtors. At the Second Day Hearing, certain parties, including the Proposed Plaintiff, raised objections to or raised concerns in connection with the granting of the FBO Accounts Order. After hearing such submissions, the U.S. Court elected to grant the FBO Accounts Order. Attached as **Appendix "E"** is a copy of the U.S. Court's decision granting the FBO Accounts Order.

<u>Insurance Order</u>

6.11    The Insurance Order authorizes the Debtors to (i) pay obligations under prepetition insurance policies, (ii) continue to pay certain brokerage fees, renew, supplement, modify

or purchase insurance coverage in the ordinary course, and (iv) maintain their surety bond program on an uninterrupted basis.

OCP Order

6.12    The OCP Order authorizes the Debtors to retain and compensate certain named professionals utilized by the Debtors in the ordinary course of business.

Bar Date Order

6.13    The Bar Date Order establishes a deadline for creditors to submit proofs of claim in the Chapter 11 Proceedings, approves procedures for submitting such proofs of claim, and approves the form of notice of the bar dates and manner of service thereof.

6.14    The Bar Date Order establishes the following bar dates:

(a)    General Bar Date – October 3, 2022: the date by which all entities (other than governmental units and certain categories of claimants exempt from complying with the applicable bar dates) that wish to assert a claim against the Debtors that arose prior to the Petition Date must file a proof of claim;

(b)    Governmental Bar Date – January 3, 2023: deadline by which each governmental unit must file a proof of claim;

(c)    Rejection Damages Bar Date – proofs of claim arising from rejection of an executory contract or unexpired lease must be filed on or before the later of (i) the General Bar Date or Governmental Bar Date, as applicable, and (ii) date that is thirty days following entry of an order approving rejection of an executory contract or unexpired lease; and

- - 26 - -

(d)  <u>Amended Schedules Bar Date</u> – in the event that the Debtors amend or supplement their Schedules (as defined in the Bar Date Order), the Debtors shall give notice of any such amendment to holders of any claim affected thereby and such holders shall be afforded at least 35 days from the date on which such notice is given to submit a proof of claim with respect to such amended claim.

<u>Bidding Procedures Order</u>

6.15  Shortly after the Petition Date, the Debtors crafted bidding procedures (the "**Bidding Procedures**") to further effectuate the Marketing Process, whether pursuant to section 363 of the U.S. Bankruptcy Code and/or provide a path for approval of the Proposed Plan of Reorganization.

6.16  The Bidding Procedure Order establishes various milestones, in respect of the Bidding Procedures and the Proposed Plan of Reorganization including:

(a)  a final bid deadline of August 26, 2022;

(b)  an auction, if necessary, to be held on August 29, 2022;

(c)  a sale objection deadline of September 6, 2022

(d)  a U.S. Court hearing on September 8, 2022 to consider approval of a sale;

(e)  a U.S. Court hearing on September 16, 2022 to consider approval of a disclosure statement;

(f)  confirmation by the U.S. Court approving a plan on October 31, 2022 (or such other date and time that the U.S. Court may direct).

6.17  The Information Officer notes that, at the Second Day Hearing, certain parties, including counsel to the Proposed Plaintiff, raised concerns regarding the expedited timeline of the

Bidding Procedure. After hearing such submissions, the U.S. Court granted the Bidding

Procedures Order and found that the expedited timeline is appropriate in the circumstances

and has the support of the UCC and other material stakeholders.

Summary Chart

6.18    For ease of reference, attached hereto as **Appendix "F"** is a chart summarizing (A) Orders

granted by the U.S. Court for which recognition has already been granted, (B) Orders

granted by the U.S. Court for which recognition is being sought at this time, and (C) Orders

granted by the U.S. Court for which recognition has not been obtained and is not being

sought at this time, with the exception of administrative orders such as retention orders.

## 7.0    DIRECTOR & OFFICER STAY

7.1    The Supplemental Order grants a stay of proceedings (commenced or continued) against

any of the former, current or future directors or officers of VDL with respect to any claim

against the directors or officers that arose before the date of the Supplemental Order and

that relates to any obligations of VDL whereby the directors or officers are alleged under

any law to be liable in their capacity as directors or officers for the payment or performance

of such obligations (the "**D&O Stay**").

7.2    At the July 19th Hearing, the Canadian Court requested further clarity regarding whether

an analogous D&O Stay was in place in the Chapter 11 Proceedings.

7.3    Since the July 19th Hearing, the Information Officer has corresponded with both United

States and Canadian counsel to the Debtors to understand the scope of the stay of

proceedings in the Chapter 11 Proceedings. Although the provisions in the Supplemental

Order providing for the D&O Stay are found in the template model order developed by the

Commercial List Users Committee and is typically granted in recognition proceedings under Part IV of the CCAA, the Information Officer understands that the stay of proceedings in place in the Chapter 11 Proceedings does not currently extend to claims against directors and officers (with the exception of derivative claims).

7.4    The Information Officer also understands that the Debtors intend to file a motion in the Chapter 11 Proceedings which will address this asymmetry. The Information Officer will provide further information regarding this motion, once filed, in a subsequent report.

## 8.0    MOTION BY PROPOSED PLAINTIFF

8.1    On July 24, 2022, counsel to the Proposed Plaintiff wrote to counsel to VDL seeking a variety of relief, including, among other things, a request to amend the Supplemental Order to grant additional powers to the Information Officer (the "**July 24 Letter**"). A copy of the July 24 Letter is attached hereto as **Appendix "G"**.

8.2    On July 29, 2022, the Information Officer's counsel wrote to counsel for the Proposed Plaintiff to provide the Information Officer's views on certain aspects of the proposed relief (the "**July 29 Letter**") prior to service of the Proposed Plaintiff Motion (as defined below). A copy of the July 29 Letter is attached hereto as **Appendix "H"**.

8.3    As set out in the July 29 Letter, with respect to the proposed additional duties of the Information Officer, the Information Officer is satisfied that its existing authority gives it the ability to attend court hearings in the Chapter 11 Proceedings and has attended all such hearings telephonically thus far. The Information Officer also intends, in accordance with existing practice and its existing authority, to review and report on any reorganization plan filed in the Chapter 11 Proceedings and its impact on Canadian creditors, with references

to fairness, reasonableness and public policy, as appropriate and relevant under Part IV of the CCAA. Accordingly, the Information Officer is of the view that augmentation of its powers is not required at this time. In this regard, the Information Officer notes at paragraph 49 of the Adjourned Relief Endorsement that this Court held:

> […] The role of the Information Officer was described by its counsel to include identifying points of prejudice or potential asymmetry with respect to the treatment of Canadian stakeholders for the court's consideration. It was suggested that this must be done contextually when there is a plan or some other proposal under consideration that affects those stakeholders. The court can and should be able to rely upon the Information Officer to carry out this role […]

8.4    On August 2, 2022, counsel to the Proposed Plaintiff served a notice of motion (the "**Proposed Plaintiff Motion**") seeking a variety of relief including:

(a)    compelling VDL to provide copies of insurance policies that may be responsive to the claims of the putative class members;

(b)    compelling VDL to provide details of intercorporate funding arrangements;

(c)    removal of the D&O Stay from the Supplemental Order;

(d)    additional duties of the Information Officer;

(e)    tolling of all prescription, time or limitation periods applicable to any Misrepresentation Rights (as defined therein) and of mandatory dismissal for delay under section 29.1 of the *Class Proceedings Act, 1992* until the stay is lifted;

(f)    appointment of Siskands LLP/Aird & Berlis LLP as representative counsel ("**Representative Counsel**") for all securities claimants and current shareholders

of VDL, funded by a charge on the estate of VDL or such other financial arrangements as the Honourable Court finds acceptable; and

(g)    creation of an equity committee in the CCAA Proceeding from which Representative Counsel shall take instruction.

8.5    With respect to the proposed additional powers of the Information Officer, for the reasons set out above, the Information Officer is of the view that augmentation of its powers is not required at this time.

8.6    With respect to the proposed tolling provisions, the Information Officer is advised by U.S. counsel to VDL that the U.S. Bankruptcy Code contains a provision tolling limitation periods for the duration of the automatic stay.[9] The Information Officer does not have concerns with a mirror provision being granted at this time in the CCAA Recognition Proceedings.

8.7    The Information Officer's comments with respect to the D&O Stay are set out above.

8.8    With respect to the balance of the relief sought as set out in the Adjourned Relief Endorsement, the COMI of VDL is the United States and the Chapter 11 Proceedings is a foreign main proceeding. In the Information Officer's view, the requested relief would

---

[9] Section 108(c) of the United States Code provides that if an applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 30 days after notice of termination or expiration of the stay under section 362, 922, 1201 or 1301 of the United States Code, as the case may be, with respect to such claim.

more appropriately be addressed in the plenary Chapter 11 Proceedings, rather than the ancillary CCAA Recognition Proceeding.

8.9    On August 8, 2022, the Canadian Court conducted a chambers hearing (the "**August 8 Hearing**") with respect to certain relief requested in the Proposed Plaintiff Motion, being compelling VDL to provide details of insurance policies that may be responsive to claims of the putative class members and compelling VDL to provide details of intercorporate funding arrangements. The Canadian Court declined to grant this relief prior to the motion scheduled for August 11, 2022. Attached hereto as **Appendix "I"** is a copy of the Canadian Court's endorsement with respect to the August 8 Hearing.

**9.0    INITIAL ACTIVITIES OF THE INFORMATION OFFICER**

9.1    The activities of the Information Officer to date have included:

(a)    reviewing relevant materials filed in the Chapter 11 Proceedings and drafts of the application materials for the CCAA Recognition Proceedings;

(b)    establishing the Case Website for the CCAA Recognition Proceedings to make available copies of the orders granted in the proceedings and other relevant motion materials and reports. As noted above, there is also a link on the Information Officer's website to the Chapter 11 Website maintained by Stretto that includes copies of the U.S. Court materials and orders, petitions and notices and other materials relevant to the Chapter 11 Proceedings;

(c)    reviewing and considering the orders made in the Chapter 11 Proceedings;

(d)     assisting the Foreign Representative with publishing a notice in *The Globe and Mail (National Edition)* on Tuesday, July 19, 2022 and Tuesday, July 26, 2022 (copies of the digital tearsheets attached as **Appendix "J"**);

(e)     monitoring the Chapter 11 Website for activity in the Chapter 11 Proceedings;

(f)     communicating with counsel to VDL and management of Voyager regarding matters relevant to the CCAA Recognition Proceedings and the Chapter 11 Proceedings;

(g)     communicating with counsel to the Proposed Plaintiff;

(h)     attending hearings before the Canadian Court on July 12, 2022, July 19, 2022 and August 8, 2022;

(i)     attending hearings before the U.S. Court on July 8, 2022 and August 4, 2022;

(j)     responding to inquiries from investors; and

(k)     with the assistance of legal counsel, preparing this First Report.

## 10.0    RECOMMENDATIONS

10.1    The Information Officer understands that recognition by the Canadian Court of the requested orders is necessary for the conduct of the Restructuring Proceedings, and that absent such recognition and relief, the restructuring efforts of the Debtors could be impaired. The Information Officer, together with its legal counsel, has reviewed the final NOL Order, Wages Order and Taxes Order, the Second Interim Cash Management Order, the Insurance Order, OCP Order, Bar Date Order and Bidding Procedures Order and is of the view that granting recognition of these orders is reasonable and appropriate in the

- - 33 - -

circumstances. Based on the foregoing, the Information Officer respectfully recommends

that the Canadian Court grant the relief requested by the Foreign Representative.


All of which is respectfully submitted to the Court this 8th day of August, 2022.


**ALVAREZ & MARSAL CANADA INC.**
**Information Officer of Voyager Digital Ltd.,**
**and not in its personal or corporate capacity**


Per:  _____
      Stephen Ferguson
      Senior Vice-President

# APPENDIX "A"

**CITATION:** In The Matter of Voyager Digital Ltd., 2022 ONSC 4553
**COURT FILE NO.:** CV-22-00683820-00CL
**DATE:** 20220804

## SUPERIOR COURT OF JUSTICE – ONTARIO
## (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE
COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**    Kimmel J.

**COUNSEL:**    *Stuart Brotman*, *Daniel Richer, and Aubrey Kauffman,* for the Applicant Voyager
Digital Ltd.

*Miranda Spence, Steve Graff, Anthony O'Brien and Garret Hunter*, for Francine
De Sousa (proposed class action plaintiff)

*Linc Rogers and Caitlyn McIntyre* for Alvarez Marsal, the Proposed Information
Officer

**HEARD:**    July 19, 2022

## ENDORSEMENT
## (INITIAL RECOGNITION AND SUPPLEMENTAL ORDER)

[1]    Following a hearing on July 12, 2022, an endorsement was released on July 13, 2022 that
established the issues for determination at this July 19, 2022 hearing. For ease of reference the
court's brief July 13, 2022 endorsement was as follows[1]:

> [1]  Voyager Digital Ltd. ("VDL") is incorporated and has its
> registered office at a law firm in British Columbia. Its shares are listed
> for sale on the Toronto Stock Exchange ("TSX"). Its subsidiaries in
> the United States operate a cryptocurrency brokerage, and custodial

---

[1] Defined terms from the July 13, 2022 endorsement shall have the same meaning in this endorsement.

and lending services. VDL maintains that the centre of its main interests ("COMI") is in the United States ("US").

[2] VDL (together with other US affiliates) commenced a case for relief under Chapter 11 of title 11 of the United States Code (The "Chapter 11 Case") in the United States Bankruptcy court for the Southern District of New York (the "US Bankruptcy Court") on July 5, 2022. On the First Day Hearing on July 8, 2022, the U.S. Bankruptcy Court granted certain Orders (the "U.S. Orders") and appointed VDL as the foreign representative of VDL. VDL seeks recognition of the U.S. Orders and various other relief set out in a proposed Initial Recognition Order and proposed Supplemental Order.

[3] VDL sought, as part of the Initial Recognition Order, a declaration that the proceeding before the US Bankruptcy Court (the "Foreign Proceeding") is a "foreign main proceeding" within the meaning of s. 45(1) of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA").

[4] The requested relief for an Initial Recognition Order and Supplemental Order proceeded on an unopposed basis, save and except with respect to the request for the court to declare that the Foreign Proceeding is a "foreign main proceeding" for purposes of Part IV of the CCAA. Counsel appearing for certain possible investors and counsel for a proposed representative plaintiff in a recently commenced proposed class action in Ontario (the "opposing counsel") each advised the court that they required some additional time to formulate their position and file evidence and/or submissions in respect of the court's determination of whether the Foreign Proceeding is a "foreign main proceeding" or a "foreign non-main proceeding" for purposes of Part IV of the CCAA (the "question").

[5] At the request of the opposing counsel, the court's determination of this question was adjourned to a hearing scheduled for 2:00 p.m. on Tuesday July 19, 2022 in Toronto, *via* video conference. The following timetable was ordered with respect to the material for this hearing:

a.    Any proponent of the position that the Foreign Proceeding is a "foreign non-main proceeding" shall deliver their material by Thursday July 14, 2022;

b.    The applicant and any parties supporting the applicant's position that the Foreign Proceeding is a "foreign main proceeding" shall deliver their material by Saturday July 16, 2022;

c.    Reply material, if any to be delivered by Sunday July 17, 2022;

d.    All materials to be filed with the court and uploaded onto CaseLines by 12:00 p.m. on Monday July 18, 2022.

[6] The amended Initial Recognition Order and Supplemental Order (that allow for the future determination of this question *nunc pro tunc*) are granted and shall issue, with my reasons to follow.

[2]    This endorsement contains the court's reasons for granting the Initial Recognition Order and Supplemental Order, and for the court's determination of the "question" after taking into account the written and oral submissions presented in connection with the July 19, 2022 hearing.

[3]    In answer to the "question", I find that the Foreign Proceeding is a "foreign main proceeding" for purposes of Part IV of the CCAA.

**The Participating Stakeholders**

[4]    VDL is not an operating company. VDL is not seeking interim financing at this time and, consequently is not seeking any charge or security related to interim financing on its properties, assets, or undertakings. The material filed on this application discloses that it has no secured creditors that will be affected by the priority Administration Charge that is granted under the paragraph 18 of the Supplemental Order (in favour of counsel to the Foreign Representative, the Information Officer and counsel to the Information Officer). VDL did not identify any stakeholders who it was required to serve with this application, pursuant to the CCAA or otherwise.

[5]    However, just prior to the commencement of this application a proposed class proceeding was commenced in the Ontario Superior Court of Justice seeking, among other things, relief under the *Securities Act* R.S.O. 1990 c. S-5 and the *Class Proceedings Act*, 1992, S.O. 1992, c 6, as amended, in which VDL, its Ontario-based director, and its Ontario-based former employee are named as defendants (the "De Sousa Action").

[6]    The proceedings involving VDL in the U.S. Bankruptcy Court were a matter of public knowledge. Counsel for the plaintiff in the De Sousa Action requested to be served or notified in connection with the Chapter 11 Case. Such counsel were served with this application. The application also came to the attention of counsel hoping to be retained by certain other investors in VDL.

[7]    These opposing counsel appeared on July 12, 2022. They also appeared on July 19, 2022 after being given the opportunity to make further written and oral submissions on the "question" in accordance with the court's July 13, 2022 endorsement.

[8]    No one else asked to be notified of insolvency proceedings in Canada, appeared or took any position in connection with the relief sought by this application aside from the participants identified in this endorsement. Opposing counsel speculate that there may be other creditors of VDL whose claims are not significant enough to warrant them retaining counsel and/or appearing.

**Legal Analytical Framework for Recognition Orders**

[9]     Comity mandates that Canadian courts should recognize and enforce the judicial acts of other jurisdictions, provided that those other jurisdictions have assumed jurisdiction on a basis consistent with principles of order, predictability, and fairness. Canadian courts have emphasized the importance of comity and cooperation in cross-border insolvency proceedings to avoid multiple proceedings, inconsistent judgments, and general uncertainty. See *Hollander Sleep Products, LLC (Re)*, 2019 ONSC 3238, at paras. 41,42 ("*Hollander*").

[10]    Part IV of the CCAA establishes the applicable process for the administration of cross-border insolvencies, with a view to promoting cooperation and coordination with foreign courts. Sections 46 and 47 of the CCAA provide as follows:

**Application for recognition of a foreign proceeding**

**46 (1)** A foreign representative may apply to the court for recognition of the foreign proceeding in respect of which he or she is a foreign representative.

**Documents that must accompany application**

**(2)** Subject to subsection (3), the application must be accompanied by

**(a)** a certified copy of the instrument, however designated, that commenced the foreign proceeding or a certificate from the foreign court affirming the existence of the foreign proceeding;

**(b)** a certified copy of the instrument, however designated, authorizing the foreign representative to act in that capacity or a certificate from the foreign court affirming the foreign representative's authority to act in that capacity; and

**(c)** a statement identifying all foreign proceedings in respect of the debtor company that are known to the foreign representative.

**Order recognizing foreign proceeding**

**47  (1)** If the court is satisfied that the application for the recognition of a foreign proceeding relates to a foreign proceeding and that the applicant is a foreign representative in respect of that foreign proceeding, the court shall make an order recognizing the foreign proceeding.

**Nature of foreign proceeding to be specified**

**(2)** The court shall specify in the order whether the foreign proceeding is a foreign main proceeding or a foreign non-main proceeding.

[11]    The determination of whether a foreign proceeding is a foreign main proceeding or a foreign non-main proceeding is a factual question. These, and related, terms are defined in s. 45 of the CCAA as follows:

**45  (1)** The following definitions apply in this Part.

**foreign court**  means a judicial or other authority competent to control or supervise a foreign proceeding.  (*tribunal étranger*)

**foreign main proceeding**  means a foreign proceeding in a jurisdiction where the debtor company has the centre of its main interests.  (*principale*)

**foreign non-main proceeding**  means a foreign proceeding, other than a foreign main proceeding.  (*secondaire*)

**foreign proceeding**  means a judicial or an administrative proceeding, including an interim proceeding, in a jurisdiction outside Canada dealing with creditors' collective interests generally under any law relating to bankruptcy or insolvency in which a debtor company's business and financial affairs are subject to control or supervision by a foreign court for the purpose of reorganization.  (*instance étrangère*)

**foreign representative**  means a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to

> **(a)** monitor the debtor company's business and financial affairs for the purpose of reorganization; or

> **(b)** act as a representative in respect of the foreign proceeding.  (*représentant étranger*)

**Centre of debtor company's main interests**

> **(2)** For the purposes of this Part, in the absence of proof to the contrary, a debtor company's registered office is deemed to be the centre of its main interests.

[12]    One of the other important considerations that has been emphasized by Canadian courts in dealing with insolvency proceedings is the need for consistency and fair treatment of all creditors across multiple jurisdictions under a single proceeding model. See *Hollander* at para. 42 and *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, at para. 22.

[13]    This is viewed to be consistent with the preferred "modified universalism" approach that is propounded in much of the Canadian jurisprudence dealing with cross-border insolvencies, described as follows:

> The notion of modified universalism is court recognition of main proceedings in one jurisdiction and non-main proceedings in other jurisdictions, representing some compromise of state sovereignty under domestic proceedings to advance international comity and co-operation.

*See MtGox Co. Ltd (Re)*, 2014 ONSC 5811, at para.11 ("*MtGox*").

**Analysis**

<u>Recognition of the Foreign Proceeding Under s. 46 and 47 of the CCAA</u>

[14]    There is no question that VDL has been named the Foreign Representative in a Foreign Proceeding. The requirements for recognizing the Ch. 11 proceedings involving VDL before the U.S. Bankruptcy Court as a foreign proceeding under ss. 46 and 47 of the CCAA are clearly satisfied and not disputed. Nor was the granting of the stay under the Initial Recognition Order

opposed, although such an order would be mandatory if the Foreign Proceeding is found to be a foreign-main proceeding, but only discretionary if it is found to be a foreign non-main proceeding.

<u>Where is the COMI of VDL Under s. 45 of the CCAA</u>

[15]    The "question" to be decided by the court in this case is whether the Foreign Proceeding is a foreign main proceeding or foreign non-main proceeding under s. 45 of the CCAA. This is dependent on where VDL's centre of main interests (COMI) is, as defined under s. 45 of the CCAA.

[16]    The applicant maintains that the Foreign Proceeding is a foreign main proceeding because the centre of VDL's COMI is in the US.  The applicant argues that there is ample proof in this case to rebut the presumption under s. 45(2) of the CCAA that its COMI is the local of its registered office in British Columbia.

[17]    The opposing counsel argue that VDL's COMI is in Canada, but do not appear to be insisting that it is in British Columbia, only that it is not in the US.

[18]    The parties agree on the test to be applied to determine whether the location in which the proceeding has been filed is VDL's COMI. This involves initial consideration of the following three primary factors:

> a.  the location in which the Foreign Proceeding has been filed is readily ascertainable by creditors;
>
> b.  the location in which the Foreign Proceeding has been filed is one in which the debtor's principal assets or operations are found; and
>
> c.  the location in which the Foreign Proceeding has been filed is where the management of the debtor takes place.

See *Zochem Inc. (Re)*, 2016 ONSC 958, at para 22 ("*Zochem*").

[19]    The applicant focuses on the location of the underlying operations of the VDL enterprise cryptocurrency business, all of which are in the US. The applicant also focuses on the fact that all the officers and senior management, and all but one of the directors, of VDL are residents and located in the US.

[20]    Opposing counsel instead focus on the business of VDL as the "parent" company, raising funds on the TSX, which activity they argue is operationally situated in Canada.  On the theory of opposing counsel, the operating businesses in the U.S. that are funded by the fruits of VDL's business in Canada, are secondary businesses to VDL's main business.

[21]    All participating parties also agree that, when these primary factors do not point to a single jurisdiction as the COMI of the debtor, other factors may need to be considered. When determining the COMI of a Canadian entity operating as part of a larger corporate group, courts have considered, among other factors:

a.   the location where corporate decisions are made;

b.   the location of employee administrations, including human resource functions;

c.   the location of the company's marketing and communication functions;

d.   whether the enterprise is managed on a consolidated basis;

e.   the extent of integration of an enterprise's international operations;

f.   the centre of an enterprise's corporate, banking, strategic and management functions;

g.   the existence of shared management within entities and in an organization;

h.   the location where cash management and accounting functions are overseen;

i.   the location where pricing decisions and new business development initiatives are created; and

j.   the location of an enterprise's treasury management functions, including management of accounts receivable and accounts payable.

See *Hollander*, at para 33; *CHC Group Ltd (Re)*, 2016 BCSC 2623 at para 11, citing *Angiotech Pharmaceuticals Inc. (Re),* 2011 BCSC 115 at para. 7 ; *Massachusetts Elephant & Castle Group, Inc (Re)*, 2011 ONSC 4201 at paras 26-31 ("*Elephant & Castle*").

[22]    While the decision making and management at the corporate group level is a relevant consideration, the analysis of VDL's COMI must still be undertaken at the entity level. See *MtGox*, at para. 11; *Hollander*, at para. 30; *Elephant & Castle*, at para. 20.

[23]    In all cases, however, the court must not lose sight of what it is attempting to determine: "… the review is designed to determine that the location of the proceeding, in fact, corresponds to where the debtor's true seat or principal place of business actually is, consistent with the expectations of those who dealt with the enterprise prior to commencement of the proceedings." See *Lightsquared LP, Re*, 2012 ONSC 2994, at para. 26 ("*Lightsquared*"); see also *Zochem* at paras. 23-25.

*The Primary Factors*

[24]    The location of the U.S. Bankruptcy Court where the Foreign Proceeding was filed is readily ascertainable to stakeholders.  VDL is clearly managed in the US. However, the location of its principal assets and operations could arguably be a question of perspective and how its creditors and other stakeholder perceive the nature of VDL's business as a holding company.

[25]    Opposing counsel primarily argue that investors and other stakeholders in the shares and securities issued by VDL have an expectation of VDL's business being conducted in and from Canada, and particularly emphasize the description of VDL's core business by its CEO as: "VDL

serves only as a publicly-traded holding company whose sole function is to raise capital from public markets by listing on the TSX." While this may be a relevant consideration, I consider it to be only the start of the analysis.

[26]    In a case involving a public company, a logical place to look for the objectively ascertainable expectations of shareholders and other stakeholders as to the location of a company's principal assets and operations is its publicly filed documents, such as the short form shelf prospectus dated August 17, 2021 (the "Prospectus") used for VDL's public offering.

[27]    The opposing counsel point to statements in the Prospectus indicating that VDL's "… securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "U.S. Securities Act"), or the securities laws of any state of the United States… and may not be offered, sold or delivered, directly or indirectly, in the United States except pursuant to an exemption from registration under the U.S. Securities Act and applicable U.S. state securities laws."

[28]    However, these prescriptive statements about the registration and sale of VDL's securities do not paint the full picture. The Prospectus referred to and relied upon by opposing counsel not only clearly states that VDL's "principal place of business is in the United States", but it also includes the following statements:

At page 22 of the Prospectus:

> The Company is a corporation formed under the laws of British Columbia, Canada; however its principal place of business is in the United States. Most of the Company's directors and officers, the Company's auditors, and the majority of the Company's assets, are located in the United States.

The narrative on this page goes on to indicate that service of claims against the non-resident directors, officers, employees etc. of VDL could be difficult, as could be the pursuit and/or enforcement of claims against them in the U.S.

At page 8 of the Prospectus:

> The Company [earlier defined as VDL] is a technology company involved in the business of developing and commercializing a digital platform focused on enabling users to buy and sell digital assets (cryptocurrencies) in one account across multiple centralized or decentralized marketplaces that unite and match buyers and sellers of cryptocurrencies. Voyager is a licensed digital asset Money Services Business that provides investors with a turnkey solution to trade digital assets. References in this prospectus, including the documents incorporated by reference herein, to the Company being licensed or registered refer to its status as a Money Services Business in the United States under FinCEN, a bureau of the United States Department of the Treasury. The Company has implement [sic] procedures in order to prevent residents in the provinces and territories of Canada from become [sic] clients or customers of its crypto-asset trading and investing business, these measures include KYC procedures and geofencing the availability of the Voyager app.

> To the best of the Company's knowledge, the Company does not have any clients or customers who are ordinarily resident in, or have immigrated to, Canada.

[29]    There is no question that VDL's decision making takes place in the US. Even before the one Canadian employee and officer of VDL left in June 2022, that was the situation. VDL does not have, and never had, any physical premises in Canada. Operationally, the entirety of the cryptocurrency business is run out of the US. Although the COMI of VDL must be analyzed at the entity level, the existence of a corporate group operating through foreign subsidiaries cannot be ignored. See *Hollander*, at para. 34.

[30]    The Prospectus contextualizes VDL's business and is an objective source from which to ascertain the reasonable expectations of VDL's stakeholders. It clearly indicates the locale of VDL's principal assets and operations and management to be the U.S.

[31]    Opposing counsel argue that there would be corporate records at VDL's head office in Vancouver and that VDL is subject to the Canadian securities' regulatory regime as a reporting issuer with shares listed on the TSX. These are disclosed in the Prospectus and do not, in my view, displace the US. as the more readily ascertainable principal place of VDL's business, operations, and management.

*The Secondary Factors*

[32]    If there was any doubt about the US as the more readily ascertainable principal place of VDL's business, an analysis of the applicable secondary factors either supports or is neutral to that same conclusion. There is little that points to Canada as the principal place of the self-described cryptocurrency business of VDL.

[33]    Opposing counsel points out that two of VDL's subsidiaries, one in Canada and one in the US, have been granted Money Services Business ("MSB") registrations with Canada's Financial Transaction and Reports Analysis Centre of Canada ("FINTRAC"), suggesting that this may be paving the way for operations in Canada. However, there is no suggestion of any activity undertaken in Canada that is reliant upon the MSB registrations, just speculation by opposing counsel that these registrations may lead to future prospective activity in Canada. This is not a current indicia of the primary seat of VDL's business being located in Canada.

[34]    Opposing counsel further speculate that there could be creditors of this securities business who did not appear on the application but for whom the court should not presume an expectation that the principal place of business of VDL is in the US. However, this speculation runs against the disclosure contained in the Prospectus about the locale of VDL's business, operations and management and does not displace that disclosure in the absence of any concrete evidence to the contrary.

[35]    Having regard to the facts and evidence before the court at this time, I find that the proceedings before the U.S. Bankruptcy Court correspond with where "the debtor's true seat or principal place of business actually is, consistent with the expectations of those who dealt with the enterprise prior to commencement of the proceedings." See *Lightsquared* , at para. 26; see also *Zochem* at paras. 23-25. The legitimate expectations of third parties dealing with VDL and its subsidiaries would consider the US to be the principal seat of VDL's business.

[36]    This case is similar to *Probe Resources Ltd (Re)*, 2011 BCSC 552, at paras. 2-3 and 24-25 and 28, in which the British Columbia Supreme Court found a publicly listed Canadian parent holding company of an oil and natural gas business operating through US subsidiaries (with nominal assets located in Canada and all of its operations, other than administration and organization matters, located in the US) to have its COMI in the US.

[37]    I find in all of the circumstances of this case that the COMI of VDL is in the US and that the Foreign Proceeding in the U.S. Bankruptcy Court should be recognized on that basis, as a foreign main proceeding. Accordingly, I find that the presumption in s. 45(2) of the CCAA has been rebutted in respect of VDL.

*Policy Considerations*

[38]    The test for determining the COMI of a debtor is not a balancing of prejudices. However, s. 61(2) of the CCAA applies and provides as follows: "Nothing in [Part IV of the CCAA] prevents the court from refusing to do something that would be contrary to public policy."

[39]    Opposing counsel make two foundational policy assertions, that: (i) if the Foreign Proceeding is recognized as a "foreign main proceeding", Canadian securities regulators and police would be prohibited from carrying out their investigative functions, and (ii) if the Foreign Proceeding is recognized as a "foreign main proceeding", Ms. De Sousa (the proposed representative plaintiff in the proposed class action) and the equity holders she wishes to represent (and possibly other Canadian stakeholders) will be excluded from participating in the restructuring proceedings of VDL.

[40]    In *MtGox*  (at para. 25), relied upon by opposing counsel, the trustee wanted ongoing litigation to be enjoined in Canada, to give priority to the protections afforded in the Japan bankruptcy proceeding. There was no prohibition against ongoing investigations by regulators or police.  There is nothing to indicate whether there was, in fact, any  Canadian police, regulatory or criminal authority involvement after the stay was granted in *MtGox*, and if not why  The suggestion by opposing counsel that this was the result of the court's recognition of the foreign proceeding in Japan as a foreign main proceeding is not supported.

[41]    Furthermore, the Supplemental Order issued by this court on July 12, 2022 in this case expressly exempts from the stay the exceptions to the automatic stay contained in Bankruptcy Code section 362(b), which exceptions include:

    a.  (1) the commencement or continuation of a criminal action or proceeding against the debtor; and

    b.  (25) under subsection (a), of -- (A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

[42]    Thus, there is no basis for the suggestion in this case that there is a public policy concern that the finding that the Foreign Proceeding before the U.S. Bankruptcy Court is a foreign main proceeding will preclude any Canadian regulatory or police investigations of VDL.

[43]    There is similarly no factual basis for the contention of opposing counsel that a finding that the Foreign Proceeding in this case is a foreign main proceeding will preclude Canadian equity holders or other stakeholders of VDL from participating, or lead to their inequitable treatment, in the restructuring proceedings of VDL.

[44]    During oral argument, further speculative concerns about the terms of a future proposed plan and the possibility of effective substantive consolidation were also raised.

[45]    Much emphasis was placed on the speculative concern that the U.S. Bankruptcy Court would not agree to the appointment of representative counsel for class action shareholders or other uniquely situated Canadian stakeholders, whereas there is precedent for so doing in CCAA proceedings, when warranted.  First, I note that it is not guaranteed that representative counsel would be appointed even if the Foreign Proceeding was declared to be a foreign non-main proceeding and there was to be a parallel CCAA proceeding in Canada.

[46]    But, a more direct rebuke to the suggestion that there would be no role opportunity for representative counsel to represent uniquely situated Canadian stakeholders in the Foreign Proceeding is found in the example of a precedent (brought to the court's attention by the applicant) for recognizing and carving out a role for representative counsel on behalf of Canadian stakeholders in a different type of U.S. bankruptcy proceeding: See *Re LTL Management LLC*, (SCJ Court File No. CV-21-00673856-00CL).

[47]    The Information Officer that has been appointed by the court in this case supports the position of VDL and is appropriately situated, by virtue of the powers, authority, duties, and responsibilities that it has been given pursuant to the Supplemental Order, to keep the court of apprised of any concerns that are specific to Canadian stakeholders that may arise in the context of future recognition orders sought from this court.

[48]    The concerns raised by opposing counsel, at some level, seem to presume that the Information Officer will fail to recognize and bring concerns to the court's attention in the future, or that the "reporting" role of the Information Officer is too limited and would need to be expanded to include monitoring and making recommendations to the court.

[49]    Counsel for the Information Officer did not necessarily accept the suggested limitations on the role of the Information Officer. The role of the Information Officer was described by its counsel to include identifying points of prejudice or potential asymmetry with respect to the treatment of Canadian stakeholders for the court's consideration.  It was suggested that this must be done contextually when there is a plan or some other proposal under consideration that affects those stakeholders.  The court can and should be able to rely upon the Information Officer to carry out this role.  It is presumptuous for opposing counsel to suggest or assume that the Information Office will not carry out this role and its duties to the best of its abilities.

[50]    But, more importantly and appropriately, counsel for the Information Officer noted that the speculative concerns raised do not affect the factual determination of the COMI of VDL, which is in the US, and the court's determination that the Foreign Proceeding is a foreign main proceeding as the CCAA mandates in such circumstances. The noted concerns are more

appropriately addressed if and when they, or other concerns, actually arise in the context of future requests for recognition orders in this proceeding.

[51]    If there are valid public policy concerns that are raised in connection with future requests for recognition orders, they may be considered by the court under s. 61(2) of the CCAA at that time. To speculate about those concerns and attempt to pre-emptively address them now at the stage of the Initial Recognition Order and Supplemental Order in the context of the determination of the "question" of whether the Foreign Proceeding is a foreign main or foreign non-main proceeding would be premature.

[52]    I do not find there to be any existing identified public policy concerns that lead me to exercise the court's jurisdiction under s. 61(2) of the CCAA to refuse to make the finding that the US is the COMI of VDL and/or to refuse to make the declaration that the Foreign Proceeding is a foreign main proceeding under part IV of the CCAA.

[53]    The court's findings and orders made at this time do not preclude the future examination of legitimate public policy concerns that may arise in connection with future requests for recognition orders in connection with the Foreign Proceeding.

[54]    Nor do they preclude any party from applying to vary or amend the Initial Recognition Order pursuant to paragraph 9 thereof, including for a request to expand the duties and powers of the Information Officer.

**Final Determination of the Question**

[55]    The only immediate and mandated effect of a determination that the Foreign Proceeding as a foreign main proceeding is that the stay is mandatory (whereas it would have been a discretionary order if I had determined it was a foreign non-main proceeding). In either event, the stay has already been ordered.  To that extent, I find myself in the same place as Newbould J. was when he said in *Zochem* (at para. 26):

> In this case it is perhaps an academic exercise to decide if the foreign proceeding is a main or non-main proceeding because it is appropriate for a stay to be ordered in either event. However, I am satisfied that for our purposes the applicants have established that the foreign proceeding is a foreign main proceeding. The court's declaration that the Foreign Proceeding is a foreign main proceeding is made *nunc pro tunc* to the date of the Initial Recognition Order and Supplemental Order, July 12, 2022.

**Kimmel J.**

**Date:** August 4, 2022

# APPENDIX "B"

Court File No. CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | TUESDAY, THE 12TH DAY OF JULY, 2022 |
| | ) | AND AMENDED AND RESTATED |
| JUSTICE KIMMEL | ) | FRIDAY, THE 5TH DAY OF AUGUST, 2022 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

# AMENDED AND RESTATED INITIAL RECOGNITION ORDER
# (FOREIGN MAIN PROCEEDING)

THIS APPLICATION, made by Voyager Digital Ltd. ("**VDL**") in its capacity as the foreign representative (the "**Foreign Representative**") of VDL in respect of the proceedings (the "**Foreign Proceeding**") commenced on July 5, 2022, in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") for an Order substantially in the form enclosed in the Application Record, was heard this day by video conference.

ON READING the Notice of Application, the affidavit of Stephen Ehrlich sworn July 10, 2022, the affidavit of Mitchell Stephenson sworn July 11, 2022, the affidavit of service of Daniel Richer sworn July 11, 2022, the affidavit of Rory Smith affirmed July 14, 2022 and the affidavit of Mitchell Stephenson sworn July 16, 2022, each filed,

AND UPON BEING ADVISED by counsel for the Foreign Representative that in addition to this Initial Recognition Order, a Supplemental Order is being sought,

-2-

AND UPON HEARING the submissions of counsel for the Foreign Representative, counsel for Alvarez & Marsal Canada Inc., in its capacity as proposed information officer (the "**Proposed Information Officer**"), and such other counsel that appeared on the application, and upon being provided with copies of the documents required by section 46 of the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 (the "**CCAA**");

AND UPON HEARING submissions from counsel for Francine De Sousa and counsel making submissions on behalf of the interests of certain retail investors seeking an adjournment of the determination as to whether the Foreign Proceeding is a "foreign main proceeding":

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**FOREIGN REPRESENTATIVE**

2.      THIS COURT ORDERS AND DECLARES that the Foreign Representative is the "foreign representative" as defined in section 45 of the CCAA of VDL in respect of the Foreign Proceeding.

**CENTRE OF MAIN INTEREST AND RECOGNITION OF FOREIGN PROCEEDING**

3.      THIS COURT DECLARES that the centre of main interest for VDL is the United States of America, and that the Foreign Proceeding is hereby recognized as a "foreign main proceeding" as defined in section 45 of the CCAA.

-3-

**STAY OF PROCEEDINGS**

4.    THIS COURT ORDERS that until otherwise ordered by this Court:

(a)    all proceedings taken or that might be taken against VDL under the *Bankruptcy and Insolvency Act*, R.S.C., 1985, c. B-3, as amended, *or the Winding-up and Restructuring Act*, R.S.C., 1985, c. W-11, as amended, are stayed;

(b)    further proceedings in any action, suit or proceeding against VDL are restrained; and

(c)    the commencement of any action, suit or proceeding against VDL is prohibited.

5.    THIS COURT ORDERS that, except with leave of this Court, VDL is prohibited from selling or otherwise disposing of:

(a)    outside the ordinary course of its business, any of its property in Canada that relates to the business; and

(b)    any of its other property in Canada.

**GENERAL**

6.    THIS COURT ORDERS that without delay after this Order is made, the Foreign Representative shall cause to be published a notice substantially in the form attached to this Order as **Schedule "A"**, once a week for two consecutive weeks, in the Globe and Mail (National Edition).

7.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, to give effect to this Order and to assist VDL and the Foreign Representative and its respective counsel and agents in carrying out the terms of this Order.

-4-

8.      THIS COURT ORDERS AND DECLARES that this Order shall be effective as of 12:01

a.m. Toronto time on the date of this Order, and this Order is not required to be entered.


9.      THIS COURT ORDERS that any interested party may apply to this Court to vary or amend

this Order or seek other relief on not less than seven (7) days' notice to VDL, the Foreign

Representative, the Proposed Information Officer and their respective counsel, and to any other

party or parties likely to be affected by the order sought, or upon such other notice, if any, as this

Court may order.


_____

Court File No. CV-22-00683820-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## NOTICE OF INITIAL RECOGNITION ORDER

PLEASE BE ADVISED that this Notice is being published pursuant to an order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**"), granted on July 12, 2022 (the "**Initial Recognition Order**").

TAKE NOTICE that on July 5, 2022, Voyager Digital Ltd. ("**VDL**") filed a voluntary petition for relief under Chapter 11, title 11 of the United States Code (the "**Chapter 11 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**"). In connection with the Chapter 11 Proceeding, VDL has been appointed as the foreign representative of its estate (the "**Foreign Representative**"). The Foreign Representative's address is 33 Irving Place, Suite 3060, New York, NY 10003.

AND TAKE NOTICE that the Initial Recognition Order and the supplemental order granted by the Canadian Court on July 12, 2022 (together with the Initial Recognition Order, the "**Recognition Orders**"), which were both issued by the Canadian Court under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA Recognition Proceeding**"), among other things:

(i)   ordered that the Chapter 11 Proceeding is recognized as a foreign proceeding;

(ii)  granted a stay of proceedings against VDL and its former, current and future directors and officers;

(iii) recognized certain orders granted by the U.S. Bankruptcy Court in the Chapter 11 Proceeding; and

(iv)  appointed Alvarez & Marsal Canada Inc. as the information officer (in such capacity, the "**Information Officer**") with respect to the CCAA Recognition Proceeding.

-2-

AND TAKE NOTICE that motions, orders and notices filed with the U.S. Bankruptcy Court in the Chapter 11 Proceeding are available at https://cases.stretto.com/Voyager and that the Recognition Orders and any other orders that may be granted by the Canadian Court in the CCAA Recognition Proceeding are available at http://www.alvarezandmarsal.com/VoyagerDigital.

AND TAKE NOTICE that counsel for the Foreign Representative is:

> **Fasken Martineau DuMoulin LLP**
> Bay Adelaide Centre, 333 Bay Street, Suite 2400, Toronto ON M5H 2T6
> Email:          VoyagerCCAACounsel@fasken.com

FINALLY TAKE NOTICE that if you wish to receive copies of the Recognition Orders or obtain further information in respect of the matters set forth in this Notice, you may contact the Information Officer:

> **Alvarez & Marsal Canada Inc.**
> Royal Bank Plaza, South Tower, 200 Bay Street, Suite 2900, Toronto ON M5J 2J1
> Phone:          [●]
> Email:          [●]

DATED AT TORONTO, ONTARIO this [●]th day of July, 2022.

**Voyager Digital Ltd.**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No. CV-22-00683820-00CL

| |
|---|
| **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>**Proceeding commenced at**<br>**Toronto** |
| **AMENDED AND RESTATED**<br>**INITIAL RECOGNITION ORDER**<br>**(FOREIGN MAIN PROCEEDING)** |
| **FASKEN MARTINEAU DuMOULIN LLP**<br>Barristers and Solicitors<br>333 Bay Street, Suite 2400<br>Bay Adelaide Centre, Box 20<br>Toronto ON   M5H 2T6<br><br>**Stuart Brotman (LSO:  43430D)**<br>sbrotman@fasken.com<br>Tel:  416 865 5419<br>**Aubrey Kauffman (LSO:  18829N)**<br>akauffman@fasken.com<br>Tel:  416 868 3538<br>**Daniel Richer (LSO:  75225G)**<br>dricher@fasken.com<br>Tel:  416 865 4445<br>**Mitch Stephenson (LSO:  73064H)**<br>mstephenson@fasken.com<br>Tel:  416 868 3502<br><br>Lawyers for the Applicant |

# APPENDIX "C"

Court File No. CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | TUESDAY, THE 12TH |
| | ) | |
| JUSTICE KIMMEL | ) | DAY OF JULY, 2022 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

# SUPPLEMENTAL ORDER

THIS APPLICATION, made by Voyager Digital Ltd. ("**VDL**") in its capacity as the foreign representative (in such capacity, the "**Foreign Representative**") of VDL in respect of the proceedings (the "**Foreign Proceeding**") commenced on July 5, 2022, in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") for an Order substantially in the form enclosed in the Application Record, was heard this day by video conference.

ON READING the Notice of Application, the affidavit of Stephen Ehrlich sworn July 10, 2022 (the "**Ehrlich Affidavit**"), the affidavit of Mitchell Stephenson sworn July 11, 2022 and the affidavit of service of Daniel Richer sworn July 11 2022, each filed, and on being advised that VDL does not have any secured creditors who are likely to be affected by the charges created herein, and on hearing the submissions of counsel for the Foreign Representative, counsel for Alvarez & Marsal Canada Inc. ("**A&M**"), in its capacity as proposed information officer (in such

capacity, the "**Proposed Information Officer**"), and such other counsel that appeared on the application, and on reading the consent of A&M to act as the information officer, filed:

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**INITIAL RECOGNITION ORDER**

2.      THIS COURT ORDERS that any capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Initial Recognition Order dated July 12, 2022 (the "**Initial Recognition Order**") or the Ehrlich Affidavit.

3.      THIS COURT ORDERS that the provisions of this Supplemental Order shall be interpreted in a manner complementary and supplementary to the provisions of the Initial Recognition Order, provided that in the event of a conflict between the provisions of this Supplemental Order and the provisions of the Initial Recognition Order, the provisions of the Initial Recognition Order shall govern.

**RECOGNITION OF FOREIGN ORDERS**

4.      THIS COURT ORDERS that the following orders (collectively, the "**Foreign Orders**") of the U.S. Bankruptcy Court made in the Foreign Proceeding are hereby recognized and given full force and effect in all provinces and territories of Canada pursuant to Section 49 of the CCAA:

(a)      order (I) authorizing VDL to act as foreign representative and (II) granting related relief, a certified copy of which is attached hereto as **Schedule "A"**;

(b)     order (I) directing joint administration of the Chapter 11 cases and (II) granting related relief, a copy of which is attached hereto as **Schedule "B"**;

(c)     order (I) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code, (II) approving the form and manner of notice, and (III) granting related relief, a copy of which is attached hereto as **Schedule "C"**;

(d)     interim order (I) approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to common stock and (II) granting related relief, a copy of which is attached hereto as **Schedule "D"**;

(e)     interim order (I) authorizing the debtors to (A) pay prepetition employee wages, salaries, other compensation, and reimbursable expenses and (B) continue employee benefits programs and (II) granting related relief, a copy of which is attached hereto as **Schedule "E"**;

(f)     order (I) extending time to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, and rule 2015.3 financial reports, (II) waiving requirements to file list of equity holders, and (III) granting related relief, a copy of which is attached hereto as **Schedule "F"**;

(g)     interim order (I) authorizing the debtors to (A) continue to operate their cash management system, (B) honor certain prepetition obligations related thereto, (C) maintain existing business forms, and (D) continue to perform intercompany

transactions, (II) granting superpriority administrative expense status to postpetition intercompany balances, and (III) granting related relief, a copy of which is attached hereto as **Schedule "G"**,

(h)    interim order (I) establishing certain notice, case management, and administrative procedures and (II) granting related relief, a copy of which is attached hereto as **Schedule "H"**; and

(i)    order (I) authorizing the debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each debtor, (II) authorizing the debtors to file a consolidated list of the debtors' fifty largest unsecured creditors, (III) authorizing the debtors to redact certain personally identifiable information, (IV) approving the form and manner of notifying creditors of commencement of these Chapter 11 cases, and (V) granting related relief, a copy of which is attached hereto as **Schedule "I"**; and

(j)    interim order (I) authorizing the payment of certain taxes and fees and (II) granting related relief, a copy of which is attached hereto as **Schedule "J"**,

provided, however, that in the event of any conflict between the terms of the Foreign Orders and the Orders of this Court made in the within proceedings, the Orders of this Court shall govern with respect to Property (as defined below) in Canada.

**APPOINTMENT OF INFORMATION OFFICER**

5.      THIS COURT ORDERS that A&M (the "**Information Officer**") is hereby appointed as
an officer of this Court, with the powers and duties set out herein and in any other Order made in
these proceedings.

**NO PROCEEDINGS AGAINST VDL, THE BUSINESS OR THE PROPERTY**

6.      THIS COURT ORDERS that until such date as this Court may order (the "**Stay Period**")
no proceeding, or enforcement process in any court or tribunal in Canada (each, a "**Proceeding**")
shall be commenced or continued against, or in respect of VDL or affecting its business
(the "**Business**") or its current and future assets, undertakings and properties of every nature and
kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), except
with leave of this Court, and any and all Proceedings currently under way against or in respect of
any of VDL or affecting the Business or the Property are hereby stayed and suspended pending
further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

7.      THIS COURT ORDERS that during the Stay Period, all rights and remedies of any
individual, firm, corporation, governmental body or agency, or any other entities (all of the
foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of VDL,
or affecting the Business or the Property, are hereby stayed and suspended except with leave of
this Court, provided that nothing in this Order shall (i) prevent the assertion of or the exercise of
rights and remedies outside of Canada, (ii) empower VDL to carry on any business in Canada
which VDL is not lawfully entitled to carry on, (iii) affect such investigations or Proceedings by a
regulatory body as are permitted by section 11.1 of the CCAA, (iv) prevent the filing of any

-6-

registration to preserve or perfect a security interest, or (v) prevent the registration of a claim for

lien.

## NO INTERFERENCE WITH RIGHTS

8.      THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to

honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by VDL and affecting the Business in

Canada, except with leave of this Court.

## ADDITIONAL PROTECTIONS

9.      THIS COURT ORDERS that during the Stay Period, all Persons having oral or written

agreements with VDL or statutory or regulatory mandates for the supply of goods and/or services

in Canada, including without limitation all computer software, communication and other data

services, centralized banking services, payroll services, insurance, transportation services, utility

or other services provided in respect of the Property or Business, are hereby restrained until further

Order of this Court from discontinuing, altering, interfering with or terminating the supply of such

goods or services as may be required by VDL, and that VDL shall be entitled to the continued use

in Canada of its bank accounts, telephone numbers, facsimile numbers, internet addresses and

domain names.

10.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection

11.03(2) of the CCAA or by leave of this Court, no Proceeding may be commenced or continued

against any of the former, current or future directors or officers of VDL with respect to any claim

against the directors or officers that arose before the date hereof and that relates to any obligations

of VDL whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations.

11.     THIS COURT ORDERS that no Proceeding shall be commenced or continued against or in respect of the Information Officer, except with leave of this Court. In addition to the rights and protections afforded the Information Officer herein, or as an officer of this Court, the Information Officer shall have the benefit of all of the rights and protections afforded to a Monitor under the CCAA, and shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.

**OTHER PROVISIONS RELATING TO INFORMATION OFFICER**

12.     THIS COURT ORDERS that the Information Officer:

    (a)     is hereby authorized to provide such assistance to the Foreign Representative in the performance of its duties as the Foreign Representative may reasonably request;

    (b)     shall report to this Court at such times and intervals that the Information Officer considers appropriate or as this Court may direct with respect to the status of these proceedings and the status of the Foreign Proceeding, which reports may include information relating to the Property, the Business, or such other matters as may be relevant to the proceedings herein;

    (c)     shall have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of

-8-

VDL, to the extent that is necessary to perform its duties arising under this Order; and

(d)     shall be at liberty to engage independent legal counsel or such other persons as the Information Officer deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order.

13.     THIS COURT ORDERS that VDL, including in its capacity as the Foreign Representative, shall (i) advise the Information Officer of all material steps taken by VDL, including in its capacity as the Foreign Representative, in these proceedings or in the Foreign Proceeding, (ii) co-operate fully with the Information Officer in the exercise of its powers and discharge of its obligations, and (iii) provide the Information Officer with the assistance that is necessary to enable the Information Officer to adequately carry out its functions.

14.     THIS COURT ORDERS that the Information Officer shall not take possession of the Property, shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

15.     THIS COURT ORDERS that the Information Officer may provide any creditor of VDL with information provided by VDL in response to reasonable requests for information made in writing by such creditor addressed to the Information Officer. The Information Officer shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Information Officer has been advised by VDL is privileged or confidential, the Information Officer shall not provide such information to creditors

unless otherwise directed by this Court or on such terms as the Information Officer and VDL, including in its capacity as the Foreign Representative, may agree.

16.     THIS COURT ORDERS that Canadian counsel to the Foreign Representative, the Information Officer and counsel to the Information Officer shall be paid by VDL their reasonable fees and disbursements incurred in respect of these proceedings, both before and after the making of this Order, in each case at their standard rates and charges unless otherwise ordered by the Court on the passing of accounts. VDL is hereby authorized and directed to pay the accounts of the Canadian counsel to the Foreign Representative, Information Officer and counsel for the Information Officer on a monthly basis, and the retainers previously paid to the Information Officer and counsel to the Information Officer, each in the amount of $75,000, are hereby approved.

17.     THIS COURT ORDERS that the Information Officer and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Information Officer and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice, and the accounts of the Information Officer and its counsel, shall not be subject to approval in the Foreign Proceeding.

18.     THIS COURT ORDERS that the Canadian counsel to the Foreign Representative, the Information Officer, and counsel to the Information Officer shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property in Canada, which charge shall not exceed an aggregate amount of CAD$500,000, as security for their professional fees and disbursements incurred in respect of these proceedings, both before and after the making of this Order. The Administration Charge shall have the priority set out in paragraph 20 hereof.

-10-

## VALIDITY AND PRIORITY OF ADMINISTRATION CHARGE

19.     THIS COURT ORDERS that the filing, registration or perfection of the Administration

Charge shall not be required, and that the Administration Charge shall be valid and enforceable

for all purposes, including as against any right, title or interest filed, registered, recorded or

perfected subsequent to the Administration Charge coming into existence, notwithstanding any

such failure to file, register, record or perfect the Administration Charge.

20.     THIS COURT ORDERS that each of the Administration Charge (as constituted and

defined herein) shall constitute a charge on the Property in Canada and such Administration

Charge shall rank in priority to all other security interests, trusts, liens, charges and encumbrances,

claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of

any Person.

21.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may

be approved by this Court, VDL shall not grant any Encumbrances over any Property in Canada

that rank in priority to, or *pari passu* with, the Administration Charge, unless the VDL also obtains

the prior written consent of the Information Officer.

22.     THIS COURT ORDERS that the Administration Charge shall not be rendered invalid or

unenforceable and the rights and remedies of the chargees entitled to the benefit of the

Administration Charge (collectively, the "**Chargees**") shall not otherwise be limited or impaired

in any way by (i) the pendency of these proceedings and the declarations of insolvency made

herein; (ii) any application(s) for bankruptcy order(s) issued pursuant to the *Bankruptcy and

Insolvency Act*, R.S.C., 1985, c. B-3, as amended (the "**BIA**"), or any bankruptcy order made

pursuant to such applications; (iii) the filing of any assignments for the general benefit of creditors

made pursuant to the BIA; (iv) the provisions of any federal or provincial statutes; or (v) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds VDL, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Administration Charge shall not create or be deemed to constitute a breach by VDL of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Administration Charge; and

(c)     the payments made by VDL to the Chargees pursuant to this Order, and the granting of the Administration Charge, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

## SERVICE AND NOTICE

23.     THIS COURT ORDERS that that the Guide Concerning Commercial List E-Service (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at https://www.ontariocourts.ca/scj/practice/practice-directions/toronto/eservice-commercial/) shall be valid and effective service.  Subject to Rule 17.05 of the Rules of Civil Procedure, this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the

-12-

Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission.  This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL 'http://www.alvarezandmarsal.com/VoyagerDigital' (the "**Case Website**").

24.     THIS COURT ORDERS that if the service or distribution of documents in accordance with the Protocol is not practicable, VDL, including in its capacity as the Foreign Representative, and the Information Officer are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or facsimile transmission to VDL's creditors or other interested parties at their respective addresses as last shown on the records of VDL and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

25.     THIS COURT ORDERS that the Information Officer (i) shall post on the Case Website all Orders of this Court made in these proceedings, all reports of the Information Officer filed herein, and such other materials as this Court may order from time to time, and (ii) may post on the Case Website any other materials that the Information Officer deems appropriate.

**GENERAL**

26.     THIS COURT ORDERS that the Information Officer may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

-13-

27.    THIS COURT ORDERS that nothing in this Order shall prevent the Information Officer

from acting as an interim receiver, a receiver, a receiver and manager, a monitor, a proposal trustee,

or a trustee in bankruptcy of VDL, the Business or the Property.

28.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal,

regulatory or administrative body having jurisdiction in Canada or in the United States to give

effect to this Order and to assist VDL, including in its capacity as the Foreign Representative, the

Information Officer, and their respective agents in carrying out the terms of this Order. All courts,

tribunals, regulatory and administrative bodies are hereby respectfully requested to make such

orders and to provide such assistance to VDL, including in its capacity as the Foreign

Representative, and the Information Officer, the latter as an officer of this Court, as may be

necessary or desirable to give effect to this Order, or to assist VDL, including in its capacity as the

Foreign Representative, and the Information Officer and their respective agents in carrying out the

terms of this Order.

29.    THIS COURT ORDERS that each of VDL, including in its capacity as the Foreign

Representative, and the Information Officer be at liberty and is hereby authorized and empowered

to apply to any court, tribunal, regulatory or administrative body, wherever located, for the

recognition of this Order and for assistance in carrying out the terms of this Order.

30.    THIS COURT ORDERS that any interested party may apply to this Court to vary or amend

this Order or seek other relief on not less than seven (7) days' notice to VDL, including in its

capacity as the Foreign Representative, the Information Officer and their respective counsel, and

to any other party or parties likely to be affected by the order sought, or upon such other notice, if

any, as this Court may order.

31.    THIS COURT ORDERS AND DECLARES that this Order shall be effective as of 12:01

a.m. Toronto time on the date of this Order and is not required to be entered.

Digitally signed by Jessica
Kimmel
Date: 2022.07.13 15:40:12 -04'00'

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No. CV-22-00683820-00CL

|  | |
|---|---|
|  | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>**Proceeding commenced at**<br>**Toronto** |
|  | **SUPPLEMENTARY ORDER** |
|  | **FASKEN MARTINEAU DuMOULIN LLP**<br>Barristers and Solicitors<br>333 Bay Street, Suite 2400<br>Bay Adelaide Centre, Box 20<br>Toronto ON   M5H 2T6<br><br>**Stuart Brotman (LSO:  43430D)**<br>sbrotman@fasken.com<br>Tel:  416 865 5419<br>**Aubrey Kauffman (LSO:  18829N)**<br>akauffman@fasken.com<br>Tel:  416 868 3538<br>**Daniel Richer (LSO:  75225G)**<br>dricher@fasken.com<br>Tel:  416 865 4445<br>**Mitch Stephenson (LSO:  73064H)**<br>mstephenson@fasken.com<br>Tel:  416 868 3502<br><br>Lawyers for the Applicant |

# APPENDIX "D"

# Voyager Corporate Structure



# APPENDIX "E"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DECISION AS TO MOTION TO PERMIT WITHDRAWALS BY CUSTOMERS OF FUNDS HELD IN FBO ACCOUNTS AT METROPOLITAN COMMERCIAL BANK

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors-in-possession in these cases (the "Debtors") have filed a motion seeking, among other things, to permit customers to withdraw funds from two "for the benefit of" (or "FBO") accounts held at Metropolitan Commercial Bank ("MC Bank"). The Debtors argued, among other things, that the funds that are actually on deposit in the FBO accounts belong directly to Voyager's customers and are not property of the Debtors' bankruptcy estates. The Official Committee of Unsecured Creditors (the "Committee"), and MC Bank, have filed papers in support of this request for relief, and no party in interest has opposed the relief. During a hearing on the motion held on August 4, 2022 (the "Hearing"), the Committee and MC Bank concurred with the Debtors' contentions that the funds in the relevant bank accounts belong to customers and are not property of the estates.

The Customer Agreement that governs the Debtors' relationships with customers, as updated through January 7, 2022, was submitted as an attachment to the Debtors' motion. [ECF No. 73.] The Customer Agreement has different provisions regarding the manner in which cash and cryptocurrency will be held. With respect to cash, paragraph 5(A) of the Customer Agreement states that customers may deposit cash that will be held in an omnibus account at MC Bank. More particularly, it states:

1

Cash deposited into the Customer's Account is maintained in an omnibus account at Metropolitan Commercial Bank (the "Bank"), which is a member of the Federal Deposit Insurance Corporation ("FDIC"). Voyager maintains an agreement with the Bank whereby the Bank provides all services associated with the movement of and holding of USD in connection with the provision of each account. Therefore, each Customer is a customer of the Bank. All U.S. regulatory obligations associated with the movement of, and holding of, USD in connection with each Account are the responsibility of the Bank. For purposes of clarity, any services pertaining to the movement of, and holding of, USD are not provided by Voyager or its Affiliates. Cash in the Account is insured up to $250,000 per depositor by the FDIC in the event the Bank fails if specific insurance deposit requirements are met.

*See* Customer Agreement, ¶ 5(A).

Different arrangements were set forth with respect to cryptocurrencies. Paragraph 5(C) of the Customer Agreement states that "Customer authorizes and instructs Voyager to hold Customer's Cryptocurrency . . . on its behalf. Customer understands that Voyager may hold Customer's Cryptocurrency together with the Cryptocurrency of other Voyager customers in omnibus accounts or wallets." *Id*. ¶ 5(C). The same paragraph then warns that the treatment of such cryptocurrency holdings in the event of an insolvency proceeding was uncertain:

In the event that Customer, Voyager or a Custodian become subject to an insolvency proceeding it is unclear how Customer Cryptocurrency would be treated and what rights Customer would have to such Cryptocurrency. How an insolvency court would characterize and treat Customer Cryptocurrency is a highly fact-depending inquiry that necessarily depends upon the circumstances of each individual case. In addition, within the U.S. there is notably little case law addressing insolvency proceedings involving Cryptocurrency. As such, the law governing the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding remains largely unsettled. Voyager does not make any representation as to the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding whether in the U.S. or in any other jurisdiction. Customer explicitly understands and acknowledges that the treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict, including but not limited to Customer being treated as an unsecured creditor and/or the total loss of all Customer Cryptocurrency.

*Id.* ¶ 5(C). Paragraph 5(D) then specified that cryptocurrency would be held in Voyager's own

2

name, and granted certain rights to Voyager with respect to the use, lending, "staking" and

rehypothecation of such cryptocurrency, "with all attendant rights of ownership:"

> Customer grants Voyager the right, subject to applicable law, without further
> notice to Customer, to hold Cryptocurrency held in Customer's Account in
> Voyager's name or in another name, and to pledge, repledge, hypothecate,
> rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or
> use any amount of such Cryptocurrency, separately or together with other
> property, with all attendant rights of ownership, and for any period of time
> and without retaining a like amount of Cryptocurrency, and to use or invest
> such Cryptocurrency at Customer's sole risk.

*Id.* ¶ 5(D).  The Debtors have contended that, pursuant to these terms, customers have only the

rights of general unsecured creditors with respect to their cryptocurrency holdings.  That

particular contention has not been challenged at this stage of these cases and is not before the

Court in connection with the present motion.

At the request of the Court the Debtors also filed copies of the agreements that govern the

FBO accounts at MC Bank.  [ECF No. 145.]  One such agreement is the "FBO Account Payment

Services Agreement," executed in 2019.  The recitals to that agreement state that Voyager wishes

to promote services to the public that entail "access to the payment system and a depository

institution to hold USD denominated funds" and that the Bank desires to "support a program"

under which "Bank provides cash management and payment concentration services through a

custodial 'for the benefit of' or 'FBO' account established by and at the Bank."  *See* FBO

Agreement, p. 1.  For that purpose, the Bank appointed Voyager as the Bank's representative to

"market, offer and sell crypto currency exchange services."  *Id.* ¶ 2.1.  Voyager agreed to open

FBO pooled accounts that would hold "all funds that the Customers remit to Bank . . ."  *Id.* ¶

3.4(a).  The parties also agreed that "[f]or clarity, at no time shall [Voyager] or any Licensee ever

collect, hold, or remit any Customer Program funds."  *Id.* ¶ 3.6.

The FBO Agreement further stated that the Bank would be the "holder" of the FBO

accounts through which funds sent by customers would be held.  *Id.* ¶ 6.2.  As a practical matter, Voyager gave instructions to the Bank with respect to movements of funds, and the FBO accounts were reconciled each business day.  Voyager took responsibility for all expenses and losses resulting from fraud or certain processing errors.  *Id.* ¶ 8.2.  The Bank reserved rights of setoff against certain other accounts held in Voyager's name in the event of a breach of Voyager's obligations.  *Id.* ¶ 8.4.

Voyager and MC Bank also executed an "ACH Origination Agreement" in 2018.  It does not appear that this agreement has any terms that pertain to the ownership of the funds contained in the FBO accounts.

The Court also asked the Debtors to file copies of sample bank statements.  [ECF No. 189.]  The bank statements for the main FBO Account were issued in the name of "Metropolitan Commercial Bank FBO Voyager Customers."  The statement for the other FBO account, used to handle wire transfers rather than ACH transfers, was issued in the name of "FBO Voyager Wires."  Other accounts that Voyager held with MC Bank were stated to be in the names of various Voyager entities themselves.

During the course of the Hearing the Court asked the Bank to confirm whether it agreed that Voyager's customers were customers of the Bank for purposes of the cash held in the FBO accounts.  The Bank's counsel did not wish to adopt that characterization, since the Bank did not have direct dealings and relationships with Voyager's customers.  However, the Bank acknowledged that "FBO" accounts generally hold funds that are administered by one entity but that belong to someone else.  The Bank also agreed that customers whose funds are held in such accounts have the benefit of FDIC insurance in the event of a failure by the bank.  The Bank also confirmed that pursuant to the terms of the FBO Agreement Voyager itself is not permitted to

4

hold or to take ownership of customer funds.

The FBO agreement included a number of terms that were capitalized but that were not defined, and it referred to the need for authorization by MC Bank of various "Programs" that apparently were not separately described or authorized.  However, the Bank and Voyager assured the Court that all relevant agreements and documents had been provided.

The Debtors have argued that the Debtors have no legal or equitable rights to the funds in the FBO accounts.  They have further contended that even if the Debtors had legal title to the funds in the FBO accounts that would be insufficient to permit those funds to be treated as property of the Debtors' estates, since the Debtors have no equitable or beneficial interests in such funds.  The Debtors have cited numerous authorities in support of those propositions.  [ECF No. 73].  It appears to the Court, based on the agreements cited above, that the Debtors do not have either legal title or equitable interests to the funds in the FBO accounts.  No party in interest has argued to the contrary.  The Debtors had administrative rights to direct cash movements, but that is all.  The funds held in the FBO accounts therefore are not "property of the estate."  *See* 11 U.S.C. § 541.

Based on the foregoing, and for the reasons stated at the Hearing, the Court has determined that customers should be permitted to withdraw funds actually held for them in the two FBO accounts at MC Bank, and that such funds are not property of the Debtors' bankruptcy estates.  A separate Order that has granted this and other relief has been entered by the Court.

One final word of caution:  I am aware that the treatment of cash and cryptocurrency in this and similar cases is a subject of avid interest among investors and insolvency attorneys, and that similar issues may arise in other cases.  These chapter 11 cases are somewhat unusual, in that the overwhelming percentage of claims are held by customers, with very few other creditors.

As a result, there really were no parties before the Court who had any strong financial interests in disputing the relief sought with respect to the FBO accounts, or in presenting any competing arguments or facts as to how the funds in the FBO accounts should be treated.  Other courts who may be presented with similar issues therefore should understand, not only that my decision in this case is based on the particular agreements that have been presented to the Court, but also that my decision has been rendered without the kind of vigorous opposition by competing creditors that may be present in other cases.  This decision is not intended to be a ruling as to the rights that customers might have in cryptocurrency cases generally, or as a ruling on any issues that competing creditors might raise in other cases.

Dated:  New York, New York
       August 5, 2022

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge

# APPENDIX "F"

**ORDERS OF U.S. COURT**

| | Order | Description |
|---|---|---|
| **A. Orders Recognized by Canadian Court on July 12, 2022** | | |
| **1.** | *Order (I) authorizing VDL to act as foreign representative and (II) granting related relief* | This Order authorizes Voyager Digital Ltd. ("**VDL**") to act as foreign representative on behalf of the estates of the Debtors in a Canadian CCAA proceeding. The Order also authorizes VDL to (i) seek recognition of the Chapter 11 Cases in a proceeding in Canada, (ii) request that the Canadian Court lend assistance to the US Bankruptcy Court in protecting the property of the estates, and (iii) seek any other appropriate relief from the Canadian Court that VDL deems just and proper in furtherance of the protection of the Debtors' estates. |
| **2.** | *Order (I) directing joint administration of the Chapter 11 cases and (II) granting relating relief* | This Order directs the joint administration of the Debtors' chapter 11 cases for procedural purposes only. This order does not provide for consolidation for substantive purposes. |
| **3.** | *Order (I) restating and enforcing the worldwide automatic stay, anti-discrimination provisions and ipso facto protections of the Bankruptcy Code, (II) approving form and manner of notice, and (III) granting related relief* | This Order restates and enforces the automatic stay in accordance with the Bankruptcy Code. The automatic stay stays, restrains and enjoins all persons and governmental units, whether of the United States or any non-U.S. jurisdiction from:<br><br>(a) Commencing or continuing any judicial, administrative or other action or proceeding against the Debtors that was or could have been commenced before the commencement of the Debtors' chapter 11 cases or recovering a claim against the Debtors that arose before the commencement of the Debtors' chapter 11 cases;<br><br>(b) Enforcing against the Debtors or against property of their estates, a judgment or order obtained before the commencement of the Debtors' chapter 11 cases;<br><br>(c) Taking any action, whether inside or outside the United States, to obtain possession of property of the Debtors' estates, wherever located or to exercise control over property of the estates or interfere in any way with the conduct by the Debtors of their business; |

| Order | Description |
|-------|-------------|
|       | (d) Taking any action to collect, assess or recover a claim against the Debtors that arose prior to the commencement of the Debtors' chapter 11 cases;<br><br>(e) Offsetting any debt owing to the Debtors that arose before the commencement of the Debtors' chapter 11 cases against any claim against the Debtors;<br><br>(f) Commencing or continuing any proceeding before the US Tax Court concerning the Debtors; and<br><br>(g) Terminating or modifying any and all contracts and leases to which the Debtors are party or signatory because of a provisions in such contract or lease conditioned on the insolvency or financial condition of the Debtors prior to the closing of the chapter 11 cases or commencement of these cases under the Bankruptcy Code.<br><br>All foreign or domestic governmental units and other regulatory authorities and those acting on their behalf are also stayed, restrained, prohibited and enjoined from (a) denying, revoking, suspending or refusing to renew any license, permit, charter, franchise or other similar grant to the Debtors the Debtors' affiliates, (b) placing conditions upon such grant to the Debtors or the Debtors' affiliates, (c) discriminating against the Debtors or the Debtors' affiliates, or (d) interfering in any way with any and all property of the Debtors' estates wherever located, on account of commencement of the chapter 11 cases, the Debtors' insolvency, the fact that the Debtors have not paid a debt dischargeable in the chapter 11 cases.<br><br>For greater certainty the following, among others, are not subject to the stay:<br><br>1. Commencement or continuation of a criminal action or proceeding against the Debtors, and<br><br>2. The commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power, the enforcement of an order or decision (other than for monetary sanctions) obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power, or any act taken by such securities self regulatory organization to delist, |

| | Order | Description |
|---|---|---|
| | | delete or refuse to permit quotation of any stock that does not meet applicable regulatory requirements. |
| **4.** | *Interim Order (I) approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to common stock and (II) granting related relief* | This interim order approves certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to the Debtors' common stock, including any beneficial ownership therein, and directing that any purchase, sale, other transfer of or declaration of worthlessness with respect to common stock in violation of the procedures shall be null and void *ab initio*.[1] |
| **5.** | *Interim Order (I) authorizing the debtors to pay (A) prepetition employee wages, salaries, other compensation and reimbursable expenses and (B) continue employee benefit programs and (II) granting related relief* | This interim order authorizes, but does not direct, the Debtors to pay certain prepetition employee wages, salaries, other compensation and reimbursable employee expenses, and to continue employee benefit programs in the ordinary course. |
| **6.** | *Order (I) extending time to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, and rule 2015.3 financial reports, (II) waiving requirements to file list of equity holders, and (III) granting related relief* | This Order extends the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date (without prejudice to the Debtors' ability to seek further extensions).<br><br>This Order also extends the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in rule 2015.3 of the Federal Rules |

[1] As set out in Exhibit "A" to the Declaration of Stephen Ehlrich dated July 6, 2022, the Debtors expect to generate various tax attributes that are of significant value to the Debtors and their estates. If no restrictions on trading or worthlessness deductions are imposed, such trading or deductions could severely limit or eliminate the Debtors' ability to use these tax attributes. The loss of these valuable estate assets could lead to negative consequences for the Debtors, their estates, their stakeholders and the overall reorganization process.

| | Order | Description |
|---|---|---|
| | | of Bankruptcy Procedure to August 4, 2022, without prejudice to the Debtors' ability to request additional extensions. |
| | | This Order also waives the requirement to file a list of equity security holders of VDL. |
| 7. | *Interim Order (I) authorizing the debtors to (A) continue to operate their cash management system, (B) honour certain prepetition obligations related thereto, (C) maintain existing business forms, and (D) continue to perform intercompany transactions, (II) granting superpriority administrative expense status to prepetition intercompany balances, and (III) granting related relief* | This Interim Order authorizes the Debtors, on an interim basis, to (a) continue operating their Cash Management System, (b) honour prepetition obligations related thereto; and (c) continue to perform intercompany transactions consistent with historical practice. All post-petition transfers and payments from the Debtors to another Debtor under any post-petition Intercompany Transactions authorized under the Interim Order are accorded superpriority administrative expense status. |
| 8. | *Interim Order (I) establishing certain notice, case management and administrative procedures and (II) granting related relief* | This Interim Order approves and implements certain notice, case management and administrative procedures, including establishing four Omnibus Hearing dates on August 16, 2022, September 13, 2022, October 18, 2022 and November 15, 2022 and authorizing the Claims and Noticing Agent to establish a Case Website. |
| 9. | *Order (I) authorizing the debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each debtor, (II) authorizing the debtors to file a consolidated list of the debtors' fifty largest unsecured creditors, (III) authorizing the debtors to redact certain personally identifiable information, (IV) approving the form and manner of* | This Order, among other things, authorizes the Debtors to prepare a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor and approves the form and manner of notifying creditors of the commencement of the chapter 11 cases. |

| | Order | Description |
|---|---|---|
| | *notifying creditors of commencement of these Chapter 11 cases, and (V) granting related relief* | |
| **10.** | *Interim Order (I) authorizing the payment of certain taxes and fees and (II) granting related relief* | This Interim Order authorizes the Debtors, in their sole discretion, to remit and pay certain accrued and outstanding Taxes and Fees. |
| **B.  Orders sought to be Recognized on August 11, 2022** | | |
| **1.** | *Order (I) approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to common stock and (II) granting related relief* | See description under A.4. |
| **2.** | *Order (I) authorizing the debtors to pay (A) prepetition employee wages, salaries, other compensation and reimbursable expenses and (B) continue employee benefit programs and (II) granting related relief* | See description under A.5. |
| **3.** | *Second Interim Order (I) authorizing the debtors to (A) continue to operate their cash management system, (B) honour certain prepetition obligations related thereto, (C) maintain existing business forms, and (D) continue to perform intercompany transactions, (II) granting superpriority administrative expense status to prepetition intercompany balances, and (III) granting related relief* | See description under A.6. The Second Interim Cash Management Order provides the following additional measures: (a)    additional assurance that the Debtors will not engage in any intercompany transactions that involve payments from a Debtor entity to a non-Debtor entity without prior written consent of the UCC; (b)    that the Debtors shall provide the UCC with rolling 13-week cash flow budgets as soon as reasonably practicable after the entry of |

| | Order | Description |
|---|---|---|
| | | the Second Interim Cash Management Order and every subsequent month thereafter[2]; and |
| | | (c) an acknowledgement that nothing in the Second Interim Cash Management Order constitutes a finding as to whether the cash management system complies with federal or state securities laws. |
| | | The final Cash Management Order will be considered by the U.S. Court on September 27, 2022. |
| **4.** | *Order (I) authorizing the payment of certain taxes and fees and (II) granting related relief* | See description under A.10. |
| **5.** | *Order (i) Setting Bar Dates for Submitting Proofs of Claim, (ii) Approving Procedures for Submitting Proofs of Claim, and (iii) Approving Notice Thereof* | This Order establishes deadlines for creditors to submit proofs of claim in the Chapter 11 Proceedings, approves procedures for submitting such proofs of claim, and approves the form of notice of bar dates and manner of service thereof. |
| | | This Order establishes the following bar dates: |
| | | (a) <u>General Bar Date</u> – October 3, 2022: the date by which all entities (other than governmental units and certain categories of claimants exempt from complying with the applicable bar dates) that wish to assert a claim against the Debtors that arose prior to the Petition Date must file a proof of claim; |
| | | (b) <u>Governmental Bar Date</u> – January 2, 2023: deadline by which each governmental unit must file a proof of claim; |

---

[2] The Information Officer has also requested that the Debtors provide copies of the above referenced cash flow forecasts to the Information Officer.

| Order | Description |
|---|---|
| | (c)   <u>Rejection Damages Bar Date</u> – proofs of claim arising from rejection of an executory contract or unexpired lease must be filed on or before the later of (i) the General Bar Date or Governmental Bar Date, as applicable, and (ii) date that is thirty days following entry of an order approving rejection of an executory contract or unexpired lease; and <br><br> (d)   <u>Amended Schedules Bar Date</u> – in the event that the Debtors amend or supplement their Schedules (as defined in the Bar Date Order), the Debtors shall give notice of any such amendment to holders of any claim affected thereby and such holders shall be afforded at least 35 days from the date on which such notice is given to submit a proof of claim with respect to such amended claim. |
| **6.**   *Order (I) Authorizing the Debtors to (A) Pay Their Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain Their Surety Bond Program, and (II) Granting Related Relief* | This Order authorizes the Debtors to (i) pay obligations under prepetition insurance policies, (ii) continue to pay certain brokerage fees, renew, supplement, modify or purchase insurance coverage in the ordinary course, and (iv) maintain their surety bond program on an uninterrupted basis. |
| **7.**   *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* | This Order authorizes the Debtors to retain and compensate certain named professionals utilized by the Debtors in the ordinary course of business. |
| **8.**   *Order (i) Approving the Bidding Procedures and Related Dates and Deadlines, and (ii) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation* | This Order memorializes bidding procedures to effectuate a marketing process to solicit investor appetite in either (a) a sale of the Debtors' entire business, or (b) a capital raise whereby a third party would provide a capital infusion into the Debtors' business enterprise. <br><br> This Order establishes various milestones in respect of the marketing process: |

|  | Order | Description |
|---|---|---|
|  |  | (a)   a final bid deadline of August 26, 2022; |
|  |  | (b)   an auction, if necessary, to be held on August 29, 2022; |
|  |  | (c)   a sale objection deadline of September 6, 2022 |
|  |  | (d)   a U.S. Court hearing on September 8, 2022 to consider approval of a sale; |
|  |  | (e)   a U.S. Court hearing on September 16, 2022 to consider approval of a disclosure statement; |
|  |  | (f)   confirmation by the U.S. Court approving a plan on October 31, 2022 (or such other date and time that the U.S. Court may direct). |
| 9. | *Order Authorizing and Approving the Appointment of Stretto, Inc. as Claims and Noticing Agent* | This Order approves the appointment of Stretto, Inc. as claims and noticing agent to, among other things (i) distribute required notices to parties in interest, (ii) receive, maintain, docket and otherwise administer proofs of claim filed in the Chapter 11 Proceedings, and (iii) provide other administrative services. |
| | **C.   Orders of the U.S. Court for which recognition is not sought[3]** | |
| 1. | *Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief* | This Order authorizes the Debtors to allow customers to withdraw customer cash from accounts held for the benefit of customers at Metropolitan Commercial Bank ("**MC FBO Accounts**"). This Order also authorizes the Debtors to continue staking cryptocurrency. Staking generates passive income on cryptocurrency assets by offering a way to earn interest on coins that are staked through staking protocols. This Order also authorizes the Debtors to liquidate cryptocurrency from customer accounts with a negative balance, sweep cash held in third-party exchanges, and conduct ordinary course reconciliation of customer accounts. |

---

[3] Does not include administrative Orders such as orders approving retention of professionals and sealing orders.

|    | Order | Description |
|----|-------|-------------|
|    |       |             |
| **2.** | *Order (I) establishing certain notice, case management and administrative procedures and (II) granting related relief* | See description under A.8. |
| **4.** | *Order authorizing the Debtors to pay prepetition corporate card expenses and granting related relief* | This Order authorizes the Debtors to pay any prepetition amounts related to corporate cards and continue using corporate cards in the ordinary course of business on a post-petition basis. In connection with the proposed retention of certain professionals, the Debtors searched certain names and entities to determine whether any potential conflicts or other relationships exist that preclude the professionals from meeting the disinterestedness standard under the U.S. Bankruptcy Code. |

# APPENDIX "G"

**AIRD BERLIS**

Miranda Spence
Direct: 416.865.3414
E-mail: mspence@airdberlis.com

July 24, 2022

**DELIVERED VIA EMAIL (sbrotman@fasken.com; jsussberg@kirkland.com)**

Fasken Martineau DuMoulin LLP
333 Bay Street, Suite 2400
Toronto, ON M5H 2T6

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
601 Lexington Avenue
New York, New York 10022

Dear Mr. Brotman and Mr. Sussberg:

Re:     **Voyager Digital Holdings, Inc., et al. (Court File No. 22-10943 (MEW),
        Southern District of New York ("Voyager" and the "Voyager US
        Proceeding", respectively)
        Voyager Digital Ltd. CCAA Proceeding (Court File No. CV-22-00683820-
        00CL) ("VDL" and the "VDL CCAA Proceeding")**

In the interest of moving forward consensually, Aird & Berlis LLP and Siskinds LLP jointly write to provide the following proposal for a resolution of the issues addressed at the hearing on July 19, 2022, which is currently under reserve, as well as other issues that are likely to be the subject of a further motion (or motions) before the Court.

1.   The Proposed Class Action Plaintiff will withdraw her objection to the Voyager US Proceeding being classified as a "foreign main proceeding";

2.   VDL will support the following amendments to the Supplemental Order granted by Justice Kimmel on July 12, 2022 (the "**Supplemental Order**"):

(a)   Paragraph 10 of the Supplemental Order shall be removed;

(b)   Paragraph 12 of the Supplemental Order shall be amended to include the following additional duties of the Information Officer:

(i)    shall file a report with the court on the state of the company's business and financial affairs — containing the Information Officer's opinion as to the reasonableness of a decision, if any, to include in a compromise or arrangement a provision that sections 38 and 95 to 101 of the *Bankruptcy and Insolvency Act,* or any similar sections of the U.S. Bankruptcy Code, do not apply in respect of the compromise or arrangement and containing the prescribed information, if any — at least seven days before any meeting to vote on the compromise or arrangement is held;

(ii)   shall attend court proceedings that relate to the Foreign Representative, hearings in the Foreign Proceeding, and meetings of the company's

creditors, if the Information Officer considers that his or her attendance is necessary for the fulfilment of his or her duties or functions; and

(iii)     shall advise the court on the reasonableness and fairness of any compromise or arrangement that is proposed between the debtors in the Foreign Proceeding and their creditors;

(c)     a new paragraph shall be added to the Supplemental Order, as follows:

(i)     THIS COURT ORDERS that commencing on the date of the Initial Recognition Order and continuing until the stay of proceedings imposed against VDL, the Business and the Property pursuant to the Initial Recognition Order, the Foreign Orders, and the Supplemental Order is terminated (the "**Tolling Termination Date**"), all prescription, time or limitation periods (including, without limitation, under section 138.14 of the *Securities Act* or any corresponding or similar provisions under the securities legislation of any other Canadian province or territory and under section 29.1 of the *Class Proceedings Act*) (collectively, "**Limitation Periods**"), applicable to any Misrepresentation Rights (as defined herein), are suspended as of the date of the Initial Recognition Order and will recommence running as of the Tolling Termination Date, and for greater certainty the time during which any Limitation Period is suspended pursuant to this Order shall not be included in the computation of any such Limitation Period. In this Order, "Misrepresentation Rights" means the rights of a purchaser of a security of VDL to (i) commence an action for damages against VDL or its current or former directors or officers; and (ii) exercise a right of rescission in connection with the purchase of a security of VDL, pursuant to and in accordance with the requirements of (a) Parts XXIII or XXIII.1 of the Securities Act, or any corresponding or similar provisions under the securities legislation of any other Canadian province or territory; and/or (b) any contractual rights granted by VDL to a purchaser of its securities that are the same or substantially the same as any such statutory rights for damages or rescission including, without limitation, in any offering memorandum pursuant to which securities of VDL were offered for sale.

3.    Voyager will apply to the Court in the Voyager US Proceeding to have A&M appointed as Foreign Representative in the place of VDL, and will take such steps as are required to have such appointment reflected in the VDL CCAA Proceeding;

4.    If requested, VDL will support the appointment of Francine De Sousa and, perhaps, other clients of either of our respective firms, to represent the interests of all VDL securities claimants and current VDL shareholders, subject to appropriate exclusions, in the VDL CCAA Proceeding, in accordance with the standard terms of such an appointment;

5.    If requested, VDL will support the appointment of Siskinds LLP/Aird & Berlis LLP as representative counsel for the VDL securities claimants and current VDL shareholders in the VDL CCAA Proceeding, to be funded by an appropriate charge on VDL's estate or such other financial arrangement as may be proposed by Siskinds LLP/Aird & Berlis LLP and accepted by the Court;



**Page 3**

6. If requested, Voyager will support the creation of an equity committee in the Voyager US Proceeding and further, or in the alternative, the inclusion of the VDL securities claimants and current VDL shareholders in the equity committee, to be funded by an appropriate charge on Voyager's estate;

7. Voyager/VDL will provide to Ms. De Sousa copies of any insurance policies, from whatever source, that may be responsive to the claims of Ms. De Sousa and the Class Members in the De Sousa Class Action; and

8. Voyager/VDL will provide to Ms. De Sousa the details of the intercorporate funding arrangement between VDL and its subsidiaries, including any debts owed by the subsidiaries to VDL and the dates and amounts of transfers from VDL to its subsidiaries since May 1, 2022.

We are available to discuss this proposal at your convenience.

Yours truly,

AIRD & BERLIS LLP

Miranda Spence

cc.   Steven Graff, Tamie Dolny, *Aird & Berlis LLP*
      Michael Robb, Anthony O'Brien, Garrett Hunter, *Siskinds LLP*
      Aubrey Kauffman, Daniel Richer, Mitch Stephenson, *Fasken Martineau DuMoulin LLP*
      Linc Rogers, Caitlin McIntyre, *Blake, Cassels & Graydon LLP*

49545504.1



# APPENDIX "H"

*Blakes*

Blake, Cassels & Graydon LLP
Barristers & Solicitors
Patent & Trademark Agents
199 Bay Street
Suite 4000, Commerce Court West
Toronto ON  M5L 1A9  Canada
Tel: 416-863-2400  Fax: 416-863-2653

**Linc Rogers**
Partner
Dir: 416-863-4168
linc.rogers@blakes.com

Reference: 99766/20

July 29, 2022

VIA E-MAIL

Aird & Berlis LLP
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Attention: Miranda Spence

**RE: Voyager Digital Holdings, Inc., et al (Court File No. 22-10943 (MEW), Southern District of New York (the "Chapter 11 Proceeding")**

**Re: Voyager Digital Ltd. Recognition Proceeding (Court File No. CV-22-00683820-00CL) (the "Recognition Proceeding") pursuant to Part IV of the Companies' Creditors Arrangement Act (Canada) ("CCAA")**

Dear Ms. Spence:

As you are aware, we are counsel to Alvarez & Marsal Canada Inc. in its capacity as court-appointed information officer in the Recognition Proceeding (in such capacity, the "**Information Officer**"). We write in response to your letter dated July 24, 2022 (the "**Letter**") and email correspondence dated July 29, 2022 requesting (i) details of the intercorporate funding arrangements between Voyager Digital Ltd. ("**VDL**") and its subsidiaries, and (ii) the Information Officer's views regarding increased powers you have proposed be vested in the Information Officer.

With respect to the intercorporate funding arrangements, the Information Officer has requested relevant information from VDL. Once the Information Officer has received and reviewed such information and is in a position to respond to your request, it will do so.

With respect to the increased powers you have proposed be vested in the Information Officer in paragraph 2(b)(ii) of the Letter, the Information Officer is satisfied that its existing authority gives it the ability to attend court hearings in the Chapter 11 Proceeding, which to date have been attended telephonically. The Information Officer either directly or through its counsel intends to attend all such relevant proceedings.  With respect to the powers proposed in paragraph 2(b)(i) and (iii) of the Letter, the Information Officer will, in accordance with existing practice and its existing authority, review and report on any reorganization plan filed in the Chapter 11 Proceeding and its impact on Canadian creditors with references to fairness, reasonableness and public policy, as appropriate and relevant under Part IV of the CCAA. Accordingly, the Information Officer is of the view that augmentation of its powers is not required at this time.  This matter can, of course, be revisited in the future should the need arise.

Page 2

*Blakes*

Should you have any questions or concerns regarding the foregoing, we are available to discuss at your convenience.

Yours very truly,

Linc Rogers

cc.    Stephen Ferguson, *Alvarez & Marsal Canada Inc., Information Officer*
       Caitlin McIntyre, *Blake, Cassels & Graydon LLP*
       Stuart Brotman, Aubrey Kauffman, Daniel Richer and Mitch Stephenson, *Fasken Martineau DuMoulin LLP*
       Steven Graff, Tamie Dolny, *Aird & Berlis LLP*
       Michael Robb, Anthony O'Brien, Garrett Hunter, *Siskinds LLP*

# APPENDIX "I"



SUPERIOR COURT OF JUSTICE

## COUNSEL SLIP/ENDORSEMENT

**COURT FILE NO.:**    <u>**CV-22-00683820-00CL**</u>        **DATE:**  <u>**8 August 2022**</u>

**NO. ON LIST:** _____

**TITLE OF PROCEEDING:**            **VOYAGER DIGITAL LTD**

**BEFORE JUSTICE:**    **CAVANAGH**

### PARTICIPANT INFORMATION

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Stuart Brotman | Voyager Digital Ltd. | sbrotman@fasken.com |
| Daniel Richer | Voyager Digital Ltd. | dricher@fasken.com |
|  |  |  |
|  |  |  |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Michael G. Robb | Francine De Sousa | michael.robb@siskinds.com |
| Garrett M. Hunter | Francine De Sousa | garett.hunter@siskinds.com |
| Steven L. Graff | Francine De Sousa | sgraff@airdberlis.com |
| Miranda Spence | Francine De Sousa | mspence@airdberlis.com |
|  |  |  |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Linc Rogers | Information Officer – Alvarez & Marsal Canada Inc. | linc.rogers@blakes.com |
| Caitlin McIntyre | Information Officer – Alvarez & Marsal Canada Inc. | caitlin.mcintyre@blakes.com |
| Natalie E. Levine | Official Committee of Unsecured Creditors | nlevine@cassels.com |

| Shane Kukulowicz | Official Committee of Unsecured Creditors | skukulowicz@cassels.com |

---

**ENDORSEMENT OF JUSTICE CAVANAGH:**

Francine De Sousa moves on behalf of the proposed class action plaintiffs in an action commenced as court file number 22-00683699-00CP for interim relief requiring that Voyager Digital Ltd. ("VDL") and any relevant directors and/or officers of VDL to provide the following information to counsel for De Sousa: (a) copies of any insurance policies that may be responsive to the claims of the putative class members in the class action; and (b) details of the intercorporate funding arrangements between VDL it is relevant subsidiaries, including any debts owed to VDL and the dates and amounts of transfers from VDL to its subsidiaries since May 1, 2022.

The motion is made in proceedings under Part IV of the CCAA. Alvarez & Marsal Inc. has been appointed as Information Officer of VDL in the Canadian CCAA proceedings. The motion is brought on an urgent basis.

A motion for additional relief including an order appointing counsel to act as representative counsel for all securities claimants and current shareholders of VDL impacted in the CCAA proceedings and the U.S. proceeding, is scheduled to be heard on August 11, 2022.

The background to these proceedings is set out in the Endorsement of Kimmel J. dated August 4, 2022.

The request for interim relief is opposed by VDL.

I am not satisfied that it is proper to grant the requested relief on an urgent basis. If VDL opposes production of any insurance policies, this question should be determined on a motion with proper materials and factums. The IO is engaged in obtaining information with respect to the financial status of VDL and counsel for IO advises that the parties have been cooperative to date in providing information. The IO expects to be able to provide a report before the hearing of the motion on August 11, 2022.

I am not prepared to grant the requested interim relief on this motion.

Digitally signed by
Mr. Justice
Cavanagh

# APPENDIX "J"

# Inflation: U.S. spent more than $5-trillion on economic stimulus during the pandemic

**FROM B1**



Shoppers walk through the Toronto Eaton Centre on Monday. Researchers with the U.S. Federal Reserve say fiscal stimulus affects the prices Canadians pay for U.S. and non-U.S. imports. FRED LUM/THE GLOBE AND MAIL

"The fiscal response was huge, but the delay in reining in monetary stimulus also played a large factor in this as well."

Like other countries, the U.S. moved quickly to launch pandemic support programs and blunt the financial impact on households.

Government spending played a "positive role" during the crisis, the Fed researchers wrote, by supporting a strong economic recovery and likely preventing "worse outcomes."

The U.S. response was especially large. It spent more than US$5-trillion, or roughly 25 per cent of gross domestic product – proportionally more than most countries.

U.S. stimulus was often paid directly to households. Families could receive three rounds of cheques – regardless of whether their employment was affected by the pandemic. An individual with an annual income of less than US$75,000 could receive US$3,200.

Flush with cash, Americans started loading up on goods, in part because they had fewer options for spending that extra money on services. A speculative mania swept through various asset classes, from stocks to snakers.

At the same time, businesses couldn't keep up with demand, with factories and ports often shuttered by public-health measures, leading to supply chain issues that drove up prices.

The Bank of Canada consistently underestimated the inflation threat and said about a fifth of its forecast error was related to global supply chain pressures, including the extent to which people bought goods.

"Instead of weakening as past downturns, U.S. consumer demand for goods unexpectedly surged well beyond prepandemic levels. Supported by fiscal policy measures, U.S. household incomes turned out to be higher than anticipated," the bank said Wednesday in its monetary policy report.

"Overall, strong foreign demand for tradable goods, such as appliances and furniture, has pushed up prices globally, including for Canadian consumers."

The Fed researchers outlined three ways fiscal stimulus affects prices. Canadians are paying more for U.S. goods as American companies struggle to keep up with scorching demand. Likewise, Canadians are paying more for products from non-U.S. countries that have seen a boost in American demand. And finally, Americans are ordering more Canadian goods than usual, contributing to the supply-demand imbalance seen at home.

"When we are competing for goods or some services on the global stage, and we're competing with an extremely strong U.S. economy, we'll have to pay up to get our fair share of those goods and services," Mr. Mendes said.

There are, of course, many explanations for the surge in inflation. Rock-bottom mortgage rates fuelled a homebuying boom in Canada, which led to higher housing costs. Commodity prices have also risen sharply, particularly after Russia's invasion of Ukraine. And supply issues are inextricably tied to public-health measures in other countries, such as recent shutdowns of major cities in China.

Domestic stimulus is another factor, the Fed researchers said. Canada's fiscal response to the pandemic amounted to roughly 20 per cent of GDP, based on International Monetary Fund estimates from last fall.

Government transfers to households spiked in 2020, driving up disposable income and supporting consumption. By June of that year, retail sales in Canada were running above prepandemic levels, despite huge job losses.

Inflation can also be self-fulfilling, for instance, companies may raise prices in anticipation of higher costs.

"I really think that the Bank of Canada is going to have to see a lot of things go right that are outside of its control to return inflation to target without causing a recession," Mr. Mendes said. Those include an easing of supply chain troubles, lower energy prices and the U.S. economy cooling to a more sustainable position, he said.

"It's an extremely tough spot for them to be in."

## Annual inflation rates



THE GLOBE AND MAIL, SOURCE: BLOOMBERG

---

**COMMERCIAL REAL ESTATE**

**ROMSPEN**
Commercial Lender

Term
Bridge
Construction

800.494.0389
romspen.com
License #10172

---

**LEGALS**

Court File No. CV-22-00683820-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF *THE COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF *THE COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## NOTICE OF INITIAL RECOGNITION ORDER

PLEASE BE ADVISED that this Notice is being published pursuant to an order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**"), granted on July 12, 2022 (the "**Initial Recognition Order**").

TAKE NOTICE that on July 5, 2022, Voyager Digital Ltd. ("**VDL**") filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "**Chapter 11 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**"). In connection with the Chapter 11 Proceeding, VDL has been appointed as the foreign representative of its estate (the "**Foreign Representative**"). The Foreign Representative's address is 33 Irving Place, Suite 3060, New York, NY 10003.

AND TAKE NOTICE that the Initial Recognition Order and the Supplemental Order granted by the Canadian Court on July 12, 2022 (together with the Initial Recognition Order, the "**Recognition Orders**"), which were both issued by the Canadian Court under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA Recognition Proceeding**"), among other things:

(i) declared that the Chapter 11 Proceeding is recognized as a foreign proceeding;

(ii) granted a stay of proceedings against VDL and its former, current and future directors and officers;

(iii) recognized certain orders granted by the U.S. Bankruptcy Court in the Chapter 11 Proceeding; and

(iv) appointed Alvarez & Marsal Canada Inc. as the information officer (in such capacity, the "**Information Officer**") with respect to the CCAA Recognition Proceeding.

AND TAKE NOTICE that motions, orders and notices filed with the U.S. Bankruptcy Court in the Chapter 11 Proceeding are available at https://cases.stretto.com/Voyager and that the Recognition Orders and any other orders that may be granted by the Canadian Court in the CCAA Recognition Proceeding are available at http://www.alvarezandmarsal.com/VoyagerDigital.

AND TAKE NOTICE that counsel for the Foreign Representative is:

**Fasken Martineau DuMoulin LLP**
Bay Adelaide Centre, 333 Bay Street,
Suite 2400, Toronto ON M5H 2T6
Email: VoyagerCCAACounsel@fasken.com

FINALLY TAKE NOTICE that if you wish to receive copies of the Recognition Orders or obtain further information in respect of the matters set forth in this Notice, you may contact the Information Officer:

**Alvarez & Marsal Canada Inc.**
Royal Bank Plaza, South Tower, 200 Bay Street, Suite 2900,
Toronto ON M5J 2J1
Phone: +1 (833) 591-1287
Email: VoyagerDigital@alvarezandmarsal.com

DATED AT TORONTO, ONTARIO this 19th day of July, 2022.

**Voyager Digital Ltd.**

---



**Altus Group**  RECENT ASSET TRANSACTIONS

| GTA: INDUSTRIAL | GVA: APARTMENT | GMA: APARTMENT | GGH: RETAIL |
| --- | --- | --- | --- |
| 200 Industrial Pky. N.
Aurora
$242 per sq. ft. | The Kaleden
Vancouver
$5,700,000
$533,282 per unit | 480 Decarie Blvd.
Saint-Laurent
$332,500 per unit | 204 First Rd. W.
Hamilton
$1,175,250
$349 per sq. ft. |

**GREATER TORONTO AREA**

| SECTOR | MUNICIPALITY | ADDRESS | PRICE | UNIT PRICE | PARAMETER |
| --- | --- | --- | --- | --- | --- |
| Industrial | Mississauga | 3439 Wolfedale Rd. | $4,650,000 | $215 | per sq. ft. |
| Retail | Brampton | 178 Church St. E. | $8,700,000 | $731 | per sq. ft. |
| Industrial | Whitchurch-Stouffville | 40 Cardico Dr. | $4,500,000 | $194 | per sq. ft. |

**GREATER VANCOUVER AREA**

| SECTOR | MUNICIPALITY | ADDRESS | PRICE | UNIT PRICE | PARAMETER |
| --- | --- | --- | --- | --- | --- |
| Office | Vancouver | #205 - 179 Davie St. | $1,300,000 | $1,399 | per sq. ft. |
| Industrial | Burnaby | 5349 Imperial St. | $4,360,000 | $759 | per sq. ft. |
| Industrial | Vancouver | #204 - 8475 Ontario St. | $1,100,000 | $615 | per sq. ft. |

**GREATER MONTREAL AREA**

| SECTOR | MUNICIPALITY | ADDRESS | PRICE | UNIT PRICE | PARAMETER |
| --- | --- | --- | --- | --- | --- |
| Apartment | Laval | 6180 du Rouge-Gorge St. | $1,470,000 | $183,750 | per unit |
| Apartment | Saint-Léonard | 4495-4499 Roquebrune St. | $1,100,000 | $275,000 | per unit |
| Apartment | Montréal-Nord | 12390 Langelier Blvd. | $1,050,000 | $150,000 | per unit |

**GREATER GOLDEN HORSESHOE**

| SECTOR | MUNICIPALITY | ADDRESS | PRICE | UNIT PRICE | PARAMETER |
| --- | --- | --- | --- | --- | --- |
| Retail | St. Catharines | 436 Vansickle Rd. | $4,250,000 | $254 | per sq. ft. |
| Apartment | Cambridge | 397 Garden St. | $2,280,000 | $190,000 | per unit |
| Industrial | Waterloo | 638 Colby Dr. | $1,600,000 | $160 | per sq. ft. |

Altus Data Solutions Canada (Altus Group 2022, altusgroup.com) – Empowering smarter real estate decisions.
This transaction data was previously released under REALNET® Canada. It will now be released by Altus Group, powered by a proprietary data platform led by Altus Data Solutions Canada. Altus Group Limited makes no representation about the accuracy, completeness or suitability of the material represented herein for the particular purposes of any reader.

---

**JLL**



**For Sale**

145-167 Bell Blvd, Belleville, ON

• 66,837 SF fully leased retail centre with national brands representing 94.5% of leased GLA
• Healthy WALT of 6.75 yrs
• Approx. 1.5 hrs east of Toronto and 45 min west of Kingston
• Shares a signalized intersection with Quinte Mall, the region's largest and busiest mall with 4,000,000 visitors annually

**Matthew T. Smith***
416-304-6004
MatthewT.Smith@am.jll.com

**Nick Macoritto***
416-238-5874
nick.Macoritto@am.jll.com

JLL Real Estate Services, Inc.
*Sales Representative     www.jll.com

---

**DOWNTOWN BOBCAYGEON**
**RETAIL STORE**



High traffic, corner location, retail store with recent major upgrades. Retail main floor approx 1,500 sq.ft. Prime exterior retail/display space approx. 1,000 sq.ft. while the full basement offers extensive storage. Upstairs is a self-contained 1 bed apartment with own entrance which can be rented for approx $1,500/mo or used for storage. Radiant heating, LED lighting system, custom made display fixtures. At least 7 parking spaces. Bobcaygeon is a year-round destination in the heart of the Kawartha Lakes, and only 1.5 hours from Toronto.

**BUILDING ONLY $929,000**

**AMANDA PARKER** Realtor*
Direct **705-991-0828**
**EXCLUSIVE**



---

**Report on Business**

**Sports**

TO SUBSCRIBE 1-866-999-9237
TGAM.CA/SUBSCRIBE

TO SUBSCRIBE 1-866-999-9237 | TGAM.CA/SUBSCRIBE

# Rogers: CEO says company intends to 'keep the Shaw cable network as independent'

■ FROM B1

Mr. Champagne said he was first informed of the outage in the late afternoon of July 8, Tokyo time. "A few hours later, I received an update indicating that the outage now seemed more serious than originally anticipated. I immediately picked up the phone, not only to contact the CEO of Rogers, but also the CEOs of TELUS and Bell to see how they could possibly help."

Mr. Staffieri said he regrets not contacting government officials sooner. "We were focused on the solution and getting our customers up and running. But nonetheless, those communications should have happened sooner for an important stakeholder such as the government," he said.

Mr. Staffieri has vowed to make changes and investments to prevent similar outages in the future, including separating the telecom's wireless and cable network cores, a measure that he said will cost at least $250-million.

"To be frank, this added layer of protection will be expensive," Mr. Staffieri told the committee, "but we know it is the right thing to do."

Like many of its peers, Rogers currently processes all voice, wireless data, internet and television traffic through one common network core, which is essentially the network's brains. Separating the wireless and cable networks will ensure that a similar outage won't knock down all of the company's services simultaneously, Rogers executives explained.

The company has also pledged to invest more in testing, oversight and artificial intelligence to improve the reliability of its networks.

Monday's hearing occurred against the backdrop of a regulatory review of Rogers's contested $26-billion takeover of Shaw Communications Inc. The Competition Bureau is attempting to block the merger, arguing that it will result in poorer service and higher prices for cellphone customers. Rogers has struck a deal to sell Shaw's Freedom Mobile to Quebecor Inc. for $2.85-bil-

lion in an attempt to address those concerns.

Consumer advocates and telecom researchers who appeared in front of the committee on Monday urged regulators to reject the merger of Canada's two largest cable networks, arguing that the outage has demonstrated the pitfalls of having too few competitors in the sector. Liberal MP Nathaniel Erskine-Smith pressed Mr. Staffieri on whether the takeover is dead, while Conservative MP Tracy Gray questioned whether Mr. Staffieri should get to keep his job.

"I'm accountable to ensure this doesn't happen again," Mr. Staffieri said in response to Ms. Gray. He also told the committee the merger with Shaw would speed up Rogers's efforts to separate its network cores.

"Our intent is to keep the Shaw cable network as independent," Mr. Staffieri said. The Toronto-based telecom would combine its own cable network with Shaw's, and keep that combined cable network separate from the Rogers wireless network, Mr. Staffieri said.

"In terms of our plan, the Shaw transaction will allow us to execute on that ability to separate those [networks] in half the time than it otherwise would," he said.

Mr. Champagne's ministry is one of two regulatory bodies that is still reviewing the takeover. Mr. Champagne has instructed Canada's wireless carriers to implement a formal framework to assist each other during network outages, provide customers with emergency roaming on their networks and follow a communications protocol to ensure consumers are kept informed.



Rogers Communications CEO Tony Staffieri, left, and CTO Ron McKenzie are seen in Ottawa on Monday. The company pledged to invest more in testing, oversight and artificial intelligence to improve the reliability of its networks. ADRIAN WYLD/THE CANADIAN PRESS

---

Tesla Inc. on Monday disclosed it has received a second subpoena from the U.S. Securities and Exchange Commission over its chief executive Elon Musk's tweets in 2018 about taking the electric automaker private.

Tesla said in a filing that it received the subpoena on June 13. The regulator had initially subpoenaed the company in November related to a settlement that required Mr. Musk's

tweets on material information to be vetted.

The November subpoena came days after Mr. Musk asked his Twitter followers whether he should sell 10 per cent of his Tesla stake to cover tax bills on stock options.

The company said on Monday it will co-operate with the government authorities. The SEC declined to comment.

Mr. Musk had in 2018 settled a

lawsuit by the regulator over his go-private tweets by agreeing to let the company's lawyers preapprove tweets with material information about the company.

In June, Mr. Musk appealed a judge's refusal to end this 2018 agreement with the SEC.

The world's richest person, who calls himself a "free speech absolutist," has said his "funding secured" tweet was truthful, likening himself to rapper Emi-

nem in seeking to throw out his 2018 agreement with the SEC.

Mr. Musk is also facing a lawsuit from Twitter for dropping his US$44-billion offer to buy the social-media company and is now preparing for a legal showdown in a trial set to begin in October.

Separately, Tesla said in the filing it has converted about 75 per cent of its bitcoin holdings into fiat currency and has re-

corded an impairment charge of US$170-million related to the asset.

As of June 30, the fair market value of its digital assets was worth US$222-million, it said in the filing.

Tesla shares were down 1.4 per cent at US$805.30 on Monday. The stock has lost nearly 23 per cent of its value this year until Friday's close price.

REUTERS

---

**COMMERCIAL REAL ESTATE**



Accelerating success.    Colliers

**For Sale**

**6745 Pacific Circle, Mississauga, Ontario**
- First class industrial building in central Mississauga location
- Zoned for outside storage with extra land
- The yard is fully secured with chain-link fencing which runs along the entire Tomken frontage plus 20' iron double gates on the west side of the property. These two roll-man gates are on the north west and south west sides of the property
- colliers.canada.com/6-CAN2010184

Glenn Forrest*                Ben Williams*
Senior Vice President         Senior Vice President
+1 416 620 2823               +1 416 620 2874
Glenn.Forrest@colliers.com    Ben.Williams@colliers.com

*Sales Representative  **Broker              Colliers Macaulay Nicolls Inc.

colliers.canada.com/toronto

**FOR SALE | FLEX OFFICE PORTFOLIO**

**MISSISSAUGA GATEWAY CENTRE**
60, 75, 80 COURTNEYPARK DRIVE WEST
MISSISSAUGA, ON



- Three Class A single-storey flex office buildings totaling 231,914 SF on a large 15.72 acre site
- 100% leased to 11 tenants with a WALT remaining of 4.5 years
- Direct transit access, adjacent to the new Courtneypark Station on the Hurontario LRT

JOHN STEWART*         SCOTT CHANDLER*
416 585 4697          416 585 4806
jstewart@ipammi.ca    schander@ipammi.ca

BILL PITT*            MICHAEL LAU*
416 585 4698          416 585 4894
bpitt@ipammi.ca       mlau@ipammi.ca

Marcus & Millichap IPA Canada Inc., Brokerage  *Broker  *Sales Representative

IPA  INSTITUTIONAL
     PROPERTY
     ADVISORS
     A MARCUS & MILLICHAP BROKERAGE

IPAMMI.CA

---

**LEGALS**

## NOTICE

**Ismail Ebrahim**, of Toronto, Ontario, has had their membership with the Chartered Professional Accountants of Ontario revoked after being found to have committed professional misconduct by the Discipline Committee of CPA Ontario on June 6, 2022.

Ebrahim failed to maintain the good reputation of the profession and serve the public interest in that they accepted and performed an assurance engagement which contravened their signed undertaking to the Professional Conduct Committee, signed or associated themself with a letter, report, statement or representation which they knew or should have known was false or misleading, and failed to perform their professional services in accordance with generally accepted standards of practice of the profession with respect to the audit of financial statements.

Ebrahim is no longer a Chartered Professional Accountant and is no longer entitled to use the designation "Chartered Professional Accountant", "Chartered Accountant," or the initials "CPA" or "CA". Ebrahim was also fined $15,000, reprimanded, and ordered to pay costs.

The full decision and reasons are available on the CPA Ontario website at https://www.cpaontario.ca/protecting-the-public/hearings-appeals/cases/d-22-002


CPA
ONTARIO                                    cpaontario.ca

---

**JLL**



**For Sale**

**10+ Acre Development Site**
**Ottawa, ON**
- Fully entitled 530,000 sf GFA
- Overlooking Mooney's Bay
- Scalable mix of retirement, apartment and condo
- Synergies as an active seniors development

Michael Betsalel*
+1 647 728 0477
michael.betsalel@am.jll.com

Earl Kufner*
+1 647 728 0463
earl.kufner@am.jll.com

Jones Lang LaSalle Real Estate Services, Inc.
*Sales Representative        www.JLL.ca

---



**FOR SALE PUBLIC AUCTION BUSINESS WITH PRIME REAL ESTATE IN SILICON VALLEY, CALIFORNIA, USA.**

To be sold together or separately.  1.308-acre site including 19,545 sq.ft. Single story building. Prime Real Estate located close to Apple's New Office Complex. Great opportunity for real estate development and/or business expansion.

Contact:
Owner:
montadet.david@gmail.com
Doug Yoder
Commercial Real Estate
Services at doug@dayoder.com

---

Sports

TO SUBSCRIBE 1-866-999-9237
TGAM.CA/SUBSCRIBE

**LEGALS**

Court File No. CV-22-00683820-00CL

ONTARIO
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF *THE COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF *THE COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**NOTICE OF INITIAL RECOGNITION ORDER**

PLEASE BE ADVISED that this Notice is being published pursuant to an order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**"), granted on July 12, 2022 (the "**Initial Recognition Order**").

TAKE NOTICE that on July 5, 2022, Voyager Digital Ltd. ("**VDL**") filed a voluntary petition for relief under Chapter 11, title 11 of the United States Code (the "**Chapter 11 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**"). In connection with the Chapter 11 Proceeding, VDL has been appointed as the foreign representative of its estate (the "**Foreign Representative**"). The Foreign Representative's address is 33 Irving Place, Suite 3060, New York, NY 10003.

AND TAKE NOTICE that the Initial Recognition Order and the Supplemental Order granted by the Canadian Court on July 12, 2022 (together with the Initial Recognition Order, the "**Recognition Orders**"), which were both issued by the Canadian Court under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA Recognition Proceeding**"), among other things:

(i)   declared that the Chapter 11 Proceeding is recognized as a foreign proceeding;

(ii)  granted a stay of proceedings against VDL and its former, current and future directors and officers;

(iii) recognized certain orders granted by the U.S. Bankruptcy Court in the Chapter 11 Proceeding; and

(iv)  appointed Alvarez & Marsal Canada Inc. as the information officer (in such capacity, the "**Information Officer**") with respect to the CCAA Recognition Proceeding.

AND TAKE NOTICE that motions, orders and notices filed with the U.S. Bankruptcy Court in the Chapter 11 Proceeding are available at https://cases.stretto.com/Voyager and that the Recognition Orders and any other orders that may be granted by the Canadian Court in the CCAA Recognition Proceeding are available at http://www.alvarezandmarsal.com/VoyagerDigital.

AND TAKE NOTICE that counsel for the Foreign Representative is:

**Fasken Martineau DuMoulin LLP**
Bay Adelaide Centre, 333 Bay Street,
Suite 2400, Toronto ON M5H 2T6
Email: VoyagerCCAACounsel@fasken.com

FINALLY TAKE NOTICE that if you wish to receive copies of the Recognition Orders or obtain further information in respect of the matters set forth in this Notice, you may contact the Information Officer:

**Alvarez & Marsal Canada Inc.**
Royal Bank Plaza, South Tower, 200 Bay Street, Suite 2900,
Toronto ON M5J 2J1
Phone:  +1 (833) 591-1287
Email:  VoyagerDigital@alvarezandmarsal.com

DATED AT TORONTO, ONTARIO this 19th day of July, 2022.

**Voyager Digital Ltd.**

To subscribe          CALL 1-800 387 5400 | TGAM.CA/SUBSCRIBE

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**     Court File No.:CV-22- 00683820-00CL

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF VOYAGER DIGITAL LTD.**

**APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

|  | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br>Proceeding commenced at Toronto |
|---|---|
|  | **FIRST REPORT OF THE INFORMATION OFFICER** |
|  | **BLAKE, CASSELS & GRAYDON LLP**<br>199 Bay Street, Suite 4000<br>Box 25, Commerce Court West<br>Toronto, ON M5L 1A9<br><br>**Linc Rogers (LSO: 43562N)**<br>linc.rogers@blakes.com<br>Tel: 416 863 4168<br><br>**Caitlin McIntyre (LSO: 72306R)**<br>caitlin.mcintyre@blakes.com<br>Tel: 416 863 4174<br><br>Counsel for Alvarez & Marsal Canada Inc., solely in its capacity as the Information Officer and not in its personal or corporate capacity |

## **EXHIBIT 4**

Second Information Officer Report
Dated September 30, 2022

Court File No. CV-22-00683820-00CL

**_ONTARIO_**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE _COMPANIES' CREDITORS ARRANGEMENT ACT_, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE _COMPANIES' CREDITORS ARRANGEMENT ACT_, R.S.C. 1985, c. C-36, AS AMENDED

**SECOND REPORT**
**OF THE INFORMATION OFFICER**

**ALVAREZ & MARSAL CANADA INC.**

**SEPTEMBER 30, 2022**

# TABLE OF CONTENTS

**1.0    INTRODUCTION**................................................................................................. **1**

**2.0    TERMS OF REFERENCE AND DISCLAIMER** .......................................... **6**

**3.0    PURPOSE OF THIS SECOND REPORT** ..................................................... **6**

**4.0    STATUS OF THE CHAPTER 11 PROCEEDINGS** ..................................... **7**

**5.0    ADDITIONAL ORDERS OF THE U.S. COURT** ....................................... **10**

**6.0    UPDATE ON VDL'S NON-CONSOLIDATED CAPITAL STRUCTURE**............... **13**

**7.0    DIRECTOR & OFFICER STAY** ................................................................. **15**

**8.0    ACTIVITIES OF THE INFORMATION OFFICER** ................................. **16**

**9.0    RECOMMENDATIONS**................................................................................ **17**

**APPENDICES**

Appendix "A" – Representative Counsel Endorsement

Appendix "B" – Press Release

Appendix "C" – U.S. D&O Motion

Appendix "D" – Stipulation

- 1 -

## 1.0    INTRODUCTION

<u>Voyager Chapter 11 Proceedings</u>

1.1    On July 5, 2022 (the "**Petition Date**"), Voyager Digital Holdings, Inc. ("**Voyager Holdings**"), Voyager Digital Ltd. ("**VDL**") and Voyager Digital, LLC ("**OpCo**") (each a "**Debtor**" and collectively, the "**Debtors**", and together with their direct and indirect non-Debtor affiliates, the "**Voyager Group**"), commenced voluntary reorganization proceedings[1] (the "**Chapter 11 Proceedings**") pursuant to Chapter 11 of the U.S. Code (the "**U.S. Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Court**").

1.2    On July 8, 2022 (the "**First Day Hearing**"), the U.S. Court granted various interim and final orders in the Chapter 11 Proceedings (the "**First Day Orders**"), including an order (the "**Foreign Representative Order**") authorizing VDL to act as foreign representative of the Debtors (in such capacity, the "**Foreign Representative**") in a proceeding to be commenced in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**" and these proceedings the "**CCAA Recognition Proceedings**", and together with the Chapter 11 Proceedings, the "**Restructuring Proceedings**"). The Foreign Representative Order also authorizes VDL to:

(a)    seek recognition of the Chapter 11 Proceedings in a proceeding in Canada;

---

[1] On July 6, 2022, the U.S. Court granted an order directing, for procedural purposes only, joint administration of the Chapter 11 Proceedings as Voyager Digital Holdings, Inc. *et al*. This order does not provide for consolidation for substantive purposes.

(b)    request that the Canadian Court lend assistance to the U.S. Court in protecting the property of the estates; and

(c)    seek any other appropriate relief from the Canadian Court that VDL deems just and proper in furtherance of the protection of the Debtors' estates.

<u>CCAA Recognition Proceedings</u>

1.3    On July 11, 2022, the Foreign Representative brought an application before the Canadian Court for certain relief pursuant to Part IV of the CCAA.

1.4    On July 12, 2022, VDL obtained two orders of Canadian Court:

(a)    an initial recognition order (the "**Initial Recognition Order**"), among other things,

(i)    declaring that VDL is the foreign representative in respect of the Chapter 11 Proceedings;

(ii)    recognizing the Chapter 11 Proceedings of VDL as a foreign proceeding under Part IV of the CCAA;

(iii)    granting a stay of proceedings in respect of VDL and their property and business; and

(iv)    prohibiting VDL from selling or otherwise disposing of any property in Canada outside of the ordinary course of business, without leave of the Canadian Court; and

(b)    a supplemental order (the "**Supplemental Order**"), among other things,

(i)    recognizing certain of the First Day Orders;

- 3 -

(ii)    appointing Alvarez & Marsal Canada Inc. as information officer in respect of the CCAA Recognition Proceedings (in such capacity, the "**Information Officer**"); and

(iii)    granting a super-priority charge up to a maximum of CDN$500,000 over VDL's property in Canada in favour of counsel to VDL, the Information Officer and counsel to the Information Officer, Blake, Cassels & Graydon LLP, as security for their professional fees and disbursements in respect of these CCAA Recognition Proceedings.

1.5    On August 5, 2022, the Canadian Court issued an amended and restated Initial Recognition Order setting out that the center of main interest of VDL is the United States and that the Chapter 11 Proceeding of VDL is a foreign main proceeding.

1.6    On August 11, 2022, the Canadian Court made an order recognizing and giving effect in Canada to nine orders of the U.S. Court, including:

(a)    the NOL Order;

(b)    the Wages Order;

(c)    the Taxes Order;

(d)    the Second Interim Cash Management Order;

(e)    the Stretto Appointment Order;

(f)    the Bar Date Order;

(g)    the Insurance Order;

(h)    the OCP Order; and

(i)        the Bidding Procedures Order;

each as defined and described in the First Report of the Information Officer dated August 8, 2022 (the "**First Report**").

1.7    As discussed in the First Report, on August 2, 2022, counsel for a proposed representative plaintiff in a proposed class action on behalf of certain equity investors (the "**Proposed Plaintiff**") served a notice of motion seeking a variety of relief including:

(a)        compelling VDL to provide copies of insurance policies that may be responsive to the claims of the putative class members;

(b)        compelling VDL to provide details of intercorporate funding arrangements;

(c)        removal of the stay in favour of directors and officers (the "**D&O Stay**") from the Supplemental Order;

(d)        additional duties of the Information Officer;

(e)        tolling of all prescription, time or limitation periods applicable to any Misrepresentation Rights (as defined therein) and of mandatory dismissal for delay under section 29.1 of the *Class Proceedings Act*, 1992 until the stay is lifted;

(f)        appointment of Siskands LLP/Aird & Berlis LLP as representative counsel ("**Proposed Representative Counsel**") for all securities claimants and current shareholders of VDL, funded by a charge on the estate of VDL or such other financial arrangements as the Honourable Court finds acceptable; and

(g)     creation of an equity committee in the CCAA Proceeding from which Proposed Representative Counsel shall take instruction.

1.8     On August 11, 2022, the Canadian Court heard a motion in respect of items (f) and (g) above. As a result of discussions among the Foreign Representative, the Information Officer and the Proposed Plaintiff, the Proposed Plaintiff did not seek the remaining relief at the August 11, 2022 motion. The Canadian Court issued an endorsement (the "**Representative Counsel Endorsement**") on August 11, 2022, finding that the Chapter 11 Proceeding, as the plenary proceeding, is the appropriate forum in which the request for appointment of Proposed Representative Counsel should be brought. A copy of the Representative Counsel Endorsement is attached hereto as **Appendix "A"**.

1.9     On September 19, 2022, the Ad Hoc Group of Equity Interest Holders of VDL (of which the Proposed Plaintiff is a member), retained Kilpatrick Townsend & Stockton LLP and Dundon Advisers, LLC in the Chapter 11 Proceedings.

1.10    Further information regarding these CCAA Recognition Proceedings, including the First Report, can be found on the Information Officer's website at https://alvarezandmarsal.com/Voyager_Digital (the "**Case Website**"). Copies of documents filed in the Chapter 11 Proceedings can be found on the case website maintained by Stretto, Inc. ("**Stretto**") at: https://cases.stretto.com/Voyager (the "**Chapter 11 Website**"), which can also be accessed via the Case Website.

**2.0    TERMS OF REFERENCE AND DISCLAIMER**

2.1    In preparing this report of the Information Officer (the "**Second Report**"), the Information Officer has relied solely on information and documents provided by the Foreign Representative, the other Debtors, and their Canadian legal counsel (collectively, the "**Information**"). Except as otherwise described in this Second Report, the Information Officer has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Information Officer has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CASs**") pursuant to the *Chartered Professional Accountants Canada Handbook*, and accordingly, the Information Officer expresses no opinion or other form of assurance contemplated under CASs in respect of the Information.

2.2    This Second Report should be read in conjunction with the Affidavit of Raajan Aery sworn September 28, 2022 (the "**Aery Affidavit**").

2.3    Unless otherwise stated, all monetary amounts contained herein are expressed in USD.

**3.0    PURPOSE OF THIS SECOND REPORT**

3.1    The purpose of this Second Report is to provide the Canadian Court with information or additional information regarding the following:

(a)    a brief update on the Marketing Process (as defined below) and the status of the Chapter 11 Proceedings;

- 7 -

(b)     the four orders that the Foreign Representative is seeking to have recognized and given effect by the Canadian Court pursuant to the CCAA being (i) Kirkland Retention Order, (ii) the BRG Retention Order, (iii) the Moelis Retention Order, and (iv) the KERP Order (each as defined and described below);

(c)     VDL's capital structure and intercompany transactions of the Voyager Group;

(d)     the stay of proceedings in place in Canada with respect to directors and officers; and

(e)     the subsequent activities of the Information Officer since the date of the First Report.

## 4.0    STATUS OF THE CHAPTER 11 PROCEEDINGS

### Restructuring

4.1     As discussed in the First Report, in late June 2022, the Voyager Group, with the assistance of its investment banker, Moelis & Company LLC ("**Moelis**"), commenced a comprehensive marketing process (the "**Marketing Process**") to solicit investor appetite in either (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry pursuant to section 363 of the U.S. Bankruptcy Code ("**363 Sale**"), or (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Voyager Group's business enterprise.

### Bidding Procedure Milestones

4.2     Shortly after the Petition Date, the Debtors crafted bidding procedures (the "**Bidding Procedures**") to further effectuate the Marketing Process, whether pursuant to a 363 Sale and/or provide a path for approval of a Stand-Alone Plan.

4.3     On August 5, 2022, the U.S. Court entered an Order (i) Approving the Bidding Procedures and Related Dates and Deadlines, and (ii) Scheduling Hearings and Objection Deadlines with respect to the Debtors' Sale, Disclosure Statement and Plan Confirmation (the "**Bidding Procedures Order**"). As noted above, the Bidding Procedures Order was recognized by the Canadian Court on August 11, 2022.

4.4     On August 22, 2022, the Debtors filed a Notice of Filing of Revised Bidding Procedures with the U.S. Court which provided notice of a hearing on September 29, 2022 to consider approval of a successful bid or bids for the Debtors' assets (the "**Sale Hearing**"). On September 20, 2022, the U.S. Court rescheduled the Sale Hearing for October 19, 2022.

Successful Bidder

4.5     On September 26, 2022, the Debtors gave notice that, upon the conclusion of an auction and various other steps contemplated by the Bidding Procedures, the Debtors, in the exercise of their business judgement, and in consultation with the official committee of unsecured creditors (the "**UCC**"), selected West Realm Shires Inc. ("**FTX US**") as the successful bidder with respect to certain of the Debtors' assets (the "**Proposed Sale**"). A copy of the Voyager Group's press release in respect of the Proposed Sale is attached hereto as **Appendix "B"**.

4.6     On September 27, 2022, OpCo and FTX US executed an asset purchase agreement (the "**Asset Purchase Agreement**") memorializing the terms of the Proposed Sale.

4.7     On September 28, 2022, the Debtors filed a motion for an order authorizing entry into the Asset Purchase Agreement. Such motion will be heard at the Sale Hearing on October 19, 2022. Objections to the Proposed Sale are due on October 12, 2022.

4.8    No relief is being sought from the Canadian Court at this time in respect of the Proposed

Sale. The Information Officer will provide details on the Proposed Sale in a further report

if and when it is considered appropriate and relevant to the CCAA Recognition Proceedings

or in response to any motion brought forward by the Foreign Representative.

<u>Plan and Disclosure Statement</u>

4.9    Simultaneously with their Marketing Process efforts, the Debtors, Moelis, and the Debtors'

other advisors began to analyze potential strategies to effectuate a standalone chapter 11

plan of reorganization ("**Stand-Alone Plan**").

4.10    On August 12, 2022, the Debtors filed a First Amended Joint Plan of Reorganization (the

"**First Amended Joint Plan**") and the proposed disclosure statement which sets out a

summary of the First Amended Joint Plan. The First Amended Joint Plan provides for a

Stand-Alone Plan that can be effectuated without a sale or strategic partner.

4.11    On August 18, 2022, the Debtors filed a motion for entry of an order approving (i) the

adequacy of the disclosure statement, (ii) solicitation and notice procedures, (iii) forms of

ballots and notices in connection therewith, and (iv) certain dates with respect thereto (the

"**Disclosure Statement Hearing**"). On August 24, 2022, the U.S. Court rescheduled the

Disclosure Statement Hearing for September 29, 2022. On September 20, 2022, the U.S.

Court rescheduled the Disclosure Statement Hearing for October 19, 2022.

4.12    Objections to the adequacy of the disclosure statement are due on October 12, 2022.

4.13    The Information Officer understands that, as soon as reasonably practicable, the Debtors

will file an amended Plan and Disclosure Statement ("**Second Amended Joint Plan**") to

seek consummation of the Proposed Sale pursuant to the Second Amended Joint Plan.

4.14    As of the date of this Second Report, the Second Amended Joint Plan has not been filed and no relief is being sought before the Canadian Court in respect of the Second Amended Joint Plan.

4.15    The Information Officer will prepare a report on the Second Amended Joint Plan if and when it is considered appropriate and relevant to the CCAA Recognition Proceedings or in response to any motion brought forward by the Foreign Representative before this Court.

<u>Bar Date</u>

4.16    As discussed in the First Report, the Bar Date Order established October 3, 2022 as the general bar date. This is the date by which all entities (other than governmental units and certain categories of claimants exempt from complying with the applicable bar dates) that wish to assert a claim against the Debtors that arose prior to the Petition Date must file a proof of claim.

**5.0    ADDITIONAL ORDERS OF THE U.S. COURT**

5.1    Since the date of the First Report, the U.S. Court has made the following orders which, as described in greater detail in the Aery Affidavit, the Foreign Representative is seeking recognition of at a hearing before the Canadian Court on October 6, 2022:

(a)    Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP (together "**Kirkland**") as attorneys for the Debtors and debtors in possession effective as of July 5, 2022 ("**Kirkland Retention Order**");

(b)    Order Authorizing the Employment and Retention of Berkeley Research Group LLC ("**BRG**"), as Financial Advisor Effective as of July 5, 2022 ("**BRG Retention Order**");

(c)    Order Authorizing the Employment and Retention of Moelis as Investment Banker and Capital Markets Advisor to the Debtors, Effective as of the Petition Date ("**Moelis Retention Order**"); and

(d)    Order Approving the Debtors' Key Employee Retention Plan ("**KERP**") and Granting Related Relief ("**KERP Order**").

5.2    Copies of all such orders and other documents related to the Chapter 11 Proceedings are available on the Chapter 11 Website, a link to which is included on the Case Website. The above orders and their relevance to the Canadian stakeholders are discussed below.

Kirkland Retention Order

5.3    On August 4, 2022, the U.S. Court entered the Kirkland Retention Order. The Kirkland Retention Order authorizes the Debtors to retain and employ Kirkland as the Debtors' U.S. insolvency counsel effective as of July 5, 2022 to perform all necessary legal services for the Debtors in connection with the Chapter 11 Proceedings, in accordance with the terms and conditions set forth in the engagement letter between the Debtors and Kirkland.

BRG Retention Order

5.4    On August 16, 2022, the U.S. Court entered the BRG Retention Order. Pursuant to the BRG Retention Order, the Debtors were authorized to retain BRG as a financial advisor, effective as of July 5, 2022.

5.5     The Debtors have retained BRG to provide various services, including supporting the development of a restructuring plan and strategic alternatives for the Debtors, preparing various financial analyses, and providing advice to management on cash conservation measures.

Moelis Retention Order

5.6     On August 16, 2022, the U.S. Court entered the Moelis Retention Order. Pursuant to the Moelis Retention Order, the Debtors were authorized to retain Moelis as the Debtors' investment banker and capital markets advisor, effective as of the Petition Date.

5.7     The Debtors have retained Moelis to provide various services, including assisting the Debtors in reviewing and analyzing their business plan and financial condition, and analyzing and negotiating any potential restructuring, sale or capital transaction.

KERP Order

5.8     On August 25, 2022, the U.S. Court entered the KERP Order. The KERP allows the Debtors to retain certain critical non-insider employees and provides for payment of cash retention awards to 38 of the Debtors' non-insider employees (the "**Participants**"). Each of the Participants performs essential accounting, cash and digital asset management, IT infrastructure, legal and other critical functions for the Debtors.

5.9     The Debtors sought approval of the KERP to avoid the departure of the Participants, key employees of the Debtors, during the Chapter 11 Proceedings. The Debtors are of the view that such departures would destroy value, harm the Debtors' restructuring efforts and adversely affect the Debtors' ability to operate in the ordinary course upon emergence from the Chapter 11 Proceedings.

5.10    The KERP Order authorizes, but does not direct, the Debtors to implement the KERP and to make the payments contemplated under the KERP specified in the Debtors' motion. The Debtors are authorized to add replacement participants to the KERP in the event that a Participant resigns or is terminated for cause.

## 6.0    UPDATE ON VDL'S NON-CONSOLIDATED CAPITAL STRUCTURE

6.1    As of the date of the First Report, based on information provided by management to the Information Officer, the Information Officer understood the amount owing to VDL from OpCo in respect of unsecured intercompany debt facilities existing at the Petition Date exceeded $71.5 million. However, this information was provided on a preliminary basis, and in the First Report, the Information Officer indicated that further review was required.

6.2    Upon receiving additional information from management of the Voyager Group, as of the Petition Date, the Information Officer understands that the amount owing to VDL from OpCo in respect of unsecured intercompany debt facilities is approximately $217.5 million, including $80.4 million which is documented by way of certain loan agreements and $137.1 million which is characterized as debt on the books and records of VDL, but for which no intercompany loan agreements exist.

6.3    In addition, as of the Petition Date, the Information Officer understands the amount owing to VDL from Voyager Holdings include (a) approximately $6.3 million in respect of an unsecured intercompany debt facility for which an intercompany loan agreement is in place, and (b) approximately $2.1 million in respect of unsecured intercompany receivables relating to allocations of expenses and management fees, recharges of bills paid on behalf of one another and cash movements between VDL and Voyager Holdings.

- 14 -

6.4    The Information Officer understands amounts owing to VDL from Voyager Group entities

(including Non-Debtors) is as follows:

| VDL Intercompany Balances | Total (USD) |
|---|---|
| | |
| **VDL Intercompany Debt** | |
| OpCo | $217,458,709.60 |
| Voyager Holdings | $6,329,942.60 |
| **Total Debtor Intercompany Debt Receivables** | **$223,788,652.20** |
| | |
| **Other Debtor Intercompany Receivables** | |
| Voyager Holdings | $2,132,044.79 |
| **Total Other Debtor Intercompany Receivables** | **$2,132,044.79** |
| | |
| **Non-Debtor Intercompany Receivables** | |
| HTC Trading | $1,122,807.31 |
| LGO SAS | $1,054,238.88 |
| Voyager Digital Brokerage Canada Ltd | $890,403.64 |
| Voyager Digital Brokerage Ltd. | $48,304.60 |
| Voyager European Holdings ApS | $866,982.03 |
| Voyager IP, LLC | $164.40 |
| **Total Non-Debtor Intercompany Receivables** | **$3,982,900.86** |

6.5    In addition to the above, based on information provided by management of the Voyager

Group, the Information Officer understands that approximately $46 million was advanced

to OpCo by VDL in the form of equity and approximately $16 million was advanced to

Voyager European Holdings ApS by VDL in the form of equity for the acquisition of

Coinify during fiscal year ended June 30, 2022.

6.6    The Information Officer has been in communication with counsel to the Proposed Plaintiff

regarding the intercompany receivables prior to the date of this Second Report.

- 15 -

**7.0    DIRECTOR & OFFICER STAY**

7.1    In the First Report, the Information Officer noted that the stay of proceedings in place in

the Chapter 11 Proceedings did not extend to claims against directors and officers (with

the exception of derivative claims) and that the Debtors intended to file a motion in the

Chapter 11 Proceedings to address the asymmetry between the D&O Stay and the Chapter

11 Proceedings.

7.2    On August 10, 2022, the Debtors filed an adversary complaint and motion (the "**U.S. D&O**

**Motion**") in the Chapter 11 Proceeding to extend the automatic stay or, in the alternative,

for injunctive relief enjoining the prosecution of pending litigation against the Debtors'

directors and officers in the class action commenced by the Proposed Plaintiff in Canada

(the "**Canadian Class Action**"). A copy of the U.S. D&O Motion is attached hereto as

**Appendix "C"**.

7.3    On August 20, 2022, the Proposed Plaintiff and the Debtors entered into a stipulation (the

"**Stipulation**") by which the Debtors agreed to adjourn the U.S. D&O Motion initially to

November 15, 2022, and thereafter as appropriate, subject to the Proposed Plaintiff

agreeing to refrain from taking any steps against any and all defendants in the Canadian

Class Action until the Proposed Plaintiff seeks and receives written permission from the

Debtors or an order from the U.S. Court. A copy of the Stipulation is attached hereto as

**Appendix "D"**.

**8.0    ACTIVITIES OF THE INFORMATION OFFICER**

8.1    The activities of the Information Officer since the date of the First Report (August 8, 2022)

have included:

(a)    reviewing relevant materials filed in the Chapter 11 Proceedings and drafts of the

application materials for the CCAA Recognition Proceedings;

(b)    maintaining the Case Website for the CCAA Recognition Proceedings to make

available copies of the orders granted in the proceedings and other non-confidential

materials. As noted above, there is also a link on the Information Officer's website

to the Chapter 11 Website maintained by Stretto that includes copies of the U.S.

Court materials and orders, petitions and notices and other materials relevant to the

Chapter 11 Proceedings;

(c)    reviewing and considering the orders made in the Chapter 11 Proceedings;

(d)    monitoring the Chapter 11 Website for activity in the Chapter 11 Proceedings;

(e)    communicating with counsel to VDL and management of the Voyager Group

regarding matters relevant to the CCAA Recognition Proceedings and the Chapter

11 Proceedings;

(f)    communicating with counsel to the Proposed Plaintiff;

(g)    attending hearings before the Canadian Court on August 11, 2022;

(h)    attending hearings before the U.S. Court on August 24, 2022 and September 29,

2022;

(i)    attending a townhall meeting of the UCC on August 11, 2022;

(j)     attending the meeting of creditors on August 30, 2022;

(k)     responding to inquiries from investors; and

(l)     with the assistance of legal counsel, preparing this Second Report.

## 9.0    RECOMMENDATIONS

9.1     The Information Officer understands that recognition by the Canadian Court of the requested orders is relevant to the conduct of the Restructuring Proceedings. The Information Officer, together with its legal counsel, has reviewed the Kirkland Retention Order, BRG Retention Order, Moelis Retention Order, and the KERP Order and is of the view that granting recognition of these orders is reasonable and appropriate in the circumstances. Based on the foregoing, the Information Officer respectfully recommends that the Canadian Court grant the relief requested by the Foreign Representative.

All of which is respectfully submitted to the Court this 30th day of September, 2022.

**ALVAREZ & MARSAL CANADA INC.**
**Information Officer of Voyager Digital Ltd.,**
**and not in its personal or corporate capacity**

Per:    _____
        Stephen Ferguson
        Senior Vice-President

# APPENDIX "A"



SUPERIOR COURT OF JUSTICE

## COUNSEL SLIP/ENDORSEMENT

**COURT FILE NO.:**    <u>CV-22-00683820-00CL</u>    **DATE:** <u>11 August 2022</u>

**NO. ON LIST:** _____

**TITLE OF PROCEEDING:**    **VOYAGER DIGITAL LTD**

**BEFORE JUSTICE:**    **CAVANAGH**

| PARTICIPANT INFORMATION |
|---|

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Stuart Brotman | Voyager Digital Ltd. | sbrotman@fasken.com |
| Daniel Richer | Voyager Digital Ltd. | dricher@fasken.com |
| | | |
| | | |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Michael G. Robb | Francine De Sousa | michael.robb@siskinds.com |
| Garrett M. Hunter | Francine De Sousa | garett.hunter@siskinds.com |
| Miranda Spence | Francine De Sousa | mspence@airdberlis.com |
| Tamie Dolny | Francine De Sousa | tdolny@airdberlis.com |
| | | |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Linc Rogers | Information Officer – Alvarez & Marsal Canada Inc. | linc.rogers@blakes.com |
| Caitlin McIntyre | Information Officer – Alvarez & Marsal Canada Inc. | caitlin.mcintyre@blakes.com |
| Ryan Jacobs | Official Committee of Unsecured Creditors | rjacobs@cassels.com |

| Shane Kukulowicz | Official Committee of Unsecured Creditors | skukulowicz@cassels.com |
| Stephen Ferguson | Alvarez & Marsal Canada Inc. | sferguson@alvarezandmarsal.com |

**ENDORSEMENT OF JUSTICE CAVANAGH:**

There are two motions before me.

First, Voyager Digital Ltd. ("VDL"), as the foreign representative of VDL in respect of the case under Chapter 11 of Title 11 of the United States Code commenced by VDL in the United States Bankruptcy Court for the Southern District of New York (the "U.S. Bankruptcy Court") (the "U.S. Proceeding"), moves for an order recognizing and enforcing in Canada certain orders entered by the U.S. Bankruptcy Court in the Chapter 11 case.

Second, Francine De Sousa, on behalf of the proposed class-action plaintiff under Court File No. 22-00683699-00 CP, moves for certain relief as set out in her Notice of Motion.

**Motion by VDL**

VDL, as foreign representative of VDL in the Chapter 11 Case seeks an order recognizing and enforcing in Canada certain Orders entered by the U.S. Bankruptcy Court. This motion is unopposed.

The Orders sought to be recognized are described in the First Report of the Information Officer at Appendix F, section B.

I am satisfied that the requested recognition order should be made.

Order to issue in form of order signed by me.

**Motion by Francine De Sousa**

The relief sought by Ms. De Sousa that is contentious is her motion for an order (i) appointing representative counsel for all securities claimants and current shareholders of VDL impacted in the proceeding commenced in this Court pursuant to the *Companies' Creditors Arrangement Act*, as amended (the "*CCAA*") and the U.S. Proceeding, to be funded by the charge on the estate of VDL; and (ii) allowing for the creation of an equity committee in the CCAA proceeding from which representative counsel shall take instructions, which will include the appointment of Ms. De Sousa as one of its members, to represent the VDL Shareholders.

Background

VDL is a public company traded on the Toronto Stock Exchange. Through its wholly-owned US subsidiary entities, Voyager Digital, LLC, and Voyager Digital Holdings, Inc., VDL and its subsidiaries operated a non-custodial cryptocurrency exchange.

Ms. De Sousa is a shareholder of VDL. She is the proposed representative plaintiff in the proposed class action against VDL and other defendants. In the proposed class action, Ms. De Sousa alleges, on her own behalf and on behalf of all persons and entities who purchased VDL shares on the secondary market from October 28, 2021 to July 5, 2022, that the defendants made misrepresentations related to the crypto asset loans made by VDL and that, as a result of these misrepresentations, she and other class members suffered financial losses.

On July 5, 2022 VDL and other related debtors commenced voluntary reorganization proceedings pursuant to Chapter 11 of the US Bankruptcy Code before the US Bankruptcy Court. On July 8, 2022, the US Bankruptcy Court granted various interim and final orders including an order authorizing VDL to act as foreign representative of the debtors in a proceeding to be commenced in this Court pursuant to the *CCAA*. On July 11, 2022, VDL, as foreign representative, brought an application before this court for certain relief pursuant to Part IV the *CCAA*. On July 12, 2022, VDL obtained two Orders of this Court: an initial recognition order and a supplemental order.

On July 19, 2022, this Court conducted a hearing with respect to determination of whether (i) the U.S. Proceeding is a "foreign main proceeding" or a "foreign non-main proceeding", and (ii) whether VDL's centre of main interest ("COMI") is the United States. On August 4, 2022, this Court issued an endorsement declaring that the U.S. Proceeding is a "foreign main proceeding" and that VDL's COMI is the United States.

In the U.S. Proceeding, the U.S. Bankruptcy Court appointed the Official Committee of Unsecured Creditors. This committee represents all unsecured creditors of the debtors in the U.S. Proceeding, including VDL. The Official Committee has retained Canadian counsel to represent its interests in the Canadian proceeding.

<u>Analysis</u>

Ms. De Sousa submits that this Court has jurisdiction to grant the requested order pursuant to the broad powers conferred by s. 11 of the *CCAA*. Ms. De Sousa submits that she meets the tests set out in the jurisprudence for the appointment of representative counsel and that this Court should grant the requested order.

I first address the preliminary objection raised by VDL, which is supported by the Official Committee of Unsecured Creditors, that is, that this motion is brought in the wrong court, and that it should properly have been brought to the U.S. Bankruptcy Court.

Ms. De Sousa submits that there is no legal requirement, under the CCAA or otherwise, for her to bring this motion in the U.S. Bankruptcy Court. She submits that her motion is properly brought to this Court. Ms. De Sousa submits that she and other the shareholders would be treated inequitably if she is required to move in the U.S. Proceeding for an order appointing representative counsel.

Ms. De Sousa points to the Order made by the U.S. Bankruptcy Court authorizing VDL to act as foreign representative in which the debtors are authorized to pay the costs of the Information Officer and its counsel, consistent with any orders of the Canadian Court. No charge is ordered. A charge was ordered in this court.

Ms. De Sousa submits that a charge to secure payment of fees of Canadian representative counsel would have to be ordered by this Court, in the first instance. Ms. De Sousa submits that that it would be a waste of judicial resources to require her to first seek an order appointing representative counsel from the U.S. Bankruptcy Court and then to come to this Court to seek recognition of this Order and an Order authorizing a charge.

Ms. De Sousa accepts that if an order is made in the Canadian proceeding appointing representative counsel, one role of representative counsel will be to retain and instruct U.S. counsel, and she assures the court that steps would be taken to ensure that there is no unnecessary duplication of work. Therefore, Ms. De Sousa accepts that there will be a need for representation of VDL shareholders in the U.S. Proceeding. Nevertheless, she submits, there will be a role for Canadian counsel given that VDL is a public company listed on the TSX and the shareholders' claims will be determined under Ontario law which will require advice from Canadian counsel.

Ms. De Sousa submits that there is authority for this Court to grant an order appointing representative counsel in ancillary Canadian proceedings that are alongside foreign main proceedings initiated under Chapter 11 of

the U.S. Bankruptcy Code. Ms. De Sousa cites as authority an order appointing representative counsel that is referenced in *Grace Canada Inc., Re*, [2008] O.J. 4208.

In *Grace*, W.R. Grace and its subsidiaries filed a joint Chapter 11 plan of reorganization with the U.S. Bankruptcy Court. Two days after the Chapter 11 proceedings were commenced, Grace Canada, Inc. commenced proceedings under the *CCAA* seeking ancillary relief to facilitate and coordinate the U.S. proceedings in Canada. By 2005, ten class actions were commenced across Canada in relation to the manufacture, distribution and sale of a certain product. In his decision, at para. 22, Farley J. noted that an order was made appointing Canadian counsel as representative counsel on behalf of the Canadian claimants to advocate their interests in the restructuring process.

I do not regard the Order made in the *Grace* proceeding to be a helpful authority for several reasons. First, unlike this motion, the motion was made by the Canadian applicant, Grace Canada, Inc., and not by the class representative in any of the class actions. Second, there is no analysis in the decision of Farley J. of the issue before me. Third, the Canadian proceedings were not subject to Part IV of the CCAA, as these amendments were not yet in force.

The U.S. Proceeding has been recognized as the foreign main proceeding and it is the plenary proceeding. The U.S. Bankruptcy Court is the is the forum within which the restructuring of VDL and the other debtors will take place. The requested order, even if it were to be granted, would still require a motion to the U.S. Bankruptcy Court for the appointment of representative counsel to represent the interests of the VDL shareholders in relation to the U.S. Proceeding, including any restructuring plan, so any efficiencies in having this motion heard in this Court are limited.

In my view, given that the U.S. Bankruptcy Court is presiding over the plenary proceeding, and this Court has recognized the U.S. Proceeding as the foreign main proceeding under Part IV of the CCAA, the requested order to appoint representative counsel should be sought from the U.S. Bankruptcy Court and not from this Court. This is consistent with the scheme of Part IV of the CCAA. It is open to the U.S. Bankruptcy Court to seek the assistance and cooperation of this Court in respect of any such request, including recognition of any Order made in the U.S. Proceeding and a request for consideration of any ancillary Order in the Canadian proceeding that may be needed to give effect in Canada to such an Order.

<u>Disposition</u>

For these reasons, Ms. De Sousa's motion for an Order appointing representative counsel to be funded by a charge on the estate of VDL is dismissed, without prejudice to her right to seek such relief from the U.S. Bankruptcy Court in the U.S. proceeding.

Ms. De Sousa advises that other relief requested in her Notice of Motion has been or is likely to be resolved and she does not seek this relief on this motion. If this relief is not, as expected, resolved on a consensual basis, Ms. De Sousa may renew her motion.

# APPENDIX "B"

https://www.investvoyager.com/pressreleases/voyager-completes-successful-auction-and-announces-agreement-for-ftx-to-acquire-its-assets

# Voyager Completes Successful Auction and Announces Agreement for FTX to Acquire Its Assets

September 26, 2022 09:54 PM EST

Voyager Digital Ltd. ("Voyager" or the "Company") (OTC Pink VYGVQ; FRA: UCD2) announced today that after multiple rounds of bidding in a highly competitive auction process that lasted two weeks, its operating company Voyager Digital LLC, selected West Realm Shires Inc. ("FTX US") as the highest and best bid for its assets. The Official Committee of Unsecured Creditors ("UCC") participated actively in the competitive auction and supports FTX US's winning bid.

FTX US's bid is valued at approximately $1.422 billion, comprised of (i) the fair market value of all Voyager cryptocurrency at a to-be-determined date in the future, which at current market prices is estimated to be $1.311 billion, plus (ii) additional consideration that is estimated as providing approximately $111 million of incremental value. The Company's claims against Three Arrows Capital remain with the bankruptcy estate, which will distribute any available recovery on such claims to the estate's creditors.

FTX US's bid maximizes value and minimizes the remaining duration of the Company's restructuring by providing a clear path forward for the Debtors to consummate a chapter 11 plan and return value to their customers and other creditors. FTX US's market-leading, secure trading platform will enable customers to trade and store cryptocurrency after the conclusion of the Company's chapter 11 cases.

The asset purchase agreement between Voyager Digital LLC and FTX US will be presented for approval to the United States Bankruptcy Court for the Southern District of New York on Wednesday, October 19, 2022 and the objection deadline to the transaction is October 12, 2022 at 4:00 p.m. prevailing Eastern Time. The sale to FTX US will be consummated pursuant to a chapter 11 plan, which will be subject to a creditor vote and is subject to other customary closing conditions. FTX US and the Company will work to close the transaction promptly following approval of the chapter 11 plan by the Bankruptcy Court.

The auction follows Voyager's July 5, 2022 entrance into a voluntary restructuring process aimed at returning maximum value to customers. Since the Company's chapter 11 filing, in furtherance of this objective, Voyager has engaged in a dual-track process, considering both a potential sale and a standalone reorganization. In-line with the process outlined in court filings, Voyager received multiple bids contemplating sale and reorganization alternatives, held an auction and, based on the results of the auction, has

determined that the sale transaction with FTX is the best alternative for Voyager stakeholders.

Additional information about the timeline and customer access to crypto will be shared as it becomes available. A copy of the Bidding Procedures, Bidding Procedures Order, Bidding Procedures Motion and other pleadings filed in this case may be obtained free of charge by visiting the Voyager case website https://cases.stretto.com/Voyager.

The results of the auction do not change the Bar Date nor the need for customers to determine whether to file a claim. More information can be found here. Customers can file a claim on Voyager's case website here. The deadline for filing a claim is October 3, 2022, at 5:00 PM ET.

Voyager was advised by Kirkland & Ellis LLP, Moelis & Company LLC, and Berkeley Research Group. FTX US was advised by Sullivan & Cromwell LLP. The UCC was advised by McDermott Will & Emery LLP and FTI Consulting.

**Forward Looking Statements**
Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that parties to whom the Company lends assets are able to repay such loans in full and in a timely manner, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other

risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. Readers are cautioned that Assets on Platform and trading volumes fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events, except as required by law. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends.

SOURCE Voyager Digital, Ltd.


**Contacts**

**Voyager Digital, Ltd.**
Voyager Public Relations Team
pr@investvoyager.com

# APPENDIX "C"

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine a. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>FRANCINE DE SOUSA, et al,<br><br>    Defendants. | Adv. Pro. No. 22-_____ |

**DEBTORS' ADVERSARY COMPLAINT TO EXTEND AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION OF PENDING LITIGATION AGAINST THE DEBTORS' DIRECTORS AND OFFICERS**

The Debtors[1] in the above-captioned Chapter 11 case ("<u>Plaintiffs</u>," and together with their debtor-affiliates, directors, and officers, the "<u>Debtors</u>"), through their undersigned proposed counsel, hereby file this adversary complaint for an extension of the automatic stay pursuant to Section 362(a) or Section 105(a) of the Bankruptcy Code.

<u>**PRELIMINARY STATEMENT**</u>

1.      Voyager Digital Ltd., one of the Debtors, and certain of the Debtors' current and former directors and officers have been named as defendants in a putative class-action lawsuit, filed in Canada, arising from the Debtor's cryptocurrency ("<u>crypto</u>") trading, lending, and selling activities (the "<u>Canadian Class Action</u>").  A copy of the Notice of Action is attached as Exhibit A hereto.

2.      The Canadian Class Action is brought against Voyager Digital Ltd. as well as certain of the Debtors' current and former directors and officers: Stephen Ehrlich (Debtors' CEO and co-founder), Philip Eytan (Debtors' non-executive Chairman and a director), Evan Psaropoulos (Debtors' Chief Commercial Officer), Lewis Bateman (Debtors' former Chief International Officer), Krisztian Toth (Debtor's director), Jennifer Ackart (Debtor's director), Glenn Stevens (Debtors' director), and Brian Brooks (Debtors' director) (collectively, the "<u>D&Os</u>").

3.      The Canadian Class Action alleges claims against the Debtor's D&Os for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

4.      The Canadian Class Action is dependent on, and inextricably intertwined with, the
Debtors' alleged conduct. To prove many of the claims in that suit, the plaintiffs must first establish
the underlying liability of the named directors and officers, which allegedly requires a vicarious
finding of underlying wrongdoing by the Debtor, Voyager Digital Ltd. The Canadian Class Action
may also require a determination as to whether the Debtors' crypto-based financial products are
securities at all—an unsettled legal issue in Canada and the United States.

5.      The Canadian Class Action is currently stayed against Debtor Voyager Digital Ltd.
pursuant to the automatic stay provided by Section 362.  This Court should extend the automatic
stay pursuant to Section 362, or issue an injunction pursuant to Section 105 to enjoin the
continuation of the Canadian Class Action as against the D&Os for the following reasons:

a.      **First**, the Debtors will be exposed to a significant risk of collateral estoppel, *stare
decisis*, and evidentiary prejudice if the Canadian Class Action is permitted to
proceed. The Debtors' D&Os' alleged conduct is the foundation for the Canadian
Class Action's claims, and any judicial decision on the claims against the D&Os
could be used against all the Debtors (not just Voyager Digital Ltd.)

b.      **Second**, some D&Os named in the Canadian Class Action are critical to the
restructuring efforts of the Debtors, and particularly given the fast pace and
anticipated short timetable of these chapter 11 cases, the Debtors need their D&Os
focused on the restructuring, not defending a class action lawsuit in Canada.

c.      **Third**, the Debtors will face likely indemnification claims if the Canadian Class
Action is allowed to continue. The Articles of Voyager Digital Ltd. require
indemnification of its directors for liabilities incurred in the course of their business
as directors, and if the Canadian Class Action results in such liability, Voyager

3

Digital Ltd. could be required to pay for such indemnification. As such, the Debtors could be directly affected should the Canadian Class Action proceed against the D&Os.

d.    **Fourth**, the Debtors' estates own property which may be depleted if the Canadian Class Action proceeds. Voyager Digital Ltd., the other Debtors, and the D&Os share insurance coverage for the Canadian Class Action. If prosecution of the Canadian Class Action continues, the Debtors and the D&Os will incur defense costs that could draw down these insurance policies, depleting an asset that the Debtors contend is the estates' property.

6.    For these reasons, the Debtors request that the Court extend the automatic state pursuant to Section 362 or issue an injunction pursuant to Section 105 to stay or enjoin the prosecution of the Canadian Class Action against the D&Os and Voyager Digital, Ltd. until the effective date of a restructuring plan in these Chapter 11 cases.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

8.    This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

9.    Venue in this district is proper pursuant to 28 U.S.C. § 1409.

10.    Pursuant to Federal Bankruptcy Rule of Procedure 7008, the Debtors consent to the entry of a final order or judgment by the Bankruptcy Court.

## PARTIES

11.    The Debtors are plaintiffs in this adversary proceeding.

12.     Francine De Sousa is the named plaintiff in the Canadian Class Action.  This
Complaint is being served on the attorneys that filed the Canadian Class Action on her behalf.

## RELIEF REQUESTED

13.     By this Complaint, the Debtors seek a declaratory judgment pursuant to Sections
105 and 362 of the Bankruptcy Code to extend the automatic stay under Sections 362(a)(1) and
362(a)(3) to the Action, or in the alternative, stay and enjoin the Canadian Class Action pursuant
to Section 105 of the Bankruptcy Code during the pendency of the Debtors' Chapter 11 cases.

## FACTUAL BACKGROUND

14.     On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition
for relief under Chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United
States Bankruptcy Court for the Southern District of New York (the "Court").  These cases are
being jointly administered pursuant to Bankruptcy Rule 1015(b).

15.     On July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee")
appointed an eight-member official committee of unsecured creditors (the "Creditors
Committee"). (ECF No. 102).

16.     The Debtors and certain of their non-Debtor affiliates (collectively, "Voyager," or
"the Company") are a crypto-based financial platform that provides brokerage services that allows
customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all"
platform. Voyager's customers can earn rewards on their cryptocurrency assets stored on the
Company's platform and trade over 100 unique digital assets. Voyager's mobile application has
been downloaded millions of times and currently had over 3.5 million active users at its peak. A
detailed description of Voyager's business operations, capital and debt structure, and the facts and
circumstances leading to these Chapter 11 cases is set forth in the *Declaration of Stephen Ehrlich,*

5

*Chief Executive Officer of Voyager Digital Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Ehrlich Declaration"), (ECF No. 15) (July 6, 2022).

17.    Debtor Voyager Digital Ltd. and certain of the Debtors' current and former directors and officers have been named as a defendant in a putative class-action proceeding filed in Toronto, Canada, captioned *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice Ct. July 6, 2022). Plaintiff Francine De Sousa, as proposed class representative, asserts claims against the D&Os and Voyager Digital Ltd. for allegedly violating Canadian securities laws.  Ex. A, Notice of Action ¶¶ 27–44.

18.    The Notice of Action asserts that Voyager Digital Ltd. is vicariously liable for the acts or omissions of the D&Os. *Id.* ¶¶ 45–48.  For example, the Notice of Action alleges that in written and oral statements, Voyager Digital Ltd. falsely represented its exposure to the Terra/Luna collapse, the exposure of its lendees to the Terra/Luna collapse, and the extent of Voyager Digital Ltd.'s liquidity issues, all of which are alleged to be "misrepresentations" under Ontario securities law. *Id.* ¶¶ 10–14.

19.    Parallel with these Chapter 11 cases, Debtor Voyager Ltd. commenced recognition proceedings under Part IV of the *Companies' Creditors Arrangement Act* (Canada) pending in the Ontario Superior Court of Justice (Commercial List). Those proceedings bear the caption *In the Matter of Voyager Digital Ltd.*, Court File No. CV-22-00683820-00CL.

20.    On July 12, 2022, the Canadian Court recognized the Chapter 11 case of Debtor, Voyager Digital, Ltd., as a foreign proceeding, subject to a further determination as to whether such Chapter 11 case is a foreign main proceeding.

21.    On August 9, 2022, the Canadian court made a determination that the "centre of main interest" of Debtor, Voyager Digital, Ltd. is in the United States and that the Chapter 11

cases of Voyager Digital, Ltd. would be recognized as a "foreign main proceeding" under Canadian law. *In the Matter of Voyager Digital Ltd.*, 2022 ONSC 4553 ¶¶ 3, 15–16 (quoting Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 47(2)). *See* Exhibit B. Pursuant to the Amended and Restated Initial Recognition Order of the Canadian Court dated July 12, 2022, and the amended and restated August 5, 2022 Order, and the Supplemental Order of the Canadian Court dated July 12, 2022, all suits in Canada against Voyager Digital Ltd. are stayed, absent a further order of that court. *Id.* ¶ 55; *see* Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 48(1) (requiring the stay after ordering recognition of a foreign main proceeding).

22.    Despite the Canadian Court's orders, and that the filing of a notice of action does not, by itself, require any response or other active proceedings in the Canadian court,[2] counsel for the plaintiff has made it clear that the plaintiff intends to pursue the action quickly. Indeed, counsel for the Canadian Class Action plaintiff has already filed a motion in the Canadian insolvency case that would, if granted and among other relief, require Voyager Digital Ltd. to provide certain discovery, create an equity committee to which the Canadian Class Action plaintiff would be appointed, and appoint the Canadian lawyers for the Canadian Class Action plaintiff as representative counsel on behalf of equity holders. *See* Exhibit C.

### *The D&O Insurance Coverage*

23.    The Debtors and their directors and officers share a common primary Executive and Corporate Securities Liability Insurance Policy and a common excess insurance policy. The Policy provides coverage for claims made against directors and executives of both Voyager Digital

---

[2]    Under Ontario Rule of Civil Procedure 14.03, a plaintiff may commence a case with a "notice of action" "that contains a short statement of the nature of the claim," which must then be followed by a full "statement of claim" "within thirty days after the notice of action is issued." Rules of Civil Procedure, R.R.O. 1990, Reg. 194, at Rule 14.03. The statement of claim and notice of action are then served together. *Id.* Service must take place "within six months after the notice of action is issued." *Id.* Rule 14.08.

Ltd. and its subsidiaries, including, but not limited to, non-indemnified losses of officers and directors under Insuring Agreement (A); losses of the Company or those of its directors and officers that the Company indemnifies, under Insuring Agreement (B); and the Company's losses from securities claims, under Insuring Agreement (C).

24.     The Company and its officers and directors are entitled to use the proceeds of that policy for "damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts … that any Insured is obligated to pay and Defense Expenses," subject to a few non-relevant limitations.  If made, such payments could deplete proceeds available to the estates.

*Voyager Digital Ltd.'s Indemnification Obligations*

25.     The Articles of Voyager Digital Ltd. obligate it to indemnify its "director[s], former director[s], [and] alternate director[s]," and their "heirs and legal personal representatives" for any "judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of," any "legal proceeding or investigative action … in which a director, former director or alternate director…, by reason of the eligible party being or having been a director or alternate director … is or may be joined as a party; or is or may be liable for in respect of a judgment, penalty or fine in, or expenses, related [thereto]." Ex. D, Articles of Voyager Digital Ltd. art. 21.1–21.2.

## THE CONTINUATION OF THE ACTIONS AGAINST THE D&Os WILL BE DETRIMENTAL TO THE DEBTORS' ESTATES

26.     If the Canadian Class Action continues, and is not stayed or enjoined, the Debtors' estate and reorganization will be harmed.

27.     ***First***, the Debtors will be exposed to a significant risk of collateral estoppel, *stare decisis*, and/or evidentiary prejudice if the Canadian Class Action against the D&Os is allowed to continue.  The Canadian Class Action raises many legal issues that will be central to the Chapter 11 proceedings.  The Debtors' alleged conduct is the foundation for the allegations against the

D&Os in the Canadian Class Action. Thus, any judicial decision—whether on the merits or on procedural issues—could be used later against the Debtors.

28.     **Second**, if the Canadian Class Action continues, an asset of the Debtors' estate—namely the insurance policy and proceeds that Debtors share with the D&Os—will be depleted. Because the insurance proceeds are paid on a first-billed, first-paid basis, allowing the Canadian Class Action to continue against the D&Os will reduce the proceeds available to the Debtors, and, once exhausted, increase the Debtors' indemnification obligations.

29.     **Third**, the Canadian Class Action will create indemnification obligations for the Debtors. In addition to the Debtors' contractual indemnification obligations to the D&Os, the Articles of Voyager Digital Ltd. obligate it to indemnify its "director[s], former director[s], [and] alternate director[s]," and their "heirs and legal personal representatives" for any "judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of," any "legal proceeding or investigative action … in which a director, former director or alternate director…, by reason of the eligible party being or having been a director or alternate director … is or may be joined as a party; or is or may be liable for in respect of a judgment, penalty or fine in, or expenses, related [thereto]." Exhibit D, Articles of Voyager Digital Ltd. art. 21.1–21.2. The Canadian Class Action raises claims against the Debtors' directors and officers, who will then have direct claims against the Debtors' estate for their defense costs and any settlement or judgment.

30.     **Fourth**, certain of the D&Os are critical to any successful restructuring, and they will be distracted from their bankruptcy-related obligations to deal with the Canadian Class Action. The D&Os have the overriding responsibility to shepherd the Debtors through their restructuring, and they will necessarily be distracted from this responsibility if they are obligated to devote time to responding to discovery demands and litigating claims against them.  These chapter 11 cases

9

are proceeding at a rapid pace, and the Debtors need their officers and directors focused on the

restructuring, not on defending a class action lawsuit in Canada.

## FIRST CLAIM FOR RELIEF

### (Section 362 Declaratory Judgment)

31.    The Debtors repeat and re-allege the allegations contained in paragraphs 1-30 of

this Complaint as if fully set forth herein.

32.    The Debtors seek an order staying the continuation of the Canadian Class Action

until the effective date of a restructuring plan in these Chapter 11 cases, pursuant to sections

362(a)(1) and 362(a)(3) of the Bankruptcy Code.

33.    Extension of the stay is warranted because continuation of the Canadian Class

Action against the D&Os would expose the Debtors to a risk of collateral estoppel, *stare decisis*,

and evidentiary prejudice.

34.    Extension of the stay is further warranted because continuation of the Canadian

Class Action against the D&Os would expose the Debtors to burdensome discovery obligations.

Discovery from the Debtors would consume significant time and resources, distract their

management, eviscerate the benefits of the automatic stay, and frustrate their ability to restructure

successfully.

35.    Extension of the stay is additionally warranted because continuation of the

Canadian Class Action against the D&Os could deplete the Debtors' insurance coverage.

36.    Extension of the stay is likewise warranted because continuation of the Canadian

Class Action against the D&Os would expose the Debtors to indemnification claims by the D&Os,

further jeopardizing property of the Debtors' estate.

37.    If the Canadian Class Action is allowed to continue, the Debtors' prospects for

confirming their restructuring plan will be impaired, thwarting the Congressional purpose of

providing the Debtors with a breathing spell from litigation pressures in their efforts to confirm a plan of reorganization. Accordingly, the automatic stay should extend to the Canadian Class Action that name D&Os as defendants or respondents.

38.     Based on the foregoing, the Debtors seek a declaratory judgment extending the stay under sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code to the continuation of the Canadian Class Action against the D&Os.

## SECOND CLAIM FOR RELIEF

### (Section 105 Injunctive Relief)

39.     The Debtors repeat and re-allege the allegations contained in paragraphs 1–38 of this Complaint as if fully set forth herein.

40.     The Debtors seek an injunction enjoining the continued prosecution of the Canadian Class Action against the D&Os under section 105(a) of the Bankruptcy Code until the effective date of a restructuring plan or further order of this Court.

41.     Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

42.     Relief under section 105 of the Bankruptcy Code is particularly appropriate in a Chapter 11 case when necessary to protect a debtor's ability to effectively confirm a restructuring plan and to preserve the property of the debtor's estates.

43.     For the reasons stated herein, this Court should apply section 105 of the Bankruptcy Code to enjoin the continuation of the Canadian Class Action against the Debtors because the continuation of that case against the Debtors will harm the Debtors' efforts to successfully restructure and will interfere with the property of the Debtors' Chapter 11 estate.

44.    The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to the parties in the Canadian Class Action. The plaintiffs in the Canadian Class Action will suffer little if any harm if the Canadian Class Action is enjoined until the effective date of the Debtors' restructuring plan.

45.    If the Canadian Class Action against the Debtors is not enjoined, the Debtors will likely suffer harm and their restructuring efforts will be threatened, including:

a.    The risk of collateral estoppel, *stare decisis*, issue preclusion, or other findings that could impair the Debtors' ability to defend themselves in subsequent litigation;

b.    The risk that a finding of liability against the D&Os will harm the Debtors' estate because a finding of liability against the D&Os will result in indemnification claims against the Debtors;

c.    The risk that continuation of the Canadian Class Action against the D&Os will result in depletion of insurance policies and proceeds through payment of the D&Os' defense costs and any settlement or judgment against them; and

d.    The fact that the D&Os will be distracted by the Canadian Class Action during a time period they should be completely focused on shepherding the Debtors through these Chapter 11 cases.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors as Plaintiffs demand judgment against the Defendants and respectfully request relief as follows:

i.    The entry of a declaratory judgment that the continuation of the Canadian Class Action against the D&Os is stayed under Bankruptcy Code Sections 362(a)(1) and/or 362(a)(3) until the effective date of a restructuring plan or further order of this Court; and/or

12

ii.    In the alternative, the entry of an Order granting an injunction pursuant to Bankruptcy Code Section 105(a) enjoining and prohibiting the continuation of the Canadian Class Action against the D&Os until the effective date of a restructuring plan or further order of this Court; and/or

iii.    Such other relief as this Court deems just and proper under the circumstances.

Dated:  August 10, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
    cmarcus@kirkland.com
    christine.okike@kirkland.com
    allyson.smith@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
*Counsel to the Debtors and Debtors in Possession*

13

**Certificate of Service**

I HEREBY CERTIFY that on this 10th day of August, 2022, I caused a true and correct

copy of the foregoing to be served by e-mail upon the following:

Michael Robb
Anthony O'Brien
Garrett Hunter
Siskinds LLP
100 Lombard St., Suite 302
Toronto ON M5C 1M3
CANADA

Steven Graff
Miranda Spence
Tamie Dolny
Aird & Berlis
181 Bay Street, Suite 1800
Toronto  ON M5J 2T9
CANADA

/s/ Michael Slade
Michael Slade

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine a. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
**INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>Debtors. | Case No. 22-10943 (MEW)<br>(Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FRANCINE DE SOUSA, et al,<br><br>Defendants. | Adv. Pro. No. 22-01133 MEW) |

**THE DEBTORS' MOTION TO EXTEND AUTOMATIC STAY OR,**
**IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING**
**PROSECUTION OF CERTAIN PENDING LITIGATION AGAINST**
**THE DEBTORS' DIRECTORS AND OFFICERS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................iii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ...................................................................................3

    A.     Voyager Overview...................................................................................4

          1.     Voyager's Business Operations..................................................4

          2.     Events Leading to the Chapter 11 Cases ....................................5

    B.     The Canadian Class Action ......................................................................7

    C.     The D&O Insurance Coverage ..................................................................9

    D.     Voyager Digital Ltd.'s Indemnification Obligations...................................9

ARGUMENT.....................................................................................................10

I.     THE AUTOMATIC STAY OF SECTION 362 SHOULD BE EXTENDED TO
      STAY THE CANADIAN CLASS ACTION. .................................................11

    A.     The Canadian Class Action Should Be Stayed Under Section 362(a)(1)
          Given the D&Os' Identity of Interest with the Debtors. ......................11

          1.     Continuation of the Canadian Class Action Could Result in
               Decisions that Could be used Against the Debtors....................12

          2.     Continuation of the Canadian Class Action Could Create
               Significant Indemnification Obligations for the Debtors' Estate. .............15

    B.     The Canadian Class Action Should Be Stayed Under Section 362(a)(3) in
          Order to Preserve and Protect the Estate's Property.............................16

II.    THE CONTINUED PROSECUTION OF THE CANADIAN CLASS ACTION
      SHOULD BE ENJOINED UNDER SECTION 105. .......................................18

    A.     Continuation of the Canadian Class Action Will Irreparably Harm the
          Debtors..........................................................................................20

    B.     There Is a Reasonable Likelihood the Debtors Will Successfully
          Restructure.....................................................................................22

    C.     The Balance of Harms Favors an Injunction. .........................................23

i

D.      An Injunction Serves the Public Interest. ................................................................24

CONCLUSION...............................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) ................................................................passim

*De Sousa v. Voyager Digital Ltd., et al.*,
    No. CV-22-00683699-00CP (Ontario Superior Court of Justice. July 6, 2022) .................7

*E. Refractories Co. v. Forty Eight Insulations Inc.*,
    157 F.3d 169 (2d Cir. 1998) ..........................................................................10

*Haw. Structural Ironworkers Pension Trust Fund v.*
    *Calpine Corp. Inc.*,
    2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ..................................19, 20, 22, 24

*In re 1031 Tax Grp., LLC*,
    397 B.R. 670 (Bankr. S.D.N.Y. 2008).........................................................passim

*In re 48th St. Steakhouse, Inc.*,
    835 F.2d 427 (2d Cir. 1987) ....................................................................11, 16

*In re Adelphia Commc'ns Corp.*,
    298 B.R. 49 (S.D.N.Y. 2003) ...................................................................19, 24

*In re Adelphia Commc'ns Corp.*,
    345 B.R. 69 (Bankr. S.D.N.Y. 2006)...............................................................16

*In re Allied Digital Techs. Corp.*,
    306 B.R. 505 (Bankr. D. Del. 2004) ...............................................................17

*In re Am. Film Techs.*,
    175 B.R. 847 (Bankr. D. Del. 1994) ...............................................................24

*In re Barney's Inc.*,
    200 B.R. 527 (Bankr. S.D.N.Y. 1996)..............................................................21

*In re Calpine Corp.*,
    354 B.R. 45 (Bankr. S.D.N.Y. 2006).........................................................passim

*In re Calpine Corp.*,
    365 B.R. 401 (S.D.N.Y. 2007) ....................................................11, 19, 20, 24

*In re Calpine*,
    2007 WL 1302604 (Bankr. S.D.N.Y. Apr. 30, 2007)............................14, 19, 20

iii

*In re Chateaugay Corp.*,
   93 B.R. 26 (S.D.N.Y. 1988) ...............................................................................18

*In re Chateaugay*,
   201 B.R. 48 (Bankr. S.D.N.Y. 1996) ..................................................................19

*In re Downey Fin. Corp.*,
   428 B.R. 595 (Bankr. D. Del. 2010) ...................................................................17

*In re Durr Mechanical Const., Inc.*,
   604 B.R. 131 (S.D.N.Y. Bankr. 2019) ................................................................16

*In re First Cent. Fin. Corp.*,
   238 B.R. 9 (Bankr. E.D.N.Y. 1999) ...............................................................17, 18

*In re Ionosphere Clubs, Inc.*,
   111 B.R. 423 (Bankr. S.D.N.Y. 1990) ...............................................13, 14, 19, 22

*In re Ionosphere Clubs, Inc.*,
   922 F.2d 984 (2d Cir. 1990) ...............................................................................10

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) ....................................................10, 14, 24

*In re Johns-Manville Corp.*,
   40 B.R. 219 (S.D.N.Y. 1984) .............................................................................14

*In re Johns-Manville Corp.*,
   600 F.3d 135 (2d Cir. 2010) ...............................................................................17

*In re Lion Capital Grp.*,
   44 B.R. 690 (Bankr. S.D.N.Y. 1984) ..................................................................14

*In re Lomas Fin. Corp.*,
   117 B.R. 64 (S.D.N.Y. 1990) ..................................................................12, 20, 22

*In re LTL Management, LLC*,
   638 B.R. 291 (Bankr. D.N.J. 2022) ....................................................................15

*In re Lyondell Chem. Co.*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) .......................................................19, 20, 22, 23

*In re Madoff*,
   2012 WL 990829 (S.D.N.Y. Mar. 26, 2012) .......................................................10

*In re MF Global Holdings Ltd.*,
   469 B.R. 177 (Bankr. S.D.N.Y. 2012) ................................................................17

*In re N. Star Contracting Corp.*,
   125 B.R. 368 (S.D.N.Y. 1991) ...............................................................12, 19

*In re OMC, Inc.*,
   2010 WL 4026097 (Bankr. S.D.N.Y. Oct. 13, 2010) ......................................24

*In re Quigley Co., Inc.*,
   676 F.3d 45 (2d Cir. 2012) .............................................................................17

*In re Residential Capital, LLC*,
   2014 WL 3798622 (Bankr. S.D.N.Y. July 31, 2014) ......................................10

*In re S.W. Bach. & Co.*,
   425 B.R. 78 (Bankr. S.D.N.Y. 2010)...............................................................22

*In re Soundview Elite Ltd.*,
   543 B.R. 78 (S.D.N.Y. 2016) ..........................................................................23

*In re United Health Care Org.*,
   210 B.R. 228 (S.D.N.Y. 1997) .......................................................11, 15, 20, 21

*In re W.R. Grace & Co.*,
   2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004)...........................................15

*In the Matter of Voyager Digital Ltd.*,
   2022 ONSC 4553 ..............................................................................................8

*In the Matter of Voyager Digital Ltd.*,
   Court File No. CV-22-00683820-00CL ..............................................................8

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ........................................................................17, 19

*Malm v. Goldin*,
   1993 WL 330489 (S.D.N.Y. Aug. 27, 1993)...................................................20

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
   474 U.S. 494 (1986)........................................................................................10

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003) ......................................................11, 12, 15, 16

*Raudonis as trustee for Walter J. Raudonis 2016 Revocable Tr. v.*
   *RealtyShares, Inc.*,
   507 F. Supp. 3d 378 (D. Mass. 2020)..............................................................18

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
   803 F.2d 61 (2d Cir. 1986) .............................................................................10

*Tenas-Reynard v. Palermo Taxi, Inc.*,
    2016 WL 1276451 (S.D.N.Y Mar. 30, 2016) ................................................................12

**Statutes**

11 U.S.C. § 362(a)(1) ................................................................................................10

11 U.S.C. § 362(a)(3) ...........................................................................................10, 16

R.S.C. 1985, c. C-36, § 47(2) ......................................................................................8

R.S.C. 1985, c. C-36, § 48(1) ......................................................................................8

**Other Authorities**

S. Rep. No. 989, 95th Cong. 2d Sess. 54-55 (1978) ..................................................10

**Rules**

Rules of Civil Procedure, R.R.O. 1990, Reg. 194 .......................................................8

The Debtors[1] seek an extension of the automatic stay to the continued prosecution of one lawsuit against one of the Debtors, Voyager Digital Ltd., and the Debtors' directors and officers, which is based on allegations regarding the Debtors' selling, lending, and trading of cryptocurrency and other financial products. Without an extension of the automatic stay pursuant to section 362(a) or section 105(a) of the Bankruptcy Code, the litigation would nullify the protections provided by the automatic stay, and would threaten the Debtor's restructuring efforts.

## PRELIMINARY STATEMENT

Voyager Digital Ltd., one of the Debtors, and certain of the Debtors' current and former directors and officers have been named as defendants in a putative class-action lawsuit, filed in Canada, arising from the Debtor's cryptocurrency ("crypto") trading, lending, and selling activities (the "Canadian Class Action"). The suit is brought against Voyager Digital Ltd. as well as certain of the Debtors' current and former directors and officers: Stephen Ehrlich (the Debtors' CEO and co-founder), Philip Eytan (the Debtors' non-executive Chairman and a director), Evan Psaropoulos (the Debtors' Chief Commercial Officer and former Chief Financial Officer), Lewis Bateman (the Debtors' former Chief International Officer), Krisztian Toth (Debtor's director), Jennifer Ackart (Debtor's director), Glenn Stevens (the Debtors' director), and Brian Brooks (the Debtors' director) (collectively, the "D&Os"). Its causes of action include alleged statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.

The Canadian Class Action is dependent on, and inextricably intertwined with, the Debtors' alleged conduct. To prove many of the claims in that suit, the plaintiffs must first establish

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

the underlying liability of the named directors and officers, which allegedly requires a vicarious finding of underlying wrongdoing by the Debtor Voyager Digital Ltd. The Canadian Class Action may also require a determination whether the Debtors' crypto-based financial products are securities at all—an unsettled legal issue in both Canada and the United States that is of great importance to the Debtors' future business.

The Canadian Class Action is currently stayed pursuant to the automatic stay under section 362 as it applies to Voyager Digital Ltd.  This Court should extend the automatic stay pursuant to section 362, or issue an injunction pursuant to section 105 to enjoin the continuation of the Canadian Class Action as against the D&Os for the following reasons:

*First*, the Debtors will be exposed to a significant risk of collateral estoppel, *stare decisis*, and evidentiary prejudice if the Canadian Class Action is allowed to continue.  The Debtors' D&Os' alleged conduct is the foundation for the Canadian Class Action's claims, and any judicial decision on the claims against the D&Os will inevitably be used against all the Debtors (not just Voyager Digital Ltd.).

*Second*, some of the D&Os named in the Canadian Class Action are critical to the restructuring efforts of the Debtors, and the Debtors' efforts to move this bankruptcy case forward as quickly as possible would be impaired if it proceeded.  For example, the Debtors possess much of the information necessary to defend against the Canadian claims (and for the plaintiffs to attempt to prosecute them); that plaintiffs will seek discovery from the Debtors is inevitable.  Such discovery would consume significant time and resources, distract the Debtors' management, and effectively eliminate the benefits of the automatic stay.

*Third*, the Debtors will face likely indemnification claims if the Canadian Class Action is allowed to continue. In addition to certain contractual indemnities, the Articles of Voyager Digital

Ltd. require indemnification of its directors for liabilities incurred in the course of their business as directors, and if the Canadian Class Action results in such liability, Voyager Digital Ltd. could be required to pay for such indemnification.  As such, the Debtors could be directly affected should the Canadian Class Action go forward against the D&Os.

*Fourth*, property of the Debtors' estate may be depleted if the Canadian Class Action is allowed to continue.  Voyager Digital Ltd., the other Debtors, and the D&Os share insurance coverage for the Canadian Class Action. If the Canadian Class action is allowed to continue, the Debtors and the D&Os will incur defense costs and losses that could draw down these insurance policies, depleting an asset that the Debtors contend is property of the estate.

For these reasons, the Debtors request that the Court extend the automatic stay pursuant to section 362 or issue an injunction pursuant to section 105 to stay or enjoin the prosecution of the Canadian Class Action (identified on Appendix A to this Motion) against the D&Os and Voyager Digital, Ltd. until the effective date of a restructuring plan in these chapter 11 cases.

## STATEMENT OF FACTS

The Debtors and certain non-Debtor affiliates (collectively, "Voyager" or "the Company") provide several services, including allowing customers to buy, sell, and trade cryptocurrency on the Voyager platform; providing custodial services for these customers to store their cryptocurrency; and providing loans to counterparties in the cryptocurrency sector, the interest on which is passed on to customers.  *See* Decl. of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ¶¶ 2, 4 (July 6, 2022) (ECF No. 15) (the "Ehrlich Decl."). Voyager's mobile-application platform has been downloaded millions of times, had over 3.5 million active users at its peak, and was one of the top ten most downloaded cryptocurrency mobile applications in the world in 2021.  *Id.* ¶ 2.

A.      **Voyager Overview**

1.      **Voyager's Business Operations**

At a basic level, cryptocurrency is a digital currency designed to serve as a medium of exchange or store of value, not necessarily tied to any government or physical asset. *See id.* ¶ 13–14. It is used to execute transactions on a "blockchain," a digital technology that verifies transactions through a fully-decentralized, community-driven, rigorous mathematical process. *Id.* The blockchain is often referred to as a digital "ledger" because it records every transaction ever made with the cryptocurrency. *Id.* Though transactions themselves are anonymized, the blockchain is freely viewable by any member of the public. *Id.* ¶ 14.

Voyager was founded in 2018 by a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. It was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and designed to be "accessible to all" by focusing on the needs of retail investors. *Id.* ¶ 18. Though the onset of the COVID-19 pandemic was followed by a sharp drop in the price of cryptocurrencies, including a fall in the price of Bitcoin of over 50% from February to March 2020, Voyager continued to provide trading services, and customers were able to trade on the platform despite extreme market volatility, while yield rewards were paid to qualifying customers. *Id.* ¶ 38. Between 2020 and 2022, the number of users on Voyager's platform grew from over 120,000 to over 3.5 million. As of July 5, 2022 (the "Petition Date"), Voyager's primary operations consisted of (i) trading services, (ii) custodial services through which customers earn interest and other rewards on sorted cryptocurrency assets, and (iii) lending programs. *Id.* ¶ 20.

4

## 2.   Events Leading to the Chapter 11 Cases

While Voyager experienced rapid growth and success, it also faced challenges. Unanticipated global events, like the COVID-19 pandemic's lingering effect, inflation, and a world economy grappling with the impact of the war in Ukraine, contributed to a widespread selloff in cryptocurrency. *Id.* ¶¶ 42–43. Distressed situations faced by two industry participants—Terra and Three Arrows Capital—exacerbated this "cryptocurrency winter." *Id.* ¶ 44.

Terra is an open-source blockchain protocol created by Terraform Labs, which issued two cryptocurrencies, Luna and TerraUSD ("UST"). UST is an algorithmic stablecoin, which was designed to trade at $1 by being "pegged" to Luna via an arbitrage mechanism whereby one UST could be traded for $1 worth of Luna. If UST traded above $1, arbitrageurs bought $1 of Luna and exchanged it for one UST, netting the difference in profit, and vice versa if UST traded below $1. Arbitrage trades were intended to keep the price of UST at $1, and to keep the tokens equally scare, limiting over- or undersupply of the two tokens. *Id.* ¶ 46.

But on May 7, 2022, $2 billion of UST was immediately sold, moving UST's price down to $0.91. UST traders rushed to sell off their coins, but found that only $100 million of UST could be burned in exchange for Luna per day, which was insufficient to "re-peg" UST to $1. *Id.* ¶ 47. This selling pressure led traders to redeem UST for Luna and then to sell their Luna, creating a "death spiral" that pushed the price of Luna from $82.55 to $0.000001 in one week, erasing over $18 billion of value and leading to further selloffs in the sector. *Id.* ¶ 48–49.

In March 2022, Voyager had entered into a master loan agreement (the "3AC Loan") with Three Arrows Capital ("3AC") under which Voyager agreed to lend 15,250 Bitcoins and 350 million USD Coin ("USDC")[2], callable at any time by Voyager. 3AC fully drew down on the

---

[2]   USDC is a stablecoin pegged 1:1 to the U.S. dollar.

15,250 Bitcoin and 350 million USDC. *Id.* ¶ 55.  Proceeds from Voyagers loans to 3AC and others were used to provide customers with a yield on the assets they store with Voyager. *Id.* ¶ 53.  After the Luna crash, Voyager began to assess 3AC's ability to repay the 3AC loan, making an initial request for a repayment of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022 *Id.* ¶ 56.  3AC paid neither amount, and on June 27, 2022, Voyager issued a notice of default to 3AC for failing to make the required payments under the 3AC Loan. *Id.*

Additionally, Voyager saw a significant uptick in customer withdrawals, putting additional strain on the Company's business, after Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced it was pausing all account withdrawals. *Id.* ¶ 62. On June 23, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day, which was necessary to ensure the Company could effectuate trades for customers, and stabilize the Company's business while it engaged in discussions with potential third-party sponsors. *Id.* ¶ 63.

But as the cryptocurrency markets continued to trend down, the Company realized that further steps were required to preserve customer investments, avoid irreparable damage to the Debtors' business, and ensure that its trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, the Company froze all withdrawals and trading activity on its platform. *Id.* ¶ 64.

Voyager's management team also sought sources of liquidity to ensure Voyager remained adequately capitalized. On June 22, 2022, Voyager Digital Holdings entered into an agreement for a revolving credit facility with Alameda Ventures Ltd. ("Alameda"), under which Alameda provided Voyager with $200 million cash and USDC and 15,000 Bitcoin subject to certain

restrictions (the "<u>Alameda Loan Facility</u>"). *Id.* ¶¶ 33, 57–58. The Alameda Loan Facility, however, was only a partial solution to the Company's liquidity issues.  Several weeks later, having sought investor interest outside of court in a sale of the Debtors' entire business or a capital raise whereby a third party would provide a capital infusion into the Company's enterprise, *id.* ¶¶ 59–60, the Debtors initiated these cases.

### B.     The Canadian Class Action

As described above, Debtor Voyager Digital Ltd. and certain of the Debtors' current and former directors and officers have been named as a defendant in a putative class-action proceeding filed in Toronto, Canada, captioned *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice. July 6, 2022). Plaintiff Francine De Sousa, as proposed class representative, asserts claims against the D&Os and Voyager Digital Ltd. for allegedly violating Canadian securities laws by making written and oral misrepresentations that they allegedly knew to be false (or about which they deliberately avoided knowledge of their falsity), or that making these statements amounted to gross misconduct; and that the statements constituted negligent misrepresentation. Notice of Action ¶¶ 27–44, *De Sousa v. Voyager Digital Ltd.*, No. CV-22-00683699-00CP (Ontario Superior Court Of Justice July 6, 2022) (the "<u>Notice of Action</u>," appended as Exhibit A to the Declaration of Michael B. Slade filed with this motion ("<u>Slade Decl.</u>")). The Notice of Action asserts that Voyager Digital Ltd. is vicariously liable for the acts or omissions of the D&Os. *Id.* ¶¶ 45–48.  For example, the Notice of Action alleges that in written and oral statements, Voyager Digital Ltd. falsely represented its exposure to the Terra/Luna collapse, the exposure of its lendees to the Terra/Luna collapse, and the extent of Voyager Digital Ltd.'s liquidity issues, all of which De Souza claims to be "misrepresentations" under Ontario securities law. *Id.* ¶¶ 10–14.

7

Parallel with these chapter 11 cases, Debtor Voyager Ltd. commenced recognition proceedings under Part IV of the *Companies' Creditors Arrangement Act* (Canada) pending in the Ontario Superior Court of Justice (Commercial List). Those proceedings bear the caption *In the Matter of Voyager Digital Ltd.*, Court File No. CV-22-00683820-00CL. On July 12, 2022 the Canadian court recognized the Chapter 11 case of Debtor, Voyager Digital Ltd. as a foreign proceeding, subject to a further determination as to whether such chapter 11 case is a foreign main proceeding. On August 9, 2022, the Canadian court made a determination that the "centre of main interest" of Voyager Digital Ltd. is in the United States and that the chapter 11 case of Voyager Digital Ltd. would be recognized as a "foreign main proceeding" under Canadian law. *In the Matter of Voyager Digital Ltd.*, 2022 ONSC 4553 ¶¶ 3, 15–16 (quoting Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 47(2)) (Slade Decl. Ex. B). Pursuant to the Amended and Restated Initial Recognition Order of the Canadian court dated July 12, 2022 and amended and restated August 5, 2022, and the Supplemental Order of the Canadian court dated July 12, 2022, all suits in Canada against Voyager Digital Ltd. are stayed, absent a further order of that court. *Id.* ¶ 55; *see* Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, § 48(1) (requiring the stay after ordering recognition of a foreign main proceeding).

Despite the Canadian court's orders, and that the filing of a notice of action does not, by itself, require any response or other active proceedings in the Canadian court,[3] counsel for the plaintiff has made it clear that the plaintiff intends to pursue the action quickly. Indeed, counsel

---

[3]    Under Ontario Rule of Civil Procedure 14.03, a plaintiff may commence a case with a "notice of action" "that contains a short statement of the nature of the claim," which must then be followed by filing of a full "statement of claim" "within thirty days after the notice of action is issued." Rules of Civil Procedure, R.R.O. 1990, Reg. 194, at Rule 14.03. The statement of claim and notice of action are then served together. *Id.* Service must take place "within six months after the notice of action is issued." *Id.* Rule 14.08.

for the Canadian Class Action plaintiff has already filed a motion in the Canadian insolvency case that would, if granted and among other relief, require Voyager Digital Ltd. to provide discovery, create an equity committee to which the Canadian Class Action plaintiff would be appointed, and appoint the Canadian lawyers for the Canadian Class Action plaintiff as representative counsel on behalf of equity holders, in each case to be funded by Debtor Voyager Digital Limited. Notice of Motion at 1–4 (attached as Slade Decl. Ex. C). The motion of the Canadian Class Action plaintiff is scheduled to be heard by the Canadian court on August 11, 2022.

### C. The D&O Insurance Coverage

The Debtors and their directors and officers share a common primary Executive and Corporate Securities Liability Insurance Policy and a common excess insurance policy. The Policy provides coverage for claims made against directors and executives of both Voyager Digital Ltd. and its subsidiaries, including, but not limited to, non-indemnified losses of officers and directors under Insuring Agreement (A); losses of the Company or those of its directors and officers that the Company indemnifies, under Insuring Agreement (B); and the Company's losses from securities claims, under Insuring Agreement (C).[4] The Company and its officers and directors are entitled to use the proceeds of that policy for "damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts … that any Insured is obligated to pay and Defense Expenses," subject to a few non-relevant limitations. If made, those payments would deplete proceeds available to all the Debtors in these cases.

### D. Voyager Digital Ltd.'s Indemnification Obligations

The Articles of Voyager Digital Ltd. obligate it to indemnify its "director[s], former director[s], [and] alternate director[s]," and their "heirs and legal personal representatives" for any

---

[4] The Debtors will be filing a motion seeking to file their insurance policies under seal.

"judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of," any "legal proceeding or investigative action … in which a director, former director or alternate director…, by reason of the eligible party being or having been a director or alternate director … is or may be joined as a party; or is or may be liable for in respect of a judgment, penalty or fine in, or expenses, related [thereto]." Articles of Voyager Digital Ltd. art. 21.1–21.2, included as Slade Decl. Ex. D.

## ARGUMENT

Section 362(a)(1) of the Bankruptcy Code prohibits "the commencement or continuation … of a judicial … action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Section 362(a)(3) similarly prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986); *accord E. Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998); *In re Residential Capital, LLC*, 2014 WL 3798622, at *8 (Bankr. S.D.N.Y. July 31, 2014); *In re Madoff*, 2012 WL 990829, at *7 (S.D.N.Y. Mar. 26, 2012); *In re Johns-Manville Corp.*, 26 B.R. 420, 425 (Bankr. S.D.N.Y. 1983). A primary purpose of the stay is to "provide[] the debtor with 'a breathing spell from his creditors'" so that its restructuring efforts can proceed in an efficient, coordinated manner. *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 64 (2d Cir. 1986) (quoting S. Rep. No. 989, 95th Cong. 2d Sess. 54-55 (1978)); *accord In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990); *In re Calpine Corp.*, 354 B.R. 45, 49 (Bankr. S.D.N.Y. 2006).

Courts have extended the automatic stay pursuant to Bankruptcy Code sections 362 and 105 in order to stay the continued prosecution of claims against non-debtors where failure to do so

would have an adverse economic impact on the debtors or would impair their restructuring efforts. *See, e.g.*, *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003); *In re Calpine Corp.*, 365 B.R. 401, 410 (S.D.N.Y. 2007); *In re 1031 Tax Grp., LLC*, 397 B.R. 670, 686 (Bankr. S.D.N.Y. 2008). Courts extend the automatic stay in such circumstances because permitting such claims to go forward would effectively eviscerate the protections that the automatic stay affords debtors. *See, e.g.*, *In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997).

In order to effectuate the purpose of the automatic stay and provide the Debtors the protections it affords, this Court should stay or enjoin the continuation of the Canadian Class Action pursuant to sections 362 and 105 of the Bankruptcy Code.

## I. THE AUTOMATIC STAY OF SECTION 362 SHOULD BE EXTENDED TO STAY THE CANADIAN CLASS ACTION.

Pursuant to section 362(a)(1), the Second Circuit has affirmed the extension of the automatic stay in order to stay actions against non-debtors where there is such an identity of interest that the action against the non-debtor would have an adverse impact on the debtor's estate or its efforts to restructure. *See Queenie*, 321 F.3d at 287-88. The Second Circuit has also affirmed the extension of the automatic stay pursuant to section 362(a)(3) to stay actions against non-debtors that would otherwise "obtain possession … or … exercise control" of the estate's property. *See In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 430–31 (2d Cir. 1987).

This Court should extend the automatic stay to the Canadian Class Action pursuant to both 362(a)(1) and 362(a)(3) for the reasons that follow.

### A. The Canadian Class Action Should Be Stayed Under Section 362(a)(1) Given the D&Os' Identity of Interest with the Debtors.

The automatic stay of section 362(a)(1) should be extended to stay actions against non-debtors "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant.'" *Queenie*, 321 F.3d at 287-88 (quoting *A.H.*

11

*Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *accord In re Durr Mechanical Const., Inc.*, 604 B.R. 131, 137 (2019); *In re N. Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y. 1991) ("[I]n circumstances where the debtor and the non-bankrupt party can be considered … as having a unitary interest, a section 362(a)(1) stay may suspend an action against a non-bankrupt party."); *In re Lomas Fin. Corp.*, 117 B.R. 64, 67-68 (S.D.N.Y. 1990); *In re Calpine*, 354 B.R. at 49. The rule prevents "a claim against the non-debtor [that] will have an immediate adverse economic consequence for the debtor's estate." *Queenie*, 321 F.3d at 287; *Tenas-Reynard v. Palermo Taxi, Inc.*, 2016 WL 1276451, at *6 (S.D.N.Y Mar. 30, 2016) (extending stay where claim against non-debtor will "constitute a claim (and hence, an 'immediate adverse economic consequence')" against debtor's estate).

There is a clear identity of interest here between the Debtors and the D&Os. The claims in the Canadian Class Action are inextricably intertwined with the legal issues that will be raised in the bankruptcy proceeding, and bear on the Debtors' alleged conduct. Indeed, the Canadian Class Action asserts liability against Voyager Digital Ltd. on the grounds of vicarious liability for the acts of the D&Os. Thus, the continuation of the Canadian Class Action against the D&Os will adversely impact the Debtors' estate: that suit will result in decisions that amount to decisions against the Debtors; it will inevitably lead to burdensome discovery from the Debtors; and it will create significant indemnification obligations for the Debtors.

1.    **Continuation of the Canadian Class Action Could Result in Decisions that Could be Used Against the Debtors.**

The automatic stay should be extended to non-debtors where "there is such identity between the debtor and the third-party defendant" that a finding or "judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins*, 788 F.2d at 999; *accord Queenie*, 321 F.3d at 288. This Court has confirmed that "a stay should be provided

to codefendants when the claims against them and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding." *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990).

The same is true here. For instance, the Canadian Class Action may tee up a legal question that is unsettled in ***any*** jurisdiction: Whether crypto-based financial products—including those brokered by, held by, and loaned by Voyager—are securities under each jurisdiction's relevant securities laws. If so, if the Canadian Class Action goes forward against the Ds&Os, the Debtors would be forced to either watch from the sidelines at great risk of prejudice to their interests on this issue, or jettison one of the principal benefits of the stay and involve themselves in the Canadian Class Action to protect those interests at great cost to the restructuring efforts. Decisions from the Canadian (or any other) court on that issue could also have significant regulatory ramifications, to the Debtors and others. The centrality of this important legal question to both the Debtors in the regulation of their (and other cryptocurrency companies') activities and in the resolution of the Canadian Class Action is reason enough on its own to extend the stay.

Beyond this legal question, the theories and factual allegations underlying the claims against the D&Os are "inextricably interwoven" with the theories and factual allegations underlying the claims against the Debtors. For one thing, the Canadian Class Action predicates its claims against Voyager Digital Ltd. on the D&Os' allegedly wrongful conduct. De Sousa's primary theory of liability against Voyager Digital Ltd. is that Voyager Digital Ltd.'s acts or omissions were "authorized, ordered and done by the [D&Os] and other agents, employees, and representatives of Voyager Digital, while engaged in the management, direction, control and transaction of the business and affairs of Voyager Digital." Notice of Action ¶ 46. According to De Sousa, the D&Os actions are attributable to Voyager Digital Ltd. by "virtue of the relationship

13

between the [D&Os] and Voyager Digital," but the D&Os are also independently, personally liable to the putative class for the same actions. *Id.* ¶¶ 47–48.

Given the identity of interests between all the Debtors and the D&Os, any decision against the D&Os would effectively amount to a decision against all the Debtors. Courts have extended the automatic stay to cover claims against non-debtors because of the risk that a decision against the non-debtors will be given collateral estoppel effect and applied against the debtors. *See, e.g.*, *In re Calpine*, 354 B.R. at 50 (extending the automatic stay to claims against non-debtor where not doing so would "expos[e] Calpine to a significant risk of collateral estoppel"); *In re Calpine*, 2007 WL 1302604, at *3 (Bankr. S.D.N.Y. Apr. 30, 2007) (same); *In re Ionosphere Clubs*, 111 B.R. at 434-35 (extending stay to action against debtor's chairman); *In re Johns-Manville*, 26 B.R. at 429 (noting that debtor "could be collaterally estopped in subsequent suits from relitigating issues determined against its officers and directors"). Even if collateral estoppel arguably would not apply, *stare decisis* would still burden the Debtors with findings and decisions rendered against the D&Os, warranting an extension of the automatic stay. *See, e.g.*, *In re Calpine*, 354 B.R. at 50.

Moreover, if the Canadian Class Action is allowed to proceed, the testimony and other evidence generated in those cases would inevitably be used later against the Debtors. That risk of evidentiary prejudice alone is sufficient to warrant extending the automatic stay to non-debtors. *See In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) (noting that a "witness may be confronted with his prior testimony under oath in a future proceeding directly involving [the debtor], whether or not [the debtor] was a party to the record on which the initial testimony was taken"); *In re Lion Capital Grp.*, 44 B.R. 690, 703 (Bankr. S.D.N.Y. 1984) ("[T]he risk that testimony by employees or agents might be subsequently employed against the debtor … warranted the issuance of a stay.").

14

Because Voyager Digital Ltd.'s alleged liability is based on, and derivative of, the D&Os'
alleged conduct, any decision or evidence gleaned against latter will be used against the Voyager
Digital Ltd. and the other Debtors. That identity of interest, together with the collateral estoppel,
*stare decisis*, and evidentiary prejudice to the Debtors, warrants extending the automatic stay to
prohibit the continuation of the Canadian Class Action.

> **2.      Continuation of the Canadian Class Action Could Create Significant
> Indemnification Obligations for the Debtors' Estate.**

Courts have extended the automatic stay pursuant to section 362(a)(1) "where an action
against one party is essentially an action against the bankruptcy debtor, as in the case where a
third-party is entitled to indemnification by the debtor for any judgment taken against it." *In re
W.R. Grace & Co.*, 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004); *accord A.H. Robins*,
788 F.2d at 999 (extension of automatic stay to non-debtors appropriate where "there is such
identity between the debtor and the third-party defendant" that a finding or "judgment against the
third-party defendant will in effect be a judgment or finding against the debtor"); *Queenie*, 321
F.3d at 288; *see also In re Calpine*, 354 B.R. at 50; *In re United Health*, 210 B.R. at 232. Courts
analyzing this issue have indicated that even the "mere possibility of indemnification obligations
warrants extension of the automatic stay." *In re LTL Management, LLC*, 638 B.R. 291, 312 (Bankr.
D.N.J. 2022) (emphasis added) (citations omitted).

There exists more than the "mere possibility" of indemnification here.  Separate and apart
from contractual indemnity, as set forth in the operative policies and articles of incorporation, the
defendant directors are entitled to indemnification from Voyager Digital Ltd. for a broad variety
of claims, including those made in the Canadian Class Action, and these policies are also shared
by the other Debtors. Allowing the Canadian Class Action against to proceed could thus create
indemnification claims against the estate.

These broad indemnification obligations warrant an extension of the stay in this case. *See In re Durr Mechanical Const., Inc.*, 604 B.R. 131, 137–38 (S.D.N.Y. Bankr. 2019). Where indemnification obligations are necessarily implicated and even cover things like "costs" and "charges," continuing the lawsuit would risk an "immediate, adverse economic impact on the estate and its unsecured creditors." *Id.* at 137. Refusing to apply the statutory stay "would defeat the very purpose and intent" of the statute. *A.H. Robins*, 788 F.2d at 999. Pursuant to section 362(a)(1), this Court should thus extend the automatic stay to the D&Os in the Canadian Class Action. *See, e.g.*, *Queenie*, 321 F.3d at 287; *In re Calpine*, 354 B.R. at 50.

### B. The Canadian Class Action Should Be Stayed Under Section 362(a)(3) in Order to Preserve and Protect the Estate's Property.

Section 362(a)(3) protects the bankruptcy estate's assets by automatically staying "any act to obtain possession … or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). This provision "prohibits interference with the disposition of the assets that are under the Court's wing—*whether or not the Debtor is named as a defendant as part of the effort*." *In re Adelphia Commc'ns Corp.*, 345 B.R. 69, 76 (Bankr. S.D.N.Y. 2006) (emphasis added). Thus, section 362(a)(3) directs the stay of any action whether against the debtor or non-debtors that would have an adverse impact on the property of the bankruptcy estate. *See In re 48th St. Steakhouse*, 835 F.2d at 431 ("If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay."); *see also Queenie*, 321 F.3d at 287 (automatic stay applies to non-debtors when claim against non-debtor will have "adverse economic consequence for the debtor's estate").

The Canadian Class Action could adversely impact property that the Debtors submit is part of their estate, and thus should be stayed pursuant to section 362(a)(3). As discussed above, the Debtors share a common director-and-officer liability policy. The Policy provides independent

16

director insurance to the D&Os, on the one hand, and indemnity coverage related to indemnity claims by the D&Os, and securities coverage to the Debtors, on the other hand. Where, like here, liability insurance policies provide direct coverage to both the D&Os *and* the Debtors, courts have held that "the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010) (quoting *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)).

In *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012), the Second Circuit confirmed that insurance policies and proceeds that cover debtors and their non-debtor affiliates are property of the estate. *Id.* at 57; *see also In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir. 2010) ("[T]he insurance policies that Travelers issued to Manville are the estate's most valuable asset."); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (agreeing with "[n]umerous courts [that] have determined that a debtor's insurance policies are property of the estate"); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (same); *In re 1031 Tax Grp.*, 397 B.R. at 677–78 (shared insurance policy was property of estate). The proceeds of such shared insurance policies are "property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010) (quoting *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)); *accord In re Quigley*, 676 F.3d at 52; *In re MF Global*, 2012 WL 1191892 at *10; *In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("[T]he estate's property interest in the proceeds of a typical liability policy is an unstated given," particularly where "the debtor is also the beneficiary of the liability insurance coverage.").

Courts have thus extended the automatic stay in situations to claims against the non-debtor where a debtor and non-debtor share a joint insurance policy; failure to do so would allow access to the estate's assets by the non-debtor. *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001–02 (4th Cir. 1986) (proceedings against non-debtors "who qualify as additional insureds under the [insurance] policy are to be stayed under section 362(a)(3)"); *see also Raudonis as trustee for Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.*, 507 F. Supp. 3d 378 (D. Mass. 2020) ("Because courts generally recognize insurance policy as 'property' under 11 U.S.C. § 541(a)(1)— and thus find such policies subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3)—the defendants' shared insurance contract arguably sweeps [non-debtors] into the reach of the automatic stay."). The result should be the same here. The Policy in this case allows the D&Os to draw down the shared insurance proceeds to pay for their defense costs and any settlements or judgments. The shared insurance proceeds are paid on a first billed, first paid basis, such that payments on behalf of the D&Os would deplete the proceeds available to the Debtors. As such, every insurance dollar paid on behalf of the D&Os leaves one fewer dollar of insurance coverage available to the Debtors' estate. *See Quigley*, 676 F.3d at 53-58; *see also In re First Cent. Fin.*, 238 B.R. at 16-17; *In re 1031 Tax Group*, 397 B.R. at 684-85. That alone warrants extending the stay pursuant to section 362(a)(3) to stop prosecution of the Canadian Class Action.

## II.   THE CONTINUED PROSECUTION OF THE CANADIAN CLASS ACTION SHOULD BE ENJOINED UNDER SECTION 105.

This Court should also enjoin the continued prosecution of the Canadian Class Action as against the D&Os pursuant to section 105(a).

Section 105(a), which authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]," gives this Court broad powers to enjoin actions against non-debtors. *See In re Chateaugay Corp.*, 93 B.R. 26, 29

(S.D.N.Y. 1988) ("[T]he Bankruptcy Court has authority under § 105 broader than the automatic

stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the

reorganization proceedings."); *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.

Inc.*, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006) ("Section 105 may support the issuance

of an injunction to parties who do not fall within the scope of section 362(a)."); *In re 1031 Tax

Grp.*, 397 B.R. at 684 ("Section 105 authorizes a bankruptcy court to exercise power outside the

bounds of the automatic stay."). "[T]he Second Circuit, courts in this District, and courts in other

circuits have 'construed [section 105] liberally to enjoin suits that might impede the reorganization

process,'" including actions against non-debtors. *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54

(S.D.N.Y. 2003) (quoting *MacArthur*, 837 F.2d at 93); *see also In re Calpine Corp.*, 365 B.R. at

409, 413-14; *Haw. Structural*, 2006 WL 3755175, at *6; *In re Lyondell Chem. Co.*, 402 B.R. 571,

588-89 (Bankr. S.D.N.Y. 2009); *In re 1031 Tax Grp.*, 397 B.R. at 684-86; *In re Calpine Corp.*,

354 B.R. at 50; *In re Calpine Corp.*, 2007 WL 1302604, at *4; *In re N. Star Contracting*, 125 B.R.

at 370 n.1; *In re Ionosphere Clubs*, 111 B.R. at 434.

A debtor's request for an injunction pursuant to section 105 is treated as a request for a

preliminary injunction.  *See In re Calpine Corp.*, 365 B.R. at 409. But a debtor "need not satisfy

the more rigorous requirements for a preliminary injunction under Rule 65 of the Federal Rules of

Civil Procedure" to obtain an injunction pursuant to section 105. *In re Chateaugay*, 201 B.R. 48,

71 (Bankr. S.D.N.Y. 1996). Instead, courts in this district apply the "traditional preliminary

injunction standard as modified to fit the bankruptcy context." *In re Calpine*, 365 B.R. at 409. That

standard involves evaluating four factors, none of which is determinative:

1.  whether there is an imminent irreparable harm to the debtor's estate in the absence of an injunction;

2.  whether there is a likelihood of a successful restructuring;

3.  whether the balance of harms tips in favor of the moving party; and

4.  whether the public interest weighs in favor of an injunction.

*See id.*; *In re United Health Care Org.*, 210 B.R. at 233; *Haw. Structural*, 2006 WL 3755175, at

*4. As outlined below, the Debtors satisfy all four of these factors.

### A.    Continuation of the Canadian Class Action Will Irreparably Harm the Debtors.

The Debtors will suffer irreparable harm to both their estate and their ability to successfully

restructure if the Canadian Class Action against the D&Os is not stayed, as continuation of the

Canadian Class Action will "burden, delay or otherwise impede the reorganization proceedings."

*In re Lyondell Chem.*, 402 B.R. at 590. In assessing whether an injunction is necessary to preserve

the estate or protect the restructuring efforts, courts in this district have focused on three factors:

(1) whether the debtors' estate would be harmed in the absence of an injunction; (2) whether the

debtors face a risk of binding rulings or evidentiary prejudice if the cases proceed against the non-

debtors; and (3) whether the litigation against the non-debtors would distract the debtors' key

personnel and frustrate their efforts to restructure. *See In re Calpine Corp.*, 354 B.R. at 50; *In re

Calpine Corp.*, 2007 WL 1302604 at *3–4; *In re Lomas Fin.*, 117 B.R. at 66-67; *Malm v. Goldin*,

1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993); *see also In re 1031 Tax Grp.*, 397 B.R. at 684-

85. Absent an injunction here, the Debtors would be irreparably harmed in each of these respects.

*First*, enjoining the Canadian Class Action is necessary to preserve the property of the

Debtors' estate. As set forth above, the shared insurance policy, and their proceeds, are assets of

the estate.  If the Canadian Class Action are allowed to proceed, the D&Os may draw down those

insurance policies, depleting the proceeds available and causing irreparable harm to the estate. *See

In re 1031 Tax Grp.*, 397 B.R. at 685 (finding irreparable harm because "[i]f the Colorado Lawsuits

20

go forward, insurance proceeds recoverable by the estate from these wasting policies may be diminished by defense costs of the [non-debtor]").

In addition, the Debtors could face substantial indemnification obligations for any attorneys' fees/expenses and losses that the defendant directors incur in the Canadian Class Action. These potential indemnification claims also constitute irreparable harm. *See In re 1031 Tax Grp.*, 397 B.R. at 685 (finding irreparable harm where "there is a substantial risk that the Debtors face liability for indemnification if the Colorado Lawsuits are permitted to continue"); *In re Calpine*, 354 B.R. at 50; *In re United Health*, 210 B.R. at 232 ("One example of a situation where such an injunction would be permitted would be a suit against a third party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against it in the case.").

*Second*, the risk of collateral estoppel, *stare decisis*, and evidentiary prejudice to the Debtors also warrants an injunction. As detailed above, a number of the claims against Voyager Digital Ltd. are premised on theories of vicarious liability. Thus, any findings and rulings against the D&Os, and any evidence generated, could be used against the Debtors.

The Debtors therefore would be in a difficult position if the Canadian Class Action is allowed to proceed against the D&Os: either take advantage of the protections of the automatic stay and be saddled with the evidence generated, findings made, and decisions rendered; or participate in the defense of the case to protect their litigation interests and lose the benefits of the automatic stay. Either option constitutes irreparable harm. *In re Calpine Corp.*, 354 B.R. at 50 ("In light of the identity of interest between [the debtor] and [the non-debtor], [the debtor] will suffer irreparable harm if the Nevada Litigation continues through the risk of collateral estoppel and evidentiary prejudice…."); *In re Barney's Inc.*, 200 B.R. 527, 531 (Bankr. S.D.N.Y. 1996) ("Courts apply section 105 of the Bankruptcy Code to enjoin litigation against non-debtors when

21

an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation.");
*In re Lomas Fin.*, 117 B.R. at 67 ("The threat of collateral estoppel would force [the debtor's key
personnel] to participate in the [action] … thus causing the corporation and its reorganization plan
irreparable harm."); *In re Ionosphere Clubs*, 111 B.R. at 435 (same); *see also In re S.W. Bach. &
Co.*, 425 B.R. 78, 102 (Bankr. S.D.N.Y. 2010).

*Finally*, even if the Debtors chose not to participate actively in the litigation of the Canadian
Class Action, they may face substantial burdens. As set forth above, plaintiffs must obtain
discovery from the Debtors to prove their claims against the D&Os, and in turn the D&Os would
have to obtain discovery from the Debtors to defend against the claims. It bears noting that these
chapter 11 cases anticipate an extremely fast timetable to benefit all stakeholders.  The Debtors
need the D&Os to be focused 100% on their restructuring efforts—not on defending a class action
lawsuit in Canada.

Courts have found that debtors would suffer irreparable harm where the failure to stay an
action against a non-debtor would result in material obligations on the debtors that would frustrate
their efforts to restructure successfully. *Haw. Structural*, 2006 WL 3755175, at *5 (affirming
extension of stay to halt claims against non-debtors where "the logistical stress on Calpine from
attempting to simultaneously undertake a massive reorganization while monitoring and producing
documents in the State Court Action threatened to irreparably impair the company's reorganization
process"); *In re Lomas Fin. Corp.*, 117 B.R. at 67 (upholding extension of automatic stay where
"key personnel would be distracted from participating in the reorganization process").

### B.       There Is a Reasonable Likelihood the Debtors Will Successfully Restructure.

Courts in this district have found a reasonable likelihood of a successful reorganization
where "the Debtors are proceeding on track, and there is no reason to believe or suspect that their
reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail." *In re*

*Lyondell Chem.*, 402 B.R. at 590. In evaluating this factor "in the earliest weeks" of the complex reorganization of Lyondell Chemical Company, a court in this district found that "the Debtors have so far been successful in doing everything they've needed to do to date," and because they "have met the challenges they have faced so far, that is sufficient." *Id.*; *see also In re Soundview Elite Ltd.*, 543 B.R. 78, 119 (S.D.N.Y. 2016) ("Courts do not demand certainty of a successful reorganization; they expect only reasonable prospects of such.").

The Debtors here are similarly "proceeding on track" toward a successful restructuring in its early stages. Despite the challenges and complexities of restructuring one of the largest crypto based finance platforms in the world, the Debtors and their D&Os have spent the weeks since the Petition Date dedicated to finding a path to successful restructuring. To date, this Court has granted first- and second-day relief (*see, e.g.*, various orders, ECF Nos. 53–60, 233, 235, 236–39) and approved proposed bidding procedures on August 5, 2022 (ECF No. 248)—and multiple indications of interest have been received. The Debtors are "proceeding on track and have met the challenges they have faced" thus far, so there is a reasonable likelihood they will successfully restructure. *See In re Lyondell Chem.*, 402 B.R. at 590.

### C.    The Balance of Harms Favors an Injunction.

The balance of harms weighs in favor of issuing an injunction. As described above, the harm to the Debtors would be irreparable if this Court does not enjoin the Canadian Class Action against the D&Os.  The Debtors would risk rulings that could be used against them; the estate's resources would be depleted; and the Debtors' efforts to restructure would be harmed.

By contrast, there would be only *de minimis* harm to De Sousa and the putative class she represents if the Canadian Class Action is enjoined. The Canadian Class Action is in its very early stages—the full statement of claim has not been issued or served.  And the Debtors do not anticipate these chapter 11 cases dragging on, so the stay sought here is temporary.  Thus, even if

an injunction were to delay a final decision on the merits in the Canadian Class Action, a modest delay is insufficient to overcome the potential harm to the Debtors: "The inability of [the defendant] to obtain a hypothetical recovery sooner … is not a harm—and is certainly not an irreparable harm sufficient to outweigh the irreparable harm that [the debtors] will suffer if the … litigation were permitted to proceed." *In re Calpine Corp.*, 365 B.R. at 413; *accord In re Am. Film Techs.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (same); *In re Johns-Manville Corp.*, 26 B.R. at 430-31.

### D.    An Injunction Serves the Public Interest.

Finally, an injunction would serve the public interest. "[I]n the context of bankruptcy proceedings, the 'public interest' element means the promoting of a successful reorganization." *In re OMC, Inc.*, 2010 WL 4026097, at *5 (Bankr. S.D.N.Y. Oct. 13, 2010); *accord In re Calpine Corp.*, 365 B.R. at 413; *Haw. Structural*, 2006 WL 3755175, at *6. Enjoining the Canadian Class Action as against the D&Os to avoid harm to the Debtors and allow them to restructure successfully is a far greater public interest than allowing De Sousa to continue pursuing claims against the D&Os that are in the earliest stages of litigation. *See Haw. Structural*, 2006 WL 3755175, at *4 ("If an action against a non-debtor would frustrate the goal of debtor reorganization, section 105(a) provides the statutory authority for an injunction staying the action against the non-debtor."); *In re Adelphia Commc'ns*, 298 B.R. at 54 ("It is well settled that bankruptcy courts, under [section 105], may extend the automatic stay to enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts.").

### CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court enter an order extending the automatic stay to the Canadian Class Action as against the D&Os pursuant to section 362, or, in the alternative, enjoining the continuation of the Canadian Class Action as against the

D&Os pursuant to Section 105, until the effective date of a restructuring plan in these chapter 11

cases, and grant such other and further relief as this Court deems just and proper.

Dated:  August 10, 2022
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            jsussberg@kirkland.com
                     cmarcus@kirkland.com
                     christine.okike@kirkland.com
                     allyson.smith@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
*Counsel to the Debtors and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of August, 2022, I caused a true and correct

copy of the foregoing to be served by e-mail upon the following:

Michael Robb
Anthony O'Brien
Garrett Hunter
Siskinds LLP
100 Lombard St., Suite 302
Toronto ON M5C 1M3
CANADA

Miranda Spence
Tamie Dolny
Aird & Berlis
181 Bay Street, Suite 1800
Toronto  ON M5J 2T9
CANADA

*/s/ Michael Slade*
Michael Slade

# APPENDIX "D"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-1133 (MEW) |
| FRANCINE DE SOUSA *et al.*, | |
| Defendants. | |

## STIPULATION

*Whereas*, Francine De Sousa, on behalf of a putative class, is the plaintiff in a class-action proceeding currently pending in the Ontario Superior Court of Justice, captioned *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (the "Canadian Class Action"); and

*Whereas*, the Debtors in the above-captioned jointly-administered chapter 11 cases filed this adversary proceeding seeking to extend the automatic stay under section 362 of the Bankruptcy Code (11 U.S.C. § 362) to the Canadian Class Action, or, in the alternative, to enjoin prosecution of the Canadian Class Action pursuant to section 105 of the Bankruptcy Code (11 U.S.C. § 105); and

*Whereas*, the Canadian court handling the Debtors' CCAA proceedings stayed the Canadian Class Action in its order recognizing these chapter 11 cases as a "foreign main proceeding" under Canadian law (the "Canadian Stay"); and

*Whereas*, counsel for De Sousa do not currently intend to seek to lift the Canadian Stay or attempt to prosecute the Canadian Class Action during the course of these Chapter 11 cases in the absence of an order lifting the Canadian Stay, and counsel for De Sousa informed counsel for Plaintiffs to that effect in writing on August 18, 2022;

*Now, therefore,* the Debtors and De Souza, by and through their undersigned counsel, have agreed that:

1.      The Debtors will adjourn their Motion to Extend Automatic Stay or, in the Alternative, for Injunctive Relief Enjoining Prosecution of Certain Pending Litigation Against the Debtors' Directors and Officers (ECF No. 3) (the "Motion"), initially to November 15, 2022, at 11:00 am EST, and thereafter as appropriate, subject to the below terms and conditions.

2.      Until and unless De Souza and/or her counsel seeks and receives written permission from the Debtors or an order to the contrary from this Bankruptcy Court, they will refrain from taking any steps against any and all defendants in the Canadian Class Action.

3.      De Souza and her counsel agree that prior to taking any steps or proceedings in the Canadian Class Action, they will seek relief from this Stipulation by agreement of the Debtors or proper motion filed in this Court, with notice given no fewer than twenty-one days prior to the hearing on such motion.

.

2

Dated: August 19, 2022

/s/ Michael Slade

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
New York, New York 10022
United States
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
    cmarcus@kirkland.com
    christine.okike@kirkland.com
    allyson.smith@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
United States
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Plaintiff Debtors*
*and Debtors in Possession*

/s/ Steven Graff

Steven Graff
Miranda Spence
Tamie Dolny
**AIRD & BERLIS LLP**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9
Canada
Telephone:    (416) 863-1500
Facsimile:    (416) 863-1515
Email:    sgraff@airdberlis.com
    mspence@airdberlis.com
    tdolny@airdberlis.com

Michael Robb
Garett Hunter
**SISKINDS LLP**
275 Dundas Street, Unit 1
P.O. Box 2520
London, Ontario N6B 3L1
Canada
Telephone:    (519) 672-2121
Facsimile:    (519) 672-6065
Email:    michael.robb@siskinds.com
    garett.hunter@siskinds.com

*Counsel to Defendant Francine De Sousa*

Court File No.:CV-22- 00683820-00CL

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF VOYAGER DIGITAL LTD.**

**APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

|  |  |
|---|---|
|  | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br>Proceeding commenced at Toronto |
|  | **SECOND REPORT OF THE**<br>**INFORMATION OFFICER** |
|  | **BLAKE, CASSELS & GRAYDON LLP**<br>199 Bay Street, Suite 4000<br>Box 25, Commerce Court West<br>Toronto, ON M5L 1A9<br><br>**Linc Rogers (LSO: 43562N)**<br>linc.rogers@blakes.com<br>Tel: 416 863 4168<br><br>**Caitlin McIntyre (LSO: 72306R)**<br>caitlin.mcintyre@blakes.com<br>Tel: 416 863 4174<br><br>Counsel for Alvarez & Marsal Canada Inc., solely in its capacity as the Information Officer and not in its personal or corporate capacity |

## **EXHIBIT 5**

*Voyager Announces Coinify Sale*
August 17, 2022

**VOYAGER**

# Voyager Announces Coinify Sale

NEW YORK, Aug. 17, 2022 /CNW/ - Voyager Digital Ltd. ("Voyager" or the "Company") (OTC Pink: VYGVQ) (FRA: UCD) today announced that European Holdings ApS, an indirect wholly-owned subsidiary of Voyager, agreed to sell all of its equity interests in Coinify ApS ("Coinify") to Ascension ApS, an entity owned by certain members of Coinify management, for US$2 million in cash. An additional, conditional earn-out payment is stipulated in the event of a subsequent sale of Coinify by Ascension ApS within three years following the transaction, thus preserving potential upside for Voyager.

Coinify is a cryptocurrency platform operating in Europe, Asia and other regions, offering individual and corporate cryptocurrency trading, crypto payment processing services, and enterprise solutions via Coinify API. Coinify's platform is separate and distinct from the Voyager platform.

Voyager purchased Coinify in August 2021; on August 16, 2022, Coinify's sale was approved by the U.S. Bankruptcy Court for the Southern District of New York, which is overseeing Voyager's ongoing Chapter 11 restructuring process. The sale of Coinify reduces overall headcount by 15% and eliminates Voyager's ongoing funding requirements for Coinify of up to US$500,000 per month.

Under Multilateral Instrument 61-101 ("MI 61-101") the transaction is considered a related party transaction, as the purchaser is controlled by Mark Højgaard, Co-founder and Chief Executive Officer, and Hans Henrik Hoffmeyer, Co-founder and Chief Operating Officer, who are senior officers. The Company relied on the exemption from the minority approval and the formal valuation requirement available to it pursuant to sections 5.7(a) and 5.5(a) of MI 61-101.

## About Voyager Digital Ltd.

Voyager Digital Ltd.'s (OTC Pink: VYGVQ) (FRA: UCD) US subsidiary, Voyager Digital, LLC, is a cryptocurrency platform in the United States founded in 2018 to bring choice, transparency, and cost-efficiency to the marketplace. Voyager offers a secure way to trade over 100 different crypto assets using its easy-to-use mobile application. To learn more about the company, please visit https://www.investvoyager.com.

## Forward Looking Statements

Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, the terms of the term sheet and any definitive loan documentation and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this press release may not occur and actual

results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that parties to whom the Company lends assets are able to repay such loans in full and in a timely manner, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. Readers are cautioned that Assets on Platform and trading volumes fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events, except as required by law. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends.

## Contacts

**Voyager Digital, Ltd.**
Voyager Investor Relations Team
investor.relations@investvoyager.com

Voyager Public Relations Team
pr@investvoyager.com

¢ View original content to download multimedia:
https://www.prnewswire.com/news-releases/voyager-announces-coinify-sale-301608002.html

SOURCE Voyager Digital Ltd.


¢ View original content to download multimedia:
http://www.newswire.ca/en/releases/archive/August2022/17/c6813.html

%SEDAR: 00005648E

CO: Voyager Digital Ltd.

CNW 17:15e 17-AUG-22