JASON B. BINFORD                           **Hearing Date: October 19, 2022, at 2:00 PM (ET)**
Texas Bar No. 24045499                 **Objection Deadline: October 12, 2022, at 4:00 PM (ET)**
ABIGAIL R. RYAN        **Objection Deadline Extended by Parties: October 14, 2022, at 4:00 PM (ET)**
Texas Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
jason.binford@oag.texas.gov
abigail.ryan@oag.texas.gov
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD AND
THE TEXAS DEPARTMENT OF BANKING

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter: 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING (I) THE ADEQUACY OF THE AMENDED DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES, (III) FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND (IV) CERTAIN DATES WITH RESPECT THERETO**

The Texas State Securities Board ("SSB") and the Texas Department of Banking ("DOB"),  by and through the Office of the Texas Attorney General ("Texas"), hereby files this Objection (the "Objection") to the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Amended Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

1

*Connection Therewith, and (IV) Certain Dates with Respect Thereto* [D.E. 289] (the "Motion"). In

support of the Objection, Texas respectfully states as follows:

## I.    OVERVIEW

From the beginning of this case, the Debtors have consistently controlled the flow of relevant

information to creditors and parties in interest[2], and the Amended Disclosure Statement[3] follows this

pattern of behavior by failing to give creditors and parties in interest sufficient information to make

an informed decision on how to vote on the Debtors' Second Amended Plan because:

1.    While the Disclosure Statement asserts that creditors may get a 70% return, this is only

hypothetical amount and the return could be much lower because the 70% estimate is based off of an

"*estimated total fair market value of Voyager's cryptocurrency assets based on 20-day average coin

prices as of September 29, 2022. . .*"; however, the Debtors fail to explain the methodology used in

calculating this average, leaving the creditors at a loss to understand how this the average was

derived and how and what sources it will be derived in the future for initial distributions;

2.    The Disclosure Statement fails to provide adequate information regarding the broad third-

party releases, including, who will be the beneficiaries of these releases; what claims are being

released; why do the Debtors seek to release these parties; the type and value of claims being

released; and what the Debtors will receive in exchange for giving these releases. Further, the broad

releases of the Debtors officers and directors are improper because the Debtors are receiving no

consideration for these releases, and once released, valuable causes of action against the officers and

directors are no longer available to potentially increase the return to unsecured creditors by a

significant amount.

3.    The Disclosure Statement does not adequately reflect the Debtors' and FTX's outstanding

---

[2] Arguably, this behavior of limiting information to Account Holders started before the bankruptcy filing. *See infra.* Paras. 4-12.
[3] Hereinafter "Disclosure Statement."

issues with State Regulators. As discussed below, the Debtors have never been licensed by the SSB

or the DOB and faces very large fines and penalties for operating without a license. FTX is also not

licensed to do business in the State of Texas. Moreover, FTX has started offering a product similar

to the "Voyager Earn Program" for which Voyager received cease-and-desist orders from multiple

states.

## II.    **BACKGROUND**

### A.    **Pre-Petition, Voyager Knew there was Trouble Ahead, but Led its Account Holders to Believe Everything was Fine.**

4.    Before June 2022, and thereafter, Voyager had many indications of the upcoming serious

financial issues---but, up to four days before suspending customers' accounts, continued to indicate

that the company was in good standing.

5.    Specifically, between March 29, 2022, and April 13, 2022, Voyager received cease and desist

orders regarding the "Voyager Earn Program" from the state securities boards of Indiana, Kentucky,

New Jersey, Oklahoma, and South Carolina, and show cause orders from the state securities boards

of Alabama, Texas, Vermont, and Washington.[4] The State of Kentucky forbade Voyager from using

its "Voyager Earn Program" in its State.[5] On June 9, 2022, that Voyager issued a press report in the

United States disclosing this information.[6]

6.    In June of 2022[7], Voyager knew that its loan to 3AC was "in jeopardy of partial or full

nonpayment."[8] Further, "[t]he Company's management team was acutely aware that nonpayment of

the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act

---

[4] Voyager MD&A SEDAR filing at p. 26:
https://www.sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=03384797&docId=5206315
[5] *See* Dkt. No. 186 at Ex. C (Dkt. No. 186 is Texas's Objection to the Debtors' Motion for Bid Procedures).
[6] *Id.*
[7] *See* Dkt. No. 15. No specific day is cited in the First-Day Declaration---just June of 2022. Further, on June 17, 2022, 3AC announced losses.
[8] Dkt. No. 15, para. 5.

as a broker for cryptocurrency assets."[9]

7.    Despite this knowledge, on June 14, 2022, Voyager sent an email to its customers[10] and issued a press report in the United States in which its CEO stated:

> 'Voyager holds a strong position in the crypto industry. Not only were we among the first to go public and provide full balance sheet transparency, our leadership also has deep financial expertise across the sector and has led companies through multiple market cycles,' said Steve Ehrlich, Chief Executive Officer and co-founder of Voyager. 'The company is well capitalized and in a good position to weather this market cycle and protect customer assets. It is Voyager's goal to continue to build secure products and services, as well as build trust and leadership in the cryptocurrency industry.'[11]

8.    Despite the positive message, two days later, on June 16, 2022, Voyager hired Kirkland and Ellis and Moelis to assess strategic solutions. [12] As anticipated, on June 17, 2022, 3AC announced heavy losses.[13] On or about June 20, 2022, Moelis started a marketing campaign for Voyager's assets, and reached out to over sixty (60) Potential Counterparties.[14]

9.    On June 22, 2022, Voyager issued a press release in the United States reporting that it had secured an unsecured loan from Alameda Ventures, Ltd. and that Alameda held approximately 11.56% of the outstanding common and variable voting shares.[15] But, the very next day, June 23, 2022, Alameda filed an Early Warning Report in Canada,[16] reporting that on June 22, 2022, it surrendered, for no consideration, 4,500,000 common and variable voting shares of Voyager Digital Ltd. worth $2.4 million US dollars, and that Alameda and its affiliates now held 9.49% of the issued and outstanding shares of Voyager.[17] This Alameda press release specifically states: "*NOT FOR DISSEMINATION IN THE U.S. OR FOR DISTRIBUTION TO U.S. NEWSWIRE SERVICES.*"[18]

---

[9] *Id.*
[10] Dkt. No. 186 at Ex. D (Letter at Dkt. No. 124, page 3).
[11] *Id.* at Ex. E.
[12] Dkt. No. 15 at para. 5.
[13] *Id.*
[14] Dkt. No. 16, para. 10-11.
[15] Dkt. No. 186 at Ex. F
[16] Dkt. No. 186 at Ex. G
[17] Dkt No. 186 at Ex. H
[18] *Id.*

10.  On June 27, 2022, Voyager issued another press release in the United States informing the

public that Voyager issued a notice of default on 3AC and that it intended to take action against

3AC.[19] Further, the press release touted the Alameda loan and again assured customers of the

integrity of Voyagers' financial condition as follows:

> The platform continues to operate and fulfill customer orders and withdrawals. As of
> June 24, 2022, Voyager had approximately US$137 million cash and owned crypto
> assets on hand. The Company also has access to the previously announced US$200
> million cash and USDC revolver and a 15,000 BTC revolver from Alameda Ventures
> Ltd. The Company has accessed US$75 million of the line of credit made available by
> Alameda and may continue to make use of the Alameda facilities to facilitate customer
> orders and withdrawals, as needed. The default of 3AC does not cause a default in the
> agreement with Alameda. 'We are working diligently and expeditiously to strengthen
> our balance sheet and pursuing options so we can continue to meet customer liquidity
> demands,' said Stephen Ehrlich, Chief Executive Officer of Voyager. As part of this
> process, the Company has engaged Moelis & Company as financial advisors.[20]

11.  However, on July 1, 2022, just four days after this press release, Voyager suspended their

customer accounts to give Voyager some breathing room to "explore strategic alternatives,"[21] and

stating that Voyager would "provide additional information at the appropriate time."[22]

**B.**    **Post-Petition, Voyager Continued to Keep Relevant Information from Account Holders
and Interested Parties.**

12.  Four days later, on July 5, 2022, Voyager filed bankruptcy and continued to operate its

businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United

States Code (the "Bankruptcy Code"). [23]

13.  On July 19, 2022, the United States Trustee for the Southern District of New York (the

"U.S. Trustee") appointed the Official Creditors' Committee (the "Committee").

14.  The Debtors started this bankruptcy on a two-track process by which the Debtors would

either restructure as set out in its First Amended Joint Plan of Reorganization[24] or sell the company.

---

[19] Dkt. No. 186 at Ex. I
[20] *Id.*
[21] Dkt. No. 186 at Ex J
[22] *Id.*
[23] Dkt. No. 1.
[24] Dkt. No. 287.

15.  To continue the second track, 16 days into the case, the Debtors filed a motion seeking an order establishing bid procedures[25] for a potential sale; however, at that time only the Debtors and the potential bidders who, before bankruptcy, had signed confidentiality agreements, knew what the assets and liabilities of the Debtors were and what assets would be included in any sale. The Account Holders and Regulators were kept in the dark.[26]

16.  The Bid Procedures Order was approved, and the Debtors continued the marketing efforts started before the bankruptcy. As this Court is aware, an auction of the Debtors' assets has been held, and the winning bidder was West Realm Shires, Inc. ("FTX").[27]

17.  Pursuant to the Asset Purchase Agreement[28] filed with this Court, as Exhibit B to the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement and (ii) Granting related Relief*[29], the sale to FTX will be consummate through confirmation of a plan, and the sale to FTX is the keystone of the Debtors' plan.

18.  The Disclosure Statement, however, does not provide creditors with adequate information to allow creditors to make an informed decision on whether to vote for or against the plan.

### III.    OBJECTION

### A.    What is "Adequate Information"?

19.  Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.[30] The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical*

---

[25] Dkt. No. 248 "Bid Procedures Order."
[26] *See* Dkt. No. 186 Texas's Objection to the Debtors' Motion for Bid Procedures.
[27] *See* Dkt. No. 457.
[28] Hereinafter "APA."
[29] Dkt. No. 472
[30]  11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

*reasonable investor of the relevant class to make an informed judgment about the plan* . . . . [31]

20.  The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated."[32]

21.  The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan.[33] Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions.[34]

22.  To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.[35]

23.  Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.[36] The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.[37]

24.  "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."[38]

25.  A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.[39] Although the adequacy of the disclosure is

---

[31] 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

[32] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414 (3d Cir. 1988)).

[33] *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).

[34] *See* 11 U.S.C. 1129(a)(2).

[35] *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).

[36] *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

[37] *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (*citing Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

[38] *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

[39] *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

7

determined on a case-by-case basis, the disclosure must "contain simple and clear language

delineating the consequences of the proposed plan on [creditors'] claims and the possible

[Bankruptcy Code] alternatives . . . ."[40]

**B.**  **The Disclosure Statement Lacks Adequate Information as to the Debtors'**
**Methodology of Calculating the 70% Estimate to Allow an Account Holder to Determine**
**what a Reasonable Recovery could be Under the Plan.**

26.  Consistent with the Debtors' act of keeping the flow of relevant information to creditors and

parties in interest to a minimum, the Disclosure Statement lacks adequate information and should not

be approved.

27.  Creditors cannot rely upon the hypothetical 70% return to creditors set out in the Disclosure

Statement because it may drastically change by the time of the creditors' initial distribution. The

Debtors admit as much in footnote 3 of the Disclosure Statement, which states:

> Recoveries are for illustrative purposes and *may materially differ from the amount*
> *portrayed in the chart.* Cryptocurrency dollarized as of the petition date for illustrative
> purposes. Illustrative recovery is shown based on the estimated total fair market value
> of Voyager's cryptocurrency assets based on 20-day average coin prices as of
> September 29th, 2022. *Actual cryptocurrency recovery will be determined by*
> *cryptocurrency prices during the fair market value reference period prior to the*
> *Effective Date and may vary materially from illustrative recoveries presented herein*
> *depending on market conditions.*

28.  As seen in footnote 3, the 70%-estimated return for Account Holders is only hypothetical

and is based off of an "*estimated total fair market value of Voyager's cryptocurrency assets based*

*on 20-day average coin prices as of September 29, 2022. . .*"[41]; however, the Debtors fail to explain

the methodology used in calculating this average, leaving creditors at a loss to understand how the

average was derived and how it will be derived in the future for initial distributions.

29.  Because price and transaction fee arbitrage are current practices in cryptocurrency pricing,

and because part of the Debtors' purported business was arbitraging crypto prices on different

---

[40] *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).
[41] Disclosure Statement at footnote 3.

exchanges to offer a better price, the Disclosure Statement should include the Debtors' source and

methods of these market valuations and the source and method to be used when pricing the initial

distributions so that Account Holders may make an informed decision regarding the plan.

**C.**     **The Disclosure Statement Fails to Provide Adequate Information Regarding the Proposed Release of Third Parties and the Broad Releases of the Officers and Directors are Improper.**

30.  To understand how broad the proposed third-party releases are the following three

definitions need to be discussed: 1. "Entity," 2. "Related Party," and 3. "Released Parties."

| Term | Definition | Cite |
|------|-----------|------|
| "Entity" | Means "person, estate, trust, governmental unit, and United States Trustee." 11 U.S.C. 101(15). | Not defined in the Disclosure Statement but defined in the Second Amended Plan as having the meaning set forth in 11 U.S.C. 101(15). Plan at PDF p. 14 at para. 57. |
| "Related Party" | means, with respect to **any Entity**, **in each case** in its capacity as such with respect to such Entity, such Entity's": [1] current and former directors, [2] managers, [3] officers, [4] investment committee members, [5] special committee members, [6] equity holders (regardless of whether such interests are held directly or indirectly), [7] affiliated investment funds or [8] investment vehicles, [9] managed accounts or funds, [10] predecessors, [11] participants, [12] successors, [13] assigns, [14] subsidiaries, [15] affiliates, [16] partners, [17] limited partners, [18] general partners, [19] principals, [20] members, [21] management companies, [22] fund advisors or | Disclosure Statement PDF p. 27. |

| | | |
|---|---|---|
| | [23] managers,<br>[24] employees,<br>[25] agents,<br>[26] trustees,<br>[27] advisory board members,<br>[28] financial advisors,<br>[29] attorneys,<br>[30] accountants,<br>[31] investment bankers,<br>[32] consultants,<br>[33] representatives, and<br>[34] other professionals and<br>[35] advisors. | |
| "Released Parties" | Means, "collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Purchaser Parties; **(e) Alameda and each of its Related Parties;** (f) each of the Released Professionals; and (g) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F of the Plan)." | Disclosure Statement PDF p. 27. |

31.  As seen above, the definition of "Related Party"[42] as applied to releases is so broad that it is impossible to know who is being released under the plan. For example, the definition of "Related Party" includes 35 different categories of persons or companies that will be released for any "Entity"—as defined by the bankruptcy code—in each case, and the definition of "Released Parties" includes—among other things—Alameda and "***each of its Related Parties***"—meaning the list of 35 different categories of persons or companies from the definition, above.

32.  Based upon these definitions, it is virtually impossible for anyone to know exactly who is being released under this plan. Likewise, if one cannot ascertain who is being released, what they are being released from is also impossible to know.

---

[42] Disclosure Statement at PDF page 27.

33.  In addition to not knowing who and what is being released, the Disclosure Statement fails to set out what consideration—if anything—the Debtors are receiving for granting these broad releases.

34.  While creditors may opt-out of the releases, that does not make such unclear, undefined, and broad releases proper. The Disclosure Statement should be easily read and transparent as to who is being released, why the Debtor is releasing them, and for what consideration. This Disclosure Statement fails in this regard.

35.  Further, the releases requested for the directors and officers are improper. A Special Committee was established by the board of directors of Debtor Voyager LLC and given the power to investigate, among other things, potential estate causes of action against the insiders of Voyager LLC and historical transactions of Voyager LLC. However, to date, no report or other information regarding the findings of the Special Committee have been filed, and what causes of action may be available to the Winddown Trustee are not public knowledge.

36.  While the Disclosure Statement says the officer and director releases are subject to the decision by the special committee, the footnote in the Plan that referred to that limitation has been deleted. On this point, the disclosure statement and plan are at odds, and creditors and parties in interest are being asked to release the officers and directors from potentially valuable causes of action that could increase the return to unsecured creditors in a significant amount.

37.  Moreover, there is no indication of what consideration or benefits the officers and directors have given for these broad releases or why the Debtor would want to release these officers and directors.

38.  As set out in the UCC's Objection at docket number 526, when deciding to approve a debtor's release of non-debtors, courts have used the factors set out in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), and the Debtors fail the majority of these factors, including, 1) the Debtors are receiving no consideration for these releases (whether from the officers or directors

or other parties), 2) creditors, or a substantial amount of creditors, will not be paid in full under the plan, and 3) the Debtors are liquidating, not reorganizing, so these release are not necessary.

39.  Therefore, the Disclosure Statement should be amended to provide adequate information about who is being released, why the Debtors are releasing them, the causes of action being released, and any consideration give to the Debtors for these releases. Alternatively, all third-party releases and officer and director releases should be removed from the plan.

**D.**     **The Debtors and FTX are not in Compliance with State Law.**

40.  As set out in paragraph 2, Voyager has received cease-and-desist letters from many states. Further, Voyager remains unlicensed by the SSB and DOB in the State of Texas. Likewise, FTX is not licensed by the SSB or the DOB and, as such, cannot legally transact business in Texas.

*i.*     ***The Debtors have engaged in unauthorized money transmission.***

41.  Under Texas law, money transmissions are regulated through the Texas Department of Banking. The Debtors do business in Texas and admit that they hold and exercise control over "FBO" bank accounts "through which funds sent by customers would be held."[43] The Debtors also (purportedly) hold cryptocurrency on behalf of customers, including convertible or redeemable "stablecoin."[44]

42.  By receiving customer cash and stablecoin in exchange for promising to fulfill customer orders regarding the custody and transmission of that monetary value, the Debtors have engaged in money transmission under Texas law.[45]

---

[43] Dkt. no. 250 (*Decision as to Motion to Permit Withdrawals by Customers of Funds Held in FBO Accounts at Metropolitan Commercial Bank*, entered August 5, 2022).
[44] *Id*. at 2.
[45] *See* Tex. Fin. Code § 151.301(b)(4) ("'Money transmission' means the receipt of money or monetary value by any means in exchange for a promise to make the money or monetary value available at a later time or different location."); *see also* Texas Department of Banking Supervisory Memorandum 1037, *Regulatory Treatment of Virtual Currency Under the Texas Money Services Act* (Apr. 1, 2019 (rev.)), https://www.dob.texas.gov/sites/default/files/files/consumer-information/sm1037.pdf ("Stablecoins that are pegged to sovereign currency may be considered a claim that can be converted into currency and thus fall within the definition of money or monetary value under Finance Code § 151.301(b)(3).").

43.  The Debtors do not have a license to conduct this money transmission and do not qualify for an exemption from licensing; Debtor Voyager Digital, LLC in fact had applied to the DOB but withdrew that license in July 2018—while nevertheless continuing to operate. Knowingly managing or owning an unlicensed money transmission business is a felony under federal law punishable by up to five years' imprisonment.[46] Administrative penalties for unauthorized money transmission are $5,000 per day per violation under Texas law.[47]

44.  The DOB has been investigating Voyager and has requested information that has not been provided, but the DOB will continue to work toward a conclusion of its investigation and its assessment of appropriate regulatory responses, including the potential imposition of fines and penalties.

45.  At this time, FTX appears to be operating illegally in Texas—it appears to be engaged in unlicensed money transmission and unregistered securities offerings.

***ii.***      ***The Debtors have engaged in unauthorized securities offerings.***

46.  The Texas Securities Act, Tex. Gov't Code §§ 4001.001-4008.105 (the "Texas Securities Act"), governs the offer and sale of securities in Texas. The Debtors offered and sold securities, as that term is defined by Section 4001.068 of the Texas Securities Act, to Texas residents.

47. The Texas Securities Act creates civil and criminal liability for violations of the law. The paragraphs below are intended to illustrate some of the potential liability Debtors and their principals may face, depending on the facts and circumstances.

---

[46] 18 U.S.C. § 1960. Given that the Debtors' business was grounded in obvious, and potentially criminal, violations of money transmission laws, it is unclear why the Debtors remain in possession and a trustee has not been appointed. *See* 11 U.S.C. § 1104(a) (identifying fraud and gross mismanagement as cause for appointing a trustee & (e) (stating that the U.S. Department of Justice "shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor [or] the debtor's chief executive or chief financial officer …participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor") (emphasis added).

[47] Tex. Fin. Code § 151.707(c). The Department is filing proofs of claim against all Debtors that are estimated based on the limited information made available by the Debtors. The Debtors' plan should include an appropriate mechanism to pay distributions on regulatory claims such as these to victims.

### *Violations of the Texas Securities Act*

48. The Debtors offered and sold securities to Texas residents that were not registered or permitted for sale in Texas. Each offer and sale violated Section 4003.01 of the Texas Securities Act and is grounds for a fine under Section 4007.106(a)(3).

49. The Debtors offered and sold securities in Texas without first being registered as dealers or agents. Each offer and sale violated Section 4004.051 of the Texas Securities Act and is grounds for a fine under Section 4007.106(a)(3).

50. The Debtors intentionally failed to disclose material facts, including the highly concentrated loans to third parties of cryptocurrency deposits Debtors received from their retail investors, the identities of those third parties, and the lack of collateral for those loans. The terms "fraud" and "fraudulent practice" are defined in Section 4001.058 to include misrepresentations, in any manner, of a relevant fact or an intentional failure to disclose a material fact.

51. The offers included statements that were materially misleading or were otherwise likely to deceive the public, including statements claiming to be a fully compliant and licensed crypto broker and touting Debtors' trustworthiness and transparency.

### *Civil Liability Created by the Texas Securities Act*

52. Debtors are civilly liable and can be sued by investors who bought securities that violate the registration provisions of the Texas Securities Act. Under Section 4008.051, investors who bought Debtors' securities may sue for recission, or damages if they no longer own the securities.

53. Debtors are civilly liable and can be sued by investors who bought securities from them for untruths or omissions. Under section 4008.052 of the Texas Securities Act, a person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security if the person offers or sells the security by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they are made, not misleading.

### *Civil Liability: Control Persons and Aiders*

54. In addition to the Debtors' liability, Section 4008.055 creates controlling person or aider liability. A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 4008.051 or 4008.052 jointly and severally with the seller, buyer, or issuer and to the same extent as the seller, buyer, or issuer.

### *Criminal Liability: Offers or Sales of Unregistered Securities or Without Being a Registered Dealer or Agent*

55. The unauthorized sale of securities is a third-degree felony. Third-degree felonies are punishable by a term of imprisonment of not more than 10 years or less than 2 years and may additionally be punished by a fine not exceeding $10,000. Under Section 4007.201(a), a person commits an offense if the person sells, offers for sale, or deals in any other manner in a security unless the security has been registered or a permit qualifying securities for sale has been issued. Under Section 4007.201(b), a person commits an offense if the person sells, offers for sale, or deals in any other manner in a security without being a registered dealer or registered agent.

### *Criminal Liability: Securities Fraud*

56. Fraudulent conduct in connection with the offer or sale of securities that involves amounts over $100,000 is a first-degree felony. First-degree felonies are punishable by imprisonment for life or for any term of imprisonment of not more than 99 years or less than 5 years and may additionally be punished by a fine not exceeding $10,000. Under Section 4007.203, a person commits an offense if the person directly or indirectly engages in a fraud or fraudulent practice, employs any device, scheme, or artifice to defraud, knowingly makes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engages in any act, practice, or course of business that operates or will operate as a fraud or deceit on any person and the conduct is committed in

connection with the sale or offer for sale of a security.

### *iii.* *The Bankruptcy Process and Sale does not Shelter the Debtor for Violations of State Laws.*

57.  The SSB and DOB reserve all rights, authority, and remedies regarding ongoing illegal

operations by the Debtors and any purchasers. In bankruptcy, a Chapter 11 Debtor is required to

comply with state laws under 28 U.S.C. Section 959(b)—and state regulators are allowed to

move forward in state court under their police and regulatory powers granted by 11 U.S.C.

Section 362(b)(4) of the Bankruptcy Code. Further, the bankruptcy process does not shield the

Debtors from administrative claims for fines and penalties accrued by illegal operations that

continue post-petition. These post-petition fines and penalties are administrative expenses

because they are seen by courts as a cost of doing business.[48]

58.  FTX appears to be in the same regulatory compliance situation as the Debtors—engaging in

unlicensed money transmission and illegal securities offerings. The bankruptcy sale process also

does not offer protection to non-debtors, such as FTX, for any acts of ongoing illegal conduct by

FTX, even if the assets are bought from the estate.[49]

59.  In an effort to clarify state regulatory obligations, the SSB and the DOB request that the

following language be included in the Disclosure Statement and any order approving the

Disclosure Statement:

> ***No Effect on Governmental Regulatory Authority:***
> *For the avoidance of doubt, nothing in the Sale Order, the APA, the Plan, or any Order*
> *confirming the Plan shall authorize or require the transfer of any Assets to a Purchaser*

---

[48] 11 U.S.C. 503(b)(1)(A). *See also In re BVS Constr., Inc.*, No. 19-60004-RBK, 2020 WL 1479826, at *2 (Bankr. W.D. Tex. Mar. 20, 2020) *Finding* (Payment of civil fines and penalties are generally part of the cost of doing business."). And *Stating* ("Multiple court of appeals cases also support the proposition that post-petition civil fines and penalties are simply part of the cost of doing business and are allowed as an administrative expense. *See Cumberland Farms, Inc. v. Fla. Dep't of Envtl. Prot.*, 116 F.3d 16 (1st Cir. 1997); *Ala. Surface Mining Comm'n v. N.P. Mining Co.* (*In re N.P. Mining Co.*), 963 F.2d 1449 (11th Cir. 1992); *U.S. Dep't of Interior v. Elliott* (*In re Elkins Energy Corp.*), 761 F.2d 168 (4th Cir. 1985)).

[49] *See In re Oldco M. Corp.*, 438 B.R. 775, 785 (Bankr. S.D.N.Y. 2010) (noting that, even when a bankruptcy sale is "free and clear," the purchaser must comply with applicable legal obligations "starting with the day it got the property"); *see also In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Tex. 1994) (stating that "[n]o subsection of § 363 applies to authorize the trustee to sell free and clear of [governmental regulatory] interests.").

*unless and until the Purchaser is registered as appropriate with the Texas State Securities Board, the Texas Department of Banking, and otherwise complies with all nonbankruptcy law.*

*Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit"); (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.*

*Further, nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Order, the APA, the Plan, or any Order confirming the Plan.*

## IV. **RESERVATION OF RIGHTS**

60. Texas reserves the right to supplement this Objection or to raise additional or further objections to the Disclosure Statemen or Plan at or prior to the Hearing, or any other relevant hearing.

## V. **PRAYER**

WHEREFORE premise considered, the Texas State Securities Board and the Texas Department of Banking request that 1) the Disclosure Statement be denied in its current form; 2) the Debtors be directed to amend the Disclosure Statement to add an explanation of the methodology and calculation used in estimating the total fair market value of Voyager's cryptocurrency assets and the methodology and calculation to be used in estimating the total fair market value of Voyager's cryptocurrency assets for the initial distribution; 3) that the Debtors be directed to fully explain the

third-party releases and officer and director releases—including, but not limited to, who is being

release, what causes of action are being released, and what consideration the Debtors have received

in exchange for these releases; 4) as to the releases of the officers and directors, that the Debtors be

directed to analyze the requested releases under the *In re Zenith* factors; and 5) That the following

language be included in the Disclosure Statement and in any order approving the Disclosure

Statement:

>  ***No Effect on Governmental Regulatory Authority:***
>
> *For the avoidance of doubt, nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan shall authorize or require the transfer of any Assets to a Purchaser unless and until the Purchaser is registered as appropriate with the Texas State Securities Board, the Texas Department of Banking, and otherwise complies with all non-bankruptcy law.*
>
> *Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit"); (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.*
>
> *Further, nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Order, the APA, the Plan, or any Order confirming the Plan.*

Finally, the Texas State Securities Board and the Texas Department of Banking pray for any

other relief that the Court finds them entitled.

*[Remainder of Page Intentionally Left Blank]*

Dated: October 14, 2022,                    Respectfully submitted,

                                            KEN PAXTON
                                            Attorney General of Texas

                                            BRENT WEBSTER
                                            First Assistant Attorney General

                                            GRANT DORFMAN
                                            Deputy First Assistant Attorney General

                                            SHAWN E. COWLES
                                            Deputy Attorney General for Civil Litigation

                                            RACHEL R. OBALDO
                                            Assistant Attorney General
                                            Chief, Bankruptcy & Collections Division

                                            */s/ Abigail Ryan*
                                            JASON B. BINFORD
                                            Texas State Bar No. 24045499
                                            LAYLA D. MILLIGAN
                                            Texas State Bar No. 24026015
                                            ABIGAIL R. RYAN
                                            Texas State Bar No. 24035956
                                            ROMA N. DESAI
                                            S.D.N.Y. Bar Number RD8227
                                            Texas Bar No. 24095553
                                            Office of the Attorney General of Texas
                                            Bankruptcy & Collections Division
                                            P. O. Box 12548
                                            Austin, Texas 78711-2548
                                            Telephone: (512) 463-2173
                                            Facsimile: (512) 936-1409
                                            jason.binford@oag.texas.gov
                                            layla.milligan@oag.texas.gov
                                            abigail.ryan@oag.texas.gov
                                            roma.desai@oag.texas.gov

                                            ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD
                                            AND THE TEXAS DEPARTMENT OF BANKING

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on October 14, 2022.

<div style="margin-left:40%;">

*/s/ Abigail Ryan*
ABIGAIL RYAN
Assistant Attorney General

</div>