Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF EXHIBITS TO THE**
**FIRST AMENDED DISCLOSURE STATEMENT RELATING TO THE SECOND**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on August 12, 2022, the above-captioned debtors and

debtors in possession (the "Debtors") filed the *Disclosure Statement Relating to the Second*

*Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code* (the "Initial Disclosure Statement") [Docket No. 288] with

the United States Bankruptcy Court for the Southern District of New York.

**PLEASE TAKE FURTHER NOTICE THAT** on October 15, 2022, the Debtors filed

the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498].

**PLEASE TAKE FURTHER NOTICE THAT** on October 17, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the *"*First Amended Disclosure Statement*"*) [Docket No. 540].

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file the following exhibits to the First Amended Disclosure Statement:

> **EXHIBIT B** - Liquidation Analysis; and
>
> **EXHIBIT C** - Frequently Asked Questions & Answers

*[Remainder of page intentionally left blank]*

Dated: October 17, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
          cmarcus@kirkland.com
          christine.okike@kirkland.com
          allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT B

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1]

### I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates. As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

### Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. This Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS.  WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about December 31, 2022 (the "Conversion Date").  Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of August 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and expenses have been projected forward or estimated as of the Conversion Date.  As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

2

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. Unaudited Financial Statements. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. Chapter 7 Liquidation Costs. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. Distribution of Net Proceeds. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimate used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

   Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. Certain Exclusions and Assumptions. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

## II.    CONCLUSIONS

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|
| Unclassified | Administrative and Priority Tax Claims | Unimpaired | 100% | 100% | 100% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | NA | NA | NA |
| 3 | Account Holder Claims | Impaired | 72% | 51% | 60% |
| 4 | Alameda Loan Facility Claims[2] | Impaired | N/A | 6% | 6% |
| 5A | OpCo General Unsecured Claims | Impaired | 72% | 51% | 60% |
| 5B | HoldCo General Unsecured Claims | Impaired | N/A | N/A | N/A |
| 5C | TopCo General Unsecured Claims | Impaired | 2% | 2% | 2% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA |
| 7 | Intercompany Claims[3] | Unimpaired | 8% | 4% | 5% |
| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | N/A | N/A |

---

[2]    The Alameda Loan Facility Claims are contributed to OpCo pursuant to the terms of the Asset Purchase Agreement and OpCo shall be entitled to the recovery on account of the Alameda Loan Facility Claims under the Plan. This Liquidation Analysis assumes that the Asset Purchase Agreement is not consummated, the Alameda Loan Facility Claims are not settled and the Holder of the Alameda Loan Facility Claims receives a recovery.

[3]    The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions. The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 of the Disclosure Statement.

### III.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

#### A.    Gross Liquidation Proceeds

1. <u>Cash and Cash Equivalents</u>:  This Liquidation Analysis projects the level of cash balances on hand from October 2, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2. <u>Cryptocurrency Assets Held</u>:  Estimated cryptocurrency values at Conversion Date are based on a 20-day historical average of prices for the period ending September 29, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for market depth and trading dynamics. Asset recovery includes cryptocurrency assets loaned and expected to be returned from counterparties prior to the Conversion Date.

3. <u>Other Assets / Investments (Non-Debtor)</u>: The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4. <u>Claims against 3AC Estate:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of August 31, 2022. This Liquidation Analysis makes no assumption regarding recovery of this claim and is reflected as a 0% recovery for purposes of this presentation.

5. <u>Intangible Assets</u>:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "<u>Debtors' IP</u>"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6. <u>Litigation Claims:</u> Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

#### B.    Liquidation Costs

7. <u>Chapter 7 Professional Fees</u>:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $7.4 million for the liquidation period, based on an estimate of approximately $0.2 million to $1.3 million per month with approximately 80% of the fees incurred in the first 6 months.

8. <u>Chapter 7 Trustee Fees</u>:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

9. <u>Chapter 7 Estate Wind-Down Costs</u>:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs, and ongoing support from the Debtors' management through a transition services agreement throughout the liquidation. For the entirety of the wind-down process, these costs have been estimated to be $18.7 million.

10. <u>3AC Litigation Pursuit:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. <u>Other Fees:</u> During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others.  For the entirety of the chapter 7 process, these costs have been estimated to be approximately $1.5 million.

       **C.**       *Claims*

12. <u>Secured Tax Claims</u>:  Based on the September 30, 2022 claims register,  no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

- <u>Administrative Claims</u>:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $49.5 million on the Conversion Date.

- <u>Priority Tax Claims</u>: Based on the September 30, 2022 claims register, federal and state tax claims have been scheduled but not quantified. To the extent that Priority Tax Claim amounts are determined, a recovery of 100% is expected.

- <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $0.0.

14. <u>Account Holder Claims</u>:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. <u>Alameda Loan Facility Claims</u>:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. <u>General Unsecured Claims</u>:  Based on the September 30, 2022 claims register, General Unsecured Claims are estimated to total approximately $14.4 million on the Conversion Date.

- General Unsecured Claims at OpCo are estimated to be $12.1 million.

-  General Unsecured Claims at HoldCo are estimated to be $0.0 million.

- General Unsecured Claims at TopCo are estimated to be $2.3 million.

17. <u>Intercompany Claims</u>: A promissory note between HoldCo as borrower and TopCo as lender, for $6.3 million including interest, likely to be considered a valid loan.  This Liquidation Analysis assumes that all other Intercompany Obligations will be recharacterized as capital contributions.

*[Remainder of page intentionally left blank.]*

# IV.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan.

Plan vs Liquidation Recoveries - Exhibit B
$ in mm

| | | | | Voyager Digital Consolidated [1,2] | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | High Case | | Low Case | |
| | Claim | Plan | Recovery | Liquidation | Recovery | Liquidation | Recovery |
| TOTAL ESTIMATED PROCEEDS (NET) [3,4,5] | | 1,330.0 | | 1,118.6 | | 955.0 | |
| Administrative Claims[6] | 49.5 | 49.5 | 100% | 49.5 | 100% | 49.5 | 100% |
| Account Holder Claims[7] | 1,763.9 | 1,271.3 | 72% | 1,056.8 | 60% | 894.4 | 51% |
| Alameda Loan Facility Claims[8] | 75.1 | n/a | 0% | 4.7 | 6% | 4.6 | 6% |
| OpCo General Unsecured Claims [9] | 12.1 | 8.7 | 72% | 7.3 | 60% | 6.2 | 51% |
| HoldCo General Unsecured Claims[9] | - | - | 0% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 2.3 | 0.0 | 2% | 0.0 | 2% | 0.0 | 2% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | 6.3 | 0.5 | 8% | 0.3 | 5% | 0.3 | 4% |
| Intercompany Interests [11] | - | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% |
| TOTAL RECOVERIES | 1,909.2 | 1,330.0 | 70% | 1,118.6 | 59% | 955.0 | 50% |

Footnotes to Analysis

(1) Assumes FTX sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at December 31, 2022.

(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.

(3) Total Estimated Proceeds (Net): primarily includes (i) FTX Transaction Proceeds (Plan only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iii) proceeds from other assets of the estate, net estimated wind down costs. Includes grossed up intercompany claim recoveries from S6M Promissory Note from HoldCo to TopCo.

(4) Estimated value of cryptocurrency portfolio under the Plan is based on underlying asset prices using a 20-day price average (9/10 – 9/29).

(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints as well as transaction fees.

(6) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of December 31, 2022.

(7) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (7/5).

(8) In the absence of a settlement, the Alameda Loan Facility Claims recover approximately 6% due to recoveries of cash and investments held at Voyager Digital Holdings, Inc. and Voyager Digital Ltd. In the Plan, recovery on the Alameda Loan Facility is allocated to OpCo.

(9) OpCo, HoldCo, and TopCo GUCs estimated based off of 9/30 Claims registry and are subject to further reconciliation.

(10) The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions. The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 of the Disclosure Statement.

(11) On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

## EXHIBIT C

**Frequently Asked Questions & Answers**

## Exhibit C

### FREQUENTLY ASKED QUESTIONS & ANSWERS

**About the Plan**

1. **How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX, USDC or are any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a higher opportunity to recover on their claim than another Account Holder). (See Question 4 below.)

| Coin | Customer Claim | | |
| --- | --- | --- | --- |
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| Total | | | $724.81 |

In accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and OpCo General Unsecured Creditors receive 100% of their claims, no consideration is allowed to be distributed to creditors holding lower priority claims against OpCo.

2. **How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Allowed Account Holder Claims and Holders of Allowed OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)      the upfront cash payment of $51.0 million,

(ii)     all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve), and

(iii)    the fair market value of all cryptocurrency held at OpCo.

1

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was sold to FTX US at prices based on the 20-day average ending September 29, 2022, the estimated Initial Distribution to creditors would be 72%, comprised of 70% from the value of the cryptocurrency portfolio (the "Cryptocurrency Initial Distribution") and the remaining 2% associated with other cash distributions (the "Cash Initial Distribution") (collectively the "Initial Distribution").

Only Account Holders who timely participate in the transfer of their Accounts to FTX US at least one Business Day prior to the Closing Date and who maintain in their Accounts Cryptocurrency supported by the Purchaser will receive their share of the Cryptocurrency Initial Distribution on an in-kind basis (as further detailed in #7 below). Account Holders will still be able to transfer their Accounts to FTX US following such date until the final migration cut-off 45 days after the Closing Date and receive their share of the Cryptocurrency Initial Distribution into their FTX US Accounts, but will receive such distribution in the form of USDC rather than in-kind cryptocurrency. Account Holders who maintain Cryptocurrency in their Accounts that is not supported by FTX US will also receive their share of the initial distribution in the form of USDC. All other distributions, including the Cash Initial Distribution, will be made on a pro rata basis in cash.

Under the Plan, the purchase price of OpCo's cryptocurrency, other than VGX, will be determined based a 20-day historical average at a future point in time during a reference period. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

An illustrative Initial Distribution spreadsheet has been made available for Account Holders at https://cases.stretto.com/Voyager/content/1713-account-holder-illustrative-recovery-analysis/ with calculations based on estimated Initial Distributions as if the portfolio had been sold on September 29th, 2022 and estimates for the size of the total claims pool against OpCo and associated holdbacks.

**3.    The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

*No*, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the ultimate purchase price to be paid for such assets by FTX US will be a key factor in determining the size of the Initial Distribution. ***As such, under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the FTX US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value. Under a wind down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. dollars.***

For example, under the FTX US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo

implied an Initial Distribution of 72%, such Account Holder would receive an Initial Distribution with value equal to $720. Such value may be in a mix of in-kind cryptocurrencies, USDC and/or U.S. dollars depending on whether such Account Holder transitioned to FTX US timely, and the nature of such Account Holder's Claims and cryptocurrencies supported on the FTX US platform.

Such creditor would then have a deficiency claim of $280 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, the FTX US earn out and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 17)

| $ actual | Illustrative July 5, 2022 Claim Value | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
| **Initial Distribution Value @Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @64.0% | $6.4 | $64.0 | $640.0 | $6,400.0 | $64,000.0 | $640,000.0 | $6,400,000.0 |
| @66.0% | $6.6 | $66.0 | $660.0 | $6,600.0 | $66,000.0 | $660,000.0 | $6,600,000.0 |
| @68.0% | $6.8 | $68.0 | $680.0 | $6,800.0 | $68,000.0 | $680,000.0 | $6,800,000.0 |
| @70.0% | $7.0 | $70.0 | $700.0 | $7,000.0 | $70,000.0 | $700,000.0 | $7,000,000.0 |
| @72.0% | $7.2 | $72.0 | $720.0 | $7,200.0 | $72,000.0 | $720,000.0 | $7,200,000.0 |
| @74.0% | $7.4 | $74.0 | $740.0 | $7,400.0 | $74,000.0 | $740,000.0 | $7,400,000.0 |
| @76.0% | $7.6 | $76.0 | $760.0 | $7,600.0 | $76,000.0 | $760,000.0 | $7,600,000.0 |
| @78.0% | $7.8 | $78.0 | $780.0 | $7,800.0 | $78,000.0 | $780,000.0 | $7,800,000.0 |
| @80.0% | $8.0 | $80.0 | $800.0 | $8,000.0 | $80,000.0 | $800,000.0 | $8,000,000.0 |
| **Implied Deficiency Claim @Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @64.0% | $3.6 | $36.0 | $360.0 | $3,600.0 | $36,000.0 | $360,000.0 | $3,600,000.0 |
| @66.0% | $3.4 | $34.0 | $340.0 | $3,400.0 | $34,000.0 | $340,000.0 | $3,400,000.0 |
| @68.0% | $3.2 | $32.0 | $320.0 | $3,200.0 | $32,000.0 | $320,000.0 | $3,200,000.0 |
| @70.0% | $3.0 | $30.0 | $300.0 | $3,000.0 | $30,000.0 | $300,000.0 | $3,000,000.0 |
| @72.0% | $2.8 | $28.0 | $280.0 | $2,800.0 | $28,000.0 | $280,000.0 | $2,800,000.0 |
| @74.0% | $2.6 | $26.0 | $260.0 | $2,600.0 | $26,000.0 | $260,000.0 | $2,600,000.0 |
| @76.0% | $2.4 | $24.0 | $240.0 | $2,400.0 | $24,000.0 | $240,000.0 | $2,400,000.0 |
| @78.0% | $2.2 | $22.0 | $220.0 | $2,200.0 | $22,000.0 | $220,000.0 | $2,200,000.0 |
| @80.0% | $2.0 | $20.0 | $200.0 | $2,000.0 | $20,000.0 | $200,000.0 | $2,000,000.0 |

**4.  Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

_No_, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and

the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 72% of their claim).

**5. Are my VGX recoveries only limited on my proportional share of $10.0 million? How is the value of my VGX being treated?**

<u>No</u>, Account Holders that held VGX are not limited to receiving their pro rata share of $10.0 million for their VGX claim. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, FTX US has agreed to offer a minimum purchase price of $10.0 million for 100% of the VGX owned by OpCo. For purposes of the enclosed illustrative recovery analysis, all of the VGX in OpCo's estate is assumed to be sold by OpCo to FTX US at the $10.0 million minimum purchase price, which ultimate proceeds will flow through to collective implied recovery values for <u>all</u> creditors. Actual consideration received for the VGX owned by OpCo's estate could materially differ from the $10.0 million offer provided by FTX US depending on a number of factors, including market conditions.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 72% of claim value, an Account Holder would receive an Initial Distribution in USDC based on (i) (x) their VGX claim value multiplied by (y) the Initial Distribution percentage, regardless of whether VGX is sold to FTX US for $10 million or if it is monetized at a higher price.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 72% of claim value, the Account Holder would receive an Initial Distribution equal to $171.49.

| | [A] Illustrative Initial Distribution % | [B] 7/5 VGX Token Price | [A] x [B] = [C] Implied VGX Recovery Price / Token | Implied Claim @VGX Token Holdings ([B] x Token Holdings) | | | | Illustrative Initial Distribution @VGX Token Holdings ([C] x Token Holdings) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
| 1.) | 64.0% | $0.2382 | $0.1524 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $15.24 | $152.44 | $1,524.43 | $15,244.34 |
| 2.) | 66.0% | $0.2382 | $0.1572 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $15.72 | $157.20 | $1,572.07 | $15,720.72 |
| 3.) | 68.0% | $0.2382 | $0.1620 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $16.19 | $161.97 | $1,619.71 | $16,197.11 |
| 4.) | 70.0% | $0.2382 | $0.1667 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $16.67 | $166.73 | $1,667.34 | $16,673.49 |
| 5.) | 72.0% | $0.2382 | $0.1715 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $17.14 | $171.49 | $1,714.98 | $17,149.88 |
| 6.) | 74.0% | $0.2382 | $0.1763 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $17.62 | $176.26 | $1,762.62 | $17,626.26 |
| 7.) | 76.0% | $0.2382 | $0.1810 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $18.10 | $181.02 | $1,810.26 | $18,102.65 |
| 8.) | 78.0% | $0.2382 | $0.1858 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $18.57 | $185.79 | $1,857.90 | $18,579.03 |
| 9.) | 80.0% | $0.2382 | $0.1906 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $19.05 | $190.55 | $1,905.54 | $19,055.42 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $66.70 ($238.19 claim value less $171.49 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC, (ii) distributions from the FTX US earn out, and (iii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

Further, on or prior to the 30-day anniversary of the later of (x) the Closing Date and (y) the date that such Account Holder becomes a Transferred Creditor, such Account Holder will also have an additional $50.00 deposited into their FTX US account if they have executed at least one trade on the FTX US platform, regardless of the size of the trade and which trade shall not be subject to any transaction fee.

**6.   If my Account Holder Claim is only $25.00, am I still entitled to receive a $50.00 account credit at FTX US?**

_Yes_, any Account Holder who transitions their Voyager account to an FTX US account is eligible for an FTX US account credit as described below. Such credits are not solely limited to Account Holders and are available for any Holder of an Allowed OpCo General Unsecured Claim under the Plan who opens an FTX US account, subject to meeting the minimum terms and conditions.

On or prior to the 30-day anniversary of the later of (x) the Closing Date and (y) the date that an Eligible Creditor (as defined in the asset purchase agreement) becomes a Transferred Creditor, $50.00 will be deposited into accounts for those eligible Transferred Creditors which have signed up for an FTX US account and have executed at least one cryptocurrency transaction on the FTX US platform within the period following the later of (x) the Closing Date and (y) the date that an Eligible Creditor becomes a Transferred Creditor. Such minimum trading requirement will not be subject to size requirements and such trade will not be subject to any transaction fees.

**7.   If I had tokens in my Voyager account that are listed as being supported and unsupported at FTX US, do I only receive U.S. Dollars in my Initial Distribution?**

_No_, to the extent a token is supported on the FTX US platform, the Cryptocurrency Initial Distribution with respect to such supported tokens will be made in kind (i.e., in the underlying cryptocurrency of the claim) to Account Holders who transition to FTX US no later than one Business Day prior to the Closing Date. Only supported token claims are available for recovery distributions on an in-kind basis and only the Cryptocurrency Initial Distribution portion of such claim recovery will be made in-kind, being denominated in such token. For unsupported tokens, distributions will be made in USDC into the claim holders' FTX US accounts.

To the extent an Account Holder owns multiple supported tokens and multiple unsupported tokens, the Account Holder will receive their Cryptocurrency Initial Distribution in-kind for each specific supported token if they timely transfer their Account to FTX US. All other Initial Distributions to Account Holders who transfer to FTX US, including those for unsupported tokens, will be made in USDC. The Cash Initial Distribution and future recovery distributions will be made to creditors in U.S. Dollars. Account holders are required to timely sign up for an FTX US account by one Business Day prior to the Closing Date in order to be eligible to receive an in-kind distribution. If an Account Holder does not open an FTX US account, all distributions will be made in U.S. Dollars, following the end of the 45-day grace period.

At this time, FTX US supports 22 tokens that were available on the Voyager platform. Excluding the impact of USDC, these 22 tokens represent approximately 77% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. As such, the Debtors anticipate that the vast majority of the Account Holder Cryptocurrency Initial Distribution will be made on an in-kind basis at Closing. FTX US has also indicated to the Debtors that other currently unsupported tokens are likely to become supported by the time of closing. For such newly supported tokens, the Cryptocurrency Initial Distribution will also be made on an in-kind basis under the Plan.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Cryptocurrency Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion, as an unsupported token, will be made in USDC. Additionally, the Account Holder would receive its pro rata share of the Initial Cash Distribution, which will be made in U.S. Dollars. Such Account Holder is also eligible for a $50.00 FTX US account credit, subject to meeting the minimum terms and conditions. All other future distributions will be made in U.S. Dollars based on the Account Holder's remaining claim (Deficiency Claim) after the Initial Distribution.

*__Currently Supported Voyager Tokens on FTX US Platform__*

| AAVE | ALGO | AVAX | SHIB |
|------|------|------|------|
| BCH | GRT | BTC | TRX |
| DAI | DOGE | ETH | YFI |
| BAT | LINK | LTC | UNI |
| MKR | NEAR | WBTC | USDT |
| SOL | SUSHI | | |

**8.   If a token in my Voyager account was listed as being unsupported at FTX US, can I select a different supported token to receive my distribution in versus U.S. Dollars?**

_No_, the in-kind distribution is only eligible for those Account Holder Claims denominated in tokens which are supported on the FTX US platform.  However, Account Holders who have timely completed all documentation and Know Your Customer "KYC" processes and who have opened an FTX US account are eligible for one cryptocurrency transaction on the FTX US platform without being subject to any transaction fee.

On the 30-day anniversary of the later of (x) the Closing Date and (y) the date that such Account Holder becomes a Transferred Creditor, such Account Holder will also have an additional $50.00 deposited into their FTX US account to the extent they have executed one cryptocurrency transaction on the FTX US platform, regardless of the size of the trade.

See Question 7 for additional detail relating to tokens supported on the FTX US platform.

**9.   If my account only had BTC, will all of my distributions be made in BTC?**

_No_, only the Cryptocurrency Initial Distribution is eligible to be made in-kind. Despite an Account Holder only owning a supported token, the Cash Initial Distribution (estimated at 2%), plus all future distributions associated with future recoveries, will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

The in-kind distribution is also only eligible for those claims denominated in those tokens which are supported on the FTX US platform. FTX US supports tokens that represent approximately 77% of the dollar value of cryptocurrency denominated Account Holder Claims as of July 5th, 2022 and, as such, the Debtors estimate that the vast majority of Account Holder Cryptocurrency Initial Distributions will be made on an in-kind basis.

**10.   Are my recoveries capped at the value I receive in the Initial Distribution?**

_No_, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) the FTX US earn out, (iii) value associated with the sale of any other OpCo assets, and (iv) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**11.  When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be made in the form of U.S. dollars.

**12.  When, and how, will I receive value from any recoveries associated with the FTX US earn out?**

The FTX US earn out is calculated based on (i) the value of the daily average assets (denominated in BTC) in the aggregate attributable to the Transferred Creditors' accounts on FTX US over the six month period following the Closing Date **divided by** (ii) the aggregate value of the assets (denominated in BTC) initially attributable to all Transferred Creditors' FTX US accounts **multiplied by** (iii) $10.0 million (subject to a cap of $20.0 million).

After six months, FTX US will calculate the earn out payment and, within ten Business Days, make the earn out payment to OpCo's estate.  Upon receipt of an earn out payment from FTX US, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any earn out distributions shall be made in the form of U.S. dollars.

**13.  What will happen to the VGX token going forward under the Plan?**

FTX US has offered to purchase all VGX in OpCo's estate for a purchase price of $10 million.  This is a floor of what OpCo will receive for VGX.

The Debtors continue to work internally and with third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US agreement and are hopeful they will be able to do so.

Any alternative solution, to be acceptable, must deliver value to OpCo and its estate that exceeds $10 million and must be compatible with the agreements between OpCo and FTX US.  If the Debtors are unable to identify a higher and better solution for VGX, OpCo will accept FTX's offer and, as a result, VGX may decline in value and may have no value post-consummation of the Plan.

Selected illustrative recovery value sensitivities associated with the ultimate value VGX is sold at, assuming all other cryptocurrencies are sold at the 20-day average price as of September 29th, are outlined below.

| | Illustrative VGX Recovery Value | | | |
| --- | --- | --- | --- | --- |
| | $10.0 | $25.0 | $50.0 | $75.0 |
| Illustrative VGX Recovery Value | $10.0 | $25.0 | $50.0 | $75.0 |
| Illustrative Other Cryptocurrency @9/ 29 20 Day Average | $1,238.5 | $1,238.5 | $1,238.5 | $1,238.5 |
| **Cryptocurrency Initial Distribution** | **$1,248.5** | **$1,288.5** | **$1,338.5** | **$1,388.5** |
| Cash Initital Distribution | $32.7 | $32.7 | $32.7 | $32.7 |
| **Total Initial Distribution** | **$1,281.2** | **$1,321.2** | **$1,371.2** | **$1,421.2** |
| Estimated 7/ 5 Claim Values | $1,778.3 | $1,778.3 | $1,778.3 | $1,778.3 |
| **Total Initial Distribution % of Claim** | **72.0%** | **74.3%** | **77.1%** | **79.9%** |

**14. Is FTX US acquiring the crypto at the July 5th price, the 20-day average as of September 29th or at a future price?**

Under the Plan, FTX US will acquire the cryptocurrency at a to be determined price based on the fair market value of such cryptocurrency during a 20-day reference period which will be determined prior to Closing.

As such, actual Initial Distributions will be dependent on the future price performance of OpCo's cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 72% based on actual cryptocurrency prices during such reference period.

**15. Is the $51 million of cash FTX US is paying to the estate above and beyond the value they pay for the cryptocurrency? Do I get a portion of that $51 million?**

*Yes*, the $51 million of upfront consideration is *in addition to* the fair market value of the cryptocurrency FTX US would acquire under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16. Who is eligible to join FTX US under the Plan in order to receive an in-kind Cryptocurrency Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims are eligible to join FTX US.

Only Account Holders who timely transfer their Accounts to FTX US by one Business Day prior to the Closing Date and maintain cryptocurrency in their Account that is supported by FTX US will receive their share of the Cryptocurrency Initial Distribution on an in-kind basis (as further detailed in #7 below). Account Holders will still be able to transfer their Accounts to FTX US following such date until the final migration cut-off 45 days after the Closing Date and receive their share of the Cryptocurrency Initial Distribution into their FTX US Accounts, but will receive such distribution in the form of USDC rather than in-kind cryptocurrency.  Account Holders who maintain Cryptocurrency in their Accounts that is not supported by FTX US will also receive their share of the initial distribution in the form of USDC.  All other distributions, including the Cash Initial Distribution, will be made on a pro rata basis in cash.

**17. What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18.  What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

Only those cryptocurrency tokens that are supported on the FTX US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through FTX US. As such, Account Holders are required to sign up for an FTX US account to the extent they wish to receive an in-kind distribution. The number of in-kind cryptocurrency tokens will depend on (i) the Cryptocurrency Initial Distribution and (ii) the 20-day average price of such cryptocurrency during the reference period.

For any specific supported cryptocurrency, a creditor can determine the number of tokens received at FTX US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Cryptocurrency\ Initial\ Distribution}{20\ day\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. BTC is a supported token at FTX US. To the extent the Account Holder signs up for an FTX US account, the Cryptocurrency Initial Distribution is 70%, and the 20-day average reference price of BTC is $19,783.48, such Account Holder would receive an Initial Distribution consisting of (a) 0.7132 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 70% Cryptocurrency Initial Distribution divided by (ii) $19,783.48 20-day average reference price) plus (b) the Cash Initial Distribution.

\* \* \* \* \*