Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re Docket Nos.:  388, 472, 507, 523, 535** |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO APA MOTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this omnibus reply in support of the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 472] (the "APA Motion") and in response to the (i) *Objection of Pierce Robertson to Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 507] (the "Robertson Objection") filed by Pierce Robertson ("Robertson"), (ii) *Limited Objection of the Ad Hoc Group of Equity Holders to Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Related Relief* [Docket No. 523] (the "AHG Objection") filed by the Ad Hoc Group of Equity Holders, and (iii) *Limited Objection of the Texas State Securities Board and the Department of Banking to Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 535] (the "Texas Objection, and together with the Robertson Objection, and AHG Objection, the "Objections") filed by the Texas State Securities Board ("TX SSB") and the Texas Department of Banking ("TX DOB"), by and through the Office of the Texas Attorney General (together with TX SSB and TX DOB, "Texas"). In further support of the APA Motion, the Debtors submit as follows:[2]

### Preliminary Statement

1. From the beginning of these chapter 11 cases, the Debtors' fundamental goal has been to achieve the best recovery for their stakeholders on the quickest timeline possible. The Debtors now stand on the precipice of achieving just that: entering into an asset purchase agreement (the "Asset Purchase Agreement") for a value-maximizing sale to FTX US (the "Sale") that delivers a meaningful recovery to creditors on an expedited timeline. The Asset Purchase Agreement is the end result of a rigorous marketing process that included discussions with approximately 90 potential counterparties and culminated in an exceptionally thorough, two-week auction for a sale of substantially all of the Debtors' assets. The transactions contemplated by the Asset Purchase Agreement maximize the value of the Debtors' estates and represent the best possible path forward for the Debtors' creditors on the quickest timeline.

2. As set forth in the Asset Purchase Agreement, the Sale contemplates approximately $1.422 billion of aggregate deal consideration comprised primarily of (a) the value of all Voyager

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan"), the Asset Purchase Agreement, and the APA Motion, as applicable.

2

cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration estimated as providing approximately at least $111 million of incremental value that includes (i) a cash payment of $51 million, (ii) an earn out of up to $20 million, (iii) the value associated with a $50 account credit for Transferred Creditors, and (iv) the transfer to Debtor Voyager Digital, LLC of all right, title, and interest in the Alameda Loan Facility Claims. The FTX US offer is the highest and best offer and should be approved.

3. The Objections ignore the realities of these chapter 11 cases and, in doing so, attempt to substitute their judgment for that of the Debtors. This is improper. Entry into the Asset Purchase Agreement is evaluated on the Debtors' business judgment alone. The Debtors, as fiduciaries to all stakeholders, pursued all possible transactions available to them, including a standalone reorganization and a sale of substantially of all of their assets. The Debtors ran an exceptionally thorough sale process, including a two-week Auction, and continued discussions with interested parties after the conclusion of the Auction to ensure that all potential paths forward were considered and no stone was left unturned. Ultimately, no higher and better alternative to the FTX US transaction emerged. The Sale to FTX US provides stakeholders with the best possible recovery and facilitates the most expedient resolution to these chapter 11 cases.

4. Importantly, through the APA Motion, the Debtors are **_not_** seeking approval of the Plan through which the Sale is contemplated to be implemented. To the contrary, at this stage, the Debtors are seeking authority to enter into the Asset Purchase Agreement to lock in the transaction with FTX US and to perform its obligations under the Asset Purchase Agreement (other than those obligations to be performed at or following the closing of the Sale) in order to progress the Plan confirmation process, pursuant to which Account Holders and other Impaired Classes of Claims

are entitled to vote on the Plan and all parties in interest will have the opportunity to object to the Plan on any valid grounds.

5.  For the reasons set forth herein, and given the narrow scope of the relief requested through the APA Motion, the Debtors respectfully request that the Court overrule any unresolved Objections, enter the proposed Order approving entry into the Asset Purchase Agreement, and grant such other and further relief that the Court deems just and proper.

## Background

6.  In late June 2022, the Debtors, with the assistance of Moelis, commenced a marketing process for a sale of the Debtors' business to, or an investment in the Debtors' business from, a third-party investor. Discussions with interested parties ultimately revealed that, though there was significant interest in consummating a transaction with the Debtors, an in-court process would be necessary to effectuate any transaction. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.

7.  Pursuant to the Debtors' marketing process, Moelis engaged with approximately 90 interested parties, provided access to the virtual data room, facilitated numerous telephone conferences with the Debtors' management team, and held multiple virtual diligence sessions with interested parties.

8.  In parallel to the Debtors' marketing process, the Debtors filed the Standalone Plan. The Standalone Plan contemplated a comprehensive restructuring transaction that would provide creditors with a meaningful recovery without the need for a transaction partner. The Standalone Plan provided parties active in the Debtors' marketing process with a "floor" that any bid would need to clear to be considered by the Debtors.

9. The Debtors established formal Bidding Procedures to guide their marketing process pursuant to the Bidding Procedures Order. The Bidding Procedures established, among other things:

- the deadlines and requirements for submitting bids and the terms and conditions that must be satisfied;
- the criteria by which the winning bidder or bidders will be selected by the Debtors; and
- August 26, 2022 as the deadline by which all bids must be actually received (which deadline was later extended to September 6, 2022).

10. The Debtors received several bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, thoroughly scrutinized each bid, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

11. Ultimately, the Debtors, in consultation with the Committee, determined that the FTX US bid was the highest and best bid and would provide meaningful value to the Debtors' estates and stakeholders. The Committee supported the designation of FTX US's bid as the highest and best and supports the Sale to FTX US.

5

12. The Debtors' marketing process was widely publicized and discussed heavily in the press. All interested parties were encouraged to submit bids. Further, the Asset Purchase Agreement included a provision that allowed the Debtors to engage with parties regarding any proposals received during the period between the close of the Auction and entry into the Asset Purchase Agreement. After the close of the Auction, the Debtors engaged with several interested parties regarding potential bids for the Debtors' assets. The Debtors continue to progress such discussions with certain parties regarding the sale of assets excluded from the Sale, including certain of the Debtors' intellectual property. However, as of the date hereof, the Debtors have not received any proposals that deliver more value to the Debtors than the Sale contemplated by the Asset Purchase Agreement. Accordingly, the Debtors believe that the Sale is the highest, best, and, ultimately, value-maximizing transaction for their estates and creditors. The Debtors are seeking authority to enter into the FTX US Asset Purchase Agreement to lock in the bid at this time in order to move forward with the Plan confirmation process and prepare for consummation of the Sale.

13. The Debtors received formal objections from Robertson, the Ad Hoc Group of Equity Holders, and Texas. The Debtors also received an objection from the Georgia Department of Banking and Finance, which was withdrawn upon resolution of the objection through language added to the APA Order.[3] Additionally, the Debtors received several informal objections and requests to include reservation of rights or other language in the proposed Order and have resolved said informal objections and requests. The Objections represent limited or protective objections focused on bespoke interests rather than the best interests of all stakeholders. In light of the robust

---

[3] *Withdrawal of the Limited Objection of the Georgia Department of Banking and Finance to the Sale of Voyager Digital, LLC in Whole or in Part* [Docket No. 551].

marketing process, deference to the Debtors' reasoned business judgment is appropriate and the Court should approve the Debtors' entry into the Asset Purchase Agreement.

## Reply

I. **Entry into the Asset Purchase Agreement Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.**

14. The "business judgment" rule is not an unduly strict standard; it merely requires showing that the decision to sell the property outside the ordinary course of business was based on the debtor's sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that judge determining a 363(b) application must find a good business reason to grant such application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

15. The "business judgment" rule also shields a debtors' decisions from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company,'" and has continued applicability in bankruptcy (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

7

16.     In addition, for the sale of any asset outside of the ordinary course, courts in this jurisdiction require that: (1) notice has been given to all creditors and interested parties; (2) the sale contemplates a fair and reasonable price; and (3) the purchaser is proceeding in good faith. *In re Gen. Motors Corp.*, 407 B.R. 463, 493–494 (Bankr. S.D.N.Y. 2009) *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010) and *aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010).

17.     It is well-settled that a sale price achieved through a court-approved auction process is presumed to be fair. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999) ("[T]he best way to determine value is exposure to a market."); *see also Allegiance Bank Texas v. M/V Lake Limo*, No. 3:17-CV-00002, 2019 WL 4054012, at *2 (S.D. Tex. Aug. 27, 2019) ("Ordinarily, 'the amount realized on sale [at auction] is an automatic determination of the [fair value].'") (quoting *Walter E. Heller & Co. v. O/S Sonny V*, 595 F.2d 968, 971 (5th Cir. 1979)); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true when the court-approved auction process yielded multiple bids and a competitive bidding process. *See In re 9 Houston LLC*, 578 B.R. 600, 614 (Bankr. S.D. Tex. 2017) (approving a sale after finding that three bids at the auction evidenced competitive bidding on property that had been "aggressively marketed").

18.     The Objections cast aspersions on aspects of the Asset Purchase Agreement and the Sale, arguing explicitly or implicitly that the Debtors' business judgment was unfairly exercised in pursuing the deal with FTX US. Those Objections put forward no factual or legal support for such arguments. In addition, as a threshold matter, many of the Objections, including those with

respect to the proposed treatment of Claims and Interests under the Plan, are objections to confirmation of the Plan and are therefore premature. Such Objections should be properly considered when the Debtors seek confirmation of the Plan. To the extent any Objections assert procedurally proper objections to the APA Motion (which they do not), such objections fail on their merits for the following reasons and the Objections should be overruled.

19. *First*, the Asset Purchase Agreement is the result of an extensive and heavily publicized marketing process. The Debtors ran a robust, comprehensive marketing process for months leading up to the Auction. Moelis cast a wide net by contacting approximately 90 potential bidders, executing non-disclosure agreements with 54 interested parties (who were provided access to a virtual data room containing detailed information about the Debtors' industry, business, and assets), and conducting numerous follow-up diligence meetings with potential bidders, the Debtors, and the Debtors' other advisors. This process was conducted in accordance with the Bid Procedures approved by this Court and standard market practice with the goal of obtaining the highest or otherwise best offer for the purchase of the Debtors' assets. The market has been thoroughly tested and the Asset Purchase Agreement with FTX US is the result of this thoughtful and thorough process.

20. *Second*, the Sale provides the highest and best value to the Debtors' Estates. If the Plan is confirmed, Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims will be paid in full and Account Holder Claims and OpCo General Unsecured Claims will receive approximately a 72% recovery even *before* any recovery that the Estate ultimately receives on its claims against 3AC. The Sale facilitates the distribution of cryptocurrency in-kind on account of over 75% in total value of cryptocurrency held by Account Holders at Voyager (and potentially more as FTX US works to support more coins on its platform)

9

and an equivalent distribution in USDC to the remaining Account Holders whose coins are not supported on the platform. And, in addition to providing recoveries in-kind, the Sale to FTX US provides all Account Holders with access to a market-leading trading platform to buy and sell cryptocurrency. The Sale also includes approximately $111 million in additional consideration while also expressly carving out additional assets, including certain causes of action, such as the 3AC Loan, that the Wind-Down Entity will be able to pursue and distribute the proceeds of to creditors after the Effective Date of the Plan resulting in additional recoveries. The Sale is the best path forward for the Debtors' creditors and better than any other transaction on the table.

21.     *Third*, the Sale will enable the Debtors to expeditiously conclude these chapter 11 cases and distribute value to their stakeholders on the quickest timeline.

22.     For the reasons set forth herein, the Sale represents the highest or otherwise best offer for the applicable assets, and provides greater recoveries for the Debtors' Estates than any other actionable alternative. Accordingly, the Debtors submit that they have met their burden and demonstrated that entry into the Asset Purchase Agreement should be approved as an exercise of their reasonable business judgment.

**II.     The FTX US Bid Is the Highest or Otherwise Best Bid.**

23.     In selecting the highest or otherwise best bid, courts have held that debtors should consider not only the amount of consideration, but also factors including "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *In re Tresha-Mob, LLC*, No. 18-52420, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) (quoting *In re Fam. Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)). Courts should defer to a debtor's business judgment to determine the highest or otherwise best bid at an auction conducted pursuant to section 363 of the Bankruptcy Code. *See In re Borders Grp.,*

*Inc.*, 453 B.R. 477, 482–83 (Bankr. S.D.N.Y. 2011) ("In the context of auctions, courts defer to a debtor's business judgment when selecting the highest and best bid.") (citing *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002)).

24. The Bid Procedures approved by the Court provided that when determining the highest or otherwise best bid, the Debtors could consider "(i) the amount of the Qualified Bid, (ii) the impact on customers, vendors, and employees, (iii) the certainty of a Qualified Bid leading to a confirmed plan, (iv) the timing associated with consummating such Qualified Bid, (v) the ability of the Qualified Bidder to obtain appropriate regulatory approvals, (vi) the execution risk attendant to any submitted Bids, and (vii) any other factors deemed relevant by the Debtors, after consultation with the Committee." The Debtors considered the above and other factors during the Auction process and in selecting the bid from FTX US. Though the Debtors received several other bids for the sale of their assets, the Debtors concluded that the sale to FTX US provided the most certainty to close and set the Debtors on a path to confirm a plan, make distributions to creditors, and exit chapter 11 in an expeditious manner.

**III.     The Robertson Objection.**

25. The Robertson Objection includes several additional objections that address specific provisions of the Asset Purchase Agreement and the Sale. For the reasons set forth below, such objections should be overruled.

**A.     The Sale of Certain Causes of Action to FTX US Is Proper.**

26. Robertson alleges that the Asset Purchase Agreement and the Plan are inconsistent regarding the causes of action sold to FTX US and the causes of action retained by the Wind-Down Trust. That is not the case.

27. The Debtors amended the Asset Purchase Agreement to clarify the causes of action sold to FTX US. The amended Asset Purchase Agreement provides in pertinent part, that the assets acquired by FTX US shall include:

> (i) all Avoidance Actions or other affirmative causes of action or claims against Seller's customers **solely to the extent that such causes of action or claims are against a customer in such person's capacity as a customer of Seller**, borrowers under the Acquired Cryptocurrency Loans **solely to the extent that such causes of action or claims are against a borrower in such person's capacity as a borrower under the Acquired Cryptocurrency Loans**, and counterparties to Assigned Contracts whether arising before or after the Closing Date, in each case, other than the Retained Avoidance Actions (the "<u>Specified Transferred Claims</u>"), and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller).

The Debtors made conforming changes to the amended Disclosure Statement. *See* Disclosure Statement Art. VII.N.

*28.* These revisions make clear that FTX US is acquiring all Avoidance Actions and other affirmative Causes of Action or Claims against customers solely to the extent such Claims and Causes of Action are against an customer in such person's capacity as a customer. FTX US has a strong business justification for doing so—commencing Avoidance Actions against customers migrating to their platform would be disruptive to their business and would mitigate the value of the acquisition to FTX US. Purchasers routinely acquire causes of action against customers in sale transactions to reduce litigation risk surrounding the transaction and facilitate the general business purposes of the sale. *See In re GBG USA Inc*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 234] (approving the debtors' sale motion, including the sale of avoidance actions); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr.

S.D.N.Y. Nov. 1, 2019) [Docket No. 494] (same); *In re Nine West Holdings, Inc.*, Case No. 8-10947 (SCC) (Bankr. S.D.N.Y June 18, 2018) [Docket No. 404] (same); *In re Agent Provocateur, Inc.*, Case No. 17-10987 (MEW) (Bankr. S.D.N.Y. June 28, 2017) [Docket No. 165] (same); *In re Angelica Corporation*, Case No. 17-10870 (JGL) (Bankr. S.D.N.Y. June 23, 2017) [Docket No. 363] (same); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. May 30, 2017) [Docket No. 684] (approving the debtors' sale motion, including the sale of avoidance claims to the extent permitted in the APA).

29.     Robertson alleges that the Debtors' pleadings do not describe the consideration paid for the Avoidance Actions sold to FTX US. As an initial matter, transfers made by customers on the Voyager platform were ordinary course transactions—in fact, these transactions are the core purpose of the Debtors' business model. The Debtors do not believe there is any value in the Avoidance Actions sold to FTX US. Section 547(b) of the Bankruptcy Code authorizes a trustee or debtor in possession to recover from a non-insider creditor payments made before a bankruptcy filing if each of the following conditions are met: (i) the payment was made to or for the benefit of the creditor; (ii) the payment was on account of an antecedent debt; (iii) the payment occurred while the debtor was insolvent; (iv) the payment occurred within 90 days before the petition was filed; and (v) the payment allowed the creditor to receive more than it would have received in a chapter 7 liquidation. 11 U.S.C. § 547(b). Section 547(c) provides, however, that a transfer may not be avoided if (i) the transfer was intended by the parties to be a contemporaneous exchange of new value given to the debtor, and was in fact a contemporaneous exchange or (ii) to the extent the transfer was in payment of a debt incurred by the debtor in the ordinary course of business between the parties, and such transfer was made in the ordinary course of business between the parties, or made according to ordinary business terms. Any Avoidance Actions pursued against

13

customers would plainly fail section 547(b), as such transfers were, among other things, not made on account of an antecedent debt. Further, cryptocurrency trades would satisfy the contemporaneous exchange defense and the ordinary course defense provided in section 547(c). Accordingly, the Debtors believe that the consideration paid for such actions is properly valued at $0 or a *de minimis* amount.

30. Importantly, FTX US is only acquiring Causes of Action against customers on account of their cryptocurrency trades. FTX US is not acquiring any other actions, which shall vest in the Wind-Down Entity or be released or settled pursuant to the Plan.

### B.  The Treatment of Account Holders Is Proper.

31. Robertson alleges, effectively, that the Debtors should be prohibited from selling any cryptocurrency to FTX US that is not supported on their platform. The Robertson Objection should be overruled.

32. At the outset, the Robertson Objection to the treatment of Account Holders under the Plan is a Plan confirmation objection and is therefore premature and procedurally improper. Through the APA Motion, the Debtors are only seeking Court approval to enter into and perform certain obligations under the Asset Purchase Agreement—they are not seeking confirmation of the Plan or authority to consummate the Sale. Objections to the proposed treatment of Account Holders under the Plan are preserved and Robertson's objection to Account Holder treatment is more properly considered at the Debtors' confirmation hearing.

33. Moreover, migrating all customer accounts and all cryptocurrency to the FTX US platform is the crux of the deal struck with FTX US. As discussed herein, the Debtors meet their burden with regards to the business judgement standard for the Sale because the Sale maximizes value for the Debtors' stakeholders. Failing to migrate over customers who own cryptocurrency

14

not supported on FTX US's platform would at worst lead to the termination of the deal with FTX US and at best result in a reduction of the purchase price.

34. FTX US currently supports over 75% in value of the Debtors' cryptocurrency on its platform and is actively working to support the currently unsupported coins in advance of the Debtors' confirmation hearing and believes that it will be able to support significantly more than 80% in value of the Debtors' cryptocurrency by the Sale closing date.

35. The Sale, in its entirety, is value-maximizing and is the best transaction available to stakeholders. No other actionable transaction is presently available whereby customers would recover more on account of their claims, and Robertson has not asserted otherwise. The alternative to the Sale is a value-destructive liquidation in which customers would receive a significantly reduced recovery and, critically, would receive *the totality of such recovery in cash*, not cryptocurrency. The Debtors evaluated other restructuring alternatives, including the Standalone Plan, but ultimately determined that such alternatives were either not viable or would leave the Debtors' stakeholders worse off than under the Sale to FTX US. While the Sale to FTX US may impact the individual tax basis of certain Account Holders, the Debtors' obligation is to maximize the value that all Account Holders will receive under the Plan. Ultimately, the recovery provided to Account Holders under the Asset Purchase Agreement is the highest and best that the Debtors were able to obtain in the market. The Robertson Objection should be overruled.

**C.    The Revised Proposed Order Approving the APA Motion Resolves Robertson's Objection to Rebalancing Transactions.**

36. The Debtors and Robertson resolved concerns regarding rebalancing and, accordingly, Robertson no longer objects to the Debtors' request for authorization to enter into rebalancing transactions to effectuate the Sale.

**IV.    The AHG Objection.**

15

37. The AHG Objection alleges that (a) the Plan substantively consolidates the Debtors and (b) the Plan and Disclosure Statement inadequately describes the sale of causes of action to FTX US. The AHG Objection is an objection to the Plan, not an objection to the APA Motion. Objections to the Plan are properly raised at confirmation. However, the Debtors made clear in the amended versions of the Plan and Disclosure Statement that the Debtors are not seeking to substantively consolidate the Debtors. *See* Plan Art. I.G; Disclosure Statement Art. III.M. Further, as described above, the amended Plan, Disclosure Statement, and Asset Purchase Agreement clarify which causes of action are being acquired by FTX US and which causes of action will remain with the OpCo's estate.

38. The AHG Objection requests that the Debtors add language to the Order to preserve the rights of the Ad Hoc Group of Equity Holders with respect to the Plan. The Debtors added such language in the revised proposed Order filed concurrently herewith. Accordingly, to the extent that the AHG Objection has not been resolved, the Debtors respectfully request that the Court overrule the AHG Objection.

## V. The Texas Objection.

39. Although styled as an objection to the APA Motion, the Texas Objection appears to seek only a reservation of rights with respect to the authority of the Texas State Securities Board to enforce the laws of Texas against FTX US following the consummation of the Sale. Since the APA Motion does not purport to limit or compromise such rights, as a resolution to the Texas Objection, the Debtors have added certain language in the proposed Order substantially similar to certain of the language requested in the Texas Objection as modified below:

**Governmental Regulatory Authority:**

Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents discharges, releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27)

16

("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

Further, nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall affect any valid setoff or recoupment rights of any Governmental Unit. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan divests any tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Order, the APA, the Plan, or any Order confirming the Plan.

40. In addition, the Debtors have included language in the proposed Order preserving Texas' rights to object to the Plan.

41. To the extent the Texas Objection raises any actual objection to the Sale (which it does not), like the Robertson Objection, it is procedurally improper because it is a premature Plan confirmation objection. Any such objection should be raised at the Confirmation Hearing. Accordingly, to the extent that the Texas Objection has not been resolved by the language added to the proposed Order, the Debtors respectfully request that the Court overrule the Objection.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the APA Motion and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: October 18, 2022<br>New York, New York | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>Christopher Marcus, P.C.<br>Christine A. Okike, P.C.<br>Allyson B. Smith (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>Email: jsussberg@kirkland.com<br>cmarcus@kirkland.com<br>christine.okike@kirkland.com<br>allyson.smith@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |