Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' OMNIBUS REPLY TO
## OBJECTIONS TO THE DISCLOSURE STATEMENT MOTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully submit this omnibus reply (this "Reply")[2] to the objections[3] to the *Disclosure*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not defined herein have the meaning given to them in the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539] (including all exhibits and other supplements thereto, and as modified, amended, or supplemented, the "Plan") or in the APA Motion (as defined below), as applicable.

[3]    The following objections were received: (a) (i) *Objection of Pierce Robertson to Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 443] (the "Initial Robertson Objection") and (ii) *Supplemental Objection of Pierce Robertson to Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 512] (the "Supplemental Robertson Objection," and, together with the Initial Robertson Objection, the "Robertson Objection"); (b) *Alfred Gentilini's Objection to Second Amended Joint Plan of Voyager Holdings, Inc. and First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc.* [Docket No. 521] and *Objection to Joint Plan of Voyager Digital Holdings, Inc. and Objection to Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc.* [Docket No. 529] (together, the "Gentilini Objection"); (c) *Objection of the Ad Hoc Group of Equity Holders to*

*Statement Relating to the Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates*

*Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (including all exhibits and other

supplements thereto, the "Disclosure Statement" and as modified, amended, or supplemented, the

"Amended Disclosure Statement") and in support of the *Debtors' Motion for Entry of an Order*

*Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures,*

*(III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect*

*Thereto* [Docket No. 289] (the "Disclosure Statement Motion") seeking entry of an order,

substantially in the form filed in connection therewith (the "Disclosure Statement Order," as

modified, amended, or supplemented, the "Revised Disclosure Statement Order").   In further

support of approval of the Amended Disclosure Statement and entry of the Revised Disclosure

Statement Order, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      After a thorough marketing process and over two-week Auction, the Debtors

entered into the Asset Purchase Agreement with FTX US to effectuate a sale of substantially all

of the Debtors' assets.[4]   The Asset Purchase Agreement contemplates that the Sale will be

---

*Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 524] (the "Ad Hoc Equity Group Objection," and the filer, the "Ad Hoc Equity Group"); (d) *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Amended Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 526] (the "Committee Objection"); (e) *Objection of the United States Trustee to First Amended Disclosure Statement Relating to Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc., and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 530] (the "U.S. Trustee Objection"); and (f) *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Amended Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "TSSB Objection," and the filing parties, collectively, "Texas") [Docket No. 533] (collectively, the "Objections," and the filing parties, the "Objectors").

[4]     Additional detail with respect to the Debtors' marketing process and entry into the Asset Purchase Agreement can be found in the *Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 472] (the "APA Motion"). Any objection to the Debtors'

effectuated through the proposed Plan. Accordingly, the Debtors seek approval of the Amended Disclosure Statement in connection therewith.

2.      The purpose of a disclosure statement is to enable holders of claims and interests to make an informed, intelligent decision regarding whether to vote to accept or reject a chapter 11 plan. And the purpose of a hearing to approve a disclosure statement is to determine whether the information provided is adequate, as required by section 1125 of the Bankruptcy Code. While this determination includes considerations of accuracy and fairness, it does not include the consideration of substantive objections a creditor may have to a proposed plan. Those considerations are taken into account at a confirmation hearing—where a proposed plan may actually be approved or denied. Here, the Debtors are providing fulsome, clear, accurate, and fair information regarding the treatment afforded their various creditor constituencies, and, therefore, respectfully submit that the Disclosure Statement should be approved.

3.      The Debtors received eight formal objections and/or supplemental objections to the approval of the Disclosure Statement, as well as a number of informal comments. The limited number of objections to the Amended Disclosure Statement is significant, given that the Debtors have over one million customers and other parties in interest in these chapter 11 cases.

4.      The objections generally fall into three broad categories: (a) objections to the adequacy of the information contained in the Disclosure Statement; (b) objections to the potential release of derivative Debtor claims that were specifically identified as a matter to be investigated, addressed, and resolved by the Special Committee of the Board of Directors of OpCo in its business judgment; and (c) objections to specific Plan provisions, that, in addition to being premature and appropriately addressed in connection with confirmation of the Plan, are incorrect.

---

entry into the Asset Purchase Agreement and sale transaction are addressed in the *Debtors' Omnibus Reply to Objections to APA Motion*, filed contemporaneously herewith.

As further described herein, the Disclosure Statement satisfies the applicable standards under the Bankruptcy Code and the remaining confirmation-related objections should be deferred to the Confirmation Hearing, as all parties' rights are reserved.

5.      The Debtors have worked, and will continue to work, with each of the Objectors to attempt to resolve their objections consensually ahead of the hearing on the Amended Disclosure Statement.  Of the remaining outstanding objections, those that raise actual disclosure deficiencies have been addressed through additional language in the Amended Disclosure Statement, as summarized in the chart attached hereto as **Exhibit A** (the "Response Chart") and as described herein.  The other outstanding Objections that seek to address alleged deficiencies of the Plan are not properly before the Court at this juncture, and their consideration is premature.  The Amended Disclosure Statement satisfies the relevant disclosure standards under section 1125 of the Bankruptcy Code, and the Debtors therefore respectfully request that the Court overrule the Objections and enter the Revised Disclosure Statement Order.

## Reply

## I.      The Amended Disclosure Statement Contains Adequate Information Under Section 1125 of the Bankruptcy Code.

6.      The Disclosure Statement complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.  Pursuant to section 1125 of the Bankruptcy Code, a disclosure statement must provide holders of claims and interests entitled to vote with "adequate information" regarding the plan.  Section 1125(a)(1) of the Bankruptcy Code states, in relevant part:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of

22-10943-mew    Doc 559    Filed 10/18/22    Entered 10/18/22 23:57:02    Main Document
Pg 5 of 38

claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

7.    "Adequate information" has been interpreted as information that is "reasonably practicable" to permit an "informed judgment" by creditors voting on a plan of reorganization. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). The adequacy of information in a disclosure statement is determined on a case-by-case basis. *See In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) (the adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties"); *see also In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.").

8.    As demonstrated in the table below and consistent with Second Circuit precedent, the Amended Disclosure Statement contains the categories of information necessary for voting creditors to make an informed judgment to accept or reject the Plan:

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Treatment of Claims and Interests | A description and summary of the treatment of all Claims and Interests under the Plan. | Article III.D |
| Debtors' Corporate History, Structure, and Business Overview | An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure. | Article V |
| Description of Events Leading to these Chapter 11 Cases | An overview of the events leading to the Debtors' filing of these chapter 11 cases, including the making and recalling of the 3AC Loan. | Article VI |

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Prepetition Marketing and Restructuring Efforts | An overview of the Debtors' prepetition efforts to stabilize operations and, in parallel, run a thorough marketing process to solicit a strategic transaction for an out-of-court financing or investment. | Article VI |
| The Special Committee's Investigation, Conclusion, and Proposed Settlements | A detailed description of the Investigation conducted by the Special Committee with respect to, among other things, Voyager's loans to third parties, and the conclusions and proposed settlement recommended by the Special Committee. | Article VI.2(b); Article VII.O |
| The Releases Contemplated under the Plan | A description of the release provisions sought pursuant to the Plan. | Article III.M; Article IV.A.3 |
| The Debtors' Plan | A description of the Debtors' Plan. | Article IV |
| The Postpetition Marketing and Sale Process and Proposed Sale to FTX US | An overview of the Debtors' sale and marketing process after the Petition Date and the details of the proposed Sale to FTX US contemplated under the Plan. | Article VII.N |
| Liquidation Analysis | An analysis of the liquidation value of the Debtors. | Exhibit B |
| Risk Factors | Certain risks associated with the Debtors' business, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information set forth in the Disclosure Statement. | Article VIII |
| Solicitation and Voting Procedures | A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan. | Article IX |
| Confirmation of the Plan | Confirmation procedures and statutory requirements for confirmation and consummation of the Plan. | Article X |
| Certain United States Federal Income Tax Consequences of the Plan | A description of certain U.S. federal income tax law consequences of the Plan. | Article XI |
| Recommendation | A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan. | Article XII |

9.     The Amended Disclosure Statement contains adequate information to allow creditors to make an informed judgment as to whether to vote to accept or reject the Plan. Specifically, the Amended Disclosure Statement describes in detail, among other things: (i) the history and background of these chapter 11 cases; (ii) the Debtors' corporate history, structure, and business overview; (iii) the treatment of each Class of Holders of Claims and Interests under

the Plan; (iv) the Debtors' pre- and postpetition marketing process, including information regarding the Debtors' two-week auction; (v) the Sale to FTX US, including a description of the consideration received and the mechanics of the Sale; (vi) a summary of the Customer Migration Protocol; (vii) a comparison of the form of and estimated recoveries of Holders in connection with the Sale and confirmation of the Plan to the form of and estimated recoveries of Holders in a liquidation scenario—the likely alternative to confirmation of the Plan; (viii) the Wind-Down Entity, including the assets to be transferred to the Wind-Down Entity and the mechanics of distributions from the Wind-Down Entity; (ix) the solicitation and voting procedures; (x) risk factors to be considered when voting on the Plan, including those associated with ongoing litigation; (xi) the Investigation, including details regarding the Special Committee's authority and mandate and the conclusions made and proposed settlements recommended by the Special Committee; and (xii) certain U.S. federal tax consequences of the Plan. *See In re Walker*, 198 B.R. 476, 479 (Bankr. E.D. Va. 1996) (holding that, in evaluating the sufficiency of a disclosure statement, "[a] debtor cannot be expected to unerringly predict the future, but rather must provide information on all factors *known to him at the time* that bear upon the success or failure of the proposals set forth in the plan." (emphasis added)).

10.    Accordingly, the Amended Disclosure Statement provides creditors with "adequate information," as defined in section 1125(a)(1) of the Bankruptcy Code, to allow creditors to make an informed judgment as to whether to vote to accept or reject the Plan, notwithstanding assertions to the contrary by the Objectors.

## II.    The Amended Disclosure Statement Resolves and Addresses the Disclosure Objections.

11.    As reflected in the Response Chart, the Debtors have provided enhanced disclosure to the extent practicable, including information regarding the Special Committee's investigation,

conclusions, and proposed settlements, with respect to derivative claims against the Debtors' directors and officers.

12.    The Debtors respectfully submit that any remaining disclosure-related objections should be overruled.  However, to maximize consensus ahead of the hearing to approve the Amended Disclosure Statement, the Debtors will continue to work with the Objectors to minimize outstanding issues regarding any pending objections.

### A.    The Robertson Objection

13.    In order to consensually resolve the Robertson Objection, the Debtors have (i) included certain agreed terms in the Plan and (ii) filed a joint stipulation on the docket of the adversary proceedings of *Voyager Digital Holdings, Inc. v. Pierce Robertson*, Adv. Proc. No. 22-01138.  Counsel to Robertson has represented that these actions resolve the Robertson Objection.  In the event that there are any outstanding objections, the Debtors address the arguments below.

1.    *Additional disclosures in the Amended Disclosure Statement address many issues in the Initial Robertson Objection.*

14.    The Initial Robertson Objection was filed on September 21, 2022 against the initial Disclosure Statement filed on August 12, 2022 that accompanied the Standalone Plan.  The Debtors filed the Amended Disclosure Statement on October 5, 2022 rendering substantially all of the points made in the Initial Robertson Objection moot.   A summary of the Debtors' responses to the Robertson Objection is as follows:[5]

- *The Disclosure Statement lacks certain financial information, including a liquidation analysis, financial projections, and valuation analysis, which would enable creditors to evaluate the projected recovery of their claims*.  The Debtors' Liquidation Analysis is attached as <u>Exhibit B</u> to the Amended Disclosure Statement.  The Liquidation Analysis clearly shows the recoveries a Holder of a Claim or Interest can expect to receive under the Plan, and the likely

---

[5]    *See* Robertson Objection, ¶ 16.

alternative to confirmation of the Plan—a liquidation. The Debtors' marketing process and Auction, and the bids received pursuant to the Auction, served as a market test to determine the value of the Debtors' business. Therefore, the Debtors have not attached a valuation analysis to the Amended Disclosure Statement. Further, financial projections are not included in the Amended Disclosure Statement as the Debtors are not reorganizing.

- *The Plan provides for general unsecured creditors to receive a* pro rata *share of the "Claims Allocation Pool," which is an undefined term*. The revised Plan removed the concept of the "Claims Allocation Pool" and instead provides specific treatment for subclasses of General Unsecured Creditors at each Debtor entity. These updates are addressed in the Amended Disclosure Statement.

- *The Disclosure Statement fails to describe certain securities fraud claims asserted against the Debtors*. The Amended Disclosure Statement provides a summary of adversary proceedings commenced in these chapter 11 cases, which includes a summary of the underlying facts of each of the proceedings, the current status of each of the proceedings, and, importantly, for certain of the proceedings, the Debtors' understanding of the potential impact (if any) on creditor recoveries. This summary includes a description of the Cassidy Class Action and the Robertson Class Action. The Debtors do not believe that the claims asserted, by Robertson or otherwise, will have a material impact on creditor recoveries. But the risk factors included in the Amended Disclosure Statement address the potentially adverse effects of litigation, including litigation arising out of or otherwise related to these chapter 11 cases. Such disclosure satisfies the requirements of the Bankruptcy Code and further disclosure is not required. *See* Amended Disclosure Statement, Art. VII.H.2(a)–(c), Art. VIII.D.2.

- *The details of the D&O Liability Insurance Policies must be disclosed.* The Amended Disclosure Statement provides an overview of the D&O Insurance Policies, including coverage amounts and other related information. *See* Amended Disclosure Statement Art. IV.A.5. Such disclosure satisfies the requirements of the Bankruptcy Code and further disclosure is not required.

- *The Debtors must explain the diminution of value of the VGX token.* As set forth in Article II of the Amended Disclosure Statement, FTX US has offered to purchase all VGX held in the Debtors' Estates for a purchase price of $10 million. The $10 million offer is a floor of what the Debtors will receive for VGX. The Debtors continue to engage in discussions third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US Asset Purchase Agreement. Further, the Amended Disclosure Statement clearly states that if the Debtors are unable to identify a higher and better solution for VGX, the Debtors will accept FTX US's offer and, as a result, VGX may decline in value and may have no value post-consummation of the Plan. *See* Amended Disclosure Statement Art. II.

- *The Debtors should disclose which cryptocurrency will be dollarized pursuant to the Plan.*  The Amended Disclosure Statement provides additional detail regarding "dollarization" including, among other things, that Account Holder Claims will be valued in U.S. dollars as of the Petition Date, consistent with section 502(b) of the Bankruptcy Code.  The Amended Disclosure Statement also provides that only those Account Holders that become Transferred Creditors at least one Business Day prior to the Effective Date and who maintain Cryptocurrency in their Account that is supported by FTX US will receive their initial distributions under the Plan in-kind (*i.e.*, in the form of Cryptocurrency) deposited into their FTX US Accounts. If (x) FTX US does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (y) a Transferred Creditor did not maintain Cryptocurrency in its Account, or (z) a Transferred Creditor becomes a Transferred Creditor after such date but before the final migration cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, such Transferred Creditor will receive their share of the initial distribution in the form of USDC. Account Holders who do not become Transferred Customers will not be eligible to receive any portion of the initial distribution from FTX US. All distributions to such Account Holders and all other distributions will be made on a pro rata basis in cash from the Debtors' Estates.  *See* Amended Disclosure Statement, <u>Exhibit C</u>.

> 2.      *The Disclosure Statement contains adequate information regarding the releases and the bases for such releases.*

15.      The Robertson Objection objects to the adequacy of the information regarding the scope of the third-party releases and the Debtor releases.   Robertson Objection ¶¶ 47, 50. However, the Amended Disclosure Statement provides sufficient information with respect to the Releasing Parties, the Released Parties, and the breadth of the release provisions contained therein, and satisfies the requirements of section 1125 of the Bankruptcy Code with respect to the Plan's proposed release provisions.

16.      Under the Debtors' Plan, the only parties that will be bound by the third party releases are parties who *affirmatively choose* to be bound.  The Disclosure Statement, the non-voting status notices, and the Ballots provide ample notice and information regarding the third party, "opt-in" releases.  The Debtors are not seeking approval of any nonconsensual third-party releases.

17.     With respect to the Debtor releases, Article IV.A.3 and Article III.M of the Disclosure Statement clearly set forth the releases contained in the Plan and adequately describe both the entities and claims being released.   The Amended Disclosure Statement provides significant disclosure regarding the making and recalling of the 3AC Loan in Article IV.2(b), the ensuing Special Committee Investigation in Article IV.2(b)(i), and the results of the Special Committee Investigation and proposed settlements in connection therewith in Article IV.2(b)(ii). Article IV.C.7 of the Disclosure Statement also describes, in detail, the mechanics and rationale for contributing third-party claims to the Wind-Down Entity.   Article III.M of the Amended Disclosure Statement states the importance of the releases (and settlements with the Debtors' CEO and CCO pursuant to the Special Committee Investigation) to the transactions contemplated under the Plan.

18.     Further, the Robertson Objection claims that the Debtors are attempting a "backdoor" non-consensual third-party release.  This is incorrect.  The Disclosure Statement clearly states that the third-party release is an "opt-in," and therefore fully consensual release. There is no confusion on that point.

19.     The asserted objections to the Debtor releases are premature at this time because such objections are Plan confirmation objections.   The Debtors submit that the Amended Disclosure Statement provides sufficient information with respect to the release provisions in the Plan.  All Holders of Claims and Interests have the requisite information necessary to determine whether to object to the Debtor releases, and whether to opt into the third party release provisions in the Plan.  Therefore, this objection should be overruled.

3.     *The remaining objections should be overruled.*

20.     The remaining objections in the Robertson Objection should be overruled because they are without merit, premature, or both.

21.     *First*, the Robertson Objection argues that the deadline to file the Plan Supplement provides voters with insufficient time to review the documents contained therein before the Voting Deadline.  The Debtors will file the Plan Supplement one week before the Voting Deadline, which provides creditors with sufficient time to review and consider the documents therein, and is consistent with procedures routinely approved in this jurisdiction.  *See In re Purdue Pharma L.P., Inc.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. May 24, 2021) (approving a deadline to file the plan supplement seven days before the voting deadline); *In re Frontier Comm's Corp.*, No. 20-22476 (RDD) (Bankr. June 30, 2020) (approving a deadline to file the plan supplement five days before the voting deadline); *In re Windstream Holdings, Inc*., No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020) (approving a deadline to file the plan supplement "prior to the confirmation hearing"); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Dec. 19, 2019) (approving a deadline to file the plan supplement five days before the voting deadline); *In re Hollander Sleep Prod., LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 25, 2019) (approving a deadline to file the plan supplement fourteen days before the debtors' confirmation date, or four days later than the Debtors' current deadline).

22.     *Second*, the Robertson Objection requests the inclusion of a "Robertson Insert" to the solicitation materials.  This request is frivolous and Robertson's efforts to solicit class action plaintiffs through the Debtors' bankruptcy process is completely improper.  As described in the Amended Disclosure Statement, if Robertson's claims are actually direct third-party claims against non-Debtor parties, they are not released by the Plan.  The Disclosure Statement does not need to address Robertson's lawsuit in any further detail.

### B.     The Gentilini Objection

23.     The Gentilini Objection alleges that Holders of Claims in Class 3 (Account Holder Claims) are receiving disparate treatment under the Plan and Holders of Claims in Class 4

(Alameda Loan Facility Claims) should not be allowed to vote, as they are not receiving a recovery and should therefore be deemed to reject the Plan. These objections are meritless and should be overruled.

24.     *First*, classification of all Account Holder Claims in Class 3 is proper, and all Holders of Claims in Class 3 are receiving fair and proper treatment under the Plan. A detailed response is provided in Section III of this Reply.

25.     *Second*, the Holder of Claims in Class 4 is entitled to vote on the Plan. The Holder of Claims in Class 4 is entitled to a recovery with respect to their Alameda Loan Facility Claims. Instead of recovering on those Claims, and as part of the consideration given to the Debtors pursuant to the sale transaction, Alameda elected to contractually convey its recovery on the Alameda Loan Facility Claims, and transfer all rights, title, and interest in the Alameda Loan Facility Claims at TopCo and HoldCo to OpCo. *See* Amended Disclosure Statement Art. X.E. The Alameda Loan Facility Claims are impaired under the Plan, and the fact that Alameda is agreeing to convey its recovery to another Debtor entity (for the benefit of other creditors) does not strip the Holder of Claims in Class 4 of its entitlement to vote.

### C.     The Ad Hoc Equity Group Objection

#### 1.     *Additional disclosures in the Amended Disclosure Statement address many issues in the Ad Hoc Objection.*

26.     The Ad Hoc Equity Group asserts that the Disclosure Statement contains inadequate disclosure regarding substantive consolidation issues. The Debtors are not seeking substantive consolidation. The Amended Disclosure Statement makes this clear. Article VIII.A(2)(a) of the Amended Disclosure Statement explicitly states that the Debtors are not being substantively consolidated under the Plan. Further, the Amended Disclosure Statement splits Claims in Class 5 (General Unsecured Claims) into three subclasses at each Debtor entity:

(i) Class 5A Claims (OpCo General Unsecured Claims); (ii) Class 5B Claims (HoldCo General

Unsecured Claims); and (iii) Class 5C Claims (TopCo General Unsecured Claims).  *See* Amended

Disclosure Statement Art. III.D.  Therefore, the Amended Disclosure Statement contains adequate

information regarding substantive consolidation.

2.    *The remaining objections should be overruled.*

27.    The Ad Hoc Equity Group's objection further asserts that the Amended Disclosure

Statement does not provide sufficient information regarding whether Account Holder Claims will

be dollarized and, if so, as of what date dollarization is to occur.  The Plan, attached as <u>Exhibit A</u>

to the Disclosure Statement, explicitly states that "Account Holder Claims shall be dollarized as

of the Petition Date," and the Amended Disclosure Statement includes a detailed description of

the dollarization process and mechanics.  *See* Plan Art. III.C.3; Amended Disclosure Statement

<u>Exhibit C</u>.  The Ad Hoc Equity Group also argues that the Amended Disclosure Statement does

not explain how Cryptocurrency assets are to be valued.  This is not true.  <u>Exhibit C</u> to the Amended

Disclosure Statement, along with a detailed description of the distribution process, provides that

the purchase price of OpCo's Cryptocurrency, other than VGX, will be determined based on the

average coin prices for the 20 calendar days during the reference period..

28.    The Ad Hoc Equity Group also objects to the scope of the releases included in the

Plan.  This argument is addressed below.

**D.    The U.S. Trustee Objection**

29.    The U.S. Trustee argues that the Plan is not clear as to whether it is a plan of

liquidation or of reorganization.  Because the Plan "contemplates liquidating the Debtors' business

and remaining assets," the Debtors removed any references to discharge of the Debtors from the

Plan.

14

30.    The U.S. Trustee objects to the third-party releases, and argues that certain releases are nonconsensual.  The Debtors are not seeking any nonconsensual third-party releases and the U.S. Trustee's argument regarding the proposed release provisions is addressed below.

31.    The U.S. Trustee also argues that the Plan and Disclosure Statement contradict the Asset Purchase Agreement with respect to the sale of certain avoidance actions.  The Amended Disclosure Statement at Article VII.N clarifies this point, and states explicitly:

> (i) all Avoidance Actions or other affirmative causes of action or claims against Seller's customers **solely to the extent that such causes of action or claims are against a customer in such person's capacity as a customer of Seller**, borrowers under the Acquired Cryptocurrency Loans **solely to the extent that such causes of action or claims are against a borrower in such person's capacity as a borrower under the Acquired Cryptocurrency Loans**, and counterparties to Assigned Contracts whether arising before or after the Closing Date, in each case, other than the Retained Avoidance Actions (the "Specified Transferred Claims"), and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller).

*See* Amended Disclosure Statement Art. VII.N.

32.    The Debtors filed an amended Asset Purchase Agreement [Docket No. 548] that further clarifies the sale of Avoidance Actions to FTX US. *See* Asset Purchase Agreement 1.1(d).

**E.    The TSSB Objection**

33.    The TSSB Objection argues that the Disclosure Statement lacks information with respect to customer treatment and recovery.  However, the Amended Disclosure Statement goes into great detail regarding customer treatment and recoveries, and how the Debtors calculated estimated recovery under the Plan, including by preparing and providing a bespoke, interactive

Excel workbook that is available to the public on the Debtors' Claims, Noticing, and Solicitation Agent's website and allows each Account Holder to determine its hypothetical recovery with respect to each Holder's specific Cryptocurrency as part of the Sale Transaction.  *See* Amended Disclosure Statement, <u>Exhibit C</u>; *see also* <u>https://cases.stretto.com/Voyager/content/1713-account-holder-illustrative-recovery-analysis/</u>.  Further, the Amended Disclosure Statement and the Asset Purchase Agreement provide a detailed description of distributions, recoveries, and how the Cryptocurrency is being valued.  *See id*. Art. III.D; Asset Purchase Agreement Sec. 2.1(d).

34.    The second objection raised in the TSSB Objection is premature at this time as it is an objection to the Plan in disguise—attempting to bar confirmation of the Plan and consummation of the Sale Transaction. The Debtors have thoroughly disclosed the risks related to compliance with both state and federal laws and their respective regulations.   By such disclosure, the Debtors meet the standard and provide the information necessary for a voter to decide to accept or reject the Plan.

35.    The Amended Disclosure Statement contains a comprehensive summary of ongoing regulatory investigations against the Debtors and fully discloses the risks associated with the regulatory landscape in which the Debtors operate.  *See* Amended Disclosure Statement Art. VIII.D.1, VIII.D.2.  The Amended Disclosure Statement specifically addresses recent actions taken by state regulators and explicitly lays out the next steps required of the Debtors in each such action. *See id*.

36.    Moreover, to the extent that the TSSB Objectors believe that any alleged noncompliance by the Debtors is a bar to Plan confirmation, such objection is raised prematurely and is inappropriate at this time.  As such, the Debtors have agreed to add language, with certain modifications, into the revised proposed Disclosure Statement Order to address the TSSB

Objectors' concerns.  With respect to the TSSB Objectors' assertion that the Debtors have not yet produced certain documents, the Debtors are diligently working toward production of such requested information consistent with the upcoming deadline agreed upon by the Debtors and the relevant TSSB Objectors.

37.    The TSSB Objectors also object to the scope of the releases included in the Plan. This argument is addressed below.

### III.    The Remaining Objections Raised Are Confirmation Issues and Should be Overruled as Premature.[6]

38.    The Robertson Objection, the Gentilini Objection, the Ad Hoc Equity Group Objection, the Committee Objection, the U.S. Trustee Objection, and the TSSB Objection each raise objections based on various confirmation-related grounds, each of which is premature, and none of which presents any basis for the Court to delay approval of the Amended Disclosure Statement and solicitation of the Plan.  The Debtors agree that the Plan must comply with the confirmation requirements in section 1129 of the Bankruptcy Code (and all other applicable provisions) and will be prepared to demonstrate as much.  But the appropriate time to test such compliance is at the Confirmation Hearing.  *See In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 n.10 (Bankr. E.D. Pa. 1987) (stating that deciding confirmation issues before disclosure may have a disenfranchising effect because the disclosure statement itself is not mailed to all creditors until after court approval is obtained); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting . . . .").

---

[6]    For the avoidance of doubt, the Debtors reserve the right to respond to any and all objections asserted in connection with confirmation of the Plan.

39.    Disputed issues related to confirmation are not relevant to assessing whether a disclosure statement contains "adequate information."  *See, e.g.*, *In Quigley Co., Inc.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues"); *In re Hyatt*, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement because questions about the debtor's proposed classification scheme "require[d] additional evidence that may be presented at a confirmation hearing" and, therefore, the "proposed classification scheme does not render the Plan patently unconfirmable as a matter of law.")  In fact, the only time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is "patently unconfirmable."  *See*, *e.g.*, *In re Cardinal Congregate I*, 121 B.R. 760, 763–64 (Bankr. S.D. Ohio 1990) (noting a review of issues affecting confirmation of the plan at the disclosure statement phase is permitted only if the proposed plan is "patently" or "facially" unconfirmable); *see also In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of a disclosure statement on confirmability grounds only "where it is readily apparent that the plan accompanying the disclosure statement could ***never*** be legally confirmed") (emphasis added).

40.    A plan is not patently unconfirmable where the debtor can show that "the plan is confirmable or that defects might be cured or involve material facts in dispute."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  Rather, "a plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 155 (citing *Monroe Well Serv.*, 80 B.R. at 333).  *See also Phoenix Petroleum*, 278 B.R. at 394 (finding that unless "the disclosure statement describes a plan

that is so fatally flawed that confirmation is impossible" the Court should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at issue).

41.     The Objectors will have ample opportunity to prosecute their confirmation objections in connection with the Confirmation Hearing, to the extent these issues remain disputed. Nevertheless, to aid the Court's analysis, the Debtors briefly address certain confirmation issues raised in the Objections to eliminate any doubt that such issues would render the Plan patently unconfirmable.

> ### A.      The Debtors' Classification and Treatment of Account Holders Claims Is Appropriate and Consistent with Bankruptcy Code.

42.     The Gentilini Objection alleges that the Debtors' treatment of claims in Class 3 is improper, as some Account Holders will receive Cash and some will receive Cryptocurrency on account of their Claim.  Gentilini Objection, ¶ 1.  Although objections to treatment under the Plan should be considered at confirmation, the Plan's treatment of Claims in Class 3 is proper.

43.     As an initial matter, the Debtors' classification of Account Holders in a single Class is proper.  Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." *See* 11 U.S.C. § 1122(a).  The Bankruptcy Code is silent on whether "substantially similar" claims must be placed in the same class.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757–58 (Bankr. S.D.N.Y. 1992) ("The express language of [section 1122 of the Bankruptcy Code] explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.").  To determine whether claims are "substantially similar," courts typically focus on "the legal character of the claim as it relates to the assets of the debtor."  *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986); *see also In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (citing *In re AOV*

*Indus., Inc.*, 792 F.2d at 1150 (concluding that when analyzing whether claims are "substantially similar," the proper focus is on "the legal character of the claim as it relates to the assets of the debtor")); *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("Claims are similar if they have substantially similar rights to the debtor's assets.").

44.    Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining to classify claims together.  *See In re Drexel Burnham Lambert Grp.*, 138 B.R. at 757 ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.")  Here, the Claims classified in Class 3 are substantially similar in terms of their legal rights against the Debtors under the Bankruptcy Code and their priority under the Plan as they are all *pari passu* unsecured claims based on Cryptocurrency in the customers' accounts.  Each Holder of an Account Holder Claim has an equal priority Claim against the Debtors' Estates, and therefore there is no justification to separately classify each Cryptocurrency into a separate class.  Similarly to how trade claims are often classified in a single class, regardless of whether the claim is in USD, Euros or other currency, the medium of Cryptocurrency underlying each Claim does not affect each Claim's priority or other rights under the Bankruptcy Code against the Debtors' Estates as, pursuant to the Voyager customer agreement, the Cryptocurrency held on the platform is held in the Debtors' commingled account(s) and is property of their Estates.  The Debtors classified all Account Holder Claims together to ensure they are treated equally in accordance with their legal rights under the Bankruptcy Code.

45.    Additionally, the treatment afforded under the Plan does not unfairly discriminate against Account Holders.  Courts in the Second Circuit have ruled that "a plan unfairly

discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment." *In re Worldcom, Inc.*, 2003 WL 23861928, at *59; *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that the second prong assessing whether the debtor cannot consummate the plan without discrimination, is not dispositive of the question of unfair discrimination).

46.     Here, there is no unfair discrimination amongst Account Holders because all Account Holders are receiving exactly the same recovery under the Plan.  As described in detail in Exhibit C to the Amended Disclosure Statement, all Account Holder claims are "dollarized" as of the Petition Date— each Account Holder's Claim is determined by the fair market value of the Cryptocurrency (based in U.S. Dollars) held by the Account Holder as of July 5th, 2022 at 00:00 UTC.  *See* Amended Disclosure Statement, <u>Exhibit C</u>.  Some Account Holders will receive their distribution in Cash and some will receive their distribution in Cryptocurrency, but each Account Holder will receive the same value of recovery on account of their Claim.  *See id.*  The Debtors are unable to assess the tax implications of receiving Cryptocurrency or Cash for any particular Account Holder, and they are not required to do so by the Bankruptcy Code, applicable law or otherwise.  Instead, the Debtors are required to distribute equivalent value to each Account Holder, and the treatment for Account Holder Claims contemplated by the Plan satisfies that requirement.

47.     The Gentilini objection also asserts that Holders of VGX Tokens will receive a smaller recovery than Holders of other Cryptocurrency coins will receive.  That assertion is incorrect.  Any Claim on account of VGX Token is classified as an Account Holder Claim, and all

Account Holder Claims and recoveries will be treated in an identical manner and, as such, Holders of Account Holder Claims will receive their *pro rata* share of the value of the Cryptocurrency on Voyager's platform, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other Cryptocurrency in their account. *See id.* As clearly laid out in the Amended Disclosure Statement, each Account Holder is afforded the same opportunity to recover its equal share of Cryptocurrency and other treatment as contemplated under the Plan.

> **B.    The Treatment of Intercompany Obligations as Capital Contributions Is Reasonable and Appropriate.**

48.    The Ad Hoc Equity Group also raises a confirmation issue in its Objection, suggesting that the Debtors' ultimate parent may be entitled to a recovery on intercompany obligations and that, consequently, equity holders may be entitled to a recovery. While the Debtors will address that issue in more detail at confirmation, the Ad Hoc Equity Group is incorrect. As described in Article IV.C.2 of the Amended Disclosure Statement, there are nine intercompany obligations owed between Debtor entities, largely to permit TopCo to provide the requisite capital necessary upon receipt of third-party equity investments to OpCo to operate the Debtors' business. Of the three intercompany obligations that are documented (six of the nine intercompany obligations are not documented), such intercompany obligations were structured to optimize tax positions in the most efficient manner. *See In re Fidelity Bond and Mortg. Co.*, 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006) (holding that issuing debt for the purpose of maximizing certain tax benefits weighs in favor of recharacterizing debt as equity).

49.    Intercompany claims like these are typically recharacterized as equity contributions, because "the fundamental inquiry in a debt recharacterization claim [is] whether the capital at issue in economic substance was an equity contribution rather than a true debt obligation." *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 73–74 (Bankr. S.D.N.Y. 2007) (noting

that a creditor was correct "in proceeding on the assumption that bankruptcy courts have the power to recharacterize ostensible debt as equity, and . . . that the substance of a transaction can trump its form on a recharacterization determination."). When applying the "*Autostyle* factors,"[7] the Debtors, as disclosed in Article IV.C.2 of the Amended Disclosure Statement, made the preliminary determination that at least eight of the nine intercompany obligations are equity contributions. If challenged, the Debtors will take the requisite steps to effectuate that recharacterization. The Amended Disclosure Statement assumes that the intercompany obligations will be recharacterized as equity contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the relevant Debtor entity. Further, the Amended Disclosure Statement appropriately discloses the potential risks associated with creditor recoveries if the intercompany obligations are determined to be valid loans. With this disclosure, the Debtors have provided Holders of Claims in the voting Classes with sufficient information to make an informed decision to accept or reject the Plan.

## C. The Release and Injunction Provisions of the Plan Are Reasonable and Appropriate.

50. The Debtors received four objections related to the third-party releases and related exculpations in the Plan. The Amended Disclosure Statement revised the contemplated opt-out structure to an opt-in structure, allowing voting or non-voting parties who choose to be releasing parties to *opt in* to the releases.

51. To the extent that any objections to the releases remain, such objections are properly addressed at the Confirmation Hearing. *See In re Drexel Burnham Lambert Grp., Inc.*,

---

[7] The Southern District of New York, along with numerous other jurisdictions, have adopted the eleven-factor test set forth in *In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001). *See e.g., In re Adelphia Commc'ns Corp.*, 365 B.R. at 74; *In re BH S & B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009). "No one factor is controlling or decisive" and "the factors must be considered with in the particular circumstances of each case." *AutoStyle*, 269 F.3d at 750.

No. 90-B-10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections
to a plan of reorganization's releases and injunction provisions were in the nature of confirmation
objections and therefore improperly raised as objections to the disclosure statement); *Nielsen v.
Specialty Equip. Cos., Inc.*, No. 92-C-20142, 1992 WL 279262, at *3 (N.D. Ill. Sept. 25, 1992)
(noting that the bankruptcy court below held that "the validity of releases [is] a plan confirmation
issue" and overruled objections to the disclosure statement regarding the appropriateness of
third-party releases). None of the issues raised by the Objectors would render the Plan "patently
unconfirmable," and any release-related issues will be addressed at the Confirmation Hearing.

52.     Nonetheless, to the extent the Court were to address the objections to the Plan's
third party releases at this stage, several key principles are worth noting. The proposed Debtor
releases were in brackets in the proposed Amended Plan[8] because they were still under
consideration by the Special Committee at the time.[9] Since then, the Debtors have added additional
language into the Amended Disclosure Statement to clarify what the proposed releases actually
are; what they release (certain of the estate's claims); and why the Debtor releases are in the
proposed Amended Plan (because, after a thorough investigation, the Special Committee
concluded that no other claims were worth pursuing). The Amended Disclosure Statement also
describes in detail the claims that the Special Committee has decided, in its business judgment, to
settle, and why.

53.     The Objections fundamentally misunderstand what the proposed releases do, what
claims could be asserted by the estate if not released, and what challenges such claims would face
and costs such claims would require the estate to incur if they were ever pursued. While the

---

[8]     *See* Docket No. 498 (Amended Proposed Disclosure Statement) at Art. IV.A.3.
[9]     *See* Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee); Docket No.
        242 (Order approving application).

proposed resolutions are being fully disclosed and will be formally presented to the Court at the

confirmation hearing, given the tenor and clear misunderstandings reflected in the Objections, the

Debtors provide the additional discussion and context below.

54.     As a threshold matter, to be clear, the Plan does not propose to release any third

party's direct claims against non-debtors (to the extent such direct claims exist) without such third

party's express consent, which would be reflected by "opting in" to such third party releases.

Holders of Claims and Interests can also affirmatively elect to "contribute" their claims to the

Wind-Down Entity and vest the Wind-Down Entity with authority to pursue such claims against

the Debtors.  This case is thus fundamentally different from cases like *In re Aegean Marine

Petroleum Network, Inc.,* 599 B.R. 717, 729 (Bankr. S.D.N.Y. 2019), where a Plan proposed so-

called "non-consensual third-party releases."  Instead, the bracketed and challenged provisions

only address causes of action that *the Debtors* may (or may not) hold against officers, directors,

and employees.  These claims belong to the Debtors *only*, and could never have been brought by

individual creditors, regulators, or anyone else other than the Debtors themselves.  *See, e.g., In re

Gen. Growth Props.*, 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) ("it is well settled that alleged 'acts

of breach of fiduciary duty, corporate waste and mismanagement . . . . become property of the

estate immediately upon the commencement of a bankruptcy case pursuant to § 541 of the

Bankruptcy Code.'"); *In re Keene Corp.*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("Claims

based upon breach of a fiduciary duty belong to a corporation.")  And the court's review of the

Debtors' decision to pursue, settle, or release any such claims "is subject to the Debtors' own

business judgment."  *In re Ditech Holding Corp.*, 606 B.R. 544, 623 (Bankr. S.D.N.Y. 2019); *In

re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) ("Although approval of a

settlement rests in the Court's sound discretion ... the debtor's business judgment should not be ignored.")

55.     To evaluate the claims that could potentially be pursued by the Debtors and the estate against officers, directors or employees, the Debtors appointed two independent directors with extensive restructuring experience and no prior affiliation with Voyager or its management team to a Special Committee of Voyager Digital, LLC.  The Debtors then delegated to that Special Committee exclusive authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate."  The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee.  The Special Committee retained  Quinn Emanuel Urquhart & Sullivan, LLP ("Special Committee Counsel") to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

56.     The Special Committee's investigation was extensive, and is described in detail in the Amended Disclosure Statement.  *See* Amended Disclosure Statement Art. VII.O.  Among other things, the Special Committee performed extensive research, requested and reviewed thousands of documents consisting of tens of thousands of pages, and interviewed 12 witnesses for a total of approximately 55 hours.  After a detailed investigation, the Special Committee found no fraud by any director or officer of the Debtors, nor was there evidence that Voyager's insiders engaged in self-dealing.  To the contrary, Voyager's officers and directors lost money alongside customers.

Ultimately the Special Committee concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and former CFO[10] related to the 3AC Loan.  However, while colorable, the standard for successfully prosecuting these claims would be difficult to meet.

57.    The Special Committee's determination to negotiate and ultimately recommend the settlements is based on the following factors, among others:  the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs.  The Special Committee therefore negotiated and approved (subject to Court approval) settlements that will result in the CEO's and former CFO's personal contributions to the estate while preserving claims against the insurance policies.

58.    Based upon the cost-benefit analysis, the Special Committee determined that the settlements embodied in the Plan and disclosed in detail in the Amended Disclosure Statement, are in the best interests of the estate.  *See* Amended Disclosure Statement Art. VI.2(b).  Further, they are subject to the approval of the Bankruptcy Court in connection with confirmation of the Plan.  *In re Innkeepers USA Trust*, 448 B.R. 131, 148-149 (Bankr. S.D.N.Y. 2011) (finding that objections to release provisions need not be addressed until the time of plan confirmation).

59.    Parties that dispute the propriety of the settlements reached can object to the proposed Plan and raise the issue at the Confirmation Hearing.  If there is a dispute, the Debtors

---

[10]    Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC

will put on evidence demonstrating that the settlements are clearly in the estate's best interests and fall well within the business judgment of the Debtors, as delegated to the Special Committees. And in the interim, challenges to the now-revised releases in the context of the Amended Disclosure Statement before the Court are premature and without merit, and they should be overruled.

60.    Additionally, the Debtors have modified the exculpation provision in the Plan to fully comply with this Court's ruling in *Aegean*. *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) (determining that an appropriate exculpation provision should bar claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court).

### D.    The Plan Can be Confirmed Pursuant to Bankruptcy Code Section 1129(b)(1).

61.    The Ad Hoc Equity Group Objection argues that the Plan is "patently unconfirmable" because the Plan contemplates premature cancellation of equity contributions, which renders it unconfirmable pursuant to Bankruptcy Code section 1129(b)(1).  However, the Plan does not discriminate unfairly and is equitable as to each Impaired Class of Claims or Interests.  The Debtors are prepared to meet their burden pursuant to section 1129(b)(1) that the Plan does not violate the prohibition on unfair discrimination at the appropriate time—the Confirmation Hearing.

62.    The Ad Hoc Equity Group Objectors argue that Class 9 (Existing Equity Interests) will "almost certainly" not receive any distribution under the Plan.  But equity interests will receive a distribution if and when they are actually in the money.  Under the Plan, Holders of Existing Equity Interests will receive their *pro rata* share of Wind-Down Trust Units on account of Wind-Down Trust Assets attributable to TopCo, which will entitle them to receive a recovery on account

of their Interests to the extent that there are distributions available at TopCo, including proceeds

of the Coinify sale after payment in full of all Claims against TopCo.  Only once the absolute

priority rule is satisfied can holders of existing equity interests receive any recovery.  Recovery to

Holders of Existing Equity Interests is only legally permissible as a matter of bankruptcy law when

Holders of Secured Tax Claims, Holders of Priority Tax Claims, Holders of Other Priority Claims,

Holders of Administrative Claims, Holders of HoldCo General Unsecured Claims, Holders of

TopCo General Unsecured Claims, and Holders of Alameda Loan Facility Claims, in each case

asserted against TopCo, all receive recovery in full on account of their Claims.  Importantly, there

is no reorganized entity for which Holders of Existing Equity Interests would be able to retain

go-forward equity interests in even if that were permissible as the Debtors intend to wind down

after confirmation and consummation of the Sale and Plan.

63.    In any event, these objections are more appropriately addressed at the

Confirmation Hearing and do not implicate approval of the Amended Disclosure Statement.  The

Debtors are prepared to meet their burden at the confirmation hearing.  None of the Objections

provide any support for a determination that the Plan is "patently unconfirmable."  Accordingly,

they are premature at this stage and the Court should overrule the Objections to the extent the

modifications reflected in the Amended Disclosure Statement and Plan did not.

## Conclusion

64.    For the reasons set forth herein, the Debtors respectfully request that the Court:

(a) approve the Amended Disclosure Statement; (b) overrule the Objections (to the extent that they

remain pending as of the hearing on the Amended Disclosure Statement); (c) enter the Revised

Disclosure Statement Order; and (d) grant such other relief as the Court deems appropriate under

the circumstances.

Dated:  October 18, 2022          /s/ Joshua A. Sussberg
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900
                                  Email:         jsussberg@kirkland.com
                                                 cmarcus@kirkland.com
                                                 christine.okike@kirkland.com
                                                 allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Response Chart**

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| **Disclosure Related Objections** | | | |
| **Adequate Information.** The Amended Disclosure Statement fails to provide adequate information regarding the scope of the releases. | Committee Objection, ¶¶ 21–31; AHG Objection, ¶¶ 46–50; Robertson Supplemental Objection, ¶¶ 15–16; TSSB Objection, ¶¶ 30–39; U.S. Trustee Objection, Section C, Section E | The Amended Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Code with respect to the Plan's proposed release and exculpation provisions. The terms of the proposed release and exculpation provisions, and their effect on creditors, are prominently displayed in the Amended Disclosure Statement, the Plan, and the proposed ballots and notices to both voting and non-voting classes. The Amended Disclosure Statement provides additional disclosures regarding the proposed release and exculpation provisions, including the importance of those provisions and the fact that the contributions of the Released Parties are essential to the Debtors' restructuring. The Amended Disclosure Statement also provides additional disclosure regarding the Special Committee Investigation and the proposed settlements with the Debtors' CEO and CCO. The Debtors believe that the Plan's releases constitute sufficient consideration on terms that have been approved in recent chapter 11 cases. Objections to the permissibility of the Debtors' releases are premature. The Debtors are prepared to meet their evidentiary burden (if any) with respect to such matters at the Confirmation Hearing, and the rights of all parties with respect to the releases under the Plan are fully reserved and preserved and may be raised as objections to Confirmation of the Plan. Objections stating that the Debtors are attempting to "backdoor" non-consensual third party releases are incorrect. The Amended Disclosure Statement clearly states that the third-party release is structured as an "opt-in" release and is therefore fully consensual. | Article III.M, Article IV.A.2(b), Article IV.A.3 |
| **Adequate Information.** The Amended Disclosure Statement lacks certain financial information, including a liquidation analysis, financial projections, and valuation analysis, which would enable creditors to | Robertson Supplemental Objection, ¶ 16 | The Liquidation Analysis clearly shows the estimated recoveries a Holder of a Claim or Interest can expect to receive under the Plan, and the likely alternative to confirmation of the Plan—a liquidation. The Debtors' marketing process and Auction, and the bids received pursuant to the Auction, served as a market test to determine the value of the Debtors' business. Therefore, the Debtors have not attached a valuation analysis to the Amended Disclosure Statement. Further, | Exhibit B |

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan, the Amended Disclosure Statement, the Disclosure Statement Motion, or the relevant Objection, as applicable.

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| evaluate the projected recovery of their claims. | | financial projections are not included in the Amended Disclosure Statement as the Debtors are not reorganizing. | |
| **Adequate Information**. The Plan provides for general unsecured creditors to receive a pro rata share of the "Claims Allocation Pool," which is an undefined term. | Initial Robertson Objection, ¶ 16 | The revised Plan removed the concept of the "Claims Allocation Pool" and instead provides specific treatment for subclasses of General Unsecured Creditors at each Debtor entity.  These updates are addressed in the Amended Disclosure Statement. | Article III.D |
| **Adequate Information**. The Amended Disclosure Statement fails to describe certain securities fraud claims asserted against the Debtors. | Initial Robertson Objection, ¶ 16 | The Amended Disclosure Statement provides a summary of adversary proceedings commenced in these chapter 11 cases, which includes a summary of the underlying facts of each of the proceedings, the current status of each of the proceedings, and, importantly, for certain of the proceedings, the Debtors' understanding of the potential impact (if any) on creditor recoveries.  This summary includes a description of the Cassidy Class Action and the Robertson Class Action.  The Debtors do not believe that the claims asserted, by Robertson or otherwise, will have a material impact on creditor recoveries.  But the risk factors included in the Amended Disclosure Statement address the potentially adverse effects of litigation, including litigation arising out of or otherwise related to these chapter 11 cases. Such disclosure satisfies the requirements of the Bankruptcy Code and further disclosure is not required. | Article VII.H.2(a)–(c), Article VIII.D.2 |
| **Adequate Information**. The Amended Disclosure Statement fails to adequately describe the opt-in provision. | AHG Objection, ¶¶ 51–52 | The Amended Disclosure Statement explicitly provides that the releases are "opt in" and describes the nature of such releases. All Holders of Claims and Interests have the requisite information necessary to determine whether to object to the Debtor releases, and whether to opt into the third party release provisions in the Plan. | Article III.M |
| **Adequate Information**. The Amended Disclosure Statement fails to adequately describe the substantive consolidation contemplated by the Plan. | AHG Objection, ¶¶ 53–60 | The Amended Disclosure Statement explicitly states that the Debtors are not being substantively consolidated under the Plan.  Further, the Amended Disclosure Statement splits Claims in Class 5 (General Unsecured Claims) into three subclasses at each Debtor entity: (i) Class 5A Claims (OpCo General Unsecured Claims); (ii) Class 5B Claims (HoldCo General Unsecured Claims); and (iii) Class 5C Claims (TopCo General Unsecured Claims). | Article III.D, Article VIII.A(2)(a) |
| **Adequate Information**. The details of the Debtors' D&O Liability Insurance Policies must be disclosed. | Robertson Supplemental Objection, ¶¶ 17 | The Amended Disclosure Statement provides an overview of the D&O Insurance Policies, including coverage amounts and other related information. | Article IV.A.5 |

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| **Adequate Information**. The Amended Disclosure Statement inadequately describes the treatment of VGX. | Robertson Supplemental Objection, ¶¶ 18–20; Gentilini Objection, ¶ 2 | Any Claim on account of VGX Token is classified as an Account Holder Claim, and all Account Holder Claims and recoveries will be treated in an identical manner and, as such, Holders of Account Holder Claims will receive their pro rata share of the value of the Cryptocurrency on Voyager's platform, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other Cryptocurrency in their account. See id. As clearly laid out in the Amended Disclosure Statement, each Account Holder is afforded the same opportunity to recover its equal share of Cryptocurrency and other treatment as contemplated under the Plan.<br><br>Additionally, FTX US has offered to purchase all VGX held in the Debtors' Estates for a purchase price of $10 million. The $10 million offer is a floor of what the Debtors will receive for VGX. The Debtors continue to engage in discussions with third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US Asset Purchase Agreement. Further, the Amended Disclosure Statement clearly states that if the Debtors are unable to identify a higher and better solution for VGX, the Debtors will accept FTX US's offer and, as a result, VGX may decline in value and may have no value post consummation of the Plan. | Article II, Exhibit C |
| **Adequate Information**. The Amended Disclosure Statement inadequately describes the methodology behind the recovery percentages attributed to Account Holders. | TSSB Objection, ¶¶ 26–28 | The Amended Disclosure Statement goes into great detail regarding customer treatment and recoveries, and how the Debtors calculated estimated recovery under the Plan, including by preparing and providing a bespoke, interactive Excel workbook that is available to the public on the Debtors' Claims, Noticing, and Solicitation Agent's website and allows each Account Holder to determine its hypothetical recovery with respect to each Holder's specific Cryptocurrency as part of the Sale Transaction. | Exhibit C; Account Holder Illustrative Analysis (available on Claims, Noticing, and Solicitation Agent's Website) |
| **Liquidating Plan**. The Amended Disclosure Statement fails to state whether the Plan is a liquidating plan. | U.S. Trustee Objection, Section B | The Debtors removed any references to discharge of the Debtors from the Plan. | Plan Article VIII |
| **Ballots**. The Amended Disclosure Statement does not include the form of Ballots. | U.S. Trustee Objection, Section D | The Debtors filed revised solicitation materials, including form of Ballots, at Docket No. 547. | Revised Solicitation Materials [Docket No. 547] |
| **Avoidance Actions**. The Plan and Asset Purchase Agreement contain contradictory provisions regarding Avoidance Actions. | U.S. Trustee Objection, Section F | The Amended Disclosure Statement clarifies the sale of Avoidance Actions to FTX US, and the Debtors filed an amended Asset Purchase Agreement [Docket No. 548] that further clarifies the sale of such Avoidance Actions. | Article VII.N, Asset Purchase Agreement 1.1(d) |

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| **Dollarization**. The Debtors inadequately describe the cryptocurrency dollarized under the Plan and how Cryptocurrency assets are valued under the Plan. The Plan does not comply with Section 502(b) of the Bankruptcy Code. | Robertson Supplemental Objection, ¶¶ 14; AHG Objection, ¶¶ 11, 76 | The Amended Disclosure Statement provides additional detail regarding "dollarization" including, among other things, that Account Holder Claims will be valued in U.S. dollars as of the Petition Date, consistent with section 502(b) of the Bankruptcy Code. The Amended Disclosure Statement also provides that only those Account Holders that become Transferred Creditors at least one Business Day prior to the Effective Date and who maintain Cryptocurrency in their Account that is supported by FTX US will receive their initial distributions under the Plan in-kind (i.e., in the form of Cryptocurrency) deposited into their FTX US Accounts. If (x) FTX US does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (y) a Transferred Creditor did not maintain Cryptocurrency in its Account, or (z) a Transferred Creditor becomes a Transferred Creditor after such date but before the final migration cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, such Transferred Creditor will receive their share of the initial distribution in the form of USDC. Account Holders who do not become Transferred Customers will not be eligible to receive any portion of the initial distribution from FTX US. All distributions to such Account Holders and all other distributions will be made on a pro rata basis in cash from the Debtors' Estates. <br><br> Exhibit C to the Amended Disclosure Statement, along with a detailed description of the distribution process, provides that the purchase price of OpCo's Cryptocurrency, other than VGX, will be determined based on the average coin prices for the 20 calendar days during the reference period.. | Plan Article III.C.3; Exhibit C |
| **Robertson Insert**. Robertson should be allowed to attach a letter to the Debtors' Solicitation Packages. | Robertson Supplemental Objection, ¶¶ 13 | This request is frivolous and Robertson's efforts to solicit class action plaintiffs through the Debtors' bankruptcy process is completely improper. As described in the Amended Disclosure Statement, if Robertson's claims are actually direct third party claims against non Debtor parties, they are not released by the Plan. The Amended Disclosure Statement does not need to address Robertson's lawsuit in any further detail. | Article III.M, Article IV.A.3 |
| **Solicitation Timeline**. The deadline to file the Plan Supplement is improper. | Robertson Supplemental Objection, ¶¶ 12 | The Debtors will file the Plan Supplement one week before the Voting Deadline, which provides creditors with sufficient time to review and consider the documents therein, and is consistent with procedures routinely approved in this jurisdiction. | Article IV.E.3 |
| **Solicitation**. The Committee should be authorized to send a letter to voting creditors. | Committee Objection, ¶¶ 39–40 | The Amended Disclosure Statement contains sufficient information for Holders of Claims to vote to accept the Plan. The Debtors have added significant additional disclosure regarding the Special Committee Investigation and the scope of the releases contemplated by the Plan. Accordingly, the Amended Disclosure | Article III.M, Article IV.A.2(b), Article IV.A.3 |

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| | | Statement addresses the Committee's concerns and the inclusion of an additional letter is unnecessary. | |
| **Confirmation-Related Objections** | | | |
| **Releases**.  The releases contained in the plan are overly broad, impermissible, and not consensual. | Committee Objection, ¶¶ 32–38; AHG Objection, ¶¶ 64–71, 80–90; Robertson Objection, ¶¶ 18-28; TSSB Objection, ¶¶ 30–39 | The releases contained in the Plan meet the applicable legal standard because they are fair, reasonable, in the best interests of the Debtors' estates, and structured as "opt in" releases.  Moreover, the breadth of the releases is consistent with those regularly approved in this jurisdiction and others.  The releases, including the settlements with the Debtors' CEO and CCO,  are also an integral part of the Plan<br><br>Objections to the permissibility of the releases are premature and relate to the Confirmation of the Plan. The Debtors intend to further establish the bases for approval of the releases at the Confirmation Hearing.<br><br>Objections stating that the Debtors are attempting to "backdoor" non-consensual third-party releases are incorrect.  The Amended Disclosure Statement clearly states that the third-party release is an "opt-in," and therefore fully consensual release. | Article III.M, Article IV.A.2(b), Article IV.A.3 |
| **Equity Interests**.   The premature cancellation of equity interests warrants denial of the Amended Disclosure Statement. | AHG Objection, ¶¶ 64–71 | The Plan does not discriminate unfairly and is equitable as to each Impaired Class of Claims or Interests.  The Debtors are prepared to meet their burden pursuant to section 1129(b)(1) that the Plan does not violate the prohibition on unfair discrimination at the appropriate time—the Confirmation Hearing. | Article IV.C.2 |
| **Intercompany Claims**. The Amended Disclosure Statement fails to adequately describe the nature, value, bases, and treatment of Intercompany Claims. | AHG Objection, ¶¶ 40–45 | Objections to the treatment of Intercompany  Claims are premature.  The Debtors are prepared to meet their evidentiary burden (if any) with respect to such matters at the Confirmation Hearing, and the rights of all parties with respect to the classification of Claims and Interests under the Plan are fully reserved and preserved and may be raised as objections to Confirmation of the Plan.<br><br>While the Debtors will address that issue in more detail at confirmation, the Ad Hoc Equity Group is incorrect.  There are nine intercompany obligations owed between Debtor entities, largely to permit TopCo to provide the requisite capital necessary upon receipt of third-party equity investments to OpCo to operate the Debtors' business. Of the three intercompany obligations that are documented (six of the nine intercompany obligations are not documented), such intercompany obligations were structured to optimize tax positions in the most efficient manner.<br><br>The Debtors, as disclosed in Article IV.C.2 of the Amended Disclosure Statement, made the preliminary determination that at least eight of the nine intercompany obligations are equity contributions.  If challenged, the Debtors will take the | Article IV.C.2 |

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| | | requisite steps to effectuate that recharacterization. The Amended Disclosure Statement assumes that the intercompany obligations will be recharacterized as equity contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the relevant Debtor entity. Further, the Amended Disclosure Statement appropriately discloses the potential risks associated with creditor recoveries if the intercompany obligations are determined to be valid loans. With this disclosure, the Debtors have provided Holders of Claims in the voting Classes with sufficient information to make an informed decision to accept or reject the Plan. | |
| **Disparate Treatment**. The Amended Disclosure Statement improperly classified and treats Account Holder Claims. | Gentilini Objection, ¶¶ 1–2 | Objections to the permissibility of the Debtors' classification scheme is premature. The Debtors are prepared to meet their evidentiary burden (if any) with respect to such matters at the Confirmation Hearing, and the rights of all parties with respect to the classification of Claims and Interests under the Plan are fully reserved and preserved and may be raised as objections to Confirmation of the Plan.<br><br>While the Debtors will address that issue in more detail at confirmation, the Debtors' classification scheme is proper. Claims classified in Class 3 are substantially similar in terms of their legal rights against the Debtors under the Bankruptcy Code and their priority under the Plan as they are all *pari passu* unsecured claims based on Cryptocurrency in the customers' accounts.<br><br>Further, there is no unfair discrimination amongst Account Holders because all Account Holders are receiving exactly the same recovery under the Plan. All Account Holder claims are "dollarized" as of the Petition Date— each Account Holder's Claim is determined by the fair market value of the Cryptocurrency (based in U.S. Dollars) held by the Account Holder as of July 5th, 2022 at 00:00 UTC. See Amended Disclosure Statement, Exhibit C. Some Account Holders will receive their distribution in Cash and some will receive their distribution in Cryptocurrency, but each Account Holder will receive the same value of recovery on account of their Claim. See id. The Debtors are unable to assess the tax implications of receiving Cryptocurrency or Cash for any particular Account Holder, and they are not required to do so by the Bankruptcy Code, applicable law or otherwise. Instead, the Debtors are required to distribute equivalent value to each Account Holder, and the treatment for Account Holder Claims contemplated by the Plan satisfies that requirement. | Exhibit C |
| **Violation of State Law**. The Debtors are not in compliance with state law. | TSSB Objection, ¶¶ 46–59 | This Objection is premature, as it operates as a "backdoor" objection to confirmation of the Plan and consummation of the Sale. The Debtors have thoroughly disclosed the risks related to compliance with both state and federal laws and their respective regulations. The Amended Disclosure Statement contains a comprehensive summary of ongoing regulatory investigations against the Debtors and fully discloses the risks associated with the regulatory landscape in which the Debtors | Article VIII.D |

| Chart of Objections Received to the Debtors' Amended Disclosure Statement[1] | | | |
|---|---|---|---|
| **Objection** | **Objection** | **Debtors' Response** | **Applicable Provision** |
| | | operate. By such disclosure, the Debtors meet the standard and provide the information necessary for a voter to decide to accept or reject the Plan. Additionally, the Debtors have agreed to add language, with certain modifications, into the revised proposed Disclosure Statement Order to address the TSSB Objectors' concerns. | |
| **Class 4 Voting**. Holders of Class 4 Claims should not be entitled to vote on the Plan. | Gentilini Objection, ¶ 3 | The Holder of Claims in Class 4 is entitled to a recovery with respect to their Alameda Loan Facility Claims. Instead of recovering on those Claims, and as part of the consideration given to the Debtors pursuant to the sale transaction, Alameda elected to contractually convey its recovery on the Alameda Loan Facility Claims, and transfer all rights, title, and interest in the Alameda Loan Facility Claims at TopCo and HoldCo to OpCo. The Alameda Loan Facility Claims are impaired under the Plan, and the fact that Alameda is agreeing to convey its recovery to another Debtor entity (for the benefit of other creditors) does not strip the Holder of Claims in Class 4 of its entitlement to vote. | Article X.E |