Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF**
**FIRST AMENDED DISCLOSURE STATEMENT RELATING TO THE SECOND**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE THAT** on August 12, 2022, the Debtors filed the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*) [Docket No. 288].

**PLEASE TAKE FURTHER NOTICE THAT** on October 5, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498].

**PLEASE TAKE FURTHER NOTICE THAT** on October 17, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 540].

**PLEASE TAKE FURTHER NOTICE THAT** on October 19, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 565].

**PLEASE TAKE FURTHER NOTICE THAT** on October 20, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 585] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* attached hereto as **Exhibit A** (the "First Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE THAT** a comparison between the Disclosure Statement and the First Amended Disclosure Statement, is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Initial Disclosure Statement, First Amended Disclosure Statement, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at

http://www.cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting

the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees

set forth therein.

[*Remainder of page intentionally left blank.*]

Dated:  October 24, 2022          /s/ Joshua A. Sussberg
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:     (212) 446-4800
                                  Facsimile:     (212) 446-4900
                                  Email:         jsussberg@kirkland.com
                                                 cmarcus@kirkland.com
                                                 christine.okike@kirkland.com
                                                 allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**First Amended Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE SECOND AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

---

[1]     The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ........................................1

**I.        INTRODUCTION** ...........................................................................................................................7

**II.       PRELIMINARY STATEMENT** ..................................................................................................7

**III.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
           THE PLAN** ...................................................................................................................................11

            A.       What is chapter 11?.............................................................................................................11
            B.       Why are the Debtors sending me this Disclosure Statement? .............................................11
            C.       Am I entitled to vote on the Plan?.......................................................................................11
            D.       What will I receive from the Debtors if the Plan is consummated? .....................................12
            E.       What will I receive from the Debtors if I hold an Allowed Administrative Claim? ..............16
            F.       How will my Account be transitioned to FTX US? ..............................................................16
            G.       What if I am unable or unwilling to transition my Account to FTX US? ..............................16
            H.       What are the sources of Consideration and other consideration required to fund the Plan? ...17
            I.       Are any regulatory approvals required to consummate the Sale Transaction and confirm
                     the Plan?..............................................................................................................................17
            J.       What happens to my recovery if the Plan is not confirmed or does not go effective? ...........18
            K.       If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                     Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                     "Consummation"?................................................................................................................18
            L.       Is there potential litigation related to the Plan?..................................................................18
            M.       Will there be releases and exculpation granted to parties in interest as part of the Plan? .......18
            N.       What is the deadline to vote on the Plan? ..........................................................................19
            O.       How do I vote for or against the Plan? ...............................................................................20
            P.       Why is the Bankruptcy Court holding a Confirmation Hearing?..........................................20
            Q.       When is the Confirmation Hearing set to occur? ..............................................................20
            R.       What is the purpose of the Confirmation Hearing?..............................................................20
            S.       What is the effect of the Plan on the Debtors' ongoing business? ........................................20
            T.       What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ...............20
            U.       Who do I contact if I have additional questions with respect to this Disclosure Statement
                     or the Plan? .........................................................................................................................21

**IV.      THE DEBTORS' PLAN** ...............................................................................................................21

            A.       The Plan. .............................................................................................................................21
            B.       The Sale Transaction............................................................................................................26
            C.       Means for Implementation of the Plan. ...............................................................................26

**V.       THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE**....................29

            A.       The Debtors' Corporate Structure and History. ...................................................................29
            B.       The Debtors' Assets and Operations.....................................................................................30
            C.       The Debtors' Capital Structure. ...........................................................................................32

**VI.      EVENTS LEADING TO THESE CHAPTER 11 CASES** ........................................................35

            A.       Market and Industry-Specific Challenges. ...........................................................................35
            B.       The Alameda Loan.................................................................................................................43
            C.       Retention of Restructuring Advisors and Initial Third-Party Outreach...............................43
            D.       Governance Initiatives. ........................................................................................................44
            E.       Voyager's Decision to Commence these Chapter 11 Cases..................................................44

**VII.     EVENTS OF THE CHAPTER 11 CASES** .................................................................................45

            A.       The Stand-Alone Plan. .........................................................................................................45

B.       First and Second Day Relief and Other Case Matters. ...................................................45
C.       Appointment of Unsecured Creditors' Committee. ......................................................47
D.       Schedules and Statements. ...........................................................................................47
E.       Bar Date Motion. ..........................................................................................................47
F.       The FBO Motion. ..........................................................................................................47
G.       The 3AC Liquidation Proceeding. ................................................................................48
H.       Litigation Matters. ........................................................................................................49
I.       The Coinify Sale. ...........................................................................................................51
J.       The Key Employee Retention Plan. ..............................................................................51
K.       Canadian Recognition Proceeding. ...............................................................................52
L.       The Unwind Motion. .....................................................................................................52
M.       The Request for Appointment of an Equity Committee. ...............................................52
N.       The Post-Petition Sale Process. ....................................................................................52
O.       The Special Committee Investigation. ..........................................................................53

VIII.    RISK FACTORS ........................................................................................................................54

A.       Risks Related to the Restructuring. ...............................................................................54
B.       Risks Related to Recoveries under the Plan. .................................................................58
C.       Disclosure Statement Disclaimer. .................................................................................58
D.       Miscellaneous Risk Factors and Disclaimers. ..............................................................60

IX.      SOLICITATION AND VOTING PROCEDURES ..................................................................64

A.       Classes Entitled to Vote on the Plan. ............................................................................64
B.       Votes Required for Acceptance by a Class. ...................................................................64
C.       Certain Factors to Be Considered Prior to Voting. .......................................................64
D.       Classes Not Entitled To Vote on the Plan. ....................................................................65
E.       Solicitation Procedures. .................................................................................................65
F.       Voting Procedures. ........................................................................................................66
G.       Voting Tabulation. .........................................................................................................67
H.       Ballots Not Counted. .....................................................................................................67

X.       CONFIRMATION OF THE PLAN ..........................................................................................68

A.       Requirements of Section 1129(a) of the Bankruptcy Code. ..........................................68
B.       Best Interests of Creditors—Liquidation Analysis. ......................................................69
C.       Feasibility. .....................................................................................................................70
D.       Acceptance by Impaired Classes. ..................................................................................70
E.       Confirmation without Acceptance by All Impaired Classes. .........................................70

XI.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
         PLAN ...........................................................................................................................................71

A.       Introduction. ..................................................................................................................71
B.       Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ................73
C.       Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
         Claims Entitled to Vote. ................................................................................................74

XII.     RECOMMENDATION OF THE DEBTORS .........................................................................80

**EXHIBITS**

EXHIBIT A        Plan

EXHIBIT B        Liquidation Analysis

EXHIBIT C        Frequently Asked Questions & Answers

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED OCTOBER 24, 2022

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE SECOND AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4 | Alameda Loan Facility Claims |
| 5A | OpCo General Unsecured Claims |
| 5B | HoldCo General Unsecured Claims |
| 5C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.     Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on November 29, 2022). |
| 2.     Ballots may be returned by the following methods: |
|     a)  For Holders of Account Holder Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting. |
|     b)  For Holders of Alameda Loan Facility Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting. |
|     c)  For Holders of General Unsecured Claims:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (ii) via first class mail, overnight courier, or hand delivery to the address set forth below: |
| <div align="center">Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602</div> |
| If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO

AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I.    INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "Debtors," the "Company," or "Voyager") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (as supplemented or amended from time to time, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by the downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Ultimately, those efforts were successful. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("FTX US" or "Purchaser") as the winning bid. The Debtors value FTX US's bid at approximately $1.422 billion, comprised of (i) the value of Cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value. Importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, FTX US will purchase all Cryptocurrency on the Voyager platform, other than VGX, at fair market value as of a to be determined date. The fair market value of any Cryptocurrency other than VGX will be calculated by Purchaser reasonably and in good faith based on market practice, available pricing information, and mutually agreed principles.

FTX US has offered to purchase all VGX in the Debtors' Estates for a purchase price of $10 million. This is a floor of what the Debtors will receive for VGX. The Debtors continue to work internally and with third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US Asset Purchase Agreement and are hopeful they will be able to do so. Any such alternative solution, to be acceptable, must deliver value to the Debtors and their Estates that exceeds $10 million and must be compatible with the agreements between the Debtors and FTX US. If the Debtors are unable to identify a higher and better solution for VGX, the Debtors will accept FTX US's offer and, as a result, VGX may decline in value and may have no value post-consummation of the Plan.

As described further in Article IV.C.6 of this Disclosure Statement, the Debtors will effectuate the transition of Account Holders to the FTX US platform pursuant to the Customer Migration Protocol, which will be included in the Plan Supplement and will be filed with the Bankruptcy Court at least 14 days in advance of the Voting Deadline. **The Customer Migration Protocol will provide, among other things, that only those Account Holders that**

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

**become Transferred Creditors at least one Business Day prior to the Effective Date and who maintain Cryptocurrency in their Account that is supported by FTX US will receive their initial distributions under the Plan in-kind (*i.e.*, in the form of Cryptocurrency) deposited into their FTX US Accounts**.  If (x) Purchaser does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (y) a Transferred Creditor did not maintain Cryptocurrency in its Account, or (z) a Transferred Creditor becomes a Transferred Creditor after such date but before the final migration cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, such Transferred Creditor will receive their share of the initial distribution in the form of USDC.  Account Holders who do not become Transferred Customers will not be eligible to receive any portion of the initial distribution from FTX US.  All distributions to such Account Holders and all other distributions will be made on a pro rata basis in cash from the Debtors' Estates.

It is anticipated that all Voyager customers will be transitioning to FTX US.  In the event that a customer is not successfully transitioned to FTX US, such customer will not be eligible for the $50 Account Credit (as discussed below).  Any customer that does not transition to FTX US at least one Business Day prior to the Closing Date will not receive the Transferred Cryptocurrency Value in kind.  Subject to the Customer Migration Protocol, any customer who transitions to FTX US after that date but prior to the cutoff will receive its initial distribution in USDC in its FTX US Account.  Any customer that does not transition to FTX US will not receive an initial distribution from FTX US but will receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.  Any subsequent distributions shall be made similarly in accordance with the Customer Migration Protocol or as otherwise provided in Article VI.C.8 of the Plan.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Customer Claim | | | Customer Recovery | | | | |
| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Supported on FTX US | Recovery Type | Illustrative Crypto Recovery %[4] | Recovery Value | # of Coins Recovered[5] |
| BTC | 0.04 | $20,157.69 | $907.07 | Yes | BTC | 70% | $636.85 | 0.03 |
| ETH | 0.19 | 1,131.60 | 214.41 | Yes | ETH | 70% | 150.54 | 0.10 |
| DAI | 49.19 | 1.00 | 49.17 | Yes | DAI | 70% | 34.53 | 34.52 |
| DOGE | 978.43 | 0.07 | 65.64 | Yes | DOGE | 70% | 46.09 | 758.59 |
| ALGO | 123.83 | 0.31 | 38.07 | Yes | ALGO | 70% | 26.73 | 79.74 |
| LINK | 0.29 | 6.31 | 1.83 | Yes | LINK | 70% | 1.28 | 0.17 |
| XRP | 122.38 | 0.33 | 39.79 | No | USDC | 70% | 27.94 | N/A |
| HBAR | 130.66 | 0.06 | 8.05 | No | USDC | 70% | 5.65 | N/A |
| BAND | 24.73 | 1.32 | 32.65 | No | USDC | 70% | 22.92 | N/A |
| VGX | 249.05 | 0.24 | 59.32 | No | USDC | 70% | 41.65 | N/A |
| TRAC | 1,471.96 | 0.19 | 286.88 | No | USDC | 70% | 201.42 | N/A |
| GALA | 2,274.69 | 0.05 | 121.01 | No | USDC | 70% | 84.96 | N/A |
| Claim | | | | | | | | |
| **Value Claimed** | | | | | | | | **$1,823.90** |
| ***Proportion of Total Platform Value*** | | | | | | | | **0.0001%** |

---

[3]   Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[4]   Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on 20-day average coin prices as of September 29th, 2022.  Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]   Illustrative number of coins recovered based on recovery value divided by the 20-day average coin price as of September 29, 2022.  Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such supported cryptocurrency's price during the fair market value reference period prior to the Effective Date.

| Illustrative Recovery | |
|---|---:|
| **Crypto Recovery** | |
| Value Recovered (In Kind) | $896.01 |
| Value Recovered (Converted to U.S. Dollars) | 384.55 |
| **Crypto Value Recovered** | **$1,280.56** |
| *% Crypto Recovery[4]* | *70%* |
| **Other Value Recovered** | **$32.29** |
| *% Other Recovery[6]* | *2%* |
| **Total Value Recovered** | **$1,312.86** |
| *% Total Recovery* | *72%* |

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VI.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VI.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to

---

[6]   Other recovery includes the estimated pro rata distribution to Account Holder Claims from (i) Voyager balance sheet cash, (ii) FTX US upfront cash consideration, (iii) FTX US earnout, (iv) other miscellaneous recoveries, including proceeds from the sale of investments and any 3AC Recovery, net of (i) payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims and (ii) funding of the Wind-Down Reserve. Each Transferred Creditor will also receive the Account Credit from FTX US.

For the purposes of the Disclosure Statement, "Account Credit" means $50 credited to each Transferred Creditor's FTX US Account, subject to the terms and the conditions of the Asset Purchase Agreement.

develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale, and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[7]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by the Purchaser represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[8] and on September 27, 2022, the Debtors and the Purchaser entered into the asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement"). The Bankruptcy Court approved entry into the Asset Purchase Agreement on October 20, 2022.

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

---

[7]    Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[8]    *See Notice of Successful Bidder* [Docket No. 457].

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests;

- consensually conveys Alameda Loan Facility Claims and any recovery on account of such Alameda Loan Facility Claims to OpCo pursuant to the Asset Purchase Agreement; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by November 29, 2022, at 4:00 p.m. prevailing Eastern Time (the "Plan Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on December 8, 2022 at 11:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4 | Alameda Loan Facility Claims | Impaired | Entitled to Vote |
| 5A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.   FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[9]**

---

[9]      The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | NA | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $0.0 | NA | N/A |
| 3 | Account Holder Claims[10] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol; (ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $1,763.9 | 72% | 51%-60% |
| 4 | Alameda Loan Facility Claims | Pursuant to the Asset Purchase Agreement, on the Effective Date, the Alameda Loan Facility Claims shall be deemed Allowed, and all rights, titles, and interests in the Alameda Loan Facility Claims shall be contractually conveyed to OpCo, and OpCo shall be entitled to any recovery on account of the Alameda Loan Facility Claims.   The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement. | $75.1 | 0% (as settled with the Holder of Alameda Loan | 6% |

---

[10] Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | | | Facility Claims)[11] | |
| 5A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol;<br><br>(ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol;<br><br>(iii) its Pro Rata share of Distributable OpCo Cash; and<br><br>(iv) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $12.1 | 72% | 51% - 60% |
| 5B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:<br><br>(i) its Pro Rata share of Distributable HoldCo Cash; and<br><br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to HoldCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $0.0 | 0% | 0% - 0% |
| 5C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:<br><br>(i) its Pro Rata share of Distributable TopCo Cash; and | $2.3 | 2% | 2% |

---

[11]    The Alameda Loan Facility Claims are contributed to OpCo pursuant to the terms of the Asset Purchase Agreement and OpCo shall be entitled to the recovery on account of the Alameda Loan Facility Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; provided that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | N/A | NA | NA |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $6.3[12] | 8% | 4% - 5% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0 | 0% | 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax | $0 | 0% | 0% |

---

[12]   The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions.  The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 herein.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | | | |

**E.        What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.        How will my Account be transitioned to FTX US?**

The Debtors will distribute a Customer Migration Protocol providing for the transition of Account Holders to the FTX US platform and delivery of Plan distributions to such Holders' FTX US Accounts that will describe the transition process in further detail. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to FTX US subject to their successful completion of FTX US's "Know Your Customer" process and other procedural requirements. A separate notice will be sent to all Account Holders through the Voyager platform once the Customer Migration Protocol has been agreed upon by the Debtors and the Purchaser. This notice will describe the steps that Account Holders and Holders of Allowed OpCo General Unsecured Claims must take to transition their accounts to FTX US.  All Account Holders and Holders of Allowed OpCo General Unsecured Claims should review this notice as soon as it becomes available.

**G.        What if I am unable or unwilling to transition my Account to FTX US?**

We expect that virtually all Account Holders will be transitioning to FTX US.  In the event that a customer is not successfully transitioned to FTX US, such customer will not be eligible for the $50 Account Credit, and will not receive the Transferred Cryptocurrency Value in kind.  They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

**H.    What are the sources of Consideration and other consideration required to fund the Plan?**

The Plan will be funded with the proceeds of the Sale Transaction, which the Debtors value at approximately $1.422 billion, consisting primarily of: (a) the value of all Voyager cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, *plus* (b) additional consideration estimated as providing at least approximately $111 million of incremental value that includes (i) a cash payment of $51 million, (ii) an earn out of up to $20 million, (iii) the right of Transferred Creditors to receive a $50 Account Credit, (iv) a cash payment equal to the Acquired Cash, and (v) the transfer to the Debtors of all right, title, and interest in the Alameda Loan Facility Claims.

**I.    Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[13] and has license applications pending[14] in eighteen (18) states.[15]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

The Purchaser maintains money transmission licenses in most, but not all, of the states in which it operates. Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the purchase by Purchaser of the Cryptocurrency of Voyager and the transition of Account Holders and General Unsecured Creditors to FTX US Accounts, subject to the terms and conditions set forth in the Asset Purchase Agreement. State banking departments may seek to limit or condition the Purchaser's acquisition of the Voyager assets to the extent that regulatory concerns are identified.

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money

---

[13]    The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[14]    On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[15]    Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

Transmission Licenses it holds (the "Licensing Wind-Down Process").  Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[16]

**J.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**K.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation.  *See* Article VIII.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations." for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

**M.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.3 of this Disclosure Statement, entitled "Releases."

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee").  The Special Committee consists of the newly appointed independent directors and was established to investigate certain

---

[16]    The state approval process for the surrender of a license typically takes several months.

historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VI.A.2(b)(i)-(ii) below. As described in Article VI.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

N.      **What is the deadline to vote on the Plan?**

The Voting Deadline is November 29, 2022, at 4:00 p.m. (prevailing Eastern Time).

O.        **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

P.        **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

Q.        **When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for Thursday, December 8, 2022, at 11:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by November 29, 2022, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

R.        **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

S.        **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date. On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

T.        **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VI herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options

relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**U.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

## IV.     THE DEBTORS' PLAN

### A.      The Plan.

The Plan contemplates liquidating the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

#### 1.      *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan.  The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors.  The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies.  Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

#### 2.      *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

3.  *Releases*

The Plan contains certain releases, as described in Article III.M of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) Purchaser and each of its Related Parties; (e) Alameda and each of its Related Parties; (f) each of the Released Professionals; and (g) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Holdings, LLC; (xviii) Blake, Cassels & Graydon LLP; and (xix) Sullivan & Cromwell LLP.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Alameda and each of its Related Parties to the extent Alameda is able to bind such Related Parties; (g)  Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (h) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (i) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (j) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan.

(a)        **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of**

any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that, subject to the D&O Settlement, nothing in Article VIII.A of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

(b)    Release by Holders of Claims or Interests.

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

### (c)    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### (d)    Injunction.

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

### 4.  *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement.  The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 5.  *Non-Released D&O Claims*

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve.  Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan.  The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; provided that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims.  For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of the Plan.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of:  (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy").  The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 6.  *Corporate Structure Upon Emergence*

On the Plan Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets.  The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Entity.

Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan and the Sale Transaction and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

**B.        The Sale Transaction.**

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. The Debtors' marketing process resulted in a sale of substantially all assets to FTX US, and is described in Article VII.J of this Disclosure Statement, entitled "The Post-Petition Sale Process."

**C.        Means for Implementation of the Plan.**

        **1.        *Wind-Down Trust.***

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee

and shall be subject to a Wind-Down Trust Oversight Committee.  The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust.  On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

## 2. *Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation.*

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

## 3. *Tax Returns.*

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## 4. *Dissolution of the Wind-Down Debtors.*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors is formed or any other jurisdiction.  The Wind-Down Trustee, however, shall have authority to take all

necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5.   *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6.   *Customer Migration Protocol*

The Transferred Cryptocurrency Value will be determined prior to the Effective Date pursuant to the Asset Purchase Agreement.

As a general matter, the Customer Migration Protocol will provide that Purchaser will make initial distributions to Transferred Creditors corresponding to their Pro Rata amounts of the Transferred Cryptocurrency Value as contemplated in the Customer Migration Protocol. Subject to the conditions set forth in the Customer Migration Protocol, if a Transferred Creditor has become a Transferred Creditor prior to one Business Day prior to the Effective Date and FTX US supports the Cryptocurrency maintained by such Transferred Creditor in such Transferred Creditor's Account (*e.g.*, BTC, ETH), Purchaser will credit to such Transferred Creditor's FTX US Account the Transferred Cryptocurrency Value in kind. Subject to the conditions set forth in the Customer Migration Protocol, if (i) Purchaser does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (ii) a Transferred Creditor did not maintain Cryptocurrency in an Account or (iii) a Transferred Creditor becomes a Transferred Creditor after such date but before the final cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, Purchaser will credit to the FTX Account of such Transferred Creditor USDC in an amount equal to the Transferred Cryptocurrency Value on a Pro Rata basis.

Following such initial distributions to Transferred Creditors, the remaining Cash available on account of the sale of Cryptocurrency to Purchaser under the Asset Purchase Agreement shall be paid by Purchaser to the Debtors and applied by the Debtors to make initial distributions of Transferred Cryptocurrency Value to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims that did not become Transferred Creditors by the cut-off date provided in the Customer Migration Protocol.

Purchaser shall have no responsibility to make any distributions other than the distributions to Transferred Creditors of their Pro Rata share of Transferred Cryptocurrency Value as contemplated by the Customer Migration Protocol. All other distributions shall be made by the Distribution Agent (other than Purchaser) or as the Distribution Agent (other than Purchaser) shall otherwise determine.

### 7.   *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined. After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them. Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution. For the avoidance of doubt, any

recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. . No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## V.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held.  Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[17]  A simplified version of the Debtors' current corporate structure is as follows:

---

[17]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.



### B. The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1. The Trading Platform.

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a

high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2. *Custodial Services.*

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3. *Staking.*

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4. *Voyager's Lending Program.*[18]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5. *Voyager's Investments.*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6. *Using Voyager's Platform.*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager

---

[18]    The Lending Program is described in further detail in the First Day Declaration.

Digital, LLC.  When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock").  All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform.  If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account.  If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### C.    The Debtors' Capital Structure.

#### 1.    The Debtors' Debt Obligations.

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility") with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[19]  However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions.  The aggregate value of the USDC outstanding is $75 million.[20]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date.  Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

#### 2.    The Debtors' Intercompany Obligations.

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations").  The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo.  Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables").  Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors.  Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.  Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced.  This Disclosure Statement assumes that five out of the six Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

---

[19]    Assuming a Bitcoin price of $20,000.

[20]    As a stablecoin, USDC is pegged to $1 per coin.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

(a)    **Intercompany Obligations by OpCo to TopCo.**

i.    ***The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021.***

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

ii.    ***The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021.***

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February

33

2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.    ***The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC.***

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.    ***The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC.***

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

(b)    **Intercompany Obligation by OpCo to HoldCo.**

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VI.A-B of this Disclosure Statement. Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

Alameda disputes the treatment of this Intercompany Obligation. Pursuant to the Asset Purchase Agreement, FTX US has agreed to contractually convey the Alameda Loan Facility Claims to OpCo.

(c)    **Intercompany Obligation by HoldCo to TopCo.**

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note"). The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo. To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo. In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe that, if litigated, the Promissory Note may be determined to be a valid loan. Although the Promissory Note was entered into after the amount was already funded to HoldCo, the fact that TopCo made a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note may result in the Promissory Note being a loan.

#### (d)    Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities. The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors.*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

#### 1.    *2020 and 2021 Market Conditions.*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether.  Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash."  Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well.  The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth.  Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic.  Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent.  The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021.  In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure.  Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth.  On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal.  But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets.  On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War").  The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well.  Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period.  Rising inflation and commodity prices contributed to investor pessimism and further sell-offs.  In June 2022, market analysts officially labeled 2022 as a bear market.

### 2.    *Cryptocurrency Industry-Wide Sell-off.*

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry.  All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date.  Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew.  In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021.  The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter."  The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a)    **The Terra Luna Collapse.**

Terra is an open-source blockchain protocol created by Terraform Labs.  Similar to the Ethereum blockchain (which issues Ether for use on its platform), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain.  In early May 2022, Luna traded at approximately $86 per share and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin.  Historically, UST traded at $1 per share. UST maintained its "peg" to Luna via an arbitrage mechanism.  If UST traded above $1, arbitrageurs bought $1 worth

of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit.  If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit.  These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either.  To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold.  The sale moved UST's per share price down to $0.91.  UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins.  Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude.  Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day.  Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna.  Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline.  Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful.  The per-share price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike.  The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

**(b)      The Making and Recalling of the Three Arrows Capital Loan.**

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in their business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[21] Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

> [P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[22]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[23]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[24]

---

[21]   December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=033384 05&docId=5134463.

[22]   August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[23]   *Id.* at 6.

[24]   *Id.* 20-21.

These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[25] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

---

[25]    *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[26] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV

---

[26]   While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12. On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses. In light of this, Voyager did not believe it needed to recall the loans to 3AC.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion. At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[27] Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC. On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius. The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[28] Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap." Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees. Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement. Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions. 3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.       ***The Special Committee Investigation.***

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e)

---

[27]    *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06eccc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[28]    Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[29]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material. Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties. The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things: Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG. At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient. BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation. Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above. In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee. In particular, Special Committee Counsel held five formal videoconference meetings with

---

[29]    See Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards. The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

## ii.    *Investigation Report, Conclusions, and Proposed Settlements.*

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO[30], related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[31]

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
| **Releases and Waivers by the Officers against the Debtors** | CEO and CCO agree to release all Causes of Action they may have against the Estates. |
| | CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full. |
| | CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification. |
| | CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's |

---

[30]    Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[31]    The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

|  | claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

**B.    The Alameda Loan.**

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, the Company entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions.

**C.    Retention of Restructuring Advisors and Initial Third-Party Outreach.**

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in

the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below.  Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry.  By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents.  In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.  Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis.  Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction.  However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D.    Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors:  (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E.    Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's

business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[32]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business.  However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VII.    EVENTS OF THE CHAPTER 11 CASES

### A.    The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement").  As discussed in greater detail in Article II herein, the Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan.  The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)     **The Joint Administration Order** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)    **The Foreign Representative Order** authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)   **The Credit Matrix Order** authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv)    **The Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

---

[32]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

(v)       *The Schedules and Statements Order* authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by 30 days [Docket No. 59];

(vi)      *Order Retaining Stretto as Noticing Agent* authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)     *The Wages Order* authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)    *The Taxes Order* authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)      *The Interim Cash Management Orders* authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[33]

(x)       *The NOL Order* approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)      *The Insurance Order* authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)     *The Case Management Order* authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)       *The Interim Compensation Order* approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)      *The Ordinary Course Professionals Order* approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)     *Applications to Retain Professionals* postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

i.        Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];

ii.       Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299];

iii.      Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297];

---

[33]    On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

  iv. Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]; and

  v. Stretto, Inc. as administrative advisor [Docket No. 241].

  The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

  **C.** **Appointment of Unsecured Creditors' Committee.**

  On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[34] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[35]

  **D.** **Schedules and Statements.**

  On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional 30 days for a total of 44 days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

  On August 18, 2022, August 19, 2022, August 22, 2022, and September 15, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, and 430]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

  **E.** **Bar Date Motion.**

  On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time. The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

  **F.** **The FBO Motion.**

  On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course*

---

[34] *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

[35] *See* Docket Nos. 403 and 404.

*Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion"). The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the FBO Accounts. To date, the Debtors have returned approximately $245.75 million of customer funds from the FBO Accounts.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan.**

**G.    The 3AC Liquidation Proceeding.**

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[36] On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[37]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the the five creditors appointed to the committee.[38] Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC

---

[36]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[37]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[38]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

Recovery"). As set forth in greater detail in Article III.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

## H. Litigation Matters.

### 1. *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### 2. *Certain Adversary Proceedings*

#### (a) *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[39] The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing. On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[40] On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[41]

#### (b) *Voyager Digital Holdings, Inc. v. Robertson, et al.*

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*. The named plaintiff was a Voyager customer. His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46). *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date. The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case. Those motions were pending on the Petition Date. Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

---

[39] *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[40] *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[41] *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action"). The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws. The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform." Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[42] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

### (c)    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[43] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022 pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On October 14, 2022, the Debtors filed a motion to dismiss the *Giacobbe* Complaint [Docket Nos. 7, 8].

### (d)    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[44] On September 30, 2022, the Lavines

---

[42]    *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[43]    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[44]    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

### I.    The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

### J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K.    Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.    The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.    The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for November 15, 2022. [Docket No. 444, 500].

### N.    The Post-Petition Sale Process.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Article II herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process.

Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the Purchaser's bid was the highest and best bid and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and the Purchaser entered into the Asset Purchase Agreement. The Debtors value FTX US's bid at approximately $1.422 billion, comprised of (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value. Pursuant to the Asset Purchase Agreement, FTX US is acquiring all Avoidance Actions or other affirmative Causes of Action or Claims against OpCo's customers solely to the extent that such Causes of Action or claims are against a customer in such person's capacity as a customer of OpCo, and borrowers under the Acquired Cryptocurrency Loans (as defined in the Asset Purchase Agreement) solely to the extent that such Causes of Action or Claims are against a borrower in such person's capacity as a borrower under the Acquired Cryptocurrency Loans. The Debtors do not believe that valid Avoidance Actions exist against Account Holders because any transactions with Account Holders were completed in the ordinary course of business consistent with past practices.

Importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's Bid are set forth in greater detail in the Asset Purchase Agreement, attached to the Plan as Exhibit A. Due to this comprehensive marketing process and robust Auction, the Sale provides all creditors with significantly more value through the Sale than they would have received had the Debtors accepted FTX US's original offer.

On September 28, 2022, the Debtors filed the Sale Motion, which seeks approval of the Debtors' entry into the Asset Purchase Agreement and authority to perform its obligations under the Asset Purchase Agreement.

**O.      The Special Committee Investigation.**

As described in Article VI.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence

performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## VIII.  RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.  Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

**1.  *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.***

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

### 2.   *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)   **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b)   **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

### (c)   **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d)   **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests

within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)        **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

(f)        **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

(g)        **Filing of a Competing Plan.**

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

(h)        **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under

chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

> (i)      **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

> (j)      **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

> (k)      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

> (l)      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

> **3.      *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.***

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

> **4.      *Governmental Approvals May Not Be Granted.***

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.        **Risks Related to Recoveries under the Plan.**

1.        *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.        *The Debtors Are Subject to the Volatility of Cryptocurrency.*

The volatility of cryptocurrency may adversely affect the fair market value to be paid by Purchaser for Voyager's Cryptocurrency as determined by the Asset Purchase Agreement, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of September 26, 2022.

3.        *The Plan Will Likely Diminish the Value of VGX.*

Given that the Debtors' business operations will be winding down following the Effective Date and consummation of the Sale Transaction, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and the Purchaser is not assuming these obligations. Purchaser has offered to purchase all VGX in the Debtors' Estates for $10 million. Accordingly, for purposes of estimated recoveries, the Debtors have assumed a $10 million purchase price for VGX. The Debtors continue to engage with third parties regarding a sale of VGX that may provide additional recovery to Holders of Claims.

4.        *The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

5.        *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

C.        **Disclosure Statement Disclaimer.**

1.        *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.        *No Legal or Tax Advice Is Provided By This Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure

Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

### 3.      *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.      *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 5.      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7.      *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.    VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

D.    **Miscellaneous Risk Factors and Disclaimers.**

1.    *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition.*[45]

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in III.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

2.    *The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations.*

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account")

---

[45]    Certain regulatory bodies have already commenced actions, which are described in Article VIII.D.2 herein.

involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager, which Voyager is in the process of preparing.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager is in the process of responding to such requests.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[46] on March 29, 2022, which required a response within 28 days. Alabama extended the response deadline to January 5, 2023. On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[47] on March 29, 2022. Indiana submitted a motion extending the time by which Voyager must respond to the order and request a hearing. Voyager submitted a second and third motion extending that deadline until October 31, 2022.

Kentucky issued an emergency cease and desist order[48] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the

---

[46] Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

[47] Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[48] Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

option to request a hearing, but otherwise, there is no pending deadline.  Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order.  Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers.  Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[49] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022.  Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. However, all response deadlines have been extended until October 31, 2022.

Oklahoma issued a cease and desist order[50] on March 29, 2022.  At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022.  Most recently on August 1, 2022, Oklahoma extended the deadline by which to respond to the order and request a hearing until October 31, 2022.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[51] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until November 30, 2022.

Vermont issued a show cause order on March 29, 2022.  At Voyager's request, Vermont extended the deadline to respond to the order multiple times.  On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings.  Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials.  On September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for 90 days.

Washington issued a statement of charges and notice of opportunity for a hearing[52] on March 29, 2022.  In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing.  On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing.  Washington agreed to extend all applicable response deadlines until October 1, 2022**.** Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

---

[49]    New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[50]    Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[51]    South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation.  The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

[52]    Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs.  The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

Texas issued a notice of hearing[53] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.

California issued a desist and refrain order[54] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[55] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

Alaska issued a cease and desist order[56] and notice of opportunity to request a hearing, on September 3, 2022. Per the notice, Voyager has 30 days to request a hearing. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

### 3.    *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

---

[53]    The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[54]    California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[55]    Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

[56]    Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts in Alaska; and from accepting any assets into existing accounts. Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

       **4.**     *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.*

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4 | Alameda Loan Facility Claims | Impaired |
| 5A | OpCo General Unsecured Claims | Impaired |
| 5B | HoldCo General Unsecured Claims | Impaired |
| 5C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a plan of reorganization by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

**D.     Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

**E.     Solicitation Procedures.**

**1.     *Claims, Noticing, and Solicitation Agent.***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.     *Solicitation Package.***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3. *Distribution of the Solicitation Package and Plan Supplement.*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by November 1, 2022 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than 14 days before the Voting Deadline, the Debtors will file the Customer Migration Protocol and the Schedule of Retained Causes of Action as part of the Plan Supplement. No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

### F. Voting Procedures

October 19, 2022 (the "Voting Record Date") is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on November 29, 2022, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.       **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report").  The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

H.       **Ballots Not Counted.**

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
> PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER
> AT (855) 473-8665.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT
> IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4 Alameda Loan Facility Claims, Holders of Class 5A OpCo General Unsecured Claims, Holders of Class 5B HoldCo General Unsecured Claims, Holders of Class 5C TopCo General Unsecured Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.      Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction to FTX US. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Sale Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. Notably, the Alameda Loan Facility Claims are Impaired under the Plan and the Alameda Loan Facility Claims are being contractually conveyed to OpCo pursuant to the Asset Purchase Agreement. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement. If the Plan is confirmed, OpCo is entitled to any recovery on account of the Alameda Loan Facility Claims under the Plan. Accordingly, OpCo has a Claim against HoldCo and TopCo on account of the Alameda Loan Facility Claims and TopCo and HoldCo reserve the right to dispute such Claim.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing

the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 5A OpCo General Unsecured Claims are treated the same under the Plan, Class 5B HoldCo General Unsecured Claims and Class 5C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, as applicable, and the Holder of the Class 4 Alameda Loan Facility Claims has agreed to settle such claim through the Asset Purchase Agreement. Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.    *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

#### (a)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### (b)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject

the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser (including, for the avoidance of doubt, in Purchaser's capacity as a Holder of Interests in the Debtors), Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review). Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid

election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

### B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.

The Plan is being structured as a taxable sale of certain assets of the Debtors (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain will be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors will in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of the Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Taxable Transaction, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a taxable transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are

generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.  The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

C.     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[57] of Allowed Claims Entitled to Vote.**

1.     *Taxable Transaction.*

(a)     **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)**

Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:  (i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions from a Wind-Down Debtor or on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

There is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Clams (or separate taxable events for both events).  This is the case even though the Taxable Transaction contemplates the migration of customers to an acquiring cryptocurrency platform.  To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance.  There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event.  While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent."  Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058.  On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency is itself not an exchange of property "differing materially either in kind or in extent."  However, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable.   The Debtors believe it would be supportable for Holders to take the position that, pursuant to the

---

[57]     Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

consummation of the Plan whereby customers may migrate to Purchaser's platform (as further described in the Customer Migration Protocol), (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction. The Debtors also continue to study whether this argument, when combined with a general "bifurcation" approach that separates the recovery Holders receive into cryptocurrency and non-cryptocurrency components, may permit Holders to take the position that, in the context of a Taxable Transaction, Holders retain their cryptocurrency positions in a tax-free manner, even if the receipt of other consideration constitutes a taxable exchange. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the argument described above that supports tax-free treatment of an In-Kind Distribution could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an In-Kind Distribution.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concept of a non-taxable in-kind distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).**

Very generally, to the extent a transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-

off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

        **(b)**        **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4 Claims**

All rights, titles, and interests in the Alameda Loan Facility Claims shall be transferred to OpCo, and Holders of Alameda Loan Facility Claims will not receive any distribution on account of such Alameda Loan Facility Claims. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement, pursuant to which its transfer to OpCo is treated as consideration paid by Purchaser for the taxable purchase of the Acquired Assets. As such, U.S. Holders of Allowed Class 4 Claims may recognize gain or loss on the disposition of the Alameda Loan Facility Claims in an amount equal to the difference between their basis in such Claim and the fair market value thereof. The tax consequences to Purchaser and its Affiliates of its acquisition of the Acquired Assets is not further discussed in this discussion.

        **(c)**        **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 5A Claims**

Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions from a Wind-Down Debtor or on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 5A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 5A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

        **(d)**        **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 5B and 5C Claims**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust

Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to HoldCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

(e)    **Net Investment Income Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(f)    **Limitations on Use of Capital Losses**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

2.    ***Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan.***

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform. U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

**3.**    *The Wind-Down Entity.*

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

#### (a)    Liquidating Trust Treatment

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code.  It may be that such treatment does not apply given the structure of the Plan.  If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

#### (b)    Disputed Ownership Fund treatment

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

**4.**    *U.S. Information Reporting and Withholding.*

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess

of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.    THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.    ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.    THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

* * * * *

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:    */s/ Stephen Ehrlich*

Name:    Stephen Ehrlich
Title:    Co-Founder and Chief Executive Officer
Voyager Digital Ltd.

Prepared By:

Dated: October 24, 2022          /s/ Joshua A. Sussberg
New York, New York              **KIRKLAND & ELLIS LLP**
                                **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                Joshua A. Sussberg, P.C.
                                Christopher Marcus, P.C.
                                Christine A. Okike, P.C.
                                Allyson B. Smith (admitted *pro hac vice*)
                                601 Lexington Avenue
                                New York, New York 10022
                                Telephone:  (212) 446-4800
                                Facsimile:  (212) 446-4900

                                *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 590]

**Exhibit B**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC.,** *et al.*[1]

## I.     INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates. As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. This Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about December 31, 2022 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of August 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. Unaudited Financial Statements. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. Chapter 7 Liquidation Costs. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. Distribution of Net Proceeds. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimate used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

   Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. Certain Exclusions and Assumptions. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

## II.    CONCLUSIONS

THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|
| Unclassified | Administrative and Priority Tax Claims | Unimpaired | 100% | 100% | 100% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | NA | NA | NA |
| 3 | Account Holder Claims | Impaired | 72% | 51% | 60% |
| 4 | Alameda Loan Facility Claims[2] | Impaired | N/A | 6% | 6% |
| 5A | OpCo General Unsecured Claims | Impaired | 72% | 51% | 60% |
| 5B | HoldCo General Unsecured Claims | Impaired | N/A | N/A | N/A |
| 5C | TopCo General Unsecured Claims | Impaired | 2% | 2% | 2% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA |
| 7 | Intercompany Claims[3] | Unimpaired | 8% | 4% | 5% |
| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | N/A | N/A |

---

[2]    The Alameda Loan Facility Claims are contributed to OpCo pursuant to the terms of the Asset Purchase Agreement and OpCo shall be entitled to the recovery on account of the Alameda Loan Facility Claims under the Plan. This Liquidation Analysis assumes that the Asset Purchase Agreement is not consummated, the Alameda Loan Facility Claims are not settled and the Holder of the Alameda Loan Facility Claims receives a recovery.

[3]    The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions. The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 of the Disclosure Statement.

### III.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

#### A.    Gross Liquidation Proceeds

1. <u>Cash and Cash Equivalents</u>:  This Liquidation Analysis projects the level of cash balances on hand from October 2, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2. <u>Cryptocurrency Assets Held</u>:  Estimated cryptocurrency values at Conversion Date are based on a 20-day historical average of prices for the period ending September 29, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for market depth and trading dynamics. Asset recovery includes cryptocurrency assets loaned and expected to be returned from counterparties prior to the Conversion Date.

3. <u>Other Assets / Investments (Non-Debtor)</u>: The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4. <u>Claims against 3AC Estate</u>: The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of August 31, 2022. This Liquidation Analysis makes no assumption regarding recovery of this claim and is reflected as a 0% recovery for purposes of this presentation.

5. <u>Intangible Assets</u>:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "<u>Debtors' IP</u>"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6. <u>Litigation Claims</u>: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

#### B.    Liquidation Costs

7. <u>Chapter 7 Professional Fees</u>:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $7.4 million for the liquidation period, based on an estimate of approximately $0.2 million to $1.3 million per month with approximately 80% of the fees incurred in the first 6 months.

8. <u>Chapter 7 Trustee Fees</u>:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

9. <u>Chapter 7 Estate Wind-Down Costs</u>:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs, and ongoing support from the Debtors' management through a transition services agreement throughout the liquidation. For the entirety of the wind-down process, these costs have been estimated to be $18.7 million.

10. <u>3AC Litigation Pursuit</u>: The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. <u>Other Fees:</u> During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others. For the entirety of the chapter 7 process, these costs have been estimated to be approximately $1.5 million.

### C.    Claims

12. <u>Secured Tax Claims:</u>  Based on the September 30, 2022 claims register,  no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

- <u>Administrative Claims</u>:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $49.5 million on the Conversion Date.

- <u>Priority Tax Claims</u>: Based on the September 30, 2022 claims register, federal and state tax claims have been scheduled but not quantified. To the extent that Priority Tax Claim amounts are determined, a recovery of 100% is expected.

- <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $0.0.

14. <u>Account Holder Claims</u>:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. <u>Alameda Loan Facility Claims</u>:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. <u>General Unsecured Claims</u>:  Based on the September 30, 2022 claims register, General Unsecured Claims are estimated to total approximately $14.4 million on the Conversion Date.

- General Unsecured Claims at OpCo are estimated to be $12.1 million.

- General Unsecured Claims at HoldCo are estimated to be $0.0 million.

- General Unsecured Claims at TopCo are estimated to be $2.3 million.

17. <u>Intercompany Claims</u>: A promissory note between HoldCo as borrower and TopCo as lender, for $6.3 million including interest, likely to be considered a valid loan.  This Liquidation Analysis assumes that all other Intercompany Obligations will be recharacterized as capital contributions.

*[Remainder of page intentionally left blank.]*

# IV.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan.

Plan vs Liquidation Recoveries - Exhibit B
$ in mm

| | | | | Voyager Digital Consolidated [1,2] | | | | |
| | | | | High Case | | Low Case | |
| | Claim | Plan | Recovery | Liquidation | Recovery | Liquidation | Recovery |
|---|---|---|---|---|---|---|---|
| **TOTAL ESTIMATED PROCEEDS (NET) [3, 4, 5]** | | 1,330.0 | | 1,118.6 | | 955.0 | |
| Administrative Claims[6] | 49.5 | 49.5 | 100% | 49.5 | 100% | 49.5 | 100% |
| Account Holder Claims[7] | 1,763.9 | 1,271.3 | 72% | 1,056.8 | 60% | 894.4 | 51% |
| Alameda Loan Facility Claims[8] | 75.1 | n/a | 0% | 4.7 | 6% | 4.6 | 6% |
| OpCo General Unsecured Claims [9] | 12.1 | 8.7 | 72% | 7.3 | 60% | 6.2 | 51% |
| HoldCo General Unsecured Claims [9] | - | - | 0% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 2.3 | 0.0 | 2% | 0.0 | 2% | 0.0 | 2% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | 6.3 | 0.5 | 8% | 0.3 | 5% | 0.3 | 4% |
| Intercompany Interests [11] | - | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | **1,909.2** | **1,330.0** | **70%** | **1,118.6** | **59%** | **955.0** | **50%** |

Footnotes to Analysis

(1) Assumes FTX sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at December 31, 2022.

(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.

(3) Total Estimated Proceeds (Net): primarily includes (i) FTX Transaction Proceeds (Plan only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iii) proceeds from other assets of the estate, net estimated wind down costs. Includes grossed up intercompany claim recoveries from S6M Promissory Note from HoldCo to TopCo.

(4) Estimated value of cryptocurrency portfolio under the Plan is based on underlying asset prices using a 20-day price average (9/10 – 9/29).

(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints as well as transaction fees.

(6) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of December 31, 2022.

(7) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (7/5).

(8) In the absence of a settlement, the Alameda Loan Facility Claims recover approximately 6% due to recoveries of cash and investments held at Voyager Digital Holdings, Inc. and Voyager Digital Ltd. In the Plan, recovery on the Alamdea Loan Facility is allocated to OpCo.

(9) OpCo, HoldCo, and TopCo GUCs estimated based off of 9/30 Claims registry and are subject to further reconciliation.

(10) The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions. The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 of the Disclosure Statement.

(11) On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

**Exhibit C**

**Frequently Asked Questions & Answers**

## Exhibit C

### FREQUENTLY ASKED QUESTIONS & ANSWERS

**About the Plan**

1.  **How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX, USDC or are any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a higher opportunity to recover on their claim than another Account Holder). (See Question 4 below.)

| Coin | Customer Claim | | |
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
|---|---|---|---|
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| Total | | | $724.81 |

In accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and OpCo General Unsecured Creditors receive 100% of their claims, no consideration is allowed to be distributed to creditors holding lower priority claims against OpCo.

2.  **How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Allowed Account Holder Claims and Holders of Allowed OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)     the upfront cash payment of $51.0 million,

(ii)    all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve), and

(iii)   the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was sold to FTX US at prices based on the 20-day average ending September 29, 2022, the estimated Initial Distribution to creditors would be 72%, comprised of 70% from the value of the cryptocurrency portfolio (the "Cryptocurrency Initial Distribution") and the remaining 2% associated with other cash distributions (the "Cash Initial Distribution") (collectively the "Initial Distribution").

Only Account Holders who timely participate in the transfer of their Accounts to FTX US at least one Business Day prior to the Closing Date and who maintain in their Accounts Cryptocurrency supported by the Purchaser will receive their share of the Cryptocurrency Initial Distribution on an in-kind basis (as further detailed in #7 below). Account Holders will still be able to transfer their Accounts to FTX US following such date until the final migration cut-off 45 days after the Closing Date and receive their share of the Cryptocurrency Initial Distribution into their FTX US Accounts, but will receive such distribution in the form of USDC rather than in-kind cryptocurrency. Account Holders who maintain Cryptocurrency in their Accounts that is not supported by FTX US will also receive their share of the initial distribution in the form of USDC. All other distributions, including the Cash Initial Distribution, will be made on a pro rata basis in cash.

Under the Plan, the purchase price of OpCo's cryptocurrency, other than VGX, will be determined based a 20-day historical average at a future point in time during a reference period. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

An illustrative Initial Distribution spreadsheet has been made available for Account Holders at https://cases.stretto.com/Voyager/content/1713-account-holder-illustrative-recovery-analysis/ with calculations based on estimated Initial Distributions as if the portfolio had been sold on September 29th, 2022 and estimates for the size of the total claims pool against OpCo and associated holdbacks.

**3.  The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

*No*, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the ultimate purchase price to be paid for such assets by FTX US will be a key factor in determining the size of the Initial Distribution. ***As such, under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the FTX US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value. Under a wind down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. dollars.***

For example, under the FTX US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo

implied an Initial Distribution of 72%, such Account Holder would receive an Initial Distribution with value equal to $720. Such value may be in a mix of in-kind cryptocurrencies, USDC and/or U.S. dollars depending on whether such Account Holder transitioned to FTX US timely, and the nature of such Account Holder's Claims and cryptocurrencies supported on the FTX US platform.

Such creditor would then have a deficiency claim of $280 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, the FTX US earn out and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022).  It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 17)

| $ actual | Illustrative July 5, 2022 Claim Value | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
| **Initial Distribution Value @Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @64.0% | $6.4 | $64.0 | $640.0 | $6,400.0 | $64,000.0 | $640,000.0 | $6,400,000.0 |
| @66.0% | $6.6 | $66.0 | $660.0 | $6,600.0 | $66,000.0 | $660,000.0 | $6,600,000.0 |
| @68.0% | $6.8 | $68.0 | $680.0 | $6,800.0 | $68,000.0 | $680,000.0 | $6,800,000.0 |
| @70.0% | $7.0 | $70.0 | $700.0 | $7,000.0 | $70,000.0 | $700,000.0 | $7,000,000.0 |
| @72.0% | $7.2 | $72.0 | $720.0 | $7,200.0 | $72,000.0 | $720,000.0 | $7,200,000.0 |
| @74.0% | $7.4 | $74.0 | $740.0 | $7,400.0 | $74,000.0 | $740,000.0 | $7,400,000.0 |
| @76.0% | $7.6 | $76.0 | $760.0 | $7,600.0 | $76,000.0 | $760,000.0 | $7,600,000.0 |
| @78.0% | $7.8 | $78.0 | $780.0 | $7,800.0 | $78,000.0 | $780,000.0 | $7,800,000.0 |
| @80.0% | $8.0 | $80.0 | $800.0 | $8,000.0 | $80,000.0 | $800,000.0 | $8,000,000.0 |
| **Implied Deficiency Claim @Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @64.0% | $3.6 | $36.0 | $360.0 | $3,600.0 | $36,000.0 | $360,000.0 | $3,600,000.0 |
| @66.0% | $3.4 | $34.0 | $340.0 | $3,400.0 | $34,000.0 | $340,000.0 | $3,400,000.0 |
| @68.0% | $3.2 | $32.0 | $320.0 | $3,200.0 | $32,000.0 | $320,000.0 | $3,200,000.0 |
| @70.0% | $3.0 | $30.0 | $300.0 | $3,000.0 | $30,000.0 | $300,000.0 | $3,000,000.0 |
| @72.0% | $2.8 | $28.0 | $280.0 | $2,800.0 | $28,000.0 | $280,000.0 | $2,800,000.0 |
| @74.0% | $2.6 | $26.0 | $260.0 | $2,600.0 | $26,000.0 | $260,000.0 | $2,600,000.0 |
| @76.0% | $2.4 | $24.0 | $240.0 | $2,400.0 | $24,000.0 | $240,000.0 | $2,400,000.0 |
| @78.0% | $2.2 | $22.0 | $220.0 | $2,200.0 | $22,000.0 | $220,000.0 | $2,200,000.0 |
| @80.0% | $2.0 | $20.0 | $200.0 | $2,000.0 | $20,000.0 | $200,000.0 | $2,000,000.0 |

**4.  Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

_No_, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and

the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 72% of their claim).

**5. Are my VGX recoveries only limited on my proportional share of $10.0 million? How is the value of my VGX being treated?**

<u>No</u>, Account Holders that held VGX are not limited to receiving their pro rata share of $10.0 million for their VGX claim. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, FTX US has agreed to offer a minimum purchase price of $10.0 million for 100% of the VGX owned by OpCo. For purposes of the enclosed illustrative recovery analysis, all of the VGX in OpCo's estate is assumed to be sold by OpCo to FTX US at the $10.0 million minimum purchase price, which ultimate proceeds will flow through to collective implied recovery values for <u>*all*</u> creditors. Actual consideration received for the VGX owned by OpCo's estate could materially differ from the $10.0 million offer provided by FTX US depending on a number of factors, including market conditions.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 72% of claim value, an Account Holder would receive an Initial Distribution in USDC based on (i) (x) their VGX claim value multiplied by (y) the Initial Distribution percentage, regardless of whether VGX is sold to FTX US for $10 million or if it is monetized at a higher price.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 72% of claim value, the Account Holder would receive an Initial Distribution equal to $171.49.

| | [A] | [B] | [A] x [B] = [C] | [B] x Token Holdings Implied Claim @VGX Token Holdings | | | | [C] x Token Holdings Illustrative Initial Distribution @VGX Token Holdings | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Illustrative Initial Distribution % | 7/5 VGX Token Price | Implied VGX Recovery Price / Token | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
| 1.) | 64.0% | $0.2382 | $0.1524 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $15.24 | $152.44 | $1,524.43 | $15,244.34 |
| 2.) | 66.0% | $0.2382 | $0.1572 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $15.72 | $157.20 | $1,572.07 | $15,720.72 |
| 3.) | 68.0% | $0.2382 | $0.1620 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $16.19 | $161.97 | $1,619.71 | $16,197.11 |
| 4.) | 70.0% | $0.2382 | $0.1667 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $16.67 | $166.73 | $1,667.34 | $16,673.49 |
| 5.) | 72.0% | $0.2382 | $0.1715 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $17.14 | $171.49 | $1,714.98 | $17,149.88 |
| 6.) | 74.0% | $0.2382 | $0.1763 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $17.62 | $176.26 | $1,762.62 | $17,626.26 |
| 7.) | 76.0% | $0.2382 | $0.1810 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $18.10 | $181.02 | $1,810.26 | $18,102.65 |
| 8.) | 78.0% | $0.2382 | $0.1858 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $18.57 | $185.79 | $1,857.90 | $18,579.03 |
| 9.) | 80.0% | $0.2382 | $0.1906 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $19.05 | $190.55 | $1,905.54 | $19,055.42 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $66.70 ($238.19 claim value less $171.49 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC, (ii) distributions from the FTX US earn out, and (iii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

Further, on or prior to the 30-day anniversary of the later of (x) the Closing Date and (y) the date that such Account Holder becomes a Transferred Creditor, such Account Holder will also have an additional $50.00 deposited into their FTX US account if they have executed at least one trade on the FTX US platform, regardless of the size of the trade and which trade shall not be subject to any transaction fee.

**6. If my Account Holder Claim is only $25.00, am I still entitled to receive a $50.00 account credit at FTX US?**

_Yes_, any Account Holder who transitions their Voyager account to an FTX US account is eligible for an FTX US account credit as described below. Such credits are not solely limited to Account Holders and are available for any Holder of an Allowed OpCo General Unsecured Claim under the Plan who opens an FTX US account, subject to meeting the minimum terms and conditions.

On or prior to the 30-day anniversary of the later of (x) the Closing Date and (y) the date that an Eligible Creditor (as defined in the asset purchase agreement) becomes a Transferred Creditor, $50.00 will be deposited into accounts for those eligible Transferred Creditors which have signed up for an FTX US account and have executed at least one cryptocurrency transaction on the FTX US platform within the period following the later of (x) the Closing Date and (y) the date that an Eligible Creditor becomes a Transferred Creditor. Such minimum trading requirement will not be subject to size requirements and such trade will not be subject to any transaction fees.

**7. If I had tokens in my Voyager account that are listed as being supported and unsupported at FTX US, do I only receive U.S. Dollars in my Initial Distribution?**

_No_, to the extent a token is supported on the FTX US platform, the Cryptocurrency Initial Distribution with respect to such supported tokens will be made in kind (i.e., in the underlying cryptocurrency of the claim) to Account Holders who transition to FTX US no later than one Business Day prior to the Closing Date. Only supported token claims are available for recovery distributions on an in-kind basis and only the Cryptocurrency Initial Distribution portion of such claim recovery will be made in-kind, being denominated in such token. For unsupported tokens, distributions will be made in USDC into the claim holders' FTX US accounts.

To the extent an Account Holder owns multiple supported tokens and multiple unsupported tokens, the Account Holder will receive their Cryptocurrency Initial Distribution in-kind for each specific supported token if they timely transfer their Account to FTX US. All other Initial Distributions to Account Holders who transfer to FTX US, including those for unsupported tokens, will be made in USDC. The Cash Initial Distribution and future recovery distributions will be made to creditors in U.S. Dollars. Account holders are required to timely sign up for an FTX US account by one Business Day prior to the Closing Date in order to be eligible to receive an in-kind distribution. If an Account Holder does not open an FTX US account, all distributions will be made in U.S. Dollars, following the end of the 45-day grace period.

At this time, FTX US supports 22 tokens that were available on the Voyager platform. Excluding the impact of USDC, these 22 tokens represent approximately 77% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. As such, the Debtors anticipate that the vast majority of the Account Holder Cryptocurrency Initial Distribution will be made on an in-kind basis at Closing. FTX US has also indicated to the Debtors that other currently unsupported tokens are likely to become supported by the time of closing. For such newly supported tokens, the Cryptocurrency Initial Distribution will also be made on an in-kind basis under the Plan.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Cryptocurrency Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion, as an unsupported token, will be made in USDC. Additionally, the Account Holder would receive its pro rata share of the Initial Cash Distribution, which will be made in U.S. Dollars. Such Account Holder is also eligible for a $50.00 FTX US account credit, subject to meeting the minimum terms and conditions. All other future distributions will be made in U.S. Dollars based on the Account Holder's remaining claim (Deficiency Claim) after the Initial Distribution.

*__Currently Supported Voyager Tokens on FTX US Platform__*

| AAVE | ALGO | AVAX | SHIB |
|------|------|------|------|
| BCH | GRT | BTC | TRX |
| DAI | DOGE | ETH | YFI |
| BAT | LINK | LTC | UNI |
| MKR | NEAR | WBTC | USDT |
| SOL | SUSHI | | |

**8.   If a token in my Voyager account was listed as being unsupported at FTX US, can I select a different supported token to receive my distribution in versus U.S. Dollars?**

__No__, the in-kind distribution is only eligible for those Account Holder Claims denominated in tokens which are supported on the FTX US platform.  However, Account Holders who have timely completed all documentation and Know Your Customer "KYC" processes and who have opened an FTX US account are eligible for one cryptocurrency transaction on the FTX US platform without being subject to any transaction fee.

On the 30-day anniversary of the later of (x) the Closing Date and (y) the date that such Account Holder becomes a Transferred Creditor, such Account Holder will also have an additional $50.00 deposited into their FTX US account to the extent they have executed one cryptocurrency transaction on the FTX US platform, regardless of the size of the trade.

See Question 7 for additional detail relating to tokens supported on the FTX US platform.

**9.   If my account only had BTC, will all of my distributions be made in BTC?**

__No__, only the Cryptocurrency Initial Distribution is eligible to be made in-kind. Despite an Account Holder only owning a supported token, the Cash Initial Distribution (estimated at 2%), plus all future distributions associated with future recoveries, will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

The in-kind distribution is also only eligible for those claims denominated in those tokens which are supported on the FTX US platform. FTX US supports tokens that represent approximately 77% of the dollar value of cryptocurrency denominated Account Holder Claims as of July 5th, 2022 and, as such, the Debtors estimate that the vast majority of Account Holder Cryptocurrency Initial Distributions will be made on an in-kind basis.

**10.   Are my recoveries capped at the value I receive in the Initial Distribution?**

__No__, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) the FTX US earn out, (iii) value associated with the sale of any other OpCo assets, and (iv) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**11.  When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be made in the form of U.S. dollars.

**12.  When, and how, will I receive value from any recoveries associated with the FTX US earn out?**

The FTX US earn out is calculated based on (i) the value of the daily average assets (denominated in BTC) in the aggregate attributable to the Transferred Creditors' accounts on FTX US over the six month period following the Closing Date **divided by** (ii) the aggregate value of the assets (denominated in BTC) initially attributable to all Transferred Creditors' FTX US accounts **multiplied by** (iii) $10.0 million (subject to a cap of $20.0 million).

After six months, FTX US will calculate the earn out payment and, within ten Business Days, make the earn out payment to OpCo's estate.  Upon receipt of an earn out payment from FTX US, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any earn out distributions shall be made in the form of U.S. dollars.

**13.  What will happen to the VGX token going forward under the Plan?**

FTX US has offered to purchase all VGX in OpCo's estate for a purchase price of $10 million.  This is a floor of what OpCo will receive for VGX.

The Debtors continue to work internally and with third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US agreement and are hopeful they will be able to do so.

Any alternative solution, to be acceptable, must deliver value to OpCo and its estate that exceeds $10 million and must be compatible with the agreements between OpCo and FTX US.  If the Debtors are unable to identify a higher and better solution for VGX, OpCo will accept FTX's offer and, as a result, VGX may decline in value and may have no value post-consummation of the Plan.

Selected illustrative recovery value sensitivities associated with the ultimate value VGX is sold at, assuming all other cryptocurrencies are sold at the 20-day average price as of September 29th, are outlined below.

| | Illustrative VGX Recovery Value | | | |
|---|---|---|---|---|
| | $10.0 | $25.0 | $50.0 | $75.0 |
| Illustrative VGX Recovery Value | $10.0 | $25.0 | $50.0 | $75.0 |
| Illustrative Other Cryptocurrency @ 9/29 20 Day Average | $1,238.5 | $1,238.5 | $1,238.5 | $1,238.5 |
| Cryptocurrency Initial Distribution | $1,248.5 | $1,263.5 | $1,288.5 | $1,313.5 |
| Cash Initital Distribution | $32.7 | $32.7 | $32.7 | $32.7 |
| Total Initial Distribution | $1,281.2 | $1,296.2 | $1,321.2 | $1,346.2 |
| Estimated 7/5 Claim Values | $1,778.3 | $1,778.3 | $1,778.3 | $1,778.3 |
| Total Initial Distribution % of Claim | 72.0% | 72.9% | 74.3% | 75.7% |

**14.  Is FTX US acquiring the crypto at the July 5th price, the 20-day average as of September 29th or at a future price?**

Under the Plan, FTX US will acquire the cryptocurrency at a to be determined price based on the fair market value of such cryptocurrency during a 20-day reference period which will be determined prior to Closing.

As such, actual Initial Distributions will be dependent on the future price performance of OpCo's cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 72% based on actual cryptocurrency prices during such reference period.

**15.  Is the $51 million of cash FTX US is paying to the estate above and beyond the value they pay for the cryptocurrency? Do I get a portion of that $51 million?**

*Yes*, the $51 million of upfront consideration is *in addition to* the fair market value of the cryptocurrency FTX US would acquire under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16.  Who is eligible to join FTX US under the Plan in order to receive an in-kind Cryptocurrency Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims are eligible to join FTX US.

Only Account Holders who timely transfer their Accounts to FTX US by one Business Day prior to the Closing Date and maintain cryptocurrency in their Account that is supported by FTX US will receive their share of the Cryptocurrency Initial Distribution on an in-kind basis (as further detailed in #7 below). Account Holders will still be able to transfer their Accounts to FTX US following such date until the final migration cut-off 45 days after the Closing Date and receive their share of the Cryptocurrency Initial Distribution into their FTX US Accounts, but will receive such distribution in the form of USDC rather than in-kind cryptocurrency.  Account Holders who maintain Cryptocurrency in their Accounts that is not supported by FTX US will also receive their share of the initial distribution in the form of USDC.  All other distributions, including the Cash Initial Distribution, will be made on a pro rata basis in cash.

**17.  What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18. What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

Only those cryptocurrency tokens that are supported on the FTX US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through FTX US. As such, Account Holders are required to sign up for an FTX US account to the extent they wish to receive an in-kind distribution. The number of in-kind cryptocurrency tokens will depend on (i) the Cryptocurrency Initial Distribution and (ii) the 20-day average price of such cryptocurrency during the reference period.

For any specific supported cryptocurrency, a creditor can determine the number of tokens received at FTX US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Cryptocurrency\ Initial\ Distribution}{20\ day\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. BTC is a supported token at FTX US. To the extent the Account Holder signs up for an FTX US account, the Cryptocurrency Initial Distribution is 70%, and the 20-day average reference price of BTC is $19,783.48, such Account Holder would receive an Initial Distribution consisting of (a) 0.7132 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 70% Cryptocurrency Initial Distribution divided by (ii) $19,783.48 20-day average reference price) plus (b) the Cash Initial Distribution.

* * * * *

**<u>Exhibit B</u>**

**Redline**

> **THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON OCTOBER 19, 2022, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FIRST AMENDED DISCLOSURE STATEMENT RELATING TO THE SECOND AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

**Page**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ........................ 1

**I.**      **INTRODUCTION** ........................................................................................... 7

**II.**     **PRELIMINARY STATEMENT** .................................................................... 7

**III.**    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
         THE PLAN** .................................................................................................. 11

    A.      What is chapter 11? ........................................................................ 11
    B.      Why are the Debtors sending me this Disclosure Statement? ........ 11
    C.      Am I entitled to vote on the Plan? ................................................. 11
    D.      What will I receive from the Debtors if the Plan is consummated? ... 12
    E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim? ... 16
    F.      How will my Account be transitioned to FTX US? ........................ 16
    G.      What if I am unable or unwilling to transition my Account to FTX US? ... 17
    H.      What are the sources of Consideration and other consideration required to fund the Plan? ... 17
    I.      Are any regulatory approvals required to consummate the Sale Transaction and confirm
            the Plan? ......................................................................................... 17
    J.      What happens to my recovery if the Plan is not confirmed or does not go effective? ... 18
    K.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
            Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
            "Consummation"? ........................................................................... 18
    L.      Is there potential litigation related to the Plan? ............................. 18
    M.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ... 19
    N.      What is the deadline to vote on the Plan? ...................................... 20
    O.      How do I vote for or against the Plan? ........................................... 20
    P.      Why is the Bankruptcy Court holding a Confirmation Hearing? .... 20
    Q.      When is the Confirmation Hearing set to occur? ........................... 20
    R.      What is the purpose of the Confirmation Hearing? ........................ 20
    S.      What is the effect of the Plan on the Debtors' ongoing business? .... 20
    T.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ... 21
    U.      Who do I contact if I have additional questions with respect to this Disclosure Statement
            or the Plan? .................................................................................... 21

**IV.**     **THE DEBTORS' PLAN** .............................................................................. 21

    A.      The Plan. ......................................................................................... 21
    B.      The Sale Transaction. ..................................................................... 27
    C.      Means for Implementation of the Plan. .......................................... 27

**V.**      **THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** ... 29

    A.      The Debtors' Corporate Structure and History. .............................. 29
    B.      The Debtors' Assets and Operations. .............................................. 30
    C.      The Debtors' Capital Structure. ...................................................... 32

**VI.**     **EVENTS LEADING TO THESE CHAPTER 11 CASES** ............................ 36

    A.      Market and Industry-Specific Challenges. ..................................... 36
    B.      The Alameda Loan. ........................................................................ 44
    C.      Retention of Restructuring Advisors and Initial Third-Party Outreach. ... 44
    D.      Governance Initiatives. ................................................................... 44
    E.      Voyager's Decision to Commence these Chapter 11 Cases. ........... 45

**VII.**    **EVENTS OF THE CHAPTER 11 CASES** ................................................. 45

| | | |
|---|---|---|
| A. | The Stand-Alone Plan. | 45 |
| B. | First and Second Day Relief and Other Case Matters. | 45 |
| C. | Appointment of Unsecured Creditors' Committee. | 47 |
| D. | Schedules and Statements. | 47 |
| E. | Bar Date Motion. | 47 |
| F. | The FBO Motion. | 48 |
| G. | The 3AC Liquidation Proceeding. | 48 |
| H. | Litigation Matters. | 49 |
| I. | The Coinify Sale. | 51 |
| J. | The Key Employee Retention Plan. | 51 |
| K. | Canadian Recognition Proceeding. | 52 |
| L. | The Unwind Motion. | 52 |
| M. | The Request for Appointment of an Equity Committee. | 52 |
| N. | The Post-Petition Sale Process. | 52 |
| O. | The Special Committee Investigation. | 53 |

**VIII.   RISK FACTORS**  …… **54**

| | | |
|---|---|---|
| A. | Risks Related to the Restructuring. | 54 |
| B. | Risks Related to Recoveries under the Plan. | 58 |
| C. | Disclosure Statement Disclaimer. | 59 |
| D. | Miscellaneous Risk Factors and Disclaimers. | 60 |

**IX.   SOLICITATION AND VOTING PROCEDURES**  …… **64**

| | | |
|---|---|---|
| A. | Classes Entitled to Vote on the Plan. | 64 |
| B. | Votes Required for Acceptance by a Class. | 64 |
| C. | Certain Factors to Be Considered Prior to Voting. | 65 |
| D. | Classes Not Entitled To Vote on the Plan. | 65 |
| E. | Solicitation Procedures. | 65 |
| F. | Voting Procedures | 66 |
| G. | Voting Tabulation. | 67 |
| H. | Ballots Not Counted. | 67 |

**X.   CONFIRMATION OF THE PLAN**  …… **68**

| | | |
|---|---|---|
| A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 68 |
| B. | Best Interests of Creditors—Liquidation Analysis. | 69 |
| C. | Feasibility. | 70 |
| D. | Acceptance by Impaired Classes. | 70 |
| E. | Confirmation without Acceptance by All Impaired Classes. | 70 |

**XI.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**  …… **72**

| | | |
|---|---|---|
| A. | Introduction. | 72 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 73 |
| C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 74 |

**XII.   RECOMMENDATION OF THE DEBTORS**  …… **80**

**EXHIBITS**

EXHIBIT A          Plan

EXHIBIT B          Liquidation Analysis

EXHIBIT C          Frequently Asked Questions & Answers

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED OCTOBER 2~~0~~4, 2022

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE SECOND AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4 | Alameda Loan Facility Claims |
| 5A | OpCo General Unsecured Claims |
| 5B | HoldCo General Unsecured Claims |
| 5C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.  Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on November 29, 2022).

2.  Ballots may be returned by the following methods:

   a)  For Holders of Account Holder Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.

   b)  For Holders of Alameda Loan Facility Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.

   c)  For Holders of General Unsecured Claims:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (ii) via first class mail, overnight courier, or hand delivery to the address set forth below:

Voyager Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY

2

UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS          OF          THE          PLAN          WILL          GOVERN.

3

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

4

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.    THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

5

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I.    INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "Debtors," the "Company," or "Voyager") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 5849] (as supplemented or amended from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by the downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Ultimately, those efforts were successful.  Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("FTX US" or "Purchaser") as the winning bid.  The Debtors value FTX US's bid at approximately $1.422 billion, comprised of (i) the value of Cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value.  Importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, FTX US will purchase all Cryptocurrency on the Voyager platform, other than VGX, at fair market value as of a to be determined date.  The fair market value of any Cryptocurrency other than VGX will be calculated by Purchaser reasonably and in good faith based on market practice, available pricing information, and mutually agreed principles.

FTX US has offered to purchase all VGX in the Debtors' Estates for a purchase price of $10 million.  This is a floor of what the Debtors will receive for VGX.  The Debtors continue to work internally and with third parties in an effort to identify a higher and better solution for VGX that is also compatible with the FTX US Asset Purchase Agreement and are hopeful they will be able to do so.  Any such alternative solution, to be acceptable, must deliver value to the Debtors and their Estates that exceeds $10 million and must be compatible with the agreements between the Debtors and FTX US.  If the Debtors are unable to identify a higher and better solution for VGX, the Debtors will accept FTX US's offer and, as a result, VGX may decline in value and may have no value post-consummation of the Plan.

As described further in Article IV.C.6 of this Disclosure Statement, the Debtors will effectuate the transition of Account Holders to the FTX US platform pursuant to the Customer Migration Protocol, which will be

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

included in the Plan Supplement and will be filed with the Bankruptcy Court at least 14 days in advance of the Voting Deadline. **The Customer Migration Protocol will provide, among other things, that only those Account Holders that become Transferred Creditors at least one Business Day prior to the Effective Date and who maintain Cryptocurrency in their Account that is supported by FTX US will receive their initial distributions under the Plan in-kind (*i.e.*, in the form of Cryptocurrency) deposited into their FTX US Accounts**. If (x) Purchaser does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (y) a Transferred Creditor did not maintain Cryptocurrency in its Account, or (z) a Transferred Creditor becomes a Transferred Creditor after such date but before the final migration cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, such Transferred Creditor will receive their share of the initial distribution in the form of USDC. Account Holders who do not become Transferred Customers will not be eligible to receive any portion of the initial distribution from FTX US. All distributions to such Account Holders and all other distributions will be made on a pro rata basis in cash from the Debtors' Estates.

It is anticipated that all Voyager customers will be transitioning to FTX US. In the event that a customer is not successfully transitioned to FTX US, such customer will not be eligible for the $50 Account Credit (as discussed below). Any customer that does not transition to FTX US at least one Business Day prior to the Closing Date will not receive the Transferred Cryptocurrency Value in kind. Subject to the Customer Migration Protocol, any customer who transitions to FTX US after that date but prior to the cutoff will receive its initial distribution in USDC in its FTX US Account. Any customer that does not transition to FTX US will not receive an initial distribution from FTX US but will receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code. Any subsequent distributions shall be made similarly in accordance with the Customer Migration Protocol or as otherwise provided in Article VI.C.8 of the Plan.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

---

[3] Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

**Account**

| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Customer Recovery Supported on FTX US | Recovery Type | Illustrative Crypto Recovery %[4] | Recovery Value | # of Coins Recovered[5] |
|------|------|------|------|------|------|------|------|------|
| BTC | 0.04 | $20,157.69 | $907.07 | Yes | BTC | 70% | $636.85 | 0.03 |
| ETH | 0.19 | 1,131.60 | 214.41 | Yes | ETH | 70% | 150.54 | 0.10 |
| DAI | 49.19 | 1.00 | 49.17 | Yes | DAI | 70% | 34.53 | 34.52 |
| DOGE | 978.43 | 0.07 | 65.64 | Yes | DOGE | 70% | 46.09 | 758.59 |
| ALGO | 123.83 | 0.31 | 38.07 | Yes | ALGO | 70% | 26.73 | 79.74 |
| LINK | 0.29 | 6.31 | 1.83 | Yes | LINK | 70% | 1.28 | 0.17 |
| XRP | 122.38 | 0.33 | 39.79 | No | USDC | 70% | 27.94 | N/A |
| HBAR | 130.66 | 0.06 | 8.05 | No | USDC | 70% | 5.65 | N/A |
| BAND | 24.73 | 1.32 | 32.65 | No | USDC | 70% | 22.92 | N/A |
| VGX | 249.05 | 0.24 | 59.32 | No | USDC | 70% | 41.65 | N/A |
| TRAC | 1,471.96 | 0.19 | 286.88 | No | USDC | 70% | 201.42 | N/A |
| GALA | 2,274.69 | 0.05 | 121.01 | No | USDC | 70% | 84.96 | N/A |

**Claim**

| | |
|---|---|
| **Value Claimed** | **$1,823.90** |
| *Proportion of Total Platform Value* | **0.0001%** |

**Illustrative Recovery**

**Crypto Recovery**

| | |
|---|---|
| Value Recovered (In Kind) | $896.01 |
| Value Recovered (Converted to U.S. Dollars) | 384.55 |
| **Crypto Value Recovered** | **$1,280.56** |
| *% Crypto Recovery[4]* | *70%* |
| **Other Value Recovered** | **$32.29** |
| *% Other Recovery[6]* | *2%* |

---

[4] Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on 20-day average coin prices as of September 29th, 2022.  Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5] Illustrative number of coins recovered based on recovery value divided by the 20-day average coin price as of September 29, 2022.  Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such supported cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6] Other recovery includes the estimated pro rata distribution to Account Holder Claims from (i) Voyager balance sheet cash, (ii) FTX US upfront cash consideration, (iii) FTX US earnout, (iv) other miscellaneous recoveries, including proceeds from the sale of investments and any 3AC Recovery, net of (i) payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims and (ii) funding of the Wind-Down Reserve.  Each Transferred Creditor will also receive the Account Credit from FTX US.

For the purposes of the Disclosure Statement, "Account Credit" means $50 credited to each Transferred Creditor's FTX US Account, subject to the terms and the conditions of the Asset Purchase Agreement.

9

| | |
|---|---|
| **Total Value Recovered** | **$1,312.86** |
| *% Total Recovery* | *72%* |

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VI.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VI.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale, and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout

10

the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[7]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by the Purchaser represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[8] and on September 27, 2022, the Debtors and the Purchaser entered into the asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement"). The Bankruptcy Court approved entry into the Asset Purchase Agreement on October 20, 2022.

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests;

- consensually conveys Alameda Loan Facility Claims and any recovery on account of such Alameda Loan Facility Claims to OpCo pursuant to the Asset Purchase Agreement; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by November 29, 2022, at 4:00 p.m. prevailing Eastern Time (the "Plan Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on [December 8, 2022 at 11:00 a.m]. (prevailing Eastern Time) (the "Confirmation Hearing").

---

[7]    Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[8]    *See Notice of Successful Bidder* [Docket No. 457].

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4 | Alameda Loan Facility Claims | Impaired | Entitled to Vote |
| 5A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |

12

| | | |
|---|---|---|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[9]**

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | NA | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed | $0.0 | NA | N/A |

---

[9]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

13

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | | | |
| 3 | Account Holder Claims[10] | Each Holder of an Allowed Account Holder Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of in~~ exchange for such Allowed Account Holder Claim:<br><br>(i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol;<br><br>(ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol;<br><br>(iii) its Pro Rata share of Distributable OpCo Cash; and<br><br>(iv) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $1,763.9 | 72% | 51%-60% |
| 4 | Alameda Loan Facility Claims | Pursuant to the Asset Purchase Agreement, on the Effective Date, the Alameda Loan Facility Claims shall be deemed Allowed, and all rights, titles, and interests in the Alameda Loan Facility Claims shall be contractually conveyed to OpCo, and OpCo shall be entitled to any recovery on account of the Alameda Loan Facility Claims. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement. | $75.1 | 0% (as settled with the Holder of Alameda Loan Facility Claims)[11] | 6% |

---

[10]   Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[11]   The Alameda Loan Facility Claims are contributed to OpCo pursuant to the terms of the Asset Purchase Agreement and OpCo shall be entitled to the recovery on account of the Alameda Loan Facility Claims.

14

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 5A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of in~~ exchange for such Allowed OpCo General Unsecured Claim:<br>(i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol;<br>(ii) the right to become a Transferred Creditor as provided in the Customer Migration Protocol;<br>(iii) its Pro Rata share of Distributable OpCo Cash; and<br>(iv) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $12.1 | 72% | 51% - 60% |
| 5B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of in~~ exchange for such Allowed HoldCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable HoldCo Cash; and<br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to HoldCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $0.0 | 0% | 0% - 0% |
| 5C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of in~~ exchange for such Allowed TopCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable TopCo Cash; and<br>(ii) to effectuate distributions from the | $2.3 | 2% | 2% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; provided that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | N/A | NA | NA |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum. | $6.3[12] | 8% | 4% - 5% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum. | $0 | 0% | 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the | $0 | 0% | 0% |

---

[12]    The recovery to Intercompany Claims reflects the assumption for purposes of the recovery analysis that the Intercompany Obligation by HoldCo to TopCo under the Promissory Note is a valid loan and all other Intercompany Obligations are capital contributions.  The Intercompany Obligations and the analysis related thereto are described in greater detail in Article V.C.2 herein.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | | | |

**E.**     **What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.**     **How will my Account be transitioned to FTX US?**

The Debtors will distribute a Customer Migration Protocol providing for the transition of Account Holders to the FTX US platform and delivery of Plan distributions to such Holders' FTX US Accounts that will describe the transition process in further detail. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to FTX US subject to their successful completion of FTX US's "Know Your Customer" process and other procedural requirements. A separate notice will be sent to all Account Holders through the Voyager platform once the Customer Migration Protocol has been agreed upon by the Debtors and the Purchaser.  This notice will describe the steps that Account Holders and Holders of Allowed OpCo General

17

Unsecured Claims must take to transition their accounts to FTX US. All Account Holders and Holders of Allowed OpCo General Unsecured Claims should review this notice as soon as it becomes available.

### G.    What if I am unable or unwilling to transition my Account to FTX US?

We expect that virtually all Account Holders will be transitioning to FTX US. In the event that a customer is not successfully transitioned to FTX US, such customer will not be eligible for the $50 Account Credit, and will not receive the Transferred Cryptocurrency Value in kind. They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

### H.    What are the sources of Consideration and other consideration required to fund the Plan?

The Plan will be funded with the proceeds of the Sale Transaction, which the Debtors value at approximately $1.422 billion, consisting primarily of: (a) the value of all Voyager cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, *plus* (b) additional consideration estimated as providing at least approximately $111 million of incremental value that includes (i) a cash payment of $51 million, (ii) an earn out of up to $20 million, (iii) the right of Transferred Creditors to receive a $50 Account Credit, (iv) a cash payment equal to the Acquired Cash, and (v) the transfer to the Debtors of all right, title, and interest in the Alameda Loan Facility Claims.

### I.    Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[13] and has license applications pending[14] in eighteen (18) states.[15]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed

---

[13]    The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[14]    On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[15]    Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

18

entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

The Purchaser maintains money transmission licenses in most, but not all, of the states in which it operates. Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the purchase by Purchaser of the Cryptocurrency of Voyager and the transition of Account Holders and General Unsecured Creditors to FTX US Accounts, subject to the terms and conditions set forth in the Asset Purchase Agreement.  State banking departments may seek to limit or condition the Purchaser's acquisition of the Voyager assets to the extent that regulatory concerns are identified.

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process").  Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[16]

**J.        What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**K.        If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**L.        Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation.  *See* Article VIII.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations." for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated amount of rejection

---

[16]    The state approval process for the surrender of a license typically takes several months.

damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

**M.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.3 of this Disclosure Statement, entitled "Releases."

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VI.A.2(b)(i)-(ii) below. As described in Article VI.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

20

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**N.    What is the deadline to vote on the Plan?**

The Voting Deadline is November 29, 2022, at 4:00 p.m. (prevailing Eastern Time).

**O.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "<u>Ballot</u>") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**P.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.    When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for Thuersday, [December 8, 2022, at 11:00 a.m.] (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by November 29, 2022, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

R.      **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

S.      **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

T.      **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VI herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

U.      **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

IV.   **THE DEBTORS' PLAN**

A.      **The Plan.**

The Plan contemplates liquidating the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

1.   *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by

22

the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article III.M of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) Purchaser and each of its Related Parties; (e) Alameda and each of its Related Parties; (f) each of the Released Professionals; and (g) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Holdings, LLC; (xviii) Blake, Cassels & Graydon LLP; and (xix) Sullivan & Cromwell LLP.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Alameda and each of its Related Parties to the extent Alameda is able to bind such Related Parties; (g) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (h) all Holders of Claims that vote to accept the Plan

23

and affirmatively opt into the releases provided by the Plan; (i) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (j) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan.

(a)       **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date; *provided* that, subject to the D&O Settlement, nothing in Article VIII.A of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

(b)       **Release by Holders of Claims or Interests.**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and**

24

all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda Loan Facility, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

(c)    **Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation

25

governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**(d)** **Injunction.**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

**4.** *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement.  The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors to effectuate the Sale Transaction and to wind down the Debtors' Estates.

**5.** *Non-Released D&O Claims*

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve.  Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan.  The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; provided that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims.  For the avoidance of doubt, this provision does not enjoin, limit, or impair direct

26

claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of the Plan.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of:  (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy").  The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

**6.   *Corporate Structure Upon Emergence***

On the Plan Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets.  The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Entity.  Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets.  For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.  Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity.  As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit).  Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration.  The Wind-Down Entity shall be deemed a successor in interest to the Debtors.  For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in

27

the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan and the Sale Transaction and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

**B.      The Sale Transaction.**

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. The Debtors' marketing process resulted in a sale of substantially all assets to FTX US, and is described in Article ~~VII.J~~VII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process."

**C.      Means for Implementation of the Plan.**

**1.      *Wind-Down Trust.***

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

28

2.  ***Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation.***

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

3.  ***Tax Returns.***

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

4.  ***Dissolution of the Wind-Down Debtors.***

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors is formed or any other jurisdiction.  The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

5.  ***Statutory Committee and Cessation of Fee and Expense Payment***

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

6.  ***Customer Migration Protocol***

The Transferred Cryptocurrency Value will be determined prior to the Effective Date pursuant to the Asset Purchase Agreement.

As a general matter, the Customer Migration Protocol will provide that Purchaser will make initial distributions to Transferred Creditors corresponding to their Pro Rata amounts of the Transferred Cryptocurrency Value as contemplated in the Customer Migration Protocol.  Subject to the conditions set forth in the Customer Migration Protocol, if a Transferred Creditor has become a Transferred Creditor prior to one Business Day prior to the Effective Date and FTX US supports the Cryptocurrency maintained by such Transferred Creditor in such Transferred Creditor's Account (*e.g.*, BTC, ETH), Purchaser will credit to such Transferred Creditor's FTX US Account the Transferred Cryptocurrency Value in kind.  Subject to the conditions set forth in the Customer Migration Protocol, if (i) Purchaser does not support the Cryptocurrency maintained by a Transferred Creditor in such Transferred Creditor's Account, (ii) a Transferred Creditor did not maintain Cryptocurrency in an Account or (iii) a Transferred Creditor becomes a Transferred Creditor after such date but before the final cut-off date 45 days after the Effective Date as contemplated in the Customer Migration Protocol, Purchaser will credit to the FTX

29

Account of such Transferred Creditor USDC in an amount equal to the Transferred Cryptocurrency Value on a Pro Rata basis.

Following such initial distributions to Transferred Creditors, the remaining Cash available on account of the sale of Cryptocurrency to Purchaser under the Asset Purchase Agreement shall be paid by Purchaser to the Debtors and applied by the Debtors to make initial distributions of Transferred Cryptocurrency Value to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims that did not become Transferred Creditors by the cut-off date provided in the Customer Migration Protocol.

Purchaser shall have no responsibility to make any distributions other than the distributions to Transferred Creditors of their Pro Rata share of Transferred Cryptocurrency Value as contemplated by the Customer Migration Protocol.  All other distributions shall be made by the Distribution Agent (other than Purchaser) or as the Distribution Agent (other than Purchaser) shall otherwise determine.

7.    *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined. After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution. For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. . No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

V.    **THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE**

A.    **The Debtors' Corporate Structure and History.**

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors.  Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency

30

assets held.  Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[17]  A simplified version of the Debtors' current corporate structure is as follows:



---

[17]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.

31

### B. The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1. The Trading Platform.

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2. Custodial Services.

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3. Staking.

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4.      Voyager's Lending Program.[18]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties.  Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin).  During these chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Galaxy Digital LLC.  The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5.      Voyager's Investments.

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives.  Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6.      Using Voyager's Platform.

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App").  Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer.  Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC.  When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock").  All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform.  If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account.  If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

## C.      The Debtors' Capital Structure.

### 1.      The Debtors' Debt Obligations.

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[19]  However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions.  The aggregate value of the USDC outstanding is $75 million.[20]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan

---

[18]     The Lending Program is described in further detail in the First Day Declaration ~~and in Article VI.B.6 of this Disclosure Statement~~.

[19]     Assuming a Bitcoin price of $20,000.

[20]     As a stablecoin, USDC is pegged to $1 per coin.

Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

## 2. *The Debtors' Intercompany Obligations.*

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations"). The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables"). Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors. Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business. Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced. This Disclosure Statement assumes that five out of the six Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

### (a)    Intercompany Obligations by OpCo to TopCo.

i.    *The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021.*

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term

Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

ii.      ***The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021.***

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.      ***The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC.***

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.      ***The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC.***

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

35

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

### (b)    Intercompany Obligation by OpCo to HoldCo.

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VI.A-B of this Disclosure Statement. Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

Alameda disputes the treatment of this Intercompany Obligation. Pursuant to the Asset Purchase Agreement, FTX US has agreed to contractually convey the Alameda Loan Facility Claims to OpCo.

### (c)    Intercompany Obligation by HoldCo to TopCo.

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note"). The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo. To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo. In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe that, if litigated, the Promissory Note may be determined to be a valid loan. Although the Promissory Note was entered into after the amount was already funded to HoldCo, the fact that TopCo made a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note may result in the Promissory Note being a loan.

### (d)    Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities. The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

36

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors.*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

#### 1.    *2020 and 2021 Market Conditions.*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

37

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

### 2. Cryptocurrency Industry-Wide Sell-off.

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a) The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its platform), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per share and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per share. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-share price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

(b)        The Making and Recalling of the Three Arrows Capital Loan.

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in their business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[21]  Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

[P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[22]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[23]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[24]  These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[21]    December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=0333840 05&docId=5134463.

[22]    August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[23]    *Id.* at 6.

[24]    *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[25] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description

---

[25]   *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[26] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had

---

[26]  While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12. On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses. In light of this, Voyager did not believe it needed to recall the loans to 3AC.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion. At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[27] Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC. On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius. The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[28] Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap." Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees. Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement. Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions. 3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.      *The Special Committee Investigation.*

---

[27]   *See, e.g.,* Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[28]   Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[29]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material. Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties. The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things: Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG. At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the

---

[29]    See Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

interviews most efficient. BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation. Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above. In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee. In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards. The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

ii.    ***Investigation Report, Conclusions, and Proposed Settlements.***

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO[30], related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[31]

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
| **Releases and Waivers by the Officers against the Debtors** | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, |

---

[30]    Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[31]    The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

44

|  |  |
|---|---|
|  | and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification.<br><br>CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of

45

action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

### B.        The Alameda Loan.

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized.  On June 22, 2022, the Company entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions.

### C.        Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry.  Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below.  Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry.  By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents.  In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.  Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis.  Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction.  However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D.        Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors:  (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director;

(iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E.    Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[32]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business.  However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

---

[32]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

## VII.    EVENTS OF THE CHAPTER 11 CASES

### A.    The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement").  As discussed in greater detail in Article II herein, the Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan.  The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)      *The Joint Administration Order* authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)     *The Foreign Representative Order* authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)    *The Credit Matrix Order* authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv)    *The Automatic Stay Order* restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)     *The Schedules and Statements Order* authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by 30 days [Docket No. 59];

(vi)    *Order Retaining Stretto as Noticing Agent* authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)   *The Wages Order* authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)  *The Taxes Order* authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)    *The Interim Cash Management Orders* authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[33]

---

[33]    On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management

(x)     **The NOL Order** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)    **The Insurance Order** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)   **The Case Management Order** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)     **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)    **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)   **Applications to Retain Professionals** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

    i.      Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];

    ii.     Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299];

    iii.    Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297];

    iv.     Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]; and

    v.      Stretto, Inc. as administrative advisor [Docket No. 241].

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.      Appointment of Unsecured Creditors' Committee.**

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[34] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring

---

prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

[34]    *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

49

efforts, the Plan, and Debtors' proposed case timeline.  The seven-member Committee is currently composed of the following members:  Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman.  The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[35]

> **D.** **Schedules and Statements.**

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional 30 days for a total of 44 days after the Petition Date.  Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022.  This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, and September 15, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, and 430].  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

---

[35]    *See* Docket Nos. 403 and 404.

E.      **Bar Date Motion.**

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion").   On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time.  The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

F.      **The FBO Motion.**

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion").  The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks.  On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177].  On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193].  On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion.  The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors.  On August 11, 2022, the Debtors began returning customer funds in the FBO Accounts.  To date, the Debtors have returned approximately $245.75 million of customer funds from the FBO Accounts.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan.**

G.      **The 3AC Liquidation Proceeding.**

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[36]  On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[37]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the the five creditors appointed to the committee.[38]  Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). As set forth in greater detail in Article III.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

### H.    Litigation Matters.

#### 1.    *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

#### 2.    *Certain Adversary Proceedings*

##### (a)    *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[39]  The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing. On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or

---

[36]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[37]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[38]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[39]    *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

alternatively, enjoin prosecution of the Canadian Class Action.[40]  On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[41]

**(b)**     ***Voyager Digital Holdings, Inc. v. Robertson, et al.***

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*.  The named plaintiff was a Voyager customer.  His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46).  *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date.  The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case.  Those motions were pending on the Petition Date.  Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action").  The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws.  The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform."  Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[42]  The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints.  To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity~~, in which case such claims would be subject to the release and exculpation provisions of the Plan to the extent they may be brought against Released Parties or Exculpated Parties~~.  To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

---

[40]     *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[41]     *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

[42]     *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

**(c)**    ***Giacobbe v. Voyager Digital Holdings, Inc. et al.***

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[43]  The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022 pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4].  On October 14, 2022, the Debtors filed a motion to dismiss the *Giacobbe* Complaint [Docket Nos. 7, 8].

**(d)**    ***Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine***

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[44]  On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

**I.**    **The Coinify Sale.**

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer

---

[43]    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[44]    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business.  Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022.  Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000.  Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

### J.        The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each a, "KERP Participant").  KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both.  Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business.  Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform.  The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K.        Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings").  Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings.  On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.        The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion").  The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors.  On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.        The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital."  *See* Letter [Docket No. 373].  According to the *First Amended Verified Statement*

*Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for November 15, 2022. [Docket No. 444, 500].

        **N.**        **The Post-Petition Sale Process.**

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Article II herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the Purchaser's bid was the highest and best bid and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and the Purchaser entered into the Asset Purchase Agreement. The Debtors value FTX US's bid at approximately $1.422 billion, comprised of (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value. Pursuant to the Asset Purchase Agreement, FTX US is acquiring all Avoidance Actions or other affirmative Causes of Action or Claims against OpCo's customers solely to the extent that such Causes of Action or claims are against a customer in such person's capacity as a customer of OpCo, and borrowers under the Acquired Cryptocurrency Loans (as defined in the Asset Purchase Agreement) solely to the extent that such Causes of Action or Claims are against a borrower in such person's capacity as a borrower under the Acquired Cryptocurrency Loans. The Debtors do not believe that valid Avoidance Actions exist against Account Holders because any transactions with Account Holders were completed in the ordinary course of business consistent with past practices.

Importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the

56

Purchaser's Bid are set forth in greater detail in the Asset Purchase Agreement, attached to the Plan as Exhibit A. Due to this comprehensive marketing process and robust Auction, the Sale provides all creditors with significantly more value through the Sale than they would have received had the Debtors accepted FTX US's original offer.

On September 28, 2022, the Debtors filed the Sale Motion, which seeks approval of the Debtors' entry into the Asset Purchase Agreement and authority to perform its obligations under the Asset Purchase Agreement.

O.    **The Special Committee Investigation.**

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

VIII.   **RISK FACTORS**

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND**

THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

### A.    Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

**1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.***

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

**2.    *Certain Bankruptcy Law Considerations.***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**(a)    Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively

58

consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)     **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)     **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)     **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)     **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition,

the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

**(f)      Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions.   Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

**(g)      Filing of a Competing Plan.**

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

**(h)      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**(i)      The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(j)      Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(k)      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.    *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.    *Governmental Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.    **Risks Related to Recoveries under the Plan.**

1.    *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.    *The Debtors Are Subject to the Volatility of Cryptocurrency.*

The volatility of cryptocurrency may adversely affect the fair market value to be paid by Purchaser for Voyager's Cryptocurrency as determined by the Asset Purchase Agreement, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of September 26, 2022.

3.    *The Plan Will Likely Diminish the Value of VGX.*

Given that the Debtors' business operations will be winding down following the Effective Date and consummation of the Sale Transaction, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and the Purchaser is not assuming these obligations. Purchaser has offered to purchase all VGX in the Debtors' Estates for $10 million. Accordingly, for purposes of estimated recoveries, the Debtors have assumed a $10 million purchase price for VGX. The Debtors continue to engage with third parties regarding a sale of VGX that may provide additional recovery to Holders of Claims.

61

    **4.**     *The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

    **5.**     *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction.  A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

    **C.**     **Disclosure Statement Disclaimer.**

    **1.**     *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

    **2.**     *No Legal or Tax Advice Is Provided By This Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

    **3.**     *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

    **4.**     *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

    **5.**     *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.      *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

D.      **Miscellaneous Risk Factors and Disclaimers.**

1.      *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition.*[45]

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in III.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

---

[45]      Certain regulatory bodies have already commenced actions, which are described in Article VIII.D.2 herein.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

> **2.      *The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations.***

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager, which Voyager is in the process of preparing.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager is in the process of responding to such requests.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to

the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[46] on March 29, 2022, which required a response within 28 days. Alabama extended the response deadline to January 5, 2023. On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[47] on March 29, 2022. Indiana submitted a motion extending the time by which Voyager must respond to the order and request a hearing. Voyager submitted a second and third motion extending that deadline until October 31, 2022.

Kentucky issued an emergency cease and desist order[48] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[49] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. However, all response deadlines have been extended until October 31, 2022.

Oklahoma issued a cease and desist order[50] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently on August 1, 2022, Oklahoma extended the deadline by which to respond to the order and request a hearing until October 31, 2022.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[51] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times.

---

[46]   Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

[47]   Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[48]   Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[49]   New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[50]   Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[51]   South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

65

The order went into effect on August 1, 2022, but all response deadlines have been extended until November 30, 2022.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for 90 days.

Washington issued a statement of charges and notice of opportunity for a hearing[52] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022**.** Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[53] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.

California issued a desist and refrain order[54] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[55] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

---

[52] Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[53] The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[54] California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[55] Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

Alaska issued a cease and desist order[56] and notice of opportunity to request a hearing, on September 3, 2022.  Per the notice, Voyager has 30 days to request a hearing.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

>   **3.** ***The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan.***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

>   **4.** ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.***

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4 | Alameda Loan Facility Claims | Impaired |
| 5A | OpCo General Unsecured Claims | Impaired |
| 5B | HoldCo General Unsecured Claims | Impaired |
| 5C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting

---

[56]    Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from:  offering or selling such accounts in Alaska; and from accepting any assets into existing accounts.  Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

**B.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a plan of reorganization by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**C.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |

| 9 | Existing Equity Interests | Impaired |
|---|---|---|

**E.    Solicitation Procedures.**

    **1.    *Claims, Noticing, and Solicitation Agent.***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

    **2.    *Solicitation Package.***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

    **3.    *Distribution of the Solicitation Package and Plan Supplement.***

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by ~~October 28~~November 1, 2022 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free)  or  (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager,  or  the  Bankruptcy  Court's  website  at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).  Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than 14 days before the Voting Deadline, the Debtors will file the Customer Migration Protocol and the Schedule of Retained Causes of Action as part of the Plan Supplement.  No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

**F.    Voting Procedures**

October 19, 2022 (the "Voting Record Date") is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the

solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on November 29, 2022, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

**G.      Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast

with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4 Alameda Loan Facility Claims, Holders of Class 5A OpCo General Unsecured Claims, Holders of Class 5B HoldCo General Unsecured Claims, Holders of Class 5C TopCo General Unsecured Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### B.       Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured

72

creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction to FTX US. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Sale Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

###### C.        Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

###### D.        Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

73

(c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.      Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. Notably, the Alameda Loan Facility Claims are Impaired under the Plan and the Alameda Loan Facility Claims are being contractually conveyed to OpCo pursuant to the Asset Purchase Agreement. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement. If the Plan is confirmed, OpCo is entitled to any recovery on account of the Alameda Loan Facility Claims under the Plan. Accordingly, OpCo has a Claim against HoldCo and TopCo on account of the Alameda Loan Facility Claims and TopCo and HoldCo reserve the right to dispute such Claim.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 5A OpCo General Unsecured Claims are treated the same under the Plan, Class 5B HoldCo General Unsecured Claims and Class 5C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, as applicable, and the Holder of the Class 4 Alameda Loan Facility Claims has agreed to settle such claim through the Asset Purchase Agreement. Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.      *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

74

2.      *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)      **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)      **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XI.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.      **Introduction.**

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for

example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser (including, for the avoidance of doubt, in Purchaser's capacity as a Holder of Interests in the Debtors), Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review).  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency.  If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES**

PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.

The Plan is being structured as a taxable sale of certain assets of the Debtors (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in ~~satisfaction of~~exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution").  As a result and in connection therewith, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.  Gain will be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation.  Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors will in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency.  There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale).  Accordingly, there is significant uncertainty with respect to the tax consequences of the Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency.  Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Taxable Transaction, potentially in a way that has a materially adverse impact on the Debtors.  The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a taxable transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan.  Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.  The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

77

C.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[57] of Allowed Claims Entitled to Vote.**

1.    *Taxable Transaction.*

(a)    **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)**

Each Holder of an Allowed Account Holder Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of~~exchange for such Allowed Account Holder Claim:  (i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions from a Wind-Down Debtor or on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

There is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Clams (or separate taxable events for both events).  This is the case even though the Taxable Transaction contemplates the migration of customers to an acquiring cryptocurrency platform.  To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance.  There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event.  While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent."  Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058.  On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency is itself not an exchange of property "differing materially either in kind or in extent."  However, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable.  The Debtors believe it would be supportable for Holders to take the position that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform (as further described in the Customer Migration Protocol), (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.  The Debtors also continue to study whether this argument, when combined with a general "bifurcation" approach that separates the recovery Holders receive into cryptocurrency and non-cryptocurrency components, may permit Holders to take the position that, in the context of a

---

[57]    Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

Taxable Transaction, Holders retain their cryptocurrency positions in a tax-free manner, even if the receipt of other consideration constitutes a taxable exchange. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the argument described above that supports tax-free treatment of an In-Kind Distribution could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an In-Kind Distribution.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concept of a non-taxable in-kind distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).**

Very generally, to the extent a transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there

will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

**(b)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4 Claims**

All rights, titles, and interests in the Alameda Loan Facility Claims shall be transferred to OpCo, and Holders of Alameda Loan Facility Claims will not receive any distribution on account of such Alameda Loan Facility Claims. The treatment of Class 4 Alameda Loan Facility Claims is contractually settled pursuant to the Asset Purchase Agreement, pursuant to which its transfer to OpCo is treated as consideration paid by Purchaser for the taxable purchase of the Acquired Assets. As such, U.S. Holders of Allowed Class 4 Claims may recognize gain or loss on the disposition of the Alameda Loan Facility Claims in an amount equal to the difference between their basis in such Claim and the fair market value thereof. The tax consequences to Purchaser and its Affiliates of its acquisition of the Acquired Assets is not further discussed in this discussion.

**(c)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 5A Claims**

Each Holder of an Allowed OpCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of~~exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Transferred Cryptocurrency Value, in Cryptocurrency or Cash as provided in the Customer Migration Protocol; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions from a Wind-Down Debtor or on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 5A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 5A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

**(d)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 5B and 5C Claims**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of~~exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of

Wind-Down Trust Assets attributable to HoldCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in ~~full and final satisfaction, compromise, settlement, and release of~~exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity if there is a Wind-Down Trust, its Pro Rata share of the Wind-Down Trust Units (if any) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

### (e)    Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### (f)    Limitations on Use of Capital Losses

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 2.    *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan.*

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform. U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

3.       *The Wind-Down Entity.*

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

(a)       **Liquidating Trust Treatment**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. It may be that such treatment does not apply given the structure of the Plan. If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

(b)       **Disputed Ownership Fund treatment**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

4.       *U.S. Information Reporting and Withholding.*

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a

82

loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.    THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.    ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.    THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

\* \* \* \* \*

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:      */s/ Stephen Ehrlich*

Name:    Stephen Ehrlich
Title:    Co-Founder and Chief Executive Officer
         Voyager Digital Ltd.

84

Prepared By:

Dated: October 2~~0~~4, 2022
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

85