**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

In re

**VOYAGER DIGITAL HOLDINGS, INC.**, *et al.*,

Debtors.[1]

-------------------------------------------------------------------- x

:   **Chapter 11**

:   **Case No. 22-10943 (MEW)**

:   **(Jointly Administered)**

:   **Re: Docket No. 690**

## OBJECTION OF METROPOLITAN COMMERCIAL BANK TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) COMPELLING THE RELEASE OF THE RESERVE HELD BY METROPOLITAN COMMERCIAL BANK ON DEBTORS' BANK ACCOUNT AND (II) GRANTING RELATED RELIEF AND CROSS-MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT SETOFF

Metropolitan Commercial Bank ("MC Bank") hereby objects to *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Dkt. No. 690] (the "Reserve Motion") and submits a cross-motion (the "Cross-Motion") for limited stay relief to permit setoff and states as follows:[2]

## PRELIMINARY STATEMENT

1.    The Reserve Motion is an unnecessary and ill-conceived gambit to involve this Court in a dispute that could and should have been resolved as a business matter between the parties. It also lacks any relevant authority for the relief it seeks. The motion should be denied.

2.    MC Bank is sympathetic to the Debtors' plight in light of the collapse of FTX and the resultant loss of the proposed sale and plan that had been scheduled to be heard on December

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]  Capitalized terms not defined herein have the meanings ascribed to them in the Reserve Motion.

8, 2022.  MC Bank and the Debtors' management team have had a productive working

relationship throughout these chapter 11 cases (and before), and MC Bank had been prepared to

reduce the amount of the Reserve in view of the reduction in the amount in the FBO accounts.

However, MC Bank is not prepared to eliminate the Reserve entirely while it remains at risk, and

the Debtors have been unwilling to take the steps necessary to significantly reduce MC Bank's

risk by closing the FBO Accounts.  The demand in the Reserve Motion that MC Bank be left

entirely exposed, with no reserve against potential losses resulting from its continued provision

of banking services to the Debtors, is unauthorized by the agreements or the Bankruptcy Code,

and is unreasonable.

3.      The presumption in the Reserve Motion that MC Bank no longer requires a

reserve because it is no longer at risk of loss is not correct.  So long as the FBO Accounts remain

open, MC Bank will be exposed to risk of loss from a number of sources, including the potential

for operational mistakes by Voyager in authorizing withdrawals from customers' wallets, and

hacking or cybersecurity events in Voyager's systems or individual customers' accounts.

Moreover, the Debtors' apparent belief that the end of the 60-day window for chargebacks

eliminates the possibility of claims arising out of prior ACH debits is incorrect.

4.      While it is true that the existing Reserve was sized based on a formula of 2x the

ACH debit limit, that Reserve is contractually available to secure Voyager's broad obligations to

indemnify MC Bank for any losses, costs or expenses it incurs.  No provision of the parties'

agreements requires the return of the Reserve, much less at a time when the FBO Accounts used

to hold funds of Voyager customers remain open.  And the suggestion in the Reserve Motion that

MC Bank will be able to look to Voyager to make the FBO Accounts whole is of little comfort,

and an exceedingly poor substitute for a proper reserve, particularly in the context of the

Debtors' rationale for the motion — that they are very nearly out of money.

5.    As shown below, the funds in the operating account on which there is a hold for

the Reserve are not property of the estate — as with any bank account, the Debtors merely have

an unsecured claim against MC Bank.  Given that, the Debtors' asserted authority for the relief

sought — section 363(b) of the Bankruptcy Code — is wholly inapposite.  Rather, before the

Debtors' business judgment as to the use of funds would have any relevance, the Court must first

determine whether the Debtors have a right to require immediate repayment of MC Bank's debt

in respect of the operating account where the Reserve is held.  For the reasons set forth herein,

the Debtors have no such right under the terms of the parties' agreements or under the

Bankruptcy Code.

6.    Notwithstanding the absence of authority for the demand made in the Reserve

Motion, in light of the reduced balance in the FBO Accounts, MC Bank is willing to voluntarily

reduce the Reserve by $7.5 million immediately, and to continue to reduce the Reserve dollar for

dollar until the FBO accounts have been closed (subject, as detailed herein, to (i) maintaining a

$1 million reserve for an additional 90 days to address issues that may arise post-closing and

(ii) MC Bank's cross-motion to set off against the Reserve for its legal fees incurred in

connection with the FBO Accounts and related agreements).

## **<u>JURISDICTION</u>**

7.    This Court has jurisdiction over the Cross-Motion pursuant to 28 U.S.C. § 1334.

The Cross-Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).  Venue is proper in

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested in the Cross-Motion is

pursuant to 11 U.S.C. § 362(d)(1).

## RELEVANT BACKGROUND[3]

### A.    The FBO Accounts and the Reserve.

8.    MC Bank is a New York-based bank that provides various banking services to the Voyager Debtors.  Relevant to this matter, Voyager maintains several accounts with MC Bank, including its primary operating account (the "Operating Account"), and pursuant to the FBO Account Payment Services Agreement dated as of June 3, 2019 (the "FBO Agreement"),[4] MC Bank holds two accounts "for the benefit of" Voyager customers (the "FBO Accounts").[5]

9.    The FBO Accounts are pooled accounts, with records maintained by Voyager, which allowed Voyager customers to transfer U.S. dollars from their individual deposit accounts into their "wallets" on the Voyager app.  From there, Voyager customers could use those U.S. dollars to purchase crypto on the Voyager platform.  When Voyager customers wished to cash out of their crypto positions, they would sell crypto via the app and could leave cash on the Voyager platform in the FBO Account or initiate a transfer of the cash, generally via an Automatic Clearing House ("ACH") transfer, from the FBO Accounts back into their individual deposit accounts.

---

[3]  Citations to "Jenkins Decl." are to the *Declaration of David Jenkins in Support of Objection of Metropolitan Commercial Bank to Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* filed contemporaneously herewith.

[4]  The FBO Agreement was filed as Exhibit A to the *Notice of Filing Certain Banking Agreements Related to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief* [Dkt. No. 145] (the "Banking Agreements Notice").

[5]  The Debtors' bank accounts are listed in Exhibit 2 of Docket No. 641.  As described in the *Statement of Metropolitan Commercial Bank in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges, (D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking Cryptocurrency, and (II) Granting Related Relief* [Dkt. No. 177], there are two FBO accounts — one for ACH activity and a much smaller one for wire transfers.

10.     Pursuant to the FBO Agreement, Voyager was and is responsible for maintaining records confirming that customer transactions in and out of the account are appropriate and accounted for, and for reimbursing the account for all losses and shortfalls.  FBO Agreement §§ 3.4(c), 5.1, 9.3.  Voyager also agreed to indemnify MC Bank for losses, costs and reasonable expenses, including attorney's fees, incurred in connection with the FBO program and Accounts, other than in the case of fraud, willful misconduct or similar conduct by MC Bank.  *Id.* §§ 9.3, 12.1.  Most account activity was via ACH transfers, and was subject to a separate ACH Origination Agreement (the "ACH Agreement")[6] dated June 9, 2018, which likewise provides for indemnity in connection with ACH transfers.  ACH Agreement § 11.

11.     To ensure that MC Bank would be made whole for any losses relating to ACH activity in the FBO Accounts, the parties agreed to create a reserve account (the "Reserve"), originally in the amount of three times the daily ACH limit.  FBO Agreement Ex. 1 at 22.  Although the amount of the Reserve was calculated based on the ACH daily limit, both the FBO Agreement and the ACH Agreement grant MC Bank broad indemnities and provide that MC Bank may set off obligations against the Reserve.  FBO Agreement § 8.4; ACH Agreement § 9.

12.     Pursuant to a letter agreement dated March 15, 2021 (the "March 2021 Letter Agreement"), the Reserve was reduced to two times the daily limit, in an agreed upon amount of $24 million, in the form of a hold on funds in the Operating Account.  Reserve Motion Ex. 1.

**B.     Activity in the first weeks of these cases.**

13.     Prior to commencing these cases, the Debtors halted all activity on their app, including not only transactions in cryptocurrency, but also the withdrawal by customers of their U.S. dollars from the FBO Accounts.

---

[6] The ACH Agreement was filed as Exhibit B to the Banking Agreements Notice.

14.     During the first weeks of these cases, some customers misused the ACH chargeback mechanism by falsely denying that they had authorized Voyager's purchases of crypto for their accounts.  Because the funds had actually been removed from these customers' accounts to purchase crypto, this activity created the risk of a shortfall in the FBO Accounts, endangering the funds belonging to other customers.

15.     On July 8, 2022, the Court approved an interim cash management order which, *inter alia*, provided that the Debtors and their respective banks were authorized to continue operating under their existing agreements which "govern the postpetition cash management relationship" between the Debtors and their banks, including with respect to reserves, fees, indemnity and offset.  *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* ¶¶ 13, 16 [Dkt. No. 53]; *accord* Dkt. Nos. 237, 580, 641 (second, third and fourth interim orders providing same).[7]

16.     In response to the improper chargeback problem, the Debtors then obtained approval of an order permitting the parties to continue performing under the FBO Agreement, including by allowing customer withdrawals to resume and the Debtors to resume making the FBO Accounts whole in the event of shortfalls.  *Order (I) Authorizing the Debtors to (A) Honor Withdrawals from the MC FBO Accounts, (B) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (C) Sweep Cash Held in Third-Party Exchanges,*

---

[7]  Subsequent citations herein to the "Cash Management Order" are to the most recent interim order at Docket No. 641.

*(D) Conduct Ordinary Course Reconciliation of Customer Accounts, and (E) Continue Staking*

*Cryptocurrency, and (II) Granting Related Relief* [Dkt. No. 247] (the "FBO Order").  The

Debtors also took proactive steps to inform customers that such fraudulent chargebacks were in

violation of law, and fortunately the problem was largely contained.

### C.    The current status of the FBO Accounts.

17.    Following entry of the FBO Order, many but not all Voyager customers withdrew

their cash from the FBO Accounts.  Jenkins Decl. ¶ 7.  The balance in the FBO accounts has

been reduced to $16.5 million in the aggregate (as of December 6, 2022) compared with the

approximately $270 million in the account as of the petition date.  *Id*.  However, there are still

more than 190,000 customers (as of December 5, 2022) with funds in the account.  *Id*.  MC Bank

has repeatedly requested that the Debtors notify customers that the FBO accounts will be closed

within 30 days, and that if they do not withdraw their funds, checks will be sent to their last

known address.  *Id.* ¶ 8.  The Debtors have not done so, leaving the end date for the FBO

Accounts, and MC Bank's potential exposure, open.

### ARGUMENT

### A.    The Reserve Motion is a procedurally improper attempt to force MC Bank to turn over funds that are not property of the estate.

18.    The Reserve Motion is styled as a motion pursuant to section 363 of the

Bankruptcy Code to force MC Bank to turn over the Reserve to allow the Debtors to spend the

funds in accordance with their business judgment.  But section 363 has no applicability here.

Section 363 concerns what the trustee or debtor in possession may do with property of the estate,

not what another party can be forced to do with property in its possession.  Even further afield,

the Reserve Motion relies upon the duties of the trustee or debtor in possession to preserve the

value of the estate pursuant to sections 1107 and 1108, combined with section 105, the last resort

whenever there is no applicable authority. These provisions offer no authority for the Debtors'
effort to compel MC Bank to pay over funds in a deposit account.

19.     Funds in a deposit account are not cash that belongs to the depositor. Rather, it is
well-established that deposits in a bank account in a debtor's name are debts owed by the bank to
the debtor. *See, e.g.*, *Citizens Bank* v. *Strumpf*, 516 U.S. 16, 21 (1995) ("[A] bank account . . .
consists of nothing more or less than a promise to pay, from the bank to the depositor . . . .");
*Bank of Marin* v. *England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is
that of debtor and creditor, founded upon contract."). While the debt itself, *i.e.*, the estate's right
to withdraw the funds, is a contractual right that is property of the estate, the cash in the Reserve
is not property of the estate that the Debtors are free to require MC Bank to pay over.

20.     The specific section of the Code addressing "an entity that owes a debt that is
property of the estate" is section 542(b). That section provides in relevant part that:

> [A]n entity that owes a debt that is property of the estate and that is
> matured, payable on demand, or payable on order, shall pay such
> debt to, or on the order of, the trustee, except to the extent that
> such debt may be offset under section 553 of this title against a
> claim against the debtor.

21.     As the Supreme Court has recognized, other, more general, provisions of the
Bankruptcy Code cannot supplant section 542's specific provisions concerning turnover. *See
City of Chicago* v. *Fulton*, 141 S. Ct. 585, 590-91 (2021) (invoking canon against surplusage in
rejecting reliance on section 362(a)(3), rather than section 542, to effect turnover). Likewise,
section 105(a)'s general provision of authority to issue orders "to carry out the provisions" of the
Bankruptcy Code does not override other explicit mandates and prohibitions in the Code. *Law* v.
*Siegel*, 571 U.S. 415, 421-22 (2014). Sections 363 and 105(a) cannot be invoked in a general
way to effect turnover; only compliance with the provisions of, and procedure contemplated by,
section 542 can accomplish that goal.

22. Thus, the relief sought by the Debtors in the Reserve Motion can only be obtained by commencement of an adversary proceeding pursuant to Bankruptcy Rule 7001. *See* Bankruptcy Rule 7001 ("The following are adversary proceedings: (1) a proceeding to recover money or property"). The Debtors' failure to seek the relief in the form of an adversary proceeding mandates the denial of the Reserve Motion.

23. By pointing out that the relief sought in the Reserve Motion is governed by Rule 7001, MC Bank is not engaging in a mere procedural "gotcha." Rather, it is to establish that the Debtors cannot collect on the debt owed by MC Bank with respect to the Reserve held in the deposit account without demonstrating that MC Bank is required by the terms of the agreements to release the Reserve, and that the Reserve funds are not subject to setoff. For the reasons that follow, the Debtors fail on both counts.[8]

**B.    Turnover of the full amount of the Reserve is not justified.**

**1.    The Reserve is not payable on demand because the FBO Agreement requires that the Reserve stay in place.**

24. There is no basis under section 542(b) to release the full amount of the Reserve because it is not "payable on demand" or "payable on order" to Voyager under the terms of the FBO Agreement.

25. The FBO Agreement, as modified by the March 2021 Letter Agreement, simply provides that there shall be a reserve account in the amount of $24 million, which may be modified based on *MC Bank's* review on an ongoing basis. The FBO Agreement does not contemplate consideration of the Debtors' business judgment in connection with the maintenance

---

[8] By responding to the Debtors' assertions in the Reserve Motion herein, MC Bank does not waive the Debtors' obligation to seek relief through an adversary proceeding and to comply with the procedural requirements that entails.

of the Reserve, and it does not say that the Reserve shall be in place only for as long as *Voyager* perceives that there is risk to MC Bank.

26.    Moreover, while the size of the Reserve was set in the first instance by the amount of ACH debit activity, there is little doubt that the parties did not anticipate the current situation, where all inbound activity in the FBO Accounts would cease but the account would stay open indefinitely in a state of suspended animation.  Thus, the fact that there is no longer inbound activity into the accounts does not resolve the question of whether a reserve is appropriate, as the Reserve Motion would have it.  Rather, the FBO Agreement contemplates generally that the Reserve will serve as a source of recovery to MC Bank for debts owed to it by Voyager, including damages and reasonable attorney's fees.  FBO Agreement § 8.4.  Under this Court's orders, that agreement continues to govern the relationship between Voyager and MC Bank as it did prepetition, including with respect to fees, reserves, offsets, indemnity, recovery, and other matters.  Cash Management Order ¶¶ 13, 16.  There is no provision of the FBO Agreement which authorizes Voyager to require, at its own discretion, that MC Bank return the Reserve. Instead, the FBO Agreement assumes that the Reserve will remain in place so long as the agreement remains in place, and directs the parties to cooperate in good faith to resolve disputes and, when appropriate, wind down the account.  *See* FBO Agreement §§ 12.17(b), 10.3(b).  MC Bank has attempted to follow this command, to no avail.

**2.    MC Bank remains at risk as long as the FBO Accounts remain open, holding funds which have not been withdrawn by customers.**

27.    The Reserve Motion is premised on the Debtors' assertion that MC Bank has no need for or entitlement to an ongoing reserve because there is no further risk from ACH activity. This premise is mistaken.

28.     First, the risk generated by ACH debits (*i.e.*, customer funds debited out of customers' deposit accounts and into the FBO Accounts) does not end in 60 days. The 60-day window is the standard time frame under the rules promulgated by the National Automated Clearing House Association ("NACHA") for a chargeback against MC Bank's account in the event that a customer disputes a debit. Once 60 days have passed, NACHA no longer imposes an automatic chargeback if a customer disputes the validity of an ACH debit. However, customers remain free to challenge ACH debits and seek a refund from their depository bank (referred to as the receiving bank or RDFI). *See* Ex. A (excerpt of NACHA rules). Pursuant to the Electronic Funds Transfer Act (the EFTA or Reg E), a consumer may have up to 120 days in some cases to notify their financial institution of (and avoid liability for) an unauthorized transfer, and, under NACHA rules, the RDFI (*i.e.*, the consumer's bank from which the funds were originally debited) may seek to recover such transfers from the bank that originated the transfer (the ODFI) for up to two years following the settlement date of the transfer. *See id.*; 12 C.F.R. part 1005. Although most chargebacks will be received within the standard 60-day window, demands for such refunds can still be successfully made by the RDFI for up to two years following the last transfer from an account. Such reversals are not unheard of. Jenkins Decl. ¶ 11. If the ODFI dishonors the refund, the RDFI (the consumer's bank) can choose to contest this dishonor or litigate or arbitrate the dispute.

29.     There is no doubt that the risk of loss from challenged ACH debits is much lower than it was during the 60-day window. But it is not zero; MC Bank has received such requests beyond 60 days many times. *Id.* In fact, the Reserve Motion (¶ 11) concedes that a demand for a refund came through in October on account of a debit which occurred in May. Although, as set

forth below, MC Bank will not insist on a reserve for two years to account for this risk, it is inaccurate to say that the window of risk closes after 60 days as the Debtors suggest.

30.    Second, there are several risks that may arise with respect to the funds remaining in the FBO accounts and the efforts to return those funds to Voyager customers.  In the ordinary course of business, most of the transfers to the remaining 190,000 customers will be completed via ACH.  Jenkins Decl. ¶ 12.  Several potential sources of risk exist.

31.    First, there is a risk that, due to erroneous recordkeeping or a dispute, a Voyager customer will claim to be entitled to more than what Voyager's records reflect.  *Id.* ¶ 14. Voyager has provided MC Bank with its internal reconciliation of customer accounts dated December 1, 2022, that shows that its records and the amount in the FBO Accounts reconcile.[9] MC Bank has a regulatory obligation to assess its risks, which includes assessing the reliability of the information it is provided by Voyager upon which it relies.  But MC Bank has no ability to audit this reconciliation, as it does not have customer-level detail.  Accordingly, MC Bank has requested that Voyager represent that the reconciliation report it provided to MC Bank on December 1, 2022 (which should be updated to the date the Reserve Motion is heard), is the product of a thorough validation process and accurately represents the universe of customers entitled to payments in the amounts set forth therein as of that date.  To date, Voyager has refused to do so.  MC Bank also requests that Voyager update that reconciliation report on a weekly basis thereafter and alert MC Bank to any inconsistencies between the prior reconciliation report and the activity to date.

---

[9]  The most recent reconciliation was a few thousand dollars off, which Voyager attributed to a timing issue. Jenkins Decl. ¶ 14 n.3.

32.    Second, although MC Bank makes every effort to protect against such risks, the reality is that hacking and other cybersecurity issues are real risks in the current environment. Examples of high-tech crypto hacking,[10] data leaks from large financial institutions,[11] and consumer-side identity theft,[12] abound.  Sophisticated criminals may be able to direct the transfer of funds to a different account from that which customer intended.  Jenkins Decl. ¶ 15.  MC Bank might be able to recover any improperly directed ACH transfer from the bank to which the funds were sent, and per the FBO Agreement and the ACH Agreement, MC Bank is not responsible under any circumstance for misdirected customer funds.  As a practical matter, however, if there are delays or difficulties in such recovery (including because the party that wrongly received the funds moves them immediately, and/or because detection of the transfer was not immediate), customers may look to MC Bank to be made whole.  As long as MC Bank holds some amount in the Reserve, it has greater assurance of being made whole.  Absent such a Reserve, the loss may well be borne by MC Bank.

33.    ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[10]  Gurley, Lauren, Zeitchik, Steven and Menn, Joseph, *FTX is investigating a potential hack*, WASH. POST (Nov. 12, 2022), https://www.washingtonpost.com/technology/2022/11/12/ftx-crypto-hack/ (describing suspected hack of crypto platform FTX resulting in loss of nearly $500 million).

[11]  Wile, Rob, *U.S. bank reveals data breach involving some credit card accounts*, NBC NEWS (Oct. 28, 2022), https://www.nbcnews.com/business/consumer/us-bank-data-breach-impacts-some-credit-card-accounts-rcna54594 (reporting inadvertent release of customer information including social security numbers, account balances and closed credit card numbers).

[12]  *See, e.g.*, Roy, Jessica, *My wallet was stolen at a bar.  Then my identity theft nightmare began*, LA TIMES (Oct. 26, 2022), https://www.latimes.com/business/technology/story/2022-10-26/identity-theft-nightmare; Fed. Trade Comm'n, *What to Know About Identity Theft*, https://consumer.ftc.gov/articles/what-know-about-identity-theft.



35.    Without belaboring the point, it is obvious that the potential both for human error and for potential criminal activity create risk for MC Bank.  Indeed, given the current status of the crypto industry and the daily stories of fraud, massive accounting failures and other

irregularities (without implying in any way that Voyager's management is guilty of such

conduct), the Debtors' insistence that MC Bank has nothing to worry about is somewhat hard to

swallow.

36.    Finally, even once the termination date for the FBO Accounts has been reached,

there will be some continuing activity in those accounts.  To date, there has already been a small

amount of credit activity returned back into the FBO Accounts due to administrative errors by

customers attempting to withdraw their funds, such as attempts to send funds to closed accounts.

MC Bank expects that it and Voyager will work cooperatively to ensure that these issues are

resolved promptly.  However, these kinds of errors may result in a portion of customer funds re-

entering the FBO Accounts temporarily after they have been transferred out, resulting in

administrative responsibilities and attendant risks to MC Bank even after money has left the

accounts.  Jenkins Decl. ¶ 18.

> ### 3.    MC Bank is willing to reduce the amount of the Reserve, provided steps are taken to ensure that the FBO Accounts are closed as soon as possible.

37.    Since the Debtors' proposed paths forward do not appear to include re-opening

the Voyager app and resuming the prepetition business,[15] there is no reason to keep the FBO

Accounts open.

38.    So long as the FBO Accounts remain open with customer funds in them, there is a

potential for mistakes, fraud, chargebacks, and other sources of possible loss.  For the protection

of MC Bank, Voyager, and the customers with funds remaining in the FBO Accounts, it makes

---

[15] *See* Tr. of Nov. 15, 2022 Hr'g at 7 (Debtors' counsel describing available paths forward as (i) platform sale "similar to the FTX construct," (ii) individualized asset sales, or (iii) "return of crypto and cash as quickly as possible to customers").  In the event of a sale, MC Bank understands that transfer of the FBO Agreement and FBO Accounts has never been contemplated, and in any event does not believe that the agreements are assignable, as MC Bank cannot be forced into a banking relationship without its consent.

sense to close the FBO Accounts as soon as possible.  Once the customer funds currently in the account are returned, there is no use for an FBO account, which can only hold customer, not Voyager, funds.  MC Bank has repeatedly requested that Voyager notify its customers that the account will be closed within 30 days, and that they must either initiate an ACH transfer to withdraw their funds or they will receive a check at their last known address.  Had MC Bank's request been implemented, there would have been no need for this motion, as MC Bank would have had no need for a continued reserve (other than to cover its right of offset with respect to its legal fees) for more than a short period after the last dollar leaves the account, absent serious problems arising during the return of the remaining FBO funds to customers.

39.    Voyager rejected MC Bank's request that the FBO accounts be closed as soon as possible because it intends to continue using the FBO Accounts in the future to make distributions of the proceeds of a sale of the business or of crypto held by Voyager.  It cannot do so.  Such a use would be fundamentally different from customers' prepetition voluntary sale of their crypto, the proceeds of which ran through the FBO Accounts.  Based on Voyager's own legal position, it does not hold any customer property.  Rather, Voyager's position has been that the crypto assets in its possession are property of the estate.  *See, e.g.*, *Debtors' Objection to Letter Filed by Aaron Niman* ¶ 12 [Dkt. No. 625] ("[A]ll of the cryptocurrencies held on the Debtors' platform is estate property that is to be distributed to creditors in accordance with the Plan.").  An FBO account cannot contain funds that are property of Voyager's estate.  *See* 12 CFR 330.5; FDIC, *Fin. Institution Letter:  Guidance on Deposit Placement and Collection Activities* (FIL-29-2020) (June 7, 2010).

40.    As is standard operating procedure for any debtor, creditor distributions can and should be made through an ordinary bank account without the attendant risks, obligations and

limitations associated with an FBO account.  However, MC Bank is willing to continue to provide the needed functionality developed for the FBO Accounts to facilitate distributions to customers through a non-FBO account, subject to agreeing on mutually acceptable terms and conditions for that account.

41.     The Reserve Motion asserts that Voyager will be in need of cash in the near term. However, there is approximately $25 million in Voyager's various operating accounts in addition to the funds subject to the Reserve.  Jenkins Decl. ¶ 9.  It is thus highly questionable whether the need for the cash in the reserve is "urgent," as the Debtors claim.[16]  Nonetheless, in light of the substantial reduction in the amounts that remain in the FBO Accounts, MC Bank is willing to release $7.5 million now to reduce the Reserve to the current FBO Account balance, and to continue to release on a weekly basis one dollar for every dollar that is withdrawn, subject to (i) setoff for MC Bank's legal fees as set forth herein[17] and (ii) retaining a $1 million static reserve for 90 days after the FBO accounts are zeroed out to account for possible chargebacks and errors.

---

[16] It should also be considered that the "urgent" need for cash is largely to pay professional fees.  Voyager's most recent monthly operating reports reflect that a very significant portion of their cash burn is attributable to bankruptcy professional fees, which appear unlikely to abate any time soon.  *See* Voyager Digital, LLC Monthly Operating Report for Oct. 2022 at 4 [Dkt. No. 17 in Case No. 22-10945] ($6,540,132 out of $7,994,941 in total disbursements, or 81.8%, attributed to "Bankruptcy Professional Fees"); Voyager Digital Holdings, Inc. Monthly Operating Report for Oct. 2022 at 4 [Dkt. No. 645 in Case No. 22-10943] ($928,002 out of $3,277,373 in total disbursements, or 28.3%, attributed to "Bankruptcy Professional Fees").  While MC Bank has no objection to professionals being paid, it does object to that use of cash taking priority over its need for protection against risk of loss.

[17] To the extent MC Bank is found to owe return of the Reserve under the terms of the FBO Agreement, such return is subject to recoupment in the amount of the fees that Voyager owes to MC Bank pursuant to the same agreement. *See In re McMahon*, 129 F.3d 93, 96 (2d Cir. 1997) ("[C]ross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered." (quoting *Nat'l Cash Register Co.* v. *Joseph*, 86 N.E.2d 561, 562 (N.Y. 1949))).

**CROSS-MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

42.    MC Bank cannot be required to turn over the full amount of the Reserve for the additional reason that a portion of the funds on deposit with MC Bank in Voyager's accounts are subject to setoff for amounts that Voyager owes to MC Bank.

43.    MC Bank hereby submits this Cross-Motion for entry of an order, substantially in the form attached hereto as Exhibit D, granting MC Bank relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to permit it to set off the amounts Voyager owes MC Bank for its legal fees owed under the FBO Agreement and the ACH Agreement.

**A.    MC Bank is entitled to set off its legal fees against any Voyager account.**

44.    Both the FBO Agreement and the ACH Agreement include broad indemnities in favor of MC Bank for losses relating to the FBO program and ACH activity, including for reasonable attorneys' fees incurred in connection with these matters.  Specifically, section 9.3 of the FBO Agreement provides that:

> [Voyager] shall be liable to Bank for any and all liabilities and every loss, cost, expense, claim, demand, and cause of action (including, without limitation, the cost of investigating the claim, the cost of litigation and reasonable attorneys' fees, whether or not legal proceedings are instituted and whether paid or incurred, as the case may be) by or on behalf of any Customer, Regulatory Authority, System, or other third party as a result of any of [Voyager]'s Programs or the [Voyager]'s failure to fully comply with the Legal Requirements.

45.    The FBO Agreement further provides that:

> [Voyager] covenants and agrees to indemnify and hold harmless and defend Bank . . . against any losses, costs or expenses, including but not limited to attorneys' fees, arising from any third party legal action, claim, demand or proceedings brought against any of them as a result of:  (i) any misrepresentation, breach of representation or warranty or failure to fulfill a covenant of this Supplement on the part of [Voyager]; (ii) any act or omission of [Voyager] or its contractors, providers or representatives which violates any Legal Requirement; (iii) any claim or action against

> the Bank related to any state or local law, rule regulation, or
> ordinance; (iv) any claim or action by any state regulatory agency,
> subdivision, or attorney general relating to any of [Voyager]'s
> Programs; or (v) any claim relating to obligations owed to or by
> [Voyager] or any third party retained by it.

FBO Agreement § 12.1(a).  The provision includes a standard carve-out for MC Bank's fraud,

willful misconduct or violation of the agreement.  The FBO Agreement also includes "any and

all costs incurred by Bank in enforcing this Supplement, including reasonable attorneys' fees"

among the debts owed by Voyager to MC Bank.  *Id.* § 8.4.

46.    In addition, section 11(a) of the ACH Agreement provides that

> The Bank shall not be responsible for [Voyager]'s acts or
> omissions (including without limitation the amount, accuracy,
> timeless, of transmittal or due authorization of any entry received
> from company) or those of any other person, including without
> limitation any Federal Reserve Bank, third party processor or
> transmission or communications facility, any receiver or receiving
> Depository Financial Institution (including without limitation the
> return of an Entry by such Receiver or Receiving Depository
> Financial Institution), and no such person shall be deemed the
> Bank's agents.  [Voyager] agrees to indemnify and hold harmless
> the Bank against any loss, liability or expense (including attorney's
> fees and expenses) resulting from or arising out of any claim of
> any person that the Bank is responsible for any act or omission of
> company or any other person described in this section 11(a).

47.    As a result of Voyager's failure and the fallout therefrom, MC Bank engaged

outside counsel to assist with matters relating to the FBO Agreement and ACH issues.  To date,

MC Bank has incurred $1,541,000 in legal fees and expenses resulting from identifying and

remedying ACH chargeback and fraud concerns, monitoring these proceedings and customer

complaints, protecting and enforcing MC Bank's rights under the FBO Agreement, and ensuring

compliance with regulatory requirements and appropriate oversight pursuant to MC Bank's

policies.  Jenkins Decl. ¶ 19.[18]

48.     Voyager is responsible for these amounts pursuant to the terms of the FBO

Agreement and the ACH Agreement.

49.     Voyager maintains its bank accounts, including operating accounts, at MC Bank;

its deposit accounts, including the $24 million Reserve, are therefore debts owed by MC Bank to

Voyager pursuant to the terms of their agreements.  *See, e.g.*, *Bank of Marin*, 385 U.S. at 101.

The terms and conditions governing the Operating Account make clear that MC Bank may "set

off the funds in this account against any due and payable debt any of you owe us now or in the

future."  *See* Ex. C at 8.[19]  Accordingly, under the terms of the Operating Account and under

New York law, MC Bank has a right to set off these obligations before returning funds from the

Reserve.  *See, e.g.*, *Junio* v. *Astoria Fed. Sav.*, 2002 WL 32001412, at *2 (E.D.N.Y. Feb. 25,

2002) (approving setoff where debtor and bank executed note expressly permitting setoff and

promissory note and checking account were mutual debts); *see generally* N.Y. DCL § 151

(codifying right to set off "any indebtedness" owed between two parties where one is in

bankruptcy).  The Cash Management Order expressly provides that Voyager and its banks would

continue performing under their agreements and preserved rights of setoff.  *See* Cash

Management Order ¶¶ 16, 21.

---

[18]  *See* Proof of Claim Nos. 11198 and 11202 (asserting claims of $1.2 million in legal fees as of October 3, 2022 bar date).

[19]  *See also* FBO Agreement § 8.4 (providing for setoff against Reserve for amounts due to MC Bank); ACH Agreement § 9 (permitting MC Bank to "debit any account" maintained by Voyager with MC Bank or "set off against any amount it owes to" Voyager to obtain payment of obligations under ACH Agreement).

**B.    Stay relief is warranted to permit MC Bank to set off its legal fees.**

50.    Pursuant to 11 U.S.C. § 362(d)(1), relief from the automatic stay can be granted "for cause."  Many courts have recognized that by establishing a right of setoff, a creditor has made the requisite *prima facie* showing of "cause" to lift the stay.  *See, e.g.*, *United States* v. *Gould*, 401 B.R. 415, 426 (9th Cir. BAP 2012); *In re Buttrill*, 549 B.R. 197, 205 (Bankr. E.D. Tenn. 2016).  Moreover, the Bankruptcy Code respects existing rights of setoff without regard to the debtors' business judgment.  *See, e.g.*, *In re Applied Logic Corp.*, 576 F.2d 952, 957-58 (2d Cir. 1978) (discussing setoff provision of Bankruptcy Act and explaining that "[t]he rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust'"); *Junio*, 2002 WL 32001412, at *8 (affirming approval of setoff by bank and noting policy favoring setoff "absent compelling circumstances").

51.    MC Bank has a current right to set off its legal fees billed to date in the amount of $1,541,000.  In the Reserve Motion, Voyager is proposing to take the remaining free cash in the estate, presumably to fund administrative expenses including professional fees, while it has no prospect of generating new cash.  MC Bank has been performing under the FBO Agreement and the ACH Agreement and incurring significant costs caused by Voyager's failure.  There is no basis to force MC Bank to exchange its fully secured claim for an unsecured one of uncertain value.

## NOTICE

52.    MC Bank will provide notice of this objection and cross-motion to the following parties and/or their respective counsel, as applicable:  (a) the Debtors; (b) the United States Trustee for the Southern District of New York; (c) the Official Committee of Unsecured Creditors; and (d) all parties on the Master Service List maintained by the Debtors' claims and noticing agent.

## **NO PRIOR REQUEST**

53.     No prior request for the relief sought in the Cross-Motion has been made to this or

any other Court.

## **CONCLUSION**

For the foregoing reasons, MC Bank respectfully requests that the Court deny the

Reserve Motion and grant limited stay relief, substantially in the form of the order attached as

Exhibit D hereto, to permit MC Bank to offset its legal fees owed under the FBO Agreement.


Dated:  December 7, 2022
      New York, New York

Respectfully submitted,

*/s/ Amy R. Wolf*
Richard G. Mason
Amy R. Wolf
Rosemary Spaziani (*pro hac vice* pending)
Angela K. Herring
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
Email:  RGMason@wlrk.com
       ARWolf@wlrk.com
       RSpaziani@wlrk.com
       AKHerring@wlrk.com

*Attorneys for Metropolitan Commercial Bank*