UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x
In re                                                             :    Chapter 11
                                                                  :
                                                                  :    Case No. 22-10943 (MEW)
VOYAGER DIGITAL HOLDINGS, INC., *et al.*,                         :
                                                                  :    (Jointly Administered)
                        Debtors.[1]                               :
                                                                  :    Re: Docket No. 690
----------------------------------------------------------------- x

**DECLARATION OF DAVID JENKINS IN SUPPORT OF OBJECTION OF METROPOLITAN COMMERCIAL BANK TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) COMPELLING THE RELEASE OF THE RESERVE HELD BY METROPOLITAN COMMERCIAL BANK ON DEBTORS' BANK ACCOUNT AND (II) GRANTING RELATED RELIEF AND CROSS-MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT SETOFF**

I, David Jenkins, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1. I am Vice President, Head of Global Payments Operations for Metropolitan Commercial Bank ("MC Bank"). MC Bank is headquartered at 99 Park Avenue, New York, New York 10016.

2. I submit this declaration in support of MC Bank's objection to *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Dkt. No. 690]. I have been personally engaged in MC Bank's relationship with the Voyager debtors (together, "Voyager").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; or (c) my evaluation and opinion based upon my experience and knowledge. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**A.    The FBO Accounts and the Reserve.**

4. MC Bank provides various banking services to the Voyager debtors. Voyager maintains several accounts with MC Bank, including its primary operating account (the "Operating Account"). Pursuant to the FBO Account Payment Services Agreement dated as of June 3, 2019 (the "FBO Agreement"), MC Bank holds two accounts "for the benefit of" Voyager customers (the "FBO Accounts").

5. In the ordinary course of business, Voyager maintained records confirming that customer transactions in and out of the FBO Accounts were appropriate and accounted for. Most account activity was via ACH transfers.

6. MC Bank maintains a reserve account in connection with the FBO Agreement in the form of a $24 million hold on funds in the Operating Account (the "Reserve").

**B.    The current status of the FBO Accounts.**

7. After the Debtors reopened withdrawals of U.S. dollars, many but not all Voyager customers withdrew their cash from the FBO Accounts. The balance in the FBO Accounts has been reduced to $16.5 million in the aggregate (as of December 6, 2022) compared with the approximately $270 million in the accounts as of the petition date. However, based on a December 5, 2022 reconciliation provided to MC Bank by Voyager, there are still more than 190,000 customers with funds in the account.

8.      MC Bank has repeatedly requested that the Debtors notify customers that the FBO Accounts will be closed within 30 days, and that, if they do not withdraw their funds, checks will be sent to their last known address. The Debtors have not done so.

**C.    The Debtors' other account balances.**

9.      Based on MC Bank's records, as of the date of this Declaration there is approximately $25 million in Voyager's various operating accounts in addition to the $24 million subject to the Reserve.

**D.    Potential risks to MC Bank.**

10.     The premise of the Reserve Motion is that MC Bank no longer has any risk from ACH chargebacks and therefore no need for the Reserve. This is not correct; MC Bank continues to have risk from a number of sources.

11.     First, the risk generated by ACH debits does not end in 60 days. The 60-day window is the standard timeframe under the rules promulgated by the National Automated Clearing House Association ("NACHA") for a chargeback against MC Bank's account in the event that a customer disputes a debit. After the 60 days, customers may still challenge the validity of an ACH debit and seek a refund from their depository bank (referred to as the receiving bank or RDFI). My understanding is that under the Electronic Funds Transfer Act (the EFTA or Reg E), a consumer may have up to 120 days in some cases to notify their financial institution of (and avoid liability for) an unauthorized transfer, and that under the NACHA rules, the RDFI (*i.e.*, the consumer's bank from which the funds were originally debited) may seek to recover such transfers from the bank that originated the transfer for up to two years following the

settlement date of the transfer.[2] Although most chargebacks will be received within the standard 60-day window, demands for such refunds can still be successfully made by the RDFI for up to two years following the last transfer from an account. In my 25 years of experience in the banking industry, I have seen such post-60 day reversals many times. In fact, the Reserve Motion notes one such instance having occurred in October, when a Voyager customer sought a refund of a May debit. Further, although MC Bank technically has the right to dishonor returns that are not received within the 60-day window, this right has very little practical effect because the customer's bank (the RDFI under NACHA rules) will likely contest any dishonored return that involves an unauthorized transfer. Such a contest would force MC Bank to accept the debit to the FBO Account and pursue any recourse MC Bank might have against the customer's bank in proceedings outside of the ACH network.

12. Second, there are several risks that may arise with respect to the funds remaining in the FBO Accounts and efforts to return those funds to Voyager customers. In the ordinary course of business, most of the transfers to the remaining 190,000 customers will be completed via ACH.

13. I have identified these risks based on MC Bank's experience to date with Voyager, as well as my experience in the banking industry generally.

14. First, there is a risk that, due to erroneous recordkeeping or a dispute, a Voyager customer will claim to be entitled to more than Voyager's records reflect. In my experience, mistakes and customer disputes are possible even with the best of controls. Voyager has provided MC Bank with its internal reconciliation of customer accounts, dated December 1,

---

[2] In addition, the customer's bank may have an indefinite time to recover transfers that settled within 95 days of the first transfer in a series of unauthorized transfers.

2022, that show that its records and the amount in the FBO Accounts reconcile.[3] MC Bank has a regulatory obligation to assess its risks, which includes assessing the reliability of the information it is provided by Voyager upon which it relies. But MC Bank has no ability to audit this reconciliation, as it does not have customer-level detail. Accordingly, MC Bank has requested that Voyager represent that the reconciliation report it provided to MC Bank on December 1, 2022 (which should be updated to the date the Reserve Motion is heard), is the product of a thorough validation process and accurately represents the universe of customers entitled to payments in the amounts set forth therein as of that date. Further, Voyager should be required to provide MC Bank an updated reconciliation report on a weekly basis thereafter and alert MC Bank to any inconsistencies between the prior reconciliation report and the activity to date.

15. Second, while MC Bank makes every effort to protect against such risks, the reality is that hacking and other cybersecurity issues are real risks in the current environment. Sophisticated criminals may be able to direct the transfer of funds to a different account from that which customer intended. MC Bank might be able to recover any improperly directed ACH transfer from the bank to which the funds were sent, and, in the ordinary course of business, Voyager has always covered shortfalls in the account. As a practical matter, however, if there are delays or difficulties in such recovery (including because the party that wrongly received the funds moves them immediately, and/or because detection of the transfer was not immediate), customers may look to MC Bank to be made whole. As long as MC Bank holds some amount in

---

[3] The most recent reconciliation was a few thousand dollars off, which I understand Voyager attributes to a timing issue.

the Reserve, it has greater assurance of being made whole. Absent such a Reserve, the loss may well be borne by MC Bank.

16. 

17. [REDACTED]

---

[4] [REDACTED]

██████████████████████████████████████████

██████████████████████████████

18. Finally, even once the termination date for the FBO Accounts has been reached, there will be some continuing activity. To date, there has already been a small amount of credit activity returned back into the FBO Accounts due to administrative errors by customers attempting to withdraw their funds, such as attempts to send funds to closed accounts. I expect that we and Voyager will work cooperatively to ensure that these issues are resolved promptly. However, these kinds of errors may result in a portion of customer funds re-entering the FBO Accounts temporarily after they have been transferred out, resulting in administrative responsibilities and attendant risks to MC Bank even after money has left the accounts.

**E.    Legal fees.**

19. As a result of Voyager's failure and the fallout therefrom, MC Bank engaged outside counsel to assist with matters relating to the FBO Agreement and ACH issues. To date, MC Bank has incurred $1,541,000 in legal fees and expenses resulting from identifying and remedying ACH chargeback and fraud concerns, monitoring these proceedings and customer complaints, protecting and enforcing MC Bank's rights under the FBO Agreement, and ensuring compliance and appropriate oversight pursuant to MC Bank's policies and regulatory requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration is true and correct to the best of my knowledge, information and belief.

Dated:  December 7, 2022
       Louisville, Kentucky

*David Jenkins*