Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF SUCCESSFUL BIDDER

**PLEASE TAKE NOTICE** that on August 5, 2022, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").[2]

**PLEASE TAKE FURTHER NOTICE** that on August 22, 2022, the Debtors filed the *Modified Bidding Procedures for the Submission, Receipt, and Analysis of Bids in connection with the Sale of the Debtors* [Docket No. 328] (the "Bid Procedures").

**PLEASE TAKE FURTHER NOTICE** that the Debtors, in the exercise of their business judgement, selected BAM Trading Services Inc. d/b/a Binance.US ("Binance US") as the Successful Bidder with respect to the Acquired Assets (as defined in the Asset Purchase Agreement).

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]  Capitalized terms used but not defined herein shall have the meanings set forth in the Bidding Procedures Order or the Asset Purchase Agreement (as defined herein), as applicable.

**PLEASE TAKE FURTHER NOTICE** that on December 18, 2022, Debtor Voyager Digital, LLC, as seller, and Binance US, as purchaser, entered into that certain asset purchase agreement memorializing the Successful Bid (the "Asset Purchase Agreement") attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Debtors' entry into the Asset Purchase Agreement is scheduled to be heard before the Honorable Michael E. Wiles in the United States Bankruptcy Court on **Thursday, January 5, 2023, at 1:00 p.m. (prevailing Eastern Time)** (the "Hearing").  Objections to the entry into the Asset Purchase Agreement are due **Friday, December 30, 2022, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder is subject to the terms and conditions of the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that copies of the Asset Purchase Agreement, and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager.  You may also obtain copies of the Asset Purchase Agreement and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of the page left blank.]*

Dated: December 19, 2022
New York, New York

/s/ *Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jsussberg@kirkland.com
                     cmarcus@kirkland.com
                     christine.okike@kirkland.com
                     allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Asset Purchase Agreement**

**Execution Verion**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 18, 2022**

**BY AND BETWEEN**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,**

**AND**

**VOYAGER DIGITAL, LLC, AS SELLER.**

---

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** .................................................................................................................1

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of the Acquired Assets | 1 |
| 1.2 | Excluded Assets | 3 |
| 1.3 | Assumption of Certain Liabilities | 5 |
| 1.4 | Excluded Liabilities | 6 |
| 1.5 | Assumption/Rejection of Certain Contracts | 6 |

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ........................................................8

| | | |
|---|---|---|
| 2.1 | Consideration; Payment | 8 |
| 2.2 | Deposit | 9 |
| 2.3 | Closing | 9 |
| 2.4 | Closing Deliveries by Seller | 10 |
| 2.5 | Closing Deliveries by Purchaser | 10 |
| 2.6 | Withholding | 11 |

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ....................................11

| | | |
|---|---|---|
| 3.1 | Organization and Qualification | 11 |
| 3.2 | Authorization of Agreement | 12 |
| 3.3 | Conflicts; Consents | 12 |
| 3.4 | Financial Statements | 13 |
| 3.5 | Cryptocurrency; Loans; Customer Accounts | 13 |
| 3.6 | Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets | 14 |
| 3.7 | Title to Properties | 14 |
| 3.8 | Contracts | 15 |
| 3.9 | Permits; Compliance with Laws | 16 |
| 3.10 | Environmental Matters | 18 |
| 3.11 | Intellectual Property; Data Privacy | 18 |
| 3.12 | Tax Matters | 19 |
| 3.13 | Affiliate Transactions | 20 |
| 3.14 | Brokers | 21 |
| 3.15 | Litigation | 21 |
| 3.16 | Absence of Changes | 21 |
| 3.17 | No Other Representations or Warranties | 21 |
| 3.18 | No Outside Reliance | 21 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ...........................22

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 22 |
| 4.2 | Authorization of Agreement | 22 |
| 4.3 | Conflicts; Consents | 22 |
| 4.4 | Financing | 23 |
| 4.5 | Permits | 23 |
| 4.6 | Brokers | 23 |
| 4.7 | No Litigation | 23 |

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 24 |
| 4.10 | No Additional Representations or Warranties | 24 |
| 4.11 | No Outside Reliance | 24 |

**ARTICLE V BANKRUPTCY COURT MATTERS** .................................................**25**

| | | |
|---|---|---|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 25 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 27 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 29 |
| 5.6 | No Successor Liability | 29 |
| 5.7 | Filings | 29 |
| 5.8 | Waiver of Conflicts | 29 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ...........................................**30**

| | | |
|---|---|---|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 32 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 38 |
| 6.7 | Use of Name | 39 |
| 6.8 | Further Assurances | 40 |
| 6.9 | Insurance Matters | 40 |
| 6.10 | User Migration | 41 |
| 6.11 | Rebalancing Exercise; Seller Statement | 43 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 45 |
| 6.13 | VGX Token Listing Review Process | 48 |
| 6.14 | Additional Bankruptcy Distributions | 48 |
| 6.15 | Unstaking | 49 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 50 |
| 6.17 | Acknowledgment by Purchaser | 50 |
| 6.18 | IT Migration | 52 |
| 6.19 | Confidentiality | 52 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 53 |
| 6.21 | Seller Expenses | 53 |
| 6.22 | Purchaser Expenses | 54 |

**ARTICLE VII CONDITIONS TO CLOSING** ....................................................**55**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 55 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 55 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 56 |
| 7.4 | Waiver of Conditions | 56 |

# TABLE OF CONTENTS

**Page**

**ARTICLE VIII TERMINATION** ...................................................................................**57**

   8.1    Termination of Agreement.................................................................57
   8.2    Effect of Termination.......................................................................59
   8.3    Reverse Termination Fee .................................................................60
   8.4    Further Effect of Termination ..........................................................60

**ARTICLE IX TAXES** ..................................................................................................**61**

   9.1    Transfer Taxes .................................................................................61
   9.2    Cooperation......................................................................................61
   9.3    Preparation of Tax Returns and Payment of Taxes ........................62

**ARTICLE X MISCELLANEOUS** ..................................................................................**63**

   10.1   Non-Survival of Representations and Warranties and Certain Covenants;
         Certain Waivers...............................................................................63
   10.2   Expenses .........................................................................................63
   10.3   Notices ............................................................................................64
   10.4   Binding Effect; Assignment............................................................65
   10.5   Amendment and Waiver ..................................................................65
   10.6   Third Party Beneficiaries ................................................................65
   10.7   Non-Recourse .................................................................................66
   10.8   Severability .....................................................................................66
   10.9   Construction ....................................................................................66
   10.10  Schedules ........................................................................................66
   10.11  Complete Agreement.......................................................................67
   10.12  Specific Performance ......................................................................67
   10.13  Jurisdiction and Exclusive Venue ...................................................67
   10.14  Governing Law; Waiver of Jury Trial .............................................68
   10.15  No Right of Set-Off .........................................................................69
   10.16  Counterparts and PDF.....................................................................69
   10.17  Publicity ..........................................................................................69
   10.18  Bulk Sales Laws..............................................................................70
   10.19  Fiduciary Obligations......................................................................70
   10.20  No Solicitation.................................................................................70
   10.21  Acknowledgment ............................................................................70

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** .........................**70**

   11.1   Certain Definitions..........................................................................70
   11.2   Index of Defined Terms ..................................................................85
   11.3   Rules of Interpretation ....................................................................86

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B    FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT

US-DOCS\137411268.27

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and interests in and to only the following assets of Seller as of the Closing, wherever located and

whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)     all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)     to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)     all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)     other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

US-DOCS\137411268.27

(e)      all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)      all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)      other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2      <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)      all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)      all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)      all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in <u>Sections 1.2(c)</u> and <u>1.2(h)</u>, the "<u>Excluded Documents</u>");

US-DOCS\137411268.27

(e)     all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)     (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)     every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)     all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)     the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

4

(m)    all Money Transmitter Licenses;

(n)    Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)    (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)    all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)    the 3AC Loan;

(r)    all VGX Token Smart Contracts; and

(s)    the properties, rights, interests and assets set forth on Schedule 1.2(s).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in Section 2.1(a), Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date;

(d)    all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)    all Liabilities relating to all Transfer Taxes; and

(f)    all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)    all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)    all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)    all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)    all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)    all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The

US-DOCS\137411268.27

Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. No Contract set forth on Schedule 1.2(s) shall be subject to the terms of this Section 1.5(b).

(c)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement but subject to Section 6.1, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; provided that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to Section 1.5(a) or Section 1.5(b) from and after the date of this Agreement.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than,

7

and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the provisions of this Section 1.5(c) shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     Subject to the terms and conditions herein, the aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "Cash Payment"), (C) the Seller Expenses, if any, payable pursuant to Section 6.21, and (D) Purchaser's obligations to make the payments set forth in Section 6.12 and Section 6.14.

(b)     Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, plus (ii) the Seller Expenses, if any, payable pursuant to Section 6.21, less (iii) the Deposit, together with all received investment income, if any (the "Closing Date Payment"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of

8

immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)     Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "Withheld Coins"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2     Deposit.

(a)     Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account (the "Escrow Account"). Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to

hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that such transfers of the Acquired Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that (i) for Acquired Coins held on the Binance.US Platform as of the Closing Date, such Acquired Coins shall be transferred to the Binance.US Platform account designated by Purchaser and (ii) in the case of ETH Coins that are Staked Coins as of the date hereof, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)    a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)    an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)    the Seller Statement pursuant to Section 6.11(c).

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)      the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6      Withholding. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "Filed CSA Documents") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1      Organization and Qualification.

(a)      Except as set forth on Schedule 3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

11

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses</u>

12

(ii) through (v), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Financial Statements. Attached to Schedule 3.4 are Parent's unaudited statements of financial position as of June 30, 2022 (the "Balance Sheet Date") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "Financial Statements"). Except as set forth on Schedule 3.4, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5    Cryptocurrency; Loans; Customer Accounts.

(a)    Schedule 3.5(a) sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (e.g., "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which Schedule 3.5(a) shall be provided to Purchaser no later than December 18, 2022. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.5(a) (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

US-DOCS\137411268.27

(c)     Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)     Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)     Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6     Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)     Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

(b)     Seller is the sole owner of all Coins relating to the exchange and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all

14

real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8    Contracts.

(a)    Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)    relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)    involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)    is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)    contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is

15

material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)    is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9    Permits; Compliance with Laws.

(a)    Except as set forth on Schedule 3.9, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including

16

Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)    Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

17

(f)    Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property; Data Privacy.

(a)    Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this

18

Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)    Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

(h)    Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)    Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on Schedule 3.11(i), Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)    To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed

19

(taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)      To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)      To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)      Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)      Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)      Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

(g)      Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)      Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for

20

travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14    <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15    <u>Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth <u>Schedule 3.15</u>, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16    <u>Absence of Changes</u>. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and (b) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under <u>Section 6.1</u> if undertaken after the date hereof.

3.17    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the

US-DOCS\137411268.27

completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to Section 10.10, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1     Organization and Qualification. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2     Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "Unsupported Jurisdiction Approvals"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), neither the

execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7     <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

US-DOCS\137411268.27

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9     Solvency. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring, has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10     No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11     No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in

24

any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

US-DOCS\137411268.27

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; <u>provided</u> <u>further</u> that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this <u>Section 5.2(a)</u> shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(a)</u>.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(b)</u>.

US-DOCS\137411268.27

(c)      Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of <u>Section 5.2(a)</u> constitutes a Higher and Better Offer (a "<u>Higher Offer Determination Notice</u>") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this <u>Section 5.2(c)</u> if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (<u>provided</u> <u>further</u> that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this <u>Section 5.2(c)</u> if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

5.3      <u>Bankruptcy Actions</u>.

(a)      No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>") containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

(b)      From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

US-DOCS\137411268.27

(c)     The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

(d)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

US-DOCS\137411268.27

5.4     Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7     Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8     Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the

Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Seller.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall not:

(i)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing

US-DOCS\137411268.27

arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)    perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)    enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)    (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)   except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any

claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)    enter into any referral agreement with a third party with respect to Users;

(x)    terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)    lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2    <u>Access to Information</u>.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the

Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; provided that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A)  would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)    The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)    From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable

33

best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)    Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, Section 6.3, Section 6.10(b) and Section 6.18), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3    Employee Matters.

(a)    From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "Seller Employees") and independent contractors of Seller or Holdings (the "Seller Contractors"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this Section 6.3; provided that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything

34

to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)    Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)    Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)    Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)    For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees mutatis mutandis to the maximum extent permitted by applicable Law.

(f)    The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued employment

or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4    <u>Regulatory Matters</u>.

(a)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature

36

and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.4, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)    Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)    From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)    Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), each Party will

use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5    Reasonable Best Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)    The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6    Data Transfer Matters.

(a)    Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise) and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer");

US-DOCS\137411268.27

(iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)    From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)    Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User and associating such information and documentation with the applicable User), as determined by Purchaser in its reasonable discretion, prior to the User Asset Migration Date, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of <u>Section 6.6(a)</u>.

6.7    <u>Use of Name</u>.

(a)    Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "<u>Seller Marks</u>"); and (iii) except as set forth in <u>Section 6.7(a)</u>, Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)    Notwithstanding <u>Section 6.7(a)</u>, for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses and assisting Purchaser with all migrations, integrations and Transactions.

6.8    <u>Further Assurances</u>.

(a)    From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); <u>provided</u> that nothing in this <u>Section 6.8</u> shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this <u>Section 6.8</u>.

(b)    Without limiting <u>Section 6.8(a)</u>, Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this <u>Section 6.8(b)</u>), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with <u>Section 6.8(a)</u>, *mutatis mutandis*.

6.9    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; <u>provided</u> that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

US-DOCS\137411268.27

6.10    <u>User Migration</u>.

(a)    Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.

(b)    Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at

41

Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the User Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the number of Acquired Coins of each type is equal to the aggregate number of Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the

43

terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)    At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each type of Acquired Coin to Purchaser in accordance with Section 2.4, and (vii) the amount of cash, Coins or other property (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) payable to each Eligible Creditor, after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser, and any identifying information and information required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement

US-DOCS\137411268.27

and any data, information or calculation set forth therein for purposes of Section 6.11(d), and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)    Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in connection with the transfer of Coins to Purchaser pursuant to Section 2.4. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12    Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller.

(a)    Subject to the provisions of Section 6.10, on the User Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's or Eligible Creditor's accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in Section 6.10. Following such User's or Eligible Creditor's satisfaction of such requirements, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date or the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, then Purchaser shall convert any Acquired Coins with respect to such Users or Eligible Creditors into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(b)    Notwithstanding anything to the contrary herein or otherwise, for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "Unsupported Jurisdiction"), Purchaser and its Affiliates shall not be required

45

to (i) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i) Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in an Unsupported Jurisdiction or (ii) Seller shall deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable Coins, cash, or other asset with respect to any User or Eligible Creditor located in such Unsupported Jurisdiction then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser shall (following receipt of any applicable assets if required) consummate the actions in such Unsupported Jurisdiction that were restricted by this Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then to the extent Purchaser is holding any Acquired Coins with respect to Users or Eligible Creditors in such Unsupported Jurisdictions, Purchaser shall convert such Acquired Coins into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(c)    From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect

US-DOCS\137411268.27

to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)    The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)    Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (e.g., a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably

47

be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

6.13    VGX Token Listing Review Process. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    Additional Bankruptcy Distributions. The provisions of this Section 6.14 shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this Section 6.14, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this Section 6.14, (d) any Purchaser Development (disregarding for the purposes of this Section 6.14 the language "prior to the Closing"), and (e) Purchaser's material breach of Section 6.12(e) or this Section 6.14 which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    Any Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto shall be made or transferred to Purchaser free and clear of any Encumbrances. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser.

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order), Seller shall deliver to Purchaser a statement setting forth (i) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with

48

all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in cash, and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "<u>Post-Bankruptcy Statement</u>"). The provisions set forth in the last sentence of <u>Section 6.11(a)</u> shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)    Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this <u>Section 6.14(a)</u> are referred to herein as "<u>Credited Additional Bankruptcy Distributions</u>".

(d)    If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to <u>Section 6.14(a)</u>, prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to <u>Section 6.14(a)</u>, Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)    There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this <u>Section 6.14</u>.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions on the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

6.15    <u>Unstaking</u>. Promptly following the date hereof (until the Closing or the earlier termination of this Agreement pursuant to <u>Article VIII</u>) but without limiting what is permitted by <u>Section 6.1(b)(iii)</u>, Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through

49

"smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins as of the date hereof) that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information

50

Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)      Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18   IT Migration. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives

of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses associated with the provision of such services on or prior to the Closing Date pursuant to this <u>Section 6.18</u>. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this <u>Section 6.18</u>. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19   <u>Confidentiality</u>.

(a)     Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under <u>Section 6.2</u>.

(b)     Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)     Notwithstanding anything to the contrary herein, the provisions of this <u>Section 6.19</u> will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this <u>Section 6.19</u> by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this <u>Section 6.19</u> by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such

52

breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.19, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.19 will survive the Closing and terminate two (2) years after the Closing Date.

6.20    Acquired Assets Owned by Non-Debtors. To the extent any item set forth in Schedule 6.20 or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this Section 6.20, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21    Seller Expenses.

(a)    Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to Section 2.1(a), without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) Section 8.1(b) or Section 8.1(c) by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (2) Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i), or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)    For purposes of this Agreement, "Seller Expenses" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary

Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22    Purchaser Expenses.

(a)    If this Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)    For purposes of this Agreement, "Liquidation" means any combination of one or more of the following:  (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)    For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation,

negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "<u>Purchaser Bid Process</u>").

(d)      All amounts payable to Purchaser pursuant to <u>Section 6.22(a)</u> upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1      <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)      there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)      the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with <u>Section 5.1(b)</u>, and (iii) be a Final Order; and

(c)      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2      <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(a)</u>) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in <u>Section 3.1(a)</u> (*Organization and Qualification*), <u>Section 3.2</u> (*Authorization of Agreement*), <u>Section 3.3(a)(i)</u> (*Conflicts; Consents*), <u>Section 3.6(a)</u> (*Exclusive Ownership*), and <u>Section 3.14</u> (*Brokers*) (collectively, the

"Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)    Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)    Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4    Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

## ARTICLE VIII

## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)     by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "Outside Date"); provided that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "Extended Outside Date" ); provided further that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)     by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in Section 7.1 or Section 7.3 would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or Section 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)    by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B)  Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)    by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)    by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)    by written notice from Purchaser to Seller, if:

(i)    the Agreement Order is not entered by January 6, 2023;

(ii)    the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)    the Plan Solicitation Order is not entered by January 6, 2023;

(iv)    the Confirmation Order is not entered by March 1, 2023;

(v)    Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

(vi)    Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

58

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)    Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)    Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)    If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential

US-DOCS\137411268.27

as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3     <u>Reverse Termination Fee</u>. In the event that (a) the conditions set forth in <u>Sections 7.1(b)</u>, <u>7.1(c)</u>, and <u>7.2</u> have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u>, (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in <u>Section 7.1(a)</u>, or (iii) this Agreement is terminated pursuant to <u>Section 8.1(g)</u> in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "<u>Reverse Termination Fee</u>").

8.4     <u>Further Effect of Termination</u>. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this <u>Section 8.4</u>:

(a)     Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to <u>Section 2.2(b)</u>, payment of any Seller Expenses to Seller pursuant to <u>Section 6.21</u> or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to <u>Section 10.12</u>.

(b)     In the event of a valid termination of this Agreement pursuant to <u>Section 8.1</u>, if Seller is entitled to receive the Deposit pursuant to <u>Section 2.2</u>, payment of any Seller Expenses pursuant to <u>Section 6.21</u>, or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u>, then, upon release of the Deposit to Seller in accordance with <u>Section 2.2(b)</u>, payment of such Seller Expenses pursuant to <u>Section 6.21</u> or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u>, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

US-DOCS\137411268.27

(c)      (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y)  solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12.  Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d)      Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

## ARTICLE IX

## TAXES

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

US-DOCS\137411268.27

9.2    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.3 constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.3(a). Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "Seller Income Tax Return"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "Transaction-Related Action"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a) (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion

62

from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)    For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)    Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

**ARTICLE X**

**MISCELLANEOUS**

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

US-DOCS\137411268.27

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

> Notices to Purchaser:
>
> BAM Trading Services, Inc. d/b/a Binance.us
> 611 Cowper Street, Suite 400
> Palo Alto, CA 94301
> Attention:        Norman Reed, General Counsel
> Email:              norman.reed@binance.us;
>                          legal@binance.us
>
> with a copy to (which shall not constitute notice):
>
> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:        Robert M. Katz
>                          Daniel Mun
>                          Adam J. Goldberg
>                          Andrew D. Sorkin
> Email:              Robert.Katz@lw.com
>                          Daniel.Mun@lw.com
>                          Adam.Goldberg@lw.com
>                          Andrew.Sorkin@lw.com

    <u>Notices to Seller</u>:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003

| | |
|---|---|
| Attention: | Stephen Ehrlich |
| | David Brosgol |
| Email: | sehrlich@investvoyager.com |
| | dbrosgol@investvoyager.com |

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

| | |
|---|---|
| Attention: | Joshua A. Sussberg, P.C. |
| | Christine A. Okike, P.C. |
| | Christopher Marcus, P.C. |
| | Jonathan L. Davis, P.C. |
| | Steve Toth |
| | Eduardo M. Leal |
| | Allyson B. Smith |
| Email: | joshua.sussberg@kirkland.com |
| | christine.okike@kirkland.com |
| | cmarcus@kirkland.com |
| | jonathan.davis@kirkland.com |
| | steve.toth@kirkland.com |
| | eduardo.leal@kirkland.com |
| | allyson.smith@kirkland.com |

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; <u>provided</u> <u>further</u> that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any

US-DOCS\137411268.27

way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or

66

included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12    Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. Except as limited by Section 8.4(d), (i) the remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended

67

(y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE

AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. The initial press release regarding this Agreement and the Transactions (the "Press Release") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to Section 10.19, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; provided that Seller shall use its

reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; provided that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20   No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21   Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

US-DOCS\137411268.27

# ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "<u>Acquired Coins</u>" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(c)    "<u>Acquired Coins Value</u>" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date.

(d)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)    "<u>Additional Bankruptcy Distributions</u>" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)    "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any

71

portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i)      "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j)      "Binance.US Platform" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(k)      "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

(l)      "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)      "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

(n)      "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o)      "Code" means the United States Internal Revenue Code of 1986.

(p)      "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin); provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

(q)      "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, 6.13, 6.14 and 6.15.

(r)      "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a

US-DOCS\137411268.27

Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

(s)     "Confidentiality Agreement" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

(t)     "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by Section 6.11(c)), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by Section 6.11(c)), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(u)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(v)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(w)     "Credit Matter" means any loan or other type of credit exposure or loan-like instrument.

US-DOCS\137411268.27

(x) "Cryptocurrency" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

(y) "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's deposits on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

(z) "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the VWAP of such Coin determined as of the Petition Date.

(aa) "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(bb) "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(cc) "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd) "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(ee) "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff) "ERISA" means the Employee Retirement Income Security Act of 1974.

(gg) "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

(hh) "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to

validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

(ii)     "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(jj)     "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

(kk)     "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll)     "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

(mm)     "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

US-DOCS\137411268.27

(nn)    "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(oo)    "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(pp)    "<u>Higher and Better Offer</u>" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of <u>Section 5.1(a)</u> for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(qq)    "<u>IFRS</u>" means the International Financial Reporting Standards.

(rr)    "<u>Intellectual Property</u>" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(ss)    "<u>IT Systems</u>" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(tt)    "<u>Knowledge of Seller</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(uu)    "<u>Knowledge of Purchaser</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

US-DOCS\137411268.27

(vv)    "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(ww)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(xx)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(yy)    "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; provided that, the 3AC Loan shall not be deemed a Loan.

(zz)    "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(aaa)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; provided that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any

77

other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule 11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(bbb)    "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(ccc)    "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

US-DOCS\137411268.27

(ddd)    "<u>Money Transmitter Requirements</u>" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

(eee)    "<u>Net Owed Coins</u>" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

(fff)    "<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

(ggg)    "<u>Ordinary Course</u>" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(hhh)    "<u>Permitted Encumbrances</u>" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on <u>Schedule 11.1(hhh)</u>, or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(iii)    "<u>Permitted Post-Closing Lien</u>" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or

79

Plan, as applicable; provided that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

(jjj)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(kkk)    "Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

(lll)    "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

(mmm)"Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

(nnn)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

(ooo)    "Plan Supplement" has the meaning set forth in the Plan.

(ppp)    "Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

(qqq)    "Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total number of such

User's Deposited Coins of such type, <u>multiplied</u> by (ii) the Rebalancing Ratio, as set forth on the Seller Statement.

(rrr)    "<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(sss)    "<u>Privacy Laws</u>" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(ttt)    "<u>Process</u>", "<u>Processed</u>" or "<u>Processing</u>" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(uuu)    "<u>Purchaser Development</u>" means any of the following, first occurring after the date hereof and prior to the Closing:  (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation, legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under <u>Section 6.12</u> or otherwise following the Closing.

(vvv)    "<u>Purchaser Group</u>" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(www) "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(xxx) "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

(yyy) "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(zzz) "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

(aaaa) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(bbbb) "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(cccc) "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

(dddd) "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

(eeee) "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller

US-DOCS\137411268.27

or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

(ffff)    "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

(gggg)   "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

(hhhh)  "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(iiii)    "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

(jjjj)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(llll)    "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

(mmmm)    "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

(nnnn)    "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(oooo)    "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(pppp)    "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(qqqq)    "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(rrrr)    "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(ssss)    "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

(tttt)    "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.

84

(uuuu) "<u>User Asset Migration Date</u>" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; <u>provided</u> that the completion of the User Migration Preparation shall not occur prior to the Closing Date.

(vvvv) "<u>VGX Token Smart Contracts</u>" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(wwww)    "<u>Voyager Platform</u>" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(xxxx) "<u>VWAP</u>" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    <u>Index of Defined Terms</u>.

Acquired Assets ...........................................1
Acquired Information ...................................2
Acquired User Data .....................................2
Acquired Voyager Claims ...........................2
Acquisition Proposal...................................26
Agreement....................................................1
Agreement Order ........................................25
Amended Disclosure Statement.................27
Anti-Money Laundering Laws ..................17
Assigned Contracts ......................................3
Assignment and Assumption
    Agreement...............................................10
Assumed Liabilities .....................................5
Authentication Credentials ........................14
Balance Sheet Date ....................................13
Bankruptcy Case ..........................................1
Bankruptcy Code .........................................1
Bankruptcy Court.........................................1
Cash Payment ..............................................8
Chosen Courts.............................................68
Closing .........................................................9
Closing Date ...............................................10
Closing Date Payment .................................8
Covered Matters..........................................29
Credited Additional Bankruptcy
    Distributions...........................................49
CSA..............................................................11
Cure Costs.....................................................5
Dataroom ....................................................21

Debtors..........................................................1
Deposit .........................................................9
DPA .............................................................18
Eligible Creditor ........................................42
Enforceability Exceptions..........................12
Environmental Permits ..............................18
Escrow Account............................................9
Escrow Agent................................................9
Excluded Assets............................................3
Excluded Contracts.......................................3
Excluded Documents ....................................3
Excluded Liabilities......................................6
Express Purchaser Representations ...........24
Express Seller Representations..................21
Extended Outside Date ..............................57
FCPA...........................................................17
Filed CSA Documents ...............................11
Financial Statements...................................13
Fundamental Representations....................56
Higher Offer Determination Notice..........27
Holdings........................................................1
Indebtedness ...............................................30
Information Presentation ...........................21
Integration Plan..........................................41
Leased Real Property .................................15
Liquidation..................................................54
Material Contract ........................................15
OFAC...........................................................17
Outside Date ...............................................57

US-DOCS\137411268.27

Parent ...........................................1
Parties .........................................1
Party ...........................................1
Paul Hastings ...........................29
Petition Date ...............................1
Petitions ......................................1
Post-Bankruptcy Statement .......49
Pre-Closing Data Transfer .........38
Press Release .............................69
Privacy Requirements .................19
Projections ................................51
Purchase Price .............................8
Purchaser......................................1
Purchaser Bid Process...............55
Purchaser Default Termination...9
Purchaser Expenses ...................54
Rebalancing Date.......................43
Rebalancing Exercise.................43
Relevant Tax Return ..................62
Reverse Termination Fee ...........60
Sanctions....................................17
Seller ...........................................1
Seller Contractors .....................34
Seller Documents .......................12
Seller Employees .......................34
Seller Expenses..........................53
Seller Income Tax Return ..........62
Seller Marks...............................39
Seller Registered IP ..................18
Seller Statement .........................44
Solvent .......................................24
Staked Coins ..............................14
Successor Liabilities ..................29
Trademark and Domain Name
    Assignment Agreement..........10
Transaction Notice.....................43
Transaction Offer Notice ...........43
Transaction-Related Action .......62
Transfer Taxes ...........................61
Unsupported Jurisdiction ..........45
Unsupported Jurisdiction Approvals .........22
Voyager User Accounts..............2
WARN Act .................................35
Withheld Coins ...........................9

US-DOCS\137411268.27

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

*(Signature pages follow.)*

US-DOCS\137411268.27

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: *Brian Shroder* _____
ACA2F0AF79BC412...
Name: Brian Shroder
Title: Chief Executive Officer

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_
Name: Stephen Ehrlich
Title:   Chief Executive Officer

*Signature Page to Asset Purchase Agreement*

# **EXHIBIT A**

## **FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

A

*Final Version*

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the sale and assignment by Seller to Purchaser of the Acquired Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.4(a) and 2.5(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Seller and Purchaser, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, Seller and the Purchaser hereby agree as follows:

1.      Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      Transfer of Acquired Assets.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

3.      Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby irrevocably assume from Seller, and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Seller's right, title and interest in and to, as of the Closing, the Assigned Contracts free and clear of all Encumbrances (other than Permitted Encumbrances). Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby assume the Assumed Liabilities.

4.      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Seller shall not and does not hereby sell, transfer, assign, convey or

deliver to Purchaser, and Seller shall retain all right, title and interest to, and Purchaser shall not and does not hereby purchase, acquire or accept, or take assignment of, any of the Excluded Assets.

5.    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume, be deemed to have assumed or be obligated to pay, perform or otherwise discharge or otherwise be liable in respect of or be responsible for, and hereby disclaims, any of the Excluded Liabilities.

6.    Terms of the Purchase Agreement.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

7.    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

8.    Successors and Assigns. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the parties hereto and their respective successors and permitted assigns under the Purchase Agreement.

9.    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10.    Additional Provisions. The provisions contained in Sections 6.8 (*Further Assurances*), 10.5 (*Amendment and Waiver*), 10.6 (*Third Party Beneficiaries*), 10.8 (*Severability*), 10.9 (*Construction*), 10.13 (*Jurisdiction and Exclusive Venue*) and 10.14(b) (*Waiver of Jury Trial*) of the Purchase Agreement are hereby incorporated by reference into this Agreement, *mutatis mutandis*, and made a part of this Agreement as if set forth fully herein.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

**VOYAGER DIGITAL, LLC**

_____
Name:
Title:

**PURCHASER:**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**


By:_____
Name:
Title:

## <u>EXHIBIT B</u>

## FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT

(See attached.)

B

*Final Version*

# TRADEMARK AND DOMAIN NAME ASSIGNMENT

This TRADEMARK AND DOMAIN NAME ASSIGNMENT (this "Assignment"), effective as of [●] (the "Effective Date"), is made by Voyager Digital, LLC, a Delaware limited liability company ("Voyager Digital") and Voyager IP, LLC (f/k/a CryptoTrading IP LLC), a Delaware limited liability company ("Voyager IP," each of Voyager Digital and Voyager IP individually, an "Assignor," and together, the "Assignors"), to BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Assignee"). Assignors and Assignee are each referred to individually as a "Party" and together as the "Parties."

**WHEREAS**, Voyager Digital and Assignee have executed an Asset Purchase Agreement, effective as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Voyager Digital has agreed to sell, transfer, assign and convey and to cause Voyager IP to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of such Assignor's right, title and interest in and to certain intellectual property assets to Assignee;

**WHEREAS**, the assets assigned pursuant to the Purchase Agreement include the intellectual property listed in Exhibit A attached hereto (the "Assigned IP");

**WHEREAS**, Assignee is a successor to that part of Assignors' business to which the Assigned IP pertain, and that business is ongoing and existing; and

**WHEREAS**, pursuant to the Purchase Agreement, Voyager Digital has agreed to execute this Assignment and to cause Voyager IP to execute this Assignment in order to effectuate, evidence and record such Assignor's assignment of the Assigned IP to Assignee in the United States Patent and Trademark Office and corresponding offices in other applicable jurisdictions.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

**SECTION 1.**  Assignment. Assignors hereby irrevocably conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all liens, all of such Assignor's right, title and interest in and to the Assigned IP, including all rights of priority and goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, all rights in and to any of the foregoing provided by applicable law of any jurisdiction, by international treaties or conventions, all rights, interests, and claims of such Assignor or any of its affiliates, all rights to collect royalties and proceeds in connection with the foregoing from and after the Effective Date, all rights to sue or otherwise recover for any past, present, or future infringement, dilution or other violations of the foregoing and all corresponding rights that, now or hereafter, may be secured throughout the world, including any deposits or prepayments with respect to any of the foregoing.

**SECTION 2.** Recordation. Assignors hereby authorize: (i) the Commissioner for Trademarks in the United States Patent and Trademark Office, and the officials of corresponding entities or agencies in any applicable jurisdictions to record this Assignment upon request by Assignee, and (ii) the registrar of the domain names identified as such in Exhibit A to effectuate the transfers to Assignee of such domain names.

**SECTION 3.** Further Assurances. From and after the Effective Date, upon Assignee's request, Assignors shall (and shall cause such Assignor's Affiliates to) cooperate with and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on such Assignor's part under applicable law to effect and validate the assignment of the Assigned IP to Assignee.

**SECTION 4.** Definitions. Capitalized terms used but not defined in this Assignment have the meanings given to such terms in the Purchase Agreement.

**SECTION 5.** Purchase Agreement. This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall this Assignment be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

**SECTION 6.** Governing Law. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment, and any Action that may be based upon, arising out of or related to this Assignment or the negotiation, execution or performance of this Assignment or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**SECTION 7.** Counterparts and PDF. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of either Party, the other Party hereto will re-execute original forms of this Assignment and deliver it to the other Party. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each Party forever waives any such defense.

*[Signature Page Follows]*

A-2

*Final Version*

**IN WITNESS WHEREOF**, Assignors and Assignee have caused this Assignment to be executed by its duly authorized representative as of the Effective Date.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

**VOYAGER IP, LLC**

By: _____
Name:
Title:

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _____
Name:
Title:

[Signature Page to Trademark and Domain Name Assignment]