Hearing Date: January 10, 2023 at 2:00 p.m.
Opp. Deadline: January 4, 2023 at 4:00 p.m.

**McELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP**
Jeffrey Bernstein, Esq.
Virginia T. Shea, Esq.
570 Broad Street, Suite 1500
Newark, NJ 07102
Phone: (973) 565-2183
jbernstein@mdmc-law.com
vshea@mdmc-law.com

*Counsel for the New Jersey Bureau of Securities*

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1] | ) Case No. 22-10943-MEW |
| Debtors. | ) (Jointly Administered) |

**RESPONSE OF THE NEW JERSEY BUREAU OF SECURITIES TO:**

**(A) DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING ENTRY INTO THE BINANCE.US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF [DOC. NO. 775],**

**(B) DEBTORS' MOTION FOR, AMONG OHER THINGS, CONDITIONAL APPROVAL OF THE ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT [DOC. NO. 779], AND**

**(C) RESERVATION OF RIGHTS.**

The New Jersey Bureau of Securities (the "Bureau"), by and through its undersigned counsel, files this response and reservation of rights (the "Response") to 1) *Debtors' Motion for*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Entry of an Order (I) Authorizing Entry into the Binance.US Purchase Agreement and (II) Granting Related Relief* [Doc. No. 775](the "APA Motion"), and 2) *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Doc. No. 779](the "Conditional Disclosure Statement Motion" and with the APA Motion, the "Motions") and respectfully states the following:

## I. Background: The Bureau's Mission and Cease and Desist Order against Voyager.

1. As stated by Gurbir S. Grewal on May 21, 2018, the then Attorney General of the State of New Jersey, "New Jersey's Bureau [of Securities] has been a national leader in proactively protecting investors against the significant threat of fraudulent activity involving initial coin offerings and cryptocurrency-related investment products." *See*, State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, Press Release dated May 21, 2018 "*New Jersey Bureau of Securities Orders Three Online Cryptocurrency Promoters to Stop Offering Unregistered Securities in the State.*" (https://nj.gov/oag/newsreleases18/pr20180521a.html) (the "Press Release"), a true and correct copy of the Press Release is attached as **Exhibit "A"** to the January 4, 2023 Declaration of Virginia T. Shea ("Shea Declaration").

2. The Bureau is charged with protecting New Jersey investors, and, to the extent a violation originates from the State of New Jersey, investors nationwide.

3. In furtherance of such mission, following a certain Bureau investigation, on March 29, 2022, the Bureau issued a Summary Cease and Desist Order (the "NJ Order") against Voyager Digital Ltd., Voyager Holdings, Inc. and Voyager Digital, LLC (collectively, "Voyager") effective

2

April 29, 2022.[2] A true and correct copy of the NJ Order is attached to the Shea Declaration as **Exhibit "B."**

4. The Bureau noted that Voyager Digital, LLC is a Delaware limited liability company that effected a foreign entity filing in New Jersey on March 2, 2018, and has offices at 185 Hudson Street, Jersey City, New Jersey. NJ Order at ¶ 9.

5. As set forth in the NJ Order, since November 1, 2019, Voyager has, at least in part, funded income generating activities, including lending operations, digital asset staking, and proprietary trading, through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts, referred to by Voyager as the "Earn Program" as further set forth in the NJ Order. The Earn Program has been a feature of all Voyager cryptocurrency trading accounts (the "Voyager Earn Program Accounts"). *Id*. at ¶ 1.

6. The Bureau also determined that Voyager solicited investors to invest in the Voyager Earn Program Accounts by depositing certain cryptocurrencies into the investors' Voyager Earn Program Account, whereby Voyager then pooled the cryptocurrencies with cryptocurrencies from retail investors to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. The Bureau also concluded that in exchange for investing in the Voyager Earn Program Accounts, investors were promised attractive interest rates that were paid monthly in the same type of cryptocurrency as originally invested. *Id.* at ¶ 2.

7. As set forth in the NJ Order, ¶¶ 33-37, the Bureau made the following conclusions of law:

- The Voyager Earn Program Account is a security as defined in N.J.S.A. 49:3-49(m).

---

[2] To the extent there is any discrepancy between the description of the NJ Order set forth herein and the NJ Order, the NJ Order shall control.

- The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

- The Voyager Earn Program Account has not been registered with the Bureau, is not exempt from registration, and is not federally covered.

- Voyager has offered and sold unregistered securities in violation of N.J.S.A. 49:3-60 and continues to do so.

- Each violation of N.J.S.A. 49:3-60 is a separate violation of the Securities Law and is cause for the denial of certain exemptions.

8. The Bureau concluded that the Voyager Earn Program Accounts were unregistered securities which were not exempt from registration and thus Voyager was operating in violation of New Jersey law, and ordered that effective April 29, 2022, Voyager and any person, agent, employee, broker, partner, officer, director, affiliate, successor, or stockholder thereof, under any of their direction or control was to CEASE AND DESIST from:

   a. Offering for sale any security, including any Voyager Earn Program Account, to or from New Jersey unless the security is registered with the Bureau, is a covered security, or is exempt from registration under the Securities Law;

   b. Accepting any additional assets into an existing Voyager Earn Program Account; and

   c. Violating any other provisions of the Securities Law and any rules promulgated thereunder for the sale of any security in New Jersey.

NJ Order at ¶ 39.

9. As of March 1, 2022, Voyager had approximately 1,530,000 Voyager Earn Program Accounts representing approximately $5 billion in assets, of which approximately 52,800 were New Jersey-based accounts representing approximately $197 million in assets. NJ Order at ¶ 4.

   **II.    Voyager's Bankruptcy and the Motions.**

10. On or about July 6, 2022, the Debtors filed their Chapter 11 Bankruptcy Petitions.

4

11. The Debtors, by way of the Motions, seek to have Bankruptcy Court approval of the *Asset Purchase Agreement Dated as of December 218, 2022 by and Between BAM Trading Services Inc. D/B/A Binance.US, as Purchaser, and Voyager Digital, LLC, as Seller* [Doc. No. 775 at pp. 47-150 of 150]("APA"), and seek conditional confirmation of their *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Doc. No. 778 at pp. 6-107 of 211] ("Disclosure Statement"). The Motions, jointly, essentially, purport to tee up the eventual sale, or more aptly put, the transfer of, customer cryptocurrency from the Voyager platform to the BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") platform, in exchange for payments to the Debtors' Bankruptcy Estate (which payments, it appears, will fund administrative expenses and avoidance actions).

12. A hallmark of the APA, and accordingly, the Third Amended Joint Plan (and corresponding Disclosure Statement) which stands or falls upon the ultimate acceptance of the APA, is that following a sophisticated "rebalancing" of cryptocurrency held by Voyager, the cryptocurrency is to be immediately transferred from the Voyager platform to the Binance.US platform. In essence, the sale purports to transfer from Voyager to Binance.US, a customer base that may or may not retain cryptocurrency in the custody of Binance.US (following a rebalancing by Voyager of the type and amount of cryptocurrency held by each customer prior to transferring of such rebalanced assets to the Binance.US platform).

13. It appears that customers may only opt out, or seek return of his/her/its rebalanced coins, after such cryptocurrency has already been transferred to the Binance.US platform, and is in its custody.

5

14. The Bureau's primary concerns with the APA and the Disclosure Statement arise out a fundamental lack of transparency as to how the sale/transfer of cryptocurrency will impact customer coins currently held by Voyager; more specifically 1) that Binance.US may not be a qualified purchaser, 2) that the APA and Disclosure Statement lack sufficient consumer-oriented transparency as to what will happen to coins once customer coins are transferred to the Binance.US platform, and 3) that without sufficient notification and/or a stopgap measure built into the APA itself, following transfer of coins to Binance.US, Binance.US will have the freedom to direct the cryptocurrency as it wishes, such that without customer knowledge, the cryptocurrency might wind-up in an offshore (non-US custodial) account, outside the reach of U.S. regulatory and enforcement authorities.

**III.    Media Reports and a Notice Filed By the United States of America Suggest That Binance.Us May Not Be a Qualified Purchaser.**

15. Neither the APA nor the Disclosure Statement appear to address the physical location of where crypto assets are going to be held in custody, following a transfer to the Binance.US platform. The Bureau is concerned that the APA and Disclosure Statement lack sufficient transparency and preventative measures to avoid transfer of customer coins outside of the United States. Account holder's cryptocurrency should not be earmarked for transfer outside of the United States without the knowledge and consent of account holders.

16. The Bureau's concerns stem in significant part from 1) a recent filing by the United States of America concerning the sale/transfer transaction, as well as 2) recent media reports questioning business practices of related entities and persons potentially in control of Binance.US.

6

### A. The United States of America Expressed Concerns with Binance.US as a Qualified Bidder.

17. As this Court is aware, the United States of America submitted a statement to address the possibility that one or more transactions contemplated by the Debtors could be subject to review by the Committee on Foreign Investment in the United States ("CFIUS"), positing that Bankruptcy courts recognize "that potential national security concerns (including CFIUS review), are relevant factors in bankruptcy proceedings, and specifically in determining whether bidders are qualified." (*Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States* at introductory paragraph)(Docket No. 797).

18. To the extent that the CFIUS has concerns with Binance.US as a qualified bidder, the Bureau joins in those concerns.

### B. The Wall Street Journal, December 22, 2022.

19. The Wall Street Journal published on article captioned "*Crypto Giant Binance Draws Calls for More Transparency*" dated December 22, 2022 (the "WSJ Article"). The WSJ Article was premised upon calls for greater industry transparency following the collapse of FTX, and stated, "[t]o many investors, the industry's biggest player, Binance, remains a black box." A true and correct copy of the WSJ Article is attached as **Exhibit "C"** to the Shea Declaration.

20. The WSJ Article stated in pertinent part:

> Like FTX, Binance discloses limited financial information. It doesn't say where the company is based. And its founder, Changpeng Zhao, is affiliated with market makers providing liquidity on its own platform, an arrangement some market observers say leads to a potential conflict of interest.
>
> "Does the exchange give preferential treatment to an affiliate? Is the exchange supporting an affiliate with customer money? These questions concern customers and the regulators who try to protect them," said Larry Harris, a finance professor at the University of Southern California's Marshall School of Business.

7

"When a business is not transparent and not regulated, we have no true understanding of what is happening inside," Prof. Harris said.

Adding to investor worries, an outside audit firm that Binance brought in to report on its reserves recently said it was suspending its work for crypto firms.

***

Binance has been shrouded in secrecy following its creation in 2017. In recent years, when cryptocurrencies were booming, investors paid scant attention to corporate structure and governance within the industry.

Binance's lack of transparency and the structure of its operations have raised concerns among regulators.

Long before FTX's collapse, the Justice Department was probing whether Binance had abetted money laundering, and the SEC asked for a list of information from Binance's U.S. affiliate, including how it relates to the global organization. Binance has said in the past that it collaborates with regulators worldwide and takes compliance obligations seriously.

Mr. Zhao, born in China and raised in Canada, launched Binance out of Shanghai. After the Chinese government issued a ban on crypto exchanges, the team moved to Japan. In 2018, Japan's financial regulator warned the company against conducting trades for residents without having a license to do so. After that, Binance stopped disclosing a specific location.

Binance denies it continued to conduct business out of China after the ban, but developers based in Shanghai were maintaining important software functions at its U.S. arm, Binance.US, as of summer last year, the Wall Street Journal reported. It made Binance.US executives worry that the U.S. Government might take issue with customer data being potentially accessible by the Chinese government.

***

After FTX filed for bankruptcy protection, Binance vowed to show customers worried about their funds that their tokens were stored safely. Binance released figures for bitcoin, but before it could release for others, Mazars, the auditing firm it used, suspended the work for Binance and other exchanges.

(Shea Declaration at **Exhibit "C."**)

## C. Governance, Risk & Compliance Monitor Worldwide, December 27, 2022.

21. Governance, Risk & Compliance Monitor Worldwide (a subscription based publication accessible, for example, through Lexis/Nexis), published an article dated December 27, 2022 captioned *French Investors Hit Binance with a $2.4 Million Fraud Lawsuit*. (the "GRC Article"). A true and correct copy of the GRC Article is annexed to the Shea Declaration at **Exhibit "D."**

22. The GRC Article reports on a lawsuit filed against Binance France and Binance Holdings Limited for engaging in deceptive business practices and fraudulent concealment. The GRC Article also reports the following:

> **US Authorities Are Also Preparing Money Laundering Charges Against Binance**
>
> The US Department of Justice (DOJ) officials are preparing charges against Binance for unlicensed money transmission, money laundering conspiracy, and violations of criminal sanctions.
>
> However, due in part to US law enforcement bureaucracy's Byzantine hierarchical structure, no decision has been made regarding when to file these charges, Coin Geek writes.
>
> Prosecutors from three different DOJ divisions, including the National Cryptocurrency Enforcement Team (NCET), the Money Laundering and Asset Recovery Section ["MLARS"][3], and the US Attorney's Office for the Western District of Washington, are working on the investigation.
>
> The investigation, which centers on the decisions made by Changpeng "CZ" Zhao, the CEO of Binance, and other important executives, started in 2018 at the Washington State Office.
>
> The DOJ was compelled to take action after the Washington agents joined forces with MLARS and the Internal Revenue Service's Criminal Investigation (IRS-CI) division after tracing how criminals were using Binance to move illegal funds.
>
> Despite this large US-based volume, Binance did not comply with US legal requirements by registering with the Department of the Treasury or implementing stringent anti-money laundering (AML) programs.

---

[3] Bracketed items within quoted articles have been added for clarity.

9

(Shea Declaration at **Exhibit "D"**).

23. Reuters reported similar interest by the DOJ in Binance activities as it reported in an article captioned *Exclusive: U.S. Justice Dept is split over charging Binance as crypto world falters* dated December 12, 2022, "Splits between U.S. Department of Justice prosecutors are delaying the conclusion of a long-running **criminal investigation** into the world's largest cryptocurrency exchange Binance four people familiar with the matter have told Reuters." A true and correct copy of this article is attached to the Shea Declaration at **Exhibit "E."**

### D. The Reuters Special Report Dated October 17, 2022.

24. Reuters published a special report on October 17, 2022 captioned *How Binance CEO and Aides Plotted to Dodge Regulators in U.S. and UK* ("Reuters Special Report"). A true and correct copy of the Reuters Special Report is attached to the Shea Declaration at **Exhibit "F."**

25. The Reuters Special Report suggests that Binance.US was created as an evasion strategy, intended to deflect regulatory focus away from the main company, Binance. According to the Reuters Special Report, Binance "the world's largest crypto exchange" experienced trouble behind the scenes:

> For at least a year before … the U.S. Justice Department had been pursuing a money laundering investigation into Binance, seeking extensive records on Binance's policies and the conduct of [Changpeng] Zhao and other top executives [as previously reported by Reuters]. Binance called such requests a "standard process" and said it works with agencies worldwide to address their questions.
>
> Now, new reporting by Reuters reveals fresh details about Binance's strategy for keeping regulations at arm's length and continuing disarray in its compliance programme [*sic*]….
>
> It shows that in 2018, Zhao approved a plan by lieutenants to "insulate" Binance from scrutiny by U.S. authorities by setting up a new American exchange. The new exchange would draw regulators' attention away from the main platform by serving as a "regulatory inquiry clearing house," according to the proposal. Executives went on to set the plan in motion, company messages show.

In public, Zhao said the new U.S. exchange – called Binance.US – was a "fully independent entity." In reality, Zhao controlled Binance.US, directing its management from abroad, according to regulatory filings from 2020, company messages and interviews with former team members. An adviser, in a message to Binance executives, described the U.S. exchange as a "de facto subsidiary."

This year, Binance.US's compliance operation has been in turmoil. Almost half the U.S. compliance team quit by mid-2022 after a new U.S. boss was appointed by Zhao, according to four people who worked at Binance.US. The staff left, these people said, because the new chief pushed them to register users so swiftly that they couldn't conduct proper money laundering checks.

The new insights come as the Justice Department is investigating whether Binance violated the Bank Secrecy Act, which requires crypto exchanges to register with the Treasury Department and comply with anti-money laundering requirements if they conduct "substantial" business in the United States.

"The Binance structure in the U.S. raises questions about the degree to which the parent company is willing to comply with U.S. laws and regulations," said Ross Delston, an independent lawyer, former banking regulator, and expert witness on anti-money laundering issues.

\*\*\*

Described on its website as an "ecosystem" with over 120 million users, Binance has set up at least 73 companies across the world, according to corporate filings and company organization [*sic*] charts. Zhao owns or partly controls at least 59. He declined to give details of the location or entity behind the main exchange, which makes money by charging fees on crypto trades.

\*\*\*

As Binance raced to expand, one market was in focus: the United States.

Within five months of Binance's launch in 2017, a third of its users – one million at the time – were U.S.-based, a company blog post said. But Binance had not registered with the Treasury Department, as the Bank Secrecy Act required of financial companies with "substantial" business in the United States.

In September 2018, the New York attorney general's office announced it had referred Binance to the state regulator for potentially violating crypto laws, after investigating whether the company accepted local residents as clients. The state regulator and attorney general's office declined to comment.

Soon after, Zhao tasked executives with finding a way to ensure Binance kept access to the U.S. market, two people working with him said. In October, dozens of

11

messages show, a group of top executives, including co-founder Yi He, sought the expertise of an entrepreneur called Harry Zhou.

Harry Zhou ran a U.S. crypto trading firm that Binance had invested in. He sent a proposal to a Binance executives' message group to address "Binance-specific risks in the US."

\*\*\*

Zhou's proposal called for Binance to register with the Treasury a separate U.S. entity that would comply with the Bank Secrecy Act. The plan is set out in a presentation, titled "Binance US Entry," that he shared with the executive group. This entity would offer traders a far slimmer selection of tokens than the main exchange, and no derivative products,, to "reduce attractiveness of enforcement" by the U.S. Securities and Exchange Commission (SEC).

The SEC declined to comment.

Binance would restrict U.S. customers' access to the main platform, the presentation said. But Binance would enable "strategic" use of virtual private networks, which obscure the location of internet users, to "minimize economic impact" of the changes. This would leave a loophole: U.S.-based traders would still be able to access the main exchange, with its greater liquidity and broader range of products, by using a VPN [Virtual Private Network] connection.

\*\*\*

As they moved forward with the plan, Harry Zhou said in a mid-November message that the future U.S. operation would have to "carefully preserve technical separation from Binance to avoid admitting it is a de facto to subsidiary." Earnings from the U.S. business could be sent to the main exchange in the form of license and service fees without threatening the legal separation of the two entities, he wrote.

\*\*\*

In early 2019, the [ ] plan began falling into place.

In February, a company called BAM Trading Services was incorporated in Delaware, using the same San Francisco address as Harry Zhou's crypto trading company. BAM registered with the Treasury as a money-services business in June 2019, just as Binance said it was banning U.S.-based users from its main exchange.

Days later, Binance unveiled a "partnership" with BAM Trading, saying BAM would license Binance's name and trading technology to launch the Binance.US exchange. Zhao said Binance.US, led by BAM, would "serve the U.S. market in full regulatory compliance" and be a "fully independent entity."

12

BAM was ultimately owned by Zhao, however, regulatory filings show. Its first chief executive, Catherine Coley, reported to the Binance.US board, chaired by Zhao. Binance's Cayman Island holding company kept custody of Binance.US customers' digital wallets, according to a 2019 company financial report. And a company organogram showed Binance.US as part of the Binance group.

\*\*\*

Despite the ban on U.S. users, Binance was aware that traders there continued to use the main platform, messages show. That August, a senior employee told a colleague in a message that the compliance department had privately told them that the exchange was, in practice, not banning U.S. users. In forum posts and online guides, Binance users said they could get around the ban by accessing the exchange via virtual private networks [VPNs].

\*\*\*

Under Coley, Binance.US wooed Americans with the promise of low trading fees. But unlike with the main Binance exchange, all U.S. customers had to submit identifying documentation to open accounts, lengthening the sign-up process. Until August 2021 the main Binance exchange let users open accounts and trade crypto anonymously by merely providing an email address. Users must now submit ID documents.

\*\*\*

In December 2020, the Justice Department's money laundering section sent its letter to Binance. As Reuters reported last month, the department requested any communications involving 12 executives including Zhao and Coley, as well as adviser Harry Zhou, related to the establishment of Binance.US and the recruitment of U.S.-based customers. The department sought any company records on [Harry Zhou's plan], along with instructions employees communicate via encrypted messaging services. That month, the SEC also issued a subpoena to BAM, addressed to Coley, requiring it to hand over documents showing what services Binance was providing the U.S. company.

Coley left suddenly four months later. Three people familiar with her exit said it followed regular clashes with Zhao. She has not made any public statements since leaving.

(Shea Declaration at **Exhibit "F"**).

**E. Based Upon the Foregoing, The Bureau is Concerned With the Qualifications of Binance.US as a Purchaser.**

26.     Based upon the United States of America's concern with Binance.US as a qualified purchaser (Docket No. 797) and based upon the foregoing media reports, the Bureau is concerned with whether Binance.US may qualify as a *bona fide* purchaser of Voyager assets and accounts.

**IV.   Disclosure to Customers Regarding Potential For Offshore Custody of Accounts and/or Prohibition of Offshore Custody Accounts.**

27.     Based upon the fact that neither the APA nor the Disclosure Statement provide any transparency as to what will happen to cryptocurrency once coins are transferred to Binance.US's platform, the Bureau proposes that the APA and the Disclosure Statement provide a mechanism to give time for customers to close out or withdraw cryptocurrency from the Binance.US exchange, and provide a mechanism with notice that coins transferred from Voyager to the Binance.US exchange may not be held outside of the United States, absent adequate notice to and consent from the account holder.

28.     The Bureau proposes that the APA, Disclosure Statement and Plan provide language to the effect that "Purchaser shall not transfer account holder cryptocurrency for 30 days [or other adequate period of time] following deposit to Purchaser's platform, unless notice of such is expressly directed and approved by the account holder in writing," in order to give each account holder sufficient time to withdraw their cryptocurrency from the Binance.US platform, if the account holder is not comfortable with retaining cryptocurrency on the Binance.US platform.

29.     The Bureau also proposes that the APA, the Disclosure Statement and Plan contain language providing that the Purchaser give notice (in bold) to each account holder that their cryptocurrency that is transferred from the Seller's exchange to the Purchaser's exchange shall remain in a Binance.US custodial account situated in the United States, unless notice is given to

the account holder advising of such intended transfer and the account holder expressly approves in writing, in advance of such intended transfer.

### V. The Proposed APA Order Contains Language Suggesting Approval of the Sale Itself, Despite Assurances From the Debtors That Sale Approval is Not Yet Being Sought.

30. The APA Motion, as represented by counsel for the Debtors, purports to seek mere "entry" into the APA, such that if the sale is not duly consummated, the Debtors can rely on certain provisions in the executed APA to recover fees. However, the proposed Order authorizing entry into the APA contains language that could be construed as approving of the sale itself, and such language could have *res judicata* effect. Specifically, the proposed Order states in pertinent part at paragraph II.2.:

> The transactions contemplated by the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement. Entry of this Order, including approval of the Seller's entry into, **and performance under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.**

(Bolding added).

31. The foregoing language is premature and should not apply to a mere sale "entry" Order because it purports to make a finding that the asset sale is in the best interest of all involved, a central tenant to approval of the sale itself. This provision should, therefore, be stricken from the proposed "entry" APA Order.

### VI. The Disclosure Statement Lacks Transparency and is Inadequate.

32. To be approved, a disclosure statement must contain "adequate information" within the meaning of 11 U.S.C. §1125(a)(1). "Adequate information" means information of a kind and

15

in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan…. that would enable a hypothetical investor typical of the relevant class to make an informed judgment about the plan… 11 U.S.C. §1125(a)(1). Adequate information is a flexible standard based on the facts and circumstances of each case. *In re Momentum Mfg. Corporation*, 25 F. 3d1132, 1136 (2d Cir. 1994*); In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D. N.Y. 1995). Among other things, a disclosure statement must provide information relevant to the risks posed to creditors under the plan. *In re. U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D.Tex 1996).

33. The Disclosure Statement does not contain adequate information about the business activities contemplated by Binance.US and the regulatory approvals that will be required to conduct that business.[4] Debtors identify the "regulatory landscape" as a risk factor of the Plan, but the Disclosure Statement contains very little discussion of what Binance US intends to do, what licenses it currently holds, and what additional licenses or registrations may be required. For example, if Binance.US intends to try to trade the VGX token, as is suggested in the Disclosure Statement, list or trade its own BNB token, or continue its own previous staking operations, securities registration will be required. Securities registration typically takes months to complete. None of these potential risks to account holders is adequately disclosed in the Disclosure Statement. In response to the stated question, "Are Regulatory Approvals Required…," only money transmitter licensing is discussed.[5]

---

[4] By contrast, there is extensive discussion of the status of Voyager's money transmitter licenses and about the many state regulatory actions which have been filed against Voyager.

[5] See Section J on pages 29-30 of the Disclosure Statement.

34. The Disclosure Statement asserts that Binance US will hold in custody the assets of account holders who migrate to its platform but fails entirely to disclose which Binance entity will custody the assets and whether account holder assets will be held in the U.S. or with an affiliated, and possibly unregulated, offshore entity. Account holders voting on confirmation of the Plan are entitled to weigh the risks to their investment that may be associated with custody by different affiliated entities, including those that may be located offshore.

35. The Disclosure Statement and Plan should also provide account holders with notice that if their cryptocurrency is transferred to an offshore custodian, the regulatory regime in that offshore locale may not adequately protect account holder interests.

36. If Binance.US intends to offer accounts/products similar to those that had been offered by Voyager, then such accounts/products likely would be deemed to be "securities" by regulators, and, accordingly, would need to be registered. The Disclosure Statement and Plan should notify account holders that if Binance.US needs to register with governing regulators, such as the Security and Exchange Commission and state regulators, such process is quite complex and takes significant time.

37. The Disclosure Statement contains inadequate information about the financial condition of Binance.US, whether there are threats to its solvency which might adversely impact account holders, and what due diligence was conducted by the Debtors in this regard.

38. The Disclosure Statement contains inadequate information about the myriad third party releases contained in the Plan and whether those releases are intended to apply to claims by regulators.

    **VII.**   **Joinder With Other State's Positions.**

39. The Bureau joins in the following objections, to the extent not already incorporated in, or inconsistent with, this Response:

A.  The *Objection to the Adequacy of Debtors' Second Amended Disclosure Statement* filed by the Vermont Department of Financial Regulation and the National Association of Attorneys General on behalf of nine additional jurisdictions, and

B.  The *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code;* and

C.  The *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief.*

## RESERVATION OF RIGHTS

40. The Bureau reserves any and all rights to supplement and/or amend this Response, to join in other or additional responses filed, and to raise any and all objections with respect to the APA Motion and the Conditional Disclosure Statement Motion at the hearing, regardless of whether such arguments are referenced herein.

WHEREFORE, The New Jersey Bureau of Securities respectfully objects to the APA Motion and the Conditional Disclosure Statement Motion, as set forth above, and seeks such relief as the Court shall deem just and proper.

{SIGNATURE BLOCK ON FOLLOWING PAGE}

Dated: January 4, 2023                    Respectfully submitted,

                            **McELROY, DEUTSCH, MULVANEY**
                              **& CARPENTER, LLP**

*/s/ Jeffrey Bernstein*
Jeffrey Bernstein, Esq.
Virginia T. Shea, Esq.
570 Broad Street, Suite 1500
Newark, NJ 07102
Telephone: (973) 565-2183
E-mail: jbernstein@mdmc-law.com
       vshea@mdmc-law.com

*Counsel for the New Jersey Bureau of Securities*