**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 |
| Debtors. | (Jointly Administered) |

## OBJECTION TO THE ADEQUACY OF DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT

The Vermont Department of Financial Regulation (Vermont) and the states of Alabama, Arkansas, California, the District of Columbia, Hawaii, Maine, North Dakota, Oklahoma and South Carolina (collectively the "Objecting States"),[2] pursuant to 11 U.S.C. § 1125, hereby object to the adequacy of Debtors' Second Amended Disclosure Statement dated December 22, 2022 (the "Second DS") and to the Debtors' proposal that it be approved on a conditional basis for distribution in connection with the solicitation of votes for the Debtor's plan. In the Objecting States' view, there are sufficient concerns about the accuracy and the adequacy of the information provided, such that the document in its current form would be misleading rather than helpful to the creditors in choosing how to cast their votes. If an inadequate disclosure statement is sent to creditors and later rejected by the Court, this process will have been a waste of time the case can ill afford. The Objecting States submit that taking additional time at this stage to fully review the document would be more efficient in the long run. In support of this Objection, the Objecting States assert the following:

---

[1] Debtors include Voyager Digital Holdings, Inc., Voyager Digital Ltd., and Voyager Digital, LLC. Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, New York 10003.
[2] The reference to "states" is a shorthand reference to the specific state agencies filing the objections. The agencies are the Alabama Securities Commission; Arkansas Securities Department; California Department of Financial Protection and Innovation, District of Columbia, Department of Insurance, Securities and Banking; Hawaii Department of Commerce and Consumer Affairs, Securities Enforcement Branch; Maine Securities Administrator; North Dakota Securities Department; Oklahoma Department of Securities; and South Carolina Attorney General Office.

## INTRODUCTION

1.     Debtors filed the above-captioned Chapter 11 cases on July 5, 2022. (Petition Date). The cases have been consolidated for procedural purposes and are jointly administered pursuant to Bankruptcy Rule 1015(b).

2.     Since the Petition Date, Debtors have been operating their businesses and managing their property as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108; however, Debtors have ceased accepting new customers on their crypto trading platform and have discontinued most pre-petition business activities.

3.     Debtors filed their initial Chapter 11 plan and disclosure statement on the Petition Date. Debtors' initial plan contemplated, inter alia, the sale of the Voyager platform. Debtors subsequently amended the initial plan and disclosure statement and also entered into an Asset Purchase Agreement with West Realm Shires Inc. (commonly known as FTX US).

4.     On November 11, 2022, FTX US and most of its affiliated companies filed their own Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware. The FTX bankruptcy filings led to the collapse of Debtors' planned sale transaction. As a result of the failure of the FTX transaction, the Debtors restarted their sale solicitation process. The details of the FTX collapse, subsequent bankruptcy filings, and their impact on the sale transaction are set forth in Debtors' Second DS, Arts. II, III, and VIII(N).

5.     Debtors also filed on December 22, 2022 an Asset Purchase Agreement with BAM Trading Services Inc. d/b/a Binance.US (Binance US), a Third Amended Plan of Reorganization (the Plan), and a Motion for Entry of an Order: (i)scheduling a combined disclosure statement approval and plan confirmation; (ii) conditionally approving the adequacy of the debtors' disclosure statement; (iii) approving: a) procedures for solicitation; b) forms of ballots and notices; c) procedures for tabulation of votes; and d) procedures for objections; and (iv) granting related relief.

6.     The Objecting States object to the adequacy of the Second DS. Although Debtors claim to seek only conditional approval, the reality is that if it is conditionally approved, this Second DS is the document that will be sent to creditors with the Plan, the Asset Purchase Agreement with Binance US and the ballots and is the document on which creditors will rely in deciding how to vote on the Plan. Because the Second DS fails to provide adequate and accurate

information, voters will be misled, and the final vote will be subject to attack and may need to be repeated to the detriment of all parties in the case.

7.     A further substantial problem is that a significant aspect of the plan, i.e., the specific process by which customers will have the option of either having their accounts retained at and administered by Binance US or returned to them is unclear.  Art. V(C)(6) of the Second DS states that customers that do not become Transferred Creditors (i.e. those holding accounts at BInance DS) within three months of the Closing Date will have their coins liquidated and returned in cash (see Par. 6.12(a) of the PA.  However, paragraph 6.12(e)(iv) of the Purchase Agreement (DE#775, Ex. B) indicates that nothing in the agreement precludes the prior Voyager customers from withdrawing any "Coins" they have on the platform.  While it appears customers will have three months to reclaim their Coins in kind, this is not entirely clear.  Perhaps there will be additional details about these processes when the Plan Supplement with the Customer Onboarding Protocol is distributed, but that will not occur until several weeks after the plan solicitation process has begun.  To the extent the Objecting States have concerns about the substantive appropriateness of Binance US as a purchasing entity, those concerns may be mitigated if customers have a fully informed, timely, and effective way of reclaiming their assets before they come under the control of Binance.  Without adequate information as to what that Protocol will provide and what protections will be extended to allow customers to withdraw their Coins in kind if they so choose, neither the customers nor the Objecting States have any clear basis at this point to assess the validity of this proposed transaction.

8.     There are several other aspects in which the Second DS is inadequate or at least misleading. The initial discussion of the terms of the overall transaction are summary and conclusory, in many cases doing nothing but referring the customers to the Purchase Agreement, itself a dense and at times nearly impenetrable document.  The problem is compounded by the fact that even the most relevant portions of the Purchase Agreement are not clearly referenced, much less explicitly set out in the Second DS, nor is the Purchase Agreement itself an attachment to the Second DS.  Indeed, there is not even a link to that document to assist the customers in assessing this proposed transaction.  The overall description of the Purchase Agreement suggests that the actual crypto coins are being sold, whereas a closer reading makes clear that, as a functional matter, it is only custody that is being transferred and the relatively minimal consideration being paid ($20 million) is being offered by Binance US to allow it to acquire the

3

right to try to retain those Voyager customers as its own customers.  Any other characterization of the proposed transactions would involve the Court and the parties in the same complex arguments being pursued in the Celsius Network LLC, *et al* bankruptcy, Case No. 22-10964 (Bankr. S.D. N.Y.) (hereafter "Celsius.") as to whether the debtors there actually "own" the crypto currency at issue.  The transfer process here does not require any such determination – indeed, the Purchase Agreement (DE#. 775, Ex. B, Sec. 6.12 (e) ) explicitly states that, at least initially, "such coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor."

9. The Second DS is also inadequate in its description of when, whether, and how, customers' accounts will actually be transferred to or retained by Binance US, It fails to describe why separate treatment is provided to the holdings of accounts in the so-called "Unsupported Jurisdictions."  The Second DS also provides no information at all about the nature of the accounts that Binance US will create for the users and what the "terms of use" will be for such accounts.  That latter point is one that has been of huge import in the Celsius case with respect to what rights various parties have in the cryptocurrency at stake there.  The absence of *any* discussion of those issues in the Second DS is striking.  It may be that such information may be provided in the Plan Supplement and the Customer Onboarding Protocol but it is impossible to know at this point.  In any case, the fact that such crucial matters are left unresolved at this point underscores the lack of clarity and specificity in the Second DS its current form.  Each of these issues will be discussed in turn below.

## THE DISCUSSION OF THE PURCHASE AGREEMENT IN THE SECOND DS IS INACCURATE AND CONFUSING

10. To evaluate the Second DS, it is necessary to understand the nature of the purchase transaction being proposed.  While the various documents being presented to the Court describe the transaction as being worth over $1 billion, that number is arrived at simply by valuing the $1 billion in coins currently being held by Voyager and adding $20 million, the only sum that Binance US is currently certain to be required to pay out of pocket.  The transaction might be worth that amount if Voyager *owned* those coins and Binance US came up with $1 billion of its own assets that it purported to transfer to Voyager for payment to the customers who would then no longer own their coins.  Unlike the current disputes being litigated in Celsius,

4

though, the Objecting States understand that Voyager does *not* claim to own the coins themselves but rather stands in the role of a custodian thereof.

11. Voyager merely proposes to transfer the coins it currently holds to an account in its name at Binance US in order to be able to carry out the Rebalancing Transaction proposed under the Plan, ostensibly so that coins will be available to be distributed on a *pro rata* basis to its customers. Only after that exercise, and after application of the Customer Onboarding Protocol described in the Purchase Agreement at Par. 6.10, will there be any transfer of assets from the Voyager "institutional account" described in the Purchase Agreement at Par. 6.11(b) to accounts tentatively established for the customers on the Binance US platform pursuant to Par. 6.12(a)

12. The Objecting States respectfully submit that in lieu, of the proposed language at paragraphs 2 and 14 of the Purchase Motion (DE# 775) and Arts. II(a) and VIII(M), (pp. 7, 59 of the Second DS) describing the transaction as having a value in excess of $1 billion, a more accurate and informative statement would provide as follows:

> The Binance US Transaction involves the transfer of approximately $1.002 billion in crypto coins (as valued on December 19, 2022) currently held by Voyager on behalf of its customer accounts to Binance to allow the Rebalancing Exercise to take place. Thereafter, those amounts will be held by Binance in the names of the prior Voyager customers to allow them to opt into becoming Binance customers or to have their accounts closed and the coins returned to them. In return, Binance will pay $20 million to Voyager which will be property of the estate and subject to distribution in accordance with the rest of the plan terms. ….

13. There is similar language in the Stakeholder letter (DE# 779, p. 119) that suggests that Binance US is "buying" the coins, which again does not appear to accurately reflect what is occurring. Rather, under the Customer Onboarding Protocol[3], it appears that customers will, in some fashion, be able to choose whether to have their accounts retained at Binance US or to be "cashed out" by having their pro rata share of the "rebalanced" crypto coins held by Voyager returned to them in kind. This is consistent with what we understand the term "Net Owed [or

---

[3] The Customer Onboarding Protocol has not been supplied to creditors and will not be provided until several weeks after the Second DS has been distributed. This discussion is based on the general discussion of this provision in the general documents.

"Owned"][4] Coins" to mean, but that term is not defined in that Stakeholder letter. Section 6.10(d) of the Purchase Agreement does state that customers will be given the right to receive their "Net Owed Coins" pursuant to Par. 6.12, but again that document is not being sent to the customers, so they will not be made aware of that protection. In any case, it is clear that there needs to be further clarification to the customers of what those terms means and what their rights are with respect to the choice as to whether to maintain or forego an account at Binance US.

14.     For these same reasons, the discussions of the tax consequences of the transaction in Article XII of the the Second DS (DE#. 779, p. 79) describe the process as involving a taxable sale of various assets to Binance US (including specifically a reference to "the Debtor's cryptocurrency" at pp. 80-81) but then also states that the process might be deemed to be an "in-kind" distribution (at p. 80). The two statements appear to be contradictory and, in any case, may be inconsistent with the nature of the transaction as essentially only a transfer of custodial authority.

15.     In short, absent a fuller and clearer presentation of the terms of the Purchase Agreement, the Objecting States assert that the Second DS is inaccurate and misleading and, as such, cannot be approved even conditionally at this time.

## THE SECOND DS PROVIDES INADEQUATE INFORMATION

16.     To be approved, a disclosure statement must contain "adequate information" within the meaning of 11 U.S.C. §1125(a)(1). "Adequate information" means information of a kind and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan…. that would enable a hypothetical investor typical of the relevant class to make an informed judgment about the plan… 11 U.S.C. §1125(a)(1). Adequate information is a flexible standard based on the facts and circumstances of each case. *In re Momentum Mfg Corp.*, 25 F. 3d1132, 1136 (2d Cir. 1994*); In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D. N.Y. 1995). Among other things, a disclosure

---

[4] Both terms are used in the documents, sometimes in the same sentence (as on p. 120 of DE#. 779). Presumably one is a typo but the Objecting States are not sure which is intended. In any case, the letter does not define either term for the benefit of the customers.

statement must provide information relevant to the risks posed to creditors under the plan. *In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex 1996).

17.   Under the Plan, all account holder claims are placed in Class 3. Account holders outside of the four so-called "Unsupported"[5] Jurisdictions are given identical treatment, which roughly consists of the opportunity to migrate to the Binance US platform, immediate access[6] to such account holder's Net Owed Coins pursuant to Section 6.12 of the Purchase Agreement (the In-Kind Coin Distribution), and a pro rata share of any future bankruptcy distributions. Account holders in Unsupported Jurisdictions, on the other hand, are only entitled to a cash distribution equal to the value at which the Net Owned Coins allocable to such account holder are liquidated (the Cash Distribution), on a delayed basis, and a pro rata share of any future bankruptcy distributions.

### A. The Second DS Does Not Provide Adequate Information about the Purchaser or the Process for the Transfer of Accounts

18.   The Second DS provides little or no information about the proposed purchaser, Binance US.  In most sales, this would not be a major concern; the purchaser would either be able to come up with the purchase prices on the closing date or not.  If it could not do so, the seller would have no obligation to close or to turn over any assets.  In this case, though, the only out-of-pocket consideration being supplied by Binance US, is $20 million, for which it will obtain the right to try to convince the holders of more than $1 billion in crypto currency to remain as its customers.  In short, this payment is basically a minimal marketing expense.

19.    Moreover, serious concerns have been raised by a number of regulatory entities with respect to Binance US.  See the discussion in the response filed by New Jersey and itsattached declaration.   While Binance US disputes those concerns and asserts that it is trying to assist in those regulatory efforts, *ibid.*, the fact is that these issues may be a major concern for any regulatory entity, and they are not discussed *at all* in the Second DS.  It is the Objecting

---

[5] The Unsupported Jurisdictions are Hawaii, New York, Texas and Vermont, states in which Binance US does not hold a current money transmitter license. On information and belief, there are other jurisdictions in which Binance US lacks a full money transmitter license or simply has a pending application, but these jurisdictions are not listed as being in the "Unsupported" group.

[6] Immediate access is subject to the requirement that account holders must complete the migration process to the Binance US platform in accordance with Section 6.10 of the Asset Purchase Agreement.  That itself assumes that Binance could legitimately hold such accounts within those jurisdictions.

7

States' understanding that other states will be submitting filings with additional information about such regulatory concerns.

20. The Second DS similarly provides little or no information about the financial condition of Binance US, the Purchaser under the Purchase Agreement, whether there are financial or regulatory threats to its solvency which might adversely impact account holders (in the same way that occurred with the FTX US transaction), and what due diligence was conducted by the Debtors in this regard. All of those are matters that would likely be of interest to customers in terms of deciding whether they wish to retain their accounts at Binance US. Some of those information *might* be included in the Customer Onboarding Protocol which is to be provided as part of the Plan Supplement, but that is not to be prepared or distributed until weeks after the Plan is circulated to creditors, and it is unclear whether its language or its terms will be reviewed or approved by this Court or regulatory entities before it is distributed.

21. The Second DS also fails to contain adequate information about the business activities contemplated by Binance US and the regulatory approvals that will be required to conduct that business on a going-forward basis.[7] Debtors identify the "regulatory landscape" as a risk factor of the Plan, but the Second DS contains very little discussion of what Binance US intends to do, what licenses it currently holds, and what additional licenses or registrations may be required. For example, if Binance US intends to try to trade the VGX token, as is suggested in the Second DS, list or trade its own BNB token, or to continue its own previous staking operations, securities registration will be required. Securities registration typically takes months to complete. None of these potential risks to account holders is adequately disclosed. In response to the stated question, "Are Regulatory Approvals Required…," only money transmitter licensing is discussed.[8]

22. The Second DS also asserts that Binance US will hold in custody the assets of account holders who migrate to its platform but fails entirely to disclose which Binance entity will have custody of the assets and whether account holder assets will be held in the U.S. or with an affiliated, and possibly unregulated, offshore entity. Account holders voting on confirmation of the Plan are entitled to weigh the risks to their investment that may be associated with custody

---

[7] By contrast, there is extensive discussion of the status of Voyager's money transmitter licenses and about the many state regulatory actions that have been filed against Voyager.
[8] See Art. IV(J) on page 20 of the Second DS.

8

by different affiliated entities and whether adequate provisions have been made to protect their investments until they have the option to decide whether to become Binance US customers or to withdraw their funds.

23. While regulatory entities may be willing to leave the reaction to some or all of these concerns to the educated choice of the customers, the reality is that, under the present documents, customers will be given no information about any of these issues *before* they are initially asked to vote for the Plan and will not be advised to wait until the Plan Supplement is available before they do choose to cast a ballot. It is also not clear in the absence of the Customer Onboarding Protocol, which will be part of the Plan Supplement, what steps will be taken to provide the full scope of necessary information to customers and what steps will be taken to ensure that their funds remain within their legal control unless and until they make that fully informed choice to allow transfer of their account to Binance US. It is wholly inappropriate even to conditionally approve a disclosure statement and voting process that is missing this crucial information.

### B. The Second DS Does Not Provide Adequate Information about the Treatment of Account Holders in the Unsupported Jurisdictions

24. To give Binance US additional time to secure licenses in the Unsupported Jurisdictions,[9] Section 6.12(b) of the Asset Purchase Agreement does not require the Debtors or

---

[9] Licensing of Binance US by the Unsupported Jurisdictions is not assured. In order to grant a money transmission license, the Vermont Commissioner of financial regulation must find that the financial responsibility, experience, character, and general fitness of Binance US command the confidence of the community and warrant belief that the business will be operated honestly, fairly, and efficiently pursuant to Vermont law. 8 V.S.A. § 2103(a). Such findings are also required with respect to each officer, director, and responsible individual of, and each person in control of, Binance US. *Id.* In making such a determination, the Commissioner may consider information that s/he has developed to date such as

- The numerous regulatory and civil actions and orders against affiliates and/or a control person of Binance US.
- The failure of a control person of Binance US to disclose several such actions and orders and the repeated submission "under penalties of perjury" of disclosure forms containing false answers to questions about the existence of such actions and orders. These failures were only corrected after discovery by the Department and reporting to Binance US.
- concerns about custody of the private keys of customer digital assets.
- The listing and trading of the digital asset BNB on the Binance US platform.
- Prior unlicensed activity in Vermont by Binance US and certain of its affiliates.
- Failure to provide certain requested information about affiliates of Binance US. *See Declaration of Ethan McLaughlin, Ex. A*

9

Binance US to make the Cash Distribution to account holders in Unsupported Jurisdictions until up to 6 months after the closing date. The cash value that such account holders will receive in such a delayed distribution will be based on the then-prevailing exchange rates (including applicable fees, spreads, costs, and expenses) on the Binance US platform,[10] rather than exchange rates in effect on the closing date or on the Petition Date (which is the date used for the rebalancing exercise to be carried out on behalf of the customers in the other jurisdictions). Moreover, account holders in Unsupported Jurisdictions will not be able to access or trade their positions in their Net Owed Coins during this delay period.

25. The Second DS contains wholly inadequate information about the reason for this disparate treatment of account holders in Unsupported Jurisdictions. Debtors fail even to disclose whether a money transmitter license is required for a purchaser of assets to make distributions in cash or in-kind to creditors under a Court-approved Chapter 11 plan. In fact, Section 6.12(b) of the Asset Purchase Agreement expressly allows both Binance US and the Debtors to make cash distributions to account holders in the Unsupported Jurisdictions without a license. The Debtors fail to disclose why Binance US or the Debtors cannot, therefore, make immediate in-kind distributions to account holders in Unsupported Jurisdictions at confirmation, whereby such account holders would receive the same form of consideration at the same time as all other Class 3 account holders. The fact that Binance US wants more time to try to obtain legal status so it can hold the accounts of those parties is not an adequate justification.

26. Moreover, the discussion of the actual treatment of account holders in Unsupported Jurisdictions is inadequately explained. Debtors reference Section 6.12 of the APA but do not explain in plain English what the treatment entails or mention that cash distributions to such account holders may be delayed by up to 6 months after the closing. Section 6.12 is unlikely to be easy for an average account holder to understand and is buried in the middle of a dense 108-page document.

27. The Second DS further fails to disclose that because of the disparate treatment of creditors within a single creditor class, the Plan is likely unconfirmable as a matter of law. See

---

[10] Account holders in other jurisdictions that migrate to the Binance US platform are not subject to involuntary liquidation, and therefore will not have their In-Kind Coin Distributions reduced by additional fees, spreads, costs, and expenses, some of which may be paid to or retained by Binance US.

10

11 U.S.C.§1123(a)(4). When a plan is so flawed that confirmation is impossible, the Court should exercise its discretion to refuse to consider the adequacy of the disclosure statement that describes it so as not to waste the parties' time on a futile exercise. *In re. Eastern Maine Electric Coop Inc.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991).

### C.  Inadequate Disclosure of Releases and Business activities

28. The Second DS contains inadequate information about the myriad third party releases contained in the Plan, the reasons and the necessity therefor, and whether those releases are intended to apply to potential claims by regulators.

29. In Article 6.B.4, there is a discussion of the Debtors' lending program and that it is expected that all loans will be unwound prior to conformation. That discussion does not mention the loan to the 3AC company that precipitated the Debtors' bankruptcy filing and what the current status is of the proceedings involving that entity. Similarly, on page 44 of the Second DS, there is a reference to $935 million being on loan to 3AC but the next sentence states that 25% of Voyager's $3.39 billion in assets were on loan to 3AC, which would be about $850 million, with no explanation of that $85 million discrepancy. As part of the discussion of the liquidation of 3AC, it would be useful to discuss the 3AC loan and the coins used there to explain the nature of the "hole" in the coins held by Voyager. This could help explain the need to "rebalance" assets prior to making a distribution which is a primary factor in the decision to work with Binance US.

### CONCLUSION

For all of the reasons set forth herein, the Objecting States respectfully request that the Court deny approval, conditional or otherwise, of the Second Amended Second DS.

Dated: January 4, 2023

Vermont Department of Financial Regulation

By: */s/ Jennifer Rood*
Jennifer.rood@vermont.gov

KAREN CORDRY,
Bankruptcy Counsel

*/s/ Karen Cordry*

Karen Cordry
D.C. Bar No. 278051
Bankruptcy Counsel,
National Association of Attorneys General
1850 M St., NW, 12th Floor
Washington, DC 20036
Telephone: (301) 933-3640
kcordry@naag.org

ATTORNEY FOR:
Alabama Securities Commission
Arkansas Securities Department
California Department of Financial Protection and Innovation
District of Columbia, Department of Insurance, Securities and Banking
Hawaii Department of Commerce and Consumer Affairs, Securities Enforcement Branch
Maine Securities Administrator
North Dakota Securities Department
Oklahoma Department of Securities
South Carolina Attorney General Office