Hearing Date: January 10, 2023 at 2:00 p.m. (ET)

Andrew G. Dietderich
Brian D. Glueckstein
Benjamin S. Beller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Counsel for Alameda Research LLC and Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10943 (MEW)<br><br>Jointly Administered |

### OBJECTION TO DEBTORS' CONDITIONAL DISCLOSURE STATEMENT MOTION

Alameda Research Ltd. ("Alameda Research"), Maclaurin Investments Ltd. (f/k/a Alameda Ventures Ltd.) ("Alameda Ventures")[2] and certain of their affiliates (collectively, "Alameda"), by and through their undersigned counsel, hereby submit this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] On September 23, 2022, Alameda Ventures Ltd. changed its name to Maclaurin Investments Ltd. This Objection continues to refer to the entity using its previous name to avoid confusion and for convenience.

*the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] (the "Conditional Disclosure Statement Motion"),[3] and respectfully state as follows:

**Preliminary Statement**

1. On November 11, 2022, Alameda Research, Alameda Ventures and over 100 of their affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware (the "Alameda Chapter 11 Cases").[4] Prior to the commencement of the Alameda Chapter 11 Cases and the commencement of the Voyager chapter 11 cases, Alameda and the Debtors maintained a number of business relationships: beginning in September 2021, Voyager made loans to Alameda Research; in June 2022, less than two weeks before the Debtors filed for bankruptcy protection, Alameda Ventures provided rescue financing to Voyager; and Alameda is a substantial shareholder of Voyager. While both Alameda's and Voyager's circumstances are notably different today than they were when the parties entered in these business arrangements, including as a result of the commencement of both the Debtors' chapter 11 cases and the Alameda Chapter 11 Cases, the Debtors have no justification for proposing a Plan that ignores fundamental requirements and protections of the Bankruptcy Code with respect to, among other things, the treatment of Alameda's claims against the Debtors. Because of those infirmities, the Plan is patently unconfirmable and otherwise falls short of the disclosure requirements under section 1125 of the

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Conditional Disclosure Statement Motion.

[4] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

Bankruptcy Code. Accordingly, the Court should deny conditional approval of the Disclosure Statement.

2.   While the Plan suffers from numerous confirmability issues that would be fatal at confirmation (if the Plan were to reach that stage), there are three defects that render the Plan patently unconfirmable and require denial of conditional approval of the Disclosure Statement.[5] *First*, the Plan does not comply with section 1129(b) of the Bankruptcy Code because it unfairly discriminates against holders of Alameda Loan Facility Claims and violates the absolute priority rule with respect to the Alameda Loan Facility Claims. The Plan provides recoveries to claims that are either of the same priority level or structurally junior to the Alameda Loan Facility Claims ahead of recoveries on Alameda Loan Facility Claims (and is ambiguous as to the relative priority of distributions to the Alameda Loan Facility Claims and distributions to Existing Equity Interests and Section 510(b) Claims) without any legal basis.

3.   *Second*, the Plan fails the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code by failing to provide Alameda Loan Facility Claims with a recovery not less than the recovery to which such claims would be entitled in a hypothetical chapter 7 liquidation. In a hypothetical chapter 7 liquidation, Alameda Loan Facility Claims would be entitled to participate *pro rata* in distributions on account of OpCo General Unsecured Claims and TopCo General Unsecured Claims, each of which are estimated to recover some

---

[5] This Objection focuses on the most glaring defects in the Plan but the issues identified herein are not exhaustive and Alameda reserves its right to object to the adequacy of the Disclosure Statement and confirmation of the Plan on any other grounds.

-3-

value in the Debtors' Liquidation Analysis,[6] but are estimated to receive no recovery under the Plan.  Accordingly, the Plan fails the best interests test.

        4.      *Third*, the Plan impermissibly gerrymanders classes of Claims by separately classifying the Alameda Loan Facility Claims (which Alameda has asserted against each Debtor) from each of OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims with no legitimate business purpose in an artificial attempt to obtain an impaired consenting class from the General Unsecured Claims Classes.

        5.      In addition to the patent unconfirmability of the Plan, the Court should deny conditional approval of the Disclosure Statement for the additional reason that it fails to provide adequate (or, in some cases, any) information concerning a number of material issues, including (i) the basis for the discrimination against and otherwise improper treatment of the Alameda Loan Facility Claims under the Plan and whether the Debtors are able to confirm a plan absent such treatment; (ii) the avoidability pursuant to section 547(b) of the Bankruptcy Code of no less than approximately $445 million of preference payments made by Alameda to OpCo in the 90-day period prior to the Alameda Petition Date in connection with certain pre-petition loans made by OpCo to Alameda, which constitute an administrative expense claim under section 503(b) of the Bankruptcy Code, and the corresponding impact on the Debtors' ability to confirm the Plan and provide creditor recoveries in light of such administrative claim; (iii) key details with respect to the claims considered by the Special Committee and proposed to be compromised through the D&O Settlement; and (iv) the value attributable to each source of

---

[6] Alameda Loan Facility Claims would also be entitled to recover *pro rata* in any distributions to HoldCo General Unsecured Claims, but the Liquidation Analysis provides for no recovery on account of HoldCo General Unsecured Claims in a hypothetical chapter 7 liquidation.  Liquidation Analysis, Section II.

recovery for each Class, including the value of and likelihood of recovery on the Wind-Down Trust Assets, and the treatment and resolution of Intercompany Claims under the Plan.

6. Accordingly, the Court should deny conditional approval of the Disclosure Statement.

**Objection**

**I. The Court Should Deny Conditional Approval of the Disclosure Statement Because The Plan is Patently Unconfirmable**

7. Courts routinely recognize that if a plan of reorganization is unconfirmable as a matter of law, the related disclosure statement cannot be approved. *See, e.g. In re GSC, Inc.*, 453 B.R. 132, 157, n.27 (Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved."); *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("[T]his court will not approve a disclosure statement for an admittedly unconfirmable plan").

8. Courts in this district have recognized that it is the court's duty not to approve a disclosure statement in connection with an unconfirmable plan because "court approval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court." *In re Filex*, 116 B.R. at 41.

9. The Plan violates multiple fundamental requirements of the Bankruptcy Code including (i) the absolute priority rule and prohibition on unfair discrimination under section 1129(b) of the Bankruptcy Code, (ii) the "best interests" test under section 1129(a)(7) of

the Bankruptcy Code, and (iii) prohibitions on gerrymandering under section 1122 of the Bankruptcy Code. As a result, the Plan is patently unconfirmable and the Court should deny conditional approval of the Disclosure Statement.

**A. The Plan Violates Section 1129(b) of the Bankruptcy Code By Unfairly Discriminating and Violating the Absolute Priority Rule With Respect to the Alameda Loan Facility Claims**

10. The Plan unfairly discriminates against the Alameda Loan Facility Claims and violates the absolute priority rule by providing recoveries on account of General Unsecured Claims that are either of the same priority level or structurally junior to the Alameda Loan Facility Claims ahead of recoveries on account of the Alameda Loan Facility Claims, and purporting to provide distributions on account of Alameda Loan Facility Claims on equal priority to Existing Equity Interests and Section 510(b) Claims, without any legal basis.

11. In order to confirm a plan of reorganization that does not satisfy section 1129(a)(8) of the Bankruptcy Code (which the Plan does not), the Debtors must prove by a preponderance of the evidence that, among other things, the Plan does not "discriminate unfairly" and is "fair and equitable," as required by section 1129(b) of the Bankruptcy Code. 11 U.S.C. § 1129(b); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 442 (1999). The Debtors cannot meet their burden on either requirement at confirmation.

12. "[T]he unfair discrimination test assures fair treatment among classes of the same priority level . . . ." *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017). The test "is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents against nonconsensual vertical discrimination." *Id*. In determining whether a plan unfairly discriminates against an impaired dissenting class, courts consider

-6-

whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale." *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

13.     To satisfy the absolute priority rule and be fair and equitable as required by section 1129(b), "(1) the plan may not give property to a junior class 'on account of' their claims or interests without holders of senior classes receiving the full value of their claims; and (2) the plan may not give property to senior classes in excess of the full value of their claims." See 11 U.S.C. § 1129(b)(2)(B)(ii) ("[T]he holder of any claim or interest that is junior to the claims of [the rejecting class] will not receive or retain under the plan on account of such junior claim or interest any property."); *In re LATAM Airlines*, 620 B.R. 722, 797 (Bankr. S.D.N.Y. 2020) ("[A] reorganization plan may not give property to the holders of any junior claim or interest on account of those claims or interest, unless all classes of senior claims either receive the full value of their claims or give their consent." (internal quotation marks and citation omitted)).

14.     In June 2022, Alameda Ventures entered into the Alameda Loan Facility with HoldCo as borrower and TopCo as guarantor. Alameda provided this rescue financing to the Debtors as the Debtors' financial situation declined in June 2022 for the express purpose of permitting the Debtors to pay customers for cryptocurrency assets that counterparties to the Debtors' lending and related activities failed to return. The Alameda Loan Facility provided the Debtors up to $200 million in cash or USDC and 15,000 Bitcoin, $75 million of which was immediately drawn in USDC and was outstanding as of the Petition Date, and forms the basis for the Alameda Loan Facility Claims.

15. Alameda has asserted the Alameda Loan Facility Claims against HoldCo, as borrower, TopCo, as guarantor, and OpCo as beneficiary of an intercompany transfer from HoldCo to OpCo of the amounts lent under the Alameda Loan Agreement.[7] Under the Plan, holders of Allowed Alameda Loan Facility Claims are entitled to distributions from the Wind-Down Trust Assets, but only after recovery (or reserve for) in full of all Allowed General Unsecured Claims.[8] But that treatment ignores that the Alameda Loan Facility Claims against each Debtor are of equal priority to the General Unsecured Claims against such Debtor, and are structurally senior to the General Unsecured Claims at HoldCo and TopCo, respectively (as well as Section 510(b) Claims and Existing Equity Interests).

16. The Debtors have no legal basis (nor have they identified one in either the Disclosure Statement or the Plan) for favoring General Unsecured Claims at each Debtor over the Alameda Loan Facility Claims, and doing so is a violation of the absolute priority rule and the unfair discrimination test of section 1129(b) (especially when there is no business being reorganized and such discrimination is coupled with vote gerrymandering, as discussed below). To comply with the absolute priority rule, the Plan cannot provide recoveries to HoldCo General

---

[7] Claim No. 11206 filed by Alameda Ventures Ltd. against HoldCo; Claim No. 11209 filed by Alameda Ventures Ltd. against TopCo; Claim No. 11213 filed by Alameda Ventures Ltd. against OpCo. In addition, the Schedules of Assets and Liabilities of HoldCo list the Alameda Loan Facility Claims as contingent, unliquidated and disputed. *See* Schedule F Attachment, ID 3.001, Schedule 2408563, Schedules of Assets and Liabilities of Voyager Digital Holdings, Inc. (Case No. 22-10943), Dkt. No. 311. The Schedules and Statements of TopCo do not include the Alameda Loan Facility Claims, but the Plan and Disclosure Statement acknowledge that TopCo is a guarantor of such obligations. *See, e.g.,* Disclosure Statement, Article IV.C.1 (acknowledging TopCo as guarantor of the Alameda Loan Facility Claims).

[8] Plan, Art. III.C.7. The Disclosure Statement and Plan are unclear whether the Debtors are purporting to provide recoveries on account of Alameda Loan Facility Claims equal in priority to recovery on account of Section 510(b) Claims and Existing Equity Interests. *See* Plan, Art. III.C.8 and Art. III.C.11 (providing that recoveries on account of Section 510(b) Claims and Existing Equity Interests shall only be made after payment or reserve in full for "Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims" without reference to Alameda Loan Facility Claims). Such treatment would similarly violate the absolute priority rule, and Alameda reserves all rights with respect to such treatment.

Unsecured Claims ahead of Alameda' claims against OpCo, TopCo General Unsecured Claims ahead of Alameda's claims against HoldCo, or to Section 510(b) Claims or Existing Equity Interests ahead of Alameda's claims against TopCo.[9] That discriminatory treatment fails all four of the factors considered under the *WorldCom* test, including when General Unsecured Claims are expected to receive multiple millions of dollars in recoveries, while Alameda Loan Facility Claims are expected to receive no recovery. *See In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, *174-75 (Bankr. S.D.N.Y. Oct. 31, 2003) (internal citations omitted)). The fact that there is not enough value for all creditors to receive material recoveries, or that Alameda's $75 million claims at each Debtor would be entitled to the vast majority of the value available at each Debtor, does not provide a legitimate basis for the Plan's discriminatory treatment.[10]

17. Alameda's rescue financing to the Debtors on the eve of their free-fall into chapter 11 constitutes valid claims against the Debtors. While the Debtors may wish to exact some form of revenge on Alameda for the failure of the FTX Transaction and may view the Alameda Loan Facility Claims as a hindrance to their reorganization efforts, Alameda, and its own creditors in the Alameda Chapter 11 Proceedings, are nevertheless entitled to receive *pro rata* recoveries with General Unsecured Claims at each applicable Debtor pursuant to section 1129(b), and ahead of distributions to Existing Equity Interests and Section 510(b) Claims. *In re Arn Ltd. L.P.*, 140 B.R. 5, 13 (Bankr. D.D.C. 1992) ("That the debtor views the claimants as

---

[9] *See In re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011), aff'd, No. 10-B-15973 SCC, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), aff'd, 487 F. App'x 663 (2d Cir. 2012) (noting that the absolute priority rule governs distribution priority for structurally subordinated creditors).

[10] *In re LightSquared Inc.*, 513 B.R. 56, 118 (Bankr. S.D.N.Y. 2014) (fact that "'there's not enough cash for everybody to receive cash' does not provide a legitimate basis for the Plan's discriminatory treatment."); *CWCapital Asset Mgmt., LLC v. Burcam Capital II*, LLC, No. 5:13-CV-278-F, 2014 U.S. Dist. LEXIS 87900, at *13-*21 (E.D.N.C. June 24, 2014) (the identity of the holder standing alone is not a basis for finding the claims themselves are dissimilar and does not justify disparate treatment of unsecured claims).

disgruntled tenants who are a nuisance to the debtor's reorganization efforts is simply not a basis for [] discrimination").

18.     Accordingly, the Disclosure Statement cannot be conditionally approved because the Plan violates section 1129(b) with respect to the Alameda Loan Facility Claims.

**B. The Plan Fails The Best Interests of Creditors Test of Section 1129(a)(7) of the Bankruptcy Code by Failing to Provide Alameda Loan Facility Claims With A Recovery Not Less Than The Recovery in a Chapter 7 Liquidation**

19.     The "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in an impaired class either (i) accepts the plan or (ii) receives or retains property of a value, as of the effective date of the plan, not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date. 11 U.S.C. § 1129(a)(7); *see also In re Leslie Fay Cos.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997). The "best interests test" focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999). To satisfy the best interests test, the Court must find that each non-consenting creditor will receive or retain value that is not less than the amount it would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. *Id.*

20.     As noted above, the Plan estimates no recovery on account of Alameda Facility Loan Claims in connection with either the Plan sale transaction or the Plan liquidation transaction, or under the Debtors' Liquidation Analysis.[11]  However, the Liquidation Analysis estimates a recovery to TopCo General Unsecured Claims and OpCo General Unsecured Claims

---

[11] The Liquidation Analysis does not include Alameda's Preference Claim, which is a material administrative expense claim under section 503(b) of the Bankruptcy Code. As noted below, the Debtors must reflect the impact of the Preference Claim on the Liquidation Analysis and on the Debtors's administrative solvency.

-10-

in both the "Low" and "High" cases for a hypothetical liquidation of the Debtors.[12] In a hypothetical chapter 7 liquidation, the Alameda Loan Facility Claims against TopCo and OpCo would be unsecured claims against those Debtors and entitled to receive distributions *pro rata* with all other unsecured claims, as applicable. Therefore, pursuant to the Debtors' Liquidation Analysis, the Alameda Loan Facility Claims would be entitled to a non-zero recovery in a hypothetical chapter 7 liquidation.[13] Because the Plan provides no recovery on account of the Alameda Loan Facility Claims, the Plan fails the best interests of creditors test under section 1129(a)(7).

### C. The Plan Impermissibly Gerrymanders Classes of Claims in Violation of Section 1122(a) of the Bankruptcy Code

21. The Plan is also patently unconfirmable because it impermissibly gerrymanders classes of Claims by separately classifying the Alameda Loan Facility Claims with no legitimate business purpose in an artificial attempt to obtain an impaired consenting class from General Unsecured Claims.

22. The Bankruptcy Code requires that the Plan designate classes of claims and interests in accordance with section 1122 of the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(1). Section 1122(a) of the Bankruptcy Code provides that chapter 11 plans "may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Furthermore, the "separate classification of unsecured claims solely to create an impaired assenting class [is not] permitted."

---

[12] Liquidation Analysis, Section II.

[13] As noted above, Alameda Loan Facility Claims would also be entitled to recover *pro rata* in any distributions to HoldCo General Unsecured Claims, but the Liquidation Analysis provides for no recovery on account of HoldCo General Unsecured Claims in a hypothetical chapter 7 liquidation. Liquidation Analysis, Section II.

*In re Boston Post Road Ltd. Partnership* (*Boston Post*), 21 F.3d 477, 483 (2d Cir. 1994) (holding that "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code.").

23.  A debtor must provide "credible proof of a legitimate reason for separate classification of similar claim." *Id.* Such "legitimate reason" must be based on a valid *business* need. *Id.* at 482-83 (emphasis added). Classifications based on the differing origins of claims that "enjoy similar rights and privileges within the Bankruptcy Code, do not alone justify separate segregation." *Id.* at 483.

24.  The Plan provides for three separate subclasses of General Unsecured Claims (Classes 4A, 4B and 4C), one against each Debtor, and a separate class of Alameda Loan Facility Claims (Class 5). The Debtors propose to distribute to each holder of a General Unsecured Claim such holder's *pro rata* share of the value attributable to the applicable Debtor against whom the holder has a General Unsecured Claim (after distribution on account of administrative and priority claims). But the Plan provides Alameda Loan Facility Claims with distributions of only the residual value of the Debtors' estates remaining after distributions not just on account of administrative and priority claims, but to all General Unsecured Claims.

25.  The separate classification of Alameda runs afoul of section 1122 of the Bankruptcy Code because there is no valid business reason for separately classifying Alameda Loan Facility Claims when the Debtors have no business following consummation of the Plan in either the Plan sale context or the Plan liquidation context — in either scenario, it is liquidating all of its assets and will have no go-forward business. *See In re Sentry Operating Co. of Tex.*, Inc., 264 B.R. 850, 861 (Bankr. S.D. Tex. June 19, 2001) (finding no valid business justification

for the separate classification of unsecured creditors that included creditors that were not related to the ongoing business). Were the Alameda Loan Facility Claims classified together with General Unsecured Claims against each Debtor, the Alameda Loan Facility Claims would constitute over 80% of the total amount of General Unsecured Claims against each Debtor and accordingly no Class of General Unsecured Claims could be a consenting Class if Alameda voted against the Plan.[14]

26. The Plan's classification scheme is intended to improperly gerrymander a class that will accept the Plan in an attempt to disenfranchise and cram down Alameda. *See In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1019 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993) (holding that "although the debtor retains some flexibility in the classification of substantially similar claims, it may not separately classify claims only to conjure up an impaired, assenting class"). The Alameda Loan Facility Claims are similarly situated and entitled to the same rights under the Bankruptcy Code as General Unsecured Claims against each Debtor. Thus, the Plan violates section 1122(a) of the Bankruptcy Code, and is therefore patently unconfirmable.

**II.     The Disclosure Statement Fails to Provide Adequate Information as Required by Section 1125 of the Bankruptcy Code**

27. Section 1125 of the Bankruptcy Code requires a disclosure statement to contain "adequate information" in order to solicit votes on a proposed chapter 11 plan. "Adequate information" is defined in the Bankruptcy Code as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical

---

[14] Disclosure Statement, Article IV.D (providing estimated claims in each Class and projected recoveries).

investor [typical of the holders of claims or interests] of the relevant class to make an informed judgment about the plan[.]" 11 U.S.C. § 1125(a)(1).

28. While the court has significant discretion in determining the adequacy of information in a disclosure statement, the disclosure statement must contain "all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." *In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (citing 11 U.S.C. § 1125(a)(1) and observing that plan proponent has "an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make an informed judgment'" about the proposed plan); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code['s] standard of adequate information.'"). Accordingly, a disclosure statement must "clearly and succinctly inform the average . . . [stakeholder] what it's going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote").

29. The Disclosure Statement as proposed fails to meet the requirements of section 1125 of the Bankruptcy Code because it fails to provide adequate disclosure with respect to, among other things, the treatment of the Alameda Facility Loan Claims under the Plan, the impact of the Alameda Administrative Claim on recoveries under the Plan, the D&O Settlement, and the value attributable to each Debtor and the treatment and resolution of Intercompany

Claims. Accordingly, the Disclosure Statement as proposed should not be conditionally approved.

### A. The Disclosure Statement Fails To Disclose the Basis for the Discriminatory and Improper Treatment of the Alameda Loan Facility Claims

30. As described above, the Plan provides for three subclasses of General Unsecured Claims, one for each Debtor. The Plan separately classifies the Alameda Loan Facility Claims, even though the Alameda Loan Facility Claims are unsecured claims asserted against each Debtor. General Unsecured Claims at each Debtor are entitled to receive recoveries on account of the value attributable to such Debtor from the Wind-Down Trust Assets after payment to administrative and priority claims, while Alameda Loan Facility Claims' recovery is further subordinated entirely to recoveries by General Unsecured Claims, despite the fact that the Alameda Loan Facility Claims are lawfully entitled to share in recoveries to General Unsecured Claims against each Debtor.

31. Although Alameda submits that the proposed treatment of its claims runs afoul of section 1129(b) as described above, discrimination can be permissible among similarly situated but separately classified creditors so long as it is not "unfair." However, the Debtors have provided *no* disclosure with respect to either the basis for the discrimination against the Alameda Loan Facility Claims or the Debtors' ability to confirm the Plan without such discrimination, which are two of the four factors that courts consider in determining whether a plan unfairly discriminates against similarly situated creditors. *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014) (citing *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, *174-75 (Bankr. S.D.N.Y. Oct. 31, 2003). In addition, the Debtors have provided no disclosure with respect to the otherwise improper treatment of the Alameda Loan Facility Claims as described above.

32. Without such disclosure, creditors are unable to make an informed decision whether the Plan can be confirmed, and the Debtors should be required to make such disclosures in the Disclosure Statement.

**B. The Disclosure Statement Fails To Disclose Alameda's Administrative Expense Claim and the Corresponding Impact on the Debtors' Ability to Confirm the Plan and Creditor Recoveries**

33. Within the 90-day period prior to the Alameda Petition Date, Alameda made cryptocurrency transfers of no less than approximately $445 million to OpCo in connection with certain pre-petition loans made by OpCo to Alameda, which are subject to avoidance as preferences pursuant to section 547 of the Bankruptcy Code (the "Preference Claim").[15] Because the Preference Claim arose after the Voyager Petition Date, the Preference Claim constitutes an administrative expense claim under section 503(b) of the Bankruptcy Code against Voyager. *Reading Co. v. Brown*, 391 U.S. 471 (1968); *In re Hanlin, I,* 176 B.R. 329, 334 (Bankr. D.N.J. 1995) (employees terminated in violation of WARN Act were entitled to administrative priority claims because the claims arose post-petition.").

34. Pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, the Plan must provide for the payment in full in cash of the Preference Claim in order for the Plan to be confirmable.

35. The Debtors should be required to add disclosure to the Disclosure Statement with respect to Alameda's Administrative Claim, and the corresponding impact of such claim on the Debtors' ability to confirm the Plan and provide recoveries to creditors under

---

[15] Alameda's analysis of the Preference Claim is ongoing, and portions of the Preference Claim may be subject to affirmative defenses by Voyager, including to the extent of an "ordinary course of business" defense pursuant to section 547(c)(2) or to the extent that Voyager is able to demonstrate that it held a valid and effective lien on collateral securing any of the repaid obligations and that the applicable value of such collateral would provide them with a recovery in a hypothetical chapter 7 liquidation of Alameda. Alameda reserves all rights with respect to any such defense or any other matter relating to the Preference Claim.

the Plan. In addition, the Debtors must reflect the impact of the Preference Claim on the Liquidation Analysis and provide disclosure with respect to whether the Debtors are administratively insolvent as a result of such claim.

### C. The Disclosure Statement Does Not Provide Sufficient Information With Respect to the D&O Settlement

36. Article VII.A.2(b)(i) of the Disclosure Statement describes the Investigation undertaken by the Special Committee with respect to, among other things, "any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC"[16] and Article VII.A.2(b)(ii) describes the Investigation Report of the Special Committee and the resulting D&O Settlement with the CEO and CCO, as set forth in the Plan.

37. The Disclosure Statement, however, fails to provide sufficient information to allow creditors to evaluate the D&O Settlement, including the value attributable to each Debtor resulting from the D&O Settlement and the corresponding releases of directors and officers of the Debtors under the Plan. The Disclosure Statement fails to identify, among other things, (i) the specific claims considered by the Special Committee determined not to be colorable, (ii) the specific claims determined to be colorable but which are proposed to be settled pursuant to the D&O Settlement, (iii) to which Debtor the claims proposed to be settled pursuant to the D&O Settlement belong, (iv) the basis for the consideration to be paid by the CEO and CCO pursuant to the D&O Settlement and (v) the risks and other considerations associated with the Debtors' ability to recover under the Debtors' D&O Liability Insurance Policies as contemplated by the D&O Settlement.

---

[16] Disclosure Statement, Article VII.A.2(b)(i).

38. Because the Plan proposes to release claims against the directors and officers, including, for certain claims, for no consideration, the Disclosure Statement must identify what those claims are, their potential value, and other key information with respect to the D&O Settlement.

### D. The Disclosure Statement Does Not Provide Sufficient Information With Respect to Allocation of Value Among Debtors and the Treatment of Intercompany Claims under the Plan

39. While the Disclosure Statement and Liquidation Analysis provide projected recoveries for all Classes under the Plan and under a hypothetical liquidation, the Disclosure Statement fails to identify the value attributable to each source of recovery for each Class, including no disclosure with respect to the value of and likelihood of recovery on the Wind-Down Trust Assets. The Debtors should be required to provide such underlying details with respect to the estimated recoveries provided in the Disclosure Statement.

40. In addition, the Disclosure Statement fails to provide adequate information with respect to the Debtors' proposed resolution of Intercompany Obligations, including HoldCo's Intercompany Claim against OpCo in connection with HoldCo's on-lending of the proceeds of the Alameda Loan Facility to OpCo. Article VI.C.2 of the Disclosure Statement describes six intercompany obligations owed to either HoldCo or TopCo and provides that "the Disclosure Statement assumes that the Intercompany Obligations will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity." The Disclosure Statement goes on to state with respect to each Intercompany Claim the factors the Debtors believe support the conclusion that each Intercompany Claim "is most likely to be a capital contribution."

41. The Disclosure Statement fails to disclose whether the merits of the Intercompany Claims were evaluated by the Special Committee or any party other than the Debtors given the potential conflict in assessing such claims. The Disclosure Statement also fails to disclose whether the Intercompany Claims are purported to be settled under the Plan and what, if any, resulting value there may be to HoldCo and TopCo from such settlement.

### Reservation of Rights

Alameda expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the Objection, the Disclosure Statement, the Plan or any other issue in these Chapter 11 Cases, and to supplement, modify, and amend this Objection, and to raise additional Objections in writing or orally at the hearing on the conditional approval of the Disclosure Statement.

### Conclusion

Alameda respectfully requests that the Court deny conditional approval of the Disclosure Statement.

| | |
|---|---|
| Dated: January 4, 2023<br>New York, New York | /s/ Andrew G. Dietderich<br>Andrew G. Dietderich<br>Brian D. Glueckstein<br>Benjamin S. Beller<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, New York 10004<br>Telephone:  (212) 558-4000<br>Facsimile:  (212) 558-3588<br>Email:  dietdericha@sullcrom.com<br>gluecksteinb@sullcrom.com<br>bellerb@sullcrom.com<br><br>*Counsel for Alameda Research LLC and Affiliates* |