ABIGAIL R. RYAN
Texas Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
AUTUMN D. HIGHSMITH
Texas Bar No. 24048806
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
autumn.highsmith@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD AND
THE TEXAS DEPARTMENT OF BANKING

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1],<br><br>Debtors. | Chapter: 11<br><br>Case No. 22-10943 (MEW)<br><br>(Jointly Administered) |

### OBJECTION OF THE TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING TO DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT RELATING TO THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The Texas State Securities Board ("SSB") and the Texas Department of Banking ("DOB"), by and through the Office of the Texas Attorney General (together, "Texas"), hereby file this Objection (the "Objection") to the *Debtors' Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

1

*Bankruptcy Code* [D.E. 778]. In support of the Objection, Texas respectfully states as follows:

## I. OVERVIEW

From the beginning of this case, the Debtors have consistently controlled the flow of relevant information to creditors and parties in interest, and the Amended Disclosure Statement (D.E. 778)[2] follows this pattern of behavior by failing to give creditors and parties in interest sufficient information to make an informed decision on how to vote on the Debtors' Third Amended Plan. For example, the Disclosure Statement fails to:

1. adequately explain the disparate treatment of Class 3 account holder claimants in "Supported" versus "Unsupported" jurisdictions or provide any justification for such disparate and unfairly discriminatory treatment;

2. provide adequate information regarding the broad third-party releases or the diligence conducted in vetting Binance.US as a qualified bidder;

3. adequately reflect the Debtors' and Binance's outstanding issues with state regulators, including that neither the Debtors or Binance US have ever been licensed by the SSB or the DOB, the Debtors face very large fines and penalties for operating without a license, and Binance US is is not guaranteed to become licensed in the "Unsupported" jurisdictions.

## II. BACKGROUND

1. On July 5, 2022, Voyager filed bankruptcy and continued to operate its businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"). [3]

2. The Debtors started this bankruptcy on a two-track process by which the Debtors would either restructure as set out in its First Amended Joint Plan of Reorganization[4] or sell the company.

---

[2] Hereinafter, the "Disclosure Statement."
[3] Dkt. No. 1.
[4] Dkt. No. 287.

3. In furtherance of the sale track, just 16 days into the case, the Debtors filed a motion seeking an order establishing bid procedures[5] for a potential sale; however, at that time only the Debtors and the potential bidders who—before bankruptcy—signed confidentiality agreements, knew what the assets and liabilities of the Debtors were and what assets would be included in any sale—the Account Holders and Regulators were kept in the dark.[6]

4. Bid procedures were approved, and West Realm Shires, Inc. ("FTX") was the winning bidder at auction.[7]

5. On October 20, 2022, the Court entered an Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief [D.E. 581].

6. However, on November 14, 2022, FTX US filed a petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.

7. On December 21, 2022, Debtors filed the Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief [D.E. 775].

8. On December 21, 2022, Debtors filed the Motion to Shorten the Notice Period with Respect to the Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance US Purchase Agreement, and (II) Granting Related Relief [D.E. 776] requesting a deadline of only 9 days later (December 30, 2022) for all parties to review and respond to the new proposed purchase agreement.

9. On December 22, 2022, Debtors filed the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [D.E. 777], and the Second Amended Disclosure Statement [D.E. 778].

10. On December 22, 2022, Debtors filed its Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally

---

[5] Dkt. No. 248 "Bid Procedures Order."
[6] *See* Dkt. No. 186 Texas's Objection to the Debtors' Motion for Bid Procedures.
[7] *See* Dkt. No. 457.

3

Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief [D.E. 779], again allowing an extremely abbreviated response period of eight (8) days to review and respond to the pending motion.

11. On December 23, 2022, the Court entered the Order Shortening the Notice Period with Respect to the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement, and (II) Granting Related Relief [D.E. 786].

12. On December 23, 2022, a Notice of Adjournment of Hearing on Debtors' APA Motion and Conditional Disclosure Statement Motion was entered, setting an objection deadline of January 4, 2023, and a hearing date of January 10, 2023, at 2pm (EST).

### III.    OBJECTION

13. Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.[8] The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, ***that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*** . . . .[9]

14. The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated."[10]

---

[8] 11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).
[9] 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).
[10] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414 (3d Cir. 1988)).

15. The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan.[11] Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions.[12]

16. To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.[13]

17. Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.[14] The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.[15]

18. "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."[16]

19. A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.[17] Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."[18]

---

[11] *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).
[12] *See* 11 U.S.C. 1129(a)(2).
[13] *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).
[14] *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).
[15] *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).
[16] *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).
[17] *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).
[18] *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

A. **The Disclosure Statement Lacks Adequate Information as to the Debtors' Treatment of Account Holders in "Unsupported" Jurisdictions, Releases, and Diligence Conducted.**

20.  Under the Plan, all account holder claims are placed in Class 3. Account holders in all but four so-called "Unsupported"[19] jurisdictions are given identical treatment, which roughly consists of the opportunity to migrate to the Binance.US platform, immediate access[20] to such account holder's Net Owed Coins pursuant to Section 6.12 of the Asset Purchase Agreement (the In-Kind Coin Distribution), and a pro rata share of any future bankruptcy distributions. Account holders in Unsupported jurisdictions, on the other hand, are entitled to a cash distribution equal to the value at which the Net Owned Coins allocable to such account holder are liquidated at a later date (the Cash Distribution) to be disbursed back to/from the Debtors pursuant to the Plan, and a pro rata share of any future bankruptcy distributions.

21. To give Binance US additional time to secure licenses in the Unsupported jurisdictions, Section 6.12(b) of the Asset Purchase Agreement does not require the Debtors or Binance US to make the Cash Distribution to account holders in Unsupported jurisdictions until up to **six (6) months** after the closing date.  The cash value that such account holders will receive pursuant to the Plan in the delayed distribution will be based on the then-prevailing exchange rates (including applicable fees, spreads, costs, and expenses) on the Binance.US platform,[21] rather than exchange rates in effect on the closing date. The funds will be distributed by Binance.US back to the Debtors for disbursement per the Plan. Account holders in Unsupported jurisdictions will not be able to access or trade their positions in their Net Owed Coins during this six (6) month delay period.

---

[19] The Unsupported jurisdictions are Hawaii, New York, Texas and Vermont, states in which Binance US does not hold a current money transmitter license.

[20] Immediate access is subject to the requirement that account holders must complete the migration process to the Binance US platform in accordance with Section 6.10 of the Asset Purchase Agreement.

[21] Account holders in other jurisdictions that migrate to the Binance US platform are not subject to involuntary liquidation, and therefore will not have their In-Kind Coin Distributions reduced by additional fees, spreads, costs, and expenses, some of which may be paid to or retained by Binance US.

6

22. The Disclosure Statement contains wholly inadequate information about the reason for the disparate treatment of account holders in Unsupported jurisdictions. Debtors fail to disclose whether a money transmitter license is required for a purchaser of assets to make distributions in cash or in-kind to creditors under a Court-approved Chapter 11 plan.  The Debtors fail to disclose why Binance US or the Debtors cannot make one-time in-kind distributions to account holders in Unsupported jurisdictions, whereby such account holders would receive the same form of consideration at the same time as all other Class 3 account holders.  Moreover, the discussion of the actual treatment of account holders in Unsupported jurisdictions is inadequately explained. Debtors reference Section 6.12 of the APA but do not explain clearly what the treatment entails or mention that cash distributions to such account holders may be delayed by up to 6 months after the closing and will be disbursed by the Debtors pursuant to the Plan.

23. The Disclosure Statement fails to disclose that because of the disparate treatment of creditors within a single creditor class, the Plan is likely unconfirmable as a matter of law.  See 11 U.S.C. Section 1123(a)(4).  When a plan is so flawed that confirmation is impossible, the Court should exercise its discretion to refuse to consider the adequacy of the disclosure statement that describes it. *In re. Eastern Maine Electric Coop Inc.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991).

24. The Disclosure Statement also fails to contain adequate information about the business activities contemplated by Binance.US and the regulatory approvals that will be required to conduct that business.[22]  Debtors identify the "regulatory landscape" as a risk factor of the Plan, but the Disclosure Statement contains very little discussion of how Binance.US intends to proceed regarding the necessary regulatory approvals, what licenses it currently holds, and what additional licenses or registrations may be required. For example, if Binance.US intends to try to trade the VGX token, as is suggested in the Disclosure Statement, list or trade its own BNB token, or to continue its own previous

---

[22] By contrast, there is extensive discussion of the status of Voyager's money transmitter licenses and about the many state regulatory actions which have been filed against Voyager.

staking operations, securities registration will be required. Securities registration typically takes months to complete. None of these potential risks to account holders is adequately disclosed. In response to the stated question, "Are Regulatory Approvals Required…," only money transmitter licensing is discussed.[23]

25. Further, pursuant to Section 6.12(a) of the APA, users in Supported jurisdictions must satisfy the requirements of Section 6.10, the "User Migration" section, within three (3) months, or Binance.US will convert the assets of those users to fiat currency at the then-prevailing rates and deliver the funds (minus fees, spreads, costs, and expenses) to the Debtors for disbursement in accordance with the Plan. One of the requirements of Section 6.10 is that users must agree to the terms and conditions of the Binance.US Platform to receive their coins or assets. This requirement and resulting penalty is not sufficiently explained in the Disclosure Statement to provide users with sufficient knowledge regarding how their assets will be handled should the APA and Plan be approved.

26. The Disclosure Statement asserts that Binance.US will hold in custody the assets of account holders who migrate to its platform but fails entirely to disclose which Binance entity will have custody of the assets and whether account holder assets will be held in the U.S. or with an affiliated, and possibly unregulated, offshore entity. Account holders voting on confirmation of the Plan are entitled to weigh the risks to their investment that may be associated with custody by different affiliated entities.

27. The Disclosure Statement contains inadequate information about the myriad third party releases contained in the Plan and whether those releases are intended to apply to potential claims by regulators.

---

[23] See Section J on pages 29-30 of the Disclosure Statement

28. The Disclosure Statement contains inadequate information about the financial condition of Binance.US, the Purchaser under the APA, whether there are threats to its solvency which might adversely impact account holders, and what due diligence was conducted by the Debtors in this regard.

**B.     The Debtors and Binance.US are not in Compliance with State Law.**

29.  Voyager was and remains unlicensed by the SSB and DOB in the State of Texas. Likewise, Binance.US is not licensed by the SSB or the DOB and, as such, cannot legally transact business in Texas.

   *i.     The Debtors have engaged in unauthorized money transmission.*

30. Under Texas law, money transmissions are regulated through the Texas Department of Banking. The Debtors do business in Texas and admit that they hold and exercise control over "FBO" bank accounts "through which funds sent by customers would be held."[24] The Debtors also (purportedly) hold cryptocurrency on behalf of customers, including convertible or redeemable "stablecoin."[25]

31. By receiving customer cash and stablecoin in exchange for promising to fulfill customer orders regarding the custody and transmission of that monetary value, the Debtors have engaged in money transmission under Texas law.[26]

32.  The Debtors do not have a license to conduct this money transmission and do not qualify for an exemption from licensing; Debtor Voyager Digital, LLC in fact had applied to the DOB but withdrew that license in July 2018—while nevertheless continuing to operate. Knowingly managing

---

[24] Dkt. no. 250 (*Decision as to Motion to Permit Withdrawals by Customers of Funds Held in FBO Accounts at Metropolitan Commercial Bank*, entered August 5, 2022).
[25] *Id*. at 2.
[26] *See* Tex. Fin. Code § 151.301(b)(4) ("'Money transmission' means the receipt of money or monetary value by any means in exchange for a promise to make the money or monetary value available at a later time or different location."); *see also* Texas Department of Banking Supervisory Memorandum 1037, *Regulatory Treatment of Virtual Currency Under the Texas Money Services Act* (Apr. 1, 2019 (rev.)), https://www.dob.texas.gov/sites/default/files/files/consumer-information/sm1037.pdf ("Stablecoins that are pegged to sovereign currency may be considered a claim that can be converted into currency and thus fall within the definition of money or monetary value under Finance Code § 151.301(b)(3).").

9

or owning an unlicensed money transmission business is a felony under federal law punishable by up to five years' imprisonment.[27] Administrative penalties for unauthorized money transmission are $5,000 per day per violation under Texas law.[28]

### ii. *The Debtors have engaged in unauthorized securities offerings.*

33. The Texas Securities Act, Tex. Gov't Code §§ 4001.001-4008.105 (the "Texas Securities Act"), governs the offer and sale of securities in Texas. The Debtors offered and sold securities, as that term is defined by Section 4001.068 of the Texas Securities Act, to Texas residents.

34. The Debtors offered and sold securities to Texas residents that were not registered or permitted for sale in Texas. Each offer and sale violated Section 4003.01 of the Texas Securities Act and is grounds for a fine under Section 4007.106(a)(3).

35. Debtors are civilly liable and can be sued by investors who bought securities that violate the registration provisions of the Texas Securities Act. Under Section 4008.051, investors who bought Debtors' securities may sue for recission, or damages if they no longer own the securities.

36. In addition to the Debtors' liability, Section 4008.055 creates controlling person or aider liability. A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 4008.051 or 4008.052 jointly and severally with the seller, buyer, or issuer and to the same extent as the seller, buyer, or issuer.

37. The unauthorized sale of securities is a third-degree felony. Under Section 4007.201(a), a person commits an offense if the person sells, offers for sale, or deals in any other manner in a security

---

[27] 18 U.S.C. § 1960. Given that the Debtors' business was grounded in obvious, and potentially criminal, violations of money transmission laws, it is unclear why the Debtors remain in possession and a trustee has not been appointed. *See* 11 U.S.C. § 1104(a) (identifying fraud and gross mismanagement as cause for appointing a trustee & (e) (stating that the U.S. Department of Justice "shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor [or] the debtor's chief executive or chief financial officer …participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor") (emphasis added).

[28] Tex. Fin. Code § 151.707(c). The Department is filing proofs of claim against all Debtors that are estimated based on the limited information made available by the Debtors. The Debtors' plan should include an appropriate mechanism to pay distributions on regulatory claims such as these to victims.

unless the security has been registered or a permit qualifying securities for sale has been issued. Under Section 4007.201(b), a person commits an offense if the person sells, offers for sale, or deals in any other manner in a security without being a registered dealer or registered agent.

38. Fraudulent conduct in connection with the offer or sale of securities that involves amounts over $100,000 is a first-degree felony. Under Section 4007.203, a person commits an offense if the person directly or indirectly engages in a fraud or fraudulent practice, employs any device, scheme, or artifice to defraud, knowingly makes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engages in any act, practice, or course of business that operates or will operate as a fraud or deceit on any person and the conduct is committed in connection with the sale or offer for sale of a security.

39. At this time, Binance US also appears to be operating illegally in Texas—it appears to be engaged in unregistered securities offerings.

### iii. *The bankruptcy process and sale does not shelter the Debtors for violations of state laws.*

40. The SSB and DOB reserve all rights, authority, and remedies regarding ongoing illegal operations by the Debtors and any purchaser(s).

41. In bankruptcy, a chapter 11 debtor is required to comply with state laws under 28 U.S.C. Section 959(b)—and state regulators are allowed to move forward in state court under their police and regulatory powers granted by 11 U.S.C. Section 362(b)(4) of the Bankruptcy Code. Further, the bankruptcy process does not shield the Debtors from administrative claims for fines and penalties accrued by illegal operations that continue post-petition. These post-petition fines and penalties are administrative expenses because they are seen by courts as a cost of doing business.[29]

---

[29] 11 U.S.C. 503(b)(1)(A). *See also In re BVS Constr., Inc.*, No. 19-60004-RBK, 2020 WL 1479826, at *2 (Bankr. W.D. Tex. Mar. 20, 2020) *Finding* (Payment of civil fines and penalties are generally part of the cost of doing business."). And *Stating* ("Multiple court of appeals cases also support the proposition that post-petition civil fines and penalties are simply part of the cost of doing business and are allowed as an administrative expense. *See Cumberland Farms, Inc. v.*

42. Binance US appears to be in the same regulatory compliance situation as the Debtors—engaging in illegal securities offerings. The bankruptcy sale process also does not offer protection to non-debtors, such as Binance US, for any acts of ongoing illegal conduct by Binance US, even if the assets are bought from the estate.[30]

43. To clarify state regulatory obligations, the SSB and the DOB request that the following language be included in the Disclosure Statement and any order approving the Disclosure Statement:

> ***No Effect on Governmental Regulatory Authority:***
> *Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit"); (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.*
>
> *Further, nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing the Sale Order, the APA, the Plan, or any Order confirming the Plan or related documents shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in the Sale Order, the APA, the Plan, or any Order confirming the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Order, the APA, the Plan, or any Order confirming the Plan.*

### IV. **RESERVATION OF RIGHTS**

44. Texas reserves the right to supplement this Objection or to raise additional or further

---

*Fla. Dep't of Envtl. Prot.*, 116 F.3d 16 (1st Cir. 1997); *Ala. Surface Mining Comm'n v. N.P. Mining Co.* (*In re N.P. Mining Co.*), 963 F.2d 1449 (11th Cir. 1992); *U.S. Dep't of Interior v. Elliott* (*In re Elkins Energy Corp.*), 761 F.2d 168 (4th Cir. 1985)).

[30] *See In re Oldco M. Corp.*, 438 B.R. 775, 785 (Bankr. S.D.N.Y. 2010) (noting that, even when a bankruptcy sale is "free and clear," the purchaser must comply with applicable legal obligations "starting with the day it got the property"); *see also In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Tex. 1994) (stating that "[n]o subsection of § 363 applies to authorize the trustee to sell free and clear of [governmental regulatory] interests.").

objections to the Disclosure Statemen or Plan at or prior to the Hearing, or any other relevant hearing.

## **PRAYER**

WHEREFORE premise considered, the SSB and the DOB request that 1) the Disclosure Statement be denied in its current form; 2) the Debtors be directed to amend the Disclosure Statement to add an explanation in clear language that its customers can understand of the proposed treatment of customer/users of the Voyager platform; 3) the Debtors be directed to fully explain the third-party releases and officer and director releases—including, but not limited to, who is being release, what causes of action are being released, and what consideration the Debtors have received in exchange for these releases; 4) as to the releases of the officers and directors, the Debtors be directed to analyze the requested releases under the *In re Zenith* factors; 5) additional information be provided regarding the diligence conducted to determine that Binance.US is a qualified bidder, and 5) the following language set forth in paragraph 63 above be included in the Disclosure Statement and in any order approving the Disclosure Statement.

Finally, the SSB and DOB request any other and further relief to which the Court finds them justly entitled.

*[Remainder of Page Intentionally Left Blank]*

Dated: January 4, 2023,

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Layla D. Milligan*
ABIGAIL R. RYAN
Texas Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
AUTUMN D. HIGHSMITH
Texas Bar No. 24048806
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
autumn.highsmith@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD
AND
TEXAS DEPARTMENT OF BANKING

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on January 4, 2023.

*/s/ Layla D. Milligan*
LAYLA D. MILLIGAN
Assistant Attorney General