Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re Docket Nos.: 775, 797, 803, 807, 808** |
| | ) | **810, 811, 812, 815** |

---

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO APA MOTION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"
or "Voyager") submit this omnibus reply (this "Reply") in support of the *Debtors' Motion for
Entry of an Order (I) Authorizing Entry Into the Binance.US Purchase Agreement and
(II) Granting Related Relief* [Docket No. 775] (the "Binance.US APA Motion") and in response
to the (i) *Limited Objection and Reservation of Rights of the U.S. Securities and Exchange
Commission to Debtors' Motions (I) Authorizing Entry into the Binance.US Purchase Agreement
and (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement* [Docket No.
807] (the "SEC Objection") filed by the U.S. Securities and Exchange Commission (the "SEC");

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

(ii) *Response of the New Jersey Bureau of Securities to: (A) Debtors' Motion for an Order (I) Authorizing Entry into the Binance.US Purchase Agreement and (II) Granting Related Relief [Doc. No. 775], (B) Debtors' Motion for, Among Other Things, Conditional Approval of the Adequacy of the Debtors' Disclosure Statement [Doc. No. 779], and (C) Reservation of Rights* [Docket No. 808] (the "New Jersey Objection") filed by the New Jersey Bureau of Securities ("New Jersey"); (iii) *Objection to Debtors' Motion for Entry of an Order Authorizing Entry into the Binance.US Asset Purchase Agreement and Joinder in the Objections of the States of New Jersey and Texas* [Docket No. 810] (the "Vermont Objection") filed by the Vermont Department of Financial Regulation ("Vermont"); (iv) *Objection of the United States Trustee to Debtors' Motions (A) for Entry of Orders (I) Authorizing Entry into the Binance.US Purchase Agreement, and (B) (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 811] (the "U.S. Trustee Objection") filed by the U.S. Trustee ("the U.S. Trustee"); (v) *Objection of the New York State Department of Financial Services to Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance.US Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 812] (the "New York Objection") filed by the New York Department of Financial Services ("New York"); (vi) *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance.US Purchase Agreement and (II) Granting Related Relief* [Docket No. 815] (the "Texas Objection"), filed by the Texas State Securities Board and the Texas Department of Banking ("Texas"); (vii) *Notice of the United States of America Concerning the Review of Certain*

Transactions by the Committee on Foreign Investment in the United States (the "CFIUS Reservation of Rights") filed by the Committee on Foreign Investment in the United States ("CFIUS"); and (viii) *Oracle's Renewed Rights Reservation Regarding Debtors' Notice of Successful Bidder and Related Request for Entry of an Order Authorizing Entry into Asset Purchase Agreement* [Docket No. 803] (the "Oracle Reservation of Rights") filed by Oracle America, Inc. ("Oracle").  In further support of the Binance.US APA Motion, the Debtors submit as follows:[2]

### **Preliminary Statement**

1.      Since the Petition Date, the Debtors worked tirelessly to identify the transaction that maximizes the value of their estates for the benefit of their creditors on the most expedient timeline possible.  As further discussed in the Binance.US APA Motion, after an exhaustive marketing process and a multi-week auction, the Debtors agreed to a proposed sale to West Realm Shires Inc. ("FTX US") and executed an asset purchase agreement to effectuate the sale of substantially all of the Debtors' assets to FTX US on September 27, 2022 (the "FTX US APA," and the transaction contemplated thereunder, the "FTX US Transaction").  However, the historic collapse of FTX due to its apparent massive fraud presented an unforeseen roadblock to consummating the FTX US Transaction.

2.      As it became clear that the FTX US Transaction would be impossible to effectuate, the Debtors sprang into action and recommenced negotiations with potential transaction partners.  After thorough negotiations with all interested parties, the Debtors determined that the proposal

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (including all exhibits and other supplements thereto, and as modified, amended, or supplemented, the "Plan"), and the Binance.US APA Motion, as applicable.

from BAM Trading Services Inc. ("Binance.US") represented the best path forward.    On December 18, 2022, Voyager Digital, LLC executed an asset purchase agreement with Binance.US (the "Binance.US APA" and the sale transaction thereunder, the "Binance.US Transaction").

3.    The Binance.US Transaction is structurally similar to the FTX US Transaction—the Debtors propose to sell substantially all of their assets to Binance.US, transfer all customer accounts to the Binance.US platform, distribute cryptocurrency or cash to Account Holders, pay Holders of General Unsecured Claims in cash, and conduct an orderly wind down of the Debtors' estates.    No other transaction proposed to the Debtors as of the date hereof provides better recoveries to creditors on a risk adjusted basis. In addition, the Binance.US Transaction provides (a) the most value currently available for the Debtors' assets and ultimately to their stakeholders—including the Debtors' customers under the circumstances that exist here, (b) the fastest route to distributing such value to customers, and (c) the least degree of risk to the Debtors' stakeholders (and particularly customers) compared to other available alternatives.    Furthermore, the Binance.US APA includes several key provisions that preserve the Debtors' ability to pursue the best alternative for creditors prior to closing.  The Binance.US APA contains a broad "fiduciary out" provision, which allows the Debtors to terminate the Binance.US APA if the Debtors determine that a better transaction is available.  Additionally, the Binance.US Transaction permits the Debtors to pivot to a toggle transaction that allows the Debtors to return cryptocurrency and cash to stakeholders if the Debtors exercise their fiduciary out or the Binance.US Transaction is not consummated by the Outside Date (the "Toggle Transaction").  If the Debtors pivot to the Toggle Transaction, the Debtors may elect to use Binance.US to provide services to facilitate the Debtors' self-liquidation, allowing the Debtors to "self-liquidate" without expending additional time, resources, and cash negotiating terms with a new third-party.

4.      Importantly, just as the Debtors did not seek approval of the FTX US Transaction outside of a chapter 11 plan, the Debtors are ***not*** seeking to do so here.  Instead, the Debtors are only seeking authority at this time to enter into the Binance.US APA—a critical prerequisite to the Debtors commencing the plan solicitation and confirmation process and ensuring Binance.US remains committed during such process.  Entry into the Binance.US APA also provides the Debtors with certain protections, including up to $15 million of expense reimbursement and a $10 million reverse termination fee under certain circumstances set forth in the Binance.US APA.  The Debtors will seek to consummate the Binance.US Transaction through confirmation of the Plan, allowing Holders of Account Holder Claims and Holders of General Unsecured Claims to vote to accept or reject the Plan and allowing all parties in interest to object to the Plan.

5.      The Debtors received formal objections to the Binance.US APA Motion from the SEC, New Jersey, the U.S. Trustee, Vermont, New York, and Texas (each, an "Objection" and, collectively, the "Objections").  In addition, CFIUS filed a statement reserving its rights under federal regulations to review national security concerns surrounding the Binance.US Transaction, and Oracle filed a reservation of rights regarding its executory contract with the Debtors.

6.      The Objections ignore the practical realities of these chapter 11 cases and fail to identify any transaction that provides a better outcome for the Debtors' creditors.  There is none.  And time is of the essence in these chapter 11 cases.  FTX US's cataclysmic collapse not only derailed these chapter 11 cases but sent shockwaves through the cryptocurrency industry.  The resulting contagion in the market contributed to other key exchanges filing for chapter 11 protection or halting trading and withdrawals on their platforms.  Given this, and the resulting prolonged timeline and increased administrative costs of these chapter 11 cases, the Debtors must move quickly to preserve the value of the Debtors' estates and maximize returns to creditors.  The

Debtors' comprehensive marketing efforts bolster the Debtors' assertion that no superior alternative transaction exists. Indeed, the speed at which the Debtors were able to negotiate and execute the Binance.US APA following the catastrophic collapse of FTX US is a testament to the exhaustive negotiations previously undertaken by the Debtors in their marketing process.

7.      Critically, the Debtors are not relinquishing any flexibility to pursue the transaction that is best for their creditors, even if that transaction is ultimately not the Binance.US Transaction: the Binance.US APA preserves the Debtors' "fiduciary out" should a higher or better alternative transaction be proposed which protects the Debtors' ability to pivot to an alternative transaction, including a self-liquidation, if the Binance.US Transaction is no longer the best outcome for the Debtors and their stakeholders. Further, the Debtors are not seeking approval of the Binance.US Transaction at this time and approval of the Binance.US APA will not prejudice the rights of all parties in interest to challenge the Binance.US Transaction at confirmation.

8.      For the reasons set forth herein, and given the narrow scope of the relief requested by the Binance.US APA Motion, the Debtors respectfully request that the Court overrule any unresolved Objections, enter the proposed Order approving entry into the Binance.US APA, and grant such other and further relief that the Court deems just and proper.

## Reply

**I.     The Court Should Approve the Debtors' Entry into the Binance.US APA.**

**A.     Entry into the Binance.US APA is a Sound Exercise of the Debtors' Business Judgment.**

9.      The Debtors' entry into the Binance.US APA is governed by the "business judgement" rule. The business judgment rule is not an unduly strict standard; it merely requires showing that the decision to enter into the Binance.US APA was based on the debtor's sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that

judge determining a 363(b) application must find a good business reason to grant such application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

10.     The "business judgment" rule also shields a debtors' decisions from judicial second guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company,'" and has continued applicability in bankruptcy (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

11.     Certain Objections indirectly argue that the Debtors' business judgment was inappropriately exercised in pursuing the Binance.US Transaction.  The Objections fail to put forward any factual or legal support for such arguments and such Objections should be overruled.

12.     ***First***, the Binance.US APA is indisputably the result of a thorough and extensive marketing process.  The Debtors' months-long marketing process was exhaustive—ultimately, the Debtors corresponded with 96 strategic and financial third parties and engaged in significant discussions and negotiations with all parties who expressed an interest in the Debtors' business.

Accordingly, when the Debtors were forced to recalibrate after the collapse of FTX, the Debtors were both aware of numerous parties that would be potentially interested in a transaction and, in most cases, had already engaged on the terms of such parties' proposals. The Debtors were also acutely aware of the deficiencies in certain proposals that previously precluded the Debtors' attempts to reach agreement on a transaction and identified such deficiencies to interested parties in an effort to have them improve proposals accordingly.

13.     For parties with which the Debtors previously engaged, the Debtors resurrected the last proposal received from such parties and initiated discussions to resolve the outstanding issues. For the handful of parties with which the Debtors did not previously negotiate the terms of a proposal, the Debtors provided strawman transaction terms based on other proposals received to serve as a negotiating "floor." Ultimately, the Binance.US Transaction proved to be the best and highest bid.

14.     The Binance.US Transaction is value-maximizing for the Debtors' creditors. Specifically, the Binance.US APA, among other things, (a) provides the most tax efficient path forward as Binance.US will enable users to access 100% of the cryptocurrency coins on the Debtors' platform, (b) is the only transaction available to the Debtors that did not contemplate the liquidation of cryptocurrency for working capital purposes, (c) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, under certain circumstances set forth in the Binance.US APA, and (d) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction under certain circumstances set forth in the Binance.US APA. None of the objectors offers a more attractive path for the Debtors or disputes the reality that the Binance.US Transaction is the estates' best option at this time.

15.     The Debtors believe that the Binance.US Transaction is the best path forward for the Debtors.  However, the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business.  Accordingly, the Debtors negotiated the proposed transaction structure, including its "fiduciary out" to permit the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Toggle Transaction (subject to expense reimbursement of Binance.US in certain circumstances set forth in the Binance.US APA), if the Debtors determine in their business judgment between now and closing that the Binance.US Transaction is no longer the highest or otherwise best option.

16.     ***Second***, as described in *Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "<u>Amended Disclosure Statement</u>"), creditor recoveries under the Binance.US Transaction are significantly higher than they would otherwise be under the Toggle Transaction.  The Binance.US Transaction yields a higher recovery to creditors than the Toggle Transaction due to a number of factors, including incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to self-liquidation of sizable positions in the marketplace) over and above that in a third party transaction, resulting in worse creditor recoveries, and requiring the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the necessary work.

17.     ***Third***, the Binance.US Transaction will enable the Debtors to expeditiously conclude these chapter 11 cases and distribute value to creditors.  The Binance.US Transaction contemplates an Outside Date (as defined in the Binance.US APA) just four months (subject to a one-month extension with a corresponding increase in Binance.US's expense reimbursement obligation to the Debtors) following the execution of the Binance.US APA, and the ability to pivot

to the Toggle Transaction reduces any transition time the Debtors would otherwise have to dedicate to developing a new transaction if the Binance.US Transaction is not able to close. Ultimately, consummating the sale to Binance.US reduces the administrative costs and uncertainty of these chapter 11 cases and allows the Debtors to return assets to customers on the shortest possible timeline.

18.     For the reasons set forth herein, the Binance.US Transaction represents the highest or otherwise best offer for the applicable assets, provides greater recoveries for the Debtors' estates than any other actionable alternative, and facilitates the most expeditious conclusion to these cases. Further, the Debtors "fiduciary out" and disclosed potential Toggle Transaction ensures that the Debtors can quickly pivot to a self-liquidation and return value to customers on an expedited basis if that becomes the highest and best option.  Accordingly, entry into the Binance.US APA should be approved as an exercise of the Debtors' reasonable business judgment.

**B.      The Objections Improperly Second Guess the Debtors' Business Judgment.**

19.     Certain Objections indirectly attack the Debtors' business judgment by calling into question the process leading to execution of the Binance.US APA, the financial position of Binance.US, and the ability of the Binance.US Transaction to close.  Such Objections are meritless.

**1.      The Binance.US Transaction Is Feasible.**

20.      The SEC, New Jersey, New York and Vermont each allege that the Binance.US APA Motion contains insufficient information about Binance.US's financial position, the feasibility of the Binance.US Transaction, or the ability for Binance.US to consummate the Binance.US Transaction.

21.     ***First***, as discussed herein, the Debtors are not seeking approval of the Binance.US Transaction at this time.  Objections to the feasibility of the Binance.US Transaction are premature and are properly considered at confirmation.

22.     **Second**, Binance.US has the financial wherewithal to make the payments contemplated under the Binance.US APA.  Under the Binance.US APA, Binance.US is required to make (1) a $20 million payment to the Debtors' estates and (2) reimburse up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Binance.US APA).  As described in the Tichenor Declaration, the Debtors performed due diligence on Binance.US, and Binance.US's financials show that it has ample cash on hand to make such payments to the Debtors.  *See Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance.US Purchase Agreement, and (II) Granting Related Relief*, filed contemporaneously herewith (the "Tichenor Declaration").

23.     **Third**, Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit).  Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use).  Binance.US also has a sizeable and adequately capitalized balance sheet.  Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

24.     The Debtors included additional disclosure in the Amended Disclosure Statement to address concerns regarding Binance.US's financial position and the feasibility of the Binance.US Transaction.  *See* Disclosure Statement, Art. V.B.

### 2.      The Debtors' Due Diligence Efforts Were Adequate.

25.     The U.S. Trustee alleges that the Debtors failed to describe the due diligence efforts undertaken in connection with the evaluation of Binance.US and the execution of the Binance.US APA.  The Debtors' advisors conducted financial and business counterparty due diligence on Binance.US.  This due diligence included reviews of certain documentation and discussions with

senior management at Binance.US relating to:  audited financial statements, interim unaudited

financial statements, available liquidity, related party services agreements, wallet infrastructure,

AML/KYC procedures, money transmitter licensing status, and business plans submitted to

selected state regulators in connection with the issuance of money transmitter licenses.  *See*

Tichenor Declaration ¶ 21.

### 3.    Binance.US's Custody and Security Protocols Are Sufficient.

26.    Vermont, New Jersey, and the U.S. Trustee each object to approval of the

Binance.US APA due to concerns about Binance.US's security protocols.

27.    The U.S. Trustee alleges that the Binance.US APA insufficiently describes the

security protocols in place if the Court approves entry into the Binance.US Transaction.  U.S.

Trustee Objection pg. 10.  Binance.US has various security protocols in place to ensure the safe

storage of customer assets.  Binance.US's security protocols have achieved various third-party

expert certifications attesting to their compliance with industry standards, including: (a) Payment

Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for

Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC

2) Type 2 attestation verified by an independent auditor.  Amended Disclosure Statement, Art.

V.B.1(b).  The Debtors understand Binance.US's security protocols to be higher than the industry

standard.

28.    The Vermont Objection alleges that the Binance.US APA does not provide the

entity that will custody customer assets.  Vermont Objection ¶ 10.  The Binance.US APA and

Amended Disclosure Statement both provide that BAM Trading Services, Inc., a Delaware

corporation, will be the Binance.US entity that will acquire the Debtors' assets and custody

customer assets post-closing (*i.e.*, the "Purchaser" under the Binance.US APA).

29.    The New Jersey Objection alleges that the Binance.US APA does not provide

sufficient transparency as to what will happen once cryptocurrency is transferred to Binance.US. The Binance.US APA contemplates that all cryptocurrency held on the Debtors' platform will remain with the Debtors up until the Effective Date. After that point, such cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US platform in accordance with the Binance.US APA and Plan, and upon such transfer, Binance.US will be obligated to make such cryptocurrency available to the relevant creditors within 5 business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on servers at Amazon Web Services (AWS). Amended Disclosure Statement, Art. V.B.1(b).

30.    The U.S. Trustee incorrectly alleges that the Binance.US APA does not protect against the transfer of customer information to Binance.US prior to closing. The Binance.US APA requires that an Account Holder affirmatively opt into the transfer of customer information prior to closing. Specifically, section 6.6(a) of the Binance.US APA provides that the Seller shall provide to Purchaser "Acquired User Data for Users *who have opted into the pre-Closing data transfer*" with the remaining data to be delivered on the closing date (emphasis added).

31.    The U.S. Trustee also alleges that the Binance.US APA does not disclose (i) the Debtors' privacy policies applicable to individuals that provided the Debtors with personally identifiable information, and (ii) if a purchaser will be required to comply with the Debtors' privacy policies. The Debtors' customer-facing website privacy policy, which is the applicable privacy policy, permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.

*See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/. Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy (available at: https://Binance.US/privacy-policy). However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Binance.US APA contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs. Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy, so that users have advance notice of the Binance.US Privacy Policy before it becomes applicable to their data. Amended Disclosure Statement, Art. V.B.1(f). The Debtors will continue to impose Voyager's disclosed security protocols before, through, and following the closing of the Binance.US Transaction, as necessary. Amended Disclosure Statement, Article VI.B.7.

32.     Finally, the U.S. Trustee suggests that the Court should appoint a consumer privacy ombudsman pursuant to Section 363 of the Bankruptcy Code. A consumer privacy ombudsman is not necessary, however, if a proposed sale complies with a debtor's privacy policy. 11 U.S.C. 363(b)(1)(A). As the Voyager Privacy Policy explicitly permits the transfer of user data in connection with a sale of the Debtors' assets in a bankruptcy proceeding, a consumer privacy ombudsman does not need to be appointed in these chapter 11 cases. *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

**C.     Objections to the Debtors' Compliance With State Law Are Not Relevant to Approval of the Asset Purchase Agreement.**

33.     Vermont, Texas, and New York object to the Binance.US APA on the grounds that neither the Debtors and/or Binance.US are currently in compliance with state law. The Debtors

strongly disagree with such assertions, but in any event, such assertions are in no way relevant to the Debtors' request for authority to enter into the Binance.US APA.  All states have the right to assert claims against the Debtors through the Debtors' claims process, and the rights of the states to object to the Plan and the Binance.US Transaction at confirmation are expressly preserved.

### D.    The Binance.US Transaction Will be Consummated Pursuant to the Plan.

34.    New Jersey alleges that the Debtors are seeking approval of the Binance.US Transaction itself through the Binance.US APA Motion because of the following language in the proposed order filed with the Binance.US APA Motion:

> The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.  The transactions contemplated by the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; provided that nothing in this Order shall limit or otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement.  **Entry of this Order, including approval of the Seller's entry into, and performance under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.** (emphasis added).

35.    The proposed Order amends the above language to make clear that the Debtors are not seeking approval of or consummation of the Binance.US Transaction pursuant to the Binance.US APA Motion.

## II.    The Binance.US APA and Amended Disclosure Statement Are Consistent Regarding the Treatment of VGX.

36.    The U.S. Trustee objects to the Binance.US APA on the basis that the Disclosure Statement and Binance.US APA are inconsistent regarding the proposed treatment of VGX token.

37.    The Binance.US APA does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform.  Binance.US will conduct an internal review process with

respect to whether it will support trading of VGX on its platform.  Such a determination involves

a myriad of factors and may require input from various third-party advisors and experts, including

legal counsel.  Accordingly, Binance.US cannot predict with any accuracy the amount of time this

analysis will require or its outcome.  Regardless of whether trading of VGX becomes supported

on the Binance.US platform, Account Holders may withdraw such tokens from their accounts on

the Binance.US platform when available to them in accordance with the Binance.US APA and the

Plan, and subject to Binance.US's terms of use.  *See* Amended Disclosure Statement, Art.

V.B.1(e).

38.    Accordingly, the Amended Disclosure Statement contains sufficient disclosure

regarding the treatment of VGX tokens under the Plan and is consistent with the Binance.US APA.

### III.    The Binance.US APA and Plan Properly Treat Creditors.

39.    Vermont, New York, Texas and Hawaii (such jurisdictions, collectively, the

"Unsupported Jurisdictions") and the U.S. Trustee allege that recoveries pursuant to the

Binance.US APA, and therefore recoveries under the Plan, constitute unfair treatment with respect

to Account Holders in Unsupported Jurisdictions.  Specifically, Vermont[3] and Texas[4] allege unfair

treatment to the extent customers in Unsupported Jurisdictions (as defined in the Binance.US

APA) receive payment in cash, while customers in Supported Jurisdictions (as defined in the

Binance.US APA) receive payment in kind (*i.e.*, in cryptocurrency).    The Unsupported

Jurisdictions and the U.S. Trustee also object to the treatment of Account Holders to the extent

---

[3]    Vermont objected to unfair treatment for account holders in its *Objection to the Adequacy of the Disclosure Statement* [Docket No. 809].

[4]    Texas objected to unfair treatment for account holders in its *Objection of the Texas State Securities Board and the Texas Department of Banking to Debtors' Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 814].

there is a time delay between distributions to Account Holders in Supported Jurisdictions and distributions to Account Holders in Unsupported Jurisdictions.

40.    As demonstrated below, these Objections are baseless, but are also raised prematurely as objections to treatment under the Plan are appropriately considered at confirmation. The Court is not being asked to evaluate or approve the proposed treatment of Account Holders at this time.

### A.    All Account Holders Are Receiving the Same Pro Rata Distributions.

41.    The Unsupported Jurisdictions' position is in any event hypocritical.    The Unsupported Jurisdictions could provide potential avenues to allow Binance.US to make distributions in kind to all Account Holders in their jurisdiction.    Instead, they object to the fact that Account Holders in their jurisdiction would receive cash when it would be their own regulatory decisions (unless they decide to provide fairly straightforward, basic accommodations to their own citizens) creating this result.    Any barriers in place preventing their constituents from receiving distributions in-kind like other states is entirely of the objecting states' own making. From the outset of these cases, the Debtors engaged in continued open dialogue with all states, including the potential transaction outcomes at play, but with regard to the Unsupported Jurisdictions, to no avail (so far).    The Debtors are thus left with no choice but to proceed with the terms contemplated by the Binance.US APA and to potentially distribute recoveries to customers in Unsupported Jurisdictions in cash equivalent value to what such customers would have received in cryptocurrency in Supported Jurisdictions.

42.    The Debtors valued all claims held by Account Holders as of the Petition Date and all Account Holder claims receive the same treatment under the Plan.    Courts commonly recognize that the requirement for equal treatment within a class requires "equality of treatment, not equality of result" because the inquiry is "not whether all of the claimants in a class obtain the same thing,

but whether they have the same opportunity." *In re Latam Airlines Group SA,* 2022 WL 2206829, at *35, (Bankr. S.D.N.Y June 18, 2022) (citing *In re Dana Corp*, 412 B.R. 53, 62 (S.D.N.Y. 2008)); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. March 12, 2018).  Courts have also recognized that "[t]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions." *In re Latam Airlines Group SA*, 2002 WL 2206829, at * 35 (citing *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 250-52 (Bankr. S.D.N.Y. 2007)).  Further, courts have held that the requirement under Section 1123(a)(4) that all claims in a given class be treated equally is satisfied when the members of the class are subject "to the same process for claim payment." *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990); *In re Breitburn Energy Partners LP*, 582 B.R. at 358.  These standards are satisfied because the process for claim payment applies uniformly under the Plan, subject to each Account Holder becoming an eligible user on the Binance.US platform in accordance with the Plan and Binance.US APA and subject to regulatory compliance.

43.     All Account Holders will receive their pro rata distribution on account of their claim valued as of the Petition Date.  There is no unequal treatment between Account Holders in Supported Jurisdictions and Unsupported Jurisdictions and both are subject to the same process for becoming eligible to receive in-kind distributions.  Any difference in results for creditors based on timing of distributions, which is unknown and subject to further developments at this stage, would not be a result of the Plan and instead would be the result of each Unsupported Jurisdiction's position on granting authority to Binance.US to provide such distributions.

44.     The Objections also allege that the "six-month" delay between distributions is

unjustifiable.  The Debtors are clear in both the Binance.US APA and the Amended Disclosure Statement that six months is the maximum amount of time that the Debtors will retain control of such assets prior to distributions to Account Holders in Unsupported Jurisdictions, and that the timing between distributions to such Account Holders could be much shorter.  In fact, there may be no delay if Binance.US receives the necessary regulatory approves at or prior to closing. Furthermore, the maximum delay in cash distributions for Account Holders in Unsupported Jurisdictions under the Binance.US APA is actually three months (not six months) relative to Account Holders in jurisdictions where Binance.US is licensed or authorized, which will receive cash distributions in lieu of in kind distributions if they do not become eligible users on the Binance.US platform within three months of closing pursuant to the Plan and Binance.US APA. The Debtors and Binance.US will continue to work with the Unsupported Jurisdictions prior to confirmation in an effort to obtain the necessary approvals to make in-kind distributions to Account Holders in the Unsupported Jurisdictions, but the Unsupported Jurisdictions (and not the Debtors) ultimately control that decision.

B.    **The Debtors Cannot Make Distributions in Kind to Account Holders in Unsupported Jurisdictions.**

45.    The Debtors are unable to make distributions in kind to Account Holders in Unsupported Jurisdictions for several reasons.  ***First***, due to legal, operational and technical limitations, the Debtors do not have the ability to distribute cryptocurrency themselves to Account Holders in Unsupported Jurisdictions.  The Voyager platform that would be required to facilitate in kind distributions to creditors is being sold to Binance.US in connection with the Binance.US Transaction, meaning that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for over 120,000 creditors. Voyager does not have necessary infrastructure or personnel to accomplish this in a safe and secure

manner due to the magnitude and complexity of such a distribution.

46.     ***Second***, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.   The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets.   Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests.  However, Chainanalysis does not support all of the tokens listed on the Voyager platform (e.g., non-transferable tokens).   While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors.  Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform.  Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

47.     ***Third***, there are technical limitations that would prevent the Debtors from making in kind distributions of certain types of cryptocurrency on the Debtors' platform.  There are 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform while they can be withdrawn from certain third-party exchanges (like Binance.US).   Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate.  The only

way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash.

48.      **Fourth**, the Debtors would need to significantly increase the engineering, regulatory, compliance and other operational staff contemplated under the chapter 11 plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform.  The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner.  This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

49.      In sum, by providing for a process that may enable Binance.US to provide in kind distributions to Account Holders in Unsupported Jurisdictions, the Binance.US APA and the Plan provide the same treatment to all Account Holders.

**IV.    The Debtors' Ability to Consummate the Binance.US Transaction Does Not Depend on Binance Obtaining Authorization in Unsupported Jurisdictions.**

50.      The U.S. Trustee alleges that the Binance.US APA cannot be approved because the sale contemplated thereunder cannot be consummated if Binance.US fails to obtain the licensing or authorizations required in Unsupported Jurisdictions prior to the closing date.  The U.S. Trustee's interpretation of the relevant provisions of the Binance.US APA is mistaken.

51.      As the U.S. Trustee correctly notes, section 6.12(b) of the Binance.US APA states that ". . . to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then Seller shall deliver all Acquired Coins in respect of all Users or Eligible Creditors located in such Unsupported Jurisdiction to Purchaser in accordance with Section 2.4(b),

21

and Purchaser shall convert such Acquired Coins into United States Dollars at the then prevailing rates (net of all applicable fees, spreads, costs and expenses (including any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser)) on the Binance.US Platform and deliver such United States Dollars in respect of such Users or Eligible Creditors to Seller within five (5) Business Days following receipt thereof from Seller, for further distribution by Seller in accordance with the Plan."  While the U.S. Trustee asserts that this provision prevents Binance.US from performing its obligations under the Binance.US APA, section 6.12(b) functions with the opposite effect, allowing Binance.US to continue to perform its obligations under the Binance.US APA in the event it does not receive licensure from Unsupported Jurisdictions. Section 6.12(b) is not a limitation on Binance.US's abilities to perform the Binance.US Transaction—it is part of Binance.US's obligations thereunder.  If Binance.US does not obtain licensure or authorizations in Unsupported Jurisdictions, it is then obliged under section 6.12(b) to "convert such Acquired Coins into United States Dollars" and deliver the value of the Account Holder's assets, in U.S. Dollars, to the Seller for further distribution to the Account Holders.  All Account Holder Claims are valued as of the Petition Date—the pro rata value to be distributed to Account Holders remains the same, even if the Account Holder Claims are ultimately paid in cash.

52.     For the foregoing reasons, the Binance.US APA does not prevent consummation of the sale in the event Binance.US does not receive regulatory approvals from Unsupported Jurisdictions.

**V.     Paul Hastings LLP Is Not Representing Parties on Both Sides of the Binance.US Transaction.**

53.     The U.S. Trustee asserts that the court should not approve section 5.8 of the Binance.US APA due to inadequate information regarding Paul Hastings LLP ("Paul Hastings") role as regulatory counsel for both the Debtors and the Binance.US.  Early in the case, Paul

Hastings approached the Office of the United States Trustee about a team from Paul Hastings, separate and distinct from the team representing Voyager, providing regulatory counsel to Binance.US. Following these discussions, it became clear to Paul Hastings and the Debtors that Paul Hastings would not be able to serve as regulatory counsel to Binance.US. It is our understanding that section 5.8 of the Binance.US APA was included in hopes that Paul Hastings would revisit the issue with the Office of the United States Trustee. This provision has been stricken from the amended Binance.US APA.

**VI.    The CFIUS Reservation of Rights.**

54.    The U.S. Attorney for the Southern District of New York filed a statement concerning CFIUS' right to review the Binance US Transaction. For the avoidance of doubt, CFIUS's rights to review the transaction are not limited by the Binance US APA and the Debtors are not seeking to limit, modify, or supplant CFIUS's right to review the Binance US Transaction. The Binance US APA states, in relevant part:

> Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), each Party will use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

> Binance US APA, ¶ 6.4 (f)

55.    Additionally, the Debtors have engaged with CFIUS regarding CFIUS' initial inquiries concerning the Binance US Transaction, which were received on December 30, 2022. Since receiving these inquiries, the Debtors and Binance US have been coordinating on responses to CFIUS' inquiries and will continue to work to provide responses to each of CFIUS' requests. The Debtors plan to make a voluntary CFIUS filing and incorporate responses to CFIUS' latest requests in such filing.

56.     Furthermore, even in the event CFIUS determines in its review process that the Binance US Transaction should not be closed due to national security concerns, the Binance US APA provides for this scenario and allows the Debtors to pivot to the Toggle Transaction, therefore allowing the Debtors to return cryptocurrency to customers quickly even if the Binance US Transaction cannot be consummated.  The Debtors reiterate that CFIUS' right to review the transaction are not limited or restricted in any manner if the Court approves entry into the Binance US APA.  Accordingly, CFIUS's rights in connection with the transaction are preserved, as are CFIUS's rights to object to the Binance US Transaction in connection with confirmation of the Plan.

**VII.     Oracle's Reservation of Rights.**

57.     Oracle's reservation of rights focuses on its executory contract with the Debtors. Specifically, Oracle seeks to reserve its rights because the Debtors have not determined whether they are assuming, or assuming and assigning to Binance.US, the contract between the Debtors and Oracle (the "Oracle Contract") and any impact that such potential assumption or assumption and assignment will have on Oracle's rights.

58.     As set forth in the Notice of Assumption of Executory Contracts and Unexpired Leases, attached as Exhibit 8 to the *Debtors' Motion for Entry of an Order (I) Scheduling A Combined Disclosure Statement Approval and Plan Confirmation hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779], should the Debtors determine to assume, or assume and assign to Binance.US the Oracle Contract, any unpaid monetary obligations under the Oracle Contract will be paid prior to such assumption or assumption and assignment.  Oracle will have the ability to object to the proposed cure costs and

the proposed assumption or assumption and assignment of the Oracle Contract if applicable.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections and enter the Order granting the Binance.US APA Motion and such other relief as the Court deems appropriate under the circumstances.

Dated:  January 8, 2023  
New York, New York

*/s/ Joshua A. Sussberg*
_____

**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
Joshua A. Sussberg, P.C.  
Christopher Marcus, P.C.  
Christine A. Okike, P.C.  
Allyson B. Smith (admitted *pro hac vice*)  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900  
Email:          jsussberg@kirkland.com  
                   cmarcus@kirkland.com  
                   christine.okike@kirkland.com  
                   allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*