Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:       (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DECLARATION OF BRIAN TICHENOR
IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING ENTRY INTO THE BINANCE US
PURCHASE AGREEMENT, AND (II) GRANTING RELATED RELIEF**

I, Brian Tichenor, hereby declare under penalty of perjury:

1.      I am a Managing Director in the Financial Institutions Group (the "FIG Group") at Moelis & Company LLC ("Moelis"). Moelis is an investment banking firm that has its principal office at 399 Park Avenue, 5th Floor, New York, New York 10022. Among the businesses and products that fall within the purview of the FIG Group are cryptocurrency, banks, asset managers, securities exchanges, specialty finance businesses, and insurance companies.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

2. The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") engaged Moelis as investment banker. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement, and (II) Granting Related Relief* [Docket No. 775] (the "Motion").[2]

3. A description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Steve Ehrlich, Co-Founder and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration") and a description of the facts and circumstances of the marketing process, the Auction, and FTX US transaction is set forth in my previous *Declaration of Brian Tichenor in Support of Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 476] (the "Previous Declaration"), and are incorporated by reference herein.

4. Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the marketing and sale process and the Auction, (b) information learned from my review of relevant documents, or (c) information I received from the Debtors or the Debtors' other advisors. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Moelis as a professional retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the First Day Declaration (as defined herein), as applicable.

2

**Qualifications**

5.      Moelis is an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority. Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Group LP. Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees based in offices in North America, South America, Europe, the Middle East, and Asia. Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

6.      Moelis provides a broad range of financial advisory and investment banking services to its clients, including (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: In re Knotel, Inc., No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); In re CBL & Assocs. Props., Inc., No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); In re Energy Alloys Holdings, LLC, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); In re Jason Indus., Inc., No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); In re The Hertz Corp., No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); In re Extraction Oil & Gas, Inc., No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); In re The McClatchy Co., No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); In re Internap Technology Solutions Inc., No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); In re Rentpath Holdings, Inc., No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); In re Sanchez Energy Corp., No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21,

2019); In re Monitronics Int'l, Inc., No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); In re Aegerion Pharmaceuticals, Inc., No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); In re Joerns WoundCo Holdings, Inc., No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); In re FTD Cos., No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); In re Hexion Holdings LLC, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 31, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys "R" US, Inc., No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc., No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re UCI International, LLC, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); In re AOG Ent., Inc., No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); In re SFX Entertainment, Inc., No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); In re American Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); In re ITR Concession Co., No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re MPM Silicones, LLC, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

7.      I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a broad range of transactions. Prior to joining Moelis, I was in the corporate and investment banking

group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group. I hold Bachelor of Science degrees in finance and computer science from Boston College and have a Master's of Business Administration degree from Georgetown University.

8. I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding Corporation pursuant to a section 363 asset sale. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac assets, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.

**Overview and Recommencement of the Marketing Process**

9. As described in greater detail in my Previous Declaration, Moelis was engaged by the Debtors in June 2022 to advise the Debtors in their efforts to navigate challenges impacting

5

the cryptocurrency industry and evaluate strategic alternatives in connection therewith. I have been involved as a senior member of the Moelis team throughout our engagement.

10. As also described in greater detail in my Previous Declaration, the Debtors conducted a marketing process that resulted in a two-week Auction and the proposed asset purchase agreement (the "FTX Purchase Agreement") with West Realm Shires Inc. (along with affiliates, "FTX," and the sale transaction thereunder, the "FTX Transaction"). The Auction was the result of the Debtors' marketing process which included engagement with over 96 interested parties with over 60 parties entering into nondisclosure agreements with the Debtors. Following the conclusion of the Auction, the Debtors sought and obtained approval to enter into the FTX Purchase Agreement. Shortly thereafter, the Debtors commenced solicitation of votes on the FTX Plan.

11. As FTX appeared to be facing financial challenges that could have impaired its ability to close on its purchase of Voyager, but before FTX's eventual chapter 11 filing, on November 10, 2022, the Debtors requested that FTX waive the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement. FTX, through its counsel, acquiesced. The Debtors immediately restarted outreach to, and received inbounds from, interested parties as a result of the growing probability that the FTX Transaction would not close. On November 11, 2022, FTX commenced chapter 11 proceedings.[3] It was well known that the Debtors' assets were once again for sale following the very public FTX collapse.

12. The Debtors and their advisors were and are keenly aware that time is of the essence and that the Debtors need to move with deliberate speed to implement an alternative transaction given both the increased volatility in the crypto space and the increased administrative costs the

---

[3] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

longer the Debtors remain in chapter 11. The Debtors thus leveraged the significant groundwork during the prior marketing process, engaging again with many of the parties that were previously involved in the process, as well as several new parties who expressed interest in acquiring the Debtors' assets. The Debtors and their advisors ensured that all interested parties understood the dynamics surrounding the previously agreed to FTX Purchase Agreement and terms of the FTX Purchase Agreement to help provide candor and transparency to the process and properly guide all interested parties to provide the best possible bids.

13. The Debtors received several proposals and engaged in extensive negotiations with the interested parties that spanned approximately one month. Moelis, along with the Debtors' other advisors, helped the Debtors consider the proposals received, including working with each interested party, answering numerous requests for additional information, holding several conferences with the Debtors' management teams, their advisors, and the Committee, pushing the bidders to improve the economic and other terms of their bids, and analyzing the viability of each of the proposed transactions. When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the counterparty due diligence conducted both prior to and during the initial Auction and during the one-month negotiation period following the collapse of FTX.

14. The Debtors also considered pursuing a transaction that would allow the Debtors to distribute cryptocurrency or cash to creditors on their own (the "Toggle Transaction"). Pursuing the Toggle Transaction would impose costs of its own on the Debtors, would take time, and would present its own risks. Among other things, the Toggle Transaction would involve the Debtors

"rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their pro rata share of cryptocurrency, to extent it can be withdrawn. While a viable option, the Toggle Transaction, among other things, could likely (a) lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third party transaction, thereby resulting in worse creditor recoveries, (b) require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required, (c) create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Toggle Transaction), (d) be less tax efficient for customers than a third-party transaction, (e) strand some coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager,[4] and (f) may severely damage the value of the VGX token, which is the native token of the Voyager brokerage platform.

15. Importantly, the Debtors and their advisors contemplated this route while utilizing it as a "floor" against which to compare bids received from third parties. Ultimately, the Debtors determined that pursuing a sale transaction with a third party could, depending on the structure of the transaction, provide the potential for the best recovery available to creditors under the circumstances while also reducing the risk surrounding execution of the transaction and reducing the likely value leakage that would occur in the Toggle Transaction. Accordingly, the Debtors, in their business judgment, determined to reengage with third parties to identify an alternative transaction partner.

---

[4] We understand that 35 tokens, which we estimate represents approximately 20% of the value of all tokens held by Voyager, are not able to be withdrawn by customers from Voyager due to technical limitations, but can be withdrawn by customers from Binance.US following consummation of the proposed transaction.

**The Binance.US Transaction**

16.     The Debtors thoroughly engaged with all interested parties, and after negotiation and deliberation, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed that certain asset purchase agreement (the "Binance.US Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" and the sale transaction thereunder, the "Binance.US Transaction"). The Debtors value the Binance.US Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 16, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Binance.US Purchase Agreement is attached as Exhibit B to the Motion.

17.     Importantly, the Binance.US Purchase Agreement permits the Debtors to pivot to the Toggle Transaction if the Debtors exercise their "fiduciary out" or the Binance.US Transaction is not effectuated by the outside date included thereunder, subject to expense reimbursement of Binance.US in certain circumstances set forth in the Binance.US Purchase Agreement. The Binance.US Transaction also includes additional benefits, as it (a) provides the most tax efficient route forward as Binance.US supports 100% of the cryptocurrency coins on the Debtors' platform, (b) is the only transaction available to the Debtors that did not contemplate requiring the Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (c) includes reimbursement by Binance.US of up to $15 million of Seller's expenses under certain circumstances set forth in the Binance.US Purchase Agreement, (d) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction under certain circumstances set forth in the Binance.US Purchase Agreement, and (e) in the event that the Debtors pivot to the Toggle

9

Transaction, provides that Binance.US will provide certain services to facilitate such Toggle Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors.

18.     Pursuant to the Binance.US Purchase Agreement, Binance.US will acquire substantially all of the Debtors' assets, including the distribution of substantially all of the cryptocurrency held by the Debtors. The transactions contemplated by the Binance.US Purchase Agreement will be effectuated through a chapter 11 plan. Ultimately, I believe that the Binance.US bid provides the most value currently available for the Debtors' assets and ultimately to their stakeholders—including the Debtors' customers under the circumstances that exist here.

19.     Moreover, the structure of the proposed transaction, including its "fiduciary out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Toggle Transaction, if the Debtors determine in their business judgment between now and closing that the Binance.US Transaction is no longer the highest or otherwise best option. Based on the diligence the Debtors have performed to date on their proposed counterparty, they (and I) believe the Binance.US Transaction is the highest and best option currently available under the circumstances. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and we continue to closely monitor developments in the sector. Not only does the structure of the proposed transaction permit the Debtors to pivot to the Toggle Transaction if they conclude the Binance.US Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Binance.US Purchase Agreement will better prepare the Debtors to complete the Toggle Transaction if necessary.

20.     Importantly, the Debtors, the Creditors Committee, and their respective advisors'

negotiated with Binance.US to include provisions designed to ensure the safety of the Debtors' cryptocurrency in advance of distributions being made to creditors. Specifically, the Binance.US Purchase Agreement provides that, up until the transfer of cryptocurrency to Binance.US, the Debtors maintain control of all their cryptocurrency, including during the rebalancing of the Debtors' cryptocurrency portfolio (that may include the use of third parties and third-party exchanges to execute the rebalancing transactions), which is a prerequisite to closing and effectuating distributions to creditors. I believe that retaining control of all of the Debtors' assets until closing is critical to minimizing risk given the increased volatility in the crypto space.

21. Further, in connection with the evaluation of the Binance.US proposal the advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

22. Moreover, it is my understanding that section 6.12 of the Binance.US Purchase Agreement provides that the Seller (prior to the transfer of cryptocurrency to Binance.US) and each transferred creditor (from and after the transfer of cryptocurrency to Binance.US) will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Binance.US Asset Purchase Agreement through and including such time as such cryptocurrency is returned to Seller or distributed to such transferred creditor.[5] It is my understanding that under the Binance.US Purchase Agreement, the cryptocurrency will be held by Binance.US solely for

---

5   *See* Binance US Purchase Agreement Section 6.12(e).

the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.[6]

23. Further, in states where Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable) to make distributions to creditors in those states (the "Unsupported Jurisdictions"), the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors. In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six (6) months following the closing (*i.e.*, an incremental 3 months following distributions to creditors in other jurisdictions), it is my understanding that the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the chapter 11 plan. It is my understanding that Binance.US shall have the opportunity to execute in such conversion transactions subject to the agreed-upon protocol between the Debtors and Binance.US set forth in the Binance.US Purchase Agreement. If Binance.US is able to obtain the necessary money transmitter licensing approvals within that six (6) month period, Binance.US would make in kind distributions to those creditors.

24. Due to legal, operational and technical limitations, if the Binance.US Transaction is approved, the Debtors will not be able to distribute cryptocurrency themselves to creditors in Unsupported Jurisdictions. First, the Voyager platform that would be required to facilitate in kind distributions to creditors is being sold to Binance.US in connection with the transaction. This means that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for over 120,000 creditors. My understanding is not only would manual distributions be extremely complex, but Voyager does not have

---

[6] *Id.*

necessary infrastructure or personnel to accomplish this in a safe and secure manner.

25. Second, my understanding is that there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform. The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets. Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests. However, Chainalysis does not support all of the tokens listed on the Voyager platform (e.g., non-transferable tokens). While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

26. Fourth, there are technical limitations that would prevent the Debtors from making in kind distributions of certain types of cryptocurrency on the Debtors' platform. There are 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform while they can be withdrawn from certain third-party exchanges (like Binance.US). Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. The only

13

way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash.

27. Finally, the Debtors would need to significantly increase the engineering, regulatory, compliance and other operational staff contemplated under the chapter 11 plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

28. It is my understanding that the Unsupported Jurisdictions can provide temporary solutions to allow Binance US to make distributions in kind to creditors in such Unsupported Jurisdictions similar to all other jurisdictions. For example, the Unsupported Jurisdictions have the right to grant or not grant Binance US a provisional license to permit it to open accounts on behalf of creditors in the Unsupported Jurisdictions in their discretion. While I understand the states may ultimately decline to do so, the Debtors likewise should not jeopardize the Binance US Transaction—which is in the best interests of their estates as a whole—or take on significant additional risks and costs to endeavor to give in-kind distributions to creditors in Unsupported Jurisdictions if the state banking departments do not opt to provide such temporary solutions.

29. I understand the Binance.US Purchase Agreement has a "No-Shop" provision which, upon entry of the Order, prohibits the Seller from soliciting alternative offers from third parties and such provision is consistent with what the Court previously approved under the FTX Purchase Agreement. However, I also understand that the Binance.US Purchase Agreement

includes a "Fiduciary Out" on the terms set forth in the Binance.US Purchase Agreement, that allows the Debtors to consider: (a) inbound third party offers that may be superior to the Binance.US Purchase Agreement; and (b) the Toggle Transaction, which the Debtors will take steps to ensure they are in a position to execute, as quickly and efficiently as possible, if it ultimately becomes the best solution for creditors.

30. Additionally, I understand that the Binance.US Purchase Agreement includes an expense reimbursement provision whereby the expense reimbursement would be owed by the Seller to Binance.US only in a narrow set of circumstances, but proved to be a critical provision during negotiations with Binance.US. Further, the Debtors successfully negotiated both (a) reimbursement by Binance.US of up to $15 million of Seller's expenses (subject to and in accordance with Section 6.21 of the Binance.US Purchase Agreement) and (b) a $10 million reverse termination fee payable to the Seller by Binance.US, in each case, subject to the terms and conditions set forth in the Binance.US Purchase Agreement. Notably, the Debtors' claims against Three Arrows Capital and other parties will remain with the bankruptcy estate and any recovery thereon will be distributed to creditors.

31. Based upon my involvement in the marketing process, including discussions and negotiations in which I both observed and participated, I believe that the Binance.US Purchase Agreement and the proposed sale are the product of good-faith, arm's-length negotiations between sophisticated and well-represented parties, and, in light of the marketing process described above, the transactions contemplated by the Binance.US Purchase Agreement provide the most value for the Debtors' assets currently available under the circumstances present in these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 9, 2023

/s/ Brian Tichenor
Name:  Brian Tichenor
Title:  Managing Director
          Moelis & Company LLC
          *Investment Banker and Financial Advisor to the Debtors and Debtors in Possession*