Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF**
**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO THE THIRD**
**AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on August 12, 2022, the Debtors filed the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Initial Disclosure Statement") [Docket No. 288].

**PLEASE TAKE FURTHER NOTICE** that on October 5, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498].

**PLEASE TAKE FURTHER NOTICE** that on October 17, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 540].

**PLEASE TAKE FURTHER NOTICE** that on October 19, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 565].

**PLEASE TAKE FURTHER NOTICE** that on October 20, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 585].

**PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591] (the "First Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that on December 22, 2022, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (the "Second Amended Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that on January 8, 2023, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 830] (the "Second Amended Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file a *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* attached hereto as **Exhibit A** (the "Revised Second Amended Disclosure Statement").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Second Amended Disclosure Statement and the Revised Second Amended Disclosure Statement, is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Initial Disclosure Statement, Second Amended Disclosure Statement, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

Dated:  January 10, 2023
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
    cmarcus@kirkland.com
    christine.okike@kirkland.com
    allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Second Amended Disclosure Statement**

THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.

THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JANUARY 10, 2023, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

Page

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ......................................1

**I.        INTRODUCTION** .................................................................................................................7

**II.       PRELIMINARY STATEMENT** .........................................................................................7

      A.        The Sale Transaction..............................................................................................7
      B.        The FTX Collapse..................................................................................................9

**III.      BACKGROUND** .................................................................................................................10

**IV.       QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      THE PLAN** ........................................................................................................................12

      A.        What is chapter 11?..............................................................................................12
      B.        Why are the Debtors sending me this Disclosure Statement?.............................12
      C.        Am I entitled to vote on the Plan?.......................................................................12
      D.        What will I receive from the Debtors if the Plan is consummated? .....................13
      E.        What will I receive from the Debtors if I hold an Allowed Administrative Claim? ......................19
      F.        What is the "toggle" feature of the Plan?............................................................20
      G.        How will my Account be transitioned to Binance.US?........................................20
      H.        What if I am unable or unwilling to transition my Account to Binance.US?........20
      I.        What are the sources of Consideration and other consideration required to fund the Plan? ..........20
      J.        Are any regulatory approvals required to consummate the Sale Transaction and confirm
             the Plan?................................................................................................................21
      K.        How will I receive my recovery as an Account Holder if the Sale Transaction is not
             consummated?.......................................................................................................22
      L.        What happens to my recovery if the Plan is not confirmed or does not go effective? ..................22
      M.        If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
             Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
             "Consummation"?.................................................................................................22
      N.        Is there potential litigation related to the Plan?..................................................22
      O.        Does the Plan provide for the subordination of any Claims?...............................22
      P.        Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............23
      Q.        What is the deadline to vote on the Plan?............................................................24
      R.        How do I vote for or against the Plan?.................................................................25
      S.        Why is the Bankruptcy Court holding a Confirmation Hearing? ........................25
      T.        When is the Confirmation Hearing set to occur? ................................................25
      U.        What is the purpose of the Confirmation Hearing?.............................................25
      V.        What is the effect of the Plan on the Debtors' ongoing business? ......................25
      W.        What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ...............25
      X.        Who do I contact if I have additional questions with respect to this Disclosure Statement
             or the Plan?...........................................................................................................26

**V.        THE DEBTORS' PLAN** ....................................................................................................26

      A.        The Plan.................................................................................................................26
      B.        The Plan Toggle.....................................................................................................33
      C.        Means for Implementation of the Plan..................................................................37

**VI.       THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE**................40

      A.        The Debtors' Corporate Structure and History. ...................................................40
      B.        The Debtors' Assets and Operations.....................................................................41
      C.        The Debtors' Capital Structure.............................................................................44

**VII.      EVENTS LEADING TO THESE CHAPTER 11 CASES** ..............................................47

|   |   |   |   |
|---|---|---|---|
| | A. | Market and Industry-Specific Challenges. | 47 |
| | B. | The Alameda Loan. | 55 |
| | C. | Retention of Restructuring Advisors and Initial Third-Party Outreach. | 56 |
| | D. | Governance Initiatives. | 56 |
| | E. | Voyager's Decision to Commence these Chapter 11 Cases. | 56 |
| **VIII.** | | **EVENTS OF THE CHAPTER 11 CASES** | **57** |
| | A. | The Stand-Alone Plan. | 57 |
| | B. | First and Second Day Relief and Other Case Matters. | 57 |
| | C. | Appointment of Unsecured Creditors' Committee. | 59 |
| | D. | Schedules and Statements. | 59 |
| | E. | Bar Date Motion. | 59 |
| | F. | The FBO Motion. | 60 |
| | G. | The 3AC Liquidation Proceeding. | 61 |
| | H. | Litigation Matters. | 61 |
| | I. | The Coinify Sale. | 64 |
| | J. | The Key Employee Retention Plan. | 64 |
| | K. | Canadian Recognition Proceeding. | 64 |
| | L. | The Unwind Motion. | 65 |
| | M. | The Request for Appointment of an Equity Committee. | 65 |
| | N. | The Post-Petition Sale Process and the Collapse of FTX. | 65 |
| | O. | The Special Committee Investigation. | 68 |
| **IX.** | | **RISK FACTORS** | **69** |
| | A. | Risks Related to the Restructuring. | 69 |
| | B. | Risks Related to Recoveries under the Plan. | 72 |
| | C. | Disclosure Statement Disclaimer. | 73 |
| | D. | Miscellaneous Risk Factors and Disclaimers. | 74 |
| **X.** | | **SOLICITATION AND VOTING PROCEDURES** | **80** |
| | A. | Classes Entitled to Vote on the Plan. | 80 |
| | B. | Votes Required for Acceptance by a Class. | 80 |
| | C. | Certain Factors to Be Considered Prior to Voting. | 80 |
| | D. | Classes Not Entitled To Vote on the Plan. | 81 |
| | E. | Solicitation Procedures. | 81 |
| | F. | Voting Procedures. | 82 |
| | G. | Voting Tabulation. | 83 |
| | H. | Ballots Not Counted. | 84 |
| **XI.** | | **CONFIRMATION OF THE PLAN** | **84** |
| | A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 84 |
| | B. | Best Interests of Creditors—Liquidation Analysis. | 85 |
| | C. | Feasibility. | 86 |
| | D. | Acceptance by Impaired Classes. | 86 |
| | E. | Confirmation without Acceptance by All Impaired Classes. | 87 |
| **XII.** | | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **88** |
| | A. | Introduction. | 88 |
| | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 89 |
| | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 90 |
| **XIII.** | | **RECOMMENDATION OF THE DEBTORS** | **97** |

**EXHIBITS**

EXHIBIT A         Plan

EXHIBIT B         Liquidation Analysis

EXHIBIT C         Frequently Asked Questions & Answers

EXHIBIT D         The Asset Purchase Agreement

## IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT
DISCLOSURE STATEMENT, DATED JANUARY 10, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.     Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on February 22, 2023). |
| 2.     Ballots may be returned by the following methods: <br><br> a)   For Holders of Account Holder Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting. <br><br> b)   For Holders of General Unsecured Claims:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below: <br><br> <div align="center">Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602</div><br><br> If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO

AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

[*Remainder of page intentionally left blank*]

## I.     INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as supplemented or amended from time to time, the "<u>Plan</u>"), which was conditionally approved by the Bankruptcy Court on January [●], 2023 [Docket No. [●]]. A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

### A.     The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("<u>FTX US</u>," and along with its parent entity and affiliates, "<u>FTX</u>") as the winning bid (the transaction contemplated thereby, the "<u>FTX Transaction</u>"). Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates. But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed. While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors. Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("<u>Binance.US</u>" or the "<u>Purchaser</u>"). The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will acquire certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform for distribution to Account Holders (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of satisfying the Debtors' obligations under the Plan) (such Cryptocurrency, "<u>Acquired Coins</u>") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset

---

[2]     Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

Purchase Agreement.  Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform.  The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements.  Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Customer Claim** | | | **Crypto Recovery** | | | | |
| **Coin** | **# of Coins Claimed** | **7/5 Coin Price** | **Claim ($)** | **Recovery Type** | **Illustrative Crypto Recovery %[4]** | **12/18 Coin Price** | **# of Coins Recovered[5]** | **Recovery Value** |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |
| **Claim** | | | | | | | | |
| **Value Claimed** | | | **$1,907.34** | **Value Recovered** | | | | **$963.91** |
| *Proportion of Total Platform Value* | | | *0.0001%* | *Proportion of Total Platform Recovery* | | | | *0.0001%* |
| **Illustrative Recovery** | | | | | | | | |
| **Crypto Recovery** | | | | | | | | |
| Value Recovered (In-Kind) | | | | | | | | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | | | | | | | | - |
| **Crypto Value Recovered** | | | | | | | | **$1,022.16** |
| **Other Items** | | | | | | | | |

---

[3]   Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[4]   Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022.  Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]   Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022.  Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]   Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

| | |
|---|---|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses[7] | (78.24) |
| **Total Other Items** | **($58.24)** |
| **Total Value Recovered** | **$963.91** |
| *% Total Recovery* | *51%* |

### B.    The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]  While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]  The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.  FTX acquiesced.  Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.  The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.  Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement.  Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.  Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

---

[7]    "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

[8]    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9]    *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10]    *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims. Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III.    BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling*

*Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

---

[11]   Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12]   *See Notice of Successful Bidder* [Docket No. 457].

[13]   Docket No. 581.

[14]   Docket Nos. 590 and 591.

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at [●]:00 [a/p.m.] (prevailing Eastern Time) (the "Confirmation Hearing").

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[17] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: <br>(i) If the Sale Transaction is consummated by the Outside Date: <br>a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; <br>b. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16]  The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17]  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

14

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Sections 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c.   its Pro Rata share of Distributable OpCo Cash; and<br><br>d.   to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;<br><br>*provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or<br><br>(ii)  If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:<br><br>a.   its Pro Rata share of Distributable OpCo Cash;<br><br>b.   its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account | | | | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i)  If the Sale Transaction is consummated by the Outside Date:<br>    a.  its Pro Rata share of Distributable Cryptocurrency in Cash;<br>    b.  its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br>    c.  its Pro Rata share of Distributable OpCo Cash; and<br>    d.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if | $14.0 | 51% | 45% | 35% – 39% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br><br> (ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br><br>    a. its Pro Rata share of Distributable Cryptocurrency in Cash; <br><br>    b. its Pro Rata share of Distributable OpCo Cash; and <br><br>    c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: <br><br> (i) its Pro Rata share of Distributable HoldCo Cash; and <br><br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $8.3 | 6% | 6% | 0% – 0% |

17

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:<br><br>(i) its Pro Rata share of Distributable TopCo Cash; and<br><br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | $75.1 | 0% | 0% | 0% – 0% |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed | $0.0 | N/A | N/A | N/A |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | | | | |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

**E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional | Article II, Section B |

| | through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

### F.    What is the "toggle" feature of the Plan?

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan. The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

### G.    How will my Account be transitioned to Binance.US?

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions. All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

### H.    What if I am unable or unwilling to transition my Account to Binance.US?

We expect that substantially all Account Holders will be transitioning to Binance.US. In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

### I.    What are the sources of Consideration and other consideration required to fund the Plan?

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[18] and has license applications pending[19] in eighteen (18) states.[20]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[21]

---

[18]    The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[19]    On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[20]    Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

[21]    The state approval process for the surrender of a license typically takes several months.

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.    How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail. It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation. *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

**O.    Does the Plan provide for the subordination of any Claims?**

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims. Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of

equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances. Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn. The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[22] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors. Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[23] Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction. Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[24] Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations. Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire Cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[25] Accordingly, the Debtors believe that such behavior warrants the equitable subordination of the Alameda Loan Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper. If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

**P.        Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases."

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation").

---

[22]   *See* Alameda Loan Agreement, Section 4.7.

[23]   *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[24]   *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[25]   *See, e.g.*, @SBF, Twitter (July 24, 2022, 8:32 P.M. ET),
       https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below. As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**Q.     What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

> IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL **NOT** BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.

**S.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.     When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at [●] [a/p].m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**V.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.     What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

**V.    THE DEBTORS' PLAN**

**A.    The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

**1.    *General Settlement of Claims and Interests***

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan.  The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors.  The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies.  Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham & Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)        **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

(b)       **Release by Holders of Claims or Interests.**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

(c)       **Exculpation.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

    (d)  **Injunction.**

**The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

**In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.**

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

### 4. *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and USDC. Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices. As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins. In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate. Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is necessary to satisfy their obligations under the Plan. Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades. At this time, the Debtors do not intend to use any derivatives or other hedging transactions. The Debtors anticipate that executing such transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional

trading accounts.  The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf.  Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party.  The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders.  In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor.  This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors.  Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made.  In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5.  *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement.  The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6.  *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement.  Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement.  The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and

reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7.    Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; *provided that*: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of:  (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy").  The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8.    Corporate Structure Upon Emergence

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets.  The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust.  Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets.  For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.

Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (e.g., income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

B.    **The Plan Toggle.**

1.    ***The Sale Transaction***

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan. If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan. The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims

and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

### (a)    Binance.US's financial wherewithal.

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet. Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

**(b)**        **Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all Cryptocurrency will remain with the Debtors up until the Effective Date.  After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (i.e., satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt.  Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including:  (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

**(c)**        **Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan).  Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations.  Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions:  Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.0000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmitter License, MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[26]

---

[26]    A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050532193-Licenses.  Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

        **(d)**       **The Binance.US Customer Onboarding Process.**

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors.  In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process.  Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis.  To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan.  See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

        **(e)**       **VGX considerations under the Sale Transaction.**

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform.  Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform.  Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel.  Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

        **(f)**       **Data Transfer and Privacy Considerations under the Sale Transaction.**

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[27] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs.  Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy.  As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

        **(g)**       **Unsupported Jurisdictions under the Sale Transaction.**

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions).  The Unsupported Jurisdictions are Hawaii, New

---

[27]   *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

York, Texas, and Vermont. Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan. Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted. For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions. As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

### 2. *The Liquidation Transaction*

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### C. Means for Implementation of the Plan.

### 1. *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust

Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue. To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2.   *Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation*

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3.   *Tax Returns*

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or

its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

#### 4. *Dissolution of the Wind-Down Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

#### 5. *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

#### 6. *Distributions of Net Owed Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7. *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined.  After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them.  Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.  For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held.  Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[28]  A simplified version of the Debtors' current corporate structure is as follows:

---

[28]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.



**Voyager Corporate Structure**

**B.        The Debtors' Assets and Operations.**

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs.  All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

**1.        The Trading Platform**

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other.  Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade.  The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies.  The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution.  Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

41

2.        *Custodial Services*

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

***PIK Rewards***. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("<u>PIK Rewards</u>") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

***Voyager Loyalty Program and VGX Token***. Voyager token ("<u>VGX</u>" or "<u>Voyager Token</u>") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "<u>Voyager Loyalty Program</u>"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

3.        *Staking*

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

4.        *Voyager's Lending Program*[29]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

5.        *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

6.        *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "<u>Voyager App</u>"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "<u>Bedrock</u>"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("<u>Chainalysis</u>"), a third-party vendor, to conduct blockchain review of crypto assets

---

[29]    The Lending Program is described in further detail in the First Day Declaration.

transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### 7. *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[30] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions

---

[30] The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

worldwide to provide the security services needed to protect client assets and data.  Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example).  Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure.  For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

### C.    The Debtors' Capital Structure.

#### 1.    *The Debtors' Debt Obligations*

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[31]  However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions.  The aggregate value of the USDC outstanding is $75 million.[32]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date.  Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

#### 2.    *The Debtors' Intercompany Obligations*

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations").  The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables").  Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors.  Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.  Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables.  The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced.  This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital

---

[31]    Assuming a Bitcoin price of $20,000.

[32]    As a stablecoin, USDC is pegged to $1 per coin.

contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

        **(a)**        **Intercompany Obligations by OpCo to TopCo.**

        i.        ***The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021***

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

        ii.        ***The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021***

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was

providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.    ***The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.    ***The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

(b)    **Intercompany Obligation by OpCo to HoldCo.**

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement. Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment. Alameda disputes the treatment of this Intercompany Obligation.

(c)    **Intercompany Obligation by HoldCo to TopCo.**

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note"). The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo. To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo. In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCo to make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

### (d)    Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities. The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

### 1.    *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

## 2.    *Cryptocurrency Industry-Wide Sell-off*

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a)    **The Terra Luna Collapse.**

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth

of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

### (b)    The Making and Recalling of the Three Arrows Capital Loan.

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[33] Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

> [P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[34]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[35] Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program. At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[36] These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[33]   December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=03338405&docId=5 134463.

[34]   August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[35]   *Id.* at 6.

[36]   *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[37] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad

---

[37] *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[38] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12. On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses. In light of this, Voyager did not believe it needed to recall the loans to 3AC.

---

[38]   While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion. At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[39] Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC. On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius. The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[40] Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap." Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees. Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement. Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions. 3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.      *The Special Committee Investigation*

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[41]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties

---

[39]  *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[40]  Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

[41]  *See* Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any

(the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material.  Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties.  The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things:  Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business.  Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges).  Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others.  In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel).  Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG.  At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient.  BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation.  Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above.  In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee.  In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards.  The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories.  These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

ii.    ***Investigation Report, Conclusions, and Proposed Settlements***

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

---

other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[42] related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[43]

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
| **Releases and Waivers by the Officers against the Debtors** | CEO and CCO agree to release all Causes of Action they may have against the Estates. |
| | CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full. |
| | CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification. |
| | CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |

---

[42]   Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[43]   The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| Commitment to Cooperate | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |
|---|---|

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

### B.    The Alameda Loan.

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[44] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under

---

[44]    *See* Section 2.6 of the Alameda Loan Agreement.

the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

### C.    Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry.  Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures:  (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below.  Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry.  By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents.  In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.  Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis.  Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction.  However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D.    Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors:  (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E.    Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[45]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business.  However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers.  Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement").  The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan.  The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)    **The Joint Administration Order** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)    **The Foreign Representative Order** authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)    **The Credit Matrix Order** authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

---

[45]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

(iv)   **The Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)    **The Schedules and Statements Order** authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi)   **Order Retaining Stretto as Noticing Agent** authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)  **The Wages Order** authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii) **The Taxes Order** authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)   **The Interim Cash Management Orders** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[46]

(x)    **The NOL Order** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)   **The Insurance Order** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)  **The Case Management Order** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)    **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)   **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)  **Applications to Retain Professionals** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

   i.   **Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];**

   ii.  **Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299];**

---

[46] On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84].  On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

iii.     *Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297]*;

iv.     *Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]*;

v.     *Stretto, Inc. as administrative advisor [Docket No. 241]*;

vi.     *Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732]*;

vii.     *ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740]*; **and**

viii.     *Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798]*.

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.     Appointment of Unsecured Creditors' Committee.**

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[47] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[48]

**D.     Schedules and Statements.**

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

**E.     Bar Date Motion.**

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and

---

[47]     *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

[48]     *See* Docket Nos. 403 and 404.

entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date"). The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time. On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

### F.    The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion"). The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts. To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts. On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan. Customers have until February 4, 2023 to withdraw**

**their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

G.    **The 3AC Liquidation Proceeding.**

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[49] On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15 Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[50]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the five creditors appointed to the committee.[51] On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[52] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[53] and the Ontario Superior Court of Justice.[54] Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[55] At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[56] Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[57] On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[58]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). At this time, the amount of any 3AC Recovery is unknown. As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

H.    **Litigation Matters.**

---

[49]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[50]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[51]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[52]    *See* Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[53]    *See In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[54]    *See* Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[55]    *See Id.*

[56]    *See Id.*

[57]    *See* Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[58]    *See* Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

1.        *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes.  Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

2.        *Certain Adversary Proceedings*

(a)        *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[59]  The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.  To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing.  On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[60]  On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[61]

(b)        *Voyager Digital Holdings, Inc. v. Robertson, et al.*

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*.  The named plaintiff was a Voyager customer.  His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46).  *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date.  The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case.  Those motions were pending on the Petition Date.  Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action").  The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the

---

[59]    *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[60]    *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[61]    *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws. The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform." Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[62] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

### (c)    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[63] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

### (d)    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[64] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

---

[62]    *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[63]    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[64]    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

## I.    The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

## J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

## K.    Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.

C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

## L.    The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

## M.    The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

## N.    The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the

Bidding Procedures.  The Auction spanned two weeks and featured multiple rounds of bids.  The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment.  Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan.  The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders.  On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid.  The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[65] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[66]  On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[67] with the modified "no-shop" provision.  On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[68] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks.  Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[69]  Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement.  S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[70]

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time.  Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[71]

---

[65]  *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[66]  *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[67]  Docket No. 581.

[68]  Docket Nos. 590 and 591.

[69]  *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[70]  *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

[71]  *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-*

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[72] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[73] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[74]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

---

*Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[72] Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[73] Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[74] Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

O.    **The Special Committee Investigation.**

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special

Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

### 1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

### 2. *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a) Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b) The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### (c) Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d) The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or

whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

#### (e)        Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

#### (f)        Continued Risk After Consummation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

#### (g)        Filing of a Competing Plan.

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

#### (h)        The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(i)       **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(j)       **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

(k)       **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)       **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.       *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.       *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.       **Risks Related to Recoveries under the Plan.**

1.       *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition,

the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

### 2.    *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

### 3.    *The Plan May Diminish the Value of VGX*

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform. Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform. The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

### 4.    *The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex*

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

### 5.    *The Closing Conditions of the Sale Transaction May Not Be Satisfied*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

### C.    Disclosure Statement Disclaimer.

### 1.    *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

### 2.    *No Legal or Tax Advice Is Provided By This Disclosure Statement*

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

### 3.    *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.    *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 5.    *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.    *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7.    *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

### D.    Miscellaneous Risk Factors and Disclaimers.

### 1.    *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[75] and has license applications pending[76] in eighteen (18) states.[77]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it

---

[75] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[76] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[77] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[78]

>    **2.    The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations**

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager. Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

---

[78]    The state approval process for the surrender of a license typically takes several months.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[79] on March 29, 2022, which required a response within twenty-eight (28) days. Alabama extended the response deadline to January 5, 2023. On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[80] on March 29, 2022. Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[81] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[82] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[83] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

---

[79] Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

[80] Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[81] Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[82] New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[83] Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[84] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[85] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[86] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[87]

California issued a desist and refrain order[88] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to

---

[84] South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

[85] Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[86] The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[87] Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[88] California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers.  No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[89] on July 26, 2022.  On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

Alaska issued a cease and desist order[90] and notice of opportunity to request a hearing, on September 3, 2022. Per the notice, Voyager has thirty (30) days to request a hearing.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

### 3.    *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

### 4.    *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition*

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

### 5.    *Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions*

Certain state regulators in the Unsupported Jurisdictions (*i.e.*, New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code.  The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to

---

[89]    Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

[90]    Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from:  offering or selling such accounts in Alaska; and from accepting any assets into existing accounts.  Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling.  For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so.  If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

## X.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.   Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.   Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.   Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

**E.      Solicitation Procedures.**

**1.      *Claims, Noticing, and Solicitation Agent***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.      *Solicitation Package***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3.    *Distribution of the Solicitation Package and Plan Supplement*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement. No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

### F.    **Voting Procedures.**

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.    **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report").  The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

<div style="border:1px solid black;">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

</div>

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

## B.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

## C. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## D. Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

E.    **Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan. Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

1.    *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)    **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)    **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed

amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review). Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class, and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

**C.**  **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[91] of Allowed Claims Entitled to Vote.**

**1.**  ***Sale Transaction or Liquidation Transaction***

**(a)**  **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).**

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Distributable

---

[91]  Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders

are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[92] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

---

[92]  The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders.  However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar.  The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan.  The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before.  There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts).  There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code.  In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under section 166 when a debt has become entirely worthless.  As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims.  Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan.  However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

        **(b)**        **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4A Claims.**

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:  (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:  (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

      (c)      **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

      (d)      **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

      (e)      **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used

in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 2.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency.  In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

### 3.    The Wind-Down Entity

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

### (a)    Liquidating Trust Treatment.

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code.  It may be that such treatment does not apply given the structure of the Plan.  If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

### (b)    Disputed Ownership Fund treatment.

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

    **4.**     ***U.S. Information Reporting and Withholding***

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

\* \* \* \* \*

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

<div style="margin-left:50%">

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:    _/s/ Stephen Ehrlich_

Name:    Stephen Ehrlich
Title:    Co-Founder and Chief Executive Officer
Voyager Digital Ltd.

</div>

Prepared By:

Dated:  January 10, 2023          /s/ Joshua A. Sussberg
New York, New York               **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 Joshua A. Sussberg, P.C.
                                 Christopher Marcus, P.C.
                                 Christine A. Okike, P.C.
                                 Allyson B. Smith (admitted *pro hac vice*)
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:  (212) 446-4800
                                 Facsimile:  (212) 446-4900

                                 *Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 852]

**Exhibit B**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC.,** *et al.*[1]

## I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates. As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under either the Plan or Plan Toggle scenarios would receive less than a full recovery in a hypothetical liquidation. Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under either the Plan or Plan Toggle scenario. Further, no Holder of a Claim or Interest would receive or retain property under the Plan or Plan Toggle scenario of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that both the Plan and Plan Toggle scenarios satisfy the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

### Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. This Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS.  WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

### Basis of Presentation

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about April 18, 2023 (the "Conversion Date").  Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of October 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date.  As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan or Plan Toggle scenario.

### Conversion Date and Appointment of a Chapter 7 Trustee

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. <u>Unaudited Financial Statements</u>. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. <u>Chapter 7 Liquidation Costs</u>. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. <u>Distribution of Net Proceeds</u>. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

   Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. <u>Certain Exclusions and Assumptions</u>. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

## II.    CONCLUSIONS

> THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Estimated Percentage Recovery Under the Plan Toggle | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | 100% | 100% | 100% | 100% |
| Unclassified | Priority Tax Claims | Unimpaired | 100% | 100% | 47% | 48% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | 100% | 100% | 99% | 99% |
| 3 | Account Holder Claims | Impaired | 51% | 45% | 35% | 39% |
| 4A | OpCo General Unsecured Claims | Impaired | 51% | 45% | 35% | 39% |
| 4B | HoldCo General Unsecured Claims | Impaired | 6% | 6% | 0% | 0% |
| 4C | TopCo General Unsecured Claims | Impaired | 64% | 64% | 65% | 65% |
| 5 | Alameda Loan Facility Claims | Impaired | 0% | 0% | 0% | 0% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA | NA |
| 7 | Intercompany Claims[1] | Unimpaired | 0% | 0% | 0% | 0% |

| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | NA | N/A | N/A |

*1) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.*

## III.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### A.    Gross Liquidation Proceeds

1. <u>Cash and Cash Equivalents</u>:  This Liquidation Analysis projects the level of cash balances on hand from December 30, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2. <u>Cryptocurrency Assets Held</u>:  Estimated cryptocurrency values at Conversion Date are based on spot prices as of December 18, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for the impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players. This discount also reflects the impact of transaction fees.

3. <u>Other Assets / Investments (Non-Debtor)</u>: The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4. <u>Claims against 3AC Estate:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of October 31, 2022. This Liquidation Analysis makes no assumption regarding recovery on account of this claim and is reflected as a 0% recovery for purposes of this Liquidation Analysis.

5. <u>Intangible Assets</u>:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "Debtors' IP"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6. <u>Litigation Claims:</u> Litigation claim recoveries are assumed to be the same under both the Plan, Plan Toggle and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

### B.    Liquidation Costs

7. <u>Chapter 7 Professional Fees</u>:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $18.2 million for the liquidation period, based on an estimate of approximately $0.1 million to $3.0 million per month with approximately 77% of the fees incurred in the first 6 months.

8. <u>Chapter 7 Trustee Fees</u>:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

9.  Chapter 7 Estate Wind-Down Costs:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs. For the entirety of the wind-down process, these costs have been estimated to be $ 16.9 million.

10. 3AC Litigation Pursuit: The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. Other Fees: During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others.  For the entirety of the chapter 7 process, these costs have been estimated to be approximately $8.4 million.

### C.    Claims

12. Secured Tax Claims:  Based on the December 6, 2022 claims register, no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. Administrative, Priority Tax Claims and Other Priority Claims:

- Administrative Claims:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $ 39.1 million on the Conversion Date.

- Priority Tax Claims: Based on the December 6, 2022 claims register, federal and state tax claims are estimated to be $3.0M.

- Other Priority Claims:  Total Other Priority Claims are estimated to be $1.0.

14. Account Holder Claims:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. Alameda Loan Facility Claims:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. General Unsecured Claims:  Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date.

- General Unsecured Claims at OpCo are estimated to be $14.0 million.

- General Unsecured Claims at HoldCo are estimated to be $8.3 million.

- General Unsecured Claims at TopCo are estimated to be $3.0 million.

## IV.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan and Plan Toggle scenarios.

.

| | Claims | Binance | | Toggle | | High Case | | Low Case | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Voyager Digital Consolidated [1,2] | All Scenarios | Plan | Recovery | Plan | Recovery | Liquidation | Recovery | Liquidation | Recovery |
| | 4/18/2023 | 4/18/2023 | | 6/18/2023 | | 4/18/2023 | | 4/18/2023 | |
| **TOTAL ESTIMATED PROCEEDS (NET)** [3, 4, 5, 6] | | 943.9 | | 849.8 | | 734.4 | | 669.6 | |
| Administrative Claims[7] | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.4 | 48% | 1.4 | 47% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims[8] | 1,763.8 | 891.4 | 51% | 797.9 | 45% | 685.5 | 39% | 621.2 | 35% |
| OpCo General Unsecured Claims [9] | 14.0 | 7.1 | 51% | 6.3 | 45% | 5.4 | 39% | 4.9 | 35% |
| HoldCo General Unsecured Claims [9] | 8.3 | 0.5 | 6% | 0.5 | 6% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 3.0 | 1.9 | 64% | 1.9 | 64% | 2.0 | 65% | 2.0 | 65% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | 1,907.3 | 943.9 | 49% | 849.8 | 45% | 734.4 | 39% | 669.6 | 35% |

Footnotes to Analysis
(1) Assumes Binance sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at April 18, 2023.
(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.
(3) Total Estimated Proceeds (Net): primarily includes (x) (i) Binance Transaction Proceeds including Expense Reimbursements (Binance/Toggle only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iv) proceeds from other assets of the estate; and (y) net estimated wind down costs.
(4) Estimated value of cryptocurrency portfolio under all scenarios is based on spot prices as of December 18, 2022.
(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players, as well as transaction fees.
(6) Analysis assumes that the Company is able to retain the necessary employees with experience and expertise required to execute a rebalance and distribution. To the extent the company is unable to retain the personnel necessary to perform these actions, recoveries would likely be significantly negatively impacted.
(7) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of April 18, 2023. OpEx and professional fees related to the extension of time in the Toggle scenario are assumed to be effectively on a cash basis and assumed to have no impact on administrative claims for illustrative purposes.
(8) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (July 5, 2022).
(9) OpCo, HoldCo, and TopCo GUCs estimated based off of December 6, 2022 Claims registry and are subject to further reconciliation and objections.
(10) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

**<u>Exhibit C</u>**

**Frequently Asked Questions & Answers**

**Exhibit C**

**FREQUENTLY ASKED QUESTIONS & ANSWERS**

**About the Plan**

1.  **How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX or USDC or in any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a greater opportunity to recover on their claim than another Account Holder). (See Question 6 below.)

| Coin | Customer Claim | | |
| --- | --- | --- | --- |
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| **Total** | | | **$724.81** |

In accordance with the U.S. Bankruptcy Code and applicable bankruptcy law, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and Holders of OpCo General Unsecured Claims receive 100% of their claims against OpCo, no consideration is allowed to be distributed to creditors holding interests and/or lower priority claims against OpCo in accordance with the absolute priority rule.

2.  **How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)    the upfront cash payment of $20.0 million,

(ii)   all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve),

1

(iii)     any expense reimbursement received from BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") pursuant to the Binance.US asset purchase agreement for reasonable expenses incurred by Voyager Digital between March 18, 2023 and Closing, subject to a $15mm cap, and

(iv)     the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Account Holder Claims and OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was transferred to Binance.US at prices as of approximately UTC 20:30 on December 18, 2022, the estimated Initial Distribution would be equal to 51% of the total dollarized claims of all Account Holders and Holders of Opco General Unsecured Claims.

Account Holders located in Supported Jurisdictions who are current Binance.US users or who are able to satisfy onboarding requirements at Binance.US within three months of Closing will receive their share of the Initial Distribution on an in-kind basis within four weeks following the later of the Closing or the completion of the transfer of user data to Binance.US.  All Account Holders in Supported Jurisdictions who do not complete such onboarding requirements within three months following the later of the Closing or the completion of the transfer of user data to Binance.US will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices which will be distributed to such Account Holders by OpCo.

For any Account Holders located in jurisdictions where Binance.US does not have required regulatory approvals as of the Closing ("Unsupported Jurisdictions" which as of the date hereof are Hawaii, New York, Texas, and Vermont), Binance. US will have until six (6) months following the Closing to obtain approvals to make distributions to Account Holders in such jurisdictions on a provisional basis. If Binance.US is unable to make distributions to Account Holders in an Unsupported Jurisdiction at the conclusion of the six (6) month period, the Account Holders in such Unsupported Jurisdiction will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices, which will be distributed to such Account Holders by OpCo.

Under the Plan, the cryptocurrency shall be subject to a rebalancing exercise, which shall occur no more than one business day prior to the Closing Date. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

After the completion of the rebalancing exercise, to the extent the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**3.   When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be dependent upon the form in which received (token or U.S. Dollars) and the transition status of each respective Account Holder.  For users onboarded onto the Binance.US platform, any distributions will be done through such platform.

**4.    Why do the implied recoveries move up or down based on cryptocurrency prices? Don't Account Holders just receive a fixed percentage?**

As previously discussed (see Question 1 above), claims are fixed based on an Account Holder's tokens and cryptocurrency prices as of the Petition Date. Since the Petition Date, the Debtor has been "long" the entire cryptocurrency portfolio. This exposes implied dollar value recoveries to movements in cryptocurrency prices between the Petition Date and the rebalancing date, given the distribution values are also based on volume-weighted dollar prices of cryptocurrency as of two days prior to the rebalancing date.

As such, an individual Account Holder's implied recoveries are impacted by (i) ***gross*** movements in U.S. Dollar-denominated cryptocurrency prices relative to the Petition Date, and (ii) ***relative*** movements in cryptocurrency prices (e.g., BTC vs. ETH).

Voyager has a relatively high percentage of altcoins, which have underperformed in the market relative to BTC / ETH and stablecoins. These cryptocurrency movements are the primary driver of any changes to an Account Holder's recovery value, as evidenced by the charts below.



**5.    The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

___No___, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

---

[1]    Implied Binance.US recovery values leave all assumptions (including Binance.US consideration, wind-down costs, other benefits (expense reimbursement and non-buyer proceeds) and other expenses (rebalancing leakage, wind-down funding leakage and VGX impact)) constant except for the difference in cryptocurrency prices on the specified dates / date ranges.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the value of such cryptocurrencies at the time of the rebalancing exercise will be a key factor in determining the size of the Initial Distribution.

***Under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the Binance.US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value.***

***Under a wind-down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. Dollars which may result in adverse tax impacts for Account Holders.***

For example, under the Binance.US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo implied an Initial Distribution of 51%, such Account Holder would receive an Initial Distribution with value equal to $510. Such value may be in a mix of in-kind cryptocurrencies or U.S. Dollars depending on whether such Account Holder transitioned to Binance.US in a timely manner.

Such Account Holder would then have a deficiency claim of $490 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 16)

| $ actual | Illustrative July 5, 2022 Claim Value | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
| **Initial Distribution Value @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 45.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 47.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 49.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 51.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 53.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 55.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 57.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 59.0% | $5.9 | $59.0 | $590.0 | $5,900.0 | $59,000.0 | $590,000.0 | $5,900,000.0 |
| **Implied Deficiency Claim @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 45.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 47.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 49.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 51.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 53.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 55.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 57.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 59.0% | $4.1 | $41.0 | $410.0 | $4,100.0 | $41,000.0 | $410,000.0 | $4,100,000.0 |

**6.  Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

_No_, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 51% of their claim).

**7.  Will VGX be supported? How is the value of my VGX being treated?**

Account Holders that held VGX will be receiving their pro rata share of their VGX claim similar to all other cryptocurrency claims. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, Binance.US has agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform.  In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX in custody at Binance.US or transfer their VGX tokens off the Binance.US platform.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. Dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. Dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 51% of claim value, an Account Holder would receive an Initial Distribution in VGX based on (x) their VGX claim value multiplied by (y) the Initial Distribution percentage.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 51% of claim value, the Account Holder would receive an Initial Distribution equal to $121.47.

| | [A] | [B] | [A] x [B] = [C] | Implied Claim @ VGX Token Holdings [B] x Token Holdings | | | | Illustrative Initial Distribution @ VGX Token Holdings [C] x Token Holdings | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Illustrative Initial Distribution %** | **7/5 VGX Token Price** | **Implied VGX Recovery Price / Token** | **100** | **1,000** | **10,000** | **100,000** | **100** | **1,000** | **10,000** | **100,000** |
| 1.) | 43.0% | $0.2382 | $0.1024 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.24 | $102.42 | $1,024.22 | $10,242.29 |
| 2.) | 45.0% | $0.2382 | $0.1072 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.71 | $107.18 | $1,071.86 | $10,718.67 |
| 3.) | 47.0% | $0.2382 | $0.1120 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.19 | $111.95 | $1,119.50 | $11,195.06 |
| 4.) | 49.0% | $0.2382 | $0.1167 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.67 | $116.71 | $1,167.14 | $11,671.44 |
| 5.) | 51.0% | $0.2382 | $0.1215 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.14 | $121.47 | $1,214.78 | $12,147.83 |
| 6.) | 53.0% | $0.2382 | $0.1262 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.62 | $126.24 | $1,262.42 | $12,624.21 |
| 7.) | 55.0% | $0.2382 | $0.1310 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.10 | $131.00 | $1,310.06 | $13,100.60 |
| 8.) | 57.0% | $0.2382 | $0.1358 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.57 | $135.76 | $1,357.69 | $13,576.99 |
| 9.) | 59.0% | $0.2382 | $0.1405 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $14.05 | $140.53 | $1,405.33 | $14,053.37 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $116.72 ($238.19 claim value less $121.47 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC and (ii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

**8.   What will happen to the VGX token going forward under the Plan?**

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX.  If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to custody of the VGX token on the Binance.US platform.  In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**9.   Do I still have access to my tokens on Binance.US if they are not supported for trading?**

**_Yes_**, upon successfully migrating to Binance.US each Account Holder will have access to the entirety of their pro rata share of the Initial Distribution (which will be made in-kind as described above). At this time, Binance.US supports trading for 82 tokens that were available on the Voyager platform. These 82 tokens represent approximately 93.2% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. Regardless of whether a token is supported or not supported for trading, Account Holders will have the ability to withdrawal and transfer their cryptocurrencies to a third-party wallet upon their receipt of a distribution should they so choose post-closing.

Binance.US has also indicated to the Debtors that other tokens currently unsupported for trading are likely to become supported by the time of Closing. For tokens that are not currently supported for trading on the Binance.US platform, Account Holders will have the ability to hold those tokens on the Binance.US platform or transfer off the platform into a third-party wallet.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion will be made in XRP. The Account Holder would be able to immediately trade the BTC and ETH received; however, the Account Holder would not be able to trade XRP on the Binance.US platform as XRP is currently unsupported for trading purposes. To the extent such Account Holder wishes to sell their XRP for U.S. Dollars, the Account Holder will be able to transfer their XRP to a third-party wallet that supports trading in XRP.

***Voyager Tokens Currently Supported for Trading on Binance.US Platform***

| AAVE | ADA | ALGO | ALICE |
|------|------|------|-------|
| ANKR | APE | ATOM | AUDIO |
| AVAX | AXS | BAND | BAT |
| BCH | BICO | BNT | BTC |
| CELO | CHZ | COMP | CRV |
| DAI | DASH | DGB | DOGE |
| DOT | EGLD | ENJ | ENS |
| EOS | ETC | ETH | FET |
| FIL | FLOW | FTM | GALA |
| GLM | GRT | HBAR | ICP |
| ICX | JASMY | KAVA | KNC |
| KSM | LINK | LPT | LRC |
| LTC | MANA | MATIC | MKR |
| NEO | OCEAN | OMG | ONT |
| OP | OXT | QNT | QTUM |
| REN | ROSE | SAND | SHIB |
| SKL | SOL | SPELL | SUSHI |
| TRX | TUSD | UNI | USDC |
| USDT | VET | WAVES | WBTC |
| XLM | XTZ | YFI | ZEC |
| ZEN | ZRX | | |

**10.  If a token in my Voyager account was listed as being unsupported for trading at Binance.US, can I select a different supported token to receive my distribution?**

<u>No</u>, the in-kind distribution will be made in the same token(s) currently in each Account Holder's Voyager account. In order to provide Account Holders with their pro rata share of the original tokens in their account and limit any potential adverse tax implications related to liquidating or converting tokens, Binance.US has agreed to provide in-kind distributions for Account Holders on all tokens, including tokens currently unsupported for trading. However, if the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**11.  If my account only had BTC, will all of my distributions be made in BTC?**

<u>Maybe</u>, the Initial Distribution will be made in-kind for all tokens for Account Holders who successfully transition to the Binance.US. platform. Any future recoveries received in token form may be distributed in-kind to successfully

transitioned Account Holders through the Binance.US platform. If any future recoveries are received in U.S. Dollars or an Account Holder has not successfully transitioned to the Binance.US platform, such distributions will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

**12.  Why can't I receive my recovery under the Plan from the Voyager platform?**

Binance.US offers users the ability to withdraw an additional 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform.  Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate.  Accordingly, the only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash.  The Binance.US platform allows users to freely transfer such tokens to their individual wallets.

Further, the Debtors would not only need to significantly increase their engineering, regulatory, compliance and other operational staff and resources, but would also require additional money transmitter licenses, authorizations, or exemptions which they currently lack.  The aforementioned additional staff and resources would also be necessary to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

Finally, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.  The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests.  However, Chainalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens).  While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors.  Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform.  Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

**13.  Are my recoveries capped at the value I receive in the Initial Distribution?**

*No*, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) value associated with the sale of any other OpCo assets, and (iii) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**14.  How will the amount of my distribution of cryptocurrency be determined?**

Under the Plan, the rebalancing exercise, and as a result each creditor's distribution of cryptocurrency, will be determined based on fair market value of such cryptocurrency as of two business days prior to the completion of the rebalancing exercise. As such, actual Initial Distributions will be dependent on the future price performance of OpCo's

cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 51% based on actual cryptocurrency prices during such reference period.

Prior to Closing, OpCo will undergo a rebalancing exercise such that the aggregate value (in U.S. Dollars) for each token to held by OpCo as a percentage of the aggregate value (in U.S. Dollars) of such token that was on deposit with Voyager as of July 5th, 2022 is consistent across OpCo's entire token portfolio, subject to a 5% variance allowance. To the extent a rebalancing delta exists for any specific token, Account Holders may receive a portion of their initial distribution in USDC or U.S. Dollars based on any implied shortfall between the value of the cryptocurrency deposited into their account relative to the dollar value of their Initial Distribution. In order to aid in the facilitation of the rebalancing exercise, OpCo has agreed to execute such exercise on the Binance.US Platform unless they can obtain a better price from another third party..

**15. Is the $20 million of cash Binance.US is paying to the estate above and beyond the value that Binance.US will distribute for the cryptocurrency on the Voyager platform? Do I get a portion of that $20 million?**

_Yes_, the $20 million of upfront consideration is _in addition to_ the fair market value of the cryptocurrency Binance.US is distributing under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16. Who is eligible to join Binance.US under the Plan in order to receive an in-kind Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims in Supported Jurisdictions are eligible to join Binance.US.

Only Account Holders in Supported Jurisdictions who timely transfer their Accounts to Binance.US within three months after the later of the Closing or the completion of the transfer of user data to Binance.US will receive their share of the Initial Distribution on an in-kind basis (as further detailed in Question 2 above). Account Holders who are located in Unsupported Jurisdictions six (6) months following the Closing, in addition to Account Holders in Supported Jurisdictions who do not successfully transition to Binance.US within the timeframe specified above, will receive their share of the Initial Distribution in the form of U.S. Dollars.

Holders of OpCo General Unsecured Claims in Supported Jurisdictions will receive their Initial Distribution in cash on the Binance.US platform if they successfully open an account on the Binance.US platform within three months of the Closing.  Otherwise such Holders of OpCo General Unsecured Claims will receive their Initial Distribution in cash from OpCo.

Future distributions will be dependent upon several factors including form of consideration recovered (as further detailed in Question 10 above).

**17. What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18. What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

All cryptocurrency tokens regardless of whether supported for trading on the Binance.US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through Binance.US. As such, Account Holders in Supported Jurisdictions are required to sign up for a Binance.US account to the extent they wish to receive

an in-kind distribution. The number of in-kind cryptocurrency tokens received will depend on (i) the Initial Distribution and (ii) the volume weighted average price of such cryptocurrency on the reference date.

For any specific cryptocurrency, an Account Holder in a Supported Jurisdiction can determine the number of tokens that it will receive at Binance.US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Initial\ Distribution\ Percentage}{2\ day\ volume\ weighted\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. To the extent the Account Holder signs up for a Binance.US account, the Initial Distribution is 51%, and the volume weighted average reference price of BTC is $16,816.20, such Account Holder would receive an Initial Distribution consisting of (a) 0.6113 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 51% Initial Distribution divided by (ii) $16,816.20 volume weighted average reference price).

**19. Who is responsible for calculating the Initial Distribution and subsequent distributions?**

As is required by the Plan, the Debtors will calculate the number of tokens and the amount of cash that is distributable to each Account Holder and each Holder of an OpCo General Unsecured Claim. To the extent distributions are to be made through the Binance.US platform, Binance.US will rely on these calculations.

**20. What is the administrative claim asserted by Alameda, and how does this impact my recovery?**

On January 4, 2023, Alameda Research Ltd. filed an objection to the Conditional Disclosure Statement Motion, claiming that they have a $445mm administrative expense claim against the Debtors, due to the loan payment that was made to the Debtors within the 90-day period prior to Alameda filing for bankruptcy protection. The Debtors dispute this claim and do not view it as valid. However, if Alameda were to prevail on its asserted administrative claim, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be materially impacted, potentially reducing illustrative recoveries to approximately 26% from 51%.

**Exhibit D**

**Asset Purchase Agreement**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 835]

**<u>Exhibit B</u>**

**Redline**

> **THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.**
>
> **THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JANUARY 10, 2023, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

<div align="center">

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**

**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

</div>

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

---

[1]    The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

**Page**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** .......... **1**

**I.    INTRODUCTION** ............................................................................................. **7**

**II.    PRELIMINARY STATEMENT** ........................................................................ **7**

    A.    The Sale Transaction. ............................................................................. 7
    B.    The FTX Collapse. ................................................................................... 9

**III.    BACKGROUND** ............................................................................................ **10**

**IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ...................................................................... **12**

    A.    What is chapter 11? ................................................................................. 12
    B.    Why are the Debtors sending me this Disclosure Statement? .............. 12
    C.    Am I entitled to vote on the Plan? .......................................................... 12
    D.    What will I receive from the Debtors if the Plan is consummated? ........ 13
    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim? ............. 19
    F.    What is the "toggle" feature of the Plan? ............................................... ~~19~~20
    G.    How will my Account be transitioned to Binance.US? .......................... 20
    H.    What if I am unable or unwilling to transition my Account to Binance.US? ............. 20
    I.    What are the sources of Consideration and other consideration required to fund the Plan? ....... 20
    J.    Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan? ...... 20~~1~~
    K.    How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated? ...... 21~~2~~
    L.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...... 21~~2~~
    M.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ...... 21~~2~~
    N.    Is there potential litigation related to the Plan? .................................... 22
    O.    Does the Plan provide for the subordination of any Claims? ................. 22
    P.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ...... 23
    Q.    What is the deadline to vote on the Plan? .............................................. 24
    R.    How do I vote for or against the Plan? .................................................. 24~~5~~
    S.    Why is the Bankruptcy Court holding a Confirmation Hearing? ........... 24~~5~~
    T.    When is the Confirmation Hearing set to occur? ................................... 24~~5~~
    U.    What is the purpose of the Confirmation Hearing? ............................... 25
    V.    What is the effect of the Plan on the Debtors' ongoing business? ......... 25
    W.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ...... 25
    X.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...... 25~~6~~

**V.    THE DEBTORS' PLAN** .................................................................................. **25~~6~~**

    A.    The Plan. ................................................................................................. 25~~6~~
    B.    The Plan Toggle. ..................................................................................... 33
    C.    Means for Implementation of the Plan. .................................................. 37

**VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** ...... **39~~40~~**

    A.    The Debtors' Corporate Structure and History. ..................................... 39~~40~~
    B.    The Debtors' Assets and Operations. ..................................................... 40~~1~~
    C.    The Debtors' Capital Structure. .............................................................. 43~~4~~

**VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES** .................................................. **467**

    A.    Market and Industry-Specific Challenges. ......................................................... 467
    B.    The Alameda Loan. ............................................................................................ 545
    C.    Retention of Restructuring Advisors and Initial Third-Party Outreach. ............ 556
    D.    Governance Initiatives. ...................................................................................... 556
    E.    Voyager's Decision to Commence these Chapter 11 Cases. .............................. 556

**VIII.    EVENTS OF THE CHAPTER 11 CASES** ....................................................................... **567**

    A.    The Stand-Alone Plan. ....................................................................................... 567
    B.    First and Second Day Relief and Other Case Matters. ...................................... 567
    C.    Appointment of Unsecured Creditors' Committee. ........................................... 589
    D.    Schedules and Statements. ................................................................................. 589
    E.    Bar Date Motion. ............................................................................................... 589
    F.    The FBO Motion. ............................................................................................... 5960
    G.    The 3AC Liquidation Proceeding. ..................................................................... 601
    H.    Litigation Matters. ............................................................................................. 601
    I.    The Coinify Sale. ............................................................................................... 634
    J.    The Key Employee Retention Plan. ................................................................... 634
    K.    Canadian Recognition Proceeding. .................................................................... 634
    L.    The Unwind Motion. .......................................................................................... 645
    M.    The Request for Appointment of an Equity Committee. .................................... 645
    N.    The Post-Petition Sale Process and the Collapse of FTX. ................................. 645
    O.    The Special Committee Investigation. ............................................................... 678

**IX.    RISK FACTORS** .............................................................................................................. **689**

    A.    Risks Related to the Restructuring. .................................................................... 689
    B.    Risks Related to Recoveries under the Plan. ..................................................... 712
    C.    Disclosure Statement Disclaimer. ...................................................................... 723
    D.    Miscellaneous Risk Factors and Disclaimers. ................................................... 734

**X.    SOLICITATION AND VOTING PROCEDURES** ............................................................ **7980**

    A.    Classes Entitled to Vote on the Plan. ................................................................. 7980
    B.    Votes Required for Acceptance by a Class. ....................................................... 7980
    C.    Certain Factors to Be Considered Prior to Voting. ............................................ 7980
    D.    Classes Not Entitled To Vote on the Plan. ......................................................... 801
    E.    Solicitation Procedures. ..................................................................................... 801
    F.    Voting Procedures. ............................................................................................. 812
    G.    Voting Tabulation. ............................................................................................. 823
    H.    Ballots Not Counted. .......................................................................................... 834

**XI.    CONFIRMATION OF THE PLAN** .................................................................................. **834**

    A.    Requirements of Section 1129(a) of the Bankruptcy Code. ............................... 834
    B.    Best Interests of Creditors—Liquidation Analysis. .......................................... 845
    C.    Feasibility. ......................................................................................................... 856
    D.    Acceptance by Impaired Classes. ...................................................................... 856
    E.    Confirmation without Acceptance by All Impaired Classes. ............................. 867

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ................................................................................................................................ **878**

    A.    Introduction. ....................................................................................................... 878
    B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. .... 889
    C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. ..................................................................... 890

XIII.    RECOMMENDATION OF THE DEBTORS .................................................................................... 967

iii

**EXHIBITS**

EXHIBIT A          Plan

EXHIBIT B          Liquidation Analysis

EXHIBIT C          Frequently Asked Questions & Answers

EXHIBIT D          The Asset Purchase Agreement

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED JANUARY 810, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.    Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on February 22, 2023). |

2.    Ballots may be returned by the following methods:

    a)   For Holders of Account Holder Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.

    b)   For Holders of General Unsecured Claims:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below:

<div align="center">

Voyager Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

</div>

If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International).

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY

2

UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

3

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES.  THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS.  THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- **THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;**

- **POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;**

- **THE DEBTORS' REGULATORY LICENSES;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;**

- **THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;**

- **THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;**

- **THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

4

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

*[Remainder of page intentionally left blank]*

6

## I.        INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [   ]] (as supplemented or amended from time to time, the "<u>Plan</u>"), which was conditionally approved by the Bankruptcy Court on January [   ], 2023 [Docket No. [   ]].  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.       PRELIMINARY STATEMENT

### A.        The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party.  Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("<u>FTX US</u>," and along with its parent entity and affiliates, "<u>FTX</u>") as the winning bid (the transaction contemplated thereby, the "<u>FTX Transaction</u>").  Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates.  But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed.  While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors.  Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("<u>Binance.US</u>" or the "<u>Purchaser</u>").  The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value.  Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will acquire certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform for distribution to Account Holders (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of satisfying the Debtors' obligations

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

under the Plan) (such Cryptocurrency, "Acquired Coins") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement.  Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform.  The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements.  Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

---

[3]    Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

8

**Account**

| Coin | Customer Claim | | | Crypto Recovery | | | | |
|---|---|---|---|---|---|---|---|---|
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |

**Claim**

| Value Claimed | $1,907.34 | Value Recovered | $963.91 |
|---|---|---|---|
| *Proportion of Total Platform Value* | *0.0001%* | *Proportion of Total Platform Recovery* | *0.0001%* |

**Illustrative Recovery**

**Crypto Recovery**

| | |
|---|---|
| Value Recovered (In-Kind) | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | - |
| **Crypto Value Recovered** | **$1,022.16** |

**Other Items**

| | |
|---|---|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses[7] | (78.24) |

---

[4]    Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022.  Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]    Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022.  Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]    Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

[7]    "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

| | |
|---|---:|
| **Total Other Items** | **($58.24)** |
| **Total Value Recovered** | **$963.91** |
| *% Total Recovery* | *51%* |

### B.     The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]  While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history.  Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]  The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.  FTX acquiesced.  Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.  The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.  Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement.  Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.  Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims.  Importantly, the "toggle" feature under the Plan ensures

---

[8]   *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9]   *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10]   *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III.    BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform.  Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets.  Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer.  Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date").  In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike.  The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022.  Total wealth in the United States declined by $5 trillion between January 2022 and May 2022.  The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022.  All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020.  Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC") and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment.  The Company's loan to 3AC was one of its largest outstanding loans.  On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna.  The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform.  Accordingly, the Company's management team immediately began to explore potential strategic solutions.  The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis").  The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022.  The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space.  With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company.  Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company.  Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan").  The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process.  To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process").  Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting

11

an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

---

[11]  Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12]  *See Notice of Successful Bidder* [Docket No. 457].

[13]  Docket No. 581.

[14]  Docket Nos. 590 and 591.

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at [  ]:00 [a/p.m.] (prevailing Eastern Time) (the "Confirmation Hearing").

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

13

| | | | |
|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[17] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:<br><br>(i) If the Sale Transaction is consummated by the Outside Date:<br><br>a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16]  The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17]  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Owned Coins allocable to such Account Holder are liquidated; | | | | |

    b.   its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

    c.   its Pro Rata share of Distributable OpCo Cash; and

    d.   to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owned Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)  If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

    a.   its Pro Rata share of Distributable OpCo Cash;

    b.   its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase

16

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i) If the Sale Transaction is consummated by the Outside Date:<br><br>a. its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from | $14.0 | 51% | 45% | 35% – 39% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br> (ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br>    a. its Pro Rata share of Distributable Cryptocurrency in Cash; <br>    b. its Pro Rata share of Distributable OpCo Cash; and <br>    c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: <br> (i) its Pro Rata share of Distributable HoldCo Cash; and <br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: <br> (i) its Pro Rata share of Distributable TopCo Cash; and <br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however,* if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor | $75.1 | 0% | 0% | 0% – 0% |

19

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | *entity*. | | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

E.      **What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|

| | | |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.      What is the "toggle" feature of the Plan?**

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan.  The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process.  As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

**G.      How will my Account be transitioned to Binance.US?**

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions.  All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

**H.      What if I am unable or unwilling to transition my Account to Binance.US?**

We expect that substantially all Account Holders will be transitioning to Binance.US.  In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind").  They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

**I.      What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed

21

Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

> **J.**     **Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[18] and has license applications pending[19] in eighteen (18) states.[20]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have

---

[18]   The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[19]   On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[20]   Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

22

applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[21]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.      How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail.  It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation.  *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total

---

[21]    The state approval process for the surrender of a license typically takes several months.

23

amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

> **O.**     **Does the Plan provide for the subordination of any Claims?**

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims.  Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime.  *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances.  Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn.  The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[22]  Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors.  Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[23]  Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction.  Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[24]  Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations.  Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[25]  Accordingly, the Debtors believe that such behavior warrants the equitable subordination of the Alameda Loan Facility Claims.  The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper.  If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *parri passu* with General Unsecured Claims at the applicable Debtor entity.

---

[22]   *See* Alameda Loan Agreement, Section 4.7.

[23]   *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[24]   *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[25]   *See*, *e.g.*, @SBF, Twitter (July 24, 2022, 8:32 P.M. ET), https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases."

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee").  The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation").  On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation.  The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below.  As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest.  The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action.  The Debtor releases are releases of the Debtors' claims against third parties.  The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan.  The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release.  Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan.  If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims.  However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.  The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan.  To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO TO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND**

**DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**Q.    What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**S.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.    When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at [  ] [a/p].m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

26

V.      **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date. On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

W.      **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

X.      **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

## V.      THE DEBTORS' PLAN

A.      **The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code. The Plan contemplates the following key terms, among others described herein and therein:

1.      *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation

Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. Releases

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham & Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)    **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

29

(b)        **Release by Holders of Claims or Interests.**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

(c)        **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

(d)        Injunction.

**The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

**In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.**

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

### 4.    *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and ~~Ethereum~~USDC.  Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices.  As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins.  In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate.  Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is necessary to satisfy their obligations under the Plan.  Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades.  At this time, the Debtors do not intend to use any derivatives or other hedging transactions.  The Debtors anticipate that executing such

transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional trading accounts. The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf. Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party. The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders. In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor. This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors. Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made. In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5.    *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6.    *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement. Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement. The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for

any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7.   *Non-Released D&O Claims*

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; *provided that*:  (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of:  (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy"). The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8.   *Corporate Structure Upon Emergence*

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets. The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust. Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended

33

that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity.  As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit).  Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration.  The Wind-Down Entity shall be deemed a successor in interest to the Debtors.  For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law.  The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken.  The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests.  The Restructuring Transactions Memorandum will be included in the Plan Supplement.

### B.        The Plan Toggle.

#### 1.        *The Sale Transaction*

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan.  If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of

34

Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan. The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

**(a)      Binance.US's financial wherewithal.**

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet.

Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

          **(b)**          **Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all Cryptocurrency will remain with the Debtors up until the Effective Date. After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (i.e., satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including: (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

          **(c)**          **Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan). Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations. Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions: Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.0000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmission License, MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[26]

---

[26] A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050532193-Licenses. Note that certain jurisdictions do not require

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

### (d)    The Binance.US Customer Onboarding Process.

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors. In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process. Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis. To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan. See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

### (e)    VGX considerations under the Sale Transaction.

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform. Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform. Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel. Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

### (f)    Data Transfer and Privacy Considerations under the Sale Transaction.

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[27] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs. Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy. As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

---

https://support.Binance.US/hc/en-us/articles/360050532193-Licenses. Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

[27]    *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

**(g)**        **Unsupported Jurisdictions under the Sale Transaction.**

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions).   The Unsupported Jurisdictions are Hawaii, New York, Texas, and Vermont.   Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable.   If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan.   Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted.   For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions.   As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

**2.**        ***The Liquidation Transaction***

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

## C.    Means for Implementation of the Plan.

### 1.    *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the

39

Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue. To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2. *Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation*

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3. *Tax Returns*

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. *Dissolution of the Wind-Down Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5. *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the

Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6.    *Distributions of Net Owned Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7.    *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined.  After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them.  Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.  For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Trust shall have,

41

retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held. Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[28] A simplified version of the Debtors' current corporate structure is as follows:



### B.    The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the

---

[28]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.

Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1.    The Trading Platform

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other. Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade. The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies. The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution. Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2.    Custodial Services

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3.    Staking

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4.    Voyager's Lending Program[29]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made

---

[29]    The Lending Program is described in further detail in the First Day Declaration.

to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5.    *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6.    *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### 7.    *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[30] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

---

[30]    The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example). Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure. For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

**C.      The Debtors' Capital Structure.**

**1.      *The Debtors' Debt Obligations***

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd. As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[31] However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions. The aggregate value of the USDC outstanding is $75 million.[32]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans. The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually. Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount

---

[31]    Assuming a Bitcoin price of $20,000.

[32]    As a stablecoin, USDC is pegged to $1 per coin.

was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

### 2.    The Debtors' Intercompany Obligations

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations").  The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo.  Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables").  Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors.  Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.  Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables.  The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced.  This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions.  The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

### (a)    Intercompany Obligations by OpCo to TopCo.

#### i.    The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan").  The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly.  No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan.  The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term

46

Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

ii.    ***The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021***

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

iii.    ***The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

iv.    ***The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

**(b)    Intercompany Obligation by OpCo to HoldCo.**

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement.  Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.  Alameda disputes the treatment of this Intercompany Obligation.

**(c)    Intercompany Obligation by HoldCo to TopCo.**

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note").  The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly.  To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo.  To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo.  In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCo to make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

**(d)    Intercompany Transactions Between Debtors.**

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities.  The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and

48

- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

### 1.    *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict

49

between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

## 2.    *Cryptocurrency Industry-Wide Sell-off*

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a)    The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

### (b)    The Making and Recalling of the Three Arrows Capital Loan.

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[33]  Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

> [P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[34]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[35]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[36]  These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[33]  December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=033384 05&docId=5134463.

[34]  August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[35]  *Id.* at 6.

[36]  *Id.* 20-21.

51

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[37]  Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm.  On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate.  They discussed 3AC generally, including whether its business objectives made it an appropriate counterpart for institutional borrowing.  3AC advised that it had substantial interest given its size and investment philosophy.  On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship.  On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion.  Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited).  In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC.  During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture

---

[37]  *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets.  In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard.  When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad experience with a counterparty who had been given detailed financial information about 3AC.  According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment.  Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions.  During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement.  Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible.  The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value.  Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[38]  The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC.  The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time.  After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan.  In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos.  Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns.  Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties.  At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion.  Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity.  During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses.  Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's

---

[38]  While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee.  The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments.  The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties.  No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

unraveling on their respective businesses.  Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12.  On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses.  In light of this, Voyager did not believe it needed to recall the loans to 3AC.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion.  At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[39]  Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC.  On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius.  The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[40]  Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap."  Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees.  Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement.  Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions.  3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.    ***The Special Committee Investigation***

---

[39]  *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[40]  Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

54

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley.  The Special Committee was vested with the authority to, among other things:  (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC.  The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee.  The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[41]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material.  Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties.  The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things:  Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business.  Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges).  Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others.  In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel).  Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG.  At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the

---

[41]   See Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

interviews most efficient.  BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation.  Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above.  In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee.  In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards.  The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories.  These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

<div align="center">ii.     <b><i>Investigation Report, Conclusions, and Proposed Settlements</i></b></div>

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022.  The Special Committee found no fraud or theft by any director or officer of any of the Debtors.  The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[42] related to the 3AC Loan.  With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect.  The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation.  These settlements are described in the following table:[43]

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
| **Releases and Waivers by the Officers against the Debtors** | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, |

---

[42]  Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[43]  The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| | the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification.<br><br>CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
|---|---|
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of

action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

### B.    The Alameda Loan.

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[44] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

### C.    Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below. Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry. By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors. Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

---

[44]  *See* Section 2.6 of the Alameda Loan Agreement.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required. Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis. Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction. However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D.    Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors: (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E.    Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day. Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors. Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[45]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business. However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

---

[45]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].  On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement").  The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan.  The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)      *The Joint Administration Order* authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)     *The Foreign Representative Order* authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)    *The Credit Matrix Order* authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv)     *The Automatic Stay Order* restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)      *The Schedules and Statements Order* authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi)     *Order Retaining Stretto as Noticing Agent* authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)    *The Wages Order* authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)   *The Taxes Order* authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)     *The Interim Cash Management Orders* authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[46]

---

[46]    On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management

(x)     ***The NOL Order*** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)    ***The Insurance Order*** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)   ***The Case Management Order*** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)     ***The Interim Compensation Order*** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)    ***The Ordinary Course Professionals Order*** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)   ***Applications to Retain Professionals*** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

    i.      ***Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234]***;

    ii.     ***Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299]***;

    iii.    ***Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297]***;

    iv.     ***Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]***;

    v.      ***Stretto, Inc. as administrative advisor [Docket No. 241]***;

    vi.     ***Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732]***;

    vii.    ***ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740]***; **and**

    viii.   ***Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798]***.

---

prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84].  On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### C.    Appointment of Unsecured Creditors' Committee.

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[47] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[48]

### D.    Schedules and Statements.

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

### E.    Bar Date Motion.

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date"). The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time. On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

---

[47]    *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

[48]    *See* Docket Nos. 403 and 404.

F.    The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion"). The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts. To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts. On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan. Customers have until February 4, 2023 to withdraw their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

G.    The 3AC Liquidation Proceeding.

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[49] On July 1, 2022, 3AC filed a

---

[49]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15 Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[50]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding.  Voyager was one of the five creditors appointed to the committee.[51]  On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[52] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[53] and the Ontario Superior Court of Justice.[54]  Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[55]  At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[56]  Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[57]  On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[58]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery").  At this time, the amount of any 3AC Recovery is unknown.  As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

### H.    Litigation Matters.

#### 1.    *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

---

[50]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[51]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[52]    *See* Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[53]    *See In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[54]    *See* Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[55]    *See Id*.

[56]    *See Id*.

[57]    *See* Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[58]    *See* Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### 2.    Certain Adversary Proceedings

#### (a)    *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[59]  The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing.  On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[60]  On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[61]

#### (b)    *Voyager Digital Holdings, Inc. v. Robertson, et al.*

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*.  The named plaintiff was a Voyager customer.  His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46).  *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date.  The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case.  Those motions were pending on the Petition Date.  Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action").  The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws.  The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform."  Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

---

[59]   *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[60]   *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[61]   *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[62] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

      **(c)**        ***Giacobbe v. Voyager Digital Holdings, Inc. et al.***

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[63] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

      **(d)**        ***Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.***

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[64] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

      **I.**        **The Coinify Sale.**

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share

---

[62]    *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[63]    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[64]    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

## J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K.    Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.    The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.    The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

### N.    The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to

provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid. The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[65] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[66] On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[67] with the modified "no-shop" provision. On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[68] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks. Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[69] Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement. S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[70]

---

[65]    *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[66]    *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[67]    Docket No. 581.

[68]    Docket Nos. 590 and 591.

[69]    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[70]    *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[71]

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[72] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[73] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[74]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

---

[71] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[72] Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[73] Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[74] Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

O.    **The Special Committee Investigation.**

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special

71

Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.        **Risks Related to the Restructuring.**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

1.        ***The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors***

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

2.        ***Certain Bankruptcy Law Considerations***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)        **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**(b)      The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

**(c)      Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

**(d)      The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

**(e)      Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

**(f)      Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions.  Some of these concerns and effects typically become more acute when a case under the

Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

**(g)    Filing of a Competing Plan.**

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

**(h)    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**(i)    The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(j)    Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(k)    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)        **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.        *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.        *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.        **Risks Related to Recoveries under the Plan.**

1.        *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.        *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

3.        *The Plan May Diminish the Value of VGX*

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform.  Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform.  The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

4.     ***The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex***

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

5.     ***The Closing Conditions of the Sale Transaction May Not Be Satisfied***

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction.  A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

C.     **Disclosure Statement Disclaimer.**

1.     ***The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.     ***No Legal or Tax Advice Is Provided By This Disclosure Statement***

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

3.     ***No Admissions Made***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.     ***Failure to Identify Litigation Claims or Projected Objections***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

5.     ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

77

6.    *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.    *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

D.    **Miscellaneous Risk Factors and Disclaimers.**

1.    *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different

78

jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[75] and has license applications pending[76] in eighteen (18) states.[77]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[78]

## 2.    The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these

---

[75]   The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[76]   On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[77]   Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

[78]   The state approval process for the surrender of a license typically takes several months.

Chapter 11 cases.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents.  In response, Voyager actively dialogued with and provided the SEC staff with the requested material.  The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940.  As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information.  As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material.  As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements.  While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate.  Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager.  Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings.  On September 12, 2022, Voyager received a subpoena requesting the same information and documents.  Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program.  The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings.  Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[79] on March 29, 2022, which required a response within twenty-eight (28) days.  Alabama extended the response deadline to January 5, 2023.  On July 7, 2022, Alabama also issued a

---

[79]    Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[80] on March 29, 2022. Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[81] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[82] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[83] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[84] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On

---

[80]  Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[81]  Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[82]  New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[83]  Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[84]  South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

81

September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[85] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[86] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[87]

California issued a desist and refrain order[88] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[89] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

---

[85] Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[86] The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[87] Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[88] California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[89] Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

Alaska issued a cease and desist order[90] and notice of opportunity to request a hearing, on September 3, 2022.  Per the notice, Voyager has thirty (30) days to request a hearing.  Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

### 3. The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

### 4. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

### 5. Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions

Certain state regulators in the Unsupported Jurisdictions (i.e., New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code.  The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling.  For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so.  If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

---

[90]   Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from:  offering or selling such accounts in Alaska; and from accepting any assets into existing accounts.  Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> ### THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### D.    Classes Not Entitled To Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

### E.    Solicitation Procedures.

#### 1.    *Claims, Noticing, and Solicitation Agent*

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.    *Solicitation Package*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3.    *Distribution of the Solicitation Package and Plan Supplement*

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement. No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

### F.    Voting Procedures.

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND

RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### G.    Voting Tabulation.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

---

> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT
> IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than

one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### B.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction.  Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario.  Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.        Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.        Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.        Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the

90

Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan. Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1. *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a) **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b) **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

91

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review). Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other

entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency.  If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.        **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution").  As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.  Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation.  Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency.  There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale).  Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency.  Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors.  The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims.  In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above.  With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan.  Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.  The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

**C.**     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[91] of Allowed Claims Entitled to Vote.**

**1.**     ***Sale Transaction or Liquidation Transaction***

**(a)**     **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).**

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:  (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

---

[91]   Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:  (i) its Pro Rata share of Distributable OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events).  This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform.  To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance.  There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event.  While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent."  Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058.  On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent."  This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable.  Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position

95

that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[92] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a

---

[92] The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

### (b)    U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4A Claims.

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the

97

Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors.  If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

**(c)      U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:  (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:  (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

(d)        **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(e)        **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**2.        *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan***

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency. In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

**3.        *The Wind-Down Entity***

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

(a)        **Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. It may be that such treatment does not apply given the structure of the Plan. If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its federal income tax return its

allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

**(b)      Disputed Ownership Fund treatment.**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

**4.      *U.S. Information Reporting and Withholding***

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.   THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

\* \* \* \* \*

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.   In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.   Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:    */s/ Stephen Ehrlich*

Name:    Stephen Ehrlich

Title:    Co-Founder and Chief Executive Officer
Voyager Digital Ltd.

101

Prepared By:

Dated:  January 810, 2023
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Plan**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 852]

**Exhibit B**

**Liquidation Analysis**

**<u>Exhibit C</u>**

**Frequently Asked Questions & Answers**

<u>Exhibit C</u>

**FREQUENTLY ASKED QUESTIONS & ANSWERS**

**About the Plan**

**1.  How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX or USDC or in any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a greater opportunity to recover on their claim than another Account Holder). (See Question  6 below.)

| Coin | Customer Claim | | |
|------|---------------|---------------|-----------|
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| **Total** | | | **$724.81** |

In accordance with the U.S. Bankruptcy Code and applicable bankruptcy law, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim.  Additionally, until Account Holders and Holders of OpCo General Unsecured Claims receive 100% of their claims against OpCo, no consideration is allowed to be distributed to creditors holding interests and/or lower priority claims against OpCo in accordance with the absolute priority rule.

**2.  How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)      the upfront cash payment of $20.0 million,

(ii)     all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve),

(iii)       any expense reimbursement received from BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") pursuant to the Binance.US asset purchase agreement for reasonable expenses incurred by Voyager Digital between March 18, 2023 and Closing, subject to a $15mm cap, and

(iv)       the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Account Holder Claims and OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was transferred to Binance.US at prices as of approximately UTC 20:30 on December 18, 2022, the estimated Initial Distribution would be equal to 51% of the total dollarized claims of all Account Holders and Holders of Opco General Unsecured Claims.

Account Holders located in Supported Jurisdictions who are current Binance.US users or who are able to satisfy onboarding requirements at Binance.US within three months of Closing will receive their share of the Initial Distribution on an in-kind basis within four weeks following the later of the Closing or the completion of the transfer of user data to Binance.US.  All Account Holders in Supported Jurisdictions who do not complete such onboarding requirements within three months following the later of the Closing or the completion of the transfer of user data to Binance.US will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices which will be distributed to such Account Holders by OpCo.

For any Account Holders located in jurisdictions where Binance.US does not have required regulatory approvals as of the Closing ("Unsupported Jurisdictions" which as of the date hereof are Hawaii, New York, Texas, and Vermont), Binance. US will have until six (6) months following the Closing to obtain approvals to make distributions to Account Holders in such jurisdictions on a provisional basis. If Binance.US is unable to make distributions to Account Holders in an Unsupported Jurisdiction at the conclusion of the six (6) month period, the Account Holders in such Unsupported Jurisdiction will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices, which will be distributed to such Account Holders by OpCo.

Under the Plan, the cryptocurrency shall be subject to a rebalancing exercise, which shall occur no more than one business day prior to the Closing Date. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

After the completion of the rebalancing exercise, to the extent the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**3.    When, and how, will I receive value from 3AC recoveries?**

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted.  Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable).  Any 3AC recovery distributions shall be dependent upon the form in which received (token or U.S. Dollars) and the transition status of each respective Account Holder.  For users onboarded onto the Binance.US platform, any distributions will be done through such platform.

**4. Why do the implied recoveries move up or down based on cryptocurrency prices? Don't Account Holders just receive a fixed percentage?**

As previously discussed (see Question 1 above), claims are fixed based on an Account Holder's tokens and cryptocurrency prices as of the Petition Date. Since the Petition Date, the Debtor has been "long" the entire cryptocurrency portfolio. This exposes implied dollar value recoveries to movements in cryptocurrency prices between the Petition Date and the rebalancing date, given the distribution values are also based on volume-weighted dollar prices of cryptocurrency as of two days prior to the rebalancing date.

As such, an individual Account Holder's implied recoveries are impacted by (i) **_gross_** movements in U.S. Dollar-denominated cryptocurrency prices relative to the Petition Date, and (ii) **_relative_** movements in cryptocurrency prices (e.g., BTC vs. ETH).

Voyager has a relatively high percentage of altcoins, which have underperformed in the market relative to BTC / ETH and stablecoins. These cryptocurrency movements are the primary driver of any changes to an Account Holder's recovery value, as evidenced by the charts below.



**5. The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

**_No_**, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

---

[1]    Implied Binance.US recovery values leave all assumptions (including Binance.US consideration, wind-down costs, other benefits (expense reimbursement and non-buyer proceeds) and other expenses (rebalancing leakage, wind-down funding leakage and VGX impact)) constant except for the difference in cryptocurrency prices on the specified dates / date ranges.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the value of such cryptocurrencies at the time of the rebalancing exercise will be a key factor in determining the size of the Initial Distribution.

***Under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the Binance.US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value.***

***Under a wind-down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. Dollars which may result in adverse tax impacts for Account Holders.***

For example, under the Binance.US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo implied an Initial Distribution of 51%, such Account Holder would receive an Initial Distribution with value equal to $510. Such value may be in a mix of in-kind cryptocurrencies or U.S. Dollars depending on whether such Account Holder transitioned to Binance.US in a timely manner.

Such Account Holder would then have a deficiency claim of $490 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 16)

| $ actual | Illustrative July 5, 2022 Claim Value | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
| **Initial Distribution Value @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 45.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 47.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 49.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 51.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 53.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 55.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 57.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 59.0% | $5.9 | $59.0 | $590.0 | $5,900.0 | $59,000.0 | $590,000.0 | $5,900,000.0 |
| **Implied Deficiency Claim @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 45.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 47.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 49.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 51.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 53.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 55.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 57.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 59.0% | $4.1 | $41.0 | $410.0 | $4,100.0 | $41,000.0 | $410,000.0 | $4,100,000.0 |

**6.  Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

<u>No</u>, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 51% of their claim).

**7.  Will VGX be supported? How is the value of my VGX being treated?**

Account Holders that held VGX will be receiving their pro rata share of their VGX claim similar to all other cryptocurrency claims. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, Binance.US has agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform.  In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX in custody at Binance.US or transfer their VGX tokens off the Binance.US platform.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. Dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. Dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 51% of claim value, an Account Holder would receive an Initial Distribution in VGX based on (x) their VGX claim value multiplied by (y) the Initial Distribution percentage.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 51% of claim value, the Account Holder would receive an Initial Distribution equal to $121.47.

| | [A] | [B] | [A] x [B] = [C] | [B] x Token Holdings Implied Claim @ VGX Token Holdings | | | | [C] x Token Holdings Illustrative Initial Distribution @ VGX Token Holdings | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Illustrative Initial Distribution % | 7/5 VGX Token Price | Implied VGX Recovery Price / Token | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
| 1.) | 43.0% | $0.2382 | $0.1024 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.24 | $102.42 | $1,024.22 | $10,242.29 |
| 2.) | 45.0% | $0.2382 | $0.1072 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.71 | $107.18 | $1,071.86 | $10,718.67 |
| 3.) | 47.0% | $0.2382 | $0.1120 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.19 | $111.95 | $1,119.50 | $11,195.06 |
| 4.) | 49.0% | $0.2382 | $0.1167 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.67 | $116.71 | $1,167.14 | $11,671.44 |
| 5.) | 51.0% | $0.2382 | $0.1215 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.14 | $121.47 | $1,214.78 | $12,147.83 |
| 6.) | 53.0% | $0.2382 | $0.1262 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.62 | $126.24 | $1,262.42 | $12,624.21 |
| 7.) | 55.0% | $0.2382 | $0.1310 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.10 | $131.00 | $1,310.06 | $13,100.60 |
| 8.) | 57.0% | $0.2382 | $0.1358 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.57 | $135.76 | $1,357.69 | $13,576.99 |
| 9.) | 59.0% | $0.2382 | $0.1405 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $14.05 | $140.53 | $1,405.33 | $14,053.37 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $116.72 ($238.19 claim value less $121.47 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC and (ii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

**8.    What will happen to the VGX token going forward under the Plan?**

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX.  If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to support custody of the VGX token on the Binance.US platform.  In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**9.    8. Do I still have access to my tokens on Binance.US if they are not supported for trading?**

***Yes***, upon successfully migrating to Binance.US each Account Holder will have access to the entirety of their pro rata share of the Initial Distribution (which will be made in-kind as described above).  At this time, Binance.US supports trading for 82 tokens that were available on the Voyager platform. These 82 tokens represent approximately 93.2% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. Regardless of whether a token is supported or not supported for trading, Account Holders will have the ability to withdrawal and

transfer their cryptocurrencies to a third-party wallet upon their receipt of a distribution should they so choose post-closing.

Binance.US has also indicated to the Debtors that other tokens currently unsupported for trading are likely to become supported by the time of Closing. For tokens that are not currently supported for trading on the Binance.US platform, Account Holders will have the ability to hold those tokens on the Binance.US platform or transfer off the platform into a third-party wallet.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion will be made in XRP. The Account Holder would be able to immediately trade the BTC and ETH received; however, the Account Holder would not be able to trade XRP on the Binance.US platform as XRP is currently unsupported for trading purposes. To the extent such Account Holder wishes to sell their XRP for U.S. Dollars, the Account Holder will be able to transfer their XRP to a third-party wallet that supports trading in XRP.

### *Voyager Tokens Currently Supported for Trading on Binance.US Platform*

| AAVE | ADA | ALGO | ALICE |
|------|------|------|-------|
| ANKR | APE | ATOM | AUDIO |
| AVAX | AXS | BAND | BAT |
| BCH | BICO | BNT | BTC |
| CELO | CHZ | COMP | CRV |
| DAI | DASH | DGB | DOGE |
| DOT | EGLD | ENJ | ENS |
| EOS | ETC | ETH | FET |
| FIL | FLOW | FTM | GALA |
| GLM | GRT | HBAR | ICP |
| ICX | JASMY | KAVA | KNC |
| KSM | LINK | LPT | LRC |
| LTC | MANA | MATIC | MKR |
| NEO | OCEAN | OMG | ONT |
| OP | OXT | QNT | QTUM |
| REN | ROSE | SAND | SHIB |
| SKL | SOL | SPELL | SUSHI |
| TRX | TUSD | UNI | USDC |
| USDT | VET | WAVES | WBTC |
| XLM | XTZ | YFI | ZEC |
| ZEN | ZRX | | |

**10.** ~~9.~~ **If a token in my Voyager account was listed as being unsupported for trading at Binance.US, can I select a different supported token to receive my distribution?**

*No*, the in-kind distribution will be made in the same token(s) currently in each Account Holder's Voyager account. In order to provide Account Holders with their pro rata share of the original tokens in their account and limit any potential adverse tax implications related to liquidating or converting tokens, Binance.US has agreed to provide in-kind distributions for Account Holders on all tokens, including tokens currently unsupported for trading. However, if the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**11.** ~~10.~~ **If my account only had BTC, will all of my distributions be made in BTC?**

***Maybe***, the Initial Distribution will be made in-kind for all tokens for Account Holders who successfully transition to the Binance.US. platform. Any future recoveries received in token form may be distributed in-kind to successfully transitioned Account Holders through the Binance.US platform. If any future recoveries are received in U.S. Dollars or an Account Holder has not successfully transitioned to the Binance.US platform, such distributions will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

**12.  Why can't I receive my recovery under the Plan from the Voyager platform?**

Binance.US offers users the ability to withdraw an additional 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. Accordingly, the only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash. The Binance.US platform allows users to freely transfer such tokens to their individual wallets.

Further, the Debtors would not only need to significantly increase their engineering, regulatory, compliance and other operational staff and resources, but would also require additional money transmitter licenses, authorizations, or exemptions which they currently lack. The aforementioned additional staff and resources would also be necessary to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

Finally, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform. The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets. Historically, the Debtors used Chainalysis for automated verification of certain user generated cryptocurrency transfer requests. However, Chainalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens). While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

**13.** ~~11.~~ **Are my recoveries capped at the value I receive in the Initial Distribution?**

***No***, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) value associated with the sale of any other OpCo assets, and (iii) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

~~12. What will happen to the VGX token going forward under the Plan?~~

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX. If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to support custody of the VGX token on the Binance.US platform. In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**14. 13. How will the amount of my distribution of cryptocurrency be determined?**

Under the Plan, the rebalancing exercise, and as a result each creditor's distribution of cryptocurrency, will be determined based on fair market value of such cryptocurrency as of two business days prior to the completion of the rebalancing exercise. As such, actual Initial Distributions will be dependent on the future price performance of OpCo's cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 51% based on actual cryptocurrency prices during such reference period.

Prior to Closing, OpCo will undergo a rebalancing exercise such that the aggregate value (in U.S. Dollars) for each token to held by OpCo as a percentage of the aggregate value (in U.S. Dollars) of such token that was on deposit with Voyager as of July 5th, 2022 is consistent across OpCo's entire token portfolio, subject to a 5% variance allowance. To the extent a rebalancing delta exists for any specific token, Account Holders may receive a portion of their initial distribution in USDC or U.S. Dollars based on any implied shortfall between the value of the cryptocurrency deposited into their account relative to the dollar value of their Initial Distribution. In order to aid in the facilitation of the rebalancing exercise, OpCo has agreed to execute such exercise on the Binance.US Platform unless they can obtain a better price from another third party..

**15. 14. Is the $20 million of cash Binance.US is paying to the estate above and beyond the value that Binance.US will distribute for the cryptocurrency on the Voyager platform? Do I get a portion of that $20 million?**

_Yes_, the $20 million of upfront consideration is _in addition to_ the fair market value of the cryptocurrency Binance.US is distributing under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

**16. 15. Who is eligible to join Binance.US under the Plan in order to receive an in-kind Initial Distribution?**

Holders of Account Holder Claims and OpCo General Unsecured Claims in Supported Jurisdictions are eligible to join Binance.US.

Only Account Holders in Supported Jurisdictions who timely transfer their Accounts to Binance.US within three months after the later of the Closing or the completion of the transfer of user data to Binance.US will receive their share of the Initial Distribution on an in-kind basis (as further detailed in Question 2 above). Account Holders who are located in Unsupported Jurisdictions six (6) months following the Closing, in addition to Account Holders in Supported Jurisdictions who do not successfully transition to Binance.US within the timeframe specified above, will receive their share of the Initial Distribution in the form of U.S. Dollars.

Holders of OpCo General Unsecured Claims in Supported Jurisdictions will receive their Initial Distribution in cash on the Binance.US platform if they successfully open an account on the Binance.US platform within three months of

the Closing. Otherwise such Holders of OpCo General Unsecured Claims will receive their Initial Distribution in cash from OpCo.

Future distributions will be dependent upon several factors including form of consideration recovered (as further detailed in Question 10 above).

**17.** ~~16.~~ **What is a "deficiency claim"?**

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

**18.** ~~17.~~ **What does an "in-kind" distribution mean?**

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

All cryptocurrency tokens regardless of whether supported for trading on the Binance.US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through Binance.US. As such, Account Holders in Supported Jurisdictions are required to sign up for a Binance.US account to the extent they wish to receive an in-kind distribution. The number of in-kind cryptocurrency tokens received will depend on (i) the Initial Distribution and (ii) the volume weighted average price of such cryptocurrency on the reference date.

For any specific cryptocurrency, an Account Holder in a Supported Jurisdiction can determine the number of tokens that it will receive at Binance.US for that specific cryptocurrency based on the following formula:

$(\text{Mod})^{ue} = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$

$$(\text{Mod})_{ind}\ tokens\ received = \frac{Claim\ Value * Initial\ Distribution\ Percentage}{2\ day\ volume\ weighted\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. To the extent the Account Holder signs up for a Binance.US account, the Initial Distribution is 51%, and the volume weighted average reference price of BTC is $16,816.20, such Account Holder would receive an Initial Distribution consisting of (a) 0.6113 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 51% Initial Distribution divided by (ii) $16,816.20 volume weighted average reference price).

**19.** ~~18.~~ **Who is responsible for calculating the Initial Distribution and subsequent distributions?**

As is required by the Plan, the Debtors will calculate the number of tokens and the amount of cash that is distributable to each Account Holder and each Holder of an OpCo General Unsecured Claim. To the extent distributions are to be made through the Binance.US platform, Binance.US will rely on these calculations.

**20.** ~~19.~~ **What is the administrative claim asserted by Alameda, and how does this impact my recovery?**

On January 4, 2023, Alameda Research Ltd. filed an objection to the Conditional Disclosure Statement Motion, claiming that they have a $445mm administrative expense claim against the Debtors, due to the loan payment that was made to the Debtors within the 90-day period prior to Alameda filing for bankruptcy protection. The Debtors dispute this claim and do not view it as valid. However, if Alameda were to prevail on its asserted administrative claim, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be materially impacted, potentially reducing illustrative recoveries to approximately 26% from 51%.

**Exhibit D**

**Asset Purchase Agreement**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 835]