Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF HEARING OF DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 11206, 11209 & 11213 OF ALAMEDA VENTURES LTD.

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Objection to Proofs of Claim Nos. 11206, 11209 & 11213 of Alameda Ventures Ltd.* (the "Objection") will be held on **March 2, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing").  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically.  Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Objection shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **February 23, 2023, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "Debtors") at https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in the subject matter of the Objection.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely response may result in entry of a final order granting the Objection as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Objection and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Objection and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  January 30, 2023
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          jsussberg@kirkland.com
                cmarcus@kirkland.com
                christine.okike@kirkland.com
                allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OBJECTION TO PROOFS OF CLAIM**
**NOS. 11206, 11209 & 11213 OF ALAMEDA VENTURES LTD.**

The above-captioned debtors and debtors in possession, Voyager Digital Ltd. ("TopCo"),

Voyager Digital Holdings, Inc. ("HoldCo"), and Voyager Digital, LLC ("OpCo," and collectively

with TopCo and HoldCo, "Voyager" or the "Debtors") hereby object to the Proofs of Claim filed

by Alameda Ventures Ltd. ("Alameda") designated Nos. 11206, 11209, and 11213 on the Debtors'

claims register (collectively, the "Alameda Proofs of Claim"), and any other claims being pursued

by Alameda or any of its affiliates (together, "AlamedaFTX") pursuant to sections 502 and 510(c)

of chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code") and Rule 3007 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## INTRODUCTION

1.       AlamedaFTX founder and former CEO Samuel Bankman-Fried, along with several executives who have pled guilty to federal felonies, orchestrated one of the largest financial frauds in history.  They duped investors and lenders into funneling billions of dollars into their crypto hedge fund, without appropriate controls, governance, and risk-management procedures.  They deceived account holders into believing their assets would be held in trust and not rehypothecated, while they freely transferred assets across their network of companies, and ultimately lost them. And they treated their customers' assets as their own personal piggy bank.  The historic AlamedaFTX fraud has undermined the integrity of the cryptocurrency industry and caused epic losses across the sector.

2.       Voyager was not spared.  As this Court has witnessed, from the commencement of these chapter 11 cases, AlamedaFTX has engaged in extensive inequitable conduct: from issuing defamatory press releases, to circumventing the Court-approved bidding and marketing process and low-balling bids for Voyager's business.  Ultimately, in September 2022, AlamedaFTX won the Voyager auction under false pretenses, only to renege two months later when its fraud was uncovered and the AlamedaFTX enterprise collapsed.  AlamedaFTX's inequitable conduct derailed these chapter 11 cases and has cost the Debtors and their creditors over $100 million.

3.       Yet, after causing massive, irreparable harm to these estates, AlamedaFTX still wants to dilute creditors while continuing to interfere with these chapter 11 cases.  In October 2022, Alameda filed $75 million Proofs of Claim (Nos. 11206, 11209, and 11213) against each of the three Debtors based on a prepetition loan of U.S. Dollar Coin that it made to *just one of them*. AlamedaFTX somehow asserts that these unsecured Claims should receive equal, *pari passu* treatment with the claims of the actual unsecured creditors whom AlamedaFTX's rampant abuse in these chapter 11 cases harmed.

4.      As a matter of fact, law, and equity, AlamedaFTX is entitled to, and deserves, nothing.  To begin, Alameda has no basis for its Proof of Claim against OpCo (No. 11213).  OpCo was not a party to the prepetition Alameda Loan Agreement and did not guarantee TopCo's or HoldCo's obligations thereunder.  Alameda's motives in filing this Proof of Claim are transparent: OpCo holds essentially all of the Debtors' assets, so Alameda is using litigation in an effort to improve the (lack of) collateral package for its loan *post hoc*.  That claim is clearly misplaced. Alameda, as a sophisticated lender, knew that its loan was deliberately structured to be junior to creditor claims at OpCo.  In fact, the loan was structured as such so that AlamedaFTX's CEO could appear to be "saving" the crypto industry—whereas, although no one knew it at the time, AlamedFTX was merely trying to save itself (the definition of a Ponzi scheme).  Based on the Alameda Loan Agreement's plain, unambiguous terms, Alameda has no claim at OpCo, and Proof of Claim No. 11213 must be denied and expunged.

5.      In any event, Voyager's Plan appropriately subordinates all three of the Alameda Proofs of Claim behind all other creditor claims under 11 U.S.C. § 510(c).  Equitable subordination was designed to address the circumstances here: when a creditor abuses the chapter 11 bankruptcy process at the expense of other creditors, this Court is empowered to, *and should*, subordinate the wrongdoer's claim, to remediate harm to injured creditors.  Subordination is the least that can be done to begin to mitigate the damage done by AlamedaFTX, and put Voyager's creditors closer to the recovery positions they would have held had AlamedaFTX honored and fulfilled its September 2022 winning bid, or if AlamedaFTX had not been involved in the Debtors' chapter 11 cases ***at all***, in which case the Debtors would have accepted a *different* bid the first time around, saving material amounts of time and cost in the process.  Under no circumstances should AlamedaFTX receive anything from these chapter 11 estates after all it has done to harm them.

6.     For these reasons, and as Voyager will be prepared to show after discovery during confirmation, Alameda's (i) claim against OpCo should be disallowed with prejudice and (ii) remaining claims should be subordinated to all other creditor claims at each of the Debtors.[2]

## RELIEF REQUESTED

7.     The Debtors request entry of an order pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 (a) rejecting Alameda Proof of Claim No. 11213, which is asserted against a non-borrowing and non-guarantor Voyager debtor, OpCo, and (b) equitably subordinating the Alameda Proofs of Claim under Section 510(c) of the Bankruptcy Code, as further provided in the Debtors' Disclosure Statement and Plan.

## JURISDICTION

8.     The U.S. Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157. Even if it were not, the Debtors confirm their consent to the Court entering a final order in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are Sections 105, 502, and 510(c) of the Bankruptcy Code and Bankruptcy Rule 3007.

---

[2]     The Debtors are serving discovery on AlamedaFTX. To the extent not addressed herein, the Debtors reserve the right to object to the remainder of the Alameda Proofs of Claim post-confirmation. The Debtors further will be objecting to any other claims filed by AlamedaFTX in these chapter 11 cases (administrative or otherwise) for the reasons set forth herein, among others.

## BACKGROUND

### A.    The AlamedaFTX Fraud

11.    In October 2017, Samuel Bankman-Fried and Gary Wang co-founded Alameda Research, LLC ("Alameda Research").[3]  Alameda Research was a crypto hedge fund with a diversified business trading in crypto assets, employing strategies in arbitrage, market making, yield farming, and trading volatility for the benefit of Bankman-Fried (90% owner) and Wang (10% owner).[4]  Bankman-Fried initially handled trading operations for Alameda Research while Wang handled engineering and programming functions.  Soon after its founding, Alameda Research hired additional employees, including Nishad Singh and Caroline Ellison.[5]  At its peak, Alameda Research was conducting nearly $15 million a day in transactions,[6] and at one point had a net asset value approaching $100 billion, according to Bankman-Fried.[7]

12.    In 2018, Bankman-Fried began building a crypto asset trading platform.[8]  In May 2019, Bankman-Fried, together with Wang and Singh, launched this platform under the name FTX Trading Ltd. d/b/a FTX.com.[9]  The FTX platform let customers trade crypto assets in exchange for fiat currency or other crypto assets.[10]  The platform grew quickly and became one of the world's

---

[3]    *SEC v. Samuel Bankman-Fried*, No. 22-10501, Dkt. 1, Compl. ¶ 14 (S.D.N.Y. 2022) [hereinafter, "SEC Compl."]. The SEC and DOJ have both undertaken extensive investigations and taken action against AlamedaFTX and some of its principals; some of these citations are allegations thus far (some have been admitted by certain wrongdoers), but the allegations are serious and highly troubling and no one remaining at AlamedaFTX has denied them.

[4]    *In re FTX Trading Ltd., et al.*, No. 22-11068, Dkt. 24, Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶ 22 (Bankr. D. Del. Nov. 17, 2022) [hereinafter, "Ray Decl."]; *see also* SEC Compl. ¶¶ 14–16.

[5]    SEC Compl. ¶ 17.

[6]    Lakshmi Varanasi, Sarah Jackson, & Britney Nguyen, *The rise and fall of FTX's Sam Bankman-Fried, who went from being a crypto billionaire to being arrested and charged with fraud*, BUSINESS INSIDER (Dec. 13, 2022), https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 [hereinafter, "Rise and Fall, BUSINESS INSIDER"].

[7]    Bankman-Fried, *FTX Pre-Mortem Overview*, BANKMAN-FRIED'S SUBSTACK at 4 (Jan. 12, 2023), https://sambf.substack.com/p/ftx-pre-mortem-overview [hereinafter, "SBF Substack"].

[8]    SEC Compl. ¶ 19.

[9]    Ray Decl. ¶ 33.

[10]    SEC Compl. ¶ 20.

largest cryptocurrency exchanges. Bankman-Fried reported that, by the end of 2021, the FTX platform held $15 billion in assets and processed 10% of the global volume of crypto trading.[11] He further claimed the FTX platform had "millions" of registered users as of July 2022.[12]

13.     The SEC has alleged that starting in 2021, Bankman-Fried directed Alameda to borrow billions of dollars from third-party crypto lending firms.[13] Public reporting suggests that Bankman-Fried was directly involved in all of Alameda's "big trades."[14]

14.     Given Bankman-Fried's control over both Alameda's investment and lending operations and the FTX platform holding customer assets, investors and platform users had concerns about the relationship between the two companies. Bankman-Fried nevertheless assured the public, repeatedly, that "Alameda is a wholly separate entity."[15]

15.     Bankman-Fried further assured the public that FTX customers' assets were secure. FTX's Terms of Service made many promises to customers, including these:

> You control the Digital Assets held in your Account.
>
> Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.
>
> None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading.
>
> FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.[16]

---

[11]   Ray Decl. ¶ 35.

[12]   *Id*.

[13]   SEC Compl. ¶ 43.

[14]   David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. TIMES (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html.

[15]   Annie Massa, Anna Irrera & Hannah Miller, *Crypto Quant Shop With Ties to FTX Powers Bankman-Fried's Empire*, BLOOMBERG (Sept. 14, 2022), https://www.bloomberg.com/news/articles/2022-09-14/trading-firm-alameda-research-powers-ftx-ceo-sam-bankman-fried-s-crypto-empire ("Questions persist, in part, because the lives of the firms' leadership and employees are so deeply entwined.").

[16]   Brady Dale & Felix Salmon, *FTX's terms-of-service forbid trading with customer funds*, AXIOS (Nov. 13, 2022), https://www.axios.com/2022/11/12/ftx-terms-service-trading-customer-funds.

16.     Likewise, FTX's website informed investors and users that "as a general principle FTX segregates customer assets from its own assets across our platforms" and that FTX maintains liquid assets for customer withdrawals to "ensure a customer without losses can redeem its assets from the platform on demand."[17]

17.     In 2021, Bankman-Fried made a $350 million profit from FTX and another $1 billion from Alameda Research.[18]  At his peak, Bankman-Fried was worth $26 billion.[19]

18.     When the crypto market began to falter in May 2022, Bankman-Fried publicly positioned himself as a hero, providing several crypto companies with lines of credit and taking over other failing crypto firms.[20]  In June 2022, after extending a $250 million line of revolving credit to ease liquidity concerns for the crypto financial services company BlockFi, Bankman-Fried lauded his stewardship of the industry in a tweet: "We take our duty seriously to protect the digital asset ecosystem and its customers."[21]  This and other transactions now appear to have been disguised ways to mask the fraud at AlamedaFTX that no one outside of AlamedaFTX knew about.

19.     In fact, it soon came crashing down.  AlamedaFTX suffered massive losses from its own deals, including a $500 million loan on which a borrower defaulted.[22]  On November 2, 2022, reports surfaced showing that a significant portion of Alameda Research's $14.6 billion in remaining assets were in FTT, a cryptocurrency token that Bankman-Fried created at FTX.[23]  Days later, FTT began to free fall, from a price of $22.18 on November 7th to $2.06 on November 9th—

---

17    FTX Policy: FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms (Mar. 10, 2022), https://www.ftxpolicy.com/posts/investor-protections.

18    Rise and Fall, BUSINESS INSIDER.

19    *Id*.

20    SEC Compl. ¶¶ 70–71.

21    *Id*. ¶ 70.

22    *In re FTX Trading Ltd., et al.*, No. 22-11068, Dkt. 176, Motion of the U.S. Trustee for Entry of an Order Directing the Appointment of an Examiner ¶ 14 (Bankr. D. Del. Dec. 1, 2022) [hereinafter, "UST Examiner Mot."].

23    *Id*. ¶ 15.

a loss of over 90% of its value.[24]  According to the U.S. Trustee, "[o]ver the course of eight days in November, beginning with reports of significant problem with [Alameda's] balance sheet," the FTX Debtors "suffered a virtually unprecedented decline in value," from $32 billion earlier in the year to "a severe liquidity crisis after a proverbial 'run on the bank' amid revelations of multiple corporate failures and misuse of customer funds facilitated by 'software to conceal' it."[25]

20.    On November 11, 2022, with Alameda Research and FTX facing a severe liquidity crisis, Bankman-Fried stepped down as CEO; Alameda Research, FTX, and 128 related entities (the "FTX Debtors") thereafter commenced chapter 11 proceedings in Delaware.[26]

21.    The question of why AlamedaFTX failed can be answered in just one word: fraud. As the SEC has alleged, Bankman-Fried and others defrauded investors, lenders, and customers by "orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire."[27]  Stated more concisely by Bankman-Fried himself:[28]



---

[24]    CoinMarketCap, https://coinmarketcap.com/currencies/ftx-token/.

[25]    UST Examiner Mot. at p. 1.

[26]    Ray Decl. ¶¶ 40, 44.

[27]    SEC Compl. ¶ 1.

[28]    @SBF, Twitter (Nov. 10, 2022, 8:13 A.M. CT), https://twitter.com/SBF_FTX/status/1590709166515310593.

22.     As detailed in the SEC's complaint against Bankman-Fried, AlamedaFTX's fraudulent scheme was longstanding and extensive.  Despite publicly touting Alameda Research as independent from FTX, Bankman-Fried took customer assets from the FTX platform at will and then used them as he pleased.[29]  Alameda Research had a virtually unlimited line of credit at FTX and was exempted from FTX's automated liquidation process.[30]  As the SEC has alleged:

> [T]here was no meaningful distinction between FTX customer funds and Alameda's own funds.  Bankman-Fried thus gave Alameda *carte blanche* to use FTX customer assets for its own trading operations and for whatever other purposes Bankman-Fried saw fit. In essence, Bankman-Fried placed billions of dollars of FTX customer funds into Alameda.  He then used Alameda as his personal piggy bank to buy luxury condominiums, support political campaigns, and make private investments, among other uses.[31]

23.     John J. Ray III, current CEO of the FTX Debtors, has confirmed many of the SEC's allegations regarding the lack of separation between the AlamedaFTX entities and the wrongdoing of AlamedaFTX principals.  According to Mr. Ray, the various AlamedaFTX entities did not have an accounting department,[32] many of the entities lacked appropriate corporate governance and never held board meetings,[33] and FTX "use[d] … software to conceal the misuse of customer funds."[34]  Ray found AlamedaFTX's balance sheets unreliable.[35]  Despite extensive experience navigating some of the most intricate and notorious financial crimes in history—*Enron included*—Ray went on to conclude: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[36]

---

[29]  *See* SEC Compl. ¶¶ 1, 26.

[30]  *Id*. ¶ 28.

[31]  *Id*. ¶ 33.

[32]  Ray Decl. ¶ 58.

[33]  *Id*. ¶ 46.

[34]  *Id*. ¶ 65.

[35]  *Id*. ¶¶ 18, 23, 28, 36 & 56.

[36]  *Id*. ¶ 5.

24.    On December 9, 2022, the DOJ indicted Bankman-Fried on eight counts, bringing charges for wire fraud on lenders and customers, as well as conspiracy charges for the wire fraud, commodities and securities fraud, money laundering, and violation of campaign finance laws.[37] In the indictment, the DOJ accused Bankman-Fried of "misappropriating … customers' deposits, and using those deposits to pay expenses and debts of Alameda Research," among other crimes.[38]

25.    Other regulators also took action.  On December 13, 2022, the SEC brought securities fraud claims against Bankman-Fried.[39]  The same day, the CFTC filed fraud claims against Bankman-Fried, FTX, and Alameda Research.[40]

26.    Ellison and Wang were charged with criminal felonies[41] and pled guilty on December 18, 2022.[42]  At her December 19, 2022 plea hearing, Ellison confessed to conspiring with Bankman-Fried and others to "provide materially misleading financial statements to Alameda's lenders" (one of whom was Voyager), admitting that "we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties."[43]  She further testified that Bankman-Fried and others had funded investments with customer funds FTX had lent to Alameda Research: "The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds."[44]

---

[37]    *United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 1:22-cr-673, Dkt. 1 (S.D.N.Y. Dec. 9, 2022).

[38]    *Id*. ¶ 3.

[39]    *See generally* SEC Compl.

[40]    *Commodity Futures Trading Commission v. Samuel Bankman-Fried, et al*., No. 22-10503, Dkt. 1, Compl. (S.D.N.Y. Dec. 13, 2022).  The CFTC amended its complaint on December 21, 2022, to add Ellison and Wang as defendants.  *Id*. at Dkt. 13.

[41]    *United States v. Samuel Bankman-Fried a/k/a "SBF,"* 1:22-cr-673, Dkt. 6, 8 (S.D.N.Y.)

[42]    Dec. 18, 2022 Ellison Guilty Plea Letter; Dec. 18, 2022 Wang Guilty Plea Letter.

[43]    *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Tr. at p. 28.

[44]    *Id*. at 28:22–29:1.

27.     As the U.S. Attorney for the Southern District of New York explained, "this is one of the biggest financial frauds in American history."[45]  This "fraud of epic proportions" caused a loss of billions of dollars in customer and investor funds.[46]  Among the victims were the Debtors.

**B.     The FTX Enterprises' Relationships with the Voyager Debtors**

28.     As explained, starting in 2021, as part of the AlamedaFTX fraud, Bankman-Fried directed Alameda Research to borrow billions of dollars from third-party crypto lending firms.[47]  One of those firms was Voyager.[48]

29.     On September 2, 2021, Alameda Research entered into a Master Loan Agreement with OpCo.[49]  Thereafter, and through June 2022, OpCo loaned Alameda Research various crypto currencies, including Bitcoin and Ethereum, with notional values in the hundreds of millions of dollars.  In deciding to issue loans to AlamedaFTX, OpCo relied on, among other things, AlamedaFTX's financial statements[50]—the same financials current CEO John Ray publicly declared are untrustworthy and former AlamedaFTX executive Caroline Ellison admitted in sworn testimony were fraudulent.[51]

---

[45]     André Beganski, *FTX 'One of the Biggest Financial Frauds in American History': Prosecutor Damian Williams*, YAHOO (Dec. 13, 2022), https://finance.yahoo.com/news/ftx-one-biggest-financial-frauds-201835031.html.

[46]     Luc Cohen and Tom Hals, *Bankman-Fried, FTX execs received billions in hidden loans, ex-Alameda CEO says*, REUTERS (Dec. 23, 2022), https://www.reuters.com/legal/alamedas-ex-ceo-tells-judge-she-hid-billions-loans-ftx-execs-2022-12-23/.

[47]     SEC Compl. ¶ 43.

[48]     Before the auction of Voyager's assets, *see infra* Background § C, Voyager requested that Alameda Research repay all outstanding loans that the Debtors had made to it to ensure equal footing for all bidders.  *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 830, Second Amended Disclosure Statement Relating to the Third Amended Joint Plan at p. 32 (Bankr. S.D.N.Y. Jan. 8, 2023) [hereinafter, the "Debtors' Disclosure Statement"].  The Debtors were unwilling to permit AlamedaFTX to participate in the auction without the return of the loans.  Alameda Research ultimately acquiesced as a result.  *Id.*

[49]     9/2/21 Master Loan Agreement.

[50]     2/22/22 Loan Risk Committee Memo.

[51]     Ray Decl. ¶¶ 18, 23, 28, 36 & 56.

30.    On May 9, 2022, after Luna de-pegged from UST, many investors in the crypto industry suffered losses.[52]  The next month, on June 14, 2022, Voyager grew concerned when a representative of one of its primary lending counterparties, Three Arrows Capital ("3AC"), advised that 3AC's principals, Kyle Davies and Su Zhu, were unreachable.[53]  Within hours, OpCo recalled its entire loan from 3AC.[54]  The next day (June 15th), one of 3AC's founders announced that the fund had incurred significant losses resulting from its Luna position.[55]  On June 24, 2022, Voyager issued a formal notice of default and acceleration to 3AC, which 3AC ignored.[56]

31.    When it appeared that 3AC's ongoing viability as a going concern might be at risk, Voyager's management team took immediate steps to identify other sources of liquidity to stabilize the business.[57]  On June 21, 2022, HoldCo as borrower and TopCo as guarantor entered into a Loan Agreement with Alameda (the "Alameda Loan Agreement"), which permitted HoldCo to draw up to $200 million cash and U.S. Deposit Coin and 15,000 Bitcoin, with certain conditions.[58] As described in more detail below, OpCo was deliberately and intentionally *not* made a party to the Alameda Loan Agreement,[59] as the loan was structured to be junior to all claims by OpCo creditors.  Due to borrowing restrictions, HoldCo ultimately only was able to access $75 million worth of U.S. Dollar Coin.[60]  This amount was funded by HoldCo to OpCo (as originally intended) and is part of the OpCo estate.[61]

---

[52]    The Debtors' Disclosure Statement at p. 60.

[53]    The Debtors did not receive any such information until after they had issued their press release on June 14, 2022. *See id.* at p. 51.

[54]    *Id.*

[55]    *Id.*

[56]    *Id.*

[57]    *Id.* at p. 64.

[58]    *Id.*; *see also* Ex. 1, 6/21/22 Alameda Loan Agreement.

[59]    The Debtors' Disclosure Statement at p. 64.

[60]    *Id.* at p. 53.

[61]    *Id.*

32.    On July 5, 2022 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[62]  As of the Petition Date, Alameda Research owed the Debtors over $376 million.[63]

33.    On October 3, 2022, AlamedaFTX filed the Alameda Proofs of Claim against each of OpCo, HoldCo, and TopCo, claiming that each one was obligated on the $75 million disbursed under the Alameda Loan Agreement.[64]

34.    More recently, Alameda has alleged in filed pleadings that it has an administrative claim against Voyager of approximately $445 million for crypto loans from OpCo to Alameda that were repaid during these chapter 11 proceedings.[65]  Although no AlamedaFTX entity has sought to lift the stay to seek such relief, AlamedaFTX's counsel has threatened to deploy such claims to hold up the Debtors' chapter 11 proceedings, delay distributions to creditors, or both.[66]

## C.    Alameda's Sabotage of the Debtors' Chapter 11 Proceedings

35.    Alameda's efforts to interfere with these cases began as soon as they were filed. On July 14, 2022 (nine days post-Petition Date), Voyager's investment banker Moelis & Company LLC ("Moelis") distributed a letter to prospective counterparties with key information regarding the Debtors' marketing process (the "Process Letter").[67]  The Process Letter asked interested parties to submit a non-binding indication of interest by the end of the month.[68]

---

[62]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 15, Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ¶ 10 (Bankr. S.D.N.Y. July 6, 2022) (the "Ehrlich First Day Declaration").

[63]    *Id*. ¶ 29.

[64]    Ex. 2, 10/3/22 Alameda Proof of Claim No. 11206; Ex. 3, 10/3/22 Alameda Proof of Claim No. 11209; Ex. 4, 10/3/22 Alameda Proof of Claim No. 11213.

[65]    The Debtors' Disclosure Statement at p. 64.

[66]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 813, Objection to Debtors' Conditional Disclosure Statement Motion (Bankr. S.D.N.Y. Jan. 4, 2023).

[67]    The Debtors' Disclosure Statement at p. 74.

[68]    *Id*.

36.    Once indications of interest were received, on July 21, 2022, Voyager filed a motion to approve bidding procedures (the "Bidding Procedures Motion"), seeking to thoroughly and promptly complete an auction for the benefit of its creditors.[69]

37.    Rather than participating in good faith in that process, AlamedaFTX tried to front-run the auction.  The very next day, July 22, 2022, Alameda, West Realm Shires Inc. ("WRS"), and other AlamedaFTX entities jointly issued a press release and low-ball proposal for the Debtors' business—which openly disparaged the Debtors.[70]

38.    In what today seems like irony, AlamedaFTX's CEO Bankman-Fried is quoted in the AlamedaFTX press release as proclaiming: "Voyager's customers did not choose to be bankruptcy investors holding unsecured claims," and promising that "[t]he goal of our joint proposal is to help establish a better way to resolve an insolvent crypto business—a way that allows customers to obtain early liquidity and reclaim a portion of their assets without forcing them to speculate on bankruptcy outcomes and take one-sided risks."[71]  It is now apparent that these quotes were all falsehoods, and part of a series of ongoing efforts to prop up the AlamedaFTX scheme by acquiring the Debtors' assets and customers and associated crypto assets that AlamedaFTX desperately needed.  AlamedaFTX's attempts to mislead creditors with false information were so egregious that the Debtors were forced to respond to correct the record on the docket.[72]

---

[69]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 126, Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect To the Debtors' Sale, and (III) Granting Related Relief (Bankr. S.D.N.Y. July 21, 2022).

[70]    The Debtors' Disclosure Statement at p. 32; *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 160, Limited Objection to Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief at p. 3 (Bankr. S.D.N.Y. July 28, 2022) [hereinafter, "FTX Limited Obj."].

[71]    *FTX Proposed Joint Plan to Offer Early Liquidity to Voyager Digital's Customers in Bankruptcy Proceeding*, PR NEWSWIRE (July 22, 2022), https://www.prnewswire.com/news-releases/ftx-proposes-joint-plan-to-offer-early-liquidity-to-voyager-digitals-customers-in-bankruptcy-proceeding-301591902.html.

[72]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 137, Response to Alameda/FTX Press Release (Bankr. S.D.N.Y. July 24, 2022).

39. AlamedaFTX's claims, made with full knowledge of their falsity, chilled Voyager's marketing process and lowered the floor for bids in the auction.[73] The reason for AlamedaFTX's tactics is now apparent: AlamedaFTX sought to chill bids, even eliminate bidders, and acquire Voyager's customers at a steep discount to keep alive AlamedaFTX's own Ponzi scheme.

40. AlamedaFTX, and their founder and then-CEO Bankman-Fried, did not stop there. On July 24, 2022, Bankman-Fried claimed that Voyager had lost some customer assets and was delaying the return of other customer assets, again disparaging Voyager's sale process:[74]



41. Bankman-Fried's tweetstorm continued, attempting to provoke anger amongst the Debtors' customers by claiming that the only opposition to his proposal was coming from "various bankruptcy agents" that were "slowly bleeding the customer's frozen assets dry with consulting fees."[75]

---

[73] The Debtors' Disclosure Statement at p. 32.
[74] @SBF,        Twitter        (July        24,        2022,        7:32        P.M.        CT),
https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4wkxALBYJjQ1U.
[75] @SBF,        TWITTER        (July        24,        2022,        various),
https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4wkxALBYJjQ1U.

42.     At the August 4, 2022, hearing, the Court addressed Alameda's ongoing attacks on the marketing and sales process: "I don't know why all this is happening and why it's happening in the press.  Certainly the parties who are on the phone know that's not how it's usually done in the bankruptcy context and it ought to stop."[76]

43.     On September 13, 2022, Voyager commenced a two-week auction.[77]  During the course of the auction, there were *numerous* leaks about bids and bidders.  Many of those leaks related to a proposed alternative bidder, Binance.US—and were negative toward Binance.US.[78]  AlamedaFTX had motive, opportunity, and a clear desire to harm Binance.US's chances given AlamedaFTX's desperate need to win the Voyager auction to prop up its own failing Ponzi scheme.  The primary party in a position to benefit from the anti-Binance leaks was AlamedaFTX.  Voyager thus strongly suspects AlamedaFTX was the source of at least some of the Binance-related leaks during the Voyager auction, and that AlamedaFTX's misconduct continued *during* the auction.

44.     Ultimately, the Debtors, in consultation with the Unsecured Creditors Committee, determined that AlamedaFTX's bid was the highest and best bid available at the time.[79]  In so doing, the Debtors did not accept several bids, including one from Binance.US that, while not higher or better than the AlamedaFTX bid at the time, was a serious and material bid.  The Debtors chose AlamedaFTX based on *numerous* representations by AlamedaFTX (including its advisors) that, among other things, AlamedaFTX was a viable entity that could, and would, be in a position to close the proposed transaction on the timeline proposed.

---

[76]   8/4/2022 Hr'g Tr. at p. 32.

[77]   The Debtors' Disclosure Statement at pp. 74–75.

[78]   *See, e.g.*, Ian Allison, *Binance's Attempt to Buy Voyager Digital's Assets Complicated by National Security Concerns: Sources*, CoinDesk (Sept. 16, 2022), https://www.coindesk.com/business/2022/09/16/binances-attempt-to-buy-voyager-digitals-assets-complicated-by-national-security-concern-source/ ("Binance's attempt to purchase crypto lender Voyager Digital's assets through a bankruptcy auction this week has been complicated by concerns the U.S. government would reject the transaction, according to people familiar with the matter.").

[79]   10/19/2022 Hr'g Tr. at p. 17-18.

45.     Thus, on September 27, 2022, Voyager (specifically, OpCo) and AlamedaFTX (specifically, WRS) entered into an Asset Purchase Agreement (the "<u>FTX Purchase Agreement</u>") memorializing the terms of the AlamedaFTX bid.[80]  The FTX Purchase Agreement required WRS to make a direct payment of $51 million to the OpCo estate and to provide substantial additional benefits to Voyager creditors.[81]  The FTX Purchase Agreement also required WRS to assign claims against HoldCo and TopCo over to OpCo so that any recovery on account of such claims would increase customer recoveries.[82]

46.     On October 20, 2022, the Court approved Voyager's entry into the FTX Purchase Agreement.[83]  Voyager subsequently filed solicitation versions of its Disclosure Statement and Plan, and the Debtors were moving full speed ahead toward confirmation in December 2022.[84]

47.     Had AlamedaFTX been a legitimate operation, and had AlamedaFTX been ready, willing, and able to meet the commitments it had made to Voyager, its creditors, and the Court, the Debtors would have consummated the transaction shortly after confirmation in December 2022 without further value leakage or waste.

48.     But AlamedaFTX's fraud and collapse devastated the Debtors and their creditors. Less than three weeks after the Court approved Voyager's entry into the FTX Purchase Agreement, AlamedaFTX's scheme unraveled, FTX froze its customer platform, and Bankman-Fried resigned.

---

[80]    FTX Purchase Agreement

[81]    *Id*. § 2.1(a).

[82]    *Id*.

[83]    Dkt. 581, Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief (Bankr. S.D.N.Y. Oct. 20, 2022).

[84]    Dkt. 590, Notice of Filing of Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Bankr. S.D.N.Y. Oct. 24, 2022); Dkt. 591, Notice of Filing of First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Bankr. S.D.N.Y. Oct. 24, 2022); Dkt. 592, Noticing of Filing of Exhibits to the Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto (Bankr. S.D.N.Y. Oct. 24, 2022).

For several days, AlamedaFTX and AlamedaFTX's advisors left the Debtors in the lurch, unwilling (or unable) to confirm or deny what appeared to have happened. On November 10, 2022, AlamedaFTX voluntarily released the Debtors from the "no shop" provisions of the FTX Purchase Agreement, while advising Voyager it would know more its plans for Voyager "soon."[85] On November 11, 2022, AlamedaFTX began commencing chapter 11 proceedings.[86] AlamedaFTX's corporate structure was so intertwined and confused, and its lack of separation between entities in substance so manifest, that AlamedaFTX's counsel did not even realize the entity that had signed the FTX Purchase Agreement had not yet filed its own bankruptcy petition until being alerted to that fact by counsel for the Debtors on November 14, 2022; that entity filed its chapter 11 proceeding shortly thereafter AlamedaFTX's counsel was so alerted.[87]

49.    When AlamedaFTX collapsed, Voyager had no choice but to restart its marketing and sales process. At the time of the restart, the cryptocurrency market had declined materially, thrown into further turmoil because of AlamedaFTX's collapse. Voyager's opportunities declined, and Binance.US materially reduced its bid from what Voyager could have accepted from Binance.US at the end of the first auction.

50.    While Binance.US's bid was materially worse the second time around, the Debtors nonetheless determined (and the Committee agreed) that Binance.US's updated (lower) bid was the best available to them following the AlamedaFTX Collapse. On December 18, 2022, Voyager and Binance.US entered into an asset purchase agreement.[88] Voyager now is moving toward a confirmation hearing and hopes to confirm its Plan on March 2, 2023.

---

[85]    11/10/22 Email from AlamedaFTX's counsel to the Debtors' counsel, "RE: [EXTERNAL] Voyager."

[86]    *In re FTX Trading Ltd., et al.*, No. 22-11068, Dkt. 1, Voluntary Petition (Bankr. D. Del. Nov. 11, 2022).

[87]    11/15/22 Email (1:59 am EST) from AlamedaFTX's counsel to the Debtors' counsel, "RE: FTX."

[88]    The Debtors' Disclosure Statement at p. 20.

51.     Voyager and its creditors have suffered massively as a result of AlamedaFTX's misconduct in these chapter 11 cases.  Even if the Court were to consider only the damage caused by AlamedaFTX's failure to honor its obligations under the FTX Purchase Agreement, those damages—which include the difference in value to the estates and creditors between the FTX Purchase Agreement and the Binance.US agreement, the additional costs for solicitation of a revised plan, and additional professional fees from a second round of bidding and a materially lengthened bankruptcy case, among other costs—the estates and creditors have suffered more than $100 million in losses.  AlamedaFTX is responsible to the estates for all these damages, and more.  Under no circumstances should any person or entity affiliated in any way with AlamedaFTX be allowed to further harm Voyager's creditors by having any of its claims allowed.

## ARGUMENT

52.     The Alameda Proofs of Claim against OpCo (No. 11213), HoldCo (No. 11206), and TopCo (No. 11209) assert $75 million claims for the amount that Alameda loaned to HoldCo under the Alameda Loan Agreement.  The Court should (i) disallow and expunge Alameda Proof of Claim No. 11213 because OpCo did not enter into or guarantee the Alameda Loan Agreement and (ii) in any event equitably subordinate in full each of the Alameda Proofs of Claim.

### A.     Alameda Has No Cognizable Claim Against OpCo.

53.     Alameda Proof of Claim No. 11213, asserted against OpCo based on a $75 million distribution under the Alameda Loan Agreement, is baseless.  The only Debtors that are parties to the Alameda Loan Agreement are HoldCo as borrower and TopCo as guarantor.[89]  OpCo is unequivocally *not* a borrower, guarantor, or otherwise a party to the Alameda Loan Agreement and in fact was left out of the agreement by design.

---

[89]    Ex. 1, 6/21/22 Alameda Loan Agreement, Schedule A.

54.    These simple facts are not in dispute: Alameda concedes that Holdco and TopCo are the only Voyager debtor parties to the Alameda Loan Agreement.[90]  Nor could there be a dispute from the face of the Alameda Loan Agreement (pictured below with highlighting added) that AlamedaFTX has no claim against OpCo (Voyager Digital, LLC).



**LOAN AGREEMENT**

This **LOAN AGREEMENT** (this "**Agreement**") is entered into as of June 21, 2022 (the "**Effective Date**") by and among **ALAMEDA VENTURES LTD** ("**Lender**"), **VOYAGER DIGITAL HOLDINGS, INC.** ("**Borrower**") and **VOYAGER DIGITAL LTD** ("**Guarantor**").  Capitalized terms used but not otherwise defined herein shall have the meanings given them on Schedule B.  The parties agree as follows:

**SCHEDULE A**
**LOAN TERMS**

| | |
|---|---|
| BORROWER: | VOYAGER DIGITAL HOLDINGS, INC. |
| **Cash Revolving Loan Amount:** | Two Hundred Million Dollars ($200,000,000.00) (the "**Cash Revolving Loan Amount**"). |
| **BTC Revolving Loan Amount:** | Fifteen Thousand (15,000) BTC (the "**BTC Revolving Loan Amount**"). |
| Guarantor: | Voyager Digital LTD. |

55.    AlamedaFTX merely contends that OpCo was "the beneficiary of an intercompany transfer of the amounts lent to" HoldCo under the agreement.[91]  From that, AlamedaFTX asserts a "Loan Claim … against [OpCo] as the beneficiary of an intercompany transfer."[92]

56.    That logic simply does not follow.  HoldCo *did* use the proceeds of the Alameda Loan Agreement to benefit OpCo's customers.  In fact, the very point of the Alameda Loan Agreement was to support OpCo customer deposits, and that is why the Alameda Loan Agreement was intended to be (and was) *junior* to creditors at OpCo.  That's why the counterparty to the agreement is HoldCo.

---

[90]  Ex. 4, 10/3/22 Alameda Proof of Claim No. 11213, Addendum at 1.

[91]  *Id.* ("… Alameda Ventures understands that the amounts borrowed under the terms of the Loan agreement by the Borrower were on-lent by the Borrower to [OpCo] to pay its customers for crypto assets that counterparties to Debtors' lending business failed or were unable to return.").

[92]  *Id.*

57.    Alameda, however, did not contract with OpCo and did not require OpCo to guarantee HoldCo's repayment obligations under the Alameda Loan Agreement, and must live with the single guarantee it did obtain.  TopCo was the sole guarantor—*not OpCo*.  And that was by deliberate design.  The loan was made by Alameda to HoldCo to ensure it would be structurally subordinate to customer claims and would be understood by all observers (including customers) to be subordinate to customer claims.  As Section 2.6 of the agreement made clear and Voyager disclosed publicly at the time (in press releases approved by AlamedaFTX), the *only* intended beneficiaries of the Alameda Loan Agreement were *customer*s at OpCo, *not OpCo itself*.[93]  Indeed, the Alameda Loan Agreement *required* HoldCo to use the loan "solely to pay customers for crypto assets" the Debtors' loan counterparties did not repay.[94]

58.    The fact that OpCo might have benefited from its parent companies' entry into the Alameda Loan Agreement is irrelevant, and does not change the analysis concerning which entities Alameda can and cannot assert a claim against.  *See, e.g.*, *Capricorn Invs. III, L.P. v. Coolbrands Int'l, Inc.*, 897 N.Y.S.2d 668, 2009 WL 2208339, at *8 (N.Y. Sup. Ct. 2009) ("despite specifically referring to CoolBrands in the Partnership Agreement, the parties did not therein … impose such obligations on CoolBrands," thus "the documentary evidence, including the Partnership Agreement itself, negates plaintiff's allegation that CoolBrands manifested an intent to be bound to the Partnership Agreement"); *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC.*, 2017 WL 2304302, at *3 (S.D.N.Y. May 18, 2017) ("As TLM MCL is not a party to that Agreement, the

---

[93]    *See* Voyager Press Release (June 17, 2022), https://www.investvoyager.com/pressreleases/voyager-digital-signs-term-sheet-for-ususd200-million-and-15-000-btc-revolving-line-of-credit-with-alameda-research ("The proceeds of the credit facility are intended to be used to safeguard customer assets in light of current market volatility and only if such use is needed."); Voyager Press Release (June 22, 2022), https://www.investvoyager.com/pressreleases/voyager-digital-provides-market-update ("VDH entered into a definitive agreement with Alameda for a US$200 million cash and USDC revolver and a 15,000 BTC revolver (the 'Loan'). As previously disclosed, the proceeds of the credit facility are intended to be used to safeguard customer assets in light of current market volatility and only if such use is needed.").

[94]    Ex. 1, 6/21/22 Alameda Loan Agreement § 2.6.

Complaint and the other documents considered by the Court do not contain sufficient allegations to survive a Motion to Dismiss."); *Kamdem-Ouaffo v. PepsiCo, Inc.*, 160 F. Supp. 3d 553, 566 (S.D.N.Y. 2016) ("under the plain terms of the Agreement, PepsiCo cannot be liable for any breach of contract under the Agreement, to which it was not a party").

59.    The undisputed facts are that the Alameda Loan Agreement was deliberately structured such that Alameda's claims would be structurally subordinate to customer account holders at OpCo.  That is why HoldCo is the party to the agreement, TopCo is the guarantor, and OpCo has no obligations thereunder.  Because there is no legal basis for Alameda Proof of Claim No. 11213, the Court should disallow and expunge that claim with prejudice.

**B.    The Alameda Proofs of Claim Should Be Equitably Subordinated to the Debtors' Other Creditors.**

60.    Alameda has caused enough harm to creditor recoveries in these chapter 11 cases. This Court should equitably subordinate in full the Alameda Proofs of Claim to all other creditor claims at each of the Debtors, as provided in the Debtors' Plan.

61.    This Court has "broad equitable powers … to achieve fairness and justice in the reorganization process." *In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014).  This Court, "under principles of equitable subordination, [can] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c)(1). Subordination is warranted when, as here, (1) the claimant engaged in inequitable conduct, (2) that conduct harmed other creditors or conferred an unfair advantage on the claimant, and (3) subordination is not otherwise inconsistent with the Bankruptcy Code.  *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 582 (S.D.N.Y. 2015); *LightSquared*, 511 B.R. 253 at 346–47.  Given AlamedaFTX's massive, historic, and rampant fraud, the elements of subordination are met here.

62.    Under the first element, inequitable conduct occurs when it would be "unjust or unfair to permit the claimant to share *pro rata* with the other claimants of equal status." *LightSquared*, 511 B.R. at 346.  This includes both conduct that is "unconscionable, unjust, unfair, close or double dealing or foul conduct," along with *lawful* conduct that "shocks one's good conscience." *Id.* at 347–48.  Unlawful conduct is not required, because bankruptcy "concerns not only the legal validity of the claim but also [a] claimant's right to share in the estate." *In re 80 Nassau Associates*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).    Accordingly, "*creditor misconduct in connection with the chapter 11 process itself*—irrespective of applicable non-bankruptcy law—*provides an appropriate predicate for equitable subordination of such creditor's claim*." *LightSquared*, 511 B.R. at 349 (emphasis added).

63.    Here, from the outset of these chapter 11 cases, AlamedaFTX's conduct repeatedly has shocked the conscience.  From day one, AlamedaFTX undermined Voyager's efforts to consummate a sale on the best terms.  On July 22, 2022—*the day after Voyager filed their Bidding Procedures Motion*—Alameda issued a press release and low-ball proposal for the Debtors' business, openly disparaging the Debtors, front-running and obstructing what was supposed to be (and would have been) an orderly process.  AlamedaFTX interrupted the process at every turn. Then, after the Debtors fought for and ran a full process at tremendous expense, AlamedaFTX made promises and entered into a binding transaction to acquire the Debtors' business that it had to know at the time it could never fulfill, as a result of which the Debtors declined other opportunities and entered into the FTX Purchase Agreement.  That transaction fell apart when AlamedaFTX's fraud was discovered and AlamedaFTX collapsed, causing massive sums of damage to the Debtors' estates that will ultimately be borne by creditors.[95]

---

[95]    The Debtors are serving discovery on AlamedaFTX and the AlamedaFTX executives that were directly and indirectly involved in this misconduct.  The Debtors will seek equitable subordination at the Confirmation Hearing

64.     *LightSquared* is on all fours with the present case.  Similar to here, during a "crucial

time" in the LightSquared chapter 11 cases, when the LightSquared debtors and their stakeholders

were negotiating the terms of a consensual reorganization plan, SPSO—already a secured debt

holder and also a competitor of the debtors'—delayed closing on hundreds of millions of dollars

of additional debt purchases while in the background strategizing to acquire the estates' assets.

511 B.R. at 353, 358–59.  With the ownership of large debt positions in flux—meaning that the

debtors, with exclusivity soon to terminate, could not determine if they had the votes to confirm a

plan—progress in the chapter 11 cases was "stymied."  *Id.* at 358–59.  As the Court found, it was

"not acceptable" for SPSO to "deploy a blocking position to control the conduct of the case itself,

to subvert the intended operation of a court-approved exclusivity termination arrangement, and to

prevent the Court from directing and having visibility into events unfolding in the case."  *Id.* at

360.  "SPSO failed to act in a way that is consistent with the most basic concepts of good faith that

are fairly to be expected of chapter 11 creditors."  *Id.*  So too here.

65.     With respect to the second element, Alameda's conduct has directly and materially

harmed the Debtors and their creditors.  *See In re KDI Holdings, Inc.*, 277 B.R. 493, 509 (Bankr.

S.D.N.Y. 1999) (finding the injury prong met if "general creditors are less likely to collect their

debts" as a result of the inequitable conduct).  This reality cannot be subject to reasonable dispute.

And once the Debtors have established that AlamedaFTX's conduct harmed the estates, "the

burden shifts to the claimant … to demonstrate that the (i) harm caused was discrete in nature and

(ii) the court cannot determine the amount of harm done without undue complication," *see In re

Mid-American Waste System, Inc.*, 284 B.R. 53, 72 (Bankr. D. Del. 2002)—a burden Alameda will

be unable to meet.

---

by default if they do not comply, as the indisputable facts and admissions of the AlamedaFTX parties *alone* are
more than sufficient to justify subordination.

66.     AlamedaFTX has caused the Debtors and their creditors substantial harm.[96]  They made a bid for the Debtors' business that they could never satisfy, luring the Debtors into entering the FTX Purchase Agreement under false pretenses.  And they set the Debtors' restructuring efforts back months, imposed millions of dollars in additional, unnecessary fees and costs on these Debtors' chapter 11 estates when bidding was reopened and Plan confirmation was delayed, impaired the Debtors' marketing and sales process, and ultimately harmed Voyager's creditors' recoveries.  Based on the Debtors' preliminary calculation, the *direct* damage from AlamedaFTX's efforts in entering into an agreement it could not honor, forcing the Debtors to go back to the drawing board and solicit a new plan, exceeds $100 million.   These circumstances require the complete subordination of AlamedaFTX's claims.  In fact, if there was ever a case to subordinate a creditor's claim, this is the case and AlamedaFTX is the creditor.[97]

67.     At this point, Voyager and its customers have suffered enough from AlamedaFTX's misconduct.  Subordinating AlamedaFTX's claims in full will not make Voyager creditors whole, but it will help alleviate some of the harm caused by AlamedaFTX's massive fraud.  What Alameda touted early in these chapter 11 cases as its North Star rings even more true today: "These bankruptcy proceedings should be about Voyager's customers, who just want their money back."[98]

---

[96]  For purposes of equitable subordination, there is no legally significant distinction between Alameda's conduct and FTX's such that Alameda can avoid accountability for its affiliate's conduct during the Debtors' auction. Both were represented by the same decisionmakers and counsel, acting as one; and, as AlamedaFTX's new CEO John Ray concluded in his first days on the job, the sprawling FTX enterprises were all "controlled by Mr. Bankman-Fried" and marred by a "complete failure of corporate controls."  Ray Decl. ¶¶ 5, 10.

[97]  The final element—that subordination is not inconsistent with the Bankruptcy Code—"warrants little attention," because Section 510(c) codified equitable subordination.  *LightSquared*, 511 B.R. at 352.

[98]  FTX Limited Obj. ¶ 4.

## CONCLUSION

For these reasons, and as will be shown at confirmation,[99] the Debtors request that the

Court enter the Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

Dated:  January 30, 2023          /s/ Joshua A. Sussberg, P.C.
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900
                                  Email:        jsussberg@kirkland.com
                                                cmarcus@kirkland.com
                                                christine.okike@kirkland.com
                                                allyson.smith@kirkland.com


                                  Michael B. Slade (admitted *pro hac vice*)
                                  Richard U.S. Howell, P.C. (admitted *pro hac vice*)
                                  300 N. LaSalle St.
                                  Chicago, Illinois 60654
                                  Telephone:    (312) 862-2000
                                  Facsimile:    (312) 862-2200
                                  Email:        mslade@kirkland.com
                                                rhowell@kirkland.com


                                  *Counsel to the Debtors and Debtors in Possession*

---

[99]  It is procedurally proper for the Court to subordinate Alameda's claims as part of Plan confirmation.  Bankruptcy Rule 7001(8) provides that a proceeding to subordinate any allowed claim is an adversary proceeding *except* when a chapter 11 plan provides for subordination, as here.  *See, e.g.*, *In re Best Products Co., Inc.*, 168 B.R. 35, 65 (Bankr. S.D.N.Y. 1994) (interpreting Rule 7001(8) and finding that the appellant creditor's procedural argument that subordination can only be adjudicated in an adversary proceeding was "simply wrong" in the context of a chapter 11 plan); *In re Wash. Mut., Inc.*, 462 B.R. 137, 145 (Bankr. D. Del. 2011) ("In this case, the Debtors' plan has provided for a class of subordinated claims.  Therefore, an adversary proceeding is not required to reach the issue of claim subordination."); *In re Fuller*, 255 B.R. 300, 305 (Bankr. W.D. Mich. 2000) ("[A] Chapter 11, 12 or 13 plan may provide for equitable relief and subordinate liens even if an adversary proceeding would be required to secure such relief outside of the plan confirmation process.").

# Exhibit 1

**LOAN AGREEMENT**

This **LOAN AGREEMENT** (this "**Agreement**") is entered into as of June 21, 2022 (the "**Effective Date**") by and among **ALAMEDA VENTURES LTD** ("**Lender**"), **VOYAGER DIGITAL HOLDINGS, INC.** ("**Borrower**") and **VOYAGER DIGITAL LTD** ("**Guarantor**"). Capitalized terms used but not otherwise defined herein shall have the meanings given them on Schedule B. The parties agree as follows:

1.    *Loans*. Lender will make extensions of credit or other financial accommodations for Borrower's benefit (each, a "**Loan**" and collectively, the "**Loans**") under two facilities, the cash revolving facility and the BTC facility, in the amounts and as otherwise identified on Schedule A, and Borrower promises to pay Lender the amount of all Loans and all debts, liabilities, obligations, covenants, indemnifications, interest, expenses and fees, created hereunder, whether arising before or after the commencement of any bankruptcy or insolvency proceeding (collectively, the "**Obligations**") pursuant to the terms and conditions of this Agreement, and as set forth herein and on Schedule A.

2.    *Borrowings*.

2.1    Notice. Borrower shall give Lender notice from a Responsible Officer by 2:00 PM Eastern Time on each proposed Funding Date as hereinafter provided of each borrowing under this Agreement, which shall specify (i) the aggregate amount of such borrowing, (ii) the date of the proposed borrowing, (iii) the Applicable Currency of such borrowing and (iv) the uses of such borrowing. If notice is received by 2:00 PM Eastern Time, then the applicable Loan shall be advanced (i) for all Loans advanced in any Applicable Currency other than Dollars, on the same calendar day, or if received thereafter, on the next calendar day, and (ii) for all Loans advanced in Dollars, on the same Business Day, or if received thereafter, on the next Business Day.

2.2    Funding Currency. Lender shall make available the amount of the Loan to be made by it on such date to Borrower in the Applicable Currency so requested by Borrower.

2.3    Funding Restrictions. Such Loans shall be limited to the Cash Revolving Loan Amount and the BTC Revolving Loan Amount, each set forth on Schedule A, and in no event shall more than $75,000,000 be funded in any rolling thirty (30) day period in the aggregate for both Loans (for determining this threshold, the BTC value shall be determined on the day the loan request is made by Borrower based upon prevailing BTC prices as listed on Coin Market Cap or another market valuation as otherwise agreed upon by the parties). There will be no more draw downs of Loans permitted at any time that the aggregate value of all Platform Assets of Borrower is less than $600,000,000 as reflected on Borrower's books and records using methodology consistent with past practice ("**Platform Asset Funding Restriction**").

2.4    Prepayments. Prepayments of the Loans shall be made in Borrower's sole and absolute discretion, without premium or penalty.

2.5    Payments. All Loans that are funded in a type of Applicable Currency shall be re-paid in the same Applicable Currency as which they were funded.

2.6    Use of Proceeds. The Borrower shall only use the proceeds of the Loans solely to pay customers for crypto assets that counterparties to the Borrower's (or its Affiliates) lending and related activities (i) fail to return to the Borrower (or its Affiliates) when such return is demanded by the Borrower, (ii) fail to return to the Borrower (or its Affiliates) when required to be returned by such counterparties, (iii) become insolvent or (iv) are unable, for whatever reason (including without limitation any unilateral imposition of a limit or prohibition on withdrawals) to return the type and amount of crypto assets lent by the Borrower (or its Affiliates).

2.7    Hard Fork. With respect to any BTC Revolving Loans, in the event of a Hard Fork in the blockchain for BTC or an Airdrop, then in addition to repayment of such BTC

-1-

CONFIDENTIAL

Revolving Loans in such amount equal to the amount drawn down and outstanding at the time of repayment, Borrower shall also deliver any incremental tokens generated as a result of a Hard Fork in the BTC protocol or an Applicable Airdrop (the "New Tokens") if the following two conditions are met:

        (a)    *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 0.5% of the average market capitalization of BTC (defined as the total value of BTC) (calculated as a 30-day average on such date).

        (b)    *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 0.5% of the average 24-hour trading volume of BTC (calculated as a 30-day average on such date).

**3.**     *Conditions to Funding*.

    **3.1**     The obligation of Lender to make an initial Loan to the Borrower is subject to the following conditions precedent, unless agreed in writing (including email) by Lender to waive such condition, in each case in Lender's sole discretion:

        (a)    Receipt by Lender of a certificate of each Loan Party executed by the Secretary of such Loan Party with appropriate insertions and attachments, including with respect to (i) the operating documents of such Loan Party (which formation document of such Loan Party shall be certified by the Secretary of State of the State of such Loan Party's formation) and (ii) the resolutions adopted by each such Loan Party's board of directors for the purpose of approving the transactions contemplated by the Loan Documents;

        (b)    Receipt by Lender of good standing certificates of each Loan Party certified by the Secretary of State (or equivalent agency) of such Loan Party's jurisdiction of organization or formation and each jurisdiction in which such Loan Party is qualified to conduct business, each as of a date no earlier than thirty (30) days prior to the date such Loan is made; and

        (c)    Receipt by Lender of a certificate of each Loan Party certifying that (i) the representations and warranties set forth in Section 4 are true and correct in all respects as of the date of such Loan, (ii) no Material Adverse Change has occurred, (iii) compliance with the matter set forth in Section 3.2(c) and (iv) compliance with the matter set forth in Section 3.2(d).

    **3.2**     The obligation of Lender to extend each Loan, including the initial Loan, is subject to the following conditions precedent unless agreed in writing (including email) by Lender to waive such condition, in each case in Lender's sole discretion:

        (a)    No Event of Default shall have occurred and be continuing;

        (b)    In the Lender's opinion exercised in good faith, there has not been (and there is not reasonably likely to occur) any Material Adverse Change;

        (c)    No Platform Asset Funding Restriction exists;

CONFIDENTIAL

VOY-INV-00009196

(d)    The Corporate Debt to Specified Asset ratio of Borrower and its Subsidiaries shall not exceed 0.25;

(e)    Receipt by Lender of a written draw request specifying the information set forth in Section 2.1, duly executed by Borrower;

(f)    No customer withdrawal requests of any Loan Party remaining unsatisfied after ten (10) calendar days of the customer's request for withdrawal; and

(g)    Execute any further instruments and take further action as the Lender reasonably requests to effect the purposes of this Agreement.

Notwithstanding the foregoing, Borrower agrees to deliver to the Lender each item required to be delivered to the Lender under this Agreement as a condition precedent to any Loan. Borrower expressly agrees that a Loan made prior to the receipt by the Lender of any such item shall not constitute a waiver by the Lender of Borrower's obligation to deliver such item, and any such Loan in the absence of a required item shall be made in each Lender's sole discretion.

4.    *Representations, Warranties and Covenants of Loan Parties*. Each Loan Party represents, warrants and covenants to Lender as follows, as of the Effective Date and with respect to covenants, for so long as this Agreement is in effect or any Obligations remain outstanding (other than inchoate obligations for which no claim has been made):

4.1    *Corporate Existence; Authority.* Each Loan Party is and will continue to be, duly existing and in good standing in its state of formation and qualified and licensed to do business in, and in good standing in, any state where such qualification is necessary, except for jurisdictions in which failure to do so would not have a material adverse effect on such Loan Party. The execution, delivery and performance by each Loan Party of this Agreement and all other related documents have been duly and validly authorized, do not conflict with such Loan Party's formation documents, and do not constitute an event of default under any material agreement by which such Loan Party is bound.

4.2    *Taxes; Legal Compliance.* Each Loan Party has filed, and will file, when due, all tax returns and reports required by applicable law. Each Loan Party has paid, and will pay when due, all taxes, assessments, deposits and contributions now or in the future owed (except for taxes and assessments being contested in good faith with adequate reserves under IFRS). Each Loan Party has complied, and will comply, in all material respects, with all applicable laws, rules and regulations.

4.3    *Insolvency.* As of the Effective Date, the Loan Parties are able to pay their debts (including trade debts) as they mature (which representation shall be made by assuming no losses arose from the loan to Three Arrows Capital Ltd.).

4.4    *Litigation*. Except (i) as otherwise set forth in the Guarantor's filings under its profile under SEDAR and the Guarantor's press releases publicly issued prior to the Effective Date and (ii) for the US Bank National Association v. Voyager Digital, LLC trademark infringement matter (Case :22-cv-01336) Filed 5/18/22, there are no actions, suits, investigations, or proceedings pending or, to the knowledge of the Loan Parties, threatened in writing by or against any Loan Party involving more than One Million Dollars ($1,000,000.00) ("**Material Litigation**").

4.5    *Negative Covenants.* No Loan Party will, and will not permit any of their Subsidiaries to, without Lender 's prior written consent (which shall be a matter of Lender's good faith business judgment), do any of the following:

-3-

CONFIDENTIAL

VOY-INV-00009197

(a)      engage in any business other than the business currently engaged in by such Loan Party or reasonably related thereto;

(b)      merge or consolidate with any other Person, or acquire, all or substantially all of the capital stock or shares or any property of another Person, in each case including for the avoidance of doubt through a merger, purchase, in-licensing arrangement or any similar transaction, unless such Loan Party is the surviving entity of such merger;

(c)      (i) create, incur or become liable for any Indebtedness in excess of $2,000,000 in  the aggregate in any calendar year (calculated without including any Indebtedness consisting of Customer Liabilities and without including any intercompany loans between Borrower and any of its Subsidiaries); (ii) grant or allow any Lien, security interest or other encumbrance on any of its property other than Permitted Liens; or (iii) directly or indirectly make any investment in excess of $1,000,000 in the aggregate in any calendar year;

(d)      (i) declare or pay any dividends (other than dividends payable solely in capital stock) or make any other distribution or payment in respect of or redeem, retire or purchase any capital stock; (ii) other than the Obligations in accordance with the terms hereof, purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity; (iii) be a party to or bound by an agreement that restricts a Subsidiary from paying dividends or otherwise distributing property to Borrower; and

(e)      directly or indirectly enter into or permit to exist any material transaction with any entity controlling, controlled by or under common control with a Loan Party other than (i) transactions that are in the ordinary course of business consistent with past practice, (ii) are on terms and conditions not less favorable than could be obtained on an arms-length basis from unrelated third parties and (iii) intercompany Indebtedness between a Loan Party and its Subsidiaries.

**4.6**      *Affirmative Covenants*. Each Loan Party shall do all of the following:

(a)      maintain its legal existence and good standing in their respective jurisdictions of organization and maintain qualification in each jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Change;

(b)      keep its business insured for risks and in amounts standard for companies in each such Loan Party's industry and location.  Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to the Lender;

(c)      notify Lender of any Material Litigation;

(d)      protect, defend and maintain the validity and enforceability of its respective assets including intellectual property that is material to its business.

**4.7**      *Ongoing Business*. Borrower agrees that Lender will be the preferred borrower for Crypto lending activities of Borrower. Borrower shall also recall all outstanding Crypto loans and shall work with Lender to restructure the outstanding Crypto loan from Borrower to Genesis in a manner and on terms satisfactory to Borrower and Lender, in their reasonable discretion. In the event that Lender defaults on the payment of any outstanding Crypto loans made by Borrower to Lender in violation of the Crypto loan agreements between Lender and Borrower, Borrower shall be entitled to offset and reduce the outstanding Obligations by the amount of all such past due Crypto loans.

-4-

VOY-INV-00009198

      **4.8**     *Full Disclosure.* No written representation, warranty or other statement of any Loan Party in any certificate or written statement given to Lender, in the aggregate, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement contained in such certificates or statements not misleading.

    **5.**     *Term*. This Agreement shall continue in effect until the maturity date set forth in <u>Schedule A</u> (the "**Maturity Date**"). On the Maturity Date or on any earlier effective date of termination of this Agreement, Borrower shall pay all Obligations in full, whether or not such Obligations are otherwise then due and payable. All payments of outstanding Loans shall be made in the Applicable Currency in which such Loan was funded by Lender. No termination shall in any way affect or impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any obligation to Lender, until all of the Obligations have been paid and performed in full (other than inchoate obligations for which no claim has been made).

    **6.**     *Defaults and Remedies.*

        **6.1**     *Events of Default.* The occurrence of any of the following shall constitute an "**Event of Default**" under this Agreement:

        (a)     Borrower shall fail to make any payment of unpaid principal or accrued but unpaid interest under this Agreement when and as the same shall become due and payable and such failure continues for ten (10) Business Days after notice of such failure shall have been furnished to Borrower by Lender;

        (b)     Borrower fails to comply with or to perform any other covenant set forth herein and such failure continues for thirty (30) days after notice of such failure shall have been furnished to Borrower by Lender;

        (c)     any of the representations and warranties set forth in this Agreement shall be untrue or shall be incorrect in any material respect when made or deemed made;

        (d)     Guarantor challenges the validity of the guaranty set forth in Section 8 of this Agreement;

        (e)     institution by or against any Loan Party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of debts, making an assignment for the benefit of such Loan Party's creditors or such Loan Party's dissolution, winding down, liquidation or ceasing to do business, in each case, that remain in effect for forty-five (45) days;

        (f)     there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Change;

        (g)     one or more judgments, orders, or decrees for the payment of money in an amount, individually or in the aggregate, of at least One Million Dollars ($1,000,000.00) (not covered by independent third party insurance as to which (i) Borrower reasonably believes such insurance carrier will accept liability, (ii) Borrower or the applicable Loan Party has submitted such claim to such insurance carrier and (iii) liability has not been rejected by such insurance carrier) shall be rendered against any Loan Party and shall remain unsatisfied, unvacated, or unstayed for a period of ten (10) days after the entry thereof;

        (h)     any financial indebtedness of any Loan Party is not paid when due, or becomes due prior to its stated maturity by reason of an event of default (howsoever described, provided that this Section 7.1(h) shall not apply to any customer withdrawal requests (which for the avoidance of doubt are covered by Section 3.2(f));

CONFIDENTIAL

VOY-INV-00009199

(i)        a Loan Party's auditor qualify its audited consolidated annual financial statements other than a going concern qualification;

(j)        there is a default in (a) any agreement to which any Loan Party is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000.00) or that could reasonably be expected to have a Material Adverse Change;

(k)        any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started or threatened, or any judgment or order of a court, arbitral body or agency is made, in relation to this Agreement or the transactions contemplated herein or against a Loan Party or any of their respective subsidiaries or their respective assets which have, or has, or are, or is, reasonably likely to constitute a Material Adverse Change or any judgment, fine, settlement or other resolution of any such litigation, arbitration of administrative proceeding resulting in obligations of the Loan Parties in excess of Five Million Dollars ($5,000,000);

(l)        (i) a notice of lien, levy, or assessment is filed against any Loan Party or their respective assets by any government agency, and is not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); and (ii)(x) any material portion of any Loan Party's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (y) any court order enjoins, restrains, or prevents any Loan Party from conducting any part of its business; or

(m)        failure of Borrower to obtain any primary debt facility or primary equity financing, in each case of comparable size as this Agreement within twelve (12) months of the Effective Date.

**6.2**    *Remedies*.  Upon an Event of Default having occurred and continuing:

(a)        Lender may declare all or any portion of the unpaid Obligations to be immediately due and payable (*provided, however*, that if an Event of Default specified in Section 6.1(e) above occurs, the entire unpaid Obligations shall forthwith become and be immediately due and payable without any notice, declaration or other act on the part of Lender); and

(b)        Lender shall be entitled to exercise any other rights which Lender may have been afforded under any contract or agreement at any time and other rights which Lender may have pursuant to applicable law.

**7.**    *Guarantee.*

**7.1**    *The Guarantee*.  Guarantor hereby guarantees to the Lender, and its respective successors, endorsees, transferees and assigns, the full and prompt payment in full when due (whether at stated maturity, by acceleration, demand or otherwise) and performance of the indebtedness, liabilities and other obligations of the Borrower to the Lender under or in connection with this Agreement and the other Loan Documents, including all unpaid principal of the Loans, all interest accrued thereon, all fees due under this Agreement and all other amounts payable by the Borrower to the Lender hereunder or in connection herewith, including, without limitation, the Obligations. The foregoing indebtedness, liabilities and other obligations of the Borrower, and all other indebtedness, liabilities and obligations to be paid or performed by the Guarantors in connection with this Section shall hereinafter be collectively referred to as the "**Guaranteed Obligations**."

**7.2**    *Obligations Unconditional*.  The obligations of the Guarantor under Section 7.1 are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Borrower under this Agreement or any other agreement or

-6-

VOY-INV-00009200

instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 7.1 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances. The Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Lender exhausts any rights, powers or remedies or proceeds against the Borrower under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

    **7.3**  ***Reinstatement***.  The obligations of the Guarantor under this Section 8 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Guarantor agrees that it will indemnify the Lender on demand for all reasonable costs and expenses (including reasonable and documented fees of counsel) incurred by such Persons in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

    **7.4**  ***Subrogation***.  Until the Guaranteed Obligations shall be satisfied in full (other than any inchoate indemnity obligations), the Guarantor shall not directly or indirectly exercise (i) any rights that it may acquire by way of subrogation under this Section 7, by any payment hereunder or otherwise, (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this Section 8 or (iii) any other right which it might otherwise have or acquire (in any way whatsoever) which could entitle it at any time to share or participate in any right, remedy or security of the Lender as against the Borrower, whether in connection with this Section 8, any of the other Loan Documents or otherwise. If any amount shall be paid to any Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents.

    **7.5**  ***Remedies***.  The Guarantor agrees that, as between the Guarantor, on one hand, and the Lender, on the other hand, the obligations of the Borrower under this Agreement and under the other Loan Documents may be declared to be forthwith due and payable as provided in Section 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7) for purposes of Section 7.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantor for purposes of Section 7.1.

    **7.6**  ***Continuing Guarantee***.  The guarantee in this Section 7 is a continuing guaranty and agreement of subordination relating to any Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and the Guarantor expressly acknowledges that the guarantee in this Section 8 shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist. The guarantee in this Section 7 shall continue in effect and be binding upon the Guarantor until payment and performance in full of the Guaranteed Obligations (other than any inchoate indemnity obligations).

CONFIDENTIAL                            VOY-INV-00009201

7.7     ***General Limitation on Guarantee Obligations***. In any action or proceeding involving any provincial, territorial or state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantor under Section 7.1 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by the Guarantor, Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

### 7.8     *Additional Waivers; General Waivers*.

(a)     Additional Waivers.  Notwithstanding anything herein to the contrary, the Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof; (ii)(A) notice of acceptance hereof; (B) notice of any other financial accommodations made or maintained under the Loan Documents or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to the Guarantor's right to make inquiry of the Lender to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or of any other fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor under this Guaranty or under the other Loan Documents) and demands to which the Guarantor might otherwise be entitled; (iii) its right, if any, to require the Lender to institute suit against, or to exhaust any rights and remedies which the Lender now have or may hereafter have against, any other guarantor of the Guaranteed Obligations or any third party, or against any collateral provided by such other guarantors or any third party; and the Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of any other guarantor of the Guaranteed Obligations or by reason of the cessation from any cause whatsoever of the liability of any other guarantor of the Guaranteed Obligations in respect thereof; (iv) any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Lender; or (B) any election by the Lender under any provision of any state or federal bankruptcy, insolvency or similar law to limit the amount of, or any collateral securing, its claim against the Guarantor.

(b)     General Waivers.  The Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

### 8.     *General*.

8.1     ***Compliance with Canadian Securities Laws***. The Parties acknowledge that the Guarantor is a reporting issuer under the securities laws of each of the provinces and territories of Canada and is a listed issuer on the Toronto Stock Exchange. As such, the Transactions, and the parties in carrying out the Transactions, are subject to applicable securities laws in Canada including, without limitation,  that the Transactions may be subject to Part 5 of Multilateral Instrument 61-101 Protection of Minority Securityholders in Special Transactions. The parties agree to use commercially reasonable efforts to comply, in a timely manner, with all of their obligations under applicable securities laws.

8.2     ***Press Releases.*** The parties agree to consult with each other prior to issuing any press release, material change report, early warning report or other public disclosure document relating to the transactions and/or the existing relationships among the parties provided, that nothing in this Section 9.2 shall be deemed to prohibit any party from making any disclosure

-8-

CONFIDENTIAL

VOY-INV-00009202

which its counsel deems necessary or advisable in order to satisfy such party's disclosure obligations imposed by applicable law.

        8.3    *No Waivers; Amendments*.  The failure of Lender at any time to require Borrower or any Loan Party to comply strictly with any of the provisions of this Agreement shall not waive Lender's right to later demand and receive strict compliance.  Any waiver of a default shall not waive any other default.  None of the provisions of this Agreement may be waived except by a specific written waiver signed by Lender and delivered to Borrower and the other Loan Parties, if applicable.  The provisions of this Agreement may not be amended except in a writing signed by Loan Parties and Lender.

        8.4    *Attorneys' Fees*.  Borrower shall reimburse Lender for all expenses and reasonable costs and expenses (including reasonable and documented attorneys' fees and expenses) for preparing, negotiating, administering, defending and enforcing this Agreement and the other Loan Documents with Lender (including appeals or insolvency proceedings). If, subject to the foregoing, Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees from the non-prevailing party.

        8.5    *Binding Effect; Assignment.*  This Agreement is binding upon and for the benefit of the successors and permitted assignees of each party. No party may not assign any rights under this Agreement without the other party's prior written consent.  Borrower shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the names and addresses of Lender and any assignee and principal amounts (and stated interest) owing to each Lender and assignee pursuant to the terms hereof from time to time.  It is the intention that this Agreement be treated registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

        8.6    *Notices*.  All notices by any party required or permitted under this Agreement or any other related agreement must be in writing and be sent via email at the e-mail address listed on the signature page hereto (or such other e-mail address as provided to the other party in writing).

        8.7    *Governing Law; Jurisdiction.*  This Agreement shall be governed by the laws of the State of New York.  Each Loan Party and Lender each submit to the exclusive jurisdiction of the federal and state courts in New York, New York.

        8.8    *Other*.  If any provision hereof is unenforceable, the remainder of this Agreement shall continue in full force and effect. This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  This Agreement (including schedules hereto) and any other written agreements and, documents executed in connection herewith are the complete agreement between Loan Parties and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated herein. This Agreement may be executed in one or more counterparts, all of which when taken together will constitute one agreement.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation assignments, assumptions, amendments, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

CONFIDENTIAL  VOY-INV-00009203

9.       *Tax Provisions.*

      9.1       *Tax Treatment.* It is the intention of the parties that for U.S. federal, and applicable state and local, income tax purposes that (i) this Agreement shall be treated as a debt instrument, (ii) if the Applicable Currency is USDC or BTC, the repayment of the USDC or BTC, respectively, shall be treated as a return of assets "identical" to those which were loaned to the Borrower within the meaning of Section 1058(b) of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations promulgated thereunder (including those in proposed form) as if the Agreement were an agreement described in Section 1058(a) of the Code, (iii) this Agreement shall not reduce the risk of loss or opportunity for gain of the Lender in any USDC or BTC borrowed hereunder, (iv) any tokens or other property distributed in respect of any USDC or BTC borrowed hereunder shall be treated as earned by and owned by the Lender as beneficial owner of the USDC or BTC, respectively, and (v) no gain or loss shall be recognized by the Borrower or Lender in connection with the lending and repayment of any USDC or BTC under Section 1001 of the Code and any similar state and local tax law. The parties agree to treat the Agreement consistently with the foregoing for all tax purposes and to report consistently with such tax treatment unless otherwise required by applicable law. Lender understands and agrees that it is solely responsible for the payment of any applicable taxes with respect to any payment it receives pursuant to this Agreement (whether in BTC, USDC, cash or any other property) and for any other income taxes resulting from the transactions contemplated herein. Lender hereby agrees to defend, indemnify, and hold harmless the Borrower and its respective officers, directors, managers, employees, and agents from any and all liabilities, costs, and expenses (including reasonable attorneys' fees) in connection with any such taxes and related costs, interest, and penalties. Lender understands and acknowledges that the characterization of the transactions contemplated by this Agreement for U.S. federal, state or local income and Canadian tax purposes is unclear. Each party further understands and acknowledges that the other party and any of its respective agents shall not provide any advice or guidance with respect to the tax consequences of the parties in connection with this Agreement. Each party is strongly encouraged to seek advice from its own tax advisor to discuss the potential tax consequences of entering into this Agreement and the receipt of any payments hereunder.

      9.2       *Transfer and Similar Taxes.* Borrower shall timely pay to the relevant governmental authority all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to any Loan Document.

      9.3       *Withholding.* Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any tax (including interest and penalties) from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is not an Excluded Tax (as defined below), then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 10.3) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made. In addition, Borrower shall indemnify Lender, within 10 days after demand therefor, for the full amount of any taxes that are not Excluded Taxes payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such tax were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error. For purposes of this Section 10.3, an "Excluded Tax" is (i) any tax (including interest and penalties) on Lender in the jurisdiction in which Lender is formed or incorporated that is imposed on or measured by net income (however denominated) or is a

-10-

CONFIDENTIAL                                                      VOY-INV-00009204

franchise tax or branch profits tax and (ii) any tax under Sections 1471 through 1474 of the Code and the authorities thereunder as in effect on the date hereof.

10.     ***Confidentiality.*** Neither party hereto may use the confidential information it receives about any other party directly or indirectly for any purpose other than the administration and enforcement of this Agreement, and may not use the confidential information for any purposes which could be deemed to be adverse to or competitive with such party's business. In handling any confidential information, each party hereto will exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (i)  as required by law, regulation, subpoena, or other order (*provided, however*, that the disclosing party shall provide written notice thereof to the applicable party (to the extent not prohibited by law or court order), and consult with such party with respect to such disclosure to the extent reasonably protectable and provide such party reasonable opportunity to object to any such disclosure or to request confidential treatment thereof); or (ii) as Lender (if the disclosing party) considers appropriate in exercising remedies under this Agreement.

11.     ***Mutual Waiver of Jury Trial***.  EACH LOAN PARTY AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT OR ANY RELATED DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

[Signature page follows.]

-11-

CONFIDENTIAL

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date initially set forth above.

**BORROWER:**

**VOYAGER DIGITAL HOLDINGS, INC.**

By: *Stephen Ehrlich*
Name: Stephen Ehrlich
Title:   Chief Executive Officer
E-mail: sehrlich@investvoyager.com

**GUARANTOR:**

**VOYAGER DIGITAL LTD.**

By: *Stephen Ehrlich*
Name: Stephen Ehrlich
Title:   Chief Executive Officer
E-mail:  sehrlich@investvoyager.com

**LENDER:**

**ALAMEDA VENTURES LTD**

By: _____
Name:  Sam Bankman-Fried
Title:   Chief Executive Officer
E-mail: sam@ftx.com

[Signature Page to Loan Agreement]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date initially set forth above.

**BORROWER:**

**VOYAGER DIGITAL HOLDINGS, INC.**

By: _____
Name:  Stephen Ehrlich
Title:    Chief Executive Officer
E-mail: sehrlich@investvoyager.com

**GUARANTOR:**

**VOYAGER DIGITAL LTD.**

By: _____
Name:  Stephen Ehrlich
Title:    Chief Executive Officer
E-mail:  sehrlich@investvoyager.com

**LENDER:**

**ALAMEDA VENTURES LTD**

By:  *Sam Bankman-Fried*
      672DA8813280489
Name:  Sam Bankman-Fried
Title:   Chief Executive Officer
E-mail: sam@ftx.com

[Signature Page to Loan Agreement]

CONFIDENTIAL

SCHEDULE A
LOAN TERMS

| BORROWER: | VOYAGER DIGITAL HOLDINGS, INC. |
|---|---|
| Cash Revolving Loan Amount: | Two Hundred Million Dollars ($200,000,000.00) (the "**Cash Revolving Loan Amount**"). |
| BTC Revolving Loan Amount: | Fifteen Thousand (15,000) BTC (the "**BTC Revolving Loan Amount**"). |
| Guarantor: | Voyager Digital LTD. |
| Draw Period: | The period of time commencing upon the Effective Date and continuing through the earlier to occur of (a) December 30, 2024 or (b) the earlier termination of this Agreement in accordance with the terms thereof ("**Draw Period**"). |
| Maturity Date: | December 31, 2024 (the "**Maturity Date**"). |
| Cash Revolving Loan: | Subject to the terms and conditions of this Agreement, during the Draw Period, and upon the delivery by Borrower to Lender of a completed and executed irrevocable loan request (in a form acceptable to Lender), Lender shall make cash loans available to Borrower in an aggregate original principal amount not to exceed the Cash Revolving Loan Amount, subject to the funding restrictions set forth in this Agreement.  Prior to the Maturity Date, Cash Revolving Loans may be repaid and reborrowed.

Lender will only be obligated to make a Cash Revolving Loan so long as the Conditions to Funding set forth in Section 3 of this Agreement have been met. |
| BTC Revolving Loan: | Subject to the terms and conditions of this Agreement, during the Draw Period, and upon the delivery by Borrower to Lender of a completed and executed irrevocable loan request (in a form acceptable to Lender), Lender shall make loans available to Borrower in an aggregate original principal amount not to exceed the BTC Revolving Loan Amount, subject to the funding restrictions set forth in this Agreement  Prior to the Maturity Date, BTC Revolving Loans may be repaid and reborrowed. |
| Repayment: | For the Cash Revolving Loan, the repayment shall be in the form of Dollars or USDC, depending on the Applicable Currency in which such Loan was funded.

For the BTC Revolving Loan, the repayment shall be in the form of BTC in an amount equal to the amount drawn down and outstanding at the time of repayment. |
| Interest: | The Loans shall accrue interest on the outstanding principal balance at a rate equal to five percent (5.0%) per annum and shall be payable on the Maturity Date (provided that under the BTC Revolving Loan the interest shall be paid in kind based on the number of BTC outstanding at the Maturity Date). Interest is computed on a three hundred sixty (360) day year for the actual number of days elapsed. |

CONFIDENTIAL

## SCHEDULE B
## DEFINITIONS

As used in this Agreement, the following words shall have the following meanings:

"**Affiliate**" is, with respect to any Person, any other Person that owns or controls directly or indirectly ten percent (10%) or more of the stock of another entity of such Person, any other Person that controls or is controlled by or is under common control with such Person and each of such Person's officers, directors, managers, joint ventures or partners. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting equity securities, by contract or otherwise and the terms "controlled by" and "under common control with" shall have correlative meanings.

"**Agreement**" is defined in the preamble hereof.

"**Airdrop**" is a distribution of a New Token or tokens resulting from the ownership of a preexisting token for which the distribution of New Tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant BTC held at a specified time.

"**Applicable Currency**" is (i) for the Cash Revolving Loans, Dollars or USDC, and (ii) for the BTC Revolving Loans, BTC.

"**Borrower**" is defined in the preamble hereof.

"**BTC**" is BITCOIN, a digital currency.

"**BTC Revolving Loan Amount**" is defined in Schedule A.

"**BTC Revolving Loans**" is all Loans advanced in BTC up to the BTC Revolving Loan Amount.

"**Business Day**" is a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"**Cash Revolving Loan Amount**" is defined in Schedule A.

"**Cash Revolving Loans**" is all Loans advanced in Dollars or USDC up to the Cash Revolving Loan Amount.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation directly or indirectly guaranteed, endorsed, co made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith in accordance with IFRS; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Corporate Debt**" is all forms of loans, notes and other indebtedness for borrowed money of Borrower and its Subsidiaries including guaranteed indebtedness of Borrower and its Subsidiaries, whether in fiat or digital assets, as measured in Dollars at the time of measurement. For the avoidance of doubt, Customer Liabilities shall not be considered Corporate Debt.

"**Customer Liabilities**" obligations to Borrower's customers incurred in connection with the provision of services by Borrower to its customers which are reflected on Borrower's books and records as liabilities.

"**Dollars**" and "**$**" is the lawful currency of the United States of America.

"**Draw Period**" is defined in Schedule A.

"**Effective Date**" is defined in the preamble hereof.

US-DOCS\132902736.2

"**Event of Default**" is defined in Section 6.1.

"**Funding Date**" is any date on which a Loan is made to or for the account of Borrower which shall be a Business Day for Loans advanced in Dollars, and any calendar day for all Loans advanced in any other Applicable Currency.

"**Guarantor**" is defined in the preamble hereof.

"**Hard Fork**" is a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a New Token).

"**IFRS**" is international financial reporting standards as in effect from time to time.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, (d) non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (e) equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (f) obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (g) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (h) all Indebtedness of others guaranteed by such Person, (i) off-balance sheet liabilities and/or pension plan or multiemployer plan liabilities of such Person, (j) obligations arising under non-compete agreements, (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the ordinary course of business and (l) Contingent Obligations.

"**Lender**" is defined in the preamble hereof.

"**Lien**" is a claim, hypothecation, mortgage, deed of trust, levy, charge, pledge, security interest, or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan**" and "**Loans**" are defined in Section 1.

"**Loan Documents**" are, collectively, this Agreement, and any other present or future agreement between any Loan Party and/or for the benefit of Lender in connection with this Agreement, all as amended, extended or restated from time to time.

"**Loan Party**" means, collectively, Borrower and Guarantor.

"**Material Adverse Change**" is (a) a material adverse change in the business, operations or condition (financial or otherwise) or reasonable prospects of Borrower and its Subsidiaries; or (b) a material impairment of (i) the reasonable prospect of repayment of any portion of the Obligations, (ii) the Loan Parties' ability to perform or otherwise comply with all or any of its or their obligations hereunder; (iii) the legality, validity or enforceability of any Loan Document or (iv) the rights and remedies of the Lender under any Loan Document except as the result of the action or inaction of the Lender, in each case in the opinion of the Lender acting in good faith. For the avoidance of doubt any diminution of value, failure to recover, impairment or other loss of greater than 25% of the value of the Loan Parties' loans made to Three Arrows Capital Ltd. and its Affiliates shall be deemed to be a Material Adverse Change.

"**Maturity Date**" is defined in Schedule A.

"**New Token(s)**" is defined in Section 2.7.

"**Obligations**" is defined in Section 1.

"**Permitted Liens**" is (a) liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which such Loan Party maintains adequate reserves on its books, if they have no priority over any of Lender's security interests; (b) statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions; (c) liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of Borrower's business and imposed without action of such parties; provided, that the payment thereof is not yet required, (d) pledges and deposits made

US-DOCS\132902736.2

in the ordinary course of business in compliance with workers' compensation, unemployment and other social security laws or regulations; (e) statutory liens imposed by law arising in the ordinary course; and (f) purchase money liens in an amount not to exceed $500,000 in the aggregate (i) on equipment and related software acquired or held by any Loan Party or its Subsidiaries incurred for financing the acquisition of the equipment and related software, if any, including the financing of the costs of shipping, taxes and installation, or (ii) existing on equipment and related software when acquired, if the lien is confined to such property, improvements thereon, and proceeds thereof, in the aggregate not exceeding Five Millions Dollars ($5,000,000).

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company association, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"*Platform Assets*" is cash held for customers, crypto assets held, crypto assets loaned and crypto asset collateral received by Borrower as currently used for reporting purposes in Guarantor's financial statements.

"**Responsible Officer**" is each of the Chief Executive Officer, the President, and the Chief Financial Officer of Borrower.

"**Specified Assets**" are the total Platform Assets of Borrower and its Subsidiaries, as measured in Dollars at the time of measurement, as reflected in Borrower's books and records consistent with past practice, less $500,000,000.

"**Subsidiaries**" is any entity of which more than fifty percent (50.0%) of the voting stock or other equity interests is owned or controlled, directly or indirectly, by a Loan Party.

"**Transactions**" are the transactions contemplated under this Agreement and the other Loan Documents.

"**USDC**" is cryptocurrency pegged to the Dollar.

US-DOCS\132902736.2

CONFIDENTIAL

VOY-INV-00009211

# Exhibit 2

Fill in this information to identify the case:

Debtor ___Voyager Digital Holdings, Inc.___

United States Bankruptcy Court for the District of ___Southern District of New York___

Case number ___22-10943___

## Official Form 410

# Proof of Claim

**04/22**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Alameda Ventures Ltd. |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| | | |
|---|---|---|
| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| | | ☐ Yes.  From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Alameda Ventures Ltd. | |
| Brian Glueckstein | |
| c/o Sullivan & Cromwell L... | |
| 125 Broad Street | |
| New York, NY 10004 | |
| **P:** (212) 558-4000 | |
| **E:** gluecksteinb@sullcrom.com | |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____ |
| | | MM/DD/YYYY |

| | | |
|---|---|---|
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes.  Who made the earlier filing? _____ |

1175309302232799779000001

| | | | |
|---|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No | |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ | |

---

7. **How much is a claim?**   See attached addendum   Does this amount include interest or other charges?

☐ No

☑ Yes.   Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum.

---

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property

**Nature of property**

☐ Real estate.   If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

---

10. **Is this claim based on a lease?**

☑ No

☐ Yes.   Amount necessary to cure any default as of the date of the petition.   $ _____

---

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes.   Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
| --- | --- | --- | --- |
| | | ☐ Yes.   Check one: | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority. For example, law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time     10/03/2022 at 11:31 am PT
                            MM / DD / YYYY HH : MM

/s/Brian D. Glueckstein
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian | D. | Glueckstein |
| --- | --- | --- | --- |
| | First Name | Middle Name | Last Name |
| Title | Partner | | |
| Company | Sullivan & Cromwell LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 125 Broad Street | | |
| | Number | Street | |
| | New York | NY | 10004 |
| | City | State | ZIP Code |
| Contact phone | | | |
| Email | gluecksteinb@sullcrom.com | | |

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Voyager Digital Holdings, Inc. |
| Debtor 2<br>(Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 22-10943 |

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Alameda Ventures Ltd.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**
Attention: Brian Glueckstein

c/o Sullivan & Cromwell LLP
Name

125 Broad Street
Number        Street

New York          NY          10004
City               State        ZIP Code

Contact phone  (212) 558-4000

Contact email  gluecksteinb@sullcrom.com

**Where should payments to the creditor be sent?** (if different)

Name

Number        Street

City               State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**

$ See attached addendum

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  |  | Amount entitled to priority |
|---|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/03/2022
                   MM / DD / YYYY

/s/ Brian D. Glueckstein
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian | D. | Glueckstein |
|---|---|---|---|
| | First name | Middle name | Last name |

Title       Partner

Company     Sullivan & Cromwell LLP
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     125 Broad Street
            Number        Street

            New York                    NY        10004
            City                        State     ZIP Code

Contact phone   (212) 558-4000          Email   gluecksteinb@sullcrom.com

### ADDENDUM TO PROOF OF CLAIM OF ALAMEDA VENTURES LTD.
### AGAINST VOYAGER DIGITAL HOLDINGS, INC., VOYAGER DIGITAL LTD.
### AND VOYAGER DIGITAL, LLC

Alameda Ventures Ltd. ("Alameda Ventures") hereby submits this proof of claim (this "Proof of Claim") against Debtors Voyager Digital Holdings, Inc., Voyager Digital Ltd. and Voyager Digital, LLC (collectively, the "Debtors") in the jointly administered chapter 11 case captioned *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in accordance with the *Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Dkt. No. 218]. Alameda Ventures' claims (the "Claims") against the Debtors, as applicable and as set forth below, arise out of the following facts and circumstances.

I.      CLAIMS

A.  **Claim for Outstanding Amounts Due Under Loan Agreement**

On June 21, 2022, Debtor Voyager Digital Holdings, Inc. (the "Borrower") entered into that certain Loan Agreement (the "Loan Agreement"), with Alameda Ventures, as lender, pursuant to which Alameda Ventures agreed to provide the Borrower a revolving credit facility of up to $200 million cash and USDC, and 15,000 Bitcoin. The Borrower's obligations under the Loan Agreement are guaranteed in full by Debtor Voyager Digital Ltd. In addition, Alameda Ventures understands that the amounts borrowed under the terms of the Loan Agreement by the Borrower were on-lent by the Borrower to Debtor Voyager Digital, LLC to pay its customers for crypto assets that counterparties to Debtors' lending business failed or were unable to return.

As of the Petition Date, Alameda Ventures was owed $75 million outstanding under the Loan Agreement, plus amounts presently unliquidated consisting of, among other amounts, accrued and unpaid interest under the Loan Agreement[1] and all other amounts due or to become due to Alameda Ventures under the terms of the Loan Agreement (collectively, the "Loan Claim"). Alameda Ventures asserts the Loan Claim against each of the Borrower and Debtor Voyager Digital Ltd., as guarantor, and against Debtor Voyager Digital, LLC as the beneficiary of an intercompany transfer of the amounts lent to the Borrower under the Loan Agreement.[2]

B.  **Unliquidated Claim for Damages Relating to Entry into Loan Agreement**

Alameda Ventures also asserts presently unliquidated claims against each of the Debtors, including, without limitation, for damages arising from each of the Debtors'

---

[1]   Under the terms of the Loan Agreement, the outstanding principal balance under the Loan Agreement accrues interest at a rate equal to five percent (5.0%) per annum.

[2]   The Debtors' Schedules of Assets and Liabilities lists an unsecured claim in the amount of $75,125,000.00 held by Alameda Ventures Ltd. solely against Voyager Digital Holdings, Inc. *See* Schedule F Attachment, ID 3.001 (Dkt. No. 311). This is incomplete.

misrepresentations and improper disclosures in connection with, and inducing Alameda Ventures to enter into, the Loan Agreement.

### C.  Unliquidated Claim for Damages Relating to Equity Purchase

On October 28, 2021, Alameda Ventures purchased in cash beneficial ownership of in aggregate 7,723,995 common shares of Voyager Digital Ltd. through a private placement issuance.  Alameda Ventures asserts presently unliquidated claims against Debtor Voyager Digital Ltd. including, without limitation, for damages arising from Voyager Digital Ltd.'s misrepresentations and improper disclosures in violation of, *inter alia*, securities and other applicable laws.

## II.    ADMINISTRATIVE EXPENSE CLAIMS

This Proof of Claim is without prejudice to claims, if any, that Alameda Ventures has or may have for payment of any additional administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Proof of Claim, and Alameda Ventures' right to file such claims or any similar claims at an appropriate time is expressly reserved.

## III.    ADDITIONAL OR SUPPLEMENTAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filing by, or on behalf of, Alameda Ventures or its affiliates, of additional or supplemental claims or proofs of claim with respect to any other liability or indebtedness of the Debtors.

## IV.    NO WAIVER

The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of Alameda Ventures' rights against any of the Debtors or any other entity or person liable for all or part of any of the claims described herein, including, but not limited to, those owned by or affiliated with any of the Debtors; (b) a waiver of the right to seek to have the reference withdrawn with respect to (i) the subject matter of this Proof of Claim, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in these bankruptcy cases against or otherwise involving Alameda Ventures; (c) a waiver of any right to the subordination, in favor of Alameda Ventures, of indebtedness or liens held by creditors of any of the Debtors; (d) a waiver or release of rights to setoff or recoupment; or (e) to elect remedies or choice of law.  Alameda Ventures expressly reserves all rights and remedies to satisfy the Claims.

## V.    RESERVATION OF RIGHTS

This Proof of Claim is filed with full reservation of rights, including the right to assert a claim for additional amounts, the right to file additional or other pleadings to assert any of the amounts set forth in the Claims, the right to pursue the Claims based upon additional or alternative legal theories, and the right to assert additional, supplementary, and/or amended

proofs of claim and requests for administrative expense reimbursements based on events, information, and/or documents obtained from the Debtors or others through discovery or otherwise.  Without in any way limiting the foregoing, Alameda Ventures' rights to assert any claims that it may have against the Debtors, or against any other party or property other than the Debtors and their estates, are expressly reserved.  To the extent that any of the Debtors or any other party takes any action that would give rise to a counterclaim or other rights or claims that Alameda Ventures may have against any of the Debtors, Alameda Ventures reserves all of its rights.  By filing this Proof of Claim, Alameda Ventures does not waive, and specifically reserves, its respective procedural and substantive defenses to any claim that may be asserted against Alameda Ventures by any of the Debtors, by any trustee of their estates, by any official committee, or by any other party.  This Proof of Claim is not intended, nor should it be construed, as Alameda Ventures' consent to jurisdiction in the Bankruptcy Court for any purpose other than with respect to this Proof of Claim, or as a waiver of Alameda Ventures' right to a trial by jury in any action or proceeding.

Alameda Ventures reserves the right to attach, produce and/or rely upon additional documentation that supports the Claims and any additional documents that may become available after further investigation or discovery, or upon request of any of the Debtors.  Nothing contained in this Proof of Claim shall limit the rights of Alameda Ventures to file papers or pleadings, or commence any proceedings, or take any actions concerning the Claims.

## VI.        NOTICE

All matters concerning this Proof of Claim, including any request for information concerning this Proof of Claim, should be addressed as follows:

Alameda Ventures Ltd.
c/o Sullivan & Cromwell LLP
Attn:    Andrew G. Dietderich
         Brian D. Glueckstein
         Benjamin S. Beller
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        gluecksteinb@sullcrom.com
        bellerb@sullcrom.com

Exhibit 3

Fill in this information to identify the case:

Debtor     Voyager Digital Ltd.

United States Bankruptcy Court for the District of     Southern District of New York

Case number    22-10944

## Official Form 410

# Proof of Claim

**04/22**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Alameda Ventures Ltd. |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| | | |
|---|---|---|
| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| | | ☐ Yes.   From whom? |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Where should payments to the creditor be sent? (if different)

Alameda Ventures Ltd.
Brian Glueckstein
c/o Sullivan & Cromwell L...
125 Broad Street
New York, NY 10004
**P:** (212) 558-4000
**E:** gluecksteinb@sullcrom.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — —

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes.  Claim number on court claims registry (if known) _____ Filed on _____<br>MM/DD/YYYY |

| | | |
|---|---|---|
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes.  Who made the earlier filing? |

1175310032232800011100001

| 6. | Do you have any number you use to identify the debtor? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: | | _____ |

| 7. | How much is a claim? | See attached addendum | Does this amount include interest or other charges? |
|---|---|---|---|
| | | | ☐ No |
| | | | ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate.   If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

| 10. | Is this claim based on a lease? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Amount necessary to cure any default as of the date of the petition. | $ | _____ |

| 11. | Is this claim subject to a right of setoff? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Identify the property: | | _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No | |
| | | ☐ Yes.  Check one: | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    10/03/2022 at 11:45 am PT
                           MM / DD / YYYY HH : MM

/s/Brian D. Glueckstein
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian | D. | Glueckstein |
| | First Name | Middle Name | Last Name |

Title      Partner

Company    Sullivan & Cromwell LLP
           Identify the corporate servicer as the company if the authorized agent is a servicer

| Address | 125 Broad Street | | |
| | Number | Street | |
| | New York | NY | 10004 |
| | City | State | ZIP Code |

Contact phone    _____

Email      gluecksteinb@sullcrom.com

**Fill in this information to identify the case:**

Debtor 1     Voyager Digital Ltd.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Southern District of New York

Case number   22-10944

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:    Identify the Claim

1. **Who is the current creditor?**

Alameda Ventures Ltd.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

2. **Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**
Attention: Brian Glueckstein

c/o Sullivan & Cromwell LLP
Name

125 Broad Street
Number    Street

New York            NY        10004
City            State        ZIP Code

Contact phone  (212) 558-4000

Contact email  gluecksteinb@sullcrom.com

**Where should payments to the creditor be sent?** (if different)

Name

Number      Street

City            State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

4. **Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____
                                                                    MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**

$ See attached addendum

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:  _____

**Basis for perfection:**  _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                               $_____

**Amount of the claim that is secured:**         $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**      $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:  _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/03/2022
                  MM / DD / YYYY

/s/  Brian D. Glueckstein
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian | D. | Glueckstein |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Partner |
|---|---|

| Company | Sullivan & Cromwell LLP |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 125 Broad Street |
|---|---|
| | Number        Street |
| | New York                          NY        10004 |
| | City                              State     ZIP Code |

Contact phone  (212) 558-4000          Email  gluecksteinb@sullcrom.com

---

**ADDENDUM TO PROOF OF CLAIM OF ALAMEDA VENTURES LTD.
AGAINST VOYAGER DIGITAL HOLDINGS, INC., VOYAGER DIGITAL LTD.
AND VOYAGER DIGITAL, LLC**

Alameda Ventures Ltd. ("Alameda Ventures") hereby submits this proof of claim (this "Proof of Claim") against Debtors Voyager Digital Holdings, Inc., Voyager Digital Ltd. and Voyager Digital, LLC (collectively, the "Debtors") in the jointly administered chapter 11 case captioned *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in accordance with the *Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Dkt. No. 218]. Alameda Ventures' claims (the "Claims") against the Debtors, as applicable and as set forth below, arise out of the following facts and circumstances.

## I.    CLAIMS

### A.  Claim for Outstanding Amounts Due Under Loan Agreement

On June 21, 2022, Debtor Voyager Digital Holdings, Inc. (the "Borrower") entered into that certain Loan Agreement (the "Loan Agreement"), with Alameda Ventures, as lender, pursuant to which Alameda Ventures agreed to provide the Borrower a revolving credit facility of up to $200 million cash and USDC, and 15,000 Bitcoin. The Borrower's obligations under the Loan Agreement are guaranteed in full by Debtor Voyager Digital Ltd. In addition, Alameda Ventures understands that the amounts borrowed under the terms of the Loan Agreement by the Borrower were on-lent by the Borrower to Debtor Voyager Digital, LLC to pay its customers for crypto assets that counterparties to Debtors' lending business failed or were unable to return.

As of the Petition Date, Alameda Ventures was owed $75 million outstanding under the Loan Agreement, plus amounts presently unliquidated consisting of, among other amounts, accrued and unpaid interest under the Loan Agreement[1] and all other amounts due or to become due to Alameda Ventures under the terms of the Loan Agreement (collectively, the "Loan Claim"). Alameda Ventures asserts the Loan Claim against each of the Borrower and Debtor Voyager Digital Ltd., as guarantor, and against Debtor Voyager Digital, LLC as the beneficiary of an intercompany transfer of the amounts lent to the Borrower under the Loan Agreement.[2]

### B.  Unliquidated Claim for Damages Relating to Entry into Loan Agreement

Alameda Ventures also asserts presently unliquidated claims against each of the Debtors, including, without limitation, for damages arising from each of the Debtors'

---

[1]    Under the terms of the Loan Agreement, the outstanding principal balance under the Loan Agreement accrues interest at a rate equal to five percent (5.0%) per annum.

[2]    The Debtors' Schedules of Assets and Liabilities lists an unsecured claim in the amount of $75,125,000.00 held by Alameda Ventures Ltd. solely against Voyager Digital Holdings, Inc. *See* Schedule F Attachment, ID 3.001 (Dkt. No. 311). This is incomplete.

misrepresentations and improper disclosures in connection with, and inducing Alameda Ventures to enter into, the Loan Agreement.

### C.  Unliquidated Claim for Damages Relating to Equity Purchase

On October 28, 2021, Alameda Ventures purchased in cash beneficial ownership of in aggregate 7,723,995 common shares of Voyager Digital Ltd. through a private placement issuance.  Alameda Ventures asserts presently unliquidated claims against Debtor Voyager Digital Ltd. including, without limitation, for damages arising from Voyager Digital Ltd.'s misrepresentations and improper disclosures in violation of, *inter alia*, securities and other applicable laws.

## II.    ADMINISTRATIVE EXPENSE CLAIMS

This Proof of Claim is without prejudice to claims, if any, that Alameda Ventures has or may have for payment of any additional administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Proof of Claim, and Alameda Ventures' right to file such claims or any similar claims at an appropriate time is expressly reserved.

## III.    ADDITIONAL OR SUPPLEMENTAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filing by, or on behalf of, Alameda Ventures or its affiliates, of additional or supplemental claims or proofs of claim with respect to any other liability or indebtedness of the Debtors.

## IV.    NO WAIVER

The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of Alameda Ventures' rights against any of the Debtors or any other entity or person liable for all or part of any of the claims described herein, including, but not limited to, those owned by or affiliated with any of the Debtors; (b) a waiver of the right to seek to have the reference withdrawn with respect to (i) the subject matter of this Proof of Claim, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in these bankruptcy cases against or otherwise involving Alameda Ventures; (c) a waiver of any right to the subordination, in favor of Alameda Ventures, of indebtedness or liens held by creditors of any of the Debtors; (d) a waiver or release of rights to setoff or recoupment; or (e) to elect remedies or choice of law.  Alameda Ventures expressly reserves all rights and remedies to satisfy the Claims.

## V.    RESERVATION OF RIGHTS

This Proof of Claim is filed with full reservation of rights, including the right to assert a claim for additional amounts, the right to file additional or other pleadings to assert any of the amounts set forth in the Claims, the right to pursue the Claims based upon additional or alternative legal theories, and the right to assert additional, supplementary, and/or amended

proofs of claim and requests for administrative expense reimbursements based on events, information, and/or documents obtained from the Debtors or others through discovery or otherwise. Without in any way limiting the foregoing, Alameda Ventures' rights to assert any claims that it may have against the Debtors, or against any other party or property other than the Debtors and their estates, are expressly reserved. To the extent that any of the Debtors or any other party takes any action that would give rise to a counterclaim or other rights or claims that Alameda Ventures may have against any of the Debtors, Alameda Ventures reserves all of its rights. By filing this Proof of Claim, Alameda Ventures does not waive, and specifically reserves, its respective procedural and substantive defenses to any claim that may be asserted against Alameda Ventures by any of the Debtors, by any trustee of their estates, by any official committee, or by any other party. This Proof of Claim is not intended, nor should it be construed, as Alameda Ventures' consent to jurisdiction in the Bankruptcy Court for any purpose other than with respect to this Proof of Claim, or as a waiver of Alameda Ventures' right to a trial by jury in any action or proceeding.

Alameda Ventures reserves the right to attach, produce and/or rely upon additional documentation that supports the Claims and any additional documents that may become available after further investigation or discovery, or upon request of any of the Debtors. Nothing contained in this Proof of Claim shall limit the rights of Alameda Ventures to file papers or pleadings, or commence any proceedings, or take any actions concerning the Claims.

**VI.      NOTICE**

All matters concerning this Proof of Claim, including any request for information concerning this Proof of Claim, should be addressed as follows:

Alameda Ventures Ltd.
c/o Sullivan & Cromwell LLP
Attn:    Andrew G. Dietderich
          Brian D. Glueckstein
          Benjamin S. Beller
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
E-mail: dietdericha@sullcrom.com
          gluecksteinb@sullcrom.com
          bellerb@sullcrom.com

# Exhibit 4

**Fill in this information to identify the case:**

Debtor _____ Voyager Digital, LLC _____

United States Bankruptcy Court for the District of _____ Southern District of New York _____

Case number _____ 22-10945 _____

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Alameda Ventures Ltd. |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Alameda Ventures Ltd.<br>Brian Glueckstein<br>c/o Sullivan & Cromwell L...<br>125 Broad Street<br>New York, NY 10004<br>**P:** (212) 558-4000<br>**E:** gluecksteinb@sullcrom.com | Where should payments to the creditor be sent? (if different) |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>— — — — — — — — — — — — — — — — — — — — — — — — | |
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____<br>MM/DD/YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

Official Form 410

1175310032232800012000001

| | | | |
|---|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No | |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ | |

| | | | |
|---|---|---|
| 7. | **How much is a claim?** | See attached addendum _____ |

Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

| | |
|---|---|
| 8. | **What is the basis of the claim?** |

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum. _____

| | |
|---|---|
| 9. | **Is all or part of the claim secured?** |

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property**

☐ Real estate.    If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

| | | | |
|---|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No | |
| | | ☐ Yes. Amount necessary to cure any default as of the date of the petition. | $ _____ |

| | | | |
|---|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No | |
| | | ☐ Yes. Identify the property: _____ | |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | | |
|---|---|---|---|
| | A Claim may be partly priority and partly nonpriority. For example, law limits the amount entitled to priority. | ☑ No | |
| | | ☐ Yes. Check one: | Amount entitled to priority |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    10/03/2022 at 12:00 pm PT
                           MM  /  DD  /  YYYY  HH  :  MM

/s/Brian D. Glueckstein
Signature

**Print the name of the person who is completing and signing this claim:**

Name
| Brian | D. | Glueckstein |
|---|---|---|
| First Name | Middle Name | Last Name |

Title
Partner

Company
Sullivan & Cromwell LLP
Identify the corporate servicer as the company if the authorized agent is a servicer

Address
125 Broad Street
| Number | Street | |
|---|---|---|
| New York | NY | 10004 |
| City | State | ZIP Code |

Contact phone    _____

Email    gluecksteinb@sullcrom.com

| **Fill in this information to identify the case:** | |
|---|---|
| Debtor 1 | Voyager Digital, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 22-10945 |

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Alameda Ventures Ltd.

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Attention: Brian Glueckstein
c/o Sullivan & Cromwell LLP
Name

125 Broad Street
Number       Street

New York        NY        10004
City                State           ZIP Code

Contact phone (212) 558-4000

Contact email gluecksteinb@sullcrom.com

**Where should payments to the creditor be sent?** (if different)

Name _____

Number       Street

City                State           ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ See attached addendum

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                $_____

**Amount of the claim that is secured:**      $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**      $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:    Sign Below**

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|

Executed on date    10/03/2022
                    MM  /  DD  /  YYYY

/s/  Brian D. Glueckstein
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brian | D. | Glueckstein |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Sullivan & Cromwell LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 125 Broad Street | | |
| | Number          Street | | |
| | New York | NY | 10004 |
| | City | State | ZIP Code |
| Contact phone | (212) 558-4000 | Email | gluecksteinb@sullcrom.com |

## ADDENDUM TO PROOF OF CLAIM OF ALAMEDA VENTURES LTD.
## AGAINST VOYAGER DIGITAL HOLDINGS, INC., VOYAGER DIGITAL LTD.
## AND VOYAGER DIGITAL, LLC

Alameda Ventures Ltd. ("Alameda Ventures") hereby submits this proof of claim (this "Proof of Claim") against Debtors Voyager Digital Holdings, Inc., Voyager Digital Ltd. and Voyager Digital, LLC (collectively, the "Debtors") in the jointly administered chapter 11 case captioned *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in accordance with the *Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Dkt. No. 218]. Alameda Ventures' claims (the "Claims") against the Debtors, as applicable and as set forth below, arise out of the following facts and circumstances.

## I.    CLAIMS

### A.  Claim for Outstanding Amounts Due Under Loan Agreement

On June 21, 2022, Debtor Voyager Digital Holdings, Inc. (the "Borrower") entered into that certain Loan Agreement (the "Loan Agreement"), with Alameda Ventures, as lender, pursuant to which Alameda Ventures agreed to provide the Borrower a revolving credit facility of up to $200 million cash and USDC, and 15,000 Bitcoin. The Borrower's obligations under the Loan Agreement are guaranteed in full by Debtor Voyager Digital Ltd. In addition, Alameda Ventures understands that the amounts borrowed under the terms of the Loan Agreement by the Borrower were on-lent by the Borrower to Debtor Voyager Digital, LLC to pay its customers for crypto assets that counterparties to Debtors' lending business failed or were unable to return.

As of the Petition Date, Alameda Ventures was owed $75 million outstanding under the Loan Agreement, plus amounts presently unliquidated consisting of, among other amounts, accrued and unpaid interest under the Loan Agreement[1] and all other amounts due or to become due to Alameda Ventures under the terms of the Loan Agreement (collectively, the "Loan Claim"). Alameda Ventures asserts the Loan Claim against each of the Borrower and Debtor Voyager Digital Ltd., as guarantor, and against Debtor Voyager Digital, LLC as the beneficiary of an intercompany transfer of the amounts lent to the Borrower under the Loan Agreement.[2]

### B.  Unliquidated Claim for Damages Relating to Entry into Loan Agreement

Alameda Ventures also asserts presently unliquidated claims against each of the Debtors, including, without limitation, for damages arising from each of the Debtors'

---

[1]    Under the terms of the Loan Agreement, the outstanding principal balance under the Loan Agreement accrues interest at a rate equal to five percent (5.0%) per annum.

[2]    The Debtors' Schedules of Assets and Liabilities lists an unsecured claim in the amount of $75,125,000.00 held by Alameda Ventures Ltd. solely against Voyager Digital Holdings, Inc. *See* Schedule F Attachment, ID 3.001 (Dkt. No. 311). This is incomplete.

misrepresentations and improper disclosures in connection with, and inducing Alameda Ventures to enter into, the Loan Agreement.

### C.  Unliquidated Claim for Damages Relating to Equity Purchase

On October 28, 2021, Alameda Ventures purchased in cash beneficial ownership of in aggregate 7,723,995 common shares of Voyager Digital Ltd. through a private placement issuance.  Alameda Ventures asserts presently unliquidated claims against Debtor Voyager Digital Ltd. including, without limitation, for damages arising from Voyager Digital Ltd.'s misrepresentations and improper disclosures in violation of, *inter alia*, securities and other applicable laws.

## II.      ADMINISTRATIVE EXPENSE CLAIMS

This Proof of Claim is without prejudice to claims, if any, that Alameda Ventures has or may have for payment of any additional administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Proof of Claim, and Alameda Ventures' right to file such claims or any similar claims at an appropriate time is expressly reserved.

## III.     ADDITIONAL OR SUPPLEMENTAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filing by, or on behalf of, Alameda Ventures or its affiliates, of additional or supplemental claims or proofs of claim with respect to any other liability or indebtedness of the Debtors.

## IV.      NO WAIVER

The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of Alameda Ventures' rights against any of the Debtors or any other entity or person liable for all or part of any of the claims described herein, including, but not limited to, those owned by or affiliated with any of the Debtors; (b) a waiver of the right to seek to have the reference withdrawn with respect to (i) the subject matter of this Proof of Claim, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in these bankruptcy cases against or otherwise involving Alameda Ventures; (c) a waiver of any right to the subordination, in favor of Alameda Ventures, of indebtedness or liens held by creditors of any of the Debtors; (d) a waiver or release of rights to setoff or recoupment; or (e) to elect remedies or choice of law.  Alameda Ventures expressly reserves all rights and remedies to satisfy the Claims.

## V.       RESERVATION OF RIGHTS

This Proof of Claim is filed with full reservation of rights, including the right to assert a claim for additional amounts, the right to file additional or other pleadings to assert any of the amounts set forth in the Claims, the right to pursue the Claims based upon additional or alternative legal theories, and the right to assert additional, supplementary, and/or amended

proofs of claim and requests for administrative expense reimbursements based on events, information, and/or documents obtained from the Debtors or others through discovery or otherwise.  Without in any way limiting the foregoing, Alameda Ventures' rights to assert any claims that it may have against the Debtors, or against any other party or property other than the Debtors and their estates, are expressly reserved.  To the extent that any of the Debtors or any other party takes any action that would give rise to a counterclaim or other rights or claims that Alameda Ventures may have against any of the Debtors, Alameda Ventures reserves all of its rights.  By filing this Proof of Claim, Alameda Ventures does not waive, and specifically reserves, its respective procedural and substantive defenses to any claim that may be asserted against Alameda Ventures by any of the Debtors, by any trustee of their estates, by any official committee, or by any other party.  This Proof of Claim is not intended, nor should it be construed, as Alameda Ventures' consent to jurisdiction in the Bankruptcy Court for any purpose other than with respect to this Proof of Claim, or as a waiver of Alameda Ventures' right to a trial by jury in any action or proceeding.

Alameda Ventures reserves the right to attach, produce and/or rely upon additional documentation that supports the Claims and any additional documents that may become available after further investigation or discovery, or upon request of any of the Debtors.  Nothing contained in this Proof of Claim shall limit the rights of Alameda Ventures to file papers or pleadings, or commence any proceedings, or take any actions concerning the Claims.

**VI.      NOTICE**

All matters concerning this Proof of Claim, including any request for information concerning this Proof of Claim, should be addressed as follows:

Alameda Ventures Ltd.
c/o Sullivan & Cromwell LLP
Attn:   Andrew G. Dietderich
           Brian D. Glueckstein
           Benjamin S. Beller
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
E-mail: dietdericha@sullcrom.com
           gluecksteinb@sullcrom.com
           bellerb@sullcrom.com