# EXHIBIT 7



## VOYAGER DIGITAL LTD.

**Management's Discussion and Analysis**

**For the quarter ending December 31, 2021**

**February 14, 2022**

HIGHLY CONFIDENTIAL

VOY-INV-00033107
VOY-INV-00033107

## Introduction

The following Management's Discussion & Analysis ("MD&A") of the financial condition and results of the operations of Voyager Digital Ltd. (the "Company" or "Voyager") constitutes management's review of the factors that affected the Company's financial and operating performance for the fiscal second quarter ended December 31, 2021. All information in this MD&A is given as of and for the three and six months ended December 31, 2021, and 2020, unless otherwise indicated. All dollar figures are stated in U.S. dollars, unless otherwise indicated.

This MD&A has been prepared in compliance with the requirements of Form 51-102F1, in accordance with National Instrument 51-102 – Continuous Disclosure Obligations. This MD&A should be read in conjunction with the unaudited interim consolidated financial statements for the quarter ended December 31, 2021, and the audited annual consolidated financial statements of the Company for the fiscal years ended June 30, 2021, together with the notes thereto. In the opinion of management, all adjustments (which consist only of normal recurring adjustments) considered necessary for a fair presentation have been included. The results for the three and six months ended December 31, 2021, are not necessarily indicative of the results that may be expected for any future period. Information contained herein is presented as of February 14, 2022, unless otherwise indicated.

For the purposes of preparing this MD&A, management considers the materiality of information. Information is considered material if: (i) such information results in, or would reasonably be expected to result in, a significant change in the market price or value of Voyager's common shares; or (ii) there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision; or (iii) it would significantly alter the total mix of information available to investors. Management evaluates materiality with reference to all relevant circumstances, including potential market sensitivity.

The words "we", "our", "us", "Company" and "Voyager" refer to Voyager Digital Ltd. together with its subsidiaries and/or the management and/or employees of the Company (as the context may require).

These documents, along with additional information about Voyager, are available under Voyager's profile at www.sedar.com.

## Caution Regarding Forward-Looking Statements

This MD&A contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates", "continues", "forecasts", "projects", "predicts", "intends", "anticipates" or "believes", or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this MD&A speak only as of the date of this MD&A or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;
- Popularity, adoption and rate of adoption of cryptocurrencies;
- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations or the interpretation or application thereof that currently apply or may become applicable to our business both in the United States and internationally;
- Our expectations with respect to the application of laws and regulations and the interpretation or enforcement thereof and our ability to continue to carry on our business as presently conducted or proposed to be conducted;
- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;

HIGHLY CONFIDENTIAL

VOY-INV-00033108
VOY-INV-00033107

- Our ability to continue to operate and expand our rewards program;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Decline in the cryptocurrency market or general economic conditions;
- Regulatory uncertainty and risk, including changes in laws or the interpretation or application or enforcement thereof and the obtaining of regulatory approvals;
- We are subject to an extensive and highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations, or regulatory interpretation of such laws and regulations, could adversely affect our brand, reputation, business, operating results, and financial condition;
- In connection with such laws and regulations or regulatory interpretation thereof, a particular crypto asset's or product offering's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset or product offering, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- Risks related to managing our growth;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Regulatory risk, including changes in laws or the interpretation or application thereof and the obtaining of regulatory approvals;
- Counterparty risk and credit risk;
- Lending risks;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Cybersecurity risks;
- Fluctuations in quarterly operating results;
- Risks related to the security of customer information;
- Competition in our industry and markets;
- Our reliance on key personnel;
- Our reliance on third party service providers;
- Exchange rate fluctuations;
- Risks related to expanding our marketing and sales;
- Risks related to our ability to adapt to rapid technological change;

2

VOY-INV-00033109
VOY-INV-00033107

- Risks related to terrorism, geopolitical crisis, or widespread outbreak of an illness or other health issue;
- Risks associated with acquisitions and the integration of the acquired businesses; and
- Risks related to international expansion.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this MD&A.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for crypto assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## Description of Business

Voyager, through its United States operating subsidiaries, operates as a crypto asset broker that provides eligible retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers order execution, market data, wallet, and custody services through its proprietary digital platform (the "Voyager Platform"). Through its subsidiary Coinify ApS, Voyager provides crypto payment solutions for both consumers and merchants around the globe.

At Voyager, we believe that crypto assets are disrupting traditional finance and investing models. We envision billions of people all over the world utilizing crypto assets to empower their financial freedom. Bitcoin and crypto assets bring an intrinsic value layer to the internet and mobile technologies. We expect this value layer to disrupt and interject itself into all forms of digital interactions, from social media, to art, to mainstream finance and business. We are building our products with this strategic hypothesis and vision in mind.

We, being a digital asset agent broker, facilitate buying and selling of crypto assets by delivering deep pools of liquidity for the Voyager Platform users. We offer a single access point to market data, wallet, and custody services for crypto assets. Through the Platform, customers can currently:

- quickly open an account; we utilize third party service providers for know-your-customer ("KYC") and anti-money-laundering ("AML") checks to ensure timely and secure account openings;
- trade "spot" between fiat and crypto assets from a single account (there is no leverage, margin or financing of such transactions);
- have an opportunity to earn rewards on certain crypto assets held in their account (the "Rewards Program[1]");
- execute trade orders across a wide spectrum of liquidity providers;

---

[1] The Rewards Program allows customers to earn in-kind payments of crypto asset for maintaining minimum crypto asset balances of the same type of crypto asset in their account. Rewards earned on crypto assets are variable and reward rates are determined by Voyager at its sole discretion. Customers may opt-out of the Rewards Program.

HIGHLY CONFIDENTIAL

VOY-INV-00033110
VOY-INV-00033107

- obtain market data to enable users to manage and track their crypto asset holdings, including delivering news to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and
- store crypto assets through multiple storage solutions while balancing security and availability.

Voyager is registered as a money services business pursuant to the Bank Secrecy Act regulations as administered by with FinCEN and is licensed to operate as a money transmitter or its equivalent in states where such requirements are applicable[2]. Voyager entered into an Account Services Agreement with Metropolitan Commercial Bank (the "Bank"), whereby the Bank provides all services associated with the movement of, and holding of, U.S. dollars for each customer account in the U.S. (using an omnibus custodial "for the benefit of" account). The Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services, (ii) listed on the New York Stock Exchange (symbol: MCB), and (iii) a member of the FDIC. The Bank receives fees for wire transactions and account transactions, subject to a minimum $10,000 monthly fee.

The registered office of the Company is Suite 2900 – 550 Burrard Street, Vancouver, BC, V7X 1J5, Canada; and its head office is 33 Irving Place, 3rd Floor, New York, New York 10003.

### Share Capital Reorganization

On September 7, 2021, Voyager's common shares commenced trading on the Toronto Stock Exchange (the "TSX") under the trading symbol of "VOYG". Prior to trading on the TSX, the Company's common shares were listed on the Canadian Stock Exchange.

On December 14, 2021, the Company's shareholders approved a reorganization of the Company's share capital structure (the "Share Capital Reorganization"). The Share Capital Reorganization was affected on December 15, 2021, and resulted in, among other things, (i) creation of a new class of variable voting shares of the Company for shareholders that are U.S. Residents, and (ii) limiting share ownership of the common shares of the Company to shareholders that are Non-U.S. Residents (the common shares and variable voting shares, together, the "shares"). Aside from the differences in (a) the residency status of shareholders of the common shares and variable voting shares and (b) the voting rights attributable to each class of shares, the shares are otherwise treated the same by the Company in all material respects. In connection with the Share Capital Reorganization the Company received certain exemptive relief from the Canadian securities administrators to enable its common shares and variable voting shares to be treated collectively as if they were a single class for certain purposes, including for take-over bid and early warning reporting purposes and to permit the Company to refer to the variable voting shares as variable voting shares.

Effective, December 23, 2021, the common shares and variable voting shares began trading on the TSX under the single and current ticker "VOYG".

### Long-term incentive plan

Through December 13, 2021, the Company granted options to directors, officers, and employees under the Company's Stock Option Plan (the "SOP"). On December 14, 2021, shareholders approved the Company's Long-Term Incentive Plan (the "LTIP") which replaced the SOP. The LTIP provides for broad-based equity awards to directors, officers, employees, and permits the granting of options, performance share units, restricted share units and/or deferred share units. Options granted under the SOP and the LTIP generally vest over three years, based on continued employment, and are settled upon vesting in shares of the Company's shares. The contractual term of the options is no more than 10 years.

### NCIB

In October 2021, the TSX approved the Company's notice of intention to make a normal course issuer bid ("NCIB"). Pursuant to the NCIB, during the 12-month period from November 2, 2021 to November 1, 2022, the Company is able to purchase up to 8.1 million shares, being approximately 5% of the Company's outstanding shares at the time. For the six months ended December 31, 2021, the Company purchased 503,800 common shares under the NCIB for total consideration of approximately $6.5 million. All purchases were made in accordance with the NCIB at prevailing market prices plus brokerage fees.

---

[2] Trading is currently available to all U.S. residents, excluding New York state. We are actively working with New York regulators to obtain a BitLicense to operate in New York and with various international regulators to operate internationally.

HIGHLY CONFIDENTIAL

VOY-INV-00033111
VOY-INV-00033107

*Alameda Research*

In October 2021, the Company entered into a subscription agreement to issue and sell 7,723,996 common shares of the Company at a price of $9.71 for the aggregate purchase price of $75.0 million to Alameda Research Ltd. The transaction closed on November 22, 2021.

*Acquisitions, Strategic Investments and Joint Ventures*

*Fundstrat investment*

In October 2021, the Company purchased 2,400,000 units of Fundstrat Global Advisors ("Fundstrat") (representing approximately 4% of the outstanding units of Fundstrat). The purchase consideration was satisfied by the issuance of 601,504 common shares of the Company.

*Joint Venture with Market Rebellion*

On August 12, 2021, FINRA approved a 50% investment by Market Rebellion, a leading provider of trading education, content, and tools for independent investors, in VYGR Digital Securities, LLC to provide brokerage for equities, options, and futures trading through the Voyager platform. Voyager and Market Rebellion intend to jointly operate a broker-dealer focused on providing online brokerage services for equities, options, and futures. VYGR Digital Securities, LLC plans to execute equity trades on behalf of Voyager's customers, and Market Rebellion intends to introduce its large and active trading community to the capabilities of this new platform.

*Coinify acquisition*

On August 2, 2021, the Company completed the acquisition of Coinify ApS ("Coinify"), a leading cryptocurrency payment platform existing under the laws of Denmark. The consideration to Coinify sellers consisted of 5,100,000 of newly issued shares of Voyager's shares[3] and $16.3 million in cash. Under the Share Purchase Agreement, Voyager retained substantially all current Coinify employees, entering into employment agreements with key members of the management team.

*LGO SAS acquisition*

On December 10, 2020, the Company acquired LGO SAS, an Autorité des marchés financiers ("AMF") regulated entity based in France, and LGO Europe SAS, in exchange for 200,000 shares of the Company's shares to be issued upon demand in accordance with the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 shares of the Company's shares after one-year, contingent upon AMF's approval of extension of the registration of LGO Europe SAS as a digital asset service provider, and declaration of Voyager's leadership as "Fit and Proper" to operate under the LGO registration, which were received on September 28, 2021.

**Token swap**

In August 2021, the Company completed a token swap as part of the LGO SAS merger with the Company[4]. The token swap and merger combined the original Voyager token, VGX, with the LGO token. To complete the token swap, the VGX and LGO tokens were converted to a single new token under the ticker VGX.

**VLP**

On September 1, 2021, the Company launched the Voyager Loyalty Program (the "VLP"). The VLP gives Voyager token holders a full suite of incentives and rewards. To participate in the VLP, customers must hold a certain number of VGX tokens to unlock various tiers which offer token utility rewards including VGX staking rewards, earnings reward boost, crypto back rewards as well as refer-a friend cash back rewards.

---

[3] A portion of newly issued shares for the Coinify acquisition consideration are subject to issuance/ redemption restrictions.
[4] International token holders were able to swap tokens through September 20th.

HIGHLY CONFIDENTIAL

VOY-INV-00033112
VOY-INV-00033107

*Sponsorship and marketing agreements*

In October 2021, the Company entered into a five-year exclusive, integrated partnership with the Dallas Mavericks, becoming the team's first cryptocurrency brokerage and international partner. Voyager and the Dallas Mavericks will work to make cryptocurrency more accessible through educational and community programs, and fan engagement promotions.

In December 2021, the Company extended its partnership with Landon Cassill for two years. Landon Cassill will be fully paid with a portfolio of cryptocurrencies that includes Bitcoin (BTC), the Voyager Token (VGX), USD Coin (USDC), StormX (STMX) and Avalanche (AVAX).

In December 2021, the Company announced a multi-year agreement with The National Women's Soccer League ("NWSL"), making Voyager the NWSL's first-ever cryptocurrency brokerage partner, further extending the league's global marketing reach, and providing players with direct financial support, crypto education, and rewards.

*Hiring*

On December 1, 2021, the Company appointed Marshall Jensen as the Company's Head of Corporate Development. Marshall has held senior roles in technology investment banking, principal investment, and in the crypto industry. He has substantive knowledge of the digital asset and crypto ecosystem, notably having served as Executive Vice President, Finance, of Digital Asset Custody Company, a crypto custodian which was acquired by BAKKT in 2019.

On December 20, 2021, the Company appointed Brian Brooks to its Board of Directors effective immediately. Brian Brooks is currently CEO of Bitfury Group Ltd. and was formerly the Acting Comptroller of the U.S. Currency at the Office of the Comptroller of the Currency and, before that, the Chief Legal Officer of Coinbase.

We have rapidly grown our employee base from 38 employees at December 31, 2020 to 250 at December 31, 2021. We expect to continue to grow our team in 2022 as we expand into NFTs, the Metaverse, and our own custody solution.

**Overall Performance**

With respect to the three months ended December 31, 2021, as compared to the three months ended December 30, 2020:

- we generated total revenues of $164.8 million compared to $3.6 million
- we reported $2.6 million net income compared to $9.0 million net loss
- our Adjusted EBITDA[5] was $17.4 million compared to $2.8 million
- our Funded Accounts[6] were 1,075 thousand compared to 43 thousand
- we had Assets on Platform[7] of $5,880.1 million compared to $229.3 million
- our Adjusted Working Capital[8] was $240.9 million compared to $20.9 million
- our equity was $313.8 million compared to $0.7 million
- we reported basic EPS of $0.02 compared to $(0.16)
- we reported diluted EPS of $0.1 compared to $(0.16)

We experienced outstanding growth in the quarter ended December 31, 2021, with total revenues of $164.8 million, up from $3.6 million for quarter ended December 31, 2020. We surpassed one million customer funded accounts at December 31, 2021, up from just 43 thousand at December 31, 2020. Our Assets on Platform increased exponentially from $229.3 million at December 31, 2020 to $5,880.1 million at December 31, 2021.

We remain focused on positioning our platform as one of the leading players in crypto assets for consumers and expect continued customer growth in the future. We have scaled our technology to accommodate rapid growth as mainstream

---

[5] Adjusted EBITDA is defined as net income/ (loss), excluding (i) change in fair value of warrant liability, (ii) share-based payments, (iii) provision/ (benefit) for income taxes, (iv) amortization of intangible assets, (v) change in fair value of investments loss, (vi) change in fair value of crypto assets borrowed, (vii) fees on crypto assets borrowed, (viii) loss on issuance of warrants and (ix) gains on acquisitions, net.

[6] A "Funded Account" is a Voyager's account into which the account user makes an initial deposit or money transfer, of any amount, during the relevant period.

[7] Assets on Platform are defined as crypto assets held, crypto assets loaned, and crypto assets collateral received.

[8] Adjusted Working Capital is defined as the difference between current assets and current liabilities excluding warrant liability.

6

VOY-INV-00033113
VOY-INV-00033107

crypto adoption has accelerated. With our platform and technological capabilities enhanced, we look forward to the next phase of our growth through product and geographic expansion, and marketing efforts to reach new customers.

We are planning our rollout of a digital crypto asset platform in Europe and Canada, launching our debit card, and adding credit products and equity trading. Further, we will continue to build out our payment processing capabilities to our merchant payment systems capabilities (acquired through the Coinify acquisition). As we look ahead, we remain committed to driving sustainable long-term customer growth and executing on our strategic priorities and will accelerate our growth through M&A when appropriate.

### Customer acquisition

Our business model encompasses efficient new customer growth and strong retention as well as expansion within existing customer base. Our new customers join our platform organically, through several referral programs and paid marketing efforts which range from market-leading partnerships with professional athletes or clicking through an online advertisement.

### Non-IFRS financial measures

We collect and analyze operating and financial data to evaluate the health of our business, allocate our resources and assess our performance. In addition to total net revenue, net loss and other results under IFRS, we utilize non-IFRS calculations of Assets on Platform, Adjusted EBITDA, and Adjusted Working Capital. We believe these non-IFRS financial measures provide useful information to investors and others in understanding and evaluating our financial condition, as well as providing a useful measure for period-to-period comparisons of our business performance. Moreover, non-IFRS financial measurements are key measurements used by our management internally to make operating decisions, including those related to operating expenses, evaluate performance, and perform strategic planning and annual budgeting. However, the non-IFRS measures are presented for supplemental informational purposes only, should not be considered a substitute for or superior to financial information presented in accordance with IFRS and may be different from similarly titled non-IFRS measures used by other companies.

### Assets on Platform

The following presents a reconciliation of crypto assets held, crypto assets loaned, and crypto assets collateral received, the most directly comparable IFRS measure, to Assets on Platform (in thousands):

| | December 31, 2021 | June 30, 2021 | December 31, 2020 |
|---|---|---|---|
| Crypto assets held | $ 2,995,759 | $ 2,286,399 | $ 73,887 |
| Crypto assets loaned | 2,702,749 | 393,561 | 155,455 |
| Crypto assets collateral received | 181,629 | – | – |
| Assets on Platform | $ 5,880,137 | $ 2,679,960 | $ 229,342 |

### Adjusted EBITDA

The following presents a reconciliation of net income/ (loss), the most directly comparable IFRS measure, to Adjusted EBITDA (in thousands):

| | Three Months Ended December 31, | | Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net income/ (loss) | $ 2,588 | $ (8,997) | $ (26,329) | $ (12,972) |
| Change in fair value of warrant liability | 3,627 | 15,589 | (6,844) | 17,102 |
| Share-based payments | 3,962 | 354 | 9,120 | 1,379 |
| Provision/ (benefit) for income taxes | 1,644 | - | (8,983) | - |
| Amortization of intangible assets | 1,650 | 65 | 2,756 | 147 |
| Change in fair value of investments | (1,864) | (10,593) | (6,114) | (10,593) |
| Change in fair value of crypto assets borrowed | 4,426 | 6,252 | 13,584 | 6,252 |
| Fees on crypto assets borrowed | 1,390 | 106 | 2,532 | 106 |
| Adjusted EBITDA | $ 17,423 | $ 2,776 | $ (20,278) | $ 1,421 |

7

HIGHLY CONFIDENTIAL

*Adjusted Working Capital*

The following presents a reconciliation of total current assets and total current liabilities, the most directly comparable IFRS measure, to Adjusted Working Capital (in thousands):

| | December 31, 2021 | June 30, 2021 | December 31, 2020 |
|---|---|---|---|
| Total current assets | $ 6,119,021 | $ 3,073,943 | $ 275,108 |
| Total current liabilities | 5,894,250 | 2,890,301 | 274,541 |
| Working capital | 224,771 | 183,642 | 567 |
| Add: Warrant liability | 16,083 | 23,810 | 20,382 |
| Adjusted Working Capital | $ 240,854 | $ 207,452 | $ 20,949 |

## Financial Overview

### *Revenues*

*Transaction revenue*

The majority of our revenue is derived from providing execution for customer-initiated crypto asset orders to buy, sell, or convert crypto assets on the platform. Transaction revenue is based on the price and quantity of the crypto assets bought, sold, or withdrawn. Transaction revenue is recognized at the time the transaction is processed on our platform.

*Fees from crypto assets loaned*

We earn fees from crypto assets lending activities with institutional borrowers. We independently negotiate with each institutional borrower the terms of an agreement. These lending agreements generally are on an unsecured and secured basis, either for a fixed term of less than one year or can be repaid on a demand basis, and provide a crypto fee based on the percentage of crypto assets lent and denominated in the related crypto asset. Voyager selects which and how much of its crypto assets are available for such lending activity.

*Staking revenue*

We also generate revenue from crypto assets through various blockchain protocols by either participating in the staking programs offered by the financial institutions, delegating crypto assets to staking platform providers or staking crypto assets directly with protocols/ smart contracts. These blockchain protocols, or the participants that form the protocol networks, reward users for performing various activities on the blockchain, such as participating in proof-of-stake networks and other consensus algorithms. In exchange for participating in proof-of-stake networks and other consensus algorithms, the Company earns rewards in the form of the native token of the network. The satisfaction of the performance obligation for processing and validating blockchain transactions occurs at a point in time when confirmation is received from the network indicating that the validation is complete, and the rewards are transferred into a digital wallet that the Company controls. At that point, revenue is recognized and is measured based on the number of tokens received and the fair value of the token at the date of recognition.

*Merchant services*

Merchant services revenue consists of fees a merchant's customer pays us to process their cryptocurrency payment transactions and is recognized upon completion of a crypto payment transaction. Revenue is recognized net of refunds, which are reversals of transactions initiated by the merchant's customer. The gross merchant services revenues collected from all merchant customers are recognized as revenue on a gross basis as we are the primary obligor to each merchant's customer and are responsible for processing the crypto currency payment, have latitude in establishing pricing with respect to the merchant's customer and other terms of service, and assume the crypto currency conversion risk for the transaction processed.

8

*Other revenue*

As part of the VGX token swap, the Company received 40 million in VGX tokens to power the Voyager Loyalty Program rewards and fund promotional campaigns for new and existing customers (the "Growth Pool")[9]. The acquisition of tokens in the Growth Pool does not qualify as an exchange that would be recognized as a transaction in the Company's financial statements ("exchange transaction"). Income from the Growth Pool is recognized when an exchange transaction occurs and is measured based on the fair value of tokens exchanged. The fair value is determined using the spot price of the token on the date of exchange.

***Expenses***

Operating expenses consist of rewards paid to customers, marketing and sales, cost of merchant services, compensation and employee benefits, trade expenses, customer onboarding and service, professional, consulting, and general and administrative expenses. Operating expenses are expensed as incurred.

*Rewards paid to customers*

Rewards paid to customers include rewards paid to customers under the Rewards Program, which is a pay-in-kind program whereby customers earn crypto assets ("rewards") for maintaining a monthly minimum of certain crypto assets of the same type in their account. The number of different crypto assets eligible for the Rewards Program may vary over time, and rewards are determined monthly by the Company.

*Marketing and sales*

Marketing and sales expenses primarily include costs related to customer advertising and marketing programs as well as commissions for referral programs.

*Cost of merchant sales*

Cost of merchant services consist of payments made to the sellers or other financial institutions related to merchant services.

*Compensation and employee benefits*

Compensation and employee benefits include salaries, bonuses, benefits, taxes, and share-based payments. Our employees include customer support, technology, marketing, executives, and other administrative support personnel.

*Trade expenses*

Trade expenses mainly include exchange fees and custody expense.

*Customer onboarding and service*

Customer onboarding and service includes fees paid to third-party customer support vendors for customer verification, KYC and AML costs as well as payment processing charges.

*Professional and consulting*

Professional and consulting expenses include fees for legal, audit, tax, and other special projects.

*General and administrative*

General and administrative expenses mainly include technology, product development, recruitment, investor relationships, insurance, amortization of intangible assets, regulatory, compliance, and other business expenses.

---

[9] Post token swap, Voyager will mint a growth pool of tokens on an annual basis as described in the VGX white paper.

HIGHLY CONFIDENTIAL

VOY-INV-00033116
VOY-INV-00033107

***Other income (loss)***

*Change in fair value of warrant liability*

Change in fair value of warrant liability represents mark-to-market adjustments in warrant liability due to revaluation of warrant liability at the end of each reporting period.

*Change in fair value of investments*

Change in fair value of investments includes net unrealized gain/ (loss) as well as net realized gains/ (loss) on investments which are carried at fair value.

*Change in fair value of crypto assets borrowed*

Change in fair value of crypto assets borrowed includes net unrealized gain/ (loss) as well as net realized gains/ (loss) on crypto assets borrowed which are carried at fair value.

*Change in fair value of crypto assets held*

Change in fair value of crypto assets held represents mark-to-market adjustments on crypto assets held which are carried at fair value.

*Fees on crypto assets borrowed*

Fees on crypto assets borrowed represent crypto fee calculated as a percentage of the crypto asset borrowed and is denominated in the related crypto asset.

*Loss on issuance of warrants*

Loss on issuance of warrants represents the difference between the fair value of the warrant at initial recognition and transaction price.

*Gain on acquisitions, net*

Gain on acquisitions, net represents gains or losses we recognized on the asset or business acquisitions.

***Provision / (benefit) for income tax***

We are subject to the income tax laws of Canada and those of the non-Canada jurisdictions in which the Company has business operations, which includes operating losses or profits in certain foreign jurisdictions for certain years depending on tax elections made, and foreign taxes on earnings of our wholly owned foreign subsidiaries. Our consolidated provision for income tax is affected by the mix of our taxable income (loss) in Canada, the United States, and foreign subsidiaries, permanent items and unrecognized tax benefits.

10

HIGHLY CONFIDENTIAL

## Results of Operations

*Revenues (in thousands)*

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ Change | 2021 | 2020 | $ Change |
| Transaction revenue | $ 86,502 | $ 2,056 | $ 84,446 | $ 130,016 | $ 3,682 | $ 126,334 |
| Merchant services | 15,844 | - | 15,844 | 29,801 | - | 29,801 |
| Fees from crypto assets loaned | 36,239 | 1,513 | 34,726 | 49,867 | 1,888 | 47,979 |
| Staking revenue | 20,722 | - | 20,722 | 28,429 | - | 28,429 |
| Other revenue | 5,541 | - | 5,541 | 8,242 | - | 8,242 |
| Total revenues | $ 164,848 | $ 3,569 | $ 161,279 | $ 246,355 | $ 5,570 | $ 240,785 |

Transaction revenues increased by $84.4 million and $126.3 million for the three and six months ended December 31, 2021, as compared to the same periods in the prior year. Trading volume increased by $8.5 billion and $13.1 billion for the three and six months ended December 31, 2021, as compared to the same periods in the prior year. We have seen significant growth in our user base, retention, engagement, and trading activity increase due to consumer interest in the crypto markets. Our Funded Accounts increased by 1.0 million since December 31, 2020. Increased interest in personal finance and investing, a positive market environment, especially in the U.S., encouraged an unprecedented number of first-time retail investors to become our customers and begin trading on our platform.

Merchant services revenue was driven by the Coinify acquisition on August 1, 2021.

Fees from crypto assets loaned increased by $34.7 million and $48.0 million for the three and six months ended December 31, 2021, as compared to the same periods in the prior year, as we grew our crypto assets lending program and increased a number of crypto assets generating yield. Crypto assets loaned increased by $2,547.3 million to $2,702.7 million as of December 31, 2021, as compared to December 31, 2020.

During the six months ended December 31, 2021, the Company started participating in various staking protocols. For the three and six months ended December 31, 2021, we recorded $20.7 million and $28.4 million in staking revenue. As of December 31, 2021, and June 30, 2021, $966.3 million and $0.0 of crypto assets held were restricted due to participation in proof-of-stake networks and other consensus algorithms.

During the three months ended December 31, 2021, the Company paid 1,811,702 in VGX tokens from the Growth Pool to settle Voyager Loyalty Program rewards and fund promotional campaigns for new and existing customers which resulted in the exchange transaction and recognition of other revenue of $5.5 million with the offset of $5.0 million in transaction revenue and $0.5 million in rewards paid to customers. During the six months ended December 31, 2021, the Company paid 2,830,869 in VGX tokens from the Growth Pool to settle Voyager Loyalty Program rewards and fund promotional campaigns for new and existing customers which resulted in the exchange transaction and recognition of other revenue of $8.2 million with the offset of $6.3 million in transaction revenue, $0.9 million in professional and consulting and $1.0 million in rewards paid to customers.

HIGHLY CONFIDENTIAL

VOY-INV-00033118
VOY-INV-00033107

*Expenses (in thousands)*

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | **$ Change** | **2021** | **2020** | **$ Change** |
| Rewards paid to customers | $ 73,034 | $ 1,540 | $ 71,494 | $ 122,693 | $ 1,540 | $ 121,153 |
| Marketing and sales | 35,057 | 1,021 | 34,036 | 51,715 | 1,353 | 50,362 |
| Cost of merchant services | 15,497 | - | 15,497 | 29,205 | - | 29,205 |
| *Share-based payments* | *3,962* | *354* | *3,608* | *9,120* | *1,379* | *7,741* |
| *Compensation and employee benefits* | *8,793* | *1,058* | *7,735* | *14,619* | *2,082* | *12,537* |
| Total compensation and employee benefits | 12,755 | 1,412 | 11,343 | 23,739 | 3,461 | 20,278 |
| Trade expenses | 7,358 | 160 | 7,198 | 11,161 | 343 | 10,818 |
| Customer onboarding and service | 3,065 | - | 3,065 | 5,654 | - | 5,654 |
| Professional and consulting | 7,522 | 725 | 6,797 | 14,338 | 1,092 | 13,246 |
| General and administrative | 7,345 | 1,619 | 5,726 | 12,960 | 3,373 | 9,587 |
| Total expenses | $ 161,633 | $ 6,477 | $ 155,156 | $ 271,465 | $ 11,162 | $ 260,303 |

*Rewards paid to customers*

The increase in rewards paid to customers for the three and six months ended December 31, 2021, as compared to same periods in the prior year, is due to our dramatic customer growth who participate in the Rewards Program and expansion of reward-bearing assets within the Reward Program.

*Marketing and sales*

Marketing and sales expenses increased by $34.0 million and $50.4 million for the three and six months ended December 31, 2021, as compared to the same periods in the prior year. The increase was primarily due to increase in various sales and marketing campaigns including market-leading partnerships with professional athletes, online advertisement, and referral programs.

*Cost of merchant services*

Cost of merchant services was driven by the Coinify acquisition on August 1, 2021.

*Total compensation and employee benefits*

Total compensation and employee benefits increased by $11.3 million and $20.3 million for the three and six months ended December 31, 2021, as compared to the same period in the prior year. The increase was driven by head count increase by 212 employees to 250 as of December 31, 2021, compared to same period in the prior year. The Coinify acquisition resulted in headcount growth of 56 employees.

*Trade expenses*

Total trade expenses increased by $7.2 million and $10.8 million for the three and six months ended December 31, 2021, as compared to the same periods in the prior year, due to increased trading volume.

*Customer onboarding and service*

Customer onboarding and service expense increased by $3.1 million and $5.7 million for the three and six months ended December 31, 2021, as compared to the same periods in the prior year, due to significant growth in a customer base.

*Professional and consulting*

Professional and consulting expense increased by $6.8 million and $13.2 million for the three and six months ended December 31, 2021, as compared to same periods in the prior year, which was primarily driven by increase in advisory and technology consulting expenses, the Coinify acquisition and general legal expenses related to the growth of the business.

12

HIGHLY CONFIDENTIAL

VOY-INV-00033119
VOY-INV-00033107

*General and administrative*

General and administrative expenses increased by $5.7 million and $9.6 million for the three and six months ended December 31, 2021, as compared to same periods in the prior year, which was primarily driven by the growth of the business which let to increased expenditure in technology, recruitment, investor relations, insurance costs and other corporate expenses.

**Other income (loss) (in thousands)**

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ Change | 2021 | 2020 | $ Change |
| Change in fair value of crypto assets held | $ 8,596 | $ 5,265 | $ 3,331 | $ (7,044) | $ 5,487 | $ (12,531) |
| Change in fair value of investments | 1,864 | 10,593 | (8,729) | 6,114 | 10,593 | (4,479) |
| Change in fair value of crypto assets borrowed | (4,426) | (6,252) | 1,826 | (13,584) | (6,252) | (7,332) |
| Change in fair value of warrant liability | (3,627) | (15,589) | 11,962 | 6,844 | (17,102) | 23,946 |
| Fees on crypto assets borrowed | (1,390) | (106) | (1,284) | (2,532) | (106) | (2,426) |
| Total other income/ (loss) | $ 1,017 | $ (6,089) | $ 7,106 | $ (10,202) | $ (7,380) | $ (2,822) |

Other income/ (loss) increased by $7.1 million for the three months ended December 31, 2021, compared to same period in the prior year, due to the increase in change in fair value of warrant liability, partially offset by the decrease in change in fair value of investments. Other income (loss) decreased by $2.8 million for the six months ended December 31, 2021, compared to same period in the prior year, due to the increase in change in fair value of warrant liability, partially offset by decreases in the change in fair value of investments, change in crypto assets held as well as change in crypto assets borrowed.

Included in change in fair value of investments and change in fair value of crypto assets borrowed are realized gains/ (loss) for the sale of the investment as well as paydown of the crypto assets borrowed, respectively.

**Provision/ (benefit) for income taxes (in thousands)**

| | Three Months Ended December 31, | | | Six Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ Change | 2021 | 2020 | $ Change |
| Provision/ (benefit) for income tax | $ 1,644 | $ - | $ 1,644 | $ (8,983) | $ - | $ (8,983) |

As of June 30, 2021, the Company's U.S. entity generated significant taxable income and was able to realize the benefit related to deferred tax assets recorded for loss carryforwards. Accordingly, the benefit for income tax for the three and six months ended December 31, 2021, is a result of taxable losses generated in the U.S. that are expected to be realized. No income tax benefit was provided for losses during the same periods in the prior year as it was not probable, due to the cumulative losses incurred, that tax benefits from loss carryforwards and other net taxable temporary differences would be realized.

HIGHLY CONFIDENTIAL

VOY-INV-00033120
VOY-INV-00033107

## Liquidity and Capital Resources[10]

Our primary sources of liquidity are cash generated from operations and net proceeds from our capital raising activities. As of December 31, 2021, we had cash and cash equivalents of $143.4 million, exclusive of cash held for customers. As of December 31, 2021, we had $80.5 million cash held for customers at the Bank (under an "for the benefit of" omnibus account).

### Cash flows (in thousands)

|  | Six Months Ended December. 31, | |
|  | 2021 | 2020 |
|---|---|---|
| Net cash used in operating activities | $ (182,211) | $ (5,977) |
| Net cash provided by investing activities | 25,305 | - |
| Net cash provided by financing activities | 23,902 | 12,151 |
| Net increase/ (decrease) in cash and cash equivalents and cash held for customers | $ (133,004) | $ 6,174 |

### Operating Activities

Net cash used in operating activities was $182.2 million for the six months ended December 31, 2021. Our net cash used in operating activities reflected a net loss of $26.3 million, non-cash adjustments of $57.6 million and changes in operating assets and liabilities of $213.5 million. Non-cash adjustments primarily included $122.7 million in rewards paid to customers, $13.6 million in change in fair value of crypto assets borrowed, $7.0 million in change in fair value of crypto assets held, $9.1 million in share-based payments, $2.8 million in amortization of intangible assets and $2.5 million in fees on crypto assets borrowed, which were partially offset by $49.9 million in fees from crypto assets loaned, $28.4 million in staking revenues, $9.0 million in deferred tax benefits, $6.8 million in change in fair value of warrant liability and $6.1 million in change in fair value of investments.

Net cash used in operating activities was $6.0 million for the six months ended December 31, 2020. Our net cash used in operating activities reflected net loss of $13.0 million, non-cash adjustments of $8.7 million and changes in operating assets and liabilities of $1.2 million. Non-cash adjustments primarily included $1.5 million in rewards paid to customers, $6.3 million in change in fair value of crypto assets borrowed, $1.4 million in share-based payments, and $17.1 million in change in fair value of warrant liability, which were partially offset by $1.9 million in fees from crypto assets loaned, $5.5 million in change in fair value of crypto assets held and $10.6 million in change in fair value of investments.

### Investing activities

Net cash provided by investing activities of $25.3 million for the six months ended December 31, 2021, primary related to proceeds received from the sale of an investment, which was partially offset by cash paid for the Coinify acquisition.

### Financing activities

Net cash provided by financing activities of $23.9 million for the six months ended December 31, 2021, primarily related to $75.0 million of proceeds received from issuing shares in private placement as well as $3.4 million of proceeds received from warrant exercises, which was partially offset by the paydown of the crypto assets borrowing of $48.1 million and share repurchases under the NCIB of $6.6 million.

Net cash provided by financing activities of $12.2 million for the six months ended December 31, 2020, was primarily due to proceeds from issuance and exercise of warrants.

### Base Shelf Prospectus

The Company has filed and obtained a receipt for its final short form Base Shelf Prospectus dated August 17, 2021 (the "Base Shelf Prospectus") with the securities regulatory authorities in each of the provinces and territories of Canada. The Base Shelf Prospectus will allow the Company to make offerings of common shares, warrants, units, debt securities, and subscription receipts, or any combination thereof, for up to an aggregate total of $300 million during the 25-month period

---

[10] The Company's liquidity and capital resources were not materially impacted by COVID-19 and related economic conditions during the period. We are continuously monitoring our liquidity and capital resources due to the current pandemic.

14

VOY-INV-00033121
VOY-INV-00033107

that the Base Shelf Prospectus is effective. For the six months ended December 31, 2021, the Company has not made any offerings related to Base Shelf Prospectus.

*Future funding*

Based on our current level of operations, we believe our available cash and cash provided by operations will be adequate to meet our current liquidity needs for the next 12 months. Our future capital requirements will depend on many factors, including market acceptance of crypto assets and blockchain technology, our growth, our ability to attract and retain customers on our platform, the continuing market acceptance of products and services, the introduction of new products and services on our platform, expansion of sales and marketing activities, and overall economic conditions. We also will continually evaluate opportunities for us to maximize our growth and further enhance our strategic position, including, among other things, acquisitions, strategic alliances, and joint ventures. As a result, we may need to raise additional funds to finance our future business activities.

## Quarterly Highlights and Results

The following sets forth our highlights of unaudited quarterly results of operations for the indicated periods (in thousands). Our historical results are not necessarily indicative of the results that may be expected in any other period in the future, and the results of a particular quarter or other interim period are not necessarily indicative of the results to be expected for the full year or any other period.

| | Q2 2022 | Q1 2022 | Q4 2021 | Q3 2021 | Q2 2021 | Q1 2021 | Q4 2020 | Q3 2020 |
|---|---|---|---|---|---|---|---|---|
| Total revenue | $ 164,848 | $ 81,507 | $ 109,048 | $ 60,438 | $ 3,569 | $ 2,001 | $ 708 | $ 282 |
| Total expenses | 161,633 | 109,832 | 77,457 | 30,592 | 6,477 | 4,685 | 4,904 | 2,067 |
| Total other income/ (loss) | 1,017 | (11,219) | 9,598 | (98,409) | (6,089) | (1,291) | (777) | 86 |
| Net income/ (loss) before income tax | 4,232 | (39,544) | 41,189 | (68,563) | (8,997) | (3,975) | (4,973) | (1,699) |
| Provision/ (benefit) for income taxes | 1,644 | (10,627) | 11,142 | - | - | - | - | - |
| Net income/ (loss) | $ 2,588 | $ (28,917) | $ 30,047 | $ (68,563) | $ (8,997) | $ (3,975) | $ (4,973) | $ (1,699) |

## *Quarterly Reconciliation of Non-IFRS Financial Measure*

In addition to our results determined in accordance with IFRS, we believe Adjusted EBITDA[11], a non-IFRS measure, is useful in evaluating our operating performance. We use Adjusted EBITDA to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that Adjusted EBITDA may be helpful to investors because it provides consistency and comparability with past financial performance. However, Adjusted EBITDA is presented for supplemental informational purposes only, has limitations as an analytical tool, and should not be considered in isolation or as a substitute for financial information presented in accordance with IFRS.

The following provides a quarterly reconciliation of net income/ (loss) to Adjusted EBITDA:

| | Q2 2022 | Q1 2022 | Q4 2021 | Q3 2021 | Q2 2021 | Q1 2021 | Q4 2020 | Q3 2020 |
|---|---|---|---|---|---|---|---|---|
| Net income/ (loss) | $ 2,588 | $ (28,917) | $ 30,047 | $ (68,563) | $ (8,997) | $ (3,975) | $ (4,973) | $ (1,699) |
| Change in fair value of warrant liability | 3,627 | (10,471) | (26,265) | 98,990 | 15,589 | 1,513 | (1,204) | (376) |
| Share-based payments | 3,962 | 5,158 | 6,214 | 5,271 | 354 | 1,025 | 283 | 269 |
| Provision/ (benefit) for income taxes | 1,644 | (10,627) | 11,142 | - | - | - | - | - |
| Amortization of intangible assets | 1,650 | 1,106 | 75 | 89 | 65 | 82 | (50) | 100 |
| Change in fair value of investments | (1,864) | (4,250) | 21,281 | (18,977) | (10,593) | - | - | - |
| Change in fair value of crypto assets borrowed | 4,426 | 9,158 | (24,473) | 30,030 | 6,252 | - | - | - |
| Fees on crypto assets borrowed | 1,390 | 1,142 | 1,101 | 1,319 | 106 | - | - | - |
| Loss on issuance of warrants | - | - | - | - | - | - | 1,157 | - |
| Gains on acquisitions, net | - | - | - | - | - | - | 706 | 44 |
| Adjusted EBITDA | $ 17,423 | $ (37,701) | $ 19,122 | $ 48,159 | $ 2,776 | $ (1,355) | $ (4,081) | $ (1,662) |

---

[11] Adjusted EBITDA is defined as net income/ (loss), excluding (i) change in fair value of warrant liability, (ii) share-based payments, (iii) provision/ (benefit) for income taxes, (iv) amortization of intangible assets, (v) change in fair value of investments loss, (vi) change in fair value of crypto assets borrowed, (vii) fees on crypto assets borrowed, (viii) loss on issuance of warrants and (ix) gains on acquisitions, net.

15

VOY-INV-00033122
VOY-INV-00033107

## Critical Accounting Estimates

In preparing interim condensed consolidated financial statements, management has made judgements and estimates that affect the application of accounting policies and the reported amounts of assets and liabilities, income and expense. Actual results may differ from these estimates. The significant judgements made by management in applying the Company's accounting policies and the key sources of estimation uncertainty were the same as those described in the last annual financial statements.

## Changes in Accounting Policies

There were no changes to the accounting policies for the three and six months ended December 31, 2021, other than as discussed below:

### *Business combinations*

Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred, which is measured at acquisition date fair value. Acquisition-related costs are expensed as incurred.

The Company determines that it has acquired a business when the acquired set of activities and assets include an input and a substantive process that together significantly contribute to the ability to create outputs. The acquired process is considered substantive if it is critical to the ability to continue producing outputs, and the inputs acquired include an organized workforce with the necessary skills, knowledge, or experience to perform that process or it significantly contributes to the ability to continue producing outputs and is considered unique or scarce or cannot be replaced without significant cost, effort, or delay in the ability to continue producing outputs.

When the Company acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances, and pertinent conditions as at the acquisition date.

Goodwill is initially measured at cost (being the excess of the aggregate of the consideration transferred over the net identifiable assets acquired and liabilities assumed). If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Company re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognized at the acquisition date. If the reassessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognized in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Company's cash-generating units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

### *Merchant services/ Cost of merchant services*

Merchant services revenue consists of fees a merchant's customer pays the Company to process their crypto currency payment transactions and is recognized upon completion of a crypto payment transaction. Revenue is recognized net of refunds, which are reversals of transactions initiated by the merchant's customer. The gross merchant services revenues collected from all merchant customers are recognized as revenue on a gross basis as the Company is the primary obligor to the merchant customers and is responsible for processing their crypto currency payments, has latitude in establishing pricing with respect to the merchant customers and other terms of service, and assumes the crypto currency conversion risk for the transactions processed.

Cost of merchant services consist of payments made to the merchants or other financial institutions.

16

VOY-INV-00033123
VOY-INV-00033107

*Staking revenue*

The Company generates revenues from crypto assets through various blockchain protocols by either participating in the staking programs offered by the financial institutions, delegating crypto assets to staking platform providers or staking crypto assets directly with protocols/ smart contracts. These blockchain protocols, or the participants that form the protocol networks, reward users for performing various activities on the blockchain, such as participating in proof-of-stake networks and other consensus algorithms. In exchange for participating in proof-of-stake networks and other consensus algorithms, the Company earns rewards in the form of the native token of the network. The satisfaction of the performance obligation for processing and validating blockchain transactions occurs at a point in time when confirmation is received from the network indicating that the validation is complete, and the rewards are transferred into a digital wallet that the Company controls. At that point, revenue is recognized. Revenue is measured based on the number of tokens received and the fair value of the token at the date of recognition.

*Crypto assets loaned/ borrowed*

The Company enters into loan/ borrow agreements for certain crypto assets with institution borrowers on an unsecured and secured basis. The term of these agreements can either be for a fixed term of less than one year or can be open-ended and repayable at the option of the Company or the borrower. These agreements bear a crypto fee receivable/ payable which is based on a percentage of the crypto asset borrowed/ lent and is denominated in the related crypto asset. Collateral received under the loan agreements, where the Company has the ability to control the collateral received, is recognized as part of the crypto assets collateral received in its interim condensed consolidated statements of financial position. The Company also recognizes a corresponding obligation to return the collateral received as part of crypto assets collateral payable in its interim condensed consolidated statements of financial position.

## Financial Instruments and Crypto Assets

All financial and non-financial assets and liabilities measured or disclosed at fair value are categorized into one of three fair value hierarchy levels in accordance with IFRS. The fair value hierarchy is based on the transparency of inputs to the valuation of an asset or liability as of the measurement date. In certain cases, the inputs used to measure fair value may fall within different levels of the fair value hierarchy. For disclosure purposes, the level in the hierarchy within which an instrument is classified in its entirety is based on the lowest level input that is significant to the position's fair value measurement:

Level 1 – quoted prices (unadjusted) in active markets for identical assets and liabilities;

Level 2 – valuation techniques for which all significant inputs are, or are based on, observable market data; or

Level 3 – valuation techniques for which significant inputs are not based on observable market data.

The following presents the fair value hierarchy for the Company's assets and liabilities measured at fair value by level as of December 31, 2021, and June 30, 2021 (in thousands):

| December 31, 2021 | Level 1 | | Level 2 | Level 3 | | Total |
|---|---|---|---|---|---|---|
| *Assets:* | | | | | | |
| Crypto assets held | $ - | $ | 2,995,759 | $ - | $ | 2,995,759 |
| Crypto assets loaned | | - | 2,702,749 | - | | 2,702,749 |
| Crypto assets collateral received | | - | 181,629 | - | | 181,629 |
| Investments | | - | 1,000 | 8,324 | | 9,324 |
| Total | $ - | $ | 5,881,137 | $ 8,324 | $ | 5,889,461 |
| *Liabilities:* | | | | | | |
| Crypto assets and fiat payable to customers | $ - | $ | 5,676,023 | $ - | $ | 5,676,023 |
| Crypto assets collateral payable | | - | 181,629 | - | | 181,629 |
| Warrant liability | | - | | 16,083 | | 16,083 |
| Total | $ - | $ | 5,857,652 | $ 16,083 | $ | 5,873,735 |

HIGHLY CONFIDENTIAL

VOY-INV-00033124
VOY-INV-00033107

| June 30, 2021 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| *Assets:* | | | | |
| Crypto assets held | $        - | $   2,286,399 | $        - | $   2,286,399 |
| Crypto assets loaned | - | 393,561 | - | 393,561 |
| Investments | 31,359 | - | 850 | 32,209 |
| Total | $   31,359 | $   2,679,960 | $   850 | $   2,712,169 |
| *Liabilities:* | | | | |
| Crypto assets and fiat payable to customers | $        - | $   2,807,015 | $        - | $   2,807,015 |
| Crypto assets borrowed | - | 36,832 | - | 36,832 |
| Warrant liability | - | | 23,810 | 23,810 |
| Total | $        - | $   2,843,847 | $   23,810 | $   2,867,657 |

There have been no transfers between levels 1 and 2, or transfers in or out of level 3 for the six months ended December 31, 2021.

Valuation of Assets/ Liabilities that use Level 1 inputs: Consists of the Company's investments which are valued using public closing price in active markets.

Valuation of Assets/ Liabilities that use Level 2 inputs: Consists of the Company's crypto assets held, crypto assets loaned, crypto assets collateral received, crypto assets and fiat payable to customers, crypto assets collateral payable and crypto assets borrowed. For the crypto assets, the fair value is determined by the Voyager's Pricing Engine using a market approach whereby volume-weighted average prices are derived from quoted market prices and spread data published by the principal exchanges and liquidity providers/ market makers as of 12:00 am UTC for identical assets.

Valuation of Assets/ Liabilities that use Level 3 inputs: Consists of the Company's warrant liability and investments. Warrant liability is valued using Black-Scholes model. Investments are initially marked at their transaction price and are revalued using net asset values or when the position is deemed to be impaired.

*Level 3 disclosures*

The following is reconciliation of warrant liability as of December 31, 2021, and 2020, respectively:

| | Fair Value |
|---|---|
| **Balance, June 30, 2021** | $   23,810 |
| Change in fair value | (6,844) |
| Exercised | (883) |
| **Balance, December 31, 2021** | $   16,083 |
| | |
| **Balance, June 30, 2020** | $   2,197 |
| Issued | 4,922 |
| Change in fair value | 17,103 |
| Exercised | (3,840) |
| **Balance, December 31, 2020** | $   20,382 |

A summary of the assumptions used in the valuation model for re-measuring warrants as of December 31, 2021, and June 30, 2021, is set out below.

| | December 31, 2021 | June 30, 2021 |
|---|---|---|
| Common share market price | CDN 15.79 | CDN 21.17 |
| Estimated weighted average life in years | 1.4 | 1.8 |
| Weighted average risk-free interest rate | 0.94% | 0.65% |
| Estimated common share weighted average price volatility | 125.56% | 144.3% |
| Expected dividend yield | - | - |
| Foreign exchange rate | $   0.79 | $   0.81 |
| Estimated weighted average fair value per warrant | $   11.42 | $   16.09 |

HIGHLY CONFIDENTIAL

VOY-INV-00033125
VOY-INV-00033107

*Valuation techniques*

The following summarizes the valuation techniques and significant inputs used in the fair value measurement of the Company's assets and liabilities:

| Category | Valuation Methods and Techniques | Key Inputs |
|---|---|---|
| Crypto assets held<br>Crypto assets loaned<br>Crypto assets collateral received<br>Crypto assets and fiat payable to customers<br>Crypto assets collateral payable<br>Crypto assets borrowed | Volume-weighted average of trading prices | Current trading prices of subject crypto assets |
| Investments | Public closing price in active markets<br>Where market prices are not available, initially marked at their transaction price and are revalued using net asset values or when the position is deemed to be impaired | Public closing prices of subject securities<br>Net asset values |
| Warrant liability | Black-Scholes model | Public closing prices of subject securities<br>Expected volatility of public closing prices of subject securities<br>Expected term of the option<br>Risk-free interest rate expected dividend yield |

*Crypto assets*

*Crypto assets held*

As of December 31, 2021, and June 30, 2021, crypto assets held consisted of the following (in thousands, except for number of coins):

| December 31, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 10,129 | $ 468,083 | 16% |
| VGX | 154,011,609 | 457,491 | 15% |
| ADA | 267,936,889 | 350,592 | 12% |
| SHIB | 7,676,785,141,501 | 256,098 | 9% |
| ETH | 67,055 | 246,493 | 8% |
| DOT | 5,597,228 | 149,392 | 5% |
| AVAX | 1,043,792 | 114,196 | 4% |
| VET | 1,241,393,450 | 102,696 | 3% |
| SOL | 560,689 | 95,264 | 3% |
| MATIC | 37,427,219 | 94,456 | 3% |
| BTT | 30,558,512,559 | 83,075 | 3% |
| LINK | 3,002,071 | 58,587 | 2% |
| MANA | 17,196,848 | 56,187 | 2% |
| HBAR | 174,565,774 | 50,669 | 2% |
| STMX | 1,540,795,095 | 32,408 | 1% |
| CKB | 1,452,752,027 | 32,345 | 1% |
| DOGE | 163,660,924 | 27,862 | 1% |
| Other | | 319,865 | 10% |
| Total | | $ 2,995,759 | 100% |

HIGHLY CONFIDENTIAL

VOY-INV-00033126
VOY-INV-00033107

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 15,396 | $ 539,928 | 24% |
| ETH | 168,731 | 383,833 | 17% |
| VGX | 139,169,871 | 351,063 | 15% |
| ADA | 218,181,643 | 277,152 | 12% |
| VET | 1,172,941,784 | 106,659 | 5% |
| BTT | 35,824,314,738 | 99,735 | 4% |
| USDC | 63,125,815 | 63,126 | 3% |
| DOGE | 221,963,050 | 56,377 | 2% |
| DOT | 3,069,732 | 50,252 | 2% |
| LINK | 1,820,365 | 35,545 | 2% |
| SHIB | 3,857,895,871,062 | 34,721 | 2% |
| HBAR | 156,280,743 | 30,533 | 1% |
| STMX | 1,503,678,568 | 28,330 | 1% |
| LTC | 161,556 | 23,299 | 1% |
| Other | | 205,846 | 9% |
| Total | | $ 2,286,399 | 100% |

As of December 31, 2021, and June 30, 2021, $966.3 million (40% of VGX, 33% of ADA, 13% of DOT, 8% of SOL and 6% in other crypto assets held) and $0.0 of crypto assets held were restricted due to participation in proof-of-stake networks and other consensus algorithms. The longest restriction for any restricted asset is 28 days.

*Crypto assets loaned*

As of December 31, 2021, and June 30, 2021, crypto assets loaned consisted of the following (in thousands, except for number of coins):

| As of December 31, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 21,939 | $ 1,013,863 | 38% |
| ETH | 186,617 | 686,001 | 25% |
| USDC | 522,739,878 | 522,740 | 19% |
| LUNA | 2,173,070 | 185,671 | 7% |
| DOGE | 478,810,483 | 81,514 | 3% |
| Other | | 212,960 | 8% |
| Total | | $ 2,702,749 | 100% |

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 3,751 | $ 131,556 | 33% |
| DOGE | 462,105,000 | 117,371 | 30% |
| ADA | 43,545,000 | 60,310 | 15% |
| ETH | 16,251 | 36,968 | 9% |
| LINK | 682,300 | 13,323 | 4% |
| Other | | 34,033 | 9% |
| Total | | $ 393,561 | 100% |

As of December 31, 2021, and June 30, 2021, the crypto assets loaned disaggregated by significant borrowing counterparty was as follows:

| | Borrowing Rates | December 31, 2021 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | 1.0% - 11% | $ 1,651,160 | $ - |
| Counterparty B | 1.0% - 10.5% | 369,633 | 164,085 |
| Counterparty C | 1.0% - 15% | 153,097 | - |
| Counterparty D | 3.1% - 8.9% | 150,955 | 57,975 |
| Counterparty E | 3% - 10% | 148,511 | - |
| Counterparty F | 5.5% - 15.0% | 141,922 | 137,056 |
| Other | 1.0% - 10% | 87,471 | 34,445 |
| Total | | $ 2,702,749 | $ 393,561 |

20

As of December 31, 2021, and June 30, 2021, the Company's crypto assets loaned balances were concentrated with counterparties as follows:

| | Geography | December 31, 2021 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | British Virgin Islands | 61% | - |
| Counterparty B | Canada | 14% | 42% |
| Counterparty C | UK | 6% | - |
| Counterparty D | US | 6% | 14% |
| Counterparty E | US | 5% | 35% |
| Counterparty F | US | 5% | - |
| Other | Various | 3% | 9% |
| Total | | 100% | 100% |

*Crypto assets and fiat payable to customers*

As of December 31, 2021, and June 2021, crypto assets and fiat payable to customers consisted of the following (in thousands, except for number of coins):

| December 31, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 31,381 | $ 1,450,216 | 26% |
| ETH | 245,206 | 901,373 | 16% |
| USDC | 579,737,506 | 579,738 | 10% |
| VGX | 148,678,352 | 441,649 | 8% |
| ADA | 263,731,919 | 345,090 | 6% |
| SHIB | 9,673,237,830,824 | 322,699 | 6% |
| LUNA | 2,412,871 | 206,160 | 4% |
| DOT | 5,646,720 | 150,713 | 3% |
| AVAX | 1,053,000 | 115,203 | 2% |
| DOGE | 601,527,799 | 102,406 | 2% |
| VET | 1,221,949,744 | 101,088 | 2% |
| USD | n/a | 100,300 | 2% |
| SOL | 551,625 | 93,724 | 2% |
| MATIC | 36,901,756 | 93,130 | 2% |
| Other | | 672,534 | 9% |
| Total | | $ 5,676,023 | 100% |

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 18,885 | $ 662,284 | 24% |
| ETH | 184,763 | 420,302 | 15% |
| VGX | 133,922,886 | 337,827 | 12% |
| ADA | 242,817,641 | 336,306 | 12% |
| USDC | 212,795,099 | 212,795 | 8% |
| DOGE | 683,333,678 | 173,561 | 6% |
| VET | 1,167,966,843 | 106,207 | 4% |
| BTT | 35,820,687,793 | 99,725 | 3% |
| DOT | 3,118,349 | 51,048 | 2% |
| LINK | 2,503,524 | 48,885 | 2% |
| SHIB | 3,781,248,577,983 | 34,031 | 1% |
| HBAR | 156,276,325 | 30,532 | 1% |
| Other | | 293,512 | 10% |
| Total | | $ 2,807,015 | 100% |

21

VOY-INV-00033128
VOY-INV-00033107

## Risk Management

The Company's financial instruments as well as crypto assets are exposed to certain financial risks, which include crypto asset risk, credit risk, currency risk and liquidity risk. The Company's senior management oversees the management of these risks. The Company's senior management is supported by a Risk Management Committee that advises on financial risks and the appropriate financial risk governance framework for the Company. The Risk Management Committee provides assurance to the Company's senior management that the Company's financial risk activities are governed by appropriate policies and procedures and that financial risks are identified, measured, and managed in accordance with the Company's policies and risk objectives. The Board of Directors has the authority to review and agree policies for managing each of these risks, which are summarized below.

### *Crypto assets risks*

#### *Custody*

The Company utilizes the functional authority granted by customers in the user agreement to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of crypto assets held in customer accounts. The Company prioritizes the use of secure self-custody and third-party custody solutions to safeguard crypto assets. However, the Company also seeks to maximize liquidity and efficient trading for customers by holding certain amounts of crypto assets with trading partners, including cryptocurrency exchanges. Finally, the Company also maintains some crypto assets in internal hot wallets to process customer requested withdrawals and transfers.

#### *Self-custody solutions*

The Company utilizes the Fireblocks platform (which operates from New York and Tel Aviv and is SOC 2 Type II compliant throughout the period September 1, 2020, to August 31, 2021), to securely store, transfer and stake a material portion of its crypto assets. The Fireblocks secure hot vault and secure transfer environments establish connections between the Company's wallets and its third-party trading partners. The Fireblocks secure hot vault environment employs multi-party computation technology where private keys are distributed across multiple locations to ensure security is not attributed to a single device at any point in time. The Fireblocks secure transfer environment utilizes enclave technology and encryption to prevent vulnerabilities associated with authenticating wallet addresses. All internal wallets owned by the Company and external wallets for addresses of the Company's third-party trading partners require multiple approvals through quorum in accordance with our whitelisting policy. As such, the Company transfers crypto assets using the Fireblocks platform without the risk of losing funds due to deposit address attacks or errors. The Fireblocks secure hot vault and secure transfer environments are integrated with the Fireblocks authorization workflow where user-level permissions as well as multi-approval workflows policies are set by the Company.

The Company employs other self-custody solutions to securely store, transfer, and stake its crypto assets. Private keys are generated, backed-up and maintained in secured locations. Access to private keys and back-ups are segregated amongst authorized personnel throughout the Company to ensure appropriate segregation of duties are maintained between departments. The Company's private key management protocols are considered highly sensitive information, and access is limited following least privilege principles to maintain their confidentiality and integrity and minimize security threats.

#### *Third-party custodians*

The Company uses institutional grade custodians to secure crypto assets. A material percentage of which are custodied among Anchorage Digital Bank N.A. ("Anchorage") and Coinbase Custody Trust Company, LLC ("Coinbase Custody"). The Company maintains internal controls to ensure that accounts held with each custodian are appropriately authorized and access restricted. As a part of regular operations, designated Company employees review and monitor custodied balances against internal records, verifying the accuracy of each crypto asset holding.

Anchorage is a federally chartered bank chartered regulated by the Office of the Comptroller of the Currency headquartered in San Francisco, California and is SOC 2 Type I certified as of October 31, 2021, and SOC 1 Type II compliant throughout the period May 1, 2021, to October 21, 2021. Anchorage generates digital asset private keys in air-gapped hardware security models and the key generation unfractured that is physically isolated from public network connectivity. Asset transfers require a quorum-based approvals from multiple authorized users in accordance with policies set by the Company.

22

Coinbase Custody, a New York state chartered trust that is a fiduciary regulated by New York Department of Financial Services operates as a standalone, independently capitalized business to Coinbase, Inc. Coinbase Custody is a fiduciary under NY State Banking Law. Coinbase Custody provides cold storage solutions that enables transfers of supported crypto assets. Private keys are encrypted and sharded so that the process of bringing a key online requires a consensus of individuals and network access with encrypted shards being stored in a restricted storage cabinet in a cold storage environment. Coinbase Custody is SOC 1 Type II compliant and SOC 2 Type II compliant.

*Trading partners*

The Company prioritizes using the self-custody and third-party custody solutions described above, but to maintain liquidity for customer trade execution, the Company also maintains crypto asset balances with several crypto trading partners, including cryptocurrency exchanges. These trading partners are domiciled across multiple geographies including the United States and Cayman Islands. The Company has a due diligence program for all trading partners and conducts security reviews. As part of its due diligence process, the Company assesses security, reputation, liquidity levels of the borrower in applicable assets, capitalization, management, internal control practices and operational risks in its determination of utilizing any trading partner. Once onboarded, each trading partner is monitored on an ongoing basis to ensure they maintain compliance with internally established credit and risk exposure thresholds. Certain trading partners accounts with material balances are integrated within the Fireblocks platform to allow authorized users to initiate transfers directly from Fireblocks to dedicated vault accounts within the platform. Trading partners' risk exposures are monitored across the Company's positions. As a part of regular operations, designated Company employees review and monitor trading partner balances against internal records, verifying the accuracy of each crypto asset holding.

Insurance policies held by the Company's custodians/ trading partners are between the applicable custodian/ trading partner and the insurer, and accordingly the Company is not a named payee on such policies. The Company is not always able to obtain and review copies of the insurance policies of its custodians/ trading partners. The Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balances that are stolen or lost from such a custodian/ trading partner. The Company does not maintain any insurance coverage over its customer crypto assets.

The Company is not aware of any security breaches or other similar incidents involving self-custodied assets or crypto assets held with any third-party custodians, trading partners or institutional borrowers. None of the third-party custodians, trading partners, or institutional borrowers holding the Company's crypto assets is a "Canadian financial institution" (as defined in NI 45-106) or, other than Anchorage, a foreign equivalent, a related party of the Company, and none provide services to the Company other than custody, trade execution, and borrowing transactions. To the Company's knowledge, none of self-custody or third-party custodians have appointed sub-custodians to hold the Company's crypto assets, though the Company understands that certain trading partners may from time to time employ sub-custodians. In the event of bankruptcy or insolvency of trading partners, third-party custodians or institutional borrowers, the Company expects that it would be treated as an unsecured creditor.

**Credit risk**

Credit risk is the risk that one party to a financial instrument will fail to fulfill an obligation and causes the other party to incur a financial loss. The Company's credit risk consists primarily of cash and cash equivalents, cash held for customers, crypto assets held, and crypto assets loaned. The credit risk is minimized by placing these instruments with major financial institutions and other institutional counterparties. Management believes that the credit risk concentration with respect to its bank deposits is remote since all cash is held with financial institutions of reputable credit.

The Company limits its credit risk of crypto assets held (including staked crypto assets) by placing these with cryptocurrency exchanges on which the Company has performed internal due diligence. The Company deems these procedures necessary as cryptocurrency exchanges are unregulated and therefore not subject to regulatory oversight. Furthermore, cryptocurrency exchanges engage in the practice of commingling their customers' assets in exchange wallets. When crypto assets are commingled, transactions are not recorded on the applicable blockchain ledger, but are only recorded by the exchange. Therefore, there is risk around the occurrence of transactions, or the existence of period end balances represented by exchanges. The Company's due diligence of exchanges include, but is not limited to, internal control procedures around on-boarding new exchanges, which includes review of the exchanges' AML and KYC policies, monitoring of market information about the exchanges security and solvency risk, setting balance limits for each exchange account based on risk exposure thresholds and having a fail-over plan to move cash and crypto currencies held with an

23

HIGHLY CONFIDENTIAL

VOY-INV-00033130
VOY-INV-00033107

exchange in instances where risk exposure significantly changes. The Company has no reason to believe it will incur material liability associated with such exposure because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within crypto asset exchanges control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss.

The crypto assets lent by the Company are exposed to the credit risk of the institutional borrowers. The Company limits such credit risk by lending to borrowers that the Company believes, based on its due diligence, to be high quality financial institutions with sufficient capital to meet their obligations as they come due. The Company's due diligence procedures for its lending activities may include review of the financial position of the borrower, liquidity levels of the borrower in applicable assets, review of the borrower's management, review of certain internal control procedures of the borrower, review of market information, and monitoring the Company's risk exposure thresholds. The Company's Risk Management Committee meets regularly to assess and monitor the credit risk for each counterparty. As of December 31, 2021, the Company has not experienced a material loss on any of its crypto assets loaned.

*Market risk*

The Company has investments in crypto assets which may be subject to significant changes in value and therefore exposed to market risk with the fluctuation in market prices. The Company monitors this risk on a daily, weekly and monthly basis. While the Company intends to have limited direct investment in crypto assets, the business model is such that the Company earns fees in crypto assets and at times may accumulate positions that are subject to market risk.

*Valuation*

The Company is exposed to risk with respect to crypto asset prices and valuations which are largely based on the supply and demand of these crypto assets in the financial markets. The Company's valuation governance framework includes numerous controls and other procedural safeguards that are intended to maximize the quality of fair value measurements. New products and valuation techniques must be reviewed and approved by senior management. As the Company's valuation process for crypto assets is automated through Voyager's proprietary pricing engine (the "Voyager Pricing Engine"), fair value estimates are also validated by the finance control function independently. Independent price verification is performed by finance control through benchmarking the Voyager Pricing Engine fair value estimates with observable market prices or other independent sources. Controls and a governance framework are in place and are intended to ensure the quality of third-party pricing sources were used.

**Currency risk**

Foreign currency risk is the risk that a variation in exchange rates between the US dollar and other foreign currencies will affect the Company's operations and financial results. The Company does not currently hedge its exposure to foreign currency cash flows as management has determined that currency risk is not significant.

**Liquidity risk**

Liquidity risk is the risk that the Company will not be able to meet its financial obligations when due. The Company manages liquidity risk by forecasting cash flows from operations and anticipating any investing and financing activities, as applicable. Management and the Board are actively involved in the review, planning and approval of significant expenditures and commitments.

The Company intends to continue to manage its short-term liquidity needs through its available cash balance and cash inflows from its operating activities. However, as described in Future funding note within Liquidity and Capital Resources section, we continually evaluate opportunities for us to maximize our growth and further enhance our strategic position, including, among other things, acquisitions, strategic alliances, and joint ventures potentially involving all types and combinations of equity, and acquisition alternatives which may require additional funding.

HIGHLY CONFIDENTIAL

VOY-INV-00033131
VOY-INV-00033107

## Related Party Transactions

Remuneration of directors and key management personnel of the Company was as follows (in thousands):

| | Three Months Ended December 31, | | | | Six Months Ended December 31, | | | |
| | 2021 | | 2020 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| Share-based payments* | $ | 7 | $ | 59 | $ | 113 | $ | 957 |
| Compensation and employee benefits | | 162 | | 170 | | 301 | | 288 |
| Total | $ | 169 | $ | 229 | $ | 414 | $ | 1,245 |

*During the first quarter, the Company issued 5,952 shares valued at $0.1 million to directors as a compensation for their service.

| | Three Months Ended December 31, | | | | Six Months Ended December 31, | | | |
| | 2021 | | 2020 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| Legal Fasken Martineau DuMoulin, LLP ("Fasken") * | $ | 242 | $ | 107 | $ | 451 | $ | 410 |

* Beginning in February 2021, a partner at Fasken began serving as a director of the Company. The Company expensed legal fees shown above for the services provided by Fasken.

## Commitments

In the ordinary course of business, the Company enters into multi-year agreements to purchase sponsorships as part of its marketing efforts.

## Contingencies

The Company is subject to various litigation, regulatory investigations, and other legal proceedings that arise in the ordinary course of its business. The Company is also subject to regulatory oversight by numerous regulatory and other governmental agencies and, along with other participants in the crypto-financial services industry, has been subject to non-public, fact-finding inquiries and investigations by both the U.S. Securities and Exchange Commission and certain state regulators in connection with certain offerings of the Company. The Company reviews its lawsuits, regulatory investigations, and other legal proceedings on an ongoing basis and provides disclosure and records provisions in accordance with IAS 37, Provisions, Contingent Liabilities and Contingent Assets. In accordance with such guidance, provisions are recorded when it is more likely than not that the Company has a present legal or constructive obligation as a result of past events, it is probable that an outflow of resources will be required, and the amount can be reliably estimated. If any of those conditions are not met, such matters result in contingent liabilities.

In December 2021, a purported class action captioned Cassidy v. Voyager Digital Ltd. and Voyager Digital LLC, et al., Case No. 1:21-cv-24441, was filed in the U.S. District Court for the Southern District of Florida. The Complaint asserts claims for alleged violations of the New Jersey Consumer Fraud Act, Florida Deceptive and Unfair Trade Practices Act and unjust enrichment in connection with the plaintiff's use of the Voyager platform and marketing related thereto. The Company disputes the claims in this case and intends to vigorously defend the case. Based on the preliminary nature of the proceeding in this case, the outcome of this matter remains uncertain.

The Company believes the ultimate resolution of existing legal and regulatory investigation matters will not have a material adverse effect on the financial condition, results of operations, or cash flows of the Company. However, in light of the uncertainties inherent in these types of matters, it is possible that the ultimate resolution may have a material adverse effect on the Company's results of operations.

## Segment Reporting

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker (the "CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a global consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. While the Company does have revenue from multiple products and geographies, no measures of profitability by product or geography are available, so discrete financial information is

HIGHLY CONFIDENTIAL

VOY-INV-00033132
VOY-INV-00033107

not available for each such component. As such, the Company has determined that it operates as one operating segment and one reportable segment.

## Disclosure Controls and Procedures and Internal Controls over Financial Reporting

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR") as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings* ("NI 52-109").

### Disclosure controls and procedures

The Company maintains DC&P, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, that are designed to provide reasonable assurance that material information is made known to the Company's Chief Executive Officer and Chief Financial Officer by others for the period in which the interim filings are being prepared and information required to be disclosed in the annual filings, interim filings or other reports filed or submitted under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation.

The Company's Chief Executive Officer and Chief Financial Officer have performed an evaluation of the effectiveness of the design of the Company's disclosure controls and procedures as of December 31, 2021.

Based upon the results that assessment as at December 31, 2021, management has concluded that the DC&P were effective to provide reasonable assurance that material information relating to the Company is accumulated and communicated to management to allow timely decisions regarding required disclosure, and that the information disclosed by the Company in the reports that it files is appropriately recorded, processed, summarized and reported within the time period specified in applicable securities legislation.

Any control system, no matter how well designed, has inherent limitations. Therefore, disclosure controls and procedures can only provide reasonable assurance with respect to timely disclosure of material information. See *"Limitations of controls and procedures"*

### Internal controls over financial reporting

Our management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, are responsible for designing internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS.

Under the supervision and with the participation of our management, including the Company's Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design of our internal controls over financial reporting as of December 31, 2021.

Based upon the results that assessment as at December 31, 2021, management has concluded that the Company's ICFR were effective.

Any control system, no matter how well designed, has inherent limitations. Therefore, internal controls over financial reporting can only provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS. See *"Limitations of controls and procedures"*

### Limitation on Scope of Design

Section 3.3(1)(b) of NI 52-109 allows an issuer to limit its design of DC&P and ICFR to exclude controls, policies, and procedures of a business that the issuer acquired not exceeding 365 days from the date of acquisition. The scope of design of internal controls over financial reporting and disclosure controls and procedures excluded the controls, policies, and procedures of Coinify which was acquired on August 1, 2021.

Coinify's contribution to our Interim Condensed Consolidated Statements of Comprehensive Income/ (Loss) for the six months ended December 31, 2021, was less than 15% of total revenues and less than 1% of total net income/ (loss), excluding the amortization of intangible assets. Additionally, as at December 31, 2021, Coinify's current assets were below

26

HIGHLY CONFIDENTIAL

1% of consolidated current assets and current liabilities were below 1% of consolidated current liabilities, and its non-current assets (excluding goodwill and intangible assets) and non-current liabilities were below 1% of consolidated non-current assets and non-current liabilities, respectively.

### Limitations of controls and procedures

Effective internal controls are required for the Company to provide reasonable assurance that its financial results and other financial information are accurate and reliable. Any failure to design, develop or maintain effective controls, or difficulties encountered in implementing, improving or remediation lapses in internal controls may affect our ability to prevent fraud, detect material misstatements, and fulfill our reporting obligations. As a result, investors may lose confidence in our ability to report timely, accurate and reliable financial and other information, which may expose us to certain legal or regulatory actions, thus negatively impacting our business, the trading process of our shares and the market value of other securities.

Management, including the Company's Chief Executive Officer and Chief Financial Officer, believes that any disclosure controls and procedures or internal controls over financial reporting, no matter how well conceived and operated, can provide only reasonable, not absolute assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, they cannot provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been prevented or detected. These inherent limitations include those judgments in decision-making can be faulty, and that breakdowns can occur because of simple errors or mistakes. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by unauthorized override of the control. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Accordingly, because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

Digital technologies are transforming traditional industries and business models and crypto and blockchains involve complex and evolving information technology processes. Digital technologies, including crypto and blockchain, also impact common control procedures, the overall control environment, risk management and audit. As a result, there is no single control framework that is designed for crypto and the blockchain. The lack of relevant official guidance from standard setters dealing with emerging issues related to cryptocurrencies is a major challenge. Accordingly, existing DC&P and ICFR frameworks may not be suitable for use with digital assts and block chain technology and may evolve from time to time to address emerging risks and technologies.

## Industry

### Trading of Cryptocurrencies

The demand for cryptocurrencies has increased over the past year as cryptocurrencies have become more widely accepted. Customers expect to be able to utilize more efficient and better infrastructures to support the trading of cryptocurrencies. Voyager's platform solves many of the problems facing people or institutions that trade crypto assets, including that:

- the market is highly fragmented, with more than 300 exchanges facilitating trading of cryptocurrencies;
- there is no centralized place or service in which to trade, which means that users often have to open accounts with multiple exchanges to trade various crypto assets; and
- many of the top tier retail customer exchanges lack a cost-effective fiat on-ramp and off-ramp for customers to turn dollars into crypto assets via a secure banking provider.

The Voyager Platform provides customers with an easy-to-use mobile app that centralizes the fragmented cryptocurrency market and allows them to trade crypto assets without paying a commission.

### Trends

In the industry, there exist multiple crypto asset exchanges offering online trading and wallets and multiple online/mobile players providing components of the crypto asset ecosystem. The largest US exchanges are Coinbase, Kraken, Gemini and Binance.US. Their models offer platforms that only send trades singularly to their wholly owned exchange with little or no information available on the platform. Additionally, exchanges focus on institutional volume and not the retail consumer

HIGHLY CONFIDENTIAL

VOY-INV-00033134
VOY-INV-00033107

and experience. Voyager's agency brokerage platform uses smart order routing to search multiple Exchanges, market makers and liquidity providers to strategically fill customer orders often at better prices than those offered by such Exchanges directly.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic crypto asset offering. The Voyager Platform supports self-directed trading of 60+ crypto assets, with the ability for customers to transfer certain of their crypto assets to their own wallet or custody with Voyager.

28

HIGHLY CONFIDENTIAL

VOY-INV-00033135
VOY-INV-00033107