# EXHIBIT 8

## LOAN AGREEMENT

This **LOAN AGREEMENT** (this "**Agreement**") is entered into as of June 21, 2022 (the "**Effective Date**") by and among **ALAMEDA VENTURES LTD** ("Lender"), **VOYAGER DIGITAL HOLDINGS, INC.** ("**Borrower**") and **VOYAGER DIGITAL LTD** ("**Guarantor**"). Capitalized terms used but not otherwise defined herein shall have the meanings given them on Schedule B. The parties agree as follows:

1.      ***Loans***. Lender will make extensions of credit or other financial accommodations for Borrower's benefit (each, a "**Loan**" and collectively, the "**Loans**") under two facilities, the cash revolving facility and the BTC facility, in the amounts and as otherwise identified on Schedule A, and Borrower promises to pay Lender the amount of all Loans and all debts, liabilities, obligations, covenants, indemnifications, interest, expenses and fees, created hereunder, whether arising before or after the commencement of any bankruptcy or insolvency proceeding (collectively, the "**Obligations**") pursuant to the terms and conditions of this Agreement, and as set forth herein and on Schedule A.

2.      ***Borrowings***.

2.1      Notice. Borrower shall give Lender notice from a Responsible Officer by 2:00 PM Eastern Time on each proposed Funding Date as hereinafter provided of each borrowing under this Agreement, which shall specify (i) the aggregate amount of such borrowing, (ii) the date of the proposed borrowing, (iii) the Applicable Currency of such borrowing and (iv) the uses of such borrowing. If notice is received by 2:00 PM Eastern Time, then the applicable Loan shall be advanced (i) for all Loans advanced in any Applicable Currency other than Dollars, on the same calendar day, or if received thereafter, on the next calendar day, and (ii) for all Loans advanced in Dollars, on the same Business Day, or if received thereafter, on the next Business Day.

2.2      Funding Currency. Lender shall make available the amount of the Loan to be made by it on such date to Borrower in the Applicable Currency so requested by Borrower.

2.3      Funding Restrictions. Such Loans shall be limited to the Cash Revolving Loan Amount and the BTC Revolving Loan Amount, each set forth on Schedule A, and in no event shall more than $75,000,000 be funded in any rolling thirty (30) day period in the aggregate for both Loans (for determining this threshold, the BTC value shall be determined on the day the loan request is made by Borrower based upon prevailing BTC prices as listed on Coin Market Cap or another market valuation as otherwise agreed upon by the parties). There will be no more draw downs of Loans permitted at any time that the aggregate value of all Platform Assets of Borrower is less than $600,000,000 as reflected on Borrower's books and records using methodology consistent with past practice ("**Platform Asset Funding Restriction**").

2.4      Prepayments. Prepayments of the Loans shall be made in Borrower's sole and absolute discretion, without premium or penalty.

2.5      Payments. All Loans that are funded in a type of Applicable Currency shall be re-paid in the same Applicable Currency as which they were funded.

2.6      Use of Proceeds. The Borrower shall only use the proceeds of the Loans solely to pay customers for crypto assets that counterparties to the Borrower's (or its Affiliates) lending and related activities (i) fail to return to the Borrower (or its Affiliates) when such return is demanded by the Borrower, (ii) fail to return to the Borrower (or its Affiliates) when required to be returned by such counterparties, (iii) become insolvent or (iv) are unable, for whatever reason (including without limitation any unilateral imposition of a limit or prohibition on withdrawals) to return the type and amount of crypto assets lent by the Borrower (or its Affiliates).

2.7      Hard Fork. With respect to any BTC Revolving Loans, in the event of a Hard Fork in the blockchain for BTC or an Airdrop, then in addition to repayment of such BTC

-1-

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

Revolving Loans in such amount equal to the amount drawn down and outstanding at the time of repayment, Borrower shall also deliver any incremental tokens generated as a result of a Hard Fork in the BTC protocol or an Applicable Airdrop (the "New Tokens") if the following two conditions are met:

        (a)     *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 0.5% of the average market capitalization of BTC (defined as the total value of BTC) (calculated as a 30-day average on such date).

        (b)     *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 0.5% of the average 24-hour trading volume of BTC (calculated as a 30-day average on such date).

3.     ***Conditions to Funding***.

        **3.1**     The obligation of Lender to make an initial Loan to the Borrower is subject to the following conditions precedent, unless agreed in writing (including email) by Lender to waive such condition, in each case in Lender's sole discretion:

        (a)     Receipt by Lender of a certificate of each Loan Party executed by the Secretary of such Loan Party with appropriate insertions and attachments, including with respect to (i) the operating documents of such Loan Party (which formation document of such Loan Party shall be certified by the Secretary of State of the State of such Loan Party's formation) and (ii) the resolutions adopted by each such Loan Party's board of directors for the purpose of approving the transactions contemplated by the Loan Documents;

        (b)     Receipt by Lender of good standing certificates of each Loan Party certified by the Secretary of State (or equivalent agency) of such Loan Party's jurisdiction of organization or formation and each jurisdiction in which such Loan Party is qualified to conduct business, each as of a date no earlier than thirty (30) days prior to the date such Loan is made; and

        (c)     Receipt by Lender of a certificate of each Loan Party certifying that (i) the representations and warranties set forth in Section 4 are true and correct in all respects as of the date of such Loan, (ii) no Material Adverse Change has occurred, (iii) compliance with the matter set forth in Section 3.2(c) and (iv) compliance with the matter set forth in Section 3.2(d).

        **3.2**     The obligation of Lender to extend each Loan, including the initial Loan, is subject to the following conditions precedent unless agreed in writing (including email) by Lender to waive such condition, in each case in Lender's sole discretion:

        (a)     No Event of Default shall have occurred and be continuing;

        (b)     In the Lender's opinion exercised in good faith, there has not been (and there is not reasonably likely to occur) any Material Adverse Change;

        (c)     No Platform Asset Funding Restriction exists;

-2-

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014166
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

(d)    The Corporate Debt to Specified Asset ratio of Borrower and its Subsidiaries shall not exceed 0.25;

(e)    Receipt by Lender of a written draw request specifying the information set forth in Section 2.1, duly executed by Borrower;

(f)    No customer withdrawal requests of any Loan Party remaining unsatisfied after ten (10) calendar days of the customer's request for withdrawal; and

(g)    Execute any further instruments and take further action as the Lender reasonably requests to effect the purposes of this Agreement.

Notwithstanding the foregoing, Borrower agrees to deliver to the Lender each item required to be delivered to the Lender under this Agreement as a condition precedent to any Loan. Borrower expressly agrees that a Loan made prior to the receipt by the Lender of any such item shall not constitute a waiver by the Lender of Borrower's obligation to deliver such item, and any such Loan in the absence of a required item shall be made in each Lender's sole discretion.

4.    ***Representations, Warranties and Covenants of Loan Parties***. Each Loan Party represents, warrants and covenants to Lender as follows, as of the Effective Date and with respect to covenants, for so long as this Agreement is in effect or any Obligations remain outstanding (other than inchoate obligations for which no claim has been made):

4.1    ***Corporate Existence; Authority.*** Each Loan Party is and will continue to be, duly existing and in good standing in its state of formation and qualified and licensed to do business in, and in good standing in, any state where such qualification is necessary, except for jurisdictions in which failure to do so would not have a material adverse effect on such Loan Party. The execution, delivery and performance by each Loan Party of this Agreement and all other related documents have been duly and validly authorized, do not conflict with such Loan Party's formation documents, and do not constitute an event of default under any material agreement by which such Loan Party is bound.

4.2    ***Taxes; Legal Compliance.*** Each Loan Party has filed, and will file, when due, all tax returns and reports required by applicable law. Each Loan Party has paid, and will pay when due, all taxes, assessments, deposits and contributions now or in the future owed (except for taxes and assessments being contested in good faith with adequate reserves under IFRS). Each Loan Party has complied, and will comply, in all material respects, with all applicable laws, rules and regulations.

4.3    ***Insolvency.*** As of the Effective Date, the Loan Parties are able to pay their debts (including trade debts) as they mature (which representation shall be made by assuming no losses arose from the loan to Three Arrows Capital Ltd.).

4.4    ***Litigation***. Except (i) as otherwise set forth in the Guarantor's filings under its profile under SEDAR and the Guarantor's press releases publicly issued prior to the Effective Date and (ii) for the US Bank National Association v. Voyager Digital, LLC trademark infringement matter (Case :22-cv-01336) Filed 5/18/22, there are no actions, suits, investigations, or proceedings pending or, to the knowledge of the Loan Parties, threatened in writing by or against any Loan Party involving more than One Million Dollars ($1,000,000.00) ("**Material Litigation**").

4.5    ***Negative Covenants.*** No Loan Party will, and will not permit any of their Subsidiaries to, without Lender 's prior written consent (which shall be a matter of Lender's good faith business judgment), do any of the following:

-3-

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014167
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

(a)        engage in any business other than the business currently engaged in by such Loan Party or reasonably related thereto;

(b)        merge or consolidate with any other Person, or acquire, all or substantially all of the capital stock or shares or any property of another Person, in each case including for the avoidance of doubt through a merger, purchase, in-licensing arrangement or any similar transaction, unless such Loan Party is the surviving entity of such merger;

(c)        (i) create, incur or become liable for any Indebtedness in excess of $2,000,000 in  the aggregate in any calendar year (calculated without including any Indebtedness consisting of Customer Liabilities and without including any intercompany loans between Borrower and any of its Subsidiaries); (ii) grant or allow any Lien, security interest or other encumbrance on any of its property other than Permitted Liens; or (iii) directly or indirectly make any investment in excess of $1,000,000 in the aggregate in any calendar year;

(d)        (i) declare or pay any dividends (other than dividends payable solely in capital stock) or make any other distribution or payment in respect of or redeem, retire or purchase any capital stock; (ii) other than the Obligations in accordance with the terms hereof, purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity; (iii) be a party to or bound by an agreement that restricts a Subsidiary from paying dividends or otherwise distributing property to Borrower; and

(e)        directly or indirectly enter into or permit to exist any material transaction with any entity controlling, controlled by or under common control with a Loan Party other than (i) transactions that are in the ordinary course of business consistent with past practice, (ii) are on terms and conditions not less favorable than could be obtained on an arms-length basis from unrelated third parties and (iii) intercompany Indebtedness between a Loan Party and its Subsidiaries.

4.6        *Affirmative Covenants*. Each Loan Party shall do all of the following:

(a)        maintain its legal existence and good standing in their respective jurisdictions of organization and maintain qualification in each jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Change;

(b)        keep its business insured for risks and in amounts standard for companies in each such Loan Party's industry and location.  Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to the Lender;

(c)        notify Lender of any Material Litigation;

(d)        protect, defend and maintain the validity and enforceability of its respective assets including intellectual property that is material to its business.

4.7        *Ongoing Business*. Borrower agrees that Lender will be the preferred borrower for Crypto lending activities of Borrower. Borrower shall also recall all outstanding Crypto loans and shall work with Lender to restructure the outstanding Crypto loan from Borrower to Genesis in a manner and on terms satisfactory to Borrower and Lender, in their reasonable discretion. In the event that Lender defaults on the payment of any outstanding Crypto loans made by Borrower to Lender in violation of the Crypto loan agreements between Lender and Borrower, Borrower shall be entitled to offset and reduce the outstanding Obligations by the amount of all such past due Crypto loans.

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014168
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

**4.8**       *Full Disclosure.*  No written representation, warranty or other statement of any Loan Party in any certificate or written statement given to Lender, in the aggregate, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement contained in such certificates or statements not misleading.

**5.**       *Term*. This Agreement shall continue in effect until the maturity date set forth in Schedule A (the "**Maturity Date**").  On the Maturity Date or on any earlier effective date of termination of this Agreement, Borrower shall pay all Obligations in full, whether or not such Obligations are otherwise then due and payable.  All payments of outstanding Loans shall be made in the Applicable Currency in which such Loan was funded by Lender.  No termination shall in any way affect or impair any right or remedy of Lender, nor shall any such termination relieve Borrower of any obligation to Lender, until all of the Obligations have been paid and performed in full (other than inchoate obligations for which no claim has been made).

**6.**       *Defaults and Remedies.*

**6.1**       *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Agreement:

(a)       Borrower shall fail to make any payment of unpaid principal or accrued but unpaid interest under this Agreement when and as the same shall become due and payable and such failure continues for ten (10) Business Days after notice of such failure shall have been furnished to Borrower by Lender;

(b)       Borrower fails to comply with or to perform any other covenant set forth herein and such failure continues for thirty (30) days after notice of such failure shall have been furnished to Borrower by Lender;

(c)       any of the representations and warranties set forth in this Agreement shall be untrue or shall be incorrect in any material respect when made or deemed made;

(d)       Guarantor challenges the validity of the guaranty set forth in Section 8 of this Agreement;

(e)       institution by or against any Loan Party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of debts, making an assignment for the benefit of such Loan Party's creditors or such Loan Party's dissolution, winding down, liquidation or ceasing to do business, in each case, that remain in effect for forty-five (45) days;

(f)       there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Change;

(g)       one or more judgments, orders, or decrees for the payment of money in an amount, individually or in the aggregate, of at least One Million Dollars ($1,000,000.00) (not covered by independent third party insurance as to which (i) Borrower reasonably believes such insurance carrier will accept liability, (ii) Borrower or the applicable Loan Party has submitted such claim to such insurance carrier and (iii) liability has not been rejected by such insurance carrier) shall be rendered against any Loan Party and shall remain unsatisfied, unvacated, or unstayed for a period of ten (10) days after the entry thereof;

(h)       any financial indebtedness of any Loan Party is not paid when due, or becomes due prior to its stated maturity by reason of an event of default (howsoever described, provided that this Section 7.1(h) shall not apply to any customer withdrawal requests (which for the avoidance of doubt are covered by Section 3.2(f));

-5-

CONFIDENTIAL                                         PRIVILEGED-CONFIDENTIAL-VOYAGER-00014169
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

        (i)       a Loan Party's auditor qualify its audited consolidated annual financial statements other than a going concern qualification;

        (j)       there is a default in (a) any agreement to which any Loan Party is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000.00) or that could reasonably be expected to have a Material Adverse Change;

        (k)       any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started or threatened, or any judgment or order of a court, arbitral body or agency is made, in relation to this Agreement or the transactions contemplated herein or against a Loan Party or any of their respective subsidiaries or their respective assets which have, or has, or are, or is, reasonably likely to constitute a Material Adverse Change or any judgment, fine, settlement or other resolution of any such litigation, arbitration of administrative proceeding resulting in obligations of the Loan Parties in excess of Five Million Dollars ($5,000,000);

        (l)       (i) a notice of lien, levy, or assessment is filed against any Loan Party or their respective assets by any government agency, and is not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); and (ii)(x) any material portion of any Loan Party's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (y) any court order enjoins, restrains, or prevents any Loan Party from conducting any part of its business; or

        (m)      failure of Borrower to obtain any primary debt facility or primary equity financing, in each case of comparable size as this Agreement within twelve (12) months of the Effective Date.

      **6.2**      ***Remedies***.  Upon an Event of Default having occurred and continuing:

        (a)       Lender may declare all or any portion of the unpaid Obligations to be immediately due and payable (*provided, however,* that if an Event of Default specified in Section 6.1(e) above occurs, the entire unpaid Obligations shall forthwith become and be immediately due and payable without any notice, declaration or other act on the part of Lender); and

        (b)       Lender shall be entitled to exercise any other rights which Lender may have been afforded under any contract or agreement at any time and other rights which Lender may have pursuant to applicable law.

    **7.**       ***Guarantee.***

      **7.1**      ***The Guarantee***.  Guarantor hereby guarantees to the Lender, and its respective successors, endorsees, transferees and assigns, the full and prompt payment in full when due (whether at stated maturity, by acceleration, demand or otherwise) and performance of the indebtedness, liabilities and other obligations of the Borrower to the Lender under or in connection with this Agreement and the other Loan Documents, including all unpaid principal of the Loans, all interest accrued thereon, all fees due under this Agreement and all other amounts payable by the Borrower to the Lender hereunder or in connection herewith, including, without limitation, the Obligations. The foregoing indebtedness, liabilities and other obligations of the Borrower, and all other indebtedness, liabilities and obligations to be paid or performed by the Guarantors in connection with this Section shall hereinafter be collectively referred to as the "**Guaranteed Obligations**."

      **7.2**      ***Obligations Unconditional***.  The obligations of the Guarantor under Section 7.1 are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Borrower under this Agreement or any other agreement or

CONFIDENTIAL
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014170
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 7.1 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances. The Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Lender exhausts any rights, powers or remedies or proceeds against the Borrower under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

7.3        *Reinstatement*.  The obligations of the Guarantor under this Section 8 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Guarantor agrees that it will indemnify the Lender on demand for all reasonable costs and expenses (including reasonable and documented fees of counsel) incurred by such Persons in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.4        *Subrogation*. Until the Guaranteed Obligations shall be satisfied in full (other than any inchoate indemnity obligations), the Guarantor shall not directly or indirectly exercise (i) any rights that it may acquire by way of subrogation under this Section 7, by any payment hereunder or otherwise, (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this Section 8 or (iii) any other right which it might otherwise have or acquire (in any way whatsoever) which could entitle it at any time to share or participate in any right, remedy or security of the Lender as against the Borrower, whether in connection with this Section 8, any of the other Loan Documents or otherwise. If any amount shall be paid to any Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents.

7.5        *Remedies*.  The Guarantor agrees that, as between the Guarantor, on one hand, and the Lender, on the other hand, the obligations of the Borrower under this Agreement and under the other Loan Documents may be declared to be forthwith due and payable as provided in Section 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 7) for purposes of Section 7.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantor for purposes of Section 7.1.

7.6        *Continuing Guarantee*. The guarantee in this Section 7 is a continuing guaranty and agreement of subordination relating to any Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and the Guarantor expressly acknowledges that the guarantee in this Section 8 shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist. The guarantee in this Section 7 shall continue in effect and be binding upon the Guarantor until payment and performance in full of the Guaranteed Obligations (other than any inchoate indemnity obligations).

-7-

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014171
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

7.7 **_General Limitation on Guarantee Obligations_**. In any action or proceeding involving any provincial, territorial or state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantor under Section 7.1 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by the Guarantor, Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

7.8 **_Additional Waivers; General Waivers_**.

(a)    Additional Waivers.   Notwithstanding anything herein to the contrary, the Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof; (ii)(A) notice of acceptance hereof; (B) notice of any other financial accommodations made or maintained under the Loan Documents or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to the Guarantor's right to make inquiry of the Lender to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or of any other fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor under this Guaranty or under the other Loan Documents) and demands to which the Guarantor might otherwise be entitled; (iii) its right, if any, to require the Lender to institute suit against, or to exhaust any rights and remedies which the Lender now have or may hereafter have against, any other guarantor of the Guaranteed Obligations or any third party, or against any collateral provided by such other guarantors or any third party; and the Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of any other guarantor of the Guaranteed Obligations or by reason of the cessation from any cause whatsoever of the liability of any other guarantor of the Guaranteed Obligations in respect thereof; (iv) any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by the Lender; or (B) any election by the Lender under any provision of any state or federal bankruptcy, insolvency or similar law to limit the amount of, or any collateral securing, its claim against the Guarantor.

(b)    General Waivers.   The Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

8.    **_General_**.

8.1    **_Compliance with Canadian Securities Laws_**. The Parties acknowledge that the Guarantor is a reporting issuer under the securities laws of each of the provinces and territories of Canada and is a listed issuer on the Toronto Stock Exchange. As such, the Transactions, and the parties in carrying out the Transactions, are subject to applicable securities laws in Canada including, without limitation,  that the Transactions may be subject to Part 5 of Multilateral Instrument 61-101 Protection of Minority Securityholders in Special Transactions. The parties agree to use commercially reasonable efforts to comply, in a timely manner, with all of their obligations under applicable securities laws.

8.2    **_Press Releases._** The parties agree to consult with each other prior to issuing any press release, material change report, early warning report or other public disclosure document relating to the transactions and/or the existing relationships among the parties provided, that nothing in this Section 9.2 shall be deemed to prohibit any party from making any disclosure

-8-

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014172
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

which its counsel deems necessary or advisable in order to satisfy such party's disclosure obligations imposed by applicable law.

        **8.3**      ***No Waivers; Amendments***. The failure of Lender at any time to require Borrower or any Loan Party to comply strictly with any of the provisions of this Agreement shall not waive Lender's right to later demand and receive strict compliance. Any waiver of a default shall not waive any other default. None of the provisions of this Agreement may be waived except by a specific written waiver signed by Lender and delivered to Borrower and the other Loan Parties, if applicable. The provisions of this Agreement may not be amended except in a writing signed by Loan Parties and Lender.

        **8.4**      ***Attorneys' Fees***. Borrower shall reimburse Lender for all expenses and reasonable costs and expenses (including reasonable and documented attorneys' fees and expenses) for preparing, negotiating, administering, defending and enforcing this Agreement and the other Loan Documents with Lender (including appeals or insolvency proceedings). If, subject to the foregoing, Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees from the non-prevailing party.

        **8.5**      ***Binding Effect; Assignment.*** This Agreement is binding upon and for the benefit of the successors and permitted assignees of each party. No party may not assign any rights under this Agreement without the other party's prior written consent. Borrower shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the names and addresses of Lender and any assignee and principal amounts (and stated interest) owing to each Lender and assignee pursuant to the terms hereof from time to time. It is the intention that this Agreement be treated registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

        **8.6**      ***Notices***. All notices by any party required or permitted under this Agreement or any other related agreement must be in writing and be sent via email at the e-mail address listed on the signature page hereto (or such other e-mail address as provided to the other party in writing).

        **8.7**      ***Governing Law; Jurisdiction.*** This Agreement shall be governed by the laws of the State of New York. Each Loan Party and Lender each submit to the exclusive jurisdiction of the federal and state courts in New York, New York.

        **8.8**      ***Other***. If any provision hereof is unenforceable, the remainder of this Agreement shall continue in full force and effect. This Agreement binds and is for the benefit of the successors and permitted assigns of each party. This Agreement (including schedules hereto) and any other written agreements and, documents executed in connection herewith are the complete agreement between Loan Parties and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated herein. This Agreement may be executed in one or more counterparts, all of which when taken together will constitute one agreement. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation assignments, assumptions, amendments, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014173
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

9.    *Tax Provisions.*

9.1    *Tax Treatment.* It is the intention of the parties that for U.S. federal, and applicable state and local, income tax purposes that (i) this Agreement shall be treated as a debt instrument, (ii) if the Applicable Currency is USDC or BTC, the repayment of the USDC or BTC, respectively, shall be treated as a return of assets "identical" to those which were loaned to the Borrower within the meaning of Section 1058(b) of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations promulgated thereunder (including those in proposed form) as if the Agreement were an agreement described in Section 1058(a) of the Code, (iii) this Agreement shall not reduce the risk of loss or opportunity for gain of the Lender in any USDC or BTC borrowed hereunder, (iv) any tokens or other property distributed in respect of any USDC or BTC borrowed hereunder shall be treated as earned by and owned by the Lender as beneficial owner of the USDC or BTC, respectively, and (v) no gain or loss shall be recognized by the Borrower or Lender in connection with the lending and repayment of any USDC or BTC under Section 1001 of the Code and any similar state and local tax law. The parties agree to treat the Agreement consistently with the foregoing for all tax purposes and to report consistently with such tax treatment unless otherwise required by applicable law. Lender understands and agrees that it is solely responsible for the payment of any applicable taxes with respect to any payment it receives pursuant to this Agreement (whether in BTC, USDC, cash or any other property) and for any other income taxes resulting from the transactions contemplated herein. Lender hereby agrees to defend, indemnify, and hold harmless the Borrower and its respective officers, directors, managers, employees, and agents from any and all liabilities, costs, and expenses (including reasonable attorneys' fees) in connection with any such taxes and related costs, interest, and penalties. Lender understands and acknowledges that the characterization of the transactions contemplated by this Agreement for U.S. federal, state or local income and Canadian tax purposes is unclear. Each party further understands and acknowledges that the other party and any of its respective agents shall not provide any advice or guidance with respect to the tax consequences of the parties in connection with this Agreement. Each party is strongly encouraged to seek advice from its own tax advisor to discuss the potential tax consequences of entering into this Agreement and the receipt of any payments hereunder.

9.2    *Transfer and Similar Taxes.* Borrower shall timely pay to the relevant governmental authority all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to any Loan Document.

9.3    *Withholding.* Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any tax (including interest and penalties) from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is not an Excluded Tax (as defined below), then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 10.3) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made. In addition, Borrower shall indemnify Lender, within 10 days after demand therefor, for the full amount of any taxes that are not Excluded Taxes payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such tax were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error. For purposes of this Section 10.3, an "Excluded Tax" is (i) any tax (including interest and penalties) on Lender in the jurisdiction in which Lender is formed or incorporated that is imposed on or measured by net income (however denominated) or is a

-10-

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014174
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

franchise tax or branch profits tax and (ii) any tax under Sections 1471 through 1474 of the Code and the authorities thereunder as in effect on the date hereof.

10.     *Confidentiality.*  Neither party hereto may use the confidential information it receives about any other party directly or indirectly for any purpose other than the administration and enforcement of this Agreement, and may not use the confidential information for any purposes which could be deemed to be adverse to or competitive with such party's business.  In handling any confidential information, each party hereto will exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (i)  as required by law, regulation, subpoena, or other order (*provided, however*, that the disclosing party shall provide written notice thereof to the applicable party (to the extent not prohibited by law or court order), and consult with such party with respect to such disclosure to the extent reasonably protectable and provide such party reasonable opportunity to object to any such disclosure or to request confidential treatment thereof); or (ii) as Lender (if the disclosing party) considers appropriate in exercising remedies under this Agreement.

11.     *Mutual Waiver of Jury Trial.*  EACH LOAN PARTY AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT OR ANY RELATED DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR ALL PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

[Signature page follows.]

-11-

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014175
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date initially set forth above.

**BORROWER:**

**VOYAGER DIGITAL HOLDINGS, INC.**

By: _Stephen Ehrlich_
Name:  Stephen Ehrlich
Title:    Chief Executive Officer
E-mail: sehrlich@investvoyager.com

**GUARANTOR:**

**VOYAGER DIGITAL LTD.**

By: _Stephen Ehrlich_
Name:  Stephen Ehrlich
Title:    Chief Executive Officer
E-mail:  sehrlich@investvoyager.com

**LENDER:**

**ALAMEDA VENTURES LTD**

By: _____
Name:  Sam Bankman-Fried
Title:   Chief Executive Officer
E-mail: sam@ftx.com

[Signature Page to Loan Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date initially set forth above.


BORROWER:

VOYAGER DIGITAL HOLDINGS, INC.

By: _____
Name:  Stephen Ehrlich
Title:   Chief Executive Officer
E-mail: sehrlich@investvoyager.com

GUARANTOR:

VOYAGER DIGITAL LTD.

By: _____
Name:  Stephen Ehrlich
Title:   Chief Executive Officer
E-mail:  sehrlich@investvoyager.com

LENDER:

ALAMEDA VENTURES LTD

By: *Sam Bankman-Fried*
872DA88132804B9...
Name:  Sam Bankman-Fried
Title:   Chief Executive Officer
E-mail: sam@ftx.com


[Signature Page to Loan Agreement]

## SCHEDULE A
## LOAN TERMS

| | |
|---|---|
| **BORROWER:** | **VOYAGER DIGITAL HOLDINGS, INC.** |
| **Cash Revolving Loan Amount:** | Two Hundred Million Dollars ($200,000,000.00) (the "**Cash Revolving Loan Amount**"). |
| **BTC Revolving Loan Amount:** | Fifteen Thousand (15,000) BTC (the "**BTC Revolving Loan Amount**"). |
| **Guarantor:** | Voyager Digital LTD. |
| **Draw Period:** | The period of time commencing upon the Effective Date and continuing through the earlier to occur of (a) December 30, 2024 or (b) the earlier termination of this Agreement in accordance with the terms thereof ("**Draw Period**"). |
| **Maturity Date:** | December 31, 2024 (the "**Maturity Date**"). |
| **Cash Revolving Loan:** | Subject to the terms and conditions of this Agreement, during the Draw Period, and upon the delivery by Borrower to Lender of a completed and executed irrevocable loan request (in a form acceptable to Lender), Lender shall make cash loans available to Borrower in an aggregate original principal amount not to exceed the Cash Revolving Loan Amount, subject to the funding restrictions set forth in this Agreement.  Prior to the Maturity Date, Cash Revolving Loans may be repaid and reborrowed.<br><br>Lender will only be obligated to make a Cash Revolving Loan so long as the Conditions to Funding set forth in Section 3 of this Agreement have been met. |
| **BTC Revolving Loan:** | Subject to the terms and conditions of this Agreement, during the Draw Period, and upon the delivery by Borrower to Lender of a completed and executed irrevocable loan request (in a form acceptable to Lender), Lender shall make loans available to Borrower in an aggregate original principal amount not to exceed the BTC Revolving Loan Amount, subject to the funding restrictions set forth in this Agreement  Prior to the Maturity Date, BTC Revolving Loans may be repaid and reborrowed. |
| **Repayment:** | For the Cash Revolving Loan, the repayment shall be in the form of Dollars or USDC, depending on the Applicable Currency in which such Loan was funded.<br><br>For the BTC Revolving Loan, the repayment shall be in the form of BTC in an amount equal to the amount drawn down and outstanding at the time of repayment. |
| **Interest:** | The Loans shall accrue interest on the outstanding principal balance at a rate equal to five percent (5.0%) per annum and shall be payable on the Maturity Date (provided that under the BTC Revolving Loan the interest shall be paid in kind based on the number of BTC outstanding at the Maturity Date). Interest is computed on a three hundred sixty (360) day year for the actual number of days elapsed. |

US-DOCS\132902736.2

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014178
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

**SCHEDULE B**
**DEFINITIONS**

As used in this Agreement, the following words shall have the following meanings:

"**Affiliate**" is, with respect to any Person, any other Person that owns or controls directly or indirectly ten percent (10%) or more of the stock of another entity of such Person, any other Person that controls or is controlled by or is under common control with such Person and each of such Person's officers, directors, managers, joint ventures or partners. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting equity securities, by contract or otherwise and the terms "controlled by" and "under common control with" shall have correlative meanings.

"**Agreement**" is defined in the preamble hereof.

"**Airdrop**" is a distribution of a New Token or tokens resulting from the ownership of a preexisting token for which the distribution of New Tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant BTC held at a specified time.

"**Applicable Currency**" is (i) for the Cash Revolving Loans, Dollars or USDC, and (ii) for the BTC Revolving Loans, BTC.

"**Borrower**" is defined in the preamble hereof.

"**BTC**" is BITCOIN, a digital currency.

"**BTC Revolving Loan Amount**" is defined in Schedule A.

"**BTC Revolving Loans**" is all Loans advanced in BTC up to the BTC Revolving Loan Amount.

"**Business Day**" is a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"**Cash Revolving Loan Amount**" is defined in Schedule A.

"**Cash Revolving Loans**" is all Loans advanced in Dollars or USDC up to the Cash Revolving Loan Amount.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation directly or indirectly guaranteed, endorsed, co made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith in accordance with IFRS; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Corporate Debt**" is all forms of loans, notes and other indebtedness for borrowed money of Borrower and its Subsidiaries including guaranteed indebtedness of Borrower and its Subsidiaries, whether in fiat or digital assets, as measured in Dollars at the time of measurement. For the avoidance of doubt, Customer Liabilities shall not be considered Corporate Debt.

"**Customer Liabilities**" obligations to Borrower's customers incurred in connection with the provision of services by Borrower to its customers which are reflected on Borrower's books and records as liabilities.

"**Dollars**" and "**$**" is the lawful currency of the United States of America.

"**Draw Period**" is defined in Schedule A.

"**Effective Date**" is defined in the preamble hereof.

US-DOCS\132902736.2

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014179
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

"**Event of Default**" is defined in Section 6.1.

"**Funding Date**" is any date on which a Loan is made to or for the account of Borrower which shall be a Business Day for Loans advanced in Dollars, and any calendar day for all Loans advanced in any other Applicable Currency.

"**Guarantor**" is defined in the preamble hereof.

"**Hard Fork**" is a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a New Token).

"**IFRS**" is international financial reporting standards as in effect from time to time.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, (d) non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (e) equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (f) obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (g) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (h) all Indebtedness of others guaranteed by such Person, (i) off-balance sheet liabilities and/or pension plan or multiemployer plan liabilities of such Person, (j) obligations arising under non-compete agreements, (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the ordinary course of business and (l) Contingent Obligations.

"**Lender**" is defined in the preamble hereof.

"**Lien**" is a claim, hypothecation, mortgage, deed of trust, levy, charge, pledge, security interest, or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan**" and "**Loans**" are defined in Section 1.

"**Loan Documents**" are, collectively, this Agreement, and any other present or future agreement between any Loan Party and/or for the benefit of Lender in connection with this Agreement, all as amended, extended or restated from time to time.

"**Loan Party**" means, collectively, Borrower and Guarantor.

"**Material Adverse Change**" is (a) a material adverse change in the business, operations or condition (financial or otherwise) or reasonable prospects of Borrower and its Subsidiaries; or (b) a material impairment of (i) the reasonable prospect of repayment of any portion of the Obligations, (ii) the Loan Parties' ability to perform or otherwise comply with all or any of its or their obligations hereunder; (iii) the legality, validity or enforceability of any Loan Document or (iv) the rights and remedies of the Lender under any Loan Document except as the result of the action or inaction of the Lender, in each case in the opinion of the Lender acting in good faith. For the avoidance of doubt any diminution of value, failure to recover, impairment or other loss of greater than 25% of the value of the Loan Parties' loans made to Three Arrows Capital Ltd. and its Affiliates shall be deemed to be a Material Adverse Change.

"**Maturity Date**" is defined in Schedule A.

"**New Token(s)**" is defined in Section 2.7.

"**Obligations**" is defined in Section 1.

"**Permitted Liens**" is (a) liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which such Loan Party maintains adequate reserves on its books, if they have no priority over any of Lender's security interests; (b) statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions; (c) liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of Borrower's business and imposed without action of such parties; provided, that the payment thereof is not yet required, (d) pledges and deposits made

US-DOCS\132902736.2

CONFIDENTIAL

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014180

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165

in the ordinary course of business in compliance with workers' compensation, unemployment and other social security laws or regulations; (e) statutory liens imposed by law arising in the ordinary course; and (f) purchase money liens in an amount not to exceed $500,000 in the aggregate (i) on equipment and related software acquired or held by any Loan Party or its Subsidiaries incurred for financing the acquisition of the equipment and related software, if any, including the financing of the costs of shipping, taxes and installation, or (ii) existing on equipment and related software when acquired, if the lien is confined to such property, improvements thereon, and proceeds thereof, in the aggregate not exceeding Five Millions Dollars ($5,000,000).

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company association, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"*Platform Assets*" is cash held for customers, crypto assets held, crypto assets loaned and crypto asset collateral received by Borrower as currently used for reporting purposes in Guarantor's financial statements.

"**Responsible Officer**" is each of the Chief Executive Officer, the President, and the Chief Financial Officer of Borrower.

"**Specified Assets**" are the total Platform Assets of Borrower and its Subsidiaries, as measured in Dollars at the time of measurement, as reflected in Borrower's books and records consistent with past practice, less $500,000,000.

"**Subsidiaries**" is any entity of which more than fifty percent (50.0%) of the voting stock or other equity interests is owned or controlled, directly or indirectly, by a Loan Party.

"**Transactions**" are the transactions contemplated under this Agreement and the other Loan Documents.

"**USDC**" is cryptocurrency pegged to the Dollar.

US-DOCS\132902736.2

PRIVILEGED-CONFIDENTIAL-VOYAGER-00014181
PRIVILEGED-CONFIDENTIAL-VOYAGER-00014165