# <u>EXHIBIT B</u>

## Objection

Hearing Date: March 2, 2023 at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline: February 23, 2023 at 4:00 p.m. (prevailing Eastern Time)

**McDermott Will & Emery LLP**
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**McDermott Will & Emery LLP**
Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | Case No. 22-10943 (MEW) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF HEARING ON OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO PROOFS OF CLAIM NOS. 11206, 11209, AND 11213**

**PLEASE TAKE NOTICE** that a hearing on the *Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209, and 11213* (the "Objection") filed by the Official Committee of Unsecured Creditors of Voyager Digital Holdings, *et al.* (the "Committee") will be held on **March 2, 2023 at 10:00 a.m., prevailing Eastern Time** (the "Hearing"). In accordance with General Order M-543 dated March 20, 2020, the Hearing

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

will be conducted telephonically. Any parties wishing to participate must do so by making
arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief
requested in the Objection shall: (a) be in writing; (b) conform to the Federal Rules of
Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York,
and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court
for the Southern District of New York; (c) be filed electronically with the Court on the docket
of *In re Voyager Digital Holdings, Inc*., No. 22-10943 (MEW) by registered users of the
Court's electronic filing system and in accordance with all General Orders applicable to
chapter 11 cases in the United States Bankruptcy Court for the Southern District of New
York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d)
be served so as to be actually received by **February 23, 2023 at 4:00 p.m., prevailing
Eastern Time**, by (i) the entities on the Master Service List available on the case website of
the above-captioned debtors and debtors in possession (the "Debtors") at
https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in
the subject matter of the Objection.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that
are timely filed, served, and received will be considered at the Hearing. Failure to file a
timely objection may result in entry of a final order granting the Objection as requested by
the Committee.

**PLEASE TAKE FURTHER NOTICE** that copies of the Objection and other
pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the
website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the
Objection and other pleadings filed in these chapter 11 cases by visiting the Court's website
at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  New York, New York
January 31, 2023

**McDermott Will & Emery LLP**

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com

and

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail: crgibbs@mwe.com
E-mail: gwilliams@mwe.com

and

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

Darren Azman
Joseph B. Evans
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

*Counsel to the Official Committee of*
*Unsecured Creditors of Voyager Digital Holdings, Inc., et al.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., et al., | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROOFS OF CLAIM NOS. 11206, 11209, AND 11213

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Voyager"), hereby objects (the "Objection") to Proofs of Claim Nos. 11206, 11209, and 11213 (collectively, the "AlamedaFTX Claims")[2] filed by Alameda Ventures Ltd. ("Alameda Ventures"), pursuant to sections 502 and 510 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3004 and 3007 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"). In support of this Objection, the Committee respectfully states as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

[2]  On January 30, 2022, the Debtors filed an objection seeking, among other things, equitable subordination of the AlamedaFTX Claims. *See* Docket No. 929.

### <u>PRELIMINARY STATEMENT</u>[3]

1.      AlamedaFTX is now a notorious criminal enterprise that stole its customers'
crypto to pay company debts, cover investment losses, fund secret political donations, make
loans to senior executives, and expense a series of vanity projects. What is not as heavily
publicized is the scheme AlamedaFTX, Bankman-Fried, and others perpetrated against Voyager
and its creditors leading up to and during these Chapter 11 Cases. While AlamedaFTX was
secretly struggling financially and using customer crypto to cover losses, AlamedaFTX set its
sights on the crypto held by the bankrupt Voyager to keep its fraud going.

2.      In connection with its attempts to buy Voyager, AlamedaFTX made a series of
false statements indicating that it was financially strong and able to consummate the Voyager
purchase. AlamedaFTX falsely represented that it had a "bottomless sea of ordinary
cryptocurrency":

> Two smaller differences.  First, different deals may have a different ability to "match" what the customers had.  FTX has a bottomless sea of ordinary cryptocurrency, but not sure we can match every currency.  On the other hand, the estate

3.      When the Committee inquired about press reports concerning AlamedaFTX's
liquidity, it received false assurances that AlamedaFTX was "rock solid," "doesn't use customer
funds or take credit risk at all," and that a competing bidder must be responsible for fake media
reports:

> That's just Binance silliness.  FTX is rock solid, doesn't use customer funds or take credit risk at all.  It cannot have "liquidity" issues because it doesn't lend.

4.      Days before AlamedaFTX's own bankruptcy filing, it made false statements to
Voyager and the Committee indicating that it was solvent, financially strong, and able to

---

[3]    Capitalized terms not otherwise defined in this preliminary statement shall have the meanings ascribed to such
terms below.

consummate the Amended FTX APA. The Committee's vote to support the Debtors' selection of AlamedaFTX as the successful bidder at the auction was a split-vote decided on the slimmest of margins. Had the Committee known the truth, it never would have allowed the AlamedaFTX deal.

5.      These representations along with more formal false representations made in connection with the Amended FTX APA almost bought AlamedaFTX and Bankman-Fried billions of dollars of Voyager's crypto. But AlamedaFTX's global fraud was exposed in November 2022, culminating in its own chapter 11 filing. As AlamedaFTX and Bankman-Fried unraveled, it became apparent that AlamedaFTX repeatedly lied to Voyager, the Committee, *and the Court* in connection with its gambit to acquire Voyager's assets. At minimum, AlamedaFTX's conduct during this proceeding is sufficient to subordinate its claims and it may even constitute a separate felony offense under 18 U.S.C. § 157(c).

6.      AlamedaFTX's well-documented lies caused Voyager's creditors to lose in excess of $100 million of value. Not satisfied with such damage, AlamedaFTX filed claims against the Debtors' estates and seeks to share *pari passu* with, and dilute recoveries to, the Debtors' legitimate creditors in its latest attempt to steal retail customer crypto. Such claims are based on loans for which AlamedaFTX never expected to be repaid and which were extended as part of a larger strategy to gain improper leverage in, and otherwise manipulate, the Debtors' sale process to (a) gain access to liquidity in the form of Voyager's (and customers') crypto and (b) lure Voyager's customers to FTX's platform where their crypto would be "safe."

7.      The majority of Voyager's creditors are retail customers who lost significant sums that impacted their daily lives. AlamedaFTX's predatory behavior and repeated deceit made a bad situation worse. Indeed, it is possible that there has never been a more compelling set of

facts that support equitable subordination of a claim than those before this Court. For these reasons and those discussed in greater detail below, the AlamedaFTX Claims should be subordinated or, in the alternative, recharacterized.[4]

### JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Code sections 105, 502, and 510 and Bankruptcy Rules 3003 and 3007.

9.      The Committee confirms its consent to the Court entering a final order in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### BACKGROUND

**A.      The AlamedaFTX Machine**

10.      In October 2017, Samuel Bankman-Fried ("Bankman-Fried") and Gary Wang co-founded crypto trading firm Alameda Research, LLC ("Alameda Research"),[5] of which

---

[4]    The Committee is serving discovery on AlamedaFTX (as defined below) and other third parties in connection with this Objection. To the extent not addressed herein, the Committee reserves the right to object to (a) the AlamedaFTX Claims on additional grounds not set forth herein; (b) the remainder of the AlamedaFTX Claims post-confirmation; and (c) any other claims filed by AlamedaFTX in these Chapter 11 Cases (administrative or otherwise.

[5]    *In re FTX Trading Ltd., et al.*, No. 22-11068, Docket No. 24, Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ¶ 22 (Bankr. D. Del. Nov. 17, 2022) (hereinafter, "Ray Decl."), attached as **Exhibit 1** to the *Declaration of Joseph B. Evans in Support of the Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209, and 11213* (the "Evans Declaration"), filed contemporaneously herewith; *see also Securities and Exchange Commission v. Samuel Bankman-Fried*, No. 22-10501, Docket No. 1, Compl. ¶ 15 (S.D.N.Y. Dec. 13, 2022) (hereinafter, "SEC Compl."), attached to the Evans Declaration as **Exhibit 2**.

Bankman-Fried owns 90%.[6] At its peak, according to Bankman-Fried, Alameda Research was conducting nearly $15 million a day in transactions,[7] and had a near $100 billion net asset value.[8] In May 2019, Bankman-Fried launched FTX Trading Ltd. d/b/a FTX.com ("FTX.com").[9] Customers used FTX.com's platform primarily to trade cryptocurrencies in exchange for fiat or other cryptocurrencies.[10] In January 2020, Bankman-Fried founded West Realm Shires Inc. d/b/a FTX US ("FTX US" and, together with FTX.com, "FTX"), which extended FTX.com's trading services to customers in the United States.[11] Under Bankman-Fried, Alameda Research, FTX, and over 100 affiliated entities (collectively, "AlamedaFTX") grew exponentially. Bankman-Fried claimed that FTX had "millions" of registered users and approximately $15 billion worth of assets on its platform.[12]

11.     Although purportedly distinct entities, in reality, the lines between Alameda Research and FTX were non-existent.[13] While Bankman-Fried purportedly stepped down from his "official" role as CEO of Alameda Research in October 2021 (replaced by co-CEOs, Caroline Ellison and Sam Trabucco),[14] he was and remained the ultimate decision-maker at Alameda Research until the hours leading up to the filing of the FTX Chapter 11 Cases (as defined below).

---

[6]   Ray Decl. ¶ 10 n. 2.
[7]   Lakshmi Varanasi, Sarah Jackson, & Britney Nguyen, *The rise and fall of FTX's Sam Bankman-Fried, who went from being a crypto billionaire to being arrested and charged with fraud*, BUSINESS INSIDER (Dec. 13, 2022), https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11.
[8]   Sam Bankman-Fried, *FTX Pre-Mortem Overview*, BANKMAN-FRIED'S SUBSTACK at 4 (Jan. 12, 2023), https://sambf.substack.com/p/ftx-pre-mortem-overview (hereinafter, "SBF Substack").
[9]   Ray Decl. ¶ 33.
[10]  SEC Compl. ¶ 20.
[11]  *Id.* at ¶ 22.
[12]  Ray Decl. ¶ 35.
[13]  Annie Massa, Anna Irrera & Hannah Miller, *Crypto Quant Shop With Ties to FTX Powers Bankman-Fried's Empire*, BLOOMBERG (Sept. 14, 2022), https://www.bloomberg.com/news/articles/2022-09-14/trading-firm-alameda-research-powers-ftx-ceo-sam-bankman-fried-s-crypto-empire ("Questions persist, in part, because the lives of the firms' leadership and employees are so deeply entwined."); SEC Compl. ¶ 53.
[14]  SEC Compl. ¶ 18.

12.     It has been alleged that even when other individuals were nominally in charge of Alameda Research, Bankman-Fried continued to direct investment and other operational decisions, frequently communicated with Alameda Research employees, and had free and full access to Alameda Research's databases[15] and its corporate bank and trading accounts.[16] It has further been alleged that the corporate operations of FTX and Alameda Research were likewise indistinguishable in many respects, with office space, equipment, books and records, and employees being interchangeable between the entities.[17] Further, when Bankman-Fried created FTX, FTX used Alameda Research bank accounts to execute trades on FTX.com's platform.[18]

**B.      The AlamedaFTX Criminal Enterprise**

13.     Bankman-Fried and AlamedaFTX were extraordinarily prominent in the crypto industry. AlamedaFTX perpetuated an image of being a lucrative crypto conglomerate through massive marketing and public relations campaigns, including sponsoring sports arenas and signing celebrities and athlete endorsements. AlamedaFTX also actively lobbied Congress on crypto matters, spreading around donations reportedly in excess of $80 million.[19] According to Bankman-Fried, all of his and AlamedaFTX's "Republican donations were dark."[20]

---

[15]   *Id.* at ¶ 17.
[16]   *Commodity Futures Trading Commission v. Samuel Bankman-Fried, et al.*, No. 1:22-10503, Docket No. 1 ¶ 21 (S.D.N.Y. Dec. 13, 2022) (hereinafter, the "CFTC Compl."), attached to the Evans Declaration as **Exhibit 3**. The CFTC amended its complaint on December 21, 2022 to name Ellison and Wang as defendants. *Id*. at Docket No. 13.
[17]   *Id.* at ¶ 18.
[18]   SEC Compl ¶ 35.
[19]   *Id*. at ¶¶ 70–71; *see also* Nik Popli, *Here's What We Know About Sam Bankman-Fried's Political Donations*, TIME (Dec. 14, 2022), https://time.com/6241262/sam-bankman-fried-political-donations.
[20]   *In re FTX Trading Ltd., et al.*, No. 22-11068, Docket No. 176, Motion of the U.S. Trustee for Entry of an Order Directing the Appointment of an Examiner ¶¶ 70–71 (Bankr. D. Del. Dec. 1, 2022) (hereinafter, "UST Examiner Mot."), attached to the Evans Declaration as **Exhibit 4**.

14.    At all times, AlamedaFTX cultivated an outward facing image of financial health, AlamedaFTX was built on a house of cards that finally started to unravel as a result of massive losses suffered by Alameda Research throughout 2022.[21]

15.    Specifically, Alameda Research was purportedly funded through "several billion dollars from external lenders in the cryptocurrency industry."[22] In summer 2022, many of these external loans were recalled, but Alameda Research did not have sufficient liquidity to respond to the recalls.[23] Instead of owning up to its failures, AlamedaFTX funneled funds from FTX.com's platform to Alameda Research to cover these recalls.[24] The entities further conspired to "provide materially misleading financial statements to Alameda's lenders" that "concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda made to FTX executives and to related parties."[25]

16.    Confronted with an $8 billion hole, and instead of facing reality, Bankman-Fried, who has since been indicted for a litany of felonies,[26] undertook a calculated campaign to present financial strength by publicly claiming that AlamedaFTX was investing in as many struggling crypto companies as possible.[27] AlamedaFTX infiltrated many major players in the crypto industry in a variety of different ways. AlamedaFTX regularly provided trade execution for many other crypto currency exchanges. AlamedaFTX also borrowed and lent to many of crypto's biggest companies. Voyager was one company that AlamedaFTX infiltrated.

---

[21]    *Id.* ¶ 14.
[22]    *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Tr. at 27:23–25, attached to the Evans Declaration as **Exhibit 5**.
[23]    *Id.* at 27:19–22.
[24]    *Id.* at 28:1–2.
[25]    *Id.* at 28:13-16.
[26]    *United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 1:22-cr-673, Docket No. 1 (S.D.N.Y. Dec. 9, 2022), attached to the Evans Declaration as **Exhibit 6**.
[27]    *See* CTFC Compl. ¶ 73.

17.     When crypto companies began to falter in May 2022, Bankman-Fried and AlamedaFTX began a self-aggrandizing campaign purporting to invest in and purchase struggling crypto companies.[28] It was later revealed, however, that "he was pursuing an aggressive acquisition strategy during this time at least in part to gain access to additional sources of capital that could be used to help support his existing businesses and fill the hole in the customer assets that had been created."[29] AlamedaFTX's attempted acquisition of Voyager was part of this strategy.

## C.    AlamedaFTX and Voyager

18.     Unlike many crypto platforms, Voyager was a crypto brokerage in which it would route its customer trades through crypto exchanges and other liquidity providers. Voyager would do so through something it called a "smart router." Many of Voyager's trades were routed to and executed by AlamedaFTX.

19.     On September 2, 2021, Alameda Research, as borrower, and Voyager Digital, LLC ("OpCo"), as lender, entered into that certain *Master Loan Agreement* (the "MLA"). Voyager extended loans to AlamedaFTX from September 28, 2021 through June 28, 2022 (collectively, the "Loans").[30] To support the extension of Voyager's lending book, AlamedaFTX provided Voyager with financial statements—these same financial statements that were admittedly false and misleading.[31] As of the Petition Date, the total amount due and owing to Voyager from Alameda Research was approximately $376.7 million.[32]

---

[28]    *See* CTFC Compl. ¶ 77; SEC Compl. ¶ 70; *see also* Alexander Osipovich, *The 30-Year-Old Spending $1 Billion to Save Crypto*, WSJ (Aug. 23, 2022), https://www.wsj.com/articles/crypto-bitcoin-ftx-bankman-fried-11661206532 ("We want to do what we can to stem contagion, and sometimes that's going to mean that we try to help out in cases where it's not enough," Mr. Bankman-Fried said. "If that never happened, I'd feel that we were being way too conservative.").

[29]    *See* CTFC Compl. at ¶ 78.

[30]    *See* Docket No. 929, ¶ 29.

[31]    *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Tr. at 28:9–21; Ray Decl. at ¶ 57.

[32]    Docket No. 15, p. 13.

20.    Shortly after execution of the MLA, in November 2021, Alameda Research purchased 7,723,996 common shares of Voyager Digital Ltd. ("TopCo").[33] In May 2022, Clifton Bay Investments LLC f/k/a Alameda Research Ventures LLC purchased 14,957,265 common and variable voting shares of TopCo.[34] As a result, AlamedaFTX entities owned approximately 11.5% of TopCo, rendering it an insider under Section 16 of the Act of 1934.[35]

**D.    In Lieu of Returning Borrowed Crypto to Voyager, AlamedaFTX Inexplicably Loans Voyager $75 Million**

21.    The "crypto winter" began in May 2022 with the collapse of Terra Luna, precipitating the failure of Three Arrows Capital ("3AC"), a hedge fund which owed Voyager hundreds of millions in crypto.[36] In June of 2022, it became clear that 3AC was insolvent, which prompted Voyager to recall its loans. 3AC, however, did not respond.[37] Customers seeking withdrawals of crypto from their respective platforms increased rapidly. As a result, Voyager faced severe liquidity constraints with an inability to meet customer withdrawal requests. Industry insiders quickly became aware of Voyager's situation when, on June 20, 2022, Voyager commenced a prepetition marketing process by contacting 60 potential partners to solicit their interest in either a sale of Voyager as a going concern or a capital raise.[38]

22.    Given Voyager's financial issues and market conditions, strategic partners were not presenting themselves.[39] AlamedaFTX, however, was willing to enter the fold. Instead of

---

[33]    Voyager Digital Ltd., Managements' Discussion and Analysis for the Quarter Ending December 31, 2021 (filed Feb. 14, 2022), attached to the Evans Declaration as **Exhibit 7**.
[34]    Alameda Research, *Alameda Ventures Acquires Shares of Voyager Digital Ltd.,* CISION PR NEWSWIRE (Jun. 17, 2022), https://www.newswire.ca/news-releases/alameda-ventures-acquires-shares-of-voyager-digital-ltd--843728978.html.
[35]    Alameda Research, *Alameda Ventures Surrenders Shares of Voyager Digital Ltd.,* CISION PR NEWSWIRE (Jun. 23, 2022), https://www.newswire.ca/news-releases/alameda-ventures-surrenders-shares-of-voyager-digital-ltd--854827297.html.
[36]    *See* Second Amended Disclosure Statement (as defined herein), Docket No. 830, pp. 49–52.
[37]    *Id.*
[38]    Docket No. 16, p. 6.
[39]    Docket No. 15, p. 24.

returning crypto on loan from Voyager, however, AlamedaFTX convinced Voyager to forego

recalling, and to instead enter into a new facility through which AlamedaFTX would loan

Voyager a mere fraction of the crypto that it borrowed from Voyager.

23.     On June 21, 2022, Voyager Digital Holdings, Inc. ("HoldCo"), as borrower,

TopCo, as guarantor, and Alameda Ventures, as lender, entered into that certain *Loan Agreement*

(the "Alameda Loan Agreement").[40] Although the facility provided availability of up to $200

million and 15,000 BTC, the terms of the Alameda Loan Agreement capped borrowings at $75

million in any rolling thirty-day period,[41] an amount that could not possibly provide Voyager

with sufficient runway to emerge from its financial crises, let alone avoid a chapter 11 filing.

Indeed, only two days later, Voyager limited daily withdrawals from $25,000 to $10,000, ten

days later, Voyager paused withdrawals altogether, and fifteen days later, on July 5, 2022 (the

"Petition Date") Voyager filed the Chapter 11 Cases.[42]

24.     AlamedaFTX accomplished several important goals through the Alameda Loan

Agreement.

25.     **First**, as noted above, it avoided, albeit temporarily, having to return more than

$376 million in crypto loans to Voyager.

26.     **Second**, it further perpetuated Bankman-Fried's self-aggrandizing crypto "white

knight" narrative by restricting the use of the loan proceeds to satisfying customer withdrawal

requests,[43] and structuring the loan as being subordinate to OpCo customer claims by not having

OpCo as a party to the Alameda Loan Agreement. In reality, the extension of the loans were akin

---

[40]   Docket No. 830, p. 44.
[41]   Alameda Loan Agreement, § 2.3, attached to the Evans Declaration as **Exhibit 8**; Sam Bankman-Fried
       (@SBF_FTX), Twitter (Jul. 22, 2022 2:14 pm ET),
       https://twitter.com/SBF_FTX/status/1550559932382150656?cxt=HHwWgIC8yeKC2YQrAAAA.
[42]   Docket No. 15, pp. 23-24.
[43]   Alameda Loan Agreement, at § 2.6.

to an equity infusion that AlamedaFTX did not expect would be repaid. Bankman-Fried acknowledged as such, stating "there's $70 million that we knew we would maybe never see again" and "when you look at Voyager . . . that's $70 million down the drain."[44]

27.    **Third**, AlamedaFTX installed itself as the "preferred borrower for Crypto lending activities of" Voyager through the Alameda Loan Agreement,[45] in furtherance of its goal of gaining quick and easy access to additional capital so that it could continue to evade discovery of its massive Ponzi scheme. Its larger goal, however, was to quickly acquire access to much more capital by acquiring the Debtors' customers and over $1 billion in crypto assets.[46]

28.    To summarize, as Voyager barreled towards bankruptcy, AlamedaFTX positioned itself as Voyager's largest borrower, TopCo's largest single equityholder, and, as a result of the Alameda Loan Agreement, Voyager's only lender. This strategic positioning put AlamedaFTX (and Bankman-Fried) in a prime position to defraud the Debtors (and their customers) in furtherance of their schemes. As discussed below, that is exactly what they attempted to do.

**E.    The Chapter 11 Cases**

29.    On July 6, 2022, the Debtors filed their Original Plan,[47] and on August 12, 2022, the Debtors filed their First Amended Plan and Original Disclosure Statement.[48] The Chapter 11 Cases were originally proceeding on a dual track, with the Debtors pursuing both a stand-alone

---

[44]    *See, e.g.*, Stacy Elliot & Daniel Roberts, *Sam Bankman-Fried: Voyager Deal Likely '$70M Down the Drain*,' DECRYPT (Aug. 10, 2022), https://decrypt.co/107143/sam-bankman-fried-voyager-deal-likely-70m-down-the-drain.

[45]    Alameda Loan Agreement, at § 4.7.

[46]    In furtherance of this goal, AlamedaFTX surrendered 2% of its shares in TopCo on June 22, 2022—the day following execution of the Alameda Loan Agreement—to reduce its ownership interests from 11.5% to 9.5% to avoid qualifying as an "insider" under Section 16 of the Securities Exchange Act of 1934. *See United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Tr. at 28:9–21; *see also* Ray Decl. at ¶ 57.

[47]    *See* Docket No. 7 (the "Original Plan").

[48]    *See* Docket No. 288 (the "Original Disclosure Statement").

restructuring (the "Stand-Alone Restructuring") and a sale either pursuant to an alternative plan

or under Bankruptcy Code section 363.[49]

**F.    AlamedaFTX Attempts to End-Run the Auction Process and Force a Sale**

30.     On July 21, 2022, the Debtors filed a motion (the "Bid Procedures Motion")

seeking approval of bidding procedures (the "Bid Procedures").[50] One day later, AlamedaFTX

sent a joint proposal to the Debtors for the purchase of substantially all of the Debtors' assets

(the "Joint Proposal").[51] Simultaneously, AlamedaFTX made the terms of the Joint Proposal

public by attaching it to a press release (the "Press Release").[52] The Joint Proposal was replete

with self-aggrandizing verbiage designed to curry the public support of the Debtors' customers.[53]

The Press Release quoted Bankman-Fried as stating:

> Voyager's customers did not choose to be bankruptcy investors holding unsecured
> claims. The goal of our joint proposal is to help establish a better way to resolve an
> insolvent crypto business – a way that allows customers to earn liquidity and
> reclaim a portion of their assets without forcing them to speculate on bankruptcy
> outcomes and take one-side risks.[54]

31.     Bankman-Fried further tweeted that "[i]f [our offer is] accepted, any customer

who wanted could come and get back their share of everything that remained as soon as

---

[49]    The Stand-Alone Restructuring and Third-Party Transaction were initially set forth in the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. And Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] (the "First Amended Plan").

[50]    *See* Docket No. 126.

[51]    *See* Docket No. 137.

[52]    *See* Joint Proposal, dated July 22, 2022, at 1, attached to the Evans Declaration as **Exhibit 9**. The Joint Proposal is available at FTX Trading Ltd., *FTX Proposes Joint Plan to Offer Early Liquidity to Voyager Digital's Customers in Bankruptcy Proceeding*, CISION PR NEWSWIRE (Jul. 22, 2022), https://www.prnewswire.com/news-releases/ftx-proposes-joint-plan-to-offer-early-liquidity-to-voyager-digitals-customers-in-bankruptcy-proceeding-301591902.html

[53]    *See generally id.*

[54]    FTX Trading Ltd., *FTX Proposes Joint Plan to Offer Early Liquidity to Voyager Digital's Customers in Bankruptcy Proceeding*, CISION PR NEWSWIRE (Jul. 22, 2022), https://www.prnewswire.com/news-releases/ftx-proposes-joint-plan-to-offer-early-liquidity-to-voyager-digitals-customers-in-bankruptcy-proceeding-301591902.html.

possible."[55] Unbeknownst to the public, Bankman-Fried was simultaneously stealing FTX's

customer assets and writing himself loans to buy political influence and real estate.[56]

32.    Bankman-Fried postured publicly as the champion of the crypto industry by

providing customers with the "right to quickly claim their remaining assets if they want, without

rent seeking in the middle."[57] In his public remarks, Bankman-Fried portrayed the Joint Proposal

as a move to help the Debtors' customers, saying that he was "happy to do what we can to get

liquidity to Voyager's customers."[58] In reality, these machinations and tactics were designed to

end-run the auction process and continue his pattern of fraud and deceit, claiming that "the

longer the process drags out, the more optionality customers lose."[59] This is further demonstrated

by the fact that one of the key terms of the offer was forgiveness of AlamedaFTX's $75 million

loan to the Debtors (the "$75M Loan"), which AlamedaFTX was now using as leverage.

33.    Additionally, AlamedaFTX aggressively sought to push the Joint Proposal

through at break-neck speed absent adherence to the Bid Procedures. Per the Joint Proposal,

AlamedaFTX sought execution of final documentation by July 30, 2022—eight days after

AlamedaFTX issued the Joint Proposal and the day after indications of interest were due.[60] The

Joint Proposal also required the Debtors to file a motion seeking approval of the deal terms by

August 3, 2022[61]—the day before the hearing on the Bid Procedures Motion.[62] AlamedaFTX's

---

[55]    Sam Bankman-Fried (@SBF_FTX), TWITTER (July 24, 2022 8:32 pm ET)
       https://twitter.com/SBF_FTX/status/1551364665187282945.
[56]    SEC Compl. ¶ 26.
[57]    Sam Bankman-Fried (@SBF_FTX), TWITTER (July 24, 2022 8:32 pm ET)
       https://twitter.com/SBF_FTX/status/1551364671965302786.
[58]    Sam Bankman-Fried (@SBF_FTX), TWITTER (July. 22, 2022, 3:14 pm ET),
       https://twitter.com/SBF_FTX/status/1550559932382150656?cxt=HHwWgIC8yeKC2YQrAAAA.
[59]    Sam Bankman-Fried (@SBF_FTX), TWITTER (July. 24, 2022, 8:32 pm ET),
       https://twitter.com/SBF_FTX/status/1551364665187282945.
[60]    See Bid Procedures Motion, Ex. 1.
[61]    See Joint Proposal, at 1.
[62]    See generally Bid Procedures Motion.

desire for an expedited closing further demonstrates how it, at Bankman-Fried's insistence, attempted to circumvent the bankruptcy process to protect its own self-interests.

34.    Ultimately, the Debtors rejected the Joint Proposal on July 24, 2022.[63] On July 28, 2022, AlamedaFTX filed an objection to the Bid Procedures Motion.[64] As part of its objection, AlamedaFTX asked the Court to approve procedures that would allow the Debtors to abandon their sale process at any time to accept some form of the Joint Proposal and to allow parties (i.e., AlamedaFTX) to submit a bid after the auction, at any point up until confirmation.[65] On August 4, 2022, the Court entered an order approving the Bid Procedures Motion.[66]

**G.    AlamedaFTX's Revised Bids and the Auction**

35.    After the Debtors' declined AlamedaFTX's expedited Joint Proposal, AlamedaFTX began participating in the Court-approved auction process. During the auction process, AlamedaFTX revised its bid multiple times and each iteration included new components designed to incentivize customers to move to FTX's platform. For example, ███████

████████████████████████████████████████████████████

███████████████████[67] AlamedaFTX's ██████████████

████████████████████████.[68] These modifications were designed to appear customer friendly, when in actuality they were an attempt to proliferate AlamedaFTX's financial strength campaign by manipulating retail creditors into supporting a deal that AlamedaFTX knew it could not consummate.

---

[63]    *See* Docket No. 137.
[64]    Docket No. 160.
[65]    *See id.*, at ¶¶ 9-11. The Court overruled AlamedaFTX's objections to the Bid Procedures Motion, declining to implement its requested modifications.
[66]    *See* Docket No. 248.
[67]    *See* Email from AlamedaFTX counsel to the Debtors' professionals, dated July 29, 2022 at 2:38 pm ET, attached to the Evans Declaration as **Exhibit 10**.
[68]    *See* Sept. 11, 2022 Bid Letter and APA, attached to the Evans Declaration as **Exhibit 11**.

36.     Indeed, throughout the auction process, the Committee was faced with a difficult choice between bidders. The Committee held 13 meetings in September 2022, the majority of which focused on developments during the auction, ████████████████████████████ ████████████████████████, and the eventual selection of AlamedaFTX.[69] The ████████████████████████████ such that the final Committee vote was split 4-3 in favor of AlamedaFTX. However, this decision was based in large part on the numerous false and misleading representations made by AlamedaFTX and forgiveness of the $75M Loan. For example, on July 27, 2022, counsel for AlamedaFTX stated that "FTX has a bottomless sea of ordinary cryptocurrency."[70] Had AlamedaFTX been forthright regarding its ability to close the transaction, ████████████████████████ ████████████████████████.

### H.     The FTX APA and Second Amended Plan

37.     At the conclusion of the auction, the Debtors, in consultation with the Committee, selected AlamedaFTX as the winning bidder.[71] On September 28, 2022, the Debtors filed the Asset Purchase Agreement by and between FTX US, as purchaser, and OpCo, as seller (the "FTX APA").[72] The FTX APA included two unusual requirements by AlamedaFTX.

38.     **First**, at AlamedaFTX's insistence, the FTX APA included an overly aggressive "no-shop" provision (the "No-Shop Provision") that prohibited the Debtors from speaking to, or sharing information with, any alternative purchaser if approached. Such a provision had no other

---

[69]     Though countless meetings were held with the Debtors and the Committee in September 2022, AlamedaFTX made **no** representations that it would be unable to consummate the proposed transaction. Had there been any such representations, the Committee would likely not have supported the AlamedaFTX bid.

[70]     Email from counsel for AlamedaFTX to the Debtors' professionals, dated July 27, 2022 at 2:36 pm ET, attached to the Evans Declaration as **Exhibit 12**.

[71]     *See* Docket No. 457.

[72]     *See* Docket No. 472, Ex. B.

15

purpose but to further chill bidding and maintain the perception that AlamedaFTX had a leg up in the sale process such that its eventual purchase of the Debtors' assets was a *fait accompli*.[73]

39.    ***Second***, notwithstanding the fact that the sale was to be accomplished through a plan, AlamedaFTX required that the Debtors file a motion seeking approval of the FTX APA (the "AlamedaFTX APA Motion") within two days of its execution,[74] likely in order to lock in its aggressive No-Shop Provision (which is reflected in the first amendment to the FTX APA (the "Amended FTX APA"))—and ready access to the Debtors' crypto assets—as quickly as possible.

40.    At the hearing to consider approval of the FTX APA, the Court took issue with this approach, stating that the AlamedaFTX APA Motion was "unlike anything I've been asked to do before" and questioning why the Court would "approve such an un-standard form of no-shop."[75] Based on the Court's comments, AlamedaFTX agreed to alter the language in the No-Shop Provision,[76] and the Court approved the Amended FTX APA on October 20, 2022.[77]

41.    AlamedaFTX made a number of representations and warranties in the Amended FTX APA, all of which we know now were completely false, including, without limitation, that (a) there were "no facts or circumstances exist that would reasonably be expected to impair or materially delay the ability of [AlamedaFTX] to consummate the transactions contemplated by this Agreement," (b) AlamedaFTX was "not in violation of any Laws or Orders applicable to the conduct of its business," and (c) AlamedaFTX had the financial wherewithal to close the sale

---

[73] *See, e.g.*, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2022), Hr'g Tr. 21:6-11 (Sussberg: "Parties in our process have expressly made concerns aware to us that FTX has a leg up and is working behind the scenes to force its way with the Customers Committee [sic] or the Company. And some parties have even indicated they may be unwilling to bid because of this.").

[74] *See* Docket No. 582, § 5.1(b).

[75] *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022), Hr'g Tr. 36:4-37:17.

[76] *See* Docket No. 582.

[77] *See* Docket No. 581.

transactions and make all payments required under the Amended FTX APA.[78] AlamedaFTX also provided what we now know to be false, misleading, and fraudulent financial statements and misrepresentations for purposes of hiding its criminal activities, inducing the Debtors to extend loans under the MLA, convincing the Debtors that it had the financial wherewithal to close the Amended FTX APA, and despite the Committee's reluctance to accept the AlamedaFTX bid ▮▮▮▮▮▮▮▮▮▮▮▮, convincing the Committee to acquiesce to the Debtors' selection of its bid as being the highest and otherwise best offer.

42.    Entry into the Amended FTX APA necessitated revisions to the Debtors' existing plan documents to reflect the contemplated sale to AlamedaFTX. At the Committee's request, the Debtors agreed to include a "toggle" provision in the revised plan documents. The goal of the toggle was to avoid further delays in consummating the Chapter 11 Cases in order to commence distributions to the Debtors' customers as swiftly as possible. The "toggle" contemplated a self-liquidation that would automatically trigger if AlamedaFTX failed to close, thereby obviating the need to resolicit a subsequent chapter 11 plan and the attendant delays and costs associated with same. Despite repeated requests by the Committee, AlamedaFTX refused to agree to the "toggle" because it would give customers the impression that there was an alternative to the AlamedaFTX sale that would effectively defeat AlamedaFTX's gambit to gain access to $1 billion that it desperately needed to continue its operations. On October 5, 2022, the Debtors filed their Second Amended Plan[79] and First Amended Disclosure Statement,[80] which did not include the "toggle" heavily advocated for by the Committee.

---

[78]    *See* Docket No. 582, §§ 4.4, 4.5(a)-(b).
[79]    *See* Docket No. 539 (the "Second Amended Plan"). The Debtors subsequently filed modified versions of the Second Amended Plan. *See* Docket Nos. 584, 590.
[80]    *See* Docket No. 540 (the "First Amended Disclosure Statement"). The Debtors subsequently filed a modified version of the First Amended Disclosure Statement. *See* Docket No. 585.

43.    On October 21, 2022, the Court entered an order approving the adequacy of the First Amended Disclosure Statement.[81] On October 28, 2022, the Debtors solicited the Second Amended Plan.[82] From entry into the FTX APA through solicitation of the Second Amended Plan on upwards of 977,000 creditors, the estate incurred costs of approximately $4 million to $5 million that were directly attributable to the proposed FTX transaction.

44.    Between solicitation of the Second Amended Plan and the anticipated closing of the AlamedaFTX transaction, AlamedaFTX was gearing up for its own chapter 11 filing, unbeknownst to the Committee. In fact, just three days before AlamedaFTX filed for chapter 11, AlamedaFTX counsel continued to mislead and reassure Committee counsel that the transaction would close. AlamedaFTX counsel told Committee counsel that AlamedaFTX "is rock solid, doesn't use customer funds or take credit risk at all. It cannot have 'liquidity issues because it doesn't lend" and stated that "we don't invest client assets (even in treasuries)", all while claiming "[a] competitor is trying to go after us with false rumors."[83] All the while, that very same counsel was surreptitiously preparing chapter 11 petitions for over 100 AlamedaFTX entities and preparing a litany of first day pleadings that would be filed in the days following the petitions.

---

[81]    *See* Docket No. 586.

[82]    *See* Docket No. 648.

[83]    *See* email from counsel to AlamedaFTX to counsel to the Committee, dated November 7, 2022 at 1:55 pm ET, attached to the Evans Declaration as **Exhibit 13** (claiming that AlamedaFTX "is rock solid, doesn't use customer funds or take credit risk at all. It cannot have 'liquidity issues because it doesn't lend."); email from counsel to AlamedaFTX to counsel to the Committee, dated November 8, 2022 at 9:34 am ET, attached to the Evans Declaration as **Exhibit 14** (claiming that reports of AlamedaFTX withdrawals being paused were the "[f]irst [he has] heard of it."). Bankman-Fried took to Twitter on November 7, 2022 to dispel the rumors, falsely claiming that "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine. … FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be. … (banks and nodes can be slow)." *See* CFTC Compl. ¶ 100.

I.      **AlamedaFTX is Exposed and its Executives are Indicted**

45.      AlamedaFTX's fraudulent enterprise was exposed in real time, beginning on November 2, 2022 when reports surfaced showing that a significant portion of Alameda Research's assets were held in FTT, FTX's native token,[84] and over the next 48 hours FTT entered free fall, from $22.18 to $2.06.[85] As additional reports emerged questioning AlamedaFTX's solvency, FTX customers rushed to withdraw their funds from the platform. By November 8, 2022, FTX shut down trading on its platform.[86] As the walls were closing in, Bankman-Fried stepped down and ceded control to new CEO John J. Ray III who promptly commenced chapter 11 proceedings (the "FTX Chapter 11 Cases") on November 11, 2022.[87]

46.      Following the filing of the FTX Chapter 11 Cases, government agencies took action against AlamedaFTX and its principals. On December 9, 2022, the Department of Justice (the "DOJ") indicted Bankman-Fried on eight counts of wire fraud, conspiracy to commit wire fraud, commodities and securities fraud, money laundering, and violation of campaign finance laws.[88] The DOJ accused Bankman-Fried of, among other things, "misappropriating … customers' deposits, and using those deposits to pay expenses and debts of Alameda Research."[89] On December 18, 2022, Ellison and Wang were indicted and pled guilty.[90] Other regulators also took action.[91]

---

[84]    *Id*. at ¶ 15.
[85]    CoinMarketCap, https://coinmarketcap.com/currencies/ftx-token/.
[86]    Yogita Khatri, *FTX Appears to Have Stopped Processing Withdrawals, On-Chain Data Show*, The Block (Nov. 8, 2022), https://www.theblock.co/post/184176/ftx-appears-to-have-stopped-processing-withdrawals-on-chain-data-show.
[87]    Ray Decl. ¶¶ 40, 44.
[88]    *United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 1:22-cr-673, Docket No. 1 (S.D.N.Y. Dec. 9, 2022).
[89]    *Id*. at ¶ 3.
[90]    Dec. 18, 2022 Ellison Guilty Plea Letter, attached to the Evans Declaration as **Exhibit 15**; Dec. 18, 2022 Wang Guilty Plea Letter, attached to the Evans Declaration as **Exhibit 16**.
[91]    *See generally* SEC Compl. (asserting securities frauds claims against Bankman Fried.

47.    The U.S. Attorney for the Southern District of New York described AlamedaFTX as "one of the biggest financial frauds in American history[,]"[92] characterizing it as a "fraud of epic proportions" that caused a loss of billions of dollars in customer and investor funds.[93] Voyager—and its customers and other creditors—are among the victims.

48.    The Securities and Exchange Commission (the "SEC") alleged that Bankman-Fried "orchestrat[ed] a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire."[94]

49.    At Ellison's plea hearing, she confessed to conspiring with Bankman-Fried and others to "provide materially misleading financial statements to Alameda's lenders" (one of whom was Voyager), admitting that AlamedaFTX "prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing."[95] She further testified that Bankman-Fried and others funded Alameda Research investments with FTX customer funds.[96]

**J.    The AlamedaFTX Empire Collapses and Subsequent Binance US Bid**

50.    In light of the filing of the FTX Chapter 11 Cases,[97] AlamedaFTX agreed to waive the No-Shop Provision under the First Amended APA.[98] After weeks of discussions

---

[92]    André Beganski, *FTX 'One of the Biggest Financial Frauds in American History': Prosecutor Damian Williams*, Yahoo (Dec. 13, 2022), https://finance.yahoo.com/news/ftx-one-one-biggest-financial-frauds-201835031.html.

[93]    Luc Cohen & Tom Hals, *Bankman-Fried, FTX execs received billions in hidden loans, ex-Alameda CEO says*, Reuters (Dec. 23, 2022), https://www.reuters.com/legal/alamedas-ex-ceo-tells-judge-she-hid-billions-loans-ftx-execs-2022-12-23/.

[94]    SEC Compl. ¶ 1.

[95]    *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Tr. at 28:9–21.

[96]    *Id*. at 28:22–29:1 ("The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds.").

[97]    Ray Decl. ¶¶ 40, 44.

[98]    On January 10, 2023, FTX US and the Debtors agreed to terminate the FTX APA. *See Joint Stipulation and Agreed Order Between the Debtors and FTX US* [Docket No. 848].

between the Debtors and Binance US, the Debtors executed a new asset purchase agreement (the "Binance APA") with Binance US.[99]

51.    Entry into the Binance APA necessitated revisions to the Debtors' plan documents and a *second* solicitation months after the Debtors had already completed solicitation of the Second Amended Plan. Such solicitation would have been unnecessary had AlamedaFTX not prohibited the inclusion of the toggle in the Second Amended Plan. Over and above the $4 million to $5 million the estates incurred to pursue consummation of the Amended FTX APA, the Debtors' estates incurred have incurred, and will continue to incur, significant additional administrative costs to get the Binance APA deal across the finish line.[100]

52.    One of the many consequences of AlamedaFTX's implosion and related inability to close the Amended FTX APA and gamesmanship during the Chapter 11 Cases (which is ongoing), was a delay in Voyager customers' receipt of long-awaited distributions. Indeed, but for AlamedaFTX's conduct during the initial bid proceedings, including its refusal to include a "toggle" in the Second Amended Plan, customers may have already received an initial distribution on account of their allowed claims. Worse yet, the Binance APA provides substantially less value to creditors. Had AlamedaFTX delivered on is promises and closed its sale, it would have provided contemplated additional consideration of approximately $111 million of incremental value.[101]

---

[99]    Between the filing of the FTX APA and December 18, 2022, the Debtors were forced to spend approximately $4 to $5 million in professional fees and solicitation costs, further dissipating the estate. Operating expenses and professional fees are estimated to continue to accrue at a rate of $8 million to $10 million per month, adding approximately $29 million to $36 million of incremental costs to the Debtors' estates, assuming the proposed Binance US deal closes on April 18, 2023 (the outside date under the Binance APA), whereas the AlamedaFTX deal was to have closed by December 30, 2022.

[100]    *See* Docket No. 777 (the "Third Amended Plan"). The Debtors subsequently filed modified versions of the Third Amended Plan. *See* Docket Nos. 829, 852.

[101]    Voyager Digital Ltd., *Voyager Completes Successful Auction and Announces Agreement for FTC to Acquire Its Assets*, PR NEWSWIRE (Sept. 26, 2022), https://www.prnewswire.com/news-releases/voyager-completes-successful-auction-and-announces-agreement-for-ftx-to-acquire-its-assets-301633679.html.

53.    Under the Binance APA, the incremental consideration is estimated to be only $30 million (including $10 million of expense reimbursement), illustrating a sizeable $81 million delta. In reality, the difference between the two proposals is even greater due to the additional costs and expenses incurred as a result of the delays, including additional Debtors' professional fees and operating costs preliminarily estimated to be in the range of $29 million to $36 million.

**K.    The AlamedaFTX Claims**

54.    Adding insult to injury, on October 3, 2022, AlamedaFTX filed four claims against the Debtors' estates, three of which are the subject of this Objection:[102] (a) Proof of Claim No. 11206 against HoldCo; (b) Proof of Claim No. 11209 against TopCo; and (c) Proof of Claim No. 11213 against OpCo (the "OpCo Claim"). Each of the AlamedaFTX Claims arise from the $75M Loan. To pile on and in a clear attempt to further disrupt customer distributions by forcing the Debtors to reserve hundreds of millions of dollars that would otherwise be put in the queue for customer distributions, AlamedaFTX initiated an adversary proceeding in the FTX Chapter 11 Cases on January 30, 2023 by filing a complaint (the "Complaint") seeking to avoid alleged preferential payments totaling $445.8 million.[103] Through the Complaint, AlamedaFTX not only seeks payment of upwards of $445 million, but it seeks to have these amounts paid *ahead* of general unsecured creditors, including customers—the same customers it purportedly

---

[102]    An affiliate of Alameda, Alameda Research Ventures LLC) also filed Claim No. 11218 against Voyager Digital Ltd. for unliquidated amounts related to misrepresentations to induce the private placement purchase of shares in Voyager Digital Ltd. While this Objection does not address Claim No. 11218, the Committee reserves its rights to object to such claim and any other claims filed by Alameda or any of its affiliates in the Chapter 11 Cases.

[103]    FTX Chapter 11 Cases, Adv. Pro. No. 23-50084, Docket No. 1. The Committee vehemently disagrees with the statements and allegations set forth in the Complaint and reserves all rights to address the merits of the Complaint in due course and at the appropriate time.

sought to protect.[104] Specifically, AlamedaFTX is seeking administrative priority status of its alleged preference claims pursuant to Bankruptcy Code sections 503 and 507.[105]

55.     In sum, AlamedaFTX has irreparably harmed the Debtors' estates and creditors, including by costing the estates upwards of $100 million per the Debtors' calculations,[106] but is now not only attempting to dilute general unsecured creditor recoveries by asserting a right to repayment on a loan that it never intended that, or expected to, be repaid, but is also asserting a right to take upwards of $445 million of the first money out following the closing of the Binance US transaction.

56.     Thus, AlamedaFTX's attempts to manipulate and sabotage these Chapter 11 Cases continue notwithstanding its collapse, and the impact of AlamedaFTX's latest actions, which could result in a reduction of in some recoveries by as much as 50%, is astonishing and unconscionable.

## OBJECTION

### A.    AlamedaFTX's Asserted Claim Against OpCo Claim Should be Expunged

57.     The OpCo Claim is baseless because OpCo is not a party to the Alameda Loan Agreement, and the claim is structurally subordinate to OpCo creditors. AlamedaFTX attempts to give credence to the OpCo Claim by asserting that the funds loaned pursuant to the Alameda Loan Agreement would be used by HoldCo to support OpCo's customer deposits.[107] That argument lacks merit for at least three reasons.

58.     *First*, OpCo has no obligation under the Alameda Loan Agreement. AlamedaFTX structured the Alameda Loan Agreement such that OpCo intentionally was not a borrower or

---

[104]  *Id.*, at Docket No. 1, ¶¶ 4-5.
[105]  *Id.*
[106]  *See* Docket No. 929, ¶¶ 2, 51, 66.
[107]  *See id.*

guarantor.[108] AlamedaFTX's attempts at revisionist history at the expense of the Debtors' estates

and creditors should not be countenanced.

59.    **Second**, the fact that the loan proceeds were used for the benefit of OpCo is

immaterial because the intent was always for OpCo to use the funds.[109] Indeed, AlamedaFTX

required that the funds be down streamed to OpCo as a condition to entering into the

agreement.[110] Again, if AlamedaFTX intended to obligate OpCo, it would have required that

OpCo be a party to the agreement.

60.    **Third**, it is a basic tenet of corporate law that "creditors of a parent entity are

subordinate to creditors of a subsidiary entity with respect to the subsidiary's assets."[111] This

principle "applies even without the existence of a formal written subordination agreement."[112]

When a holding company and operating company claimants face off in bankruptcy, courts will

subordinate the claims of lenders to the holding company to those of the operating company.[113]

Accordingly, AlamedaFTX would recover assets once held by OpCo only if all of OpCo's

---

[108]    *See* Docket No. 929, ¶ 31.
[109]    *See, e.g., Sobel v. Major Energy Servs.*, LLC, No. 19CV8290, 2020 WL 6561602, at *8 (S.D.N.Y. July 31, 2020), *report and recommendation adopted*, No. 19CIV8290PGGDCF, 2020 WL 5362357 (S.D.N.Y. Sept. 8, 2020) (noting that "[i]t is black letter law that non-parties ordinarily cannot be held liable for a breach of contract" and that, "as a general rule, under New York law, a parent and subsidiary are treated as separate legal entities, and a contract by one does not legally bind the other") (internal quotations and citations omitted); *Reza v. Khatun*, No. 09-CV-233, 2017 WL 11700559, at *4 (E.D.N.Y. Dec. 22, 2017) ("Under New York law, it is well established that — with few exceptions — a breach of contract claim cannot be maintained against a party who is not a signatory to the underlying agreement, and not in privity with a contracting party.") (citations omitted); *Black Car & Livery Ins., Inc. v. H & W Brokerage, Inc.*, 28 A.D.3d 595, 813 N.Y.S.2d 751, 752 (2d Dep't 2006) (holding that "breach of contract cause of action was properly dismissed ... since [the respondent] was not a party to the agreement in question").
[110]    Alameda Loan Agreement, § 2.6 (HoldCo could only use the loan proceeds "to pay customers for crypto assets that counterparties to [HoldCo]'s (or its Affiliates) lending and related activities" failed to repay).
[111]    J. Maxwell Tucker, *Substantive Consolidation: The Cacophony Continues*, 18 AM. BANKR. INST. L. REV. 89, 90 n.3 (2010).
[112]    *Id.* at 160.
[113]    *See In re CIL Ltd.*, 582 B.R. 46, 103–04 (Bankr. S.D.N.Y. 2018) (Finding that the claims against a "pure 'holdco' . . . were structurally subordinated to the claims of" the operating company's creditors) (citing *NA Gen. P'ship & Subsidiaries v. Comm'r*, Case No. 525-10, 2012 WL 2344719, at *9 (U.S. Tax Ct. Jun. 19, 2012) ("With holding companies, any debt issued is necessarily subordinated to the creditors of its operating company.").

creditors are paid in full and OpCo made a distribution to HoldCo on account of HoldCo's equity

interests in OpCo. OpCo's creditors will not be made whole under the Third Amended Plan—

something AlamedaFTX had a contributing hand in—and so there will be no excess funds

available for OpCo to make an upward distribution to HoldCo.

61.    For the foregoing reasons, AlamedaFTX does not hold a valid claim against

OpCo, and as such, the OpCo Claim should be disallowed and expunged with prejudice.

**B.    The AlamedaFTX Claims Should Be Equitably Subordinated**

62.    AlamedaFTX's inequitable and fraudulent conduct has delayed creditor

recoveries and diminished the estates' assets, including through the unnecessary expenditure of

professional fees and the depletion of cognizable bids. All in, AlamedaFTX's inequitable and

fraudulent conduct has, or will have, directly cost the Debtors and their creditors between

approximately $114 million to $122 million. Accordingly, the AlamedaFTX Claims should be

equitably subordinated to all other creditor claims.

63.    The doctrine of equitable subordination "is one such equitable power that a

bankruptcy court may employ to rearrange the priorities of creditors' interests and to place all or

part of a wrongdoer's claim in an inferior status, in order to achieve a just result."[114] Pursuant to

Bankruptcy Code section 510(c), a court may:

> (1) under principles of equitable subordination, subordinate for
> purposes of distribution all or part of an allowed claim to all or part
> of another allowed claim or all or part of an allowed interest to all
> or part of another allowed interest; or (2) order that any lien securing
> such a subordinated claim be transferred to the estate.[115]

---

[114] *LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014).

[115] 11 U.S.C. § 510(c).

64.    Bankruptcy Code section 510(c) permits a bankruptcy court to subordinate a claim to those of other creditors where it would be unjust or unfair to permit the holder of such claim to share *pro rata* with other creditors of equal status.[116] Bankruptcy courts in the Second Circuit may equitably subordinate a claim if three conditions are met:[117] (a) the claimant must have engaged in some type of inequitable conduct; (b) the misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code.[118]

### i.    AlamedaFTX's Conduct was Inequitable

65.    Under the first prong of the equitable subordination analysis, inequitable conduct is comprised of actions that "may be lawful but [are] nevertheless contrary to equity and good conscience."[119] "Such conduct includes 'a secret or open fraud [or] an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.'"[120] While there is nothing inherently inequitable about loaning money to an undercapitalized debtor,[121] such a debtor is more vulnerable to predation—especially by its insiders, which can abuse their close relationship with the debtor to improve their position at the

---

[116]    *In re LightSquared Inc.*, 511 B.R. 253 (Bankr. S.D.N.Y. 2014).

[117]    *In re Aéropostale, Inc.*, 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016); *In re LightSquared*, 511 B.R. at 347; *ABF Capital Mgmt. v. Kidder, Peabody & Co. (In re Granite Partners)*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997).

[118]    The third prong is a vestige of equitable subordination's common law origins and "is likely to be moot due to the enactment of Bankruptcy Code section 510(c). *See In re KDI Holdings, Inc.*, 277 B.R. 493, 509 (Bankr. S.D.N.Y. 1999). "Accordingly, a complaint that satisfies the first two prongs of the [equitable subordination] test would survive a motion to dismiss." *In re Hydrogen, L.L.C.*, 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010).

[119]    *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).

[120]    *In re Aéropostale, Inc.*, 555 B.R. at 398 (quoting *In re 80 Nassau Assocs.*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).

[121]    *See KDI Holdings*, 277 B.R. at 514 ("[A]n insider's infusion of money into a financially distressed company in the form of a loan does not necessarily amount to inequitable conduct.").

expense of unsecured creditors—than a properly capitalized debtor.[122] Therefore, "[a] court may equitably subordinate a claim [against an undercapitalized debtor] if there is some showing of suspicious, inequitable conduct beyond mere . . . undercapitalization of the [debtor]," such as "'fraud, spoilation, mismanagement[,] or faithless stewardship," by which a claimant, seized on the debtor's increased vulnerability to defraud the debtor's creditors or to take unfair advantage of the debtor.[123] AlamedaFTX checks all of the boxes—secret *and* open fraud, unjust enrichment, and predatory acts.

66.    AlamedaFTX's conduct, both prior to and after the Petition Date has been inequitable at best, nefarious, fraudulent, and criminal at worst. Before the Petition Date, the Debtors were a melting ice cube. Assets were leaving the eco-system in droves and the Debtors were on the brink of being unable to meet customer withdrawal demands. AlamedaFTX, an insider by way of its substantial equity position in Voyager, and a borrower with upwards of $370 million owed to the Debtors took advantage of this situation. AlamedaFTX offered the Debtors a purported lifeline in the form of a $75M Loan—an amount that proved insufficient to keep the Debtors out of bankruptcy for more than two weeks. AlamedaFTX knew that the $75M Loan would go unpaid and did not care because its real goals were to feign heroism and use this $75 million bargaining piece in its pursuit of quickly laying siege to the Debtors' assets and customers and the much needed liquidity that would follow.[124]

---

[122]    *Cf. In re LMcD, LLC*, 405 B.R. 555, 560 (Bankr. M.D. Pa. 2009) (determining whether to pierce the corporate veil under Pennsylvania law) ("The United States Supreme Court has recognized the vulnerability created by the undercapitalization of an entity.").

[123]    *AutoStyle*, 269 F.3d at 747 (internal citations and quotations omitted).

[124]    Bankman-Fried stated that "when you look at Voyager… that's $70 million down the drain." Stacy Elliot & Daniel Roberts, *Sam Bankman-Fried: Voyager Deal Likely '$70M Down the Drain*,' DECRYPT (Aug. 10, 2022), https://decrypt.co/107143/sam-bankman-fried-voyager-deal-likely-70m-down-the-drain.

67.      After the Petition Date, AlamedaFTX began its full-scale assault on the Debtors

and their creditors. One day after the Debtors filed the Bid Procedures Motion, which indicated

that 83 potential bidders had been contacted and over 37 entered into confidentiality agreements,

AlamedaFTX disregarded its own confidentiality agreement and made a public offer for the

Debtors' assets in the form of the Joint Proposal.[125] Such offer would provide the Debtors with

only $15 million cash, but AlamedaFTX was willing to write off its $75 million loan issued only

one month prior as an additional form of consideration.

68.      The Joint Proposal provided AlamedaFTX with incredible upside. AlamedaFTX

would fund an escrow account with the fair market value of all of the Debtors' crypto (more than

$1 billion). The crypto would be transferred to AlamedaFTX and every customer that signs up

for FTX's platform would receive a cash distribution. To keep that cash on FTX's platform, FTX

waived trading fees for these customers. As described by Bankman-Fried, customers could use

the cash to "get remaining assets back right away, with no fees or additional haircut." In other

words, AlamedaFTX would receive upwards of $1 billion in crypto, upwards of 1 million

customers, and potentially all of its cash back. All AlamedaFTX would need to do is pay $15

million and forego its $75M Loan, which was never expected to be paid back.

69.      When the Debtors rejected the Joint Proposal, AlamedaFTX went into overdrive.

Bankman-Fried immediately took to his more than one million twitter followers, stating "Sad

facts from a bankruptcy process," which included his claim that "the *traditional* process is that

before customers get their assets back, they get fucked" and disparagement *good faith* bidders

who "wanted to submit a lower bid – taking a large share of customer assets in the middle."[126]

---

[125]  *See* n.46, supra.
[126]  Sam Bankman-Fried (@SBF_FTX), Twitter (July 24, 2022 8:32 pm ET)
        https://twitter.com/SBF_FTX/status/1551364658669371392.

AlamedaFTX then sought to implement a procedure in the Bid Procedures to allow the Debtors to end the auction process at any moment to pursue a private sale to AlamedaFTX. AlamedaFTX then began submitting revised bids with further incentives for customers to move to FTX's platform. Each and every act was "an affront to the duty of good faith imposed on those who participate in chapter 11 proceedings"[127] and a blatant attempt to circumvent the bankruptcy process.

70.    We now know that Bankman-Fried was lashing out because his fraudulent enterprise was at risk. At all relevant times, AlamedaFTX was perpetrating a massive fraud worse, in the words of now-CEO John Ray, than Enron.[128] At its core, the fraudulent scheme was simple—Bankman Fried "used [Alameda Research] as his personal piggy bank to buy luxury condominiums, support political campaigns, and make private investments, among other uses."[129] To do so, he siphoned FTX customer funds through a backdoor program from FTX to Alameda Research. In an attempt to avoid discovery of his fraudulent enterprise, Bankman-Fried and others orchestrated the theft of billions of dollars in crypto from the FTX platform, prepared false and misleading financial statements to hide their actions, and then set out to acquire distressed crypto companies to gain access to more liquidity through acquiring crypto and customers who would believe that their crypto assets would be safe.[130]

71.    However, Bankman-Fried's Ponzi scheme was perilously close to being uncovered. AlamedaFTX was insolvent and in search of desperately needed sources of liquidity as quickly as possible.[131] Accordingly, having failed in its attempts to force a quick, private sale

---

[127]   *In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014).
[128]   *See* Ray Decl., ¶¶ 4–5.
[129]   SEC Compl. ¶ 37.
[130]   *See* n.84, *supra*.
[131]   UST Examiner Mot. ¶ 14; SEC Compl. ¶ 5; CFTC Compl. ¶ 78.

under the Joint Proposal, it was critical that AlamedaFTX succeeded at the auction. Crucial,
again to AlamedaFTX's success at this stage was its ability to use forgiveness of the $75 million
loan as a bargaining chip to gain an advantage in the process. AlamedaFTX's bid was only
negligibly better than the second highest and would likely not have been chosen absent the credit
given AlamedaFTX in the bid process on account of the $75M Loan. Winning was not enough,
however. AlamedaFTX had to ensure that no other bidder could top its winning bid and sought
to bind the Debtors to an inappropriate and out-of-market No-Shop Provision.

72.    Throughout this entire process, AlamedaFTX lied[132] by continuously representing
that it was solvent and capable of consummating the transaction, including through
representations and warranties in the FTX APA, which stated that: (a) "no facts or circumstances
exist that would reasonably be expected to impair or materially delay the ability of
[AlamedaFTX] to consummate the transactions contemplated by this Agreement;" (b)
"[AlamedaFTX] is not in violation of any Laws or Orders applicable to the conduct of its
business;" and (c) [AlamedaFTX] has and will have at closing sufficient funds to make all
payments under the First Amended FTX APA.[133]

73.    Importantly, beyond mere bad faith and close dealing, this signed submission
constitutes direct fraud on this court, a crime under federal law. Section 157(2) of title 18 of the
United States Code criminalizes filing a document in the bankruptcy with the intent to execute or
conceal fraud.[134] Section 157(3) of title 18 of the United States Code criminalizes making a false
representation in relation to a bankruptcy with the intent to execute or conceal fraud.[135] In this

---

[132]    Given the information that is now public, it is apparent Bankman-Fried signed the FTX APA knowing full well
the condition of AlamedaFTX. *See, e.g.*, *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea
Tr. at 28:22–29:1 ("The investments were done in the name of Alameda instead of FTX in order to conceal the
source and nature of those funds.").

[133]    *See* Docket No. 582, §§ 4.4, 4.5(a)-(b).

[134]    18 U.S.C. § 157(2).

[135]    18 U.S.C. § 157 (3).

case, AlamedaFTX and Bankman-Fried's APA is both fraudulent itself and an attempt to disguise the broader fraud of AlamedaFTX. This is essential because "creditor misconduct in connection with the chapter 11 process itself—irrespective of applicable non-bankruptcy law—provides an appropriate predicate for equitable subordination of such creditor's claim."[136]

74.    In equitable subordination cases, bankruptcy courts look to the totality of the circumstances surrounding a creditor's relationship with the debtor for inequitable conduct. "If a claimant has engaged in inequitable conduct, its claim may be equitably subordinated irrespective of whether that conduct is related to the acquisition or assertion of the claim."[137]

75.    Here, AlamedaFTX's inequitable conduct consisted of, at a minimum, the following bad acts: (a) inducing Voyager to extend loans to it by providing false and misleading financial statements and making related fraudulent misrepresentations; (b) convincing Voyager to borrow funds from AlamedaFTX in an amount that represented a fraction of the liquidity Voyager would have received had it recalled its loans to Alameda Research; (c) attempting to force a quick, private sale of the Debtors' assets through the Joint Proposal so that it could gain quick access to $1 billion in crypto and more victims for its fraudulent schemes by way of the Debtors' customers; (d) blatantly attempting to curry the creditors' favor in the public domain by holding up the Joint Proposal, and eventually the Amended FTX APA, as the only hope for Voyager's customers; (e) attempting to circumvent the Debtors' sale process and bid procedures and chill bidding to ensure that it would not only win the auction, but be able to acquire the Debtors' assets at a deep discount; (f) utilizing the $75M Loan as an effective credit bid during

---

[136]    *In re LightSquared Inc.*, 511 B.R. 253, 349 (Bankr. S.D.N.Y. 2014).

[137]    *In re Sunbeam Corp.*, 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977); *see also Pepper v. Litton*, 308 U.S. 295, 307-08 (1939) ("[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim and see that injustice or unfairness is not done in the administration of the bankrupt estate.").

the auction to gain a leg up and ensure its ultimate success; (g) inducing the Debtors, and

reluctantly, the Committee, to accept its bid as the highest and best offer for the Debtors' assets;

(h) knowingly executing a document—the Amended FTX APA—which included affirmative

covenants that were false; (i) requiring the Debtors to obtain approval of the Amended FTX APA

from this Court on short order, in part so that it could lock in its No-Shop Provision; (j)

permitting the Debtors to move forward with soliciting the Second Amended Plan, seeking

approval of the Amended FTX APA even though it was propped up lies; and (k) continuing to

mislead the Committee as late as November 8, 2022, mere days before it filed for chapter 11

protection, that there were no impediments to closing the deal contemplated under the Amended

FTX APA.

76.     The totality of the circumstances overwhelmingly demonstrates that

AlamedaFTX's conduct was exactly the kind that "shocks one's good conscience" and

encompasses secret and open fraud, "unconscionable, unjust, unfair, close or double dealing, and

foul conduct."[138] Accordingly, the first prong of equitable subordination has been met.

### ii.     The Debtors' Creditors Were Irreparably Harmed as a Result of AlamedaFTX's Conduct

77.     The second prong of an equitable subordination analysis requires an allegation

that "general creditors are less likely to collect their debts as a result of the alleged inequitable

conduct."[139] AlamedaFTX's inequitable and unconscionable conduct has directly and materially

harmed the Debtors, their estates, and creditors.[140] As detailed above, AlamedaFTX's actions

during these Chapter 11 Cases has cost, or will cost, the estates between approximately $114

---

[138]   *In re 80 Nassau Assocs.*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting *In re Tampa Chain Co.,* 53 B.R. 772, 779 (Bankr.S.D.N.Y.1985)).

[139]   *In re KDI Holdings*, 277 B.R. at 514 (internal citation omitted).

[140]   *See In re KDI Holdings, Inc*., 277 B.R. 493, 509 (Bankr. S.D.N.Y. 1999) (finding the injury prong met if "general creditors are less likely to collect their debts" as a result of the inequitable conduct).

million to $122 million to the detriment of the Debtors' customers and other creditors. Not to be undone, through its Complaint, AlamedaFTX seeks to do even more violence to creditor recoveries.

78.     AlamedaFTX's fraudulent participation in the bid process, its misrepresentations made therein, and AlamedaFTX's and subsequent collapse have each significantly harmed and diminished the estates. As result of the delays in the Chapter 11 Cases, substantial additional costs and expenses have been incurred. Most notably, these include professional fees incurred through negotiating a new transaction with Binance US and revising and resoliciting the Debtors' plan documentation, as well as the month to month operational costs of funding a complex chapter 11 case. Every Voyager creditor has been disadvantaged by AlamedaFTX's conduct and will recover less as a direct result of the swelling professional fees that have been incurred since the AlamedaFTX transaction failed. Therefore, the AlamedaFTX Claims should be equitably subordinated to all other claims.[141]

## C.    AlamedaFTX's Claim Should Be Recharacterized as Equity

79.     The $75m Loan was a capital contribution disguised as debt that must be recharacterized. "[R]echaracterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*."[142] Accordingly, the "ultimate exercise" in evaluating recharacterization is evaluating the parties' intent,[143] which is evaluated by

---

[141]    *See In re 80 Nassau Assocs.,* 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) ("it is sufficient to allege that the general creditors are less likely to collect their debts. In that event, the claim will be subordinated to the payment of all other claims.") (internal citations omitted).

[142]    *In re Live Primary, LLC*, 626 B.R. 171, 190 (Bankr. S.D.N.Y. 2021) (quoting *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 747–48 (6th Cir. 2001).

[143]    *Live Primary*, 6262 B.R. at 191 (quoting *Lyondell Chem. Co.*, 544 B.R. at 103).

applying the eleven-factors articulated in *AutoStyle Plastics*.[144] However, no one factor is

dispositive and not all factors must weigh in favor of recharacterization.[145]

80.    With respect to the $75m Loan, the fourth (source of repayment), fifth

(inadequacy of capitalization), sixth (identity of interest between creditor and stockholder),

seventh (security for the advances), eighth (ability to obtain alternative financing), and ninth

(subordination to claims of outside creditors) factors all weigh in favor of recharacterization.

81.    *The Source of Repayment*: When "the expectation of repayment depends solely on

the success of the borrower's business, the transaction has the appearance of a capital

contribution."[146] Repayment of the $75m Loan was wholly dependent on Voyager's success. As

discussed above, AlamedaFTX purposefully lent the funds to TopCo, which has no assets, at a

time when Voyager was insolvent. The *only* future outcome that featured repayment of the $75m

Loan was a profitable Voyager. AlamedaFTX knew that and did not care—it had no expectation

of repayment.[147] When "there is no indication that the parties had any expectation that the loan

would be repaid" the fourth factor weighs in favor of recharacterization.[148]

82.    *Inadequate Capitalizaton*: "Thin or inadequate capitalization is strong evidence

that the advances are capital contributions rather than loans."[149] The $75m Loan was provided

---

[144]    *See, e.g., Live Primary*, 626 B.R. at 191 (applying the *AutoStyle* factors); *Lyondell Chem. Co.*, 544 B.R. at 93–
94 (same). The eleven factors are: "(1) The names given to the instruments, if any, evidencing the indebtedness;
(2) The presence or absence of a fixed maturity date and schedule of payments; (3) The presence of absence of a
fixed rate of interest and interest payments; (4) The source of repayments; (5) The adequacy or inadequacy of
capitalization; (6) The identity of interest between the creditor and the stockholder; (7) The security, if any, for
the advances; (8) The corporation's ability to obtain financing from outside lending institutions; (9) The extent
to which the advances were subordinated to the claims of outside creditors; (10) The extent to which the
advances were used to acquire capital assets; and (11) The presence of absence of a sinking fund to provide
repayments." *In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2011).

[145]    *Lyondell Chem. Co.*, 544 B.R. at 94.

[146]    *Id.* at 96 (quoting *AutoStyle* 269 F.3d at 751).

[147]    Stacy Elliot & Daniel Roberts, *Sam Bankman-Fried: Voyager Deal Likely '$70M Down the Drain*,' DECRYPT
(Aug. 10, 2022), https://decrypt.co/107143/sam-bankman-fried-voyager-deal-likely-70m-down-the-drain.

[148]    *In re TransCare Corp.*, 602 B.R. 234, 244 (Bankr. S.D.N.Y. 2019)

[149]    *AutoStyle*, 269 F.3d at 751.

because the Debtors were facing a run on the bank. Two days after the Alameda Loan

Agreement was executed, Voyager reduced withdrawal limits, ten days later, withdrawals were

paused, and fifteen days later, the Chapter 11 Cases commenced.[150] Voyager was unquestionably

under-capitalized.

83.    *Identity of Interest Between Stockholder and Creditor*: "If stockholders make

advances in proportion to their respective stock ownership, an equity contribution is indicated."

AlamedaFTX entities was Voyager's largest single equityholder when the $75m Loan was

made.[151]

84.    *Security for the Advances*: The $75m Loan was not secured by any collateral.[152]

85.    *Ability to Obtain Alternative Financing*: "When there is no evidence of other

outside financing, the fact that no reasonable creditor would have acted in the same manner is

strong evidence that the advances were capital contributions rather than loans." *Id.* Here, given

the Debtors' financial position at the time of the transaction, no lenders other than AlamedaFTX

were willing to extend funding on viable terms.[153]

86.    *Subordination to Claims of Outside Creditors*: The Alameda Loan Agreement

was deliberately structured by AlamedaFTX such that the $75m Loan would be structurally

subordinate to customer account holders at OpCo.

87.    AlamedaFTX, Voyager's largest equityholder, provided Voyager with $75

million designed to be subordinate to customer claims and for the sole purpose of honoring

---

[150]    Docket No. 15, pp. 23-24.
[151]    *AutoStyle* 269 F.3d at 751.
[152]    *See id.* ("The absence of a security for an advance is a strong indication that the advances were capital
        contributions rather than loans.").
[153]    Docket No. 16, p. 6 ("While the Debtors' marketing efforts yielded one proposal for an out-of-court Financing,
        the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not
        achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the
        timeline required.")

customer withdrawals with no expectation to be repaid. It is evident that the intent was a capital contribution and such intent is well-established by the majority of the *Autostyle* factors. For these reasons, the AlamedaFTX Claims should be recharacterized as equity.

## RESERVATION OF RIGHTS

88.     This Motion is without prejudice to the Committee's rights to object to the AlamedaFTX Claims in the future on any additional ground or to any other claims of AlamedaFTX that have been or may be asserted against the Debtors. The Committee further reserves its rights to (a) amend, modify, or supplement this Motion for any reason, including, but not limited to, any information the Committee learns throughout its discovery process, (b) assert additional arguments not set forth herein, and (c) respond to any response of AlamedaFTX or any other party in interest, either by further submission to this Court, at oral argument, or by testimony to be presented at any hearing. Nothing in this Motion shall be construed as (a) a waiver of the Committee's rights to bring any future causes of action against AlamedaFTX and any other entity, or (b) a waiver of any arguments or admissions with respect to AlamedaFTX's Complaint.

## CONCLUSION

WHEREFORE, the Committee respectfully request that the Court (a) expunge Claim No. 11213 in its entirety, (b) equitably subordinate the AlamedaFTX Claims to the claims of all other general unsecured creditors pursuant to Bankruptcy Code section 510(c), or, in the alternative, recharacterize the AlamedaFTX Claims as equity, and (c) grant such other and further relief as the Court may deem just and appropriate.

*[Remainder of Page Intentionally Left Blank]*

Dated:  New York, New York
      January 31, 2023

**McDermott Will & Emery LLP**

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail:    dazman@mwe.com
E-mail:    jbevans@mwe.com

- and -

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail:    crgibbs@mwe.com
E-mail:    gwilliams@mwe.com

- and -

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail:    gsteinman@mwe.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

      I hereby certify that on this 31st day of January 2023, I caused a true and correct copy of the foregoing (i) *Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209 and 11213* and (ii) the related *Declaration of Joseph B. Evans in Support of the Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209 and 11213* to be served on (1) the party listed below by e-mail and electronic notification pursuant to the CM/ECF system for the United States Bankruptcy Court for the Southern District of New York ("ECF Notification") and (2) the Service List via (x) ECF Notification or (y) e-mail as indicated in the attachment hereto.

*/s/ Darren Azman*
Darren Azman

Alameda Ventures Ltd.
c/o Sullivan & Cromwell LLP
Attn:   Andrew G. Dietderich
       Brian D. Glueckstein
       Benjamin S. Beller
125 Broad Street
New York, New York 10004
E-mail: dietdericha@sullcrom.com (via ECF and e-mail)
      gluecksteinb@sullcrom.com (via ECF and e-mail)
      bellerb@sullcrom.com (via e-mail only)

## SERVICE LIST

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country | Email | Method of Service |
|---|---|---|---|---|---|---|---|---|---|
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | | OAG@DC.GOV | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O 3SIXINDS LLP | | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | | ANTHONY.OBRIEN@3SIXINDS.COM | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O 3SIXINDS LLP | ATTN: ANTHONY O'BRIEN | 275 SUNDAS STREET UNIT 1 | LONDON | ON | N6B3L1 | | MICHAEL.ROBB@3SIXINDS.COM / GARETT.HUNTER@3SIXINDS.COM | VIA E-MAIL |
| GOOGLE, LLC | | 1600 AMPHITHEATRE PKWY | | MOUNTAIN VIEW | CA | 94043 | | COLLECTIONS@GOOGLE.COM | VIA E-MAIL |
| OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DIST OF NEW YORK | | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 201 VARICK STREET, ROOM 1006 | NEW YORK | NY | 10014 | | RICHARD.MORRISSEY@USDOJ.GOV / MARK.BRUH@USDOJ.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | | 100 F STREET NE | | WASHINGTON | DC | 20549 | | SECBANKRUPTCY-OGC-ADO@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 PEARL STREET SUITE 20-100 | | NEW YORK | NY | 10004-2616 | | NYROBANKRUPTCY@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | | BANKRUPTCYNOTICESCHR@SEC.GOV | VIA E-MAIL |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | | CONSUMERINTEREST@ALABAMAAG.GOV | VIA E-MAIL |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | | ATTORNEY.GENERAL@ALASKA.GOV | VIA E-MAIL |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | | AGINFO@AZAG.GOV | VIA E-MAIL |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST. STE 200 | | LITTLE ROCK | AR | 72201 | | OAG@ARKANSASAG.GOV | VIA E-MAIL |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | | XAVIER.BECERRA@DOJ.CA.GOV | VIA E-MAIL |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L CARR JUDICIAL BUILDING | 1300 BROADWAY, 10TH FL | DENVER | CO | 80203 | | CORA.REQUEST@COAG.GOV | VIA E-MAIL |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 06106 | | ATTORNEY.GENERAL@CT.GOV | VIA E-MAIL |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL PL01 | | TALLAHASSEE | FL | 32399 | | ASHLEY.MOODY@MYFLORIDALEGAL.CO | VIA E-MAIL |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | | HAWAIIAG@HAWAII.GOV | VIA E-MAIL |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST., SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | | LAWRENCE_WASDEN@AG.IDAHO.GOV / AGWASDEN@AG.IDAHO.GOV | VIA E-MAIL |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | | INFO@ILSAMANDGAN.ORG | VIA E-MAIL |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | | CONSUMER@AG.IOWA.GOV | VIA E-MAIL |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | | DEREK.SCHMIDT@AG.KS.GOV | VIA E-MAIL |
| STATE OF LOUISIANA | DEPT OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITAL DRIVE | | BATON ROUGE | LA | 70802 | | ADMININFO@AG.STATE.LA.US | VIA E-MAIL |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | | ATTORNEY.GENERAL@MAINE.GOV | VIA E-MAIL |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | | OAG@OAG.STATE.MD.US | VIA E-MAIL |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST STE 1400 | | ST. PAUL | MN | 55101 | | ATTORNEY.GENERAL@AG.STATE.MN.US | VIA E-MAIL |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | | CONSUMER.HELP@AGO.MO.GOV | VIA E-MAIL |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | | CONTACTDOJ@MT.GOV | VIA E-MAIL |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST | CONCORD | NH | 03301 | | ATTORNEYGENERAL@DOJ.NH.GOV | VIA E-MAIL |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | | HBALDERAS@NMAG.GOV | VIA E-MAIL |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E | DEPT. 125 | BISMARCK | ND | 58505 | | NDAG@ND.GOV | VIA E-MAIL |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | | QUESTIONS@OAG.OK.GOV | VIA E-MAIL |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | | CONSUMER.HELP@DOJ.STATE.OR.US / ATTORNEYGENERAL@DOJ.STATE.OR.U | VIA E-MAIL |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 02903 | | ELLEN.ROSENBLUM@DOJ.STATE.OR.US / ATTORNEYGENERAL@DOJ.STATE.OR.U | VIA E-MAIL |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | | UAG@UTAH.GOV | VIA E-MAIL |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST | | MONTPELIER | VT | 05609 | | AGO.INFO@VERMONT.GOV | VIA E-MAIL |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST | | RICHMOND | VA | 23219 | | MAIL@OAG.STATE.VA.US | VIA E-MAIL |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | | CONSUMER@WVAGO.GOV | VIA E-MAIL |
| TORONTO STOCK EXCHANGE | | 300 - 100 ADELAIDE ST | | WEST TORONTO | ON | M5H 1S3 | | WEBMASTER@TMX.COM | VIA E-MAIL |
| KELLEHER PLACE MANAGEMENT, LLC | HORWOOD MARCUS & BERK CHARTERED | 500 W. MADISON ST | SUITE 3700 | CHICAGO | IL | 60661 | | AHAMEE@HMBLAW.COM | VIA ECF |
| METROPOLITAN COMMERCIAL BANK | BALLARD SPAHR LLP | 200 IDS CENTER | 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | | NKELMAN@BALLARDSPAHR.COM / SINGERSG@BALLARDSPAHR.COM | VIA ECF / VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | WACHTELL, LIPTON, ROSEN & KATZ | 51 WEST 52ND STREET | | NEW YORK | NY | 10019-6150 | | RGMASON@WLRK.COM / AMVEZ-F@WLRK.COM / AAKHERN@WLRK.COM | VIA ECF / VIA E-MAIL / VIA E-MAIL |
| JASON RAZNICK | JAFFE RAITT HEUER & WEISS P.C. | 27777 FRANKLIN ROAD | SUITE 2500 | SOUTHFIELD | MI | 48034 | | PHAGE@JAFFELAW.COM / BWRIGHT@JAFFELAW.COM | VIA ECF / VIA E-MAIL |
| ORACLE AMERICA, INC | BUCHALTER, A PROFESSIONAL CORPORATION | 55 SECOND STREET | SUITE 1700 | SAN FRANCISCO | CA | 94105 | | SCHRISTIANSON@BUCHALTER.COM / DCRISTIANSON@BUCHALTER.COM | VIA ECF / VIA E-MAIL |
| ALAMEDA RESEARCH LLC & AFFILIATES | SULLIVAN & CROMWELL LLP | 125 BROAD STREET | | NEW YORK | NY | 10004 | | BELLERB@SULLCROM.COM | VIA ECF / VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL | KIRKLAND & ELLIS LLP / KIRKLAND & ELLIS INTERNATIONAL LLP | 601 LEXINGTON AVENUE | | NEW YORK | NY | 10022 | | JSUSSBERG@KIRKLAND.COM / CMARCUS@KIRKLAND.COM / CHRISTINE.OKIKE@KIRKLAND.COM / ALLYSON.SMITH@KIRKLAND.COM | VIA ECF / VIA E-MAIL / VIA E-MAIL / VIA E-MAIL |

| Name | Firm | Attn | Address | City | State | Zip | Email | Method |
|---|---|---|---|---|---|---|---|---|
| EMERALD OCEAN ISLE, LLC; AMANO GLOBAL HOLDINGS, INC.; SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINNOCK LLLP | ATTN MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | 111 W. WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | MATTHEW@GOLDMCLAW.COM; HARLEY@GOLDMCLAW.COM; STEVEN@GOLDMCLAW.COM | VIA E-MAIL; VIA E-MAIL; VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC; AMANO GLOBAL HOLDINGS, INC.; SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C 1221 | FREEHOLD | NJ | 07728-2141 | DTABACHNIK@DTTLAW.COM | VIA ECF |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE F | OKLAHOMA CITY | OK | 73139 | GEORGELAWOK@GMAIL.COM | VIA ECF |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL R. RYAN, LAYLA D MILLIGAN & JASON B BINFORD | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ABIGAIL.RYAN@OAG.TEXAS.GOV; LAYLA.MILLIGAN@OAG.TEXAS.GOV; JASON.BINFORD@OAG.TEXAS.GOV | VIA ECF; VIA E-MAIL; VIA E-MAIL |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS | BANKRUPTCY DIVISION | ATTN: ROMA N. DESAI | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ROMA.DESAI@OAG.TEXAS.GOV | VIA ECF |
| OFFICE OF THE ATTORNEY GENERAL | BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS, JR. | BANKRUPTCY DIVISION PO BOX 20207 | NASHVILLE | TN | 37202-0207 | AGBANKNEWYORK@AG.TN.GOV | VIA ECF |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD | 89 MAIN STREET | MONTPELIER | VT | 05620 | JENNIFER.ROOD@VERMONT.GOV | VIA ECF |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E. JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | ANGELINAEL@JPFIRM.COM | VIA ECF |
| MICHAEL LEGG | C/O KATHY Y. LEBIT, CRYSTAL & LIFFMAN CO. | ATTN: ROBERT H. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2200 | CLEVELAND | OH | 44114 | RKRACHT@CARYSTLLEBIT.COM; NROLESKI@CARYSTLLEBIT.COM | VIA E-MAIL; VIA E-MAIL |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BARSKI | 9375 E. SHEA BLVD, STE 100 | SCOTTSDALE | AZ | 85260 | CBARSKI@BARSKILAW.COM | VIA ECF |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ATTORNEY GENERAL | ATTN: JOHN P. REDING | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | JOHN.REDING@ILAG.GOV | VIA ECF |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | | ATTN: NATHAN HOVEY, ASSISTANT ATTORNEY GENERAL | DEPARTMENT OF LAW 40 CAPITOL SQUARE SW | ATLANTA | GA | 30334 | NHOVEY@LAW.GA.GOV | VIA ECF |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS & KENNETH J. AULET | SEVEN TIMES SQUARE | NEW YORK | NY | 10036 | SWISSNER-GROSS@BROWNRUDNICK.COM; KAULET@BROWNRUDNICK.COM | VIA ECF; VIA ECF |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST & ESQ & RACHEL O. WOLKINSON | FIFTEENTH STREET NW SUITE 2200 | WASHINGTON | DC | 2006 | SBEST@BROWNRUDNICK.COM; RWOLKINSON@BROWNRUDNICK.COM | VIA E-MAIL; VIA E-MAIL |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | 1251 AVENUE OF THE AMERICAS, 37TH FL | NEW YORK | NY | 10020 | ADAM.SWICK@AKERMAN.COM; JOHN.THOMPSON@AKERMAN.COM; JOANNE.GELFAND@AKERMAN.COM | VIA ECF; VIA ECF; VIA ECF |
| JON GIACOBBE | WELLS FARGO BANK, N.A. | ATTN: A. MANNY ALICANDRO | 1 BRIARVALA, SUITE I-1 | NEW YORK | NY | 10004 | MANNY.ALICANDRO@LAWYER.COM | VIA ECF |
| STATE OF WASHINGTON | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY WALLACH | FIFTEEN PIEDMONT CENTER 3575 PIEDMONT ROAD, N.E. | ATLANTA | GA | 30305 | GWALLACH@ALDRIDGEPITE.COM | VIA ECF |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY E. MOYNIHAN | THE GRACE BUILDING 1114 AVENUE OF THE AMERICAS | NEW YORK | NY | 10036 | DPOSNER@KILPATRICKTOWNSEND.COM; KMOYNIHAN@KILPATRICKTOWNSEND.COM | VIA E-MAIL; VIA E-MAIL |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | PROSENBLATT@KILPATRICKTOWNSEND.COM | VIA E-MAIL |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | RPACHULSKI@PSZJLAW.COM; AKORNFELD@PSZJLAW.COM; DGRASSGREEN@PSZJLAW.COM; JROSELL@PSZJLAW.COM | VIA E-MAIL; VIA E-MAIL; VIA E-MAIL; VIA ECF |
| STATE OF WASHINGTON | OFFICE OF ATTORNEY GENERAL | ATTN: STEPHEN MANNING, ASSISTANT ATTORNEY GENERAL | GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION | OLYMPIA | WA | 98504-4010 | STEPHEN.MANNING@ATG.WA.GOV | VIA ECF |
| MARGOLIS | MINTZ & GOLD LLP | ATTN: KATHLEEN R. GOTTESMAN | 600 THIRD AVENUE, 25TH FLOOR | NEW YORK | NY | 10016 | GOTTESMAN@MINTZANDGOLD.COM | VIA ECF |
| U.S. SECURITIES & EXCHANGE COMMISSION | | ATTN: THERESE A. SCHEUER | 100 F STREET, NE | WASHINGTON | DC | 20549 | SCHEUERT@SEC.GOV | VIA E-MAIL |
| NEW JERSEY DIVISION OF FINANCIAL SERVICES | CONSUMER PROTECTION AND FINANCIAL ENFORCEMENT | ATTN: KEVIN M. POMFRET, LINDA DONAHUE, JASON D. ST. JOHN | 1201 THIRD AVENUE | NEW YORK | NY | 10004 | KEVIN.POMFRET@DFS.NY.GOV; LINDA.DONAHUE@DFS.NY.GOV; JASON.STJOHNDFS.NY.GOV | VIA E-MAIL; VIA E-MAIL; VIA E-MAIL |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE P.O. BOX 2075 | MORRISTOWN | NJ | 07975 | VSHEA@MDMC-LAW.COM | VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 36TH FLOOR | NEW YORK | NY | 10281 | NLEONARD@MDMC-LAW.COM | VIA ECF |
| USKO, INC. | PULLMAN, CAPPUCKIIA PULLEN, LLP | ATTN: RANDALL A. PULLMAN | 2161 NW MILITARY HIGHWAY SUITE 400 | SAN ANTONIO | TX | 78213 | RPULLMAN@PULMANLAW.COM | VIA E-MAIL |
| CELSIUS NETWORK LLC | LATHAM & WATKINS LLP | ATTN: ADAM J. GOLDBERG, NACIF TAOUSSI, JONATHAN J. WEICHSELBAUM | 1271 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | ADAM.GOLDBERG@LW.COM; NACIF.TAOUSSI@LW.COM; JON.WEICHSELBAUM@LW.COM | VIA ECF; VIA E-MAIL; VIA E-MAIL |
| BAM TRADING SERVICES INC. DBA BINANCE.US | LATHAM & WATKINS LLP | ATTN: ANDREW M. SORKIN | 555 ELEVENTH STREET, NW | WASHINGTON | DC | 20004 | ANDREW.SORKIN@LW.COM | VIA E-MAIL |
| BAM TRADING SERVICES INC. DBA BINANCE.US | | ATTN: KAREN CORDRY | 1850 M ST, NW, 12TH FLOOR | WASHINGTON | DC | 20036 | KCORDRY@NAAG.ORG | VIA ECF |
| ATTORNEYS FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH DAKOTA | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | | 1425 BUR PLACE, 15TH FLOOR | ONEINDALE | | 11556 | SGUGLIANO@AMFPC.COM | VIA ECF |
| CELSIUS NETWORK LLC | AKIN GUMP STRAUSS HAUER & FELD L.L.P. | ATTN: MITCHELL P. HURLEY, DEAN L CHAPMAN, JR. | ONE BRYANT PARK | NEW YORK | NY | 10036 | MHURLEY@AKINGUMP.COM; DCHAPMAN@AKINGUMP.COM | VIA E-MAIL; VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL | PAUL HASTINGS LLP | ATTN: JONATHAN D. CANFIELD | 200 PARK AVENUE | NEW YORK | NY | 10166 | JONCANFIELD@PAULHASTINGS.COM | VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL | PAUL HASTINGS LLP | ATTN: MATTHEW M. MURPHY, MICHAEL A. WHALEN | 71 SOUTH WACKER DRIVE SUITE 4500 | CHICAGO | IL | 60606 | MATTHEWMURPHY@PAULHASTINGS.COM; MICHAELWHALEN@PAULHASTINGS.COM | VIA E-MAIL; VIA E-MAIL |