**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | : | Case No. 22-10943 (MEW) |
| Debtors. | : | (Jointly Administered) |

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

## MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

Michelle D. DiVita[1] ("Movant"), pursuant to § 1104(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 2007.1, hereby files this motion (the "Motion") for the entry of an order authorizing the appointment of a Chapter 11 trustee in the above-captioned Chapter 11 cases. In support of this Motion, Movant respectfully represent the following:

## PRELIMINARY STATEMENT

Debtors have a history of financial statement inaccuracies and public misrepresentations that were known, or reasonably discoverable, at the beginning of the bankruptcy proceeding. Despite its pre-petition conduct, no party requested an appointment of an independent examiner. As such, Debtors self-appointed a committee for its investigation. Investigative findings from said committee only found culpability in a breach of duty of care in one of its loans. Thus, Debtors remained in control of the estate. As justification for Debtors' continued control and limited investigation, Debtors proposed an expeditious plan of sale of substantially all of its assets to its

---

[1] I am a pro se creditor with account ending 67CA who joined the platform in September 2021 after accepting a click-through Customer Agreement updated August 20, 2021. While I am an attorney licensed to practice in the states of Illinois (2019) and Minnesota (2022), I have no litigation experience nor had any knowledge of bankruptcy law prior to this case. Before becoming an attorney, I worked in corporate finance at a Fortune 100 company reporting and analyzing financial statements and technology transactions.

largest shareholder, borrower, and lender that would return a majority of cryptocurrency to customers shortly after its December 2022 confirmation hearing. However, the plan collapsed, a reasonably foreseeable outcome left by Debtors' repeated inability to conduct due diligence for the benefit of the estate. Unfortunately, customers are the ones left with claims against an estate that lost $100 million from repeated mismanagement.

With a history of pre-petition misconduct and a failed attempt at a Chapter 11 plan under its belt, Debtors have the gall to propose a plan in substantially the same form as the failed transaction. Conveniently, the new plan contains the same broad-releasing releases without any additional consideration for its $100 million mishap (barring its previous $600 million+ uncollateralized lending snafu). Even though the failed plan gave a state agency enough time to find the basis for **three (3) claims for securities fraud totaling $40 billion each,** the Official Committee of Unsecured Creditors Committee continues to support the plan, along with expansive releases, in exchange for first dibs at any litigation arising from the Wind Down Trust. Yet creditors seem to be the only ones not benefitting, as they are stuck with dollarized claims bearing the brunt of the market downside and capped on the upside. The people already harmed by Debtors stand to receive less cryptocurrency from an equally-risky counterparty and no benefit of additional investigative findings or additional consideration under the current plan. Customers must somehow trust Debtors to mitigate counterparty and regulatory risk of the Binance transaction—a task in which Debtors have repeatedly failed —in order to effectuate a plan risky enough to warrant a "toggle transaction" as a safeguard. As such, interests of unsecured creditors have been continuously and expeditiously eroded under Debtors continued management and a trustee is the most cost-efficient way to bring this case to an equitable end.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334(b) and 157. Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. § § 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a), 1104(a), and 1106(a).

## BACKGROUND

2.      On July 5, 2022 (the "Petition Date"), Voyager and each of its affiliated debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Voyager Bankruptcy"). The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b). On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

3.      Information regarding the Debtors history and business operations, capital structure, and secured indebtedness, and the events leading up to the commencement of these Chapter 11 cases can be found in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration") and *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (the "Disclosure Statement").

4.    At the heart of the Voyager Bankruptcy is that certain Master Loan Agreement dated March 4, 2022 by and between Voyager Digital, LLC ("OpCo"), HTC Trading, Inc.[2] (together with OpCo, "3AC Lender") and Three Arrows Capital Ltd. ("3AC") (the "3AC Loan"). *See* **Exhibit A** ("Acceleration Notice") for the Acceleration Notice and Notice of Event of Default outlining the loan terms and recall notices.

5.    With the 3AC Loan in the spotlight, investigative findings also centered on the 3AC Loan. The Debtor-appointed Special Committee *solely* found insider culpability arising from the 3AC Loan, specifically in the form of a breach of the duty of care owed by Stephen Ehrlich ("CEO") and Evan Psaropoulos ("CCO"). Debtors settled any of its potential claims against both CEO and CCO, as well as all insiders, for any claims related to the 3AC Loan (or not), as part of its sale of substantially all of its assets to West Realm Shires Inc. ("AlamedaFTX"). *See Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket 590] (the "AlamedaFTX Transaction") at 28, 52-54.

6.    Yet before discussions began with 3AC, Debtors conveniently modified its Customer Agreement on January 7, 2022 to shift the risk of its lending activity directly customers. More specifically, the change removed any independence or controls between the Debtors' lending activity (and resulting borrower risk) from customer's cryptocurrency deposits. Since "[c]ustomers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement," it remains unclear how customers with accounts created prior to January 7, 2022 "digitally execut[ed]" the latest agreement, particularly since the previous version described the relationship as a "commercial arrangement." *See* First Day Declaration at 13; *see also* **Exhibit B** for a redline of the current Customer Agreement to the prior version. Despite this "commercial

---

[2] HTC Trading, Inc. is a wholly-owned affiliate of Debtors but not included in the bankruptcy filing.

arrangement," Movant did not receive a notice regarding any changes to the agreement she signed

(even though a courtesy email is a commercially reasonable standard) when at least one state's

data privacy laws require notice of unilateral changes to user agreements for cloud-based

platforms. Specifically, the old version of the Customer Agreement updated on August 21, 2021

made the following promises to customers that no longer exist in the current version:

> Section 10(A). Overview.
>
>> Other than in extenuating circumstances, the payment, non-payment, default, or reduction of a particular Loan will not affect Customer's Cryptocurrency.
>>
>> The Loans operate independently from the Rewards Program and to the extent that a particular Borrower defaults on a Loan, Customer will nonetheless remain able to access and withdraw Cryptocurrency consistent with the terms of this Section 10.
>
> Section 10(C). How Rewards Are Paid.
>
>> The payment, non-payment, default, or reduction of a particular Loan will not affect whether or not Rewards are paid.
>>
>> The Loans operate independently from the Rewards Program and to the extent that a particular Borrower defaults on a Loan, Customer will nonetheless earn and be paid Rewards consistent with the terms of this Section 10.
>
> *Id.*

Notwithstanding conveniently-timed changes to the Customer Agreement for the risky

3AC Loan, the bankruptcy process brought to light more than a due diligence failure.

7.    Despite claims that "Voyager disclosed the size of the 3AC Loan in the Company's

publicly [sic] filed financial reports . . . [and] disclosed the balance of its seven largest

cryptocurrency loans in its March 31, 2022 quarterly financial statements," Debtors severely

underreported the 3AC loan balance. *See* First Day Declaration at 4 n.2. On its publicly filed

financial statements for March 31, 2022, the balance reported for Counterparty B (now known to be 3AC) totaled $326 million— an amount significantly lower than the approximate $1 billion value of 15,250 BTC[3] and USDC 350,000,000 calculated based on March 31 prices. *See* **Exhibit C** ("Financial Statements").

As of March 31, 2022 and June 30, 2021, the crypto assets loaned disaggregated by significant borrowing counterparty was as follows (in thousands):

|  | Borrowing Rates | March 31, 2022 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | 1.0% - 7.5% | $ 728,160 | $ - |
| Counterparty B | 2.0% - 9.0% | 326,317 | - |
| Counterparty C | 4.0% - 13.5% | 295,115 | - |
| Counterparty D | 1.0% - 15.0% | 252,267 | - |
| Counterparty E | 1.0% - 30.0% | 141,228 | 164,085 |
| Counterparty F | 0.5% - 8.9% | 119,488 | 57,975 |
| Counterparty G | 10.0% | 34,908 | 137,056 |
| Other | 1.0% - 10.0% | 124,961 | 34,445 |
| Total |  | $ 2,022,444 | $ 393,561 |

As of March 31, 2022 and June 30, 2021, the Company's crypto assets loaned balances were concentrated with counterparties as follows:

|  | Geography | March 31, 2022 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | British Virgin Islands | 36% | - |
| Counterparty B | Singapore | 16% | - |
| Counterparty C | U.S. | 15% | - |
| Counterparty D | United Kingdom | 12% | - |
| Counterparty E | Canada | 7% | 42% |
| Counterparty F | U.S. | 6% | 14% |
| Counterparty G | U.S. | 2% | 35% |
| Other | Various | 6% | 9% |
| Total |  | 100% | 100% |

8.     Despite only reporting a $326 million balance for the 3AC Loan, Debtors confirmed the 3AC Loan balance on April 3 totaled $935 million, or *$609 million more* than the amount disclosed in Debtors' financial statements published May 16, 2022. *See* Disclosure Statement at

---

[3] BTC closed at a price of $45,538.68. *Bitcoin USD (BTC-USD) Price History*, Yahoo Finance (last visited Jan. 31, 2023) https://finance.yahoo.com/quote/BTC-USD/history?period1=1648684800&period2=1648684800&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

51. No statements of material change regarding crypto assets loaned can be found in the Financial Statements provided in Exhibit C.

9.      In addition to the 3AC loan balance discrepancy, the Voyager Bankruptcy filings exposed a ***$1.1 billion shortfall in the reported amount of crypto assets loaned***. Debtors reported a total balance of $2.0 billion balance in crypto assets loaned. *See* Financial Statements at 21.  The actual loan balance totaled $3.1 billion on April 3. *See* Disclosure Statement at 51.

10.     Additional discrepancies emerged from the underreported loans. For example, the reported loan balance for AlamedaFTX totaled $728 million. *See* Financial Statements at 21. Yet, the AlamedaFTX loan balance on April 3 was actually $1.23 billion. *See* Disclosure Statement at 51.

11.     Debtors materially undervalued BTC to substantiate the underreported amount of cryptocurrency loaned from its counterparties.  Calculating the fair value of BTC shown in the below excerpt from the Financial Statements results in a coin price of $7,046.23, when the market price actually closed at $45,538.68[4] (or approximately 546% higher).

As of March 31, 2022 and June 30, 2021, crypto assets loaned consisted of the following (in thousands, except for number of coins):

| March 31, 2022 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| USDC | 633,149,877 | $        633,150 | 31% |
| ETH | 191,660 | 629,100 | 31% |
| BTC | 53,840 | 379,369 | 19% |
| LUNA | 2,059,577 | 212,236 | 10% |
| Other | | 168,589 | 9% |
| Total | | $     2,022,444 | 100% |

12.     Three months after the partial-disclosure of the 3AC Loan balance, the full-disclosure of the *actual* balance contained new misleading financial statements. In its public filings, Debtors provided assurances in regards to its ability to raise capital and meet liquidity requirements with its assets on hand. More specifically, the Form 51-102F3 filed on June 22, 2022

---

[4] *See* fn.3, *supra*.

and attached as **Exhibit D** (the "Material Change Report") prefaced the 3AC disclosure by first summarizing Debtors' definitive agreement between Voyager Digital Holdings, Inc. ("HoldCo") and AlamedaFTX for a $200 million USDC and 15,000 BTC revolver (the "Alameda Loan"). The Alameda Loan contained the same coin types and similar amounts to the hole left by 3AC totaling $350 million USDC and 15,250 BTC. As described in the filing, the loan would "help Voyager meet customer liquidity needs" and  "only if such use is needed" because Debtors already had "US$152 million cash and owned crypto assets on hand." *Id.* at 2. News sources and equity researchers came to the conclusion that a combined disclosure meant "Voyager customers should therefore not be impacted by the company's exposure to Three Arrows Capital"[5] and only downgraded the stock from "buy" to "neutral."[6] Debtors led the public to draw this conclusion during a time when the 3AC Loan was already in default and 3AC continued to default by failing to pay the fully-recalled loan. *See* Acceleration Notice at 1.

13.    Coinbase, one of the only known publicly-traded and properly-audited cryptocurrency exchanges to place a bid on Voyager's assets, was one of the first to catch wind of Debtors' financial reporting inconsistences and reportedly backed out of its bid after finding "the financials don't add up."[7]

---

[5] Tom Carreras, *Alameda Bails Out Voyager Digital on News of 3AC Exposure*, CRYPTO BRIEFING (June 22, 2022), https://cryptobriefing.com/voyager-tumbles-by-63-percent-following-news-of-3ac-exposure/.
[6] Maria Gracia Santillana Linares, *Troubled Crypto Brokerage Voyager Presses Three Arrows Capital To Repay $650 Million Loan Amid Capital Crunch*, FORBES (June 22, 2022), https://www.forbes.com/sites/mariagraciasantillanalinares/2022/06/22/troubled-crypto-brokerage-voyager-presses-three-arrows-capital-to-repay-650-million-loan-amid-capital-crunch/?sh=6ecb712fff6f ("This credit line may have initially worked in some circles as equity research firm BTIG initially maintained Voyager Digital stock a 'Buy' rating on its stock Wednesday morning. However, it was immediately downgraded an hour later to 'Neutral' per its latest report when Voyager CEO Steve Ehrlich revealed the true extent of the company's exposure to 3AC.").
[7] Ian Allison, *Binance, FTX Among Crypto Players in Hunt to Buy Voyager Digital Assets as Coinbase Backs Out: Sources*, COINDESK (Aug. 26, 2022) https://www.coindesk.com/business/2022/08/25/binance-ftx-among-crypto-players-in-hunt-to-buy-voyager-digital-assets-as-coinbase-backs-out-sources/.

14.     Despite a track record of misstated financials, Debtors provided repeated assurances that its management had the requisite background in the financial sector to weather a bear market leading up to its bankruptcy. Yet, such statements turned out to be false as further demonstrated by a series of counterintuitive business decisions: (i) Debtors did not recall any loans at the onset of "crypto winter"; and (ii) Debtors loaned out more crypto the same day it began recalling the 3AC Loan, entering into $0.5 billion worth of term sheets with AlamedaFTX for 12,000 BTC[8] and 155,000 ETH on June 13.[9] *See Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief [Docket No. 470]* at Annex I-II. In addition to increasing its lending activity in a bear market, Debtors raised capital for TopCo from the same two parties that held a majority of the loans outstanding for OpCo (i.e., AlamedaFTX and 3AC) through a private placement of common shares, a move that diluted shareholder value, granted AlamedaFTX insider status, and compromised the recovery potential for OpCo customers exposed to undercollateralized loans.[10]

15.     One explanation for the counterintuitive moves of the seasoned financial sector management stems from Alameda's claims issues arising from the interconnectedness of HoldCo, OpCo, and TopCo. *See* Proofs of Claim Nos. 11206, 11209 & 11213 of Alameda Ventures Ltd. (collectively, the "Alameda Claims"). Stephen Ehrlich signed the Alameda Loan Agreement as CEO of both HoldCo and TopCo, yet AlamedaFTX asserts OpCo was a party to the loan because

---

[8] The price of BTC closed at $22,487.39 on June 13. See Yahoo Finance https://finance.yahoo.com/quote/BTC-USD/history?period1=1655078400&period2=1655078400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[9] The price of ETH closed at $1,204.58 on June 13. See Yahoo Finance at https://finance.yahoo.com/quote/ETH-USD/history?period1=1655078400&period2=1655078400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true.

[10] *Voyager Digital Provides Update on Closing of US$60MM Private Placement of Common Shares Led by Leading Crypto Companies*, Voyager Press Release (May 24, 2022), https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-closing-of-ususd60mm-private-placement-of-common-shares-led-by-leading-crypto-companies ("Alameda Research was the lead subscriber under the private placement with participation by Galaxy Digital, Blockdaemon, Digital Currency Group, and Three Arrows Capital, among others.").

it was made in connection with OpCo's liquidity needs, a statement consistent with Debtors' press release. *Id.* Another connected entity, HTC Trading, Inc., a wholly-owned entity registered in the Cayman Islands, is not a party to the bankruptcy despite being a 3AC Lender and the trading arm of the platform. Debtors conducted business through this entity as "[c]ustomer assets are sent to/from Binance or HTC Trading wallets." *See* Class Action Compl. and Demand for Jury Trial, *Robertson v. Cuban*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (ECF No. 1) ¶ 95. The companies under TopCo shared officers and directors, as well as financing, and intercompany transactions should be subject to additional scrutiny along with investigation of the beneficial owners of entities not included as Debtors.

16.    Even if its management was properly disinterested amongst the entities, Debtors failed to manage the business at the most basic levels. It did not fully implement a Risk Committee despite lending out over $5 billion of its customer deposits at any given time. Debtors engaged in high-risk, uncollateralized loans or accepted risky collateral (e.g., a borrower's own exchange token). While Debtors rely on "consent to rehypothecation" to justify its lending activity in regards to customer assets, "rehypothecation" applies to collateral or margin accounts. The only application to Debtors' business practices stems from collateral held in (apparently very limited) circumstances for its lending activities. Thus, if Debtors lent out the collateral of its borrowers, it is highly likely Debtors lent out more cryptocurrency than amounts deposited by customers, placing such deposits at even greater risk in a highly-leveraged environment. Rehypothecation, together with its commingling of customer funds, are two practices already known to be high-risk and favored by the traditional financial sector in which Debtors' management originates.[11]

---

[11] *See* Letter from Senator Warren to Treasury Secretary Yellen, Sept. 15, 2022, https://www.warren.senate.gov/imo/media/doc/2022.09.15%20Letter%20to%20Treasury%20re%20Crypto%20Risks1.pdf ("At the same time, companies like Voyager and Celsius have been commingling – a notoriously risky banking practice – customer funds with their own assets or with those of other customers, meaning that "customers

Certainly Debtors business practices were inconsistent with the management practices it led customers to believe, particularly in the case of USDC holders (particularly targeted by Debtors) who were not even participating in the typical volatility associated with cryptocurrency markets.

17.    Other than insiders, regulators appear to be the only other people aware of the true nature of Debtors 'business practices. Debtors received numerous investigative inquiries and orders related to the Voyager Earn Program from the Securities and Exchange Commission ("SEC") and between March 29, 2022 and April 13, 2022, states including Indiana, Kentucky, New Jersey, Oklahoma, South Carolina, Alabama, Texas Vermont, and Washington. *See* Financial Statements at 26. New Jersey recently filed a claim on December 30, 2022 totaling $30,599,999,000 for each of the Debtors' entities, based on its findings that the Voyager Earn Program violated its securities laws while" Debtors face [additional] liability for restitution for defrauding investors." *See* Proofs of Claim filed by the State of New Jersey Bureau of Securities designated Nos. 12036, 12037, 12038 (collectively, the "New Jersey Proofs of Claim").

18.    The Debtors also face criminal liability with the Texas State Securities Board, as Debtors' conduct may be "punishable by up to five years' imprisonment." *See Objection of the Texas State Securities Board and the Texas Dep't of Banking to Debtors' Second Amended Disclosure Statement Relating to the Third Am. Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 814] (the "Texas Disclosure Objection") at ¶ 32. Setting forth a similar framework for its conclusion as Movant, the

---

cannot make a claim to their crypto."). *See* Caitlin Long, *Two Wall Street Terms Every Bitcoin Trader Needs To Learn Now*, FORBES (Aug. 13, 2018), https://www.forbes.com/sites/caitlinlong/2018/08/13/the-r-and-c-words-enter-the-vocabulary-of-bitcoin-enthusiasts/?sh=732faca868f3 ("Rehypothecation and commingling are pervasive Wall Street practices that enable the financial system to create more claims to an underlying asset than there are underlying assets.").

state also questions Debtors' fitness to remain in possession of the estate when a trustee

appointment is necessary in light of Debtors' conduct:

> Given that the Debtors' business was grounded in obvious, and potentially criminal, violations of money transmission laws, it is unclear why the Debtors remain in possession and a trustee has not been appointed. See 11 U.S.C. § 1104(a) (identifying fraud and gross mismanagement as cause for appointing a trustee & (e) (stating that the U.S. Department of Justice "shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor [or] the debtor's chief executive or chief financial officer …participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor"). *Id.* at ¶ 32 n.27.

19.    In regards to criminal culpability, reasonable comparisons can be made between

Debtors' platform and an increasingly-common fraud referred to as a "pig butchering scheme." A

Texas plaintiff suing Binance describes how she" was enticed by false promises of . . . financial

prosperity through cryptocurrency investments." *See Suppl. Declaration to the Texas State*

*Securities Board and the Texas Dep't of Banking's Objection to the Debtors' Second Amended*

*Plan Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings,*

*Inc., and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and Obejection to*

*Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase*

*Agreement and (II) Granting Related Relief* [Docket No. 817] (the "Texas Declaration") at ¶ 47.

The scammers "over subsequent communications, gain [victims'] trust" and by using the

appearance of a legitimate platform, scammers can  "convince the victims to purchase fake

investments or otherwise transfer funds to undisclosed criminal enterprises." *Id.* at n.4. Binance,

also effectuating transactions for Debtors, may be implicated as a result.

20.    The culpability behind Debtors affairs can be seen in the Committee's legal fees,

with time charged for "[r]esearch regarding states in which Voyager operated illegally." *See First*

*Interim Application of McDermott Will & Emery LLP for Compensation for Services and*

*Reimbursement of Expenses as Counsel to the Official Committee of Unsecured Creditors for the Period from July 22, 2022 through October 31, 2022* [Docket No. 768] ("<u>McDermott Fee Statement</u>") at 615.

21.    Even if Debtors operated with all of the requisite licenses and filings, Debtors made a series of misleading statements in its direct communications with depositors and investors leading up to the Petition Date after the initial recall of the 3AC Loan on June 13, 2022.[12] Specifically, Debtors made the following statements regarding its business practices and financial condition to the public and/or directly to account holders on June 14:

> Voyager differentiates itself through a straightforward, low-risk approach to lending and asset management by working with a select group of reputable counterparties, which are all vetted through extensive due diligence by its Risk Committee.[13]

> The company is well capitalized and in a good position to weather this market cycle and protect customer assets.[14]

> As a public company, Voyager operates with a consistently high level of transparency, providing regular quarterly financial statements detailing the company's financial position and financial statement disclosure surrounding risk management practices and counterparty exposure. *See* **<u>Exhibit E</u>** for the customer email received by Movant at 10:11 AM EST.

> On our balance sheet, Voyager is well-capitalized and positioned to weather the bear market. *Id.*

---

[12] *See* Exhibit A ("On June 13, 2022, at 3:13 p.m. (New York City time), Lender sent written notice to Borrower exercising the Callable Option with respect to the BTC Open Loan and recalling 1,250 BTC of the BTC Open Loan (the "Initial Recall Amount") in accordance with the terms of the Loan Agreement. Borrower failed to deliver the Initial Recall Amount to Lender when due by the Close of Business on June 15, 2022, which was the Recall Delivery Date with respect to the Initial Recall Amount.").

[13] *See Voyager Digital Provides Update on Asset and Risk Management*, Voyager Press Release (June 14, 2022, 7:45 AM ET), https://www.prnewswire.com/news-releases/voyager-digital-provides-update-on-asset-and-risk-management-301567456.html.

[14] *Id.*

As you personally consider which crypto platform can support you through all market cycles, I urge you to look at how the company is disclosing the details of its financial position. *Id.*







In light of the underreported loans, customers had no way to know the true risk profile of the Debtors and had to rely on Debtors' statements regarding its financial condition – statements that were false and misleading.

22.    Debtors continued to make false and/or misleading statements and/or material omissions after the Petition Date. Debtors claim in multiple bankruptcy filings that the June 14 press release was published *before* receiving notice of 3AC's insolvency. *See* Disclosure Statement at 52; *see Debtors' Objection to Proofs of Claim Nos. 11206, 11209 & 11213 of Alameda Ventures Ltd.* [Docket No. 929] ("Alameda Claim Obj.") at n.53. However, Debtors fail to explain why it proceeded to tweet and send emails to customers linking the press release *after* it fully recalled the 3AC Loan at 8:07 AM EST. *See* Exhibit A at 1. Further, Debtors fail to mention that at the time the press release was issued, it made an initial recall of the 3AC Loan the day prior. With payment still outstanding at the time of the press release, Debtors were not in a position to make any

definitive statements regarding its financial position, let alone on multiple platforms. It remains unclear what tipped Debtors off to initially recall the loan on June 13.

23.     Despite the aforementioned onslaught of potential civil and criminal liabilities, and inaccurate financial reports and related misstatements, Debtors have agreed to settle any potential estate causes of action against the CEO and CCO for a cash contribution of $1,125,000. Based on the approximate $1 billion value of the transferred customer assets, or "Assumed Liabilities" as named in the current purchase agreement, with claims valued at the lowest point to date, the CEO's cash contribution represents only 0.1125% of the customer assets he mishandled. *See Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] (as amended, the "Binance APA") at 1-3, 9.  Even with a generous settlement valuation of $22 million, the settlement only equates to approximately 2.2% of the customer claims portion of the estate.

24.     Further, the basis of a < 3% settlement stems from self-reported claims by the CEO and CCO that they do not have substantial assets. With a repeated history of underreporting financial items on behalf of Debtors (and at the detriment of creditors), it is unclear why such statements have not been subject to additional scrutiny by the bankruptcy professionals retained in the case.  Creditors have an interest in finding hidden assets upon the Committee's conclusion "that the Debtors have valid and substantial claims against Ehrlich and the CCO for breach of their duties of care relating to their role in approving Voyager's ill-fated loans to 3AC." Yet Committee agreed to the settlement amount "[i]n light of the limited collectability" despite little to no indication it seriously pursued avenues for collection. *See Letter of the Official Committee of Unsecured Creditors in Support of Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 566] ("Committee Supp. Letter") at 2, 6. Even with the Debtors'

generous settlement under the proposed plan, Debtors recently removed the exception for fraud and misconduct for released estate claims. With potentially fraudulent CEO and CCO statements serving as the basis for releases, the Committee should have automatically objected to the removal of the exception for the benefit of creditor collection. *See Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 829] (as amended, the "Binance Plan") at Exh. B, p. 58. The Committee did not object to the removal of this language.

25.     The CEOs claims of $2.7 million in assets contradict information found in Debtors' public filings. Stephen Ehrlich sold shares worth $29,954,000 CAD on February 12th, 2021 and $15,297,046.6 CAD thereafter.[15] Debtors claim the CEO received limited proceeds from the transaction, however, his ownership interests in the reported entities amounted to some significant amount of control or benefit. The entities were included as part of the insider disclosures for the required on Debtors' OTCQB Certification and CSE Form 2-A mandated in cases with beneficial ownership or control by an insider. In addition to the CEO's SJE Consulting, LLC receiving stock sale proceeds, the CEO's Honos Financial LLC entity received consulting fees in connection with his services. Both of these entities received PPP loans[16] claiming < $13k in annual payroll expenses for two reported employees. With limited employee-related expenses, it remains unclear what business activities could substantiate an insignificant ownership interest in an entity the CEO chose to hold its stock in. In addition, news reports indicate the CEO has an investment interest in a new web3 fund, Druid Ventures, although the investment amount is unreported.[17]

---

[15] Andreas Repeta, *Voyager: Distortions Of Price Discovery And Price Symmetry*, SEEKING ALPHA (Jun. 07, 2021), https://seekingalpha.com/article/4433530-voyager-distortions-of-price-discovery-and-symmetry.
[16] See Loan #9412327309 for Honos Financial LLC and Loan #8469797306 for SJE Consulting LLC.
[17] Lauren Coffey, *Exclusive: Tampa entrepreneur launches $12.5M+ web3-focused fund*, TAMPA BAY BUSINESS JOURNAL (Apr. 4, 2022), https://www.bizjournals.com/tampabay/news/2022/04/04/tampa-entrepreneur-launches-web3-investment-fund.html.

26.    Movant is not the only one suspicious of the CEO's assets, but Debtors' professionals have explored and incurred material fees in connection with potential fraudulent transfers. The Special Committee's investigation warranted "[l]egal research on fraudulent marital transfers under Connecticut law" even though the outcome its findings have not been made available to creditors nor disclosed by Debtors. *See Fourth Monthly Fee Statement for Compensation for Services Rendered and Reimbursement of Expenses Incurred as Special Counsel to Voyager Digital LLC During the Period of October 1, 2022, through October 31, 2022* at 17. Debtors professionals also researched fraudulent transfers beyond the Special Committee's investigation and prepared memos – incurring more than $17,000 to explore the seemingly legitimate issue. *See Fourth Monthly Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Counsel to the Debtors and Debtors in Possession for the Period from October 1, 2022 through October 31, 2022* [Docket No. 692] ("K&E Fourth Fee Statement") at 26-28.

27.    The Committee's professionals also indicate time spent to "[r]esearch case law and statutes related to fraudulent transfer doctrine." *See* McDermott Fee Statement at 26. However, no outcome of the Committee's findings have been published on the docket. The only investigation results outside of the Committee Supp. Letter can be found in the below excerpt redacted under temporary seal. Creditors have repeatedly requested the Committee publish the unredacted findings, as without an examiner it is the only chance at an understanding of the events that transpired and how Debtors can be held accountable. Yet, the document remains under seal as of the date of this motion even though the temporary seal automatically lifted in October 2022. *See Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Amended Disclosure Statement, (II) Solicitation and*

*Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain*

*Dates With Respect Thereto* [Docket No. 526] (the "Committee Objection") at ¶ 4 under temporary

seal in accordance with the *Common Interest and Confidentiality Stipulation and Protective Order*

[Docket No. 408] (the "Protective Order").



28.    With insiders at a heightened risk for preference payments in a "bank run"

scenario,[18] two insiders not mentioned in the settlement, but potentially holding positions on the

---

[18] Kitty Calavita et al., Big Money Crime: Fraud and Politics in the Savins and Loan Crisis (University of California Press, 1997) ("Insiders [owners and officers] know when their bank is failing. If they took $10 million from the till at this point it would be an easily prosecutable crime. If instead they have the board of directors which they control pay them a large bonus and/or authorize large dividends at a time when the outside auditors are still blessing the.., financials and no one writes or says out loud what is really happening one has.., committed an unprosecutable crime.").

Risk Committee,[19] may have substantial assets based on reported stock sales of $3,635,248.75 CAD from Hanshe Gerard, and Janice Barrilleaux sold shares worth at least $3,635,248.75 CAD.[20] No investigative findings have been provided to support their release in exchange for no consideration, nor has confirmation been provided that preference claims do not exist.[21]

29.    The settlement also provides that insiders may be holders of estate claims as unsecured creditors. It unclear from the filings whether such accounts were examined for preference payments or if account claims were audited in general. The only insider agreeing to subordination of their claim is the CCO.

30.    Debtors claimed to have 3.5 million active users and total funded accounts of 1,190,000,[22] but only 983,931 claims are listed in the 18,000 page PDF of customer claims. *See Second Amended Schedules of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945)* [Docket No. 18] (the "Customer Claims Schedule") at Schedule F Attachment p. 1-18,452. Of the claims on the schedule, approximately 20% of accounts hold < 10 VGX and nothing else.[23] The volume (~200,000 accounts) of small holdings (< $5) of Debtors' token (VGX) warrants additional investigation. Particularly since that is a $1 million recovery to actual creditors in the event such claims can be traced back to only a handful of beneficiaries. Further, there are twenty (20) accounts associated with the same last 4 digits as my account number disclosed in FN 1. Not only does this give rise to questions regarding claims, but the ability and adequacy of the voting procedures that

---

[19] Members of the Risk Committee were not fully disclosed with the only information found in the Disclosure Statement providing it "included certain officers and other members of the treasury and legal teams." *See* Disclosure Statement at 51.

[20] *See* Repeta, *supra*.

[21] *Id.*

[22] *Voyager Digital Reports Revenue of US$102.7 Million for the Quarter Ended March 31, 2022*, Voyager Press Release (May 16, 2022), https://www.prnewswire.com/news-releases/voyager-digital-reports-revenue-of-us102-7-million-for-the-quarter-ended-march-31--2022--301547719.html.

[23] Claims data was analyzed by converting the PDF file format to a .csv file and running the data through Alteryx, a data science and analytics automation platform.

may be relying on bad or duplicative data. Since insiders may make up a larger percentage of claims on a dollar basis (as ~60% of account holders have claims under $100), the legitimacy of the voting procedures and solicitation must be confirmed in order to effectuate a plan with reasonable confidence regarding its level of approval. With Debtors ability to distinguish legitimate from illegitimate claims in question, some additional concerns arise in Debtors' ability to aggregate 12,000 Proofs of Claim totaling approximately $2.1 billion and object to such claims in an omnibus fashion. *See Debtors' Motion for an Order (I) Approving (A) Omnibus Claims Objection Procedures and Form of Notice, (B) Omnibus Substantive Claims Objections, and (C) Satisfaction Procedures and Form of Notice and (II) Waiving Bankruptcy Rule 3007(e)(6)* [Docket No. 925] at ¶ 9. Debtors' counsel has had concerns over claims reconciliation and the effect on solicitation stemming back to November with at least one time entry "Analyze issues re claims reconciliation and effect on solicitation" and justifiably so given the large volume of claims data. *See* K&E Fourth Fee Statement at 53, 90. With 12,000 claims requiring additional analysis, some confidence in the ability to manage the original 900,000+ claims would be needed to remain confidence in Debtors' data consolidation abilities.

31.    With minimal value contributed to the estate to date, the estate value has continued to decrease with over $100 million in costs incurred from the collapse of the AlamedaFTX Transaction. *See* Alameda Claim Obj. at ¶ 2. Despite the lack of self-awareness when describing Alameda's activities that "duped investors and lenders into funneling billions of dollars into their crypto [platform], without appropriate controls, governance, and risk-management procedures," Debtors assert that "AlamedaFTX won the Voyager auction under false pretenses." *Id.* at ¶ 1-2. However, when Debtors entered into the transaction, management knew or should have known (i) AlamedaFTX suffered a $1.3+ billion liquidity impairment from Voyager's collapse; (ii) an

Alameda email address was used for Buyer notices in the AlamedaFTX APA; (iii) Alameda was its largest shareholder, borrower, and "sophisticated" lender and engaged in the same activities and comingling of funds that rendered Voyager insolvent; (iv) none of Alameda's financial statements were audited and the last audited financial statements of the WRS silo were from December 31, 2021. *See Notice of Filing of First Amendment to Asset Purchase Agreement* [Docket No. 548] (the "AlamedaFTX APA") at p. 51; *See* Alameda Claim Obj. at ¶ 1; *see Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings (Case No. 22-11068-JTD)* ("Enron CEO Declaration") at ¶ 23, 55.

32.     Further, value continues to erode as liquidation is a near certainty, yet Debtors proceeded with KERP bonuses, kept almost all insiders retained, and conduct routine shut downs to the application for maintenance paid for out of the estate to keep the business running. Individuals remaining on the payroll include "Chief Marketing Officer" despite clear indication after two proposed plans of reorganization that Debtors' rehabilitation is unlikely.

33.     Additional diminution of value will certainly result in another failed plan of reorganization, with $25M in Debtors' professional fees supporting the first failed plan of reorganization and $10M incurred for the Committee's professionals. *See Objection to Interim and Final Fee Application and Motion to Appoint Fee Examiner on this Mega Bankruptcy Case* [Docket No. 924] at ¶ 7. The Binance Plan carries enough of a risk of failure to support a "toggle" option in the event the sale is not consummated. No financial model has been provided that weighs the costs of a failed transaction against the toggle transaction, and Debtors plan only resorts to a toggle transaction in the event the Binance APA falls through (leaving creditors with the option to support the Binance Plan or allow the Debtors to waste more time going back to the drawing

board). Time is of the essence in the case of dollarized claims, with the creditors left with only the downside and an upside capped at the claims amount on the Petition Date.

34.     Debtors do not a have a track record to support any financial-related assurances contained in the Binance Plan, nor does Binance have an independent audit of its financials for Debtors to rely on for proper due diligence as its previously-engaged auditors quit the crypto industry entirely.

35.     Debtors cannot be trusted to weigh regulatory risks associated with the Binance APA. For example, the sale of "liveness check" selfies includes biometric PII that is heavily scrutinized and the subject of major class action settlements. Creditors may have additional claims upon the consummation of sale transaction should such transaction commence in jurisdictions such as California and Illinois. Movant is unaware whether a privacy ombudsman has been appointed despite a previous request from the Trustee. Further, its unclear how such data will be used when Binance will be collecting its own data as part of the KYC onboarding.

36.     In addition to financial and regulatory risks, Debtors have included broad-reaching releases that further compromise plan confirmation. Debtors do not provide additional consideration to those who "opt-in" to such releases. Those who do <u>not</u> vote automatically "opt-in" to releases without their explicit consent. Repeated confusion regarding the nature of the paragraph long releases, and what claims are and are not included (of particular interest to creditors who want to hold the CEO accountable) remain unclear as repeated questions raised in the Committee townhalls. The complicated language suggests some creditors may not understand what they are consenting to. The released parties are not making a substantial contribution towards the plan. Customers have been instructed by the Committee to approve the plan with releases because "if the releases are removed, Voyager would not have been required to move forward with

that result" and "[i]f the Plan is not confirmed, there is risk of delay and a significant reduction to creditor recoveries." *See* Committee Supp. Letter at 5-6.

37.     In light of the Debtors financial and regulatory misgivings, and multiple allegations of criminal conduct, an investigation in a neutral, independent manner with the facilitation and backing of the U.S. Government could explore a Ponzi scheme determination. Some investigation should be conducted due to the fact that Voyager paid out $182 million in rewards between July 1, 2021 and March 31, 2022, while running a cumulative net loss before income tax since September 1, 2020. Post-petition losses evidence the same, if not more unprofitability, stemming from the lack of new deposits that actually funded Debtors' growth. *See* Exhibit C at 12. Creditors might have a shot at a timely and substantial recover if the Internal Revenue Service agrees with the Ponzi determination and expands current ruling to apply favorable tax treatment to victims of cryptocurrency platforms.

| (in thousands) | Q3 2022 | Q2 2022 | Q1 2022 | Q4 2021 | Q3 2021 | Q2 2021 | Q1 2021 | Q4 2020 |
|---|---|---|---|---|---|---|---|---|
| Total revenue | $ 102,743 | $ 164,848 | $ 81,507 | $ 109,048 | $ 60,438 | $ 3,569 | $ 2,001 | $ 708 |
| Total expenses | 145,703 | 161,633 | 109,832 | 77,457 | 30,592 | 6,477 | 4,685 | 4,904 |
| Total other income (loss) | (7,535) | 1,017 | (11,219) | 9,598 | (98,409) | (6,089) | (1,291) | (777) |
| Net income (loss) before income tax | (50,495) | 4,232 | (39,544) | 41,189 | (68,563) | (8,997) | (3,975) | (4,973) |
| Provision (benefit) for income tax | 10,945 | 1,644 | (10,627) | 11,142 | - | - | - | - |
| Net income (loss) | $ (61,440) | $ 2,588 | $ (28,917) | $ 30,047 | $ (68,563) | $ (8,997) | $ (3,975) | $ (4,973) |

38.     In addition to Ponzi-related investigation efforts, exploration into BTC transfers moving from Debtors 'associated wallet[24] on June 13, the same day the 3AC Loan was initially recalled, should be investigated. Prior to June 13, the wallet began to send more BTC than received in March 2022 (a time the regulatory pressure ramped up), with two wallets[25] on the receiving end of the large-volume transactions.[26]   A series of circular transactions to the same wallet with smaller

---

[24] *See* wallet address data for "12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW" at the following link: https://oxt.me/address/12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW
[25] Both "1A5PFH8NdhLy1raKXKxFoqUgMAPUaqivqp" and "bc1q8z3tnkvh4s0mjmrrt4gyptakq77m66lqmmrqtw" are associated with the same wallet as the account in n.24.
[26] *See* e.g., April 8 (https://bitinfocharts.com/bitcoin/block/730983/12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW), April 11 (https://bitinfocharts.com/bitcoin/block/731443/12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW), and April

transfers to other wallets as beneficiaries (all of which are drained) indicate some "blender" or "mixing" software might be involved in order to avoid tracing the transactions. The Debtors ' initially identified wallet maintains a balance that primarily consists of an October 17 BTC transfer of 6,500, consistent with the recall of the Alameda loan, and indicate a high-probability that the wallet is associated with Debtors.[27]

39.    The Committee has not provided a sufficient check on the Debtors' management based on the passive acceptance of repeatedly-false financial disclosures, failure to object to fraud exceptions, failure to serve public interest in transparency, limited investigatory efforts with findings that remain redacted, yet has the responsibility of managing a litigation trust and appointing a trustee. The Committee has not communicated with creditors beyond four (4) town halls, a fraction of the communication provided by other cryptocurrency Committees with large creditor bodies, and customers remain confused asking repeated questions on dollarization of claims (a subsection that warrants codified reform) and the meaning/impact of the legalese-filled releases when townhalls are conducted.

**RELIEF REQUESTED AND BASIS FOR RELIEF**

40.    Movant respectfully requests that the Court enter an Order authorizing the appointment of a Chapter 11 trustee pursuant to §§ 1104(a) and 1104(e) of the Bankruptcy Code because the required "cause" under § 1104(a)(1) of the Bankruptcy Code exists, the appointment of a Chapter 11 trustee is in the best interests of creditors, equity security holders, and other interests of the estate under § 1104(a)(2) of the Bankruptcy Code, and if there are "reasonable

---

29 (https://bitinfocharts.com/bitcoin/block/734109/12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW) transactions for examples.

[27] *See* https://bitinfocharts.com/bitcoin/block/759119/12qA97T8hsDgvVoRCXGZifd9PCraqvd2DW providing additional confirmation Debtors are associated with account in n.24.

grounds to suspect" actual fraud in management and its financial reporting under § 1104(e), important policy considerations are at play.

41.    Section 1104(a) of the Bankruptcy Code governs the appointment of a Chapter 11 trustee and provides, in part, as follows:

> At any time after the commencement of the case, but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee -
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>>
>> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

42.    The appointment of a Chapter 11 Trustee is an extraordinary remedy. In light of the extraordinary facts of this case, the appointment of a Chapter 11 trustee is warranted for both "cause" and being in the best interest of creditors and other interests of the estate.

### A.    Cause Exists to Appoint a Chapter 11 Trustee Under Section 1104(a)(1)

43.    Pursuant to section 1104(a)(1) of the Bankruptcy Code, "cause" exists to appoint a Chapter 11 trustee where there is fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor. 11 U.S.C. § 1104(a)(1). This is not an exhaustive list. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003). Courts have considered other factors to determine whether to appoint a Chapter 11 trustee, such as (a) materiality of the misconduct of the debtor's management, (b) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other interested parties, (c) existence of prepetition voidable preferences or

fraudulent transfers, (d) willingness or inability of management to pursue estate causes of action, (e) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (f) self-dealing by management or waste or squandering of corporate assets. *See In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000). The court has broad discretion in determining whether the challenged conduct establishes "cause" under section 1104(a)(1). *See In re Sharon Steel Corp.*, 871 F.2d at 1225.

44.    Here, Debtors concealed the true nature of its lending activities by publishing financial reports that materially understated their loan positions by more than $1 billion USD. Using its false financial statements, potentially inflated account numbers, and a borrower/shareholder relationship combined with intercompany loans to conceal lending risks, multiple insiders have profited from Debtors scheme. Some officers cashed out their cheaply-acquired stock positions at the peak for millions of dollars, while almost all insiders receive five-figure monthly salaries despite there being no platform or company to operate. Such profiteering is made off of the backs of customers who deposited money from Debtors' inducements, assurances, and false statements regarding the nature of its risk management and business activities. Despite the handsome take-home pay, Debtors repeatedly fail to conduct even basic, let alone adequate due diligence related to any of its business dealings. Debtors eroded the value of the estate both before and after bankruptcy by failing to do the most basic, let alone adequate due diligence on its leading counterparties. Or maybe due diligence is not the issue as the Special Committee attests. Rather, 3AC, AlamedaFTX, and Debtors all shared a highly-leveraged, interconnected asset management strategy propped up by exchange-based tokens to increase the available amount of leverage, and creative reporting (if any) on its financial statements. Debtors seem to do the requisite due diligence when protecting themselves, as right before the 3AC Loan

the customer agreement shifted all of the borrower risk to its customers without any notice. Regardless, hundreds of thousands, if not millions of individuals are left in the wake of mismanagement at best, or an empathy-devoid level of greed at worst.

45.    As the bankruptcy proceedings continue, Debtors have presented a plan containing broad-reaching releases in exchange for a minimal cash payment, with the total settlement amounting to ~2% of the estate value despite repeated and proven claims of criminally and civilly liable business practices. Releases extend beyond those who (minimally) settled, and apply to all estate claims beyond the limited investigative findings related to the 3AC Loan.

46.    Further, corroborating fee statements suggest some form of fraudulent transfers occurred, unsurprising given the conflicting public record of the CEO and CCO's lucrative business dealings. Potential avoidance actions and fraudulent transfers need to be further explored, particularly given the ability for cryptocurrency to act as a money laundering tool. In the case of Debtors' business activities, transactions should be reviewed related to insiders' customer accounts, potential transfers to fake or invalid accounts, and suspicious wallet activity arising after the 3AC Loan and heightened regulatory scrutiny.

47.    In exchange for broad-reaching releases, Creditors are left with plan that shields insider assets, thwarts actual attempts at a worthwhile investigation, all for Debtors to avoid any form of accountability after losing the deposits of hard-working Americans. Such outcome is not surprising considering at least one jurisdiction has threatened jail time. However, these types of self-serving motivations may taint the reliability of the 12+ bankruptcy professionals retained in connection with these cases, as this case has perpetuated Debtors' fraud and created a false narrative that this is a legitimate business enterprise with a chance of rehabilitation.

48.    The majority of the value of the estate derives from customer assets and customer

data. Yet, Debtors acquired the value on the basis of false claims made in regards to management's

experience, trustworthiness, risk controls, asset management strategy, and financial health. With

no remaining semblance of trust, the fundamental principle of any custodial relationship, Debtors

continue to keep a full staff of highly-paid insiders on payroll at the creditors' expense. Yet,

somehow Debtors' managed to erode at least $100 million of value by failing to conduct an iota

of due diligence, going as far as shielding themselves from known liquidity risks stemming from

this Voyager Bankruptcy. All in exchange for a 0.1125% cash payment.

49.    Once cause has been established, section 1104(a)(1) requires the appointment of a

Chapter 11 trustee. See *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136

(10th Cir. 1988); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 640 (Bankr. D. N.M. 2009).

50.    The record before the Court constitutes sufficient cause to appoint a Chapter 11

trustee under the clear and convincing evidence standard of proof. Accordingly, the appointment

of a Chapter 11 trustee under section 1104(a)(1) is required upon this Motion.

**B.    The Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors,
Equity Security Holders, and the Other Interests of the Estate Under Section
1104(a)(2)**

51.    Section 1104(a)(2) of the Bankruptcy Code "create a flexible standard [that] …

allows the appointment of a trustee even where no 'cause' exists, but where to do so would be in

the best interest of the constituents." *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr.

S.D.N.Y. 1990). Even in the absence of "cause" required under section 1104(a)(1) of the

Bankruptcy Code, a court may exercise its discretion and still appoint a trustee under section

1104(a)(2) if doing so is in the best interest of the parties. *See In re The 1031 Tax Grp., LLC*, 374

B.R. 78, 90-91 (Bankr. S.D.N.Y. 2007). Therefore, the court has even broader discretionary

powers under section 1104(a)(2) and may consider equitable factors to determine whether appointing a trustee is in the interests of the estate and its creditors. *See, e.g., In re Cerleritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

52.     The factors considered by courts when determining if the appointment of a trustee is warranted under section 1104(a)(2) include (a) the trustworthiness of the debtor, (b) the debtor's past and present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the business community and of creditors in present management, and (d) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *See In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168).

53.     Generally, Debtors first lost the trust of customers when it concealed $1 billion of crypto asset loaned. Specifically, Movant, relying on Debtors' tweets regarding its financial statements in the 1-2 weeks leading up to the bankruptcy, decided not to withdraw her cryptocurrency despite known upcoming short-term cash flow pressures. With a genuine curiosity on how a $600 million loan could take down a multi-billion dollar exchange, and desire to educate herself for future cryptocurrency-related investments, Movant reviewed Debtors' financial filings shortly after the Petition Date. After discovering some inconsistencies and errors, which were hard to find given Debtors' unfamiliar bank-like balance sheet, Movant still remained optimistic. The first erosion of trust started with the redline of the customer agreement. The pointed, unilateral, risk-shifting nature of the changes, made with *zero* notice to customers, caused Movant to question Debtors' intentions for the first time. When the Disclosure Statement filed more than two months after the Petition Date showed that the financial statements did not contain mere "inconsistencies"

or "errors," but an intention to conceal the amount of lending by loaning more than $1 billion the day after the reporting period ended, Debtors' self-serving nature was made clear. Any remaining trust was completely eroded when the CEO, a tenured professional in the traditional financial sector, claimed only $2.7 in assets—and then the small semblance of hope I had remaining from my faith in the bankruptcy process disappeared the $1,000+/hour professionals believed him.

54.    With the sale or disposal of all assets under both proposed plans, there are no prospects for rehabilitation. Further, Debtors seek to repeat the past by proposing a plan that takes the same form of the failed AlamedaFTX Transaction. Under its liquidation options, the Debtors and the Committee contend that the Binance APA is less expensive than the toggle transaction, both of which are less expensive than a Chapter 7 liquidation. While creditors may incur more tax liabilities under Chapter 7 than a liquidating plan under Chapter 11, it remains unclear how the Binance APA (and its inherent risk) could be less expensive than the toggle transaction (that removes said risks) without a financial model or information coming from a trusted party. With financial, regulatory, and counterparty risks stemming from the Binance APA, past-experience suggests Debtors cannot effectively evaluate and effectuate a plan in substantially the same form as the failed FTX Transaction.

55.    "Unlike robust investigations by bankruptcy examiners, 'settlements in bankruptcy [resulting from committee or trustee investigations] avoid assigning culpability, pretermit fact finding, and may manipulate consent doctrines in ways that undermine legitimacy in the eyes of the public and aggrieved constituencies.'" *See In re FTX Trading Ltd., et al., Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Exmainer (Case No. 22-11068)* at ¶ 43. Unfortunately for creditors in this case, an examiner was not appointed early on (even though examiners were appointed in the Celsius and AlamedaFTX bankruptcy proceedings).

The last round of objections to the Binance APA, and in light of securities fraud findings, questioning management is not only reasonable under the circumstances, but prudent. Movant has serious concerns arise in the sale of customers' biometric PII and the status of the privacy ombudsman remains unclear.

56.     A trustee can provide a non-biased assessment of the cost-benefit analysis of the Binance APA compared to the toggle transaction, and even liquidation (Movant has experienced more erosion of value from the estate than any potential tax liability amount). Regardless of whether the trustee finds the Binance APA or toggle transaction to be favorable, a trustee can remove broad-reaching releases and other likely-contested elements of the plan to avoid a drawn out legal proceeding and related professional costs.  A trustee can also consolidate investigative findings from both Debtor and the Committee and explore potential causes of action stemming from all parties not yet investigated and no longer released, furthering the transparency and accountability functions of the bankruptcy process. Since at least one state government found Debtors' liable for securities fraud, an arm of the Department of Justice would be best-equipped to  manage and coordinate multiple state investigations and claims to make sure adequate recovery in all jurisdictions is provided. Further, the Committee has not demonstrated it can further creditors' best interests to the point where Movant has followed this case and filed this motion out of a pure moral obligation to object to de minimis releases in light of criminal wrongdoing.

57.     The appointment of a trustee in these Chapter 11 cases is clearly in the best interests of creditors and the estate pursuant to section 1104(a)(2). The benefits of a trustee's objective management of the debtors far outweighs the costs. Accordingly, the Court should appoint a Chapter 11 trustee under section 1104(a)(2) upon this Motion.

## C.  **Policy Considerations**

58.    Under § 1104(e), the U.S. Trustee must bring a motion to appoint a chapter 11 trustee when there are "reasonable grounds to suspect that current members of the governing body of the debtor ... participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor." While § 1104(e) mandates that a motion be made in the face of such evidence, it does not change the standards for appointment. Yet, the legislative history of § 1104(e) of the Bankruptcy Code mandates "vigilance and action where fraud, dishonesty, or criminal conduct by current members of management is suspected" with no room for discretion. *See In re The 1031 Tax Grp., LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007).

59.    Here, the "reasonable grounds to suspect" standard is not only met, but Debtors fraud has been proven by the finding of culpability under New Jersey law, in addition to the various inconsistencies and findings herein between the Financial Statements, First Day Declaration, and Disclosure Statement. However, Movant – a creditor with an immaterial claim – has incurred the most loss from her discovery of the financial statement issues and moral (not mandated) obligation to raise the issue herein. The bulk of the discussions to date surround the cost-benefit analysis of adversarial matters instead of analyzing the best result for creditors. The bankruptcy court, and professionals appointed in this case, can lead jurisprudence in cryptocurrency through decisions that serve to right a wrong. Or maybe that is an argument on why bankruptcy is not the best forum for this case – it is a system intended to be used for the well-meaning. However, similar to how fraudsters can exploit vulnerabilities in the financial system, it appears the same has occurred in the legal system. No Debtor exhibiting such a careless disregard entrusted with the life savings of others should have made it this far along in the Chapter 11 process, let alone perpetuate a continued exploitation of people in a focused pursuit for exculpation.

60.     Under section 105(a) of the Bankruptcy Code, courts can, on their own motion,

order the appointment of a Chapter 11 trustee. *See United States v. Bond*, 762 F.3d 255, 260 n.4

(2d Cir. 2014) Courts rarely exercise this power, doing so only when they must take immediate

action to avoid substantial harm to the estate or prevent an abuse of process (*see In re Mother

Hubbard, Inc.*, 152 B.R. 189, 197 (Bankr. W.D. Mich. 1993)).

61.     Disallowance for broker-dealer Ponzi schemes to file a Chapter 11 exists for this

very reason. Debtors have isolated the broker-dealer entity from bankruptcy proceedings, and

while Chapter 11 has been found to benefit customers the same way broker-dealer regulations

have, it requires giving customer-creditors the distribution of assets that would have occurred were

a stockbroker under the Bankruptcy Code. I respectfully ask the court to consider the underlying

intent of the legislation in its review of this Motion, while respecting the nuances that may be

available in cryptocurrency cases favoring Chapter 11 (without loss of the broker-dealer

protections), and whether a trustee would be best-equipped to effectuate a similar result herein.


## NOTICE

62.     Movant will provide notice of this Motion to the following parties and their

respective counsel as applicable: (a) the Debtors; (b) the U.S. Trustee; (c) the Committee; (d) the

United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue

Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors

conduct their business operations; and (h) any party that has requested notice pursuant to

Bankruptcy Rule 2002. Considering the nature of the relief requested herein, the Movant submits

that no other or further notice is necessary.

## NO PRIOR REQUEST

63.     No prior request for the relief sought herein has been made by Movant to this Court

or any other court.


*[Remainder of page intentionally left blank]*

WHEREFORE, for the foregoing reasons, Movant respectfully requests that this Court

enter an order directing the appointment of a Chapter 11 trustee in these Chapter 11 cases pursuant to

section 1104(a) of the Bankruptcy Code and Bankruptcy Rule 2007.1(a), and granting such other and

further relief as is just and proper.

Respectfully submitted by,

Dated: January 31, 2023

*Michelle D. DiVita*

**Michelle D. DiVita**
Minneapolis, Minnesota

# EXHIBIT A

## 3AC Acceleration Notice

DocuSign Envelope ID: F2A4F41C-BACF-45D4-991E-FEB4E7EA7978



808

June 24, 2022

**VIA ELECTRONIC MAIL**

THREE ARROWS CAPITAL LTD.
operations@threearrowscap.com

cc:    loan@tpscap.com

Re:    **Acceleration Notice and Notice of Event of Default**

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Master Loan Agreement, dated March 4, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and between Three Arrows Capital Ltd. ("Borrower"), Voyager Digital, LLC ("Voyager") and HTC Trading, Inc. (collectively, "Lender"), and Voyager, in its capacity as administrative agent for Lender ("Administrative Agent"), (ii) that certain Loan Refinance Term Sheet, dated May 12, 2022 (the "BTC Term Sheet"), by and between Borrower and Lender, pursuant to which Lender made a loan of 15,250 Bitcoin ("BTC") on an open/callable basis (the "BTC Open Loan"), and (iii) that certain Loan Refinance Term Sheet, dated May 13, 2022 (the "USDC Term Sheet"), between Borrower and Lender, pursuant to which Lender made a loan to Borrower of 350,000,000 USD Coin ("USDC") on an open/callable basis (the "USDC Open Loan").    Capitalized terms used herein but not specifically defined herein shall have the meanings ascribed to them in the Loan Agreement.

On June 13, 2022, at 3:13 p.m. (New York City time), Lender sent written notice to Borrower exercising the Callable Option with respect to the BTC Open Loan and recalling 1,250 BTC of the BTC Open Loan (the "Initial Recall Amount") in accordance with the terms of the Loan Agreement. Borrower failed to deliver the Initial Recall Amount to Lender when due by the Close of Business on June 15, 2022, which was the Recall Delivery Date with respect to the Initial Recall Amount.

On June 14, 2022, at 8:07 a.m. (New York City time), Lender sent written notice to Borrower exercising the Callable Option with respect to (i) the BTC Open Loan and recalling an additional 14,000 BTC of the BTC Open Loan and (ii) the USDC Open Loan and recalling 350,000,000 USDC of the USDC Open Loan (collectively, the "Second Recall Amount"), in each case, in accordance with the terms of Loan Agreement.    Borrower failed to deliver the Second Recall Amount to Lender when due by the Close of Business on June 16, 2022, which was the Recall Delivery Date with respect to the Second Recall Amount.

DocuSign Envelope ID: F2A4E41C-BACF-45D4-991E-FEB4E7EA7973

THREE ARROWS CAPITAL LTD.
June 24, 202
Page 2

**809**

    **NOTICE IS HEREBY GIVEN** to Borrower that as a result of Borrower's failure to deliver the Initial Recall Amount and the Second Recall Amount to Lender when due, one or more Defaults and Events of Default have occurred and are continuing under the Loan Agreement, including, without limitation, an Event of Default under Section X(e) of the Loan Agreement (the "Specified Event of Default").

    There also may be other Defaults or Events of Default that have occurred and are continuing.  The fact that such other Defaults or Events of Default are not specified herein shall not be construed as a waiver thereof or a waiver of the right to exercise any rights and remedies with respect thereto.  Lender continues to evaluate their response to the Specified Events of Default, and may, in its sole discretion, take any and all actions it may deem necessary for purposes of preserving and protecting the current value of the Collateral securing the Obligations.

    Notwithstanding any prior or contemporaneous discussions or understandings, Lender has not waived the Specified Events of Default or any other Defaults or Events of Default that may exist, nor does Lender have any obligation to waive, forebear from exercising their rights and remedies with respect to any Default or Event of Default (including without limitation, the Specified Events of Default).

    **FURTHER NOTICE IS HEREBY GIVEN to Borrower that, pursuant to Section XI(a) of the Loan Agreement, as a result of the occurrence of the Specified Event of Default, Lender hereby declares the principal of, and any and all accrued and unpaid interest and fees in respect of, the BTC Open Loan, the USDC Open Loan, all other Loans, and all other Obligations, whether evidenced by the Loan Agreement, by the BTC Term Sheet, by the USDC Term Sheet or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable. LENDER HEREBY DEMANDS that Borrower pay to Lender the full amount of the BTC Open Loan, the USDC Open Loan and all other Obligations outstanding under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet and the other Loan Documents (including, without limitation, all principal, interest, fees, expenses and charges accrued through the date of payment by 5:00 p.m. (New York City time) on June 24, 2022.**

    As of June 24, 2022, the total principal amount of the BTC Open Loan is 15,250 BTC and the total principal amount of the USDC Open Loan is 350,000,000 (in each case which do not include accrued interest, fees, expenses and charges payable under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet and the other Loan Documents).

    This demand for payment is issued to you pursuant to the notice provisions of the Loan Agreement and shall constitute an Acceleration Notice for all purposes under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet, and the other Loan Documents.  The Acceleration Date as referred to in the Loan Agreement shall be June 24, 2022.

DocuSign Envelope ID: F2A4E41C5BACF45D1991E-FEBME7EA7978

THREE ARROWS CAPITAL LTD.

June 24, 202

Page 3

810

Lender hereby further confirms by notice to Borrower that the BTC Open Loan, the USDC Open Loan and all other Loans (if any) outstanding under the Loan Agreement are hereby terminated and immediately due and payable pursuant to Section II(d) of the Loan Agreement.

Please be advised that Lender intends to collect the indebtedness due to it under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet and other Loan Documents and may exercise any and all rights and remedies available to it, including, without limitation, such rights and remedies as are granted pursuant to the terms of the Loan Documents. Nothing herein contained shall be deemed to be an election of remedies by Lender. The exercise by Lender of any of its rights and remedies under the Loan Documents shall not be deemed a waiver of or preclude the exercise of any other of its rights and remedies under the Loan Documents, or any rights and remedies at law or in equity (and all such rights and remedies are specifically reserved).

Nothing contained herein nor any delay or failure by Lender in exercising any rights or remedies under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet, the other Loan Documents, or applicable law with respect to the Specified Event of Default shall be deemed to: (i) constitute a waiver of the Specified Event of Default or any other Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet or any other Loan Document; (ii) constitute a waiver of any rights, claims, and remedies under the Loan Documents or applicable law; or (iii) constitute a course of dealing among the parties.

Lender hereby reaffirms that all rights and remedies of Lender at law, at contract, in equity, or otherwise arising under the Loan Agreement, the BTC Term Sheet, the USDC Term Sheet or the Loan Documents due to the occurrence and continuation of the Specified Event of Default are reserved.

Be advised that all money expended by Lender in accordance with the terms of the Loan Agreement and the other Loan Documents shall, as and to the extent provided in the Loan Agreement and the other Loan Documents, be added to the outstanding principal indebtedness secured by the Collateral, shall bear interest, and be subject to the payment of attorneys fees, costs and expenses as set forth in the Loan Agreement and the other Loan Documents.

[Signature page follows]

DocuSign Envelope ID: F2A4E41C-BACF-45D4-991E-FEB4E7EA797B

THREE ARROWS CAPITAL LTD.
June 24, 202
Page 4

811

Very truly yours,

VOYAGER DIGITAL, LLC, as Lender and
Administrative Agent

By: _____

Name:  Evan Psaropoulos

Title:  CCO


HTC TRADING, INC., as Lender

By: _____

Name:  Philip Eytan

Title:  Director

812

**THREE ARROWS CAPITAL, LTD**

**Annual Report**

December 31, 2020

# EXHIBIT B

## Redline of Customer Agreement

Customer Agreement

Updated ~~August 20~~January 7, ~~2021~~2022

In consideration of Voyager Digital, LLC, and its agents and assigns, which includes affiliated entities, ("Voyager") opening an account (the "Account") on your ("Customer") behalf, Customer represents and agrees to the terms and conditions set forth below (the "Customer Agreement"). For the avoidance of doubt, this Customer Agreement governs the relationship between Customer and Voyager exclusively as it relates to the services provided by Voyager as described herein. Any other services, now or in the future, provided by an affiliate of Voyager, whether in connection with the Account, or otherwise, unless specifically identified herein shall not be governed by this Customer Agreement. Customer understands that the Voyager trading platform (the "Platform") is operated by Voyager, together with certain of its affiliates (each, an "Affiliate" and together, the "Affiliates"), and may be accessed via website (the "Website") and mobile application (the "App").

CUSTOMER UNDERSTANDS THAT THE TERMS AND CONDITIONS OF THIS CUSTOMER AGREEMENT GOVERN ALL ASPECTS OF RELATIONSHIP WITH VOYAGER REGARDING CUSTOMER'S ACCOUNT. THE CUSTOMER WILL CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS CUSTOMER AGREEMENT BEFORE CHECKING THE BOX AND CLICKING CONTINUE UNDER "BY CREATING AN ACCOUNT, YOU ~~AGRE~~AGREE TO OUR TERMS" (WHICH ARE AVAILABLE BY CLICKING ON "TERMS" LINK (OR SIMILAR LINK). IF THE CUSTOMER HAS ANY QUESTIONS ABOUT ANY OF THE PROVISIONS IN THIS CUSTOMER AGREEMENT, THE CUSTOMER MAY EMAIL SUPPORT@INVESTVOYAGER.COM. THE CUSTOMER UNDERSTANDS THAT CLICKING CONTINUE UNDER "BY CREATING AN ACCOUNT, YOU AGREE TO OUR TERMS" IS THE LEGAL EQUIVALENT OF MANUALLY SIGNING THIS CUSTOMER AGREEMENT AND THE CUSTOMER WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. BY ENTERING INTO THIS CUSTOMER AGREEMENT, THE CUSTOMER ACKNOWLEDGES RECEIPT OF THE VOYAGER PRIVACY POLICY.

THE TRADING OF CRYPTOCURRENCY INVOLVES SIGNIFICANT RISK. BY ENTERING INTO THIS CUSTOMER AGREEMENT, THE CUSTOMER ACKNOWLEDGES RECEIPT OF THE VOYAGER RISK DISCLOSURE STATEMENT.

1.   Acceptance of Terms and Conditions

By using the Platform, Customer agrees to follow and be bound by this Customer Agreement, including, without limitation, the policies referenced herein. If Customer ~~understands that if they do~~does not agree to be bound by the terms of this Customer Agreement, ~~that they~~Customer should not access the Platform. Customer further understands that Voyager has the right to change and modify the terms and conditions of the Customer Agreement at any time in Voyager's sole discretion. If Voyager materially updates, modifies, or revises the Customer Agreement, Voyager will, at its discretion, post a revised copy of the Customer Agreement on the Website, or make it available through the App, as further detailed in Section 33 -

Miscellaneous. Other than as may be required pursuant to applicable law, Voyager shall have full discretion to determine when and how Voyager notifies Customer of changes to the Customer Agreement. All changes will be effective immediately. Customer understands that by continuing to use the Platform, accessing the Account, or utilizing the Services (as defined below) constitutes an act of acceptance with respect to any such changes.

2.    Capacity and Status; Eligibility

The Customer represents and warrants that Customer is of legal age under the laws of the state where the Customer resides and is authorized to enter into the Customer Agreement. Voyager reserves the right to assess or reassess at any time Customer's eligibility to maintain an Account and utilize the Platform. Without limiting the foregoing, by accessing the Platform and utilizing the Services, Customer acknowledges and understands that laws regarding financial instruments, which sometimes include Cryptocurrency (as defined below), may vary from state to state, and it is Customer's obligation alone to ensure that Customer fully complies with any law, regulation or directive, relevant to Customer's state of residency with regard to the use of the Platform and the Services. For the avoidance of doubt, the ability to open an Account and access the Platform does not necessarily mean that Customer's activities in connection therewith are legal under the laws, regulations or directives relevant to the Customer's state of residency. "Cryptocurrency" means any digital asset or digital currency that is available for trading or custody through the Services.

3.    U.S. Residents Only

The Information (as defined below), Platform, and associated Services are intended for U.S. residents only. They shall not be considered a solicitation to any person in any jurisdiction where such solicitation would be illegal. The products and services described on the Website and available through the Platform are offered only in jurisdictions where they may be legally offered. Neither the Website nor the App shall be considered a solicitation for, or offering of, any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal. Customer understands that Voyager, at Voyager's sole discretion, may accept unsolicited accounts from non-U.S. residents, depending on the country of residence and other factors.

4.    Account Opening; Applicable Laws and Regulations

To help the U.S. government better detect the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an Account. Customer understands that when the Customer opens an Account that Voyager will ask for the Customer's name, address, date of birth and other identifying information. Voyager may also ask for copies of the Customer's driver's license, passport or other identifying documents. The Customer understands that Voyager will take steps to verify the accuracy of the information the Customer provides to Voyager in connection with an Account opening. These verification procedures may, in Voyager's sole discretion, require that Customer verify certain information provided to Voyager or provide additional documentation to Voyager, including but not limited to providing bank

statements, social security number verification, bank account ownership verification, or liveness checks. Voyager will not open an Account or may restrict Customer's access to the Account and the Services at any time and in Voyager's sole discretion, but in any event until such time as all verification procedures have been completed to Voyager's satisfaction.

The Customer further understands that if the Customer attempts to access the Account from a jurisdiction subject to certain U.S. sanctions or if the Customer is ordinarily resident in such a jurisdiction, or if Voyager reasonably believes that the Customer is attempting such access or has become a resident in such a jurisdiction, Voyager may restrict the Account, and any pending orders may be cancelled. If this happens, the Customer understands that the Customer should contact support@investvoyager.com, and that the Customer may be asked to provide supplemental information as part of this process. The Customer further understands that the Customer must close all Accounts before establishing residency in any jurisdiction subject to U.S. sanctions.

5.    Account Funding; Regulatory Treatment

(A)  Customer Cash. Customer understands and acknowledges that ~~they~~Customer may arrange to deposit United States Dollars ("USD" or "Cash") into the Account. Cash deposited into the Customer's Account is maintained in an omnibus ~~fashion~~account at ~~a bank~~Metropolitan Commercial Bank (the "Bank"), which is a member of the Federal Deposit Insurance Corporation ("FDIC"). ~~Customer~~Voyager maintains an agreement with the Bank whereby the Bank provides all services associated with the movement of and holding of USD in connection with the provision of each Account. Therefore, each Customer is a customer of the Bank.  All U.S. regulatory obligations associated with the movement of, and holding of, USD in connection with each Account are the responsibility of the Bank.  For purposes of clarity, any services pertaining to the movement of, and holding of, USD are not provided by Voyager or its Affiliates. Cash in the Account is insured up to $250,000 per depositor ~~against the failure of~~by the FDIC ~~member bank~~in the event the Bank fails if specific insurance deposit requirements are met. FDIC insurance does not protect against the failure of Voyager or any Custodian (as defined below) or malfeasance by any Voyager or Custodian employee. Voyager ~~and the bank at which Customer Accounts are held are~~is not ~~members~~a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") or the Securities Investor Protection Corporation ("SIPC")~~,~~. and therefore ~~Customer~~Cash is not SIPC ~~-~~protected.

(B)  Customer Cryptocurrency Deposits. When Customer initiates a Cryptocurrency deposit (a "Cryptocurrency Deposit") into the Customer's Account, Customer is solely responsible for executing the Cryptocurrency Deposit properly and accurately. Voyager is not responsible for any Cryptocurrency until such time as such Cryptocurrency is successfully deposited into the relevant wallet address provided by Voyager to Customer as evidenced by such deposit appearing on the relevant block explorer for such deposit. Voyager is not responsible for any delays, losses or fees in connection with a Cryptocurrency Deposit and is not obligated to assist or support Customer in any fashion with respect to an unsuccessful Cryptocurrency Deposit or with respect to any issues that Customer may experience at a point in time prior to the successful completion of a Cryptocurrency Deposit; provided, however, that Voyager may, in its sole discretion, provide reasonable assistance to Customer in the event that a Customer requests

assistance in connection with an attempted, failed, erroneous, or otherwise incomplete Cryptocurrency Deposit, including ~~by~~but not limited to, those deposits sent by Customer to a Cryptocurrency wallet designated by Voyager for a different ~~digital asset~~type of Cryptocurrency than the Cryptocurrency being sent by Customer, whether or not such deposit is evidenced on the ~~Blockchain~~blockchain. Voyager does not guarantee that any such assistance will result in the successful completion or remediation of a Cryptocurrency Deposit or the recovery of any Cryptocurrency. Furthermore, subject to Voyager's sole discretion, Voyager may charge reasonable fees in connection with any such assistance upon recovery of Customer assets to Customer Account. Customer understands that a Cryptocurrency Deposit cannot be reversed once properly initiated.

(C)  Customer Cryptocurrency. Customer authorizes and instructs Voyager to hold Customer's Cryptocurrency (whether purchased on the Platform or deposited by Customer into the Account pursuant to the Cryptocurrency Deposit mechanics outlined above) on its behalf. Customer understands that Voyager may hold Customer's Cryptocurrency together with the Cryptocurrency of other Voyager customers in omnibus accounts or wallets. In addition, Customer understands and authorizes Voyager to delegate some or all custody functions to one or more Affiliates or third parties (which may include, but not be limited to exchanges and custodians) at Voyager's discretion (each a "Custodian"). Some or all custody functions provided by a Custodian may be performed, supported, or conducted in foreign jurisdictions, or conducted by Custodians domiciled, registered, or subject to the laws and regulations of foreign jurisdictions. Voyager will exercise reasonable skill and care in the selection, appointment, and periodic review of any such Custodian. Voyager will maintain true, complete and accurate records relating to Customer Cryptocurrency. Customer and Voyager understand that the legal treatment of Cryptocurrency is unsettled and disparate across different jurisdictions. In the event that Customer, Voyager or a Custodian become subject to an insolvency proceeding it is unclear how Customer Cryptocurrency would be treated and what rights Customer would have to such Cryptocurrency. How an insolvency court would categorize and treat Customer Cryptocurrency is a highly fact-dependent inquiry that necessarily depends upon the circumstances of each individual case. In addition, within the U.S. there is notably little case law addressing insolvency proceedings involving Cryptocurrency. As such, the law governing the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding remains largely unsettled. Voyager does not make any representation as to the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding whether in the U.S. or in any other jurisdiction. Customer explicitly understands and acknowledges that the treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict, including but not limited to Customer being treated as an unsecured creditor and/or the total loss of all Customer Cryptocurrency.

(D)  Consent to Rehypothecate. Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, <u>stake, arrange for staking,</u> or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any

period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk.

6.    Voyager Services

The Account is self-directed. The services offered by Voyager pursuant to this Customer Agreement include, but are not limited to (a) the ability to place various types of orders through the Platform with respect to Cryptocurrency, (b) participation in the Rewards Program (as defined below), and (c) such other programs, features, or services as Voyager may make available to Customer through the Platform from time to time (collectively, the "Services").

Customer appoints Voyager as Customer's agent for the purposes of (a) supporting Customer's activities with respect to the Services, (b) carrying out Customer's instructions to Voyager in accordance with the terms and conditions of this Customer Agreement, and (c) taking any action that Voyager reasonably and in good faith deems necessary or advisable to accomplish the purposes of this Customer Agreement.

Customer understands and acknowledges that Voyager is authorized at all times to place, withdraw, modify, suspend, cancel, terminate, or alter, in any fashion orders and transactions placed by Customer through the Platform, as well as take any and all other actions that Voyager deems appropriate or necessary in order to carry out Customer instructions.

7. Orders

(A)  Overview. Customer may place market orders through the Account in either USD amounts or in Cryptocurrency amounts. In addition to market orders, Customer may also place limit orders. A limit order may be "good till canceled" which means the order remains valid until (A) it is executed, or (B) Customer cancels the order. Customer understands that limit orders may not be executed at any particular time, or at all, if there is not sufficient trading at or better than the limit price that Customer specifies, and are good until Customer cancels them; provided, however, that Voyager has the right, in its sole discretion, to cancel any limit order, whether "good till canceled" or otherwise, that remains unexecuted for sixty (60) calendar days or if deemed a risk by Voyager. Customer understands that additional transaction and order types may be made available to Customer on the Platform from time to time as determined by Voyager in Voyager's sole discretion.

(B)  Sufficient Funds. To execute a purchase order for Cryptocurrency, Voyager requires that Customer's Account contain available funds equal to, but in most cases, greater than the purchase price of the Cryptocurrency plus any associated fees or commissions and that all payments for the purchase be made without set-off, counterclaim or deduction. Customer agrees that any purchase order accepted by Voyager (inadvertently or otherwise) without sufficient funds or Cryptocurrency in Customer's Account will be subject to liquidation at Customer's expense.

(C)  No Liability for Failure to Settle. Customer understands and agrees that Voyager is not responsible for any delay in the settlement of a transaction resulting from circumstances beyond

Voyager's reasonable control, or the failure of any other person or party (including Customer) to perform all necessary steps to enable the completion of a transaction.

(D)  Refusal to Allow USD Withdrawals. Voyager may refuse to allow a USD withdrawal from Customer's Account, when it deems it appropriate or necessary, in its sole discretion, including in the following instances: (1) Voyager believes that such refusal is necessary in order for Voyager to comply with its anti-money laundering compliance obligations, (2) the withdrawal would leave insufficient funds in the Account to pay for any unsettled transactions, (3) the amount of such withdrawal is equal to or greater than the sum of all USD deposits made into the Account within the immediately preceding sixty (60) days, or (4) the account ownership, naming convention, or other details associated with the withdrawal account, do not match the Account. Where Customer makes a deposit into the Account and effectuates one or more transactions thereafter, subsequent withdrawal requests may be subject to delays, holds, or limits, as determined by Voyager in its sole discretion.

(E)  Discretion to Decline Execution of or Cancel Orders. Voyager may, in its sole discretion, decline the execution of any order for any reason, including, but not limited to, the size of an order, market conditions, Customer breach of this Customer Agreement, actual, potential, or apparent violation of any applicable laws, rules or regulations, insufficient or inadequate funds in the Account (including all commission, charges, taxes and any amount in addition to the price of the Cryptocurrency that Voyager reasonably considers may be necessary), or any other appropriate risk considerations. If Voyager accepts an order and then an event takes place which means that it is no longer reasonable for Voyager, in its sole determination, to act on that order, Voyager will be entitled to disregard or cancel Customer's order and Voyager shall not have any liability to Customer as a result of such action. Voyager further reserves the right not to execute orders for Cryptocurrency or to close any open positions therein, without any further notice to Customer, in the following circumstances: (a) Customer order violates any applicable laws, rules, regulations, or appears intended to defraud or manipulate the market; (b) the existence of abnormal market conditions or a significant disruption in, or premature close of, trading in or of the underlying Cryptocurrency or the market or an exchange on which the underlying Cryptocurrency is traded; (c) Force Majeure (as defined in Section 15 - Information), or action by an exchange, regulatory or governmental authority that disrupts trading in the relevant security; or (d) Voyager is unable to obtain satisfactory liquidity in order to satisfy the order.

(F)  Trade Receipts. Voyager will prepare receipts outlining the details of orders and the corresponding transactions effected by a Customer through the Platform, in form and format as required pursuant to applicable law, rule or regulation (each, a "~~Trading~~Trade Receipt"). Voyager will deliver and make available Trade Receipts to Customer electronically, through the App, or otherwise, in Voyager's sole discretion.

(G)  Cancellations. Customer agrees that it is Customer's responsibility to review order execution confirmations and statements promptly upon receipt. Notwithstanding any other provision in this Agreement, ~~Trading~~Trade Receipts will be considered binding on Customer unless Customer notifies Voyager of any objections within two (2) hours from the time Trade ~~Confirmations~~Receipts are delivered. Customer understands that any objection that Voyager receives from Customer consistent with the immediately preceding sentence is simply a request

that Voyager attempt to cancel or modify an order. Voyager is not liable to Customer if Voyager is unable to cancel or modify an order. Customer understands and agrees that, if an order cannot be cancelled or modified, Customer is bound by any execution of the original order, even if Customer's objection to the transaction is ultimately determined to be valid.

(H)  No Guarantee Order Will be Filled. There is no guarantee that an order will be filled. An Order may fail to be filled or Voyager may, in its sole discretion, refuse to execute an order for any reason, including: (1) due to the failure, misuse, degradation, corruption, downtime, or unavailability of any Voyager or third party trading, communication or operations systems, (2) market volatility, (3) the existence, detection, or suspicion of unusual market, trading, or order activity, or (4) the existence, detection, or suspicion of fraud or any other activity that presents, or potentially presents to Voyager, in Voyager's sole discretion, any commercial, economic, or reputational risk. Where a delay in fulfilling an order occurs for any reason, Voyager will attempt to execute the order as soon as reasonably practicable.; provided that Voyager reserves the right to cancel a delayed order in the event of a material price fluctuation or for any other reason in accordance with this Customer Agreement. Voyager will not be liable or have any responsibility for any Losses (as defined below) suffered by Customer in connection with an order that is not filled or is erroneously filled.

(I)  Aggregation of Orders. Customer understands and acknowledges that Voyager may, in its sole discretion, aggregate Customer orders with the orders of other customers (a "Batched Order"). In such instances, a Customer order may not be placed or executed on a real-time basis, but rather batched with one or more orders from other Voyager customers. The price of a particular Cryptocurrency may be higher or lower at the time of execution of a Batched Order as compared to the time at which the Customer's original order was placed. A Batched Order may only partially fill, in which case some or part of the order is executed. In the event of a partial fill, Voyager will allocate the purchased Cryptocurrency or proceeds among the participating Customers in the Batched Order in a pro-rata fashion. A Batched Order may become fully executed through one or more partial fills, in which case the price of the relevant Cryptocurrency or amount of proceeds may change, or, for a variety of reasons, a Batched Order may only ever executebe executed partially. Voyager will not be liable or have any responsibility for any Losses suffered by Customer in connection with or as a result of a Customer order being included in a Batched Order.

(J)  Market Volatility. In the event of a market disruption or Force Majeure, Voyager may do one or more of the following: (a) suspend access to the Account; (b) prevent Customer from completing any and all actions via the Services, including closing any open positions in the Account; or (c) cease to follow any Customer instructions. Following any such event, when trading resumes, Customer acknowledges that prevailing market rates may differ significantly from the rates available prior to such event.

(K)  Suspension. If at any time any exchange, trading venue, or market suspends trading in any Cryptocurrency that forms the subject of a Customer order, then the applicable order may be suspended. In addition, Customer may not be able to sell any Cryptocurrency that Voyager holds on Customer's behalf or effectuate Withdrawals (defined in Section 8 – Cryptocurrency Withdrawals below) or USD withdrawals until such suspension is terminated and trading

recommences. Following the lifting of a suspension, outstanding orders with respect to the affected Cryptocurrency will be executed as and when Voyager is reasonably able to do so. Voyager cannot guarantee the price at which such orders will execute.

(L)  Delisting or Non-Supported Cryptocurrency. Voyager, at all times and in its sole and absolute discretion, determines the Cryptocurrencies available on the Platform. Voyager may, at any time and in its sole and absolute discretion, (i) remove or restrict the trading of a particular Cryptocurrency on the Platform, either completely or limit such removal or restriction to a particular jurisdiction, and (ii) determine the time and date on which trading should cease or be restricted. Customers shall generally receive not less than 30 days' notice, which notice shall be posted in the App, (see Section 23 – Consent to Electronic Delivery of Documents) regarding any such actions, unless Voyager determines in its sole and absolute discretion that immediate removal or restriction of such Cryptocurrency is appropriate and/or necessary due to legal, regulatory, compliance, reputational or similar concerns. If at any time any ~~of the~~ Cryptocurrency that forms the subject of a Customer order is delisted or Voyager no longer supports the trading in such Cryptocurrency for any reason, then the applicable order will be immediately closed. If Voyager is notified that a Cryptocurrency in Customer's Account is likely to be delisted or removed or canceled from one or more exchanges or trading venues, and Voyager reasonably believes that trading in the Cryptocurrency will be materially affected by such delisting, removal or cancellation, then Customer authorizes Voyager to attempt to sell the Cryptocurrency on Customer's behalf at such time and price, and in such manner, as Voyager may determine in its sole discretion (a "Delisting Sale"). Customer understands and agrees that Voyager is not obligated to engage in a Delisting Sale and will not be liable for any loss sustained by Customer during Voyager's attempt to execute a Delisting Sale.

(M) Position Limits. Customer understands and acknowledges that Voyager may impose trading and/or position or volume limits on Customer's Account ("Limits"). Limits are subject to change at any time in Voyager's sole discretion. In the event that Customer attempts to place an order or effect a transaction that would result in the breach of a particular Limit, Voyager may, in its sole discretion, refuse to act upon such instructions. Customers may request details regarding Limits by contacting Voyager at support@investvoyager.com.

(N)  No Leverage. Customer understands that Voyager does not offer leverage as part of the Services. For the avoidance of doubt each purchase of Cryptocurrency must be fully funded.

8.    Cryptocurrency Withdrawals

Customer may arrange to withdraw and transfer Cryptocurrency in the Account to an external wallet (such process, a "Withdrawal"). Voyager will effectuate a Withdrawal based upon Customer's written instructions; provided~~, however,~~ that Customer understands and agrees that Voyager may, in its sole discretion, delay, modify or prohibit, in whole or in part, any requested Withdrawal, including in instances where: (a) Voyager believes such action is prudent in order to satisfy Voyager's anti-money laundering obligations, (b) Voyager suspects that the Customer, the wallet address, or the Withdrawal itself are connected to, associated with, or being used in furtherance of potential fraud, (c) Customer is in violation of the Customer Agreement, (d) the Withdrawal is being attempted within sixty (60) days of a deposit of USD or Cryptocurrency into

the Account, or (e) outstanding fees are associated with the Account or the Account would, after the Withdrawal, have an insufficient balance to cover actual or anticipated fees. Customer understands that, once initiated on the network associated with the Cryptocurrency subject to the Withdrawal, a Withdrawal will typically be processed at the speed of such network, but that in certain situations, a Withdrawal may be delayed in connection with any latency, congestion, disruption, or other delay of such network. Customer understands that Voyager cannot reverse a Withdrawal that has been broadcast to a Cryptocurrency network. Customer also understands that Voyager reserves the right to cancel any pending Withdrawal as required by law or in response to a subpoena, court order, or other binding government order.

Customer understands that ~~they are~~Customer is exclusively responsible for ensuring that a Withdrawal is being made to the correct or intended wallet address. Withdrawals cannot be reversed once broadcast to the relevant Cryptocurrency network. Voyager will not be liable for any loss that results from inaccurate, incomplete, or misleading details that Customer may provide in connection with a Withdrawal. Voyager will not bear any liability for any failure, error or delay in processing a Withdrawal. Voyager may, in its sole discretion, provide reasonable assistance to Customer in the event that a Customer requests reasonable assistance in connection with an attempted, failed, or otherwise erroneous Withdrawal. Voyager does not guarantee that any such assistance will result in the successful completion or remediation of a Withdrawal or the recovery of any Cryptocurrency. Voyager may charge fees in connection with any such assistance. Customer understands that a Withdrawal cannot be reversed once properly initiated.

With respect to certain Cryptocurrencies on the Voyager Platform, the Services available to Customer may only include the ability to purchase or sell Cryptocurrencies, and may not permit the transfer or withdrawal of all or any part of the balance held in such Cryptocurrencies (a "Non-Supported Transfer Cryptocurrency"). The Cryptocurrencies that Voyager supports for transfer or withdrawal as part of the Services on the Platform may change from time to time, in Voyager's sole and absolute discretion. Customer acknowledges and agrees that, unless Voyager supports the Cryptocurrency for withdrawal and transfer, Customer will not be able to take possession of Cryptocurrencies. Accordingly, a Non-Supported Transfer Cryptocurrency may not be withdrawn or transferred from Customer Account to any wallet, address, storage device or the like, or exchange, brokerage, bank, staking platform, custodian or the like. Subject to other limitations set forth herein, Customer shall have the option to sell Customer's Non-Supported Transfer Cryptocurrencies on the Voyager Platform and withdraw all or any part of the balance (held in U.S. dollars) from Customer Account.

9.    Cryptocurrency Networks; Forks; Aidrops.

(A) Voyager does not own or control the underlying software protocols which govern the operation of a Cryptocurrency available for trading on the Platform. In general, the underlying protocols are open source and anyone can use, copy, modify, and distribute them. Voyager is not responsible for operation of the underlying protocols, and Voyager makes no guarantee of their functionality, security, or availability. The underlying protocols are subject to sudden changes in operating rules ("Forks"), and such Forks may materially affect the value, function, or even the name of the Cryptocurrency Voyager or its Custodian holds for Customer benefit. In the event of

a Fork or any other similar operational change to a Cryptocurrency network Voyager may take all steps that it determines necessary to protect the security and safety of the Platform, including temporarily suspending Voyager operations (with or without advance notice to Customer). Voyager will use its reasonable efforts to provide notice to Customer of its response to any Fork or similar operational change affecting a Cryptocurrency. In response to a Fork or other similar operational change, Voyager may determine not to support such Cryptocurrency on the Platform. Customer understands and accepts the risks of Forks and other similar operating changes to Cryptocurrency available through the Platform. Customer agrees that Voyager is not responsible for any loss of value that Customer may experience as a result, whether directly or indirectly, from any such Fork or similar operating change. Customer further acknowledges and accepts that Voyager has no obligation or responsibility to assist Customer with respect to any Cryptocurrency that Voyager determines not to support.

(B)  In the event that a Cryptocurrency network attempts to or does contribute (an "Airdrop") Cryptocurrency ("Airdropped Cryptocurrency") or any other similar event to a Cryptocurrency network, then Voyager may, in its sole discretion, take steps that it determines necessary to manage the Platform, including how and whether to incorporate Airdropped Cryptocurrency into the Platform, distribute it to Customer or do nothing, or such other action or inaction that Voyager deems appropriate in its sole discretion. Customer understands and accepts the risks of Airdrops and other similar events to a Cryptocurrency available through the Platform, and understands and agrees that ownership of a Cryptocurrency in the Voyager App for which an Airdrop is occurring on the date of such Airdrop does not in and of itself grant entitlement to or ownership of the Airdropped Cryptocurrency. Customer agrees that Voyager is not responsible for any loss of value that Customer may experience as a result, whether directly or indirectly, from any such Airdrop or similar event. Customer further acknowledges and accepts that Voyager has no obligation or responsibility to assist Customer with respect to any Cryptocurrency that Voyager determines not to support whether or not Voyager receives an Airdropped Cryptocurrency by virtue of its holding omnibus custody of the Cryptocurrency related to such airdrop. To the extent that Voyager is aware of the Airdrop, Voyager will use its reasonable efforts to provide notice to Customer of its response to any Airdrop. Voyager may, in its sole discretion, elect to: (1) subject to potential fees, support the Airdropped Cryptocurrency and update the Account as appropriate, (2) abandon or otherwise not pursue obtaining the Airdropped Cryptocurrency from the relevant network, (3) liquidate the Airdropped Cryptocurrency and distribute the proceeds to Customer or hold the funds in Customers Account for the benefit of Customer, (4) deliver the Airdropped Cryptocurrency to Customer within a time period as determined by Voyager in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Cryptocurrency (subject to the withholding and retention by Voyager of any amount reasonably necessary, as determined by Voyager in its sole discretion, to fairly compensate Voyager for the efforts expended to obtain and deliver such Airdropped Cryptocurrency to Customer), or (5) determine, in its sole discretion, that the Airdrop, although received by Voyager, does not have sufficient market support or sufficient value to warrant Voyager incorporating the Airdropped Cryptocurrency into the Platform in any way or distribute the Airdropped Cryptocurrency to its users.

10.  Rewards Program

By entering into this Customer Agreement, and subject to clause (F) of this Section 10, Customer understands, acknowledges and agrees that they are Customer is opting into the Voyager Rewards Earn Program (the "Rewards Program"). The Rewards Program allows Customer to earn in-kind payments of Cryptocurrency for maintaining additional Cryptocurrency of the same type kind of Cryptocurrency held in the(ir) Customer's Account (the "Rewards"). The terms and conditions governing the Rewards Program are as follows:

(A)  Overview. In addition to the broad rights granted to Voyager pursuant to Section 5(D), participants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise. Voyager provides Customer with the opportunity to earn Rewards based upon a number of factors, including but not limited to the amount of Cryptocurrency in the Customer's Account, whether there is market demand for the Cryptocurrency, the type of Cryptocurrency held, and the amount of time Customer holds Cryptocurrency in the Customer's Account. Other than in extenuating circumstances, the payment, non-payment, default, or reduction of a particular Loan will not affect Customer's Cryptocurrency. The Loans operate independently from the Rewards Program and to the extent that a particular Borrower defaults on a Loan, Customer will nonetheless remain able to access and withdraw Cryptocurrency consistent with the terms of this Section 10 Each Customer participating in the Rewards Program acknowledges and agrees that Voyager may rely on the consent to rehypothecate granted by each customer pursuant to Section 5(D) – Consent to Rehypothecate with respect to Cryptocurrency held in such Customer Account. Such consent to rehypothecate expressly includes allowing Voyager to (1) stake Cryptocurrency held in an omnibus fashion through various blockchain protocols (either by delegating Cryptocurrencies to the financial institutions which, in return, stake such Cryptocurrencies or using staking service providers to stake Cryptocurrencies); and (2) lend such Cryptocurrency to various institutional third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Voyager enters into these Loans as principal and independently negotiates with each Borrower the terms of a Loan, but these Loans are generally unsecured, for a fixed term of less than one year or can be repaid on a demand basis, and provide a fee payable in Cryptocurrency based on the percentage and denominated in the Cryptocurrency lent. Voyager selects which and how much Cryptocurrencies are available for such staking and lending.

(B)  How Rewards Are Calculated. Rewards earned on Cryptocurrency are variable. Voyager will typically publish anticipated Rewards reward rates once per month on or before the first business day of each month. Rates Reward rates may be tiered, with specified rates in effect at any time only applied to specified portions of amounts of Cryptocurrency held in the Account. Rewards will be payable in arrears and added to the Account on or before the fifth business day of each calendar month for the prior calendar month. Voyager uses the daily balance method to calculate the Rewards on the Account. This method applies a daily periodic rate to the specified principal in the Account each day. The daily periodic rate is calculated by dividing the applicable interest rate by three hundred sixty-five (365) days, even in leap years. Voyager will determine the Reward rates and tiers for each month in Voyager's sole discretion, and Customer

acknowledges that such ~~rates~~Rewards may not be equivalent to benchmark interest rates observed in the market for bank deposit accounts.

(C)  How Rewards Are Paid. Rewards will be credited to the Account within five (5) business days following the end of each calendar month. The Account must be open on such date in order to receive this ~~Rewards~~ payment of Rewards. All Rewards will be paid in Cryptocurrency. Once Rewards have been credited to the Account, Customer may earn Rewards on such Cryptocurrency in future months. Rewards will be paid in kind (i.e., in the type of Cryptocurrency that is ~~earning Rewards). The payment, non-payment, default, or reduction of a particular Loan will not affect whether or not Rewards are paid. The Loans operate independently from the Rewards Program and to the extent that a particular Borrower defaults on a Loan, Customer will nonetheless earn and be paid Rewards consistent with the terms of this Section 10~~held in the Account).

(D)  Withdrawals. Customer may request a Withdrawal at any time, consistent with the mechanics outlined in Section 8 – Cryptocurrency Withdrawals. However, for Customers in the Rewards Program, Withdrawals may be delayed, or in some instances subject to partial completion. Customer understands and acknowledges that Customer may only be able to earn Rewards to the extent that Customer satisfies certain minimum Cryptocurrency balance requirements ("Minimum Balance"). Voyager will publish Minimum Balance details on the Platform. Minimum Balance details are subject to change at any time. If a Withdrawal results in a particular Cryptocurrency balance in Customer's Account falling below a Minimum Balance, then Customer will not earn Rewards with respect to such Cryptocurrency.

(E)  REWARDS PROGRAM RISKS. Participating in the Rewards Program may put Customer's Cryptocurrency at risk.

(1)  ~~By virtue of entering into a commercial arrangement such as this Customer Agreement,~~Voyager will use Customer's Cryptocurrency to engage in staking and lending activities. Loans made by Voyager may not be secured. Customer ~~is exposed~~has exposure to ~~potential~~both Voyager's and each Borrower's credit risk. ~~By participating in~~In the ~~Rewards Program Customer's~~event of a Borrower default, Voyager does not have an obligation or the ability to return affected Cryptocurrency ~~may be at increased risk of loss~~back to Customer's Account.

(2)  Loans may not be secured. Cryptocurrency subject to ~~a Loan~~all lending activity or certain staking activity delegated to a third party financial institution will not be held by Voyager or ~~the~~its Custodians. Customer understands and acknowledges that Voyager is not responsible for any Cryptocurrency that Voyager does not itself hold or that is not held with one of its Custodians.

(3)  The Rewards Program and Voyager's underlying ~~Loans~~staking and lending activities are not insured.

(4)  ~~Voyager may, at any time and in its sole and absolute discretion, remove or restrict the trading of a particular Cryptocurrency on the Platform which may result in necessary adjustments to the Rewards Program, including but not limited to Customer no longer being able to earn Rewards with respect to such Cryptocurrency, or resulting in earned but unpaid Rewards being extinguished.~~

(~~5~~)  Customer understands each of the aforementioned risks and accepts the risk of loss associated with participating in the Rewards Program up to, and including, total loss of all Customer Cryptocurrency.

(F)  Opt Out. Customer may opt-out of the Rewards Program at any time by ~~following the instructions~~doing so in the App. ~~A request to opt-out of the Rewards Program will be effective on the following business day.  Upon the effectiveness of an opt-out, Customer will be credited with the amount of Rewards earned but not yet paid out.  Such amounts will be deposited to Customer's Accounts promptly following the end of the applicable month.~~

CUSTOMER UNDERSTANDS AND ACKNOWLEDGES THAT EVEN IF CUSTOMER OPTS OUT OF THE REWARDS PROGRAM, CUSTOMER WILL REMAIN SUBJECT TO THE TERMS OF SECTION 5 – ACCOUNT FUNDING; REGULATORY TREATMENT. THEREFORE, EVEN IF CUSTOMER DOES NOT PARTICIPATE IN THE REWARDS PROGRAM, CUSTOMER CRYPTOCURRENCY WILL STILL BE SUBJECT TO BEING HELD BY CUSTODIANS, WHICH MAY BE: (1) LOCATED WITHIN THE U.S. OR IN A FOREIGN JURISDICTION OR (2) HELD IN VOYAGER'S NAME OR OTHERWISE, OR (3) PLEDGED, REPLEDGED, HYPOTHECATED, SOLD, LOANED, STAKED OR OTHERWISE TRANSFERRED AT CUSTOMER'S SOLE RISK AND IN VOYAGER'S SOLE DISCRETION.

11.  Account Termination

(A)  Termination by Customer. Customer may request to close or terminate the Account at any time by notifying Voyager Support at support@investvoyager.com and requesting in writing that their Account be closed. Closing the Account will not affect any rights and obligations incurred prior to the date of Account closure. Upon the termination of the Account, Customer authorizes Voyager to immediately settle all outstanding transactions in the Account and liquidate outstanding positions in the Account, as necessary. Customer shall be required to provide transfer instructions with respect to USD or Cryptocurrency remaining in the Account. Customer understands and agrees that ~~they are~~Customer is responsible for any fees, costs, expenses, charges, or obligations (including, but not limited to, attorney and court fees or transfer costs of funds or Cryptocurrency) associated with closing the Account. In the event that the costs of closing the Account exceed the value in the Account, Customer will be responsible for reimbursing Voyager. Voyager may delay or refuse to terminate an Account, in instances it deems appropriate or necessary, in its sole discretion, including but not limited to, where: (a) Voyager believes such action is prudent in order to satisfy Voyager's anti-money laundering obligations, (b) Voyager suspects that the Customer is connected to, engaged in, or acting in furtherance of fraud, or potential fraud, (c) Customer is in violation of the Customer Agreement,

(d) termination is being attempted within sixty (60) days of a deposit of USD or Cryptocurrency into the Account, or (e) the Account has outstanding actual or anticipated fees or other charges against it (the "Voyager Hold Purposes").

(B)  Termination by Voyager. Customer agrees that, without notice, Voyager may terminate this Customer Agreement, suspend, restrict, limit or shutdown all or part of the Services, the Account, as well as Customer's access to the Platform, with or without cause at any time and effective immediately, whether for maintenance or otherwise. Voyager shall not be liable to Customer or any third party for the termination or suspension of the Services or Platform, or any claims related to such termination or suspension.

(C)  Effect of Termination. Upon termination or cancellation of the Account, Customer must provide Voyager with transfer instructions, together with all other information that Voyager may reasonably request, in order to transfer any remaining Cryptocurrency out of the Account. All such transfers must be completed within ninety (90) days following Account deactivation or cancellation. Voyager may delay or refuse to effectuate such a transfer or termination, in instances it deems appropriate or necessary, in its sole discretion, including, but not limited to, the Voyager Hold Purposes described in Section 11(A) above. If Cryptocurrency is not transferred out of the Account within ninety (90) days of the termination or cancellation of the Account, Customer hereby agrees that Voyager is permitted to sell any remaining Cryptocurrency on the open market at the prevailing market price and return the proceeds (less any damages, fee, costs, or other obligations to which Voyager is entitled) to any valid bank account linked to the Account.

12.  Customer Representations, Warranties and Responsibilities

Customer represents, warrants, and/or acknowledges, as applicable, as of the date of this Customer Agreement, and on each date that the Customer utilizes the Services:

(A)  Self-Directed Account. Customer understands and acknowledges that the Account is self-directed, and that Customer is solely responsible for any and all orders placed in the Account. Customer understands that ~~they are~~Customer is fully responsible for safeguarding Customer's ~~Login Credentials~~login credentials and that Customer is responsible for any trade placed through, originating from, or associated with the Account whether placed by Customer or another third-party as a result of Customer's failure to safeguard the ~~Login Credentials~~login credentials. Customer represents that all orders entered by Customer through the Account are unsolicited and based upon Customer's decisions.

(B)  Investment Advice. Customer understands that Voyager, together with its affiliates, ~~do~~does not provide recommendations or any investment advice. Customer represents that ~~they have~~Customer has not received any investment advice from Voyager, or its affiliates, and does not expect to receive any investment advice from Voyager or any of its affiliates. Customer understands and agrees that under no circumstances will Customer's use of the Platform or Account be deemed to create a relationship that includes the provision of or tendering of investment advice.

(C)  Research Materials. To the extent that research materials or similar information is made available through the Platform, the Customer understands that these materials are intended for information and educational purposes only and they do not constitute a recommendation to enter into any transactions or to engage in any investment strategies.

(D)  Anti-Money Laundering. Customer represents and warrants to Voyager that ~~they are~~Customer is not: (a) located in, under the control of, or a national or resident of any country to which the United States has embargoed goods or services, (b) identified as a "Specially Designated National," (c) placed on the Commerce Department's Denied Persons List, and (d) a person who is subject to any law, regulation, or list of any government authority (including, without limitation, the U.S. Office of Foreign Asset Control list) that would prohibit or limit Voyager's ability to conduct business with Customer. Customer further represents and warrants that ~~they~~Customer will not use the Platform if the laws of Customer's country or jurisdiction prohibit Customer from doing so in accordance with this Agreement.

(E)  Customer Information. Customer: (i) certifies that the information contained in this Customer Agreement, the Account application, and any other document that Customer furnishes to Voyager in connection with the Account is complete, true, and correct; (ii) authorizes Voyager to contact any individual or firm noted on documents provided to Voyager and any other normal sources of debit or credit information; (iii) authorizes anyone so contacted to furnish such information to Voyager as Voyager may request; and (iv) agrees that this Customer Agreement, the Account application, and any other document Customer furnishes in connection with the Account is Voyager's property. Customer shall promptly advise Voyager of any changes to the information in such agreements and documents in writing within ten (10) calendar days. Customer authorizes Voyager to obtain reports and provide information to others concerning Customer's creditworthiness and business conduct. Upon Customer request, Voyager agrees to provide Customer a copy of any report so obtained. Voyager may retain this Customer Agreement, the Account application, and all other such documents and their respective records at Voyager's sole discretion. Customer understands that Voyager may take steps to verify the accuracy of the information Customer provides to Voyager in the Voyager Account application or otherwise, including by directly or indirectly making any inquiries Voyager considers necessary to verify Customer identity or protect against fraud and that Voyager may restrict Customer access to the Account or take other action Voyager reasonably deems necessary pending such verification.

(F)   Risks. The Customer understands that all investments involve risk, that losses may exceed the principal invested, and that the past performance of a Cryptocurrency, industry, sector, market, or financial product does not guarantee future results or returns. Customer further understands that there are risks associated with utilizing an internet-based trading system including, without limitation, the failure of hardware, software and internet connections as well as the risk of malicious software introductions.

(G)  Assistance by Voyager. Customer understands that when Customer requests assistance from Voyager or Voyager employees in using the tools available on the Website or the App, it will be limited to an explanation of the tool's functionality and, if requested by Customer, to the entry by Voyager or Voyager or its affiliates employees of variables provided by Customer, and that such

assistance does not constitute investment advice, a recommendation, an opinion with respect to the suitability of any transaction, or solicitation of any orders.

(H)  Unavailability in Certain Jurisdictions. Customer understands that the Service is not provided to, and may not be used by, any person in any jurisdiction where the provision or use thereof would be contrary to applicable laws and regulations. Voyager is not available in all jurisdictions. Customer agrees to refrain from using the Service if Customer begins to reside in a jurisdiction where the Service would violate any of the laws and regulations of such jurisdiction. Customer will not provide incorrect information about Customer's address, residency or domicile and will immediately inform Voyager if there is any change to previously provided information.

(I)  No Tax or Legal Advice. Customer understands that neither the Customer Agreement or any other document or communication received from Voyager shall be construed as providing any legal, accounting, estate, actuary, or tax advice. Customer agrees to review publicly available information regarding the Customer's positions in the Account, Account statements and Trade Confirmations. Customer must rely upon its own representatives, including its own legal counsel and accountant, as to legal, tax and related matters concerning any of Customer's activities with respect to the Account, including any assets or transactions in the Account and for preparation of any legal, accounting or tax documents.

13.  Risk Disclosure Statement

Customer represents that they have read and understands the Voyager Cryptocurrency Disclosure Statement, available at https://www.investvoyager.com/riskdisclosure/.

14.  Limited License; Restrictions; Related Terms

(A)  Limited License. Subject to the registration and eligibility requirements and the terms and conditions set forth herein, Voyager hereby grants to Customer a limited, non-exclusive and non-transferable license to (i) download the App from an authorized application store and install and use the App in accordance with this Customer Agreement and any and all other documentation governing the use of the App, and (ii) use the Services, made available in or otherwise accessible through the App.

(B)  Restrictions. Customer will not: (i) copy the App, except as expressly permitted by this license; (ii) modify, translate, adapt, or otherwise create derivative works or improvements, whether or not patentable, of the App; (iii) reverse engineer, disassemble, decompile, decode, or otherwise attempt to derive or gain access to the source code of the App or any part thereof; (iv) remove, delete, alter, or obscure any trademarks or any copyright, trademark, patent, or other intellectual property or proprietary rights notices from the App, including any copy thereof; (v) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the App, or any features or functionality of the App, to any third-party for any reason, including by making the App available on a network where it is capable of being accessed by more than one device at any time; or (vi) remove, disable, circumvent, or otherwise create or implement

any workaround to any copy protection, rights management, or security features in or protecting the App.

(C)  Related Terms. Customer acknowledges and agrees that the App is provided under license, and not sold, to Customer. Customer does not acquire any ownership interest in the App under this Customer Agreement, or any other rights thereto other than to use the App in accordance with the license granted, and subject to all terms, conditions, and restrictions, under this Customer Agreement. Voyager and its licensors reserve and shall retain their entire right, title, and interest in and to the App, including all copyrights, trademarks, and other intellectual property rights therein or relating thereto, except as expressly granted to Customer in this Customer Agreement. Customer acknowledges that when Customer downloads, installs, or uses the App, Voyager may use automatic means (including, for example, cookies and web beacons) to collect information about Customer's Mobile Device (as defined below) and about Customer's use of the App. Customer also may be required to provide certain information as a condition for downloading, installing, or using the App or certain of its features or functionality. All information Voyager collects through or in connection with the App is subject to Voyager's Privacy Policy. By downloading, installing, using, and providing information to or through the App, Customer consents to all actions taken by Voyager with respect to Customer information in compliance with the Privacy Policy. Voyager may, from time to time, in its sole discretion, develop and provide App updates, which may include upgrades, bug fixes, patches, other error corrections, and/or new features (collectively, including related documentation, "Updates"). Updates may also modify or delete in their entirety certain features and functionality. Customer agrees that Voyager has no obligation to provide any Updates or to continue to provide or enable any particular features or functionality. Based on Customer's Mobile Device settings, when Customer's Mobile Device is connected to the internet either (i) the App will automatically download and install all available Updates; or (ii) Customer may receive notice of or be prompted to download and install available Updates. Customer shall promptly download and install all Updates and acknowledge and agree that the App or portions thereof may not properly operate should Customer fail to do so. Customer further agrees that all Updates will be deemed part of the App and be subject to all terms and conditions of this Customer Agreement. Customer acknowledges and agrees that, in order to use certain features and functions of the App, including the ability to purchase and sell Cryptocurrency, Customer must have and maintain an active Account. In addition, Customer acknowledges and agrees that Customer may not be able to access all or some of the Services through the App outside of jurisdictions where Voyager is approved to conduct business. Customer acknowledges and agrees that Voyager may suspend or terminate, at any time and without notice to Customer, Customer's license to download, install, and use the App, and to access and use Services through the App.

15. Information

The Platform and Services may include and make available certain Information. "Information" includes, without limitation, market data, various analytical tools (such as price quotes, exchange rates, news, headlines and graphs), links to other websites, newsletters and other information ("Third Party Information") provided by third parties (each, a "Third Party" and collectively, the "Third Parties"). By making Information available through the Platform, neither Voyager nor any of its Affiliates endorse, represent, warrant, guarantee, sponsor or otherwise are responsible for

the accuracy, correctness, timeliness, completeness or suitability of such Information. Information is provided solely for the Customer's personal and noncommercial use. Customer understands that Voyager is not required to continue to provide or update any Information and that Voyager may cease to provide such Information at any time. For the avoidance of doubt, Voyager is not responsible for the termination, interruption, delay or inaccuracy of any Information. Customer undertakes not to enable deep linking or any other form or re-distribution or re-use of the Information. None of the Information may be redistributed or used for any purpose other than with respect to the Services, including, without limitation, any trading activity outside of the Platform and the Services. In addition, certain Third Parties may impose additional restrictions and rules with respect to the use of Third Party Information, the terms of which are available on the relevant Third Party websites.

Third Party Information may also include links to other websites or resources. Customer acknowledges and agrees that neither Voyager nor the Third Parties are responsible for the availability of such external sites or resources. Voyager and the Third Parties do not endorse and are not liable for any content, advertising, products, or other materials on or available through such sites or resources.

Voyager does not prepare, edit, or endorse Third Party Information. Voyager does not guarantee the accuracy, timeliness, completeness or usefulness of Third Party Information, and is not responsible or liable for any content, advertising, products, or other materials on or available from third party sites. Customer will not hold Voyager and/or any Third Party liable in any way for (a) any inaccuracy of, error or delay in, or omission of the Information; or (b) any loss or damage arising from or occasioned by (i) any error or delay in the transmission of such Information; (ii) interruption in any such Information due either to any negligent act or omission by any party to any "Force Majeure" (e.g., flood, extraordinary weather conditions, earthquake or other act of God, fire, war, insurrection, epidemic, pandemic, riot, labor dispute, accident, action of government, communications or power failure, equipment or software malfunction); (iii) to any other cause beyond the reasonable control of Voyager and/or Third Party; or (iv) non-performance.

16.  Third Party Services

Voyager may, at Voyager's sole discretion, arrange for certain actions on the Platform to be performed by or through certain Third Parties. In addition, Customer may be made aware of, or offered, additional services, content, features, products, non-Voyager applications, offers and promotions provided through Third Parties ("Third Party Services"). Voyager's inclusion or promotion of Third Party Services on the Platform does not reflect a sponsorship, endorsement, approval, investigation, verification and certification or monitoring of such Third Party Services by Voyager. Customer's acquisition of Third Party Services, and any exchange of data between Customer and any provider of Third Party Services, is solely between Customer and such Third Party. Customer chooses to use any Third Party Services at Customer's own risk, and under terms and conditions agreed between Customer and such Third Party. Customer further acknowledges that Voyager has no control over Third Party Services and that Customer may be charged fees by the Third Party Service provider. Voyager is not responsible for any Third Party Services' fees. Customer is solely responsible for the use of any Third Party Service, and

Customer agrees to comply with all terms and conditions applicable to any Third Party Service when using such.

17. Prohibited Use

In connection with Customer's use of the Services, Customer agrees and represents that it will not engage in any Prohibited Business or Prohibited Use (each as defined below). Voyager reserves the right to cancel or suspend an Account or block transactions or freeze funds or Cryptocurrency immediately and without notice if Voyager determines, in its sole discretion, that an Account is associated with a Prohibited Use or a Prohibited Business.

(A)  Prohibited Use. Without express written consent from Voyager and compliance with applicable laws and regulations, Customer may not use an Account to engage in the following categories of activity ("Prohibited Uses"). Each of the below examples are representative, but not exhaustive. If at any time Customer is uncertain as to whether or not Customer's use of the Services involves a Prohibited Use, or if Customer has any questions about how these requirements apply, please contact Voyager at support@investvoyager.com. By opening an Account, Customer confirms that it will not use an Account to do any of the following:

(1)  Investment Activity. Make statements as to Customer's eligibility to provide investment advice, portfolio management or any other services or activities which may require a license, registration or notification in the state where the Customer is resident or the state where other Customers are resident.

(2)  Endorsements. Make statements that Voyager or its Affiliates endorse, maintain any control or guarantee the accuracy or completeness of any information published, posted or shared by Customer with other Customers.

(3)  Unlawful Activity. Activity which would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Voyager conducts business, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information.

(4)  Abusive Activity. Actions which impose an unreasonable or disproportionately large load on Voyager's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to the Platform that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to the Platform, other Customers' Accounts, computer systems or networks connected to the Platform, through password mining or any other means; use Account information of another party to access or use the Platform; or transfer Customer's Account access or rights to Customer's Account to a third party, unless by operation of law or with the express permission of Voyager.

(5)   Circumvention and Reverse Engineering. Unlawfully access or attempt to gain access, reverse engineer or otherwise circumvent any security measures that Voyager has applied to the Services or the Platform.

(6)   Abusive Trading Techniques. Utilize trading strategies aimed at exploiting errors in prices or concluding trades at off-market prices, or taking advantage of internet delays (such a scalping or sniping), including, without limitation, entering into transactions or combinations of transactions which taken together or separately are for the purpose of manipulating the Platform and the Services.

(7)   Abuse Other Customers. Interfere with another individual's or entity's access to or use of any Services; defame, abuse, extort, harass, stalk, threaten or otherwise violate or infringe the legal rights (such as, but not limited to, rights of privacy, publicity and intellectual property) of others; incite, threaten, facilitate, promote, or encourage hate, racial intolerance, or violent acts against others; harvest or otherwise collect information from the Platform about others, including without limitation, email addresses, without proper consent.

(8)   Fraud: Activity which operates to defraud Voyager, Voyager customers, or any other person; provide any false, inaccurate, or misleading information to Voyager.

(9)   Gambling: Lotteries; bidding fee auctions; sports forecasting or odds making; fantasy sports leagues with cash prizes; internet gaming; contests; sweepstakes; games of chance.

(10)   Intellectual Property Infringement: Engage in transactions involving items that infringe or violate any copyright, trademark, right of publicity or privacy or any other proprietary right under the law, including, without limitation, sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder; use of Voyager intellectual property, name, or logo, including, without limitation, use of Voyager trade or service marks, without express consent from Voyager or in a manner that otherwise harms Voyager or the Voyager brand; any action that implies an untrue endorsement by or affiliation with Voyager.

(11)   Competition: Utilize confidential information received by Customer from Voyager or Third Party to develop a service that competes with the Services, or the services of any of Voyager's Affiliates.

(B)   Prohibited Business. In addition to the Prohibited Uses described above, the following categories of businesses, business practices, and sale items are barred from the Services ("Prohibited Businesses"). Most Prohibited Businesses categories are imposed by law as well as card networks, the requirements of Voyager's banking providers or processors. The specific types of use listed below are representative, but not exhaustive. If Customer is uncertain as to whether or not Customer's use of the Services involves a Prohibited Business, or if Customer has any questions about how these requirements apply, please contact Voyager support@investvoyager.com. By opening an Account, Customer confirms that Customer will not use the Services in connection with any of the following businesses, activities, practices or items:

(1)   Intellectual Property or Proprietary Rights Infringement: Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder.

(2)   Counterfeit or Unauthorized Goods: Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen.

(3)   Drugs and Drug Paraphernalia: Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs.

(4)   Pseudo-Pharmaceuticals: Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local or national regulatory body.

(5)   Substances Designed to Mimic Illegal Drugs: Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom).

(6)   Multi-level Marketing: Pyramid schemes, network marketing, and referral marketing programs.

(7)   Unfair, Predatory or Deceptive Practices: Investment opportunities or other services that promise high rewards; Sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that Voyager determines, in its sole discretion, to be unfair, deceptive, or predatory towards consumers.

(8)   High Risk Businesses: Any businesses that Voyager believes poses elevated financial risk, legal liability, or violates card network or bank policies.

18. Privacy

By accessing the Platform and using the Services, Customer is consenting to having Customer's personal data transferred to and processed by Voyager. For information about how Voyager collects, uses, shares and otherwise processes information Customer information, please see Voyager's Privacy Policy.

By entering into this Customer Agreement, Customer acknowledges receipt of the Privacy Policy, which may be amended from time to time by posting a new version to the Website, or as made available through the App.

19.  State License Disclosures

Voyager maintains various licenses to engage in money transmission activities. Voyager maintains licenses in each of the jurisdictions identified in the Voyager State License Disclosure, available here. By accessing the Platform and using the Services, Customer acknowledges receipt of the Voyager State License Disclosure.

20. Limitation of Liability; Indemnification

Customer agrees that the Customer's use of the Information, Services and Platform is provided by Voyager at the Customer's sole risk. The Platform, Services, Information, or any other information or features provided, or made available by, Voyager, any of its Affiliates, or any Third Party, including, without limitation, Third Party Services are provided on an "as is," "as available" basis without warranties of any kind, either express or implied, statutory (including, but not limited to, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), implied warranties arising from trade usage, course of dealing, course of performance, or the implied warranties of merchantability or fitness for a particular purpose or application, other than those warranties which are implied by and incapable of exclusion, restriction or modification under the laws applicable to the Customer Agreement.

THE CUSTOMER UNDERSTANDS AND AGREES THAT VOYAGER, ITS AFFILIATES, AND THEIR RESPECTIVE PARTNERS, MANAGING DIRECTORS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, AND THIRD PARTY PROVIDERS WILL NOT BE LIABLE TO THE CUSTOMER OR TO THIRD PARTIES UNDER ANY CIRCUMSTANCES, OR HAVE ANY RESPONSIBILITY WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, TRADING LOSSES, AND DAMAGES) THAT THE CUSTOMER MAY INCUR IN CONNECTION WITH THE CUSTOMER'S USE OF THE SERVICES (INCLUDING BUT NOT LIMITED TO THIRD PARTY SERVICES) OR THE PLATFORM PROVIDED BY VOYAGER UNDER THE CUSTOMER AGREEMENT. VOYAGER, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS SHALL NOT BE LIABLE BY REASON OF DELAYS OR INTERRUPTIONS OF INFORMATION, THE PLATFORM OR SERVICES (INCLUDING BUT NOT LIMITED TO THIRD PARTY SERVICES) OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF VOYAGER'S, ITS AFFILIATES, OR THIRD PARTY SYSTEMS, REGARDLESS OF CAUSE, INCLUDING, WITHOUT LIMITATION, THOSE CAUSED BY GOVERNMENTAL OR REGULATORY ACTION, THE ACTION OF ANY EXCHANGE OR OTHER SELF REGULATORY ORGANIZATION, OR THOSE CAUSED BY SOFTWARE OR HARDWARE MALFUNCTIONS.

Except as otherwise provided by law, Voyager, its Affiliates and their respective partners, directors, officers, employees or agents (collectively, "Indemnified Parties") shall not be liable for any expenses, losses, costs, damages, liabilities, demands, debts, obligations, penalties, charges, claims, causes of action, penalties, fines and taxes of any kind or nature (including, without limitation, legal expenses and attorneys' fees) (whether known or unknown, absolute or contingent, liquidated or unliquidated, direct or indirect, due or to become due, accrued or not accrued, asserted or unasserted, related or not related to a third party claim, or otherwise) (collectively, "Losses") by or with respect to any matters pertaining to the Customer Agreement, the Services, Information, or Third Party Services, except to the extent that such Losses are actual Losses and are determined by a court of competent jurisdiction or an arbitration panel in a final non-appealable judgment or order to have resulted solely from the Voyager's gross negligence or intentional misconduct. In addition, the Customer agrees that the Indemnified

Parties shall have no liability for, and the Customer agrees to indemnify, defend and hold harmless the Indemnified Parties from all Losses that result from: (i) any noncompliance by the Customer with any of the terms and conditions of the Customer Agreement or Third Party Services; (ii) any third-party actions related to the Customer's receipt and use of any Information, Third Party Services, other third party content, or other such information obtained through the Platform, whether authorized or unauthorized under the Customer Agreement; (iii) any third party actions related to the Customer's use of the Platform, Information, or Third Party Services; (iv) the Customer or the Customer's agent's misrepresentation or alleged misrepresentation, or act or omission; (v) Indemnified Parties following the Customer or the Customer's agent's directions or instructions, or failing to follow the Customer or the Customer's agent's unlawful or unreasonable directions or instructions; (vi) any activities or services of the Indemnified Parties in connection with an Account (including, without limitation, any technology services, reporting, trading, or research services); (vii) the occurrence of, and any Indemnified Parties' action or inaction with respect to, a Potential Fraudulent Event (as defined in paragraph 3 of Section 21 below); or (viii) the failure by any person not controlled by the Indemnified Parties and their Affiliates to perform any obligations to the Customer. Further, if the Customer authorizes or allows third parties to gain access to the Platform, Information or the Account, whether by virtue of Third Party Services or otherwise, the Customer will indemnify, defend and hold harmless Voyager, its Affiliates and its and their respective directors, officers, employees and agents against any Losses arising out of claims or suits by such third parties based upon or relating to such access and use. Voyager does not warrant against loss of use or any direct, indirect or consequential damages or Losses to the Customer caused by the Customer's assent, expressed or implied, to a third party accessing an Account or information, including, without limitation, access provided through any Third Party Service.

The Customer also agrees that Indemnified Parties will have no responsibility or liability to the Customer in connection with the performance or non-performance by any exchange, clearing organization, data provider, or other third party (including, but not limited to, other money services businesses, clearing firms, banks, liquidity providers, or market makers) or any of their respective agents or affiliates, of its or their obligations relative to any Cryptocurrency or other products. The Customer agrees that Indemnified Parties will have no liability, to the Customer or to third parties, or responsibility whatsoever for: (i) any Losses resulting from a cause over which Indemnified Parties do not have direct control, including, without limitation, the failure of mechanical equipment, hack, unauthorized access, theft, operator errors, government restrictions, force majeure, market data availability or quality, exchange rulings or suspension of trading; and (ii) any special, indirect, incidental, consequential, punitive or exemplary damages (including, without limitation, lost profits, trading losses and damages) that the Customer may incur in connection with the Customer's use of the Platform, and other services provided by Indemnified Parties under the Customer Agreement or in connection therewith.

CUSTOMER AGREES TO INDEMNIFY VOYAGER FOR ACTUAL, REASONABLE LEGAL COSTS AND EXPENSES DIRECTLY RELATED TO THE ACCOUNT THAT ARE A RESULT OF ANY REGULATORY INQUIRY, LEGAL ACTION, LITIGATION, DISPUTE, OR INVESTIGATION THAT ARISES OR RELATES TO CUSTOMER OR CUSTOMER'S USE OF THE ACCOUNT OR THE SERVICES. CUSTOMER UNDERSTANDS THAT, AS A RESULT, VOYAGER WILL BE ENTITLED TO CHARGE THE ACCOUNT FOR SUCH

COSTS WITHOUT NOTICE, INCLUDING LEGAL AND ENFORCEMENT RELATED COSTS THAT VOYAGER INCURS. ANY WITHHOLDING WILL LAST FOR A PERIOD OF TIME THAT IS REASONABLY NECESSARY TO RESOLVE ANY REGULATORY OR LEGAL ISSUE AT HAND, AND VOYAGER MAY PLACE ANY AMOUNTS GARNERED FROM CUSTOMER IN A SEPARATE ACCOUNT, AND WILL PAY TO CUSTOMER THE REMAINING BALANCE AFTER ANY NOTED ISSUE HAS BEEN RESOLVED. FURTHERMORE, CUSTOMER AGREES THAT WHERE SUCH ACTIONS RELATE TO A SPECIFIC ASSET IN THE ACCOUNT, THAT ASSET MAY NOT BE TRANSFERRED OUT OF THE ACCOUNT UNTIL THE MATTER IS RESOLVED.

21.  Electronic Access

Customer is solely responsible for keeping all Account numbers and CSI confidential and will not share this information with third parties. "CSI" shall mean all of the Customer's sensitive information regarding access to the Account, including the Customer's username, password, as well as any other information connected to Customer's two-factor authentication Account access methodology ("2-Factor Authentication"). Customer agrees and accepts full responsibility for monitoring and safeguarding the Accounts and access to the Accounts. Specifically, by using the Services, Customer represents and warrants to Voyager that Customer has installed and implemented appropriate means of protection relating to the security and integrity of the internet-connected device(s) that Customer uses to access the Platform and the Services and that Customer has taken appropriate action to protect such devices from viruses or other similar harmful or inappropriate materials, devices, information, or data. Customer further undertakes to protect Voyager from any wrongful transmission of computer or other viruses or similarly harmful or inappropriate materials or devices to the Platform.

CUSTOMER UNDERSTANDS AND ACKNOWLEDGES THAT THE USE OF 2-FACTOR AUTHENTICATION PROVIDES ADDITIONAL SECURITY AND PROTECTION AGAINST UNAUTHORIZED ACCOUNT ACCESS. FAILURE TO IMPLEMENT 2-FACTOR AUTHENTICATION EXPOSES CUSTOMER TO POTENTIAL SIGNIFICANT RISK, INCLUDING THE RISK OF UNAUTHORIZED ACCOUNT ACCESS AS WELL AS THE COMPLETE LOSS OF ALL FUNDS AND CRYPTOCURRENCY IN THE CUSTOMER ACCOUNT. IF CUSTOMER CHOOSES TO ACCESS THE ACCOUNT AND THE SERVICES WITHOUT 2-FACTOR AUTHENTICATION ENABLED IT SHALL DO SO AT ITS SOLE RISK AND SHALL BE SOLELY LIABLE FOR ANY LOSSES SUFFERED BY CUSTOMER OR VOYAGER IN CONNECTION WITH ANY UNAUTHORIZED ACCOUNT ACCESS, TAKEOVER, OR USE OF ANY KIND.

The Customer agrees to immediately notify Voyager in writing, delivered via e-mail and a recognized international delivery service, if the Customer becomes aware of: (i) any loss, theft, or unauthorized use of Customer CSI or Account numbers, including inability to utilize 2-Factor Authentication; (ii) any failure by the Customer to receive any communication from Voyager indicating that an order was received, executed or cancelled, as applicable; (iii) any failure by the Customer to receive an accurate written confirmation of an order, execution, or cancellation; (iv) any receipt by the Customer of confirmation of an order, execution or cancellation, which the Customer did not place; (v) any inaccurate information in or relating to the Customer orders,

trades, margin status, Account balances, deposits, withdrawals, securities positions or transaction history; or (vi) any other unauthorized use or access of the Customer Accounts.

Each of the events described above shall be deemed a "Potential Fraudulent Event." The use and storage of any information including the Account numbers, CSI, portfolio information, transaction activity, account balances and any other information or orders available on the Customer's wireless, web-enabled cellular telephone or similar wireless communications device (each, a "Mobile Device") or the Customer's personal computer is at the Customer's own risk and is the Customer's sole responsibility. The Customer represents that the Customer is solely responsible for and has authorized any orders or instructions appearing in, originating from, or associated with the Accounts, the Account numbers, the Customer username and password, or CSI. The Customer agrees to notify Voyager immediately after the Customer discovers any Potential Fraudulent Event, but in no event more than twenty-four (24) hours following discovery.

Upon the occurrence of a Potential Fraudulent Event or Voyager's suspicion that a Potential Fraudulent Event has occurred or is likely to occur, Voyager may amend or issue Customer new CSI, require Customer to change CSIs, and/or suspend or limit access to the Platform and Services. In the event that Customer is unable to access the Account due to the fact that they are unable, for any reason, to complete necessary 2-Factor Authentication, including because Customer is unable to access their Mobile Device, changed their telephone number, or otherwise, Customer may be unable to access the Account for an extended period of time. Voyager will provide Customer with reasonable assistance in an attempt to restore 2-Factor Authentication operability.

Upon request by Voyager, the Customer agrees to report any Potential Fraudulent Event promptly to legal authorities and to provide Voyager a copy of any report prepared by such legal authorities. The Customer agrees to cooperate fully with the legal authorities and Voyager in any investigation of any Potential Fraudulent Event and the Customer will complete any required affidavits promptly, accurately and thoroughly. The Customer also agrees to allow Voyager access to the Customer's Mobile Device, the Customer's computer, and the Customer's network in connection with Voyager's investigation of any Potential Fraudulent Event. The Customer understands that if the Customer fails to do any of these things the Customer may encounter delays in regaining access to the Account.

22. Electronic Signatures: Modifications to the Customer Agreement

The Customer agrees to transact business with the Voyager electronically. By electronically signing the Customer Agreement, the Customer acknowledges and agrees that such electronic signature is valid evidence of the Customer's consent to be legally bound by the Customer Agreement and such subsequent terms as may govern the use of the Platform. The use of an electronic version of any document fully satisfies any requirement that the document be provided to the Customer in writing. The Customer accepts notice by electronic means as reasonable and proper notice, for the purpose of any and all laws, rules and regulations. Customer understands that, if required by applicable law, or if Voyager decides in its sole discretion, Voyager may provide Customer with notices by other means, including emails linking to the Platform, other

emails, or text messages. The electronically stored copy of the Customer Agreement on the Website is considered to be the true, complete, valid, authentic and enforceable record of the Customer Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. The Customer agrees to not contest the admissibility or enforceability of Voyager's electronically stored copy of the Customer Agreement.

In addition, if the Customer requests other Services provided by Voyager that require the Customer to agree to specific terms and conditions electronically (through clicks or other actions) or otherwise, such terms and conditions will be deemed an amendment and will be incorporated into and made part of this Customer Agreement.

23.  Consent to Electronic Delivery of Documents

(A)  Consent. By agreeing to electronic delivery, the Customer is giving informed consent to electronic delivery of all Agreement Documents, as defined below, other than those the Customer has specifically requested to be delivered in paper form. "Agreement Documents" include notices, disclosures, current and future account statements, regulatory communications (such as prospectuses, proxy solicitations, and privacy notices), trade confirmations, tax-related documents, and any other information, documents, data, and records regarding the Account, the Customer Agreement (including, without limitation, amendments to the Customer Agreement), and the Services delivered or provided to the Customer by Voyager, and any other parties. The Customer agrees that the Customer can access, view, download, save, and print any Agreement Documents received via electronic delivery for the Customer's records.

(B)  Electronic Delivery System. The Customer acknowledges Voyager's primary method of communication with the Customer includes: (i) posting information on the Website, (ii) providing information via the App, (iii) sending email(s) to the Customer's email address of record, and, to the extent required by law, (iv) providing the Customer with notice(s) that will direct the Customer to the App or the Website where information can be read and printed. Unless otherwise required by law, Voyager reserves the right to post Agreement Documents on the Website without providing notice to the Customer. Further, Voyager reserves the right to send Agreement Documents to the Customer's postal or email address of record, or via the App or Website. The Customer agrees that all Agreement Documents provided to the Customer in any of the foregoing manners is considered delivered to the Customer personally when sent or posted by Voyager, whether the Customer receives it or not.

All e-mail notifications regarding Agreement Documents will be sent to the Customer's e-mail address of record. The Customer agrees to maintain the e-mail address provided to Voyager until the Customer provides Voyager with a new one. The Customer understands that e-mail messages may fail to transmit promptly or properly, including being delivered to SPAM folders. The Customer further understands that it is their sole responsibility to ensure that any emails from Voyager are not marked as SPAM. Regardless of whether or not the Customer receives an e-mail notification, the Customer agrees to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. If the Customer authorizes someone else to access the e-mail account provided to Voyager, the Customer agrees

to tell the authorized individual to share the Agreement Documents with the Customer promptly, and the Customer accepts the risk that they will see sensitive Account information. The Customer understands that if a work e-mail address or computing or communications device is used for Account access the employer or other employees may have access to the Agreement Documents.

Additionally, the Customer acknowledges that the internet is not a secure network and agrees that the Customer will not send any confidential information, including, without limitation, Account numbers or passwords, in any unencrypted e-mails. The Customer also understands that communications transmitted over the internet may be accessed by unauthorized or unintended third parties and agrees to hold Voyager and its Affiliates, and each Voyager's and ifs Affiliates' respective directors, officers, employees and agents harmless for any such access regardless of the cause.

The Customer agrees to promptly and carefully review all Agreement Documents when they are delivered and notify Voyager in writing within five (5) calendar days of delivery if there is objection to the information provided (or other such time specified in the Customer Agreement). If the Customer fails to object in writing within such time, Voyager is entitled to treat such information as accurate and conclusive. The Customer will contact Voyager to report any problems with accessing the Agreement Documents.

(C)  Costs. Potential costs associated with electronic delivery of Agreement Documents may include charges from internet access providers and telephone companies, and the Customer agrees to bear these costs. Voyager will not charge the Customer additional online access fees for receiving electronic delivery of Agreement Documents.

(D)  Revocation of Consent. Subject to the terms of the Agreement Documents, the Customer may revoke or restrict consent to electronic delivery of Agreement Documents at any time by notifying the Voyager in writing of the intention to do so. The Customer also understands that the Customer has the right to request paper delivery of any Agreement Document that the law requires Voyager to provide to the Customer in paper form. Voyager will not treat the Customer request for paper copies as a withdrawal of consent to electronic delivery of Agreement Documents. The Customer understands that if revoking or restricting consent to electronic delivery or requesting paper delivery of Agreement Documents, Voyager, in its sole discretion, may charge the Customer a reasonable service fee for the delivery of any Agreement Documents that would otherwise be delivered to the Customer electronically, restrict or close the Account(s), or terminate the Customer's access to the Platform in each case, in Voyager's sole discretion. The Customer understands that neither the revocation or restriction of consent, nor the request for paper delivery, nor Voyager's delivery of paper copies of Agreement Documents will affect the legal effectiveness or validity of any electronic communication provided while consent was in effect.

(E)  Duration of Consent. Customer consent to receive electronic delivery of Agreement Documents will be effective immediately and will remain in effect unless and until either the Customer or Voyager revokes it. In the event that Customer revokes such consent, Customer understands and acknowledges that Voyager may immediately terminate this Agreement. The

Customer understands that it may take up to three (3) business days to process a revocation of consent to electronic delivery, and that the Customer may receive electronic notifications until such consent is processed.

(F)   Hardware and Software Requirements. The Customer understands that in order to access the Platform, utilize the Services and receive electronic deliveries, the Customer must have access to a computer or Mobile Device, a valid e-mail address, and the ability to download such applications as Voyager may specify and to which the Customer has access. The Customer also understands that if the Customer wishes to download, print, or save any information, that the Customer must have access to a printer or other device in order to do so.

(G)  Consent and Representations. The Customer hereby agrees to have carefully read the above information regarding informed consent to electronic delivery and fully understand the implications thereof. Additionally, the Customer hereby agrees to all conditions outlined above with respect to electronic delivery of any Agreement Document. The Customer will maintain a valid e-mail address and continue to have access to the internet.

24.  Electronic Fund Transfers

(A)  Overview. Customer understands that the Account provides for certain electronic fund transfer ("EFT") capabilities. This Section applies solely with respect to EFTs. Customer understands and agrees that Customer's use of any EFT function is subject to the disclosures set forth in Section 24 – Electronic Fund Transfers, and Customer acknowledges that they have received and reviewed such disclosures.

(B)  Customer Liability. Customer agrees to contact Voyager immediately if Customer believes an EFT has been initiated without Customer's permission. Also, in the event that an Account Statement shows an EFT transfer that Customer did not make, Customer agrees to contact Voyager promptly but in any event within 60 days after the Account Statement is made available to Customer. The longer Customer waits to notify Voyager of any unauthorized EFT the more likely it is that Customer will be unable to obtain any lost funds.

(C)  Contact Information. In the event of an unauthorized EFT Customer should contact Voyager Support.

(D)  Transfer Types and Limits. EFTs are subject to the following limits:

USD Deposits: Daily limit: $5,000.

USD Withdrawals: Daily limit: $25,000.

(E)  Fees. Voyager will not charge Customer any fees in connection with the initiation and completion of any EFT, however, third party fees, including foreign taxes, as applicable, may apply.

(F)   Confidentiality. Voyager may disclose information to third parties about Customer as well as the EFTs effectuated out of the Account in the following circumstances:

(1)   Where it is necessary or helpful for completing or correcting transactions and resolving claims regarding transactions;

(2)   In order to verify the existence and condition of the Account to a third party;

(3)   In order to comply with a valid request by a government agency a court order, or other legal or administrative reporting requirements;

(4)   If Customer consents by giving Voyager written permission; to Voyager employees, auditors, affiliates, service providers, or attorneys as needed;

(5)   In order to prevent, investigate or report possible illegal activity;

(6)   In order to authorize EFTs; or

(7)   Otherwise as necessary to fulfill our obligations under this Agreement.

Please see Voyager's Privacy Policy for further details.

(G)   Documentation. Upon the completion of an EFT Customer has a right to a written receipt (an "EFT Receipt") including the details of the EFT. In addition, the Customer has a right to transaction statements in connection with the Account ("Account Statements").

(H)   Voyager Liability. In no event will Voyager be liable to Customer for any equitable, consequential (including lost profits, indirect, extraordinary, incidental, punitive, or special damages). For instance, Voyager will not be liable to Customer if:

(1)   Customer does not have enough funds in the Account to complete the EFT;

(2)   Voyager has placed a hold or other limit on Customer's Account in connection with any legal, regulatory, or administrative process, or in connection with Voyager's anti-money laundering and compliance obligations;

(3)   Voyager experienced a technical malfunction that the Customer was aware of at the time of the transaction;

(4)   Voyager suspects that the requested EFT is unauthorized; or

(5)   Circumstances beyond Voyager's control prevent the completion of the EFT or otherwise cause an EFT to be completed incorrectly or inaccurately.

(I)   Errors; Questions.

In the event that Customer believes an EFT Receipt or Account Statement is incorrect (an "EFT Error") or if Customer has any questions about an EFT, contact Voyager at Voyager Support.

The following are considered EFT Errors:

(1)  An unauthorized EFT;

(2)  An incorrect EFT to or from Customer's Account;

(3)  An improperly recorded EFT on Customer's Account Statement; or

(4)  A computational or bookkeeping error related to Customer's Account.

The following are NOT considered EFT Errors:

(1)  A routine inquiry about Customer's account balance or the status of pending transfers to or from Customer's account, unless Customer expressly notifies Voyager of an error in connection with the transfer;

(2)  A request for information for tax or other recordkeeping purposes; or

(3)  A request for duplicate copies of documentation.

Voyager must be properly notified no later than 60 days after Customer was provided access to the statement in question. In order for Voyager to be properly notified, Customer must conduct the following steps:

(1)  Contact Voyager Support and submit the request under the subcategory: Unauthorized USD Transfer or USD Transfer Error.

(2)  Provide Voyager with Customer's name and email address or phone number that is actively associated with the Account.

(3)  Describe the EFT Error or the transfer that Customer is unsure of and explain as clearly as Customer can why Customer believes an error is present or why Customer needs more information.

(4)  State the type, date, and dollar amount of the suspected EFT Error.

If Customer orally notifies Voyager of an EFT Error or question, Customer is required to send the complaint or question, in writing and in the same manner described above, to Voyager Support within 10 business Days.

Voyager will generally determine whether an error occurred within 10 business days after Voyager is properly notified of the EFT Error by Customer and will correct any error promptly. If

Voyager needs more time, however, Voyager may take up to 45 days to investigate Customer's complaint or question.

For EFT Errors involving new Accounts and point-of-sale transactions, Voyager may take up to 90 days to investigate the complaint or question.

Within 3 business days after completing an investigation, Voyager will communicate the results to Customer. If Voyager determines that there was no error, Voyager will send Customer a written explanation. Customer may ask for copies of the documents that Voyager used in an investigation. "Business days" are Monday through Friday, excluding federal holidays.

25. ACH

Customer authorizes Voyager, at its discretion and without further prior notice, to utilize an electronic check process or Automated Clearing House ("ACH") facility to draft funds in the amount of any checks payable to Voyager, its agents or assigns. Money deposited via ACH is normally not available for five (5) to ten (10) business days. Customer understands that for ACH transfers to be established, the name on the Account must match Customer's bank account. To send and receive funds via ACH, Customer's bank must be a member of the ACH system. For ACH transactions, Customer hereby grants Voyager limited power of attorney to effectuate such transactions. Customer understand that if Customer decides to rescind an ACH transfer, or if an ACH transaction is returned to Customer's bank for any reason, Customer hereby directs and grants Voyager power of attorney to redeem any and all Cryptocurrency purchases and deposits necessary to fulfill and make such rescission regardless of whether Customer incurs a loss. The remediation described in the preceding sentence may result in a delay of returned funds or liquidation of Customer assets. Voyager may also choose to sever the client relationship and return prior deposits if warranted to protect Voyager from risk or potential fraud. An ACH bank reversal may occur when (1) there are insufficient funds in Customer's bank account, (2) there is a duplicate transaction, (3) the transaction is denied, (4) the type of account is incorrect, or 5) any of the return reasons as noted in ACH Return Codes R01 – R33. Customer acknowledges that in the event of an ACH bank reversal, Customer might incur a fee.

26.  Questions; Feedback; Complaints

If Customer has any questions, would like to provide feedback, or would like more information regarding the Services, please feel free to email Voyager at support@investvoyager.com.

If Customer has a complaint or dispute with Voyager in connection with the Services (a "Complaint"), Customer agrees to contact Voyager through Voyager's support team at support@investvoyager.com in order to attempt to resolve any such Complaint amicably. When submitting a Complaint, please provide Voyager with your name, address, and any other information that Voyager may need in order to identify Customer and the Account. Voyager will acknowledge receipt of the Complaint upon receipt. Upon receipt of a Complaint, a Voyager support member will review the Complaint based upon the information provided in such Complaint and, if necessary, reach out to Customer via e-mail in order to attempt to resolve such Complaint. Customer satisfaction is a priority and while Voyager hopes that all issues related to

the Account or Service can be resolved through the aforementioned Customer support process, if a Complaint is not resolved in a manner satisfactory to Customer, the Customer may require that Customer and Voyager pursue any unresolved Complaint (or portion thereof) through arbitration, consistent with the terms of Section 26 – Arbitration Agreement below.

27.  Arbitration Agreement

Voyager and Customer agree to attempt informal resolution of any Complaint arising in connection with this Agreement, the Account, the Platform, or the Services consistent with the procedures outlined in Section 25 – Questions; Feedback; Complaints, including but not limited to engaging in non-lawyer mediation, prior to any demand for ~~adjudication~~arbitration.

VOYAGER AND CUSTOMER FURTHER AGREE THAT IF THE PARTIES CANNOT ~~SOLVE~~RESOLVE SUCH COMPLAINT INFORMALLY AND CONSISTENT WITH THE PROCEDURES OUTLINED IN SECTION 25 – QUESTIONS; FEEDBACK; COMPLAINTS, ~~ANY SUCH DISPUTE~~THE COMPLAINT SHALL BE FINALLY ~~SETTLED~~AND EXCLUSIVELY RESOLVED IN BINDING ARBITRATION, ON AN INDIVIDUAL BASIS, ~~IN ACCORDANCE WITH~~ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND IN ACCORDANCE WITH THE AAA'S RULES FOR ARBITRATION OF CONSUMER-RELATED DISPUTES~~, AND~~. VOYAGER AND CUSTOMER HEREBY EXPRESSLY WAIVE ANY RIGHT TO GO TO COURT, TO HAVE A TRIAL BY JURY, AND THE RIGHT TO PARTICIPATE IN A CLASS-ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. ~~THE ARBITRATION WILL OCCUR IN NEW JERSEY AND~~UNLESS VOYAGER AND CUSTOMER BOTH AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS OR MORE THAN ONE CUSTOMER'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF REPRESENTATIVE OR CLASS PROCEEDING. THE ARBITRATOR SHALL ALSO HAVE EXCLUSIVE AUTHORITY TO DECIDE ANY ISSUES RELATING TO THE MAKING, VALIDITY, ENFORCEMENT, OR SCOPE OF THIS ARBITRATION AGREEMENT, ARBITRABILITY, DEFENSES TO ARBITRATION INCLUDING UNCONSCIONABILITY, OR THE VALIDITY OF THE JURY TRIAL OR CLASS ACTION WAIVERS.

THE ARBITRATION WILL BE CONDUCTED CONFIDENTIALLY BY A SINGLE, NEUTRAL ARBITRATOR AND WILL OCCUR ON A DOCUMENTS-ONLY BASIS OR, IF VOYAGER OR CUSTOMER CHOOSES, OVER TELEPHONE, VIDEO, OR IN PERSON. FOR AN IN-PERSON ARBITRATION, THE PROCEEDINGS WILL BE IN THE CITY OR COUNTY WHERE CUSTOMER PRIMARILY RESIDES, OR IF CUSTOMER DOES NOT RESIDE IN THE UNITED STATES, IN THE STATE OF NEW JERSEY. CUSTOMER AGREES TO BEAR ITS OWN ATTORNEY'S FEES, COSTS, AND EXPENSES. THE ARBITRATOR MAY AWARD ANY RELIEF THAT A COURT OF COMPETENT JURISDICTION COULD AWARD, INCLUDING ATTORNEYS' FEES WHEN AUTHORIZED BY LAW, AND THE ~~ARBITRAL~~ARBITRATOR'S DECISION MAY BE ENFORCED IN ANY COURT. ANY DISPUTE BETWEEN THE PARTIES WILL BE GOVERNED BY THIS CUSTOMER AGREEMENT AND THE LAWS OF THE STATE OF NEW JERSEY AND APPLICABLE UNITED STATES LAW, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES THAT MAY PROVIDE FOR THE

APPLICATION OF THE LAW OF ANOTHER JURISDICTION. VOYAGER AND CUSTOMER FURTHER AGREE THAT THE STATE OR FEDERAL COURTS IN NEW JERSEY HAVE EXCLUSIVE JURISDICTION OVER ANY APPEALS OF OR AN APPLICATION TO VACATE AN ARBITRATION AWARD AND OVER ANY LAWSUIT BETWEEN THE PARTIES NOT SUBJECT TO ARBITRATION. IN SUCH CASES, VOYAGER AND CUSTOMER AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS OF NEW JERSEY AND AGREE TO WAIVE ANY AND ALL OBJECTIONS TO THE EXERCISE OF JURISDICTION OVER THE PARTIES BY SUCH COURTS AND TO VENUE IN SUCH COURTS.

IN THE EVENT THE PROHIBITION ON CLASS ARBITRATION OR ANY OTHER PROVISION OF THIS SECTION IS DEEMED INVALID OR UNENFORCEABLE, THEN CUSTOMER AGREES AND UNDERSTANDS THAT THE REMAINING PORTIONS OF THE ARBITRATION PROVISIONS IN THIS SECTION WILL REMAIN IN FULL FORCE AND EFFECT.

NOTWITHSTANDING VOYAGER AND CUSTOMER'S AGREEMENT TO RESOLVE ALL DISPUTES THROUGH ARBITRATION, EITHER VOYAGER OR CUSTOMER MAY SEEK RELIEF IN A SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF THAT COURT'S JURISDICTION.

28.  Telephone Conversations and Electronic Communications

Customer understands and agrees that Voyager may record and monitor any telephone or electronic communications with the Customer. Unless otherwise agreed in writing in advance, Voyager does not consent to the recording of telephone conversations by any third party of the Customer. The Customer acknowledges and understands that not all telephone or electronic communications are recorded by Voyager, and Voyager does not guarantee that recordings of any particular telephone or electronic communications will be retained or are capable of being retrieved.

29.  Oral Authorization

Customer agrees that Voyager shall be entitled to act upon any oral instructions given by the Customer with respect to the Account so long as Voyager reasonably believes such instruction was actually given by the Customer or the Customer's authorized agent.

30.  Effect of Attachment or Sequestration of Account

If Voyager, a service provider, or their respective officers, directors, agents, employees, and representatives (collectively, the "Voyager Representatives") are served with levies, attachments, garnishments, summons, subpoenas, court orders, or other legal process which name Customer as a debtor or otherwise, Voyager Representatives shall be entitled to rely upon the representations, warranties, and statements made in such legal process. Customer hereby agrees that Voyager Representatives may respond to any such legal process in their own discretion without regard to jurisdiction or forward such legal process to any other party as may be

appropriate. Voyager Representatives shall not be liable for refusing to obey any orders given by or for the Customer with respect to an Account that has been subject to an attachment or sequestration in any legal proceeding against the Customer, and Voyager Representatives shall be under no obligation to contest the validity of any such attachment or sequestration. Customer agrees to indemnify, defend, and hold all of the Voyager Representatives harmless from all actions, claims, liabilities, losses, costs, attorney's fees, or damages associated with compliance with any process that any Voyager Representative reasonably believes in good faith to be valid.

31.  Event of Death

It is agreed that in the event of the Customer's death or the death of one of the joint Account holders, the representative of the Customer's estate or the survivor or survivors shall promptly give Voyager written notice thereof, and Voyager may, before or after receiving such notice, take such proceedings, require such papers and inheritance or estate tax waivers, retain such portion of, or restrict transactions in the Accounts as Voyager may deem advisable to protect Voyager against any tax, liability, penalty or loss under any present or future laws or otherwise. Notwithstanding the above, in the event of the Customer's death or the death of one of the joint Account holders, all open orders shall be canceled, but Voyager shall not be responsible for any action taken on such orders prior to the actual receipt of notice of death. Further, in Voyager's discretion it may close out the Account without awaiting the appointment of a personal representative for the Customer's estate and without demand upon or notice to any such personal representative. The estate of any of the Account holders who have died shall be liable and each survivor shall continue to be liable, jointly and severally, to Voyager for any net debit balance or loss in said Account in any way resulting from the completion of transactions initiated prior to the receipt by Voyager of the written notice of the death of the decedent or incurred in the liquidation of the Account or the adjustment of the interests of the respective parties, and for all other obligations pursuant to the Customer Agreement. Such notice shall not affect Voyager's rights under the Customer Agreement to take any action that Voyager could have taken if the Customer had not died.

Upon the death or incapacity of an Account owner and if the legal heirs or representatives of such Account owner would like to withdraw the remaining balance in the Account, to the extent there is any, such legal heirs should present to Voyager the necessary official legal documents from the applicable authorities in the relevant jurisdiction, and Voyager, upon checking such documents, shall allow such withdrawal in accordance with any applicable laws.

32.  Unclaimed Property

If there are funds or Cryptocurrency in an Account and Voyager is unable to contact Customer at the address shown in Voyager's records, and has no record of Customer's use of the Services for an extended period (as defined by applicable law), Voyager may be required to report and deliver such funds or Cryptocurrency to the applicable governmental authority as unclaimed property. Voyager reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds and Cryptocurrency, as permitted by applicable law.

33.  Tax Reporting; Tax Withholding

The taxation of Cryptocurrency transactions is extremely complex, and no attempt is made herein to fully describe the various tax rules that apply to such transactions or to explain in complete detail the rules which are mentioned. However, generally, any sales, exchanges or dispositions of Cryptocurrency may have U.S. federal, state, local and non-U.S. income tax consequences for the Customer and may result in the Customer having to pay additional income taxes. Customers may have a variety of tax reporting obligations with respect to certain Cryptocurrency. Each Customer should confer with their tax advisor regarding the tax consequences of utilizing each of the Account based upon the Customer's particular circumstances. The Customer and Customer's tax advisors are responsible for how Customer's activity in the Account is reported to the Internal Revenue Service ("IRS") or any other taxing authority. Voyager assumes no responsibility to Customer for the tax consequences of any transactions.

The proceeds of sale transactions and dividends paid will be reported to the IRS in accordance with applicable law. Under penalties of perjury, the Customer certifies that the taxpayer identification number provided or will provide to Voyager (including any taxpayer identification number on any Form W-9 that the Customer has provided or will provide to Voyager) is the Customer's correct taxpayer identification number. The Customer certifies that the Customer is not subject to backup withholding and is a United States Person (including a U.S. resident alien) as such term is defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("U.S. Person"). If a correct Taxpayer Identification Number is not provided to Voyager, the Customer understands the Customer may be subject to backup withholding tax at the appropriate rate on all dividends, interest and gross proceeds paid to the Customer. Backup withholding taxes are sent to the IRS and cannot be refunded by Voyager. The Customer further understands that if the Customer waives tax withholding and fails to pay sufficient estimated taxes to the IRS, the Customer may be subject to tax penalties.

34. Miscellaneous.

(A) Interpretation. The heading of each provision of the Customer Agreement is for descriptive purposes only and shall not be (1) deemed to modify or qualify any of the rights or obligations set forth in the Customer Agreement or (2) used to construe or interpret any of the provisions under the Customer Agreement. When a reference is made in this Customer Agreement to a Section, such reference shall be to a Section of this Customer Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in the Customer Agreement, they shall be deemed to be followed by the words "without limitation." The word "or," when used in the Customer Agreement, has the inclusive meaning represented by the phrase "and/or." Unless the context of the Customer Agreement otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively; and (ii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to the Customer Agreement in its entirety. The word "will" expresses an obligation equivalent to "shall." The Customer Agreement will not be construed in favor of or against any party by reason of the extent to which any party participated in the preparation of the Customer Agreement.

(B)  Binding Effect; Assignment. This Customer Agreement shall bind Customer's heirs, assigns, executors, successors, conservators, and administrators. Customer may not assign this Customer Agreement or any rights or obligations under this Customer Agreement without first obtaining Voyager's prior written consent. Voyager may assign, sell or transfer the Account and this Customer Agreement, or any portion thereof, at any time, without prior notice to Customer.

(C)  Severability. If any provisions or conditions of this Customer Agreement are or become inconsistent with any present or future law, rule or regulation of any applicable government, regulatory, or self-regulatory agency or body, or are deemed invalid or unenforceable by any court of competent jurisdiction, such provisions shall be deemed rescinded or modified, to the extent permitted by applicable law, to make this Customer Agreement in compliance with such law, rule or regulation, or to be valid and enforceable, but in all other respects, this Customer Agreement shall continue in full force and effect.

(D)  Website Postings. Customer agrees and understands that Voyager or any of its Affiliates may post other specific agreements, disclosures, policies, procedures, terms and conditions that apply to Customer's use of the App, the Website or the Account on the Website ("Website Postings"). Customer ~~understand~~understands that it is Customer's continuing obligation to understand the terms of the Website Postings, and Customer agrees to be bound by the Web Postings as are in effect at the time of Customer's use.

(E)  Entirety of Agreement. This Customer Agreement, any attachments hereto, other agreements and policies referred to in this Customer Agreement (including the Website Postings), and the terms and conditions contained in Customer's Account statements and confirmations, contain the entire agreement between Voyager and Customer and supersedes all prior or contemporaneous communications and proposals, whether electronic, oral or written, between Voyager and Customer, provided, however, that any and all other agreements between Voyager and Customer, not inconsistent with this Customer Agreement, will remain in full force and effect.

(F)  Amendment. Voyager may, at any time, amend the Customer Agreement without prior notice to the Customer. No provision of the Customer Agreement can be amended by Customer in any respect. The current version of the Customer Agreement will be posted on the Website and made available through the App and Customer's continued use of the Platform after such amendment constitutes agreement to be bound by all then-in-effect amendments to the Customer Agreement, regardless of whether the Customer has actually reviewed it. Continued use of the Platform after such posting will constitute the Customer's acknowledgment and acceptance of such amendment. The Customer agrees to regularly consult the App and Website for up-to-date information about the Services and any modifications to the Customer Agreement.

(G)  No Waiver; Cumulative Nature of Rights and Remedies; Non-Waiver of Rights. Customer understands that Voyager's failure to insist at any time upon strict compliance with any term contained in this Customer Agreement, or any delay or failure on Voyager's part to exercise any power or right given to Voyager in this Customer Agreement, or a continued course of such conduct on Voyager's part, shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to Voyager in this Customer Agreement are cumulative and not exclusive of any other rights or

remedies to which Voyager is entitled. This Customer Agreement shall not be construed to waive rights that cannot be waived under applicable laws and regulations.

(H)  Relationship of the Parties. Customer agrees and understands that nothing in this Customer Agreement shall be deemed to constitute, create, imply, give effect to, or otherwise recognize a partnership, employment, joint venture, or formal business entity of any kind; and the rights and obligations of the parties shall be limited to those expressly set forth herein.

(I)    No Third-Party Beneficiaries. Except for the indemnity and exculpation provisions herein, nothing expressed in, mentioned in, or implied from this Customer Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under or in respect to this Customer Agreement to enforce any of its terms which might otherwise be interpreted to confer such rights to such persons, and this Customer Agreement and all representations, warranties, covenants, conditions and provisions hereof are intended to be and are for the exclusive benefit of the parties.

(J)    Survival. All provisions of this Customer Agreement that by their nature extend beyond the expiration or termination of this Agreement, including, without limitation, sections pertaining to suspension or termination, debts owed, general use of the Services, disputes with Voyager, and general provisions, shall survive the termination or expiration of this Agreement.

(K)  Written Notice. Customer agrees that if Voyager sends an email to the email address on record for the Account, this constitutes "written notice" from Voyager to Customer. For all notices made by email, the date of receipt is considered to be the date of transmission.

(L)  Governing Law. The laws of the State of New Jersey (regardless of the choice of law rules thereof) shall govern this Customer Agreement and all transactions in the Account.

Document comparison by Workshare 10.0 on Tuesday, August 16, 2022 3:46:27 PM

| Input: | |
|---|---|
| Document 1 ID | file://H:\Documents\Voyager\Customer Agreement 10.19.21 Snapshot.docx |
| Description | Customer Agreement 10.19.21 Snapshot |
| Document 2 ID | file://H:\Documents\Voyager\Customer Agreement 6.9.22 Snapshot.docx |
| Description | Customer Agreement 6.9.22 Snapshot |
| Rendering set | WW Default |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 93 |
| Deletions | 79 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 172 |

# **EXHIBIT C**

## Financial Statements

# VOYAGER

## VOYAGER DIGITAL LTD.

**Management's Discussion and Analysis**

**For the quarter ending March 31, 2022**

**May 16, 2022**

## Introduction

The following Management's Discussion & Analysis ("MD&A") of the financial condition and results of the operations of Voyager Digital Ltd. (the "Company" or "Voyager") constitutes management's review of the factors that affected the Company's financial and operating performance for the fiscal third quarter ended March 31, 2022. All information in this MD&A is given as of and for the three and nine months ended March 31, 2022 and 2021, unless otherwise indicated. All dollar figures are stated in U.S. dollars, unless otherwise indicated.

This MD&A has been prepared in compliance with the requirements of Form 51-102F1, in accordance with National Instrument 51-102 – Continuous Disclosure Obligations. This MD&A should be read in conjunction with the unaudited interim condensed consolidated financial statements for the quarter ended March 31, 2022, and the audited annual consolidated financial statements of the Company for the fiscal year ended June 30, 2021, together with the notes thereto. In the opinion of management, all adjustments (which consist only of normal recurring adjustments) considered necessary for a fair presentation have been included. The results for the three and nine months ended March 31, 2022 are not necessarily indicative of the results that may be expected for any future period. Information contained herein is presented as of May 16, 2022, unless otherwise indicated.

For the purposes of preparing this MD&A, management considers the materiality of information. Information is considered material if: (i) such information results in, or would reasonably be expected to result in, a significant change in the market price or value of Voyager's common shares; or (ii) there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision; or (iii) it would significantly alter the total mix of information available to investors. Management evaluates materiality with reference to all relevant circumstances, including potential market sensitivity.

The words "we", "our", "us", "Company" and "Voyager" refer to Voyager Digital Ltd. together with its subsidiaries and/or the management and/or employees of the Company (as the context may require).

These documents, along with additional information about Voyager, are available under Voyager's profile at www.sedar.com.

## Caution Regarding Forward-Looking Statements

This MD&A contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates," "continues," "forecasts," "projects," "predicts," "intends," "anticipates" or "believes," or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this MD&A speak only as of the date of this MD&A or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;
- Popularity, adoption and rate of adoption of cryptocurrencies;
- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations or the interpretation or application thereof that currently apply or may become applicable to our business both in the United States (the "U.S.") and internationally;
- Our expectations with respect to the application of laws and regulations and the interpretation or enforcement thereof and our ability to continue to carry on our business as presently conducted or proposed to be conducted;
- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;

- Our ability to continue to operate and expand our rewards program;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Decline in the cryptocurrency market or general economic conditions;
- Regulatory uncertainty and risk, including changes in laws or the interpretation or application or enforcement thereof and the obtaining of regulatory approvals;
- We are subject to an extensive and highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations, or regulatory interpretation of such laws and regulations, could adversely affect our brand, reputation, business, operating results, and financial condition;
- In connection with such laws and regulations or regulatory interpretation thereof, a particular crypto asset's or product offering's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset or product offering, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- Risks related to managing our growth;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Regulatory risk, including changes in laws or the interpretation or application thereof and the obtaining of regulatory approvals;
- Counterparty risk and credit risk;
- Lending risks;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Cybersecurity risks;
- Fluctuations in quarterly operating results;
- Risks related to the security of customer information;
- Competition in our industry and markets;
- Our reliance on key personnel;
- Our reliance on third party service providers;
- Exchange rate fluctuations;
- Risks related to expanding our marketing and sales;

- Risks related to our ability to adapt to rapid technological change;
- Risks related to terrorism, geopolitical crisis, or widespread outbreak of an illness or other health issue;
- Risks associated with acquisitions and the integration of the acquired businesses; and
- Risks related to international expansion.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this MD&A.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for crypto assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## Description of Business

Voyager, through its U.S. operating subsidiaries, operates as a crypto asset broker that provides eligible retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers order execution, market data, wallet, and custody services through its proprietary digital platform (the "Platform"). Through its subsidiary Coinify ApS ("Coinify"), Voyager provides crypto payment solutions for both consumers and merchants around the globe.

Since its launch, the Company has enhanced functionality of the Platform with a number of customer features, including:

- increasing the number of crypto assets supported by the Platform;
- adding liquidity providers to its proprietary smart router technology to expand the depth of liquidity and quality of trade execution for customer trades;
- integrating the operational infrastructure of its liquidity partners and custodians into one Platform;
- providing customers with crypto rewards paid monthly and in-kind to customers holding requisite minimum balances of eligible crypto assets in their Voyager Account (the "Rewards Program"[1]); and
- launching the Voyager Loyalty Program for customers that hold a certain number of VGX tokens to unlock various tiers that offer token utility rewards, including VGX staking rewards, earnings reward boost, crypto back rewards, as well as refer-a-friend cash back rewards.

---

[1] The Rewards Program allows customers to earn in-kind payments of crypto assets for maintaining minimum crypto asset balances of the same type of crypto asset in their account. Rewards earned on crypto assets are variable and reward rates are determined by Voyager at its sole discretion. Customers may opt-out of the Rewards Program. The Rewards Program is the subject of certain state regulatory orders and an SEC investigation. Subject to Voyager's ongoing communications with the Kentucky Department of Financial Institutions), it is expected that the Rewards Program will not be available to Kentucky residents as a result of a cease and desist order issued by that state as of June 1, 2022. See the section on Contingencies.

The Platform is designed to be a single access point to market data, wallet and custody services for crypto assets.  Through the Platform, most customers can currently:

- quickly open an account; we utilize third party service providers for know-your-customer ("KYC") and anti-money-laundering ("AML") checks to ensure timely and secure account openings;
- trade "spot" between fiat and crypto assets from a single account (there is no leverage, margin or financing of such transactions);
- have an opportunity to earn rewards on certain crypto assets held in their account under the Rewards Program;
- execute trade orders utilizing a wide spectrum of liquidity providers;
- obtain market data to help manage and track their crypto asset holdings, including delivering news to keep customers connected to the market, and providing portfolio tools to track performance, balances and transactions; and
- store crypto assets (Voyager utilizes multiple storage solutions while balancing security and availability).

The Platform uses a dynamic router and customized algorithms to execute customer orders to one or several crypto asset exchanges, market makers or liquidity providers to efficiently buy or sell crypto assets on behalf of its customers. The Platform (1) quotes the average price for a crypto asset as delivered by a proprietary quoting service that aggregates Voyager's available liquidity and computes a price, and (2) uses the smart order routing to search all open liquidity providers used by Voyager to find a better rate than the quoted price.  The Platform configuration is designed to provide customers with trade execution that considers the price, certainty of execution, reliability of the trading venue, and speed of execution.

Voyager is registered as a money services business pursuant to the Bank Secrecy Act regulations as administered by the Financial Crimes Enforcement Network and is licensed to operate as a money transmitter or its equivalent in states where such requirements are applicable[2]. Voyager entered into an Account Services Agreement with Metropolitan Commercial Bank (the "Bank"), whereby the Bank provides all services associated with the movement of, and holding of, U.S. dollars for each customer account (using an omnibus custodial "for the benefit of" account). The Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services, (ii) listed on the New York Stock Exchange (symbol: MCB), and (iii) a member of the FDIC. The Bank receives fees for wire transactions and account transactions, subject to a minimum $10,000 monthly fee.

The registered office of the Company is Suite 2900 – 550 Burrard Street, Vancouver, BC, V7X 1J5, Canada; and its head office is 33 Irving Place, 3rd Floor, New York, New York 10003.

### *Share capital reorganization*

On September 7, 2021, Voyager's common shares commenced trading on the Toronto Stock Exchange (the "TSX") under the trading symbol of "VOYG". Prior to trading on the TSX, the Company's common shares were listed on the Canadian Stock Exchange.

On December 14, 2021, the Company's shareholders approved a reorganization of the Company's share capital structure (the "Share Capital Reorganization"). The Share Capital Reorganization was affected on December 15, 2021, and resulted in, among other things, (i) creation of a new class of variable voting shares of the Company for shareholders that are U.S. Residents, and (ii) limiting share ownership of the common shares of the Company to shareholders that are Non-U.S. Residents (the common shares and variable voting shares, together, the "shares"). Aside from the differences in (a) the residency status of shareholders of the common shares and variable voting shares and (b) the voting rights attributable to each class of shares, the shares are otherwise treated the same by the Company in all material respects. In connection with the Share Capital Reorganization the Company received certain exemptive relief from the Canadian securities administrators to enable its common shares and variable voting shares to be treated collectively as if they were a single class for certain purposes, including for take-over bid and early warning reporting purposes and to permit the Company to refer to the variable voting shares as variable voting shares.

---

[2] Trading is currently available to all U.S. residents, excluding New York state. We are actively working with New York regulators to obtain a BitLicense to operate in New York and with various international regulators to operate internationally.

Effective December 23, 2021, the common shares and variable voting shares began trading on the TSX under the single and current ticker "VOYG". Voyager is OTCQX Markets listed under the ticker "VGYVF", Cusip 92919V405 and is held at DTC.

### Long-term incentive plan

Through December 13, 2021, the Company granted options to directors, officers, and employees under the Company's Stock Option Plan (the "SOP"). On December 14, 2021, shareholders approved the Company's Long-Term Incentive Plan (the "LTIP") which replaced the SOP. The LTIP provides for broad-based equity awards to directors, officers, employees, and permits the granting of options, performance share units, restricted share units and/or deferred share units. Options granted under the SOP and the LTIP generally vest over three years, based on continued employment, and are settled upon vesting in shares of the Company's shares. The contractual term of the options is no more than 10 years.

### Normal course issuer bid

In October 2021, the TSX approved the Company's notice of intention to make a normal course issuer bid ("NCIB"). Pursuant to the NCIB, during the 12-month period from November 2, 2021 to November 1, 2022, the Company is able to purchase up to 8.1 million shares, being approximately 5% of the Company's outstanding shares at the time. For the nine months ended March 31, 2022, the Company purchased 503,800 common shares under the NCIB for total consideration of approximately $6.5 million. All purchases were made in accordance with the NCIB at prevailing market prices plus brokerage fees.

### Alameda Research

In October 2021, the Company entered into a subscription agreement to issue and sell 7,723,996 common shares of the Company at a price of $9.71 for the aggregate purchase price of $75.0 million to Alameda Research Ltd. The transaction closed on November 22, 2021.

### Voyager Digital Ventures, LLC

In May 2022, the Company created a new subsidiary, Voyager Digital Ventures, LLC, to manage existing and future investments in strategic partners and early stage crypto centric businesses.

### Acquisitions, strategic investments and joint ventures

#### Fundstrat investment

In October 2021, the Company purchased 2,400,000 units of Fundstrat Global Advisors ("Fundstrat") (representing approximately 4% of the outstanding units of Fundstrat). The purchase consideration was satisfied by the issuance of 601,504 common shares of the Company.

#### Joint venture with Market Rebellion

On August 12, 2021, FINRA approved a 50% investment by Market Rebellion, a leading provider of trading education, content, and tools for independent investors, in VYGR Digital Securities, LLC to provide brokerage for equities, options, and futures trading through the Platform. Voyager and Market Rebellion intend to jointly operate a broker-dealer focused on providing online brokerage services for equities, options, and futures. VYGR Digital Securities, LLC plans to execute equity trades on behalf of Voyager's customers, and Market Rebellion intends to introduce its large and active trading community to the capabilities of this new platform.

#### Coinify acquisition

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform existing under the laws of Denmark. The consideration to Coinify sellers consisted of 5,100,000 of newly issued shares of

Voyager's shares[3] and $16.3 million in cash. Under the Share Purchase Agreement, Voyager retained substantially all current Coinify employees, entering into employment agreements with key members of the management team.

*LGO SAS acquisition*

On December 10, 2020, the Company acquired LGO SAS, an Autorité des marchés financiers ("AMF") regulated entity based in France, and Voyager Europe SAS (formerly LGO Europe SAS), in exchange for 200,000 shares of the Company's shares to be issued upon demand in accordance with the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 shares of the Company's shares after one-year, contingent upon AMF's approval of extension of the registration of Voyager Europe SAS as a digital asset service provider, and declaration of Voyager's leadership as "Fit and Proper" to operate under the LGO registration, which were received on September 28, 2021.

**Token swap**

In August 2021, the Company completed a token swap as part of the LGO SAS merger with the Company[4]. The token swap and merger combined the original Voyager token, VGX, with the LGO token. To complete the token swap, the VGX and LGO tokens were converted to a single new token under the ticker VGX.

**Loyalty program**

On September 1, 2021, the Company launched the Voyager Loyalty Program (the "VLP"). The VLP gives Voyager token holders a full suite of incentives and rewards. To participate in the VLP, customers must hold a certain number of VGX tokens to unlock various tiers which offer token utility rewards including VGX staking rewards, earnings reward boost, crypto back rewards as well as refer-a friend cash back rewards.

**Sponsorship and marketing agreements**

In September 2021, the Company announced a market-leading partnership with four-time Super Bowl champion, Rob Gronkowski as a brand ambassador. Voyager and Rob Gronkowski will launch a series of campaigns designed to bring cryptocurrency investment more accessible, useful, and engaging.

In October 2021, the Company entered into a five-year exclusive, integrated partnership with the Dallas Mavericks, becoming the team's first cryptocurrency brokerage and international partner. Voyager and the Dallas Mavericks will work to make cryptocurrency more accessible through educational and community programs, and fan engagement promotions.

In December 2021, the Company extended its partnership with Landon Cassill for two years. Landon Cassill will be fully paid with a portfolio of cryptocurrencies that includes Bitcoin (BTC), Voyager Token (VGX), USD Coin (USDC), StormX (STMX) and Avalanche (AVAX).

In December 2021, the Company announced a multi-year agreement with The National Women's Soccer League ("NWSL"), making Voyager the NWSL's first-ever cryptocurrency brokerage partner, further extending the league's global marketing reach, and providing players with direct financial support, crypto education, and rewards.

**Hiring**

On December 1, 2021, the Company appointed Marshall Jensen as the Company's Head of Corporate Development. Marshall has held senior roles in technology investment banking, principal investment, and in the crypto industry. He has substantive knowledge of the digital asset and crypto ecosystem, notably having served as Executive Vice President, Finance, of Digital Asset Custody Company, a crypto custodian which was acquired by BAKKT in 2019.

On December 20, 2021, the Company appointed Brian Brooks to its Board of Directors effective immediately. Brian is currently CEO of Bitfury Group Ltd. and was formerly the Acting Comptroller of the U.S. Currency at the Office of the Comptroller of the Currency and, before that, the Chief Legal Officer of Coinbase.

We have rapidly grown our employee base from 79 employees at March 31, 2021 to 318 at March 31, 2022.

---

[3] A portion of newly issued shares for the Coinify acquisition consideration are subject to issuance/ redemption restrictions.
[4] International token holders were able to swap tokens through September 20, 2021.

## Overall Performance

With respect to the three months ended March 31, 2022, as compared to the three months ended March 31, 2021:

- we generated total revenues of $102.7 million compared to $60.4 million
- we reported a net loss of $61.4 million compared to $68.6 million
- our Adjusted EBITDA[5] was negative $53.5 million compared to positive $48.2 million
- our Funded Accounts[6] were 1,190 thousand compared to 274 thousand
- we had Assets on Platform[7] of $5,795.3 million compared to $2,556.6 million
- our Adjusted Working Capital[8] was $185.4 million compared to $197.1 million
- our equity was $257.8 million compared to $98.3 million
- we reported basic and diluted EPS of $(0.36) compared to $(0.49)

This quarter Voyager continued customer engagement with our product innovation and diversification resulting in customer funded account growth by 115 thousand. This quarter was challenging for Voyager due to global market conditions, driven by low industry volumes, which negatively impacted trading activity by our customers resulting in decrease in transaction revenue. Despite suppressed industry volumes, we continued to deliver on our revenue diversification strategy coupled with deployment of the launch of debit cards to pre-registered customers and additional products including by adding more coins to staking platforms. We remain focused on positioning our platform as one of the leading players in digital assets for consumers and expect continued customer growth in the future.

We have scaled our technology to accommodate rapid growth as mainstream crypto assets adoption has accelerated. With our platform and technological capabilities enhanced, we look forward to the next phase of our growth through enhanced products and services, geographic expansion, and marketing efforts to reach new customers.

Further, we will continue to build out our payment processing capabilities to our merchant payment systems capabilities (acquired through the Coinify acquisition). As we look ahead, we remain committed to driving sustainable long-term customer growth and executing on our strategic priorities and will accelerate our growth through M&A when appropriate.

### Customer acquisition

Our business model encompasses efficient new customer growth and strong retention as well as expansion within existing customer base. Our new customers join our platform organically, through several referral programs and paid marketing efforts which range from market-leading partnerships with professional athletes or clicking through an online advertisement.

Additionally, we extended our marketing efforts with the launch of our "Crypto for All" campaign. Our new campaign focuses on bringing more humanity and accessibility to the world of crypto. The new campaign features Voyager customers from a variety of backgrounds sharing their thoughts and experiences with crypto and Voyager highlighting transparency, inclusivity, freedom, and opportunity. The campaign is currently running across a wide range of digital channels in the U.S.

---

[5] Adjusted EBITDA is defined as net income (loss), excluding (i) change in fair value of warrant liability, (ii) share-based payments, (iii) provision (benefit) for income tax, (iv) amortization of intangible assets, (v) change in fair value of investments loss, (vi) change in fair value of crypto assets borrowed, (vii) fees on crypto assets borrowed, (viii) loss on issuance of warrants and (ix) gains on acquisitions, net.
[6] A "Funded Account" is a Voyager's account into which the account user makes an initial deposit or money transfer, of any amount, during the relevant period.
[7] Assets on Platform are defined as cash held for customers, crypto assets held, crypto assets loaned, and crypto assets collateral received.
[8] Adjusted Working Capital is defined as the difference between current assets and current liabilities excluding warrant liability.

### Non-IFRS financial measures

We collect and analyze operating and financial data to evaluate the health of our business, allocate our resources and assess our performance. In addition to total net revenue, net loss and other results under IFRS, we utilize non-IFRS calculations of Assets on Platform, Adjusted EBITDA, and Adjusted Working Capital. We believe these non-IFRS financial measures provide useful information to investors and others in understanding and evaluating our financial condition, as well as providing a useful measure for period-to-period comparisons of our business performance. Moreover, non-IFRS financial measurements are key measurements used by our management internally to make operating decisions, including those related to operating expenses, evaluate performance, and perform strategic planning and annual budgeting. However, the non-IFRS measures are presented for supplemental informational purposes only, should not be considered a substitute for or superior to financial information presented in accordance with IFRS and may be different from similarly titled non-IFRS measures used by other companies.

### Assets on Platform

The following presents a reconciliation of cash held for customers, crypto assets held, crypto assets loaned, and crypto assets collateral received, the most directly comparable IFRS measure, to Assets on Platform:

| (in thousands) | March 31, 2022 | June 30, 2021 | March 31, 2021 |
|---|---|---|---|
| Cash held for customers | $ 112,413 | $ 162,852 | $ 77,747 |
| Crypto assets held | 3,433,142 | 2,286,399 | 2,099,204 |
| Crypto assets loaned | 2,022,444 | 393,561 | 379,643 |
| Crypto assets collateral received | 227,339 | - | - |
| Assets on Platform | $ 5,795,338 | $ 2,842,812 | $ 2,556,594 |

### Adjusted EBITDA

The following presents a reconciliation of net loss, the most directly comparable IFRS measure, to Adjusted EBITDA:

| (in thousands) | Three Months Ended March 31 | | Nine Months Ended March 31 | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Net loss | $ (61,440) | $ (68,563) | $ (87,769) | $ (81,535) |
| Change in fair value of warrant liability | (9,981) | 98,990 | (16,825) | 116,092 |
| Share-based payments | 5,386 | 5,271 | 14,506 | 6,650 |
| Provision for income tax | 10,945 | - | 1,962 | - |
| Amortization of intangible assets | 1,624 | 89 | 4,380 | 236 |
| Change in fair value of investments | - | (18,977) | (6,114) | (29,570) |
| Change in fair value of crypto assets borrowed | - | 30,030 | 13,584 | 36,282 |
| Fees on crypto assets borrowed | - | 1,319 | 2,532 | 1,428 |
| Adjusted EBITDA | $ (53,466) | $ 48,159 | $ (73,744) | $ 49,583 |

### Adjusted Working Capital

The following presents a reconciliation of total current assets and total current liabilities, the most directly comparable IFRS measure, to Adjusted Working Capital:

| (in thousands) | March 31, 2022 | June 30, 2021 | March 31, 2021 |
|---|---|---|---|
| Total current assets | $ 5,910,855 | $ 3,073,943 | $ 2,684,093 |
| Total current liabilities | 5,731,605 | 2,890,301 | 2,585,269 |
| Working capital | 179,250 | 183,642 | 98,824 |
| Add: Warrant liability | 6,102 | 23,810 | 98,236 |
| Adjusted Working Capital | $ 185,352 | $ 207,452 | $ 197,060 |

8

## Financial Overview

### *Revenues*

*Transaction revenue*

Our transaction revenue is derived from providing execution for customer-initiated crypto asset orders to buy, sell, or transfer crypto assets on the platform. Transaction revenue is based on the price and quantity of the crypto assets bought, sold, or withdrawn. Transaction revenue is recognized at the time the transaction is processed on our platform.

*Fees from crypto assets loaned*

We earn fees from crypto assets lending activities with institutional borrowers. We independently negotiate with each institutional borrower the terms of an agreement. These lending agreements generally are on an unsecured and secured basis, either for a fixed term of less than one year or can be repaid on a demand basis, and provide a crypto fee based on the percentage of crypto assets lent and denominated in the related crypto asset. We elect which and how much of our crypto assets are available for such lending activity.

*Merchant services*

Merchant services revenue consists of fees a merchant's customer pays us to process their cryptocurrency payment transactions and is recognized upon completion of a crypto payment transaction. Revenue is recognized net of refunds, which are reversals of transactions initiated by the merchant's customer. The gross merchant services revenues collected from all merchant customers are recognized as revenue on a gross basis as we are the primary obligor to each merchant's customer and are responsible for processing the crypto currency payment, have latitude in establishing pricing with respect to the merchant's customer and other terms of service, and assume the crypto currency conversion risk for the transaction processed.

*Staking revenue*

We also generate revenue from crypto assets through various blockchain protocols by either participating in the staking programs offered by the financial institutions, delegating crypto assets to staking platform providers or staking crypto assets directly with protocols/ smart contracts. These blockchain protocols, or the participants that form the protocol networks, reward users for performing various activities on the blockchain, such as participating in proof-of-stake networks and other consensus algorithms. In exchange for participating in proof-of-stake networks and other consensus algorithms, the Company earns rewards in the form of the native token of the network. The satisfaction of the performance obligation for processing and validating blockchain transactions occurs at a point in time when confirmation is received from the network indicating that the validation is complete, and the rewards are transferred into a digital wallet that the Company controls. At that point, revenue is recognized and is measured based on the number of tokens received and the fair value of the token at the date of recognition.

*Other revenue*

As part of the VGX token swap, the Company received 40 million in VGX tokens to power the Voyager Loyalty Program rewards and fund promotional campaigns for new and existing customers (the "Growth Pool")[9]. The acquisition of tokens in the Growth Pool does not qualify as an exchange that would be recognized as a transaction in the Company's financial statements ("exchange transaction"). Income from the Growth Pool is recognized when an exchange transaction occurs and is measured based on the fair value of tokens exchanged. The fair value is determined using the spot price of the token on the date of exchange.

---

[9] Post token swap, Voyager will mint a growth pool of tokens on an annual basis as described in the VGX white paper.

**Expenses**

Operating expenses consist of rewards paid to customers, marketing and sales, cost of merchant services, compensation and employee benefits, trade expenses, customer onboarding and service, professional, consulting, and general and administrative expenses. Operating expenses are expensed as incurred.

*Rewards paid to customers*

Rewards paid to customers include rewards paid to customers under the Rewards Program, which is a pay-in-kind program whereby customers earn crypto assets ("rewards") for maintaining a monthly minimum of certain crypto assets of the same type in their account. The number of different crypto assets eligible for the Rewards Program may vary over time, and rewards are determined monthly by the Company and paid to customers as permitted by applicable law.

*Marketing and sales*

Marketing and sales expenses primarily include costs related to customer advertising and marketing programs as well as commissions for referral programs.

*Cost of merchant services*

Cost of merchant services consist of payments made to the sellers or other financial institutions related to merchant services.

*Compensation and employee benefits*

Compensation and employee benefits include salaries, bonuses, benefits, taxes, and share-based payments. Our employees include customer support, technology, marketing, executives, and other administrative support personnel.

*Trade expenses*

Trade expenses mainly include gas, exchange, and custody fees.

*Customer onboarding and service*

Customer onboarding and service includes fees paid to third-party customer support vendors for customer verification, KYC and AML costs as well as payment processing charges.

*Professional and consulting*

Professional and consulting expenses include fees for legal, audit, tax, and other special projects.

*General and administrative*

General and administrative expenses mainly include technology, product development, recruitment, investor relationships, insurance, amortization of intangible assets, regulatory, compliance, and other business expenses.

**Other income (loss)**

*Change in fair value of warrant liability*

Change in fair value of warrant liability represents mark-to-market adjustments in warrant liability due to revaluation of warrant liability at the end of each reporting period.

*Change in fair value of investments*

Change in fair value of investments includes net unrealized gain (loss) as well as net realized gain (loss) on investments which are carried at fair value.

*Change in fair value of crypto assets borrowed*

Change in fair value of crypto assets borrowed includes net unrealized gain (loss) as well as net realized gain (loss) on crypto assets borrowed which are carried at fair value.

*Change in fair value of crypto assets held*

Change in fair value of crypto assets held represents mark-to-market adjustments on crypto assets held which are carried at fair value.

*Fees on crypto assets borrowed*

Fees on crypto assets borrowed represent crypto fees calculated as a percentage of the crypto asset borrowed and is denominated in the related crypto asset.

*Loss on issuance of warrants*

Loss on issuance of warrants represents the difference between the fair value of the warrant at initial recognition and transaction price.

*Gain on acquisitions, net*

Gain on acquisitions, net represents gains or losses we recognized on the asset or business acquisitions.

**Provision (benefit) for income tax**

We are subject to the income tax laws of Canada and those of the non-Canada jurisdictions in which the Company has business operations, which includes operating losses or profits in certain foreign jurisdictions for certain years depending on tax elections made, and foreign taxes on earnings of our wholly owned foreign subsidiaries. Our consolidated provision for income tax is affected by the mix of our taxable income in Canada, the U.S., and foreign subsidiaries, permanent items and unrecognized tax benefits.

## Results of Operations

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Transaction revenue | $ 33,386 | $ 53,736 | $ (20,350) | $ 163,402 | $ 57,418 | $ 105,984 |
| Other revenue | 5,626 | - | 5,626 | 13,868 | - | 13,868 |
| | 39,012 | 53,736 | (14,724) | 177,270 | 57,418 | 119,852 |
| Less: Trade expenses | (2,984) | (726) | (2,258) | (14,145) | (1,069) | (13,076) |
| Less: Customer onboarding and service | (3,525) | (2,677) | (848) | (9,179) | (2,677) | (6,502) |
| | $ 32,503 | $ 50,333 | $ (17,830) | $ 153,946 | $ 53,672 | $ 100,274 |
| **(in millions)** | | | | | | |
| Trading volume[10] | $ 4,783 | $ 4,942 | $ (159) | $ 18,434 | $ 5,546 | $ 12,888 |
| Trading volume, excluding stablecoins | 3,165 | 4,481 | (1,316) | 13,944 | 4,936 | 9,008 |
| | | | | | | |
| Average transaction spread[11], excluding stablecoins | 92.1 | 116.0 | (23.9) | 105.6 | 111.7 | (6.1) |

| (in thousands) | March 31, 2022 | March 31, 2021 | Change |
|---|---|---|---|
| Funded Accounts | 1,190 | 274 | 916 |

Transaction revenue decreased by $20.4 million for the three months ended March 31, 2022, as compared to the same period in the prior year. Transaction revenue is largely driven by trading volume and transaction spreads. During the quarter ended March 31, 2022, trading volume, excluding stablecoins, decreased from $4.5 billion to $3.2 billion, a decrease of 29.4%, and average transaction spread, excluding stablecoins, decreased from 116.0 basis points to 92.1 basis points as compared to the same period in the prior year. For the nine months ended March 31, 2022, transaction revenue increased by $106 million, as compared to the same period in the prior year. During the nine months ended March 31, 2022, trading volume, excluding stablecoins, increased from $4.9 billion to $13.9 billion, an increase of 182.5%, and average transaction spread, excluding stablecoins, decreased from 111.7 basis points to 105.6 basis points as compared to the same period in the prior year.

During the three and nine months ended March 31, 2022, the Company paid 2,997,889 and 5,828,757, respectively, in VGX tokens from the Growth Pool to settle Voyager Loyalty Program rewards as well as fund promotional campaigns for new and existing customers which resulted in recognition of other revenue of $5.6 million and $13.8 million, respectively.

Trade expenses increased by $2.3 million and $13.1 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year, mainly due to gas fees related to increase in ETH transfers.

Customer onboarding and service expenses increased by $0.8 million and $6.5 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year, due to growth in a customer base. Customer Funded Accounts grew by 916 thousand from March 31, 2021 to March 31, 2022.

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Fees from crypto assets loaned | $ 31,025 | $ 6,702 | $ 24,323 | $ 80,892 | $ 8,590 | $ 72,302 |
| Staking revenue | 14,359 | - | 14,359 | 42,788 | - | 42,788 |
| Less: Rewards paid to customers | (59,321) | (7,409) | (51,912) | (182,014) | (8,949) | (173,065) |
| | $ (13,937) | $ (707) | $ (13,230) | $ (58,334) | $ (359) | $ (57,975) |

| (in thousands) | March 31, 2022 | March 31, 2021 | Change |
|---|---|---|---|
| Crypto assets loaned | $ 2,022,444 | $ 379,643 | $ 1,642,801 |
| Crypto assets staked | $ 895,698 | $ - | $ 895,698 |

---

[10] "Trading volume" is the total U.S. dollar equivalent value of customer orders executed through the Platform during the period of measurement. Trading volume represents the sum of the product of the quantity of crypto asset bought or sold by customers and the customer's fill price for the related orders. The Platform (1) quotes an estimated price (which is the average price for a crypto asset as delivered by a proprietary quoting service that aggregates Voyager's available liquidity and computes a price), and (2) uses the smart order routing to search all open liquidity providers used by Voyager to find a better rate than the quoted estimated price. Where the router is able to achieve a better rate, Voyager shares a percentage of the price improvement with the customer and retains the remainder, comprising Voyager's transaction spread.

[11] "Average transaction spread" is calculated as net transaction spread divided by trading volume; only spread-generating coins are included in the calculation.

Fees from crypto assets loaned increased by $24.3 million and $72.3 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year, as we grew our crypto assets lending program and increased a number of crypto assets generating yield. Crypto assets loaned increased by $1,642.8 million to $2,022.4 million as of March 31, 2022, as compared to March 31, 2021.

During the nine months ended March 31, 2022, the Company started participating in various staking protocols. For the three and nine months ended March 31, 2022, we recorded $14.4 million and $42.8 million in staking revenue. As of March 31, 2022, $895.7 million of crypto assets held were delegated to participation in proof-of-stake networks and other consensus algorithms.

Rewards paid to customers increased by $51.9 million and $173.1 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year. The increase was primarily due to significant growth in the number of customers who participate in the Rewards Program and expansion of reward-bearing crypto assets within the Reward Program. On May 1, 2022, we announced a tiered rewards structure for BTC, ETH and USDC to limit the amount of rewards paid to customers in the higher tiers. Pursuant to this tiered rewards structure, a customer is rewarded the tiered percentage that corresponds to the applicable amount of BTC, ETH and USDC held by such customer in his or her account. The customer earns rewards equivalent to the relevant tier percentage for the full amount of eligible crypto assets.[12]

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Merchant services revenue | $ 18,347 | $ - | $ 18,347 | $ 48,148 | $ - | $ 48,148 |
| Less: Cost of merchant services | (17,979) | - | (17,979) | (47,184) | - | (47,184) |
| | $ 368 | $ - | $ 368 | $ 964 | $ - | $ 964 |

Merchant services revenue and cost of merchant services was driven by the Coinify acquisition on August 1, 2021.

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| *Share-based payments* | $ 5,386 | $ 5,271 | $ 115 | $ 14,506 | $ 6,650 | $ 7,856 |
| *Compensation and employee benefits* | 12,365 | 2,476 | 9,889 | 26,984 | 4,558 | 22,426 |
| Total compensation and employee benefits | 17,751 | 7,747 | 10,004 | 41,490 | 11,208 | 30,282 |
| Professional and consulting | 6,033 | 1,141 | 4,892 | 20,371 | 2,233 | 18,138 |
| General and administrative | 7,743 | 1,957 | 5,786 | 20,703 | 5,327 | 15,376 |
| | $ 31,527 | $ 10,845 | $ 20,682 | $ 82,564 | $ 18,768 | $ 63,796 |

| | March 31, 2022 | March 31, 2021 | Change |
|---|---|---|---|
| Headcount | 318 | 79 | 239 |

Total compensation and employee benefits increased by $10.0 million and $30.3 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year. The increase was driven by a headcount increase of 239 employees to 318 employees as of March 31, 2022, compared to the same period in the prior year. The Coinify acquisition resulted in headcount growth of 54 employees.

Professional and consulting expense increased by $4.9 million and $18.1 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year, which was primarily driven by increase in advisory and technology consulting expenses related to the growth of the business, the Coinify acquisition and general legal expenses related to regulatory matters.

General and administrative expenses increased by $5.8 million and $15.4 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year, which was primarily driven by the growth of the business which led to increased expenditure in technology, recruitment, investor relations, insurance costs and other corporate expenses.

---

[12] For example, currently, if a customer holds $40,000 USDC on the Platform he or she will earn 9% on the first $25,000 USDC and 7.25% on USDC amounts between $25,001 and $40,000 USDC.

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Total revenues | $ 102,743 | $ 60,438 | $ 42,305 | $ 349,098 | $ 66,008 | $ 283,090 |
| Total operating expenses, excluding marketing and sales | 115,336 | 21,657 | 93,679 | 335,086 | 31,463 | 303,623 |
| Income (loss) before other loss, excluding marketing and sales | (12,593) | 38,781 | (51,374) | 14,012 | 34,545 | (20,533) |
| Marketing and sales | 30,367 | 8,935 | 21,432 | 82,082 | 10,288 | 71,794 |
| Income (loss) before other loss | $ (42,960) | $ 29,846 | $ (72,806) | $ (68,070) | $ 24,257 | $ (92,327) |

Marketing and sales expenses increased by $21.4 million and $71.8 million for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year. The increase was primarily due to increase in various sales and marketing campaigns including market-leading partnerships with professional athletes, online advertisement, and referral programs.

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Change in fair value of crypto assets held | $ (17,516) | $ 12,953 | $ (30,469) | $ (24,560) | $ 18,440 | $ (43,000) |
| Change in fair value of investments | - | 18,977 | (18,977) | 6,114 | 29,570 | (23,456) |
| Change in fair value of crypto assets borrowed | - | (30,030) | 30,030 | (13,584) | (36,282) | 22,698 |
| Change in fair value of warrant liability | 9,981 | (98,990) | 108,971 | 16,825 | (116,092) | 132,917 |
| Fees on crypto assets borrowed | - | (1,319) | 1,319 | (2,532) | (1,428) | (1,104) |
| Total other loss | $ (7,535) | $ (98,409) | $ 90,874 | $ (17,737) | $(105,792) | $ 88,055 |

Other loss decreased by $90.9 million for the three months ended March 31, 2022, as compared to the same period in the prior year, primarily due to the decrease in change in fair value of warrant liability. Other loss decreased by $88.1 million for the nine months ended March 31, 2022, as compared to the same period in the prior year, due to the decrease in change in fair value of warrant liability, partially offset by the increase in change in fair value of crypto assets held.

Included in change in fair value of investments and change in fair value of crypto assets borrowed are realized gain (loss) for the sale of the investment as well as paydown of the crypto assets borrowed, respectively.

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Provision for income tax | $ 10,945 | $ - | $ 10,945 | $ 1,962 | $ - | $ 1,962 |

Provision for income tax increased by the change in valuation allowance on our deferred tax assets for the three and nine months ended March 31, 2022, as compared to the same periods in the prior year.

14

**Liquidity and Capital Resources[13]**

Our primary sources of liquidity are cash generated from operations and net proceeds from our capital raising activities. As of March 31, 2022, we had cash and cash equivalents of $99.4 million, exclusive of cash held for customers. As of March 31, 2022, we had $112.4 million cash held for customers at the Bank (under a "for the benefit of" omnibus account).

*Cash flows*

| (in thousands) | Nine Months Ended March 31 | | | |
| | 2022 | | 2021 | |
|---|---|---|---|---|
| Net cash (used in) provided by operating activities | $ | (194,431) | $ | 13,411 |
| Net cash provided by investing activities | | 25,576 | | - |
| Net cash provided by financing activities | | 23,877 | | 131,724 |
| Net (decrease) increase in cash and cash equivalents and cash held for customers | $ | (144,978) | $ | 145,135 |

*Operating activities*

Net cash used in operating activities was $194.4 million for the nine months ended March 31, 2022. Our net cash used in operating activities reflected a net loss of $87.8 million, non-cash adjustments of $97.2 million and changes in operating assets and liabilities of $203.8 million. Non-cash adjustments primarily included $182.0 million in rewards paid to customers, $24.6 million in change in fair value of crypto assets held, $14.5 million in share-based payments and $13.6 million in change in fair value of crypto assets borrowed, which were partially offset by $80.9 million in fees from crypto assets loaned, $42.8 million in staking revenue and $16.8 million in change in fair value of warrant liability.

Net cash provided by operating activities was $13.4 million for the nine months ended March 31, 2021. Our net cash provided by operating activities reflected net loss of $81.5 million, non-cash adjustments of $113.5 million and changes in operating assets and liabilities of $18.6 million. Non-cash adjustments primarily included $116.1 million in change in fair value of warrant liability, $36.3 million in change in fair value of crypto assets borrowed, $8.9 million in rewards paid to customers and $6.7 million in share-based payments, which were partially offset by $29.6 million in change in fair value of investments, $18.4 million in change in fair value of crypto assets held and $8.6 million in fees from crypto assets loaned.

*Investing activities*

Net cash provided by investing activities of $25.6 million for the nine months ended March 31, 2022 primarily related to proceeds received from the sale of an investment, which was partially offset by cash paid for the Coinify acquisition.

*Financing activities*

Net cash provided by financing activities of $23.9 million for the nine months ended March 31, 2022 primarily related to $75.0 million of proceeds received from issuing shares in private placement and $3.4 million of proceeds received from warrant exercises, which were partially offset by paydown of borrowings of $48.1 million and share repurchases under the NCIB of $6.6 million.

Net cash provided by financing activities of $131.7 million for the nine months ended March 31, 2021 primarily related to $145.5 million of proceeds received from issuing shares and warrants in private placements and $5.4 million of proceeds received from warrant exercises, which were partially offset by paydown of borrowings of $21.0 million.

**Private Placement**

On May 16, 2022, the Company announced that it has obtained subscription agreements from subscribers for a private placement of common shares of the Company (the "Shares") for gross proceeds of approximately $60 million at a price of $2.34 per Share (equivalent CDN$3.00 per Share) (the "Offering"). Closing of the Offering remains subject to customary closing conditions, including approval of the TSX.

---

[13] The Company's liquidity and capital resources were not materially impacted by COVID-19 and related economic conditions during the period. We are continuously monitoring our liquidity and capital resources due to the current pandemic.

*Base Shelf Prospectus*

The Company has filed and obtained a receipt for its final short form Base Shelf Prospectus dated August 17, 2021 (the "Base Shelf Prospectus") with the securities regulatory authorities in each of the provinces and territories of Canada. The Base Shelf Prospectus will allow the Company to make offerings of common shares, warrants, units, debt securities, and subscription receipts, or any combination thereof, for up to an aggregate total of $300.0 million during the 25-month period that the Base Shelf Prospectus is effective. As of March 31, 2022, the Company has not made any offerings related to Base Shelf Prospectus.

*Future funding*

Based on our current level of operations, we believe our available cash and cash provided by operations will be adequate to meet our current liquidity needs for the next 12 months. Our future capital requirements will depend on many factors, including market acceptance of crypto assets and blockchain technology, our growth, our ability to attract and retain customers on our platform, the continuing market acceptance of products and services, the introduction of new products and services on our platform, expansion of sales and marketing activities, and overall economic conditions. We also will continually evaluate opportunities for us to maximize our growth and further enhance our strategic position, including, among other things, acquisitions, strategic alliances, and joint ventures. As a result, we may need to raise additional funds to finance our future business activities.

## Quarterly Highlights and Results

The following sets forth our highlights of unaudited quarterly results of operations for the indicated periods. Our historical results are not necessarily indicative of the results that may be expected in any other period in the future, and the results of a particular quarter or other interim period are not necessarily indicative of the results to be expected for the full year or any other period.

| (in thousands) | Q3 2022 | Q2 2022 | Q1 2022 | Q4 2021 | Q3 2021 | Q2 2021 | Q1 2021 | Q4 2020 |
|---|---|---|---|---|---|---|---|---|
| Total revenue | $ 102,743 | $ 164,848 | $ 81,507 | $ 109,048 | $ 60,438 | $ 3,569 | $ 2,001 | $ 708 |
| Total expenses | 145,703 | 161,633 | 109,832 | 77,457 | 30,592 | 6,477 | 4,685 | 4,904 |
| Total other income (loss) | (7,535) | 1,017 | (11,219) | 9,598 | (98,409) | (6,089) | (1,291) | (777) |
| Net income (loss) before income tax | (50,495) | 4,232 | (39,544) | 41,189 | (68,563) | (8,997) | (3,975) | (4,973) |
| Provision (benefit) for income tax | 10,945 | 1,644 | (10,627) | 11,142 | - | - | - | - |
| Net income (loss) | $ (61,440) | $ 2,588 | $ (28,917) | $ 30,047 | $ (68,563) | $ (8,997) | $ (3,975) | $ (4,973) |

*Quarterly Reconciliation of Non-IFRS Financial Measure*

In addition to our results determined in accordance with IFRS, we believe Adjusted EBITDA, a non-IFRS measure, is useful in evaluating our operating performance. We use Adjusted EBITDA to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that Adjusted EBITDA may be helpful to investors because it provides consistency and comparability with past financial performance. However, Adjusted EBITDA is presented for supplemental informational purposes only, has limitations as an analytical tool, and should not be considered in isolation or as a substitute for financial information presented in accordance with IFRS.

The following provides a quarterly reconciliation of net income (loss) to Adjusted EBITDA:

| (in thousands) | Q3 2022 | Q2 2022 | Q1 2022 | Q4 2021 | Q3 2021 | Q2 2021 | Q1 2021 | Q4 2020 |
|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ (61,440) | $ 2,588 | $ (28,917) | $ 30,047 | $ (68,563) | $ (8,997) | $ (3,975) | $ (4,973) |
| Change in fair value of warrant liability | (9,981) | 3,627 | (10,471) | (26,265) | 98,990 | 15,589 | 1,513 | (1,204) |
| Share-based payments | 5,386 | 3,962 | 5,158 | 6,214 | 5,271 | 354 | 1,025 | 283 |
| Provision (benefit) for income tax | 10,945 | 1,644 | (10,627) | 11,142 | - | - | - | - |
| Amortization of intangible assets | 1,624 | 1,650 | 1,106 | 75 | 89 | 65 | 82 | (50) |
| Change in fair value of investments | - | (1,864) | (4,250) | 21,281 | (18,977) | (10,593) | - | - |
| Change in fair value of crypto assets borrowed | - | 4,426 | 9,158 | (24,473) | 30,030 | 6,252 | - | - |
| Fees on crypto assets borrowed | - | 1,390 | 1,142 | 1,101 | 1,319 | 106 | - | - |
| Loss on issuance of warrants | - | - | - | - | - | - | - | 1,157 |
| Gains on acquisitions, net | - | - | - | - | - | - | - | 706 |
| Adjusted EBITDA | $ (53,466) | $ 17,423 | $ (37,701) | $ 19,122 | $ 48,159 | $ 2,776 | $ (1,355) | $ (4,081) |

## Critical Accounting Estimates

In preparing interim condensed consolidated financial statements, management has made judgements and estimates that affect the application of accounting policies and the reported amounts of assets and liabilities, income and expense. Actual results may differ from these estimates. The significant judgements made by management in applying the Company's accounting policies and the key sources of estimation uncertainty were the same as those described in the last annual financial statements.

## Changes in Accounting Policies

There were no changes to the accounting policies for the three and nine months ended March 31, 2022, other than as discussed below:

### *Business combinations*

Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred, which is measured at acquisition date fair value. Acquisition-related costs are expensed as incurred.

The Company determines that it has acquired a business when the acquired set of activities and assets include an input and a substantive process that together significantly contribute to the ability to create outputs. The acquired process is considered substantive if it is critical to the ability to continue producing outputs, and the inputs acquired include an organized workforce with the necessary skills, knowledge, or experience to perform that process or it significantly contributes to the ability to continue producing outputs and is considered unique or scarce or cannot be replaced without significant cost, effort, or delay in the ability to continue producing outputs.

When the Company acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances, and pertinent conditions as at the acquisition date.

Goodwill is initially measured at cost (being the excess of the aggregate of the consideration transferred over the net identifiable assets acquired and liabilities assumed). If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Company re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognized at the acquisition date. If the reassessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognized in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Company's cash-generating units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

### *Merchant services/ Cost of merchant services*

Merchant services revenue consists of fees a merchant's customer pays the Company to process their crypto currency payment transactions and is recognized upon completion of a crypto payment transaction. Revenue is recognized net of refunds, which are reversals of transactions initiated by the merchant's customer. The gross merchant services revenues collected from all merchant customers are recognized as revenue on a gross basis as the Company is the primary obligor to the merchant customers and is responsible for processing their crypto currency payments, has latitude in establishing pricing with respect to the merchant customers and other terms of service, and assumes the crypto currency conversion risk for the transactions processed.

Cost of merchant services consist of payments made to the merchants or other financial institutions.

*Staking revenue*

The Company generates revenues from crypto assets through various blockchain protocols by either participating in the staking programs offered by the financial institutions, delegating crypto assets to staking platform providers or staking crypto assets directly with protocols/ smart contracts. These blockchain protocols, or the participants that form the protocol networks, reward users for performing various activities on the blockchain, such as participating in proof-of-stake networks and other consensus algorithms. In exchange for participating in proof-of-stake networks and other consensus algorithms, the Company earns rewards in the form of the native token of the network. The satisfaction of the performance obligation for processing and validating blockchain transactions occurs at a point in time when confirmation is received from the network indicating that the validation is complete, and the rewards are transferred into a digital wallet that the Company controls. At that point, revenue is recognized. Revenue is measured based on the number of tokens received and the fair value of the token at the date of recognition.

*Crypto assets loaned/ borrowed*

The Company enters into loan/ borrow agreements for certain crypto assets with institutional borrowers on an unsecured and secured basis. The term of these agreements can either be for a fixed term of less than one year or can be open-ended and repayable at the option of the Company or the borrower. These agreements bear a crypto fee receivable/ payable which is based on a percentage of the crypto asset borrowed/ lent and is denominated in the related crypto asset. Collateral received under the loan agreements, where the Company has the ability to control the collateral received, is recognized as part of the crypto assets collateral received in its interim condensed consolidated statements of financial position. The Company also recognizes a corresponding obligation to return the collateral received as part of crypto assets collateral payable in its interim condensed consolidated statements of financial position.

## Financial Instruments and Crypto Assets

All financial and non-financial assets and liabilities measured or disclosed at fair value are categorized into one of three fair value hierarchy levels in accordance with IFRS. The fair value hierarchy is based on the transparency of inputs to the valuation of an asset or liability as of the measurement date. In certain cases, the inputs used to measure fair value may fall within different levels of the fair value hierarchy. For disclosure purposes, the level in the hierarchy within which an instrument is classified in its entirety is based on the lowest level input that is significant to the position's fair value measurement:

Level 1 – quoted prices (unadjusted) in active markets for identical assets and liabilities;

Level 2 – valuation techniques for which all significant inputs are, or are based on, observable market data; or

Level 3 – valuation techniques for which significant inputs are not based on observable market data.

The following presents the fair value hierarchy for the Company's assets and liabilities measured at fair value by level as of March 31, 2022 and June 30, 2021 (in thousands):

| March 31, 2022 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| *Assets:* | | | | |
| Crypto assets held | $ - | $ 3,433,142 | $ - | $ 3,433,142 |
| Crypto assets loaned | - | 2,022,444 | - | 2,022,444 |
| Crypto assets collateral received | - | 227,339 | - | 227,339 |
| Investments | - | 512 | 8,052 | 8,564 |
| Total | $ - | $ 5,683,437 | $ 8,052 | $ 5,691,489 |
| *Liabilities:* | | | | |
| Crypto assets and fiat payable to customers | $ - | $ 5,482,009 | $ - | $ 5,482,009 |
| Crypto assets collateral payable | - | 227,339 | - | 227,339 |
| Warrant liability | - | - | 6,102 | 6,102 |
| Total | $ - | $ 5,709,348 | $ 6,102 | $ 5,715,450 |

| June 30, 2021 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets:** | | | | |
| Crypto assets held | $          - | $   2,286,399 | $          - | $   2,286,399 |
| Crypto assets loaned | - | 393,561 | - | 393,561 |
| Investments | 31,359 | - | 850 | 32,209 |
| Total | $   31,359 | $   2,679,960 | $   850 | $   2,712,169 |
| **Liabilities:** | | | | |
| Crypto assets and fiat payable to customers | $          - | $   2,807,015 | $          - | $   2,807,015 |
| Crypto assets borrowed | - | 36,832 | - | 36,832 |
| Warrant liability | - | - | 23,810 | 23,810 |
| Total | $          - | $   2,843,847 | $   23,810 | $   2,867,657 |

There have been no transfers between levels 1 and 2, or transfers in or out of level 3 for the nine months ended March 31, 2022.

Valuation of Assets/ Liabilities that use Level 1 inputs: Consists of the Company's investments which are valued using public closing price in active markets.

Valuation of Assets/ Liabilities that use Level 2 inputs: Consists of the Company's crypto assets held, crypto assets loaned, crypto assets collateral received, crypto assets and fiat payable to customers, crypto assets collateral payable, crypto assets borrowed and investments. For the crypto assets, the fair value is determined by the Voyager's Pricing Engine using a market approach whereby volume-weighted average prices are derived from quoted market prices and spread data published by the principal exchanges and liquidity providers/ market makers as of 12:00 am UTC for identical assets.

Valuation of Assets/ Liabilities that use Level 3 inputs: Consists of the Company's warrant liability and investments. Warrant liability is valued using Black-Scholes model. Investments are initially marked at their transaction price and are revalued using net asset values or when the position is deemed to be impaired.

### Level 3 disclosures

The following is reconciliation of warrant liability as of March 31, 2022 and 2021, respectively (in thousands):

| | Fair Value |
|---|---|
| **Balance, June 30, 2021** | $   23,810 |
| Change in fair value | (16,825) |
| Exercised | (883) |
| **Balance, March 31, 2022** | $   6,102 |
| | |
| **Balance, June 30, 2020** | $   2,197 |
| Issued | 4,923 |
| Change in fair value | 116,092 |
| Exercised | (24,976) |
| **Balance, March 31, 2021** | $   98,236 |

A summary of the assumptions used in the valuation model for re-measuring warrants as of March 31, 2022 and June 30, 2021, is set out below.

| | March 31, 2022 | June 30, 2021 |
|---|---|---|
| Common share market price | CDN$   6.71 | CDN$   21.17 |
| Estimated weighted average life in years | 1.3 | 1.8 |
| Weighted average risk-free interest rate | 2.25% | 0.65% |
| Estimated common share weighted average price volatility | 122.42% | 144.3% |
| Expected dividend yield | - | - |
| Foreign exchange rate | $   0.80 | $   0.81 |
| Estimated weighted average fair value per warrant | $   4.41 | $   16.09 |

*Valuation techniques*

The following summarizes the valuation techniques and significant inputs used in the fair value measurement of the Company's assets and liabilities:

| Category | Valuation Methods and Techniques | Key Inputs |
|---|---|---|
| Crypto assets held<br>Crypto assets loaned<br>Crypto assets collateral received<br>Crypto assets and fiat payable to customers<br>Crypto assets collateral payable<br>Crypto assets borrowed | Volume-weighted average of trading prices | Current trading prices of subject crypto assets |
| Investments | Public closing price in active markets<br>Where market prices are not available, initially marked at their transaction price and are revalued using net asset values or when the position is deemed to be impaired | Public closing prices of subject securities<br>Net asset values |
| Warrant liability | Black-Scholes model | Public closing prices of subject securities<br>Expected volatility of public closing prices of subject securities<br>Expected term of the option<br>Risk-free interest rate expected dividend yield |

*Crypto assets*

*Crypto assets held*

As of March 31, 2022 and June 30, 2021, crypto assets held consisted of the following (in thousands, except for number of coins):

| March 31, 2022 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 25,171 | $ 1,145,803 | 33% |
| ADA | 272,537,531 | 311,141 | 9% |
| VGX | 166,941,442 | 306,946 | 9% |
| SHIB | 8,129,000,481,638 | 211,354 | 6% |
| ETH | 59,579 | 195,561 | 6% |
| USDC | 167,291,082 | 167,291 | 5% |
| DOT | 6,340,479 | 135,237 | 4% |
| SOL | 823,148 | 101,109 | 3% |
| VET | 1,247,773,431 | 97,325 | 3% |
| AVAX | 977,774 | 95,287 | 3% |
| DOGE | 628,031,160 | 86,759 | 3% |
| MATIC | 39,633,018 | 64,140 | 2% |
| BTT | 30,503,515,682,093 | 61,007 | 2% |
| LINK | 3,428,100 | 57,995 | 2% |
| HBAR | 196,036,461 | 46,298 | 1% |
| Other |  | 349,889 | 9% |
| Total |  | $ 3,433,142 | 100% |

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 15,396 | $ 539,928 | 24% |
| ETH | 168,731 | 383,833 | 17% |
| VGX | 139,169,871 | 351,063 | 15% |
| ADA | 218,181,643 | 277,152 | 12% |
| VET | 1,172,941,784 | 106,659 | 5% |
| BTT | 35,824,314,738 | 99,735 | 4% |
| USDC | 63,125,815 | 63,126 | 3% |
| DOGE | 221,963,050 | 56,377 | 2% |
| DOT | 3,069,732 | 50,252 | 2% |
| LINK | 1,820,365 | 35,545 | 2% |
| SHIB | 3,857,895,871,062 | 34,721 | 2% |
| HBAR | 156,280,743 | 30,533 | 1% |
| STMX | 1,503,678,568 | 28,330 | 1% |
| LTC | 161,556 | 23,299 | 1% |
| Other | | 205,846 | 9% |
| Total | | $ 2,286,399 | 100% |

As of March 31, 2022 and June 30, 2021, $895.7 million (mainly comprised of 96% of VGX, 94% of ADA, 92% of DOT, 90% of SOL, and 89% of MATIC) and $0.0 million of crypto assets held were restricted due to participation in proof-of-stake networks and other consensus algorithms. The lock-up period for any restricted asset is generally no longer than 28 days.

*Crypto assets loaned*

As of March 31, 2022 and June 30, 2021, crypto assets loaned consisted of the following (in thousands, except for number of coins):

| March 31, 2022 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| USDC | 633,149,877 | $ 633,150 | 31% |
| ETH | 191,660 | 629,100 | 31% |
| BTC | 53,840 | 379,369 | 19% |
| LUNA | 2,059,577 | 212,236 | 10% |
| Other | | 168,589 | 9% |
| Total | | $ 2,022,444 | 100% |

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 3,751 | $ 131,556 | 33% |
| DOGE | 462,105,000 | 117,371 | 30% |
| ADA | 43,545,000 | 60,310 | 15% |
| ETH | 16,251 | 36,968 | 9% |
| LINK | 682,300 | 13,323 | 4% |
| Other | | 34,033 | 9% |
| Total | | $ 393,561 | 100% |

As of March 31, 2022 and June 30, 2021, the crypto assets loaned disaggregated by significant borrowing counterparty was as follows (in thousands):

| | Borrowing Rates | March 31, 2022 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | 1.0% - 7.5% | $ 728,160 | $ - |
| Counterparty B | 2.0% - 9.0% | 326,317 | - |
| Counterparty C | 4.0% - 13.5% | 295,115 | - |
| Counterparty D | 1.0% - 15.0% | 252,267 | - |
| Counterparty E | 1.0% - 30.0% | 141,228 | 164,085 |
| Counterparty F | 0.5% - 8.9% | 119,488 | 57,975 |
| Counterparty G | 10.0% | 34,908 | 137,056 |
| Other | 1.0% - 10.0% | 124,961 | 34,445 |
| Total | | $ 2,022,444 | $ 393,561 |

21

As of March 31, 2022 and June 30, 2021, the Company's crypto assets loaned balances were concentrated with counterparties as follows:

| | Geography | March 31, 2022 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | British Virgin Islands | 36% | - |
| Counterparty B | Singapore | 16% | - |
| Counterparty C | U.S. | 15% | - |
| Counterparty D | United Kingdom | 12% | - |
| Counterparty E | Canada | 7% | 42% |
| Counterparty F | U.S. | 6% | 14% |
| Counterparty G | U.S. | 2% | 35% |
| Other | Various | 6% | 9% |
| Total | | 100% | 100% |

*Crypto assets and fiat payable to customers*

As of March 31, 2022 and June 30, 2021, crypto assets and fiat payable to customers consisted of the following (in thousands, except for number of coins):

| March 31, 2022 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 32,875 | $ 1,496,469 | 27% |
| USDC | 841,567,122 | 841,567 | 15% |
| ETH | 244,108 | 801,256 | 15% |
| ADA | 268,674,618 | 306,731 | 6% |
| VGX | 160,251,289 | 294,645 | 5% |
| SHIB | 9,421,797,884,728 | 244,967 | 4% |
| LUNA | 2,110,276 | 217,460 | 4% |
| DOT | 6,411,514 | 136,753 | 2% |
| USD | n/a | 111,681 | 2% |
| SOL | 820,859 | 100,828 | 2% |
| VET | 1,230,926,166 | 96,011 | 2% |
| AVAX | 979,059 | 95,413 | 2% |
| DOGE | 613,016,276 | 84,685 | 2% |
| MATIC | 39,159,683 | 63,374 | 1% |
| LINK | 3,616,288 | 61,179 | 1% |
| HBAR | 245,134,396 | 57,893 | 1% |
| Other | | 471,097 | 9% |
| Total | | $ 5,482,009 | 100% |

| June 30, 2021 | Number of Coins | Fair Value | Fair Value Share |
|---|---|---|---|
| BTC | 18,885 | $ 662,284 | 24% |
| ETH | 184,763 | 420,302 | 15% |
| VGX | 133,922,886 | 337,827 | 12% |
| ADA | 242,817,641 | 336,306 | 12% |
| USDC | 212,795,099 | 212,795 | 8% |
| DOGE | 683,333,678 | 173,561 | 6% |
| VET | 1,167,966,843 | 106,207 | 4% |
| BTT | 35,820,687,793 | 99,725 | 3% |
| DOT | 3,118,349 | 51,048 | 2% |
| LINK | 2,503,524 | 48,885 | 2% |
| SHIB | 3,781,248,577,983 | 34,031 | 1% |
| HBAR | 156,276,325 | 30,532 | 1% |
| Other | | 293,512 | 10% |
| Total | | $ 2,807,015 | 100% |

## Risk Management

The Company's financial instruments as well as crypto assets are exposed to certain financial risks, which include crypto asset risk, credit risk, currency risk and liquidity risk. The Company's senior management oversees the management of these risks. The Company's senior management is supported by a Risk Management Committee that advises on financial risks and the appropriate financial risk governance framework for the Company. The Risk Management Committee provides assurance to the Company's senior management that the Company's financial risk activities are governed by appropriate policies and procedures and that financial risks are identified, measured, and managed in accordance with the Company's policies and risk objectives. The Board of Directors has the authority to review and agree policies for managing each of these risks, which are summarized below.

### Crypto assets risks

#### Custody

The Company utilizes the functional authority granted by customers in the user agreement to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of crypto assets held in customer accounts. The Company prioritizes the use of secure self-custody and third-party custody solutions to safeguard crypto assets. However, the Company also seeks to maximize liquidity and efficient trading for customers by holding certain amounts of crypto assets with trading partners, including cryptocurrency exchanges. Finally, the Company also maintains some crypto assets in internal hot wallets to process customer requested withdrawals and transfers.

#### Self-custody solutions

The Company utilizes the Fireblocks platform (which operates from New York and Tel Aviv and is SOC 2 Type II compliant), to securely store, transfer and stake a material portion of its crypto assets. The Fireblocks secure hot vault and secure transfer environments establish connections between the Company's wallets and its third-party trading partners. The Fireblocks secure hot vault environment employs multi-party computation technology where private keys are distributed across multiple locations to ensure security is not attributed to a single device at any point in time. The Fireblocks secure transfer environment utilizes enclave technology and encryption to prevent vulnerabilities associated with authenticating wallet addresses. All internal wallets owned by the Company and external wallets for addresses of the Company's third-party trading partners require multiple approvals through quorum in accordance with our whitelisting policy. As such, the Company transfers crypto assets using the Fireblocks platform without the risk of losing funds due to deposit address attacks or errors. The Fireblocks secure hot vault and secure transfer environments are integrated with the Fireblocks authorization workflow where user-level permissions as well as multi-approval workflows policies are set by the Company.

The Company employs other self-custody solutions to securely store, transfer, and stake its crypto assets. Private keys are generated, backed-up and maintained in secured locations. Access to private keys and back-ups are segregated amongst authorized personnel throughout the Company to ensure appropriate segregation of duties are maintained between departments. The Company's private key management protocols are considered highly sensitive information, and access is limited following least privilege principles to maintain their confidentiality and integrity and minimize security threats.

#### Third-party custodians

The Company uses institutional grade custodians to secure crypto assets. A material percentage of which are custodied among Anchorage Digital Bank N.A. ("Anchorage") and Coinbase Custody Trust Company, LLC ("Coinbase Custody"). The Company maintains internal controls to ensure that accounts held with each custodian are appropriately authorized and access restricted. As a part of regular operations, designated Company employees review and monitor custodied balances against internal records, verifying the accuracy of each crypto asset holding.

Anchorage is a federally chartered bank regulated by the Office of the Comptroller of the Currency headquartered in San Francisco, California and is SOC 2 Type I certified and SOC 1 Type II compliant. Anchorage generates digital asset private keys in air-gapped hardware security models and the key generation unfractured that is physically isolated from public network connectivity. Asset transfers require a quorum-based approvals from multiple authorized users in accordance with policies set by the Company.

Coinbase Custody, a New York state chartered trust that is a fiduciary regulated by New York Department of Financial Services, operates as a standalone, independently capitalized business to Coinbase, Inc. Coinbase Custody is a fiduciary under NY State Banking Law. Coinbase Custody provides cold storage solutions that enables transfers of supported crypto assets. Private keys are encrypted and sharded so that the process of bringing a key online requires a consensus of individuals and network access with encrypted shards being stored in a restricted storage cabinet in a cold storage environment. Coinbase Custody is SOC 1 Type II compliant and SOC 2 Type II compliant.

*Trading partners*

The Company prioritizes using the self-custody and third-party custody solutions described above, but to maintain liquidity for customer trade execution, the Company also maintains crypto asset balances with several crypto trading partners, including cryptocurrency exchanges. These trading partners are domiciled across multiple geographies including the U.S. and Cayman Islands. The Company has a due diligence program for all trading partners and conducts security reviews. As part of its due diligence process, the Company assesses security, reputation, liquidity levels of the borrower in applicable assets, capitalization, management, internal control practices and operational risks in its determination of utilizing any trading partner. Once onboarded, each trading partner is monitored on an ongoing basis to ensure they maintain compliance with internally established credit and risk exposure thresholds. Certain trading partners accounts with material balances are integrated within the Fireblocks platform to allow authorized users to initiate transfers directly from Fireblocks to dedicated vault accounts within the platform. Trading partners' risk exposures are monitored across the Company's positions. As a part of regular operations, designated Company employees review and monitor trading partner balances against internal records, verifying the accuracy of each crypto asset holding.

Insurance policies held by the Company's custodians/ trading partners are between the applicable custodian/ trading partner and the insurer, and accordingly the Company is not a named payee on such policies. The Company is not always able to obtain and review copies of the insurance policies of its custodians/ trading partners. The Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balances that are stolen or lost from such a custodian/ trading partner. The Company does not maintain any insurance coverage over its customer crypto assets.

The Company is not aware of any security breaches or other similar incidents involving self-custodied assets or crypto assets held with any third-party custodians, trading partners or institutional borrowers. None of the third-party custodians, trading partners, or institutional borrowers holding the Company's crypto assets is a "Canadian financial institution" (as defined in NI 45-106) or, other than Anchorage, a foreign equivalent, a related party of the Company, and none provide services to the Company other than custody, trade execution, and borrowing transactions. To the Company's knowledge, none of self-custody or third-party custodians have appointed sub-custodians to hold the Company's crypto assets, though the Company understands that certain trading partners may from time to time employ sub-custodians. In the event of bankruptcy or insolvency of trading partners, third-party custodians or institutional borrowers, the Company expects that it would be treated as an unsecured creditor.

**Credit risk**

Credit risk is the risk that one party to a financial instrument will fail to fulfill an obligation and causes the other party to incur a financial loss. The Company's credit risk consists primarily of cash and cash equivalents, cash held for customers, crypto assets held, crypto assets loaned, and crypto assets collateral received. The credit risk is minimized by placing these instruments with major financial institutions and other institutional counterparties. Management believes that the credit risk concentration with respect to its bank deposits is remote since all cash is held with financial institutions of reputable credit.

The Company limits its credit risk of crypto assets held (including staked crypto assets) by placing these with cryptocurrency exchanges on which the Company has performed internal due diligence. The Company deems these procedures necessary as cryptocurrency exchanges are unregulated and therefore not subject to regulatory oversight. Furthermore, cryptocurrency exchanges engage in the practice of commingling their customers' assets in exchange wallets. When crypto assets are commingled, transactions are not recorded on the applicable blockchain ledger, but are only recorded by the exchange. Therefore, there is risk around the occurrence of transactions, or the existence of period end balances represented by exchanges. The Company's due diligence of exchanges include, but is not limited to, internal control procedures around on-boarding new exchanges, which includes review of the exchanges' AML and KYC policies, monitoring of market information about the exchanges security and solvency risk, setting balance limits for each exchange

account based on risk exposure thresholds and having a fail-over plan to move cash and crypto currencies held with an exchange in instances where risk exposure significantly changes. The Company has no reason to believe it will incur material liability associated with such exposure because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within crypto asset exchanges control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss.

The crypto assets lent by the Company are exposed to the credit risk of the institutional borrowers. The Company limits such credit risk by lending to borrowers that the Company believes, based on its due diligence, to be high quality financial institutions with sufficient capital to meet their obligations as they come due. The Company's due diligence procedures for its lending activities may include review of the financial position of the borrower, liquidity levels of the borrower in applicable assets, review of the borrower's management, review of certain internal control procedures of the borrower, review of market information, and monitoring the Company's risk exposure thresholds. The Company's Risk Management Committee meets regularly to assess and monitor the credit risk for each counterparty. As of March 31, 2022, the Company has not experienced a material loss on any of its crypto assets loaned.

*Market risk*

The Company has investments in crypto assets which may be subject to significant changes in value and therefore exposed to market risk with the fluctuation in market prices. The Company monitors this risk on a daily, weekly and monthly basis. While the Company intends to have limited direct investment in crypto assets, the business model is such that the Company earns fees in crypto assets and at times may accumulate positions that are subject to market risk.

*Valuation*

The Company is exposed to risk with respect to crypto asset prices and valuations which are largely based on the supply and demand of these crypto assets in the financial markets. The Company's valuation governance framework includes numerous controls and other procedural safeguards that are intended to maximize the quality of fair value measurements. New products and valuation techniques must be reviewed and approved by senior management. As the Company's valuation process for crypto assets is automated through Voyager's proprietary pricing engine (the "Voyager Pricing Engine"), fair value estimates are also validated by the finance control function independently. Independent price verification is performed by finance control through benchmarking the Voyager Pricing Engine fair value estimates with observable market prices or other independent sources. Controls and a governance framework are in place and are intended to ensure the quality of third-party pricing sources were used.

**Currency risk**

Foreign currency risk is the risk that a variation in exchange rates between the U.S. dollar and other foreign currencies will affect the Company's operations and financial results. The Company does not currently hedge its exposure to foreign currency cash flows as management has determined that currency risk is not significant.

**Liquidity risk**

Liquidity risk is the risk that the Company will not be able to meet its financial obligations when due. The Company manages liquidity risk by forecasting cash flows from operations and anticipating any investing and financing activities, as applicable. Management and the Board are actively involved in the review, planning and approval of significant expenditures and commitments.

The Company intends to continue to manage its short-term liquidity needs through its available cash balance and cash inflows from its operating activities. However, as described in Future funding note within Liquidity and Capital Resources section, we continually evaluate opportunities for us to maximize our growth and further enhance our strategic position, including, among other things, acquisitions, strategic alliances, and joint ventures potentially involving all types and combinations of equity, and acquisition alternatives which may require additional funding.

**Related Party Transactions**

Remuneration of directors and key management personnel of the Company was as follows (in thousands):

| | Three Months Ended March 31 | | | | Nine Months Ended March 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2022 | | 2021 | |
| Share-based payments* | $ | 33 | $ | 155 | $ | 146 | $ | 443 |
| Compensation and employee benefits | | 2,148 | | 1,442 | | 2,449 | | 2,399 |
| Total | $ | 2,181 | $ | 1,597 | $ | 2,595 | $ | 2,842 |

* During the first quarter, the Company issued 5,952 shares valued at $0.1 million to directors as compensation for their service.

| | Three Months Ended March 31 | | | | Nine Months Ended March 31 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2022 | | 2021 | |
| Legal Fasken Martineau DuMoulin, LLP ("Fasken") * | $ | 88 | $ | 107 | $ | 539 | $ | 410 |

* Beginning in February 2021, a partner at Fasken began serving as a director of the Company. The Company charged legal fees shown above for the services provided by Fasken.

**Commitments**

In the ordinary course of business, the Company enters into multi-year agreements to purchase sponsorships as part of its marketing efforts.

**Contingencies**

The Company is subject to various litigation, regulatory investigations, and other legal proceedings that arise in the ordinary course of its business. The Company reviews its lawsuits, regulatory investigations, and other legal proceedings on an ongoing basis and provides disclosure and records provisions in accordance with IAS 37, Provisions, Contingent Liabilities and Contingent Assets. In accordance with such guidance, provisions are recorded when it is more likely than not that the Company has a present legal or constructive obligation as a result of past events, it is probable that an outflow of resources will be required, and the amount can be reliably estimated. If any of those conditions are not met, such matters result in contingent liabilities. With respect to matters discussed below, the Company believes the ultimate resolution of existing legal and regulatory investigation matters will not have a material adverse effect on the financial condition, results of operations, or cash flows of the Company. However, in light of the uncertainties inherent in these types of matters, it is possible that the ultimate resolution may have a material adverse effect on the Company's results of operations.

The Company, along with other participants in the crypto-financial services industry, has been subject to non-public, fact-finding inquiries and investigations by both the U.S. Securities and Exchange Commission and certain state regulators in connection with certain offerings of the Company. Between March 29, 2022 and April 13, 2022, the Company received cease and desist orders from the state securities divisions of Indiana, Kentucky, New Jersey, Oklahoma and South Carolina, and orders to show cause or similar orders or notices from the state securities divisions of Alabama, Texas, Vermont and Washington. These state orders generally assert that through the Rewards Program, the Company was engaged in the unregistered offering and selling of securities or investment contracts in the form of the Company's customer accounts that permit customers to earn rewards on their eligible crypto asset balances. These state orders only apply to the Rewards Program and the remainder of the Company business is not affected by the state orders. The Company is in ongoing communications to better understand the terms of the respective regulatory orders, including any civil penalties, their applicable effective dates. Given the preliminary and/or ongoing nature of communications with the SEC and state regulators, an estimate of the required cash amount (or outflow of resources), if any, cannot be determined with certainty or reliably estimated as of the date hereof.

In December 2021, a purported class action captioned Cassidy v. Voyager Digital Ltd. and Voyager Digital LLC, et al., Case No. 1:21-cv-24441, was filed in the U.S. District Court for the Southern District of Florida. The complaint asserted claims for alleged violations of the New Jersey Consumer Fraud Act and the Florida Deceptive and Unfair Trade Practices Act as well as unjust enrichment in connection with the plaintiff's use of the Company's platform and marketing related thereto. In April 2022, the Cassidy plaintiff filed an amended complaint removing the unjust enrichment claim but also alleging additional violations of the federal and Florida securities laws with respect to the Rewards Program. The Company

disputes the claims in this case and intends to vigorously defend the case. Based on the preliminary nature of the proceeding in this case, the outcome of this matter remains uncertain.

## Segment Reporting

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker (the "CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a global consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. While the Company does have revenue from multiple products and geographies, no measures of profitability by product or geography are available, so discrete financial information is not available for each such component. As such, the Company has determined that it operates as one operating segment and one reportable segment.

## Disclosure Controls and Procedures and Internal Controls over Financial Reporting

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing and maintaining disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR") as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings* ("NI 52-109").

### Disclosure controls and procedures

The Company maintains DC&P, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, that are designed to provide reasonable assurance that material information is made known to the Company's Chief Executive Officer and Chief Financial Officer by others for the period in which the interim filings are being prepared and information required to be disclosed in the annual filings, interim filings or other reports filed or submitted under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation.

The Company's Chief Executive Officer and Chief Financial Officer have performed an evaluation of the effectiveness of the design of the Company's disclosure controls and procedures as of March 31, 2022.

Based upon the results that assessment as at March 31, 2022, management has concluded that the DC&P were effective to provide reasonable assurance that material information relating to the Company is accumulated and communicated to management to allow timely decisions regarding required disclosure, and that the information disclosed by the Company in the reports that it files is appropriately recorded, processed, summarized and reported within the time period specified in applicable securities legislation.

Any control system, no matter how well designed, has inherent limitations. Therefore, disclosure controls and procedures can only provide reasonable assurance with respect to timely disclosure of material information. See "*Limitations of controls and procedures*"

### Internal controls over financial reporting

Our management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, are responsible for designing internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS.

Under the supervision and with the participation of our management, including the Company's Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design of our internal controls over financial reporting as of March 31, 2022.

Based upon the results of that assessment as at March 31, 2022, management has concluded that the Company's ICFR were effective.

Any control system, no matter how well designed, has inherent limitations. Therefore, internal controls over financial reporting can only provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS. See "*Limitations of controls and procedures*"

### Limitation on Scope of Design

Section 3.3(1)(b) of NI 52-109 allows an issuer to limit its design of DC&P and ICFR to exclude controls, policies, and procedures of a business that the issuer acquired not exceeding 365 days from the date of acquisition. The scope of design of internal controls over financial reporting and disclosure controls and procedures excluded the controls, policies, and procedures of Coinify which was acquired on August 1, 2021.

Coinify's contribution to the Company's interim condensed consolidated statements of comprehensive loss for the nine months ended March 31, 2022, was approximately 16% of total revenues and 1% of total net loss, excluding the amortization of intangible assets. Additionally, as at March 31, 2022, Coinify's current assets were below 1% of consolidated current assets and current liabilities were below 1% of consolidated current liabilities, and its non-current assets (excluding goodwill and intangible assets) and non-current liabilities (excluding deferred tax liabilities) were below 1% of consolidated non-current assets and non-current liabilities, respectively.

### Limitations of controls and procedures

Effective internal controls are required for the Company to provide reasonable assurance that its financial results and other financial information are accurate and reliable. Any failure to design, develop or maintain effective controls, or difficulties encountered in implementing, improving or remediation lapses in internal controls may affect our ability to prevent fraud, detect material misstatements, and fulfill our reporting obligations. As a result, investors may lose confidence in our ability to report timely, accurate and reliable financial and other information, which may expose us to certain legal or regulatory actions, thus negatively impacting our business, the trading process of our shares and the market value of other securities.

Management, including the Company's Chief Executive Officer and Chief Financial Officer, believes that any disclosure controls and procedures or internal controls over financial reporting, no matter how well conceived and operated, can provide only reasonable, not absolute assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, they cannot provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been prevented or detected. These inherent limitations include those judgments in decision-making can be faulty, and that breakdowns can occur because of simple errors or mistakes. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by unauthorized override of the control. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Accordingly, because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

Digital technologies are transforming traditional industries and business models and crypto and blockchains involve complex and evolving information technology processes. Digital technologies, including crypto and blockchain, also impact common control procedures, the overall control environment, risk management and audit. As a result, there is no single control framework that is designed for crypto and the blockchain. The lack of relevant official guidance from standard setters dealing with emerging issues related to cryptocurrencies is a major challenge. Accordingly, existing DC&P and ICFR frameworks may not be suitable for use with digital assets and block chain technology and may evolve from time to time to address emerging risks and technologies.

## Industry

### *Trading of Cryptocurrencies*

The demand for cryptocurrencies has increased over the past year as cryptocurrencies have become more widely accepted. Customers expect to be able to utilize more efficient and better infrastructures to support the trading of cryptocurrencies. Voyager's platform solves many of the problems facing people or institutions that trade crypto assets, including that:

- the market is highly fragmented, with more than 300 exchanges facilitating trading of cryptocurrencies;
- there is no centralized place or service in which to trade, which means that users often have to open accounts with multiple exchanges to trade various crypto assets; and
- many of the top tier retail customer exchanges lack a cost-effective fiat on-ramp and off-ramp for customers to turn dollars into crypto assets via a secure banking provider.

The Voyager platform provides customers with an easy-to-use mobile app that centralizes the fragmented cryptocurrency market and allows them to trade crypto assets without paying a commission.

### *Trends*

In the industry, there exist multiple crypto asset exchanges offering online trading and wallets and multiple online/mobile players providing components of the crypto asset ecosystem. The largest U.S. cryptocurrency exchanges are Coinbase, Kraken, Gemini and Binance.US. Their models offer platforms that only send trades singularly to their wholly owned exchange with little or no information available on the platform. Additionally, exchanges focus on institutional volume and not the retail consumer and experience. Voyager's agency brokerage platform uses smart order routing to search multiple exchanges, market makers and liquidity providers to strategically fill customer orders often at better prices than those offered by such Exchanges directly.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, SoFi, Block (formerly Square) and Paypal. The Voyager platform supports self-directed trading of 100+ crypto assets, with the ability for customers to transfer certain of their crypto assets to their own wallet or custody with Voyager.

# EXHIBIT D

Material Change Report

## FORM 51-102F3

## MATERIAL CHANGE REPORT

**Item 1 – Name and Address of Company:**

Voyager Digital Ltd. ("**Voyager**" or the "**Company**")
33 Irving Plaza, Suite 3060
New York, NY
10003

**Item 2 – Date of Material Change:**

June 22, 2022

**Item 3 – News Release:**

The news release dated June 22, 2022  was disseminated via PRNewswire, has been filed on
SEDAR and is available at www.sedar.com.

**Item 4 – Summary of Material Change:**

Voyager announced its subsidiary, Voyager Digital Holdings, Inc. ("VDH"), has entered into a
definitive agreement with Alameda Ventures Ltd. ("Alameda") related to the previously
disclosed credit facility, which is intended to help Voyager meet customer liquidity needs during
this dynamic period.

VDH entered into a definitive agreement with Alameda for a US$200 million cash and USDC
revolver and a 15,000 BTC revolver (the "Loan"). As previously disclosed, the proceeds of the
credit facility are intended to be used to safeguard customer assets in light of current market
volatility and only if such use is needed. In addition to this facility, as of June 20, 2022, Voyager
has approximately US$152 million cash and owned crypto assets on hand, as well as
approximately US$20 million of cash that is restricted for the purchase of USDC.

Voyager concurrently announced that its operating subsidiary, Voyager Digital, LLC, may issue
a notice of default to Three Arrows Capital ("3AC") for failure to repay its loan. Voyager's
exposure to 3AC consists of 15,250 BTC and $350 million USDC. The Company made an initial
request for a repayment of $25 million USDC by June 24, 2022, and subsequently requested
repayment of the entire balance of USDC and BTC by June 27, 2022. Neither of these amounts
has been repaid, and failure by 3AC to repay either requested amount by these specified dates
will constitute an event of default. Voyager intends to pursue recovery from 3AC and is in
discussions with the Company's advisors regarding the legal remedies available. The Company
is unable to assess at this point the amount it will be able to recover from 3AC.

**Item 5 – Full Description of Material Change:**

**5.1        Full Description of Material Change**

Voyager announced its subsidiary, Voyager Digital Holdings, Inc. ("VDH"), has entered into a
definitive  agreement  with  Alameda  Ventures  Ltd.  ("Alameda")  related  to  the  previously

disclosed credit facility, which is intended to help Voyager meet customer liquidity needs during this dynamic period.

VDH entered into a definitive agreement with Alameda for a US$200 million cash and USDC revolver and a 15,000 BTC revolver (the "Loan"). As previously disclosed, the proceeds of the credit facility are intended to be used to safeguard customer assets in light of current market volatility and only if such use is needed. In addition to this facility, as of June 20, 2022, Voyager has approximately US$152 million cash and owned crypto assets on hand, as well as approximately US$20 million of cash that is restricted for the purchase of USDC.

Alameda's obligation to provide funding is subject to certain conditions, which include: no more than US$75 million may be drawn down over any rolling 30-day period; the Company's corporate debt must be limited to approximately 25 percent of customer assets on the platform, less US$500 million; and additional sources of funding must be secured within 12 months. This is a summary of the Loan terms; a copy of the Loan agreement will be filed at http://www.sedar.com.

Voyager concurrently announced that its operating subsidiary, Voyager Digital, LLC, may issue a notice of default to Three Arrows Capital ("3AC") for failure to repay its loan. Voyager's exposure to 3AC consists of 15,250 BTC and $350 million USDC. The Company made an initial request for a repayment of $25 million USDC by June 24, 2022, and subsequently requested repayment of the entire balance of USDC and BTC by June 27, 2022. Neither of these amounts has been repaid, and failure by 3AC to repay either requested amount by these specified dates will constitute an event of default. Voyager intends to pursue recovery from 3AC and is in discussions with the Company's advisors regarding the legal remedies available. The Company is unable to assess at this point the amount it will be able to recover from 3AC.

Alameda currently indirectly holds 22,681,260 common shares of Voyager ("Common Shares"), representing approximately 11.56% of the outstanding Common and Variable Voting Shares. The Loan is considered a "related party transaction" pursuant to Multilateral Instrument 61-101 - Protection of Minority Security Holders in Special Transactions ("MI 61-101"). Voyager is relying on the exemption available under Section 5.7(1)(f) of MI 61-101 minority shareholder approval requirement. Additionally, the Loan is exempt from the formal valuation requirement of MI 61-101 pursuant to Section 5.4(1) of MI 61-101. The Loan Agreement was approved by the Board of Directors of Voyager.

**5.2    Disclosure for Restructuring Transactions**

Not applicable.

**Item 6 – Reliance on subsection 7.1(2) of National Instrument 51-102**

Not applicable.

**Item 7 – Omitted Information**

Not applicable.

- 3 -

**Item 8 – Executive Officer:**

The following senior officer of the Company is knowledgeable about the subject matter of this material change report and may be contacted for further information:

Stephen Ehrlich
Chief Executive Officer
Telephone: 212-547-8807

**Item 9 – Date of Report:**

June 22, 2022

# EXHIBIT E

Customer Email

## DiVita, Michelle D.

| | |
|---|---|
| **From:** | Michelle DiVita < ███████████████ > |
| **Sent:** | Friday, October 14, 2022 6:05 PM |
| **To:** | DiVita, Michelle D. |
| **Subject:** | Fwd: An update on recent market news |
| | |
| **Categories:** | Ready to file |

Begin forwarded message:

> **From:** Voyager <no-reply@investvoyager.com>
> **Date:** June 14, 2022 at 9:11:16 AM CDT
> **To:** ███████████████
> **Subject: An update on recent market news**
> **Reply-To:** no-reply@investvoyager.com



Hi Voyagers,

When we started Voyager, we made the decision to be one of the first public companies in the crypto industry. We could have easily kept things private, and some elements of our business would have been a whole lot easier. I'll be the first one to tell you that. But we didn't. We chose to be public because we are here to prioritize our customer assets at all times. Period.

This means going the extra mile to be transparent about our balance sheet and providing regular updates on the state of our assets. The market is seeing some tough volatility right now, exacerbated by the news that Celsius has paused customer withdrawals. So I want to be ultra-clear on a few key points:

**Voyager has zero customer asset exposure to Celsius.** While we announced a partnership in 2019, through our ongoing due diligence and rigorous risk management process, we made a decision to start moving funds from Celsius earlier this year.

**We have never engaged in DeFi lending activities, including algorithmic stablecoin staking and lending.**

**We have zero exposure to derivative assets like stETH.**

As many of you know, Voyager has the benefit of seasoned leaders who've been through multiple market cycles. In other words, we have the experience to plan for volatile markets and the ability to stay agile. On our balance sheet, Voyager is well-capitalized and positioned to weather the bear market.

As you personally consider which crypto platform can support you through all market cycles, I urge you to look at how the company is disclosing the details of its financial position. Very few in the crypto industry are doing that today.

**This is also a good time to remind everyone that USD is held by our banking partner, Metropolitan Commercial Bank, which is FDIC insured. The cash you hold with Voyager is protected up to $250,000—which means it's as safe with us as at a bank.**

Keep looking forward. Market cycles are temporary, and Voyager is here to stay.

Regards,
Steve

---




    

©2022 Voyager Digital, LLC. VOYAGER is a trademark of Voyager IP, LLC, a wholly owned subsidiary of Voyager Digital Ltd. All services provided by Voyager Digital, LLC, a FinCEN registered company. Investments are subject to market risk. 2500 Plaza 5, 25th Floor, Jersey City, NJ 07311. All rights reserved. Terms of Use. Risk Disclosure. Unsubscribe.

Voyager VOYG is listed on the TSX.  CANADA: VOYG  |  US: VYGVF