

The New York Times
Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

February 1, 2023

Sworn to me this 1st day
of February, 2023

Ellen Herb
______________________
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

2/1/2023, NYT & NATL, pg B3

______________________________________________

Larnyce Tabron

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: VOYAGER DIGITAL HOLDINGS, INC., et al.,[1] Debtors. | Chapter 11<br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |
| --- | --- |

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**



**POLICY | LABOR**

SCOTT MCINTYRE FOR THE NEW YORK TIMES

**Federal Reserve officials are closely watching hiring and wages in their campaign against high inflation.**

# *Wages Showed Moderation At Year's End, Report Says*

By JEANNA SMIALEK

A measure of pay and benefits that the Federal Reserve has been watching closely amid a strong labor market rose less than expected at the end of 2022, fresh data showed Tuesday.

The Employment Cost Index climbed 1 percent in the final quarter of 2022 versus the prior three months, more slowly than the 1.1 percent that economists expected and a slowdown from the previous 1.2 percent reading.

The data will probably reaffirm to central bankers that the economy and labor market are cooling, which could help inflation return to normal over time. While wage gains are still faster than normal, the moderation could help central bankers feel comfortable as they adjust interest rates less aggressively than they did throughout 2022.

The employment cost measure picked up by 5.1 percent on a yearly basis, close to the 5 percent reading in the previous quarter's report. In the decade leading up to the pandemic, the index averaged 2.2 percent yearly gains, underscoring the continued rapidness of today's pace. But a measure of private-sector wages not including benefits, which economists see as a particularly good indicator of labor market tightness, slowed slightly.

Fed officials are closely watching the labor market — and wages in particular — as they try to gauge how much further they have to go in their campaign against stubbornly high inflation. While goods price increases that are tied to supply chain snarls are beginning to fade, central bankers are worried that rapid pay gains could keep services costs rising rapidly. Labor is a big expense for service companies, like hotels and

***Cool-down signals could influence a rate increase by the Fed.***

restaurants, and firms might pass higher wage costs on to customers in the form of higher prices. Bigger paychecks could also help sustain consumer demand, keeping pressure on prices.

The Fed's next interest-rate decision will be announced on Wednesday. Central bankers are widely expected to raise rates by a quarter of a percentage point, after raising them by three-quarters of a point per meeting for much of 2022 and by half a point at their last gathering, in December.

The new adjustment would push rates up to a range of 4.5 to 4.75 percent. The question now is how many more moves the Fed will make — and how long policymakers will hold interest rates at a high level.

Steeper borrowing costs deter consumers from making big purchases and businesses from expanding, which can slow the economy and weaken the labor market. Fed officials are hoping that they can cool the economy by just enough to allow supply and demand to come back into balance — causing inflation to moderate — without causing a punishing recession. But they have been clear that they are willing to accept some pain to bring price increases back under control.

And they have underlined that they think the labor market needs to slow down to put inflation on a more sustainable path.

"We want strong wage increases," Jerome H. Powell, the Fed chair, said at his last news conference in December. "We just want them to be at a level that's consistent with 2 percent inflation," he said, referring to the Fed's target inflation rate.

For now, America's rate of price increases remains much faster, at 5 percent. Mr. Powell will give another news conference on Wednesday, after the release of the Fed's rate decision at 2 p.m. Eastern time.

# *Republicans Want Spending Cuts but Are Short on Specifics*

FROM FIRST BUSINESS PAGE

him about when House Republicans plan to release their budget.

"It is essential that Speaker McCarthy likewise commit to releasing a budget, so that the American people can see how House Republicans plan to reduce the deficit," Brian Deese, the director of the White House's National Economic Council, and Shalanda Young, the director of the White House budget office, wrote in a memo released on Tuesday.

Ahead of the meeting, the three primary negotiators who have to broker a deal jousted from afar.

At a fund-raiser in New York on Tuesday, Mr. Biden called Mr. McCarthy a "decent man" but lamented that he had to cater to the hard-liners in the Republican Party to become speaker by offering "off the wall" concessions.

"Look, this is not your father's Republican Party," Mr. Biden said. "No, I mean it, this is a different breed of cat."

Separately on Tuesday, Mr. McCarthy accused Mr. Biden of being irresponsible by suggesting that he was unwilling to seek common ground over the debt ceiling and said that the White House's refusal to bargain was "childish."

"Why would you put the economics of America in jeopardy?" Mr. McCarthy said to reporters. "Why would you play political games? I'm not."

Senator Mitch McConnell, Republican of Kentucky and the minority leader, said on Tuesday that he would defer to Mr. McCarthy given that Republicans hold a majority in the House while Democrats control the Senate. He also noted that during a similar debt standoff in 2011, he ultimately cut a deal with Mr. Biden, then the vice president, that averted a default by imposing spending cuts. Mr. Biden is resisting such an approach today.

"It is not unprecedented to have a discussion about spending in connection with the debt ceiling," Mr. McConnell said. "The president knows full well since he was my negotiating partner years ago that this has been done before."

He added, "I think the deal has to be cut obviously between the House majority and the Democratic president in order to have a chance to survive over here."

Reaching a deal will not be easy. The White House has said it will not negotiate over raising the debt limit, and Republicans have been struggling to find agreement among themselves over how to cut spending. Deficit reduction pledges are poised to collide with the reality that austerity measures tend to be unpleasant.

"The public doesn't like debt and deficits, but it doesn't like spending cuts or tax increases, either," said William G. Gale, a senior fellow at the Brookings Institution and the author of "Fiscal Therapy: Curing America's Debt Addiction and Investing in the Future." "Against that backdrop, why would any politician fall on his sword to cut spending or raise taxes?"

After a $5 trillion spending spree to combat the coronavirus pandemic, the nation's debt burden has become too enormous to chip away at without considerable pain. The Committee for a Responsible Federal Budget estimated this month that it would require $14.6 trillion in deficit reduction to balance the budget over the next decade. That feat would require all spending to be cut by roughly one-quarter.

Excluding the most politically crucial budget items — defense, veterans, Social Security and Medicare — would require an even bigger scalpel. With those areas off the table, spending on the remaining "discretionary" items would need to be slashed by 85 percent.

KENNY HOLSTON/THE NEW YORK TIMES

Speaker Kevin McCarthy called President Biden "childish" for refusing to bargain over the debt ceiling. "Why would you play political games?" he asked.

For months before the midterm elections in November, Mr. Biden warned voters that if Republicans won control of Congress, they would seek to slash funding for social safety net programs, threatening Social Security and Medicare. That has left Republicans on the defensive since taking control of the House this year, because making a dent in future deficits is practically impossible without touching those programs.

Many Republicans are mindful that they are facing something of a political live wire. Former President Donald J. Trump warned Republicans this month to steer clear of the retirement programs during the debt ceiling negotiations. "Under no circumstances should Republicans vote to cut a single penny from Medicare or Social Security," he said in a video message.

Despite vague proposals to restructure the safety net programs, most Republicans insist that they merely want to cut waste from the programs to preserve them long term.

The White House and Republicans are expected to unveil detailed budget proposals over the next two months that will formally lay out spending priorities. The Biden administration's budget will be released on March 9. Representative Steve Scalise of Louisiana, the majority leader, suggested on Tuesday that House Republicans would submit a budget in April.

"I hope the president meets his deadline, just like we're going to work to meet our deadline," Mr. Scalise said at a news conference.

The contours of that budget are starting to take shape, but differences within the Republican Party will not be easy to bridge.

Representative Chip Roy, a Texas Republican who initially withheld support from Mr. McCarthy in his run for House speaker, said Mr. McCarthy had committed to enacting the biggest discretionary spending cuts in history for the upcoming fiscal year. He said that a $130 billion reduction could be accomplished without cuts to military spending, Social Security or Medicare. Instead, he said on Twitter, money that goes to "woke & weaponized bureaucrats" would be scaled back.

But other influential Republicans contend that big changes to so-called entitlement programs must be considered.

Representative Matt Gaetz, Republican of Florida, said on Fox News last week that he was disappointed that some of his colleagues had given up on overhauling safety net programs such as

***A renewed focus on fiscal restraint poses its own political risks.***

Medicaid and the Supplemental Nutrition Assistance Program, which provides food stamps. He called for changes that would make fewer people eligible to receive the benefits.

"If we impose work requirements on SNAP and on Medicaid expansion for able-bodied adults, we would have the ability to save $1 trillion during the 10-year budget window," Mr. Gaetz said.

Some Republicans, such as Senator Rand Paul of Kentucky and Representative Nancy Mace of South Carolina, have been calling for "penny plans" that would cut total spending across the board by a percentage to balance the budget in as little as five years.

Russell Vought, who was Mr. Trump's director of the Office of Management and Budget, has produced the most detailed budget proposal thus far. He has been talking with House Republicans since late last year about how to balance the budget without cutting Social Security and Medicare.

The plan includes a $22 billion cut to the Department of Health and Human Services that would gut funding for the Centers for Disease Control and Prevention and chop $26 billion from the Department of Housing and Urban Development, including a phaseout of Section 8 grants that Mr. Vought says are "a magnet for crime and decreased property values." It would also freeze Medicaid, eliminate the Affordable Care Act's coverage expansions and reduce disability benefits for veterans.

To help balance the budget over a decade, Mr. Vought's budget projects that the economy will achieve 3.1 percent growth next year and average about 2.8 percent for the remaining years. Those forecasts are far more optimistic than those of the International Monetary Fund, which projected this week that the U.S. economy would grow by a tepid 1.4 percent this year and 1 percent in 2024.

Mr. Vought acknowledged that it was unfortunate that more was not done to curtail spending during the Trump era, when Republicans and Democrats lifted the debt ceiling three times.

"I do wish we could have had other things attached to the debt ceiling increases," Mr. Vought said. "The new House Republican majority was put into office to deal with these economic problems."

Mr. Biden and his aides have increasingly called for House Republicans to make their debt limit demands clear, as proposals that would reduce funding for poor people and veterans could prove to be a political gift for the president.

However, the White House has held firm that Mr. Biden does not intend to cut a deal to raise the debt limit and warned that Republicans were being reckless by threatening the full faith and credit of the United States.

"Raising the debt ceiling is not a negotiation," Mr. Deese and Ms. Young wrote in their memo on Tuesday. "It is an obligation of this country and its leaders to avoid economic chaos."

Catie Edmondson, Jim Tankersley and Carl Hulse contributed reporting.

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: TRICIDA, INC.,[1] Debtor. ) Chapter 11 ) Case No. 23-10024 (JTD) ) **Docket Ref. Nos. 11 & 100**

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On January 11, 2023, the above-captioned debtor and debtor-in-possession (the "Debtor"), filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. On January 11, 2023, the Debtor filed a motion (the "Bidding Procedures and Sale Motion"), pursuant to sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), seeking entry of an order (the "Bidding Procedures Order") (a) scheduling an auction (the "Auction") for the sale of the Debtor's assets (the "Assets") on or about February 15, 2023, at 10:00 a.m. and a hearing to approve the sale of the Assets (the "Sale Hearing") on or about February 21, 2023; (b) approving procedures (the "Bidding Procedures") for submitting competing bids for the Assets; (c) authorizing, but not directing, the Debtor to designate the Stalking Horse Bidder and approving the Bid Protections in accordance with the Bid Procedures, (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtor to enter into and perform under a purchase agreement, as applicable, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, (e) approving the form and manner of the notice of the Auction and the Sale Hearing, and (f) establishing procedures for the assumption and assignment of the Assumed Contracts (as defined in the Bidding Procedures and Sale Motion) to any purchaser(s) of the Assets and approving the manner of notice thereof (the "Assumption and Assignment Notice").

3. On January 26, 2023, the Bankruptcy Court entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with regard to any Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtor will conduct the Auction. The Auction shall be held on February 15, 2023, starting at 10:00 a.m. (prevailing Eastern Time), or such other time as the Debtor shall designate, and notify all Qualified Bidders. Professionals and principals for the Debtor, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, the U.S. Trustee, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures Order, and any other parties the Debtor deems appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **February 10, 2023, at 10:00 a.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4. The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances, will be held before the Honorable John T. Dorsey, United States Bankruptcy Judge, 824 North Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801 on **February 21, 2023, at 2:00 p.m. (prevailing Eastern Time)**, or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by including such adjournment on any agenda filed with the Bankruptcy Court or by the filing of a notice with the Bankruptcy Court.

5. Objections to approval of the Sale, the conduct at the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and served so as to be received before **4:00 p.m. (prevailing Eastern Time) on February 17, 2023** (the "Sale Objection Deadline") by the following parties (collectively, the "Notice Parties"): (a) proposed counsel to the Debtor, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, CA 90013 (Attn.: Sam Newman (sam.newman@sidley.com), Julia Philips Roth (julia.roth@sidley.com), Charles Persons (cpersons@sidley.com) and Geoffrey Levin (glevin@sidley.com)); (b) proposed co-counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801 (Attn.: Sean M. Beach (sbeach@ycst.com) and Allison S. Mielke (amielke@ycst.com)); (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn.: Timothy J. Fox, Jr., Esq. (Timothy.J.Fox@usdoj.gov)); and (d) proposed counsel to the Official Committee of Unsecured Creditors, Womble Bond Dickinson (US) LLP 1313 North Market Street, Suite 1200, Wilmington, DE 19801 (Attn: Donald J. Detweiler (Don.Detweiler@wbd-us.com) and Todd Atkinson (Todd.Atkinson@wbd-us.com)).

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

6. This Sale Notice is subject to the fuller terms and conditions of the Bidding Procedures and Sale Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict. The Debtor encourages all parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Bidding Procedures and Sale Motion or the Bidding Procedures Order, may make a written request to Julia Philips Roth (julia.roth@sidley.com) and Charles Persons (cpersons@sidley.com). In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order and this Notice are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtor's claims and noticing agent's website free of charge at http://kccllc.net/Tricida.

Dated: January 27, 2023, Wilmington, Delaware, /s/ Allison S. Mielke, **YOUNG CONAWAY STARGATT & TAYLOR, LLP,** Sean M. Beach (No. 4070), Allison S. Mielke (No. 5934), Andrew A. Mark (No. 6861), Carol Cox (No. 6936), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: sbeach@ycst.com, amielke@ycst.com, amark@ycst.com, ccox@ycst.com -and- **SIDLEY AUSTIN LLP,** Samuel A. Newman (admitted *pro hac vice*), Julia Philips Roth (admitted *pro hac vice*), 555 West Fifth Street, Los Angeles, California 90013, Telephone: (213) 896-6000, Facsimile: (213) 896-6600, Email: sam.newman@sidley.com, julia.roth@sidley.com -and- Charles M. Persons (admitted *pro hac vice*), Jeri Leigh Miller (admitted *pro hac vice*), Chelsea McManus (admitted *pro hac vice*), 2021 McKinney Avenue, Suite 2000, Dallas, Texas 75201, Telephone: (214) 981-3300, Facsimile: (213) 981-3400, Email: cpersons@sidley.com, jeri.miller@sidley.com, cmcmanus@sidley.com -and- Michael A. Sabino (admitted *pro hac vice*), 787 Seventh Avenue, New York, New York 10019, Telephone: (212) 839-5300, Facsimile: (212) 839-5599, Email: msabino@sidley.com, *Proposed Attorneys for Debtor, Tricida, Inc.*

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is Tricida, Inc. (2526). The Debtor's service address is 7000 Shoreline Court, Suite 201, South San Francisco, CA 94080.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 22-10943 (MEW) ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at 10:00 a.m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004.

**PLEASE BE ADVISED**: THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is **January 10, 2023** (the "Voting Record Date"), which is the date for determining which Holders of Class 3 Claims (Account Holder Claims), Class 4A Claims (OpCo General Unsecured Claims), Class 4B Claims (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**Plan and Disclosure Statement Objection Deadline**. The deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time: (i) ***Debtors:* Voyager Digital Holdings, Inc.,** 33 Irving Place, Suite 3060, New York, NY 10003, Attention: Stephen Ehrlich and David Brosgol; (ii) ***Counsel to the Debtors:* Kirkland & Ellis LLP,** 601 Lexington Avenue, New York, New York 10022, Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith; (iii) ***Counsel to the Committee:* McDermott Will & Emery LLP,** One Vanderbilt Avenue, New York, NY 10017-3852, Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman; and (iv) ***United States Trustee:* Office of the United States Trustee for the Southern District of New York,** U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014, Attention: Richard Morrissey; Mark Bruh.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format, or on a CD-ROM or flash drive), contact the Debtors' Claims, Noticing, and Solicitation Agent, by: (a) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 15, 2023** (*provided* that (i) the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases will be filed on or before **February 1, 2023**; and (ii) the Customer Onboarding Protocol and the Schedule of Retained Causes of Action will be filed on or before **February 8, 2023**) and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**HOW TO OPT INTO THE RELEASES:** Any Holder of a Claim or Interest that wants to grant the Third-Party Release set forth in Article VIII.B of the Plan must return its Ballot or Non-Voting Status Notice, as applicable, to the Claims, Noticing, and Solicitation Agent by no later than **February 22, 2023**, by following the instructions for electing to opt into the Third-Party Release set forth in such Ballot or Non-Voting Status Notice, as applicable.

**RELEASES**

**Article VIII.A of the Plan contains the following Debtor Release: Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

**Article VIII.B of the Plan contains the following Third-Party Release: Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Article VIII.C of the Plan provides for the following Exculpation: Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Article VIII.D of the Plan provides for the following Injunction: The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

**In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.**

Dated: January 13, 2023, New York, New York, /s/ Joshua A. Sussberg, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.