**AFFIDAVIT OF PUBLICATION**

**IN THE MATTER OF:** *{ KIRKLAND & ELLIS LLP }*

**STATE OF NEW YORK**

      **ss:**

**COUNTY OF NEW YORK**

I, Jonathan Florez, being duly sworn, hereby certify that (a) I am the Account Planner, US Advertising of FT Publications, Inc. Publisher of the FINANCIAL TIMES, a daily newspaper published and of general circulation Worldwide including the City and County of New York, and (b) that the Notice of which the annexed is a copy was published in THE FINANCIAL TIMES ON THE:

2nd Day of February 2023.

Jonathan Florez, ACCOUNT PLANNER, **ADVERTISING:**

**Signature** *[signed]*

JESSICA WONG
Notary Public - State of New York
NO. 01WO6203455
Qualified in Kings County
My Commission Expires 4/6/2024

*[signed]*

**Date: 02/02/2023**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1]
Debtors.

Chapter 11
Case No. 22-10943 (MEW)
(Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at 10:00 a.m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004.

**PLEASE BE ADVISED**: THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is **January 10, 2023** (the "Voting Record Date"), which is the date for determining which Holders of Class 3 Claims (Account Holder Claims), Class 4A Claims (OpCo General Unsecured Claims), Class 4B Claims (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote**.

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**Plan and Disclosure Statement Objection Deadline**. The deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time: (i) *Debtors:* **Voyager Digital Holdings, Inc.,** 33 Irving Place, Suite 3060, New York, NY 10003, Attention: Stephen Ehrlich and David Brosgol; (ii) *Counsel to the Debtors:* **Kirkland & Ellis LLP,** 601 Lexington Avenue, New York, New York 10022, Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith; (iii) *Counsel to the Committee:* **McDermott Will & Emery LLP,** One Vanderbilt Avenue, New York, NY 10017-3852, Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman; and (iv) *United States Trustee:* **Office of the United States Trustee for the Southern District of New York,** U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014, Attention: Richard Morrissey; Mark Bruh.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format, or on a CD-ROM or flash drive), contact the Debtors' Claims, Noticing, and Solicitation Agent, by: (a) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); (b) e-mailing VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 15, 2023** (*provided* that (i) the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases will be filed on or before **February 1, 2023**; and (ii) the Customer Onboarding Protocol and the Schedule of Retained Causes of Action will be filed on or before **February 8, 2023**) and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN:** IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

**HOW TO OPT INTO THE RELEASES:** Any Holder of a Claim or Interest that wants to grant the Third-Party Release set forth in Article VIII.B of the Plan must return its Ballot or Non-Voting Status Notice, as applicable, to the Claims, Noticing, and Solicitation Agent by no later than **February 22, 2023**, by following the instructions for electing to opt into the Third-Party Release set forth in such Ballot or Non-Voting Status Notice, as applicable.

**RELEASES**

**Article VIII.A of the Plan contains the following Debtor Release**: Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

**Article VIII.B of the Plan contains the following Third-Party Release**: Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, as representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

**Article VIII.C of the Plan provides for the following Exculpation**: Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Article VIII.D of the Plan provides for the following Injunction**: The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

Dated: January 13, 2023, New York, New York, */s/ Joshua A. Sussberg*,
**KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

# COMPANIES & MARKETS

## The day in the markets

### What you need to know

- Wall Street stocks edge lower as investors await Fed meeting clues
- Markets expect quarter-point rate rise but await Powell comments
- Dollar slips while Asian equities advance

Wall Street stocks slipped yesterday with the US Federal Reserve poised to lift borrowing costs by a quarter percentage point in what would be the smallest increase in rates since last March.

The benchmark S&P 500 fell 0.3 per cent while the tech-heavy Nasdaq Composite declined 0.2 per cent after demand for US workers grew more than expected in December and US manufacturing activity declined to its weakest level in more than two-and-a-half years.

The US Dollar index, a measure of the currency's strength against a basket of six peers, fell 0.4 per cent.

Fed officials were yesterday expected to increase rates by 0.25 percentage points to a range of 4.5-4.75 per cent, the highest level since September 2007 at the start of the global financial crisis.

Having lifted rates in 0.5 percentage point and 0.75 percentage point increments since May, such a move would mark a shift to a more traditional pace of monetary tightening and reflect growing confidence that inflation is on a downward trajectory.

With a quarter-point move all but nailed on, markets are likely to swing higher or lower on the language deployed by Fed chair Jay Powell in his press conference after the rate announcement.

"We expect Powell's comments will be quite hawkish in order to underscore that slowing is not stopping and to discourage markets from expecting rate cuts in 2023," said analysts at JPMorgan.

Despite a more "encouraging" outlook, Powell is expected to point yet again to the "historical costs of easing too soon".

The Bank of England and European Central Bank are due to implement their own interest rate increases today with both expected to opt for 0.5 percentage point adjustments upwards.

The pan-regional Stoxx Europe 600 traded flat after eurozone inflation fell more than expected to 8.5 per cent in January, down from 9.2 per cent in December.

Economists polled by Reuters had forecast a decline to 9 per cent. Core inflation, which omits relatively volatile food and energy prices, remained at 5.2 per cent with investors having expected a decline to 5.1 per cent.

London's FTSE 100 benchmark edged 0.1 per cent lower.

In Asia, Hong Kong's Hang Seng added 1 per cent, China's CSI 300 index of Shanghai and Shenzhen stocks rose 0.9 per cent while Seoul's Kospi gained 1.2 per cent. **George Steer**

### US manufacturing shrank at the fastest pace in over 2.5 years
ISM Manufacturing PMI index



A reading below 50 shows the sector is contracting
Source: Refinitiv

## Specialised ETFs fall flat from marijuana to the metaverse

### Francesco Franzoni
#### Markets Insight



From the legalisation of marijuana to the rise of working from home, if there is a trend or theme in markets, there will be an exchange traded fund for it. As the cost of issuance of new ETFs is low and the competition between fund issuers intense, financial innovation has flourished.

Thousands of new ETFs have been launched over the past three decades. The range of recent specialised ETFs seemingly stretches as far as the imagination of investors.

But does financial innovation in the ETF space create value for investors? A study to be published in the Review of Financial Studies that I co-authored with Itzhak Ben-David, Byungwook Kim and Rabih Moussawi suggests otherwise. Our results show that, on average, new equity ETFs are poor investments on a risk-adjusted basis.

It points the finger at specialised equity ETFs that focus on specific industries and themes. Over the past two decades, industry and thematic ETFs have underperformed broad-based benchmarks by about 30 per cent in the first five years since their inception.

Out of these, only about 3 percentage points is due to their fees and 27 percentage points to the underperformance of the base assets.

The need to attract investors' attention has led ETF providers to ride the latest trends, turning a passive product into an active bet on the theme du jour.

After the success of the first wave of ETFs tracking broad-based indices such as the S&P 500 index, competition intensified and fees declined.

To counteract this development, issuers came up with new types of products which charged higher fees and tracked smaller segments of the market. Smart beta ETFs, which are constructed to reflect investment approach rather than straight market capitalisation, were introduced. Then came ETFs based on industries and, thematic versions. Single-stock ETFs are but the latest step in the evolution of the species.

Newly launched ETFs focus on the flavour-of-the-month topics that investors are excited about. In 2020, new ETFs held portfolios related to areas such as Covid-19 vaccines, telemedicine and gaming/sports betting. In 2021, investors' dreams included bitcoin, electric cars and the metaverse.

Naturally, ETF issuers design new products with one consideration in

> Assets are overvalued at the time of launch and underperform in the following years

mind: to maximise their revenues. Revenues are greater when the fee rate and the assets that investors pour in are higher. With thousands of ETFs already on the market, new ETFs need to be unique and catch investors' attention.

If the idea behind the ETF provides investors with the excitement to bet on their preferred theme, they will be less sensitive to the price that they pay for the product.

So amid the forced restructuring imposed by falling markets, the industry is renewing its bet on specialised ETFs.

Despite managing only 18 per cent of the assets in equity-focused ETFs in the US, these products are true blockbusters as they collect about 35 per cent of the revenues due to higher fees. Academic literature has shown that investors chase assets that have recently experienced good returns. Possibly aware of these results, issuers introduce products that track "hot" industries and themes.

As a result, the stocks in the baskets of specialised ETFs start from relatively high valuations. In particular, new ETFs hold firms that, before the fund launch, had unusually high past returns (outperforming benchmarks by 5 per cent a year, on average) and received very favourable media coverage. The high fees that specialised ETFs charge contribute to their poor performance — overall about 0.60 percentage points.

But fees are not the main reason for the gross underperformance. That is driven simply by the assets that specialised ETFs choose to hold. They are overvalued at the time of launch and underperform in the following years.

Investors should beware when considering investing in specialised ETFs. They risk losing along three dimensions: they sacrifice portfolio diversification, they are likely to invest in overvalued assets and they pay higher fees.

Our research shows that recent episodes of protracted and deep drawdowns for specialised ETFs are a widespread phenomenon.

Jack Bogle, the founder of the index fund industry and an advocate of passive investing, was very critical of ETFs. His view was that ETFs are the greatest marketing innovation of the 21st century but one that does not serve investors well. Our study buttresses this view, as far as specialised ETFs are concerned.

*Francesco Franzoni is professor of finance at the University of Lugano and senior chair at the Swiss Finance Institute*

## Markets update



| | US | Eurozone | Japan | UK | China | Brazil |
|---|---|---|---|---|---|---|
| **Stocks** | S&P 500 | Eurofirst 300 | Nikkei 225 | FTSE100 | Shanghai Comp | Bovespa |
| Level | 4058.40 | 1786.59 | 27346.88 | 7761.11 | 3284.92 | 111215.52 |
| % change on day | -0.45 | -0.14 | 0.07 | -0.14 | 0.90 | -1.95 |
| **Currency** | $ index (DXY) | $ per € | Yen per $ | $ per £ | Rmb per $ | Real per $ |
| Level | 102.229 | 1.092 | 129.255 | 1.233 | 6.741 | 5.075 |
| % change on day | 0.296 | 0.552 | -0.607 | 0.162 | -0.229 | -0.325 |
| **Govt. bonds** | 10-year Treasury | 10-year Bund | 10-year JGB | 10-year Gilt | 10-year bond | 10-year bond |
| Yield | 3.488 | 2.282 | 0.477 | 3.305 | 2.925 | 12.666 |
| Basis point change on day | -2.870 | -0.300 | -1.660 | -2.600 | 1.000 | -5.600 |
| **World index, Commods** | FTSE All-World | Oil - Brent | Oil - WTI | Gold | Silver | Metals (LMEX) |
| Level | 427.88 | 83.55 | 77.24 | 1923.90 | 23.00 | 4356.30 |
| % change on day | -0.02 | -2.23 | -2.07 | -0.01 | -2.71 | 0.67 |

Yesterday's close apart from: Currencies = 16:00 GMT; S&P, Bovespa, All World, Oil = 17:00 GMT; Gold, Silver = London pm fix. Bond data supplied by Tullett Prebon.

## Main equity markets





### Biggest movers

| % | | US | | | Eurozone | | | UK | |
|---|---|---|---|---|---|---|---|---|---|
| **Ups** | | Old Dominion Freight Line | 9.06 | | Bbva | 4.70 | | Segro | 2.38 |
| | | Advanced Micro Devices | 8.01 | | Renault | 3.17 | | Smiths | 2.23 |
| | | Stryker | 7.10 | | A.p. Moller - Maersk B | 3.10 | | 3i | 2.22 |
| | | Altria | 4.46 | | Publicise | 2.47 | | Ocado | 2.20 |
| | | Applied Materials | 2.88 | | Deutsche Post | 2.09 | | Rs | 1.86 |
| **Downs** | | Westrock | -14.54 | | Hann.rueck | -5.26 | | Astrazeneca | -2.93 |
| | | Electronic Arts | -11.93 | | Merck | -4.29 | | Anglo American | -2.29 |
| | | Match | -9.52 | | Talanx | -3.44 | | Abrdn | -2.12 |
| | | Johnson Controls Int | -6.43 | | Raiffeisen Bank Internat | -2.61 | | Vodafone | -2.08 |
| | | Synchrony Fin | -5.74 | | Jeronimo Martins | -2.21 | | Compass | -1.89 |

Prices taken at 17:00 GMT. Based on the constituents of the FTSE Eurofirst 300 Eurozone. All data provided by Morningstar unless otherwise noted.

## Wall Street

Transportation and logistics group **Old Dominion Freight** topped the S&P 500 index after reporting "record-breaking results in 2022".

Adding a further boost to the stock was a 33.3 per cent year-on-year rise in quarterly dividend to 40 cents per share. This would be paid on March 15 to shareholders registered on March 1.

Joining Old Dominion Freight near the peak of the blue-chip benchmark was chipmaker **Advanced Micro Devices**, which reported forecast-beating earnings and revenue.

UBS drew attention to AMD's data centre performance, which achieved a 42 per cent year-on-year jump in revenue to $1.7bn in the fourth quarter.

The broker expected this division to increase sales by another 20 per cent this year as rival Intel lagged behind AMD in its product road map.

Narrowing losses propelled **Peloton** higher with the fitness bikes group posting a quarterly net loss of $335.4mn, its best performance since its fiscal fourth quarter of 2021.

Peloton said this showed "the changes we're making are working". For its third consecutive quarter, Peloton generated more revenue from subscriptions than it did from hardware sales, paving the way towards a significant improvement in gross margins, it added. *Ray Douglas*

## Europe

Italian fashion group **OVS** jumped after announcing strong 2022 sales and calling off its acquisition of department store chain Coin.

OVS said takeover talks had ended, allowing it to instead focus on deleveraging, "which, in this market context . . . appears to be in our shareholders' best interests".

Net sales leapt 11 per cent last year to exceed €1.5bn, beating consensus estimates and generating free cash flow of more than €60mn.

Retirement homes operator **Orpea**, which had been rocked by allegations that residents were being mistreated, dived on reaching an agreement in principle on a financial restructuring plan.

This scheme, unveiled in November, included a debt-to-equity swap worth about €3.8bn and a capital increase of up to €1.5bn.

The French group warned that the restructure would "lead to a massive dilution for existing shareholders".

If they opted not to participate in the capital increase, these shareholders would see their stake reduced to just 0.4 per cent of Orpea.

Sweden's **Husqvarna**, home to outdoor power products such as Flymo lawnmowers, rallied after net sales in the fourth quarter comfortably topped analysts' estimates. *Ray Douglas*

## London

Commercial broadcaster **ITV** advanced off the back of an article stating that there were multiple expressions of interest in its content production arm.

Reuters said French TV production group Banijay and Hollywood executive Peter Chernin were both eyeing a stake in the maker of *Love Island*.

Citi said such speculation highlighted "the potential 'hidden value' within" ITV Studios, although it was difficult to see how this could be unlocked.

"Selling a small stake would obviously be the easiest way to signal value for ITV stakeholders," said the broker, "but it is not clear that potential acquirers would be willing to pay a premium for a stake unless there is a pathway to control" the division.

**Vodafone** was in the lower half of the FTSE 100 index after Margherita Della Valle, interim chief executive, admitted the telco could "do better" following a recent decline in European revenue.

Growth in service revenue slowed to 1.8 per cent in its fiscal third quarter, down from 2.5 per cent in the preceding period, driven by a particularly weak performance in Spain where revenue slid 8.7 per cent.

**Made Tech**, which provides IT services to the public sector, leapt more than a fifth on reporting a 76 per cent jump in half-year revenue. *Ray Douglas*



---

### Legal Notices

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL HOLDINGS, INC., et al., Debtors. Chapter 11. Case No. 22-10943 (MEW) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

[Extensive legal notice text regarding Voyager Digital Holdings bankruptcy proceedings, disclosure statement, plan confirmation hearing scheduled for March 2, 2023 at 10:00 a.m., voting record date January 10, 2023, voting deadline February 22, 2023 at 4:00 p.m., objection deadline February 22, 2023 at 4:00 p.m., and related procedural information. Counsel: Kirkland & Ellis LLP, Joshua A. Sussberg, Christopher Marcus, Christine A. Okike, Allyson B. Smith, 601 Lexington Avenue, New York, NY 10022.]

---

## Businesses For Sale

**FT BUSINESS**
Tuesday, Friday & Saturday: Business for Sale, Business Opportunities, Business Services, Business Wanted, Franchises

**Classified Business Advertising**
UK: +44 20 7873 3920 | Email: advertising@ft.com