Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' REPLY IN SUPPORT OF**
**ENTRY OF THE FINAL CASH MANAGEMENT ORDER**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") in response to the *Limited Objection to Cash Management* [Docket No. 886] (the "Limited Objection") filed by the United States Trustee for the Southern District of New York (the "U.S. Trustee") and in further support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances,*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*and (III) Granting Related Relief* [Docket No. 10] (the "Motion").[2] The Debtors request that the final order[3] (the "Final Order") authorizing the Motion be entered and, in further support of the Motion, submit the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors With Respect to the Debtors' Security Protocols* (the "Security Declaration"), attached hereto as **Exhibit A**, and state the following:

### Preliminary Statement

1. In the Limited Objection, the U.S. Trustee raises certain concerns regarding the storage and security of the Debtors' digital assets. To date, no other party, including the Official Committee of Unsecured Creditors (the "Committee"), has raised similar concerns or objected to the Motion. The Debtors submit the Security Declaration to provide information supporting the security protocols and processes in place to protect cryptocurrency assets in order to meet their burden under section 345(b) of the Bankruptcy Code to the extent applicable to digital assets. As set forth in the Security Declaration, the Debtors maintain robust security measures to ensure that the Debtors' digital assets are properly protected during these chapter 11 cases. Moreover, as discussed in the Security Declaration, the Debtors maintain a security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces. The Debtors also work with leading vendors that are used by institutions worldwide to provide the security services necessary to protect their digital assets and client data.

2. Accordingly, the Debtors believe the Security Declaration resolves the U.S. Trustee's concerns and submit that they have met their burden under section 345 of the Bankruptcy

---

[2] Capitalized terms not otherwise defined herein are given the meanings ascribed to them in the Motion.

[3] The Debtors will file a revised version of the Final Order prior to the hearing.

2

Code, to the extent applicable, that the Debtors' assets are sufficiently protected. For these reasons, the Court should enter the Final Order.

### Reply

3.  Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes the deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). As a practical matter, a debtor is vested with some discretion in investing money of the estate, but "section 345(b) of the Bankruptcy Code limits that discretion." *In re Ditech Holding Corp.*, 605 B.R. 10, 16–17 (Bankr. S.D.N.Y. 2019). The purpose of section 345(b) of the Bankruptcy Code is "to ensure 'that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate,' while also giving bankruptcy courts the flexibility to modify such requirement for 'just cause' where strict compliance might 'work to needlessly handcuff larger, more sophisticated debtors.'" *Id.* at 22 (citing H.R. Rep. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994)).

4.  For deposits of money or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires a debtor to "bond" such deposit, "unless the court for cause orders otherwise." 11 U.S.C. § 345(b). Additionally, under the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines"), debtors in possession must deposit all estate funds into accounts at a depository institution on a pre-approved list issued by the U.S. Trustee.

3

5. In its Limited Objection, the U.S. Trustee argues that it is the Debtors' "burden to demonstrate that the requirements of 11 U.S.C. § 345, as applicable, are satisfied." Obj. ¶ 9. The U.S. Trustee further argues that "[a]lthough there is no need to reach the issue as to whether cryptocurrency is money, an asset of the debtors must be kept safe."[4] *Id*. ¶ 8. The Debtors have demonstrated as much and are safely securing their cryptocurrency and other digital assets as set forth in the Security Declaration.

6. As discussed in the Security Declaration, the Debtors security protections include, among other things, conducting first and third-party security assessments, multi-party computation and asset protection, and diligent monitoring and proactive hunting for risks. Security Declaration ¶ 13. These security measures have been sufficient to safeguard the Debtors' valuable digital assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. *Id*. ¶ 16. Such protocols have kept the Debtors' cryptocurrency assets secure since the Debtors' inception—the Debtors have never been subject to a security breach. *Id*. ¶ 18.

7. Moreover, no party in interest besides the U.S. Trustee has asserted or raised any concerns about the security of the Debtors' assets. Indeed, at the U.S. Trustee's behest, the Debtors worked with the Committee and provided diligence with respect to their security protocols to provide assurances that the Debtors' digital assets are protected. Following a review of the diligence materials, the Committee did not flag any concerns or raise any issues with respect to the security of the Debtors' assets.

---

[4] It is unclear if a debtor's cryptocurrency is "money of the estate" subject to compliance with section 345 of the Bankruptcy Code. The Bankruptcy Code does not define "money," and, to date, no court or federal agency has concluded that cryptocurrency is money. By this Reply, the Debtors are not taking a position regarding such a determination and reserve all rights and defenses related thereto.

4

8.      For these reasons, the Court should find that the Debtors have met their burden establishing that their assets have been and remain secure during these chapter 11 cases.

## Reservation of Rights

9.      The Debtors expressly reserve all rights with respect to the Motion and this Reply, including the right to supplement or add to the legal and factual arguments to further respond to the Limited Objection at the hearing on the Motion or otherwise. In the event the Court determines that it is necessary to resolve the issue of whether cryptocurrency is "money" to enter a final order on the Motion, or decides that the issue needs to be resolved later in these chapter 11 cases, the Debtors reserve all rights with respect thereto and request permission to fully brief the issue.

10.      For the avoidance of doubt, nothing herein, including any omission, shall be interpreted or construed as waiver or limitation on any such rights or an admission that section 345 of the Bankruptcy Code applies to cryptocurrency or other digital assets, and the Debtors reserve all rights with respect thereto.

## Conclusion

11.      For the reasons stated above and in the Motion, the Court should grant the relief requested in the Final Order.

*[Remainder of Page Intentionally Left Blank.]*

WHEREFORE, the Debtors request that the Court enter the Final Order granting the relief requested in the Motion and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: February 5, 2023<br>New York, New York | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>Christopher Marcus, P.C.<br>Christine A. Okike, P.C.<br>Allyson B. Smith (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br>Email:           jsussberg@kirkland.com<br>                     cmarcus@kirkland.com<br>                     christine.okike@kirkland.com<br>                     allyson.smith@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |

**Exhibit A**

**Security Declaration**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF STEPHEN EHRLICH,**
**CHIEF EXECUTIVE OFFICER OF THE DEBTORS,**
**WITH RESPECT TO THE DEBTORS' SECURITY PROTOCOLS**

I, Stephen Ehrlich, Chief Executive Officer of Voyager Digital, LLC (together with the above-captioned debtors and debtors in possession, the "Debtors") and certain of its Debtor and non-Debtor affiliates (collectively, with the Debtors, "Voyager" or the "Company"), hereby declare under penalty of perjury:

**A.    Background**

1.    I am the Co-Founder and Chief Executive Officer of Voyager Digital, LLC and have held that position since Voyager's founding in 2018. I am also the Chief Executive Officer of Voyager Digital Holdings, Inc. Prior to co-founding Voyager Digital, LLC, I co-founded and served as Chief Executive Officer of Voyager Digital Canada Ltd. and served on Voyager Digital

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Canada Ltd.'s board of directors. I served as Vice-President, Brokerage of E*Trade Financial Corporation from 1999 to 2006 and Chief Executive Officer of ETrade Professional Trading from 2002 to 2006 before I founded Lightspeed Financial, LLC in 2006.

2. I am generally familiar with the Debtors' day-to-day operations, business, and security protocols. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with other members of Voyager's management team and advisors, my review of relevant documents and information concerning Voyager's operations and security protocols, or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

B. **The Debtors' Cryptocurrency Assets and Location of Such Assets**

3. The Debtors currently maintain cryptocurrency coin assets (the "Coins"). I understand, from conversations with the Debtors' Chief Financial Officer, that these Coins are worth approximately $1.3 billion as of January 24, 2023. The Debtors currently store the majority of their Coins in digital "wallets" on the blockchain, which may only be accessed through a self-custody or the third-party digital asset custody platform. The Debtors use four different custodial solutions to hold and safely store a majority of the Coins—Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase" and collectively, the "Custodians").[2]

4. All of the Custodians are third-party custodians. Through third-party custodial agreements, the Custodian receives digital assets for storage by generating private keys with their public keys pairs, with the Custodian retaining custody of the private keys. In third-party custodial

---

[2] The Debtors have approximately $7-10 million worth of Coins held on exchanges and $3-5 million worth of Coins in hardware wallets that are not supported by the Custodians.

2

relationships, Voyager pays the Custodians for use of their secure wallet technology and in turn the Custodians protect the private keys to Voyager's cryptocurrency wallets and secure Voyager's cryptocurrency assets. Private keys are an alphanumeric string known only to the holder of a digital asset, which must be used to transact the digital asset. If a private key is stolen, the digital assets in that wallet can be transferred to someone else's personal wallet. If a private key is lost, it could prevent the customer from accessing their digital asset. Therefore, protecting private keys is crucial to maintaining digital asset security. Private keys are also represented by the corresponding public key. Public keys are an alphanumeric string on a Blockchain that indicates ownership/possession of a specific amount of a digital asset by a specific network participant.

5.   All of the Custodians are major providers in the cryptocurrency ecosystem and many businesses in the industry use the same custody solutions.  All were assessed by Voyager's security and financial teams during the onboarding process of these arrangements. Outsourcing to the Custodians is beneficial to Voyager because these Custodians have inherent security features and expertise in the space to hold and safeguard cryptocurrency that Voyager does not have.  Custodians also have the necessary resources to mitigate security risks, thereby providing Voyager with a safe and regulated storage platform for their digital assets.  It is also safer to hold cryptocurrency with multiple Custodians due to portfolio diversification.

6.   While there are thousands of cryptocurrencies in existence, Voyager currently maintains over 100 different cryptocurrencies. Voyager has agreed to provide the U.S. Trustee and Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Committee") a full accounting of the cryptocurrency and other digital assets in each Debtor's possession, including where such assets are held and the source of such cryptocurrency upon entry of a final order approving the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing*

*the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 10].

### i. Coins on Fireblocks

7. The Debtors currently store the majority of their Coins on Fireblocks. Fireblocks is widely recognized as an industry-leading provider of cryptocurrency storage services, and the Debtors have used Fireblocks to store cryptocurrency since 2020.

8. Fireblocks is a unique hybrid between self-custody and third-party custodian whereby they offer hosted wallet software that Voyager controls. Fireblocks' grants Voyager a license to access and use Fireblocks' services, which consists of software on a SAAS basis and/or mobile application and includes a cryptocurrency wallet that stores private and public keys, interacts with various blockchains to send and receive digital currency, and monitors their balance (the "Fireblocks Vault"). To use Fireblocks' service for every generated wallet in the Fireblocks Vault, Voyager is required to activate the private key share that will be generated on Voyager's mobile device (the "Private Key Share"). If the mobile device was stolen or damaged, Voyager can use an individual recovery passphrase that Voyager is required to have, which is used to recover the Private Key Share in the event that the mobile device or Fireblocks' app is damaged or stolen. If the mobile device was stolen or damaged, Fireblocks also provides Voyager the ability to reconstruct private keys for their wallets in the Fireblocks Vault.

### ii. Coins on Copper

9. The Debtors have used Copper since early 2022. Pursuant to their arrangement with Copper, Voyager contracts with Copper and trusted third-party, Nemean Services Ltd.,

4

whereby Voyager holds a custody account with Copper and Copper provides custody for Voyager's digital assets. In order for Voyager to withdraw digital assets from their Copper custody account to an external location on the blockchain, Voyager must authorize the transaction using Copper's standalone secure custody application ("Copper Unlimited"). Copper Unlimited requires authorizations from both Copper and Voyager, who each hold one of three unique distributed keys calls "shards." Nemean Services Ltd. is exclusively charged with holding the third shard as a failsafe in the event that Copper or Voyager are unable to access or otherwise lose their shard.

### iii. Coins on Anchorage

10. Anchorage receives Voyager's digital assets for storage by generating private keys and their public key pairs, with Anchorage retaining custody of such private keys. Upon receipt, Anchorage custodies the digital assets in Voyager's name or accounts established for the benefit of Voyager. In turn, Voyager pays a monthly custody fee for services provided by Anchorage. The Debtors currently store approximately seven Coins on Anchorage. The debtors have used Anchorage since 2021.

### iv. Coins on Coinbase

11. Coinbase provides Voyager with a segregated custody account controlled and secured by Coinbase ("Custodial Account") to store certain digital assets supported by Coinbase ("Digital Assets") on Voyager's behalf. The Debtors currently store approximately six Coins on Coinbase. Coinbase has provided services to the Debtors since early 2021.

12. Coinbase's custodial services allow Voyager to deposit Digital Assets from a public blockchain into their Custodial Account, withdraw Digital Assets from their Custodial Account, and access other services as may be agreed. Coinbase securely stores all Digital Asset private keys in offline storage. Coinbase implements and maintains a reasonable information security

5

program that include policies and procedures that are reasonably designed to safeguard Coinbase custody's electronic systems from, among other things, unauthorized access. Pursuant to Voyager's agreement with Coinbase, Voyager must provide the names of authorized employees who are authorized to access the Coinbase custody site. Such people must verify all transaction information prior to submitting instructions to Coinbase custody.

## C. Overview of the Debtors' Coin Security Processes and Procedures

13. The Debtors have a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets. For example, Voyager would have to marry up its two key halves with a third at Fireblocks that they own and store in order to use a private key to access a wallet held at Fireblocks.

14. Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables

6

Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (e.g., the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

15. Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

16. The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as lass past to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Coin assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. Indeed, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

D.   **Overview of the Debtors' Other Security Measures**

17. I am also familiar with the Debtors' other policies, procedures, and security controls employed to prevent misappropriation and external cyber-attacks with respect to the Coins and

7

Coin-based transactions. The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Debtors' customer experience team and then escalated, as necessary, to the Debtors' anti-fraud operations team to review and investigate.

18. The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces. The Debtors also work with leading vendors that are used by institutions worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach.[3] Between December 2021 and October 2022 alone, the Company's security team mitigated over seven million intrusion attempts. As of the date hereof, Voyager has not experienced any data breaches or successful intrusions to Voyager's systems.

19. I believe that the Debtors' current security protocols and posture provide sufficient security for the Debtors' Coins for at least three reasons. *First*, Coins held by the Custodians are protected from misappropriation by individuals within Voyager because any transaction involving the Coins requires multiple levels of coordinated authorizations. *Second*, Coins are protected from outside cyberattacks as they are securely maintained in wallets through the custodial system provided by the Custodians. I am aware that the Custodians are industry leading providers of cryptocurrency storage services. *Finally*, people, technology, and process are all monitored diligently and the relevant security enforcement controls are in place.

---

[3] For the avoidance of doubt, this declaration does not apply to breaches outside the scope of Voyager's controls and platform security, including, but not limited to, customer accounts being hacked due to, for example, weak passwords.

8

20.     Due to the digital nature of the Coins, they cannot be stored in a traditional bank account, and I believe that the security protocols and controls as described herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Coins require.  I believe the Debtors' current security protocols and controls and long-standing relationships with the Custodians are reasonable and appropriate to safeguard the Debtors' Coins.

[*Remainder of Page Intentionally Left Blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 5, 2023

/s/ *Stephen Ehrlich*
Name:  Stephen Ehrlich
Title:   Co-Founder and Chief Executive Officer
Voyager Digital, LLC