**<u>Exhibit C</u>**

# EXHIBIT 11

September 11, 2022

**VIA EMAIL**

Moelis & Company LLC
399 Park Avenue, 4th Floor
New York, NY 10022
Attn:   Jared Dermont (jared.dermont@moelis.com)
        Barak Klein (barak.klein@moelis.com)
        Mike DiYanni (michael.diyanni@moelis.com)
        Brian Tichenor (brian.tichenor@moelis.com)

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:   Joshua A. Sussberg, P.C. (jsussberg@kirkland.com)
        Christopher Marcus, P.C. (cmarcus@kirkland.com)
        Christine A. Okike, P.C. (christine.okike@kirkland.com)
        Allyson B. Smith (allyson.smith@kirkland.com)

McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017
Attn:   Darren Azman (dazman@mwe.com)

Re:     In re Voyager Digital Holdings, Inc., *et al.* (Case No. 22-10943 (MEW))

Ladies and Gentlemen:

        On behalf of West Realm Shires Inc.[1] ("FTX US") and Alameda Ventures Ltd.
("Alameda" and together with FTX US, "we" or "Buyer"), we are pleased to submit the
following revisions to our bid of September 6, 2022 (the "Original Bid" and, as updated, the
"Revised Bid") to acquire certain assets of Voyager Digital, LLC, a Delaware limited liability
company ("Seller" or "Voyager").  This Revised Bid supersedes any corresponding terms in our
Original Bid; any terms and conditions not described below remain unchanged from the Original
Bid.  Capitalized terms not defined herein shall have the meanings ascribed to them in the
Original Bid.

        As discussed with you, below are the key terms of our Revised Bid:

(i)     **Transaction Structure**. Based on Voyager's stated preference for implementing a
        transaction through a plan of reorganization (the "Plan"), the Revised Bid contemplates a
        363 sale implemented through a Plan on terms acceptable to Buyer. However, to the
        extent Voyager would now prefer to implement the transaction prior to Plan effectiveness

---

[1]     West Realm Shires Inc. is the parent of West Realm Shires Services Inc. d/b/a FTX US, a Delaware corporation
        that provides cryptocurrency exchange services to customers in 49 states in the United States.

through a traditional 363 asset sale and court approval on an expedited basis, Buyer is
open to adjusting its proposal further to accommodate that structure and timeline.

(ii) **Purchase Price**. The Cash Payment shall be increased to $42,500,000. In addition, we
will acquire all cryptocurrency and cash and cash equivalents of the estate (other than
crypto held as collateral under Seller's crypto loans or any cash amounts necessary for
the estate's wind down expenses) at fair market value, calculated based on the same
mechanics we have previously described. As discussed, our view continues to be that
minor changes in price will have far less value to the estate than the differential ability of
Alameda to provide the re-balancing needed for over $1 billion in cryptocurrency without
haircut.

In addition, Buyer will make a supplemental payment to Seller of up to $15,000,000 in
the aggregate (the "Supplemental Payment"), based on the average daily assets
attributable to FTX customer accounts opened by Voyager customers or creditors in the
six months after the closing date (scaled linearly between $0 and $15,000,000 for such
average assets for between 0% and 200% of the starting asset balance). Together,
assuming achievement of the full Supplemental Payment, our Revised Bid would result
in total cash payable to the estate of $57,5000,000.

(iii) **Trading Credit**. In order to incentivize customers to transfer their accounts to the FTX
US platform, we will provide an initial $30 credit into the account of each Voyager
customer or creditor who transfers their account, even if they currently have a $0 balance
in their account at Voyager. This initial credit would not be set against any customer's or
creditor's allowed claim amount, and will be purely an incentive offered by FTX for
Voyager customers and creditors to transfer their account to FTX.

(iv) **Marked Agreement**. An updated Asset Purchase Agreement reflecting the terms of our
Revised Bid is attached here as Exhibit 1.

Should an Auction be conducted, Buyer reserves the right to supplement, amend, or
otherwise modify the Bid as may be necessary or appropriate.

DocuSign Envelope ID: 686492FD-401A-43BD-A078-8E2D8ED394B6

22-10943-mew    Doc 998-3    Filed 02/13/23    Entered 02/13/23 22:57:51    Exhibit C -
Unredacted Exhibit 11 to Evans Declaration    Pg 5 of 144

Very truly yours,

West Realm Shires Inc.

By:

Name: Dan Friedberg

Title: Executive Vice President

Alameda Ventures Ltd.

By:

Name: Dan Friedberg

Title: Legal Counsel

cc:    Andy Dietderich
       Brian D. Glueckstein
       Mitchell S. Eitel
       (Sullivan & Cromwell LLP)

**Exhibit 1**

**Revised Asset Purchase Agreement**

**FTX/Alameda BID DRAFT**
**UPDATED - September 11, 2022**
**Confidential**

# FOR DISCUSSION PURPOSES ONLY

---

## ASSET PURCHASE AGREEMENT[1]

### DATED AS OF [●], 2022

### BY AND BETWEEN

### WEST REALM SHIRES INC. AND ALAMEDA VENTURES LTD.

### AS PURCHASERS

### AND

### VOYAGER DIGITAL, LLC

### AS SELLER.

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever unless and until the definitive agreement providing for the transaction has been executed and delivered by all parties thereto.*

---

[1]    **Note to Draft**: Transaction structure subject to ongoing tax and accounting diligence and review. Agreement subject to material revision based on ultimate transaction structure.

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED
LIABILITIES ................................................................................................................5

1.1    Purchase and Sale of the Acquired Assets ........................................................5
1.2    Excluded Assets ................................................................................................6
1.3    Assumption of Certain Liabilities .....................................................................8
1.4    Excluded Liabilities .........................................................................................9
1.5    Assumption/Rejection of Certain Contracts .....................................................9

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ....................................................11

2.1    Consideration; Payment; Initial Distribution .................................................11
2.2    Deposit ...........................................................................................................12
2.3    Closing ...........................................................................................................13
2.4    Closing Deliveries by Seller ...........................................................................13
2.5    Closing Deliveries by Purchasers ...................................................................14
2.6    Supplemental Payment....................................................................................14
2.7    Withholding ....................................................................................................14

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ...............................15

3.1    Organization and Qualification.......................................................................15
3.2    Authorization of Agreement ...........................................................................15
3.3    Conflicts; Consents ........................................................................................15
3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts..........................16
3.5    Financial Statements .......................................................................................17
3.6    Title to Acquired Assets..................................................................................17
3.7    Title to Properties...........................................................................................17
3.8    Contracts .........................................................................................................17
3.9    Compliance with Laws ....................................................................................19
3.10   Environmental Matters....................................................................................20
3.11   Intellectual Property; Cybersecurity and Personal Information.........................20
3.12   Tax Matters .....................................................................................................22
3.13   Employees.......................................................................................................23
3.14   Affiliate Transactions......................................................................................23
3.15   Brokers ...........................................................................................................23
3.16   No Litigation...................................................................................................23
3.17   No Other Representations or Warranties ..........................................................23
3.18   No Outside Reliance .......................................................................................24

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASERS.......................24

4.1    Organization and Qualification........................................................................24
4.2    Authorization of Agreement ...........................................................................24
4.3    Conflicts; Consents ........................................................................................25

2

4894-0335-4158 v.6

4.4    Financing...............................................................................................25
4.5    Absence of Restraints; Compliance with Laws; Permits.........................25
4.6    Brokers.................................................................................................26
4.7    No Litigation.........................................................................................26
4.8    No Other Representations or Warranties ...............................................26
4.9    No Outside Reliance .............................................................................26

ARTICLE V BANKRUPTCY COURT MATTERS ...........................................................27
5.1    Bid Protections......................................................................................27
5.2    No-Shop.................................................................................................29
5.3    Bankruptcy Actions ..............................................................................29
5.4    Cure Costs .............................................................................................31
5.5    Confirmation Order...............................................................................31
5.6    Approval ................................................................................................32
5.7    Filings ...................................................................................................32

ARTICLE VI COVENANTS AND AGREEMENTS ...........................................................32
6.1    Conduct of Business of Seller...............................................................32
6.2    Access to Information............................................................................35
6.3    Regulatory Approvals............................................................................36
6.4    Customer Transition..............................................................................36
6.5    Transfer of Acquired Cryptocurrency Loans .........................................38
6.6    Reasonable Efforts; Cooperation ..........................................................38
6.7    Further Assurances................................................................................38
6.8    Insurance Matters..................................................................................38
6.9    Receipt of Misdirected Assets; Liabilities ............................................38
6.10   Wind-Down............................................................................................39
6.11   Confidentiality ......................................................................................39

ARTICLE VII CONDITIONS TO CLOSING.....................................................................40
7.1    Conditions Precedent to the Obligations of Purchasers and Seller........40
7.2    Conditions Precedent to the Obligations of Purchasers.........................40
7.3    Conditions Precedent to the Obligations of Seller.................................41
7.4    Waiver of Conditions ............................................................................41

ARTICLE VIII TERMINATION ...................................................................................41
8.1    Termination of Agreement.....................................................................41
8.2    Effect of Termination............................................................................43

ARTICLE IX TAXES.................................................................................................44
9.1    Transfer Taxes ......................................................................................44
9.2    Allocation of Purchase Price.................................................................44
9.3    Cooperation...........................................................................................45
9.4    Preparation of Tax Returns and Payment of Taxes ...............................45

ARTICLE X MISCELLANEOUS ...................................................................................................46

10.1    Non-Survival of Representations and Warranties and Certain Covenants;
         Certain Waivers .................................................................................................46
10.2    Expenses ............................................................................................................46
10.3    Notices ...............................................................................................................46
10.4    Binding Effect; Assignment...............................................................................48
10.5    Amendment and Waiver .....................................................................................48
10.6    Third-Party Beneficiaries ..................................................................................48
10.7    Non-Recourse .....................................................................................................48
10.8    Severability ........................................................................................................49
10.9    Construction .......................................................................................................49
10.10   Schedules ...........................................................................................................49
10.11   Complete Agreement ..........................................................................................50
10.12   Specific Performance .........................................................................................50
10.13   Jurisdiction and Exclusive Venue......................................................................50
10.14   Governing Law; Waiver of Jury Trial ...............................................................51
10.15   No Right of Set-Off ...........................................................................................52
10.16   Counterparts and PDF........................................................................................52
10.17   Publicity ............................................................................................................52
10.18   Bulk Sales Laws .................................................................................................52
10.19   Fiduciary Obligations.........................................................................................52
10.20   No Solicitation ...................................................................................................53

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .....................................53

11.1    Certain Definitions.............................................................................................53
11.2    Index of Defined Terms .....................................................................................62
11.3    Rules of Interpretation .......................................................................................63

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                     AGREEMENT

[EXHIBIT B   FORM OF ESCROW AGREEMENT][2]

---

[2]    **Note to Draft**: K&E to confirm if needed and if so, provide updated form.

4894-0335-4158 v.6

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of [●], 2022, is made by and between (i) West Realm Shires Inc., a Delaware corporation ("FTX"), and Alameda Ventures Ltd., a Seychelles limited company ("Alameda" and, together with FTX, each, a "Purchaser" and collectively, "Purchasers"), and (ii) Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchasers and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchasers desire to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchasers the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Plan and subject to entry of the Confirmation Order and consummation of the Plan.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchasers and Seller hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchasers, and Purchasers shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means the following properties, rights, interests and other assets of Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any of the following properties, rights, interests, and other assets acquired by Seller after the date hereof and prior to the Closing, but excluding in all cases the Excluded Assets:

5

(a)      all Cryptocurrency attributable to customer accounts on the Voyager Platform;

(b)      the Contracts listed on <u>Schedule 1.1(b)</u> (the "<u>Assigned Contracts</u>"), including all Contracts evidencing the Cryptocurrency Loans (for the avoidance of doubt, not including the 3AC Loan) (the "<u>Acquired Cryptocurrency Loans</u>");

(c)      with respect to each Acquired Cryptocurrency Loan, the security interest in and to any collateral, including any Cryptocurrency, attributable to or backing such Acquired Cryptocurrency Loan (such collateral for all Acquired Cryptocurrency Loans, collectively, the "<u>Collateral</u>"), all rights in the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(d)      (i) all Avoidance Actions or other affirmative causes of action or claims against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), whether arising before or after the Closing Date, other than the Retained Avoidance Actions, and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller);

(e)      all Cash and Cash Equivalents, other than cash held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve ("<u>Acquired Cash</u>"); and

(f)      all Documents.

1.2      <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under all properties, rights, interests and other assets of Seller other than the Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"); <u>provided</u> that, at any time up to five (5) Business Days prior to the Closing, the Purchasers may notify Seller that they wish to purchase any of the properties, rights, interests and other assets of Seller set forth in clauses (p) through (s), and upon such notice, any such properties, rights, interests and other assets shall be deemed Acquired Assets for all purposes under this Agreement for no additional consideration or adjustment to the Purchase Price:

(a)      all Cash and Cash Equivalents held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid

6

to Advisors or other professional service providers, in each case, other than Cryptocurrency attributable to customer accounts on the Voyager Platform or Collateral;

(b)     all Contracts of Seller, other than the Assigned Contracts (the "Excluded Contracts");

(c)     all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller), (ii) that are Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; provided that, to the extent not prohibited by applicable Law, Purchasers shall have the right to make copies of any portions of such Documents;

(d)     all Documents prepared or received by Seller or any of its Affiliates in connection with this Agreement or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the Transactions, including all analyses relating to the business of Purchasers or their Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates;

(e)     all current and prior insurance policies of Seller, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all Retained Avoidance Actions, (ii) all other demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchasers or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchasers or their respective Affiliates entered into on or after the date hereof;

(i)    all Tax refunds that are refunds of income Taxes of the Seller or that are refunds of Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period;

(j)    the 3AC Loan and any Actions related thereto;

(k)    the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(l)    all Governmental Authorizations, including Money Transmitter Licenses;

(m)    any accounts receivable, negotiable instruments and chattel paper of Seller, for the avoidance of doubt, other than with respect to the Acquired Cryptocurrency Loans;

(n)    any amounts or Liabilities owing to Seller from its Affiliates;

(o)    any Leased Real Property;

(p)    any tangible assets (including Equipment) of Seller;

(q)    all employment agreements or arrangements with employees of Seller or its Affiliates and all personnel records (including all human resources and other records) of Seller or its Affiliates relating to employees of Seller or any of its Affiliates;

(r)    all of Seller's rights in Seller Intellectual Property, and all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(s)    any goodwill, payment intangibles and general intangible assets and rights of Seller other than those associated with or related to the Acquired Assets; and

(t)    the properties, rights, interests and assets set forth on Schedule 1.2(t).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, effective as of the Closing, in addition to the payment of the Cash Payment and the Currency Consideration in accordance with Section 2.1, Purchasers shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably transfer, assign, convey, and deliver to Purchasers, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities and obligations of Seller under the Assigned Contracts that become due from and after the Closing;

8

(b)      all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)      all Liabilities arising out of the ownership of the Acquired Assets, in each case, by Purchasers from and after the Closing Date;

(d)      all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchasers under this Agreement and all Transfer Taxes that Purchasers bears under Section 9.1;

(e)      all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date, provided that Assumed Liabilities will not include any Taxes other than in this Section 1.3(e) and Section 1.3(d) (and, for the avoidance of doubt, any income Taxes of the Seller or any Taxes with respect to the Acquired Assets for a Pre-Closing Tax Period are not Assumed Liabilities); and

(f)      all Liabilities for which Purchasers have agreed to be responsible in accordance with this Agreement.

1.4      Excluded Liabilities. Purchasers shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5      Assumption/Rejection of Certain Contracts.

(a)      Assumption and Assignment of Executory Contracts. Seller shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchasers pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchasers, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller

shall, pursuant to the Plan, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchasers (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchasers pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchasers shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Excluding or Adding Assigned Contracts Prior to Closing. Promptly, but in any event within ten (10) days following the date hereof, Seller shall deliver to Purchasers (x) a true and complete list of all material Contracts used in the Debtors' business to which Seller is a party, together with Seller's good faith best estimate of the amount of Cure Costs with respect to each such Contract, and within two (2) Business Days of Purchasers' request, Seller shall make available a true and copy of any such Contract. Purchasers shall have the right to notify Seller in writing of any Assigned Contract that they do not wish to assume or a Contract to which Seller is a party that Purchasers wish to add as an Assigned Contract up to five (5) Business Days prior to the anticipated Closing (the "Designation Deadline"), and (i) any such previously considered Assigned Contract that Purchasers no longer wish to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchasers wish to assume as an Assigned Contract, to the extent assignable under applicable Law, shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchasers, in each case, without any adjustment to the Purchase Price. Purchasers shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. For the avoidance of doubt, (x) if Purchasers have not informed Seller of their intent to assume any additional Assigned Contracts or other executory contracts or unexpired leases in accordance with the foregoing, then all such executory contracts or unexpired leases (whether or not known or disclosed by Seller to Purchasers) shall be deemed to be Excluded Contracts and may be rejected by Seller as of the Closing, and (y) no prepetition Cure Cost shall be due or payable with respect to any executory contract or unexpired lease until the assumption thereof.

(c)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchasers to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchasers as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent that the purported assignment or transfer of any Acquired Asset (i) would be prohibited by applicable Law, (ii) would be reasonably likely to subject Purchasers or their Affiliates to civil or criminal liability or (iii) would constitute a breach, default or violation

10

of a Law or Order, in each case, without the receipt of a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) (each such Consent or Governmental Authorization, a "Necessary Consent"), and such Necessary Consent has not been obtained prior to the Closing, such asset shall be deemed not be an Acquired Asset at the Closing and shall not be transferred to, or received by, Purchasers, unless and until the Necessary Consent is obtained. In such event, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Necessary Consent is obtained and six (6) months following the Closing (or the closing of the Bankruptcy Case, if shorter), Seller and Purchasers shall (A) use reasonable best efforts to secure such Necessary Consent as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchasers, including subcontracting, licensing, sublicensing, or passing through via a swap arrangement to Purchasers any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchasers shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Necessary Consent has not been obtained and (2) Purchasers shall assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Necessary Consent requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchasers in accordance with the terms of this Agreement, the Plan, the Confirmation Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    <u>Consideration; Payment; Initial Distribution</u>.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchasers for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $42,500,000 (the "Cash Payment") and (iii) the Fair Market Value of all Acquired Cash and all Cryptocurrency of Seller (in each case, other than any Collateral or such Cryptocurrency that are deemed to be Excluded Assets pursuant to the definition of "Fair Market Value") as of the Reference Date (the "Currency Consideration"). For purposes of this Section 2.1, (x) the "Reference Date" shall be the second (2nd) Business Day immediately prior to the Closing Date, or such other reference date as the Parties may mutually agree and (y) the "Fair Market Value" of any Cryptocurrency shall be such price for the Cryptocurrency as of the Reference Date, as calculated by Alameda reasonably and in good faith based on market practice and available pricing information and agreed by Seller; provided that, if the Parties cannot agree on the value of any specific Cryptocurrency on the Reference Date, then such Cryptocurrency shall be deemed to be an Excluded Asset for all purposes under this Agreement.

(b)    Seller shall use its reasonable best efforts to calculate the Pro Rata Share of any initial distributions due to any Transferred Creditors (taking into account both the Cash

Payment and the Currency Consideration) under the Plan (the aggregate amount of such distribution, the "Initial Distribution") within [one (1) Business Day prior to the Closing Date].[3]

(c)    With respect to any Transferred Creditors, at or as promptly as possible following the Closing (the actual date of such distribution, the "Initial Distribution Date"), Purchasers shall deliver, or cause to be delivered, to such Transferred Creditors, on behalf of Seller, their Pro Rata Share of the Initial Distribution directly to their FTX Accounts, in US Dollars or, if elected by such Transferred Creditors prior to the Closing, in BTC, USDC and/or any other Cryptocurrency carried by FTX on its platform in the ordinary course of business, equal to the value of such Initial Distribution as of the Closing Date.

(d)    At the Closing, Purchasers shall deliver, or cause to be delivered, to Seller: (i) the Cash Payment, plus (ii) the Currency Consideration, less (iii) the aggregate amount of the Initial Distributions to be paid to Transferred Creditors pursuant to Section 2.1(b), less (iv) the Deposit, less (v) the difference between the aggregate amount of the Expense Reimbursement at the Closing and the Initial Expense Reimbursement Payment (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller at least two (2) Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchasers have, on or prior to the date hereof, made an earnest money deposit with SRS Acquiom (the "Escrow Agent") in the amount equal to the greater of $5,000,000 and ten percent (10%) of the Cash Payment (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate escrow account, established pursuant to the escrow agreement, [dated as of the date hereof, by and among Seller, Purchasers and the Escrow Agent, substantially in the form attached hereto as Exhibit C][4] (the "Escrow Agreement"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchasers and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by Seller pursuant to Section 8.1(d) or 8.1(f) (or by Purchasers pursuant to Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then Seller shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchasers within five (5) Business Days after such termination.

---

[3]    **Note to Draft**: Timing and mechanics for distribution to be discussed.

[4]    **Note to Draft**: K&E to provide details of escrow arrangement.

4894-0335-4158 v.6

(d)    The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the Closing, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Seller.

2.3    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other Transactions (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the Effective Date of the Plan (as defined therein), subject to the full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchasers:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    control of any possessory Collateral held by Seller and executed versions of any assignments, deeds and other documents of assignment, conveyance or transfer required under applicable Law to evidence the transfer to Purchasers of the Acquired Cryptocurrency Loans and Seller's rights with respect to the Acquired Cryptocurrency Loans, the Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(c)    copies of all Documents that are Acquired Assets, in such digital format as reasonably requested by Purchasers prior to the Closing;

(d)    an Internal Revenue Service Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes, as applicable;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 0 have been satisfied;

(f)    a joint written instruction, duly executed by Seller, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit; and

(g)    such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements or other documents

13

evidencing or otherwise necessary to give effect to the transfer of the Acquired Assets and assumption of the Assumed Liabilities, each in form and substance reasonably acceptable to Seller and Purchasers, in each case duly executed by Seller.

2.5    Closing Deliveries by Purchasers. At the Closing, Purchasers shall deliver to (or at the direction of) Seller:

(a)    the Closing Date Payment;

(b)    the Assignment and Assumption Agreement, duly executed by each Purchaser;

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied;

(d)    a joint written instruction, duly executed by Purchasers, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit; and

(e)    such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements or other documents evidencing or otherwise necessary to give effect to the transfer of the Acquired Assets and assumption of the Assumed Liabilities, each in form and substance reasonably acceptable to Seller and Purchasers, in each case duly executed by Purchasers.

2.6    Supplemental Payment. Subject to the occurrence of the Closing and the terms and conditions set forth in this Section 2.6, Purchasers will pay to Seller an amount in US Dollars (the "Supplemental Payment"), equal to (x) the value of the daily average assets (in BTC-denominated terms based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by FTX in its sole discretion) attributable in the aggregate to the Transferred Creditors' FTX Accounts during the six (6) month period following the Initial Distribution Date (the "Payment Period"), divided by (y) the value of the assets (in BTC-denominated terms and based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by FTX in its sole discretion) attributable to the Transferred Creditors' FTX Accounts in the aggregate on the day after the Initial Distribution Date, multiplied by (z) $7,500,000; provided that in no event shall the Supplemental Payment exceed $15,000,000. Purchasers shall make the Supplemental Payment to Seller within ten (10) Business Days following the end of the Payment Period.

2.7    Withholding. Purchasers shall be entitled to deduct and withhold from the Purchase Price all taxes that Purchasers are required to deduct and withhold under any applicable tax Law. All such withheld amounts shall be treated as delivered to Seller for all purposes hereunder. If Purchasers are required to deduct and withhold from the Purchase Price under any applicable tax Law, Purchasers shall (a) use commercially reasonable efforts to give Seller notice at least five (5) days before deduction and withholding (or, if five (5) days' notice is not reasonably practical, as promptly as practical) and (b) reasonably cooperate with Seller to use commercially reasonable efforts to mitigate deduction and withholding.

14

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business to the extent publicly available on the CSA's System for Electronic Document Analysis and Retrieval (the "Filed CSA Documents"), (ii) disclosed in any forms, statements or other documents filed by the Debtors with the Bankruptcy Court in the Bankruptcy Case, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchasers as follows as of the date hereof and as of the Closing Date:

3.1    Organization and Qualification. Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    Authorization of Agreement. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement, and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the consummation by it of the Transactions; and

(c)    this Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3    Conflicts; Consents.

4894-0335-4158 v.6

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained[, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(a) are made, given or obtained (as applicable),][5] neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts.

(a)    Schedule 3.4(a) sets forth a list of all Cryptocurrency of Seller as of the date of this Agreement, the means through which Seller controls such Cryptocurrency (e.g., "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to customer accounts on the Voyager Platform. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.4(a), free and clear of all Encumbrances (other than Permitted Encumbrances); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.4(b) sets forth a list of all Cryptocurrency Loans as of the date of this Agreement, including (i) the counterparty thereto, (ii) the amount and type of all Cryptocurrency loaned under each Cryptocurrency Loan, (iii) the amount and type of assets, including Cryptocurrency and fiat currency, in which each Cryptocurrency Loan may be repaid, (iv) the amount and type of any collateral held by Seller with respect to each Cryptocurrency Loan, including the means through which Seller controls such collateral, and (v) the interest rate and maturity of each Cryptocurrency Loan.

---

[5]    **Note to Draft**: To be determined whether necessary based on Acquired Assets.

4894-0335-4158 v.6

(c)  Schedule 3.4(c) sets forth a list of all Voyager Customers, the account position (including type and amount of Cryptocurrency) that such customer held as of immediately prior to the Petition Date, and, to the Knowledge of Seller, the amount of the unsecured claim held by such Voyager Customer against Seller as of the Petition Date.

3.5  Financial Statements. Attached to Schedule 3.5 are Seller's audited statements of financial position as of June 30, 2022 and as of June 30, 2021, and the related statements of loss and the changes in equity and cash flows for each fiscal year then ended (collectively, the "Financial Statements"). Except as set forth on Schedule 3.5, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied. The Financial Statements present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Seller as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.6  Title to Acquired Assets. Seller has good and valid title to all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchasers will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

3.7  Title to Properties.

(a)  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)  Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8  Contracts.

(a)  Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that:

(i)  relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)  provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

17

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $1,000,000 during any fiscal year;

(v)    contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for Intellectual Property limiting Seller's use of such Intellectual Property to specified fields of use or specified territories;

(vi)    is a Contract governing the collection, Processing, use, disclosure, storage, transfer or disposal of Personal Information or customer information by or on behalf of Seller or any of its Affiliates, including the transfer or sale of any Personal Information or customer information by Seller or any of its Affiliates to any third party;

(vii)    evidences or relates to a Cryptocurrency Loan, including security or collateral agreements;

(viii)    is a custody agreement or agreement with any Person performing validation services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any other Contracts that are material to the Acquired Assets, including agreements with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or platform.

18

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchasers of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has received no written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9    Compliance with Laws.

(a)    Seller is not in violation of any Laws or Orders applicable to the Acquired Assets, except for violations the existence of which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Seller and each of its directors, officers and employees acting in such capacity are and have been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, nor any employee, agent or representative or other Person who performs or has performed services on behalf of Seller, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), Her Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor are any of the foregoing designated as

19

a Specially Designated National or Blocked Person by OFAC and (ii) Seller has not been in violation of applicable Sanctions.

(d)    Seller and each of its directors, officers and employees acting in such capacity are and have been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property; Cybersecurity and Personal Information.

(a)    Schedule 3.11(a) sets forth a true, correct and complete list of all Seller Registered IP, indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and

20

sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property.

(g)    Seller and its Affiliates have complied in all material respects with all applicable Privacy and Data Security Requirements, and the consummation of the Transactions will not cause the Seller or its Affiliates to breach, in any material respect, any Privacy and Data Security Requirements.

(h)    Seller and its Affiliates have established and implemented a comprehensive written information security program that contains administrative, physical and technical safeguards regarding privacy, cybersecurity and data security that are commercially reasonable and designed to protect against any anticipated threats or hazards to the security, integrity and confidentiality of Personal Information and against any Security Incident.

(i)    To the Knowledge of Seller, there have been no Security Incidents involving Personal Information in the Seller's or its Affiliates' custody, possession or control or for which the Seller or its Affiliates are otherwise responsible. The Seller and its Affiliates have not: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy and Data Security Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy and Data Security Requirements by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy and Data Security Requirements; or (iv) made any ransomware or similar payment in connection with any Security Incident.

4894-0335-4158 v.6

3.12    <u>Tax Matters</u>.

(a)    Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)    All material Taxes owed by Seller that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with IFRS.

(c)    There are no Encumbrances for Taxes on any of the assets of Seller other than Permitted Encumbrances.

(d)    Seller (to the extent related to the Acquired Assets) has reported, withheld and paid all Taxes required to have been reported, withheld and paid in connection with amounts paid or owing by it to any employee, independent contractor, creditor, stockholder or other third party except where the failure to make such payment, individually or in the aggregate, is not or would not reasonably be expected to be material to the business, taken as a whole or to cause any Encumbrances to be imposed upon Seller's assets.

(e)    Seller is not and has not been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than Seller) under U.S. Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(f)    Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(g)    Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulations Section 1.6011-4(b)(2).

(h)    Seller has not received any claim in writing from a Governmental Body or social security administration in a jurisdiction where Seller or any of its Affiliates (to the extent related to the Acquired Assets) does not file Tax Returns that such Seller or its Affiliate is or may be subject to taxation by that jurisdiction.

(i)    Seller has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of Law with respect to Seller's assets. Seller has not executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Body and has not been subject to any ruling guidance specific to Seller with respect to the Acquired Assets that would, in any manner, bind, obligate or restrict Purchasers or any of their Affiliates.

(j)    Notwithstanding anything in this Agreement to the contrary, no representation or warranty is made with respect to the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Employees</u>. Seller is not party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to Seller by or on behalf of any labor union and (ii) there is no pending or, to the Knowledge of Seller, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of Seller. Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.14    <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.14</u> or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.15    <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller.

3.16    <u>No Litigation</u>. Except for the general pendency of the Bankruptcy Case and Actions that would not reasonably be expected to have a Material Adverse Effect, there are no Actions pending or, to the Knowledge of Seller, threatened against or affecting Seller.

3.17    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Seller Representations</u>") (<u>it being understood</u> that Purchasers have relied only on such express representations and warranties), Purchasers acknowledge and agree that neither Seller nor any other Person on behalf of Seller makes, and no Purchaser has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchasers or any of their Affiliates or Advisors on behalf of Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither Seller

23

nor any other Person will have or be subject to any Liability whatsoever to any Purchaser, or any other Person, resulting from the distribution to Purchasers or any of their Affiliates or Advisors, or Purchasers' or any of their Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchasers or any of their Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    No Outside Reliance. Notwithstanding anything contained in this Article III or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchasers or any other Person on behalf of Purchasers or any of their Affiliates or Advisors, are, in each case, specifically disclaimed by Purchasers and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers represent and warrant to Seller as follows as of the date hereof and as of the Closing Date:

4.1    Organization and Qualification. Each Purchaser is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to each Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchasers' ability to consummate the Transactions. Each Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchasers' ability to consummate the Transactions.

4.2    Authorization of Agreement.

(a)    Each Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions.

24

(b)    The execution, delivery and performance by each Purchaser of this Agreement, and the consummation by each Purchaser of the Transactions, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on the part of any Purchaser are necessary to authorize the execution, delivery and performance by such Purchaser of this Agreement and the consummation by it of the Transactions.

(c)    This Agreement has been duly executed and delivered by each Purchaser and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of each Purchaser, enforceable against each Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    Conflicts; Consents.

(a)    Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchasers of this Agreement, nor the consummation by Purchasers of the Transactions, nor performance or compliance by Purchasers with any of the terms or provisions hereof, will (i) conflict with or violate any provision of any Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to any Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which any Purchaser is a party or accelerate any Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Purchaser or any of their Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

(b)    Purchasers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchasers of this Agreement or the consummation by Purchasers of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

4.4    Financing. Purchasers have, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment and the Currency Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions. Purchasers are and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5    Absence of Restraints; Compliance with Laws; Permits.

(a)        No Purchaser is in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

(b)        Purchasers hold and are in compliance with all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership or use of the Acquired Assets, except those the absence of which to have would not, individually or in the aggregate, reasonably be expected to be material to Purchasers' business.

4.6        Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchasers that might be entitled to any fee or commission in connection with the Transactions.

4.7        No Litigation. There are no Actions pending or, to the Knowledge of Purchasers, threatened against or affecting Purchasers, in each case, that would, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

4.8        No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Purchaser Representations") (it being understood that Seller has relied only on such express representations and warranties), Seller acknowledges and agrees that no Purchaser nor any other Person on behalf of any Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or Advisors on behalf of Purchasers or any of their Affiliates or Advisors. Without limiting the foregoing, no Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller or any of its Affiliates or Advisors, or Seller's or any of its Affiliates' or Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to Seller or any of its Affiliates or Advisors in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.9        No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, each Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to such Purchaser and on which Purchasers may rely in connection with the Transactions. Each Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf

26

of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and that no Purchaser has relied on any such representations, warranties or statements. Each Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, such Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchasers or any of their Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchasers have relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    <u>Bid Protections</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchasers have made the highest or otherwise best bid pursuant to the Bidding Procedures Order and appoints Purchasers to act as the Stalking Horse Bidder (as defined in the Bidding Procedures Order) in connection with the Auction and, in connection therewith, agrees to pay Purchasers the following (the Expense Reimbursement and the Break-Up Fee, collectively, the "<u>Bid Protections</u>"):

(i)    Seller shall promptly pay or cause to be paid to Purchasers all reasonable and documented out-of-pocket fees and expenses (including attorneys' fees and expenses) incurred by Purchasers in connection with or related to Purchasers' evaluation, consideration, analysis, negotiation and documentation of this Agreement or the Transactions (the "<u>Expense Reimbursement</u>") as follows: (i) $2,000,000 (the "<u>Initial Expense Reimbursement Payment</u>") within two (2) Business Days following the Court's entry into the Stalking Horse Order; and (ii) the remainder of the Expense Reimbursement either (x) at the Closing, as a reduction to the Purchase Price pursuant to <u>Section 2.1(d)</u>, or (y) if this Agreement is terminated prior to the Closing for any reason other than by Seller pursuant to <u>Section 8.1(d)</u> or <u>8.1(f)</u> (or by Purchasers pursuant to <u>Section 8.1(c)</u> in circumstances where Seller would be entitled to terminate this Agreement pursuant to <u>Section 8.1(d)</u> or <u>Section 8.1(f)</u>), then within two (2) Business Days following such termination.

(ii)    If this Agreement is terminated prior to the Closing for any reason other than by Seller pursuant to Section 8.1(d) or 8.1(f) (or by Purchasers pursuant to Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then Seller shall pay to Purchasers, in addition to the Expense Reimbursement, a fee equal to $3,000,000 (the "Break-Up Fee"), in immediately available funds within two (2) Business Days following such termination.

(b)    Promptly, and in any event within two (2) Business Days following entry into this Agreement, Seller shall file with the court a motion, in form and substance acceptable to Purchasers, seeking approval of the Bid Protections (including approval of the Bid Protections as allowed administrative expenses of the Debtors' estate under Section 503(b) of the Bankruptcy Code) and the no-shop provisions set forth in Section 5.2 (the "Stalking Horse Motion"). Seller shall provide notice on the docket of the Stalking Horse Motion and set a date for the Stalking Horse Hearing (as defined in the Bidding Procedures Order) pursuant to the Bidding Procedures Order and shall use reasonable best efforts to seek entry of an order of the Bankruptcy Court, in form and substance acceptable to Purchasers, approving the Bid Protections and the no-shop provisions set forth in Section 5.2 and providing for payment by Seller of the Bid Protections as and when such amounts are due and payable hereunder (the "Stalking Horse Order"), as promptly as practicable, and in any event, no event later than October 1, 2022.

(c)    All amounts payable to Purchasers pursuant to Section 5.1(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchasers in writing, and without the requirement of any notice or demand from Purchasers or any application to or order of the Bankruptcy Court other than the Stalking Horse Order.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 5.1 are an integral part of the Transactions and that, without these agreements, the other Parties would not enter into this Agreement. Each of the Parties further acknowledges that the payment by Seller of the Break-Up Fee and the Expense Reimbursement is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchasers, in the circumstances in which such Break-Up Fee and Expense Reimbursement is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. Without limiting in any way Purchasers' rights to specific performance set forth in Section 10.12, Purchasers' receipt in full of the Break-Up Fee and the Expense Reimbursement as provided herein shall be the sole and exclusive monetary remedy of Purchasers against Seller, and Seller shall have no further liability or obligation, under this Agreement or relating to or arising out of any such breach of this Agreement or failure to consummate the Transactions. The obligations to pay the Break-Up Fee and Expense Reimbursement in accordance with the provisions of Section 5.1(a) will (i) be binding upon and enforceable against Seller immediately upon the Bankruptcy Court's entering the Stalking Horse Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Case, any plan of reorganization or liquidation in the Bankruptcy Case, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to pay Purchasers the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry

of the Stalking Horse Order are, binding upon (A) Seller, (B) any successors or assigns of Seller, (C) any trustee, examiner or other representative of Seller's estate, (D) reorganized Seller, if applicable, and (E) any other entity vested or revested with any right, title or interest in or to Seller, or any other Person claiming any rights in or control (direct or indirect) over Seller (each of (A) through (E), a "<u>Successor</u>") as if such Successor were Seller hereunder. The obligations of Seller to pay Purchasers the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

5.2    <u>No-Shop</u>.

(a)    From and following the earlier of (x) the Auction being declared closed as contemplated in the Bidding Procedures Order and (y) entry into the Stalking Horse Order, Seller shall not, and shall not permit their Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchasers, their Affiliates and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give notice to Purchasers if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, proposal or offer and the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchasers reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto.

5.3    <u>Bankruptcy Actions</u>.[6]

(a)    Within [two (2)] Business Days after the date hereof, Seller shall file with the Bankruptcy Court the Plan Solicitation Motion. The Plan Solicitation Motion, Plan Solicitation Order and Confirmation Order shall be in form and substance acceptable to Purchasers; <u>provided</u>

---

[6]    **Note to Draft**: In connection with this agreement, Alameda will agree in the Plan to subordinate its loan claim to other unsecured creditors of Seller.

4894-0335-4158 v.6

that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchasers (such consent not to be unreasonably withheld).

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall use its reasonable best efforts to obtain entry by the Bankruptcy Court of the Confirmation Order.

(c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (ii) commence solicitation of the Plan, and (iii) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion,[7] and in any case prior to the Outside Date.

(d)    Purchasers shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchasers and their Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchasers under this Agreement and the Plan, and demonstrating that each Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchasers' ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each of Seller and Purchasers shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan.

(f)    If an Auction is conducted, and Purchasers are not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchasers may elect, in their sole discretion, to serve as a backup bidder (the "Backup Bidder") and keep Purchasers' bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If Purchasers agree to serve as the Backup Bidder and the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the

---

[7]    **Note to Draft**: Plan timeline to be consistent with timeline already established and noticed by Debtors.

Transactions on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)     Seller and Purchasers acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchasers acknowledges that, subject to Sections 5.1 and 5.2, Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order.

(h)     Notwithstanding any other provision of this Agreement to the contrary, but subject to Section 5.2, Purchasers acknowledge that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction in accordance with the Bidding Procedures Order, in each case, prior to earlier of the entry of the Stalking Horse Order or the Auction being declared closed.

(i)     Purchasers shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchasers agree that they will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchasers' Advisors available to testify before the Bankruptcy Court.

(j)     Nothing in this Section 5.3 shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations, but subject to the provisions of the Bidding Procedures Order.

5.4     Cure Costs. Subject to entry of the Confirmation Order and consummation of the Plan, Purchasers shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchasers in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Confirmation Order. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchasers on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchasers the Assigned Contracts, (c) find that each Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchasers

31

are not a successor to Seller, and grant Purchasers the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchasers shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchasers have provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchasers shall have no Liability for any Excluded Liability. Purchasers agree that they will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Confirmation Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchasers are a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.6     Approval. Seller's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.7     Filings. Seller shall, and shall cause the other Debtors to, give Purchasers reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that are material, inconsistent with the Transactions and/or impact Cryptocurrency of the Seller or Voyager Accounts (such approval not to be unreasonably withheld, provided that Purchasers may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would not be consistent with the consummation of the Transactions as set forth herein).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Seller.

        (a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)        Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not:

(i)        (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person other than as permitted pursuant to Section 6.1(b)(iv);

(ii)        sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $5,000,000, except (A) Ordinary Course dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Seller, and (B) leases or subleases of real property under which Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchasers; provided that, Seller shall not sell, lease, transfer, mortgage, pledge, assign or otherwise dispose of any Acquired Assets (or permit to become subject to any additional Encumbrance, other than in respect of Permitted Encumbrances);

(iii)        make or authorize capital expenditures, including for property, plant and Equipment, except for those [(A) that are consistent in all material respects with Seller's plan that was previously made available to Purchasers], (B) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (C) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (C) not to exceed $2,000,000 in the aggregate;

33

(iv)    except as permitted under Section 6.1(b)(iii), make any acquisition of, or investment in, any properties, assets, securities or business (including by merger);

(v)    perform or offer to perform any staking activities;

(vi)    enter into referral agreements with a third party with respect to the Voyager Customers and any Documents or account information with respect thereto;

(vii)    except pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $300,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any material Seller Plan or (6) take any action to accelerate any rights or benefits under any Seller Plan; provided however that the foregoing shall not restrict Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(viii)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization);

(ix)    grant any Encumbrance (other than Permitted Encumbrances) on any of its Acquired Assets other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(x)    enter into any new Contract that would constitute a Material Contract if entered into prior to the date of this Agreement, or materially amend or modify any Material Contract (other than any Excluded Contract);

(xi)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchasers or their Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchasers' or their Subsidiaries' operations. Prior to the Closing, each of Purchasers and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, the COVID-19 pandemic shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> (any action or inaction described in this clause of this <u>Section 6.1(c)</u>, a "<u>COVID-19 Response</u>").

6.2    <u>Access to Information</u>.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will provide Purchasers and their authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller, in order for Purchasers and their authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchasers if such access or disclosure (A) would cause significant competitive harm to Seller if the Transactions are not consummated, (B) would waive any legal privilege or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound (and which is not entered into in contemplation hereof) (<u>provided</u> that, at Purchasers' reasonable request, the Parties shall implement appropriate and mutually agreeable measures to permit the disclosure of such information in a manner to remove the basis for the non-disclosure to the greatest extent reasonably possible, including by arrangement of appropriate clean room procedures, redaction of text from documents or entry into a customary joint defense agreement with respect to any information to be so provided). Notwithstanding anything to the contrary contained herein, no COVID-19 Response by Seller shall be deemed to violate or breach this <u>Section 6.2</u> in any way or serve as a basis for Purchasers to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)    The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the Transactions, and will be governed by the confidentiality provisions in <u>Section 6.11</u>. Purchasers will, and will cause its Advisors to, abide by such confidentiality provisions with respect to such access and any information furnished to Purchasers or any of their Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchasers may not rely on the accuracy of any such information, in each case, other than the Express Seller Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchasers will provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchasers (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Seller, Purchasers will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchasers may intend to destroy, alter or dispose of. From and after the Closing, Purchasers will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

6.3     Regulatory Approvals.

(a)     Subject to Section 6.6, Seller will (i) cooperate with Purchasers in exchanging such information and providing such assistance as Purchasers may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.3(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.3(a) or Section 6.3(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Subject to Section 6.6, Purchasers will, and will cause their Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings made by Seller pursuant to Section 6.3(a), and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.3(b) or Section 6.3(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.4     Customer Transition.

(a)     From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including any service providers), and use reasonable best efforts, in each case, to: (i) develop orderly and transparent procedures with respect to the migration of Voyager Customers and other Voyager Creditors to the FTX platform, including the posting of prominent links on the home page for the mobile application and website of the Seller's platform to direct Voyager Customers and other Voyager Creditors to the FTX migration process; (ii) effect the orderly

migration of any Voyager Customers and other Voyager Creditors who elect to open an FTX Account, and to minimize any disruption to the businesses of Seller and Purchasers or any adverse effect that might result from the actions contemplated hereby; and (iii) take, or cause to be taken, all appropriate action, to do or cause to be done all things reasonably necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions and to make effective the arrangements contemplated by this Section 6.4.

(b)     As soon as reasonably practicable (and in any event within two (2) Business Days) following the date of entry into this Agreement, Seller shall send a written notice informing each Voyager Creditor of the Transactions and the availability of the referral option contemplated by this Section 6.4.

(c)     Without limiting the foregoing, (i) Seller shall use commercially reasonable efforts to promote the transition of all Voyager Creditors to the FTX platform and to support the opening of FTX Accounts by such Voyager Creditors, including through the sharing and obtaining of relevant information relating to Voyager Creditors to help facilitate FTX's "KYC" and on-boarding process and information relating to Voyager Creditors' account positions or holdings in their Voyager Accounts as of the Petition Date, and (ii) the Parties shall cooperate to transition any Voyager Creditors to the FTX platform, including by (A) facilitating the execution of a new customer agreement between Voyager Creditors and FTX (or its relevant Affiliates), (B) distributing election forms to any Transferred Creditors with respect to their preferred currency for the Initial Distribution, (C) facilitating the Initial Distribution to Transferred Creditors' FTX Accounts, and (D) executing a new customer agreement and, if applicable, any other documentation, including loan, pledge or security agreements. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require FTX to (x) in connection with the opening of any FTX Account, waive FTX's customary "KYC" or customer-screening procedures applicable to FTX's new customers generally administered in the ordinary course of business or (y) provide or match any Cryptocurrency or product offered by Seller that FTX does not provide or offer in the ordinary course of business.

(d)     At or promptly following the Closing, FTX shall credit to each Transferred Creditor's FTX Account an amount equal to $30.00 (the "Trading Credit").

(e)     Notwithstanding anything to the contrary herein, Seller shall remain in material compliance with all privacy policies, notices or representations of Seller that are in effect as of the date of this Agreement and shall cooperate with Purchasers to ensure that the transfer of all Personal Information to Purchasers in connection with the Transactions will be consistent with such privacy policies, notices or representations.

(f)     From and following the date of this Agreement, Seller shall not, and shall cause its Affiliates not to, provide any customer information to any third party outside of the Ordinary Course, including to any third party crypto exchange or platform, or refer any Voyager Customers to any third party crypto exchange or platform, except to FTX's platform pursuant to the arrangements contemplated by this Section 6.4.

6.5    <u>Transfer of Acquired Cryptocurrency Loans</u>. From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including counterparties to Acquired Cryptocurrency Loans), and use reasonable best efforts to transfer all rights and interests of Seller in the Acquired Cryptocurrency Loans, all Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral, to Purchasers as of the Closing.

6.6    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this <u>Section 6.6</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.7    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.8    <u>Insurance Matters</u>. Purchasers acknowledge that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third-party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchasers and the Acquired Assets and no further coverage shall be available to Purchasers or the Acquired Assets under any such policies.

6.9    <u>Receipt of Misdirected Assets; Liabilities</u>.

(a)    From and after the Closing, if Seller or any of its Affiliates receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchasers, and such asset will be deemed the property of Purchasers held in trust by Seller for Purchasers until so transferred. From and after the Closing, if Purchasers or any of their Affiliates receives any right,

property or asset that is an Excluded Asset, Purchasers shall promptly transfer or cause such of their Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchasers for Seller until so transferred.

(b)    From and after the Closing, if Seller or any of its Affiliates is subject to a Liability that should belong to Purchasers pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchasers, and Purchasers shall assume and accept such Liability. From and after the Closing, if Purchasers or any of their Affiliates is subject to a Liability that should belong to Seller pursuant to the terms of this Agreement, Purchasers shall promptly transfer or cause such of its Affiliates to transfer such Liability to Seller, and Seller shall accept such Liability.[8]

6.10    <u>Wind-Down</u>. Following completion of the referral of customers pursuant to <u>Section 6.4</u> and the Closing, Seller shall promptly discontinue any business operations related to the Voyager Platform and wind down its operations.

6.11    <u>Confidentiality</u>.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under <u>Section 6.2</u>. Purchasers shall, and shall cause their respective Affiliates and respective Advisors to, keep confidential any Confidential Information concerning Seller furnished in connection with the Transactions. Seller shall, and shall cause their respective Affiliates and respective Advisors to, keep confidential any Confidential Information concerning Purchasers furnished in connection with the Transactions.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchasers and their Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause its Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchasers, disclose to any Person any Confidential Information relating to Purchasers and their Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this <u>Section 6.11</u> will not prohibit any disclosure required by applicable Law or Order, or to the extent not specifically directed at the Transaction, in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization. Purchasers acknowledge and understand that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchasers, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this <u>Section 6.11</u> by any of such Party's Affiliates or Advisors. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach

---

[8]    **Note to Draft**: Section 6.10 is duplicative of Sections 3.17 and 4.9.

of this Section 6.11 by Seller or Purchasers are inadequate to protect Purchasers or Seller and their respective Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available any Party or their Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.11, each other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.11 will survive the Closing and terminate two (2) years after the Closing Date.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchasers and Seller. The respective obligations of each Party to this Agreement to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchasers) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order, and the Plan shall become effective in accordance with its terms, in each case, without amendment, modification or supplementation, other than immaterial clarifications, with respect to this Agreement and the Transactions, without Purchasers' prior written consent (not to be unreasonably withheld).

7.2    Conditions Precedent to the Obligations of Purchasers. The obligations of Purchasers to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchasers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (provided that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of Section 3.5 or in Section 3.8)) and (ii) the representations and warranties set forth in Section 3.1, Section 3.2 and Section 3.15 (collectively, the "Fundamental Representations") shall be true and correct in all but de minimis respects as of the Closing Date as though made on and as

of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but de minimis respects only as of such date;

(b)    Seller shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing; and

(c)    Seller shall have delivered, or caused to be delivered, to Purchasers all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchasers in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchasers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Purchasers shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4    Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchasers or Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement.

## ARTICLE VIII

## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchasers;

(b)    by written notice of either Purchasers or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party

under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchasers or Seller, if the Closing shall not have occurred on or before the date that is sixty (60) days following the date that the Confirmation Order is entered by the Bankruptcy Court (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)    by written notice from Seller to Purchasers, upon a breach of any covenant or agreement on the part of Purchasers, or if any representation or warranty of Purchasers will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied; provided that (i) if such breach is curable by Purchasers then Seller may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchasers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchasers to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchasers may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchasers notify Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchasers at any time that Purchasers are in material breach of, any covenant, representation or warranty hereunder;

(f)    by written notice from Seller to Purchasers, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchasers fail to complete the Closing within two (2) Business Days after the date required by Section 2.3;

(g)    by written notice from Seller to Purchasers, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)    by written notice from Purchasers to Seller, if (A) Seller or Seller's Affiliate seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or

42

manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets;

(i)      by written notice from Purchasers to Seller, if:

(i)      Seller does not publicly announce Purchasers as the Successful Bidder and execute this Agreement (with Seller's obligations subject to Bankruptcy Court approval where indicated) on or prior to September 16, 2022;

(ii)      Seller and Buyer have not amended this Agreement to include the terms of the mutually-agreed Plan in form acceptable to each of them on or prior to October 1, 2022;

(iii)      the Stalking Horse Order is not entered by October 1, 2022;

(iv)      Seller fails to pay the Initial Expense Reimbursement Payment within one (1) Business Day of the time it is due and payable pursuant to Section 5.1(a);

(v)      Seller or any of the other Debtors file any motions, pleadings, notices and other documents with the Bankruptcy Court in breach of Section 5.7;

(vi)      the Confirmation Order has not become a Final Order by December 15, 2022;[9] or

(vii)      the Closing has not occurred on or prior to the thirtieth day following the Bankruptcy Court's entry of the Confirmation Order;

(j)      by written notice from Purchasers to Seller, if Seller or its Affiliates or Advisors have committed a breach of Section 5.2; or

(k)      by written notice from Purchasers to Seller, if (i) Seller determines that an Auction will be held, and such Auction is not completed by September 16, 2022, (ii) if the Purchasers are not the Successful Bidder at the Auction, or Seller fails to deliver an executed counterpart of this Agreement at or prior to the Auction, (iii) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchasers at the Auction (unless Seller has agreed in its sole discretion to be the Backup Bidder), or (iv) the Bankruptcy Court approves an Alternative Transaction other than with Purchasers.

8.2      Effect of Termination. In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided, further, that no termination will relieve either Party from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of

---

[9]      **Note to Draft**: Date to be 30 days following currently expected confirmation date.

expenses or out-of-pocket costs, and would include the benefits of the Transactions (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of the non-breaching Party) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder). For purposes of this Agreement, "willful breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act. Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

**ARTICLE IX**

**TAXES**

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchasers. Seller and Purchasers will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes, and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

9.2    <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchasers, Seller and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in [<u>Schedule 9.2</u>][10] (the "<u>Allocation Methodology</u>"). As soon as commercially practicable, but no later than ninety (90) days following the determination of the final Purchase Price, Purchasers shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "<u>Allocation</u>"). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchasers, then Purchasers and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchasers cannot resolve such dispute within thirty (30) days of Purchasers' receipt of Seller's objection, each Party agrees to report the allocation of the total consideration (including any Assumed Liabilities) as determined for U.S. federal income Tax purposes in a manner consistent with Section 1060 of the Code and to report such allocation on Internal Revenue Service Form 8594 and any other forms or statements required by the Code, Treasury Regulations, the Internal Revenue Service or any applicable state or local Tax authority.

---

[10]    **Note to Draft**: This is subject to review of the schedule.

To the extent Seller does not make a written objection within thirty (30) days or the Parties agree in writing on the final Allocation following such an objection, the Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2).

9.3     Cooperation. Purchasers and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Seller. Seller shall provide Purchasers with a draft of the Tax Returns filed after the date hereof that are described in Section 9.4(a)(i) at least thirty (30) days prior to the filing of any such Tax Return. Seller shall consider in good faith and not unreasonably fail to reflect any changes reasonably requested by Purchasers with respect to such Tax Returns. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.4 is otherwise reflected as an adjustment to Purchase Price, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.4(a).

(b)     Purchasers shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.4(a). With respect to any Straddle Period, Purchasers shall provide Seller with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchasers shall consider in good faith and not unreasonably fail to reflect any changes reasonably requested by Seller with respect to such Tax Returns. Purchasers shall be responsible for paying any Taxes allocable to the portion of a Straddle Period after the Closing Date reflected on any Tax Return that Purchasers are obligated to prepare and file under this Section 9.4(b). Seller shall be responsible for paying any Taxes allocable to the portion of a Straddle Period ending on the Closing Date, except to the extent any Seller Tax is otherwise reflected as an adjustment to Purchase Price.

(c)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in clause (i), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchasers and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 5.1</u> and <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (b) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party. For the avoidance of doubt, the Parties agree that the delivery of any notices, demands or other communications hereunder shall not be deemed to be a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.

<u>Notices to Purchasers</u>:

West Realm Shires Inc.
Alameda Research LLC
2000 Center Street, 4th Floor
Berkeley, CA 94704

| | |
|---|---|
| Attention: | Ramnik Arora |
| | Can Sun |
| | Rahul Sharma |
| Email: | ramnik@alameda-research.com |
| | can@ftx.com |
| | rahul@ftx.us |

with a copy to (which shall not constitute notice):

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

| | |
|---|---|
| Attention: | Andrew G. Dietderich |
| | Brian D. Glueckstein |
| | Mitchell S. Eitel |
| Email: | dietdericha@sullcrom.com |
| | gluecksteinb@sullcrom.com |
| | eitelm@sullcrom.com |

<u>Notices to Seller</u>:

[_____]
[_____]
[_____]

| | |
|---|---|
| Attention: | [_____] |
| Email: | [_____] |

4894-0335-4158 v.6

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Attention:    Joshua A. Sussberg, P.C.
              Christine A. Okike, P.C.
              Christopher Marcus
              Jonathan L. Davis, P.C.
              Steve Toth
              Eduardo M. Leal
              Allyson B. Smith

Email:        joshua.sussberg@kirkland.com
              christine.okike@kirkland.com
              cmarcus@kirkland.com
              jonathan.davis@kirkland.com
              steve.toth@kirkland.com
              eduardo.leal@kirkland.com
              allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchasers and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Confirmation Order and consummation of the Plan, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchasers and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or Exhibits hereto may be (a) amended only in a writing signed by Purchasers and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third-Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract,

48

tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in this Agreement to which the relevance of such item is reasonably apparent on its face. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or Exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with any other agreements expressly referred to herein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchasers would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Party to remedy any breach of any representation or warranty of such Party made herein.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction

over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflict of laws principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchasers, on their own behalf and on behalf the Purchaser Group and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchasers, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchasers pursuant to this Agreement or any other document or instrument delivered by Purchasers in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Seller nor Purchasers shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchasers or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which any Purchaser or Seller (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains

the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estates, subject to the terms and conditions set forth in this Agreement (including the payment of the Bid Protections when due and payable upon the terms set forth in this Agreement).

10.20    No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

## ARTICLE XI[11]

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "3AC" means Three Arrows Capital, Ltd.

(b)    "3AC Loan" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(c)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(d)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(e)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause

---

[11]    **Note to Draft**: Applicable definitions to be updated to conform to Plan, as necessary.

the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise) to a purchaser or purchasers other than Purchasers or effecting any other transaction (including a Chapter 11 plan) the consummation of which would be substantially inconsistent with the Transactions.

(g)    "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(h)    "<u>Avoidance Action</u>" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim.

(i)    "<u>Bidding Procedures Order</u>" means the Bankruptcy Court's *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j)    "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(k)    "<u>Cash and Cash Equivalents</u>" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, any other cash equivalents and Cryptocurrency not attributable to customer accounts on Seller's proprietary platform, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(l)    "<u>Code</u>" means the United States Internal Revenue Code of 1986.

(m)    "<u>Confidential Information</u>" means any information relating to the business, financial or other affairs (including future plans and targets) of any Party; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by any Party in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party from a third party not known by such receiving Party after reasonable inquiry to be bound by a duty of confidentiality to such other Party with respect to such information.

(n)    "<u>Confirmation Order</u>" means an Order of the Bankruptcy Court reasonably acceptable to the Parties (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan in a form reasonably acceptable to Purchasers and Seller, as may have been amended,

supplemented or otherwise modified with the consent of Purchasers (such consent not to be unreasonably withheld, delayed, or conditioned), (ii) approving this Agreement and (iii) authorizing Seller to undertake the Transactions, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

(o)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(p)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(q)     "Cryptocurrency" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

(r)     "Cryptocurrency Loans" means loans made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector.

(s)     "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(t)     "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form, including, for the avoidance of doubt, all customer information, including "know your customer" information and applicable account positions or holdings, with respect to the Voyager Accounts.

(u)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(v)     "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(w)     "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(x)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(y)    "Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(z)    "Final Order" shall mean an Order which has not been stayed (or with respect to which any stay has been lifted) and (i) as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari has expired and no appeal, motion, stay or petition is pending, or (ii) in the event that such an appeal or petition thereof has been sought, either (A) such Order shall have been affirmed by the highest court to which such Order was appealed or certiorari shall have been denied, and the time to take any further appeal or petition of certiorari shall have expired or (B) such appeal, motion, stay or petition shall not have been granted and shall no longer be pending and the time for seeking such appeal, motion, stay or petition shall have expired.

(aa)    "FTX Account" means a customer account opened by a Voyager Creditor with FTX.

(bb)    "GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

(cc)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(dd)    "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ee)    "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ff)    "IFRS" means the International Financial Reporting Standards.

(gg)    "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures, including all divisions, revisions, continuations, continuations-in-part, substitutes, re-examinations, extensions and reissues; (ii) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, social media accounts and identifiers, IP addresses, logos, symbols, assumed names, fictitious names, source of origin, trade dress, corporate names and Internet domain names, in each case, whether or not registered, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations, renewals and applications for any of the foregoing; (v) trade secrets and confidential or proprietary know-how, processes, ideas, schematics, business methods, formulae, drawings, prototypes, models, designs, data, databases, algorithms, customer lists and supplier lists; (vi) published and unpublished works

56

of authorship, whether copyrightable or not (including data, databases, Software, Internet websites, content and other compilations of information); (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property rights, proprietary rights or industrial rights, in each case, arising in any jurisdiction of the world.

(hh)    "Knowledge of Purchasers" means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(ii)    "Knowledge of Seller" means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(jj)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(kk)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ll)    "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other force majeure; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the

57

foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws; (vii) Effects in, arising from or relating to (A) the taking of any action expressly required by this Agreement or at the request of Purchasers or their Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchasers or Purchasers' plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii)  Effects that arise from any seasonal fluctuations in the business; (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items; or (x)  (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Plan or the Disclosure Statement, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; provided, however, that with respect to clauses (i), (ii), (iii), (iv), (v) or (vi), such Effects will not be excluded to the extent the same disproportionately affects the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

(mm)   "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(nn)   "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission Laws.

(oo)   "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order).

(pp)   "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case and past practice in light of the current pandemic, epidemic or disease outbreak.

(qq)   "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers',

warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (iv) licenses granted on a non-exclusive basis to customers or end-users of Seller's products and services in the Ordinary Course, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets in any material respect, (vi) any Encumbrances set forth on Schedule 11.1(qq), and (vii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(rr)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(ss)    "Personal Information" means any information that (i) identifies or can reasonably be used to identify an individual or (ii) that constitutes "personal information," "personal data," "nonpublic personal information," or any other equivalent term as defined under or otherwise protected by Privacy and Data Security Laws.

(tt)    "Plan" means a plan of reorganization prepared by Seller and approved by Purchasers in its sole discretion and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable. The Plan shall be consistent with the August 15, 2022 Joint Proposal of FTX and Alameda to the Debtors, except as contemplated by this Agreement, and the Plan shall include provisions relating to all matters either party to this Agreement shall request, including, among other things, the treatment of claims and interests; the establishment of a litigation trust; the exculpation and release of Purchasers, Seller and other parties; the assumption or rejection of contracts; the administration of claims; the making of distributions; the implementation of the Transactions; the winding-up of the affairs of the Debtors; the modification of the Plan; and the retention of jurisdiction by the Bankruptcy Court and other legal and administrative matters.

(uu)    "Plan Solicitation Motion" means Seller's motion for an Order (which shall be in form and substance reasonably acceptable to Purchasers), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory Contracts and unexpired leases under the Plan.

(vv)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(ww)    "Plan Supplement" has the meaning set forth in the Plan.

(xx)    "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(yy)    "Privacy and Data Security Laws" means any and all applicable Laws, rules, or regulations together with any guidance, decisions, determinations, orders, or associated binding judgments of any Governmental Body regarding privacy, cybersecurity or the Processing or protection of personal information or personal data, including, as applicable: the Gramm-Leach-Bliley Act and its implementing regulations; the GDPR and any national laws implementing the GDPR; and all applicable Laws or regulations requiring notification in connection with an Security Incident.

(zz)    "Privacy and Data Security Requirements" means all (i) Privacy and Data Security Laws, (ii) industry standards and practices such as the Payment Card Industry Data Security Standard, (iii) contractual obligations imposed on the Seller or its Affiliates and (iv) any policies, notices or representations published or adopted by the Seller or its Affiliates, whether internal or publicly available, in each case, to the extent related to privacy, cybersecurity or the Processing or protection of any Personal Information.

(aaa)    "Pro Rata Share" means, with respect to any Transferred Creditor, such Transferred Creditor's pro rata share of any distributions to Transferred Creditors in accordance with the Plan and as determined by Seller.

(bbb)    "Process" or "Processing" means any operation or set of operations performed, whether by manual or automated means, on Personal Information or on sets of Personal Information, such as the collection, use, storage, disclosure, analysis, deletion or modification of Personal Information.

(ccc)    "Purchaser Group" means Purchasers, any Affiliate of a Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(ddd)    "Retained Avoidance Action" means any Avoidance Action against (i) 3AC or any Affiliate, (ii) any insider as defined in the Bankruptcy Code or (iii) any other Avoidance Action that Purchasers agree in writing prior to the Closing may be retained by the Debtors.

(eee)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(fff)    "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(ggg)    "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by, or licensed exclusively to, Seller.

(hhh)    "Seller Parties" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(iii)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension

60

benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(jjj)    "Seller Registered IP" means all Seller Intellectual Property that is issued by, registered with, renewed by, or the subject of a pending application before any Governmental Body or Internet domain name registrar.

(kkk)    "Software" means any and all computer programs, applications, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, and application programming interfaces, in each case, whether in source code, object code or other form or format, including libraries, subroutines and other components thereof, together with input and output formats, and all user manuals, instructions and other documentation relating to any of the foregoing.

(lll)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(mmm)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(nnn)    "USD Wind-Down Reserve" means the amount estimated by the Debtors in good faith, and in consultation with Purchasers, to be appropriate to establish a reserve to ensure full funding of the winding up of the affairs of the Debtors and the closing of the Bankruptcy Case.

(ooo)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ppp)    "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(qqq)    "Transferred Creditors" means Voyager Creditors who have completed all documentation and "KYC" processes required by FTX in the ordinary course of FTX's business

61

with respect to similarly situated clients and who have opened FTX Accounts as of the Closing Date.

(rrr)    "Transactions" means the transactions contemplated by this Agreement.

(sss)    "Voyager Account" means any active account at Seller that (i) contains Cryptocurrency or other investment assets or products or (ii) is held by any Person who has completed Seller's customary "KYC" processes.

(ttt)    "Voyager Creditor" means any Voyager Customer or other general creditor of the Debtors with an allowed claim under the Plan.

(uuu)    "Voyager Customer" means any Person who maintained a Voyager Account with Seller as of the Petition Date.

(vvv)    "Voyager Platform" means the Seller's proprietary mobile and web platform.

11.2    Index of Defined Terms.

Acquired Assets ........................................... 5
Acquired Cash.............................................. 6
Acquired Cryptocurrency Loans................ 6
Agreement..................................................... 5
Alameda ........................................................ 5
Allocation.................................................... 44
Allocation Methodology ........................... 44
Anti-Money Laundering Laws.................. 20
Assigned Contracts ....................................... 6
Assignment and Assumption Agreement.. 13
Assumed Liabilities ..................................... 8
Backup Bidder ........................................... 30
Bankruptcy Case ........................................... 5
Bankruptcy Code ......................................... 5
Bankruptcy Court......................................... 5
Bid Protections.......................................... 27
Break-Up Fee ............................................ 28
Cash Payment............................................ 11
Chosen Courts............................................ 51
Closing ....................................................... 13
Closing Date............................................... 13
Closing Date Payment............................... 12
Collateral...................................................... 6
COVID-19 Response ................................. 35
CSA............................................................. 15
Cure Costs .................................................... 9

Currency Consideration ............................ 11
Dataroom.................................................... 23
Debtors.......................................................... 5
Deposit ....................................................... 12
Designation Deadline................................ 10
Enforceability Exceptions......................... 15
Environmental Permits.............................. 20
Escrow Agent............................................. 12
Escrow Agreement..................................... 12
Excluded Assets ........................................... 6
Excluded Contracts ...................................... 7
Excluded Liabilities .................................... 9
Expense Reimbursement............................ 27
Express Purchaser Representations........... 26
Express Seller Representations ................. 23
Fair Market Value ..................................... 11
FCPA........................................................... 19
Filed CSA Documents ............................... 15
Financial Statements ................................. 17
FTX ............................................................... 5
Fundamental Representations ................... 40
Holdings........................................................ 5
Indebtedness............................................... 33
Information Presentation........................... 23
Initial Distribution.................................... 12
Initial Distribution Date ........................... 12

Initial Expense Reimbursement Payment . 27
Leased Real Property ............................... 17
Material Contract .................................... 17
Necessary Consent ................................... 11
OFAC ..................................................... 19
Outside Date............................................ 42
Parent ...................................................... 5
Parties...................................................... 5
Party ........................................................ 5
Petition Date............................................. 5
Purchase Price .......................................... 11
Purchaser.................................................. 5

Purchasers .................................................. 5
Reference Date.......................................... 11
Sanctions .................................................. 19
Seller ....................................................... 5
Stalking Horse Motion.............................. 28
Stalking Horse Order ............................... 28
Successful Bidder...................................... 30
Successor.................................................. 29
Supplemental............................................ 14
Trading Credit.......................................... 37
Transfer Taxes ......................................... 44

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under IFRS consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and Exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall." The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (a) included in the Dataroom, (b) actually delivered or provided to Purchasers or any of Purchasers' Advisors or (c) made available upon request, including at Seller's offices.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)    Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature pages follow.]*

4894-0335-4158 v.6

DocuSign Envelope ID: 686492FD-401A-43BD-A078-8F2D8ED39AB6

22-10943-mew    Doc 998-3    Filed 02/13/23    Entered 02/13/23 22:57:51    Exhibit C -
Unredacted Exhibit 11 to Evans Declaration    Pg 71 of 144

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**WEST REALM SHIRES INC.**

By: _____

Name: Dan Friedberg

Title:  Executive Vice President

**ALAMEDA VENTURES LTD.**

By: _____

Name: Dan Friedberg

Title:  Legal Counsel

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

## <u>EXHIBIT A</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

4894-0335-4158 v.6

**[EXHIBIT B**

**FORM OF ESCROW AGREEMENT]**

B-1

**FOR DISCUSSION PURPOSES ONLY**

---

**ASSET PURCHASE AGREEMENT[1]**

**DATED AS OF [●], 2022**

**BY AND BETWEEN**

**WEST REALM SHIRES INC. AND ALAMEDA VENTURES LTD.**

**AS PURCHASERS**

**AND**

**VOYAGER DIGITAL, LLC**

**AS SELLER.**

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever unless and until the definitive agreement providing for the transaction has been executed and delivered by all parties thereto.*

---

[1]    **Note to Draft**: Transaction structure subject to ongoing tax and accounting diligence and review. Agreement subject to material revision based on ultimate transaction structure.

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF
ASSUMED LIABILITIES** **5**

1.1    Purchase and Sale of the Acquired Assets    5
1.2    Excluded Assets    6
1.3    Assumption of Certain Liabilities    8
1.4    Excluded Liabilities    9
1.5    Assumption/Rejection of Certain Contracts    9

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING**    **11**

2.1    Consideration; Payment; Initial Distribution    11
2.2    Deposit    12
2.3    Closing    13
2.4    Closing Deliveries by Seller    13
2.5    Closing Deliveries by Purchasers    14
2.6    Supplemental ~~Payments~~Payment    14
2.7    Withholding    ~~15~~14

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER**    **15**

3.1    Organization and Qualification    ~~16~~15
3.2    Authorization of Agreement    ~~16~~15
3.3    Conflicts; Consents    ~~16~~15
3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts    ~~17~~16
3.5    Financial Statements    17
3.6    Title to Acquired Assets    ~~18~~17
3.7    Title to Properties    ~~18~~17
3.8    Contracts    ~~18~~17
3.9    Compliance with Laws    ~~20~~19
3.10    Environmental Matters    ~~21~~20
3.11    Intellectual Property; Cybersecurity and Personal Information    ~~21~~20
3.12    Tax Matters    22
3.13    Employees    23
3.14    Affiliate Transactions    ~~24~~23
3.15    Brokers    ~~24~~23
3.16    No Litigation    ~~24~~23
3.17    No Other Representations or Warranties    ~~24~~23
3.18    No Outside Reliance    24

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASERS**    ~~25~~24

4.1    Organization and Qualification    ~~25~~24
4.2    Authorization of Agreement    ~~25~~24

1

4.3    Conflicts; Consents ............................................................. ~~26~~25
4.4    Financing ............................................................................. ~~26~~25
4.5    Absence of Restraints; Compliance with Laws; Permits ...... ~~26~~25
4.6    Brokers ................................................................................. 26
4.7    No Litigation ........................................................................ ~~27~~26
4.8    No Other Representations or Warranties ............................... ~~27~~26
4.9    No Outside Reliance ............................................................. ~~27~~26

**ARTICLE V BANKRUPTCY COURT MATTERS** .......................... ~~28~~27

5.1    Bid Protections .................................................................... ~~28~~27
5.2    No-Shop .............................................................................. 29
5.3    Bankruptcy Actions ............................................................ ~~30~~29
5.4    Cure Costs ........................................................................... ~~32~~31
5.5    Confirmation Order ............................................................ ~~32~~31
5.6    Approval ............................................................................. ~~33~~32
5.7    Filings ................................................................................. ~~33~~32

**ARTICLE VI COVENANTS AND AGREEMENTS** ........................ ~~33~~32

6.1    Conduct of Business of Seller ............................................ ~~33~~32
6.2    Access to Information ......................................................... ~~36~~35
6.3    Regulatory Approvals ......................................................... ~~37~~36
6.4    Customer Transition ........................................................... ~~37~~36
6.5    Transfer of Acquired Cryptocurrency Loans ...................... 38
6.6    Reasonable Efforts; Cooperation ........................................ 38
6.7    Further Assurances ............................................................. ~~39~~38
6.8    Insurance Matters ............................................................... ~~39~~38
6.9    Receipt of Misdirected Assets; Liabilities .......................... ~~39~~38
6.10   Wind-Down ........................................................................ ~~40~~39
6.11   Confidentiality ................................................................... ~~40~~39

**ARTICLE VII CONDITIONS TO CLOSING** ................................ ~~41~~40

7.1    Conditions Precedent to the Obligations of Purchasers and Seller ...... ~~41~~40
7.2    Conditions Precedent to the Obligations of Purchasers ...... ~~41~~40
7.3    Conditions Precedent to the Obligations of Seller ............. 41
7.4    Waiver of Conditions ......................................................... ~~42~~41

**ARTICLE VIII TERMINATION** ................................................... ~~42~~41

8.1    Termination of Agreement .................................................. ~~42~~41
8.2    Effect of Termination ......................................................... ~~44~~43

**ARTICLE IX TAXES** .................................................................... ~~45~~44

9.1    Transfer Taxes .................................................................... ~~45~~44
9.2    Allocation of Purchase Price .............................................. ~~45~~44
9.3    Cooperation ........................................................................ 45
9.4    Preparation of Tax Returns and Payment of Taxes ............ ~~46~~45

2

**ARTICLE X MISCELLANEOUS**                                                                                    **46**

    10.1   Non-Survival of Representations and Warranties and Certain Covenants;
           Certain Waivers ........................................................................................ 46
    10.2   Expenses ................................................................................................ ~~47~~46
    10.3   Notices ................................................................................................... ~~47~~46
    10.4   Binding Effect; Assignment ...................................................................... 48
    10.5   Amendment and Waiver ........................................................................... ~~49~~48
    10.6   Third-Party Beneficiaries ........................................................................ ~~49~~48
    10.7   Non-Recourse ......................................................................................... ~~49~~48
    10.8   Severability ............................................................................................ 49
    10.9   Construction ........................................................................................... 49
    10.10  Schedules .............................................................................................. 49
    10.11  Complete Agreement ............................................................................... 50
    10.12  Specific Performance .............................................................................. 50
    10.13  Jurisdiction and Exclusive Venue ........................................................... ~~51~~50
    10.14  Governing Law; Waiver of Jury Trial ...................................................... 51
    10.15  No Right of Set-Off ................................................................................. 52
    10.16  Counterparts and PDF ............................................................................. 52
    10.17  Publicity ................................................................................................. 52
    10.18  Bulk Sales Laws ..................................................................................... ~~53~~52
    10.19  Fiduciary Obligations ............................................................................. ~~53~~52
    10.20  No Solicitation ....................................................................................... 53

**ARTICLE XI   ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**                     **53**

    11.1   Certain Definitions .................................................................................. 53
    11.2   Index of Defined Terms ........................................................................... 62
    11.3   Rules of Interpretation ............................................................................. 63

### INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
              AGREEMENT

[EXHIBIT B   FORM OF ESCROW AGREEMENT][2]

---

[2]   **Note to Draft**: K&E to confirm if needed and if so, provide updated form.

### ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of [●], 2022, is made by and between (i) West Realm Shires Inc., a Delaware corporation ("<u>FTX</u>"), and Alameda Ventures Ltd., a Seychelles limited company ("<u>Alameda</u>" and, together with FTX, each, a "<u>Purchaser</u>" and collectively, "<u>Purchasers</u>"), and (ii) Voyager Digital, LLC, a Delaware limited liability company ("<u>Seller</u>"). Purchasers and Seller are each referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, on July 5, 2022 (the "<u>Petition Date</u>"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("<u>Parent</u>"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("<u>Holdings</u>" and, collectively with Seller and Parent, the "<u>Debtors</u>"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), to be jointly administered for procedural purposes (collectively, the "<u>Bankruptcy Case</u>"); and

WHEREAS, Purchasers desire to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchasers the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Plan and subject to entry of the Confirmation Order and consummation of the Plan.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchasers and Seller hereby agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchasers, and Purchasers shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means the following properties, rights, interests and other assets of Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in

4

accordance with IFRS, including any of the following properties, rights, interests, and other assets acquired by Seller after the date hereof and prior to the Closing, but excluding in all cases the Excluded Assets:

(a)    all Cryptocurrency attributable to customer accounts on the Voyager Platform;

(b)    the Contracts listed on <u>Schedule 1.1(b)</u> (the "<u>Assigned Contracts</u>"), including all Contracts evidencing the Cryptocurrency Loans (for the avoidance of doubt, not including the 3AC Loan) (the "<u>Acquired Cryptocurrency Loans</u>");

(c)    with respect to each Acquired Cryptocurrency Loan, the security interest in and to any collateral, including any Cryptocurrency, attributable to or backing such Acquired Cryptocurrency Loan (such collateral for all Acquired Cryptocurrency Loans, collectively, the "<u>Collateral</u>"), all rights in the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(d)    (i) all Avoidance Actions or other affirmative causes of action or claims against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), whether arising before or after the Closing Date, other than the Retained Avoidance Actions, and (ii) all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to licenses or Assigned Contracts), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set-off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (other than against Seller);

(e)    all Cash and Cash Equivalents, other than cash held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve ("<u>Acquired Cash</u>"); and

(f)    all Documents.

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under all properties, rights, interests and other assets of Seller other than the Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"); <u>provided</u> that, at any time up to five (5) Business Days prior to the Closing, the Purchasers may notify Seller that they wish to purchase any of the properties, rights, interests and other assets of Seller set forth in clauses (p) through (s), and upon such notice, any such properties, rights, interests and other assets shall be deemed Acquired Assets for all purposes under this Agreement for no additional consideration or adjustment to the Purchase Price:

(a)    all Cash and Cash Equivalents held for the benefit of Voyager Customers and any Cash and Cash Equivalents necessary to establish a USD Wind-Down Reserve, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than Cryptocurrency attributable to customer accounts on the Voyager Platform or Collateral;

(b)    all Contracts of Seller, other than the Assigned Contracts (the "Excluded Contracts");

(c)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller), (ii) that are Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; provided that, to the extent not prohibited by applicable Law, Purchasers shall have the right to make copies of any portions of such Documents;

(d)    all Documents prepared or received by Seller or any of its Affiliates in connection with this Agreement or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the Transactions, including all analyses relating to the business of Purchasers or their Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates;

(e)    all current and prior insurance policies of Seller, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)    all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)    (i) all Retained Avoidance Actions, (ii) all other demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchasers or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchasers or their respective Affiliates entered into on or after the date hereof;

(i)     all Tax refunds that are refunds of income Taxes of the Seller or that are refunds of Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period;

(j)     the 3AC Loan and any Actions related thereto;

(k)     the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(l)     all Governmental Authorizations, including Money Transmitter Licenses;

(m)     any accounts receivable, negotiable instruments and chattel paper of Seller, for the avoidance of doubt, other than with respect to the Acquired Cryptocurrency Loans;

(n)     any amounts or Liabilities owing to Seller from its Affiliates;

(o)     any Leased Real Property;

(p)     any tangible assets (including Equipment) of Seller;

(q)     all employment agreements or arrangements with employees of Seller or its Affiliates and all personnel records (including all human resources and other records) of Seller or its Affiliates relating to employees of Seller or any of its Affiliates;

(r)     all of Seller's rights in Seller Intellectual Property, and all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(s)     any goodwill, payment intangibles and general intangible assets and rights of Seller other than those associated with or related to the Acquired Assets; and

(t)     the properties, rights, interests and assets set forth on Schedule 1.2(t).

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Confirmation Order and subject to the consummation of the Plan, effective as of the Closing, in addition to the payment of the Cash Payment and the ~~Cryptocurrency~~Currency Consideration in accordance with Section 2.1, Purchasers shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably transfer, assign, convey, and deliver to Purchasers, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

7

(a)    all Liabilities and obligations of Seller under the Assigned Contracts that become due from and after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the ownership of the Acquired Assets, in each case, by Purchasers from and after the Closing Date;

(d)    all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchasers under this Agreement and all Transfer Taxes that Purchasers bears under Section 9.1;

(e)    all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date, provided that Assumed Liabilities will not include any Taxes other than in this Section 1.3(e) and Section 1.3(d) (and, for the avoidance of doubt, any income Taxes of the Seller or any Taxes with respect to the Acquired Assets for a Pre-Closing Tax Period are not Assumed Liabilities); and

(f)    all Liabilities for which Purchasers have agreed to be responsible in accordance with this Agreement.

1.4    Excluded Liabilities. Purchasers shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Seller shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchasers pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchasers, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume

8

and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Plan, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchasers (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchasers pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchasers shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Excluding or Adding Assigned Contracts Prior to Closing. Promptly, but in any event within ten (10) days following the date hereof, Seller shall deliver to Purchasers (x) a true and complete list of all material Contracts used in the Debtors' business to which Seller is a party, together with Seller's good faith best estimate of the amount of Cure Costs with respect to each such Contract, and within two (2) Business Days of Purchasers' request, Seller shall make available a true and copy of any such Contract. Purchasers shall have the right to notify Seller in writing of any Assigned Contract that they do not wish to assume or a Contract to which Seller is a party that Purchasers wish to add as an Assigned Contract up to five (5) Business Days prior to the anticipated Closing (the "Designation Deadline"), and (i) any such previously considered Assigned Contract that Purchasers no longer wish to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchasers wish to assume as an Assigned Contract, to the extent assignable under applicable Law, shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchasers, in each case, without any adjustment to the Purchase Price. Purchasers shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. For the avoidance of doubt, (x) if Purchasers have not informed Seller of their intent to assume any additional Assigned Contracts or other executory contracts or unexpired leases in accordance with the foregoing, then all such executory contracts or unexpired leases (whether or not known or disclosed by Seller to Purchasers) shall be deemed to be Excluded Contracts and may be rejected by Seller as of the Closing, and (y) no prepetition Cure Cost shall be due or payable with respect to any executory contract or unexpired lease until the assumption thereof.

(c)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchasers to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchasers as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

9

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent that the purported assignment or transfer of any Acquired Asset (i) would be prohibited by applicable Law, (ii) would be reasonably likely to subject Purchasers or their Affiliates to civil or criminal liability or (iii) would constitute a breach, default or violation of a Law or Order, in each case, without the receipt of a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) (each such Consent or Governmental Authorization, a "Necessary Consent"), and such Necessary Consent has not been obtained prior to the Closing, such asset shall be deemed not be an Acquired Asset at the Closing and shall not be transferred to, or received by, Purchasers, unless and until the Necessary Consent is obtained. In such event, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Necessary Consent is obtained and six (6) months following the Closing (or the closing of the Bankruptcy Case, if shorter), Seller and Purchasers shall (A) use reasonable best efforts to secure such Necessary Consent as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchasers, including subcontracting, licensing, sublicensing, or passing through via a swap arrangement to Purchasers any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchasers shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Necessary Consent has not been obtained and (2) Purchasers shall assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Necessary Consent requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchasers in accordance with the terms of this Agreement, the Plan, the Confirmation Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment; Initial Distribution.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchasers for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $40,000,00042,500,000 (the "Cash Payment") and (iii) the Fair Market Value of all Acquired Cash and all Cryptocurrency of Seller (in each case, other than any Collateral or such Cryptocurrency that are deemed to be Excluded Assets pursuant to the definition of "Fair Market Value") as of the Reference Date (the "CryptocurrencyCurrency Consideration"). For purposes of this Section 2.1, (x) the "Reference Date" shall be the second (2nd) Business Day immediately prior to the Closing Date, or such other reference date as the Parties may mutually agree and (y) the "Fair Market Value" of any Cryptocurrency shall be such price for the Cryptocurrency as of the Reference Date, as calculated by Alameda reasonably and in good faith based on market practice and available pricing information and agreed by Seller;

provided that, if the Parties cannot agree on the value of any specific Cryptocurrency on the Reference Date, then such Cryptocurrency shall be deemed to be an Excluded Asset for all purposes under this Agreement.

(b)    Seller shall use its reasonable best efforts to calculate the Pro Rata Share of any initial distributions due to any Transferred Creditors (taking into account both the Cash Payment and the ~~Cryptocurrency~~Currency Consideration) under the Plan (the aggregate amount of such distribution, the "Initial Distribution") within [one (1) Business Day prior to the Closing Date].[3]

(c)    With respect to any Transferred Creditors, at or as promptly as possible following the Closing (the actual date of such distribution, the "Initial Distribution Date"), Purchasers shall deliver, or cause to be delivered, to such Transferred Creditors, on behalf of Seller, their Pro Rata Share of the Initial Distribution directly to their FTX Accounts, in US Dollars or, if elected by such Transferred Creditors prior to the Closing, in BTC, USDC and/or any other Cryptocurrency carried by FTX on its platform in the ordinary course of business, equal to the value of such Initial Distribution as of the Closing Date.

(d)    At the Closing, Purchasers shall deliver, or cause to be delivered, to Seller: (i) the Cash Payment, plus (ii) the ~~Cryptocurrency~~Currency Consideration, less (iii) the aggregate amount of the Initial Distributions to be paid to Transferred Creditors pursuant to Section 2.1(b), less (iv) the Deposit, less (v) the difference between the aggregate amount of the Expense Reimbursement at the Closing and the Initial Expense Reimbursement Payment (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller at least two (2) Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchasers have, on or prior to the date hereof, made an earnest money deposit with [SRS Acquiom] (the "Escrow Agent") in the amount equal to the greater of $5,000,000 and ten percent (10%) of the Cash Payment (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate escrow account, established pursuant to the escrow agreement, [dated as of the date hereof, by and among Seller, Purchasers and the Escrow Agent, substantially in the form attached hereto as Exhibit C][4] (the "Escrow Agreement"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchasers and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by Seller pursuant to Section 8.1(d) or 8.1(f) (or by Purchasers pursuant to Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then Seller shall retain the Deposit together with all received investment income, if any.

---

[3]    **Note to Draft**: Timing and mechanics for distribution to be discussed.
[4]    **Note to Draft**: K&E to provide details of escrow arrangement.

11

(c)     If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchasers within five (5) Business Days after such termination.

(d)     The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the Closing, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other Transactions (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the Effective Date of the Plan (as defined therein), subject to the full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchasers:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     control of any possessory Collateral held by Seller and executed versions of any assignments, deeds and other documents of assignment, conveyance or transfer required under applicable Law to evidence the transfer to Purchasers of the Acquired Cryptocurrency Loans and Seller's rights with respect to the Acquired Cryptocurrency Loans, the Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral;

(c)     copies of all Documents that are Acquired Assets, in such digital format as reasonably requested by Purchasers prior to the Closing;

(d)     an Internal Revenue Service Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes, as applicable;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 0 have been satisfied;

(f)   a joint written instruction, duly executed by Seller, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit; and

(g)   such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements or other documents evidencing or otherwise necessary to give effect to the transfer of the Acquired Assets and assumption of the Assumed Liabilities, each in form and substance reasonably acceptable to Seller and Purchasers, in each case duly executed by Seller.

2.5   <u>Closing Deliveries by Purchasers</u>. At the Closing, Purchasers shall deliver to (or at the direction of) Seller:

(a)   the Closing Date Payment;

(b)   the Assignment and Assumption Agreement, duly executed by each Purchaser;

(c)   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied;

(d)   a joint written instruction, duly executed by Purchasers, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit; and

(e)   such other instruments of assumption and other instruments or documents, including bills of sale and/or assignment and assumption agreements or other documents evidencing or otherwise necessary to give effect to the transfer of the Acquired Assets and assumption of the Assumed Liabilities, each in form and substance reasonably acceptable to Seller and Purchasers, in each case duly executed by Purchasers.

2.6   <u>Supplemental ~~Payments~~Payment</u>. ~~(a)~~  Subject to the occurrence of the Closing, ~~at the times~~ and ~~subject to~~ the terms and conditions set forth in this <u>Section 2.6</u>, Purchasers will pay to ~~each Transferred Creditor into such Transferred Creditor's FTX Account, the following amounts (it being understood that there will be no payment for any Payment Period for which such payments are zero):~~

~~(i)   within [ten (10) Business Days following the end of each Payment Period],~~Seller an amount in US Dollars ~~equal to~~ (the "Supplemental Payment ~~such Transferred Creditor is entitled to for such Payment Period; plus~~

~~(ii)   within [two (2) Business Days] following the Closing Date, a credit of $25.00 (the "Initial Trading Credit"); plus~~

~~(iii)   within [ten (10) Business Days following the end of each Payment Period], an amount in US Dollars equal to fifty percent (50%) of the revenue FTX generated from such Transferred Creditor based on their individual account activity in~~

13

~~their FTX Account during such Payment Period, as determined by FTX in its sole discretion (together with the Initial Trading Credit, the "Trading Credits").~~

~~(b)     For purposes of this~~ Section 2.6:

~~(i)     "Payment Period" means each ninety-one (91) day period for the one (1) year immediately following the Closing Date.~~

~~(ii)     "Supplemental Payment" means, with respect to a given Transferred Creditor and Payment Period, an amount~~"), equal to (x) the value of the daily average assets (in BTC-denominated terms based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by FTX in its sole discretion) attributable in the aggregate to the Transferred ~~Creditor~~Creditors's FTX ~~Account~~Accounts during the ~~applicable~~ six (6) month period following the Initial Distribution Date (the "Payment Period"), divided by (y) the value of the assets (in BTC-denominated terms and based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by FTX in its sole discretion) attributable to the Transferred ~~Creditor~~Creditors's FTX ~~Account~~Accounts in the aggregate on the [~~day after the~~] Initial Distribution Date, multiplied by (~~y~~z) ~~such Transferred Creditor's Pro Rata Share of $6,250,000~~$7,500,000; provided that in no event shall the Supplemental ~~Assets~~Payment exceed ~~such Transferred Creditor's Pro Rata Share of $12,500,000; provided, further, that in no event~~$15,000,000. Purchasers shall make the ~~aggregate~~ Supplemental ~~Assets~~ Payment to ~~all Transferred Creditors for all Payment Periods exceed $50,000,000.~~

~~(c)     Notwithstanding anything to the contrary in the foregoing, the Initial Distribution, Supplemental Payment and any other distributions on account of claims under the Plan (for the avoidance of doubt, excluding the Trading Credits) shall not exceed, in the aggregate, for any Transferred Creditor, the allowed claim (pursuant to section 502 of the Bankruptcy Code) of such Transferred Creditor.~~

~~(d)     The right to receive any payment under this~~ Section 2.6 ~~shall not be transferable or assignable by any Person~~Seller within ten (10) Business Days following the end of the Payment Period.

2.7    Withholding. Purchasers shall be entitled to deduct and withhold from the Purchase Price all taxes that Purchasers are required to deduct and withhold under any applicable tax Law. All such withheld amounts shall be treated as delivered to Seller for all purposes hereunder. If Purchasers are required to deduct and withhold from the Purchase Price under any applicable tax Law, Purchasers shall (a) use commercially reasonable efforts to give Seller notice at least five (5) days before deduction and withholding (or, if five (5) days' notice is not reasonably practical, as promptly as practical) and (b) reasonably cooperate with Seller to use commercially reasonable efforts to mitigate deduction and withholding.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business to the extent publicly available on the CSA's System for Electronic Document Analysis and Retrieval (the "Filed CSA Documents"), (ii) disclosed in any forms, statements or other documents filed by the Debtors with the Bankruptcy Court in the Bankruptcy Case, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchasers as follows as of the date hereof and as of the Closing Date:

3.1     Organization and Qualification. Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Seller is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2     Authorization of Agreement. Subject to requisite Bankruptcy Court approvals:

(a)     Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)     the execution, delivery and performance by Seller of this Agreement, and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the consummation by it of the Transactions; and

(c)     this Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained[, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(a) are made, given or obtained (as applicable),][5] neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Cryptocurrency; Cryptocurrency Loans; Customer Accounts.

(a)    Schedule 3.4(a) sets forth a list of all Cryptocurrency of Seller as of the date of this Agreement, the means through which Seller controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to customer accounts on the Voyager Platform. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.4(a), free and clear of all Encumbrances (other than Permitted Encumbrances); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.4(b) sets forth a list of all Cryptocurrency Loans as of the date of this Agreement, including (i) the counterparty thereto, (ii) the amount and type of all Cryptocurrency loaned under each Cryptocurrency Loan, (iii) the amount and type of assets, including Cryptocurrency and fiat currency, in which each Cryptocurrency Loan may be repaid, (iv) the amount and type of any collateral held by Seller with respect to each Cryptocurrency Loan, including the means through which Seller controls such collateral, and (v) the interest rate and maturity of each Cryptocurrency Loan.

(c)    Schedule 3.4(c) sets forth a list of all Voyager Customers, the account position (including type and amount of Cryptocurrency) that such customer held as of

---

[5]    **Note to Draft**: To be determined whether necessary based on Acquired Assets.

immediately prior to the Petition Date, and, to the Knowledge of Seller, the amount of the unsecured claim held by such Voyager Customer against Seller as of the Petition Date.

3.5    <u>Financial Statements</u>. Attached to <u>Schedule 3.5</u> are Seller's audited statements of financial position as of June 30, 2022 and as of June 30, 2021, and the related statements of loss and the changes in equity and cash flows for each fiscal year then ended (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.5</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied. The Financial Statements present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Seller as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.6    <u>Title to Acquired Assets</u>. Seller has good and valid title to all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to <u>Section 1.5(c)</u>, Purchasers will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

3.7    <u>Title to Properties</u>.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8    <u>Contracts</u>.

(a)    <u>Schedule 3.8</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

17

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $1,000,000 during any fiscal year;

(v)    contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for Intellectual Property limiting Seller's use of such Intellectual Property to specified fields of use or specified territories;

(vi)    is a Contract governing the collection, Processing, use, disclosure, storage, transfer or disposal of Personal Information or customer information by or on behalf of Seller or any of its Affiliates, including the transfer or sale of any Personal Information or customer information by Seller or any of its Affiliates to any third party;

(vii)    evidences or relates to a Cryptocurrency Loan, including security or collateral agreements;

(viii)    is a custody agreement or agreement with any Person performing validation services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any other Contracts that are material to the Acquired Assets, including agreements with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or platform.

(b)       Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchasers of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has received no written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9       Compliance with Laws.

(a)       Seller is not in violation of any Laws or Orders applicable to the Acquired Assets, except for violations the existence of which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)       Seller and each of its directors, officers and employees acting in such capacity are and have been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)       Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, nor any employee, agent or representative or other Person who performs or has performed services on behalf of Seller, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), Her Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31

19

CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor are any of the foregoing designated as a Specially Designated National or Blocked Person by OFAC and (ii) Seller has not been in violation of applicable Sanctions.

(d)    Seller and each of its directors, officers and employees acting in such capacity are and have been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property; Cybersecurity and Personal Information.

(a)    Schedule 3.11(a) sets forth a true, correct and complete list of all Seller Registered IP, indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

4894-0335-4158 v.56

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property.

(g)    Seller and its Affiliates have complied in all material respects with all applicable Privacy and Data Security Requirements, and the consummation of the Transactions will not cause the Seller or its Affiliates to breach, in any material respect, any Privacy and Data Security Requirements.

(h)    Seller and its Affiliates have established and implemented a comprehensive written information security program that contains administrative, physical and technical safeguards regarding privacy, cybersecurity and data security that are commercially reasonable and designed to protect against any anticipated threats or hazards to the security, integrity and confidentiality of Personal Information and against any Security Incident.

(i)    To the Knowledge of Seller, there have been no Security Incidents involving Personal Information in the Seller's or its Affiliates' custody, possession or control or for which the Seller or its Affiliates are otherwise responsible. The Seller and its Affiliates have not: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy and Data Security Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy and Data Security Requirements by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or

alleged violation of any Privacy and Data Security Requirements; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)    Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)    All material Taxes owed by Seller that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with IFRS.

(c)    There are no Encumbrances for Taxes on any of the assets of Seller other than Permitted Encumbrances.

(d)    Seller (to the extent related to the Acquired Assets) has reported, withheld and paid all Taxes required to have been reported, withheld and paid in connection with amounts paid or owing by it to any employee, independent contractor, creditor, stockholder or other third party except where the failure to make such payment, individually or in the aggregate, is not or would not reasonably be expected to be material to the business, taken as a whole or to cause any Encumbrances to be imposed upon Seller's assets.

(e)    Seller is not and has not been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries) or has any material Liability for the Taxes of any Person (other than Seller) under U.S. Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(f)    Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(g)    Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulations Section 1.6011-4(b)(2).

(h)    Seller has not received any claim in writing from a Governmental Body or social security administration in a jurisdiction where Seller or any of its Affiliates (to the extent related to the Acquired Assets) does not file Tax Returns that such Seller or its Affiliate is or may be subject to taxation by that jurisdiction.

(i)    Seller has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of Law with respect to Seller's assets. Seller has not executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Body and has not been subject to any ruling guidance specific to Seller

22

with respect to the Acquired Assets that would, in any manner, bind, obligate or restrict Purchasers or any of their Affiliates.

(j)      Notwithstanding anything in this Agreement to the contrary, no representation or warranty is made with respect to the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    Employees. Seller is not party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to Seller by or on behalf of any labor union and (ii) there is no pending or, to the Knowledge of Seller, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of Seller. Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.14    Affiliate Transactions. Except as set forth on Schedule 3.14 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.15    Brokers. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller.

3.16    No Litigation. Except for the general pendency of the Bankruptcy Case and Actions that would not reasonably be expected to have a Material Adverse Effect, there are no Actions pending or, to the Knowledge of Seller, threatened against or affecting Seller.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Seller Representations") (it being understood that Purchasers have relied only on such express representations and warranties), Purchasers acknowledge and agree that neither Seller nor any other Person on behalf of Seller makes, and no Purchaser has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other

23

materials prepared by Moelis) (the "Information Presentation") or in that certain datasite administered by Datasite (the "Dataroom") or elsewhere to Purchasers or any of their Affiliates or Advisors on behalf of Seller or any of its Affiliates or Advisors. Without limiting the foregoing, neither Seller nor any other Person will have or be subject to any Liability whatsoever to any Purchaser, or any other Person, resulting from the distribution to Purchasers or any of their Affiliates or Advisors, or Purchasers' or any of their Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchasers or any of their Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    No Outside Reliance. Notwithstanding anything contained in this Article III or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchasers or any other Person on behalf of Purchasers or any of their Affiliates or Advisors, are, in each case, specifically disclaimed by Purchasers and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers represent and warrant to Seller as follows as of the date hereof and as of the Closing Date:

4.1    Organization and Qualification. Each Purchaser is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to each Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchasers' ability to consummate the Transactions. Each Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchasers' ability to consummate the Transactions.

4.2    Authorization of Agreement.

(a)     Each Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions.

(b)     The execution, delivery and performance by each Purchaser of this Agreement, and the consummation by each Purchaser of the Transactions, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on the part of any Purchaser are necessary to authorize the execution, delivery and performance by such Purchaser of this Agreement and the consummation by it of the Transactions.

(c)     This Agreement has been duly executed and delivered by each Purchaser and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of each Purchaser, enforceable against each Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchasers of this Agreement, nor the consummation by Purchasers of the Transactions, nor performance or compliance by Purchasers with any of the terms or provisions hereof, will (i) conflict with or violate any provision of any Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to any Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which any Purchaser is a party or accelerate any Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Purchaser or any of their Subsidiaries, except, in the case of clauses (i) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

(b)     Purchasers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchasers of this Agreement or the consummation by Purchasers of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

4.4     Financing. Purchasers have, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment and the ~~Cryptocurrency~~Currency Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions. Purchasers are and shall be capable of

25

satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Absence of Restraints; Compliance with Laws; Permits.

(a)     No Purchaser is in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

(b)     Purchasers hold and are in compliance with all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership or use of the Acquired Assets, except those the absence of which to have would not, individually or in the aggregate, reasonably be expected to be material to Purchasers' business.

4.6     Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchasers that might be entitled to any fee or commission in connection with the Transactions.

4.7     No Litigation. There are no Actions pending or, to the Knowledge of Purchasers, threatened against or affecting Purchasers, in each case, that would, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchasers to consummate the Transactions.

4.8     No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Purchaser Representations") (it being understood that Seller has relied only on such express representations and warranties), Seller acknowledges and agrees that no Purchaser nor any other Person on behalf of any Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or Advisors on behalf of Purchasers or any of their Affiliates or Advisors. Without limiting the foregoing, no Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller or any of its Affiliates or Advisors, or Seller's or any of its Affiliates' or Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to Seller or any of its Affiliates or Advisors in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.9     No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, each Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to such Purchaser and on which Purchasers may rely in connection with the Transactions. Each Purchaser acknowledges and agrees that all other representations,

4894-0335-4158 v.56

warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and that no Purchaser has relied on any such representations, warranties or statements. Each Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, such Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchasers or any of their Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchasers have relied only on the Express Seller Representations).

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

5.1    <u>Bid Protections</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchasers have made the highest or otherwise best bid pursuant to the Bidding Procedures Order and appoints Purchasers to act as the Stalking Horse Bidder (as defined in the Bidding Procedures Order) in connection with the Auction and, in connection therewith, agrees to pay Purchasers the following (the Expense Reimbursement and the Break-Up Fee, collectively, the "<u>Bid Protections</u>"):

(i)    Seller shall promptly pay or cause to be paid to Purchasers all reasonable and documented out-of-pocket fees and expenses (including attorneys' fees and expenses) incurred by Purchasers in connection with or related to Purchasers' evaluation, consideration, analysis, negotiation and documentation of this Agreement or the Transactions (the "<u>Expense Reimbursement</u>") as follows: (i) $2,000,000 (the "<u>Initial Expense Reimbursement Payment</u>") within two (2) Business Days following the Court's entry into the Stalking Horse Order; and (ii) the remainder of the Expense Reimbursement either (x) at the Closing, as a reduction to the Purchase Price pursuant to <u>Section 2.1(d)</u>, or (y) if this Agreement is terminated prior to the Closing for any reason other than by Seller pursuant to <u>Section 8.1(d)</u> or <u>8.1(f)</u> (or by Purchasers pursuant to

27

Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then within two (2) Business Days following such termination.

(ii)    If this Agreement is terminated prior to the Closing for any reason other than by Seller pursuant to Section 8.1(d) or 8.1(f) (or by Purchasers pursuant to Section 8.1(c) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f)), then Seller shall pay to Purchasers, in addition to the Expense Reimbursement, a fee equal to $3,000,000 (the "Break-Up Fee"), in immediately available funds within two (2) Business Days following such termination.

(b)    Promptly, and in any event within two (2) Business Days following entry into this Agreement, Seller shall file with the court a motion, in form and substance acceptable to Purchasers, seeking approval of the Bid Protections (including approval of the Bid Protections as allowed administrative expenses of the Debtors' estate under Section 503(b) of the Bankruptcy Code) and the no-shop provisions set forth in Section 5.2 (the "Stalking Horse Motion"). Seller shall provide notice on the docket of the Stalking Horse Motion and set a date for the Stalking Horse Hearing (as defined in the Bidding Procedures Order) pursuant to the Bidding Procedures Order and shall use reasonable best efforts to seek entry of an order of the Bankruptcy Court, in form and substance acceptable to Purchasers, approving the Bid Protections and the no-shop provisions set forth in Section 5.2 and providing for payment by Seller of the Bid Protections as and when such amounts are due and payable hereunder (the "Stalking Horse Order"), as promptly as practicable, and in any event, no event later than October 1, 2022.

(c)    All amounts payable to Purchasers pursuant to Section 5.1(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchasers in writing, and without the requirement of any notice or demand from Purchasers or any application to or order of the Bankruptcy Court other than the Stalking Horse Order.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 5.1 are an integral part of the Transactions and that, without these agreements, the other Parties would not enter into this Agreement. Each of the Parties further acknowledges that the payment by Seller of the Break-Up Fee and the Expense Reimbursement is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchasers, in the circumstances in which such Break-Up Fee and Expense Reimbursement is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. Without limiting in any way Purchasers' rights to specific performance set forth in Section 10.12, Purchasers' receipt in full of the Break-Up Fee and the Expense Reimbursement as provided herein shall be the sole and exclusive monetary remedy of Purchasers against Seller, and Seller shall have no further liability or obligation, under this Agreement or relating to or arising out of any such breach of this Agreement or failure to consummate the Transactions. The obligations to pay the Break-Up Fee and Expense Reimbursement in accordance with the provisions of Section 5.1(a) will (i) be binding upon and enforceable against Seller immediately upon the Bankruptcy

28

Court's entering the Stalking Horse Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Case, any plan of reorganization or liquidation in the Bankruptcy Case, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to pay Purchasers the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry of the Stalking Horse Order are, binding upon (A) Seller, (B) any successors or assigns of Seller, (C) any trustee, examiner or other representative of Seller's estate, (D) reorganized Seller, if applicable, and (E) any other entity vested or revested with any right, title or interest in or to Seller, or any other Person claiming any rights in or control (direct or indirect) over Seller (each of (A) through (E), a "Successor") as if such Successor were Seller hereunder. The obligations of Seller to pay Purchasers the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

5.2    No-Shop.

(a)    From and following the earlier of (x) the Auction being declared closed as contemplated in the Bidding Procedures Order and (y) entry into the Stalking Horse Order, Seller shall not, and shall not permit their Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchasers, their Affiliates and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give notice to Purchasers if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, proposal or offer and the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchasers reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto.

5.3    Bankruptcy Actions.[6]

(a)    Within [two (2)] Business Days after the date hereof, Seller shall file with the Bankruptcy Court the Plan Solicitation Motion. The Plan Solicitation Motion, Plan Solicitation Order and Confirmation Order shall be in form and substance acceptable to Purchasers; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchasers (such consent not to be unreasonably withheld).

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall use its reasonable best efforts to obtain entry by the Bankruptcy Court of the Confirmation Order.

(c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (ii) commence solicitation of the Plan, and (iii) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion,[7] and in any case prior to the Outside Date.

(d)    Purchasers shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchasers and their Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchasers under this Agreement and the Plan, and demonstrating that each Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchasers' ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Each of Seller and Purchasers shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan.

(f)    If an Auction is conducted, and Purchasers are not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchasers may elect, in their sole discretion, to serve as a backup

---

[6]    **Note to Draft**: In connection with this agreement, Alameda will agree in the Plan to subordinate its loan claim to other unsecured creditors of Seller.

[7]    **Note to Draft**: Plan timeline to be consistent with timeline already established and noticed by Debtors.

4894-0335-4158 v.56

bidder (the "Backup Bidder") and keep Purchasers' bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If Purchasers agree to serve as the Backup Bidder and the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)    Seller and Purchasers acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchasers acknowledges that, subject to Sections 5.1 and 5.2, Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order.

(h)    Notwithstanding any other provision of this Agreement to the contrary, but subject to Section 5.2, Purchasers acknowledge that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction in accordance with the Bidding Procedures Order, in each case, prior to earlier of the entry of the Stalking Horse Order or the Auction being declared closed.

(i)    Purchasers shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchasers agree that they will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchasers' Advisors available to testify before the Bankruptcy Court.

(j)    Nothing in this Section 5.3 shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations, but subject to the provisions of the Bidding Procedures Order.

5.4    Cure Costs. Subject to entry of the Confirmation Order and consummation of the Plan, Purchasers shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchasers in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5    Confirmation Order. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchasers on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchasers the Assigned Contracts, (c) find that each Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchasers are not a successor to Seller, and grant Purchasers the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchasers shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchasers have provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchasers shall have no Liability for any Excluded Liability. Purchasers agree that they will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Confirmation Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchasers are a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.6    Approval. Seller's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.7    Filings. Seller shall, and shall cause the other Debtors to, give Purchasers reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that are material, inconsistent with the Transactions and/or impact Cryptocurrency of the Seller or Voyager Accounts (such approval not to be unreasonably withheld, provided that Purchasers may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would not be consistent with the consummation of the Transactions as set forth herein).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    <u>Conduct of Business of Seller</u>.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall carry on its business in the Ordinary Course in all material respects; <u>provided</u> that no action by Seller with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchasers otherwise consent in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; <u>provided</u> that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this <u>clause (A)</u>, other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person other than as permitted pursuant to <u>Section 6.1(b)(iv)</u>;

33

(ii)    sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $5,000,000, except (A) Ordinary Course dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Seller, and (B) leases or subleases of real property under which Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchasers; provided that, Seller shall not sell, lease, transfer, mortgage, pledge, assign or otherwise dispose of any Acquired Assets (or permit to become subject to any additional Encumbrance, other than in respect of Permitted Encumbrances);

(iii)    make or authorize capital expenditures, including for property, plant and Equipment, except for those [(A) that are consistent in all material respects with Seller's plan that was previously made available to Purchasers], (B) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (C) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (C) not to exceed $2,000,000 in the aggregate;

(iv)    except as permitted under Section 6.1(b)(iii), make any acquisition of, or investment in, any properties, assets, securities or business (including by merger);

(v)    perform or offer to perform any staking activities;

(vi)    enter into referral agreements with a third party with respect to the Voyager Customers and any Documents or account information with respect thereto;

(vii)    except pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $300,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any material Seller Plan or (6) take any action to accelerate any rights or benefits under any Seller Plan; provided however that the foregoing shall not restrict Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(viii)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization);

(ix)    grant any Encumbrance (other than Permitted Encumbrances) on any of its Acquired Assets other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(x)    enter into any new Contract that would constitute a Material Contract if entered into prior to the date of this Agreement, or materially amend or modify any Material Contract (other than any Excluded Contract);

(xi)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchasers or their Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchasers' or their Subsidiaries' operations. Prior to the Closing, each of Purchasers and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, the COVID-19 pandemic shall in no event be deemed to constitute a breach of this Section 6.1 (any action or inaction described in this clause of this Section 6.1(c), a "COVID-19 Response").

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will provide Purchasers and their authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller, in order for Purchasers and their authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchasers if such access or disclosure (A) would cause significant competitive harm to Seller if the Transactions are not consummated, (B) would waive any legal privilege or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound (and which is not entered into in contemplation

35

hereof) (provided that, at Purchasers' reasonable request, the Parties shall implement appropriate and mutually agreeable measures to permit the disclosure of such information in a manner to remove the basis for the non-disclosure to the greatest extent reasonably possible, including by arrangement of appropriate clean room procedures, redaction of text from documents or entry into a customary joint defense agreement with respect to any information to be so provided). Notwithstanding anything to the contrary contained herein, no COVID-19 Response by Seller shall be deemed to violate or breach this Section 6.2 in any way or serve as a basis for Purchasers to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)    The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the Transactions, and will be governed by the confidentiality provisions in Section 6.11. Purchasers will, and will cause its Advisors to, abide by such confidentiality provisions with respect to such access and any information furnished to Purchasers or any of their Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchasers may not rely on the accuracy of any such information, in each case, other than the Express Seller Representations.

(c)    From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchasers will provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchasers (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Seller, Purchasers will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchasers may intend to destroy, alter or dispose of. From and after the Closing, Purchasers will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

6.3    Regulatory Approvals.

(a)    Subject to Section 6.6, Seller will (i) cooperate with Purchasers in exchanging such information and providing such assistance as Purchasers may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.3(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.3(a) or Section 6.3(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

36

(b)     Subject to <u>Section 6.6</u>, Purchasers will, and will cause their Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings made by Seller pursuant to <u>Section 6.3(a)</u>, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.3(b)</u> or <u>Section 6.3(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.4     <u>Customer Transition</u>.

(a)     From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including any service providers), and use reasonable best efforts, in each case, to: (i) develop orderly and transparent procedures with respect to the migration of Voyager Customers and other Voyager Creditors to the FTX platform, including the posting of prominent links on the home page for the mobile application and website of the Seller's platform to direct Voyager Customers and other Voyager Creditors to the FTX migration process; (ii) effect the orderly migration of any Voyager Customers and other Voyager Creditors who elect to open an FTX Account, and to minimize any disruption to the businesses of Seller and Purchasers or any adverse effect that might result from the actions contemplated hereby; and (iii) take, or cause to be taken, all appropriate action, to do or cause to be done all things reasonably necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions and to make effective the arrangements contemplated by this <u>Section 6.4</u>.

(b)     As soon as reasonably practicable (and in any event within two (2) Business Days) following the date of entry into this Agreement, Seller shall send a written notice informing each Voyager Creditor of the Transactions and the availability of the referral option contemplated by this <u>Section 6.4</u>.

(c)     Without limiting the foregoing, (i) Seller shall use commercially reasonable efforts to promote the transition of all Voyager Creditors to the FTX platform and to support the opening of FTX Accounts by such Voyager Creditors, including through the sharing and obtaining of relevant information relating to Voyager Creditors to help facilitate FTX's "KYC" and on-boarding process and information relating to Voyager Creditors' account positions or holdings in their Voyager Accounts as of the Petition Date, and (ii) the Parties shall cooperate to transition any Voyager Creditors to the FTX platform, including by (A) facilitating the execution of a new customer agreement between Voyager Creditors and FTX (or its relevant Affiliates), (B) distributing election forms to any Transferred Creditors with respect to their preferred currency for the Initial Distribution, (C) facilitating the Initial Distribution to Transferred Creditors' FTX Accounts, and (D) executing a new customer agreement and, if applicable, any other documentation, including loan, pledge or security agreements. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require FTX to (x) in connection with the opening of any FTX Account, waive FTX's customary "KYC" or customer-screening procedures applicable to FTX's new customers generally

37

administered in the ordinary course of business or (y) provide or match any Cryptocurrency or product offered by Seller that FTX does not provide or offer in the ordinary course of business.

(d)    At or promptly following the Closing, FTX shall credit to each Transferred Creditor's FTX Account an amount equal to $30.00 (the "Trading Credit").

(e)    (d) Notwithstanding anything to the contrary herein, Seller shall remain in material compliance with all privacy policies, notices or representations of Seller that are in effect as of the date of this Agreement and shall cooperate with Purchasers to ensure that the transfer of all Personal Information to Purchasers in connection with the Transactions will be consistent with such privacy policies, notices or representations.

(f)    (e) From and following the date of this Agreement, Seller shall not, and shall cause its Affiliates not to, provide any customer information to any third party outside of the Ordinary Course, including to any third party crypto exchange or platform, or refer any Voyager Customers to any third party crypto exchange or platform, except to FTX's platform pursuant to the arrangements contemplated by this Section 6.4.

6.5    Transfer of Acquired Cryptocurrency Loans. From and after the date hereof, the Parties shall cooperate with each other and shall cause their respective Advisors to cooperate with each other and any applicable third parties (including counterparties to Acquired Cryptocurrency Loans), and use reasonable best efforts to transfer all rights and interests of Seller in the Acquired Cryptocurrency Loans, all Collateral, the security agreements and any and all other agreements related to the Collateral, and all proceeds under the Collateral, to Purchasers as of the Closing.

6.6    Reasonable Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

38

6.7    _Further Assurances_. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.8    _Insurance Matters_. Purchasers acknowledge that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third-party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchasers and the Acquired Assets and no further coverage shall be available to Purchasers or the Acquired Assets under any such policies.

6.9    _Receipt of Misdirected Assets; Liabilities_.

(a)    From and after the Closing, if Seller or any of its Affiliates receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchasers, and such asset will be deemed the property of Purchasers held in trust by Seller for Purchasers until so transferred. From and after the Closing, if Purchasers or any of their Affiliates receives any right, property or asset that is an Excluded Asset, Purchasers shall promptly transfer or cause such of their Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchasers for Seller until so transferred.

(b)    From and after the Closing, if Seller or any of its Affiliates is subject to a Liability that should belong to Purchasers pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchasers, and Purchasers shall assume and accept such Liability. From and after the Closing, if Purchasers or any of their Affiliates is subject to a Liability that should belong to Seller pursuant to the terms of this Agreement, Purchasers shall promptly transfer or cause such of its Affiliates to transfer such Liability to Seller, and Seller shall accept such Liability.[8]

6.10    _Wind-Down_. Following completion of the referral of customers pursuant to Section 6.4 and the Closing, Seller shall promptly discontinue any business operations related to the Voyager Platform and wind down its operations.

6.11    _Confidentiality_.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2. Purchasers shall, and shall cause their respective Affiliates and respective Advisors to, keep confidential any Confidential Information concerning Seller furnished in connection with the Transactions. Seller shall, and shall cause their respective

---

[8]    **Note to Draft**: Section 6.10 is duplicative of Sections 3.17 and 4.9.

Affiliates and respective Advisors to, keep confidential any Confidential Information concerning Purchasers furnished in connection with the Transactions.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchasers and their Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause its Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchasers, disclose to any Person any Confidential Information relating to Purchasers and their Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.11 will not prohibit any disclosure required by applicable Law or Order, or to the extent not specifically directed at the Transaction, in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization. Purchasers acknowledge and understand that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchasers, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.11 by any of such Party's Affiliates or Advisors. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.11 by Seller or Purchasers are inadequate to protect Purchasers or Seller and their respective Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available any Party or their Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.11, each other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.11 will survive the Closing and terminate two (2) years after the Closing Date.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchasers and Seller. The respective obligations of each Party to this Agreement to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchasers) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order, and the Plan shall become effective in

40

accordance with its terms, in each case, without amendment, modification or supplementation, other than immaterial clarifications, with respect to this Agreement and the Transactions, without Purchasers' prior written consent (not to be unreasonably withheld).

7.2    <u>Conditions Precedent to the Obligations of Purchasers</u>. The obligations of Purchasers to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchasers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.8</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.15</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all but de minimis respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but de minimis respects only as of such date;

(b)    Seller shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing; and

(c)    Seller shall have delivered, or caused to be delivered, to Purchasers all of the items set forth in <u>Section 2.4</u>.

7.3    <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchasers in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchasers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Purchasers shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u>.

7.4     <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchasers or Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement.

## ARTICLE VIII

## TERMINATION

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchasers;

(b)     by written notice of either Purchasers or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchasers or Seller, if the Closing shall not have occurred on or before the date that is sixty (60) days following the date that the Confirmation Order is entered by the Bankruptcy Court (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)     by written notice from Seller to Purchasers, upon a breach of any covenant or agreement on the part of Purchasers, or if any representation or warranty of Purchasers will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Purchasers then Seller may not terminate this Agreement under this <u>Section 8.1(ed)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchasers of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(ed)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchasers to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchasers may not terminate this Agreement under this <u>Section 8.1(fe)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30)

42

days after Purchasers notify Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f~~e~~) will not be available to Purchasers at any time that Purchasers are in material breach of, any covenant, representation or warranty hereunder;

(f)      by written notice from Seller to Purchasers, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchasers fail to complete the Closing within two (2) Business Days after the date required by Section 2.3;

(g)      by written notice from Seller to Purchasers, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)      by written notice from Purchasers to Seller, if (A) Seller or Seller's Affiliate seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets;

(i)      by written notice from Purchasers to Seller, if:

(i)      Seller does not publicly announce Purchasers as the Successful Bidder and execute this Agreement (with Seller's obligations subject to Bankruptcy Court approval where indicated) on or prior to September 16, 2022;

(ii)      Seller and Buyer have not amended this Agreement to include the terms of the mutually-agreed Plan in form acceptable to each of them on or prior to October 1, 2022;

(iii)      the Stalking Horse Order is not entered by October 1, 2022;

(iv)      Seller fails to pay the Initial Expense Reimbursement Payment within one (1) Business Day of the time it is due and payable pursuant to Section 5.1(a);

(v)      Seller or any of the other Debtors file any motions, pleadings, notices and other documents with the Bankruptcy Court in breach of Section 5.7;

(vi)      the Confirmation Order has not become a Final Order by December 15, 2022;[9] or

---

[9]      **Note to Draft**: Date to be 30 days following currently expected confirmation date.

4894-0335-4158 v.5~~6~~

(vii)    the Closing has not occurred on or prior to the thirtieth day following the Bankruptcy Court's entry of the Confirmation Order;

(j)    by written notice from Purchasers to Seller, if Seller or its Affiliates or Advisors have committed a breach of Section 5.2; or

(k)    by written notice from Purchasers to Seller, if (i) Seller determines that an Auction will be held, and such Auction is not completed by September 16, 2022, (ii) if the Purchasers are not the Successful Bidder at the Auction, or Seller fails to deliver an executed counterpart of this Agreement at or prior to the Auction, (iii) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchasers at the Auction (unless Seller has agreed in its sole discretion to be the Backup Bidder), or (iv) the Bankruptcy Court approves an Alternative Transaction other than with Purchasers.

8.2    Effect of Termination. In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided, further, that no termination will relieve either Party from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of the non-breaching Party) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder). For purposes of this Agreement, "willful breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

## ARTICLE IX

## TAXES

9.1    Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchasers. Seller and Purchasers will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes, and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

44

9.2    <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchasers, Seller and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in [Schedule 9.2][10] (the "<u>Allocation Methodology</u>"). As soon as commercially practicable, but no later than ninety (90) days following the determination of the final Purchase Price, Purchasers shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "<u>Allocation</u>"). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchasers, then Purchasers and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchasers cannot resolve such dispute within thirty (30) days of Purchasers' receipt of Seller's objection, each Party agrees to report the allocation of the total consideration (including any Assumed Liabilities) as determined for U.S. federal income Tax purposes in a manner consistent with Section 1060 of the Code and to report such allocation on Internal Revenue Service Form 8594 and any other forms or statements required by the Code, Treasury Regulations, the Internal Revenue Service or any applicable state or local Tax authority. To the extent Seller does not make a written objection within thirty (30) days or the Parties agree in writing on the final Allocation following such an objection, the Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this <u>Section 9.2</u>).

9.3    <u>Cooperation</u>. Purchasers and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Seller. Seller shall provide Purchasers with a draft of the Tax Returns filed after the date hereof that are described in <u>Section 9.4(a)(i)</u> at least thirty (30) days prior to the filing of any such Tax Return. Seller shall consider in good faith and not unreasonably fail to reflect any changes reasonably requested by Purchasers with respect to such Tax Returns. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this <u>Section 9.4</u> is otherwise reflected as an adjustment to Purchase Price, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this <u>Section 9.4(a)</u>.

(b)    Purchasers shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.4(a)</u>. With respect to any Straddle Period, Purchasers shall provide Seller with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchasers shall consider in good faith and not unreasonably fail to reflect any changes reasonably requested by Seller with respect to such Tax Returns. Purchasers shall be responsible for paying any Taxes allocable to the portion of a Straddle Period after the Closing Date reflected on any Tax Return that Purchasers are obligated to prepare and

---

[10]    **<u>Note to Draft</u>**: This is subject to review of the schedule.

4894-0335-4158 v.56

file under this <u>Section 9.4(b)</u>. Seller shall be responsible for paying any Taxes allocable to the portion of a Straddle Period ending on the Closing Date, except to the extent any Seller Tax is otherwise reflected as an adjustment to Purchase Price.

(c)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in <u>clause (i)</u>, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchasers and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 5.1</u> and <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs

and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated pursuant to Section 5.25.4.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party. For the avoidance of doubt, the Parties agree that the delivery of any notices, demands or other communications hereunder shall not be deemed to be a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code.

Notices to Purchasers:

West Realm Shires Inc.
Alameda Research LLC
2000 Center Street, 4th Floor
Berkeley, CA 94704
Attention:    Ramnik Arora
              Can Sun
              Rahul Sharma
Email:        ramnik@alameda-research.com
              can@ftx.com
              rahul@ftx.us

with a copy to (which shall not constitute notice):

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention:    Andrew G. Dietderich
              Brian D. Glueckstein
              Mitchell S. Eitel
Email:        dietdericha@sullcrom.com
              gluecksteinb@sullcrom.com
              eitelm@sullcrom.com

Notices to Seller:

|_____|
|_____|
|_____|
Attention:       [_____]
Email:           [_____]

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:       Joshua A. Sussberg, P.C.
                 Christine A. Okike, P.C.
                 Christopher Marcus
                 Jonathan L. Davis, P.C.
                 Steve Toth
                 Eduardo M. Leal
                 Allyson B. Smith
Email:           joshua.sussberg@kirkland.com
                 christine.okike@kirkland.com
                 cmarcus@kirkland.com
                 jonathan.davis@kirkland.com
                 steve.toth@kirkland.com
                 eduardo.leal@kirkland.com
                 allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchasers and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Confirmation Order and consummation of the Plan, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchasers and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or Exhibits hereto may be (a) amended only in a writing signed by Purchasers and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third-Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the

48

Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Disclosure Statement will be deemed a disclosure against any representation or warranty set forth in this Agreement to which the relevance of such item is reasonably apparent on its face. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or Exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the

parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    <u>Complete Agreement</u>. This Agreement, together with any other agreements expressly referred to herein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets, the assumption of the Assumed Liabilities and the other Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12    <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchasers would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Party to remedy any breach of any representation or warranty of such Party made herein.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflict of laws principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I)

CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchasers, on their own behalf and on behalf the Purchaser Group and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchasers, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchasers pursuant to this Agreement or any other document or instrument delivered by Purchasers in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. Neither Seller nor Purchasers shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchasers or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which any Purchaser or Seller (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be

necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estates, subject to the terms and conditions set forth in this Agreement (including the payment of the Bid Protections when due and payable upon the terms set forth in this Agreement).

10.20    <u>No Solicitation</u>. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

## ARTICLE XI[11]

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>3AC</u>" means Three Arrows Capital, Ltd.

(b)    "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(c)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

---

[11]    **Note to Draft**: Applicable definitions to be updated to conform to Plan, as necessary.

(d)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(e)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise) to a purchaser or purchasers other than Purchasers or effecting any other transaction (including a Chapter 11 plan) the consummation of which would be substantially inconsistent with the Transactions.

(g)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(h)    "Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim.

(i)    "Bidding Procedures Order" means the Bankruptcy Court's *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(k)    "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, any other cash equivalents and Cryptocurrency not attributable to customer accounts on Seller's proprietary platform, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(l)    "Code" means the United States Internal Revenue Code of 1986.

(m)    "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of any Party; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by any Party in violation of this Agreement) generally available to, or

known by, the public, (ii) is independently developed by a Party without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party from a third party not known by such receiving Party after reasonable inquiry to be bound by a duty of confidentiality to such other Party with respect to such information.

(n)    "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan in a form reasonably acceptable to Purchasers and Seller, as may have been amended, supplemented or otherwise modified with the consent of Purchasers (such consent not to be unreasonably withheld, delayed, or conditioned), (ii) approving this Agreement and (iii) authorizing Seller to undertake the Transactions, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

(o)    "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(p)    "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(q)    "Cryptocurrency" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

(r)    "Cryptocurrency Loans" means loans made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector.

(s)    "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(t)    "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form, including, for the avoidance of doubt, all customer information, including "know your customer" information and applicable account positions or holdings, with respect to the Voyager Accounts.

(u)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(v)      "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(w)      "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(x)      "ERISA" means the Employee Retirement Income Security Act of 1974.

(y)      "Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(z)      "Final Order" shall mean an Order which has not been stayed (or with respect to which any stay has been lifted) and (i) as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari has expired and no appeal, motion, stay or petition is pending, or (ii) in the event that such an appeal or petition thereof has been sought, either (A) such Order shall have been affirmed by the highest court to which such Order was appealed or certiorari shall have been denied, and the time to take any further appeal or petition of certiorari shall have expired or (B) such appeal, motion, stay or petition shall not have been granted and shall no longer be pending and the time for seeking such appeal, motion, stay or petition shall have expired.

(aa)      "FTX Account" means a customer account opened by a Voyager Creditor with FTX.

(bb)      "GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

(cc)      "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(dd)      "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ee)      "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ff)     "IFRS" means the International Financial Reporting Standards.

(gg)     "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures, including all divisions, revisions, continuations, continuations-in-part, substitutes, re-examinations, extensions and reissues; (ii) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, social media accounts and identifiers, IP addresses, logos, symbols, assumed names, fictitious names, source of origin, trade dress, corporate names and Internet domain names, in each case, whether or not registered, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations, renewals and applications for any of the foregoing; (v) trade secrets and confidential or proprietary know-how, processes, ideas, schematics, business methods, formulae, drawings, prototypes, models, designs, data, databases, algorithms, customer lists and supplier lists; (vi) published and unpublished works of authorship, whether copyrightable or not (including data, databases, Software, Internet websites, content and other compilations of information); (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property rights, proprietary rights or industrial rights, in each case, arising in any jurisdiction of the world.

(hh)     "Knowledge of Purchasers" means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(ii)     "Knowledge of Seller" means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(jj)     "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(kk)     "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ll)     "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions

affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws; (vii) Effects in, arising from or relating to (A) the taking of any action expressly required by this Agreement or at the request of Purchasers or their Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchasers or Purchasers' plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii)  Effects that arise from any seasonal fluctuations in the business; (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items; or (x)  (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Plan or the Disclosure Statement, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; provided, however, that with respect to clauses (i), (ii), (iii), (iv), (v) or (vi), such Effects will not be excluded to the extent the same disproportionately affects the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

(mm) "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(nn) "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission Laws.

(oo) "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order).

(pp) "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case and past practice in light of the current pandemic, epidemic or disease outbreak.

(qq) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (iv) licenses granted on a non-exclusive basis to customers or end-users of Seller's products and services in the Ordinary Course, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets in any material respect, (vi) any Encumbrances set forth on Schedule 11.1(qq), and (vii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(rr) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(ss) "Personal Information" means any information that (i) identifies or can reasonably be used to identify an individual or (ii) that constitutes "personal information," "personal data," "nonpublic personal information," or any other equivalent term as defined under or otherwise protected by Privacy and Data Security Laws.

(tt) "Plan" means a plan of reorganization prepared by Seller and approved by Purchasers in its sole discretion and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable. The Plan shall be consistent with the August 15, 2022 Joint Proposal of FTX and Alameda to the Debtors, except as contemplated by this Agreement, and the Plan shall include provisions relating to all matters either party to this Agreement shall request, including, among other things, the treatment of claims and interests; the establishment of a litigation trust; the exculpation and release of Purchasers, Seller and other parties; the assumption or rejection of contracts; the administration of claims; the making of distributions; the implementation of the Transactions; the winding-up of the affairs of the Debtors; the modification of the Plan; and the retention of jurisdiction by the Bankruptcy Court and other legal and administrative matters.

(uu) "Plan Solicitation Motion" means Seller's motion for an Order (which shall be in form and substance reasonably acceptable to Purchasers), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information"

(as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory Contracts and unexpired leases under the Plan.

(vv)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(ww)    "Plan Supplement" has the meaning set forth in the Plan.

(xx)    "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(yy)    "Privacy and Data Security Laws" means any and all applicable Laws, rules, or regulations together with any guidance, decisions, determinations, orders, or associated binding judgments of any Governmental Body regarding privacy, cybersecurity or the Processing or protection of personal information or personal data, including, as applicable: the Gramm-Leach-Bliley Act and its implementing regulations; the GDPR and any national laws implementing the GDPR; and all applicable Laws or regulations requiring notification in connection with an Security Incident.

(zz)    "Privacy and Data Security Requirements" means all (i) Privacy and Data Security Laws, (ii) industry standards and practices such as the Payment Card Industry Data Security Standard, (iii) contractual obligations imposed on the Seller or its Affiliates and (iv) any policies, notices or representations published or adopted by the Seller or its Affiliates, whether internal or publicly available, in each case, to the extent related to privacy, cybersecurity or the Processing or protection of any Personal Information.

(aaa)    "Pro Rata Share" means, with respect to any Transferred Creditor, such Transferred Creditor's pro rata share of any distributions to Transferred Creditors in accordance with the Plan and as determined by Seller.

(bbb)    "Process" or "Processing" means any operation or set of operations performed, whether by manual or automated means, on Personal Information or on sets of Personal Information, such as the collection, use, storage, disclosure, analysis, deletion or modification of Personal Information.

(ccc)    "Purchaser Group" means Purchasers, any Affiliate of a Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(ddd)    "Retained Avoidance Action" means any Avoidance Action against (i) 3AC or any Affiliate, (ii) any insider as defined in the Bankruptcy Code or (iii) any other

4894-0335-4158 v.56

Avoidance Action that Purchasers agree in writing prior to the Closing may be retained by the Debtors.

(eee) "<u>Securities Act</u>" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(fff) "<u>Security Incident</u>" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(ggg) "<u>Seller Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by, or licensed exclusively to, Seller.

(hhh) "<u>Seller Parties</u>" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(iii) "<u>Seller Plan</u>" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(jjj) "<u>Seller Registered IP</u>" means all Seller Intellectual Property that is issued by, registered with, renewed by, or the subject of a pending application before any Governmental Body or Internet domain name registrar.

(kkk) "<u>Software</u>" means any and all computer programs, applications, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, and application programming interfaces, in each case, whether in source code, object code or other form or format, including libraries, subroutines and other components thereof, together with input and output formats, and all user manuals, instructions and other documentation relating to any of the foregoing.

(lll) "<u>Straddle Period</u>" means any taxable period that includes but does not end on the Closing Date.

(mmm) "<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar

61

ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(nnn)    "USD Wind-Down Reserve" means the amount estimated by the Debtors in good faith, and in consultation with Purchasers, to be appropriate ~~for~~to establish a reserve to ensure full funding of the winding up of the affairs of the Debtors and the closing of the Bankruptcy Case.

(ooo)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ppp)    "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(qqq)    "Transferred Creditors" means Voyager Creditors who have completed all documentation and "KYC" processes required by FTX in the ordinary course of FTX's business with respect to similarly situated clients and who have opened FTX Accounts as of the Closing Date.

(rrr)    "Transactions" means the transactions contemplated by this Agreement.

(sss)    "Voyager Account" means any active account at Seller that (i) contains Cryptocurrency or other investment assets or products or (ii) is held by any Person who has completed Seller's customary "KYC" processes.

(ttt)    "Voyager Creditor" means any Voyager Customer or other general creditor of the Debtors with an allowed claim under the Plan.

(uuu)    "Voyager Customer" means any Person who maintained a Voyager Account with Seller as of the Petition Date.

(vvv)    "Voyager Platform" means the Seller's proprietary mobile and web platform.

11.2    Index of Defined Terms.

| | | | | |
|---|---|---|---|---|
| Acquired Assets | 5 | Assigned Contracts | 6 |
| Acquired Cash | 6 | Assignment and Assumption Agreement | 13 |
| Acquired Cryptocurrency Loans | 6 | Assumed Liabilities | 8 |
| Agreement | 5 | Backup Bidder | ~~31~~30 |
| Alameda | 5 | Bankruptcy Case | 5 |
| Allocation | ~~45~~44 | Bankruptcy Code | 5 |
| Allocation Methodology | ~~45~~44 | Bankruptcy Court | 5 |
| Anti-Money Laundering Laws | 20 | Bid Protections | ~~28~~27 |

62

| | |
|---|---|
| Break-Up Fee | 28 |
| Cash Payment | 11 |
| Chosen Courts | 51 |
| Closing | 13 |
| Closing Date | 13 |
| Closing Date Payment | 12 |
| Collateral | 6 |
| COVID-19 Response | 35 |
| ~~Cryptocurrency Consideration~~ | ~~11~~ |
| CSA | 15 |
| Cure Costs | 9 |
| Currency Consideration | 11 |
| Dataroom | ~~24~~23 |
| Debtors | 5 |
| Deposit | 12 |
| Designation Deadline | 10 |
| Enforceability Exceptions | ~~16~~15 |
| Environmental Permits | ~~21~~20 |
| Escrow Agent | 12 |
| Escrow Agreement | 12 |
| Excluded Assets | 6 |
| Excluded Contracts | 7 |
| Excluded Liabilities | 9 |
| Expense Reimbursement | ~~28~~27 |
| Express Purchaser Representations | ~~27~~26 |
| Express Seller Representations | ~~24~~23 |
| Fair Market Value | 11 |
| FCPA | ~~20~~19 |
| Filed CSA Documents | 15 |
| Financial Statements | 17 |
| FTX | 5 |

| | |
|---|---|
| Fundamental Representations | ~~41~~40 |
| Holdings | 5 |
| Indebtedness | 33 |
| Information Presentation | ~~24~~23 |
| Initial Distribution | 12 |
| Initial Distribution Date | 12 |
| Initial Expense Reimbursement Payment | ~~28~~27 |
| ~~Initial Trading Credit~~ | ~~14~~ |
| Leased Real Property | ~~18~~17 |
| Material Contract | ~~18~~17 |
| Necessary Consent | 11 |
| OFAC | ~~20~~19 |
| Outside Date | 42 |
| Parent | 5 |
| Parties | 5 |
| Party | 5 |
| ~~Payment Period~~ | ~~15~~ |
| Petition Date | 5 |
| Purchase Price | 11 |
| Purchaser | 5 |
| Purchasers | 5 |
| Reference Date | 11 |
| Sanctions | ~~20~~19 |
| Seller | 5 |
| Stalking Horse Motion | 28 |
| Stalking Horse Order | ~~29~~28 |
| Successful Bidder | ~~31~~30 |
| Successor | 29 |
| Supplemental ~~Payment~~ | ~~15~~14 |
| Trading ~~Credits~~Credit | ~~14~~37 |
| Transfer Taxes | ~~45~~44 |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under IFRS consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and Exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise

specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall." The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (a) included in the Dataroom, (b) actually delivered or provided to Purchasers or any of Purchasers' Advisors or (c) made available upon request, including at Seller's offices.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)    Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

4894-0335-4158 v.56

(m)   A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

[*Signature pages follow*.]

4894-0335-4158 v.56

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**WEST REALM SHIRES INC.**

By: _____
Name:
Title:

**ALAMEDA VENTURES LTD.**

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

## EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

4894-0335-4158 v.56

**[EXHIBIT B**

**FORM OF ESCROW AGREEMENT]**