## Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
|  | : | Case No. 22-10943 (MEW) |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

-------------------------------------------------------------------x

<br>

## INVESTIGATION REPORT OF THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF VOYAGER DIGITAL, LLC

<br>

QUINN EMANUEL URQUHART & SULLIVAN, LLP

51 Madison Avenue, 22nd Floor
New York, New York  10010

*Counsel to the Special Committee of the Board of*
*Directors of Voyager Digital, LLC*

October 7, 2022

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.  Voyager Digital, LLC's principal place of business is 701 S Miami Ave, 8th Floor, Miami, FL 33131.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      EXECUTIVE SUMMARY OF THE SPECIAL COMMITTEE'S FINDINGS
AND CONCLUSIONS ................................................................................................1

II.     PROCEDURAL BACKGROUND ...........................................................................3

    A.      The Bankruptcy Filing ................................................................................3

    B.      Special Committee Appointment And Mandate ........................................4

    C.      Retention of Professionals ..........................................................................5

    D.      Stipulated Protective Order .........................................................................5

    E.      Discovery Conducted in Furtherance of Investigation .............................6

    F.      Coordination With the UCC ........................................................................7

    G.      Special Committee Meetings .......................................................................7

III.    RELEVANT FACTUAL BACKGROUND AND FINDINGS ...............................7

    A.      Voyager's Corporate Structure ...................................................................7

    B.      Voyager LLC's Directors & Officers ........................................................8

    C.      Voyager LLC Operating Agreement .........................................................12

        1.      Governance .....................................................................................12

        2.      Exculpation; No Modification of Fiduciary Duties ...................13

        3.      Indemnification Provision............................................................14

    D.      Voyager's D&O Insurance .........................................................................14

        1.      XL Specialty Insurance Company Management Liability Policy
(Primary) .......................................................................................15

            (a)      ███████ Exclusions to Coverage ..................................16

            (b)      Excess Layer Policies ........................................................17

        2.      XL Specialty Insurance Company Cornerstone A-Side
Management Liability Insurance Policy ....................................17

        3.      D&O Insurance Analysis...............................................................18

    E.      D&O Indemnification Agreements.............................................................18

    F.      Voyager's Business .....................................................................................19

        1.      Brokerage Services ........................................................................20

        2.      Custodial Services .........................................................................20

        3.      Lending Program ...........................................................................21

        4.      Staking ............................................................................................22

5.    Customer FBO Accounts .................................................................23

6.    ██████████████████████████████████.................................23

G.    Circumstances Leading to the Chapter 11 Cases ..................................24

1.    Terra Luna Collapse ......................................................................24

2.    3AC Collapse ................................................................................24

3.    The Gates .....................................................................................25

H.    Risk Committee ....................................................................................26

1.    Voyager Grows Its Lending Program and Kind Of Formalizes Its
Risk Committee .............................................................................26

2.    The Lending Diligence Process ......................................................27

3.    Lending Practices and Procedures ...................................................29

I.    The 3AC Loans .....................................................................................30

1.    Background of Relationship ............................................................30

2.    Due Diligence ...............................................................................30

3.    Loans Made under the 3AC MLA ..................................................35

4.    Relative Size of Loans to 3AC .......................................................36

5.    3AC's Participation in Equity Raise ...............................................37

6.    Re-Rating of the 3AC Loan ...........................................................38

7.    Voyager Recalls the 3AC Loan ......................................................38

8.    3AC Commences Liquidation Proceedings .....................................39

9.    3AC Loans from Other Lenders .....................................................40

J.    Other Loans Made by Voyager .............................................................41

K.    Customer Agreement ............................................................................42

██████████████████████.............................................................43

████████████████████████████████████.............................43

████████████████████████████████████████████.............46

██████████████████████████████████████████.................46

████████████████████████████████████████.......................47

M.    Intercompany Transactions and Insider Payments .................................49

1.    Intercompany Transactions .............................................................49

2.    Insider Payments ............................................................. 50

3.    Side-A D&O Insurance Policy ........................................ 50

IV.    LEGAL FRAMEWORK ........................................................... 50

A.    Note on Claims Considered ...................................................... 50

B.    Choice of Law ......................................................................... 51

C.    Applicable Breach of Fiduciary Duty Law ............................... 51

██████████████████████ ....................................... 52

████████████████████████████ ........................... 52

███████████████████████████ ............................. 55

█████████████████████████████████████ ........... 56

██████████████████████████████████████████ ... 58

V.    CONCLUSIONS AND RECOMMENDATIONS ...................... 59

████████████████████████████████████████████ ... 59

███████████████████████████████████████████ ..... 60

█████████████████████████████████████ ............. 60

D.    Cost-Benefit Analysis ............................................................. 61

1.    Litigation of These Claims Will Be Costly .................... 61

2.    Limited Potential Sources of Recovery .......................... 61

3.    Officers May Have Indemnification Claims Against the Estate ... 62

████████████████████████████ ............................. 62

I.    **EXECUTIVE SUMMARY OF THE SPECIAL COMMITTEE'S FINDINGS AND
CONCLUSIONS**[1]

Voyager Digital, LLC ("Voyager LLC" and with its affiliates, "Voyager" or the
"Company") is a cryptocurrency brokerage that allows customers to buy, sell, trade, and store
cryptocurrency on its platform.  Voyager was founded in 2018 by a group of financial and tech
entrepreneurs, with the stated purpose of bringing "choice, transparency, and cost efficiency to
cryptocurrency investors and was designed to be 'accessible to all' by focusing on the needs of
retail investors."[2]  Within 4 years, Voyager's platform evolved into a brokerage with 3.5 million
users and more than $5.9 billion of cryptocurrency assets held.

Voyager makes money by brokering and/or executing cryptocurrency trades between its
customers and exchanges and liquidity providers, and retaining all or a portion of the spread
between the price quoted to the customer and the ultimate executed trade price.  In order to
attract and retain customers, Voyager offers its customers "rewards," comprising issuance of its
own proprietary Voyager token and, to a greater degree, "payment-in-kind" interest on customer
coins deposited on Voyager's platform.

Voyager funded its customer Rewards Program through yield-generating activities;
namely, lending large amounts of its customers' cryptocurrencies to third parties at varying
interest rates, as well as "staking" its customers' cryptocurrencies.  As Voyager's customer base
quickly expanded, Voyager needed to identify and lend to additional and larger lending
counterparties in order to continue to fund the Rewards Program which, even then, was a loss-
leader.

Meanwhile, the Company itself was experiencing dramatic growth.  What began as an
operation based out of a 15-seat WeWork co-working space in Manhattan with a handful of
employees exploded into company with approximately 350 employees. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

Beginning in May 2021, Voyager added to its legal department by hiring David Brosgol
to serve as General Counsel, Manisha Lalwani to address regulatory legal issues, and David Brill
to focus on corporate legal issues.  Additionally, through 2021 and 2022, Voyager attempted to
formalize existing processes.  For example, prior to 2021, lending risks were discussed on an
informal basis among a handful of members from Voyager's management, treasury, and finance
teams, including CEO Stephen Ehrlich and the Company's then-CFO, Evan Psaropoulos, Chief
Operating Officer, Gerard Hanshe, and Treasury Director, Ryan Whooley, but by fall of 2021, an
effort was underway to establish a more formal "Risk Committee."  And lending guidelines were
being introduced—such as the amount of Voyager's assets on platform that could be loaned out

---

[1]    Capitalized terms not otherwise defined in Section I have the meanings given to them herein.

[2]    *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter
11 Petitions and First Day Motions* (Dkt. No. 15) ("First Day Decl.") ¶ 19.

at any one time, as well as caps on loan amounts based on the assets of each borrower—although these guidelines were characterized more as "soft" rules and were not strictly followed. The guidelines developed over time and the Risk Committee was not formally established by charter until May 4, 2022.

Meanwhile, in early March 2022, Voyager entered into a master loan agreement with Three Arrows Capital Ltd. ("3AC"), a cryptocurrency hedge fund based in Singapore. Between March 8, 2022 and May 5, 2022, Voyager loaned 350 million USDC (at 9-10% interest) and 15,250 Bitcoin (at 2-3% interest) on an unsecured basis (the "3AC Loans")—which, as of the beginning of June 2022, represented a quarter of Voyager's total assets on platform.



At the same time, the crypto markets were experiencing significant volatility as a result of several macro factors, including concerns over inflation and the onset of hostilities in Ukraine. Then, in mid-May 2022, the value of Terra USD ("Terra") and its companion LUNA coin ("Luna") completely collapsed. Despite checking in with 3AC on several occasions, Voyager did not learn of 3AC's significant exposure to Luna until the middle of June 2022, shortly before Voyager attempted to recall the entirety of the 3AC Loans. 3AC did not repay any portion of the loans. Simultaneously, severe industry headwinds caused customers to seek to withdraw their assets from the Voyager platform. Despite limiting and then pausing customer withdrawals, Voyager was unable to save its business without filing for chapter 11 relief.

Contemporaneous with its chapter 11 filing, the Voyager LLC Board established the Special Committee to, among other things, investigate Voyager LLC's historical transactions, including the 3AC Loans. At the Special Committee's direction, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") has conducted a more than two-month investigation (the "Investigation") into the Voyager LLC estate's potential causes of action against its insiders arising from the 3AC Loans, or other business practices.

Upon consideration of the factual record developed over the course of the Investigation and research and analysis of relevant legal theories, Quinn Emanuel has concluded



While Voyager LLC may have non-frivolous claims against its officers, the costs of litigating these claims (including expert fees) will be significant.  There are D&O insurance policies providing up to $20 million of coverage; however, the officers will have first-priority access to those funds

Mr. Ehrlich monetized approximately $30 million worth of Voyager stock in 2021, albeit he asserts that all but $6 million of the shares were owned by others (primarily family members).  During the Investigation, several members of the Risk Committee confirmed they own some amount of cryptocurrency assets, which are held on Voyager's platform.

## II.    PROCEDURAL BACKGROUND

### A.    THE BANKRUPTCY FILING

Voyager LLC filed for chapter 11 relief on July 5, 2022 (the "Petition Date") in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[4]  Voyager LLC and its affiliated debtors and debtors in possession—Voyager Digital Holdings, Inc. and

---

[4]  *See Chapter 11 Voluntary Petition for Non-Individual* (Dkt. Nos. 1, 3)

Voyager Digital Ltd. (collectively, the "Debtors")—continue to operate their businesses and manage their properties under section 1107 of the Bankruptcy Code.

On July 19, 2022, the United States Trustee for the Southern District of New York appointed the UCC pursuant to section 1102 of the Bankruptcy Code.[5]  The UCC comprises seven individual customers of Voyager LLC.[6]  On July 22, 2022, the UCC selected McDermott Will & Emery LLP ("MWE") as its legal counsel and FTI Consulting ("FTI") to serve as financial advisor.[7]

## B.    SPECIAL COMMITTEE APPOINTMENT AND MANDATE

On July 5, 2022 the Board of Directors of Voyager LLC (the "Board"), by unanimous written consent (the "UWC"), established the Special Committee, comprising the two independent directors of the Board, Jill Frizzley and Timothy Pohl (the "Independent Directors").[8]

Pursuant to the UWC, the Board authorized and empowered the Special Committee to exercise all the powers and authority of the Board, and to act on behalf of the Board, to the fullest extent permitted under Delaware law and the Third Amended and Restated Limited Liability Company Agreement of Voyager LLC (the "Operating Agreement") with respect to the following matters:

> (a)    investigating any historical transactions, public reporting, or regulatory issues undertaken by Voyager LLC that the Special Committee deems necessary or appropriate, and the facts and circumstances surrounding such transactions;

> (b)    interviewing and soliciting information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by Voyager LLC that the Special Committee deems necessary and appropriate;

> (c)    requesting documentation and information regarding Voyager LLC's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager LLC that the Special Committee deems necessary and appropriate to review; and

---

[5]    *See Amended Appointment of Official Creditors' Committee* (Dkt. No. 106).

[6]    *See id.*

[7]    *See Application to Employ McDermott Will & Emery LLP as Counsel to the Official Committee of Unsecured Creditors of Voyager Digital Holdings, Inc., et al.* (Dkt. No. 317); *Application to Employ FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors of Voyager Digital Holdings, Inc., et al.* (Dkt. No. 318).

[8]    *See UWC at 1.*

(d)    performing any other activities consistent with the matters described in the
UWC or as the Special Committee or the Board otherwise deems necessary and
appropriate.[9]

The UWC further provides that the Special Committee has the sole authority to
prosecute, settle, or extinguish any and all claims and causes of action arising from the historical
transactions that are investigated by the Special Committee, and to retain advisors, including
legal counsel, financial advisors, or other consultants or experts to advise the Special Committee
(with (a)-(d), the "Special Committee Mandate").[10]

In addition to the establishment of the Special Committee, an independent director was
appointed to the board of directors of each of Voyager Digital Ltd. (Matthew Ray) and Voyager
Digital Holdings, Inc. (Scott Vogel).

C.    RETENTION OF PROFESSIONALS

On July 13, 2022, the Special Committee selected Quinn Emanuel to serve as special
counsel to Voyager LLC to provide independent advice to, and act at the exclusive direction of,
the Special Committee in connection with the Special Committee's Mandate.[11]  Voyager LLC
retained Quinn Emanuel pursuant to an engagement letter dated as of July 16, 2022.[12]  The
Bankruptcy Court approved Voyager LLC's retention of Quinn Emanuel as special counsel
pursuant to sections 327(e) and 328(a) of the Bankruptcy Code on August 4, 2022.[13]

The Debtors' financial advisor, Berkeley Research Group, LLC ("BRG") has provided
assistance to and performed analysis for Quinn Emanuel and the Special Committee throughout
the Investigation.

D.    STIPULATED PROTECTIVE ORDER

On August 23, 2022, the Debtors, the Special Committee, and the UCC entered into the
Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order")
pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded

---

[9]    *See id.* at 1-2.

[10]    *See id.* at 2.

[11]    *See Application to Employ Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to
Debtor Voyager Digital, LLC's Application for Entry of an Order Pursuant to 11 U.S.C. §§ 327(e) and
328(a) and Fed. R. Bankr. P. 2014, 2016 and 5002 Authorizing Employment and Retention of Quinn
Emanuel Urquhart & Sullivan, LLP as Special Counsel to Voyager Digital, LLC Effective July 13, 2022*
(Dkt. No. 125).

[12]    *See id.* at Ex. 1.

[13]    *See Order Pursuant to 11 U.S.C. § 327(e) and 328(a) and Fed. R. Bankr. P. 2014, 2016 and
5002 Authorizing Debtor Voyager Digital, LLC to Employ and Retain Quinn Emanuel Urquhart &
Sullivan, LLP as Special Counsel Effective July 13, 2022* (Dkt No. 242).

to "Confidential" and "Highly Confidential" discovery material.[14]  Given the unique features of the Debtors' Chapter 11 Cases, including that the Debtors have no material creditor constituency other than customers, whose interests are represented by the UCC, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties.[15]  The Bankruptcy Court entered the Protective Order on September 13, 2022.[16]

### E.    DISCOVERY CONDUCTED IN FURTHERANCE OF INVESTIGATION

The Special Committee's discovery efforts consisted of three primary methods of gathering information:    (a) interviews with Voyager's officers, director and employees; (b) review of documents produced by Voyager in response to document requests; and (c) research of publicly available information.

The interviews, while not transcribed, were attended by at least two Quinn Emanuel attorneys, with at least one attorney tasked with taking meticulous notes.  A total of 12 interviews were conducted with the following individuals on the following dates:

| Name | Title | Date of Interview |
|---|---|---|
| David Brill | Deputy General Counsel; Risk Committee Member (non-voting) | Sept. 14, 2022 |
| David Brosgol | General Counsel; Risk Committee Member | Sept. 1, 2022 |
| Jonathan Brosnahan | Treasurer; Risk Committee Member (non-voting) | Aug. 31, 2022 |
| Stephen Ehrlich | Chief Executive Officer; Risk Committee Chair | Sept. 12, 2022 |
| Gerard Hanshe | Chief Operating Officer; Risk Committee Member | Sept. 8, 2022 |
| Marshall Jensen | Head of Corporate Development; Risk Committee Member | Sept. 8, 2022 |
| Pam Kramer | Chief Marketing Officer | Sept. 9, 2022 |
| Manisha Lalwani | Counsel – Regulatory | Sept. 6, 2022 |
| Ashwin Prithipaul | Chief Financial Officer (since May 2022); Risk Committee Member | Sept. 6, 2022 |
| Evan Psaropoulos | Chief Commercial Officer; Chief Financial Officer (prior to May 2022); Risk Committee Member | Sept. 13, 2022 |
| Brian Silard | Operations Data Analyst | Aug. 31, 2022 |
| Ryan Whooley | Treasury Director and Product Manager; Risk Committee Member (non-voting) | Sept. 7, 2022 |

---

[14]    *See Notice of Presentment of Common Interest Confidentiality Stipulation and Protective Order* (Dkt. No. 342) at Ex. A.

[15]    *See id.* ¶ 6.

[16]    *See Common Interest Confidentiality Stipulation and Protective Order* (Dkt. No. 408).

In addition to these interviews, Quinn Emanuel attorneys attended two two-hour videoconferences with Evan Psaropoulos, Ryan Whooley, BRG, the Debtors' general restructuring counsel, Kirkland & Ellis, LLP ("Kirkland"), MWE, and FTI regarding Voyager's staking program (discussed below).

The Special Committee also requested documents and information responsive to approximately 30 separate requests.[17]   Quinn Emanuel received and reviewed approximately 11,000 documents consisting of approximately 40,000 pages responsive to these document and information requests.

### F.    COORDINATION WITH THE UCC

From the outset of the Investigation, Quinn Emanuel coordinated closely with the UCC's professionals, MWE and FTI.  Specifically, Quinn Emanuel and MWE held three meetings concerning the Special Committee Mandate and/or the status and progress of the Investigation, and Quinn Emanuel invited MWE and FTI to sit in on—and ask questions during—the Special Committee's interviews of Voyager officers, director, and employees.  Additionally, Quinn Emanuel and MWE attended three joint meet-and-confers with Kirkland regarding the status of document discovery.

### G.    SPECIAL COMMITTEE MEETINGS

Through the course of the Investigation, Quinn Emanuel held five formal videoconference meetings with the Special Committee, in which Quinn Emanuel updated the Special Committee members on the status of the Investigation and the bankruptcy case.  The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories.  Additionally, the Special Committee attended a videoconference meeting with BRG concerning the Debtors' going-forward business plan.  These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general case trajectory including their sale efforts.

## III.    RELEVANT FACTUAL BACKGROUND AND FINDINGS

### A.    VOYAGER'S CORPORATE STRUCTURE

As set forth in the corporate structure chart below, Debtor Voyager Digital Ltd. currently owns, directly or indirectly, Voyager Digital Holdings, Inc. and Voyager LLC.  Voyager Digital Ltd. is a public company that has traded on the Toronto Stock Exchange since 2021 under the ticker "VOYG."[18]  As of the Petition Date, Voyager Digital Ltd. had approximately 196,000,000 shares of common stock outstanding, approximately 9.5% of which is held by Alameda Research

---

[17]    *See Special Committee's Initial Document Requests to Voyager LLC*, dated July 7, 2022; *Special Committee's First Supplemental Document Requests to Voyager LLC*, dated Aug. 1, 2022; *Special Committee's Second Supplemental Document Requests to Voyager LLC*, dated Aug. 10, 2022.

[18]    First Day Decl. ¶ 19.

Ventures LLC and Alameda Ventures Ltd. (together and with their affiliates, "Alameda") with
the remainder widely held by investors.[19]



### B.    VOYAGER LLC'S DIRECTORS & OFFICERS

Voyager LLC's directors and officers ("D&Os") are as follows:

| Stephen Ehrlich | Chief Executive Officer & Director |
| --- | --- |
| Gerard Hanshe | Chief Operations Officer |
| Pam Kramer | Chief Marketing Officer |
| Ashwin Prithipaul | Chief Financial Officer |
| Michael Legg | Chief Communications Officer |
| Evan Psaropoulous | Chief Commercial Officer |

---

[19]    *Id.* ¶ 36

| Daniel Constantino | Chief Information Security Officer |
| Rakesh Gidwani | Chief Technology Officer |
| Mark Egert | Chief Compliance Officer |
| Janice Barrilleaux | Chief Administrative Officer |
| Timothy Pohl | Independent Director (Post-Petition) |
| Jill Frizzley | Independent Director (Post-Petition) |

As noted above, Quinn Emanuel conducted interviews with twelve individuals from Voyager, including many of the Company's officers. Background on the relevant interviewees is set forth below.

**Stephen Ehrlich, Chief Executive Officer and Director**. Mr. Ehrlich co-founded Voyager in 2018.[20] Previously, he was CEO at E*TRADE Professional Trading LLC, where he led the management buyout of the Lightspeed division, as a result of which he became CEO of Lightspeed Financial, LLC.[21] He holds an accounting degree from Franklin & Marshall College.[22] He is the CEO of Voyager LLC and is on the Board of Voyager LLC. Mr. Ehrlich also sits on the board of directors of Voyager Digital Ltd. Mr. Ehrlich holds roughly $90,000 to $100,000 worth of cryptocurrency assets on the Voyager platform.[23]

**Evan Psaropoulos, Chief Commercial Officer and former Chief Financial Officer**. Mr. Psaropoulos's career began in public accounting at PricewaterhouseCoopers LLP, then he transitioned to leveraged finance at Credit Suisse and to senior finance leadership roles at various public and private companies.[24] Mr. Psaropoulos joined Voyager in September of 2020. As CFO, Mr. Psaropoulos was responsible for the financial performance of the business; he monitored rewards inflows and outflows, and he was responsible for analyzing lending risks, including evaluating the credit risk of Voyager's borrowers.[25] His title was changed in May of 2022 to Chief Commercial Officer, when Ashwin Prithipaul was appointed to serve as CFO.[26] He holds a degree in Accountancy from John Carroll University and an M.B.A. from Cornell University and is a CPA.[27] Mr. Psaropoulos has a "few" hundred thousand dollars invested in crypto, all of which is stored on Voyager's platform.[28]

---

[20] *Id.* at Ex. M.

[21] *Id.*

[22] *Id.*

[23] Summary of Interview with S. Ehrlich ("Ehrlich") at 1.

[24] First Day Decl. at Ex. M.

[25] Summary of Interview with E. Psaropoulos ("Psaropoulos") at 2-3.

[26] *Id.* at 2.

[27] First Day Decl. at Ex. M.

[28] Psaropoulos at 2.

**Ashwin Prithipaul, Chief Financial Officer**.  Prithipaul started at Voyager only on May 16, 2022, after Psaropoulos assumed the role of Chief Commercial Officer.[29]  Previously, Mr. Prithipaul was appointed as CFO at DriveDigital LLC and Galaxy Digital Holdings Ltd., which the Company believed would be helpful from a regulatory standpoint.  As CFO of Voyager LLC, Mr. Prithipaul directly reports to the CEO, Mr. Ehrlich, and is charged with overseeing the financial health and financial statements of Voyager.[30]  On September 23, 2022, Voyager announced that Mr. Prithipaul "will depart from the Company after a transition period."[31]

**Gerard Hanshe, Chief Operating Officer**.  Mr. Hanshe joined Voyager in 2018 and became Chief Operating Officer in November 2020.  As COO, he is responsible for the data analysis and operations teams, and works closely with the customer service and treasury teams.[32]  Prior to joining Voyager, Hanshe practiced law and served as product manager, and data and business analyst for a large public legal services firm.[33]  Mr. Hanshe was also a professional trader, and principal of a direct access equities broker.[34]  He holds a law degree from St. John's University School of Law and finance and MBA degrees from Hofstra University.[35]  Mr. Hanshe has an undisclosed sum of crypto assets, all on the Voyager platform.[36]

**Pam Kramer, Chief Marketing Officer**.  Pam Kramer's duties include overseeing the brand, advertising, marketing, social media, and customer insights.[37]  Ms. Kramer joined Voyager in 2021.  She was previously Chief Product Officer and then Chief Marketing Officer at E*TRADE, CMO and General Manager of MarketTools/Zoomerang (now part of SurveyMonkey), and LendingClub's first CMO.  Ms. Kramer holds an M.A. in East Asian Studies from Cornell University and a B.A. in English Literature and Political Science from the University at Buffalo.[38]

**Marshall Jensen, Head of Corporate Development**.  Mr. Jensen joined the Voyager in late 2021 to focus on acquisition opportunities and lead strategic initiatives related to Voyager's expansion of its product offering and geographic reach.[39]  Mr. Jensen began his career as a corporate lawyer at Shearman and Sterling, then transitioned to traditional banking roles at

---

[29]   Summary of Interview with A. Prithipaul ("Prithipaul") at 2; Psaropoulos at 2.

[30]   Prithipaul at 2.

[31]       Press Release, *Voyager Announces CFO Departure*, Sept. 23, 2022, https://www.investvoyager.com/pressreleases/voyager-announces-cfo-departure/.

[32]   Summary of Interview with G. Hanshe ("Hanshe") at 1.

[33]   First Day Decl. at Ex. M.

[34]   *Id.*

[35]   *Id.*

[36]   Hanshe at 2.

[37]   First Day Decl. at Ex. M.

[38]   *Id.*

[39]   *Id.*

companies such as UBS and Fort Mason Capital. His first experience in the cryptocurrency industry began in late 2017, when he began working at Digital Asset Custody Company, Inc. ("DACC"), a start-up crypto custodian platform. There, he did financing and corporate development work, and established the company's initial infrastructure.[40]

**David Brosgol, General Counsel**. Mr. Brosgol has been Voyager's general counsel since he joined the Company in February of 2021. ███████████████████████████████████████████████████████████████████████████ Brosgol attended UVA Law School and after practicing law at Hogan & Hartson, he worked in-house at various financial firms, including as asset manager in alternative products; as General Counsel and Managing Director at hedge fund Maverick Capital; and as a manager and advisor at crypto company Anchorage.[43] He also cofounded DACC, which sought to become a leader in the custodial space for digital assets and was acquired by Bakkt.[44]

**Ryan Whooley, Treasury and Product Manager**. Mr. Whooley started at Voyager in 2019 after over eight years at Teneo, where he consulted on general corporate strategy, focusing on communications, data science, and the creation and sales of data projects.[45] At Voyager, Mr. Whooley oversees most of the operations that relate to customer crypto assets, including executing trades for customers and creating the trading product.[46] He is the point of contact for Voyager's trading partners and borrowers.[47] He is also active in the Company's custody operations and capital markets yield function (*i.e.*, lending and staking), which includes day-to-day check-ins with trading and lending partners.[48] Whooley has an undisclosed, but sizable, sum of crypto assets, all stored on the Voyager platform.[49]

**Jon Brosnahan, Treasurer**. Mr. Brosnahan joined Voyager in December of 2021. Brosnahan's responsibilities include overseeing cash-related treasury and crypto processes.[50] He

---

[40]  *Id.*

[41]  *Id.*

██████████████████████████████████████████

[43]  First Day Decl. at Ex. M.

[44]  *Id.*

[45]  Summary of Interview with R. Whooley ("Whooley") at 1.

[46]  *Id.*

[47]  *Id.*

[48]  *Id.*

[49]  *Id.* at 2.

[50]  Summary of Interview with J. Brosnahan ("Brosnahan") at 1.

reports to the CFO, which until May 2022 was Mr. Psaropoulos.[51]  Mr. Brosnahan was tasked
with overseeing the diligence process for both new and existing borrowers.[52]

**Manisha Lalwani, Regulatory Counsel**.  Ms. Lalwani joined Voyager in August of
2021.[53]  Prior to joining Voyager, she worked at Bank of Montreal, where she focused on legal
issues related to crypto-based ETFs.[54]

**David Brill, Deputy General Counsel**.  Brill joined Voyager in March of 2021, and has
primarily focused on legal issues related to the commercial activities of the Company.[57]

### C.    VOYAGER LLC OPERATING AGREEMENT

Voyager LLC's Operating Agreement, which was originally entered into on January 23,
2018 (the "Original Operating Agreement"), has been amended and restated three times.

### 1.    Governance

At all relevant times, Voyager LLC was under the management and supervision of its
sole member, Voyager Digital Holdings, Inc. (the "Member"), and its day-to-day business was
conducted by officers, which were appointed by the Member.  Until the Operating Agreement
was amended in July 2022 to add a board of directors, the Operating Agreement provided that
the "powers of the Company shall be exercised exclusively by or under the exclusive authority
of, and the business and affairs of the Company shall be managed under the exclusive direction
and control of the Member."[59]  In other words, the Member was the manager of Voyager LLC,
and was serving the oversight role equivalent to a board of directors.  The Operating Agreement
also provides that the "Member may designate employees of the Company or such individuals as

---

[51]  *Id.*

[52]  *Id.*

[53]  Summary of Interview with M. Lalwani ("Lalwani") at 2.

[54]  *Id.*



[57]  Brill at 1-2.



[59]  First Amended and Restated Operating Agreement, dated May 28, 2021 (the "First A&R
Operating Agreement") § 4.1.

officers of the Company (the 'Officers') as it shall deem necessary or desirable to carry out the business of the Company."[60]

## 2.    Exculpation; No Modification of Fiduciary Duties

The Operating Agreement does not contain provisions modifying fiduciary duties. It does, however, contain an exculpation provision, relieving the specified parties from liability under certain circumstances. The list of exculpated parties and the breadth of the exculpation expanded in the course of amendments from the Original Operating Agreement. Under the Original Operating Agreement, only Officers and the Member were exculpated. Exculpation was limited to acts and omissions that did not result from willful misfeasance or gross negligence, with the exception of acts and omissions in reliance on the advice of counsel or an accountant, in which case such conduct would be fully protected.

The Operating Agreement was amended and restated on May 28, 2021. The exculpation provision was expanded to provide that the Member and its members, managers, directors, Officers, employees, and agents will not be liable to the Company or the Member for acts or omissions if, in good faith, such person determined that such conduct was in the best interests of the Voyager LLC. In addition, the exculpation provision provided that none of the exculpated parties would be liable if they rely in good faith on advice of professional advisors to Voyager LLC, unless an act or failure to act resulted from their willful misfeasance or gross negligence. Specifically, Section 4.6 of the First A&R Operating Agreement provides:

> The Member and its members, managers, directors, Officers,[61] employees and agents (collectively, the 'Representatives') shall not be liable to the Company for (a) the performance of, or the omission to perform, any act or duty on behalf of the Company if, in good faith, such Person determined that such conduct was in the best interests of the Company, (b) the termination of the Company and this Agreement pursuant to the terms hereof, and (c) the performance of, or the omission to perform, any act on behalf of the Company in good faith reliance on advice of legal counsel, accountants or other professional advisors to the Company, unless such act or failure to act resulted from their respective willful misfeasance or gross negligence. The Member and the officers may consult with counsel and accountants in respect of Company affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants.[62]

---

[60]  *Id.* at § 4.2(a).

███████████████████████████████████████████████████████████

[62]  *Id.* at § 4.6

███████████████████████████████████████

There were two subsequent amended and restated Voyager LLC Operating Agreements, neither of which altered the exculpation provision, except that the most recent amended and restated Voyager LLC Operating Agreement, dated July 4, 2022, added Directors to the list of exculpated parties at the same time that the Directors were added as the governing body of Voyager LLC.

### 3.    Indemnification Provision

In addition to exculpation, the Operating Agreement indemnifies the same individuals, except for "fraud, willful misconduct, or gross negligence."[64]   Specifically, Voyager LLC, its receiver or its trustee:

> shall indemnify, defend and hold the Member (and its Representatives) harmless from and against any expense, loss, damage or liability incurred or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of such Person on behalf of the Company, and amounts paid in settlement of any of the foregoing, provided that the same were not the result of fraud, willful misconduct or gross negligence on the part of the Person against whom a claim is asserted. The Company shall advance reasonable attorneys' fees and other costs and expenses incurred by the Member and the officers in connection with the defense of any pending or threatened action or proceeding which arises out of conduct that is the subject of the indemnification provided hereunder, subject to the agreement of the Member or officer, as the case may be, to reimburse the Company for such advance to the extent that it shall finally be determined by a court of competent jurisdiction that the Member or officer was not entitled to indemnification under this Section[.][65]

### D.    VOYAGER'S D&O INSURANCE

As detailed below, Voyager Digital Ltd. purchased a primary insurance policy and one excess layer of coverage along with a Side-A Policy for a total available limit of $20 million applicable to the claims that are the subject of the Investigation.   However, the putative

---

████████████████

[64]   Operating Agreement § 4.7.

[65]   *Id.*

defendants will have first-priority access to apply those funds to their defense costs ████████████
████████████████████████████████████████████████████████████████████████████████

### 1.    XL Specialty Insurance Company Management Liability Policy (Primary)

XL Specialty Insurance Company Policy Number ELU181214-22 provides Executive and Corporate Securities Liability insurance (the "Management Liability Policy" or the "Policy") to the Named Insured, Voyager Digital Ltd. and its subsidiaries as defined by the Management Liability Policy.  It has effective dates of February 22, 2022 to July 1, 2023[67] and a maximum aggregate limit of $5 million, including all Defense Expenses as defined by the Management Liability Policy.

The Management Liability Policy provides coverage only to Insured Persons[68] under the Policy and all coverages that would otherwise be available to the Company[69] (defined to include Voyager LLC) have been deleted by endorsement. ████████████████████████████████████

Specifically, the Policy provides:  "The Insurer shall pay on behalf of Insured Persons Loss[70]
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[67]    The Policy Period was extended by endorsement from February 22, 2023 to July 1, 2023. Management Liability Policy, Endorsement No. 40.

[68]    "Insured Persons" is defined to mean, among other things:

(1)    Any past, present or future natural person director or officer, or member or manager of the board of managers, of the Company and those persons serving in a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States;

(2)    Any past, present or future natural person employee of the Company (other than an individual described in (J)(1) above) to the extent any Claim is: (a) a Securities claim, or (b) made and maintained against both such employee and an Insured Person as defined in (J)(1) above . . . .

*Id.* § (II)(J) (as amended by Endorsement No. 28).

[69]    "Company" is defined as "the Parent Company and any Subsidiary created or acquired on or before the Inception Date set forth in Item 2 of the Declaration or during the Policy Period, subject to General Conditions VI(D).  The term Company shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction."  The term "Company" expressly includes Voyager LLC by endorsement.  *Id.* § II(D) & Endorsement No. 5.

[70]    "Loss" is defined as "damages, judgments, settlements pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law)

resulting from a Claim[71] first made against the Insured Persons during the Policy Period . . . for a Wrongful Act[72], except to the extent such Loss is paid by any other Insurance Program or as indemnification from any source."[73]

### (a)        ██████ *Exclusions to Coverage*

Even though the Policy includes an insured versus insured exclusion, the "DIP Insured v. Insured Endorsement" provides that the insured versus insured exclusion "will not apply to a Claim brought in the name or on behalf of the Company as a debtor-in-possession against an Insured Person and which Claim is made and continuously maintained without the solicitation, assistance, participation or intervention of an Insured Person."[74]



---

that any insured is legally obligated to pay and Defense Expenses, including that portion of any settlement which represent the claimant's attorneys' fees." *Id.* § II(O) (as amended by Endorsement No. 14).

[71]    "Claim" is defined to mean, among other things, "any civil, criminal, administrative or regulatory proceeding commenced by: (a) service of a complaint or similar pleading. . . ." *Id.* § II(C). As such, an action against Insured Persons will be considered a Claim under the Management Liability Policy.

[72]    "Wrongful Act" is defined to mean, among other things, "[a]ny actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person while acting in his or her capacity as such or due to his or her status as such . . . ." *Id.* § II(U)(1). By endorsements, the definition of Wrongful Act is amended to include wrongful conduct by an Insured Person "while acting in his or her capacity as a Selling Shareholder" or "Controlling Person." *Id.* at Endorsement Nos. 8 & 26. The definition of Wrongful Act is broad and the allegations against the Insured Persons should meet the definition of Wrongful Acts.

[73]    *Id.* § I(A) as amended by Endorsement No. 2.

[74]    *Id.* at Endorsement No. 12.

[75]    *Id.* § III(B)(3) (as amended by Endorsement No. 18).

███████████████████████████████████████

**(b)**    *Excess Layer Policies*

There is one excess layer above the primary Management Liability Policy, currently split between three insurers.

The excess layer of $5 million, which includes amounts paid for Defense Expenses, is in effect from February 22, 2022 to February 22, 2023 and is split between two policies:  (1) a policy issued by Certain Underwriters at Lloyd's of London and Associated Industries Insurance Company covering the first $2 million of the $5 million (the "Lloyd's Excess Policy"); and (2) a policy issued by Relm Insurance Ltd. covering the second $3 million of the $5 million (the "Relm Excess Policy").█

The Lloyd's Excess Policy and the Relm Excess Policy terminate on February 22, 2023 and the renewal policy is an XL Specialty Insurance Company Excess Policy with limits of $5 million.  This Policy, however, will not respond to any claims brought against individuals within the prior policy period to the extent those claims are brought prior to February 22, 2023.

**2.      XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy**

In addition to the Management Liability Policy and excess policies, XL issued a Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22 (the "Side-A Policy").  It has effective dates of July 1, 2022 to July 1, 2023 and an aggregate limit of liability of $10 million, which may only be applied to cover costs, including Defense Expenses, of the Insured Persons.[77]  It sits above the Management Liability Policy and the two excess policies as a second layer excess policy.

████████████████████████████████

████████████████████████████████████████████

---

[77]  "Insured Persons" means: "any past, present, or future director or officer, fiduciary, general counsel, member of the Board of Managers or any employed lawyers acting in their legal capacity(ies), of the Company and any person serving in a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States . . . ."  *Id.* § II(I).  "Company" in turn is defined to mean: "the Parent Company and any Subsidiary created or acquired on or before the inception date set forth in ITEM 2 of the Declarations or during the Policy Period, subject to CONDITION (C).  Company shall include the Parent Company or any Subsidiary as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code."  *Id.* § II(C).

### 3.    D&O Insurance Analysis



### E.    D&O INDEMNIFICATION AGREEMENTS

Voyager LLC, Voyager Digital Holdings, Inc., and Voyager Digital Ltd. have entered into separate indemnification agreements with officers and certain senior employees.  Some individuals entered into an indemnification agreement with only one entity, while others entered into separate indemnification agreements with multiple entities.  Voyager LLC and Voyager Digital Holdings, Inc. used the same form agreement, while Voyager Digital Ltd. used a different form of indemnification agreement.  Although there are differences between the two forms, in essence, both forms provide for indemnification of the officer/employee, unless the individual acts in bad faith.  One notable exception, however, is that if there is a settlement, the form used by Voyager LLC and Voyager Digital Holdings, Inc. provides for indemnification under all circumstances, without limitation, including all liability arising out of  "active or passive wrongdoing of the Indemnitee," unless it would be unlawful to indemnify.



Among the individuals who are party to an indemnification agreement with Voyager LLC are: Stephen Ehrlich; Evan Psaropoulos; David Brosgol; Pam Kramer; Gerard Hanshe; and Marshall Jensen.[81]

With respect to proceedings by or brought in the right of Voyager, LLC, the Voyager LLC indemnification agreement provides that the indemnitee is entitled to indemnification if:

> Indemnitee **acted in good faith and in a manner Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company**; provided, however, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such Expenses as the Court of Chancery of the State of Delaware or such other court shall deem proper.[82]

Finally, Voyager LLC is required to indemnify the indemnitee with respect to any settlement, even in connection with liability "arising out of the negligence or active or passive wrongdoing of the Indemnitee," unless it is unlawful to indemnify.[83]

## F.    VOYAGER'S BUSINESS

Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards, (iii) lending, and (iv) staking.[84]

All of Voyager's customer-facing services are accessible through a mobile application (the "Voyager App") that users can download on their smartphones and other smart devices.[85] Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement (the "Customer Agreement"), and can link their bank accounts or

---

[81]    As noted in Section III.C.3, Voyager LLC's Operating Agreement requires Voyager LLC to indemnify the Member and its members, managers, directors, Officers, employees and agents, except for "fraud, willful misconduct or gross negligence." *See* Operating Agreement § 4.7.

[82]    Voyager LLC Indemnification Agreement § 1(b) (emphasis added).

[83]    *Id.* § 2.

[84]    First Day Decl. ¶ 20

[85]    *Id.* ¶ 30

off-site cryptocurrency wallets to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's cryptocurrency on the platform.[86]

## 1.    Brokerage Services

Voyager operates as a cryptocurrency "agency broker," providing retail and institutional customers with access to its digital platform to buy and sell crypto assets across more than a dozen exchanges, liquidity providers, and market makers.[87]  The platform uses a dynamic router and customized algorithms to execute customer orders on one or more crypto exchanges, market makers or liquidity providers ("Exchanges") to efficiently buy or sell cryptocurrencies on behalf of its customers.  The platform is configured to (1) quote the average price for a crypto asset in the market, as delivered by a proprietary quoting service that aggregates Voyager's available liquidity and computes a price, and (2) use the smart order router to search all open Exchanges to find a better rate than the quoted price.[88]  The platform configuration is intended to provide customers with high quality trade execution (usually defined by the best prices, certainty of execution, reliability of the trading venue, and speed of execution).[89]

The majority of Voyager's revenue is derived from providing execution for customer-initiated orders to buy or sell crypto assets on the platform.[90]  Specifically, while Voyager does not charge a commission to its customers for effectuating a trade, Voyager does retain the spread between the price at which Voyager is able to obtain the specified coin, and the price quoted to the customer.[91]

## 2.    Custodial Services

Digital currencies deposited by customers are stored in Voyager's platform rather than individualized digital wallets.[92]  Cryptocurrency assets are commingled on an asset-by-asset basis and swept from Voyager's commingled wallet to a third-party custodial account that

---

[86]    *Id.*

[87]    *Id* ¶¶ 21-22.  The exchanges include Binance, FTX, Kraken, Coinbase, and Bitflex, among others.  *See* Hanshe at 2.  Liquidity providers include Jump, Galaxy, Wintermute, and Jane Street, among others.  *Id.*  Voyager preferred executing trades via liquidity providers because, unlike exchanges, they had no prefunding requirement.  *Id.*  Exchanges, on the other hand, required that Voyager maintain assets on the exchange platform ready to deploy to execute trades.  *Id.*  Voyager would then settle up with customers who had executed the trades.  *Id.*

[88]    *See* Hanshe at 2-3.

[89]    First Day Decl. ¶ 22.

[90]    Hanshe at 3.

[91]    *Id*.

[92]    First Day Decl. ¶ 23.

protects and secures keys to Voyager's cryptocurrency deposits.[93]    Voyager uses several
custodial accounts depending on the specific type of coin.[94]

In the second half of 2020, Voyager instituted a new program (the "<u>Rewards Program</u>")
that gave customers certain benefits for keeping their assets on-platform.[95]    The program, which
is similar to retail or restaurant loyalty programs, was instituted after Voyager personnel noticed
competitors instituting similar customer programs.[96]    The Rewards Program primarily consists of
three segments:    The first is a "refer-a-friend" incentive that would give customers a small
amount of Voyager tokens ("<u>VGX</u>"), a digital currency issued and administered by Voyager; the
second is a program that would allow customers to share in the spread made on their trades if
Voyager was able to execute at a price lower than the listed asking price; and the final—and by
far most important piece of the Rewards Program—was the interest or yield program, where
customers would be paid a yield, akin to payment-in-kind interest ("<u>PIK Interest</u>") on the coins
they deposit on Voyager's platform.[97]    Customers can earn up to 12 percent on certain digital
currencies, provided that such customers maintain a minimum monthly balance and keep their
assets on Voyager's platform.[98]

Voyager's management would set rewards rates for each coin based several factors,
including the market, company targets, estimated customer retention, and discussions with
individual customers.[99]    The rates were generally set on a monthly basis, though, at some time in
the second half of 2021, Voyager promised its customers that it would hold rates steady for the
remainder of the year.[100]    According to Mr. Psaropoulos, Voyager did a good job of staying
competitive with its rates, although they may have been too high in November and December of
2021.[101]

### 3.    <u>Lending Program</u>

Voyager began its lending program in 2020, at approximately the same time it launched
its Rewards Program, as the two went "hand in hand."[102]    Voyager would lend cryptocurrency
deposited on its Platform to third parties, and the yield generated was passed on to customers.[103]

---

[93]    *Id.* ¶ 31.

[94]    *Id.*

[95]    Whooley at 2; Ehrlich at 6; Hanshe at 3.

[96]    Whooley at 2; First Day Decl. ¶ 26.

[97]    Hanshe at 3.

[98]    First Day Decl. ¶ 24.

[99]    Hanshe at 3.

[100]    *Id.*

[101]    Psaropoulos at 2.

[102]    Hanshe at 3.

[103]    First Day Decl. ¶ 29.

The third parties paid Voyager a pre-negotiated interest rate that was payable in either cash or PIK.[104]    According to Voyager, its lending program "is an integral part of its business and necessary to provide customers with a meaningful return on their assets."[105]    According to Mr. Psaropoulos, if there were no Rewards Program, the Company would not be engaged in lending.[106]    The Customer Agreement explicitly discloses the nature of Voyager's lending program, including that loans to third parties may not be secured or collateralized, and that Voyager may not have the ability to return customer cryptocurrencies in the event of a borrower's default.[107]

### 4.    Staking

Voyager also "staked" cryptocurrencies on behalf of its customers.[108]    Staking is a way to earn passive interest on cryptocurrency by "staking" it on the blockchain for a fixed period of time during which such cryptocurrency cannot be withdrawn.[109]

Deposited cryptocurrency assets are used to verify transactions on the blockchain.    The "blockchain" is a digital technology that vets and certifies transactions through a complex mathematical process.[110]

Voyager makes staking easier for customers by staking the cryptocurrency they already have on Voyager's platform through the Voyager App, instead of transferring the cryptocurrency out and staking the cryptocurrency on their own.[111]    Pursuant to the Customer Agreement, customers participating in the Rewards Program consent to Voyager's authority to "stake Cryptocurrency held in an omnibus fashion through various blockchain protocols" and Voyager may "select[] which and how much cryptocurrencies are available for such staking and lending."[112]    Voyager's staking efforts were a key way to generate income for Voyager at a significantly lower risk than a traditional loan.

---

[104]    *Id.*

[105]    *Id.*

[106]    Psaropoulos at 2.

[107]    *See* Customer    Agreement,    updated    Jan.    7,    2022,    §§    5(D),    10, https://www.investvoyager.com/useragreement/.

[108]    First Day Decl. ¶ 28.

[109]    *Id.*

[110]    *Id.* ¶ 13.

[111]    *Id.* ¶ 28.

[112]    Customer Agreement § 10(A).

5.    **Customer FBO Accounts**

Voyager customers can fund their accounts on Voyager's platform by transferring their cash via Automated Clearing House ("ACH") or wire transfers from their personal banks account to two "for the benefit of" accounts (the "FBO Accounts") held at MC Bank.[113]

Pursuant to the Customer Agreement, "cash deposited in the Customer's Account is maintained in an omnibus account at [MC Bank] . . . .  Voyager maintains an agreement with [MC Bank] whereby [MC Bank] provides all services associated with the movement of and holding of USD."[114]   Additionally, the account services agreement between Voyager and MC Bank establishes that MC Bank is the holder of the FBO Accounts through which funds sent by customers are held.

6.



---

[113]   *See* First Day Decl. at Ex. A (Evidentiary Support for First Day Pleadings) ¶¶ 29-33.

[114]   Customer Agreement § 5(A).

[121]   *Id.* at 2.

### G.    CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASES

The first half of 2022 brought significant volatility—and declines—in both traditional and cryptocurrency markets.  Among the major cryptocurrencies that experienced significant declines in the first half of 2022 was Bitcoin, which slumped more than 37% in June 2022 alone and, as of the Petition Date, was down 60% for the year.[122]  Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew.[123]

### 1.    Terra Luna Collapse

Terra is an open-source blockchain protocol created by Terraform Labs.  Terra issues Luna, a cryptocurrency that is used to execute transactions on the Terra blockchain.  In early May 2022, Luna traded at approximately $86 and had a market capitalization of approximately $14 billion.[124]

Terraform Labs also issued Terra, an algorithmic stablecoin.  Historically, Terra traded at $1.  Terra maintained its "peg" to Luna via an arbitrage mechanism.  If Terra traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one Terra worth more than $1, netting the difference as profit.  If Terra traded below $1, arbitrageurs bought one Terra for less than $1 and exchanged it for $1 worth of Luna, netting the difference as profit.  These arbitrage trades push the price of UST back to $1.[125]

On May 7, 2022, $2 billion of UST was unstaked and immediately sold, moving UST's price down to $0.91.[126]  Upon seeing UST "de-peg," UST holders rushed to unstake and sell their coins, leading to a downward spiral.  Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna.  Within the span of one week, Luna's price fell from $82.55 to $0.000001.[127]

### 2.    3AC Collapse

The collapse of Luna had a significant effect on the cryptocurrency industry.  Cryptocurrency-focused hedge funds and other companies that owned Luna incurred losses on their position.  Some participants were unable to sell Luna under staking or other lock-up agreements, and as a result incurred up to a near total loss on their investment.[128]

---

[122]  First Day Decl. ¶ 43.

[123]  *Id.*

[124]  *Id.* ¶ 45.

[125]  *Id.* ¶ 46.

[126]  *Id.* ¶ 47.

[127]  *Id.* ¶ 48.

[128]  *Id.* ¶ 50.

In early June 2022, it was reported that 3AC may have incurred significant losses due to Luna's collapse. On June 15, one of 3AC's founders stated that the fund incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions.[129] On June 27, 2022, 3AC was ordered by a British Virgin Islands court to commence liquidation proceedings.[130]

As discussed below in greater detail, Voyager had entered into a number of third-party loans in order to fund yield on the assets customers stored with Voyager. 3AC was one of the largest of these third-party borrowers. Between March 8 and May 5, Voyager lent 15,250 Bitcoins ("BTC") and 350 million USD Coins ("USDC") to 3AC, all on a fully callable basis.[131] On June 13, 2022, Voyager made an initial request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of BTC and USDC by June 27, 2022.[132] 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loans.[133]

### 3. The Gates

On June 13, 2022, Celsius Network announced that it was raising the "gates" on account activity, pausing all account withdrawals and transfers due to what it referred to as "extreme market conditions."[134] Celsius's announcement triggered a further drop in the crypto markets.[135] Following this news, Voyager saw a significant uptick in customer withdrawals, putting additional strain on Voyager's business and risking its ability to serve customers who remained on its platform.[136] On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day in hopes that it would allow it to stabilize its business.[137] However, the crypto markets continued its downward trend, and on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.[138]

---

[129]    *Id.* ¶ 51.

[130]    *Id.*

[131]    *See* March 8, 2022 Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695 & 9696]; March 15, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695]; April 1, 2022 Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009615 & 9666]; May 5, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00014816].

[132]    Brill at 2.

[133]    First Day Decl. ¶ 56; Acceleration Notice and Notice of Default [PRIVILEGED-CONFIDENTIAL-VOYAGER-00006335].

[134]    *Id.* ¶ 62.

[135]    *Id.*

[136]    *Id.*

[137]    *Id* ¶ 63.

[138]    *Id.*

H.    **RISK COMMITTEE**

1.    **Voyager Grows Its Lending Program and Kind Of Formalizes Its Risk Committee**

Around the time that Voyager began its lending program in 2020, members of Voyager management and finance teams—Ehrlich, Hanshe, Whooley (and Evan Psaropoulos once he joined the Company)—began holding informal meetings to discuss the lending market.[139] During these discussions, the team would discuss counterparty credit risk.[140]

As Voyager's business grew quickly, Voyager began to put more formal processes in place. By mid-2021, David Brosgol, the Company's General Counsel, recommended that the Company establish a more formal Risk Committee.[141]

In the late summer or fall of 2021, Mr. Jensen put together a template on Excel to illustrate the types of questions that the Risk Committee may consider and how the Risk Committee would vote to approve borrowers.[143]    Following his arrival to serve as Treasurer in early 2022, Mr. Brosnahan drafted a Risk Committee charter in or about late March 2022.[145]  This charter was discussed by members of the Risk Committee but not approved by formal vote until May 4, 2022.[146]  While the Risk Committee had both voting and non-voting members, the Risk Committee only ever took one formal vote, and that vote was to approve the Charter.[147]

The composition of the Risk Committee from its more formal establishment in August 2021 through June 2022 was as follows:

---

[139]    Hanshe at 3.

[140]    *Id.*

[141]    Ehrlich at 3; Lalwani at 5; Brosgol at 4; Summary of Interview with Marshall Jensen ("<u>Jensen</u>") at 2; Hanshe at 4.

[143]    *Id.*

[145]    *See* Risk Committee Charter "Charter") [VOY-INV-00000177];

[146]

[147]    Psaropoulos at 5.

| Voyager Risk Committee Composition August 2021-June 2022 | | | |
|---|---|---|---|
| 8/24/2021 | 9/30/2021 | 3/1/2022 | 3/31/2022 |
| David Brill<br>David Brosgol<br>Steve Ehrlich<br>Evan Psaropoulos<br>Ryan Whooley | Lewis Bateman<br>David Brill<br>David Brosgol<br>Dan Constantino<br>Steve Ehrlich<br>Gerard Hanshe<br>Evan Psaropoulos<br>Ryan Whooley | Lewis Bateman<br>David Brill<br>David Brosgol<br>Jon Brosnahan<br>Dan Constantino<br>Steve Ehrlich<br>Gerard Hanshe<br>Marshall Jensen<br>Evan Psaropoulos<br>Ryan Whooley | David Brill<br>David Brosgol<br>Jon Brosnahan<br>Dan Constantino<br>Steve Ehrlich<br>Gerard Hanshe<br>Marshall Jensen<br>Evan Psaropoulos<br>Ryan Whooley |

As mentioned, not all members of the Risk Committee were so-called "voting members."  And, as noted, the Risk Committee has only ever taken one formal vote—the vote to approve its Charter.

### 2.    The Lending Diligence Process

The Risk Committee delegated the role of conducting diligence on lending counterparties to Messrs. Psaropoulos, Whooley, and Brosnahan (as of December 2021) (the "Diligence Team").[151]

---

[151]    Charter ¶ 2.

██████████████████████████████████████████████████████

Ostensibly, the Diligence Team would conduct the on-boarding diligence process for potential new borrowers, and then report to the Risk Committee with their findings and recommendations.[156]  The diligence process included the following: (i) preliminary discussions with potential borrower concerning business strategy needs, rates, and/or lending parameters; (ii) the execution of a non-disclosure agreement and the exchange of written materials including Anti-Money Laundering Policies, incorporation documents, and financials; (iii) one or more formal diligence calls; (iv) completion of a due diligence questionnaire ("DDQ"); and (v) a review of public information concerning the potential borrower.[157]  Generally, if it became clear during the diligence process that the potential counterparty would not be a good borrower, the Diligence Team would not bring the prospective relationship to the attention of the full Risk Committee.[158]

With respect to the financial information Voyager received from potential counterparties, the type varied.  For example, Voyager received audited financials (*e.g.*, Genesis, Vertu), unaudited financials (*e.g.*, Galaxy, DV Chain); balance sheets (*e.g.*, Celsius, Bitgo), and/or income statements (Wintermute).  As discussed below, Voyager received a one-line NAV statement from 3AC.

Mr. Brosnahan would conduct ongoing diligence on current borrowers on a roughly quarterly basis.[159]  Based on information gleaned during the ongoing diligence of Celsius—██████████████████████████—the Company decided to end its lending relationship with Celsius and recall all outstanding loans to Celsius in February of 2022, purportedly because of issues Celsius was having with regulators and rumors of its high-risk investments.[160]

████████████████████████████████████████████████████████
████████████████████████████████████████

---

██████████████████████

[156]  Psaropoulos at 4; Whooley at 3-4.

[157]  Whooley at 3; Psaropoulos at 6-7.

[158]  *Id.*  According to Mr. Whooley, there were several such counterparties that Voyager rejected before the potential relationship was brought before the Risk Committee, including DV Chain and Babel Finance.  Whooley at 3.

[159]  Whooley at 4.

[160]  Brosgol at 6-7; Whooley at 5.

█████████████████████████████

### 3.    Lending Practices and Procedures

Once the Diligence Team finished its review and presented its recommendations to the Risk Committee, if the Company decided to go forward with a lending relationship, then it would execute a Master Loan Agreement ("MLA") with the given counterparty and begin lending coin pursuant to one or more separate term sheets.[162]    The lending documents operate such that the MLA contains the legal terms and conditions, such as rights and duties of the parties, but the term sheets contain the financial details of the loans.[163]

███████████████████████████████████████████████████████████
███████████████████████████████████████████    In consultation with its outside counsel, Paul Hastings, Voyager created a form MLA that contains all of the terms and conditions that Voyager would want.[166]    ███████████████████████████████████    Generally, the counterparty would review the form MLA and provide revisions, to which Voyager would either agree or object.[168]    In at least one instance, a potential lending relationship was scrapped because Voyager and the counterparty could not agree to MLA terms.[169]

For each individual loan, Voyager would enter into a term sheet with the borrower.    The term sheets contain the financial terms, such as the amount lent, the interest rate, and whether the loan was collateralized.[170]    The Risk Committee did not see or consider any of the term sheets— it was left to the "Finance Team" which consists of the same individuals comprising the Company's Diligence Team (i.e., Messrs. Psaropoulos, Whooley, and Brosnahan) to negotiate and execute term sheets.[171]    The Finance Team placed only two soft limits on the amounts they could lend:  (i) for any given coin, they could only lend 85% of the total amount of that coin that Voyager had on platform (subject to modification based on the liquidity and availability of the coin); and (ii) for any given counterparty, Voyager would only lend up to a notional amount equal to 25% of that party's NAV—but this was also subject to adjustment based on the facts and circumstances surrounding the loan in question.[172]    ████████████████████████████

---

[162]    Psaropoulos at 3.

[163]    See e.g., 3AC MLA [VOY-INV-00003432].



[166]    Id.

████████████████████████████████

[168]    Brill at 2.

[169]    Whooley at 3.

[170]    See e.g., March 15, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009674].

[171]    Whooley 3-4; Psaropoulos at 3; Jensen at 2-3.

[172]    Brosnahan at 3; Whooley at 3; Psaropoulos at 4.

███████████████████████████████████████████████

## I. THE 3AC LOANS

### 1. Background of Relationship

3AC was a Singapore-based hedge fund founded in 2012 by Kyle Davies and Shu Zu.[175] Between 2015 and 2020, 3AC experienced rapid growth and extreme profitability, becoming known as a "behemoth" in the industry.[176] While individuals at Voyager were aware of 3AC's existence prior to 2022,[177] Voyager did not consider the prospect of doing business with 3AC until one of Voyager's investors suggested that the Company's management team seek out a relationship with them in early 2022.[178] Management then began an outreach campaign to get in touch with 3AC personnel.[179] They found success when Mr. Psaropoulos connected with Tim Lo, an employee at Tai Ping Shan Capital ("TPS")—an over-the-counter trading desk related to 3AC—through a mutual acquaintance in early 2022.[180] Through Mr. Lo, the relationship between Voyager and 3AC began to develop.[181]

### 2. Due Diligence

At the outset, it was clear to Voyager personnel that 3AC was interested in borrowing potentially large sums from Voyager.[182] ████████████████████████████████████ ███████████████████████████████████████████████ Thus, the Diligence Team quickly got to work onboarding 3AC as a lender.

---

████████████████████████

████████████

[175]  *Three Arrows Founders Break Silence Over Collapse of Crypto Hedge Fund*, Bloomberg, July 22, 2022, https://www.bloomberg.com/news/articles/2022-07-22/three-arrows-founders-en-route-to-dubai-describe-ltcm-moment.

[176]  *Id.*; Whooley at 3.

[177]  Brill at 2; Psaropoulos at 5

[178]  Psaropoulos at 5.

[179]  *Id.*

[180]  *Id.*

[181]  *Id.*

[182]  Whooley at 5.

████████████

The process began with an introductory call between Mr. Lo and Messrs. Psaropoulos and Whooley on February 7, 2022.[184]  During that call, Mr. Psaropoulos gave an overview of Voyager's business and Mr. Lo shared certain high-level information about 3AC's NAV and borrowing appetite.[185]  Specifically, Mr. Lo estimated 3AC's NAV to be $3.5 billion, and explained that 3AC was only interested in borrowing on an uncollateralized basis.[186]  On February 11, 2022, 3AC and Voyager signed a Mutual Non-Disclosure Agreement and the Finance Team held several more calls and correspondence with Mr. Lo, mostly concerning certain provisions of the MLA that 3AC wanted removed.[187]  The standard provisions in Voyager's form MLA that 3AC wanted changed were (i) the requirement to provide financial statements to Voyager and (ii) the provision giving Voyager consent rights over a change in control at 3AC.[188]

---

**To:** Evan Psaropoulos [epsaropoulos@investvoyager.com]; Ryan Whooley [rwhooley@investvoyager.com]; Brian Nistler [bnistler@investvoyager.com]; David Brill [dbrill@investvoyager.com]
**Cc:** Tim [Tim@threearrowscap.com]; Jonathan Yeung [jonathan@tpscap.com]
**From:** Tim Lo [timlo@tpscap.com]
**Sent on behalf of:** Tim Lo <timlo@tpscap.com>
**Sent:** Wed 2/16/2022 3:51:54 PM Eastern Standard Time
**Subject:** [EXT] TPS 3AC <> Voyager Digital - MLA Comments

Hi Evan, Ryan, David, Brian,

Hope all is well with you!

We took a look at your MLA and would like to request to move the clauses that are highlighted in red. We treat all lenders equally, and our usual MLA does not give a vote if we change ownership, and as communicated, we don't send financials to lenders either. In addition to this, please revise the jurisdiction to the British Vigin Islands ("BVI") and not New York.

---

With respect to the obligation to provide financial statements, Mr. Lo offered to send over an "NAV statement" in lieu of financials.[190]  The NAV statement was a one-page document on 3AC's letterhead summarily stating 3AC's NAV as of January 1, 2022 was $3.729 billion.[191]  The document follows:

---

[184]    Psaropoulos at 5.

[185]    *Id.*

[186]    According to Mr. Psaropoulos, NAV is a calculation of a company's assets less liabilities (*i.e.*, the company's equity value), and it is calculated mark-to-market.  *Id.*  Mr. Psaropoulos never verified that 3AC's NAV was calculated mark-to-market.  *Id.*

[187]    *Id.*; Whooley at 4.

[188]    *See* Feb. 16, 2022 Email from T. Lo to E. Psaropoulos [VOY-INV-0000006].

[190]    Psaropoulos at 7.

[191]    *See* Jan. 1, 2022 NAV Statement [VOY-INV-00000451]:

---

**AUM Letter**                                                    PRIVATE & CONFIDENTIAL

**Three Arrows Capital Ltd. (the "Company")**

1-January-2022

To Whom It May Concern,

We confirm the following for Three Arrows Capital Ltd as at 1-January-2022 in millions of USD.

**NAV 3,729**

On behalf of Three Arrows Capital Ltd:

_____

Kyle Davies
Director

---

Mr. Psaropoulos explained during his interview that he had experience with NAV statements before Voyager, and admitted that the one-page statement Voyager received from 3AC was "unusual" and "light" on information compared to others he has seen.[192]

On February 28, 2022, a diligence call was held between Voyager and 3AC.[193]   In attendance from 3AC were Kyle Davies and Tim Lo.[194]  The Voyager Diligence Team was in attendance, as were two members of the Company's legal team, David Brill and Brian Nistler.[195] During the call, the Diligence Team, led by Mr. Brosnahan, asked numerous questions about 3AC's business and financial health, and ascertained that 3AC: (i) manages only its founders' assets; (ii) was involved in some venture projects, like GBTC and Solana, but most of its venture activities involved small sums (*i.e.*, six figure investments); (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading (meaning 3AC had taken long positions on

---

[192]   Psaropoulos at 7.

[193]   Brosnahan at 4; Whooley at 4; Psaropoulos at 5-6.

[194]   Psaropoulos at 5.

[195]   *Id.*

BTC through traditional and synthetic investments); (iv) limits its own borrowing to 1x NAV; (v) would not take a position larger than 1-3% of circulation of any given alt-coin, to protect its liquidity; and (vi) does not provide financials to lenders because there was a prior incident in which they gave their balance sheet to BlockFi, who used information gleaned from the financial document to decipher 3AC's trading strategies and copied them.[196] During this February 28 call, 3AC did not discuss its investment in Luna.[197] ███████████████████████████

██████████████

There was a Risk Committee Meeting the next day, March 1, 2022, and the potential lending relationship with 3AC was one of the items discussed.[199]

> **Loan Book Risk Committee - Meeting Agenda 3.1.2022**
>
> Ryan Whooley <rwhooley@investvoyager.com>                           Tue, Mar 1, 2022 at 11:16 AM
> To: David Brill <dbrill@investvoyager.com>, David Brosgol <dbrosgol@investvoyager.com>, Dan Costantino <dcostantino@investvoyager.com>, Evan Psaropoulos <epsaropoulos@investvoyager.com>, Gerard Hanshe <ghanshe@investvoyager.com>, Jon Brosnahan <jbrosnahan@investvoyager.com>, Lewis Bateman <lbateman@investvoyager.com>, Marshall Jensen <mjensen@investvoyager.com>, Steve Ehrlich <sehrlich@investvoyager.com>
>
> **Loan Book Risk Committee**
> *Meeting Agenda 3.1.2022*
>
> - Lending & Staking Update
> - Three Arrows
> - Loan Thresholds
> - Diligence Reviews
> - New Counterparties
> - A.O.B.

Marshal Jensen and David Brill attended the meeting remotely, but all others members of the Risk Committee were in Voyager's WeWork office in New York City.[200] The meeting began with an overview of Voyager's current trading, lending, and staking positions, which was led by Mr. Whooley.[201] Then, Mr. Psaropoulos opened the discussion about 3AC by explaining the size and rate of the potential loans that 3AC was willing to borrow.[202] Then, Mr. Brosnahan walked through a summary of the diligence call that the Diligence Team conducted the night before, as well as the Diligence Team's overall impression of 3AC's creditworthiness, ████████████████████ ████████████████████████████████████████████████████████████

---

[196]   *Id.* at 5-6; Brosnahan at 4; Whooley at 4.

[197]   Psaropoulos at 6.

████████████████████████████

[199]   *See* March 1, 2022 Risk Committee Agenda [VOY-INV-00000454].

[200]   Psaropoulos at 6.

[201]   Whooley at 4.

[202]   *Id.*; Psaropoulos at 6.

████████████████████

During the
ensuing discussion, Mr. Ehrlich responded that is was not uncommon for hedge funds like 3AC
to take any and all steps to avoid sharing their trading strategies, and that he was not concerned
about the lack of financial statements.[206]

In the end, all
members of the Risk Committee were comfortable with taking 3AC on as a borrower.

It was particularly important to Mr.
Psaropoulos that Genesis was already a lender to 3AC.[210]  This was because Mr. Psaropoulos
was familiar with the rigorous diligence process that Genesis conducts when deciding to lend,
and the fact that 3AC passed Genesis' onboarding process, in his mind, was significant.[211]

According to Mr. Whooley, the Risk
Committee discussed implementing a credit limit upon 3AC equal to 25% of the amount set forth
in the January 1, 2022 NAV statement, roughly $930 million.[213]  It was also discussed that
Voyager would not lend the full that amount (*i.e.*, nearly $1 billion) immediately, but would
instead ramp up to that amount over the ensuing months.[214]

According to Mr. Whooley, the Finance Team envisioned that 3AC would become one of
Voyager's largest lending counterparties, "similar to Alameda."[215]  And, like their existing
relationship with Alameda, Voyager hoped 3AC would eventually become a trading counterparty
and an investor in Company.[216]  In fact, during the February 28, 2022, diligence call, Mr.

---

206  *Id.*; Ehrlich at 4; Brosgol at 6.

210  *Id.* at 6.

211  *Id.*

213  Whooley at 5.

214  *Id.*

Psaropoulos floated the idea of 3AC participating in a private placement that Voyager was pursuing.[217]  Voyager wanted 3AC to be an investor because such an investment from 3AC would not only align 3AC with Voyager by ensuring 3AC had "skin in the game," but it would also boost Voyager's reputation in the marketplace.[218]  For his part, Mr. Davies did not express any interest in investing in Voyager at the time, but the idea was revisited several months later.[219]

Additional diligence materials, including an organizational chart, incorporation certificates, an Anti-Money Laundering Policy, and a completed DDQ were sent to Voyager on March 3, 2022, ███████████████████████████████████████████████████████████ ███████████████████████████████████  The MLA was executed on March 4, 2022, with both the change in control and audited financial statement provisions stricken from the final document.[222]  The MLA did include a provision requiring 3AC to provide Voyager with a copy of its NAV statement, prepared in accordance with generally accepted accounting principles, upon Voyager's reasonable request, and at a minimum on a quarterly basis.

### 3.  Loans Made under the 3AC MLA

The first two loans made by Voyager to 3AC were issued on March 8, 2022, for 100,000,000 USDC at an interest rate of 9% and 2,750 BTC at an interest rate of 2%.[223]  On March 15, 2022, Voyager issued to 3AC an additional 100,000,000 USDC at interest rate of 9%.[224]  None of these loans were collateralized.

On March 23, 2022, Voyager received an updated NAV statement from 3AC, dated March 1, 2022.[225]  The updated statement showed that 3AC's NAV had dropped from $3.729 billion to $3.218 billion.[226]  Despite this precipitous drop in value, the Finance Team determined to lend an additional 150,000,000 in USDC at a rate of 8% ███████████████████ ███████████████████████████████  and 10,000 BTC at a rate of 2%.[227]  ██████████  the

---

[217]  Psaropoulos at 6.

[218]  *Id.*

[219]  *See infra* Section III.I.5.

███████████████████████████████████████████████████████████

███████████████████████████████

[222]  *See* 3AC MLA [VOY-INV-00003432].

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████

[225]  *See* March 1, 2022 NAV Statement [VOY-INV-00000129].

[226]  *Id.*

[227]  *See* April 1, 2022 Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009615 & 9666].

Finance Team was unconcerned about 3AC's drop in NAV as it tracked declines across the market.[228]  On May 5, 2022, Voyager issued its final loan to 3AC, for 2,500 BTC at a rate of 2%.[229]  Again, this loan was not collateralized.  After approving 3AC as a borrower, the Risk Committee was never subsequently consulted about the issuance of any of the loans to 3AC, nor was it presented with the term sheets.[230]  In general, Mr. Whooley would receive an in-bound request, and would discuss with Mr. Psaropoulos, and Mr. Ehrlich would ultimately determine whether to approve the specific loan.[231]

### 4.  Relative Size of Loans to 3AC

As of April 3, 2022, Voyager had assets on platform ("AOP") of $5.64 billion.[232]



---

[228] Psaropoulos at 7.

[229] May 5, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00014816].

[230] Psaropoulous at 3; Jensen at 2; Whooley at 4.

[231] Psaropoulos at 3, 4.

[232] Treasury Weekly Update, March 28-April 3 [VOY-INV-00000107].

Approximately two months later, on June 6, 2022, Voyager's AOP had dropped to $3.39 billion, ███████████████████████████████████████████ approximately 38% was on loan to 3AC (approximately $830 million) ███████████████████████████



### 5.    3AC's Participation in Equity Raise

In late May 2022, Voyager closed a private placement of 22,991,453 shares issued to various investors at $2.34 per share, for a total equity raise of $60 million.[237]   3AC participated in the private placement, but it only provided $1,999,998 in exchange for 854,700 shares.[238]   As noted above, Voyager was mostly interested in 3AC's participation in the private placement for the message it would send to the market, not as a lead investor for the raise.[239]

Around the same time as the equity raise, Mr. Ehrlich, and Voyager co-founder Phillip Eytan,[240] were approached by two parties that were interested in purchasing Voyager; however,

---

[237]   *See* Subscription Agreement [PRIVILEGED-CONFIDENTIAL-VOYAGER-00010550] at 6.

[238]   *Id.* at 4.

[239]   Jensen at 3.

[240]    Mr. Eytan has no role at Voyager LLC, but is on the Board of Directors of Debtor Voyager Digital Ltd.

Mr. Ehrlich was not looking to sell the Company, and would only entertain an offer to purchase Voyager for approximately $6 per share or $1.2 billion—well above Voyager's market capitalization.[241]

### 6.    Re-Rating of the 3AC Loan

Between May 9, 2022 and May 12, 2022, the value of Terra, and Luna crashed to almost zero.[242]



When Voyager learned about 3AC's potential exposure to Luna, Mr. Whooley reached out to Mr. Lo and was "told it was an insignificant loss for 3AC."[244]

However, the Finance Team ceased issuing further loans to 3AC, despite requests from 3AC to borrow more.[247]    Additionally, the crash of Terra and Luna had a tremendous effect on the crypto markets, and the Finance Team believed it would be appropriate to re-rate all of its outstanding loans.[248]    With respect to 3AC, Voyager rerated its outstanding USDC loans to 10% and its BTC loans to 3% on May 12 and 13, 2022.[249]

### 7.    Voyager Recalls the 3AC Loan

The week after the crash of Terra and Luna, Messrs. Psaropoulos and Whooley had dinner with Mr. Lo in New York City.[250]    At the dinner, the three of them spoke for several hours

---

[241]    Ehrlich at 6.

[242]    *See* Krizstian Sandor, Ekin Genç, *The Fall of Terra: A Timeline of the Meteoric Rise and Crash of UST and LUNA*, CoinDesk, Aug. 19, 2022, https://www.coindesk.com/learn/the-fall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-LUNA/

[244]    Psaropoulos at 7; Whooley at 5.

[247]    *See* May 20, 2022 Slack Message between R. Whooley & J. Brosnahan [PRIVILEGED-CONFIDENTIAL-VOYAGER-00000478].

[248]    Summary of Interview of B. Silard at 2-3.

[249]    *See* May 12, 2022 and May 13, 2022 Loan Refinance Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00005995 & 10827].

[250]    Psaropoulos at 7; Whooley at 5.

about 3AC's financial health.[251]  Mr. Lo informed Messrs. Psaropoulos and Whooley that 3AC's losses were limited to roughly $100 million, a number that was not concerning given the relative size of 3AC's NAV.[252]  Things between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius lowered its gates and paused withdraws.[253]  Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC.  On June 13, 2022, Mr. Psaropoulos held a Zoom call with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius.[254]

███████████████████████████████████████████████████████████████████

Mr. Psaropoulos immediately called Mr. Lo and was informed that Kyle Davies and Shu Zu had "gone dark" and that things "are in bad shape."[256]  Mr. Lo suggested that Voyager immediately recall its outstanding loans to 3AC.[257]  Mr. Psaropoulos asked Mr. Lo how much Voyager should recall, and the latter responded:  "All of it."[258]  Mr. Psaropoulos hung up and called Mr. Ehrlich to inform him.[259]  Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

3AC did not return any of the loaned amounts, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC.[260]

## 8.    3AC Commences Liquidation Proceedings

Following Voyager's notice of default and acceleration, 3AC was put into liquidation by a court in the British Virgin Islands.[261]  The liquidation is currently ongoing and is overseen by Joint Liquidators Russell Crumpler and Christopher Farmer of Teneo.[262]

---

[251]  Psaropoulos at 7.

[252]  *Id.*

[253]  *Id.* at 7-8.

[254]  *Id.* at 8.

███████████████████████████████████████████████████████████

[256]  Psaropoulos at 8.

[257]  *Id.*

[258]  *Id.*

[259]  *Id.*

[260]    *See* Acceleration Notice and Notice of Default [PRIVILEGED-CONFIDENTIAL-VOYAGER-00006335].

[261]    Serena Ng, Caitlin Ostroff & Vicky Ge Huang, *Crypto Hedge Fund Three Arrows Ordered by Court to Liquidate*, WSJ, June 29, 2022, https://www.wsj.com/articles/crypto-fund-three-arrows-ordered-to-liquidate-by-court-11656506404.

### 9.    3AC Loans from Other Lenders

According to the Affidavit of Russell Crumpler, Joint Liquidator of Three Arrows Capital Ltd, filed in 3AC's liquidation proceeding on July 9, 2022, 3AC owed the following amounts to parties other than Voyager:

| Counterparty | Aggregate Amount Outstanding | Aggregate Amount of Collateral |
|---|---|---|
| Equities First Holdings LLC | $162,059,500 | 6,500,000 GBTC |
| Tower Square Capital Limited | 158.95031466 BTC<br>13,206.76723 USDC<br>1,121,542.58188 Terra | N/A |
| Ashla International Inc | 500 BTC<br>10,000,000 Terra | N/A |
| Plutus Lending LLC | 10,000,000 USDC | N/A |
| Connor Zautke (Master Trade Agreement) | 12.7233 BTC<br>109.4143 ETH | N/A |
| Stephen Zautke (Master Trade Agreement) | 218.3534 BTC<br>1,735.3587 ETH | N/A |
| LuneX Ventures LP | 88 BTC | N/A |
| Kenrick Drijkoningen | 55 BTC<br>$250,000 | N/A |
| Play Future Fund Limited | $600,000 capital call | N/A |
| Banton Overseas Limited | 150 BTC<br>387 ETH | N/A |
| Moonbeam Foundation Ltd (liquidity consulting agreement) | 200,000 MOVR<br>10,000,000 GLMR | N/A |
| Moonbase One Ltd (assigned MLA) | 17,000,000 USDC | N/A |
| PureStake Ltd | 8,000,000 USDC | N/A |
| Livetree Community Ltd | $300,000<br>10,000 DOT | N/A |
| Onchain Custodian | 30.18386678 BTC | N/A |
| Singapore Biget Pte Ltd | $16,322,226 | $6,615,000 |
| SBI Crypto Co Ltd | 362.82191561 BTC | 506.69 ETH |
| 210K Capital, LP | 68.20101004 BTC | N/A |
| Hashkey Trading | 444,196.08 Terra | 69.21 BTC (accounted for in balance principal) |

---

[262]    Dietrich Knauth, *Three Arrows liquidators asks U.S. court to force crypto founders to cooperate*, Reuters, July 11, 2022, https://www.reuters.com/legal/litigation/three-arrows-liquidators-asks-us-court-force-crypto-founders-cooperate-2022-07-11/

| Counterparty | Aggregate Amount Outstanding | Aggregate Amount of Collateral |
|---|---|---|
| FalconX Ltd | $65,474,982.33 | N/A |
| Mirana Corp | $13,062,418.07 | $37,098,062.97 (accounted for in balance principal) |
| CoinList Services LLC | 35,000,000 USDC | N/A |
| DRB Panama Inc | 1300 BTC 15,000 ETH | N/A |
| Genesis Asia Pacific Pte Ltd | $2,360,302,065 | 2,125,794 shares of Grayscale Bitcoin Trust 446,928 shares in Grayscale Ethereum Trust 2,076,238 shares in Grayscale Bitcoin Trust 13,241,612 shares of Grayscale Bitcoin Trust 2,739,043.83 AVAX tokens 13,583,265 NEAR tokens |
| Arrakis Capital Ltd | 20,000,000 USDC | N/A |
| Celsius Network Ltd | 75,344,178.08 USDC | N/A |

While some of 3AC's loans from other parties were collateralized, as indicated above, most were under- or unsecured. ███████████████████████████████████

### J.    OTHER LOANS MADE BY VOYAGER

As of the Petition Date, Voyager LLC had loans outstanding to six other counterparties. Despite this, the loans to 3AC represented 57.8% of Voyager LLC's loan portfolio:



| Loan Counterparty | Amount Outstanding as of Petition Date (in USD) | Percentage of Total Amount of Loans Outstanding | Final Recall Date[267] |
|---|---|---|---|
| JUMP | $        13,551,142.40 | 1.2% | 7/7/2022 |
| Galaxy | 34,146,537.46 | 3.0% | 7/21/2022 |
| Wintermute | 27,812,995.66 | 2.4% | 7/21/2022 |
| Alameda | 385,264,936.66 | 33.9% | 9/6/2022 |
| Anchorage | 944,342.45 | 0.1% | 8/2/2022 |
| Genesis | 17,722,534.77 | 1.6% | 8/1/2022 |
| 3AC | 657,404,783.21 | 57.8% | N/A |
| **TOTAL** | **$      1,136,847,272.61** | | |

███████████████████████████████████

### K.    CUSTOMER AGREEMENT

The Customer Agreement governs Voyager's contractual relationship with its customers. The Customer Agreement has evolved since its first iteration in September 2018, when it was called a "User Agreement." The User Agreement contains the following language:

> I understand that my Voyager Account is self-directed. Accordingly, I appoint Voyager as my agent for the purposes of carrying out my directions to Voyager in accordance with the terms and conditions of this Agreement.[268]

The User Agreement also disclosed that Voyager was not a broker-dealer, nor a member of Financial Industry Regulatory Authority or Securities Investor Protection Corporation ("SIPC"), and that customers' cryptocurrency investments were not protected by either Federal Deposit Insurance Corporation ("FDIC") or SIPC insurance.

In October 2019, the User Agreement was amended to include a "Risk Disclosure" section, which disclosed that:

> We will lend, sell, pledge, rehypothecate, assign, invest, use, commingle, or otherwise dispose of funds and cryptocurrency assets to counterparties such as BlockFi, and we will use our commercial best efforts to prevent losses.[269]

---

[267]    A small number of termed loans to remain outstanding. Specifically, Voyager has a single loan outstanding to Galaxy for 50,915,978 HBAR (worth approximately $3,138,384.54) that matures on November 13, 2022, and two loans outstanding to Alameda for 50,000,000 USDC and 62,500 ETH (worth approximately $70,725,308.92) that mature on November 26, 2022 and November 28, 2022, respectively.

[268]    Original User Agreement [VOY-INV-00008206].

Additionally, the 2019 amendment added clearer customer consent language stating that Voyager could act as a custodian (but without using the term itself) to hold the cryptocurrencies in Voyager's name or in another name, and could "pledge, repledge, hypothecate, sell, lend, or otherwise transfer or use" such cryptocurrencies with "attendant rights of ownership."[270]

In April 2021, Voyager transitioned to a new, longer form Customer Agreement. A "Risk Disclosure" section was replaced with a longer "Account Funding; Regulatory Treatment" section with two relevant subsections: Customer Cash and Customer Cryptocurrency. The Customer Cash section incorporated more extensive FDIC-related disclosures, explaining that customer cash was commingled and protected only up to $250,000, and only against the failure of the holding bank, not of Voyager. Meanwhile, the Customer Cryptocurrency section contained extensive and explicit authorizations for Voyager to act as custodian and to delegate custodian functions to third parties in its discretion. The section also explained the uncertain effects of insolvency proceedings on customer cryptocurrencies, including that such effects may include the customer "being treated as an unsecured creditor and/or the total loss of all Customer Cryptocurrency."[271]

The April 2021 Customer Agreement also added disclosures regarding the Rewards Program (referred to as the "Interest Program" in the Customer Agreement) funded by Voyager's lending activities. Voyager disclosed that the loans made by Voyager to third parties may not be secured or collateralized, and that Voyager had no obligation or ability to return customer cryptocurrencies in the event of borrower's default; consequently, the Interest Program could result in total loss of customer cryptocurrencies.

The Customer Agreement also added an option for customers to opt out of the Interest Program.

The Customer Agreement was amended in November 2021 to include disclosures relating to staking.[272] The most recent version of the Customer Agreement, dated January 7, 2022, was amended to include additional disclosures regarding Voyager's relationship with MC Bank.[273]

---

[269] Oct. 2019 Amended User Agreement [VOY-INV-00008089].

[270] *Id.*

[271] Apr. 2021 Customer Agreement [VOY-INV-00008226].

[272] Nov. 2021 Customer Agreement [VOY-INV-00008059].

[273] Jan. 7, 2022 Customer Agreement (Operative) [VOY-INV-00007999].











## M.    INTERCOMPANY TRANSACTIONS AND INSIDER PAYMENTS

### 1.    Intercompany Transactions

The Debtors maintain business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (the "Intercompany Balances"). In the ordinary course of business, the Debtors make Intercompany Transactions to either (a) reimburse certain Debtors or non-Debtor affiliates for various expenditures associated with their business or (b) fund certain Debtors' or non-Debtor affiliates' accounts in anticipation of such expenditures as needed.[310]



In addition to the foregoing, Voyager LLC is listed on Debtor Voyager Digital Holdings, Inc.'s Schedule of Assets and Liabilities as a general unsecured creditor with a claim in the amount of $26,274,919.31. The basis of the claim is "intercompany" and the claim is *not* listed as contingent, unliquidated or disputed. The nature of the claim (*e.g.*, a loan) is not noted in the schedules. This claim is listed as a intercompany receivable asset on Debtor's Voyager LLC's schedules of assets and liabilities.[312]

---

[310]    *See Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related thereto, (C) Maintain Existing Business Forms, and (D) Continue to Preform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* (Dkt. No. 10), ¶ 37.

[312]    Debtor Voyager Digital Ltd. is also listed as a creditor on Debtor Voyager Digital Holdings, Inc.'s Schedules of Assets and Liabilities holding two (2) general unsecured claims in the amount of $8,329,942.60 and $2,132,044.79. These claims are also listed as "intercompany" and <u>not</u> listed as contingent, unliquidated or disputed.

### 2.    <u>Insider Payments</u>

The Statement of Financial Affairs of Debtor Voyager Digital Holdings, Inc. discloses that payments in the aggregate amount of $8,415,736.35 were made to insiders within the one year period prior to the Petition Date.[313]    The basis for the payments are listed as payroll, benefits, bonuses, director compensation, and expense reimbursement.  Of the foregoing amount, payments in the aggregate amount of $2,298,487.50 were made to Mr. Ehrlich, which includes a bonus payment of $1.9 million made on February 28, 2022.  A complete schedule of payments to insiders within one year of the petition date is listed within Attachment 4 to the Statement of Financial Affairs.



### 3.    <u>Side-A D&O Insurance Policy</u>

As noted above, the Company purchased the Side-A Policy for $10 million on July 1, 2022 (*i.e.*, on the eve of the chapter 11 filing), which would potentially be available to cover the insured D&Os' Defense Expenses and other costs.[316]    However, this contract may be voidable as a preference or fraudulent transfer—Quinn Emanuel's analysis on this issue is ongoing.[317]

## IV.    LEGAL FRAMEWORK

### A.    NOTE ON CLAIMS CONSIDERED

The Special Committee's Mandate includes an Investigation of Voyager LLC's potential estate claims and causes of action against its insiders, including claims arising from the 3AC Loan.

---

[313]    *Statement of Financial Affairs of Voyager Digital Holdings, Inc.* ("<u>SOFA</u>") (Dkt. No 312).

[316]    *See supra* Section III.D.2.

[317]    *CONFORMED TO REFLECT SUBSEQUENT ACTIVITY: ON NOVEMBER 3, 2022 (SEE ATTACHED CORRESPONDENCE)—QUINN EMANUEL SENT LETTER TO INSURERS NOTIFYING THEM OF POTENTIAL AVOIDANCE OF AMOUNTS RECEIVED AS SET FORTH IN DISCLOSURE STATEMENT.*

**B.**    **CHOICE OF LAW**



**C.**    **APPLICABLE BREACH OF FIDUCIARY DUTY LAW**





















## V.    CONCLUSIONS AND RECOMMENDATIONS







**D.    COST-BENEFIT ANALYSIS**

      **1.**      <u>**Litigation of These Claims Will Be Costly**</u>



      **2.**      <u>**Limited Potential Sources of Recovery**</u>



### 3.    Officers May Have Indemnification Claims Against the Estate



Dated: October 7, 2022

New York, New York

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani
Katherine A. Lemire
Kate Scherling
Zachary R. Russell
Meredith R. Mandell
Joanna D. Caytas
51 Madison Ave., 22nd Floor
New York, New York 10010

*Counsel to the Special Committee of the Board of
Directors of Voyager Digital, LLC*

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7200**

WRITER'S EMAIL ADDRESS
**susheelkirpalani@quinnemanuel.com**

November 3, 2022

<u>VIA E-MAIL AND CERTIFIED MAIL</u>

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT 06103
proclaimnewnotices@xlcatlin.com

XL Specialty Insurance Company
70 Seaview Avenue
Stamford, CT 06902

RE:    ***In re Voyager Digital Holdings, Inc.***, No. 22-10943 (Bankr. S.D.N.Y) –
**Cornerstone A-Side Management Liability Insurance Policy ELU184179-22**

Dear Sir/Madam:

We represent the Special Committee of Voyager Digital, LLC ("Voyager LLC") in connection with the chapter 11 case for Voyager LLC and its affiliated debtors Voyager Digital Ltd. and Voyager Digital Holdings, Inc. (together with Voyager LLC, the "Debtors") currently pending in the United States Bankruptcy Court for the Southern District of New York (jointly administered under Case No. 22-10943). Reference is made to that certain insurance policy ELU184179-22, entitled Cornerstone A-Side Management Liability Insurance Policy, issued on July 1, 2022 (the "Side-A Policy").

As you may know, the Debtors' chapter 11 cases have been moving expeditiously towards emergence from bankruptcy pursuant to which certain causes of action belonging to the Debtors will be retained and transferred to a wind-down entity. The Special Committee of Voyager LLC has been charged with investigating some of the causes of action that may be so retained and transferred for later prosecution or settlement for the benefit of creditors. As part of that effort, the Special Committee has worked collaboratively with the Official Committee of Unsecured Creditors and have identified potential causes of action against you in connection with the Side-A Policy.

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI |
MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY |
STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Specifically, we have investigated the Side-A Policy and believe that the Debtors' estates have actionable claims relating to the Side-A Policy, including without limitation, clawback as a fraudulent transfer or preferential payment.  Importantly, the Debtors purchased the Side-A Policy mere days before their bankruptcy filing, and the Side-A Policy's $10 million premium is 100% of the Side-A Policy's stated coverage.  Based upon these and other facts, we believe there are actionable claims in connection with the Debtors' purchase of the Side-A Policy.

Indeed, pursuant to Article 5.E of the *Debtors' Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (Dkt. No. 590) (the "Plan"), and as detailed in section VI.B.2.ii of the court-approved *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (Dkt. No. 591), upon confirmation of the Plan, the right to pursue avoidance actions related to the Side-A Policy will be explicitly preserved and transferred to a liquidating trust or other wind-down entity for the purposes of pursuing any and all recoveries available related to the Side-A Policy.

We write to make you aware of the potential for such litigation.  Should you, as insurer, make any coverage payments to any claimants under the Side-A Policy, such payments will be made at your own risk and would not relieve you of any potential liability to the Debtors' estates, including the potential clawback liability for the return of premiums paid for the Side-A Policy.

Sincerely,

Susheel Kirpalani

cc:    Darren Sonderman/CAC Specialty
        Darren Azman/McDermott Will & Emery LLP
        Joseph B. Evans/McDermott Will & Emery LLP
        John J. Calandra/McDermott Will & Emery LLP
        Michael B. Slade/Kirkland & Ellis LLP
        Kate Scherling/Quinn Emanuel Urquhart & Sullivan, LLP
        Zachary Russell/Quinn Emanuel Urquhart & Sullivan, LLP