Daniel Newsom
Pro Se Creditor
Georgia, USA

Jon Warren
Pro Se Creditor
Florida, USA


**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Voyager Digital Holdings, Inc, et al., [1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors | ) | (Jointly Administered) |
| | ) | |

_____


**NOTICE OF FILING OF OBJECTION OF UNSECURED CREDITORS TO 1) DEBTORS' MOTION FOR FINAL ORDER APPROVING THE AMENDED PURCHASE AGREEMENT AND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE APPROPRIATENESS OF THIRD PARTY RELEASES, 2) THE INADEQUACY OF THE PLAN TO MEET THE BANKRUPTCY FAIR AND EQUITABLE STANDARD FOR THE OUTCOME OF VGX, AND 3) THE APPOINTMENT OF THE PROPOSED WIND DOWN TRUSTEE, LEGAL COUNSEL AND EXISTING UCC MEMBERS.**

The above-captioned creditor (the "Creditors") state the following in support of this objection (this "Objection") to the Amended Purchase Agreement[2] (the APA) and Disclosure Statement[3]:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Third Amended Joint Plan of Voyager Digital Holdings, INC. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code: Doc 852

[3] Notice of Filing of Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 Bankruptcy Code: Doc 863

## PRELIMINARY STATEMENT

As noted in the *Motion for Appointment of a Chapter 11 Trustee* [Docket 941] by Movant, Michelle DiVita[4], "the Debtors have a history of financial statement inaccuracies and public misrepresentations that were known, or reasonably discoverable, at the beginning of the bankruptcy proceeding. Despite its pre-petition conduct, no party requested an appointment of an independent examiner. As such, Debtors self-appointed a committee for its investigation. Investigative findings from said committee only found culpability in a breach of duty of care in one of its loans. Thus, Debtors remained in control of the estate. As justification for Debtors' continued control and limited investigation, Debtors proposed an expeditious plan of sale of substantially all of its assets to its largest shareholder, borrower, and lender that would return a majority of cryptocurrency to customers shortly after its December 2022 confirmation hearing. However, the plan collapsed, a reasonably foreseeable outcome left by Debtors' repeated inability to conduct due diligence for the benefit of the estate. Unfortunately, customers are the ones left with claims against an estate that lost $100 million from repeated mismanagement."

In the *Motion for Appointment of a Chapter 11 Trustee* [Doc 941], there are substantial questions that have yet to be answered.  These answers could lead to additional valuable and colorful claims creditors may have against the directors and officers–or other third parties.  Based on the factual release of the investigation performed by the Special Committee, investigators did not identify, investigate or disclose explanations to many of the concerning questions raised in the motion made by Ms. DiVita [Doc 941]; such as, risk-shifting changes to the Customer Agreement,

---

4 MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE: Doc  941

financial statement inaccuracies, misleading public filings, criminal/illegal operations

(lack of proper licenses), potential fraudulent transfers not pursued by the Debtors or

UCC, basis for Ponzi determination, securities violations (the sale of unregistered

securities), and more.[5]  To avoid duplicative work, there will be minimal rehashing of

what has already been presented to the court for consideration by Ms. DiVita and other

regulatory agencies, with the exception of the submission of additional evidence to be

admitted for consideration relating to securities violations.

The professionals for both the Debtors and the UCC have stated throughout

these bankruptcy proceedings that their main objective is to maximize recovery for

creditors; in order to truly generate maximum recovery, the creditors ask that the court

considers the appropriateness of the releases in their entirety based on 1) the apparent

lack of investigation (and corresponding minimalistic consideration) regarding concerns

raised by the State Departments of Banking and Securities Boards, the SEC, Ms. DiVita

and many other creditors throughout the bankruptcy proceedings, and 2) the precedent

set forth in *In re Purdue Pharma, L.P.,* 2021 U.S. Dist. LEXIS 242236 (S.D.N.Y. 2021)

("*Purdue 2*"), where the court found that the bankruptcy code lacks the authority to

permit non-consensual releases for direct claims against non-debtors in non-asbestos

cases.

Additionally, creditors have raised concerns regarding an apparent conflict of

interest that exists between the UCC Chair, Jason Raznick, and the CEO, Stephen

Erhlich.  Creditors would like to ensure the court is aware of the existing relationship

between these two individuals and formally object to the appointment of his personal

attorney, Paul Hage, as the wind down trustee.  Specifically, creditors ask the court,

---

[5] MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE, pages  3-25: Doc 941

and/or UST, to appoint independent third parties to preside over the wind down trust, and
not the personal attorney of Mr. Raznick, McDermot, Will & Emery LLP as counsel to the
wind down trust, or current members of the UCC that are being named to serve as part
of the wind down trust.

Furthermore, the plan for VGX is inconsistent with the bankruptcy standard:
Plans can be confirmed as long as they do not discriminate unfairly, are fair and
equitable with respect to each class of claims or interests.[6]  However, the plan for VGX
does not rise to the standard of fair and equitable.

## BACKGROUND

1. Appropriateness of Releases

    a. To date, two investigations have been completed regarding the conduct of the
       directors and officers: the investigation performed by the Counsel to the Official
       Committee of Unsecured Creditors and the investigation performed by the
       Special Committee.  Both investigations found some level of wrongdoing
       surrounding the 3AC loan, but after the releases of the factual investigation
       performed by the Special Committee and the unredacted report provided by the
       UCC's counsel, neither investigation was exhaustive in their efforts to explore
       whether the broad releases were justified or the consideration provided sufficient.
       In fact, the Special Committee's disclosure prior to the order to release the full
       factual investigation left out viable claims committed by the directors and officers
       as discovered by the UCC's counsel (e.g. the purchase of an insurance policy, or
       better stated an "escrow policy," on the eve of bankruptcy).  Why they might have
       omitted certain facts is unclear.  But what is clear is that multiple potential

---

[6] 11 U.S.C. § 1191.

4

material claims were left unexplored, or undisclosed, in both investigations; including, but not limited to:

 i. The many concerning questions or allegations previously raised by the State Departments of Banking and Securities Boards, the SEC, Ms. DiVita and many other creditors throughout the bankruptcy proceedings.

 ii. The misleading or outright false statements made by the CEO, other directors and officers and marketing team that contradict the terms set forth in the customer agreement.

 iii. The fraudulent sale of unregistered securities: The Voyager Loyalty Program (or "Earn Program") and VGX.

  1. While the SEC has yet to formally seek the designation of VGX or the Earn Program as a security, the ability to pursue securities fraud matters to all creditors who were invested in VGX or the Earn Program, so they can pursue their actual claim–rescissionary damages–and not the claim resulting from the Debtors' bankruptcy petition.  The difference for many creditors can be hundreds of thousands of dollars.

  2. Voyager and its directors and officers have publicly rejected the security designation for VGX.  But if the organization and its directors and officers truly believed that VGX was simply a "rewards program" or utility token, why would Voyager through Mr. Erhlich and other directors and officers promote the token in a way that would lead investors to believe VGX **would grow in value based on the efforts of others in exchange for money**[7]?

---

[7] The Howey Test

a.  Consider the direct promotion of VGX by Mr. Ehrlich
emphasizing the secondary market trading potential of
VGX as if it were akin to stock in the company and not
airline miles or credit card rewards:  "Buy more.. [sic].. In
all seriousness, its undervalued like VYGR stock…so
many great things to come…we are excited," Stephen
Erhlich regarding VGX (from Telegram):



b.  Mr. Erhlich also promoted the token directly by posting or
retweeting tweets that celebrate VGX increasing
dramatically in price, and even urging investors to buy
more.  Here are just a few examples of many:







c.  The value of VGX was unequivocally based on the efforts
of others; specifically, Voyager and its directors and

officers.  Here is another one of the many promotional tweets Mr. Erhlich retweeted specifically discussing how the efforts of the Voyager marketing team will cause VGX to 3-5x in value:



2.  The current plan for VGX violates the bankruptcy code:

   a.  VGX does not have any underlying technology that would give the token value post consummation of the plan in the event the VGX Smart Contract is not sold.

   b.  While the code does not require that creditors within the same class must receive the same value, they must be able to take the same action, and, without the sale

of the VGX smart contract (and with the dissolution of Voyager), VGX account holders will be handed a worthless piece of digital code to be sold on the secondary market in attempt to race others to the finish line before the price drops to zero.

3. The apparent conflict of interest between Mr. Raznick and Mr. Erhlich and effectiveness of the UCC in general:

    a. Mr. Raznick has existing relationships with Mr. Erhlich and Kevin O'Leary (a major FTX ambassador).

    b. The chance exists for creditors to perceive that the relationship with Mr. Ehrlich may have influenced Mr. Raznick's decisions to not pursue third party causes of actions more decisively, and, as UCC chair, that he may have influenced other UCC members to do the same.

    c. The chance exists for creditors to perceive that the relationship with Mr. O'Leary may have influenced Mr. Raznick's vote during the original bid/auction process that led him to influence other UCC members and vote for FTX over Binance.

        i. Apparently the Debtor's counsel share the same concerns as the creditor body, as they have subpoenaed any Benzinga employees, and, specifically, Mr. Raznick, in their objection to Alameda's proofs of claim[8]:

    d. Binance.US apparently also shares concerns regarding the UCC's commitment to bankruptcy code, as the UCC was withheld from negotiations for the Binance.US transaction for "confidentiality concerns." Creditors were offered no

---

[8] DEBTORS' NOTICE OF SUBPOENA TO SAMUEL BANKMAN-FRIED, pages 7 and 17: Doc 971. The term "Benzinga.com" means the financial media outlet Benzinga.com, Benzinga-related entities, their predecessors in interest, and their past and present officers, directors, agents, servants, employees, and anyone else acting on its behalf or otherwise subject to their control, individually and collectively, including Jason Raznick.

explanation as to why, and are only left with the result that this deal was inferior
to Binance.US's original offer during the first bidding round.





i.

e.    Creditors can objectively determine that the UCC's chair and members have
been ineffective in their effort to maximize recovery for creditors based on the
facts; including, but not limited to:

    i.    Insiders and other third parties being released for minimal to no consideration despite evidence of wrongdoing in limited investigations.

    ii.    The UCC was withheld from negotiations for the Binance.US transaction and apparently did not take action to attempt to do their duty to represent creditor interests.

    iii.    The UCC has not objected to the exorbitant fees charged by professionals, and only through the efforts of pro se creditors and the UST, was action taken to curb depletion of the estate's funds, despite cost control measures being a primary function of the UCC.

    iv.    The professionals, by their own estimation, have cost the estate in excess of $100 million by failing to do proper due diligence on the FTX transaction, and yet the UCC is not objecting to releases that would prevent the estate from going after the professionals charging thousands of dollars an hour to do a thoroughly effective job.

f.    An example of concerns raised by creditors can be found in a *Letter to the Honorable Judge Wiles, January 9, 2023* [Doc 843]:[9]

    i.    "A significant number of creditors have lost faith in our existing UCC team as well as their chosen legal counsel. (See attachment 3). There are significant concerns about perceived conflicts of interest, as well as failure to communicate and engage with the creditor class, as well as failure to represent to the courts, creditor sentiments and wishes.

    ii.    Examples of perceived conflicts of interest:

        1.    Steve Ehrlich provides funds and/or public support (via his multiple LLCs; Crypto Trading Technologies, Honos Financial, Lightspeed Financial, Voyager) to Jason Raznick, via his wholly owned (at the

---

[9] Letter to the Judge, January 9, 2023, page3: Doc 843

time) Bezinga company (sponsoring Bezinga Global Small Cap
Conference, Bezinga List Maker Series, Bezinga FinTech Award).
These business relationships and engagements go back to at
least 2010, in addition to publicly referring to each other as friends.

2. Jason Raznick then requests/volunteers to be the Chairman of the
Unsecured Creditors Committee, responsible for overseeing
creditor fiduciary responsibility and overseeing the actions of
Steve Ehrlich and Debtors in Possession.

3. Jason Raznick then selects McDermott Will & Emory as legal
counsel representing the UCC committee, being paid millions of
dollars from creditor assets.

4. McDermott Will & Emory then sponsors/funds Jason Raznick
business, sponsoring Future of Crypto Conference Bezinga,
December 2022.

5. The creditors are appreciative of the efforts with internal meetings
the UCC committee invests their personal time in, but due to
potential for perceptions of the conflict of interests listed above, we
would request that once converted to Chapter 7, and Case
Trustee appointed, a revised UCC board is included in the
process.

iii.    In addition, McDermott has frustrated a significant portion of the creditor
class, by keeping us uninformed of their actions and not expressing
creditor sentiment to Judge Wile. For example, during the Kerp hearing,
Judge Wile ruled in favor of passing the KERP plan, after stating he had
not heard objections from creditors, and both Kirkland and UCC
supported it. Only the US Treasury office objected to it. But McDermott

failed to mention to the Court that the vast majority of polled creditors

objected to it. Greater than >90%. As McDermott is acting as the agent of

the UCC only, a revised membership would resolve this concern as well."

g.  Here is an example of a creditor's formal information request sent to the

VoyagerUCC in October of 2022 regarding Jason's apparent conflict of interest

that was ignored by the UCC, despite the court order that they must respond

within 30 days (please note the question in bullet point 6):



Dan Newsom <newsomdrt@gmail.com>                                          Oct 12, 2022, 5:00 PM
to voyagerUCC

Hello, I am requesting information regarding the decision made by the UCC to approve, or to not object to, the portion of the proposed purchase agreement that would grant the CEO, Stephen Ehrlich (Steve), personal protection from liability in the event creditors accept their recovery claims. You have 30 days to respond, but given the pace with which this novel bankruptcy case is proceeding, I would appreciate the information requested below as soon as possible.

1. Is the investigation into the actions of the debtors, including Steve and other insiders or third party members, complete?

2. If so, what is the result of your findings?
Did your investigation include fraud, breach of fiduciary duty, and the sale of unregistered securities? Were there any other potential legal courses of action you considered in your investigation?

3. If you cannot share the result, can you answer—based on your findings so far—whether or not you anticipate pursuing legal action against the debtors, including Steve and other insiders or third party members?

4. If the investigation is not complete, why would you approve, or not object to, the inclusion of personal liability protection for Steve and an opt-in protective clause for third party members?  What advantage do we, unsecured creditors, gain from having this particular portion of the agreement included?

5. If you do not intend to pursue legal action against the debtors (et al), why did you ask the class action group to voluntarily dismiss their case?

6. Based on Steve's twitter history, he and the Chair of the UCC, Jason Raznick (Jason), are friends.  It appears there is a conflict of interest where Jason is friends with the CEO of the company in Chapter 11 Bankruptcy, who was granted protection in the purchase agreement at no benefit to unsecured creditors (pending approval). Can you confirm that the relationship between Steve and the UCC chair has been vetted properly, and that Jason isn't influencing the committee to accept the inexplicable and undeserved protection requested for Steve?

h.  Examples of publicly available information regarding apparent direct or indirect

conflicts of interest. If this is what's available publicly, creditors are justified in

their concerns that material conflicts of interest may exist behind closed doors:



← **Tweet**



**Stephen Ehrlich** ✔
@Ehrls15

Great interview with my buddy @JasonRaznick @stoolpresidente and @Benzinga. Hey Raz, next time let's get Dave to open an @investvoyager account for BTC and VGX.

Dave Portnoy was ready to leave Barstool | #RazReport Part 1 youtu.be/e6i8MSGktX0 via @YouTube

 YouTube



Dave Portnoy Talks What It Was Like To Create Barstool Sports From...

Taking you behind the curtains of @barstoolsports



[Continuation of thread]



https://www.youtube.com/watch?v=DhpaXRgWot0

Timestamp 1:09.25:
Jason, "Do I count as one of your brothers?"
Steve, "I have two biological brothers. You're a brother from another mother."
Jason, "Totally."



*[Pictured above: Jason Raznick, Steve Erhlich and Kevin O'Leary (FTX*

*promoter. November 18, 2016)]*

# **OBJECTION**

4. Appropriateness of Releases

    a. Per the FTC, in their *OBJECTION BY FEDERAL TRADE COMMISSION TO DEBTORS' THIRD AMENDED JOINT PLAN [Doc 1042]*, releases are impermissible.

    b. Per the Counsel to the Official Committee of Unsecured Creditors, 1) there are viable claims against directors and officers, and 2) the third party releases included in the APA are in no way necessary to effectuate the sale transaction between the debtor and [purchaser].[10]

    c. As stated previously in the motion by Ms. DiVita [Doc 941]: "Debtors have agreed to settle any potential estate causes of action against the CEO and CCO for a cash contribution of $1,125,000. Based on the approximate $1 billion value of the transferred customer assets, or "Assumed Liabilities" as named in the current purchase agreement, with claims valued at the lowest point to date, the CEO's cash contribution represents only 0.1125% of the customer assets he mishandled… Further, the basis of a < 3% settlement stems from self-reported claims by the CEO and CCO that they do not have substantial assets. With a repeated history of underreporting financial items on behalf of Debtors (and at the detriment of creditors), it is unclear why such statements have not been subject to additional scrutiny by the bankruptcy professionals retained in the case."[11] Thus, the provided consideration falls woefully inadequate compared to the

---

[10] Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Amended Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto Page 7: Doc 526

[11] MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE, page 16: Doc 941

damage caused.  Additionally, the consideration is based only on the word of the individuals who have repeatedly lied to or misled customers and investors.

d.  Furthermore, the release of the factual record of the investigation performed by the Special Committee revealed they failed to disclose, among other things, colorful claims identified by the UCC's counsel; for example, the purchase of a D&O insurance policy on the eve of bankruptcy.  However, that report did reveal that Mr. Erhlich claimed he owned $6 million worth of the shares sold at the peak of Voyager's stock performance in 2021, and yet, despite the sale of those shares, along with his salary and bonuses drawn in all the years he has been an executive at various companies, he attests that his net worth is only $2.7 million (including the value of his home).

e.  If the investigations performed by the Special Committee and the UCC left out even one colorful claim, how can creditors be assured that the investigations were thorough and that the releases are justified or the consideration adequate?

f.  Importantly, on December 15, 2021, in *In re Purdue Pharma, L.P.,* 2021 U.S. Dist. LEXIS 242236 (S.D.N.Y. 2021) ("*Purdue 2*")*,* the court determined that the Bankruptcy Code does not permit courts the authority to approve plans with non-consensual releases of Appellants' direct claims against third parties or other non-debtors in non-asbestos cases[12].  While the ruling acknowledges the bankruptcy code does permit the court the ability to release derivative claims against third parties, even creditors that do not opt-in to the releases are left with minimal options to pursue recovery on their own, or even as part of a class.  In other words, the estate's direct claims may be pursued more effectively via the substantial resources being earmarked for the estate's wind down trust.

---

[12] Purdue Pharma LP, 635 B.R. 25 (S.D.N.Y 2021).

g.  We acknowledge that the opt-ins grant some flexibility here for individual creditors; however, the creditors are not able to vote on the estate's releases and this could impact the ability of the wind down trust, and, by extension, the creditors, to pursue additional recovery.  We ask the court to consider this ruling in conjunction with all of the other unaddressed concerns or allegations raised by the many interested parties throughout this bankruptcy when deciding on the appropriateness of the releases.

5.  The plan for VGX violates the bankruptcy code:

a.  Specifically, in the event that the VGX Smart Contract is not sold, the current plan unfairly discriminates against Account Holders of VGX.

i.  Creditors who do not hold VGX will have the option to take the actions of **holding or selling crypto currencies that have not been rendered worthless by the actions of the Debtors.**

ii.  Account Holders of VGX are confused by the plan for VGX and are already taking actions (such as early account registration with Binance.US) to be able to sell the token as quickly as possible to receive the maximum benefit:



**DJ Crypto** ✔ @DJCryptoYT · Feb 15                                ···

If you haven't already, creating a @BinanceUS account could help in the transfer process. It's my belief the first one in will have the benefit. I'm not sure how they'll handle $VGX exactly but I expect a major sell off and a major buy back based on who accounts.binance.us/en/register?re…… Show more

binance.us
Create a free account | Binance.US
Register an account with Binance.US today

💬 9        🔁        ♡ 14        ᴵˡˡ 2,667        ⬆

21

      iii.    This alone creates an issue for the plan confirmation as the actions VGX

Holders must take are not equal to that of other creditors within the same

class; namely a race to sell what is now a worthless piece of digital code,

in the event the smart contract is not sold.

      iv.    In the event the VGX smart contract cannot be sold, creditors request the

court to order a more thorough plan for the VGX token requiring it to be

valued in USD and liquidated using the same pro rata formula as all other

members of the same class in order not to create an unfair, inequitable, or

discriminatory outcome for same class creditors that is inconsistent with

the bankruptcy code.

6.  The apparent conflict of interest

    a.   While the conflict of interest standards for appointing individuals to the UCC are

not readily clear to creditors in this case, we are aware that stringent conflict of

interest restrictions exist for appointing attorneys in bankruptcy proceedings: **11

U.S.C. § 327.** Section 327 of the Bankruptcy Code provides a heightened

standard in evaluating conflicts, and is written to protect debtors, and their

creditors, from attorneys whose interests conflict with the bankruptcy estate. §

327(a) includes dual requirements: an attorney employed by the Trustee "must

not hold or represent an interest adverse to the estate," and further, must be

"**disinterested**." 11 U.S.C. § 327(a).

      i.    Disinterested, as defined by the bankruptcy code 11 U.S.C. § 327(c):

does not have an interest materially adverse to the interest of the estate

or of any class of creditors or equity security holders, by reason of any

direct or indirect relationship to, connection with, or interest in, the debtor,

or for any other reason.**[13]**

---

[13] 11 U.S.C. § 101(14)(E)(1994)(defining "disinterested person")

b.  Further, in the event a creditor objects to the employment of an attorney representing another creditor (in this case, Mr. Raznick's personal attorney Paul Hage's appointment as Wind Down Trustee), the court shall disapprove where there is an actual conflict of interest.[14]

   i.  Of note: In *in re Kendavis Indus. Int'l., 91 B.R. 742, 754* (Bankr. N.D. Tex. 1988)[15], the court found all conflicts are actual and potential conflicts do not exist.

c.  It is inconsistent with the stringent conflicts of interest requirements of the bankruptcy code to allow even the chance the perception exists that Mr. Raznick's relationship with Mr. Ehrlich may have caused material harm to the estate as is evidenced by 1) the rapid capitulation of the UCC following the initial objection to releases for minimal to no consideration and limited scope of the UCC's investigation, 2) the exorbitant fees charged by the professionals were only curbed after pro se creditors filed motions with the support of the UST to appoint a fee examiner when monitoring expenses–when expense control is one of the primary functions of the UCC, and 3) the sponsorship of Benzinga conference by McDermot, Will & Emery suggesting a chance that a quid pro quo relationship exists between their firm and Mr. Raznick.

d.  The appointment of Mr. Raznick's personal attorney as the wind down trustee and selection of McDermott, Will & Emery LLP to represent the wind down trust thus violate the bankruptcy codes heightened requirements regarding conflicts of interest, direct or indirect; considering they were selected by Jason Raznick, who

---

[14] 11 U.S.C. § 327[(c)]In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, **unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.**

[15] *in re Kendavis Indus. Int'l., 91 B.R. 742, 754* (Bankr. N.D. Tex. 1988),

does appear to have a conflict of interest with the CEO, and, perhaps even, with FTX insiders, as is evidenced by the inexplicable selection of FTX (despite creditor concerns) and the subpoena of any Benzinga employee, and, specifically, Jason Raznick, by Kirkland & Ellis relating to their objection to Alameda's proofs of claims.

7. The general effectiveness of the UCC

    a. As previously stated, the creditors objectively determine that the members of the UCC have not delivered on representing creditors' best interest; including, but not limited to:

        i. The UCC's failure to object to insiders and other third parties being released for minimal to no consideration despite evidence of wrongdoing in limited investigations.

        ii. The UCC's failure to object to their exclusion from the Binance.US negotiation process, or explain to creditors why they were not involved in representing creditor interests.

        iii. The UCC's failure to object to the exorbitant fees charged by professionals, and only through the efforts of pro se creditors and the UST, was action taken to curb depletion of the estate's funds, despite cost control measures being a primary function of the UCC.

        iv. The UCC's failure to object to releases for professionals who, by their own estimation, have cost the estate in excess of $100 million by failing to do proper due diligence on the FTX transaction.

## Relief Requested

8. Remove releases in their entirety from the plan. They are neither justified nor appropriate.

9. Based on the apparent conflicts of interest, deny 1) the appointment of Paul Hage as the Wind Down Trustee, 2) employment of McDermott, Will & Emery as counsel to the wind down trust, and 3) appointment of existing UCC members to the Wind Down Trust, and, instead, appoint independent third parties to preside over the Wind Down Trust and the fate of creditor recoveries.

10. Require a specific plan for the fate of VGX, as the current plan does not meet the bankruptcy standard for fair and equitable treatment in the event that the VGX smart contract is not sold. Specifically, in the event the VGX smart contract cannot be sold to a buyer–rendering the VGX token a worthless piece of digital code, VGX Account Holders request the court to order a more thorough plan for the VGX token requiring it to be valued in USD using the same pro rata formula as same class members, liquidated (not transferred to Binance), and their pro rata claim be distributed in cash by the estate to Account Holders who hold VGX.

## **NOTICE**

9. The Creditors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the U.S. Trustee; (b) the Committee; ( c) the United States Attorney's Office for the Southern District of New York; (d) the Attorney General in the States where the Debtors conducted their business operations and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Creditors submit, that in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Creditors respectfully request that the Court grant the requested reliefs herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  February 22nd, 2023

`

**CREDITORS**

**/s/ _Daniel Newsom_**
Daniel Newsom
Georgia, USA
newsomds@outlook.com


**/s/ _Jon Warren_**
Jon Warren
Florida, USA
jontenxmedia@gmail.com


## CERTIFICATE OF SERVICE

 I hereby certify that on this 22nd day of February 2023, a true and correct copy of the foregoing **NOTICE OF FILING OF OBJECTION OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR FINAL ORDER APPROVING AMENDED PURCHASE AGREEMENT AND THE AMENDED DISCLOSURE STATEMENT WITH RESPECT (I) THE ADEQUACY OF TO THE PLAN FOR VGX AND (II) THE APPROPRIATENESS OF THIRD PARTY RELEASES** has been served via-email, as indicated in the attached Service List.

/s/ _Daniel Newsom_
Daniel Newsom
Pro Se Creditor

| Name | Email | Method of Service |
|---|---|---|
| DISTRICT OF COLUMBIA OFFICE OF THE ATTORNEY GENERAL | OAG@DC.GOV | Email |
| FRANCINE DE SOUSA C/O SISKINDS LLP | ANTHONY.OBRIEN@SISKINDS.COM<br>MICHAEL.ROBB@SISKINDS.COM<br>GARETT.HUNTER@SISKINDS.COM | Email |
| GOOGLE, LLC | COLLECTIONS@GOOGLE.COM | Email |
| OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DIST OF NEW YORK | RICHARD.MORRISSEY@USDOJ.GOV<br>MARK.BRUH@USDOJ.GOV | Email |
| SECURITIES & EXCHANGE COMMISSION | SECBANKRUPTCY-OGC-ADO@SEC.GOV<br>BANKRUPTCYNOTICESCHR@SEC.GOV | Email |
| SECURITIES & EXCHANGE COMMISSION NEW YORK REGIONAL OFFICE | NYROBANKRUPTCY@SEC.GOV | Email |

| | | |
|---|---|---|
| STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL | CONSUMERINTEREST@ALABAMAAG.GOV | Email |
| STATE OF ALASKA OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@ALASKA.GOV | Email |
| STATE OF ARIZONA OFFICE OF THE ATTORNEY GENERAL | AGINFO@AZAG.GOV | Email |
| STATE OF ARKANSAS OFFICE OF THE ATTORNEY GENERAL | OAG@ARKANSASAG.GOV | Email |
| STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL | XAVIER.BECERRA@DOJ.CA.GOV | Email |
| STATE OF COLORADO OFFICE OF THE ATTORNEY GENERAL | CORA.REQUEST@COAG.GOV | Email |
| STATE OF CONNECTICUT OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@CT.GOV | Email |
| STATE OF FLORIDA OFFICE OF THE ATTORNEY GENERAL | ASHLEY.MOODY@MYFLORIDALEGAL.CO | Email |
| STATE OF HAWAII OFFICE OF THE ATTORNEY GENERAL | HAWAIIAG@HAWAII.GOV | Email |
| STATE OF IDAHO OFFICE OF THE ATTORNEY GENERAL | LAWRENCE.WASDEN@AG.IDAHO.GOV AGWASDEN@AG.IDAHO.GOV | Email |
| STATE OF ILLINOIS OFFICE OF THE ATTORNEY GENERAL | INFO@LISAMADIGAN.ORG | Email |
| STATE OF IOWA OFFICE OF THE ATTORNEY GENERAL | CONSUMER@AG.IOWA.GOV | Email |
| STATE OF KANSAS ATTORNEY GENERAL | DEREK.SCHMIDT@AG.KS.GOV | Email |
| STATE OF LOUISIANA DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | ADMININFO@AG.STATE.LA.US | Email |
| STATE OF MAINE OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@MAINE.GOV | Email |
| STATE OF MARYLAND OFFICE OF THE ATTORNEY GENERAL | OAG@OAG.STATE.MD.US | Email |
| STATE OF MINNESOTA OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@AG.STATE.MN.US | Email |
| STATE OF MISSOURI OFFICE OF THE ATTORNEY GENERAL | CONSUMER.HELP@AGO.MO.GOV | Email |
| STATE OF MONTANA OFFICE OF THE ATTORNEY GENERAL | CONTACTDOJ@MT.GOV | Email |
| STATE OF NEW HAMPSHIRE OFFICE OF THE ATTORNEY GENERAL | ATTORNEYGENERAL@DOJ.NH.GOV | Email |

| STATE OF NEW MEXICO OFFICE OF THE ATTORNEY GENERAL | HBALDERAS@NMAG.GOV | Email |
|---|---|---|
| STATE OF NORTH DAKOTA OFFICE OF THE ATTORNEY GENERAL | NDAG@ND.GOV | Email |
| STATE OF OKLAHOMA OFFICE OF THE ATTORNEY GENERAL | QUESTIONS@OAG.OK.GOV | Email |
| STATE OF OREGON OFFICE OF THE ATTORNEY GENERAL | ELLEN.ROSENBLUM@DOG.STATE.OR.US | Email |
| STATE OF RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL | AG@RIAG.RI.GOV | Email |
| STATE OF UTAH OFFICE OF THE ATTORNEY GENERAL | UAG@UTAH.GOV | Email |
| STATE OF VERMONT OFFICE OF THE ATTORNEY GENERAL | AGO.INFO@VERMONT.GOV | Email |
| STATE OF VIRGINIA OFFICE OF THE ATTORNEY GENERAL | MAIL@OAG.STATE.VA.US | Email |
| TORONTO STOCK EXCHANGE | WEBMASTER@TMX.COM | Email |
| STATE OF WEST VIRGINIA OFFICE OF THE ATTORNEY GENERAL | CONSUMER@WVAGO.GOV | Email |
| HORWOOD MARCUS & BERK CHARTERED | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM | Email |
| METRPOLITAN COMMERCIAL BANK BALLARD SPAHR LLP | SINGERG@BALLARDSPAHR.COM | Email |
| METROPOLITAN COMMERCIAL BANK WACHTELL, LIPTON, ROSEN & KATZ | RGMASON@WLRK.COM ARWOLF@WLRK.COM AKHERRING@WLRK.COM | Email |
| JASON RAZNICK JAFFE RAITT HEUER & WEISS, P.C. | PHAGE@JAFFELAW.COM | Email |
| STEVE LAIRD FORSHEY & PROSTOK LLP | BFORSHEY@FORSHEYPROSTOK.COM | Email |
| ORACLE AMERICA, INC. BUCHALTER, A PROFESSIONAL CORPORA | SCHRISTIANSON@BUCHALTER.COM | Email |
| ALAMEDA RESEARCH LLC & AFFILIATES SULLIVAN & CROMWELL LLP | DIETDERICHA@SULLCROM.COM GLUECKSTEINB@SULLCROM.COM BELLERB@SULLCROM.COM | Email |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. KIRKLAND & ELLIS LLP KIRKLAND & ELLIS INTERNATIONAL LLP | JSUSSBERG@KIRKLAND.COM CMARCUS@KIRKLAND.COM CHRISTINE.OKIKE@KIRKLAND.COM ALLYSON.SMITH@KIRKLAND.COM | Email |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO | MATTM@GOLDMCLAW.COM HARLEYG@RESTRUCTURINGSHOP.COM | Email |

| | | |
|---|---|---|
| LAVINE, AND ADAM LAVINE C/O GOLDSTEIN & MCCLINKOCK LLLP | STEVENY@GOLDMCLAW.COM | |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | DTABACHNIK@DTTLAW.COM | Email |
| MATTHEW EDWARDS C/O LIZ GEORGE AND ASSOCIATES | GEORGELAWOK@GMAIL.COM | Email |
| TEXAS STATE SECURITIES BOARD OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ABIGAIL.RYAN@OAG.TEXAS.GOV LAYLA.MILLIGAN@OAG.TEXAS.GOV JASON.BINFORD@OAG.TEXAS.GOV | Email |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ROMA.DESAI@OAG.TEXAS.GOV | Email |
| OFFICE OF THE ATTORNEY GENERAL BANKRUPTCY DIVISION | AGBANKNEWYORK@AG.TN.GOV | Email |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION ASSISTANT GENERAL COUNSEL | JENNIFER.ROOD@VERMONT.GOV | Email |
| ROBERT SNYDERS & LISA SNYDERS C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ANGELINAL@JPFIRM.COM | Email |
| MICHAEL LEGG C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | RRK@MCCARTHYLEBIT.COM NRO@MCCARTHYLEBIT.COM | Email |
| MICHAEL GENTSCH C/O BARSKI LAW PLC | CBARSKI@BARSKILAW.COM | Email |
| ILLINOIS SECRETARY OF STATE C/O OFFICE OF THE ATTORNEY GENERAL | JOHN.REDING@ILAG.GOV | Email |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | NHOVEY@LAW.GA.GOV | Email |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS C/O BROWN RUDNICK LLP ATTN: SIGMUND S. WISSNERGROSS ESQ. & KENNETH J. AULET | SWISSNER-GROSS@BROWNRUDNICK.COM KAULET@BROWNRUDNICK.COM | Email |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS C/O BROWN RUDNICK LLP ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | SBEST@BROWNRUDNICK.COM RWOLKINSON@BROWNRUDNICK.COM | Email |
| ED BOLTON C/O AKERMAN LLP | ADAM.SWICK@AKERMAN.COM JOHN.THOMPSON@AKERMAN.COM JOANNE.GELFAND@AKERMAN.COM | Email |

| JON GIACOBBE ATTN: A. MANNY ALICANDRO | MANNY@ALICANDROLAWOFFICE.COM | Email |
|---|---|---|
| WELLS FARGO BANK, N.A. C/O ALDRIDGE PITE, LLP | GWALLACH@ALDRIDGEPITE.COM | Email |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS C/O KILPATRICK TOWNSEND & STOCKTON LLP | DPOSNER@KILPATRICKTOWNSEND.COM<br>KMOYNIHAN@KILPATRICKTOWNSEND.COM<br>PROSENBLATT@KILPATRICKTOWNSEND.COM | Email |
| PIERCE ROBERTSON C/O PACHULSKI STANG ZIEHL & JONES LLP | RPACHULSKI@PSZJLAW.COM<br>AKORNFELD@PSZJLAW.COM<br>DGRASSGREEN@PSZJLAW.COM<br>JROSELL@PSZJLAW.COM | Email |
| STATE OF WASHINGTON OFFICE OF ATTORNEY GENERAL | STEPHEN.MANNING@ATG.WA.GOV | Email |
| MARCUM LLP MINTZ & GOLD LLP | GOTTESMAN@MINTZANDGOLD.COM | Email |
| U.S. SECURITIES & EXCHANGE COMMISSION | SCHEUERT@SEC.GOV | Email |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES CONSUMER PROTECTION AND FINANCIAL ENFORCEMENT | KEVIN.PUVALOWSKI@DFS.NY.GOV<br>LINDA.DONAHUE@DFS.NY.GOV<br>JASON.STJOHN@DFS.NY.GOV | Email |
| NEW JERSEY BUREAU OF SECURITIES | VSHEA@MDMC-LAW.COM<br>NLEONARD@MDMC-LAW.COM | Email |
| NEW JERSEY BUREAU OF SECURITIES | | Email |
| USIO, INC. PULMAN, CAPPUCCIO & PULLEN, LLP | RPULMAN@PULMANLAW.COM | Email |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US LATHAM & WATKINS | ADAM.GOLDBERG@LW.COM<br>NACIF.TAOUSSE@LW.COM<br>JON.WEICHSELBAUM@LW.COM<br>ANDREW.SORKIN@LW.COM | Email |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | KCORDRY@NAAG.ORG | Email |
| USIO, INC. & FICENTIVE, INC. RUSKIN MOSCOU FALTISCHEK, P.C. | SGIUGLIANO@RMFPC.COM | Email |
| CELSIUS NETWORK LLC AKIN GUMP STRAUSS HAUER & FELD, L.L.P. | MHURLEY@AKINGUMP.COM<br>DCHAPMAN@AKINGUMP.COM | Email |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. PAUL HASTINGS LLP | JONCANFIELD@PAULHASTINGS.COM<br>MATTMURPHY@PAULHASTINGS.COM | Email |

| | MICHAELCWHALEN@PAULHASTINGS.COM | |
|---|---|---|