Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' OMNIBUS OBJECTION TO**
**CERTAIN MOTIONS SET FOR HEARING ON MARCH 2, 2023**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this objection (this "Objection") in response to the *Motion for Appointment of a Chapter 11 Trustee* [Docket No. 941] (the "Trustee Motion") filed by Michelle D. DiVita and the letter filed by Tracy Hendershott [Docket No. 843] (the "Letter," together with the Trustee Motion, the "Motions", and Mr. Hendershott and Ms. DiVita, the "Movants").

**Preliminary Statement**[2]

1.    After a long and arduous road with unexpected twists and turns, on March 2, 2023 the Debtors are poised to confirm their Plan, which 97% of creditors voted to accept. The Plan

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not defined in this section shall have the meanings ascribed to such terms elsewhere in this Objection, or in the Disclosure Statement and Plan.

effectuates a transaction that maximizes creditor recoveries, provides the Debtors' customers with the opportunity to receive recovery of in-kind cryptocurrency (as applicable), and delivers the quickest recovery to creditors—if the Combined Hearing is successful in *exactly one week*. The Debtors had approximately 1.1 million customers as of the Petition Date. Only a handful have voiced objections.

2. Now, on the eve of confirmation of the Plan, two creditors aver that there is "cause" to appoint a trustee under section 1104(a)(1) of the Bankruptcy Code, the appointment of a trustee is in the best interests of creditors and the estate under section 1104(a)(2) of the Bankruptcy Code, and that there are policy considerations that support appointment of a trustee. None of these arguments have merit, and the Motions should be denied.

3. ***First***, sufficient cause for appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code does not exist. The Movants misrepresented numerous facts in an attempt to justify the appointment of a trustee and reference various aspects of these chapter 11 cases that are irrelevant to whether sufficient cause exists. Additionally, all of the reasoning the Movants offered in support of appointing a trustee is conclusory in nature, has yet to be proven as fact, and falls far short of the clear and convincing evidence standard required under section 1104(a)(1) of the Bankruptcy Code.

4. ***Second***, despite the Movants' arguments, appointing a trustee at this point in the case would not be in the best interests for any parties under section 1104(a)(2) of the Bankruptcy Code— including the Movants themselves. The appointment of a trustee would be highly value destructive and scuttle the Debtors' efforts to bring these chapter 11 cases to a value-maximizing conclusion, especially given that solicitation and voting on the Plan is already completed with customers voting to overwhelmingly accept, and the confirmation hearing is set for exactly one week away. In fact,

the appointment of a trustee would introduce substantial additional cost, delay, and inefficiency that would drastically reduce potential recoveries available to all creditors.

5. The Movants' grievances with the Debtors' management team cloud any ability to view the cases (and the success thereof) objectively and properly apply bankruptcy and other relevant law. Simply put, the appointment of a trustee at this time would not achieve Movants' objectives. Instead, it would unwind the substantial progress to date and set these chapter 11 cases back to square one.

6. If viewed objectively, the Movants would recognize that the legal burden to appoint a trustee cannot be satisfied as the Debtors—thanks in large part to the tireless effort of their management team—have managed these chapter 11 cases responsibly and with the due care required, having reached significant accomplishments in the mere eight months these chapter 11 cases have been pending. This includes executing and obtaining approval for entry into two separate asset purchase agreements with—at the time—the top two cryptocurrency exchanges in the industry.

7. The Movants should also recognize that ***within 37 days*** following FTX's catastrophic and historic collapse that cratered the Debtors' initial sale process and the cryptocurrency markets globally, the Debtors, their management team, and advisors immediately hit the ground running to re-engage with interested third parties to identify, negotiate, and ultimately execute a complex transaction positioned to maximize value for all creditors. Nor do the Movants recognize that the complexity of such a transaction is nearly impossible to replicate without the sophisticated and knowledgeable approach that only the Debtors can provide on the timeline contemplated under the Plan. Neither the Plan nor anything remotely similar would be possible if the management team were removed and a trustee appointed, and creditors would inure further delay of significantly diminished recoveries. The Movants ignore the substantial progress made in these cases, while

continually raising unfounded issues, forcing the Debtors to face further distractions and incur further fees and expenses in addressing the serious yet baseless allegations included in filings such as the Motions.

8. Additionally, as described in the Debtors' Exclusivity Motions,[3] the Debtors have made substantial progress in these chapter 11 cases and taken numerous actions for the benefit of their estates, including having:

- filed a standalone chapter 11 plan of reorganization, which could be effectuated without the participation of a third-party partner, on the first day of these chapter 11 cases, complementing the Debtors' ongoing marketing efforts by setting a floor against which potential transactions would be measured;

- obtained important procedural and operational relief in the form of "first day" and "second day" relief, stabilizing the Debtors' business and the Debtors' relationships with third parties following the commencement of these chapter 11 cases;

- obtained court approval to honor customer withdrawals from the "for the benefit of" accounts ("FBO Accounts") held at Metropolitan Commercial Bank ("MC Bank") that, to date, returned approximately $248 million of customer funds from the FBO Accounts;

- sought and were granted an Initial Recognition Order and Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List), which, among other things, recognized the chapter 11 case of Debtor Voyager Digital Ltd. as a foreign main proceeding;

- conducted arms-length negotiations with all potential transaction parties resulting in the sale of Coinify ApS, a global cryptocurrency payment processor distinct from the Voyager platform, in exchange for, among other things, $2 million in cash;

- maintained responsive communication with the Debtors' customers, comprised of over 1.1 million active users as of the Petition Date;

- engaged meaningfully with the Committee, including providing extensive diligence and holding numerous telephonic and in-person meetings;

---

[3] *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 609] and the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 796] (collectively, the "Exclusivity Motions").

- assisted the Special Committee with their investigation into, among other things, historical transactions and other potential insider claims, including by holding over 55 hours of interviews with 12 Voyager employees, producing over 11,000 documents totaling more than 40,000 pages, and hosting numerous information sessions that also included management and advisors to the Committee;

- prepared and submitted the Debtors' schedules of assets and liabilities and statements of financial affairs;

- conducted a two-week, highly competitive auction process, resulting in the selection of a bid valued at approximately $1.422 billion;

- through the Special Committee, negotiated the terms of the proposed D&O Settlement—which provides for, among other things, the return of approximately $1.2 million in cash to the Debtors' estates, and is supported by the Committee;

- negotiated and agreed with counsel to FTX US that the "No-Shop" provision of the FTX Purchase Agreement be waived as FTX's situation continued to devolve;

- swiftly engaged in good-faith, arm's-length negotiations with several potential transaction parties following the collapse of the FTX Transaction;

- evaluated a variety of deal structures and terms and determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' assets;

- filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690], pursuant to which the Debtors sought to compel the release of $24 million of the Debtors' cash held in reserve by MC Bank and ultimately achieved the release of that reserve over time;

- negotiated and obtained Court approval of a joint stipulation with FiCentive, Inc. and MC Bank to, among other things, terminate the Debtors' debit card program and authorize the release to the Debtors of a $500,000 reserve balance held at MC Bank;

- negotiated and executed an asset purchase agreement with Binance.US on December 18, 2022, memorializing the terms of the Binance.US bid (the "Asset Purchase Agreement"), and filed a motion seeking authorization to enter into the Asset Purchase Agreement;

- filed their Disclosure Statement, Plan, and related documents, including a motion seeking conditional approval of the Disclosure Statement, on December 22, 2022;

- resolved formal objections and informal comments to obtain approval of (a) entry into the Asset Purchase Agreement on January 11, 2023, which memorialized the terms of the

5

successful bid and proposed sale transaction to be consummated through a chapter 11 plan, and (b) the Disclosure Statement on January 11, 2023;

- completed solicitation of the Plan on January 25, 2023;

- reached agreement with various state entities regarding the voting of their claims, *see Joint Stipulation and Agreed Order Between the Debtors and Governmental Claimants* [Docket No. 1001];

- negotiated and executed a stipulation with FTX to resolve certain outstanding issues and agree on a path forward to resolve FTX's asserted preference actions; *see Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1048]; and

- completed the voting period which ended as of the Voting Deadline on February 22, 2023.

9. ***Third***, Movants' purported "policy considerations" in favor of appointing a trustee in these chapter 11 cases are belied by the actual facts of these chapter 11 cases. While the Movants may believe the allegations in the Motions, that does not make them true and actionable.

10. Ultimately, the issues raised in the Motion are unfounded and untimely. Appointment of a trustee while the Debtors are on the precipice of confirming the Plan would be an unmitigated disaster. In circumstances similar to these, this Court and others have denied requests for the appointment of a trustee. The Court should do the same here.

## Objection

### I. No Cause Exists to Appoint a Chapter 11 Trustee Under Section 1104(a)(1).

11. Section 1104(a)(1) of title 11 of the United States Code (the "Bankruptcy Code") provides that a trustee shall be appointed for cause, which includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C. § 1104(a). The appointment of a trustee is an extraordinary remedy. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990)).

6

12. Thus, there is a strong presumption against appointing a chapter 11 trustee, which "must be considered a last resort." *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002); *see also In re Marvel Ent. Grp., Inc.*, 140 F.3d 463. 471 (3d Cir. 1998). "'Chapter 11 of the Code is designed to allow the debtor-in-possession to retain management and control of the debtor's business operations unless a party in interest can prove that the appointment of a trustee is warranted,' and there is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *Adelphia Commc'ns Corp.*, 336 B.R. at 655 (quoting *Ionosphere Clubs*, 113 B.R. at 168).

13. Accordingly, the party seeking appointment of a trustee must meet a "very high" standard. *In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005). Clear and convincing evidence must be presented to support such requested relief. *See Marvel Ent. Grp., Inc.*, 140 F.3d at 471; *Adelphia Commc'ns Corp.*, 336 B.R. at 656; *Ionosphere Clubs*, 113 B.R. at 168. As set forth herein, the Movants fall well short of establishing the need for a trustee.

### A. The Movants Fail to Demonstrate Cause for Appointment of a Trustee.

14. The Movants present a laundry list of allegations, none of which support a finding that "cause" exists for the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code.

#### 1. The Movants' Allegations Misrepresent the Facts of These Chapter 11 Cases.

15. The Movants allege that the Debtors concealed lending activities, understated loan positions, and used false financial statements. Trustee Motion ¶ 44. These allegations are without merit and misrepresent the events leading to these chapter 11 cases, as described in greater detail in Article VII of the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 853] (the "Disclosure Statement").

7

16. The Debtors' lending business was described and disclosed in public filings, which stated that the Debtors earned fees from lending activities. Disclosure Statement, Article VII.A.2(b). Those fees were part of the income earned by the Debtors' business. And the Debtors had to earn income in order to pay rewards to customers.

17. This was not a secret. Account Holders acknowledged and consented to the Debtors' lending activity in both the August 2021 and January 2022 customer agreements. *Id*. Those agreements are exceptionally clear, describing to all customers that by participating in the Debtors' rewards' program, they were consenting to have their deposits rehypothecated in this manner:

> Consent to Rehypothecate. Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk.

January 2022 Customer Agreement at 5(D).[4] Customers had the ability to "opt out" of this regime, but few did.[5]

---

[4] The Customer Agreement dated August 2021 contained similar language: "Consent to Rehypothecate. Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk." *See* August 2021 Customer Agreement at 5(D).

[5] *See* January 2022 Customer Agreement at 10(F) ("Customer may opt-out of the Rewards Program at any time by doing so in the App."); August 2021 Customer Agreement at 10(F) ("Customer may opt-out of the Rewards Program at any time by following the instructions in the App. A request to opt-out of the Rewards Program will be effective on the following business day. Upon the effectiveness of an opt-out, Customer will be credited with the amount of Rewards earned but not yet paid out. Such amounts will be deposited to Customer's Accounts promptly following the end of the applicable month.").

The Court, reviewing the Customer Agreements, has also noted the provisions permitting Voyager to modify the terms of service. *Transcript Regarding Hearing Held on 1/10/2023* [Docket No. 864], 99:15–99:19. All customers were well informed of the Voyager business model.

8

18.  The Movants also allege loan positions were understated, pointing to the Debtors' outstanding loan amounts per financial statements as of March 31, 2022 not matching outstanding loan amounts referenced in the Disclosure Statement as of April 3, 2022. Trustee Motion ¶¶ 7–11, 44. March 31, 2022 and April 3, 2022 are not the same day, and the statements in the Debtors' public financial statements in early 2022 were each accurate at the time they were made. They are also not relevant to whether a trustee should be appointed a year later, in February 2023, when the Debtors are on the precipice of a transaction that is clearly in the best interests of Account Holders.[6]

19.  In sum, the assertions the Movants point to as justification for appointing a trustee under section 1104(a)(1) of the Bankruptcy Code do not support the Trustee Motion. They are heavily disputed and, in any event, have no bearing on the operation of these chapter 11 cases. Even if these assertions were true and relevant (they are not), they certainly do not constitute clear and

---

[6]  To the extent the Movants are suggesting that they did not understand the percentage of customer assets that had been rehypothecated as permitted by the Customer Agreements as of a particular day, or did not understand that the Debtors' loan book was concentrated amongst a few parties, their complaint has no merit. In fact, the Debtors had publicly disclosed in its prior public filing that as of December 31, 2021, the Debtors' loans (publicly disclosed as having been made on either a collateralized or uncollateralized basis) were approximately 49% of the amounts owed to customers, and were highly concentrated, with 1 counterparty reflecting 61% of the outstanding loans:

As of December 31, 2021, and June 30, 2021, the crypto assets loaned disaggregated by significant borrowing counterparty was as follows:

|  | Borrowing Rates | December 31, 2021 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | 1.0% - 11% | $ 1,651,160 | $ - |
| Counterparty B | 1.0% - 10.5% | 369,633 | 164,085 |
| Counterparty C | 1.0% - 15% | 153,097 | - |
| Counterparty D | 3.1% - 8.9% | 150,955 | 57,975 |
| Counterparty E | 3% - 10% | 148,511 | - |
| Counterparty F | 5.5% - 15.0% | 141,922 | 137,056 |
| Other | 1.0% - 10% | 87,471 | 34,445 |
| Total |  | $ 2,702,749 | $ 393,561 |

As of December 31, 2021, and June 30, 2021, the Company's crypto assets loaned balances were concentrated with counterparties as follows:

|  | Geography | December 31, 2021 | June 30, 2021 |
|---|---|---|---|
| Counterparty A | British Virgin Islands | 61% | - |
| Counterparty B | Canada | 14% | 42% |
| Counterparty C | UK | 6% | - |
| Counterparty D | US | 6% | 14% |
| Counterparty E | US | 5% | 35% |
| Counterparty F | US | 5% | - |
| Other | Various | 3% | 9% |
| Total |  | 100% | 100% |

While one may criticize the Debtors' business model in hindsight, the business model was fully disclosed and the loan amounts were disclosed for customers to review (or not).

9

convincing evidence as required under section 1104(a)(1) of the Bankruptcy Code, and therefore there is no cause to appoint a trustee.

### 2. The Movants' Assertions Regarding the Releases Are Irrelevant.

20. The Movants also suggest that the proposed Debtor releases, as disclosed in Articles IV.P and V.A.3 of the Disclosure Statement and Article VIII of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (the "Plan"), justify appointment of a trustee. Trustee Motion ¶¶ 45, 47. While the Movants may personally disagree with the releases, nothing in the proposed releases in the Plan implies or establishes any level of fraud, dishonesty, incompetence, or mismanagement, let alone the level required under section 1104(a)(1) of the Code. In fact, the Debtor releases contemplated under the Plan were determined by the Special Committee to be appropriate after a robust investigation conducted with oversight from disinterested directors and other highly qualified professionals. Disclosure Statement, Articles IV.P, VIII.O. The Committee also participated in the investigation and came to the same conclusion. The Movants' dissatisfaction with the conclusions of the investigation does not negate the appropriateness of the releases. Further, the Motion appears to confuse Debtor releases with third party releases—the Debtor releases do not have any bearing on direct creditor claims (if any exist), and the third-party releases contemplated under the Plan are only those voluntarily and affirmatively opted into, as is made clear throughout the Debtors' materials, including their solicitation materials.

**Item 4.    Third-Party Release.**

AS A HOLDER OF A CLASS 3 CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN. YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN. YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE. **YOUR DECISION TO COMPLETE AND RETURN THE OPT-IN NOTICE IS ENTIRELY VOLUNTARY AND NOT A REQUIREMENT UNDER THE PLAN OR APPLICABLE LAW.** YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.

☐    By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.

### 3.    The Movants' Allegations Are Conclusory in Nature.

21.    The rest of the Movants' assertions are unsubstantiated conjecture about these chapter 11 cases that have no merit. For example, the Movants allege that various fee statements which have been filed "suggest some form of fraudulent transfers occurred." Trustee Motion ¶ 46. That assertion makes no sense. The fact that professionals have researched potential avoidance claims does not suggest there were any, let alone any impropriety justifying appointment of a trustee.

**II.    The Appointment of a Chapter 11 Trustee Is Not In the Best Interests of Creditors, Equity Security Holders, or the Interests of the Estate.**

22.    Pursuant to section 1104(a)(2) of the Bankruptcy Code, the Court may appoint a trustee if it finds that such an appointment would be "in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). In making such a determination, courts "eschew rigid absolutes and look to the practical realities and necessities" of the case. *Ionosphere Clubs*, 113 B.R. at 168. While this standard is "amorphous and necessarily involves a great deal of judicial discretion," courts within the Second Circuit consider:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment.

11

*In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y. 2007) (quoting *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007).

23. The appointment of a trustee would be highly value-destructive and diminish the recoveries available to the Debtors' stakeholders.

24. *First*, the Debtors have already completed solicitation of the Plan, which has been overwhelmingly accepted by customers, and a hearing to confirm the Plan is scheduled for March 2, 2023, a mere one week away. At this incredibly late stage in these chapter 11 cases, the appointment of a trustee would undo the significant amount of work the Debtors have done and restart the case at square one. Starting over at this point would only further erode the Debtors' estates.

25. *Second*, the appointment of a trustee would result in an individual with less expertise than the Debtors' current management being put in charge of the Debtors' highly complex business. A trustee would invariably take time to get up to speed, and the resulting expenses and delay for the trustee and any new advisors to understand the complexity of the numerous issues in these chapter 11 cases would be substantial, further eroding creditor recoveries. It is at best unclear whether anyone other than the current management team can engineer a positive outcome for creditors, and the Movants offer zero evidence that a trustee would be an improvement.

26. *Third*, the Debtors' estates are currently well managed, making the appointment of a trustee unnecessary. During these chapter 11 cases, the Debtors have worked nonstop to maximize the value of their estates. The crucial work the Debtors have carried out over the course of these chapter 11 cases includes holding multiple marketing processes to obtain the highest value possible for the Debtors' assets, and filing multiple plans of reorganizations including the latest Plan which

features a toggle in the event the Binance.US sale cannot be consummated. The appointment of a trustee would reverse that progress and return the Debtors to the beginning of these proceedings.[7]

27. **_Fourth_**, the Debtors' estates and stakeholders would not benefit from the appointment of a trustee. The Debtors are working in close collaboration with the Committee, U.S. Trustee, and various other stakeholders. This Court has held that '[w]here a case has an active creditors committee functioning effectively and working well with the debtors, as it does here, there is little benefit in appointing a trustee." *1031 Tax Grp.*, 374 B.R. at 91. That is particularly true here, which further underscores that the appointment of a trustee is not justified under section 1104(a)(2) of the Bankruptcy Code.

28. The Movants' other arguments for why a trustee would be in the best interest of the various parties to these chapter 11 cases are unpersuasive and misguided. Again, the Movants' personal lack of "trust" in the Debtors' current management team does not lead to the inevitable conclusion that a trustee would better serve the interests of the estate, and the Movants again offer mischaracterized facts to justify their lack of trust. Trustee Motion ¶ 53.

29. The Movants cite the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* in the FTX bankruptcy proceedings in an attempt to justify appointing a trustee here. Trustee Motion ¶ 55; *In re FTX Trading LTD.*, Case No. 22-11068 (Bankr. D. Del. Dec. 1, 2022) [Docket No. 176]. But the FTX bankruptcy court denied that request for a variety of reasons, including because the duties an examiner would perform were already being handled by highly qualified professionals and the high cost of an examiner (which could potentially exceed $100 million) would not be in the best interests of creditors. The Celsius bankruptcy court also denied such a motion, on the basis that the potential for a consensual plan remained possible.

---

[7] *See In re Celsius Network, LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y Feb. 15, 2023) Hr'g Tr. 88:16–88:17 ("The appointment of a chapter 11 trustee will set this case back to about day one or two.").

13

*See In re Celsius Network, LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y Feb. 15, 2023) Hr'g Tr. 98:09–99:08 ("I'm going to deny the chapter 11 trustee motion . . . . I commend the Debtors' counsel and the Committee's counsel in their efforts to reach out with a proposed plan sponsor . . . . It's progress. . . . [T]he issue for today is whether or not a new fiduciary, a chapter 11 trustee, should be appointed.  My conclusion is, on the record today, the answer to that is no.").  Similar arguments should prevail here.  Contrary to what the Movants may believe, "[t]he appointment of a trustee imposes substantial financial burdens on a debtor's estate which can preclude the possibility of reorganization." *In re Century Glove, Inc.*, 73 B.R. 528, 537 (Bankr. D. Del. 1987).  Given the potential expense and current status of these chapter 11 cases, appointing a trustee would be counterproductive and would not be in the best interest of any party.  Therefore, the Trustee Motions should be denied.

### III.    Policy Considerations Do Not Support Appointment of a Chapter 11 Trustee.

30.    Finally, the Movants claim there are policy considerations that support appointing a trustee.  There are not.  The Movants point to section 1104(e) of the Bankruptcy Code as some sort of call to action for the U.S. Trustee to move for the appointment of a trustee given the Movants believe there are "reasonable grounds to suspect that current members of the governing body of the debtor ... participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor."  Trustee Motion ¶¶ 58-59; 11 U.S.C. § 1104(e).  The Movants' assertion that the "Debtors['] fraud has been proven by the finding of culpability under New Jersey law" is misleading and misconstrues the actions taken by New Jersey Bureau of Securities.  Trustee Motion ¶ 59.  Contrary to what the Movants may believe, no party has proven fraud in these chapter 11 cases, and the other "facts" that the Movants assert are categorically wrong as discussed above.  Instead, the Movants appear only to be acting on their frustrations following the market contagion and fallout

14

that has transpired since the Luna collapse and again following FTX's historic implosion. No policy considerations justify appointment of a trustee at this time.

31. Because there is no basis in fact or law to support the Movants' contention that there is "cause" to appoint a chapter 11 trustee, the Trustee Motion must be denied.

**IV.  The Request for Conversion to a Chapter 7 Liquidation Should be Denied.**

32. The Letter requests conversion of these chapter 11 cases to a chapter 7 liquidation. The Movants argue, with minimal explanation, that creditors feel there is justification to convert these chapter 11 cases because of continuing diminution of the estate, absence of a reasonable likelihood of rehabilitation, and mismanagement. This argument lacks merit and is nonsensical. Conversion to chapter 7 immediately wipes away the progress made to date and would result in materially lower recoveries for creditors than are already provided for in either transaction contemplated under the Plan. Disclosure Statement, Exhibit B (showing 51% estimated recovery for Account Holder Claims under the Plan, 45% under a chapter 11 liquidation, and 35%- 39% under a hypothetical chapter 7 liquidation). And creditors have overwhelmingly rejected this proposition through the solicitation process, with an incredible 97% voting in favor to approve the current Plan. To grant the Letter's request would be to override the will of the Debtors, the UCC, and the vast majority of creditors who support the Plan.

33. Similar to the consideration of whether appointment of a chapter 11 trustee is justified, the question of whether to convert a chapter 11 case to a chapter 7 case turns on whether there is sufficient "cause" to do so. Under 11 U.S.C. § 1112(b)(1), "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." Section 1112(b)(4) of the Bankruptcy Code contains a non-exhaustive list of causes for conversion, including "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and

15

"(B) gross mismanagement of the estate." *See In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 692 (S.D.N.Y. 2020), aff'd, No. 20-3555, 2021 WL 5917775 (2d Cir. Dec. 15, 2021). The movant bears the initial burden to demonstrate "cause." *In re Red Bull Taxi Inc.*, No. 16-13153 (MKV), 2017 WL 1753234, at *2 (Bankr. S.D.N.Y. May 3, 2017); *In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr. D.N.H. 2008).

34. Chapter 11 embraces the "two recognized policies . . . of preserving going concerns and maximizing property available to satisfy creditors." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435, (1999). Principally, the "goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the [c]hapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987).

35. The interests of the Debtors' stakeholders are best served through the Plan and the chapter 11 process. Conversion to a chapter 7 would leave a chapter 7 trustee to start these cases over again without the benefit of the sale contemplated in the Plan and, in the event the sale cannot be consummated, the toggle transaction. Notably, the toggle portion of the Plan already contemplates returning assets to creditors in a manner that will be more efficient than a chapter 7 in the event it becomes necessary for the Debtors to "toggle" to a self-liquidation. Under chapter 7, this would not be available, and the Debtors would not be able to agilely navigate the cryptocurrency market and return cryptocurrency to customers with minimal leakage to ensure maximum recoveries—a process that has already commenced and has been successful to date. Starting from square one under a chapter 7 would result in massive, inevitable value destruction. Additionally, chapter 7 would likely result in the termination of the Debtors' management team, who are integral to the Debtors' restructuring efforts and have intimate knowledge about the Debtors' business.

16

Without their involvement, recoveries and distributions to creditors would be significantly reduced. Further, these chapter 11 cases could not have advanced to their current point, with a confirmable Plan in place that is supported by a vast majority of creditors, without the support of the management team. Absolutely nothing good would come from a conversion to a chapter 7 liquidation at this juncture.

36.    The Movants support the request that the cases be converted to chapter 7 by claiming "[a] reorganization has been known by the Debtors, their representatives at Kirkland and UCC representatives at McDermott, to not be possible since late Summer of 2022 [and t]here is no interested party, after two rounds of auctions, to secure any asset of Voyager beyond their customer base, and the assets bought by the customers." Letter, Page 2. These assertions are false. In fact, the current Plan, up for confirmation in less than a week, is confirmable, has significant support from stakeholders, maximizes the value of the estates, and provides for the return of assets to customers in-kind on an efficient timeline. Indeed, that transaction, compared to all alternatives, including and especially a chapter 7 liquidation, was adjudged to be in the best interest of creditors by the Debtors and the UCC, and has now been approved by 97% of creditors.

37.    The Movants further assert that "creditor assets are not being served by continuously extending the Chapter 11 timeline." *Id.* This quip ignores, or does not take into account, that a confirmation hearing is scheduled for these chapter 11 cases imminently on March 2, 2023. It also ignores the reality that the Debtors were originally scheduled for a sale and confirmation hearing less than six months after the Petition Date premised on a sale to FTX, and only "extended" the timeline due to FTX's historic collapse—and even then pivoted very quickly to another transaction, which is contemplated under the Plan before the Court next week. Ironically, this uninformed assertion also overlooks that converting to a chapter 7 would essentially restart these bankruptcy proceedings that

17

would be incredibly time consuming and cost-inefficient, far more so than allowing the Debtors to continue carrying out these chapter 11 cases.

38. In the liquidation that the Movants request, there would be substantial uncertainties about the future of the Debtors' assets leading to further doubt over the amount of creditor recoveries and distributions. Not only does the currently proposed Plan represent the best outcome for the Debtors' estates, it is the best path forward for countless others who hold a stake in these chapter 11 cases.

39. In sum, the Movants have failed to meet their burden in establishing cause to justify converting these chapter 11 cases to chapter 7. The Movants' assertions that the continuation of the chapter 11 process will result in a substantial continuing loss to the Debtors' estate and subject the estate to mismanagement pursuant to sections 1112(b)(4)(A) and (B) of the Bankruptcy Code are predicated only on flimsy, conclusory statements. None of that is accurate. In reality, consistent with the goals of chapter 11, the Plan will preserve and enhance value for the benefit of the Debtors and their creditors, and current management: (a) has been an integral part of forming and prosecuting the Plan; and (b) is critical to implementing the Plan as efficiently as possible following confirmation.

40. For all of these reasons, the Court should also deny the relief requested in the Letter.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court deny the Motions and grant such other and further relief as the Court deems appropriate.

| | |
|---|---|
| Dated:  February 23, 2023<br>New York, New York | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>Christopher Marcus, P.C.<br>Christine A. Okike, P.C.<br>Allyson B. Smith (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:     (212) 446-4900<br>Email:           jsussberg@kirkland.com<br>                      cmarcus@kirkland.com<br>                      christine.okike@kirkland.com<br>                      allyson.smith@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |