ABIGAIL R. RYAN
Texas Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
AUTUMN D. HIGHSMITH
Texas Bar No. 24048806
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
autumn.highsmith@oag.texas.gov

ATTORNEYS FOR THE TEXAS STATE SECURITIES BOARD AND
THE TEXAS DEPARTMENT OF BANKING

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1],<br><br>Debtors. | Chapter: 11<br><br>Case No. 22-10943 (MEW)<br><br>(Jointly Administered) |

## OBJECTION OF THE TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING TO FINAL APPROVAL OF THE ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT AND <u>CONFRIMATION OF THE CHAPTER 11 PLAN</u>

The Texas State Securities Board ("SSB") and the Texas Department of Banking ("DOB"), by and through the Office of the Texas Attorney General ("Texas"), hereby files this Objection (the "Objection") to the final approval of the adequacy of disclosures in the Debtors' *Second Amended Disclosure Statement* ("Disclosure Statement") and confirmation of the *Third Amended Joint Plan*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

("Plan"). (Dkt. no. 863). In support of the Objection, Texas respectfully states as follows:

## OVERVIEW

The disclosure statement is inadequate, and the plan cannot be confirmed because adequate information was not provided to inform general unsecured creditors that—if Alameda is successful in proving its administrative expense claim—their recovery could be decreased from 51% to 24%-26%—an amount much lower than what the general unsecured claimants are estimated to receive in a Chapter 7 liquidation. Further, while the Plan states that the Debtors believe Alameda's claim is not valid and that the Debtors will try to subordinate it based upon Alameda's bad acts, little information is given to show the likelihood of success or Alameda's possible counter arguments so as to allow general unsecured creditors to weigh the risks of voting for a Plan that offers them a possible recovery between 24% to 51% or vote against the Plan and receive approximately 35% to 39% recovery in a Chapter 7.

The Disclosure Statement also fails to provide adequate information regarding the transfer, use, and indemnity requirements the account holders must agree to in order to use Binance.us services. Specifically, Binance.us's Terms of Use ("ToU") to which customers must agree shows that Binance.us relies upon Binance.com and other "Related Parties" to provide services to Binance.us and requires that customers acknowledge that all of their information given to Binance.us may be transferred to any country anywhere in the world—including countries that do not adequately regulate financial services, require the safekeeping of data, or promote the protection of customers. The ToUs also require customers to indemnify and hold harmless acts of not only Binance.us but other Related Parties, affiliates, licensors, and others. The acts for which this indemnity would relate is stated as "access to or use of the Services," and the "Services" are defined to include virtually any service that Binance.us may offer to clients. So, under these ToUs, customers' information can be transferred to almost any company or person that Binance.us desires, and, if any issues arise in the customers' access to or use of Binance.us's Services, the customers have absolutely no right to challenge the issue.

The plan needlessly and unfairly discriminates against Texas consumers by holding their assets for six months post confirmation. At the closing of the sale, Binance.us will have already received all of the Texas customers' contact information—as Binance is buying the right to Voyager's customer list, but still seeks that Voyager hold Texas consumers' coin for an extra six months while Binance.us attempts to get licensed. It will be almost impossible for Binance.us to be licensed by the Texas SSB and the DOB within six months and, as such, holding the Texas consumers' coin for six months accomplishes nothing. Further, Voyager may transfer some of the consumers' coin without the need of a Money Transmission License.

Finally, the releases and injunctions provided for in the Plan are nothing more than a disguised discharge—something that the Debtors are not allowed under 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code and should not be approved.

## OBJECTION

**A.    The Disclosure Statement Fails to Adequately Inform Unsecured Creditors that They may Receive Only at 24% to 26% Recovery under the Plan—a Percentage Lower than what the Unsecured Creditors would Receive in a Chapter 7 Liquidation.**

1.    Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, ***that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*** . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

2. This disclosure requirement is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

3. The "adequate information" requirement is designed to help creditors negotiate plan treatment with the Debtor. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions, including the disclosure requirement of section 1125. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

4. To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).

5. Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (*citing Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

6. "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

7. A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

8. The Debtors' Disclosure Statement does not adequately inform unsecured creditors that—if Alameda is successful in its administrative expense claim—the unsecured creditors' recovery would be less than what they would receive in a Chapter 7 liquidation.

9. In the sections of Disclosure Statement upon which unsecured creditors would rely, it does not mention that the recovery could be reduced from 51% to 24%[2]. For instance, in paragraph D titled "What will I receive from Debtors if the Plan is consummated?" on PDF page 22 of the Disclosure Statement, it states in bold and underlined letters:

> **In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan.**

10. While this paragraph is followed by a general warning that the recoveries are just estimates, no mention is made of the fact that the unsecured creditors' recovery could be slashed to approximately 24%.[3] In fact, the chart of approximate recoveries on PDF page 23 of the disclosure

---

[2] *See e.g.* Dkt. No. 863 at PDF pages 22-23.
[3] Dkt. No. 863 at PDF page 23.

statement lists some possibilities for unsecured creditor recoveries[4]—but fails to list the possibility that the unsecured creditor claims could be reduced to 24%.[5]

11.     One must get to PDF page 64 before the Disclosure Statement mentions that unsecured creditor recoveries could be reduced from 51% to approximately 24% if Alameda is successful in its claim. The only other time that the possibility of this reduction is mentioned is on PDF page 198 of 420, and in this paragraph the approximate percentage of reduction changes to 26% from 24%.[6]

12.     Further, the Disclosure Statement does not adequately inform the creditors of the likelihood of Alameda prevailing. The Disclosure Statement makes general statements about the historical facts of Alameda's claim, that the Debtors do not believe that the Alameda claim is valid and that, based upon Alameda's bad acts, they will seek to subordinate it, but no likelihood of success is given, nor are Alameda's potential counter arguments set out to allow general unsecured creditors to make an informed choice as to whether to vote for the Plan and receive a possible recovery between 24% to 51% or vote against the Plan and possibly receive a 35% to 39% recovery in a Chapter 7 liquidation.[7]

B.      **The Disclosure Statement is Inadequate as it Fails to inform Account Holders of Binance.us's ToUs that Require Account Holders to Allow the Transfer of Personally Sensitive Information to any Party in any part of the World as Required by Binance.us, and then Strips the Account Holders of any Legal Recourse for any Issues that may Arise.**

13.     Further, the Disclosure Statement lacks adequate information as to the ToUs that customers will have to agree to in order to use Binance.us's Services. Specifically, the independence of Binance.us from Binance.com is of the utmost importance to safeguarding consumers' privacy and coin from improper uses. While Binance.us, as Purchaser, purports to operate independently from

---

[4] Recoveries for unsecured creditors list in the chart include: Sale Transaction Recovery under the Plan = 51%; Projected Liquidation Transaction Recovery under the Plan = 45%; and Liquidation Recovery = 35% to 39%.
[5] While footnote 17 gives a high-level warning of the possibility of an Alameda recovery reducing the projected recoveries setout in the chart, no actual percentages of such reduction are mentioned.
[6] Dkt. No. 863 at PDF page 64 (citing 24%) and page 198 (citing 26%).
[7] *See e.g.* Dkt. No. 863 at PDF pages 21, 32, 64, & 198

Binance.com, the ToUs suggest otherwise. In fact, Binance.us's ToUs that customers must agree with to open an account—even if the account is unused—purport to allow the use of the customers Privately Identifiable Information and other sensitive information by unnamed "Related Parties" and "third-parties," as well as by Binance.com and require that customers hold harmless and indemnify these unnamed parties from legal liability.

> i. <u>Under Binance.us's ToU, Clients must Authorize Binance.us to rely upon and use an Unknown Number of Undisclosed Entities Operating in Unspecified Countries</u>.

14. Binance.us requires clients to accept ToU that govern the access and use of its website and the use of its services.[8] The ToU were last updated on December 7, 2022, although Binance.us may amend of modify the ToU at any time.[9] If the Binance.us APA is approved in this bankruptcy proceeding, clients of Voyager migrating to Binance.us appear obligated to accept the ToU to access their assets from Binance.us.[10]

15. The ToU purport to explain the rights clients give to Binance.us and its "<u>parents, subsidiaries, affiliates, entities under common ownership, or otherwise related parties.</u>"[11] The ToU broadly and collectively refers to the parties in this quote as "Related Parties."[12] As defined, "Related Parties" appear to include <u>Binance.com, BAM Management Co., CPZ Holdings, and Zhao</u>.[13]

16. Per the ToU, the Related Parties play key roles in the services provided by Binance.us and may even effectively permit Binance.com to act in the U.S. <u>even though Binance.com purportedly does not deal with U.S. customers</u>.[14] For example, the ToU indicates Related Parties may act as market makers as follows:

> [Binance.us] appoints market makers, including Related Parties and market makers that

---

[8] Exhibit A – Declaration of Joe Rotunda, Texas State Securities Board, at para. 107.
[9] *Id*.
[10] *Id*. at 108.
[11] *Id*.
[12] *Id*.
[13] *Id*.
[14] *Id*. at para. 109.

are incorporated or otherwise operating outside of the United States, to promote liquidity and facilitate trading on the Platform and with respect to certain of BAM's other trading products and services.[15]

17. Related Parties are also involved in other services, and the ToU requires clients to acknowledge and agree:

> …that certain services, including One Click Buy/Sell ("OCBS"), Convert, and over-the-counter ("OTC") trading, are executed against or facilitated by [Binance.us], Related Parties, and/or other entities, and that it is anticipated that there are circumstances under which [Binance.us] will transact on the platform for its own account.[16]

18. Clients must also assume certain risks related to the otherwise unnamed Related Parties and other third-parties, including risks related to digital assets deposited with Related Parties or other third-parties.[17] The ToU requires clients to acknowledge and accept the risk of Binance.us "…having Digital Assets on deposit or with any third-party, including Related Parties, in a custodial relationship that has attendant risks, which include security breaches, risk of contractual breach and risk of loss." Absent additional information, one is unable to evaluate the degree of risk or likelihood of loss resulting from Binance.us having Digital Assets on deposit or with unnamed third-parties.[18]

19. Although clients must accept the ToU and the ToU explains Related Parties and third parties are important, the ToU *does not name the Related Parties*.[19] Absent the provision of additional information, their identities, qualifications, experience, and location are apparently unknown to clients purportedly bound by these ToUs.[20]

---

[15] *Id.*
[16] *Id.* at para. 110.
[17] *Id.* at para. 111.
[18] *Id.*
[19] *Id.* at para. 112.
[20] *Id.* at para. 112.

  ii.  *Security and Use of Sensitive Identifying Information.*

20. Section 1.1 of the Purchase Agreement provides that Voyager, prior to closing, is required to provide Binance.us with "Acquired Assets." Sections 1.1 and 1.1(b) of the APA defines "Acquired Assets" to include, to the extent permissible under federal, state, local and other laws, names, account numbers, social security numbers, passports and passport numbers, driver licenses and driver license numbers, email and mailing addresses, phone numbers, user names, user IDs, passwords and other information for all active and inactive Voyager User Accounts and other customers located or having a home address in the United States.

21. The Purchase Agreement does not appear to impose any restrictions or requirements that relate to the use of personal identifying information and other sensitive information by Binance.us. The ToU accepted by clients does, however, appear to broadly authorize Binance.us to transfer this information.[21] Clients appear obligated to agree as follows:

> [a]ll information processed by [Binance.us], its Related Parties, or other parties from which [Binance.us] receives data management services may be transferred, processed, and stored anywhere in the world, including, but not limited to, the United States.[22]

22. As such, absent additional clarification, this clause shows that Binance.us may be able to transfer, process, and store this information in any country—including countries that do not adequately regulate financial services, require the safekeeping of data, or promote the protection of customers.[23] Moreover, the ToU does not seem to provide clients with the identity of countries that have received or may receive such information or provide a mechanism for clients to discover this information in the event of any compromise of such information.[24]

---

[21] *Id.* at para. 114, fn. 9 which states "The ToU also direct clients to review and accept its privacy policy. By its own terms, the privacy policy does not limit the ToU and even explains that Binance.us uses client information in accordance with the ToU."
[22] *Id.* at para. 114.
[23] *Id.* at para. 115.
[24] *Id.* at para. 115.

      ii.      *Waiver of Legal Liabilities*.

23.    The ToU purports to limit not only Binance.us legal liability but also the liability of Related Parties and the Staking Services Provider and the officers, directors, employees, affiliates, agents, licensors, and contractors thereof. As such, it requires clients to agree to "*indemnify and hold harmless*" these parties *from and against all claims, suits, investigations and other allegations and actions brought by any third-party, including governmental authority*, in any way related to their "access to or use of the Services." It broadly defines "Services" to include virtually any service Binance.us may offer to clients.[25]

24.    Again, the ToU does not identify the Related Parties. It also does not define many of these new terms – such as licensors and contractors—or provide clients with the identity, location, or experience of said parties. Moreover, as drafted, clients may be required to indemnify Binance.us or others—including unknown parties—for costs arising out of investigations, allegations, or claims brought against Binance.us in this bankruptcy proceeding.[26]

25.    Because the Disclosure Statement fails to give information adequate for general unsecured creditors to weigh the risk of voting for a Plan that, in the end, could slash their recovery to 24%-26%—an amount less than they would receive in a Chapter 11, and because account holders are not adequately informed as to the use of their private information and legal waivers they must sign in order to use Binance.us's Services, the Disclosure Statement should not be approved and the Plan should not be confirmed.

**C.**    **The Plan Needlessly and Unfairly Discriminates Against Texas Consumers**.

26.    The Plan does not satisfy the requirements for confirmation because the terms of the APA, which are incorporated into the Plan, discriminate between customers based on their state of

---

[25] *Id*. at para. 116.
[26] *Id*. at para. 117.

residency.

27. As this Court is aware, the APA and Plan both provide that because Texas is a jurisdiction not supported by Binance.us, the Texas customers' coin will not transfer from the Debtor to Binance.us, but, instead, will be held by Voyager for six months to allow Binance.us an opportunity to become licensed by the DOB and SSB.

28. While Binance.us has affirmatively represented to its customers that it was working on getting licensed in Texas[27], Binance.us has never applied for a license with the SSB[28], and, after a year, abandoned its license application with the DOB after failing to submit sufficient financial information.[29]

29. To believe that Binance.us will be able to fulfill the licensing requirements of the DOB in six months—when they could not do so in a year—defies logic. However, because of this belief, Texas customers will be required to wait for six (6) months in a highly volatile and fluctuating market while Binance.us purports to obtain appropriate licensure, and failing that approval, have their assets liquidated for disbursement pursuant to the Plan.

30. At closing, Binance will have already received what it bargained for—Voyager's customer list, which includes all of the Texas customers' personal information. To hold the customers' coin for six months longer serves no purpose, as it will be all but impossible to become licensed with the SSB and DOB in that amount of time.

31. There is no reason, however, for Binance and Voyager to treat Texas as an "unsupported jurisdiction" because Texas does not require Binance or the Debtors to have "a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations

---

[27] Exhibit A at para. 60.
[28] *Id.* at para. 61.
[29] *Id.* at para. 19, 26, 64, 118.

TEXAS DOB AND SSB OBJECTION                                                                                   PAGE 11

hereunder."[30]

32. First, Texas only treats transmission of "stablecoin" virtual currency as money transmission. Non-stablecoin virtual currency transmission and custody services are not regulated by the Texas Money Services Act.[31] Binance does not need a Texas money transmission license to provide Voyager's Texas customers with transmission, exchange, or custody services relating to non-stablecoin virtual currencies such as Ether or Bitcoin.[32]

33. Second, Texas does not require a Texas money transmission license for payment or transmission of money or monetary value, including stablecoin, to Texas payees from out-of-state payors. Since Voyager is the initial payor for the distributions made through Binance, and since Voyager is not located in Texas, Binance does not need a Texas money transmission license to receive stablecoin from Voyager for distribution to Voyager's Texas customers. Binance can provide distributions to Voyager's Texas customers through Binance accounts on a withdrawal-only basis without a Texas money transmission license.

34. While Binance would need a license to solicit or accept further deposits of monetary value or stablecoin from Texas customers for custody or transmission, Binance does not need to conduct such activities in order to consummate the sale transaction and perform its obligations under the APA. Nothing in the APA requires Binance to conduct additional money transmission using additional money or monetary value that is not directly distributed by Voyager. Binance does not need to conduct this further money transmission to consummate the Voyager asset purchase and perform

---

[30] Dkt. No. 835, the *Binance Asset Purchase Agreement* as amended at § 6.12(b).

[31] *See* Supervisory Memorandum 1037, Regulatory Treatment of Virtual Currencies Under the Texas Money Services Act (April 1, 2019) (explaining that "a sovereign-backed stablecoin may be considered money or monetary value under the Money Services Act" but that other cryptocurrencies as currently implemented cannot be considered money or monetary value under the Money Services Act"), *available at* https://txdob.ctspublish.com/texas/browse/txdobset/texas/z20000593/JD_SM-1037.

[32] While licensure by the Texas State Securities Board would likely be required to exchange non-stablecoin virtual currencies, no license would be required to make a one-time disbursement or allow customers to withdraw their coins without the option to further exchange or invest in products of Binance.us.

Binance's obligations thereunder. Therefore, Texas should not be treated as an "Unsupported Jurisdiction" under the APA or Plan.

**D.   The Releases and Injunctions provided for in the Plan Provide the Equivalent of a Discharge to the Debtors, to Which the Debtors are not Entitled Under 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code.**

35.   Section VIII.B of the Plan, entitled "Releases by Holders of Claims and Interests," is nothing more than a disguised discharge—a benefit to which the Debtors are not entitled. Specifically, this section of the Plan releases Debtors and Debtors' officers, directors, and employees, and Binance.us, among others, from all "Causes of Action" by all "Releasing Parties." The phrase "Causes of Action" is broadly defined, and, when coupled with Section VIII.D of the Plan—the Injunction section—only furthers the scope of this disguised discharge.

36.   Under 11 U.S.C. section 1141(d)(3), a plan does not discharge a debtor if "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. section 1141(d)(3). Here, the Debtors' Plan is a liquidating plan, which establishes a Wind-Down Trust that will not conduct any business operations. Further, the Debtors would be denied a discharge under Section 727(a)(1) because the Debtors are not individuals.

37.   Therefore, the Releases and Injunctions provided for in the Plan should not be approved as they amount to a disguised discharge to which the Debtors are not entitled.

## PRAYER

WHEREFORE premise considered, the Texas State Securities Board requests that the Disclosure Statement not be approved, and the Plan not be confirmed and for any other relief that the Court finds the Texas Department of Banking and the State Securities Board entitled.

Dated: February 24, 2023,                  Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 24035956
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
S.D.N.Y. Bar Number RD8227
Texas Bar No. 24095553
AUTUMN D. HIGHSMITH
Texas Bar No. 24048806
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2173
Facsimile: (512) 936-1409
jason.binford@oag.texas.gov
layla.milligan@oag.texas.gov
abigail.ryan@oag.texas.gov

ATTORNEYS FOR THE TEXAS DEPARTMENT OF BANKING
AND THE TEXAS STATE SECURITIES BOARD

## CERTIFICATE OF SERVICE

      I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on February 24, 2023.

*/s/ Abigail Ryan*
ABIGAIL RYAN
Assistant Attorney General