**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1],<br><br>Debtors. | Chapter: 11<br><br>Case No. 22-10943 (MEW)<br><br>(Jointly Administered) |

**FIRST AMENDED DECLARATION OF JOSEPH JASON ROTUNDA**
**DIRECTOR OF ENFORCEMENT OF THE TEXAS STATE SECURITIES BOARD**

My name is Joseph Jason Rotunda. I am over eighteen (18) years of age and competent to testify to the matters included in this declaration. I am making this declaration voluntarily and based upon my personal knowledge.

## BACKGROUND OF DECLARANT

1. I am an attorney and I have been licensed to practice law in Texas since May 2001.

2. I have been employed as the Director of the Enforcement Division of the Texas State Securities Board (the "TSSB") since March 2007. The TSSB is a state agency charged with protecting Texas investors. Its Enforcement Division is responsible for detecting and preventing violations of the Securities Act, Tex. Gov't Code §§ 4001.001-4008.105 (the "Texas Securities Act"), including fraud committed in connection with the sale of securities, illegal sales of unregistered securities, and sales of securities by unregistered dealers. The Enforcement Division also pursues administrative and civil enforcement actions, refers criminal cases for prosecution, and assists prosecutors in securing convictions.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

3.   I serve as the Vice-Chair of NASAA's Enforcement Section. NASAA was organized in 1919 and is the oldest international organization devoted to investor protection. Its membership consists of 67 state, provincial, and territorial securities agencies from 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Canada, and Mexico. Among other things, NASAA's Enforcement Section oversees the activities of project groups dedicated to commodities and derivatives, technology, training, and other matters.

4.   I am familiar with digital assets through my employment with the TSSB and work with NASAA. I first began considering digital assets in 2013 as part of NASAA's Enforcement Section, and that year I drafted a public warning recognizing that bad actors may begin fraudulent schemes tied to digital currencies. The following year, I prepared and distributed reference materials to securities regulators and spoke about digital currencies at NASAA's Annual Public Policy Symposium. Since 2014, I have served as a speaker addressing digital assets at other conferences, events, and training sessions for NASAA, the U.S. Commodity Futures Trading Commission (the "CFTC"), the Financial Industry Regulatory Authority, the U.S. Securities and Exchange Commission (the "SEC"), the Federal Trade Commission, law enforcement agencies and associations, and various private organizations.

5.   I have supervised numerous investigations and enforcement actions involving digital assets. In 2017, the Enforcement Division secured the first enforcement action filed by a state securities regulatory agency against a promoter of fraudulent digital asset investments. Since the entry of this action, the Enforcement Division has secured enforcement actions against approximately 200 parties accused of illegally and/or fraudulently offering products tied to digital assets to Texans.

6.   I have been coordinating and leading other securities regulators. In 2018, I helped organize and manage a task force with members from more than 40 jurisdictions that led to more than 300 inquiries and investigations and more than 85 enforcement actions involving cryptocurrency investments. More recently, I have been assisting a working group of state securities regulators considering investments in interest-bearing cryptocurrency depository accounts. The TSSB and other members of the group filed administrative enforcement actions, including orders and charging documents, related to these products against parties that include Voyager Digital Ltd., Voyager Digital Holdings, Inc., and Voyager Digital, LLC (collectively "Voyager"), Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Network, LLC, and Celsius Lending, LLC (collectively "Celsius") and BlockFi, Inc., BlockFi Lending, LLC, and BlockFi Trading, LLC (collectively "BlockFi").

7.   In 2022, BlockFi settled many cases and claims from various securities agencies when a BlockFi entity agreed to pay approximately $50 million to state regulators, approximately $50 million to the SEC, and to register future products. Although Voyager and Celsius have since filed for bankruptcy, the TSSB cases against Voyager and Celsius are pending at the State Office of Administrative Hearings ("SOAH"). The TSSB also filed administrative charging documents against Sam Bankman-Fried ("Bankman-Fried"), believed to be the control person of West Realm Shires Services dba FTX US ("FTX.us"), and Alexander Mashinsky ("Mashinsky"), believed to be the control person of Celsius.

## PREVIOUS OBJECTION TO VOYAGER'S
## PRIOR AGREEMENT TO SELL ASSETS TO FTX.US

8.   On October 14, 2022, Texas objected to Voyager's proposed sale of certain assets, consisting largely of its client accounts, to FTX.us. The objection included a declaration that cited the TSSB investigation of FTX.us, FTX Trading, LTD., and Bankman-Fried. The objection was

filed before the collapse of FTX.us and entities controlled by Bankman-Fried and before the arrest of Bankman-Fried.

9.    Following the collapse of FTX.us, Voyager announced it agreed to a proposed sale of client accounts to BAM Trading Services, Inc. dba Binance.us ("Binance.us"). I have prepared this declaration in support of an objection to Voyager's proposed sale of client accounts to Binance.us as I believe it is in the public interest and relates to potential harm to Voyager clients.

### THE TSSB INVESTIGATONS OF BINANCE.US, BINANCE.COM, AND ZHAO

10. This declaration summarizes certain evidence and information received during the Enforcement Division's investigation of Binance.us, Binance Holdings Ltd. ("Binance.com"), Changpeng Zhao ("Zhao"), and other persons and entities affiliated therewith.

11. The Enforcement Division initially opened its case on August 27, 2019, one day after Binance.com announced it was launching Binance Lending. At the time, Binance.com was promoting Binance Lending by purportedly guaranteeing passive returns as high as 15% to clients.

12. On May 18, 2021, the Enforcement Division opened a new investigation to consolidate and organize its work in reviewing cryptocurrency depository accounts. This investigation includes Binance.com, Binance.us, and Zhao, as well as Celsius, Voyager, and others believed to be parties dealing in the same or similar investments.

13. Information reviewed during the TSSB investigation indicates Zhao was born in the Jiangsu province of China but emigrated to Vancouver, Canada, as a child. The information also indicates Zhao later returned to China and appears to have resided in China until as recently as 2017. However, we have learned that Zhao does not currently appear to be a resident of China. He claims to be Canadian, and our investigation shows he receives correspondence in London, England, and he may reside in Malta.

14. I have reviewed information that shows Zhao founded Binance.com in China on or about July 14, 2017. I have also reviewed information where Zhao claims Binance.com is not a Chinese company, that Binance.com was never incorporated in China, and that Binance.com does not currently operate in China.

15. Binance.com does not have a parent corporation and Binance.com does not appear to publish the current address of its headquarters or any offices. Binance.com is, however, believed to maintain a business address in the Cayman Islands. The investigation shows that Zhao currently serves as the Chief Executive Officer of Binance.com and appears to continue to directly or indirectly own Binance.com.

16. Binance.com now purportedly operates the largest cryptocurrency exchange based on trading volume. In addition to spot trading, it offers other products and services, including investments that appear facially similar to the cryptocurrency depository accounts offered by BlockFi, Voyager, Celsius, and other firms.

17. On or about June 14, 2019, Binance.com announced it would cease offering services to individual and corporate clients located in the United States. The restriction was memorialized in its terms of use and became effective on September 12, 2019. As of January 1, 2023, the terms of use adopted by Binance.com continue to purport to prohibit dealings with clients located in the United States.

### THE OWNERSHIP AND REGULATION OF BINANCE.US

18. The day before Binance.com claimed it would stop transacting business in the United States, it announced it planned to expand to the United States through a partnership with Binance.us. It published the announcement on its website. I have reviewed the announcement, and it reads in part as follows:

Global cryptocurrency exchange Binance[.com] today announced its partnership with BAM Trading Services Inc. [later known as Binance.us] to begin preparation to launch trading services for users in the United States. Binance[.com] will license its cutting-edge matching engine and wallet technologies to its US partner BAM to launch Binance.US, acknowledged by its recently approved FinCEN registration on June 11, 2019.

19. At the time of this announcement, Binance.us was already incorporated with the Delaware Department of State, Division of Corporations. It had also already obtained its registration as Money Services Business with the Financial Crimes Enforcement Network, Department of the Treasury ("FinCEN"), pursuant to the Bank Secrecy Act of 1970, 31 U.S.C. 5311 et seq., and regulations promulgated thereunder. Its license number is 31000229445266. I reviewed the FinCEN database as recently as December 30, 2022, and noted it shows Binance.us conducts money service business activities in the District of Columbia and various states, including Texas. However, as described later in this declaration, Binance.us applied for but failed to obtain a money transmitter license in Texas and its application was deemed abandoned in December 2022.

20. Binance.us is headquartered in Palo Alto, California, and operates a platform that permits users to buy, sell, and trade cryptocurrencies through an online portal or a smartphone application. As of January 4, 2023, Binance.us also permits clients to earn up to 15% APY by staking cryptocurrencies.

21. Zhao is the Director of Binance.us and indirectly owns Binance.us through a series of corporate affiliates. He owns 100% of CPZ Holdings, Limited ("CPZ Holdings"). CPZ Holdings owns 100% of BAM Management Company Limited ("BAM Management Co."). BAM Management Co. owns approximately 81% of BAM Management US Holdings, Inc. ("BAM

Management US"). BAM Management US owns 100 percent of the common stock issued by Binance.us.[2]

22. Based on this organizational structure, Zhao appears to be the indirect owner of both Binance.us and Binance.com. As described herein, Zhao is Canadian and not believed to be a resident of the United States.

23. As also described herein, although BAM Management US and Binance.us are domestic companies, they are controlled by foreign entities organized in different countries. BAM Management Co. is a Cayman Islands Limited Company and CPZ Holdings is a British Virgin Islands Limited Company.

24. Although Binnace.us is a domestic entity, it is affiliated with Binance.com. As described earlier herein, both entities appear to be under common ownership and control of Zhao. As described later herein, they also share a contractual relationship and Binance.us relies on intellectual property it licenses from Binance.com and services provided by affiliates controlled by Zhao. As also described later herein, Binance.us appears to require all clients – including clients acquired from this bankruptcy proceeding – to agree to terms of use that authorize certain dealings between Binance.us and certain unnamed "Related Parties," a term that includes parents, affiliates, and entities under common ownership. Clients of Binance.us – a domestic company – therefore agree to give rights and authority to "Related Parties" that include the Cayman Islands Limited Company, a British Virgin Islands Limited Company, and an owner who may reside in Malta.

25. Based upon my training and experience, I know the TSSB and other state securities regulators often experience difficulty – and in some cases are simply precluded – from effectively

---

[2]    This is a non-exclusive list of potential affiliates of Binance.us and/or parties under common control of Zhao. Other affiliates and/or parties may include BAM Securities, Inc., Binance Capital Management, Binance Asia Services Pte. Ltd., Binance Jersey, Binance Uganda, and other entities.

protecting investors when they purchase investments from organizations operating outside the United States, their information is transferred and/or maintained outside the United States, or their assets or funds are transferred to and/or maintained by entities operating outside the United States. The TSSB and other state regulators may therefore experience difficulty protecting, obtaining information for, subpoenaing records from, or monitoring dealings with Voyager clients following any sale of their accounts. The issues associated with readily obtaining accurate information about Binance.com are even more significant in light of the Ontario Securities Commission ("OSC") accusing Binance.com of providing false information and the UK Financial Conduct Authority (the "FCA") finding an affiliate "is not capable of being effectively supervised." The OSC and FCA actions are described in the next section of this declaration.

26. Moreover, Binance.us has already failed to provide information to a Texas regulator. When it unsuccessfully applied for a money transmission license in Texas, Binance.us repeatedly failed to provide requested information about Zhao to the Texas Department of Banking (the "DOB"). The repeated failure to provide information about Zhao to the DOB is described later in this declaration.

## RECENT REGULATORY ACTIONS AGAINST BINANCE.COM, BINANCE.US, ZHAO AND AFFILIATED OR RELATED PARTIES

27. I am aware of regulatory issues implicating Binance.com and Binance.us, as well as affiliates thereof or entities believed to be owned or controlled by Zhao. This section of the declaration summarizes some, but not all, recent regulatory issues.

28. The OSC is the regulator responsible for administering and enforcing compliance with Ontario's Securities Act and its Commodity Futures Act, and it is also responsible for administering certain provisions of Ontario's Business Corporations Act.

29. On or about December 30, 2021, the OSC released a statement that explained "[n]o entity in the Binance group of companies holds any form of securities registration in Ontario" and "they are not authorized to offer trading in derivatives or securities to persons or companies located in the province."

30. On March 17, 2022, the OSC published an undertaking given by Binance.com and Binance Canada Capital Markets. The undertaking was executed by Zhao for Binance.com and Lawrence Truong for Binance Canada Capital Markets.

31. The OSC issued an announcement describing the undertaking and the acts preceding the entry of the undertaking. The announcement reads in part as follows:

> In 2021, Binance publicly announced its intention to withdraw its services from Ontario. However, on December 29, 2021, Binance falsely notified investors that it was allowed to continue its operations in Ontario. These events resulted in the OSC issuing an announcement on December 30, 2021 to confirm that no entity in the Binance group of companies holds any form of securities registration in Ontario. This continues to be the case.

> Further, Binance subsequently confirmed to OSC Staff and advised Ontario investors that trading restrictions were in place for Ontario accounts on the Binance platform, whereas at the time Ontario investors were in fact able to continue to trade.

> In the undertaking, Binance confirms that activities involving Ontario residents have ceased, apart from certain permitted actions to protect investors. Additionally, Binance commits that it will continue to prevent any activities involving Ontario residents, apart from these permitted actions, and to provide fee waivers and offer

fee reimbursements to certain Ontario users. Binance undertakes to maintain these restrictions until further notice to Binance by the OSC.

32. The De Nederlandsche Bank is the central bank of the Netherlands. Its mission is to safeguard financial stability and contribute to sustainable prosperity in the Netherlands.

33. On or about April 18, 2021, the De Nederlandsche Bank issued a public warning regarding Binance.com. It reads in part as follows:

> De Nederlandsche Bank (DNB) announces that Binance* is providing crypto services in the Netherlands without the required legal registration with DNB. This means Binance is not in compliance with the Anti-Money Laundering and Anti-Terrorist Financing Act (Wet ter voorkoming van witwassen en financieren van terrorisme – Wwft) and is illegally offering services for the exchange between virtual and fiduciary currencies and it is illegally offering custodian wallets.
>
> This may increase the risk of customers becoming involved in money laundering or terrorist financing.

34. The announcement uses an annotation to explain the term "Binance" includes Binance.us. The annotation is referenced using an asterisk and reads, "[t]his includes Binance Holdings Limited [Binance.com in this declaration] as the owner of intellectual property rights, as well as the entities ("Binance Operators") under which Binance provides crypto services in the Netherlands."

35. On or about April 25, 2022, based on violations of the Money Laundering and Terrorist Financing (Prevention) Act, the De Nederlandsche Bank assessed an administrative fine of EUR 3,325,000 against Binance.com for offering unregistered crypto services. In a translated statement, it claimed "[t]he basic amount [of the fine] has been increased due to the increased seriousness

and culpability." Although Binance.com reportedly objected to the fine on or about June 2, 2022, it apparently withdrew the appeal on or about July 27, 2022. In a translated statement, the De Nederlandsche Bank announced the withdrawal of the appeal means the fine has "become irrevocable."

36. The FCA is the agency responsible for regulating financial services in the United Kingdom. On June 26, 2021, the FCA published a warning titled *Consumer warning on Binance Markets Limited and the Binance Group*. The warning alleged "[t]he Binance Group appear [sic] to be offering UK customers a range of products and services via a website, Binance.com" and explained that "Binance Markets Limited [an affiliate of Binance.us] is not permitted to undertake any regulated activity in the UK."

37. The FCA later updated the warning to reflect the entry of its First Supervisory Notice, Reference No. 688849, dated June 25, 2021. The First Supervisory Notice found, among other things, that Binance Markets Limited (referred to as the "Firm" therein) failed to (a) provide requested information relating to how its business and the Binance Group were organized, (b) explain the routes UK customers could use to purchase products, and (c) identify the legal entity behind www.binance.com. It also found as follows:

> Based upon the Firm's engagement to date, the FCA considers that the Firm is not
> capable of being effectively supervised. This is of particular concern in the context
> of the Firm's membership of a global Group which offers complex and high-risk
> financial products, which pose a significant risk to consumers.

38. The First Supervisory Notice also prevented Binance Markets Limited from carrying out certain regulated activities without prior written consent from the FCA and required it to add a

disclaimer to its website. On July 1, 2021, Binance.com updated www.binance.com to include a disclaimer that, as of January 4, 2023, reads in relevant part as follows:

> Binance has updated its website and app to provide a notice about Binance Markets Limited ("BML") as requested by the Financial Conduct Authority ("FCA") in the United Kingdom ("UK").

> The FCA issued a notice on 2021-06-26 (UTC) ("FCA Notice") regarding Binance Markets Limited. BML is a company incorporated in the UK and regulated by the FCA. BML is a separate legal entity and does not offer any products or services via www.binance.com.

> The FCA Notice applies only to BML, as the entity is regulated by the FCA. The FCA Notice requires BML to seek prior written consent of the FCA in order to undertake any regulated activities in the UK. The FCA Notice does not apply to the products and services provided through www.binance.com, nor does it change any arrangement with our users.

> We are aware of some confusion in the community and wish to provide clarity on the situation.

## SEC ALLEGATIONS THAT A TOKEN LISTED BY BINANCE.US IS REGULATED AS A SECURITY BY FEDERAL SECURITIES LAWS

39. On or about July 21, 2022, the SEC filed a civil complaint against a former manager of Coinbase Global, Inc. and others in *SEC v. Ishan Wahi et al.*, Case No. 2:22-cv-01009 in the United States District Court for the Western District of Washington, Seattle Division.[3] The

---

[3]    The SEC action was not filed against Binance.com, Binance.us, or Zhao. Instead, it involves accusations of insider trading of certain crypto asset securities that Coinbase Global, Inc. allegedly announced would be listed on its platform.

complaint alleged the defendants were part of a scheme to trade cryptocurrencies based on inside information.

40. The complaint filed by the SEC focused in part on AMP. I am familiar with AMP and understand it is an ERC20-compatible cryptocurrency that uses a proof-of-stake consensus mechanism and purportedly enables the immediate settlement of payment transactions. Its contract address is 0xfF20817765cB7f73d4bde2e66e067E58D11095C2, and as of 10:45 a.m. CT on January 3, 2023, its market capitalization is approximately $130.5 million, its circulating supply is approximately 43.2 billion, and its price is approximately $0.003093 per AMP.

41. The complaint filed by the SEC alleged AMP "was a crypto asset security." Binance.us had listed AMP on its platform and, as such, Binance.us appears to have offered AMP to most residents of the United States. After the SEC alleged AMP was a security, Binance.us removed AMP from its platform effective August 15, 2022.

## REPORTS OF OTHER
## INVESTIGATIONS BY REGULATORS AND LAW ENFORCEMENT

42. In 2021, Bloomberg reported the U.S. Justice Department, Internal Revenue Service and CFTC were investigating Binance.com.

43. On or about June 6, 2022, Bloomberg reported the SEC was investigating whether Binance.com's initial coin offing of Binance coin, commonly referred to as BNB, was an unregistered securities offering that violated federal securities laws.

44. On or about December 12, 2022, Reuters reported the U.S. Department of Justice is investigating Binance.com and Zhao. According to its reporting, the investigation is focusing on compliance with U.S. anti-money laundering laws, and "[s]ome of the at least half dozen federal prosecutors involved in the case believe the evidence already gathered justifies moving

aggressively against the exchange and filing criminal charges against individual executives including founder Changpeng Zhao."

45. As described in more detail later in this declaration, on or about February 12, 2023, the Wall Street Journal reported the SEC issued a Wells notice to an issuer of Binance USD.

**ALLEGED USE OF BINANCE.COM BY CRIMINALS FOR MONEY LAUNDERING**

46. I am familiar with Chainalysis, Inc. ("Chainalysis"), a business that operates in New York and provides blockchain data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies. I am also aware that some state securities regulators have engaged Chainalysis to provide blockchain training, tools, and/or other services.

47. On January 15, 2020, Chainalysis issued a report titled *Crypto Money Laundering: How Criminals Cash Out Billions in Bitcoin and Other Cryptocurrencies*. The report discussed its work in tracing approximately $2.8 billion in Bitcoin believed to have been moved from criminal entities to cryptocurrency exchanges in 2019. Chainalysis found Binance.com received 27.5% of Bitcoin, valued at around $770 million – a sum greater than any other cryptocurrency exchange.

48. At least one Texas resident filed a lawsuit against Binance.com and other defendants that alleges conduct consistent with the report by Chainalysis. The case was filed in the United States District Court for the Eastern District of Texas on May 20, 2022, and it is styled *Gadasalli v. Bulasa et al.*, Case No. 4:22-cv-00249-ALM.

49. The lawsuit generally alleges the plaintiff was the victim of a pig butchering scheme[4] that induced her to transfer fiat currency and cryptocurrency valued at more than $8 million. The

---

[4]    A pig butchering scheme is a type of affinity fraud where scammers seemingly contact victims at random and, over subsequent communications, gain their trust. The scammers then leverage the trust to convince the victims to purchase fake investments or otherwise transfer funds to undisclosed criminal enterprises. The name of the scheme is a reference to fattening hogs before slaughter.

amended complaint[5] specifically alleges the plaintiff met a defendant through Tinder, a popular online dating service, and communicated through WhatsApp, a popular application that permits text, video, and voice communications. The plaintiff claims she was enticed by false promises of romance and financial prosperity through cryptocurrency investments. She allegedly sent fiat currency and cryptocurrency to defendant and/or an associate of defendant, and that Binance.com and another exchange allegedly rendered substantial assistance to defendant by ignoring their own internal policies and procedures and by knowingly maintaining inadequate KYC/AML policies. Binance.com reportedly collected "significant transaction fees" from the scheme.

50.  On June 20, 2022, the Court issued a scheduling order that set a final pretrial conference for June 29, 2023. As of December 30, 2022, the latest entry in the docket, as reflected in PACER, was dated June 27, 2022. It shows Binance.com filed a motion to dismiss the amended complaint for lack of personal jurisdiction and failure to state a claim for which relief can be granted. The motion appeared to be pending as of the date of the original declaration.

### TSSB COMMUNICATIONS WITH BINANCE.COM, BINANCE.US AND ZHAO

51. On May 14, 2021, I sent correspondence addressed to Zhao as the Chief Executive Officer of Binance.com and Brian Brooks as the Chief Executive Officer at Binance.us. The correspondence notified Zhao and Brooks that the Enforcement Division understood that

---

[5]    The amended complaint alleges that "the Texas State Securities Board (TSSB) is one of the most active and prominent state-based regulatory bodies in the United States that investigates and prosecutes malfeasant actions by cryptocurrency businesses and harm-inducing actors. In one such prosecution, the TSSB issued a March 2021 "Cease and Desist Order" to prevent a Binance impersonator from operating in Texas under the business names "Binance Assets" and "BinanceAssets LTD" -- an Order that, upon information and belief, was issued with BINANCE's assistance and approval and which BINANCE's Chief Executive Officer (Changpeng "CZ" Zhao) publicly praised on Twitter on the company's behalf…" The text is followed by an image that shows a tweet purportedly from Zhao that contains three identical emojis of folded hands and a hyperlink to an article published by CoinDesk discussing the case. I am familiar with the action referenced in the complaint and the image of the tweet. It was an Emergency Cease and Desist Order entered against Delta Crypt Limited dba Binance Assets dba BinanceAssets LTD dba Bit Kind LTD, numbered as Order No. ENF-21-CDO-1831 and issued on March 14, 2021. I supervised the investigation of this case, reviewed the evidence, assisted in drafting and revising the action, and assisted in drafting the press release. I do not recall, and our records do not reflect, receiving assistance or approval from Binance.com, Binance.us, or Zhao.

Binance.com and Binance.us were promoting, offering, or otherwise dealing in certain products that paid variable or fixed rates of returns to clients who deposited, transferred, or tendered cryptocurrencies. It also provided Zhao and Brooks with an overview of the Texas Securities Act and explained the products may constitute investment contracts, notes, or evidences of indebtedness regulated as securities by the Texas Securities Act.

52. On or about June 15, 2021, Binance.com, through counsel, responded to the inquiry. It provided the Enforcement Division with information that explained "Binance[.com] is unable to provide services to any U.S. person." As of December 30, 2022, Binance.com appears to be continuing to deal in interest-bearing cryptocurrency depository accounts or similar products in other countries. Per its website, Binance.com also continues to purport to restrict sales by excluding residents of the United States.

53. On June 18, 2021, Binance.us, through counsel, informed the Enforcement Division that Binance.us "does not offer users an interest-bearing deposit account for digital assets" and that it does not "offer any other equivalent products or services."

54. Although Binance.us may not be offering interest-bearing cryptocurrency depository accounts in the United States, it offers other services to residents of the United States. However, I understand that Binance.us restricted residents of 13 states, including Texas, from accessing its services when it launched in the United States in or around September 2019.

55. Since then, Binance.us started offering services to residents of at least 9 of the 13 states it originally banned from accessing and using its services. Binance.us now appears to offer its services to residents of 46 states. It continues to purport to preclude residents of Hawaii, New York, Texas, and Vermont from accessing its services.

56. In or around December 2022, I downloaded the smartphone application for Binance.us and created an account by truthfully and accurately entering my credentials and identifying myself as a Texas resident. The application assigned ID No. 610003272 to me and/or my account, and I am able to use the application to review a newsfeed, access information about cryptocurrency staking, view the best and worst performing cryptocurrencies, and review other information. I am not, however, able to add a payment method, complete identity verification, or otherwise fund my account. Instead, the application indicates my region is "Not Yet Supported" and provides an explanation that reads, "[y]our local regulators have not yet approved Binance.US to operate in your region. We are working hard to gain approval as quickly as possible."

57. After installing the application and creating an account, I used a laptop computer and internet browser to access a news release purportedly issued by Binance.us on April 6, 2022. The news release contains information similar to the notification that appeared through the smartphone application. It explains that Binance.us "continues to work closely with the remaining [unsupported] state regulatory agencies to secure approvals so it can offer its services across all U.S. states and territories."

58. In December 2022, I accessed a webpage published by Binance.us that addresses the decision refrain from providing services to residents of Texas and the other three unsupported states. This webpage directs residents of these states to follow a hyperlink to "sign up now and be the first to know when we are coming your way!" The webpage also incorporates a button labeled "follow" that may provide residents of these states with the ability to track changes to the list of unsupported states.

59. The statements set forth herein suggest that Binance.us may be creating an impression that it plans to begin doing business in Texas in the future. I have uncovered other statements that also

suggest Binance.us plans to begin doing business in Texas. For example, I reviewed a tweet that asked Catherine Coley, the previous CEO of Binance.us, "[w]hen will Texas be allowed on Binance US?" On May 28, 2020, Coley, writing from @cryptocoley, responded by stating "[o]nce we are approved to operate as a business in Texas. Work in progress."

60. On August 4, 2020, Coley tweeted "Waiting for Texas? Put your name in here," followed by a hyperlink to binanceusl.ink/when.[6] On August 21, 2020, Coley tweeted "Sign up here so you're first to know when Texas! #ClearEyesFullHeartsCantLose" followed by the same hyperlink. She tweeted other comments suggesting Binance.us was working to obtain some type of authorization to operate in Texas, including a tweet on July 14, 2020, that explains "Texas, yes – we are working on our license to operate there…"

61. As described in the next section of this declaration and elsewhere herein, I am aware that Binance.us applied for but did not obtain a money transmission license from the DOB. However, notwithstanding the communications described herein, I am not aware of any dealings with the TSSB that may relate to a license, registration, or permit to offer or sell securities in Texas. My understanding is (a) neither Binance.us nor Zhao have applied to be registered as securities dealers or agents with the TSSB and (b) neither Binance.us nor Zhao have applied with the TSSB to register or permit securities issued by Binance.us.

### THE REFUSAL TO PROVIDE FINANCIAL
### INFORMATION FOR ZHAO TO TEXAS REGULATORS
### IN CONNECTION WITH A MONEY TRANSMITTER LICENSING APPLICATION

62. As described earlier in this declaration, Binance.us is registered as a Money Transmission Business with FinCEN and FinCEN's online database shows Binance.us conducts money service business in Texas.

---

[6]     I attempted to use this hyperlink but was redirected to a webpage under support.binance.us that indicated I was not authorized to access it.

63. A money services business acting as such in Texas must generally be licensed with the DOB. The website used by the DOB describes the requirement as follows:

> A money services business that conducts currency exchange or money transmission activities as defined by Chapter 151 of the Texas Finance Code must be licensed by the Department. However, a licensed money service business (MSB) may appoint authorized delegates to conduct money transmission on its behalf that are not individually licensed by the Department. The Department is responsible to protect the interests of Texas consumers who use MSBs by ensuring the overall financial condition of the MSB is sound and the MSB is properly monitoring transactions to deter money laundering, terrorist funding, or financial crimes from occurring.

64. I understand Binance.us applied for a money transmission license in Texas but the application was abandoned on or about December 5, 2022. The abandonment of the application appears to be a consequence of Binance.us refusing to provide current financial information for Zhao, as the ultimate person in control of Binance.us.

65. I have reviewed correspondence sent from the DOB to Binance.us that describes the refusal to provide this information. It indicates the DOB first requested financial information for Zhao on or about September 20, 2021, and again on or about April 28, 2022, August 2, 2022, and November 21, 2022. It also indicates Binance.us repeatedly informed the DOB it would provide financial information for Zhao. For example, the letter explains Binance.us notified the DOB on May 27, 2022, as follows:

> Changpeng Zhao is diligently working to provide an updated personal financial
> statement… a copy of which will be provided to the Department under separate
> cover as soon as possible.

66. Additionally, the letter indicates Binance.us provided a more elaborate response to the DOB on September 1, 2022, representing as follows:

> Changpeng Zhao is diligently working to provide updated personal financial
> information to address this request. [Binance.us] is more than happy to cooperate
> with this request and we look forward to providing this information to the
> Department as soon as possible. [Binance.us] anticipates providing information
> regarding Zhao's ownership in entities affiliated with [Binance.us], his ownership
> interest in entities affiliated with Binance.com, and his personal cryptocurrency
> holdings…. "[b]ecause Zhao is a high net worth individual with various complex
> financial holdings, the burden to provide the detailed personal financial statement
> would be significant. Rather, [Binance.us] believes that in this case, the probative
> value of providing such detail is clearly outweighed by the effort needed to provide
> it and that the financial responsibility of Zhao will be clearly demonstrated by the
> information that will be disclosed to the Department shortly."

67. The correspondence indicates Binance.us never provided the current financial information for Zhao. Instead, it indicates that, on or about October 21, 2022, Binance.us provided several online articles referencing Zhao's "financial responsibility" and "business acumen." These included nine online articles, including two articles from 2018.

68. In addition to failing to provide financial information for Zhao as the control person for Binance.us, the correspondence indicates Binance.us also failed to provide the DOB with material information relating to entities under common majority ownership with Binance.us.

69. As of January 4, 2023, the online database accessible through the DOB's website does not contain any entries reflecting approval or licensing of Binance.us as a money transmitter in Texas.

**BINANCE.US' STAKING PROGRAM DIFFERS FROM TRADITIONAL CRYPTO STAKING AND APPEARS TO CONSTITUTE AN ILLEGAL SECURITIES OFFERING**

70. I am familiar with staking. As the Director of the TSSB's Enforcement Division, I have supervised investigations of staking programs and understand investments tied to staking programs may be regulated as securities depending on the facts of each case, the terms of each offer, and the features of each token. For example, in January 2018, the TSSB entered its first enforcement action that found investments in a specific staking program, based on its terms and the representations of the parties, were regulated as securities by the Texas Securities Act.[7]

71. I also understand officials from the SEC similarly concluded staking programs may be regulated as securities. For example, Gurbir S. Grewal, the Director of Enforcement of the SEC, recently explained the SEC will be focusing on securities law violations relating to lending and staking products. He made these comments on June 21, 2022, when he provided the following testimony before the U.S. House of Representatives Committee on Financial Services Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets about increasing resources of the SEC's Crypto Asset and Cyber Unit:

> …the expanded unit will leverage the agency's expertise to ensure investors are protected in the crypto markets and from cyber-related threats, with a focus on investigating securities law violations related to crypto asset offerings, exchanges,

---

[7]    *In the Matter of BitConnect*, Order No. ENF-18-CDO-1754 (Jan. 4, 2018).

broker-dealers, and lending and staking products; decentralized finance ("DeFi")

platforms; non-fungible tokens ("NFTs"); and stablecoins.

72. On May 3, 2022, the SEC published a press release that contains the same or a substantively

similar position regarding staking. I have also read media reports that show, as recently as

September 2022, SEC Chair Gary Gensler publicly commented that cryptocurrencies and

intermediaries that permit holders to stake tokens may be regulated by the federal securities laws.

73. The SEC is not simply providing commentary and guidance relating to staking transactions.

Instead, it appears to be acting.  For example, on February 9, 2023, the SEC charged Payward

Ventures, Inc. and Payward Trading Ltd., entities commonly known as Kraken, in Case No. 23-

cv-588 filed in the United States District Court for the Northern District of California, San

Francisco Division. According to the complaint, Kraken promoted a cryptocurrency staking

investment program by touting the simplicity of the service and Kraken's strategies for obtaining

returns. In order to participate in the program, investors allegedly transferred cryptocurrencies to

Kraken and Kraken thereafter pooled and staked the cryptocurrencies on behalf of investors. The

SEC alleged this service constituted a regulated securities transaction.

74. Kraken did not contest the allegations in court. Instead, without admitting or denying the

allegations, it consented to a final judgment subject to court approval. The final judgment will

permanently enjoin the defendants from violating Section 5 of the Securities Act of 1933, 15 U.S.

Code § 77a et seq (the "Securities Act of 1933"), which requires the registration of non-exempt

securities, and it will also permanently enjoin the defendants, and any entity they control, from

directly or indirectly offering or selling securities through crypto asset staking services or staking

programs.

75. The SEC issued a press release announcing the action against and settlement with Kraken. The press release strongly signaled the SEC's intent of continuing to file enforcement actions against promoters of unregistered staking services. SEC Chair Gensler was quoted in the press release, and his public statement leaves no doubt about the agency's application of securities regulation to staking:

> Whether it's through staking-as-a-service, lending, or other means, crypto intermediaries, when offering investment contracts in exchange for investors' tokens, need to provide the proper disclosures and safeguards required by our securities laws… Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection.

76. Like Kraken, Binance.us offers clients the opportunity to stake tokens through its unique staking program. Binance.us's staking program implicates many different cryptocurrencies, including Audius (commonly referred to as AUDIO), Avalanche (commonly referred to as AVAX), Band Protocol (commonly referred to as BAND), Binance Coin (commonly referred to as BNB), Cardano (commonly referred to as ADA), Celer Network (commonly referred to as CELR), Cosmos (commonly referred to as ATOM), Flow (commonly referred to as FLOW), Ethereum (commonly referred to as ETH), Fantom (commonly referred to as FTM), Fetch.ai (commonly referred to as FET), Harmony (commonly referred to as ONE), Kusama (commonly referred to as KSM), Livepeer (commonly referred to as LPT), Near Protocol (commonly referred to as NEAR), Oasis Network (commonly referred to as ROSE), Polkadot (commonly referred to as DOT), Polygon (commonly referred to as MATIC), SKALE Network (commonly referred to as SKL), Solana (SOL), Tezos (commonly referred to as XTZ), The Graph (commonly referred to as

GRT), Threshold Network Token (commonly referred to as T), Tron (commonly referred to as TRX), and VeChain (commonly referred to as VET/VTHO).

77. The website for Binance.us is promoting its staking program by touting lucrative yields, and as recently as February 22, 2023, the website claimed the yield may be "up to 16.00% APY."

78. Although I am a resident of Texas and Texas is a restricted state, I am nevertheless able to access the description of the staking program as published through Binance.us' website. It describes the staking program in part as follows:

> Cryptocurrency staking allows you to earn passive income on your existing cryptocurrency holdings. Like the name suggests, cryptocurrency staking is typically, but not always, available on assets that use the Proof-of-Stake (PoS) consensus mechanism.

> Here's how it works: When you stake crypto, you commit your assets toward securing the asset's Proof-of-Stake (PoS) network. As long as your assets remain staked, they're used to verify transactions on the network, facilitate decentralized governance, and improve the network's resilience. To incentivize staking, the network generates rewards through newly created block rewards and/or transaction fees collected from circulating assets.

> Independent cryptocurrency staking can be a daunting process for most individuals. In addition to meeting hardware requirements that may vary from asset to asset, users may also need to install and run their own nodes. That's where Binance.US Staking comes in. With a user-friendly interface and industry-leading uptime across nodes, Staking is the destination of choice for customers looking to earn rewards on their assets.

79. Binance.us touts the simplicity of its staking program. For example, its website is promoting its staking program by claiming Binance.us:

> …simplifies the staking process to a few clicks, allowing customers to easily, securely, and conveniently stake and earn passive income on their cryptocurrency holdings… Enjoy peace of mind when you stake, using funds that would otherwise be sitting in your Binance.US Wallet. Choose from a growing selection of supported Proof-of-Stake cryptocurrencies, featuring some of the best APYs on the market.

80. Investors participating in this staking program must authorize Binance.us to deal with Binance.com as a Related Party. As described in more detail later in this declaration, the Terms of Use (the "ToU") for Binance.us defines the term "Related Party" to include Binance.com. Using this terminology, the ToU describe the ways Binance.com may play key roles in Binance.us' staking program and clarify the authority of Binance.us to "stake the designated Digital Assets… by delegating such Digital Assets to a third-party staking service provider… or [Binance.com as] a Related Party."

## THE LEGAL FRAMEWORK FOR ANALYZING
## THE REGULATION OF BINANCE.US'S STAKING PROGRAM

81. My analysis of the ToU, other information published by Binance.us, and other information obtained during the TSSB investigation shows the staking program promoted by Binance.us may constitute an investment contract that is regulated as a security.

82. Although I am most familiar with securities laws adopted in Texas, key provisions of the Texas Securities Act are similar to federal laws and a number of key federal court rulings have been adopted or cited with approval by Texas courts. As such, I am familiar with the definition of

"security" as set forth in the Securities Act of 1933. The federal statute, like the analogous provision of the Texas Securities Act, defines the term to include an "investment contract."

83. Neither the Texas Securities Act nor the Securities Act of 1933 does not define the term "investment contract." However, the United States Supreme Court established a test for considering whether a financial product constitutes an investment contract and is therefore regulated as a security.

84. The United States Supreme Court first articulated the investment contract test in *SEC. v. C.M. Joiner Leasing Corp*., 320 U.S. 344 (1943) and later more fully addressed in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Accounting for subsequent treatment such as *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975), the test is commonly recognized as an investment of money in a common enterprise or common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. The test was adopted in Texas in *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637 (1977), and most recently restated and applied in Life Partners v. Arnold, 464 S.W.3d 660 (2015).

85. The investment contract test is not restrictive. Instead, precedent demands the investment contract test be broadly applied and construed. In *Howey*, the United States Supreme Court even explained the investment contract test "embodies a flexible, rather than a static, principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." More recently, the United States Supreme Court considered legislative intent when applying the investment contract test, writing "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389 (2004) (quoting *Reves v. Ernst &* Young, 494 U.S. 56 (1990), a case considering the regulation of notes). Failure

to broadly construe the test consistent with legislative intent may fundamentally undermine regulation and endanger the public because promoters could simply adapt, adjust, and rework products to avoid regulation.

86. In addition to the broad construction of the investment contract test, courts focus on the substance – not the appearance – of transactions. The United States Supreme Court described this analytic framework when holding that, "in searching for the meaning and scope of the word 'security'… form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U. S. 332 (1967). Similarly, in *Forman*, the United States Supreme Court recognized that "because securities transactions are economic in character, Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto."

87. The reach of the *Howey* test is evident from the robust body of caselaw. Federal and state courts have applied the test and found many different, unique and exotic financial products constitute investment contracts, including investments tied to animals such as muskrats in *State v. Robbins*, 240 N.W. 456 (Minn. 1932), earthworms in *Smith v. Gross*, 604 F.2d 639 (9th Cir. 1979), and chinchillas in *Hollywood State Bank v. Wilde*, 70 160 P.2d 846 (Cal. 1945) and *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974), as well as investments tied to yachts in *SEC v. Payne*, 33 F. Supp. 988 (D. Mass. 1940), vending machines in *Ascher v. United States, 143 F.2d 592* (6th Cir. 1944), vineyards in *Kerst v. Nelson*, 213 N.W. 904 (1927), art in *Stenger v. R.H. Love Galleries*, 741 F.2d 144 (7th Cir. 1984), and gold and silver coins in *SEC v. Brigadoon Scotch Distribs., Ltd.*, 388 F. Supp. 1288 (S.D.N.Y. 1975).

88. The *Howey* test has also been applied to investments incorporating, derived from or otherwise tied to digital assets. For example, in 2013, the SEC filed a complaint against Trendon

T. Shavers and Bitcoin Savings and Trust, his organization, in the United States District Court for the Eastern District of Texas, Sherman Division. The complaint alleged the defendants sold investments tied to Bitcoin. According to the complaint, investors purchased the investments using Bitcoin, and the defendants paid returns of up to seven percent per week using Bitcoin. The SEC alleged the product was regulated as a security and the defendants perpetrated a Ponzi scheme.

89. On August 8, 2013, the Court issued a Memorandum Opinion determining the investments tied to Bitcoin were investment contracts and were regulated as securities. The Court thereafter revisited the issue of subject-matter jurisdiction and, on August 26, 2014, again found the investments tied to Bitcoin were investment contracts that were regulated as securities. Shavers was later prosecuted, convicted, and incarcerated.

### APPLICATION OF THE INVESTMENT CONTRACT TEST PART I: THE ECONOMIC REALITIES OF BINANCE.US' STAKING PROGRAM

90. Disregarding form for substance and recognizing that names are not dispositive, the economic realities appear to show that Binance.us' staking program does not actually provide investors with the opportunity to stake their own tokens.

91. For example, instead of developing the sophisticated technical knowledge necessary to stake tokens, clients rely on Binance.us' blockchain, digital asset and staking expertise. Additionally, clients do not need to acquire and maintain hardware necessary to stake tokens, and they are instead able to participate in the staking program through Binance.us' smartphone application or website. In fact, Binance.us uses a simplified model where clients only need to click several buttons from the user interface to consummate their transactions.

92. Because users are participating in a service managed by Binance.us, they do not interface with nodes or validators or and aspects of the blockchain. They instead interact only with

Binance.us and receive all material information and confirmations relating to the transactions from Binance.us.

93. Binance.us does not appear to provide clients with any specific information about where and how their tokens are deployed on blockchains, meaning that clients of Binance.us are apparently unable to independently verify the accuracy and truthfulness of Binance.us' communications or the profitability of their investments.

94. The Binance.us model also differs from traditional staking in the payment of rewards. Clients of Binance.us do not receive rewards directly through the blockchain; instead, Binance.us receives rewards, calculates rewards for each investor, and distributes rewards to each investor pursuant to its calculations.

95. Finally, clients of Binance.us do not have the requisite "stake" in staking because Binance.us purports to protect them from "slashing," a term that describes a penalty that reduces the number of tokens held in a node when a validator identifies harmful activity.

### APPLICATION OF THE INVESTMENT CONTRACT TEST PART II: THE FOUR FACTORS OF HOWEY AND BINANCE.US' STAKING PROGRAM

96. The analysis of economic realities clearly demonstrates that clients investing in Binance.us' staking program are not staking their own tokens. This conclusion leads to an obvious question: if Binance.us' staking program is not traditional staking, what is it? The answer, simply put, is that Binance.us' staking program is an investment of money in a common enterprise with the expectation of profit from the managerial or entrepreneurial efforts of others. In other words, because Binance.us' staking program satisfies all four factors of the *Howey* test, it is an investment contract regulated as a security.

97. The first factor of the *Howey* test is satisfied because the staking program promoted by Binance.us involves an investment of money.[8] The investment of money occurs when a client invests cryptocurrencies to invest in the staking program.

98. The mere fact that clients are transacting in cryptocurrencies instead of fiat currencies does not negate this factor. As federal courts have recognized, "in spite of Howey's reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract." *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991). Accordingly, the term "investment of money" is more broadly interpreted to mean an "investment of consideration" satisfied by payments in money or transactions in goods or services. It is clear investors are giving something of value to participate in Binance.us' staking program: the ability to maintain, control, and use tokens during the pendency of the investment in exchange for promises of returns equal to the number of tokens originally committed plus an additional number of tokens as APY.

99. The second factor of the *Howey* test is satisfied because investors are in a horizontally common relationship with each other and in a vertically common relationship with Binance.us. To satisfy the "common enterprise" aspect of the Howey test, various federal courts require a showing of either "horizontal commonality" or "vertical commonality." *Revak v. SEC Realty Corp.*, 18 F.3d. 81, 87-88 (2d Cir. 1994) (explaining that horizontal commonality is "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually

---

[8]     This paragraph and subsequent paragraphs apply the *Howey* test to Binance.us' staking program to demonstrate it appears to be an investment contract subject to regulation by federal and various state securities laws. These paragraphs summarize only key aspects of the analysis because digital assets and staking are necessarily complex subjects and courts have developed a considerable body of caselaw pertinent to the applicability of the Howey test. I am available to testify or otherwise provide a more detailed and comprehensive analysis.

combined with the pro-rata distribution of profits" and describing different forms of vertical commonality, which focus "on the relationship between the promoter and the body of investors").

100.     Investors in the staking service stand in a horizontally common relationship with each other because they invest the same assets as other investors, the same contractual terms apply to each investor, their assets are pooled with other investors, their assets are deposited in the same node or same types of nodes or nodes maintained by the same service providers as other investors, and returns are paid on equal terms to all similarly situated investors without preference. Investors in the staking service also stand in a vertically common relationship with Binance.us because they are dependent on Binance.us's efforts and expertise. These efforts and expertise are clear from the ToU and the website used by Binance.us. These materials claim Binance.us "makes staking simple," it provides "some of the best APYs on the market," it is "striving to offer class-leading APYs for all supported cryptocurrencies on Biannce.US Staking," and it is "working to bring you even more staking options to choose from." Because investors stand in a vertically common relationship with Binance.us and a horizontally common relationship with other investors, the second factor of the *Howey* test is satisfied.

101.     The third factor of the *Howey* test is satisfied because investors expect to profit from the staking program. In *Edwards*, the United States Supreme Court held that profits, as contemplated by the *Howey* test, means "profits that investors seek on their investment" and these profits are "income or return[s], to include, for example, dividends, other periodic payments, or the increased value of the investment." It also held "[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns." Applying this precedent, it is clear, for many reasons, that investors expect to profit from the staking program. Perhaps the most obvious example is Binance.us' use of terminology such as "APY" that are often associated with

certificates of deposit, promissory notes, and other traditional and regulated financial products. The returns on those traditional products, like the returns for Binance.us' staking program, are variable in nature, meaning actual rates of return may differ from projections depending on market forces like supply and demand, and on other circumstances. Investors absolutely expect to profit from their participation in the staking program – otherwise, there would be little or no incentive to invest in the service.

102.    The fourth and final factor of the *Howey* test is satisfied because profits are dependent on the essential managerial and entrepreneurial efforts of others. Clients invested in Binance.us' staking service are wholly passive, unable to take independent steps to influence the profitability of the staking service, and incapable of monitoring, independently verifying, or changing the acts of Binance.us. These clients rely on Binance.us to identify profitable tokens and to develop, maintain, and upgrade the technology and applications used to drive its staking program. Binance.us is also responsible for identifying and attracting sufficient numbers of clients holding sufficient quantities of tokens to meet any thresholds for staking, pooling tokens among various users, developing private nodes for its customers, identifying other appropriate nodes operated by third parties, addressing issues relating to voting rights while tokens are purportedly locked-in to staking, safeguarding tokens in transit, collecting rewards, and paying returns. While stakers are typically exposed to slashing events when staking tokens, Binance.us protects its clients from slashing. As explained in the ToU, Binance.us undertakes "commercially reasonable efforts to prevent any staked assets from slashing" and it also "agrees to compensate [its clients] for any slashing penalties" under most circumstances. Based on the forgoing, profits are dependent on the managerial and essential efforts of others.

## BINANCE.US' STAKING PROGRAM MAY ALSO BE REGULATED
## AS A SECURITIES AS A NOTE OR EVIDENCE OF INDEBTEDNESS

103.    As described in the preceding paragraphs, Binance.us' staking program appears to be an investment contract regulated as a security. Although this analysis was limited to the application of the *Howey* test, the staking program offered by Binance.us may also constitute other types of securities.  For example, considering economic realities and focusing on form over substance, investments in its staking program may be regulated as an evidence of indebtedness because Binance.us is promising to pay in the future for consideration presently received.  The staking program may also be regulated as a note because clients appear motivated by returns, Binance.us is broadly offering the product to retail investors residing in unrestricted states, and absent the application of securities laws no other alternative regulatory regime reduces the risks associated with the product or adequately protects clients of the firm.

## CLIENTS ACQUIRED FROM VOYAGER CAN INVEST IN BINANCE.US'S
## STAKING PROGRAM EVEN THOUGH THE PRODUCT APPEARS ILLEGAL

104.    Based upon the forgoing, the staking program may violate federal law because Binance.us does not appear to have registered the staking program with the SEC. State securities regulators in supported jurisdictions may also take the position the staking program violates various state securities laws. The staking program promoted by Binance.us also appears to constitute a security under the Texas Securities Act and Binance.us would appear to violate the Texas Securities Act should it chose to offer or sell unregistered investments in the staking program to Texas residents.

105.    I understand that Binance.us may be considering changes to its staking program, and these changes may be designed to address issues associated with securities regulation. As of the date of this declaration, however, I am not aware of any steps Binance.us has taken to revise its staking program or those portions of the ToU that address its staking program. Moreover, if

Binance.us is concerned regulators may accuse the firm of illegally dealing in its staking program, it has not paused or stopped sales of its staking program. Finally, I'm more than willing to meet with representatives of Binance.us to discuss any potential revisions to its staking program that may ensure compliance with securities laws or protect its clients.

106.    Instead of revising its staking program or pausing or stopping sales due to regulatory issues, Binance.us appears ready to permit clients acquired in this proceeding to participate in its staking program. On December 19, 2022, Brian Shroder ("Shroder"), the President and Chief Executive Officer of Binance.us, tweeted about the deal between Voyager and Binance.us pending in this bankruptcy proceeding. Shroder tweeted from @brianshroder and explained Binance.us will permit the new clients to access all services – including staking – provided by the firm:

> 4/ New to http://Binance.US customers will have access to our suite of products & services, such as ~150 different cryptocurrencies, 300 trading pairs, 5,000+ convert pairs, industry-leading low fees, incl. 0 fee BTC & ETH trading & the largest US on-chain staking platform

## NEW CLIENTS MUST AUTHORIZE BINANCE.US TO DEAL WITH AN UNKNOWN NUMBER OF UNDISCLOSED ENTITIES IN UNSPECIFIED COUNTRIES

107.    Binance.us requires clients to accept ToU that govern the access and use of its website and the use of its services. The ToU were last updated on December 7, 2022, although Binance.us may amend of modify the ToU at any time.

108.     If the Binance US Purchase Agreement (the "Purchase Agreement") is approved in this bankruptcy proceeding, clients of Voyager migrating to Binance.us appear obligated to accept the ToU to access their assets from Binance.us. The ToU purport to explain the rights clients give to Binance.us and its "parents, subsidiaries, affiliates, entities under common ownership, or

otherwise related parties." The ToU broadly and collectively refers to the parties in this quote as "Related Parties." As defined, "Related Parties" appear to include Binance.com, BAM Management Co., CPZ Holdings, and Zhao.

109.    Per the ToU, the Related Parties play key roles in the services provided by Binance.us and may even effectively permit Binance.com to act in the U.S. even though Binance.com purportedly does not deal with U.S. customers. For example, the ToU indicates Related Parties may act as market makers as follows:

> [Binance.us] appoints market makers, including Related Parties and market makers that are incorporated or otherwise operating outside of the United States, to promote liquidity and facilitate trading on the Platform and with respect to certain of BAM's other trading products and services.

110.    Related Parties are also involved in other services, and the ToU requires clients to acknowledge and agree:

> …that certain services, including One Click Buy/Sell ("OCBS"), Convert, and over-the-counter ("OTC") trading, are executed against or facilitated by [Binance.us], Related Parties, and/or other entities, and that it is anticipated that there are circumstances under which [Binance.us] will transact on the platform for its own account."

111.    Clients must also assume certain risks related to the otherwise unnamed Related Parties and other third-parties, including risks related to digital assets deposited with Related Parties or other third-parties. The ToU require clients to acknowledge and accept the risk of Binance.us

…having Digital Assets on deposit or with any third-party, including Related

Parties, in a custodial relationship that has attendant risks, which include security

breaches, risk of contractual breach and risk of loss." Absent additional

information, I am unable to evaluate the degree of risk or likelihood of loss resulting

from Binance.us having Digital Assets on deposit or with any third-party.

112.    Although clients must accept the ToU and the ToU explains Related Parties and

third parties are important, the ToU does not name the Related Parties. Absent the provision of

additional information, their identities, qualifications, experience and location are apparently

unknown to clients purportedly bound by the ToU.

**BINANCE.US WILL ACQUIRE PERSONNALY IDENTIFYING INFORMATION
AND CAN SEND THIS INFORMATION TO BINANCE.COM AND OTHER PARTIES**

113.    Section 1.1 of the Purchase Agreement provides that Voyager, prior to closing, is

required to provide Binance.us with "Acquired Assets." Sections 1.1 and 1.1(b) of the Purchase

Agreement define "Acquired Assets" to include, to the extent permissible under federal, state, local

and other laws, names, account numbers, social security numbers, passports and passport numbers,

driver licenses and driver license numbers, email and mailing addresses, phone numbers, user

names, user IDs, passwords and other information for all active and inactive Voyager User

Accounts and other customers located or having a home address in the United States.

114.    The Purchase Agreement does not appear to impose any restrictions or

requirements that relate to the use of personal identifying information and other sensitive

information by Binance.us. The ToU accepted by clients does, however, appear to broadly

authorize Binance.us to transfer this information.[9] Clients appear obligated to agree as follows:

---

[9]    The ToU also direct clients to review and accept its privacy policy. By its own terms, the privacy policy does not limit the ToU and even explains that Binance.us uses client information in accordance with the ToU.

DECLARATION OF JOSEPH JASON ROTUNDA
Page 36

[a]ll information processed by [Binance.us], its Related Parties, or other parties

from which [Binance.us] receives data management services may be transferred,

processed, and stored anywhere in the world, including, but not limited to, the

United States."

115.     As such, absent additional clarification, this clause shows that Binance.us may be

able to transfer, process and store this information in any country – including countries that do not

adequately regulate financial services, require the safekeeping of data or promote the protection of

customers. Moreover, the ToU do not seem to provide clients with the identity of countries that

have received or may receive such information or provide a mechanism for clients to discover this

information in the event of any compromise of such information.

## VOYAGER CLIENTS MUST WAIVE LEGAL LIABILITIES FOR BINANCE.US AND OTHER PARTIES THAT APPEAR TO INCLUDE BINANCE.COM AND ZHAO

116.     The ToU purports to limit not only Binance.us legal liability but also the liability

of Related Parties and the Staking Services Provider and the officers, directors, employees,

affiliates, agents, licensors and contractors thereof. As such, it requires clients to agree to

"indemnify and hold harmless" these parties from and against all claims, suits, investigations and

other allegations and actions brought by any third-party, including governmental authority, in any

way related to their "access to or use of the Services." It broadly defines "Services" to include

virtually any service Binance.us may offer to clients.

117.     Again, the ToU does not identify the Related Parties. It also does not define many

of these new terms – such as licensors and contractors – or provide clients with the identity,

location or experience of said parties. Moreover, as drafted, clients may be required to indemnify

Binance.us or others – including unknown parties – for costs arising out of investigations,

allegations or claims brought against Binance.us in this bankruptcy proceeding.

**AUDITING ISSUES AND BINANCE.US' CAPITALIZATION AND RESERVES**

118.    As described earlier herein, Zhao indirectly owns Binance.us and Binance.us refused to provide current financial information for Zhao and information relating to other parties to the DOB in connection with its application for a money transmission license. As such, we do not know whether they possess sufficient capital to facilitate the Purchase Agreement or reimburse Binance.us for costs that may be incurred if the Purchase Agreement is approved in this proceeding.

119.    The current capitalization of Binance.us is unknown at this time. I have, however, reviewed a blog used by Binance.us to provide information to clients and the public. I reviewed an entry Binance.us published in the blog on December 18, 2022. The entry represents that Binance closed a round of seed funding at a $4.5 billion in valuation as of April 2022 – meaning the value of the Voyager deal is almost one-quarter of Binance.us' overall valuation.

120.    Although Binance.us published a blog entry discussing its valuation, Binance.us has not filed current audited financial records in the bankruptcy proceedings reflecting its capitalization. Also, I have not been provided with or reviewed current audited financial statements that show Binance.us possesses the capital necessary to acquire Voyager assets, pay costs associated with the transition of clients and process subsequent transactions and withdrawals. I have also not reviewed such information showing that Binance.us can complete the deal and satisfy clients without jeopardizing its ability to continue operating.

121.    Given its contractual relationship with Binance.us, potential dealings as a "Related Party" and the common ownership of Zhao, the capitalization of Binance.com may be highly important to this matter. I am not, however, aware of any recent audited financial reports published by Binance.com.

122.    I am aware that Mazars Group ("Mazars"), an international tax and audit firm, appears to have performed a proof-of-reserves and proof-of-liabilities assessment for Binance.com. I am also aware Binance.com released information relating to a report purportedly prepared by Mazars. Binance.com appears to have since removed information about the audit from its website, but as of January 3, 2023, I was able to access a cached webpage titled *Frequently Asked Questions on Mazars Verification of Proof of Reserves*.

123.    The report prepared by Mazars was apparently based on information provided by Binance.com to Mazars largely relating to Bitcoin as of November 22, 2022. It reportedly showed that Binance.com had sufficient Bitcoin reserves to meet approximately 101 percent of platform liabilities.

124.    As recently as January 1, 2023, I was unable to access the report from the website used by Mazars and I understand Mazars removed the references to the report from its website. Binance.com claimed Mazars temporarily paused their work with cryptocurrency clients, including Binance.com.

125.    The Mazars report only address Bitcoin; it did not address other cryptocurrencies held, minted, issued by or otherwise affiliated with Binance.com or Binance.us. These cryptocurrencies include popular tokens, such as Ether (ETH), as well as other tokens such as Binance USD (BUSD), a USD-denominated stablecoin launched pursuant to a partnership with Paxos, and BNB token, a native token that in part provides a discount on trading fees to clients of Binance.com and Binance.us.

126.    Blockchain records and analyses of voluminous data provide additional insight into other tokens held in wallets associated with Binance.com. However, blockchains were developed as a solution to the double-spending problem associated with electronic monetary transactions. As

such, it shows the transfer of assets and the location of assets, but generally does not show liabilities. Even with a clear, accurate understanding of the tokens held in Binance.com's wallets or Binance.us's wallets, it is almost impossible to independently ascertain and verify liabilities associated with the tokens. Information relating to liabilities is often exclusively in possession with the parties to transactions, and at this point, this information is simply not available through Binance.com or Binance.us.

## REGULATORY ISSUES TIED BUSD, THE STABLECOIN
## LAUNCHED THROUGH A PARTNERSHIP WITH PAXOS AND BINANCE

127.    BUSD is a stablecoin purportedly backed by real assets and pegged at a one-to-one valuation with the US Dollar. Binance.us promotes BUSD by claiming it is approved by the New York State Department of Financial Services (NYSDFS) and issued by Paxos.

128.    However, Binance.com appears to peg BUSD by locking it to the Ethereum blockchain and issuing a Binance.com-pegged BUSD on other networks. The pegged BUSD tokens are neither approved by the NYSDFS nor issued by Paxos.

129.    On or about February 12, 2023, the Wall Street Journal reported the SEC issued a Wells notice to Paxos. A Wells notice informs recipients about potential enforcement action. The submission of this Wells notice to Paxos suggests the SEC may be planning to allege BUSD is an unregistered security.

130.    On or about February 13, 2022 – the day after the Wall Street Journal report – the NYSDFS ordered Paxos to stop minting BUSD.

131.    On February 24, 2023, I used the site search parameter of google.com to determine whether Binance.us was disclosing the regulatory issues relating to BUSD in www.binance.us.  I was unable to locate any disclosure of this information.  Instead, the website continues to highlight the regulatory approval of BUSD by claiming BUSD is "US Regulated by NYDFS," BUSD is

"[a]pproved and regulated by NYDFS, ensuring consumer protection," BUSD "is issued on Ethereum by Paxos and regulated by the NYDFS," and BUSD is "a new USD-denominated stablecoin approved by the New York State Department of Financial Services (NYDFS) launched in partnership with Paxos."

132.　　　In addition to failing to disclose regulatory information relating to BUSD, Binance.us appears to continue to permit its clients to purchase BUSD using debit cards, ACH, and USD balances.

## BINANCE.US AND ITS RELATIONSHIP WITH
## PRIME TRUST, A TRUST COMPANY TIED TO FINANCIAL SCHEMES

133.　　　Clients may use USD to execute trades through Binance.us through a fiat wallet issued by Binance.us or a linked wallet operated by Prime Trust, LLC ("Prime Trust.")

134.　　　The ToU directs clients to a linked wallet addendum that sets forth additional terns between clients and Binance.us that relate to the linked wallet operated by Prime Trust. As described earlier herein, clients acquired from Voyager will appear required to agree to the ToU and, as such, may elect to use the linked wallet operated by Prime Trust.

135.　　　I am familiar with Prime Trust. As described in this section, Prime Trust is not licensed to operate as a money transmission business in Texas, has been subject to various regulatory actions and was associated with alleged securities scams operated by MyConstant, Celsius and Bankman-Fried.

136.　　　I understand Prime Trust is a for-profit trust company chartered in Nevada. It was organized on April 13, 2016, and may also operate as Fund America, Prime Fintech Services, and Prime Fintech Services LLC.

137.　　　On or about January 20, 2022, the DOB entered a consent order against Prime Trust. The consent order reflects the DOB's conclusions that (a) Prime Trust engaged in money

transmission in connection with these services, (b) the DOB had not licensed Prime Trust; (c) Prime Trust was not an authorized delegate of a license holder; (d) Prime Trust was not excluded from licensure under Finance Code Chapter 151; and (e) Prime Trust was not subject to an exemption under Finance Code Chapter 151 or applicable rules. It also shows the DOB found Prime Trust was violating Finance Code § 151.302 and assessed an administrative penalty of $29,850.

138.    Prime Trust has been operating as a money transmitter in Texas pursuant to a temporary money transmitter license (License No 3237) obtained from DOB on December 17, 2021. DOB records reflect that Prime Trust agreed to make a good faith effort to fulfill all requirements to obtain a license to conduct money transmission in Texas as detailed in Chapter 151 of the Finance Code. It also agreed to take certain steps, such as notifying Texas customers that it would cease providing money transmission, if it abandoned its license.

139.    The temporary money transmitter license for Prime Trust expired on December 12, 2022. On December 30, 2022, I queried the online database accessible through the DOB, and was unable to locate an active money transmitter license for Prime Trust in Texas.

140.    I also accessed the public NMLS Consumer Access database, which is derived from the Nationwide Multistate Licensing System/Nationwide Mortgage Licensing System and Registry. It was created by the Conference of State Bank Supervisors (the "CSBS") and the American Association of Residential Mortgage Regulators. The NMLS Consumer Access database is owned and operated by the State Regulatory Registry LLC, a wholly owned subsidiary of CSBS.

141.    The NMLS Consumer Access database does not show an active money transmitter licenses for Prime Trust in Texas. Instead, it shows Prime Trust has only obtained and maintained

money transmitter licenses in Alaska, Arizona, Arkansas, Connecticut, Georgia, Idaho, Iowa, Kansas, Maryland, Minnesota, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Pennsylvania, South Dakota and West Virginia.

142.    In addition to the consent order entered by the DOB, I understand that Prime Trust has been subject to various other regulatory enforcement actions. These actions are include (a) an action filed by the Connecticut Banking Commissioner on March 15, 2022, Order No. 2240901, (b) an action filed by the Pennsylvania Department of Banking and Securities on May 26, 2022, Docket No. 220022, (c) an action by the Idaho Department of Finance on July 28, 2022, Docket No. 2022-12-05, (d) an action filed by the Alaska Department of Commerce, Community and Economic Development, Division of Banking and Securities, on March 24, 2022, Order No. AK-MT-015756, and (e) an action filed by the Minnesota Department of Commerce on October 4, 2022, No. 74985/ABH.

143.    I am also aware the California Business, Consumer Services and Housing Agency, Department of Financial Protection and Innovation, recently filed a desist and refrain order against (a) CONST LLC dba MyConstant, Constant and Constant P2P and (b) Duy Huynh. The order was entered on December 21, 2022, and it a scheme to sell unregistered securities and engage in unlicensed loan brokering. As described in the order, although not named as a respondent, Prime Trust played a key role in facilitating fiat currency transactions for clients of respondents. Prime Trust has since published a FAQ on its website relating to this enforcement action, and the FAQ highlights allegations that the Chief Executive Officer and Chief Operating Officer may have had wallet keys to access funds/collateral at Prime Trust and MyConstant may have improperly referred to a $130,000,000 insurance guarantee at Prime Trust:

**Q: MyConstant records indicate the CEO and COO have wallet keys to access any funds/collateral at Prime Trust. What steps have been or are being taken to prevent them from using their keys to take our funds/collateral, etc?**

A: Prime Trust has frozen all MyConstant fiat accounts to prevent unauthorized transactions. We do not have visibility into digital asset accounts because we do not provide custody of digital assets to MyConstant.

We are working with MyConstant to devise a secure way to disburse funds to their customers as quickly as possible. They have not yet provided us with a timeline or a procedure.

**Q: My Constant references a $130m insurance guarantee at Prime Trust. Is this true?**

A: This is not accurate. Please see our FAQ on FDIC insurance.

144.    I also understand Prime Trust was closely associated with and recently sued by Celsius. As described herein, I am familiar with Celisus. On September 17, 2021, the Enforcement Division filed a Notice of Hearing and docketed a case against Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Lending, LLC, and Celsius Network LLC. On August 4, 2022, the Enforcement Division filed a Notice of Hearing and docketed a case against Alexander Mashinsky, the Chief Executive Officer and/or principal of these entities. The actions generally accused the parties of illegally dealing in cryptocurrency depository accounts that purported to pay lucrative yields to Texans. According to the pleadings, as many as 17,000 Texans may have invested in the illegal products. The cases are pending.

145.    On July 13, 2022, the parties filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. The debtors moved for joint

administration of the cases under the Chapter 11 case for Celsius Network, LLC, Case No. 22-10964.

146.     On August 23, 2022, Celsius Network Limited and Celsius Network, LLC, filed an adversarial complaint against Prime Trust. They alleged that, from 2020 through mid-2021, crypto assets from New York and Washington users were held by Prime Trust but that Prime Trust purported to terminate its relationship with Celsius Network Limited and Celsius Network, LLC, in June 2021. It also alleged Prime Trust complied in part by transferring $119 million in crypto assets, based on valuations as of the filing of the adversarial compliant. However, Prime Trust allegedly failed to transfer 398 BTC, 196,268 CEL, 3,470 ETH and 2,200,000 USDC valued at roughly $17 million. The case was dismissed when Prime Trust agreed to return the remaining crypto assets to a designed wallet subject to further orders from the court regarding their distribution.

147.     Prime Trust is also associated with Bankman-Fried and many other companies commonly owned and/or controlled by him (collectively "FTX"). For example, Prime Trust's payments, custody, liquidity and settlement APIs served FTX, and in a press release dated December 22, 2021, Prime Trust credited new customers with driving Prime Trust's growth. The press release specifically identified FTX as driving Prime Trust's growth.

148.     Additionally, according to records of the United States Federal Election Commission, FEC Form 3X, Filing FEC-1587723, approximately $14 million was sent from Prime Trust to Protect our Future PAC, a political action committee organized in January 2022 to "help elect candidates who will be champions for pandemic prevention." Although not disclosed in filings, information received to date indicates Bankman-Fried was behind $13 million of the $14 million donation and an affiliate or other officer of FTX was behind the remaining $1 million.

149.     Based upon the allegations set forth in FTX's bankruptcy proceeding and allegations in civil filings by the SEC, as well as other information reviewed by the Enforcement Division, FTX may have used assets owned by its clients to make these political contributions through Prime Trust.

150.     Prime Trust has since issued an FAQ addressing its dealings with FTX and a blog that recognizes its "customers are asking fundamental questions concerning the stability and credibility of all market participants."

## POTENTIAL STRUCTURAL IMPLICATIONS AND
## SECURITY ISSUES ARISING FROM THE LACK OF CLIENT SUPPORT

151.     Although regulated securities firms typically provide clients with a telephone number for customer support, Binance.us does not have a customer service telephone number. Accordingly, Voyager clients migrating to Binance.us may only be able to contact Binance.us through a support ticketing system, electronic mail or the means specified in the Purchase Agreement.

152.     The lack of telephone support complicates the transaction contemplated by the purchase agreement. Without universal telephone support from the start, the parties to the transaction will likely be largely using electronic communications to provide instructions, answer questions and work through any number of issues that may impact any number of clients. In this context, the inability to communicate with Binance.us via telephone from the start is much more than a mere inconvenience. It instead threatens harm to the integrity of the process and may prove dangerous to clients. Hackers and bad actors may attempt to leverage the lack of immediate telephone support by spoofing emails, impersonating parties, using social engineering to access accounts or take various other steps to appropriate assets. These are not hypothetical or imaginary issues - as described earlier herein, the TSSB has already filed at least one enforcement action to

stop a bad actor from impersonating Binance to perpetrate a fraud. Absent the implementation of

more robust support measures, the system used by Binance.us may increase risks to creditors of

Voyager that are eager to finally receive returns of their assets.


Executed in Austin, Texas, on this, the 24th day of February 2023.


By:    /s Joseph Jason Rotunda
       Joseph Jason Rotunda
       Director of Enforcement
       Texas State Securities Board
       208 E. 10th Street, 5 Floor
       Austin, Texas 78701
       Bar No 24029808
       Telephone: 512-305-8392
       Email: jrotunda@ssb.texas.gov