## Exhibit A

**Committee Report**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' INVESTIGATIVE**
**REPORT CONCERNING LOANS MADE TO THREE ARROWS CAPITAL**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## I. Scope

As directed by the Court on February 7, 2023, this memorandum contains facts that were discovered during the course of an investigation conducted by the Official Committee of Unsecured Creditors (the "UCC") into the lending practices of Voyager Digital LLC, Voyager Digital Holdings, Inc. and Voyager Digital Ltd. (collectively, the "Debtors" or "Voyager"). The UCC examined potential claims that Voyager may have against its directors and officers, but ultimately focused on loans made by the Debtors to Three Arrows Capital Pte. Ltd ("3AC"). This memorandum limits factual findings to pre-petition date conduct and does not include all facts known about 3AC and its own off-shore insolvency proceedings. This memorandum is limited to factual findings concerning loans to 3AC. While other parties and individuals are referenced in this memorandum, this memorandum does not contain all facts known to the UCC concerning those parties and individuals. The UCC believes that there are potential causes of action against third-parties. The factual predicate for those causes of action are outside the scope of this memorandum and are not included herein.

## II. Procedural Background

### A. Filing for Bankruptcy

On July 5, 2022 (the "Petition Date"), the Debtors filed for Chapter 11 relief in the Bankruptcy Court for the Southern District of New York.[2] The Debtors continue to operate under section 1107 of the Bankruptcy Code. The Debtors retained Kirkland and Ellis LLP ("Kirkland") and Berkeley Research Group ("BRG") to represent them in connection with the bankruptcy cases.

---

[2] *See* Chapter 11 Voluntary Petition for Non-Individual (Dkt. Nos. 1, 3).

On July 19, 2022, the United States Trustee for the Southern District of New York appointed seven individual creditors to the UCC.[3] The UCC retained McDermott Will & Emery LLP ("McDermott") and FTI Consulting ("FTI").[4]

### B.    Special Committee Investigation

On the Petition Date, Voyager Digital, LLC appointed Jill Frizzley and Tim Pohl to act as a Special Committee ("SC"). The SC was appointed to "investigate historical transactions, public reporting, and regulatory issues undertaken by the Company and the facts and circumstances surrounding such transactions."[5] On July 16, 2022, the SC retained the law firm Quinn Emanuel ("Quinn") "to provide advice to, and to act on behalf of Voyager Digital, LLC" through the SC investigation.[6] The UCC conducted an investigation alongside the SC investigation. Throughout the pendency of the investigation, McDermott maintained close contact with Quinn. The Debtors produced documents to the SC and the UCC.[7]

As previously disclosed to the UCC, there were several sets of document requests related to the investigation. On July 7, 2022, the SC served Voyager with eight initial document requests.[8] On August 1, 2022, Quinn served its First Supplemental Discovery Requests, including eleven

---

[3] *See* Amended Appointment of Official Creditors' Committee (Dkt. No. 106).

[4] *See* Application to Employ McDermott Will & Emery LLP as Counsel to the Official Committee of Unsecured Creditors of Voyager Digital Holdings, Inc., et al. (Dkt. No. 317); Application to Employ FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors of Voyager Digital Holdings, Inc., et al. (Dkt. No. 318).

[5] *See* the Unanimous Written Consent authorized by the Board of Directors of Voyager LLC (July 5, 2022) at 1.

[6] *See* Application to Employ Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Debtor Voyager Digital, LLC's Application for Entry of an Order Pursuant to 11 U.S.C. §§ 327(e) and 328(a) and Fed. R. Bankr. P. 2014, 2016 and 5002 Authorizing Employment and Retention of Quinn Emanuel Urquhart & Sullivan, LLP as Special Counsel to Voyager Digital, LLC Effective July 13, 2022 (Dkt. No. 125).

[7] The SC and UCC did not take third party discovery in connection with the investigation.

[8] *See* Special Committee's Initial Document Requests to Voyager LLC, dated July 7, 2022.

requests.[9] On August 4, 2022, McDermott served 33 requests on behalf of the UCC. On August 10, 2022, Quinn served another ten requests. On August 25, 2022, McDermott served formal requests for production containing 75 requests. On August 30, 2022, the UCC sent a letter to the Debtors concerning discovery and identifying areas of information that had yet to be produced. In addition to these formal requests, FTI made a number of requests to the Debtor's financial consultant, BRG, responses to which were also reviewed. Kirkland produced documents to McDermott and Quinn throughout August and September. In total, the UCC received 16,616 documents.[10]

In addition to the review of Debtors' documents, the UCC and SC conducted a series of interviews of twelve key Debtor directors, officers, and employees.[11] During the interviews, Quinn and McDermott both questioned the witnesses. A protective order executed between Voyager and McDermott designates the interviews as "Highly Confidential" with certain restrictions on what can be shared publicly and with the members of the UCC.[12] On February 13, 2023, Judge Wiles filed an order in the Court stipulating that certain portions of the investigation can now be publicly

---

[9] *See* Special Committee's First Supplemental Document Requests to Voyager LLC, dated Aug. 1, 2022.

[10] The Debtors provided an excel file which detailed all of the transfers to insiders within the one year prior to the petition date (VOY-INV-00008350). That excel file did not identify significant transfers to insiders and/or transfers not in the ordinary course. The Debtors warranted that the summary excel file provides all of the transfers to insiders in the one year prior to the petition date and that no other transfers exist in that time period. The Debtors cited technical difficulties in being able to provide information about every transaction at third-party cryptoexchanges and OTC desks. As a result, every single transaction has not been independently verified.

[11] This report details McDermott's notes and recollections of statements made by Voyager executives during the UCC's investigative interviews of them. These interviews were not transcribed by a court reporter. In referencing their statements herein and/or in quoting from Voyager's First Day Declaration, the UCC is not endorsing their accuracy. Nothing herein should be construed as necessarily accepting any interviewee's version of the facts as true, accurate, or complete. The witnesses were not under oath during these interviews.

[12] *See* Notice of Presentment of Common Interest Confidentiality Stipulation and Protective Order (Dkt. No. 342), Ex. A at *5-6.

share, and accordingly, the UCC re-filed its initial objections to the Disclosure Statement in an

unredacted form.[13] The SC and UCC interviewed the following 12 witnesses:

| # | Date | Witness |
|---|------|---------|
| 1. | August 31, 2022 | Treasurer Jon Brosnahan |
| 2. | August 31, 2022 | Operations Data Analyst Brian Silard |
| 3. | September 1, 2022 | General Counsel David Brosgol |
| 4. | September 6, 2022 | Chief Financial Officer Ashwin Prithipaul |
| 5. | September 6, 2022 | Head Regulatory Counsel Manisha Lalwani |
| 6. | September 7, 2022 | Treasury Director Ryan Whooley |
| 7. | September 8, 2022 | Chief Operating Officer Gerard Hanshe |
| 8. | September 8, 2022 | Head of Corporate Development Marshall Jensen |
| 9. | September 9, 2022 | Chief Marketing Officer Pam Kramer |
| 10. | September 12, 2022 | Chief Executive Officer Steve Ehrlich |
| 11. | September 13, 2022 | Chief Commercial Officers Evan Psaropoulos |
| 12. | September 14, 2022 | Deputy General Counsel David Brill |

Along with these interviews, the UCC also engaged in a number of Zoom meetings and

discussions with Debtors and their professionals.  For example, the UCC conducted diligence on

the staking program and interviewed Mr. Whooley on August 9, 2022 and Mr. Whooley and Mr.

Psarapoulos on August 11, 2022.  When issues arose concerning the availability of certain

documents and data, the UCC interviewed Mr. Whooley and Debtors' professionals via Zoom on

that subject.

### III.    The Facts Learned During the UCC's Investigation

####    A.    Voyager's Corporate Structure

Voyager Digital Ltd. is a publicly traded company listed on the Toronto Stock Exchange.

As of the Petition Date, Voyager Digital Ltd. had approximately 196,000,000 shares of common

stock outstanding, with approximately 9.49% held by Alameda and the remainder widely held by

---

[13] *See* Order Regarding Disclosure of Portions of Special Committee's Investigation Report (Dkt. No. 997).

other investors.[14] The chart below shows the company's structure as presented in Ehrlich's First

Day Declaration.[15]



### 1.    Operating Agreement

Voyager Digital, LLC, the "operating company" that ran the public-facing crypto

brokerage, is managed pursuant to an Operating Agreement (the "Operating Agreement")

---

[14] *Id.* at ¶ 36.

[15] First Day Decl. at Ex. B.

originally executed on January 23, 2018, which was amended and restated three times. Under the terms of the most recent Operating Agreement, Voyager Digital, LLC is managed by its sole member, Voyager Digital Holdings, Inc (the "Member").[16] The Member is empowered to elect both Directors and Officers of Voyager Digital, LLC, and these directors and officers carry out the usual business and operations of the company.[17] Previous versions of the Operating Agreement did not allow for a Board of Directors, and instead gave sole authority to the Member.[18]

### B.    Voyager's Business Model

#### 1.    Crypto Brokerage

Voyager's operations were primarily (i) brokerage services, (ii) custodial services through which users earn interest and other rewards, (iii) lending, and (iv) staking.[19] Users downloaded the Voyager App and connected it to a bank account or crypto wallet, which allowed them to fund an account or transfer crypto onto the Voyager platform. Users then bought and sold crypto on the Voyager platform. Voyager listed over 100 different cryptocurrencies for users to trade on its platform, including its native Voyager crypto ("VGX").[20]

The vast majority of Voyager's revenue came from its "brokerage" services. Ryan Whooley stated that Voyager built a back end "smart router," which it used to interact with APIs[21]

---

[16] Third Amended and Restated Operating Agreement, dated July 4, 2022 (the "Third A&R Operating Agreement") § 4.1.

[17] *Id.*

[18] First Amended and Restated Operating Agreement, dated May 28, 2021 (the "First A&R Operating Agreement") § 4.1.

[19] First Day Decl. ¶ 10.

[20] *See* "Crypto assets supported on the Voyager app," Voyager Blog (Mar. 2, 2022) https://www.investvoyager.com/blog/list-of-crypto-assets-supported-on-voyager-app/.

[21] An API, short for "application programming interface," is programming code that permits two or more applications to communicate and share data.

from a number of different crypto exchanges and OTC desks[22] to fill trades.[23] Voyager's smart router purportedly caused user crypto trades to be filled efficiently.[24] According to Mr. Ehrlich, Voyager would examine several exchanges and quote a price to users.[25] When a user executed a trade, Voyager captured the difference between the quoted customer price and the price at which Voyager executed the trade as "spread revenue."[26] The following shows Voyager's revenue, including spread revenue, as presented in its Management Discussion and Analysis filings dated May 16, 2022:[27]

| | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| *(in thousands)* | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Transaction revenue | $ 33,386 | $ 53,736 | $ (20,350) | $ 163,402 | $ 57,418 | $ 105,984 |
| Other revenue | 5,626 | - | 5,626 | 13,868 | - | 13,868 |
| | 39,012 | 53,736 | (14,724) | 177,270 | 57,418 | 119,852 |
| Less: Trade expenses | (2,984) | (726) | (2,258) | (14,145) | (1,069) | (13,076) |
| Less: Customer onboarding and service | (3,525) | (2,677) | (848) | (9,179) | (2,677) | (6,502) |
| | $ 32,503 | $ 50,333 | $ (17,830) | $ 153,946 | $ 53,672 | $ 100,274 |
| *(in millions)* | | | | | | |
| Trading volume[10] | $ 4,783 | $ 4,942 | $ (159) | $ 18,434 | $ 5,546 | $ 12,888 |
| Trading volume, excluding stablecoins | 3,165 | 4,481 | (1,316) | 13,944 | 4,936 | 9,008 |
| Average transaction spread[11], excluding stablecoins | 92.1 | 116.0 | (23.9) | 105.6 | 111.7 | (6.1) |
| *(in thousands)* | | | March 31, 2022 | March 31, 2021 | | Change |
| Funded Accounts | | | 1,190 | 274 | | 916 |

---

[22] A crypto exchange is an online platform used to buy, sell, and trade crypto assets. An OTC desk, on the other hand, facilitates private crypto trades directly between two parties

[23] *See* Whooley Interview for the Special Committee Investigation ("Whooley") at 7. Citations to interviews are referring to notes taken by McDermott Will & Emery during the investigation.  .

[24] *Id.*

[25] *See* Ehrlich Interview for the Special Committee Investigation ("Ehrlich") at 55-56.

[26] *Id.*; See Hanshe Interview for the Special Committee Investigation ("Hanshe") at 55-56; *Id.*

[27] May 16, 2022 Voyager Management's Discussion and Analysis at 13 [VOY-INV-00033052].

## 2.    Crypto Custody and the Voyager "Rewards" Program

In addition to executing trades for users, Voyager also custodied their crypto.[28] Voyager

commingled user crypto in omnibus wallets held by a number of custody providers.[29] These

custody providers include Anchorage Digital Bank N.A., Coinbase Custody Trust Company, LLC,

Copper Technologies Limited, and Fireblocks, Ltd.

Voyager implemented a "Rewards Program" in 2020.[30] Voyager's Customer Agreement,

stated that users were automatically opted into the Rewards Program. [31] The Customer  Agreement

permitted a user to "opt-out of the Interest Program at any time by doing so in the App."[32] The

Rewards Program primarily consists of three segments: (1) "refer-a friend," in which users earned

a small amount of VGX for referring new users; (2) a program that allow users to share in the

spread made on their trades if Voyager was able to execute at a price lower than the listed asking

price; and (3) a program in which users would be paid a fixed yield on the crypto they deposit with

Voyager.[33] The amount of yield differed for each crypto, and was changed regularly.[34] The yields

were as high as 12 percent on certain crypto, and required that users maintain a minimum monthly

---

[28] First Day Decl. ¶ 11.

[29] *Id.* ¶ 13.

[30] Ehrlich at 19; Hanshe at 8.

[31] January 7, 2022, Voyager Customer Agreement [VOY-INV-00007999]; *see also* Whooley at 9-10.

[32] January 7, 2022, Voyager Customer Agreement [VOY-INV-00007999]. Even if a user opted out of the rewards program, the user's crypto would still be custodied by Voyager, per the User Agreement. *Id.*

[33] Hanshe at 56.

[34] *Id.*

balance and keep their assets on Voyager's platform.[35] The following shows yields on the various cryptocurrencies offered to Voyager users as of April 26, 2022:[36]

**Voyager Inventory Card**

**Available Inventory**

| Asset | Rate | Size | | Asset | Rate | Size | | Asset | Rate | Size |
|-------|------|------|---|-------|------|------|---|-------|------|------|
| AAVE | 4.50% | $1 to $5 | | GALA | 6.50% | $1 to $5 | | QTUM | 5.00% | $1 to $5 |
| AMP | 4.50% | $1 to $5 | | GLM | 5.00% | $1 to $5 | | SAND | 9.50% | $10+ |
| APE | 13.50% | $1 to $5 | | HBAR | 9.00% | $10+ | | SHIB | 6.00% | $10+ |
| AVAX | 10.00% | $1 to $5 | | ICX | 5.00% | $1 to $5 | | SOL | 7.50% | $1 to $5 |
| BAT | 5.00% | $1 to $5 | | IOT | 5.00% | $1 to $5 | | STMX | 7.00% | $10+ |
| BTC | 2.00% | $1 to $5 | | JASMY | 10.00% | $1 to $5 | | SUSHI | 4.00% | $1 to $5 |
| BTT | 4.00% | $10+ | | KAVA | 15.00% | $1 to $5 | | UMA | 4.00% | $1 to $5 |
| CHZ | 4.50% | $1 to $5 | | KNC | 3.00% | $1 to $5 | | VET | 7.00% | $10+ |
| CKB | 4.00% | $10+ | | LINK | 5.50% | $10+ | | XLM | 5.50% | $5 to $10 |
| DGB | 4.00% | $5 to $10 | | LTC | 4.00% | $5 to $10 | | XMR | 4.00% | $1 to $5 |
| DOGE | 6.00% | $10+ | | LUNA | 9.00% | $10+ | | XRP | 5.00% | $5 to $10 |
| EGLD | 6.50% | $5 to $10 | | MANA | 3.00% | $10+ | | XVG | 4.00% | $1 to $5 |
| ENJ | 4.00% | $5 to $10 | | OCEAN | 5.00% | $1 to $5 | | YFI | 4.00% | $1 to $5 |
| ETH | 4.00% | $10+ | | OMG | 5.00% | $1 to $5 | | ZEC | 4.00% | $1 to $5 |
| FTM | 7.50% | $5 to $10 | | OXT | 5.00% | $1 to $5 | | ZRX | 4.00% | $1 to $5 |

The Rewards Program was primarily implemented as a marketing tool.[37] Voyager executives stated that many other exchanges offered rewards, and that they referred to the rewards rates of competitors in setting Voyager's rates.[38] The Rewards Program was run at a loss to Voyager almost every month since its inception. Voyager executives voiced concerns about the cost of significant returns offered to users in the Rewards Program. In one conversation in February 2022, Mr. Psaropoulos told Mr. Whooley that he was "[t]rying to talk Steve [Ehrlich] into taking BTC down to 4%" and that "if we want to have that rate on [BTC], we'd have to be open to other

---

[35] First Day Decl. ¶ 11.

[36] April 26, 2022, Voyager Inventory Card [VOY-INV-00005619].

[37] Psaropoulos at 6, 104.

[38] Whooley at 50; Brian Silard Interview ("Silard") at 31.

strategies beyond basic lending. [O]r we have to beef up the team *and onboard/lend to riskier borrowers*."[39]

The Rewards Program was run at a substantial loss.[40] During the first three months in 2022, the Rewards Program lost more than $13 million, as shown in the following chart from Voyager's Management Discussion and Analysis dated May 16, 2022 and demonstrated in a Treasury Weekly Update for the week of March 28th, 2022, showing a loss of $2.8 million in the month of March.[41] The Treasury Weekly Update for the end of April show that Voyager lost $748 thousand on the Rewards Program.[42] Treasury Weekly Updates are PowerPoint presentations put together by Mr. Brosnahan, with information filled out by a member of Mr. Whooley's team.[43]

| (in thousands) | Three Months Ended March 31 | | | Nine Months Ended March 31 | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | $ Change | 2022 | 2021 | $ Change |
| Fees from crypto assets loaned | $ 31,025 | $ 6,702 | $ 24,323 | $ 80,892 | $ 8,590 | $ 72,302 |
| Staking revenue | 14,359 | - | 14,359 | 42,788 | - | 42,788 |
| Less: Rewards paid to customers | (59,321) | (7,409) | (51,912) | (182,014) | (8,949) | (173,065) |
| | $ (13,937) | $ (707) | $ (13,230) | $ (58,334) | $ (359) | $ (57,975) |

In total, during financial year 2022, Voyager lost over $58 million on their Rewards Program.[44]

Voyager executives said they viewed the Reward Program cost as a marketing expense necessary for user acquisition.[45] Voyager primarily implemented the lending program to fund the

---

[39] February 23, 2022 Slack Chat Between Ryan Whooley and Evan Psaropoulos [VOY-INV-00005464].

[40] Whooley at 93; Psaropoulos at 104.

[41] May 16, 2022 Voyager Management's Discussion and Analysis at 12 [VOY-INV-00033052]; *see also* Treasury Weekly Update, Week of March 28th to April 3rd [VOY-INV-00000107].

[42] Treasury Weekly Update, Week of April 25th to May 1st [VOY-INV-00003059].

[43] Brosnahan at 35. The Treasury Weekly Updates were presented to the Risk Committee and contained information about Voyager's business operations, including: (1) an executive summary, (2) AUM broken down by crypto asset, (3) lending by crypto asset and borrower, (4) staking by crypto assets and institutional partner, (5) trading revenue, and (6) summary of the month performance to-date.

[44] June 19, 2022 Voyager Consolidated P&L [VOY-INV-00006109]

[45] Psaropoulos at 104.

Rewards Program.[46] Over the course of the Lending Program, Voyager had a number of counterparties.

- 3AC

- Tai Mo Shan Limited

- Alameda Research/FTX

- Anchorage Digital

- BitGo, Inc.

- Celsius Network LLC

- Galaxy Digital Holdings Ltd.

- Genesis Global Trading, Inc.

- Jump Crypto

- Tesseract Group Oy

- Wintermute Trading Ltd

Typically, Voyager would enter into a Master Loan Agreement (MLA) approved by Mr. Ehrlich with each counterparty.[47] After that MLA was executed, various Voyager employees, primarily Evan Mr. Psaropoulos and Mr. Whooley, would negotiate terms with counterparties through a series of term sheets.

At various times during 2022, entities including 3AC, Celsius Network LLC ("Celsius"), and Alameda Research LLC ("Alameda") each borrowed more than 25% of Voyager's total

---

[46] Hanshe at 8.

[47] Ehrlich at 9; Psaropoulos at 65.

assets.[48] Voyager executives stated that they primarily focused on the size and reputation of borrowers to determine creditworthiness.[49] According to Voyager witnesses, there were only a few counterparties who could borrow hundreds of millions of dollars of crypto assets.

### 3. Lending Diligence

Initially, around the time that Voyager began its lending program in 2020, members of Voyager management and finance teams— Mr. Ehrlich, Gerard Hanshe, Mr. Whooley (and Mr. Psaropoulos once he joined the Company in August 2020)— stated that they began holding informal meetings to discuss the lending market and counterparty risk.[50]

### a. Risk Committee

According to David Brosgol and Mr. Ehrlich, Voyager established a Risk Committee in 2021.[51] The UCC did not identify documents reflecting formal Risk Committee meetings or records prior to the fall of 2021. In the fall of 2021, Marshall Jensen, Director of Corporate Development, drafted a template suggesting practices for the Risk Committee.[52] Treasurer Jon Brosnahan drafted a Risk Committee charter in or about late March 2022.[53] The charter was not formally adopted until May 4, 2022.[54] While the Risk Committee had both voting and non-voting

---

[48] *See, e.g.*, Management's Discussion & Analysis for the quarter ending March 31, 2022, at 21, 22 (May 16, 2022) (available publicly on SEDAR) (listing counterparties and the fair value of their borrowings)*;* May 24, 2022, Treasury Weekly Update [VOY-INV-00003161].

[49] *See, e.g.,* Psaropoulos at 71; Whooley at 16.

[50] Hanshe at 26-27.

[51] Ehrlich at 31; Brosgol at 6.

[52] Marshall Jensen Interview ("Jensen") at 2-3.

[53] Brosnahan at 5-6.

[54] Hanshe at 6-7; *See* Risk Committee Charter ("Charter") [VOY-INV-00000177].

members, Mr. Psaropoulos recalled that the Risk Committee only ever took one formal vote, and

that vote was simply to approve the Charter.[55] The Charter included the following members:[56]

**Risk Committee Members**

| Name | | Title | Role |
|------|------|-------|------|
| Steve Ehrlich | SE | Chief Executive Officer | Chair/Voting |
| Evan Psaropoulos | EP | Chief Financial Officer | Voting |
| David Brosgol | DB | General Counsel | Voting |
| Gerard Hanshe | GH | Chief Operating Officer | Voting |
| Marshall Jensen | MJ | Director of Corporate Development | Voting |
| Dan Costantino | DC | Chief Information Security Officer and Chief Product Officer | Non-Voting |
| Ryan Whooley | RW | Head of Treasury and Trading | Non-Voting |
| Jon Brosnahan | JB | VP, Corporate Treasury | Non-Voting |
| David Brill | Brill | Head Commercial Counsel | Non-Voting |

Voyager executives did not believe that the Risk Committee maintained the power to stop

or overturn decisions made by Mr. Ehrlich or Mr. Psaraploulous. We have not identified

documentation of Risk Committee votes, except for approval of the Charter.

The Risk Committee met regularly throughout 2022.[57] Mr. Whooley, Mr. Psaropoulos, and

Mr. Brosnahan, conducted some diligence on potential borrowers.[58] Diligence included some

discussions with borrowers, exchange of some limited written materials, short "diligence calls,"

and a due diligence questionnaire.[59] Audited financial statements and other detailed financial

information was not provided by certain borrowers.

---

[55] Psaropoulos at 66.

[56] Mar. 31, 2022, Voyager Risk Committee Meeting Minutes [VOY-INV-00013503].

[57] Brosgol at 8.

[58] Whooley at 14; Brosnahan at 31.

[59] Whooley at 16-19; Hanshe at 44-45, 71-72.

Voyager received different amounts of financial information from different counterparties.[60] For example, Voyager received audited financials (e.g., Genesis), unaudited financials (e.g., Galaxy); balance sheets (e.g., Celsius, Bitgo), and/or income statements (Wintermute). 3AC only provided Voyager with a short one sentence statement of its net asset value (NAV).

After the limited diligence was complete, Mr. Whooley or Mr. Psaropoulos would present their findings to the Risk Committee, after which Mr. Ehrlich would decide whether or not to go forward with the lending relationship.[61] The MLA contains the legal terms and conditions, such as rights and duties of the parties, but the term sheets contain the financial details of the loans.[62] The Risk Committee did not review individual term sheets for loans which set forth the amount borrowed, the interest rates, and the collateral.[63]

For each individual loan, Voyager would enter into a series of term sheets with the borrower. The term sheets contain the financial terms, such as the amount lent, the interest rate, and whether the loan was collateralized.[64] The Term Sheets were not reviewed or approved by the Risk Committee. The Risk Committee did not vote on Term Sheets.

---

[60] Psaropoulos at 72.

[61] Whooley at 14.

[62] *Id.*

[63] *Id.*

[64] Whooley at 35, 38; *See, e.g.*, May 5, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00014816].

### 4.    Staking

In addition to lending, Voyager also maintained a staking program.  In staking, crypto is locked to a protocol on the blockchain for a fixed period of time in exchange for some reward.[65] When staking, the user is generally required to participate in some way in the protocol by verifying transactions or other technical functions.[66]   Users earn a yield in exchange for staking.  Staking yields are generally paid in the native currency of the protocol.  As staking can be somewhat technically complex there are a number of providers that offer "staking as a service," which helps users handle the technical aspects of staking.  Voyager used a number of staking as a service providers to handle the technical aspects of the Voyager staking program.

Pursuant to the Customer Agreement, users participating in the Rewards Program consent to Voyager's authority to "stake Cryptocurrency held in an omnibus fashion through various blockchain protocols" and Voyager may "select[] which and how much cryptocurrencies are available for such staking and lending."[67] Voyager effectuated the staking program by using staking as a service providers, such as BlockDaemon.  BlockDaemon is paid with a percentage of the staking yield and is responsible for ensuring that the crypto is appropriately staked and avoids having those staked positions "slashed," which is a penalty that most protocols can impose if one

---

[65] First Day Decl. ¶ 12.

[66] *Id*.

[67] *See* CustomerAgreement, updated Jan. 7, 2022, § 10(A), https://www.investvoyager.com/useragreement/.

who stakes makes a technical error.[68] Generally, staking generated a rate of return slightly lower than loans.[69] Voyager executives correctly viewed staking as having less risk than loans.[70]

### C.    Loans – Counterparties

#### 1.    Alameda/FTX

Voyager's lending relationship with Alameda began in 2021.[71] Voyager performed limited monitoring diligence of Alameda, finding that it was "low risk."[72] Alameda collapsed in November of 2022 and is currently in Chapter 11 bankruptcy. Voyager and Alameda/FTX are currently engaged in litigation concerning its credit relationship.

#### 2.    Celsius

Voyager began its relationship with Celsius in 2021 or earlier.[73] Initially, Voyager evaluated the risk of loaning to Celsius as "low risk of default."[74] Risk Committee meeting minutes from February 9, 2022 show that Voyager had increased its loans with Celsius to $98M, despite also increasing its risk rating for Celsius to "low/moderate risk."[75] At its peak in 2022, Voyager had over $400 million in assets on loan to Celsius.[76]

---

[68] Psaropoulos at 18.

[69] *Id.*

[70] Psaropoulos at 5.

[71] Master Loan Agreement, dated September 2, 2021 [VOY-INV-00000238]

[72] Feb. 22, 2022, Alameda Research – Borrowed Ongoing Credit Risk Summary [VOY-INV-00007361].

[73] Letter from Finance and Treasury Department to Loan Risk Committee regarding Celsius Borrower Ongoing Credit Risk Summary, dated September 6, 2021 [VOY-INV-00006613].

[74] Brosnahan at 34; Feb. 9, 2022 Celsius – Borrower Ongoing Credit Risk Summary [VOY-INV-00007363].

[75] Risk Committee Meeting Minutes, dated February 9 [VOY-INV-00007363].

[76] Brosnahan at 74., May 4, 2022 Risk Committee Meeting Minutes [VOY-INV-00013506].

During the investigation, multiple Voyager executives mentioned discomfort regarding Voyager's lending relationship with Celsius, citing various issues including regulatory risk.[77] Voyager largely terminated its lending relationship with Celsius in March of 2022.[78] It effectively replaced Celsius with 3AC. Celsius froze its assets on June 12, 2022. Celsius eventually collapsed and is currently in Chapter 11 Bankruptcy.

### 3.    Three Arrows Capital (3AC)

Voyager's relationship with 3AC began in early 2022. Voyager executives stated that because of the prestige that 3AC had at the time in the industry, they intentionally sought out a lending relationship with 3AC.[79]

Given Voyager's need to lend large quantities of assets to help fund its Rewards Program, executives were aware of the potential value of 3AC as a counterparty.[80] According to Mr. Psaropoulos, in order to onboard 3AC, Voyager began a diligence process in February of 2022. The process began with an introductory call between Mr. Lo and Mr. Psaropoulos and Mr. Whooley on February 7, 2022.[81] During that call, Mr. Lo shared certain high-level information including 3AC's alleged NAV.[82] Mr. Lo told Mr. Psaropoulos and Mr. Whooley that 3AC was

---

[77] Brosnahan at 40, Whooley at 21; Brosgol at 11.

[78] See, e.g., Treasury Weekly Update, Week of March 28 – April 3 [VOY-INV-00000107].

[79] Psaropoulos at 18.

[80] Whooley at 30.

[81] Psaropoulos at 14-15.

[82] Id.

only interested in borrowing on an uncollateralized basis.[83] At this time, Voyager was receiving collateral on loans it was making to Alameda.[84]

On February 11, 2022, 3AC and Voyager signed a Mutual Non-Disclosure Agreement and held follow up calls and correspondence with Mr. Lo, mostly concerning certain provisions of the Voyager MLA that 3AC wanted removed.[85] The standard provisions in Voyager's form MLA that 3AC wanted changed were (i) the requirement to provide audited financial statements to Voyager and (ii) the provision giving Voyager consent rights over a change in control at 3AC.[86]

On February 28, 2022, the first and only diligence call was held between Voyager and 3AC. Mr. Brosnahan recollected that call lasting 30 minutes, while Mr. Whooley recollected it lasted an hour.[87] According to Voyager executives, Kyle Davies and Tim Lo from 3AC participated in the call.[88] Mr. Whooley, Mr. Psaropoulos and Mr. Brosnahan, as well as attorneys David Brill and Brian Nistler, attended the call for Voyager.[89] Mr. Brosnahan led Voyager's diligence during the call, asking general questions about 3AC's business and financial health, and concluded that 3AC: (i) alleged to manage only its founders' assets (though this was apparently contradicted by 3AC's org chart, which 3AC later sent to Voyager); (ii) was involved in some venture projects, such as Solana, but mostly involving only Layer 1 assets; (iii) was largely engaged in arbitrage trading, which was supposedly delta neutral, and also engaged in thematic

---

[83] Whooley at 17-18.

[84] Whooley at 39; see also Loan Term Sheet dated January 12, 2022 [VOY-INV-00020783]

[85] Whooley at 17-18.

[86] Feb. 16, 2022 Email from T. Lo to E. Psaropoulos [VOY-INV-0000006].

[87] Brosnahan at 53; Whooley at 16.

[88] Psaropoulos at 15.

[89] *Id.*

trading (meaning 3AC had taken long positions on BTC through traditional and synthetic investments); (iv) limits its own borrowing to 1x NAV; (v) would not take a position larger than 1-3% of circulation of any given alt-coin, to protect its liquidity; and (vi) does not provide financials to lenders because there was a prior incident in which they gave their balance sheet to BlockFi, who used information gleaned from the financial document to decipher 3AC's trading strategies and copied them.[90]

The Voyager due diligence team did not ask 3AC or know the following among other things: how 3AC computed its NAV and/or an NAV more up to date than January 1, 2022; the extent to which 3AC's NAV had changed up or down over any prior period of time; how much of 3AC's assets were encumbered; how much of 3AC's assets were staked or otherwise illiquid; 3AC's net concentration of alt-coins[91]; the percentage of 3AC's investing that was venture projects; or whether 3AC was profitable. The Voyager due diligence team did not have 3AC's income statements, cash flow statements, or balance sheet. It did not do any stress testing of 3AC's liquidity. During our interviews, numerous employees involved in due diligence (including Mr. Brosnahan and Mr. Whooley) told us that they did not have a background in credit risk evaluation.[92]

On March 1, 2022, the Risk Committee met and discussed lending to 3AC.[93] According to Mr. Brosnahan, the Risk Committee's discussion of the 3AC lending relationship during this

---

[90] Notes from John Brosnahan on 3AC Diligence, dated February 28, 2022 [VOY-INV-00013711]

[91] Alt-coins is a term that is used to refer to particular cryptocurrencies that have much lower volume and are less popular than major cryptocurrencies, such as Bitcoin, Ethereum, USDT, and USDC. Different industry participants have different opinions on which cryptocurrencies are "altcoins."

[92] Brosnahan at 6, 23; Whooley at 3.

[93] March 1, 2022 Risk Committee Agenda [VOY-INV-00000454].

meeting lasted about thirty minutes.[94] Mr. Psaropoulos opened the discussion about 3AC by explaining the size and rate of the potential loans that 3AC was willing to borrow.[95] Mr. Brosnahan walked through a summary of the diligence call that the Diligence Team conducted the night before, as well as the Diligence Team's overall impression of 3AC's creditworthiness.[96] Mr. Psaropoulos stated that he believed it was safe to lend to 3AC in part because knew that Genesis had lent to 3AC (though he said he was aware that Genesis, unlike Voyager, received collateral from 3AC), and Voyager had gone through Genesis diligence process and believed it to be robust.[97] Mr. Ehrlich stated that he was comfortable extending a significant loan  to 3AC despite 3AC refusing to provide financials because that was not uncommon for hedge funds.[98]

After the March 1, 2022 Risk Committee meeting, 3AC provided certain diligence materials provided including an organizational chart, incorporation certificates, an Anti-Money Laundering Policy, and a completed DDQ.[99] These documents were not reviewed by the Risk Committee.[100] The DDQ disclosed that 3AC had external investors. This was contrary to 3AC's representation on the February 28, 2022 Diligence Call that 3AC was self-funded[101] When McDermott pointed that the provided corporate organization chart demonstrated the presence of

---

[94] Brosnahan at 59.

[95] Psaropoulos at 17; Whooley at 17.

[96] Brosnahan at 70.

[97] Psaropoulos at 21; 82.

[98] Brosgol at 35; Psaropoulos at 45.

[99] March 4, 2022, Voyager Due Diligence Questionnaire [VOY-INV-00000160].

[100] Psaropoulos at 70-71; Ehrlich at 45.

[101] Whooley at 69.

external investors through the existence of "feeder funds", the interviewees replied that they had
not looked closely at the chart.[102]

In connection with the DDQ, 3AC reportedly provided Voyager with a one page "Net Asset
Value" statement.[175] The NAV statement was a one-page document on 3AC's letterhead
summarily stating 3AC's NAV as of January 1, 2022 was $3.729 billion.[176]



The MLA was executed on March 4, 2022, three days prior to 3AC providing the DDQ.[103]
The MLA did not require 3AC to provide Voyager with audited financial statements nor any

---

[102] *Id.*

[175] Jan. 1, 2022 NAV Statement [VOY-INV-00000451].

[176] See Jan. 1, 2022 NAV Statement [VOY-INV-00000451].

[103] March 4, 2022 Master Loan Agreement [VOY-INV-000003432].

financial statements (income statements, balance sheets, or cash flow statements). It only required 3AC to provide Voyager with a copy of its NAV statement, prepared in accordance with generally accepted accounting principles, upon Voyager's reasonable request, and at a minimum on a quarterly basis.[104] After approving 3AC as a borrower, the Risk Committee never subsequently discussed the issuance of any term loan to 3AC.[105] Term loans were approved by Mr. Whooley, Mr. Psaropoulos, and Mr. Ehrlich without consulting the Risk Committee.[106]

The first two loans made by Voyager to 3AC were made on March 8, 2022, for 100,000,000 USDC at an interest rate of 9% and 2,750 BTC at an interest rate of 2%.[107] On March 15, 2022, Voyager issued to 3AC an additional 100,000,000 USDC at interest rate of 9%.[108] None of these loans were collateralized and none of their terms were reviewed or approved by the Risk Committee.[109] In internal conversations, Voyager executives explicitly viewed 3AC loans as a replacement for Celsius.[110]

On March 25, 2022, Mr. Ehrlich and Mr. Psaropoulos discussed learning of a deal in which 3AC borrowed "10 figures".[111] 3ACs increased borrowings likely made it more leveraged. On

---

[104] *Id.*

[105] Psaropoulos at 66; Whooley at 22-25; Jensen at 6.

[106] Psaropoulos at 63-66; Whooley at 22, 24 and 25.

[107] March 8, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695 & 9696].

[108] March 15, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695].

[109] *See* March 8, 2022 Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695 & 9696]; March 15, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009695]; April 1, 2022 Term Sheets [PRIVILEGED-CONFIDENTIAL-VOYAGER-00009615 & 9666]; May 5, 2022 Term Sheet [PRIVILEGED-CONFIDENTIAL-VOYAGER-00014816].

[110] *See* March 7, 2022 Slack Chat [VOY-INV-00005496]

[111] March 25, 2022 Slack Chat [VOY-INV-00005564]

March 30, 2022, Voyager received an updated NAV statement from 3AC, dated March 1, 2022.[112]
The updated statement showed that 3AC's NAV had dropped from $3.729 billion to $3.218
billion.[113] No executive involved in the risk monitoring process asked 3AC any question about the
drop in NAV.

The Risk Committee met March 31, 2022, but its meeting minutes reflect that it did not
discuss 3AC, nor did it discuss 3AC's drop in NAV.[114] Mr. Psaropoulos stated that he was
unconcerned by the drop in NAV because it tracked the market overall.[115] However, 3AC had
previously represented to Voyager on February 28, 2022 that it maintained a "hedged" market
position.[116] On April 1, 2022 Voyager lent an additional 150,000,000 in USDC at a rate of 8% and
10,000 BTC (at the time worth roughly $460 million) at a rate of 2%.[117]

On May 5, 2022, Voyager issued its final loan to 3AC, for 2,500 BTC at a rate of 2%.[118]
Prior to making the loan, Voyager asked and relied on the verbal assurance from Mr. Lo that if the
NAV at 3AC had not changed.[119] Around this time, the popular stablecoin UST and its associated
altcoin Luna ("TerraLuna") had begun to collapse.  UST had widespread usage in the industry as
an algorithmic stablecoin which was supposed to always be worth $1 USD, i.e. its "peg".  On May

---

[112] March 25, 2022 Slack Chat [VOY-INV-00014548]; *See* March 1, 2022 NAV Statement [VOY-INV-00000129].

[113] *Id.*

[114] See Risk Committee Meeting Minutes dated March 31, 2022 [REVVOYA0011_QUINN-00000362[; Whooley at
36.

[115] Psaropoulos at 26.

[116] *Id.*

[117] *See* April 1, 2022 Loan Term Sheet [VOY-INV-00005707]; April 1, 2022 Loan Term Sheet [VOY-INV-
00024472].

[118] Loan Term Sheet, dated May 5, 2022 [VOY-INV-00004874].

[119] Conversation with Tim Lo [VOY-INV-00014548].

7th, 2022, UST de-pegged for the first time, dropping to $.985.[120] On May 9th, 2022, UST de-pegged for a second time, dropping to a low of $.35.[121] Beginning on May 9thth, 2022, Luna depreciated as well, dropping from over $68 to under $.1 on May 12th.

The crash of TerraLuna had a tremendous effect on the crypto markets, and the Finance Team believed it would be appropriate to re-rate all of its outstanding loans.[122] As rumors began to swirl concerning TerraLuna, Mr. Whooley reached out to Mr. Lo to ask about 3AC's exposure on May 9th, 2022.[123] On a phone call on May 11th, 2022, Mr. Lo told Mr. Whooley that 3AC had not lost a significant amount in the collapse.[124] Subsequently, on May 12th, 2022 Mr. Whooley, Mr. Psaropoulos, and Mr. Lo met for dinner and discussed the matter further.[125] Mr. Lo represented that 3AC had lost approximately $100 million in TerraLuna, which was immaterial considering 3ACs overall assets.[126]

3AC invested in TerraLuna through its investment in the Luna Guard Foundation ("LFG"). The LFG was established by Do Kwon, founder of the TerraLuna ecosystem, as an organization meant to support the UST peg by purchasing Bitcoin to be deployed during periods of market volatility.[127] On February 22nd, 3AC led an investment round in the LFG, a round that raised over

---

[120] *See* https://www.coindesk.com/learn/the-fall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna/.

[121] Id.

[122] *Id.*

[123] *See* conversation between Tim Lo and Whooley, dated May 9, 2022 [VOY-INV-00014548]; *see also* Psaropoulos at 25.

[124] *Id.* at 61,; see also Slack Conversation between Whooley and Brosnahan, dated May 11, 2022 [PRIVILEGED-CONFIDENTIAL-VOYAGER-00000462].

[125] *Id.*

[126] *Id.* at 26.

[127] https://www.coindesk.com/learn/the-fall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna/.

$1 billion in capital for the LFG.[128] 3AC's involvement and investment in TerraLuna was public
on social media reports and remains public today.[129] While the TerraLuna ecosystem was crashing,
the LFG poured nearly $2.8 billion worth of Bitcoin into the system to try and hold the peg.[130]
When McDermott showed witnesses public reporting of 3AC's involvement in the LFG, they did
not recall reviewing the information prior to extending loans to 3AC.

On May 23, 2022, 3AC provided a new NAV reflecting an additional decrease of $600
million. We have not identified any indication that the drop of $600 million drop in 3ACs NAV
was discussed at any Risk Committee meeting.[131]

On June 12, 2022, after Celsius filed for bankruptcy, Voyager reached out again to all of
its borrowers to inquire about their financial health, including 3AC.[132] On June 13, 2022, Mr.
Psaropoulos held a Zoom call with Mr. Lo during which Mr. Lo informed him that 3AC had no
exposure to Celsius.[133] However, on June 14, 2022, Mr. Lo reached out to Mr. Psaropoulos and
Mr. Whooley via text and informed them that they should call him immediately.[134] Following this
message, Mr. Psaropoulos called Lo who indicated that Kyle Davies and Shu Zu were missing and

---

[128] https://www.coindesk.com/markets/2022/02/22/foundation-focused-on-ust-stablecoin-raises-1b-in-luna-sale/.

[129] https://twitter.com/terra_money/status/1496162890369404933?ref_src=twsrc%5Etfw.

[130] https://www.coindesk.com/business/2022/11/16/luna-foundation-guard-spent-28b-defending-ust-peg-third-party-audit-finds/

[131] May 23, 2022 Slack Chat [VOY-INV-00005689]

[132] *Id.*

[133] *Id.*

[134] *Id.; see also* Text Conversation between Ryan Whooley and Tim Lo, dated June 14, 2022 [VOY-INV-00022551]; Text Conversation between Evan Mr. Psaropoulos and Tim Lo, dated June 14, 2022 [VOY-INV-00022181].

things were "in bad shape."[135] Mr. Lo suggested that Voyager should recall all of its loans.[136] Mr.

Psaropoulos informed Mr. Ehrlich and shortly thereafter Voyager recalled all of its loans.[137]

3AC returned no assets to Voyager and on June 24, 2022 Voyager issued a notice of default

and acceleration to 3AC.[138] 3AC entered liquidation in the British Virgin Islands on June 27,

2022.[139] These liquidation proceedings are ongoing.[140]

### D.    Alameda Credit Facility

After learning of the likely insolvency of 3AC and its presumed default on the loan,

Voyager began exploring options to preserve liquidity and avoid bankruptcy. On June 17, 2022,

Voyager announced it had signed a non-binding terms sheet with Alameda Research, securing

$200 million in USDC/USD and 15,000 BTC in a revolving credit facility.[141] Under the terms of

the agreement, Voyager could draw down up to $75 million in any rolling 30-day period.[142]

Voyager immediately drew down $75 million, but was unable to avoid insolvency.

---

[135] *Id.*

[136] *Id.*

[137] Ehrlich at 17.

[138] *See* Acceleration Notice and Notice of Default [PRIVILEGED-CONFIDENTIALVOYAGER-00006335].

[139] *See* Memorandum Opinion and Order granting in Part and Denying in Part the Foreign Representatives' Service Motion, In re Three Arrows Capital, Ltd., Bankr. Court, S.D.N.Y. (Dec. 29, 2022) at 4.

[140] *Id.*

[141] Summary of Terms and Conditions, dated June 17, 20220 [VOY-INV-00015505]

[142] *Id.*

E.    **Public Documents**

1.    **Material Change Report**

As a Canadian publicly traded company, Voyager Digital Ltd. is subject to "Continuous Disclosure Obligations," i.e, an obligation to report to the appropriate regulator any activity or statement that may result in a "material or adverse effect on the business and future proposes of the Company and would be unduly detrimental to the interests of the Company."[143]

Following the Celsius's decision to halt withdrawals, Voyager reached out to 3AC to determine whether the company was experiencing any liquidity issues.[144] Following repeated and unsuccessful contact efforts, Voyager "determined it was prudent to request a withdrawal of the crypto assets loaned by it to 3AC."[145] 3AC failed to repay the loan by the first due date of June 16, 2022 and based on a failure to communicate, Voyager determined it was unlikely to repay its obligation. [146] At this time, Voyager determined that without repayment of the loan, it may be unable to satisfy user withdrawal requests and may experience a significant liquidity crisis.[147]

Voyager filed a confidential "Material Change Report" with the Ontario Securities Commission on June 16, 2022.[148]  Voyager engaged in subsequent conversation with the Commission regarding the filing, and provided additional information regarding its outstanding

---

[143] Jun. 16, 2022, Form 51-102F3 Material Change Report at 3 [REVVOYA0011_QUINN-00000306].

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.*

loans and the impact default would have on the business.[149] Voyager continued to file updated
Material Change Reports, culminating in a final Material Change Report filed on June 29, 2022
relating to the issuance of a notice of default to 3AC and the publication of that information.[150]

### F.    Insurance

The UCC reviewed insurance policies to identify potential sources of recovery. For the
period from 2022 to 2023, Voyager purchased a primary policy and three excess policies that
provide a total of $10 million in coverage for liability payments and defense cost for claims made
against the company's directors and officers.[151] The terms of this coverage are contained in the XL
Specialty Insurance Company Policy Number ELU181214-22. Three excess policies subsequently
purchased each follow form to the XL Primary Policy, and thus a claim that is covered under the
XL Primary Policy should also be covered by the excess policies.

The XL Primary Policy defines "Wrongful Act" to include "any actual or alleged act, error,
omission, misstatement, misleading statement, neglect, or breach of duty by an Insured Person
while acting in his or her capacity as such or due to his or her status as such."[152]

Shortly before filing for bankruptcy, Voyager also purchased a new policy from XL (the
"XL Cornerstone Policy") with limits of $10 million.  This insurance policy is currently the subject
of an investigation by the Special Committee and UCC as a potential voidable transfer.[153]

---

[149] Jun. 20, 2022, Email from Raymond Ho re: "Voyager Digital – Confidential Material Change Report – OSC
Review" [REVVOYA0011_QUINN-00000343].

[150] Jun. 29, 2022, Letter from Ontario Securities Commission to Ashwin Prithipaul [REVVOYA0011_QUINN-
00000350].

[151] Voyager also purchased two property insurance policies, but these policies were not relevant to the special
committee investigation.

[152] Endorsement No. 39 ¶ 10.

[153] See Exhibit A, Redacted Report filed by Quinn (February 14, 2023).

### G.    Settlement Agreement with Mr. Ehrlich and Mr. Psaropoulos

In connection with the D&O Settlement and accompanying releases contemplated in the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, the Unsecured Creditors Committee conducted an investigation into the personal finances of Mr. Ehrlich and Mr. Psaropoulos.[154] Mr. Ehrlich and Mr. Psaropoulos produced statements summarizing their finances; Mr. Ehrlich reported his net worth as approximately $2.57 million while Mr. Psaropoulos reported his net worth as approximately █████████. McDermott arranged for depositions of Mr. Ehrlich and Mr. Psaropoulos to confirm the veracity of these statements. In connection with the depositions, McDermott served requests for production on Mr. Ehrlich and Mr. Psaropoulos to further evaluate these claims. McDermott reviewed 476 documents produced in response to those requests. Mr. Psaropoulos was deposed on February 17, 2023. Mr. Ehrlich was deposed on the morning of February 28, 2023. Nothing McDermott learned from the documents produced and the two depositions we took has changed our view about the Debtors's ability to collect significant sums of money from either Mr. Ehrlich or Mr. Psaropoulos.

---

[154] The D&O Settlement contemplated in the Third Amended Joint Plan of Voyager Digital Ltd. and Its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code (Dkt. 852) states that "In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above."